just note, once again, for the record, that these companies have been absolutely adamant in their refusal to provide loss data, either by zip code or by census tract. Until they do, the prima facie evidence that is so obvious in the zip code analysis, we are going to have to assume is correct.

Let me, finally—well, let me make two other observations here. I know you asked the folks from State Farm how many African American agents they had. Our information, and I am not—I do not have this directly, because, once again, this data has not been provided—is that there are only about 20 black agents in the entire State for State Farm insurance. If that is totally incorrect, fine. There are more than that here? OK. We would be eager to see the real data. I guess that is the point we want to get at.

Mrs. COLLINS. Well, we have asked for the information. It is going to be made a part of the record.

Mr. CREAMER. Fine. Fine. You know, this is just word of mouth information. We would love to see the real empirical information.

Finally, on the question of Allstate's presentation. They gave us information having to do with market penetration. Now, we would very much like to see the studies, the detailed studies upon the basis of which that information is derived. One of the reasons that the insurance industry gives us for their refusal to provide the kind of information you request, is the proprietary nature of information having to do with precisely the question of market penetration, which they would like to prevent their competitors from having. Apparently somebody has aggregated all of this data, at least according to Allstate and makes it available. We have certainly made available to the committee our methodology. We would love to see the detailed studies and the source of those studies, which were not documented, as I understand it—at least we could not discern exactly who did the study of market penetration. We would be very eager to see that.

Mrs. COLLINS. Without a doubt, this is a complex problem and a complex question. We have every intention of having sufficient congressional hearings until we have a clear understanding on the entire subcommittee of the nature of the problem before moving forward with the bill. If, in fact, any of the witnesses who are here today, either Allstate or State Farm, you, Mr. Creamer, or Mr. Redmond of the Northwest Austin Council, have further information, supportive data of any claims that have been made here today on testimony on the record—on this congressional record, this is a full congressional hearing—we would appreciate receiving it from you within the next 5 working days so that we will have time to absorb it, to analyze it and to make it a part of this full Congressional record.

This will not be the last hearing that we have on this matter. It may be the last one we have in Chicago, but it will not be the last hearing that we have on this matter.

I thank all of the witnesses for coming here today. We appreciate the spirit of cooperation with which you have come. That adjourns the hearing. The hearing is adjourned.

[Whereupon, at 12:22 p.m., the subcommittee was adjourned.]

[The following material was received for the record:]

390



**CLIFF STEARNS**
6TH DISTRICT, FLORIDA

CO-4MITTEES:

**ENERGY AND COMMERCE**

SUBCOMMITTEES:
BANKING MEMBER
COMMERCE, CONSUMER
PROTECTION, AND
COMPETITIVENESS
ENERGY AND POWER
CHAIRMAN
**MILITARY PERSONNEL
TASK FORCE**
**HEALTH CARE POLICY
TASK FORCE**

**Congress of the United States**
**House of Representatives**
**Washington, DC 20515-0906**

April 30, 1993

REPLY TO:
☐ 332 CANNON BUILDING
WASHINGTON, DC 20515-0906
(202) 225-6766
FAX: (202) 225-3973

FLORIDA DISTRICT OFFICES
☐ 115 S.E. 25TH AVENUE
OCALA, FL 34471
(904) 351-8777
FAX: (904) 351-8011
☐ 1726 KINGSLEY AVE., 62
SUITE B
ORANGE PARK, FL 32073
(904) 269-3203
FAX: (904) 269-3343
☐ 111 S. 6TH STREET
LEESBURG, FL 34748
(904) 326-6266
FAX: (904) 326-8430

Mr. Thomas J. Weatherspoon
State Farm Insurance Companies
One State Farm Plaza
Bloomington, Illinois 61710-0001

Dear Mr. Weatherspoon:

I was very sorry that I could not attend the Subcommittee on Commerce, Consumer Protection, and Competitiveness hearing in Chicago on insurance redlining and H.R. 1188, the Anti-Redlining Insurance Disclosure Act. Chairwoman Collins has graciously held open the hearing record to permit me the opportunity to ask you some questions about your testimony.

We would appreciate it if you would submit your reply to these questions within five (5) working days:

1. There were assertions made by other witnesses that the census track reporting required under H.R. 1188 would not be nearly as burdensome or expensive as the insurance industry has asserted. Please clarify why you feel this requirement would be onerous. Include, if able, estimated costs of converting to census track basis, costs of maintaining both census track and zip code reporting for state requirements, current and future computing capacity requirements, and any other information you believe would be helpful.

2. Mr. Creamer of Illinois Public Action chastised Allstate and State Farm for not providing "crucial loss data," which included information regarding claims, loss ratios, and specific underwriting guidelines, and belittled assertions by both insurers that the requested information was proprietary in nature. Please explain why this information is proprietary and the impact on your competitiveness if this information were to be made publicly available.

Thank you very much for your timely response to these questions. Please return these questions to my Committee staff:

THIS STATIONERY PRINTED ON PAPER MADE OF RECYCLED FIBERS

Mary Moore Hamrick
Committee on Energy and Commerce, Minority
564 Ford House Office Building
U.S. House of Representatives
Washington, D.C. 20515

If you have any questions or comments, please contact Mary Moore Hamrick at
202/226-3400. Again, we would appreciate your response to these questions within five (5)
working days.

Sincerely,

Cliff Stearns
Ranking Minority Member
Subcommittee on Commerce, Consumer
Protection and Competitiveness

# State Farm Insurance Companies

ONE STATE FARM PLAZA
BLOOMINGTON, ILLINOIS 61710

JUDITH K. MINTEL
ASSOCIATE GENERAL COUNSEL
(309) 766-9529

May 12, 1993

CORPORATE LAW DEPARTMENT

Representative Cliff Stearns
Subcommittee on Commerce, Consumer
   Protection and Competitiveness
House of Representatives
Congress of the United States
Washington, DC 20515-0906

Dear Representative Stearns:

This letter responds to your April 30 inquiries addressed to Mr.
Thomas J. Weatherspoon.

### SECTION ONE - CENSUS TRACT/COST ISSUES

Your first area of inquiry relates to the requirements in HR 1188
for the reporting of insurance company statistical data using
census tracts. Census tract information is not currently
identified in State Farm's records, nor to our knowledge in any
insurance company records. Therefore, substantial time and
expense would be involved in developing census tract information
for all new and renewal business. There would also be
significant cost involved for the government in receiving and
processing the data. The inclusion of just census tract
information in State Farm statistical records is estimated to
cost millions of dollars and require an additional significant
annual maintenance cost. This estimate is necessarily general
because the requirements of HR 1188 are general; without the
specifics of a detailed data call a more refined cost estimate is
not possible unless we make several assumptions which may or may
not be true.

This general cost estimate, however, does not tell the full story
of the cost to State Farm or other problems in implementing HR
1188. That bill calls for a number of other data elements, in
addition to census tract information, that are not currently
identified in State Farm's records such as "total amount of
coverage," the racial and gender characteristics of all
applicants and the market value of property. For example, since
a single car may be driven by several drivers of both sexes and
multiple races what information should be reported? Insurance on
a rental dwelling property may involve an owner of one sex and
race, and periodically changing renters of other races and sexes.
How is this information to be collected or reported? Depending

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
STATE FARM LIFE INSURANCE COMPANY                STATE FARM FIRE AND CASUALTY COMPANY

393

2

on the answers to these questions, significant additional costs
may be involved.

Since much of the data required to be reported under HR 1188 is
not currently available to State Farm, we would have to contact
all renewal business and obtain information needed to meet the
reporting requirements. State Farm currently has more than 35
million auto policies and more than 21 million homeowners
policies in force. There is of course no way for us to check the
accuracy of the data provided by policyholders nor is there any
incentive for a policyholder to provide the information
requested.

In summary, to satisfy the requirements of data reporting under
HR 1188 State Farm will be required to incur millions of dollars
of out-of-pocket costs annually that cannot be precisely
estimated without further implementation information to produce
data of questionable accuracy. These out-of-pocket costs do not
include the lost opportunity costs of being able to collect other
statistical information which is of greater value to State Farm
and our customers.

I also want to share with you the following information
concerning the difficulties that would be presented to State Farm
by a census tract reporting requirement.

In State Farm's case, developing census tract information would
require matching our policy master records to a purchased
address/census tract file to create a census tract code for each
master record. Two separate procedures for State Farm Fire and
Casualty Company and State Farm Mutual Automobile Insurance
Company would need to be developed due to the fact that the two
companies have unique systems. Electronic files with policy
number and assigned census tract would then be matched by policy
number to State Farm statistical premium and loss files.

To add census tract information to State Farm's statistical
records would require updating and modifying all State Farm data
files. The software currently used with these files involves
thousands of programs that State Farm relies on to operate our
day to day business. All of this software would require review
and modification. In addition to development of a system to
convert current files to accommodate census tract information,
another system must be designed to continually update company
records.

Purchasing the address/census tract software would be one of the
least significant costs involved in developing and implementing a
statistical system that incorporates census tract information.
Those skeptical of the significant cost involved in such an
effort simply do not understand the volume of insurance company
statistical records and the size of each individual record.

3

The conversion to census tract is expensive, time consuming and exceedingly difficult because of the volume of data that is inherent in insurance company statistical records. The proposed Act requires data be collected in at a minimum 150 metropolitan statistical areas (MSA's) by census tract or county in MSA's that have populations of less than 30,000. Census tracts are designed to contain approximately 4,000 households and are therefore usually smaller and more numerous than zip codes. For example, the City of Chicago has over 1,000 census tracts, but only 60 zip codes. This means that an average MSA may contain several hundred census tracts. Unlike zip code, each census tract does not have a unique number. This fact necessitates the use of data indicators in a statistical record for county and MSA as well as census tract which will cause additional volume and thus aggravate data storage problems. The bill also requires that each company report approximately 49 data elements sometimes by census tract, sometimes by individual policy.

As a result of its data reporting requirements, HR 1188 proposes the collection of such a volume of data (involving literally billions, if not trillions of individual data elements) that the computer capacity necessary to contain and process the data will be very large. The Department of Commerce will incur significant costs in creating the data processing capacity to handle the volume, or in the alternative, a private contractor will need to be hired. In either case, the cost will be significant to the government as well as to the companies required to report. An estimate of the volume of data elements involved in HR 1188 for just the private passenger auto insurance line is attached.

In addition, duplication of state regulation in the area of data reporting and the regulation of market conduct should be considered prior to enactment of HR 1188 in order to eliminate any unnecessary expenditure of government and business resources. Superimposing a federal regulatory system on top of, and in addition to, the current state system will cause confusion and be unnecessarily expensive.

If it is determined that the federal government should become active in the areas of data reporting or regulation of insurance company market conduct, the bill should preempt all state laws rather than the current provisions of HR 1188 which specify that no preemption is intended. Some examples of the problems that will be created by duplicate regulation are as follows:

1. Several state statutes or regulations including those in California, Missouri, Illinois, New York and Texas require the collection of statistical data by zip code using either statistical or annual statement definitions of lines of business. The federal data requirements using census tract and potentially definitions of line of business that are

395

4

different will require companies to maintain two parallel
data systems, an expensive and unnecessary result.

2.   There may be a conflict of laws in some of the mandatory
     data elements in that some state laws may prohibit the
     collection of gender and race in the taking of an insurance
     applications.

3.   Federal restrictions on agent terminations in urban areas
     can conflict with the state's ability to encourage a company
     to avoid financial problems; one of the best tools a state
     regulator now has in the solvency prevention area is to
     order a company to reduce or stop the writing of new
     business.  Federal restrictions on agent terminations may
     adversely affect a state regulator's ability to use this
     tool.  Another potential area of conflict is in the area of
     state agent licensing requirements and federal agent
     termination restrictions placed on insurers.

### SECTION TWO - TRADE SECRET ISSUES

Your second area of inquiry relates to the trade secret rights
that State Farm has in some of the information to be appropriated
and made publicly available by the current provisions of HR 1188.
To aid in your understanding of the trade secret issues involved,
we have attached a copy of language from a typical Trade Secret
Act.  The basic requirements to qualify information as a trade
secret are that the information be secret and that it be valuable
to the conduct of a business.  HR 1188 would compromise State
Farm's trade secret rights in a number of areas.

HR 1188 requires public access to data and information which
State Farm has historically treated as a trade secret such as
underwriting guidelines, individual policyholder information
(particularly policy expirations) and statistical information by
geographic area.  State Farm regards our detailed statistical
information as valuable because it provides us a crucial and
justifiable business advantage over our competitors.  We have
tried to consistently defend its confidentiality and have
divulged it willingly to state regulators only when aggregated
with other insurers' data or when we have received appropriate
assurances that its confidentiality will be protected.
One measure of the value of this type of statistical data to
competitors in the insurance business is to examine what
insurance companies have paid to the Insurance Services Office
(ISO) in the past to compile and share similar information.  ISO
is a statistical organization that sells various data services.
Included in these services are either rates or loss costs for
various geographic areas, classes, rules, policy forms, etc.
The ISO annual income for sales of its statistical information
countrywide is likely to be in the tens of millions of dollars.

5

The volume of State Farm homeowners and auto statistical data expressed as a percentage of the market is approximately equal to the total market share of all companies reporting to ISO. Based on the volume of State Farm's data it can be assumed that the volume of this data and, therefore its value, would be at least equivalent to ISO data.

Such data are valuable because they provide essential business information critical to all pricing and marketing decisions. Engaging in the insurance business without it would be foolhardy and highly risky at best and impossible at worst. If HR 1188 were enacted, smaller companies could use State Farm data in their pricing and marketing decisions without paying for it. Forcing a business to give its competitors valuable information that costs a significant amount to develop is unfair.

In addition, the availability of State Farm's statistical information would enable competitors to gain a competitive advantage over State Farm in several ways. First, a competitor could actuarially estimate the price that it believes State Farm should be charging in any particular area and thus, predict and parallel our future rate changes. In addition a competitor could easily calculate whether the profit margin, if any, in a particular area would support another entrant and at what price. Rather than responding to the market and consumers in deciding whether to offer its product and at what price, a competitor would be tempted to respond to State Farm's profit margin.

In the area of marketing, knowing where State Farm is writing the largest amount of profitable business can give a competitor valuable information as to where to focus its marketing efforts. Due to State Farm's success in personal lines a competitor, especially a new entrant, could target market only those territories in which State Farm is showing the greatest profitability and average share of the market. A competitor who sees that State Farm has a greater share of the market in a territory could use that information in deciding whether to set its rates at or below ours in a particular territory in order to cut into our marketshare. Alternatively, a competitor may decide not to market aggressively in a territory in which State Farm has a greater share of the market if the profitability were low. Either way the competitor can use State Farm's data to its advantage and the disadvantage of State Farm in determining its pricing and marketing policies without incurring any significant cost.

Access to State Farm data could also provide competitors an unfair advantage in the area of regulatory approvals. Often state governments will refuse to approve proposed changes in pricing, coverage and marketing in the absence of statistical data supporting the change. Without going through the expense of

collecting the statistical data itself, a competitor may use State Farm's data to gain various regulatory approvals.

To our knowledge no government collects the type of detailed business information required to be reported in HR 1188 on any other industry. This bill goes beyond anything required of banks, for example, with respect to disclosures concerning mortgage loans. Enacting HR 1188 would be the equivalent of asking General Motors in what areas of the country and on what models it earns its greatest profits and then providing this information to the public including Japanese auto manufacturers.

In addition to State Farm's trade secret rights in our statistical data, State Farm has trade secret rights in our underwriting guidelines. State Farm's underwriting guidelines set forth systematically and in detail the eligibility criteria State Farm applies in reviewing applications for various insurance products, procedures for applying those criteria and guidance for any necessary departure from those criteria. The guidelines are a compilation of State Farm's sophisticated business judgments about the strategies and procedures needed to create and maintain a stable client base that State Farm can serve effectively, efficiently and to the mutual long term benefit of both the company and its customers. The business judgments embodied in the underwriting guidelines are based on long and vast experience gained over 70 years through enormous expenditure of time and resources.

The guidelines provide a blueprint of State Farm's customer selection process and therefore our customer base. Access to information identifying State Farm's target customer market and policyholder profile would give competing insurers, without equivalent expenditure of time or money, the benefit of State Farm's considerable experience and expertise in the making of fundamental marketing decisions.

Making public the valuable proprietary information contained in State Farm's underwriting guidelines would harm not only individual insurers such as State Farm, but would also harm the competitive market for insurance products in general. Use by competing insurance companies of State Farm underwriting rules in an attempt to duplicate State Farm's broad success in the personal lines insurance market would tend to homogenize underwriting practices of insurers and diminish the availability of insurance to risks outside State Farm's targeted customer market. Also, companies that have successfully used their underwriting rules to identify and develop specialized niches in the insurance market could see those markets unfairly pirated through the public exposure of their underwriting rules.

The above is a brief summary of some of our trade secret concerns in the areas of statistical data and underwriting rules. I hope it is responsive to your inquiries. I have also enclosed State Farm's response to the IPAC testimony submitted to the Subcommittee for your information. If you have any further questions, please let me or Mr. Weatherspoon know and we will be happy to help you further.

Very truly yours,

Judith Mintel

**398**

ESTIMATION OF DATA VOLUME FOR AUTOMOBILE INSURANCE

"ANTI- RED LINING IN INSURANCE DISCLOSURE ACT"

ITEMS TO BE REPORTED FOR EACH POLICY AS REQUIRED IN SECTION 3(b)(2)

| Sub Paragraph | Data to be Reported | # of Items |
|---------|----------|-----------|
| (A) | MSA, Census Tract, County | 3 |
| (B) | Insurer | 1 |
| (C) | Issuance Date | 1 |
| (D) | Line, Subline, Class | 3 |
| (E) | Type of policy, and type of endorsement (assuming 1 policy and up to 5 endorsements) | 6 |
| (F) | For each of approximately 20 possible available coverages, the amount of coverage provided | 20 |
| (G) | Total premium amount for coverage specified in (F) | 1 |
| (H) | Policy duration | 1 |
| (I) | Gender of applicants (assuming a maximum of 3 applicants per car) | 3 |
| | Race of applicants (assuming a maximum of 3 applicants per car) | 3 |
| (J) | Type of Market (Voluntary or Residual) | 1 |
| (K) | A reason code for any declination, cancellation, and non-renewal | 3 |
| (L) | Market Value, Type, and Use of Automobile | 3 |
| | TOTAL | 49 |

As required in Section 3(b)(2), this information will be reported for each policy and for each application, resulting in 49 x 2 = 98 total items per vehicle.

According to recent U.S. Department of Transportation data, there are approximately 150,000,000 private passenger automobiles registered nationally. We are assuming that one-third of these vehicles fall within the designated MSAs.

150,000,000 x 1/3 = 50,000,000 Vehicles in MSAs

50,000,000 x 98 = 4,900,000,000 Data items to be reported each year

As specified in Section 3(b)(3), this data will be maintained for 5 years

5 x 4,900,000,000 = 24,500,000,000 = 24.5 Billion items of data

This number would be augmented by other reporting requirements such as Sections 3(a)(1) and 3(b)(1)(B). The inclusion of Homeowners Insurance and Commercial Property Insurance would significantly raise the above total.

## Exhibit II

### Typical Legal Definition of Trade Secret

"Trade secret" means the whole or any portion or phase of any . . . compilation of information which is for use or is used in the operation of a business which provides the business an advantage or an opportunity to obtain an advantage over those who do not know or use it. "Trade secret" includes any scientific, technical or commercial information including any design, process, procedure, list of suppliers, list of customers, business code, or improvement thereon. Irrespective of novelty, invention, patent ability, the state of the prior art and the level of skill in the business, art or field to which the subject matter pertains a trade secret is considered to be:

1.   Secret;

2.   Of value;

3.   For use or in use by the business; and

4.   Of advantage to the business or providing an opportunity to obtain an advantage over those who do not know or use it;

when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

**RESPONSE OF STATE FARM TO REDLINING ALLEGATIONS**
**CONTAINED IN THE TESTIMONY OF ILLINOIS PUBLIC ACTION**
**IN A HEARING BEFORE THE ENERGY AND COMMERCE SUBCOMMITTEE**
**ON COMMERCE, CONSUMER PROTECTION AND COMPETITIVENESS**
**ON APRIL 26, 1993**

The testimony submitted by Illinois Public Action (IPAC)
concerning State Farm distorts and misrepresents State Farm's
record of service to the Chicago community. In our statement at
the April 26, 1993 hearing State Farm explained in detail our
commitment to serving the entire City of Chicago. Currently
State Farm insures more than 300,000 cars, more than 175,000
homes and more than 9,000 rental dwellings located in all of the
City's zip codes. We have 165 agents who have located their
offices in the City. Our statement to the Subcommittee
establishes that our agents have no territorial restrictions and
are free to serve customers anywhere they can find them. As a
result, there is significant State Farm activity throughout the
City of Chicago even in those zip codes where no State Farm
agents are physically located.

Notwithstanding this information, IPAC continues to dwell on its
unremarkable discovery that State Farm does not have the same
number of agents and policies in every zip code and Congressional
District. Without any further evidence, IPAC concludes that
"redlining" must be the cause of these differences. The
unsupported premise of the IPAC testimony is that because there
are some differences in State Farm sales data that can be
superficially correlated with census data relating to race, the
differences must be due to intentional racial discrimination.
This is a false premise and an inaccurate conclusion.

3

Any discussion of the important issues involved in urban marketing of insurance products must proceed from a common understanding of what is meant by "redlining." IPAC provides no such definition. However, a definition derived from common usage of the term might be as follows:

> A refusal to sell a product at or above costs to individuals solely because they reside in a geographic area that is predominantly minority,

Using this definition one could examine the number of insurance policies in effect in geographic areas meeting the objective criteria that are chosen to determine whether an area is "predominantly minority." If a significant number of insurance policies are in force in the selected areas, the proof of an essential element of the "redlining" offense--refusal to sell-- would not be present.

If one were unwilling to adopt a definition of this sort, insisting that a relative comparison of one area to another was necessary in judging whether an insurer had in significant measure "refused to sell" in a minority area, then it would be necessary to address at least three important issues including:

1.  How should the standard of comparison be chosen--by reference to which geographic unit or area?

4

2.  How should the variations in sales activities caused by
    legitimate economic factors be accounted for--factors such
    as variations in demand for insurance, the effect of
    competition among insurers in a given area, crime rates,
    population and the number of vehicles or dwelling for which
    insurance is sought, etc.?

3.  Is it fair or reasonable to vary the standard of comparison
    from company to company and from time to time?

None of these important issues was addressed in the IPAC
analysis.

Under the IPAC analysis and criteria, all sorts of ordinary
business activities would be suspect.  For example, what if it
were shown that the postal service delivers less mail or that
attorneys have fewer offices in minority areas than in non-
minority areas?  Would this automatically mean that "redlining"
had occurred?  Each of these examples could be explained by the
ordinary operation of economic or social forces unrelated to
racial considerations.  Perhaps fewer letters were mailed to
certain areas or, perhaps attorney offices are located for
convenient access to the courts.  In any event, these examples
indicate the very serious flaw in the IPAC approach.  IPAC
assumes that because racial discrimination <u>could</u> be a cause of

5

different service distributions, any observed difference <u>must</u> be
proof of "redlining."   .

One of the primary ways in which the IPAC testimony distorts
State Farm's record of good service is by setting up arbitrary
and unfair standards of comparison.  For example, IPAC calls
State Farm "racist" and accuses the company of "redlining"
because State Farm has fewer agents per zip code and fewer
policies per zip code in an area of Chicago (the West Side) that
IPAC categorizes as "low income minority" than the company has in
another area of the City (Lincoln Park) categorized as
"predominately white."  Both areas are in fact racially mixed and
have residents with varying income levels.

IPAC chooses the Lincoln Park area of Chicago as its standard of
comparison perhaps because this area has one of the highest
concentrations of State Farm agent offices and business anywhere
in the country.  It is unreasonable and arbitrary for IPAC to
suggest that State Farm is failing to live up to societal
obligations anywhere we sell fewer policies and have fewer agents
than the Company has in the Lincoln Park area of Chicago.  If
this were the legal standard, then State Farm would be
underserving and discriminating against almost every other
geographic area in which we do business.  IPAC's false comparison
belies the significant service that State Farm is providing to
those residing on Chicago's West Side.  Instead, IPAC establishes

6

an arbitrary and unreasonable performance standard to support
their inflammatory charges.

The Lincoln Park area of Chicago also has significantly different
economic characteristics than the West Side which, of course,
IPAC fails to mention.  The demand for insurance is significantly
higher.  This can be attributed to the area's larger population,
the fact that it has more assets to insure (including more owner-
occupied housing) and greater purchasing power.  Also, Lincoln
Park is an area with a significantly lower crime rate than the
West Side.  The relative amount of retail sales is another major
distinguishing economic characteristic of the two areas.

It is more reasonable to conclude that it is these and other
economic differences that cause the observed differences in State
Farm sales activity, not discriminatory practices supposedly
adopted because of the racial composition of the two
neighborhoods.  This is especially true in the absence of any
evidence of unfair treatment by State Farm of individuals due to
race.  The variation in economic characteristics offers a
logical, reasonable explanation for the variation in State Farm
activity by geographic area while the variations in the racial
composition of the two areas do not.

Ironically, one could also identify numerous counties in
downstate Illinois (that IPAC presumably would categorize as

7

"predominately white") having fewer State Farm agents' offices
and policies per zip code than are present on the West Side of
Chicago. In addition, one could locate numerous "predominately
white" neighborhoods in cities such as Baltimore, Philadelphia,
Milwaukee and New York, that could claim their area is being
discriminated against and is being underserved by State Farm in
comparison to the service received by Chicago's West Side.

What IPAC seems to advocate is essentially a "parity requirement"
that would demand that insurance companies have the same number
of agents and policies in each zip code. A failure to conform to
that standard, in IPAC's view, is conclusive evidence of
intentional discrimination. State Farm rejects that view. We
submit that such a standard is an unreasonable one that virtually
no insurer--indeed virtually no business--could or should have to
meet.

The flaws in the IPAC approach are also evident in the apparent
variation of their performance standards from company to company.
If the same performance standards that IPAC applied to State Farm
were applied to any other insurance company, a pronounced and
pervasive service failure would likely appear. It is likely that
State Farm insures more cars on the West Side of Chicago than
several major insurance companies write in the entire City of
Chicago, but it is State Farm that is singled out by IPAC as
"racist." How can this be right? This indicates that any

8

performance standards must be reasonably developed, communicated
to all those expected to comply and uniformly administered.

Using the IPAC comparison standard would mean that any company
newly entering an area or having difficulties competing in
certain areas could be charged with discrimination and failure to
serve that neighborhood. This approach is counter-productive to
the goal of increasing the affordability and availability of
insurance products in all areas of the City.

IPAC also points out in its analysis that the ratio of State Farm
auto policies between the Lincoln Park area and the West Side is
5 to 1 while the similar ratio for Allstate is approximately 2 to
1. Using such ratios is highly misleading and ignores the fact
that an insurer may be writing a very large number of policies in
a neighborhood like the West Side--14,290 auto policies in State
Farm's case. There is no explanation anywhere in the IPAC report
as to why these ratios are significant in and of themselves, or
why a company should strive to reduce the ratios. Perversely,
these ratios, if used as a measure of performance, would tend to
make companies look better that are having competitive
difficulties in neighborhoods such as Lincoln Park.

Also, if a low ratio is adopted as a performance goal, companies
might be encouraged to improve their ratios by writing less
business in neighborhoods like Lincoln Park without necessarily

9

writing more business in neighborhoods like the West Side of Chicago. Contraction of overall service to insurance consumers in the City is presumably not a goal that IPAC seeks to promote.

There is no evidence that has been presented to this Subcommittee of practices that constitute racial discrimination against any individual who is or has sought to become a State Farm policyholder. There is no evidence that State Farm has treated any individual unfairly because of race, much less evidence of a pattern of mistreatment of individuals. The allegations made before this Subcommittee have all involved charges of racial discrimination by insurance companies, not against individuals, but against zip codes, Congressional Districts or other geographic areas. Apparently, the inference to be drawn by these allegations is that geographic areas have or should have independent and separate legal rights from the individuals residing in them.

IPAC's allegations against State Farm accusing the Company of wrongdoing are inaccurate and inflammatory. They are based on unreasonable, elusive and arbitrary performance standards that vary from time to time and company to company. They imply that certain geographic areas, as opposed to individuals, can suffer racial discrimination and should be given preferential treatment. They fail to take into account, or even acknowledge, economic differences among geographic areas that are more likely to explain the differences in insurance sales activity than the racial composition of the neighborhood. State Farm stands on our proven record of providing service to all of Chicago's diverse population. IPAC is wrong.

Exhibit I

Variation in AGENT LOCATION

Economic Explanations More Probable Than Discrimination

While the study presented by IPAC shows that the number of State Farm agents varies between zip codes and congressional districts in Chicago, it provides no evidence regarding the cause of this variance. There are numerous possible explanations; having observed that differences exist leaves open the question of what factors are responsible. IPAC asserts that discrimination is the cause, but provides no evidence to support this explanation over economic considerations. Discrimination suggests that companies are systematically ignoring potential customers, an economically irrational behavior. The diagram below suggests several possible explanations for the boxed outcome of differing agent counts by area. To demonstrate discrimination, IPAC would need to show why discrimination is the true cause, as opposed to the myriad other rational explanations. That is, they would need to demonstrate why arrows 1 through 10 — which represent economically rational decision making — should be replaced by an arrow representing the irrational practice of discrimination. The only way to provide proof of discrimination would be through a carefully designed study of agents selling insurance. Without such a study, it is more logical to assume that agents are making rational economic decisions than to assume that they are systematically ignoring portions of the market.

Economic Reasons Why State Farm Agent Location Varies by Area                    Outcome

1. Population ------------------------------------------------->

2. Number of Vehicles ---------------------------------------->

3. Economic Demand ------------------------------------------->

4. Safety of Customers and Employees ------------------------->

5. Traffic Patterns ------------------------------------------>

6. Shopping Areas -------------------------------------------->

7. Overall Sales in Area ------------------------------------->

8. Competition ----------------------------------------------->

9. Cost / Availability of Office Space ----------------------->

10. Other Market Considerations ------------------------------->



Number of
State Farm Agents
Varies by Area

Exhibit II
Variation in POLICY LOCATION
Economic Explanations More Probable Than Discrimination

While the study presented by IPAC shows that the number of State Farm policies in force varies between zip codes and congressional districts in Chicago, it provides no evidence regarding the cause of this variance. There are numerous possible explanations; having observed that differences exist leaves open the question of what factors are responsible. IPAC asserts that discrimination is the cause, but provides no evidence to support this explanation over economic considerations. Discrimination suggests that companies are systematically ignoring potential customers, an economically irrational behavior. The diagram below suggests several possible explanations for the boxed outcome of differing policy counts by area. To demonstrate discrimination, IPAC would need to show why discrimination is the true cause, as opposed to the myriad other rational explanations. That is, they would need to demonstrate why arrows 1 through 10 — which represent economically rational decision making — should be replaced by an arrow representing the irrational practice of discrimination. The only way to provide proof of discrimination would be through a carefully designed study of individuals seeking insurance. Without such a study, it is more logical to assume that firms are making rational economic decisions than to assume that they are systematically ignoring portions of the market.



Number of
State Farm Policies
Vary by Area

Economic Reasons Why State Farm Policy Counts Vary by Area                                    Outcome

1. Population ----------------------------------------------------------------->

2. Number of Vehicles -------------------------------------------------------->

3. Competition ---------------------------------------------------------------->

4. Propensity to Self-Insure ------------------------------------------------->

5. Exposure to Risk ---------------------------------------------------------->

6. Purchasing Power ---------------------------------------------------------->

7. Cost of Providing Insurance ----------------------------------------------->

8. Total Assets to be Protected ---------------------------------------------->

9. Demand for Highly-Serviced Insurance Products ---------------------------->

10. Other Market Considerations ---------------------------------------------->

004212

410

**U.S. House of Representatives**
Committee on Energy and Commerce

SUBCOMMITTEE ON COMMERCE,
CONSUMER PROTECTION, AND COMPETITIVENESS

Washington, DC 20515-6120

April 28, 1993

Mr. Thomas J. Weatherspoon
Executive Assistant - Agency
State Farm Mutual Auto Insurance Company
One State Farm Plaza
Bloomington, IL 61710

Dear Mr. Weatherspoon:

This letter is a follow-up to the Subcommittee's April 26, 1993, hearing on insurance redlining. As requested at the hearing, please provide answers to the following questions within five business days.

(1) State Farm testified that it has 70 agents in the Seventh Congressional District of Illinois. Please provide a listing of these 70 agents and their addresses, broken down by three areas - outside the City of Chicago, in the downtown area of the City of Chicago, and elsewhere in the City of Chicago. How many of these seventy agents are African-American?

(2) How many agents does State Farm have in Illinois? Also, how many agents does State Farm have in the United States? How many of each are African-American?

In addition, please answer the following question.

(3) In a recent decision, the Seventh Circuit Court of Appeals upheld regulations of the Department of Housing and Urban Development that provided that the Fair Housing Act prohibits discrimination in the provision of property insurance. Does State Farm support this ruling? Does State Farm support vigorous enforcement of the Fair Housing Act with respect to insurers?

If you have any questions about your response, you may contact Richard Huberman of the Subcommittee staff at (202) 226-3160. Thank you for your cooperation.

Sincerely,

*Cardiss Collins*

CARDISS COLLINS
Chairwoman

CC:rh

## State Farm Insurance Companies

ONE STATE FARM PLAZA
BLOOMINGTON, ILLINOIS 61710

JUDITH K. MINTEL
ASSOCIATE GENERAL COUNSEL
(309) 766-8520

CORPORATE LAW DEPARTMENT

May 5, 1993

Representative Cardiss Collins
2264 Rayburn Office Building
Washington, DC  20515-1307

Dear Congresswoman Collins:

In response to your request for further information concerning
State Farm business practices and positions, please be advised as
follows:

In our testimony on April 26, we noted that State Farm has more
than 70 agents in zip codes located in whole or in part in the
Seventh Congressional District.  Since State Farm's business
records are not organized based on Congressional Districts and
Congressional District boundaries are not necessarily contiguous
with zip codes, we presented this agent count in a manner that is
consistent with our business records.  In response to your
written request for information relating to this count we
presented Subcommittee staff on May 4 with the list of eighty
agents that formed the basis of our testimony and discussed our
methodology for identifying those agents in your Congressional
District having offices inside the City boundaries, but outside
the downtown area.  Several improvements to this methodology were
also discussed with Staff.  Based on what we learned we are
attempting to refine our agent count in the Seventh Congressional
District.  If further information is developed, we will
immediately forward it to you.

In the State of Illinois State Farm has 1,085 agents.  The number
of State Farm agents companywide excluding our Canadian operation
is 17,246.

With regard to your questions concerning the demographic
characteristics of our agency force, we are in continuing
discussions with your Staff concerning several issues with regard
to this information which we trust will be resolved to our mutual
satisfaction.

With regard to your question concerning the recent Seventh
Circuit Court of Appeals' decision, it is State Farm's view that
the major issue here is jurisdictional and not substantive.
State Farm believes strongly in the purpose and the goals of the
Fair Housing Act and we support vigorous enforcement of state
laws that have similar goals.  However, given the current state
of the laws relating to whether the federal government or the

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

STATE FARM LIFE INSURANCE COMPANY     STATE FARM FIRE AND CASUALTY COMPANY

laws that have similar goals. However, given the current state of the laws relating to whether the federal government or the states are the primary regulator of the business of insurance, it is State Farm's belief that the Seventh Circuit Court adopted an erroneous interpretation of both the Fair Housing Act and the McCarran-Ferguson Act.

We believe the language and the legislative history of the Fair Housing Act clearly indicate that it was never intended to apply to the business of insurance. In our opinion the Seventh Circuit erroneously interpreted the requirements of the McCarran-Ferguson Act when the Court determined that the Fair Housing Act merely "duplicates" Wisconsin's insurance law and thus may co-exist with it without invalidating, impairing, or superseding the state's law within the meaning of McCarran-Ferguson. By so holding the Seventh Circuit has invited a disruption of the national policy that Congress promulgated nearly a half century ago for the allocation of state and federal responsibilities in the regulation of insurance. If future judicial decisions apply the Seventh Circuit's reasoning, a wide range of federal laws that seem to parallel state insurance laws may be held applicable to insurance and when so applied effectively undermine the ability of the states to achieve a balance among state policies that affect insurance regulation.

State Farm supports vigorous enforcement of state laws regulating the business of insurance including those relating to unfair discrimination in insurance practices.

I hope this is responsive to your inquiry. If you have any further questions, please let me know.

Very truly yours,

Judith Mintel

JKM/kr

State Farm Agents Locating Offices
in the non-Chicago Portion of Illinois' 7th Congressional District

| Name | Business Street | Business City | Business Zip | U.S. Congressional District |
|---|---|---|---|---|
| Monti | 4321 St. Charles Road | Bellewood | 60104-1100 | 007 |
| Polec | 212 Manheim Road | Bellewood | 60104-1338 | 007 |
| Williams | 1031 South 17th Avenue | Maywood | 60153-1703 | 007 |
| Estreda | 2201 Roosevelt, Suite C | Broadview | 60153-6413 | 007 |
| Slamick | 1718 Roosevelt Road | Broadview | 60153-6641 | 007 |
| Masqueleir | 10055 Roosevelt Road, Suite C | West Chester | 60154-2641 | 007 |
| Jurik | 515 N. Wolf Road | Hillside | 60162-1271 | 007 |
| Peterson | 5555 W. St. Charles Road | Berkely | 60163-1211 | 007 |
| Koca | 7601 Madison | Forrest Park | 60130-1402 | 007 |
| Bramek | 8404 W. 26th Street | North Riverside | 60546-1315 | 007 |
| Costello | 8909 W. Carmak Road | North Riverside | 60546-1143 | 007 |
| Sellers | 8408 W. 26th Street | North Riverside | 60546-1315 | 007 |
| Lemely | 191 N. Marion | Oak Park | 60301-1033 | 007 |
| Perrin | 1100 Lake Street, Suite 35 | Oak Park | 60301-1066 | 007 |
| Brown | 310 Chicago Avenue | Oak Park | 60302-2315 | 007 |
| Broadus | 505 S. Oak Park Avenue | Oak Park | 60304-1211 | 007 |
| Gelnopolos | 7417 W. North Avenue | River Forrest | 60105-1131 | 007 |
| Soffel | 7975 W. Lake Street | River Forrest | 60305-5379 | 007 |
| Costanza | 1836 N. 77th Court | Elmwood Park | 60635-3635 | 007 |

004216

State Farm Agents Locating Offices
in the Chicago Portion of Illinois' 7th Congressional District

| Name | Business Street | Business City | Business Zip | U.S. Congressional District |
|------|-----------------|---------------|--------------|------------------------------|
| Heneghan | 307 N. Michigan, Suite 1514 | Chicago | 60601-5405 | 007 |
| Perisin | 168 N. Michigan, Suite 805 | Chicago | 60601-7509 | 007 |
| Nazar | 25 E. Washington, Lower Level | Chicago | 60602-1702 | 007 |
| Newlin | 111 W. Washington, Suite 1042 | Chicago | 60602-2705 | 007 |
| Fournier | 111 W. Washington, Suite 1260 | Chicago | 60602-2706 | 007 |
| Curl | 120 S. LaSalle, Room 651 | Chicago | 60603-3404 | 007 |
| Triplett | 208 S. LaSalle, Suite 1873 | Chicago | 60604-1104 | 007 |
| Spinelli | 618 S. Dearborn | Chicago | 60605-1840 | 007 |
| Lauder | 150 S. Wacker, Suite 3240 | Chicago | 60606-4202 | 007 |
| Yun | 219 W. Cermack | Chicago | 60616-1913 | 007 |
| McKenzie | 725 W. 31st Street | Chicago | 60616-3006 | 007 |
| Lindquist | 612 N. Michigan Ave., Room 418 | Chicago | 60611-3111 | 007 |
| Behrends | 435 N. Michigan Ave., Suite 1333 | Chicago | 60611-4008 | 007 |
| Douglas | 325 W. Huron, Suite 304 | Chicago | 60610-3617 | 007 |
| Navarro | 640 N. LaSalle, Suite 580 | Chicago | 60610-3731 | 007 |
| Brundage | 4019 W. 31st Street | Chicago | 60623-0019 | 007 |
| Adkins, III | 5310 W. North Avenue | Chicago | 60639-4337 | 007 |
| Williams | 5931 W. Lake Street | Chicago | 60644-1833 | 007 |
| Jepsen | 1921 N. Harlem Ave., Suite 5108 | Chicago | 60635-3792 | 007 |

**CLIFF STEARNS**
6TH DISTRICT, FLORIDA
_____
**COMMITTEES:**
_____
**ENERGY AND COMMERCE**
_____
SUBCOMMITTEES:
RANKING MEMBER
COMMERCE, CONSUMER
PROTECTION, AND
COMPETITIVENESS
ENERGY AND POWER
CHAIRMAN
**MILITARY PERSONNEL
TASK FORCE**
**HEALTH CARE POLICY
TASK FORCE**



## Congress of the United States
### House of Representatives
### Washington, DC 20515-0906

April 27, 1993

REPLY TO:
□  222 CANNON BUILDING
WASHINGTON, DC 20515-0906
(202) 225-5744
FAX (202) 225-3973

FLORIDA DISTRICT OFFICES
□  119 S E 25TH AVENUE
OCALA, FL 34471
(904) 351-8777
FAX (904) 351-8011
□  1726 KINGSLEY AVE SE
SUITE 8
ORANGE PARK, FL 32073
(904) 269-2203
FAX (904) 269-3343
□  111 S 6TH STREET
LEESBURG, FL 34748
(904) 326-8285
FAX (904) 326-8430

Mr. Robert Creamer
Executive Director
Illinois Public Action
1 Quincy Court
Chicago, Illinois 60604

Dear Mr. Creamer:

I was very sorry that I could not attend the Subcommittee on Commerce, Consumer Protection and Competitiveness hearing in Chicago on insurance redlining and H.R. 1188, the Anti-Redlining Insurance Disclosure Act. Chairwoman Collins has graciously held open the hearing record to permit me the opportunity to ask you some questions about your testimony.

We would appreciate it if you would submit your reply to these questions within five (5) working days:

1.  You indicated in your testimony that the insurance industry inaccurately claimed that converting existing information systems to a census track basis would be expensive and burdensome. You indicated that the process of adding census track data was so easy that your organization would be eager to accept a "lucrative consulting contract" from the insurance industry to process this data.

   ● What do you know about the information systems and data management capabilities of insurance companies, particularly Allstate and State Farm?

   ● What expertise does your organization have in converting *existing* data management systems to a census track basis? Have you ever converted any company or organization's database from a zip code basis to census track basis? If so, please describe the company or organization, type of data collected, size of the database, and any other pertinent information.

THIS STATIONERY PRINTED ON PAPER MADE OF RECYCLED FIBERS

**416**

Mr. Robert Creamer
Illinois Public Action
Page 2

2.  You indicated in your testimony that you collect a variety of types of information on your members in your "very little computer," including nine digit zip codes. What types of data do you collect and what is the size of the database? You also implied that you kept census track data. Do you, in fact, keep such data? If so, for what purposes?

3.  In your testimony, you took issue with the analysis of the ACORN study performed by the Insurance Information Institute. In particular, you took issue with the statement that:

> Census data on family income are not reliable. In blue collar neighborhoods, income may be under reported as a significant number of workers, particularly independent contractors like plumbers and carpenters, may receive a lot of cash income, which may not be reported. As a result, two neighborhoods which *report* the same income, may have substantially different levels of actual income.

In your testimony, you asserted that there was "absolutely no evidence" to suggest the above statement was true. Yet, we do know that at least 20% of all Americans do not report their true income to the Internal Revenue Service, particularly with respect to cash-based income. What makes you believe that census data on income would be any more accurate than the data collected by the I.R.S.?

4.  In your testimony you criticized Allstate for not having a large enough market share in particular zip codes and attributed that to deliberate marketing strategies designed to exclude minority and poor insureds. Are you suggesting that the government should require insurance companies to have a minimum market share in particular zip codes? For instance, if Insurance Company A only had a 30% market share in zip code 1, their competitor had 40%, and the residual market had the remaining 30%, should Insurance Company A be forced to increase its market share, irrespective of other factors? If so, what impact would this have on competition?

5.  In your testimony you described the disparities between insurance coverage between the 7th and 9th congressional districts of Illinois. Are you asserting that insurance companies make "redlining" decisions based on the placement of congressional district lines, lines drawn by the Illinois legislature?

6.  In your testimony, you criticized Allstate and State Farm for not publicly providing claims data, loss data, and underwriting guidelines which these companies considered confidential. You belittled their claims that this information was important to their business and the public release of such

Mr. Robert Creamer
Illinois Public Action
Page 3

information could place them at a competitive disadvantage. Exactly what
information, if any, do you believe insurance companies should keep
confidential?

Thank you very much for your timely response to these questions. Please return
these questions to my Committee staff:

Mary Moore Hamrick
Committee on Energy and Commerce, Minority
564 Ford House Office Building
U.S. House of Representatives
Washington, D.C. 20515

If you have any questions or comments, please contact Mary Moore at 202/226-3400.
Again, we would appreciate your response to these questions within five (5) working days.

Sincerely,

Cliff Stearns
Ranking Minority Member
Subcommittee on Commerce, Consumer
Protection and Competitiveness

E:\docs\bob\insurance\b1188ips.qlw

418


**Illinois Public Action**

May 4, 1993

1 Quincy Court
Suite 714
Chicago, IL 60604
(312) 431-1800

313 Mattis
Champaign, IL 61820
(217) 352-1604

117 S. Third St., 6A
Rockford, IL 61107
(815) 965-8853

311 18th Street
Rock Island, IL 61201
(309) 788-1775 or 76

3028 W. Main
Belleville, IL 62223
(618) 236-2924

Honorable Cliff Stearns
c/o Mary Moore Hamrick
Committee on Energy and Commerce, Minority
54 Ford House Office Building
U.S. House of Representatives
Washington, D.C. 20515

Dear Mr. Stearns:

I am writing in response to your letter of April 27,
received by fax on April 30, 1993.

(It is unfortunate you were unable to attend the
hearing, as several of your questions seem to stem from a
misunderstanding of my testimony, as would have been
readily apparent had you been present or from a close
reading of the transcript.)

Question #1:

In the course of a response to a question from the
Committee Chair, I indicated that the insurance industry's
claim that it would present an onerous burden to sort its
data by census tract was incorrect and disingenuous.

The smallest familiarity with modern data base
technology makes it clear that the translation and storage
of customer data by census tract is a small, inexpensive
proposition -- especially for large insurance firms like
Allstate and State Farm.

There are numerous firms throughout the nation who can
affix a census tract code to customer files that already
have addresses.

Metro Mail of Lincoln, Nebraska (402-475-4591) will
append census tract and block codes (block codes are the
subsets of census tracts) for $3 per thousand names (a
third of a cent per record.)

Alternatively if a firm wished to buy the software to
append census tract codes on its own computer, the software
can be purchased from Bamberg-Handley (407-898-1701) for
about $10,000. If the firm already has the capability of
converting 5 digit zip codes to 9 digit zip codes (I'm sure
Allstate and State Farm do, since it saves them a great
deal on mailing), a program to convert 9 digit zip codes to
census tracts (and census blocks) is only $4,000.

♻ recycled· 940

Mr. Cliff Stearns
page 2

I indicated, in jest, that for a lucrative contract we could show Allstate or State Farm how to perform this relatively simple and inexpensive task.

Most modern relational data bases allow the user to sort on any field in the database.

We maintain our quarter million file membership list on a small 386 computer that uses a relational database. We can sort our file by zip code, carrier route, street name, area code, last name, first name, membership status, etc. -- in other words on any field in the record. I'm sure Allstate and State Farm can do the same with their huge mainframes and sophisticated software.

A customer record can have a zip code, a census tract code and any of many other parameters indicated in it. And it can be sorted by any or all of them. Once a census tract code is affixed to a company's customer records, the company can report the data on premiums written, losses, number of policies, etc. by either zip code or census tract through the execution of a simple computer program.

Anyone who is vaguely familiar with computers and data bases would concur with this analysis; it does not require any special knowledge of the information systems and data management capabilities of insurance companies.

Question #2:

As I indicated earlier, we maintain a variety of pieces of data on our membership including name, address, zip, carrier route, phone number, membership status, etc. We do not keep this data by census tract, but we have on ocassion found it desirable to convert this data to census tract. We have found that the many vendors in the market place do an excellent and relatively inexpensive job of this task. I suspect even Allstate and State Farm could afford them.

Question 3:

In my response to a question from the Committee Chair, I indicated that there is no evidence that residents of blue collar neighborhoods significantly underrepresent their real incomes relative to residents of white collar communities. I stand by my statement.

Mr. Cliff Stearns
page 3

Question 4:

.   No.

Question 5:

  No.

Question 6:

  As we have clearly expressed in our testimony before the
Committee's two recent hearings, automobile liability and
homeowners insurance are a necessity for urban residents. As a
consequence, access to affordable coverage must be available to
all consumers, regardless of race or geographic location.

  The practice of choosing to avoid marketing in Chicago's
inner-city neighborhoods by State Farm and Allstate, as is
clearly evident from the zip code distribution of both agent
locations and policies, makes it difficult for consumers to
purchase coverage from these two firms, the largest and
generally least expensive providers of auto and home coverage.

  If there are legitimate business reasons that can explain
this prima facia evidence of discrimination, we believe the
companies should provide such evidence to the Committee.

  I would point out that most states have fairly elaborate
regulatory structures that require public disclosure of loss
data. Even Illinois, which does regulate rates in any way,
requires limited disclosure of loss information for certain
types of homeowners coverage.

  It would be no major burden, and certainly not detrimental to
competition, for State Farm and Allstate to provide this
information to the public, and the Committee is certainly
justified in requesting it.

                      Sincerely,

                      Robert B. Creamer
                      Executive Director

jdc:RBC

421

--

**ALLSTATE INSURANCE COMPANY**

LAW DEPARTMENT
Allstate Plaza North - F7
Northbrook, Illinois 60062

Writer's Direct Dial 708 402-5173
Telecopier 708 402-5670

MICHAEL P. DUNCAN
Vice President and
Assistant General Counsel

May 4, 1993

The Honorable Cardiss Collins
Chairwoman, Subcommittee on
Commerce, Consumer Protection,
and Competitiveness
U.S. House of Representatives
Washington D.C. 20515

      Re:  **Response to the Subcommittee's Follow-up Questions from**
           **April 26th Hearing**

Dear Congresswoman Collins:

This letter is a response to follow-up questions posed to
Allstate at the April 26, 1993 hearing.  Specifically, the
Subcommittee requested Allstate to provide answers to the
following questions:

> (1) In a recent decision, the Seventh Circuit Court of
> Appeals upheld regulations of the Department of Housing
> and Urban Development that provided that the Fair
> Housing Act prohibits discrimination in the provision
> of property insurance.  Does Allstate support this
> ruling?  Does Allstate support vigorous enforcement of
> the Fair Housing Act with respect to insurers?

"Redlining" or any type of arbitrary or capricious discriminatory
practices are abhorred by Allstate and, as stated in our
testimony, are practices in which we do not engage.   The main
issue presented in the *NAACP v. American Family* case, however,
was not whether redlining is wrong - it undoubtedly is, but
whether the McCarran-Ferguson Act precludes the application of
the Fair Housing Act to insurers writing property insurance which

Page 2
May 4, 1993
Congresswoman Collins


is subject to regulation under state insurance laws.

Allstate's believes that the McCarran-Ferguson Act precludes the application of the Fair Housing Act to the business of insurance. The McCarran-Ferguson Act grants the states the supreme authority to regulate the business of insurance unless there is a federal act which "specifically relates to the business of insurance...."


We see *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419 (4th Cir. 1984) as correct in holding that the Fair Housing Act does not apply to property insurance because neither in the Fair Housing Act nor the legislative intent of the Act indicates that it specifically applies to the business of insurance. Allstate believes that the Department of Housing and Urban Development has no statutory authority to promulgate rules which expand the scope of the Fair Housing Act to apply to insurance.

> (2) Attached to your testimony were maps that showed Allstate's market penetration for both automobile and homeowners insurance by Chicago zip code. Please provide the data that Allstate used to prepare these maps.

We calculated our market share by zip code for Private Passenger Auto and Homeowners using the following methodology:

<u>Private Passenger Auto</u> - The numerator is determined by the number of cars in the zip code currently being insured by Allstate Insurance Company. The denominator is defined as Private Passenger Vehicle Registrations. This includes the number of privately owned passenger automobiles, light trucks and vans in a geographical area. Company, police and government owned cars are excluded. Private Passenger Vehicle Registrations is provided by Donnelly Marketing Information Service and is updated annually.

<u>Homeowners</u> - This numerator is the combination of homeowner and condominium policies in force for the Allstate Insurance Company. The denominator is defined as households and is again provided by the Donnelly Marketing Information Services. For this purpose household is defined as one or more persons who live together in the same housing unit.

**423**

Page 3
May 4, 1993
Congresswoman Collins

We calculated our approximate market share percentages in all zip
codes except in three downtown zip codes[1] where there is a very
low number (typically less than 100) of automobiles or
households.  The Donnelly Marketing Information Services has a
propriety interest in the information they provide.  We can not
share this information, although it can be purchased through
Donnelly.  We have, however, attached an exhibit which states our
resulting market share by zip code.

As discussed with Richard Huberman, Allstate will provide
comments to Illinois Public Action's zip code study by Friday,
May 7.  We appreciate the opportunity to discuss these important
issues.  If you have any questions regarding the response to
these questions, please contact Chuck Bruse or me.

Sincerely,

Michael P. Duncan
Vice President and
Assistant General Counsel

cc:  M. Afable
     M. Antonio
     C. Bruse
     C. Burns
     F. Cripe
     J. Kucera
     M. McCabe
     R. Pike
     R. Woodard

---

[1] Zip codes 60602, 60603, and 60654 are downtown business
areas.  60654 is actually the zip code for the Merchandise Mart.

**ALLSTATE INSURANCE COMPANY**
**ZIP CODE MARKET PENETRATION ESTIMATES**

| ZIP CODE | 1991 AUTOMOBILE PENETRATION | 1990 HOMEOWNER PENETRATION |
|---|---|---|
| 60601 | 13.4% | 7.1% |
| 60602 | N/A | N/A |
| 60603 | N/A | N/A |
| 60604 | 26.7 | 26.9 |
| 60605 | 18.5 | 30.6 |
| 60606 | 50.6 | 44.9 |
| 60607 | 11.4 | 23.0 |
| 60608 | 11.6 | 14.3 |
| 60609 | 11.8 | 14.8 |
| 60610 | 13.0 | 13.7 |
| 60611 | 13.8 | 13.1 |
| 60612 | 13.3 | 14.2 |
| 60613 | 14.9 | 21.2 |
| 60614 | 11.7 | 19.8 |
| 60615 | 19.2 | 27.0 |
| 60616 | 15.9 | 18.3 |
| 60617 | 20.3 | 27.5 |
| 60618 | 17.3 | 27.0 |
| 60619 | 33.0 | 48.5 |
| 60620 | 24.7 | 36.1 |
| 60621 | 18.9 | 26.0 |
| 60622 | 9.4 | 14.5 |
| 60623 | 10.6 | 16.1 |
| 60624 | 17.7 | 28.3 |
| 60625 | 12.1 | 25.4 |

REF: zipcode

**ALLSTATE INSURANCE COMPANY**
**ZIP CODE MARKET PENETRATION ESTIMATES**

| ZIP CODE | 1991 AUTOMOBILE PENETRATION | 1990 HOMEOWNER PENETRATION |
|---|---|---|
| 60626 | 8.4 | 17.6 |
| 60627 | 15.6 | 22.7 |
| 60628 | 23.5 | 33.8 |
| 60629 | 17.7 | 22.6 |
| 60630 | 20.7 | 21.7 |
| 60631 | 19.8 | 21.4 |
| 60632 | 19.2 | 20.0 |
| 60633 | 17.7 | 12.7 |
| 60634 | 18.9 | 21.0 |
| 60635 | 21.7 | 22.2 |
| 60636 | 18.4 | 29.7 |
| 60637 | 19.9 | 33.4 |
| 60638 | 21.2 | 23.0 |
| 60639 | 12.9 | 22.9 |
| 60640 | 11.0 | 21.0 |
| 60641 | 17.5 | 21.9 |
| 60642 | 23.5 | 19.6 |
| 60643 | 21.5 | 30.1 |
| 60644 | 16.9 | 35.9 |
| 60645 | 13.2 | 18.7 |
| 60646 | 18.9 | 20.0 |
| 60647 | 14.1 | 19.9 |
| 60648 | 28.9 | 27.0 |
| 60649 | 17.9 | 39.6 |

REF: zipcode

**ALLSTATE INSURANCE COMPANY**
**ZIP CODE MARKET PENETRATION ESTIMATES**

| ZIP CODE | 1991 AUTOMOBILE PENETRATION | 1990 HOMEOWNER PENETRATION |
|---|---|---|
| 60650 | 13.5 | 18.8 |
| 60651 | 10.8 | 24.3 |
| 60652 | 21.5 | 25.8 |
| 60653 | 20.0 | 19.7 |
| 60654 | N/A | N/A |
| 60655 | 20.4 | 21.3 |
| 60656 | 19.4 | 20.8 |
| 60657 | 13.9 | 22.0 |
| 60658 | 11.1 | 16.4 |
| 60659 | 13.0 | 20.2 |
| 60660 | 11.6 | 16.9 |

REF: zipcode

427

## ALLSTATE INSURANCE COMPANY

LAW DEPARTMENT
Allstate Plaza North - F7
Northbrook, Illinois 60063

Writer's Direct Dial 708 402-5173
Telecopier 708 402-5670

MICHAEL P. DUNCAN
Vice President and
Assistant General Counsel

May 14, 1993

The Honorable Cardiss Collins
Chairwoman, Subcommittee on
Commerce, Consumer Protection,
and Competitiveness
U.S. House of Representatives
Washington, D.C. 20215

    Re:  Illinois Public Action - "An Analysis
         of Zip Code Distribution..."

Dear Congresswoman Collins:

    At the April 26th hearing of your Subcommittee on Commerce,
Consumer Protection, and Competitiveness, a presentation was made
by Illinois Public Action (IPA).  They submitted a paper entitled
"An Analysis of Zip Code Distribution of State Farm and Allstate
Agents and Policies in Chicago".  You asked for Allstate's
comments.

    The most complimentary I can be on the purported analysis is
to say that it is at best "pseudo science".  It has false
premises and inaccurate data.  The false premises and data are
manipulated to come to a preconceived result.

    The most effective rebuttal to the allegations made is the
evidence presented by Allstate at the hearing and illustrated in
maps attached to our testimony which show that Allstate has a
significant amount of market share in every zip code in which
people live in the city of Chicago.

    I will address some specifics about the paper of Illinois
Public Action.  First, no statistical correlation is provided to
support the claim that Allstate discriminates against lower
income neighborhoods.  Secondly, there is no logic to the
conclusion that it is somehow necessary to have an agent in every

05/14 '93 09:32    ID:ALLSTATE HO F7        FAX:708-402-5670       PAGE

Congresswoman Cardiss Collins
May 14, 1993
Page 2


zip code or to have agents evenly distributed by zip code or by
congressional district. Neither zip codes nor the congressional
districts are regarded as insurance marketing units. They have
totally different purposes not relevant to marketing insurance.
To analyze our business primarily on distribution of agents in
zip codes and congressional districts leads to faulty
conclusions. Such an analysis also ignores the existence of
agent offices on the borders, but just outside of a zip code or
congressional district, apparently in the belief that people will
not go across the street to do business because it would take
them outside of their congressional district or zip code.
Furthermore, we testified that the location of an office is not
necessarily indicative of marketing success. We have two offices
in zip code 60614 (Lincoln Park) and no offices in 60624
(Garfield Park), yet we have significantly higher market shares
in Garfield Park both for automobile and homeowners products than
we do in Lincoln Park.

     An additional fault of Illinois Public Action's "analysis"
is that zip codes are compared without regard to the actual
insurable vehicles or residential units they contain. Our
analysis, based on market share, is a sound basis for examination
of the issue. If one compares insurance written in the
congressional districts selected by IPA based on market share
instead of number of policies written, a completely different
picture develops. IPA concludes that in the 5th Constrict
Allstate has more than twice the average number of policies than
in the 7th District. Looking at market share the results are as
follows:

ALLSTATE MARKET SHARE

| CONGRESSIONAL DISTRICT | HOME OWNER | AUTO |
|---|---|---|
| FIFTH | 28.8% | 14.1% |
| SEVENTH | 36.1% | 11.8% |

     We repeat what we said at the hearing. With approximately
24% of the homeowners' and 17% of the auto markets in Chicago and
with our distribution of market share by zip code as shown in our
exhibits, the allegation that we redline is totally without
foundation.

     Finally, you will recall the testimony of Ms. Petty, a west

Congresswoman Cardiss Collins
May 14, 1993
Page 3

side resident, on behalf of ACORN.  She noted that she was able
to get quotes from a number of Allstate agents on the phone.
Clearly, we are accessible.

    Thank you for the opportunity to respond for the record on
this matter.  Please let me know if you need any additional
information.

Michael P. Duncan
Vice President and
Assistant General Counsel

ls

cc:  R. Pike
     C. Bruse
     R. Woodard

*September 23, 1993*        EXTENSIONS OF REMARKS        **22459**

Not only did we fail to stand up to the Serbs, we prevented the Bosnians from defending themselves.

The arms embargo on the outgunned Bosnians make absolutely no sense at all.

To have imposed the arms embargo in the first place is incomprehensible. To have kept it in place for so long, and after so much suffering, is utterly shameful.

I believe that lifting the arms embargo is the very least we could have done.

Bosnian President Alija Izebegovic expressed this anguish the best, when he said: "Defend us or let us defend ourselves. You have no right to deprive us of both."

What can we do now?

Only actions, not words or good intentions, matter now.

To continue the arms embargo would condemn the Bosnians to a long cold winter of continued rape, slaughter, and starvation.

Beyond lifting the arms embargo, the U.N. war crimes tribunal appointed this weekend must vigorously pursue the barbaric butchers who are responsible for these unspeakable atrocities.

In addition, we must make absolutely clear to the brutal dictator of Belgrade, Slobodan Milosevic, that aggression in Kosova will be met with a swift and strong response.

But now we must act to halt the bloodshed in Bosnia.

Our conscience demands it.

Our humanity demands it.

This is nothing less than one of the great moral challenges of our time.

And we've got to have the courage to meet it.

For humanity's sake, I pray that we will.

---

## HOUSE BANKING COMMITTEE APPROVES LEGISLATION TO CURB INSURANCE REDLINING

### HON. JOSEPH P. KENNEDY II
OF MASSACHUSETTS
IN THE HOUSE OF REPRESENTATIVES
*Thursday, September 23, 1993*

Mr. KENNEDY. Mr. Speaker, I am pleased to report to my colleagues that H.R. 1257, "The Insurance Consumer Protection Act of 1993," was approved by the Committee on Banking, Finance and Urban Affairs on September 22, 1993. H.R. 1257 addresses the problem of discrimination in the insurance industry.

The Banking Committee, during extensive hearings concerning the issue of insurance redlining, received compelling testimony regarding the affordability, availability, and adequacy, of insurance for minority and low-income citizens. The committee heard testimony that several agents were told by a company sales manager to "get away from blacks," and sell to "good, solid, premium-paying white people." Another agent was told by a company underwriter that "We don't write Blacks or Hispanics." This shocking anecdotal evidence was supported by 12 years of data submitted by Missouri State Insurance Commissioner Jay Angoff. This data was collected from insurers themselves and is similar to the data H.R. 1257 would collect elsewhere in the

country. It shows that, in the cities of St. Louis and Kansas City, low-income minorities had to pay more money for less coverage than their white counterparts, despite the fact that losses in minority areas were actually less than those in white areas. This evidence directly challenges industry assertions that minorities are too risky to insure. Based on this disturbing evidence, the committee was compelled to act on this important issue.

Prior to the committee markup, we received letters regarding this legislation from HUD Secretary Henry G. Cisneros and OMB Associate Director Christopher Edley. Copies of these letters are enclosed.

Secretary Cisneros expressed his "wholehearted support" for this legislation, and provided reasons why HUD should administer the program it would establish.

Mr. Edley's letter sets forth the principles that the administration supports in legislation to address insurance redlining. Virtually all of those principles are directly reflected in the provisions of H.R. 1257, including: reporting by census tract, reporting of the race and gender of policyholders, reporting of claims information, and reporting on a continual basis—that is without a sunset. These provisions are not contained in any other legislation introduced to address the insurance redlining issue.

Mr. Speaker, these are important issues and I am pleased that the administration has taken a position on them. At this point, I would respectfully ask that the letters enclosed from the Office of Management and Budget and the Department of Housing and Urban Development be included in the RECORD for the benefit of my colleagues.

[The material follows.]

OFFICE OF MANAGEMENT AND BUDGET,
*Washington, DC, September 20, 1993.*
Hon. JOSEPH P. KENNEDY II,
*Chairman, Subcommittee on Consumer Credit and Insurance, Committee on Banking, Finance and Urban Affairs, House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Administration recognizes that the practice of insurance redlining can have severe economic impacts on both businesses and individuals, and as a result on whole neighborhoods and communities. To effectively detect and address the problem of insurance redlining, the collection of data assessing the availability, affordability and quality of insurance for individuals and small businesses is necessary. Any discrimination discerned from the analysis of these data would then be aggressively opposed.

Working with the Departments and Commerce, Housing and Urban Development and Treasury and other interested agencies, we have developed a set of principles that the Administration could support in final legislation addressing the problem of insurance redlining. I have enclosed these principles with this letter.

The Administration believes that insurance redlining is an important issue that deserves immediate attention and welcomes your Committee's action on this matter. The Administration urges Congress to act quickly on the insurance redlining provisions and separate other unrelated provisions that may impede enactment of final legislation.

Thank you for your consideration of the Administration's principles. If you have any

questions about these principles feel free to contact me at 395-3120.

Sincerely,
CHRISTOPHER F. EDLEY, Jr.
*Associate Director for Economics and Government.*

Enclosure.

ADMINISTRATION PRINCIPLES ON INSURANCE REDLINING

The following five elements outline the Administration's principles regarding the collection of insurance data.

1. Insurers (including Fair Access to Insurance Requirements—FAIR plans) should be required annually to disclose information to the federal government on the nature of their business activity:

The information should be reported by census tract or their statistical equivalent (if necessary by street address and zip code) and submitted in a machine readable format to facilitate efficient evaluation of the data.

The information should be collected at the individual policy level.

The information should include data on (1) pricing, number and total coverage levels of policies issued, denied, cancelled and renewed, (2) data on the number of insurance agents employed, terminated and relocated by region and (3) data on claims costs and other objectives economic variables as determined by the federal government.

The information should include (1) the race, gender and income level of all applicants and policyholders, (2) the race of agents and (3) other variables as determined by the federal government.

Administration of data collection/analysis should be modeled after Home Mortgage Disclosure Act data (HMDA) collection/analysis.

These data, consistent with the Freedom of Information Act, should be made available to the public for review.

2. The federal government shall compile, analyze and prepare an annual report of such data.

3. Disclosure of such information should be mandatory for all auto, commercial, small business and homeowners lines of insurance. Disclosure of private mortgage insurance shall be contingent upon a determination that insurers are not complying with the reporting requirements modeled after HMDA:

Disclosure requirements should be phased in over a few years to reduce extreme burden on insurers (particularly small insurance companies).

4. Failure to disclose information, submit data on time or provide follow-up data as required should result in a sufficiently large civil money penalty to discourage such occurrences.

5. Within a reasonable period of time after enactment of such legislation, an evaluation of the disclosure requirement and the data collected should be conducted and a report submitted to the President and Congress to determine the need to continue/modify such requirements.

---

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,
*Washington, DC, September 22, 1993.*
Hon. JOSEPH P. KENNEDY II,
*Chairman, Subcommittee on Consumer Credit and Insurance, House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN, I am writing to express my wholehearted support of Title II of the proposed Insurance Consumer Protection Act on insurance redlining. This legislation is necessary to address a major impediment to home ownership now experienced by low-income and minority persons.

I also want to state the reasons why we believe that the Department of Housing and Urban Development and its Office of Fair Housing and Equal Opportunity should administer this program:

The Courts have supported the Department's position that insurance redlining is a violation of the Fair Housing Act for which the Secretary of HUD has enforcement responsibility.

The authority to test discriminatory insurance practices would mesh with the substantial experience FHEO has acquired in conducting testing under the Fair Housing Initiatives Program.

HUD's new oversight responsibilities relating to the secondary mortgage market (Fannie Mae and Freddie Mac), the Federal Housing Finance Board and the Resolution Trust Corporation closely relate to the insurance redlining issue.

In closing I would like to reiterate that this function provides an excellent fit with our existing fair housing and other programmatic responsibilities. I will provide to FHEO from existing HUD resources whatever is necessary to achieve these additional responsibilities.

Sincerely,

HENRY G. CISNEROS,
*Secretary.*

---

TRIBUTE TO WENDELL W. YOUNG III

## HON. THOMAS M. FOGLIETTA

OF PENNSYLVANIA

IN THE HOUSE OF REPRESENTATIVES

*Thursday, September 23, 1993*

Mr. FOGLIETTA. Mr. Speaker, I rise on this occasion to salute Wendell W. Young III, on the occasion of his being elected an international vice president of the 1.3 million member strong United Food and Commercial Workers Union, representing workers throughout the United States and Canada.

Wendell is currently serving as president of the Pennsylvania State Council of the UFCW. He has served as president of the Philadelphia area Local 1776 for 31 years, representing 24,000 workers in southeastern and central Pennsylvania.

I have known Wendell Young for years in his service as president of the local 1776 of the United Food and Commercial Works, and I cannot think of a more fitting tribute to Wendell than his being elected to an international vice presidency. He has committed decades of service and devotion to the members of his union, and his experience and knowledge will do nothing but strengthen the union as it forges ahead towards the turn of the century.

---

KETUBAH B'NAI B'RITH 13TH BIRTHDAY CELEBRATION

## HON. HENRY A. WAXMAN

OF CALIFORNIA

IN THE HOUSE OF REPRESENTATIVES

*Thursday, September 23, 1993*

Mr. WAXMAN. Mr. Speaker, I rise today to congratulate Ketubah B'nai B'rith on the celebration of its 13th year of service to southern California. Ketubah B'nai B'rith has been integral in providing humanitarian assistance to worthy groups throughout the Greater Los Angeles area. This organization's uninterrupted commitment to service is a testament to its founders embrace of American values and ideals.

Ketubah B'nai B'rith will be celebrating its 13th year with a Bar/Bat Mitzvah party on Sunday, October 3, 1993 at the JW Marriott Hotel, 2151 Avenue of the Stars, Los Angeles CA. During the festivities, guests will be entertained by the renowned musical comedy star John Raitt, who has appeared in such Broadway favorites as Carousel.

A number of important participants in this organization will be honored at this ceremony, virtually all of whom are long-time constituents and friends of mine. W.C. Chastain, a leader in the world of business and commerce, will be honored as a patron of the Ketubah Contract, the newsletter of this group. Additionally, a special tribute will be paid to past presidents of Ketubah, including my dear friends Hy and Ethel Haves, Ketubah's founders. Hy also has the distinction of being the Honorary Mayor of the Palisades Highlands.

Other past presidents who will be honored include Darnold and Phyllis Blivas, the late Bob and Myrtle Ensel, Edwin and Susan Isenberg, Lou and Dorothy Miller, David and Rose Siegel, and Dr. William and Norma Zack. The current presidents of this association are Marvin and Ruth Levin.

The Ketubah Bar/Bat Mitzvah Party will also seek to raise funds for the organization, allowing it to continue its noble work on behalf of B'nai B'rith and the community. The Ketubah charitable fund is used to support the B'nai B'rith agencies, including the Anti Defamation League, B'nai B'rith Youth Organization and Hillel; plant trees in the B'nai B'rith International Forest in Israel; provide local services, including an annual Passover Seder for the elderly and indigent; and assist in furthering B'nai B'rith's programs political action, Jewish learning, and senior services.

I would like to strongly commend Ketubah B'nai B'rith for its important role in the southern California community, and wish it many more years of prosperity and service to humanity.

---

TRIBUTE TO FOURTH ANNUAL FATHER ROGER GIGLIO DINNER HONOREES

## HON. JOSÉ E. SERRANO

OF NEW YORK

IN THE HOUSE OF REPRESENTATIVES

*Thursday, September 23, 1993*

Mr. SERRANO. Mr. Speaker, I rise today to pay tribute to Mrs. Aida Rosa, Mr. Peter Castellana, Jr., Ms. Nancy Biberman, Ms. Ismene Speliotis and Dr. Earnest Drucker, who will be honored this coming October 1 at the fourth annual Father Roger Giglio dinner held by the Saint Benedict the Moor community-based AIDS and drug rehabilitation program in the South Bronx.

Aida Rosa, Principal of P.S. 30 in the South Bronx, is an outstanding educator who, in her commitment to increasing the learning capacity of her pupils, works actively—and successfully—to improve the overall quality of their lives. She collaborates closely with educational, health and social service agencies, and as a member of Community Planning Board No. 1, and various other boards, plays a crucial role in gaining better services and living conditions for the entire South Bronx community.

Peter Castellana is the president of Western Beef, a chain of 14 food stores he and his brothers built with the aim of providing quality products at affordable prices to lower income communities. Mr. Castellana is involved in numerous social programs serving children, and under his direction Western Beef makes major contributions to community food banks.

Nancy Biberman and Ismene Speliotis are president and vice-president, respectively, of the Women's Housing & Economic Development Corp., or WHEDCO, not-for-profit corporation they founded to develop and operate interconnected housing and economic development programs for low-income women and their families. These highly talented and motivated individuals have made important contributions to New York City's low-income and homeless populations throughout their careers. As director and associate director of the Highbridge Community Housing Development Fund, they worked together to develop a 23 building, $60 million, housing rehabilitation project for low- and moderate-income families in the South Bronx. Now with WHEDCO they are developing a comprehensive housing, job training, and economic development project called Urban Horizons, and are consultants to five community-based organizations developing special needs housing in the Bronx, Brooklyn, Manhattan, and Queens.

Dr. Ernest Drucker, director of the Division of Community Health and professor in the Department of Epidemiology and Social Medicine at the Bronx's Montefiore Medical Center/Albert Einstein College of Medicine, is a leading figure in the field of social epidemiology, the study of the health consequences of social problems. Long an active voice on drug policy reform both domestically and internationally, he is editor-in-chief of the international journal "Addiction Research"; an editor of the "International Journal on Drug Policy"; and a member of the editorial board of the "American Journal of Drug and Alcohol Abuse." Dr. Drucker is a member of the board of directors of Saint Benedict the Moor and of Housing Works, Inc., an AIDS housing organization in New York City. He is also a founder and chairman of the board of directors of the international medical relief and human rights organization "Doctors of the World."

Mr. Speaker, these individuals have demonstrated extraordinary dedication to the most vulnerable members of our society. Their efforts are an eloquent tribute to the spirit of the late Father Roger Giglio, who founded the St. Benedict the Moor Aids and drug rehabilitation program and was its driving force until his death several years ago. I hope my colleagues will join me in recognizing their outstanding contributions, as well as those of Saint Benedict the Moor, which will honor them on October 1.

S. HRG. 103–793

# HOMEOWNERS' INSURANCE DISCRIMINATION

# HEARING

### BEFORE THE

## COMMITTEE ON
## BANKING, HOUSING, AND URBAN AFFAIRS
## UNITED STATES SENATE

### ONE HUNDRED THIRD CONGRESS

### SECOND SESSION

### ON

THE AVAILABILITY, AFFORDABILITY, AND ACCESSIBILITY OF HOME-
OWNERS' INSURANCE, PARTICULARLY IN URBAN NEIGHBORHOODS.
COMMUNITY ACTIVISTS AND INTEREST GROUPS ARGUE THAT MANY
URBAN AREAS HAVE INSURANCE PROBLEMS BECAUSE OF INSUR-
ANCE DISCRIMINATION BASED ON RACIAL AND INCOME CHARACTER-
ISTICS OF A GEOGRAPHIC AREA—I.E., REDLINING

INSURERS RESPOND THAT THEY PROVIDE COVERAGE BASED ON
COLOR-BLIND UNDERWRITING GUIDELINES AND THEY SIMPLY DIF-
FERENTIATE BETWEEN RISKS IN PROVIDING COVERAGE TO INDIVID-
UALS AT A PRICE THAT REFLECTS EXPECTED LOSSES; HIGHER
PRICES, PARTICULARLY IN URBAN NEIGHBORHOODS, THAT REFLECT
A GREATER RISK OF CRIME, VANDALISM, OR LOSS

### MAY 11, 1994

Printed for the use of the Committee on Banking, Housing, and Urban Affairs



U.S. GOVERNMENT PRINTING OFFICE

84–051 CC          WASHINGTON : 1994

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402

ISBN 0-16-046080-8

## COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

DONALD W. RIEGLE, JR., Michigan, *Chairman*

PAUL S. SARBANES, Maryland
CHRISTOPHER J. DODD, Connecticut
JIM SASSER, Tennessee
RICHARD C. SHELBY, Alabama
JOHN F. KERRY, Massachusetts
RICHARD H. BRYAN, Nevada
BARBARA BOXER, California
BEN NIGHTHORSE CAMPBELL, Colorado
CAROL MOSELEY-BRAUN, Illinois
PATTY MURRAY, Washington

ALFONSE M. D'AMATO, New York
PHIL GRAMM, Texas
CHRISTOPHER S. BOND, Missouri
CONNIE MACK, Florida
LAUCH FAIRCLOTH, North Carolina
ROBERT F. BENNETT, Utah
WILLIAM V. ROTH, JR., Delaware
PETE V. DOMENICI, New Mexico

STEVEN B. HARRIS, *Staff Director and Chief Counsel*
HOWARD A. MENELL, *Republican Staff Director*
GLENN IVEY, *Counsel*
MARK KAUFMAN, *Financial Policy Analysis*
TIMOTHY P. MITCHELL, *Legislative Assistant*
DOUGLAS NAPPI, *Republican Counsel*
JONATHAN KAMARCK, *Republican Staff Director/Subcommittee on Housing*
EDWARD M. MALAN, *Editor*

(II)

# CONTENTS

### WEDNESDAY, MAY 11, 1994

|  | Page |
|---|---|
| Opening statement of Chairman Riegle | 1 |
| Opening statements, comments, or prepared statements of: |  |
| Senator Feingold | 9 |
| Prepared statement | 44 |
| Senator D'Amato | 11 |
| Prepared statement | 45 |
| Senator Kerry | 12 |

### WITNESSES

| | |
|---|---|
| Congresswoman Cardiss Collins, U.S. Representative in Congress from the 7th District of the State of Illinois | 3 |
| Congressman Joseph P. Kennedy, II, U.S. Representative in Congress from the 8th District of the State of Massachusetts | 5 |
| Deval L. Patrick, Assistant Attorney General for Civil Rights, U.S. Department of Justice | 13 |
| Prepared statement | 46 |
| Discrimination in insurance is prohibited by the Fair Housing Act | 46 |
| Enforcement efforts | 47 |
| Roberta Achtenberg, Assistant Secretary for Fair Housing and Equal Opportunity, U.S. Department of Housing and Urban Development | 17 |
| Prepared statement | 49 |
| Insurance and the Fair Housing Act | 49 |
| Risk, race, and insurance | 50 |
| Current HUD initiatives | 51 |
| The need for data disclosure | 53 |
| Risk, race, and insurance, revisited | 54 |
| Response to written questions of Senator Bond | 156 |
| William R. Tisdale, president, National Fair Housing Alliance; accompanied by: Shanna L. Smith and Cathy Cloud | 29 |
| Prepared statement | 54 |
| Introduction | 55 |
| I. NFHA's homeowners' insurance testing project | 55 |
| II. NFHA's testing process | 56 |
| III. Target company and agent selection | 56 |
| IV. Testing results | 57 |
| V. Insurance companies, in general | 57 |
| VI. The Fair Housing Act prohibits insurance discrimination | 59 |
| VII. Why are so few complaints filed? | 60 |
| VIII. Recommendations | 61 |
| Conclusion | 62 |
| J. Robert Hunter, commissioner, Texas Department of Insurance | 33 |
| Prepared statement | 63 |
| Definitions | 63 |
| Data collection | 64 |
| Evidence of redlining—the Texas experience | 64 |
| Underwriting guidelines | 65 |
| Reporting by census tract vs. reporting by zip code | 66 |
| Collecting race and gender data | 66 |
| Reporting of claims information | 66 |
| Automatic sunset provision | 67 |
| Review of S. 1917 | 67 |
| Conclusion | 67 |

(III)

IV

| | Page |
|---|---|
| J. Robert Hunter, commissioner, Texas Department of Insurance—Continued | |
| Response to written questions of Senator Riegle | 158 |
| Lynn M. Schubert, assistant general counsel, American Insurance Association | 37 |
| Prepared statement | 67 |
| I. Introduction | 67 |
| II. Definition of redlining | 68 |
| III. The first step toward a solution | 69 |
| IV. Is insurance available? | 69 |
| V. Potential Federal action | 72 |
| VI. Affirmative efforts by the industry | 73 |
| VII. Other issues | 76 |
| VIII. Conclusion | 77 |
| Charles Kamasaki, National Council of La Raza | 41 |
| Prepared statement of Raúl Yzaguirre | 77 |
| I. Introduction | 77 |
| II. Impact of discrimination on the Hispanic community | 78 |
| III. Effects of housing discrimination | 81 |
| IV. Home ownership opportunities denied | 82 |
| V. Recommendations | 83 |
| Letter dated May 9, 1994, to Senator Riegle | 85 |

### ADDITIONAL MATERIAL SUPPLIED FOR THE RECORD

| | |
|---|---|
| An analysis of zip code distribution of State Farm and Allstate agents and policies in Chicago | 88 |
| State of Missouri, Director of Insurance, Jay Angoff | 116 |
| Prepared statement | 123 |
| Homeowners' Insurance in Missouri | 123 |
| The NAACP Legal Defense and Educational Fund, Inc. | 131 |
| Nationwide Insurance Companies | 133 |
| Health News Daily, May 11, 1994, FDC Reports | 135 |
| Patton, Boggs & Blow, LLP, letter dated May 13, 1994, from John L. Oberdorfer | 141 |
| State of Minnesota, Department of Commerce | 145 |

# HOMEOWNERS' INSURANCE DISCRIMINATION

---

## WEDNESDAY, MAY 11, 1994

U.S. SENATE,
COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS,
*Washington, DC.*

The Committee met at 10:05 a.m., in room SD–538 of the Dirksen Senate Office Building, Senator Donald W. Riegle, Jr. (Chairman of the Committee) presiding.

### OPENING STATEMENT OF CHAIRMAN DONALD W. RIEGLE, JR.

The CHAIRMAN. The Committee will come to order.

Let me welcome all those in attendance this morning and invite those standing to find seats. We're pleased to have everyone here today. We're anticipating two of our colleagues from the House of Representatives coming to make statements this morning. We'll accommodate them—I see Congresswoman Cardiss Collins arriving. I'd like to invite her to come on up to the table and be seated. I know our colleague, Joe Kennedy, is also coming over this morning and will be here shortly.

I'm going to make a brief opening statement and call on Senator Feingold, who has asked for the opportunity to make a presentation to the Committee. We're delighted that he is here and sitting in with us, and I've invited him to sit up here with the Members this morning.

After we have gotten started with the background information, I'm going to call on our colleague from the House, Congresswoman Collins, who I'm delighted is here today, and I'll say more about that just shortly.

This morning, the Committee will consider whether homeowners' insurance is as available, affordable, and accessible to all Americans as it should be, and most particularly those living in urban neighborhoods.

We're going to consider not only if insurance companies are refusing to sell in certain areas, but if they are also charging more for insurance coverage or offering restricted insurance coverage without justification.

This Committee has considered claims of what is commonly referred to as redlining, screening people out for credit or other kinds of financial services, and we've done that on several occasions.

In fact, we have included provisions in virtually every bill that the Committee has passed during my 6 years as Chairman to ensure as a matter of law and legal right that credit is available to all communities.

(1)

The Committee included provisions in the Financial Institutions Reform, Recovery, and Enforcement Act, known as FIRREA, and amended the Home Mortgage Disclosure Act to address the problems of mortgage discrimination. We amended the Equal Credit Opportunity Act to require regulators to notify the Justice Department about instances of lending discrimination.

We have also held hearings to make sure that fair lending laws are being enforced aggressively and effectively. Since lenders require their borrowers to secure property insurance, eliminating homeowners' insurance discrimination is a logical and necessary progression of the Committee's efforts to ensure that there is an adequate and fair flow of capital into distressed communities and that there, in fact, be fair access to financial services by all citizens.

In 1968, the Fair Housing Act banned redlining and housing discrimination. The Federal courts have also made it clear that the Fair Housing Act bans homeowners' insurance discrimination. Nevertheless, we still find many serious and terribly troubling examples of discrimination fully 26 years after Lyndon Johnson signed that piece of legislation, and I remember it well because I was there as a new Member of Congress at the White House at that bill-signing.

One insured drew a line around the entire city of St. Louis, Missouri, and labeled it "ineligible property."

In Milwaukee—Senator Kennedy? Congressman Kennedy, why don't you just come right on up and take a seat beside Congresswoman Collins?

In Milwaukee, a district sales manager was taped while criticizing other agents for writing too many policies for blacks and suggesting ways to avoid writing policies for black Americans.

This Committee has also heard testimony about the tremendous shortage of property insurance in Los Angeles. For example, California's Department of Insurance has reported that 61 percent of the businesses damaged in the riots after the Rodney King verdict were uninsured because coverage was too expensive or just not available. An additional 4 percent said the agent they contacted would not quote rates in their area.

In Georgia, and here in Washington, DC, insurance regulators are investigating charges of insurance discrimination.

The State of Texas recently fined Allstate $850,000 for discriminatory practices. The Ohio insurance department fined Farmers Insurance for determining rates by zip codes instead of by municipality, which led to underpricing insurance in the suburbs.

Today, we will hear from a panel of experts in this field, including Texas insurance commissioner, Robert Hunter; Lynn Schubert, of the American Insurance Association; Wayne Tisdale, president of the National Fair Housing Alliance, which I understand has some discouraging, but nevertheless, important results to share with us from a tester program; and Raúl Yzaguirre, of the National Council of La Raza.

They'll be followed by Assistant Attorney General, Deval Patrick, of the Justice Department and Assistant Secretary, Roberta Achtenberg, of HUD, who will testify about the Administration's enforcement efforts in this area.

I want to say that this is an abbreviated opening statement with respect to the work of this Committee and the counterpart Committee in the House, upon which our colleague serves.

Putting an end to discriminatory financial practices in this country, in the banking system, in the insurance system, and in every other way, are part of fulfilling the basic doctrine of this land.

The laws that have been written and signed into effect prohibit many of the practices that are going on today and have been going on for decades. We're determined to use every power at our command to bring that to an end.

It doesn't mean anything to talk about using our normal capital markets and free enterprise system to get resources into the entire fabric of our land and into our distressed communities if there are barriers that prevent that capital from flowing there.

If people can't get mortgages or they can't get home insurance which enables them to get mortgages, the whole system starts to just malfunction and die right on the spot. We can't have that. That's not what America is about and the law says it shouldn't be that way and we're not going to tolerate those practices.

If we need stronger penalties with respect to enforcement and remedial action, then those are precisely, the steps that we'll need to take. This practice has to stop if we want to have any hope of having the kind of America that we speak about and hold out as a vision and also that can work fairly and properly on a day-to-day basis.

Senator Feingold, if I may, I think I'm going to call on our House colleagues who have come across to let them make their opening statements. After they have done so, I'm going to call on you as a witness, in effect, before the Committee, and then other Members of the Committee for opening statements.

Let me welcome my two colleagues.

I want to just say, Congresswoman Collins, you and I served together a good many years ago as seatmates on the Foreign Relations Committee in the House, the International Relations Committee. I remember that opportunity with special fondness. I'm a great admirer of you and your record. I'm just delighted that you're here to make a statement to the Committee this morning.

## OPENING STATEMENT OF CONGRESSWOMAN CARDISS COLLINS, U.S. REPRESENTATIVE IN CONGRESS FROM THE 7TH DISTRICT OF THE STATE OF ILLINOIS

Representative COLLINS. Thank you very much. I remember those days as well and they're certainly very fond memories for me, equally.

Mr. Chairman, and Members of the Committee, I certainly appreciate this opportunity to testify today on the very important issue of insurance redlining.

Over the last year, the Energy and Commerce Subcommittee on Commerce, Consumer Protection, and Competitiveness has examined redlining practices of insurance companies. At the Subcommittee's two hearings, we heard very disturbing reports about a variety of practices insurance companies use to deny access to insurance to the residents of the urban areas.

4

Some may say that insurance redlining is a thing of the past, but the witnesses at our hearings testified that the practice continues, in fact, flourishes. Some may say that redlining doesn't exist or they're not sure it's a problem.

I know it's a problem. My constituents know it's a problem. Most people living in urban areas know it's a problem. For example, those at the hearing cannot forget Selwyn Whitehead of the Economic Empowerment Foundation, who testified about her experience in trying to get liability insurance for her telecommunications consulting firm in the late 1980's.

When she identified her firm as a woman-owned firm, of color, in Oakland, California, she was turned away or quoted premiums of $8,000 to $10,000 per year. When she called on behalf of her fictitious white male boss, a Mr. Selwyn Whitehead, the first quote was for a mere $1,200.

The statistics speak for themselves. Illinois Public Action testified that there are 52 State Farm offices and 32 Allstate offices in a predominantly white congressional district in Chicago. But, in the Chicago portion of my district, according to Public Action, there are only 6 State Farm offices and 2 Allstate offices outside the downtown area.

I'd like to submit for the record the detailed study prepared by Illinois Public Action called, "An Analysis of Zip Code Distribution of State Farm and Allstate Agents and Policies in Chicago."

ACORN testified that in Chicago, only 51.1 percent of occupied, single-family units in low-income neighborhoods, and only 57.6 percent in minority neighborhoods, were covered by any type of insurance, compared to 90-percent coverage in high-income and 87.7 percent coverage in white areas.

There is plenty of other evidence of redlining behavior by insurance companies themselves. For example, the NAACP has a lawsuit pending against American Family Mutual Insurance Company. That's the case where the sales manager was recorded as telling an agent:

I think you write too many blacks. You gotta sell good, solid, premium-paying white people.

The California Insurance Department recently entered into a $500,000 settlement with the California Insurance Group after the company was accused of redlining large areas of San Francisco. Other witnesses today will provide still more evidence of redlining.

As a practical matter, access to property insurance is a necessity for mortgage loans and is often essential for access to very small business loans. Without access to affordable insurance, small businesses in our urban areas cannot prosper, nor generate badly needed jobs.

Similarly, access to affordable automobile insurance is often essential for residents in the inner cities to keep or to hold their jobs.

My constituents still suffer daily the indignities of insurance redlining. They want to start seeing some relief.

We, here in Washington, can argue about the perfect bill, but my constituents want results. We can wait forever for State legislators to pass the perfect bill, or even any bill, for that matter. But the people in Chicago and other urban areas want results.

We can argue about the perfect bill and let the clock keep ticking away. Maybe we can even wait until next Congress, or the Congress after that, in the hope of the perfect bill. But I feel the environment for good legislation will not be any better next year and will likely be worse, if anything. While we argue over the perfect bill, the people back home don't have any results.

I would urge this Committee to begin the process of fighting redlining by supporting appropriate legislation, and yield back the balance of my time, Mr. Chairman.

The CHAIRMAN. Thank you very much. I very much appreciate your coming over and testifying today. I think you state very powerfully what this problem is and the need for us to do something about fixing it.

Let me say that if any of you need to leave for reasons of activities on the House side, feel free to do so at any time.

Let me also say to Congressman Joe Kennedy how much I appreciate your being here and your leadership on our counterpart Committee in the House and in this area.

Your family has given great service to this country and here in the Senate, your father and now your uncle are doing so. I have the particular privilege of occupying the office, here in the Senate Dirksen Building, that was your father's office when he was here as a Senator, and that has a very special meaning to me, as you know.

We welcome you here. You come very much enveloped in that family legacy of standing up on these civil rights, human rights, and equity issues. And so, it's entirely appropriate that you come to testify today on this issue where you've been giving very important leadership.

## OPENING STATEMENT OF CONGRESSMAN JOSEPH P. KENNEDY, II, U.S. REPRESENTATIVE IN CONGRESS FROM THE 8TH DISTRICT OF THE STATE OF MASSACHUSETTS

Representative KENNEDY. Senator, I very much appreciate your welcoming remarks, most particularly because they come from you.

I, having served on the House Banking Committee now for close to 8 years, have come to realize how difficult many of the issues that you have focused on, particularly in your Chairmanship over here, have been, and how divisive they can be, and how difficult it is to gain any kind of consensus.

I look around this Committee room and see that there are some similarities, though we finally did get a Republican to join us on this issue. But the fact is, Senator, your leadership in taking on a lot of special interests that surround banking and insurance issues is something to be very much commended.

I think everybody is going to miss the leadership that you have shown on this Committee, particularly those of us that struggle with many of the same issues on the House side.

I want to really thank you and tell you that we're going to miss you, but I'm sure you'll find a way to keep your oar in the water there, Senator.

The CHAIRMAN. Thank you. Thank you. I assure you, I will.

Representative KENNEDY. I want to thank the other Members of the Committee. I also want to pay particular thanks to Senator

6

Feingold for the tremendous work that he's doing on this issue. The bill that he has filed here on the Senate side is, I think, one that can really get to the heart of whether or not these kinds of practices can be documented in a fashion that will allow us to significantly change the policies of the insurance industries in this country.

All of us, particularly Members of this Committee, are very familiar with how the HMDA data on the banks have enabled us to get very significant amounts of dollars by the banks to begin flowing into inner-city neighborhoods and into neighborhoods of color around this country.

The light of reality and the light of what is good for this country will shed itself on this issue if, in fact, we get the data that Senator Feingold is seeking.

I would urge the Members of this Committee to look closely at his legislation and I hope that you would support it if it has an opportunity to come to the Senate Floor and in this Committee on the way to the Floor.

I want to thank, obviously, all the others for your longstanding commitment to ending inequality in this country, Senator Kerry, Senator Campbell, and Senator D'Amato.

It's fitting that you have decided to examine the serious problem of insurance redlining in the property and casualty area. If any issue deserves your principled leadership, it's this one.

People are being denied reasonable insurance for reasons having nothing to do with risk factors, but having everything to do with their race, their wealth, and their neighborhood. We have in our country a system of insurance that is separate and unequal. It is wrong. It's un-American. It must stop.

If you're an African-American, a Latino, an Asian, or a gay, then Nationwide is not on your side. You're in slippery hands with Allstate. And, unlike a good neighbor, State Farm is not there. Let's just look at some of the facts.

The California Insurance Group gave maps to agents which covered in yellow ink the African-American, Hispanic, and gay neighborhoods of San Francisco. The company deemed those areas off limits for the purposes of writing policies.

California's insurance commissioner, John Garamendi, sued the company for unlawful discrimination. Ultimately, he reached a $500,000 settlement and won a commitment from the company to increase its business in minority and gay communities by $3 to $4 million over the next 4 years.

As you will hear about later this morning, the National Fair Housing Alliance is about to press charges against Allstate and Nationwide for discrimination in four major cities. The findings used in these cases established dramatic evidence of discrimination.

In Chicago, for instance, testers found evidence of discrimination as cases were examined.

In Atlanta, where the eyes of the world will be focused in 2 years from now during the Olympics, only 2 percent of Nationwide's 155 offices are located in or near a minority area.

In Wisconsin, where the Committee held a hearing earlier this year, the NAACP has recently filed suit against the American Family Insurance Company, the State's largest underwriter of home-

owners' insurance, for redlining minority areas of Milwaukee. One of the company's sales managers was caught on tape making the following statement, and I quote:

Very honestly, I think you write to too many blacks. You've got to sell to good premium-paying white people. Very honestly, black people will buy anything that looks good right now. But when it comes to pay for it next time, you're not going to get your money out of them. The only way you're going to correct your performance is to get away from the blacks.

The agent who was the focus of those comments has been subsequently fired.

Mr. Chairman, I'm sure you've heard insurers tell you, as I have, that urban homeowners are adequately served by State-sanctioned F.A.I.R. plans. In limited instances, that may be so. But F.A.I.R. plans are far too often poor substitutes for private insurance. Instead of pooling truly high-risk homeowners, they have become dumping grounds for everyone living in the city, including the people who are good risks—the people who live in solid neighborhoods who take care of their homes. F.A.I.R. plans require people to pay more in premiums for less coverage.

A recent study by the community group, ACORN, shows that urban and minority consumers are paying as much as 270 percent more for F.A.I.R. plans than they pay for the equivalent in private insurance coverage. F.A.I.R. plans aren't fair. They are simply a rip-off.

You've probably also heard insurers say that they can't insure urban residents because losses are too high. Again, the evidence suggests that this is simply a flimsy excuse. Missouri's insurance commissioner analyzed 12 years' worth of data collected on white and black areas of St. Louis and Kansas City. The numbers show that residents of low-income black areas pay more for homeowners' insurance and get less coverage than whites of the same income, even though their losses are less than those of whites.

All in all, Mr. Chairman, the record suggests a nationwide pattern of discrimination by insurers with respect to urban and minority consumers. Although HUD and the Justice Department have begun to seriously examine the practices of the insurance industry, more needs to be done.

As the GAO recently reported to you, we need more information about who is getting insurance and not and why. I believe that we need information to be as detailed as possible, including census tract, race, gender, and loss data. Such information will help us shine a light on an industry practice and expose the truth about redlining once and for all.

Those who have nothing to hide will have nothing to fear. Others who receive much needed prodding will get that to correct the indefensible practices that they pursue.

Some of us may differ about how to best address the issue of insurance redlining, but I believe that most of us agree that there is a serious problem and we must get working to resolve it.

The Home Mortgage Disclosure Act and other laws have helped us eliminate discrimination in the banking industry. Now it's time to expand the fight for fairness into the insurance industry as well.

In closing, let me thank you again, Mr. Chairman, for having me here this morning. I'd be happy to answer any questions that you might have, but I'd just urge all of the Members of the Committee

to please try to move on this issue. It's wrong. I think we can do something about helping people that are denied access to an important industry in this country.

Than you very much, Mr. Chairman.

The CHAIRMAN. Let me just say, in response to your specific suggestion, Senator Feingold has prepared a bill which he's going to discuss here momentarily. I intend to work with him to either join an effort with his bill, perhaps with some modifications, or produce a bill of our own within this Committee, which might then be combined with his bill, but we're going to move ahead on this.

Representative KENNEDY. Teriffic.

The CHAIRMAN. Let me just say two other things of a personal sort, if I may. I'll be brief about it.

I remember back in 1967, when your mother, Ethel Kennedy, came to my office. I was a young freshman Member of Congress, a Republican at that time, and she was there with some other activists because she was distressed that there were not enough public swimming facilities in the District of Columbia for the children and the young people here in the District at that time.

We've had patterns of deprivation of that sort here and other places for a long, long time. She felt so strongly about it that she came to lobby on that effort.

I happened to be assigned, Congresswoman Collins, at that time to the D.C. Appropriations Subcommittee, which was not exactly seen as one of the choice assignments in the House, but it was an interesting place. As a matter of fact, it gave me the chance to get involved in that issue and we were able to do something about it, and a lot of progress was made.

That family commitment was not just on your father's side. I can assure you, from first-hand testimony, it was your mother as well.

Representative KENNEDY. Thank you.

The CHAIRMAN. I want to say something else because we're in a period of time when there's a lot of hostile sharpshooting toward people in public office and, unfortunately, as part of the media becomes an entertainment business as much as the news business, it seems like that mushrooms.

I was struck, as you were speaking, by just the family history here. Your Uncle Joe, losing his life in uniform to this country, your Uncle Jack Kennedy to an assassin's bullet, and your father to an assassin's bullet. The fact that you've picked up the flag and carried it ahead on behalf of your family commitment to public service in such a distinguished way, that your Uncle Ted Kennedy is leading the effort here in the Senate, as he has for years and years and years on health care reform—a tremendous example of a commitment of life and heart and soul to the pressing issues of our country and to other citizens within our country.

I think if we need to maybe think a bit and restore ourselves about examples of things that are right and good and decent about our system and the people who commit themselves to public service, we don't really have to look any further than your family or your appearance here today on this issue.

It's just something I wanted to say and I appreciate it. I appreciate that effort by everyone who—I met your brother Michael the

other day, who I know is involved also as a campaign manager this year, apparently, up in Massachusetts.

Representative KENNEDY. Hopefully, he won't be having to work too hard.

The CHAIRMAN. I don't know. He looked to be working pretty hard the day I saw him.

In any event, it's a very special part of the example, I think, that is being set in the country and we don't talk enough about it. We ought to talk more about it.

Representative KENNEDY. It's a little embarrassing to talk about it in that respect. All I can say is thank you very, very much for those remarks.

I think that the only thing that Teddy might have disagreed with was when you initially introduced me as "Senator" Kennedy. He probably would have taken great offense to that.

The CHAIRMAN. Well, maybe some day. I may have been a little ahead of myself on that one.

[Laughter.]

Senator Feingold, I've asked you to sit up here with the Committee today, rather than to sit as a witness, although you're now going to speak as a witness on behalf of your bill. We're delighted to have you here. With the support and permission of Senator D'Amato, I'm going to call on you now and then we'll go to the statements of other Members at that point.

### OPENING STATEMENT OF SENATOR RUSSELL D. FEINGOLD

Senator FEINGOLD. Thank you very much, Mr. Chairman. I thank the Ranking Member. I thank you for the courtesy of allowing me to sit up here, for the chance to testify, and especially for holding this hearing on the problem of discrimination in the determination of who has access to affordable, high-quality homeowners' insurance in America.

I'd also like to thank you, as Representative Kennedy did, for your past leadership and continued efforts through community banking and reinvestment legislation to expand financial services to individuals and communities that have been bypassed in the past by the private market.

As Representative Kennedy said, on these and other issues, your leadership will be sorely missed. I'm only sorry that I only had the chance to work with you, here in the Senate, for 2 years, but I was well aware, as Chairman of Wisconsin's State Senate Banking Committee for 10 years, of your fine work.

I also want to thank both Representative Collins and Representative Kennedy for, of course, taking the lead on this issue. I am only following in the hard work that they have already done in the House, hoping to bring the Senate in line in helping with this tremendous effort.

Representative Kennedy, it was your willingness to help us focus on the situation in Milwaukee earlier this year that specifically got me involved. We were, of course, very troubled by the reports of Milwaukee being number one, number two, or number three in a variety of studies showing discrimination in this area.

It's painful, but the only way to respond is to act. It is because of your leadership that I got involved, and I thank you for that and

10

thank you for your kind words about the bill, the specifics of which, of course, you were the inspiration.

I thank you.

During this hearing, the Senate Banking Committee will gather testimony from a diverse group of individuals and organizations that will, of course, describe the extent of the lack of access to affordable, quality, homeowners' insurance. This will not come as a surprise to most people in this room. That's because we've already had three decades of research, studies, and reports which have reaffirmed the extent of the problem of insurance redlining.

It's time that we heed these studies and the three decades of research and take concrete steps toward addressing the shameful practice of insurance redlining, which strikes at the core of the ability of many Americans to participate fully in our society by being able to enjoy one very important part of the American dream, that of home ownership.

That's why, upon learning of the efforts of Representative Kennedy, Representative Collins, and others, I decided to introduce S. 1917, the Anti-Redlining and Insurance Disclosure Act of 1994.

This bill would require insurance companies to disclose information regarding where they write property insurance patterned after the reporting requirements that are already required of banks and thrifts under the Home Mortgage Disclosure Act.

Just very briefly, Mr. Chairman, there are three major components of this bill that make it, I think, meaningful.

First, it is important that any data collection and reporting requirements on insurance costs and policies be done at the most detailed level that is reasonably feasible. Therefore, I think, in this matter, it is preferable to require reporting by census tract rather than zip code, since that allows for more detailed detection and analysis.

The census tract reporting standard is that which we require of the banking industry under the Home Mortgage Disclosure Act, and I think it should be applied to the insurance industry as well.

Second, Mr. Chairman, the collection of data on insurance losses and claims should also be included in any insurance disclosure initiative. That data would be essential for any proper analysis necessary to resolve disputes that arise involving claims that there are disparities in the price of insurance between different neighborhoods or groups of people that are solely based on loss experience and the associated risk involved, rather than suggesting, as we must in some situations, that it has to do with prejudice.

Third, and finally, Mr. Chairman, since the collection and disclosure of such data will provide affected individuals and Federal and State regulators valuable information necessary to enforce our Nation's anti-discrimination laws, it is important that it be made available to the greatest number of communities and individuals as possible.

This bill, S. 1917, would require that data be collected in 150 metropolitan statistical areas.

Mr. Chairman, we have to place all people of all races and ethnic backgrounds on a level playing field when it comes to the opportunity to purchase insurance. It's difficult enough these days to be

11

able to afford to buy a home and keep up the payments. It's almost impossible to purchase one without homeowners' insurance.

Expanding home ownership is critical to any effort at urban revitalization and we have to remove all barriers, such as insurance redlining, in order to fulfill any such goals.

So, again, I thank you very much, Mr. Chairman, Representative Kennedy, for this opportunity.

The CHAIRMAN. Thank you, Senator Feingold, and I appreciate your leadership. We'll work with you on this.

Let me now call on Senator D'Amato for his opening statement.

## OPENING STATEMENT OF SENATOR ALFONSE M. D'AMATO

Senator D'AMATO. Mr. Chairman, I'd like to join you in welcoming our distinguished panel of witnesses which includes Representative Collins and Representative Kennedy. I'd also like to welcome our colleague, Senator Feingold.

Mr. Chairman, you should be commended, because this Committee has spent quite a bit of time and has done quite meaningful work under your leadership to ensure that the plight of economically deprived individuals and communities is not exacerbated as a result of the denial of financial services.

Under your leadership, we were able to pass a bill designed to eliminate the abusive mortgage-lending practices of unscrupulous loan sharks, whose high-interest mortgage scams are diverting resources directed at the elderly and low-income homeowners.

With respect to the insurance industry and homeowners' insurance, the guiding principles must be sound and objective underwriting practices, not the color of a person's skin. The fact is that there should be one standard applied for all.

I look forward to working with you, Mr. Chairman, and with Senator Feingold in producing legislation that will give us the opportunity to monitor carefully, without bringing about undue regulations that will be burdensome and thereby self-defeating, a system that will bring about accountability so that we can be assured that there is that one standard criteria applied on eligibility and on the ability to pay, within a sound rating system, and other considerations that would give pause to concern.

This is something that cannot be tolerated. Home ownership becomes a myth if discrimination precludes affordable insurance, because the two are inextricably linked. You cannot buy a home unless you have this insurance.

The CHAIRMAN. Right.

Senator D'AMATO. If you have to purchase a home and have insurance that costs you twice as much simply because of your origin or the color of your skin, that is absolutely unacceptable.

I hope that we can work on this issue together. I know we can. We've done it heretofore on other legislative initiatives—we've worked together in a bipartisan fashion to put together legislation, and I believe that can be done again.

The CHAIRMAN. Thank you very much, Senator D'Amato. I appreciate that.

You've been a terrific colleague on these legislative issues as we've been able to work together on them. I appreciate your statement today and I'm confident that working together, as we've done

12

in every other case, we can find a package that will work. We'll do it on a bipartisan basis and incorporate Senator Feingold's thinking as well, and that will be a very important piece of work.

Senator Kerry, we'd like your statement next.

### OPENING STATEMENT OF SENATOR JOHN F. KERRY

Senator KERRY. Thank you, Mr. Chairman. Joe's left. I would have, obviously, joined you in your appropriate commendation of his efforts over the years, and his family's efforts, which I join in.

This is an important hearing and I think our colleague, Senator Russ Feingold, is to be commended for pursuing this effort.

It's really astonishing, when you think about it, that this fight is going on. I was just reading Deval Patrick's testimony. I have to go down to the Committee in which he is currently testifying on the issue, ironically, of the international convention for the elimination of all forms of discrimination which we have in front of the Foreign Relations Committee today.

I was just thinking about that. That was put before us by President Carter. It was signed in 1965. The Bush and Reagan Administrations didn't believe in it, so it never came back to Congress. Now, we finally have it back with a few reservations. That's what we're really talking about here today. It's an attitude that has persisted about enforcement and about what we really care about.

I was just reading the regulation that applies to the Fair Housing Act, which simply says that no one can refuse to provide property or hazard insurance for dwellings or provide such insurance differently because of race, color, religion, sex, handicap, familial status, or national origin. It's their finding that that constitutes a violation of the Act.

Now that's pretty straightforward stuff. I know games played by some people about the application, but if you read the history of the struggle between the various circuits and companies contesting this notion, it is at the core of a problem that is searing at this Nation's conscience.

If you go back to 1832 and read DeToquevile, he observed, then, that the great unresolved issue in America was race. In 1994, the great unresolved and, to many people's thinking, worsening issue remains race.

When companies not only adopt the bad public policy, but the bad business policy of not doing business in whole sectors of our country, they are writing out the whole American dream. They're just rubbing it off. I think it's disgusting. I think it is contrary to the best notions of business practice.

In my hat, as Chairman of the Subcommittee on Urban and Minority-owned Business Development of the Small Business Committee, I would say that there's a huge opportunity there for good businesses. But the underwriting is critical, obviously, and that's what you're looking at today.

I want to join with you, Senator D'Amato, Senator Feingold, and others in saying, this Committee should resolve the question of this struggle between the jurisdictions of our courts and resolve it clearly that the Fair Housing Act applies, and set up a fair regimen.

If you look at other countries on this planet, they are creating banks, whole banks whose lending practices only among the poor

have a better rate of return than the Texas banks did to a lot of rich people in this country.

I hope we're going to seize this front and center and do the job that Senator Feingold, Congressman Kennedy, and Congresswoman Collins are asking us to do, and I'm glad you're pushing for this and I want to join you.

The CHAIRMAN. Thank you very much, Senator Kerry.

Let me now invite Roberta Achtenberg up to the witness table, and also, Deval Patrick, who has another appearance this morning on the Senate side. We're delighted to have you both here.

Senator KERRY. You're already here. I thought you were downstairs. I'll be back and forth.

The CHAIRMAN. Assistant Attorney General Patrick, I know you went through your confirmation process recently. Have you had occasions to make other formal presentations to the Senate?

Mr. PATRICK. This is one of my firsts, Mr. Chairman. I had an appearance about a half-hour ago in the Senate Foreign Relations Committee and I had to go defend someone else's budget before the Appropriations Committee about 2 weeks ago.

The CHAIRMAN. I see. So you've had a couple of warm-ups for the main event here today.

Mr. PATRICK. A couple of warm-ups, that's right.

The CHAIRMAN. All right. Very good. Why don't we hear from you now and then we'll go to Ms. Achtenberg.

Senator KERRY. He's already prepared to show you his scars.

[Laughter.]

Mr. PATRICK. I hope I don't gain any new ones today.

[Laughter.]

## OPENING STATEMENT OF DEVAL L. PATRICK, ASSISTANT ATTORNEY GENERAL FOR CIVIL RIGHTS, U.S. DEPARTMENT OF JUSTICE

Mr. PATRICK. Mr. Chairman, Senator D'Amato, and other Members of the Committee, I very much appreciate the opportunity to appear before you today to talk about this very important problem of discrimination on the basis of race in the provision of homeowners' insurance.

We prepared a formal statement which has been presented, I believe, and I'd ask that that be made a part of the record.

The CHAIRMAN. Without objection, it is so ordered.

Mr. PATRICK. I will just summarize now, briefly, and then give you some opportunities for questions, if you have any.

This problem, through the efforts of this Committee and others, is gaining increasing attention, as you know. I look forward to using the full extent of my authority as Assistant Attorney General for the Civil Rights Division at the Department of Justice to eliminate this form of discrimination as all others.

One lesson we've learned, from more than 25 years of fair housing enforcement, is that the actions of many players, can have an impact on the ability to obtain and enjoy housing.

The Civil Rights Division has often challenged direct providers of housing by taking action against unlawful discrimination in the sale and rental markets. Recently, we've addressed unlawful discrimination in the mortgage lending industry and have faced up to

the devastating impact that such discrimination can have on individuals and communities.

Discrimination in the homeowners' insurance industry has an equally devastating impact and that's important to see. As the United States Court of Appeals for the 7th Circuit succinctly noted: No insurance, no loan, no loan, no house. I believe that's the point you were making, Senator D'Amato, and it is as simple as that.

In spite of this obvious practical, real-life link, our efforts to address discrimination in homeowners' insurance have been slowed by claims that such discrimination is not sufficiently related to housing to evoke coverage under the Fair Housing Act.

The Department of Justice and HUD have consistently, through both Democratic and Republican Administrations, argued that discrimination by insurers of housing violates the Fair Housing Act. Although we argued successfully in court in 1978 that insurance redlining is prohibited by the Fair Housing Act, the Court of Appeals for the 4th Circuit reached a contrary holding in 1984, which gave comfort to those resisting enforcement.

This decision, however, did not weaken the resolve of the enforcement agencies. On January 23, 1989, HUD published regulations implementing the Fair Housing Act, stating that, and I'm quoting:

Refusing to provide property or hazard insurance for dwellings or providing such insurance differently because of race, color, religion, sex, handicap, familial status, or national origin, constitutes a violation of the Act.

The road to substantive enforcement, however, has not been smooth. It rarely is in the area of civil rights. The Civil Rights Division received allegations in 1988 that American Family Insurance, a Wisconsin insurer, had directed its agents not to sell property insurance in areas where African-Americans constituted the majority of the population.

An investigation was initiated, but the company declined to cooperate, arguing that insurance discrimination did not fall within the Fair Housing Act.

Our investigation was delayed for 4 years by litigation of this issue, which was eventually resolved in our favor by the Court of Appeals for the 7th Circuit, as I referred to a moment ago.

Nationwide Insurance Company also claimed the Fair Housing Act did not reach racial discrimination in homeowners' insurance when it refused to comply with a HUD request for information necessary to investigate a complaint of discrimination in the provision of homeowners' insurance.

The company sued the Secretary of HUD over the issue and in February of this year, after more than 2 years of litigation, an order was entered upholding our position that the Fair Housing Act prohibits racial discrimination in the provision of homeowners' insurance.

We have recently been successful elsewhere in litigating this issue. In practical terms, this is really no longer an issue.

We are pleased that progress has been made in clarifying the meaning of the Act. The HUD regulations are particularly significant, and I'll defer to my colleague on that in a moment, since they are entitled to substantial deference by the courts.

15

The 7th Circuit concluded that the regulations were valid and controlling and we believe that sound reasoning should and will be followed by other courts that are presented with this issue.

Our initial lesson from investigating claims of insurance discrimination is that such investigations can be exceedingly complex. The investigations are sometimes compared to lending discrimination investigations, but several differences make insurance discrimination investigations even more subtle.

The Home Mortgage Disclosure Act, HMDA, as it's sometimes referred to, provides us useful information about the lending practices of depository financial institutions. We know the number of minorities who apply for mortgage financing, the number accepted, and the number rejected, and this information is very helpful in surfacing suspicious behavior and practices.

We do not have comparable information, yet, about the performance of property insurance companies. Also, while a depository institution may receive several thousand loan applications in a given year, a property insurance company may write or renew several hundred thousand policies in the same time period. Unlike lenders, property insurance companies, to the best of our knowledge, do not maintain records regarding the rejected applications, nor do they record the race of applicants or policyholders.

For these reasons, it is more difficult to assess claims that a particular company is discriminating. Discrimination can occur without an application or a record if an agent, on account of race, declines to return a phone call, fails to keep an appointment, or simply tells a prospective customer that the company will not insure the property because of its condition or location. Given the state of available records, this type of discrimination might best be detected by traditional fair housing testing.

Possible discrimination at the underwriting stage must also be addressed. Our own investigations have revealed that policy-holders in minority neighborhoods might receive insurance only after being subjected to unorthodox inspections or being required to make repairs that are not required in other neighborhoods of other property owners.

We have found that dwellings in minority neighborhoods often receive inferior insurance coverage that only allows for the repair, rather than the replacement, of a dwelling in the event of a property claim or total loss, or imposes a low dollar limit that prevents its replacement.

We've also found that some companies charge a higher premium per dollar of insurance coverage for the inferior repair cost policies than they do for the more desirable replacement cost policy. Senator Kerry's point—bad business as well as race discrimination.

Finally, insurance companies can inflict substantial damage on neighborhoods by refusing, because of the racial or national origin identity of the neighborhood, to market their products. It's often revealing to examine the number of insurance offices located in minority neighborhoods, as compared to the number located in identifiably white areas.

The marketing of insurance products relies heavily on a community approach with agents located in close proximity to the areas they intend to serve. If a company desires to redline an area as off-

limits for company business, it can do so without drawing a red or, in some cases, a yellow line on a map. It can simply decline to open offices in the area or otherwise to market in that area.

The effect is as predictable as that caused by lending discrimination and by lending redlining. That is, that minority neighborhoods are abandoned by mainstream economies without the tools available to the middle class to maintain themselves.

Improved information would promote compliance with and enforcement of the Fair Housing Act. It would be helpful to have information comparable to that which we have about banks.

HMDA, which requires reporting at the census tract level, as you know, has proven very useful, indeed, to us. We rely heavily on that information which allows us to identify the racial or ethnic identity of a select area. Because of the wealth of other information available by census tract, reporting at this level also permits us to control for other legitimate, nonracial factors, so that we can fairly evaluate whether race or risk is at the heart of a company's decision.

We also would find it useful to have information on the types of policies issued by race and national origin in each census tract. This information would allow us to evaluate, more readily, whether minority neighborhoods are offered inferior insurance protection. Information on claims paid and loss data would also be useful, particularly because this will allow us to test one of the excuses insurance companies sometimes offer for choosing not to insure minority homeowners in minority neighborhoods.

Improved reporting would not only aid our law enforcement efforts, equally importantly, it should also lead to improved performance and voluntary compliance within the industry.

We have spent considerable time working with representatives of the lending industry to obtain voluntary compliance with civil rights laws and we have encouraged self-assessment and voluntary corrective action.

This effort has been very, very successful, and many lenders are now using HMDA data for their own benefit. Self-assessments are being performed, business practices are being changed, and many lenders seem to be doing a better job of serving minority neighborhoods. That doesn't mean our work is done, but it means that we are working in concert with the industry to address this problem.

To the best of our knowledge, most insurance companies do not maintain information in a form today that readily lends itself to an evaluation of their performance in minority neighborhoods.

We intend to devote considerable resources to uncovering and remedying unlawful discrimination by property insurance companies. I urge insurance companies to recognize the importance of this issue to individuals, to neighborhoods, and to the Nation, and I urge them to evaluate their own performance in compliance with the law and to take voluntary corrective action.

Companies should be on notice that if they fail to address the issue voluntarily, the Department of Justice will use its enforcement powers to compel a remedy. I therefore urge this Committee, Mr. Chairman, to give us the tools to do this efficiently and fairly.

Thank you very much.

The CHAIRMAN. Thank you very much. Very helpful testimony.

Ms. Achtenberg, we're delighted to have you back before the Committee and we appreciate all the important work you're doing at HUD. We'd like to hear from you now.

**OPENING STATEMENT OF ROBERTA ACHTENBERG, ASSISTANT SECRETARY FOR FAIR HOUSING AND EQUAL OPPORTUNITY, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

Ms. ACHTENBERG. Thank you, Mr. Chairman, Senator D'Amato. I'd be pleased to summarize the statement that I submitted for the record, with your permission.

I'd like to thank you and the Committee for the opportunity to discuss with all of you one of our Nation's most pressing civil rights and urban development issues.

As the Nation's chief fair housing law enforcement agency, HUD will vigorously enforce the Fair Housing Act as it applies to discriminatory insurance policies and practices, just as we do in the areas of real estate sales, mortgage lending, and other practices related to housing. But HUD's interest in this issue extends beyond its responsibility to fully enforce the Fair Housing Act.

Property insurance is essential for the revitalization of this Nation's cities. Insurance is required to purchase or improve a home or to start or expand a business. As the President's National Advisory Panel on Insurance in Riot-Affected Areas concluded some 25 years ago, "Communities without insurance are communities without hope."

As was succinctly stated by my colleague, the Attorney General, the Fair Housing Act prohibits insurance redlining and other policies and practices that deny insurance or make it unavailable on the basis of race or any other protected status under the Act. The Fair Housing Act also prohibits discrimination in the terms, conditions, costs, or other aspects of insurance coverage.

HUD and the Department of Justice have taken this position since the issue first arose in 1978. In regulations implementing the Fair Housing Amendments Act of 1988, as was referred to by the Attorney General, HUD expressly prohibited refusing to provide property or hazard insurance or providing such insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

In his recent Executive Order No. 12892 entitled, Leadership and Coordination of Fair Housing and Federal Programs, Affirmatively Furthering Fair Housing, President Clinton made explicit reference to HUD's jurisdiction when he called for the agency to promulgate regulations describing the conduct prohibited by property insurers under the Fair Housing Act.

The statement of Attorney General Patrick described in more detail the considerations the courts have given to this question. In short, those courts considering the issue have concluded that insurance is covered by the Act. While the 4th Circuit held to the contrary in the Mackey case, so referred to, in 1992, the 7th Circuit in American Family, as quoted earlier, after HUD's promulgation of regulations asserting the coverage of insurance under the Act in 1988, found that the reasoning of the Mackey case no longer was persuasive.

18

The court stated that events had bypassed Mackey noting that HUD regulations were controlling on this issue because they were based on HUD's authority to act and they were according due deference to the regulatory exercise by the executive agency.

The key sections of the Fair Housing Act are section 3604(a), which makes it unlawful to "otherwise make unavailable or deny a dwelling," and section 3604(b), prohibiting discrimination, "in the provision of services or facilities in connection therewith."

Because property insurance is required to secure a mortgage loan, which generally is required to purchase a home, denying insurance makes the home unavailable.

I will not reiterate the quote referred to by the Attorney General, from the American Family case. That makes it quite clear that if you are providing insurance on a discriminatory basis, then home ownership will be so affected.

HUD's authority in the area of discriminatory insurance policy and practices is identical to its authority in other areas covered by the Fair Housing Act. In addition to the investigation of complaints, the Secretary of HUD can begin investigations and file complaints on his own initiative. Also, the Fair Housing Act requires the Department of Housing and Urban Development to seek voluntary compliance, on the part of the industry, so that we can move to prevent discrimination by encouraging the industry to adopt policies and practices that bring about fairness in the provision of insurance. We intend to do so.

We are authorized to fund private groups—we, meaning HUD—to fund private group activity to educate the public and to assist private enforcement efforts, and we intend to do so.

HUD is the only Federal agency charged with the responsibility to promulgate regulations that would further define the substance of Acts, that the Secretary will consider, that constitute reasonable cause to believe that discrimination has occurred. And we intend to do so.

The business of insurance, Mr. Chairman, is the business of distinguishing among risks and grouping them in terms of the potential for compensable losses that they pose during the life of a policy. There is little doubt that the vast majority of insurers are attempting to make conscientious efforts to carefully consider the perils that potential insurance risks pose when they market their products.

However, we must recognize the possibility that unlawful discrimination can occur in the insurance industry. In some instances, evidence of racial discrimination in the insurance industry can be overt, as was referred to by Congresswoman Cardiss Collins and which references were reiterated by other members of the panel.

More common, however, are various subtle forms of disparate treatment. Paired testing has been used to uncover instances where a caller from a predominantly minority area has been given very different information than a caller from a white community with identical financial and other socioeconomic characteristics, except for the racial composition of the areas of the callers involved.

The minority area resident often must call several times before reaching an agent. The minority resident may be told that an inspection will be necessary prior to offering a policy. The minority

19

resident may be offered a policy at a higher price for less coverage. The minority resident may be referred to a F.A.I.R. plan. The minority resident may never receive a quote in the mail, though a quote was promised. The minority resident may just not be offered any service whatsoever.

The caller from the white neighborhood, on the other hand, may be offered a policy on the phone during the first call, may be offered a choice of policies and premiums, and may be eagerly and politely solicited as a client.

Or may not be. That is what we are here today to discuss, and it is to those issues that the legislation introduced in the House by Congresswoman Collins, the legislation introduced in the House by Congressman Kennedy, and the legislation introduced in the Senate by Senator Feingold, would begin to address.

To illustrate the outcome of such potentially discriminatory practices, the Missouri insurance commissioner recently found that residents of low-income minority areas of St. Louis paid 50 percent more for similar coverage than did residents of low-income white areas, even though the loss experience had been higher in the white communities, a fact that was referred to by the Chairman.

Some industry underwriting practices that may be applied uniformly and otherwise appear race-neutral, may have a disparate impact on minority communities. This may occur when insurers, for example, will not provide coverage or will refuse to provide full replacement coverage on lower-valued or older homes. Some insurers may refuse to insure homes valued at less than $50,000, or homes that were built before 1950.

In the United States today, 47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000. Similarly, 40 percent of black households compared to 29 percent of white households live in homes built before 1950.

The racial effect is clear—although these types of statistics do not, in themselves, prove a violation of the Fair Housing Act. Where there is a business necessity for such a practice and no less discriminatory alternative is available, no violation would exist. But when practices with such racial impacts are not legally or otherwise justified, a case-by-case, Fair Housing Act analysis is warranted.

There is evidence that these types of practices are pervasive in some markets. The Texas Office of Public Insurance Counsel, for example, conducted a review of the underwriting guidelines widely used by Texas insurance companies. It found that approximately 90 percent of the market in that State is covered by insurers with restrictive age and value criteria in their underwriting guidelines.

Secretary Cisneros is acting aggressively to combat insurance discrimination. We have recently created a separate insurance unit to address these issues at HUD. Its first task will be the development of regulations clarifying HUD's current prohibition against insurance discrimination.

It has been 25 years since passage of the Fair Housing Act and HUD has yet to promulgate substantive regulations defining, in depth, insurance practices that violate the Act and what HUD will do to identify and redress those violations. It is high time that HUD took the responsibility for doing so, and we intend to.

Several complex issues must be addressed in promulgating such a regulation. I intend to do so in close collaboration with the insurance companies, their trade associations, State regulators, civil rights groups, and community organizations of all kinds. I have already begun informal discussions with representatives of these interests to learn more about their views and about issues that they would like HUD to address through its rule-making power.

We will be conducting public hearings, around the country, where we will invite industry representatives, insurance regulators, advocacy groups, and private citizens, alike, to testify on the proposed rule's content.

Based on the comments we receive, the evidence presented at public hearings, the literature, and the written guidance we receive from additional communications with the industry and others, HUD will publish a proposed rule and, after careful consideration of the comments received, a final rule.

We are considering what must be addressed in the regulation for it to be effective as guidance to HUD investigators, State and local civil rights agencies, and private fair housing groups, in order for it to serve as a guidepost for preventive acts by the industry and in order for the regulation to be a clear description of the rights afforded protected classes under the Fair Housing Act.

To do so, the regulation will address specific practices that are prohibited under the Fair Housing Act, describe the standards to be utilized in determining whether violations of the Act occur, discuss investigative techniques that will be utilized, discuss remedies that will be sought where violations are found, and discuss the nature and extent of voluntary affirmative efforts that are appropriate for the industry to undertake in order to eliminate discrimination.

As in other areas of fair housing law enforcement, standards to determine discrimination will be based on the principles of overt discrimination, disparate treatment, and disparate impact. The investigative techniques we will utilize will include those that have grown from our fair housing investigative experience across the board, but they will most definitely include statistical analysis of disclosure data (should such disclosure data become available), paired testing, and content analysis of underwriting manuals and other documents pertaining to evaluation of risk and marketing practices—all of the kinds of tactics that we currently utilize, as does the Justice Department, in lending discrimination investigations today.

A description of appropriate remedies will also be included in the rule which will help guide self-evaluation and corrective actions by the industry, even when we, HUD, are not otherwise involved in the complaint investigation.

Remedies to be considered will be similar to the kinds of relief that have already been obtained by the Department of Justice in their lending discrimination settlements.

HUD's primary enforcement tool has been the investigation and conciliation of complaints. They include those brought to HUD by individuals who believe their rights have been violated, and complaints brought by fair housing organizations. Additionally, the

21

Secretary, as I stated before, has the authority to initiate an investigation to determine whether a complaint should be issued.

We are dismayed by the continuing efforts of some in the insurance industry to resist HUD's investigation of insurance discrimination cases. With the decision that was referred to by the Attorney General in the Nationwide case, we believe that this issue has been settled.

Whether cases are investigated by HUD itself, by the Department of Justice, or by State and local agencies with laws substantially equivalent to the Federal Fair Housing Act, HUD is committed to conducting full and fair investigations and we would call upon the insurance industry to cooperate with our investigatory processes rather than to resist them.

Assistant Attorney General Patrick and I intend to work together, closely, to assure an effective and coordinated approach to the investigations of claims of insurance discrimination.

As in the case of mortgage lending discrimination, the Secretary of HUD and the Attorney General will join forces to conduct joint investigations, where appropriate, combining our distinct powers and authorities to more effectively address discriminatory behavior.

Through our fair housing initiatives program, we have supported in the past, and will continue to support, private enforcement efforts in this area. We are expanding, significantly, our financial commitment to these activities, for the coming year, to a level that constitutes the largest single set-aside for any such activity in the history of our program.

Now, a word on the disclosure bills that are currently before the Committee.

As the Attorney General stated, a HMDA-like Federal disclosure rule for insurance would be an invaluable tool for both enforcement agencies, HUD, and Justice, in our enforcement efforts and for the efforts of private enforcement entities, as well as State and local enforcement entities.

The Administration is pleased that legislation to provide disclosure data for the insurance industry has been reported by two House Committees. The Administration looks forward, as well, to prompt House passage of legislation and urges favorable consideration of legislation by this Committee and the full Senate.

We fully support the principles of insurance disclosure, which include information such as race, gender, and income of all applicants and policyholders, number of policies issued on a neighborhood basis, and an annual report analyzing this information by the Federal Government.

Nationwide reporting, obviously, is preferable and reporting of data that can be easily analyzed and accurately analyzed is preferable.

Let me say that HMDA has been extraordinarily helpful to the enforcement agencies, as has been previously described. Similar information for property insurers would be equally valuable information for our law enforcement efforts. Particularly when analyzed in conjunction with United States Census Bureau data, through reporting, we could identify neighborhoods and population groups that appear to be underserved, given their income, value of property, and socioeconomic status, as well as their racial status.

22

While such information, alone, would not confirm or deny the existence of discrimination, it would go a long way in pointing us in the right direction.

Let me say, Mr. Chairman, Senator D'Amato, in closing, that, as has been previously stated, but is worthy of reiteration, race has no place in the insurance market and all of HUD are eager to work with all of you and our colleagues at the Justice Department to make sure that fair access to insurance is a reality in our urban communities and throughout the Nation.

Thank you very much.

The CHAIRMAN. Thank you, Ms. Achtenberg.

Senator D'Amato, why don't you go first and then I'll follow.

Senator D'AMATO. First of all, I want to compliment our colleague, Senator Feingold, for his work in this area.

Mr. Patrick, I want to compliment you. It seems to me that your approach, as it relates to encouraging the industry to come forth and to work together cooperatively in developing programs, standards, et cetera, is really the way to go.

Mr. PATRICK. Thank you, Senator.

Senator D'AMATO. We can really do serious damage if we're not careful in the way we bring about the most well-intended rules and regulations. By the same token, it's absolutely unacceptable to deny people the opportunity of insurance, to put unreasonable conditions, or to drive the cost up. This can very directly affect their ability to own a home.

Mr. PATRICK. Right.

Senator D'AMATO. That has absolutely got to be stopped. There can be no ifs, ands, or buts.

To the Assistant Secretary, I remind you that during a very controversial period of time in the confirmation hearings, I supported you. I voted for you.

I want to ask you something, as it relates to what I hear taking place at HUD, and I'd like a candid answer.

Is your office attempting, or have you attempted, to develop rules and regulations as it relates to real estate advertising, in publications such as newspapers? Have we reached the point of, what I call minutia, that we would actually begin to get into the language, descriptive language, describing the proximity of a house, such as within walking distance of transportation, railroad, and that there may be certain words that a realtor would be precluded from printing because someone says that certain words or phrases do not take into consideration those people who are ambulatory?

I raise this because a number of people have brought this to my attention and to a number of my colleagues' attention as well. I have been told that rules were being circulated, or being explored, in a proposal that would bar certain words and phrases from advertising.

Let me give you another example. I think your aware of my concern on this issue. I've asked my staff to contact HUD with respect to this. And if it's not the case, then I want to hear about it.

"Master bedroom." I have heard that describing something as a "master bedroom" may be considered inappropriate. If that's the case, and if we have people looking into this kind of thing, it is ridiculous. We're trivializing a very important area.

004261

23

Ms. ACHTENBERG. Senator.

Senator D'AMATO. Yes.

Ms. ACHTENBERG. I would agree with you that if HUD were acting in such a way, that would be ridiculous. I want to assure you that no document that has ever emanated from my office has ever made any kind of suggestion related to the example.

Senator D'AMATO. So that if a newspaper were to turn down an advertisement because they are afraid of being sued, as it relates to the Fair Housing Act, you would be in a position to advise them that they need not, that you would not take action as it relates to the advertisement of a master bedroom or a walk-in closet or a house or development being in close proximity to a church or a temple, et cetera.

Ms. ACHTENBERG. HUD has never taken any such position and we would not under my Administration.

Senator D'AMATO. I want you to know, I think you've gone a long way because this statement is important, so that it's on the record and so that this area of free speech, in terms of our commercial enterprises, is permitted to go forth.

About 2 weeks ago I was informed that this is something that some people have been confronted with. Apparently, some of the fair housing groups, in conjunction with local newspapers, have decided, or the papers decided, that they wouldn't take certain advertisements.

I think that this type of action trivializes the key elements that we're talking about today. This gives firepower to people who don't want to do anything.

I want to see that people have a right to buy a home, and I want to see that they have all those things that may seem to be intangible. How many people think about the fact that, unless you can get that insurance, you're denied that real opportunity.

I'm very glad, Ms. Achtenberg, that you've put that out for the record.

Ms. ACHTENBERG. Thank you, Senator.

Senator D'AMATO. I wanted to, before I left this hearing, be able to get that out.

Mr. Patrick, good seeing you.

Mr. PATRICK. Thank you, Senator.

Senator D'AMATO. Thank you, Mr. Chairman.

The CHAIRMAN. Thank you, Senator D'Amato.

Just two questions that I want to go to our next panel. Let me ask you both this. To what extent is the Federal Government allowed to attack insurance discrimination without violating the McCarran-Ferguson Act? And do you agree with recent court rulings like the NAACP versus the American Family Insurance Company that McCarran-Ferguson does not apply to subsequently enacted civil rights statutes such as the Fair Housing Act?

Mr. Patrick, why don't you start?

Mr. PATRICK. I'll take a stab at that first.

As you probably know, Mr. Chairman, no court has found the McCarran-Ferguson Act a bar or barrier to the enforcement of the Fair Housing Act, and that has been the position of the Department of Justice consistently.

We appreciate the issue that is presented, but, again, the weight of legal authority is against the view that McCarran-Ferguson is any bar or any obstacle to what we're trying to accomplish under the Fair Housing Act.

Ms. ACHTENBERG. Mr. Chairman, I would only point out that that has consistently been our position since 1978, through four Presidential Administrations, and will continue to be the position of the Clinton Administration.

The CHAIRMAN. So that presents no barrier problems in terms of your getting at these issues.

Ms. ACHTENBERG. Not from our point.

Mr. PATRICK. Not as we see it.

The CHAIRMAN. All right. Very good. Now, let me ask you both to summarize, if you would, what types of data could the Federal Government collect that would be most useful in identifying and combating this kind of insurance discrimination?

Mr. PATRICK. I went first the last time. Would you like to take this?

Ms. ACHTENBERG. Mr. Chairman, we would prefer nationwide reporting, which would be the most useful to us. I think the validity of that stands on its own. We would prefer reporting that will assure that we can identify when insurance is denied, as well as when it is offered, as was stated by my colleague.

It is important that the reporting be done in sufficiently small geographic entities so that we can accurately assess whether or not neighborhoods are being restricted for any reason, and so that we might determine the reasons for those restrictions.

While we can aggregate data up, we can't aggregate it down. So smaller is better in this particular regard.

We also need data on acceptance, denials, renewals, and nonrenewals. This information would be exceedingly important in helping us determine whether or not people are being granted insurance, and helping us assess whether they are being granted or denied on the basis of similar terms or conditions.

This is the kind of information we are provided through the HMDA data and I would expect that similar information would be as useful to us in this area as it has been in the lending area.

Mr. PATRICK. Mr. Chairman, I concur in all of that and add what I'm sure my colleague intended to add and would agree with, which is policy types, because we have seen through some of the studies that we've looked at that there are differences in quality of insurance offered that appear to be explained, or partly explained, by issues of race. I'd also say that we'd be looking for gender reporting information.

Ms. ACHTENBERG. Race.

Mr. PATRICK. Race and gender as well.

The CHAIRMAN. This discussion, in the end, will come down, I think, to two contesting points of view. On the one hand, there will be people who will argue whether this involves too much Government interference, too much Government bureaucracy, too much recordkeeping, too much costs associated with recordkeeping, and so forth.

Is there something inherently distasteful or wrong about the Government coming into private-sector activities with some kind of a regulatory oversight and regulatory regime?

We'll hear voices stating those views.

On the other hand, what we're really talking about is the American birthright, the fact that in America, when a person is born and is an American citizen, there are certain basic rights that accrue to that person that are as fundamental as air and water. That is the right to, all the guarantees under the Constitution, the Bill of Rights.

This is really an American birthright issue, as I see it. That is, does a citizen have the right, under the law, to the kind of equal treatment that other people in the society receive that is being denied to them by the economic or the business system?

To the extent part of their birthright is being taken away, or they're being cheated out of it, then that's when the Government, in effect, has to step in to make sure that the practices are fair so that somebody isn't, in effect, turned into a second-class citizen by virtue of an imperfection in the way the private sector is working.

This seems to me to be a classic case of that and it's not something that's new on the radar screen. We passed laws in the past, in the distant past, going back decades now, to try to get at this issue of housing discrimination and to stop the practice of people being cheated out of their birthright, either based on race, color of skin, gender, or orientation, that we've said violates the basic fabric of the law of this country. These are both God-given rights, as we recognize them within our constitutional democracy, and our laws, our whole pattern of laws, designed to make sure that everybody gets the same fair shake.

But what we find is this persistent pattern of people being cheated out of their birthright. We find it in mortgage discrimination, where somebody may go in. It may be a single mother. It may be an African-American person. It may be a Hispanic person. And, in a certain number of cases, they're treated differently, and in an inferior way, and oftentimes cheated out of the opportunity to get credit to buy a house that is given directly to the next person through the door, or in line, whose status is a little bit different.

The same thing is happening in the insurance area. In some respects, it's more subtle and it's a little harder, perhaps, to see quite as readily, although, if anybody makes any real effort to see it, it certainly can be seen and identified, to deny people their birthright based on business practices that cheat them, that cheat them out of the full American franchise of citizenship.

It's just outrageous. I mean, we send people to jail for relatively inconsequential things by comparison. When you think about the scale of the crime of cheating somebody out of their birthright, where should that be on the scale of things that we apply sanctions or punishment to?

That, to me, is a serious offense. That is a major offense, if you come in and basically cheat somebody out of part of their citizenship and put them in an inferior status and, in a sense, lock them there.

That, to me, is about as un-American as you can get. I read these FBI reports that come in, that are done on nominees, as the Chair-

Case: 1:13-cv-08564 Document #: 134-8 Filed: 08/11/17 Page 74 of 452 PageID #:57

man of the Committee. That's one of my responsibilities, to read these confidential FBI documents. I'm always struck by the things that the FBI goes out to find out about, whether somebody has any relatives living in a Communist country, whether there's some suggestive negative inference about that, or whether they might have used marijuana in college, things of that kind.

There's a great investigative effort made to determine these things and identify them in an FBI report, but I've never seen in an FBI report, yet, where it said, so and so was engaged in a business practice that cheated a large part of the rest of America out of its birthright.

I've never seen that, and I've never seen that because they don't look at that. In other words, they have a blind eye on that issue. We don't measure that because it is not seen as something that's an important yardstick as to whether somebody does or doesn't reach the level of qualifying for Federal service.

I think what we have to do is reorient our thinking here, because we're not going to have a society that holds itself together, where there are the bonds of common respect and community and affiliation, if some of the people in this society are cheated out of their birthright right from the beginning and then the system comes along with an inequitable pattern of practices that locks in that second-class citizenship and says, no, you're not going to get a mortgage or, no, you're not going to get mortgage insurance.

The system can't hold itself together that way. It's not right. It's a violation of everything we say we believe, but it's also unworkable as a practical matter. You can't ask people to give a full affiliation to the country at the same time part of their citizenship is being taken away from them. You can't do that. No nation is going to be able to hold itself together under that kind of an operating pattern of conduct.

We have to get rid of that. Fortunately, we have an Administration that is selecting people to serve who believe in correcting these problems, as both of you do, and, certainly, as President Clinton does, and is dedicated to the practice of getting it done.

I was so refreshed when the Comptroller of the Currency, Gene Ludwig, was first named and came in here for his confirmation hearing. I asked him about racial discrimination and discrimination in lending through the banking system.

He said it was abhorrent to him and that he was going to rip it out root and branch. That was his phraseology. He said it with feeling and conviction and I knew he meant it, and the practice, since, has shown that.

I don't know why it's taken us nearly 300 years to get to the point where we finally had a Comptroller of the Currency who would say that to a part of the business system so we can make sure that the American birthright and franchise is out there for everybody and not just for some.

This is a very important hearing because this gets right to the issue of whether or not we're going to have full and equal citizenship for people and whether other people can have homes.

We talk about the breakdown of the family unit. It's not easy to hold families together today with all the other pressures, problems,

27

crime, deprivation, lack of job opportunity, and a lot of other things.

If a family can get far enough ahead of the game to move out of an apartment, acquire a house, and work for the goal of maintaining a home and achieving home ownership and to raise a family within the greater security and well-being of a home that that family can struggle to acquire, that's a centerpiece in the whole American dream. It's the whole way we think about families developing and having the chance to achieve the things that families want.

If we somehow have a system that's working so imperfectly that we cheat a large part of the country out of the chance to get into home ownership, at the same time we're talking about family values, it just doesn't add up because, in effect, we're handicapping, hurting, and damaging the prospects of a large part of our country from achieving the very things we all know we want.

I think America is changing for the better. We're waking up to these things, we're dealing with these things, we're forcing changes, and we're writing these laws systematically, one by one, to get the information, to identify the practice, and to stop the practice, all with the mind of making sure that everybody gets their full American birthright.

I wish people got it automatically, as they should. We shouldn't have to write a lot of laws to make business do what it should do without any laws. But the reason we need the laws, the practices, and the data, is that too much of the business system is not willing to see to it that everybody gets their full American franchise of citizenship so the Government has to come in to make sure that we're getting fair treatment.

The easiest way to get this done with no bureaucracy and no recordkeeping is for every CEO in the country, that runs one of these institutions, to say, we're stopping those practices. We're going to offer things on an absolutely fair basis, and I don't want anybody turned away who comes in who's creditworthy and who has a legitimate need. I don't want them turned away based on race. I don't want them turned away based on gender. I don't want them turned away based on what block they live on, this block versus three blocks over in the other direction. I don't want them turned away based on their orientation or status.

I want people treated fairly and equitably. If every CEO in this country would say that, and send that directive down the line, and say that anybody that didn't practice that was going to get fired, and that people who did practice it were going to be rewarded and would be the people who would advance in the company, we wouldn't have to have this hearing. We wouldn't have to worry about this problem. We wouldn't have to worry about getting Government in the act to figure out how to make sure it happens, after 300 years, because the private system would be doing it as a matter of course, as a matter of decency and propriety, and because it's what America is supposed to be all about.

When I hear somebody say, well, we don't want Government in the act, when Government gets into the act for this purpose, to make sure that every citizen gets their full citizenship, that's when

28

the Government needs to be in the act. If the private sector will do the job, then Government can get out of the act.

That would be my preference. But until such time as we see an end to these practices, then Government has to be in the act because Government is for the people, it's of the people. It's the only real voice and power that the people have when some other force is taking away part of their citizenship.

It's the Government's job to see that everybody gets their full citizenship back, that it's intact, it's solid, and that it works.

So, if you happen to be an African-American, you can say to your children, we're on the same footing as everybody else in this country, and you're not going to have to try to run the race with a 50-pound load on your back that's put there in the form of discrimination because you happen to have a different skin color than the child that lives down the street or next door.

We're not going to have that. That's what has to end in this country. If we don't talk about it, if we don't focus it, and if we don't create a moral imperative about it, then we're not going to correct these problems.

I'd like to see more attention paid to it. I'd like to see a little more investigative journalism, to go out, find these problems, and put them on the air. Let the public see it, because the public will not tolerate this. People are inherently fair and they don't want this denial of citizenship going on for a large part of our society.

I just know enough about the people of this country, representing them here for 28 years, to know that most people don't want that, and that isn't what they believe in. They believe in fairness, decency, and equity and that's how they want the system to work.

If we can get it to work without the regulations, so much the better. But when it doesn't work, then Government has a necessary and proper role to stand in there beside the citizen to see to it that they get their full citizenship.

That's what we're here about today. That's why this is important. This is not a garden-variety hearing. This is about America, about who we are, what our future is going to be, and that's why we've got to get this done one way or the other.

Thank you very much for appearing here today.

Mr. PATRICK. Thank you, Mr. Chairman.

The CHAIRMAN. Let me excuse this panel and call the next panel to the table.

Let me introduce our next panel as they're coming forward and being seated.

We have Mr. William Tisdale, who is the president of the National Fair Housing Alliance, which is an organization representing 60 private, nonprofit fair housing agencies located in 35 different States across the country.

Mr. Robert Hunter is the commissioner of the Texas Department of Insurance, and, previously, also held the position of Federal Insurance Administrator.

Ms. Lynn Schubert is assistant general counsel with the American Insurance Association, a national organization representing more than 270 insurance companies. She is testifying on behalf of the Independent Insurance Agents of America and the Council of Insurance Agents and Brokers.

29

Mr. Charles Kamasaki is here today representing the National Council of La Raza. This organization represents 170 community-based organizations which together serve 37 States and reach more than 2 million Hispanic Americans annually.

We're delighted to have you all. Mr. Tisdale, we'll start with you and we'll make your full statement a part of the record. I would appreciate, if you can, if you'd summarize as much as possible and then we'll go to questions.

## OPENING STATEMENT OF WILLIAM R. TISDALE, PRESIDENT, NATIONAL FAIR HOUSING ALLIANCE; ACCOMPANIED BY: SHANNA L. SMITH AND CATHY CLOUD

Mr. TISDALE. Thank you, Chairman Riegle. With me today are Shanna Smith, who is the executive director of the National Fair Housing Alliance, and Cathy Cloud, who is the program director who coordinated NFHA's homeowners' insurance testing project. They will be assisting me in presenting some of the testimony and with the questions.

I'm William Tisdale, president of the National Fair Housing Alliance, NFHA, located in Washington, DC. I'm also the executive director of the Metropolitan Milwaukee Fair Housing Council.

We applaud you, Senator Riegle, for convening this hearing to deal with the discriminatory practices and policies of the homeowners' insurance industry.

NFHA has been investigating these problems since 1991, and will take this opportunity to reveal publicly, for the first time, some of the evidence that we've accrued based on the conduct, discriminatory conduct, of two of the largest insurance companies in this country—Nationwide and Allstate. These companies have engaged, and continue to engage, in practices and policies that intentionally deny, limit, and make unavailable homeowners' insurance to people living in minority neighborhoods throughout the United States.

Therefore, today, we are filing formal complaints, these complaints, with the U.S. Department of Housing and Urban Development against both Nationwide and Allstate to force them to eliminate their discriminatory policies which have had such an adverse impact on minority and integrated neighborhoods throughout the United States.

The testing in this project was funded, for the most part, through the Fair Housing Initiatives program, a program created by Congress to improve fair housing enforcement efforts in this country. The HUD-funded portion of the project was completed in early 1993. NFHA used its own resources to undertake the analysis and to conduct additional testing in 1994, some as recently as just last week.

The insurance industry has been aware of the problem of discrimination for decades now. Major changes were announced over 15 years ago. But the studies of the insurance discrimination from that time through our own testing project, which was just completed, as I indicated, demonstrate that the problem is still pervasive and persistent. It has not gone away. We have found evidence of discrimination in the very companies that were the focus of anti-discrimination activities over 20 years ago.

Within the private fair housing enforcement movement, testing is always carefully constructed and controlled. This project was no different. These tests compared the treatment between white neighborhoods and African-American and Latino neighborhoods.

Nationwide and Allstate were selected specifically because of the egregious nature of the complaints from actual homeowners. We have been involved in the investigation of other companies as well.

One of the things we noted was that for all of the cities where we conducted testing, insurance agents tended to be located outside of minority neighborhoods. We have on display, here, maps of Milwaukee and Atlanta. In Atlanta, for example, these two companies have 180 offices, but only four are located in minority neighborhoods. All of those four border white neighborhoods. In Milwaukee, there are no Allstate offices located in minority neighborhoods and Nationwide operates in Milwaukee only through an 800 number.

The investigation, conducted by NFHA, identified the following types of discriminatory practices and policies used by agents working for Nationwide and Allstate.

First, was refusing to provide insurance because of the age of the home. For example, in Louisville, an Allstate agent said, and I quote:

I don't like to insure anything over 30 years old. It is too hard, after all the remodeling and things like that, to mess with. I'm trying to eliminate them from my portfolio.

Another practice is refusing to insure properties because of the market value of the home. A Nationwide agent in Milwaukee said:

We don't insure for less than $55,000. Well, we can't insure it. We can't do it.

A third practice is requiring homeowners to provide the name and telephone number of their mortgage lender, to gather information about the property before providing a quote, before a quote is provided.

Just last week, a Nationwide agent asked a Latino tester, who is your mortgage company? Do you have a number for them? The reason, ma'am, is because it's like the difference between an Escort and a Cadillac. The mortgage company can tell us what the house is like.

Other demands of minority applicants are requiring inspection of the home prior to providing information on the cost or type of insurance available, and requiring a credit check for applicants from minority neighborhoods.

In addition to these incredible practices just described, the most pervasive discrimination involved charging higher premiums for comparable policies, charging higher rates for inferior policies, and refusing to provide replacement cost coverage on the structure and contents of homes in minority neighborhoods.

We have brought some displays which illustrate some of the differences in treatment that I've just described.

Based upon a conservative analysis of neighborhood-based tests, NFHA can document the following for four cities in which testing was conducted. In Louisville, African-American testers experienced discrimination more than 47 percent of the time. In Atlanta and Milwaukee, African-American testers experienced discrimination more than 60 percent of the time. And, in Chicago, Latino testers experienced discrimination more than 95 percent of the time.

31

Insurance companies, in general, are engaging in practices and policies that have the intent and effect of denying, limiting, or restricting homeowners' insurance for people living in minority communities. What we have found is not unique to our investigation. The practices and policies identified in our testing are widespread throughout the industry. They have been identified over and over and over again in previous investigations.

Our recommendations to this Committee center around two issues. The first, is to increase funding for both education and enforcement efforts. The second, is to create legislation which increases our access to information about insurance practices.

Therefore, we request that you continue to increase the enforcement budgets of both HUD and the Department of Justice. Specifically, we want to encourage you to increase the allocations to the Fair Housing Initiatives program, the program that funded this work, and target a portion of community development block grants for local fair housing enforcement activities.

Congress should enact disclosure legislation which will provide, at a minimum, the following: Disclosure of underwriting guidelines. Disclosure of loss data. Disclosure of the type of policies and the cost of policies. Reporting of race, national origin, and gender of policyholders. Reporting for all metropolitan statistical areas. And, reporting the above information by census tract.

The insurance industry may argue that the cost of disclosure is prohibitively expensive. Senator, I submit to you that nothing is more expensive, nothing is more costly, than the disinvestment in our neighborhoods.

Senator Riegle, we would like to take just a moment, if we could, to explain some of our displays.

The CHAIRMAN. Please do.

Mr. TISDALE. Thank you. Shanna. Cathy.

Ms. SMITH. One of the constant criticisms is that houses that are used in the testing are run down, vacant, and vandalized.

Senator, these two houses were used in this test of Nationwide in Milwaukee, Wisconsin. This house was completely denied insurance coverage because they have a minimum insurance policy of $55,000.

This house was quoted at less than $55,000, but the Nationwide agent provided coverage for this particular house.

This house is in a white neighborhood. This house is in a neighborhood that is 80 percent African-American.

It says, "You're in good hands with Allstate," and we have a real question about that.

It says, who gets inferior coverage for double the premium?

In this instance, the testers were told—this tester was calling on this house in a predominantly white neighborhood and was provided guaranteed replacement cost coverage at an annual premium of only $155.

This home is in an African-American community. They were provided only a market-rate policy for $330.

But if you look, what people talk about, these are not vacant and vandalized homes. These are middle-income, moderate-income neighborhoods. Good housing.

The CHAIRMAN. And well-maintained.

Ms. SMITH. Yes.

The CHAIRMAN. If you look at this house, they planted flowers, the lawn is in good condition, and the house is in good condition. Obviously, it's a house that's well-tended and occupied by people who care about the house.

Ms. SMITH. That was critical to us in our testing, that we selected homes that people looking at them would say, why wouldn't you insure this property? Because, first, Senator, I would ask, could you guess which home, here, would be in the minority neighborhood?

The CHAIRMAN. I have an idea that it may be the reverse of what one would think. But you explain.

Ms. SMITH. That's correct.

[Laughter.]

In this situation, this white tester called an Allstate agent. Thirty minutes after leaving a message on the answering machine, the Allstate agent returned the phone call. Two days later, the agent provided the white tester with a quote that included guaranteed replacement cost coverage.

An African-American woman called over a 5-day period leaving three messages with the exact same Allstate agent with her name and phone number. She also had an answering machine. This agent never returned her call. These are lovely homes, and they can't, number one, get equal coverage. They can't even get their phone calls returned because they're located in minority neighborhoods.

The CHAIRMAN. Thank you. Those are very powerful illustrations. Does that complete your presentation, Mr. Tisdale?

Mr. TISDALE. Yes.

The CHAIRMAN. Thank you very much for all this work and this valuable analysis. This gets right at the issue and, of course, we don't have a way, in this country, of easily calculating what the economic cost is of redlining and destroying neighborhoods. In a sense, starving them to death. Not giving them the credit. Not giving them the normal access to economic opportunity that's available other places.

As communities get into a downward spiral that goes on over the years, and we end up with terrible problems, as we now have in many cities, part of that has been caused and fostered by these very discriminatory practices. So, in a sense, the cost of allowing those practices to continue is a very high cost. It's not just in the denial of a person's citizenship rights, in fundamental ways, but there's a huge societal cost. There's a huge economic cost that wrecks part of America, in effect, all in the name of good business practice.

It's a real subversion of the whole free enterprise system, if you will, because it ends up doing so much costly damage. And, now, we're trying to figure out how to fix the damage.

So we come along with programs to try to go back in and repair urban areas that are in much worse shape, partly because they've been starved to death from the normal flow of business transactional efforts in mortgages and insurance and so forth, that should have been going in over the years.

I think that's another thing that the public needs to understand. Where did today's problems come from? So that when we fix these defects in the system, over time, we ought to see these communities start to rebuild and flourish in ways that they've not been able to do.

Mr. Hunter, we're pleased to have you and we'll make your statement a part of the record. We'd like your comments now.

## OPENING STATEMENT OF J. ROBERT HUNTER, COMMISSIONER, TEXAS DEPARTMENT OF INSURANCE

Mr. HUNTER. Thank you, Mr. Chairman. I am Bob Hunter, the commissioner of insurance in Texas.

I've been in this room many times before because when I was Federal Insurance Administrator, this is where both my appropriations and my oversight occurred. Even so, on a few times, I enjoyed being in this room.

I was also here, several times, as president of the National Insurance Consumer Organization over the last 15 years. So, I do feel at home. On this issue, I've been here before, too.

In Texas, we have maps, similar to this agent map, if you'd like to see them, on State Farm in Houston and so on. It's not limited to these two maps. There are other maps like this.

The CHAIRMAN. I understand.

Mr. HUNTER. As Federal Insurance Administrator, I documented insurance redlining on several occasions. During the 1970's, we even put evidence before this Committee that showed that you were more likely in New York to get put into the F.A.I.R. plan, the high-cost plan, if you were black than if you had a building code violation.

We know that it was not risk-related based upon that data and the data that has been flowing for 25 years, all the way since President Johnson's commission that was mentioned earlier.

The data still flows. The studies that we've seen from California, the yellow lines replacing the red lines, the studies of ACORN, and others. And, now, they don't use lines at all. It's income-related, value of home that you've heard about, requiring supporting business, such as a homeowners' policy, before they'll sell you an auto policy, and so on.

So if you don't have money, you're not going to get it, and that has an obvious impact, not just in the cities, but in rural areas. Redlining is not limited to poor people in the cities. We just had a hearing in Big Spring, Texas, and we had witness after witness coming forth, agents saying, we can't find a company to write us.

The CHAIRMAN. I see. In rural areas.

Mr. HUNTER. Even in rural areas, where houses go below these magic numbers, like $60,000, or whatever the limits are. In rural areas, that's also true. I encourage you not to think of it as just a problem of the inner cities, although that's been a focus.

On March 31, 1994, I held a public hearing on redlining in Houston. Among other things, and I'll make the entire transcript available if you would like that for your Committee, but I've attached to my testimony the testimony of a gentleman from Habitat.

Now Habitat, in Houston, has 50 homes. This gentleman works with the residents in trying to get them their financial needs, in-

34

cluding insurance. They were only able to find one standard insurance company willing to write them—Farmers Insurance. No other company would quote.

In the 3 years he's been working with them, they've had one claim on the 50 homes. A tree fell, during a storm, and damaged the roof. That's it. That's good experience and you know, if you know something about Habitat, you know that they're careful in terms of what they do.

The CHAIRMAN. Right.

Mr. HUNTER. These are sweat-equity people, working hard to make their community viable, and they can't get insurance. I think that's very telling testimony. But it's not just testimony that we have. At the hearing, only two insurers spoke up. Trade organizations came forward, but individual insurers are reluctant to come forward in these things.

To their credit, Hartford Insurance Company came forward to testify that they had undertaken a self-analysis, something that you just called for, Mr. Chairman. It was painful. What they found is what the witness testified.

As a result, they're trying to change the way they're doing business. They're looking to get minority agents, place them in these redlined places, train them, help them, and support them, to try to make a difference.

That's the testimony of Hartford. I don't believe that many companies have done what Hartford has done. That is, the painful kind of step-by-step review, what are we doing, sitting around a table saying, gee, what we've been doing is wrong. That's hard.

The CHAIRMAN. We may ask them to come as an example of somebody who is trying to change and do something constructive and positive.

Mr. HUNTER. Right. I think you should.

Additionally, I think you have to be careful how you define redlining. Some try to define it, very narrowly, as, if you don't draw a line on a map, you haven't done anything wrong.

I think you should define it as being unfair discrimination in availability, price, benefits, service, or quality of insurance, to a class of people, based upon factors that are not risk-related and are outside the control of the customer. So that things like the age of the house—if there's no good evidence—you end up with redlining.

The CHAIRMAN. We put older houses on historic registries. An older house isn't necessarily—that's a fake issue.

Mr. HUNTER. Yes. So discrimination like race, gender, income, value of house, age of house, those things need to be part of the definition of redlining, in my view, for it to be a complete definition. And how do you attack redlining? I think data is the essential first step.

So, Senator Feingold and the people that came from the House this morning are doing the right thing, in my view.

After decades of study, the insurers still say we don't do it. Let's get the data on the table. Data, in small enough geographical units to see what's happening, by race, income, and other demographics, is essential to this long overdue determination.

We need to know. In homeowners, auto insurance, which is missing from Senator Feingold's bill, but which I think should be added,

35

and small business lines, at least, we need to know where companies are writing, where they place their agents, what premiums they charge, and what losses they incur, in my view, in order to get the answers to these questions.

For a year, Texas has studied the problem. For the first time, we have zip code data. We have looked at it and we see redlining documented in our data. For example, and some of the data is attached to my testimony, Mr. Chairman, we have shown that there is a direct correlation between lack of availability of auto insurance and the racial and income make-up of the zip code.

In zip codes where auto insurance availability is two times worse than the Statewide average, the minority population is two times higher. And, where coverage is half as hard to get as the Statewide average, the minority population is half the Statewide average.

We've seen a direct correlation. The data is attached to the testimony. We'd be happy to share the entire State zip code data with you, if you would like.

Texas, starting only 1 year ago, is already a front runner in data collection. The States need the momentum of congressional action to get moving nationally on this important work. For instance, I'm in the process of drafting a regulation to require a simple thing—that underwriting guides be risk-related and based upon substantial evidence.

That sounds pretty easy and pretty obvious, but I anticipate a huge fight on that issue and it will be viewed as a revolutionary step. But I'm taking that step because of the study of the Texas Office of Public Insurance Counsel, which was cited earlier, that showed that 88 percent of the companies have age of home restrictions in Texas, and 90 percent of the companies restrict writings based on the value of the home. The typical value is $55,000 to $60,000, sometimes higher. The median-value of homes in Texas is $43,000. So, they're writing off a lot of homes.

The CHAIRMAN. That's interesting. The median-value is $43,000.

Mr. HUNTER. Right.

The CHAIRMAN. So half the houses in the State are at that level or below that level.

Mr. HUNTER. Right. Well more than half are below the $60,000.

The CHAIRMAN. Yes, absolutely.

Mr. HUNTER. So low-income areas of Texas are being written off, and that's redlining, in my view.

The CHAIRMAN. It's second-class citizenship. That's basically what it boils down to.

Mr. HUNTER. It's exactly what you just said a few minutes ago, Senator.

Last week, I imposed a record fine on Allstate Insurance Company, $850,000, the most ever levied against a company. They've agreed to it as a consent order. It's twice what my lawyers recommended.

[Laughter.]

The CHAIRMAN. It looks like you need new lawyers, too.

[Laughter.]

Mr. HUNTER. They wouldn't write people with only one car. They wouldn't write people who were not in the market for other insur-

ance, like homeowners. They wouldn't write single people, and so on. As a result, we had these kinds of practices.

At the same time, our staff, newly invigorated after this, has brought actions against 59 other companies, disciplinary actions, with similar problems. Those 59 are based upon our sample companies of 75 that we reviewed. So 59 out of 75.

In your invitation to testify, you raised four questions which I answered in my prepared statement. As an actuary, I believe you should require census tract, not just five-digit zip, to enable research in homogeneous areas, such as you do in HMDA. I think that's the right approach.

I believe you should obtain age data, as well as race and gender, because I think there's discrimination by age.

I think you should get the claims data. If you don't, when you tell the company, look, you're doing something bad here, they'll say, it's a good business practice and we can prove it, but you won't be able to test that argument.

I encourage you to consider strongly S. 1917, Senator Feingold's bill. I would strengthen it. I would look at Congressman Kennedy's bill for ideas.

Specifically, I would collect auto insurance data, which the bill does not. Many poor, in minority areas, don't own homes. People don't own homes and they're being discriminated against where they have to buy auto insurance. Also, renter's insurance should be added, in my view.

I would like to make all the data open-record data. One of the key problems I have in Texas is that, although I can now collect underwriting guidelines, I cannot disclose them by company. So the practices are not publicly available. And, I think, public exposure of some of these things will change them, just the public exposure.

The CHAIRMAN. Can you hold a public meeting and describe the practices, listing them as Company A, Company B, and Company C?

Mr. HUNTER. I can do that. In fact, that's what we have done.

The CHAIRMAN. So the company that wants to pursue it can inquire of the company that they might be talking to, where they fall.

Mr. HUNTER. Right. But, in Texas, the legislature, I think wisely, has moved in the direction of using competition to control rates.

So I get out rate guides. People love the rate guides. They go out by the tens of thousands, and we are encouraging people to shop.

But what happens is that, in areas like this, people come back and say, well, I found a cheap company, but they won't even quote for me. And I can't even tell them, don't bother with that company, based upon what I already know about their underwriting guidelines, because I'm prohibited to release that.

The CHAIRMAN. Right.

Mr. HUNTER. People get frustrated, give up, and go to the assigned risk plan, the F.A.I.R. plan, or something.

Just speaking for myself, one last personal note. I think I need your help. The momentum that these kinds of hearings and this type of legislation being debated gives to the State is very, very important.

Texas is ahead of the curve, in my view, of what's going on in the rest of the country. Only 22 States agreed to participate in the

National Association of Insurance Commissioners' study of redlining by supplying data, and that tells you something, in my view.

I do thank you for your leadership on this, and Senator Feingold and the Ranking Republican.

The CHAIRMAN. Thank you for what you're doing in Texas and for coming today. It's a very helpful example of national leadership that you're giving, and I much appreciate it.

Mr. HUNTER. Yes, sir.

The CHAIRMAN. We'll follow up at our end.

Ms. Schubert, we'd like to hear from you now.

### OPENING STATEMENT OF LYNN M. SCHUBERT, ASSISTANT GENERAL COUNSEL, AMERICAN INSURANCE ASSOCIATION

Ms. SCHUBERT. Thank you, Mr. Chairman, for inviting us to testify here today on the important topic of equal access to insurance for all Americans. As you stated, AIA represents more than 270 companies writing property and casualty insurance in every State and jurisdiction in the United States.

I think it's probably important for me to state, on the record, that the companies that have been discussed earlier today, on this panel, are not members of the AIA, but the Hartford Company, that Mr. Hunter did mention, is a member of AIA, and we have a number of companies like that.

We're here today, Mr. Chairman, as a group who is trying to do something positive and trying to make a difference in this area.

The organizations, that I'm testifying on behalf of today, have one overriding goal on the issue of insurance access and availability. That is, that urban residents and businesses, equally with all other Americans, must be able to purchase attractive insurance products at a price reasonably based on the risk. AIA, IIAA, and the Council members are committed to working with legislators, regulators, consumers, and brokers to ensure that this occurs.

To determine whether or not insurance is available in all areas, we could support Federal data collection of insurance information if it is designed to produce a fair, efficient, and effective study of insurance availability and cost. H.R. 1188, pending in the House, appears to be such a measure and AIA, IIAA, and the Council support this bill.

Any data collection will show that some areas, especially in our cities, have higher numbers of residents and small businesses without insurance than other areas. These discrepancies are related to a whole host of socioeconomic circumstances faced by people who work and live in the urban areas and which also increase the cost of insurance. Outright racial or ethnic discrimination also may occur. We hope that it is infrequent. We know that it's a violation of Federal and State law. AIA advocates stringent prosecution wherever it is found.

The American birthright, that you described, to equal treatment should be protected and it's something that we certainly support. Any discrepancies in availability of insurance, whether they're caused by discrimination or by economics, must be addressed.

It is cold comfort to the citizens for whom insurance is unavailable to explain to them the reasons why the problem exists. We believe that it is time to start attacking these problems head-on.

Mr. Chairman, the Committee has asked AIA to address three specific questions in its testimony. We have done so, in detail, in our written statement. This morning, I will attempt to summarize for you our responses to those questions.

First, you asked for AIA's views on whether insurers illegally discriminate. It's impossible to say that there's not one underwriter, one agent, or one company out there, that is illegally discriminating in the selling of insurance. We do not believe that it's a systemic problem, but, rather, if it occurs, it occurs in isolated instances.

The most important thing to note in this discussion is that even in the question itself, the description states that discrimination is illegal, and that is a fact. It is illegal in every State. It's illegal through Federal law.

All States have laws against unfair discrimination in the insurance industry. The National Association of Insurance Commissioners Model Unfair Trade Practices Act prohibits arbitrary underwriting decisions, based upon geographic location alone, as unfair discrimination. AIA strongly supports this provision. We supported its adoption at the NAIC and we have urged its adoption by State legislatures across the country.

If insurers are illegally discriminating, they should be prosecuted. States currently have the authority to do this and are doing so in appropriate situations. As was stated earlier, insurance must be based on the risk. It cannot be based on race.

The second request of the Committee was for AIA to discuss the findings of recent property insurance studies. This is the bottom-line question that really must be addressed, whether consumers wishing to purchase insurance currently are able to do so.

A number of studies, from 1979 through 1993, show that a large percentage, 98 to 99 percent, of homeowners have homeowners' insurance. More recently, in 1993, AIA commissioned a study, by an independent agency, of the core of six American cities, and I'd just like to point out some of the key highlights of this survey because it did look at predominantly minority zip codes. It looked at areas where we were concerned there may be a problem.

From those six cities, less than 2 percent of the homeowners surveyed did not carry any homeowners' insurance. Ninety-three percent had comprehensive coverage and about 5 percent carried more basic homeowner insurance policies covering fire damage only, or fire and windstorm damage.

There were no significant differences among African-Americans and whites in terms of the insurance coverage. Ninety-nine percent of African-American homeowners had insurance with 92 percent of those African-Americans having comprehensive homeowners' insurance.

Ninety-eight percent of those homeowners identifying themselves as white had some homeowners' insurance, including 94 percent with comprehensive policies. Nearly 9 in 10 urban homeowners said it was very, or somewhat, easy to find homeowners' insurance. An even higher share, 93 percent, said it was convenient to contact an insurance agent or insurance company. Very few respondents, only 3 percent, said they were aware of anyone in their neighbor-

hood who had experienced difficulty in obtaining homeowners' insurance.

There are other surveys and studies that show similar results. Those results are discussed in detail in our written statement. However, there are other studies that show other results and we've heard discussions, today, of testing, that apparently may or may not show different results when we finally get the details and we can investigate that situation.

While we have a detailed analysis of the cause of the differences between the studies and critiques of the different methodologies of the studies, we are not here today to argue the numbers with you. We agree that it is time to take a close look at this issue. And, instead, these differences are the very reason we're willing to support Federal data collection. We want to know what the information is on the availability and cost of certain lines of insurance.

As Representative Kennedy has stated, those who have nothing to hide, have nothing to fear. We welcome thoughtful investigation and analysis of this issue.

This leads directly to the third question posed by the Committee—What steps should the Federal Government take to identify and combat illegal property insurance discrimination if such discrimination exists?

As mentioned earlier, a fair, economical, efficient data collection scheme, on a Federal level, to determine if insurance is equally available, based on the risk for all Americans, is something that AIA, IIAA, and the Council support. The parameters of such a data collection effort, however, are very critical.

Inordinate costs of collecting data with limited value would not assist the insurance consumer, but, rather, harm that consumer with either higher prices or possibly less financially sound insurers.

Collection of data which reveals what insurance is being sold, where it is being sold, who is selling it, and how much it costs the consumer would answer the question of whether or not insurance is equally available. This collection should be undertaken in a format to provide the most information in the most useful form in the most cost-efficient fashion.

H.R. 1188 appears to establish such a data collection scheme and I urge this Committee to review that bill, as well as the bill pending in the Senate. The information which will be provided by H.R. 1188 would allow regulators to focus efforts on zip codes. It is a collection by five-digit zip code. It would allow regulators to focus their efforts on zip codes with significant disparities between the number of homeowners and the number of homeowners' insurance policies, rather than being required to review detailed information for huge numbers of census tracts where no problems exist whatsoever.

We urge you to look at a data collection scheme that would allow you to look broadly at all the zip codes where you have a concern and then focus your efforts on where there are these disparities. Spend the time of the regulators, then, getting into the more detailed information requiring insurers to produce more detailed information, at a smaller level, at that point. Regulators, currently, can do that and I urge that that is the way to move forward in trying to address this issue.

40

Mr. Patrick did state, very accurately, that several hundred thousand insurance applications are collected every year by insurers in comparison to only thousands of mortgage applications.

HMDA is not necessarily appropriate for the insurance industry.

AIA recognizes there are a number of issues that may have an impact on urban consumers and their ability to obtain insurance. AIA members and others are taking steps to address these issues and I would like to take just a minute, if I could this morning, to address some of our efforts.

The CEO's of many AIA member companies are doing just what you, Mr. Chairman, suggested. They are making a commitment to equal treatment. Additionally, it is our belief that partnerships between the insurance industry and consumer organizations, civil rights organizations, and housing organizations are the most productive way to move forward.

AIA would also like to work with legislators and regulators to develop products and marketing ideas which adequately serve all residents and businesses. We want to discuss the establishment of programs to facilitate greater access to insurers.

For example, we already are working with regulators, in a number of States, on programs to bring urban-based independent agents together with our standard companies. One State, which is moving forward quickly on this issue, is Georgia. In Atlanta, AIA, the Urban League, the IIAA, the insurance department, and State legislators have established a task force to address the issue of insurance in urban markets.

One of the first projects of the task force is the agent-insurer partnership. This partnership has resulted in a number of appointments already being made by standard companies to urban-based and minority agents.

Now that this program has proven successful, we are working to expand these efforts nationwide. We have specifically spoken with Commissioner Hunter, and he has requested some detailed information on the Atlanta project. We're looking forward to moving forward in Texas as well as a number of other States.

In addition, we also support the inclusion of homeowners' insurance in existing F.A.I.R. plans to address the needs of homeowners who are unable to find insurance in the voluntary market.

In California, we've joined forces with a broad coalition of consumer and civil rights groups, led by Consumers Union and the Latino Issues Forum, to create an innovative, no-frills, no-fault automobile insurance policy. This policy is a perfect example of a creative, practical, and sound solution to a real problem of people in need.

Independent actuaries have concluded that this policy could save California consumers $1.8 billion in the first year alone. We are working to inform legislators and regulators about the potential benefits of this and similar new products.

Education——

The CHAIRMAN. I'm going to ask you, if you can, to wrap up in the next 30 seconds because I'm afraid we're not going to have enough time for Mr. Kamasaki and, then, I've got to go tend to another assignment, here, shortly.

41

Ms. SCHUBERT. Yes, sir. I have just two points to make very, very briefly.

The CHAIRMAN. Thank you.

Ms. SCHUBERT. Education and reduction of the risk.

AIA is working with State regulators and legislators on the issue of education, both for the insurance industry about opportunities in urban markets, as well as consumers, to educate consumers on how to shop for the best product.

And, second, most importantly, perhaps, we're working with consumer and community organizations like ACORN, to work with their Neighborhood Home and Safety Program, to reduce the risk in neighborhoods so that we can make insurance more cost-efficient and more available.

In conclusion, we just want to state that we're committed to working on this issue. We want to work with the Senate. We support data collection and we look forward to working with you on making it effective and efficient.

Thank you.

The CHAIRMAN. Thank you. I appreciate the constructive tone that you present from your organization and some of the positive steps that have been taken by the Hartford and others.

Also, we may have some differences at the end of the day in terms of what we collect and how we collect it, but I would suggest that we try to work together to see if we can work that out.

Mr. Kamasaki, we're pleased to have you.

## OPENING STATEMENT OF CHARLES KAMASAKI, NATIONAL COUNCIL OF LA RAZA

Mr. KAMASAKI. Mr. Chairman, I'm happy to be here. Let me first apologize on behalf of my president, Raúl Yzaguirre, who is not able to be here. I apologize to you that you're getting the second string, and I will try to be brief in deference to your time constraints. Let me try to make three points.

The first is, I believe, the evidence is sufficient to warrant immediate congressional action. Mr. Chairman, in my written statement we go through, in quite exhaustive detail, the history of social science research on discrimination, as it applies to Latinos, in virtually every field—employment, housing, the housing rental market, mortgage lending, and the emerging data that is now coming out with respect to insurance.

The point I would like to make is that, at virtually every stage of this process, there have been naysayers. They have argued—the industry in each of these cases has argued—that the problem is not serious, that these are isolated examples, and that they're caused by market factors not related to discrimination.

I would note that after disclosure or after there has been sufficient social science research on these issues, invariably, the evidence has demonstrated that, in fact, the problem is serious, that it is widespread, that it goes beyond isolated examples, and that alternative causes, like market factors, do not explain disparities between minorities and nonminorities.

We believe such is the case with insurance redlining.

It is clear, and we agree, that there is not sufficient data to make conclusive judgments about the scope and degree of insurance red-

42

lining with respect to either African-Americans or Latinos. We acknowledge the fact that the industry, at least, makes the argument that some of these disparities may be attributable to factors other than discrimination.

But, Mr. Chairman, given the history that we document in our statement, and given the history on these issues, it seems to me this is one of those cases where we think it's a duck. It looks like a duck. It walks like a duck. It quacks like a duck. And that, if we needed no evidence other than the fact that the recent National Fair Housing Alliance testing that we were pleased to join in and which demonstrates a virtual statistical certainty of discrimination for each Latino seeking insurance, we would argue the problem is clearly sufficiently documented to warrant an immediate congressional response.

The second point I would make is to note how modest this response is. We are not asking for new regulations. We are not asking for a new standard for judging discrimination. We're not asking for affirmative action or quotas in the number of insurance policies sold. What we are asking for is data disclosure, to permit enforcement agencies to review data, to permit social scientists, researchers, and others to review the data, and, finally, to permit the kind of self-analysis that you mentioned earlier today.

In fact, Mr. Chairman, if every CEO of every insurance company were to issue the kind of order that you talked about earlier today, that CEO would, in fact, need the very kind of data that is required in this bill in order to assess the performance of his/her own company and assess the performance of each and every employee in that company.

It seems to me, given the scope of the problem, that the kind of response that we and others are seeking embodied in Mr. Kennedy's bill and Mr. Feingold's bill, is really quite modest.

Finally, I would just note for the record that there have been some press reports that have alleged that there is somehow some disunity within the civil rights community on this issue. I just wanted to introduce, and ask that it be made part of the record, a letter sent to you yesterday, on behalf of a coalition of 24 civil rights and consumer organizations, which demonstrates that those press reports are not accurate.

Let me stop at this time and entertain questions.

The CHAIRMAN. Thank you. Thank you for very good remarks. Without objection, we'll make that letter a part of the record.

I want to thank all of you for your testimony today and for your leadership in your respective capacities in this area. I think we've really laid the problem out today, along with some very constructive ideas, legislative and other, as to how we go about dealing with it.

But I want to thank each of you and I want you to know that when we state intentions in this Committee, we have a very high batting average of following through and doing what we say we're going to do. We're going to push ahead on this because it's very important. I urge all of you to do so as well, and let's collaborate as we go and see if we can't make a lot of progress here.

Thank you very much.

Ms. SCHUBERT. Thank you, Mr. Chairman.

43

Mr. TISDALE. Thank you.

The CHAIRMAN. The Committee stands in recess.

[Whereupon, at 12:22 p.m., the Committee was recessed.]

[Prepared statements, response to written questions, and additional material supplied for the record follow:]

44

## PREPARED STATEMENT OF SENATOR RUSSELL D. FEINGOLD

Thank you, Mr. Chairman, for holding this hearing on the problem of discrimination in the determination of who has access to affordable high quality homeowners' insurance in America. I would also like to thank you for requesting the recent GAO study on data needed to examine issues pertaining to the availability, affordability, and accessibility of property insurance, and for your past leadership and continued efforts through community banking and reinvestment legislation to expand financial services to individuals and communities that have been bypassed in the past by the private market. Your leadership on these and other issues will be sorely missed here in the Senate and by the entire Nation, and I feel fortunate to have had the opportunity and privilege of serving with you in this body—even for the short period of time it has been.

During this hearing the Senate Banking Committee will gather testimony from a diverse group of individuals and organizations on a subject that strikes at the core of the ability of many Americans to participate fully in our society by being able to enjoy that which has come to be known as the "American dream"—home ownership.

Three decades of research, studies, and reports have reaffirmed the extent of the problem of insurance redlining that prompted the 1968 National Advisory Panel on Insurance's description that "Communities without insurance are communities without hope" as well as the inadequacy of State and Federal responses to address it. These studies, as well as testimony and evidence gathered before both the House Banking and Energy and Commerce Committees, thanks to the efforts of both Representatives Joseph Kennedy and Cardiss Collins, have indicated that hundreds of thousands, if not millions, of individuals and entire neighborhoods continue to be denied or provided inferior insurance coverage and that insurance redlining practices are currently widespread throughout the United States.

It is not only disturbing that discrimination continues to exist today, but it troubles me even more so that the fine city of Milwaukee, Wisconsin, has received national attention regarding this problem. In fact, a CNN television report even stated that Milwaukee is becoming not only famous for beer, but for insurance discrimination as well.

Today's disturbing results concerning the occurrence of insurance discrimination, to be released by the National Fair Housing Alliance and later discussed here by its President, William Tisdale, a fellow Wisconsinite who shares my concerns over the problem at a national level as well as in Milwaukee, will add to this perception and come on the heels of an Urban Institute report which showed that Milwaukee was the most economically segregated city among the 100 largest U.S. metropolitan areas.

Some will argue that the disparities in the access to and availability of insurance are solely based on principles of economics and statistically based risk assessments—and not on principles of prejudice. Sadly enough, it appears that this is not always the case. Take the words of an insurance .company district sales manager from Milwaukee, who was recorded as telling his agents:

".... I think you write too many blacks. . . . You gotta sell good, solid premium paying white people. . . . They own their homes, the white works. . . . Very honestly, black people will buy anything that looks good right now. . . . But when it comes to pay for it next time. . . . You're not going to get your money out of them. . . ."

This "quit writing all those blacks . . ." prejudicial policy was not only communicated to agents verbally, but was placed in writing as well. And it has been reported that the manager even showed one agent how to accomplish this goal by stating that:

"If a black wants insurance, you don't have to say, just tell them, because based on this kind of policy, the company will only allow me to accept an annual premium. Do it that way."

Activity of this type that has prompted such allegations of discrimination in the insurance industry cannot and must not be tolerated anywhere in our society.

To address this problem, I introduced S. 1917, "The Anti-Redlining in Insurance Disclosure Act of 1994," which would require insurance companies to disclose information regarding where they write property insurance, patterned after the reporting requirements already required of banks and thrifts under the Home Mortgage Disclosure Act. This information would allow members of the public, regulators, the insurance industry, and Congress the means to identify the extent of the problem and would assist affected individuals and Federal and State agencies efforts at enforcing our Nation's anti-discrimination laws.

45

There are several components which S. 1917 includes which are critical for any meaningful measure designed to address the problem of insurance redlining.

First, it is important that any data collection and reporting requirements on insurance costs and policies be done at the most detailed level which is reasonably feasible. For example, it is preferable to require reporting by census tract rather than zip code since it allows for more detailed detection and analysis, as census tract populations are much smaller and homogeneous than many urban zip codes which often contain neighborhoods that have a diverse range of economic, racial, and housing stock characteristics, thereby resulting in a "masking" effect for purposes of statistical analysis. The census tract reporting standard that is required of the banking industry under the Home Mortgage Disclosure Act should be applied to the insurance industry as well. S. 1917 takes this approach.

Second, the collection of data on insurance losses and claims should also be included in any insurance disclosure initiative. Such data would be essential for any proper analysis necessary to resolve disputes that arise involving claims that disparities in the price of insurance between different neighborhoods or groups of people are solely based on loss experience and the associated risk involved rather than prejudice.

Finally, since the collection and disclosure of such data will provide affected individuals and Federal and State regulators valuable information necessary to enforce our Nation's anti-discrimination laws, it should be made available to the greatest number of communities and individuals as possible. S. 1917 would require that data be collected in 150 Metropolitan Statistical Areas.

I am also interested in exploring whether or not the insurance industry should be required to meet the same requirements that are imposed upon the banking industry under the Community Reinvestment Act. To that end, S. 1917 calls for a study which would review the feasibility of creating reinvestment requirements for insurers similar to those already applied to depository institutions.

In conclusion, I would like to again thank Senator Riegle for holding this hearing and look forward to working with the distinguished Chairman and other Members of this Committee toward addressing the problem of insurance redlining.

---

## PREPARED STATEMENT OF SENATOR ALFONSE M. D'AMATO

Mr. Chairman, I would like to join you in welcoming our distinguished panel of witnesses, particularly our colleagues from the House, Representatives Collins and Representative Kennedy. The presence of so many distinguished witnesses says a great deal about the importance of the subject matter of today's hearing.

Today the Committee is focusing its attention on insurance redlining-whether, and to what extent, it occurs. In this context, we are concerned with discrimination against residents of economically distressed areas in the writing of homeowners' insurance based on factors unrelated to sound actuarial practices.

Mr. Chairman, this Committee, under your leadership, has invested a great deal of energy in addressing the plight of economically deprived individuals and communities. The Committee has worked hard to ensure that every American is treated fairly in seeking financial services.

Mr. Chairman, just last session, you and I sponsored a bill designed to eliminate the abusive mortgage lending practices of unscrupulous "loan sharks" whose high-interest mortgage scams are directed at the elderly and low-income homeowners.

With respect to the insurance industry and homeowners' insurance, the guiding principle must be sound and objective underwriting practices. My father is an insurance professional. He always took great pride in helping his customers' plan for their future financial security. Now, the risk of insuring any two homes is never the same—that is why rates should vary from case to case. But my father has always believed that every potential customer must be judged by one standard—by the risk. Any other standard just won't do.

This conviction is shared by the Committee. Discrimination of any kind is wrong and it is unacceptable. For this reason, the Committee has invested time and energy to ensure fair access to financial services for one simple reason.

At the same time, we must remember that insurance companies are in business, and an integral part of that business is assessing and managing risk. Insurers must be able to assess risk in a businesslike fashion. That means that they must be able to charge rates in accordance with the risks involved.

Mr. Chairman, the Committee must review the available evidence and ascertain whether, and to what extent, the insurance industry engages in discriminatory practices in the writing of homeowners' insurance.

004284

46

## PREPARED STATEMENT OF DEVAL L. PATRICK

ASSISTANT ATTORNEY GENERAL FOR CIVIL RIGHTS

U.S. DEPARTMENT OF JUSTICE

Mr. Chairman and Members of the Committee, I appreciate the opportunity to appear before this Committee to discuss what the Attorney General and I believe to be an increasingly significant issue in civil rights enforcement—discrimination on the basis of race or national origin in the provision of homeowners' insurance. I assure you that I will use the full extent of my authority as Assistant Attorney General for the Civil Rights Division to eliminate all forms of race and national origin discrimination that hinder the ability to obtain and enjoy housing, including discrimination in the property insurance industry.

One lesson we have learned from more than 25 years of fair housing enforcement is that the actions of many players can have an impact on the ability to obtain and enjoy housing. The Civil Rights Division has often challenged direct providers of housing by taking action against unlawful discrimination in the sale and rental markets. In recent years, we have targeted unlawful discrimination in the mortgage lending industry and have learned the devastating impact that such discrimination can have on individuals and communities. Although we know less about the extent of discrimination in the homeowners' insurance industry, we do know that ending such discrimination is critical to fair housing enforcement. As the United States Court of Appeals for the Seventh Circuit succinctly noted, "no insurance, no loan; no loan, no house . . ." NAACP v. American Family Mutual Insurance, 978 F.2d 287, 297 (7th Cir. 1992), cert. denied, 61 U.S.L.W. 3771 (U.S. May 17, 1993).

Our Department recently completed an investigation involving discrimination in the provision of homeowners' insurance, and we have also investigated claims of insurance discrimination originally presented to the Department of Housing and Urban Development [HUD]. Although the results of the investigations are not yet public, the long and detailed investigations have helped educate us regarding how such discrimination occurs. Our work has also clarified for us the type of factual information that is necessary to detect unlawful discrimination in this industry. We do not purport to have all the answers to the difficult questions but I am pleased to share our experiences with you.

### Discrimination in Insurance is Prohibited by the Fair Housing Act

Historically, the efforts of our Department to address the issue of homeowners' insurance discrimination have been slowed by claims that such discrimination is not sufficiently related to housing to evoke coverage under the Fair Housing Act. The coverage issue has been the focus of several lawsuits and initially resulted in inconsistent Federal court decisions. The confusion caused several insurance companies that were subjects of Federal investigations to refuse to cooperate, even in the face of HUD subpoenas. We believe that this issue can now be laid to rest such that we can proceed to resolve the merits of discrimination claims.

Our Department and HUD have consistently argued that discrimination by insurers of housing violates the Fair Housing Act. The Department of Justice presented that argument in 1978 as amicus in the first case to address the issue, Dunn v. Midwestern Indemnity Co., 472 F. Supp. 1106 (S.D. Ohio 1979). In that case, the court held that "the concerns of insurance redlining are within the especial province of the Fair Housing Act." Id. at 1112. The Court of Appeals for the Fourth Circuit, however, reached a contrary holding in Mackey v. Nationwide Insurance Companies, 724 F.2d 419 (4th Cir. 1984), and this is the decision upon which investigative targets relied in resisting our enforcement efforts. This decision, however, did not change the position of the enforcement agencies. On January 23, 1989, HUD published regulations implementing the Fair Housing Act stating that "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently because of race, color, religion, sex, handicap, familial status, or national origin" constitutes a violation of the Act. 24 C.F.R. § 100.70(d)(4).

But the road to substantive enforcement has been difficult. The Civil Rights Division received allegations in 1988 that American Family Insurance, a Wisconsin insurer, had directed its agents not to sell property insurance in areas where African-Americans constituted a majority of the population. An investigation was initiated and the company initially said it would cooperate. When a formal request for information was presented to the company, however, it declined to provide any information, citing its position that the Department of Justice lacked authority under the Fair Housing Act to investigate claims of racial discrimination in homeowners' insurance. The local NAACP chapter subsequently filed a lawsuit raising claims under the Fair Housing Act, 42 U.S.C. §§ 1981 and 1982, and the company raised the same

47

defense to the Fair Housing Act claim. We supported the private plaintiffs' Fair Housing Act claim as *amicus curiae*, but the district court dismissed that claim. The private lawsuit was permitted to proceed since other causes of action remained; but since the remaining statutes do not provide enforcement authority to our Department our investigation was thwarted. We participated as *amicus curiae* in the Court of Appeals for the Seventh Circuit and that Court, on October 20, 1992, reversed the district court decision and held that the allegations did state a claim under the Fair Housing Act. *NAACP* v. *American Family Mutual Insurance,* 978 F.2d 287 (7th Cir. 1992), *cert. denied,* 61 U.S.L.W. 3771 (U.S. May 17, 1993). That decision allowed our investigation to resume after a delay of almost 4 years. The private case has yet to be resolved.

Nationwide Insurance Company also claimed the Fair Housing Act did not reach racial discrimination in homeowners' insurance when it refused to comply with a HUD request for information necessary to investigate a complaint of discrimination in the provision of homeowners' insurance. The company sued the Secretary of HUD over the issue and in February 1994, after more than 2 years of litigation, an order was entered upholding our position that the Fair Housing Act prohibits racial discrimination in the provision of homeowners' insurance. *Nationwide Insurance Co.* v. *Cisneros,* Civil Action No. C–3–92–52, (S.D. Ohio, Feb. 24, 1994). The company has appealed the district court's decision. The Department of Justice urged this same position as *amicus curiae* in private litigation before the District Court for the Northern District of Indiana in *United Farm Bureau Insurance Co.* v. *Metropolitan Human Relations Comm'n.,* C.A. No. F89–252 (N.D. Ind.) and that Court agreed with us, following the Seventh Circuit precedent in *American Family.* We also urged the District Court for the Northern District of Ohio to allow a Fair Housing Act claim that a private mortgage insurance company was discriminating on the basis of national origin. *Briceno* v. *United Guaranty Residential Insurance Co.,* Case No. 3:89CV7325.

In view of this litigation, the HUD regulations are particularly significant, since they are entitled to substantial deference by the courts. And we do not believe that there is an existing conflict between the circuits, since the Fourth Circuit's decision in *Mackey* was rendered prior to the issuance of the regulations. The Seventh Circuit concluded that the regulations were valid and controlling, and we believe that reasoning should be followed by other courts that are presented with the issue.

## Enforcement Efforts

As a result of our work on discrimination by property insurance companies, our initial lesson is that such investigations can be exceedingly complex. The investigations are sometimes compared to lending discrimination investigations, but several differences make insurance discrimination investigations even more complex.

The Home Mortgage Disclosure Act (HMDA) provides us useful information about the lending practices of depository financial institutions. We know the number of minorities who apply for mortgage financing, the number accepted, and the number rejected. This information is very helpful in selecting targets for investigation. We do not have comparable information about the performance of property insurance companies. Also, while a depository institution may receive several thousand loan applications in a given year, a property insurance company may write or renew several hundred thousand policies in the same time period. Unlike lenders, property insurance companies, to the best of our knowledge, do not maintain records regarding the rejected applications nor do they record the race of applicants or policyholders.

For these reasons, it is difficult to assess claims that a particular company is discriminating, for example, by refusing to insure properties in African-American or Latino neighborhoods. Discrimination can occur without an application or a record if an agent declines to return a phone call, fails to keep an appointment, or simply tells a prospective customer that the company will not insure the property because of its condition or location. Given the state of available records, this type of discrimination might best be detected by traditional fair housing testing. We are anxious to review the results of testing of property insurance companies which we understand are soon to be released by the National Fair Housing Alliance so that we can obtain a better understanding of discrimination that might be occurring at this preapplication stage.

We also believe that possible discrimination at the underwriting stage must be addressed. Our own investigations have revealed that policyholders in minority neighborhoods might receive insurance only after being subjected to inspections or being required to make repairs that are not required in other neighborhoods. In addition, properties in some minority neighborhoods are appraised for a lower amount than the replacement cost, but we do not believe that such facts should preclude

48

a property owner, who is willing to purchase the necessary insurance, from protecting his or her property and guaranteeing that it can be replaced in the event of a catastrophe. However, we have found that dwellings in minority neighborhoods often receive inferior insurance coverage that only allows for the repair, rather than the replacement, of a dwelling in the event of a property claim, or imposes low dollar limits that prevent its replacement. We also believe that some companies may charge a higher premium per dollar of insurance coverage for the inferior repair cost policies than they do for the more desirable replacement cost policies.

Finally, insurance companies can inflict substantial damage on neighborhoods by refusing because of the racial or national origin identity of the neighborhood to market their products. It is often revealing to examine the number of insurance offices located in minority neighborhoods as compared to the number located in identifiably white areas. The marketing of insurance products relies heavily on a community approach with agents located in close proximity to the areas they intend to serve. If a company desires to redline an area as off-limits for company business, it can do so without drawing a red line on a map—it can simply decline to open offices in the area.

We are attempting to address these issues in our investigations. We have expended considerable resources to correlate the addresses from company records with the census tract in which the property is located, a process known as "geocoding." This enables us to evaluate the racial impact of questionable policies. We are examining differences in pricing and policies offered. We are looking closely at marketing efforts and comparing market shares in white and minority neighborhoods. Of course, insurance companies remain free to make decisions based on risk, but there is a substantial difference between risk discrimination and race discrimination.

As should be obvious from my description of the work of our Department, improved information sources would promote better compliance with, and enforcement of, civil rights laws. It would be helpful to have information comparable to that which we have about banks, such as the number of applications received by race and national origin and the corresponding number of acceptances and rejections. HMDA, which requires reporting at the census tract level, has proved very useful. We rely heavily on that information, which allows us to identify the racial or ethnic identity of a select area. If the information is reported in such a way that it includes diverse neighborhoods, it still may be necessary to perform the arduous and expensive task of geocoding policy activity to determine the impact of company practices on minorities. We also would find it useful to have information on the types of policies issued, by race and national origin, in each neighborhood. This information would allow us to evaluate readily whether minority neighborhoods are offered inferior insurance protection. Information on claims paid and loss data would also help us. The Administration is pleased that legislation to combat redlining in insurance has been reported by two House Committees. The Administration looks forward to prompt House passage of the anti-redlining legislation and urges favorable consideration of similar legislation by this Committee and the full Senate this year.

Improved reporting would certainly aid our law enforcement efforts, but equally importantly it should also lead to improved performance and voluntary compliance within the insurance industry. We have spent considerable time working with representatives of the lending industry to obtain voluntary compliance with civil rights laws, and have encouraged self-assessment and voluntary corrective action. We continue to sue those who fail to heed our message, but we credit voluntary corrective action, as indicated by the limited relief that we requested from the Shawmut Mortgage Company when it took corrective action before we began an investigation. Many lenders are now using HMDA data for their own benefit. Self-assessments are being performed, business practices are being changed, and many lenders seem to be doing a better job in serving minority neighborhoods. To the best of our knowledge, most insurance companies do not maintain information in a form that readily permits an evaluation of their performance in minority neighborhoods.

In closing, I emphasize that we intend to devote considerable resources to the issue of unlawful discrimination by property insurance companies, and we expect to be able to better articulate the problems and potential solutions through our litigation program. We agree that a significant problem exists in the industry that is comparable to the problems discovered in the lending industry. We hope that insurance companies, which to this point have fought their inclusion under the Fair Housing Act, will recognize the importance of the issue. We urge them to evaluate their own performance and compliance with the law and to take voluntary corrective action. Such voluntary corrective action will be a very positive factor as we exercise litigation judgment. Companies should also be on notice that, if they fail to address the issue voluntarily, the Department of Justice will use its enforcement powers to

compel a remedy and the costs likely will greatly exceed the costs of voluntarily compliance.

I appreciate the opportunity to present our views on this important subject and look forward to working with the Committee.

--------

## PREPARED STATEMENT OF ROBERTA ACHTENBERG

ASSISTANT SECRETARY FOR FAIR HOUSING AND EQUAL OPPORTUNITY

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Mr. Chairman, Members of the Committee: Thank you for the opportunity to discuss with you one of our Nation's most pressing civil rights and housing and urban redevelopment issues. It is a top priority for HUD to assure the American people the full protection of the Fair Housing Act (the Act). To do so, we are charged with providing the same protection from discrimination in the provision of property insurance that we provide in all other residential real estate related transactions including real estate practices and mortgage lending.

HUD's interest in this issue extends beyond its legal responsibility to fully enforce the Fair Housing Act. Property insurance is essential for the revitalization of this Nation's cities. Insurance is required to purchase or improve a home or to start or expand a business. As the President's National Advisory Panel on Insurance in Riot-Affected Areas concluded 25 years ago, "Communities without insurance are communities without hope." (The President's National Advisory Panel on Insurance in Riot-Affected Areas (1968) *Meeting the Insurance Crisis of Our Cities*, Washington, DC: The President's National Advisory Panel on Insurance in Riot Affected Areas.)

Let me take a few minutes to discuss with you our authority under the Fair Housing Act and why discriminatory insurance practices, when they exist, can be such a serious problem for urban communities and for the people within them who are protected by the Act. Then I would like to describe how Secretary Cisneros plans to move to identify insurance redlining and discrimination and use the full weight of our enforcement authority to remedy and prevent it. Finally, I will suggest what can be done to more effectively support the efforts of our agency, community groups, and the insurance industry to eliminate discrimination and assure fair access to property insurance.

### Insurance and the Fair Housing Act

Discrimination on the basis of race and national origin in the provision of property insurance is prohibited by the Fair Housing Act of 1968. HUD and the Department of Justice have consistently taken this position since the issue first arose in 1978.

Several Administrations, beginning with a HUD General Counsel opinion in 1978, have concluded that the Fair Housing Act prohibits: (1) insurance redlining and other policies and practices that deny insurance or make it unavailable on the basis of race or any other protected status, and (2) discrimination in the terms, conditions, costs, or other aspects of insurance coverage. Again, in regulations implementing the Fair Housing Amendments Act of 1988, HUD determined that the Act prohibits "refusing to provide . . . property or hazard insurance . . . or providing such . . . insurance differently because of race, color, religion, sex, handicap, familial status, or national origin" (24 C.F.R. Section 100.70(a)(4)). And in his recent Executive Order 12892—Leadership and Coordination of Fair Housing in Federal Programs: Affirmatively Furthering Fair Housing—President Clinton made explicit reference to the coverage of property insurance discrimination under the Fair Housing Act when he called for HUD to promulgate regulations describing the nature and scope of coverage and the conduct prohibited by property insurers under the Fair Housing Act.

The statement offered today by Assistant Attorney General for Civil Rights Patrick describes in more detail the consideration the courts have given this question in the face of opposition to our attempts to investigate complaints we have received. The Department of Justice, HUD, and those courts considering the issue have concluded that insurance is covered by the Act. *Dunn* v. *Midwestern Indemnity Mid-American Fire & Casualty Co.*, 472 F. Supp. 1106 (S.D. Ohio 1979), *McDiarmid* v. *Economy Fire & Casualty Co.*, 604 F. Supp. 105 (S.D. Ohio 1984), *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 2335 (1993), *Nationwide Mutual Insurance Co.* v. *Cisneros*, No. C3–92–52 (S.D. Ohio Feb. 24, 1994). But see *Mackey* v. *Nationwide Insurance Co.*, 724 F.2d 419 (4th Cir. 1984). In addition, we do not believe there is a conflict between the circuits. While the Fourth Circuit held to the contrary, that decision was rendered prior to HUD's regulation stating that insurance is covered by the Act. The Seventh

50

Circuit in the 1992 *American Family* case, in finding that insurance is covered, found the reasoning of that 1984 decision unpersuasive. The court stated "events have bypassed *Mackey*," and found the regulations to be controlling, based upon HUD's statutory authority to issue them and the weight such regulations are accorded.

The key sections of the Fair Housing Act are 3604(a) which makes it unlawful to "otherwise make unavailable or deny, a dwelling" and 3604(b) prohibiting discrimination "in the provision of services or facilities in connection therewith." Because property insurance is required to secure a mortgage loan, which generally is required to purchase a home, denying insurance makes that home unavailable. As the Court explained in the *American Family* case, "no insurance, no loan; no loan, no house." I should point out that the Supreme Court had the opportunity to modify this ruling and declined to do so.

HUD's authority with respect to discriminatory insurance policy and practices is identical to other areas subject to the Fair Housing Act. In addition to the investigation of complaints, the Secretary is authorized to initiate investigations and the Secretary can issue complaints on his own initiative where warranted. Furthermore, the Fair Housing Act requires the Department to go beyond enforcement to seek voluntary compliance on the part of the industry so we can move to prevent discrimination by adopting policies and practices that bring about fairness in the provision of insurance. We are authorized to fund private group activity to educate the public and to assist private enforcement efforts. And, HUD is the only Federal agency charged with the responsibility to promulgate regulations that define the substantive acts that the Secretary will consider to constitute reasonable cause.

Before I describe to you how we are moving to carry out those responsibilities, it is important to consider the kinds of policies and practices that are the targets of our charge.

## Risk, Race, and Insurance

The business of insurance is the business of distinguishing among risks and grouping them in terms of the potential for compensable losses they pose during the life of a policy. "Fair discrimination"—the concept of treating similar risks similarly—is the bedrock principle of insurance underwriting. There is little doubt that the vast majority of insurers are making conscientious efforts to carefully consider the perils that potential insurance risks pose when they market their products.

However, we must recognize the possibility that unlawful discrimination can occur in the insurance market.

Sometimes such discrimination takes an overt and explicit form. More often it is more subtle and more widespread. Sometimes even policies and practices that are neutral on their face have a disproportionate racial impact. Some of these may violate the law where they cannot meet the established test of business necessity and the showing that there is no less discriminatory alternative. Below are some examples of analyses by State Insurance Commissioners, consumer advocates, and academic researchers depicting situations which may operate to discriminate and deny fair access to property insurance to those protected by the Act. In considering the documented examples that follow, it is important to stress that the finding of a violation occurs on a case by case basis—after full investigation and opportunity for an administrative hearing or a trial in Federal court.

In some instances, evidence of racial discrimination in the insurance industry can be overt. A district manager for a Wisconsin insurance company wrote, *"Quit writing all those blacks!!"* on an agent's list of life insurance clients. The same district manager was tape-recorded advising an agent under his supervision, "You write too many blacks. You gotta start writing good, solid premium-paying white people." The insurance company, *American Family*, is the defendant in a lawsuit filed in Federal court under the Fair Housing Act by the NAACP, the ACLU, and other plaintiffs including a member of the City of Milwaukee's Common Council.

Another documented example of redlining occurred when several agents with the California Insurance Group provided sworn affidavits to the California Insurance Commissioner that their company provided them with maps of San Francisco with the low-income and minority communities outlined in yellow. These maps were accompanied by instructions not to produce any commercial insurance in these areas. The California Insurance Commissioner charged the company with 252 violations of the State's insurance code. The company subsequently reached a settlement with the Commissioner in which it agreed to pay a fine of $400,000 and undertake several reforms to increase its market share in underserved areas.

Discrimination also can occur in marketing or advertising by insurance providers. It can occur in the pre-application process or in the processing of an application through the use of discriminatory underwriting guidelines. And not all cases involve

Case: 1:13-cv-08564 Document #: 134-8 Filed: 08/11/17 Page 99 of 452 PageID #:5...

51

denial of insurance. Where insurance is provided discrimination still can occur in the disparate treatment of applicants based upon their race or the racial characteristics of their neighborhood.

Paired testing has been used to uncover instances where a caller from a predominantly minority area will be given very different information than a caller from a white community with identical financial and other socioeconomic characteristics, except for the race of the residents. The minority area resident often must call several times before reaching an agent, may be told an inspection is necessary prior to offering a policy, is offered a policy at a higher price for less coverage, gets referred to a FAIR Plan, never receives a quote in the mail, or is just not offered any service. The caller from the white neighborhood, on the other hand, will be offered a policy on the phone during the first call, is offered a choice of policies and premiums, and is eagerly and politely solicited as a client.

To illustrate the outcome of such practices, the Missouri Insurance Commissioner recently found that insurers charged policyholders in low-income minority areas higher premiums than they did policyholders in low-income white areas for comparable policies even though the losses were higher in the white communities. Residents in the minority areas were paying one and one half times the premium in the white areas ($7.30 per thousand dollars of coverage compared to $4.65) for inferior "limited policies," while the loss ratios were 72 percent in the white areas, but just 57 percent in the minority areas.

In addition to discriminatory treatment, seemingly neutral policies can have an adverse racial impact and may violate the Act. For example, sometimes insurers have minimum value or maximum age requirements for property that they will insure. Homes valued at less than $50,000 or built before 1950 often do not qualify for insurance, or only qualify for limited policies like basic fire or market value policies rather than full replacement cost policies. These practices have a clear adverse impact on racial minorities because among owner-occupants in single family dwellings, Black households are more than twice as likely as white households (47 percent of black households but just 23 percent of white households) to reside in homes that are valued at less than $50,000. Similarly, 40 percent of black households but only 29 percent of white households live in homes that were built prior to 1950.

And these may not be isolated policies. According to a 1994 review of underwriting guidelines of major insurers in Texas carried out by the Texas Office of Public Insurance Counsel, approximately 90 percent of the market in that State is covered by insurers that have underwriting restrictions associated with the age and value of homes. (Office of Public Insurance Counsel (1994) "A Review of Homeowners Insurance Underwriting Guidelines Used in Texas," Austin: Office of Public Insurance Counsel.)

I want to stress that, as is the case with mortgage lending and all other areas covered by the Act, a disproportionate adverse impact alone does not constitute a violation of the Fair Housing Act. Where there is a business necessity and no less discriminatory alternative, no violation exists.

## Current HUD Initiatives

HUD has much to learn about the nature of the insurance industry's policies and practices. We intend to move deliberately, but speedily to apply our expert knowledge of the Fair Housing Act and the forms discrimination takes to this high priority area. We will utilize all of the measures we have open to us to assure that there is fair, non-discriminatory access to property insurance.

I would like to briefly describe some of these measures to you.

INSURANCE UNIT

Meeting the commitment both Secretary Cisneros and I made to The President in the Secretary's Performance Agreement, last month the Department created and began staffing a separate unit charged with examining fair housing related insurance matters.

One of the first tasks of that unit is to develop regulations implementing the Fair Housing Act's prohibition against discriminatory insurance practices. It has been 25 years since the passage of the Fair Housing Act and HUD has yet to promulgate regulations that define the lending and insurance policies and practices that violate the Act. It is high time that we do so.

INSURANCE REGULATION

Several complex issues must be addressed in promulgating the regulation. We intend to work in close collaboration with insurance companies, trade associations, State regulators, civil rights groups, and community organizations. We have already begun informal discussions with representatives of these interests to learn more about their views and about issues they would like HUD to address through its rule-

making. These will continue in the form of group meetings, individual detailed discussions, structured focus groups and consultations on specific issues with insurance companies, advocacy groups and trade associations.

In addition, I will hold a series of public meetings around the country for industry, advocacy groups, and private citizens alike to testify on the rule's content.

Based on the comments we receive, the evidence presented at the public hearings, and the written guidance we receive from additional communications with the industry and others, we will publish a proposed rule. Following careful consideration of the response we receive to that proposal, we will issue a final regulation.

We are considering what must be addressed in the regulation for it to: (1) be effective as guidance to HUD investigators, State and local civil rights agencies, and private fair housing groups; (2) serve as a guidepost for preventive acts by the industry; and (3) be a clear description of the rights afforded protected classes. To do so, the regulation will address specific practices that are prohibited under the Fair Housing Act, describe the standards to be utilized in determining whether violations of the Act occur, discuss investigative techniques that will be utilized, remedies that will be sought where violations are found, and voluntary affirmative efforts that are appropriate to eliminate discrimination.

The standards to determine discrimination in this area as in all other covered areas—will be based on the principles of overt discrimination, disparate treatment, and disparate impact.

The investigative techniques we consider will grow from our experience, but they might include statistical analysis of disclosure data, paired-testing, content analysis of underwriting manuals and other documents pertaining to evaluation of risk and marketing practices—all employed in lending discrimination investigations today.

A description of appropriate remedies will help guide self-evaluation and corrective action by the industry—even where we are not involved through a complaint investigation. Remedies we will consider would be those appropriate to the insurance industry and may include many similar to those in lending discrimination settlements secured by the Department of Justice.

Let me emphasize that no conclusions have been drawn, except the fact that many complex issues must be addressed. We have many questions that we will explore in as open and comprehensive a manner as possible. All relevant parties—insurance companies and agents, trade associations, regulators, civil rights groups, community organizations, consumer advocates, and others—will be involved in this process.

### FHIP Grants, Testing, and Private Enforcement

For many years HUD has worked in partnership with local public and private fair housing enforcement organizations. Primarily through our Fair Housing Initiatives Program (FHIP), we have provided financial support for private enforcement initiatives that carry out the promise of the Fair Housing Act and will continue doing so in the future. In fact, the complaints filed with HUD today by the National Fair Housing Alliance are the product of a FHIP grant.

This fiscal year I have set aside a portion of the FHIP appropriation to fund private enforcement initiatives that will address discrimination in property insurance. This set-aside is the single largest amount devoted solely to this enforcement area in the history of the program.

### Complaint Investigations

HUD's primary enforcement tool has been the investigation and conciliation of complaints brought to the agency by individuals who believe their rights have been violated, fair housing organizations, and others. The Secretary also has the authority to initiate a complaint when there is reason to believe that violation has occurred or is about to occur and can begin an investigation to determine whether such a complaint should be issued.

We are dismayed by the continuing efforts of some in the insurance industry to resist our efforts to investigate insurance discrimination cases. With the decision in the *Nationwide Insurance Co.* v. *Cisneros*, we believe this issue has been settled. Whether cases are investigated by the Department itself or by State or local agencies with laws which are substantially equivalent to the Fair Housing Act, we are committed to conducting full, fair investigations. We call on the insurance industry to cooperate with our investigatory processes.

There has not been a significant number of complaints filed involving insurance-discrimination. A total of six insurance discrimination cases are now pending, five with the Department and one with a State or local agency which has a law that is substantially equivalent to the Fair Housing Act. Several of these are expected to result in enforcement action.

We do not believe that the number of cases reflects a lack of discrimination; rather they are a result of a lack of knowledge regarding the Act's coverage of such discrimination and the difficulty applicants and homeowners have in knowing when discrimination has occurred. That is why we commend you, Mr. Chairman, and the Members of your Committee for these hearings today regarding this important matter. We expect to see a significant increase in complaints filed with the issuance of further regulations to clarify the application of the Act; the adoption of disclosure of data requirements through legislation of the kind Congress is considering; increased attention to this serious problem and the Department's enforcement program by the media; and enhanced financial support for education, outreach and private enforcement through HUD's FHIP program. This has been our experience in the lending area where, over the past 4 years as similar measures were taken, the number of lending complaints per year has increased 4 times and the proportion of lending complaints filed each year has doubled.

A HUD/DOJ JOINT INVESTIGATION TASK FORCE

Assistant Attorney General Patrick and I are working together closely to a assure an effective and coordinated approach on our investigations and our mutual interests in addressing insurance discrimination. As in the case of mortgage lending, the Secretary of HUD and the Attorney General will join forces to conduct joint investigations where appropriate, combining their distinct powers and authorities to more effectively address discriminatory behavior.

**The Need for Data Disclosure**

Our activities have been assisted significantly by the valuable informational hearings that Congress has held during the past 2 years on this issue. Your hearing today no doubt will reveal additional important information.

One issue that Congress has been discussing is a national disclosure bill for insurance. A HMDA-like disclosure law for insurance companies, containing race and gender information on a neighborhood basis, would be an immensely constructive tool for our agency in its enforcement efforts and for the organizing and local enforcement efforts of private and public fair housing organizations.

The Administration is pleased that legislation to prevent redlining in insurance has been reported by two House Committees. The Administration looks forward to prompt House passage of anti-redlining legislation and urges favorable consideration of anti-redlining legislation by this Committee and the full Senate this year.

As the GAO noted in its recent report, "Property Insurance: Data Needed to Examine Availability, Affordability, and Accessibility Issues," (February 1994) important informational gaps persist. The report stated that information on the number of properties insured, types and costs of policies, loss data, marketing activity, and agent location is needed to address availability, affordability, and accessibility issues.

We fully support the Administration's principles for insurance disclosure which the Office of Management and Budget provided in September. These principles call for the disclosure of the following:

- race, gender, and income of all applicants and policyholders—this is data similar to that required by HMDA and is likely to yield the same benefits;
- number of policies on a neighborhood basis; and
- an annual report analyzing this information by the Federal Government as is done for HMDA data.

In addition, differentiation by policy type and disclosure of loss experience; the requirement that insurers provide rejected applicants with the reason for the adverse decision (HMDA provides for optional reporting of this information); and the reporting of investment activity aimed at low- and moderate-income communities will add information to assist our enforcement efforts, better utilize limited resources, enable industry self-evaluation, and better assure that justice is done when a complaint is investigated.

The lessons of HMDA are instructive. In the area of lending today we can identify variations in mortgage loan activity by neighborhood, race, and gender as well as by income and other demographic factors. Individual application approval and rejection rates can be examined. While HMDA data alone cannot conclusively determine whether or not a lender has violated the law, it is most useful for targeting investigations and, in conjunction with other information, helping us determine whether or not a given institution has violated the law.

Similar information for property insurers would be equally valuable information for law enforcement in this area. Particularly when analyzed in conjunction with Census Bureau data, we could identify neighborhoods and population groups that appear to be underserved given their income, value of their property, and other so-

cioeconomic information. Again, such information alone would not confirm or deny the existence of discrimination. But it would be useful for targeting investigations, determining where to file Secretary initiated complaints, and supplying critical information as part of those investigations.

Such disclosure would also provide vital information for local enforcement efforts. Community organizations which have negotiated $30 billion in CRA agreements in over 100 communities with lenders, according to the National Community Reinvestment Coalition, often rely on HMDA data as the basis for their challenges and their agreements. Access to HMDA-like information for property insurers may well yield similar benefits. Given the value of this information to local community organizations and fair housing groups, we recommend that, like HMDA, the data be made available for every metropolitan area in the United States. The mere fact of disclosure will lead at least some property insurers to more carefully consider their underwriting and marketing practices. Sunshine is often the best antidote.

HMDA has been an invaluable tool in the area of mortgage lending. It is imperative we develop a similar tool for insurance.

### Risk, Race, and Insurance, Revisited

Race has long been a central factor in the operation of the Nation's housing markets. The Fair Housing Act was passed and has been amended for the purpose of changing this reality. Just as we intend to vigorously enforce the law in the areas of real estate sales and rental practices and mortgage lending, we intend to do so in the area of property insurance.

Race has no place in the insurance market. We are eager to work with you to make this a reality in our urban communities and throughout the Nation.

This concludes my statement Mr. Chairman. I would be pleased at this time to answer any questions you or the Members of the Committee may have.

---

### PREPARED STATEMENT OF WILLIAM R. TISDALE

PRESIDENT, NATIONAL FAIR HOUSING ALLIANCE

ACCOMPANIED BY: SHANNA L. SMITH AND CATHY CLOUD

Members of the Committee, my name is William R. Tisdale and I am President of the National Fair Housing Alliance located in Washington, DC. I am also the Executive Director of the Metropolitan Milwaukee Fair Housing Council. With me this morning are Shanna Smith, the Executive Director of the Alliance, and Cathy Cloud, who is the Program Director and who coordinated the homeowners' insurance testing project. NFHA is a private, nonprofit corporation representing some 60 private, nonprofit fair housing agencies located in 35 States, the entire organized private fair housing movement. In addition there are approximately 40 supporting members representing State and local civil rights agencies and other organizations and individuals who support the principles of fair housing.

The National Fair Housing Alliance was founded in 1988. The mission of the Alliance is to promote the achievement of "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." The Alliance believes that by vigorous, positive, and focused action we can work together to achieve fair housing through outreach, education, litigation, conciliation and research into the nature, extent, and effects of housing discrimination.

The members of the Alliance are dedicated to working to develop and implement strategies to reduce, and eventually eliminate, racially and ethnically segregated housing patterns and to make all housing accessible regardless of race, color, religion, sex, familial status, disability, or national origin.

This hearing examines *"Discrimination in the Homeowners' Insurance Industry."* But before we present the evidence NFHA has developed about this issue, the National Fair Housing Alliance wants to recognize the leadership of the Senate Banking, Housing, and Urban Affairs Committee for its long history of examining discriminatory practices in housing and especially its work on the issues involving mortgage lending. This Committee did not simply examine the lending institutions, but has scrutinized as well the practices and policies of the Federal regulatory agencies, the private mortgage insurance industry, and the secondary mortgage market. Because of your diligence and dedication to ensuring fair and equal treatment and access to credit, more and more people living in minority, integrated and low- and moderate-income neighborhoods throughout America have a real opportunity to purchase housing. Your work will result in the preservation of housing and improved quality of life for the millions of families living in these communities.

We applaud you, Senator Riegle, for convening this hearing to deal with the discriminatory practices and policies of the homeowners' insurance industry. NFHA has been investigating these problems since 1991, and we will take this opportunity to reveal publicly for the first time some of the evidence of discriminatory conduct on the part of two of the country's largest insurance companies—Nationwide and Allstate. These companies, we believe, have engaged and continue to engage in practices and policies that intentionally deny, limited, and make unavailable homeowners' insurance to people living in minority neighborhoods throughout the United States.

The U.S. Department of Housing and Urban Development provided much of the financial support for this investigation. Former HUD Secretary Jack Kemp made fair housing one of the Department's priorities, and supported fair housing financially through the Fair Housing Initiatives Program (FHIP). NFHA was awarded a $500,000 FHIP grant, in part, to conduct testing of the homeowners' insurance industry. In addition, hundreds of hours were donated by NFHA staff and affiliates as well as staff and affiliates of the National Council of La Raza. Their efforts to conduct a responsible investigation of the insurance industry have produced compelling documentation of discrimination in American cities.

While test reports provided evidence of discriminatory practices from the beginning, NFHA did not file complaints during the Kemp administration because of the serious backlog of complaints at HUD's Office of General Counsel. At that time, we also lacked confidence in HUD's ability to conduct an investigation of this magnitude against such a large industry.

NFHA has now decided to file administrative complaints with HUD because there has been a substantial improvement in HUD's ability to handle systemic complaints. Under the direction of Secretary Henry Cisneros, HUD's Office of Fair Housing and Equal Opportunity is implementing comprehensive procedures and putting in place competent, trained staff. NFHA has great expectations that HUD will effectively investigate claims of the magnitude presented in this testing project.

Equally important is Secretary Cisneros' support of the Federal appellate courts' interpretation that the Fair Housing Act covers not only disparate treatment, but disparate impact—not only intentional acts of discrimination, but policies and practices that have the effect of denying, limiting, or otherwise making unavailable housing, financing, and insurance.

In addition, Attorney General Janet Reno has pledged to use the full extent of the Fair Housing Act to pursue claims of discrimination. With HUD and Justice both finally speaking with one strong voice about the law, NFHA will utilize the system Congress implemented with the Fair Housing Amendments Act of 1988 to address our charges of discrimination.

## Introduction

### I. NFHA's Homeowners' Insurance Testing Project

In 1990, the National Fair Housing Alliance concluded that, if left unchallenged, homeowners' insurance discrimination, like racial steering practices and mortgage lending discrimination, would have the same effect: the disinvestment, deterioration, demolition, and demise of neighborhoods. In July, 1990, NFHA submitted a proposal to HUD, in response to a Fair Housing Initiatives Program (FHIP) application, to conduct testing of homeowners' insurance companies in selected cities across the United States. The application was funded, and in October, 1991, NFHA began work on this project. The HUD funded-portion of the project was completed in early 1993. NFHA used its own resources to undertake the analysis and to conduct additional testing in 1994, some as recently as last week.

Congress passed the Federal Fair Housing Act to combat the individual and systemic practices and policies that discriminate against America's minority and integrated neighborhoods. Let's be perfectly clear: We are going to discuss violations of Federal law—laws that you enacted to protect residents of our communities from unlawful discriminatory practices. Congress also passed and authorized funds for the Fair Housing Initiatives Program (FHIP) to provide direct funding to private, nonprofit fair housing agencies to conduct testing, investigation, conciliation, and litigation against entities violating the Fair Housing Act. These congressionally authorized and appropriated funds have made it possible for NFHA to conduct this investigation, the results of which we will describe today.

We should be clear that discriminatory practices and policies that deny, limit or otherwise make unavailable homeowners' insurance because of the race, national origin, sex, color, religion, familial status, or disability of the individual or the racial or ethnic make-up of the neighborhood where the property is located VIOLATE the Federal Fair Housing Act. The issue of insurance discrimination is not new. Com-

56

munity organizations, fair housing agencies, and HUD have been looking at this problem since the 1970's. In fact, HUD published a handbook in 1979 that stated:

> While mortgage redlining has most severely affected lower income and minority families, the impact of insurance redlining extends to more than just the poor. Homeowners and investor owners of multi-family dwellings in urban neighborhoods are painfully familiar with the practices of non-renewal of policies on properties which they have owned for years. Because of the growing impact insurance is having on those areas of cities targeted for revitalization efforts, the urgency of examining the problem more closely is obvious.

"Insurance Redlining: A Guide For Action," U.S. Department of Housing and Urban Development, 1979.

Today there has been a renewed focus on lending discrimination, and many people point out that the movement to combat lending discrimination dates back to the late 1960's. What is not so well remembered is that the anti-redlining movement began as a response to insurance redlining before it moved on to lending discrimination.

Public focus on the problems that we are reviewing here today, the types of studies done recently by ACORN, the use of testing, and the move for Federal legislation in this area, began in the late 1960's and early 1970's as people in minority neighborhoods and people in integrated neighborhoods found insurance companies canceling their policies. After years of organizing around this issue, the National People's Action, the largest community-based coalition working on the anti-redlining campaign, declared 1979 the year of insurance.

In March of 1979, there was a national conference in Chicago. At this conference, the President of Allstate announced a new commitment by that company to inner-city neighborhoods and a new type of policy and a special program to build the capacity to rebuild urban communities. Within a year, Aetna, Travelers, State Farm, and several other companies had signed pledges not to discriminate. Aetna even published an advertisement in many national magazines depicting themselves as a man eating a dinner of crow to symbolize their admission of past practices.

Community groups engaged in various forms of testing. Indeed, the testing section of the 1981 guide to fighting lending discrimination developed by the National People's Action quotes extensively from test reports from Nationwide where people in minority communities were discouraged from obtaining insurance.

The insurance industry has been aware of the problem of discrimination for decades now. Major changes were announced over 15 years ago. But the studies of insurance discrimination from that time through our own testing project that was completed just last week demonstrate that the problem is pervasive and persistent. It has not gone away. We have found what we believe to be evidence of discrimination in the very companies that were the focus of anti-discrimination activities over 20 years ago.

## II. NFHA's Testing Process

NFHA designed and implemented a nationwide program of testing for insurance discrimination. This nationwide approach ensured consistency in the cities in which testing was conducted. Each site conducted between 30 and 40 matched pair telephone tests.

The testing conducted in this program consisted of matched pairs of testers calling the same insurance office and routinely speaking with the same agent. Neighborhood tests were based on the racial/ethnic composition of the neighborhood (minority tester with property in predominantly minority neighborhood; white tester with property in white neighborhood). NFHA matched the characteristics of the houses for which insurance was being sought. In Chicago, all minority testers were Hispanic; in the other cities, minority testers were African-American.

The tester houses were well-maintained homes located in moderate/middle income neighborhoods. Every effort was made to match neighborhoods based on value of housing (this was difficult to achieve because the historically dual housing market has devaluated properties in minority neighborhoods). Most houses were built before 1950. Houses were always matched on type of construction (brick/frame/stucco) and generally were matched on age and square footage.

## III. Target Company and Agent Selection

The selection of Nationwide and Allstate was based on bona fide insurance discrimination complaints. Sites were requested to provide information about the number and geographical distribution of captive agents for each company. These companies were selected for two reasons:

(1) the egregious nature of existing complaints; and
(2) the preponderance of captive agents in the participant cities.

57

The use of captive agents was important to ensure consistency, because captive agents generally write policies for only one insurance company. A random selection process was utilized for identification of specific agents/offices for testing. In smaller cities, all captive agents were put into a pool and selected at random. In larger cities, a smaller geographic subset of agents was put into the pool, and agents were selected at random from that subset.

**IV. Testing Results**

A. The investigation conducted by NFHA identified the following types of discriminatory practices and policies used by agents working for Nationwide and Allstate:

1. In minority neighborhoods, refusing to provide insurance because of the age of the home.

*"I don't like to insure anything over 30 years old. . . . It is too hard after all the remodeling and things like that to mess with. I am trying to eliminate them from my portfolio."*—ALLSTATE agent for a home in Louisville, Kentucky.

2. In minority neighborhoods, refusing to insure properties because of the market value of the homes.

*"We don't insure for less than $55,000. Well, we can't insure it. Can't do it."*—NATIONWIDE agent for a home in Milwaukee, Wisconsin. This company provided a replacement cost coverage policy for a similar property located in a white neighborhood.

3. In minority neighborhoods, requiring homeowners to provide the name and telephone number of their mortgage lender to gather information about the property before providing a quote.

*"Who's your mortgage company? Do you have a number for them? . . . The reason ma'am is because it's like the difference between an Escort and a Cadillac. [The mortgage company] can tell us what the house is like."*—NATIONWIDE agent for a property in Chicago, Illinois.

4. In minority neighborhoods, requiring inspection of the home prior to providing information on the cost or type of insurance available.

5. Requiring a credit check for applicants from minority neighborhoods;

6. Charging higher premiums for less coverage for properties in minority neighborhoods as compared to similar homes (square footage, age, construction type) in white neighborhoods;

7. Refusing to provide replacement cost coverage on the structure and contents on homes in minority neighborhoods;

8. Refusing to return telephone calls of minorities seeking insurance.

B. Based upon a conservative analysis of neighborhood-based test reports, NFHA can document the following for four cities in which testing was conducted:

1. Louisville: African-American testers experienced discrimination more than 47 percent of the time.

2. Atlanta: African-American testers experienced discrimination more than 60 percent of the time.

3. Milwaukee: African-American testers experienced discrimination more than 60 percent of the time.

4. Chicago: Latino testers experienced discrimination more than 95 percent of the time.

**V. Insurance Companies, In General, are Engaging in Practices and Policies that have the Intent and Effect of Denying, Limiting, or Restricting Homeowners' Insurance for People Living in Minority Communities**

While Nationwide and Allstate were revealed to engage in specific discriminatory practices in our investigation, other companies are known to engage in discriminatory practices as well. I will now discuss the wide range of discriminatory practices common throughout the country.

A. MINIMUM INSURANCE AMOUNTS

What is the difference between a mortgage lender and insurance company instituting a minimum policy? Nothing. Both practices can have a disparate impact on people living in minority and integrated neighborhoods. In Ohio, an insurance company failed to renew a homeowners' policy on a property that was built through the Habitat for Humanity program because the company would not insure properties valued at less than $65,000. HUD and the Federal regulatory agencies recently issued a policy statement indicating that there are circumstances in which minimum

004296

loan policies would constitute discrimination. Minimum insurance policies have the same discriminatory effect.

### B. MAXIMUM AGE REQUIREMENTS

Lenders cannot use the age of housing alone to deny a mortgage loan; yet, insurance companies are refusing to write policies for homes built as late as 1960 regardless of the condition of the homes. Maximum age standards strike hardest at our Nation's cities, where the housing stock is generally older than in the suburbs. If the lender's underwriter and appraiser and the secondary mortgage market believe that the property is a good investment, why should an insurance company be able to deny coverage based solely upon the age of the property?

### C. CREDIT CHECK REQUIREMENTS FOR SOME APPLICANTS

Instances have been reported in which minority applicants applying for insurance in minority neighborhoods were told they would have to have a credit report run before the agent could provide a quote. This requirement was posed by the agent without any indication that the tester's credit was a problem. All the agent knew was the address and value of the property, yet the same agent did not tell the white tester calling about property located in a white neighborhood that a credit check must be run prior to receiving a quote.

Sound familiar? Mortgage lenders used the credit issue to discourage minority loan applicants when evidence now clearly demonstrates that 80 percent of *all* loan applicants have items on their credit reports that require explanation.

However, when the *insurance* application is for a minority homebuyer, we know the mortgage lender and mortgage insurer have already reviewed the credit report and found the applicant to be a good credit risk. Should the insurance company be able to use the same credit report to reject an applicant? If I pay my bills on time and meet my credit obligations, why should the amount of credit I have determine whether I receive a homeowners' policy? Why am I a "moral hazard" to the insurance company, but a "good credit risk" to the lender?

These differences in treatment are similar to the practices used by mortgage lenders to discourage minorities from applying for credit, practices now determined to be discriminatory.

### D. INSPECTION REQUIREMENTS PRIOR TO PROVIDING A QUOTE FOR INSURANCE

It sounds like good business to inspect a property before you insure it. Lenders conduct appraisals to evaluate a property, but lenders appraise *every* property. Insurance agents have told applicants from minority neighborhoods that inspections are required, but the same agents rarely if ever tell applicants from white neighborhoods that an inspection is required and virtually never tell them an inspection must be done before a quote can even be given!

### E. IS YOUR CURRENT POLICY BEING CANCELED OR NON-RENEWED?

Many agents immediately assume that applicants from integrated and minority neighborhoods are calling because their policies have been canceled. It is frequently one of the first questions asked of these callers. If your insurance policy has been canceled, of course, it is highly unlikely that you will be able to get other coverage, so it is a way of immediately disqualifying the applicant. Callers from white neighborhoods, however, are rarely asked about cancellations during their initial contact with an agent.

Are policies in minority and integrated neighborhoods canceled more often? No recent studies are available, but old studies and much anecdotal evidence indicate that policies in those neighborhoods are canceled more readily for reasons which do not apply to white neighborhoods. NFHA members, for example, report homeowners being canceled after 20 years of coverage when they made their first claim.

### F. REPLACEMENT COST COVERAGE VERSUS MARKET VALUE COVERAGE

Insurance companies will state that they are writing policies in minority neighborhoods. This may be true, but Congress must ask the same questions it asked the lenders: are these inferior policies, do they provide adequate insurance coverage, are they priced based upon real or perceived risks, are homeowners offered the opportunity to purchase replacement cost coverage or are they relegated to the Fair Plan or market value policies?

Insurance companies will claim that homeowners living in lower priced homes in urban areas, where the houses are older and cost more to rebuild than to sell, create a "moral hazard" if the company provides replacement cost coverage for their homes. These companies allege that, if they provide replacement cost coverage, the homeowners have an incentive to burn down their homes to collect the insurance because the replacement cost substantially exceeds the market value. Can you honestly

59

imagine thousands of homeowners in the neighborhoods pictured in these photos burning down their homes? Is there proof that minorities and whites living in homes built before 1960 are more likely to burn down their property? Is there evidence linking the availability of replacement cost coverage for moderately priced housing with an increased likelihood that the homeowner will burn down his/her home? NO!

The Federal Insurance Administration (FIA) challenged this presumption in a 1978 report. An FIA investigation of Detroit found that "[t]here was no evidence that any policy-by-policy analysis was made to determine whether the low-market value of a property, in relation to replacement value, had increased the probability that the owner might resort to arson." (See Federal Insurance Administration, U.S. Department of Housing and Urban Development, Insurance Crisis in Urban American (1978), at 5.)

Yet, the "moral hazard" reason is raised repeatedly in defense of denying homeowners replacement cost coverage for homes located in minority and integrated neighborhoods throughout the United States.

## VI. The Fair Housing Act Prohibits Insurance Discrimination

There should be no doubt that the Fair Housing Act covers homeowners' insurance under both sections 3604 and 3605. Five out of six Federal court decisions have held that homeowners' insurance discrimination is within the purview of the Fair Housing Act. The most recent decision involves one of the companies NFHA tested: Nationwide Mutual Insurance Company. Nationwide sued HUD to prevent HUD from conducting an investigation of allegations of discrimination in Ohio. In September, 1993, the court in Dayton, Ohio ruled for HUD. The Toledo Fair Housing Center, a NFHA member, has also sued Nationwide in State court alleging discrimination against African-Americans living in Toledo's minority neighborhoods. In addition, the Seventh Circuit Court of Appeals ruled that insurance discrimination is prohibited under the Fair Housing Act in *NAACP* v. *American Family Mutual Insurance Company Co.*, 978 F. 2nd 287 (1993). The only dissenting decision comes the fourth circuit in 1984.

FEDERAL FAIR HOUSING ACT: SECTIONS 3604 AND 3605

Section 3604 makes it unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable or deny,* a dwelling to any person because of race, color, religion, sex, familial status, (handicap) or national origin.

(b) To discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling or *in the provision of services* or facilities *in connection therewith,* because of the race, color, religion, sex, familial status, (handicap) or national origin.

Section 3605 states:

(a) In General—It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Definition—As used in this section, the term "residential real-estate related transaction" means any of the following:

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

(B) secured by residential real estate.

The phrase "otherwise make unavailable" has been broadly construed to various practices including practices that result in segregated housing patterns. While the Act does not explicitly mention mortgage lending or insurance discrimination, Federal courts have held that this section prohibits these types of discrimination. *(See e.g., Laufman* v. *Oakley Building & Loan,* (Ohio 1976); *Dunn* v. *Midwestern Indemnity* (Ohio 1979), *McDiarmid* v. *Economy Fire and Casualty Co.,* (Ohio 1984).

In the American Family decision, the Seventh Circuit Court of Appeals stated: "The phrase 'in provision of services,' 'in connection' with the sale or rental of a dwelling has been broadly construed to encompass discriminatory practices of insurers. Insurance is thus viewed as a 'service' that is supplied 'in connection with' the sale or rental of a house."

NFHA also contends that section 3605 prohibits insurance discrimination, because the purpose of insurance is to provide financial assistance to the homebuyer/homeowner "for purchasing, constructing, improving, repairing, or maintaining a dwell-

ing." For example, most homeowners rely on insurance to *repair a dwelling* that has been damaged by wind, storm, fire, vandalism, or other insurable events; homebuilders must have insurance in order to *construct a dwelling*; homebuyers are required to have insurance in order to *finance the purchase of their dwelling*; and in order to *improve a dwelling* through a home improvement loan, the homeowner must have adequate insurance. [See attached Amicus Curiae Brief *United Farm Bureau Mutual Insurance Company* v. *Metropolitan Human Relations Commission*, Case No. 93–1739, U.S. Court of Appeals, Seventh Circuit. August 1993.]

## VII. Why Are So Few Complaints Filed?

### A. WHO RECOGNIZES DISCRIMINATION TODAY?

HUD conducted studies of housing discrimination in the rental and sales markets in 1989 and found that when African-American and Latino testers inquired about housing, they experienced discrimination more than 50 percent of the time. HUD estimated that more than 2 million instances of housing discrimination occur annually. How many complaints are filed annually with HUD, State, local, and private fair housing organizations? Fewer than 20,000. Why? Because discrimination is subtle and sophisticated and, without testing, it is difficult to detect. Sometimes it is simply easier to find other housing than to have to face discrimination.

The Federal regulators have had access to mortgage loan applications for decades, but only recently have they begun to report evidence of discrimination to the Department of Justice. Why? There are numerous reasons including a previous lack of presidential leadership on the issues of fair housing; failure of Federal regulators to even acknowledge that discrimination existed; bank examiners without training about what constitutes a violation of the Fair Housing Act; little credibility in Federal and State civil rights agencies to investigate complaints. . . .

So even though a handful of neighborhood groups and fair housing agencies have known and challenged discriminatory insurance practices, there has been little or no support for Federal or State government to fully investigate fair housing act violations.

Who reads an insurance policy? In informal surveys conducted by NFHA with audiences that have included real estate agents, mortgage loans officers, neighborhood residents, and civil rights advocates, it is rare indeed to find more than two people who have read their homeowners' insurance policy. If an agent states that "it's the company policy or practice and this is the best coverage I can provide," who really challenges it? You may question the agent, but who complains? Most people simply call another company to try to get better coverage or simply take the agent at his/her word. We are reminded of loan officers who told people that the only loan they could make in minority and integrated neighborhoods required a 20 percent downpayment, Government financing or only a shorter loan term. Most people have no way of determining if they are victims of insurance discrimination.

### B. WHAT HAS THE GOVERNMENT DONE TO ENFORCE THE LAWS?

The level of enforcement activity by State and Federal agencies against discrimination in insurance has actually declined over the years. In the late 1970's and early 1980's, several State agencies investigated complaints, did studies, and fined companies found to be engaging in discriminatory practices. HUD took an active role, and even issued a handbook on fighting discrimination: "Insurance Redlining: A Guide for Action."

But today, the major efforts to combat insurance discrimination remain even more in the hands of private fair housing groups and community organizations than was the case over a decade ago. The Government has generally failed to take an active role in enforcement. Now, with Congress paying more attention to this form of discrimination and with new leadership at HUD and the Department of Justice, we see a heightened interest in the enforcement of the fair lending laws against insurance discrimination.

### C. THE ROLE OF INFORMATION

As with lending discrimination, one key to increased enforcement lies in providing the public with information about where companies do and do not issue policies. Neither enforcement agencies nor members of the industry can effectively review insurance availability problems until there is a good source of data defining where policies of different types are and are not made. Just as the Home Mortgage Disclosure Act data has lead to both an increased level of enforcement by many parties and to self-review and reform by some industry leaders, so insurance disclosure holds the potential to be a catalyst for enforcement and reform in insurance discrimination. At its best, such data define cases of potential discrimination for testing

61

or direct litigation. At a minimum, such data provide a focus for discussion about what constitutes a legitimate business practice.

### D. EDUCATION AND OUTREACH

While HUD and private fair housing groups have engaged in extensive media campaigns to teach individuals how to recognize and report discrimination in rental and sales practices, these same efforts have not been duplicated in the areas of lending and insurance. Because discrimination is so subtle and sophisticated, people need to be taught how to identify suspicious actions.

## VIII. Recommendations

The National Fair Housing Alliance makes the following recommendations to address discrimination in the homeowners' insurance industry:

### A. DIRECTIVE FROM CONGRESS THAT FUNDS IN FEDERAL PROGRAMS BE APPROPRIATED FOR EDUCATION, ENFORCEMENT, AND RESEARCH CONCERNING HOMEOWNERS' INSURANCE

1. Fair Housing Initiatives Program (FHIP) Funds: Congress can begin by increasing the 1995–96 FHIP allocation in enforcement from $9 million to $15 million or, at the least, reallocating $3 million from education to enforcement. It makes little sense to increase the knowledge of the public about housing, lending, and insurance discrimination without providing adequate funds for enforcement efforts. There must be adequate funds in enforcement to cover the costs of systemic investigations, analysis, and expert witness costs.

2. CDBG Funds: While more than 800 cities in the United States receive CDBG funds, fewer than 30 cities provide funding for enforcement of the Federal Fair Housing Act. The CDBG program requires each city to "affirmatively further fair housing." Those cities that do not provide funding for fair housing may not, in fact, be fulfilling this mandate. Congress should support HUD's recommendations to establish a separate funding line item for fair housing education *and* enforcement activities. In addition, HUD must establish standards that define affirmatively furthering fair housing" which should include comprehensive education, enforcement, and research components. At a minimum, these should address the application of the Fair Housing Act in rental, sales, lending, and insurance issues for all protected classes, regardless of income.

3. Congress should allocate additional funds for HUD's Fair Housing and Equal Opportunity Division to hire and train staff specializing in systemic type investigations.

### B. LEGISLATION: CONGRESS SHOULD ENACT A DISCLOSURE BILL

1. Insurance discrimination is a civil rights issue. HUD has *primary* authority for enforcing the Fair Housing Act; therefore, HUD should receive the disclosure data, have resources to analyze and investigate patterns of disinvestment and make the data available to the public. The Senate House, Banking, and Urban Affairs Committee should monitor the fair housing elements of the insurance industry in the same affirmative manner that it has monitored the mortgage lending industry.

2. Congress should enact disclosure legislation which will provides, at a minimum, the following:

    a. Disclosure of Underwriting Guidelines
    b. Disclosure of Loss Data
    c. Disclosure of type of policy, cost of policy
    d. Reporting of the race, national origin and gender of policyholders
    e. Reporting for all Metropolitan Statistical Areas
    f. Reporting the above information by Census Tract

### C. WHY ARE THESE ELEMENTS NECESSARY?

*1. Access to Underwriting Guidelines*

We must have access to underwriting guidelines. Several years ago, mortgage lenders claimed their underwriting guidelines were "trade secrets" and they claimed they would lose their competitive edge if forced to reveal the guidelines. The insurance industry is making the same claims now. What has happened since the lenders made their underwriting standards public? Better underwriting policies and practices are being put into place. Antiquated and discriminatory guidelines were identified and removed. Sound lending in urban areas is underway in many cities. Legitimate underwriting guidelines can be defended. No one is insisting that insurance companies write policies for people who burn houses, inflate claims, file false claims, or commit other illegal acts. No one is asking an insurance company to insure a property that is a fire or safety hazard. What the Fair Housing Act requires is poli-

cies that do not have a discriminatory effect or impact on a person based upon race, color, religion, sex, familial status, disability, or national origin—or against a neighborhood because of the race or national origin of the residents.

### 2. Loss Data

The industry must present information about the number, type, and amount of claims filed. Without this information, Congress and the public will not know if higher premiums charged in minority, integrated, older, or lower income neighborhoods are based upon higher risks or whether these high premiums are being used to subsidize other neighborhoods, as some studies reveal.

### 3. Disclosure of Type and Cost of Policies

Just as it is important for us to know if conventional loans are available in all neighborhoods, we need to know what types of policies are being written in minority neighborhoods. Certainly insurers will come forward with numbers showing they are writing policies in some of the same neighborhoods where we have documented discrimination, but do these policies include their top of the line packages or are they minimum insurance at maximum price? Remember when lenders made loans in minority neighborhoods, but the terms and conditions were more restrictive, not based on risk, but based on race. The insurance industry must provide documentation that their business decisions are based on risk and not race. This provision will give governmental agencies, fair housing advocates, and neighborhood groups that information necessary to determine if fair treatment is reality.

### 4. Reporting Race, National Origin, and Gender

This information is critical and easy to obtain. Just as mortgage lenders record the information or have the loan applicant complete the section on race, insurance companies can include this information on their application. If they are uncomfortable asking the applicant over the telephone, they can send a form for the applicant to complete and return in one of the companies regular mailings to the policyholder. People are not offended by the question when they understand that the information is being used to guarantee equal treatment. The Fair Housing Act was not passed to tell minorities, women, disabled persons that they have rights, it was passed to tell the individuals and companies who own and manage housing, lending and insurance that these people and the neighborhoods where they live have rights under the law.

### 5. Reporting Information By Census Tract

Currently, insurance companies keep information by zip code. Zip codes are large geographic areas that encompass many minority and non-minority neighborhoods. Many zip codes are so large that they actually take in very high-income white neighborhoods, moderate-income integrated and minority neighborhoods as well as very low-income communities. An insurance company could report that it is writing 20 percent of the policies in the zip code, but that 20 percent could be confined to the high-income white neighborhood. Census tracts usually have 5,000 people within their boundaries and provide demographic data that is essential to determining the characteristics of neighborhoods such as race, income, and age of housing. Census tract reporting is required of mortgage lenders, and Congress gave them 1 year to convert from zip code to census tract after passing the Home Mortgage Disclosure Act. It is certainly much easier and less expensive now to convert. However, I have no doubt that insurance companies will argue that the expense is enormous and will be passed on to the consumer in higher premiums. Congress listened to this same argument from the lenders, and the lenders who went out of business did so because of their failure to provide safe and sound loans, not because of a burdensome expense of reporting loan information by census tract.

### 6. Reporting for ALL Metropolitan Statistical Areas

Insurance discrimination is a violation of Federal law. This is a civil rights issue and Congress has the responsibility to assist HUD, Justice, and the public in insuring fair enforcement of the law. The Federal Fair Housing Act provides protection based upon race, color, religion, sex, familial status, disability, or national origin. It also protects people who live in minority and integrated neighborhoods. Clearly the MSA in the United States include people and neighborhoods represented in the protected classes. How can we justify protecting some, but not all, of the residents in the country? Reporting must be inclusive.

### Conclusion

It is important that Congress take swift and comprehensive action to address discrimination in the homeowners' insurance industry. For more than 20 years, the

63

mortgage lending industry claimed that denial of loans in minority neighborhoods was based upon sound lending practices. We are confident that insurance companies will claim they are insuring risk, not race. But we believe the evidence disclosed to you today is simply the tip of the insurance discrimination iceberg. Congress must stand firm with this powerful and wealthy industry. America's neighborhoods are counting on you to provide HUD and the public with the tools necessary to identify and eliminate discrimination in all forms.

---

## PREPARED STATEMENT OF J. ROBERT HUNTER

COMMISSIONER, TEXAS DEPARTMENT OF INSURANCE

### *Insurance Redlining*

Mr. Chairman and Members of the Committee, I am pleased to appear before the Banking Committee once again. When I was Federal Insurance Commissioner, I spent many long and occasionally enjoyable hours here before Chairman Proxmire.

More than 25 years have passed since President Lyndon B. Johnson's Commission on Insurance Availability in Urban America, formed in the aftermath of Los Angeles rioting, told us that "communities without insurance are communities without hope." As Federal Insurance Commissioner, I ran the riot reinsurance and FAIR Plan programs which sprang from that commission's studies. During the 1970's, we at the Federal Insurance Administration performed several studies documenting the fact that some insurers were avoiding certain neighborhoods. One of our reports showed that in New York City, residents were more likely to be denied homeowners' insurance if they were black than if they had building code violations.

Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk. One of these factors, unfortunately, is your location on a city map that probably does not have any red boundary lines drawn on it but it might as well because the results are the same. I commend this Committee and the Members of Congress who have introduced redlining legislation for their recognition—and rejection—of this antiquated form of underwriting and their determination to do something about it.

### Definitions

In your deliberations on these bills, you will hear and see the word "redlining" over and again. I think it behooves each of us to be clear about the meaning of this emotionally laden word when we use it.

My definition of redlining is simple. By redlining I mean unfair discrimination in the availability, price, benefits, or quality of insurance for a class of consumers based on factors outside the control of the consumer.

Redlining is not only geographic; it includes unfair discrimination based on race, gender, age, income level, value of home, age of home, or other characteristics that the consumer cannot change.

By this definition, redlining occurs when a class of individuals is denied insurance, charged a higher price, provided fewer benefits or given inferior service for a reason unrelated to their risk or for a reason that is contrary to public policy.

Data indicate that unfair discrimination against several classes of individuals, particularly minorities and low-income citizens, is practiced all too commonly in the insurance industry, denying many consumers the ability to purchase cars or homes or maintain small businesses. The Federal Fair Housing Act, as interpreted by the Supreme Court, is an example of the Federal interest in ensuring that redlining does not prevent classes of consumers from purchasing a home. Denying insurance to citizens and small businesses in economically underdeveloped areas contributes to the web of inadequate economic opportunity and social decay. There was a television investigative report a number of years ago called "The Poor Pay More." We see the same result in insurance. The channeling of low-income people into high-risk, high-rate insurance companies is redlining.

I want to make it clear that I am coming at this problem not only as a State official with a consumer protection mandate and a personal history as an insurance consumer advocate. I also approach redlining as an actuary with experience in risk analysis and insurance loss projection. Underwriting standards that take a monolithic approach to neighborhoods, home value and age of home just don't make sense. They treat well maintained, structurally sound, and burglar-resistant homes the same as fire traps.

64

When I conducted a public heading on redlining in Houston on March 31, I received a clear-cut example of this approach to underwriting. Habitat for Humanity, an organization associated with former President Jimmy Carter, has built 50 homes for—and, of particular importance, *with*—low-income families in Houston. This is sweat equity, and the new owners have not only worked on the construction but learned a great deal about home maintenance. These homes and their owners are quality risks. This group of homeowners in Houston have made only one claim—for a tree that fell during a storm. Nonetheless, only one major insurance company, Texas Farmers, was willing to insure these homes. A transcript of the Habitat for Humanity representative's testimony is shown as ATTACHMENT A.

The approach taken by other companies to the question of insuring these Habitat for Humanity homes was not genuine underwriting. Rather, it was the application of certain preconceptions about how people across the tracks live their lives and tend their homes. So when I urge action, including voluntary action by insurance companies, to end redlining, I'm not talking social engineering but I am talking the use of sound business practices that separate profitable from unprofitable insurance business one risk at a time.

## Data Collection

How do we begin to attack redlining? The essential first step is to identify all areas that are being unfairly discriminated against in the availability, price, benefits, or quality of insurance. To solve the problem of redlining, *all* areas where consumers are being unfairly discriminated against must be identified.

This requires reliable data broken into small enough pieces to see what is happening to specific neighborhoods and other specific groups of consumers. I would like to see data that tells what is happening in rural areas as well as in cities, and I would like to have urban data all the way down to the census tract level.

Certain lines of inurance—homeowners, automobile, and small business commercial policies—are most susceptible to redlining, and those are the lines where the need for good, reliable statistical data are most crucial.

The kinds of statistics we need include data about service (including locations of insurance agents), coverages sold in an area, premium volume, prices charged, and losses (including loss ratios).

Texas has been trying for more than a year to assess the degree to which redlining occurs in our State. We have used data calls, a consulting actuary's study and the more anecdotal route of public hearings. This is an ongoing effort to come up with the sometimes elusive truth about whether the industry does things its spokespersons deny it does. It is a pity that Texas has taken so long to identify the problem. It is doubly tragic that I must report that Texas is at the cutting edge of data analysis on this issue.

The paragraphs that follow will summarize some of our preliminary findings in Texas.

## Evidence of Redlining—the Texas Experience

One place we looked for evidence of redlining was the placement of drivers in the Texas Automobile Insurance Plan (TAIP), which operates as our State's assigned risk plan for drivers who have been rejected for coverage by insurance companies in the voluntary market. It is noteworthy that the TAIP offers only liability coverages, not comprehensive coverage that pays when cars are stolen or vandalized. Even if one assumes—as I do not—that low-income or high-minority neighborhoods are by definition high-crime neighborhoods, this should not be a reason for sending drivers to the TAIP.

Studies of TAIP assignments in 1993 show that consumers who live in zip codes with predominantly low-income and minority populations are disproportionately insured through the TAIP compared with those from zip codes with higher-than-average income and higher-than-average Anglo populations. Rural consumers also are disproportionately represented in the TAIP.

TAIP assignments are one indicator of auto insurance availability in particular neighborhoods. *Statistics gathered through this year's NAIC call to insurers writing auto insurance in Texas also showed a direct correlation between lack of availability and the ethnic and racial minority percentages of the population in the zip code.* The data presented in ATTACHMENT B graphically portray the existence of auto insurance redlining. The data show that the higher the minority population in a zip code, the worse the auto insurance availability. In addition, lower availability of auto insurance correlates with lower median household income in a zip code.

004303

- In zip codes where auto insurance availability is two times worse than the State average, the minority population percentage in the zip code also is twice the State average; and
- In zip codes where auto insurance is written in non-standard companies half as much as the Statewide average, the minority population percentage is also half the Statewide average.

The data also show a strong correlation between low median household income and low availability of insurance. I can supply a copy of these data in full zip code detail to this Committee if you desire it.

The Texas Department of Insurance is doing a similar analysis of homeowners' insurance by zip code, but we do not have any preliminary results at this time.

I cannot overemphasize the importance of gathering thorough and reliable statistics on the insurance marketplace. Like the NAIC, Texas' efforts in this direction are just beginning. Texas is a pioneer in gathering insurance data independently of industry-controlled statistical organizations, and we intend to have a continuing flow of zip coded data on automobile, homeowners, and commercial insurance. We have just scratched the surface in our ability to detect redlining and other unfairly discriminatory insurance practices, and this data flow will put us in a much better position to protect the insurance-buying public in the future. To have any hope of a national picture in the foreseeable future, we must have congressional action. Insurance is, I fear, just too powerful a special interest in most States.

**Underwriting Guidelines**

We are looking not only at evidence of redlining, We are reviewing companies' underwriting guidelines to determine the causes. Several common underwriting guidelines adversely affect the availability of homeowners' insurance in minority and low-income neighborhoods as well as in some rural and inter-urban communities. Texas' Office of Public Insurance Counsel (OPIC) reviewed the homeowners underwriting guidelines filed with our Department by insurance companies this year and issued a report (ATTACHMENT C) showing that:

- 88 percent of the companies have age-of-home restrictions.
- More than 90 percent of the companies have minimum coverage amounts, often above Texas' median housing value of $42,500. Many won't write homes valued under $60,000 or higher!
- 60 percent of the companies have location restrictions. While not as overt as a red line map, these restrictions prohibit coverage for certain consumers in very vague terms without objective standards (e.g. "unprotected areas").

All of these underwriting guidelines have an adverse impact on the availability of homeowners' insurance for consumers in older or lower income inner-city and rural neighborhoods.

Regulatory action against unfair underwriting practices is a new phenomenon but I predict you will see much more of it as the trend toward election or appointment of consumer-oriented insurance commissioners continues throughout the Nation. In Texas, the Commissioner received clear-cut legislative authority only last year to request and receive companies' underwriting guidelines and to use them in enforcement actions (but we are not free to disclose them to the public, which inhibits out ability to make competition in price fully effective—we need an informed consumer for that). Our Department just initiated disciplinary actions against 59 companies, including some of the largest auto writers, for alleged unfairly discriminatory underwriting guidelines, which either exclude people or force them into high-rate companies merely because they are single, have only one car, have a driver's license from the "wrong" country, won't buy another kind of insurance policy from the same company or had been rejected or canceled by a different company.

On May 2, 1994, I imposed a Texas record fine of $850,000 on Allstate for applying similar guidelines. In this case, we actually received videotapes showing agent after agent turning down an applicant because he was single, had only one car and was not in the market for any insurance but an auto policy.

Although the practices involved in these disciplinary cases do not involve excluding specific neighborhoods, they do have disproportionate impact on racial and ethnic minority populations and low-income consumers. That is why the focus on redlining should not be limited to discrimination based on geographic location alone.

Besides the disciplinary actions mentioned above, I am considering further rulemaking, enforcement actions and proposed legislation to further combat unfair underwriting practices and redlining. One of the ideas I'm considering is requiring that an underwriting guide be demonstrated as risk related by statistics in order to use it in Texas.

In your letter of invitation to testify at this hearing, your staff asked me to address several specific issues related to various data collection bills now pending in Congress. These are (1) reporting by census tract versus reporting by zip code, (2) the collection of race and gender data, (3) reporting on claims information, and (4) including an automatic sunset provision with the reporting requirements. I will discuss each of these in order.

## Reporting by Census Tract Versus Reporting by Zip Code

Although current reporting of neighborhood-related insurance data is by zip code in the vast majority of States, it is not sufficient for your purposes. Congress would come closer to getting the information it needs on redlining if it requires reporting by census tract. Demographic information from the Bureau of the Census is far more complete and accurate for census tracts than it is for zip codes. In addition, census tracts tend to be smaller and more demographically homogeneous than zip codes, thereby giving a clearer, better focused picture of the treatment of minority and low-income neighborhoods than we get from looking at zip code data. Furthermore, zip codes exist to expedite mail handling and are subject to change whenever necessary to further that objective. Census tract boundaries are less likely to shift. I believe the larger insurance companies that would object to reporting could easily adapt to census-tract reporting because the necessary software is readily available. In fact, section 14(b) of S.1917, the legislation now under review by this Committee, requires the Secretary to provide insurance companies with this software. If insurers claim that census tract is too difficult, you might consider requiring reporting by 9-digit zip code, which can, as I understand it, be used to construct census tracts. All insurers must have this information in order to obtain mail cost savings.

## Collecting Race and Gender Data

I support the collection of race and gender data because it will further the objective of discouraging unfair discrimination, including those forms of discrimination that have the intent and/or effect of redlining. This kind of data collection is essential if Congress is to determine whether insurance companies are, in fact, discriminating based on race or gender. It will also provide stronger factual support for legislative, judicial, and regulatory actions to protect the rights of racial and ethnic minority populations to buy insurance at fair and affordable rates. Finally, and possibly of greatest importance, such data might increase the availability of insurance to minorities by opening the eyes of many insurance companies to the effect of their underwriting guidelines on these populations. Such companies could be expected to act to increase their minority business to avoid discrimination suits, regulatory action, and further legislation.

At my March 31 redlining hearing in Houston, an ITT Hartford representative testified the company had gone through a painful process in which it came to realize its underwriting practices were causing unintended problems for some minorities. The company is taking initial steps to turn this around, including a program to develop more minority agents to work in underserved areas. Thus, by forcing companies to examine the effects of their underwriting guidelines on minorities and low-income consumers, we hopefully will begin the process of their own self-examination and reform.

## Reporting of Claims Information

Claims information is vital if Congress, regulators, and others are to accurately assess the extent of redlining and other forms of unfair discrimination in the sale and pricing of insurance and take appropriate corrective action. What if you collect data from an insurer and see what appears to be unfair discrimination based on where it wrote its policies? What if it then says it is making a sound business judgment based on the claims? Where are we then?

Claims data are highly relevant information, and we seek it in our own data calls because assuring fair rates is only half the regulatory battle. If a homeowner in a predominantly minority area pays the same rate as one in an upscale corner of the same city but receives scaled-down benefits if he or she has a fire or other loss, that is redlining as surely as rejection for coverage or assignment to a high-risk company. This, in fact, might very well be happening in some of our cities. Public adjusters have told our Department that some insurance companies have different payment standards in minority areas than in other areas. Trial lawyers and some adjusters also have alleged that insurers pay smaller damages for minority claimants. But, as an insurance regulator, I need solid statistical support for rulemaking and enforcement actions against such behavior, and I believe Congress also needs more than hunches and anecdotal evidence. You need these data!

Finally, enlightened insurance regulators and companies are coming to understand that they have an obligation to attack the root cause of rising insurance rates

by encouraging better construction, stronger defenses against crime and other loss-prevention measures. The Texas Department of Insurance recently created its first Safety Unit to lead the way in this effort. Claims data, by neighborhood, can help regulators and the industry target areas where loss prevention efforts can do the most good.

## Automatic Sunset Provision

There should be no automatic sunset provision. The purposes of the bill set out in section 2 will continue to exist in the future. If the bill makes sense now, it will make sense 10 years from now, and Congress would be remiss to pretend that red-lining is a disease that can be cured in a short period of time with no danger of remission.

## Review of S. 1917

Finally, the Committee staff asked for my review of Senator Feingold's bill, S. 1917. Following are some problem areas and my recommendations for change:

1. The bill does not include the collection of data on personal auto insurance. Auto insurance is as important, if not more important, than homeowners' insurance in minority and low-income neighborhoods where home ownership is more of a dream than a reality. Our data show significant redlining in auto insurance. The bill should include collection of data on auto insurance.

2. In addition to region, race, gender, age of home, and location of home, data on the age of the insured should be collected for homeowners and auto.

3. Section 12(a)(2) should be changed to make data available to the public as soon as possible. I suggest that the agency be allowed time to review the data but that a preliminary report should be issued 30 days after the data is due from insurers and a final report issued 60 days after the data is due from insurers.

4. Section 12(c) makes losses by individual insurers by zip code or census tract a closed record. To combat unfair discrimination in claims payments, it is crucial that this information be open to the public.

5. Renters' insurance is excluded from the definition of residential property insurance in section 13(c)—designated lines of insurance. Because many low-income and minority consumers are unable to purchase homes but need insurance for their personal property, data should be collected on renters insurance.

I should point out that S. 1917 is stronger than the House Commerce Committee version of the bill in that body, but far weaker than the Banking Committee version. It represents a good compromise, in my view, if the items I listed above are amended onto S. 1917.

## Conclusion

Based on available data, it is obvious that redlining is a problem in many urban communities and rural areas. Other forms of discrimination, such as underwriting guidelines that deny coverage or assign consumers to high-risk, high-rate companies because they are single or own only one car or don't buy other kinds of insurance from a company often have the same effect on minority and low-income people as geographic redlining. More data is necessary if policymakers and insurance regulators are to fully understand the scope of this problem and take the actions necessary to protect the insurance-buying public. Congress is to be commended for taking on this difficult but extremely important issue. I urge you to strengthen and approve S. 1917.

---

## PREPARED STATEMENT OF LYNN M. SCHUBERT

### Assistant General Counsel, American Insurance Association

### I. Introduction

The American Insurance Association is a national trade organization representing more than 270 companies writing property and casualty insurance in every State and jurisdiction of the United States. AIA members write 36 percent of all commercial property and casualty insurance in the United States. They also write a significant amount of personal, homeowners, and automobile insurance. AIA member companies employ more than 145,000 people and pay $2.2 billion in State taxes and fees (including payroll taxes) to State governments each year.

We appreciate the opportunity to be here today to discuss the important topic of access to insurance for urban residents and businesses. I have been authorized to present this testimony not only on behalf of the AIA, but also on behalf of the Independent Insurance Agents of America (IIAA) and the Council of Insurance Agents

68

and Brokers (The Council). IIAA is a trade association representing nearly 300,000 independent insurance agents. The Council (formerly the National Association of Casualty and Surety Agents, NACSA) represents the Nation's 300 largest commercial insurance agencies and brokerages who write over $70 billion in premiums annually.

These organizations have one over-riding goal on the issue of insurance access and availability Chairman Riegle: Urban residents and businesses, as all other Americans, must be able to purchase attractive insurance products at a price reasonably based on the risk. AIA, IIAA, and The Council members are committed to working with legislators, regulators, consumers, and brokers to ensure that this occurs.

It is a fact that certain areas—especially in our cities—have higher numbers of residents and small businesses without insurance than other areas. These discrepancies are related to a whole host of socio-economic circumstances faced by people who work and live in the urban areas, and which also increase the cost of insurance. Outright racial or ethnic discrimination may also occur. We hope that it is infrequent. We know that it is a violation of Federal and State law. We advocate stringent prosecution wherever it is found.

To determine whether or not insurance is available in all areas, we could support Federal data collection of insurance information—if it is designed to produce a fair, efficient, and effective study of insurance availability and cost. H.R. 1188, pending in the House, is such a measure, and AIA, IIAA, and The Council support this bill. The details of the bill and the reasons for our support are addressed later in this testimony.

If there are availability problems, however, whether they are caused by economics or by discrimination, they must be addressed. It is cold comfort to the citizens for whom insurance is unavailable to explain to them the reasons why the problem exists. We believe it is time to start attacking these problems head-on.

We encourage and will participate in thorough and thoughtful dialogue on the subject of urban insurance coverage with the goal of developing workable solutions to the problems. Specifically, we would like to work with legislators and regulators to develop products and marketing ideas which adequately serve urban residents and businesses. We want to discuss the establishment of market assistance plans and other programs to facilitate greater access to insurers. For example, we already are working with regulators in a number of States on programs to bring urban-based independent agents together with companies.

One State which is moving forward on this issue is Georgia. In Atlanta, AIA, in conjunction with the Urban League, the Independent Insurance Agents of America, the Insurance Department and State regulators, has established a task force to address the issue of insurance in urban markets. One of the first projects of the task force is the Agent/Insurer Partnership. The task force has put together a directory of profile forms completed by minority agents and has distributed it to standard insurance companies. These companies have reviewed the profiles, and are in the process of making agency appointments from the directory. While the process is not complete, a number of appointments already have been made. Now that this program has proven successful, we are working to expand these efforts nationwide.

In addition, we also support the inclusion of homeowners' insurance in existing Fair Access to Insurance Requirement Plans (FAIR) to address the needs of homeowners who are unable to find insurance in the voluntary market.

In California we publicly have supported a proposal which would provide for Statewide rating of basic first party insurance in the context of a cost effective no-fault system. We believe this system should be considered in other States where auto insurance costs are too high, especially for low-income urban citizens. We will continue to explore other options along these lines for other lines of insurance.

Allegations have been made that insurance is unavailable in urban areas due to insurance redlining. Further, this Committee has asked us to address the question of whether insurers illegally discriminate in providing property insurance. Before any further discussion of the positive efforts of the industry in the areas of insurance availability and cost let me address the specific question posed by the Committee. To answer this question we need to start with a discussion of the concept of redlining.

## II. Definition of Redlining

Redlining is an illegal offensive practice that cannot be tolerated. AIA opposes redlining. The term has long referred to an attempt to discriminate on the basis of race or ethnic origin by not doing business within certain "redlined" neighborhoods. The practice is illegal, reprehensible, inexcusable, and must not be tolerated. Violators should be punished.

Defining the term, however, in order to identify the specific activities that constitute the practice of redlining, has proven a difficult task. Redlining is an emotionally charged term that connotes different things to different people and, as such, has defied definition in a universally accepted manner. In recent years insurance regulators and industry representatives have spent many hours debating the issue and hammering out language describing and prohibiting certain practices that constitute redlining. This language, embodied in the National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act, defines and prohibits the following as unfair discrimination:

Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazard by refusing to insure, refusing to renew, canceling, or limiting the amount of insurance coverage on a property or casualty risk solely because of the geographic location of the risk, unless such action is the result of the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience.

We strongly endorse this provision. We have supported its adoption by the NAIC and its passage in State legislatures across the country. The language clearly proscribes arbitrary underwriting decisions based upon geographic location alone. It recognizes, however, that sound underwriting and actuarial principles cannot be ignored by the industry—insurers must make rational underwriting decisions that will preserve their solvency and protect consumers.

AIA has a clear record of opposition to the arbitrary reliance by insurers upon physical location alone when rendering underwriting decisions. Throughout our history we have consistently stated our belief that insurance should be readily available, subject to fair and sound underwriting principles. The first step to making insurance available is the development of products that are attractive and affordable for urban residents and businesses.

### III. The First Step Toward a Solution

We must focus our attention immediately on a fundamental issue, i.e., the rapid development and approval of attractive and affordable insurance products tailored to meet the needs of urban consumers.

In California, we have joined forces with a broad coalition of consumer and civil rights groups led by Consumers Union and the Latino Issues Forum to create an innovative, no-frills no-fault automobile insurance policy. This policy is a perfect example of a creative, practical, and sound solution to a real problem of people in need.

The policy is designed to be offered Statewide at one low price. It guarantees all injured accident victims at least $15,000 in medical and wage loss benefits for a uniform Statewide price, and removes nuisance and minor injury litigation for non-economic losses. Independent actuaries have concluded that the basic coverage could be sold, on an actuarially sound Statewide basis, for $220, saving California consumers $1.8 billion in the first year alone.

Unfortunately, this product is not yet available to California consumers. During recent sessions of the California legislature, the bill that would pave the way for provision of this product in the marketplace has been bottled up.

The National Conference of Insurance Legislators recently has approved a model automobile insurance law providing $15,000 of basic personal compensation coverage and property damage liability coverage, along with limits on lawsuits and health care costs. AIA estimates the average price for the minimum mandated coverage would be $117 in Vermont, $146 in Missouri, and $199 in Texas.

We are working to inform legislators and regulators about the potential benefits of this and similar new products. AIA encourages all State legislators and insurance regulators to maintain a receptive attitude toward innovative and experimental insurance products. These kinds of products will serve as the key that will guarantee an open door to insurance for all consumers.

### IV. Is Insurance Available?

In addition to the question of illegal discrimination, the Committee also has requested us to address the findings of recent property insurance studies. This is the bottom line question that must be addressed: Whether those urban consumers wishing to purchase insurance currently are able to do so.

A number of studies from 1979 through 1993 show that a large percentage of homeowners have homeowners' insurance. In 1979, the AIA sponsored a nationwide study on availability of homeowners' insurance. That study showed that 98 percent of homeowners had homeowners' insurance. Eighty-eight percent of those surveyed had comprehensive coverage covering fire, theft, vandalism, and liability. Fifteen percent had more limited coverage.

In 1980, R.L. Associates, a private research firm in Princeton, NJ, conducted a similar survey for the All-Industry-Research Advisory Council (now Insurance Research Council). This survey focused on the urban core of America, surveying urban core neighborhoods in six of the largest American cities: Atlanta, Chicago, Cleveland, Los Angeles, Philadelphia, and New York (borough of Brooklyn). The results of the 1980 survey were consistent with those of 1979. In fact, the total percentage of homeowners with homeowners' insurance increased from 98 percent to 99 percent. The percentage with comprehensive versus more limited coverages also increased, from 88 percent to 90 percent.

In 1993, a similar study was commissioned by AIA and performed by R.L. Associates. The survey covered the experiences of homeowners with regard to obtaining various forms of property insurance and their attitude toward that coverage. The results of this study conclusively demonstrate that property insurance is widely available in each of the cities surveyed, and that such coverage is "very easy" or "somewhat easy" to obtain for the vast majority of policyholders. During the past 5 years few respondents have been turned down for any type of homeowners' coverage, and an even smaller percentage have had their coverage canceled or non-renewed for any reason.

When combined with previous empirical research, this survey indicates that the percentage of urban homeowners with property insurance is comparable to that in suburban and rural jurisdictions. Moreover, to the extent that some homeowners are without coverage, this decision is likely to be based on personal choice or economic constraints, rather than difficulty in obtaining insurance.

Following are key highlights from the survey of 1,502 urban homeowners in Chicago, Los Angeles, Atlanta, Brooklyn, Cleveland, and Philadelphia:

- Less than 2 percent of the homeowners surveyed in the six cities did not carry any homeowners' insurance. Ninety-three percent had comprehensive coverage covering fire, theft, storm damage, vandalism, and liability. About 5 percent carried more basic home insurance policies covering fire damage only or fire and windstorm damage.
- The percentage of homeowners without any coverage ranged from less than 1 percent in Chicago and Atlanta to 3 percent in Los Angeles.
- There were no significant differences among African-Americans and whites in terms of insurance coverage. Ninety-nine percent of African-American homeowners carried either comprehensive (92 percent) homeowners' coverage or more basic policies (7 percent). Ninety-eight percent of those identifying themselves as white had some homeowners' coverage, including 94 percent with comprehensive policies and 4 percent with basic coverage.
- Nearly nine in ten (87 percent) of urban homeowners said it was very or somewhat easy to find homeowners' insurance. An even higher share (93 percent) said it was convenient to contact an insurance agent or insurance company.
- Urban homeowners use a variety of methods to shop for and purchase homeowners' insurance including telephoning an agent, having an agent come to their homes, traveling to an agent's office, purchasing through a mortgage or real estate office, and purchasing home insurance by mail. A significant number of homeowners in each of the six cities have used one of these methods to purchase home insurance.
- Only 3 percent of urban homeowners had experienced cancellation or non-renewal of home insurance coverage during the past 5 years. Reasons for cancellation or non-renewal cited by this small group of homeowners included non-payment or late payment of premiums, loss experience (multiple theft or fire claims), insurance companies that ceased writing home insurance, and physical problems with the property.
- Very few respondents (3 percent) said that they were aware of anyone in their neighborhood who had experienced difficulty in obtaining homeowners' insurance.

Other surveys and studies show similar results. The Roper Organization, Inc., a nationally known public opinion survey firm, included a question on homeowners' insurance as part of a representative sample of 1,976 Americans for the 1992 *Public Attitude Monitor* published by the Insurance Research Council. Conducted during June 1992, the survey found that 94 percent of those surveyed owning homes had homeowners' insurance. Not surprisingly, the Roper survey showed some variations in the share of homeowners with insurance by region, income, and community type. For example, the survey indicated that homeowners living in central cities of metropolitan areas with populations of greater than 250,000 actually were more likely to have homeowners' insurance (96 percent) than the population as a whole. Central city residents owning homes, including those living in very large cities with more than a million people, were more likely to have homeowners' insurance than persons

71

living in suburbs (95 percent) and those living in rural areas and small towns (91 percent).

The 1992 Roper findings are nearly identical to those from another independent national survey conducted by Cambridge Reports, Inc. in 1989 on home ownership and home insurance rates. The Cambridge survey found that 95 percent of home-owners nationally carried homeowners' insurance.

Other surveys also document that small business insurance consumers are largely able to obtain desired insurance coverages and that voluntary market availability improved steadily during the 1980's. The purchase of various insurance coverages by small businesses increased during the 1980's. Urban small businesses were in some cases more likely to have some coverages than their suburban, small town or rural counterparts. Nationally representative surveys of small businesses *(Small Business Attitude Monitor 1991, Business Attitude Monitor, 1988)* conducted by the Insurance Research Council showed that the share of small businesses purchasing key coverages such as property and liability rose from 1988 to very high levels by 1991. This evidence of general availability and affordability tracks well with the independent data on the use of FAIR plans in commercial lines.

This evidence of general availability and affordability tracks well with the independent data on the use of FAIR plans in commercial lines.

Participation of the FAIR plan in the marketplace is decreasing. Commercial lines premium volume written through the FAIR Plans declined steadily in most States from 1986 through 1991 as a percentage of total commercial premium volume. For example, commercial written premiums in the Illinois FAIR Plan declined from about 1 quarter of 1 percent (0.24 percent) to less than $\frac{1}{10}$th of 1 percent (.088 percent) of total commercial premium in the voluntary market. In addition to Illinois, AIA analyzed the District of Columbia and eight large urban States: California, Georgia, Massachusetts, Michigan, New Jersey, New York, Ohio, and Pennsylvania, and found that each experienced significant drops in FAIR Plan commercial lines premium volume in relation to the State commercial voluntary market. The decline in FAIR Plan premium volume in relation to the commercial voluntary market generally indicates that businesses were having an easier time finding insurance through the voluntary market.

Personal lines FAIR Plan premium volume also decreased in Illinois and other States relative to the voluntary market from 1986 through 1991. For example, FAIR Plan premium volume in Illinois dropped from just over $\frac{1}{2}$ of 1 percent (0.52 percent) to about $\frac{1}{3}$ of 1 percent (.036 percent) of total personal lines (homeowners) premiums from 1986 to 1991. In New York, FAIR Plan premium dropped from $\frac{9}{10}$ths of 1 percent of the voluntary market to under $\frac{9}{10}$ths of 1 percent. Overall, in eight out of the nine States that we analyzed, premium volume in the FAIR plan declined in relationship to the voluntary market between 1986 and 1991, and in the remaining State where FAIR plan market penetration did not decline, the increase was less than $\frac{3}{10}$ths of 1 percent.

The number of applications received by the FAIR Plans for commercial and personal lines combined also generally decreased from 1986 to 1991. Our analysis of applications and policies issued in the ten jurisdictions examined indicates that over that period, the number of applications received annually declined by an average of 25.5 percent and the number of policies and binders issued by each of the plans annually decreased by an average of 23.3 percent. These are all signs of improving property insurance availability in the voluntary markets of these States and the District of Columbia. The bottom line conclusion is that the percentage of risks written by the FAIR Plan versus the voluntary market is decreasing steadily.

Small businesses located in major cities were just as likely as their counterparts in suburbs, non-metropolitan cities and towns, and rural areas to have liability insurance, more likely to have business interruption insurance, and somewhat less likely to have property insurance. In this context, urban applies to small businesses located within the city limits of a large city. As for specifically inner-city businesses, the only representative study of which we are aware on these businesses was published in 1982 by All Industry Research Advisory Council (now the Insurance Research Council). This study, *Availability and Use of Business Insurance by Small Urban Businesses*, covers inner-city businesses in Chicago, Atlanta, Boston, Brooklyn, Cleveland, Detroit, Los Angeles, and Philadelphia. The survey indicated that at that time 92 percent of the inner-city firms had some type of property-liability coverage and 86 percent had the property coverages of fire, wind, and vandalism.

Small businesses in inner-city Los Angeles were as likely as businesses in the overall sample to have at least one or more of the property-liability coverages.

Although it appears from the data that insurance is available and affordable to the vast majority of residents and businesses in inner-city areas, we recognize that this still might leave some insurable risks without coverage for one reason or an-

other. We must continue our efforts to make insurance available for all insurable risks.

## V. Potential Federal Action

The third question asked by the Committee is what steps the Federal Government should take to identify and combat illegal property insurance discrimination, if such discrimination exits. As mentioned earlier, a fair, economical, efficient data collection scheme on the Federal level to determine if insurance is equally available, based on the risk, for all Americans, is something AIA, IIAA, and The Council could support. The parameters of such a data collection effort, however, are critical. Inordinate costs of collecting data with limited value would not assist the insurance consumer, but rather, harm that consumer with either higher prices or possibly less financially sound insurers.

Collection of data which reveals what insurance is being sold, where it is being sold, who is selling it and how much it costs the consumer, would answer the question of whether or not insurance is available. This collection should be undertaken in a format to provide the most information, in the most useful form, in the most cost-efficient fashion.

The most that is needed today is a data collection and study effort, designed to collect a limited amount of data from insurers on limited lines, in a limited number of cities, for a limited period of time. The data should answer the four issues addressed above, who, what, where and how much. It should require reporting in a format that readily is obtainable and is cost effective—five-digit zip code. Various studies could be undertaken for more complex issues such as commercial insurance, agent appointments and terminations, insurance applicants, and the effectiveness of the data collection.

Data collection should be limited in time and scope to answer the question is insurance available equally in all neighborhoods at a cost commensurate with the risk. The question of whether or not insurers are illegally discriminating is a question of regulation for insurance regulators. Federal data collection can assist regulators in making this determination, but data collection alone cannot answer that question or enforce discrimination laws.

The lines of insurance raising concern are homeowners, dwelling fire and allied lines and private passenger automobile. Data collection should be limited to those lines. To determine the current situation, the duration of the study should be limited. Anywhere from 1 to 5 years of data collection would show the status of insurance availability. The unit of measurement also needs to be reasonable. Data on the existence and details of policies is kept by most insurers on a computer system which includes at most only the five-digit zip code of the property insured. Insurers have gone to great expense in recent years to install these systems so that they can report five-digit zip code information to State regulators.

The full address of the property insured often only is in a manually kept record, and sometimes, if the property is part of an umbrella policy, not even there. Virtually no insurer has a statistical reporting computer system which collects or could store nine-digit zip code information. The capital which would be required to convert existing computer systems to report on any basis other than five-digit zip code is extraordinary, and the value of data on any other basis is limited.

Last year, Mr. Chairman, you requested the U.S. General Accounting Office to investigate the necessity of Federal reporting to determine availability, affordability, and accessibility of property insurance. The GAO undertook an extensive investigation of this issue, starting with a review of existing literature, proposed bills, and State requirements. GAO staff discussed the issue with trade associations—including a number of meetings with AIA staff—consumer groups, statistical agents, research organizations and the NAIC, and ultimately developed their own analyses and conclusions.

The result of this study, the GAO Report to the Chairman, Committee on Banking, Housing, and Urban Affairs, "Property Insurance, Data Needed to Examine Availability, Affordability, and Accessibility Issues" was released on February 9, 1994. In analyzing what data should be reported, the report begins with the statement that collection of zip code data is important. While the report does state that census tract reporting could be more useful, it goes on to say that this would require restrictions due to the volume of data which would be generated. "The value of this reporting must be weighed carefully against the additional burden it places on companies to comply."

According to the report, the data that can be reported readily by companies (zip code data for policy information) would be useful to examine availability and affordability issues, "but will not be sufficient to determine conclusively whether unfair discrimination exists or why." However, the data would be a marked improvement

73

over what is available today and "could serve to point regulators more effectively in directions for further probing."

At this time insurance is regulated by the States. It is up to State insurance regulators, among other things, to investigate insurer practices and punish those insurers who illegally discriminate. Analysis of data reported by zip code clearly would allow regulators and others to determine if there is a disparity between the number of owner-occupied homes within a zip code and the number of homeowners' policies. Any large disparity then would indicate that the appropriate regulator needs to ask insurers for more detailed information within that particular zip code. This would limit the volume of information collected by the Federal Government to a manageable load, but would provide the information needed to investigate areas of concern.

Additionally, the number of areas to be studied under any Federal data collection should be related to the question raised. The allegations giving rise to this issue at the Federal level address insurance availability in urban areas. To determine the solution, data needs to be collected for those areas where there is alleged to be a problem. Twenty-five of the largest urban areas include approximately 43 percent of the United States population. This number clearly is sufficient to address the question.

Any Federal data collection should be drafted in a fashion to provide quick, efficient, and cost effective data collection. H.R. 1188, introduced by Congresswoman Cardiss Collins of Illinois, is a bill which would gather the information necessary to determine if insurance is available in all neighborhoods equally, where the insurance is being provided, who is providing the insurance, what kind of insurance is provided, and what it costs, on a five-digit zip code basis. This information could be reported within 1 year, rather than the up to 3 years it could take for insurers to begin providing census tract data, and at a reasonable cost to the consumer, rather than the exorbitant cost to consumers of insurers implementing an entirely new reporting system for the Federal Government, while keeping in place their reporting systems for State regulators.

The information which would be provided by H.R. 1188 would allow regulators to focus efforts on zip codes with significant disparities between number of homeowners and number of homeowners' policies, rather than being required to review detailed information for huge numbers of census tracts with no problems whatsoever.

Time and effort could be spent on addressing real problems of our urban cores rather than over-reporting and reviewing of unnecessary data.

AIA, IIAA, and The Council urge the Committee to consider a Federal data collection effort which will address the issue of insurance availability and cost in a rational, effective fashion.

## VI. Affirmative Efforts by the Industry

AIA recognizes that there are a number of issues that may have an impact on urban consumers and their ability to obtain insurance. The term redlining often is used loosely as a catch-all, short-hand term to identify a wide variety of issues affecting the urban areas of our Nation. AIA members and others are taking steps to address these issues. It is our belief that partnerships between the insurance industry and consumer organizations, civil rights organizations and housing organizations are the most productive way to move ahead.

A. LOCATION OF AGENTS WITH COMPANY APPOINTMENTS

One of the most controversial issues is whether agents with standard company appointments can be found in urban areas. Some urban consumers contend that insurance companies selectively place agents in locations that discourage applications for policies from certain geographic areas. The majority of AIA member companies market their products through the independent agency system. These agents are truly independent entrepreneurs, usually representing more than one insurer. These agents are not company employees placed in a particular office by the insurance company. The companies they represent cannot and do not control the location of the agent's place of business.

However, AIA, IIAA, and The Council are committed to the idea of increasing the number of minority and urban based agents with standard company appointments. The Atlanta Agent/Insurer Partnership discussed earlier is one example of what the industry is doing to move forward on this issue. Another example is insurers' participation in agent association programs such as INVEST, a program which assists students with financial difficulties to start a career in the insurance industry.

AIA and the IIAA also are working closely together on other efforts to increase the number of minority agents with standard company appointment in programs such as grouping of agents and special brokers programs.

004312

74

A number of these types of programs are in the development stages around the country.

B. Other Marketing Systems

It is important to note, however, that about 60 percent of personal lines insurance is not sold through the independent agency system. It is sold by captive agents, employees, or by direct marketing such as mail and telephone. Increasing the number of independent agents serving urban areas alone will not be enough to resolve access problems. Other marketing techniques will be required to better serve urban areas. AIA members currently are participating in discussions at the NAIC meetings on this subject, and would be delighted to assist regulators in developing such techniques within the limits of State and Federal antitrust laws.

C. The Product

Residents in urban areas must have ready access to insurance products that are attractive to them as well as affordable. As discussed above, the first requirement is the product. Products can be offered which provide coverages and limits which are desirable, at a price that is affordable. AIA consistently has supported the authorization by law and the approval by regulators of such products. However, each policy must be underwritten carefully, looking at underlying risk factors. To make such products available to greater numbers of consumers, risk factors must be decreased. Specifically, I am referring to the high risk of fire, high crime rates, excessive increases in automobile repair costs, and health costs.

Some view refusals to issue replacement cost coverage in homeowners' policies for risks that evidence a substantial disparity between replacement cost and market value as redlining. Again, we disagree. AIA acknowledges that many insurers will not provide this coverage when there is a wide disparity between the replacement cost and the market value of a structure. In most instances, in order to qualify for replacement cost coverage, an insured must buy enough coverage to represent at least 80 percent of the cost of replacing the structure. This requirement may present a dilemma for insureds who own homes built before the 1950's. For many of these older homes the cost to replace the building with the exact type of materials used in the original construction far exceeds what the owner might spend to replace the dwelling using modern materials and simpler construction techniques. Replacement cost coverage is not well-suited for these kinds of properties, because insureds may be unwilling or unable to buy—and insurers may be unwilling to sell—insurance in an amount well beyond the price for which the dwelling could be sold. Insurers, however, have responded to the needs of property owners faced with this disparity. For example, a lower cost variable percentage replacement loss settlement endorsement has been developed.

This endorsement permits an insured to choose to insure at a lower percentage of insurance to replacement value (i.e., usually 50 percent, 60 percent, or 70 percent), rather than the 80 percent usually required for replacement cost coverage. Thus, if the policyholder decides to insure for 50 percent of the replacement cost of the property, the premium would be lower than coverage for 70 percent of the replacement cost. However, if the property is totally destroyed, the proceeds to the policyholder would be 50 percent of the replacement cost of the property.

Additionally, the industry has developed repair cost policies that delete the replacement cost provision and provide that a damaged dwelling will be repaired or replaced with commonly used building materials instead of materials of like kind and quality. It is important to recognize that when faced with a dilemma such as this, the insurance industry has responded with products suited for a particular purpose. Without the regulatory approval of these products, the industry cannot address the problems of the consumer. These are further examples of the industry responding to consumer needs with specialized products.

It has been asserted that these types of products are inferior and do not provide the same coverage as is available to properties without this large difference between market value and replacement costs. However, the cost of insurance is based in part on the expected cost to pay a claim under the policy. The price of providing replacement cost policies for these types of properties is so high that prior to the development of alternative products, consumers asserted that property insurance was unavailable because it was unaffordable. To address this concern, insurers developed new products that would provide a measure of coverage and protection, but would not cost so much as to be unavailable. The price of insurance must reflect the risk. Companies will continue to attempt to address the needs of consumers by creating legitimate products that can be purchased for a reasonable price.

75

D. MARKETING AND SERVICE

Marketing and servicing products in communities where English often is a second language presents special difficulties. AIA companies have added Spanish speaking customer service representatives to personal lines service centers and toll free hot lines, print posters and brochures in both English and Spanish, and have programs to target small and disadvantaged contractors. These efforts make marketing and servicing products in the urban areas more effective.

E. EDUCATION

Education is critical to the availability and accessibility of insurance. Education must be conducted both for consumers and for insurers. Currently AIA members are working with individual State regulators as well as the NAIC Insurance Availability and Affordability Task Force Subcommittee on Education to develop programs to increase the knowledge of average and low-income consumers about insurance, and to increase the knowledge of underwriters and agents about urban neighborhoods and opportunities. We believe this concerted effort will assist in increasing the availability and accessibility of insurance products which are truly priced based on the risk.

F. PRODUCT PRICING

Some consumers allege that insurers intentionally overprice a product to prevent sales in urban areas. In many States, pricing of insurance is determined through a regulatory approval process. Rates are not intentionally set higher for urban risks to prevent people from purchasing the insurance. Individual company rates should be and are based on loss experience and are subject to the review of the State insurance regulator. In many cases, urban insurance rates are the same as or lower than those applicable to risks in suburban areas. In other instances policies for risks in urban areas will be more expensive than similar risks in suburban areas. This rate disparity is due to the increased costs of certain policies, such as increased incidents and severity of claims in certain areas, or increased distance from a fire station.

Automobile insurance is a good example of this cause and effect. The cost of automobile insurance reflects the costs of goods and services that are paid by automobile insurance premiums, including litigation, health care, and auto repair. The frequency of bodily injury liability claims countrywide has increased 19.0 percent from 1987 through the third quarter of 1992, according to NAII/ISO Fast Track data. The increase in the loss cost for bodily injury liability during that same period was 67.1 percent. Meanwhile, the frequency of property damage liability claims and collision claims in countrywide has decreased 11.0 percent and 16.0 percent, respectively, with the loss costs increasing 13.0 percent and 1.4 percent. This helps demonstrate that liability claims and the resulting medical costs are a major source of high and rising auto insurance costs.

Of course, these costs are not uniform between States, or within areas of certain States. For example, in Illinois, the average loss cost for bodily injury liability is $109, compared to the countrywide average loss cost of $119. In the District of Columbia, the average loss cost for bodily injury liability is $191, compared to the countrywide average loss cost of $119. Virginia has an average loss cost for bodily injury liability of $101, and Maryland $144. Some other average loss costs as of the third quarter of 1992 for these areas are: property damage liability: Illinois $65, D.C. $79, Virginia $47, Maryland $62, countrywide $56; collision: Illinois $117, D.C. $150, Virginia $76, Maryland $104, countrywide $103. These costs are reflected in rates charged in these States.

There also are significant differences in how costs are distributed within States. For example, according to a 1990 report, the bodily injury liability claim frequency per 100 insured cars in Chicago was 3.07 versus the Illinois Statewide average of 1.81. This means that bodily injury liability claims were filed 69.6 percent more often in Chicago than for the State, as a whole. Also, there were 52 bodily injury liability claims for every 100 property damage liability claims in Chicago compared to 34 for the State, as a whole. Thus, in Chicago, an injury claim was 55 percent more likely to be filed for each property damage claim, than the average for the State of Illinois.

We understand the role that insurance costs play in limiting access to insurance. We know that rates based on loss experience may be more than some consumers are able to pay. In fact, if insurance is not affordable, it essentially is not available. However, we believe there are rational solutions to problems relating to the cost and the value of auto insurance. One such solution is the development of innovative, low-cost products such as our no-frills, no-fault automobile insurance policy proposed in California. With cooperation and creativity we can meet the needs of all consumers, including those who are low income, by offering them useful and afford-

76

able insurance products. If these products are available, and consumers are interested in purchasing them, insurers are sure to increase their marketing efforts to be the company making those sales.

## G. Risk Reduction

To lower cost and increase insurance availability, the risk in some neighborhoods must be decreased. AIA and member companies are working with community organizations such as the Association of Communities for Reform Now (ACORN) on programs such as the ACORN Neighborhood Home and Safety Program to assist communities in lowering their risks, and then providing insurance for those participating residents.

## VII. Other Issues

In recent discussions of redlining, many of the above issues have been raised. Additionally, issues of insurance investment in urban areas, affirmative action within insurance companies and contributions to minority or urban-oriented organizations have been added to the discussion. I would like to address what we are doing in connection with these broader social and economic issues. We are proud of our successes, and would like to mention them. However, we recognize that more has to be done by everyone, including insurers, to help revitalize our urban areas.

## A. Affirmative Action within Insurance Companies

AIA member companies fund and participate in the recruitment and advancement of minorities through a variety of programs, both external and internal. The external organizations supported by our members include: The Urban League, Black Executive Exchange Program, and SER (Jobs for Progress, Inc.), minority summer internship and scholarship programs like INROADS, inner-city youth job training initiatives like INVEST and the STAG Program. Internal initiatives include targeted college recruitment, company-wide managerial diversity training, the creation of specific, regular opportunities for minority employees to meet and network with top management, minority career development programs, coaching and mentoring programs. Several companies have made an explicit commitment to promote minorities to the highest professional and managerial positions. Some advance the process by auditing the employee mix to ensure representation of the labor pool at large.

In addition to employee opportunities for minorities, many companies also target minority companies as vendors. For example, one AIA member's targeted minority vendors program played a part in 12 percent of the company's 1991 purchases being made through minority or women vendors.

## B. Jobs in Urban Areas

Probably the most important need of urban centers today is jobs for urban residents. Many AIA member companies maintain significant facilities in urban areas across America. Thousands of workers are employed by the insurance industry in cities such as Chicago, Atlanta, Baltimore, Boston, Cleveland, Dallas, Detroit, Los Angeles, Miami, New York City, Philadelphia, and Pittsburgh.

## C. Insurance Company Investment in Urban Areas

Related to the issue of jobs is the issue of investment. Insurance industry investment in urban areas is significant. Excluding all other types of insurance investments in urban areas and only considering the purchase of municipal bonds, the insurance industry has invested billions of dollars a year into urban areas. For example, for the most recent year for which we have data, 1989, insurers held or sold a total of $1.8 billion in various Chicago municipal bonds. For Los Angeles city alone, insurers held or sold $573.4 million in these bonds. For Los Angeles county, insurers sold or held $501.2 million in bonds. The total of all bonds sold or held by insurers as of the end of 1989 for both Los Angeles city and county was approximately $1.1 billion. In addition to these investment dollars, companies also contribute financially to many regional and national organizations dedicated to the advancement of minority interests and the revitalization of American cities. A list of some of these organizations is attached as Appendix A.

These contributions assist not only residents in urban areas, but all of America, by giving urban residents a chance for housing, education, cultural activities, career training, and a host of other opportunities which would not be available without the efforts of corporate America. The insurance industry is proud of its participation in these programs, and intends to look for additional ways to assist in the revitalization of our urban areas.

77

## VIII. Conclusion

This sensitivity to the benefits of working with minorities and women as employees and managers, as a sales force, as vendors, as customers, and as citizens, is well documented in the insurance industry. We are committed to work with the Congress, State legislators, insurance regulators and consumers to address both broad social and economic and insurance specific problems.

In summary, we oppose redlining. We support the NAIC Unfair Trade Practices Model Act. We support H.R. 1188. Further, we look forward to working with the Senate as you address these important issues.

-------

### PREPARED STATEMENT OF RAÚL YZAGUIRRE
#### PRESIDENT OF THE NATIONAL COUNCIL OF LA RAZA

### I. Introduction

Chairman Riegle and distinguished Members of the Senate Banking, Housing, and Urban Affairs Committee, my name is Raúl Yzaguirre, and I am President of the National Council of La Raza (NCLR). NCLR is the Nation's largest constituency-based Hispanic organization, representing 170 affiliated community-based organizations which together serve 37 States, Puerto Rico, and the District of Columbia, and reach more than two million Hispanics annually. We are pleased that the Committee is conducting this hearing on insurance discrimination, and we appreciate the opportunity to present our views on this important economic development and civil rights issue.

Since its inception, NCLR has maintained a major institutional focus on civil rights and the principle of equal access to opportunity for all Americans. In addition, we have long recognized the critical importance of access to the tools of economic development and to housing affordability.

In the area of civil rights, in recent years NCLR has done research and policy analysis on such subjects as employment discrimination and Government enforcement of civil rights protections for Hispanics. In December of 1993, NCLR issued a report, *The Empty Promise: Civil Rights Enforcement and Hispanics,* which documented the Equal Employment Opportunity Commission's ineffectiveness in protecting the Hispanic community against employment discrimination. NCLR has recently launched a "Know Your Rights" public information and education campaign, a privately funded nationwide effort designed to educate Hispanics about their civil rights and to develop improved, community-based models to increase the effectiveness of civil rights enforcement. NCLR completed a complementary Fair Housing Education and Outreach project, designed to help raise awareness within the Hispanic community about housing discrimination and the fair housing enforcement process. In cooperation with five of our affiliates, the project was undertaken in Chicago, San Diego, Kansas City, El Paso, and the State of Nebraska.

In the field of housing and community development, NCLR has since 1972 provided direct on-site technical assistance to scores of communities and community-based organizations in the planning, financing, development, and management of housing construction and rehabilitation programs. These projects include a series of self-help rehabilitation programs in Texas financed by the Farmers Home Administration (FmHA); one of a very few FmHA-financed limited-equity cooperatives in the United States (in Arizona); Community Development Block Grant-financed tenement rehabilitation programs in urban areas of Texas; a self-financed and self-sufficient farmworker mobile home cooperative in Florida; litigation-supported anti-displacement programs in Virginia; and a series of Department and Housing and Urban Development-funded housing developments for low-income, elderly, and handicapped persons in Texas, Arizona, and California. In 1991, NCLR helped local groups to leverage over $5 million for the construction and rehabilitation of more than 190 housing units, including 45 units for farmworker families. NCLR is also helping six low-income communities in Arizona with the financing and design of safe drinking water and sewer system. Currently, NCLR is in the initial phases of a major new effort, the *Southwest Community Development Initiative*. The Initiative is' a multi-year program designed to improve the socio-economic conditions of Hispanics in the Southwest through comprehensive support and assistance to its traditional constituency, Hispanic-controlled community development corporations (CDC's) and other nonprofit community-based organizations. Targeting urbanized areas in Texas, New Mexico, Arizona, California, and Colorado, the Initiative will help about 20 selected Hispanic community development entities to increase their staff and organizational capacity, resources, and linkages, and to achieve multiple

78

community impacts ranging from housing and community facility development to local political empowerment and improved human services. The Initiative establishes NCLR as a national and regional intermediary, working with other national, regional, and local entities to achieve broad community development objectives.

NCLR's experience has led it to an increased focus on the nexus between the civil rights and housing development fields—the issue of fair lending and disinvestment and the issue of discrimination in insurance and other crucial business and consumer services. In 1987, we joined the Center for Community Change, ACORN, and others in supporting the permanent authorization of the Home Mortgage Disclosure Act (HMDA). During the debate over the Financial Institutions Reform, Recovery, and Enforcement Act in 1989, NCLR strongly supported the provisions that expanded HMDA reporting requirements. Since 1990, we have conducted a series of training sessions for our affiliates on the Community Reinvestment Act (CRA) and HMDA. NCLR not only recognizes the crucial link between civil rights and housing development, but has through its varied activities attempted to make the link concrete. We, therefore, have a profound interest in the subject of insurance discrimination, particularly homeowners' insurance discrimination.

## II. Impact of Discrimination on the Hispanic Community

### A. OVERVIEW

The history of Hispanic Americans is, in large part, a history of discrimination. The beginnings of the Mexican American experience are rooted in conquest, conflict, and hostility. After the end of the Mexican War in 1848 thousands of Mexicans were murdered. During this time, executions without trial and lynching were a common thread of life in the Southwest. It is not surprising that, then and since, Mexican Americans have been subject to enormous discrimination in education, employment, housing, and the administration of justice.

When Puerto Ricans became U.S. citizens in 1917 as a result of the Jones Act, they too suffered the consequences and stigma of being a conquered minority group. Arriving to the mainland as agricultural laborers and later as industrial workers, Puerto Ricans have faced high levels of social and economic discrimination in education, housing, and employment.

Other Hispanics, including Cuban and Central Americans, have also been subjected to severe levels of discrimination. The stereotypes associated with "Hispanic" are applied indiscriminately to Mexicans, Puerto Ricans, Cubans, and other Spanish speakers. The literature of the U.S. is replete with derogatory references to Hispanics, as "mongrels," "lazy," "ignorant, illiterate and non-moral," etc. The public war against drugs in the 1980's added to hostility against Hispanics as the media focus almost exclusively on South American druglords and traffickers. These references have formed the basis for a stereotype of Hispanics as being inferior, primitive, and dishonest; such stereotypes lead, directly or indirectly, consciously or unconsciously, to discrimination.

While many would prefer to believe that prejudice and bigotry have been all but eradicated—and indeed, there has been much progress—the impact of continued discrimination should not be underestimated. The effects of such discrimination translate directly into social and economic behaviors and conditions which are destructive to all of society. We cite below some historical and recent studies documenting the scope and degree of the more "traditional" forms of employment and housing discrimination against Hispanic Americans.

### B. EMPLOYMENT DISCRIMINATION

Employment discrimination serves as a useful, if imprecise, indicator of discrimination against Hispanics in other areas. And in a more obvious way, employment discrimination against Hispanics often delineates the social and economic boundaries within which Hispanics operate, including where they live.

Mounting evidence indicates that negative attitudes about Hispanics affect their employment opportunities. A 1989 study conducted by the Urban Poverty and Family Structure Project at the University of Chicago analyzed the manner in which employer's perceptions of ethnicity and race affect hiring decisions. The study, based on interviews with 185 Chicago-area employers, found that 70 percent of those surveyed made distinctions among employees or potential employees based on ethnicity and race. According to the employers, being Hispanic and/or Black was perceived as being "lower class" and being White meant "middle class." The study confirmed the tendency of employers to generalize about the meaning of ethnicity and race with regard to the quality of the work force and to rely on these generalizations in their hiring practices.

A 1989 study by the Urban Institute indicates that unequal treatment of Hispanic and Black jobseekers is entrenched and widespread. This "hiring audit" enlisted re-

79

cent college graduates who were over-qualified for positions advertised through newspapers; auditors were articulate and poised, spoke and dressed conventionally, and posed as having prior job experience. Auditors were carefully matched on all characteristics that could affect a hiring decision, and were trained to behave as similarly as possible in an interview setting.

The 360-audit study conducted in Chicago and San Diego indicates that Hispanics, like Blacks, are systematically denied equal opportunity in the hiring process. The study found:

- White applicants received 33 percent more interviews and 52 percent more job offers than the Hispanic applicants; and
- 31 percent of the Hispanic applicants encountered unfavorable treatment in the hiring process, compared to only 11 percent of the Anglo applicants.

Similar results were found in a 1992 hiring audit conducted in the Washington, DC—metropolitan area by the Fair Employment Council of Greater Washington (FEC). In its study, the FEC also used closely matched pairs of Hispanic and Anglo testers to inquire about and apply for advertised job openings by both telephone and mail. The study found that Hispanic testers encountered discrimination due to their national origin in more than one job application in five, or about 22 percent of the time.

Survey research conducted by the General Accounting Office (GAO) documented additional evidence of national origin discrimination against Hispanics. In a March 1990 report on the Immigration Reform and Control Act of 1986 (IRCA), the GAO reported the results of a survey of 4,362 employers concerning the effects of IRCA's employer sanctions provisions on their hiring practices. The GAO found that:

- An estimated 10 percent of the employers surveyed reported discriminating against employees or job applicants solely on the basis of national origin characteristics;
- An estimated 5 percent began a practice of refusing to hire persons based on "foreign" appearance or speech accent; and
- An estimated 8 percent required only "foreign-looking" and "foreign-sounding" persons to comply with IRCA's employment verification requirements, rather than requiring all job applicants to comply as mandated by IRCA.

The effects of employment discrimination may also be measured in terms of lost wages. Labor market research provides substantial evidence that, throughout the 1980's, Hispanics continued to experience high-levels of employment discrimination. At least five independent studies have found that, even after controlling for factors known to affect employment and earnings, such as age, occupation, and educational attainment, a significant proportion of the "earnings gap" between Hispanics and Anglos appears to be attributable to employment discrimination.

- A 1982 National Council of La Raza study, *The Effects of Discrimination on the Earnings of Hispanic Workers: Findings and Policy Implications,* using data from the U.S. Bureau of the Census, March 1981 Current Population Survey, found that 14 percent of the earnings gap between White males and Hispanic males and 29 percent of the gap between White males and Hispanic females were due to ethnicity alone, suggesting serious levels of employment discrimination;
- A 1982 U.S. Commission on Civil Rights report, *Unemployment and Underemployment Among Blacks, Hispanics and Women,* using data from the March 1980 Current Population Survey, found that, while disparities in unemployment and underemployment between Hispanic and Anglos could be explained to some extent as reflections of differences in education, training, and age, substantial disparities remained even after controlling for these factors. The Commission concluded that sufficient evidence exists to suggest that discrimination continues to be a significant, if not precisely quantifiable, factor in employment disparities between Whites and Hispanics.
- A 1985 University of Colorado study, using Census data to analyze the causes of the disparity in earnings among Hispanic, Anglo, and Black males, found that in 1980 discrimination and labor market segmentation accounted for 18 percent of the difference between Hispanic and Anglo male earnings.
- A 1990 study sponsored by the Inter-University Program (IUP) for Latino Research, using data from the 1940, 1950, 1960, 1970, and 1980 Censuses, and the 1983, 1986, and 1988 Current Population Surveys, analyzed and compared Latino and White incomes from 1939 to 1987. After controlling for demographic, occupational, and human capital differences between Hispanics and Whites, the researchers estimated that employment discrimination accounted for:
  - ☆ Approximately 10–16 percent of the gap between Latino male and White male incomes from 1973 through 1987; and

80

☆ Approximately 30–40 percent of the Latino female-White male income gap over the same period.

The study concluded that, although significant progress was made in the 1960's, inequality due to discrimination in the labor market has not declined, and for many Hispanics has actually increased over the past 20 years. According to the IUP study, discrimination has actually increased for Latino women compared to White women, for Mexican native-born males compared to White males and for Mexican immigrants given similar patterns of industrial employment compared to White men. This persistence and/or renewal of discrimination coincides with the end of major initiatives and some reversals in the area of affirmative action.

- Finally, a study reported in 1991 by Edwin Melendez of the Massachusetts Institute of Technology compared the hourly wages of Hispanics and non-Hispanics in New York City. The study, which used 1980 Census Public Use Microdata Sample for New York City, found that while labor market location was responsible for a substantial proportion of the Hispanic/non-Hispanic wage differential, discrimination was still a very significant factor. The study concludes that discrimination in employment accounted for:

  ☆ One-third of the wage gap for Mexican, Puerto Rican, and Cuban men and one-half of the wage gap for Other Hispanic men in the New York City labor market; and

  ☆ Between one-fifth and one-half of the wage gap for all Hispanic women in New York City.

Taken together, the results of these studies provide compelling evidence of persistent, severe employment discrimination against Hispanics. Despite the fact that the studies relied on a number of different data bases and used somewhat different methodologies, the research findings are remarkably consistent:

- The percentage of the Hispanic male-Anglo income gap attributable to employment discrimination falls within a 10–18 percent range;
- The percentage of the Hispanic female-Anglo male income gap attributable to employment discrimination falls within 30–40 percent range.

Considered as a whole, the combination of the cited studies offer persuasive evidence that Hispanics suffer from high levels of discrimination in the labor market. At a minimum, the evidence indicates that true equal employment opportunity for Latinos remains an unfulfilled goal.

C. HOUSING DISCRIMINATION

In addition to employment discrimination, a growing body of evidence documents the scope and degree of housing discrimination against Hispanics:

- *Dallas:* A 1979 HUD audit in Dallas was the first HUD research to focus on the extent of housing discrimination against Hispanics. It had previously been assumed that Hispanics would suffer less than Blacks from housing discrimination for two reasons: Hispanics were a smaller subpopulation, and the income of Hispanic renters was somewhat greater than that of Black renters. The results of the audit showed otherwise.

  The Dallas study found that 42 percent of dark-skinned Mexican Americans and 16 percent of light-skinned Mexican Americans were given false information on the availability of rental units. The chance of dark-skinned Mexican Americans experiencing at least one instance of discrimination in a typical housing search was 96 percent, and the probability of light-skinned Mexican Americans experiencing similar discrimination was about 65 percent.

  The incidence of discriminatory treatment against dark-skinned Mexican Americans was found to be far greater than that against either Blacks or light-skinned Mexican Americans. Discriminatory treatment against dark-skinned Mexican Americans regarding availability of a unit was two and one-half times as great than against either Blacks or light-skinned Mexican Americans. Furthermore, discriminatory treatment against dark-skinned Mexican Americans on terms and conditions of the contract was far greater.

- *Denver:* A 1982 HUD-funded study in Denver also found evidence of housing discrimination against Hispanics. When teams of White and Hispanic auditors were sent out to homes that were advertised for sale, the White auditors received considerably more information when they asked about homes similar to the advertised house in the same general area or in other locations. One in three Hispanic auditors was told that there were no homes available which were similar to the advertised home in the same general area, compared to one in five White auditors. Furthermore, 60 percent of Hispanic auditors were told of no similar homes in other areas, compared to 31 percent of White auditors. These differences

81

in the degree to which Hispanic and White auditors were informed of housing alternatives were sizable and statistically significant.

Discrimination against Hispanics regarding housing availability was not found to be as widespread in the rental housing market in Denver, but some differences in the treatment of Hispanic and White auditors strongly suggest discrimination. For example, Hispanic auditors were twice as likely as Whites to be told that the advertised units were unavailable, and also twice as likely not to be told of other rental housing possibilities which might meet their needs. In neither case, however, were the differences statistically significant.

• *Boston:* A Boston telephone survey found major differences in treatment of Whites and minorities. In a HUD-funded study in 1981, a telephone survey was done of selected realtors who were advertising units for rent. The test teams consisted of three persons: one that would normally be identified by voice as White, one as Black, and one as Hispanic. In the 42 tests conducted, all White testers were invited to come to the office to be shown a unit, while Black and Hispanic renters were informed that no units were available 31 times.

Site visits were carried out on 47 rental firms, including those that were already covered by the telephone survey and continued to advertise units for rent. In 23 of 47 tests, only the White testers were shown units while Black and Hispanic testers were told nothing was available.

• *Housing Discrimination Study:* In 1989, HUD sponsored a national fair housing audit study which was conducted by The Urban Institute. Results were based on 3,800 fair housing audits (paired tests) conducted in 25 metropolitan areas. Pairs of auditors—one White and the other minority—posed as otherwise identical homeseekers. They responded separately to advertisements randomly selected from the major newspapers of 40 metropolitan areas, and recorded their treatment by real estate and rental agents. According to THE study, Hispanics seeking homes experienced discrimination in at least half of their encounters with both sales and rental agents. The HUD study found that the incidence of discrimination is 56 percent for Hispanic homebuyers and 50 percent for Hispanic renters.

Given this large and growing body of evidence, the National Council of La Raza believes that housing discrimination experienced by the Nation's 25 million Americans of Hispanic descent is massive in scale. The effects of such discrimination are examined below.

## III. Effects of Housing Discrimination

### A. OVERVIEW

While the effects of employment discrimination can be quantified in terms of lost wages, similar calculations with respect to housing discrimination are necessarily more complex and imprecise. One obvious effect is that Latinos almost certainly pay more for comparable housing than non-Hispanics. Given that one effect of housing discrimination is to artificially limit the portion of the housing market accessible to the Latino community, the laws of supply and demand would dictate that the relative price of housing available to Hispanics would increase. And indeed, survey data suggest that Hispanic families pay an excessive portion of their incomes for housing. Between 1978 and 1991, the proportion of poor Hispanic households spending at least 30 percent of their income on housing grew from 69 percent to 80 percent. In 1991, 48 percent of all Hispanic households spent at least 30 percent of their income on housing, and 24 percent of all such households paid at least 50 percent of their income on housing. By comparison, 31 percent of non-Hispanic households spent at least 30 percent of their income on housing, and 14 percent paid at least 50 percent of their income on housing during the same period.

Given the complex relationship between housing location, the quality of Government services, and the nature of the economic development process, housing discrimination has more deleterious—if somewhat more subtle—impacts on Hispanics. These impacts include inferior schooling and stunted opportunities for economic development.

### B. SCHOOL SEGREGATION

The significance of discrimination against Latinos seeking housing cannot be overemphasized. One effect of housing discrimination is school segregation. Analyses of Census data reveal that Hispanic students are more likely than other minority students to attend predominately minority schools; for example, in the 1991–1992 school year, almost three-quarters (73.4 percent) of all Latino students attended schools that were predominately minority, compared to two-thirds (66.0 percent) of Black students. This study, which was commissioned by the National School Board Association, documents the extent and severity of school segregation, noting the "educational damage associated with racial segregation." Segregation by race is

strongly related to segregation by poverty. Students in segregated schools not only face discrimination and stereotypes about minority schools but also attend—schools struggling with the much greater concentration of health, social, and neighborhood problems that are associated with high levels of poverty.

Problems of race and poverty segregation are the direct result of housing policies and housing discrimination. Unless we address the issue of discrimination in the housing market, we are unlikely to successfully resolve the problems associated with school segregation.

## C. ECONOMIC DEVELOPMENT STUNTED

A related and equally devastating effect of housing discrimination is its impact on the economic development of a neighborhood. Economic isolation is in large part the direct result of discriminatory housing practices which lead to the concentration of minorities in certain neighborhoods, which in turn are associated with the disinvestment of banking institutions as well as the exodus of the myriad consumer and business services that are crucial to the economic well being of individuals and communities. Individuals and entire neighborhoods suffer the brunt of disinvestment. Disinvestment by economic entities fosters an atmosphere rife with opportunities for exploitation. In many Latino neighborhoods, while there is limited or no access to banking institutions, there is no shortage of usurious check cashing establishments, "currency exchanges," loan sharks, and other shady sources of financing and credit, and no shortage of customers in need of their services. Sociologist William Julius Wilson argues that as communities are isolated from mainstream economic and social institutions, so too are they isolated from mainstream patterns and norms of behavior. Economic isolation is thus inextricably intertwined with persistent poverty, neighborhood decline, and all the social problems attributable thereto.

## IV. Home Ownership Opportunities Denied

### A. OVERVIEW

In 1991, the *American Housing Survey* (AHS) indicated that only 39 percent of the Hispanic population in the U.S. owned a home; in contrast, 66 percent of the non-Hispanic population owned a home. From a different perspective, approximately 85 percent of all homeowners were non-Hispanic Whites, 8 percent were Black, and only 4 percent were Hispanic.

The social and economic consequences of this disparity are enormous. High rates of home ownership among Americans—frequently encouraged and facilitated by various public policies and subsidies—have been cited by historians and economists alike as being responsible for the "fluidity" or "upward mobility" characteristic of American society. In addition to the clear economic advantages accrued to homeowners in terms of savings, accumulation of wealth, and tax benefits, the very idea of home ownership has had powerful symbolic significance for generations of Americans. If you worked hard and "played by the rules," every American family could expect to own their own home. This ideal, and the fact—that it was true for most Americans, played a major role in assuring that every American "bought into" our social, economic, and political system.

The denial of home ownership opportunities to Hispanics and others based on race or national origin is thus twice damaging—it directly harms the victims of discrimination and also undermines the very ideals upon which our society functions.

### B. DISCRIMINATION IN THE MORTGAGE MARKET

The significantly lower levels of home ownership among Latinos are attributable in part to their relatively high rates of poverty. Yet, poverty alone does not account for the consistently low rates of Hispanic home ownership across income, geography, and over time. Discrimination against Hispanics in the private housing finance market appears to play a significant role; for example:

- The 1990 Home Mortgage Disclosure Act (HMDA) data show that within each income category and for every type of loan documented—Government-backed, conventional, refinancing, home improvement—Hispanics were significantly less likely to receive loan approvals than Whites with similar incomes; specifically:
  - ☆ A greater percentage of *low-*income Whites (69 percent) obtained conventional mortgage loans than *moderate-*income Hispanics (68 percent).
  - ☆ *Low-*income Whites had significantly greater approval rates than *upper-*income Hispanics for refinancing and home improvement loans.
- A Department of Justice investigation of a well-known mortgage company in Boston found that in 1992, the denial rate was 11 percent for white mortgage applicants, 21 percent for blacks, and 24 percent for Hispanics.

83

- According to a 1993 study by Avery, Sniderman, and Beeson who analyzed 1991 HMDA data, the denial rate for mortgage loan applications from Hispanics is 50 percent higher than for White applicants with the *same* income characteristics.

A common industry response to higher denial rates of mortgage applications from Hispanics is the assertion that Hispanics have higher loan-to-value ratios and are therefore presumed to be more likely to default on a loan. Yet a 1993 study by Berkovec, Canner, Gabriel, and Hannan found that the default rate for Hispanic households does not differ significantly from the rate for White households.

In short, discrimination in the mortgage lending process is a serious problem for Hispanics, and cannot easily be accounted for by market factors.

C. INSURANCE DISCRIMINATION

NCLR believes that discrimination against Hispanics in the insurance market is similarly pervasive, although there are far fewer studies focusing exclusively on insurance discrimination in general or homeowners' insurance discrimination in particular. However, anecdotal evidence suggests that insurance companies "redline" minority neighborhoods in much the same way that banks "redline" minority neighborhoods; for example:

- In 1993, the Texas Department of Insurance (TDI) analyzed participation trends in the State-sponsored insurance plan to which rejected insurance applicants are typically referred. The TDI study found that those areas of high Hispanic concentration (including Dallas, Houston, and the Rio Grande Valley) had significantly higher rates of participation in the State-sponsored insurance pools implying disparities in rejection rates of Hispanic applicants. The study also revealed that those areas without insurance agent operations had high concentrations of Hispanics.
- An ACORN study of five cities indicates that minority and low-income neighborhoods were underinsured by as much as 48 percent in some low-income neighborhoods compared to non-minority areas.
- Just this year, the National Fair Housing Alliance (NFHA) made public the results of a 3 year, in-depth investigation of insurance company practices. Using testers from White and minority neighborhoods, NFHA found widespread discrimination against minority testers in their attempts to obtain homeowners' insurance. In the city of Chicago, the incidence of discriminatory treatment of Latinos more than 95 percent. That is, in over 95 percent of the attempts by a Latino tester to obtain insurance, the insurance company:

  (1) did not return phone calls to offer either a quote on policies or to provide needed information;

  (2) would sell only lower-quality insurance coverage and fail to inform the Latino tester that the coverage was substandard while testers in White neighborhoods were told about top-of-the-line policies; or

  (3) applied stricter standards, such as minimum value requirements.

The implications of insurance discrimination against Latinos are far-reaching. Without homeowners' insurance, Latinos cannot qualify for mortgage loans and therefore cannot become homeowners. Many lenders require replacement value coverage—which, as the NFHA study revealed, is infrequently offered to testers from minority neighborhoods. In addition, the higher costs for insurance coverage in Latino neighborhoods directly affects the level of income disposable toward the purchase of a home. Home ownership is crucial to maintaining or furthering the economic and social viability of neighborhoods. Hence, discrimination by insurance companies can have the effect of stunting economic development and contributing to the decline of neighborhoods in much the same way as housing and mortgage discrimination.

Given the historical evidence regarding discrimination against Hispanics in the employment, housing, and mortgage markets, the strong indications that similar discrimination may be taking place in the insurance market, and the severe consequences such discrimination would have on Latinos' housing choices and rates of home ownership, NCLR believes the time has come for the Congress to enact insurance disclosure legislation. Described below are what we believe to be the essential elements of such legislation.

V. Recommendations

The National Council of La Raza supports the enactment of strong, landmark insurance disclosure legislation. To be effective, such legislation must include four basic provisions:

- *Zip + 4:* It is essential to report information about the availability, cost, and quality of insurance policies on a zip + 4 basis. Reporting on a zip + 4 basis would

84

allow use of demographic data from the Census Bureau because such data are easily translated into census tract units. Moreover where Hispanics are concerned, the spatial and geographic patterns of Hispanic households, with few exceptions, are not accurately captured by zip codes. By using zip + 4 as the reporting unit, experts and practitioners would be able to analyze whether insurance coverage amount, price, and quality vary according to the demographics of neighborhoods, in particular whether it varies according to the race and income of a neighborhood.

- *Loss Data:* In order to determine whether differences in the cost of insurance reflect real loss experience or racial prejudice and stereotypes, information regarding losses must be made available for analysis.
- *Coverage:* The scope of insurance disclosure legislation should be broad. There is no substantive basis for limiting disclosure of insurance practices to a few urban areas. Excluding small cities and rural areas from the scope of the legislation would amount to a Congressional finding that discrimination only occurs in large, urban areas.
- *Race and Ethnic Data:* This information is essential for civil rights enforcement purposes.

The Los Angeles riots were a painful reminder of the disaffection of minority communities who feel shut out, who have no access, and who feel that American institutions do not offer them the protections other Americans receive. It is the duty of Congress to take immediate, substantive, pro-active steps to address illegal insurance discrimination and the consequences associated with denial of insurance coverage.

On behalf of the National Council of La Raza, we thank the Committee for its consideration of our views, and we are ready to answer any questions you may have.

r-10-94 TUE 18:33 ACORN     FROM CHALLE) KAMASAKI    P.02

.  May 9, 1994

The Honorable Donald W. Riegle
Chairman
Committee on Banking, Housing, and Urban Affairs
U.S. Senate
Washington, D.C. 20510

Dear Chairman Riegle:

We write to urge you to support and move legislation this
year that would require insurance companies to disclose
information regarding where they write property insurance,
comparable to the information reported by banks and thrifts under
the Home Mortgage Disclosure Act (HMDA).

In 1968, the National Advisory Panel on Insurance in Riot
Affected Areas found that "communities without insurance are
communities without hope." After the riots in Los Angeles in
1992, surveys found that the insurance crisis in minority and low-
income areas had not materially abated. Numerous studies by
academics, state insurance departments, the federal government and
advocacy organizations and recent litigation have demonstrated
that discrimination and redlining are pervasive in the insurance
industry.

Redlining on the basis of geographic location by the
insurance industry has a devastating impact on individuals and
communities. It crushes opportunities for homeownership and
economic mobility, and is a major impediment to the creation of
affordable housing and community development in minority and low
- and moderate-income neighborhoods.

We commend you for requesting a study by the General
Accounting Office on what data should be collected to examine
disparities in the availability, affordability, and accessibility
of property insurance. We believe that that recently released
report --together with mounting evidence of insurance
discrimination-- justify a forceful and immediate response by
Congress.

We believe that data collection including race, national
origin, and gender data would serve several purposes. First, it
would allow the industry, the Congress, and the public to assess
the scope and extent of disparities in the provision of property
insurance by neighborhood.

Second, it would contribute to an objective assessment of the
underlying causes of any such disparities. For over two decades,
the insurance industry has dismissed charges of redlining by
insisting that any disparities in availability or price of
insurance reflect differences in risk. Civil rights, community,
and consumer organizations, citing evidence based on statistical
data on losses, litigation, and testing, have argued that

**86**

discrimination based on the racial characteristics of neighborhoods exists, and is pervasive. Data collection will allow this debate to be settled conclusively, and allow for considered responses by policy makers at the state and federal levels.

Third, data collection can materially assist efforts to enforce state and federal laws prohibiting discrimination in the provision of insurance. As a leading Congressional supporter of the Home Mortgage Disclosure Act (HMDA), we need not tell you how useful this data can be to the banking agencies, HUD, and the Justice Department in their efforts to eradicate lending discrimination. Like HMDA data, data on insurance company activities won't by itself prove discrimination by individual companies. It will, however, assist regulators and civil rights organizations in targeting companies for investigation and enforcement.

Finally, in the same way that the sunshine created by HMDA has produced a revolution in mortgage lending, we are convinced that simply requiring public disclosure of policy information will result in significant changes in insurance industry practices.

We commend you for your staunch commitment over the years to civil rights, community economic development, and consumer protection. We hope that, under your leadership, strong and comprehensive legislation in this area can be enacted this year.

Sincerely,

Alliance to End Childhood Lead Poisoning

American Civil Liberties Union

Association of Community Organizations for Reform Now
(ACORN)

Center for Community Change

Consumer Federation of America

Consumers Union

Lawyers Committee for Civil Rights Under Law

Leadership Conference on Civil Rights

The McAuley Institute

National Association for the Advancement of Colored People
(NAACP)

NAACP Legal Defense and Educational Fund, Inc.

National Council of La Raza

National Fair Housing Alliance

National Insurance Consumer Organization

National League of Cities

National Low-Income Housing Coalition

National Neighborhood Coalition

National Puerto Rican Coalition

National Urban League

NETWORK: A National Catholic Social Justice Lobby

Organization for a New Equality (O.N.E.)

Public Citizen's Congress Watch

United Methodist Church, General Board of Church and
Society

U.S. Public Interest Research Group



# An Analysis of Zip Code Distribution of State Farm and Allstate Agents and Policies in Chicago

## ILLINOIS PUBLIC ACTION
### April, 1993

AN ANALYSIS OF ZIP CODE DISTRIBUTION OF
STATE FARM AND ALLSTATE AGENTS AND POLICIES IN CHICAGO

## Summary of Findings

**STATE FARM AND ALLSTATE AGENTS DISPROPORTIONATELY CONCENTRATED
IN NORTHWEST AND SOUTHWEST SIDE ZIP CODES**

:   State Farm and Allstate, the nation's two largest providers
of automobile and homeowners insurance, claim not to discrimi-
nate in marketing or to redline Chicago neighborhoods. However
their agents are disproportionately located on the city's
northwest and southwest sides:

- Nine northwest and **three southwest** side zip codes had five
  or more State Farm **agents while seven** west side and seven
  south side zips had **one or no agents.**

- Nine northwest, four southwest, and two far-south side zip
  codes had five or more Allstate agents while seven west
  side and seven south side zips had one or no agents.

**STATE FARM AND ALLSTATE POLICIES ARE DISPROPORTIONATELY CON-
CENTRATED IN NORTHWEST AND SOUTHWEST SIDE ZIP CODES**

Both State Farm and Allstate contend that the lack of agents
does not mean a community is underserved. However the data on
auto and home policies provided by the two companies documents a
similar pattern of disproportionate distribution:

- Ten northwest and five southwest side zip codes had the
  heaviest concentrations of State Farm policies while seven
  west side and eight south side zips had the least.

- Six northwest, four southwest side, and four far-south
  side zip codes had the heaviest concentrations of Allstate
  policies while four west side and three near-south side
  zips had the least.

**POLICY DISTRIBUTIONS LARGELY REFLECT RACE AND INCOME PATTERNS OF
CHICAGO COMMUNITIES**

The disproportionate distribution of both agents and
policies generally corresponds to the race and income make-up of
Chicago community areas:

- All of the seventeen zip codes with the greatest concen-
  trations of State Farm policies are in majority white
  communities, while all but one of the sixteen zip codes
  with the least concentration, outside the downtown area,
  are in majority black or hispanic communities.

* Allstate had a similar concentration in the majority white
  communities on the northwest and southwest side although a
  significant proportion of its policies are in the higher
  income majority black communities.  However most zip codes
  with the least concentration of policies, outside the
  downtown area, are in low income communities that are
  majority black or hispanic.

STATE FARM AND ALLSTATE AGENTS AND POLICIES ARE DISPROPORTION-
ATELY DISTRIBUTED BY CONGRESSIONAL DISTRICT

   Congressional districts, which in Chicago largely adhere to
racial boundaries, show the same pattern of disproportionate
distribution of auto and home policies:

* **The seven zip codes, excluding the Loop, in the
  predominantly black Seventh District had 6 State Farm
  agents and an average of 3,568 policies while the six zip
  codes in the neighboring but predominantly white Fifth
  District had 56 agents and average of 18,250 policies.**

  Allstate had 8 agents and an average of 3,124 policies in
  the Seventh District zips but 42 agents and an average of
  7,583 policies in the Fifth District zip codes.

* **The four zip codes in the predominantly black Second
  District had 4 State Farm agents and an average of 6,233
  policies while the four zip codes in the neighboring but
  predominantly white Third District had 25 agents and
  average of 17,777 policies.**

  Allstate had 10 agents and an average of 8,574 policies in
  the Second District zips but 36 agents and an average of
  9,154 policies in the Third District zip codes.

*     *     *

AN ANALYSIS OF ZIP CODE DISTRIBUTION OF
STATE FARM AND ALLSTATE AGENTS AND POLICIES IN CHICAGO

Introduction: AGENT DISTRIBUTION AND REDLINING

In testimony presented to the U.S. House Subcommittee on
Commerce, Consumer Protection and Competitiveness last month,
and in previous studies, Illinois Public Action has documented
the unequal distribution of State Farm and Allstate offices in
Chicago neighborhoods.

These analyses have consistently found a disproportionate
concentration of such offices in northwest and southwest side
communities that are predominantly white and middle income, and
a corresponding lack of those offices in communities on the west
and south side that are predominantly black and hispanic.

We have contended that this pattern of office location is a
result of discriminatory marketing, often referred as
"redlining", that makes it difficult for inter-city consumers to
shop for and purchase insurance coverage from State Farm and
Allstate.  These two firms, who dominate market share both in
Illinois and nationwide for automobile and homeowners insurance,
generally charge the lowest rates.

As a consequence, many low-income minority Chicagoans are
forced into the hands of the "non-standard" carriers which
typically have the highest rates and the poorest records of
consumer service.  With auto liability coverage mandated by law
and lenders requiring coverage for home mortgages, the poorest
consumers are forced to pay the most for their insurance.

Both State Farm and Allstate have challenged these analyses
and they insist that they do not engage in discriminatory
marketing or other redlining practices.  As they have recently
stated to the Subcommittee:
"State Farm strives to offer our insurance products to the
general public in a manner that does not discriminate on the
basis of race, color, religion or national origin." (1)

"Allstate feels that it is accessible in every neighborhood
in the city of Chicago." (2)

Further, both firms claim that because agents are not
restricted to selling policies in their immediate vicinity and
are willing to provide pricing information over the phone,
office locations are not meaningful:

- 2 -

"Just because there is not an agent's office in a particular
area does not mean the service provided to consumers living
in that area is inferior...Regardless of whether or not a
State Farm agent's office is located in a particular zip
code, State Farm insurer cars and homes on a non-discrimi-
natory basis throughout the city." (3)

"Simply because an agent is not located on a given block or
in a particular neighborhood, it should not be construed
that we (Allstate) do not write or are seeking to avoid
business in that particular location." (4)

However the following analysis substantially contradicts the
claims of both companies. Based on the zip code data on
policies and agent locations provided by State Farm and
Allstate, it is clear that:

* the marketing of policies is closely correlated with the
  geographic distribution of agents and offices;

* that policies are correspondingly concentrated in the
  communities with the most agents and lacking in those
  communities with few or no agents; and

* this uneven distribution of agents and policies largely
  reflects the racial and income make-up of those
  communities.


AGENT DISTRIBUTION BY ZIP CODE

As indicated by previous analyses of advertised office
locations, both State Farm and Allstate have widely uneven
distributions of agents in Chicago communities.

State Farm lists 186 agents ("independent contractors" and
trainee agents) as having had offices in 58 Chicago zip codes
during the last five years. Although this was an average of
slightly more than three per zip, the distribution ranges from
no agents in a dozen west side and south side zip codes to as
many as twenty in one northwest side zip code. Overall most
State Farm agents are concentrated in ten north and northwest,
three southwest and one far southeast side zip codes. (Map I)

Allstate lists 215 agents as of February 28, 1993 located in
57 Chicago zip codes (or an average of slightly less than four
per zip code.) However a similar pattern of uneven distribution
is evident -- ranging from several zip codes on the northwest
and southwest sides with more than a dozen agents to ten zip
codes on the south and west sides with no agents.

- 3 -

As with State Farm, most Allstate agents are located on the northwest side followed by the southwest side zip codes; although Allstate has a substantially larger number of agents on the far south side side.  (Map II)

Agent distribution is closely correlated with policy distribution for both companies.  Although zip codes are not a precise designation of the immediate service area (not infrequently an office located on the border of one zip code markets to policyholders across the street in the neighboring zip), the zip codes with the most agents generally have the most policies, and those with the fewest agents have fewer policies.

### TABLE I -- AGENTS AND POLICIES PER ZIP CODE

**State Farm (auto/1991)**

|  | (#) | Total Policies | Average per Zip Code |
|---|---|---|---|
| Zip Codes with 0 to 1 agents | 19 | 60,200 | 3,168 |
| Zip Codes with 2 to 4 agents | 19 | 107,139 | 5,639 |
| Zip Codes with 5 or more agents | 14 | 147,503 | 10,536 |

**Allstate (auto liability/1992)**

|  | (#) | Total Policies | Average per Zip Code |
|---|---|---|---|
| Zip Codes with 0 to 1 agents | 18 | 28,048 | 1,558 |
| Zip Codes with 2 to 4 agents | 18 | 57,159 | 3,572 |
| Zip Codes with 5 or more agents | 16 | 63,958 | 3,762 |

NOTE -- data for both firms excludes the downtown zip codes 60601-60606 and O'Hare (60666)

SOURCES: State Farm, Allstate -- see Appendix A



MAP I

STATE FARM AGENTS
BY ZIP CODE

0-1 Agents

2-4 Agents

5+ Agents

004333



MAP II

ALLSTATE AGENTS
BY ZIP CODE

0-1 Agents

2-4 Agents

5+ Agents

DOWNTOWN DELIVERY ZIP CODES

- 5 -

While it should come as no surprise that agents and offices
are located in neighborhoods with the most policyholders, both
State Farm and Allstate have maintained that agent location does
not indicate discriminatory marketing. However the zip code
data provided by these companies clearly demonstrate that the
number of policies is closely correlated with the geographic
distribution of agents and offices.


## POLICY DISTRIBUTION BY ZIP CODE

### State Farm Policies by Zip Code

Based on the exposure data provided to the Subcommittee,
State Farm Mutual had 316,710 policies in the City of Chicago
during 1991. Map III illustrates the distribution of those
policies by zip code.

As is immediately apparent, State Farm policyholders are
concentrated in the same communities as their agents. Fourteen
north side, five southwest side, one far-south side and one
southeast side zip codes had 125% or more of the average number
of policies. At the same time, ten south side and eight west
side zip codes had less than 75% of the average.

State Farm Fire & Casualty lists 176,843 homeowners policy
exposures in 1991 for Chicago. These were distributed similarly
as seen on Map IV. Twelve north side, four southwest side and
one southeast side zip codes had more than 125% of the average
number of policies. At the same time, nine south side and six
west side zip codes had less than 75% of the average.

Racial and income breakdowns by zip code are not readily
available, but there are data for corresponding community areas.
(See Appendix B) Zip codes do not precisely correspond with the
community areas, and several include diverse communities, eg.
60608 includes both the white and average income community of
Bridgeport and the hispanic and lower-income Lower West Side
community (Pilsen). However the community area data allow for
some comparisons of policy distribution by race and income.

The zip codes with the highest concentration of State Farm
policyholders are all majority white community areas, while
almost all of zip codes with the fewest average policies
(outside the downtown Loop and Near North areas) are either
majority black or hispanic.

Most of the zip codes with the fewest State Farm policies
are low-income. However there is no necessary correspondence



MAP III

STATE FARM AUTO
POLICIES

BY ZIP CODE
(1991)

Average per zip
code was 5,460

75% or less
of average

75%-125% of
average

125% or more
of average

DOWNTOWN DELIVERY ZIP CODES



- 9 -

with income: eight of the northwest side zip codes with the highest concentrations of policies are average income, while only one of the five far-south side zip codes representing average income areas had a high concentration of policies.

Although there is a larger number of State Farm policies in average income majority black communities than low-income areas, the numbers are not at all comparable to those in similar income majority white communities.

## Allstate Policies by Zip Code

Allstate auto and home policies also closely track agent locations. Allstate had 149,930 automobile liability policies, as measured in written car years, in Chicago during 1992, distributed over 57 zip codes as illustrated by Map V.

Again there was a heavy concentration in the same northwest side, the southwest side and southeast side zip codes as with State Farm. However Allstate also had a larger proportion on its policies in the five far-south side zip codes and a smaller percentage on the far north side.

The distribution of residential property insurance, including both homeowners and renters insurance, was virtually the same based on the data provided to the Subcommittee. Allstate had some 151,493 such new or renewed policies in Chicago in 1992 -- see Map VI.

In general, Allstate's policy distribution corresponds more closely with income distribution than race. While almost all of the zip codes (outside of downtown) with the lowest percentage of Allstate policyholders were either majority black or hispanic, these were also communities with the lowest incomes.

There was a higher concentration of both auto and home policies in the majority black zip codes representing average income communities. (As indicated above, Allstate has a higher number of agents in those areas while having only a handful in the lower-income zip codes.)

## POLICY DISTRIBUTION BY CONGRESSIONAL DISTRICT

Another revealing approach to analyzing the zip code policy data provided by State Farm and Allstate is by congressional district. Following last year's redistricting, congressional districts closely follow racial boundaries, particularly in Chicago.





MAP VI

ALLSTATE HOME
& RENTERS POLICIES

BY ZIP CODE
(1992)

Average per zip
code was 2,690

75% or less
of average

75%-125% of
average

125% or more
of average

DOWNTOWN DELIVERY ZIP CODES

- 12 -

Zip code alignments, of course, do not necessarily correspond to the boundaries of the new congressional districts, and often a zip code may be part of two or more such districts. As a consequence, we examined the number of policies in only the 47 zip codes which are wholly or predominantly in a congressional district; the information was not available to accurately apportion the multi-district zip codes.

Tables II and III summarize the policy information by congressional district (see Appendix C for full data.) While the seven Chicago congressional districts represent varying proportions of the cities (and thus differing number of zip codes), several interesting comparisons are possible.

In the four south side zip codes of the predominantly black Second District, there were just four State Farm agents, and an average of 3,767 auto policies and 2,466 home policies. By contrast, the four southwest side zip codes in the overwhelmingly white Third District had 25 agents and averaged 11,766 auto and 6,011 home policies -- nearly three times that of the Second District.

Similarly, in the predominantly black Seventh District, excluding the Loop six zip codes but even including the Near North communities, there were just 6 State Farm agents in seven zip codes. These zips averaged 2,041 auto policies and 1,527 home policies.

The five zip codes in the adjacent and predominantly hispanic Fourth District had just eight agents; they averaged 3,965 auto and 2,560 home policies. However the neighboring six zip codes in the overwhelmingly white Fifth District had 56 agents; and an average of 11,835 auto and 6,415 home policies -- more than five times the average per zip code in the Seventh District and two-and-a-half times the average in the Fourth.

The pattern is similar, if not as extreme, for Allstate. While the number of agents was greater in the Third District zip codes that the Second, and the average number of policies, both home in auto, was much closer.

However the non-Loop zip codes in the Seventh District had only Allstate eight agents, averaging just 1,325 auto and 1,799 home policies. In the Fourth District, there were six agents and an average of 2,417 auto and 2,677 home policies.

By contrast, in the Fifth District there were 42 agents and an average of 3,924 auto policies and 3,659 home policies -- more than twice the average in the Seventh and more than 50% greater than in the Fourth.

- 13 -

TABLE II -- STATE FARM POLICIES BY CONGRESSIONAL DISTRICT IN
CHICAGO

AUTO/1991

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 25,629 | 3,661 | 10 |
| 2 | 4 | 15,067 | 3,767 | 4 |
| 3 | 4 | 47,065 | 11,766 | 25 |
| 4 | 5 | 19,825 | 3,965 | 8 |
| 5 | 6 | 71,008 | 11,835 | 56 |
| 7 | 6 downtown<br>7 other | 1,868<br>14,290 | 311<br>2,041 | 9<br>6 |
| 9 | 8 | 51,730 | 6,466 | 28 |

HOME/1991

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 12,487 | 1,784 | 10 |
| 2 | 4 | 9,863 | 2,466 | 4 |
| 3 | 4 | 24,044 | 6,011 | 25 |
| 4 | 5 | 12,801 | 2,560 | 8 |
| 5 | 6 | 38,491 | 6,415 | 56 |
| 7 | 6 downtown<br>7 other | 1,470<br>10,688 | 245<br>1,527 | 9<br>6 |
| 9 | 8 | 27,212 | 3,402 | 28 |

* Includes zip codes only wholly or predominantly in a
  congressional district; does not include partial zip codes.

- 14 -

TABLE III -- ALLSTATE POLICIES BY CONGRESSIONAL DISTRICT IN CHICAGO

AUTO (Liability)/1992

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 20,221 | 2,889 | 14 |
| 2 | 4 | 17,130 | 4,282 | 10 |
| 3 | 4 | 20,028 | 5,007 | 36 |
| 4 | 5 | 12,085 | 2,417 | 6 |
| 5 | 6 | 23,546 | 3,924 | 42 |
| 7 | 6 downtown | 770 | 128 | 20 |
|   | 7 other | 9,278 | 1,325 | 8 |
| 9 | 8 | 15,240 | 1,905 | 35 |

HOME (Homeowners & Renters)/1992

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 21,405 | 3,058 | 14 |
| 2 | 4 | 17,170 | 4,292 | 10 |
| 3 | 4 | 16,588 | 4,147 | 36 |
| 4 | 5 | 13,387 | 2,677 | 6 |
| 5 | 6 | 21,952 | 3,659 | 42 |
| 7 | 6 downtown | 853 | 142 | 20 |
|   | 7 other | 12,595 | 1,799 | 8 |
| 9 | 8 | 16,482 | 2,060 | 35 |

* Includes zip codes only wholly or predominantly in a congressional district; does not include partial zip codes.

- 15 -

As with the community area data, the congressional district analyses demonstrate the same pattern of uneven distribution of agents and policies, which largely reflect the racial and income make-up of those districts.

## A Concluding Note

Only with policy information by census tract could a more precise correlation between agents, policies, race and income be possible. However the zip code data presented to the Subcommittee does provide a clear picture of the disproportionate concentration of policies in predominantly white and middle-income northwest and southwest side communities and a corresponding lack of those policies in communities on the west and south side that are predominantly black or hispanic. And that disproportionate distribution closely reflects the office locations of State Farm and Allstate agents.

## NOTES

(1) Quoted from correspondence to Representative Cardiss Collins, Chair of the Subcommittee on Commerce, Consumer Protection and Competitiveness, U.S. House of Representatives from Cranford A. Ingham, Vice-President and General Counsel, State Farm Mutual Automobile Insurance Company, dated March 30, 1993.

(2) Quoted from correspondence to Representative Cardiss Collins, Chair of the Subcommittee on Commerce, Consumer Protection and Competitiveness, U.S. House of Representatives from Allstate Insurance Company, March, 1993.

(3) State Farm, op cit.

(4) Allstate, op cit.

All data subsequently cited on agent locations, automobile and home insurance policies by zip codes from information provided to the Subcommittee in these correspondences. Data in Appendix B on community areas from the Census Bureau, U.S. Department of Commerce.

•　　•　　•

APPENDIX A -- Agents and Policies by Zip Code

STATE FARM (auto/1991)

| Zip Codes with 0 to 1 Agents | | Zip Codes with 2 to 4 Agents | | Zip Codes with 5 or More Agents | |
|---|---|---|---|---|---|
| Zip | Policies | Zip | Policies | Zip | Policies |
| 60607 | 1105 | 60609 | 3942 | 60614 | 9013 |
| 60608 | 4076 | 60610 | 3506 | 60617 | 10303 |
| 60612 | 1016 | 60611 | 2587 | 60618 | 11001 |
| 60620 | 5899 | 60613 | 5565 | 60625 | 9203 |
| 60621 | 1026 | 60615 | 3303 | 60629 | 13739 |
| 60622 | 3818 | 60616 | 3861 | 60630 | 11809 |
| 60624 | 1017 | 60619. | 4614 | 60631 | 7175 |
| 60627 | 2148 | 60623 | 3240 | 60634 | 18925 |
| 60633 | 2669 | 60626 | 4000 | 60638 | 14171 |
| 60636 | 1829 | 60628 | 5191 | 60639 | 7258 |
| 60637 | 2516 | 60632 | 9386 | 60641 | 10398 |
| 60642 | 5184 | 60635 | 9021 | 60646 | 9417 |
| 60644 | 1961 | 60640 | 5563 | 60652 | 9769 |
| 60648 | 8410 | 60643 | 7808 | 60659 | 5322 |
| 60649 | 2033 | 60645 | 7322 | | |
| 60651 | 3098 | 60647 | 4749 | (14) | 147,503 |
| 60653 | 436 | 60655 | 7543 | | |
| 60657 | 7430 | 60656 | 11660 | Average: 10,536 | |
| 60658 | 4529 | 60660 | 4278 | | |
| (19) | 60,200 | (19) | 107,139 | | |
| Average: 3,168 | | Average: 5,639 | | | |

107

APPENDIX A/2

ALLSTATE (auto liability/1992)

| Zip Codes with 0 to 1 Agents | | Zip Codes with 2 to 4 Agents | | Zip Codes with 5 or More Agents | |
|---|---|---|---|---|---|
| Zip | Policies | Zip | Policies | Zip | Policies |
| 60608 | 2196 | 60607 | 417 | 60610 | 1246 |
| 60609 | 2150 | 60613 | 2576 | 60614 | 3049 |
| 60611 | 890 | 60616 | 2074 | 60618 | 5642 |
| 60612 | 824 | 60617 | 6607 | 60620 | 7456 |
| 60615 | 2297 | 60619 | 8701 | 60629 | 6702 |
| 60621 | 1988 | 60625 | 3576 | 60631 | 2285 |
| 60622 | 1569 | 60628 | 7082 | 60632 | 4773 |
| 60623 | 2414 | 60630 | 4542 | 60634 | 5421 |
| 60624 | 1536 | 60633 | 626 | 60635 | 1430 |
| 60626 | 1513 | 60638 | 4828 | 60639 | 3699 |
| 60627 | 181 | 60640 | 2154 | 60641 | 4622 |
| 60636 | 2411 | 60645 | 2341 | 60643 | 4469 |
| 60637 | 2321 | 60647 | 3756 | 60646 | 2406 |
| 60642 | 211 | 60649 | 3038 | 60652 | 3729 |
| 60644 | 2060 | 60657 | 3081 | 60655 | 2670 |
| 60648 | 206 | 60660 | 1706 | 60656 | 2306 |
| 60651 | 2305 | | | 60659 | 2053 |
| 60653 | 976 | (16) | 57,159 | | |
| | | | | (17) | 63,958 |
| (18) | 28,048 | Average: 3,572 | | | |
| | | | | Average: 3,762 | |
| Average: 1,558 | | | | | |

004346

**108**



109



APPENDIX C -- Chicago Agents and Policies by Congressional
              District

**State Farm (1991)**

FIRST DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|---|---|---|---|
| 60615 | 2 | 3303 | 1608 |
| 60619 | 4 | 4614 | 2382 |
| 60637 | 0 | 2516 | 1102 |
| 60642 | 0 | 5184 | 2554 |
| 60649 | 1 | 2033 | 1094 |
| 60653 | 0 | 436 | 153 |
| 60655 | 3 | 7543 | 3594 |
| TOTAL | 1.1 | 25629 | 12487 |
| Av./Zip | | 3661 | 1784 |

SECOND DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|---|---|---|---|
| 60620 | 1 | 5899 | 3662 |
| 60627 | 0 | 2148 | 1134 |
| 60628 | 2 | 5191 | 3757 |
| 60636 | 1 | 1829 | 1310 |
| TOTAL | 4 | 15067 | 9863 |
| Av./Zip | 1 | 3767 | 2466 |

THIRD DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|---|---|---|---|
| 60629 | 7 | 13739 | 7639 |
| 60632 | 4 | 9386 | 5230 |
| 60638 | 5 | 14171 | 6399 |
| 60652 | 9 | 9769 | 4776 |
| TOTAL | 25 | 47065 | 24044 |
| Av./Zip | 6.2 | 11766 | 6011 |

004349

111

APPENDIX C/2

### FOURTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60608 | 1 | 4076 | 2192 |
| 60609 | 3 | 3942 | 2356 |
| 60622 | 0 | 3818 | 2026 |
| 60623 | 2 | 3240 | 2640 |
| 60647 | 2 | 4749 | 3587 |
| TOTAL | 8 | 19825 | 12801 |
| Av./Zip | 1.6 | 3965 | 2560 |

### FIFTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60614 | 5 | 9013 | 7432 |
| 60625 | 6 | 9203 | 4247 |
| 60630 | 12 | 11809 | 6144 |
| 60634 | 20 | 18925 | 9577 |
| 60641 | 10 | 10398 | 5459 |
| 60656 | 3 | 11660 | 5632 |
| TOTAL | 56 | 71008 | 38491 |
| Av./Zip | 9.3 | 11835 | 6415 |

### SEVENTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60601-06 | 9 | 1868 | 1470 |
| 60607 | 0 | 1105 | 707 |
| 60610 | 2 | 3506 | 2991 |
| 60611 | 3 | 2587 | 2268 |
| 60612 | 0 | 1016 | 563 |
| 60624 | 0 | 1017 | 475 |
| 60644 | 1 | 1961 | 1160 |
| 60651 | 0 | 3098 | 2524 |
| TOTAL (non-Loop) | 6 | 14290 | 10688 |
| Av./Zip (non-Loop) | 0.9 | 2041 | 1527 |

004350

APPENDIX C/3

NINTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60613 | 2 | 5565 | 3596 |
| 60626 | 3 | 4000 | 2407 |
| 60631 | 6 | 7175 | 3603 |
| 60640 | 2 | 5563 | 2589 |
| 60645 | 3 | 7322 | 3945 |
| 60646 | 10 | 9417 | 4558 |
| 60648 | 0 | 8410 | 4033 |
| 60660 | 2 | 4278 | 2481 |
| TOTAL | 28 | 51730 | 27212 |
| Av./Zip | 3.5 | 6466 | 3402 |

APPENDIX C/4

Allstate (1992)

FIRST DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60615 | 1 | 2297 | 3929 |
| 60619 | 3 | 8701 | 8064 |
| 60637 | 0 | 2391 | 2297 |
| 60642 | 0 | 211 | 1432 |
| 60649 | 3 | 3038 | 2933 |
| 60653 | 0 | 976 | 655 |
| 60655 | 7 | 2607 | 2095 |
| TOTAL | 14 | 20221 | 21405 |
| Av./Zip | 2 | 2889 | 3058 |

SECOND DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60620 | 7 | 7456 | 6219 |
| 60627 | 0 | 181 | 1080 |
| 60628 | 2 | 7082 | 6743 |
| 60636 | 1 | 2411 | 3128 |
| TOTAL | 10 | 17130 | 17170 |
| Av./Zip | 2.5 | 4282 | 4292 |

THIRD DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60629 | 8 | 6702 | 6272 |
| 60632 | 8 | 4773 | 3893 |
| 60638 | 4 | 4824 | 3633 |
| 60652 | 16 | 3729 | 2790 |
| TOTAL | 36 | 20028 | 16588 |
| Av./Zip | 9 | 5007 | 4147 |

114

APPENDIX C/5

FOURTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|---|---|---|---|
| 60608 | 2 | 2196 | 2773 |
| 60609 | 0 | 2150 | 2441 |
| 60622 | 1 | 1569 | 1916 |
| 60623 | 0 | 2414 | 2733 |
| 60647 | 3 | 3756 | 3524 |
| TOTAL | 6 | 12085 | 13387 |
| Av./Zip | 1.2 | 2417 | 2677 |

FIFTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|---|---|---|---|
| 60614 | 9 | 3049 | 4264 |
| 60625 | 2 | 3576 | 3448 |
| 60630 | 3 | 4542 | 3188 |
| 60634 | 13 | 5451 | 4742 |
| 60641 | 10 | 4622 | 3442 |
| 60656 | 5 | 2306 | 2868 |
| TOTAL | 42 | 23546 | 21952 |
| Av./Zip | 7 | 3924 | 3659 |

SEVENTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|---|---|---|---|
| 60601-06 | 20 | 770 | 853 |
| 60607 | 2 | 417 | 395 |
| 60610 | 5 | 1246 | 2047 |
| 60611 | 1 | 890 | 1476 |
| 60612 | 0 | 824 | 480 |
| 60624 | 0 | 1536 | 1604 |
| 60644 | 0 | 2060 | 2454 |
| 60651 | 0 | 2305 | 4141 |
| TOTAL (non-Loop) | 8 | 9278 | 12595 |
| Av./Zip (non-Loop) | 1.1 | 1325 | 1799 |

APPENDIX C/6

NINTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60613 | 4 | 2576 | 2877 |
| 60626 | 1 | 1513 | 1427 |
| 60631 | 14 | 2285 | 2432 |
| 60640 | 5 | 2153 | 2131 |
| 60645 | 2 | 2341 | 2499 |
| 60646 | 7 | 2406 | 2402 |
| 60648 | 0 | 206 | 1056 |
| 60660 | 2 | 1760 | 1658 |
| TOTAL | 35 | 15240 | 16482 |
| Av./Zip | 4.4 | 1905 | 2060 |



**State of Missouri**

Department of Insurance
P.O. Box 690
Jefferson City, Missouri 65102-0690

**Mel Carnahan, Governor**

Jay Angoff
Director

May 10, 1994


The Honorable Donald W. Riegle
Chairman Committee on Banking, Housing and Urban Affairs
The United States Senate
Washington, D.C. 20610-8076

Dear Senator Riegle:

It is with deep personal regret that I am unable to attend the
hearing on Insurance Redlining scheduled for tomorrow, due to my
commitments concerning health care reform measures in this state.
I am enclosing our March 1993 study as you have requested.    In
addition, my staff has prepared new tables which will be of
interest to your committee.

Since the Missouri Department of Insurance has completed several
market conduct exams on the issue of affordability and availability
of insurance.  Below are some observations drawn from those exams.

First, there is an essential need for data.  Missouri began to
collect homeowners insurance and private passenger automobile
insurance data by zip code since 1979 under our statute, Section
374.400, Revised Statutes of Missouri.  Without an adequate data
base, it is difficult to monitor the degree of competition in the
individual neighborhoods (zip codes) of this state and to know
which companies write what type of coverage in what geographic
location.  The department needs to be able to direct its efforts
intelligently to the problem areas or target the companies that
appear to reduce coverage for protected classes of business.

Second, there is a need to monitor competition for personal lines.
In accordance with the McCarran Ferguson Act of 1945 we believe
that if open competition is employed by a state for rate
regulation, then "active supervision" must be implemented.  It is
by monitoring competition and its effects that we are able to
ensure that all markets are being served in this state effectively.

Our mode of monitoring competition and  policing the protections
provided in the Unfair Trade Practices Act has been by zip code
analysis.  .There is pending legislation before the U.S. Congress
that supports this position. (Kennedy H.R.1257 and Collins HR
1188).   From our analysis and market conduct examinations of
insurers we have seen that there is a problem in the <u>accessibility</u>

Harry S Truman State Office Building, Room 630 ● 301 West High ● Jefferson City, Missouri 65101
Telephone 314/751-4126 or TDD 314/526-4536 (Hearing Impaired)

The Honorable Donald W. Riegle
May 10, 1994
Page 2

of insurer placed agents, in the <u>availability</u> of coverage due to underwriting rules and in the <u>affordability</u> of coverage fairly priced.

Using our data on agent appointments by zip code and consequent number of policies written, we found that a strong significant positive correlation existed in that the more agents in a locale, the more policies written.

After targeting several exams of major writers of homeowners coverages in our state we have learned that several underwriting variables are being used as surrogates for valid criteria.

Variables such as the age of the home is used as a substitute for the condition of residence. The condition of the property has an intuitive fairness in that it is tied to the probability of loss; however, a false assumption exists in that older homes must be in poor condition. Such a standard overlooks the effects of rehabilitation of older properties such that their heavier construction is more resistant to high winds than a new home.

Another variable used is the minimum amount of insurance coverage which presumes that a smaller home is more likely to suffer a loss than a larger, more expensive property. Tornadoes, of course, are insensitive to the value or size of a home. Larger homes present greater exposure to risk, as any insurer's rate table will reflect.

Another variable is the relationship of replacement cost to market value of a property. This is unnecessary since market value policies have been developed to address this issue.

Most insurers have undertaken to use variables to accept or reject a risk; variables that are convenient though are in no way accurate in assessing the risk of the loss. Use of such variables create dislocation in the competitive market by leaving various populations without coverage with little or no concern as to the impact upon neighborhoods since these variables are thought of as "objective". No test of disparate impact has ever been applied in any states' Unfair Trade Practice laws for insurance.

As to the matter of affordability of coverage, we have done some initial evaluations of territorial rating structures in light of five years of loss cost data from over 95% of the Missouri market. We have employed analysis of variance techniques and multiple regressions in order to defend territorial assignments. To date, our conclusion is that the primary force in territorial assignments

118

Honorable Donald W. Riegle
May 10, 1994
Page 3

is a market driven desire to seek and avoid segments of the
population through pricing mechanisms.  This type of analysis can
only be accomplished through the collection of loss data by zip
code as well as exposure data.

Since states are unwilling or unprepared to monitor competition in
their markets, including the collection of loss data to evaluate
the fairness of rate structures as they exist, we strongly support
the concept of a federal mandate as in H.R. 1257 and H.R. 1188.

Sincerely,

JAY ANGOFF
Director of Insurance
State of Missouri

JA:dh

Enclosure

# Missouri Department of Insurance
## Market Excluded by Minimum Value
## Policy Underwriting Rule

| ZIP CODE Category | % Houses Less Than $40,000 |
|---|---|
| 100% Urban | 20.69 |
| 100% Rural | 55.19 |
| > 80% Non-white | 67.06 |
| Statewide | 26.87 |

Source: Bureau of the Census - 1990 Census

# Missouri Department of Insurance
# Market Excluded by Minimum Value
# Policy Underwriting Rule

| ZIP CODE Category | % Houses Less Than $50,000 |
|---|---|
| 100% Urban | 34.14 |
| 100% Rural | 67.88 |
| > 80% Non-white | 83.03 |
| Statewide | 38.83 |

Source: Bureau of the Census - 1990 Census

# Missouri Department of Insurance
## Market Excluded by Age of Home
## Using 35 Year Underwriting Rule

| ZIP CODE<br>Category | % Houses<br>Built Before<br>1960 |
|---|---|
| 100% Urban | 68.67 |
| 100% Rural | 38.17 |
| > 80% Non-white | 90.02 |
| Statewide | 43.48 |

Source:  Bureau of the Census - 1990 Census

# Missouri Department of Insurance
# Market Excluded by Age of Home
# Using 25 Year Underwriting Rule

| ZIP CODE Category | % Houses Built Before 1970 |
|---|---|
| 100% Urban | 85.99 |
| 100% Rural | 53.37 |
| > 80% Non-white | 95.79 |
| Statewide | 61.37 |

In our preliminary analysis of territory base rates, we have found a surprisingly low correlation between territorial base rates and territory loss experience.

## PREPARED STATEMENT OF JAY ANGOFF

### DIRECTOR, MISSOURI INSURANCE DEPARTMENT

I am very pleased to announce that almost all of the leading homeowners' insurers in Missouri have voluntarily agreed to allow us to disclose the ratio between their statewide market share and their high-minority zip code market shares. I applaud them for their positive and helpful responses and for the spirit of cooperation they have shown.

They have also raised some important issues that should be given serious consideration by anyone interested in how the homeowners' insurance market functions. These issues include:

1. *Whether an insurer who is located in a certain region of the State should be required to insure people throughout the State.* Some insurers specialize in insuring people in the region in which they're located. They employ people in that region and they know that region well. Is there anything wrong with such insurers limiting themselves to insuring people in their own region?

2. *Whether cost per $1,000 of premium is the best way to measure the cost of insurance.* Several insurers accurately point out that lower amounts of insurance cost more per $1,000 of insurance than do higher amounts of insurance; and that low-income people, who presumably buy lesser amounts of insurance, would therefore pay more per $1,000 of coverage. On the other hand, this argument does not justify lower loss ratios (i.e., amount paid out per premium dollar) for lower amounts of coverage than for higher amounts of coverage.

3. *Whether Missouri law authorizes insurers to refuse to write in certain zip codes.* Subsection (c) of section 375.936(11) of the Missouri code prohibits refusing to insure based on geographic location. Subsection (g) prohibits refusing to insure based on race. Subsection (i)a, however, provides that the prohibitions contained in subsections (c) and (g) do not apply if the refusal to insure "is for a business purpose which is not a mere pretext for unfair discrimination." If some insurers do refuse to write in certain zip codes, therefore, are they merely doing what the law permits them to do?

4. *Whether insurers who do have a substantial presence in urban areas should be penalized for "cherry-picking" the market.* If a limited number of insurers are willing to write substantial business in urban areas, is it fair to them to require them to insure all urban business?

5. *Whether, as a practical matter, insurers can be forced to write business in areas in which they don't wish to write.* Regardless of what the law provides, and regardless of the context to which the State disseminates comparative price information or information about how to contact insurers, if an insurance company has no agents in certain areas will residents of those areas buy insurance from that company?

The Department believes that all the above are important questions which do not have easy answers. We look forward to a continued discussion on homeowners' insurance issues in hopes that these issues can be resolved in a manner that will benefit both the public and the insurance industry.

---

## HOMEOWNERS' INSURANCE IN MISSOURI

### Introduction

Statistical data on the availability and affordability of homeowners' insurance in Missouri has been available for years, but has never been extensively studied.

This report is a synopsis of an initial study undertaken by the Missouri Department of Insurance to analyze the information reported by the insurance industry to the department regarding rates charged, claims paid, and types of policies sold in low-income areas.

The report compares the experience in low-income zip codes in St. Louis and Kansas City to statewide market experience. It also compares what is happening in the insurance market in predominantly black low-income neighborhoods and predominantly white low-income neighborhoods.

### Background

Missouri is one of the few States in the Nation with extensive and detailed data on homeowners' insurance.

In 1978, the Missouri legislature enacted a law directing the Missouri Department of Insurance to collect data on homeowners' insurance on an annual basis. The following year a similar law was enacted requiring collection of auto insurance data.

124

These laws provide that each insurer writing business in the State is required to report all premium and loss data to the director of the department. The laws also state that the director shall establish the statistical base for the reporting of the information.

Pursuant to those laws, Missouri has required that insurance companies report statistical information by zip code. The data to be reported includes the number of policies a company writes, the amount of premium it receives, the amount of claims it pays, and the amount it pays out in claims.

Neither of the statutes regarding the collection of the data state that it will remain confidential. In fact, the automobile insurance disclosure law expressly states that the director shall make reports of the data available to the public. Nevertheless, due to the claims of insurers that this information was proprietary, prior Administrations verbally agreed that information that identified companies would remain confidential.

That agreement was put in writing in 1987 in a departmental bulletin issued by Director Lewis Crist. This bulletin, which does not have the force of law, stated that homeowners' and auto insurance data submitted to the department "will not be distributed to anyone other than the submitting insurer or a member of its group except on an aggregate (total of all insurers reporting) basis."

In view of the understanding that has existed between the department and the insurance industry, the department believes that at this time it would be unsporting to identify individual company data, or to release the data in a manner that would enable the reader, by using other publicly available data, to identify individual company data. Therefore, this report contains no data that would enable a reader to identify any individual insurer data.

**Findings**

This study is based upon the last 5 years of information filed by insurance companies writing homeowners' insurance in Missouri.

*Table 1* sets out the average rates charged, the types of policies sold, and the losses paid in minority and white low-income zip codes in St. Louis. That data is compared to statewide data for all incomes and all zip codes.

As this table demonstrates, St. Louis policyholders in the eight minority low-income urban zip codes paid an average of $6.15 for every thousand dollars of insurance coverage. Policyholders in the three white low-income zip codes paid $4.70 per thousand. On a statewide basis, policyholders paid $4.27.

In addition, differences exist in coverage costs within the minority zip codes. For example, the cost per thousand ranged from a low of $5.64 in zip code 63133, which is 82 percent minority, to a high of $7.77 per thousand in zip code 63106, which is 94 percent minority.

Substantial differences also exist in the types of insurance policies sold in the minority and white low-income zip codes. For example, 74 percent of all policies sold in minority zip codes were limited policies, whereas, 41 percent of policies sold in white zip codes were limited policies. Only 23 percent of policyholders bought limited policies on a statewide basis.

So-called limited policies limit coverage in some way. Typically, a limited policy insures the actual cash value of the home rather than its replacement cost. It may also limit liability, theft, or contents coverage. In contrast, a standard policy typically covers the costs of replacing the dwelling and its contents, and provides comprehensive liability coverage.

Finally, the amount of money insurers paid out to policyholders in claims differed by zip code. For example, for every dollar insurers received in premium from policyholders in minority low-income zip codes, they paid out 64 cents in claims—in insurance jargon—their loss ratio was 64 percent. In contrast, insurers paid out 66 cents on the dollar in white low-income zip codes, and 58 cents on the dollar statewide.

*Table 2* breaks out St. Louis cost and pay out information further by type of policy purchased. For example, the average cost for a limited policy in minority zip codes was $7.30 compared to $4.65 in white zip codes and $5.45 statewide. Yet the 57 percent loss ratio in minority zip codes was substantially lower than the 72 percent loss ratio in white zip codes.

*Tables 3 and 4* set out the same type of data for Kansas City as do tables 1 and 2 for St. Louis. In Kansas City, as in St. Louis, residents of minority low-income zip codes paid more for coverage than both residents of white low-income zip codes and Missouri residents in general. Also, insurers sold more limited policies in minority low-income zip codes than they did in white low-income zip codes or statewide. And their loss ratio on those policies—45 percent—was lower than it was in either white low-income zip codes or statewide.

125

*Table 5* ranks the top 20 homeowners' insurers by ratio of statewide market share to market share in minority low-income zip codes.

As the table indicates, Company A's market share statewide was 62 times greater than its market share in minority zip codes. Eleven insurers had statewide market shares that were more than three times their minority market shares.

On the other hand, eight carriers had higher market shares in the minority zip codes than they did in the State as a whole.

TABLE 1

## ST. LOUIS MSA
### LOW INCOME URBAN ZIPS

| ZIP | AVERAGE HOUSEHOLD INCOME* | % NON-WHITE POPULATION* | AVERAGE COST PER THOUSAND | % STANDARD POLICIES | % LIMITED POLICIES | LOSS FREQUENCY | LOSS SEVERITY | CASH FLOW LOSS RATIO |
|---|---|---|---|---|---|---|---|---|
| **Minority (Greater than 80% Non-White)** | | | | | | | | |
| 63106 | $12,324 | 94% | $7.77 | 12% | 88% | 3.89% | $3,035 | 72% |
| 63107 | $19,113 | 87% | $6.61 | 13% | 87% | 4.73% | $2,585 | 63% |
| 63112 | $24,251 | 86% | $6.32 | 31% | 69% | 5.82% | $2,402 | 61% |
| 63113 | $19,086 | 99% | $6.44 | 16% | 84% | 7.42% | $1,643 | 64% |
| 63115 | $21,957 | 99% | $5.72 | 31% | 69% | 7.19% | $1,755 | 58% |
| 63120 | $22,143 | 96% | $6.05 | 29% | 71% | 12.97% | $1,343 | 85% |
| 63133 | $23,601 | 82% | $5.64 | 50% | 50% | 6.60% | $1,703 | 52% |
| 63140 | $16,507 | 99% | $7.15 | 26% | 74% | 5.23% | $3,571 | 89% |
| **Area Totals** | **$19,873** | **93%** | **$6.15** | **26%** | **74%** | **7.10%** | **$1,863** | **64%** |
| **White (Less than 20% Non-White)** | | | | | | | | |
| 63111 | $22,527 | 5% | $4.73 | 62% | 38% | 7.71% | $1,765 | 65% |
| 63118 | $22,130 | 19% | $4.84 | 46% | 54% | 7.23% | $2,021 | 72% |
| 63143 | $25,509 | 16% | $4.36 | 80% | 20% | 5.87% | $2,050 | 55% |
| **Area Totals** | **$23,389** | **13%** | **$4.70** | **59%** | **41%** | **7.15%** | **$1,922** | **66%** |

-7-

### STATEWIDE
### ALL INCOME - ALL ZIPS

| | AVERAGE HOUSEHOLD INCOME* | % NON-WHITE POPULATION* | AVERAGE COST PER THOUSAND | % STANDARD POLICIES | % LIMITED POLICIES | LOSS FREQUENCY | LOSS SEVERITY | CASH FLOW LOSS RATIO |
|---|---|---|---|---|---|---|---|---|
| **Statewide** | **$33,484** | **12%** | **$4.27** | **77%** | **23%** | **7.83%** | **$1,838** | **58%** |

*Derived from 1990 Census Data

127

TABLE 2

## ST. LOUIS MSA - LOW INCOME URBAN ZIPS

| | AVERAGE COST PER THOUSAND | LOSS FREQUENCY | LOSS SEVERITY | CASH FLOW LOSS RATIO |
|---|---|---|---|---|
| **Minority (Greater than 80% Non-White)** | | | | |
| All Policies | $6.15 | 7.10% | $1,863 | 64% |
| Standard Policies | $4.77 | 9.70% | $2,172 | 76% |
| Limited Policies | $7.30 | 6.17% | $1,689 | 57% |
| **White (Less than 20% Non-White)** | | | | |
| All Policies | $4.70 | 7.15% | $1,922 | 66% |
| Standard Policies | $4.73 | 8.71% | $1,677 | 63% |
| Limited Policies | $4.65 | 4.95% | $2,533 | 72% |
| **Statewide - All Zips** | | | | |
| All Policies | $4.27 | 7.83% | $1,838 | 58% |
| Standard Policies | $4.10 | 8.93% | $1,827 | 61% |
| Limited Policies | $5.45 | 4.20% | $1,913 | 47% |

TABLE 3

## KANSAS CITY MSA
## LOW INCOME URBAN ZIPS

| ZIP | AVERAGE HOUSEHOLD INCOME* | % NON-WHITE POPULATION* | AVERAGE COST PER THOUSAND | % STANDARD POLICIES | % LIMITED POLICIES | % LOSS FREQUENCY | LOSS SEVERITY | CASH FLOW LOSS RATIO |
|---|---|---|---|---|---|---|---|---|
| **Minority (Greater than 80% Non-White)** | | | | | | | | |
| 64130 | $23,355 | 95% | $6.22 | 45% | 55% | 8.58% | $1,823 | 63% |
| 64128 | $20,512 | 91% | $6.52 | 35% | 65% | 8.95% | $1,452 | 55% |
| Area Totals | $21,934 | 93% | $6.32 | 41% | 59% | 8.71% | $1,685 | 60% |
| **White (Less than 20% Non-White)** | | | | | | | | |
| 64124 | $22,682 | 16% | $5.65 | 54% | 46% | 7.34% | $3,309 | 100% |
| 64120 | $21,508 | 15% | $6.06 | 35% | 65% | 1.95% | $4,426 | 41% |
| 64125 | $23,547 | 8% | $5.99 | 46% | 54% | 7.78% | $2,043 | 72% |
| 64123 | $25,346 | 8% | $5.40 | 63% | 37% | 8.08% | $2,846 | 89% |
| 64053 | $23,682 | 4% | $4.97 | 65% | 35% | 5.73% | $1,950 | 53% |
| Area Totals | $23,353 | 10% | $5.46 | 58% | 42% | 7.14% | $2,807 | 84% |

## STATEWIDE
## ALL INCOME - ALL ZIPS

| | AVERAGE HOUSEHOLD INCOME* | % NON-WHITE POPULATION* | AVERAGE COST PER THOUSAND | % STANDARD POLICIES | % LIMITED POLICIES | % LOSS FREQUENCY | LOSS SEVERITY | CASH FLOW LOSS RATIO |
|---|---|---|---|---|---|---|---|---|
| Statewide | $33,484 | 12% | $4.27 | 77% | 23% | 7.83% | $1,838 | 58% |

*Derived from 1990 Census Data

-9-

<u>TABLE 4</u>

## KANSAS CITY MSA - LOW INCOME URBAN ZIPS

| | AVERAGE COST PER THOUSAND | LOSS FREQUENCY | LOSS SEVERITY | SH FLOW LOSS RATIO |
|---|---|---|---|---|
| **Minority (Greater than 80% Non-White)** | | | | |
| All Policies | $6.32 | 8.71% | $1,685 | 60% |
| Standard Policies | $5.45 | 11.44% | $2,011 | 75% |
| Limited Policies | $7.65 | 6.79% | $1,298 | 45% |
| **White (Less than 20% Non-White)** | | | | |
| All Policies | $5.46 | 7.14% | $2,807 | 84% |
| Standard Policies | $5.32 | 9.81% | $2,515 | 90% |
| Limited Policies | $5.75 | 3.45% | $3,957 | 72% |
| **Statewide - All Zips** | | | | |
| All Policies | $4.27 | 7.83% | $1,838 | 58% |
| Standard Policies | $4.10 | 8.93% | $1,827 | 61% |
| Limited Policies | $5.45 | 4.20% | $1,913 | 47% |

130

TABLE 5

| Top 20 Writers | Statewide to Minority Index |
|---|---|
| Company A | 62.00 |
| Company B | 41.25 |
| Company C | 36.33 |
| Company D | 22.24 |
| Company E | 15.13 |
| Company F | 11.67 |
| Company G | 6.32 |
| Company H | 3.64 |
| Company I | 3.49 |
| Company J | 3.33 |
| Company K | 3.08 |
| Company L | 2.77 |
| Company M | 0.91 |
| Company N | 0.70 |
| Company O | 0.63 |
| Company P | 0.58 |
| Company Q | 0.55 |
| Company R | 0.37 |
| Company S | 0.11 |
| Company T | 0.06 |

Statewide to Minority Index = Statewide Market Share divided by Minority Market Share

Company A's market share is 62 times larger than its minority market share.

Table does not rank insurers by size.

131

## STATEMENT OF THE
## NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.

### MAY 18, 1994

This statement is submitted by the NAACP Legal Defense & Educational Fund, Inc. (LDF) for the Senate Banking Committee's Hearing on Homeowners' Insurance Discrimination.

LDF has been widely recognized for its contribution to civil rights enforcement through litigation efforts to eradicate the causes and effects of racial discrimination and segregation in all aspects of American life. Through litigation and legislative activities, LDF has demonstrated a steadfast commitment to ensuring equal opportunities in housing. LDF played an integral role in the passage of the 1988 Amendments to the Fair Housing Act and continues to enforce the Act through private litigation throughout the United States.

In accord with its commitment to guarantee equal opportunities in housing, LDF is concerned that all Americans have access to homeowners' insurance without regard to the race of individuals or the race or socio-economic status of the residents within a particular neighborhood. LDF has gained a keen awareness of the existence of widespread claims of discrimination in the provision of homeowners' insurance through its work with fair housing groups, attorneys, insurance company employees, and State Insurance Commissioners.

As the Southern District of Ohio succinctly noted in *McDiarmid* v. *Economy Fire & Casualty*, 604 F. Supp. 105, 107 (S.D. Ohio 1979), "It is elementary that without insurance, mortgage financing will be unavailable, because a mortgage lender simply will not lend money on the property. Without mortgage financing, homes cannot be purchased. Thus, the availability of insurance and the ability to purchase a home go hand in hand and vary, in direct proportion, to one another." Accordingly, the ideal of equal opportunities in housing cannot be achieved without ensuring that Americans are not subjected to discrimination in the provision of homeowners' insurance.

Insurance discrimination not only impacts individuals who seek to obtain insurance, it also has a devastating effect on entire neighborhoods. Where insurance is denied because of the racial composition of the neighborhoods, these neighborhoods are more prone to become areas of desolation. Residents of these areas are less likely to attain the dream of home ownership, which ultimately has an adverse impact on the economic viability of these communities. The few residents of these areas who become homeowners without insurance are then left without any means for restoring their property if damage or loss occurs, thus, possibly leaving abandoned or ill-kept homes within these neighborhoods.

In addition to claims of individual discriminatory treatment by insurance companies and agents, LDF has received information about several alleged practices by insurance companies that may have the effect of discriminating on the basis of race.

1. *Minimum Value*—We have been informed that many insurance companies have underwriting guidelines which prohibit agents from writing policies for properties valued under a certain dollar amount, such as $40,000. In a large number of localities such minimum value requirements may adversely affect a disproportionate number of minorities. We are aware of no evidence that would justify use of such requirements with a disproportionate adverse impact.

2. *Maximum Age*—Throughout the United States, minorities are concentrated in urban areas; many of these minority areas encompass the oldest areas within these cities. Thus, underwriting guidelines under which companies refuse to provide insurance to individuals who live in older homes may also have a disparate impact on minorities.

3. *Inferior Policies*—We have received allegations that individuals who reside in minority communities are often given inferior homeowners' policies, as compared with those who live in predominantly white areas. These inferior policies limit a policyholder's recovery for loss or damage to the amount at which the property is valued on the market, whereas, residents of predominately white areas allegedly receive replacement cost coverage. The insurance industry has not, to our knowledge, provided any data or evidence to support such discriminatory availability of policy types.

4. *Cost Disparities*—LDF also is aware of studies that suggest minorities and residents of minority communities are likely to be charged significantly more for policies than are residents of predominately white areas.

5. *Marketing Practices*—We have seen evidence that appears to indicate that insurance marketing practices do not treat white and minority consumers equally. Alleged discriminatory practices include failure to locate agents in minority neighbor-

132

hoods and failure to advertise in minority areas. In addition, LDF has received complaints from insurance agents who were discouraged from writing policies in minority neighborhoods or blatantly directed to discontinue selling in these areas.

LDF's experience and our consultation with other fair housing advocates has identified the practices set out above as serious areas of concern for minority homeowners and homeseekers. The amount of evidence and the number of complaints of homeowners' insurance discrimination seem to be increasing. Yet, the insurance industry adamantly denies that any discriminatory practices occur with regard to the provision of homeowners' insurance. This is precisely the factual dispute that existed between advocates and the mortgage industry prior to the enactment of The Home Mortgage Disclosure Act (HMDA). Our Nation's experience under HMDA leaves no doubt that legislation requiring data collection is needed to provide the public and Federal agencies with information that would demonstrate the depth of this problem and provide the basis from which fair housing enforcement efforts may be made. In addition, data collection will provide the insurance companies with information that will enable them to monitor themselves and will provide incentive for these companies to change policies which may have a discriminatory impact.

The following types of information are essential to enable meaningful analysis of the facts concerning claims of homeowners' insurance discrimination:

- Reporting of the race of applicants and policyholders;
- Extensive geographic reporting throughout the country, inclusive of cities with significant minority populations;
- Reporting within small enough areas to observe neighborhood activity, such as by census tract;
- Loss data, *i.e.*, amount and number of claims by neighborhood and data that would justify rating territories (without this information, it would be impossible to conclude whether or not legitimate risk factors account for any dearth of policies or higher premium rates in minority areas); and
- Type of policies sold in each neighborhood and prices charged for these policies.

Too often, African-Americans are denied the opportunity to purchase homes because of discrimination by realtors, sellers, and mortgage providers. Legislation has given victims of housing discrimination the tools with which to challenge the discriminatory actions of these individuals and entities. However, discrimination in the provision of homeowners' insurance has not been as comprehensively studied and addressed. Congressional intervention is needed now, in the form of strong legislation which would provide the means for monitoring the actions of the insurance industry. Without legislation, it will continue to be very difficult to assess the magnitude of the unequal treatment of minority communities by insurance companies and, in all likelihood, Americans will continue to suffer from this form of discrimination.



## NATIONWIDE INSURANCE COMPANIES

ONE NATIONWIDE PLAZA, COLUMBUS, OH 43216

W. CRAIG ZIMPHER
ASSOCIATE VICE PRESIDENT
GOVERNMENT RELATIONS

May 12, 1994


The Honorable Donald W. Riegle
Chairman
Banking, Housing and Urban Affairs Committee
United States Senate
Washington, D.C. 20510

Re: Urban Insurance Availability

Dear Mr. Chairman:

As a corporate policy, the Nationwide Insurance Enterprise staunchly opposes
"redlining". Nationwide is the country's fourth largest auto insurer and fifth
largest homeowners insurer. We achieved those high rankings by actively
soliciting customers, not by arbitrarily rejecting them.

We have established underwriting guidelines which assure fair and equal
treatment for all insurance applicants, regardless of where they live, their
race, their age or their gender. Our corporate policy is to treat all applicants
for insurance alike – as prospective policyholders. We write homeowners
policies according to fair and sound underwriting guidelines, not according to
any arbitrary bias or unfair or unlawful discrimination, as some would have
you believe.

This hearing has been advertised as a hearing on "redlining". The more
appropriate term should be "urban insurance problems". Both "redlining" and
"discrimination" are tossed about loosely these days, as insurance industry
critics charge the industry with unfair practices involving the cost and
availability of insurance.

NATIONWIDE LIFE INSURANCE CO
NATIONWIDE MUTUAL INSURANCE CO
NATIONWIDE MUTUAL FIRE INSURANCE CO

The Honorable Donald W. Riegle
Page 2
May 12, 1994

Some people confuse insurers' responsibility for addressing financial security needs with an unintended role of correcting social deficiencies. As a result, insurers are commonly asked to insure the uninsurable. Using the insurance mechanism to correct perceived social inequities will stretch the system beyond its purpose and capabilities. Possibly the worst deception being perpetrated today is the one that leads people to believe that social problems can be solved within the insurance process at a price everyone can or will want to pay.

Nationwide has a clear-cut and firm corporate policy prohibiting redlining. The company underwrites all applicants individually to assure equal treatment to make certain that all policies are properly priced. The company applies its criteria evenly, no matter where a person lives -- in a fancy suburb, a rural area, a small town, big city, or wherever.

In conclusion, many inner-city areas suffer from certain urban insurance problems which adversely affect the availability and affordability of insurance products. These problems are not the result of "redlining", but are caused by a combination of historical, social, and economic factors the insurance industry has not created. Nationwide pledges its support and commitment to work with you and the others on the Committee to address the problems that affect our nation's insurance market. We would look forward to a cooperative and mutually respectful process toward that end.

Sincerely,

W. Craig Zimpher

cc:    Banking Committee Members



# **REPORTS**

TRADEMARKS REG. U.S. PATENT OFFICE

Published by F-D-C Reports, Inc.
**55 YEARS**
Devoted to Specialized Health Care Information

# **Health News Daily**®

SPECIALIZED DAILY INFORMATION SERVICE FOR EXECUTIVES AND DECISION-MAKERS IN THE HEALTH INDUSTRIES, PUBLISHED BY F-D-C
REPORTS, INC., 5550 FRIENDSHIP BLVD., SUITE ONE, CHEVY CHASE,MD 20815-7278, FAX 24-HOUR No. (301)656-3094; PHONE (301)657-9830

**Vol. 6, No. 91**   CONTENTS COPYRIGHTED © F-D-C REPORTS, INC., 1994   **Wednesday, May 11, 1994**

## TODAY'S NEWS

**Health care infrastructure, complexity of reform proposals must be considered** in addition
to issue of costs, CBO Director Reischauer urges ......................... **Story below**
**Senate Labor & Human Resources Committee will report out health reform bill** by
Memorial Day, Sen. Kennedy says May 10 .................................. **Page 2**
**SmithKline Beecham will manufacture and market generic *Tagamet*** through Penn Labs
subsidiary and Lederle generics division  .................................. **Page 3**
**Quad generic trial: Shah guilty, Bansal acquitted May 9** after jury trial in Baltimore federal
court; government loses conspiracy case against former executives ................. **Page 4**

**HEALTH CARE ADMINISTRATIVE COMPLEXITIES AS CRITICAL TO REFORM SUCCESS** as cost containment,
Congressional Budget Office Director Robert Reischauer told reporters May 10 in Washington, D.C. Saying that
he is "still waiting" to see comprehensive health reform legislation that can achieve the goals of covering most
uninsured Americans with reasonable cost containment and in a workable framework, Reischauer warned: "The
architects of these health care reform proposals have to be careful that they are not creating systems that require
more institutional capacity and more administrative experience than we are capable of conjuring up."

The CBO director characterized the low-income and small-business subsidies central to President
Clinton's Health Security Act (HR 3600, S 1757), Rep. Jim Cooper's (D-Tenn.) Managed Competition Act (HR
3222, S 1579) and Sen. John Chafee's (R-R.I.) HEART bill (HR 3704, S 1770) as "immensely complicated things
to administer." Senate Labor and Human Resources Committee Chairman Edward Kennedy's (D-Mass.) proposal,
which will be marked up beginning May 18, could well be "equally if not more complex," Reischauer suggested
based on news accounts of the measure.

Discounts for low-income Americans and small, low-wage businesses "in effect are a welfare program,"
Reischauer asserted. Noting that "premiums have to be paid to insurers on a monthly or quarterly basis," he
asked: "Are we determining income eligibility on a quarterly or monthly or annual basis? Is it prospective or
retrospective income that we're worried about?"

Even once such issues have been resolved, "it's going to be no easy task to make the system work,"
Reischauer declared, given the scope of the subsidies outlined in the major reform proposals. For example, CBO
has estimated that roughly half of the U.S. population could be eligible for discounts under the Administration's

Subscription to F-D-C Reports "Health News Daily" (ISSN 1042-2781) is $1,195 per year.
Additional copies of "Health News Daily" $495 each year when mailed in same envelope with $1,195 subscription copy.
This newsletter is available electronically via Newsnet (800-345-1301), DataStar (800-221-7754), Dialog (800-334-2564) and BRS (800-289-4277).

Contents of "Health News Daily"® are protected by the U.S. Copyright Law. Reproduction, photocopying, storage or transmission by magnetic
or electronic means is strictly prohibited by law. Authorization to photocopy items for internal or personal use is granted by F-D-C Reports, Inc.,
when the fee of $2.00 per copy of each page is paid directly to Copyright Clearance Center, 222 Rosewood Dr., Danvers, MA 01923 (508) 750-8400.
The Transactional Reporting Service fee code is: 1042-2781/94 $0.00 + $2.00. Violation of copyright will result in legal action, including civil and/or
criminal penalties, and suspension of service.

bill by the time it is fully implemented. Regarding the Managed Competition Act, about 60% of people enrolled in purchasing cooperatives and 22% of those receiving insurance outside the cooperatives would likely qualify for subsidies, he said. Reischauer added that the bill's Health Care Standards Commission would conservatively be processing 43 mil. applications for assistance every year.

CBO projects that the volume of information generated by subsidy programs would far outstrip the capacity of current data-collection systems. "New systems are going to have to be developed to ascertain" information that is not currently gathered, Reischauer said, such as the number of full-time employees working in a given firm for a specified period of time, in order to determine insurance costs accurately, as well as whom to bill for what portion of coverage. Such institutions "take a long time to build," Reischauer declared. "This is not something we can plop into place in six months, or nine months, or a one-year period."

In a worst-case scenario, a poorly constructed reform bill hastily passed by Congress would not resolve the problems of the current insurance market while effectively unraveling that system, Reischauer cautioned. Noting that repeal of the law could follow, he suggested that lawmakers should take heed from their experience with the Medicare Catastrophic Care Act and build in "clear benefits" that "materialize quickly for the American people." Such a "support group," the CBO director concluded, could help defray some of the inevitable protests from insurers and providers that would surface following the enactment of comprehensive reform.

"Health reform is different" from almost all other legislation considered by Congress, Reischauer said, explaining that "it has to be a single, integrated whole." When provisions such as mandatory alliances or an employer mandate are dropped for political reasons, the result can be a transformation of "the entire workings of the system you're trying to put together." With this caveat in mind, Reischauer urged policymakers not to add or subtract major provisions during floor debate. "We're going to really need some time in this whole process...to at least do some lab testing to see whether the thing works," he stated.

On the subject of upcoming CBO analyses, Reischauer reported that his agency would release shortly a report on the Affordable Health Care Now Act (HR 3080) authored by House Minority Leader Robert Michel (R-Ill.) and supported by GOP leadership. The analysis of Chafee's HEART bill may be finished by the end of June, he said, cautioning that "we are having our problems" modeling the economic impact of the legislation, given that it would permit the insurance market to reorganize along several different lines. CBO will complete its work on the House Ways and Means mark the week of May 9, Reischauer forecast, noting that the agency has not done a "behavioral analysis" of that legislation.

Commenting on the Cooper bill, Reischauer said that although CBO's recently released report concluded that the bill's revenues would not pay for its proposed subsidies, "it's reparable in lots of different ways." The issue of why the tax-cap revenues in HR 3222 are substantially lower in this year's analysis compared to those calculated for last year's bill has not yet been resolved, he noted. In general, using tax-cap revenues to finance health reform raises problems of equity, Reischauer asserted, since high-cost plans do not necessarily imply high-quality coverage. Rather, some plans are expensive because they cover high-risk individuals, or because they are located in areas of the country with higher living costs.

The task of designing a tax cap is "not a simple kind of thing, and a lot of people seem to be approaching it in that way," the CBO director said. "There's a whole bunch of other factors [besides plan costs] at play, and until you are able to either make adjustments for that — or even the playing field — it doesn't make any sense" to apply a tax cap to health insurance, he insisted. Overall, "I think there's more work to be done" on all the plans that have been introduced, Reischauer concluded.

**SENATE LABOR COMMITTEE WILL REPORT OUT REFORM BILL BY MEMORIAL DAY,** Chairman Edward Kennedy (D-Mass.) said May 10 following a speech before the American Federation of Teachers in Washington, D.C. Refusing to comment on the voluntary alliance structure in his bill, a key difference with President Clinton's Health Security Act (S 1757), Kennedy nevertheless emphasized that his proposal would achieve universal coverage, the White House's bottom line.

© F-D-C Reports, Inc., 1994. Photocopying without permission is strictly prohibited. See Page One. Multiple copy rate: $495 when mailed in the same envelope with $1,195 subscription.

Although Kennedy would have a maximum of only eight legislative days to mark up his bill — consideration is scheduled to begin May 18 — committee staffers say the Massachusetts Democrat likely will hold to his timetable. The fast-track approach indicates that Kennedy already may have the votes to pass his bill.

The 16-member labor panel, whose composition is substantially more liberal then the Finance Committee, includes Democrats Tom Harkin (Iowa), Paul Wellstone (Minn.), Paul Simon (Ill.), Howard Metzenbaum (Ohio) and Barbara Mikulski (Md.). Republican Sen. Jim Jeffords (Vt.), the lone GOP co-sponsor of S 1757 in either chamber, also is a member of the committee, in addition to moderates Nancy Kassebaum (R-Kan.) and Dave Durenberger (D-Minn.).

Administration officials note that the level of support Jeffords gives to the President on the Senate floor will be critical. The Vermont Republican, who supports the state single-payer option in the White House plan, could be affected by his state legislature's recent rejection of a Canadian-style delivery system. While Senate moderates are critical to breaking filibusters, Kennedy said that he does not expect Republican members to employ the chamber's parliamentary delay tactics.

In the area of federal subsidies, the Kennedy bill would offer support to workers based on individual wages rather than firm size, the model contained in the President's proposal. Administration officials say they are not opposed to the Labor approach, noting that it achieves the goal of targeting needy low-income individuals and giving employers the incentive to hire them.

A surprise speaker at the AFT meeting was President Clinton, who continued his attack on opponents of the employer mandate and mandatory alliances. Noting that there are few choices for financing universal coverage other than requiring firms to contribute to worker premiums, he asked rhetorically: "Should I raise your taxes as an alternative?"

On the issue of consumer choice within alliances, Clinton maintained that his plan would offer Americans a "minimum of three choices [of plan] a year, every year." That number could increase over time, he predicted, stating that "if the evidence of the California [public employees] cooperative buying plan is any indication, we'll get a lot more...They have 15 choices this year of plans, and everybody's insurance rates went down. This is about protecting an increasing choice, not about reducing choice."

**SMITHKLINE BEECHAM WILL SUPPLY GENERIC _TAGAMET_ TO LEDERLE** through SB's Penn Labs subsidiary, the company announced May 10. The generic cimetidine product will be manufactured by SB under the Penn Labs label; SB will market the anti-ulcer medication to hospitals and managed-care organizations, while American Cyanamid's Lederle Standard Products generic drug division will distribute SB's generic cimetidine to wholesalers and chain and independent pharmacies.



Managing Editor: John Zekotnik    Assistant Managing Editor: Geyer Longenecker
Senior Editors: Nellie Bristol, Anne Montgomery, Denise Peterson    HHS: Scott Long
Executive Editors: Cole Palmer Werble, David Blue    Publisher: Wallace Werble, Jr.
Prescription Pharmaceutical News: Janet Aker, Michael McCaughan, Carol Nicholson, Danielle Coulton, Lisa Gidin, Bill Paulson, Eli Embley, Tom Kelly, Joey Waxman, Allen Kamer, Rachel Fishman
Health Policy & Biomedical Research News: John Parker, Lisa White, Anne Petruska, Katherine Pushkar, Karl Uhlendorf
Nonprescription Pharmaceuticals & Nutritionals News: Timothy Harrington, Tula Michaelides, Catherine Heinze, Kelly Mason, Holly Mead, Cindy Newberry
Medical Devices, Diagnostics & Instrumentation News: Janet Coleman, Randy Burkholder, Christine Harrington, Jon Dobson, Faith Bushnaq, Judd Stitziel, Mark Brager
Toiletries, Fragrance & Skin Care News: Susan Easton, Heather Swain, Chris Glass, Audrey Witteman
Circulation Manager: Edward Picken, 5550 Friendship Blvd., Suite One, Chevy Chase, MD 20815-7278, Phone: (301) 657-9830

F-D-C Reports Research Service ®   Information Research & Document Service now available from F-D-C Reports. Contact Meghanne Malone, Research Services Manager, at (301) 657-9830.

SB will market generic cimetidine under the Tagamet NDA. The generic version will be yellow in order to distinguish it from the pale green color of the branded product, the company said.

Lederle will begin to distribute the generic version of the $H_2$ antagonist on May 17, when the U.S. patent on Tagamet expires. SB said that although its corporate strategy "continues to emphasize maintaining the steady flow of new SB pharmaceutical products," the company also intends to "minimize the anticipated reduction in our share of the $H_2$-blocker market." U.S. sales of Tagamet in the first quarter were $155 mil.

The announcement follows April 29 tentative ANDA approvals for DuPont Merck and Novopharm to produce 200 mg, 300 mg, 400 mg and 800 mg strengths of cimetidine; Mylan was granted the first tentative ANDA approval for the four strengths of cimetidine on Oct. 22, 1993. DuPont Merck will distribute cimetidine through its recently established Endo Labs subsidiary; Endo plans to make the product available to other companies, which presumably include Merck-Medco's West Point Pharma generic drugs subsidiary. Mylan announced a co-promotion agreement with Lilly in mid-April under which Mylan's generic cimetidine will be included in a disease-management program marketed to managed care buyers.

As part of SB's strategy to protect cimetidine market share, the company filed a second trade patent, trademark and trade dress lawsuit in Philadelphia federal court May 9. The latest suit charges Novopharm and Schein Pharmaceuticals with "promoting and soliciting orders for pharmaceutical (cimetidine) tablets copying SmithKline's distinctive trade dress and infringing upon SmithKline's distinctive and unique light green color trademark" for Tagamet. A similar suit was filed against Mylan May 6.

The similar color "is calculated to and will mislead the consuming public and trade into believing" that Novopharm's products are produced or authorized by SmithKline, the suit maintains. Schein is named as a defendant based on SB's belief that they have an agreement to distribute Novopharm's cimetidine tablets in the U.S. "SmithKline learned this past week that defendant Schein will be shipping Novopharm cimetidine on May 18, 1994," the suit notes.

Tagamet's light green color is the subject of SB's new print ad campaign in trade magazines with the headline: "A 17-year record of quality that will have the competition green with envy." The ads display enlarged versions of the four different Tagamet tablets and encourage pharmacists to "look for the distinctive light green color and Tagamet name on every Tagamet tablet you dispense."

**QUAD GENERIC DRUG TRIAL: SHAH GUILTY, BANSAL ACQUITTED** May 9 after a four-week trial and five days of jury deliberation before Baltimore federal court Judge Peter Messitte. Dilip Shah was found guilty of making a false statement to FDA concerning Quad's vancomycin hydrochloride under 18 USC 1001 and 18 USC 2. Bansal was acquitted of conspiracy to defraud the U.S. government under 18 USC 371. He is the only defendant brought to trial by the Justice Department in its generic drug investigations to be acquitted.

The jury hung on three additional counts against Shah: conspiracy to defraud the government; making a false statement concerning ritodrine HCl; and making a false statement concerning complaint files. The judge declared a mistrial on the three counts. It is understood to be unlikely that Shah will be retried, as acts for which he was not convicted can nonetheless be considered when his penalty is decided at the sentencing, which is scheduled for early August.

Former Quad Executive VP-Scientific Affairs Dulal Chatterji, a co-conspirator of Shah who testified against him at the trial, will be sentenced on May 12 by Judge John Hargrove, who presided over all of the generic scandal trials previous to that of Bansal and Shah.

Beginning with the legal definition of conspiracy — "an unlawful agreement between two or more persons" resulting in at least one overt illegal act — the prosecution presented in its opening argument a selection of the 32 overt acts which Shah allegedly committed, including "normalization" of data; stating that an unsterile batch of ketamine was sterile; writing three batch records for one batch of vancomycin, an injectable antibiotic;

© F-D-C Reports, Inc., 1994. Photocopying without permission is strictly prohibited. See Page One.
Multiple copy rate: $495 when mailed in the same envelope with $1,195 subscription.

and inventing company records. Bansal, charged only with conspiracy, was described as "loyally and corruptly" carrying out Shah's illegal instructions.

Prosecution and defense agreed that Bansal played a smaller role than did Shah in the illegal conduct of Quad pharmaceuticals. Bansal's attorney noted that Bansal was mentioned in only four of the 32 overt acts named in connection with the conspiracy, and that he was a recently hired Quad employee who did not have the same long-standing relationships as did many other convicted conspirators.

## PEOPLE

**Norian Corp.:** Former Collagen International and Corporate Controller Marc Faeber joins Norian as chief financial officer and VP-finance....

## PUBLIC HEALTH

**AZT use during pregnancy:** Public Health Service establishes a task force to "explore the medical and policy implications" of a recently announced National Institute of Allergy and Infectious Diseases-sponsored study that found a 67.5% effectiveness rate with AZT in preventing HIV transmission from pregnant women to their infants. The task force will "address critical questions regarding testing, monitoring and resource needs, which are raised as a result of this study," HHS Assistant Secretary for Health Philip Lee explains May 10. Members are: Chair Lynn Mofenson, MD, National Institute of Child Health and Human Development; James Balsley, MD/PhD, National Institute of Allergy and Infectious Diseases; Martha Rogers, MD, Centers for Disease Control and Prevention; and Helene Gayle, MD, Centers for Disease Control and Prevention....

## REGULATORY NEWS

**Medicare-Medicaid Coverage Databank:** Employers may file information on the health care coverage of workers using scannable paper forms or preformatted diskettes available from the Health Care Financing Administration, or in an electronic format submitted on magnetic cartridges, according to a preliminary guidance published by HCFA in the May 10 *Federal Register*. Established by the 1993 budget law, the databank will be used to determine whether Medicare and Medicaid enrollees have additional insurance that must first pay for health care services. According to the preliminary guidance, the information that employers must furnish includes the name and tax identification number of each worker, the type of group health plan for each individual, and the coverage period. On May 6, HCFA Administrator Bruce Vladeck said that the Clinton Administration is seeking an 18-month delay in implementation of the reporting requirement, which now is scheduled to begin in January 1995. A same-say General Accounting Office report noted that HCFA will have to collect information on 160 mil. Americans, and concluded that the data bank will cost more than $100 mil. over five years and produce few benefits....

**Greenwich Pharmaceuticals:** Company has "received notification from FDA that both an independent evaluation of the efficacy of *Therafectin* (amiprilose HCl) and the supervisory review of the Pilot Drug Division's review of the Therafectin NDA concluded that the application lacks substantial evidence of Therafectin's effectiveness in the treatment of rheumatoid arthritis," Greenwich reports May 10. The company plans to meet with FDA before the end of May and expects that it will receive "a notice of an opportunity for a hearing"....

## PRODUCT NEWS

**Bio-Vascular:** Firm receives FDA marketing clearance for its *Peri-Strips* device for reinforcing staple lines during lung surgery, Bio-Vascular announces May 10. The strips are an adaptation of the *Supple Peri-Guard* pericardium product and are intended for use with surgical staplers. Supple Peri-Guard, previously cleared for use as a "pericardial closure" and a "soft tissue patch," is made of bovine pericardium cross-linked with glutaraldehyde, the St. Paul, Minnesota-based firm explains. The new Peri-Strips make the staple site "air tight" and shorten hospital stays, the company claims. Additional uses for the material are under development; further 510(k) applications are expected by the end of the year....

© F-D-C Reports, Inc., 1994. Photocopying without permission is strictly prohibited. See Page One.
Multiple copy rate: $495 when mailed in the same envelope with $1,195 subscription.

## INDUSTRY NEWS

**Cardiotronics:** Company proposes the acquisition of all outstanding R2 Medical stock for $4 a share in cash or Cardiotronics stock, the firm reports May 10. The Carlsbad, California-based rapid cardiac resuscitation and support device firm's proposal is being reviewed by R2's board. "We believe that a combination of Cardiotronics' direct-sales organization and R2 Medical's market position would create a strong competitor in the stimulation-electrode market, and would be in the best interests of the shareholders of each company," states Ronald Bromfield, president and CEO of Cardiotronics. A Securities and Exchange Commission filing related to the proposal discloses Cardiotronics owns 175,500 R2 shares, or about 6.6% of outstanding common stock....

**U.S. Bioscience:** NIH is contemplating granting to the West Conshohocken, Pennsylvania-based company an exclusive worldwide license to a U.S. patent for "Acid Stable Purine Dideoxynucleosides Active Against the Cytopathic Effects of Human Immunodeficiency Virus" and a U.S. patent for "2'-Fluorofuranosyl Derivatives and Novel Method of Preparing 2'-Fluoropyrimidine and 2'-Fluoropurines" and corresponding foreign patents. The license may be limited to the treatment for HIV infection using 2-fluoropurine dideoxynucleosides (F-ddA and F-ddI), which have been shown to inhibit HIV reverse transcriptase and cytopathic effects of HIV *in vitro*, a May 10 *Federal Register* notice explains....

**Diagnostek:** Contract with State of New Jersey will "generate revenues of approximately $75 mil. over the three-year term," the pharmacy benefit management firm says. The contract calls for Diagnostek's HPI Health Care Services subsidiary to service 19 public hospitals representing about 8,000 patients. "Although the incumbent provider indicated an intention to protest this award, Diagnostek contemplates it will begin service under this contract this summer or in the early fall"....

**Progenics/American Cyanamid:** Research agreement will focus on the development of anti-HIV compounds employing Tarrytown, New York-based Progenics' Universal Neutralizing Antibody technology and Cyanamid's conjugation technology, the firms announce May 10....

## RESEARCH

**Collagen:** Firm receives FDA approval of an Investigational Device Exemption to begin human studies with its *Collagraft* bone graft strip for the treatment of scoliosis, President and CEO Howard Palefsky announces at a May 10 session of the Alex. Brown 19th Annual Health Care Seminar in Baltimore, Maryland. The study, which will be conducted by Collagraft marketing/clinical partner Zimmer, will include 224 subjects at 10 sites. The paste form of Collagraft was approved in May 1993 for use in long-bone fractures and traumatic osseous defects; the second-generation solid strip form received approval in January....

**Genelabs:** Company announces May 10 that it has begun *Phase II/III* study of GL701-DHEA (dehydroepi-androsterone) for the treatment of mild-to-moderate systemic lupus erythematosus in women who require steroids for treatment. GL-701 "may improve the quality of life for lupus patients through reduction of prednisone usage," Redwood City, California-based Genelabs maintains....

**Chiron:** Firm is discontinuing the development of the t-88 monoclonal antibody for the treatment of gram negative sepsis after the agent "did not demonstrate a reduction in mortality" in an 826-patient *Phase III* trial. "This was a well conducted clinical trial by a group of experts in critical care," Chiron explains. "The data are high quality, of which we are proud. Unfortunately, the results were not positive." Chiron "remains committed to the development of products that have potential application in critical care therapeutics, which includes the development of products that have potential application in treating sepsis or septic shock," the company adds. Chiron and Miles are collaborating on the development of an anti-TNF monoclonal antibody for the indication, which showed a "trend" in favor of drug in a first *Phase III* trial....

© F-D-C Reports, Inc., 1994. Photocopying without permission is strictly prohibited. See Page One. Multiple copy rate: $495 when mailed in the same envelope with $1,195 subscription.

## 141

PATTON, BOGGS & BLOW, L.L.P.
2550 M STREET, N.W.
WASHINGTON, D.C. 20037-1350
(202) 457-6000
FACSIMILE (202) 457-6315

WRITER'S DIRECT DIAL

(202) 457-6424

May 13, 1994

The Honorable Donald Riegle
Chairman, Committee on Banking,
 Housing and Urban Affairs
United States Senate
Room SD-105
Dirksen Senate Office Building
Washington, D.C.

Re: May 11, 1994 Hearings on Homeowners Insurance
Discrimination

Dear Mr. Chairman :

On behalf of American Family Mutual Insurance Company, I would like to address one aspect of the testimony presented on May 11, 1994, by Assistant Attorney General Patrick . That testimony stated that American Family had not cooperated in an investigation initiated by the Civil Rights Division in 1986. American Family respectfully disagrees and would like to correct. the record.

First, when the Civil Rights Division requested materials from the company in 1986, the controlling law was the Fourth Circuit's decision in Mackey v. Nationwide Insurance Companies, 724 F.2d 419 (1984), that the Fair Housing Act did not cover home insurance. Rather than undergo an extensive intrusion into its business operations, American Family respectfully advised the Division that it did not have jurisdiction. The company wants to urge the Committee not to confuse the legal position it took , based on that opinion, with rejection or resistance to the principles underlying the Fair Housing Act.

This issue arose again in NAACP v. American Family Mutual Insurance Company. The United States District Court for the Eastern District of Wisconsin agreed with the company's view that the Act did not reach insurance companies. As a consequence, the Division did not pursue its negotiations with the company to obtain the information it had requested. Instead, it presented the Government's views before the Court of Appeals for the Seventh Circuit. On October 20, 1992, the Court of Appeals reversed the decision by the Eastern District and held that. as a result of HUD's promulgation of regulations in 1989, the Act does apply to home insurance. Within a month of that decision, the company offered to voluntarily provide the

**142**

The Honorable Donald Riegle
May 13, 1994
Page 2

information the Department substantial volumes of data and records and made its employees
available for interviews by Division investigators. It did so even though it sought further judicial
review of the matter. Mr. Shriner's letter of November 12, 1992 to the Assistant Attorney
General (attached) documents the company's offer.

I would appreciate your making this letter a part of the hearing record.

Sincerely,

John L. Oberdorfer

JLO/mm

cc: Paul Hancock, Esq.

004381

FOLEY & LARDNER

FIRST WISCONSIN CENTER
777 EAST WISCONSIN AVENUE
MILWAUKEE, WISCONSIN 53202-6367
TELEPHONE (414) 271-2400
TELEX 26 819
(FOLEY LARD MIL)
FACSIMILE (414) 289-3791
WRITER'S DIRECT LINE

MADISON, WISCONSIN
CHICAGO, ILLINOIS
WASHINGTON, D.C.
ALEXANDRIA, VIRGINIA
ANNAPOLIS, MARYLAND
JACKSONVILLE, FLORIDA
ORLANDO, FLORIDA
TALLAHASSEE, FLORIDA
TAMPA, FLORIDA
WEST PALM BEACH, FLORIDA

A MEMBER OF GLOBALEX
WITH MEMBER OFFICES IN

LONDON, ENGLAND
PARIS, FRANCE
BERLIN, GERMANY
STUTTGART, GERMANY
DRESDEN, GERMANY
SINGAPORE
TAIPEI, TAIWAN

**414-289-3549**

November 12, 1992

**BY FEDERAL EXPRESS**

John R. Dunne, Esq.
Assistant Attorney General
Civil Rights Division
United States Department of Justice
Washington, D.C.  20530

Re:  <u>American Family Mutual Insurance Company</u>

Dear Mr. Dunne:

We are counsel to American Family in the <u>NAACP</u> case now pending in the United States District Court for the Eastern District of Wisconsin and the United States Court of Appeals for the Seventh Circuit, to which you adverted in your letter of November 3, 1992 to Mr. Dale Mathwich, Chairman and CEO of American Family.  Accordingly, Mr. Mathwich has asked that I respond to that letter on American Family's behalf and represent the company with respect to the Department's investigation.

The short answer to the question asked in your letter is that American Family is willing voluntarily to provide the information which the Department needs to complete its investigation.  Because the Court of Appeals has determined that the Fair Housing Act applies to the business of homeowners' insurance (although American Family may seek further review of the question), the company considers that the previous ground for its declining to provide information (which, of course, went to the Department's jurisdiction to investigate at all) is no longer extant.

Since the last contact between American Family and the Department, nearly four years ago, the <u>NAACP</u> action has been filed and there has been considerable discovery and other trial preparation.  Thus, we are in a position to discuss specifically which information is available, in what form, and with what



NOV 13 '92  08:52                                      4142893791        PAGE.002

144

John R. Dunne, Esq.
November 12, 1992
Page 2

degree of expense and difficulty in retrieval. I had hoped to
discuss these matters with Mr. Conrad before writing to you, but
I understand that he will be out of his office until next
Tuesday. I will call him then to discuss these details of
production.

American Family notes with pleasure and relies upon
your statement that the Department has not made a final decision
on the merits of this matter and that your purpose is to avoid
litigation if it is not meritorious. We believe that we can
persuade the Department, based upon what we have developed in
defending the NAACP case, that there is in fact no basis for
Justice Department involvement. I look forward to discussing
these matters further with Mr. Conrad next week.

Very truly yours,

Thomas L. Shriner, Jr.

## HOMEOWNERS' INSURANCE:
## AN INVESTIGATION INTO POSSIBLE ILLEGAL DISCRIMINATION
### CONDUCTED BY THE MINNESOTA DEPARTMENT OF COMMERCE
### MARCH 8, 1994

### Executive Summary

The Department of Commerce is the State agency responsible for regulating insurance industry practices within Minnesota. The Department initiated an investigation into potential "redlining" problems in the Twin Cities Metropolitan Area following a nationally released report produced by the Association of Community Organizations for Reform Now (ACORN). The report identified Minneapolis/St. Paul as one of fourteen (14) metro areas nationwide where "redlining" was occurring.

The term "redlining" is frequently used to describe a practice whereby insurance companies refuse to offer or cancel homeowners' insurance solely because of the location of a home within a city. Minnesota Statutes do not use nor define redlining. However, Minnesota Statute § 72A.20 subdivision 13 (1992) does provide protection for homeowners from such discriminatory practices. Specifically, the statute prohibits an insurer from refusing to offer or cancel coverage based on: (1) The location of a home within a city, (2) the age of the home, (3) a prior declination by another insurer, or (4) because the home was previously insured under the FAIR Plan.

Minnesota Statutes require insurers who offer to provide coverage on homes within *any* area within a city to offer the same policies/programs to homes in *all* areas within the same city. However, insurers are entitled to charge rates which reflect the age of mechanical systems within the dwellings and other factors such as proximity to fire protection etc.

In February 1993, the Department began accumulating information from a variety of sources in an attempt to determine if redlining was occurring within the Twin Cities Metropolitan Area. During the course of the investigation, the Department reviewed the records and data provided by the (23) companies having at least a 1 percent market share of the Minnesota homeowners' insurance market. To determine whether any patterns of abuse or violations had occurred, Department investigators reviewed thousands of pages of underwriting guidelines and over 4,000 cancellation, declination, and non-renewal notices to homeowners.

Our investigation found that 97 percent (3,917) of the cancellations, declinations, and non-renewals reviewed were in compliance with the applicable statutes and rules. In addition, of the 3 percent (125) cancellation, declinations, and non-renewals identified as not complying with the statute only twelve involved activities that might fall within the commonly used definition of redlining. *Based on our findings, we have concluded that although isolated violations of statute may have occurred, the available evidence does not substantiate the allegation that insurers are engaging in any pattern or general practice of redlining within the Twin City Metropolitan Area.*

### Statutory/Regulatory History

Minnesota Statute § 72A.20 subd. 13 (1992) prohibits insurers who write homeowners' coverage within a city from refusing to offer, write, or renew a policy or charge differential rates for homeowners' insurance solely because of the location of a home in that city; the age of the home; declination by another insurer; or because of prior coverage issued under the FAIR (Minnesota Property Placement Facility) plan.

The law allows companies to underwrite and set premium rates to reflect extraordinary hazards, availability of fire protection, and concentration of the insurer's risks. The law also allows for rating, but not declining a homeowner policy based upon the age of the electrical, plumbing, heating/cooling system, wiring, or other structural items affected by age.

The Commerce Department enforces the statutory protections of the law and places special attention on homeowner policy cancellation, nonrenewal, and declination actions of insurance companies. Department records show that there were 124 cancellation/nonrenewal investigations conducted in 1991. As a result of these investigations, seven (7) company actions were rescinded by the insurer or reversed by the Department, and five (5) administrative actions (i.e. Consent Orders) were taken. In 1992, 166 cancellation/nonrenewal investigations were conducted, fourteen (14) voluntary reinstatements or Department reversals occurred, and four (4) administrative actions taken. 1993 statistics available for this study indicate that the Department has conducted 100 such investigations, leading to five (5) voluntary reinstatements or Department reversals, and one (1) administrative action.

146

Most, if not all, of these corrective actions were based on deficiencies in form, content, or notice requirements. Neither Department complaint records nor investigation results indicate a pattern of illegal discrimination by insurance companies in the area.

**Investigation Chronology**

In February, 1993, the Association of Community Organizations for Reform Now (ACORN) provided the Department with a copy of its report stating that "redlining" was occurring in 14 cites throughout the Nation including the Minneapolis/St. Paul Metropolitan Area.

The report said that companies were refusing to write homeowners' coverage in certain areas of the Twin Cities. The ACORN report specifically cited: (1) more frequently required home inspections in the inner-cities than in the suburbs; (2) a higher percentage of uninsured homes in the inner-cities; (3) higher costs of coverage per $1,000 of value; and (4) fewer agents in the inner-cities as evidence that "redlining" was occurring.

The ACORN report was based primarily on the review of zip code reports which list insurance company cancellation, declination, and nonrenewal actions and, test calling conducted by members of ACORN. ACORN's findings were based upon 48 calls made in each city to different insurance agents. Because of the limited scope of ACORN's survey, one call could effect a difference in survey findings of between 4–9 percent.

In February 1993, then-Commissioner Bert McKasy wrote to ACORN to inform them that our Department would conduct an investigation, per their request, into the sale of homeowners' coverage by a number of the major insurance carriers. Our investigation attempted to verify the accuracy of ACORN's assertions and to determine whether such factors, in and of themselves, evidence the existence of redlining in the Twin Cities.

The Department obtained a computer printout from the National Association of Insurance Commissioners (NAIC) which identified the market share of business for homeowner insurers in Minnesota. In order to determine insurance company compliance with Minnesota statute, an extraordinarily large group of companies was included in our investigation. The Department of Commerce investigated companies with a market share of 1 percent or greater *(23 companies, with a total market share of 77.08 percent per the 1991 annual statements; see attached listing)*. Of this group, (6) companies were affiliated with at least one other company in the sample group (standard/preferred), and share joint underwriting, claims, and policy issuance departments.

In addition to the zip codes used by ACORN, we added the communities of West St. Paul and South St. Paul. These communities were added because of the potential for having a higher than average minority population. It was also determined that the investigation would thoroughly review each company's: 1) underwriting standards, directives, manuals, and instructions; 2) agent locations; and 3) declinations, cancellations, and nonrenewals of homeowners' insurance for 1991 and 1992. During the week of April 15, orders requiring the production of extensive amounts of documentation were sent to each of the 23 companies. Most insurers needed up to 60 days to assemble the information and documentation required.

A review of the thousands of pages of underwriting material was completed by the week of August 9. Upon completion of the review, companies were sent a letter advising them of the provisions of their underwriting standards which were of concern to the Department. After these notifications were sent, a total sampling of 4,042 declinations, cancellations, and nonrenewals was drawn from the policyholder/applicant lists provided by each insurer. During the week of August 20, each insurer was sent a letter requiring the production of the corresponding notices that were sent to the insureds indicated in our sample. The responses were received, in their entirety, by early November, 1993. A thorough review of each notice was conducted to assure compliance with regulations and statutes concerning the form, method, and basis for the company's action.

This review was completed and companies were notified of the results the week of November 18. Each company was given the opportunity to review actions which appeared to be in violation of Minnesota statute. The companies were also asked to provide the Department with any additional information, documentation, or rebuttal. This information was received, in its entirety, by December 15, 1993.

In December, the Department determined that a cost analysis should be done by comparing each company's rates between the inner-cities and suburbs, and between different geographic locations within both Minneapolis and St. Paul.

On December 29, 1993, rate surveys were sent to each of the 23 companies and the Minnesota Property Placement Facility (FAIR Plan). The rate surveys required

147

companies to provide premium quotes for all available company programs/policies for a HO–3 (homeowner) policy (or their closest equivalent) on a 1940 frame construction home with a replacement value of $75,000. The age of the roof was established at 10 years old, and the home had a one car detached garage. The value of the personal property was established at $35,000. Companies were also required to provide rate quotes for an HO–4 (tenants) policy, with personal property valued at $35,000. Each company was provided with a list of zip codes for the cities of St. Paul, Minneapolis and surrounding suburbs.

This expanded investigation required Enforcement Division employees, who live in the inner-city, to call agents and obtain quotes from two different agents of each of the six (6) companies with the largest market share. In total, the employees made contact with thirty-four agents. Two of the employees represented minority cultures, and all used actual homes for purposes of obtaining quotes and inspections (if required).

## Investigative Findings

### UNDERWRITING (CHART #1)

Based upon the review of the underwriting material, there appeared to be no basis to conclude that any of the twenty-three (23) insurance companies were intentionally targeting inner-city homeowner applicants or policyholders in an attempt to illegally discriminate in the issuance of homeowner coverage.

Actuarial examinations conducted by this Department in conjunction with the investigation strongly suggest that insurance carriers' loss experience closely correlates with premium rates. We examined two carriers with a combined market share of 33.6 percent. One carrier was found to actually be charging less in the inner-cities than their loss experience would dictate. The other carrier was found to closely align its premium rates with loss experience.

While the actuarial data did show there to be higher costs for inner-city coverage than for suburban coverage, the costs were reflected in the loss experience of the insurance companies. On average, the difference was $42.43 per year. The investigation concluded that homeowners' insurance is available to inner-city homeowners and that loss experience on inner-city policies is a reason for the different premium prices. Of particular note is that some rural areas actually have higher premium expenses than either the inner-cities or the suburbs. The primary reason for the higher premium rates is lack of fire protection, water sources, etc.

The review of the underwriting standards and guidelines of each company found that eighteen (18) insurers had some portion of their underwriting guidelines which needed to be changed to conform with all current statutory requirements. The Department did identify a few instances where company guidelines provided for declinations based solely on the age of the applicant's dwelling. Fourteen (14) of the companies provide rating discounts based upon the age of the home (mostly in the form of a "New Home" discount). The Department of Commerce only allows such discounts if the company also offers comparable coverage and discounts for older homes which have updated electrical, plumbing, heating/cooling systems, and wiring. Our investigation revealed that the vast majority of the companies do offer comparable premium discounts and/or coverage options for older homes. Those that did not were notified of the need to amend their underwriting policies.

It should be pointed out that prior to June 1992, one company did have underwriting standards which specifically mentioned the geographic location of the home (e.g. "St. Paul-Minneapolis Area"). However, this criteria was eliminated by the company prior to our investigation.

### CANCELLATION/NONRENEWAL/DECLINATION (CHART #2)

A review of each of the 4,042 declination cancellation, and nonrenewal actions shows that 125 actions were found to be in violation of the statutes/rules. Most of the violations were a result of deficiencies in the notice form and length of prior notification (107 actions). These violations occurred because of the failure by some of the insurers to include specific information in the notice (e.g. right to appeal, right to have a new agent assigned, specific loss information) or in the time notification requirements (e.g. exceeding the 59 day underwriting standard, less than 60 days notice, etc.)

Twelve of the 125 violations identified appear to relate to potential redlining. In these cases, the declination appeared to be based solely on the age of the home. The remaining six actions were based on reasons other than those allowed by statute or rule (e.g. requested by agent without documentation as to basis, requested by mortgage company, etc.). *Based upon this information and documentation the investigation concluded that 99.7 percent of the 4,042 met the requirements of Minnesota's "redlining" statute.*

148

SUMMARY OF AGENT LOCATIONS (CHART #3)

Although there are no regulatory or statutory requirements that establish a minimum agent-to-policyholder ratio, the office locations for each company's agents were requested and charted. The Department does not believe the charting should be interpreted as an accurate depiction of a company's agent representation in any specific geographic location because these agencies could have more than one agent at each location/agency.

In a society that is effectively linked by telecommunications, companies can conduct most of their business through direct mail solicitation and provide application processing, underwriting, claims, and customer service by phone. Also, independent agents can legally broker business for other non-appointed agents. This would allow a company to market in a geographic location without officially establishing an agent/agency presence.

*While quantifiable results were not reached, the Department does not believe that agency location significantly inhibited access to insurance. The Department does recognize, however, that agency location is an important convenience issue.*

SUMMARY OF RATE SURVEY (CHART #4)

For purposes of the rating survey, South St. Paul and West St. Paul were considered suburban quotes. This did not adversely affect the comparison, since these communities were usually quoted at a lower rate than St. Paul and Minneapolis. The rate surveys were compiled in a chart which allows the comparison of each company's rate within the city limits of St. Paul and Minneapolis as well as urban to suburban comparisons. The chart does not provide company-to-company rate comparisons. Each column represents the dollar amount difference between the highest and the lowest rate quoted in that category for urban vs. suburban locations.

The maximum annual difference of any company rates between equivalent suburban and urban risk was $95.38 for the HO–3 (homeowners) policies and $26.50 for the HO–4 (renters) policies. The average difference between the suburban and urban rates for the 23 companies and the FAIR Plan was $42.43 for the HO–3 risks, and $7.49 for the HO–4 risks. There were three (3) companies that had no difference between suburban and urban rates for their HO–3 policies, and seven (7) companies that had no rate difference for their HO–4 policies. One company quoted some urban rates lower than some of their suburban rates for their HO–4 policies.

Seven (7) companies appear to have charged different rates within the city limits of Minneapolis/St. Paul for policies on identical homes, a practice in violation of the current statute. The differences ranged from $7–$73 and the Department is requiring these companies to take corrective action. These were isolated instances and did not appear to show a pattern of intentional wrongdoing.

QUOTES OBTAINED FROM AGENTS

There were 34 actual calls completed by Department personnel. The callers found only one instance where the agent seemed reluctant to provide a quote (but it was provided) and one instance where the agent did not return the phone call (contact was not made with the agent personally, only a name and phone number was left with his office). In all other instances the agents were described by the callers as polite, willing, and sometimes eager to provide quotes. Very few agents advised that an inspection would be necessary prior to writing the coverage, and all provided written confirmation of their quotes to the callers when requested. The callers have also received several follow-up phone calls from the quoting agents anxious to write the insurance coverage.

**Conclusions and Corrective Actions Taken**

Although patterns of illegal discrimination were not substantiated, the Department of Commerce would like to thank ACORN for requesting this investigation. Several corrective actions resulted from the investigation.

The Department strongly supports inner-city home ownership as one way to stabilize neighborhoods and available homeowners' insurance is critical to this goal. Continuing oversight and the monitoring of insurance industry practices by the Department of Commerce combined with an on-going and constructive dialog between insurers, agents, community organizations, and inner-city homeowners is the best method of insuring compliance with Minnesota's statutes.

**Conclusions**

UNDERWRITING

Underwriting policies regarding new home construction discounts were the primary area in need of updating to conform with the Minnesota statute prohibiting premium discounts based exclusively on the age of a dwelling. However, because in-

149

surance companies can adjust rates based on the level of risk (age of mechanical systems within a dwelling) the Department does not believe that the updating will significantly change the affordability of homeowners' insurance.

CANCELLATION/NONRENEWAL/DECLINATION

Ninety-seven percent of the 4,042 actions reviewed by the Department were found to be in compliance with Minn. Stat. 72A.20 subd. 13. Most of the violations in the 3 percent were technical in nature. The Department considers this low frequency of violations a sign that illegal cancellation, nonrenewal, or declination is not prevalent in the Twin Cities.

AGENT LOCATIONS

There is no regulatory or statutory requirement for locations of insurance agent offices. Although there are fewer agents located in the city than in the suburbs, this does not constitute illegal discrimination. With insurance available by both mail and phone, agent location does not seem to limit access to coverage.

ORAL AND WRITTEN INSTRUCTIONS TO AGENTS TO AVOID INNER CITY AREAS:

Three agents recommended by ACORN were interviewed in the belief that they knew of illegal discrimination practices on the part of insurance companies. No evidence of illegal discrimination was uncovered as a result of these interviews.

RATE SURVEY

The Department found that some companies have higher insurance premium rates in the inner-cities than in the suburbs. The average difference was $42/year for homeowners and $7 for renters. The urban-suburban differences were relatively small and related to the loss experience of the insurance company as confirmed by an actuarial study performed in correlation with the investigation.

The investigation identified companies which charged different rates within different areas of the city. This is not allowed and corrective action is being taken.

QUOTES FROM AGENTS

The Department conducted tests to see if agents were willing to sell in the inner-city and concluded that agents were reasonably eager to sell and quote insurance to inner-city homeowners.

**Corrective Action**

Departmental action which has been taken as a resolution to the several findings of this investigation:

- The Department is issuing a bulletin to all insurers authorized to write homeowners' insurance, which details the requirements and prohibitions of Minn. Stat. 72A.20 subd. 13. This bulletin specifically addresses the prohibition of discounts based on the age of the home; underwriting eligibility restrictions based on the age of the home; and the proper form and filing requirements of cancellation/nonrenewal notices.
- The Department required each of the companies found to have underwriting and rating standards in violation of State statute, to immediately correct these standards, materials, guidelines, and instructions, and provide confirmation and evidence of these corrections.
- The Department required each company, where applicable, to file corrected copies of their cancellation, nonrenewal, and declination forms.

## CHART #1 - UNDERWRITING

| Company | Market Share (91) | Restricted Binding or Decline Due to Age of Structure * | Rating based on Age of Structure + | Declined Based on Location |
|---|---|---|---|---|
| Allstate | 5.9% | X | | |
| AMCO | 1.47% | X | | |
| American Family | 13.22% | X | | |
| Austin Mutual | 1.57% | X | X | |
| Owners Insurance Company | 1.12% | X | X | |
| Auto Owners | 1.64% | X | X | |
| Citizens Insurance Company | 1.20% | X | | |
| Farmers Home Mutual | 1.05% | N/A | N/A | N/A |
| Gopher State Mutual | 1.09% | N/A | N/A | N/A |
| Horace Mann | 1.07% | N/A | N/A | N/A |
| Illinois Farmers | 9.24% | X | X | |
| Milbank Insurance Company | 1.63% | X | X | |
| Minnesota Mutual | 1.27% | X | | |
| Mutual Service Insurance Company | 1.74% | X | X | |
| Northstar Mutual | 2.68% | X | X | |
| Pacific Indemnity | 1.54% | | X | |
| Prudential Property & Casualty | 1.35% | X | X | |

* Declination may only pertain to preferred programs or policies.
+ Most companies have filed a "new home" discount.
1 Underwriting rule change 6/92.

## CHART #1 - UNDERWRITING (CONTINUED)

| Company | Market Share (91). | Restricted Binding or Decline Due to Age of Structure * | Rating based on Age of Structure + | Declined Based on Location |
|---|---|---|---|---|
| St. Paul Guardian | 2.97% | | X | |
| State Farm Fire & Casualty | 20.16% | X | X | X[1] |
| State Farm General Insurance | 1.22% | X | X | |
| USAA | 1.28% | X | | |
| Waseca Mutual | 1.21% | X | X | |
| Western National | 1.46 | X | | |

*    Declination may only pertain to preferred programs or policies.
+    Most companies have filed a "new home" discount.
1    Underwriting rule change 6/92.

CHART #2 - CANCELLATIONS/NONRENEWALS

| Company | Number of Improper Cancels/Non-Renewals (#/sample size/percentage) | Notice/Form/Notification | Age of Dwelling (Declined/Cancelled) | Improper Basis for Cancellation/Nonrenewal | Property Location (Declined/Canceled) | Other |
|---|---|---|---|---|---|---|
| Allstate | 10/217/4.6% | 8 | 2 | | | |
| AMCO | 4/113/3.5% | 4 | | | | |
| American Family | 4/434/9% | | 4 | | | |
| Austin Mutual | 6/229/2.1% | 4 | | 2 | | |
| Auto Owners/Owners | 0/54/0% | N/A | N/A | N/A | N/A | N/A |
| Citizens Insurance | 4/46/8.6% | 3 | | 1 | | |
| Farmers Home Mutual | 29/714/4.06% | 29 | | | | |
| Gopher State Mutual | 25/330/7.57% | 25 | | | | |
| Horace Mann | 1/15/6.6% | 1 | | | | |
| Illinois Farmers | 7/201/3.48% | 7 | | | | |
| Milbank Insurance Company | 6/172/3.48% | 6 | | | | |
| Minnesota Mutual | 1/86/1.1% | | 1 | | | |
| Mutual Service Insurance | 2/253/0.7% | 2 | N/A | N/A | N/A | N/A |
| Northstar Mutual | 0/153/0% | N/A | N/A | N/A | N/A | N/A |
| Pacific Indemnity | 1/120/.8% | 1 | | | | |
| Prudential | 2/76/2.6% | 1 | 1 | | | |
| St. Paul Guardian | 14/275/5.09% | 11 | | 3 | | |
| State Farm Insurance | 1/329/0.03% | 1 | | | | |
| USAA | 1/1/100% | 1 | | | | |
| Wasca Mutual | 0/5/0% | N/A | N/A | N/A | N/A | N/A |
| Western National | 7/169/4.14% | 3 | 4 | | | |

153

**CHART # 3**
**NUMBER OF AGENTS**
(Does Not Indicate The Number Of Office Locations)

| Company | St. Paul, S. St. Paul, W. St.Paul | Mpls | Surrounding 7 County Area |
|---|---|---|---|
| Allstate Ins. Co | 4 | 8 | 121 |
| American Family Mut | 17 | 8 | 252 |
| Auto Owners/Owners | 71 | 7 | 314 |
| AMCO | 9 | 4 | 99 |
| Austin Mut | 8 | 4 | 57 |
| Citizens Ins. Co | 12 | 3 | 66 |
| Farmers Home Mut | 11 | 6 | 89 |
| Gopher State Mut | 7 | 3 | 87 |
| Horace Mann | 4 | 0 | 21 |
| Illinois Farmers | 34 | 10 | 352 |
| Milbank Ins. Co | 2 | 0 | 24 |
| Minnesota Mut | 141 | 32 | 528 |
| Mutual Service Ins | 5 | 0 | 59 |
| North Star Mut | 4 | 0 | 53 |
| Pacific Indemnity | 5 | 5 | 31 |
| Prudential Prop. & Cas | 0 | 0 | 260 |
| State Farm (Fire & General) | 26 | 19 | 182 |
| St. Paul Guardian | 22 | 22 | 122 |
| USAA | 0 | 0 | 0 |
| Waseca Mut | 3 | 0 | 55 |
| Western National | 12 | 6 | 94 |

|  | Totals: 397 | 137 | 2,840 |
|---|---|---|---|
|  | Percentages: 13.9% | 4.8% | 81.8% |

004392

CHART #4 - RATE SURVEY

| Company | HO-3 St. Paul | HO-4 St. Paul | HO-3 Mpls. | HO-4 Mpls. | HO-3 St. Paul v. Suburbs | HO-4 St. Paul v. Suburbs | HO-3 Mpls. v. Suburbs | HO-4 Mpls. v. Suburbs | Max Diff. HO-3, Suburbs v. Cities | Max Diff. HO-4 Suburbs v. Cities |
|---|---|---|---|---|---|---|---|---|---|---|
| Allstate Insurance Company | $61 | $12 | $61 | $12 | $77 | $12 | $61 | $12 | $77 | $12 |
| AMCO Insurance Company | $0 | $0 | $0 | $0 | $57 | $8 | $59 | $8 | $59 | $8 |
| American Family Mutual Insurance Company | $0 | $0 | $0 | $0 | $54 | $14 | $0 | $0 | $54 | $14 |
| Austin Mutual Insurance Company #1 | $0 | $0 | $0 | $0 | $40.91 | *$0 | $40.91 | *$0 | $40.91 | *$0 |
| Austin Mutual Insurance Company #2 | $0 | - | $0 | - | $39.91 | - | $39.91 | - | $39.91 | - |
| Auto-Owners Insurance Company | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Citizens Security Mutual Ins. Co. #1 | $0 | $0 | $0 | $0 | $87.16 | $26.38 | $70.16 | $23.88 | $87.16 | $26.38 |
| Citizens Security Mutual Ins. Co. #2 | $0 | - | $0 | - | $95.38 | - | $76.38 | - | $95.38 | - |
| Farmers Home Mutual Insurance Company | $0 | $0 | $0 | $0 | $22 | $10 | $22 | $10 | $22 | $10 |
| Gopher State Mutual Insurance Company | $0 | - | $0 | - | $23 | - | $23 | - | $23 | - |
| Horace Mann Insurance Company | $57 | $10 | $57 | $10 | $57 | $10 | $57 | $10 | $57 | $10 |
| Illinois Farmers Insurance Company | $0 | $0 | $0 | $0 | $59 | $10 | $59 | $10 | $59 | $10 |
| Milbank Insurance Company | $0 | $0 | $0 | $0 | $55 | $9 | $55 | $9 | $55 | $9 |
| Minnesota Mutual Fire & Casualty Co. #1 | $72 | $7 | $0 | $0 | $72 | $7 | $72 | $7 | $72 | $7 |
| Minnesota Mutual Fire & Casualty Co. #2 | $71 | - | $0 | - | $71 | - | $71 | - | $71 | - |
| Mutual Service Casualty Ins. Co. #1 | $73 | $10 | $0 | $0 | $73 | $10 | $73 | $10 | $73 | $10 |
| Mutual Service Casualty Ins. Co. #2 | $56 | - | $0 | - | $56 | - | $56 | - | $56 | - |
| North Star Mutual Insurance Company #1 | $0 | $0 | $0 | $0 | $24 | $5 | $24 | $5 | $24 | $5 |
| North Star Mutual Insurance Company #2 | $0 | - | $0 | - | $16 | - | $16 | - | $16 | - |

Note: For purposes of pricing So. St. Paul and West St. Paul were considered suburbs.
  * Indicates same suburban rates higher than St. Paul/Mpls. rates.
  [1] The Fair Plan does not issue HO-3 coverage (HO-8); HO-3 and HO-4 are not replacement policies (ACV).

CHART #4 - RATE SURVEY - Continued

| Company | HO-3 St. Paul | HO-4 St. Paul | HO-3 Mpls. | HO-4 Mpls. | HO-3 St. Paul v. Suburbs | HO-4 St. Paul v. Suburbs | HO-3 Mpls. v. Suburbs | HO-4 Mpls. v. Suburbs | Max Diff. HO-3 Suburbs v. Cities | Max Diff. HO-4 Suburbs. v. Cities |
|---|---|---|---|---|---|---|---|---|---|---|
| Owners Insurance Company | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Pacific Indemnity Company | $0 | $0 | $0 | $0 | $42 | $0 | $42 | $0 | $42 | $0 |
| Prudential Property & Casualty Ins. | $0 | $0 | $0 | $0 | $57 | $12 | $57 | $12 | $57 | $12 |
| St. Paul Guardian Insurance Company #1 | $0 | $0 | $45 | $0 | $0 | $0 | $7 | $0 | $7 | $7 |
| St. Paul Guardian Insurance Company #2 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| State Farm Fire and Casualty Company | $0 | $0 | $60 | $0 | $60 | $8 | $60 | $8 | $60 | $8 |
| State Farm General Insurance Company | $0 | - | $64 | - | $64 | - | $64 | - | $64 | - |
| United Services Automobile Assn. | $0 | $0 | $0 | $0 | $50.81 | $0 | $0 | $0 | $50.81 | $0 |
| Waseca Mutual Insurance Company | $0 | $0 | $0 | $0 | $78 | $4 | $0 | $0 | $78 | $4 |
| Western National Mutual Insurance Company | $0 | $0 | $0 | $0 | $17.87 | $10.76 | $17.87 | $10.76 | $17.87 | $10.76 |
| Minnesota Property Placement Facility[1] | $0 | $0 | $0 | $0 | $38.30 | $26.50 | $35.28 | $26.50 | $38.30 | $26.50 |

Note: For purposes of pricing St. St. Paul and West St. Paul were considered suburbs.
* Indicates some suburban rates higher than St. Paul/Mpls. rates.
[1] The Fair Plan does not issue HO-3 coverage (HO-8); HO-3 and HO-4 are not replacement policies (ACV).

### RESPONSE TO WRITTEN QUESTIONS OF SENATOR BOND
### FROM ROBERTA ACHTENBERG

**Q.1. Condition Federal Assistance on a Housing Discrimination Plan.** Ms. Achtenberg, I understand that HUD is developing a regulation which would provide for the Department to withhold Federal assistance, including public housing, CDBG and HOME assistance, if a jurisdiction fails to develop a HUD-approved plan to combat housing discrimination. This sounds like another way for HUD to micromanage the decisionmaking of jurisdictions. How do you envision implementation of this rule? Won't the withholding of HUD funding, such as CDBG funding, primarily adversely impact the low-income families that need the benefit of the funding most?

**A.1.** HUD is developing a regulation to implement the requirement which Congress placed in Title I in 1983 requiring every recipient of CDBG assistance to certify that it will affirmatively further fair housing. Similar statutory requirements appear in the HOME program and the legislation creating the CHAS. The certification is not limited to these programs and includes both publicly assisted and private housing within a jurisdiction.

The proposed rule will require each Entitlement community (and State) to develop an analysis of impediments to fair housing and develop a plan to address these impediments. Communities which have not previously developed an analysis (more than 100 communities have done so since the concept was introduced as a "safe harbor" in HUD's 1989 CDBG regulations) would have 1 year from the date of HUD's final regulation to do so. The fair housing plan (analysis plus action plan) would NOT be submitted to HUD for advance approval. Instead, a summary of the plan would be submitted, together with the fair housing actions taken the preceding year and those planned for the forthcoming year.

HUD would raise questions about an applicant's certification only where there was evidence of a problem which the applicant failed to address. We do not believe that this would constitute "micromanaging the decisionmaking of jurisdictions." In fact, it is the present system that often requires us to second guess a jurisdiction's actions under its certification because no document exists summarizing the city's fair housing "temperature."

We would expect that any differences of opinion about an applicant's identification of impediments or actions to address them could be readily resolved through negotiation. If not, HUD could require special assurances or condition the grant on the community's taking certain actions by a prescribed time. HUD would seek to impose sanctions only as a last resort, recognizing that any interruption of the flow of funds would be harmful to the low- and moderate-income residents whom the programs are designed to benefit. This is precisely the same enforcement mechanism which HUD currently has with respect to CDBG and HOME funds. The proposed fair housing planning regulation does not change enforcement procedures in any way.

**Q.2. Property Insurance Redlining.** Ms. Achtenberg, I understand that President Clinton signed recently an Executive Order directing HUD to issue guidelines on property insurance discrimination. I am concerned that HUD intends to regulate the insurance

industry under the Fair Housing Act without any legal authority. How does HUD intend to implement this order?

**A.2.** Several administrations, beginning with a HUD General Counsel opinion in 1978, have concluded that Title VIII of the Civil Rights Act of 1968, as amended (the Federal Fair Housing Act), prohibits discrimination in the area of property or hazard insurance. Because HUD is the primary Title VIII law enforcement agency, and the only agency with authority to promulgate regulations under that Act, the Department has the responsibility to issue rules applying the Act to property insurance.

In regulations implementing the Fair Housing Amendments Act of 1988, HUD determined that the Act prohibits "refusing to provide . . . property or hazard insurance . . . or providing such . . . insurance differently because of race, color, religion, sex, handicap, familial status, or national origin (24 C.F.R. Section 100.70(a)(4)).

Courts that have considered the issue have concluded that insurance is covered by the Act. *Dunn* v. *Midwestern Indemnity Mid-American Fire & Casualty Co.,* 472 F. Supp. 1106 (S.D. Ohio 1979), *McDiarmid* v. *Economy Fire & Casualty Co.,* 604 F. Supp. 105 (S.D. Ohio 1984), *NAACP* v. *American Family Mutual Insurance Co.,* 978 F. 2d 287 (7th Cir. 1992), *cert. denied,* 113 S. Ct. 2335 (1993), *Nationwide Mutual Insurance Co.* v. *Cisneros,* No. C3–92–52 (S.D. Ohio Feb. 24, 1994). But see *Mackey* v. *Nationwide Insurance Co.,* 724 F. 2d 419 (4th Cir. 1984).

The key sections of the Fair Housing Act are 3604(a) which makes it unlawful to "otherwise make unavailable or deny, a dwelling" and 3604(b) prohibiting discrimination "in the provision of services or facilities in connection therewith." Because property insurance is required to secure a mortgage loan, which generally is required to purchase a home, denying insurance makes that home unavailable. As the Court explained in the *American Family* case, "no insurance, no loan; no loan, no house." When the Supreme Court was presented with the opportunity to modify this ruling it declined to do so.

It is important to understand that HUD has no intention of regulating the insurance industry. The responsibility of the Department is to interpret and enforce the Fair Housing Act as it applies to insurance.

In order to clarify the application of the Act to insurance, HUD has begun a collaborative process that will involve close consultation with the insurance industry, regulators, civil rights organizations, and other community groups.

An advanced notice of proposed rulemaking will be issued to solicit written comments from all interested parties. Several informal meetings will be held with representatives of insurance companies, agents, State insurance commissioners, and various community advocates. At least four public hearings will be held around the Nation. A proposed rule applying the Fair Housing Act to insurers will be drafted and widely distributed. Comments will be obtained and the proposal will be revised prior to issuance of the final rule. Throughout this process HUD will retain the assistance of outside consultants with recognized credentials and experience in fair housing and the business of insurance.

**Q.3. Fair Housing Litigation Policy.** Ms. Achtenberg, I understand that HUD may have a policy to settle as many fair housing claims [as] possible. Are you aware of any policy of HUD directing attorneys to settle fair housing cases? What is HUD's policy as to settling fair housing cases?

**A.3.** I am not aware of any departmental policy on settling fair housing litigation. However, the Secretary and I agree that HUD should not be in the business of conducting protracted legal maneuvers for the purpose of merely delaying a finding and remedial order against the Department. HUD has settled, or is engaging in settlement negotiations, in several law suits where HUD's liability has already been established or where the Department has determined that the plaintiffs have raised legitimate claims of violation of law.

**Q.4. Occupancy Standard.** Ms. Achtenberg, I understand that HUD may be developing a new policy on occupancy standards. For example, is HUD considering developing a new occupancy standard that is broader than a 2-person per bedroom standard? Many States establish a 2-person per bedroom standard as a legitimate occupancy standard under the Fair Housing Act? If not, why not?

**A.4.** As you know, the Fair Housing Act prohibits discrimination based on familial status—that is, based on the presence of children under the age of 18 in housing. Any policy limiting the number of persons who reside in housing may operate to disqualify or otherwise adversely affect families with children.

The guidance issued by former General Counsel Keating in 1991 permits consideration of a variety of factors, including the size and configuration of bedrooms, to be considered in the establishment of occupancy standards. Although that guidance has sometimes been misinterpreted to allow housing providers to set two person per bedroom occupancy standards in every situation, it does not in fact authorize such action. There are a number of circumstances where the availability of particularly large bedrooms, use of space other than that denominated as "bedroom" space (such as dens or living rooms), or other factors could result in upward revision of a two person per bedroom guideline.

HUD is considering developing a new occupancy standard policy, which will provide clearer standards regarding the number of persons who can occupy housing.

### RESPONSE TO WRITTEN QUESTIONS OF SENATOR RIEGLE FROM J. ROBERT HUNTER

**Q.1.** Most studies have been based on data grouped according to zip code. Would it be helpful for the data to be grouped in smaller geographic units, like census tracts, or nine-digit zip codes?

**A.1.** Yes. Five-digit zip codes are much smaller than the typical rating territory for homeowners' insurance and are therefore more useful in evaluating insurance availability within a city or county. However, five-digit zip codes are still large enough to capture two or more neighborhoods with differing characteristics, as interpreted by some insurers. The preferred method for geographic coding of premium and loss experience is with a census tract, census block group, or census block number. The census tract is typically small-

er than a zip code and consists of a number of census block groups which, in turn, consist of the smallest unit—census blocks. In addition to a more precise mapping of particular neighborhoods or neighborhood characteristics, the use of census mapping for insurance premium and losses allows for direct comparison with other census information, including economic, demographic, and housing statistics. Since zip codes do not exactly match census groupings, census data by zip codes represent an estimate, albeit a statistically accurate estimate, of various economic, demographic, and housing characteristics. The availability of nine-digit zip code insurance premium and loss experience would allow for a more accurate mapping of zip code to census data.

**Q.2.** The American Insurance Association's study on homeowners' insurance found that blacks are three times more likely than whites to purchase their insurance through State plans, the insurance pool of last resort for those unable to get insurance through the regular market. State plan policies cost more and provide less coverage than conventional homeowners' policies. Is this evidence of insurance discrimination, or did the study provide some alternative explanation for the disparity? What are your general views of the AIA study?

**A.2.** The AIA report purported to be a study of homeowners' insurance availability. In fact, the study did not measure availability as you or I would understand the term—the ability of people to purchase the insurance they want and/or need at affordable prices. The AIA study surveyed homeowners in selected cities and found that the vast majority of these homeowners had homeowners' insurance. This finding simply confirms that if you need a mortgage to purchase a home, then you need to purchase insurance to protect the mortgage lender. The study was essentially a tautology by limiting the sample to those residents who, unless they owned their homes outright, had to have insurance. This is not a random sample of insurance consumers. The study shed no light on the real issues of availability. Were people priced out of the home buying market because of the price of insurance? Were some neighborhoods denied mortgage lending because insurers would not sell insurance to protect the lenders? Were some consumers forced to accept inferior policies because insurers would not offer full homeowners' coverage in certain areas? The AIA study was silent on these availability issues.

The AIA study does report a higher incidence of blacks purchasing insurance thorough State plans than whites. Thus, for those consumers who were able to obtain homeowners' insurance, the study suggests differential insurance availability by race.

**Q.3.** Would loss data have been helpful in analyzing the data you collected for your study?

**A.3.** Yes. While we can evaluate insurance availability using only premium and exposure data by zip code, it is only with the analysis of loss data that we can evaluate whether the charged rates are fair. Loss data by zip code, or by census block in the future, is essential for determining whether the rates charged in two different geographic rating territories actually reflect the expected losses and are fair for those areas. With loss data by zip code, we can de-

termine if the rates are fair within a rating territory, i.e., are the existing geographic territorial groupings fair? In addition, loss data by type of loss—theft, fire, wind & hail, freezing water, etc.—enable us to evaluate insurers' explanations for their underwriting practices in different geographic areas.

**Q.4.** Ms. Schubert's written testimony states repeatedly that physical location alone should not be the basis of underwriting decisions. To what extent should physical location be significant in underwriting decisions?

**A.4.** Location can be important for exposure to catastrophic risk, such as flood, earthquake, and wind damage. (Damage from wind is the only one of these causes of loss covered in the typical homeowners' policy.) Otherwise, location should not, in my view, be a significant underwriting factor. Of course, the decision about how to group risks geographically—the determination of rating territories—is a fundamental public policy decision.

**Q.5.** Insurers frequently say that certain urban neighborhoods pay more for insurance because of a higher incidence of crime and vandalism. Is this accurate? How do insurance companies determine the incidence of crime and vandalism? How do they draw the lines between neighborhoods and decide which areas should be charged more?

**A.5.** Insurance losses are caused by a variety of factors in addition to theft and vandalism, including fire, wind & hail, freezing water, and liability. All other factors equal, higher theft losses in one area than another should result in higher rates in one area. However, the other factors are rarely equal. For example, the amount of insured property, and thus the insurer's exposure to loss, is typically greater in neighborhoods with greater insurance availability than those neighborhoods which insurers label as "high crime."

Theoretically, insurers would determine the incidence of crime in a given neighborhood by looking at loss data by cause of loss. For all but the very largest insurers, looking at statistically valid loss data by type of loss by zip code has been impossible because loss data by zip code has not been available. Moreover, even the largest insurers will not have loss data for those zip codes in which they do not actively write business. Another source of crime data comes from the FBI and/or local police departments. These data are typically not available by small geographic areas within a city. Finally, insurers may use the services of a third-party vendor who interprets existing sources of crime data into smaller geographic units. An example of this type of product is the Geographic Underwriting Service sold by the Insurance Services Office (ISO).

In some States, like Texas, the Department of Insurance promulgates rating territories for all insurers. In most States, insurers either create their own rating territories or rely on those developed by an advisory organization like ISO. In establishing rating territories, insurers may create areas ranging in size from a single zip code to several counties. We have found that the basis for insurers' determination of rating territories has as much or more to do with subjective factors as with objective characteristics of an area.

◯

VOLUME 33 NUMBER 6 JUNE 2014

# Banking & Financial Services

# POLICY REPORT

## FEATURES

**Race Discrimination Is Not Risk Discrimination: Why Disparate Impact Analysis of Homeowners Insurance Practices Is Here to Stay** . . . . . . . . . . . . . . . . . 1
By Stephen M. Dane

**Bitcoin and the Secured Lender** . . . . . . . . . . 13
By Pamela J. Martinson and Christopher P. Masterson

## THE MONITOR

Bank Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Securities/Section 20/Broker-Dealer . . . . . . . . . . . . . 27

Futures/Derivatives/Swaps/Commodities . . . . . . . . . 31

Court Developments . . . . . . . . . . . . . . . . . . . . . . . . 35



# Banking & Financial Services Policy Report

### Editor-in-Chief

Robert V. Hale
*San Francisco, CA*

### Publisher

Richard Rubin

### Editorial Advisory Board

Bowman Brown, Partner
*Shutts & Bowen*
*Miami, FL*

Arnold G. Danielson, President
*Danielson Associates, Inc.*
*Rockville, MD*

Charles E. Dropkin, Partner
*Proskauer Rose LLP*
*New York, NY*

Walter A. Effross, Professor
*The American University*
*Washington College of Law*
*Washington, DC*

Melanie L. Fein, Attorney &
Financial Services Consultant
*Great Falls, VA*

Carl Felsenfeld, Professor
*Fordham University School of Law*
*New York, NY*

Douglas E. Harris,
General Counsel
*BrokerTec Futures Exchange, LLC*
*BrokerTec Clearing Company, LLC*
*Jersey City, NJ*

Michael J. Halloran, Partner
*Pillsbury Winthrop LLP*
*San Francisco, CA*

Edward I. Handelman,
Senior Attorney
*Citigroup Bank Regulatory Office*
*New York, NY*

Edward D. Herlihy, Partner
*Wachtell, Lipton, Rosen & Katz*
*New York, NY*

Dennis J. Lehr, Of Counsel
*Hogan & Hartson*
*Washington, DC*

Arthur W. Leibold Jr., Partner
*Dechert*
*Washington, DC*

David B. Lipkin
*Law Offices of David B. Lipkin*
*Bala Cynwyd, PA*

Edward J. McAniff, Partner
*O'Melveny & Myers*
*Los Angeles, CA*

Wilson Mitchell
*KPMG Banking Group*
*New York, NY*

John C. Murphy, Partner
*Cleary, Gottlieb, Steen & Hamilton*
*Washington, DC*

Edward L. Neumann,
Managing Director
*The Farragut Group*
*Arlington, VA*

Barnet Reitner, Partner
*Reitner & Stuart*
*San Luis Obispo, CA*

Paul Allan Schott, National
Director Bank Regulatory Services
*Pricewaterhouse Coopers*
*Washington, DC*

John E. Shockey, Partner
*Milbank, Tweed, Hadley & McCloy LLP*
*Washington, DC*

James C. Sivon, Partner
*Barnett and Sivon, P.C.*
*Washington, DC*

Jeffrey Spivack, Senior Manager
*Grant Thornton*
*New York, NY*

John Teolis, Partner
*Blake Cassels & Graydon*
*Toronto, Canada*

Thomas P. Vartanian, Partner
*Fried, Frank, Harris, Shriver &*
*Jacobson*
*Washington, DC*

John Villa, Partner
*Williams & Connolly*
*Washington, DC*

Charles K. Whitehead,
Associate Professor of Law
*Cornell Law School*
*Ithaca, NY*

Richard M. Whiting,
General Counsel
*The Financial Services Roundtable*
*Washington, DC*

### Editorial Office:

76 Ninth Avenue
New York, NY 10011
(212) 771-0600



Copyright © 2014 CCH Incorporated

**Banking & Financial Services Policy Report** (ISSN 1530-499X) is published monthly by Aspen Publishers, 76 Ninth Avenue, New York, NY 10011, (212) 771-0600. One year subscription (12 issues) costs $905. To subscribe, call 800-638-8437. For customer service, call 800-234-1660. Postmaster: Send address changes to **Banking & Financial Services Policy Report**, Aspen Publishers, Distribution Center 7201 McKinney Circle, Frederick, MD 21704. **Purchasing reprints:** For customized article reprints, please contact *Wright's Media* at 1-877-652-5295 or go to the *Wright's Media* website at *www.wrightsmedia.com.*

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

—From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations.



Aspen Publishers
**Banking & Financial Services Policy Report**
Distribution Center
7201 McKinney Circle
Frederick, MD 21704

Forwarding Service Requested

**TIMELY REPORT**
**Please Expedite**

**To subscribe, call 1-800-638-8437 or order online at www.aspenpublishers.com**

June/9900613064

# Race Discrimination Is Not Risk Discrimination: Why Disparate Impact Analysis of Homeowners Insurance Practices Is Here to Stay

**By Stephen M. Dane**

On February 15, 2013, the US Department of Housing and Urban Development (HUD) issued a final rule on implementation of the Fair Housing Act's Discriminatory Effects Standard (the Rule).[1] This regulation resolved some discrepancies among the federal courts of appeals regarding the proper analysis of disparate impact claims brought under the federal Fair Housing Act (FHA), which HUD, the US Department of Justice, and private individuals enforce through administrative and court proceedings.[2]

Although the Rule was merely intended to "formalize [HUD's] longstanding view" that disparate impact liability is available under the FHA and to establish a uniform standard for determining when a specific business practice violates the FHA, insurance publications and experts have expressed alarm that such a regulation would be applied to homeowners insurers. Industry lawyers claim that successful disparate impact claims against property insurers would "alter risk-based business practices" and "allow the government or private plaintiffs to substitute their business judgment" for that of insurers.[3] We are told that the Rule would "prevent insurance companies from using risk-based methods of rating and underwriting."[4] It is asserted that the HUD Rule "would effectively permit it to negate more than 150 years of public policy, regulatory principles, actuarial standards, and state-based regulation of insurance, and eliminate risk-based pricing of homeowners insurance."[5] This promulgation by HUD is seen as so unjustified that three property/casualty trade organizations

have filed two separate lawsuits seeking to have the Rule declared void and inapplicable to homeowners insurers.[6]

One would have thought Hurricane Katrina had made a re-appearance to wreak havoc on the property insurance industry.

This article explains why these fears are utterly unfounded. For one thing, nothing radically "new" happened when HUD issued its Rule. The homeowners insurance industry has been subject to the FHA since its enactment in 1968. HUD's position that insurers are subject to FHA enforcement was formalized when it published regulations in 1989 prohibiting discrimination by homeowners insurers based on race, religion, disability, familial status, and other protected characteristics, a regulation repeatedly upheld by the courts. The FHA has been consistently interpreted by the courts to include a disparate impact basis for liability, even before HUD's most recent Rule was adopted, so the insurance industry has been subject to disparate impact claims for decades. HUD officials told Congress in 1994 that insurance company practices with a disparate impact may violate the act if they cannot meet the established test of business justification. The Department of Justice has filed or supported disparate impact claims against insurers for decades. In addition to the federal government's efforts to enforce the FHA against insurers based on a disparate impact theory of liability, private litigants have also done so successfully.

Second, disparate impact analysis is not inconsistent with "the business of insurance." Some aspects of the business of insurance, such as underwriting and rate-making, do include the classification of risk. But insurers do a lot more to run their insurance businesses than assess "risk of loss" or engage in "risk-based" practices. Insurers direct sales teams and sales agents. They have marketing departments. They employ people to design

**Stephen M. Dane** is a partner in Relman, Dane & Colfax, PLLC, a civil rights law firm based in Washington, DC. He has been involved in insurance redlining and discrimination litigation since 1991. His firm also conducts disparate impact analyses for financial institutions to assist with their regulatory compliance. The author thanks his partner John P. Relman, who provided many valuable insights during the preparation of this article.

new products and add new product features. They operate claims departments. These ordinary business practices, which do not explicitly assess or classify risks, are no different for insurers than for other businesses subject to the FHA. Even those parts of the "business of insurance" involving risk assessment are compatible with disparate impact analysis. For example, nonactuarial intervention in underwriting is common, and could result in unjustified adverse impacts. Insurance actuaries who assess "risk" are constantly reviewing and modifying their algorithms, and before establishing a final pricing strategy they often take into account factors that include an element of judgment (*e.g.*, profitability levels, competitor prices, rating territory boundaries, trending assumptions, and so on). Indeed, some factors—such as race, religion, and national origin—are prohibited by state insurance laws even if they have an actuarial connection to risk of loss. There is enough flexibility in the industry's traditional assessment of risk to allow for disparate impact analysis, without conflicting with "the business of insurance."

Third, the business justification prong of the Rule itself preserves the viability of insurance business practices that are legitimately business justified. According to HUD's Rule, business practices with a disparate impact on a protected group "may still be lawful if supported by a legally sufficient justification," which is defined to include practices that are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."[7] So long as those interests cannot be served by another business practice with a less discriminatory effect—the burden of proof of which rests on the government or a fair housing plaintiff—such business practices are completely lawful under the Rule and the act. If any challenged insurance practices with no less discriminatory alternatives are based on legitimate risk-based underwriting or pricing, then they will suffer no liability under the FHA.

Fourth, many state laws allow disparate impact claims against homeowners insurers. Regardless of what HUD or the courts may think about the reach of the federal FHA, insurers in states that allow disparate impact claims as a matter of state law still remain exposed to such claims.

Finally, even when a disparate impact analysis of insurer business practices cannot, standing alone,

result in liability under the federal FHA, it is still relevant to the issue of "intent" and can be used by plaintiffs and the government in fair housing enforcement actions to support claims of intentional discrimination. A business practice with a known disparate impact, supported by little or no statistical analysis prior to implementation, can be combined with other evidence of discriminatory intent to support a finding of liability.

Disparate impact analysis is here to stay, either on the federal level under HUD's Rule, or at the state level in those states that recognize the doctrine. It remains relevant to claims of intentional discrimination even in the absence of HUD's Rule. A company's self-analysis of the disparate impact of its business practices is a responsible business practice in which lenders, governments, and others in the housing industry routinely engage. Homeowners insurers would be prudent to do the same, and those who fail to do so may find themselves on the wrong end of an enforcement action, regardless of HUD's Disparate Impact Rule.

## Disparate Impact Rule Reaffirms Preexisting Law

Since the FHA was amended in 1988, every court to consider the issue has held that the act prohibits acts of discrimination by homeowner's insurers.[8] Most of these decisions have gone no further than the language of 42 U.S.C. § 3604(a), which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of" a protected characteristic, such as race.[9] This is due, in part, to the link between the ability to obtain insurance and the ability to obtain housing—adequate insurance is necessary to the ownership or rental of housing.[10]

Section 3604(b) has also been interpreted to prohibit homeowners insurance discrimination. This provision makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services or facilities in connection therewith,* because of race . . . ."[11] HUD published a regulation under this section in 1989 that prohibits discrimination by homeowners insurers based on race, religion, disability, familial status, and other protected characteristics.[12] This regulation has repeatedly been

upheld by the courts.[13] The US Courts of Appeals for the Sixth, Seventh, and Ninth Circuits and several lower courts have all determined that homeowners insurance is clearly and simply a "service" rendered "in connection" with the sale or rental of a dwelling.[14] The Department of Justice has filed several enforcement actions against homeowners insurers.[15]

The 1988 amendments to the act also substantially rewrote 42 U.S.C. Section 3605 so that it, too, includes homeowner's insurance transactions. Prior to 1988, Section 3605 prohibited discrimination in mortgage "loan transactions," even those engaged in by insurers. When Congress passed the Fair Housing Amendments Act of 1988, it completely rewrote Section 3605 so that it is no longer limited only to loan transactions. That section now makes it unlawful to make unavailable, or to discriminate in the terms or conditions of, a "residential real estate–related transaction," which includes "the making or purchasing of loans or *providing other financial assistance for . . . purchasing, constructing, improving, repairing, or maintaining a dwelling.*" The new definition makes clear that Congress intended to prohibit discrimination in transactions, like insurance, that provide financial assistance for "repairing" or "maintaining" a dwelling. Accordingly, several courts have held that homeowners insurance falls within the scope of Section 3605's protections because it "provides the financial assistance necessary" to maintain, repair, or construct a dwelling.[16] This is also HUD's view of Section 3605.[17]

The applicability of HUD's fair housing regulations to homeowners insurers and all that entails is nothing new. The Act has regulated insurance behavior for more than 45 years. In this regard, HUD's issuance of a regulation that applies to insurers should come as no surprise to anyone.

What about disparate impact? Starting in 1974 and continuing through 2014, all 11 courts of appeals to consider the issue have adopted the disparate impact standard as a basis for liability under the FHA.[18] HUD itself has a long history of interpreting the FHA to encompass disparate impact claims, including claims against insurers. HUD officials testified before Congress in 1994 that insurance company practices "neutral on their face [but] hav[ing] a disproportionate racial impact . . . may violate the [Act] where they cannot meet the established test" of business

justification.[19] Under the new Section 3605, it is unlawful for a defendant to not "mak[e] available" a residential real-estate-related transaction because of race or any other prohibited basis. There is no implication of intent or motive in this phrase. A housing transaction can be "made unavailable" to an individual by operation of facially neutral rules just as much as by operation of rules that express their discriminatory intent. Clearly the language Congress used in the new Section 3605 could encompass practices with a disparate impact.

When HUD adopted the Disparate Impact Rule, it explicitly noted that the disparate impact standard of proof was already "well established."[20] The Rule is merely a formal adoption of the courts' and HUD's own long-held interpretation of the FHA.[21]

It should be noted here that HUD is not the only federal regulatory agency to adopt and apply the disparate impact standard of liability to financial institutions that regularly assess financial risk. Other federal agencies charged with implementing and administering the FHA have embraced the use of disparate impact analysis. Since at least 1994, all five federal financial regulatory agencies have used disparate impact analysis to assess liability under the various federal antidiscrimination laws they enforce, including the FHA.[22] Indeed, the disparate impact doctrine has been an integral part of Regulation B, which prohibits discrimination in underwriting and pricing in *lending* transactions, since it was promulgated in 1985.[23]

Moreover, disparate impact liability has been the basis for fair housing enforcement actions against insurers long before HUD issued its Rule. Over the past two decades the homeowners insurance industry has been the subject of significant private and public enforcement actions under the FHA. Virtually all of the major carriers, and several smaller ones, have been the subject of fair housing complaints based on claims of race discrimination in the underwriting, marketing, advertising, and sale of their products.

As a result, many historical homeowners insurance underwriting and pricing policies have been successfully challenged under the FHA on disparate impact grounds, including the age of the dwelling, the

minimum dwelling value, the ratio of a dwelling's market value to its replacement cost, and credit scoring.[24] The nation's largest homeowners insurers no longer use dwelling age or minimum market value as part of their underwriting processes. Many have also eliminated restrictions on the availability of full and guaranteed replacement cost policies, with companies finally making such policies available in African-American and minority neighborhoods. Insurers have abandoned explicitly race-based and geographically based marketing plans.[25]

These challenges to traditional underwriting and marketing practices have been supported both by the testing of agents conducted by fair housing organizations[26] and by statistical analyses demonstrating the racial impact of certain facially neutral criteria. Many of the challenged underwriting criteria were not supported by any company or industry empirical loss or claims data, so they could not be justified by business necessity.

Nothing radically "new" appeared when HUD issued its Disparate Impact Rule in 2013. What it announced in a formal regulation has been the law of the land, and has been applied to homeowners insurers, for decades.

## Disparate Impact Is Not Inconsistent with "the Business of Insurance"

A central tenet of the industry alarm about HUD's Disparate Impact Rule is the fervent assertion that the imposition of disparate impact liability is fundamentally inconsistent with the business of insurance. The foundation of the business of insurance, and in particular underwriting and rate-making, is the classification of risk. We are told that to eliminate statistical disparities among different demographic groups, many risk-based variables would have to be eliminated from the underwriting process, and insurers would have to charge everyone the same rate regardless of risk. The expressed fear is that a disparate impact analysis will effectively negate more than 150 years of public policy, regulatory principles, actuarial standards, state-based regulation of insurance, and risk-based pricing.

One problem with these assertions is that not all homeowners insurance business practices are actuarially based, or based on an assessment of risk. For example,

marketing and advertising campaigns, sales techniques, the placement of agent offices, insurance product design and benefits, the settlement of claims, renewal of policies, and other business practices are not based on actuarial analysis or modeling. Such business practices may have significantly different impacts on populations protected by the FHA, but they are not based on actuarial studies.[27]

Indeed, even insurance "underwriting guidelines," that is, those rules that determine whether an applicant is eligible to purchase homeowners insurance, may not be actuarially based:

> Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk.[28]

Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property.[29] "Historically, underwriters have relied on experience, market knowledge, intuition, and oral history more than statistical insights when evaluating risk."[30] Unlike insurance rates, insurance underwriting and eligibility guidelines are often not required to be filed, justified, or approved by state insurance regulators.[31] State insurance regulatory regimes are notorious for their lack of transparency and have actively resisted making publicly available any information regarding the availability and affordability of insurance in low-income and minority regions.[32] Several underwriting guidelines historically used by homeowners insurers were shown in the 1990s to have *not* been adopted as a result of any actuarial or other analysis of risk.[33] Accordingly, they have been largely abandoned by the industry.[34]

Nonactuarial intervention in underwriting is common. In the underwriting process, underwriters or systems assemble and review underwriting information. They then place an application into a tier. Often an underwriting score is calculated, although varying levels of review by human underwriters may also occur. The score and human review determine whether the application is accepted, rejected, or in need of further review. There is significant variation among insurers in the way this process is implemented, with agents

sometimes making case-by-case decisions, sometimes limited quality control, and the use of pooled industry data that is analyzed only to the point of meeting minimum regulatory scrutiny. Even when underwriting scores are available, half or more of underwriting decisions may be ultimately made by human underwriters.[35]

> Few, if any, underwriting decisions are truly binary. That's why insurers still need teams of people who know how to *balance the nuances of risk quality, emerging exposures, market contexts and competitive strategies as they make critical underwriting decisions*.[36]

This dependence on human judgment no doubt explains why some analyses of insurer behavior reveal questionable patterns that *cannot* be explained by risk of loss. For example, in *NAACP v. American Family Mutual Insurance Company*,[37] the government alleged that the company's loss data did *not* explain or otherwise justify its low overall market share of policies on homes in majority black census tracts in Milwaukee County, Wisconsin, nor the preponderance of repair-cost policies in those areas.[38]

Moreover, there is not agreement among actuaries as to how "risk" should be assessed in the pricing of homeowners insurance. For example, most homeowners insurance policies are sold as "all risk" policies, meaning that they cover a wide range of potential loss-causing perils, such as fire, theft, weather damage, burst pipes, and so on. Some experts contend that multi-peril rating "is critical for maintaining economic efficiency and actuarial equity," but some actuaries involved in pricing homeowners insurance are now suggesting "decomposing" the set of dependent variables by individual peril.[39] Current multi-peril rating practice is based on modeling each peril in isolation from the others, which requires an assumption that covered perils are independent from one another, and that sets of parameters from each peril are unrelated to one another. These assumptions are now being tested, however, as "it seems unlikely that perils are independent" of one another, and some studies have demonstrated a statistically significant dependence among perils. For this reason, actuaries are exploring alternative approaches to homeowners insurance rating systems.[40]

Even actuarially based insurance business practices are often derived, modified, or ignored for reasons

unrelated to risk. State rate regulatory laws generally permit the rate filer to consider management's business judgment and competition in the determination of the rates to be filed and charged to insureds. The Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking acknowledges that although the actuary's role is to derive an estimation of future costs resulting from the transfer of risk, "other business considerations are also a part of ratemaking," and include input from other disciplines such as marketing, underwriting, and finance.[41]

For example, despite what a company's actuaries may determine is a fair and reasonable rate for a specific insurance product in a specific geographic rating territory based on expected loss costs, company executives may reject that determination "for competitive reasons," that is, to beat a competitor's price and sell more policies. The actuarially determined rates might be rejected or modified by business executives to penetrate (or withdraw from) a specific market. Or they might be adjusted in response to agent input or customer responses.[42] These nonactuarial adjustments are frequently permissible under state law.

Moreover, there are some factors that can *never* be used to set prices, or to underwrite new business, *even if* those factors are shown to be "actuarially justified." Typical among these absolutely prohibited factors are race, color, religion, and national origin. Even if an insurer could prove through actuarial analysis that members of a protected racial group tended to show greater homeowner loss costs, claims, or risk—all other factors being equal—the insurer would still be prohibited by state law from refusing to sell insurance, or charging higher prices, to members of that racial population.

These absolute prohibitions are well known and have been embedded in state laws for decades. Homeowners insurers have successfully conducted "the business of insurance" by operating within these limitations, and have not gone out of business because they cannot use these factors.

It is apparent that the pricing and underwriting functions of homeowners insurers, even if based at some level on the actuarial analysis of appropriate data sets, can be and are adjusted by considerations unrelated to risk. The assertion that actuarial risk factors are the *only*

considerations that drive the "business of insurance" goes too far.

The point here is that the industry's reliance on "actuarial necessity" as the linchpin of the "business of insurance" is a cliché in this context—a sophisticated-sounding catchphrase that cannot possibly eliminate all possible applications of disparate impact analysis to homeowners insurance, such as those insurance business practices to which actuarial science does not speak, or on which actuarial science has no definitive answer. There is not, and never has been, an absolute homage to actuarial outcomes in the business or regulation of insurance. Actuarial risk assessment is certainly useful and desirable in many instances, but there are no absolutes here. HUD's Disparate Impact Rule can safely operate within traditional actuarial constraints without jeopardizing "the business of insurance." Certainly no court will rule, as a matter of law, that HUD's Disparate Impact Rule is inapplicable to all insurance business practices, especially those that are not based on actuarial or risk-based analysis.

## Disparate Impact Analysis Is Consistent with Risk Assessment

In any event, the entreaty that disparate impact is "incompatible" with the business of insurance is belied by the business justification prong of the Rule itself. Business practices with a disparate impact on a protected group "may still be lawful if supported by a legally sufficient justification," which is defined to include practices that are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."[43] Specifically, a business practice that has a disparate impact on a protected group is nevertheless legal under the FHA if it "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and there is no less discriminatory alternative available to achieve those interests.[44] Not every housing practice that has a disparate impact is illegal. Courts use the disparate impact framework only "to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests."[45] HUD has stated that "nothing in the [FHA] requires or encourages any practice that is inconsistent with sound actuarial and underwriting principles … ."[46]

The terms "actuarial justification" and "actuarial necessity" certainly *sound* like quintessential "legally sufficient justifications" under this standard. Depending on the insurance practice at issue, a homeowners insurer—like any other provider of housing or housing services subject to the FHA—may indeed be in full compliance with the act even if its practice results in a disparate impact. But this can only be determined on a case-by-case basis and is dependent on the individual practice being challenged, the challenger's ability to prove some disparate impact in the first instance, the business interest at issue, and—in the case of insurers because of McCarran Ferguson[47]—the state law in which the practice arose.

Disparate impact is not a "gotcha" standard of liability intended to trap unwitting defendants, nor does it require quotas or set-asides. When an insurer, using evidence that is neither hypothetical nor speculative, can establish a legitimate, nondiscriminatory justification for a practice that may have a discriminatory effect, the insurer can prevail unless the plaintiff then demonstrates the existence of a less discriminatory alternative practice that achieves the same objective. If any challenged insurance practices with no less discriminatory alternatives are based on legitimate risk-based underwriting or pricing, then they will suffer no liability under the FHA.

It is sometimes claimed that having to live under the shadow of the Disparate Impact Rule poses an undue burden to insurers because insurers do not collect data about the race of their customers and they would therefore be required to collect demographic data that they do not currently obtain. But in this regard homeowners insurers are no different from other businesses that are subject to the FHA. Apartment managers do not record the race of housing applicants or tenants. Real estate sales agents do not record the race of their buyers. Although some lenders are required to collect and report racial and gender demographic data of loan applicants, they are not required to collect or report data about the other protected class characteristics (such as religion, disability, or familial status) to which the Disparate Impact Rule applies. In this respect there is no additional burden that is unique to "the business of insurance" that distinguishes it from any other housing industry subject to the Rule.

More fundamentally, this notion that the Disparate Impact Rule requires housing providers to collect and analyze racial or other demographic data about their

*customers* misconceives how many disparate impact claims are proven. For example, a challenge to an insurer's sales, marketing, or underwriting practices would require a comparison of the way a particular policy or practice will impact members of a protected class *in the relevant market* as compared to nonprotected potential customers in that market.[48]

Indeed, for disparate impact claims based solely on neighborhood racial composition, as distinct from disparate impact claims based on the race of applicants or existing customers, the relevant demographic data required for analysis is found in publicly available census and geographic data, not in customer files.[49] The race of an insurer's customers, as distinct from the racial composition of the neighborhoods within which it does business, is largely irrelevant to such geographic redlining claims.

Finally, HUD's Rule places the burden of proving disparate impact in the first instance, and a less discriminatory alternative at the back end, on the *plaintiff*, not the defendant insurer. For a plaintiff to make such a showing, the plaintiff must have a data source with the relevant demographic information (*e.g.*, race) to demonstrate the impact. If a fair housing plaintiff has a data source sufficient to prove that a specific insurance business practice has a disparate impact based on race, the insurer would also have access to the same data source. Moreover, the insurer's burden under HUD's Rule is merely to prove the "business justification" for the challenged practice. Certainly the insurer has a pre-existing source of data to meet this burden, and would not have to capture "more" data *post hoc*.[50]

HUD's Disparate Impact Rule therefore does not, as many insist, impose any additional data collection burden on homeowners insurers. To the contrary, the Rule does nothing more that promote the careful analysis of existing data so that no otherwise qualified segments of the market are unnecessarily excluded by unjustified assumptions about risk.

## Disparate Impact Analysis Is Alive and Well at the State Level

Another reason why disparate impact analysis is here to stay, regardless of HUD's federal Rule, is that it is embedded, implicitly or explicitly, in many state regulatory regimes. Disparate impact analysis is not exclusive to the federal government, nor does it necessarily

conflict with state laws. Many state civil rights laws are in complete harmony with federal civil rights policy, not just in areas of housing, but in all segments of the economy, including employment, banking, education, public accommodations, and others. Several states allow disparate impact fair housing claims, even against insurance companies. Indeed, many state fair housing laws have been deemed "substantially equivalent" to the federal FHA[51] and would apply the principles of disparate impact to homeowners insurers to the same extent as the federal FHA.

For example, California, North Carolina, and the District of Columbia allow disparate impact fair housing claims by statute in all contexts; there are no exemptions for homeowners insurers.[52] Several state supreme courts have interpreted their state fair housing laws to encompass disparate impact claims, even when their statutes do not explicitly use the term.[53] Lower state court decisions throughout the country embrace disparate impact as a matter of state law.

In *Toledo Fair Housing Center v. Nationwide Insurance Company*,[54] a class of homeowners and a local fair housing agency sued Nationwide Insurance solely under Ohio state law for alleged redlining. Specifically, plaintiffs alleged that two of Nationwide's underwriting guidelines had a disparate impact on homeowners in African-American neighborhoods, and therefore violated the state's fair housing law. Nationwide moved for summary judgment, arguing that a disparate impact approach would "undermine the insurance business" and would "conflict with the Ohio Insurance code." The court rejected both arguments, finding that "the disparate impact approach does not unduly burden the business of selling insurance" because the theory does not impede an insurer from showing a legitimate business justification. Moreover, the court further found that disparate impact liability against an insurer "does not conflict with the Ohio insurance code."[55]

This and similar cases and state statutes refute the concern that HUD's Disparate Impact Rule "conflicts" with the state insurance law of all 50 states. There may indeed be some situations in which McCarran Ferguson will reverse preempt a federal FHA claim challenging a specific insurance business practice in a specific state. But that determination can only be made on a case-by-case basis, and until a court is presented with such

004410

particularized facts, it will not invalidate the Rule in the abstract and immunize all insurance practices in all states.[56] The viability of disparate impact challenges to homeowner insurance practices under state law thus ensures that the concept will still be something insurers must address, regardless of the existence of HUD's Rule.

## Disparate Impact Analysis Is Relevant to Claims of Intentional Discrimination

Finally, disparate impact analysis must always be a concern of homeowners insurers because, regardless of whether it might be sufficient to support fair housing liability as a stand-alone theory, it is nevertheless relevant and admissible in enforcement actions that are based on claims of intentional discrimination.

Statistical evidence has long been recognized by the US Supreme Court as an important type of circumstantial evidence that can be used to prove intent. For example, in employment discrimination cases the Supreme Court has held that statistics showing an imbalance between the racial composition of an employer's work force compared to the racial composition of the general population is often "a telltale sign" of purposeful discrimination.[57] In some cases statistical evidence alone can support a finding of intent. Housing discrimination cases premised on allegations of discriminatory intent have successfully presented statistical evidence showing substantial imbalances in the defendant's treatment of customers.[58]

Evidence that an insurer's policy or practice has a substantial disparate impact on a protected class, when combined with direct or circumstantial evidence of discriminatory motive, is therefore relevant and admissible in a fair housing enforcement action.

## Conclusion

The Introduction to this article quoted a number of industry experts who decried the alleged seismic repercussions of HUD's Disparate Impact Rule, and its application to insurers. The same arguments have been rejected by courts as overly "sweeping" and "fanciful."[59]

Essentially, [Prudential's] argument turns on the purportedly unique nature of the insurance industry, which must "discriminate" based on an assessment of risk. However, this argument is unavailing in light of the availability of the "business justification" defense. Plaintiffs do not challenge Prudential's right to evaluate homeowners' insurance risks fairly and objectively. Rather, plaintiffs allege that the underwriting policies and practices employed by Prudential are *not* purely risk-based. Furthermore, defendants cannot point to anything in the FHA itself that would justify this Court in carving out an exception for a particular type of organization.[60]

The Fifth Circuit similarly observed that the insurance industry's "ominous" description of the way that disparate impact will force federal courts to act as "super actuaries" by substituting their judgment for the judgment of each of the 50 states "although colorful, is incorrect."[61] Courts are regularly called upon to evaluate whether a practice with a disparate impact is nevertheless justified by a business necessity. "[Allstate's] attempt to distinguish the business of insurance from other businesses is unpersuasive." Moreover, supposed conflicts between disparate impact theory and state insurance laws "are entirely conjectural."[62]

The Seventh Circuit made the same observations in *NAACP v. American Family*.[63] Insurers are no different from lenders when it comes to risk assessment. Like insurers, lenders must evaluate risks, such as whether to extend credit in the first instance, and if so at what rate of interest. The FHA indisputably applies to lenders, so "it is difficult to see risk classification as a principled ground to exclude insurers" from disparate impact analysis.[64] The court in *American Family* also famously wrote, "risk discrimination is not race discrimination,"[65] a line often quoted by industry apologists who object to the application of disparate impact analysis to homeowners insurance. But in the next sentence the court cautioned that "efforts to differentiate more fully among risks may produce classifications that could be generated by discrimination."[66]

Homeowners insurers have been operating profitably for decades in a world in which every circuit court that has addressed the issue, as well as HUD, has found that disparate impact liability exists under the FHA—without the calamitous results predicted by industry pundits. Disparate impact liability does not require the abandonment of legitimate, risk-based analyses. It is

absolutely compatible with the business of insurance. Responsible insurers would be prudent to incorporate compliance with it into their basic business models. It is a concept that is here to stay.

## Notes

1. 78 Fed. Reg. 11,460 (Feb. 15, 2013).

2. *See* 42 U.S.C. §§ 3610-3614.

3. P. Hancock, A. Glass, and R. Smerage, "HUD Proposal Would Impose 'Disparate Impact' Regulation on Property Insurance," *Legal Backgrounder*, Vol. 27, No. 11 (June 8, 2012), at pp.1, 3.

4. E. Tosaris, "The Disparate Impact Rule and Its Impact on State Insurance Regulation," *The Regulator* (Spring, 2013) at p.9.

5. S. Stead and L. Mirel, "Commentary: Will HUD's Disparate Impact Rule Have Say in Ratemaking?," available at *http:// www.insurancejournal.com/news/national/2013/04/10/287803. htm*.

6. *American Insurance Ass'n et al. v. HUD*, Case No. 1:13-cv-00966 (D. D.C.); *Property Casualty Insurers Ass'n of America v. Donovan*, Case No. 1:13-cv-08564 (N.D. Ill.).

7. 24 C.F.R. § 100.500.

8. *See, e.g., Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1360 (6th Cir. 1995), *cert. denied*, 516 U.S. 1140 (1996); *United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n*, 24 F.3d 1008 (7th Cir. 1994); *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992); *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 Ma/V., 2007 WL 6996777, at *2 (W.D. Tenn. July 6. 2007); *Nevels v. Western World Ins. Co.*, 359 F. Supp. 2d 1110, 1117-1122 (W.D. Wash. 2004); *National Fair Housing Alliance v. Prudential Ins. Co.*, 208 F. Supp. 2d 46, 55-59 (D.D.C. 2002); *Lindsey v. Allstate Ins. Co.*, 34 F. Supp. 2d 636, 641-643 (W.D. Tenn. 1999); *Strange v. Nationwide Mut. Ins. Co.*, 867 F. Supp. 1209, 1212, 1213-1215 (E.D. Pa. 1994). Even before the Fair Housing Amendments Act of 1988, federal district courts had so held. *See, e.g., McDiarmid v. Econ. Fire & Cas. Co.*, 604 F. Supp. 105, 107 (S.D. Ohio 1984); *Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106, 1109 (S.D. Ohio 1979).

9. 42 U.S.C. § 3604(a) (emphasis added).

10. *Nationwide*, 52 F.3d at 1360 ("[T]he availability of property insurance has a direct and immediate effect on a person's ability to obtain housing."); *Nevels*, 359 F. Supp. 2d at 1119 ("Plaintiffs…, without liability insurance, face significant financial risk, and their ability to provide housing for disabled individuals is threatened."); *American Family*, 978 F.2d at 297-298, 300 ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."); *United Farm Bureau*, 24 F.3d at 1014 n.8 ("This undoubtedly could make owning and retaining real property unavailable…."); *Lindsey*, 34 F. Supp. 2d at 641-643 (FHA prohibits discriminatory refusal to underwrite homeowner's insurance); *United States v. Mass. Indus. Fin. Agency*, 910 F. Supp. 21, 27 (D. Mass. 1996)

("Few, if any, banks make home loans to uninsured borrowers. Thus, property insurers in effect have the power to make housing unavailable to potential buyers.").

11. 42 U.S.C. § 3604(b) (emphasis added).

12. 24 C.F.R. § 100.70(d)(4).

13. *American Family*, 978 F.2d at 300-301, *cert. denied*, 508 U.S. 907 (1993) (regulation applying FHA to insurers is a valid exercise of HUD's authority); *Ojo*, 600 F.3d at 1208 (9th Cir. 2010) (en banc) (holding that "HUD's construction of the FHA is reasonable" in "prohibit[ing] racial discrimination in both the denial and pricing of homeowner's insurance"); *Nationwide* 52 F.3d at 1354, *cert. denied*, 516 U.S. 1140 (1996) (deferring to HUD's regulation in holding that "insurance underwriting practices are governed by the Fair Housing Act").

14. *See, e.g., Ojo*, 600 F.3d at 1208; *American Family*, 978 F.2d at 298; *Lindsey*, 34 F. Supp. 2d at 642-643 (claims of discrimination by insurers in setting premiums and failing to renew policies are also covered by the Fair Housing Act, even though they do not directly affect the "availability" of housing).

15. *See, e.g., United States v. Am. Family Mut. Ins. Co.* (E.D. Wis. 1995); *United States v. Nationwide Mut. Ins. Co. et al.*, No. C2-97-291 (S.D. Ohio 1997); *United States v. Erie Insurance*, Case No. 08-cv-0945 (W.D.N.Y. 2008); *United States v. GuideOne Mutual Ins. Co.*, Case No. 3:09-cv-757 (W.D. Ky. 2009), all available at *http://www.justice.gov/crt/about/hce/caselist.php*.

16. *Prudential*, 208 F. Supp. 2d at 58; *Nevels*, 359 F. Supp. 2d at 1121-1122.

17. *See* Letter from Elizabeth K. Julian, HUD Acting Ass't Secretary for Policy and Initiatives, to Richard D. Rogers, Deputy Director, Illinois Dep't of Insurance (Jan. 26, 1996) (Julian 1/26/96 Letter).

18. *See generally* R. Schwemm, *Housing Discrimination: Law and Litigation* § 10:4 (2013) (citing cases from all 11 circuits holding that the FHA allows for disparate impact liability). The most recent reaffirmation that disparate impact analysis can lead to liability under the FHA is found in *Inclusive Communities Project, Inc. v. Texas Dep't Housing and Community Affairs*, ___ F.3d ___, 2014 WL 1257127 (5th Cir. 2014).

19. *Homeowners Insurance Discrimination: Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs*, 103d Cong. 50 (1994) (stmt. of Roberta Achtenberg, Ass't Sec'y for Fair Hous. & Equal Opportunity).

20. 78 Fed. Reg. 11,460, 11461-11462 (listing examples of HUD's adjudications, published and internal guidance, and litigation in support of disparate impact (Feb. 15, 2013)).

21. 76 Fed. Reg. 70,921-70,923 and nn.11, 16 (Nov. 16, 2011).

22. *See, e.g.,* Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18,266 (Apr. 15, 1994) (available at *www.occ.treas.gov/news-issuances/ federal-register/94fr9214.pdf*). *See also* Interagency Fair Lending Examination Procedures, at Appendix 26–28 (available at *http:// www.federalreserve.gov/boarddocs/caletters/2009/0906/09-06_ attachment.pdf*). The financial regulatory agencies are the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Board of Governors of the Federal Reserve





System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration.

23. 12 C.F.R. § 202.6, n.2.

24. *See, e.g.*, *United States v. Nationwide Mut. Ins. Co. et al.*, No. C2-97-291 (Dep't of Justice Mar. 10, 1997) (consent decree) (available at *http://www.justice.gov/crt/about/hce/documents/ nationsettle.php*) (Department of Justice (DOJ) settlement with Nationwide Insurance under the Fair Housing Act eliminating age of dwelling as an underwriting criterion); *United States v. Am. Family Mut. Ins. Co.* and *NAACP v. Am. Family Mut. Ins. Co.* (Dep't of Justice July 13, 1995) (consent decree) (available at *http://www.justice.gov/crt/about/hce/documents/amfamsettle. php*) (DOJ settlement with American Family Mutual Insurance Company under the Fair Housing Act eliminating age of dwelling as an underwriting criterion); *Toledo Fair Hous. Ctr. et al. v. Nationwide Ins. Co. et al.*, 704 N.E.2d 667, 674-676 (Ohio Com. Pl. 1997) (plaintiffs survived summary judgment because Nationwide did not provide sufficient business justification in response to the racially disparate impact of age of dwelling standard demonstrated by plaintiffs' statistical expert, minimum dwelling value, and ratio of dwelling market value to replacement cost, 705 N.E. 2d 1 (Ohio Com. Pl. 1998) (settlement); *DeHoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) (credit scoring), 240 F.R.D. 269, 276 (W.D. Tex. 2007) (settlement); *Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46 (D.D.C. 2002) (market value of home, ratio between replacement cost and market value, credit scoring).

25. For a historical discussion of the intersection between race discrimination and homeowner's insurance, *see* Carol Heimer, "The Racial and Organizational Origins of Insurance Redlining," 10 *J. Intergroup Relations* 42 (1982), and Gregory Squires, "Racial Profiling, Insurance Style: Insurance Redlining and the Uneven Development of Metropolitan Areas," 25 *J. Urban Affairs* 4, 391-410 2003). For a broader discussion of the many issues surrounding race discrimination and disparate impact claims brought under the Fair Housing Act against insurers, *see* Dana Kaersvang, "The Fair Housing Act and Disparate Impact in Homeowners Insurance," 104 Mich. L. Rev. 1993 (2006).

26. "Testers" are individuals who, without an intent to purchase homeowner's insurance, pose as potential purchasers for the purpose of collecting evidence of unlawful discrimination. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). *See generally* Shanna Smith and Cathy Cloud, "Documenting Discrimination by Homeowners Insurance Companies Through Testing," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory Squires ed., Urban Institute Press 1997).

27. *See, e.g.*, Robert W. Klein, "Availability and Affordability Problems in Urban Homeowners Insurance Markets," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at pp.47–48 (identifying several non-risk-related barriers that can influence the availability and affordability of homeowners insurance in urban markets, including agent bias, prejudicial views of decisionmaking personnel, adverse selection,

agent commission structures, etc.); J. Schultz, "Homeowners Insurance Availability and Agent Location," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at p.83 (analyzing impact of agent locations on availability of insurance); Kaersvang, *supra*, n.33 at 2013–2017 (identifying several insurer business practices with a disparate impact that may not be justified by business necessity).

28. Testimony of J. Robert Hunter, former Texas Insurance Commissioner, before the US Senate Committee on Banking (quoted in D.J. Powers, "The Discriminatory Effects of Homeowners Insurance Underwriting Guidelines," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at p.119.

29. Hunter Testimony, at 125-133, 137 (identifying several common underwriting guidelines that may result in a disparate impact on protected classes).

30. G. McGiffin, "Are Underwriters Smarter Than Predictive Models?", *Insurance Innovation Reporter* (Dec. 9, 2013) (discussing improved methods of predictive modeling and suggesting that "predictive modeling and statistical analysis might replace heuristics-based analysis that has long been the standard practice in underwriting"), available at *http://iireporter.com/ are-underwriters-smarter-than-predictive-models*.

31. Powers, *supra*, n.28, at p.121 (only nine states require the filing of underwriting guidelines. Rate filings typically do not include underwriting guidelines, which are generally considered secret and proprietary, and in most states are *not* subject to filing requirements. Birny Birnbaum, *Insurers' Use of Credit Scoring for Homeowners Insurance In Ohio: A Report to the Ohio Civil Rights Commission*, at pp.1–2, 10 (Jan. 2003) (in contrast to rate filings, underwriting guidelines are not typically filed with the Ohio Department of Insurance); *id.* at pp.15-16 (in most states, insurer changes to underwriting guidelines receive no regulatory scrutiny).

32. D. Schwarcz, "Transparently Opaque: Understanding the Lack of Transparency in Insurance Consumer Protection," 61 *UCLA Law Review* 394, 396-397, 428 (2014); *see also* Annual Report of the People's Insurance Counsel Division of the Office of the Attorney General, State of Maryland, at p.5 (May 2012) (a review by Maryland's Attorney General of homeowners filings containing actuarial data determined that "in most instances [the] filings did not include adequate supporting actuarial data," and even after requesting additional information "in several cases the insurers' responses were unsatisfactory."), available at *http://www.oag.state.md.us/PIC/Annual_Report_2012.pdf*.

33. For example, one historical underwriting guideline that had been used by many large insurers like Nationwide, State Farm, and Allstate prior to disparate impact challenges prohibited the sale of dwelling replacement coverage insurance on dwellings whose "market value" was significantly less than their replacement cost. But in fact the insurers rarely retained any information on market values of homes, or any data showing higher rates of loss as the gap widened between the two values. Richard J. Ritter, "Racial Justice and the Role of the U.S. Department of Justice in Combating Insurance Redlining," in



*Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at p.197. Moreover, the determination of "market value" was subjective, not subject to uniform standards, and was usually discarded. *Id. See also id.* at p.208 (the presumption that older homes pose higher risks may or may not be supported by the insurer's loss data).

34. *See supra* n.24.

35. D. Light, *Transforming Underwriting: From Risk Selection to Portfolio Management*, at pp.7, 12 (Celent, March 2004), available at *http://www.edmblog.com/weblog/files/insurance_transforming_underwriting_celent_up.pdf*.

36. McGiffin, *supra* n.30.

37. 978 F.2d 287 (7th Cir. 1992).

38. *See also* Klein, *supra* n.27 at p.73 (after studying a large data-set made available by the National Association of Insurance Commissioners, the author concludes that "the indicated relationship between race and the availability of insurance persists, *even imperfectly controlling for the risk of loss*."); Ritter, *supra* n.33 at p.198 ("[I]nsurers may not have previously analyzed their loss experiences" in order to explain disparities in market share between minority neighborhoods and white neighborhoods).

39. E. Frees, G. Meyers, and A. Cummings, "Predictive Modeling of Multi-Peril Homeowners Insurance," *Variance*, Vol. 6, No. 1, at p.12 (Casualty Actuarial Society 2012), available at *http://www.variancejournal.org/issues/?fa=article&abstrID=6918*.

40. *Id. See also* "How Predictive Modeling Has Revolutionized Insurance," *Insurance Journal*, June 18, 2012 (proposing the way actuaries can improve loss prediction by using more refined data analysis, for both pricing and under-writing), available at *http://www.insurancejournal.com/news/national/2012/06/18/251957.htm*; 2013 Insurance Predictive Modeling Survey (Nov. 4, 2013) (reporting survey results indicating only 37 percent of homeowners insurers use predictive analytics), available at *http://news.advizorsolutions.com/index.php/insurance-industry-must-make-investments-in-predictive-analytics*.

41. *http://www.casact.org/professionalism/standards/princip/sppcrate.pdf* at p.4. *See also* S. Dane, "The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories," 24 *J. Ins. Reg.* 21, 24–27 (2006) (discussing aspects of the homeowners insurance ratemaking function that allow for subjective and nonactuarial judgments, including but not limited to the delineation of rating territory boundaries).

42. *See, e.g.*, M. Miller and M. Golden, *Introduction to Price Optimization*, at Slides 7 and 10 (listing certain Competitive Adjustments that are often made to indicated loss costs during the rate setting process), available at *http://www.naic.org/documents/committees_c_d_auto_insurance_study_group_140317_materials.pdf*.

43. 24 C.F.R. § 100.500.

44. 24 C.F.R. § 100.500(b). Once this showing is made, a plaintiff may still prevail if he or she can prove that the legitimate nondiscriminatory business interests supporting the challenged

practice could be served by another practice that has a less discriminatory effect. 24 C.F.R. § 100.500(c).

45. *Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374–375 (6th Cir. 2007). *See also Prudential*, 208 F. Supp. 2d at 60 (insurers' ability to assess risk on legitimate grounds is preserved in light of the "business justification" element of disparate impact analysis).

46. Julian 1/26/96 Letter, *supra* n.17.

47. The McCarran Ferguson Act, 15 U.S.C. §§ 1011–1015, generally reverse preempts any law of Congress, not specifically related to insurance, that will "invalidate, impair, or super-sede" state insurance codes. It has generally not prevented the enforcement of the federal Fair Housing Act because in almost all cases the courts have determined that the Act is "consistent with" the state law in which the claim arose. *See* cases cited *supra* n.8. *But see Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) (McCarran Ferguson reverse preempts disparate impact pricing claims in Missouri, but not necessarily claims of intentional discrimination).

48. *See, e.g.*, R. Schwemm, *Housing Discrimination: Law and Litigation* § 10:6 (2013) (plaintiff's *prima facie* case in a disparate impact case "should generally focus on the relative impact of the defendant's policy on the local population"); S. Dane, Disparate "Impact Analysis in the Mortgage Lending Context," 115 *Banking L.J.* 900, 904–905 (1998) (defining the appropriate comparison populations is critical to proper disparate impact analysis).

49. *See, e.g.*, Klein, *supra* n.27 at p.52 (using demographic data at the zip code level to measure differences in affordability and availability of insurance based on neighborhood racial composition); Ritter, *supra* n.33 at p.199 (analysis of loss data and loss ratios by census tract permits an assessment of the extent to which losses influence an insurer's market share).

50. *See* Kaersvang, *supra* n.33 at 2013 ("If accurate classification of risk is as important to the insurance business as insurers claim, it seems unlikely that insurers would rely on risk-assessment factors without knowing how those factors correlate to risk.").

51. *See* 42 U.S.C. § 3610(f) (allowing HUD to certify any state agency for referrals of complaints when the agency enforces fair housing rights that are "substantially equivalent" to the Fair Housing Act), list of equivalent state jurisdictions available at *http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/partners/FHAP/equivalency*.

52. Cal. Gov't Code § 12955.8; N.C. Gen. Stat. § 41A-5(a)(2); D.C. Code § 2-1401.03. The Attorneys General from six states submitted a joint comment during HUD's rulemaking that commended disparate impact as "squarely aligned" with their states' interests in removing barriers to fair housing.

53. *See, e.g.*, *Com'n on Human Rights & Opportunities v. Sullivan Associates*, 250 Conn. 763, 792–793 (1999); *Saville v. Quaker Hill Place*, 531 A.2d 201, 205–206 (Del. 1987); *Bowman v. City of Des Moines Mun. Housing Agency*, 805 N.W.2d 790, 798–799 (Iowa 2011); *Malibu Investment Co. v. Sparks*, 996 P.2d 1043, 1050–1051 (Utah 2000); *State Civ. Rights Com'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000) (*dicta*).

004414





54. 704 N.E. 2d 667 (C.P. Ohio 1997).

55. 704 N.E. 2d at 671.

56. *See, e.g.*, *Ojo*, 600 F.3d at 1208 (9th Cir. 2010) (the FHA allows disparate impact claims against insurers "in both the denial and pricing of insurance;" but McCarran Ferguson analysis must then be applied for the specific state in which the claim arose).

57. *International Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 340 n.20 (1977). *See, e.g.*, *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (whether a practice bears more heavily on one race than another provides "an important starting point" for determining whether discriminatory intent was a motivating factor); *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 190 (5th Cir. 1983) (gross statistical disparities, standing alone, may justify an inference of discriminatory motive).

58. *See, e.g.*, *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233–236 (8th Cir. 1976); *Jordan v. Dellway Villa of Tenn., Ltd.*, 661 F.2d 588, 589–590 (6th Cir. 1981); *Mayor of Baltimore v. Wells Fargo Bank,*

*N.A.*, 2011 U.S. Dist. LEXIS 44013, at n.4 (D. Md. 2011); *DeKalb County v. HSBC N. Am. Holdings*, 2013 U.S. Dist. LEXIS 185976 (N.D. Ga. 2013).

59. *Prudential*, 208 F. Supp. 2d at 60; *Dehoyos*, 345 F.3d at 297 n.5.

60. *Prudential*, 208 F. Supp. 2d at 60.

61. *DeHoyos*, 345 F.3d at 297 n.5.

62. *Dehoyos* at 299, n.7.

63. *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992).

64. *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992). *See generally* Kaersvang, *supra* n.33 at pp.2010–2011 (discussing the way empirical evidence undermines the argument that risk assessment by insurers differs from other risk assessment by lenders and others).

65. 978 F.2d at 290.

66. 978 F.2d at 290.






**PCI**

**Property Casualty Insurers**
**Association of America**

Advocacy. Leadership. Results.

ROBERT GORDON
SENIOR VICE PRESIDENT
POLICY DEVELOPMENT AND RESEARCH

September 25, 2014

The Honorable Julian Castro, Secretary
The Honorable John Trasviña, Assistant Secretary
U.S. Department of Housing and Urban Development
451 17th Street, S.W.
Washington, DC 20410

Dear Secretary Castro and Assistant Secretary Trasviña:

On September 4, 2014, the United States District Court for the Northern District of Illinois issued the enclosed Memorandum Opinion and Order granting in part the motion for summary judgment filed by Property Casualty Insurers Association of America ("PCI") in *Property Casualty Insurers Association of America v. Donovan*, No. 13-8564. The Court remanded the case to HUD for further proceedings.

In its opinion, the Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in its Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. The Court further directed HUD to explain why application of its Rule to homeowners insurance did not violate the filed-rate doctrine, which forbids courts from invalidating or modifying rates that have been filed with regulatory agencies. *Id.* at 43. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It noted that HUD's previous response to comments raising this issue was inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

PCI intends to submit additional comments to HUD to address the issues identified in the Court's order. If there is a deadline for submitting comments, please let me know.

Additionally, PCI requests that HUD re-open the public comment period to inform others that the Agency expects to fully consider the complex issues presented by application of the Disparate Impact Rule to homeowner's insurance. The case-by-case application of disparate impact liability to insurers presents significant legal and compliance uncertainty, subjects insurers to conflicting regulatory requirements, imposes significant expenses on the property and casualty industry, and interferes with State regulation of insurance. We respectfully suggest that HUD should solicit public comments on this important issue.

September 25, 2014
Page 2

Please contact me at (202) 639-0490 or Robert.Gordon@pciaa.net if you have any questions or information.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

cc:    Helen R. Kanovsky
       Jeanine Worden
       Kyle R. Freeny

**Property Casualty Insurers** Association of America
444 North Capitol Street NW, Suite 801, Washington, DC 20001-1508

# PCI

CAP DISTRICT
MD 207
26 SEP '14
PM 2 L

Hasler
09/26/2014
US POSTAGE $000.48°
FIRST-CLASS MAIL
ZIP 20001
011D12503836

To:

Ms. Helen R. Kanovsky
U.S. Department of Housing and Urban
Development
451 17th Street, S.W.
Washington, DC 20410

10110

204103

004418

No. 13-1371

# In the Supreme Court of the United States

---

TEXAS DEPARTMENT OF HOUSING
AND COMMUNITY AFFAIRS, *et al.*,

*Petitioners*,

v.

THE INCLUSIVE COMMUNITIES PROJECT, INC.,

*Respondent*.

---

*On Writ of Certiorari to the United States
Court of Appeals for the Fifth Circuit*

---

**BRIEF OF *AMICI CURIAE* NATIONAL FAIR HOUSING
ALLIANCE, CENTER FOR COMMUNITY SELF-HELP,
AND HOPE ENTERPRISE CORPORATION
IN SUPPORT OF RESPONDENT**

---

Morgan Williams
  *General Counsel*
National Fair Housing
Alliance
1101 Vermont Ave., N.W.
Suite 710
Washington, D.C. 20005
(202) 898-1661
mwilliams@nationalfairhousing.org

John P. Relman
  *Counsel of Record*
Sasha Samberg-Champion
RELMAN, DANE &
COLFAX PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
jrelman@relmanlaw.com

*Counsel for Amici Curiae*

---

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

i

## TABLE OF CONTENTS

STATEMENT OF INTEREST . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.  Disparate Impact Analysis Has
    Been Integral to the Fair Housing Act's
    Success . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    1. Fairer Standards in Lending . . . . . . . . . . 6

    2. The Transformation of the Property
       Insurance Industry . . . . . . . . . . . . . . . . . 10

    3. Refusal to Make Home Loans for Row
       Houses . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    4. Lessons Learned . . . . . . . . . . . . . . . . . . . 15

II. Compliance With the Fair Housing Act
    Requires Only Sharpened Thinking
    About Policies, not Racially Engineered
    Outcomes . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    1. A Potential Defendant Can Avoid
       Liability Without Adopting Race-
       Conscious Policies . . . . . . . . . . . . . . . . . 19

    2. Disparate Impact Doctrine Promotes
       Individualized Consideration and
       Entrepreneurial Thinking . . . . . . . . . . . 25

III. Disparate Impact Claims Complement
     Discriminatory Treatment Claims Rather
     Than Adding to the Burden of Litigation . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ii

# TABLE OF AUTHORITIES

## CASES

*Betsey v. Turtle Creek Assocs.*,
  736 F.2d 983 (4th Cir. 1984) . . . . . . . . . . . . . . . 23

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) . . . . . . . . . . . . . . . . . . . . . . 17

*Huntington Branch, N.A.A.C.P. v. Town of
  Huntington*, 844 F.2d 926 (2d Cir. 1988),
  *aff'd*, 488 U.S. 15 (1998) . . . . . . . . . . . . . . . 30, 31

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . 21

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . 21

*Nat'l Fair Hous. Alliance v. Prudential Ins.*,
  208 F. Supp. 2d 46 (D.D.C. 2002) . . . . . . . . . . . 11

*Parents Involved in Cmty. Sch. v. Seattle Sch.
  Dist. No. 1*,
  551 U.S. 701 (2007) . . . . . . . . . . . . . . . . . . . . . . 32

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) . . . . . . . . . . . . . . . . . . . . . . 20

*Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*,
  704 N.E.2d 667 (Ct. C.P. Ohio 1997) . . . . . . . . . 10

*Watson v. Fort Worth Bank & Trust*,
  487 U.S. 977 (1988) . . . . . . . . . . . . . . . . . . . . . . 29

## STATUTES

42 U.S.C. § 3601 . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

iii

## REGULATIONS

24 C.F.R. § 100.50 . . . . . . . . . . . . . . . . . . . . . . . . . . 21

24 C.F.R. § 203 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## OTHER AUTHORITIES

David Bornstein, *'Invisible' Credit? (Read This Now!)*, N.Y. Times (Oct. 2, 2014) . . . . . . . . 27, 28

Ann Carrns, *Paying The Rent On Time Can Enhance Your Credit Report*, N.Y. Times (Feb. 4, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Consent Decree in *United States v. Nationwide Mut. Ins. Co.*, C2-97-291 (S.D. Ohio Mar. 10, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Stephen M. Dane, *Race Discrimination Is Not Risk Discrimination: Why Disparate Impact Analysis Of Homeowners Insurance Practices Is Here To Stay*, 33 No. 6 Banking & Fin. Servs. Pol'y Rep. 1 (June 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fair Housing Enforcement – Occupancy Standards: Notice of Statement of Policy*, 63 Fed. Reg. 70,982 (Dec. 22, 1998) . . . . . . . . . . . . . . . . . 23, 24

Susan Wharton Gates, et al., *Automated Underwriting in Mortgage Lending: Good News For The Underserved?*, 13 Housing Policy Debate 369 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kenneth R. Harney, *Discriminating Lenders, Or Just Discrimination?*, Wash. Post (May 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

iv

Melissa Hart, *Disparate Impact Discrimination: The Limits Of Litigation, The Possibilities For Internal Compliance*, 33 J. C. & U. L. 547 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Interagency Fair Lending Examination Procedures . . 8

Interagency Statement on Fair Lending Compliance and the Ability-to-Repay and Qualified Mortgage Standards Rule . . . . . . . . . . . . . . . . . . . . . . . . . 8

Rakesh Kochnar & Richard Fry, Pew Research Center, *Wealth Inequality Has Widened Along Racial, Ethnic Lines Since End Of Great Recession* (Dec. 12, 2014) . . . . . . . . . . . . . . . . . . 27

Jonnelle Marte, *The Monthly Bill That Could Save – Or Destroy – Your Credit Score*, Wash. Post (Dec. 9, 2014) . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Nat'l Comm'n on Fair Hous. & Equal Opportunity, *The Future of Fair Housing: Report of the National Commission on Fair Housing and Equal Opportunity* (Dec. 2008) . . . . . . . . . . . . 16

News Release, U.S. Dep't of Hous. & Urban Dev., *HUD Announces $100,000 Settlement Of Fair Lending Complaint Against First Indiana Bank, N.A.* (June 4, 2007) . . . . . . . . . . . . . . . . . . . 14-15

Policy Statement on Discrimination in Lending . . . 8

*Predatory Lending: Joint Hearing Before a Subcommittee of the Committee on Appropriations*, 107th Cong. (May 14, 2001) . . 13

v

Press Release: HUD, Connecticut Management Company Settle Claim Alleging Discrimination Against Families With Children (Aug. 16, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Prohibition of Property Flipping in HUD's Single Family Mortgage Insurance Programs, 68 Fed. Reg. 23,370 (May 1, 2003) . . . . . . . . . . . . . . . . . 14

Julie Scharper, *Flipping Cases Of City Homes Drop 77% Since '99, Report Says*, Balt. Sun (Mar. 23, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Gregory D. Squires, *Racial Profiling, Insurance Style: Insurance Redlining And The Uneven Development Of Metropolitan Areas*, 25 J. of Urban Aff. 391 (2003) . . . . . . . . . . . . . . . . . 10, 11

Statement In Support of Complaint of the National Fair Housing Alliance Against Allstate Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Kenneth Temkin, *et al.*, *Inside A Lender: A Case Study Of The Mortgage Application Process, in* Mortgage Lending Discrimination: A View of Existing Evidence (The Urban Institute 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Margery Austin Turner & Felicity Skidmore, *Introduction, Summary, and Recommendations*, *in* Mortgage Lending Discrimination: A View of Existing Evidence (The Urban Institute 1999) . 7

1

## STATEMENT OF INTEREST[1]

The National Fair Housing Alliance ("NFHA") is the only national organization dedicated solely to ending discrimination and ensuring equal opportunity in housing for all people.  Founded in 1988, NFHA is a consortium of more than 220 private, non-profit fair housing organizations, state and local civil rights agencies, and individuals throughout the United States.  NFHA and its members use a variety of means to accomplish the Fair Housing Act's goals of ensuring equal and fair access to housing.  Those means include education and outreach, research, public policy initiatives, and, where appropriate, enforcement actions.

NFHA and its members work with those regulated by the Act as well as those protected by it in order to increase housing opportunities for everyone.  Since 1991, NFHA has provided consulting and compliance services to real estate and housing industry professionals, including the nation's largest insurance and lending corporations, in order to help those entities comply with the Fair Housing Act and improve customer service.   NFHA helps these entities determine if their policies have an unjustified disparate impact on classes protected by the Fair Housing Act, and if so, to modify those policies to ameliorate discriminatory outcomes.  NFHA's long and varied

---

[1] Pursuant to Supreme Court Rule 37.6, *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* and its counsel made a monetary contribution to its preparation or submission.  All parties' letters consenting to the submission of *amicus* briefs have been filed with the Clerk's Office.

2

experience across the country positions it well to inform this Court as to the actual workings of the Act's disparate impact doctrine on the ground.

The Center for Community Self-Help ("Self-Help") is a family of non-profit organizations that promote ownership and economic opportunity for all. Among its other activities, Self-Help operates a network of state and federally chartered credit unions dedicated to the responsible and inclusive provision of loans and other financial services. Self-Help has intimate familiarity with the methods by which credit can be extended in a responsible manner to populations that traditionally have been denied it.

Since 1980, Self-Help has become one of the nation's largest community economic development financial institutions. It has generated over $6.5 billion in lending to families and communities throughout the nation who are underserved by traditional financial institutions.

Hope Enterprise Corporation ("HOPE") is a community development financial institution, community development intermediary, and policy center. It provides affordable financial services; leverages private, public, and philanthropic resources; and engages in policy analysis in order to fulfill its mission of strengthening communities, building assets, and improving lives in economically distressed parts of the Mid South.

Since 1994, HOPE has generated $2 billion in financing and related services for the unbanked and underbanked, entrepreneurs, homeowners, nonprofit organizations, and health care providers, and for other

3

community development purposes. Collectively, these projects have benefitted 650,000 individuals in the Mississippi Delta, Hurricane Katrina-affected areas, and other distressed communities throughout Arkansas, Louisiana, Mississippi, and Tennessee. HOPE is intimately familiar with credit and other lending practices that ensure full and equal access to responsible credit for the populations it serves.

## SUMMARY OF ARGUMENT

For four decades, the Fair Housing Act has been construed to include disparate impact liability. During that time, housing, lending, and insurance markets – once bastions of overt segregation and discrimination – have made important strides toward becoming fair and open to all. This is not a coincidence. Disparate impact doctrine has been at the very core of the Act's successes, and it must remain in effect for that progress to continue.

For example, the doctrine has fundamentally changed the culture of the lending industry. An industry that once relied on subjective assessments of potential borrowers – judgments that frequently were infected by unwitting bias or stereotypes – now relies on statistical analysis to produce policies that are both less discriminatory and more predictive of risk. Industry changes that were triggered by fear of disparate impact liability have made industry players better at their jobs. The industry has improved at identifying qualified borrowers in all neighborhoods, and it has done so without sacrificing legitimate business needs or return on investment. In accordance with the requirements of the disparate impact doctrine, the industry has learned to use a finer scalpel to

4

separate good risk from bad rather than relying on broad, categorical exclusions. It now can identify more qualified borrowers, and that means greater profit for the industry, even as populations and neighborhoods that historically have been starved of credit see greater opportunity.

Some industry players, however, continue to exclude individuals from housing, or treat some consumers differently, on the basis of unjustified categorical judgments. The disparate impact doctrine remains the best tool available to require reasoned conversations, focused on evidence, as to how to refine those policies to eliminate unnecessary discriminatory effects while still accomplishing legitimate goals.

The disparate impact doctrine imposes neither undue burden nor surprising obligations, nor does it require regulated entities to impose race-conscious policies. Rather, all entities must do is apply real scrutiny to those policies that limit the availability of housing. In short, they must get smarter and more efficient in order to be fairer.

The less discriminatory alternatives required by the doctrine permit individuals to be judged on their merit rather than excluded from housing on the basis of broad, categorical judgments. And these alternatives often prove more profitable, or otherwise beneficial to the entity adopting them, as well.

The disparate impact doctrine has contributed greatly to a productive dialogue between those regulated by the Act and those protected by it. It has permitted conversations (in litigation and otherwise) to focus on best practices rather than accusations of bad

5

motives. It has given regulated entities across the country clear and objective guidance as to their obligations, rather than having the legality of entities' practices turn on what their subjective motivations may have been. And it has motivated a variety of players to creatively and collaboratively search out less discriminatory alternatives that, not coincidentally, also make the housing, lending, and insurance industries more efficient.

In these industries, no policy decision is made in a vacuum. Any entity's practices are influenced by those of many others, as well as decades or more of past practices. Often the most discriminatory practices are also the most widespread and firmly ingrained.

It sometimes is necessary and appropriate to search for the discriminatory intent that may underlie these practices. But the disparate impact doctrine offers another, less confrontational tool that can be more productive. It focuses the conversation on solutions rather than a search for blame. That has made it a powerful and successful means of changing industry practices in ways that achieve the common goals of business and consumers: improving access to products without sacrificing profit or legitimate business needs.

## ARGUMENT

## I.    Disparate Impact Analysis Has Been Integral to the Fair Housing Act's Success

Congress enacted the Fair Housing Act against the background of systemic segregation and discrimination. It was well aware that the problems it was attacking were (and remain) deeply rooted in American society. *See* Br. for Respondent at 8. Congress said as much in

6

the Act's ambitious statement of purpose, which appears directly in the statutory text and should inform construction of its other provisions: "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The wording of this affirmative goal (which has no analog in, for example, Title VI of the Civil Rights Act of 1964) suggests that Congress intended the Act to achieve positive results – providing for fair housing – as well as to identify and to punish specific wrongdoers. And that is exactly what the Act has done. Disparate impact has been central to the Act's success up to now and remains a necessary and appropriate tool for continued enforcement of the FHA.

The following examples illustrate how the Fair Housing Act's disparate impact doctrine has led, and can continue to lead, to more refined policies that promote equal opportunity and individualized consideration – often without the need for litigation. That is because, in each case, a disparate impact analysis not only helps to identify the problem but also frames a productive conversation about the solution.

## 1. Fairer Standards in Lending

One of the greatest successes of the disparate impact doctrine – though, as yet, far from a completed project – has been the transformation of the very culture of mortgage underwriting. It once was standard practice in the lending industry to rely heavily on subjective assessments of a prospective borrower's creditworthiness. Then the industry began relying on objective underwriting criteria, but it chose those criteria using little more than assumptions and

7

crude stereotypes, such as the "redlining" by which lenders deemed entire neighborhoods unfit for credit.

Many had long seen such criteria as discriminatory. But it was difficult to systematically analyze the discriminatory results until Congress amended the Home Mortgage Disclosure Act in 1989. The amendment required banks to collect and report certain details regarding every loan application, including demographic information about prospective borrowers. Studies of that newly available data – including influential reports by the Federal Reserve Bank of Boston – soon revealed disparities in lending outcomes that could not be justified by inputs. *See* Margery Austin Turner & Felicity Skidmore, *Introduction, Summary, and Recommendations*, *in* Mortgage Lending Discrimination: A View Of Existing Evidence 1, 10 (The Urban Institute 1999) (describing "explosive effect" of Boston Fed study on industry and the "extensive soul searching" that followed), *available at* http://www.urban.org/uploadedpdf/mortgage_lending .pdf.

In response, practices changed. In the mid-1990s, the Government Sponsored Entities ("GSEs") Fannie Mae and Freddie Mac introduced their automated underwriting systems, Desktop Underwriter and Loan Prospector. These automated systems permitted any lender to evaluate prospective loans using objective criteria such as loan-to-value and debt-to-income ratios that were, at least in theory, based on sound statistical principles. These systems are evaluated for compliance with fair lending principles by the GSEs themselves, as well as by the Department of Housing and Urban Development ("HUD"). Their use quickly proved to

8

make lending decisions both more accurate and fairer. *See, e.g.*, Susan Wharton Gates, et al., *Automated Underwriting in Mortgage Lending: Good News For The Underserved?*, 13 Hous. Policy Debate 369, 383-85 (2002), http://content.knowledgeplex.org/kp2/img/cache/sem/39460.pdf (last visited Dec. 22, 2014). Meanwhile, HUD and other federal agencies that regulate mortgage lending, including the Department of Justice, issued regulatory and enforcement documents embracing the disparate impact standard in this context.[2]

Accepting and internalizing the principles underlying disparate impact analysis, leading players in the industry have refined the GSEs' automated underwriting systems. They have developed lending standards of their own – customized to reflect their unique customer bases – that more accurately and objectively separate qualified from unqualified borrowers. The result has been that credit markets, though still far from completely fair, are now more open than ever before to those traditionally shut out of credit. Meanwhile, banks have discovered that these less discriminatory criteria also work better at identifying real risk.

---

[2] *See, e.g.*, Policy Statement on Discrimination in Lending, *available at* http://www.occ.treas.gov/news-issuances/federal-register/94fr9214.pdf; Interagency Fair Lending Examination Procedures, *available at* http://www.ffiec.gov/pdf/fairlend.pdf; Interagency Statement on Fair Lending Compliance and the Ability-to-Repay and Qualified Mortgage Standards Rule, *available at* http://www.federalreserve.gov/news events/press/bcr eg/bcreg20131022a1.pdf.

9

Many leading banks have adopted a process by which they systematically search out the least discriminatory underwriting criteria that also are reliable indicators of risk. As more information about prospective borrowers becomes available, a bank may choose from a large number of potential variables to include in underwriting. Many of those variables prove to be redundant, because they are highly correlated with each other. After evaluating various combinations, a bank usually settles on a handful of factors that, collectively, are sufficiently predictive of risk.

The bank then tests that collection of variables for discriminatory impact based on race, sex, age, and other protected classifications. Should a discriminatory impact be apparent, the bank substitutes for one criterion another that is highly correlated with it, and tests again, repeating the process as necessary. Sometimes the substitution fails to ameliorate the disparity; sometimes it degrades the predictive quality of the algorithm too much. But through a highly honed and efficient statistical analysis, eventually a bank can isolate and eliminate those variables that cause unnecessary discriminatory impact, without compromising its ability to identify risk.

This process – developed as a direct result of the challenge the disparate impact doctrine posed to the lending industry – is now standard practice among major lenders. It has resulted in a fairer loan process for all borrowers and a more profitable one for banks. Those who historically have been denied loans at a disproportionate rate now have greater access. And not only have lenders fully retained their ability to identify and respond to risk, they have also expanded their

10

customer base. This offers enormous potential to increase profit. In short, the industry is better off for the rationalization of its processes required by disparate impact doctrine.

### 2. The Transformation of the Property Insurance Industry

The property insurance industry has experienced a similar transformation in its culture. Even after the Fair Housing Act banned overt refusal to insure homes in predominantly African-American communities, the industry for many years adopted exclusionary policies – not backed by evidence – that produced the same discriminatory effect.

For example, many insurers refused coverage based on highly subjective assessments of a homeowner's "pride of ownership" or "good housekeeping." *See* Consent Decree in *United States v. Nationwide Mut. Ins. Co.*, C2-97-291 (S.D. Ohio Mar. 10, 1997), *available at* http://www.justice.gov/crt/about/hce/documents/nationsettle.php. They would refuse to insure homes worth less than a certain amount, or homes of a certain age. *See, e.g., Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 704 N.E.2d 667, 674 (Ct. C.P. Ohio 1997) (describing evidence showing that minimum-value requirement excluded 83 percent of homeowners in majority African-American neighborhoods, compared with 31 percent in white neighborhoods). Or they would refuse to insure homes that were valued at less than the estimated cost to rebuild them, on the assumption (not supported by evidence) that the owners of such homes would burn them down. *See* Gregory D. Squires, *Racial Profiling, Insurance Style: Insurance Redlining And The Uneven Development Of*

11

*Metropolitan Areas*, 25 J. of Urban Aff. 391, 400 (2003); *see, e.g.*, *Nat'l Fair Hous. Alliance v. Prudential Ins.*, 208 F. Supp. 2d 46 (D.D.C. 2002).

Such distinctions could be legitimate, despite their obvious discriminatory effect, if they were, in fact, better correlated with risk than with race. But when sued under a disparate impact theory, insurers could not demonstrate any actuarial basis for these policies. Nor could they justify their decision to exclude these properties from insurance coverage altogether rather than charging rates that reflected their supposedly higher risk. Rather, the insurers simply created categorical exclusions (as well as highly subjective grounds for exclusion) that tracked their prior overt discrimination. Only when faced with disparate impact liability did the insurance industry eliminate these and other[3] discriminatory practices – and they did not face the dire consequences (such as a rash of burned-down homes) that they had feared.

---

[3] Many more examples can be given of such unreasonable restrictions. One property insurer allegedly refused to insure homes with flat roofs in one area. *See* Statement In Support of Complaint of the National Fair Housing Alliance Against Allstate Corporation (attachment to HUD complaint), *available at* http://www.nationalfairhousing.org/Portals/33/NFHA%20HUD%20Complaint%20v%20%20Allstate%20Attachment%20B.pdf. For more examples, *see* Stephen M. Dane, *Race Discrimination Is Not Risk Discrimination: Why Disparate Impact Analysis Of Homeowners Insurance Practices Is Here To Stay*, 33 No. 6 Banking & Fin. Servs. Pol'y Rep. 1 (June 2014) (collecting examples of insurance practices based not on "careful, statistical studies," but rather on "subjective stereotypes about classes of consumers and types and geographic location of property").

12

We recognize the important step forward that occurred when many insurers ceased their intentional and overt discrimination. That was a milestone on the path to a fairer society. But those whom the Fair Housing Act is meant to protect often remained excluded, regardless of the insurers' benign intentions. For the Act's intended beneficiaries, its protections would have been a dead letter without the disparate impact doctrine.

Once faced with disparate impact liability, the insurance industry, like the lending industry, significantly changed its culture. It began looking for ways to profitably offer insurance to more people, rather than looking for reasons to exclude people from coverage. That required it to develop more refined underwriting criteria that could distinguish between good and bad risk in traditionally underserved communities, sometimes in cooperation with fair housing advocates such as amici. For example, instead of categorically excluding older homes, property insurers began requiring more rigorous inspection of older heating, plumbing, and electrical systems. Any problems that turn up in such inspections often can be redressed, resulting in the improvement of older housing stock even as property insurers' legitimate concerns are met.

The bottom line is that disparate impact liability has forced the property insurance industry to become fairer, and at the same time more dynamic, creative, and profitable. There remains much work to be done to make the property insurance industry truly non-discriminatory, but considerable progress has been made in a short period of time.

13

### 3. Refusal to Make Home Loans for Row Houses

Despite the progress detailed above, unjustified and discriminatory practices continue and, in some cases, are newly instituted. A representative example is the refusal by some lenders to make home loans secured by row houses in certain urban locations. This policy, like far too many others, was enacted in response to real problems but took an overly blunt approach and, in the process, disproportionately affected people and communities of color.

The impetus for this policy was a highly publicized series of inflated appraisals. Dilapidated row houses in areas with lower home values (and with predominantly African-American residents) were fraudulently assigned values comparable to better-maintained row houses in wealthier areas. These improper comparisons generated artificially high appraised values, facilitating the "flipping" of these row houses at inflated prices. Inexperienced homebuyers were targeted by predatory sellers and found themselves stuck with purportedly renovated dwellings that proved uninhabitable. *See, e.g.*, *Predatory Lending: Joint Hearing Before a Subcommittee of the Committee on Appropriations*, 107th Cong. (May 14, 2001), *available at* https://bulk.resource.org/gpo.gov/hearings/107s/85218.txt.

In response, many industry players joined forces and took effective steps to crack down on this practice, including prosecuting wrongdoers, educating prospective homebuyers, and reforming lending

14

guidelines.[4]   As a result, appraisal fraud in the communities in question plummeted.  *See* Julie Scharper, *Flipping Cases Of City Homes Drop 77% Since '99, Report Says*, Balt. Sun (Mar. 23, 2006), http://articles.baltimoresun.com/2006-03-23/news/0603230009_1_flipping-predatory-lending-homebuyers (last visited Dec. 22, 2014).

Nonetheless, certain lenders took a blunter and more exclusionary approach:  they simply stopped making loans secured by row houses.  Thus, the same predominantly African-American communities victimized by the fraudulent appraisals now faced difficulty in buying or selling their homes.  This refusal persisted years after the less discriminatory alternatives described above were implemented and the reports of widespread appraisal fraud diminished.  *See* Kenneth R. Harney, *Discriminating Lenders, Or Just Discrimination?*, Wash. Post (May 19, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/05/18/AR2007051800742.html (last visited Dec. 22, 2014).  Only when faced with litigation under a disparate impact theory did the lenders in question agree to drop their no-row-houses policy.  *See, e.g.*, News Release, U.S. Dep't of Hous. & Urban Dev., *HUD Announces $100,000 Settlement Of Fair Lending*

---

[4] For example, the Federal Housing Administration promulgated a rule imposing stringent requirements on those properties resold within 180 days after purchase at more than twice the original price.  Such sales now require documentation explaining how improvements to the property justify the increased price.  *See* Prohibition of Property Flipping in HUD's Single Family Mortgage Insurance Programs, 68 Fed. Reg. 23,370 (May 1, 2003) (codified at 24 C.F.R. § 203).

15

*Complaint Against First Indiana Bank, N.A.* (June 4, 2007), http://archives.hud.gov/news/2007/pr07-080.cfm (last visited Dec. 22, 2014).

The no-row-house policy demonstrates how many industry players, if not required to do otherwise, will continue to employ shortcuts instead of precise solutions, and, in the process, cause discriminatory results. The lenders in question confronted a real problem that did correlate to rowhouses in certain underserved areas. But the problem was not the rowhouses.

The lenders could instead have focused on the actual problem, which was that the combination of poor underwriting practices and unreliable appraisals left them too often with loans in default and collateral that turned out to be worthless. Once the appraisal concern was resolved, they could have improved their loan products and underwriting policies to reduce the risk of default. They could have employed some of same measures that the Federal Housing Administration used to ensure the value of the collateral. These alternative solutions would more directly address the problem without unnecessarily excluding vulnerable and underserved populations from housing and lending opportunities. The disparate impact doctrine simply requires a good-faith effort at more precise solutions, rather than a blanket ban on service to those who live in a broad class of properties.

### 4. Lessons Learned

These experiences have important implications for this Court's analysis. Petitioners and their amici rely heavily on the notion that applying disparate impact

16

analysis to housing, lending, and insurance decisions is a novel concept that will degrade decision-making. Implicit in their briefs is the assumption that industry requirements and processes are carefully calibrated to distinguish between qualified and unqualified candidates. *See, e.g.*, AIA Br. at 15 (assuring this Court that insurers never "discriminate among insureds based on factors that not are legitimately related to risk"). As the discussion above makes clear, the views of petitioners and their amici are mistaken in two ways.

First, many entities continue to exclude people based on overbroad generalizations. Entities pursuing legitimate objectives still employ imprecise classifications, based on stereotypes or hunches rather than sound data, and in doing so unnecessarily disqualify people who disproportionately are of color. It is, unfortunately, not rare to find that decisions that exclude people from housing or provide it on inferior terms still are based on received wisdom or sloppy thinking that cannot withstand close scrutiny. Inevitably these unexamined hunches about what "just makes sense" are influenced by this country's long history of intentional, institutionalized discrimination and housing segregation. *See, e.g.*, The Nat'l Comm'n on Fair Hous. & Equal Opportunity, *The Future of Fair Housing: Report of the National Commission on Fair Housing and Equal Opportunity* 6-9 (Dec. 2008) (summarizing some of this history), *available at* http://www.nationalfairhousing.org/Portals/33/report s/future_of_fair_Housing.pdf.

17

Present-day actors, often without awareness that they are doing so, thus perpetuate past discrimination through requirements and processes that achieve their stated goals only imprecisely (at best). They may honestly believe their methods are sound until confronted with evidence of unjustified discriminatory impact. *See, e.g.*, Kenneth Temkin, *et al.*, *Inside A Lender: A Case Study Of The Mortgage Application Process*, *in* Mortgage Lending Discrimination, *supra*, at 145-49. Sometimes the requirements causing discriminatory effects are of recent vintage. Other times they are vestiges of past discrimination that linger on, unexamined, long after those who instituted them have passed from the scene. For just that reason, this Court has long recognized that disparate impact doctrine is essential with respect to practices that "operate to 'freeze' the status quo of prior discriminat[ion]." *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971). If not scrutinized, the housing practices of today have a tendency to reproduce the effects of those of yesterday.

Second, it is now well established that, far from degrading the quality of decision-making, disparate impact analysis improves it. To the extent that the housing, lending, and insurance industries have become fairer and more efficient in recent years – and they have – the disparate impact doctrine, and the principles underlying it, have driven much of that progress.

While entities should re-examine their exclusionary policies on a regular basis as a matter of sound practice, experience teaches us that they often require prodding to do so. The disparate impact doctrine has

18

performed that function. It has given entities an incentive to internalize fair housing principles and critically evaluate their own policies. It also has given them a vocabulary to assess the propriety of their policies – both internally and with outsiders – without charging anyone with discriminatory intent and with an eye toward constructive solutions. In short, disparate impact analysis has not simply been a vehicle for litigation; it has been a mechanism for obviating the need for litigation and improving the performance of the free market. *Cf.* Melissa Hart, *Disparate Impact Discrimination: The Limits Of Litigation, The Possibilities For Internal Compliance*, 33 J. C. & U. L. 547 (2007) (describing how the greatest success of Title VII's disparate impact doctrine has not been in litigation, but rather through motivating employers to voluntarily make workplaces more equitable), *available at* http://www.stetson.edu/law/academics/highered/home/media/2007/DisparateImpact.pdf.

## II. Compliance With the Fair Housing Act Requires Only Sharpened Thinking About Policies, not Racially Engineered Outcomes

It is not nearly so burdensome to comply with the Fair Housing Act's disparate impact doctrine as petitioners and their amici suggest. In particular, such compliance does not "effectively compel entities to engage in race-conscious decision-making in order to avoid legal liability." Texas Br. at 43. This assertion confuses a potential defendant's obligations outside of litigation with a plaintiff's initial burden once disparate impact litigation commences.

19

In reality, to avoid disparate impact liability, an entity need only ensure that policies that exclude individuals from housing do so fairly and precisely. It need only avoid relying on the overbroad and unexamined grounds for exclusion that too often are little more than a proxy for race or other protected classifications.

By requiring greater precision in decision-making, the doctrine safeguards the right to be treated as an individual rather than as a member of an unjustly disfavored class. And it serves not only fairness, but also the economy as a whole, by unleashing creative and entrepreneurial thinking and encouraging collaboration among multiple stakeholders.

### 1. A Potential Defendant Can Avoid Liability Without Adopting Race-Conscious Policies

A prospective defendant's compliance obligations outside of litigation necessarily are informed by, but are not co-extensive with, the standards for prevailing at various stages of disparate impact litigation. The decision below, following the guidance of the Department of Housing and Urban Development's regulation, properly articulated a three-part burden-shifting process for adjudicating disparate impact claims before remanding for the district court to assess in the first instance whether plaintiff had made out a claim.

No court has applied that process in this case (which began, and was litigated for a long while, solely as a discriminatory treatment claim, see Br. for Respondent at 25-27 (describing summary judgment

20

briefing focused on allegations of intentional discrimination)).  But if properly applied, the process works quite differently from Texas's description of it. Texas errs in describing disparate impact litigation as requiring an initial finding of liability based solely on impact followed by the adjudication of an affirmative defense based on justification.  *See* Tex. Br. at 12.  In reality, there is no finding of liability at all unless and until a plaintiff shows not only that a policy has a disparate impact, but also that the policy is unnecessary.

A plaintiff bears the initial burden of demonstrating that a specific policy of the defendant results in a substantial discriminatory impact.  It is not sufficient for a plaintiff to complain about an unfortunate outcome and call on the defendant to do something about it; rather, the plaintiff must challenge a specific practice that causes that outcome, in order to start a productive conversation about whether that practice is justified and necessary.[5]  *See Ricci v. DeStefano*, 557 U.S. 557, 581 (2009) (discarding test results because of racial disparities in outcomes without finding the test itself deficient would "amount to a *de facto* quota system").  Nor is it sufficient for a plaintiff to point to a trivial disparity, or one that can be explained without reference to any policy of the defendant.

---

[5] For example, it is insufficient for a plaintiff to allege that housing projects are approved more often in some neighborhoods than in others.  That is an outcome, not a policy.  If there exists an explicit policy to achieve that outcome, of course, that may amount to intentional discrimination.

21

If a plaintiff can identify a specific practice that does cause a substantial discriminatory impact, the defendant then must articulate a legitimate interest that the challenged policy furthers. Finally, in order to prevail, the plaintiff bears the ultimate burden of demonstrating that the defendant can achieve that legitimate interest through an alternative approach that reduces or eliminates the discriminatory effect. *See* 24 C.F.R. § 100.50.

This burden-shifting approach is based upon, and resembles, the *McDonnell Douglas* burden-shifting that this Court has adopted for intentional discrimination claims. Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny, as under disparate impact doctrine, a plaintiff challenging a policy must first demonstrate that the policy has a discriminatory effect.[6] *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). The defendant must then articulate a legitimate reason for that policy, and the plaintiff then bears the ultimate burden of showing that the proffered reason is pretextual and that the real reason is discriminatory.

As this comparison with the *McDonnell Douglas* framework demonstrates, the burdens the parties bear at various stages in litigation should not be confused with the ultimate question or a prospective defendant's obligations to avoid liability. With respect to intent claims, the plaintiff bears almost precisely the same

---

[6] The first step in the *McDonnell Douglas* analysis is somewhat different when the plaintiff challenges an individual employment action as opposed to a larger policy of the type that would be at issue in a disparate impact claim.

22

burden at step one (of showing discriminatory impact), yet no one contends that an entity accordingly must use race-conscious decision-making to avoid liability. Rather, an entity's compliance obligations are shaped by steps two and three of the analysis. To avoid discriminatory intent liability, it must ensure that each policy is actually motivated by a legitimate, non-discriminatory rationale.

To avoid disparate impact liability, an entity likewise should focus on the second and third steps of the disparate impact burden-shifting process. An entity first should ensure that each policy that excludes people from housing opportunities (*e.g.*, requirements for obtaining a loan or a rental apartment) is justified by a legitimate business purpose and demonstrates validity in operation (*e.g.*, it is accurate and predictive in identifying risk). It then should ensure that it is not foregoing an alternative policy that could achieve that purpose with less discriminatory impact.

So long as the entity follows these steps, it has nothing to fear in litigation, no matter what impact its policies have. The disparate impact doctrine will never bar it from accomplishing legitimate ends. And its compliance burden is a slight one that largely overlaps with what would be, in any event, sound business practice.

Nor does the disparate impact doctrine leave regulated entities particularly uncertain as to what their obligations are. Disparate impact doctrine focuses on objective practices rather than subjective intent. Court rulings and agency statements therefore can provide clear guidance as to whether a practice is permissible. Industry groups, housing advocates, and

23

others can work together to formulate practices that will survive scrutiny everywhere.

For example, HUD guidance has made clear what factors a landlord must consider in determining how many people may occupy an apartment. Before this guidance, many landlords imposed arbitrary and unnecessarily restrictive limits (such as permitting no more than one person per bedroom) that ran afoul of the Fair Housing Act's ban on discrimination against families with children. Congress added this protected class in the 1988 amendments, as evidence mounted that banning families with children has a discriminatory effect on African Americans, who are more likely to continue renting after having children, as well as on women. *See, e.g.*, *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984) (no-child policy resulted in building evicting 75 percent of people of color, compared with 26 percent of white residents). In 1991, HUD's General Counsel issued guidance to all regional offices as to what occupancy standards had an unjustifiable disparate impact on this new protected class. HUD later reaffirmed these standards by official notice. *See Fair Housing Enforcement – Occupancy Standards: Notice of Statement of Policy*, 63 Fed. Reg. 70,982 (Dec. 22, 1998).

HUD made clear that building owners and others usually could permissibly limit occupancy to two people per bedroom (but not to fewer), but could only impose such limits after carefully ensuring that they were necessary given the residence in question and the age of the residents. A family of five might comfortably live in a spacious two-bedroom apartment – particularly one with a den or study that could function as a

24

bedroom – but not a mobile home with two bedrooms. Similarly, an infant might permissibly share a bedroom with its parents, whereas a teenager might not. 63 Fed. Reg. at 70,985. The relevant factors thus are clearly enough defined that landlords should have little trouble determining whether it is appropriate to impose a two-person-per-bedroom limit, though regrettably many landlords pay the HUD guidance no heed.[7] So long as a landlord follows the HUD guidance, it can be confident that it is applying the less discriminatory alternative required by the disparate impact doctrine.

The disparate impact doctrine thus lends itself to the development of clear standards and agency guidance, as controversies over the legitimacy of certain practices are quickly resolved one way or the other.[8] By contrast, it is difficult to say in advance

---

[7] For example, one management company recently evicted a family of five from the 1464-square-foot apartment with two bedrooms and a den/study that the family had occupied for almost a decade. In settling a complaint against the company, HUD reiterated the obligation to take into account the size and characteristics of the property before limiting occupancy. *See* Press Release: HUD, Connecticut Management Company Settle Claim Alleging Discrimination Against Families With Children (Aug. 16, 2013), http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2013/HUDNo.13-124 (last visited Dec. 22, 2014).

[8] This will likely prove true for today's emerging controversies, such as claims that apartment buildings act improperly in imposing "blanket bans" on residents with any criminal history, no matter how old, minor, or otherwise irrelevant to a prospective tenant's ability to meet the qualifications of tenancy. *Cf.* Texas Br. at 47-48 (pointing to EEOC guidance on use of criminal history in employment decisions); National Leased Housing Assn. Br. at 15-

25

whether an intentional discrimination claim will succeed against a given practice. The same practice may give rise to liability or not depending on what evidence regarding intent emerges during litigation.

## 2. Disparate Impact Doctrine Promotes Individualized Consideration and Entrepreneurial Thinking

The less discriminatory alternative usually is one that features more individualized decision-making rather than exclusion pursuant to overly broad categorical judgment. Far from requiring race-conscious decision-making, these solutions thus ensure that each individual can be considered fairly on the merits. Once individuals are given such consideration, entities remain free to exclude them for valid reasons. In fashioning the grounds for exclusion, entities simply must use a finer scalpel.

Thus, petitioners and their amici have it precisely backwards in contending that disparate impact analysis "is fundamentally outcome-oriented," AIA Br. at 10, or that it "strikes at the heart of the concept of fair discrimination," *id.* at 21. To the contrary: the disparate impact doctrine requires entities to

---

17 (describing problems posed by screening for criminal history). We are sympathetic to such claims, as the bans in question disproportionately exclude people of color, and apartment buildings can achieve their legitimate objectives with more finely-tuned policies that have a less discriminatory sweep. But the larger point is that, one way or the other, this issue can be resolved quickly, including through litigation and agency guidance, leaving apartment buildings on notice as to whether engaging in this practice exposes them to liability.

26

substitute *fair* discrimination for *unfair* or irrational discrimination.

The disparate impact doctrine has encouraged various entities to take a hard look at unexamined assumptions and to think creatively about better solutions. In doing so, it has unleashed considerable entrepreneurship. The result is good for business, good for consumers, and good for the economy.

A current example is the ongoing development of creative, less discriminatory refinements to the widely used credit score formulas. Those extending credit – whether for home loans, credit cards, or the like – have long relied on "credit scores," numbers that purport to measure how likely the prospective borrower is to make regular and timely debt payments.

Without question, it is legitimate and proper for those extending credit to rely on such an assessment; indeed, a uniformly applied formula for measuring creditworthiness is far preferable to subjective and discretionary assessments. But in practice, credit scores have taken into account only a small amount of the information that now is available. As a result, they have perpetuated the results of past denial of credit and other financial opportunities to certain communities.

For example, the major credit scoring companies traditionally have counted as positive events only the repayment of conventional credit. They have treated as non-events the regular and timely payment of other recurring expenses, such as utility and phone bills (though they do note the non-payment of those bills as negative events). In particular, they have ignored the

27

regular and timely payment of rent, even as they give great weight to almost identical mortgage payments. *See, e.g.*, Jonnelle Marte, *The Monthly Bill That Could Save – Or Destroy – Your Credit Score*, Wash. Post (Dec. 9, 2014), http://www.washingtonpost.com/news/get-there/wp/2014/12/09/the-monthly-bill-that-could-save-or-destroy-your-credit-score/ (last visited Dec. 22, 2014).

The result has been a vicious circle: it is difficult to qualify for credit unless one already has access to it or one's family has the wealth to secure credit despite a poor personal credit score, which is much less common for families of color than for white families.[9] Accordingly, communities that long have been excluded from opportunities to secure credit or build wealth remain shut out. Millions of people – disproportionately people of color – have good income and pay their bills on time every month, yet are considered "subprime" borrowers by official measures. These "credit invisibles" pay significantly higher rates for loans, if they can secure conventional loans at all. They are impaired in their ability to buy a house or a car, or to get a small-business loan to start an enterprise. *See* David Bornstein, *'Invisible' Credit? (Read This Now!)*, N.Y. Times (Oct. 2, 2014), http://opinionator.blogs.nyt

---

[9] A recent study found that the median white family has 13 times the net worth of the median African-American family. See Rakesh Kochnar & Richard Fry, Pew Research Center, *Wealth Inequality Has Widened Along Racial, Ethnic Lines Since End Of Great Recession* (Dec. 12, 2014), http://www.pewresearch.org/fact-tank/2014/12/12/racial-wealth-gaps-great-recession/ (last visited Dec. 22, 2014).

28

imes.com/2014/10/02/invisible-credit-read-this-now/?_r=0 (last visited Dec. 22, 2014).

While this situation is regrettable, it does not represent a Fair Housing Act violation unless a less discriminatory alternative is available. Until recently, there was a good reason for not considering consistent rental payments in credit scores: such payments were not reported.

Now, multiple companies are developing mechanisms by which this information will reach credit scorers. One of the major credit scorers is creating a tool through which property managers can report rent payments. *See supra* Marte, *Monthly Bill*. Other companies are competing to create tools by which renters themselves can report their payments. *See* Ann Carrns, *Paying The Rent On Time Can Enhance Your Credit Report*, N.Y. Times (Feb. 4, 2014), http://www.nytimes.com/2014/02/04/your-money/paying-the-rent-on-time-can-enhance-your-credit-report.html?_r=0 (last visited Dec. 22, 2014).

Disparate impact doctrine has helped create the environment in which such innovation can flourish. It has fostered a data-driven culture that thrives on better information and fairer measurements. And it creates a marketplace for such innovations, because alternatives that are proven to be effective but less discriminatory must be adopted. The disparate impact standard thus is a dynamic one that both responds to and shapes technological developments.

29

### III. Disparate Impact Claims Complement Discriminatory Treatment Claims Rather Than Adding to the Burden of Litigation

Of course, there sometimes will be good-faith disagreements about whether a policy with substantial discriminatory effects is truly necessary or whether a proposed alternative is sufficiently effective. There also, unfortunately, will always be entities that make little or no effort to comply with their Fair Housing Act obligations, including those based on discriminatory intent as well as those based on disparate impact. In these instances, where litigation is necessary, the disparate impact doctrine has proven to be an important tool for making the housing industry's practices more sensible as well as less discriminatory. In the process, it has not significantly added to the number of Fair Housing Act suits filed or the burden of litigating such suits.

In practice, discriminatory treatment and disparate impact claims typically are brought together. As many courts have recognized, the line between these claims can be quite thin. *See* San Francisco Br. at 26-27. They require much the same evidence, since indicia of unjustified disparate impact can be evidence of discriminatory intent, while a disparate impact claim can rely in part on evidence of attitudes and assumptions that – while perhaps not sufficient to establish that a decision was directly motivated by discriminatory animus – considerably undermines any notion that the defendant has sought and implemented the least discriminatory alternative. *See, e.g., Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 990-91 (1988) (observing that one employee's remark that

30

"teller position was a big responsibility with 'a lot of money ... for blacks to have to count'" is evidence that "may not prove discriminatory intent, but [does] suggest a lingering form of the problem that Title VII was enacted to combat").

But resolution of claims under a disparate impact theory can be simpler. It is easier for a defendant to agree that a *practice* is unnecessarily discriminatory – and to change it – than to acknowledge that a person had discriminatory intent. And the result, whether through settlement or at the end of litigation, can produce clear guidance for other players in a way that a finding that an individual had discriminatory intent cannot.

Moreover, even the most unjustifiable of rules can be difficult to challenge under a discriminatory intent theory, because often they are the product of group-think rather than an individual. Like-minded industry officials tend to simultaneously adopt similar policies. Indeed, because both the lending and insurance industries are so dependent on secondary markets, there is a powerful disincentive to exercise independent judgment and stray from conventional wisdom, no matter how based on prejudice and stereotype the prevailing attitude may be. It is often futile as well as pointless in these industries to attempt to trace a policy to *any* sort of specific intent, discriminatory or otherwise.

Accordingly, our experience teaches us that it would be counterproductive to reframe an inquiry about the objective efficacy and necessity of concrete practices into one about discriminatory motives. *Cf. Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d

31

926, 935 (2d Cir. 1988) (trial court's "insistence on probing the 'pretextual' nature of appellees' justifications" was improper because it drew analysis "away from its proper focus"), *aff'd*, 488 U.S. 15 (1998). Conversations about discriminatory impact and less discriminatory alternatives can be productive and cooperative ones in which both parties seek mutually beneficial solutions. Potential adversaries can become partners instead.

Allegations of discriminatory intent, while sometimes necessary, make such non-confrontational discussions harder. They tend to end conversations rather than begin them. And focusing on a defendant's subjective sincerity rather than its objective actions simply introduces into litigation another layer of thorny evidentiary questions and intrusive inquiries. *See* San Francisco Br. at 27-28.

That said, it is no small thing for an entity to choose to adopt or maintain policies with substantial discriminatory effects rather than substituting policies that ameliorate those effects while still accomplishing legitimate purposes. As the above discussion has made clear, those entities and industries that set out in good faith to eliminate unnecessary discriminatory effects generally find themselves able to do so. The conduct at issue in successful disparate impact litigation is not innocent or accidental.

The choice to gratuitously inflict harm on the vulnerable populations the Act is meant to protect can readily be described as some form of "discrimination." It amounts to indifference to the patterns of segregation and unequal access to housing and credit that the Fair Housing Act was meant to end. If that

32

discrimination is not intentional, then it is at least negligent, perhaps reckless. In any event, such distinctions mean little to the person on the receiving end of the discriminatory act – the Act's intended beneficiary.

* * * * *

The Fair Housing Act is justly celebrated as one of this country's landmark laws. It is no small accomplishment that intentional discrimination in housing, lending and insurance, once this country's official policy, is now outlawed. "Yet our tradition is to go beyond present achievements, however significant, and to recognize and confront the flaws and injustices that remain." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 787 (2007) (Kennedy, J., concurring).

Almost fifty years after the Act's passage, we remain a country that, in many places, is literally divided by race and color. These divisions permit the unequal opportunities of the past to be routinely maintained and recreated by seemingly neutral requirements.

These barriers to housing opportunities – some the product of animus, some of carelessness – are not insurmountable. The disparate impact doctrine has greatly advanced the purposes of the Fair Housing Act, by forcing those once content to rely on stereotypes and unexamined assumptions to, instead, make more reasoned decisions based on evidence. And it has permitted constructive dialogue between all stakeholders by turning the conversation away from accusations of discriminatory animus and toward

33

practical solutions. Experience resoundingly demonstrates that we all benefit from the sounder policies that result.

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted,

John P. Relman
  *Counsel of Record*
Sasha Samberg-Champion
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
jrelman@relmanlaw.com

Morgan Williams
  *General Counsel*
National Fair Housing Alliance
1101 Vermont Ave., N.W., Suite 710
Washington, D.C. 20005
(202) 898-1661
mwilliams@nationalfairhousing.org

*Counsel for Amici Curiae*

American Bar Association
www.supremecourtpreview.org

No. 13-1371

# In the Supreme Court of the United States

TEXAS DEPARTMENT OF HOUSING
AND COMMUNITY AFFAIRS, *et al.*,

*Petitioners*,

v.

THE INCLUSIVE COMMUNITIES PROJECT, INC.,

*Respondent.*

*On Writ of Certiorari to the United States
Court of Appeals for the Fifth Circuit*

**BRIEF OF *AMICI CURIAE* NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF COLORED PEOPLE AND
THE MILWAUKEE BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE IN SUPPORT OF RESPONDENT**

Marshall Taylor
  *Interim General Counsel*
Khyla D. Craine
  *Assistant General Counsel*
NAACP
4805 Mount Hope Drive
Baltimore, M.D. 21215

Stephen M. Dane
  *Counsel of Record*
Laura Arandes
RELMAN, DANE
  & COLFAX PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
sdane@relmanlaw.com

*Counsel for Amici Curiae*

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . iii

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.  THE FAIR HOUSING ACT PROVIDES FOR
CLAIMS OF DISPARATE IMPACT. . . . . . . . 4

II.  DISPARATE IMPACT IS CONSISTENT
WITH  SOUND  FINANCIAL  RISK
ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . 6

   A.  Far  From  Prohibiting  Legitimate  Risk
Analysis, The Disparate Impact Paradigm
Encourages It. . . . . . . . . . . . . . . . . . . . . . 6

      1.  *Past Intentional Discrimination Sets
the  Stage  for  the  Unjustified
Impediments That Continue to Limit
Equal  Access  to  Homeowner's
Insurance.* . . . . . . . . . . . . . . . . . . . . . . 8

      2.  *The "Business of Insurance" Consists
of Many Business Practices That Are
Not Actuarially Based.* . . . . . . . . . . . . 11

      3.  *Insurers  Continue  to  Engage  In
Practices  That  Result  In  Adverse
Racial  Impacts  But  Cannot  Be
Justified By Actuarial Risk.* . . . . . . . 15

ii

4. *The Disparate Impact Standard Distinguishes Between Those Aspects of the Insurance Business That Are Based On Legitimate Actuarial Considerations and Those That Are Not.* . . . . . . . . . . . . . . . . . . . . . . . . 18

B. The McCarran-Ferguson Act is Not a Universal Bar to Disparate Impact Analysis. . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

iii

# TABLE OF AUTHORITIES

## CASES

*Am. Ins. Ass'n v. U.S. Dep't of Hous. & Urban Dev., et al.,*
No. 13-00966, 2014 WL 5802283 (D.D.C. Nov. 7, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Barnett Bank of Marion Cnty. v. Nelson,*
517 U.S. 25 (1996) . . . . . . . . . . . . . . . . . . . . . . 22

*Bowman v. City of Des Moines Mun. Hous. Agency,*
805 N.W.2d 790 (Iowa 2011) . . . . . . . . . . . . . . 25

*Comm'n on Human Rights & Opportunities v. Sullivan Assocs.,*
739 A.2d 238 (Conn. 1999) . . . . . . . . . . . . . . . . 25

*DeHoyos v. Allstate Corp.,*
345 F.3d 290 (5th Cir. 2003) . . . . . . . . 18, 19, 23

*Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.,*
472 F. Supp. 1106 (S.D. Ohio 1979) . . . . . . . . . 9

*Fuller v. Teachers Ins. Co.,*
No. 06-cv-00438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,*
508 F.3d 366 (6th Cir. 2007) . . . . . . . . . . . . . 6, 7

*Griggs v. Duke Power Co.,*
401 U.S. 429 (1971) . . . . . . . . . . . . . . . . . . 2, 15

*Humana Inc. v. Forsyth,*
525 U.S. 299 (1999) . . . . . . . . . . . . . . . . . . . . . 22

iv

*Jones v. Travelers Cas. Ins. Co. of Am.*,
  No. 13-CV-02390, 2013 WL 4511648 (N.D. Cal.
  Aug. 22, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Lumpkin v. Farmers Grp., Inc.*,
  No. 05-2868 Ma/V., 2007 WL 6996777 (W.D.
  Tenn. July 6, 2007) . . . . . . . . . . . . . . . . . . . . . 23

*Mackey v. Nationwide Ins. Cos.*,
  724 F.2d 419 (4th Cir. 1984) . . . . . . . . . . . . . . 23

*Malibu Inv. Co. v. Sparks*,
  996 P.2d 1043 (Utah 2000) . . . . . . . . . . . . . . . 25

*Metro. Life Ins. Co. v. Ward*,
  470 U.S. 869 (1985) . . . . . . . . . . . . . . . . . . . . . 22

*Moore v. Liberty Nat'l Life Ins. Co.*,
  267 F.3d 1209 (11th Cir. 2001) . . . . . . . . . 19, 23

*NAACP v. Am. Family Mut. Ins. Co.*,
  978 F.2d 287 (7th Cir. 1992) . . . . . . 2, 5, 6, 21, 23

*NAACP v. Ameriquest Mortg. Co., et al.*,
  635 F. Supp. 2d 1096 (C.D. Cal. 2009) . . . . . . . . 1

*NAACP v. Sec'y of HUD*,
  817 F.2d 149 (1st Cir. 1987) . . . . . . . . . . . . . . . 1

*NAACP v. Town of Huntington*,
  844 F.2d 926 (2d Cir. 1988) . . . . . . . . . . . . . . . 1

*Nationwide Mut. Ins. Co. v. Cisneros*,
  52 F.3d 1351 (6th Cir. 1995) . . . . . . . . . . . . . . 23

*Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of
  Am.*,
  208 F. Supp. 2d 46 (D.D.C. 2002) . . . 7, 18, 19, 23

v

*Nevels v. W. World Ins. Co., Inc.*,
   359 F. Supp. 2d 1110 (W.D. Wash. 2004) . . . . . 10

*Ojo v. Farmers Grp., Inc.*,
   356 S.W.3d 421 (Tex. 2011) . . . . . . . . . . . . . . . 23

*Prop. Cas. Ins. Ass'n v. Donovan*,
   No. 13 C 8564, 2014 WL 4377570 (N.D. Ill. Sept.
   3, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Saunders v. Farmers Ins. Exch.*,
   537 F.3d 961 (8th Cir. 2008) . . . . . . . . . . . . . . 23

*Saville v. Quaker Hill Place*,
   531 A.2d 201 (Del. 1987) . . . . . . . . . . . . . . . . . 25

*State of Indiana, Civ. Rights Comm'n v. Cnty. Line
   Park, Inc.*,
   738 N.E.2d 1044 (Ind. 2000) . . . . . . . . . . . . . . 25

*Thompson v. Metro. Life Ins. Co.*,
   149 F. Supp. 2d 38 (S.D.N.Y. 2001) . . . . . . . . . . 8

*Toledo Fair Hous. Ctr. et al. v. Nationwide Ins. Co.
   et al.*,
   704 N.E.2d 667 (Ohio Com. Pl. 1997) . . . . . . . . 25

*Town of Huntington v. Huntington Branch, NAACP*,
   488 U.S. 15 (1988) . . . . . . . . . . . . . . . . . . . . . . . 5

*Trafficante v. Metro. Life Ins. Co.*,
   409 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . 10

*United Farm Bureau Mut. Ins. Co. v. Metro. Human
   Relations Comm'n*,
   24 F.3d 1008 (7th Cir. 1994) . . . . . . . . . . . . . . 23

vi

*United States v. Mort. Guar. Ins. Corp.*,
No. 2:11-00882-RCM, 2012 WL 1606235 (W.D.
Pa. Apr. 30, 2012) . . . . . . . . . . . . . . . . . . . . . . . 8

*Wai v. Allstate Ins. Co.*,
75 F. Supp. 2d 1 (D.D.C. 1999) . . . . . . . . . . . . 10

**STATUTES**

12 U.S.C. § 2803 . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. §§ 3601 *et seq.* . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 3610(f) . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Gov't Code § 12955.8 (2012) . . . . . . . . . . . . 24

D.C. Code § 2-1401.03 (2012) . . . . . . . . . . . . . . . 24

N.C. Gen. Stat. § 41A-5(a)(2) (2009) . . . . . . . . . . . 24

**REGULATIONS**

12 C.F.R. § 202.6 n.2 . . . . . . . . . . . . . . . . . . . . . . 20

24 C.F.R. § 100.500 . . . . . . . . . . . . . . . . . . . . . . . 12

24 C.F.R. § 100.500(b) . . . . . . . . . . . . . . . . . . . . . 6

24 C.F.R. § 100.500(c) . . . . . . . . . . . . . . . . . . . . . 17

HUD, Final Rule, Implementation of the Fair
Housing Act's Discriminatory Effects Standard,
78 Fed. Reg. 11,460 (Feb. 15, 2013) . . . . . . . . 17

Interagency Task Force on Fair Lending, *Policy
Statement on Discrimination in Lending,* 59 Fed.
Reg. 18,266 (Apr. 15, 1994), *available at* http://
www.occ.treas.gov/news-issuances/federal-
register/94fr9214.pdf . . . . . . . . . . . . . . . . . . . . 20

vii

## RULES

Sup. Ct. R. 37.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

Barbara Arwine, *Comments of Lawyers' Committee for Civil Rights Under Law Regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard* (2012), *available at* http://www.regulations.gov/#!documentDetail;D=HUD-2011-0138-0075 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Board of Directors of the Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Casualty Actuarial Society (May 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix (2014), *available at* http://www.naic.org/documents/committees_c_d_auto_insurance_study_group_140317_materials.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Carol A. Heimer, *The Racial And Organizational Origins Of Insurance Redlining*, Vol. X, No. 3 J. Intergroup Relations 42 (Autumn 1982) . . . . . . . 9

Dana L. Kaersvang, *The Fair Housing Act and Disparate Impact in Homeowners Insurance*, 104 Mich. L. Rev. 1993 (2006) . . . . . . . . . . . . . . . . . 12

Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets, in* Insurance Redlining . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 18

viii

Donald Light, *Transforming Underwriting: From Risk Selection to Portfolio Management*, Celent (2004), *available at* http://www.edmblog.com/weblog/files/insurance_transformingunderwriting_celent_wp.pdf . . . . . . . . . . . . . . . . . . . . 13, 14

Gail McGiffin, *Are Underwriters Smarter Than Predictive Models?*, Ernst & Young, LLP (Dec. 9, 2013), *available at* http://iireporter.com/are-underwriters-smarter-than-predictive-models/ . . . . . . . . . . . . . . . 13, 14

N.J. Citizen Action et al., *Insurance Redlining: Is It Happening in Your Neighborhood?* (2004) . . . . 16

Office of the Comptroller of the Currency, et al., *Interagency Fair Lending Examination Procedures*, *available at* http://www.federalreserve.gov/boarddocs/caletters/2009/0906/09-06_attachment.pdf . . . . . . . . . . . . . . . . . 20

Pennsylvania Coalition Against Domestic Violence & Women's Law Project, *Insurance Discrimination Against Victims of Domestic Violence* (1998), *available at* http://www.womenslawproject.org/brochures/Insurance_discrimDV.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

President's National Advisory Panel on Insurance in Riot Affected Areas, Meeting the Insurance Crisis of Our Cities (U.S. Gov't Print. Office 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ix

Jay D. Schultz, *Homeowners Insurance Availability and Agent Location, in* Insurance Redlining .. 12

Robert G. Schwemm, Housing Discrimination: Law and Litigation § 10:4 (2014) ............... 4

*Senate Committee on Banking, Housing, and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner) ......................... 13

Shanna Smith, *Comments of National Fair Housing Alliance and Other Civil Rights Organizations Regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard* (2012), *available at* http://www.regulations.gov/#!documentDetail;D=HUD-2011-0138-0076 ........... 12

Gregory D. Squires, *Race, Politics, and the Law: Recurring Themes in the Insurance Redlining Debate, in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions ("Insurance Redlining") (Gregory D. Squires ed., 1997) ........... 9, 10

Gregory D. Squires & Jan Chadwick, *Linguistic Profiling: A Continuing Tradition of Discrimination in the Home Insurance Industry?*, 41 Urb. Aff. Rev. 400 (2006), *available at* http://uar.sagepub.com/content/41/3/400. .. 10

x

Barbara Van Kerkhove, *The Homeowners Insurance Gap: How Race and Neighborhood Composition Explain Cost and Access Disparities in Rochester and Monroe County, NY* (2005), *available at* http://faceraceroc.org/wp-content/uploads/2013/05/H-Home-Insurance-Redlining.pdf . . . . . . . . 16

1

## INTEREST OF AMICI CURIAE[1]

Amici are the National Association for the Advancement of Colored People and the Milwaukee Branch of the National Association for the Advancement of Colored People.

Founded in 1909, the National Association for the Advancement of Colored People ("NAACP") is the nation's oldest, largest, and most recognized civil rights organization. The mission of the NAACP is to ensure the political, educational, social, and economic equality of rights for all persons, and to eliminate racial hatred and racial discrimination. NAACP's former Washington Bureau Director, Clarence Mitchell, Jr., was a major force behind passage of Title VIII, and the NAACP has long advocated for fair housing through policy and litigation. *See, e.g.*, *NAACP v. Ameriquest Mortg. Co., et al.*, 635 F. Supp. 2d 1096 (C.D. Cal. 2009); *NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988); *NAACP v. Sec'y of HUD*, 817 F.2d 149 (1st Cir. 1987).

For over 90 years, the Milwaukee Branch of the NAACP ("Milwaukee NAACP") has continued the mission of the NAACP in the greater Milwaukee, Wisconsin region. In particular, the Milwaukee NAACP has a strong history of combating discrimination in homeowner's insurance, having spent over a decade

---

[1] Petitioners' and Respondent's written letters of consent to amicus briefs have been lodged with the Clerk. Pursuant to Rule 37.6, counsel for amici authored this brief in whole, no counsel for a party authored this brief in whole or in part, and no person or entity – other than amici, their members, and their counsel – contributed monetarily to the preparation or submission of this brief.

2

litigating the seminal case *NAACP v. American Family Mutual Insurance Company*, 978 F.2d 287 (7th Cir. 1992).

## SUMMARY OF ARGUMENT

The NAACP agrees with the Respondent, the federal Courts of Appeals, and the United States Department of Housing and Urban Development ("HUD") that the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601 *et seq.*, recognizes disparate impact claims. Based on its text and legislative history, as well as this Court's rationale in *Griggs v. Duke Power Co.*, 401 U.S. 429, 431 (1971), numerous federal courts have concluded correctly that the FHA calls for disparate impact liability. It would be inconsistent with this Court's sound precedent to provide a pathway for discrimination in housing and by housing-related industries that the Court has found impermissible in the employment sector.

Three property insurance trade organizations,[2] as amici in support of Petitioners, contend that disparate impact liability under the FHA "strike[s] at core principles of sound insurance practice" and will "upend fundamental tenets of the insurance business." Ins. Br. at 3-4. They argue that disparate impact liability under the FHA will force insurers "to forgo considering factors that correlate to risk" and will "work . . . a disruption" on the risk analysis and risk differentiation that are foundational elements of insurance. Ins. Br. at 5, 11.

---

[2] Brief for the American Insurance Association, the National Association of Mutual Insurance Companies, and the Property Casualty Insurers Association of America as Amici Curiae Supporting Petitioners ("Ins. Br."), filed November 24, 2014.

3

They also argue that allowing disparate impact analysis under the FHA will "conflict" with the reverse-preemption provisions of the McCarran-Ferguson Act, and therefore Congress could not have intended to create disparate impact liability in the FHA. Ins. Br. at 9-10.

These concerns of the property insurance industry are unfounded. They fail to account for the "business justification" component of disparate impact analysis. Sound insurance practices – such as accounting for legitimate risk in underwriting and relying on actuarially sound distinctions in pricing policies – are protected from liability under disparate impact analysis. Insurance business practices, like other private sector housing practices that sometimes result in a disparate impact based on protected classification, are legally permissible under the FHA if they are necessary to achieve a legitimate business interest – such as risk assessment and differentiation.

The insurance trade organizations thus miss the point in focusing on practices that are actuarially sound and otherwise have business justification. Those practices are not threatened by disparate impact analysis and will not be affected by this Court's decision one way or the other. Rather, what are potentially affected by this Court's decision are practices that have a disparate impact and are *not* necessary to accomplish legitimate business needs. Contrary to the impression the insurance amici attempt to create, the insurance industry has a long history of such unnecessarily discriminatory practices, and such practices continue today, giving disparate impact analysis continued importance in accomplishing

4

the goals of the Congresses that enacted and later amended the FHA.

The McCarran-Ferguson argument also fails to inform the question of congressional intent under the FHA. The McCarran-Ferguson Act may occasionally reverse-preempt federal civil rights claims, including disparate impact claims under the FHA, but only in those situations where state law permits a specific insurance practice that otherwise would be banned by federal law. McCarran-Ferguson reverse-preemption can only be determined in the context of a specific state law and a specific insurance business practice. That a small number of potential FHA disparate impact claims may prove to be reverse-preempted under McCarran-Ferguson is no basis for "blanket" McCarran-Ferguson reverse-preemption of all disparate impact claims.

## ARGUMENT

## I.  THE FAIR HOUSING ACT PROVIDES FOR CLAIMS OF DISPARATE IMPACT.

The Fair Housing Act of 1968 ("FHA"), as amended, codified at 42 U.S.C. §§ 3601 *et seq.*, provides protection from intentional discrimination *and* discrimination by effect. For forty years, the federal courts have consistently held that disparate impact applies in FHA cases. *See* Robert G. Schwemm, Housing Discrimination: Law and Litigation § 10:4 at 10-35 (2014) (documenting the "strong consensus" among the courts that the Fair Housing Act includes a discriminatory effect standard and observing that "[n]ot a single court of appeals currently espouses the

5

view that the effect theory is inappropriate for Fair Housing Act cases.").

The NAACP has used the disparate impact theory effectively in countless cases to ensure that governmental entities and private businesses, including insurance companies, do not institute unjustified practices and policies that have a widespread and disproportionate negative effect upon protected classes. For example, in *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15, 17 (1988), the NAACP successfully challenged a zoning restriction that only allowed the construction of multifamily housing projects in the town of Huntington's "urban renewal area." *Id.* at 16. The Supreme Court upheld the decision of the Second Circuit to strike the restriction, noting that the NAACP had successfully demonstrated a disparate impact on the town's low-income and black residents. *Id.* at 18. This is just one example of the many cases that the NAACP has brought using the disparate impact theory in order to eradicate housing segregation across the nation.

The NAACP agrees, for the reasons stated by Respondent The Inclusive Communities Project, Inc., and the other amici supporting Respondent, that the Fifth Circuit's decision below should be affirmed. In this brief, the NAACP will respond to arguments by several insurance industry amici on how disparate impact affects the business of insurance. As the Milwaukee NAACP successfully argued in *NAACP v. American Family Mutual Insurance*, 978 F.2d 287 (7th Cir. 1992), disparate impact theory in the FHA has allowed and currently allows insurance carriers to conduct their business, including the assessment of

6

risk, in a non-discriminatory manner. And, as the *American Family* court held, the McCarran-Ferguson Act does not automatically bar application of the FHA. *Id.* at 289.

## II. DISPARATE IMPACT IS CONSISTENT WITH SOUND FINANCIAL RISK ANALYSIS.

### A. Far From Prohibiting Legitimate Risk Analysis, The Disparate Impact Paradigm Encourages It.

The insurance groups mischaracterize disparate impact analysis in an effort to paint it as threatening legitimate and necessary insurance industry practices. In fact, as set forth in HUD regulations, and as applied by the appellate court below, the FHA's disparate impact test is explicitly crafted to avoid that result. The industry groups can suggest otherwise only by completely ignoring the "business justification" prong of disparate impact analysis.

Specifically, a business practice that has a disparate impact on a protected group is nevertheless legal under the FHA if it "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(b), and those interests cannot be served by another practice that has a less discriminatory effect. "Not every housing practice that has a disparate impact is illegal. We use [the disparate impact framework] to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests." *Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations*

7

*Comm'n*, 508 F.3d 366, 374-5 (6th Cir. 2007); *see also Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 59 n.8 (D.D.C. 2002) (insurers' ability to assess risk on legitimate grounds is preserved in light of the "business justification" element of disparate impact analysis).

Assessment of risk is a legitimate interest of property insurers. Identifying specific characteristics that affect risk, conducting actuarial assessments of those characteristics, and establishing fair prices that account for them are all legitimate, substantial, nondiscriminatory business practices. They meet the "legally sufficient justification" prong of the disparate impact analysis and should normally survive a disparate impact attack.

The insurance industry amici acknowledge that "discrimina[tion] among insureds based on factors that are not legitimately related to risk . . . would undermine the sound actuarial principles on which the provision of insurance is based." Ins. Br. at 15. What they do not acknowledge is that many of their practices do just that; i.e., they rely on factors that are not legitimately related to risk, yet result in discrimination. Insurance industry amici suggest that "actuarial" principles govern all aspects of their business, but actuarial and risk assessments are relevant to just *some* aspects of the insurance business. As we show below, the "business of insurance" is not a unitary enterprise, designed to follow mechanically from actuarial calculations. Rather, it is a cluster of related practices, many totally removed from actuarial calculation but nonetheless carrying the potential for discriminatory effects.

8

### 1. *Past Intentional Discrimination Sets the Stage for the Unjustified Impediments That Continue to Limit Equal Access to Homeowner's Insurance.*

Contrary to the insurance industry amici's assertion, insurers do not always use objective, actuarially-based risk analysis to justify their business practices. The "business of insurance" consists of much more than assessing the "risk of loss." Insurance companies direct sales teams and sales agents. They have marketing departments. They operate claims departments. They establish pricing strategies by taking into account both actuarial determinations and non-actuarial factors, such as profitability levels, competitor prices, rating territory boundaries, and loss trending assumptions. Any of these practices may result in unjustified, illegitimate race disparities.

For decades before and after the FHA's enactment in 1968, insurers unabashedly treated homeowners seeking insurance differently based on their race or the racial composition of the neighborhoods in which they lived.[3] The term "redlining" originally referred to the

---

[3] Homeowner's insurance is but one area in which insurers have engaged in intentional discrimination. *See, e.g.*, *United States v. Mort. Guar. Ins. Corp.*, No. 2:11-00882-RCM, 2012 WL 1606235 (W.D. Pa. Apr. 30, 2012) (consent order settling challenge to practice of denying mortgage insurance to applicants on maternity leave, resulting in differential treatment on the basis of sex and familial status); *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 42 (S.D.N.Y. 2001) (challenging policies steering African Americans to substandard and "significantly more expensive" life insurance).

9

widely-used practice of color-coding neighborhoods, typically defined by their racial or ethnic composition, to describe where insurance products would be limited or denied. *See, e.g.*, Carol A. Heimer, *The Racial And Organizational Origins Of Insurance Redlining*, Vol. X, No. 3 J. Intergroup Relations 42, 49 (Autumn 1982). As late as the 1960s, homeowner's insurance underwriting guidelines utilized such maps to indicate where agents should avoid writing policies or should issue policies only after special review or with different terms. *Id.*

Even though courts found such disparate treatment unlawful under the FHA as early as 1979, *see Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106 (S.D. Ohio 1979), this and similar practices persisted long afterward. A treatise on insurance redlining recounts stark examples of explicitly discriminatory practices in the 1970s and 1980s:

> In 1977 the chief actuary of the New York Department of Insurance stated: "Take Harlem, for example. They don't need any insurance because they don't have anything of value to insure." In 1988 some American Family Mutual Insurance Company agents were instructed in writing to *"quit writing* all those *blacks."* . . . In 1994 the Texas commissioner told the U.S. Senate Committee on Banking, Housing, and Urban Affairs that "we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk."

Gregory D. Squires, *Race, Politics, and the Law: Recurring Themes in the Insurance Redlining Debate*,

10

*in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions 6-7 (Gregory D. Squires ed., 1997) (internal citations omitted) [hereinafter "Insurance Redlining"].

During the 1990s, discriminatory treatment was revealed by a study in which African-American testers with addresses in African-American neighborhoods were paired with white testers with addresses in white neighborhoods to contact homeowner's insurance companies in nine different cities. Gregory D. Squires & Jan Chadwick, *Linguistic Profiling: A Continuing Tradition of Discrimination in the Home Insurance Industry?*, 41 Urb. Aff. Rev. 400, 404, 407 (2006), *available at* http://uar.sagepub.com/content/41/3/400. In 221 tests, the white caller received more favorable treatment nearly twice as often as the African-American caller did. *Id.* at 405.[4]

Such discriminatory insurance practices create or entrench precisely the kind of segregated living patterns that the FHA was designed to dismantle. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (noting Congress's purpose in enacting the FHA "to replace the ghettos by truly integrated and balanced

---

[4] Although this brief focuses on race, insurers also have engaged, and continue to engage, in disparate treatment based on other FHA-protected categories. *See, e.g., Nevels v. W. World Ins. Co., Inc.*, 359 F. Supp. 2d 1110, 1118 (W.D. Wash. 2004) (defendant did "not deny that Plaintiffs' [property] insurance policies were cancelled because Plaintiffs cared for individuals with mental disabilities"); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) (insurer refused coverage for homeowners who operated group homes for adults, resulting in differential treatment on the basis of disability).

11

living patterns" (internal quotation marks omitted)). As observed by a presidential commission the year the FHA was passed, "[i]nsurance is essential to revitalize our cities. . . . Without insurance, buildings are left to deteriorate; services, goods and jobs diminish. Efforts to rebuild our nation's inner cities cannot move forward. Communities without insurance are communities without hope." President's National Advisory Panel on Insurance in Riot Affected Areas, Meeting the Insurance Crisis of Our Cities 1 (U.S. Gov't Print. Office 1968).

### 2. The "Business of Insurance" Consists of Many Business Practices That Are Not Actuarially Based.

Not all homeowner's insurance business practices are actuarially based. For example, marketing and advertising campaigns, sales techniques, agent office placements, insurance product design and benefits, and processes for settling claims and renewing policies are not based on actuarial analysis or modeling. These ordinary business practices, which do not explicitly assess or classify risks, are no different for insurers than for other businesses subject to the Fair Housing Act. Yet such business practices may have significantly different impacts on different populations, with no business justification for that disparity. *See, e.g.*, Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets*, *in* Insurance Redlining at 47-48 (identifying several non-risk related barriers that can influence the availability and affordability of homeowners insurance in urban markets, including agent bias, prejudicial views of decision-making personnel, adverse selection, agent

12

commission structures, etc.); Jay D. Schultz, *Homeowners Insurance Availability and Agent Location*, *in* Insurance Redlining at 83 (analyzing impact of agent locations on availability of insurance); Dana L. Kaersvang, *The Fair Housing Act and Disparate Impact in Homeowners Insurance*, 104 Mich. L. Rev. 1993, 2013-17 (2006) (identifying several insurer business practices with a disparate impact that may not be justified by business necessity).[5]

Indeed, even insurance "underwriting guidelines," the rules that determine whether an applicant is eligible to purchase homeowner's insurance, may not be actuarially based. *See* D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining at 119 ("Today, we still find

---

[5] During the Notice and Comment period in advance of HUD's promulgation of the disparate impact regulation now at 24 C.F.R. § 100.500, many commenters specifically addressed how the proposed disparate impact regulation should apply in cases against insurance companies. *See, e.g.*, Shanna Smith, *Comments of National Fair Housing Alliance and Other Civil Rights Organizations Regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard* (2012), *available at* http://www.regulations.gov/ #!documentDetail;D=HUD-2011-0138-0076 (last visited Dec. 18, 2014) (discussing less discriminatory alternative in the context of insurance litigation); Barbara Arwine, *Comments of Lawyers' Committee for Civil Rights Under Law Regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard* (2012), *available at* http://www.regulations.gov/#!documentDetail;D=HUD-2011-0138-0075 (last visited Dec. 18, 2014) (highlighting usefulness of disparate impact analysis in "a wide variety of homeowners' insurance cases" and citing specific examples of objectionable insurance practices).

13

insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk." (quoting *Senate Committee on Banking, Housing, and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner))). "Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property." *Id.* at 137; *see also generally id.* at 125-33. "Historically, underwriters have relied on experience, market knowledge, intuition and oral history more than statistical insights when evaluating risk." *See* Gail McGiffin, *Are Underwriters Smarter Than Predictive Models?*, Ernst & Young, LLP (Dec. 9, 2013), *available at* http://iireporter.com/are-underwriters-smarter-than-predictive-models/ (last visited Dec. 18, 2014).

During the underwriting process, human judgment interacts with actuarial calculations. As a starting point, an underwriting score may be calculated based on actuarial criteria. *See* Donald Light, *Transforming Underwriting: From Risk Selection to Portfolio Management*, Celent, 6-7, 12 (2004), *available at* http://www.edmblog.com/weblog/files/insurance_transformingunderwriting_celent_wp.pdf (last visited Dec. 18, 2014). The score is then subject to a discretionary review to determine whether the application is accepted, rejected, or in need of further review. *See id.* at 7. There is significant variation among insurers in how this process is actually implemented, and varying levels of quality control. *See id.* Even when underwriting scores are available, "half or more of the

14

underwriting decisions may be ultimately made . . . by human underwriters." *Id.* at 7. *See also* McGiffin at 7 ("Few, if any, underwriting decisions are truly binary. That's why insurers still need teams of people who know how to balance the nuances of risk quality, emerging exposures, market contexts and competitive strategies as they make critical underwriting decisions.").

Insurance industry amici assert that insurance rating practices are "nothing more than the allocation of pooled risks by establishing rates." Ins. Br. at 14. But actuarially-derived insurance rates may be modified or ignored for reasons unrelated to risk. This is because state laws often permit insurance companies to modify their rates based on business judgment and competition. Even the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking acknowledges that, although the actuary's role is to derive an estimation of future costs resulting from the transfer of risk, "other business considerations are also a part of ratemaking"; those considerations may include marketing, underwriting, and finance. *See* Board of Directors of the Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Casualty Actuarial Society 4:143-44 (May 1988).

For example, despite what a company's actuaries may determine is a fair and reasonable rate for a specific insurance product in a specific geographic rating territory based on expected loss costs, company executives may reject that determination for competitive reasons, *i.e.*, in order to beat a competitor's

15

price and sell more policies. *See, e.g.*, Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix, 7, 10 (2014), *available at* http://www.naic.org/documents/committees_c_d_auto_insurance_study_group_140317_materials.pdf (last visited Dec. 18, 2014) (listing certain competitive adjustments that are often made to predicted loss costs during the rate-setting process). The actuarially-determined rates might be rejected or modified by business executives in order to penetrate (or withdraw from) a specific market. *See id.* at 7. Or they might be adjusted in response to agent input or customer responses. *Id.* So, while market forces may indeed support the use of efficient, risk-based calculations, Ins. Br. at 15, those same market forces, to be competitive, provide incentives to modify actuarially-derived rates in order to penetrate – or avoid – specific markets and specific business prospects.

### 3. Insurers Continue to Engage In Practices That Result In Adverse Racial Impacts But Cannot Be Justified By Actuarial Risk.

Due in large part to enforcement of the FHA and other anti-discrimination statutes, insurance practices that overtly discriminate on the basis of race have become significantly less common, but insurance underwriting is still tainted by "practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 429, 431 (1971). A comprehensive study of the availability and price of homeowner's insurance in 33 metropolitan neighborhoods, conducted by the National Association of Insurance Commissioners ("NAIC") in the mid-

16

1990s, found that the racial composition of a neighborhood had a statistically significant relationship to the number and cost of insurance policies in that neighborhood that could not be adequately justified based on actuarial risk factors. Klein, *in* Insurance Redlining at 44-45. Regression analysis showed that none of the potentially legitimate business explanations for those disparities, including loss costs, demographic variables, and housing characteristics, could account for the disparate racial impact. *See generally id.* at 43-78.[6]

When insurance company practices produce such disparate effects that they cannot be justified by actuarial principles, the FHA requires the insurer to identify the practice causing these effects and search for less discriminatory alternatives. These alternatives would align underwriting more closely with actuarially-

---

[6] Findings at the local level echo NAIC's national research. One study found that homeowners in the most heavily minority areas of Rochester, New York received premiums nearly three times higher than those in the surrounding towns, which were overwhelmingly white. *See* Barbara Van Kerkhove, *The Homeowners Insurance Gap: How Race and Neighborhood Composition Explain Cost and Access Disparities in Rochester and Monroe County, NY* 3 (2005), *available at* http://faceraceroc.org/wp-content/uploads/2013/05/H-Home-Insurance-Redlining.pdf (last visited Dec. 18, 2014). After testing variables that might legitimately explain these differences, the report concluded that almost all of those variables had no correlation, or were negatively correlated, to racial disparities in premiums. *Id.* at 5; *see also* N.J. Citizen Action et al., *Insurance Redlining: Is It Happening in Your Neighborhood?* (2004) (analysis of four New Jersey cities finding significantly higher costs of homeowner's insurance for Hispanic customers, and no significant variations in house price or unit size that accounted for this disparity).

17

sound risk factors. Accordingly, it is at least misleading to assert, as the insurance industry does, that "insurers would have to forgo considering factors that correlate to risk." Ins. Br. at 5. Disparate impact analysis requires precisely the opposite. An insurer's consideration of factors resulting in adverse effects will not give rise to disparate impact liability if those factors actually correlate to actuarial risk and there is no less discriminatory means of achieving that goal. *See* 24 C.F.R. § 100.500(c); HUD, Final Rule, Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460, 11,475 (Feb. 15, 2013).[7]

---

[7] The disparate impact standard is equally vital to eliminate unjustified discriminatory effects of insurance practices on the basis of other characteristics protected by the FHA. *See, e.g., Jones v. Travelers Cas. Ins. Co. of Am.*, No. 13-CV-02390, 2013 WL 4511648 (N.D. Cal. Aug. 22, 2013) (insurer ended coverage for rental property upon discovering it housed Section 8 tenants, resulting in alleged disparate impact on the basis of race, sex, age, and familial status); *Fuller v. Teachers Ins. Co.*, No. 06-cv-00438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007) (denying motion to dismiss disparate impact claims based on insurer's cancellation of coverage for group home for people recovering from drug and alcohol addiction because of the unjustified adverse impact on individuals with mental and physical disabilities); Pennsylvania Coalition Against Domestic Violence & Women's Law Project, *Insurance Discrimination Against Victims of Domestic Violence* 4-7 (1998), *available at* http://www.womenslawproject.org/ brochures/Insurance_discrimDV.pdf (last visited Dec. 18, 2014) (detailing property and casualty insurance policies that had disparate adverse impact on the basis of sex by precluding coverage for domestic violence victims).

18

### 4. The Disparate Impact Standard Distinguishes Between Those Aspects of the Insurance Business That Are Based On Legitimate Actuarial Considerations and Those That Are Not.

Insurance companies often make pricing and underwriting decisions that are affected by considerations other than risk. These aspects of the insurance business have been found to cause racial disparities that cannot be explained by risk of loss. *See e.g.*, Klein, *in* Insurance Redlining, at 72-73 (concluding that the "relationship between race and the availability of insurance persists, even imperfectly controlling for the risk of loss."). The purpose and design of the disparate impact standard is to root out such practices that cannot be justified on the basis of legitimate actuarial factors.

Indeed, measured against the reality of the insurance business, it is not surprising that the core claim advanced by the insurance industry amici has been rejected by courts as overly "sweeping," *Prudential*, 208 F. Supp. 2d at 60, and even "fanciful," *DeHoyos v. Allstate Corp.*, 345 F.3d 290, 297 n.5 (5th Cir. 2003). The court in *Prudential* elaborated:

> Essentially, [Prudential's] argument turns on the purportedly unique nature of the insurance industry, which must "discriminate" based on an assessment of risk. However, this argument is unavailing in light of the availability of the "business justification" defense. Plaintiffs do not challenge Prudential's right to evaluate homeowners insurance risks fairly and

19

objectively. Rather, plaintiffs allege that the underwriting policies and practices employed by Prudential are *not* purely risk-based. Furthermore, defendants cannot point to anything in the FHA itself that would justify this Court in carving out an exception for a particular type of organization.

208 F. Supp. 2d at 60.

The Fifth Circuit similarly observed that the insurance industry's "ominous" description of how disparate impact will force federal courts to act as "super actuar[ies,] . . . although colorful, is incorrect." *DeHoyos*, 345 F.3d at 297 n.5. Courts are regularly called upon to evaluate whether a practice with a disparate impact is nevertheless justified by a business necessity, and the "attempt to distinguish the business of insurance from other businesses is unpersuasive." *Id.* The court also noted that the supposed conflicts between disparate impact enforcement and state insurance laws "are entirely conjectural." *Id.* at 299 n.7; *see also Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1220-23 (11th Cir. 2001) (noting that "Liberty National argues that racial discrimination is acceptable in the Alabama . . . insurance context so long as those racial distinctions have an actuarial basis," and holding that "[a]bsent more convincing evidence that racial discrimination in the insurance context is an integral part of Alabama's regulatory scheme, Liberty National's argument must fail.").[8]

_____

[8] We also observe that the federal financial regulatory agencies have embraced the use of disparate impact analysis as part of their regulation of lenders, who also are in the business of financial risk

20

The insurance industry's reliance on "actuarial necessity" as the linchpin of the "business of insurance" is a chimera in this context – a sophisticated-sounding catchphrase that ignores whole swaths of the insurance business which may cause discriminatory effects but which are outside the domain of actuarial science. There is not, and never has been, an absolute homage to actuarially-required outcomes in the business or regulation of insurance.

Insurance industry amici's members have been operating profitably for decades in a world where every circuit court that has addressed the issue, as well as HUD, has found that disparate impact liability exists under the FHA – without the calamitous results amici predict. That is unsurprising. The disparate impact standard is specifically crafted not to endanger legitimate business practices, in insurance or in other aspects of the housing market. It is easily compatible

---

assessment. Since at least 1994, all five federal financial regulatory agencies have used disparate impact analysis to assess liability under the various federal anti-discrimination laws they enforce, including the Fair Housing Act. *See, e.g.*, Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18,266 (Apr. 15, 1994), *available at* http://www.occ.treas.gov/news-issuances/federal-register/94fr9214.pdf (last visited Dec. 18, 2014). *See also* Office of the Comptroller of the Currency, et al., *Interagency Fair Lending Examination Procedures*, app. at 26-28, *available at* http://www.federalreserve.gov/boarddocs/caletters/2009/0906/09-06_attachment.pdf (last visited Dec. 18, 2014). Indeed, the disparate impact doctrine has been an integral part of Regulation B, which prohibits discrimination in underwriting and pricing in *lending* transactions, since the regulation was promulgated in 1985. 12 C.F.R. § 202.6 n.2.

21

with insurance and other housing practices that are, in fact, "actuarially justified." [9]

## B. The McCarran-Ferguson Act is Not a Universal Bar to Disparate Impact Analysis.

As our case in *NAACP v. American Family Mutual Insurance*, 978 F.2d 287 (7th Cir. 1992), illustrates, the McCarran-Ferguson Act does not serve as a universal bar to enforcement of the Fair Housing Act against insurers. The insurance industry amici contend that interpreting the FHA to permit disparate impact liability would "contravene the McCarran-Ferguson Act," Ins. Br. at 4, and would "impair state laws regarding differentiation among risks of the same class or hazard. . . ," *id.* at 11.[10] In an extreme stretch of false

---

[9] In addition to asserting that disparate impact interferes with the actuarial analyses that insurers purportedly rely on, the insurance industry amici complain that it will be compelled to collect demographic data in violation of state law. Ins. Br. at 4-5, 16-17, 22-23. HUD's disparate impact rule does not impose any new recordkeeping requirement, so homeowner's insurers are no different from other businesses that are subject to the FHA. Apartment managers do not record the race of housing applicants or tenants. Real estate sales agents do not record the race of their buyers. Although some lenders are required by federal law to collect and report racial and gender demographic data of loan applicants, 12 U.S.C. § 2803, they are not required to collect or report data about the other protected class characteristics (such as religion, disability, or familial status).

[10] Another amicus in support of Petitioners raises this argument as well, but its brief suffers from the same infirmities as the

---

22

equivalence, the insurance industry amici posit that the passage of the McCarran-Ferguson Act in 1945 is conclusive of congressional intent in 1968 (when the Fair Housing Act was enacted) and in 1989 (when the Fair Housing Amendments Act was enacted) as to *all* housing transactions – even those unrelated to insurance. Ins. Br. at 3-4, 9-10.

The McCarran-Ferguson Act has no bearing on the Fair Housing Act disparate impact issue before the Court. The application of the McCarran-Ferguson Act is fact and state specific, and its application will have different results depending on the state and business practice at issue. The Court has limited the application of the reverse-preemption provisions of the McCarran-Ferguson Act only in the context of whether *a specific state law* purports to regulate *a specific insurance business practice. See e.g., Humana Inc. v. Forsyth*, 525 U.S. 299, 303 (1999) (considering federal RICO charges in light of Nevada state policy on insurance fraud); *Barnett Bank of Marion Cnty. v. Nelson*, 517 U.S. 25 (1996) (interpreting federal statute on national bank's sale of insurance in the context of Florida state law prohibiting banks from selling most types of insurance); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880-81 (1985) (examining whether McCarran-Ferguson protected Alabama preferential insurance tax statute). We have not located any decision of the Court applying the McCarran-Ferguson Act to interpret or invalidate the application of a federal law in all 50 states.

---

insurance industry brief. *See* Brief of Washington Legal Foundation as Amicus Curiae in Support of Petitioners, filed November 24, 2014.

23

Most lower courts have concluded that the McCarran-Ferguson Act does *not* preclude Fair Housing Act claims from going forward against property insurers, because no state insurance law would be "invalidated, impaired, or superseded" by a finding of liability under the Fair Housing Act. *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1363 (6th Cir. 1995) (Ohio); *United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n*, 24 F.3d 1008, 1016 (7th Cir. 1994) (Indiana); *Am. Family Mut. Ins. Co.*, 978 F.2d at 296 (Wisconsin); *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 421 (4th Cir. 1984) (North Carolina). *Accord, Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1220-23 (11th Cir. 2001) (Alabama insurance law would not be impaired if insurance discrimination claims under § 1981 and § 1982 were successful). This is so even if the claims against an insurance company are based on a disparate impact theory of liability. *Dehoyos*, 345 F.3d at 298-99 (Florida and Texas); *Prudential*, 208 F. Supp. 2d at 58-61 (Ohio); *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 Ma/V., 2007 WL 6996777, at *2 (W.D. Tenn. July 6, 2007) (Tennessee).

McCarran-Ferguson may occasionally reverse-preempt disparate impact FHA claims, but only in those situations where a specific insurance practice is permitted by state law. *See, e.g., Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 434 (Tex. 2011) (Texas law permits race-neutral credit scoring that has a racially disparate impact, and permitting a challenge to such a practice "would frustrate the regulatory policy of Texas."); *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 968 (8th Cir. 2008) (Missouri's law would be "frustrated and interfered with" if a plaintiff could challenge

24

insurance prices under the FHA). In such
circumstances, compliance with state law will be
deemed a "business justification" sufficient to defeat a
disparate impact claim. But even those decisions do not
call into question the legitimacy of disparate impact
claims in general.[11]

Nor is disparate impact analysis exclusive to federal
law. Many states allow disparate impact claims as a
matter of state law, even against insurance companies,
and thus disparate impact analysis does not
necessarily "directly conflict" with state laws. For
example, California, North Carolina, and the District
of Columbia expressly provide by statute for disparate
impact fair housing claims without exemptions for any
particular type of business, including homeowner's
insurers. *See* Cal. Gov't Code § 12955.8 (2012); N.C.
Gen. Stat. § 41A-5(a)(2) (2009); D.C. Code § 2-1401.03
(2012). Additionally, several states' supreme courts

---

[11] The insurance industry amici rely heavily on their own cases,
*American Insurance Ass'n v. United States Department of Housing
& Urban Development, et al.*, No. 13-00966, 2014 WL 5802283
(D.D.C. Nov. 7, 2014) ("*AIA*"), and *Property Casualty Insurers Ass'n
of America v. Donovan*, No. 13 C 8564, 2014 WL 4377570 (N.D. Ill.
Sept. 3, 2014) ("*PCIA*") to support their arguments that the Fair
Housing Act does not support disparate impact claims, cannot be
reconciled with the "business of insurance," and violates
McCarran-Ferguson. Ins. Br. at 2-3, 9, 20-23. *AIA* must be
disregarded. The court's decision in that case has been appealed by
the government to the U.S. Court of Appeals for the D.C. Circuit,
and squarely conflicts with 40 years of precedent from almost
every federal court in the nation. And the court in *PCIA* never even
questioned disparate impact as a mode of analysis in the abstract.
It merely instructed HUD to reconsider its recent regulation on
disparate impact to address more fully the concerns of the
insurance industry.

25

have interpreted their state fair housing laws to encompass disparate impact claims, even if their statutes do not explicitly use that term. *See, e.g., Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 255-56 (Conn. 1999); *Saville v. Quaker Hill Place*, 531 A.2d 201, 205-06 (Del. 1987); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790, 798-99 (Iowa 2011); *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1050-51 (Utah 2000); *State of Indiana, Civ. Rights Comm'n v. Cnty. Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000). And according to at least one state court, "the disparate-impact approach does not unduly undermine the business of selling insurance [and] does not conflict with Ohio insurance law." *Toledo Fair Hous. Ctr. et al. v. Nationwide Ins. Co. et al.*, 704 N.E.2d 667, 670-71 (Ohio Com. Pl. 1997).

State fair housing laws are often in complete harmony with the federal Fair Housing Act. *See* Ins. Br. at 15-16 (citing state insurance laws that expressly prohibit discrimination based on race, color, religion, and national origin). Indeed, many state fair housing laws have been deemed "substantially equivalent" to the FHA[12] and so, to the same extent as the federal law, would apply the principles of disparate impact to homeowners insurers. Thus, contrary to the insurance industry amici's assertions, disparate impact claims

---

[12] *See* 42 U.S.C. § 3610(f) (allowing HUD to certify any state agency for referrals of complaints when the agency enforces fair housing rights that are "substantially equivalent" to the Fair Housing Act). The list of equivalent state jurisdictions is available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/partners/FHAP/equivalency (last visited Dec. 18, 2014).

26

under the FHA do not automatically violate the McCarran-Ferguson Act. Accordingly, insurance industry amici's effort to derive from the McCarran-Ferguson Act any congressional intent to exclude disparate impact analysis from operation of the Fair Housing Act is fundamentally flawed in its entirety.

## CONCLUSION

For the foregoing reasons, the NAACP respectfully requests that this Court hold that disparate impact liability is viable under the Fair Housing Act and affirm the judgment of the court of appeals.

Respectfully submitted,

Stephen M. Dane
*Counsel of Record*
Laura Arandes
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
sdane@relmanlaw.com

Marshall Taylor
*Interim General Counsel*
Khyla D. Craine
*Assistant General Counsel*
NAACP
4805 Mount Hope Drive
Baltimore, M.D. 21215

*Counsel for Amici Curiae*



**PCI**

**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

January 26, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

**Re:     Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
Discriminatory Effects Standard**

Dear Sir or Madam:

On September 4, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued the enclosed Memorandum Opinion and Order in *Property
Casualty Insurers Association of America v. Donovan*, No. 13-8564 (*PCI*), remanding the
case to the Department of Housing and Urban Development (HUD) for further
consideration of whether HUD's Disparate Impact Rule (*Implementation of the Fair
Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can
be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the Court's order and requested
HUD to re-open the public comment period to inform others that the Agency expects to
fully consider the complex issues presented by application of the Disparate Impact Rule
to homeowners' insurance. For the reasons explained below, the Disparate Impact Rule
cannot lawfully be applied to homeowners insurance. Application of the Rule to
homeowners insurance would impair state regulation of insurance in violation of the
McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners
insurance, and would impose needless costs on providers of homeowners
insurance and their customers. HUD should therefore exempt homeowners insurance
from the Rule.[1]

---

[1] HUD has not yet opened a public comment period, and On November 3, 2014, Judge Leon of the
U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the
Disparate Impact Rule in American Insurance Association v. U.S. Department of Housing and Urban
Development, No. 13-cv-00966 (D.D.C.). But PCI is submitting these comments now in an abundance of
caution, given the remand from Judge St. Eve.

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

Regulations Division
January 26, 2015
Page 2

# I.     BACKGROUND

## A.     The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by a fire, the insurer will pay to repair her home. Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions, that is, decisions about whether to insure and how to price a particular risk or class of risk. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial implications. Actuaries examine numerous factors that correlate with losses. *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to that home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard. Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* Admin. Rec. 383; Decl. of Teresa C. Cracas ¶ 6 (stating that Cincinnati Insurance Company does not collect information on race or ethnicity); Decl. of Michael Dawdy ¶ 11 (State Auto Insurance Companies does not collect data on policyholders' race or ethnicity); Decl. of Ronald Joseph Zaleski, Sr. ¶ 11 (Selective Insurance Company of America does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); Decl. of Peter Drogan ¶ 7 (Amica Mutual Insurance Company does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers. *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on neutral risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.

Regulations Division
January 26, 2015
Page 3

*See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty
Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—
A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012). Such a pricing scheme would also greatly
reduce the financial incentive for customers to reduce risks, construct safer houses, and
maintain existing houses. Avraham, *The Economics of Insurance Law*, *supra* pp. 66-67.

### B.    State Regulation Of Insurance and The McCarran-Ferguson Act

The states have traditionally regulated the insurance industry, from the pricing of
insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance
was largely immune from federal regulation because the business of insurance was not
considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75
U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States
v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of
insurance across state lines constituted interstate commerce susceptible to federal
regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to
ensure that ruling would not undermine the states' long-standing regulation of insurance.
Today, "State regulation of insurance is comprehensive and includes rate and coverage
issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).

In the McCarran-Ferguson Act, Congress expressly stated that "the continued
regulation and taxation by the several States of the business of insurance is in the public
interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress
shall be construed to invalidate, impair, or supersede any law enacted by any State for the
purpose of regulating the business of insurance … unless such Act specifically relates to
the business of insurance." 15 U.S.C. § 1012(b). Thus, federal law must not be read to
authorize regulations that either "directly conflict with state regulation" of insurance or
whose "application … frustrate any declared state policy or interfere with a State's
administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299,
310 (1999).

### C.    The Fair Housing Act and the Disparate Impact Rule

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any
person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the
provision of services or facilities in connection therewith, because of race, color, religion,
sex, familial status, or national origin." 42 U.S.C. § 3604(b). The Act makes no reference
to either disparate impact or homeowners insurance.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of
the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70921 (Nov.

Regulations Division
January 26, 2015
Page 4

16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* at 70921. The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70924.

Representatives of the insurance industry submitted comments explaining why disparate impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes, whether by statute, regulation, or under the "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, the application of disparate impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.

HUD promulgated its final Disparate Impact Rule on February 15, 2013. 78 Fed. Reg. 11460. The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

**D.    The Litigation Brought by PCI**

On November 27, 2013, the Property Casualty Insurers Association of America (PCI) challenged both the Disparate Impact Rule as applied to the provision of homeowners insurance and HUD's process for issuance of the Rule, under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* On September 3, 2014, the Court granted in part PCI's motion for summary judgment.

Regulations Division
January 26, 2015
Page 5

The Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. Those conflicts, the Court explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It held that HUD's response to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

**E.** **The Supreme Court's Grant of Certiorari in the *Inclusive Communities* Case and Judge Leon's Vacating of the Disparate Impact Rule**

On October 2, 2014, the Supreme Court granted certiorari in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, No. 13-1371, to address the question whether disparate impact claims of any sort are cognizable under the FHA. Oral argument took place on January 21, 2015. PCI, the American Insurance Association, and the National Association of Mutual Insurance Companies submitted a brief amicus curiae supporting petitioners, explaining that the FHA does not recognize disparate impact liability. The brief also explains that interpreting the FHA to permit disparate-impact liability would upend fundamental tenets of the insurance business and contravene the McCarran-Ferguson Act.

On November 3, 2014, Judge Leon of the U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the Disparate Impact Rule in *American Insurance Association v. U.S. Department of Housing and Urban Development*, No. 13-cv-00966 (D.D.C.). Judge Leon held that "the FHA unambiguously prohibits *only* intentional discrimination." Op. at 17. On December 18, 2014, the government filed its notice of appeal.

The Supreme Court is scheduled to decide later this year whether the FHA permits imposition of disparate impact liability altogether. It should hold that the FHA does not. But even if the Court were to interpret the FHA as allowing disparate impact claims in certain circumstances, disparate impact liability must not be extended to homeowners insurance. Reading the FHA to permit disparate impact claims regarding homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of

Regulations Division
January 26, 2015
Page 6

homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers.

## II.   REQUEST FOR RELIEF

For the reasons set forth below, HUD should exempt homeowners insurance from its Disparate Impact Rule.

### A.   Disparate Impact Claims Are Not Cognizable Under The FHA

In *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, the Supreme Court is likely to rule that disparate impact claims are not cognizable under the FHA. As Judge Leon's recent decision in *American Insurance Association v. U.S. Department of Housing and Urban Development* indicates, a necessary consequence of that holding would be the vacating of the Disparate Impact Rule in its entirety. Whatever the Supreme Court ultimately decides, its opinion would be extremely important for HUD to consider before applying its Rule to insurers.

The Supreme Court is likely to hold that the FHA does not authorize disparate impact claims for several reasons. First, the FHA's terms indicate that it is limited to claims of intentional discrimination. The FHA prohibits various acts performed "*because of* race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604 (emphasis added). Accordingly, it only prohibits actions taken against persons because of their race or other protected characteristic. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (interpreting similar wording in Title VI of the Civil Rights Act to reach only intentional discrimination). Actions taken for other reasons that happen to affect different racial, gender, religious, or other groups differently are not prohibited by the FHA because they are not actions performed "because of race" or other protected characteristics. They are, by definition, actions taken "because of" other factors.

An example from the insurance context may help to illustrate this point. An insurer might charge different customers different rates based on whether or not their homes contain a fire extinguisher. This insurance pricing factor may mean that more people of a particular national origin may pay higher or lower insurance rates than others. But insurers would not be charging different rates "because of" national origin. Indeed, they could not do so, because insurers do not currently obtain data about the national origin, race, color, religion, or disability status of their policyholders. PCI Reply Br. at 7; Decl. of Teresa C. Cracas ¶ 6; Decl. of Michael Dawdy ¶ 11; Decl. of Ronald Joseph Zaleski, Sr. ¶ 11; Decl. of Peter Drogan ¶ 7.

Regulations Division
January 26, 2015
Page 7

The FHA's legislative history also indicates that it does not authorize disparate impact claims. During floor debates, no Representative or Senator suggested that the FHA could be used to impose disparate impact liability. Instead, the debates show Congress's intention to prohibit intentional discrimination. *See, e.g.*, 114 Cong. Rec. 5643 (1968) (Mondale: "The bill permits an owner to do . . . everything he could ever do with property, except refuse to sell it to a person solely on the basis of his color or his religion. That is all it does. It does not confer any right."); 114 Cong. Rec. 2283 (Brooke: "A person can sell his property to anyone he chooses, as long as it is by personal choice and not because of motivations of discrimination."); 114 Cong. Rec. 2530 (Tydings: the problem Congress intended to address was "the deliberate exclusion from residential neighborhoods on grounds of race"); 114 Cong. Rec. 3421 (Mondale: "[T]he basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it. It would not overcome the economic problem of those who could not afford to purchase the house of their choice."); 114 Cong. Rec. 3129 (Hatfield: the FHA prohibits a person being "denied the right to buy a home within a community according to his economic ability . . . merely because his skin is of a different color"); 114 Cong. Rec. 3252 (Scott: the FHA would ensure that individuals "can rent or buy the dwelling of their choice, if they have the money or credit to qualify").

**B.  Application of the Disparate Impact Rule to Homeowners Insurance Would Impair State Laws Regulating Insurance and Thus Violate the McCarran-Ferguson Act**

HUD must provide an exemption for homeowners insurance because application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. Op. at 42. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing

Regulations Division
January 26, 2015
Page 8

operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

### 1. State Laws Requiring Insurers To Engage in Risk-Based Pricing

The vast majority of states—40 of 50—require insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I, *infra*. Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5; N.J. Stat. Ann. § 17:29A-4; N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03; S.C. Code Ann. § 38-73-430; Tenn. Code Ann. § 56-5-304; Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I, *infra*.

In compliance with these laws, insurers charge different rates to different customers based on the required actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of 40 of the 50 states. Application of the Disparate Impact Rule to insurers would therefore "impair" and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly required by state law. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Moreover, the burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. For example, insurers would be liable if their use of an actuarially justified factor was not "*necessary* to achieve a legitimate interest." 24 C.F.R. § 100.500(c) (emphasis added). And even if every risk factor were proved necessary, plaintiffs could still prevail by showing that insurers' interests could be served by another practice with a less discriminatory effect, even if the alternative practice were less effective than the use of actuarial risk factors. *Id.*; Admin. Rec. at 625.

Regulations Division
January 26, 2015
Page 9

      HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *See id.* at 311; 24 C.F.R. § 100.500. *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would strip them of the ability to rely on state law and institutions that McCarran-Ferguson is designed to guarantee.

    **2.    State Laws Permitting Insurers To Engage in Risk-Based Pricing and Underwriting**

        **a.    State Insurance Laws**

      Every state has permitted insurers to charge different rates to different customers based on the customers' risk profiles. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Numerous other states use very similar language to expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). Under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(4); 18 Del.

Regulations Division
January 26, 2015
Page 10

Code § 2503; Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2); S.D. Codified Laws § 58-24-6; Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I, *infra*. As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal…laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted by the laws of 47 states. *See* Table I, *infra*.

b.    **State Fair Housing Laws**

HUD noted during the *PCI* litigation that some states have fair housing laws and that some state courts look to the FHA for guidance in interpreting those laws. HUD Mem. ISO Mot. to Dismiss at 28. HUD suggested that some of these state laws might in theory be interpreted to permit disparate impact claims against insurers. *Id.* Even in

Regulations Division
January 26, 2015
Page 11

states with fair housing laws, if the fair housing law does not specifically displace the state's insurance laws discussed above, then those insurance laws would remain valid. HUD did not show—and did not even claim— that any state's fair housing law displaces its insurance laws. Accordingly, if these valid state insurance laws requiring or permitting insurers to engage in risk-based pricing and underwriting conflict with the Disparate Impact Rule, then HUD's Rule is impermissible under the McCarran-Ferguson Act. PCI submits, based on the statutes described above, below, and in Table I, that state insurance laws in all 50 states clearly do conflict with the Disparate Impact Rule.

### c. Limitations on Use of Certain Risk Factors

HUD also noted during the *PCI* litigation that some states have laws restricting the discriminatory use of some factors in insurance pricing and underwriting, specifically credit history, geographic location, domestic violence victimization, and property age. HUD Mem. ISO Mot. to Dismiss at 26. As PCI pointed out in its responsive brief, these laws do not alleviate the conflict between the Disparate Impact Rule and state laws requiring or permitting insurers to engage in risk-based pricing and underwriting. Indeed, these laws prohibiting *discriminatory* use of certain risk factors permit insurers to rely on those factors so long as they do so in accordance with "sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience." Colo. Rev. Stat. § 10-3-1104(1)(f) (XIV) (permitting insurers to take geographic location into account so long as it is related to anticipated loss experience); *see also, e.g.*, Ark. Code Ann. § 23-66-206(14)(C) (permitting insurers to consider geographic location so long as it is not a mere pretext for discrimination); Ind. Code § 27-2-17-5(b) (same); Wis. Admin. Code Ins. § 6.68(3)(a) (same); Ala. Admin. Code r. 482-1-127.06 (prohibiting insurers from making decisions based solely on credit score or using credit history for any unfairly discriminatory reason); Alaska Stat. § 21.36.460(c) (permitting insurers to use credit history so long as they use it in combination with other substantive factors); N.Y. Ins. Law § 2802 (same); W. Va. Code Ann. § 33-17A-6(h) (same); Del. Code Ann. tit 18, § 4124 (permitting insurers to base decisions on age of property if decisions are "for a business purpose which is not a mere pretext for unfair discrimination"); Va. Code Ann. § 38.2-508(5) (same). These statutes thus delineate the extent to which insurers can use certain risk factors and which applications may be unfairly discriminatory. Therefore, they highlight the conflict between the Disparate Impact Rule's application to insurance pricing that uses standard actuarial factors and state laws' approval of insurers' reliance on just those factors.

Regulations Division
January 26, 2015
Page 12

### 3. State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—47 of 50, plus the District of Columbia—require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I, *infra*. Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05.

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g., Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting

Regulations Division
January 26, 2015
Page 13

plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is unlawful under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4. The Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the states' filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g., Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986).

The district court in *PCI* found that HUD had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. Op. at 44-45. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* at 45.

The filed-rate doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g., McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F3d 229, 236-39, 242 (3rd Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011);; *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005); *see also, e.g.*, Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 118 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates).

Applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g., Square D*, 476 U.S. at 417; *Korte*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted). Nor does the extent or the vigor of an agency's review of filed rates matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

Regulations Division
January 26, 2015
Page 14

### 5. Displacement of the Regulation of Insurance from States to Federal Courts

HUD's basic response to the numerous indisputable conflicts between the Disparate Impact Rule and state laws regulating insurance described in the preceding sections is that the Rule's burden-shifting framework would allow defendant companies to raise these state-law considerations on a case-by-case basis. In response to a plaintiff's *prima facie* case, a company could rely on these state laws to show that its pricing or underwriting practices were "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Far from alleviating the conflict between the Disparate Impact Rule and state insurance regulation, this response only confirms that the Rule makes the conflict inescapable.

As the Seventh Circuit has explained, the McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (McCarran-Ferguson prohibits the federal courts from "regulating the … insurance industry" via litigation). That is just what the Rule's burden-shifting framework would do. In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act (ADA) to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.*

HUD's Disparate Impact Rule would similarly lead to federal courts usurping core functions of the states' administrative regimes, including rate-making and underwriting, as well as all other insurance activities regulated by state law. State insurance commissioners currently regulate and supervise the insurance business, enforce insurance laws, and punish violators. *See, e.g.*, 1 Plitt et al., *Couch on Insurance* §§ 2:7-2:8. Under HUD's Rule, in order to avoid liability insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that "the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of that factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule

Regulations Division
January 26, 2015
Page 15

challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eight Circuit's similar recognition in *Saunders* that 'a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime." *Id.* That concern should preclude application of the Rule to risk-based pricing and underwriting of homeowners insurance.

### C. Peripheral Insurance Activities Not Mentioned in HUD's Rulemaking

In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70924. During the course of the *PCI* litigation, however, HUD indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. HUD Reply Br. at 3. HUD should exempt from the Disparate Impact Rule all homeowners insurance practices, not just pricing and underwriting.

As an initial matter, the relevant provisions of the FHA do not apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership. As the Seventh Circuit has explained, 42 U.S.C. § 3604 only "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992). The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." That section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

Regulations Division
January 26, 2015
Page 16

In any event, regulating broad categories of insurance practices in federal court on the basis of a federal statute that does not specifically relate to insurance would violate the McCarran-Ferguson Act by displacing the regulation of such practices by state regulators and courts. States pervasively regulate such practices. *See, e.g.*, Wis. Stat. Ann. § 628.01-628.98 (regulating marketing); Utah Code Ann. 1953 §§ 31A-23a-101 *et. seq.* (same); R.I. Gen. Laws. § 27-3.2-4 (requirements for salespersons); Ind. Code § 27-4-1-4.5 (regulating claims settlement); N.Y. Ins. Law § 2601 (same); Alaska Stat. § 21.36.125 (same); Ga. Code Ann., §§ 33-6-30 *et. seq.* (same). To move the locus of this regulation from the states into federal courts on the basis of a statute that does not mention insurance would violate the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

PCI respectfully requests that HUD provide an exemption or safe harbor for insurance practices beyond just rate-setting and underwriting. That is the only approach consistent with the FHA and the controlling precedent of *Mutual of Omaha*.[2]

## D. Application of the Disparate Impact Rule to Homeowners Insurance Would Undermine the Fundamental Nature of Insurance

As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using of any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. Admin. R. at 377.

---

[2] Absent creating a wholesale exemption for the provision and pricing of homeowners insurance, HUD should recognize that use of actuarially-sound, risk-based pricing and underwriting practices always constitutes a legitimate business interest. HUD should also require that any alternative proffered by a plaintiff or by HUD be equally effective to the challenged practice or combination of practices.

Regulations Division
January 26, 2015
Page 17

This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. Op. at 46. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Thus, it was not enough for HUD to impose *prima facie* liability on core insurance practices and then allow insurers the possibility of justifying their practices during the "Sisyphean" process of burden-shifting litigation. *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 376 (6th Cir. 2007). Rather, HUD should consider the costs to insurers of being subjected to such litigation, especially under a burden-shifting framework that places a difficult burden on defendants (proving that insurance practices are "necessary" to a substantial interest) and allows plaintiffs to win if they can show that an alternative exists that has less disparate impact. Indeed, under the burden-shifting framework adopted by HUD, some actuarially justified practices will not only be burdensome to justify and therefore likely relinquished, but will actually be prohibited. HUD expressly rejected a burden-shifting framework that would require plaintiffs or HUD to show that a proposed alternative approach is "equally effective," Admin. Rec. at 625. As a result, some actuarially justified factors will be prohibited because some other, less predictive factor may be used as a substitute. Federal courts reviewing insurance practices in all 50 states are likely to reach inconsistent judgments about which neutral risk factors violate the Fair Housing Act under this framework. They may also hold insurers liable for using neutral risk factors deemed acceptable by state courts. Moreover, HUD should consider the potential effects—including adverse selection and decreases in coverage—of imposing a rule of law that declares many core insurance practices unlawful (unless proven innocent in unpredictable litigation) and directs insurers to avoid all disparate impacts on protected groups.

Regulations Division
January 26, 2015
Page 18

**E.    HUD Can and Should Exempt Homeowners Insurance from the Rule
for the Reasons Set Forth Above**

HUD has previously maintained that it cannot exempt homeowners insurance
from the Disparate Impact Rule because "creating exemptions beyond those found in the
Act would run contrary to Congressional intent." Admin. Rec. at 627. HUD based this
assertion entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro
Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the
*Groach* court's finding that "categorical bars *are justified*" when the "plaintiff has no
chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the
*Groach* court went on to point to homeowners insurance as an example of when
application of the Disparate Impact Rule is never appropriate. *Id.* at 290-91.

\*      \*      \*

The Supreme Court is expect to decide whether disparate impact claims are not
cognizable under the Fair Housing Act. Regardless of the outcome of that case, however,
application of the Disparate Impact Rule to homeowners insurance would impair state
regulation of insurance in violation of the McCarran-Ferguson Act, interfere with the fair
and efficient operation of the market for homeowners insurance, and impose needless
costs on providers of homeowners insurance and their customers. HUD should therefore
exempt homeowners insurance from the Disparate Impact Rule.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

Enclosures



# FEDERAL REGISTER

| Vol. 80 | Thursday, |
|---------|-----------|
| No. 136 | July 16, 2015 |

Part III

## Department of Housing and Urban Development

24 CFR Parts 5, 91, 92, *et al.*
Affirmatively Furthering Fair Housing; Final Rule

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Parts 5, 91, 92, 570, 574, 576, and 903**

**[Docket No. FR–5173–F–04]**

**RIN 2501–AD33**

### Affirmatively Furthering Fair Housing

**AGENCY:** Office of the Secretary, HUD.

**ACTION:** Final rule.

**SUMMARY:** Through this final rule, HUD provides HUD program participants with an approach to more effectively and efficiently incorporate into their planning processes the duty to affirmatively further the purposes and policies of the Fair Housing Act, which is title VIII of the Civil Rights Act of 1968. The Fair Housing Act not only prohibits discrimination but, in conjunction with other statutes, directs HUD's program participants to take significant actions to overcome historic patterns of segregation, achieve truly balanced and integrated living patterns, promote fair housing choice, and foster inclusive communities that are free from discrimination. The approach to affirmatively furthering fair housing carried out by HUD program participants prior to this rule, which involved an analysis of impediments to fair housing choice and a certification that the program participant will affirmatively further fair housing, has not been as effective as originally envisioned. This rule refines the prior approach by replacing the analysis of impediments with a fair housing assessment that should better inform program participants' planning processes with a view toward better aiding HUD program participants to fulfill this statutory obligation.

Through this rule, HUD commits to provide states, local governments, public housing agencies (PHAs), the communities they serve, and the general public, to the fullest extent possible, with local and regional data on integrated and segregated living patterns, racially or ethnically concentrated areas of poverty, the location of certain publicly supported housing, access to opportunity afforded by key community assets, and disproportionate housing needs based on classes protected by the Fair Housing Act. Through the availability of such data and available local data and knowledge, the approach provided by this rule is intended to make program participants better able to evaluate their present environment to assess fair housing issues such as segregation,

conditions that restrict fair housing choice, and disparities in access to housing and opportunity, identify the factors that primarily contribute to the creation or perpetuation of fair housing issues, and establish fair housing priorities and goals.

**DATES:** *Effective Date:* August 17, 2015.

**FOR FURTHER INFORMATION CONTACT:** George D. Williams, Sr., Deputy Assistant Secretary for Policy, Legislatives Initiatives and Outreach, Office of Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW., Room 5246, Washington, DC 20410; telephone number 866–234–2689 (toll-free) or 202–402–1432 (local). Individuals who are deaf or hard of hearing and individuals with speech impairments may access this number via TTY by calling the toll-free Federal Relay Service during working hours at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### Purpose of the Regulatory Action

From its inception, the Fair Housing Act (and subsequent laws reaffirming its principles) has not only prohibited discrimination in housing related activities and transactions but has also provided, through the duty to affirmatively further fair housing (AFFH), for meaningful actions to be taken to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing. Prior to this rule, HUD directed participants in certain HUD programs to affirmatively further fair housing by undertaking an analysis of impediments (AI) that was generally not submitted to or reviewed by HUD. This approach required program participants, based on general guidance from HUD, to identify impediments to fair housing choice within their jurisdiction, plan, and take appropriate actions to overcome the effects of any impediments, and maintain records of such efforts. Informed by lessons learned in localities across the country, and with program participants, civil rights advocates, other stakeholders, and the U.S. Government Accountability Office all commenting to HUD that the AI approach was not as effective as originally envisioned, in 2013 HUD initiated the rulemaking process to propose a new and more effective approach for program participants to use in assessing the fair housing issues and factors in their jurisdictions and regions and for establishing fair housing priorities and goals to address them.

The approach proposed by HUD in 2013, and adopted in this final rule, with revisions made in response to public comments, strengthens the process for program participants' assessments of fair housing issues and contributing factors and for the establishment of fair housing goals and priorities by requiring use of an Assessment Tool, providing data to program participants related to certain key fair housing issues, and instituting a process in which HUD reviews program participants' assessments, prioritization, and goal setting. While the statutory duty to affirmatively further fair housing requires program participants to take actions to affirmatively further fair housing, this final rule (as was the case in the proposed rule) does not mandate specific outcomes for the planning process. Instead, recognizing the importance of local decisionmaking, the new approach establishes basic parameters to help guide public sector housing and community development planning and investment decisions in being better informed about fair housing concerns and consequently help program participants to be better positioned to fulfill their obligation to affirmatively further fair housing.

### Summary of Legal Authority

The Fair Housing Act (title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601–3619) declares that it is "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." See 42 U.S.C. 3601. Accordingly, the Fair Housing Act prohibits, among other things, discrimination in the sale, rental, and financing of dwellings, and in other housing-related transactions because of "race, color, religion, sex, familial status,[1] national origin, or handicap." [2] See 42 U.S.C. 3604 and 3605. Section 808(d) of the Fair Housing Act requires all executive branch departments and agencies administering housing and urban development programs and activities to administer these programs in a manner that affirmatively furthers fair housing. See 42 U.S.C. 3608.

---

[1] The term "familial status" is defined in the Fair Housing Act at 42 U.S.C. 3602(k). It includes one or more children who are under the age of 18 years being domiciled with a parent or guardian.

[2] Although the Fair Housing Act was amended in 1988 to extend civil rights protections to persons with "handicaps," the term "disability" is more commonly used and accepted today to refer to an individual's physical or mental impairment that is protected under federal civil rights laws, the record of such an impairment, and being regarded as having such an impairment. For this reason, except where quoting from the Fair Housing Act, this preamble and final rule use the term "disability."

Section 808(e)(5) of the Fair Housing Act (42 U.S.C. 3608(e)(5)) requires that HUD programs and activities be administered in a manner affirmatively furthering the policies of the Fair Housing Act.

*Summary of the Major Provisions of the Rule*

The Affirmatively Furthering Fair Housing (AFFH) regulations promulgated by this final rule:

a. Replace the AI with a more effective and standardized Assessment of Fair Housing (AFH) through which program participants identify and evaluate fair housing issues, and factors contributing to fair housing issues (contributing factors);

b. Improve fair housing assessment, planning, and decisionmaking by HUD providing data that program participants must consider in their assessments of fair housing—designed to aid program participants in establishing fair housing goals to address these issues and contributing factors;

c. Incorporate, explicitly, fair housing planning into existing planning processes, the consolidated plan and PHA Plan, which, in turn, incorporate fair housing priorities and goals more effectively into housing, and community development decisionmaking;

d. Encourage and facilitate regional approaches to address fair housing issues, including collaboration across jurisdictions and PHAs; and

e. Provide an opportunity for the public, including individuals historically excluded because of characteristics protected by the Fair Housing Act, to provide input about fair housing issues, goals, priorities, and the most appropriate uses of HUD funds and other investments, through a requirement to conduct community participation as an integral part of the new assessment of fair housing process.

This new approach is designed to empower program participants and to foster the diversity and strength of communities by overcoming historic patterns of segregation, reducing racial or ethnic concentrations of poverty, and responding to identified disproportionate housing needs consistent with the policies and protections of the Fair Housing Act. The rule also seeks to assist program participants in reducing disparities in housing choice and access to housing and opportunity based on race, color, religion, sex, familial status, national origin, or disability, thereby expanding economic opportunity and enhancing the quality of life.

*Summary of Benefits and Costs*

HUD believes that the rule, through its improvements to the fair housing planning process, has the potential for substantial benefit not only for program participants but also for the communities they serve and the United States as a whole. The new approach put in place by this rule is designed to improve the fair housing planning process by providing better data and greater clarity to the steps that program participants must undertake to assess fair housing issues and contributing factors and establish fair housing priorities and goals to address them. The fair housing issues, contributing factors, goals, and priorities identified through this process will be available to help inform program participants' investments and other decisionmaking, including their use of HUD funds and other resources. These improvements should yield increased compliance with fair housing and civil rights laws and fewer instances of litigation pertaining to the failure to affirmatively further fair housing. Through this rule, HUD commits to provide states, local governments, PHAs, the communities they serve, and the general public, to the fullest extent possible, with local and regional data on patterns of integration and segregation, racially or ethnically concentrated areas of poverty, access to housing and key community assets that afford opportunity, and disproportionate housing needs based on characteristics protected by the Fair Housing Act. From these data, program participants should be better able to evaluate their present environment to assess fair housing issues, identify the significant contributing factors that account for those issues, set forth fair housing priorities and goals, and document these activities.

As detailed in the Regulatory Impact Analysis (found at *www.regulations.gov* under the docket number 5173–F–03–RIA), HUD does not expect a large aggregate change in compliance costs for program participants as a result of the proposed rule. Currently, HUD program participants are required to conduct an AI to fair housing choice, take appropriate actions to overcome the effects of identified impediments, and maintain records relating to the duty to affirmatively further fair housing. An increased emphasis on affirmatively furthering fair housing within the planning process may increase compliance costs for some program participants, but this final rule, as provided in Section III of this preamble, has strived to mitigate the increase of such costs. The net change in burden for

specific local entities will depend on the extent to which they have been complying with the planning process already in place. The local entities that have been diligent in completing rigorous AIs may experience a net decrease in administrative burden as a result of the revised process. Program participants are currently required also to engage in outreach and collect data in order to meet the obligation to affirmatively further fair housing. As more fully addressed in the Regulatory Impact Analysis that accompanies this rule, HUD estimates compliance costs to program participants of $25 million annually, as well as resource costs to HUD of $9 million annually.

The rule covers program participants that are subject to a great diversity of local conditions and economic and social contexts, as well as differences in the demographics of populations, housing needs, and community investments. The rule provides for program participants to supplement data provided by HUD with available local data and knowledge and requires them to undertake the analysis of this information to identify barriers to fair housing. Also, the rule affords program participants considerable choice and flexibility in formulating goals and priorities to achieve fair housing outcomes and establishing the metrics that will be used to monitor and document progress. The precise outcomes of the proposed AFH planning process are uncertain, but the rule will enable each jurisdiction to plan meaningfully.

## II. Background

*A. Legal Authority*

HUD's July 2013 proposed rule fully set out the legal basis for HUD's authority to issue regulations implementing the obligation to affirmatively further fair housing, but HUD believes it is important to restate such authority in this final rule.

The Fair Housing Act (title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601–3619), enacted into law on April 11, 1968, declares that it is "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." See 42 U.S.C. 3601. Accordingly, the Fair Housing Act prohibits discrimination in the sale, rental, and financing of dwellings, and in other housing-related transactions because of race, color, religion, sex, familial status, national origin, or handicap. See 42 U.S.C. 3601 *et seq.* In addition to prohibiting discrimination, the Fair Housing Act (42 U.S.C. 3608(e)(5))

**42274** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

requires that HUD programs and activities be administered in a manner to affirmatively further the policies of the Fair Housing Act. Section 808(d) of the Fair Housing Act (42 U.S.C. 3608(d)) directs other Federal agencies ''to administer their programs . . . relating to housing and urban development . . . in a manner affirmatively to further'' the policies of the Fair Housing Act, and to ''cooperate with the Secretary'' in this effort.

The Fair Housing Act's provisions related to ''affirmatively . . . further[ing]'' fair housing, contained in sections 3608(d) and (e) include more than the Act's anti-discrimination mandates. *NAACP, Boston Chapter* v. *HUD,* 817 F.2d 149 (1st Cir. 1987); see, *e.g., Otero* v. *N.Y. City Hous. Auth.,* 484 F.2d 1122 (2d Cir. 1973); *Shannon* v. *HUD,* 436 F.2d 809 (3d Cir. 1970).When the Fair Housing Act was originally enacted in 1968 and amended in 1988, major portions of the statute involved the prohibition of discriminatory activities (whether undertaken with a discriminatory purpose or with a discriminatory impact) and how private litigants and the government could enforce these provisions

In section 3608(d) of the Fair Housing Act, however, Congress went further by mandating that ''programs and activities relating to housing and urban development'' be administered ''in a manner affirmatively to further the purposes of this subchapter.'' This is not only a mandate to refrain from discrimination but a mandate to take the type of actions that undo historic patterns of segregation and other types of discrimination and afford access to opportunity that has long been denied. Congress has repeatedly reinforced this mandate, requiring in the Housing and Community Development Act of 1974, the Cranston-Gonzalez National Affordable Housing Act, and the Quality Housing and Work Responsibility Act of 1998, that covered HUD program participants certify, as a condition of receiving Federal funds, that they will affirmatively further fair housing. See 42 U.S.C. 5304(b)(2), 5306(d)(7)(B), 12705(b)(15), 1437C–1(d)(16).[3]

In examining the legislative history of the Fair Housing Act and related statutes, courts have found that the purpose of the affirmatively furthering fair housing mandate is to ensure that recipients of Federal housing and urban development funds and other Federal funds do more than simply not discriminate: Recipients also must take actions to address segregation and related barriers for groups with characteristics protected by the Act, as often reflected in racially or ethnically concentrated areas of poverty. The U.S. Supreme Court, in one of the first Fair Housing Act cases it decided, referenced the Act's cosponsor, Senator Walter F. Mondale, in noting that ''the reach of the proposed law was to replace the ghettos 'by truly integrated and balanced living patterns.' '' *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 211 (1972).[4] The Act recognized that ''where a family lives, where it is allowed to live, is inextricably bound up with better education, better jobs, economic motivation, and good living conditions.'' 114 Cong. Rec. 2276–2707 (1968). As the First Circuit has explained, section 3608(d) and the legislative history of the Act show that Congress intended that ''HUD do more than simply not discriminate itself; it reflects the desire to have HUD use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases.'' *NAACP, Boston Chapter* v. *HUD,* 817 F.2d at 154; See also *Otero* 484 F.2d at 1134 (section 3608(d) requires that ''[a]ction must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunity the Act was designed to combat'').

The Act itself does not define the precise scope of the affirmatively furthering fair housing obligation for HUD's program participants. Over the years, courts have provided some guidance for this task. In the first appellate decision interpreting section 3608, for example, the U.S. Court of Appeals for the Third Circuit emphasized the importance of racial and socioeconomic data to ensure that ''the agency's judgment was an informed one'' based on an institutionalized method to assess site selection and related issues. *Shannon,* 436 F.2d at 821–22. In multiple other decisions, courts have set forth how the section applies to specific policies and practices of HUD program participants. See, *e.g., Otero,* 484 F.2d at 1132–37; *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43 (1st Cir. 2000); *U.S. ex rel. Anti-Discrimination Ctr.* v. *Westchester Cnty.,* 2009 WL 455269 (S.D.N.Y. Feb. 24, 2009).

In addition to the statutes and court cases emphasizing the requirement of recipients of Federal housing and urban development funds and other Federal funds to affirmatively further fair housing, executive orders have also addressed the importance of complying with this requirement.[5]

### B. HUD's July 19, 2013, Proposed Rule

On July 19, 2013, at 78 FR 43710, HUD published its proposed rule that described the new assessment of fair housing (AFH) process that would replace the AI. As stated in the July 19, 2013, rule, HUD proposed a process that should aid program participants to more effectively carry out the obligation to affirmatively further fair housing by more directly linking the identification of fair housing issues, prioritization, and goal setting to housing and community development planning processes currently undertaken by program participants and that is required as a condition of their receipt of HUD funds.

At the jurisdictional planning level, HUD requires program participants

---

[3] Section 104(b)(2) of the Housing and Community Development Act (HCD Act) (42 U.S.C. 5304(b)(2)) requires that, to receive a grant, the state or local government must certify that it will affirmatively further fair housing. Section 106(d)(7)(B) of the HCD Act (42 U.S.C. 5306(d)(7)(B)) requires a local government that receives a grant from a state to certify that it will affirmatively further fair housing. The Cranston-Gonzalez National Affordable Housing Act (NAHA) (42 U.S.C. 12704 *et seq.*) provides in section 105 (42 U.S.C. 12705) that states and local governments that receive certain grants from HUD must develop a comprehensive housing affordability strategy to identify their overall needs for affordable and supportive housing for the ensuing 5 years, including housing for homeless persons, and outline their strategy to address those needs. As part of this comprehensive planning process, section 105(b)(15) of NAHA (42 U.S.C. 12705(b)(15)) requires that these program participants certify that they will affirmatively further fair housing. The Quality Housing and Work Responsibility Act of 1998 (QHWRA), enacted into law on October 21, 1998, substantially modified the United States Housing Act of 1937 (42 U.S.C. 1437 *et seq.*) (1937 Act), and the 1937 Act was more recently amended by the Housing and Economic Recovery Act of 2008, Public Law 110–289 (HERA). QHWRA introduced formal planning processes for PHAs—a 5-Year Plan and an Annual Plan. The required contents of the Annual Plan include a certification by the PHA that the PHA will, among other things, affirmatively further fair housing.

[4] Reflecting the era in which it was enacted, the Fair Housing Act's legislative history and early court decisions refer to ''ghettos'' when discussing racially concentrated areas of poverty.

[5] Executive Order 12892, entitled ''Leadership and Coordination of Fair Housing in Federal Programs: Affirmatively Furthering Fair Housing,'' issued January 17, 1994, vests primary authority in the Secretary of HUD for all federal executive departments and agencies to administer their programs and activities relating to housing and urban development in a manner that furthers the purposes of the Fair Housing Act. Executive Order 12898, entitled ''Executive Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,'' issued on February 11, 1994, declares that Federal agencies shall make it part of their mission to achieve environmental justice ''by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations.''

receiving Community Development Block Grant (CDBG), HOME Investment Partnerships (HOME), Emergency Solutions Grants (ESG), and Housing Opportunities for Persons With AIDS (HOPWA) formula funding to undertake an analysis to identify impediments to fair housing choice within the jurisdiction and take appropriate actions to overcome the effects of any impediments, and keep records on such efforts. See §§ 91.225(a)(1), 91.325(a)(1).[6] Similarly, PHAs must commit, as part of their planning process for PHA Plans and any plans incorporated therein, to examine their programs or proposed programs, identify any impediments to fair housing choice within those programs, address those impediments in a reasonable fashion in view of the resources available, work with jurisdictions to implement any of the jurisdiction's initiatives to affirmatively further fair housing that require PHA involvement, maintain records reflecting those analyses and actions, and operate programs in a manner that is consistent with the applicable jurisdiction's consolidated plan. See §§ 903.7(o), 903.15.

Over the past several years, HUD reviewed the efficacy of these mechanisms to fulfill the affirmatively furthering fair housing mandate and concluded that the AI process could be improved to make it a more meaningful tool to integrate fair housing into program participants' planning efforts. HUD issued its Fair Housing Planning Guide (Planning Guide) in 1996 to provide extensive guidance on how to affirmatively further fair housing. However, HUD has not, in a systematic manner, offered to its program participants the data in HUD's possession that may better help them frame their fair housing analysis, and HUD generally did not require AIs to be submitted to HUD for review.

These observations are reinforced by a recent report by the U.S. Government Accountability Office (GAO) entitled "HUD Needs to Enhance Its Requirements and Oversight of Jurisdictions' Fair Housing Plans," GAO–10–905, Sept. 14, 2010. See *http://www.gao.gov/new.items/d10905.pdf* (GAO Report). In this report, the GAO found that there has been uneven attention paid to the AI by local communities in part because sufficient

guidance and clarity were viewed as lacking. Specifically, GAO stated that it found that "HUD's limited regulatory requirements and oversight" contributed to many HUD program participants placing a "low priority on ensuring that their AIs serve as effective planning tools." [7] In its recommendations, GAO emphasized that HUD could assist program participants by providing more effective guidance and technical assistance and the data necessary to prepare fair housing plans.

Stemming from substantial interaction with program participants and advocates, and in light of the GAO Report, HUD concluded that the current AI process was not well integrated into the planning efforts for expenditure of funds made by HUD program participants. HUD recognized that many program participants actively grapple with how issues involving race, national origin, disability, and other fair housing issues do and should influence grant decisions as part of housing and community development planning. HUD found that program participants often turned to outside consultants to collect data and conduct the analysis, but that program participants had little incentive or awareness to use this analysis as part of the investments and other decisions they made as part of the consolidated plan or PHA Plan processes. HUD further concluded that, in a time of limited resources, HUD could do more to support program participants in the process, especially through the provision of data, meaningful technical assistance, and additional guidance. All these findings led HUD to the decision to offer a new approach of linking fair housing issue identification, prioritization, and goal setting with program participants' traditional planning processes related to housing and community development.

To more effectively carry out its affirmatively furthering fair housing obligation, in the July 19, 2013, rule, HUD proposed a new AFH process to replace the AI process. As provided in the proposed rule, the new AFH process involved the following key features: (1) A new fair housing assessment tool; (2) the provision of nationally uniform data that would be the predicate for and would help frame program participants' assessment activities; (3) meaningful and focused direction regarding the purpose of the AFH and the standards by which it would be evaluated; (4) a

more direct link between the AFH and subsequent program participant planning documents—the consolidated plan and the PHA Plan—that would tie fair housing planning into the priority setting, commitment of resources, and specification of activities to be undertaken; and (5) a new HUD review procedure based on clear standards that would facilitate the provision of technical assistance and reinforce the value and importance of fair housing planning activities.

As provided in the proposed rule, the new AFH process would be established in regulations in 24 CFR part 5, subpart A, with conforming amendments provided in the following regulations: 24 CFR part 91 (Consolidated Submission for Community Planning and Development Programs); 24 CFR part 92 (HOME Investment Partnerships Program); 24 CFR part 570 (Community Development Block Grants); 24 CFR part 574 (Housing Opportunities for Persons With AIDS); 24 CFR part 576 (Emergency Solutions Grants Program); and 24 CFR part 903 (Public Housing Agency Plans).

A more detailed discussion of HUD's July 19, 2013, proposed rule, including the specific AFH regulations and conforming amendments proposed, can be found at 79 FR 43716 through 43723. HUD refers interested parties to the preamble to the proposed rule for a detailed discussion of the proposed AFH process and the reasons for HUD's proposal of the features and elements of the new AFH process.

*C. Proposed Assessment Tool*

On September 26, 2014, at 79 FR 57949, HUD published in the **Federal Register**, the proposed "Assessment Tool" to be used by program participants to evaluate fair housing choice in their jurisdictions, to identify barriers to fair housing choice at the local and regional levels, and to set fair housing goals to overcome such barriers and advance fair housing choice. HUD published the proposed Assessment Tool for a period of 60 days in accordance with HUD's July 19, 2013, proposed rule, and in accordance with the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*

HUD appreciates the comments submitted on the proposed Assessment Tool, and will follow the September 2014 notice with a second notice soliciting comment for another 30-day period, as required by the Paperwork Reduction Act, and advise of changes made to the proposed Assessment Tool in response to the initial 60-day solicitation of comment.

---

[6] For these programs, the consolidated plan is intended as the program participant's comprehensive mechanism to gather relevant housing data, detail housing, homelessness, and community development strategies, and commit to specific actions. These are then updated through annual action plans.

[7] The GAO noted that close to 30 percent of the grantees from whom GAO sought documentation had outdated AIs and that almost 5 percent of the grantees were unable to provide AIs when requested.

In addition, it is important to note that the burden imposed by the Assessment Tool and additional Assessment Tools issued by HUD must, in accordance with the Paperwork Reduction Act, be renewed for approval by the Office of Management and Budget (OMB) every 3 years, at which point, the opportunity is also presented to assess whether the Assessment Tool is aiding fair housing planning as intended by this rule.

### D. Solicitation of Comment on Proposed Staggered Submission of AFH

On January 15, 2015, at 80 FR 2062, HUD published in the **Federal Register** a document reopening the public comment period on the issue of providing a later submission deadline for certain entities. In this document, HUD advised that it was considering providing certain HUD program participants—States, Insular Areas, qualified PHAs, jurisdictions receiving a small CDBG grant—with the option of submitting their first AFH at a date later than would otherwise be required for program participants that are neither States, Insular Areas, qualified PHAs, nor grantees receiving a small CDBG grant, as proposed to be defined by the January 15, 2015, document.

For PHAs, section 2702 of title II of the Housing and Economic Recovery Act (HERA)[8] introduced a definition of "qualified PHAs" to exempt such PHAs, that is, PHAs that have a combined total of 550 or fewer public housing units and section 8 vouchers, are not designated as troubled under section 6(j)(2) of the 1937 Act, and do not have a failing score under the Section Eight Management Assessment Program (SEMAP) during the prior 12 months, from the burden of preparing and submitting an annual PHA Plan. Given that Congress has determined that qualified PHAs should have reduced administrative burdens, HUD proposed that it is appropriate to provide these agencies with more time to submit their first AFH.

With respect to small CDBG grants, there is no statutory definition on which HUD can rely as is the case for qualified PHAs. However, as noted in the January 15, 2015, document, in HUD's Congressional Justifications issued in support of HUD's Fiscal Years (FYs) 2013 and 2014 budget requests, HUD proposed to establish a minimum grant threshold of approximately $350,000, based on a percentage of the CDBG formula appropriation. Therefore, HUD proposed, similar to qualified PHAs, to

delay the submission date of the first AFH for entitlement jurisdictions receiving a grant of 0.0125 percent of the CDBG formula appropriation or less.

With respect to States and Insular Areas, HUD advised that it decided to design a separate Assessment Tool for States and Insular Areas. HUD agreed with commenters responding to the Assessment Tool, published on September 26, 2014, that a separate Assessment Tool for States and Insular Areas would address commenters' concerns about the AFH approach being better suited for entitlement jurisdictions. HUD also advised that the separate Assessment Tool will not be provided for public comment as part of the second statutorily required public comment period on the Assessment Tool published on September 26, 2014. Rather, HUD will have the Assessment Tool for States and Insular Areas separately undergo the full notice and comment process (a 60-day notice and a 30-day notice) under the Paperwork Reduction Act, and this decision automatically means a later first AFH submission deadline for States and Insular areas.

Although not part of the January 15, 2015, document, in the preamble to the Assessment Tool published on September 26, 2014, HUD advised that the draft Assessment Tool for which public comment was sought is the Assessment Tool designed for use by entitlement jurisdictions and for joint submissions by entitlement jurisdictions and for PHAs where the entitlement jurisdiction is chosen as the lead entity. HUD clarified that the Assessment Tool is not the tool that will be used by regionally collaborating entitlement jurisdictions or PHAs that will not be making a joint submission, nor will it be used by States and Insular areas. In brief, HUD committed to provide a separate Assessment Tool for PHAs. HUD also advised of its intention to develop program-specific participant Assessment Tools to be available for public comment at the time that HUD publishes the first Assessment Tool for its additional 30 days of public comment. HUD since decided to have the State and PHA Assessment Tools undergo the full notice and comment process under the Paperwork Reduction Act (a 60-day notice and a 30-day notice).

In response to the January 15, 2015, document HUD received 21 public comments. The majority of public commenters were supportive of a delayed submission of the first AFH for States, Insular Areas, qualified PHAs, and jurisdictions receiving small CDBG grants. Commenters, however, differed

on where to draw the threshold for a small CDBG. Commenters suggested that the threshold should be drawn at $1 million. A commenter, commenting on the percentage that HUD proposed, suggested a percentage cutoff of 0.018 percent rather than HUD's suggested percentage of 0.0125. The commenter explained that this threshold would bring the cutoff to approximately $500,000, and at that level, administrative funds can be up to $100,000, an increase from $70,000, which is the amount that would be available to entitlement jurisdictions receiving $348,875—the amount under the HUD-proposed threshold. The public comments received in response to the January 15, 2015, document can be found at the following Web site: *http://www.regulations.gov/ #!docketDetail;D=HUD-2015-0009.*

After consideration of the comments on the CDBG threshold, HUD has decided to set the threshold for a small CDBG grant at a FY 2015 grant of $500,000 or less. HUD believes that this dollar threshold is appropriate for providing a delayed first AFH submission for certain CDBG grantees. Therefore, as a result of HUD's January 15, 2015, proposal and in consideration of comments responding to that proposal, States, Insular Areas, qualified PHAs, and CDBG grantees receiving an FY 2015 CDBG grant of $500,000 or less will have a delayed first-AFH submission deadline, as will all PHAs, even those that are not qualified PHAs. For PHAs, the first AFH submission deadline will be based on when the PHA Assessment Tool has been approved by OMB—following HUD undertaking the notice and comment process required by the Paperwork Reduction Act—and announced by HUD as available for use.

### III. Overview of Final Rule—Key Changes Made at Final Rule Stage

In the proposed rule, HUD solicited public comment on the new AFH process and included 19 issues for which HUD specifically solicited comment. In Section IV of this preamble, HUD provides a summary of the significant comments raised by the public comments and provides HUD's response to these issues. HUD received more than 1,000 public comments on the July 19, 2013, proposed rule. HUD appreciates all the questions raised, and suggestions and recommendations made by the public commenters. After review and consideration of the public comments and upon further consideration of issues by HUD, the following highlights key clarifications

---

[8] Public Law 110–289, 122 Stat. 2654, approved July 30, 2008, see 122 Stat. 2863.

**Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations **42277**

and changes made by HUD in this final rule.

The final rule:

• Clarifies that HUD supports a balanced approach to affirmatively furthering fair housing by revising the "Purpose" section of the rule and the definition of "affirmatively furthering fair housing." Also, HUD has created a new provision listing goals and priorities a program participant may take to affirmatively further fair housing, which may include, but are not limited to, place-based solutions and options to increase mobility for protected classes. (See §§ 5.150, 5.152, and 5.154.)

• Replaces the term "proactive steps" in the definition of "affirmatively furthering fair housing" with the term "meaningful actions" and defines "meaningful actions." (See § 5.152.)

• Revises the definition of "Assessment Tool" to advise that the tool is not solely a single form or template, but refers to any form or template issued by HUD as an Assessment Tool for the AFH and includes instructions. The definition makes clear that HUD may issue different Assessment Tools for different types of program participants.

• Clarifies, through the addition of a new § 5.151, that implementation of the new AFH process commences when the Assessment Tool designated for use by the program participant has been approved by OMB, and the availability for use of such Assessment Tool is published in the **Federal Register.**

• Adds a definition of "data" to collectively refer to "HUD-provided data" and "local data," both of which terms are also defined. (See § 5.152.)

• Replaces the term "determinant" with a more plain language term—"fair housing contributing factor" or simply "contributing factor." (See § 5.152.)

• Adds a definition of "disability." (See § 5.152.)

• Clarifies when disproportionate housing needs exist by revising the definition of "disproportionate housing needs." (See § 5.152.)

• Revises the definitions of "fair housing choice" and "fair housing issue" by removing outdated terminology (*i.e.,* "handicap") and making certain additional clarifying changes. (See § 5.152.)

• Adds a definition of "geographic area" which refers to the area of analysis of a program participant that may be a jurisdiction, region, state, Core-Based Statistical Area (CBSA), or another applicable area, depending on the area served by the program participant. (See § 5.152.)

• Adds a definition of "housing programs serving specified populations" to clarify that participation in HUD and Federal housing programs serving specified populations does not present a fair housing issue of segregation, provided that such programs comply with the program regulations and applicable Federal civil rights statutes and regulations. (See § 5.152.)

• Revises the definition of "integration" to provide greater clarity as to the meaning of this term. (See § 5.152.)

• Adds a definition of "local knowledge" based on and consistent with the description of such term in the Assessment Tool. (See § 5.152.)

• Revises the definition of "segregation" to provide greater clarity. (See § 5.152.)

• Adds a definition of "qualified PHA." (See § 5.152.)

• Revises and clarifies how the analysis of data and the identification of fair housing priorities and goals should be undertaken, including emphasizing that the program participant is responsible for establishing appropriate priorities and goals. (See § 5.154(d).)

• Clarifies that although regionally collaborating program participants need not be contiguous and may cross state boundaries, regionally collaborating program participants should be located within the same CBSA, as defined by OMB at the time of submission of the regional AFH, but HUD allows for exceptions. (See § 5.156.)

• Emphasizes that "acceptance" of an AFH means only that, for purposes of administering HUD program funding, HUD has determined that the program participant has provided an AFH that meets the required elements. Acceptance does not mean that the program participant has complied with its obligation to affirmatively further fair housing under the Fair Housing Act; has complied with other provisions of the Fair Housing Act; or has complied with other civil rights laws and regulations. (See § 5.162.)

• Provides a staggered submission deadline for AFHs; that is, the rule specifies the order of submission by which program participants will submit their first AFH. The rule provides that entitlement jurisdictions receiving an FY 2015 CDBG grant of $500,000 or less, States, Insular Areas, and PHAs will submit their first AFH in the second stage of submission, or at such time as the Assessment Tool specifically applicable to one of these program participants has been approved by OMB and announced by HUD as available for use. The Assessment Tool specifically applicable to a program participant will specify the first-AFH submission deadline, and will ensure the same level of transition as provided for entitlement jurisdictions, which will be the first program participants to submit an AFH. (See § 5.160(a).)

• Allows PHAs, whether submitting an AFH as part of participation with their consolidated plan program participants, other PHAs, or on their own, to submit an AFH every 5 years, imposing on PHAs similar requirements to those placed on jurisdictions subject to the consolidated plan requirements. (See §§ 5.160 and 903.15.)

• Provides that a program participant that undertook a Regional AI in connection with a grant awarded under HUD's FY 2010 or 2011 Sustainable Communities Competition is not required to undertake an AFH for the first AFH submission stage. (See § 5.160(a).)

• Clarifies the conditions under which HUD may not accept an AFH, and provides examples of an AFH that is substantially incomplete with respect to the fair housing assessment, and examples of an AFH that is inconsistent with fair housing and civil rights requirements; and emphasizes that HUD will work with program participants to achieve an AFH that is accepted. (See § 5.162.)

• Provides greater flexibility to program participants in determining when a program participant must revise an AFH, and specifies conditions when HUD may intervene and require a program participant to revise an AFH, but also provides program participants with the opportunity to disagree with HUD's determination. HUD also expands the time frame in which to revise an AFH. (See § 5.164.)

• Revises for PHAs the three options provided in the proposed rule by which a PHA may conduct and submit an AFH. (See § 903.15.)

• Adds a new "certification" provision, which clarifies that program participants must certify that they will affirmatively further fair housing when required by statutes and regulations governing their programs, and provides that challenges to the certifications will follow the procedures for consolidated plan program participants in 24 CFR part 91 and for PHA Plan program participants in 24 CFR part 903, as revised in this final rule. (See § 5.166.)

• Moves fair housing-related material from § 903.2(d) to § 903.15(d).

In addition to these changes, HUD also corrected editorial and technical errors identified by the commenters. HUD believes that these changes, more fully discussed below, respond to commenters' requests that they be given

more clarity, more flexibility, and more time in fair housing planning.

## IV. Public Comments and HUD's Response to Public Comments

### A. The Public Comments Generally

HUD received over 1,000 public comments, including duplicate mass mailings, resulting in approximately 885 unique public submissions covering a wide range of issues. Comments came from a wide variety of entities, including PHAs, other housing providers, organizations representative of housing providers, governmental jurisdictions and agencies, civil rights organizations, tenant and other housing advocacy organizations, and individuals. All public comments can be viewed at *http://www.regulations.gov/#!docketDetail;D=HUD-2013-0066.*

Many commenters expressed outright support for HUD's proposal, without suggesting any changes and requesting that HUD proceed to implement as quickly as possible. Commenters who expressed general support for the rule stated that the rule was a step toward increased opportunity in housing, and that the rule would assist in attaining the goals of the Fair Housing Act.

Many commenters, however, also expressed outright opposition to the rule, stating that HUD's proposal was without legal foundation, that it was an intrusion on affairs that should be handled by local jurisdictions for a variety of reasons, and that the proposal constituted social engineering.

The majority of commenters, whether supportive of HUD's proposal or opposed, provided thoughtful comments for HUD's consideration, advising how the proposal would work better with certain changes, or advising why the proposal would not work and why HUD should withdraw the proposal completely or go back to the drawing board, so to speak. With respect to this latter theme, several commenters expressed support for the new AFH process but requested that HUD give the new approach more thought and reopen the public comment period on the proposed rule, implement the new approach as a pilot first, issue a second proposed rule, or issue an interim rule, which would provide the opportunity for another round of comments.

While commenters raised a wide variety of issues concerning HUD's proposal, the following highlights comments and concerns shared by many commenters:

• HUD's proposal lacked a balanced approach; that is, HUD's proposal seemed to discourage, if not implicitly prohibit, continued investment of Federal resources in areas of racial or ethnic concentration of poverty;

• HUD's proposal lacked reference to benchmarks and outcomes so that HUD and the public could determine a program participant's progress in affirmatively furthering fair housing in accordance with the participant's assessment of fair housing;

• HUD's proposal was not clear on the standards of review of an AFH;

• HUD's proposed new AFH approach is too burdensome, duplicating actions already required by the consolidated plan and PHA Plan;

• HUD lacks the capacity to effectively carry out its responsibilities under the proposal;

• HUD's proposal is an intrusion on the affairs and responsibilities of local governments, and opens the door to the Federal Government determining zoning, the placement of infrastructure, and other local services;

• HUD's proposal does not take into consideration the unique status of States, which have no control over local governments, and consequently, the AFH should only apply to entitlement jurisdictions;

• HUD must carefully screen the accuracy of data to be provided by HUD because prior experience in other programs has shown that the data are not always reliable;

• HUD's proposal is an expansion of the Fair Housing Act, which does not require an assessment of such nonhousing elements as transportation, employment, education, and similar elements; and

• HUD needs to clarify the process it will use when a program participant does not have an AFH that has been accepted, as well as the consequences.

Again, HUD appreciates the time that commenters took to provide helpful information and valuable suggestions. As can be seen by HUD's promulgation of this final rule, HUD decided to proceed to the final rule stage and put in place the new AFH approach. However, as provided in the overview of changes made at the final rule stage, program participants and other interested members of the public can see the many changes that HUD made in response to public comments, and how specific concerns were addressed in these final regulations.

In the following section of the preamble, HUD addresses the public comments.

### B. Specific Public Comments

#### 1. Balanced Approach

*Comment: Proposed rule appears to prohibit program participants from using Federal resources in neighborhoods of concentrated poverty.* A substantial number of commenters who expressed support for the rule stated that the proposed rule did not provide a balanced approach to investment of Federal resources. Commenters stated that the proposed rule appeared to solely emphasize mobility as the means to affirmatively further fair housing, and by such emphasis, the rule devalued the strategy of making investments in neighborhoods with racially/ethnically concentrated areas of poverty (RCAPs/ECAPs). They stated that the proposed rule could be read to prohibit the use of resources in neighborhoods with such concentrations. Commenters stated that the proposed rule, if implemented without change, would have the unintentional effect of shifting resources away from low-income communities of color, and threaten targeted revitalization and stabilization investments in such neighborhoods if jurisdictions misinterpreted the goals of deconcentration and reducing disparities in access to assets, and focused only on mobility at the expense of existing neighborhood assets. Commenters stated that the final rule must clarify that program participants are expected to employ both strategies—(1) to stabilize and revitalize neighborhoods that constitute RCAPs/ECAPs, and (2) enhance mobility and expand access to existing community assets. Commenters stated that these should not be competing priorities. Some commenters also expressed concern that the proposed rule language might be interpreted to only allow preservation of existing affordable housing if it was also part of a more intensive area-wide redevelopment strategy.

Commenters stated that older people and persons with disabilities, in particular, may have difficulty maintaining their homes and are very vulnerable to being institutionalized if they are displaced. Other commenters stated that RCAPs/ECAPs are often near transit and therefore ripe for gentrification and, while gentrification can be a positive outcome at times, gentrification can also lead to isolation of low-income families and a further decrease in socioeconomic opportunities. The commenters stated that there needs to be recognition in the rule that it is important to retain the character of communities while investing more resources in the area rather than attempting to remove people who have cultural, ethnic and historical connections to their neighborhoods.

Commenters recommended that HUD should, in § 5.150, which addresses the purpose of the rule, change the "or" to "and" in the last sentence. Some commenters also stated that the definition of "affirmatively furthering fair housing" also needs to explicitly include improvement and preservation of subsidized housing. Other commenters stated that the rule should explicitly state development on public housing sites is consistent with the obligation to affirmatively further fair housing.

*HUD Response:* The duty to affirmatively further fair housing does not dictate or preclude particular investments or strategies as a matter of law. Under HUD's rule, program participants will identify fair housing issues and contributing factors, prioritize contributing factors (giving highest priority to those factors that limit or deny fair housing choice or access to opportunity or negatively impact fair housing or civil rights compliance), and propose goals to address them. Program participants have latitude, if they so choose, to prioritize their goals and strategies in the local decisionmaking process based on the information, data and analysis in the AFH.

HUD's rule recognizes the role of place-based strategies, including economic development to improve conditions in high poverty neighborhoods, as well as preservation of the existing affordable housing stock, including HUD-assisted housing, to help respond to the overwhelming need for affordable housing. Examples of such strategies include investments that will improve conditions and thereby reduce disparities in access to opportunity between impacted neighborhoods and the rest of the city or efforts to maintain and preserve the existing affordable rental housing stock, including HUD-assisted housing, to address a jurisdiction's fair housing issues. Preservation activities such as the Rental Assistance Demonstration (RAD) or the Choice Neighborhoods Initiative may be a part of such a strategy.

There could be issues, however, with strategies that rely solely on investment in areas with high racial or ethnic concentrations of low-income residents to the exclusion of providing access to affordable housing outside of those areas. For example, in areas with a history of segregation, if a program participant has the ability to create opportunities outside of the segregated, low-income areas but declines to do so in favor of place-based strategies, there could be a legitimate claim that HUD and its program participants were acting

to preclude a choice of neighborhoods to historically segregated groups, as well as failing to affirmatively further fair housing as required by the Fair Housing Act.

A balanced approach would include, as appropriate, the removal of barriers that prevent people from accessing housing in areas of opportunity, the development of affordable housing in such areas, effective housing mobility programs and/or concerted housing preservation and community revitalization efforts, where any such actions are designed to achieve fair housing outcomes such as reducing disproportionate housing needs, transforming RCAPs/ECAPs by addressing the combined effects of segregation coupled with poverty, increasing integration, and increasing access to opportunity, such as high-performing schools, transportation, and jobs.

In addition, place-based and mobility strategies need not be mutually exclusive; for instance, a regional AFH could conclude that additional affordable housing is needed in higher opportunity areas and thus new construction should be incentivized in those places. At the same time, while such efforts are being implemented, preserving the existing affordable rental stock can also still be a priority based on the fair housing issues identified in the AFH, which may include the disproportionate housing needs analysis in the AFH or the need to avoid displacement of assisted residents from areas that may be experiencing economic improvement. Program participants have latitude to adjust their goals, priorities, and strategies in the local decisionmaking process based on the information, data and analysis in the AFH, so long as the goals, priorities, strategies, and actions affirmatively further fair housing.

*Rule changes and clarifications.* To help clarify these issues, in this final rule HUD revises the purpose section (§ 5.150) and the definition of "affirmatively furthering fair housing" (§ 5.152) to clarify that HUD supports a balanced approach to affirmatively furthering fair housing. In this final rule, HUD has added a new provision describing potential actions or strategies a program participant may take, which is inclusive of both place-based solutions and options to preserve existing affordable housing. Strategies can include increasing mobility for members of protected classes to provide greater access to opportunity. (§ 5.154(d)(5).)

HUD also revises the definition of "affirmatively furthering fair housing"

in this final rule by replacing the term "proactive steps" with the term "meaningful actions." At the proposed rule stage, commenters requested that HUD ensure that "proactive steps" would not be interpreted in a manner that conflicted with the well-established case law under the Fair Housing Act that defines the contours of the affirmatively furthering fair housing mandate. Upon further review, HUD found that the term "proactive" has various meanings and does not have a body of case law applying the term in the civil rights context. For this reason, HUD replaces "proactive steps" with "meaningful actions," a concept used by the Supreme Court in civil rights case law and used by Federal agencies in explaining civil rights requirements.[9] With such case law foundation, "meaningful actions" provides greater clarity on the actions that program participants are expected to take in carrying out their duty to affirmatively further fair housing. Additionally, in contrast to "proactive," which may convey only a future-oriented approach, the term "meaningful actions" encompasses actions to either address historic or current fair housing problems, or both, as well as proactively responding to anticipated fair housing problems. (§ 5.152.)

To provide further clarity, HUD defines the term meaningful actions to mean those significant actions that are designed and can be reasonably expected to achieve a material positive change that affirmatively furthers fair housing by, for example, increasing fair housing choice or decreasing disparities in access to opportunity. (§ 5.152.)

*Comment: Not all segregation is equal or negative.* Commenters stated that some housing segregation may be self-imposed, especially among newly arrived immigrant populations. The commenters requested that HUD study the dynamics of segregation besides referencing traditional studies and their assumptions so that policies derived from the new AFH process do not have unintended consequences and adversely

---

[9] *See e.g.,* Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency, August 11, 2000; Department of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 FR 41455–41472 (June 18, 2002); The Department of Housing and Urban Development, Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons 72 FR 2732–2754 (January 22, 2007); *Alexander v. Choate,* 469 U.S. 287, 83 L. Ed. 2d 661, 105 S. Ct. 712 (1985); *Lau v. Nichols,* 414 U.S. 563 (U.S. 1974); *United Air Lines, Inc.* v. *Air Line Pilots Ass'n, Int'l,* 563 F.3d 257, 268 (7th Cir. 2009).

**42280** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

affect the protected classes that we are all trying to assist.

*HUD Response:* Individuals are free to choose where they prefer to live. The Fair Housing Act does not prohibit individuals from choosing where they wish to live, but it does prohibit policies and actions by covered entities and individuals that deny choice or access to housing or opportunity through the segregation of persons protected by the Fair Housing Act.

A key purpose of the Fair Housing Act is to create open residential communities in which individuals may choose where they prefer to live without regard to race, color, national origin, disability, and other characteristics protected by the Act. HUD is familiar with the research on immigrant communities and recognizes that there are complex social dynamics at work in different parts of the nation. The purpose of the AFH is to help identify potential fair housing related issues, including factors that limit or deny individuals or groups with a full range of housing options and choices on the basis of being in a protected class as defined by the Fair Housing Act.

In response to these and similar comments, HUD has made several changes to the regulatory text.

*Rule Changes.* The definition of "affirmatively furthering fair housing" in § 5.152 in this final rule revises language from the proposed rule that included the phrase, "to end racially or ethnically concentrated areas of poverty," to "transforming . . . [those areas] into areas of opportunity." This final rule also makes several clarifications in § 5.154, which addresses the "Assessment of Fair Housing." Revised § 5.154(d)(4)(ii) provides that the AFH must identify significant contributing factors, prioritize such factors, and justify the prioritization of the contributing factors that will be addressed in the program participant's fair housing goals. In prioritizing contributing factors, program participants shall give highest priority to those factors that limit or deny fair housing choice or access to opportunity, or negatively impact fair housing or civil rights compliance.

## 2. Competing with Other HUD Priorities

*Comment: The proposed rule competes with other HUD policies and directives.* Commenters stated that HUD's proposed rule competes with other HUD policies and directives. Commenters stated that, in recent years, HUD has sought to make several policy changes that would limit the ability of program participants to affirmatively further fair housing and these policies

include reducing the power of flat rents to incentivize mixed-income communities in public housing, proposing to limit CDBG eligibility for higher-income communities, and decreasing fair market rents that create higher rent burdens for voucher holders. The commenters stated that these policies lower the quality of housing and increase concentration of voucher-assisted households in developments and neighborhoods with higher concentration of poverty. Some commenters also expressed concern that the provisions on segregation may inadvertently prohibit currently authorized program activities that serve specific populations, including the elderly, persons with disabilities and the homeless, or may appear to create a barrier to capital reinvestment or preservation of existing affordable housing if it is located in an area that meets the rule's definitions of segregation or racially or ethnically concentrated areas of poverty.

*HUD Response:* As discussed under the "Legal Authority" section of the preamble to this final rule, program participants that receive assistance from HUD under the programs covered by this final rule have statutory obligations to affirmatively further fair housing, apart from the obligation imposed by the Fair Housing Act itself. They also must comply with the authorizing statutes governing the programs in which they participate, as well as the regulations implementing those statutes. Complying with both types of obligations is a condition of receiving Federal financial assistance from HUD, and the obligations are not inconsistent with each other.

To confirm there is no inconsistency, HUD has made key changes in this final rule, especially by adding a new definition of "housing programs serving specified populations," as noted in Section III of this preamble. The final rule also adopts amended language in the "Purpose "and "strategies and actions" sections (§§ 5.150 and 5.154) that addresses preservation of affordable housing.

While the final rule encourages local governments to confront historic siting issues through public and assisted housing, the final rule also recognizes the critical role and inherent value in the existing stock of long-term affordable housing. The nation is in the midst of a rental housing crisis, with over 7.5 million very low-income families facing worst case housing needs for affordable housing, meaning they either pay more than half their incomes for rent or live in severely inadequate housing conditions. This figure that

does not include an additional estimated 580,000 to 1.42 million persons experiencing homelessness or an additional millions of low-income homeowners also facing exorbitant often unaffordable housing costs.[10]

*Rule change and clarification.* HUD clarifies that participation in HUD and other Federal programs that serve specified populations is not inconsistent with the duty to affirmatively further fair housing, through the added definition of "housing programs serving specified populations" and in new language to the definition of "segregation," both added in this final rule. (*See* § 5.152.)

*Comment: The rule conflicts with HUD programs such as those providing designated housing for seniors and persons with disabilities.* Commenters stated that the proposed rule's direction to PHAs to design their tenant selection and admission policies and development activities to reduce concentrations of tenants with disabilities conflicts with HUD programs carried out by PHAs and other program participants that provide transitional housing, permanent supportive housing, and other housing restricted to elderly persons or to nonelderly persons with disabilities, including those having experienced homelessness, which often require recipients to live in close proximity so that services can be provided in a coordinated and cost-effective manner. A commenter requested that HUD add an explicit statement in the final rule that participants in HUD program and other Federal programs that provide services to elderly persons, persons with disabilities, or other specified populations, are not violating their obligation to affirmatively further fair housing.

*HUD Response:* In its recent Statement on the Role of Housing in Advancing the Goals of *Olmstead* (*Olmstead* Statement or Statement), HUD discussed at length the interaction

---

[10] For the worst case housing needs estimate, see: HUD, Office of Policy Development and Research, "Worst Case Housing Needs: 2015 Report to Congress—Executive Summary" (January 2015). *http://www.huduser.gov/portal/publications/affhsg/wc_HsgNeeds15.html.* For estimates on homelessness, see: HUD, "The 2014 Annual Homeless Assessment Report (AHAR) to Congress (October 2014) (for Point in Time estimate of 578,000 people who were homeless on any given night in January 2014). *https://www.hudexchange.info/resources/documents/2014-AHAR-Part1.pdf,* and HUD, "2013 Annual Homeless Assessment Report: Part 2—Estimates of Homelessness in the U.S." (February 2015) (Throughout the course of the year in 2013, an estimated 1.42 million people used a homeless shelter at some point). *https://www.hudexchange.info/onecpd/assets/File/2013-AHAR-Part-2-Section-1.pdf.*

between the civil rights related duties to provide housing for persons with disabilities in the most integrated setting appropriate to their needs, as mandated by section 504 of the Rehabilitation Act and the Americans with Disabilities Act, and the HUD programs that are authorized to provide housing serving specified populations.[11] HUD encourages program participants and members of the public to read this Statement carefully. The Statement clearly presents how the legal requirements of civil rights statutes requiring persons with disabilities to be served in integrated settings are appropriately addressed in the context of HUD housing programs that are permitted to serve populations consisting exclusively or primarily of persons with disabilities. These programs are authorized by program statute or executive order or when a different or separate setting is the only one that will provide persons with disabilities with housing that affords them an equal opportunity for the housing to be effective, consistent with HUD's section 504 regulations at 24 CFR 8.4(b)(1)(iv).

To address the concerns in this rule, consistent with the guidance provided in its *Olmstead* Statement, HUD has added a definition of "housing programs serving specified populations" in § 5.152 that explicitly states that participation in these programs does not present a fair housing issue of segregation, provided that such programs are administered to comply with program regulations and applicable civil rights requirements. Housing programs serving specified populations are HUD and Federal housing programs, including designation in programs, as applicable, such as HUD's Supportive Housing for the Elderly, Supportive Housing for Persons with Disabilities, homeless assistance programs under the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11301, *et seq.*), and housing designated under section 7 of the United States Housing Act of 1937 (42 U.S.C. 1437e) that: (1) Serve specific identified populations; and (2) comply with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–2000d–4) (Nondiscrimination in Federally Assisted Programs), the Fair Housing Act (42 U.S.C. 3601–19), including the duty to affirmatively further fair housing, section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), and the Americans with Disabilities Act (42 U.S.C. 12101, *et*

*seq.*), and other Federal civil rights statutes and regulations.

A violation would occur, however, if the programs are administered in a manner in which they do not comply with applicable civil rights laws. For example, a program participant providing housing for individuals with disabilities may not refuse to serve individuals who are deaf or hard of hearing because of the cost of interpreters. Because the example would provide different services based on type of disability, such a limitation is prohibited by civil rights statutes and regulations. However, as long as the program is administered and operated in accordance with program requirements and civil rights statutes and regulations, participation does not present a fair housing issue.

By adding such a definition, HUD seeks to assure current and prospective program participants that utilize Federal housing programs, including HUD or other Federal agency programs (such as the housing programs of the U.S. Department of Veterans Affairs or the U.S. Department of Agriculture's Rural Housing Service housing programs) to serve specific populations does not violate this rule's provisions related to the definition of "segregation" or the general duty to affirmatively further fair housing. Participation in these Federally funded programs is encouraged, as is coordination of programs together to support housing options for specific groups, including the homeless and persons with disabilities.

HUD's *Olmstead* Statement discusses these legal requirements and the resulting trend of shifting service delivery from a medical, institutional model designed for the efficiency of the provider to a model emphasizing personal choice and the provision of services in integrated settings where individuals with disabilities can live and interact with persons without disabilities to the fullest extent possible. As set forth in HUD's *Olmstead* Statement, HUD encourages providers of housing for persons with disabilities to explore various housing models and the needs of their communities. While HUD encourages these efforts, HUD reiterates the legal authority of providers of housing to persons with disabilities to develop and operate project-based or single-site supportive housing projects both as permanent supportive housing for the homeless and for individuals with disabilities as authorized by the statutes and regulations that govern the housing, so long as such operation is consistent with civil rights laws and regulations, including section 504 of the

Rehabilitation Act of 1973 and HUD's regulations at 24 CFR part 8.

*Rule change.* This final rule adds a definition of "Housing programs serving specified populations" in § 5.152, as described above.

### 3. Scope of AFFH

#### a. Scope of AFFH Obligation

*Comment: HUD's definition of affirmatively furthering fair housing should be changed.* Commenters stated that what constitutes affirmatively furthering fair housing has never fully been defined by Congress or HUD, and they supported HUD's effort to create such a definition. Commenters stated that although they support HUD's efforts, HUD's definition expands affirmatively furthering fair housing to include access to nonhousing elements, such as transportation, employment, education, and other community facilities, extends the protections of the Fair Housing Act to non-protected classes through a prohibition on racially or ethnically concentrated areas of poverty.

Commenters stated that access to community resources is very important, and often has an impact on neighborhoods, their residents, and quality of life; however, it is not covered by the Fair Housing Act, and is, therefore beyond the scope of the protections of the Fair Housing Act.

Other commenters stated that HUD's duty is to ensure that historical segregation has been remedied, and that HUD's rule which goes beyond this duty is unnecessary and contrary to the legislative intent. Commenters stated that HUD has no constitutional authority to practice social engineering, especially at the expense of taxpayers, local or state governments, and the general population.

Commenters stated that while the rule's focus on disparities in access to community assets is noble, the requirement to reduce these disparities for the classes protected under the Fair Housing Act has little to do with affirmatively furthering fair housing. Commenters stated that they have sometimes seen public school systems willing to take the steps needed to help achieve stable integrated neighborhoods (and the public schools play a major role in perpetuating housing segregation), but reducing disparities without integrating the schools is reminiscent of the separate but equal doctrine.

Commenters stated that even more removed from affirmatively furthering fair housing are such issues as recreational facilities and programs, social service programs, parks, roads,

---

[11] See *http://portal.hud.gov/hudportal/documents/huddoc?id=OlmsteadGuidnc060413.pdf.*

street lighting, trash collection, street cleaning, crime prevention, and police protection activities which the commenters stated were also in the 1995 HUD Fair Housing Planning Guide. Commenters stated that recipients have largely left these peripheral issues out of their analyses of impediments (AIs) for good reasons because they have little, if nothing, to do with affirmatively furthering fair housing and addressing them would make the cost of conducting an AI (and AFH) soar.

Commenters recommended that HUD issue a more narrowly tailored definition of "affirmatively furthering fair housing" and remove nonhousing subjects from the list of elements to be addressed in the Assessments of Fair Housing. The commenters stated that at the same time, they encourage HUD, outside of the rulemaking process to continue to work with housing authorities and other interested parties to increase funding for and to make available resources that will increase access of groups with characteristics protected by the Fair Housing Act as well as low-income families to transportation, employment, education and other community facilities.

In contrast to these commenters, other commenters commended HUD for its definition of "affirmatively furthering fair housing" in the proposed rule and, as stated by the commenters, HUD's clarification that affirmatively furthering fair housing means expanding access to important community assets and resources that have an impact on the quality of life for residents. Commenters stated that HUD has taken a very important step towards achieving Congress' vision about how the Fair Housing Act should be a tool for creating equal opportunity. Commenters stated that HUD's rule is consistent with the Fair Housing Act, at 42 U.S.C. 3608, and as interpreted by the Federal courts in a series of landmark decisions. The commenters stated that the statutory duty to affirmatively further fair housing was recognized by the appellate court in *N.A.A.C.P Boston Chapter* v. *HUD*, 817 F.2d 149, 155 (1st Cir. 1987), which held that the Fair Housing Act obligated HUD "[to] do more than simply not discriminate itself; it reflects the desire to have HUD use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases."

*HUD Response:* HUD's final rule is a fair housing planning rule, which is designed to help program participants fulfill their statutory obligation to affirmatively further fair housing. HUD developed the AFH as a mechanism to enable program participants to more effectively identify and address fair housing issues and contributing factors. Because housing units are part of a community and do not exist in a vacuum, an important component of fair housing planning is to assess why families and individuals favor specific neighborhoods in which to reside and whether there is a lack of opportunity to live in such neighborhoods for groups of persons based on race, color, national origin, disability, and other characteristics protected by the Fair Housing Act. HUD's Assessment Tool, which includes a section on community assets and exposure to adverse community factors, is meant to aid program participants in determining if and where conditions exist that may restrict fair housing choice and access to opportunity. In order for program participants to identify such conditions, which constitute fair housing issues, access to opportunity warrants consideration in the overall analysis performed in preparing an AFH. The Assessment Tool guides program participants in considering access to public transportation, quality schools and jobs, exposure to poverty, environmental health hazards, and the location of deteriorated or abandoned properties when identifying where fair housing issues may exist. Following this analysis, the program participants are to set goals consistent with fair housing and civil rights requirements to overcome those issues within their respective geographic area, determined, by the program participant, to be priority fair housing issues. Such an analysis and prioritization of goals is consistent with the intent of the Fair Housing Act and Fair Housing Act case law. Courts have found that the purpose of the affirmatively furthering fair housing mandate is to ensure that recipients of Federal housing and urban development funds do more than simply not discriminate: It obligates them to take meaningful actions to address segregation and related barriers for those protected by the Act, particularly as reflected in racially or ethnically concentrated areas of poverty.[12]

*Comment: In the AFFH rule, HUD takes the analysis of disparate impact one step further.* Commenters stated that HUD is inappropriately using the disparate impact theory as the basis for its AFFH rule. Commenters stated that

statutes that create disparate impact liability use different language—such as language proscribing actions that "adversely affect" an individual because of his or her membership in a protected group—to focus on the effect of the action on the individual rather than on the motivation for the action. Commenters stated that unlike such statutes, the text of the Fair Housing Act does not prohibit practices that result in a disparate impact in the absence of discriminatory intent. Commenters stated that by its plain terms, section 3604 of the Fair Housing Act prohibits only intentional discrimination. Commenters stated that HUD's rule contemplates an analysis that goes well beyond the finding of any specific intent to discriminate. Commenters stated that HUD's rule contemplates massive plans that take into account statistical analyses of race, gender, land use, facilities, siting and a variety of other contributing factors, and HUD does not require an analysis to show that any discrimination against a member of a protected class was intentional, but rather the entire contemplation of HUD's rule is that through careful planning in advance and carefully implemented restrictions on actions of participants (albeit benign actions), HUD can decide how best to avoid actions that might have a discriminatory impact on one or more protected groups.

Commenters stated that whether HUD's extensive planning exercise, which commenters claim overrides local laws, rules and practices, is wise or should be the law of the land is perhaps a legitimate subject for debate, but that debate should occur within the legislative body that establishes the laws, not in a proposed regulation of an agency of the executive branch that has been created to administer the laws, not create them. HUD must be bound by the terms of the Fair Housing Act, and that act does not authorize the use of disparate impact analysis as the basis for a finding of discrimination.

*HUD Response:* The basis for HUD's AFFH rule is the Fair Housing Act and certain other statutory provisions, specifically the Housing and Community and Development Act of 1974 and the U.S. Housing Act of 1937, that require HUD programs to be administered in a manner that affirmatively furthers fair housing. This means that HUD has the statutory authority to ensure that participants in HUD-funded programs not only refrain from discrimination, but also take meaningful actions to increase fair housing choice and access to opportunity and combat discrimination.

---

[12] See discussion in the July 19, 2013, proposed rule at 78 FR 43712, *N.A.A.C.P. Boston Chapter* v. *Secretary of Housing and Urban Development*, 817 F.2d 149 (1st Cir. 1987), *Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122 (2d Cir. 1973); *Shannon* v. *HUD*, 436 F.2d 809 (3d Cir. 1970).

Pursuant to its authority under the Fair Housing Act, HUD has long directed program participants to undertake an assessment of fair housing issues—previously under the AI approach, and following the effective date of this rule, under the new AFH approach. The intent of both planning processes (previously the AI and now the AFH) is to help program participants determine whether programs and activities restrict fair housing choice and access to opportunity, and, if so, develop a plan for addressing these restrictions.

In response to comments asserting that the Fair Housing Act does not recognize disparate impact liability, *the Supreme Court recently ruled* that the Fair Housing Act prohibits discrimination *caused by* policies or practices that have an unjustified disparate impact because of race, color, religion, sex, familial status, national origin, or disability. *Texas Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys Project,* No. 13–1371, 2015 U.S. LEXIS 4249 (June 25, 2015). In that decision, the Supreme Court also acknowledged ''the Fair Housing Act's continuing role in moving the Nation toward a more integrated society.'' (See case cited at page 42.)

b. Scope of AFFH Coverage— Populations

*Comment: Poverty is not a protected class.* Commenters stated that Congress has not yet extended the protections of the Fair Housing Act to persons based on economic circumstances; that is, poverty is not a protected class. Commenters stated that HUD, in its AFFH rule, endeavors to extend Fair Housing Act protections to certain classes of people who are economically disadvantaged without statutory authority by requiring an analysis of racially or ethnically concentrated areas of poverty.

*HUD Response:* HUD agrees with the comment that the Fair Housing Act does not prohibit discrimination on the basis of income or other characteristics not specified in the Act, and it is not HUD's intent to use the AFFH rule to expand the characteristics protected by the Act. HUD would note that the majority of its programs are meant to assist low-income households to obtain decent, safe, and affordable housing and such actions entail an examination of income. Moreover, the Fair Housing Act does require HUD to administer its housing and urban development programs—that is, programs that target assistance to low-income persons—in a manner to affirmatively further fair housing. Accordingly, it is entirely consistent

with the Fair Housing Act's duty to affirmatively further fair housing to counteract past policies and decisions that account for today's racially or ethnically concentrated areas of poverty or housing cost burdens and housing needs that are disproportionately high for certain groups of persons based on characteristics protected by the Fair Housing Act. Preparation of an AFH could be an important step in reducing poverty among groups of persons who share characteristics protected by the Fair Housing Act. The focus and purpose of the AFH is to identify, and to begin the process of planning to overcome, the causes and contributing factors that deny or impede housing choice and access to opportunity based on race, color, religion, sex, national origin, familial status, and disability. In addition, a large body of research has consistently found that the problems associated with segregation are greatly exacerbated when combined with concentrated poverty. That is the legal basis and context for the examination of RCAPs/ECAPs, as required by the rule.

*Comment: Affirmatively furthering fair housing should consider groups beyond those based on the protected characteristics listed in the Fair Housing Act.* In contrast to the commenters in the preceding comment, other commenters stated that affirmatively furthering fair housing should recognize and consider a wider range of classes targeted for discrimination. The commenters urged HUD, in the final rule, to recognize members of the lesbian, gay, bisexual, and transgender (LGBT) community, Housing Choice Voucher (HCV) holders (often subject to source of income discrimination as a proxy for discrimination based on race, familial status, and disability), victims of domestic violence, homeless individuals, migrant workers, and residents in rural areas, as groups in need of protections. The commenters stated that these vulnerable populations are disproportionately members of Federally-protected classes, and HUD should encourage program participants to address their housing barriers as part of their efforts to affirmatively further fair housing. Commenters stated that the severity of affordable housing need is not necessarily dictated by membership in a protected class.

*HUD Response:* While HUD recognizes that persons may experience housing discrimination based on their source of income, marital status, migrant worker status, history of domestic violence, or homelessness, etc., as provided in the response to the preceding comment, HUD may not expand, through regulation, protected

bases beyond those specified in the Fair Housing Act. The Fair Housing Act does recognize discrimination against LGBT individuals when such discrimination is on the basis of sex, which is a protected characteristic, as stated in § 5.152 of this final rule, which includes nonconformity with gender stereotypes. Such discrimination should, as appropriate, be considered in a program participant's AFH.

*Comment: The AFH analysis must address every protected class.* Commenters stated that if a State or jurisdiction makes the determination that its AFH plan that there is no need to affirmatively further fair housing for a particular group or groups, then the jurisdiction should offer an explanation of this determination. The commenters stated that the baseline presumption should be that every AFH analysis will discuss every protected class in each analysis section, with an explanatory note where the AFH authors elect to only discuss a subset of the protected classes. The commenters stated that this will not only encourage jurisdictions to examine the disparate housing needs and level of segregation of each protected class within their region, but will also encourage research and planning strategies to account for intersectionality—*i.e.,* the distinct experiences of members of one or more protected classes, and stated, as an example, women who are members of racial and ethnic minority groups and may have disproportionate housing needs in a jurisdiction based not only on their identity as a member of a racial or ethnic minority group, but also their identity as women. Some commenters suggested that the proposed rule appears to focus only on protected classes of race and ethnicity.

A commenter suggested that, to ensure that each State, jurisdiction, or PHA fully accounts for every protected class within its region, HUD's final rule should revise § 5.154(d)(2)(iii) and (iv) as follows with italics reflecting new language and brackets reflecting deleted language: ''(iii) Identify whether *there are* significant disparities in access to community assets [exist across] for all protected classes *as compared to other groups* within the *same* jurisdiction and region; and (iv) Identify whether *there are* disproportionate housing needs *for each protected class as compared to other groups* within the *same* jurisdiction and region.''

*HUD Response:* The proposed rule provided for the analysis of data on the basis of race, color, religion, sex, familial status, national origin, and disability, and the final rule adopts this language (see introductory text to

**42284** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

§ 5.154(d)). Program participants that do not address fair housing issues on these bases run the risk of having their AFH determined to be incomplete and, consequently, not accepted. While proposed § 5.154 listed all the protected classes, HUD determined that the language of this section could be better stated. HUD did not adopt the exact language presented by the latter commenter, but made the clarification requested by this commenter.

*Rule clarification.* In § 5.154(d)(2), which pertains to the program participant's analysis of data, HUD clarifies that such analysis pertains to "each protected class."

*Comment: Housing options must allow elderly persons to age in place.* Commenters stated that housing options that support successful aging in place are disproportionately unavailable in racially concentrated segregated neighborhoods. The commenters stated that such communities lack the supportive services and transportation options that are necessary to support successful aging, and that unlike one who lives in a community with more robust options and resources, people in protected classes who live in segregated communities may be forced as they age to make the Hobson's choice of foregoing suitable housing and services or breaking social ties to get access to such supports and services. The commenters asked HUD to provide program participants with adequate information and insight into housing and housing-related aspects of communities that will help people age in place, such as transportation, accessibility and walkability improvements. The commenters stated that the AFH process offers HUD the opportunity to assist program participants to plan for the future and for the needs of a growing population, in support of the Fair Housing Act's goal of integration.

*HUD Response:* While noting that "age" is not a protected class under the Fair Housing Act, Title VI, or Section 504, HUD agrees that adequate information and insight into housing and housing-related aspects of communities such as transportation and physical accessibility, as well as other housing-related aspects of communities such as access to high performing schools, are important items that must be considered in the context of affirmatively furthering fair housing. HUD's proposed Assessment Tool provides for consideration of these factors under the heading of "Disparities in Access to Opportunity," and an analysis of the availability of these assets on a nondiscriminatory basis is

part of the AFH, and undertaken to help avoid displacement of existing residents in areas experiencing renewed economic growth or housing price appreciation, or disinvestment in existing low-income neighborhoods.

*Comment: Clarify applicability of affirmatively furthering fair housing to LGBT individuals.* Commenters stated that it is unclear whether, apart from the listed protected classes, other groups are protected by HUD's rule. Commenters urged HUD to require program participants to consider the housing needs and barriers faced by LGBT individuals and families. Commenters stated that such inclusion would make the AFFH rule consistent with HUD's February 3, 2012, rule prohibiting discrimination against LGBT individuals and families in HUD-funded or Federal Housing Administration-insured housing, referred to as the Equal Access Rule. (See § 5.105(a)(2).) Commenters further stated that such inclusion would align with the decisions of Federal courts across the country, which have recognized protections for LGBT individuals on the basis of sex as a protected class. Commenters stated that, because HUD's rule addresses steps that HUD program participants should take to ensure fair housing for all, LGBT individuals and families should be included along with the seven protected classes under the federal Fair Housing Act.

Other commenters stated that, while discrimination based on sexual orientation and gender identity is not explicitly prohibited by the Fair Housing Act, HUD explained in the preamble its Equal Access Rule that it interprets the Fair Housing Act's prohibition against discrimination based on "sex" to include gender identity. The commenters stated that while this has extended crucial protections to transgender and gender nonconforming individuals, truly ensuring fair housing requires more than just investigation of claims of discrimination after the fact. Commenters stated that explicitly enumerating LGBT individuals and families among those groups whose needs and barriers to housing will receive particular consideration by program participants is especially important.

*HUD Response:* It is HUD's policy to ensure equal access on the basis of sexual orientation, gender identity, and marital status in housing assisted by HUD or subject to a mortgage insured by FHA. HUD published its Equal Access Rule on February 3, 2012, to formally establish this policy. (See 77 FR 5662, codified at § 5.105(a)(2).) HUD's Equal Access Rule did not and could not,

however, expand statutory fair housing protection to all persons on these bases. The principal legal authorities for the AFFH rule are the affirmative provisions of the Fair Housing Act, the United States Housing Act of 1937, the Housing and Community Development Act of 1974, and Executive Order 12892 (Leadership and Coordination of Fair Housing in Federal Programs: Affirmatively Furthering Fair Housing). HUD may not expand, through regulation, the range of protected characteristics specified in the statutes and executive order.

Although sexual orientation and gender identity are not identified as protected classes in the Fair Housing Act, the Fair Housing Act's prohibition of discrimination on the basis of sex prohibits discrimination against LGBT individuals in certain circumstances, such as those involving nonconformity with gender stereotypes. Therefore, for example, a landlord's refusal to renew the lease of a HCV holder because he or she failed to conform to male or female gender stereotypes could be a violation of HUD's Equal Access Rule as well as the Fair Housing Act. Fair housing complaints filed on this basis as well as results of testing or local knowledge of these types of discriminatory practices should, if appropriate, be considered in a program participant's AFH.

In addition, a program participant may be located in a State or locality that has adopted a fair housing statute or ordinance that extends fair housing protection on bases in addition to those specified in the Fair Housing Act. Therefore, the program participant may find it beneficial for its larger planning efforts to include such additional protected bases in its AFH. Even so, HUD cannot direct a program participant to do so or to consider AFH content that covers protected classes beyond those in the Fair Housing Act.

### c. Scope of AFFH Coverage—Resources

*Comment: Clarify use of resources to which AFH would apply.* Many commenters stated that the final rule should be explicit that all of a program participant's housing and community development resources, as well as its policies, practices, and procedures must be assessed, and that these resources would involve not only HUD funds or other Federal funds but non-federal resources. Commenters stated that influencing the allocation of HUD dollars is insufficient and that other Federal and State programs must also spend resources in ways that affirmatively further fair housing. The commenters stated that the proposed rule could be misunderstood to only

consider use of HUD funds or Federal funds, and that however large the Federal investment in housing may be, it is small in comparison to housing activity in the private market.

Commenters stated that the final rule should make explicit what is already implicit and that is that the duty to affirmatively further fair housing applies to a program participant's activities that do not involve the use of HUD funds. Commenters stated that the scope of the duty is particularly important in two contexts. First, when a program participant has violated the nondiscrimination provisions of the Fair Housing Act through activities that do not involve HUD or other Federal funds, that entity cannot certify that it is in compliance with the duty to affirmatively furthering fair housing, and HUD should not accept the certification of such a program participant unless its AFH includes an effective remedy for the violation. Second, in many cases, meaningful goals designed to address fair housing contributing factors may require actions on the part of program participants that do not involve the use of HUD funds. The commenters offered as an example that a jurisdiction's existing zoning ordinance may be identified as one of the contributing factors influencing existing residential segregation, concentrations of poverty, disparities in access to community assets, and disproportionate housing needs based on protected class. Commenters stated that even if the ordinance does not violate the nondiscrimination provisions of the Fair Housing Act the jurisdiction may need to adopt an inclusionary zoning ordinance because such a policy would be the most effective means of addressing the identified contributing factors under the circumstances. Commenters offered as another example, a jurisdiction that has cited the lack of access to mass transit as a contributing factor which hinders the development of affordable units in a high opportunity area and that may need to extend bus service to that neighborhood.

Commenters stated that section 3608 of the Fair Housing Act does not permit jurisdictions to violate fair housing standards with non-HUD resources and, at the same time, certify compliance with the obligation to affirmatively furthering fair housing by analyzing only activities using HUD funds. The commenters stated that if a city's zoning division is enforcing a zoning code (using all local funds) that has been found to discriminate and yet is using CDBG funds in unobjectionable ways, HUD should not accept a CDBG AFFH

certification that fails to address a plan to remedy the zoning problem. Commenters concluded that this is well established law and should be made explicit in the final rule and mechanisms should be included to address this issue.

In contrast to these commenters, other commenters stated that the final rule should be clear that the AFFH rule only applies to programs under HUD's jurisdiction. Commenters stated that imposing the AFFH rule on other resources, such as education, health care, and transportation, requires significantly more comprehensive federal authority that incorporates other federal departments. Commenters stated that the final rule should set clear parameters regarding the resources and programs that are governed by the rule.

*HUD Response:* As HUD stated in the proposed rule, it is a statutory condition of the receipt of HUD funding that program participants certify that they will affirmatively further fair housing. The proposed rule provided that program participants would take meaningful actions to further the goals identified in an AFH conducted in accordance with the requirements of this rule and would take no action materially inconsistent with their obligation to affirmatively further fair housing. While the duty to affirmatively further fair housing derives from the receipt of HUD funds, commenters are correct in saying that the duty applies to all of a program participant's programs and activities related to housing and urban development.

*Comment: The scope of activities related to housing and urban development should be determined by the program participant.* Commenters stated that the appropriate scope of activities should be left up to the communities to decide given the wide variety and characteristics of the communities that participate in this program. Commenters stated that a one size fits all mandate runs the real risk of further eroding the consolidated plan process and substantially reducing the consolidated plan's real value and impact in how a community conducts and implements its planning efforts.

Other commenters stated that the duty to affirmatively further fair housing should apply to activities that make sense. The commenters stated that affirmatively further fair housing should apply to activities in which there is an opportunity for unfair housing to occur such as home purchase or rental.

*HUD Response:* HUD agrees with the commenters that the analysis of fair housing issues, the identification and prioritization of contributing factors,

and the establishment of goals to address such issues are to be determined by the program participant. This rule cannot provide grantees with authority or obligations beyond those they already have legal jurisdiction over. In some cases, program participants may be local government agencies having authority over some areas that other participants, such as public housing authorities, do not. In many cases, the analysis of local fair housing issues that the rule requires will include issues beyond the program participants' legal authority to change. For example, a PHA may be unable to change a zoning law. In such cases, the analysis is still useful in identifying those challenges that, while they may beyond the program participants' control, could be addressed by other state or local government agencies or that otherwise present a barrier or constitute a fair housing contributing factor, as defined in the rule.

While HUD will review a program participant's AFH for consistency with fair housing and civil rights laws and determine if the AFH is substantially complete, the best source of information about housing and related issues in a geographic area will almost always be found with the program participant or participants undertaking Federally funded housing and related activities in the geographic area or areas that they serve. The program participants are in the better position to identify housing choice issues faced by residents in their areas. HUD's AFFH rule is intended to help program participants by providing additional information and data that is expected to aid the program participants' analysis and final decisions on investment of Federal funds. HUD will then review the analysis of a program participant for consistency with fair housing and civil rights laws, as well as determine if such analysis is substantially complete. HUD may determine that a program participant's analysis, goals, or actions are materially inconsistent with current Federal laws and regulations related to fair housing and civil rights, or that the program participant has failed to fulfill their obligations to conduct a complete analysis. In such cases, HUD will request that the program participant revise the associated AFH to ensure compliance. Such a request does not interfere with local decisionmaking powers of HUD's program participants, but ensures that such decisionmaking comports with a program participant's overall obligation to affirmatively furthering fair housing.

However, as noted in HUD's response to an earlier comment pertaining to

community assets, fair housing choices are not limited to transactions relating to rental or ownership of housing. Fair housing issues may arise from such factors as zoning and land use; the proposed location, design, and construction of housing; public services that may be offered in connection with housing (*e.g.,* water, sanitation), and a host of other issues. Accordingly, the AFH approach focuses primarily on how to assist program participants in being better informed about, and better able to set goals and priorities relating to, conditions in their current environments that involve fair housing concerns, such as patterns of integration and segregation; racially or ethnically concentrated areas of poverty; disproportionate housing needs, and housing-related barriers in access to education, employment, transportation, and jobs, among others, to ensure that these conditions are taken into consideration in making funding decisions.

The final rule provides, as did the proposed rule, that program participants have flexibility in setting goals and priorities relating to fair housing concerns so long as those goals are designed, and are consistent with, the analysis of data and local knowledge and the obligation to affirmatively further fair housing and other fair housing and civil rights requirements.

### d. Scope of AFFH Coverage—Activities

*Comment: Clarify scope of activities considered to be activities relating to housing and urban development under the Fair Housing Act should be Federally-funded grant programs.* Commenters stated that activities considered related to housing and urban development under the Fair Housing Act should include those eligible under the CDBG program, ESG, the HOME program and other Federal grant programs, as well as PHA mandated activities. Commenters stated that this should be the minimum requirement, and going beyond the minimum should be at the discretion of each program participant. The commenters stated that mandating program participants to go beyond the minimum would likely result in an administrative burden that HUD has not contemplated.

PHA commenters stated that, as HUD is aware, PHAs may only conduct activities within their areas of operation, as defined by State or local law, and that these geographic constraints impede PHAs' ability to implement activities envisioned by a multi-jurisdictional, regional or state AFH. The commenters stated that, for example, a PHA that serves a predominantly minority or high poverty area can only undertake activities within that specific geographic area. Commenters requested that the final rule recognize PHAs' geographic constraints and limit PHAs' liability for issues or activities outside their area of operation pursuant to a jointly-undertaken AFH. PHA commenters stated the following activities should be exempt from fair housing planning: Redevelopment on public housing sites owned by a PHA before the effective date of the rule; public housing developments operated by a PHA with fewer than 100 public housing units; public housing developments operated by a PHA which house only elderly persons or persons with disabilities, or both; public housing developments operated by a PHA which consist of only one general occupancy, family public housing development; public housing developments approved for demolition or for conversion to project-based or tenant-based assistance, including conversions under the Rental Assistance Demonstration program or any equivalent program; public housing developments which include public housing units operated in accordance with a HUD-approved mixed-finance plan; and large redevelopment efforts intended to revitalize neighborhoods and reduce poverty.

Other commenters requested that the proposed rule not address coverage of non-housing CDBG activities, such as community projects, public facilities and economic development. The commenters stated that while these are not housing projects, HUD's rule indicated that funding decisions of these projects may be covered by the rule, but the rule was not clear on this issue.

Other commenters stated that ''activities relating to housing and urban development'' is extremely broad and HUD needs to clarify or elaborate on what this means.

*HUD Response:* HUD-funded and other Federally-funded housing and urban development activities are explicitly covered by the duty to affirmatively further fair housing. This rule does not change the scope of the duty to affirmatively further fair housing.

HUD recognizes that program participants may be limited by their State and local enabling statutes in taking certain actions. Nonetheless, the inclusion of a larger regional analysis for participants is necessary to put the local fair housing issues into context required by the Fair Housing Act and case law (*e.g. Thompson* v. *HUD*). While a grantee may be serving a central city, the regional conditions of surrounding suburbs may be highly relevant to identifying fair housing issues, including those that are beyond the grantees' immediate control or legal authority to influence. Barriers to fair housing choice or other ''fair housing contributing factors'' (as defined in the rule) may still be relevant in helping to explain the fair housing issues facing the program participant. In some cases, this may help in encouraging regional solutions to shared problems, and in some cases may simply add needed context to program participants' planning processes.

The AFH is primarily intended as a planning tool designed to identify the full range of fair housing issues affecting a program participants' geographic area, including the jurisdiction, region, and fair housing issues identified may not necessarily be limited to those under the control of the program participant or involving the use of HUD or other Federal assistance. Once fair housing issues and contributing factors have been identified, the scope of actions that program participants may decide to take, and are capable of taking, to address these fair housing issues and contributing factors may often be broader than the scope of the program participants' activities receiving the HUD or Federal assistance that trigger the obligation to affirmatively further fair housing. An objective of the AFH approach is to have program participants consider all available means to address fair housing issues and contributing factors that arise within their geographic area of analysis or impact their geographic area.

### 4. Benchmarks and Outcomes

*Comment: Program participants must be required to establish benchmarks and timeframes for each goal.* Many commenters recommended that the final rule require program participants to establish specific action steps/strategies and/or benchmarks in the AFH in order to be able to measure a program participant's progress toward achieving fair housing goals. Commenters stated that GAO, in studying compliance with the obligation to affirmatively furthering fair housing, stressed the need for benchmarks and timeframes. Commenters suggested that proposed § 5.154 clearly delineate what kinds of milestones HUD reviewers would use to determine that a PHA or jurisdiction has made progress toward its goals identified in a participant's AFH. Commenters stated that § 5.154 must be amended to require that participants submit benchmarks, a timetable in which to complete those benchmarks, and information about the entity

responsible for completing them, in their AFH.

Commenters recommended including benchmarks/timeframes for each goal under four general categories: Modifying local regulations and codes, constructing new developments, creating new amenities, and facilitating the movement of people. Other commenters suggested that not only should the AFH have benchmarks but the benchmarks should have deadlines. Commenters stated that HUD should provide numerical benchmarks for determining "measureable difference in access." Commenters stated that if a participant fails to meet a benchmark the participant should file a justification noting a plan to achieve the benchmark or modify the benchmark within 30 days of submission of the justification. The commenters stated that HUD should post this justification on its Web site for public comment within 30 days, and within 30 days of receiving those comments, HUD should complete its review and approve/reject the plan or modification. Other commenters suggested that the benchmarks and timeframes should be outlined in the Consolidated Plan and Annual Action Plans.

Other commenters similarly asked that HUD mandate specific outcomes of the AFH process. Commenters stated that without outcomes, the new AFH process is rendered worthless. Commenters stated that HUD's rule focuses on process, not outcomes and it is the latter which is important.

In contrast to the above commenters, other commenters stated that while they are sympathetic to those who believe that enforcement of the duty to affirmatively furthering fair housing must be far more rigorous and that specific benchmarks should be laid out in the AFH, they believe such a shift would be unwise. Commenters stated that the new AFH process already brings significantly more accountability to communities and promises to vastly improve the fair housing process; and therefore more stringent applications beyond what has been set out in the proposed rule would be counter-productive and could stymie what would otherwise be productive development.

On the subject of outcomes, commenters, in contrast to the commenters above, stated that they supported HUD's approach of not mandating certain outcomes, but welcomed HUD, through guidance, to provide examples of outcomes that may reasonably be achieved through the new AFH process.

*HUD Response:* HUD agrees with the commenters that the AFH process, to be effective, should have benchmarks and outcomes, but HUD agrees with the latter commenters that the final rule should not specify the benchmarks or mandate certain outcomes. The final rule provides for the establishment of benchmarks, but established by the program participant and not by HUD. However, as part of the AFH review process, HUD will include review of benchmarks and outcomes, as reflected in a program participant's goals. With respect to the request for guidance, HUD intends to provide the guidance on benchmarks and outcomes requested by the commenters.

*Rule change.* HUD adds § 5.154(d)(4)(iii) to provide that it is program participants that "identify the metrics and milestones" for determining what fair housing results will be achieved.

*Comment: Require annual publically available performance reports.* Commenters recommended that HUD require annual publically available performance reports that include actions carried out and results achieved. Commenters stated that the rule should include a performance report requirement to describe efforts to carry out the duty to affirmatively further fair housing. Commenters recommended amending § 91.520 (Performance reports) by adding the following language: "The Performance report must include . . . actions taken to affirmatively further fair housing, including the jurisdiction's progress in executing its AFH plan in a timely manner, . . . ." Other commenters stated that the final rule should amend § 903.7(r)(1) (Annual Performance Reports) to require annual performance reports that identify actions carried out to mitigate or address each of the goals in the AFH, describe the results of those actions and specify which fair housing issues were impacted and how they were impacted.

Commenters stated in requiring performance reports, HUD should spell out what information participants must report in terms of progress they have made toward their fair housing goals, and the reports should include uses for the range of HUD grants received and any actions taken with respect to policies, practices, and non-financial resources.

Other commenters recommended that performance results could be provided through a comprehensive 5-year review for each required element of the AFH.

*HUD Response:* Neither the proposed rule nor this final rule requires new performance reporting. Instead HUD

relies upon existing performance reporting requirements or performance assessment requirements already set out in regulations governing consolidated plan program participants and PHAs. For some existing performance review or reporting requirements, HUD builds upon these requirements by specifically referencing review of AFH performance. For example, see § 91.105(e)(1)(i) of the consolidated plan regulations. Similarly the CDBG regulations at § 570.441(b)(3) provide for review of performance in carrying out the duty to affirmatively further fair housing. With respect to PHAs, HUD's Public Housing Assessment System (PHAS) regulations provide in § 902.1(b) that a PHA's compliance with the duty to affirmatively further fair housing and other civil rights requirements such as section 504 of the Rehabilitation Act of 1973 is monitored in accordance with applicable program regulations and the PHA's Annual Contributions Contract. With respect to specific program regulations, § 905.308 of HUD's Capital Fund regulations in 24 CFR part 905 encompasses a PHA's duty to affirmatively further fair housing in the use of its capital funds, and § 905.802 of those same regulations provide for HUD review of PHA performance under the Capital Fund regulations. In addition, HUD's Office of Fair Housing and Equal Opportunity has existing procedures in place to investigate complaints and conduct compliance reviews relating to a program participant that is not affirmatively furthering fair housing. Given these performance review and monitoring processes already in place, HUD did not see any need to add new review requirements.

HUD notes that the community participation requirements of the AFH, which incorporate the community participation requirements of the consolidated plan regulations in 24 CFR part 91, and those for PHA Plans in 24 CFR part 903, provide an opportunity for a review by the public of the performance by the program participant.

5. Determinants (Contributing Factors in the Final Rule) and Goals

As noted in Section III of this preamble, HUD is replacing "determinant" with "contributing factor." However, since the proposed rule used the word "determinant" and this was the term used in submitting public comments on this issue, HUD retains the word "determinant" for this discussion of public comments.

*Comment: More than one goal needs to be established.* Many commenters stated that the final rule should prohibit program participants from setting only

**42288** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

one goal. Commenters stated that each community should be required to set more than one goal to mitigate the impact of determinants that cause fair housing issues, and that those communities should be required to report on the impact of their activities to address these issues in a specified format. Commenters stated that the compliance with the duty to affirmatively further fair housing must recognize that while barriers for people of diverse racial and ethnic groups, disabilities, and familial status often overlap, they are not interchangeable and all need to be addressed comprehensively to truly further fair housing.

Some commenters stated that even two goals are not sufficient to ensure progress toward ending segregation and increasing access to community assets. Commenters stated that no program participant should have the option to only select one goal to address or mitigate its identified fair housing issues. Commenters urged HUD to set a higher standard of performance, and to require program participants to set goals and identify specific milestones, and timetables. Commenters stated that the language in the proposed rule must be changed at the final rule stage to reflect all of the components of the duty to affirmatively further fair housing, as described in the definition for this term. Commenters stated that the final rule must require program participants to set fair housing goals based on all of the most significant fair housing determinants.

Other commenters stated that while one substantive goal may be sufficient for some program participants, the option to address only one goal may set a low bar for others. Commenters stated that reference to "one goal" signals to program participants that additional existing fair housing issues can be ignored or somehow de-prioritized, undermining much of what HUD sets out to accomplish with this rule." Commenters stated that setting just one goal will not even require communities to address both the need to strategically enhance neighborhood assets (*e.g.*, through targeted investment in neighborhood revitalization or stabilization) and the need to promote greater mobility and access to areas offering vital assets such as quality schools, employment, and transportation for members of protected classes.

Commenters recommended that the final rule clarify that program participants must identify at least one goal to address and/or mitigate each fair housing issue identified in the analysis

as a discriminatory barrier. Commenters stated that although resource constraints in jurisdictions may limit the scope of fair housing goals, it is critical for long-term planning and regional integration for the jurisdiction to identify and execute even modest goals for each fair housing issue or barrier identified.

*HUD Response:* The regulation does not prescribe a minimum or maximum number of fair housing contributing factors ("determinants" in the proposed rule) or goals to be set for those factors. Although, HUD believes it would be a rare situation in which a program participant has only one goal, HUD does not disregard the possibility that a program participant may identify a single contributing factor and have only one goal for addressing that contributing factor, or that a program participant that has more than one contributing factor may have the same goal for addressing each of those contributing factors. HUD is interested in the substance of the goals and how a program participant's goal or goals would address contributing factors. HUD will evaluate whether the goals appropriately focus on contributing factors, and appear achievable by the program participant. This final rule includes additional clarifying language on prioritizing the most significant contributing factors. In addition, HUD intends to provide greater detail on identifying contributing factors and setting goals in the Assessment Tool and other sub-regulatory guidance.

Also, HUD recognizes that not all identified contributing factors may be obstacles to fair housing requiring an action or goal to eliminate them. For example, a contributing factor may be outside of a program participant's control, such as a neighboring jurisdiction's zoning policies as opposed to the zoning policies of the jurisdiction of the program participant.

In this rule, despite many commenters' concerns to the contrary as discussed in this preamble, it is not HUD's intention to dictate to program participants the decisions that they make based on local conditions. As stated in the proposed rule, through this new AFH process, HUD is not mandating specific outcomes for the planning process. Instead, recognizing the importance of local decisionmaking, the new AFH process establishes basic parameters and helps guide public sector housing and community development planning and investment decisions to fulfill the obligation to affirmatively further fair housing. In addition, it is important to remember that the AFHs will be made available to communities and residents of these

communities will have the opportunity to weigh in on whether program participants have accurately identified contributing factors and have established goals appropriate for identified contributing factors and related fair housing issues.

*Rule change.* This final rule adds §5.154(d)(4)(iii) that provides that the AFH must set goals for overcoming the effect of contributing factors as prioritized in accordance with paragraph (d)(4)(ii) of the section. This new section further provides that for each goal, a program participant must identify one or more contributing factors that the goal is designed to address, describe how the goal relates to overcoming the identified contributing factor(s) and related fair housing issue(s), and identify metrics and milestones for determining what fair housing results will be achieved. For instance, where segregation in a development or geographic area is determined to be a fair housing issue, with at least one significant contributing factor, HUD would expect the AFH to include one or more goals to reduce the segregation. HUD believes that this added language gives program participants the flexibility to decide, given local factors and conditions, the number of contributing factors that exist and the number of goals to be established.

*Comment:* Specify that goals must be to overcome fair housing contributing factors rather than mitigate and address the contributing factors. Several commenters stated that regulatory language related to the contributing factor analysis must be revised to require program participants not just to "mitigate or address" problems, but to overcome them. A commenter stated that while the definition of "affirmatively furthering fair housing" in the rule is strong, the proposed requirements for what a program participant must do under the AFH weakens the current standard. The commenter stated that under the current AI process, guidance and enforcement practice all require a participant to "conduct an analysis to identify impediments to fair housing choice within the jurisdiction, and take appropriate actions to overcome the effects of any impediments identified through that analysis. . . . (§91.225(a)(1))." The commenter stated that by requiring only that participants "mitigate or address" the determinants of fair housing issues rather than "take appropriate actions to overcome the effects of impediments," HUD appears, perhaps inadvertently, to be taking a

step back from the current standards to which participants are to be held.

*HUD Response:* HUD agrees with the commenter and has replaced, where appropriate, "mitigate and address" with "overcome." HUD stated in the proposed rule that the new AFH process is needed to "facilitate efforts to overcome barriers to fair housing choice." Mitigating and addressing the contributing factors are part of those efforts to overcome such barriers, but the commenters are correct in stating that the ultimate goal is to overcome.

*Rule Change.* This final rule revises the first sentence of the proposed definition of the term "affirmatively furthering fair housing" in § 5.152 to say that affirmatively furthering fair housing means taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics.

*Comment:* Consider using a term other than "determinant." Commenters stated that HUD should consider using a different term, such as "drivers" in place of the term "determinants," which they stated better describes "the informal nature of the process of hypothesizing about causes and effects [of discrimination and segregation] through community dialogue." Commenters stated that, as provided in the proposed rule, the point of data analysis is to take stock of current conditions and provide information about disparities to initiate a community conversation about how the drivers may have led to those conditions. Commenters stated using the term "determinants" suggests a more scholarly investigation between outcomes and other variables, and not the desired community conversation.

*HUD Response:* HUD agrees with the commenters and, as noted in Section III, of the preamble, HUD is replacing "determinant" with "fair housing contributing factor."

*Comment:* Determinants may be difficult to identify. Commenters stated that while it may be easy to determine the presence of segregation or integration, it is not easy, or may even be impossible to identify "primary determinants" and to further refine that analysis to identify the "most significant determinants." Commenters stated that the requirement to assess determinants is very complex and is often related to factors outside of a program participant's control. Another commenter stated that while it is relatively easy to identify fair housing issues based on some of the thresholds

in the rule, determining their exact causes can be exceedingly complex, with many factors of history and geography—most of which are well outside of the control of the program participant. Commenters stated that because HUD already has data on determinants, HUD should be in charge of conducting the review to find the answers it seeks.

Other commenters stated that the "determination of the 'primary determinants' for causal conditions is often inherently arguable, vulnerable to differing interpretations and prioritization" and that the final rule should recognize that the identified conditions should be addressed by the authority and resources available to the jurisdictions. The commenters stated that without bright lines for widely varying circumstances, "any proposed criterion for acceptance or rejection of an AFH alone should be on a predominantly procedural basis." Commenters stated that the final rule should place less emphasis on an analysis that may or may not be of any relevance, which would free up resources to be targeted towards developing solutions. Commenters stated that it is a generous assumption that all program participants have the capacity to perform the required determinants analysis. Other commenters stated that such a requirement creates legal and political exposure to the agencies and entities that they might designate as having ownership of historical determinants of segregation and concentrations of poverty and that this process of "finger pointing and blame" heightens the potential for adversarial relationships to develop among the very partners that must effectively work together to improve the communities served through programmatic resources.

Other commenters stated that for program participants to properly identify determinants, additional guidance is needed from HUD. Commenters stated that while the assessment of determinants is central to the AFH process, the lack of guidance in the rule about determinants is a major shortcoming, as the proposed rule had a limited explanation of what a fair housing determinant is, how determinants should be identified, and how to set goals to mitigate or address determinants. The commenter stated that even though the proposed rule recognizes the need for such guidance in the summary of the rule and the assessment tool is identified as the means of providing such guidance, the "assessment tool" is defined as something that HUD will issue in the

future. The commenter stated that without seeing the tool, jurisdictions may not have the necessary information to prepare these central elements of an AFH. To mitigate concern about the absence of guidance on determinants in the rule, the commenter suggested that the final rule incorporate the guidance that is being developed as an assessment tool by including illustrative examples of determinants and fair housing priorities and goals for mitigating and addressing the determinants that should be considered in drafting the AFH. Alternatively, the commenter stated that the assessment tool should "at a minimum be published for comment before it is finalized."

*HUD Response:* HUD agrees that identifying factors contributing to fair housing issues may not always be easy. It is for this reason that HUD seeks to assist with such identification by providing to program participants local and regional data on patterns of integration, racially or ethnically concentrated areas of poverty, barriers to access to key community assets, and disproportionate housing needs based on characteristics protected by the Fair Housing Act. While HUD cannot guarantee that the provision of such data will always make evident the factors contributing to such fair housing issues, HUD believes that the data will help in this regard. In addition, the questions presented in the AFH Assessment Tool (which was published for comment after the proposed rule) are designed to help program participants determine the factors that give rise to fair housing issues in their respective geographic areas of analysis. The community participation process will also assist program participants in identifying contributing factors and receiving feedback on whether the correct contributing factors have been identified. HUD will also provide instructions, guidance, training, and technical assistance in various formats to help program participants make this identification.

With respect to commenters' concerns about finger pointing and blame, the purpose of the AFH is to analyze data and local knowledge to identify barriers with a view toward overcoming them, not assigning blame. Although the rule recognizes that many obstacles to housing choice that exist today reflect historic patterns of segregation, the analysis required by the AFH is to identify contributing factors to fair housing issues as a means of better planning how to address the fair housing issues. By providing data, HUD seeks to help program participants in determining the cause of fair housing

**42290** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

issues, the extent of impact, and how such fair housing issues may be addressed.

With respect to commenters' concerns about the resources necessary to achieve the desired goals, HUD recognizes that there are likely insufficient funds to achieve every goal for every identified contributing factor, which is why the final rule directs program participants to identify significant fair housing contributing factors and to prioritize such factors. HUD further recognizes that there may be disagreement about which contributing factors are the significant factors leading to a fair housing issue. The public participation process should be of assistance to program participants in helping to identify and prioritize the contributing factors that should be the focus of the AFH.

*Comment: Zoning and land use should be explicitly identified as a determinant.* Commenters stated that the determinants analysis should include a detailed assessment of a community's zoning and land use regulations. Commenters stated that although the proposed rule requires program participants to use an assessment tool to identify the primary fair housing determinants, they stated that there is no clear indication in the rule that this assessment tool will include a template for analysis of zoning and land use regulations. The commenter stated that because zoning and land use policies are not implicitly listed, the rule may be signaling that a robust assessment of zoning and land use policies with respect to impeding or limiting fair housing choice is not required. Commenters requested that language be added to § 5.154(d)(3) that would provide that based upon data identified under § 5.154 (d)(2) and community input, the analysis will assess whether a participant's laws, policies, or practices limit fair housing choice, and that examples of such laws, policies or practices include, but are not limited to, zoning, land use, housing plans or policies, or development plans or policies.

*HUD Response:* The proposed rule did not identify all the questions that would be included in the Assessment Tool, as the Assessment Tool was still under development at the time of publication of the proposed rule. However, as seen in the proposed Assessment Tool published on September 26, 2014, the Assessment Tool does provide for an analysis of land use and zoning laws. HUD also plans to provide program participants with guidance on conducting such an analysis.

*Comment: Goals should not be equated with outcomes.* Commenters stated that goals should be measured by the extent to which they are achieved. Commenters stated that goals may simply be a process goal that, if implemented, would affirmatively further fair housing; that is, if the process is implemented, the goal is achieved. The commenters stated that goals should not be required to be outcome goals, since the ability to influence and reduce segregation is limited by a number of factors, both known and unknown, including individual preferences, inadequate funding to "move the needle" in a significant way, and the lack of state control over local decision making.

*HUD Response:* HUD agrees with the commenters that goals should not be equated with outcome. A goal is what one hopes to achieve by taking certain action and the outcome reflects the results of taking such action. As stated earlier in this preamble, HUD is not mandating specific outcomes, and HUD gives program participants the discretion and flexibility to set goals, taking into consideration the nature and scope of fair housing issues and contributing factors in the relevant geographic areas of analysis and the capacity of the program participant to address fair housing issues. HUD agrees that some goals may be process goals, such as amending a local land use or zoning law to remove barriers to the development of affordable housing in areas of opportunity. Achievement of the process goal by the enactment of the amendment that removes the barriers is a short-term outcome. However, an action of this kind could also yield long-term outcomes, such as reducing segregation or increasing access to opportunity.

6. Integrated Settings for Persons With Disabilities

*Comment: The rule, if implemented properly, will significantly improve housing opportunities for persons with disabilities.* Many commenters expressed support for the rule's recognition that affirmatively furthering fair housing includes affording persons with disabilities the opportunity to live in the most integrated setting appropriate to the needs of persons with disabilities. Commenters stated that discrimination against persons with disabilities has too often been ignored, and expressed support for the rule's definitions of "fair housing choice" and "segregation" and the rule's statement that for individuals with disabilities, integration also means that such individuals are housed in the most

integrated setting appropriate. Commenters stated that the most integrated setting is one that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible, consistent with the requirements of the Americans with Disabilities Act and section 504 of the Rehabilitation Act of 1973. Commenters requested that the final rule also include the following language from HUD's *Olmstead* Statement: "Examples of integrated settings include scattered-site apartments providing permanent supportive housing, tenant-based rental assistance that enables individuals with disabilities to lease housing in integrated developments, and apartments for individuals with various disabilities scattered throughout public and multifamily housing developments." The commenters stated that including these examples will help regulated entities better understand their obligations.

*HUD Response:* HUD appreciates the suggestion to include in the rule examples of integrated settings as provided in HUD's *Olmstead* Statement. However, HUD believes that guidance, not the regulatory text, is the better location for these examples and HUD will include these examples in its guidance on affirmatively furthering fair housing.

*Comment: Include a reference to providing integrated settings for persons with disabilities with respect to the steps to be taken by PHAs to affirmatively further fair housing.* Commenters recommended that in § 903.2, which addressed PHAs taking steps to deconcentrate poverty and comply with fair housing requirements, HUD include a reference to promoting opportunities for persons with disabilities to live in the most integrated setting appropriate.

*HUD Response:* Section 903.15 of this final rule already captures this concept. Section 903.15(d)(2)(ii) provides that affirmative steps include PHAs engaging in ongoing coordination with state and local disability agencies to provide additional community-based housing opportunities for individuals with disabilities and connect such individuals with supportive services to enable an individual with a disability to transfer from an institutional setting into the community.

*Comment: Specify disability organizations that are to be consulted in the development of an AFH.* Commenters requested that the rule specify that disability organizations, such as protection and advocacy agencies, independent living centers, and State and local affiliates of The Arc, Mental Health America, The National

Alliance on Mental Illness, and United Cerebral Palsy, be consulted in the preparation of the AFH and the consolidated plan, as well as the citizen participation plan. Commenters stated that these organizations typically have the best knowledge concerning persons with disabilities who are needlessly segregated.

*HUD Response:* The final rule, at § 5.158(a), requires program participants to undertake consultation in accordance with consolidated plan requirements and requirements governing PHA planning. While HUD mandates meaningful consultation with certain types or categories of organizations, HUD declines to mandate consultation with specifically named organizations.

*Comment: Define "institution".* Commenters stated that the rule refers to "deinstitutionalizing" persons with disabilities, but does not define "institution," perhaps leaving it to the courts to determine whether housing provided to the disabled as part of a supportive services program or a PHA's designated housing plan is sufficiently community-based to comply with the rule. Commenters stated that consistent with the *Olmstead* decision, the rule also should recognize that the goal of "deinstitutionalizing" persons with disabilities into community-based settings should only apply when: (1) Such placement is appropriate; (2) the affected person does not oppose such treatment; and (3) the placement can be reasonably accommodated, taking into account the available resources and the needs of other individuals with disabilities.

*HUD Response:* The focus of this rule is about fair housing planning and how the process of fair housing planning should be undertaken. For each of the protected classes covered by the Fair Housing Act, and consequently covered by this final rule, program participants should rely on rules already in place to ensure nondiscrimination for these protected classes, and be guided by these existing requirements in planning the actions they intend to undertake to promote fair housing choice and access to opportunity. HUD therefore declines to adopt commenters' suggestion to have the rule address in more detail the goal of deinstitutionalizing persons with disabilities. Those requirements are adequately addressed in the Department of Justice's rules and guidance implementing the Americans with Disabilities Act, in the Department of Health and Human Services's Medicaid rules on Home and Community Based Services, and in HUD's *Olmstead* Statement.

*Comment: Do not hold PHAs accountable for inability to move persons with disabilities to integrated settings.* Commenters stated that it is troublesome to consider that PHAs may be held accountable for the lack of "disability-related services" that may be available in a person's living environment. Commenters stated that PHAs are not funded for these special needs services and do not have the trained staff to handle these needs. Commenters stated that to relocate disabled persons from institutions into "the most integrated setting appropriate" is a noble pursuit but brings up other issues, such as what resources are available to up-fit units to meet the mobility requirements of the relocates or where they will be able to secure supportive services for those who need mental health services? Commenters stated that often even wheelchair accessible units compliant with fair housing design standards do not come with all the supports a person may need, such as lifts in the bedroom to help them into bed, power door locks, and cameras at the front door to enable who is outside their door before opening it, etc. are expensive items to install and maintain.

*HUD Response:* HUD recognizes that PHAs and all program participants may be limited in fulfilling their AFFH goals based on available resources. What is expected of program participants, however, is to ensure that they are taking meaningful actions within their control and that their actions do not contribute to or perpetuate discrimination, segregation, and limitation of housing choice, including against persons with disabilities. This rule does not create new obligations on PHAs to provide housing in integrated settings for persons with disabilities. HUD notes that PHAs have existing obligations to provide housing in the most integrated setting appropriate under section 504 of the Rehabilitation Act and under the Americans with Disabilities Act. Moreover, since State Medicaid agencies have the obligation to provide health care services to individuals with disabilities in the most integrated settings appropriate to their needs, such services should be provided by such agencies. However, one of the biggest needs faced by States in *Olmstead* implementation is locating affordable housing where individuals with disabilities may live and receive State-provided services, and PHA's play an important role, through their public housing and HCV programs in making such housing available. Recent

experience, including the Non-Elderly Disabled (NED) 2 Housing Vouchers and the Section 811 Project Rental Assistance program, have shown that closer collaboration between PHAs and State Housing Agencies with State Medicaid Agencies enhances the ability to fulfill their respective responsibilities in this area. HUD intends for its guidance to supplement the AFFH regulations and will provide more information about these collaborations.

*Comment: The rule should address PHA admission preferences.* Commenters made several different suggestions on how the rule could address PHA admission preferences. Some commenters stated that the rule should mandate that PHAs establish preferences for persons with disabilities. Commenters stated that historically, persons with disabilities have been dramatically underrepresented on PHA waitlists due to the absence of outreach and the sheer isolation of nursing home and institutionalized residents. Commenters stated that there is an urgent need for the creation of a preference for persons with disabilities, and the AFH should mandate that PHAs establish preferences for persons with disabilities. Other commenters stated that in § 903.2(d)(2)(ii), the rule lists residency preferences such as those designed to assist in deinstitutionalizing individuals with disabilities as an example of a PHA activity that will affirmatively further fair housing. Commenters suggested that HUD change "residency preferences" to "admissions preferences" because admissions preferences will more effectively further the goal of integrating persons with disabilities into housing with the non-disabled population. Commenters further stated that residency preferences, particularly in communities with high non-minority populations, have the potential to be used as a barrier to affirmatively furthering fair housing by affording a preference to persons who are very likely to be non-minority. Commenters stated that this may result in minority applicants spending a disproportionate amount of time on housing waitlists, frustrating the purpose of the affirmatively furthering fair housing mandate.

*HUD Response:* The Quality Housing and Work Responsibility Act of 1998 (QHWRA) (title V of Pub. L. 105–276, approved October 21, 1998) eliminated Federal admissions preferences and allows PHAs to adopt their own preferences pursuant to the local PHA planning, including an assessment of local housing needs and review by the Resident Advisory Board, and

consistent with Federal fair housing and civil rights requirements. Given that QHWRA eliminated imposed preferences on PHAs and determined that PHAs were in the best position to determine preferences, if any, based on local conditions, this final rule does not mandate preferences on PHAs.

7. Community/Citizen Participation and Engagement

*Comment: Require maximum citizen participation at every stage in the fair housing planning process.* Commenters state that HUD should require that program participants maximize citizen participation in every stage of the assessment process. Commenters stated that the AFH should be developed by way of an iterative community process so that community members have the opportunity to respond at each stage of the development of the data and action plan, rather than only to a fully-developed plan.

Commenters stated that enhanced participation would be achieved by: (1) Creating an affirmative marketing plan for every event open to the public; (2) publishing all materials and reports in plain language, and in multiple languages; and (3) making all comments on the process available to the public. Commenters stated that, during the consultation phase, program participants should engage in and develop an affirmative marketing plan for activities related to the public participation process that includes an assessment and identification of possible stakeholders. Commenters stated that this plan should be submitted to HUD as evidence of the planning and action steps the program participant undertook to ensure that maximum community participation among stakeholders occurred.

Commenters stated that all of the marketing materials and other materials associated with affirmatively furthering fair housing compliance should be published in plain language so that they can be understood even by those with no expertise in fair housing. In addition to using plain language, commenters stated that these same materials should be translated and published in languages that are most relevant to the program participant's community. Commenters stated that understanding fair housing needs must go beyond data analysis and involve input from those individuals who have first-hand knowledge of the existing hurdles and barriers in their communities. Commenters stated that an aggressive outreach campaign is necessary to ensure that those individuals with concerns are heard, and that no one

should be prevented from participating in the process and from providing valuable insight into the fair housing barriers in a community because of a comprehension or language barrier.

Other commenters also focused on marketing campaigns as being critical to meaningful participation. Commenters stated that participants should create major marketing campaigns to educate the public about the negative impact of housing discrimination and how to be proactive on the matter. The commenters stated that this should all be done with particular sensitivity to historically underserved audiences, keeping cultural and linguistic attributes in mind because these are the very individuals most impacted by the new rule and affirmatively furthering fair housing issues.

*HUD Response:* HUD appreciates the commenter suggestions, but HUD regulations for almost all HUD programs already require HUD program participants to engage in affirmative fair housing marketing. HUD therefore declines to expand upon existing affirmative fair housing marketing requirements at this time, but the final rule does strengthen the proposed rule's community participation requirements.

This final rule strengthens the provisions of proposed § 5.158 pertaining to community participation in the AFH by directing program participants to employ communications means designed to reach the broadest audience. The final rule provides that such communications may be met by publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each document available on the Internet, on the program participant's official government Web site, as well as at libraries, government offices, and public places. Also, program participants are required to ensure that all aspects of community participation are conducted in accordance with applicable fair housing and civil rights laws that, among other things, assure access to communications for persons with limited English proficiency (LEP) and access to meetings and materials for persons with disabilities.

With respect to the comment regarding relevant languages, HUD funding recipients are already required to take reasonable steps to ensure meaningful access to their programs and activities by LEP persons by existing law, including title VI of the Civil Rights Act. HUD's guidance on LEP can be found at 72 FR 2732 (January 22, 2007). Sections 91.105, 91.115, and 570.441 of this final rule direct that the citizen

participation plan required by the consolidated plan regulations shall require that the jurisdiction take reasonable steps to provide language assistance to ensure meaningful access to citizen participation by persons with limited English proficiency.

*Rule change.* This final rule revises § 5.158(a) to include language that strives to ensure that the AFH, the consolidated plan, and the PHA Plan and any plan incorporated therein are informed by meaningful community participation, and to achieve this objective, program participants should employ communications means designed to reach the broadest audience. The revised section provides that such communications may be met, as appropriate, by publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each document available on the Internet, on the program participant's official government Web site, as well as at libraries, government offices, and public places.''

*Comment: Utilize public participation tools that will reach residents in isolated areas.* Commenters stated that HUD must ensure that the approved plans demonstrate effective methods for maximum engagement, particularly for isolated rural jurisdictions and their residents to participate in this process. Commenters stated that those who fall under any of the protected classes and live in isolated communities may encounter obstacles to participate in an AFH process, such as limited public meetings that are located far from their local community. Commenters stated that methods for maximizing public participation need not be sophisticated, merely effective and efficient, and that remote real-time access to video links, or 'electronic clickers' that allow for anonymous and active participation are used in certain circumstances and should be identified in the planning process so that this engagement process is presented to and approved by HUD.

In a similar vein, commenters stated persons with disabilities in nursing homes and institutions are isolated from the general public. Commenters stated that often, access to persons with disabilities in these settings is monitored or controlled by gatekeepers such as facility staff, medical personnel, or guardians. Commenters recommended that a program participant's citizen participation plan include special notification to nursing homes and other institutions for persons with disabilities, as well as follow up visits and phone calls. Commenters stated that although HUD's proposal

includes a requirement that the AFH and related documents be accessible to persons with disabilities, there is no similar requirement relating to the materials and documents relied upon by program participants in deliberating upon and drafting the AFH must be accessible. Commenters recommended that HUD require that such materials be accessible and that Web site information be Section 508 compliant.

*HUD Response:* HUD agrees that the community participation processes must consider the populations served, and where they are located, and they must choose public participation approaches that will reach the populations served. These approaches must be reflected in the program participant's citizen participation plan, and HUD emphasizes this point in language added to § 5.158(a). In addition, HUD encourages its program participants to consult the section 508 Web site and that of the U.S. Access Board, both of which provide guidance on making Web sites accessible to persons with disabilities. See *www.section508.gov* and *www.access-board.gov.*

*Rule change.* This final rule revises § 5.158(a) to include language that provides that program participants shall ensure that all aspects of community participation are conducted in accordance with fair housing and civil rights laws, including title VI of the Civil Rights Act of 1964 and the regulations at 24 CFR part 1; section 504 of the Rehabilitation Act of 1973 and the regulations at 24 CFR part 8; and the Americans with Disabilities Act and the regulations at 28 CFR parts 35 and 36, as applicable.

*Comment: Modify or replace citizen participation requirements for States.* Commenters stated that generating citizen participation at the state level is costly and, in most cases, fruitless. Commenters stated that meaningful and widespread citizen participation for States is expensive and likely require the employment of a consultant. Commenters stated that States are huge geographic areas in which to undertake meaningful citizen participation. Commenters stated that consultation with interest groups is generally more productive because interest groups have a more immediate interest in providing input to the planning process. The commenters stated that interest groups respond to public participation because of their potential for gain, while citizens whose communities may or may not receive a CDBG grant or other CPD assistance, have less interest in providing their input and less of an

expectation that they will benefit from a program.

Commenters asked that to minimize costs and in acknowledgement that typical citizens have little or no interest in a statewide consolidated plan or AFH, encourage, but do not require, State citizen participation plans to provide for citizen and resident participation, and permit States to rely almost exclusively on participation of the organizations described in § 91.115(a)(2)(ii).

In a similar vein, other commenters stated that the public participation requirements in § 91.115 should reflect differences between State and local governments. The commenters stated that the best methods for effective and meaningful interaction vary tremendously based on the size of a jurisdiction's service area.

*HUD Response:* The community participation requirements for States have long been required under the Consolidated Plan regulations, and HUD believes they have worked well. This final rule applies the same community participation process that States now use under the consolidated plan.

*Comment: Clarify that States only need to consult with agencies and organizations that fall under State Consolidated Plan.* Commenters stated that the language in the rule pertaining to State consultation for the AFH should make it clear that a State only needs to consult with agencies and organizations that fall under the State consolidated plan.

*HUD Response:* Similar to HUD's response to the preceding comment, the AFH regulations in § 91.110(a) (introductory paragraph) do not delineate that only State public or private agencies must be consulted. Such delineation is not currently there in the Consolidated Plan regulations and therefore is not delineated in this final rule. However in adding a new paragraph (a)(1) to § 91.110, which pertains to HUD's public housing program or HCV, HUD has clarified that consultation is only required of PHAs administering public housing or HCV programs on a statewide basis or that certify consistency with a State's consolidated plan.

*Rule change.* In § 91.110, paragraph (a)(1) is revised from the proposed rule to clarify that, with respect to public housing or HCV programs, the State shall consult with any PHA administering public housing or section 8 programs on a state-wide basis as well as with PHAs that certify consistency with a State's consolidated plan.

*Comment: Clarify that States do not need to analyze a PHA's geographic*

*area if the PHA adopts the State's AFH.* Commenters expressed concern that if local PHAs adopt the State's AFH, there will be a requirement for the State to analyze units that are much smaller than would otherwise be expected for a statewide analysis because a local PHA is tied to a small jurisdiction (city or county), and the AFH would need to use block group or census tract data and information about the local housing market, trends and stakeholders to be helpful in planning a course of action to address fair housing issues. The commenters stated that this level of analysis is not a reasonable expectation to place on the State for its AFH. Commenters stated that a State needs assurance that its AFH would not need to change course based on the make-up of local PHAs opting to use the State AFH in lieu of their own.

*HUD Response:* All jurisdictions and insular entities will be required to consult with PHAs on PHA programs. To clarify, States must conduct outreach to PHAs that administer public housing or Section 8 programs on a statewide basis or that certify consistency with the State's consolidated plan. PHAs, however, cannot adopt a State's AFH, but they may work in collaboration with a State pursuant to § 5.156 and § 903.15(a)(1). In addition, as provided in § 5.156(a)(3), all collaborating program participants are accountable for the analysis and any joint goals and priorities to be included in the collaborative AFH, and collaborating program participants are also accountable for their individual analysis, goals, and priorities to be included in the collaborative AFH.

*Comment: Public hearings are not the best vehicles to ensure public participation of the targeted populations.* Commenters stated that public hearings, which they described as the primary vehicles for soliciting community feedback on the AFH, are hardly a sufficient mechanism to ensure the participation of the target population. Commenters stated that, recognizing that such public hearings may not be sufficiently proactive, § 91.115(a)(2)(iii) provides that a State should also explore alternative public involvement techniques including the use of focus groups. Commenters asked that the rule be altered so that all program participants must consider and ultimately employ such techniques, and public hearings would be optional. Commenters stated that program participants and PHAs must be required to pursue outreach strategies that actively engage the community in a dialogue to ensure that their vision of

change for their community is also brought to bear.

*HUD Response:* Public hearings should not be the only vehicle to solicit public participation but HUD believes they can be an effective vehicle based on experience under current regulations. As HUD stated in response to earlier comments, the program participant's public participation processes must consider the populations served, and where they are located, and they must choose public participation approaches that will reach the populations served and these approaches must be reflected in the program participant's community participation plan. Please note earlier discussion of changes to § 5.158 to strengthen community participation.

*Comment: A public hearing should not be required until the AFH is completed.* Commenter stated that the proposed amendment to § 91.105 would require at least one public hearing on the AFH before it is published for comment. The commenters stated that this requirement confuses the planning principle of citizen participation for plans with research studies like the AFH (which is not a plan). The commenters stated that under sound planning principles, the appropriate time for a public hearing on a research study like an AFH, would be when the AFH is completed and made available for public comment. Commenters stated that there is no need for a public hearing before the AFH is completed, and the comment period should be conterminous with the notice period for a public hearing on the AFH. Commenters stated that HUD has not shown any factual basis for a need for a public hearing prior to the AFH being issued for comment and public hearing. This additional public hearing requirement will only delay completion of the AFH an extra month—and given the realities of how recipients have handled AIs, this is time that cannot be lost.

Commenters urged HUD to eliminate the requirement of a public hearing before the AFH is published for comment and urged that the comment period start when the public notice of the public hearing on the draft AFH is published. Commenters stated that the time period should be no less than 30 days.

*HUD Response:* As stated in response to the preceding comment, HUD believes that a public hearing can be a useful vehicle for involvement of the public on a program participant's AFH. HUD also believes that the final rule's scheduling of the public hearing is at the appropriate time—that is, while the

AFH is in development so that a program participant may take into consideration the views and recommendations of the affected community. This is the approach taken for the consolidated plan. A public hearing is held during the development of the consolidated plan, not after the consolidated plan is completed. HUD is taking this same approach for the AFH because, in HUD's experience, it will yield valuable information from the community to inform the program participant regarding the identification of fair housing issues, contributing factors, goals, and priorities.

*Comment: Separate public hearings must be required for AFH performance reports.* Commenters stated that there must be a separate public hearing for the performance reports pertaining to the AFH and consolidated plan. The commenters stated that the CDBG statute, the basis for the Consolidated Plan regulations, calls for "public hearings to obtain citizen views and to respond to proposals and questions at all stages of the community development program, including at least the development of needs, the review of proposed activities, and review of program performance" [42 U.S.C. 5304 (a)(3)(D)]. Commenters stated that the same must be required of AFH performance reports.

*HUD Response:* HUD encourages transparency, but will not require a separate public hearing for the performance reports related to the consolidated plan. HUD's regulations already provide for public input on performance reports for participating jurisdictions; *e.g.,* § 91.105(e)(1).

*Comment: Meaningful public participation of targeted populations will require technical assistance.* Commenters stated that public participation by members of protected classes should be more strongly emphasized. Commenters stated that, in those places that have a disproportionately low share of protected class members as compared to surrounding cities or counties, the final rule should incorporate a requirement to conduct outreach to protected class members who live in those other places (*e.g.,* those who commute to jobs from those other places).

Other commenters stated that while the citizen participation plan of the consolidated plan is "designed especially to encourage participation by low- and moderate-income persons, particularly those living in slum and blighted areas and in areas where CDBG funds are proposed to be used," the consultation requirements in § 91.105(a)(2) limit participation to

organizations "that have the capacity to engage with data informing the AFH." (See also § 91.100(e).) Commenters stated that the rule provides no guidance about what is meant by these qualifications. Commenters expressed concern that these qualifiers may be used by some participants to exclude from the AFH process organizations that have meaningful experience to share but lack sophisticated data analysis expertise. The commenters stated that rule should not imply that groups that lack the ability to conduct data analysis themselves cannot participate meaningfully in a discussion about the implications of such analysis or the steps that should be taken to overcome problems identified through such analysis.

Other commenters stated that with respect to the consultation requirements in § 91.105(a)(2), two factors must be considered: (i) That the low- and moderate-income persons contemplated in the citizen participation plan are more than likely to participate in the development of the AFH and other policies through the structure and mobilization of community-based organizations, and (ii) that such community-based organizations generally lack the capacity to engage with technical data. The commenters stated that jurisdictions will achieve meaningful community participation through pro-active implementation of capacity-building strategies, including allocation of funds, as part of their duty to "take appropriate actions to encourage the participation by low- and moderate-income persons." The commenters stated that the CDBG program calls on insular area jurisdictions to include in their citizen participation plans a policy regarding provision of technical assistance to groups that are representative of persons of low- and moderate-income. (See § 570.441(b)(2).) The commenters stated that AFFH rule should include similar requirements.

Other commenters also emphasized the importance of involving community-based organizations. The commenters stated that community-based organizations communicate quickly to families—much faster than any national entity, and that their materials for the public are highly culturally competent and in the community's preferred language. Commenters stated that these local groups have made the difference between a family losing or preserving their home. Commenters stated that these organizations stay in touch with families and maintain relationships that have been unmanageable by vast national programs.

Additional commenters similarly stated there are very positive provisions for community involvement in the planning process but no support for capacity building is identified in the rule itself. Commenters stated that the effectiveness of community engagement will depend on existing community capacity, unless additional support is included in 2015 budget.

*HUD Response:* The commenters raise very important issues that need to be taken into consideration when program participants are planning outreach efforts. The issues raised by commenters also underscore the importance of allowing program participants to tailor outreach efforts to ensure effectiveness given the populations in their areas, and that HUD should not prescribe a list of outreach actions that a program participant must undertake. The program participants are in a good position to tailor outreach methods that will provide for meaningful actions.

However, as stated in responses to prior similar public comments, HUD has revised § 5.158 in this final rule to strengthen the community participation requirements by directing program participants to employ communications methods that are designed to reach the broadest audience, and that are conducted in accordance with fair housing and civil rights laws, including title VI of the Civil Rights Act of 1964 and the regulations at 24 CFR part 1; section 504 of the Rehabilitation Act of 1973 and the regulations at 24 CFR part 8; and the Americans with Disabilities Act and the regulations at 28 CFR parts 35 and 36, as applicable. In addition, HUD will be providing technical assistance on techniques to encourage participation by the groups that otherwise may not participate. HUD will also review the results of the program participants' community participation process as part of its review of the AFH.

*Comment: Program participants should be required to document activities targeted to obtain input from protected classes, and identify the organizations with whom they consulted.* Commenters stated that program participants should be required to document how their community engagement activities will target protected classes. Other commenters suggested that the rule require program participants to identify the organizations with whom they consulted.

*HUD Response:* The AFFH final rule at § 5.158 requires program participants to consult with the agencies they identify in their PHA Plan or consolidated plan. Program participants are also required to retain records of their community participation efforts, which would be available if HUD investigates a complaint or conducts a compliance review relating to a program participant's duty to affirmatively further fair housing. (See § 5.168.)

*Comment: Include real estate and housing professionals in the AFH planning process.* Commenters stated that the real estate profession is a diverse profession today and has first-hand experience in addressing housing issues in a community, and that the inter-related issues of housing, education, transportation and economic development are front and center issues for real estate. Commenters stated that each individual REALTOR® and other real estate professionals are intimately familiar with their community and the issues impacting housing choices, and they provide an invaluable resource, particularly the real estate professional serving, and part of, today's multi-ethnic and diverse communities, needs to be invited to participate in the planning process. Commenters stated that similarly, property owners, landlords and business owners all have a personal stake in the decisions flowing from the AFH process. Commenters further stated that while not directly impacted by the rule, the interactions of these individuals with covered program participants, be they local PHAs or municipal governments, can be seriously affected by decisions flowing from the AFH process, and that these important providers of jobs, housing opportunities and local economic activity—strongly committed to fair housing principles—must be assured a maximum voice in the community participation process. The commenters stated that consultation with state housing finance agencies and the National Council of State Housing Agencies would be helpful in ensuring that State level concerns are appropriately addressed in the final rule.

*HUD Response:* The commenters identify important groups and organizations that would lend valuable perspectives during the AFH planning process. Identification of these groups underscores the importance of designing a meaningful participation process to ensure that all interested parties have the opportunity to have a voice in the development of the AFH.

*Comment: Require each program participant to identify a coordinating entity to oversee the public participation process.* Commenters stated that community participation is a critical component of the process, and how participants engage members of their community, as well as how those views are eventually represented or reported in the AFH, will substantially impact the success of the AFH process. Commenters stated that in order to realize the goals embedded in the rule, the community participation component must be significantly strengthened in a number of ways, one of which would be to have each AFH identify a coordinating entity that will oversee the process. Commenters stated that this coordinating entity (CE) would be comprised of all elements of stakeholders, including public, private, academic, and community-based representatives, and the coordinating entity would develop a comprehensive community-organizing plan that encompasses all parts of the community in the process. The commenters stated that both public and private funds should support the establishment and implementation of this CE, which will act as an organizing and monitoring entity.

*HUD Response:* The commenters have provided an innovative approach to the AFH community participation process, and program participants are free to adopt such approach but it is not one that HUD will mandate by regulation. (See § 5.156(d).) The entity that is ultimately accountable for the community participation process is the program participant.

*Comment: The AFH consultation process requires program participants to seek input from fair housing stakeholders, but this requirement is not in the citizen participation provisions.* Commenters stated that while the description of the AFH consultation process requires participants to seek input from fair housing stakeholders, this requirement does not carry through to the citizen participation provisions. Commenters stated that the citizen participation requirements are much more general, and only require that citizen participation plans "provide for and encourage citizens, residents and other interested parties to participate in the development of the AFH, any significant revisions to the AFH, the consolidated plan, any substantial amendments to the consolidated plan, and the performance report." Commenters stated that to ensure a strong linkage between the AFH and the consolidated plan and public housing plan, the consultation provisions of the AFH should also be applied to the citizen participation plans for the applicable programs.

*HUD Response:* Through the consultation process, HUD directs program participants to consult with organizations that administer housing, organizations experienced in housing

issues, and organizations experienced in fair housing issues. The AFH's community participation process is designed to reach out to the residents of the community or geographic area in which the program participant operates, and there is no requirement that the citizens be experienced in housing issues or fair housing issues. However, the rule's provision on community participation is flexible enough so as to permit fair housing groups to be among the "interested parties" that may participate in hearings alongside other members of the public.

*Comment: The mandate to ensure meaningful access to citizen participation by persons with Limited English Proficiency is too broad.* Commenters stated that the citizen participation requirement, which states that, "at a minimum, the citizen participation plan shall require that the local government take reasonable steps to provide language assistance to ensure meaningful access to citizen participation by persons with limited English proficiency" is too broad and, given the multitude of the various languages spoken in a given area could constitute a substantial level of expense to provide language assistance.

*HUD Response:* The "mandate" is one of taking "reasonable steps." HUD recognizes that it may not be reasonable for local governments to assist all LEP persons because of the wide variations of languages that may be spoken in a given area. However, HUD further notes that it is a violation of title VI of the Civil Rights Act to deny meaningful access to programs and activities based on a person's national origin. Program participants should be aware of the languages spoken by LEP persons in their jurisdiction and take the steps set out in HUD guidance to assure access under title VI.

*Comment: HUD should require LEP translation, not simply require reasonable steps to assist LEP individuals.* Commenters stated that the final rule should require jurisdictions to provide and implement a citizen participation plan that accounts for people with limited English proficiency and persons with disabilities, and not simply require that reasonable steps be taken to assist LEP individuals. Commenters stated that, in the alternative, HUD should adopt, in the regulatory text, certain preamble language. Commenters stated that the preamble to the proposed rule stated that the requirement in proposed § 91.105(a)(4) to provide meaningful access within the public participation process to LEP persons "strives to have local governments involve these

individuals to the maximum extent possible." The commenters recommended that the preamble language be included in the regulatory text but revised to read, ". . . the maximum extent possible, and in compliance with title VI and other laws requiring meaningful access to LEP persons." The commenters stated that this strengthened language highlights the importance of language access, and serves as a reminder that in certain cases, jurisdictions may have obligations beyond voluntary compliance with respect to ensuring meaningful access to LEP persons.

Commenters stated that while HUD's rule proposed to amend the Consolidated Plan regulations to require that the citizen participation plan include an assessment of language needs, no such provisions are included in the proposed amendments to regulations concerning the PHA Plan process at 24 CFR part 903. Commenters ask that § 903.17(c) be amended to require that PHAs: (1) Include outreach to LEP populations in its outreach activities within the jurisdiction, and (2) identify the need for translation of notices and vital documents with respect to the PHA Plan process. The commenters also asked that HUD require PHAs conducting public hearings pursuant to § 903.17(a) to describe how they will identify and address the needs of LEP attendees.

*HUD Response:* Requirements related to LEP derive from title VI of the Civil Rights Act of 1964 and Executive Order 13166, and HUD's LEP guidance at 72 FR 2732 (January 22, 2007). Under HUD's guidance, funding recipients are required to take reasonable steps to ensure meaningful access to their programs and activities by LEP persons. The HUD LEP guidance discusses title VI's requirements for document translation and the provision of language assistance. For this reason, HUD declines to mandate the specific measure that the commenters suggest; rather, the requirement to take "reasonable steps" applies to all program participants and all program participants' programs and activities. As noted earlier in this preamble, this final rule, in § 5.158, states that program participants should employ communications methods designed to reach the "broadest audience." This language includes involving LEP persons to the maximum extent possible. On the issue of public hearings, HUD believes that the inclusion of measures to include LEP persons in the community participation process that is part of the PHA planning process is sufficient.

*Comment:* HUD's communication mandates to program participants must go beyond assisting LEP individuals; it must include persons with disabilities. Commenters stated that reasonable accommodations for persons with disabilities are essential to ensuring that all residents of a jurisdiction may access the proposed AFH plan, and provide meaningful input into its development. The commenters stated that in order to ensure that residents with disabilities can participate in each step of the AFH plan, it will be necessary for the jurisdiction's proposed plan and materials to be available in formats accessible to people with communications disabilities, for any public hearings or meetings to make available sign language interpreters or other appropriate auxiliary aids and services, and for the physical buildings hosting the public hearings or meetings to be accessible to persons with disabilities.

*HUD Response:* HUD has modified the final rule to make clear to program participants that community participation (like all other programs, services, and activities) must be accessible to persons with disabilities. The access issues discussed by the commenter all fall within existing requirements of section 504 of the Rehabilitation Act and the Americans with Disabilities Act that are applicable to program participants.

*Comment: HUD must define "vital document."* Commenters stated that it is imperative that the final rule define what is meant by "vital documents" as used in Consolidated Plan regulations at § 91.105(a)(4) (Local governments) and § 91.115(a)(4) (States). The commenters stated that while the term appears throughout HUD's "Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons" (HUD LEP Guidance), the term should be defined specifically in the context of the citizen participation process with respect to an AFH. The commenters stated that "vital documents" in the HUD LEP Guidance describe those documents that are "critical for ensuring meaningful access." The commenters stated that, borrowing language from that definition, they propose that the final rule include a definition of "vital document" as describing "those documents and other materials that are critical for ensuring meaningful access to the community participation process."

*HUD Response:* HUD appreciates the recommendations, but declines to define this term for the AFH process.

This term has been defined for quite some time in HUD's LEP Guidance. HUD therefore does not see the need to define this term in regulation but will continue to provide support through guidance. HUD notes that, in general, documents related to public participation would be considered vital based on HUD's LEP Guidance.

*Comment: Require program participants conducting public meetings to track the languages spoken at the meeting.* Commenters stated that program participants conducting public meetings/hearings regarding the AFH should be required to track the languages spoken by meeting attendees. The commenters stated that this information will inform program participants' subsequent assessments of language needs, and that if a program participant finds that LEP persons are continually underrepresented at public meetings/hearings, it must take steps, outlined in its assessment of language needs, to improve attendance by LEP residents.

The commenters stated that the final rule should note that jurisdictions needing guidance in determining which language groups require translated vital documents and notices should consult with the four factor analysis detailed in the HUD LEP Guidance, which is a balancing test that considers the following: (1) The number of LEP persons served or likely to be served or encountered; (2) frequency of contact with LEP persons; (3) importance of the activity or program at issue; and (4) available resources. The commenters stated that this test can provide jurisdictions with an initial snapshot of the language access needs for the purposes of ensuring effective citizen participation, including what languages should be covered.

*HUD Response:* HUD appreciates the suggestion and commends any program participant that undertakes the effort to track languages spoken at meetings, since this information would be evidence of effective outreach to persons with LEP, as required by title VI of the Civil Rights Act, in the event HUD receives a complaint or conducts a compliance review on this issue. However, HUD declines to mandate such tracking.

## 8. Collaboration, Consultation, and Other Planning Efforts

*Comment: The consultation requirement does not appear to apply to PHAs.* Commenters stated that while it is clear that the consultation requirement applies to States and local jurisdictions that are required to produce consolidated plans (see §§ 91.110(a)(2) and 91.100(e), respectively), this consultation requirement does not appear to apply to PHAs and it should.

*HUD Response:* HUD disagrees with the commenters. Consultation requirements for PHAs are fundamentally different as direct consultation is focused upon the residents served. This takes place through specific consultation of the Resident Advisory Board (see § 903.13), as well as residents in the HCV program. Public participation requirements for PHAs also require that PHAs "conduct reasonable outreach activities to encourage broad public participation" and take a number of actions to ensure such participation occurs (see § 903.17). HUD Guidance also directly specifies interaction with difficult to reach groups such as those with LEP (PIH Notice 2011–31[13]).

*Comment: Require jurisdictions to consult with financial institutions.* Commenters stated that HUD should require jurisdictions to consult with local financial institutions about issues related to access to credit and mortgage lending as part of the development of the AFH. Commenters also stated that HUD should require jurisdictions to consult with community development financial institutions (CDFIs) and to review local financial institutions' Community Reinvestment Act (CRA) public performance reports as part of preparing the AFH.

*HUD Response:* HUD encourages jurisdictions to consult with financial institutions as suggested by the commenters, and encourages financial institutions to participate in community participation processes, but HUD declines to require jurisdictions to undertake consultation with financial institutions.

*Comment: Provide guidance on what is meant by "sufficiently independent and representative."* Commenters stated that HUD should provide clarification regarding the rule's consultation requirements at § 91.100, specifically, the requirement that organizations be "sufficiently independent and representative." Commenters stated that many community organizations with valuable input are also CDBG subgrantees. Commenters requested that HUD should ensure the rule's more clear linkage of the AFH to the consolidated plan process does not exclude those subgrantees representing protected classes from the AFH consultation process.

*HUD Response:* The broad citizen participation requirements under § 91.100 are intended to include consultation with a wide variety of public and private agencies, local governments, and PHAs. The proposed rule provided additional language that emphasizes that "sufficiently independent and representative" organizations must be consulted on the obligation to affirmatively further fair housing, but such language is not intended to exclude subgrantees or other interested organizations from the consultation process.

*Comment: Other planning efforts must include Qualified Allocation Plan and Metropolitan Transportation Plan.* Commenters stated that there are two other sets of plans and programs that should be coordinated with the AFH fair housing planning effort—the Low Income Housing Tax Credit (LIHTC),[14] Qualified Allocation Plan, and the Department of Transportation's (DOT's) Metropolitan Transportation Plan (MTP) and/or Transportation Improvement Plan (TIP). Commenters stated that given the volume of the LIHTCs and studies indicating LIHTC-financed projects are often located in areas of concentrated racial or ethnic poverty, the availability of LIHTCs and the Qualified Allocation Plan (QAP) process should be included in the AFH analysis and AFFH certification consideration. The statute requires QAP selection criteria to include, among other factors, the location of proposed projects and the needs of two protected classes, special needs populations and families with children. The MTP is a planning document that considers goals, strategies, and projects with a 20-year time horizon; and this plan is updated every 5 years. The commenters stated that the TIP is a statement of proposed transportation investments that is updated every 4 years. The commenters stated that Metropolitan Planning Organizations (MPOs), which have a comprehensive public participation process, are responsible for these planning endeavors. The commenters also stated that there is also a parallel statewide process, and that is Transit-Oriented Development, which is the siting of transit lines and transit stops, bus routes and frequency. The commenters stated that these planning efforts work to prevent segregation and are important informing fair housing planning. Commenters requested that

---

[13] See *http://portal.hud.gov/hudportal/documents/huddoc?id=PIH2011-31.PDF.*

[14] Although the popular terminology is low-income housing tax credit or LIHTC, the correct legal name is Low-Income Housing Credit. The word "tax" is not in the legal name.

QAP, MTP, TIP be included in required planning efforts.

Other commenters stated that as the largest producer of affordable housing in this country, the LIHTCs must be a part of the AFH planning process. Commenters stated that inclusion of LIHTC is especially important since, according to the commenters, LIHTC funding is limited to Qualified Census Tracts, which bear a strong resemblance to concentrated areas of poverty.[15] Commenters stated that LIHTC is also one of the funding vehicles for rehabilitating or producing HUD-supported housing, such as mixed-finance public housing developments, rehabilitated project-based Section 8 developments, Sections 202 and 811 properties, and supportive housing under the McKinney-Vento program. Commenters stated that HUD should be coordinating its enforcement of the duty to affirmatively further fair housing with the Department of Treasury and making all efforts to have Treasury incorporate the principles of affirmatively furthering fair housing into its administration of the LIHTCs.

In contrast to these commenters, other commenters stated that requiring AFH planning to be coordinated with other plans by other agencies is a legal stretch and is problematic in implementation. These commenters stated that HUD should not mandate coordination with any plan or programs that are beyond the control of the program participant and over which HUD does not have jurisdiction. Commenters stated that coordination with other Federal agencies should not be required because just getting all HUD entitlements to cooperate and line up consolidated planning processes would be a monumental task. They stated that asking jurisdictions also to line up with additional Federal agencies is not feasible.

Commenters stated that it is unclear how the AFH and the QAP for LIHTC would successfully meld together given these conflicting goals. The commenters stated that the goals of LIHTC do not match the goals of the AFFH rule. Commenters stated that LIHTC, New Market Tax Credit (NMTC), and Enterprise Zones actually encourage or prioritize development of projects in

areas of low-income households. The commenters stated that for the LIHTCs there is, in fact, a basis boost for locating projects in Qualified Census Tracts (areas of low-income concentration) specifically to encourage the construction of multifamily projects in these areas/communities.

*HUD Response:* Commenters have identified some planning processes being undertaken by other Federal agencies. If HUD program participants are involved in any of these planning efforts, these should be addressed in their AFH, and the Assessment Tool provides for such inclusion. HUD agrees that coordination with these other planning efforts will enhance a program participant's assessment of fair housing. HUD declines, however, to mandate in the regulation coordination with these other planning processes.

In response to the specific comments on the use of Federal programs that encourage redevelopment of or investment in low-income neighborhoods, the use of various strategies including redevelopment or preservation of existing affordable housing is not necessarily at odds with the planning requirements in this regulation.

*Comment: Clarify the composition of a Fair Housing Advisory Council.* Commenters stated that the term Fair Housing Advisory Council could be interpreted to allow a jurisdiction to meet the consultation requirement by only engaging a hand-picked advisory council while avoiding consultation with any of the fair housing organizations listed at the beginning of the entire section (such as Fair Housing Initiative programs (FHIPs)) and other public and private fair housing service agencies). Commenters requested that HUD clarify the composition of such councils.

*HUD Response:* HUD agrees with commenters' concerns and did not intend to allow for a Fair Housing Advisory Council to be considered a replacement for the broader consultation requirements in part 91.

*Rule change.* HUD has removed the language regarding Fair Housing Advisory Councils in proposed §§ 91.100(e) and 91.110(a)(2). In lieu of rule language, HUD intends to provide guidance on models for meeting the consultation requirements, which may include Fair Housing Advisory Councils.

*Comment: Convene a Partnership on Sustainable Communities or Reconvene the President's Council on Fair Housing.* Commenters stated that there is more that HUD could do, through its own planning efforts, and these include

convening a Partnership on Sustainable Communities along with other Federal agencies and offices that are responsible for housing, fair housing, civil rights, or equal opportunity outcomes, to develop a strategic plan to address cross-agency action towards regional fair housing and civil rights goals that support both mobility and investment goals. The commenters also stated that the President's Council on Fair Housing, originally established under President Clinton's Executive Order 12892 to foster access to opportunity and integration strategies across Federal agencies should be reconvened.

*HUD Response:* HUD appreciates these suggestions from the commenters and will take these under consideration as ways in which HUD and other Federal agencies may be helpful to jurisdictions and other program participants in carrying out their obligation to affirmatively further fair housing.

*Comment: HUD must work closely with the U.S. Department of Transportation (DOT) in assisting program participants to affirmatively further fair housing.* Commenters stated that HUD must work with DOT staff to share AFH data on segregation, concentrated poverty, and access to opportunity trends—and identify ways that MPOs and transit agencies can align AFH with the DOT's equity and environmental justice analyses per their title VI obligations. Commenters stated that the two agencies should provide guidance for regions and jurisdictions that assist in aligning AFH-Consolidated Plans-Public Housing Plans-and Regional Transportation Plan timelines and goals so that they can achieve integrated, coherent use of their HUD and DOT resources.

*HUD Response:* HUD appreciates these suggestions and is working with DOT to share data that enhances the planning processes of both agencies.

*Comment: Consultation requirements for States exceed those required by statute.* Commenters stated that the "consultation" requirements for States appear to greatly expand the requirements under QHWRA, in a way that does not appear to have a legal basis under either QHWRA or Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act). Commenters stated that the "consultation" requirements go far beyond consultation and actually require the State to help the PHA remedy its fair housing violations. Commenters stated that the only requirement under QHWRA is that States discuss how they will help "troubled" PHAs with financial or

---

[15] Contrary to the commenters' statement, tax law does not limit LIHTCs to buildings located in Qualified Census Tracts. Rather one of the three types of proposed projects to which allocating agencies must give preference is "projects which are located in qualified census tracts . . . and the development of which contributes to a concerted community revitalization plan" (emphasis added; citation omitted). Many LIHTC projects are appropriately located in locales that are not Qualified Census Tracts.

technical assistance, as set forth in their comprehensive housing affordability strategy (CHAS) or consolidated plan (Consolidated Plan). Commenters further stated that QHWRA specifically defines a troubled PHA as one whose physical units do not meet ''acceptable housing conditions,'' and the statute states that if public housing is distressed, the solution is for the PHA to ''voucher out'' the PHAs residents.

Commenters stated that § 91.110 of the proposed rule states that ''If a PHA is required to implement remedies under a Voluntary Compliance Agreement, the State should consult with the PHA and identify the actions it may take, if any, to assist the PHA in implementing the required remedies.'' The commenters stated that this provision goes far beyond QHWRA, which only speaks to assisting troubled PHAs with financial or technical assistance, and that by stating that the State has an obligation to help a PHA, the rule shifts the burden from the PHA to the state to address problems created by the PHA or other non-state entity.

Commenters stated that this same regulatory section states that: ''The State shall consult with any state housing agency administering public housing concerning consideration of public housing needs, planned programs and activities for the AFH, strategies for affirmatively furthering fair housing, and proposed actions to affirmatively further fair housing, and proposed actions to affirmatively further fair housing.'' Commenters stated that while ''all state agencies administering public housing'' could refer to State agencies only, it could also be interpreted to mean any PHA operating in the State, including those in entitlement jurisdictions.

Commenters concluded by stating that HUD needs to clearly say that the State consultation only applies to PHAs located in non-entitlement jurisdictions, and that the language in the proposed rule that says the State should identify what actions the State should take to assist the PHA when the PHA is implementing the required remedies should be removed as it has no legal basis under the QWHRA or other legislation that of which the commenters are aware.

Other commenters similarly stated that under the State Consultation Requirements in § 91.110(a)(2), which provides that the ''State shall consult with state and regionally-based organizations that represent protected class members . . . and other public and private fair housing service agencies, to the extent such agencies operate in the State,'' HUD needs to be clear that this applies to such entities and regional organizations that operate in the State's non-entitlement jurisdictions, and that the focus should be on the non-entitlement areas in these consultations.

*HUD Response:* HUD disagrees that the consultation requirements imposed on States exceed statutory authority. With respect to a PHA under a voluntary compliance agreement (VCA), the language in § 91.110(a)(1) encourages States to consult with such PHA. There is no mandate to provide funding for those PHAs under a VCA.

In response to comments that the States have a very different role from entitlement jurisdictions, HUD is developing an Assessment Tool especially for States that will take into consideration the different role of States.

### 9. Consolidated Plan

*Comment: Standards by which HUD will measure strategies and actions in Consolidated Plan are unclear.* Commenters stated that the standards by which HUD will measure the strategies and actions in the consolidated plan and Annual Action Plan are unclear. Commenters stated that the proposed rule and guidance reiterate that jurisdictions will be able to choose the strategies in the consolidated plan and the actions in the Annual Action Plan that will be used to support the goals in the AFH, but that detailed guidance is needed for jurisdictions to understand the standards by which HUD will review the strategies and actions supporting AFH goals in the consolidated plan and Annual Action Plan. Commenters stated that these changes to the Annual Action Plan regulations do not include information about consequences, like withholding of grant funds, if HUD does not approve the strategies or actions listed in the consolidated plan or Action Plan. Commenters stated that although there is a clear relationship between the AFH and consolidated plan and Annual Action Plan, the final rule should clearly state the expectations of how each document should relate. Commenters stated that, for instance, it is unclear whether all priorities and goals identified in the AFH must be addressed in strategies in the consolidated plan and whether each Annual Action Plan must include actions to address all priorities and goals in the AFH. Commenters stated that no changes were made to the Consolidated Annual Performance and Evaluation Report (CAPER) regulations, and that it is unclear whether HUD's review of actions carried out in support of AFH goals will be altered when reviewing the CAPER after the final rule is in effect. Commenters stated that clarity on HUD's expectations regarding reporting requirements is needed.

*HUD Response:* The standard of review of the consolidated plan at § 91.500(b) is unchanged by this rule. A plan will only be disapproved if it is inconsistent with the consolidated plan statute (Cranston-Gonzalez National Affordable Housing Act (42 U.S.C. 12703 *et seq.*)) or the plan is substantially incomplete. With respect to the latter, based on this rule's requirements at §§ 91.215, 91.315, and 91.415, a strategic plan must include how its priorities and objectives will affirmatively further fair housing consistent with the goals and other elements in the assessment, and will identify additional objectives for any goals that are not addressed. Therefore, for a strategic plan to be complete and meet HUD review standards, a jurisdiction must at a minimum identify strategies and actions to overcome the contributing factors and show how it plans to address each of the goals identified in the AFH (although it is not necessary to be a one-for-one match up as a single strategy may address multiple goals or a combination of strategies may address a single goal). In turn, the annual action plan will require the jurisdiction to describe the actions it plans to take in a particular year that address goals identified in the AFH (see §§ 91.220, 91.320, 91.420). If the substantive elements of the consolidated plan or annual action plan are not included in a consolidated plan, the plan may be disapproved as substantially incomplete. See § 91.500(b) of the Consolidated Plan regulations, which provide examples of actions that may result in a determination by HUD that the plan cannot be accepted or is substantially incomplete.

In this regard, a consolidated plan or annual action plan may also be disapproved as substantially incomplete if the AFFH certification is rejected by HUD, after HUD has determined the certification to be inaccurate based on inspection of evidence and provided the program participant an opportunity for notice and comment. New AFFH certification language at §§ 91.225, 91.325, 91.425, and 903.15(d)(3) provides the standard under which HUD will review the validity of AFFH certifications.

HUD further notes that, under the Fair Housing Act and program statutes, program participants are ultimately responsible for affirmatively furthering fair housing, not just developing an

AFH with goals and priorities and planning documents with strategies and actions. It is the program participants' responsibility to affirmatively further fair housing and to set, evaluate, and readjust goals, priorities, strategies, and actions to fulfill that legal duty.

*Comment: Additional attention needs to be paid to impact on HOME consortium.* Commenters stated there is insufficient guidance on the changes that will be necessary to the HOME consortium grant agreement for HOME Consortia, and reference to their re-certification process under the State's Consolidated Plan, regardless of renewal clauses contained in their current Consortia Agreements.

*HUD Response:* HUD will provide additional guidance as needed, as well as technical assistance on a case-by-case basis.

*Comment: Require States to include language in their Consolidated Plans on how they will use their resources to assist with achievement of fair housing goals.* Commenters stated that regional collaboration should be encouraged, and the new AFH regulations should require that States include language in their consolidated plans on how they will use resources to assist the regions with their fair housing goals. Commenters stated that an AFH is not intended for States and should not be forced on States merely for ease of administration. States are diverse and should be given the flexibility to assist regional collaborations without having to fit their mold.

*HUD Response:* The AFH includes States, but HUD recognizes that fair housing planning assessments by States will be different in scope and emphasis than entitlement jurisdiction. Therefore, as noted earlier in this preamble, and in the publication of the AFH Assessment Tool, HUD is developing a separate Assessment Tool for States.

*Comment: The Consolidated Annual Performance and Evaluation Report (CAPER) can measure AFFH performance; program participants should continue to be allowed self-evaluation.* Commenters stated that performance review by HUD of the Consolidated Plan regulations should be the same one used to assess how program participants have acted with respect to the goals they set out for affirmatively furthering fair housing. Commenters stated that feedback on progress of affirmatively furthering fair housing is included within CAPER, and this should continue to be a self-evaluation that is then reviewed by HUD. Commenters stated that HUD does not review CAPERs with any consistency, and that, for some years, a review letter comes within six months of the CAPER submission; other years there has been no letter at all. Commenters stated that jurisdictions across the country report similarly mixed responses from the various HUD field offices, and they asked why HUD would not hold all jurisdictions to the same level of review.

*HUD Response:* The annual performance reporting requirements at § 91.520, including the requirement to report on actions taken to affirmatively further fair housing, and HUD review requirements at § 91.525 are unchanged in this rule. Levels of review may vary based on priorities and resources. HUD takes note of the commenters' concerns about consistency in review.

*Comment: Allow jurisdictions to match up planning cycle to next available cycle.* Commenters recommended that jurisdictions be given the ability to match up planning cycles in the next available cycle. Commenters stated that this may require the PHA and or the consolidated plan length (3 to 5 years) to be shorter or lengthen to match up, but should be decided at the local level and approved by HUD. Commenters stated that matching up FYs is less important if the AFH is planned for and produced before the PHA/consolidated plan are due. Commenters stated that if a region wants to align their 5-year consolidated plan cycles to facilitate a regional AFH, according to, the commenters stated their understanding of existing rules, many jurisdictions would need to prepare a shorter consolidated plan—perhaps even just one or two years, further increasing costs and demands on scarce staff time in an upcoming 5-year period.

*HUD Response:* Jurisdictions already have the flexibility—and HUD intends to accommodate such flexibility—to change the submission date of its consolidated plan under § 91.10. This section explicitly allows changes, with HUD's agreement, to allow for strategic plans to stretch beyond 5 years for the purpose of aligning plans.

*Comment: No additional public comment period is required for AFH; public comment period for CAPER and Consolidated Plan is sufficient.* Commenters stated that the public comment periods for the CAPER and consolidated plan (15 and 30 days, respectively) are sufficient. Commenters stated that it seems that the AFH requirements of holding one public hearing, as well as consultation with various fair housing and similar groups, will fit into the current planning and reporting citizen participation process.

*HUD Response:* The AFH is a distinct document with data, analysis, and priority and goal setting that feeds into the consolidated plan. Further, public input is a fundamental and necessary component in the AFH process. Jurisdictions may be able to appropriately conduct some outreach or hearings on both, but must be aware that submission timelines require that the AFH must be submitted 270 calendar days (for first AFHs) or 195 calendar days (for subsequent AFHs) before the start of the first program year to which the new housing and homeless needs assessment, market analysis, and strategic plan, as required by 24 CFR 91.15(b)(2), and referred to in the regulatory text as the "new consolidated plan" applies. It may be more likely that there be shared outreach efforts on a prior year action plan or performance report, but in any such case the AFH should be a distinct agenda item for any public hearing.

*Comment: Recommendations for comment period for AFH.* Commenters stated that the AFH review for public comment on consolidated plan participants should be a minimum of 45 days. Other commenters stated that HUD's rule should allow up to 30 days for public comment, allowing the program participant to decide on an appropriate comment period within these parameters. Yet other commenters stated that 15 days is insufficient time for public comment.

*HUD Response:* This rule sets the minimum public comment period for a jurisdiction at 30 days, the same period required for the consolidated plan. The minimum public comment period for a PHA remains 45 days under existing PHA Plan public comment requirements. Jurisdictions may choose to follow a longer public comment period, if desired.

*Comment: Placing AFH community participation and consultation requirements in 24 CFR 91.110 and 91.115 creates certain issues for State grantees.* Commenters stated that placing the community participation and consultation requirements applicable to the AFH in §§ 91.110 and 91.115 has the virtue of giving formal recognition to the distinctive character of State-level undertakings in connection with the two processes. Commenters stated that additional clarification may be needed to limit consultation obligations to entities that fall under the coverage of the two processes—*i.e.*, making consultation with entitlement localities or PHAs, for example, optional rather than mandatory where there is no state program coverage.

*HUD Response:* HUD has not changed the requirement in this rule, but only extended such requirements to the AFH process. As provided in the rule, the requirement for States is to consult with "any housing agency administering public housing or section 8 on a State-wide basis as well as all public housing agencies that certify consistency with the State's consolidated plan." (See § 91.110(a)(1).) HUD understands this requirement to limit required consultation to State level public housing agencies or those that certify consistency with the State's consolidated plan.

*Comment: Consolidated Plan public participation requirements can be improved to achieve more meaningful public comment.* Commenters stated that the consolidated plan public participation requirements could be improved to foster more genuine and complete public participation. Commenters stated that given the amount of information in a draft AFH or draft consolidated plan, a 60-day (60 calendar days) public review and comment period is warranted. Commenters stated that not only is there much to read and assess, community-based organizations need time for their members to process comments before presenting them at a hearing or later in writing (see § 91.105(b)(4)). Commenters stated that there must be an adequate amount of time between the availability of a draft AFH or draft consolidated plan and a public hearing to obtain public comments about it, perhaps 30 days. Commenters stated that advocates have experienced public hearings about draft consolidated plans within the current 30-day review and comment period, affording the public only one or two weeks to review the draft and prepare testimony (see § 91.105(b)(3)). Commenters stated that there must be a reasonable amount of time between the hearing about the draft AFH or consolidated plan and submission to HUD for review, perhaps one to two weeks. Commenters further stated that advocates have experienced consolidated plans or PHA Plans submitted to HUD a day or two after a public hearing, not a sufficient amount of time for the jurisdiction or the PHA to have considered public or resident comment (see § 91.105(b)(5)). Commenters stated that in 1994 advocates called for a period of 60 days to review consolidated plan performance, and that given the importance of AFFH performance, there must be more than a 15-day review period. At a minimum 60 days is

suggested in light of the next point—the need for a performance report rehearing.

*HUD Response:* As stated previously in this preamble, the AFH regulations state the minimum public comment period. Program participants may set higher public comment periods. Citizen participation plans are also subject to citizen input. Participants are required to demonstrate in the AFH that they have considered community comments and how they have dealt with those comments. Just setting a minimum time period for consideration does not guarantee that the time will be used for the purpose of review, which is why HUD will instead look to the summary of citizen input and responses as demonstration that public input was considered. Further, it is up to jurisdictions to decide how to appropriately schedule public hearings, so long as the scheduling is done in a manner that makes the hearing accessible to all and promotes public participation. While HUD will not require all participants to hold separate hearings on performance reports, jurisdictions may choose to do so.

*Comment: Make all comment periods for all reports the same.* Commenters stated that comment periods for all reports should be the same to create a reliable schedule community members can depend on.

*HUD Response:* It is HUD's position that not all reports warrant the same period of public comment. HUD has set public comment period for the AFH in line with the consolidated plan and annual action plan requirements (*e.g.*, 30 days). The performance report comment period of 15 days is unchanged by this rule and reflects the nature of the document as reporting out of actions taken rather than a proposal for future action that may be subject to more public debate.

*Comment: The new certifications at § 91.225 and in part 903 are too broad.* Commenters stated that requiring a program participant, at § 91.225, to certify that "it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing" is too broad of a legal standard, and may result in increased litigation spurred by individual instances, or decisions of the State or a State recipient that one or more parties may feel is inconsistent with an AFH, even though a State's actions, on the whole, affirmatively further fair housing as set forth under the AFH and other related program requirements. The commenters stated that these decisions may be related to non-housing community assets over which State housing program administrators have no

knowledge or control, or may relate to actions of individual state recipients over which the state has no legal authority.

PHA commenters stated that the proposed certification sets forth an unreasonable expectation. The commenters stated that under this standard, a PHA would be hard-pressed to justify capital improvements on a property that exists in a neighborhood lacking community assets, and that similarly, a PHA would struggle to explain how lowering their voucher payment standard in order to be able to stretch their budget and continue to serve the same number of families meets the definition of "affirmatively furthering fair housing."

Other commenters stated that the program participants do not know what "materially inconsistent" means in the certification; that HUD offered no explanation of its meaning. The commenters asked who decides what is "material" and what are the criteria for being deemed "materially inconsistent." The commenters stated if HUD does not define this term and does not identify criteria that it will use to review and approve AFHs, then HUD must exercise flexibility in interpreting this provision. Commenters stated that under the proposed rule's definition of affirmatively furthering fair housing, which can be read to discourage investments in existing low-income neighborhoods, the certification can be challenged on the basis that investments in poverty/minority concentrated neighborhoods are a violation of affirmatively furthering fair housing, because the effect of such investment does not "expand access to high opportunity neighborhoods" and develop "investment possibilities in underserved communities."

Commenters stated that HUD must provide certification that has clear standards for meeting compliance standards; that program participants should not bear the burden of providing that they have complied with ill-defined and changeable standards.

Commenters recommended that HUD should add language to the AFFH certification to more clearly state its meaning of the certification—that HUD should adopt the language from the Westchester consent decree, requiring that in certifying compliance with the obligation to affirmatively further fair housing, the jurisdiction or PHA acknowledges that "the location of affordable housing is central to the fulfilling the commitment to affirmatively further fair housing because it determines whether such housing will reduce or perpetuate

residential segregation." Other commenters recommended the final sentence of the certification state preservation of affordable housing and investment in areas of racial or ethnic concentrations of poverty are not actions necessarily materially inconsistent with the obligation to affirmatively further fair housing.

*HUD Response:* The commenters concerns about the certification provisions largely arise from concerns that HUD's rule did not assure a balanced approach and that participation in HUD or other Federal housing programs serving specified populations may be viewed as a violation of the duty to affirmatively further fair housing. HUD has already addressed both of these concerns in this preamble by advising of revisions in this final rule to the "purpose" section of the regulation and to the definition of "affirmatively furthering fair housing," and by inclusion of a definition of "housing programs serving specified populations."

HUD does not believe the standard of material inconsistency is overly broad. The obligation to affirmatively further fair housing is a statutory obligation, and the certification provisions simply restate the fact that a participant cannot act in a way that is inconsistent with its legal obligation. Unrelated types of actions would not be materially inconsistent; there would have to be some relationship between the action and the obligation to affirmatively further fair housing. HUD would review the AFH and certification and determine if the actions planned to address the goals in the AFH, or the actions that are taken by the program participant, including those based on the AFH, are materially inconsistent with the obligation to affirmatively further fair housing. If they are, HUD would review the certification under existing procedures in 24 CFR part 91 or the procedures in § 903.15(d)(3) to determine whether the statutory duty is violated.

HUD believes that the certification language is appropriate and consistent with statutory requirements and, therefore, makes no change in this final rule.

*Comment: Certification should clarify the duty to affirmatively further fair housing with respect to non-federal funds.* Commenters asked that the certification at § 91.225 provide that a program participant will take no action, "whether using federal funds or not," that is materially inconsistent with its obligation to affirmatively further fair housing. The commenters stated that this same phrase should be added to the certification language at § 91.325 and § 91.425. Commenters further stated that the applicability of the duty to affirmatively further fair housing to all housing and community development resources could be strengthened by including language similar to that used by the Federal Transit Administration in its update of guidance on title VI of the Civil Rights Act. The commenters stated that the guidance includes the following language: "Title VI prohibits recipients of Federal financial assistance (*e.g.*, states, local governments, and transit providers) from discriminating on the basis of race, color, or national origin in their programs or activities, and it obligates Federal funding agencies to enforce compliance."

Other commenters, however, stated that the certification should not pertain to activities that do not involve HUD or other Federal funds.

*HUD Response:* HUD believes the existing certification appropriately reflects the scope of actions to which the program participant must certify.

*Comment: Certification should be both prospective and retrospective.* Commenters stated that any jurisdiction other than one that is submitting a certification for the first time should be obliged to make a retrospective representation about AFFH compliance. The commenters stated that a jurisdiction should be required to make explicit the fact that it is making a certification with the intention that HUD rely on it without conducting an independent investigation. The commenters recommended that the certification requirement in the final rule read as follows: "Each jurisdiction is required to submit a certification that it has and will affirmatively further fair housing, which means that: (a) It has and will take all meaningful steps possible to overcome barriers to fair housing choice that exist in or are contributed to by the jurisdiction; (b) it has not and will not take any action inconsistent with its obligation to affirmatively further fair housing; and (c) it has not and will not fail to act where such failure to act has been or would be inconsistent with its obligation to affirmatively further fair housing. The certification shall include a statement from the jurisdiction that it is representing that the certification is true, complete, and based on supporting evidence, and that it understands that HUD is entitled to rely upon such certification without conducting an independent investigation."

*HUD Response:* HUD disagrees with the recommendation to change the language of the certification. Program participants are subject to certifications to AFFH for all periods of time during which funds are received from HUD. Therefore, if a program participant did not affirmatively further fair housing in a prior time period when HUD funds were received, it was in violation of a prior AFFH certification. HUD notes that the commenter is correct that HUD relies on certifications for purposes of extending funding to program participants. However, HUD sees no need to include this language in the regulation, since funding is conditioned on the certification and, if the certification is inaccurate, HUD has existing processes to investigate or challenge it.

### 10. Definitions

*Comment: The definition of "affirmatively furthering fair housing" is improved but can be read as discouraging investments in existing low-income neighborhoods.* Many commenters stated that the regulation's proposed definition of affirmatively furthering fair housing is more straight forward than the previous definition and that increased clarity will promote greater compliance by participants in Federal programs. Commenters specifically pointed to phrasing in the definition which states that affirmatively furthering fair housing means taking proactive steps beyond combating discrimination.

However, other commenters stated that HUD's definition can be read as discouraging investments in existing low income neighborhoods. The commenters stated that HUD's definition makes no mention of the kinds of investments in underserved communities that have been shown to improve those neighborhoods, such as quality affordable housing, and can be read as explicitly excluding affordable housing investments in low-income minority communities. Commenters stated that under this definition, virtually any investment in poverty/minority concentrated neighborhoods can be attacked under this provision.

*HUD Response:* As noted earlier in this preamble, HUD did not intend to indicate that an investment in a neighborhood of racial or ethnic concentration of poverty is not an acceptable means of affirmatively furthering fair housing. Such investments may be an acceptable means of affirmatively furthering fair housing when designed to achieve fair housing outcomes such as reducing disproportionate housing needs, eliminating RCAPs/ECAPs, increasing integration, and increasing access to opportunity, such as high performing schools, transportation, and jobs. HUD

believes that the clarifications and changes made to the purpose section and the definition of "affirmatively furthering fair housing" demonstrate that the final rule supports a balanced approach.

*Rule change and clarification.* In § 5.150, HUD revises the purpose and in § 5.154(d)(5) HUD adds strategies and actions, to clarify HUD's support for a balanced approach to affirmatively furthering fair housing. Additionally, as noted earlier in this preamble, HUD has replaced the term "proactive steps" with "meaningful actions" in the definition of "affirmatively furthering fair housing" to clarify the types of actions grantees are expected to take to affirmatively further fair housing.

*Comment: The term "community assets" is not clearly defined in the rule; the term "neighborhood asset" is not defined.* Commenters stated that the term "community assets," which is defined as part of the definition of "significant disparities in access to community assets" is not clearly defined in the rule compared to the data sets HUD is providing. Commenters stated that different measures for community assets are included in different parts of the rule. Other commenters stated that any definition of "community assets" should include affordable housing itself as an example of a community asset. In fact, "community assets" should be broadly defined to include factors such as affordable housing, access to healthy food, quality schools, social services, transportation, and other factors that foster a healthful, secure, and opportunity-centered quality of life.

Other commenters stated that the term "neighborhood asset" was used but not defined and that any use of the term "neighborhood asset" should include a social/family network of support, stating that such networks increase individuals' access to opportunities and resources.

*HUD Response:* HUD appreciates the concerns and suggestions made by the commenters. HUD's Assessment Tool, published on September 26, 2014, addresses more thoroughly certain community assets that are key to access to opportunity, and HUD believes the Assessment Tool is more appropriate for addressing and clarifying what is meant by community assets. HUD further notes, however, that many communities have unique assets and the use of a broad definition is intended to capture not only the most common assets that afford access to opportunity, but also those that are less common, but nonetheless very important in communities across the nation. In this final rule, HUD does not use the term "neighborhood asset."

*Comment: Strengthen the definition of "community participation."* Commenters stated that the proposed definition of "community participation" should provide detailed, result orientated steps that will aid states, local governments, and public housing agencies in understanding the rigor and importance of the requirement that funding recipients proactively involve the community in furthering fair housing. Commenters stated that the proposed definition of "community participation" should provide specific examples of acceptable community participation plans to clearly illustrate the importance of community participation and provide guidance to funding recipients. Commenters additionally stated that the proposed definition of "community participation" should require recipients of funding not just to "consider the views and recommendations received" and have a "process for incorporating such [community] views in decisions and outcomes," but should also have a requirement that recipients of funding demonstrate that such views have, indeed, been incorporated into decisions and outcomes.

*HUD Response:* HUD declines to revise the definition of "community participation" in the manner the commenters suggest. The additional detail that commenters are seeking about community participation can be found in § 5.158, entitled "Community participation, consultation, and coordination."

*Comment: HUD's definition of "concentration" is without appropriate basis.* Commenters expressed disagreement with HUD's definition of a concentration of minorities as provided in the proposed rule, which commenters stated automatically defines an area of concentration as any area that has a non-white population of 50 percent of more. The commenters stated that, as HUD has noted, the U.S. is moving to majority minority status, and therefore to use the automatic 50 percent standard is a false measure that does not accurately reflect local community demographics or take into account the changing demographics of the United States as a whole. The commenters stated that HUD's definition makes an assumption that an area that is "majority minority" is, in itself, an inherently bad thing—an assessment that many would disagree with, and that the "solution" called for by this "problem," following the logic that commenters stated HUD is using, would require program participants to adopt a strategy encouraging minorities to move out of the suburbs and into the central city.

Commenters stated that HUD's definition of concentration in the proposed rule is the one that has been used by HUD's Office of Fair Housing and Equal Opportunity (FHEO) for competitive programs such as Choice Neighborhoods and Sustainable Communities, but given that the basis for conducting the AFH (and previously the AI) has been based on CDBG statute, as well as the other formula programs in the Office of Community Planning and Development (CPD), the commenters recommend that HUD use the CPD definition instead. Commenters stated that the CPD definition provides that a concentration exists if the minority population is ten percent higher than the jurisdiction as a whole, and provided the following example—if a jurisdiction was 10 percent minority, then any census tract over 20 percent would constitute a concentration, and if a jurisdiction was 60 percent minority, a concentration would exist if the census tract was more than 70 percent minority. Commenters stated that this is a fairer and more reasonable method of measuring concentrations (particularly at a State level where vast areas of geography is involved) as well as reasonably addressing minority majority jurisdictions, both urban and suburban.

*HUD Response:* First, HUD would clarify that neither the proposed rule nor the final rule includes a numeric threshold in the definition of the term, "racially or ethnically concentrated area of poverty." The commenters referring to a 50 percent threshold for minority population are instead commenting on the AFFH Data Documentation paper that HUD released concurrently with the proposed rule, and which HUD also requested comment on. The comments on those thresholds will be addressed through the development of the Assessment Tool, including consideration of the correct threshold that may be applicable to different geographic areas, for instance rural versus central city areas.

In addition, the comments on the use of a 10 percent threshold used in HUD's consolidated planning regulations appear to refer to those regulations' provisions on disproportionate housing needs analysis and not to a threshold for defining an area as having a high minority population. HUD notes that the term "concentration" appears in other HUD regulations, including in the requirements on site and neighborhood standards, without the specific threshold provided in the regulatory text itself. See, for example, §§ 91.220,

**42304** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

92.353, 570.208, 891.125(c), 891.680, 905.602, 972.218, 982.54, and 983.57.

*Comment:* Revise the definition of "fair housing choice" with respect to persons with disabilities. Commenters asked that the final rule clarify that fair housing choice means that housing is not conditioned on acceptance of disability-related services (unless that is one of the rare instances in which it is specifically required by a Federal statute).

Other commenters stated that the definition of fair housing choice must clearly indicate that "choice" includes residents' ability to choose to remain in homes and communities where they have long lived and where they have deep and important social, community, and economic ties, even if those communities are racially or ethnically concentrated areas of poverty. Commenters recommended the following revised definition of "fair housing choice" with respect to persons with disabilities: "For persons with disabilities, fair housing choice is the ability to live where they choose. This includes access to accessible housing, and, for disabled persons in institutional or other residential environment, housing in the most integrated setting appropriate as required under law, if they so desire, including disability-related services that an individual needs to live in such housing. Fair Housing Choice also means recognizing that not all persons with disabilities desire to live in an integrated setting and that those people have the right to choose to reside with others with the same disability in housing built to meet their needs that includes services focusing on that specific disability."

Other commenters stated that HUD's definition of fair housing choice includes housing choices not constrained by barriers "related to" protections contained in the Fair Housing Act and the commenters stated that they object to HUD's apparent inclusion of matters correlated with protected classes but not related causally to those characteristics.

*HUD Response:* HUD appreciates the commenters' suggestions and, as noted earlier in this preamble has revised the definition of "fair housing choice." Although HUD's definition of fair housing choice does not address the involuntary receipt of services, HUD interprets its regulations under section 504 of the Rehabilitation Act to require disability-related services to be voluntary.

*Rule change.* HUD has revised the definition of "fair housing choice" in § 5.152 to mean that individuals and families have the opportunity, as well as the information and options to live where they choose free of discrimination or other barriers, and that persons with disabilities have the option to reside in accessible housing and in the most integrated setting appropriate to an individual's needs, as required under Federal civil rights law. This choice also includes disability-related services an individual may require in order to live in such housing.

*Comment:* The definition of "fair housing issue" is meaningless. Commenters stated that the definition of "fair housing issue" includes, "any other condition that impedes or fails to advance fair housing choice." The commenters stated that by including anything and everything, the definition means nothing. The commenters stated that HUD must provide a definition of "fair housing choice" that program participants can understand. The commenters stated that the definition of "fair housing issue" in the proposed rule can lead to the conclusion that, since men and women with disabilities have lower incomes than unprotected classes, and since lower incomes impede housing choice, the lower incomes of persons with disabilities is a matter subject to requirements and mitigation under the Fair Housing Act. Commenters recommended that HUD adopt the following definition: "Fair housing issue means unequal housing opportunities for persons in a protected class under federal law and evidence of illegal discrimination or violation of existing civil rights law, regulations, or guidance, as well as any other condition that impedes or fails to advance fair housing choice."

Other commenters stated that the definition of "fair housing issue" must omit reference to ongoing local or regional segregation. Commenters stated that because fair housing issues do not stop at the borders between jurisdictions, it is important that the definition of fair housing issue use "and" instead of "or."

*HUD Response:* HUD disagrees with the commenters, but does agree that a clarification would be helpful. The definition of "fair housing issue" is intentionally broad because the factors and conditions that may impede fair housing choice or access to opportunity are wide and varied.

*Rule change.* As noted earlier in this preamble, HUD has made certain clarifying changes to the definition of "fair housing issue." (See § 5.152.) Specifically, a fair housing issue is a condition in a program participant's geographic area of analysis that restricts fair housing choice or access to opportunity.

*Comment:* The definition of "integration" does not clearly define the geographic area under review. Commenters stated that the definition of "integration" does not clearly define the geographic area under review, but includes, "jurisdiction or Metropolitan Statistical Area (MSA)." The commenters stated that those geographic designations may represent vastly different areas with vastly different demographic characteristics. The commenters stated that a community may be integrated in a jurisdiction but segregated in an MSA or vice versa. Commenters stated that reference to "Metropolitan Statistical Area as a whole" should be removed in the definition of "integration." Commenters stated that MSAs cover broad areas that a single jurisdiction cannot influence, as multiple jurisdictions are often captured in a single MSA. Commenters stated that another concern with the definition is the standard presented for persons with disabilities, which is that they live, "in the most integrated setting appropriate." Commenters asked whom does HUD believe is competent to determine what is appropriate. Commenters stated that the better terminology is to state the most integrated setting chosen by the household.

Other commenters asked that in the definition of "integration," HUD replace the word "handicap" with "persons with disabilities."

*HUD Response:* The geographic area under review will differ depending upon who is the program participant. In this regard, HUD has included a definition of "geographic area" that is intended to acknowledge that different program participants have different geographic areas in which they will undertake their assessment of fair housing. With respect to integration, as noted earlier in this preamble, HUD has revised the definition of "integration," which HUD believes addresses the commenters concerns.

*Rule change.* The definition of "integration" in § 5.152 is revised. HUD has replaced the word "handicap" with "disability" and has better identified the particular geographic areas at issue, by providing a definition of geographic area in § 5.152, which program participants will analyze using the Assessment Tool.

*Comment:* HUD needs to define "region." Commenters stated that if HUD is requiring a regional analysis for every entity submitting an AFH, then HUD must define what is meant by a "region." Commenters asked whether a

region for State AFH planning purposes is the State and surrounding States, or all the regions within a State, however those are defined.

*HUD Response:* The duty to affirmatively further fair housing requires a regional analysis. The court in *HUD* v. *Thompson* placed a strong emphasis on the need for regional solutions to decrease segregation and racial isolation. For these reasons, a PHA would need to consider fair housing effects outside its jurisdictional border, as would an entitlement jurisdiction, in order to meet the requirements under the Fair Housing Act and fair housing case law. A PHA may conduct its own AFH with geographic scope and proposed actions scaled to the PHA's operations and region. PHAs choosing to conduct and submit an independent AFH, must include an analysis for the PHA service area and region, in a form prescribed by HUD, in accordance with § 5.154(d)(2). Program participants' regions will ultimately be defined by the AFH Assessment Tool provided by HUD.

*Comment: The definition of "segregation" needs further clarification.* Commenters stated that the definition of "segregation" is unclear as to whether HUD is defining segregation in terms of a jurisdiction, some other "geographic area," or a particular development—the same concern expressed about geographic area that commenters expressed about the definition of "integration." Commenters stated that the definition is confusing when it references "particular housing developments"—that the definition seems to say that segregation occurs when there is a high concentration of persons with disabilities "in a particular housing development," though, the commenters stated that it is unclear whether concentrations in a development apply only to persons with disabilities or other protected groups as well.

Other commenters stated that HUD should strike the phrase "a particular housing development" or else this would lead to individual projects having to deny eligible applicants housing if they do not meet particular characteristics. Commenters also stated that HUD should strike the clause "or other clauses" because this phrase is simply too vague.

Commenters stated that HUD must define "segregation" to be the result of government or private sector actions and not the actions of individuals making their own location decisions. Commenters stated that the term "segregation" is a politically and emotionally loaded term and its use

may create obstacles to rational discussion of the reasons why certain racial/ethnic groups are clustered in particular locations. Commenters stated that the use of more neutral terms such as "dissimilarity index" and "isolation index" would enable communities to explore these questions without the value-laden judgment implicit in the use of the term "segregation."

*HUD Response:* HUD understands that the term "segregation" may be an emotionally charged term, but the Fair Housing Act was enacted to overcome historic patterns of segregation, including the exclusion of people because of their characteristics protected by the Fair Housing Act. HUD declines the commenters' suggestion to define "segregation" as a result of government or private sector actions. Instead, the final rule generally defines "segregation" as a high concentration of persons according to protected class status regardless of the cause. The rule also provides more specificity regarding segregation of persons with disabilities. Thus, identifying a pattern of "segregation" is only the first step in the analysis. Program participants will then assess the related contributing factors to determine whether addressing them should be a high priority (*e.g.,* where the contributing factor represents a limitation or denial of fair housing choice or access to opportunity, or negatively impact fair housing or civil rights compliance). HUD agrees with commenters that segregation at the development or building level can include not only persons with disabilities but also persons with other protected characteristics. HUD has addressed the issue of the size of geographic area at issue in segregation by providing a definition of geographic area.

*Rule change.* Similar to the change made to the definition of "integration" HUD has revised the definition of "segregation" and has added a new defined term of "housing programs serving specified populations" to clarify that developments that may contain a high proportion of persons with disabilities do not constitute a "fair housing issue of segregation" provided the program or program activity serving those residents is not otherwise violating applicable Federal civil rights requirements, including the duty to affirmatively further fair housing. (See § 5.152.)

*Comment: The definitions of racially or ethnically concentrated areas of poverty are defined by census tract, which can be problematic.* Commenters stated that the definition of racially or ethnically concentrated areas of poverty

is defined by census tract boundaries, and the commenters expressed concern that this will not allow for any analysis of areas that may be smaller than census tracts but still are racially or ethnically concentrated areas of poverty. The commenters recommended that HUD clarify that program participants should consider smaller such concentrated areas of poverty as part of their analysis.

*HUD Response:* Neither the proposed rule nor the final rule include a limitation that the definition of an RCAP/ECAP is based only on a census tract. The final rule states that an RCAP/ECAP "means a geographic area with significant concentrations of poverty and minority populations." The term "geographic area" is further defined as, "a jurisdiction, region, State, Core-Based Statistical Area (CBSA), or another applicable area (*e.g.,* census tract, neighborhood, Zip code, block group, housing development, or a portion thereof) relevant to the analysis required to complete the assessment of fair housing, as specified in the Assessment Tool." As such, the Assessment Tool will propose the appropriate level of geography for determining various elements of the AFH, including RCAPs/ECAPs. In general, RCAPs/ECAPs will likely be based on census tracts, at least for many program participants, including entitlement jurisdictions as well as PHAs in urban areas. However, other levels of geography may be relevant for different elements, for example HUD's Small Area Fair Market Rents use zip codes, which may be useful for some types of analyses in a participant's AFH.

*Rule Change.* This final rule adds a definition of the term "geographic area."

*Comment: The definition of significant disparities in access to community assets is too broad.* Commenters stated that HUD's definition of this term is too open-ended to be useful and open to many different interpretations and uses. Commenters stated that, for example, based on the literal meaning of the words, it is hard to understand how a disparity in access to educational assets could exist with regard to any household within a local school's attendance area since all school-aged children are eligible to attend and the schools typically provide transportation. Commenters also asked about the meaning of "differences in access to transportation." Commenters asked if low-income areas with a high percentage of a particular race have more access to public transportation, or if more affluent communities have little access to public transportation, is that a disparity in access that should be addressed. Other commenters stated

that the definition of "significant disparities in access to community assets" should be more precise. Commenters stated that the definition should include a "measurable difference in access." The commenters stated that because even minute differences may be measurable, this language should include a qualifier such as a "significant or material" measurable difference. Commenters also stated that the Fair Housing Act does not cover significant disparities in community assets and such inclusion is beyond the scope of the statute.

*HUD Response:* As stated in HUD's proposed rule, research indicates that disparities in access to community assets negatively impact educational and economic outcomes. Sustained exposure to highly distressed neighborhoods is associated with a reduction in children's odds of high school graduation by at least 60 percent, while low-income students who have access to asset-rich neighborhoods with good schools may realize math and reading gains that help close the achievement gap. (See 78 FR 43714.) Given this research, one of HUD's objectives through the new AFH process is to reduce disparities in access to community assets (that is access to opportunity) based on race, color, religion, sex, familial status, national origin, or disability.

HUD declines to set out a measureable standard for determining significant disparities in community assets, as program participants and communities should have flexibility in making such a determination since these disparities will vary across communities. HUD believes the Assessment Tool will help program participants to identify such significant disparities through the provision of data.

*Comment: Other terms need to be defined.* Commenters suggested definitions for such terms as "affirmative move," "complaint," "discrimination," "exclusionary practices," "fair" "fair housing," "family," "homelessness," "inclusive communities," "jurisdiction," "local data," "material inconsistency with data," and "neighborhood."

*HUD Response:* As noted in Section III of this preamble, HUD has included a definition on "local data" but declines to define these additional terms. For some of the terms, such as "fair" and "complaint," the rule uses these terms based on the common dictionary definition of such terms. The term "fair housing" reflects the meaning as used in the Fair Housing Act. For terms such as "family" and "homeless," these terms are already defined in HUD regulations,

and the final rule does not need to further define these terms. The term "jurisdiction" is defined in HUD's regulations in 24 CFR part 91, as noted by HUD in the introductory language to the definition section, § 5.152. Commenters asked that HUD define "inclusive communities" to emphasize that the rule is speaking of such term in the context of protected classes. HUD believes such qualification is unnecessary since this rule is about providing an approach for program participants to more effectively affirmatively further fair housing for persons with characteristics protected by the Fair Housing Act. The term "material inconsistency with data" is addressed in the data document.

*New terms defined.* As noted in Section III of this preamble, HUD has added, in this final rule, definitions for "data," which includes a definition for "HUD-provided data" and "local data." HUD defines "local data" as metrics, statistics, and other quantified information, that are subject to a determination of statistical validity by HUD, relevant to the program participant's geographic areas of analysis, that can be found through a reasonable amount of search, are readily available at little or no cost, and are necessary for the completion of the AFH using the Assessment Tool. The phrase "subject to a determination of statistical validity by HUD" is included to clarify that HUD may decline to accept local data that HUD has determined is not valid but not that HUD will apply a rigorous statistical validity test for all local data. HUD also provides a definition for "local knowledge." As also noted in Section III and discussed in response to several comments, HUD has included in this final rule definitions for "geographic area," "housing programs serving specified populations" and "qualified PHA." In this final rule, HUD has also added a definition of "joint participation" to refer to the collaboration of two or more program participants conducting an AFH, but which is distinguished from regional collaborating program participants, which must include in such collaboration at least two consolidated plan program participants. (See § 5.152.)

## 11. Disproportionate Housing Needs

*Comment: HUD's definition of disproportionate housing needs is overly complicated.* Commenters stated that the approach HUD took in defining disproportionate housing needs seems overly complicated and that HUD has failed to demonstrate that the "measures and indices are valid, robust, and

stable." Other commenters stated that HUD's apparent treatment of disproportionate need appears to conflate potential disparate impact on protected classes with the effects of real estate markets. Commenters stated that HUD should consider whether members of protected classes have disproportionate housing needs compared to similarly situated members of unprotected classes (*e.g.,* households in protected classes living near transportation hubs or near high performing schools compared to households living near these community assets who are not in protected classes).

Other commenters stated that the proposed definition of disproportionate housing needs seems to indicate that affordable housing projects should only house families in protected classes with disproportionate housing needs and exclude other low-income individuals who qualify for such housing. Commenters asked whether this means that Federal funds should be devoted only to helping those in a protected class and not others with the same economic challenges. Commenters stated that moving households from an area of poverty as currently defined and putting them in one that is not an area of poverty may cause the second area to become an area of poverty or otherwise "flip the communities." Other commenters stated that the categories of housing need included in the definition of "disproportionate housing need" (cost burden, severe cost burden, overcrowding, and substandard housing) and their accompanying analyses are too expansive and recommended conducting an analysis solely on income, as income directly correlates to other identified factors.

Commenters stated that it is crucial that the disproportionate housing need analysis be regional in scope, to encompass the entire housing market, so that the solutions developed are not primarily focused on providing housing where the majority of low-income families already live. Other commenters stated that a final rule should ensure that the definition of "disproportionate housing needs" is more clearly focused on regional housing needs rather than conditions "within the jurisdiction."

Lastly, commenters questioned the basis for the threshold of 10 percent. Commenters recommended changing the percentage from 10 percent to at least 20 percent. Commenters stated that the American Community Survey (ACS), which HUD proposes to use, has high margins of error, often over 20 percent in a given census tract and occasionally approaching 30 percent.

Commenters stated that because the margins of error are so high, the percentage should be changed from 10 percent to 20 percent or higher, especially for more rural states and rural areas within all states.

*HUD Response:* HUD agrees with the commenters that the definition of "disproportionate housing needs" in the proposed rule was not as clear as intended. As noted in the overview of changes made at the final rule stage (Section III of this preamble), HUD has revised the definition of "disproportionate housing needs" and removed the 10 percent threshold.

HUD agrees with the commenters that a single numeric threshold for determining disproportionate housing needs would be unsuccessful in accurately identifying disproportionality across different population sizes, demographic characteristics, and relative to other protected classes or subsets of the same protected class within a category of housing need, as well as relative to the total population. As commenters pointed out, the same threshold also may not accurately depict disproportionate housing need in both low- and high-density areas, or among both homogenous and heterogeneous populations. HUD's intention is to identify disproportionate housing need in an inclusive and relative way, and to do so fairly in every set of circumstances. Therefore, HUD revises the definition of disproportionate housing need to remove the numeric threshold and provide more clarity to the meaning of disproportionate housing needs.

An example of disproportionate housing needs would be found when, according to U.S. Census Bureau data, a significantly higher proportion of the jurisdiction's black residents experience a severe cost burden when compared to the proportion of the jurisdiction's white residents experiencing a severe cost burden. Another example of disproportionate housing need can be found when a higher proportion of Hispanic individuals with limited English proficiency experience substandard housing conditions than the proportion of the state's population that experiences substandard housing conditions.

*Rule change.* HUD has revised the definition of "disproportionate housing needs" in § 5.152. HUD's revised definition uses the term "significant disparities," but this term does not mean "statistically significant," but rather is included to note the possibility of existence of substantial disparities, which should be interpreted as

"significant" in terms of their impact on affected persons rather than merely "statistically significant."

12. Housing Choice Vouchers

*Comment: Fund the Housing Choice Voucher program in order to affirmatively further fair housing.* Commenter stated that the best way to deconcentrate poverty is to double funding to increase the payment standard for the HCV program so that more households can live in higher-income resource-rich communities. Commenters stated that the HCV program has traditionally been a tool to help minorities and lower income families move into housing areas not as concentrated with poverty, but with the funding cuts, barely perceptible increases in fair market rents (FMRs), and increased utility costs, rental units in deconcentrated areas are not even available or eligible because the rents are too high. The commenters stated that therefore the only areas in which a voucher holder can find housing are in the traditional areas in which they have always lived in. Commenters stated that, unless funding is restored and payment standards and FMRs are adjusted upwards, the HCV program cannot realistically be a vehicle for affirmatively furthering fair housing.

*HUD Response:* HUD is cognizant of the constraints within which program participants must operate, in particular given the current budgetary environment.

*Comment: HCV "hard units" should not be the sole consideration in an assessment of fair housing.* Commenters stated that given the growing predominance of HCV, "hard units" should not be the sole consideration for the AFH; rather consideration must include the full portfolio of a PHA's Federally-assisted units, vouchers, project-based vouchers (PBV), and RAD converted units (PBV or project-based rental assistance (PBRA)). Commenters stated that it is unclear if "hard units" means only public housing units, or if the term also covers PHA-owned units that have PBVs or PBRA (important after RAD conversions), or other PBV units in properties that the PHA does not own. Commenters stated that HUD should define "hard units" to include all PHA-owned units that have HUD-funded rental assistance, and all units, regardless of ownership, that have PHA-administered PBVs.

*HUD Response:* HUD agrees that "hard" units, such as public housing units, PBVs, and PHA-administered PBRA are not the sole consideration of an AFH, and notes that Section 8 HCVs will also be addressed in a program

participant's AFH. Greater specificity on different program types will be addressed in the Assessment Tool, rather than in the regulatory text.

*Comment: HCV program conflicts with duty to affirmatively further fair housing as presented in HUD's rule.* Commenters asked, given that the HCV program presents a choice of housing location to voucher holders, whether HUD expects PHAs to impose restrictions that limit locational choice in order to affirmatively further fair housing. Commenters stated that, while PHAs can and do make efforts to recruit participating landlords in diverse areas and inform voucher holders about housing opportunities in low-minority areas, ultimately, voucher holders may make their own housing choices based on a number of different considerations, including proximity to existing family and social networks, employment opportunities, and religious institutions; access to public services, including public transit; and landlord willingness to participate in the program. Commenters stated that families may choose to live in areas of concentrated poverty even when other choices exist.

Commenters stated that one of the goals of AFH is not to steer applicants to low-income areas, but that, given that funding resources are at a historical low and trends are still set for that to continue, a PHA would be in direct conflict with that intent. Commenters stated that increasingly public housing programs are developing new housing units in low-income areas due to lower costs associated with construction there, and PHAs that have difficulty meeting housing assistance payment obligations for the HCV program are being instructed by HUD to discontinue allowing their participants to move to higher cost areas to mitigate their shortfall. Commenters stated that given the continued downward trend of funding for PHAs, this instruction places PHAs in direct conflict with the duty to affirmatively further fair housing as provided in HUD's rule.

Other commenters stated that not all cities have high poverty, high minority, and poor performing schools located in the same areas, and that, in many communities, some of the best schools are in low-income areas, and this occurs as a result of magnet and charter schools choosing to locate in these areas. The commenters stated that PHAs can encourage voucher holders to consider non-minority areas of the city but cannot force or steer them to these areas. Commenters further stated that it is problematic to pay higher rents only in non-minority neighborhoods as a means of encouraging minorities to live in non-

minority areas, and, to do so, brings up the concern that minority landlords that own units in minority areas would believe they were being discriminated against by lower rent payments.

*HUD Response:* HUD disagrees with the commenters' statement that the HCV program conflicts with the duty to affirmatively further fair housing. HCV participants can choose any housing that meets the requirements of decent, safe, and affordable housing in the private market. Most HCV programs are administered locally by PHAs, which must comply with fair housing and civil rights laws. This rule does not impose restrictions that limit participant choice in the HCV program. The question is whether there are impediments in the locality that limit housing choice; for example, the lack of affordable housing in diverse neighborhoods, the lack of information about housing opportunities in more affluent or diverse neighborhoods, racial steering, and misconceptions about the type of housing appropriate to persons with disabilities. The HCV program already operates under requirements that reinforce housing choice. For example, during a voucher recipient's briefing, if the client is living in a high-poverty census tract in the PHA's jurisdiction, the briefing already must explain the advantages of moving to an area that does not have a high concentration of poor families. In addition, under the SEMAP, the PHA is scored on the following factors if it is in a metropolitan fair market rent area: whether the PHA has adopted and implemented a written policy to encourage participation by owners of units located outside areas of poverty or minority concentration; whether it informs voucher holders of the full range of areas where they may lease units both inside and outside the PHA's jurisdiction; and whether it supplies a list of landlords or other parties who are willing to lease units including units outside areas of poverty or minority concentration.

*Comment: Require PHAs to demonstrate efforts to enable families to move to new jurisdictions who seek to move.* Commenters stated that it is especially critical that PHAs and other entities that administer HCVs be required to demonstrate that they are making efforts to assist those voucher holders who seek to move to communities of higher opportunity and to remove barriers, such as onerous portability requirements, that impede use of vouchers to obtain housing opportunities outside of the jurisdictional boundaries of the PHA. Commenters stated that unless such

demonstration is required of PHAs, the HCV program will not live up to its objective of promoting integration and mobility and, instead, will reinforce prevailing patterns of racial segregation.

Other commenters recommended that HUD designate regional housing choice voucher initiatives as a recognized activity for fair housing opportunity. Commenters recommended HUD could improve the HCV program to better facilitate movement of people by supporting mobility programs and by changing FMRs and payment standards to improve access to areas that are not RCAPs and are already high in community assets such as quality schools.

*HUD Response:* As stated in response to the preceding comment, PHAs administering HCVs will continue to be subject to fair housing and civil rights laws. In addition, PHAs may consider implementing success rate payment standards if less than 75 percent of voucher recipients can find housing within the term of their voucher. PHAs can also consider exception payment standards for a portion of the fair market rent area to increase housing opportunities. More generally, this final rule aligns the PHA Plan and consolidated plan development process for the furtherance of goals specified in the AFH. This final rule creates a structure for PHAs to cooperate fully with their local jurisdiction toward this purpose.

In addition, this rule provides PHAs the option to cooperate with each other in the creation of an AFH, allowing PHAs to develop a coordinated approach to address fair housing issues. Such an approach could help to expand mobility through the creation of cooperation, agreements, memorandums of understanding (MOUs), consortia, or other tools to take regional approaches to HCV mobility policies.

*Comment: It is not clear how the rule applies to voucher-only PHAs and small PHAs.* Commenters stated that the rule is too vague regarding what requirements will be made for voucher-only PHAs, and also of small PHAs. Commenters stated that § 903.2 (now § 903.15) of the proposed rule describes a PHA's burden to affirmatively further fair housing through its "development related activities," but it is unclear whether or how the rule applies to voucher-only PHAs. Commenters stated that, considering the constrained fiscal environment in which PHAs are operating and the lack of fee income generated by voucher only PHAs, HUD should consider limiting the rule's applicability to PHAs with development programs. Commenters asked how HUD

expects voucher only PHAs to have their tenants de-concentrate when tenants choose where to live.

Other commenters stated that in § 91.110 HUD omits references to the HCV program in several places without any apparent reason. Commenters stated that they assume this was a mistake. Commenters stated that HUD should: insert "or the Housing Choice Voucher program" at the end of the first parenthetical in paragraph (a); insert "or the Housing Choice Voucher program" after the first reference to "public housing" in paragraph (a)(1); and change "PHA's program" to "PHA's programs" in paragraph (a)(1) near the bottom of 78 FR 43736.

Other commenters stated that it is important for HUD to clarify in the final rule that the affirmatively furthering fair housing obligations and certifications apply to the HCV Administrative Plan and all PHA planning documents, including the Moving to Work Plans for those PHAs that have been selected for the Moving to Work program. Commenters stated that these documents specify key PHA policies that affect efforts to expand housing choice within their jurisdiction and throughout the regional housing market in which they are located.

Commenters stated that past actions, such as setting higher payment standards in higher cost suburban locations are no longer feasible. Commenters stated that, in the event that HUD deems the rule is applicable to voucher-only PHAs, the commenters requested guidance regarding what steps such PHAs can take to affirmatively expand housing opportunities. Other commenters requested that HUD add an explicit statement in the final rule that defines a PHA's undertaking of recruitment activities to encourage participation by landlords in low-poverty, low-minority areas within the PHA's jurisdiction as meeting its duty to affirmatively further fair housing.

*HUD Response:* HUD appreciates the recommendations made by the commenters but specifying which HUD programs in which PHAs are covered by the duty to affirmatively further fair housing is unnecessary. The duty to affirmatively further fair housing and the requirement to conduct an AFH applies to all PHAs, regardless of the HUD program or initiative in which they are participating. Therefore HCV-only PHAs must submit an accepted AFH and include goals to affirmatively further fair housing in their planning processes. With respect to the commenter's reference to development activities in § 903.2 of the proposed rule and HCV-only PHAs, HUD notes that

the section under the proposed rule and § 903.15 of this final rule makes reference to both operational and development activities. However, HUD has also clarified strategies and actions that a PHA may take in § 5.154 of this rule, and those include both mobility-based options that may be more applicable to HCV-only agencies, as well as place-based solutions that may have more applicability to public housing only agencies.

13. Local Control and Zoning

*Comment: HUD's rule is an effort to impede local control on zoning.* Commenters stated that HUD's rule opens the door for the Federal government to determine zoning, rents, placement of infrastructure and other services over the local government, and that the Federal government is ill-suited to determine best practices for the thousands of diverse localities across the nation. Commenters stated that HUD's rule will subvert private property laws and limit if not eliminate any or all future suburban development. Commenters stated that land use control belongs with local governments, not the Federal government, and that housing and development actions cannot be accommodated through Federal mandates.

Commenters stated that through this rule HUD is furthering the idea that there is housing discrimination and unfairness toward those who are not financially able to afford living in a more affluent neighborhood and that a Federal agency can now impose a rule on local municipalities and counties that they must not only zone for and build affordable housing, but that HUD actually has the authority to make land use decisions on behalf of the municipality. Commenters stated that great care must be used to avoid unintended negative consequences, and that the worthy objective of HUD's rule could be upset by the costs of compliance especially by medium-sized and smaller municipalities and by the potential fear of having HUD personnel in Washington supplant their knowledge in thousands of jurisdictions around the country.

Commenters stated that while HUD advises that it is not prescribing specific actions or solutions, the rule has the potential to greatly influence local decisions by issuing guidance that becomes akin to regulations. Commenters stated that clearly, one-size-fits-all solutions should not be suggested or imposed by HUD, and any guidance must clearly present pros and cons for different types of situations. Commenters stated that land use

planning should be primarily the province of local units of government, and that housing activity is uniquely local and reflects the desire and aspirations of specific communities and the complex interaction of market forces at the local level. The commenters stated that a Federal regulation that potentially dictates the use of particular local planning tools and the location, place and form of development does not reflect local community or market circumstances and is not appropriate. The commenters stated that policies that work in one region may have serious unintended negative consequences in another, and that the United States is far too diverse demographically, historically, geographically and economically to successfully implement a "one-size-fits-all" program.

*HUD Response:* HUD agrees that determinations about the goals, priorities, strategies, and actions that a community will take to affirmatively further fair housing should be made at the local level. This rule does not impose any land use decisions or zoning laws on any local government. Rather, the rule requires HUD program participants to perform an assessment of land use decisions and zoning to evaluate their possible impact on fair housing choice. This assessment must be consistent with fair housing and civil rights requirements, which do apply nondiscrimination requirements to the land use and zoning process. However, this rule does not change those existing requirements under fair housing and civil rights law. Instead, the purpose of this assessment is to enable HUD program participants to better fulfill their existing legal obligation to affirmatively further fair housing, in accordance with the Fair Housing Act and other civil rights laws.

It is important to note, however, that while zoning and land use are generally local matters as stated by the commenters, when local zoning or land use practices violate the Fair Housing Act or other Federal civil rights laws such as title VI of the Civil Rights Act, section 504 of the Rehabilitation Act, or the Americans with Disabilities Act, they become a Federal concern, as with any violation of Federal law that occurs at a local level. See, *e.g., U.S.* v. *City of Black Jack, Missouri,* 508 F.2d 1179, 1187–1188 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975); *U.S.* v. *Yonkers Board of Education,* et al., 837 F.2d 1181 (2d. Cir. 1987), cert. denied, 486 U.S. 1055 (1988).

Inclusion of zoning and land use is not intended to assume these issues will have such implications for most or many program participants. However,

including zoning and land use for consideration is needed to gain an accurate overall picture of local housing and neighborhood issues, such as the availability of affordable rental housing in a diverse set of communities.

HUD also agrees that "one size fits all" solutions should not be mandated by Federal regulation. HUD is not prescribing any "one size fits all" or specific solutions to fair housing issues that may exist in a given locality; rather, HUD requires that planning documents such as the consolidated plan—which, again, affects Federal funding—consider the findings of the AFH. The manner in which this consideration is implemented, however, will, absent violations of Federal law and regulation, be up to the jurisdiction. Thus, the goals, priorities, strategies and actions that a community will take to fulfill its obligation to affirmatively further fair housing will be decided at the local level based on data and analysis from the AFH.

It is true that the United States is demographically, historically, geographically, and economically diverse. This final rule takes this variation into account and provides flexibility for the broad diversity of types of HUD program participants. Further guidance will help program participants apply the rule to meet their specific needs and characteristics. There is also flexibility provided in how best to craft strategies and actions to meet local needs and challenges. Program participants still are required to follow applicable Federal laws, and in the case of Federal programs that provide funding for affordable housing and economic development, these include the legal obligation to affirmatively further fair housing under the Fair Housing Act.

*Rule change.* HUD has added a "strategies and actions" provision in § 5.154(d)(5).

*Comment: HUD's rule is based on the mistaken belief that zoning and discrimination are the same.* Commenters stated that equating zoning with discrimination is wrong. Commenters stated that zoning laws restrict what can be built, not who lives there, and that just because a community uses zoning to limit high density housing does not make the community racist. Commenters stated that it has been proven over and over again in cities that high density housing stretches municipalities and school systems beyond their limited resources. Commenters stated that zoning laws are geared to provide for the safety, security, peace, tranquility, enjoyment, and preservation of the property values

of both existing and future individual and commercial property owners, the latter of which also includes an investor's ability to generate an acceptable rate of return or cost of capital.

Commenters stated that developers choose where they will purchase, develop, and build based upon the existing zoning laws that have been put in place, in most cases years in advance of any development, as part of that community's long term planning and development process, and that amendments and modifications to such zoning laws are reviewed and approved by a city planning commission or zoning review board including public comment, and they are ultimately ratified by the local city council.

Commenters stated that data can be manipulated and interpreted improperly to further social engineering motives, and that HUD's data does not show and cannot prove that zoning laws are solely responsible for any perceived racism.

In contrast to these commenters, other commenters stated that HUD's rule should assure that State, regional, and local government entities are focused on strengthening their local land use and zoning policies so that they encourage affordable housing development in areas of opportunity and that they increase the availability of land for the development of low and moderate income housing. Commenters stated that, in addition to zoning, there are many local policies that often create significant impediments, including stringent design, parking and setback requirements and excessive fees for utilities, parks, storm water, etc. Commenters stated that to counteract these types of local barriers, broader regional policies should be implemented and enforced, and that communities should also reduce or waive these fees for affordable units as a means of addressing impediments.

Other commenters stated that there can be affordable housing and good zoning, and urged HUD to not adopt regulations that can be used against communities that are equally concerned about the environment, loss of green space, flooding, clean water, wetlands and natural beauty, which are things that all people, including those in lower income brackets, need.

*HUD Response:* The issue of including zoning and land use as factors for consideration in the AFH was addressed in response to the preceding comment. As to the comment that data can be manipulated to further social engineering, it is the program participants themselves, which include State and local governments, that will

analyze the data and produce the AFH, and program participants may include any statistically valid local data that they can obtain and believe relevant to the AFH. The AFH will help inform future planning related to the use of Federal funding and other funding for housing and economic development. This final rule, and Assessment Tools and guidance to be issued, will assist recipients of Federal funding to use that funding and, if necessary, adjust their land use and zoning laws in accordance with their existing legal obligation to affirmatively further fair housing. The approaches that can be taken to accomplish this are varied and not specifically prescribed by this rule. This rule, in accordance with existing law, simply requires an assessment, based on data, of effects on the availability of affordable housing, and does not overturn any local decisionmaking process.

*Comment: Provide examples of zoning laws that are barriers to fair housing.* Commenters stated that it would be helpful if HUD would give specific examples of codes or regulations and specific standards that HUD considers to further fair housing or that HUD considers to present barriers to fair housing. Commenters stated that some may see a zoning law as a barrier to affordable housing and others as an affirmative act to prevent displacement of low-income and minority households.

*HUD Response:* Zoning and land use laws that are barriers to fair housing choice and access to opportunity can be quite varied and often depend on the factual circumstances in specific cases, including zoning and land use laws that were intended to limit affordable housing in certain areas in order to restrict access by low-income minorities or persons with disabilities. Examples of egregious zoning actions that were found to violate the Fair Housing Act can be found going back to the zoning ordinance at issue in *U.S.* v. *City of Black Jack,* 508 F.2d 1179 (1974). An example of a positive zoning action that would further fair housing would be the removal of such an ordinance. HUD will include additional examples in its guidance for its affirmatively furthering fair housing regulations.

14. Standards for Review

*Comment: Final rule should designate HUD offices with responsibility of review of AFHs.* Many commenters requested that the final rule designate HUD's Office of Fair Housing and Equal Opportunity (FHEO) as the lead authority regarding AFH review and acceptance, and certification that a

participant is affirmatively furthering fair housing and that FHEO be provided sufficient resources to carry out this new responsibility. The commenters stated that designation of FHEO as the lead reviewing office would maintain consistency and preserve institutional knowledge among reviewers even as administrations change.

Other commenters recommended that the rule designate HUD's Office of Community Planning and Development (CPD) as HUD to review and approve the AFH for participants in HUD's CDBG, HOME, ESG, and HOPWA programs because these programs fall under CPD's jurisdiction.

Other commenters recommended that the final rule explicitly state that HUD's Office of Public and Indian Housing (PIH), CPD, and FHEO all be designated with equal authority to review AFHs.

Other commenters recommended that HUD regional and field offices be required to review the AFHs of program participants in their jurisdictions to alleviate any problem of inadequate HUD staffing at HUD Headquarters.

Other commenters recommended that HUD establish "Fair Housing Review Councils" to review AFHs, review complaints, and recommend remedies to HUD, with a cross-section of HUD agency officials providing consistent guidance, based on the model that HUD's Office of Sustainable Housing and Communities (now HUD's Office of Economic Resilience) undertook in reviewing applications for grants under HUD's Sustainable Communities Initiative (SCI). Commenters stated that, under this model, the following HUD offices, OSHC, CPD, FHEO, and PIH, along with Federal colleagues from the Federal Highway Administration of the U.S. Department of Transportation, and the Environmental Justice Division of the Environmental Protection Agency all jointly reviewed applications, alongside of experts from the field. Commenters stated that, alternatively the council could be comprised of candidates who apply for membership on the council and who have qualifying credentials that include demonstrated experience in housing law, policy, and/or finance; affordable housing development; asset-building, transportation equity, housing, community and economic development; civil rights, fair housing, educational equity, youth development; urban planning, public health/health equity, environmental justice, criminal justice reform with a representative mix from philanthropy, public sector, and the private sector.

Another commenter stated that no matter who reviews AFHs that HUD

should ensure that AFHs are reviewed in a consistent and objective manner so that the outcome of the review is not dependent on the perspective of the individual reviewer or HUD office. Similar to this comment, another commenter recommended that the same set of HUD employees review all AFHs using clear and detailed standards of review.

*HUD Response:* HUD appreciates the recommendations regarding who, within HUD or outside of HUD, should review AFHs. There is no need for HUD to specify in the final rule which offices will review AFHs and HUD emphasizes that HUD's review of an AFH under § 5.162 is a "HUD" review. However, since this rule provides that an AFH is a necessary and important component of the consolidated plan and PHA planning processes, HUD can assure program participants that the review of AFHs will be a collaborative process among FHEO, CPD, PIH, the Office of General Counsel, and their respective staff in their regional and field offices, and other HUD staff that HUD may determine should be involved in review of AFHs.

HUD also understands concerns about variations in outcomes of review of AFHs as a result of different reviewers, but HUD also assures that all reviewers of AFHs will perform their reviews under clear and consistent evaluation standards. HUD also believes that program participants' use of an Assessment Tool to create their AFH will help to ensure that AFHs are developed consistently and will facilitate objective, consistent reviews.

*Comment: Review of an AFH should not precede review of the consolidated plan or PHA Plan, but should occur simultaneously.* Commenters stated that review of AFH should not precede review of the consolidated Plan but should occur at the same time. Commenters expressed that this approach would only delay funding to program participants.

*HUD Response:* The responsibility to affirmatively further fair housing is such an important responsibility placed on HUD and its program participants by the Fair Housing Act that HUD concluded, particularly in light of the criticism of the former AI process, that to fulfill this statutory obligation as intended, the AFH should commence prior to submission of a program participant's consolidated plan or PHA Plan, as applicable. As HUD stated in its proposed rule, it is also important that the AFH be informed by meaningful community participation. The community participation and consultation requirements that HUD has

established in § 5.158 provide for reasonable opportunities for the public to be involved in the development of the AFH prior to its incorporation into the consolidated plan or PHA Plan. This prior involvement should facilitate HUD's review of the AFH. The involvement should also facilitate review of the consolidated plan and/or PHA Plan, or any plan incorporated therein, since the affected communities would have already had the opportunity to review and comment on the AFH, HUD will have the opportunity to identify any deficiencies in the AFH, and the program participant will have the opportunity to correct any deficiencies, prior to incorporation of the AFH into the consolidated plan or PHA Plan, such that funding to program participants will not be delayed.

*Comment: HUD's review and acceptance of AFH is vague and does not specify how HUD will evaluate the AFH.* Commenters stated that the rule lacked necessary details on how an AFH is to be reviewed and accepted or not accepted by HUD. Commenters stated that the rule suffers from overwhelming vagueness in terms of expected actions and outcomes that leaves program participants exposed to extreme risks and litigation challenges. Commenters stated that the proposed rule does not provide specific details on how HUD will evaluate the effects of the AFH, which was one of GAO's primary criticisms of the AI process. Commenters stated that the rule is particularly not clear with respect to HUD's non-acceptance of an AFH that is "materially inconsistent with the data and other evidence available to the jurisdiction" or "substantially incomplete," and without clarity as to the meaning of these terms, the AFHs of program participants are subject to rejection and program participants are vulnerable to litigation. Commenters stated that "materially inconsistent" in particular would subject program participants to arbitrary decisions by HUD or to litigation by third parties. Commenters stated that HUD should define these terms or eliminate them from the regulatory text. Other commenters stated that the rule should provide more examples of what these terms mean. Other commenters stated that only substantial incompleteness should be a basis for rejection of an AFH and not inconsistency with fair housing and civil rights laws.

Other commenters asked for the rule to be clear on the impact if a portion of an AFH is not acceptable.

*HUD Response:* HUD understands commenters' concerns about the standards of review provision in the

rule. It was not HUD's intention to be vague, but it was also not HUD's intention to be overly prescriptive as to the standards by which HUD will evaluate and determine whether to accept an AFH. HUD recognizes that the content of a program participant's AFH depends on local conditions and local laws, and very prescriptive standards may interfere with the local assessment and planning that a program participant must undertake.

As HUD stated in the proposed rule, this final rule will be supported by HUD with technical assistance and examples that will help guide program participants as to what it means to have an AFH that is substantially incomplete or one that is inconsistent with fair housing or civil rights laws. However, in the regulatory text, HUD has included two examples for each of these categories.

The reference to acceptance or nonacceptance of a portion of an AFH in the proposed rule was directed to program participants submitting collaborative AFHs; that is, a joint AFH or Regional AFH. HUD has revised the language in § 5.162 to clarify how nonacceptance of a joint or regional AFH may occur. An AFH as a whole will either be accepted, or not accepted with respect to an individual program participant. This means that if a portion of a program participant's AFH, such as the analysis of a key issue, is not accepted then the entire AFH for that program participant is not accepted. In addition, HUD's determination not to accept an AFH with respect to one program participant does not necessarily affect the acceptance of the AFH with respect to another program participant in the case of a joint or regional AFH.

*Rule change.* In this final rule, HUD revises § 5.162 to state that HUD will provide written notification to the program participant or participants (where a regional AFH is submitted) of HUD's nonacceptance of the AFH (either to one or more program participants or all when a regional AFH is submitted) and the written notification will specify the reasons why the AFH was not accepted and will provide guidance on how the AFH should be revised in order to be accepted.

*Comment: HUD should review an AFH holistically and not reject an AFH for a single concern or withhold funds.* Commenters stated that HUD should review an AFH holistically and that a single deficiency should not be the basis for a negative determination. Commenters recommended that the final rule should provide that: (1) An unsatisfactory "AFH plan" will not be

**42312** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

the sole cause for suspension of funds, but there must also be a problem in AFH implementation such as a sustained pattern of fair housing violations; (2) only funds directly involved in the fair housing violation may be suspended (*e.g.,* distinguish effect on HOME, ESG, CDBG funds); and (3) HUD will offer an appeal process if HUD finds the AFH or its implementation unacceptable. Other comments asked that the rule provide information about the consequences and remedies if HUD finds an AFH substantially incomplete and that HUD clarify the consequences of submitting an unacceptable AFH after the initial resubmission.

Commenters recommended that a program participant's funds be partially or wholly suspended when a resubmitted AFH is rejected and until an acceptable AFH is submitted. Other commenters recommended that HUD consider sanctions other than withholding a program participant's HUD funds if the participant is unwilling or unable to submit an acceptable AFH. The commenters stated that HUD funds properly spent create housing opportunities and that it is hard to see how withholding the resource necessary to create affordable housing improves the situation for a program participant that is not willing to create affordable housing choices for its residents. Commenters stated that, if local opposition to fair housing makes it difficult for local officials to submit an AFH that would be accepted by HUD, HUD should carefully consider remedies other than withholding HUD funds and thus rewarding those in the community opposed to affordable housing.

*HUD Response:* HUD appreciates the recommendations made by the commenters but believes that the rule contains the right approach. With respect to concerns about violations of Fair Housing Act requirements, it is important to point out that the rule addresses the fair housing planning process, and the assessment of fair housing planning. This rule does not focus on actions taken by a program participant that may result in a violation of the Fair Housing Act, including a failure to affirmatively further fair housing, or other civil rights laws.

With respect to funding, the current process for distribution of funding under the programs covered by this rule is that a program participant does not receive funding until its consolidated plan or PHA Plan, as applicable, is accepted by HUD. This final rule does not alter that process. The rule, however, does make an accepted AFH a required element of a consolidated plan or PHA Plan.

As provided in the proposed rule and adopted in this final rule, if HUD identifies a deficiency in a program participant's AFH, HUD will notify the program participant and advise of the deficiency and how the program participant may address the deficiency so that HUD can accept the AFH. Because HUD will work with a program participant to produce an AFH that HUD will accept, HUD believes it is unlikely that a program participant will not produce an AFH that will be accepted by HUD. One of the significant changes that HUD committed to make under this AFH process is greater engagement by HUD and better guidance to program participants on how to fulfill their duty to affirmatively further fair housing.

*Comment: HUD should contact a program participant for discussion about any AFH deficiencies rather than reject the AFH.* Commenters recommend that HUD should contact a program participant for discussion about deficiencies with an AFH rather than reject the AFH if it finds priorities or goals are materially inconsistent with evidence available to the program participant. Another commenter stated that HUD set forth potential reasons for rejecting an AFH and not pre-determine expected results of participants' assessments.

*HUD Response:* The rule already provides for the practices that the commenters are requesting. HUD's initial nonacceptance of an AFH is not the end of the AFH review process. HUD will not only advise a program participant of deficiencies identified in the AFH but how these deficiencies may be overcome. HUD's review is not based on any predetermined expected results. Moreover, the rule does not restrict HUD from contacting a program participant to obtain information about an AFH if HUD believes it does not have adequate information to decide whether or not to accept an AFH.

## 15. Enforcement and Oversight

*Comment: HUD only needed to enforce the existing AI requirement.* Commenters stated that HUD cites to the GAO report as one justification for its proposed rule, but stated that GAO recommended modest, incremental changes to HUD's oversight processes to address the substantial, systemic weaknesses identified by GAO. Commenters stated that HUD, rather than elect to address its own deficiencies and implement an effective means to oversee compliance of program participants with the duty to affirmatively further fair housing, proposed a radical revision to the definitions underpinning the duty to affirmatively further fair housing, and the processes used by some HUD program participants to determine methods for overcoming identified fair housing issues and their contributing factors. The commenters urged HUD to reconsider its approach to and attend to its own performance with regard to the duty to affirmatively furthering fair housing before expanding the policy reach of the Fair Housing Act. The commenters stated that an alternative approach would be to strengthen HUD's support for and oversight of effective implementation of the duty to affirmatively further fair housing, consistent with HUD's existing Fair Housing Planning Guide. Commenters stated that rather than going forward with a new approach, HUD could make sure program participants prepare current AIs that meet standards laid out in guidance such as HUD's Fair Housing Planning Guide.

*HUD Response:* HUD considered various options for how to improve the affirmatively furthering fair housing process and determined that a comprehensive improvement of the AI process and clarification of requirements for both program participants as well as HUD is likely to lead to a more effective fair housing planning process. HUD believes that its provision of data to its program participants is an important component of improving fair housing planning, as is the community participation requirement, the Assessment Tool, and greater integration to the extent possible with the PHA planning and consolidated planning processes.

*Comment: HUD needs to specify the range of sanctions to be imposed on program participants for failure to affirmatively further fair housing.* Commenters stated that the proposed rule was deficient regarding how HUD would enforce the rule's requirements. Commenters stated that the most significant areas needed for improvement of HUD's proposed rule relate to oversight and accountability. The commenters stated specifically that the proposed rule (1) fails to provide an effective mechanism for HUD to assess initial and ongoing compliance with the obligation, and (2) lacks a mechanism for individuals and communities aggrieved by violations of the rule to challenge those practices administratively. Commenters stated that while HUD has the power to withhold funds for lack of compliance, HUD needs to establish a process of "progressive discipline" to bring about

compliance before going to the extreme of withholding funds.

Commenters stated that HUD needs to specify that it has a range of sanctions available to use for failure to affirmatively further fair housing, including something HUD has still not done (or at least not persuaded the Department of Justice to do), which is to bring a False Claims Act claim against jurisdictions that make false or fraudulent representations. The commenters stated that taking such action would hardly be unprecedented in the context of protecting the Federal government from fraud, stating that the Department of Health and Human Services, for example, has no problem bringing False Claims Act claims against those who defraud the Federal Government in connection with Medicaid. The commenters stated that it is equally important for HUD to build in a real auditing function, not unlike the Internal Revenue Service (IRS). The commenters stated that the effectiveness of the IRS has obviously varied greatly over time, but the underlying problem faced by the IRS is one well worth thinking about. Commenters stated that some taxpayers will meet their obligations because it would never occur to them not to, while others are committed to evading their obligations unless and until caught.

Other commenters expressed concern that HUD did not propose to amend its existing regulations at § 570.912 (nondiscrimination noncompliance) and § 570.913 (other remedies noncompliance). These commenters stated that these regulations provide for a wide range of sanctions, including referral to the Attorney General for the commencement of an appropriate civil action, and while HUD's proposed rule references § 570.601 (affirmatively furthering fair housing) §§ 570.912 and 570.913 need to be amended to reference § 570.601 to reflect the applicability of these sanctions to the duty to affirmatively further fair housing.

*HUD Response:* HUD understands the commenters' concerns regarding the absence of an enforcement provision in this final rule with respect to the duty to affirmatively further fair housing. This final rule, however, is a planning rule, not a rule directed to the enforcement of the duty to affirmatively further fair housing. As a planning mechanism, this rule provides for a review by HUD of the AFH to determine compliance with the standards set forth in § 5.154, and for acceptance, or nonacceptance and resubmission (in the case of nonacceptance) of an AFH if the AFH fails to meet these standards.

While HUD declines to include a provision in this planning rule that would specifically set out the process for enforcing the duty to affirmatively further fair housing, HUD notes that it already has the authority to enforce this statutory obligation and that HUD uses its existing Fair Housing Act, title VI of the Civil Rights Act, section 504 of the Rehabilitation Act, and the Americans with Disabilities Act regulations and processes to accept complaints and conduct compliance reviews regarding the duty to affirmatively further fair housing. As provided in this final rule, HUD also may follow procedures set out in 24 CFR parts 91 and 903 when it has information that a program participant's certification to affirmatively further fair housing may be invalid. HUD believes that it is unnecessary for the rule to reflect additional complaint receipt, investigation, compliance review, and enforcement procedures when such processes and authorities are already in existence under other regulations.

*Comment: HUD's rule needs to clearly address oversight and accountability following acceptance of an AFH.* Commenters stated that once an AFH is accepted, there remains the need for oversight and meaningful enforcement. The commenters recommended that HUD require annual performance reports to document actions taken to address or mitigate each of the goals identified in the AFH, describe the results of those actions, and specify which fair housing issues were impacted and how they were impacted. Commenters stated that, in addition to the standard review process, and to ensure in-depth evaluation of AFHs, the final rule should provide for periodic audits by HUD of selected AFHs, and that, in the event that program participants have not met their substantive benchmarks, HUD require that these participants provide specific reasons for why these goals have not met and disclose how the participant is working to overcome any barriers to completion. Commenters stated that a formal complaint process for community stakeholders to object to the program participant's actions or certification that they are affirmatively furthering fair housing is critically important, and must be added.

Other commenters stated that critical to effective enforcement of the AFH process is for HUD to: (1) Permit residents and the public to file complaints with HUD objecting to the AFH or to the failure to meet the duty to affirmatively further fair housing; and (2) establish an enforcement mechanism setting forth how complaints will be processed and what potential sanctions

may result from violations. Commenters stated that, while the rule places great emphasis on, and significantly strengthens, public and community participation in the AFH process, the rule inexplicably includes no provisions that set forth the right of community members to complain about compliance with the duty to affirmatively further fair housing or the enforcement mechanism to be used in processing such a complaint. The commenters stated that this was especially disappointing because in recent years HUD has developed an internal process for accepting third party complaints alleging violations of the duty to affirmatively further fair housing that details how to handle and investigate such complaints. The commenters stated that, through the process developed for these matters, HUD accepted and investigated complaints of non-compliance with the affirmatively furthering fair housing requirement and established a uniform enforcement mechanism for ensuring compliance with the duty to affirmatively further fair housing.

Commenters stated that, based on the proposed rule, program participants are their own monitors, and that is the case under the current AI system—program participants essentially operate in a system of voluntary compliance with their duty to affirmatively further fair housing and that HUD's rule does nothing to change this system by not including concrete enforcement mechanisms in the rule. The commenters stated that transparent enforcement and true accountability is paramount to successful rules and regulations.

*HUD Response:* In response to earlier comments, HUD has already advised that it declines to add to performance review and monitoring that are already in place under consolidation plan and applicable public housing and Section 8 regulations. In addition, as noted in the response to the preceding comment, this rule is a planning rule and not a rule directed to the enforcement of the duty to affirmatively further fair housing. Procedures to receive and investigate complaints, conduct compliance reviews, challenge AFFH certifications, and obtain compliance are already available to HUD under regulations implementing the Fair Housing Act and other civil rights statutes.

*Comment: Do not establish a public complaint or contestation of an AFH.* In contrast to the above commenters, other commenters stated that they are aware of some stakeholders and advocates who are asking that HUD include a process for public complaints or contestation of

**42314** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

an AFH and the fair housing goals derived from that assessment, and that HUD provide interested members of the public with standing for individual actions concerning AFHs and fair housing goals. The commenters stated that they are strongly opposed to both of these possibilities. The commenters stated that recent decisions surrounding fair housing litigation have demonstrated the imagination and persistence of fair housing litigants, and that there are ample tools available for fair housing litigation without any additional grounds being created.

*HUD Response:* The AFH process contains opportunities for public involvement in the AFH process, which are provided in §§ 5.158, 91.105, 91.115, 91.401, 903.17, and 903.19. HUD anticipates that participation in the process will reduce complaints regarding the results. Furthermore, any aggrieved person can file a complaint with HUD regarding any fair housing-related matters, including an AFH. Since such complaint process already exists, HUD declines to include additional complaint provisions in the rule.

*Comment: The new AFH process will not reduce litigation.* Commenters stated that HUD repeatedly advised in the proposed rule that one of the goals of the new AFH process is to ''reduce the risk of litigation for program participants.'' The commenters expressed concern that the rule will increase litigation due to a lack of specificity as to what is expected of program participants, and as program participants pursue competing goals set by HUD. The commenters asked HUD to provide program participants with protection from litigation based on their compliance with the policies and procedures of the AFH rule.

*HUD Response:* One way in which this final rule is intended to help reduce the risk of litigation is by providing more specificity compared to the AI process that the AFH approach replaces. By creating an Assessment Tool that will allow program participants to identify housing segregation, disproportionate housing needs, and the contributing factors that affect fair housing choice and access to opportunity, program participants will better be able to direct their Federal and other resources and make other decisions relating to housing and community development in ways that fulfill their civil rights obligations, thus reducing the potential for liability. Public participation in the AFH process may also reduce the need to seek recourse in courts. Regarding protection from litigation, HUD cannot by

regulation either grant or foreclose legal jurisdiction over particular claims in courts.

16. Procedural Issues

a. Period of Review of an AFH

*Comment: The 60-day review period is too brief given the volume of AFHs to be reviewed and HUD's limited staff, and will result in an incomplete review.* Many commenters expressed the concern that the 60-day review period is too brief for HUD to undertake a thorough review of AFHs. Commenters stated that HUD has limited staff and there will be times when HUD will receive many AFHs at once making it difficult for HUD to give all the AFHs the thorough and critical review that is needed, and consequently some AFHs may be deemed accepted based on an incomplete review.

Several commenters recommended that HUD phase-in initial AFH submission dates so that limited staff resources can provide the highest level of review for all AFHs and ensure that most AFHs will be reviewed within two years after the effective date of the regulation.

Several commenters recommended that, to avoid such a consequence, the rule should provide for a longer review period by HUD, such as 90 days or 120 days. The commenters submitted that 60 days is too brief a period to provide any meaningful review of the AFH and the likely result will be as ineffective a review process as the current AIs and consolidated planning review process.

Other commenters suggested that for any AFH that did not undergo a thorough review but HUD deems accepted the acceptance should be valid for only a one-year period.

Other commenters stated that the final rule must provide a backstop to prevent acceptance of inadequate AFHs.

*HUD Response:* In developing the proposed rule, HUD gave careful consideration to the period of time that HUD staff would need to properly review and evaluate AFHs and HUD determined that a 60-day period presented a reasonable period for HUD staff to review and determine whether to accept or not accept an AFH. In settling on a 60-day period, HUD considered that the AFH Assessment Tool would not only provide a streamlined format making it easier for program participants to submit an AFH, but also make it easier for HUD staff to review an AFH.

HUD points out that its review of an AFH does not end with the 60-day review period and HUD's possible acceptance of an AFH. HUD's review of

strategies and actions to affirmatively further fair housing continues with HUD's review of a consolidated plan or PHA Plan. As stated in the proposed rule, ''an accepted AFH and completion of corresponding requirements related to affirmatively furthering fair housing in the consolidated plan and PHA Plan will be required for HUD to approve those respective plans.'' (See 78 FR 43715.)

However, HUD believes that a staggered submission deadline, as recommended by many commenters, would be helpful not only to HUD but to program participants, and the final rule adopts a staggered submission approach.

*Rule change.* In this final rule, HUD revises § 5.160 (Submission Requirements) to provide for a staggered submission deadline for AFHs. Entitlement jurisdictions that receive an FY 2015 CDBG grant of more than $500,000, and PHAs joining in submission with such entitlement jurisdictions will be the first program participants to submit their first AFH. States, Insular Areas, PHAs, and entitlement jurisdictions receiving an FY 2015 CDBG grant that is $500,000 or less will have a later first AFH submission deadline.

b. Approval Versus Acceptance of an AFH

*Comment: HUD should approve an AFH, not simply accept.* Commenters requested that there should be an active approval by HUD, not solely an acceptance of an AFH, and that HUD should allow sufficient time for review to be able to approve an AFH. Another commenter stated that, in spite of HUD disclaimers to the contrary, HUD's deemed acceptance of an AFH creates the impression of a ''safe harbor'' for jurisdictions that may be violating the Fair Housing Act on an ongoing basis. The commenter recommended that the deemed accepted provision be removed, and replaced with an audit-type review.

Commenters recommended that if HUD cannot perform a thorough review of any one AFH within the time period for AFH review, HUD should designate the AFH as un-reviewed, and not deem it accepted. In a similar vein, other commenters stated that HUD should eliminate the characterization of ''deemed accepted'' for AFHs that were not reviewed. The commenters stated that HUD must make an affirmative determination of AFH compliance, rather than allowing for acceptance by default.

Another commenter suggested that HUD not automatically deem accepted any AFH that HUD has not had the time

to thoroughly review unless the program participant submits evidence that demonstrates its AFH is affirmatively supported by a broad cross section of stakeholders representing each of the protected classes, and is not subject to any significant challenges. Other commenters recommended that HUD not review each and every AFH but undertake a sample of AFHs and the sample reviewed would be based on fair housing complaints directed to a particular program participant.

*HUD Response:* HUD believes that the final rule achieves the appropriate balance of interests by requiring program participants to submit AFHs to HUD for review and acceptance rather than requiring AFHs to be approved by HUD. Program participants have asked for flexibility in determining their goals, priorities, strategies, and actions to affirmatively further fair housing at the local level, and the rule provides this flexibility. However, HUD believes it would be inappropriate to create the perception of a safe harbor or limit a private right of action under the Fair Housing Act based on an "approval" of an AFH. For this reason, HUD has decided to limit its review to acceptance or nonacceptance. HUD understands the concerns of commenters about the "deemed accepted" provision, but HUD believes the time allotted for review of AFHs, coupled with the adoption of a staggered AFH submission approach, is sufficient.

c. Appeal of HUD's Acceptance of an AFH

*Comment: The final rule should provide a right to appeal HUD's acceptance of an AFH.* Many commenters asked that HUD establish a mechanism that enables advocates to appeal a HUD decision to "accept" an AFH. Commenters stated that such appeal would then trigger an immediate in-depth review by HUD of an AFH. Some commenters recommended that HUD provide for public comment on the AFH during HUD's review of an AFH. Commenters recommended that members of a community be allowed to file a complaint at any time, and that the final rule outline the specific process involved for filing a complaint, and provide that HUD respond to all complaints, in writing, within 90 days.

Other commenters stated that allowing a complaint to be filed will add additional layers of burden to the AFH process and might be easily abused. Commenters stated that the requirements for public participation in the AFH process and those involved in the consolidated and PHA Plans provide ample opportunities for the public to

register their concerns. Commenters stated that any further appeal or complaint process for members of the public will unreasonably delay implementation of plans and recommends that HUD reject proposals to create a private right of action or any further appeal or complaint processes in the proposed rule.

Commenters recommended that if HUD adds an appeal process that the grounds for an appeal be narrowly defined and the burden of proof placed on the party challenging the AFH. Other commenters suggested that the final rule provide a process by which interested members of the public can file a challenge with HUD in cases where they believe that a participant has failed to meet the requirements of the regulation or failed to meet its obligation to affirmatively further fair housing. Commenters stated that such a challenge should trigger HUD's reconsideration of the AFH that was submitted, in light of the information provided by the party bringing the challenge.

Other commenters stated that HUD should reject recommendations by commenters to create a private right of action for a deficient AFH.

*HUD Response:* HUD believes that establishing a new appeal process specifically regarding HUD's decision to accept an AFH is unnecessary given that HUD maintains a complaint process for any fair housing matter. Further, HUD's requirement of robust community participation in the development of an AFH will create a forum for the public to seek changes. This complements and in no way diminishes the current complaint review process. The final rule provides at § 5.158, as did the proposed rule, that to ensure that the AFH is informed by meaningful community participation, program participants must give the public reasonable opportunities for involvement in the development of the AFH and in the incorporation of the AFH into the consolidated plan, PHA Plan, and other planning documents, as may be applicable. This section further provides that the consolidated plan program participant must follow the policies and procedures described in its applicable citizen participation plan adopted pursuant to 24 CFR part 91 (see §§ 91.105, 91.115, and 91.401) in the process of developing the AFH, obtaining community feedback, and addressing complaints. The jurisdiction must consult with the agencies and organizations identified in consultation requirements at 24 CFR part 91 (see §§ 91.100, 91.110, and 91.235). For PHA Plans, this section provides that PHAs must follow the policies and procedures

described in §§ 903.13, 903.15, 903.17, and 903.19 in the process of developing the AFH, obtaining community feedback and addressing complaints.

The processes, both for the consolidated plan and the PHA Plan, require the program participant to provide a summary of the public comments and a summary of the comments or views not accepted and the reasons that they were not accepted. By applying the longstanding citizen participation requirements of the consolidated plan and the PHA Plan to the AFH, which were not applied to the AI, HUD submits that any serious deficiencies that may be in a proposed AFH or other concerns that members of the public may have about an AFH will be addressed in the citizen participation processes. For these reasons, HUD's final rule does not need to provide another public comment period during the HUD review of AFHs.

With respect to filing a complaint that a program participant has failed to meet the requirements of the regulations or failed to meet its obligation to affirmatively further fair housing, nothing in the proposed rule or in this final rule prohibits a member of the public from notifying or filing a complaint with HUD that a program participant has violated a statutory or regulatory requirement, whether such requirement is the duty to affirmatively further fair housing or another program requirement. As noted earlier in this preamble, HUD has existing procedures under the Fair Housing Act and other civil rights statutes to handle such complaints, including complaints that question a program participant's AFH.

d. Distinguishing AFH Planning From Affirmatively Furthering Fair Housing

*Comment: Clarify the relationship of an acceptance of an AFH to the duty to affirmatively further fair housing.* Commenters stated that acceptance of an AFH should mean that HUD has determined that a program participant has complied with its obligation to affirmatively further fair housing under the Fair Housing Act; has complied with other provisions of the Act, and has complied with other civil rights laws, regulations or guidance. According to a commenter, if HUD is not willing to indemnify a program participant based on HUD's acceptance of the participant's AFH, HUD should include in the final rule a list of safe harbor criteria and guidance for compliance and noncompliance. Commenters further stated that the purpose of preparing the AFH and submitting it to HUD for review and approval, and the program participant's good faith efforts

in addressing its fair housing goals, should mean that the jurisdiction has complied with its legal obligation to affirmatively further fair housing. Commenters stated that program participants that comply with the standards of HUD's regulation must be provided with a safe harbor from litigation.

In contrast to these commenters, other commenters stated that the final rule should clarify that an accepted AFH does not provide a determination of compliance with the obligation to affirmatively further fair housing, including, but not limited to, any ''safe harbor'' provision. The commenters stated that, in this regard, HUD should clarify that the final rule does not foreclose litigation, and that HUD specifically disclaim any notion of a ''safe harbor'' for jurisdictions with a current AFH plan that has been accepted by HUD.

*HUD Response:* The preparation and submission of an AFH that is accepted by HUD does not fulfill a program participant's obligation to affirmatively further fair housing, rather it is a first step towards that duty. As stated in HUD's proposed rule, and earlier in this preamble to the final rule, the purpose of the AFH is to provide and aid program participants with a more effective means of meeting the statutory obligation to affirmatively further fair housing. Whether a program participant, in fact, affirmatively furthers fair housing depends upon the actions the program participant takes, not the actions a program participant states that it plans to take in its AFH.

For purposes of receiving funding from HUD, each program participant must certify that it will affirmatively further fair housing. In general, this means that a program participant will take meaningful actions to further the goals in its AFH, conducted in accordance with the requirements of 24 CFR 5.150 through 5.180, and that it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing. Specific certification language can be found in 24 CFR 91.225 (entitlements), 91.325 (States), 91.425 (consortia), 570.487(b)(1) (State CDBG grantees), 570.601 (all CDBG grantees) and 903.7(o)(3) (public housing agencies). The rule also defines affirmatively furthering fair housing for purposes of fair housing planning, at 24 CFR 5.152, as by stating that it means taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. As this section provides, specifically, affirmatively furthering fair housing means taking actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially or ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws.

HUD explicitly stated in the proposed rule that HUD's acceptance of an AFH only means that the program participant has met the planning requirement described in the rule, but does not mean that HUD has determined that a program participant has complied with its obligation to affirmatively further fair housing under the Fair Housing Act, or with other civil rights statutes and regulations. HUD reiterates that statement in this final rule.

*Comment: Notify program participants of acceptance of its AFH.* Commenters recommended that HUD send program participants acknowledgement of acceptance of their AFH.

*HUD Response:* As described in § 5.162 of this final rule, program participants will know that their AFH has been accepted 61 calendar days after the date that HUD receives the AFH, unless HUD has provided written notification that it does not accept the AFH.

### e. Submission and Response Deadlines

#### i. 45 Days To Resubmit Nonaccepted AFH

*Comment: Allow more than 45 days to revise a rejected AFH.* Commenters asked that HUD allow more than 45 days to resubmit an AFH to permit participants to develop the changes and obtain whatever governing body approvals it may need before resubmitting it. The commenters stated that many governing boards meet only on a monthly basis.

*HUD Response:* HUD understands that there may be circumstances where program participants will require more than 45 days to resubmit an AFH that HUD will accept. Therefore, this final rule states that HUD will provide program participants with a specific time period to revise and resubmit the AFH, and that this period will be at least 45 days, but may be greater if so warranted.

*Rule change.* HUD revises § 5.162(c) to state that HUD will provide a program participant with a time period to revise and resubmit the AFH of no less than 45 calendar days after the date on which HUD provides written notification that it does not accept the AFH.

*Comment: Clarify the process to revise a rejected AFH.* Commenters stated that HUD's proposed rule was unclear whether the public comment period required by 24 CFR part 91 applies to AFHs that are resubmitted because they were originally rejected by HUD. The commenters stated that if the public comment period does apply, that would make it difficult to meet the 45-day resubmission deadline of paragraph. Commenters asked that HUD clarify whether another public comment period and consultations are not required when resubmitting a rejected AFH.

*HUD Response:* HUD has revised § 5.162(c) to clarify the process for revisions and resubmissions of an AFH. Program participants will be afforded a period of time no less than 45 days after the data on which HUD notifies the program participant that it does not accept the AFH.

#### ii. Comment Period on Draft AFH

*Comment: HUD should require jurisdictions to provide a longer comment period on draft AFHs.* Commenters stated that HUD should require jurisdictions to provide a 45-day to 60-day public comment period on their draft AFHs. Commenters stated that a longer period is important to ensure that the process is open and inclusive of all members of the community.

*HUD Response:* HUD's consolidated plan regulations provide and have long provided for a minimum 30-day public comment period for its citizen participation requirement. As stated earlier in this preamble, HUD emphasizes that this is the minimum and not maximum period of time provided for the citizen participation requirement under the consolidated planning processing. With respect to PHAs, this final rule adopts the provisions in the proposed AFH rule that PHAs must follow the policies and procedures in 24 CFR part 903 pertaining to community input.

#### iii. 270 Day Submission of AFH

*Comment: The 270-day submission places the AFH process outside of the Consolidated Plan process.* Commenters stated that the requirement that a participant must submit an initial AFH to HUD at least 270 calendar days before the start of the program participant's program year substantially places the AFH process outside many communities' consolidated plan process and will not integrate fair housing

concerns into the consolidated plan process but will force a participant to conduct a separate process with associated expenses and allocations of scarce administrative resources. Commenters stated that participants should be allowed the option to choose, based on local conditions and characteristics of the participant and its community, to prepare the AFH within its consolidated plan process and timing schedule.

Other commenters stated that the 270 days is too long a submission prior to the consolidated plan. The commenters stated that State participants would have to start the AFH/consolidated plan process in mid-December of 2013 to meet a 2016 due date, or almost 2 and ½ years before the consolidated plan would become effective. The commenters stated that with this length of time since the start of the development of the AFH, the data that is used for the AFH may not be valid by the time the AFH is submitted, and that the data should be fresh when program participants are thinking about fair housing at the same time consolidated plans are being developed.

Other commenters stated that under the proposed rule, an AFH would be due 270 days before a consolidated plan participant could begin its plan, and that the "begin" date would occur after 60 days of HUD review of the AFH, a total of 330 days. Commenters stated that, in effect, this would mean State grantees would have to start their AFH and consolidated planning efforts a minimum of 19 months ahead of the consolidated plan start date. Commenters stated that the time and resources necessary to complete the AFH and consolidated planning processes are simply too long and intensive, and that the effect of this AFH and consolidated planning processes would be that program participants would be in a constant planning and reporting cycle, draining staff time and resources away from effective implementation and monitoring of identified goals and objectives of both the AFH and consolidated plan.

*HUD Response:* The 270-day period remains in the final rule but that period only pertains to the first AFH to be submitted by program participants. The final rule provides ample time to prepare the first AFH and better aligns with the consolidated and PHA planning processes. HUD believes the 270-day time period is needed to allow the results of the AFH to inform the consolidated and PHA plans.

*Comment: Clarify when the 270 days commences, and clarify what program year means.* Commenters asked that the submission of the AFH 270 days in advance needs to be clearly defined in the rule. The commenters asked whether the submission deadline refers to the start of the program participant's fiscal year or the due date of the consolidated plan. Other commenters asked whether "program year" as used in the rule refers to a PHA's fiscal year, the federal fiscal year, or the calendar year. The commenters stated that many PHAs participate in multiple programs, and they operate on a mix of schedules, rendering the term "program year" largely meaningless.

*HUD Response:* HUD believes that the staggered submission deadline provided in § 5.160, which divides program participants into categories, clarifies what is meant by program year and fiscal year.

*Comment: Reconcile contradiction in AFH submission between § 5.160(a) and § 5.160(c).* Commenters stated that the proposed regulations provide the requirements for submission of the AFH to HUD in terms of submission deadline and frequency. Commenters stated that proposed § 5.160(a)(1) and (a)(2) state the submission deadline for initial AFH and subsequent AFH Statements, respectively as follows: (1) ". . . each program participant . . . shall submit an initial AFH to HUD at least 270 calendar days before the start of the program participant's program year,") and (2) "After acceptance of its initial AFH, each program participant . . . shall submit subsequent AFHs to HUD at least 195 calendar days before the start of the jurisdiction's program year.") Commenters stated that these two provisions contradict proposed § 5.160(c) (Frequency of submission): ("Each consolidated plan program participant must submit an AFH at least once every 5 years, or as such time agreed upon by HUD and the program participant in order to coordinate the AFH submission with time frames used for consolidated plans, . . .") Commenters stated that HUD's Consolidated Plan regulations require entitlement jurisdictions to submit their Consolidated Plan One-Year Action Plans annually 45 days prior to the start of jurisdiction's program year, and, therefore, it is unclear whether HUD expects the localities to submit an AFH on an annual or 5 year basis.

Commenters further stated that, in addition, the proposed rule at § 5.160(a)(1), which requires submission of the initial AFH Statement 270 calendar days prior to the start of a jurisdiction's program year would result in localities having to formulate and submit their initial AFH during their CAPER formulation and submission process for the prior program year's consolidated plan. Commenters stated that attempting to formulate and submit both Federally-required reports within the same time frame would create an excessive administrative burden.

Commenters recommended that HUD: (1) Modify proposed § 5.160(a)(1) and (a)(2) to provide clarification and be consistent with proposed regulation § 5.160(c) regarding frequency of submission; and (2) modify proposed regulation § 5.160(a)(1) to change the submission deadline to relieve the administrative burden to be closer the consolidated planning cycle (for example, 180–210 calendar days before), and provided the following suggested language: The amended regulation § 5.160(a)(1) may be modified to read as follows: ". . . each program participant . . . shall submit an initial AFH to HUD at least (180–210) calendar days before the start of their 3- or 5-year consolidated planning process, . . .").

Finally, PHA commenters stated that a PHA that elects to submit an independent AFH is required to update its PHA Plan annually, while all other program participants are required to submit only every 5 years? The commenters asked HUD to justify this position.

*HUD Response:* The staggered submission deadlines provided in the final rule address the concerns raised by the commenters. In addition, as noted earlier in this preamble, under the overview of changes made at the final rule stage, PHAs will be required to submit AFHs every 5 years.

## f. Abbreviated AFH for Small Entities

*Comment: Allow small program participants to submit an abbreviated AFH.* Commenters requested that HUD allow small program participants to submit an abbreviated AFH. Commenters stated that small program participants do not have the resources or staff to develop the AFH envisioned in the proposed rule. Commenters stated that small program participants have smaller staffs which would be burdened with these new data requirements and goals in the rule. The commenters stated that little data is available at the jurisdiction level for small jurisdictions but only available at county or even State regional level resulting in a skewed measurement that can falsely shape the AFH. Commenters suggested that an abbreviated AFH would focus solely on (1) a summary of fair housing issues in the jurisdiction, if any, (2) community input through the Consolidated Plan, and (3) a discussion of the use of CDBG, HOME, and other

**42318** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

possible resources to address fair housing issues in the community.

*HUD Response:* HUD recognizes that a "one size fits all" approach may place the same burdens on all entities but that such small entities have fewer resources to deal reasonably with such burdens. As discussed in Section II.D of this preamble, the final rule provides for a staggered AFH submission deadline. Certain program participants (States, Insular Areas, PHAs) and small program participants (qualified PHAs and jurisdictions that receive a small CDBG grant in fiscal 2015) have the option of submitting their first AFH at a later date than provided for entitlement jurisdictions that receive an FY 2015 CDBG grant of more than $500,000. The staggered submission recognizes the capacity challenges, especially of small entities, and it is HUD's expectation that by the time their AFHs are due, the AFH approach and submission requirements will be more refined and these small entities and HUD can benefit from the experience of program participants that have already submitted AFHs.

The term "qualified PHA" was established by the Housing and Economic Recovery Act of 2008 (HERA) (Pub. L. 110–289, approved July 30, 2008) and defines such PHA as one that has a combined unit total of 550 or less public housing units and section 8 vouchers; is not designated as troubled under section 6(j)(2) of the 1937 Act, and does not have a failing score under SEMAP during the prior 12 months. HERA exempted qualified PHAs from the requirement to prepare and submit an annual plan. As discussed in Section II.D of this preamble, an FY 2015 CDBG grant of $500,000 or less has been designated a small CDBG grant.

*Rule Change.* Section 5.160 provides that PHAs, and entitlement jurisdictions that receive an FY 2015 CDBG grant that is $500,000 or less, as well as States, and Insular Areas, may submit their first AFHs at a later date than entitlement jurisdictions that receive an FY 2015 CDBG grant of more than $500,000 and PHAs that jointly submit an AFH with an entitlement jurisdiction that receives an FY 2015 CDBG grant of more than $500,000.

g. Recently Completed AIs

The proposed rule asked the question whether HUD should waive or delay preparation and issuance of an AFH for program participants that recently conducted a "comprehensive" AI. Although a few commenters stated that the AFH should not be waived because the AI is a failed process, overwhelmingly commenters responded yes, that the AFH should be waived or

delayed because significant time and resources already went into preparation of the AI. Specific comments were as follows:

*Comment: Allow the use of a recently completed AI to comply with first AFH submission requirement.* Commenters stated that developing an AI can be a costly and time-consuming effort and the product of that effort should not be discarded and that it would seem unfair and a waste of resources to require a program participant that, in good faith, recently completed a comprehensive AI to start all over and create a new AFH. Commenters requested that HUD not require program participants to create a new AFH if an AI was completed within 5 years of the date of the final AFH and the program participant's current consolidated plan has already been submitted or their next Consolidated Plan is due to be submitted within 12 months or less of the date the AFFH final rule. In that case, the AFH would be required to be submitted in conjunction with the program participant's next 5-year consolidated plan.

Other commenters ask that HUD allow a completed Fair Housing and Equity Assessment (FHEA) to count as an AFH. Commenters recommended that Regional Analysis of Impediments developed in support of the Sustainable Communities program should also be permitted to continue for some period of time.

*HUD Response:* HUD believes that the staggered AFH submission deadline provided in this final rule addresses to a considerable extent the commenters' concerns about recently completing an AI and then having to, perhaps within a short period of time, complete an AFH. HUD, however, wanted to ensure that for recipients of an FY2010 or 2011 Sustainable Communities Competition award that completed a regional analysis of impediment (RAI) in connection with such award, and where the RAI was submitted within 30 months prior to the date when the program participant's AFH is due, such RAI would be accepted in lieu of the AFH. The analysis required under the Sustainable Communities competition award is a more rigorous analysis and more comparable to the AFH approach provided in this rule.

*Rule change.* HUD has revised § 5.160 to provide that entitlement jurisdictions that participated in and signed on to a HUD-approved RAI in accordance with a grant awarded under HUD's FY 2010 or 2011 Sustainable Communities Competition that was submitted within 30 months prior to the date when the

program participant's AFH is due will be accepted in lieu of the AFH.

h. Resolving Disputes on the Content of a Joint or Regional AFH

In the proposed rule, HUD asked the commenters what process should guide the resolution of disputes between collaborating program participants if an AFH is not accepted because of disagreements between the collaborating program participants. The comments were as follows:

*Comment: Provide for dispute resolution and set an end date for such resolution.* Commenters stated that a dispute among program participants is particularly worrisome, because failure to submit a consolidated plan within the federal fiscal year precludes the ability of the program participant to work through the issues and ever receive funding. Commenters requested that HUD allow a program participant, caught in this situation, to proceed to submit its consolidated plan, and then allow the program participant a specific amount of time for the participant to work through differences with HUD. Commenters stated that it is critical that the process for resolving disputes about the content of an AFH should not jeopardize receipt of critical funding. The commenters stated that HUD should assure that resources do not get unreasonably delayed and establish a review/approval/dispute process that is responsive to local operational needs such that funds continue to flow while these issues are addressed, barring a clearly unresponsive noncompliant program participant.

Commenters stated that there needs to be some HUD Headquarters involvement where a disagreement continues beyond some reasonable period, such as 60 to 90 days. Commenters stated that meeting with HUD to facilitate agreement and/or mediation as a last resort would be a great process to guide the resolution of disputes between program participants. The commenters stated that HUD would be in the best position to provide technical assistance to iron out any differences.

Other commenters stated that HUD should offer technical assistance with the disapproval of the first AFH submitted, and needs to be clear about all issues in the first letter of disapproval, so a program participant can expect, once identified issues are addressed, approval of the AFH would be forthcoming, rather than learning that additional issues have been identified.

Commenters stated that the rule should provide for a dispute process so that everyone knows how to resolve a

dispute and funding will not be jeopardized.

In contrast to the foregoing commenters, other commenters stated that HUD should not concern itself with the internal problem-solving mechanisms of the regional collaboration. Commenters stated that the party responsible for submitting the regional AFH to HUD should have authority over disputes, as they are lead agency and responsible for the AFH. Commenters stated that if a participant does not agree with the AFH, they can submit a dissenting opinion. This should include ability by the dissenter to not do the activity they disagree with, or to do activities they deem more appropriate.

*HUD Response:* HUD appreciates commenters responding to the specific question posed on this issue. On further consideration, HUD declines to include a dispute resolution process in the rule and has also removed the provisions regarding PHA dissenting opinions. Since joint and regional collaborations are entirely voluntary, HUD anticipates that disputes among collaborative program participants would be the exception as the program participants themselves selected the collaborative relationship. HUD also encourages MOUs to be entered into by collaborative program participants as a means of resolution, so that if disputes do arise, the collaborative program participants can resolve issues among themselves without HUD intervention.

i. Impact of Disaster Situations on an AFH

*Comment: Serious consideration must be given to timing of submission of an AFH that must be revised as a result of a declared disaster.* Commenters stated that the requirement that an AFH be revised in the event of a Presidentially-declared disaster is appropriate but when the revision must be done and submitted to HUD must be considered in light of the multiplicity of tasks required during disaster recovery. Commenters stated that the program participants will likely be consumed with disaster recovery tasks for some time, and that any requirement by HUD to revise the AFH within a brief period following the disaster may divert human resources from disaster recovery. Commenters stated that HUD must recognize that a program participant's first responsibility will be to deal with the victims of the disaster. Commenters stated that HUD should leave preliminary determinations of the need for and timing of revisions to the local jurisdiction.

Commenters stated that the rule should integrate revising the AFH with the timeline for the Action Plan recovery expenditures required under HUD's Community Development Block Grant–Disaster Recovery (CDBG–DR) program, and recommended that HUD establish a requirement that, as part of the Action Plan process under CDBG–DR, grantees be required to discuss in the Action Plan how the AFFH related data that the CDBG–DR Notice provides impacts the barriers identified in the AFH and/or creates any new barriers, and how the Action Plan's programs address those barriers. Commenters stated that a uniform requirement of a revision following a disaster calls for specificity not only regarding the timing and submission of the revised AFH but the content. Commenters stated that the elements included in revision of the AFH should be a modified or condensed set of elements that target the most impacted aspects of the disaster rather than require a complete revision and rewrite of the AFH. Additionally, commenters stated that HUD should at least exempt grantees from the public hearings, only when a revision is needed due to a major disaster.

Other commenters also stated that there should be no assumption that a natural disaster automatically requires jurisdictions to deviate from the priorities set out in a compliant AFH. Commenters stated that this is an issue that would need to be addressed on a case-by-case basis. Commenters stated that, in some cases, a disaster could have no effect on compliance with the AFH if it is fairly localized in a rural area or the low-income housing is repairable and the most immediate need would be to get people back into their homes. Commenters stated that revising an AFH following a disaster should only be required where the disaster requires substantial reconstruction of new housing, not those primarily requiring repair of existing housing. Commenters stated that HUD's rule needs to allow some flexibility and discretion in determining whether and when a jurisdiction needs to revise its AFH.

Other commenters state that while HUD must give program participants adequate time to revise an AFH in the event of a major natural disaster, program participants should not be exempt from revision as a result of a major natural disaster. Commenters stated that natural disasters confront communities with a challenge to rebuild and to start over, and that this presents a totally unique opportunity to rebuild without the pre-disaster patterns of segregation. Commenters stated that the rule must anticipate these pressures and create the circumstances where fair housing practices can be applied and a positive pro-integrative transformation can take place. Other commenters similarly stated that natural disasters, while creating many barriers, also can provide opportunities to increase access and better inclusion in the future, and that these opportunities should be pointed out to the entities and they should be monitored to see how well they serve fair housing goals during the disaster and in their rebuilding efforts. Commenters stated that the AFH and disaster relief goals can and should be coordinated so that disaster relief funds are not misdirected to maintain the status quo, including high levels of racial segregation and low levels of affordable housing in high opportunity areas.

Some commenters suggested that HUD should work with the Federal Emergency Management Agency (FEMA) on developing appropriate recommendations and guidelines instead of establishing a new and separate mandated process. In addition to opposing a mandate to revise an AFH as a result of a disaster situation, commenters stated that HUD should be precluded from denying relief to jurisdictions due to disputes about the AFH and the actions identified therein. Commenters stated that it would be unconscionable that HUD use disaster relief funds as leverage in bona fide disputes with local jurisdictions.

Other commenters recommended that HUD should consider an AFH template specifically for a disaster-declared area, similar to what it does with waivers requests for the use of CDBG–DR funding, with options that a grantee can utilize under various categories. The commenters stated that the template should establish fair share allocations of disaster recovery resources for households based on income, sex, age, national origin, disability etc. to ensure members of classes of persons protected under the Fair Housing Act receive access to disaster recovery funds at a rate equal to the degree they were impacted by the disaster; require housing units rebuilt in the wake of a disaster to be "visitable" to persons with disabilities; and require a disaster vulnerability assessment of neighborhoods and ensure that in neighborhoods where there are concentrations of persons protected under the Fair Housing Act such residents receive fair access to infrastructure to remediate the vulnerability of these areas to future disaster.

Other commenters suggested that HUD provide a guidebook for

**42320** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

jurisdictions to use to modify their AFH post-disaster plans and to lawfully exercise opportunities posed by large rebuilding programs. In the immediate aftermath of a major disaster jurisdictions face many challenges in gearing up to rebuild. The commenters stated that, by pre-developing guidance, HUD would ensure that the process of modifying the AFH would be informed by best practices and proceed smoothly.

*HUD Response:* HUD appreciates the very good suggestions offered by commenters regarding preparation of an AFH in the face of a disaster situation causing significant damage to an area or areas of the U.S., and, thereby, possibly requiring changes to a program participant's AFH. HUD wholeheartedly agrees with the commenters that their first responsibility is to assist the residents in the areas affected by the disaster. HUD will consider working with FEMA on guidance related to the revision of an AFH after a disaster.

*Rule change.* HUD has revised § 5.164 (Revising an Accepted AFH) to provide that a program participant must revise its AFH whenever a "material change" in circumstances occurs in the jurisdiction of a program participant, which is a change that affects the information on which the AFH is based to the extent that the analysis, fair housing contributing factors, or the priorities and goals of the AFH no longer reflect actual circumstances.

Revised § 5.164 provides examples of what constitutes a material change such as a Presidentially declared disaster, under title IV of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 *et seq.*), in the program participant's area that is of such a nature as to significantly impact the program participant's duty to affirmatively further fair housing; significant demographic changes; new significant contributing factors in the participant's jurisdiction; and civil rights findings, determinations, settlements (including Voluntary Compliance Agreements), or court orders. While a Presidentially declared disaster is the most prominent example, it is only one example, and a material change is not limited to Presidentially declared disasters. Other disasters that cause significant damage to housing or infrastructure, result in significant displacement of populations, or have significant disproportionate effects based on protected class in their direct effects in response or recovery, would be among the types of disasters likely to significantly impact the steps required to affirmatively further fair housing and therefore be consider a "material change." HUD will work with grantees

that experience such events and provide additional clarifying guidance as may be needed given the material change at issue.

Revised § 5.164 further provides that where a revision to an AFH is required because of a material change in circumstances, the revision shall be submitted within 12 months of the onset of the material change in circumstances, or at such later date as HUD may provide, and that where a revision is required due to a Presidentially declared disaster, the time for submission shall be automatically extended to the date that is 2 years after the date upon which the disaster declaration is made, and the deadline may be further extended upon the request for good cause shown.

Revised § 5.164 also provides that HUD may require a program participant to revise an AFH upon written notification to the program participant specifying the reasons why HUD determined a revised AFH is necessary. Revised § 5.164 allows, however, for a program participant to respond to HUD and advise of reasons why the program participant believes a revised AFH is not necessary.

### j. Need for Safe Harbor

*Comment: Provide a safe harbor for program participants that faithfully follow the requirements in the AFH rule.* Commenters stated that the proposed rule lacks a "safe harbor"; that is, that the rule provides no assurances that a program participant has sufficiently met its obligation to affirmatively further fair housing. Commenters stated that a safe harbor is especially important in the initial years of implementation of the new AFH process because it is a major change from the AI process, and, as with any transition to a new system, the new AFH approach may not play out as HUD envisioned. Commenters stated that HUD needs to recognize program participants for their good faith efforts to comply with new requirements, and hold them harmless for factors outside of their control. Commenters stated that they appreciate HUD stating that, through this new AFH process, HUD expects to reduce litigation and the commenters suggest that including a safe harbor would definitely reduce litigation.

Commenters stated that part of the reason for requesting a safe harbor is that HUD must recognize that there are factors beyond a program participant's control, and that such factors include operating under a consent decree pursuant to a court order that requires a program participant to take action in accordance with the decree that may

conflict with the AFH rule, or a program participant is faced with concentrations of populations that occur for nondiscriminatory purposes, as for example, populations surrounding HUD-funded Historically Black Colleges and Universities.

Other commenters clarified that they are not seeking a safe harbor that the program participant has fulfilled its duty to affirmatively further fair housing, but rather the commenters stated that they are seeking a safe harbor that, if a program participant submits an AFH, and if HUD approves the AFH, then the program participant is considered in compliance with the AFH planning requirements.

*HUD Response:* As stated earlier in this preamble, this rule does not assess whether a program participant has carried out its statutory obligation to affirmatively further fair housing. As also stated earlier in this preamble, an AFH will be deemed accepted after 60 calendar days from the date HUD receives an AFH unless HUD has provided the program participant(s) with notification that HUD does not accept the AFH.

### 17. Entitlement and Nonentitlement Jurisdictions and Role of the States

*Comment: State AFHs should cover only nonentitlement jurisdictions.* Commenters stated that State AFHs should cover only the non-entitlement jurisdictions, and should not be required to cover entitlement jurisdictions. Commenters stated that entitlement jurisdictions will be required to prepare their own AFH, therefore requiring the State to also complete an assessment of the same area would be redundant and a waste of time and money. Commenters stated that the basis for States preparing the AFH is based on the use of CDBG, HOME, ESG, and HOPWA funding, and that States use these resources primarily in non-entitlement jurisdictions, and that, in fact, States may not legally use most of their HUD resources in entitlement jurisdictions, just as entitlement jurisdictions are required to use their HUD funding within their own geographic boundaries. Commenters stated that since entitlement jurisdictions will be required to prepare their own AFHs, having the State do an assessment of these same areas would be redundant and a waste of resources. Commenters stated that if States choose to participate in regional AFHs that include entitlement jurisdictions, they may do so and the AFH would include the entitlement jurisdictions. Commenters recommended that the definition of a State AFH (§ 5.152

Definitions) should be limited to non-entitlement areas of the State.

Commenters stated that HUD does not appear to understand how States operate, and how they are different from entitlement jurisdictions. Commenters stated that what a State can accomplish is different from what an entitlement community can accomplish. The commenters stated that the geographic scope of entitlement communities is limited and their structures of control are far greater, both politically and economically. The commenters stated that State entities cover widely varying geographies and tend to have far more limited capacity to control political and economic outcomes. Commenters stated that, throughout the proposed rule, guidelines that may be appropriate to entitlement local governments are being applied inappropriately to State programs.

Commenters stated that the new mapping system to gather data is not workable for State grantees. Commenters stated that it would be helpful if when HUD designs mapping systems for collecting data they work with a sub-committee that includes State grantees. The commenters stated that the whole data gathering system for the e-con planning suite is another example of mapping systems that do not work for State grantees. It is fine if HUD wants to offer this mapping system as a tool that can be used but its use should not be made mandatory.

To resolve the treatment of States in the AFH regulations, commenters recommended that HUD have separate regulatory sections for States and local governments that acknowledge the differences in their needs, capabilities and size of geography. Commenters stated that HUD's proposed rule did not acknowledge that State governments operate at a different level of responsibility and for a different geographic area of coverage; and that States are more like HUD in their administration of housing and community development programs than local governments.

Commenters further stated that States have limited influence over local government actions that could be most effective addressing a fair housing issue, and that while there may be significant fair housing issues in a locality, a State may have no ability to influence the locality, and, therefore, a State cannot include goals for mitigating the factors contributing to the fair housing issue. Commenters stated that States do not have control over zoning and local land use decisions; that land use decisions are local responsibilities that can be informed by using geographic data

systems and maps that analyze current demographic and socio-economic conditions. The commenters stated that State AFHs should not be rejected under § 5.162(b) if they do not address local issues.

Commenters stated that providing separate sections for State and local governments is not unprecedented, pointing to HUD's Consolidated Plan regulations at 24 CFR part 91 that separate certain State and local requirements in recognition of their differences. Commenters further recommended that HUD draft regulatory sections applicable to States in close consultation with a wide variety of States (small and large States; States with many local entitlement jurisdictions and States with few local entitlement jurisdictions; and States with few metropolitan areas and states that are predominantly metropolitan) and their associations, such as the Council of State Community Development Agencies (COSCDA) and the National Council of State Housing Agencies (NCSHA).

Commenters stated that while HUD specifically addresses four distinct types of program participants, States apparently fall under the more generic category of "jurisdiction" per § 91.5. Commenters stated that this becomes problematic when examining the language describing the required elements of the analysis, which speaks in terms of various signifiers within "the jurisdiction and region." Commenters stated that, in the case of States, what this means is not altogether clear. Commenters asked that HUD clarify whether the State analysis covers the jurisdiction (which the commenters said taken literally would mean the State as a whole) or only those portions of the State nonentitlement areas that are subject to the various CPD programs (noting that the geography of entitlements varies with each program). The commenters stated that the inclusion or exclusion of entitlement jurisdictions with their primarily urban/suburban populations would produce very different assessment outcomes.

Commenters recommended that regional analysis should only be required when a regional AFH is prepared. The commenters stated that since a State's jurisdiction is much larger than a local jurisdiction's, the rule should require only a statewide analysis, but allow those States that prefer to undertake smaller geography analyses to do so. Other commenters stated that HUD should revise § 5.154 (d) and (e) of the proposed rule to establish different requirements that are appropriate to State governments.

Commenters stated that if HUD does not distinguish the responsibilities of the State from nonentitlement jurisdictions in the final rule, HUD must clarify that a State is not responsible for the failure of its subrecipients to comply with the requirements of this rule or to monitor their compliance. Commenters stated that States should not be bound by administrative actions taken by HUD against a local jurisdiction that fails to submit an acceptable AFH. Commenters stated that in the case of a local jurisdiction's failure to submit an accepted AFH, and HUD withholds the jurisdiction's CDBG award, the State jurisdiction should not be prohibited from awarding other CPD funds to the local jurisdiction. Commenters stated that States are better equipped and suited to develop policies and priorities for distributing funds according to procedures that seek to minimize concentrations and promote choices of places to live. Commenters stated that States should only be responsible for monitoring their subgrantees' efforts to affirmatively further fair housing, not all of the jurisdictions in the non-entitlement areas, and that for non-entitlement areas within the State that have not been funded by the State, the final rule should not expect States to be held responsible for subgrantees' actions to affirmatively further fair housing.

Other commenters stated that States, particularly, should be held accountable for the duty to affirmatively further fair housing based not only on how States expend HUD funds, but also on the level of compliance they require of local jurisdictions, including those that do not receive HUD funds. Commenters stated that State laws and regulations governing zoning and preventing exclusionary practices are one such mechanism for encouraging compliance. The commenters stated that expenditure of State discretionary funds (including non-HUD funds as well as non-federal funds) for housing production and preservation, economic development, water and sewer infrastructure, transportation, and school building facilities can also have a powerful impact and should be included in the creation and implementation of an AFH.

Finally, commenters addressed the consultation requirement and noted that the proposed rule states at § 91.110(a)(2) that the "State shall consult with state and regionally-based organizations that represent protected class members . . . and other public and private fair housing service agencies, to the extent such agencies operate in the State." Commenters recommended that States be required to consult with entities in non-entitlement areas only and that the

focus should be on these non-entitlement areas in these consultations. Commenters stated that regarding consultation by States, only statewide public housing authorities must be consulted in developing an AFH. Commenters stated that the proposed rule at § 91.110 (a)(1) provides: "The State shall consult with any state housing agency administering public housing (PHA) concerning consideration of public housing needs, planned programs and activities, the AFH . . ." Commenters stated that the language should indicate clearly that it is only statewide housing authorities that must be consulted. Commenters stated that if HUD's intent was broader, that language should be limited to "representatives of public housing authorities covered by the state's Consolidated Plan" not all public housing authorities.

*HUD Response:* The commenters raise very valid points about the differences between entitlement jurisdictions and the role of States with respect to receipt, distribution, and expenditure of HUD funds. HUD believes a rule change is not necessary, however, in recognition of the unique role that States play, HUD intends to develop a format of the Assessment Tool that is more tailored to the activities of States.

18. Regional Collaboration and Regional Analysis.

*Comment: It is important for PHA and local jurisdictions to collaborate: Require a letter affirming cooperation.* Commenters stated that currently, in most locations, fair housing planning between jurisdictions and PHAs is not significantly interwoven. Commenters stated that PHAs are oftentimes distinct legal entities outside the control of local governments, even though they may be located within the geographical boundary of a jurisdiction, and that the only linkage may be the appointment of PHA board members by the local elected official or body. Commenters stated that notwithstanding a strong linkage, a jurisdiction's discussion with PHAs is often very helpful in better understanding the real "impediments" a PHA's residents face in trying to locate affordable housing outside of the public housing developments and gaining a better understanding of the nuances of any discriminatory actions they may encounter, and that therefore, it is important for jurisdictions and PHAs to come to the table and fully collaborate in the development of the AFH.

Commenters requested that to ensure such cooperation, HUD should require a letter affirming cooperation between the two entities in the development and

implementation of the AFH. Other commenters stated that HUD should require a meeting of the entities seeking to engage in joint participation with HUD's staff in FHEO. Commenters stated that HUD should issue a sample agreement for use between or among program participants seeking to jointly undertake the AFH planning process.

*HUD Response:* HUD appreciates the value that the commenters see in a joint participation by PHA and local government, and HUD seeks to be helpful to such entities in their efforts to jointly undertake AFH planning, but HUD declines to require such entities to execute a letter or agreement affirming cooperation or meet with FHEO staff. As noted in response to an earlier comment, HUD encourages the creation of MOUs to govern the joint participation process when completing an AFH.

*Comment: Clarify whether a regional analysis is required of every AFH and if so, define "region."* Commenters stated that § 5.154(d)(2) requires analysis of various data "within the jurisdiction and region." Commenters stated that the mandated nature of this provision, "that the program participant must identify, within the jurisdiction and region, integration and segregation patterns and trends across protected classes; racially or ethnically concentrated areas of poverty; whether significant disparities in access to community assets exist across protected classes within the jurisdiction and region; and whether disproportionate housing needs exist across protected classes" appears to require a participant to in effect conduct a regional AFH effort and eventual plan without drawing any distinctions between a community's jurisdiction where it practices a higher level of responsibility and influence than for a "region." Commenters stated that for many participants this provision will be burdensome and ineffectual especially for larger metro regions of a large number of diverse and independent governmental entities. The commenters stated that the provision as worded will mandate a high level of added expense and administrative burden. The commenters asked HUD to clarify whether the intention of the rule is to require a regional analysis only when there is a regional plan, or for every AFH.

Other commenters stated that a regional analysis should only be required when a regional AFH is prepared. The commenters recommended that HUD modify the rule so that it is clear that the analysis applies to the jurisdiction or, if a regional AFH is prepared, the region

consisting of the regional AFH participants.

Commenters stated that if HUD is requiring a regional analysis for every entity submitting an AFH, then HUD must define what is meant by a "region." Commenters stated that the definition of a region indicated in HUD's proposed rule is that a region is the area in which two or more program participants collaborate on a single AFH. Commenters stated that this definition is problematic for many reasons, one of the most important being that it could perpetuate a core problem with current strategies to affirmatively further fair housing. The commenters stated that under current regulations, communities can form a consortium for purposes of obtaining HUD funds subject to the requirement to affirmatively further fair housing, but that it is often the case that asset-rich communities—often times communities greatly in need of affirmatively furthering fair housing—have little incentive to join a consortium.

Commenters asked whether a region for State AFH planning purposes is the State and surrounding States, or all the regions within a State, however those are defined. Other commenters also asked that HUD exempt states from analyzing data for regions.

*HUD Response:* All program participants must use HUD-provided data and that data will include regional data. A look at regional data is important because the demographic makeup of a program participant's population may be very different from the demographic makeup of the larger region's population. For example, certain communities within a region may have large concentrations of persons with disabilities when compared to the broader region, or a disproportionately small percentage of families with children when compared to the larger region, or contain most of the region's racially or ethnically concentrated areas of poverty. Therefore, an examination of such data is important in order to accurately assess the factors that contribute to a program participant's own fair housing issues.

With respect to the set of comments requesting that HUD clarify the definition of a region when referring to "regional data" or a "regional analysis," the Assessment Tool will address this request.

With respect to the set of comments requesting that HUD require particular communities to participate in a regional AFH, HUD declines to impose such a requirement. Program participants should determine whether they want to

collaborate with other program participants and, if so, who they want to collaborate with.

*Comment: HUD must provide incentives to achieve regional collaboration because regional collaboration is difficult.* Commenters stated that many fair housing issues transcend local jurisdictions but they are not convinced that increased collaboration will result from HUD's rule. Commenters stated that the proposed rule encourages regional collaboration in the development of AFHs, but stated that there are many factors that make regional collaboration difficult. Commenters stated that without these incentives, jurisdictions may be reluctant to take on the challenge of inter-jurisdictional collaboration. Commenters stated that policies adopted by one jurisdiction or region are not simply voted on by another jurisdiction. Commenters stated that the difficulty is that decisions are made within the boundaries of the jurisdictions, and though collaboration can be attempted, the politics of ideology and money often get in the way of noble regional efforts.

Commenters also stated that HUD must ensure that all program participants that participate in regional AFHs identify priorities, set goals appropriate to the needs in individual jurisdictions, adopt spending plans and strategies to achieve goals, and establish timetables, benchmarks and measurable outcomes for each goal. Commenters stated that they are concerned that regional collaboration efforts over the past 15 to 20 years have more often resulted in overly-generalized analyses which fail to provide accountability for individual jurisdictions, and recommend few, if any, meaningful actions to overcome fair housing barriers. Commenters stated that HUD must take care to avoid this result in the proposed rule. Commenters stated that § 5.156(d) of the proposed rule states only that "A Regional AFH does not relieve each regionally collaborating program from its obligation to analyze and address local fair housing issues and determinants that affect housing choice within its respective jurisdiction." Commenters expressed concern about the sufficiency of this provision and recommended that this section should be amended to require that regionally collaborating programs, especially those exercising land use and zoning powers, are required not just to analyze barriers within their own boundaries but also to adopt jurisdiction-specific actions to overcome those barriers. Commenters stated that HUD might also provide more detail

about how such regional planning would work in non-contiguous jurisdictions.

Other commenters stated that the need to analyze and address local fair housing issues and contributing factors creates burden and does not relieve collaborating regions from burdens as suggested by HUD's promotion of regional collaboration. Commenters stated that it is counterintuitive to suggest or even encourage participants to engage each other in developing a regional AFH if participants are still required to provide an analysis of local issues as stated in § 5.156(d). Commenters stated that a regional AFH would only benefit from reduced burden if the issues at the regional and local level are consistent to the extent that one analysis would cover both levels, but that participants would not know this until well into the AFH process. Commenters stated that this may result in increased costs and use of resources, as well as delays in completion of the AFH, which is the opposite of HUD's promotion of regional collaboration on AFHs. Commenters stated that they agree that any regional analysis must tie back to each collaborating community with specific actions it will take to affirmatively further fair housing, but that given the goal of connecting the AFH with future consolidated plans, this requirement could be better crafted to incentivize partnership. Commenters stated that with the tight timeframe for the completion of the AFH within one year before the submission of the consolidated plan, communities are developing recommendations for fair housing twice within a 2-year period, creating redundancy.

Commenters suggested the rule include stronger language recommending the creation of regional AFHs in large metropolitan regions that focus on robust analyses of fair housing conditions and include broader regional recommendations, and that the rule not include recommendations specific to individual program participant jurisdictions. Commenters suggested that for each consolidated plan completed by jurisdictions within the region covered by the regional AFH, the AFH should include strategic plan recommendations to affirmatively further fair housing tied both to the analysis and recommendations included in the regional AFH. Commenters stated that under this model the regional AFH becomes the "existing conditions report" for multiple communities on the state of fair housing in the region, with each community using the consolidated planning process to develop local

implementation in response. The commenters stated that since only one regional AFH would be needed in each of these regions, the reporting burden for individual program participants within each region would be reduced, but clarified that in recommending this model of a regional AFH, the regional AFH would be developed in active collaboration with program participant jurisdictions.

Other commenters stated that for regional collaboration to be meaningful it must not be conducted exclusively by jurisdictions consisting of uniform or near-uniform demographics.

Other commenters stated that, as proposed, the rule encourages only narrow partnerships, primarily among existing CDBG or HOME consortia, and given the regional scope needed to properly analyze and contextualize the provided data, these small collaborations will need to use scarce administrative dollars to find outside assistance. The commenters stated that while there is some efficiency to be gained from these types of collaborations, the most effective AFHs will be based on regions defined by the boundaries of MPOs or Regional Councils.

Commenters stated that regional jurisdictions do not necessarily conform to MSA boundaries, and that many have the capacity to perform the analysis and policy recommendation tasks necessary to complete a regional AFH. Commenters stated that none of the materials released by HUD in association with the proposed rule mention the FHEA or the RAI being developed by participants in the Sustainable Communities Regional Planning Grant program, and this is a mistake on HUD's part. Commenters stated that these regions are large enough to capture the dynamics that create both RCAPs and areas of opportunity, and that they also have existing agencies with the capacity to provide rigorous data analysis and community engagement, linking fair housing efforts with other Federal planning efforts, such as transportation.

Other commenters expressed concern that the rule would allow non-contiguous jurisdictions to collaborate on a regional AFH. The commenters stated that as proposed, the rule would allow any two jurisdictions across the nation to form a regional AFH, and this allows for illogical and counterproductive collaborations. The commenters stated that this would allow a partnership of all-white communities to submit a regional AFH that could mask the fair housing issues in their jurisdictions. The commenters

stated that this risk is intensified given that the proposed rule does not require specific outcomes and allows AFHs to identify only one issue.

Other commenters stated that the importance of assessing housing needs on a regional basis should be emphasized, including in the definitions of "disproportional housing needs," "segregation" and "fair housing choice."

*HUD Response:* HUD understands that regional collaboration can be challenging, but believes that, in many cases, the benefits will outweigh the challenges, and HUD will continue to encourage regional collaboration and provide incentives, such as bonus points in HUD notices of funding availability (NOFAs), where feasible.

With respect to commenters' concern that regional collaboration will produce overly generalized analyses and fail to provide accountability for individual jurisdictions, the proposed rule specifies that a regional AFH must include barriers to fair housing at both the local and regional levels, and that participating in a regional AFH does not relieve program participants from analyzing and addressing fair housing issues and contributing factors within individual jurisdictions.

As the rule makes clear, when collaborating to submit a joint or regional AFH, program participants may divide work as they choose, but all participants are accountable for the analysis and any joint goals and priorities. Program participants are also accountable for their individual analysis, goals, and priorities. (See § 5.156(a)(3).) For example, in a regional collaboration involving two entitlement jurisdictions and two PHAs, the entitlement jurisdictions may conduct certain parts of the joint analysis and the PHAs may conduct other parts. HUD believes it is best left to the program participants in a joint or regional collaboration to decide how their individual expertise may best contribute to a joint or regional AFH. However, notwithstanding the division of labor that program participants may choose, each program participant is accountable for the joint analysis, goals, and priorities in a joint or regional AFH, as well as being accountable for any individual analysis, goals, and priorities that the participant includes in the joint or regional AFH.

*Rule clarification.* HUD has revised the final rule to clarify that joint participants and regionally collaborating participants must not only analyze and address local fair housing issues and contributing factors that affect choice but must also set goals within their

respective geographic areas of analysis. (See § 5.156(e).)

With respect to commenters suggestion that regional collaboration will not be as meaningful if collaboration is only among regions with like demographics, and those that stated that regional jurisdictions do not necessarily conform to MSA boundaries, HUD declines to impose additional requirements for jurisdictions that choose to collaborate on regional AFHs, in order to require a particular demographic mix. HUD notes that all program participants must conduct an analysis of fair housing barriers both within a local jurisdiction and at the regional level, which will prevent jurisdictions from conducting a narrow analysis of patterns solely within the jurisdiction.

With respect to the comments regarding FHEAs prepared with support from the HUD Sustainable Communities Initiative, HUD encourages communities that have prepared a FHEA to use this process and analysis to inform the creation of a RAI. HUD will provide guidance to grantees on how to convert a FHEA to a successful Regional AFH.

With respect to the comments regarding RAIs prepared with support from the HUD Sustainable Communities Initiative, HUD noted earlier in this preamble that a RAI prepared in connection with an FY 2010 and FY 2011 Sustainable Communities Initiative award will be accepted by HUD as the program participant's first AFH due under the submission requirements of § 5.160. (See § 5.160(a)(2).)

With respect to commenters' concern that allowing noncontiguous jurisdictions will result in ineffective collaborations, HUD has revised § 5.156(a)(1) to clarify that regionally collaborating participants need not be contiguous but must be located within the same CBSA, as defined by OMB at the time of submission of the regional AFH. Alternatively, if the program participants are not located in a CBSA, the program participants may submit a request in writing to HUD seeking approval as regionally collaborating program participants for the reasons stated in the request. The term "Combined Statistical Area" was removed from the final rule due to concerns with adding an unnecessary level of complexity and administrative burden in the provision of Federal data for program participants.

While all forms of regional collaborations are greatly encouraged, HUD acknowledges that there may be administrative challenges to providing the data, maps, and tables for some

elements in the Assessment Tool that will need to be provided to some types of regional collaborations. For instance, program participants seeking to do a regional AFH, that are not in the same CBSA, could likely have numerous issues with aggregating different types of data. HUD notes that it will work with program participants to address such challenges, but may be limited by considerations with the format in which the data may be realistically provided. HUD will nevertheless endeavor to provide such collaborations with appropriate leeway in submitting their AFHs in a manner so that they can be accepted by HUD.

Whatever form of collaboration is selected by program participants and approved by HUD, HUD reiterates that the rule specifies that a regional AFH must include barriers to fair housing at both the local and regional levels, and that participating in a regional AFH does not relieve program participants from analyzing and addressing fair housing issues and contributing factors within individual jurisdictions. (See § 5.156(e).)

With respect to commenters' request that the definitions of "disproportionate housing needs," "segregation" and "fair housing choice," emphasize the importance of assessing housing needs on a regional basis, please see HUD's earlier response to comments about suggested revisions to these terms.

*Comment: Mandate that municipalities consider regional needs for members of a protected class.* A commenter stated that the most crucial omission in the proposed rule was allowing municipalities the option of taking a regional approach to affirmatively furthering fair housing rather than mandating consideration of regional needs for increased housing opportunity for members of protected classes. The commenter stated that this flaw allows affluent communities that have excluded members of protected classes to continue excluding because they have no existing concentrations of class members who are being denied fair housing. A program participant could argue that it has no need to allow the development of additional subsidized housing that might be affordable for protected class members because it had no existing residents who would be income-eligible.

Other commenters stated that the rule should require participants to analyze the regional impacts of local decisions and implement strategies that make measurable progress toward promoting integration and reducing disparities in access to community assets across jurisdictional lines. The commenters

stated that in many cases this will require the sort of regional collaboration that the proposed rule encourages.

*HUD Response:* All program participants submitting an AFH must take regional needs into consideration. The regulatory text at § 5.154(d)(2), entitled "Analysis of data" requires identification of various issues "within the jurisdiction *and* region" (emphasis added). With respect to commenters' request that participants analyze regional impacts of local decisions, HUD believes that the requirement that participants analyze issues and impacts of both a jurisdiction and a region addresses the commenters' concern.

*Comment: Regional assessment is at odds with consultation requirements.* Commenters stated the proposed rule at § 5.156(a) (Regional assessments and fair housing planning) indicates that consultation with adjacent units of general local government, while encouraged, is not mandatory. The commenters stated that the rule provides that two or more program participants (regionally collaborating program participants) may, and are encouraged to, collaborate to conduct and submit a single regional AFH to evaluate fair housing issues and contributing factors from a regional perspective (Regional AFH). The commenters stated that, however, proposed regulations in 24 CFR part 91 regarding the formulation of a locality's consolidated plan require consultation with adjacent localities. The commenters stated that HUD's regulation at § 91.100(a)(5) (Consultation; local governments, General) provides that "[t]he jurisdiction shall consult with adjacent units of general local government, including local government agencies with metropolitan-wide planning and transportation responsibilities, particularly for problems and solutions that go beyond a single jurisdiction." (Emphasis added.) The commenters stated that to require a central city in a metropolitan area, such as New York City, to consult with adjacent local governments, and by implication, request that such localities use their limited entitlement grant funds to assist the central city to meet its fair housing goals, may not be practical or financially feasible.

The commenters requested that § 91.100(a)(5) be amended to be consistent with the proposed regulation § 5.156(a). The commenters stated that § 91.100(a)(5) should be revised to read as follows: "The jurisdiction *may also consult* with adjacent units of general local government, including local government agencies with metropolitan-

wide planning and transportation responsibilities, particularly for problems and solutions that go beyond a single jurisdiction." (Emphasis added.)

*HUD Response:* HUD agrees with commenters and is maintaining existing consultation requirements, which provides in § 91.100(a)(5) that jurisdictions should consult with adjacent units of general local government.

*Comment: Allow PHAs to participate in a regional AFH.* Commenters stated that an option for PHAs to participate in a regional AFH should be specifically stated in the rule and cited to § 5.156 and § 903.15. The commenters stated that most PHAs in cities that are HUD 'entitlements' should collaborate in their city's AFH, but that for PHAs in cities participating in a regional AFH, an additional option should be added to the list in § 903.15.

*HUD Response:* HUD agrees with the commenters and has made explicit that PHAs have the option to participate in a regional AFH.

*Rule change.* The final rule revises the proposed definition of "regionally collaborating program participants" in § 5.152, now entitled "regionally collaborating participants," to state that "A PHA may participate in a regional assessment in accordance with PHA Plan participation requirements under 24 CFR 903.15(a)(1)."

*Comment: Allow States to participate in a regional AFH.* It is not clear from the proposed rule whether or not States are able to be a partner in a regional AFH and what that collaboration would look like.

*HUD Response:* States are encouraged to participate in joint or regional AFHs, particularly with program participants within their own jurisdictions. In cases where the participants are not located in the same State or CBSA, the participants must submit a written request to HUD for approval stating why the collaboration is appropriate.

*Rule change.* The final rule provides that program participants, whether contiguous or noncontiguous, that are either not located within the same CBSA or that are not located within the same State and seek to collaborate on an AFH, must submit a written request to HUD for approval of the collaboration, stating why the collaboration is appropriate. The collaboration may proceed upon approval by HUD. (See § 5.156(a)(2).)

*Comment: Regional councils of governments, Metropolitan Planning Organizations and other regional planning bodies should be permitted to serve as the lead entity for Regional*

*AFHs.* Commenters stated that regional councils of government should be explicitly permitted to serve as the "lead entity." The commenters stated that the preamble to the draft rule calls for a "lead entity," but states that the lead entity must be a "member." The commenters stated that regional councils serve all local governments in the region and are in a strong position to oversee and administer preparation of an AFH.

The commenters also stated that the opportunity presented by the revisions of the AFH process for HUD grant participants is an opportunity to build on existing capacities in regional partnerships which would further the intentions of the proposed rule to include incorporation of fair housing issues across the spectrum of regional decisions. The commenters stated that specifically, many regional planning commissions, MPOs and/or councils of government already prepare detailed assessments of housing needs within a region, utilizing many of the same data sets, assessment tools, and public participation techniques envisioned for AFH planning in the proposed rule, but that because these institutions are not formally participants in the consolidated planning process, they have not traditionally been involved in consolidated planning nor in coordinating consolidated plans with other regional land use and transportation plans.

The commenters stated that HUD should add language at the final rule state to maximize the opportunity and flexibility for a variety of regional institutions to be involved in AFH planning processes. The commenters stated that HUD should make it reasonably easy for participants to designate other agencies or institutions (including county governments, MPOs, Regional Planning Commissions, etc.) as lead agencies in development of AFH plans and assessments, and that HUD should support a wide range of institutional partnership structures at the regional and state levels in the preparation of AFHs, even to the extent of including non-participants in the governance structure of these organizations. The commenters stated that the exact institutional configuration of regional AFH planning agencies should be allowed to vary from state to state, with states encouraged to utilize existing structures of regional governance and collaboration.

The commenters further stated that like other Federal agencies which administer grant programs with regional entities (and the commenters cited to EPA, DOT), HUD should strive for

**42326** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

flexibility in the form of regional collaborative partnerships for AFH preparation, both to leverage existing partnerships in AFH development, but also to catalyze increased integration between housing and community development issues with larger regional development plans, and noted that participation in regional AFHs would be voluntary. The commenters stated that rather than writing rules and policies with a ''one-size-fits-all'' approach standardized across the country, HUD should be flexible in encouraging AFH preparation on a regional level and working with existing regional institutions, but noted that this flexibility must be combined with strong standards to ensure that regions and individual communities are making progress in their goals to affirmatively further fair housing.

*HUD Response:* HUD agrees with the commenters that a variety of regional institutions should be involved in AFH planning processes. For this reason, HUD requires consultation with local and regional government agencies with metropolitan-wide planning and transportation responsibilities in § 91.100. HUD also agrees that collaboration to prepare a regional AFH can take many forms and that the rule should be flexible to allow for a range of regional collaborations, which is provided for in § 5.156(a).

HUD declines to expand the definition of a ''lead entity,'' at § 5.156(a), to include any entity that is not a program participant. HUD has revised the final rule to clarify that the lead entity need not be responsible for the preparation of an AFH (by deleting ''the development'' of the regional AFH from the ''lead entities'' responsibilities). A lead entity is responsible for overseeing the submission of a regional AFH and obtaining the express consent of all other regionally collaborating program participants who join in the regional AFH. In addition, where alignment of program years and/or fiscal years is not possible, the submission deadline for a regional AFH will be based on the lead entity's program years and/or fiscal years. Regional councils of governments, MPOs, and other regional planning bodies may lead and coordinate the development of a RAI, as long as a regionally collaborating participant serves as a lead entity for submission purposes.

19. Bonuses and Incentives

a. Bonuses and Incentives, Generally

*Comment: Reward HUD program participants that show progress in affirmatively furthering fair housing.* Commenters suggested that HUD reward participants that can demonstrate integration within their jurisdiction or substantial efforts to promote integration within their jurisdiction. The commenters stated that such rewards could include bonus points awarded under competitive funding, additional or set aside funds, and/or reduced regulatory burdens for such participants. The commenters stated that these rewards would be communities that are moving in a positive direction; that is, they are at, near, or moving closer to the demographics of their region. The commenters stated that diverse communities should be offered higher marks for their progress (intentional or not) and be given preference over exclusionary communities for Federal investments. The commenters stated that would be a much stronger incentive if it were tied to regional plans that included the potential for other Federal agencies (especially those of the Sustainable Communities Partnership— HUD, EPA, DOT—and the Department of Education) to consider a community's ranking or score related to inclusion and integration. Other commenters stated that HUD should provide priority scoring on competitive grants for projects and activities that implement stated goals in adopted AFHs (similar to Preferred Sustainability Status adopted by some Partnership for Sustainable Communities agencies, but with inclusion of additional agencies that have authority over issues related to fair housing, including Treasury, DOJ, EDA, USDA.

*HUD Response:* HUD appreciates these suggestions and will take them into consideration.

*Comment: Include the Qualified Allocation Plan (QAP) in the AFH analysis.* Commenters stated a QAP should be included in an AFH analysis, and that the QAP should include incentives and/or bonuses for proposals that will affirmatively further fair housing.

*HUD Response:* A QAP is the mechanism by which state housing finance agencies establish the criteria by which applicants will be awarded low-income housing tax credits (LIHTC). QAPs are required by statute to include certain specified criteria and preferences; however, states are permitted discretion in other program design elements. Because the LIHTCs are the largest producer of affordable housing in the country today, QAPs have a significant impact on the location and occupancy of new affordable housing units. Accordingly, QAPs play a key role in shaping local fair housing issues. Program participants, including States, will be required in the Assessment Tool to analyze data on the location and occupancy of affordable LIHTC units and to consider the impact of a QAP on fair housing issues in their jurisdiction. HUD welcomes innovative approaches by States to encourage state housing finance agencies to affirmatively further fair housing through benefits and incentives.

*Comment: States can provide incentives for their subgrantees to affirmatively further fair housing.* Commenters stated that a State can choose to fund non-entitlement communities that plan to address fair housing issues that are identified in the AFH. The commenters stated that States can also, to the extent feasible, use HOME funds to directly address fair housing issues in non-entitlement areas.

*HUD Response:* HUD welcomes innovative approaches by States to ensure that subgrantees effectively affirmatively further fair housing.

b. Bonuses and Incentives for Regional Collaboration

*Comment: Incentives are necessary to achieve regional collaboration because of the difficulties involved in collaborating beyond regions.* Commenters stated that encouragement of regional collaboration by HUD is an important acknowledgement that segregation does not stop at a community's borders. The commenters stated that it is also important because there are many factors that make regional collaboration difficult, and if HUD wants to encourage regional AFHs, HUD should provide incentives— financial or non-financial—for such efforts. The commenters stated that without these incentives, jurisdictions may be reluctant to take on the challenge of inter-jurisdictional collaboration. Commenters stated that because of the difficulties of collaborating regionally, incentives will need to be of great worth. Some commenters stated that the best incentive is money, but recognized that HUD's ability to provide financial incentives is limited. Some commenters stated that awarding bonus points for collaborative and cooperative approaches is an excellent idea to increase the potential for diverse input into the document, especially for competitive funding, such as has been done in HUD's Continuum of Care and Sustainable Communities competitions.

Other commenters suggested non-financial incentives that HUD should consider to encourage regional collaboration among local governments

and States and greater engagement with public housing planning, including: (1) National level partnerships: The commenters stated that HUD should continue to build strong partnerships at the national level, opening the doors to encourage collaboration at the local and regional level. The commenters stated that national level partnerships can be effective in setting the tone at the local and regional levels and can catalyze regional planning in partnership with other public and private agencies. The commenters stated that partnerships develop and increase capacity, ensure coordination among stakeholders, increase program efficiency and sustainability and, most importantly, help to meet the needs of the community. As an example of such national partnerships, the commenters cited to the partnership between HUD and DOL, under the American Recovery and Reinvestment Act, 2009, which was created to encourage PHAs and local Workforce Investment Boards (WIBs) to collaboratively identify opportunities to train and place public housing residents into jobs created by PHAs' Recovery-funded capital improvement projects. (2) Grant Application Bonus Points: The commenters stated that awarding bonus points in HUD grant applications for creating partnerships with other local governments and Federal grant programs will assist in increasing capacity, avoid duplication of services, and create sustainability. As an example of this effective grant bonus points, the commenters cited to the recent NOFA in which HUD awarded bonus points for applicants that have received Preferred Sustainability Status.

Other commenters stated HUD should request the Department of Treasury to provide incentives for states to grant regions a direct allocation of low-income housing tax credits if: (1) They have an approved regional AFH that is aligned with their Regional Transportation Plan; and, (2) their QAP will help implement goals of the AFH. However, the commenters did not provide suggestions on what incentives should be offered.

*HUD Response:* HUD appreciates these suggestions offered by all commenters, and will take them into consideration.

*Comment: Reward regional collaboration by giving priority in the provision of HUD technical assistance.* Commenters stated that regional collaborations and large urban counties should be allowed to have some priority in the provision of HUD fair housing technical assistance. Commenter stated that these potential collaborations may be more complicated in nature and may have a greater need for technical assistance, especially at the planning stage.

PHA commenters submitted similar comments stating that HUD needs to consider that the governance of public housing agencies varies from state to state. The commenters stated that not all local governments have authority over their local PHA or even the ability to require the PHA to engage in any type of collaborative effort or planning, nor do many local governments financially support (or have the means to financially support) the local PHA. The commenters stated that one way to promote regional collaboration would be to provide the technical assistance needed to bring all parties to the table and then assurance that the work product will be accepted by HUD. The commenters stated that in large regions with many HUD-funded jurisdictions, including multiple PHAs, there are often multiple HUD representatives assigned to the local jurisdictions. The commenters further stated that when local jurisdictions meet to discuss common issues, they sometimes find that the guidance they have been given by their various HUD representatives is not consistent. The commenters stated that a consistent message from HUD would be one way to promote regional collaboration.

*HUD Response:* With respect to commenters seeking first priority for HUD technical assistance, HUD will not commit to prioritize which program participants receive technical assistance, but as HUD has stated in its proposed rule and reiterates in this final rule, HUD is committed to providing technical assistance to all program participants throughout the process and as promptly as possible.

*Comment: Consider a broader meaning of regional collaboration, and require AFHs to include entire metropolitan regions.* Commenters stated that the rule considers a "regional" collaboration to be a collaboration of two or more program participants. The commenters stated that the most obvious collaborations would arise from jurisdictions that are members of HOME consortia, but that a two-community "region" or even a HOME consortium is hardly a true region. The commenters stated that housing discrimination may be localized, but public policies that discourage housing choice occur over a much broader area. The commenters stated that while they would not discourage such smaller collaborations if such collaborations are the only ones possible, the commenters felt that HUD should encourage program participants to consider broader regional collaborations that align with other regional planning processes, such as those of a metropolitan planning organization or regional planning council.

The commenters stated that § 5.156(b) requires that entitlement jurisdictions coordinate program years and submission deadlines. The commenters stated that this requirement works well for existing HOME consortia as these entities have already aligned their program years, but that many urban counties have discovered, during negotiations over HOME consortia, that adjusting of program years can be a barrier to collaboration, particularly for smaller jurisdictions that fear the fiscal and budgeting impacts of such a change. The commenters stated that steps should be taken to ensure that this issue does not prevent regional collaboration in the development and implementation of AFHs.

The commenters also stated that § 5.156(d) states that the preparation of a regional AFH "does not relieve each regionally collaborating program participant from its obligation to analyze and address local fair housing issues and contributing factors that affect housing choice within its respective jurisdiction." The commenters stated that they agree that any regional analysis must connect each collaborating community with specific actions it will take to affirmatively further fair housing, but that given the goal of connecting the AFH with future consolidated plans, this requirement could be better crafted to incentivize partnerships. The commenters stated that with the tight timeframe for the completion of the AFH within one year before the submission of the consolidated plan, communities are developing recommendations for fair housing twice within a 2-year period, and this creates redundancy.

Conversely, other commenters recommended that the final regulations allow regional AFHs to focus on robust analyses of fair housing conditions and to include broader regional recommendations for implementation, leaving recommendations for actions specific to individual entitlement jurisdictions to the consolidated planning process. The commenters stated that such local recommendations should be consistent with the analysis included in the regional AFH, and supportive of the implementation steps included in the regional AFH. The commenters stated that under this model the regional AFH becomes the "existing conditions report" for multiple communities on the state of

fair housing in the region, along with steps that can be taken throughout the region, with each community using the consolidated planning process to develop recommendations for response within their own jurisdiction. The commenters stated that these two efforts will be connected and supportive of one another, but not redundant.

Other commenters suggested that HUD strengthen its regional emphasis by requiring AFHs to include entire metropolitan regions (working through MPOs, large PHAs, and/or counties) and to measure existing conditions (housing segregation, poverty concentration and opportunity assets) as well as the goals and progress of the consolidated plan based on a region's demographics and opportunity structures. The commenters stated that while metropolitan regions should be the scope and scale for assessing and addressing integration and housing opportunity, local jurisdictions cannot be let "off the hook." The commenters stated that each community within a metro region (and unincorporated areas that aren't within local jurisdictions but part of the metro area) must be included in both the analysis of available data in the AFH and the plans and goals reflected in a regional consolidated plan, and that each local community's current situation as well as its goals and progress should be measured against regional demographics, trends, and assets. The commenters suggested that a community's progress should be assessed and measured in connection with its region.

The commenters further stated that a community's goals should be based on regional goals, which should be based on regional demographics and opportunity structures. The commenters stated that, in this way, the most pressure for making progress toward greater inclusion would be put on communities that have done the least (the most exclusive), have the most (community assets—schools, jobs, tax base, etc.), and whose racial and economic demographics are the farthest away from the region's demographics. The commenters stated that, at the same time, communities that are moving in a positive direction (becoming increasingly diverse and inclusive and closer to the region's demographic and economic mix) should be viewed in a more positive light and given credit for their progress. The commenters concluded by stating the need to ensure that communities with fewer assets (in relationship to its region) such as lower fiscal capacity, lower incomes, and struggling schools are not viewed in the same light as their wealthier neighbors.

*HUD Response:* With respect to the set of comments regarding timing of submissions, HUD encourages program participants preparing a regional AFH to align submission deadlines using procedures already available for changing program year and fiscal year start dates. Where such alignment is not practicable, program participants may still collaborate but may require incorporation into their respective plans at different time periods that more closely align with their consolidated plan or PHA Plan cycle.

With respect to the set of comments requesting that HUD require all or a majority of jurisdictions within a metropolitan area to participate in a regional AFH, HUD declines to impose this as a requirement in the rule. HUD prefers to preserve flexibility in the rule and believes that program participants should determine the other program participants with which they collaborate on a regional AFH.

HUD agrees with the comment that it should encourage program participants to consider broader regional collaborations that align with other regional planning processes, such as those of a metropolitan planning organization or regional planning council. HUD will work with the DOT to include guidance on partnering with metropolitan planning organizations in the guidance it provides to program participants.

With respect to the set of comments requesting that HUD clarify whether regionally collaborating participants must set fair housing goals specific to individual jurisdictions included in the regional AFH, HUD has changed the language of the rule to make clear that they must do so.

*Rule clarification.* In § 5.156, HUD clarifies that each regionally collaborating program participant must set goals for its geographic area of analysis.

*Comment: Incentives for regional collaboration may harm rural communities.* Commenters stated that providing incentives to program participants that engage in regional collaboration can work to the disadvantage of rural communities that are in critical need of resources because they will not be able to gain bonus points for competitively distributed funding, and therefore may not be rated sufficiently high in a funding competition to secure funding.

*HUD Response:* HUD appreciates commenters raising this concern. HUD will seek to encourage jurisdictions to collaborate with rural communities. As HUD's final rule provides, a regional AFH does not require regions to be

contiguous, subject to HUD approval. In addition, in its funding competitions, HUD structures any bonus points in a manner that avoids precluding any applicant from the ability to obtain bonus points.

*Comment: Allow States to award bonus points to subgrantees.* Commenters stated that HUD should allow States to structure "bonus points" and criteria for awarding bonus points to subgrantees. The commenters stated that State grantees would be better served by allowing them to structure their evaluation of applications from subgrantees to consider the degree to which the applicant's proposal encourages regional collaboration.

*HUD Response:* HUD welcomes innovative approaches by States to ensure that subgrantees effectively affirmatively further fair housing, consistent with program requirements.

*Comment: Reward bonus points for regional AFHs that are effective not simply because they are regional AFHs.* Commenters stated that rather than merely allowing regional AFHs, the final rule should give incentives to jurisdictions that are willing to reach out and work together to improve housing choice. The commenters stated that it may require more time and political leadership from a jurisdiction to be part of a meaningful regional AFH process, but it also could result in a more effective fair housing strategy. The commenters stated that regions often work together on transportation planning, so it would make sense to give incentives for regional fair housing planning as well.

*HUD Response:* The reason that HUD strongly encourages collaboration by program participants (whether regionally collaborating program participants or joint participants) is that HUD expects that jurisdictions working together will more effectively affirmatively further fair housing, and may be able to reduce costs by sharing resources. HUD already strongly encourages collaboration by program participants (whether regionally collaborating participants or joint participants) because HUD expects that the very fact that jurisdictions are working together will lead them to more effectively affirmatively further fair housing.

*Comment: Provide an incentive for PHAs to participate in Regional AFHs by providing an Option 4 similar to Option 3.* HUD could provide an Option 4, similar to Option 3, which would allow any PHA that primarily serves an area covered by a regional AFH to be bound by the regional AFH, whether or not the PHA participates in its

preparation. The commenters stated that an Option 4 concerning regional AFHs would go further to incentivize regional collaboration, as well as make this option more viable to PHAs. The commenters recommended that HUD incorporate in § 903.15, in a new Option 4 or such other section as HUD determines best, the option for two or more PHAs to join together to submit a regional AFH, with or without Con Plan jurisdictions.

*HUD Response:* HUD has reordered and substantially revised PHA options to participate. HUD is now providing a new Option 2 entitled "Assessment of Fair Housing with PHAs," which allows PHAs to engage in joint collaboration in the preparation and submission of the AFH. PHAs may also engage in an AFH with a group of PHAs under Option 2, or may engage with State or relevant CDBG jurisdictions under Option 1, entitled "Assessment of Fair Housing with Units of General Local Government or State Government Agencies."

### 20. Public Housing Issues and Options 1, 2, and 3

#### a. PHA Certification

*Comment: PHA's certification, in particular, is subject to challenge.* Commenters stated that proposed § 903.2(d)(3)(i)(A) Validity of Certification, which is moved to § 903.15(d) in this final rule, indicates that a PHA's certification that it is affirmatively furthering fair housing is subject to challenge if it "does not reduce racial and national origin concentrations in developments or buildings and is perpetuating segregated housing." The commenters stated that there is danger that this provision could be interpreted to preclude the use of capital funds or other resources to rehabilitate, modernize, or otherwise improve the living conditions for existing residents of public housing who choose to remain in their homes and communities. The commenters stated that they are especially concerned because challenges may occur after HUD has accepted an AFH completed by a jurisdiction required to submit a consolidated plan, by PHA that elects to prepare its own AFH, or by a State; and after HUD has approved a Consolidated Plan or a Public Housing Agency Plan. The commenters stated that therefore, after PHAs have complied with these requirements in good faith, and after HUD has reviewed documents and determined that they meet fair housing requirements, PHAs remain at risk of being found out of compliance with fair housing requirements, as a result of the certification. The commenters stated

that PHAs should not be burdened with having to prove they are accomplishing tasks or outcomes which HUD does not define, nor should HUD be authorized to challenge civil rights certifications on the basis of general or ill-defined grounds.

Commenters recommended that to overcome the vagueness in the PHA civil rights certification, and to tie the assessment of compliance more to results, the rule should state that an action or set of actions qualifies as "meaningful" only if the PHA explains in its PHA Plan the measurable results it expects to see within a specified timeframe, explains how the anticipated results would further the goals identified in the applicable AFH, and then reports and assesses the actual results in a subsequent Plan. The commenters stated that these changes would advance the overall purpose of the rule, as stated in § 5.150, to provide "a stronger accountability system governing fair housing planning, strategies, and actions." The commenters stated that their suggested changes also are consistent with language in proposed § 903.2(d)(3) and § 903.7(o)(3)(vii) that emphasize that compliance with the obligation to affirmatively further fair housing depends on the implementation of the plan and the results of actions.

*HUD Response:* Section 903.15(d) (formerly, § 903.2(d)) of this final rule applies to PHAs generally and is not limited in time to HUD's review of an AFH or PHA Plan (which includes the civil rights certification). HUD has clarified the validity of certification language to correspond with a PHA's civil rights and fair housing requirements, as well as the duty to adhere to the AFFH regulations in §§ 5.150–5.180.

*Comment: Exempt certain program participants from submitting certifications.* Commenters encouraged HUD to exempt certain agencies from submitting the certifications required by 24 CFR 903.2. Commenters stated PHAs operating under a consent decree pursuant to a court order, PHAs that have received a SEMAP deconcentration bonus, or PHAs that have otherwise made acceptable deconcentration certifications should be exempt as HUD has already determined that the PHA is acting in accordance with the goals of the proposed rule.

*HUD Response:* HUD will not exempt certain participants from submitting the statutorily required civil rights certification, which incorporates an AFFH certification, as implemented by HUD's rule at § 903.7(o). The fact that a PHA has received a deconcentration

bonus is commendable but is not a basis for exemption from the AFFH certification.

*Comment: Clarify that a PHA's AFFH certification applies to a PHA's Housing Choice Voucher Administrative Plan.* Commenters stated that proposed § 903.7(o)(2) adds the specification that certification applies to any plan that is incorporated in a PHA's annual or 5-year plan under other regulations. The commenters recommended that HUD state specifically that the AFFH certification applies to a PHA's HCV Administrative Plan, which includes numerous policies that are central to the obligation to affirmatively further fair housing, such as payment standards, occupancy standards, policies on housing search time, and how the PHA Plans to expand housing choices.

*HUD Response:* The AFFH rule provides that the civil rights certification implemented at § 903.7(o) applies to all PHA plans and any plan incorporated therein. No category of PHAs has been excluded.

*Comment: Clarify what "contribution" means in § 903.7(o)(3)(vi).* Commenters stated that in the civil rights certification required in § 903.7(o), paragraph (3) states that a PHA shall be considered in compliance with the certification requirement to affirmatively further fair housing if the PHA fulfills the requirements of § 903.2(d) and, among other things, complies with any contribution or consultation requirement with respect to any applicable AFH under 24 CFR 5.150–5.166. The commenters stated that it is not clear what is meant by "contribution."

*HUD Response:* The rule at § 5.156 sets out the roles PHAs may play when contributing to joint or regional AFHs, as well as setting out specific consultation requirements.

#### b. Planning Efforts Required of PHAs

*Comment: Other planning efforts go beyond activities that PHAs can handle; other planning efforts should not be part of the AFH requirement.* Commenters stated that the proposed rule takes an expansive view of the scope of a program participant's obligations entailing activities and strategies well beyond the usual scope of activities for a consolidated plan agency. Commenters stated that these include actions to influence local land use and zoning, social service delivery, public transportation, etc., and that while these actions may have some utility where a program participant is a unit of a local government that has a greater degree of direct control over these and other areas, they do not fit as well with the

**42330** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

varied scope of powers and responsibilities of PHAs and housing finance agencies (HFAs), especially those whose activities are limited to voucher administration. Commenters stated that this suggests that the other planning efforts and programs should not be tied in to the AFH requirement. The commenters stated that related to this concern is HUD's statement in the rule that it plans to use transportation and other data, and whether local/regional transportation agencies or other agencies agree with the data could be problematic. The commenters stated that if there are disagreements over not only data but also the goals or methods to be used, the process for reconciling these differences only adds to the administrative complexity and potential cost of implementation. The commenters stated that it is unclear how much leverage or authority the HUD programs associated with the AFH would have in these other areas.

*HUD Response:* HUD understands that the scope of activities in any program participant's jurisdiction, not only that of a PHA, that may impact fair housing choice and access to opportunity are broad and the rule acknowledges such broad scope. However, the Assessment Tool helps program participants to determine which activities or factors have greater impact than others, prioritize these factors, and establish goals to address those that are designed by the program participant as priorities.

c. Options for AFH Submission

*Comment: Clarify which PHAs may participate under each of the three options.* Commenters stated that PHAs are required to submit an AFH (and to conduct an AI) and the current rule limits Option 3 to PHAs "covered by state agencies," but all PHAs are covered by one State agency or another. It appears that all PHAs have the option of participating in the State AFH and consolidated plan. If that is not the case, HUD must clarify language to indicate which PHAs may participate under a State's AFH. Finally, the regulation seems to permit agencies within jurisdictions subject to consolidated plan requirements and those which are not to conduct their own AFH. However, although PHAs outside of jurisdictions that are required to submit consolidated plans, "may choose whether to participate or not with the State in the preparation of the state agency's AFH," they, "will be bound either way by the state agency conclusions contained in the State's AFH." HUD should clarify this language. If PHAs have 3 options

available, as it appears, the rule should state those choices clearly. If PHAs have only 2 options available, the rule should state so clearly. If PHAs outside local jurisdictions that are required to submit consolidated plans have only 1 option available, HUD should amend the proposed rule to allow those PHAs discretion to conduct their own AFH.

*HUD Response:* HUD agrees and has clarified the three options available to PHAs. The final rule collapses the proposed rule's Option 1 and Option 3 into a revised Option 1 entitled "Assessment of Fair Housing with Units of General Local Government or State Governmental Agencies." As such, HUD is indicating that a PHA may participate in the development of an AFH with either a unit of general local government or a State governmental agency, as applicable, under Option 1. HUD has further clarified in § 91.110(a)(1) that only PHAs that operate on a State-level or that certify consistency with a State consolidated plan will participate with State Governmental Agencies under Option 1.

i. Option 1

*Comment: The final rule must reinforce the acceptability of option 1.* Commenters stated that the final rule must clearly reinforce the acceptability of the first option throughout the text of the final rule, including in the definition of "affirmatively furthering fair housing", the definition of "fair housing choice," and in the opening subsection pertaining to the Assessment of Fair Housing. The final rule must recognize that affirmatively furthering fair housing may entail devoting resources to improve areas of concentrated racial and ethnic poverty by preserving and improving affordable housing, and by implementing investment policies that augment access to essential community assets for protected class residents who wish to remain in their communities—while protecting them from the forces of displacement.

*HUD Response:* As noted earlier in this preamble, the "Purpose" section of the rule and the definition of "affirmatively furthering fair housing" have been clarified in this final rule in a manner that indicates preserving affordable housing may be part of an appropriate strategy for addressing fair housing issues and contributing factors raised in the assessment of fair housing. The concept of affirmatively furthering fair housing embodies a balanced approach in which additional affordable housing is developed in areas of opportunity with an insufficient supply of affordable housing; racially or

ethnically concentrated areas of poverty are transformed into areas of opportunity that continue to contain affordable housing as a result of preservation and revitalization efforts; and the mobility of low-income residents from low-opportunity areas to high-opportunity areas is encouraged and supported as a realistic, available part of fair housing choice.

*Comment: Give PHAs the discretion to collaborate with whatever jurisdiction the PHA chooses.* Commenters stated where a PHA operates in more than one jurisdiction, the agency must collaborate with the jurisdiction within which 60 percent of its housing is located unless, "the majority is closer to 50 percent," in which case the agency may choose the locality with which it collaborates. Commenters stated that since PHAs will be attending to local political and policy relationships, they should have the discretion to collaborate with any jurisdiction within whose boundaries it operates housing, and that such jurisdiction will likely be the one where most of the PHA's housing is located, but there may be good reasons for PHAs to collaborate with other jurisdictions. The commenters stated that HUD's rule does not address agencies operated under forms of consortia in several jurisdictions, and that the agency may prefer to operate under a single AFH and may need to collaborate with one jurisdiction that includes 60 percent of its housing stock. Commenters stated that HUD should grant PHAs discretion to choose a jurisdiction without Federally-imposed conditions.

Similarly, commenters stated that HUD should modify standards in § 903.15(a)(1) which allows a PHA to participate in the AFH of "its" local jurisdiction rather than submit its own AFH. Commenters stated that the following changes ensure PHAs and localities consider use of all resources and reduce burdens for PHAs. The commenters recommended that which jurisdictions can collaborate should not be determined only with regard to where majority of "hard units" are located—that PHAs should have discretion to decide whom to collaborate with, so long as the PHA has some "hard units" or vouchers in the same geographical area as the chosen jurisdiction, and the joint AFH covers all the PHA's units and vouchers. Commenters stated that focusing on hard units will narrow the assessment and could lead to overlooking how changes in policies that affect where families use HCVs to rent homes could help overcome barriers to fair housing choice and promote desegregation and deconcentration.

Similarly, other commenters stated that amending Option 1 in § 903.15 to allow a PHA to participate in an AFH with a broad choice of program participants is one way that HUD can best encourage collaboration. Commenters stated that this would allow PHAs flexibility and control of the AFH process. Commenters stated that HUD should define "hard units" to include all Federally-assisted owned and managed units subject to a PHA's control including but not limited to Section 202 Supportive Housing for the Elderly, Section 8 Moderate Rehabilitation, project-based vouchers and RAD conversions. Commenters stated that many PHAs are currently converting their public housing stock to RAD project-based Section 8 or project-based vouchers, and that if HUD does not broaden the definition in the final rule, then formerly public housing units that will not be considered in PHAs' AFH processes. Commenters stated that in some cases a PHA's vouchers may be utilized primarily or substantially in an adjacent jurisdiction, which should be considered a basis for determining an applicable jurisdiction. Commenter stated that Option 1 does not accurately reflect HUD's intent to implement a full range of regionalization options, and needs to be clarified to allow and encourage two or more PHAs to work together on an AFH, within a regional boundary. Commenters stated that Option 1 is meant to cover PHAs that wish to file an AFH with another PHA in the region, although the language is unclear, and therefore must be modified to explicitly allow for PHAs that wish to submit an AFH with other PHAs in its region.

*HUD Response:* HUD appreciates the concerns raised by the commenters and agrees that PHAs should be given the option to choose a jurisdiction with regard to all units in their inventory, and that HUD should not question that selection unless the PHA is required under a VCA to participate with a specific jurisdiction.

*Rule change.* This final rule revises § 903.15(a) to incorporate these provisions.

*Comment: PHAs should determine which Unit of General Local Government to work with.* PHAs choosing Option 1 should have the discretion to decide which consolidated plan jurisdiction to work with in developing a joint AFH, provided the PHA has some "hard units" or some vouchers in the same geographic area as the consolidated plan jurisdiction, and provided the joint AFH covers all of the PHA's hard units and vouchers. Commenters stated that it is unclear if

"hard units" means only public housing units or PHA-owned units that have PBVs or PBRA, or PBV units in properties that the PHA does not own. Commenters requested that HUD define "hard units" to include all PHA-owned units that have HUD-funded rental assistance, and all units, regardless of ownership, that have PHA-administered PBVs. Commenters stated that paragraph (a)(1) of § 903.15 assumes one jurisdiction "governs the PHA's operation" for HCV-only agencies, but that is untrue for some agencies, and the rule should allow an HCV-only PHA administering vouchers in the area of a sub-state consolidated plan jurisdiction to participate in the locality's AFH.

*HUD Response:* HUD agrees that PHAs should be given the option to choose a jurisdiction with regard to all units in their inventory, regardless of the type of HUD assistance attached. HUD has clarified Option 1 in § 903.15 to address this concern. However, if a PHA is under a VCA and such PHA chooses to participate with a unit of general local government or a State governmental agency, then it shall participate with the entity specified in its VCA.

*Comment: Are PHAs administering HCV programs only limited to Option 1?* Commenters stated that changes to the proposed § 903.15(a)(1) indicate that a Section 8 only PHA would choose Option 1 and coordinate with the jurisdiction that governs PHA's operation for developing the AFH. The commenters asked whether Section 8 only PHAs are precluded from choosing Option 2 or Option 3.

*HUD Response:* HCV-only PHAs will have all available options open to them. In addition, like all participating PHAs, HCV-only PHAs will have the ability to choose their level of involvement in the planning process.

*Comment: Why not adopt preamble language on dissenting views in Option 1?* Commenters stated that it appears that the difference between Options 1 and 3 is that the PHA can submit dissenting views under Option 1. The commenters asked why was the verbiage found in the Summary of Proposed Rule regarding submission of dissenting opinions for Option 1, but not included in the regulatory text at § 903.15(a)(1) of the proposed rule. The commenters stated that the rule takes an expansive view of the scope of a program participant's obligations that entails activities and strategies well beyond the span of a state HFA's control or involvement, such as actions to influence local land use and zoning, social service delivery and public transportation. The commenters stated

that the proposed requirements may make sense where the program participant is a unit of local government, but they do not fit the powers and responsibilities of PHAs and state HFAs, that are without any oversight or management of public housing.

*HUD Response:* After receiving significant comment on dissenting opinions and on program participant disputes, HUD has removed the dissenting opinion from the rule. Instead, HUD encourages that jointly participating entities execute a MOU to govern the dispute resolution process.

### ii. Option 2

*Comment: Option 2 is a burdensome option.* Commenters stated that in the case of PHAs who choose Option 2, documenting and analyzing the PHA programs and policies has been running at least 500 hours. Commenters stated that imposing this burden when there have been significant cuts in agency funding is a real cause for alarm. Commenters stated that, in particular, for HOME agencies which bore the brunt of budget cuts, the available Administrative funds have been cut severely and makes this added "unfunded mandate" almost impossible to take seriously.

Similarly, commenters stated that Option 2 permits PHAs to do their own AFH, but a PHA would still be required to contribute or consult in the formulation of the separate AFHs of jurisdictions that overlap with the PHA, and to implement initiatives that require their involvement. The commenter stated that § 903.15(c) would require PHAs doing their own AFH to update their AFH annually, and this is unnecessarily burdensome. All other PHAs would be required to update their AFHs every 5 years. The commenters stated that PHAs should be subject to the same 5-year AFH requirement as required of all other entities.

Other commenters stated that if the PHA selects Option 2 then the PHA must update its AFH yearly. The commenters stated that due to the comprehensive nature of the AFH plan, the AFH should be completed with the 5-Year PHA Plan. The commenters stated that the PHA Annual Plan would provide updates of agency's progress furthering the goals of the AFH. The commenters stated that the requirement for an annual update to the AFH should be removed because an PHA Annual Plan can meet the same objective as an annually updated AFH for the following reasons: (1) The Annual Plan will continue to focus on the goals of the AFH as it provides a progress report on

both the successes achieved and adjustments made related to the AFH goals; (2) It will retain an ongoing focus on the attainment of the AFH goals; and (3) It will streamline the process while achieving the intent of the AFH planning process.

*HUD Response:* HUD agrees with the commenters that if PHAs are engaging in the Independent PHA Planning Option, they do not have to engage in the exercise with a consolidated plan participant but may still be consulted for data; and if PHAs are engaging in the Independent PHA Planning Option, they may still engage in community participation with the consolidated plan entity's AFH preparation and may submit comments to allow a disagreement to be known.

*Rule change.* This final rule revises the paragraph on PHAs submitting an independent AFH and moves it from proposed § 903.15(a)(2) to § 903.15(a)(3), and removes proposed § 903.15(c), which had required such PHAs to update annually.

*Comment: Small PHAs have no option other than Option 2, which is burdensome.* Commenters stated that a PHA may conduct its own AFH with Option 2 and update its AFH every year. Commenters stated that small PHAs and consortia of PHAs that operate in communities are not subject to the consolidated plan requirement, and that these agencies may find that collaborating with development of a statewide plan is inappropriate. Commenters stated that they should not be burdened with a requirement to update AFHs annually nor be forced into an AFH collaboration that may not be in the agency's best interests or those of its participants. The commenters recommended that PHAs preparing an AFH under Option 2 should be subject to the same revision requirements as imposed on all other program participants.

Similarly, others commenters stated the proposed rule would require PHAs preparing their own AFH to update that assessment annually without any justification for this differential treatment. The commenters stated that while many PHAs may elect to participate in an AFH with their locality, many smaller agencies are located in localities which do not receive grants covered by this proposed rule and so do not prepare consolidated plans. The commenters stated that the only choices available to them are to participate in their state's AFH or prepare their own assessment, and the latter alternative carries with it the unreasonable burden of revising the assessment annually rather than

quinquennially. The commenters stated that with Federal funding for PHAs at unprecedented low levels, PHAs simply will not have the funds or other resources to implement an exceptionally burdensome requirement for annual reviews and revisions. The commenters stated that HUD should not impose revision and updating requirements on PHAs that are more burdensome than requirements imposed on other program participants that are required to prepare an AFH and consolidated plan.

*HUD Response:* HUD agrees that PHAs should not have a higher burden under the Independent PHA Planning Option than consolidated plan participants engaged in drafting the AFH. However, HUD disagrees with the suggestion of only one option and reiterates that PHAs always have three options. They may always perform the AFH with units of general local government or State governmental agencies (as applicable), other PHAs in the region, or independently.

*Comment: A PHA in a metropolitan area administering an HCV program should be required to consider the entire metropolitan area.* Commenters stated that any PHA in a metropolitan area administering an HCV program that chooses Option 2 should be required to consider the entire metropolitan area as its geographic scope for the AFH and in certifying that it is affirmatively furthering fair housing choice. Commenters also recommended that, in § 903.15(a)(2), the PHA be required to consider the whole metro area as its scope for analysis and action.

*HUD Response:* PHAs choosing to conduct and submit an independent AFH, that are engaging in the HCV program, must include an analysis for the PHA service area and region, in a form prescribed by HUD in accordance with § 5.154(d)(2). This may include an entire metropolitan area or not, depending upon the state and locality. Their strategies and actions will address contributing factors, related fair housing issues, and goals in the applicable AFH, consistent with § 5.154, in a reasonable manner in view of the resources available. PHAs actions shall be related to the geographic scope of their operations. HUD encourages PHAs to collaborate with relevant entities.

*Comment: A PHA choosing Option 2 must certify that it has reviewed and considered existing regional or statewide AFHs.* Commenters stated that a PHA that chooses Option 2 and submits its own AFH should be required in the final rule to demonstrate and certify that it has reviewed and considered existing regional or statewide AFHs for the area.

*HUD Response:* This is not a requirement of the rule but a best practice.

### iii. Option 3

*Comment: Clarify which PHAs can opt for Option 3.* Commenters stated that this section must be redrafted to spell out to whom this option is applicable and whether these agencies have any options for preparing AFHs or not. The commenters stated that most agencies not located in local jurisdictions required to submit consolidated plans may choose to participate in the States' AFHs and comply with goals in their consolidated plans, these agencies deserve the same set of choices as are available to agencies in a local jurisdiction. The commenters stated that this section is confusing as it pertains to agencies operating jointly with other agencies as consortia or simply under a memorandum of understanding concerning joint administration and management. The commenters stated that this section does not discuss options available to PHAs that may operate in more than one jurisdiction, one of which may prepare a local consolidated plan and one which may not. The commenters urged HUD to permit all PHAs the ability to perform their own AFH and certify their plans consistent with that assessment.

Commenters also stated it is unclear to which agencies HUD intends Option 3 to apply. The commenters stated that this option is likely attractive to some PHAs that overlap with a sub-state entitlement jurisdiction and are not interested in spending the staff time that Options 1 or 2 require. The commenters stated that any PHA (except one that administers only public housing that is located primarily or wholly within a sub-state jurisdiction that submits an AFH) should be able to opt to be covered by the state AFH, unless there is a regional AFH that covers its service area. The commenters stated that PHAs must still submit the civil rights certification and should have to explain how they will address fair housing issues and contributing factors in their own programs, even if the state AFH does not include goals or strategies directly applicable to the PHA. The commenters stated that AFHs of many local jurisdictions may not have appropriate regional focus to cover PHAs that serve suburban cities or towns too small to be entitlement jurisdictions.

*HUD Response:* HUD has removed Option 3 as a separate option and has incorporated Option 3 into Option 1.

*Comment: Option 3 may result in a more cumbersome process for States.* Commenters stated that this language (§ 903.15(a)(3)) seems to be an effort to entice local PHAs to participate in the statewide AFH process by requiring annual updates of local PHA developed AFHs. The commenters stated that they are concerned that the AFH process could become somewhat more cumbersome for States, depending on the expectations of the State when local PHAs opt into the state AFH and on the number of participating local PHAs.

*HUD Response:* HUD has clarified both the consultation requirement for States under § 91.110(a)(1) and the options for PHA assessment to provide greater clarity on State/PHA interactions. The obligation for States to consult with the applicable PHAs has been clarified and further instruction will be provided when HUD publishes a State entity AFH template for public comment in accordance with the Paperwork Reduction Act.

*Comment: Option 3 indicates that PHAs need not assess administration of a PHA's HCV program.* Commenters stated that the rule states PHAs choosing Option 3 "must demonstrate that their development related activities affirmatively further fair housing. . . ." which implies that these PHAs have no obligation to demonstrate that how they administer their HCV programs, which many have, meets the obligation to affirmatively further fair housing. The commenters stated that HUD should revise the final sentence of § 903.15(a)(3) to include the administration of HCV programs.

*HUD Response:* HUD disagrees that PHAs need not assess their HCV program, as it is covered by fair housing and civil rights laws and regulations. HCV-only PHAs will be required to participate in cooperation with a State, jurisdiction, or insular area as provided in Option 1, participate with other PHAs as provided in Option 2, or participate alone under Option 3.

### d. Additional Options for HUD Consideration

*Comment: Allow one or more PHAs to submit a joint AFH.* Commenters stated that there should be an additional option available to PHAs explicitly allowing one or more PHAs in a region to work together to develop a joint AFH. The commenters stated that each PHA should maintain its own obligation to affirmatively further fair housing and to set its own PHA-specific goals and report on its progress in meeting these goals. The commenters stated that HUD should modify § 5.154(e)(1), which addresses what happens when a PHA and a Con Plan jurisdiction collaborate on a joint AFH and disagree over some elements. The commenters stated that HUD should reference § 5.154(e)(1) in the parenthetical at the end of § 903.15(a)(1).

*HUD Response:* HUD agrees that regional partnerships of consolidated plan participants may conduct a regional AFH, and has clarified that PHAs participating under Option 1 in § 903.15 may also be part of a regional collaboration if the unit of general local government or State governmental agency that they are participating with is part of a regional collaboration. In addition, HUD agrees with commenters and has explicitly indicated that PHAs may conduct an AFH under Option 2 in § 903.15. In all cases where a PHA is jointly participating in conducting an AFH, the PHA must incorporate any joint and individual goals developed in the AFH into its PHA Plan, as per the requirements in § 5.154. As HUD has noted earlier in this preamble, whether a PHA or another program participant, all collaborating program participants are also accountable for their individual analysis, goals, and priorities to be included in the collaborative AFH.

### v. Other Comments

*Comment: The PHA Plan does not appropriately reference the AFH.* Commenters stated that unlike the proposed changes to the Consolidated Plan's public participation provisions, the proposed rule did not insert references to the AFH in the key provisions of the PHA Plan rule, especially those relating to resident and public participation. The commenters stated that the AFH and consideration of its goals with respect to a PHA's programs, policies, and practices should be integrated into the PHA Plan.

*HUD Response:* HUD disagrees but has clarified § 903.15 to clarify the impact of the AFH on the PHA Plan. HUD has also clarified its regulations in §§ 5.150–5.180 to provide that strategies and actions to effectuate the goals and priorities in the AFH must be reflected in PHAs' and jurisdictions' planning documents.

*Comment: Remove the requirement that a PHA notify HUD of selected option 60 days before AFFH certification is due.* Commenters stated that the proposed rule would require PHAs to notify HUD 60 days before their PHA Plan AFFH certification is due to HUD of which option they are following. Commenters recommended HUD remove this notification requirement, stating that it serves no apparent purpose. The commenters stated that this time frame seems inconsistent with the requirement that an initial AFH be submitted to HUD at least 270 days before the start of the program year. The commenters stated that if HUD believes that it is important to make sure each PHA has thought about which option it will follow, HUD could require PHAs to include in the Annual PHA Plan submitted after the effective date of the rule its decision about which option it intends to choose for the AFH, which would allow public and resident input into the decision. In that case, the initial AFH should not be due until at least one year later.

*HUD Response:* HUD agrees with the commenters. The selection should be made earlier, but should not have a required deadline. PHAs must notify HUD of the option they choose.

*Comment: Clarify what is meant by "differentiated sections" in § 5.154(e)(1).* Commenters stated that HUD should clarify the proposed language of § 5.154(e)(1). The commenters stated that it is not clear what "differentiated sections" means, and what the consequences are of HUD's decisions on which provisions are approved in the case of a disagreement. Commenters stated that if HUD approves the jurisdiction's AFH despite the PHA's dissent on some portion, the PHA should be bound by the approved provisions from which it had dissented, and that conversely, if HUD agrees with the PHA's alternative, the jurisdiction should be bound by it. The commenters stated that because of the potential consequences for jurisdictions in such a case, HUD should make clear that jurisdictions can include in their submission to HUD their response to a PHA's disagreements.

*HUD Response:* HUD agrees that differentiated sections of an AFH, due to one or more PHA dissents, is untenable for review. As such, HUD has removed the dissenting opinion from the joint participation option and instead encourages MOUs to govern dispute resolution amongst jointly participating entities.

*Rule change.* This final rule removes § 5.154(e) and thus all references to "differentiated sections."

*Comment: Allow a PHA that disagrees with any aspect of a jurisdiction's AFH to propose alternative priorities and strategies.* Commenters recommended that HUD require a PHA that disagrees with any aspect of the jurisdiction's AFH to propose an alternative strategy or priority, and explain why the alternative is better designed to achieve the joint goal(s).

*HUD Response:* As provided in the response to the preceding comment,

HUD has removed the dissenting opinion provision.

*Comment: Additional guidance is needed on collaboration on AFHs.* Commenters stated that the rule provides no guidance on notice requirements of program participants seeking to collaborate with other program participants in an AFH. The commenters stated that, at minimum, consolidated plan jurisdictions should be required to publicly notice other program participants within their regional boundaries of the AFH process. The commenters stated that § 5.156 should be amended to add a section encouraging program participants that plan to submit a joint AFH to notify consolidated plan jurisdictions and PHAs within their region of their intention to file a regional AFH and who to contact for more information about the regional process.

*HUD Response:* Additional guidance is forthcoming on such issues.

*Comment: A regional approach to AFH does not exempt PHAs from an individual affirmatively furthering fair housing obligation.* Commenters stated regionalization must not relieve program participants of individual obligations to affirmatively further fair housing. The commenters stated that the final rule must reflect that each collaborating PHA has an obligation to affirmatively further fair housing, to set local PHA-specific goals, and to report on progress. The commenters recommended that the final rule add language as follows at § 5.156(d) Content of the Regional Assessment: "Each collaborating member must set its own goals to affirmatively further fair housing, take its own meaningful actions to affirmatively further fair housing and report on its progress to affirmatively further fair housing." The commenters stated that an AFH submitted by a PHA independently should not be too narrow in scope that it precludes consideration of regional fair housing issues. The commenters stated that currently a PHA is required to certify that its PHA Plan is consistent with the consolidated plan of overlapping jurisdictions.

*HUD Response:* HUD agrees that each program participant, including each PHA, has its own duty to affirmatively further fair housing, which is not reduced by participation in a collaborative AFH. HUD disagrees with the commenters as to the specific language suggested and does not incorporate this language into this final rule. However, the rule has been clarified to indicate that all program participants must perform the AFH and that any relevant fair housing issues,

contributing factors, and goals for each program participant must be addressed in their joint AFH, and strategies and actions to address the AFH goals and priorities must be included in planning documents.

*Comment: 5-Year Plan Should Align with Applicable AFH.* Commenters recommended that HUD modify § 903.6 to clarify that the 5-year Plan should align with the applicable AFH. Commenters stated that his change integrates the AFH into already-required planning processes. The commenter stated that HUD should include a provision that requires PHAs to incorporate in their next 5-year Plan after the preparation of the AFH goals and objectives consistent with the AFH, and adopt quantifiable measures for achievement over the 5-year period. The commenter stated that this is consistent with § 903.15(e) which would require PHAs to modify their 5-year PHA Plans if a significant change in the applicable AFH "necessitates a PHA Plan amendment."

*HUD Response:* HUD recommends aligning the 5-year planning cycle, if possible, for purposes of ensuring consistency with the most current AFH. Also, HUD has clarified in 24 CFR part 5 that strategies and actions to address contributing factors and related goals and priorities identified in a PHA's AFH must be included in PHA plan documents.

*Comment: Clarify consultation requirement when a PHA is under a voluntary compliance agreement.* Commenters cited the proposed rule language that states: "The State shall consult with any PHA concerning consideration of public housing needs, planned programs and activities for the AFH, strategies for affirmatively furthering fair housing, and proposed actions to affirmatively further fair housing, and proposed actions to affirmatively further fair housing. If a PHA is required to implement remedies under a VCA, the State should consult with the PHA and identify the actions it may take, if any, to assist the PHA in implementing the required remedies." The commenters stated that this may be interpreted to force States to assist PHAs financially, potentially in conflict with a state consolidated plan method of distribution of Federal funds. The commenters stated that this language appears to have no legal basis under the QHWRA or the Fair Housing Act, and the language should be removed from the rule.

*HUD Response:* HUD disagrees with the commenters. The language in the proposed rule provided only that a State jurisdiction may assist, if possible. The

language is therefore permissive and not mandated or required.

21. Access to Opportunity

Several commenters expressed opposition to the rule's objective to provide access to opportunity on the basis of statements that included the following: Access to better neighborhoods should depend on hard work and not on government give away programs; adequate mechanisms exist through the free market for access to areas where equal opportunities exist for all persons regardless of any special emphasis status that significantly lag actual conditions; that the preamble to the rule itself acknowledges that improving educational outcomes for disadvantaged children relies upon the family structure and that illegitimacy is the most important factor in children's educational attainment; and that the rule runs the risk of encouraging reformers to pursue policies that will hurt communities because any policy that seeks to make homes in a higher income area accessible to lower income families (disproportionately minority) could do so only by functionally decreasing the value of some homes or providing them some sort of assistance.

Other commenters expressed strong support that the Fair Housing Act should be a tool for creating equal opportunity in our country. The commenters stated that the Fair Housing Act requires that housing and community development programs be administered in a way to help overcome problems associated with racial segregation and expand the housing choices available in America, and that, in the proposed rule, HUD clarifies that this also means expanding access to important community assets and resources that have an impact on the quality of life for residents.

Specific issues raised by commenters on access to opportunity include the following:

*Comment: Program participants should not be required to examine data beyond that required under the Fair Housing Act.* Commenters stated that while they understand that the availability of certain data is necessary for program participants to examine certain fair housing issues in their community, they do not agree that requiring program participants to examine data surrounding access to education, employment, low-poverty, transportation, and environmental health are required as part of the Fair Housing Act. Commenters stated that these social and physical improvement indices represent HUD's selection of relevant factors, but there are significant

questions as to the viability of those factors in judging the results of efforts to affirmatively further fair housing. Commenters stated that HUD should list these data elements as an option for program participants to use in their AFH, not a requirement.

*HUD Response:* HUD understands the commenters' concerns surrounding the type of data to be used in the AFH. HUD will provide program participants with data, which will be more fully addressed in the Assessment Tool. The HUD-provided data will need to be supplemented with local data, which is subject to a HUD determination of statistical validity and relevance to the program participant's geographic areas of analysis. As noted earlier in this preamble, the phrase ''subject to a determination of statistical validity by HUD'' clarifies that HUD may decline to accept local data that HUD has determined is not valid but not that HUD intends to apply a rigorous statistical validity test for all local data. This local data should be readily available to the program participant at little or no cost and can be found through a reasonable amount of search.

Analyzing data and incorporating local knowledge on community assets is an important part of a fair housing analysis. As currently proposed, this data will include information on segregation, racially or ethnically concentrated areas of poverty, disproportionate housing needs and disparities in access to opportunity among protected classes. Disparities in access to opportunity—which includes ''substantial and measurable'' differences in access to educational, transportation, economic, and other important opportunities in a community—affects fair housing choice and patterns of segregation and integration. Measuring these differences is vital to understanding fair housing issues and furthering fair housing choice in a community.

*Comment: Allow program participants to use the Integrated Disbursement and Information System performance measurement system.* Commenters stated that HUD should allow program participants to use the Integrated Disbursement and Information System (IDIS) Performance Measurement System, which allows one to select a Goal, Outcome, Objective, and a Goal Outcome Indicator for each activity, and qualitative performance is then reported in narratives in the CAPER. The commenters stated that this process should continue to be allowed as it is manageable, and that HUD should be careful to not develop unrealistic outcome measures that are

based on theory and may not accurately reflect the impact of a particular activity.

*HUD Response:* HUD appreciates the commenters' suggestion. Consolidated plan participants will continue to use IDIS to report on their performance under the consolidated plan, which includes actions taken to affirmatively further fair housing.

*Comment: HUD must validate idiosyncratic measures it has selected ahead of their use on a national basis.* Commenters stated that while some measures and indices in HUD's rule are commonly used, other unique measures have been developed by HUD, and in particular, the idiosyncratic measures must be validated ahead of their use on a national basis for such an important task. The commenters asked about the following: (1) For RCAPs and ECAPS, why has HUD chosen the thresholds it describes, because, the commenters stated, they do not seem consistent with other commonly used measures of the concentration of poverty, race or ethnicity, and HUD should justify and validate these thresholds; (2) for the Indices of Dissimilarity and Isolation, the commenters stated that although both are common measure of spatial segregation, it is not clear why program participants should use both, and commenters asked what values HUD used to define low, moderate and high segregation using the dissimilarity index; (3) for Predicted Racial/Ethnic Composition Ratio, the commenters asked why HUD proposed using income brackets in this ratio because they appear to be irrelevant to the measure, and the ratio appears to treat higher than predicted proportions of high income minorities and lower than predicted proportions of low income minorities as a problem. The commenters asked that since the income brackets described are, ''notional,'' how does HUD propose to develop actual brackets, and how are those brackets related to the predicted racial/ethnic composition ratio; (4) for Community Asset Exposure Indices, the commenters stated that the descriptions of these indices and their uses implies that there may be more or different indices used in the future; and (5) for Disproportionate Housing Needs, the commenters asked the basis for the threshold of 10 percent as defining ''disproportionate.''

*HUD Response:* HUD recognizes that particular thresholds and measurements may not apply equally to all program participants. However, most of the issues raised by these specific comments are better addressed through the Assessment Tool and related

guidance and not through direct changes to the regulatory text itself. In terms of the comment on the 10 percent threshold for disproportionate housing needs that was present in the proposed rule text, HUD agrees with the commenter and has changed the definition of the term to delete the threshold from the regulatory text.

*Rule Change.* As noted earlier in this preamble, the definition of ''disproportionate housing needs'' in § 5.152 of this final rule has been revised to remove the 10 percent threshold. This final rule states that disproportionate housing needs exist where there are significant disparities in the proportion of members of a protected class experiencing a category of housing need when compared to the proportion of members of any other relevant groups or the total population experiencing that category of housing need in the applicable geographic area.

*Commenters: Indicators of effectiveness should be measurable and show progress of improved integration over time.* Commenters stated that HUD should identify long-term indicators and short-term performance measures for program participants to meet fair housing goals. The commenters stated that performance measures could include metrics related to the number of jurisdictions in high-opportunity areas that revise zoning codes to reduce fair housing issues; strategic investments made in high-poverty communities that expand multiple aspects of opportunity (besides affordability); and the number of affordable housing units for families with children that are located near schools with high educational opportunity. The commenters stated that long-term indicators could be borrowed from segregation, concentrated poverty, and opportunity data that HUD provides, in addition to some of the housing choice indicators that the Partnership for Sustainable Communities have identified for their grantees—but disaggregated to evaluate housing choice for protected classes.

Other commenters stated that the primary indicators of effectiveness in a jurisdiction and its region are changes over time, in the rates of segregation and percentage of families of color living in high poverty neighborhoods, and the comparative distribution of government assisted housing resources by neighborhood poverty rates and levels of racial concentration.

Commenters stated that indicators must be matched to the program implemented and stated, for example, that if a jurisdiction implements a homeownership program to disperse the minority population into non-minority

**42336** **Federal Register** / Vol. 80, No. 136 / Thursday, July 16, 2015 / Rules and Regulations

areas one measure of effectiveness is the time it takes to market and fill a vacant unit. The commenters stated that this would assist in evaluating the advertising effectiveness as well as the receptivity of minorities willing to relocate their families possibly out of their comfort zone into a non-minority neighborhood.

*HUD Response:* HUD appreciates the commenters' suggestions and will consider them in developing guidance that will assist program participants in complying with this rule.

*Comment: Compare the number of fair housing complaints filed in one year to the prior two years.* Commenters stated that one indicator that could be used to determine effectiveness would be to compare the number of fair housing complaints filed within a certain jurisdiction in a year, in comparison to previous years. The commenters stated that it would also be useful to compare the number of units created in higher income areas over a period of time—perhaps 5 years—to see if the state/locally conceived and implemented policies are providing for greater housing choice for lower income households.

*HUD Response:* HUD appreciates the suggestion and will give consideration as to whether such comparison is helpful in determining the effectiveness of the new AFH approach and in creating guidance for program participants on effective goals and the metrics and milestones that program participants will use to measure and report on their success in meeting goals. HUD notes, however, that individuals decide to file or not file fair housing complaints for a variety of reasons, so a simple comparison of the number of complaints in various years may not be very meaningful when considered in isolation from other factors.

*Comment: The job access index is not applicable to rural areas.* Commenters stated that one of the key measures provided in the proposed rule is the job access index, which pertains to the accessibility of a given residential neighborhood as a function of its distance to all job locations, with distance to larger employment centers weighted more heavily. The commenters stated that the job access index may not be appropriate for rural areas, where the real distance to the job location is from the house to the barn. The commenters stated that community assets are fewer in rural areas, but that does not mean this situation needs to be corrected. The commenters stated that population density needs to be considered in the application of key measures, and that communities with a

population density that would classify the area as "rural" should be exempt from this regulation.

*HUD Response:* HUD acknowledges the unique issues and challenges in applying the rule to rural communities and intends the implementation of the rule to be flexible and adaptable to meet those challenges. The commenter is correct that some of the data on community assets, including access to jobs, transportation, and education may very well appear different when mapped or incorporated into an index to measure those assets. The purpose of the indices is to provide an easy-to-use simple measure, in part to reduce the burden on program participants in developing an AFH. However, where the usefulness of the index itself is limited, either by data limitations or how it is applied in certain areas, including rural areas, those limitations can be acknowledged by the program participant in the AFH by supplementing HUD-provided data with local data and knowledge.

The larger question is what goals, strategies, and actions the program participant can design and adopt to meet the fair housing and equal opportunity needs of its jurisdiction. In many rural areas, for instance where poverty is much more widespread than in an urban or metro area, the strategies will often be different. HUD's rule already acknowledges that place-based strategies can be adopted to address problematic issues identified in the needs analysis portion of the AFH Plan. In the case of rural areas, this is particularly important to acknowledge. For instance, in making decisions about where an affordable housing development or assistance is needed, the fact that poverty is often spread over large geographic portions of rural America will be a key consideration in deciding how to best allocate housing resources.

Valuable research and guidance on the topic of poverty in rural areas and the unique challenges and potential strategies that can be employed to address it is available from a variety of private sources as well as different Federal agencies and offices. Among the Federal sources of information on this issue are: CPD's Rural Housing and Economic Development Gateway Web site; the U.S. Department of Agriculture's Economic Research Service; and the Federal Reserve, which has sponsored and produced studies on rural poverty issues.

*Comment: The rule should support a multi-agency approach to access to opportunity.*

Commenters stated that "the proposed rule acknowledges that the prospects for individual or familial success are influenced by a variety of neighborhood features far more extensive than just housing." The commenters ask why a multi-agency approach, such as a Federal interagency working group, has not been formulated to address these issues, as has been done in the areas of environmental justice and healthy homes.

*HUD Response:* HUD agrees with the premise of the question and takes this proposal under advisement. It is consistent with the approach adopted by the current Administration, which has convened Federal interagency working groups on both affordable housing and neighborhood issues.

The Neighborhood Revitalization Initiative included staff from HUD, and the Departments of Education, Justice, HHS, and Treasury. It examined and made recommendations for place-based revitalization initiatives and combining Federal programs with similar goals to do so. Out of these recommendations, these agencies were able to achieve better coordination with respect to HUD's Choice Neighborhoods Initiative, Education's Promise Neighborhoods Grant Program, and DOJ's Byrne Criminal Justice Innovation Grant Program. See also OMB Memorandum M–09–28, Developing Effective Place-Based Policies for the FY 2011 Budget, dated August, 11, 2009, available online at *http://www.whitehouse.gov/omb/assets/memoranda_fy2009/m09-28.pdf.*

A related Rental Policy Working Group convened staff from Federal agencies—HUD, USDA's Rural Housing Service, and Treasury—to reduce and streamline regulatory requirements, and to help preserve the existing affordable rental housing stock. For more information, see: *http://archives.huduser.org/aff_rental/home.html.* HUD's Strong Cities, Strong Communities (*www.huduser.org/portal/sc2/home.html*) provides capacity building resources and technical assistance to local governments and helps coordinate programs and reduce regulatory burden when combining funding from different Federal agencies.

*Comment: Access to the community asset of public education is not the same thing as access to high-performing schools.* Commenters stated that HUD needs to make clear that access to educational opportunities that should be pursued is access to high-performing schools. Commenters stated that consistent with settled civil rights law in the areas of education and fair housing, the rule must make clear that access to education means access to

stably-integrated or majority white schools with at least average standardized test scores, graduation rates, and college or technical training matriculation rates. Access to educational opportunity can involve high poverty, non-white schools with lower than average test scores, higher than average dropout rates, and/or lower than average college or technical training matriculation.

*HUD Response:* HUD agrees that access to high-performing schools is a critical neighborhood component that should be considered in efforts to affirmatively further fair housing. The neighborhood school proficiency index includes school-level data on the percent of elementary school students who are proficient in reading and math according to state exams, to determine which neighborhoods have high-proficient and low-proficient elementary schools.

*Comment: Access to transit alone does not satisfy the duty to affirmatively further fair housing.* The commenters stated that performance of schools near segregated central city projects continues at very low levels, while unemployment and crime are higher in these areas than in any other part of the region. The commenters stated that many public health measures are also the worst in the region, but because these areas are near transit, color-blind community developers have persuaded state and local authorities that locating housing in these declining segregated neighborhoods is consistent with their obligation to affirmatively further fair housing.

The commenters stated that transit does a poor job of connecting low-wage workers with available jobs because most new jobs are scattered and beyond the access of even the best transit systems. The commenters stated that many of the most exclusive and wealthiest communities will rank poorly on the transit access index. The commenters stated that using access to and distance from bus or rail transit could have the unintentional effect of undermining regional fair housing goals by reducing the responsibility of some of the highest opportunity communities to promote fair housing and achieve more inclusive communities. The commenters stated that, in too many cases, this was an intentional and common tactic to discourage low-income residents from moving into such communities. The commenters stated that lack of transit should not be allowed to reduce a community's responsibility or steer a region's plan away from communities with strong assets such as schools and jobs and

toward higher poverty communities or even diverse communities. The commenters stated that access to transit is not a substitute for good schools and strong diverse neighborhoods and should not be used to encourage more affordable housing in places impacted by poverty while exclusionary communities with less transit are let ''off the hook.''

The commenters stated that the proposed rule must clarify that neighborhoods, which are impoverished and segregated, but proximate to transit cannot be considered areas of opportunity for which access ranks high.

*HUD Response:* HUD agrees that a racially or ethnically concentrated area of poverty is not an area of opportunity simply because it is served by a public transportation system or any single indicator of opportunity. However, access to public transportation may be one indicator of access to opportunity. The comments address the manner in which HUD will provide data on transportation rather than the language of the regulation itself. This final rule continues to reference transportation as a key community asset that program participants should take into consideration in developing their AFH.

Transportation is a key factor in assessing total housing affordability, and, specifically, access to public transportation options can be critical to providing access to jobs, education, health care, and other amenities and community assets for low-income families, the elderly, and persons with disabilities. Increasingly, planners and policymakers are taking transportation into account for purposes of both new development and prioritizing preservation of existing affordable housing. Reviewing available data can also assist planners in identifying existing communities in need of improved transportation options.

HUD has worked to identify a comprehensive set of data that allow a multisector assessment. Moreover, because research on measuring access to community assets is continually evolving, HUD is committed to reviewing the data on an ongoing basis for potential improvements. As with all data metrics, the measures in each category have strengths as well as limitations, and no criteria should be assessed in isolation from the other measures or required assessments.

The specific measures and data to be used to assess transportation issues as one possible source of disparities in access to opportunity will be determined through guidance, including the Assessment Tool.

*Comment: Access to employment alone does not satisfy the duty to affirmatively further fair housing.* As with access to transit, access to employment opportunities cannot alone satisfy the duty to affirmatively further fair housing. The rule must make clear that access to employment means access to jobs that could actually be filled by low-income, low-skilled, non-white citizens. As a result, residents have been less likely—not more likely—to be employed and far more likely to become incarcerated. ''Access to employment neighborhoods'' must be defined as areas where new entry-level jobs are increasing and where there is evidence that these jobs will actually be filled by poor, low-skilled, non-white citizens. Throughout the country the growth of jobs—and particularly the growth of jobs for poorly educated, low-skilled, non-white citizens—is at the edge of metropolitan areas. Segregated and unequal education received in segregated neighborhoods prevents workers from accessing existing employment opportunities.

The commenters stated that the final rule must clarify that, when neighborhoods are proximate to clusters of employment but have high rates of unemployment and comparatively low wages, these neighborhoods cannot be considered areas with access to employment opportunity for purposes of the proposed rule.

*HUD Response:* As stated above, HUD agrees that a racially or ethnically concentrated area of poverty is not an area of opportunity simply because of any single indicator of opportunity. However, HUD declines to include in the final rule the commenters' proposal. Economic factors, including access to jobs, are key considerations in assessing neighborhood opportunity. As with transportation, HUD-provided data will help program participants better assess local needs and frame appropriate strategies, which can encompass both mobility and place-based investment approaches. The specific data sources and indices used to measure access to employment opportunities will be determined through the Assessment Tool and guidance.

*Comment: Access to quality food is an important community asset that helps build strong neighborhoods.* Commenters stated that areas with restricted access to affordable, healthy food options are heavily concentrated in communities of color and low-income neighborhoods. The commenters stated that lack of access to quality foods increases the prevalence of obesity, diabetes, and other diet-related conditions, and that this is a problem

with racial and economic dimensions. The commenters stated that wealthy neighborhoods have three times the number of supermarkets as their low-income counterparts, and that this disparity becomes even more dramatic when comparing predominantly white neighborhoods with black neighborhoods. The commenters asked that access to quality food be a community asset measure.

*HUD Response:* While HUD agrees with the commenters about the importance of access to high-quality and affordable food options at the neighborhood level, this final rule does not adopt the suggestion that this topic be added as an additional separate measure of access to community assets in the Code of Federal Regulations. This and other important neighborhood factors will be addressed in guidance and in the data that HUD will provide to program participants. Moreover, lack of access to affordable, high-quality sources of food is the type of information that could be expected to be identified through community participation, which is a required part of the AFH process. Program participants must summarize comments made in the community participation process and explain why any such comments are not addressed in the AFH.

22. Data and Mapping Issues

a. Data and Index Issues

In the preamble to the proposed rule, HUD solicited comments on a number of specific issues. Among the questions posed by HUD were the following two questions (#1 and #9) regarding data that will be used for completing an AFH:

1. The field of geo-coded data is rapidly evolving and, as HUD works to refine data related to access to important community assets, it welcomes suggestions for improvement. Such comments can include the description of cases or situations where the indicators may or may not appropriately portray neighborhood qualities. Are the nationally uniform data that HUD is providing to assist in the assessment of segregation, concentration of poverty, and disparities in access to community assets appropriate? Do these data effectively measure differences in access to community assets for each protected class, such as persons with disabilities? To what extent, if at all, should local data, for example on public safety, food deserts, or PHA-related information, be required to supplement this nationally uniform local and regional data? (See 78 FR 43724.)

9. An analysis of disproportionate housing needs is currently required as part of the consolidated plan, and this proposed rule would make disproportionate

housing needs an element of the AFH as well. If a disproportionate housing needs analysis is a part of the AFH, should it remain in the consolidated plan as well? Is this analysis most appropriate in either the AFH or the consolidated plan, or is it appropriate, as the current proposed rule contemplates, to have the analysis in both places, assuming the analysis is the same for both planning exercises?(See 78 FR 43724.)

In response to these requests for public input and to the information on the data methodology posted online, HUD received a large volume of public comments and questions on data issues.

*Comments:* The public comments received included the views, recommendations, and further questions as follows:

• States and rural areas require a different level of data and analysis as compared to metropolitan areas and urban counties.

• The format in which data are provided—HUD should provide the data as either raw data or tabular datasets.

• HUD should allow groups to upload additional data to the data tool.

• HUD should provide additional datasets, such as HMDA data, foreclosures, fair housing complaint data, testing results, local surveys, and citizen narratives.

• Some specific types of data on access measures may not be effective. The education data may not capture local enrollment policies. In terms of the transportation data, many localities do not have this data reported or publicly available. Job access data does not capture actual commute time.

• Many commenters noted that since the proposed rule did not contain the data tool, or the AFH Assessment Tool, the commenters could not make more specific points on what they will, should, or should not contain.

• HUD should provide data on concentrations of poverty by protected class other than race/ethnicity.

• HUD should preview the tool and make the data tool available to the public, in addition to grantees (this will help in the public's participation in the local AFH process).

• Program participants should be required to post the data they are using on their own Web sites and do so prior to any public hearing.

• The data that HUD is requiring is excessive, and the data may also be duplicated in the consolidated plan and action plans.

• HUD should provide one composite index to assess neighborhood access to community assets and stressors, rather than HUD's approach to provide separate indices represented independently.

*HUD Response:* In regard to commenters' requests for greater specificity in the regulatory language itself, HUD continues to take the position that it is appropriate that many of these items are better addressed in the Assessment Tool and as guidance and should not be included in the regulatory text itself. This will allow flexibility and further refinements to be made on a timelier basis in response to public input and in response to experience gained through program participants' use of the Assessment Tool in preparing and submitting an AFH.

In response to the numerous comments that the data tool as originally presented for public comment was not effective for all types of program participants, including smaller jurisdictions and States, HUD has made numerous changes and improvements. The public comments in this area were extremely valuable, and HUD expects to make further refinements during the guidance and implementation process. Program participants and the public have had additional opportunity for providing comments on both the Assessment Tool, as that document went through the Paperwork Reduction Act process and, in the case of the data tool itself, HUD will continue to refine the data tool based on ongoing public input and future research and analysis.

HUD is incorporating nationally available data determined to be statistically valid by HUD after conducting thorough research and analysis, as well as extensive consultation between HUD staff and external research and policy experts. Many comments requested that additional types of data be added to the types to be provided by HUD. The data are not intended to be exhaustive but are intended to provide a baseline for program participants to use and HUD encourage program participants to supplement with local data and knowledge. HUD also expects that as more nationally uniform sources of data become available the types of data provided to program participants for their planning purposes can be added to.

The manner in which the assessment of data should be used to inform local decision making will be provided in the Assessment Tool and through technical assistance and guidance. These will be particularly important for State-level, as well as smaller, nonmetro and rural program participants.

*Comment: Definitions are not effective in capturing important racially or ethnically concentrated areas of poverty in a particular community.* Commenters stated that the rule should allow

participants to propose an alternative definition, which should be subject to public comment as part of the AFH process and approval by HUD before they can be adopted.

*HUD Response:* HUD has not adopted this proposal because of the need to provide for some level of consistency in the way program participants conduct an AFH. HUD notes, however, that the rule affords program participants the flexibility to supplement the HUD-provided data with relevant, statistically valid State and local data, qualitative analysis and explanation, and information received during the public participation and outreach process. In addition, program participants have latitude to adjust their goals and strategies in the local decisionmaking process in order to select the most effective ways to address the issues and contributing factors identified by the data and analysis.

*Comment: HUD should clarify how it will use and evaluate any supplemental local data.* Commenters stated that localities should have the opportunity to explain how the data should be properly interpreted and would welcome a dialogue with HUD regarding this data. Commenters recommended that HUD explicitly offer this level of transparency and suggest this type of exchange. Commenters stated that, at a minimum, the rule should clarify that when localities submit supplemental data that is more accurate or telling, HUD will rely on that local source in place of the standard indices.

*HUD Response:* HUD will grant considerable weight to any convincing showing from a program participant that adds to the AFH, particularly with additional data sources used to supplement the HUD-provided data, where these are found HUD to be accurate, statistically valid, and relevant. HUD expects to provide additional guidance to assist program participants as they conduct their AFHs.

*Comment: The rule should require program participants to survey local opinions about diversity.* Several commenters made this recommendation.

*HUD Response:* Program participants are encouraged to undertake active outreach efforts such as this, but the rule does not require it outside of the public participation requirements in the rule.

*Comment: Make local data publicly available.* Commenters stated that program participants should make all the data they are using available for public review prior to a hearing and opportunity for comment.

*HUD Response:* The final rule includes this requirement in the citizen participation section of the regulations. (See §§ 91.105(b)(1)(i) and 91.115(b)(1)(i).)

*Comment: Revise § 5.154(d) and (e) to establish different requirements that are appropriate to State governments.* Commenters stated that the level of data analysis required of state governments must cover broader areas of geography, but should not require the same level of geographic specificity as local governments.

*HUD Response:* HUD agrees that the requirements of the rule should be appropriate for different types of HUD program participants, including States, and the definition of "geographic area" in the final rule reflects this fact. Also, HUD believes § 5.154 is appropriate as presented in the rule. HUD anticipates that the level of data analysis for different types of program participants is best addressed through the Assessment Tool, the associated data tool, and guidance rather than in the final rule.

### b. Data Documentation

*Comment:* Comments received on the AFFH Data Documentation paper were as follows:

• Where did HUD discover the values it uses to define low, moderate, and high segregation using the dissimilarity index? Are these arbitrary values?

• The definition of RCAPs/ECAPs will be problematic for many regions. The 40 percent threshold is too high in many rural and smaller regions.

• HUD should use an alternative to the 40 percent poverty threshold for RCAPs/ECAPs.

• The proposed rule was vague about the proposed weights to various input categories for accessing fair housing neighborhoods. For example, does "transportation access" rate higher, lower, or the same as school proficiency index scores?

• HUD should provide data at the census tract level.

*HUD Response:* The comments refer not to the rule itself, but to the AFFH Data Documentation paper that was posted online concurrently with the proposed rule. HUD appreciates the very useful feedback that commenters provided on the Data Documentation paper. These comments will be used in developing and refining the Assessment Tool and the related data tool.

While HUD's final rule and the Assessment Tool rely heavily on the use of census tracts in identifying areas of concentration as well as opportunity areas, among researchers there are well known limitations to the use of census

tracts. A census tract with relatively high poverty may actually be located within a larger area experiencing significant economic improvement. Moreover, HUD recognizes that while census tracts are often used in the research literature in part due to their value in quantitative analysis and the existence of relevant data, there are known limitations, including the fact that they are not always synonymous with neighborhoods as understood at the local level and their varying relevance in different geographies, for example, between central cities and rural areas.

In interpreting the presence of RCAPs/ECAPs, program participants should take into account the characteristics of adjoining or nearby census tracts, for instance, that may indicate a particular tract is located in a more desirable area or an area that is experiencing improved economic conditions or residency patterns. In addition, HUD notes that the definitions of segregation and RCAPs/ECAPs are not new legal thresholds based on a bright line test alone. Further, it is not HUD's intent that the current regulation inadvertently lead to decisions based strictly on an overly strict application of the various definitions and thresholds in the regulations and the Assessment Tool. The program participant's AFH can and should expand on both through qualitative discussion, and the legal definitions themselves are restricted in purpose to the rule (as provided in § 5.152 that has been revised to clarify that the definitions apply only to the AFH planning process in §§ 5.150 through 5.180). On a related note, the regulation, in the definition of "geographic area," allows for the use of census block groups, although HUD notes and recognizes that doing so can often carry even more caveats in terms of possible limitations than do census tracts but nevertheless the rule retains the flexibility for program participants to include the use of block groups, at their discretion.

*Comment: Clarify that statistical measurements do not apply to individuals.* Commenters asked that the regulatory text clarify that the new statistical measurements are not intended to apply to private persons.

*HUD Response:* HUD believes the rule is sufficiently clear on this point as is, and, therefore, the change suggested by the comment is not adopted.

*Comment: No funding should be denied for disparities revealed by HUD data.* Commenters stated that, because of the unreliability of HUD data, no funding should be denied to a program

participant where data or other information in an AFH shows either a failure to meet affirmative obligations or a prima facie case of intentional or disparate impact discrimination. Commenters stated that HUD must further investigate the matter and not act on the basis of its data.

*HUD Response:* The AFH is an analysis to be used by program participants in setting priorities and goals and informing strategies on how to affirmatively further fair housing. The identification of a fair housing contributing factor or issue in an AFH is meant to aid program participants in fulfilling their duty to affirmatively further fair housing, and is not intended to result in the nonacceptance of an AFH or deny funding. While the data provided in an AFH may assist HUD in understanding some of a program participant's fair housing successes and challenges, HUD's findings of noncompliance with fair housing and other civil rights requirements, and its acceptance or nonacceptance of an AFH, are not based solely on demographic data. HUD findings are the result of investigations that are consistent with statutory and regulatory standards. Furthermore, HUD will not undertake an enforcement action without affording the program participant due process, which could include the program participant's questioning HUD's investigative findings and conclusions.

The AFH is intended primarily as a planning document to assist program participants in planning appropriate strategies to address the challenges that may be present in their jurisdiction or region. The definition of fair housing issues provided in the regulation and any numeric thresholds associated with it that HUD provides in guidance for the AFH document do not create separate new legal thresholds for the purposes of enforcement, establishing prima facie findings of violations of civil rights laws or similar new legal requirements. They are for the purposes of guiding program participants in identifying potential fair housing issues in the State, locality, or region that should be addressed in the AFH itself.

*Comment: Deference should be given to local data.* Other commenters stated that when a program participant has more recent data, even if it contradicts HUD's data, deference should be given to the participant's data so that HUD is not substituting its judgment for that of the program participants. Commenters stated that the final rule should explicitly allow for deference to each entity's choices of data used to support the AFH.

*HUD Response:* Program participants are not limited to the use of data provided by HUD but, for consistency purposes, they must include data provided by HUD in their analysis of fair housing issues and contributing factors. Indeed, where relevant local data is available to a program participant, the program participant must consider it in conducting its AFH.

*Comment: Establish a process to resolve disputes over data.* Commenters stated that a process should be established for settling disputes over the use of certain data or inaccurate data analysis. Commenters stated that HUD data varies in its reliability, citing fair market rents that do not reflect current actual market rents and the lack of data with respect to persons with disabilities, and suggested creating a process for a participant to challenge the local data.

*HUD Response:* The use of local data is subject to HUD review for statistical validity, reliability, and relevance. Any questions HUD may have regarding the use of local data would arise as HUD reviews a program participant's AFH. In the review process, HUD may ask questions about the local data used by a program participant or HUD may decide not to accept an AFH if it determines that the data used are not valid, reliable, or relevant. The rule provides a process for HUD and a program participant to communicate and resolve AFH deficiencies leading to HUD's nonacceptance of an AFH. (See § 5.162.) Disputes over data would be addressed in this process.

*Comment: Advise how frequently HUD will update its data.* Commenters stated that HUD should advise how frequently it will update the data it provides. Commenters stated that the proposed rule stated that HUD would update the data periodically, but program participants need more specificity as to when the updates will occur. Commenters stated that HUD should update the data annually or biannually. Commenters stated that if jurisdictions are to use the data to track the progress of their policies, they will need to have updates at regular, timely and predictable intervals.

*HUD Response:* HUD will keep program participants advised as to updates to the data it provides and any other data-related enhancements to the AFH Assessment Tool. HUD declines to specify an interval for periodic updating of data—in part, because it does not always control the source of data and, in part, because enhancements to the data are likely to occur without particular regularity.

*Comment: Local data should be an option not a requirement to supplement other data.* Commenters stated that local data should not be required to supplement the national uniform local and regional data. It should be used at the program participant's discretion. Commenters stated that supplementing HUD's data with their own data collection efforts will be expensive and time-consuming, undermining one of the agency's goals for the new rule. The commenters stated that they want to be sure that they are addressing their most pressing fair housing needs and issues, but they do not want to be required to participate in a data analysis exercise that will not provide useful guidance about how to proceed.

*HUD Response:* HUD agrees that obtaining and compiling data could be a resource-intensive pursuit. HUD will only require program participants to obtain data that is readily available at little or no cost, including in terms of staff time. HUD believes that local data should be used to supplement HUD-provided data and is requiring program participants to include such data in their AFH. Where useful local data exists, it can be a valuable means of supplementing the national data and could be quite important to an AFH that applies to a particular area. Therefore, this rule balances these competing values by not requiring data to be compiled or obtained if it does not exist (although doing so is not prohibited), but where useful data exists, is relevant to the program participant's geographic area of analysis, and is readily available at little or no cost, the rule requires that it be considered.

*Rule Change.* This final rule adds new definitions for the terms, "local data" and "local knowledge" in § 5.152.

c. Rural Data Issues

*Comment: HUD must provide reliable data for rural areas.* Commenters expressed concern about the reliability of HUD's available data for rural areas. The commenters stated that their experience has been that assessing social, economic, and housing characteristics is often complicated in rural areas due to sparse populations, limited sampling, undercounts, and exclusion. The commenters stated that there is a clear relationship between the population size of a geographic area and the reliability of data: As the population in rural areas is smaller, the likelihood of reliability within survey data is lower.

The commenters stated that while the ACS provides more timely data than its predecessor, the decennial long-form, it has a somewhat smaller sample and therefore less reliable results for less populated areas, potentially distorting

**42341**

the actual picture of segregation or isolation. Commenters further stated that the ACS provides only pooled estimates (five years' worth of data) for jurisdictions with 20,000 or fewer people, and that as a result, the figures may not show some important details, especially when things change markedly as they did at the beginning of the recent recession. The commenters stated that data averaged over a period ''masked'' the dramatic change. The commenters stated that the best solution for this problem would be to expand the ACS sample size, or alternatively, calculate and provide a data reliability indicator to accompany the datasets.

*HUD Response:* HUD appreciates the valuable feedback provided by commenters on these and other issues specific to rural America. As stated above in the response to comments on the community assets section, HUD acknowledges the unique issues and challenges in applying the rule to rural communities and intends the implementation of the rule to be flexible and adaptable to meet those challenges.

While HUD does not believe specific changes are required to the regulatory text, it does plan to take into account specific issues related to data concerns in developing and refining the Assessment Tool over time. In addition, HUD plans to provide guidance and technical assistance recognizing that different strategies will be appropriate in different places. Jurisdictions in nonmetropolitan areas can also work with state grantees which will have a role in developing AFHs. Program participants will also have flexibility in developing their AFH to explain actual local conditions in qualitative terms that may not be reflected by data.

*Comment: Rural areas will be required to rely on local data, which will be burdensome and costly and will force rural areas to use inaccurate or incomplete information.* Commenters stated that useful data from other Federal sources either is not available for rural jurisdictions or is not recent enough to be reliable. The commenters stated that, for example, it is more difficult to obtain residential building data for sparsely populated counties or smaller geographic units, but this information is readily available in metropolitan areas. The commenters stated that Home Mortgage Disclosure Act information, too, is limited for rural, nonmetropolitan areas because banks operating entirely outside of metropolitan areas are not required to provide lending data, and that out-of-date data sources include HUD's Picture of Subsidized Housing data, currently available only for 2009.

The commenters stated that the net effect of these data issues is that rural jurisdictions preparing AFHs must supplement the data HUD provides with locally sourced information such as tax records, building permits, etc., to ensure as complete a picture as possible, verifying, clarifying, or challenging what the HUD data sets indicate., and that compiling such data will be burdensome and costly. Commenters stated that jurisdictions in rural areas be given additional resources to conduct research and gather local data.

Similarly, commenters stated that because of the concerns with accuracy of data to be provided by HUD for rural areas, HUD should not require rural jurisdictions to use HUD data but be provided the option to use such data or only local data.

Other commenters reiterated the concerns about the accuracy and reliability of HUD-provided data for rural areas, and asked HUD to provide guidance on what additional information should be sought and considered by rural areas. Commenters stated that HUD could aid rural jurisdictions by providing a data guide explaining these issues and suggesting alternative sources, such as the Census Bureau's Small Area Income and Poverty Estimates.

*HUD Response:* HUD appreciates this valuable feedback and the time and effort made by commenters to present their valid concerns with applying data to different parts of the nation, including rural areas. While HUD does not believe that specific changes in the regulatory text are needed, it does plan to take these and other points into consideration during the development of the Assessment Tool.

### 23. Transparency

*Comment: All AFH and related documents and the availability of such documents for public viewing should be provided to the public through all available means.* Commenters stated that the key to making the AFH process work is to maximize public participation and that is achieved by having AFHs and related documents available to the public using all available means, including posting online and having hard copies available at program participants' offices or libraries. Many commenters requested that AFH information be posted on program participants' Web sites. Commenters recommended that a program participant's proposed and final AFHs and all relevant data and other information used in preparing the AFH be made available on an easily identifiable page of the participant's Web site. Commenters recommended that the consolidated plan and all performance reports, including all attachments and supporting data be posted in full length in a searchable format, easily downloadable, on a dedicated page of the participant's Web site. Commenters stated that the availability of AFH documents should be made through social media.

*HUD Response:* HUD understands the importance of the Internet when communicating with the public and has made rule changes to update the outreach requirements for program participants.

*Rule change.* HUD has revised § 5.158 to explicitly state that, in order to ensure that the AFH, the consolidated plan, and the PHA Plan are informed by meaningful community participation, program participants should employ communications means designed to reach the broadest audience. This final rule says that such communications may be met by publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each document available on the Internet—on the program participant's official government Web site—as well as at libraries, government offices, and public places. Further, the rule requires program participants to ensure that all aspects of community participation are conducted in accordance with fair housing and civil rights laws, including title VI of the Civil Rights Act of 1964 and the regulations at 24 CFR part 1, Section 504 of the Rehabilitation Act of 1973 and the regulations at 24 CFR part 8, and the Americans with Disabilities Act and the regulations at 28 CFR parts 35 and 36, as applicable.

*Rule Change.* HUD has revised §§ 91.105(b)(1) and 91.115(b)(1) to provide that a jurisdiction may make the HUD-provided data available to the public by cross-referencing to the data on HUD's Web site.

*Comment: Publicly post AFHs.* Some commenters also proposed that HUD should post the completed and accepted AFHs on its own Web site as an information clearinghouse. Commenters stated that this could be a valuable resource for best practices, as an aid and guide for other program participants in completing their own AFHs and for practitioners, industry professionals, researchers and advocates in assessing fair housing issues and strategies. Other commenters suggested that HUD should post all submitted AFHs.

*HUD Response:* HUD thanks the commenters for this proposal and will explore options for posting completed AFHs online, along with additional

guidance that may be helpful to program participants, affordable housing advocates and organizations, fair housing groups, and the general public.

*Comment: All relevant documents should be translated by program participants into other languages and be accessible to persons with disabilities.* Commenters stated that relevant documents, AFHs, consolidated plans should be translated by program participants into languages other than English for LEP residents, and should be made available in newspapers or other media serving non-English speaking stakeholders or interested members of the community, or that summaries of the documents should be provided through such news outlets. Commenters also stated that outreach for public engagement should be either conducted in other languages or with interpretation services. Other commenters asked that HUD ensure that these documents are available to persons with disabilities.

*HUD Response:* Federal law pertaining to ensuring that persons with limited English proficiency (LEP) can participate in Federal and Federally-funded programs is well established, and HUD does not need to further address this matter in its rule. Title VI of the Civil Rights Act of 1964 protects individuals from discrimination on the basis of their race, color, or national origin in programs that receive Federal financial assistance. The failure to ensure that persons who are LEP can effectively participate in, or benefit from, Federally-assisted programs may violate Title VI's prohibition against national origin discrimination. Executive Order 13166, signed on August 11, 2000, directs all Federal agencies, including HUD, to work to ensure that programs receiving Federal financial assistance provide meaningful access to LEP persons. All programs and operations of entities that receive Federal financial assistance from the Federal Government, including, but not limited to, state agencies, local agencies, and for-profit and non-profit entities, must comply with the title VI requirements. With respect to persons with disabilities, section 504 of the Rehabilitation Act of 1973 requires HUD recipients to make information accessible to persons with disabilities, and the Americans with Disabilities Act requires State and local governments to provide equal access and effective communication with individuals with disabilities by, inter alia, providing information in accessible formats (*e.g.,* accessible electronic formats, large print, Braille, audio recordings); providing sign language interpreters and computer-assisted real time

transcription, as needed, to persons who are deaf or hard of hearing; and holding meetings in venues that are accessible to persons with disabilities, including individuals who use wheelchairs.

*Comment: Program participants should report their progress and outcomes from their AFH.* Commenters stated that program participants should report their progress and outcomes from the AFH in their various grant reports, just as they do for individual grant activities. Commenters stated that the rule should specify what information program participants are required to provide about the progress they have made, including their use of financial resources and any actions they have taken with respect to their policies, practices, and non-financial resources. Other commenters stated that assessment and compliance reports should be posted promptly on the jurisdiction's Web site.

*HUD Response:* HUD's consolidated plan regulations already provide for performance reports and the opportunity for the public to comment on performance reports. (See § 91.105(d).)

*Comment: HUD should have a Web page devoted to AFHs.* Several commenters stated that HUD should have a page on its Web site with information on the AFH submission deadlines and copies of all AFHs. Another commenter stated that for each AFH submission HUD should assign a number that should be used to track the submission status on HUD's Web site.

*HUD Response:* HUD appreciates these recommendations. While HUD cannot commit at this time to have a Web site that provides this information, HUD will definitely explore this recommendation.

*Comment: Make uniform data available to the public.* Commenters ask that the nationally uniform local and regional data be made available to the public, including via HUD's Web site to encourage research.

*HUD Response:* HUD's data will be available on HUD's Web site for all the public to view and access. The data will not be limited to program participants that must prepare an AFH.

## 24. Technical Assistance

*Comment: HUD-provided technical assistance will be critical to the success of the new AFH process.* Many commenters stated that HUD-provided technical assistance will be critical as program participants adapt to dramatic changes in regulatory requirements, not to mention reduced HUD funding that has had a significant impact on the ability of local jurisdictions to maintain

adequate staffing levels. Commenters stated that, as suggested by the GAO report addressing the duty to affirmatively further fair housing, HUD, and its field offices have not provided sufficient technical assistance or conducted adequate monitoring. Commenters stated that even conscientious, experienced staffs of program participants are challenged by the lack of direction, assistance and oversight from field offices, and that imposing new regulations is not going to solve this problem; rather, it will only serve to exacerbate it.

*HUD Response:* HUD reiterates the commitment made in the proposed rule to provide technical assistance to program participants as they transition to the new AFH process.

*Comment: Types of technical assistance that would be helpful.* In the proposed rule, HUD solicited comment on what forms of technical assistance would be most helpful to program participants. In response to this question, commenters suggested regional meetings hosted by HUD, webinars, audio-visual materials, and other online training, face-to-face training, classroom training, and guidance that includes numerous examples of how to undertake the analysis required and complete the Assessment Tool.

*HUD Response:* HUD appreciates the suggestions and will strive to provide as much and as varied assistance as possible.

## 25. Administrative Burden

### a. Duplication and Redundancy

*Comment: Eliminate the duplication between the AFH and Consolidated Plan.* Commenters stated that the proposed rule added duplication between the AFH and elements currently required to be included in the consolidated plan. Commenters stated that given the avowed desire of HUD to simplify and shorten these key planning documents with a view toward making them more accessible to affected parties, this duplication of publication seems unnecessary.

Other commenters state that, at the outset, former Secretary Donovan stated that one of his goals was reducing redundancy and conflicting Federal planning requirements and making plans more integrated and effective. Commenters stated that the proposed rule, if adopted, threatens to move further away from the goal of integrated planning and places a significant new burden on localities at time when support and resources from HUD are shrinking.

Commenters stated, as proponents of local comprehensive planning, they understand and support the concept of looking broadly at the multiple factors that affect housing and community development. Commenters stated that it is less clear that the AFH is best suited for this analysis and could create both needlessly duplicative planning processes and uncertainty about enforcement and local control of key policies and regulatory functions. Commenters stated that this uncertainty could, ironically, actually slow the adoption of effective housing policies in many communities.

Other commenters stated that to reduce the redundancy between the AFH and the consolidated plan, the consolidated plan should fully incorporate the AFH. Commenters stated that the AFH community participation process is duplicative of the citizen participation process in the consolidated plan process. Commenters stated that the rule is silent as to whether the community engagement process for the AFH can be combined with the consolidated planning community engagement process. If the process for both plans cannot be consolidated, this poses a potential burden on program participants and could lead to community members growing fatigued with duplicative events.

Commenters stated that to fully integrate all planning processes, the AFH must be part of the consolidated plan process to more directly and effectively incorporate fair housing planning into the comprehensive housing and community development planning that program participants undertake through the consolidated plan. Commenters stated that the incorporation of the AFH into the consolidated plan would allow a single community participation process, and would reduce duplicative analyses. Commenters stated that a single plan would support the goal of closely linking the AFH with funding priorities, and could help avoid delays in funding and implementing fair housing and community investment strategies. Commenters stated that the incorporation of the two plans will save time and resources, and increase efficiency and consistency in the planning process. Commenters stated that the obligation to affirmatively further fair housing will be strengthened by a clearer and more direct inclusion of affirmatively furthering fair housing considerations and the AFH in the consolidated plan and PHA Plan processes for establishing fund allocation priorities.

Commenters stated that the AFH should not separately precede the consolidated plan, but should be developed as part of the consolidated plan. If the AFH is submitted significantly ahead of the consolidated plan, program participants would be in a constant planning and reporting cycle which would drain staff time and resources from effective implementation and monitoring of identified goals and objectives of both the AFH and consolidated plan. Commenters stated that if the AFH is developed separately from the consolidated plan there would be unnecessarily redundant analysis, and public confusion resulting from separate duplicative citizen participation hearings.

Commenters stated that having the fair housing goals right next to the data in the consolidated plan where the issues exist would fully integrate fair housing planning with the consolidated plan without requiring two entirely separate documents and planning periods. Commenters stated that this would also substantially ease the burden on program participants of having to prepare different submissions and would avoid having the fair housing discussion essentially separate from the Plan. Commenters stated that any nonduplicative elements that HUD felt was missing between the AFH and the Plan could be added to the Plan, but the need for separate documents would no longer exist.

*HUD Response:* HUD appreciates the concerns and recommendations made by the commenters. HUD has previously addressed the importance of having the AFH precede and not be undertaken concurrently with the consolidated plan and PHA Plan. An analysis of barriers to fair housing choice has always been an analysis separate from the consolidated planning or PHA planning processes. The purpose of the separate analysis is to inform the broader scope in planning undertaken for the consolidated plan and PHA Plan. At the start of this new approach to analyzing fair housing issues HUD believes such analysis is more effective as a separate process. As the new AFH process is implemented and HUD has the opportunity to review how the new AFH process has worked among program participants following the first AFH submissions, HUD may consider greater integration in the consolidated planning and PHA planning processes, or other changes based on the experience with the first round of AFH submissions.

## b. Placement of Disproportionate Housing Needs

HUD's proposed rule sought comment regarding the inclusion of an analysis of disproportionate housing needs in the AFH and the consolidated plan. Specifically, the proposed rule asked: "If a disproportionate housing needs analysis is a part of the AFH, should it remain in the consolidated plan as well? Is this analysis most appropriate in either the AFH or the consolidated plan, or is it appropriate, as the current proposed rule contemplates, to have the analysis in both places, assuming the analysis is the same for both planning exercises?"

*Comments:* Commenters presented the following answers to this question:

*No duplication of analysis:* Several commenters recommended that an analysis of disproportionate housing needs be included in either the AFH or the consolidated plan, but not in both. Commenters stated that given HUD's desire to simplify and shorten planning documents, the inclusion of a disproportionate housing needs analysis in both the AFH and the consolidated plan seems unnecessary and duplicative. Commenters suggested combining the AFH and the consolidated plan to create one plan. Commenters stated that it would be wasteful to put forth twice the effort in two different planning cycles to reach the same results, and instead recommended the analysis be completed once to avoid redundancy of process and minimize the possibility of unintentional inconsistencies. Commenters recommended that, wherever possible, the requirements should be nonduplicative.

*Analysis should be in AFH only.* Commenters stated that an analysis of disproportionate housing needs is an essential element of fair housing planning, and should appear in the AFH. Commenters stated that an analysis of disproportionate housing needs is most relevant to the AFH, which can then influence the consolidated plan without being repeated. Commenters stated that understanding housing conditions and housing cost burdens of persons who are members of protected classes under the Fair Housing Act is a principal factor in planning for fair housing and for making decisions regarding the relative level of funds to allocate for activities targeted at populations in specific income categories. Commenters stated that if the AFH is to become a component of the consolidated plan, the analysis of disproportionate housing needs should be covered only once in

the AFH component of the consolidated plan. Commenters stated that if the AFH is to become the major analytical tool for assessing this aspect of housing, then "serving a warmed over version in the consolidated plan accomplishes little" and could simply be addressed through a reference in the consolidated plan to the AFH.

*Analysis should be in consolidated plan only.* Several commenters recommended that an analysis of disproportionate housing needs only be included in the consolidated plan.

Commenters stated that because disproportionate housing needs does not always mean 'fair housing' the disproportionate housing needs analysis should not be a part of the AFH. Other commenters stated that disproportionate housing needs is not covered by the Fair Housing Act. Commenters stated that a disproportionate housing needs analysis is appropriate for inclusion in consolidated plans and PHA Plans, but is inappropriate for inclusion under affirmatively furthering fair housing standards.

*Analysis should be in both planning documents.* Several commenters recommended including a disproportionate housing needs analysis in both the AFH and the consolidated plan. Commenters stated that the centrality of this data to the decision making process in both the AFH and consolidated planning process means that it belongs in both planning areas, and that inclusion in both will not result in added cost and will help decision makers focus on this piece of essential planning data. Commenters recommended that a disproportionate housing needs analysis should be in both the AFH and the consolidated plan, because the consolidated plan regulation calls for such an analysis to be based on the income categories of extremely low income, low income, moderate income, and middle income, and without that analysis in the consolidated plan, it would be even easier for jurisdictions to set consolidated plan priorities that do not address the critical need for housing programs and policies that serve extremely low income people. Commenters recommended that the analysis of disproportionate housing need appear in both the consolidated plan and the AFH, and recommended incorporating the AFH Assessment Tool and data into the Integrated Disbursement and Information System (IDIS) with the consolidated planning and reporting templates. Another commenter stated that if HUD does not incorporate fair housing directly into the consolidated plan, then the analysis

of disproportionate housing needs should be in both the consolidated plan and the AFH.

*HUD Response:* HUD appreciates the feedback in response to HUD's question about placement of the analysis of disproportionate housing needs. HUD agrees with the commenters that the analysis of disproportionate housing needs should not be in both documents. Since the analysis for disproportionate housing needs in the AFH and the consolidated plan would be almost identical, inclusion in both would be duplicative. The final rule provides for placement of the analysis of disproportionate housing needs in the AFH. HUD also agrees with the commenters who stated that analysis of disproportionate housing needs is an essential element of fair housing planning and that understanding the housing conditions and costs of housing for persons who are members of protected classes under the Fair Housing Act is a principal factor in fair housing planning.

In this final rule, HUD requires program participants to identify disproportionate housing needs for members of racial and ethnic groups in their AFH, and to assess any such needs for fair housing issues.

Under HUD's Consolidated Plan regulations, jurisdictions must include disproportionate housing needs in their consolidated plan. The regulations state that for any of the income categories enumerated in paragraph (b)(1) of the section, to the extent that any racial or ethnic group has disproportionately greater need in comparison to the needs of that category as a whole, assessment of that specific need shall be included. (See § 91.205(b)(2).) The Consolidated Plan regulations also require the jurisdiction to identify and describe any areas within the jurisdiction with concentrations of racial/ethnic minorities and/or low-income families, stating how it defines the terms "area of low-income concentration" and "area of minority concentration" for this purpose. (§ 91.210(a).)

The disproportionate housing needs analysis required in the AFH is a broader analysis than must be done in connection with the consolidated plan since, for AFH purposes, the analysis must include groups with protected characteristics beyond race and ethnicity. HUD has determined that the disproportionate housing needs analysis is necessary to inform the AFH and that it therefore makes sense for the analysis to be performed at the time the program participant is preparing the AFH, rather than waiting until it prepares the consolidated plan. When a consolidated

plan jurisdiction has conducted the requisite analysis on disproportionate housing needs of racial and ethnic minorities in an AFH, it will not be required to conduct a new analysis for purposes of the consolidated plan. In addition, HUD makes a similar change to reduce to the PHA Plan regulations. Section 903.7(a) provides that were a housing needs assessment undertaken as part of the AFH, it is not required as part of the analysis conducted for the PHA Plan.

*Rule Change.* HUD makes conforming changes to the Consolidated Plan regulations to provide that where a disproportionate housing needs assessment is undertaken as part of the AFH it is not required as part of the analysis conducted for the consolidated plan (see §§ 91.205(b)(2), 91.305(b)(2)).

### c. Consultants

*Comment: Program participants will be forced to hire consultants to comply with the reporting requirements of the rule.* Commenters stated that program participants will be forced to hire consultants to comply with the requirements of the rule. Commenters stated that because of the extensive analysis required by the proposed rule, it will be impossible for program participants to avoid hiring consultants, and because consultants will be needed by program participants to prepare their respective AFHs, the cost of hiring a consultant will rise because of increased demand for such services. Commenters stated that the costs associated with the hiring of a consultant will offset much or all of the cost benefit from the HUD-provided data, because such data is not sufficient for compliance. Commenters stated that consultants will also be expensive in rural areas because of the poor quality of HUD data in such rural areas.

*HUD Response:* In the notice published in the **Federal Register** on September 26, 2014, soliciting public comment on the AFH Assessment Tool (79 FR 57949), HUD stated, "With the data that HUD provides for use with the Assessment Tool supplemented by available local data and local knowledge, HUD does not anticipate the need for any program participant to turn to outside consultants to collect data and conduct the assessment." However, HUD appreciates the commenters' concern about the new AFH process and acknowledges that, in some cases, program participants may hire consultants, as they had when conducting the AI. HUD believes that by providing the data in a more systematic and accessible manner, most program participants will not require

consultants. To this end, HUD commits to tailor its AFHs to the program participant in a manner that strives to reduce burden and create an achievable AFH for all involved. HUD intends to provide, in the Assessment Tool, a set of questions in a standard format to clarify and ease the analysis that program participants must undertake. The Assessment Tool, coupled with the data provided by HUD, is designed to provide an easier way to undertake a fair housing assessment. With respect to concerns about data, the final rule invites program participants to supplement HUD's data with local data or with local knowledge.

This final rule adopts new definitions of the terms ''local data'' and ''local knowledge'' to clarify that these terms refer to readily available information that requires little or no cost to obtain.

In addition, HUD has committed to provide technical assistance with preparation of the AFH. These features and the approach of the AFH should result in an effective but not costly or burdensome assessment.

*Rule Change.* Section 5.152 adds the definition of the terms ''local data'' and ''local knowledge.''

*Comment: Program participants can and should hire consultants to provide objective and expert analysis.* In contrast to the preceding commenters, other commenters recommended that HUD make clear in the final rule that program participants may, and should, use independent outside consultants when preparing the required assessment. Commenters articulated the following reasons that consultants should be used. First, the commenters stated a self-assessment involves an inherent conflict and an independent assessment is necessary to generate an accurate and disinterested report. Commenters stated, for example, employees of a program participant may fear consequences of calling out a participant's practices that do not affirmatively further fair housing, or that reflect poorly on the local government or the community generally. Second, the commenters stated not every program participant has in-house resources or knowledge to complete an assessment. Commenters stated that program participants may not have sufficient staff to undertake the assessment, and even if they have sufficient staff, such staff may not have the skills or experience needed to conduct the assessment and accurately analyze and evaluate the data. Commenters stated that, in essence, the consultants are the best equipped to prepare the required analysis. Commenters stated that, if utilized, the consultants should be hired

through an open and competitive bidding process. Commenters stated that, alternatively, HUD could maintain a registry of qualified consultants.

*HUD Response:* HUD has designed the AFH process so that an AFH can be completed without the use of consultants. HUD intends to develop an Assessment Tool to bring certainty to the questions and issues that a program participant must explore to achieve a meaningful AFH. Therefore, program participants may, but are not required to, use consultants in preparing their AFHs, though HUD believes that a consultant will not be necessary to complete an AFH.

Regarding the issue of requiring a competitive bidding process to hire consultants, regulating bidding procedures is outside the scope of this rulemaking. There are existing HUD and Federal guidelines concerning acquisition of services by program participants using Federal funds, and the program participant that seeks to obtain consultant services will need to determine whether these Federal guidelines apply and, if so, the applicable procedure for obtaining consultant services. HUD also declines to maintain a registry of consultants qualified to prepare AFHs.

### d. Scarcity of Resources

*Comment: Additional resources are needed for the rule to succeed.* Commenters stated that limited resources, economic conditions, the location of existing affordable housing, competing priorities for resources, and inability of states to impact local government and individual decision making to affect fair housing are just a few reasons that the rule will not succeed. Commenters stated that HUD underestimates the resource investment that will be necessary on the part of program participants. Commenters stated that, contrary to HUD's claim, simply providing data does not mean that the requirements will not be extremely burdensome to program participants. Commenters stated that HUD is presuming that the data will show a clear, consistent, and easily comprehensible picture—a highly unlikely outcome in most communities, and that the more plausible outcome is a muddled picture showing various needs in various locations, which program participants will have to parse and interpret in order to make use of the data.

Other commenters stated that local governments and States are not responsible for individual differences, and should not be blamed for the results of those differences. The commenters

stated that they should not be forced into the business of spending limited resources and forcing the private market into building or offering housing, infrastructure and transportation that have questionable benefit, and possibly negative consequences, for targeted groups.

*HUD Response:* As stated in the proposed rule, HUD's approach to fair housing planning envisions a process that is structurally incorporated into the consolidated planning and PHA planning processes, building upon what is already familiar to HUD program participants—supported by HUD technical assistance, HUD-provided data, and an Assessment Tool. HUD is aware that the provision of data alone will not necessarily reduce burden, but data provided by HUD and utilization of familiar planning processes, in conjunction with use of an Assessment Tool, will make for a more effective and less burdensome fair housing planning process.

The rule itself establishes four broad categories of fair housing-related issues that must be addressed in the AFH and for which HUD will provide relevant data, including maps and tables for the jurisdiction. The four categories, as provided in § 5.154, are: integration and segregation; racially or ethnically concentrated areas of poverty; disparities in access to opportunity; and disproportionate housing needs. The specific criteria for how to address each of the main categories of needs and potential issues will be provided in greater detail in the Assessment Tool and related guidance. HUD intends to refine and improve the Assessment Tool on an ongoing basis, with the goal of effective implementation while minimizing the burden on HUD program participants.

HUD also agrees that many AFHs will not always present one clear picture with only one obvious available solution. By its very nature, the AFH is a planning document intended to help inform and guide local decisionmaking in addressing complex physical, social, and economic problems, including a greater need for affordable housing, and addressing neighborhood conditions with limited budgets. By providing data and a framework for analysis, however, the AFH is intended to assist program participants in their own prioritization of how best to allocate scarce resources to meet identified local needs and comply with their duty to affirmatively further fair housing. The goal is not to create difficulties for program participants, but to empower participants to fulfill their legal

obligation to affirmatively further fair housing.

A basic tenet of planning and performance management is recognition of "external factors" and other barriers to achieving goals, and which are beyond an organization to control (See, *e.g.*, the Federal Government Performance and Results Act). This rule allows grantees to identify such barriers. Included in such considerations is the identification of funding dependencies and contingencies.

*Comment: HUD should delay implementation of AFH until there is an improved economic environment.* Commenters stated that regardless of how well-meaning this rule may be, it is the worst possible time to impose new regulatory burdens on housing authorities and other program participants. PHA commenters stated that most, if not all of PHA programs, are currently funded at an all-time low level. Commenters stated that public housing operating subsidy is funded at 82 percent, that Section 8/HCV administrative fees are funded at 69 percent, that voucher subsidy is at 94 percent which is resulting in voucher programs serving fewer families nationwide, forcing agencies to terminate families. PHA commenters stated that the capital fund grants to address the $25 billion capital repair backlog is now below $2 billion which HUD admits does not even keep up with annual accrual. Commenters stated that PHAs are struggling to meet payroll and keep their units leased as housing authorities' waiting lists grow, much less meeting the myriad existing regulations on the books. Commenters stated that HUD proposed an approach to the duty to affirmatively further fair housing that will increase workload and regulatory burden at a time program participants cannot handle such increased workload. Commenters stated that former HUD Secretary Donovan himself testified to Congress that HUD was finding it difficult to meet its own obligations due to funding cuts.

*HUD Response:* HUD understands the constraints of the funding environment. The intent of HUD's rule is to provide for a meaningful AFH, while minimizing burden on PHA staff and acknowledging the diversity of PHAs in terms of capacity. By providing the data to the program participants and creating an Assessment Tool that allows program participants to perform the assessment themselves rather than hire consultants, this rule should ensure that PHAs can complete the AFH within their current funding environment. Also, the AFH may assist program participants in making choices as to the uses of their

funding that will affirmatively further fair housing. In addition, as discussed earlier, HUD has decided to implement staggered submission deadlines for different categories of program participants in § 5.160.

*Comment: HUD should have taken modest steps to improve fair housing planning.* Commenters stated that since 1995, HUD has not been able to oversee and monitor program participants' compliance with or performance related to HUD's existing requirement to affirmatively further fair housing, its requirement to conduct an AI, or determine whether program participants were successful in affirmatively furthering fair housing. Commenters stated that the GAO report and HUD's internal report on the matter included suggestions for improving the HUD's performance of these tasks without a wholesale revision of the affirmatively furthering fair housing process or a radical expansion of the concepts involved in affirmatively furthering fair housing. Commenters stated that those approaches appeared to be well within HUD's reach and could have finally provided a baseline against which HUD could measure the effectiveness of the rule's approach to affirmatively furthering fair housing. The commenters stated that rather than taking those modest steps to improve affirmatively furthering fair housing performance and outcomes, HUD has proposed a dramatic expansion and modification to the rule governing affirmatively furthering fair housing. The commenters stated that HUD's proposal imposes new and burdensome tasks on program participants and on HUD at a time when the resources needed to administer existing programs are inadequate for HUD program participants and for HUD. Commenters stated that they are concerned that this regulatory expansion will have the same impact on affirmatively furthering fair housing and fair housing goals as HUD's 1995 rule and its amendments, which is that program participants and HUD will complete additional analyses, submit additional reports to HUD in prescriptive formats, report on outcomes or the lack thereof, to approximately the same effect. Commenters stated that this is not the time to implement a new rule on affirmatively furthering fair housing—not for HUD and not for the HUD program participants.

*HUD Response:* HUD previously addressed comments asking why HUD took the direction it did to improve the effectiveness of affirmatively furthering fair housing.

HUD's rule responds not only to the recommendations of the 2010 GAO

study, but HUD's own internal 2009 review, which included requiring that the required fair housing analyses AFHs be submitted to HUD for review, and for HUD to accept or not accept them within specific timeframes according to a clear standard of review. HUD's rule also places a duty upon HUD to provide data in a reliable and accessible format to reduce the burden on program participants in completing their AFHs.[16]

*Comment: The rule must clearly state that the AFH does not create an obligation to fund a specific project.* Commenters stated that the rule must clearly state that the AFH does not create an obligation to fund a specific project, program, need, or geographic area and that the final rule should contain a statement acknowledging that program participants have limited resources and must make choices how to allocate funds in a manner that may not address all needs.

*HUD Response:* The commenters are correct, the AFH, which is a planning process does not create an obligation to fund a specific project, program, need, or geographic area. The final rule, takes into consideration that a program participant in all likelihood will not be able to address all fair housing issues it may want to tackle and, therefore, prioritization will be necessary. The AFH process established by this rule allows for a flexible approach that permits program participants to consider a variety of available strategies to meet a wide range of local needs and housing market conditions consistent with the duty to affirmatively further fair housing with limited programmatic resources. The AFH is intended to aid rather than supplant local decisionmaking, and the various policy options adopted by program participants will depend fundamentally on the local context and the particular circumstances that prevail when the issues are considered.

*Comment: Fair housing planning should be considered a CDBG eligible activity so that it can be properly funded.* Commenters stated that there is added stress on declining CDBG budget to do more with less money. Commenters stated that if this rule is put in place there needs to be clear expectations for what smaller communities can do as opposed to larger communities. Commenters stated that this rule creates additional burdens for program participants trying to make

---

[16] See: "HUD Needs to Enhance Its Requirements and Oversight of Jurisdictions' Fair Housing Plans," GAO–10–905 (September 2010), GAO; and "Analysis of Impediments Study," (Washington, DC, 2009) HUD, Policy Development Division, Office of Policy Development and Research, HUD.

a community better with activities when they have only two staff persons able to administer the entire program. Commenters stated that making a difference in a small community can only be done in incremental steps and a community of 50,000 compared with a community of 1.5 million must be considered differently, and that for a small community the tactics to deal with segregation are limited by funding. Commenters stated that for the new AFH process to be successful fair housing planning should be considered a CDBG activity instead of being an eligible expense under the CDBG administrative cap.

Commenters recommended that fair housing be identified as a separate or stand-alone eligible activity, not subject to the 20 percent administrative and 15 percent public service caps, so that more funding may be directed to these activities. The commenters stated that in addition, fair housing programs and planning should automatically be presumed to meet the low- and moderate-income national objective.

Other commenters stated that HUD must be realistic about the cost implications of its proposed rule, especially on small organizations, and ensure that the requirements are consistent with the capacity of agencies to implement them. The commenters stated that this might mean a phase-in of requirements for smaller program participants, or providing technical assistance or funding to program participants to carry out their responsibilities.

*HUD Response:* HUD recognizes that smaller program participants do not have the same capacity as larger participants and therefore burdens can be greater. HUD has strived in this final rule to reduce costs and burdens involved in implementation of the new AFH as much as possible, especially for smaller program participants. The guidance that HUD intends to provide will further refine the application of the rule's requirements to specific types of program participants, especially smaller PHAs and local government agencies with limited staff and resources. In addition, HUD plans to provide technical assistance to program participants where requested, which will help smaller program participants that may have small staffs to complete the AFH. HUD has provided for later submission deadlines for CDBG entitlement jurisdictions receiving an FY 2015 grant of $500,000 or less and "qualified PHAs" in this final rule in an effort to reduce burdens on smaller program participants and jurisdictions in conducting the AFH.

*Comment: Paperwork costs will increase under the new AFH process.* Commenters stated that costs, not solely paperwork costs, but travel costs, advertising costs, and costs for administrative staff would increase under the new AFH process. Commenters stated that the costs of advertisements alone, to meet the additional public hearing requirements at the State level are significant. Commenters stated that in addition to the requirement to spend resources for more hearings and advertising, program participants will have to: Dedicate huge amount of staff time to prepare an AFH (1,150 hours, or about 29 work weeks for the average State as per the record keeping requirements in the proposed rule); work with 15 local PHAs that are not in entitlement jurisdictions in developing their plans, and attend numerous requested meetings to undertake the require consultations. The commenters stated that the result of such burden is to draw staff away from effectively operating their programs to preparing the AFH instead.

Other commenters stated that the addition of another series of public meetings, time consuming consolidation of documentation, drafting and staffing a report through city channels, and numerous meetings, outside of the consolidated plan cycle is extremely discouraging to a burdened staff with limited resources at their disposal. The commenters stated that the cost burden identified on **Federal Register** page 43728 with 1,637,200 hours for this should be enough to shelve this idea for a long time.

Commenters stated that the process of holding public hearings around a state, especially a large state, would generate transportation, lodging and food costs as well as advertising to try to generate participation. Commenters stated that there also will be changes to internal processes that will result in additional paperwork needed during the eligibility review process to connect each funded activity to the AFH goals, and that there will be additional time and funding needed for various funded activities to support the AFH.

Commenters stated that while they appreciate enhanced public participation requirements and the mandate that that Federal program participants consult with organizations representing members of protected classes as well as public and private fair housing agencies, they are concerned about the capacity of such organizations to have the time to offer meaningful input—especially if plan submission cycles result in multiple simultaneous requests. The commenters stated that it

takes repeated effort to build rapport with their communities, and that it takes a significant investment in increasing civic participation among historically under represented community members. The commenters reiterated that this effort, although worthwhile, is very time consuming and requires more than one full-time employee, which for some communities, is more than the entire CDBG staff.

Commenters stated that the proposed rule has the appearance of reducing the time spent by program participants in data collection but it increases the time spent in preparing a written analytical report. Commenters stated that given the volume of data presented combined with what the commenters stated appears to them to be an increase in the analysis expected, the commenters anticipate an increase to the paperwork costs associated with the AFH and stated that any efforts going toward increased paperwork could result in decreased financial resources available to serve tenants.

*HUD Response:* HUD is cognizant of the additional costs that some aspects of the new process may present, such as the costs of public hearings, travel, and ensuring outreach to members of the community. However, HUD believes that the fact the AFH is submitted every 3 to 5 years, and is not an annual submission, allows for greater planning on the part of the program participant with respect to how and where to conduct public hearings, which hopefully mitigates expenditures. With respect to time spent preparing the analysis, HUD believes that the Assessment Tool reduces such burden. HUD's Assessment Tool aides program participants in their analysis by providing a series of questions about fair housing issues and contributing factors and providing menus for several responses to certain questions, which decreases rather than increases paperwork. HUD also believes that the revised process for conducting an assessment will reduce or eliminate many program participants' view that they must rely on consultants, as many did in creating AIs under prior requirements set out in regulations and the Fair Housing Planning Guide.

## V. Findings and Certifications

*Regulatory Planning and Review—Executive Orders 12866 and 13563*

Under Executive Order 12866 (Regulatory Planning and Review), a determination must be made whether a regulatory action is significant and, therefore, subject to review by OMB in accordance with the requirements of the

**42348** **Federal Register**/Vol. 80, No. 136/Thursday, July 16, 2015/Rules and Regulations

order. Executive Order 13563 (Improving Regulations and Regulatory Review) directs executive agencies to analyze regulations that are outmoded, ineffective, insufficient, or excessively burdensome and to modify, streamline, expand, or repeal them in accordance with what has been learned. Executive Order 13563 also directs that, where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, agencies are to identify and consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public. This rule was determined to be a "significant regulatory action," as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action under the order). HUD submits that the approach to fair housing planning proposed by this rule is consistent with the objectives of Executive Order 13563 to modify regulations that are outmoded and ineffective. HUD completed a Regulatory Impact Analysis for this final rule, which can be found at *www.regulations.gov*, under the docket number 5173–F–03–RIA. This section summarizes the findings of that analysis.

Summary of Analysis

As more fully addressed earlier in this preamble, this rule establishes an integrated assessment and planning process, the Assessment of Fair Housing (AFH) approach, to give HUD program participants a more effective means to affirmatively further the purpose of the Fair Housing Act. The AFH replaces the analysis of impediments (AI) approach long used by HUD to aid its program participants in affirmatively furthering fair housing but ultimately determined not to be as effective as HUD envisioned. The new approach being established by this rule is accompanied by more support from HUD. HUD will provide States, local governments, and PHAs with data on patterns of (1) integration and segregation; (2) racially and ethnically concentrated areas of poverty; (3) access to education, employment, low-poverty neighborhoods, transportation, environmental health, and other assets that comprise areas of opportunity; and (4) disproportionate housing needs of protected classes. HUD will provide such data from nationally standardized datasets to local entities for the planning process. States, local governments and PHAs will supplement HUD-provided data with local data and local knowledge they have of such fair housing issues. Although HUD is

providing more support to its program participants through this new approach, HUD recognizes that the AFH process will be a substantial change from the current AI process.

While the final rule imposes increased costs of data collection and paperwork on participating jurisdictions and PHAs, most of the positive impacts entail changes in equity, human dignity, and fairness. HUD's primary estimate of compliance costs for its program participants is $25 million per year. HUD estimates that it will incur costs of $9 million to review participants' analyses and provide guidance and feedback.

Need for the Rule

Despite genuine progress and a landscape of communities transformed in the more than 40 years since the Fair Housing Act was enacted, the ZIP code in which a child grows up all too often remains a strong predictor of that child's life course. There are communities that remain segregated by classes protected by the Fair Housing Act. Racially-concentrated areas of poverty exist in virtually every metropolitan area. Disparities in access to important community assets prevail in many instances.

Efforts to not only combat ongoing discrimination, but increase housing choice and access to opportunity are at the core of HUD's fair housing efforts. However, HUD's efforts to date to have its grantees engage in fair housing planning, by undertaking an analysis of impediments (AI) to housing choice, have not been as effective as HUD intended. Under the AI planning process, HUD did not specify or provide grantees relevant information, and did not clearly link grantees' AIs to community planning efforts, such as the Consolidated Plan and the PHA Plan. Under the GAO report referenced earlier in this preamble, the GAO's analysis of 30 AIs highlighted the most common impediments to fair housing choice: zoning and site selection, inadequate public services in low- and moderate-income areas, less favorable mortgage terms from private lenders, and lack of access to information about fair housing rights and responsibilities (GAO, 2010).

Barriers that inhibit community improvements are as costly as barriers that prevent people from settling in their preferred community. The assets offered by a neighborhood can influence the number and profile of people and families who want to live in such a neighborhood. These assets include good schools; safe streets; access to good jobs; a good health infrastructure; available services such as childcare,

parks and open space; diverse and healthy food choices; and a range of transportation options (including accommodations for disabilities). As an alternative, increasing a neighborhood's appeal to families, families with different income and ethnic profiles, can encourage a more diversified population and reduce isolation, thus advancing fair housing goals.

GAO's report recommended that HUD establish rigorous standards for submission, checking, and verification of AIs, and GAO recommended measuring grantees' progress in addressing fair housing impediments. HUD's new regulations being promulgated by this final rule adopt these recommendations.

The new regulation provides a fair housing planning process that builds upon the Consolidated Plan and the PHA planning process, utilizing planning procedures familiar to HUD's program participants. As noted earlier, the regulations provide for grantees to submit their AFHs to HUD, every 5 years, and for HUD to review and evaluate AFHs to determine whether to accept or not accept. Although HUD will provide nationally available data to program participants, the regulations recognize the value of local data, which may be more relevant and current than HUD-provided data. Accordingly, program participants must describe any local data utilized in development of their AFH. The regulations also impose a separate community participation process for the AFH, but using the procedures already in place for the community participation process required by the Consolidated Plan and PHA Plan.

Benefits

The benefits of this rule can be significant. HUD and its grantees have a statutory duty to affirmatively further fair housing. This is not an administrative requirement that can be waived by HUD. As the preamble to the proposed rule provided and reiterated in the preamble to this final rule, the AI process, utilized to date, has been highly criticized as not an effective AFFH tool. The outcomes that HUD seeks from this rule are those intended by the Fair Housing Act—overcoming historic patterns of segregation, promoting fair housing choice, and fostering inclusive communities that are free from discrimination.

Executive Order 13563 (Improving Regulation and Regulatory Review, issued in January 2011) allows regulatory agencies "where appropriate and permitted by law" to "consider (and discuss qualitatively) values that are

difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.'' While the final rule imposes increased costs of data collection and paperwork on participating jurisdictions and PHAs most of the positive impacts entail changes in equity, human dignity, and fairness. If the rule prompts communities to promote a more racially and socio-economically equitable allocation of neighborhood services and amenities, residents would enjoy the mere sense of fairness from the new distribution. Elevating communities out of segregation revitalizes the dignity of residents who felt suppressed under previous housing and zoning regimes. Quantifying such factors as fairness and dignity is likely impossible, yet these values are the crux of the final rule. Since the rule primarily results in such unquantifiable impacts, it is appropriate to consider many of its effects in qualitative terms.

The new AFFH regulations are designed and intended to improve the process for carrying out a statutory mandate, potentially improving the lives of protected classes who face barriers to fair housing choice. The best outcome of the rule would be for each program participant to have the capacity and a well-considered strategy to affirmatively further fair housing. The regulations, however, do not prescribe, compel, or enforce concrete actions that must be taken by HUD's program participants. The regulations instead encourage a more engaged and data-driven approach to assessing the state of fair housing and planning actions.

Increasing a neighborhood's appeal to families with different income and ethnic profiles can encourage a more diversified population and reduce isolation, thus advancing fair housing goals. A key challenge in transforming neighborhoods and promoting integrated communities is preserving their affordability and highlighting their appeal without radically changing their character. Transformation, particularly of lower income neighborhoods, can induce gentrification, which can help advance fair housing goals and integration, but it can also change the ethnic mix to the extent that the minorities who originally populated the neighborhood are no longer present, and thus do not accrue the benefit of the initial investments. The rule strives to establish a balanced approach, as discussed earlier in this rule, to avoid such outcomes that could negate the progress strived to be achieved by the new regulations.

Costs

The rule's impacts on program participants are associated with executing the envisioned planning process. Though HUD estimates new costs exceed new cost savings, the final rule makes several key changes that will reduce costs and burden while replacing the AI process with the new AFH process. First, the final rule advises that HUD will provide versions of the Assessment Tools (or Template), the document by which a program participant will document its assessment of fair housing issues in its geographic area, that are tailored to the roles and responsibilities of the various program participants covered by this rule. HUD agreed with commenters that a one size Assessment Tool does not fit all and that Assessment Tools tailored to the roles and responsibilities of the various program participants, whether they are entitlement jurisdictions, States, or public housing agencies (PHAs), will eliminate examination of areas that are outside of a program participant's area of responsibility. Second, HUD recognizes that all program participants do not have the same recourses and capacity and HUD provides additional time for small entities, qualified PHAs (as defined by statute) and jurisdictions that receive a Community Development Block Grant (CDBG) of $500,000 or less, to complete their first AFH. Third, HUD provides a staggered submission deadline for program participants to submit their first AFH. As reflected in the proposed rule, HUD intends to provide all program participants with considerable time to transition from the current AI approach to the new AFH approach. Fourth, the final rule provides that a program participant that undertook a Regional AI in connection with a grant awarded under HUD's Fiscal Year 2010 or 2011 Sustainable Communities Competition is not required to undertake an AFH for the first AFH submission stage.

While these significant changes reduce burden and costs and while the new AFH approach builds upon the existing Consolidated Planning and PHA Planning processes, HUD recognizes that there will be costs. The new AFH will involve additional document preparation. Costs associated with such preparation are not significantly increased because States, local governments, and PHAs are already required to address analyses comparable to those required by the AFH, such as disproportionate housing needs, and undertake activities to offer fair housing choice, and maintain

records of the activities and their impact. However, the new AFH involves a separate community participation process, and HUD recognizes that this new participation process entails additional costs. Accordingly, the aggregate compliance cost on local entities is expected to be in the range of $25 million per year after the second year of implementation, $9 million for HUD, for a total of $34 million.

There will also be costs associated with the strategies and actions program participants take to address the goals of the AFH. However, the rule covers program participants subject to a diversity of local conditions and economic and social contexts. Therefore, this analysis is unable to quantify the outcomes of the process to identify (1) barriers to fair housing, (2) program participants' decisions on which barriers to address, (3) the types of policies to address those barriers, and (4) those policies' effects on protected classes. The precise outcomes of the AFFH planning process are uncertain, but the rule will enable each jurisdiction to plan meaningfully.

The net change in burden for specific local entities will depend on the extent to which they have been complying with the planning process already in place. The local entities that have been diligent in completing rigorous AIs may experience a net decrease in administrative burden as a result of the revised process. Many program participants spend considerable time and funds trying in good faith to comply with the existing AI requirements, given the absence of specificity, and for those program participants, the new AFH process, given its specificity should be easier and less costly.

PHAs, which are not required to prepare AIs, may already spend considerable time cooperating with local governments by drawing upon the information and housing needs analysis in the local Consolidated Plan to inform the PHA plan and assessing the potential effectiveness of strategies such as local preferences. Indeed PHAs are currently required to certify that the PHA Plan is consistent with the consolidated plan applicable to the PHA. However, the demands of the new process are expected to result in a net increase of administrative burden for entities that have not regularly conducted an analysis of impediments to barriers to fair housing choice. For these entities, the new AFH process will result in an increase in burden and cost. Similarly, the burden of the rule will vary by data aptitude and resources of the program participant. Entities that have invested in data systems and are

able to access more easily relevant local data would in all likelihood have a reduced burden. A program participant that already collects data and employs analysts who study local trends will be able to respond with little additional effort compared to a program participant that does not have this capacity.

Summary Tables

The primary compliance costs are for the HUD program participants to prepare a more rigorous five year plan. The cost will depend upon on the difficulty of preparation for a particular as well as how different the new fair housing planning process is

from current practices. About $3 million annually of these costs are comprised of training and public participation costs. In addition to the burden on HUD program participants, HUD itself will need to hire staff to implement the rule; provide data support; and review submitted AFHs.

### TABLE—ANNUAL COMPLIANCE COSTS

| Compliance costs in a typical year ($millions) | | | |
|---|---|---|---|
| Costs to all grantees | | | |
| | Primary Estimate | Lower Bound | Upper Bound |
| Analysis | 22 | 4 | 39 |
| Training | 2.2 | 0.8 | 2.2 |
| Participation | 1.2 | 1.2 | 1.2 |
| Total | 25.4 | 6.0 | 42.4 |

*\***Note:** Compliance Costs in first two years are less.

### TABLE—ANNUAL TOTAL COSTS AND HUD RESOURCE COSTS

| | Primary estimate | Lower bound | Upper bound |
|---|---|---|---|
| **Annual Costs to HUD** | | | |
| HUD Costs | 9 | ................... | ................... |
| **Annual Total Costs to Grantees and HUD** | | | |
| Total | 34.4 | 15.0 | 51.4 |

HUD judges the merits of this rule by the value it can create for protected classes. Ultimately, that value will be created by new program participant policies that result from the improved

planning and analytical process. Section 5 of HUD's Regulatory Impact Analysis assesses several examples of policies that may be pursued by program participants in response to the new

AFFH process. While this list is far from exhaustive, it does provide insight into the types of impacts we can expect from this rule. As such, the impacts are summarized in the table below.

### TABLE—SUMMARY OF IMPACTS OF NEW GRANTEE POLICY EXAMPLES

| Potential rule outcome | Potential benefits and transfers | Potential costs |
|---|---|---|
| Inclusionary Zoning Policies | Transfer: Housing units and associated locational amenities that would have otherwise been market-rate are transferred to protected classes. | Costs: Reductions in consumer and producer surplus (deadweight loss) associated with increased prices and reduced quantities. |
| Removal of Harmful Regulations that act as Barriers to Fair Housing (e.g. minimum lot size requirements). | Benefit: Increased consumer surplus from reduction in prices and increased quantities. | None. |
| Creation of New Amenities (Transit Stop Example). | Benefit: Reductions in commute times or costs .............. | Costs: Construction, maintenance, and operating costs. |
| Mobility Policies ................... | Transfer: Units and associated locational amenities that otherwise would have been market-rate, are transferred to protected classes. | Costs: Administrative costs associated with implementing mobility programs (e.g. paperwork costs and outreach to target landlords.) |

Summary of Impact

The AFFH regulations being promulgated by this final rule are designed and expected to improve the process for carrying out a statutory mandate, potentially improving the lives of protected classes who face barriers to fair housing choice. As

presented above, HUD's Regulatory Impact Analysis estimates compliance costs for its program participants and costs to HUD to implement the rule.

Actions taken by program participants as a result of this rule may result in new local approaches to reducing segregation, eliminating racially

concentrated areas of poverty, reducing disparities in access to opportunity, and reducing disproportionate housing needs. HUD believes that some of these new approaches would better achieve the goals of fair housing, meaning that communities would be more integrated, fewer people would live in high-

poverty, segregated neighborhoods, and access to high-quality education, job opportunities, and other community assets would be more equal.

The preceding provides an overview of the analysis that is more fully discussed in HUD's Regulatory Impact Analysis, and which can be found at HUD's docket for this rule at *www.regulations.gov.* HUD's Regulatory Flexibility Analysis below highlights changes made at the final rule stage to minimize burden on small entities.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. The undersigned certifies that this rule would not have a significant economic impact on a substantial number of small entities.

HUD anticipates that the final rule will strengthen the way in which HUD and its program participants will take affirmative steps to further fair housing under the Fair Housing Act. Although local governments, States, and PHAs must affirmatively further fair housing independent of any regulatory requirement imposed by HUD, HUD recognizes its statutory responsibility to provide leadership and direction in this area under the Fair Housing Act, while preserving local determination of fair housing needs and strategies.

To help program participants more effectively meet their statutory obligation to affirmatively further fair housing, this rule establishes a fair housing planning process, the AFH process, to assist program participants in identifying barriers to fair housing choice in their areas. The AFH approach replaced the prior AI process, which did not work as effectively as HUD initially envisioned. Although the fair housing planning process established by this rule presents a more comprehensive approach than the prior AI process, HUD designed the approach to minimize burden to the extent feasible. The rule minimizes burden by coordinating the AFH with existing planning processes, the consolidated plans for State and local governments, and PHA Plans for PHAs.

The AFH approach requires program participants to complete a fair housing analysis using factors stated in the rule along with HUD-provided data, which is national in scope, and to supplement the HUD-provided data where relevant

and easily obtainable, with local data. This analysis will then be updated every 3 to 5 years through the consolidated plan for States and local governments, and every 5 years through the PHA Plan for PHAs, as a basis for strategies to address identified factors that contribute to or impede fair housing choice and access to opportunity, such as quality schools or improved transportation. Thus, part of the burden minimization presented by this approach is to require such analysis not annually but every 3 to 5 years. HUD believes that given the comprehensive nature of this new approach, the analysis should sustain a multi-year span.

In addition to building upon existing planning processes, this rule further strives to minimize burden by HUD by providing program participants with data on access to opportunity through categories such as education, employment, low poverty exposure, and transportation, as well as patterns of integration and segregation, racially or ethnically concentrated areas of poverty, disproportionate housing needs based on protected class, and data on national trends in housing discrimination. The national data will be provided at the time of the issuance of the Assessment Tool, which is currently undergoing the approval process under the Paperwork Reduction Act. The 60-day notice, required under the Paperwork Reduction Act, can be found at 79 FR 57949 (September 26, 2014).

With HUD-provided data and any additional local data provided by program participants, program participants can better identify, in their areas, patterns of integration and segregation, disparities in access to opportunity by members of protected classes, racially or ethnically concentrated areas of poverty, and disproportionate housing needs based on protected class. With such identification, program participants can focus on areas for improvement, develop strategies to address barriers to fair housing choice, and prioritize where resources will be deployed first. To further ease burden on program participants, through this rule, HUD commits to be available to provide technical assistance to program participants in the development of their AFHs.

The provision of data by HUD, and the agency's active role in assisting program participants with an AFH, will minimize burden for all program participants, large and small, in meeting their statutory obligation to affirmatively further fair housing.

At this final rule stage and in response to public comment, HUD has

taken additional steps to reduce burden on entities that are small in size or may, notwithstanding size, have less capacity to perform the assessment of fair housing as provided in the rule. HUD recognizes that small program participants may have extremely limited staff or, as a result of funding shortages, currently struggle to effectively carry out program requirements. This final rule provides that, while all participants will be given significant lead time to complete their first AFH, program participants that are PHAs, entitlement jurisdictions receiving an FY 2015 CDBG grant of $500,000 or less, States (including State PHAs submitting alone), and Insular Areas are all provided with the option to submit their first AFH at a date later than that required for entitlement jurisdictions that receive an FY 2015 CDBG grant of more than $500,000.

This submission structure extends the time that the staff of these program participants have to complete their first AFH, submitted through the Assessment Tool as provided in the rule. The delayed submission date for the first AFH not only extends the time in which staff of these program participants may work with HUD on addressing any issues that arise in completing the Assessment Tool, but they will have the benefit of the experience of those program participants that were the first to submit their AFHs. It is expected that after submission of the first AFH, program participants will have both experience and a system in place, making future submissions an easier task.

HUD also intends to design an Assessment Tool that is tailored for program participants other than entitlement jurisdictions that receive an FY 2015 CDBG grant of more than $500,000, another measure designed to minimize burden. HUD believes that through the measures taken in this rule—HUD-provided data, technical assistance, a delayed submission deadline for the first AFH, and a planned tailored Assessment Tool—HUD has minimized burden associated with the new AFH approach, without, however, minimizing the effectiveness of the new approach. As a result of these measures, this rule does not have a significant economic impact on a substantial number of small entities.

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits, to the extent practicable and permitted by law, an agency from promulgating a regulation that has federalism implications and either imposes substantial direct

compliance costs on state and local governments and is not required by statute, or preempts state law, unless the relevant requirements of section 6 of the executive order are met. This rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the executive order. HUD anticipates that the rule will assist program participants of HUD funds in undertaking their actions and strategies to affirmatively further fair housing. As HUD has noted in the preceding section discussing the Regulatory Flexibility Act and in the Background section of this preamble, the obligation to affirmatively further fair housing is imposed by statute directly on local governments, States, and PHAs, as the agencies charged with administering the Fair Housing Act.

HUD is responsible for overseeing that its programs are administered in a manner that furthers the purposes and policies of fair housing and entities receiving HUD funds fulfill their affirmatively furthering fair housing obligation.

The approach taken by HUD in this rule is to help local governments, States, and PHAs meet this obligation in a way that is meaningful, but without undue burden. As noted throughout this preamble, HUD will provide local and regional data on patterns of integration and segregation and access to community assets in education, neighborhood stability, credit, employment, transportation, health, and other community amenities, as well as national trends in housing discrimination. This approach, in which HUD offers data, clear standards, guidance, and technical assistance, is anticipated to reduce the burden and cost that are involved in current regulatory schemes governing affirmatively furthering fair housing. Since Federal law requires states and local governments to affirmatively further fair housing, there is no preemption, by this rule, of State law.

*Paperwork Reduction Act*

The information collection requirements of this rule are those largely contained in the Assessment Tool. The Assessment Tool consists of questions to the grantees to solicit information to help grantees in the fair housing planning required by this rule. The Assessment Tool is undergoing the required notice and solicitation of public comment process required by the Paperwork Reduction Act. This process commenced with the first notice published by HUD on September 26,

2014. When this process has been concluded, HUD will submit the information collection requirements to OMB for approval. In accordance with the Paperwork Reduction Act, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information, unless the collection displays a currently valid OMB control number.

*List of Subjects*

*24 CFR Part 5*

Administrative practice and procedure, Aged, Claims, Grant programs—housing and community development, Individuals with disabilities, Intergovernmental relations, Loan programs—housing and community development, Low and moderate income housing, Mortgage insurance, Penalties, Pets, Public housing, Rent subsidies, Reporting and recordkeeping requirements, Social security, Unemployment compensation, Wages.

*24 CFR Part 91*

Aged, Grant programs—housing and community development, Homeless, Individuals with disabilities, Low and moderate income housing, Reporting and recordkeeping requirements.

*24 CFR Part 92*

Administrative practice and procedure, Grant programs—housing and community development, Low and moderate income housing, Manufactured homes, Rent subsidies, Reporting and recordkeeping requirements.

*24 CFR Part 570*

Administrative practice and procedure, American Samoa, Community development block grants, Grant programs—education, Grant programs—housing and community development, Guam, Indians, Lead poisoning, Loan programs—housing and community development, Low and moderate income housing, New communities, Northern Mariana Islands, Pacific Islands Trust Territory, Pockets of poverty, Puerto Rico, Reporting and recordkeeping requirements, Small cities, Student aid, Virgin Islands.

*24 CFR Part 574*

Community facilities, Disabled, Grant programs—health programs, Grant programs—housing and community development, Grant programs—social programs, HIV/AIDS, Homeless, Housing, Low and moderate income housing, Nonprofit organizations, Rent subsidies, Reporting and recordkeeping requirements, Technical assistance.

*24 CFR Part 576*

Community facilities, Emergency solutions grants, Grant programs—housing and community development, Grant program—social programs, Homeless, Reporting and recordkeeping requirements.

*24 CFR Part 903*

Administrative practice and procedure, Public housing, Reporting and recordkeeping requirements.

Accordingly, for the reasons described in the preamble, HUD amends parts 5, 91, 92, 570, 574, 576, and 903 of title 24 of the Code of Federal Regulations as follows:

## PART 5—GENERAL HUD PROGRAM REQUIREMENTS; WAIVERS

■ 1. The authority citation for part 5 continues to read as follows:

**Authority:** 42 U.S.C. 1437a, 1437c, 1437d, 1437f, 1437n, 3535(d), Sec. 327, Pub. L. 109–115, 119 Stat. 2936, and Sec. 607, Pub. L. 109–162, 119 Stat. 3051.

## Subpart A—Generally Applicable Definitions and Federal Requirements; Waivers

■ 2. Add an authority citation for part 5, subpart A, to read as follows:

**Authority:** 29 U.S.C. 794, 42 U.S.C. 1437a, 1437c, 1437c–1(d), 1437d, 1437f, 1437n, 3535(d), and Sec. 327, Pub. L. 109–115, 119 Stat. 2936; 42 U.S.C. 3600–3620; 42 U.S.C. 5304(b); 42 U.S.C. 12101 *et seq.;* 42 U.S.C. 12704–12708; E.O. 11063, 27 FR 11527, 3 CFR, 1958–1963 Comp., p. 652; E.O. 12892, 59 FR 2939, 3 CFR, 1994 Comp., p. 849.

■ 3. Subpart A is amended by adding §§ 5.150–5.152, 5.154, 5.156, 5.158, 5.160, 6.162, 5.164, 5.166, 5.168, and 5.169–5.180 under an undesignated center heading to read as follows:

### Affirmatively Furthering Fair Housing

Sec.
5.150    Affirmatively Furthering Fair Housing: Purpose.
5.151    Affirmatively Furthering Fair Housing: Implementation.
5.152    Definitions.
5.154    Assessment of Fair Housing (AFH).
5.156    Joint and Regional AFHs.
5.158    Community participation, consultation, and coordination.
5.160    Submission requirements.
5.162    Review of AFH.
5.164    Revising an accepted AFH.
5.166    AFFH certification.
5.168    Recordkeeping.
5.167–5.180    [Reserved]

### Affirmatively Furthering Fair Housing

**§ 5.150    Affirmatively Furthering Fair Housing: Purpose.**

Pursuant to the affirmatively furthering fair housing mandate in

section 808(e)(5) of the Fair Housing Act, and in subsequent legislative enactments, the purpose of the Affirmatively Furthering Fair Housing (AFFH) regulations in §§ 5.150 through 5.180 is to provide program participants with an effective planning approach to aid program participants in taking meaningful actions to overcome historic patterns of segregation, promote fair housing choice, and foster inclusive communities that are free from discrimination. The regulations establish specific requirements for the development and submission of an Assessment of Fair Housing (AFH) by program participants (including local governments, States, and public housing agencies (PHAs)), and the incorporation and implementation of that AFH into subsequent consolidated plans and PHA Plans in a manner that connects housing and community development policy and investment planning with meaningful actions that affirmatively further fair housing. A program participant's strategies and actions must affirmatively further fair housing and may include various activities, such as developing affordable housing, and removing barriers to the development of such housing, in areas of high opportunity; strategically enhancing access to opportunity, including through: Targeted investment in neighborhood revitalization or stabilization; preservation or rehabilitation of existing affordable housing; promoting greater housing choice within or outside of areas of concentrated poverty and greater access to areas of high opportunity; and improving community assets such as quality schools, employment, and transportation.

### § 5.151 Affirmatively Furthering Fair Housing: Implementation.

Section 5.160 of the AFH regulations provides the date by which program participants must submit their first AFH. A program participant's AFH submission date is the date by which the program participant must comply with the regulations in §§ 5.150 through 5.180. Until such time, the program participant shall continue to conduct an analysis of impediments, as required of the program participant under one or more of the HUD programs listed in § 5.154, in accordance with requirements in effect prior to August 17, 2015.

### § 5.152 Definitions.

For purposes of §§ 5.150 through 5.180, the terms "consolidated plan," "consortium," "unit of general local government," "jurisdiction," and "State" are defined in 24 CFR part 91. For PHAs, "jurisdiction" is defined in 24 CFR 982.4. The following additional definitions are provided solely for purposes of §§ 5.150 through 5.180 and related amendments in 24 CFR parts 91, 92, 570, 574, 576, and 903:

*Affirmatively furthering fair housing* means taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws. The duty to affirmatively further fair housing extends to all of a program participant's activities and programs relating to housing and urban development.

*Assessment of Fair Housing (assessment or AFH)* means the analysis undertaken pursuant to § 5.154 that includes an analysis of fair housing data, an assessment of fair housing issues and contributing factors, and an identification of fair housing priorities and goals, and is conducted and submitted to HUD using the Assessment Tool. The AFH may be conducted and submitted by an individual program participant (individual AFH), or may be a single AFH conducted and submitted by two or more program participants (joint AFH) or two or more program participants, where at least two of which are consolidated plan program participants (regional AFH).

*Assessment Tool* refers collectively to any forms or templates and the accompanying instructions provided by HUD that program participants must use to conduct and submit an AFH pursuant to § 5.154. HUD may provide different Assessment Tools for different types of program participants. In accordance with the Paperwork Reduction Act (44 U.S.C. Chapter 35) (PRA), the Assessment Tool will be subject to periodic notice and opportunity to comment in order to maintain the approval of the Assessment Tool as granted by the Office of Management and Budget (OMB) under the PRA.

*Community participation,* as required in § 5.158, means a solicitation of views and recommendations from members of the community and other interested parties, a consideration of the views and recommendations received, and a process for incorporating such views and recommendations into decisions and outcomes. For HUD regulations implementing the Housing and Community Development Act of 1974, the statutory term for "community participation" is "citizen participation," and, therefore, the regulations in 24 CFR parts 91, 92, 570, 574, and 576 use this term.

*Consolidated plan program participant* means any entity specified in § 5.154(b)(1).

*Contributing factor.* See definition of "fair housing contributing factor" in this section.

*Data.* The term "data" refers collectively to the sources of data provided in paragraphs (1) and (2) of this definition. When identification of the specific source of data in paragraph (1) or (2) is necessary, the specific source (HUD-provided data or local data) will be stated.

(1) *HUD-provided data.* As more fully addressed in the Assessment Tool, the term "HUD-provided data" refers to HUD-provided metrics, statistics, and other quantified information required to be used with the Assessment Tool. HUD-provided data will not only be provided to program participants but will be posted on HUD's Web site for availability to all of the public;

(2) *Local data.* As more fully addressed in the Assessment Tool, the term "local data" refers to metrics, statistics, and other quantified information, subject to a determination of statistical validity by HUD, relevant to the program participant's geographic areas of analysis, that can be found through a reasonable amount of search, are readily available at little or no cost, and are necessary for the completion of the AFH using the Assessment Tool.

*Disability.* (1) The term "disability" means, with respect to an individual:

(i) A physical or mental impairment that substantially limits one or more major life activities of such individual;

(ii) A record of such an impairment; or

(iii) Being regarded as having such an impairment.

(2) The term "disability" as used herein shall be interpreted consistent with the definition of such term under section 504 of the Rehabilitation Act of 1973, as amended by the ADA Amendments Act of 2008. This definition does not change the definition of "disability" or "disabled person" adopted pursuant to a HUD program statute for purposes of determining an individual's eligibility

to participate in a housing program that serves a specified population.

*Disproportionate housing needs* refers to a condition in which there are significant disparities in the proportion of members of a protected class experiencing a category of housing need when compared to the proportion of members of any other relevant groups or the total population experiencing that category of housing need in the applicable geographic area. For purposes of this definition, categories of housing need are based on such factors as cost burden, severe cost burden, overcrowding, and substandard housing conditions, as those terms are applied in the Assessment Tool.

*Fair housing choice* means that individuals and families have the information, opportunity, and options to live where they choose without unlawful discrimination and other barriers related to race, color, religion, sex, familial status, national origin, or disability. Fair housing choice encompasses:

(1) Actual choice, which means the existence of realistic housing options;

(2) Protected choice, which means housing that can be accessed without discrimination; and

(3) Enabled choice, which means realistic access to sufficient information regarding options so that any choice is informed. For persons with disabilities, fair housing choice and access to opportunity include access to accessible housing and housing in the most integrated setting appropriate to an individual's needs as required under Federal civil rights law, including disability-related services that an individual needs to live in such housing.

*Fair housing contributing factor (or contributing factor)* means a factor that creates, contributes to, perpetuates, or increases the severity of one or more fair housing issues. Goals in an AFH are designed to overcome one or more contributing factors and related fair housing issues, as provided in § 5.154.

*Fair housing issue* means a condition in a program participant's geographic area of analysis that restricts fair housing choice or access to opportunity, and includes such conditions as ongoing local or regional segregation or lack of integration, racially or ethnically concentrated areas of poverty, significant disparities in access to opportunity, disproportionate housing needs, and evidence of discrimination or violations of civil rights law or regulations related to housing. Participation in ''housing programs serving specified populations,'' as defined in this section, does not present

a fair housing issue of segregation, provided that such programs are administered by program participants so that the programs comply with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–2000d–4) (Nondiscrimination in Federally Assisted Programs); the Fair Housing Act (42 U.S.C. 3601–19), including the duty to affirmatively further fair housing; section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794); the Americans with Disabilities Act (42 U.S.C. 12101, *et seq.*); and other Federal civil rights statutes and regulations.

*Fair housing enforcement and fair housing outreach capacity* means the ability of a jurisdiction, and organizations located in the jurisdiction, to accept complaints of violations of fair housing laws, investigate such complaints, obtain remedies, engage in fair housing testing, and educate community members about fair housing laws and rights. This definition covers any State or local agency that enforces a law substantially equivalent to the Fair Housing Act (see 24 CFR part 115) and any organization participating in the Fair Housing Initiative Programs (see 24 CFR part 125).

*Geographic area* means a jurisdiction, region, State, Core-Based Statistical Area (CBSA), or another applicable area (*e.g.,* census tract, neighborhood, Zip code, block group, housing development, or portion thereof) relevant to the analysis required to complete the assessment of fair housing, as specified in the Assessment Tool.

*Housing programs serving specified populations.* Housing programs serving specified populations are HUD and Federal housing programs, including designations in the programs, as applicable, such as HUD's Supportive Housing for the Elderly, Supportive Housing for Persons with Disabilities, homeless assistance programs under the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11301 *et seq.*), and housing designated under section 7 of the United States Housing Act of 1937 (42 U.S.C. 1437e), that:

(1) Serve specific identified populations; and

(2) Comply with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–2000d–4) (Nondiscrimination in Federally Assisted Programs); the Fair Housing Act (42 U.S.C. 3601–19), including the duty to affirmatively further fair housing; section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794); the Americans with Disabilities Act (42 U.S.C. 12101, *et seq.*); and other Federal civil rights statutes and regulations.

*Insular area* has the same meaning as provided in § 570.405.

*Integration* means a condition, within the program participant's geographic area of analysis, as guided by the Assessment Tool, in which there is not a high concentration of persons of a particular race, color, religion, sex, familial status, national origin, or having a disability or a particular type of disability when compared to a broader geographic area. For individuals with disabilities, integration also means that such individuals are able to access housing and services in the most integrated setting appropriate to the individual's needs. The most integrated setting is one that enables individuals with disabilities to interact with persons without disabilities to the fullest extent possible, consistent with the requirements of the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*) and section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). See 28 CFR part 35, appendix B (addressing 28 CFR 35.130 and providing guidance on the American with Disabilities Act regulation on nondiscrimination on the basis of disability in State and local government services).

*Joint participants* refers to two or more program participants conducting and submitting a single AFH (a joint AFH), in accordance with § 5.156 and 24 CFR 903.15(a)(1) and (2), as applicable.

*Local knowledge.* As more fully addressed in the Assessment Tool, local knowledge means information to be provided by the program participant that relates to the participant's geographic areas of analysis and that is relevant to the program participant's AFH, is known or becomes known to the program participant, and is necessary for the completion of the AFH using the Assessment Tool.

*Meaningful actions* means significant actions that are designed and can be reasonably expected to achieve a material positive change that affirmatively furthers fair housing by, for example, increasing fair housing choice or decreasing disparities in access to opportunity.

*Program participants* means any entities specified in § 5.154(b).

*Protected characteristics* are race, color, religion, sex, familial status, national origin, having a disability, and having a type of disability.

*Protected class* means a group of persons who have the same protected characteristic; *e.g.,* a group of persons who are of the same race are a protected class. Similarly, a person who has a mobility disability is a member of the protected class of persons with

disabilities and a member of the protected class of persons with mobility disabilities.

*Qualified public housing agency (Qualified PHA).* Refers to a PHA:

(1) For which the sum of:

(i) The number of public housing dwelling units administered by the PHA; and

(ii) The number of vouchers under section 8(o) of the United States Housing Act of 1937 (42 U.S.C. 1437f(o)) administered by the PHA is 550 or fewer; and

(2) That is not designated under section 6(j)(2) of the United States Housing Act of 1937 as a troubled PHA, and does not have a failing score under the Section 8 Management Assessment Program (SEMAP) during the prior 12 months.

*Racially or ethnically concentrated area of poverty* means a geographic area with significant concentrations of poverty and minority populations.

*Regionally collaborating participants* refers to joint participants, at least two of which are consolidated plan program participants. A PHA may participate in a regional assessment in accordance with PHA Plan participation requirements under 24 CFR 903.15(a)(1). Regionally collaborating participants conduct and submit a single AFH (regional AFH) in accordance with § 5.156.

*Segregation* means a condition, within the program participant's geographic area of analysis, as guided by the Assessment Tool, in which there is a high concentration of persons of a particular race, color, religion, sex, familial status, national origin, or having a disability or a type of disability in a particular geographic area when compared to a broader geographic area. For persons with disabilities, segregation includes a condition in which the housing or services are not in the most integrated setting appropriate to an individual's needs in accordance with the requirements of the Americans with Disabilities Act (42 U.S.C. 12101, *et seq.*), and section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). (See 28 CFR part 35, appendix B, addressing 25 CFR 35.130.) Participation in ''housing programs serving specified populations'' as defined in this section does not present a fair housing issue of segregation, provided that such programs are administered to comply with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–2000d–4) (Nondiscrimination in Federally Assisted Programs): The Fair Housing Act (42 U.S.C. 3601–19), including the duty to affirmatively further fair housing: section 504 of the

Rehabilitation Act of 1973 (29 U.S.C. 794); the Americans with Disabilities Act (42 U.S.C. 12101, *et seq.*); and other Federal civil rights statutes and regulations.

*Significant disparities in access to opportunity* means substantial and measurable differences in access to educational, transportation, economic, and other important opportunities in a community, based on protected class related to housing.

### § 5.154   Assessment of Fair Housing (AFH).

(a) *General.* To develop a successful affirmatively furthering fair housing strategy, it is central to assess the elements and factors that cause, increase, contribute to, maintain, or perpetuate segregation, racially or ethnically concentrated areas of poverty, significant disparities in access to opportunity, and disproportionate housing needs. For HUD program participants already required to develop plans for effective uses of HUD funds consistent with the statutory requirements and goals governing such funds, an AFH will be integrated into such plans.

(b) *Requirement to submit an AFH.* In furtherance of the statutory obligation to affirmatively further fair housing, an AFH must be developed following the AFH consultation, content, and submission requirements described in §§ 5.150 through 5.180, and submitted in a manner and form prescribed by HUD by the following entities:

(1) Jurisdictions and Insular Areas that are required to submit consolidated plans for the following programs:

(i) The Community Development Block Grant (CDBG) program (see 24 CFR part 570, subparts D and I);

(ii) The Emergency Solutions Grants (ESG) program (see 24 CFR part 576);

(iii) The HOME Investment Partnerships (HOME) program (see 24 CFR part 92); and

(iv) The Housing Opportunities for Persons With AIDS (HOPWA) program (see 24 CFR part 574).

(2) Public housing agencies (PHAs) receiving assistance under sections 8 or 9 of the United States Housing Act of 1937 (42 U.S.C. 1437f or 42 U.S.C.1437g).

(c) *Fair housing data.* Program participants will use HUD-provided data, as defined within the definition of ''data'' in § 5.152, and supplement the HUD-provided data, as needed, with local data and local knowledge, as guided by the Assessment Tool.

(d) *Content.* Using the Assessment Tool prescribed by HUD, each program participant shall conduct an AFH for the purpose of examining its programs,

jurisdiction, and region, and identifying goals to affirmatively further fair housing and to inform fair housing strategies in the consolidated plan, annual action plan, the PHA Plan and any other plan incorporated therein, and community plans including, but not limited to, education, transportation, or environmental related plans. The AFH's analysis, goals, and priorities will address integration and segregation; racially or ethnically concentrated areas of poverty; disparities in access to opportunity; and disproportionate housing needs based on race, color, religion, sex, familial status, national origin, and disability. The AFH will assess the jurisdiction's fair housing enforcement and fair housing outreach capacity. At a minimum, the AFH will include the following elements:

(1) *Summary of fair housing issues and capacity.* The AFH must include a summary of fair housing issues in the jurisdiction, including any findings, lawsuits, enforcement actions, settlements, or judgments related to fair housing or other civil rights laws, an assessment of compliance with existing fair housing laws and regulations, and an assessment of the jurisdiction's fair housing enforcement and fair housing outreach capacity.

(2) *Analysis of data.* Using HUD-provided data, local data, local knowledge, including information gained through community participation, and the Assessment Tool, the program participant will undertake the analysis required by this section. This analysis will address the following to the extent the data or local knowledge are informative of the following:

(i) Identification of integration and segregation patterns and trends based on race, color, religion, sex, familial status, national origin, and disability within the jurisdiction and region;

(ii) Identification of racially or ethnically concentrated areas of poverty within the jurisdiction and region;

(iii) Identification of significant disparities in access to opportunity for any protected class within the jurisdiction and region; and

(iv) Identification of disproportionate housing needs for any protected class within the jurisdiction and region.

(3) *Assessment of fair housing issues.* Using the Assessment Tool provided by HUD, the AFH will identify the contributing factors for segregation, racially or ethnically concentrated areas of poverty, disparities in access to opportunity, and disproportionate housing needs as identified under paragraph (d)(2) of this section.

(4) *Identification of fair housing priorities and goals.* Consistent with the

identification of fair housing issues, and the analysis and assessment conducted under paragraphs (d)(1) through (3) of this section, the AFH must:

(i) Identify and discuss the fair housing issues arising from the assessment; and

(ii) Identify significant contributing factors, prioritize such factors, and justify the prioritization of the contributing factors that will be addressed in the program participant's fair housing goals. In prioritizing contributing factors, program participants shall give highest priority to those factors that limit or deny fair housing choice or access to opportunity, or negatively impact fair housing or civil rights compliance; and

(iii) Set goals for overcoming the effects of contributing factors as prioritized in accordance with paragraph (d)(4)(ii) of this section. For each goal, a program participant must identify one or more contributing factors that the goal is designed to address, describe how the goal relates to overcoming the identified contributing factor(s) and related fair housing issue(s), and identify the metrics and milestones for determining what fair housing results will be achieved. For instance, where segregation in a development or geographic area is determined to be a fair housing issue, with at least one significant contributing factor, HUD would expect the AFH to include one or more goals to reduce the segregation.

(5) *Strategies and actions.* To implement goals and priorities in an AFH, strategies and actions shall be included in program participants' consolidated plans, Annual Action Plans, and PHA Plans (including any plans incorporated therein), and need not be reflected in their AFH. Strategies and actions must affirmatively further fair housing and may include, but are not limited to, enhancing mobility strategies and encouraging development of new affordable housing in areas of opportunity, as well as place-based strategies to encourage community revitalization, including preservation of existing affordable housing, including HUD-assisted housing.

(6) *Summary of community participation.* The AFH must include a concise summary of the community participation process, public comments, and efforts made to broaden community participation in the development of the AFH; a summary of the comments, views, and recommendations, received in writing, or orally at public hearings, during the community participation process; and a summary of any comments, views, and

recommendations not accepted by the program participant and the reasons for nonacceptance.

(7) *Review of progress achieved since submission of prior AFH.* For each AFH submitted after the first AFH submission, the program participant will provide a summary of progress achieved in meeting the goals and associated metrics and milestones of the prior AFH, and identify any barriers that impeded or prevented achievement of goals.

### § 5.156 Joint and Regional AFHs.

(a) *General.* For the purposes of sharing resources and addressing fair housing issues from a broader perspective, program participants are encouraged to collaborate to conduct and submit a single AFH, either a joint AFH or regional AFH (as defined in § 5.152), for the purpose of evaluating fair housing issues and contributing factors.

(1) Collaborating program participants, whether joint participants or regionally collaborating participants, need not be located in contiguous jurisdictions and may cross State boundaries, provided that the collaborating program participants are located within the same Core Based Statistical Area (CBSA), as defined by the United States Office of Management and Budget (OMB) at the time of submission of the joint or regional AFH.

(2) Program participants, whether contiguous or noncontiguous, that are either not located within the same CBSA or that are not located within the same State and seek to collaborate on an AFH, must submit a written request to HUD for approval of the collaboration, stating why the collaboration is appropriate. The collaboration may proceed upon approval by HUD.

(3) Collaborating program participants must designate, through express written consent, one participant as the lead entity to oversee the submission of the joint or regional AFH on behalf of all collaborating program participants. When collaborating to submit a joint or regional AFH, program participants may divide work as they choose, but all program participants are accountable for the analysis and any joint goals and priorities, and each collaborating program participant must sign the AFH submitted to HUD. Collaborating program participants are also accountable for their individual analysis, goals, and priorities to be included in the collaborative AFH.

(4) Program participants that intend to prepare either a joint or regional AFH shall promptly notify HUD of such

intention and provide HUD with a copy of their written agreement.

(b) *Coordinating program years and submission deadlines.* (1) To the extent practicable, all collaborating program participants must be on the same program year and fiscal year (as applicable) before submission of the joint AFH or regional AFH. (See § 5.160 and 24 CFR 91.10 and 903.5.) The applicable procedures for changing consolidated plan program participant program year start dates, if necessary, are described in 24 CFR 91.10. The applicable procedures for changing PHA fiscal year beginning dates, if necessary, are described in 24 CFR part 903.

(2) If alignment of a program year or fiscal year is not practicable, the submission deadline for a joint AFH or regional AFH must be based on the designated lead entity's program year start date or fiscal year beginning date (as applicable), as provided in § 5.160(c). Within 12 months after the date of AFH acceptance, each collaborating program participant that has a program year start date, or fiscal year beginning date, earlier than the designated lead entity must make appropriate revisions to its full consolidated plan (as described in § 91.15(b)(2) of this chapter), or PHA Plan and any plan incorporated therein, to incorporate strategies and proposed actions consistent with the fair housing goals, issues, and other elements identified in the joint AFH or regional AFH.

(c) *Procedures for withdrawal from a joint or regional collaboration.* A program participant that, for any reason, decides to withdraw from a previously arranged collaborative AFH must promptly notify HUD of the withdrawal. HUD will work with the withdrawing program participant, as well as the remaining collaborative participants, to determine whether a new submission date is needed for the withdrawing participant or the remaining participants. If a new submission date is needed for the withdrawing participant or the remaining participants, HUD will establish a submission date that is as close as feasible to the originally intended submission date and is no later than the original joint or regional submission date unless good cause for an extension is shown.

(d) *Community participation.* Collaborating program participants must have a plan for community participation that complies with the requirements of §§ 5.150 through 5.180. The community participation process must include residents, and other interested members of the public, in the jurisdictions of each collaborating program participant, and

not just those of the lead entity. In addition, the community participation process must be conducted in a manner sufficient for each consolidated plan program participant collaborating in a joint AFH or regional AFH to certify that it is following its applicable citizen participation plan, and for each PHA, collaborating in a joint AFH or regional AFH, to satisfy the notice and comment requirements in 24 CFR part 903. To the extent that public notice and comment periods provided in §§ 5.150 through 5.180 or in the consolidated plan or PHA plan regulations differ, the longer period shall apply. A material change that requires any collaborating program participant to revise its AFH pursuant to § 5.164(a)(1) will trigger a requirement to revise the joint or regional AFH.

(e) *Content of the joint or regional AFH.* A joint or regional AFH must include the elements required under § 5.154(d). A joint or regional AFH does not relieve each collaborating program participant from its obligation to analyze and address local and regional fair housing issues and contributing factors that affect housing choice, and to set priorities and goals for its geographic area to overcome the effects of contributing factors and related fair housing issues.

**§ 5.158   Community participation, consultation, and coordination.**

(a) *General.* To ensure that the AFH is informed by meaningful community participation, program participants must give the public reasonable opportunities for involvement in the development of the AFH and in the incorporation of the AFH into the consolidated plan, PHA Plan, and other required planning documents. To ensure that the AFH, the consolidated plan, and the PHA Plan and any plan incorporated therein are informed by meaningful community participation, program participants should employ communications means designed to reach the broadest audience. Such communications may be met, as appropriate, by publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each document available on the Internet, on the program participant's official government Web site, and as well at libraries, government offices, and public places. Program participants shall ensure that all aspects of community participation are conducted in accordance with fair housing and civil rights laws, including title VI of the Civil Rights Act of 1964 and the regulations at 24 CFR part 1; section 504 of the Rehabilitation Act of 1973 and the regulations at 24 CFR part 8; and the

Americans with Disabilities Act and the regulations at 28 CFR parts 35 and 36, as applicable. At a minimum, whether a program participant is preparing an AFH individually or in combination with other program participants, AFH community participation must include the following for consolidated plan program participants and PHAs (as applicable):

(1) *Consolidated plan program participants.* The consolidated plan program participant must follow the policies and procedures described in its applicable citizen participation plan, adopted pursuant to 24 CFR part 91 (see 24 CFR 91.105, 91.115, and 91.401), in the process of developing the AFH, obtaining community feedback, and addressing complaints. The jurisdiction must consult with the agencies and organizations identified in consultation requirements at 24 CFR part 91 (see 24 CFR 91.100, 91.110, and 91.235).

(2) *PHAs.* PHAs must follow the policies and procedures described in 24 CFR 903.13, 903.15, 903.17, and 903.19 in the process of developing the AFH, obtaining Resident Advisory Board and community feedback, and addressing complaints.

(b) *Coordination.* (1) As described in 903.15, a PHA may fulfill its responsibility to conduct an AFH by:

(i) Participating with a consolidated plan program participant, including State jurisdictions; or

(ii) Participating with one or more PHAs in the planning, and preparation of the AFH; or

(iii) Preparing its own AFH.

(2) When working with other program participants, PHAs are encouraged to enter into Memorandums of Understanding (MOUs) to clearly define the functions, level of member participation, method of dispute resolution, and decisionmaking process of the program participants, in the creation of the AFH.

**§ 5.160   Submission requirements.**

(a) *First AFH*—(1) *Submission deadline for program participants.* (i) For each program participant listed in this paragraph (a)(1)(i), the first AFH shall be submitted no later than 270 calendar days prior to the start of:

(A) For consolidated plan participants not covered in paragraph (a)(1)(i)(B) or (C) of this section, the program year that begins on or after January 1, 2017 for which a new consolidated plan is due, as provided in 24 CFR 91.15(b)(2); and

(B) For consolidated plan participants whose fiscal year (FY) 2015 CDBG grant is $500,000 or less, the program year that begins on or after January 1, 2018 for which a new consolidated plan is

due, as provided in 24 CFR 91.15(b)(2);

(C) For consolidated plan participants that are Insular Areas or States, the program that begins on or after January 1, 2018 for which a new consolidated is due, as provided in 24 CFR 91.15(b)(2); and

(D) For PHAs, except for qualified PHAs, the PHA's fiscal year that begins on or after January 1, 2018 for which a new 5-year plan is due, as provided in 24 CFR 903.5; and

(E) For qualified PHAs, the PHA's fiscal year that begins on or after January 1, 2019 for which a new 5-year plan is due, as provided in 24 CFR 903.5; and

(F) For joint or regional program participants, the date provided under this paragraph (a)(1) or under paragraph (a)(2) of this section, dependent upon the program participant that is selected to be the lead entity, as provided in § 5.156(b)(2).

(ii) If the time frame specified in this paragraph (a)(1) would result in a first AFH submission date that is less than 9 months after the date of publication of the Assessment Tool that is applicable to the program participant or lead entity, the participant(s)' submission deadline will be extended as specified in that Assessment Tool publication to a date that will not be less than 9 months from the date of publication of the Assessment Tool.

(2) *Exceptions to the first submission deadline for recently completed Regional Analysis of Impediments (RAI).* An entitlement jurisdiction subject to the submission deadline in paragraph (a)(1) of this section is not required to submit an AFH by the deadline specified in such paragraph if the entitlement jurisdiction has completed a HUD-approved RAI in accordance with a grant awarded under HUD's FY 2010 or 2011 Sustainable Communities Competition and submitted the RAI within 30 months prior to the date when the program participant's AFH is due as provided under this section.

(3) *Compliance with existing requirements until first AFH submission.* Except as provided in paragraph (a)(4) of this section, until such time as program participants are required to submit an AFH, the program participant shall continue to conduct an analysis of impediments, as required of the program participant by one or more of the HUD programs listed in § 5.154, in accordance with requirements in effect prior to August 17, 2015.

(4) *New program participants.* For a new program participant that has not submitted a consolidated plan or PHA

plan as of August 17, 2015, HUD will provide the new program participant with a deadline for submission of its first AFH and the strategies and actions to implement an accepted AFH, which shall be incorporated into the program participant's consolidated plan or PHA plan, as applicable, within 18 months of the start date of its first program year or fiscal year, as applicable.

(b) *Second and subsequent AFHs.* After the first AFH, for all program participants, subsequent AFHs are due 195 calendar days before the start of the first year of the next 3 to 5-year cycle (as applicable), as described in paragraph (a)(1) of this section; that is, the subsequent AFH is to precede the next strategic plan under 24 CFR 91.15(b)(2) or 5-year plan under 24 CFR 903.5.

(c) *Collaborative AFHs.* All collaborative program participants, whether joint participants or regionally collaborating participants, will select a lead entity and submit the AFH according to that entity's schedule.

(d) *Frequency.* All program participants shall submit an AFH no less frequently than once every 5 years, or at such time agreed upon in writing by HUD and the program participant, in order to coordinate the AFH submission with time frames used for consolidated plans, participation in a regional AFH, cooperation agreements, PHA Plans, or other plans. (See 24 CFR 91.15(b)(2) and 903.15.)

(e) *Certification.* Each program participant, including program participants submitting a joint or regional AFH, must certify that it will take meaningful actions to further the goals identified in its AFH conducted in accordance with the requirements in §§ 5.150 through 5.180 and 24 CFR 91.225(a)(1), 91.325(a)(1), 91.425(a)(1), 570.487(b)(1), 570.601, 903.7(o), and 903.15(d), as applicable. The certification will be required at the time a program participant submits its first AFH and for each AFH thereafter. If a PHA Plan, consolidated plan, Action Plan, or other submission requiring a civil rights-related certification is due prior to the time of submission of the AFH, the participant will complete a certification, in a form provided by HUD, that it will affirmatively further fair housing, or complete such other certification that HUD may require in accordance with applicable program regulations in effect before August 17, 2015.

**§ 5.162   Review of AFH.**

(a) *Review and acceptance of AFH*— (1) *General.* HUD's review of an AFH is to determine whether the program

participant has met the requirements for providing its analysis, assessment, and goal setting, as set forth in § 5.154(d). The AFH will be deemed accepted after 60 calendar days after the date that HUD receives the AFH, unless on or before that date, HUD has provided notification that HUD does not accept the AFH. In its notification, HUD will inform the program participant in writing of the reasons why HUD has not accepted the AFH and the actions that the program participant may take to resolve the nonacceptance.

(2) *Meaning of "acceptance".* HUD's acceptance of an AFH means only that, for purposes of administering HUD program funding, HUD has determined that the program participant has provided an AFH that meets the required elements, as set forth in § 5.154(d). Acceptance does not mean that the program participant has complied with its obligation to affirmatively further fair housing under the Fair Housing Act; has complied with other provisions of the Fair Housing Act; or has complied with other civil rights laws and regulations.

(b) *Nonacceptance of an AFH.* (1) HUD will not accept an AFH if HUD finds that the AFH or a portion of the AFH is inconsistent with fair housing or civil rights requirements or is substantially incomplete. In connection with a regional or joint AFH, HUD's determination to not accept the AFH with respect to one program participant does not necessarily affect the acceptance of the AFH with respect to another program participant.

(i) The following are examples of an AFH that is inconsistent with fair housing and civil rights requirements:

(A) HUD determines that the analysis of fair housing issues, fair housing contributing factors, goals, or priorities contained in the AFH would result in policies or practices that would operate to discriminate in violation of the Fair Housing Act or other civil rights laws;

(B) The AFH does not identify policies or practices as fair housing contributing factors, even though they result in the exclusion of a protected class from areas of opportunity.

(ii) The following are examples of an AFH that is substantially incomplete:

(A) The AFH was developed without the required community participation or the required consultation;

(B) The AFH fails to satisfy a required element in §§ 5.150 through 5.180. Failure to satisfy a required element includes an assessment in which priorities or goals are materially inconsistent with the data or other evidence available to the program participant or in which priorities or

goals are not designed to overcome the effects of contributing factors and related fair housing issues.

(2) HUD will provide written notification to the program participant, including each program participant involved in a collaborative AFH (joint or regional AFH), of HUD's nonacceptance of the AFH and the written notification will specify the reasons why the AFH was not accepted and will provide guidance on how the AFH should be revised in order to be accepted.

(c) *Revisions and resubmission.* HUD will provide a program participant, including each program participant involved in a collaborative AFH, with a time period to revise and resubmit the AFH, which shall be no less than 45 calendar days after the date on which HUD provides written notification that it does not accept the AFH. The revised AFH will be deemed accepted after 30 calendar days of the date by which HUD receives the revised AFH, unless on or before that date HUD has provided notification that HUD does not accept the revised AFH.

(d) *Accepted AFH as requirement for consolidated plan and PHA Plan approval.* If a program participant does not have an accepted AFH, HUD will disapprove a consolidated plan (see 24 CFR 91.500) or a PHA Plan (see 24 CFR 903.23) except where delayed submission is otherwise permitted under § 5.156 or § 5.160.

(1) If a consolidated plan program participant fails to submit an AFH as required by § 5.160, HUD may establish an alternative date for the jurisdiction to submit its consolidated plan, but in no event past the August 16 deadline provided in 24 CFR 91.15. Failure to submit a consolidated plan by August 16 of the Federal fiscal year for which funds are appropriated will automatically result in the loss of the CDBG funds to which the jurisdiction would otherwise be entitled.

(2) If a PHA fails to submit the AFH in accordance with § 5.160, the PHA must have an accepted AFH no later than 75 calendar days before the commencement of the PHA's fiscal year to avoid any potential impacts on funding.

**§ 5.164   Revising an accepted AFH.**

(a) *General*—(1) *Minimum criteria for revising the AFH.* An AFH previously accepted by HUD must be revised and submitted to HUD for review under the following circumstances:

(i) A material change occurs. A material change is a change in circumstances in the jurisdiction of a program participant that affects the information on which the AFH is based

to the extent that the analysis, the fair housing contributing factors, or the priorities and goals of the AFH no longer reflect actual circumstances. Examples include Presidentially declared disasters, under title IV of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 *et seq.*), in the program participant's area that are of such a nature as to significantly impact the steps a program participant may need to take to affirmatively further fair housing; significant demographic changes; new significant contributing factors in the participant's jurisdiction; and civil rights findings, determinations, settlements (including Voluntary Compliance Agreements), or court orders; or

(ii) Upon HUD's written notification specifying a material change that requires the revision.

(2) *Criteria for revising the AFH.* The criteria that will be used in determining when revisions to the AFH are appropriate must be specified in the citizen participation plan adopted under the consolidated plan pursuant to 24 CFR part 91, and the public participation procedures and significant amendment process required under 24 CFR part 903. Such criteria must include, at a minimum, the circumstances described in paragraph (a)(1) of this section.

(3) *Revised AFH.* A revision pursuant to paragraph (a)(1) of this section consists of preparing and submitting amended analyses, assessments, priorities, and goals that take into account the material change, including any new fair housing issues and contributing factors that may arise as a result of the material change. A revision may not necessarily require the submission of an entirely new AFH. The revision need only focus on the material change and appropriate adjustments to the analyses, assessments, priorities, or goals.

(b) *Timeframe for revision.* (1) Where a revision is required under paragraph (a)(1)(i) of this section, such revision shall be submitted within 12 months of the onset of the material change, or at such later date as HUD may provide. Where the material change is the result of a Presidentially declared disaster, such time shall be automatically extended to the date that is 2 years after the date upon which the disaster declaration is made, and HUD may extend such deadline, upon request, for good cause shown.

(2)(i) Where a revision is required under paragraph (a)(1)(ii) of this section, HUD will specify a date by which the program participant must submit the

revision of the AFH to HUD, taking into account the material change, the program participant's capacity, and the need for a valid AFH to guide planning activities. HUD may extend the due date upon written request by the program participant that describes the reasons the program participant is unable to make the deadline.

(ii) On or before 30 calendar days following the date of HUD's written notification under paragraph (a)(1)(ii) of this section, the program participant may advise HUD in writing of its belief that a revision to the AFH is not required. The program participant must state with specificity the reasons for its belief that a revision is not required. HUD will respond on or before 30 calendar days following the date of the receipt of the program participant's correspondence and will advise the program participant in writing whether HUD agrees or disagrees with the program participant. If HUD disagrees, the program participant must proceed with the revision. HUD may establish a new due date that is later than the date specified in its original notification.

(c) *Community participation.* Revisions to an AFH, as described in this section, are subject to community participation. The jurisdiction must follow the notice and comment process applicable to consolidated plan substantial amendments under the jurisdiction's citizen participation plan adopted pursuant to 24 CFR part 91 (see 24 CFR 91.105, 91.115, and 91.401). A consortium must follow the participation process applicable to consolidated plan substantial amendments under the consortium's citizen participation plan adopted pursuant to 24 CFR 91.401. Insular areas submitting an abbreviated consolidated plan shall follow the citizen participation requirements of 24 CFR 570.441. The PHA must follow the notice and comment process applicable to significant amendments or modifications pursuant to 24 CFR 903.13, 903.15, 903.17, and 903.21.

(d) *Submission to HUD of the revised AFH.* Upon completion, any revision to the AFH must be made public and submitted to HUD at the time of the revision.

(e) *PHAs.* Upon any revision to the AFH pursuant to §§ 5.150 through 5.180, PHAs must revise their PHA Plan within 12 months, consistent with the AFH revision, and pursuant to 24 CFR 903.15(c).

### § 5.166  AFFH certification.

(a) *Certifications.* Program participants must certify that they will affirmatively further fair housing when

required by statutes and regulations governing HUD programs. Such certifications are made in accordance with applicable program regulations. Consolidated plan program participants are subject to the certification requirements in 24 CFR part 91, and PHA Plan program participants are subject to the certification requirements in 24 CFR part 903.

(b) *Procedure for challenging the validity of an AFFH certification.* (1) For consolidated plan program participants, HUD's challenge to the validity of an AFFH certification will be based on procedures and standards specified in 24 CFR part 91.

(2) For PHA Plan program participants, HUD's challenge to the validity of an AFFH certification will be based on procedures and standards specified in 24 CFR part 903.

### § 5.168  Recordkeeping.

(a) *General.* Each program participant must establish and maintain sufficient records to enable HUD to determine whether the program participant has met the requirements of this subpart. A PHA not preparing its own AFH in accordance with 24 CFR 903.15(a)(3) must maintain a copy of the applicable AFH and records reflecting actions to affirmatively further fair housing as described in 24 CFR 903.7(o). All program participants shall make these records available for HUD inspection. At a minimum, the following records are needed for each consolidated plan program participant and each PHA that prepares its own AFH:

(1) Information and records relating to the program participant's AFH and any significant revisions to the AFH, including, but not limited to, statistical data, studies, and other diagnostic tools used by the jurisdiction; and any policies, procedures, or other documents relating to the analysis or preparation of the AFH;

(2) Records demonstrating compliance with the consultation and community participation requirements of §§ 5.150 through 5.180 and applicable program regulations, including the names of organizations involved in the development of the AFH, summaries or transcripts of public meetings or hearings, written public comments, public notices and other correspondence, distribution lists, surveys, or interviews (as applicable);

(3) Records demonstrating the actions the program participant has taken to affirmatively further fair housing, including activities carried out in furtherance of the assessment; the program participant's AFFH goals and strategies set forth in its AFH,

consolidated plan, or PHA Plan, and any plan incorporated therein; and the actions the program participant has carried out to promote or support the goals identified in accordance with § 5.154 during the preceding 5 years;

(4) Where courts or an agency of the United States Government or of a State government has found that the program participant has violated any applicable nondiscrimination and equal opportunity requirements set forth in § 5.105(a) or any applicable civil rights-related program requirement, documentation related to the underlying judicial or administrative finding and affirmative measures that the program participant has taken in response.

(5) Documentation relating to the program participant's efforts to ensure that housing and community development activities (including those assisted under programs administered by HUD) are in compliance with applicable nondiscrimination and equal opportunity requirements set forth in § 5.105(a) and applicable civil rights related program requirements;

(6) Records demonstrating that consortium members, units of general local government receiving allocations from a State, or units of general local government participating in an urban county have conducted their own or contributed to the jurisdiction's assessment (as applicable) and documents demonstrating their actions to affirmatively further fair housing; and

(7) Any other evidence relied upon by the program participant to support its affirmatively furthering fair housing certification.

(b) *Retention period.* All records must be retained for such period as may be specified in the applicable program regulations.

## §§ 5.167–5.180   [Reserved]

## PART 91—CONSOLIDATED SUBMISSION FOR COMMUNITY PLANNING AND DEVELOPMENT PROGRAMS

■ 4. The authority citation for part 91 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3601–3619, 5301–5315, 11331–11388, 12701–12711, 12741–12756, and 12901–12912.

■ 5. In § 91.5, the introductory text is revised to read as follows:

### § 91.5   Definitions.

The terms *Affirmatively Furthering Fair Housing, Assessment of Fair Housing or AFH, elderly person,* and *HUD* are defined in 24 CFR part 5.

*   *   *   *   *

■ 6. In § 91.100, paragraphs (a)(1) and (5) and (c) are revised and paragraph (e) is added to read as follows:

### § 91.100   Consultation; local governments.

(a) *General.* (1) When preparing the AFH and the consolidated plan, the jurisdiction shall consult with other public and private agencies that provide assisted housing, health services, and social services (including those focusing on services to children, elderly persons, persons with disabilities, persons with HIV/AIDS and their families, homeless persons), community-based and regionally-based organizations that represent protected class members, and organizations that enforce fair housing laws.

*   *   *   *   *

(5) The jurisdiction also should consult with adjacent units of general local government and local and regional government agencies, including local government agencies with metropolitan-wide planning and transportation responsibilities, particularly for problems and solutions that go beyond a single jurisdiction.

*   *   *   *   *

(c) *Public housing agencies (PHAs).* (1) The jurisdiction shall consult with local PHAs operating in the jurisdiction regarding consideration of public housing needs, planned programs and activities, the AFH, strategies for affirmatively furthering fair housing, and proposed actions to affirmatively further fair housing in the consolidated plan. (See also 24 CFR 5.158 for coordination when preparing an AFH jointly with a PHA.) This consultation will help provide a better basis for the certification by the authorized official that the PHA Plan is consistent with the consolidated plan and the local government's description of its strategy for affirmatively furthering fair housing and the manner in which it will address the needs of public housing and, where necessary, the manner in which it will provide financial or other assistance to a troubled PHA to improve the PHA's operations and remove the designation of troubled, as well as obtaining PHA input on addressing fair housing issues in the Public Housing and Housing Choice Voucher programs.

(2) This consultation will also help ensure that activities with regard to affirmatively furthering fair housing, local drug elimination, neighborhood improvement programs, and resident programs and services, those funded under a PHA's program and those funded under a program covered by the consolidated plan, are fully coordinated to achieve comprehensive community development goals and affirmatively further fair housing. If a PHA is required to implement remedies under a Voluntary Compliance Agreement, the local jurisdiction should work with or consult with the PHA, as appropriate, to identify actions the jurisdiction may take, if any, to assist the PHA in implementing the required remedies. A local jurisdiction may use CDBG funds for eligible activities or other funds to implement remedies required under a Voluntary Compliance Agreement.

*   *   *   *   *

(e) *Affirmatively Furthering Fair Housing.* (1) The jurisdiction shall consult with community-based and regionally-based organizations that represent protected class members, and organizations that enforce fair housing laws, such as State or local fair housing enforcement agencies (including participants in the Fair Housing Assistance Program (FHAP)), fair housing organizations and other nonprofit organizations that receive funding under the Fair Housing Initiative Program (FHIP), and other public and private fair housing service agencies, to the extent that such entities operate within its jurisdiction. This consultation will help provide a better basis for the jurisdiction's AFH, its certification to affirmatively further fair housing, and other portions of the consolidated plan concerning affirmatively furthering fair housing.

(2) This consultation must occur with any organizations that have relevant knowledge or data to inform the AFH and that are sufficiently independent and representative to provide meaningful feedback to a jurisdiction on the AFH, the consolidated plan, and their implementation.

(3) Consultation must occur at various points in the fair housing planning process, meaning that, at a minimum, the jurisdiction will consult with the organizations described in this paragraph (e) in the development of both the AFH and the consolidated plan. Consultation on the consolidated plan shall specifically seek input into how the goals identified in an accepted AFH inform the priorities and objectives of the consolidated plan.

■ 7. In § 91.105, paragraphs (a)(1) and (a)(2)(i) through (iii) are revised, paragraph (a)(4) is added, and paragraphs (b), (c), (e)(1), (f), (g), (h), (i), (j) and (l) are revised to read as follow:

### § 91.105   Citizen participation plan; local governments.

(a) *Applicability and adoption of the citizen participation plan.* (1) The jurisdiction is required to adopt a citizen participation plan that sets forth

the jurisdiction's policies and procedures for citizen participation. (Where a jurisdiction, before August 17, 2015, adopted a citizen participation plan it, will need to amend the citizen participation plan to comply with provisions of this section.)

(2) *Encouragement of citizen participation.* (i) The citizen participation plan must provide for and encourage citizens to participate in the development of the AFH, any revisions to the AFH, the consolidated plan, any substantial amendment to the consolidated plan, and the performance report. These requirements are designed especially to encourage participation by low- and moderate-income persons, particularly those persons living in areas designated by the jurisdiction as a revitalization area or in a slum and blighted area and in areas where CDBG funds are proposed to be used, and by residents of predominantly low- and moderate-income neighborhoods, as defined by the jurisdiction. A jurisdiction must take appropriate actions to encourage the participation of all its citizens, including minorities and non-English speaking persons, as provided in paragraph (a)(4) of this section, as well as persons with disabilities.

(ii) The jurisdiction shall encourage the participation of local and regional institutions, Continuums of Care, and other organizations (including businesses, developers, nonprofit organizations, philanthropic organizations, and community-based and faith-based organizations) in the process of developing and implementing the AFH and the consolidated plan.

(iii) The jurisdiction shall encourage, in conjunction with consultation with public housing agencies, the participation of residents of public and assisted housing developments (including any resident advisory boards, resident councils, and resident management corporations) in the process of developing and implementing the AFH and the consolidated plan, along with other low-income residents of targeted revitalization areas in which the developments are located. The jurisdictions shall make an effort to provide information to the PHA about the AFH, AFFH strategy, and consolidated plan activities related to its developments and surrounding communities so that the PHA can make this information available at the annual public hearing(s) required for the PHA Plan.

\* \* \* \* \*

(4) The citizen participation plan shall describe the jurisdiction's procedures for assessing its language needs and identify any need for translation of notices and other vital documents. At a minimum, the citizen participation plan shall require that the jurisdiction take reasonable steps to provide language assistance to ensure meaningful access to participation by non-English-speaking residents of the community.

(b) *Development of the AFH and the consolidated plan.* The citizen participation plan must include the following minimum requirements for the development of the AFH and the consolidated plan:

(1)(i) The citizen participation plan must require that at or as soon as feasible after the start of the public participation process the jurisdiction will make the HUD-provided data and any other supplemental information the jurisdiction plans to incorporate into its AFH available to its residents, public agencies, and other interested parties. The jurisdiction may make the HUD-provided data available to the public by cross-referencing to the data on HUD's Web site.

(ii) The citizen participation plan must require that, before the jurisdiction adopts a consolidated plan, the jurisdiction will make available to residents, public agencies, and other interested parties information that includes the amount of assistance the jurisdiction expects to receive (including grant funds and program income) and the range of activities that may be undertaken, including the estimated amount that will benefit persons of low- and moderate-income. The citizen participation plan also must set forth the jurisdiction's plans to minimize displacement of persons and to assist any persons displaced, specifying the types and levels of assistance the jurisdiction will make available (or require others to make available) to persons displaced, even if the jurisdiction expects no displacement to occur.

(iii) The citizen participation plan must state when and how the jurisdiction will make this information available.

(2) The citizen participation plan must require the jurisdiction to publish the proposed AFH and the proposed consolidated plan in a manner that affords its residents, public agencies, and other interested parties a reasonable opportunity to examine its content and to submit comments. The citizen participation plan must set forth how the jurisdiction will publish the proposed AFH and the proposed

consolidated plan and give reasonable opportunity to examine each document's content. The requirement for publishing may be met by publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each document available on the Internet, on the jurisdiction's official government Web site, and as well at libraries, government offices, and public places. The summary must describe the content and purpose of the AFH or the consolidated plan (as applicable), and must include a list of the locations where copies of the entire proposed document may be examined. In addition, the jurisdiction must provide a reasonable number of free copies of the plan or the AFH (as applicable) to residents and groups that request it.

(3) The citizen participation plan must provide for at least one public hearing during the development of the AFH or the consolidated plan (as applicable). See paragraph (e) of this section for public hearing requirements, generally.

(4) The citizen participation plan must provide a period, not less than 30 calendar days, to receive comments from residents of the community on the consolidated plan or the AFH (as applicable).

(5) The citizen participation plan shall require the jurisdiction to consider any comments or views of residents of the community received in writing, or orally at the public hearings, in preparing the final AFH or the final consolidated plan (as applicable). A summary of these comments or views, and a summary of any comments or views not accepted and the reasons why, shall be attached to the final AFH or the final consolidated plan (as applicable).

(c) *Consolidated plan amendments and AFH revisions*—(1)(i) *Criteria for amendment to consolidated plan.* The citizen participation plan must specify the criteria the jurisdiction will use for determining what changes in the jurisdiction's planned or actual activities constitute a substantial amendment to the consolidated plan. (See § 91.505.) The citizen participation plan must include, among the criteria for a substantial amendment, changes in the use of CDBG funds from one eligible activity to another.

(ii) *Criteria for revision to the AFH.* The jurisdiction must specify the criteria the jurisdiction will use for determining when revisions to the AFH will be required. (At a minimum, the specified criteria must include the situations described in 24 CFR 5.164.)

(2) The citizen participation plan must provide community residents with reasonable notice and an opportunity to comment on substantial amendments to the consolidated plan and revisions to the AFH. The citizen participation plan must state how reasonable notice and an opportunity to comment will be given. The citizen participation plan must provide a period, of not less than 30 calendar days, to receive comments on the consolidated plan substantial amendment or any revision to the AFH before the consolidated plan substantial amendment is implemented or the revised AFH is submitted to HUD for review.

(3) The citizen participation plan shall require the jurisdiction to consider any comments or views of residents of the community received in writing, or orally at public hearings, if any, in preparing the substantial amendment of the consolidated plan or significant revision to the AFH (as applicable). A summary of these comments or views, and a summary of any comments or views not accepted and the reasons why, shall be attached to the substantial amendment of the consolidated plan or revision to the AFH (as applicable).

\* \* \* \* \*

(e) *Public hearings*—(1)(i) *Consolidated plan.* The citizen participation plan must provide for at least two public hearings per year to obtain residents' views and to respond to proposals and questions, to be conducted at a minimum of two different stages of the program year. Together, the hearings must address housing and community development needs, development of proposed activities, proposed strategies and actions for affirmatively furthering fair housing consistent with the AFH, and a review of program performance.

(ii) *Minimum number of hearings.* To obtain the views of residents of the community on housing and community development needs, including priority nonhousing community development needs and affirmatively furthering fair housing, the citizen participation plan must provide that at least one of these hearings is held before the proposed consolidated plan is published for comment.

(iii) *Assessment of Fair Housing.* To obtain the views of the community on AFH-related data and affirmatively furthering fair housing in the jurisdiction's housing and community development programs, the citizen participation plan must provide that at least one public hearing is held before

the proposed AFH is published for comment.

\* \* \* \* \*

(f) *Meetings.* The citizen participation plan must provide residents of the community with reasonable and timely access to local meetings, consistent with accessibility and reasonable accommodation requirements, in accordance with section 504 of the Rehabilitation Act of 1973 and the regulations at 24 CFR part 8; and the Americans with Disabilities Act and the regulations at 28 CFR parts 35 and 36, as applicable.

(g) *Availability to the public.* The citizen participation plan must provide that the consolidated plan as adopted, consolidated plan substantial amendments, HUD-accepted AFH, revisions to the AFH, and the performance report will be available to the public, including the availability of materials in a form accessible to persons with disabilities, upon request. The citizen participation plan must state how these documents will be available to the public.

(h) *Access to records.* The citizen participation plan must require the jurisdiction to provide residents of the community, public agencies, and other interested parties with reasonable and timely access to information and records relating to the jurisdiction's AFH, consolidated plan, and use of assistance under the programs covered by this part during the preceding 5 years.

(i) *Technical assistance.* The citizen participation plan must provide for technical assistance to groups representative of persons of low- and moderate-income that request such assistance in commenting on the AFH and in developing proposals for funding assistance under any of the programs covered by the consolidated plan, with the level and type of assistance determined by the jurisdiction. The assistance need not include the provision of funds to the groups.

(j) *Complaints.* The citizen participation plan shall describe the jurisdiction's appropriate and practicable procedures to handle complaints from its residents related to the consolidated plan, amendments, AFH, revisions, and the performance report. At a minimum, the citizen participation plan shall require that the jurisdiction must provide a timely, substantive written response to every written resident complaint, within an established period of time (within 15 working days, where practicable, if the jurisdiction is a CDBG grant recipient).

\* \* \* \* \*

(l) *Jurisdiction responsibility.* The requirements for citizen participation do not restrict the responsibility or authority of the jurisdiction for the development and execution of its consolidated plan or AFH.

■ 8. In § 91.110, paragraph (a) is revised to read as follows:

### § 91.110 Consultation; States.

(a) When preparing the AFH and the consolidated plan, the State shall consult with public and private agencies that provide assisted housing (including any State housing agency administering public housing), health services, social services (including those focusing on services to children, elderly persons, persons with disabilities, persons with HIV/AIDS and their families, and homeless persons), and State-based and regionally-based organizations that represent protected class members and organizations that enforce fair housing laws during preparation of the consolidated plan.

(1) With respect to public housing or Housing Choice Voucher programs, the State shall consult with any housing agency administering public housing or the section 8 program on a Statewide basis as well as all PHAs that certify consistency with the State's consolidated plan. State consultation with these entities may consider public housing needs, planned programs and activities, the AFH, strategies for affirmatively furthering fair housing, and proposed actions to affirmatively further fair housing. This consultation helps provide a better basis for the certification by the authorized official that the PHA Plan is consistent with the consolidated plan and the State's description of its strategy for affirmatively furthering fair housing, and the manner in which the State will address the needs of public housing and, where applicable, the manner in which the State may provide financial or other assistance to a troubled PHA to improve its operations and remove such designation, as well as in obtaining PHA input on addressing fair housing issues in public housing and the Housing Choice Voucher programs. This consultation also helps ensure that activities with regard to affirmatively furthering fair housing, local drug elimination, neighborhood improvement programs, and resident programs and services, funded under a PHA's program and those funded under a program covered by the consolidated plan, are fully coordinated to achieve comprehensive community development goals and affirmatively further fair housing. If a PHA is required to implement remedies under a

Voluntary Compliance Agreement, the State should consult with the PHA and identify actions the State may take, if any, to assist the PHA in implementing the required remedies.

(2) The State shall consult with State-based and regionally-based organizations that represent protected class members, and organizations that enforce fair housing laws, such as State fair housing enforcement agencies (including participants in the Fair Housing Assistance Program (FHAP)), fair housing organizations and other nonprofit organizations that receive funding under the Fair Housing Initiative Program (FHIP), and other public and private fair housing service agencies, to the extent such entities operate within the State. This consultation will help provide a better basis for the State's AFH, its certification to affirmatively further fair housing, and other portions of the consolidated plan concerning affirmatively furthering fair housing. This consultation should occur with organizations that have the capacity to engage with data informing the AFH and be sufficiently independent and representative to provide meaningful feedback on the AFH, the consolidated plan, and their implementation. Consultation must occur at various points in the fair housing planning process, meaning that, at a minimum, the jurisdiction will consult with the organizations described in this paragraph (a)(2) in the development of both the AFH and the consolidated plan. Consultation on the consolidated plan shall specifically seek input into how the goals identified in an accepted AFH inform the priorities and objectives of the consolidated plan.

*    *    *    *    *

■ 9. In § 91.115, paragraphs (a)(1) and (2) are revised, paragraph (a)(4) is added, and paragraphs (b), (c), (f), (g), and (h) are revised to read as follows:

**§ 91.115  Citizen participation plan; States.**

(a) * * *

(1) *When citizen participation plan must be amended.* The State is required to adopt a citizen participation plan that sets forth the State's policies and procedures for citizen participation. (Where a State, before August 17, 2015, adopted a citizen participation plan, it will need to amend the citizen participation plan to comply with provisions of this section.)

(2) *Encouragement of citizen participation.* (i) The citizen participation plan must provide for and encourage citizens to participate in the development of the AFH, any revision to the AFH, the consolidated plan, any substantial amendments to the consolidated plan, and the performance report. These requirements are designed especially to encourage participation by low- and moderate-income persons, particularly those living in slum and blighted areas and in areas where CDBG funds are proposed to be used and by residents of predominantly low- and moderate-income neighborhoods. A State must take appropriate actions to encourage the participation of all its residents, including minorities and non-English speaking persons, as provided in paragraph (a)(4) of this section, as well as persons with disabilities.

(ii) The State shall encourage the participation of Statewide and regional institutions, Continuums of Care, and other organizations (including businesses, developers, nonprofit organizations, philanthropic organizations, and community-based and faith-based organizations) that are involved with or affected by the programs or activities covered by the consolidated plan in the process of developing and implementing the AFH and the consolidated plan.

(iii) The State should also explore alternative public involvement techniques that encourage a shared vision of change for the community and the review of program performance; *e.g.,* use of focus groups and use of the Internet.

*    *    *    *    *

(4) *Language assistance for those with limited English proficiency.* The citizen participation plan shall describe the State's procedures for assessing its language needs and identify any need for translation of notices and other vital documents. At a minimum, the citizen participation plan shall require the State to make reasonable efforts to provide language assistance to ensure meaningful access to participation by non-English speaking persons.

(b) *Development of the AFH and the consolidated plan.* The citizen participation plan must include the following minimum requirements for the development of the AFH and consolidated plan:

(1)(i) The citizen participation plan must require that at or as soon as feasible after the start of the public participation process the State will make HUD-provided data and any other supplemental information the State intends to incorporate into its AFH available to the public, public agencies, and other interested parties. The State may make the HUD-provided data available to the public by cross-referencing to the data on HUD's Web site.

(ii) The citizen participation plan must require that, before the State adopts an AFH or consolidated plan, the State will make available to its residents, public agencies, and other interested parties information that includes the amount of assistance the State expects to receive and the range of activities that may be undertaken, including the estimated amount that will benefit persons of low- and moderate-income and the plans to minimize displacement of persons and to assist any persons displaced. The citizen participation plan must state when and how the State will make this information available.

(2) The citizen participation plan must require the State to publish the proposed AFH and the proposed consolidated plan in a manner that affords residents, units of general local governments, public agencies, and other interested parties a reasonable opportunity to examine the document's content and to submit comments. The citizen participation plan must set forth how the State will make publicly available the proposed AFH and the proposed consolidated plan and give reasonable opportunity to examine each document's content. To ensure that the AFH, the consolidated plan, and the PHA plan are informed by meaningful community participation, program participants should employ communications means designed to reach the broadest audience. Such communications may be met by publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each document available on the Internet, on the grantee's official government Web site, and as well as libraries, government offices, and public places. The summary must describe the content and purpose of the AFH or the consolidated plan (as applicable), and must include a list of the locations where copies of the entire proposed document(s) may be examined. In addition, the State must provide a reasonable number of free copies of the plan or the AFH (as applicable) to its residents and groups that request a copy of the plan or the AFH.

(3) The citizen participation plan must provide for at least one public hearing on housing and community development needs and proposed strategies and actions for affirmatively furthering fair housing consistent with the AFH, before the proposed consolidated plan is published for comment. To obtain the public's views on AFH-related data and affirmatively furthering fair housing in the State's housing and community development

programs, the citizen participation plan must provide that at least one public hearing is held before the proposed AFH is published for comment.

(i) The citizen participation plan must state how and when adequate advance notice of the hearing will be given to residents, with sufficient information published about the subject of the hearing to permit informed comment. (Publishing small print notices in the newspaper a few days before the hearing does not constitute adequate notice. Although HUD is not specifying the length of notice required, HUD would consider 2 weeks adequate.)

(ii) The citizen participation plan must provide that the hearing be held at a time and accessible location convenient to potential and actual beneficiaries, and with accommodation for persons with disabilities. The citizen participation plan must specify how it will meet these requirements.

(iii) The citizen participation plan must identify how the needs of non-English speaking residents will be met in the case of a public hearing where a significant number of non-English speaking residents can be reasonably expected to participate.

(4) The citizen participation plan must provide a period, of not less than 30 calendar days, to receive comments from residents and units of general local government on the consolidated plan or the AFH (as applicable).

(5) The citizen participation plan shall require the State to consider any comments or views of its residents and units of general local government received in writing, or orally at the public hearings, in preparing the final AFH and the final consolidated plan. A summary of these comments or views, and a summary of any comments or views not accepted and the reasons therefore, shall be attached to the final AFH or the final consolidated plan (as applicable).

(c) *Amendments*—(1)(i) *Criteria for amendment to consolidated plan.* The citizen participation plan must specify the criteria the State will use for determining what changes in the State's planned or actual activities constitute a substantial amendment to the consolidated plan. (See § 91.505.) The citizen participation plan must include, among the criteria for a consolidated plan, substantial amendment changes in the method of distribution of such funds.

(ii) *Criteria for revision to the AFH.* The State must specify the criteria it will use for determining when revision to the AFH will be appropriate. (At a minimum, the specified criteria must

include the situations described in 24 CFR 5.164.)

(2) The citizen participation plan must provide residents and units of general local government with reasonable notice and an opportunity to comment on consolidated plan substantial amendments and any revision to the AFH. The citizen participation plan must state how reasonable notice and an opportunity to comment will be given. The citizen participation plan must provide a period, of not less than 30 calendar days, to receive comments on the consolidated plan substantial amendment or revision to the AFH before the consolidated plan substantial amendment is implemented or the revised AFH is submitted to HUD.

(3) The citizen participation plan shall require the State to consider any comments or views of its residents and units of general local government received in writing, or orally at public hearings, if any, in preparing the substantial amendment of the consolidated plan or revision to the AFH (as applicable). A summary of these comments or views, and a summary of any comments or views not accepted and the reasons why, shall be attached to the substantial amendment of the consolidated plan or any revision to the AFH (as applicable).

* * * * *

(f) *Availability to the public.* The citizen participation plan must provide that the consolidated plan as adopted, consolidated plan substantial amendments, the HUD-accepted AFH, any revision to the AFH, and the performance report will be available to the public, including the availability of materials in a form accessible to persons with disabilities, upon request. The citizen participation plan must state how these documents will be available to the public.

(g) *Access to records.* The citizen participation plan must require the State to provide its residents, public agencies, and other interested parties with reasonable and timely access to information and records relating to the State's AFH, consolidated plan and use of assistance under the programs covered by this part during the preceding 5 years.

(h) *Complaints.* The citizen participation plan shall describe the State's appropriate and practicable procedures to handle complaints from its residents related to the consolidated plan, consolidated plan amendments, the AFH, any revisions to the AFH, and the performance report. At a minimum, the citizen participation plan shall

require that the State must provide a timely, substantive written response to every written resident complaint, within an established period of time (within 15 working days, where practicable, if the State is a CDBG grant recipient).

* * * * *

■ 10. In § 91.205, paragraph (b)(2) is revised to read as follows:

### § 91.205   Housing and homeless needs assessment.

* * * * *

(b) * * *

(2) Until the jurisdiction has submitted an AFH, which includes an assessment of disproportionate housing needs in accordance with 24 CFR 5.154(d)(2)(iv), the following assessment shall continue to be included in the consolidated plan. For any of the income categories enumerated in paragraph (b)(1) of this section, to the extent that any racial or ethnic group has disproportionately greater need in comparison to the needs of that category as a whole, assessment of that specific need shall be included. For this purpose, disproportionately greater need exists when the percentage of persons in a category of need who are members of a particular racial or ethnic group in a category of need is at least 10 percentage points higher than the percentage of persons in the category as a whole. Once the jurisdiction has submitted an AFH, however, this assessment need not be included in the consolidated plan.

* * * * *

■ 11. In § 91.215, paragraph (a)(5) is added to read as follows:

### § 91.215   Strategic plan.

(a) * * *

(5)(i) Describe how the priorities and specific objectives of the jurisdiction under paragraph (a)(4) of this section will affirmatively further fair housing by setting forth strategies and actions consistent with the goals and other elements identified in an AFH conducted in accordance with 24 CFR 5.150 through 5.180.

(ii) For AFH goals not addressed by these priorities and objectives, identify any additional objectives and priorities for affirmatively furthering fair housing.

* * * * *

■ 12. In § 91.220, paragraph (k) is revised to read as follows:

### § 91.220   Action plan.

* * * * *

(k)(1) *Affirmatively furthering fair housing.* Actions it plans to take during the next year that address fair housing goals identified in the AFH.

(2) *Other actions.* Actions it plans to take during the next year to address obstacles to meeting underserved needs, foster and maintain affordable housing, evaluate and reduce lead-based paint hazards, reduce the number of poverty-level families, develop institutional structure, and enhance coordination between public and private housing and social service agencies (see § 91.215(a), (b), (i), (j), (k), and (l)).

\* \* \* \* \*

■ 13. In § 91.225, paragraph (a)(1) is revised to read as follows:

### § 91.225 Certifications.

(a) \* \* \*

(1) *Affirmatively furthering fair housing.* Each jurisdiction is required to submit a certification that it will affirmatively further fair housing, which means that it will take meaningful actions to further the goals identified in the AFH conducted in accordance with the requirements of 24 CFR 5.150 through 5.180, and that it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing.

\* \* \* \* \*

■ 14. Section 91.230 is revised to read as follows:

### § 91.230 Monitoring.

The plan must describe the standards and procedures that the jurisdiction will use to monitor activities carried out in furtherance of the plan, including strategies and actions that address the fair housing issues and goals identified in the AFH, and that the jurisdiction will use to ensure long-term compliance with requirements of the programs involved, including civil rights related program requirements, minority business outreach, and the comprehensive planning requirements.

■ 15. In § 91.235, paragraphs (c)(1) and (4) are revised to read as follows:

### § 91.235 Special case; abbreviated consolidated plan.

\* \* \* \* \*

(c) *What is an abbreviated plan?*—(1) *Assessment of needs, resources, and planned activities.* An abbreviated plan must contain sufficient information about needs, resources, and planned activities to address the needs to cover the type and amount of assistance anticipated to be funded by HUD. The plan must describe how the jurisdiction will affirmatively further fair housing by addressing issues identified in an AFH conducted in accordance with 24 CFR 5.150 through 5.180.

\* \* \* \* \*

(4) *Submissions, certifications, amendments, and performance reports.* An Insular Area grantee that submits an abbreviated consolidated plan under this section must comply with the submission, certification, amendment, and performance report requirements of 24 CFR 570.440. This includes certification that the grantee will affirmatively further fair housing, which means that it will take meaningful actions to further the goals identified in an AFH conducted in accordance with the requirements of 24 CFR 5.150 through 5.180, and that it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing.

\* \* \* \* \*

■ 16. In § 91.305, paragraph (b)(2) is revised to read as follows:

### § 91.305 Housing and homeless needs assessment.

\* \* \* \* \*

(b) \* \* \*

(2) Until the jurisdiction has submitted an AFH, which includes an assessment of disproportionate housing needs in accordance with 24 CFR 5.154(d)(2)(iv), the following assessment shall continue to be included in the consolidated plan. For any of the income categories enumerated in paragraph (b)(1) of this section, to the extent that any racial or ethnic group has disproportionately greater need in comparison to the needs of that category as a whole, assessment of that specific need shall be included. For this purpose, disproportionately greater need exists when the percentage of persons in a category of need who are members of a particular racial or ethnic group in a category of need is at least 10 percentage points higher than the percentage of persons in the category as a whole. Once the jurisdiction has submitted an AFH, however, this assessment need not be included in the consolidated plan.

\* \* \* \* \*

■ 17. In § 91.315, paragraph (a)(5) is added to read as follows:

### § 91.315 Strategic plan.

(a) \* \* \*

(5)(i) Describe how the priorities and specific objectives of the State under § 91.315(a)(4) will affirmatively further fair housing by setting forth strategies and actions consistent with the goals and other elements identified in an AFH conducted in accordance with 24 CFR 5.150 through 5.180.

(ii) For AFH goals not addressed by these priorities and objectives, identify

any additional objectives and priorities for affirmatively furthering fair housing.

\* \* \* \* \*

■ 18. In § 91.320, paragraph (j) is revised to read as follows:

### § 91.320 Action plan.

\* \* \* \* \*

(j)(1) *Affirmatively furthering fair housing.* Actions it plans to take during the next year that address fair housing goals identified in the AFH.

(2) *Other actions.* Actions it plans to take during the next year to implement its strategic plan and address obstacles to meeting underserved needs, foster and maintain affordable housing (including allocation plans and policies governing the use of Low-Income Housing Credits under 26 U.S.C. 42, which are more commonly referred to as Low-Income Housing Tax Credits), evaluate and reduce lead-based paint hazards, reduce the number of poverty-level families, develop institutional structure, enhance coordination between public and private housing and the needs of public housing (including providing financial or other assistance to troubled PHAs), and encourage public housing residents to become more involved in management and participate in homeownership.

\* \* \* \* \*

■ 19. In § 91.325, paragraph (a)(1) is revised to read as follows:

### § 91.325 Certifications.

(a) *General*—(1) *Affirmatively furthering fair housing.* Each State is required to submit a certification that it will affirmatively further fair housing, which means that it will take meaningful actions to further the goals identified in an AFH conducted in accordance with the requirements of 24 CFR 5.150 through 5.180, and that it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing.

\* \* \* \* \*

■ 20. Section 91.415 is revised to read as follows:

### § 91.415 Strategic plan.

Strategies and priority needs must be described in the consolidated plan, in accordance with the provisions of § 91.215, for the entire consortium. The consortium is not required to submit a nonhousing Community Development Plan; however, if the consortium includes CDBG entitlement communities, the consolidated plan must include the nonhousing Community Development Plans of the CDBG entitlement community members

of the consortium. The consortium must set forth its priorities for allocating housing (including CDBG and ESG, where applicable) resources geographically within the consortium, describing how the consolidated plan will address the needs identified (in accordance with § 91.405), setting forth strategies and actions consistent with the goals and other elements identified in an AFH conducted in accordance with 24 CFR 5.150 through 5.180, describing the reasons for the consortium's allocation priorities, and identifying any obstacles there are to addressing underserved needs.

■ 21. In § 91.420, paragraph (b) is revised to read as follows:

§ 91.420  Action plan.

\* \* \* \* \*

(b) *Description of resources and activities.* The action plan must describe the resources to be used and activities to be undertaken to pursue its strategic plan, including actions the consortium plans to take during the next year that address fair housing issues identified in the AFH. The consolidated plan must provide this description for all resources and activities within the entire consortium as a whole, as well as a description for each individual community that is a member of the consortium.

\* \* \* \* \*

■ 22. In § 91.425, paragraph (a)(1)(i) is revised to read as follows:

§ 91.425  Certifications.

(a) *Consortium certifications—(1) General*—(i) *Affirmatively furthering fair housing.* Each consortium must certify that it will affirmatively further fair housing, which means that it will take meaningful actions to further the goals identified in an AFH conducted in accordance with the requirements of 24 CFR 5.150 through 5.180, and that it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing.

\* \* \* \* \*

■ 23. In § 91.505, add paragraph (d) to read as follows:

§ 91.505  Amendments to the consolidated plan.

\* \* \* \* \*

(d) The jurisdiction must ensure that amendments to the plan are consistent with its certification to affirmatively further fair housing and the analysis and strategies of the AFH.

## PART 92—HOME INVESTMENT PARTNERSHIPS PROGRAM

■ 24. The authority citation for part 92 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d) and 12701–12839.

■ 25. Revise 92.104 to read as follows:

§ 92.104  Submission of a consolidated plan and Assessment of Fair Housing.

A jurisdiction that has not submitted a consolidated plan to HUD must submit to HUD, not later than 90 calendar days after providing notification under § 92.103, a consolidated plan in accordance with 24 CFR part 91 and an Assessment of Fair Housing (AFH) in accordance with 24 CFR 5.150 through 5.180.

■ 26. In § 92.508, revise paragraph (a)(7)(i)(C) to read as follows:

§ 92.508  Recordkeeping.

(a) \* \* \*
(7) \* \* \*
(i) \* \* \*
(C) Documentation of the actions the participating jurisdiction has taken to affirmatively further fair housing, including documentation related to the participating jurisdiction's Assessment of Fair Housing as described in 24 CFR 5.168.

\* \* \* \* \*

## PART 570—COMMUNITY DEVELOPMENT BLOCK GRANTS

■ 27. The authority citation for part 570 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d) and 5300–5320.

■ 28. In § 570.3, revise the introductory text to read as follows:

§ 570.3  Definitions.

The terms *Affirmatively Furthering Fair Housing, Assessment of Fair Housing or AFH, HUD,* and *Secretary* are defined in 24 CFR part 5. All of the following definitions in this section that rely on data from the United States Bureau of the Census shall rely upon the data available from the latest decennial census or the American Community Survey.

\* \* \* \* \*

■ 29. In § 570.205, paragraph (a)(4)(vii) is revised to read as follows:

§ 570.205  Eligible planning, urban environmental design and policy-planning-management-capacity building activities.

(a) \* \* \*
(4) \* \* \*
(vii) Assessment of Fair Housing.

\* \* \* \* \*

■ 30. In § 570.441, paragraphs (b) introductory text, (b)(1) introductory text, (b)(2), (b)(3), (b)(4), (c), (d), and (e) are revised to read as follows:

§ 570.441  Citizen participation—insular areas.

\* \* \* \* \*

(b) *Citizen participation plan.* The insular area jurisdiction must develop and follow a detailed citizen participation plan and must make the plan public. The plan must be completed and available before the AFH and statement for assistance is submitted to HUD, and the jurisdiction must certify that it is following the plan. The plan must set forth the jurisdiction's policies and procedures for:

(1) Giving citizens timely notice of local meetings and reasonable and timely access to local meetings consistent with accessibility and reasonable accommodation requirements in accordance with section 504 of the Rehabilitation Act of 1973 and the regulations at 24 CFR part 8, and the Americans with Disabilities Act and the regulations at 28 CFR parts 35 and 36, as applicable, as well as information and records relating to the grantee's proposed and actual use of CDBG funds including, but not limited to:

\* \* \* \* \*

(2) Providing technical assistance to groups that are representative of persons of low- and moderate-income that request assistance in commenting on the AFH and developing proposals. The level and type of assistance to be provided is at the discretion of the jurisdiction. The assistance need not include the provision of funds to the groups;

(3) Holding a minimum of two public hearings for the purpose of obtaining residents' views and formulating or responding to proposals and questions. Each public hearing must be conducted at a different stage of the CDBG program year. Together, the hearings must address affirmatively furthering fair housing, community development and housing needs, development of proposed activities, proposed strategies and actions for affirmatively furthering fair housing consistent with the AFH, and a review of program performance. There must be reasonable notice of the hearings, and the hearings must be held at times and accessible locations convenient to potential or actual beneficiaries, with reasonable accommodations, including materials in accessible formats, for persons with disabilities. The jurisdiction must specify in its citizen participation plan

how it will meet the requirement for hearings at times and accessible locations convenient to potential or actual beneficiaries;

(4) Assessing its language needs, identifying any need for translation of notices and other vital documents and, in the case of public hearings, meeting the needs of non-English speaking residents where a significant number of non-English speaking residents can reasonably be expected to participate. At a minimum, the citizen participation plan shall require the jurisdiction to make reasonable efforts to provide language assistance to ensure meaningful access to participation by non-English speaking persons;

\*    \*    \*    \*    \*

(c) *Publication of proposed AFH and proposed statement.* (1) The insular area jurisdiction shall publish a proposed AFH and a proposed statement consisting of the proposed community development activities and community development objectives (as applicable) in order to afford affected residents an opportunity to:

(i) Examine the document's contents to determine the degree to which they may be affected;

(ii) Submit comments on the proposed document; and

(iii) Submit comments on the performance of the jurisdiction.

(2) The requirement for publishing in paragraph (c)(1) of this section may be met by publishing a summary of the proposed document in one or more newspapers of general circulation and by making copies of the proposed document available on the Internet, on the grantee's official government Web site, and as well at libraries, government offices, and public places. The summary must describe the contents and purpose of the proposed document and must include a list of the locations where copies of the entire proposed document may be examined.

(d) *Preparation of the AFH and final statement.* An insular area jurisdiction must prepare an AFH and a final statement. In the preparation of the AFH and final statement, the jurisdiction shall consider comments and views received relating to the proposed document and may, if appropriate, modify the final document. The final AFH and final statement shall be made available to the public. The final statement shall include the community development objectives, projected use of funds, and the community development activities.

(e) *Program amendments.* To assure citizen participation on program amendments to final statements and any revision to the AFH, the insular area grantee shall:

(1) Furnish its residents with information concerning the amendment to the consolidated plan or any revision to the AFH (as applicable);

(2) Hold one or more public hearings to obtain the views of residents on the proposed amendment to the consolidated plan or revision to the AFH;

(3) Develop and publish the proposed amendment to the consolidated plan or any revision to the AFH in such a manner as to afford affected residents an opportunity to examine the contents, and to submit comments on the proposed amendment to the consolidated plan or revision to the AFH, as applicable;

(4) Consider any comments and views expressed by residents on the proposed amendment to the consolidated plan or revision to the AFH, and, if the grantee finds it appropriate, make modifications accordingly; and

(5) Make the final amendment to the community development program or revision to the AFH available to the public before its submission to HUD.

\*    \*    \*    \*    \*

■ 31. In § 570.486, paragraphs (a)(2), (4), and (5) are revised to read as follows:

#### § 570.486   Local government requirements.

(a) \* \* \*

(2) Ensure that residents will be given reasonable and timely access to local meetings, consistent with accessibility and reasonable accommodation requirements in accordance with section 504 of the Rehabilitation Act of 1973 and the regulations at 24 CFR part 8, and the Americans with Disabilities Act and the regulations at 28 CFR parts 35 and 36, as applicable, as well as information and records relating to the unit of local government's proposed and actual use of CDBG funds;

\*    \*    \*    \*    \*

(4) Provide technical assistance to groups that are representative of persons of low- and moderate-income that request assistance in developing proposals (including proposed strategies and actions to affirmatively further fair housing) in accordance with the procedures developed by the State. Such assistance need not include providing funds to such groups;

(5) Provide for a minimum of two public hearings, each at a different stage of the program, for the purpose of obtaining residents' views and responding to proposals and questions. Together the hearings must cover community development and housing needs (including affirmatively furthering fair housing), development of proposed activities, and a review of program performance. The public hearings to cover community development and housing needs must be held before submission of an application to the State. There must be reasonable notice of the hearings and they must be held at times and accessible locations convenient to potential or actual beneficiaries, with accommodations for persons with disabilities. Public hearings shall be conducted in a manner to meet the needs of non-English speaking residents where a significant number of non-English speaking residents can reasonably be expected to participate;

\*    \*    \*    \*    \*

■ 32. In § 570.487, paragraph (b) is revised to read as follows:

#### § 570.487   Other applicable laws and related program requirements.

\*    \*    \*    \*    \*

(b) *Affirmatively furthering fair housing.* The Act requires the State to certify to the satisfaction of HUD that it will affirmatively further fair housing. The Act also requires each unit of general local government to certify that it will affirmatively further fair housing. The certification that the State will affirmatively further fair housing shall specifically require the State to assume the responsibility of fair housing planning by:

(1) Taking meaningful actions to further the goals identified in an AFH conducted in accordance with the requirements of 24 CFR 5.150 through 5.180;

(2) Taking no action that is materially inconsistent with its obligation to affirmatively further fair housing; and

(3) Assuring that units of local government funded by the State comply with their certifications to affirmatively further fair housing.

\*    \*    \*    \*    \*

■ 33. In § 570.490, paragraphs (a)(1) and (b) are revised to read as follows:

#### § 570.490   Recordkeeping requirements.

(a) *State records.* (1) The State shall establish and maintain such records as may be necessary to facilitate review and audit by HUD of the State's administration of CDBG funds under § 570.493. The content of records maintained by the State shall be as jointly agreed upon by HUD and the States and sufficient to enable HUD to make the determinations described at § 570.493. For fair housing and equal opportunity purposes, and as applicable, such records shall include documentation related to the State's AFH, as described in 24 CFR part 5,

subpart A (§ 5.168). The records shall also permit audit of the States in accordance with 24 CFR part 85.

\* \* \* \* \*

(b) *Unit of general local government's record.* The State shall establish recordkeeping requirements for units of general local government receiving CDBG funds that are sufficient to facilitate reviews and audits of such units of general local government under §§ 570.492 and 570.493. For fair housing and equal opportunity purposes, and as applicable, such records shall include documentation related to the State's AFH as described in 24 CFR part 5, subpart A (§ 5.168).

\* \* \* \* \*

■ 34. In § 570.506, paragraph (g)(1) is revised to read as follows:

**§ 570.506   Records to be maintained.**

\* \* \* \* \*

(g) \* \* \*

(1) Documentation related to the recipient's AFH, as described in 24 CFR part 5, subpart A (§ 5.168).

\* \* \* \* \*

■ 35. In § 570.601, paragraph (a)(2) is revised to read as follows:

**§ 570.601   Public Law 88–352 and Public Law 90–284; affirmatively furthering fair housing; Executive Order 11063.**

(a) \* \* \*

(2) Public Law 90–284, which is the Fair Housing Act (42 U.S.C. 3601–3620). In accordance with the Fair Housing Act, the Secretary requires that grantees administer all programs and activities related to housing and urban development in a manner to affirmatively further the policies of the Fair Housing Act. Furthermore, in accordance with section 104(b)(2) of the Act, for each community receiving a grant under subpart D of this part, the certification that the grantee will affirmatively further fair housing shall specifically require the grantee to take meaningful actions to further the goals identified in the grantee's AFH conducted in accordance with the requirements of 24 CFR 5.150 through 5.180 and take no action that is materially inconsistent with its obligation to affirmatively further fair housing.

\* \* \* \* \*

■ 36. In § 570.904, paragraph (c) is revised to read as follows:

**§ 570.904   Equal opportunity and fair housing review criteria.**

\* \* \* \* \*

(c) *Review for fair housing*—(1) *General.* See the requirements in the Fair Housing Act (42 U.S.C. 3601–20), as well as § 570.601(a).

(2) *Affirmatively furthering fair housing.* HUD will review a recipient's performance to determine if it has administered all programs and activities related to housing and urban development in accordance with § 570.601(a)(2), which sets forth the grantee's responsibility to affirmatively further fair housing.

\* \* \* \* \*

## PART 574—HOUSING OPPORTUNITIES FOR PERSONS WITH AIDS

■ 37. The authority citation for part 574 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d) and 12901–12912.

■ 38. Section 574.530 is revised to read as follows:

**§ 574.530   Recordkeeping.**

Each grantee must ensure that records are maintained for a 4-year period to document compliance with the provisions of this part. Grantees must maintain the following:

(a) Current and accurate data on the race and ethnicity of program participants.

(b) Documentation related to the formula grantee's Assessment of Fair Housing, as described in 24 CFR 5.168.

## PART 576—EMERGENCY SOLUTIONS GRANTS PROGRAM

■ 39. The authority citation for part 576 continues to read as follows:

**Authority:** 42 U.S.C. 11371 *et seq.*, 42 U.S.C. 3535(d).

■ 40. In § 576.500, revise paragraph (s)(1) to read as follows:

**§ 576.500   Recordkeeping and reporting requirements.**

\* \* \* \* \*

(s) \* \* \*

(1) Records demonstrating compliance with the nondiscrimination and equal opportunity requirements under § 576.407(a) and the affirmative outreach requirements in § 576.407(b), including:

(i) Data concerning race, ethnicity, disability status, sex, and family characteristics of persons and households who are applicants for, or program participants in, any program or activity funded in whole or in part with ESG funds; and

(ii) Documentation required under 24 CFR 5.168 in regard to the recipient's Assessment of Fair Housing and the certification that the recipient will affirmatively further fair housing.

\* \* \* \* \*

## PART 903—PUBLIC HOUSING AGENCY PLANS

■ 41. The authority citation for part 903 continues to read as follows:

**Authority:** 42 U.S.C. 1437c; 42 U.S.C. 1437c–1; Pub. L. 110–289; 42 U.S.C. 3535d.

■ 42. The heading of subpart A is revised to read as follows:

**Subpart A—Deconcentration of Poverty**

■ 43. The heading of subpart B is revised to read as follows:

**Subpart B—PHA Plans and Fair Housing Requirements**

■ 44. Section 903.1 is revised to read as follows:

**§ 903.1   What is the purpose of this subpart?**

The purpose of this subpart is to specify the process which a Public Housing Agency, as part of its annual planning process and development of an admissions policy, must follow in order to develop and apply a policy that provides for deconcentration of poverty and income mixing in certain public housing developments.

■ 45. Section 903.2 is amended by:
■ a. Revising the section heading;
■ b. Removing paragraph (d);
■ c. Redesignating paragraph (e) as paragraph (d); and
■ d. Revising newly redesignated paragraph (d).

The revisions read as follows:

**§ 903.2   With respect to admissions, what must a PHA do to deconcentrate poverty in its developments?**

\* \* \* \* \*

(d) *Relationship between poverty deconcentration and fair housing.* The requirements for poverty deconcentration in paragraph (c) of this section and for fair housing in 24 CFR 903.15(d) arise under separate statutory authorities.

■ 46. In § 903.7, paragraphs (a) and (o) are revised to read as follows:

**§ 903.7   What information must a PHA provide in the Annual Plan?**

\* \* \* \* \*

(a) *A statement of housing needs.* (1) This statement must address the housing needs of the low-income and very low-income families who reside in the jurisdiction served by the PHA, and other families who are on the public housing and Section 8 tenant-based assistance waiting lists, including:

(i) Families with incomes below 30 percent of area median (extremely low-income families);

(ii) Elderly families;

(iii) Until the PHA has submitted an Assessment of Fair Housing (AFH), which includes an assessment of disproportionate housing needs in accordance with 24 CFR 5.154(d)(2)(iv), households with individuals with disabilities and households of various races and ethnic groups residing in the jurisdiction or on the waiting list. Once the PHA has submitted an AFH, however, such households need not be addressed in this statement.

(2) A PHA must make reasonable efforts to identify the housing needs of each of the groups listed in paragraph (a)(1) of this section based on information provided by the applicable consolidated plan, information provided by HUD, and other generally available data.

(i) The identification of housing needs must address issues of affordability, supply, quality, accessibility, size of units, and location.

(ii) The statement of housing needs also must describe the ways in which the PHA intends, to the maximum extent practicable, to address those needs and the PHA's reasons for choosing its strategy.

\* \* \* \* \*

(o) *Civil rights certification.* (1) The PHA must certify that it will carry out its plan in conformity with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–2000d–4), the Fair Housing Act (42 U.S.C. 3601–19), section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), title II of the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 *et seq.*), and other applicable Federal civil right laws, and that it will affirmatively further fair housing, which means that it will take meaningful actions to further the goals identified in the AFH conducted in accordance with the requirements of 24 CFR 5.150 through 5.180, that it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing, and that it will address fair housing issues and contributing factors in its programs, in accordance with paragraph (o)(3) of this section.

(2) The certification is applicable to both the 5-Year Plan and the Annual Plan, including any plan incorporated therein.

(3) A PHA shall be considered in compliance with the certification requirement to affirmatively further fair housing if the PHA fulfills the requirements of §§ 903.7(o)(1) and 903.15(d) and:

(i) Examines its programs or proposed programs;

(ii) Identifies any fair housing issues and contributing factors within those programs, in accordance with 24 CFR 5.154;

(iii) Specifies actions and strategies designed to address contributing factors, related fair housing issues, and goals in the applicable Assessment of Fair Housing consistent with 24 CFR 5.154, in a reasonable manner in view of the resources available;

(iv) Works with jurisdictions to implement any of the jurisdiction's initiatives to affirmatively further fair housing that require the PHA's involvement;

(v) Operates programs in a manner consistent with any applicable consolidated plan under 24 CFR part 91, and with any order or agreement, to comply with the authorities specified in paragraph (o)(1) of this section;

(vi) Complies with any contribution or consultation requirement with respect to any applicable AFH, in accordance with 24 CFR 5.150 through 5.180;

(vii) Maintains records reflecting these analyses, actions, and the results of these actions; and

(viii) Takes steps acceptable to HUD to remedy known fair housing or civil rights violations.

\* \* \* \* \*

■ 47. Section 903.15 is revised to read as follows:

### § 903.15 What is the relationship of the public housing agency plans to the Consolidated Plan, the Assessment of Fair Housing, and a PHA's Fair Housing Requirements?

(a) The preparation of an Assessment of Fair Housing (AFH) is required once every 5 years, in accordance with 24 CFR 5.150 through 5.180. PHAs have three options in meeting their AFH requirements. PHAs must notify HUD of the option they choose. The options are:

(1) *Option 1: Assessment of Fair Housing with Units of General Local Government or State Governmental Agencies.* (i) A PHA may work with a unit of general local government or State governmental agency in the preparation of the AFH.

(A) A PHA must choose the unit of general local government or State governmental agency in which the PHA is located, unless the PHA's service area is within two or more jurisdictions.

(B) If the PHA serves residents of two or more jurisdictions, the PHA may choose the jurisdiction that most closely aligns to its planning activities under this part and 24 CFR part 905, unless the PHA has preexisting obligations prescribed in a binding agreement with HUD or the courts, such as a Recovery Agreement, Voluntary Compliance Agreement, or Consent Decree.

(C) If a PHA has a preexisting obligation prescribed in a binding agreement with HUD or the courts, the PHA must work with the general unit of local government named in the Agreement or Decree, when preparing the AFH.

(ii) A PHA working with a unit of general local government or State governmental agency in the preparation of the AFH will have fulfilled the requirements of AFH submission when the general unit of local government or State governmental agency submits an AFH.

(iii) If the unit of general local government or state governmental agency's AFH is accepted, all PHAs working with the unit of general local government or State governmental agency in the preparation of the AFH will be covered by the applicable goals contained in the AFH.

(iv) If a PHA joins with a unit of general local government or State governmental agency in the preparation of an AFH, the PHA must ensure that its PHA Plan is consistent with the general unit of local government's or State governmental agency's applicable consolidated plan and its AFH. (See also 24 CFR 5.158 for coordination when preparing an AFH jointly with a jurisdiction.)

(v) PHAs are encouraged to enter into Memorandums of Understanding (MOU) with units of general local government, State governmental agencies, and other PHAs to clearly define the functions, level of member participation, method of dispute resolution, and decisionmaking process of the program participants in the creation of the AFH.

(2) *Option 2: Assessment of Fair Housing with Public Housing Agencies.* (i) A PHA may jointly participate with one or more PHAs in the planning, participation, and preparation of the AFH consistent with the requirements of 24 CFR 5.150 through 5.180, and with the geographic scope and proposed actions scaled to the PHAs' operations and region, as provided in § 5.154.

(A) PHAs preparing a joint submission of an AFH are encouraged to prepare MOUs or other such cooperative agreements, which clearly define the functions, level of member participation, method of dispute resolution, and decisionmaking process for the jointly participating PHAs. The MOU or cooperative agreement should also clearly indicate a lead agency that will submit on behalf of the joint participants.

(B) An accepted AFH submitted on behalf of jointly participating PHAs will fulfill the submission requirements for all entities.

(C) If jointly participating PHAs' AFH is accepted, all PHAs participating in the creation of the AFH will be covered by the applicable goals contained in the AFH.

(ii) If a PHA joins with other PHAs in the submission of an AFH, the PHA must ensure that its 5-year PHA Plan is consistent with the AFH and its obligation to affirmatively further fair housing.

(iii) A PHA that is jointly participating with other PHAs in the creation of an AFH must certify consistency with the consolidated plan of the unit of general local government or State governmental agency in which the PHA is located, unless the PHA's service area is within two or more jurisdictions. If a PHA's service area is within two or more jurisdictions then:

(A) The PHA may choose to certify consistency with the jurisdiction that most closely aligns to its planning activities under this part and 24 CFR part 905, unless the PHA has pre-existing obligations prescribed in a binding agreement with HUD or the courts, such as a Recovery Agreement, Voluntary Compliance Agreement, or Consent Decree.

(B) If a PHA has a preexisting obligation prescribed in a binding agreement with HUD or the courts, the PHA must certify consistency with the general unit of local government named in the Voluntary Compliance Agreement or Consent Decree, when preparing the AFH.

(iv) In the event that HUD accepts an AFH under this option, and such AFH conflicts with the accepted AFH conducted by the unit of general local government or State governmental agency, a PHA's certification of consistency with the consolidated plan shall be accepted as a certification of consistency with the consolidated plan for all actions that do not directly conflict with the PHA's AFH that has been accepted by HUD.

(3) *Option 3: Independent PHA Assessment of Fair Housing.* (i) A PHA may conduct its own AFH with geographic scope and proposed actions scaled to the PHA's operations and region, in accordance with 24 CFR 5.154(d). An accepted AFH submitted by a PHA performing an independent AFH will fulfill the submission requirements for that PHA and the PHA shall be covered by the goals contained in the AFH.

(ii) A PHA that is performing its own AFH must certify consistency with the consolidated plan of the unit of general local government or State governmental agency in which the PHA is located, unless the PHA's service area is within

two or more jurisdictions. If a PHA's service area is in two or more jurisdictions then:

(A) The PHA may choose to certify consistency with the jurisdiction that most closely aligns to its planning activities under this part and 24 CFR part 905, unless the PHA has pre-existing obligations prescribed in a binding agreement with HUD or the courts, such as a Recovery Agreement, Voluntary Compliance Agreement, or Consent Decree.

(B) If a PHA has a preexisting obligation prescribed in a binding agreement with HUD or the courts, the PHA must certify consistency with the general unit of local government named in the Voluntary Compliance Agreement or Consent Decree, when preparing the AFH.

(iii) In the event that HUD accepts an AFH under this option, and such AFH conflicts with the AFH conducted by the unit of general local government or State governmental agency, the PHA's certification of consistency with the consolidated plan shall be accepted as a certification of consistency with the consolidated plan for all actions that do not directly conflict with the PHA's AFH that has been accepted by HUD.

(b) PHAs may but are not required to request a change in their fiscal years to better coordinate their planning cycle with the planning performed under each of the options listed in paragraph (a) of this section.

(c) If a material change in circumstances occurs in the jurisdiction of a PHA that requires a revision to the AFH, as specified in 24 CFR 5.164, the PHA will have up to 12 months to incorporate any goals from the revised AFH into its 5-Year PHA Plan, in accordance with the provisions of 24 CFR 903.21.

(d) *Fair housing requirements.* A PHA is obligated to affirmatively further fair housing in its operating policies, procedures, and capital activities. All admission and occupancy policies for public housing and Section 8 tenant-based housing programs must comply with Fair Housing Act requirements and other civil rights laws and regulations and with a PHA's plans to affirmatively further fair housing. The PHA may not impose any specific income or racial quotas for any development or developments.

(1) *Nondiscrimination.* A PHA must carry out its PHA Plan in conformity with the nondiscrimination requirements in Federal civil rights laws, including title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the

Fair Housing Act. A PHA may not assign housing to persons in a particular section of a community or to a development or building based on race, color, religion, sex, disability, familial status, or national origin for purposes of segregating populations.

(2) *Affirmatively Furthering Fair Housing.* A PHA's policies should be designed to reduce the concentration of tenants and other assisted persons by race, national origin, and disability in conformity with any applicable Assessment of Fair Housing as defined at 24 CFR 5.150 through 5.180 and the PHA's assessment of its fair housing needs. Any affirmative steps or incentives a PHA plans to take must be stated in the admission policy.

(i) HUD regulations provide that PHAs must take steps to affirmatively further fair housing. PHA policies should include affirmative steps to overcome the effects of discrimination and the effects of conditions that resulted in limiting participation of persons because of their race, national origin, disability, or other protected class.

(ii) Such affirmative steps may include, but are not limited to, marketing efforts, use of nondiscriminatory tenant selection and assignment policies that lead to desegregation, additional applicant consultation and information, provision of additional supportive services and amenities to a development (such as supportive services that enable an individual with a disability to transfer from an institutional setting into the community), and engagement in ongoing coordination with state and local disability agencies to provide additional community-based housing opportunities for individuals with disabilities and to connect such individuals with supportive services to enable an individual with a disability to transfer from an institutional setting into the community.

(3) *Validity of certification.* (i) A PHA's certification under § 903.7(o) will be subject to challenge by HUD where it appears that a PHA:

(A) Fails to meet the affirmatively furthering fair housing requirements at 24 CFR 5.150 through 5.180, including failure to take meaningful actions to further the goals identified in the AFH; or

(B) Takes action that is materially inconsistent with its obligation to affirmatively further fair housing; or

(C) Fails to meet the fair housing, civil rights, and affirmatively furthering fair housing requirements in 24 CFR 903.7(o).

(ii) If HUD challenges the validity of a PHA's certification, HUD will do so in writing specifying the deficiencies, and will give the PHA an opportunity to respond to the particular challenge in writing. In responding to the specified deficiencies, a PHA must establish, as applicable, that it has complied with fair housing and civil rights laws and regulations, or has remedied violations of fair housing and civil rights laws and regulations, and has adopted policies and undertaken actions to affirmatively further fair housing, including, but not limited to, providing a full range of housing opportunities to applicants and tenants and taking affirmative steps as described in paragraph (d)(2) of this section in a nondiscriminatory manner.

In responding to the PHA, HUD may accept the PHA's explanation and withdraw the challenge, undertake further investigation, or pursue other remedies available under law. HUD will seek to obtain voluntary corrective action consistent with the specified deficiencies. In determining whether a PHA has complied with its certification, HUD will review the PHA's circumstances relevant to the specified deficiencies, including characteristics of the population served by the PHA; characteristics of the PHA's existing housing stock; and decisions, plans, goals, priorities, strategies, and actions of the PHA, including those designed to affirmatively further fair housing.

■ 48. In § 903.23, paragraph (f) is added to read as follows:

### § 903.23  What is the process by which HUD reviews, approves, or disapproves an Annual Plan?

\*    \*    \*    \*    \*

(f) *Recordkeeping.* PHAs must maintain a copy of the Assessment of Fair Housing as described in 24 CFR part 5, subpart A (§§ 5.150 through 5.180) and records reflecting actions to affirmatively further fair housing, as described in § 903.7(o).

Dated: June 30, 2015.

**Julián Castro,**

*Secretary.*

[FR Doc. 2015–17032 Filed 7–15–15; 8:45 am]

**BILLING CODE 4210–67–P**



**Property Casualty Insurers**
**Association of America**

Advocacy. Leadership. Results.

July 29, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

> **Re:** **Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's Discriminatory Effects Standard**
>
> ***Property Casualty Insurers Association of America v. Donovan*, 66 F. Supp.3d 1018 (N.D. Ill. 2014)**

Dear Sir or Madam:

On September 3, 2014, Judge St. Eve of the U.S. District Court for the Northern District of Illinois issued a memorandum opinion and order in *Property Casualty Insurers Association of America v. Donovan*, 66 F. Supp.3d 1018 (N.D. Ill. 2014) (*PCI*), granting summary judgment to PCI on its claims that the Department of Housing and Urban Development's (HUD's) "application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious." *Id.* at 1030. Judge St. Eve remanded the case to HUD for further consideration of whether the Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can lawfully be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional comments to HUD to address the issues identified in the district court's remand decision and requested that HUD re-open the public comment period to inform others that HUD expects to fully consider the complex issues presented by application of the Disparate Impact Rule (the "Rule") to homeowners insurance. On January 26, 2015, PCI submitted the promised additional comments to HUD setting forth the following reasons that the Disparate Impact Rule cannot lawfully be applied to homeowners insurance. PCI noted that application of the Rule to homeowners insurance would (i) impair state regulation of insurance in violation of the McCarran-Ferguson Act, (ii) fundamentally interfere with the provision of homeowners insurance, and (iii) impose needless costs on providers of homeowners insurance and their customers. Consistent with the relief PCI sought in the district court and the direction given by that court on remand to HUD, PCI requested that HUD exempt homeowners insurance from the Rule.

On June 25, 2015, the U.S. Supreme Court handed down its decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, No. 13-1371. The Supreme Court held that the Fair Housing Act (FHA) permits assertion

Regulations Division
Page 2

of disparate-impact claims, but the Court emphasized that disparate-impact liability must be limited in key respects. The Supreme Court's explanation of those limitations further supports PCI's contention that homeowners insurance should be exempted from the Disparate Impact Rule. PCI thus submits these supplemental comments to take account of the Supreme Court's decision.[1]

## I.    The Supreme Court's Decision

In *Texas Department of Housing and Community Affairs*, the Supreme Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" Slip Op. at 21 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." Slip Op. at 18. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 20, 22.

The first of those safeguards is "[a] robust causality requirement." *Id.* at 20. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). Referring approvingly to the opinion below of Fifth Circuit Judge Jones, the Court held up as a paradigmatic case of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policy." *Id.* at 18. Homeowners insurers exemplify the potential defendants the Court had in mind, in that the extensive state regulation of their industry provides a quintessential case of the "valid interest[s]" to which the Court made reference. Businesses, the Court also stated, "must be given latitude to consider market forces." *Id.* at 19. Again, homeowners insurance markets, with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* at

---

[1] HUD has not yet opened a public comment period. But PCI is submitting these comments now in an abundance of caution, given the remand from Judge St. Eve and HUD's statement in other litigation that it is "currently reviewing its regulation in light of the judgment" in *PCI*. Motion to Govern Future Proceedings and Response to Plaintiffs' Motion to Vacate and Remand, *American Insurance Ass'n v. United States Department of Housing and Urban Development*, No. 14-5321 (D.C. Cir. July 24, 2015).

Regulations Division
Page 3

20. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 21. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 21. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## II.    The McCarran-Ferguson Act Requires an Exemption from Disparate-Impact Claims for Homeowners Insurance

In her September 3, 2014 decision remanding the *PCI* case to HUD, Judge St. Eve ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. *PCI*, 66 F. Supp.3d at 1027. Those conflicts, Judge St. Eve explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. Judge St. Eve also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 1028. She held that HUD's responses to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 1029.

In our January 26, 2015 comments, PCI discussed three reasons why HUD must provide an exemption for homeowners insurance.

*First*, application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI*, 66 F. Supp.3d at 1027. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

The evaluation required by the district court shows that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage

Regulations Division
Page 4

in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

*Second*, application of the Disparate Impact Rule to homeowners insurance would interfere with the provision of homeowners insurance. As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." *PCI*, Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." *PCI*, Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. *PCI*, Admin. R. at 377. This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

*Third*, application of the Disparate Impact Rule to homeowners insurance would impose needless costs on providers of homeowners insurance and their customers.

## III. The Supreme Court's Reasoning Confirms that an Exemption for Homeowners Insurance Is Required

The two key safeguards the Supreme Court established on disparate-impact claims in *Texas Department of Housing and Community Affairs* provide further support for each of PCI's three arguments.

Most fundamentally, the Supreme Court's determination that FHA disparate-impact claims must satisfy "[a] robust causality requirement" confirms that the Disparate

Regulations Division
Page 5

Impact Rule cannot be applied to homeowners insurance without running afoul of the McCarran-Ferguson Act and interfering in the lawful operation of the homeowners insurance markets. Slip Op. at 20. In describing the causality requirement, the Court identified as a quintessential example of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21. That is precisely the circumstance in which companies offering homeowners insurance find themselves. Application of disparate-impact liability under the FHA to homeowners insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id.* at 19.

As PCI described at length in its January 26, 2015 comments, companies offering homeowners insurance are regulated by a panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance, expressly delineating and permitting the use of such methods, and requiring the filing of homeowners insurance rates with state administrative bodies for approval. PCI January 26, 2015 Comments at 7-13. Those state laws mandate or expressly permit homeowners insurers to use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates to various risk classifications. They thus "substantially limit" the discretion of homeowners insurance companies in a manner that would make it impossible to ascribe any apparently disparate effects of the companies' underwriting or pricing practices to their independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the sort of "double bind of liability" the Court warned against. That is just what the McCarran-Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be defined in a way that gives "latitude to consider market forces" also reinforces PCI's contention that disparate-impact liability should not be permitted against homeowners insurers. Slip Op. at 19. As PCI highlighted in its earlier comments, insurance markets run efficiently when insurance is priced in accord with actuarially sound, risk-based factors. PCI January 26, 2015 Comments at 2-3, 16-17. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation. The extensive state-law framework governing the pricing of homeowners insurance is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market and in particular actuarially sound, risk-based pricing. Slip Op. at 21. Unless that specter were vanquished, "the FHA would have

Regulations Division
Page 6

undermined its own purpose as well as the free-market system." *Id.* Under the McCarran Ferguson Act regulation of the market for homeowners insurance is reserved to the states. Exempting homeowners insurance from disparate-impact claims is necessary to ensure that the threat of disparate-impact litigation does not impair states' legal regimes governing the pricing of homeowners' insurance or hinder the efficient operation of insurance market in accord with those state-law regimes.

Finally, the Supreme Court's caution that the FHA should not be interpreted to promote the use of racial (or other suspect) classifications supports each of PCI's arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," the Court explained, would perversely "tend to perpetuate race-based considerations rather than move beyond them." Slip Op. at 21. But that is just what extending disparate-impact liability to homeowners insurers would do.

State law ensures that homeowners insurers price their products in accordance with risk-based, actuarially sound factors. State law does not permit reliance on, and homeowners insurers do not rely on, racial (or other suspect) classifications in pricing their products. Yet, the failure to exempt homeowners insurers from disparate-impact liability would effectively require them to compile data on the racial (and other suspect) characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts in insurance provision. Exempting homeowners insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners insurers would, contrary to the McCarran-Ferguson Act, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners insurance by imposing significant and needless costs on providers of homeowners insurance and their customers.

\*     \*     \*     \*

Regulations Division
Page 7

  The Supreme Court's decision in *Texas Department of Housing and Community Affairs* strongly supports PCI's arguments that HUD should exempt homeowners insurance from the Disparate Impact Rule. For all the reasons given above and in PCI's earlier comments, HUD should act promptly to establish such an exemption.

      Sincerely,

      Robert Gordon
      Senior Vice President
      Policy Development and Research

## Casualty Actuarial and Statistical (C) Task Force

## Price Optimization White Paper

I. <u>Scope</u>

1. In this paper, the Casualty Actuarial and Statistical (C) Task Force provides background research on price optimization, identifies potential benefits and drawbacks to the use of price optimization, and presents options for state regulatory responses regarding the use of price optimization in ratemaking. The Task Force is not expressing an opinion on the policy decisions that have been or may be made by each state concerning rating practices that may incorporate price optimization.

2. The primary focus of the paper is on personal lines ratemaking. Ratemaking concepts and principles (e.g., cost-based actuarial indications or unfair discrimination) may have application to commercial lines of business, as well.

3. Though price optimization could be used in risk selection, marketing or other insurer operations, these issues are not addressed in this paper. The NAIC should consider whether these are issues that need to be addressed.

II. <u>Introduction</u>

4. Ratemaking is the process of establishing rates used in insurance or other risk transfer mechanisms. This process may involve a number of considerations, including estimates of future claims costs and expenses, profit and contingencies, marketing goals, competition, and legal restrictions. Actuaries play a key role in the ratemaking process and are generally responsible for determining the estimated costs of risk transfer. The advent of more sophisticated data mining tools and modeling techniques have allowed the use of more objective and detailed quantitative information for aspects of the rate-setting process for which insurers have traditionally relied on judgment or anecdotal evidence.

5. Making adjustments to actuarially indicated rates is not a new concept; it has often been described as "judgment." Insurers often considered how close they could get to the indicated need for premium without negatively affecting policyholder retention and how a given rate would affect the insurer's premium volume and expense ratio. Before the introduction of data-driven quantitative techniques, the answers to these questions were largely subjective. Historically, when judgment was applied, the changes were made on a broad level (e.g., an entire rating territory).

6. In recent years, through a process or technique referred to by many as "price optimization," insurers have started using big data (data mining of insurance and non-insurance databases of personal consumer information where permitted by law), advanced statistical modeling or both to select prices that differ from indicated rates at a very detailed or granular level. Formalized and

1

mechanized adjustments can be made to indicated rates for many risk classifications and, ultimately, perhaps even for individual insureds.

7. According to the Casualty Actuarial Society (CAS), until recently, companies had limited ability to quantitatively reflect individual consumer demand in pricing.[1] By measuring and using price elasticity of demand, an insurer can "optimize" prices to charge the greatest price without causing the consumer to switch to another insurer. It is this use of elasticity of demand that has led to criticisms that price optimization penalizes customers.

8. Critics object to insurers' use of price optimization when it results in unfairly discriminatory rates. Price optimization may use external, non-insurance databases to gather personal consumer information or detailed information about competitors' pricing to model consumer demand and predict the response of consumers to price changes. Some critics argue that price optimization has been developed to increase insurers' profits by raising premiums on individuals who are less likely to shop around for a better price, and many of these people are low-income consumers. The Consumer Federation of America (CFA) asserts that price optimization introduces a systematic component to rate setting unrelated to expected losses or expenses. The CFA has called price optimization unfairly discriminatory, claiming that it can result in drivers with the same risk profile being charged different rates.[2]

9. Regulators accept some deviations from indicated rates and rating factors. However, they are concerned that the use of sophisticated methods of price optimization could deviate from traditional ratemaking, extending beyond acceptable levels of adjustment to cost-based rates and resulting in prices that vary unfairly by policyholder. Regulators in each state determine the acceptable level of adjustment allowable based on state law and regulatory judgment.

10. In late 2013, the NAIC's Auto Insurance (C/D) Study Group began to study the use of price optimization in auto insurance. Because the topic of price optimization goes beyond auto insurance and requires a great deal of actuarial or statistical expertise, the Study Group asked the Task Force to perform any additional research necessary on the use of price optimization, including studying regulatory implications, and respond to the Study Group with a report or white paper documenting the relevant issues.

III. Background: State Rating Law, Actuarial Principles and Definitions

11. The basis for all rate regulation is established by the state law—both statutory and case law. State authority is derived from the inclusion in almost all states' laws that personal lines insurance "rates

---

1. Casualty Actuarial Society Committee on Ratemaking Price Optimization Working Party
2. Consumer Federation of America, March 31, 2014. "Insurance Commissioners Should Bar Industry Practice of Raising Rates on Customers Based on Shopping Habits," accessed at http://consumerfed.org/press_release/insurance-commissioners-should-bar-industry-practice-of-raising-rates-on-customers-based-on-shopping-habits/.

shall not be inadequate, excessive or unfairly discriminatory."[3] The NAIC has three model law guidelines related to rate regulation: 1) Property and Casualty Model Rating Law (File and Use Version) (#1775);[4] 2) Property and Casualty Model Rate and Policy Form Law Guideline (#1776);[5] and 3) Property and Casualty Model Rating Law (Prior Approval Version) (#1780).[6]

12. In Model #1775 and Model #1776, the description of "unfairly discriminatory rates" is as follows:

"Section 5. Rate Standards

Rates shall be made in accordance with the following provisions:

    A. Rates shall not be excessive, inadequate, or unfairly discriminatory.

       …

       (3) Unfairly Discriminatory Rates. Unfair discrimination exists if, after allowing for practical limitations, price differentials fail to reflect equitably the differences in expected losses and expenses. …"[7]

In Model #1780,[8] a description of "unfairly discriminatory rates" is suggested to be adopted in regulation but does not provide wording for the description.

13. The actuarial profession utilizes ratemaking principles. The following are the four principles in the CAS "Statement of Principles Regarding Property and Casualty Insurance Ratemaking":

    a.   Principle 1: A rate is an estimate of the expected value of future costs.

    b.   Principle 2: A rate provides for all costs associated with the transfer of risk.

    c.   Principle 3: A rate provides for the costs associated with an individual risk transfer.

    d.   Principle 4: A rate is reasonable and not excessive, inadequate or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer.[9]

14. The following terms are used in this paper:

---

3. Illinois law only contains that requirement for workers' compensation and medical professional liability. Kentucky statute § 304.13-031 includes the requirement only when the market is not competitive.

4. NAIC model law Guideline 1775; NAIC Model Regulation Service – January 2010.

5. NAIC model law Guideline 1776; NAIC Model Regulation Service – October 2010.

6. NAIC model law Guideline 1780; NAIC Model Regulation Service – October 2010.

7. NAIC Guideline 1775: Property and Casualty Model Rating Law (File and Use Version), Model Regulation Service—January 2010
NAIC Guideline 1776: Property and Casualty Model Rate and Policy Form Law Guideline, Model Regulation Service—October 2010.

8. NAIC model law guideline "Property and Casualty Model Rating Law (Prior Approval Version) Guideline 1780, Model Regulation Service—October 2010.

9. Casualty Actuarial Society, 1988. *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, accessed at *www.casact.org/professionalism/standards/princip/sppcrate.pdf.*

a.  In this paper, "price optimization" refers to the process of maximizing or minimizing a business metric using sophisticated tools and models to quantify business considerations. Examples of business metrics include marketing goals, profitability and policyholder retention.

b.  "Actuarial judgment" is used in many of the actuarial methodologies in the rate-setting process (e.g., selection of loss development factors, trends, etc.). Actuarial Standard of Practice (ASOP) No. 1, *Introductory Actuarial Standard of Practice,* states that "the ASOPs frequently call upon actuaries to apply both training and experience to their professional assignments, recognizing that reasonable differences may arise when actuaries project the effect of uncertain events."[10] According to the CAS, "[i]nformed actuarial judgments can be used effectively in ratemaking."[11] Actuarial judgments are made throughout the ratemaking (as well as risk classification) process, including assumptions on the inputs and assessing the accuracy of the results. Price optimization is a tool and does not replace actuarial judgment in ratemaking; actuarial judgment remains a separate and distinct exercise that is fully consistent with and permitted by sound actuarial standards.

c.  "Ratemaking" is "the process of establishing rates used in insurance or other risk transfer mechanisms. This process involves a number of considerations, including marketing goals, competition and legal restrictions, to the extent they affect the estimation of future costs associated with the transfer of risk."[12] Basic elements that go into the risk transfer estimate include claim and claim handling expense, underwriting expenses, policy acquisition and a reasonable profit.

d.  A "cost-based" rate is an estimate of all future costs associated with an individual risk transfer and is developed from and consistent with the expected claims, claim handling expense, underwriting expenses, policy acquisition expense, a reasonable profit, investment income and other risk transfer costs.

e.  The "actuarial indication" is also referred to as a "cost-based indication" and is an actuarially sound estimate of the cost to transfer covered risk from a policyholder to the insurer. These estimates are based on the data at hand, the analytical techniques used and actuarial judgment about the underlying cost drivers. There can be a variety of reasons why the actuarial indication could have limitations, such as low volume of data/credibility or a problem with data quality or biases in the analytical technique(s) used. Additionally, there could be changes that are not fully reflected in the data, such as internal company changes or changes in the external environment. The actuarial indication excludes adjustments that are not in accordance with actuarial principles.

f.  "Price elasticity of demand" (commonly known as just "price elasticity") measures the rate of response of quantity demanded due to a price change. Price elasticity "is used to see how sensitive the demand for a good is to a price change. The higher the price elasticity, the more sensitive consumers are to price changes. A very high price elasticity suggests that when the price of a good goes up, consumers will buy a great deal less of it, and when the

---

10. Actuarial Standards Board, 2013. Actuarial Standard of Practice No. 1, *Introductory Actuarial Standard of Practice*.

11 Casualty Actuarial Society, 1988. *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, accessed at www.casact.org/professionalism/standards/princip/sppcrate.pdf.

12. Casualty Actuarial Society, 1988. *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*.

price of that good goes down, consumers will buy a great deal more. A very low price elasticity implies just the opposite—that changes in price have little influence on demand."[13]

g. A "rating plan" in the context of this paper is a structure of elements used to determine the premium to be charged a specific risk. The elements include a set of rules, risk classifications and sub-classifications, factors, discounts, surcharges, and fees applied to a base rate that determines the price to be charged a consumer to transfer risk to the insurer. Generally, a rating plan is embodied in a document called a rating manual.[14]

h. "Rating variables" (or "rating classes") are those explicitly stated in the insurer's rating plan and necessary to calculate the premium to be charged. Items such as loss development, trend or price elasticity would not be considered a rating variable unless these items are part of a filed rating plan. A rating variable includes consideration of tier placement within a company (but not across companies; underwriting determines the acceptability of a risk to a company) and insurance scores of all types.

i. A "rating factor" is the numerical value assigned to a rating variable for premium calculation purposes.

j. A "rating cell" is the result of any combination of rating variables in the rating plan.

k. The "rate" is defined as an estimate of all future costs associated with an individual risk transfer. A base value used as the starting point for the calculation of a premium and other rating factors that adjust the base value are considered to be rates.

l. A "risk profile" is the set of characteristics set forth in the insurer's rating plan required to calculate the premium to be charged for the purpose of transferring the individual's risk to the insurer. Two individuals with the same risk profile have the same risk, loss and expense expectations.

m. The "price" or "premium" charged a consumer incorporates management decisions after taking into account other considerations such as underwriting, marketing, competition, law and claims, in addition to the actuarial estimate of the rate. The price (or premium) charged is calculated by taking the individual's risk profile and applying the final rates and rules contained in the insurer's rating plan according to the policyholder's relevant characteristics.

n. The purpose of "capping" or "transition" rules is to provide stability to the insurer's book of business when large premium changes are possible. A premium or rate "capping" rule is a widely used practice where the change in premium from the current premium to the renewing premium (increase or decrease) is reduced. Capping impacts the premium change at renewal on a policy-by-policy basis and is usually in effect for a short period of time (e.g., the full approved premium will be charged after no more than three renewal cycles). Capping usually occurs when large policy premium changes (increases or decreases) are

---

13. Moffatt, M. Economics expert, Economics.about.com.
14. Paraphrased from the Casualty Actuarial Society's Foundations of Casualty Actuarial Science.

caused by significant changes to the insurer's base rates or its rating factors. Transition rules are effectively the same as capping rules, which can occur when overhauling a company's rating plan or when merging books of business from different rating plans.

## IV. Price Optimization Background

15. There is no single or widely accepted definition of price optimization. In economics, optimization is "(f)inding an alternative with the most cost-effective or highest achievable performance under the given constraints, by maximizing desired factors and minimizing undesired ones."[15]

16. Definitions or descriptions of price optimization as used in insurance, offered by various stakeholders, include the following:

    a. The CAS defines price optimization as "the supplementation of traditional actuarial loss cost models to include quantitative customer demand models for use in determining customer prices. The end result is a set of proposed adjustments to the cost models by customer segment for actuarial risk classes."[16]

    b. The American Academy of Actuaries' (Academy) Price Optimization Task Force defines price optimization as "a sophisticated technique based on predictive modeling results and business objectives and constraints that are intended to assist insurance companies in setting prices. It is an additional component of the pricing process in which the business manager goes from cost-based rates to final prices by integrating expected costs with expected consumer demand behavior, subject to target business objective(s). The target business objective(s) may be to improve profit, increase volume, increase or maintain retention, or some combination thereof. These targeted business objectives represent the insurer's pricing strategy. Price optimization is a technique used to achieve that pricing strategy."[17]

    c. Towers Watson defines price optimization as "a systematic process for suggesting adjustments to theoretical cost-based prices that better achieve business objectives, subject to known constraints."[18]

    d. Earnix defines price optimization as a "systematic and statistical technique to help an insurer determine a rating plan that better fits the competitive environment, within actuarial and regulatory standards." Earnix adds that price optimization helps inform an insurer's judgment when setting rates by producing suggested competitive adjustments that balance and help the insurer achieve certain business goals, including loss ratios,

---

15. *www.businessdictionary.com/definition/optimization.html.*
16. Casualty Actuarial Society Committee on Ratemaking Price Optimization Working Party, 2014. "Price Optimization Overview."
17. American Academy of Actuaries, April 15, 2015, letter.
18. Towers Watson, Nov. 3, 2014. Letter to Joseph G. Murphy, accessed at *www.naic.org/documents/committees_c_d_auto_insurance_study_group_related_141103_towers_watson.pdf.*

customer retention and new business.[19] Earnix describes price optimization as an application of prescriptive analytics as opposed to predictive analytics. Prescriptive analytics use predictive models and business goals as inputs to recommend decisions to achieve the optimal results.

    e. The Ohio Department of Insurance (DOI) describes price optimization as varying premiums based upon factors that are unrelated to risk of loss in order to charge each insured the highest price that the market will bear.[20]

    f. The Consumer Federation of America (CFA) describes price optimization as a practice where premiums are set based on the maximum amount a consumer is willing to pay, rather than the traditionally accepted methods of calculating premiums based on projected costs, such as claims, overhead and profit.[21]

17. Many regulators have noted that price optimization is a complex process based on predictive modeling intended to assist insurance companies in setting prices. It is an additional component of the pricing process in which the insurer transitions from actuarial indicated rates to the selected rates charged individual risks.

18. According to Earnix,[22] price optimization uses a variety of applied mathematical techniques (linear, nonlinear and integer programming) in the ratemaking process to analyze more granular data.

19. There are several different types of price optimization, and price optimization can be performed at different levels of aggregation. According to Towers Watson,[23] there are three main types of optimization used in ratemaking:

    a. Ratebook Optimization – using mathematical algorithms informed by cost and demand models to adjust factors in an existing structure.

    b. Individual Price Optimization – a non-parametric rate engine that builds a price based on the cost and demand for the product.

    c. Hybrid Optimization – create a new rate factor based on the demand model that overlays the cost-based rate algorithm.[24]

---

19. Earnix. "Introduction to Price Optimization," accessed at
www.naic.org/documents/committees_c_catf_related_price_optimization_docs_reffered_in_memo_to_castf.pdf.

20. Ohio DOI, Bulletin 2015-01.

21. Consumer Federation of America, 2013. Letter to state insurance commissioners.

22. Earnix Ltd. provides integrated pricing and customer analytics software that allows financial services companies to predict customer risk and demand and its impact on business performance. Its software platform allows insurance companies to harness customer data and optimize business performance across auto, home, commercial and other product lines; www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=1745902.

23. Towers Watson & Company manages employee benefit programs; develops attraction, retention and reward strategies; advises pension plan sponsors on investment strategies; provides strategic and financial advice to insurance and financial services companies; and offers actuarial consulting; www.bloomberg.com/profiles/companies/TW:US-towers-watson-&-co.

20. With ratebook optimization, the model proposes alternative selections of rating factors in the existing rating plan to achieve an insurer's business goals. These models generally determine selections at the classification level to optimize the insurer's program. According to the CAS, insurers engaging in the ratebook form of price optimization will not charge different premiums to consumers with the same risk profile. The CAS says there is no mechanism in the insurers' rating plans to charge different premiums to consumers with the same risk profile.

21. With individual price optimization, prices are determined at the individual policy level based on cost and demand. This type of price optimization is believed to be more common with retail or personal service companies in the U.S. and in insurance pricing in other countries.

22. With hybrid optimization, an additional factor is added to an insurer's existing rating plan to incorporate other aspects from a demand model such as expected retention, profitability, rate of transition from the current premium towards the proposed premium, premium volume or expense. The new rating factor would be designed to modify the existing rating plan to achieve an insurer's business goals; the rating factor may or may not be correlated with expected costs.

23. Some distinguish between "constrained" versus "unconstrained" optimization. Generally, constrained optimization refers to an insurer setting maximum and minimum limits on the model's output. For example, in price optimization, a price could be constrained by the current price and the fully loss-based indicated price. Unconstrained optimization has no such limits.

24. Vendors such as Towers Watson and Earnix have developed commercially available software for carriers that perform price optimization. The use of the software can vary from insurer to insurer, as each insurer may specify its own objectives and constraints. According to Towers Watson, its software provides: 1) an environment for a carrier to integrate its own models (e.g., loss cost models, expense assumptions and policyholder demand models) on customer data; and 2) mathematical algorithms that search the universe of rating structure parameters (i.e., relativities) to identify the set(s) that most closely meet the carrier's corporate objectives, subject to its constraints. Thus, each optimization exercise is unique to the insurer and relies on the insurer's data, assumptions, input models, targets and constraints. Some insurers develop their own price optimization software.

25. In the traditional rate-setting process, actuaries determine expected losses, expenses and profit loading; adjustments may be made to reflect business considerations such as marketing/sales, underwriting and competitive conditions. Depending on the situation, regulators may permit insurers to reflect judgment and the competitive environment in rates (e.g., to reflect differences expected in future costs that might differ from past costs or to avoid adverse selection and the resulting associated costs to the company and consumers). However, the insurer must ensure that

---

24. Guven, S., 2015. FCAS, MAAA, Towers Watson & Company. Presentation, Casualty Actuarial Society's RPM Seminar.

filed rates are not excessive, inadequate or unfairly discriminatory. This table provides a high-level comparison of these approaches:

|  | Traditional Approach | Price Optimization Approach |
|---|---|---|
| Rating Plan Development: | Base rate (loss cost) x adjustment factor | Base rate (loss cost) x adjustment factor |
| Adjustment factors (for auto insurance) are based on … | Age, gender, territory, make and model year, and many other rating variables | Age, gender, territory, make and model year, and many other rating variables |
| Adjustment to rates based on market, regulatory and other considerations are based on … | Qualitative assessment | Qualitative and quantitative assessments informed by analysis of risk-related and non-risk-related data |
| Basis for adjustments to rates is … | Insurer judgment | Automatic, systematic analysis (modeling) |

26. Price optimization based on quantitative modeling has been characterized by the CFA as a new technique and a departure from traditional cost-based ratemaking. The CFA says it uses additional, and sometimes more complex, models that incorporate non-risk-related factors to quantify the effects of rate changes with the objective to improve profitability, attract new business and retain existing business, or other measures (business metrics).

27. Traditional cost-based ratemaking often includes judgment to select rate factors to achieve insurer objectives. The key difference between traditional judgment and price optimized modeling techniques is that with price optimized modeling: 1) market demand and customer behavior are quantified instead of being subjectively determined; and 2) the effect of the deviation from the cost-based rate on business metrics is mathematically measured. Both approaches can make adjustments to the indicated cost-based rating factors, but with price optimization, these adjustments are made to rating factors with more clearly quantified insurer goals, and in lieu of or in addition to adjustments to rating factors, price optimization could be used to adjust the rate or premium for an individual policy.

28. According to Towers Watson, price optimization incorporates models that generate a much larger number of rate scenarios to run through the price assessment environment and helps to better identify which scenarios best achieve business objectives.

29. Towers Watson notes that "elasticity of demand is a key ingredient" in the price optimization process. Towers Watson also notes that the input models in its optimization software include policyholder demand models, which "do not describe which customers shop more or less but rather how likely a customer is to renew a policy or accept an insurer's quote." Policyholder demand models, according to Towers Watson, are generally fit to recent, customer-level, historical data that

9

contains information about the customer, as well as what purchase decision the customer made (e.g., did the customer renew – yes/no, did she or he accept this quote – yes/no). [25]

30. Price optimization has been used for years in other industries, including retail and travel. However, the use of model-driven price optimization in the U.S. insurance industry is relatively new. A 2013 Earnix survey[26] of 73 major insurers found that 55% consider customer price elasticity. Of large insurance companies (with gross written premiums over $1 billion), 45% currently use some form of price optimization, with an additional 29% of all companies reporting they plan to do so in the future. State regulators report receipt of few rate filings specifically identifying the use of price optimization. This may be because price optimization is not clearly disclosed to regulators when a filing is made or because price optimization is used in a manner that is not directly part of a filed rating plan.

V. <u>Identify Potential Benefits and Drawbacks of Price Optimization</u>

31. Price optimization affects the selected rates, rating factors or premium rather than the cost-based indications. Historically, selections are often based, in part, on judgment. Therefore, regulators are challenged with reviewing an insurer's selected rates or rating factors without, in certain cases, knowing how price optimization influenced the insurer's selections. General guidelines some regulators may use to review rates include the relationship between the current, indicated and selected rates or factors, how far the selected rates or factors vary from the indications, or the relationship between factors for a rating plan variable. Distilling the voluminous information connected with price optimization makes determining the extent and effect of a program much more difficult for regulators. In addition, regulators must rely upon insurers to present accurate and complete information on indicated rates and the adjustments to arrive at selected rates. Regulators do not currently have the data necessary for an independent evaluation of most of the insurer modeling and calculations.

32. One aspect of working with generalized linear models (GLMs) and rating plans is that they can produce large changes in the risk estimate of individual policies between versions (or when introduced in a rating plan), often as the compounding of many small changes across all the rating variables. As such, companies need ways to provide rate stability when implementing a new rating plan or changes to an existing rating plan. One of the goals within constrained optimization can be to limit policyholder disruption. According to the CAS,[27] price optimization may improve rate stability and lower an insurer's long-term cost for providing coverage and limit policyholder disruption. This may be viewed as indirectly favorable for consumers who do not want to shop for insurance on a regular basis.

---

25. Marin, A. and T. Bayley, 2010. "Price Optimization for New Business Profit and Growth," accessed at *www.towerswatson.com/en/Insights/Newsletters/Global/Emphasis/2010/iEmphasisi-20101*.

26 Auto Insurance Pricing Practices in North America – Benchmark Survey, *http://earnix.com/auto-insurance-pricing-practices-in-north-america-3/3403/*.

27. Casualty Actuarial Society, 2014. Letter to the Casualty Actuarial and Statistical Task Force.

33. Consumer advocates assert that deviation from cost-based ratemaking through price optimization will disfavor those consumers with fewer market options, less market power and less propensity to shop around—in particular, low-income and minority consumers.[28] Based on an Insurance Information Institute (III) poll, however, lower-income customers (under $35,000 annual income) are more likely to shop for insurance than more affluent individuals (above $100,000 annual income), who might shop less.[29] However, Robert P. Hartwig, president of the III, states that the "assertion that low-income consumers are particularly vulnerable because they do not shop is … entirely unsubstantiated." A poll conducted by the III "found that 68% of people with annual income under $35,000 compared prices when most recently buying auto insurance, a higher percentage than any other income group. [61%] of respondents with income above $100,000 said they had shopped around."[30] The CFA notes that only 18% of drivers shop for auto insurance every year, and 58% rarely or never shop according to a Deloitte survey.[31] A recent study by the Insurance Research Council (IRC) reports 26% of households with incomes of $100,000 or more reported shopping for auto insurance within the 12 months prior to the survey; 25% of households with incomes between $60,000 and $99,999 reported shopping; 25% of households with incomes between $35,000 and $59,999 reported shopping; 23% of households with incomes between $20,000 and $34,999 reported shopping; and 21% of households with incomes less than $20,000 reported shopping. The IRC study notes that "among racial/ethnic groups, Hispanic respondents were least likely to have shopped (22%), while black respondents were most likely to have shopped (33%) for auto insurance."[32]

34. According to the CFA, there is no evidence that price optimization improves rate stability, lowers long-term costs or limits policyholder disruption. Price optimization is not needed to select rates less than indicated rates, as evidenced by decades of rate filings. It is unclear how an insurer's long-term cost for providing coverage is improved by price optimization when price optimization is a non-cost-based adjustment to cost-based rate indications. Cost-based regulatory standards do not permit unfair discrimination in the name of "avoiding policyholder disruption." It is important to present consumers with the true cost of insurance and the role of markets to allow consumers to address policyholder disruption by shopping around.[33]

35. Mr. Hartwig claims the price optimization process does not (unfairly) discriminate and does not abandon the core principle of risk-based pricing. He said it simply provides "more precision in the

---

28. Comments of the Consumer Federation of America; Center for Economic Justice; Americans for Insurance Reform; United Policyholders; Center for Insurance Research; and Peter Kochenburger, NAIC Consumer Representative; on the March 24, 2015, Draft Casualty Actuarial and Statistical ( C) Task Force Price Optimization White Paper, April 20, 2015.

29. Scism, L., 2015. "N.Y. Regulator Studying How Car, Other Insurance Rates Are Set," *Wall Street Journal*, accessed at *www.wsj.com/articles/n-y-regulator-studying-how-car-other-insurance-rates-are-set-1426793439?tesla=y.*

30. Scism, L., Feb. 20, 2015. "Loyalty to Your Car Insurer May Cost You," accessed at *http://blogs.wsj.com/moneybeat/2015/02/20/loyalty-to-your-car-insurer-may-cost-you/.*

31. "The Voice of the Personal Lines Consumer" a survey by Deloitte released in 2012.

32. Insurance Research Council, "Shopping for Auto Insurance and the Use of Internet-Based Technology," June 2015.

33. Comments on the Casualty Actuarial and Statistical (C) Task Force's Draft Price Optimization White Paper, *Consumer Federation of America and Center for Economic Justice*, not dated but received by the Task Force and posted as discussion material for the Task Force's July 21, 2015, conference call.

process associated with pricing, and it allows insurers in an analytical way to deal with what-if scenarios."[34]

36. State insurance regulators are concerned with the shift from "loss-based ratemaking principles to principles that encompass subjective market driven ratemaking"[35] and question how price optimization "would not conflict with state rating laws that require rates not to be excessive, inadequate and unfairly discriminatory."[36]

37. Insurers argue price optimization is a technological improvement over current practices, and criticisms are aimed at individual price optimization—not the ratebook form of price optimization used in setting rates.

38. Some insurers contend that price optimization is allowed under the current Actuarial Standards of Practice.

## VI. Regulatory Responses to Price Optimized Rating Schemes

39. State law requires that rates not be excessive, inadequate or unfairly discriminatory. Regulators should consider whether these requirements can be met when price optimized rating schemes are used. Even if the requirements can be met, some constraints on the optimization might be needed.

40. Regulators have a number of potential responses regarding price optimization. Numerous states defined price optimization and issued bulletins prohibiting the defined practice. New York issued letters to insurers to further study price optimization. References to and some descriptions of bulletins are provided in the attached Appendix A.

41. Some state regulators believe that existing state laws are sufficient to deal with price optimization and that no bulletin or other public statement is necessary. Many states have not received a filing that stated price optimization was incorporated into the rating process. Many states are looking more closely at the issue or are waiting for the issue to be more thoroughly discussed and reported upon by the NAIC.

42. Regulators have broad authority to ensure rating practices are consistent with state rating laws. The Task Force identified the following options for regulatory responses to price optimized rating schemes:

    a.   Determine which price optimization practices, if any, are allowed in a particular state.

---

34. Weisbaum, H., 2014. "Data Mining Is Now Used to Set Insurance Rates; Critics Cry Foul," accessed at www.cnbc.com/id/101586404.

35. Piazza, Richard, Casualty Actuarial and Statistical (C) Task Force letter to Gary R. Josephson, CAS President, regarding the CAS "Discussion Draft of Statement of Principles Regarding Property and Casualty Insurance Ratemaking," May 22, 2013.

36. Ibid.

12

b. Define any constraints on the price optimization process and outcomes.
   i. A constraint might limit the pricing adjustment to be between the current rate and the actuarial indicated rate and always move in the direction of the actuarial indicated rate.
   ii. A constraint might require selected rating factors to be between the current and actuarial indicated factors, within a confidence interval around the current/indicated factors, or directionally consistent with the current factors.
   iii. A constraint might limit the variables that can be used in defining a risk class, such as a categorical or numerical measure of retention.
   iv. A constraint might be that price optimization can only be applied to specific class sizes, not class sizes so small that price optimization could be applied at the individual insured level or to small groups of insureds.
   v. A constraint could be that price optimization adjustment to rating factors must produce rates that maintain cost-based differences.

c. Develop regulatory guidance on the meaning of statutory rate requirements so that rates are not excessive, inadequate or unfairly discriminatory.
   i. Provide clear examples of what is unacceptable.
   ii. Identify principles under which the legal requirements for rates are met.

d. Enhance filing requirements using a specific definition of "actuarial indication" of needed rates and rating factors.
   i. Consider whether the actuarial indication is a point estimate or any selected value within a confidence interval around the point estimate.
   ii. Consider whether to require actuarial certification that the indications presented in the rate filing are based solely on cost considerations and are not otherwise adjusted.
   iii. Consider requiring disclosure of any adjustments to rates that are not based on expected cost.
   iv. Consider not allowing any non-cost-based adjustments to selected rates or rating factors.

e. Require specific explanation or reasoning to support any proposed or selected rate that deviates from the actuarially indicated rate.

f. Change filing requirements to require the following transparency, with consideration of state law regarding confidentiality:
   i. Disclosure of whether price optimization, including any customer demand considerations, is used.
   ii. Disclosure of differences in proposed prices for the insurer's existing and new customers with the same risk profile.

13

iii. Filing of a report showing the distribution of expected loss ratios under the current prices and under the proposed prices (e.g., a histogram with two series). If the distribution under proposed prices is wider compared to the distribution under current rates, then there could be additional subsidies in the proposed rates. Note that this could be affected by changes in an insurer's mix of business, etc.

iv. Disclosure of all data sources, models and risk classifications used by an insurer to calculate a premium, whether referred to as underwriting, tier placement, rating factors, discounts, surcharges or any other term.

v. Disclosure of which rating factor or factors are affected by price optimization, the size of the impact by rating factor and the cumulative impact of price optimization across all rating factors for existing policyholders and applicants for insurance.

vi. Filing of a certification by an actuary that all non-cost-based considerations affecting the proposed rates and rating factors are documented in the filing. The certification would also identify the exhibits where differences are shown. A more precise definition of price optimization may be needed.

g. Ensure that the regulatory system does the following:

i. Requires all rating factors be filed and all adjustments to indicated rates be disclosed.

ii. Maintains adequate resources for reviewing complex rate filings, including price optimization.

iii. Establishes regulatory practice with more in-depth review of price optimization models used in ratemaking.

1. States and/or the NAIC should obtain expertise with models.

2. Modeling experts should review how a particular model works and the accuracy and appropriateness of input data in order to make an informed determination regarding the statutory rate requirements.

## VII. Recommendations for Regulators

43. This white paper is focused on price optimization in personal lines and its impact on rates. The previous paragraphs provide the Task Force's background research and study of price optimization. Utilizing this study, the Task Force makes the following recommendations regarding rates and regulatory rate review for personal lines insurance.

44. The Task Force recognizes there are numerous definitions of price optimization. Companies can use the term to encompass activities that might include retention models, elasticity of demand, maximization of profit, competitive analysis, etc. The Task Force agreed not to recommend a definition of price optimization but rather, under any definition of price optimization, recommend

that the states address the requirement in their state rating laws that "rates shall not be excessive, inadequate, or unfairly discriminatory."

45. The Task Force recommends that rating plans should be derived from sound actuarial analysis and be cost-based. The proposed rates developed from an actuarial analysis need to comply with state laws. They should also be consistent with the actuarial principles derived from a professional actuarial body and the actuarial standards of practice established by the Actuarial Standards Board (ASB).

46. The Task Force recommends that two insurance customers having the same risk profile should be charged the same premium for the same coverage. Some temporary deviations in premiums might exist between new and renewal customers with the same risk profile because of capping or premium transition rules.

47. The Task Force acknowledges that not all rates and rating plans that are accepted or approved strictly adhere to the actuarial indications. While actuarial indications are largely preferred over pure judgment, regulators acknowledge that the actuarial indications are only an estimate of the cost to transfer risk and that some insurer judgment will inevitably enter the rate setting process. The Task Force recommends states allow flexibility reflecting insurance loss and expense costs in the selection of rating factors. Some additional recommendations regarding the acceptance of deviations from the actuarial indications are as follows:

    a.  The Task Force recommends the selection of a proposed rate between the currently approved rate and the actuarially indicated rate be allowed if based on reasonable considerations adhering to state law and consistent with actuarial principles and Standards of Practice reflecting expected insurance loss and expense costs.

    b.  The Task Force recommends that a selected rate outside the range defined by the current and indicated rate may be acceptable provided it is disclosed, complies with state law and is shown to be consistent with actuarial ratemaking principles and Standards of Practice.

    c.  The Task Force acknowledges that capping and transitional rules can be in the public's best interest but recommends regulators consider the extent to which they will allow capping and transitional rating. Consideration should be given to the length of time over which premium changes will be limited before they reach the approved rate level, the size and reasonableness of capping's upper and lower bounds, and the extent to which capping of one rate might affect rates charged to others.

48. The Task Force recommends that under the requirement "rates shall not be … unfairly discriminatory," insurance rating practices that adjust the current or actuarially indicated rates or the premiums, whether included or not included in the insurer's rating plan, should not be allowed

15

when the practice cannot be shown to be cost-based or comply with the state's rating law. With due consideration as to whether practices are cost-based or in compliance with state rating law, the Task Force believes the following practices , at a minimum, are inconsistent with statutory requirements that "rates shall not be … unfairly discriminatory:"

    a.   Price elasticity of demand.
    b.   Propensity to shop for insurance.
    c.   Retention adjustment at an individual level.
    d.   A policyholder's propensity to ask questions or file complaints.

49. The Task Force recommends that rating plans in which insureds are grouped into homogeneous rating classes should not be so granular that resulting rating classes have little actuarial or statistical reliability. The use of sophisticated data analysis to develop finely tuned methodologies with a multiplicity of possible rating cells is not, in and of itself, a violation of rating laws as long as the rating classes and rating factors are cost-based.

VIII. <u>State Considerations</u>

50. With due consideration of the above recommendations, the Task Force proposes the following:

    a.   Consider issuing a bulletin to address insurers' use of methods that may result in non-cost based rates. (See Appendix B.)

    b.   Consider enhancing requirements for personal lines rate filings to improve disclosure and transparency around rates, rate indications and rate selections. (See Appendix C.)

    c.   Analyze models used by insurers in ratemaking to ensure the model adheres to state law and actuarial principles. A list of possible questions is provided to assist the regulatory analysis. (See Appendix D.)

Adopted by the Casualty Actuarial and Statistical (C) Task Force, Nov. 19, 2015.
Adopted by the Property and Casualty Insurance (C) Committee, Nov. 21, 2015.
Adopted by the Executive (EX) Committee and Plenary, April 6, 2016.

Nov. 19, 2015

Appendix A

**State Actions Taken Prior to Adoption of the White Paper**

1. Maryland, the first state to take explicit action against price optimization in rate setting, released Bulletin B 14-23 on Oct. 31, 2014.[37] The Maryland Insurance Administration announced it determined that price optimization is a practice in which an insurer varies rates based on factors other than the risk of loss, such as the willingness of some policyholders to pay higher premiums than other policyholders, resulting in rates that are unfairly discriminatory in violation of state law. Insurers using price optimization techniques in Maryland were required to end such practices and resubmit rates compliant with the bulletin no later than Jan. 1, 2015.

2. In February 2015, the Ohio DOI issued Bulletin 2015-01, noting that "price optimization involves gathering and analyzing data related to numerous characteristics specific to a particular policyholder that are unrelated to risk of loss or expense."[38] The bulletin says that insurer usage of the price elasticity of demand, or how much of a premium increase a particular policyholder will tolerate before switching insurers, is unrelated to risk of loss or expense. The Ohio DOI said that by its nature, price optimization can result in two insureds with similar risk profiles being charged different premiums. Insurance companies that use these price optimization techniques in Ohio were required to end the practice and resubmit rates compliant with the bulletin no later than June 30, 2015.

3. The California DOI issued a "Notice Regarding Unfair Discrimination in Rating Price Optimization" on Feb. 18, 2015, and generally defined price optimization as setting rates based on a willingness of an individual or group to pay more than another individual or group.[39] The Notice states that any insurer currently using price optimization to adjust rates in California must cease doing so. "Any insurer that has employed price optimization to adjust its rates in the ratemaking/pricing process shall remove the effect of any such adjustments from any filing to be submitted subsequent to the date of the Notice. And any insurer that has a factor or factors based on price optimization in its rating plan shall remove the factor or factors in its next filing."

4. On March 18, 2015, the New York Department of Financial Services (NYDFS) sent a letter to P/C insurers and defined price optimization as the practice of varying rates based on factors other than those directly related to risk of loss—for example, setting rates or factors based on an insured's likelihood to renew a policy or on an individual's or class of individuals' perceived willingness to pay a higher premium relative to other individuals or classes. The NYDFS declared such practices as inconsistent with traditional cost-based rating approaches and said such practices could violate its law prohibiting rates to be unfairly discriminatory. The NYDFS is seeking to determine whether

---

37. *http://insurance.maryland.gov/Insurer/Documents/bulletins/bulletin-14-23-unfair-discrimination-in-rating.pdf.*
38. *https://insurance.ohio.gov/Legal/Bulletins/Documents/2015-01.pdf.*
39. *www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/PriceOptimization.pdf.*

insurers use price optimization in New York and has required insurers to answer its specific rating questions by April 15, 2015.[40]

5. The Florida Office of Insurance Regulation Informational Memorandum OIR-15-04M was issued May 14, 2015.[41] Rates within a risk classification system would be considered fair if differences in rates reflect material differences in expected cost for risk characteristics. Price optimization involves analysis and incorporation of data not related to expected cost for risk characteristics—that is, it involves factors not related to expected loss and expense experience. The memorandum states the use of price optimization results in rates that are unfairly discriminatory and in violation of Sections 627.062 and 627.0651, Florida Statutes. Insurers that have used price optimization in the determination of the rates filed and currently in effect should submit a filing to eliminate that use. Insurers should ensure that any filings subsequent to the date of the Memorandum do not utilize price optimization in any manner.

6. The Vermont Department of Financial Regulation, Division of Insurance, issued Insurance Bulletin No. 186 titled Price Optimization in Personal Lines Ratemaking on June 24, 2015.[42] The bulletin is applicable to all personal lines policies. Price optimization, in some of its application, involves the judgmental use of factors not specifically related to a policyholder's risk profile to adjust the policyholder's insurance premium. Unfair discrimination is considered to exist if price differentials "fail to reflect equitably the differences in expected losses and expenses"[43] for different classes of policyholders. The bulletin states that Vermont law is clear and that both base rates and rating classes must be based on factors specifically related to an insurer's expected losses and expenses. Insurers are directed that all personal lines rate filings must disclose whether the company uses non-risk-related factors to help determine the insured's final premium.

7. Washington's Technical Assistance Advisory 2015-01 was issued July 9, 2015, by the state of Washington, Office of the Insurance Commissioner, on the subject of price optimization.[44] The advisory states Washington law requires that premium rates for insurance not be excessive, inadequate or unfairly discriminatory. A rate is not unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer. Thus, rates must be based on cost associated with risk. Charging higher rates to certain consumers based on their willingness to look elsewhere for insurance does not reflect a genuine increased cost incurred by the insurer. To the extent that an insurer's use of price optimization results in premiums, rates or rating factors unrelated to cost and risk, it will be considered unfairly discriminatory and in violation of Washington law.

---

40. *Insurance Journal*, 2015. "New York DFS Opens Inquiry Into Price Optimization," accessed at www.insurancejournal.com/news/east/2015/03/20/361413.htm.
    41. www.floir.com/siteDocuments/OIR-15-04M.pdf.
    42. www.dfr.vermont.gov/reg-bul-ord/price-optimization-personal-lines-ratemaking.
    43. Chapter 128 of Title 8 V.S.A.
    44. www.insurance.wa.gov/about-oic/newsroom/news/2015/documents/TAA-PO-July2015.pdf.

18

Nov. 19, 2015

8. The following additional states and district issued bulletins or communicated policies on price optimization:

    a. Virginia, July 2015[45]

    b. Indiana, July 20, 2015[46]

    c. Pennsylvania, Aug. 22, 2015[47]

    d. Maine, Aug. 24, 2015[48]

    e. District of Columbia, Aug. 25, 2015[49]

    f. Montana, Sept. 12, 2015[50]

    g. Rhode Island, Sept. 18, 2015[51]

    h. Delaware, Oct. 1, 2015[52]

    i. Minnesota, Nov. 16, 2015[53]

---

45. https://www.scc.virginia.gov/boi/co/pc/files/pc_handbook.pdf.
46. www.in.gov/idoi/files/Bulletin_219.pdf.
47. www.pabulletin.com/secure/data/vol45/45-34/1559.html.
48. www.maine.gov/pfr/insurance/bulletins/pdf/405.pdf.
49. http://disb.dc.gov/node/1107816.
50. http://csimt.gov/wp-content/uploads/PriceOptMemo_091215.pdf.
51. www.dbr.state.ri.us/documents/news/insurance/InsuranceBulletin2015-8.pdf.
52. http://delawareinsurance.gov/departments/documents/bulletins/domestic-foreign-insurers-bulletin-no78.pdf?updated.
53. http://mn.gov/commerce-stat/pdfs/insurance-bulletin-price-optimization.pdf.

Nov. 19, 2015

Appendix B

**Potential State Bulletin**

INSURANCE BULLETIN XXX                                                                                           DATE

PRICE OPTIMIZATION
In Personal Lines Ratemaking

This bulletin is applicable to all property and casualty insurers issuing personal lines policies in [STATE].

While there is no universally accepted definition of price optimization, the practice, in some of its applications, involves the use of factors not specifically related to an insured's expected losses and expenses but are used to help determine or to adjust an insured's premium. An example would be using an individual policyholder's response to previous premium increases to determine how much of a premium increase the policyholder will tolerate at renewal before switching to a different insurer. This practice can result in two policyholders receiving different premium increases even though they have the same loss history and risk profile. It can also result in premiums that are excessive or inadequate.

Property and casualty insurers doing business in [STATE] are reminded that all ratemaking must conform to the statutory requirements contained in [STATUTE(S)]. Rates must not be "… excessive, inadequate or unfairly discriminatory …" A rate will be considered unfairly discriminatory if price differentials fail to reflect equitably the differences in expected losses and expenses for different classes of policyholders. Both base rates and rating classes must be based on policyholder characteristics specifically related to an insurer's expected losses, expenses or policyholders' risk. While insurers may employ actuarial judgment in setting their rates, judgmental adjustments to a rate may not be based on non-risk-related policyholder characteristics such as an individual's "price elasticity of demand," which seek to predict how much of a price increase an individual policyholder will tolerate before switching to a different insurer.

The following practices are inconsistent with statutory requirements that "rates not be … unfairly discriminatory":

    a. Price elasticity of demand.
    b. Propensity to shop for insurance.
    c. Retention adjustment at an individual level.
    d. A policyholder's propensity to ask questions or file complaints.

The Department of Insurance (DOI) does not intend this bulletin to prohibit or restrict such practices as capping or transitional pricing when applied on a group basis. Insurers should group individual policyholders into justifiable, supportable, risk-based classifications and treat similarly situated policyholders the same with respect to insurance pricing. Likewise, the use of sophisticated data analysis to develop finely tuned methodologies with a multiplicity of possible rating cells is not, in and of itself, necessarily a violation of rating laws as long as the classifications are based strictly on expected losses, expenses or other justifiable, supportable risk characteristics.

*[Drafting note: States will need to consider whether the bulletin should also apply to commercial lines policies and adjust the bulletin accordingly.]*

20

Nov. 19, 2015

Appendix C

**Potential Requirements for Rate Filings**

1. The insurer should disclose the current, risk-based indicated (see #2 for definition) and the selected rating factor, rate or premium adjustments.

2. The risk-based indicated charge should be actuarially justified as the measurement of the cost to transfer risk from the insured to the insurer. Actuarial judgment [see 14.b for definition) to evaluate that transfer cost can be included.

3. The insurer must adequately explain any deviation from the actuarial indication to the selected change for each rating characteristic.

4. The insurer should disclose and adequately explain any capping rule and the plan to transition toward the indicated charge over time. Beyond the overall effect of capping or transition rules, the insurer should disclose and justify, in detail, any differences between new business and existing business pricing.

5. The insurer should disclose all data, sources and models used in ratemaking. In particular, the insurer should disclose use of customer elasticity of demand or demand models in the selection of rates. The insurer should disclose constraints used in the selection of rates. States should consider the proprietary nature of such information and grant confidentiality as appropriate and allowed under state law.

6. For any deviations around the actuarial indication, insurers should evaluate credibility of the actuarial indication and make appropriate actuarial assumptions. When rating classes are so granular that there is limited credibility, regulators should consider whether to allow such a rating plan.

7. Some states might decide to require an attestation of the proposed rates in a rate filing. Potential attestation could include:
   a. Attestation that proposed rates are within a reasonable range of cost-based indications.
   b. Attestation that actuarial indications are cost-based, which would inform regulators that any deviations from actuarial indications should be evaluated according to the law.
   c. Attestation that actuarial indications are based on a sound actuarial methodology.

8. The insurer should provide a disruption report that shows the distribution of proposed policyholder premium changes (percentage change) when the existing book of business is renewed under the proposed rating plan.

*Note: States should consider the proprietary nature of each requirement and grant confidentiality as appropriate and if allowed under state law.*

21

Nov. 19, 2015

Appendix D

**Potential Questions for Regulators to Ask**
**Regarding the**
**Use of Models in P/C Rate Filings**

Insurers might use a model in the development of proposed rates and rating factors. The Task Force offers some potential questions a regulator could ask regarding the use of models in rate proposals. Questions may include, but not be limited by, the following:

Model Description

1. Please provide a high-level description of the workings of the model that was used to select rates and rating factors that differ from the indicated.
2. What is the purpose of the model? What does the model seek to maximize or minimize (e.g., underwriting profit, retention, other) and explain.
3. Under what specific constraints is any maximization/minimization performed? Identify each constrained variable and its minimum and maximum values.

Model Variables

4. How were the input variables for your model selected?
   a. What is the support for the model variables, including the predictive values and error statistics for the model variables?
   b. Are the parameters loss-related, expense-related or related to the risk in some other way?
5. Which of the input variables are internal (customer-provided or deduced from customer-provided information) or external?
   a. Identify whether each input variable is used in your rating plan.
   b. For each external variable, please identify:
      i. The owner or vendor of the data (e.g., Department of Motor Vehicles).
      ii. Which variables are subject to the requirements of the federal Fair Credit Reporting Act.
      iii. How you ensure that the data are complete and accurate.
      iv. The framework, if any, that provides consumers a means of correcting errors in the data pertaining to them.

Model Constraints and Output

6. What level of granularity is your model output (e.g., the class plan level, individual rating factors, or some other level such as household or demographic segment that is different from the rating plan)?
7. What are the limits (or constraints) for the selected rating plan factors, if any?
8. How do the modeled values compare to the company experience?

*Note: Regulators should evaluate the particular filing and associated costs to insurers to determine the extent of questioning needed. Regulators should also consider the potential proprietary nature of modeling information and grant confidentiality as appropriate and if allowed under state law.*