**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PROPERTY CASUALTY INSURERS )
ASSOCIATION OF AMERICA, )
                                 )
             Plaintiff, )
                                 )       Case No. 1:13-cv-08564
       v. )
                                   )       Judge Amy J. St. Eve
BENJAMIN S. CARSON, SR., in his official )
capacity as Secretary of Housing and )
Urban Development, and UNITED STATES )
DEPARTMENT OF HOUSING AND URBAN )
DEVELOPMENT, )
                                   )
             Defendants. )

**PLAINTIFF'S LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1 of the United States District Court for the Northern District of Illinois, Plaintiff Property Casualty Insurers Association of America hereby submits the following statement of undisputed material facts. Because this case concerns a challenge under the Administrative Procedure Act ("APA"), review is based on the administrative record that was before the agency when it issued the regulation or decision at issue. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). This statement therefore principally addresses the record materials that were before the United States Department of Housing and Urban Development ("HUD") and the relevant portions of HUD's proposed rule, final rule, and supplemental explanation. Whether HUD's action was "not in accordance with law" or "arbitrary" and "capricious" under 5 U.S.C. § 706(2)(A) is a question of law. *See* Joint Status Report (Dkt. No. 16) at 4; *see also, e.g., Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (review of agency action under the

APA is based entirely on the agency's record and thus can be resolved at the motion to dismiss stage); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) ("[T]he question whether HHS acted in an arbitrary and capricious manner is a legal one ....").

**Plaintiff Property Casualty Insurers Association of America**

1.      Property Casualty Insurers Association of America ("PCI") is an Illinois-based trade association of property and casualty insurers representing more than 1,000 member companies.  (*See* Declaration of Robert Gordon ¶ 2; A.R. 553.)  PCI's members provide homeowners, property, and hazard insurance ("homeowners insurance"), subject to state insurance regulations, in every state of the United States.  (*See* Declaration of Robert Gordon ¶ 3.)

2.      PCI's mission is to promote and protect the viability of a competitive private insurance market for the benefit of consumers and insurers.  (*See* Declaration of Robert Gordon ¶ 4.)  PCI advocates on behalf of its members on policy issues at the state and federal levels and provides its members with information relevant to legal and public policy developments affecting the property and casualty insurance industry.  (*See* Declaration of Robert Gordon ¶ 4.)

**Defendants Department of Housing and Urban Development and Benjamin S. Carson**

5.      Defendant Department of Housing and Urban Development is an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3531 et seq., Pub. L. No. 89−117, 79 Stat. 451.  (*See* First Amended Complaint ¶ 18.)

6.      Defendant Benjamin Carson is the Secretary of the Department of Housing and Urban Development and is responsible for the Department's promulgation of the challenged regulations.  (*See* First Amended Complaint ¶ 19.)

**Venue and Jurisdiction**

7.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff

PCI resides in this district and no real property is involved in this action.  (*See* Declaration of

Robert Gordon ¶ 2.)

8.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because PCI brings this action under the Administrative Procedure Act and the

McCarran-Ferguson Act.  (*See* First Amended Complaint ¶ 20.)

**HUD's Proposed Rule**

9.      On November 16, 2011, HUD issued a proposed rule entitled "Implementation of

the Fair Housing Act's Discriminatory Effects Standard."  76 Fed. Reg. 70921 (Nov. 16, 2011)

(A.R. 1).  The proposed rule purported to "confirm" that the Fair Housing Act may be violated

by a housing practice that has a discriminatory effect, regardless of whether the practice was

adopted for a discriminatory purpose.  76 Fed. Reg. at 70924 (A.R. 4).

10.      The proposed rule cited "the provision and pricing of homeowner's insurance" as

an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of

persons delineated by characteristics protected by the Act."  76 Fed. Reg. at 70924 (A.R. 4).  The

proposed rule did not discuss the McCarran-Ferguson Act.  76 Fed. Reg. at 70924 (A.R. 4).  The

proposed rule noted that there had been "some variation in the application of the discriminatory

effects standard" among the courts and set forth a three-step burden-shifting framework for

determining whether a challenged practice violates the rule.  76 Fed. Reg. at 70921 (A.R. 1).

**Comments by The Insurance Industry on HUD's Proposed Rule and HUD's Responses**

11.      In response to HUD's proposed rule, insurance industry groups submitted detailed

comments to HUD, raising numerous objections.  (*See* Comments of the Property Casualty

Insurers Association of America (Jan. 17, 2012) (A.R. 552-556); Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 371-383); Comments of the American Insurance Association (Jan. 17, 2011) (A.R. 454-459).)

### The McCarran-Ferguson Act

12.     Comments from the insurance industry explained that the application of disparate impact liability to homeowners insurance would violate the McCarran-Ferguson Act.  (*See* A.R. 554; A.R. 378-379.)

13.     In the final Rule, HUD responded by asserting that federal agencies need not consider whether their regulations comply with the McCarran-Ferguson Act because that Act is directed at courts, not agencies.  78 Fed. Reg. at 11475 (A.R. 627).

### The Incompatibility of Disparate Impact and Homeowners Insurance

14.     Comments from the insurance industry explained that the imposition of disparate impact liability is fundamentally inconsistent with the business of insurance.  (A.R. 554; A.R. 376.)  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11475 (A.R. 627).

15.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11475 (A.R. 627).

16.     Comments from the insurance industry explained that the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk.  (A.R. 376; A.R. 554.)  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11475 (A.R. 627).

17.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

18.     Comments from the insurance industry explained that insurers use actuarially justified risk factors to group policyholders for the purpose of treating those with similar risk profiles similarly. (A.R. 376.) In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

19.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

20.     Comments from the insurance industry explained that race or other protected class characteristics are not part of the risk assessment process. (A.R. 376.) In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

21.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

22.     Comments from the insurance industry explained that, to eliminate statistical disparities among different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process, and insurers would have to charge everyone the same rate regardless of risk. (A.R. 377.) In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

23.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11475 (A.R. 627).

24.     Comments from the insurance industry explained that eliminating risk-based pricing would have significant negative consequences including "adverse selection."  (A.R. 378.) In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11475 (A.R. 627).

25.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11475 (A.R. 627).

26.     In the final Rule, HUD did not confirm that the legitimate use of actuarial risk factors is a legitimate business interest.  78 Fed. Reg. at 11475 (A.R. 627).

The Filed Rate Doctrine

27.     Comments from the insurance industry explained that application of the proposed rule to homeowners insurance would violate the "filed rate" doctrine.  (A.R. 378.)  In the final Rule, HUD acknowledged this comment, but did not respond to it.  78 Fed. Reg. at 11474 (A.R. 626).

An Exemption or Safe Harbor for Homeowners Insurance

28.     Comments from the insurance industry requested that, in light of the inherent conflict between disparate impact liability and risk-based insurance practices, HUD exempt homeowners insurance underwriting and pricing from the Disparate Impact Rule.  (A.R. 555; A.R. 380.)

29.     Comments from the insurance industry requested, in the alternative, that HUD provide regulatory safe harbors for "long-recognized risk-related factors, such as use of prior insurance claims, age and condition of property, and distance from fire station."  (A.R. 380.)

30.     In the final Rule, HUD refused to grant an exemption for homeowners insurance. 78 Fed. Reg. at 11475 (A.R. 627).  HUD also refused to create a safe harbor for the use of any risk factors.  78 Fed. Reg. at 11475 (A.R. 627).

31.     In response to insurance associations' requests for an exemption for homeowners insurance or safe harbors for certain risk factors, HUD stated that "[c]reating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act."  78 Fed. Reg. at 11475 (A.R. 627).

32.     HUD also asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional intent."  78 Fed. Reg. at 11475 (A.R. 627).

33.     Comments from the insurance industry explained that the failure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject homeowners insurers to baseless litigation and threaten the sound actuarial standards underpinning the homeowners insurance market.  (A.R. 380.)  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11475 (A.R. 627).

The Burden-Shifting Framework

34.     Comments from the insurance industry explained that HUD's proposed three-step burden-shifting approach for resolving disparate impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).  (A.R. 381-382; A.R. 458.)  In the final rule, HUD asserted that *Wards Cove* does not govern FHA claims.  78 Fed. Reg. at 11473 (A.R. 625).

35.     Comments from the insurance industry explained that the framework improperly failed to require a plaintiff to challenge a "specific" practice and failed to require a plaintiff to show a "significant" disparate impact.  (A.R. 381-382.)  In the final rule, HUD rejected a requirement that a plaintiff challenge a "specific" practice and rejected a "significance requirement" for disparate impact liability.  78 Fed. Reg. at 11468-11469 (A.R. 620-621).

36.     Comments from the insurance industry explained that the framework improperly required the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard.  (A.R. 382.)  In the final rule, HUD rejected commenters' suggestions to remove the "necessary" requirement from the burden-shifting regime.  78 Fed. Reg. at 11471 (A.R. 623).

37.     Comments from the insurance industry explained that the framework improperly shifted the burden of persuasion to the defendant.  (A.R. 458; A.R. 382.)  In the final rule, HUD rejected suggestions that it keep the burden of proof on plaintiffs throughout the process of establishing a disparate impact claim.  78 Fed. Reg. at 11473-74 (A.R. 625-626).

38.     Comments from the insurance industry explained that the framework improperly failed to require the plaintiff to prove that a proposed alternative practice would be "equally as effective" as the challenged practice.  (A.R. 381-382.)  In the final rule, HUD rejected a requirement that an alternative "practice with a less discriminatory effect" be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest.  78 Fed. Reg. at 11472-73 (A.R. 624-625).  HUD's only explanation was that housing practices covered by the Act are "not readily quantifiable."  78 Fed. Reg. at 11473 (A.R. 625).

39.     Comments from the insurance industry explained that insurers do not collect data on race and ethnicity and, therefore, that insurers are unable to assess whether facially neutral risk-related underwriting and rating factors have a disparate impact on protected classes. (A.R. 383.)  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11475 (A.R. 627).

**HUD's Final Rule**

40.     On February 15, 2013, HUD issued its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" (the "Disparate Impact Rule" or the "Rule").  78 Fed. Reg. 11460 (Feb. 15, 2013) (A.R. 612).  The Rule purported to "formalize[]" HUD's view that the FHA's prohibition on discrimination may be violated by practices that have a discriminatory effect in the absence of a discriminatory intent.  78 Fed. Reg. at 11460 (A.R. 612).

41.     In adopting the Rule, HUD purported to apply its disparate impact standard to homeowners insurance.  78 Fed. Reg. at 11474-11475 (A.R. 626-627).  In adopting the Rule, HUD rejected requests by the insurance industry for an exemption from the Rule or the creation of safe harbors for insurance.  78 Fed. Reg. at 11474-11475 (A.R. 626-627).

42.     The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."  78 Fed. Reg. at 11482 (A.R. 634) (adding 24 C.F.R. § 100.500(a)).

43.     The Rule provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification."  78 Fed. Reg. at 11482 (A.R. 634) (adding 24 C.F.R. § 100.500).

44.     The Rule sets forth a three-step burden-shifting framework for determining whether the Rule has been violated.  78 Fed. Reg. at 11482 (A.R. 634) (adding 24 C.F.R. § 100.500(c)(1)-(3)).

**PCI's Challenge to the Disparate-Impact Rule**

The Initial District-Court Litigation

45.     On November 27, 2013, PCI filed its original complaint, challenging the application of HUD's Disparate Impact Rule to the pricing of homeowners insurance as arbitrary and capricious and otherwise contrary to law.  (*See* Dkt. No. 1.)

46.     The parties cross-moved for summary judgment, and HUD also moved to dismiss for lack of jurisdiction, arguing that PCI lacked standing and that its claims were unripe.  (*See* Dkt. Nos. 21, 30.)

47.     On September 3, 2014, the Court issued a decision on the parties' motions.  *See Prop. Cas. Ins. Ass'n of Am. v. Donovan ("PCI")*, 66 F. Supp. 3d 1018 (N.D. Ill. 2014).  The Court dismissed without prejudice as unripe PCI's claim that the Rule violates the McCarran-Ferguson Act.  *Id.* at 1040-42.  The Court granted summary judgment in HUD's favor on PCI's claim that the Rule violates the requirements for disparate-impact liability established in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), ruling that the burden-shifting framework HUD adopted embodied a reasonable interpretation of the FHA.  But the Court granted summary judgment to PCI on its remaining claims, concluding that HUD's explanation was arbitrary and capricious in several respects.  *See PCI,* 66 F. Supp. 3d at 1046-52.

48.     The Court reasoned that HUD's brief response to the insurance industry's detailed comments failed to provide a reasoned explanation for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking.  *Id.* at 1048.  The Court criticized HUD

for making "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether entire categories of disparate-impact claims against insurers would be barred. *Id.*

49.     The Court found "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *[Doe v.] Mutual of Omaha*, 179 F.3d [557,] 563-64 [(7th Cir. 1999)], and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048. It noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049.

50.     The Court explained that HUD must, on remand, provide a reasoned explanation for preferring case-by-case adjudication over rulemaking, which would involve determining whether the benefits of proceeding through case-by-case adjudications outweighed the benefits of including an exemption or safe harbor for homeowners insurers. *Id.* at 1048-49. The Court found arbitrary and capricious HUD's suggestion that homeowners insurers might defend their policies on a case-by-case basis as part of the burden-shifting framework of the Rule. *Id.* at 1051. The Court reached the same conclusion with respect to HUD's response to comments regarding the operation of the filed-rate doctrine. *Id.* at 1050.

51.     The Court also concluded that HUD had acted in an arbitrary and capricious manner by failing to address the substance of the homeowners insurance industry's arguments that the Rule would prevent the use of actuarially sound underwriting and risk assessment factors and thereby undermine the fundamental nature of the insurance business itself. The Court explained:

> HUD's response to the insurance industry's concerns that exposing them to
> disparate impact liability would undermine the fundamental nature of insurance

-11-

was arbitrary and capricious. HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework. The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period.

*Id.* at 1051.

52.     The Court remanded to HUD for further proceedings.

Post-Remand Submissions

53.     PCI requested that HUD reopen the comment period. (*See* A.R. 4416-4418.)

54.     PCI submitted a comment letter to HUD addressing the issues identified in the Court's order. (*See* A.R. 4496-4513.) The comments repeated PCI's request for an exemption for homeowners insurers because the Rule "would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers." (A.R. at 4496.)

55.     Specifically, PCI explained that calculating the risk of loss is fundamental to the business of insurance, (A.R. 4497-4498, 4511-4512), and that because the "vast majority of states" require insurers to set rates based on "neutral actuarial factors," the Disparate Impact Rule's burden-shifting framework would violate the McCarran-Ferguson Act and "interfere with insurers' compliance with state law," (A.R. at 4503-4504). Additionally, PCI noted that forty-seven states expressly permit insurers to group insureds based on risk, so the Disparate Impact Rule's burden-shifting framework interferes with that express permission, in violation of the McCarran-Ferguson Act. (A.R. at 4504-4505).

-12-

56.    Moreover, PCI's comment noted that forty-seven states and the District of Columbia "require insurers to file their rates with state insurance commissioners for review and approval."  (A.R. at 4507.).  The Disparate Impact Rule would therefore violate the McCarran-Ferguson Act by "substituting the judgment of a federal court for that of state regulators" to invalidate state insurance laws.  (A.R. 4507-4508.).  Similarly, the comment added that the Disparate Impact Rule would violate the filed-rate doctrine because it would allow "private lawsuits and government enforcement actions that question the permissibility of a filed rate."  (A.R. 4508).

57.    PCI also requested that HUD clarify that plaintiffs must show that alternative practice must be "equally effective" as the challenged practice.  (A.R. 4512.)  PCI noted that the Disparate Impact Rule would drastically distort the homeowners insurance market by undermining the fundamental nature of insurance:  Insurers would refrain from using actuarially sound risk factors in the underwriting and pricing process to avoid liability, or be forced to use less predictive factors, which would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability.  (*See* A.R. at 4511-4512).

58.    PCI's comment also alerted HUD to the importance of the Supreme Court's upcoming consideration of *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc. ("Inclusive Communities")*, 135 S. Ct. 2507 (2015), concerning disparate-impact liability under the FHA. (*See* A.R. 4501.)

The Supreme Court's *Inclusive Communities* Decision

59.    While the matter was before HUD on remand, the Supreme Court decided the *Inclusive Communities* case, upholding the validity of disparate-impact liability under the FHA but narrowing its scope.  The Court cautioned that the "FHA is not an instrument to force

housing authorities to reorder their priorities," 135 S. Ct. at 2522, and explained that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies," *id.* Accordingly, the Court emphasized the importance of limiting the scope of possible disparate-impact liability "so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 2518. And it cautioned against a rule that would encourage the consideration of race "in a pervasive way" and thereby raise serious constitutional questions. *Id.* at 2523.

60.     The Court also gave specific guidance on how disparate-impact claims should be litigated under the FHA. A claim may not be based "solely on a showing of statistical disparity." *Id.* at 2522. Instead, plaintiffs must satisfy a "robust causality requirement," pointing to specific policies that caused a disparity, to ensure that defendants are not "held liable for racial disparities they did not create." *Id.* at 2523. Defendants must have "leeway to state and explain the valid interest served by their policies" and "latitude to consider market factors" without plaintiffs second-guessing "which of two reasonable approaches" a defendant should follow. *Id.* at 2222–23.

61.     In light of this decision, PCI submitted additional supplemental comments to HUD, requesting an exemption to the Disparate Impact Rule for homeowners insurers in accordance with *Inclusive Communities*. (*See* A.R. 4615-4620.) PCI argued that the "robust causality requirement" to state a disparate-impact claim precluded suits against homeowners insurers. (*See* A.R. 4616.) Because homeowners insurers are regulated by a "panoply" of state laws, their discretion is "substantially limit[ed]" and thus does not cause any disparate impacts. (*See* A.R. 4619.) PCI explained that homeowners insurance markets, "with their dependence on

actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability." (*See* A.R. 4616.) PCI reiterated its previous comments about how the Rule would disrupt the homeowners insurance industry and impose needless costs on insurers. (*See* A.R. 4619.)

HUD's Supplemental Explanation

62.  On October 5, 2016, HUD issued its Supplemental Explanation, titled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance." 81 Fed. Reg. 69012 (Oct. 5, 2016) (A.R. 1813-1820.) HUD concluded that there should be no "categorical exemptions or safe harbors for insurance practices" and that "concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis." 81 Fed. Reg. at 60912 (A.R. at 1813).

63.  HUD made no effort to address the key holding of *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557, 564 (7th Cir. 1999). HUD mentioned *Mutual of Omaha* only once, and it did so simply to support the uncontroversial point that the McCarran-Ferguson Act bars application of disparate- impact liability only when it would impair state law. *See* 81 Fed. Reg. at 69015 (A.R. 1816). HUD never addressed *Mutual of Omaha*'s holding that the McCarran-Ferguson Act prohibits a federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mut. of Omaha*, 179 F.3d at 564.

64.  HUD's only response to homeowners insurers' showing that the McCarran-Ferguson Act requires an exemption for risk-based pricing and underwriting was to argue that insurers could defend their practices under the Rule's burden-shifting framework. *See* 81 Fed. Reg. at 69015, 69017 (A.R. 1816, 1818). HUD stated that it was "impossible . . . to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to

-15-

avoid case-by-case disputes over its application." 81 Fed. Reg. at 69013 (A.R. 1814.). HUD

noted concerns raised by insurers about application of the Rule to "sound actuarial underwriting

principles" and "accurate risk-based pricing," which would "threaten[]" "accurate risk

assessment" and "the sound actuarial standards underpinning the insurance market." 81 Fed.

Reg. at 69014 (A.R. 1815). But HUD responded by concluding that it would not create an

"exemption from discriminatory effects liability for *all* insurance practices or for *all*

underwriting practices in order to accommodate the insurance industry's concerns." *Id.*

(emphasis added); *see id.* at 69015 (A.R. 1816) ("[W]holesale exemptions for all insurance

practices or all insurance underwriting practices would necessarily be overbroad …."); *id.* at

69017 (A.R. 1818) ("HUD declines to create a broad exemption"—"for *all* insurance practices or

*all* underwriting decisions"—"because doing so would immunize a host of potentially

discriminatory insurance practices that do not involve actuarial or risk-based calculations.").

     65.    HUD did not dispute that state law uniformly permits and often requires insurers

to consider actuarial risk factors. *See* 81 Fed. Reg. at 69015 (A.R. 1816). Rather, it

"recognize[d] that risk-based decision making is an important aspect of sound insurance

practice." *Id.* But HUD also asserted that "nothing in the Rule prohibits insurers from making

decisions that are in fact risk-based." *Id.* HUD stated that "[u]nder the standard established by

the Rule, practices that an insurer can prove are risk-based, *and for which no less discriminatory*

*alternative exist*s, will not give rise to discriminatory effects liability." *Id.* (emphasis added).

HUD did not address continued objections that HUD had previously specifically rejected

requests that it clarify that an alternative practice must be "equally effective" as the challenged

practice. HUD did not resolve or even acknowledge the discrepancy in its logic.

-16-

66.     HUD failed to address *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty.*

*Metro Human Relations Comm'n*, 508 F.3d 366, 375-76 (6th Cir. 2007), which noted that there

is no need to "engage in the Sisyphean task of working through the burden-shifting framework in

each individual case when the plaintiff has no chance of success."

67.     HUD did not adequately consider the cost of case-by-case adjudication.  HUD

simply asserted that an exemption for risk-based insurance pricing would not reduce insurers'

costs: "[T]he arguments and evidence that would be necessary to establish whether a practice

qualifies for the requested exemption would effectively be the same as the arguments and

evidence necessary for establishing a legally sufficient justification."  81 Fed. Reg. at 69017

(A.R. 1818).  HUD did not address commenters' observations about the costs to insurers and

courts at the third step of the burden-shifting process.

68.     HUD also argued that an exemption is inappropriate in light of certain state anti-

discrimination laws that may apply to homeowners insurance.  81 Fed. Reg. at 69016 (A.R.

1817).  HUD reasoned that such an exemption would "deprive all states of federal support in

addressing discriminatory insurance practices" and asserted that an exemption would therefore

"be at odds with the purpose of [the] McCarran-Ferguson [Act]."  *Id.*  HUD also asserted in

passing that "McCarran-Ferguson requires a fact-intensive inquiry."  81 Fed. Reg. at 69016

(A.R. 1817).  But HUD did not explain why this would be the case for risk-based pricing and

underwriting.

69.     HUD did not address comments demonstrating that accurate risk assessment is

critical to the business of insurance and that depriving insurers of the ability to accurately

consider risk would cause adverse selection, motivating lower risk customers to forego insurance

altogether and threatening insurers' viability.

70.    HUD's Supplemental Explanation concluded that "applying the filed rate doctrine to prioritize state ratemaking over a federal statute would seem to stand the Supremacy Clause on its head." 81 Fed. Reg. at 69018 (internal quotation marks omitted) (A.R. 1819). HUD disregarded decisions holding that the filed-rate doctrine bars challenges under federal statutes that interfere with state insurance regimes.

71.    The Supplemental Explanation mentioned *Inclusive Communities* only in a few footnotes and did not address the limitations on disparate-impact liability articulated by the Supreme Court. *See* 81 Fed. Reg. at 69013 nn.11&13, 69014 n.24, 69015 n.42 (A.R. 1814-1816).

### Harm to PCI and Its Members

72.    PCI and its insurer members are injured by the Disparate Impact Rule. (*See* A.R. 552-556; A.R. 371-383; A.R. 454-459; Declaration of Robert Gordon ¶¶ 6-7; *PCI*, 66 F. Supp. 3d at 1043-1044.)

73.    The Rule directly regulates homeowners insurers, including PCI's member companies. *See* 78 Fed. Reg. at 11474-11475 (A.R. 626-627); (A.R. 553 ("The issue the rule presents for insurers is whether non-racially motivated and sound actuarial underwriting principles recognized by state insurance regulators that permit accurate risk-based pricing for consumers can be prohibited by federal regulators who find them to have a 'disparate impact' and whether such HUD actions would violate a federal statute reserving the power to regulate insurance to the states.")); (A.R. 554 ("HUD's reference to insurance in the preamble of the proposed rule suggests that it may use its disparate impact rule to become a federal regulator of insurance underwriting practices despite McCarran-Ferguson's explicit reservation of insurance

-18-

regulatory powers to the states.")); (A.R. 455-456 (The proposed rule "would seek to add regulation or enforcement at the federal level.")); (A.R. 373); *PCI*, 66 F. Supp. 3d at 1043.

74.     The ability to consider actuarially justified risk factors is critical to the business of insurance.  (*See* A.R. 554 (Insurers "need … to distinguish between different types and degrees of risk.  Indeed, risk discrimination is the foundation of insurance underwriting …."); A.R. 376 ("The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk.  Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly."); A.R. 376 ("To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the very essence of risk-based pricing.").)

75.     If the Rule remains in effect, insurers' ability to consider actuarially justified risk factors in underwriting and rating insurance will be impaired.  (A.R. 377 ("To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process.  In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk."); *see also* Declaration of Peter Drogan ¶ 14.)

76.     The Rule would thus prevent accurate risk assessment, result in adverse selection, and reduce insurance coverage, all of which would injure homeowners insurers.  (A.R. 378 ("If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer.").)

-19-

77.     To attempt to comply with the Rule, homeowners insurance companies would be required to incur expense collecting demographic data that they do not currently obtain from their customers and analyzing that data to determine whether their use of facially neutral underwriting and rating factors have a disparate impact.  (A.R. 383 ("Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity.  Without collecting such data indicative of protected class, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes."); *see also* Declaration of Ronald Zaleski ¶ 11; Declaration of Peter Drogan ¶ 7; Declaration of Michael Dawdy ¶ 11; Declaration of Teresa Cracas ¶¶ 6-7; *PCI*, 66 F. Supp. 3d at 1044.)

78.     The Rule would impose significant new burdens on homeowners insurers required to justify their practices in litigation under the burden-shifting framework adopted in the Rule.  (*See* A.R. 382-383; A.R. 458; *see also* Declaration of Ronald Zaleski ¶ 18; Declaration of Peter Drogan ¶¶ 10-12; Declaration of Michael Dawdy ¶¶ 13-14; Declaration of Teresa Cracas ¶¶ 8-11, 13.)

79.     PCI and its member companies have expended substantial resources analyzing the Rule and potential compliance with the Rule.  If the Rule is not set aside, PCI and its member companies will continue to expend substantial resources analyzing these issues.  (*See* Declaration of Robert Gordon ¶ 7; Declaration of Teresa Cracas ¶ 12.)

80.     PCI's members "would have been better off if HUD had exempted homeowners insurers from the Disparate Impact Rule, created safe harbors in the Rule for long-recognized actuarial risk factors, and/or adopted the insurance industry's proposed burden-shifting framework for proving disparate impact claims."  *PCI*, 66 F. Supp. 3d at 1045.

Dated:          September 8, 2017

Respectfully submitted,

PROPERTY CASUALTY INSURERS
ASSOCIATION OF AMERICA

By:  /s/ Seth P. Waxman
Seth P. Waxman (*pro hac vice*)
Jonathan G. Cedarbaum (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Peter A. Gabrielli (*pro hac vice*)
Anuradha Sivaram (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 8, 2017, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

/s/ *Seth P. Waxman*
Seth P. Waxman (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND
  DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
Email: seth.waxman@wilmerhale.com