**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:13-cv-08564 |
| MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | Chief Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................1

    A.    Risk-Based Pricing And Underwriting Of Homeowners Insurance ..................... 1

    B.    The 2013 Rule And Prior Proceedings In This Court ............................................. 3

    C.    *Inclusive Communities* ................................................................................ 5

    D.    HUD's Supplemental Explanation And PCI's Motion For Summary Judgment ................................................................................ 5

    E.    HUD's 2018-2020 Rulemaking ................................................................ 6

ARGUMENT ................................................................................................7

I.    The Supplemental Explanation Inadequately Considered *Inclusive Communities* ..............8

II.    The Supplemental Explanation Did Not Adequately Consider The McCarran-Ferguson Act ................................................................................10

    A.    The Supplemental Explanation Ignored *Mutual Of Omaha*'s Key Holding......... 11

    B.    HUD's Decision To Address McCarran-Ferguson Preclusion On A Case-By-Case Basis Instead Of Categorically Exempting Risk-Based Pricing And Underwriting Regulated by State Law Was Arbitrary And Capricious........ 12

        1.    HUD considered only a broad exemption for "insurance" or "underwriting" without considering a targeted exemption for the risk-based pricing and underwriting of homeowners insurance ...............13

        2.    HUD's reasoning in rejecting an exemption for risk-based rating and underwriting was internally inconsistent .............................................14

        3.    HUD's reliance on the burden-shifting framework was arbitrary and capricious ................................................................................15

    C.    HUD's Reliance On Federal Support for State Antidiscrimination Laws Was Arbitrary ................................................................................ 19

    D.    HUD Erroneously Relied On An Asserted Need For Factual Development........ 20

III.    The Supplemental Explanation Did Not Adequately Consider The Rule's Effects On The Business Of Insurance ................................................................................21

IV.    The Supplemental Explanation Did Not Adequately Explain Why The Rule Would Not Violate The Filed-Rate Doctrine................................................................23

CONCLUSION................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Association of Private Sector Colleges and Universities v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012) ............................................................................14

*Blue Cross and Blue Shield of Delaware, Inc. v. Elliott*,
  479 A.2d 843 (Del. Super. Ct. 1984) ...................................................................3

*Clement v. SEC*,
  674 F.2d 641 (7th Cir. 1982) ..............................................................................14

*Defenders of Wildlife v. Environmental Protection Agency*,
  420 F.3d 946 (9th Cir. 2005), *rev'd on other grounds*, 551 U.S. 644 (2007)...................15

*Doe v. Mutual of Omaha*,
  179 F.3d 557 (7th Cir. 1999) ..........................................................4, 11, 12, 20

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)...................................................................................8, 14

*General Chemical Corp. v. United States*,
  817 F.2d 844 (D.C. Cir. 1987)............................................................................15

*Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human
  Relations Commission*, 508 F.3d 366 (6th Cir. 2007) .......................................18

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
  954 F.2d 485 (8th Cir. 1992) ..............................................................................25

*H.J., Inc. v. Northwestern Bell Telephone Co.*,
  420 N.W.2d 673 (Minn. Ct. App. 1988)..............................................................25

*Humana, Inc. v. Forsyth*,
  525 U.S. 299 (1999).............................................................................................17

*Illinois v. United States*,
  666 F.2d 1066 (7th Cir. 1981) ............................................................................14

*In re Universal Underwriters Life Insurance Co.*,
  685 N.W.2d 44 (Minn. Ct. App. 2004)..................................................................3

*Jones v. Travelers Casualty Insurance Company of America*,
  No. C-13-02390, 2015 WL 5091908 (N.D. Cal. May 7, 2015)..........................20

*Keogh v. Chicago & Northwestern Ry. Co.*,
  260 U.S. 156 (1922)..............................................................................................23

*Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp. of Delaware*,
  805 F. Supp. 1277 (D.S.C. 1992) .......................................................................25

*Lumpkin v. Farmers Group, Inc.*,
  No. 05-2868, 2007 WL 6996777 (W.D. Tenn. July 6, 2007) ..............................14

*Massachusetts Fair Housing Center v. U.S. Departmet of Housing and Urban
  Development*, No. CV 20-11765-MGM, 2020 WL 6390143 (D. Mass.,
  Oct. 25, 2020) .......................................................................................................7

*McCray v. Fidelity National Title Insurance Co.*,
  682 F.3d 229 (3d Cir. 2012) ...............................................................................24

*Motor Vehicle Manufactures Association v. State Farm Mutual Auto Insurance
  Co.*, 463 U.S. 29 (1983) ...............................................................8, 10, 12, 13, 23

*NAACP v. American Family Mutual Insurance Co.*,
  978 F.2d 287 (7th Cir. 1992) ...............................................................................22

*Property Casualty Insurers Association of America v. Donovan*,
  66 F. Supp. 3d 1018 (N.D. Ill. 2014) ..........................................................*passim*

*Property Casaulty Insurers Association of America v. Carson*,
  No. 13-CV-8564, 2017 WL 2653069 (N.D. Ill. June 20, 2017) ...........................8

*Saunders v. Farmers Insurance Exchange*,
  537 F.3d 961 (8th Cir. 2006) .........................................................................4, 21

*Saunders v. Farmers Insurance Exchange (Saunders I)*,
  440 F.3d 940 (8th Cir. 2006) ........................................................................20, 24

*Schermer v. State Farm Fire and Casualty Co.*,
  721 N.W.2d 307 (Minn. 2006) ............................................................................24

*Schilke v. Wachovia Mortgage, FSB*,
  820 F. Supp. 2d 825 (N.D. Ill. 2011) ..................................................................24

*Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  476 U.S. 409 (1986) .............................................................................................24

*St. James Hospital v. Heckler*,
  760 F.2d 1460 (7th Cir. 1985) .............................................................................17

*Taffet v. Southern Co.*,
  967 F.2d 1483 (11th Cir. 1992) (en banc) ...........................................................25

*Texas Department of Housing and Community Affairs v. The Inclusive
  Communities Project, Inc.*, 135 S. Ct. 2507 (2015) ....................................*passim*

iii

*Toledo Fair Housing Center v. Nationwide Mutual Insurance Co.*,
    94 Ohio Misc. 2d 151 (C.P. 1997) ...................................................................20

*Viens v. America Empire Surplus Lines Insurance Co.*,
    113 F. Supp. 3d 555 (D. Conn. 2015) ..............................................................20

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994) ..........................................................................3, 24

## STATUTES, RULES, AND REGULATIONS

24 C.F.R.
    § 100.500(a) .......................................................................................................3
    § 100.500(c)(2) .................................................................................................11

78 Fed. Reg. 11460 (Feb. 15, 2013) .........................................................................1

81 Fed. Reg. 69,012 (Oct. 5, 2016)................................................................ *passim*

83 Fed. Reg. 28,560 (June 20, 2018) ........................................................................6

84 Fed. Reg. 42,854 (Aug. 19, 2019)........................................................................7

15 U.S.C. §§ 1011-1015 ............................................................................... *passim*

Fed. R. Civ. P. 12(b)(1)............................................................................................20

## STATE AUTHORITIES

Ind. Code Ann. § 27-1-22-5 .......................................................................................3

Md. Code Ins. § 27-501 ............................................................................................19

N.J. Stat. Ann. § 17:29A-7........................................................................................3

Ohio Revised Code Ann. §§ 3935.04, 3935.03 .........................................................3

Tenn. Code Ann. § 56-5-104(1).................................................................................14

Wis. Stat. Ann. § 625.13 ...........................................................................................3

## OTHER AUTHORITIES

Abraham, *Efficiency and Fairness in Insurance Risk Classification*,
    71 Va. L. Rev. 403 (1985) ...............................................................................2

Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty
    Actuarial Society E-Forum 276 (Winter 2009) ................................................2

Office of Management and Budget (OMB), Pending EO 12866 Regulatory
Review, "Reinstatement of HUD's Discriminatory Effects Standard (FR-
6251) (Apr. 12, 2021), https://tinyurl.com/58rc6w5w..........................................................7

President Biden, "Memorandum on Redressing Our Nation's and the Federal
Government's History of Discriminatory Housing Practices and Policies,"
(Jan. 26, 2021), https://tinyurl.com/7szztr ..........................................................................7

## INTRODUCTION

In 2014, this Court held that the Department of Housing and Urban Development's ("HUD") decision to apply its 2013 Disparate Impact Rule ("2013 Rule" or "Rule")[1] to homeowners insurance was arbitrary and capricious.  *Property Cas. Ins. Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-51 (N.D. Ill. 2014) ("*PCI*").  The Court held that HUD had inadequately considered concerns raised by the insurance industry that applying the Rule to homeowners insurance would violate the McCarran-Ferguson Act and the filed-rate doctrine and undermine the fundamental risk-based nature of homeowners insurance.  *Id.* at 1048-1051. Remanding the case to HUD, the Court ordered the agency either to better explain its decision or to institute a new rule.  *Id.* at 1050.

Nearly two years later, HUD published a supplemental explanation without modifying the Rule.  The 2016 supplemental explanation is longer than the original, but no more adequate. Once again, HUD did not meaningfully address the significant concerns raised by this Court and reiterated by the insurance industry in public comments.  Nor did it adequately address the Supreme Court's intervening decision in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), which defined the limits of permissible disparate-impact claims under the Fair Housing Act (FHA).  The supplemental explanation thus fails to remedy the violations of law this Court identified in 2014 or comply with Supreme Court precedent.  This Court should vacate the 2013 Rule as applied to risk-based pricing and underwriting of homeowners insurance.

## BACKGROUND

### A.    Risk-Based Pricing And Underwriting Of Homeowners Insurance

---

[1] *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013).

Risk-based pricing and underwriting is the process of setting insurance rates based on an insured's loss history and risk of future losses. To calculate the probability that a future loss will occur and its likely cost, actuaries rely on a host of verifiable factors that correlate with historical losses. *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors commonly include, among others, the construction materials used to build a house, previous losses, proximity to fire hydrants, and the presence of a security system. SOF ¶ 11.

Using neutral, actuarially justified factors to calculate the probability and amount of potential losses is critical to insurers' ability to set rates that accurately reflect the cost of providing insurance—accuracy that is vital to the fair and efficient operation of insurance markets and to compliance with state-law prohibitions against unfairly discriminatory rates (*i.e.*, rates that treat consumers with similar risk profiles differently). Abraham, 71 Va. L. Rev. at 421. If an insurer's rates are too low relative to the risks covered by its policies, the insurer might collect insufficient premiums to pay claims. Inaccurate pricing also reduces incentives for customers to mitigate risks, construct safer homes, and maintain existing homes. *Id*.

Rate setting and other aspects of insurance are comprehensively regulated by state laws that prohibit insurers from charging "excessive, inadequate, or unfairly discriminatory rates," *see* Abraham, 71 Va. L. Rev. at 406—meaning rates that are excessive or inadequate relative to the risk of loss presented or that differ for insureds (including applicants for insurance) who present similar risk profiles. To guard against "inadequate" rates and the risk of insurer insolvency they pose, these state laws affirmatively permit or expressly require risk-based pricing and underwriting. SOF ¶¶ 47, 85. State regulators carefully review insurance rates—often with their

own actuaries—to ensure that rates reflect all the factors required by state law and are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13; *In re Universal Underwriters Life Ins. Co.*, 685 N.W.2d 44, 47 (Minn. Ct. App. 2004).[2] Federal law in turn ensures that States remain the primary regulators of insurance. The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, precludes federal regulation from interfering with state regulation of insurance, and the filed-rate doctrine precludes challenges to rates approved by a state regulator, *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).

**B.    The 2013 Rule And Prior Proceedings In This Court**

HUD's 2013 Rule provides that housing practices with a discriminatory effect violate the FHA even where there has been no intent to discriminate. 24 C.F.R. § 100.500(a) (2013). During the notice-and-comment period, representatives of the homeowners-insurance industry submitted detailed comments seeking an exemption from the proposed rule for homeowners insurance and explaining why applying the Rule to homeowners insurance would be unlawful and ill-advised. SOF ¶ 11. Among other things, these comments explained that applying disparate-impact liability to homeowners insurance would undermine actuarially sound risk-based pricing and underwriting by constraining insurers' ability to rely on risk factors that happen to have some unintended disproportionate effect on a class protected by the FHA, even though members within and without the protected class with similar risk profiles are treated similarly. *Id.* ¶ 22. These comments explained that this would have the effect of increasing adverse selection, which reduces the availability of coverage as delinking prices from risk forces insurers to abandon the market while decreasing affordability as remaining insurers are forced to

---

[2] *See also, e.g.*, N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ohio Revised Code Ann. §§ 3935.04, 3935.03; *Blue Cross & Blue Shield of Delaware, Inc. v. Elliott*, 479 A.2d 843, 847 (Del. Super. Ct. 1984).

increase rates to address the resulting increase in the frequency and severity of claims. *Id.* ¶ 24. The comments further explained that disparate-impact liability would interfere with state regulatory regimes in violation of the McCarran-Ferguson Act and the filed-rate doctrine by subjecting insurers to liability for considering factors that they are permitted or even required to consider under state law. *Id.* ¶¶ 12, 27.

When HUD rejected the requested exemption, PCI initiated this suit. *Id.* ¶ 45. In 2014, this Court granted summary judgment to PCI in part, holding that HUD's decision to apply the Rule to homeowners insurance was arbitrary and capricious. *PCI*, 66 F. Supp. 3d at 1046-52. The Court held that HUD failed to provide a reasoned explanation for its decision to reject a categorical exemption in favor of case-by-case application of McCarran-Ferguson preclusion. *Id.* at 1048. That "lack of analysis" was "particularly glaring" in light of *Doe v. Mutual of Omaha*, 179 F.3d 557, 563-64 (7th Cir. 1999), and *Saunders v. Farmers Insurance Exchange*, 537 F.3d 961, 967 (8th Cir. 2006), which recognized the inherent conflict between federal disparate-impact liability and state rate regulation. *PCI*, 66 F. Supp. 3d at 1048. This Court further held that in failing to adequately consider the Rule's clash with the McCarran-Ferguson Act, HUD also failed adequately to consider the filed-rate doctrine. *Id.* at 1050.

Finally, the Court concluded that HUD had made "no effort to evaluate" concerns that the Rule would undermine the fundamental nature of insurance by precluding reliance on actuarially sound risk factors. *PCI*, 66 F. Supp. 3d at 1051. HUD had disregarded those concerns on the ground that insurers could raise them on a case-by-case basis under the Rule's burden-shifting framework. *Id.* But this Court made clear that HUD was obligated either to respond to the substance of those concerns directly or else provide a reasoned explanation for preferring case-

by-case consideration, and HUD did neither. *Id.* The Court remanded to HUD with instructions either to provide a reasoned explanation or to institute a new rule. *Id.* at 1050, 1054.

### C.  *Inclusive Communities*

While this case was pending on remand, the Supreme Court decided *Inclusive Communities*. The Court held that disparate-impact claims are cognizable under the FHA. But the Court also circumscribed the scope of those claims in important respects, making clear that the FHA is not intended to interfere with legitimate business practices or hold defendants "liable for racial disparities they did not create." 135 S. Ct. at 2523.

PCI submitted comments to HUD arguing that HUD had to take *Inclusive Communities* into account in complying with this Court's mandate. SOF ¶ 62. In particular, PCI emphasized that *Inclusive Communities* prohibits application of the Rule to legitimate business practices, including risk-based homeowners insurance practices that comply with state law. *Id.* PCI also submitted comments addressing each of the legal defects identified in this Court's 2014 decision. *Id.* ¶¶ 54-57.

### D.  HUD's Supplemental Explanation And PCI's Motion For Summary Judgment

In October 2016 HUD published its Supplemental Explanation. 81 Fed. Reg. 69,012. The Supplemental Explanation again rejected insurers' request for an exemption for homeowners insurance, concluding that an exemption would be "unworkable and inconsistent with" the objectives of the FHA. *Id.* at 69,013. HUD stated that "in light of the variety of practices and relevant state laws, as well as the substantial range of possible discriminatory effects claims," insurers' concerns "can and should be addressed on a case-by-case basis" to "balance[] [the insurance industry's] concerns against HUD's obligation to give maximum force to the [FHA]." *Id.* HUD did not genuinely address the costs of case-by-case adjudication under the burden-

shifting framework, instead simply declaring that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." *Id.* at 69,017. HUD disagreed that an exemption was necessary in light of the McCarran-Ferguson Act or filed-rate doctrine, *id.* at 69,015-16, 69,018-19, and did not address comments demonstrating that accurate risk assessment is critical to the business of insurance or that constraining insurers' consideration of risk would cause adverse selection, motivating lower-risk customers to forego insurance altogether while threatening insurer solvency, *id.* at 69,017-18; SOF ¶ 69. The Supplemental Explanation mentioned *Inclusive Communities* only in a few footnotes and did not address the limitations on disparate-impact liability articulated by the Supreme Court. 81 Fed. Reg. at 69,013 nn.11&13, 69,014 n.24, 69,015 n.42.

PCI moved again for summary judgment in this Court, challenging HUD's continued refusal to grant an exemption for risk-based pricing and underwriting of homeowners insurance. SOF ¶ 74. PCI argued that the 2016 Supplemental Explanation, like the 2013 Rule itself, was arbitrary and capricious because it failed adequately to consider the McCarran-Ferguson Act, the filed-rated doctrine, the effects of the Rule on the business of insurance, and the newly articulated limits on permissible disparate-impact liability under *Inclusive Communities. Id.*

### E.    HUD's 2018-2020 Rulemaking

After PCI moved for summary judgment, HUD published a notice stating that it was considering changing the 2013 Rule in light of *Inclusive Communities*. 83 Fed. Reg. 28,560 (June 20, 2018). The parties agreed to stay this case, SOF ¶ 75, and PCI submitted comments to HUD arguing that the Rule had to be modified in light of *Inclusive Communities* and urging HUD to exempt risk-based homeowners insurance practices from the Rule entirely. SOF ¶ 76.

6

HUD subsequently published a new proposed rule, *see* 84 Fed. Reg. at 42,854 (Aug. 19, 2019), to which PCI responded with comments supporting many of HUD's proposed changes but again urging an exemption for homeowners insurance.  SOF ¶¶ 84-86.

For several months, HUD took no action.  In August 2020, this Court lifted the stay in this case then permitted summary-judgment briefing to resume "because after many months HUD has not yet adopted a new rule[.]"  SOF ¶ 87.  HUD then issued a final rule that made significant changes to the 2013 Rule to conform to *Inclusive Communities*.  But that revised rule was promptly enjoined by another court, *see Massachusetts Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 2020 WL 6390143, at *8 (D. Mass., Oct. 25, 2020), so the 2013 Rule has remained continuously in effect.

On January 26, 2021, President Biden directed the Secretary of HUD to "examine the effects of the [2020 Rule]," including the "effect that amending the [2013 Rule] … has had on HUD's statutory duty to ensure compliance with the FHA."[3]  In response, on April 12, 2021, HUD submitted for inter-agency review a proposal to "[r]einstate" the 2013 Rule.[4]  This Court then granted PCI's request to resume briefing on its renewed motion for summary judgment challenging the 2013 Rule.

## ARGUMENT

HUD's refusal to exempt risk-based pricing and underwriting of homeowners insurance from the 2013 Rule or to give due consideration to *Inclusive Communities* in deciding whether to do so was arbitrary and capricious.  "[A]n agency must give adequate reasons for its decisions" and "must examine the relevant data and articulate a satisfactory explanation for its action

---

[3] President Biden, "Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies," (Jan. 26, 2021), https://tinyurl.com/7szztr; SOF ¶ 90.
[4] Office of Management and Budget, Pending EO 12866 Regulatory Review, "Reinstatement of HUD's Discriminatory Effects Standard (FR-6251) (Apr. 12, 2021), https://tinyurl.com/58rc6w5w; SOF ¶ 91.

including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quotation marks omitted). An agency decision is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As explained below, HUD fell short of these obligations.

**I.      The Supplemental Explanation Inadequately Considered *Inclusive Communities*[5]**

In *Inclusive Communities*, the Supreme Court set forth significant limitations on disparate-impact liability. The Court emphasized that regulated entities must be free to make "the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." 135 S. Ct. at 2518. And it cautioned against any disparate-impact framework that did not have "adequate safeguards at the prima facie stage" to prevent the use of race "in a pervasive way." *Id.* at 2523. For these reasons, the Supreme Court set clear limits and provided specific guidance on how disparate-impact claims may be litigated under the FHA. A disparate-impact claim may not be based "solely on a showing of statistical disparity." *Id.* at 2522. Instead, plaintiffs must satisfy a "robust causality requirement," citing a specific policy that caused a disparity, to ensure that defendants are not "held liable for racial disparities they did not create." *Id.* at 2523. Significantly, the Court explained that the required causal connection cannot be shown where a "law substantially limits [a defendant's] discretion." *Id.* at 2524. Moreover, defendants must have "leeway to state and explain the valid interest served by their policies" and "latitude to consider market factors" without plaintiffs second-guessing

---

[5] In ruling on PCI's motion to amend the complaint in June 2017, this Court denied PCI's request to add a stand-alone claim that the Rule contravenes *Inclusive Communities*, but the Court allowed PCI to add a claim that HUD failed to adequately consider *Inclusive Communities* and agreed that *Inclusive Communities* may be "relevant to one or more" of the other remaining claims. *Property Cas. Insurers Ass'n of Am. v. Carson*, 2017 WL 2653069, at *9 (N.D. Ill. June 20, 2017).

"which of two reasonable approaches" a defendant should follow. *Id.* at 2522-23. And only practices that are "artificial, arbitrary, and unnecessary" should give rise to liability. *Id.* at 2524.

Despite the importance of *Inclusive Communities* and the constraints it placed on disparate-impact liability, the Supplemental Explanation mentioned the decision only in a few footnotes that did not address these newly mandated guardrails at all. *See* 81 Fed. Reg. at 69,013 nn.11&13, 69014 n.24, 69015 n.42. PCI submitted supplemental comments after this Court's remand that identified the numerous ways in which applying disparate-impact liability to risk-based pricing and underwriting would contravene *Inclusive Communities*. SOF ¶ 62. But in response, HUD merely reiterated without analysis that it "continues to believe that case-by-case adjudication is preferable to creating the requested exemptions or safe harbors for insurance practices." *See* 81 Fed. Reg. at 69,013.

HUD's failure to take *Inclusive Communities* into account or respond to comments addressing it when considering the need for an exemption for risk-based pricing and underwriting of homeowners insurance was arbitrary and capricious. For example, the Supplemental Explanation failed to address comments explaining that failing to exempt homeowners insurers from disparate-impact liability impinges upon insurers' "latitude to consider market factors," *Inclusive Cmtys.*, 135 S. Ct. at 2523. SOF ¶¶ 61-62. And HUD's passing references to *Inclusive Communities* included no response to PCI's comment that homeowners insurance markets, "with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability." SOF ¶ 62.

Similarly, the Supplemental Explanation failed to explain how the Rule could be applied to homeowners insurance without running afoul of *Inclusive Communities*' "robust causality

requirement." 135 S. Ct. at 2523; *see id.* at 2524 (where law "substantially limits" a defendant's discretion, disparate-impact case should be dismissed). Industry comments explained that the McCarran-Ferguson Act and state laws "substantially limit" insurers' discretion, such that any disparate effects of underwriting or pricing practices cannot be ascribed to insurers' independent choices. SOF ¶ 62. PCI reminded HUD that a "panoply" of state laws requiring the use of actuarially sound pricing methods for homeowners insurance "substantially limit" its discretion and argued that the *Inclusive Communities'* causality standard confirms that the Rule cannot be applied to homeowners insurance. *Id.* But the Supplemental Explanation was silent regarding why an exemption for homeowners insurance was not required in light of the tension between state insurance law and *Inclusive Communities*' "robust" causation standard. SOF ¶ 72.

Nor did HUD respond to comments that the Rule improperly promotes consideration of racial (or other suspect) classifications so as to "inject racial considerations into every housing decision" and "perpetuate race-based considerations rather than move beyond them," *Inclusive Cmtys.*, 135 S. Ct. at 2524; SOF ¶¶ 62, 72. HUD's failure to address comments requesting an exemption for homeowners insurance in light of these key considerations was arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

## II. The Supplemental Explanation Did Not Adequately Consider The McCarran-Ferguson Act

This Court previously held that HUD failed to provide a reasoned explanation for choosing to address conflicts between the Rule and the McCarran-Ferguson Act on a case-by-case basis rather than through an exemption, noting that HUD "made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers" and "failed to even acknowledge" the Seventh Circuit's controlling decision in *Mutual of Omaha*, which supports such a categorical bar. *PCI*, 66 F.

Supp. 3d at 1048-49.  The Supplemental Explanation does not cure those defects.

###### A.     The Supplemental Explanation Ignored *Mutual Of Omaha*'s Key Holding

The Seventh Circuit held in *Doe v. Mutual of Omaha* that "requir[ing] federal courts to determine whether [challenged insurance practices] are actuarially sound and consistent with state law" violates the McCarran-Ferguson Act.  179 F.3d at 564.  The court of appeals explained that "[s]tate regulation of insurance is comprehensive and includes rate and coverage issues, so if federal courts are now to determine whether [particular insurance practices] are actuarially sound and consistent with principles of state law they will be stepping on the toes of state insurance commissioners."  *Id.* (citation omitted).  As this Court previously observed, *Mutual of Omaha* thus supports the argument that McCarran-Ferguson "bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." *PCI*, 66 F. Supp. 3d at 1028-29, 1039.

As applied to risk-based pricing and underwriting, the Rule mandates exactly the kind of federal-court review *Mutual of Omaha* forbids and subjects insurers to conflicting regulatory schemes.  It requires an insurer defendant to persuade a federal court that the use of any risk factor resulting in any statistical disparity is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests," 24 C.F.R. § 100.500(c)(2)—in other words, to show that the practice is actuarially sound.  Insurer defendants would also have to defeat plaintiffs' efforts to show that a challenged practice "could be served by another practice that has a less discriminatory effect."  *Id.* § 100.500(c)(3).  Both the second and third prongs of HUD's burden-shifting test thus involve federal courts in superintending the actuarial soundness of insurance practices.

Despite this Court's admonition that *Mutual of Omaha* "calls into question the viability of disparate impact claims against insurers," *PCI*, 66 F. Supp. 3d at 1028, the Supplemental

Explanation made no effort to address the decision's key holding.  HUD evaded this critical issue by mentioning *Mutual of Omaha* only once, to support the uncontroversial point that McCarran-Ferguson precludes disparate-impact liability only when it would conflict with state law.  81 Fed. Reg. at 69,015.  HUD never addressed *Mutual of Omaha*'s holding, which this Court emphasized, that the McCarran-Ferguson Act prohibits federal courts from determining whether insurance practices "are actuarially sound and consistent with state law."  *Mutual of Omaha*, 179 F.3d at 564.  This failure to confront the contradictions in state and federal law was arbitrary and capricious.  *See State Farm*, 463 U.S. at 43 (rule is arbitrary and capricious where agency "entirely failed to consider an important aspect of the problem").

> **B.** **HUD's Decision To Address McCarran-Ferguson Preclusion On A Case-By-Case Basis Instead Of Categorically Exempting Risk-Based Pricing And Underwriting Regulated by State Law Was Arbitrary And Capricious**

In its 2014 motion for summary judgment and subsequent comments to HUD, PCI demonstrated that the insurance laws in every State uniformly permit risk-based pricing and underwriting, SOF ¶¶ 47, 56, and indeed that almost all state laws expressly *require* the use of risk-based pricing.  *Id*.  PCI similarly showed that the vast majority of States require insurers to file rates with state regulators for review or approval.  *Id*.  PCI urged HUD to adopt an exemption because applying the Rule to homeowners insurance would invalidate, impair, or supersede these state laws, in violation of McCarran-Ferguson, by imposing liability on insurers that use valid actuarial risk factors that happen to have a disparate impact if some other, less effective factor could be used.  SOF ¶¶ 47, 55.  In 2014, this Court held that HUD had failed to consider this concern or provide a reasoned explanation for rejecting an exemption and instead requiring insurers to defend their practices case by case under the Rule's burden-shifting framework.  *PCI*, 66 F. Supp. 3d at 1048-49.  The Supplemental Explanation suffers from the same defect and is arbitrary and capricious for several reasons.

12

1. **HUD considered only a broad exemption for "insurance" or "underwriting" without considering a targeted exemption for the risk-based pricing and underwriting of homeowners insurance**

In rejecting an exemption, HUD first threw up its hands, claiming that it was "practically impossible … to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application."  81 Fed. Reg. at 69,013.  HUD acknowledged that insurers' comments focused on protecting "sound actuarial underwriting principles" and "accurate risk-based pricing" from liability that would "threaten[]" "accurate risk assessment" and "the sound actuarial standards underpinning the insurance market," 81 Fed. Reg. at 69,014.  But it responded only by declining to exempt "*all* insurance or … underwriting practices," *id.* (emphasis added); *see id.* at 69,015, 69,017.  HUD thus failed to explain why it declined to exempt the particular practice of risk-based pricing and underwriting of homeowners insurance.

PCI's primary argument has been that the use of actuarial risk factors, which is central to the business of insurance, is required or permitted by state insurance laws and that imposing federal liability on those state-regulated practices would violate McCarran-Ferguson's reverse preemption standards.  SOF ¶ 93 (explaining that the issue is whether HUD can prohibit "non-racially motivated and sound actuarial underwriting principles recognized by state insurance regulators that permit accurate risk-based pricing"); SOF ¶ 47 (noting state law permits insurers "to make rating and underwriting decisions on the basis of objective risk factors"); SOF ¶ 56 (focusing on "neutral actuarial factors"); *PCI*, 66 F. Supp. 3d at 1034 (describing PCI's litigation as "seeking to invalidate the Disparate Impact Rule as it applies to the provision and pricing of homeowners insurance").  HUD's statement in the Supplemental Explanation that "wholesale exemptions for all insurance practices or all insurance underwriting practices would necessarily be overbroad" was thus unresponsive to the primary contention this Court directed HUD to

13

address. 81 Fed. Reg. at 69,015. Even if HUD could properly conclude that *some* insurance practices should be considered on a case-by-case basis—and therefore that an exemption for *all* insurance practices was unwarranted—it was arbitrary and capricious to rely on that conclusion to deny an exemption for risk-based pricing and underwriting.[6] And it was not "practically impossible" for HUD to define the scope of such an exemption, 81 Fed. Reg. at 69,013, given that commenters explained that this practice involves the use of long-recognized, verifiable, actuarially sound factors that demonstrably correlate with losses, including the risk of future losses. SOF ¶¶ 11, 29.

### 2. HUD's reasoning in rejecting an exemption for risk-based rating and underwriting was internally inconsistent

HUD's Supplemental Explanation did not dispute that state law uniformly permits and indeed usually requires insurers to consider actuarial risk factors. *See* 81 Fed. Reg. at 69,015.[7] To the contrary, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice" and disavowed any intention to "prohibit[] insurers from making decisions that are in fact risk-based." *Id.* But despite disclaiming any intent to prohibit risk-based decisions, HUD also made clear that risk-based practices are not protected from liability if a "less discriminatory alternative" can be shown at step three of the burden-shifting framework, *id.*, and HUD again failed to require that such an alternative practice must be "equally effective" in predicting risk as the challenged practice.

---

[6] *See Encino Motorcars*, 136 S. Ct. at 2125 (requiring "a rational connection between the facts found and the choice made"); *Clement v. SEC*, 674 F.2d 641, 647 (7th Cir. 1982) (vacating agency's explanation for rule change where it did not adequately address a prong of challenger's argument); *Illinois v. United States*, 666 F.2d 1066, 1080 (7th Cir. 1981) (agency must "fairly and adequately addresses the complex issues and arguments of the parties before it"); *Association of Priv. Sector Colls. and Univs. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (explanation was arbitrary and capricious where agency responded to question related to commenters' concerns, but "never really answered" commenters' precise questions).
[7] HUD cited *Lumpkin v. Farmers Group, Inc.*, 2007 WL 6996777 (W.D. Tenn. July 6, 2007), for the proposition that Tennessee law does not require that practices with an unjustified discriminatory effect must be permitted as long as the rates are actuarially sound, *see* 81 Fed. Reg. at 69,016, but Tennessee law, too, permits risk differentiation and requires insurers to consider past and prospective loss experience, catastrophe hazards, and all other relevant factors. *See* Tenn. Code Ann. § 56-5-104(1).

14

Absent an exemption, the Rule thus permits imposition of disparate-impact liability on precisely the state-law-sanctioned risk-based practices that HUD disclaimed any intent to invalidate: As long as some alternative pricing practice produces less of a disparate impact as defined by the FHA, the risk-based practice permitted or required by state law is unlawful under the 2013 Rule, even if the alternative is less effective in predicting losses and was never reviewed or accepted by state regulators. Although the Rule thus threatens to prohibit exactly the risk-based practices that HUD said would be protected, HUD did not resolve or even acknowledge this discrepancy in its logic, even though commenters identified this flaw. SOF ¶ 58 ("[T]he burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. . . . [E]ven if every risk factor were proved necessary, plaintiffs could still prevail by showing [a less discriminatory alternative]."); SOF ¶¶ 95-96 ("To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process."). The illogical failure to consider these implications of the Rule was arbitrary and capricious. *See General Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987) (agency analysis "arbitrary and capricious" where explanation was "internally inconsistent"); *Defenders of Wildlife v. EPA*, 420 F.3d 946, 959 (9th Cir. 2005) ("[I]nternally contradictory agency reasoning renders resulting action arbitrary and capricious." (internal quotation marks omitted)), *rev'd on other grounds*, 551 U.S. 644 (2007). And by denying the existence of a conflict between the burden-shifting framework and state regulation of risk-based practices, HUD failed to grapple with the substance of insurers' request for an exemption as this Court ordered it to do. *PCI*, 66 F. Supp. 3d at 1048-49.

### 3. HUD's reliance on the burden-shifting framework was arbitrary and capricious

The Court previously faulted HUD for "disregarding" insurance industry concerns "merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *PCI*, 66 F. Supp. 3d at 1051; *id.* (holding that HUD had failed to "provide a reasoned explanation why case-by-case determinations of the insurers' arguments are preferable to rulemaking"). The Supplemental Explanation's continued reliance on the availability of the burden-shifting framework as an answer to those concerns thus contravened this Court's decision. It was also arbitrary and capricious. The burden-shifting inquiry in case-by-case litigation is not an adequate substitute for an exemption. HUD fails to articulate a cogent reason why case-by-case litigation is superior to an appropriately framed exemption.

First, as explained above, applying the burden-shifting framework to a challenge to risk-based pricing and underwriting would require a federal court to pass judgment on the actuarial soundness of the challenged practice. That is precisely what *Mutual of Omaha* holds would violate the McCarran-Ferguson Act. *See supra* at 11-12.

Second, under the Rule, insurers can be held liable for using actuarially sound risk factors whenever a plaintiff can identify an alternative factor that would assertedly "serve the defendant's legitimate business interests," *PCI*, 66 F. Supp. 3d at 1052, even if the alternative is less effective in predicting loss than the challenged practice, 78 Fed. Reg. at 11,473 (A.R. 625). The Rule thus makes homeowners insurers liable for risk-based pricing and underwriting practices they are permitted or required to use as a matter of state law, and the burden-shifting framework only exacerbates that conflict in every case. States permit insurers to discriminate between actuarially defined risk pools, prohibiting only "*unfairly* discriminatory" rates that charge different prices to customers with similar risk profiles. *See* SOF ¶ 47. But the burden-shifting framework effectively prohibits distinctions based on actuarial risk, requiring courts to

determine whether less-effective alternative factors would have less of a disparate impact than challenged factors. This displaces States' prohibition of "unfairly" discriminatory rates (defined as rates that treat consumers with similar risk profiles differently) with a different federal standard under the FHA. At a minimum, the third step of the Rule's burden-shifting test would "impair" state insurance laws in violation of McCarran-Ferguson, *see Humana, Inc. v. Forsyth*, 525 U.S. 299, 307, 309-10 (1999), while "frustrat[ing] … declared state policy" and "interfer[ing] with a State's administrative regime," *id*. at 310. Case-by-case application of the burden-shifting framework thus aggravates, rather than alleviates, the conflict between HUD's standards and state-law requirements. HUD's continued reliance on that framework as a basis to reject an exemption thus disregarded this Court's warning that challenges to "rate classifications may usurp core rate-making functions of the State's administrative regime." *PCI*, 66 F. Supp. 3d at 1048-49. PCI has repeatedly explained this objection to HUD, *see* SOF ¶¶ 47, 55-57, but the Supplemental Explanation ignored it—a failure that alone provides reason to find the Supplemental Explanation inadequate. *See St. James Hosp. v. Heckler*, 760 F.2d 1460, 1469 (7th Cir. 1985) (failure to respond to significant criticisms renders agency rulemaking inadequate).

Third, requiring insurers to defend risk-based pricing and underwriting practices under the burden-shifting framework in every case—even if they could prevail—would impose significant and unjustified expenses on the industry, in turn increasing the cost of insurance for consumers. Under HUD's approach, every insurer must defend every challenged actuarial risk factor it uses, perhaps even on a region-by-region basis as different plaintiffs allege disparate impacts among particular populations of insureds. As this Court emphasized, it makes no sense to require insurers to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI*, 66 F.

Supp. 3d at 1051 (quoting *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 375-76 (6th Cir. 2007)).

HUD's Supplemental Explanation failed to acknowledge these substantial frictional costs or the Court's emphasis on *Graoch*. HUD's sole response to the cost concern was to assert *ipse dixit* that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. But HUD cited no factual basis or procedural analysis for its counterintuitive assumption that it would cost as much to demonstrate eligibility once for an exemption as it would to repeatedly litigate the actuarial soundness of a challenged practice in different cases in different courts at the last stage of a burden-shifting framework.

Moreover, as commenters explained, the burden-shifting framework requires insurers to establish not merely that a practice is purely risk-based; it also requires insurers to litigate whether a less discriminatory alternative exists, which conflicts with state regulatory law and imposes significant new burdens. *See* SOF ¶¶ 98-99. This burden is especially difficult because *insurers do not collect data on subscribers' race, ethnicity, or other protected characteristics* and have no other means of anticipating disparities, an issue that PCI raised to HUD. *See* SOF ¶ 62; *id.* at ¶ 97 ("Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity. Without collecting such data indicative of protected classes, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes."). Even

assuming insurers could lawfully collect the data necessary to defend themselves,[8] doing so would be expensive and would intrude upon policyholders who would be required to self-report race and ethnicity data, while encouraging the undue attention to race that *Inclusive Communities* warned against, 135 S. Ct. at 2523. The Supplemental Explanation arbitrarily and capriciously failed to consider these added consequences and costs, even though PCI raised them, SOF ¶¶ 55, 62; *see also* SOF ¶¶ 97-98.

> ### C. HUD's Reliance On Federal Support for State Antidiscrimination Laws Was Arbitrary

HUD asserted that exempting homeowners insurance from the Rule would "deprive all states of federal support in addressing discriminatory insurance practices," contrary to "the purpose of [the] McCarran-Ferguson [Act]." 81 Fed. Reg. at 69,016. This reasoning was arbitrary and capricious.

The McCarran-Ferguson Act was not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). State antidiscrimination laws—which States enforce themselves—are not enacted "for the purpose of regulating" insurance and thus do not trigger McCarran-Ferguson concerns.

Moreover, even if a State's fair-housing law were identical to the FHA and would permit a disparate-impact challenge to risk-based pricing and underwriting in state court, federal litigation under HUD's Rule would still require federal courts applying federal law to second-

---

[8] Insurers might not even be permitted to collect that data, given state prohibitions on "treating similar risks in a dissimilar manner." SOF ¶ 97; *see, e.g.*, Md. Code Ins. § 27-501 (prohibiting solicitation of information about protected characteristics).

guess the actuarial soundness of insurance practices regulated by state law, contrary to *Mutual of Omaha*. *See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law … requiring a federal court to decide whether an insurance policy is consistent with state law… obviously would interfere with the administration of the state law."). HUD's reliance on snippets from out-of-circuit district court decisions and an intermediate Ohio state court decision, none of which addressed these issues, provided no basis for disregarding McCarran-Ferguson's plain text and the Seventh Circuit's controlling decision in *Mutual of Omaha*.[9]

### D. HUD Erroneously Relied On An Asserted Need For Factual Development

HUD asserted in passing that "McCarran-Ferguson requires a fact-intensive inquiry." 81 Fed. Reg. at 69,016. To the extent HUD viewed this as a further basis to deny an exemption for risk-based pricing and underwriting, HUD offered no support for the proposition. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of actuarial risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting.

HUD relied on *Saunders v. Farmers Insurance Exchange (Saunders I),* 440 F.3d 940, 946 (8th Cir. 2006). But that decision, reviewing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, merely held that "the nature of the plaintiffs' price discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear from the record "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case later returned to the Eighth Circuit and it became clear that the plaintiffs were relying on a disparate-impact theory, the court stressed that "HUD has

---

[9] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

never applied a disparate impact analysis to insurers," *Saunders*, 537 F.3d at 964 n.3, and that

there was "doubt" whether HUD could do so, *id.* at 964. As this Court previously recognized,

the *Saunders* court ultimately held that the plaintiffs' FHA challenge was foreclosed by the

McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's

administrative regime. *Id.* at 968; *see PCI*, 66 F. Supp. 3d at 1048-49. HUD's reliance on

*Saunders* as grounds to deny a categorical exemption for the use of actuarial risk factors was

arbitrary and capricious.[10]

## III. The Supplemental Explanation Did Not Adequately Consider The Rule's Effects On The Business Of Insurance

This Court previously concluded that HUD had made "no effort to evaluate the substance

of the insurance industry's concerns" that the Rule would prevent the use of actuarially sound

risk factors and thereby undermine the fundamental nature of the insurance business. *PCI*, 66 F.

Supp. 3d at 1051. HUD's Supplemental Explanation similarly fails to grapple with that concern.

Indeed, HUD's discussion of the Rule's impact on the fundamental nature of insurance is

interwoven with its analysis of the McCarran-Ferguson Act and generally falls short for the same

reasons that its consideration of McCarran-Ferguson does.

As explained above, the Rule prohibits purely risk-based practices if a plaintiff proves the

existence of a less discriminatory "alternative risk-based practice." 81 Fed. Reg. at 69,017. And

in HUD's view, that alternative practice need not be "equally effective" at predicting risk as the

challenged practice. 78 Fed. Reg. at 11,473. Comments in the record, however, demonstrated

---

[10] The Supplemental Explanation also asserted that case-by-case adjudication is required due to variation in state laws. *See* 81 Fed. Reg. at 69,016. But HUD did not dispute that every State either permits or requires the use of actuarial risk factors. Alleged variation in state law is thus no basis for denying a targeted exemption for risk-based pricing and underwriting, as opposed to a broader exemption for homeowners insurance generally, because there is no variation when it comes to the use of actuarial risk factors in pricing and underwriting.

that accurate risk assessment is critical to the business of insurance. Commenters explained that actuarially classifying insurance applicants and policyholders by risk in the process of rate-making and underwriting is the foundation of the business of insurance. *See* SOF ¶¶ 16, 94; *see also* SOF ¶ 56. To "actuarially determine rates that most accurately measure loss potential," insurers must "identify relationships between factors and risk of loss and allocate costs accordingly." SOF ¶ 94. As the Seventh Circuit and commenters have observed, failure to differentiate between risk levels generates market inefficiency and adverse selection. *See NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out."); SOF ¶ 62 ("[T]o ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. … This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability … ."); SOF ¶ 56 ("Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards."); *see also* SOF ¶¶ 76-77. Over time, adverse selection reduces the availability of coverage as insurers are forced to abandon the market and decreases affordability as the remaining insurers use higher rates to address the resulting increased frequency and severity of claims. *See* SOF ¶¶ 58, 62.[11]

HUD was thus on notice that an "alternative risk-based practice" that is less predictive of risk is not an adequate substitute for a risk-based factor that is a better predictor of risk but

---

[11] The Treasury Department added its voice to the chorus of opposition in its October 2017 report, which asked HUD to "reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles." SOF ¶ 73.

causes some degree of disparate impact. Setting rates based on alternative factors that are less predictive of risk fails to adequately account for the risk of loss, creates market inefficiency, and drives consumers from the market. *See* SOF ¶ 96 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans."). That would dramatically transform the homeowners-insurance industry, preventing insurers from "mak[ing] the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system," precisely the result the Supreme Court ruled outside the limitation of disparate impact liability. *Inclusive Cmtys.*, 135 S. Ct. at 2518.

HUD's Supplemental Explanation acknowledged commenters' concerns that applying the Rule would undermine the "fundamental nature of insurance," but concluded without analysis that those concerns did not warrant an exemption for "all insurance practices or all underwriting decisions." 81 Fed. Reg. at 69,017. That explanation fails for the reasons explained above. *Supra* p. 13. HUD again made no effort to engage with the substance of the insurers' concerns; its failure to adequately consider this "important aspect" of the problem caused by applying the Rule to homeowners insurance was arbitrary and capricious. *State Farm*, 463 U.S. at 43.

## IV. The Supplemental Explanation Did Not Adequately Explain Why The Rule Would Not Violate The Filed-Rate Doctrine

This Court directed HUD, on remand, to "explain its decision regarding the filed-rate doctrine," which "forbids courts from invalidating or modifying rates that have been filed with regulatory agencies." *PCI,* 66 F. Supp. 3d at 1049; *see also Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 161-165 (1922). HUD did not dispute in its Supplemental Explanation that the doctrine applies to insurance rates filed with state insurance commissions. SOF ¶ 71.[12] Instead,

---

[12] *See, e.g., Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 311-19 (Minn. 2006) (filed-rate doctrine required dismissal of claim that higher prices for homeowners insurance for certain homes was

HUD asserted that the filed-rate doctrine does not apply to FHA claims because such claims "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effect." 81 Fed. Reg. at 69,018. But an FHA claim that an insured is being charged more because of the insured's race necessarily seeks to "invalidat[e]" the rate charged and thus squarely implicates the filed-rate doctrine. *Schilke*, 820 F. Supp. 2d at 835. The claimed discriminatory effect in such a case would arise from disparate rates, and any remedy would require the insurer to use non-filed rates. Moreover, a court resolving an FHA claim under the Rule would, in fact, have to consider the reasonableness of the challenged rate at step two of the burden-shifting framework. In any event, it is well established that the filed-rate doctrine bars claims that do more than simply challenge the "reasonableness" of rates.[13]

HUD also argued that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes." 81 Fed. Reg. at 69,018 (quoting *Saunders I*, 440 F.3d at 944). But HUD's position and the superseded decision in *Saunders*, on which HUD relied, are inconsistent with the weight of case law holding that the filed-rate doctrine *does* bar federal challenges to rates filed with state agencies. *See, e.g., Wegoland*, 27 F.3d at 20 (finding RICO claim barred, noting "courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies"); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (filed-rate doctrine "applies with equal force … whether the rate at issue has

---

racially discriminatory); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011) ("Numerous courts have held … filed-rate doctrine applies to … insurance.").

[13] *See, e.g., Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 415 & n.17 (1986) (filed-rate doctrine barred recovery of treble damages under antitrust laws even though antitrust claims do not challenge reasonableness of rates but rather method by which they were adopted); *Schilke*, 820 F. Supp. 2d at 836 (filed-rate doctrine foreclosed claims based on failure to disclose aspects of rates); *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 235-42 (3d Cir. 2012) (filed-rate doctrine barred antitrust challenge to rates).

been set by a state rate-making authority or a federal one").[14]  This is all the more clear in the

context of state regulation of insurance, where "normal rules of pre-emption" do not apply.  *PCI*,

66 F. Supp. 3d at 1025.

## CONCLUSION

The Court should grant PCI's motion for summary judgment and vacate the Rule to the

extent that it applies to risk-based pricing and underwriting of homeowners insurance.


Dated:  May 28, 2021                          Respectfully submitted,

                                              PROPERTY CASUALTY INSURERS
                                              ASSOCIATION OF AMERICA

                                              /s/ *Seth P. Waxman*
                                              Seth P. Waxman (*pro hac vice*)
                                              Catherine M.A. Carroll (*pro hac vice*)
                                              Anuradha Sivaram (*pro hac vice*)
                                              Athena L. Katsampes (*pro hac vice*)
                                              WILMER CUTLER PICKERING HALE AND DORR LLP
                                              1875 Pennsylvania Avenue, NW
                                              Washington, DC 20006
                                              Tel.: (202) 663-6000
                                              Fax: (202) 663-6363
                                              E-mail: seth.waxman@wilmerhale.com

                                              Rowe W. Snider (# 03125194)
                                              Alyssa M. Gregory (# 6320588)
                                              LOCKE LORD LLP
                                              111 South Wacker Drive
                                              Chicago, IL 60606
                                              Tel.: (312) 443-0700
                                              Fax: (312) 896-0336
                                              Email: rsnider@lockelord.com

                                              *Attorneys for Plaintiff*

---

[14] *See also H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992) (RICO action could "disrupt the state administrative process and constitute a 'collateral attack on a rate order,' contrary to state law") (quoting *H.J., Inc. v. Nw. Bell Corp.*, 420 N.W.2d 673, 677 (Minn. Ct. App. 1988)); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1296 (D.S.C. 1992).