EXHIBIT 6



**Property Casualty Insurers
Association of America**
Advocacy. Leadership. Results.

August 19, 2018

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410

**RE:    Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate
Impact Standard, Docket No. FR-6111-A-01, RIN 2529-ZA01**

      The Property Casualty Insurers Association of America ("PCI") appreciates the opportunity to provide comments in response to the Advance Notice of Proposed Rulemaking ("ANPRM") published by the Department of Housing and Urban Development ("HUD") on June 20, 2018[1] regarding possible reconsideration of HUD's Fair Housing Act ("FHA") Disparate Impact Rule.[2] PCI is a trade association that represents nearly 1,000 property and casualty insurance providers and 340 insurance groups. It has the broadest cross section of home, auto, and business insurers of any national property casualty trade association, with large and small member companies in all 50 states. PCI's members write $245 billion in annual premiums and account for 38% of the nation's property and casualty insurance market. PCI and its members have a direct interest in whether the Disparate Impact Rule applies to property and casualty insurance, including homeowners insurance.

      In the ANPRM, HUD indicated that it is considering what changes may be necessary to the Disparate Impact Rule in light of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). *See* 83 Fed. Reg. at 28,561. HUD also invited public comment on "other amendments to the Disparate Impact Rule that may be necessary or helpful." *Id.* For the reasons set forth below, and consistent with the recommendation of the Department of the Treasury,[3] PCI strongly urges HUD to reconsider application of the Disparate Impact Rule to property and casualty insurance covered by the FHA, which we will refer to as "homeowners insurance" for purposes of these comments.[4]

---

[1] 83 Fed. Reg. 28,560 (June 20, 2018).

[2] The ANPRM defines the "Disparate Impact Rule" to encompass both HUD's February 15, 2013 final rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard," 78 Fed. Reg. 11,460 (Feb. 15, 2013), and HUD's October 5, 2016 supplemental explanation entitled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("Supplemental Explanation").

[3] *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities Asset Management and Insurance* at 109-110 (Oct. 2017), https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.

[4] We use the term "homeowners insurance" to mean any form of property and casualty insurance the provision of which HUD asserts to be subject to the FHA.

**Property Casualty Insurers Association of America**
8700 West Bryn Mawr Avenue, Suite 1200S, Chicago, IL 60631-3512
Telephone 847-297-7800

444 N. Capitol Street NW, Suite 801, Washington, D.C., 20001-1508
Telephone 202-639-0490

pciaa.net

As explained below, HUD should create an express exemption or safe harbor for homeowners insurance so defined.

The Disparate Impact Rule—promulgated during the prior Administration—purported to "formalize" HUD's position "that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin—"regardless of whether there was an intent to discriminate." 78 Fed. Reg. 11,460, 11,460 (Feb. 15, 2013). Setting aside the merits of applying such a standard generally, it is clear that the Disparate Impact Rule cannot lawfully or reasonably be applied to the provision of homeowners insurance, which is based on purely objective analyses of actuarial risk and is extensively regulated by state insurance laws that—under the McCarran-Ferguson Act—take precedence over generally applicable federal laws such as the FHA. An exemption for homeowners insurance is required for at least four reasons:

**First**, application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act. The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, preserves the historic role of the states in regulating the business of insurance. It prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance." *Id.* § 1012(b). State insurance laws extensively regulate the pricing and underwriting of homeowners insurance. Application of the Rule to homeowners insurance would conflict with state insurance laws in every state. State insurance laws uniformly permit risk-based pricing and underwriting. As a matter of state insurance law, only "unfair discrimination" is prohibited—*risk* discrimination based on actuarial principles is uniformly permitted. "Risk discrimination is not race discrimination." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992). Indeed, almost all state laws expressly *require* the use of risk-based pricing. Moreover, the vast majority of states require insurers to file insurance rates with state regulators for review and/or approval. HUD's Disparate Impact Rule would invalidate, impair, or supersede these laws, and thus contravene McCarran-Ferguson. The Rule would require insurers to defend the actuarial soundness of their practices in federal court, which in and of itself amounts to impermissible federal regulation of the business of insurance. The Rule would also impose liability on any insurer using a valid actuarial risk factor that happens to have a disparate impact if some other, less effective factor could be used. Finally, the Disparate Impact Rule would intrude upon the state rate-setting process.

**Second**, application of the Disparate Impact Rule is fundamentally inconsistent with the business of insurance. Providers of homeowners insurance must be permitted to make pricing and underwriting decisions based on objective considerations of actuarial risk. Absent the ability to engage in actuarial risk segmentation, insurers would be forced to charge the same rates to insureds posing different levels of risk, not only undermining required risk-based pricing, but also creating adverse selection and moral hazard, undermining the availability and affordability of insurance, and potentially leading to the collapse of market segments. HUD's Disparate Impact Rule threatens to cause precisely these problems because it requires insurers to abandon actuarially sound methods in favor of substitutes that are less effective at furthering the businesses' legitimate, nondiscriminatory interests.

**Third,** application of the Disparate Impact Rule to homeowners insurance would contravene the limits imposed by the Supreme Court in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). The Court made clear in *Inclusive Communities* that disparate-impact liability under the FHA cannot be imposed based on effects the defendant did not cause, cannot be applied in a manner that requires the pervasive consideration of race, and cannot be applied in a way that would interfere with, or require courts to second-guess, legitimate business choices. As applied to the homeowners insurance industry, which depends on objective, actuarially-based underwriting and ratemaking processes, the Rule would violate each of the limits identified in *Inclusive Communities*.

**Finally**, application of the Disparate Impact Rule to homeowners insurance would violate the filed-rate doctrine. In most states, insurance rates are subject to review and approval by state regulators. The filed-rate doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). The doctrine applies to claims alleging disparate impact caused by insurance rates. *See, e.g., Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307 (Minn. 2006). The Disparate Impact Rule, however, would do precisely what the doctrine forbids by calling on courts to hold filed rates invalid.

For all of these reasons, as explained in detail below, HUD should modify the Disparate Impact Rule to exempt homeowners insurance.

PCI's comments are broken into four sections. Section I provides the relevant background regarding homeowners insurance, state insurance law, the McCarran- Ferguson Act, the FHA and the Disparate Impact Rule, PCI's lawsuit challenging the Rule, the Supreme Court's decision in *Inclusive Communities*, and subsequent proceedings before HUD regarding the Rule. Section II explains in detail why the Disparate Impact Rule cannot lawfully or reasonably be applied to homeowners insurance and why HUD can and should expressly exempt homeowners insurance from disparate-impact liability under the FHA. Section III responds to the list of six specific questions posed by HUD in the ANPRM. *See* 83 Fed. Reg. at 28,561. Section IV concludes the comments with PCI's request that HUD exempt homeowners insurance from disparate-impact liability under the FHA.

## I.      BACKGROUND

### A.      The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by fire, the insurer will pay to repair her home. Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions—that is, decisions about whether to insure and how to price a particular risk or class of risk. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial

implications. Actuaries examine numerous factors that correlate with losses. *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham*, Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to the home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard. Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* A.R. 376, *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014) (ECF No. 19); ECF No. 44-2 ¶ 6, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect information on race or ethnicity); ECF No. 44-3 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 ¶ 7, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers. *See NAACP*, 978 F.2d at 290; Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on objective, predictive, and permitted risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards. *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law— A Primer*, 19 Conn. Ins. L.J. 29, 44 (2012). Such a pricing scheme would greatly reduce the financial incentive for customers to reduce risks, construct safer houses, and maintain existing houses. Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L. J.at 66-67. It would also lead to overconsumption of risk, such as increased building in environmentally sensitive areas.

### B.    State Regulation of Insurance

The states have traditionally regulated the insurance industry, from the pricing and underwriting of insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constitutes interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to ensure that the ruling would not undermine the states' long-standing regulation of insurance.

Today, "[s]tate regulation of insurance is comprehensive and includes rate and coverage issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999). Several features of state insurance regulation are relevant here:

First, state insurance law affirmatively permits risk-based pricing and underwriting. Insurance law generally prohibits insurers from charging "excessive, inadequate, or unfairly discriminatory rates." As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."[5] For purposes of state insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted). For example, Wisconsin law provides that "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Other state laws include similar provisions. *See infra* p. 12-13. Many states prohibit unfair discrimination not just in statutes addressing rating but also in unfair trade practice laws governing insurance generally. As a matter of state insurance law, discrimination on the basis of risk is uniformly permitted.

Second, the vast majority of states not only permit risk-based pricing but expressly require it. State laws make clear that failing to take risk into account results in unfair discrimination. They also mandate that insurers consider past losses and other actuarially relevant factors in developing insurance rates. For example, the Indiana Code provides that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Other states have similar laws. *See infra* p. 13.

Third, state insurance commissioners review the rates charged by insurers to protect consumers. The vast majority of states require insurers to file insurance rates with state regulators for review and/or approval. *See, e.g.*, Ind. Code Ann. § 27-1-22-4(a) ("Every insurer shall file with the commissioner every manual of classifications, rules, and rates, every rating schedule, every rating plan, and every modification of any of the foregoing which it proposes to use."); Wis. Stat. Ann. § 625.13(1) ("[E]very authorized insurer and every rate service organization licensed under s. 625.31 which has been designated by any insurer for the filing of rates under s. 625.15(2) shall file with the commissioner all rates and supplementary rate information and all changes and amendments thereof made by it for use in this state within 30 days after they become effective."). State regulators carefully review insurance rates—often with their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13; *see also infra* p. 16.

## C.     The McCarran-Ferguson Act

In the McCarran-Ferguson Act, Congress expressly stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C.

---

[5] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4, https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

§ 1011.  Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application … [would] frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance.  *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

### D.     The Fair Housing Act and the Disparate Impact Rule

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  The FHA does not specifically relate to the business of insurance and thus is displaced by state laws regulating insurance, pursuant to McCarran-Ferguson, in the event of a conflict or interference with state law.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011).  In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  *Id.* at 70,921.  The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  *Id.* at 70,924.

Representatives of the insurance industry submitted comments explaining why disparate-impact liability cannot lawfully be applied to homeowners insurance.  The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways.  For instance, the Rule would prohibit conduct that state law requires or authorizes.  The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, application of disparate-impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.  Finally, commenters noted that application of the Rule to homeowners insurance would violate the "filed-rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities.

HUD promulgated its final Disparate Impact Rule on February 15, 2013.  78 Fed. Reg. 11,460 (Feb. 15, 2013).  The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.500(a) (2013).  It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

6

The Rule provides that disparate impact litigation under the FHA should proceed under a burden-shifting framework that could impose liability on defendants for maintaining legitimate business practices that incidentally produce discriminatory effects. Under that framework, a plaintiff must first demonstrate that a housing-related practice has a disparate effect on a protected class, regardless of whether there is any discriminatory motive for the practice. 24 C.F.R.§ 100.500(c)(1). The defendant must then show that the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Notwithstanding such a showing, the defendant may still be found liable if the plaintiff establishes "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). The alternative identified by the plaintiff need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. Thus, compliance with the Disparate Impact Rule may require businesses to abandon sound, good-faith methods in favor of substitutes that are less effective at furthering the businesses' legitimate, nondiscriminatory interests.

Notwithstanding the insurance industry's comments, the final Rule did not exempt homeowners insurance or meaningfully address whether extension of disparate-impact liability to homeowners insurance would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. The final Rule's preamble merely asserted (without any support) that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude *HUD* from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs *courts* on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11,475 (emphasis added). HUD thus did not consider whether the Rule conflicts with state laws and policies permitting and requiring risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that application of disparate-impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of actuarial risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11,475 (quoting a comment). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-based pricing and underwriting. HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."). HUD thus acknowledged the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of actuarial risk factors in fact is a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *See id.* at 11,475.

### E. The Litigation Brought by PCI

On November 27, 2013, PCI filed an Administrative Procedure Act challenge to HUD's decision to apply the Disparate Impact Rule to homeowners insurance. *See Property Casualty Insurers Association of America v. Carson*, No. 13-8564 (N.D. Ill.). On September 3, 2014, the court granted PCI's motion for summary judgment in part, concluding that HUD's explanation

was arbitrary and capricious in several respects. *See Prop. Cas. Ins. Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-52 (N.D. Ill. 2014) ("*PCI*").

The court rejected HUD's contention that it could disregard the McCarran-Ferguson Act entirely. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking. *PCI*, 66 F. Supp. 3d at 1048. The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048. The court noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049. The court also determined that HUD had inadequately examined whether the filed-rate doctrine would bar application of the Rule. *Id.* at 1050. Finally, the court concluded that HUD had made "no effort to evaluate" the substance of the homeowners insurance industry's argument that the Rule would prevent the use of actuarially sound risk factors and thereby undermine the fundamental nature of the insurance business. *Id.* at 1051. Accordingly, the court remanded to HUD for further explanation of these issues.

## F. PCI's Post-Remand Comments

In September 2014, PCI informed HUD that it intended to submit additional comments addressing the issues that the District Court had instructed HUD to consider on remand. *See* Letter from PCI to HUD, at 1 (Sept. 25, 2014) (A.R.4419). PCI then submitted comments further explaining how the Disparate Impact Rule would invalidate, impair, or supersede states' regulation of insurance and distort the homeowners insurance market. *See* Letter from PCI to HUD (Jan. 26, 2015) (A.R. 4496-4513). PCI emphasized that the Rule's burden-shifting process would impose liability on homeowners insurers for providing and pricing insurance using actuarially sound methods. *Id.* at 8 (A.R. 4503). PCI explained that prohibiting those methods would violate the McCarran-Ferguson Act and the filed-rate doctrine, as well as harm the homeowners insurance industry. *See id.* at 9-18 (A.R. 4504-4513). PCI's comment also alerted HUD to the importance of the Supreme Court's upcoming consideration of the *Inclusive Communities* case. *See id.* at 5-6 (A.R. 4500-4501).[6]

## G. The Supreme Court's Decision in *Inclusive Communities*

On June 25, 2015, the Supreme Court issued its decision in *Inclusive Communities*. *See* 135 S. Ct. 2507. In that decision, the Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" *Id.* at 2524 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." *Id.* at

---

[6] PCI hereby incorporates by reference its September 25, 2014 and January 26, 2015 letters submitted to HUD. They are attached hereto as Exhibits 1 and 2.

2522. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 2523.

The first of those safeguards is "[a] robust causality requirement." 135 S. Ct. at 2523. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). Referring approvingly to the opinion below of Fifth Circuit Judge Edith Jones, the Court held up as paradigmatic cases of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 2524.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policies." 135 S. Ct. at 2522. Businesses, the Court also stated, "must be given latitude to consider market factors." *Id.* at 2523.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." 135 S. Ct. at 2523. "[I]nterpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## H.    PCI's Post-*Inclusive Communities* Comment

Shortly after the Supreme Court issued its decision in *Inclusive Communities*, PCI submitted comments explaining that HUD must consider the Supreme Court's newly articulated limitations on disparate-impact liability. *See* Letter from PCI to HUD (July 29, 2015) (A.R. 4615-4621).[7] PCI emphasized that *Inclusive Communities* prohibited application of the Rule to legitimate business practices, including risk-based homeowners insurance practices. *See id.* at 5-7 (A.R. 4619-4621).

## I.    HUD's Supplemental Explanation

On October 5, 2016, HUD published its Supplemental Explanation. *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016). The Supplemental Explanation rejected insurers' request for an exemption from the Disparate Impact Rule, concluding that insurers' concerns "can and should be addressed on a case-by-case basis." *Id.* HUD's only response to insurers' showing that the McCarran-Ferguson Act requires an exemption for risk-based pricing and underwriting was to argue that insurers could defend their practices in court under the Rule's burden-shifting framework. *See id.* at 69,015, 69,017. Notably, HUD did not dispute that state law uniformly permits and often

---

[7] PCI also incorporates this letter by reference. It is attached hereto as Exhibit 3.

requires insurers to consider actuarial risk factors. *See id.* at 69,015. In fact, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice*." Id.* Even more significantly, HUD conceded that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.* HUD's sole rationale for denying an exemption for the use of actuarial risk factors was that insurers can later justify using such factors on a case-by-case basis under the Rule's burden-shifting framework. *See id.*

### J. PCI's Renewed Legal Challenge

Following HUD's Supplemental Explanation, PCI promptly sought leave to file an amended complaint to challenge that explanation. The District Court granted leave, and on June 27, 2017, PCI filed its First Amended Complaint challenging HUD's application of the Disparate Impact Rule to homeowners insurance, including HUD's reasoning set forth in its Supplemental Explanation. *See* ECF No. 131. On September 8, 2017, PCI filed a motion for summary judgment explaining the numerous ways in which HUD's Supplemental Explanation remained arbitrary and capricious. *See* ECF Nos. 136 & 137. HUD sought an extension of time for its response, and the parties subsequently agreed to stay the litigation, ultimately agreeing to a continued stay of the case in light of HUD's publication of the ANPRM on June 20, 2018. *See* ECF No. 159. Per the parties' agreement, the case is currently stayed until October 19, 2018, at which time the parties shall file a joint status report. *See* ECF No. 160.

## II. HUD SHOULD EXEMPT HOMEOWNERS INSURANCE FROM DISPARATE-IMPACT LIABILITY UNDER THE FHA

As explained below, application of the Disparate Impact Rule to homeowners insurance would (A) violate the McCarran-Ferguson Act; (B) undermine the fundamental nature of the business of insurance; (C) contravene the limits imposed by the Supreme Court in *Inclusive Communities*; and (D) violate the filed-rate doctrine. Accordingly, HUD should adopt an express exemption for homeowners insurance.

### A. Application of the Disparate Impact Rule to Homeowners Insurance Would Violate the McCarran-Ferguson Act

HUD must provide an exemption for homeowners insurance because application of the Disparate Impact Rule to homeowners insurance would invalidate, impair, or supersede state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI*, 66 F. Supp. 3d at 1048. It concluded that HUD had acted arbitrarily and capriciously because "it [had] made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) improperly requiring federal courts to determine whether challenged insurance practices are actuarially sound, (ii) conflicting with state

laws permitting or requiring insurers to engage in risk-based pricing and underwriting; and (iii) impairing state laws and regulations providing for state administrative review of insurance rates.

### 1. The Rule Would Improperly Require Federal Courts To Determine Whether Challenged Practices Are Actuarially Sound

The McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Mutual of Omaha*, 179 F.3d at 564 (McCarran-Ferguson prohibits the federal courts from "regulating the … insurance industry" via litigation). In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.* Indeed, the district court in the *PCI* case observed that "*Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." 66 F. Supp. 3d at 1039; *see also id.* at 1028-29 (describing *Mutual of Omaha*). The court specifically rejected the argument previously made by HUD that the relevant language in *Mutual of Omaha* was dicta. *See id.* at 1039 n.6 ("*Mutual of Omaha* is binding on this Court.").

HUD's Disparate Impact Rule would similarly force federal courts to second-guess the actuarial soundness of particular state-regulated insurance practices. Under the Rule, in order to avoid liability, insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that a "challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of a particular risk factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice, in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*." 66 F. Supp. 3d at 1048. Despite the court's emphasis on *Mutual of Omaha*, HUD's Supplemental Explanation made no effort to address the decision's key holding. It mentioned *Mutual of Omaha* only once, and it did so simply to support the uncontroversial point that the McCarran-Ferguson Act bars application of disparate-impact liability only when it would conflict with state law. *See* 81 Fed. Reg. at 69,015. HUD never addressed the clear holding of *Mutual of Omaha* that the *PCI* court noted and found applicable here: that the McCarran-Ferguson

Act prohibits a federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564.

## 2. The Rule Would Conflict with State Laws Permitting or Requiring Insurers To Engage in Risk-Based Pricing and Underwriting

State insurance law uniformly permits insurers to rely on actuarial risk factors in setting rates and making underwriting decisions. Under state insurance law, only "unfair discrimination" is prohibited. Unfair discrimination occurs only when insureds posing similar risks are treated differently. Differential treatment of insureds posing different risks is uniformly allowed. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). As another example, Arizona laws specifies:

> A rate is not unfairly discriminatory in relation to another in the same class if it reflects equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, if the rates reflect the differences with reasonable accuracy.

Ariz. Rev. Stat. Ann. § 20-383(D); *see also, e.g.*, Colo. Rev. Stat. § 10-4-403(1)(c); Mich. Comp. Laws Ann. § 500.2403(1)(d); Minn. Stat. Ann. § 70A.04(4); Mo. Ann. Stat. § 379.318(4); Nev. Rev. Stat. Ann. § 686B.050(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); N.M. Stat. Ann. § 59A-17-6(E); N.C. Gen. Stat. Ann. § 58-40-20(e); Tenn. Code Ann. § 56-5-103(a), (d). *See generally* Table I (attached).

The principle that only "unfair" discrimination is prohibited is enshrined in both state insurance rating laws (like those quoted above) and state insurance unfair practices laws, which address both the pricing and provision of insurance more generally. *See* Table I (attached); *see, e.g.*, Iowa Code Ann. § 507B.4(3)(g) (specifying that it is an unfair trade practice to "[m]ak[e] or permit[] any unfair discrimination between insureds of the same class for essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance other than life or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.").

In addition, numerous states expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). For example, under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference

among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209(b); Colo. Rev. Stat. § 10-4-403(4); 18 Del. Code § 2503(5); Md. Code Ann., Ins. § 11-205(f); Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2) Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I (attached).[8]

As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g.*, *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Moreover, the vast majority of states *require* insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I (attached)*; see also PCI*, 66 F. Supp. 3d at 1039 (noting that "some states require insurers to use risk-based pricing" and that others "merely permit risk-based pricing"). Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5(3); N.J. Stat. Ann. § 17:29A-4(c); N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03(C); S.C. Code Ann. § 38-73-430(1); Tenn. Code Ann. § 56-5-104(1); Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I (attached).

Indeed, as noted above, state insurance laws also make clear that failure to account for differences in actuarially-expected losses constitutes prohibited "unfair discrimination." For

---

[8] PCI's identification of the specific state laws at issue distinguishes this case from *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003). *But see* 81 Fed. Reg. at 69,015, 69,018 (continuing to rely on *Dehoyos*).

example, Utah law provides that "[a] rate is unfairly discriminatory if price differentials fail to equitably reflect the differences in expected losses and expenses after allowing for practical limitations." Utah Code Ann. § 31A-19a-201(4)(a); *see also, e.g.*, Ariz. Rev. Stat. Ann. § 20-383(D); Colo. Rev. Stat. § 10-4-403(1)(c); Mich. Comp. Laws Ann. § 500.2403(1)(d); Minn. Stat. Ann. § 70A.04(4); Mo. Ann. Stat. § 379.318(4); Nev. Rev. Stat. Ann. § 686B.050(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); N.M. Stat. Ann. § 59A-17-6(E); N.C. Gen. Stat. Ann. § 58-40-20(e); Tenn. Code Ann. § 56-5-103(a), (d).

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1557 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal … laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted or even required by state law.

In compliance with state insurance laws, insurers charge different rates to different customers and make underwriting decisions based on actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks or risk-based underwriting practices would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of the vast majority of the states. The McCarran-Ferguson Act ensures that federal laws of general applicability do not "'invalidate, impair, or supersede' [a] State's law." *Humana*, 525 U.S. at 307. To invalidate means "to render ineffective," and to supersede is "to displace (and thus render ineffective) while providing a substitute rule." *Id.* (internal quotation marks omitted). Application of the Disparate Impact Rule to insurers would "invalidate, impair, or supersede" state law and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly permitted or required by state law. *Id.* at 310.

Moreover, under the Rule, insurers can be held liable for using actuarially sound risk factors in any case where a plaintiff can identify an alternative factor that would merely "serve the defendant's legitimate business interests." *PCI*, 66 F. Supp. 3d at 1052; *see* 24 C.F.R. § 100.500(c)(3). In its rulemaking, HUD declined to require that the alternative practice be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. The Rule would thus make homeowners insurers liable for risk-based pricing and underwriting practices they are permitted or required to use as a matter of state law. As explained above, states permit insurers to discriminate between risk pools, prohibiting only "unfairly discriminatory" rates—that is, rates that discriminate between insureds posing the same risk. But the Rule effectively prohibits distinctions based on actuarial risk, requiring courts to determine whether less predictive alternative factors

would have less of a disparate impact than challenged factors. This displaces states' prohibition of only "unfairly" discriminatory rates with a different federal standard under the FHA. At a minimum, it "impair[s]" state laws. *Humana,* 525 U.S. at 309-310. Application of the Rule to risk-based pricing and underwriting permitted or required as a matter of state law would not only directly conflict with state law but also "frustrate … declared state policy" and "interfere with a State's administrative regime." *Id.* at 310.

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *Humana,* 525 U.S. at 311; *Nat'l Mining Ass'n v. U.S. Dep't of Interior,* 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But, as explained above, far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would require federal courts to evaluate the actuarial soundness of challenged practices and would permit insurers to be held liable for use of actuarially sound practices.

In its Supplemental Explanation, HUD also argued that an exemption for homeowners insurance is inappropriate in light of certain state anti-discrimination laws that may apply to insurance. 81 Fed. Reg. at 69,016. HUD reasoned that such an exemption would "deprive all states of federal support in addressing discriminatory insurance practices" and asserted that an exemption would therefore "be at odds with the purpose of [the] McCarran-Ferguson [Act]." *Id.* This reasoning is arbitrary and capricious. The McCarran-Ferguson Act is not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "*for the purpose of regulating the business of insurance*." 15 U.S.C. § 1012(b) (emphasis added). State antidiscrimination laws—which states may enforce themselves, if appropriate—are not enacted "for the purpose of regulating the business of insurance" and thus have no bearing on whether application of the Disparate Impact Rule to risk-based pricing and underwriting would violate the McCarran-Ferguson Act.

Even if a state's fair-housing law were identical to the FHA and would permit a disparate impact challenge to risk-based pricing and underwriting in state court, any federal litigation under HUD's Disparate Impact Rule would still require federal courts applying federal law to second-guess the actuarial soundness of insurance practices regulated by state law—contrary to the express holding of *Mutual of Omaha. See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with state law—obviously would interfere with the administration of the state law."). HUD's reliance on snippets of discussion from out-of-circuit district court decisions and a state court decision, none of which addressed these issues,[9] provided

_____

[9] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

no basis for disregarding the plain text of the McCarran-Ferguson Act and the Seventh Circuit's controlling decision in *Mutual of Omaha*. In sum, HUD cannot rely on state antidiscrimination laws to overlook the clear conflict between the Disparate Impact Rule and state insurance laws permitting risk-based pricing and underwriting.

HUD also asserted in passing in the Supplemental Explanation that "McCarran-Ferguson requires a fact-intensive inquiry." 81 Fed. Reg. at 69,016. But HUD offered no support for the proposition. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of actuarial risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting. HUD relied on *Saunders v. Farmers Insurance Exchange (Saunders I)*, 440 F.3d 940, 946 (8th Cir. 2006). But that court, reviewing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, merely held that "the nature of plaintiffs' price discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case returned to the Eighth Circuit and it was clear that the plaintiffs were relying on a disparate-impact theory, the court noted that "HUD has never applied a disparate impact analysis to insurers," *Saunders v. Farmers Ins. Exch. (Saunders II)*, 537 F.3d 961, 964 n.3 (8th Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)), and that there was "doubt" as to whether it could, *id.* at 964. The court ultimately held that the plaintiffs' FHA challenge was foreclosed by the McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's administrative regime. *Id.* at 968. This hardly counsels against a categorical exemption for the use of actuarial risk factors.

### 3. The Rule Would Conflict with State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—48 of 50, plus the District of Columbia— require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I (attached). Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05(b).

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate

16

review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g.*, *Saunders II*, 537 F.3d at 968 ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is not permitted under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

*     *     *

For all of these reasons, application of the Disparate Impact Rule to homeowners insurance would "invalidate, impair, or supersede" state laws governing insurance in every state. Accordingly, application of the Rule to homeowners insurance would violate the McCarran-Ferguson Act. For that reason alone, HUD should grant an exemption for homeowners insurance.[10]

## B.    Application of the Disparate Impact Rule Is Fundamentally Inconsistent with the Business of Insurance

The Disparate Impact Rule conflicts with the fundamental, risk-based nature of homeowners insurance. In exchange for assuming a customer's risk, the insurer charges a rate derived from the likelihood and amount of potential losses. *See, e.g.*, 1 Steven Plitt et al., Couch

---

[10] In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70,924. HUD later indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. 81 Fed. Reg. at 69,017. HUD should exempt all homeowners insurance practices, not just pricing and underwriting. The relevant provisions of the FHA should not be construed to apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership—the relevant activity protected by the FHA. As the Seventh Circuit has explained, 42 U.S.C. § 3604 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP*, 978 F.2d at 301. The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." The section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

on Insurance § 1:6 (3d ed. 2013).[11]  Insurers also estimate their loss potential when determining whether to underwrite a particular type of hazard.  *See, e.g.*, *id.* § 1:2.  As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk."  A.R. at 376.  The essence of risk-based insurance practices is "identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly."  A.R. at 376.

Actuaries calculate the amount and probability of loss by reviewing objective risk factors. *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates,* Casualty Actuarial Society E-Forum at 284; Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. at 414.  As noted above, with respect to homeowners insurance, such factors may include, among others, the materials used to build a house, the house's proximity to fire hydrants, the presence of a security system in the house, the presence of a trampoline in the yard, and the history of losses associated with the house or similar units.  Quantifying the impact of any risk factor is a purely mathematical and unbiased statistical exercise.  Far from the "artificial, arbitrary, and unnecessary" practices that may incur liability under the FHA under *Inclusive Communities*, 135 S. Ct. at 2524, the actuarial assessment of risk is designed to precisely identify "the expected value of all future costs associated with an individual risk transfer."[12]  Insurers and actuaries do not consider the race of customers or potential customers, or any other protected characteristic, at any point during ratemaking, underwriting, or any other business operation.[13]

But despite the neutrality of insurance practices with respect to all protected characteristics, the Disparate Impact Rule could penalize insurers for relying on actuarially sound factors if they happened to disproportionately affect a protected class.[14]  In addition to improperly holding defendants "liable for racial disparities they did not create," *Inclusive Communities*, 135 S. Ct. at 2523 (*quoting Wards Cove*, 490 U.S. at 653)—as discussed below—this would irreparably distort the market for homeowners insurance.  Tying rates to risk factors ensures that prices accurately reflect an insurer's costs of covering particular classes of risk for particularly situated customers. Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.  Removing risk factors from the ratemaking calculus could make it prohibitively expensive to insure high-risk properties, perhaps eliminating coverage across the market.  It would also cause adverse selection, as customers with a low risk of loss would be charged more than necessary to cover their risk.  *See* Letter from PCI to HUD, at 2 (Jan. 26, 2015) (A.R. 4497) ("Lower-risk customers would be overcharged for

---

[11] Other factors that affect the provision and pricing of homeowners insurance include policy limits, deductibles, and the insurer's costs of doing business.  *Id.*

[12] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4, https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

[13] *See* ECF No. 44-2 at ¶ 6 (insurer does not collect information on race or ethnicity); ECF No. 44-3 at ¶ 11 (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 at ¶ 11 (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 at ¶ 7 (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

[14] Scholars have predicted that "protected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications."  Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284.

insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards."). As the Seventh Circuit has explained,

> Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*NAACP*, 978 F.2d at 290.

The Disparate Impact Rule's effects on homeowners insurance pricing would also generate negative externalities beyond the insurance market. Risk-based insurance pricing encourages safer practices. For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials. Eliminating risk factors from the pricing model could reduce such expedient disincentives. *See, e.g.*, Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. at 66-67. Disallowing risk-based pricing inherently creates cross-subsidies from low-risk activities to high-risk activities, with the resulting unfairly discriminatory prices creating moral hazards and forcing more low-risk activities and consumers out of the market.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11,475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. 66 F. Supp. 3d at 1051. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Despite the district court's holding, HUD's Supplemental Explanation continued to rely on the ability of insurers to defend their practices in litigation under the Rule. *See* 81 Fed. Reg. at 69,017. But as explained above, HUD has indicated that a purportedly less discriminatory alternative need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. HUD has thus made clear that under the Disparate Impact Rule, disparate-impact liability does, in

fact, extend to purely risk-based practices as long as there exists some other practice that produces less of a disparate impact, even if it is not "equally effective" as the challenged practice. Any replacement risk factor would necessarily correspond to a different risk than the one identified as relevant by sound actuarial methods. As a result, the original risk of loss would still exist, and it would not be correctly reflected in the price of insurance. *See* ECF No. 44-4 ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans"). This would result in overcharging customers with a low risk of loss and likely driving many of them out of the market. The third step of the burden-shifting framework is accordingly a perfect example of the hazards of allowing plaintiffs to "second-guess which of two reasonable approaches" a defendant should adopt. *Inclusive Communities*, 135 S. Ct. at 2522.

Moreover, the fact that actuarially sound homeowners insurance practices could withstand challenges under the Disparate Impact Rule's burden-shifting framework does not remove the need for an express exemption. Forcing insurers to defend the use of potentially any risk factor in court would needlessly raise costs for the industry and waste judicial resources. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 375 (6th Cir. 2007) ("[I]f no disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate impact challenges to that practice.").

For all of these reasons, the Disparate Impact Rule would fundamentally alter the business of insurance if applied to homeowners insurance.

## C. Application of the Disparate Impact Rule to Homeowners Insurance Would Contravene the Limitations Imposed in *Inclusive Communities*

Applying the Disparate Impact Rule to homeowners insurance would also run afoul of the limitations on disparate-impact liability articulated by the Supreme Court in the *Inclusive Communities* case. Although the Supreme Court in *Inclusive Communities* recognized that disparate-impact claims are cognizable under the FHA, the Court emphasized that they "must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Inclusive Cmtys.*, 135 S. Ct. at 2518. Only "artificial, arbitrary, and unnecessary" practices that are causally linked to a racial imbalance by robust evidence, beyond a mere correlation, may be subject to liability. *Id.* at 2522-24. These requirements ensure that defendants are not "held liable for racial disparities they did not create." *Id.* at 2523 (citing *Wards Cove*, 490 U.S. at 653). Moreover, the Court indicated that when a defendant articulates a "valid interest served by their policies," the plaintiff should not be allowed to "second-guess which of two reasonable approaches" a defendant should follow. *Id.* at 2522. The Court also cautioned against any disparate-impact framework that did not have "adequate safeguards at the prima facie stage" to prevent the use of race "in a pervasive way" or the injection of "racial considerations into every housing decision." *Id.* at 2523-24. The Court recognized that the absence of such safeguards would tend to "perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. And fundamentally, the Court expressed concern that the "specter of disparate-impact litigation" could discourage businesses from undertaking activities essential to a well-functioning housing market. *Id.* at 2524.

Applied to homeowners insurers, the Disparate Impact Rule reaches far beyond these limits. As explained above, insurers make pricing and underwriting decisions based on demonstrable risk factors—that is, based on objective, actuarially sound data about the likelihood and value of their customers' potential losses. This practice is not merely "practical." *Inclusive Cmtys.*, 135 S. Ct. at 2518. It is necessary for sustaining a viable homeowners insurance market. Homeowners insurers do not consider, nor generally have, data regarding their customers' protected characteristics, and the fact that some risk factors may correlate to a disparity caused by other socioeconomic conditions outside the insurers' control does not satisfy the "robust causality requirement" *Inclusive Communities* demands. *See* 135 S. Ct. at 2523. Yet the Disparate Impact Rule would subject homeowners insurers to liability for such imbalances that their legitimate, fundamental business practices "did not create." *Id.* at 2523. As long as plaintiffs could show that risk-based pricing or underwriting resulted in slightly different rates or coverage, on average, for members of different protected classes, they would arguably satisfy their prima facie burden. Indeed, HUD rejected a requirement that a disparate impact must be significant. 78 Fed. Reg. at 11,468.

Moreover, in describing the causality requirement, the Court identified as a quintessential example of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." 135 S. Ct. at 2524. That is precisely the circumstance in which companies offering homeowners insurance find themselves. Application of disparate-impact liability under the FHA to homeowners insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id.* at 2523. As explained above, companies offering homeowners insurance are regulated by a panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance, expressly delineating and permitting the use of such methods, and requiring the filing of homeowners insurance rates with state administrative bodies for approval. *See supra* p. 16. Those state laws mandate or expressly permit homeowners insurers to use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates for various risk classifications. They thus "substantially limit" the discretion of homeowners insurance companies in a manner that would make it impossible to ascribe any disparate effects of the companies' underwriting or pricing practices to their independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the sort of "double bind of liability" the Court warned against. That is also just what the McCarran-Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be limited in a way that gives "latitude to consider market factors" also reinforces PCI's contention that disparate-impact liability should not be permitted against homeowners insurers. 135 S. Ct. at 2523. As PCI has explained, insurance markets run efficiently when insurance is priced in accord with actuarially sound, risk-based factors. *See supra* at pp. 17-18. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation. The extensive state-law framework governing the pricing of homeowners insurance is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage

21

businesses from undertaking the very activities that ensure a well-functioning housing market and in particular actuarially sound, risk-based pricing. 135 S. Ct. at 2524. Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id*. Under the McCarran Ferguson Act, regulation of the market for homeowners insurance is reserved to the states. Exempting homeowners insurance from disparate-impact claims is necessary to ensure that the threat of disparate-impact litigation does not impair states' legal regimes governing the pricing of homeowners' insurance or hinder the efficient operation of insurance market in accord with those state-law regimes.

Moreover, even after insurers successfully defend the legitimacy of actuarial practices at the second step of HUD's burden-shifting process, the Disparate Impact Rule would still penalize them if plaintiffs identified a less effective practice that produced less of a disparate effect. Contrary to *Inclusive Communities*, this would essentially allow plaintiffs to "second-guess" and uproot insurers' sound business practices. Under the Rule, an insurer can be compelled to adopt a less effective alternative as long as it merely "serve[s]" the same interest as the challenged policy. 24 C.F.R. § 100.500(c)(3).

Finally, the Supreme Court's caution that the FHA should not be interpreted to promote the use of racial (or other suspect) classifications supports each of PCI's arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," the Court explained, would perversely "tend to perpetuate race-based considerations rather than move beyond them." 135 S. Ct. at 2524. But that is just what extending disparate-impact liability to homeowners insurers would do. State law ensures that homeowners insurers price their products in accordance with risk-based, actuarially sound factors. State law does not permit reliance on, and homeowners insurers do not rely on, prohibited classifications in pricing their products. Yet, the failure to exempt homeowners insurers from disparate-impact liability would effectively require them to collect and analyze sensitive data on the protected characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts. Exempting homeowners insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners insurers would, contrary to the teachings of *Inclusive Communities*, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners insurance by imposing significant and needless costs on providers of homeowners insurance and their customers.

For all of these reasons, application of the Disparate Impact Rule to insurance would run afoul of the limitations imposed by the Court in *Inclusive Communities*.

### D. Application of the Disparate Impact Rule to Homeowners Insurance Would Violate the Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara*

*Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986); *PCI,* 66 F. Supp. 3d at 1049. The doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).[15]

The doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g.*, *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 236-39, 242 (3d Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013); *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005) , *aff'd*, 721 N.W.2d 307 (Minn. 2006); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*, No. 3375, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000); *see also, e.g.*, Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates); *McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-CV-W, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

The district court in *PCI* found that HUD initially had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. *PCI*, 66 F. Supp. 3d at 1050. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* In its Supplemental Explanation, HUD did address the filed-rate doctrine. It did not dispute that the doctrine applies to insurance rates filed with state insurance commissions. Instead, HUD argued first that the filed-rate doctrine does not apply to FHA claims because they "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effects." 81 Fed. Reg. at 69,018 (quoting *Lumpkin, v. Farmers Grp., Inc.*, No. 05-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)). This argument fails for multiple reasons. An FHA claim that an insured is being charged more because of the insured's race seeks to "invalidat[e]" the rate charged and thus squarely implicates the filed-rate doctrine. *Schilke*, 820 F. Supp. 2d at 835. A claimed discriminatory effect would occur through disparate rates, and it is difficult to imagine how the Rule could remedy such an effect other than by causing insurers to change their rates. Moreover, a court resolving an FHA claim under the Rule would, in fact, have to consider the reasonableness of the challenged rate at step two of the burden-shifting framework. In any event, it is well established that the filed-rate doctrine bars claims that do more than simply challenge the "reasonableness" of rates.[16]

---

[15] The extent or the vigor of the agency's review of filed rates does not matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

[16] *See, e.g., Square D. Co.*, 476 U.S. at 415 & n.17 (filed-rate doctrine barred recovery of treble damages under

HUD also argued that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes." 81 Fed. Reg. at 69,018 (quoting *Saunders I*, 440 F.3d at 944). But HUD's position and the *Saunders* decision on which HUD relied are inconsistent with the weight of the case law holding that the filed-rate doctrine does bar challenges under *federal* laws to rates filed with *state* agencies. *See, e.g., Wegoland*, 27 F.3d at 20 (finding RICO claim barred, noting "courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies"); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (filed-rate doctrine "applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one").[17] This is all the more clear in a case involving state regulation of insurance, where the McCarran-Ferguson Act "overturn[s] the normal rules of pre-emption." *PCI*, 66 F. Supp. 3d at 1025.

At bottom, applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Wegoland*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted).

\*       \*       \*

For all of these reasons, the Disparate Impact Rule cannot and should not be applied to homeowners insurance. Applying the Rule to homeowners insurance runs afoul of the McCarran-Ferguson Act—a critical consideration that a federal court has previously faulted HUD for failing adequately to address. It also significantly interferes with the business of insurance, which requires consideration of actuarial risk. Application of the Rule to homeowners insurance flouts the important limitations on disparate-impact liability laid out by the Supreme Court in *Inclusive Communities*. Finally, the filed-rate doctrine bars application of the Rule to homeowners insurance.

Notwithstanding all these legal impediments, HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475. But HUD has never explained how compliance with a federal statute—the McCarran-Ferguson Act—would be contrary to congressional intent. Nor has it explained how arbitrarily and capriciously applying the Rule to the business of providing homeowners insurance, disregarding limitations imposed by the Supreme Court, or violating the filed-rate doctrine would further congressional intent. HUD based its assertion that it could not grant an exemption entirely

---

antitrust laws even though antitrust claims do not challenge reasonableness of rates but rather method by which they were adopted); *Schilke*, 820 F. Supp. 2d at 836 (filed-rate doctrine foreclosed claims based on failure to disclose aspects of rates); *McCray*, 682 F.3d at 235-42 (filed-rate doctrine barred antitrust challenge to rates).

[17] *See also H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992) ("Allowing a RICO action . . . would similarly disrupt the state administrative process and constitute a 'collateral attack on a rate order,' contrary to state law.") (quoting *H.J., Inc. v. Nw. Bell Corp.*, 420 N.W.2d 673, 676 (Minn. Ct. App. 1988)); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1296 (D.S.C. 1992).

on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Graoch* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the *Graoch* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 390-91. The district court in the PCI case recognized that case law HUD itself previously relied upon makes clear that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI*, 66 F. Supp. 3d at 1051 (quoting *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 375-76 (6th Cir. 2007)). In the Supplemental Explanation, however, HUD failed even to acknowledge *Graoch*.

Even if an insurer could successfully defend risk-based practices under the Rule's burden-shifting framework, HUD's denial of an exemption would still be arbitrary and capricious. Requiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on the industry. Under HUD's approach, every insurer would have to defend each of the actuarial risk factors it uses, perhaps even on a region-by-region basis as different plaintiffs assert alleged disparate impacts among particular populations of insureds. HUD's only response was that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. HUD provided no basis, however, for its counterintuitive assumption that it would cost as much to demonstrate eligibility for an exemption for risk-based pricing and underwriting as it would to litigate the actuarial soundness of a challenged practice.

Moreover, the Rule would require insurers to establish not merely that a practice is purely risk-based; it would also require insurers to litigate the third step of the burden-shifting approach, disputing that less discriminatory alternatives exist. This would be especially difficult for insurers because—as noted—they do not collect data on subscribers' race, ethnicity, or other protected characteristics and have no other means of anticipating disparities.[18] And assuming they could collect the necessary data to defend themselves, it would be very expensive and would intrude upon policyholders who would be required to self-report race and ethnicity data. ECF No. 44-2 ¶¶ 11–12; ECF No. 44-3 ¶ 14. HUD's prior Supplemental Explanation arbitrarily and capriciously failed to consider these added costs.

Accordingly, HUD can and should exempt homeowners insurance from disparate-impact liability under the FHA.

---

[18] *See* ECF No. 44-2 ¶ 6; ECF No. 44-3 ¶ 11; ECF No. 44-4 ¶ 11; ECF No. 44-5 ¶ 7. Insurers might not even be permitted to collect that data, given state prohibitions on "treating similar risks in a dissimilar manner." Letter from NAMIC to HUD, at 5, 12 (Jan. 17, 2012) (A.R. 376, 383); *see also* Md. Code Ins. § 27-501 (prohibiting solicitation of information about protected characteristics).

### III.   RESPONSES TO SPECIFIC ISSUES RAISED BY HUD

In the ANPRM, HUD indicated that it is "particularly interested" in responses to a number of listed questions.  83 Fed. Reg. at 28,56l.  PCI's comments above, explaining the need for an exemption for homeowners insurance, address some of the listed questions.  Other questions, however, have not yet been fully addressed.  PCI responds below to each of the questions posed.

**1.     Does the Disparate Impact Rule's burden of proof standard for each of the three steps of its burden-shifting framework clearly assign burdens of production and burdens of persuasion, and are such burdens appropriately assigned?**

#### Clarity of Assignment of Burdens

Under the Disparate Impact Rule, the plaintiff has the initial burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.  24 C.F.R. § 100.500(c)(1).  If the plaintiff meets that burden, the defendant has the burden of proving that the challenged practice is necessary to achieve "one or more [of its] substantial, legitimate, nondiscriminatory interests."  *Id.* § 100.500(c)(2).  If the defendant meets its burden, the plaintiff "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."  *Id.* § 100.500(c)(3).

It is not immediately clear whether the burden that shifts to the defendant at the second step of the burden-shifting test is a burden of production or persuasion—that is, whether the defendant must merely set forth evidence that the challenged practice is necessary to achieve a substantial, legitimate, and nondiscriminatory interest, or whether the defendant must persuade a decisionmaker of that fact.  But by its plain terms, the Rule appears to shift the burden generally, which presumably would include the burden of persuasion.  *See* 78 Fed. Reg. at 11,473-11,474.

#### Appropriateness of Assignment of Burdens

In the absence of statutory direction to the contrary, the Supreme Court has held that disparate-impact liability must be premised on exacting standards in order to avoid unjustified, expensive, and time-consuming litigation.  Under those standards, a plaintiff must make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class.  *Wards Cove*, 490 U.S. at 658.  If a plaintiff makes this prima facie showing, the defendant need only present evidence that the challenged practice serves its legitimate goals.  *See id.* at 659.  The burden of persuasion remains on the plaintiff.  *See id.*  When a defendant produces such evidence, the plaintiff may prevail only if he or she can prove that the defendant refused to adopt an alternative practice that would have served its goals equally effectively without causing the disparate impact.  *See id.* at 660-61.

The Disparate Impact Rule's three-step burden-shifting approach for resolving disparate impact claims conflicts with the Supreme Court's decision in *Wards Cove* in several respects relevant to the homeowners insurance industry.

At the first step of the process, HUD specifically, and improperly, omitted the requirement that any disparate impact be "significant."  *See* 78 Fed. Reg. at 11,468-11,469.  The Rule provides

that a plaintiff need only show that the challenged practice "caused or predictably will cause" a disparate impact. This is less demanding than the showing required by *Wards Cove*.

At the second step, HUD improperly shifted the burden of persuasion to the defendant. That contravenes Supreme Court precedent. In outlining the framework for a disparate impact analysis (under Title VII) the Supreme Court held that that the burden of persuasion "must remain with the plaintiff, for it is he who must prove that it was 'because of such an individual's race, color,' etc., that he was denied a desired employment opportunity." *Wards Cove*, 490 U.S. at 660. The burden of proving that a practice does or does not serve legitimate interests should properly rest on the party seeking to alter business practices—particularly those that are authorized under state law—by imposing disparate-impact liability. Additionally, the Supreme Court has expressly rejected reading a "necessity" requirement into a disparate impact framework, concluding that such a requirement would impose a degree of scrutiny impossible to meet. *Id.* at 659 ("[T]here is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet[.]").

The third step of the burden-shifting framework is unlawful because plaintiffs do not need to show that any proffered alternative practice is "equally effective" as the challenged practice at serving the defendant's legitimate business interests. *See Wards Cove*, 490 U.S. at 661 (any "alternative practices" a plaintiff might offer must be "equally effective").

The Rule's burden-shifting provisions are also contrary to the limitations outlined in *Inclusive Communities*, especially when applied to the homeowners insurance industry, which operates by classifying risks based on a broad range of actuarial data.

First, the Rule impermissibly permits plaintiffs to state a prima facie claim of disparate impact merely by pointing to a statistical disparity and without establishing a robust causal connection between a defendant's policies and a racial disparity. But *Inclusive Communities* emphasized that disparate impact claims may not be premised on the simple existence of a racial disparity and must be subject to "a robust causality requirement." 135 S. Ct. at 2522-23. Accordingly, by permitting plaintiffs to bring claims based on the mere existence of a statistical disparity or a loose causal connection between a defendant's actions and a disparity, the Rule is contrary to law.

Second, the Rule requires homeowners insurance providers to show that their challenged practice is strictly "necessary" to achieving a legitimate business goal. The Rule thus would invalidate not simply those policies that are "artificial, arbitrary and unnecessary," but also legitimate business practices. The Rule would thereby inhibit "profit-related decisions that sustain a vibrant and dynamic free-enterprise system." 135 S. Ct. at 2518, 2524. The Rule thus exceeds the limitations the Supreme Court placed on disparate impact claims in *Inclusive Communities.*

The Rule is also inconsistent with the Administrative Procedure Act, which provides that "the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91 (1981). Because a charge brought by HUD under the FHA may be heard in either an administrative or judicial proceeding, the burden-shifting standards established in the Disparate Impact Rule must satisfy the Administrative Procedure Act's requirement that the

proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof. As explained above, the Rule requires defendants to show that the challenged practice is "necessary" to serve a legitimate interest at the second step of the burden-shifting test. This requires defendants to disprove the facts necessary to sustain plaintiffs' proposed order, and thus has the effect of improperly shifting the burden of persuasion to defendants in violation of the Administrative Procedure Act.

**2.      Are the second and third steps of the Disparate Impact Rule's burden shifting framework sufficient to ensure that only challenged practices that are artificial, arbitrary, and unnecessary barriers result in disparate impact liability?**

No. As discussed immediately above, the burden-shifting framework proposed in the Rule falls short of what would be required to ensure that the Rule permits challenges only to "artificial, arbitrary, and unnecessary barriers." *Inclusive Cmtys.*, 135 S. Ct. at 2524.

**3.      Does the Disparate Impacts Rule's definition of ''discriminatory effect'' in 24 CFR 100.500(a) in conjunction with the burden of proof for stating a prima facie case in 24 CFR 100.500(c) strike the proper balance in encouraging legal action for legitimate disparate impact cases while avoiding unmeritorious claims?**

No. Both the definition of "discriminatory effect" in 24 C.F.R. § 100.500(a) and the burden of proof for stating a prima facie case in 24 C.F.R. § 100.500(c)(1) afford inadequate protection to defendants. Subsection 100.500(a) provides that a practice has a discriminatory effect when "it actually or predictably results in a disparate impact." 24 C.F.R. § 100.500(a). Subsection 100.500(c)(1) provides that a plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* § 100.500(c)(1). These definitions are unreasonable in a number of respects.

First, inclusion of practices that merely "predictably" may result in a disparate impact is inappropriate. The FHA does not prohibit practices that simply *might* result in disparate impact. The statute provides that it is unlawful "*[t]o discriminate* against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b) (emphasis added). Imposing liability based on "predict[ions]" of possible disparate effects does not comport with the "robust causality" requirement the Supreme Court has demanded. *Inclusive Cmtys.*, 135 S. Ct. at 2523.

Second, the provisions fail to specify that the disparate impact must be "significant." The Supreme Court in *Wards Cove* held that a plaintiff must make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class. *See* 490 U.S. at 658. Absent such a requirement, the Disparate Impact Rule would improperly threaten to require the use of race "in a pervasive way" and inject "racial considerations into every housing decision." *Inclusive Cmtys.*, 135 S. Ct. at 2523-24.

Third, the provisions do not make clear that a plaintiff must challenge a specific practice of the defendant's. The Court in *Wards Cove* specified that "a plaintiff must demonstrate that it is the application of a *specific or particular* employment practice that has created the disparate impact

under attack." *Wards Cove*, 490 U.S. at 657 (emphasis added). A generalized challenge to an array of practices is not cognizable under *Wards Cove*. And it would cause insurers to be held liable for disparities they "did not create." *Inclusive Cmtys.*, 135 S. Ct. at 2523 (emphasizing need to demonstrate causation).

**4.     Should the Disparate Impact Rule be amended to clarify the causality standard for stating a prima facie case under *Inclusive Communities* and other Supreme Court rulings?**

Yes. *Inclusive Communities* requires a "robust causality requirement." 135 S. Ct. at 2523. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove*, 490 U.S. at 653). The Rule, however, at most requires minimal causation. *See* 24 C.F.R. § 100.500(c)(1). Indeed, by imposing liability for practices that "predictably" might result in a disparate impact, *see* 24 C.F.R. §§ 100.500(a) & (c)(1), the Rule dispenses with any causation requirement. Moreover, as noted, the Rule does not require that it be a "specific" practice that causes the disparate impact, nor does it require the practice to have caused a "significant" disparate impact—both of which are importation protections under Supreme Court precedent.

**5.     Should the Disparate Impact Rule provide defenses or safe harbors to claims of disparate impact liability (such as, for example, when another federal statute substantially limits a defendant's discretion or another federal statute requires adherence to state statutes)?**

Yes. As explained at length above, the Disparate Impact Rule should be amended to exempt homeowners insurance. Such an exemption is necessary because application of the Rule to homeowners insurance would (1) violate the McCarran-Ferguson Act; (2) undermine the fundamental nature of the business of insurance; (3) contravene the limits imposed by the Supreme Court in *Inclusive Communities*; and (4) violate the filed-rate doctrine. To the extent HUD elects to create a more generally worded exemption—such as for situations where "another federal statute substantially limits a defendant's discretion or another federal statute requires adherence to state statutes"—HUD should make clear that the exemption applies to homeowners insurance in light of the McCarran-Ferguson Act and state insurance laws.

**6.     Are there revisions to the Disparate Impact Rule that could add to the clarity, reduce uncertainty, decrease regulatory burden, or otherwise assist the regulated entities and other members of the public in determining what is lawful?**

Yes. As explained at length above, the Disparate Impact Rule should be amended to exempt homeowners insurance. Such an exemption would provide much-needed clarity to, and reduce the uncertainty of, providers of homeowners insurance, who are permitted and required by state insurance laws to use actuarial risk factors to make pricing and underwriting decisions, yet face potential liability under the Rule for doing so. Providing for such an exemption would also prevent the massive regulatory burden that would be imposed if insurers were required to try to ascertain whether accepted actuarial risk factors have a disparate impact on certain groups (assuming insurers are even permitted to try to do so).

## IV.   CONCLUSION

For the reasons set forth above, PCI respectfully requests that HUD amend the Disparate Impact Rule to exempt homeowners insurance from disparate-impact liability under the FHA.


Sincerely,


Robert Gordon
Senior Vice President
Policy Development and Research


cc:    Emily Newton

# TABLE I

## State Insurance Laws

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | Ala. Code § 27-13-27 | Ala. Code § 27-13-27 | Ala. Code § 27-13-3; Ala. Code § 27-13-30 |
| Alaska | Alaska Stat. § 21.39.030(a)(2) | Alaska Stat. § 21.39.030(a)(1), (4); Alaska Stat. § 21.36.090(c) | Alaska Stat. § 21.39.040 |
| Arizona | Ariz. Rev. Stat. Ann. § 20-356(2); Ariz. Rev. Stat. Ann. § 20-383(D); Ariz. Rev. Stat. Ann. § 20-384(B) | Ariz. Rev. Stat. Ann. § 20-356(1), (4); Ariz. Rev. Stat. Ann. § 20-383(D); Ariz. Rev. Stat. Ann. § 20-384(C); Ariz. Rev. Stat. Ann. § 20-448(C) | Ariz. Rev. Stat. Ann. § 20-357 |
| Arkansas | Ark. Code Ann. § 23-67-208(d); Ark. Code Ann. § 23-67-209(a) | Ark. Code Ann. § 23-67-208(d); Ark. Code Ann. § 23-67-209(b); Ark. Code Ann. § 23-67-210 | Ark. Code Ann. § 23-67-211(a) |
| California | | Cal. Ins. Code § 1861.05(b) | Cal. Ins. Code § 1861.05(b)-(d); *see also* Cal. Ins. Code § 1860.1 |
| Colorado | Colo. Rev. Stat. § 10-4-403(1)(c), (2) | Colo. Rev. Stat. § 10-4-403(1)(c), (4); Colo. Rev. Stat. § 10-3-1104(1)(f)(II) | Colo. Rev. Stat. § 10-4-404; Colo. Rev. Stat. § 10-4-406 |
| Connecticut | | Conn. Gen. Stat. § 38a-803(4) | Conn. Gen. Stat. § 38a-688; Conn. Gen. Stat. § 38a-663(9)-(10). |
| Delaware | 18 Del. Code § 2503(a)(3) | 18 Del. Code § 2503(a)(2), (a)(5); 18 Del. Code § 2503(b); 18 Del. Code § 2504(c) | 18 Del. Code § 2504 |

1

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| District of Columbia | DC Stat. § 31-2703(b) | DC Stat. § 31-2703(a), (c); DC Stat. § 31-2231.13(c), (d) | DC Stat. § 31-2704 |
| Florida | Fla. Stat. § 627.062(2)(e)(6) | Fla. Stat. § 627.062(1), (2)(e)(6) | Fla. Stat. § 627.062; Fla. Stat. § 627.0645 |
| Georgia | Ga. Code Ann. § 33-9-4(4) | Ga. Code Ann. § 33-9-4(1), (7) | Ga. Code Ann. § 33-9-21, Ga. Code Ann. § 33-9-9; Ga. Code Ann. § 33-9-26 |
| Hawaii | Hawaii Rev. Stat. § 431:14-103(a)(2) | Hawaii Rev. Stat. § 431:14-103(a)(1), (5); Hawaii Rev. Stat. § 431:13-103(a)(7)(B) | Haw. Rev. Stat. § 431:14-104(a); Haw. Rev. Stat. § 431:14-106(a) |
| Idaho | Idaho Code Ann.§ 41-1437(1) | Idaho Code Ann.§ 41-1405(1); Idaho Code Ann.§ 41-1437(3) | |
| Illinois | | 215 Ill. Comp. Stat. 5/424(3) | |
| Indiana | Ind. Code § 27-1-22-3(a)(1) | Ind. Code § 27-1-22-3(a)(2), (a)(4); Ind. Code § 27-4-1-4(a)(7) | Ind. Code § 27-1-22-4(a); Ind. Code § 27-1-22-5(a) |
| Iowa | | Iowa Code Ann. § 515F.4; Iowa Code Ann. § 507B.4(3)(g) | Iowa Code Ann. § 515F.5 |
| Kansas | Kan. Stat. Ann. § 40-953; Kan. Stat. Ann. § 40-954(a) | Kan. Stat. Ann. § 40-953; Kan. Stat. Ann. § 40-954(c) | Kan. Stat. Ann. § 40-955 |
| Kentucky | Ky. Rev. Stat. Ann. § 304.13-057 | Ky. Rev. Stat. Ann.§ 304.12-080(1) | Ky. Rev. Stat. Ann. § 304.13-051 |
| Louisiana | La. Rev. Stat. Ann. § 22:1454(B)(1) | La. Rev. Stat. Ann. § 22:1454(A), (B)(2); La. Rev. Stat. Ann. § 22:1964(7)(c); La. Rev. Stat. Ann. § 22:34 | La. Rev. Stat. Ann. § 22:1451; La. Rev. Stat. Ann. § 22:1464 |
| Maine | Me. Rev. Stat. Ann. 24-A, § 2303(1)(C) | Me. Rev. Stat. Ann. 24-A, § 2303(1)(B), (G); Me. Rev. Stat. Ann. 24-A, § 2162(2) | Me. Rev. Stat. Ann. 24-A § 2304-A |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Maryland | Md. Code Ann., Ins. § 11-205(c) | Md. Code Ann., Ins. § 11-205(d), (f); Md. Code Ann., Ins. § 27-212(e)(1) | Md. Code Ann., Insurance § 11-206 |
| Massachusetts | Mass. Gen. Laws Ann. 174A, § 5(a)(3); Mass. Gen. Laws Ann. 175A, § 5(a)(1) | Mass. Gen. Laws Ann. 174A, § 5(a)(2); Mass. Gen. Laws Ann. 175A, § 5(a)(3), (4) | Mass. Gen. Laws Ann. 174A, § 6; Mass. Gen. Laws Ann. 175A, § 6 |
| Michigan | Mich. Comp. Laws Ann. § 500.2110(1); Mich. Comp. Laws Ann. § 500.2403(1)(a), (d) | Mich. Comp. Laws Ann. § 500.2110(3); Mich. Comp. Laws Ann. § 500.2110a; Mich. Comp. Laws Ann. § 500.2403(1)(c), (d) | Mich. Comp. Laws Ann. § 500.2406; Mich. Comp. Laws Ann. § 500.2408 |
| Minnesota | Minn. Stat. Ann. § 70A.04(4); Minn. Stat. Ann. § 70A.05(1) | Minn. Stat. Ann. § 70A.04(1), (4); Minn. Stat. Ann. § 70A.05(2) | Minn. Stat. Ann. § 70A.06 |
| Mississippi | Miss. Code. Ann. § 83-2-3(1)(d), (2)(a) | Miss. Code. Ann. § 83-2-3(1)(a), (d), (2)(b) | Miss. Code. Ann. § 83-2-7 |
| Missouri | Mo. Ann. Stat. § 379.318(1), (4) | Mo. Ann. Stat. § 379.318(2), (4) | Mo. Ann. Stat. § 379.321 |
| Montana | Mont. Code Ann. § 33-16-201(2)(a) | Mont. Code Ann. § 33-16-201(1)(a), (4); Mont. Code Ann. § 33-18-210 | Mont. Code Ann. § 33-16-203 |
| Nebraska | | Neb. Rev. St. § 44-7510(3) | Neb. Rev. St. § 44-7508 |
| Nevada | Nev. Rev. Stat. Ann. § 686B.060(1); Nev. Rev. Stat. Ann. § 686B.050(4) | Nev. Rev. Stat. Ann. § 686B.050(1), (4); Nev. Rev. Stat. Ann. § 686B.060(2); Nev. Rev. Stat. Ann. § 686a-130(5) | Nev. Rev. Stat. Ann. § 686B.070; Nev. Rev. Stat. Ann. § 686B.090; Nev. Rev. Stat. Ann. § 686B.110 |
| New Hampshire | N.H. Rev. Stat. Ann. § 412:15(I)(d), (II)(a) | N.H. Rev. Stat. Ann. § 412:15(I)(d); N.H. Rev. Stat. Ann. § 412:15(II)(b) | N.H. Rev. Stat. Ann. § 412:16 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| New Jersey | N.J. Stat. Ann. § 17:29A-4(c); N.J. Stat. Ann. § 17:29A-7; N.J. Stat. Ann. § 17:29A-11 | N.J. Stat. Ann. § 17:29A-4; N.J. Stat. Ann. § 17:29A-7 | N.J. Stat. Ann. § 17:29A-6; N.J. Stat. Ann. § 17:29A-7 |
| New Mexico | N.M. Stat. Ann. § 59A-17-6(E); N.M. Stat. Ann. § 59A-17-7(A) | N.M. Stat. Ann. § 59A-17-6(A), (E); N.M. Stat. Ann. § 59A-17-7(B); N.M. Stat. Ann. § 59A-16-17(D) | N.M. Stat. Ann. § 59A-17-9 |
| New York | N.Y. Ins. Law § 2304(a) | N.Y. Ins. Law § 2303; N.Y. Ins. Law § 2304(b), (c) | N.Y. Ins. Law § 2305(a), (b) |
| North Carolina | N.C. Gen. Stat. Ann. § 58-40-20(e); N.C. Gen. Stat. Ann. § 58-40-25(1) | N.C. Gen. Stat. Ann. § 58-40-25(2); N.C. Gen. Stat. Ann. § 58-40-20(a), (e) | N.C. Gen. Stat. Ann. § 58-40-30; N.C. Gen. Stat. Ann. § 58-40-40; N.C. Gen. Stat. Ann. § 58-40-45 |
| North Dakota | N.D. Cent. Code Ann. § 26.1-25-03(1)(a) | N.D. Cent. Code Ann. § 26.1-25-03(1)(c) | N.D. Cent. Code Ann. § 26.1-25-04 |
| Ohio | Ohio Rev. Code Ann. § 3935.03(C); Ohio Rev. Code Ann. § 3937.02(A) | Ohio Rev. Code Ann. § 3935.03(B); Ohio Rev. Code Ann. § 3937.02(C), (D); Ohio Rev. Code Ann. § 3901.21(M) | Ohio Rev. Code Ann. § 3935.04 |
| Oklahoma | | Okla. Stat. Ann. tit. 36, § 902; Okla. Stat. Ann. tit. 36, § 985 | Okla. Stat. Ann. tit. 36, § 987 |
| Oregon | Or. Rev. Stat. Ann. § 737.310(4) | Or. Rev. Stat. Ann. § 737.310(1), (8); Or. Rev. Stat. Ann. § 746.015(1) | Or. Rev. Stat. Ann. § 737.205; Or. Rev. Stat. Ann. § 737.325 |
| Pennsylvania | 40 Penn. Stat. § 1183(a); 40 Penn. Stat. § 1223(a)(3) | 40 Penn. Stat. § 1183(c)-(d); 40 Penn. Stat. § 1223(a)(2); 40 Penn. Stat. § 1171.5(a)(7) | 40 Pa. Stat. § 710-5(a); 40 Pa. Stat. § 710-6; 40 Pa. Stat. § 710-7 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Rhode Island | R.I. Gen. Laws Ann. § 27-44-5(e)(1); R.I. Gen. Laws Ann. § 27-6-4(3) | R.I. Gen. Laws Ann. § 27-44-5(a), (d), (e)(2); R.I. Gen. Laws Ann. § 27-6-4(2) | R.I. Gen. Laws Ann. § 27-44-6(a) |
| South Carolina | S.C. Code Ann. § 38-73-430(1); S.C. Code Ann. § 38-73-330(3) | S.C. Code Ann. § 38-73-430(3)-(4); S.C. Code Ann. § 38-73-330(2) | S.C. Code Ann.§ 38-73-520 |
| South Dakota | S.D. Codified Laws § 58-24-6.1 | S.D. Codified Laws § 58-24-5; S.D. Codified Laws § 58-24-6; S.D. Codified Laws § 58-24-6.1; S.D. Codified Laws § 58-33-26 | S.D. Codified Laws § 58-24-10 |
| Tennessee | Tenn. Code Ann. § 56-5-103(d); Tenn. Code Ann. § 56-5-104(1) | Tenn. Code Ann. § 56-5-104(2) ; Tenn. Code Ann. § 56-5-103(a)(1), (d) | Tenn. Code Ann. § 56-5-105 |
| Texas | Tex. Ins. Code Ann.§ 2251.051; Tex. Ins. Code Ann.§ 2251.052(a) | Tex. Ins. Code Ann. § 2251.051; Tex. Ins. Code Ann. § 2251.052(b)-(c) | Tex. Ins. Code Ann.§ 2251.101; Tex. Ins. Code Ann.§ 2251.103 |
| Utah | Utah Code Ann. § 31A-19a-201(4)(a); Utah Code Ann. § 31A-19a-202(1)-(2) | Utah Code Ann. § 31A-19a-201(1), (4)(a); Utah Code Ann. § 31A-19a-202(3) | Utah Code Ann.§ 31A-19a-203 |
| Vermont | Vt. Stat. Ann. tit. 8, § 4685(d); Vt. Stat. Ann. tit. 8, § 4686(1) | Vt. Stat. Ann. tit. 8, § 4685(a), (d); Vt. Stat. Ann. tit. 8, § 4686(2); Vt. Stat. Ann. tit. 8, § 4724(7)(A) | Vt. Stat. Ann. tit. 8, § 4688 |
| Virginia | Va. Code Ann. § 38.2-1904(A), (B) | Va. Code Ann. § 38.2-1904(A)(3) | Va. Code Ann. § 38.2-1906 |
| Washington | Wash. Rev. Code Ann. § 48.19.030(3) | Wash. Rev. Code Ann. § 48.19.020; Wash. Rev. Code Ann. § 48.19.030(2)(b); Wash. Rev. Code Ann. § 48.18.480 | Wash. Rev. Code Ann. § 48.19.040; Wash. Rev. Code Ann. § 48.19.060 |

5

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| West Virginia | W. Va. Code § 33-20-3(a) | W. Va. Code § 33-20-3(b), (c)(2); W. Va. Code § 33-11-4(7)(c) | W.Va. Code § 33-20-4 |
| Wisconsin | Wis. Stat. Ann. § 625.11(4); Wis. Stat. Ann. § 625.12(1) | Wis. Stat. Ann. § 625.12(2); Wis. Stat. Ann. § 625.11(1), (4) | Wis. Stat. Ann. § 625.13 |
| Wyoming | | Wyo. Stat. Ann. § 26-14-105; Wyo. Stat. Ann. § 26-13-112(c) | Wyo. Stat. Ann. § 26-14-107 |

# EXHIBIT 1



**Property Casualty Insurers
Association of America**

Advocacy. Leadership. Results.

ROBERT GORDON
SENIOR VICE PRESIDENT
POLICY DEVELOPMENT AND RESEARCH

September 25, 2014

The Honorable Julian Castro, Secretary
The Honorable John Trasviña, Assistant Secretary
U.S. Department of Housing and Urban Development
451 17th Street, S.W.
Washington, DC 20410

Dear Secretary Castro and Assistant Secretary Trasviña:

On September 4, 2014, the United States District Court for the Northern District of Illinois issued the enclosed Memorandum Opinion and Order granting in part the motion for summary judgment filed by Property Casualty Insurers Association of America ("PCI") in *Property Casualty Insurers Association of America v. Donovan*, No. 13-8564. The Court remanded the case to HUD for further proceedings.

In its opinion, the Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in its Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. The Court further directed HUD to explain why application of its Rule to homeowners insurance did not violate the filed-rate doctrine, which forbids courts from invalidating or modifying rates that have been filed with regulatory agencies. *Id.* at 43. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It noted that HUD's previous response to comments raising this issue was inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

PCI intends to submit additional comments to HUD to address the issues identified in the Court's order. If there is a deadline for submitting comments, please let me know.

Additionally, PCI requests that HUD re-open the public comment period to inform others that the Agency expects to fully consider the complex issues presented by application of the Disparate Impact Rule to homeowner's insurance. The case-by-case application of disparate impact liability to insurers presents significant legal and compliance uncertainty, subjects insurers to conflicting regulatory requirements, imposes significant expenses on the property and casualty industry, and interferes with State regulation of insurance. We respectfully suggest that HUD should solicit public comments on this important issue.

September 25, 2014
Page 2

Please contact me at (202) 639-0490 or Robert.Gordon@pciaa.net if you have any questions or information.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

cc:     Helen R. Kanovsky
        Jeanine Worden
        Kyle R. Freeny

# EXHIBIT 2



**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

January 26, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

**Re:    Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
        Discriminatory Effects Standard**

Dear Sir or Madam:

On September 4, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued the enclosed Memorandum Opinion and Order in *Property
Casualty Insurers Association of America v. Donovan*, No. 13-8564 (*PCI*), remanding the
case to the Department of Housing and Urban Development (HUD) for further
consideration of whether HUD's Disparate Impact Rule (*Implementation of the Fair
Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can
be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the Court's order and requested
HUD to re-open the public comment period to inform others that the Agency expects to
fully consider the complex issues presented by application of the Disparate Impact Rule
to homeowners' insurance. For the reasons explained below, the Disparate Impact Rule
cannot lawfully be applied to homeowners insurance. Application of the Rule to
homeowners insurance would impair state regulation of insurance in violation of the
McCarran-Ferguson Act, would fundamentally interfere with the provision of
homeowners insurance, and would impose needless costs on providers of homeowners
insurance and their customers. HUD should therefore exempt homeowners insurance
from the Rule.[1]

---

[1] HUD has not yet opened a public comment period, and On November 3, 2014, Judge Leon of the
U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the
Disparate Impact Rule in American Insurance Association v. U.S. Department of Housing and Urban
Development, No. 13-cv-00966 (D.D.C.). But PCI is submitting these comments now in an abundance of
caution, given the remand from Judge St. Eve.

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

Regulations Division
January 26, 2015
Page 2


# I.    BACKGROUND

## A.    The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by a fire, the insurer will pay to repair her home. Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions, that is, decisions about whether to insure and how to price a particular risk or class of risk. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial implications. Actuaries examine numerous factors that correlate with losses. *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to that home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard. Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* Admin. Rec. 383; Decl. of Teresa C. Cracas ¶ 6 (stating that Cincinnati Insurance Company does not collect information on race or ethnicity); Decl. of Michael Dawdy ¶ 11 (State Auto Insurance Companies does not collect data on policyholders' race or ethnicity); Decl. of Ronald Joseph Zaleski, Sr. ¶ 11 (Selective Insurance Company of America does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); Decl. of Peter Drogan ¶ 7 (Amica Mutual Insurance Company does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers. *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on neutral risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.

Regulations Division
January 26, 2015
Page 3

*See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty
Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—
A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012). Such a pricing scheme would also greatly
reduce the financial incentive for customers to reduce risks, construct safer houses, and
maintain existing houses. Avraham, *The Economics of Insurance Law*, *supra* pp. 66-67.

### B.     State Regulation Of Insurance and The McCarran-Ferguson Act

The states have traditionally regulated the insurance industry, from the pricing of
insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance
was largely immune from federal regulation because the business of insurance was not
considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75
U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States
v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of
insurance across state lines constituted interstate commerce susceptible to federal
regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to
ensure that ruling would not undermine the states' long-standing regulation of insurance.
Today, "State regulation of insurance is comprehensive and includes rate and coverage
issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).

In the McCarran-Ferguson Act, Congress expressly stated that "the continued
regulation and taxation by the several States of the business of insurance is in the public
interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress
shall be construed to invalidate, impair, or supersede any law enacted by any State for the
purpose of regulating the business of insurance … unless such Act specifically relates to
the business of insurance." 15 U.S.C. § 1012(b). Thus, federal law must not be read to
authorize regulations that either "directly conflict with state regulation" of insurance or
whose "application … frustrate any declared state policy or interfere with a State's
administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299,
310 (1999).

### C.     The Fair Housing Act and the Disparate Impact Rule

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any
person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the
provision of services or facilities in connection therewith, because of race, color, religion,
sex, familial status, or national origin." 42 U.S.C. § 3604(b). The Act makes no reference
to either disparate impact or homeowners insurance.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of
the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70921 (Nov.

Regulations Division
January 26, 2015
Page 4

16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* at 70921. The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70924.

Representatives of the insurance industry submitted comments explaining why disparate impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes, whether by statute, regulation, or under the "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, the application of disparate impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.

HUD promulgated its final Disparate Impact Rule on February 15, 2013. 78 Fed. Reg. 11460. The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

**D.      The Litigation Brought by PCI**

On November 27, 2013, the Property Casualty Insurers Association of America (PCI) challenged both the Disparate Impact Rule as applied to the provision of homeowners insurance and HUD's process for issuance of the Rule, under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* On September 3, 2014, the Court granted in part PCI's motion for summary judgment.

004499

Regulations Division
January 26, 2015
Page 5

The Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. Those conflicts, the Court explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It held that HUD's response to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

### E. The Supreme Court's Grant of Certiorari in the *Inclusive Communities* Case and Judge Leon's Vacating of the Disparate Impact Rule

On October 2, 2014, the Supreme Court granted certiorari in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, No. 13-1371, to address the question whether disparate impact claims of any sort are cognizable under the FHA. Oral argument took place on January 21, 2015. PCI, the American Insurance Association, and the National Association of Mutual Insurance Companies submitted a brief amicus curiae supporting petitioners, explaining that the FHA does not recognize disparate impact liability. The brief also explains that interpreting the FHA to permit disparate-impact liability would upend fundamental tenets of the insurance business and contravene the McCarran-Ferguson Act.

On November 3, 2014, Judge Leon of the U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the Disparate Impact Rule in *American Insurance Association v. U.S. Department of Housing and Urban Development*, No. 13-cv-00966 (D.D.C.). Judge Leon held that "the FHA unambiguously prohibits *only* intentional discrimination." Op. at 17. On December 18, 2014, the government filed its notice of appeal.

The Supreme Court is scheduled to decide later this year whether the FHA permits imposition of disparate impact liability altogether. It should hold that the FHA does not. But even if the Court were to interpret the FHA as allowing disparate impact claims in certain circumstances, disparate impact liability must not be extended to homeowners insurance. Reading the FHA to permit disparate impact claims regarding homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of

Regulations Division
January 26, 2015
Page 6

homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers.

## II. REQUEST FOR RELIEF

For the reasons set forth below, HUD should exempt homeowners insurance from its Disparate Impact Rule.

### A. Disparate Impact Claims Are Not Cognizable Under The FHA

In *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, the Supreme Court is likely to rule that disparate impact claims are not cognizable under the FHA. As Judge Leon's recent decision in *American Insurance Association v. U.S. Department of Housing and Urban Development* indicates, a necessary consequence of that holding would be the vacating of the Disparate Impact Rule in its entirety. Whatever the Supreme Court ultimately decides, its opinion would be extremely important for HUD to consider before applying its Rule to insurers.

The Supreme Court is likely to hold that the FHA does not authorize disparate impact claims for several reasons. First, the FHA's terms indicate that it is limited to claims of intentional discrimination. The FHA prohibits various acts performed "*because of* race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604 (emphasis added). Accordingly, it only prohibits actions taken against persons because of their race or other protected characteristic. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (interpreting similar wording in Title VI of the Civil Rights Act to reach only intentional discrimination). Actions taken for other reasons that happen to affect different racial, gender, religious, or other groups differently are not prohibited by the FHA because they are not actions performed "because of race" or other protected characteristics. They are, by definition, actions taken "because of" other factors.

An example from the insurance context may help to illustrate this point. An insurer might charge different customers different rates based on whether or not their homes contain a fire extinguisher. This insurance pricing factor may mean that more people of a particular national origin may pay higher or lower insurance rates than others. But insurers would not be charging different rates "because of" national origin. Indeed, they could not do so, because insurers do not currently obtain data about the national origin, race, color, religion, or disability status of their policyholders. PCI Reply Br. at 7; Decl. of Teresa C. Cracas ¶ 6; Decl. of Michael Dawdy ¶ 11; Decl. of Ronald Joseph Zaleski, Sr. ¶ 11; Decl. of Peter Drogan ¶ 7.

004501

Regulations Division
January 26, 2015
Page 7

The FHA's legislative history also indicates that it does not authorize disparate impact claims. During floor debates, no Representative or Senator suggested that the FHA could be used to impose disparate impact liability. Instead, the debates show Congress's intention to prohibit intentional discrimination. *See, e.g.*, 114 Cong. Rec. 5643 (1968) (Mondale: "The bill permits an owner to do . . . everything he could ever do with property, except refuse to sell it to a person solely on the basis of his color or his religion. That is all it does. It does not confer any right."); 114 Cong. Rec. 2283 (Brooke: "A person can sell his property to anyone he chooses, as long as it is by personal choice and not because of motivations of discrimination."); 114 Cong. Rec. 2530 (Tydings: the problem Congress intended to address was "the deliberate exclusion from residential neighborhoods on grounds of race"); 114 Cong. Rec. 3421 (Mondale: "[T]he basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it. It would not overcome the economic problem of those who could not afford to purchase the house of their choice."); 114 Cong. Rec. 3129 (Hatfield: the FHA prohibits a person being "denied the right to buy a home within a community according to his economic ability . . . merely because his skin is of a different color"); 114 Cong. Rec. 3252 (Scott: the FHA would ensure that individuals "can rent or buy the dwelling of their choice, if they have the money or credit to qualify").

**B. Application of the Disparate Impact Rule to Homeowners Insurance Would Impair State Laws Regulating Insurance and Thus Violate the McCarran-Ferguson Act**

HUD must provide an exemption for homeowners insurance because application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. Op. at 42. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing

Regulations Division
January 26, 2015
Page 8

operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

### 1.   State Laws Requiring Insurers To Engage in Risk-Based Pricing

The vast majority of states—40 of 50—require insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I, *infra*. Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.,* Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5; N.J. Stat. Ann. § 17:29A-4; N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03; S.C. Code Ann. § 38-73-430; Tenn. Code Ann. § 56-5-304; Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I, *infra*.

In compliance with these laws, insurers charge different rates to different customers based on the required actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of 40 of the 50 states. Application of the Disparate Impact Rule to insurers would therefore "impair" and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly required by state law. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Moreover, the burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. For example, insurers would be liable if their use of an actuarially justified factor was not "*necessary* to achieve a legitimate interest." 24 C.F.R. § 100.500(c) (emphasis added). And even if every risk factor were proved necessary, plaintiffs could still prevail by showing that insurers' interests could be served by another practice with a less discriminatory effect, even if the alternative practice were less effective than the use of actuarial risk factors. *Id.*; Admin. Rec. at 625.

Regulations Division
January 26, 2015
Page 9

     HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *See id.* at 311; 24 C.F.R. § 100.500. *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would strip them of the ability to rely on state law and institutions that McCarran-Ferguson is designed to guarantee.

     **2.**     **State Laws Permitting Insurers To Engage in Risk-Based Pricing and Underwriting**

          **a.**     **State Insurance Laws**

     Every state has permitted insurers to charge different rates to different customers based on the customers' risk profiles. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Numerous other states use very similar language to expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). Under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(4); 18 Del.

Regulations Division
January 26, 2015
Page 10

Code § 2503; Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2); S.D. Codified Laws § 58-24-6; Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I, *infra*. As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal…laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted by the laws of 47 states. *See* Table I, *infra*.

**b.    State Fair Housing Laws**

HUD noted during the *PCI* litigation that some states have fair housing laws and that some state courts look to the FHA for guidance in interpreting those laws. HUD Mem. ISO Mot. to Dismiss at 28. HUD suggested that some of these state laws might in theory be interpreted to permit disparate impact claims against insurers. *Id.* Even in

Regulations Division
January 26, 2015
Page 11

states with fair housing laws, if the fair housing law does not specifically displace the state's insurance laws discussed above, then those insurance laws would remain valid. HUD did not show—and did not even claim— that any state's fair housing law displaces its insurance laws. Accordingly, if these valid state insurance laws requiring or permitting insurers to engage in risk-based pricing and underwriting conflict with the Disparate Impact Rule, then HUD's Rule is impermissible under the McCarran-Ferguson Act. PCI submits, based on the statutes described above, below, and in Table I, that state insurance laws in all 50 states clearly do conflict with the Disparate Impact Rule.

### c.  Limitations on Use of Certain Risk Factors

HUD also noted during the *PCI* litigation that some states have laws restricting the discriminatory use of some factors in insurance pricing and underwriting, specifically credit history, geographic location, domestic violence victimization, and property age. HUD Mem. ISO Mot. to Dismiss at 26. As PCI pointed out in its responsive brief, these laws do not alleviate the conflict between the Disparate Impact Rule and state laws requiring or permitting insurers to engage in risk-based pricing and underwriting. Indeed, these laws prohibiting *discriminatory* use of certain risk factors permit insurers to rely on those factors so long as they do so in accordance with "sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience." Colo. Rev. Stat. § 10-3-1104(1)(f) (XIV) (permitting insurers to take geographic location into account so long as it is related to anticipated loss experience); *see also, e.g.*, Ark. Code Ann. § 23-66-206(14)(C) (permitting insurers to consider geographic location so long as it is not a mere pretext for discrimination); Ind. Code § 27-2-17-5(b) (same); Wis. Admin. Code Ins. § 6.68(3)(a) (same); Ala. Admin. Code r. 482-1-127.06 (prohibiting insurers from making decisions based solely on credit score or using credit history for any unfairly discriminatory reason); Alaska Stat. § 21.36.460(c) (permitting insurers to use credit history so long as they use it in combination with other substantive factors); N.Y. Ins. Law § 2802 (same); W. Va. Code Ann. § 33-17A-6(h) (same); Del. Code Ann. tit 18, § 4124 (permitting insurers to base decisions on age of property if decisions are "for a business purpose which is not a mere pretext for unfair discrimination"); Va. Code Ann. § 38.2-508(5) (same). These statutes thus delineate the extent to which insurers can use certain risk factors and which applications may be unfairly discriminatory. Therefore, they highlight the conflict between the Disparate Impact Rule's application to insurance pricing that uses standard actuarial factors and state laws' approval of insurers' reliance on just those factors.

Regulations Division
January 26, 2015
Page 12

### 3. State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—47 of 50, plus the District of Columbia—require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I, *infra*. Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05.

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g., Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting

Regulations Division
January 26, 2015
Page 13

plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is unlawful under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4. The Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the states' filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g., Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986).

The district court in *PCI* found that HUD had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. Op. at 44-45. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* at 45.

The filed-rate doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g., McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F3d 229, 236-39, 242 (3rd Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011);; *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005); *see also, e.g.*, Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 118 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates).

Applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g., Square D*, 476 U.S. at 417; *Korte*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted). Nor does the extent or the vigor of an agency's review of filed rates matter— the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

Regulations Division
January 26, 2015
Page 14

### 5. Displacement of the Regulation of Insurance from States to Federal Courts

HUD's basic response to the numerous indisputable conflicts between the Disparate Impact Rule and state laws regulating insurance described in the preceding sections is that the Rule's burden-shifting framework would allow defendant companies to raise these state-law considerations on a case-by-case basis. In response to a plaintiff's *prima facie* case, a company could rely on these state laws to show that its pricing or underwriting practices were "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Far from alleviating the conflict between the Disparate Impact Rule and state insurance regulation, this response only confirms that the Rule makes the conflict inescapable.

As the Seventh Circuit has explained, the McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (McCarran-Ferguson prohibits the federal courts from "regulating the ... insurance industry" via litigation). That is just what the Rule's burden-shifting framework would do. In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act (ADA) to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.*

HUD's Disparate Impact Rule would similarly lead to federal courts usurping core functions of the states' administrative regimes, including rate-making and underwriting, as well as all other insurance activities regulated by state law. State insurance commissioners currently regulate and supervise the insurance business, enforce insurance laws, and punish violators. *See, e.g.*, 1 Plitt et al., *Couch on Insurance* §§ 2:7-2:8. Under HUD's Rule, in order to avoid liability insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that "the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of that factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule

Regulations Division
January 26, 2015
Page 15

challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eight Circuit's similar recognition in *Saunders* that 'a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime." *Id.* That concern should preclude application of the Rule to risk-based pricing and underwriting of homeowners insurance.

### C. Peripheral Insurance Activities Not Mentioned in HUD's Rulemaking

In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70924. During the course of the *PCI* litigation, however, HUD indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. HUD Reply Br. at 3. HUD should exempt from the Disparate Impact Rule all homeowners insurance practices, not just pricing and underwriting.

As an initial matter, the relevant provisions of the FHA do not apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership. As the Seventh Circuit has explained, 42 U.S.C. § 3604 only "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992). The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." That section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

Regulations Division
January 26, 2015
Page 16

In any event, regulating broad categories of insurance practices in federal court on the basis of a federal statute that does not specifically relate to insurance would violate the McCarran-Ferguson Act by displacing the regulation of such practices by state regulators and courts. States pervasively regulate such practices. *See, e.g.*, Wis. Stat. Ann. § 628.01-628.98 (regulating marketing); Utah Code Ann. 1953 §§ 31A-23a-101 *et. seq.* (same); R.I. Gen. Laws. § 27-3.2-4 (requirements for salespersons); Ind. Code § 27-4-1-4.5 (regulating claims settlement); N.Y. Ins. Law § 2601 (same); Alaska Stat. § 21.36.125 (same); Ga. Code Ann., §§ 33-6-30 *et. seq.* (same). To move the locus of this regulation from the states into federal courts on the basis of a statute that does not mention insurance would violate the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

PCI respectfully requests that HUD provide an exemption or safe harbor for insurance practices beyond just rate-setting and underwriting. That is the only approach consistent with the FHA and the controlling precedent of *Mutual of Omaha*.[2]

**D.    Application of the Disparate Impact Rule to Homeowners Insurance Would Undermine the Fundamental Nature of Insurance**

As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using of any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. Admin. R. at 377.

---

[2] Absent creating a wholesale exemption for the provision and pricing of homeowners insurance, HUD should recognize that use of actuarially-sound, risk-based pricing and underwriting practices always constitutes a legitimate business interest. HUD should also require that any alternative proffered by a plaintiff or by HUD be equally effective to the challenged practice or combination of practices.

Regulations Division
January 26, 2015
Page 17

This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. Op. at 46. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Thus, it was not enough for HUD to impose *prima facie* liability on core insurance practices and then allow insurers the possibility of justifying their practices during the "Sisyphean" process of burden-shifting litigation. *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 376 (6th Cir. 2007). Rather, HUD should consider the costs to insurers of being subjected to such litigation, especially under a burden-shifting framework that places a difficult burden on defendants (proving that insurance practices are "necessary" to a substantial interest) and allows plaintiffs to win if they can show that an alternative exists that has less disparate impact. Indeed, under the burden-shifting framework adopted by HUD, some actuarially justified practices will not only be burdensome to justify and therefore likely relinquished, but will actually be prohibited. HUD expressly rejected a burden-shifting framework that would require plaintiffs or HUD to show that a proposed alternative approach is "equally effective," Admin. Rec. at 625. As a result, some actuarially justified factors will be prohibited because some other, less predictive factor may be used as a substitute. Federal courts reviewing insurance practices in all 50 states are likely to reach inconsistent judgments about which neutral risk factors violate the Fair Housing Act under this framework. They may also hold insurers liable for using neutral risk factors deemed acceptable by state courts. Moreover, HUD should consider the potential effects—including adverse selection and decreases in coverage—of imposing a rule of law that declares many core insurance practices unlawful (unless proven innocent in unpredictable litigation) and directs insurers to avoid all disparate impacts on protected groups.

Regulations Division
January 26, 2015
Page 18

### E.   HUD Can and Should Exempt Homeowners Insurance from the Rule for the Reasons Set Forth Above

HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." Admin. Rec. at 627. HUD based this assertion entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Groach* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the *Groach* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 290-91.

*       *       *

The Supreme Court is expect to decide whether disparate impact claims are not cognizable under the Fair Housing Act. Regardless of the outcome of that case, however, application of the Disparate Impact Rule to homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, interfere with the fair and efficient operation of the market for homeowners insurance, and impose needless costs on providers of homeowners insurance and their customers. HUD should therefore exempt homeowners insurance from the Disparate Impact Rule.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

Enclosures

# EXHIBIT 3



**Property Casualty Insurers
Association of America**

Advocacy. Leadership. Results.

July 29, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

      **Re:    Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
              Discriminatory Effects Standard**

              ***Property Casualty Insurers Association of America v. Donovan*, 66 F.
              Supp.3d 1018 (N.D. Ill. 2014)**

Dear Sir or Madam:

      On September 3, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued a memorandum opinion and order in *Property Casualty Insurers
Association of America v. Donovan*, 66 F. Supp.3d 1018 (N.D. Ill. 2014) (*PCI*), granting
summary judgment to PCI on its claims that the Department of Housing and Urban
Development's (HUD's) "application of the Disparate Impact Rule to homeowners
insurance was arbitrary and capricious." *Id.* at 1030. Judge St. Eve remanded the case to
HUD for further consideration of whether the Disparate Impact Rule (*Implementation of
the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15,
2013)) can lawfully be applied to homeowners insurance.

      On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the district court's remand decision
and requested that HUD re-open the public comment period to inform others that HUD
expects to fully consider the complex issues presented by application of the Disparate
Impact Rule (the "Rule") to homeowners insurance. On January 26, 2015, PCI submitted
the promised additional comments to HUD setting forth the following reasons that the
Disparate Impact Rule cannot lawfully be applied to homeowners insurance. PCI noted
that application of the Rule to homeowners insurance would (i) impair state regulation of
insurance in violation of the McCarran-Ferguson Act, (ii) fundamentally interfere with
the provision of homeowners insurance, and (iii) impose needless costs on providers of
homeowners insurance and their customers. Consistent with the relief PCI sought in the
district court and the direction given by that court on remand to HUD, PCI requested that
HUD exempt homeowners insurance from the Rule.

      On June 25, 2015, the U.S. Supreme Court handed down its decision in *Texas
Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
No. 13-1371. The Supreme Court held that the Fair Housing Act (FHA) permits assertion

Regulations Division
Page 2

of disparate-impact claims, but the Court emphasized that disparate-impact liability must be limited in key respects. The Supreme Court's explanation of those limitations further supports PCI's contention that homeowners insurance should be exempted from the Disparate Impact Rule. PCI thus submits these supplemental comments to take account of the Supreme Court's decision.[1]

## I.    The Supreme Court's Decision

In *Texas Department of Housing and Community Affairs*, the Supreme Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" Slip Op. at 21 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." Slip Op. at 18. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 20, 22.

The first of those safeguards is "[a] robust causality requirement." *Id.* at 20. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). Referring approvingly to the opinion below of Fifth Circuit Judge Jones, the Court held up as a paradigmatic case of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policy." *Id.* at 18. Homeowners insurers exemplify the potential defendants the Court had in mind, in that the extensive state regulation of their industry provides a quintessential case of the "valid interest[s]" to which the Court made reference. Businesses, the Court also stated, "must be given latitude to consider market forces." *Id.* at 19. Again, homeowners insurance markets, with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* at

---

[1] HUD has not yet opened a public comment period. But PCI is submitting these comments now in an abundance of caution, given the remand from Judge St. Eve and HUD's statement in other litigation that it is "currently reviewing its regulation in light of the judgment" in *PCI*. Motion to Govern Future Proceedings and Response to Plaintiffs' Motion to Vacate and Remand, *American Insurance Ass'n v. United States Department of Housing and Urban Development*, No. 14-5321 (D.C. Cir. July 24, 2015).

Regulations Division
Page 3

20. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 21. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 21. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## II. The McCarran-Ferguson Act Requires an Exemption from Disparate-Impact Claims for Homeowners Insurance

In her September 3, 2014 decision remanding the *PCI* case to HUD, Judge St. Eve ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. *PCI*, 66 F. Supp.3d at 1027. Those conflicts, Judge St. Eve explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. Judge St. Eve also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 1028. She held that HUD's responses to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 1029.

In our January 26, 2015 comments, PCI discussed three reasons why HUD must provide an exemption for homeowners insurance.

*First*, application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI*, 66 F. Supp.3d at 1027. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

The evaluation required by the district court shows that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage

Regulations Division
Page 4

in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

*Second*, application of the Disparate Impact Rule to homeowners insurance would interfere with the provision of homeowners insurance. As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." *PCI*, Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." *PCI*, Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. *PCI*, Admin. R. at 377. This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

*Third*, application of the Disparate Impact Rule to homeowners insurance would impose needless costs on providers of homeowners insurance and their customers.

## III.  The Supreme Court's Reasoning Confirms that an Exemption for Homeowners Insurance Is Required

The two key safeguards the Supreme Court established on disparate-impact claims in *Texas Department of Housing and Community Affairs* provide further support for each of PCI's three arguments.

Most fundamentally, the Supreme Court's determination that FHA disparate-impact claims must satisfy "[a] robust causality requirement" confirms that the Disparate

Regulations Division
Page 5

Impact Rule cannot be applied to homeowners insurance without running afoul of the
McCarran-Ferguson Act and interfering in the lawful operation of homeowners insurance
markets. Slip Op. at 20. In describing the causality requirement, the Court identified as a
quintessential example of claims lacking the required causality element those where
another "law substantially limits the [defendant's] discretion." *Id.* at 21. That is
precisely the circumstance in which companies offering homeowners insurance find
themselves. Application of disparate-impact liability under the FHA to homeowners
insurers would leave them caught between conflicting federal and state legal regimes and
thus place them in just the "double bind of liability" the Court instructed must be
avoided. *Id.* at 19.

As PCI described at length in its January 26, 2015 comments, companies offering
homeowners insurance are regulated by a panoply of state laws requiring the use of
actuarially sound pricing methods for homeowners insurance, expressly delineating and
permitting the use of such methods, and requiring the filing of homeowners insurance
rates with state administrative bodies for approval. PCI January 26, 2015 Comments at
7-13. Those state laws mandate or expressly permit homeowners insurers to use neutral
actuarial factors (such as loss history, distance from a fire station, building material, etc.)
to determine risk and generally prohibit insurers from charging inadequate rates to
various risk classifications. They thus "substantially limit" the discretion of homeowners
insurance companies in a manner that would make it impossible to ascribe any apparently
disparate effects of the companies' underwriting or pricing practices to their independent
choices. As the Supreme Court emphasized, when companies' policies are subject to
legal constraints of these sorts, it is the companies' obligation to comply with those legal
requirements that is the cause of any resulting disparate effects, not the companies' own
decisions. Interpreting the FHA to permit disparate-impact claims against companies in
these circumstances would penalize them for following state law, placing them in the sort
of "double bind of liability" the Court warned against. That is just what the McCarran-
Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be defined in a way
that gives "latitude to consider market forces" also reinforces PCI's contention that
disparate-impact liability should not be permitted against homeowners insurers. Slip Op.
at 19. As PCI highlighted in its earlier comments, insurance markets run efficiently when
insurance is priced in accord with actuarially sound, risk-based factors. PCI January 26,
2015 Comments at 2-3, 16-17. This sends appropriate and socially beneficial market
signals about risk taking and risk mitigation. The extensive state-law framework
governing the pricing of homeowners insurance is intended to promote such efficient
operation. The "specter of disparate-impact litigation," however, as the Court
recognized, could actually discourage businesses from undertaking the very activities that
ensure a well-functioning housing market and in particular actuarially sound, risk-based
pricing. Slip Op. at 21. Unless that specter were vanquished, "the FHA would have

Regulations Division
Page 6

undermined its own purpose as well as the free-market system." *Id.* Under the McCarran
Ferguson Act regulation of the market for homeowners insurance is reserved to the states.
Exempting homeowners insurance from disparate-impact claims is necessary to ensure
that the threat of disparate-impact litigation does not impair states' legal regimes
governing the pricing of homeowners' insurance or hinder the efficient operation of
insurance market in accord with those state-law regimes.

Finally, the Supreme Court's caution that the FHA should not be interpreted to
promote the use of racial (or other suspect) classifications supports each of PCI's
arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial
considerations into every housing decision," the Court explained, would perversely "tend
to perpetuate race-based considerations rather than move beyond them." Slip Op. at 21.
But that is just what extending disparate-impact liability to homeowners insurers would
do.

State law ensures that homeowners insurers price their products in accordance
with risk-based, actuarially sound factors. State law does not permit reliance on, and
homeowners insurers do not rely on, racial (or other suspect) classifications in pricing
their products. Yet, the failure to exempt homeowners insurers from disparate-impact
liability would effectively require them to compile data on the racial (and other suspect)
characteristics of their customers in a defensive effort to ensure that they would not be
accused of causing prohibited disparate impacts in insurance provision. Exempting
homeowners insurance from disparate-impact liability would thus ensure compliance
with the Supreme Court's direction that race-based considerations not be injected where
they are properly absent. By introducing race-based considerations where none currently
exist, the application of disparate-impact liability to homeowners insurers would,
contrary to the McCarran-Ferguson Act, significantly undermine the state regulation of
unfair discrimination. It would also interfere with the provision of homeowners
insurance by imposing significant and needless costs on providers of homeowners
insurance and their customers.

\*     \*     \*     \*

Regulations Division
Page 7


The Supreme Court's decision in *Texas Department of Housing and Community Affairs* strongly supports PCI's arguments that HUD should exempt homeowners insurance from the Disparate Impact Rule. For all the reasons given above and in PCI's earlier comments, HUD should act promptly to establish such an exemption.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research