# EXHIBIT 7

LAW OFFICES
## WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

KANNON K. SHANMUGAM
(202) 434-5050
kshanmugam@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

August 20, 2018

<u>Via Federal eRulemaking Portal</u>

Office of the General Counsel
Rules Docket Clerk
Department of Housing and Urban Development
451 Seventh Street, S.W., Room 10276
Washington, DC 20410

Re: Docket No. FR-6111-A-01: Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

To whom it may concern:

I represent the American Insurance Association (AIA) and the National Association of Mutual Insurance Companies (NAMIC), two nonprofit trade associations whose members sell homeowner's insurance in every state in the nation. In 2013, HUD promulgated a rule creating a burden-shifting framework for disparate-impact liability under the Fair Housing Act of 1968 (FHA), 42 U.S.C. § 3601 *et seq*. *See* 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500). In the preamble to this "Disparate-Impact Rule," HUD expressed its view that insurers may be liable on a disparate-impact theory for practices related to the provision and pricing of homeowner's insurance. *Id.* at 11,475.

In June 2013, AIA and NAMIC filed suit against HUD in a federal district court in the District of Columbia, challenging the Disparate-Impact Rule under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. Those proceedings were ongoing when the Supreme Court decided *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). In *Inclusive Communities*, the Supreme Court recognized disparate-impact liability under the FHA but laid out a series of safeguards necessary for such liability to be permissible. After obtaining leave to amend their complaint, AIA and NAMIC moved for summary judgment in the District of Columbia litigation, arguing that the Disparate-Impact Rule was inconsistent with the safeguards set out by the Supreme Court.

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 2

Presumably in response to AIA and NAMIC's motion for summary judgment, HUD published an advanced notice of proposed rulemaking on June 20, 2018, seeking public comment on the changes necessary to the Disparate-Impact Rule in light of *Inclusive Communities*. *See* 83 Fed. Reg. 28,560. Consistent with the positions taken by AIA and NAMIC in the District of Columbia litigation, I write on behalf of AIA and NAMIC to submit the following comments.

As applied to homeowner's and other insurers, the Disparate-Impact Rule does not comport with the limitations on disparate-impact liability articulated in *Inclusive Communities* for at least four reasons. *First*, the rule injects pervasive consideration of race and other protected characteristics into insurers' ratemaking and underwriting decisions. *Second*, state law limits insurers' ability to consider race or other protected characteristics as part of the ratemaking and underwriting process, and the McCarran-Ferguson Act protects state insurance regulation from federal interference. *Third*, the Disparate-Impact Rule impermissibly allows claims to proceed based entirely on statistical evidence. *Fourth*, the Rule allows plaintiffs to displace the valid policies of the homeowner's insurers. For these reasons, HUD should exempt homeowner's and other insurers from disparate-impact liability under the Rule.[1]

1. **The Disparate-Impact Rule Requires Insurers To Consider Race And Other Protected Characteristics Pervasively During The Ratemaking And Underwriting Process**

In *Inclusive Communities*, the Supreme Court stated that disparate-impact liability under the FHA cannot be construed to "cause race to be used and considered in a pervasive way." 135 S. Ct. at 2523. Such a construction, the Court explained, would violate the FHA, raise serious constitutional questions, undermine the purposes of the Act, and "set our Nation back in its quest to reduce the salience of race in our social and economic system." *Id.* at 2524. Applying the Disparate-Impact Rule in the unique context of homeowner's insurance would do precisely that.

a. At its core, insurance is a means of both shifting and distributing financial risk. In order to ensure that their risk calculations are accurate, insurers must identify risk

---

[1] This submission focuses primarily on homeowner's insurance. The concerns it raises, however, extend beyond that specific context. Fair-housing advocates have invoked the Disparate-Impact Rule against other insurers, such as insurers that offer habitational insurance to landlords. *See National Fair Housing Alliance* v. *Travelers Indemnity Co.*, 261 F. Supp. 3d 20, 29 (D.D.C. 2017). Any exemption that HUD provides should therefore apply to all insurance products that would otherwise fall within the scope of the Disparate-Impact Rule.

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 3

characteristics, sort applicants into groups corresponding to differences in expected loss, and then allocate the grouped risks by establishing rates. Insurers perform this task by collecting and analyzing data regarding the risks they intend to classify. For homeowner's insurance, underwriting professionals and actuaries will take into account characteristics, such as the age of a home, its location, its replacement or repair cost, the presence of smoke detectors, and various permissible risk characteristics regarding applicants and policyholders. Homeowner's insurers then sort insurance applicants into categories corresponding to anticipated risk and allocate premium rates to the various groups.

Before HUD promulgated the Disparate-Impact Rule, insurers did not collect data concerning race or membership in other protected classes for the purpose of making underwriting or rating decisions. Indeed, at least one state explicitly prohibits them from collecting such data at all. *See* Md. Code Ann. Ins. § 27-501(c)(1). Insurers do not consider race or other protected characteristics when making underwriting and rating decisions. Instead, insurers identify and analyze risk factors related to individual properties, as just explained. Insurers next group the risks they have identified in a way that allows them to establish fair rates, consistent with the obligations imposed by state law. The viability of insurers' products depends on their accurate and impartial evaluation of risk. Membership in a protected class is not an actuarially significant factor within the meaning of state law or actuarial practice, and it plays no role in insurers' underwriting and rating decisions.

The Disparate-Impact Rule fundamentally alters that system. As one court has already recognized, in order to determine whether their practices are resulting in or perpetuating a disparate impact, insurers would need to "collect and analyze certain types of race-based data on their clients and prospective clients"—a practice that is "expressly prohibited in many states." *American Insurance Ass'n* v. *HUD*, 74 F. Supp. 3d 30, 44 & nn.27-28 (D.D.C. 2014), vacated and remanded on other grounds, No. 14-5321 (D.C. Cir. Sept. 23, 2015). Insurers would first need to analyze whether state law allows them to collect data on protected characteristics. If it did, they would need to decide how to collect the data from existing and prospective policyholders. Insurers would then need to determine how to store and manage the data they collected.[2] Insurers would next need to analyze what, if anything, state law allows them to do with the data about protected characteristics that

---

[2] To take those steps, insurers would have to expend substantial resources. Compliance departments, for example, may need to dedicate attorney time to determine whether and how insurers may collect data on race and other protected characteristics under state law. Information-technology personnel, for instance, may need to design and build any necessary systems to house the newly collected data—and insurers would have to buy any related materials, including computer hardware and software. And, of course, insurers would have to design and conduct surveys to collect the data.

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 4

they collect. Assuming that insurers could lawfully use data about the race and other protected characteristics of their insureds, they would need to use those data to identify any disparities between the various protected groups.

It is not hard to see how the Disparate-Impact Rule necessarily injects consideration of race and other protected characteristics into the currently protected-characteristic-neutral underwriting and ratemaking processes. And it puts insurers in an obvious bind. Any risk factor that disproportionately affects a protected group could trigger a disparate-impact claim under the Rule. At the same time, changing risk factors or rates because of the potential impact on protected groups could make the insurer's rates unfairly discriminatory, thereby violating sound insurance practice (by reflecting factors unrelated to risk of loss) and state law (by reflecting the insured's protected status). Of course, explicit consideration of race or other protected characteristics in underwriting or ratemaking could violate state and federal laws prohibiting differential treatment based on race or membership in a protected class (*i.e.*, disparate treatment); intentionally using race in ratemaking could even expose insurers to punitive damages, *see* Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(II), or criminal liability, *see* S.D. Codified Laws § 58-11-55. In states that require prior approval of rates, moreover, an insurer could be put in the untenable position of telling the state that it considered race or another protected characteristic explicitly in the ratemaking process.

b.   Because it would require the consideration of race and other protected characteristics, construing the FHA to permit disparate-impact liability against insurers also would raise serious constitutional concerns. When a law or rule "compels race-based [decisions], it by definition raises a serious constitutional question." *Miller* v. *Johnson*, 515 U.S. 900, 923 (1995). And it is a "cardinal principle" of statutory construction that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems," a statute should be construed "to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988).

Applying the Disparate-Impact Rule to insurers raises serious constitutional concerns because—as explained above—the Rule compels insurers to "use[] and consider[] [race] in a pervasive way." *Inclusive Communities*, 135 S. Ct. at 2523.[3] By "plac[ing] a racial thumb on the scales[,] . . . [the Disparate-Impact Rule] require[s] [insurers] to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes." *Ricci* v. *DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring).

---

[3] The constitutional implications of the Disparate-Impact Rule are not limited to the context of race; by its terms, the Rule also implicates other constitutionally protected characteristics such as sex and religion. *See* 24 C.F.R. § 100.500(a).

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 5

That type of decisionmaking indisputably discriminates on the basis of race, *see id.* at 579-580 (majority opinion), and the Supreme Court has expressly reserved the question whether such racially discriminatory treatment, even if motivated by "a legitimate fear of disparate impact," could survive constitutional scrutiny, *id.* at 584. More broadly, the Disparate-Impact Rule, as it applies to insurers, violates the command "[a]t the heart of the Constitution's guarantee of equal protection" that "the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller*, 515 U.S. at 911 (internal quotation marks and citation omitted). Because the Disparate-Impact Rule requires insurers to take race and other protected characteristics into account when making rating and underwriting decisions, it "demand[s] the very racial stereotyping the Fourteenth Amendment forbids." *Id.* at 928.

By requiring insurers to take race and other protected characteristics into account in their decisionmaking when they otherwise would not, the Disparate-Impact Rule perversely *causes* insurers to adopt "race-based considerations rather than mov[ing] beyond them." *Inclusive Communities*, 135 S. Ct. at 2524. In so doing, the Rule undermines the very purpose of the Fair Housing Act by increasing, rather than reducing, the salience of race and other protected characteristics in housing decisions. The Rule should exclude homeowner's insurers from its coverage.

2. **State Law Limits Insurers' Discretion To Consider Race And Other Protected Characteristics As Part of The Ratemaking And Underwriting Process**

As the Supreme Court explained in *Inclusive Communities*, disparate-impact liability under the FHA incorporates "[a] robust causality requirement" to prevent defendants from "being held liable for racial disparities they did not create." 135 S. Ct. at 2523. A disparate-impact claim under the statute thus cannot lie when a "law substantially limits the [defendant's] discretion," because the law breaks the "causal connection" between the challenged policy and the allegedly disparate impact. *Id.* at 2524. That limitation forecloses disparate-impact claims based on insurers' rating and underwriting decisions. The insurance laws of every state circumscribe insurers' ability to consider protected characteristics such as race when making rating and underwriting decisions. As a result, any disparate-impact claim based on underwriting and rating practices necessarily fails. Nor can HUD interpret the FHA to displace those valid state laws, as the McCarran-Ferguson Act protects state insurance policies from federal interference. The only solution is for HUD to exempt homeowner's insurers from the Rule's reach.

a. In every state, the law restricts insurers' discretion to consider factors such as race, religion, and national origin. Most states' insurance laws address ratemaking and underwriting directly, specifying that "no risks may be grouped by classifications based in

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 6

whole or in part on race, color, creed, or national origin of the risk."[4] Other states' insurance laws prohibit insurers from considering membership in a protected class "when deciding whether to provide, renew, or cancel homeowners insurance."[5] And a third group of states has adopted insurance laws that generally prohibit "unfairly discriminatory" rates.[6] In each of the states in the third group, administrative interpretations or other sources of law make clear that insurers may not differentiate among their insureds on the basis of membership in a protected class.[7] In addition, many states have overlapping laws that expressly allow insurers to make distinctions based on "differences among risks that can be demonstrated to have a probable effect upon losses or expenses."[8]

---

[4] Ark. Code Ann. § 23-67-209(b); *see also* Alaska Stat. § 21.36.460(d)(4); Ariz. Rev. Stat. Ann. § 20-384; Cal. Ins. Code § 679.71; Colo. Rev. Stat. § 10-3-1104; Del. Code Ann. tit. 18, § 2304(22); Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(I); Haw. Rev. Stat. § 431:14-103; 215 Ill. Comp. Stat. 5/424(3); Iowa Code § 515F.4(3); Kan. Stat. Ann. § 40-954(c); Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Md. Code Ann. Ins. § 27-501; Minn. Stat. Ann. § 70A.5(2); Miss. Code Ann. § 83-2-3; Mont. Code Ann. § 33-18-210(5); Neb. Rev. Stat. § 44-7510(3); Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(b); N.J. Stat. Ann. § 17:29B-4(7)(c)-(d); N.M. Stat. Ann. § 59A-17-7; N.Y. Ins. Law § 2606; N.C. Gen. Stat. Ann. § 58-3-25(c); N.D. Cent. Code § 26.1-25-03; Okla. Stat. Ann. tit. 36, § 985; 40 Pa. Cons. Stat. Ann. § 1171.5(7); R.I. Gen. Laws § 27-44-5; S.C. Code Ann. § 38-75-1210(B)(1); Tex. Ins. Code Ann. § 544.002; Utah Code Ann. § 31A-19a-202(3); Vt. Stat. Ann. tit. 8, § 4724(7)(B); Wash. Rev. Code § 48.30.300; Wis. Stat. § 625.12; Wyo. Stat. Ann. § 26-14-105(b); D.C. Code § 31-2231.13(d).

[5] Mass. Gen. Laws Ann. ch. 175, § 4C; *see also* Conn. Gen. Stat. § 38a-816(12)-(13); Fla. Stat. § 626.9541; Ind. Code § 27-7-12-7; Ky. Rev. Stat. Ann. § 304.12-085; La. Stat. Ann. § 22:1964(7)(f); Mich. Comp. Laws § 500.2027; Mo. Rev. Stat. § 375.936(11)(g); S.D. Codified Laws § 58-11-55; Tenn. Code Ann. § 56-8-104(7)(F); Va. Code Ann. § 38.2-1904(A); W. Va. Code § 33-17A-6.

[6] *E.g.*, Idaho Code § 41-1405; *see also* Ala. Code § 27-13-27; Ohio Rev. Code Ann. § 3935.03; Or. Rev. Stat § 737.310.

[7] *See, e.g.*, Ala. Admin. Code r. 482-1-074-03; Idaho Admin. Code r. 18.01.51.011; Ohio Rev. Code. Ann. § 4112.02; Or. Admin. Rules 836-081-0010.

[8] W. Va. Code § 33-20-3(c)(2); *see also, e.g.*, Alaska Stat. § 21.39.030; Ariz. Rev. Stat. Ann. § 20-384; Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(1)(c); Conn. Gen. Stat. § 38a-686; Haw. Rev. Stat. § 431:14-103; Iowa Code § 515F.4; Kan. Stat. Ann. § 40-954; Ky. Rev. Stat. Ann. § 304.13-031; Me. Rev. Stat. tit. 24-A, § 2303(2); Minn. Stat. Ann. § 70A.5(2); Miss. Code Ann. § 83-2-3; Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(b); N.M. Stat. Ann. § 59A-17-7; N.D. Cent. Code § 26.1-25-03; Ohio Rev. Code Ann. § 3935.03; Utah Code Ann. § 31A-19a-202(3); Vt. Stat. Ann. tit. 8, § 4724(7)(B); Va. Code Ann. § 38.2-1904(A)(3); Wis. Stat. Ann. § 626.12(2); Wyo. Stat. Ann. § 26-14-105(b).

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 7

Because state law "substantially limits" insurers' discretion when it comes to ratemaking and underwriting, it severs the causal connection between insurers' ratemaking and underwriting decisions and any resulting disparate impact. *Inclusive Communities*, 135 S. Ct. at 2524. Disparate-impact claims based on those decisions are therefore not cognizable. *Inclusive Communities*, 135 S. Ct. at 2524. For that additional reason, the Disparate-Impact Rule is unlawful as applied to insurers' underwriting and ratemaking practices.

b. Given that state law often expressly prohibits insurers from considering race or other protected characteristics during the actuarial process, the Disparate-Impact Rule runs afoul of the McCarran-Ferguson Act, 15 U.S.C. 1011-1015. McCarran-Ferguson establishes a form of reverse preemption, authorizing state insurance law to prevail over general federal law despite the Supremacy Clause's ordinary operation. In relevant part, McCarran-Ferguson provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. 1012(b). Federal law "impair[s]" state law for purposes of McCarran-Ferguson if application of the federal law would frustrate declared state policy or interfere with a state's administrative regime. See *Humana, Inc.* v. *Forsyth*, 525 U.S. 299, 310 (1999). McCarran-Ferguson further provides that "silence on the part of the Congress shall not be construed to impose any barrier to the regulation . . . of such business by the several States." 15 U.S.C. 1011.

The FHA is a general federal law that triggers the reverse-preemption principle of the McCarran-Ferguson Act. The FHA does not specifically relate to the business of insurance, so it does not evince an intention to override the states' authority to regulate insurance within the meaning of McCarran-Ferguson. See, *e.g.*, *Ojo* v. *Farmers Group Inc.*, 600 F.3d 1205, 1209 (9th Cir. 2010) (en banc); *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 295 (7th Cir. 1992). As a result, HUD cannot construe the FHA in a way that would "invalidate, impair or supersede" state insurance laws. 15 U.S.C. 1012(b). To do so would bring the FHA and McCarran-Ferguson into conflict, and HUD cannot interpret the statute it administers to "limit[] the work of a second statute" that "it does not administer." *Epic Systems Corp.* v. *Lewis*, 138 S. Ct. 1612, 1629 (2018).

Interpreting the FHA to impose disparate-impact liability on homeowner's insurers, as HUD has done through the Disparate-Impact Rule, creates a conflict between the FHA and McCarran-Ferguson in many cases. In order to avoid disparate-impact liability under HUD's interpretation of the FHA, insurers would be compelled to collect data on protected characteristics, *but see* Md. Code Ann. Ins. § 27-501(c)(1); to consider that data, *but see, e.g.*, S.C. Code Ann. § 38-75-1210(B)(1); Tex. Ins. Code Ann. § 544.002, and to make classification and rating decisions that take into account membership in protected groups, *but see, e.g.*, Tenn. Code Ann. § 56-5-303 (a)(2)(d). With regard to these and other similar state laws,

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 8

disparate-impact liability would plainly contravene the reverse-preemption provision of the McCarran-Ferguson Act. Disparate-impact liability would more broadly impair both states' ability to base insurance regulation solely on insured risk and state insurance commissioners' authority to determine the adequacy and appropriateness of rates, also in contravention of McCarran-Ferguson. As the association of state insurance commissioners has warned, application of disparate-impact theory "makes impossible the operation of state laws establishing insurers' right to use rationally based, neutral risk-selection techniques." National Association of Insurance Commissioners Br. at 2, *Nationwide Mutual Insurance Co.* v. *Cisneros*, 516 U.S. 1140 (1996) (No. 95-714).

Notably, lower courts have recognized the conflict between imposition of disparate-impact liability on homeowner's insurers under the FHA and McCarran-Ferguson's protection of state insurance regulation. *See Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961, 967 (8th Cir. 2008); *Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351, 1361 (6th Cir. 1995); *NAACP*, 978 F.2d at 290-291; *see also Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 299 (5th Cir. 2003) (Jones, J., concurring in part and dissenting in part). In *Saunders* v. *Farmers Insurance Exchange*, for example, the Eighth Circuit affirmed the dismissal of a claim alleging a disparate impact in the pricing of homeowner's insurance, holding that McCarran-Ferguson barred the claim because the claim would interfere with Missouri's comprehensive regulatory regime. 537 F.3d at 967-968. The court noted that Missouri law required insurers to establish rates based on economic factors essential to insurer solvency, such as loss experience, and further permitted insurers to classify risks based on standards that "measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses." *Id.* at 967 (quoting Mo. Rev. Stat. § 379.318(2)). The court reasoned that allowing a federal court to "determine that the [i]nsurers' filed rates are unlawful using [the] different federal standard [of] disparate racial impact" would improperly interfere with state law and, in particular, with the ratemaking authority of the state insurance commissioner. *Id.* at 968.

The policy underlying McCarran-Ferguson underscores that Congress could not have intended to impose disparate-impact liability on homeowner's insurers in the FHA—or to give HUD the power to do so through rulemaking in the absence of a clear statutory authorization. HUD therefore should expressly exempt homeowner's insurers from liability under the Rule.

c. Because of its impact on state law, the Disparate-Impact Rule also violates Executive Order 13132, titled "Federalism." 64 Fed. Reg. 43,255 (Aug. 10, 1999). As is relevant here, Executive Order 13123 requires agencies to construe federal statutes to preempt state law only where there is "clear evidence" that Congress intended preemption of state law or where the exercise of state authority conflicts with the exercise of federal authority under the statute. § 4(a), 64 Fed. Reg. at 43,257; *see* Memorandum from OIRA

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 9

Administrator, *Guidance for Implementing E.O. 13132*, at 3 (Oct. 28, 1999) ("OIRA Guidance") (requiring state and federal authority to conflict "directly"). The Order further provides that, before promulgating a rule that preempts state law, the agency must consult with state and local officials during the regulatory process. § 6(c), 64 Fed. Reg. at 43,258.

The Disparate-Impact Rule, as applied to homeowner's insurers, necessarily preempts some state law. The Rule in effect requires insurers to consider protected characteristics to avoid disparate-impact liability. But in many cases, state law forbids insurers from doing so. *See* p. 5-6, *supra*. That means compliance with both federal and state law is impossible for homeowner's insurers—which means state law is preempted. *See Mutual Pharmaceutical Co.* v. *Bartlett*, 133 S. Ct. 2466, 2476-2477 (2013).

That creates two problems. The first is that Executive Order 13132 forbids HUD to construe the FHA to preempt state insurance law. The FHA lacks any "clear" indication—indeed, any indication at all—that Congress intended to preempt state insurance law by enacting the statute. § 4(a), 64 Fed. Reg. at 43,257. And the exercise of state authority over the insurance industry does not "directly conflict" with HUD's authority under the FHA, OIRA Guidance 3, because McCarran-Ferguson expressly preserves state control over insurance regulation. The second problem is that, despite the Disparate-Impact Rule's preemptive effect, HUD does not appear to have consulted with state officials about the Rule. *But see* E.O. 13132, § 6(c), 64 Fed. Reg. at 43,258. Quite the opposite: HUD contended that the Rule "does not . . . preempt state law within the meaning of the Executive Order." 78 Fed. Reg. at 11,481. HUD can remedy these two problems by exempting homeowner's insurers from the Disparate-Impact Rule.

3. **The Disparate-Impact Rule Allows Claims To Proceed Based Entirely On Statistics**

As noted above, *Inclusive Communities* construed the FHA's disparate-impact standard to incorporate a "robust causality requirement [that] ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact." 135 S. Ct. at 2523 (internal quotation marks omitted). Another consequence of that causality requirement is that defendants may not be "held liable for racial disparities they did not create." *Id.* As a result, a disparate-impact claim under the FHA that "relies on a statistical disparity" cannot proceed "if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* That limitation is crucial. If racial disparity alone established a prima facie case of disparate impact, potential defendants would almost inexorably rely on "racial quotas"—"a result that Congress and [the Supreme] Court have rejected repeatedly in the past." *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 652-653 (1989); *accord Inclusive*

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 10

*Communities*, 135 S. Ct. at 2523.  The Disparate-Impact Rule flouts that statutory limitation.

     a.    In order to make a prima facie showing of disparate impact under the Rule, a plaintiff need only demonstrate that "a challenged practice caused or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1).  In the final version of the Rule, HUD made clear its view that a plaintiff need *not* identify a specific policy that is alleged to cause the disparity.  "Under th[e] rule," HUD wrote in the preamble, whether a party must "identify[] the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis."  78 Fed. Reg. at 11,469.  HUD also confirmed that a plaintiff may establish a prima facie case of disparate impact under the Rule using only statistical evidence showing the existence of a disparity.  *Id.* at 11,478.

     The difference between disparate-impact claims authorized by the FHA and the disparate-impact claims envisioned by HUD's Rule is substantial.  The Disparate-Impact Rule envisions prima facie liability based entirely on a showing of statistical disparity, even if there is no evidence of causation.  *Inclusive Communities* forecloses that approach.  135 S. Ct. at 2523.

     b.    The difference between *Inclusive Communities* and HUD's Rule is significant, and it has an especially harsh effect on insurers.  If members of a protected class brought a claim under the Disparate-Impact Rule, they could succeed at the prima facie stage simply by pointing to the statistical disparity in insurers' rates, without any showing of causation.  The insurer then would face the burden of collecting evidence explaining why its rating classifications were necessary to achieve a substantial, legitimate, nondiscriminatory interest and explaining why another practice could not also serve that interest.  That process is expensive and time-consuming, even when the answer is relatively simple.  Under the more limited approach articulated by *Inclusive Communities*, however, such a claim should fail at the outset unless the plaintiffs could "point to a defendant's policy or policies causing that disparity."  135 S. Ct. at 2523.  Such a standard, unlike the much lower standard of the Disparate-Impact Rule, "protect[s] potential defendants against abusive disparate-impact claims."  *Id.* at 2524.

**4.**    **The Disparate-Impact Rule Allows Plaintiffs To Displace Valid Policies**

     Finally, *Inclusive Communities* dictates that "[g]overnmental or private policies are not contrary to the [FHA's] disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers."  135 S. Ct. at 2524 (internal quotation marks omitted).  The Supreme Court has explained that disparate-impact liability under the FHA is not a

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 11

tool for plaintiffs to force defendants to "reorder their priorities" or to "displace valid governmental and private priorities." *Id.* at 2522, 2524. Instead, the disparate-impact requirement is intended "solely" to remove artificial, arbitrary, and unnecessary barriers; claims that are no more than "an attempt to second-guess which of two reasonable approaches" a defendant should follow are not cognizable. *Id.* at 2522. The Disparate-Impact Rule ignores that limitation by imposing a flawed burden-shifting test.

  a. Under the Disparate-Impact Rule, a plaintiff first has the burden to make a prima facie case of disparate-impact liability by demonstrating "that a challenged practice caused or predictably will cause a discriminatory effect," as that factor is interpreted by HUD. 24 C.F.R. § 100.500(c)(1). If the plaintiff meets that burden, the defendant must show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Once the defendant makes that showing, the plaintiff "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice *could be served* by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3) (emphasis added).

  Crucially, the Disparate-Impact Rule does not require that the plaintiffs' preferred alternative practice achieve the defendant's concededly valid interest as effectively as the challenged practice. In fact, HUD expressly rejected such a requirement. A commenter suggested that, "in order for [disparate-impact] liability to attach," HUD should require that "the alternative practice . . . be equally effective as the challenged practice, or at least as effective as the challenged practice." 78 Fed. Reg. 11,473. But HUD stated that it did "not believe the rule's language need[ed] to be" revised. *Id.*

  The Supreme Court's decision in *Inclusive Communities* shows that HUD was wrong. As written, the Disparate-Impact Rule allows private plaintiffs to "second-guess which of two reasonable approaches" a defendant should follow. *Inclusive Communities*, 135 S. Ct. at 2522. The Rule thus allows plaintiffs to displace all manner of valid policy choices rather than solely removing "artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (internal quotation marks omitted).

  b. A hypothetical from the insurance context illustrates the problem. Consider a claim that an insurer's rates for customers of a particular religion in a certain city are disproportionately high. As explained above, the plaintiff could make out its prima facie case simply by showing a statistical disparity. The insurer might respond that adherents of the particular religion are concentrated in a certain part of the city, say, around their place of worship. If the homes in that part of the city rely on wood-burning stoves for heat, those homes face greater risk of fire damage, which leads the insurer reasonably to charge higher rates. By pointing to the risk of loss through fire, the insurer has shown that its

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 12

"challenged practice"—charging a higher rate—"is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests"—fairly reflecting the loss costs of the risk insured. 24 C.F.R. § 100.500(c)(2). Even after the insurer has made that showing, however, the plaintiff still might prevail under the Rule by pointing out that there are several fire stations near the insured properties and insisting that the insurer charge rates based on the proximity of fire stations, not the condition of the insured property. To be sure, the proximity of fire stations is relevant; it might mitigate the severity of loss through fire and therefore lowers the insurer's expected loss costs. But it is nowhere near as effective in furthering the insurer's legitimate goal of setting a rate that actually reflects the insured risk.

Under the Disparate-Impact Rule, the plaintiff's claim would succeed. But it should fail under the FHA, because the choice to set a rate based on the property's condition is not an "artificial, arbitrary, and unnecessary barrier[]." *Inclusive Communities*, 135 S. Ct. at 2524 (internal quotation marks omitted). As such, the choice between two valid factors for setting rates is properly left to the insurers and cannot be displaced by a plaintiff on disparate-impact grounds. The Disparate-Impact Rule, however, ignores that limitation and improperly authorizes disparate-impact claims that stretch far beyond the bounds of the statute.

\*     \*     \*     \*     \*

The clear upshot of the Supreme Court's decision in *Inclusive Communities* is that homeowner's insurers cannot be subject to disparate-impact liability under the FHA. But the Disparate-Impact Rule not only subjects insurers to disparate-impact liability; it singles them out as an example of parties that may be liable under the statute on a disparate-impact theory. HUD has no discretion here: to comply with *Inclusive Communities*, HUD must expressly exempt homeowner's and other insurers from disparate-impact liability under the Rule.

                                        Yours sincerely,

                                        Kannon K. Shanmugam