EXHIBIT 8



October 18, 2019

Office of General Counsel, Rules Docket Clerk
Department of Housing and Urban Development
451 Seventh Street, SW, Room 10276
Washington, DC 20410-0001

**RE:**     **HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, Docket No. FR-6111-P-02, RIN 2529-AA98**

The American Property Casualty Insurance Association ("APCIA") appreciates the opportunity to provide comments in response to the Notice of Proposed Rulemaking ("NPRM") titled "HUD's Implementation of the Fair Housing Act's Disparate Impact Standard" published by the Department of Housing and Urban Development ("HUD") on August 19, 2019.[1] APCIA is the primary national trade association for home, auto, and business insurers. Its members make up nearly 60 percent of the U.S. property casualty insurance market. It has the broadest cross section of home, auto, and business insurers and reinsurers of any national property casualty trade association, with member companies ranging in size from large to small and operating in all 50 states. APCIA's members write $412 billion in annual premiums. APCIA and its members have a direct interest in whether and how disparate-impact liability under the Fair Housing Act ("FHA") applies to property and casualty insurance, including homeowners insurance and commercial habitational insurance.[2] As explained below, APCIA supports the proposed rulemaking but respectfully requests that HUD take additional steps to appropriately limit the application of disparate-impact liability to homeowners and commercial habitational insurance.

## I. EXECUTIVE SUMMARY

HUD's February 15, 2013 final rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" (the "Disparate Impact Rule")[3] provides "that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin— "regardless of whether there was an intent to discriminate"—and sets forth a specific framework

---

[1] 43 Fed. Reg. 42,854 (Aug. 19, 2019).

[2] Commercial habitational insurance is commercial insurance that covers various kinds of properties in which people live other than single-family homes and includes apartment buildings, condominium buildings, and other multiple-family dwellings. These comments generally refer to homeowners and commercial habitational insurance but also apply to any other form of property and casualty insurance the provision of which HUD asserts to be subject to the FHA, whether sold in the admitted, non-admitted, or surplus lines markets. Admitted insurers—subject to full state insurance regulation—write 99% of the homeowners market.

[3] 78 Fed. Reg. 11,460 (Feb. 15, 2013); *see* 24 C.F.R. § 100.500.

for applying that disparate-impact standard. [4]  In the preamble to the 2013 Rule, HUD expressed its view that insurers may be liable on a disparate-impact theory for practices related to the provision and pricing of homeowner's insurance.[5]  HUD's August 19, 2019 NPRM "proposes to amend HUD's interpretation of the FHA's disparate-impact standard to better reflect the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, and to provide clarification regarding the application of the standard to State law governing the business of insurance."[6]

As explained in detail below, APCIA supports HUD's proposal to modify the 2013 Disparate Impact Rule to take into account the Supreme Court's decision in *Inclusive Communities* but also urges HUD to take specific steps to appropriately address the unique problems that would arise were the Rule applied in the context of homeowners and commercial habitational insurance.

### A. HUD's Proposed Modifications Of The Burden-Shifting Framework Are Consistent With *Inclusive Communities*

Two years after HUD promulgated the 2013 Disparate Impact Rule, the Supreme Court considered the application of disparate-impact liability under the FHA and recognized important limitations on the doctrine in its *Inclusive Communities* decision.  Those limitations were not reflected in the 2013 Rule, and HUD has properly proposed to amend the Rule to take the limitations into account.  APCIA supports HUD's proposal to amend the Rule's burden-shifting framework to comply with *Inclusive Communities*.  HUD's proposed changes largely conform to the Supreme Court's instructions, including its requirement that only "artificial, arbitrary, and unnecessary" practices that are causally linked to a racial imbalance by robust evidence, beyond a mere correlation, may be subject to liability.  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2522-24 (2015).  Subject to the specific suggested changes described below, HUD should finalize its proposed modifications of the Disparate Impact Rule as soon as possible to bring the Rule into conformity with binding precedent.

### B. HUD Should Exempt Risk-Based Pricing And Underwriting Of Homeowners And Commercial Habitational Insurance From Disparate-Impact Liability Under The FHA

In addition to modifying the Disparate Impact Rule's burden-shifting framework, HUD also should adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance.  An exemption is required for several reasons:

*First*, the application of disparate-impact liability to risk-based pricing and underwriting of homeowners and commercial habitational insurance—that is extensively regulated by the states—is inconsistent with the business of insurance.  Risk-based pricing and underwriting are critical to the functioning of the insurance market.  They ensure that insureds are charged an amount

---

[4] 78 Fed. Reg. at 11,460; *see also* 24 C.F.R. § 100.500.

[5] 78 Fed. Reg. 11,475.

[6] 43 Fed. Reg. 42,854.

appropriate for the risk they present, prevent adverse selection, and promote the broad availability of insurance. Preventing insurers from adequately accounting for risk by imposing disparate-impact liability would undermine these important objectives.

*Second*, application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would contravene the limitations set forth in *Inclusive Communities*, because, among other things, risk-based pricing and underwriting are not arbitrary, artificial or unnecessary practices, are not the cause of any alleged disparate impacts, and are permitted and mandated by state insurance regulation that limits insurers' discretion.

*Third*, application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would violate the McCarran-Ferguson Act by improperly requiring federal courts to determine whether challenged practices are actuarially sound; conflicting with state laws permitting or requiring insurers to engage in risk-based pricing and underwriting (*see* Appendix I); and conflicting with state laws and regulations providing for state administrative review of insurance rates.

*Finally*, the application of the Disparate Impact Rule to risk-based pricing of homeowners and commercial habitational insurance would violate the filed-rate doctrine, which prohibits claims against insurers based on rates filed with regulatory authorities.

## C.     If HUD Does Not Entirely Exempt Risk-Based Pricing And Underwriting, It Should Modify And Clarify The Defenses In The Rule

If risk-based pricing and underwriting of homeowners and commercial habitational insurance are not exempted entirely, HUD should clarify existing defenses under the Rule to ensure that the Rule does not run afoul of *Inclusive Communities* or the McCarran-Ferguson Act.

As an initial matter, HUD should adopt an express defense in § 100.500(c) for risk-based pricing and underwriting of homeowners and commercial habitational insurance under the Rule's burden-shifting framework. If a Defendant shows that it relied on risk-based pricing and underwriting, that should be a complete defense at Step 2 of the burden-shifting framework. The plaintiff should not have an opportunity to rebut the defense at Step 3.

HUD should likewise modify the defenses it has proposed to ensure that the Rule is not improperly applied to risk-based pricing and underwriting of homeowners and commercial habitational insurance:

*First*, HUD should clarify that the causation analysis under the Rule must consider whether a challenged practice is too remote to the alleged disparate impact to give rise to liability and that more than statistical correlation is required.

*Second*, HUD should specify that the "Limited Discretion" defense in § 100.500(c)(1) applies not only where state insurance law compels an insurer to engage in the challenged practice but also where state law permits the challenged practice.

3

*Third*, HUD should modify the algorithm defense in § 100.500(c)(2) in several ways. The opening portion of the defense should make clear that the defense applies whenever the cause of the alleged discriminatory effect is the use of an algorithmic model by the defendant, not just when the plaintiff has affirmatively "allege[d] that the cause of a discriminatory effect is a model used by the defendant." The first variation of the defense—set forth in proposed § 100.500(c)(2)(i)—should be revised to apply where "the model was empirically derived and is a demonstrably and statistically sound algorithm which accurately predicts risk or other similar valid objectives," as long as the model does not use race, color, religion, sex, handicap, familial status, or national origin ("FHA-protected characteristics") as factors.[7] Similarly, the third variation of the defense—set forth in proposed § 100.500(c)(2)(iii)—should be amended to delete the vague requirement that the model not rely on factors that are "close proxies" for protected classes. Further, to protect the proprietary nature of models and actuarial analyses, a defendant should be able to prove that its model was empirically derived, is a demonstrably and statistically sound algorithm that accurately predicts risk or other similar valid objectives, and does not rely on FHA-protected characteristics as factors without being required to produce the model itself or all of its inputs. Finally, the second variant of the algorithm defense—set forth in Proposed § 100.500(c)(2)(ii)—should not be limited to models developed by third parties "that determine[] industry standards."

*Fourth*, proposed § 100.500(d)(1)(i) should be clarified to require the plaintiff to prove, by the preponderance of the evidence, all of the elements of the *prima facie* case, including that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law." This change will conform with *Inclusive Communities'* specific requirement that the plaintiff always carries the burden of establishing that the challenged policy or practice is based on arbitrary, artificial, and unnecessary barriers, even if the plaintiff has alleged sufficient plausible facts to survive a motion to dismiss at the pleading stage.

### D.  HUD Should Make Clear That Disparate-Impact Challenges Are Inconsistent With Risk-Based Pricing And Underwriting

At a minimum, HUD should make clear in the preamble to a final rule (1) that disparate-impact liability cannot apply to risk-based pricing and underwriting of homeowners and commercial habitational insurance and (2) that HUD will not seek to apply the Rule to those activities. As examples of proposed clarifications to the preamble, HUD should acknowledge that risk-based pricing and underwriting are not "arbitrary, artificial, or unnecessary" practices and instead "advance valid interests." HUD should also make clear that disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance, requiring insurers to collect and analyze data on FHA-protected characteristics.

---

[7] 78 Fed. Reg. at 11,460; *see also* 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(2)(i), (ii), (iii)).

4

## II.    BACKGROUND

### A.    The Business Of Insurance

Insurance is a means by which one party (the insured) transfers financial risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged, the insurer will pay for related repairs. Insurance rates are based on an insured's loss history and risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions—that is, decisions about whether to insure and how to price a particular risk or class of risk.[8]

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and to project their financial implications. Actuaries examine numerous factors that correlate with losses.[9] For homeowners and commercial habitational insurance, underwriters have historically reviewed four categories of factors to assess the risk of property damage claims: (1) Construction (e.g., frame, masonry, fire resistant, non-combustible, use of cladding, age and type of roof, age of wiring and plumbing system); (2) Occupancy (e.g., habitational, manufacturing, office), (3) Protection (e.g., alarms, sprinklers, smoke detectors, fire departments (paid or volunteer), water source and distance to fire station and water source, wind mitigation); and (4) Exposure (e.g., the nature of the surrounding area, such as other buildings that may be more susceptible to loss, dry brush or woodlands v. paved parking areas, number of stories).[10] Other factors considered in underwriting and pricing insurance include, for instance, the value of the property and any history of previous losses related to the dwelling or similar units. ***Homeowners and commercial habitational insurance actuaries do not consider FHA-protected characteristics when evaluating these factors.*** Indeed, they do not have that data and may be prohibited from collecting it.[11]

---

[8] *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* §§ 1:2; 1:6 (3d ed. 2013).

[9] *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985).

[10] *See* Christopher J. Boggs, *Understanding Commercial Property Underwriting and 'COPE'* (2015), https://www.insurancejournal.com/news/national/2015/02/03/356085.htm.

[11] *See* A.R. 376, *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014) (ECF No. 19); ECF No. 44-2 ¶ 6, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect information on race or ethnicity); ECF No. 44-3 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 ¶ 7, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates); ECF No. 27-2 ¶ 4, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or retain electronic records of race, color, or national origin and does not have capabilities to store and use such information); ECF No. 27-3 ¶ 9, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or consider race, color, religion, or national origin in underwriting and rating homeowners' insurance); ECF No. 27-5 ¶ 5, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (prior to the Disparate Impact Rule, insurer did not collect date on race, color, religion, national origin, sex, familial status, or handicap of its policyholders).

Many insurers also tailor their offerings for risks for which they have expertise and knowledge. Professional underwriters routinely avoid or exclude risks for which they lack expertise, knowledge, or actuarial data. Even where insurers rely on such professional underwriting judgment without undertaking an actuarial analysis of the type typically used in rate-making and pricing, they are required to consider similar factors bearing on risk of loss, and do not consider—and are prohibited from considering—race, color, religion, sex, or any other FHA-protected characteristics.

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that insured and similarly situated insureds.[12] If insurers could not set rates or make underwriting decisions based on objective, predictive, and permitted risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.[13] Such a scheme would greatly reduce the financial incentive for insureds to reduce risks, construct safer houses, and maintain existing houses.[14] Moreover, without the ability to appropriately rate risks according to specific and appropriate risk-characteristics, insurance companies would likely withdraw from specific lines of business or adversely select only choice risks, leading to less availability of insurance and a reduction of competition in the market. Accurate pricing is also critical to ensuring the solvency of insurers. An insurer is considered insolvent when it lacks the financial resources to make promised payments to insureds, beneficiaries and claimants.[15] If an insurer sets a price too low or fails to accurately account for the risks involved with policies, it may not have sufficient funds to pay claims that are made.[16]

## B. State Regulation Of Insurance

The states have traditionally regulated the insurance industry—from pricing, underwriting, and claims handling, to company capital requirements and solvency.[17] Today, "[s]tate regulation

---

[12] *See N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

[13] *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 44 (2012).

[14] Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J.at 66-67.

[15] Robert W. Klein, Ph.D, *Insurance Regulation and the Challenge of Solvency II: Modernizing the System of U.S. Solvency Regulation* (2012), https://www.namic.org/pdf/publicpolicy/insRegSolvII.pdf.

[16] *See, e.g.,* Zain Mohey-Deen & Richard J. Rosen, *The Risks of Pricing New Insurance Products: The Case of Long-Term Care*, FEDERAL RESERVE BANK OF CHICAGO, https://www.chicagofed.org/publications/chicago-fed-letter/2018/397 ("Underpricing a new product was the major cause of the insolvency of Penn Treaty . . . at the time the tenth-largest [long-term] insurer.").

[17] Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. 168 (1868). Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constitutes interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to ensure that the ruling would not undermine the states' long-standing regulation of insurance.

of insurance is comprehensive and includes rate and coverage issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999). Several features of state insurance regulation are relevant here.

First, state insurance law affirmatively permits risk-based pricing and underwriting. Insurance law generally prohibits insurers from charging "excessive, inadequate, or unfairly discriminatory rates." As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."[18] For purposes of state insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences."[19]

Second, the vast majority of states not only permit risk-based pricing but expressly *require* it. State laws make clear that failing to take risk into account results in unfair discrimination. They also mandate that insurers consider past losses and other relevant risk factors in developing insurance rates. *See infra* p. 25.

Third, state insurance commissioners review the rates charged by insurers to protect consumers. The vast majority of states—49 out of 50 plus the District of Columbia—require insurers to file insurance rates with state regulators for review and/or approval.[20] State regulators carefully review insurance rates—often with their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory.[21]

Fourth, under existing state laws, insurers are typically **prohibited** from taking FHA-protected characteristics into account,[22] and may not even collect information about prospective insureds' membership in FHA-protected classes.[23]

---

[18] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 1988), https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

[19] Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted).

[20] *See infra* p. 27. As noted in footnote 2 *supra*, admitted insurers write 99% of the homeowners market. Rate filing is also generally required for small-to-mid-market commercial habitational insurance. A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

[21] *See, e.g.*, WIS. STAT. ANN. § 625.13; *see also infra* p. 27.

[22] *See, e.g.*, CAL. INS. CODE § 679.71 (prohibiting insurers from denying insurance or providing insurance on less favorable terms due to an applicant's marital status, sex, race, color, religion, national origin, or ancestry); MD. CODE ANN. INS. § 27-501(c)(1) (prohibiting insurers or insurance producers from inquiring about race, creed, color, or national origin in any manner of requesting general information related to an insurance application).

[23] *See, e.g.*, CAL. INS. CODE § 10141.

One of the primary aims of state insurance regulation is to protect policyholders against excessive insurer insolvency risk.[24] State regulators are concerned with how insurers deploy surplus, so insurers operating in their jurisdictions remain solvent. As part of solvency regulation, state regulators review insurers capitalization, asset quality, reinsurance and liquidity.[25] The surplus produced to capitalize the business, purchase quality assets, purchase reinsurance, and facilitate overall liquidity derives not only from return on investments, the transfer of risk to reinsurers, and other surplus preservation strategies, but also from premiums retained after covered losses are paid. The aggregate difference between premiums collected and covered losses paid produces a significant portion of the surplus that ensures solvency and the insurer's ability to pay current and future claims. This concern for solvency is embedded in state laws regulating the business of insurance, such as a prohibition against rates that are "excessive, *inadequate* or unfairly discriminatory." *See infra* § IV.B.2. Rate regulation is an integral aspect of solvency regulation because it ensures that insurance companies charge premiums that are sufficient to cover current and future claims.[26]

## C.      The McCarran-Ferguson Act

In the McCarran-Ferguson Act, Congress expressly stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance." *Id.* § 1012(b). Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application … [would] frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).[27]

---

[24] Shauhin Talesh, *Insurance Law As Public Interest Law*, 2 UC IRVINE L. REV. 985, 1005-06 (2012) ("As articulated by most states, the goals of insurance regulation include fair pricing of insurance, *protecting insurance company solvency*, preventing unfair practices by insurance companies, and ensuring the availability of insurance coverage.") (emphasis added); National Association of Insurance Commissioners, *The U.S. National State-Based System of Insurance Financial Regulation and the Solvency Modernization Initiative* § 2.3 (August 14, 2013), https://www.naic.org/documents/committees_e_us_solvency_framework.pdf ("The state regulatory system in the United States has had over a 100 year history of solvency regulation.").

[25] *See, e.g.* National Association of Insurance Commissioners, *Financial Analysis Handbook* 41, 51, 65, 69 (2019), https://www.naic.org/prod_serv/FAH-ZU-19.pdf (suggesting, among other factors, capitalization, asset quality, reinsurance, and liquidity as measures of solvency to be considered by state insurance regulators).

[26] Joshua Phares Ackerman, *The Unintended Federalism Consequences of the Affordable Care Act's Insurance Market Reforms*, 34 Pace L. Rev. 273, 283 (2014)

[27] Congress remains committed to the principle of leaving the regulation of insurance to the states. *See* Congressional Research Service, *Insurance Regulation: Legislation in the 115th Congress*, Summary (Oct. 19, 2018), https://crsreports.congress.gov/product/pdf/R/R44958 ("Since 1868, the individual states have been the primary regulators of insurance with the National Association of Insurance Commissioners (NAIC) acting to coordinate state actions and collect national data").

### D.    The Fair Housing Act And The 2013 Disparate Impact Rule

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). The FHA does not specifically relate to the business of insurance and thus is displaced by state laws regulating insurance, pursuant to McCarran-Ferguson, in the event of a conflict or interference with state law.

In 2013, HUD promulgated a rule authorizing disparate-impact claims under the FHA and providing a framework for such claims. *See* 78 Fed. Reg. 11,460 (Feb. 15, 2013). The "Disparate Impact Rule"—which remains in place today—provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). No showing of intent to discriminate is required.

The Rule provides that disparate-impact litigation under the FHA should proceed under a burden-shifting framework. Under that framework, a plaintiff must first demonstrate that a housing-related practice has a disparate effect on a FHA-protected class. 24 C.F.R.§ 100.500(c)(1). The defendant must then show that the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Notwithstanding such a showing, the defendant may still be found liable if the plaintiff establishes "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). The alternative identified by the plaintiff need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. Thus, compliance with the Disparate Impact Rule may require businesses to abandon sound, good-faith methods in favor of substitutes that are less effective at furthering the businesses' legitimate, nondiscriminatory interests. In the final Rule, HUD declined to exempt homeowners insurance or meaningfully address whether extension of disparate-impact liability to homeowners insurance would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act.[28]

### E.    The Supreme Court's Decision In *Inclusive Communities*

On June 25, 2015, the Supreme Court issued its decision in *Inclusive Communities*. *See* 135 S. Ct. 2507. In that decision, the Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" *Id.* at 2524

---

[28] Both predecessors of APCIA—the American Insurance Association ("AIA") and the Property Casualty Insurers Association of America ("PCI")—filed lawsuits under the Administrative Procedure Act challenging the 2013 Disparate Impact Rule. A description of that litigation and additional comments submitted by PCI and AIA is set forth in Appendix II to these comments. Effective January 1, 2019, AIA merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association. Prior to the merger of AIA and PCI, comments were filed by each separate trade in response to the 2018 ANPRM.

(quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." *Id.* at 2522. In order to ensure that disparate-impact claims are properly limited, the Court held that key "safeguards" must be put in place. *Id.* at 2523.

In addition to limiting challenges to "artificial, arbitrary and unnecessary" practices, the Court made clear that claims must satisfy "[a] robust causality requirement." *Id.* Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). Referring approvingly to the opinion below of Fifth Circuit Judge Edith Jones, the Court explained that where another "law substantially limits the [defendant's] discretion," causation cannot be established. *Inclusive Cmtys.*, 135 S. Ct. at 2524.

Another safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policies." *Id.* at 2522. Businesses, the Court also stated, "must be given latitude to consider market factors." *Id.* at 2523.

The Supreme Court cautioned that without these safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* "[I]nterpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## F.     HUD's NPRM

On August 19, 2019, the NPRM was published in the Federal Register. *See* 84 Fed. Reg. at 42,854. The NPRM proposes to make a number of important changes to the current Disparate Impact Rule to bring it into compliance with the limits set forth in *Inclusive Communities*. We discuss below the proposed changes relevant to APCIA's comments.

*First*, the NPRM would amend current 24 C.F.R. § 100.500 to make clear that a disparate-impact plaintiff must, consistent with *Inclusive Communities*, meet a *prima facie* burden of plausibly alleging each of the following elements:

(1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

10

(2) That there is a robust causal link between the challenged policy or practice and a disparate impact on members of a protected class that shows the specific practice is the direct cause of the discriminatory effect;

(3) That the alleged disparity by the policy or practice has an adverse effect on members of a protected class;

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct link between the disparate impact and the complaining party's alleged injury.

84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(b)).

*Second*, the NPRM would revise the regulations to provide a disparate-impact defendant with a number of defenses. A defendant "may establish that a plaintiff's allegations do not support a prima facie case of discriminatory effect" if the defendant satisfies the requirements of one of three specified defenses:

- The initial defense applies if a defendant "shows that its discretion is materially limited by a third party such as through … [a] Federal, state, or local law … [or a] binding or controlling court, arbitral, administrative order, or administrative requirement." 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(1)). This materially limited discretion defense applies where a defendant faces external limits on its action and therefore cannot be found to have caused any disparate impact.

- The next defense applies "[w]here a plaintiff alleges that the cause of a discriminatory effect is a model used by the defendant, such as a risk assessment algorithm." 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(2)). This "algorithm defense" is available if the defendant:

  o "(i) Provides the material factors that make up the inputs used in the challenged model and shows that these factors do not rely in any material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act and that the model is predictive of credit risk or other similar valid objective"; or

  o "(ii) Shows that the challenged model is produced, maintained, or distributed by a recognized third party that determines industry standards, the inputs and methods within the model are not determined by the defendant, and the defendant is using the model as intended by the third party"; or

  o "(iii) Shows that the model has been subjected to critical review and has been validated by an objective and unbiased neutral third party that has analyzed the challenged model and found that the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives, and that none of the factors used in the algorithm rely in any

material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act";

- The final defense applies if the "defendant demonstrates that the plaintiff has failed to allege sufficient facts under paragraph (b)" as part of the plaintiff's *prima facie* case. 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(3)).

*Third*, the NPRM proposes to clarify which party has the burden of proof at different stages of the burden-shifting framework. It specifies that a "plaintiff must prove by a preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(2) through (5) of this section." 84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(d)(1)(i)). If the defendant "rebuts a plaintiff's assertion that the policy or practice is arbitrary, artificial, and unnecessary under paragraph (b)(1) of this section by *producing* evidence showing that the challenged policy or practice advances a valid interest (or interests)," then:

the plaintiff must prove by the preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in an *equally effective* manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(d)(1)(ii)) (emphasis added). The burden of proof remains with the plaintiff throughout this process.

But the NPRM would also specify that the defendant "may, as a complete defense," make one of three showings:

(1) prove the elements of the limited discretion defense or the algorithm defense, or

(2) demonstrate that the plaintiff has not proven by a preponderance of the evidence the elements of the plaintiff's *prima facie* burden set forth in proposed § 100.500(b)(2)-(5);[29] or

(3) demonstrate that "the alternative practice or policy identified by the plaintiff … would not serve the valid interest identified by the defendant in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant." 84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(d)(2)).

*Fourth*, the NPRM proposes to insert into the regulations the following statement:

(e) Business of insurance laws. Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance.

---

[29] As explained below, we believe this should reference § 100.500(b)(1), not § 100.500(b)(2). HUD should correct this in the final rule.

84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(e)).  The NPRM explains that this provision "clarifies that the Fair Housing Act does not 'specifically relate to the business of insurance,'" and therefore is preempted by state insurance laws to the extent it conflicts with them.  84 Fed. Reg. at 42,860.

The NPRM then re-affirms HUD's prior position declining to provide an exemption for homeowners insurance.  The NPRM explains that "[p]roposed paragraph (e) does not provide the safe harbor for insurance, which some commenters requested."  84 Fed. Reg. at 42,860.  To the contrary, the NPRM indicates that the proposal is intended to "affirm[] in regulation HUD's past position … that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case."  *Id.*  The NPRM acknowledges that the materially limited discretion defense "would have a similar effect to a safe harbor" and prevent insurers from being placed in a "double bind of liability" where they would be subject to liability under the Rule for actions required in order to comply with other laws.  *Id.*  But the NPRM proposes to require insurers to raise this defense on a case-by-case basis.  The NPRM provides no substantive explanation for HUD's decision not to adopt an exemption for homeowners insurance.  *See id.*

## III. HUD'S PROPOSED MODIFICATIONS OF THE BURDEN-SHIFTING FRAMEWORK ARE CONSISTENT WITH *INCLUSIVE COMMUNITIES*

APCIA supports HUD's proposal to modify the burden-shifting framework set forth in the Disparate Impact Rule.  The modifications suggested are fully consistent with—and indeed mandated by—the Supreme Court's 2015 decision in the *Inclusive Communities* case as well as the Court's prior decision in *Wards Cove*, 490 U.S. at 657.

Although the Supreme Court in *Inclusive Communities* recognized that disparate-impact claims are cognizable under the FHA, the Court emphasized that they "must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system."  *Inclusive Cmtys.*, 135 S. Ct. at 2518.  Only "artificial, arbitrary, and unnecessary" practices that are causally linked to a racial imbalance by robust evidence, beyond a mere correlation, may be subject to liability.  *Id.* at 2522-24.  These requirements ensure that defendants are not "held liable for racial disparities they did not create."  *Id.* at 2523 (citing *Wards Cove*, 490 U.S. at 653).  Moreover, the Court indicated that when a defendant articulates a "valid interest served by their policies," the plaintiff should not be allowed to "second-guess which of two reasonable approaches" a defendant should follow.  *Id.* at 2522.  The Court also cautioned against any disparate-impact framework that did not have "adequate safeguards at the prima facie stage" to prevent the use of race "in a pervasive way" or the injection of "racial considerations into every housing decision."  *Id.* at 2523-24.  The Court recognized that the absence of such safeguards would tend to "perpetuate race-based considerations rather than move beyond them."  *Id.* at 2524.  And fundamentally, the Court expressed concern that the "specter of disparate-impact litigation" could discourage businesses from undertaking activities essential to a well-functioning housing market.  *Id.*

The various requirements imposed as part of the plaintiff's *prima facie* burden in proposed 24 C.F.R. § 100.500(b) are generally consistent with the Supreme Court's guidelines:

- In section 100.500(b), the NPRM would require that the plaintiff's claim focus on "a specific, identifiable policy." That requirement was set forth by the Court in *Wards Cove*. *See* 490 U.S. at 657 ("As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.").

- In section 100.500(b)(1), the NPRM requires a plaintiff to allege that the challenged policy or practice is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective." That tracks the Court's confirmation in Inclusive Communities that challenged policies are "not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" *Inclusive Cmtys.*, 135 S. Ct. at 2524; *see also id.* at 2522.

- Proposed § 100.500(b)(2) would require a "robust causal link" between the challenged practice and the alleged disparate impact. The Court in *Inclusive Communities* noted the importance of a "robust causality requirement." *Id.* at 2523.

- Proposed § 100.500(b)(3) would require that "the alleged disparity caused by the policy or practice [have] an adverse effect on members of the protected class." That requirement conforms with the Supreme Court's observation that "a plaintiff bringing a disparate impact claim challenges practices that have a 'disproportionately adverse effect on minorities.'" *Inclusive Cmtys.*, 135 S. Ct. at 2513 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

- Proposed § 100.500(b)(4) mandates that the disparity caused by a practice be "significant." In *Wards Cove*, the Supreme Court similarly recognized that any disparate impact must be significant. *See* 490 U.S. at 657 ("Respondents will also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a *significantly* disparate impact on employment opportunities for whites and nonwhites." (emphasis added)).

Additionally, the limited discretion defense proposed in § 100.500(c)(1) also finds direct support in *Inclusive Communities*. That defense would preclude disparate-impact liability where the defendant can show that "its discretion is materially limited by a … Federal, state, or local law; or … [a] binding or controlling court, arbitral, regulatory or administrative requirement." In *Inclusive Communities,* the Court explained that if "federal law substantially limits [a defendant's] discretion," then a plaintiff will be unable to "show a causal connection" between the challenged policy and a disparate impact. 135 S. Ct. at 2524.

Finally, the NPRM would clarify that if a defendant rebuts the plaintiffs' assertion that the challenged practice is arbitrary, artificial, or unnecessary by showing that it advances a valid interest, then the plaintiff "must prove by the preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in *an equally effective* manner without imposing materially greater costs on, or creating other material burdens for, the defendant." *See* proposed § 100.500(d)(1)(ii) (emphasis added). HUD previously

14

had declined to include this key requirement—that a proposed alternative practice be "equally effective"—in the Disparate Impact Rule. *See* 78 Fed. Reg. at 11,473. That requirement, however, was mandated by the Supreme Court in *Wards Cove*. *See* 490 U.S. at 661 ("Of course, any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring procedures in achieving petitioners' legitimate employment goals.").

For all of these reasons, APCIA agrees that the proposed modifications to the Disparate Impact Rule's burden-shifting framework are generally consistent with the Supreme Court's guidance and should be adopted.[30]

## IV. HUD SHOULD EXEMPT RISK-BASED PRICING AND UNDERWRITING OF HOMEOWNERS AND COMMERCIAL HABITATIONAL INSURANCE FROM DISPARATE- IMPACT LIABILITY UNDER THE FHA

Although APCIA appreciates the modifications that HUD has proposed to the burden-shifting framework under the Disparate Impact Rule, APCIA respectfully urges HUD to also adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance, particularly. As explained below, such an exemption is necessary in light of the nature of the business of insurance, the limitations imposed *by Inclusive Communities* and the NPRM, the McCarran-Ferguson Act, and the filed-rate doctrine.

### A. Application Of The Disparate Impact Rule Is Fundamentally Inconsistent With The Business Of Insurance

An exemption is appropriate because the Disparate Impact Rule conflicts with the fundamental, risk-based nature of homeowners and commercial habitational insurance. In exchange for assuming a customer's risk, the insurer charges a rate derived from the likelihood and amount of potential losses. *See, e.g.*, 1 Steven Plitt et al., Couch on Insurance § 1:6 (3d ed. 2013).[31] Insurers also estimate their loss potential when determining whether to underwrite a particular type of hazard. *See, e.g., id.* § 1:2. As members of the insurance industry commented during HUD's prior rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." A.R. at 376.[32] The essence of risk-based insurance practices is "identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly." *Id.*[33]

Actuaries calculate the amount and probability of loss by reviewing objective risk factors. *See* Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates,* Casualty

---

[30] HUD may wish to consider flipping the order of Proposed § 100.500(b)(2) (robust causal link) and Proposed § 100.500(b)(3) (adverse effect), given that the adverse effect is a necessary predicate to finding a causal link between that effect and the challenged practice.

[31] Other factors that affect the provision and pricing of homeowners insurance include policy limits, deductibles, and the insurer's costs of doing business. *Id.*

[32] *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014) (ECF No. 19).

[33] *Id.*

Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). With respect to homeowners and commercial habitational insurance, such factors may include, among others, the materials used to build a dwelling, the dwelling's proximity to fire hydrants and fire stations with employed or volunteer fire fighters, the presence of a security system in the dwelling, and the history of losses associated with the dwelling or similar units.[34] Quantifying the impact of any risk factor is a purely mathematical and unbiased statistical exercise. Far from the "artificial, arbitrary, and unnecessary" practices that may incur liability under the FHA under *Inclusive Communities*, 135 S. Ct. at 2524, the assessment of risk is designed to precisely identify "the expected value of all future costs associated with an individual risk transfer."[35] Insurers and actuaries do not consider the race of customers or potential customers, or any other characteristic protected by the FHA, at any point during ratemaking, underwriting, or any other business operation.[36]

But despite the neutrality of insurance practices with respect to all FHA-protected characteristics, the Disparate Impact Rule could penalize insurers for relying on sound risk factors if they happened to disproportionately affect a class protected by the FHA.[37] In addition to improperly holding defendants "liable for racial disparities they did not create," *Inclusive Communities*, 135 S. Ct. at 2523 (*quoting Wards Cove*, 490 U.S. at 653)—as discussed below—this would irreparably distort the market for homeowners and commercial habitational insurance. Tying rates to risk factors ensures that prices accurately reflect an insurer's costs of covering particular classes of risk for similarly situated customers. Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. Removing risk factors from the ratemaking calculus could make it prohibitively expensive for an insurer that is writing these risks at an inadequate rate to insure high-risk properties, perhaps eliminating coverage across the market. It would also cause adverse selection, as customers with a low risk of loss would be charged more than necessary to cover their

---

[34] For homeowners and commercial habitational insurance, underwriters have historically reviewed four categories of factors to assess the risk of property damage claims: (1) Construction, (2) Occupancy, (3) Protection, and (4) Exposure. *See supra* § II.A.

[35] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 1988), https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

[36] *See* ECF No. 44-2 ¶ 6, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect information on race or ethnicity); ECF No. 44-3 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 ¶ 7, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates); ECF No. 27-2 ¶ 4, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or retain electronic records of race, color, or national origin and does not have capabilities to store and use such information); ECF No. 27-3 ¶ 9, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or consider race, color, religion, or national origin in underwriting and rating homeowners' insurance); ECF No. 27-5 ¶ 5, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (prior to the Disparate Impact Rule, insurer did not collect date on race, color, religion, national origin, sex, familial status, or handicap of its policyholders).

[37] Scholars have predicted that "protected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284.

risk. *See* Letter from PCI to HUD, at 2 (Jan. 26, 2015) (A.R. 4497) ("Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards."). As the Seventh Circuit has explained,

> Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992).

The Disparate Impact Rule's effects on homeowners and commercial habitational insurance pricing would also generate negative externalities beyond the insurance market. Risk-based insurance pricing encourages safer practices. For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials. Eliminating risk factors from the pricing model could reduce such expedient disincentives. *See, e.g.*, Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 66-67 (2012). Disallowing risk-based pricing inherently creates cross-subsidies from low-risk activities to high-risk activities, with the resulting unfairly discriminatory prices creating moral hazards and forcing more low-risk activities and consumers out of the market.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of risk factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11,475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1051 (N.D. Ill. 2014) ("*PCI*"). "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Despite the district court's holding, HUD's NPRM continues to rely on the ability of insurers to defend their practices in litigation under the Rule. It proposes to "affirm[] in regulation HUD's past position … that case-by-case adjudication is the proper way to resolve cases to

17

determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case." 84 Fed. Reg. at 42,860.

Allowing plaintiffs to mandate use of alternative risk factors via case-by-case adjudication would undermine the business of insurance. Any replacement risk factor would necessarily correspond to a different risk than the one identified as relevant by sound risk-based methodologies. As a result, the original risk of loss would still exist, and it would not be correctly reflected in the price of insurance. *See PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-4 ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans"). This would result in overcharging customers with a low risk of loss and likely driving many of them out of the market. The third step of the burden-shifting framework is accordingly a perfect example of the hazards of allowing plaintiffs to "second-guess which of two reasonable approaches" a defendant should adopt. *Inclusive Communities*, 135 S. Ct. at 2522.

Moreover, the fact that risk-based insurance practices could withstand challenges under the Disparate Impact Rule's burden-shifting framework does not remove the need for an express exemption. Forcing insurers to defend the use of potentially any risk factor in court would needlessly raise costs for the industry and customers more broadly and waste judicial resources. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 375 (6th Cir. 2007) ("[I]f no disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice.").

### B. Application Of The Disparate Impact Rule Would Contravene The Limitations Imposed In *Inclusive Communities* And Those Set Forth In The NPRM

HUD should adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance because under the limitations set forth in *Inclusive Communities* and in the NPRM, challenges to risk-based pricing and underwriting should fail in every case. In these circumstances, where any challenge must fail as a matter of law, litigants should not be put to the burden of litigating each matter on a case-by-case basis.

### 1. Risk-Based Pricing and Underwriting Are Not Arbitrary, Artificial, or Unnecessary

As noted above, under *Inclusive Communities* and the NPRM, a plaintiff can make out a *prima facie* case of disparate-impact discrimination under the FHA only by challenging a practice that is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective." Proposed § 100.500(b)(1); *see Inclusive Cmtys.*, 135 S. Ct. at 2524. A plaintiff challenging the use of risk-based pricing and underwriting could never make this showing. As explained above, insurers make pricing and underwriting decisions based on demonstrable risk factors—that is, based on objective data about the likelihood and value of their customers' potential losses. *See supra* § II.A. This practice is not merely "practical." *Inclusive Cmtys.*, 135 S. Ct. at 2518. It is essential for sustaining a viable insurance market. There is nothing "arbitrary" or "artificial" about

18

risk-based pricing and underwriting. Indeed, they are a fundamental aspect of the business of insurance necessary to maintain solvency for the protection of current and future insureds and claimants. By taking into account expected losses and loss-related expenses, insurers make coverage broadly available at appropriate prices while conforming to the state statutory mandate and regulatory admonition that rates must not be "excessive, inadequate or unfairly discriminatory." *See supra* §§ II.A & B, IV.A.

## 2. The "Robust Causal Link" Requirement Cannot Be Met

A plaintiff challenging risk-based pricing and underwriting of homeowners and commercial habitational insurance also cannot satisfy the "robust causal link" requirement set forth in the NPRM. *See* Proposed § 100.500(b)(2); *see also Inclusive Cmtys.*, 135 S. Ct. at 2523. This requirement "protects defendants from being held liable for racial disparities they did not create." *Id.* Homeowners and commercial habitational insurers do not consider, nor do they collect, data regarding their customers' FHA-protected characteristics. *See supra* § II.A. An insurer's reliance on risk-based pricing and underwriting is not "the direct cause" of any resulting disparate impact. Proposed § 100.500(b)(2). To the extent a plaintiff asserts disparate impact arising from risk-based pricing and underwriting, any alleged disparity among protected classes is the result of factors that are not within the control of insurers. For example, a prospective insured's proximity to a fire station staffed with employed (not volunteer) firefighters is highly correlated to future loss projections and proximity factors into pricing as a result. Predicating alleged disparate-impact liability based on this factor would compromise an important tool for ensuring the solvency of homeowners and commercial habitational insurers and their ability to pay current and future claims, while doing nothing to combat unlawful discrimination.

## 3. State Insurance Regulation Limits Insurers' Discretion

Disparate-impact challenges to risk-based pricing and underwriting also cannot succeed in light of the materially limited discretion defense proposed in the NPRM, as required by *Inclusive Communities*. As noted, under the proposed rule, a disparate-impact claim cannot proceed where a "defendant shows that its discretion is materially limited by … [a] Federal, state, or local law." Proposed § 100.500(c)(1)(i). This defense was mandated by *Inclusive Communities*, where the Court explained that when a "law substantially limits the [defendant's] discretion," causality cannot be shown. 135 S. Ct. at 2524. That is the case here. Application of disparate-impact liability to risk-based pricing and underwriting by homeowners and commercial habitational insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id*. at 2523. As explained above, insurers are regulated by state laws (including unfair trade practices laws) permitting and requiring the use of risk-based pricing and underwriting and requiring the filing of rates with state administrative bodies for approval. *See supra* § II.B; *infra* § IV.C.2. Those state laws mandate or expressly permit insurers to use neutral risk factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates for various risk classifications. State laws thus "substantially limit" the discretion of insurers in a manner that would make it impossible to ascribe any disparate effects of underwriting or pricing practices to insurers' independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the

companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the "double bind of liability" the Court warned against.

### 4. Risk-Based Pricing and Underwriting Are Necessary for the Insurance Market to Function

Application of disparate-impact liability to risk-based pricing and underwriting would also contravene the Supreme Court's instruction that the FHA must be limited in a way that gives "latitude to consider market factors." *Inclusive Cmtys.,* 135 S. Ct. at 2523. As explained above, insurance markets function efficiently when insurance is priced in accord with risk-based factors. *See supra* §§ II.A, IV.A. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation, providing an incentive to guard against risk and, thereby, avoiding the societal consequences of moral hazard. The extensive state-law framework governing the pricing of insurance, which includes safeguards against insurer insolvency, is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Inclusive Cmtys.*, 135 S. Ct. at 2524. Unless that specter is vanquished, the FHA will "undermine[] its own purpose as well as the free-market system." *Id*.

### 5. Application of Disparate Impact Would Unnecessarily Inject Racial and Other Demographics Considerations into Insurance

Finally, application of disparate-impact liability to risk-based pricing and underwriting would improperly promote consideration of racial (or other suspect) classifications. The Court in *Inclusive Communities* explained that "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." 135 S. Ct. at 2524. But that is just what extending disparate-impact liability to homeowners and commercial habitational insurers would do. State law ensures that homeowners insurers price their products in accordance with risk-based factors. State law does not permit reliance on, and homeowners and commercial habitational insurers do not rely on, classifications prohibited by the FHA. Yet, the failure to exempt homeowners and commercial habitational insurers from disparate-impact liability would effectively require them to collect and analyze sensitive—and previously uncollected—data on the FHA-protected characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts. Exempting homeowners and commercial habitational insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners and commercial habitational insurers would, contrary to the teachings of *Inclusive Communities*, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners and commercial habitational insurance by imposing significant and needless costs on insurers and their customers.

20

Because application of disparate-impact liability to risk-based pricing and underwriting would run afoul of all of these limitations, HUD should grant an exemption for those activities.

### C. Application Of The Disparate Impact Rule To Homeowners And Commercial Habitational Insurance Would Violate The McCarran-Ferguson Act

HUD should also provide an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance because application of the Disparate Impact Rule also would invalidate, impair, or supersede state laws regulating insurance and therefore violate the McCarran-Ferguson Act. But rather than propose such an exemption, the NPRM avoids any analysis of McCarran-Ferguson.

The court hearing the challenge to the 2013 Disparate Impact Rule brought by PCI criticized HUD for failing to explain how the Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *See PCI*, 66 F. Supp. 3d at 1048. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking. *Id.* The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048.

That critique also applies to the NPRM, which does not adequately address the McCarran-Ferguson Act. In the NPRM, HUD does not assess whether application of the McCarran-Ferguson Act would bar application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance in all or most cases. Instead, HUD proposes to add a provision confirming that nothing in the Rule "is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business if insurance. *See* Proposed § 100.500(e). APCIA appreciates HUD's acknowledgment of that point but respectfully submits that it is insufficient under the district court's analysis. *See PCI*, 66 F. Supp. 3d at 1048.

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners and commercial habitational insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) improperly requiring federal courts to determine whether challenged insurance practices are actuarially sound, (ii) invalidating state laws permitting or requiring insurers to engage in risk-based pricing and underwriting; and (iii) impairing state laws and regulations providing for state administrative review of insurance rates. The Disparate Impact Rule's violation of the McCarran-Ferguson Act is most obvious in cases where an insurer's rates or underwriting guidelines are submitted to—and subject to review by—the states. In those instances, there can be no dispute that the Disparate Impact Rule is inapplicable in light of McCarran-Ferguson.

### 1. The Rule Would Improperly Require Federal Courts to Determine Whether Challenged Practices Are Actuarially Sound

The McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Mutual of Omaha*, 179 F.3d at 564 (McCarran-Ferguson prohibits the federal courts from "regulating the … insurance industry" via litigation). In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.* Indeed, the district court in the *PCI* case observed that "*Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." *PCI*, 66 F. Supp. 3d at 1039; *see also id.* at 1028-29 (describing *Mutual of Omaha*). The court specifically rejected the argument previously made by HUD that the relevant language in *Mutual of Omaha* was dicta. *See id.* at 1039 n.6 ("*Mutual of Omaha* is binding on this Court.").

Application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would similarly force federal courts to second-guess the actuarial soundness of particular state-regulated insurance practices. Under the Rule, in order to bring a challenge, a plaintiff would need to demonstrate that an alternative to the pricing or underwriting practice challenged would be "less discriminatory" and "would serve the defendant's identified interest in an equally effective manner." Proposed § 100.500(d)(1)(ii). A defendant could avoid liability by demonstrating that "the alternative practice … would not serve the valid interest identified by the defendant in an equally effective manner." *Id.* § 100.500(d)(2)(iii). Litigating these issues would necessarily involve an examination into whether use of a particular risk factor was legitimate, and federal courts would find themselves evaluating whether a practice is actuarially sound and which of two practices is more predictive of loss. Thus, in every case under the Rule challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts, on the basis of a law that does not mention insurance, is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

As noted, the *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*." *PCI*, 66 F. Supp. 3d at 1048. Despite the court's emphasis on *Mutual of Omaha*, HUD's NPRM again makes no effort to address the decision's key holding. HUD never addressed the clear holding of *Mutual of Omaha* that the *PCI* court noted and found applicable here: that the McCarran-Ferguson Act prohibits a federal court from determining

22

whether an insurer's practices "are actuarially sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564.

### 2. The Rule Would Conflict with State Laws Permitting or Requiring Insurers to Engage in Risk-Based Pricing and Underwriting

State insurance law uniformly permits insurers to rely on risk factors in setting rates and making underwriting decisions. Under state insurance law, only "unfair discrimination" is prohibited. Unfair discrimination occurs only when insureds posing similar risks are treated differently. Differential treatment of insureds posing different risks is uniformly allowed (and, indeed, required, as explained below). Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." WIS. STAT. ANN. § 625.11(4). As another example, Arizona laws specifies:

> A rate is not unfairly discriminatory in relation to another in the same class if it reflects equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, if the rates reflect the differences with reasonable accuracy.

ARIZ. REV. STAT. ANN. § 20-383(D); *see also, e.g.*, COLO. REV. STAT. ANN. § 10-4-403(1)(c); MICH. COMP. LAWS ANN. § 500.2403(1)(d); MINN. STAT. ANN. § 70A.04(4); MO. ANN. STAT. § 379.318(4); NEV. REV. STAT. ANN. § 686B.050(4); N.H. REV. STAT. ANN. § 412:15(I)(d); N.M. STAT. ANN. § 59A-17-6(E); N.C. GEN. STAT. ANN. § 58-40-20(e); TENN. CODE ANN. § 56-5-103(a), (d). *See generally* Appendix I (attached).

The principle that only "unfair" discrimination is prohibited is enshrined in both state insurance rating laws (like those quoted above) and state insurance unfair practices laws, which address both the pricing and provision of insurance more generally. *See* Appendix I; *see, e.g.*, IOWA CODE ANN. § 507B.4(3)(g) (specifying that it is an unfair trade practice to "[m]ak[e] or permit[] any unfair discrimination between insureds of the same class for essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance other than life or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.").

In addition, numerous states expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, CONN. GEN. STAT. § 38a-803(4); N.H. REV. STAT. ANN. § 412:15(I)(d); VA. CODE ANN. § 38.2-1904(A)(3). For example, under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in

> hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

IND. CODE ANN. § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of risk-based pricing. *See, e.g.*, ARIZ. REV. STAT. ANN. § 20-356(4); ARK. CODE ANN. § 23-67-209(b); COLO. REV. STAT. ANN. § 10-4-403(4); DEL. CODE ANN. tit. 18 § 2503(5); MD. CODE ANN. INS. § 11-205(f); ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(G); MINN. STAT. ANN. § 70A.05(2); NEV. REV. STAT. ANN. § 686B.060(2); TEX. INS. CODE ANN. § 2251.052(c); *see generally* Appendix I.[38]

As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any . . . of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Moreover, the vast majority of states *require* insurers to set rates based on past losses, anticipated future losses, related loss expenses, and other neutral factors, which (taken together) form the foundation of risk-based pricing and underwriting as a mechanism for complying with state prohibitions against "unfair discrimination" and "inadequate" rates and their hedge against insurer solvency for the protection of insureds and claimants alike. *See* Appendix I; *see also PCI*, 66 F. Supp. 3d at 1039 (noting that "some states require insurers to use risk-based pricing" and that others "merely permit risk-based pricing"). Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." IND. CODE ANN. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." WIS. STAT. ANN. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, GA. CODE ANN. § 33-9-4(4); MD. CODE ANN., INS. § 11-205(c); MASS.

---

[38] APCIA's identification of the specific state laws at issue distinguishes this case from *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003).

GEN. LAWS ANN. ch. 174A, § 5(3); N.J. STAT. ANN. § 17:29A-4(c); N.Y. INS. LAW § 2304(a); OHIO REV. CODE ANN. § 3935.03(C); S.C. CODE ANN. § 38-73-430(1); TENN. CODE ANN. § 56-5-104(1); WASH. REV. CODE ANN. § 48.19.030(3); *see generally* Appendix I.

Indeed, as noted above, state insurance laws also make clear that failure to account for differences in expected losses constitutes prohibited "unfair discrimination." For example, Utah law provides that "[a] rate is unfairly discriminatory if price differentials fail to equitably reflect the differences in expected losses and expenses after allowing for practical limitations." UTAH CODE ANN. § 31A-19a-201(4)(a); *see also, e.g.*, ARIZ. REV. STAT. ANN. § 20-383(D); COLO. REV. STAT. § 10-4-403(1)(c); MICH. COMP. LAWS ANN. § 500.2403(1)(d); MINN. STAT. ANN. § 70A.04(4); MO. ANN. STAT. § 379.318(4); NEV. REV. STAT. ANN. § 686B.050(4); N.H. REV. STAT. ANN. § 412:15(I)(d); N.M. STAT. ANN. § 59A-17-6(E); N.C. GEN. STAT. ANN. § 58-40-20(e); TENN. CODE ANN. § 56-5-103(a), (d).

States similarly prohibit insurers from charging "inadequate rates," thereby requiring them to take into account risk in order to remain solvent. *See* Appendix I (the same state laws prohibiting unfair discrimination, and thus permitting risk discrimination, also prohibit "inadequate" rates). For example, Texas insurance law provides that "[a] rate may not be excessive, *inadequate*, unreasonable, or unfairly discriminatory for the risks to which the rate applies. TEX. INS. CODE ANN. § 2251.052 (emphasis added). A rate is "inadequate if it "is insufficient to sustain projected losses and expenses to which the rate applies" and "continued use of the rate endangers the solvency of an insurer using the rate[]." TEX. INS. CODE ANN. § 2251.051(c). Other state statutes contain similar requirements. *See, e.g.,* N.Y. INS. LAW § 2303 ("Rates shall not be excessive, *inadequate*, unfairly discriminatory, destructive of competition or *detrimental to the solvency of insurers*.") (emphases added); COLO. REV. STAT. ANN. § 10-4-403 ("Rates shall not be excessive, *inadequate*, or unfairly discriminatory" and "[c]oncerning inadequacy, rates are not inadequate unless clearly insufficient to sustain projected losses and expenses") (emphasis added); *see also* Appendix 1 (column 3). As explained by the Pennsylvania Superior Court:

> With or without regulation, it has always been in the public interest to have insurance premiums high enough to assure the payment of losses, and yet low enough to enable the public to secure protection upon the payment of a reasonable premium. To assure the availability of funds by insurers to pay losses, the state has long required insurance companies to be licensed, to maintain reserves and to submit to examination to determine solvency and compliance with the law. This has discouraged companies from charging 'inadequate' rates.

*Ins. Dep't v. City of Philadelphia*, 173 A.2d 811, 814 (Pa. 1961); *see also Engelman*, 692 A.2d at 480 (describing the prevention of inadequate insurance rates as one of the principal aims of the Maryland Insurance Code). Under the McCarran-Ferguson Act, a federal law must not be

25

interpreted as prohibiting practices that state insurance law permits.[39] Yet undermining the states' efforts to guard against insurer insolvency by prohibiting inadequate rates is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to foreclose insurances practices expressly permitted or even required by state law.

In compliance with state insurance laws, insurers charge different rates and make different underwriting decisions relative to customers posing different risks and/or presenting with different loss profiles. Despite these state-authorized differences, HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a FHA-protected characteristic, thus creating a conflict between the Rule and the laws of the vast majority of the states. The McCarran-Ferguson Act ensures that federal laws of general applicability do not "'invalidate, impair, or supersede' [a] State's law." *Humana*, 525 U.S. at 307. To invalidate means "to render ineffective," and to supersede is "to displace (and thus render ineffective) while providing a substitute rule." *Id.* (internal quotation marks omitted). To impair a State's law is to "hinder its operation or frustrate [a] goal of that law." *Id.* at 311 (internal quotation marks and citation omitted). Application of the Disparate Impact Rule to insurers would "invalidate, impair, or supersede" state law and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly permitted or required by state law. *Id.* at 310.

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *Humana*, 525 U.S. at 311; *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But, as explained above, far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Case-by-case adjudication in federal court would require federal courts to evaluate the soundness of challenged practices and would permit insurers to be held liable for use of sound risk-based practices.

### 3. The Rule Would Conflict with State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—49 of 50, plus the District of Columbia—require admitted insurers to file their rates with state insurance commissioners for review and approval.

---

[39] *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1557 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal … laws."); *Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations).

*See* Appendix I.[40]  Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection.  *E.g.*, CONN. GEN. STAT. § 38a-689(a); FLA. ADMIN. CODE ANN. r. 69O-170.013(1)(b); GA. CODE ANN. § 33-9-21(a); KAN. STAT. ANN. § 40-955 (a), (l); KY. REV. STAT. ANN. § 304.13-051(4); ME. REV. STAT. ANN. tit. 24-A § 2938-A; MD. CODE ANN., INS., § 27-501(h)(2); MICH. COMP. LAWS ANN. § 500.2119; MO. CODE REGS. ANN. tit. 20, § 500-9.100; N.H. INS. 3306.01(a); N.J. STAT. ANN. § 17:22-6.14a1; N.M. STAT. ANN. § 59A-17-5.1; 28 TEX. ADMIN. CODE § 5.9342; UTAH ADMIN. CODE R. R590-127; VT. STAT. ANN. tit. 8, § 4688; W. VA. CODE R. § 114-74-4.  State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound risk factors and are not excessive, inadequate, or unfairly discriminatory.  *E.g.*, WIS. STAT. ANN. § 625.13; N.J. STAT. ANN. § 17:29A-7; IND. CODE ANN. § 27-1-22-5; GA. CODE ANN. § 33-9-26; KAN. STAT. ANN. § 40-955 (a), (l); MD. CODE ANN., INS. § 27-501(h)(2); MICH. COMP. LAWS ANN. § 500.2119; N.J. STAT. ANN. § 17:22-6.14a1; VT. STAT. ANN. tit. 8, § 4688; W. VA. CODE R. § 114-74-4.  For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner.  CAL. INS. CODE § 1861.05(b).

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair, invalidate, or supersede these laws by substituting the judgment of a federal court for that of state regulators.  *Humana*, 525 U.S. at 310.  The laws governing rate filing provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states.  If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired, invalidated, or superseded by the application of the Rule.  *See, e.g.*, *Saunders II*, 537 F.3d at 968 ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials.  If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'").  Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state regulator would not establish that the rate was lawful.  Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to litigate in federal court whether every component of their rating and underwriting plans and other business practices "advances a valid interest."  *See* Proposed § 100.500(d)(1)(i).  Such interference with the states' insurance administration regimes is not permitted under the McCarran-Ferguson Act.  *Humana*, 525 U.S. at 310.

*        *        *

For all of these reasons, application of the Disparate Impact Rule to homeowners and commercial habitational insurance would "invalidate, impair, or supersede" state laws governing

---

[40] As previously noted, admitted insurers account for 99% of homeowners policies.  *See supra* n.2.  Rate filing is also generally required for small-to-mid-market commercial habitational insurance.  A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

insurance in every state.  Accordingly, application of the Rule to homeowners and commercial habitational insurance would violate the McCarran-Ferguson Act.  For that reason alone, HUD should grant an exemption for homeowners and commercial habitational insurance.[41]

### D.  Application Of The Disparate Impact Rule To Risk-Based Pricing Would Violate The Filed-Rate Doctrine

HUD also must exempt risk-based pricing of homeowners and commercial habitational insurance[42] from the Rule in order to avoid conflict with the filed-rate doctrine.  The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions."  *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986); *PCI*, 66 F. Supp. 3d at 1049.  The doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers."  *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).[43]

The doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities.  *See, e.g.*, *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 236-39, 242 (3d Cir. 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013); *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005), *aff'd*, 721 N.W.2d 307 (Minn. 2006); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*, No. 3775, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000); *see also, e.g.*, CAL. INS. CODE § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred

---

[41] In the preamble to HUD's 2011 proposed rule, HUD addressed the "provision and pricing of homeowner's insurance."  76 Fed. Reg. at 70,924.  HUD later indicated that the Disparate Impact Rule might also apply to other insurance practices, such as claims processing or marketing.  81 Fed. Reg. at 69,017.  The relevant provisions of the FHA, however, should not be construed to apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership—the relevant activity protected by the FHA.  As the Seventh Circuit has explained, 42 U.S.C. § 3604 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant."  *N.A.A.C.P.*, 978 F.2d at 301.  The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing.  Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices.  That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith."  The section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD.  Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection."  *Southend Neighborhood Improvement Ass'n v. St. Clair Cty.*, 743 F.2d 1207, 1210 (7th Cir. 1984).  Because homeowners and commercial habitational insurers provide no such services, they are not covered by § 3604(b).

[42] The filed-rate doctrine applies to large commercial habitational insurance to the extent insurers file their rates.  *See supra* n.2 and n.40.

[43] The extent or the vigor of the agency's review of filed rates does not matter—the filed-rate doctrine applies whenever rates have been filed.  *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates); *McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-CV-W-FJG, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

The district court in *PCI* found that HUD initially had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. *PCI*, 66 F. Supp. 3d at 1050. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* In the NPRM, HUD has again failed to address the filed-rate doctrine. That was arbitrary and capricious.

At bottom, applying the Disparate Impact Rule to homeowners and commercial habitational insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and federal government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Wegoland*, 27 F.3d at 19; *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted).

### E.      HUD Has Authority To Exempt Homeowners And Commercial Habitational Insurance

For all of the reasons set forth above, the Disparate Impact Rule cannot and should not be applied to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Applying the Rule to risk-based pricing and underwriting would significantly interfere with the essential economic principles that underlie the business of insurance, which requires consideration of risk. It also would contravene the limitations on disparate-impact liability laid out by the Supreme Court in *Inclusive Communities*. Application of the Rule would further run afoul of the McCarran-Ferguson Act—a critical consideration that a federal court has previously faulted HUD for failing adequately to address. Finally, the filed-rate doctrine bars application of the Rule to the pricing of homeowners and commercial habitational insurance.

Notwithstanding all these legal impediments, HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475. But HUD has never explained how disregarding limitations imposed by the Supreme Court or complying with the McCarran-Ferguson Act would be contrary to congressional intent. Nor has it explained how arbitrarily and capriciously applying the Rule to the business of providing homeowners and commercial habitational insurance or violating the filed-rate doctrine would further congressional intent. HUD previously based its assertion that it could not grant an exemption entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human*

*Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Graoch* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Id.* (emphasis added). Indeed, the *Graoch* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 390-91. The district court in the PCI case recognized that case law HUD itself previously relied upon makes clear that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI*, 66 F. Supp. 3d at 1051 (quoting *Graoch*, 508 F.3d at 375-76). In the NPRM, however, HUD failed even to acknowledge *Graoch*.

Even if an insurer could successfully defend risk-based practices under the Rule's burden-shifting framework, HUD's denial of an exemption would still be arbitrary and capricious. Requiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on the industry and customers broadly, making insurance less affordable for all. Under HUD's approach, in many cases insurers would have to defend each of the risk factors they use, perhaps even on a region-by-region basis as different plaintiffs assert alleged disparate impacts among particular populations of insureds. HUD's only response previously was that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. HUD provided no basis, however, for its counterintuitive assumption that it would cost as much to demonstrate eligibility for an exemption for risk-based pricing and underwriting as it would to litigate the soundness of a challenged practice on a case-by-case basis in multiple jurisdictions at different points in time.

Moreover, the Rule would require insurers to establish not merely that a practice is purely risk-based; it would also require insurers to litigate the third step of the burden-shifting approach, disputing that less discriminatory alternatives exist. This would be especially difficult for insurers because—as noted—they do not collect data on subscribers' FHA-protected characteristics and have no other means of anticipating disparities. And assuming they could collect the necessary data to defend themselves, it would introduce race or ethnicity as a pervasive factor, which the Court in *Inclusive Communities* warned against, and intrude upon policyholders who would be required to self-report race and ethnicity data. *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶¶ 11–12; *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-3 ¶ 14.

Accordingly, HUD can and should exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from disparate-impact liability under the FHA.

30

## V. IF HUD DOES NOT GRANT AN EXEMPTION, IT SHOULD MODIFY AND CLARIFY THE DEFENSES IN THE RULE TO ADDRESS ISSUES UNIQUE TO RISK-BASED INSURANCE PRICING AND UNDERWRITING AND TO MORE CLOSELY CONFORM TO *INCLUSIVE COMMUNITIES*

For all of the reasons set forth above, HUD should exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from disparate-impact liability under the FHA. If HUD elects not to recognize such an exemption, at a minimum it should incorporate a number of additional clarifications to the defenses in the proposed rule. The specific modifications and clarifications requested by APCIA are attached in Appendix III.

### A. HUD Should Enact A New Defense In § 100.500(c) For Risk-Based Pricing And Underwriting

As an initial matter, HUD should add a new defense in proposed § 100.500 for defendants that can show that they were engaged in risk-based pricing and underwriting. Currently that section would recognize defenses where a defendant's discretion is materially limited by a third party, where the defendant relied on an algorithmic model, and where the plaintiff has failed to allege sufficient facts to meet its burden at the *prima facie* stage. HUD should add a fourth defense for use of risk-based pricing and underwriting.

For the reasons set forth above that support creation of a full exemption for risk-based pricing and underwriting, HUD should create a substantive defense for risk-based pricing and underwriting. If a Defendant shows that it relied on risk-based pricing and underwriting, that should be a complete defense at Step 2 of the burden-shifting framework. The plaintiff should not have an opportunity to rebut the defense at Step 3.

As explained above, allowing a plaintiff to litigate at Step 3 whether some other alternative risk factor would be less discriminatory but "equally effective" would impermissibly require federal courts to adjudicate the actuarial soundness of challenged insurance practices. But that is precisely what the Seventh Circuit in *Mutual of Omaha* indicated a federal court cannot do in light of the McCarran-Ferguson Act. *See* 179 F.3d at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law," then federal courts would "find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do." *Id.*

A defendant seeking to invoke the defense would need to establish that it applies. The defense would be inapplicable if the defendant were not in fact engaging in risk-based pricing and underwriting. If, for example, an insurer determined rates based in part on a factor considered not for its predictive value, but for its ability to exclude members of a FHA-protected class, the defense would be unavailing. The defense would apply only to efforts to engage in risk-based pricing and underwriting. As noted at the outset, nothing in the Rule would be deemed to exempt an insurer from claims of intentional disparate treatment, in the event such insurer did in fact consider a FHA-protected characteristic in the sale, rental, or financing of dwellings or in other housing-related activities subject to the FHA.

31

**B.      HUD Should Ensure That Plaintiffs Satisfy The Robust Causation Standard Required By *Inclusive Communities* In § 100.500(b)(1)**

Although the proposed Rule incorporates the "robust" causation requirement discussed in *Inclusive Communities*, causation plays a particularly important role in the context of insurance. Commercial insurers, for example, have no direct relationship with tenants or homeowners. They are not landlords, provide no financing to tenants or homeowners, and may not even provide direct insurance to the parties who might bring suit for alleged disparate-impact liability under the FHA. Such an insurer's policies or practices, therefore, are likely to be only remotely related to the housing opportunities and decisions of allegedly FHA-protected class members, as the connection between housing opportunities and decisions of allegedly affected class members would be separated by a host of factors unrelated to insurance. Indeed, the connection between housing opportunities and specific insurance practices across all types of homeowners and commercial habitational insurance is often remote. The Supreme Court in *Inclusive Communities* observed that in situations like that, it may be difficult, if not impossible, to meet the robust causation standard the Court held to be necessary to ensure that disparate-impact liability does not raise constitutional concerns. *See* 135 S. Ct. at 2523-24 (explaining that a plaintiff challenging the decision of a private developer to construct a new building in a particular location may not be able to show causation "because of the multiple factors that go into investment decisions about where to construct or renovate housing units"). The Court has also made clear that mere statistical disparities or correlation is insufficient to show that a challenged policy or practice was the cause of a disparate impact. HUD should ensure that these concerns are reflected in subsection (b)(1), by clarifying that the causation analysis must consider whether a practice is too remote to give rise to liability, and that more than statistical correlation is required.

**C.      HUD Should Expand The "Limited" "Discretion" Defense In § 100.500(c)(1)**

HUD should also amend the limited discretion defense set forth in proposed § 100.500(c)(1). As drafted, the defense could be read to apply only where state law <u>required</u> the challenged insurance practice. HUD should clarify that the defense also applies where state insurance law <u>permits</u> the challenged practice.

As proposed, the defense applies only if a "defendant shows that its discretion is materially limited by a third party such as through … [a] Federal, state, or local law." Proposed § 100.500(c)(1)(i). A defendant's discretion to act is plainly limited where state law <u>compels</u> the defendant to engage in the challenged practice. In some cases, however, state law may merely <u>permit</u> the challenged practice without compelling it. Where the state law at issue is a state insurance regulation, such permission ought to be sufficient given the limitations imposed by the McCarran-Ferguson Act.

As explained above, it is well established that, in light of the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d at 1557 n.9 (Under McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal … laws."); *Dexter*, 527 F.2d at 236 (same); *Boulware*, 2009 WL 3830640, at *8 (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public

insurance fraud prosecutions); *Chair King*, 1995 WL 1760037, at \*5 (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). The mere fact that state law permits a practice might not, in most circumstances, preclude federal regulation of the practice. But insurance is different because of McCarran-Ferguson. Where a defendant can show that the practice challenged is permitted by state insurance law, it should be able to invoke a defense set forth in the Disparate Impact Rule.

### D. HUD Should Modify The Algorithm Defense In § 100.500(c)(2)

HUD also should revise the algorithm defense proposed in the NPRM. *See* Proposed § 100.500(c)(2). The proposed defense—which lays out three different ways to fall within its scope—is important and appropriate. Where a defendant has legitimately relied on an algorithmic model, it cannot be found to have directly caused any resulting disparate impact. Under the NPRM and *Inclusive Communities*, the requisite "robust causal link" is missing. The defendant has not adopted some arbitrary or irrational practice. It has relied on an algorithmic model designed to engage, for example, in "risk assessment." *Id.* HUD therefore should retain the algorithm defense. At the same time, however, the defense should be refined in a number of respects:

First, the opening portion of the defense in proposed § 100.500(c)(2) should be modified. The defense should not be applicable only if the plaintiff has affirmatively "*allege[d]* that the cause of a discriminatory effect is a model used by the defendant." (Emphasis added.) Such a requirement would allow plaintiffs to engage in artful pleading and avoid triggering the defense. Instead, the defense should apply "if the cause of a discriminatory effect is a model used by the defendant." The provision should also be clarified to explicitly include actuarial analyses, to avoid disputes as to whether such analyses constitute a "model."

Second, the first variation of the defense—set forth in proposed § 100.500(c)(2)(i)— applies where a defendant identifies the factors used in the model, "shows that these factors do not rely in any material part on factors that are substitutes or close proxies for protected classes" under the FHA, and shows that "the model is predictive of credit risk or other similar valid objective." This variant of the defense should be revised to make clear that it applies where the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other similar valid objectives, as long as the model does not use FHA-protected characteristics as factors. There should be no inquiry into whether the facially valid factors in a predictive model are somehow deemed to be "substitutes or close proxies for protected classes." That portion of the defense is ambiguous and threatens to spawn unnecessary litigation. It is not clear what it means for "factors" to "rely in material part on factors that are substitutes or close proxies for protected classes." The clause injects significant uncertainty and invites needless litigation, as plaintiffs would invariably contend that nearly any factor is a "substitute" or "close proxy" for protected classes. It is also unnecessary, inasmuch as a defendant shown to have intentionally used a "substitute" for a protective class would remain potentially liable for intentional discrimination. The algorithm model defense should require a defendant to show that characteristics protected by the FHA are not used as factors in the model.

Third, the confusing and unnecessary requirement in the proposed rule that factors not be "proxies" for protected classes should also be eliminated from the third variant of the algorithm defense for these same reasons. *See* Proposed § 100.500(c)(2)(iii).

Fourth, for the first and third variants of the algorithm defense, the defendant should be able to prove the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives without requiring the model itself or all of the inputs be produced. Nor should the defendant be required to produce its model or algorithm to show that it does not take into account the FHA-protected characteristics. Computerized models, actuarial analysis, or algorithms are often highly proprietary and would, if publicly disclosed, potentially cause competitive harm and over time create an anti-competitive insurance market.

Fifth, the defense in Proposed § 100.500(c)(2)(ii) should not be limited to models from third parties "that determine[] industry standards." In many instances, algorithmic models are developed by reputable third parties that do not serve to determine industry standards. In some industries, however, standards are not set by the kinds of third parties that might develop an algorithmic model. In the homeowners and commercial habitational insurance industry, for example, there is no third party charged with determining industry standards that is in a position to develop a risk-based pricing and underwriting model. The Rule should be less prescriptive on this issue to permit its application in a wider range of cases, so long as the model at issue is in fact developed by a reputable third party. Moreover, many insurance companies have in-house expertise in modeling and development of algorithms for purposes of actuarial and underwriting analysis. So long as the model does not take account of protected characteristics, the defense should apply regardless of whether it was developed internally or by third parties.

### E.     Issues Relating To Burdens Of Proof

Proposed § 100.500(c)(3) appropriately allows a defendant to show that the plaintiff has failed to meet his or her burden of proof at the pleading stage for reasons other than those specifically discussed in (c)(1) (limited discretion) and (2) (use of algorithms or models). The Rule should clarify that it is plaintiff's *burden* to establish the elements of paragraph (b). To do so, it should be revised to state that it is a defense if the defendant "demonstrates that the plaintiff has failed to allege sufficient facts to [meet plaintiff's burden] under paragraph (b) of this section."

Proposed § 100.500(d)(1)(i) provides that, where the case is not resolved at the pleading stage, ultimately the "plaintiff must prove by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(2) through (5) of this section . . . ." As drafted, the provision omits a reference to paragraph (b)(1). Paragraph (b)(1) requires the plaintiff to plausibly allege that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law." This provision may have been omitted on the theory that if the defendant rebuts this showing, the plaintiff then has the burden of demonstrating that a less discriminatory policy or practice exists meeting the requirements of paragraph (d)(ii). However, consistent with *Inclusive Communities* and prior Supreme Court caselaw, the plaintiff always carries the burden of establishing that the challenged policy or

34

practice is based on arbitrary, artificial, and unnecessary barriers, even if the plaintiff has alleged sufficient plausible facts to survive a motion to dismiss at the pleading stage. *See Inclusive Cmtys.*, 135 S. Ct. at 2522. Thus, paragraph (d)(1)(i) should be modified to require the plaintiff to demonstrate by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(1) through (5).

## VI. AT A MINIMUM, HUD SHOULD MAKE CLEAR IN THE FINAL RULE THAT DISPARATE-IMPACT CHALLENGES ARE INCONSISTENT WITH RISK-BASED PRICING AND UNDERWRITING

As explained above, we believe HUD should grant a broad exemption from disparate-impact liability for risk-based pricing and underwriting of homeowners and commercial habitational insurance. Alternatively, HUD should revise the defenses in proposed § 100.500(c) to incorporate a defense for risk-based pricing and underwriting. If HUD does not take either step, however, it should at a minimum make clear in the preamble to the final rule that (1) disparate-impact challenges to risk-based pricing and underwriting cannot succeed, and (2) HUD will not bring such challenges.

### A. HUD Should Acknowledge Key Aspects Of Insurers' Defenses

In light of the significant limitations on disparate-impact liability proposed in the NPRM and mandated by the Supreme Court in *Inclusive Communities*, as well as the restraints imposed by the McCarran-Ferguson Act, disparate-impact challenges to risk-based pricing of homeowners and commercial habitational insurance cannot succeed. HUD should acknowledge the numerous barriers to such claims in the preamble to the final rule to avoid spawning unnecessary litigation. Specifically, HUD should acknowledge the following:

- Risk-based pricing and underwriting are not "arbitrary, artificial, or unnecessary" practices and instead "advance valid interests." Risk-based pricing and underwriting are critical to the appropriate provision of insurance and to maintaining solvency since both are driven by expected losses and related expenses and neither relies on factors that are substitutes or close proxies for protected classes.

- For the reasons explained above, disparate-impact challenges to risk-based pricing and underwriting cannot satisfy the "robust causal link" and "direct cause" requirement of the NPRM. Use of legitimate risk factors does not cause disparate impact; any impact is caused by socioeconomic factors outside the control of insurers.

- Disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance, requiring insurers to collect and analyze data on FHA-protected characteristics.

35

- State insurance regulations materially limit insurers' discretion to depart from risk-based pricing and underwriting, making applicable HUD's proposed limited discretion defense in § 100.500(c)(1) and undermining causation.

- The "algorithm" defense is generally applicable to homeowners and commercial habitational insurers who use models or actuarial analyses to make risk-based pricing and underwriting determinations, both of which are predictive of risk and do not consider factors that are characteristics of FHA-protected classes.

- Using a policy or practice less predictive of risk would not serve "valid interests" in an "equally effective" manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

For all of the reasons noted above, disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot succeed on the merits. HUD should acknowledge these barriers expressly in the final rule. Doing so will make clear to litigants that the requirements laid out in *Inclusive Communities* and in the NPRM apply to these kinds of challenges and generally will foreclose them. This will bring added clarity and certainty to an area of the law that was unsettled by HUD's 2013 adoption of the Disparate Impact Rule.

### B. HUD Should Also Commit Not To Bring Disparate-Impact Challenges To Risk-Based Pricing And Underwriting Of Homeowners And Commercial Habitational Insurance

The FHA may be enforced by private parties, *see* 42 U.S.C. § 3613, or by HUD and the Attorney General, *see id.* §§ 3610, 3611, 3614. Government enforcement can move forward in administrative proceedings or federal court. *See id.* §§ 3612, 3614. For all of the reasons stated in these comments, HUD should commit not to institute disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitation insurance. Such claims will fail as a matter of law, and given the significant legal hurdles, are not an efficient use of HUD's resources.

Thus, regardless of whether HUD adopts an exemption or defense for risk-based pricing and underwriting of homeowners and commercial habitation insurance, it should commit in the final rule not to pursue disparate-impact challenges to those practices.

## VII. RESPONSES TO SPECIFIC ISSUES RAISED BY HUD

We set forth below our responses to the particular issues raised by HUD in the NPRM. These responses should be read in light of the comments above, which addressed many of these issues.

**A.** **How well do HUD's proposed changes to its disparate impact standard align with the decision and analysis in *Inclusive Communities* with respect to the proposed prima facie burden, including:**

    **1.** **Each of the five elements in the new burden-shifting framework outlined in paragraph (b) of § 100.500;**

As a preliminary matter, the requirement that a *prima facie* case be "based on an allegation that a specific, identifiable policy or practice has a discriminatory effect" incorporates the Supreme Court's instruction in *Inclusive Communities* that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to *a defendant's policy or policies* causing that disparity." 135 S. Ct. at 2523 (emphasis added). (It also aligns with the Court's requirement in *Ward's Cove* that "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." 490 U.S. at 657.)

As explained above in § III, subject to the additional changes proposed in this letter, the five elements of a *prima facie* case of disparate-impact liability proposed by HUD, are consistent with *Inclusive Communities* and heed the Court's caution against allowing "disparate-impact liability [to] displace valid governmental and private priorities, rather than solely "remov[ing] . . . artificial, arbitrary, and unnecessary barriers." *Inclusive Cmtys.*, 135 S. Ct. at 2524.

Element 1: The requirement that the challenged policy or practice be "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law" mirrors *Inclusive Communities'* instruction that policies are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." *Id.* It also reflects the Court's recognition of the importance of allowing businesspeople "latitude to consider market factors." *Id.* at 2523.

Element 2: The requirement of a "[r]obust causal link between the challenged policy or practice and a disparate impact on members of a protected class which shows the specific practice is the direct cause of the discriminatory effect" incorporates the Court's statement that a *prima facie* case of disparate impact includes a "robust causality requirement." *Id.* Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove*, 490 U.S. at 653).

Element 3: The requirement that "the alleged disparity caused by the policy or practice has an adverse effect on members of a protected class" conforms with the Supreme Court's statement that "a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities.'" *Inclusive Cmtys*, 135 S. Ct. at 2513 (citing *Ricci*, 557 U.S. at 577).[44]

Element 4: The requirement that a plaintiff show that "the alleged disparity caused by the policy or practice is significant" aligns with the Court's warning against allowing the Disparate

---

[44] As noted in footnote 30, HUD may wish to consider switching the order of elements 2 and 3.

Impact Rule to improperly require the use of race "in a pervasive way" and inject "racial considerations into every housing decision." *Inclusive Cmtys.*, 135 S. Ct. at 2523-24. Moreover, the requirement conforms with *Wards Cove's* holding that a plaintiff must make a *prima facie* showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class. *See Wards Cove*, 490 U.S. at 657.

Element 5: The requirement that "there is a direct link between the disparate impact and the complaining party's alleged injury" also conforms with the Supreme Court's statement that "a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities.'" *Inclusive Cmtys.*, 135 S. Ct. at 2513 (citing *Ricci*, 557 U.S. at 577).

## 2. The three methods described in paragraph (c) of § 100.500 through which defendants may establish that plaintiffs have failed to allege a prima facie case.

The defenses set forth in the proposed rule, subject to the proposed changes, are appropriate and align with the Supreme Court's decision in *Inclusive Communities*:

Materially limited discretion defense (§ 100.500(c)(1)): As noted above, this defense codifies the Supreme Court's instruction that where a "federal law substantially limits the [government's] discretion" a disparate-impact case should be dismissed. *Inclusive Cmtys.*, 135 S. Ct. at 2524.

Algorithmic defense (§ 100.500(c)(2)): The algorithmic defense is consistent with *Inclusive Communities'* emphasis on the importance of allowing actors the "latitude to consider market factors." *Id.* at 2523.

Failure to allege sufficient facts (§ 100.500(c)(2)): This defense supports the requirements of a plaintiff's prima facie case set forth above. It allows a defendant to obtain dismissal when it can show that the plaintiff failed to satisfy the various requirements of the Rule. As discussed above, the requirements for a prima facie case are fully consistent with *Inclusive Communities*. This proposed defense is thus fully consistent with that case as well.

## B. What impact, using specific court cases as reference, did *Inclusive Communities* have on the number, type, and likelihood of success of disparate impact claims brought since the 2015 decision? How might this proposed rule further impact the number, type, and likelihood of success of disparate impact claims brought in the future?

It is difficult to quantify the effect that *Inclusive Communities* has had on the number and type of disparate-impact claims brought. There is some indication that the Court's recognition of the important limitations on disparate-impact liability has reduced the number of non-meritorious cases proceeding in the courts. One study of the impact of the case concluded that *Inclusive*

*Communities* reduced the likelihood of success of FHA disparate-impact claims.[45]  That study indicated that in the first two years following *Inclusive Communities*, defendants prevailed by a ratio of approximately 6 to 1.[46]  The study further indicated that since the beginning of 2018, the rate fell to approximately 4 to 1, particularly in cases involving public landlords or lending institutions as defendants.[47]  As the study observed,[48] within the past three years, when FHA disparate-impact claims have not succeeded, it is often due to one or more of the following: inability to satisfy the robust causality requirement,[49] insufficient evidence of a statistical disparity,[50] and failure to identify a particular challenged policy.[51]

As explained at length above, the proposed rule will promote the efficient resolution of non-meritorious claims at an earlier stage of litigation and will discourage plaintiffs from alleging non-meritorious claims in the first instance.

### C. How, specifically, did *Inclusive Communities*, and the cases brought since *Inclusive Communities*, expand upon, conflict, or align with HUD's 2013 final disparate impact rule and with this proposed rule?

As explained in detail above, the proposed changes to the Disparate Impact Rule described in the NPRM, subject to the additional proposed changes in this letter, would bring the 2013 Rule into compliance with the limitations articulated by the Supreme Court in *Inclusive Communities*. The framework set forth in *Inclusive Communities* imposed more guardrails on the application of disparate-impact liability than the framework announced in the 2013 Rule.  *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019) ("We read the Supreme Court's opinion in *[Inclusive Communities]* to undoubtedly announce a more demanding test than that set forth in the HUD regulation.").  For example, the 2013 Rule did not include the requirement that a plaintiff challenge an "arbitrary, artificial, and unnecessary" policy or a "robust

[45] David L.Callies and Derek B. Simon, *Fair Housing and Discrimination After Inclusive Communities*, 33 PROB. & PROP. 43, 48 (2019).

[46] *Id.* at 47.

[47] *Id.*

[48] *Id.*

[49] *See Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs,* No. 3:08-CV-0546-D, 2016 WL 4494322, at *1 (N.D. Tex. Aug. 26, 2016) (holding that plaintiff had not proved that defendant's exercise of discretion—and not other factors—caused the statistical disparity); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 906 (5th Cir. 2019) (holding that plaintiff "had not provided facts linking the "no vouchers" policy to the "possible statistical disparity").

[50] *See, e.g, Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Fla.*, 759 F. App'x 828, 835 (11th Cir. 2018) (holding that plaintiffs' statistical evidence "does not establish a disparate impact, let alone any causal connection between the [challenged policy] and the disparate impact.").

[51] *See, e.g., City of Joliet, Ill. v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) (holding that disparate-impact claim failed because the challenged action—the condemnation of Evergreen Terrace— "is a specific decision, not part of a policy to close minority housing in [the city]."); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1113 (8th Cir. 2017) (dismissing FHA disparate-impact claim on summary judgment because plaintiffs merely "attempt to bootstrap numerous 'one-time decision[s]' together in order to allege the existence of a City policy to misapply the housing code").

causality requirement." Indeed, the 2013 Rule required a defendant to show that its challenged practice is strictly "necessary" to achieving a legitimate business goal and permitted a plaintiff to prevail even if the plaintiff's proposed alternative practice was not "equally effective." *See* 24 C.F.R. § 100.500(b)(1)(i), (ii); 78 Fed. Reg. at 11,473.

The Proposed Rule better aligns with *Inclusive Communities* and subsequent cases because the Proposed Rule incorporates the safeguards set forth in *Inclusive Communities*, as described above. Subsequent case law has confirmed the importance of the robust causality requirement to the disparate-impact inquiry. *See Ellis v. City of Minneapolis*, 860 F.3d 1106 (8th Cir. 2017); *Oviedo Town Ctr, II, L.L.P. v. City of Oviedo, Florida*, 759 F. App'x. 828, 833-35 (11th Cir. 2018). Subsequent case law has also focused on *Inclusive Communities*' aim of using the disparate-impact theory to dismantle "artificial, arbitrary, and unnecessary barriers." *See, e.g., Ellis*, 860 F.3d at 1114 (requiring that a plaintiff's allegations "point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity" to establish a prima facie case of disparate impact). By including these requirements in the plaintiff's *prima facie* burden, the Proposed Rule implements the limitation set forth in *Inclusive Communities*.

> **D.** **How might the proposed rule increase or decrease costs and economic burden to relevant parties (e.g. litigants including private citizens, local governments, banks, lenders, insurance companies, or others in the housing industry) relative to the 2013 disparate impact rule? How might the proposed rule increase or decrease costs and economic burden to relevant parties relative to *Inclusive Communities*?**

The Proposed Rule will decrease costs and economic burdens on litigants relative to the 2013 Disparate Impact Rule. First, it will reduce confusion among litigants by conforming HUD's disparate-impact standard to the standard set forth by the Supreme Court in *Inclusive Communities*. Second, the *prima facie* standard proposed by HUD will allow for the disposal of non-meritorious disparate-impact claims at an earlier stage of the litigation, which will reduce litigation costs for both plaintiffs and defendants.

> **E.** **How might a decision *not* to amend HUD's 2013 final disparate impact rule affect the status quo since *Inclusive Communities*?**

As reflected in cases such as *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.4 (4th Cir. 2018), and *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016), courts have grappled with the differences between HUD's 2013 final Disparate Impact Rule and *Inclusive Communities* since 2015. Were HUD not to amend the 2013 Disparate Impact Rule, courts and litigants would continue to bear the burden of reconciling differences between the Rule and *Inclusive Communities*. Amending the 2013 Disparate Impact Rule as reflected in the NPRM would clarify the disparate-impact standard for courts and litigants, thus reducing the cost of litigation.

**F.    What impact, if any, does the addition of paragraph (e) of § 100.500 regarding the business of insurance have on the number and type of disparate impact claims? What impact, if any, does the proposed paragraph (e) have on costs (or savings) and economic burden of disparate impact claims?**

The addition of paragraph (e) of § 100.500 will not impact the number and type of disparate-impact claims, nor will it impact the costs and economic burden of disparate-impact claims.  As described at length above, HUD made clear in the NPRM that proposed paragraph (e) is intended to "affirm[] in regulation HUD's past position … that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case."  84 Fed. Reg. at 42,860.  To succeed on a McCarran-Ferguson defense, then, defendants will be required to litigate the issue on a case-by-case basis, imposing significant and unnecessary burdens.  HUD's mere acknowledgement of the McCarran-Ferguson Act does not alleviate this burden on defendants.

**G.    Any other data, information, or analysis the public can provide to assist HUD in assessing the impact of the proposed regulation relative to the 2013 disparate impact final rule and the 2015 Supreme Court decision in *Inclusive Communities*.**

As explained in depth above, as compared to the 2013 Disparate Impact Rule, the proposed rule more closely aligns with the principles and explicit requirements set forth in *Inclusive Communities*.  The proposed requirements for a *prima facie* case are consistent with *Inclusive Communities*.  Additionally, the defenses provided in paragraph (c) of § 100.500 incorporate *Inclusive Communities'* guidance that where a "federal law substantially limits the [government's] discretion" a disparate-impact case should be dismissed and that actors should be given the "latitude to consider market factors."  *Inclusive Cmtys.*, 135 S. Ct. at 2523-24.  The proposed rule will reduce burdens on litigants and the courts by conforming to the *Inclusive Communities* standard and by allowing for the disposal of non-meritorious disparate-impact claims at earlier stages of the litigation.

**H.    Whether, and under what circumstances, punitive or exemplary damages may be appropriate in disparate impact litigation in federal courts (question under § 100.7; pp. 12-13 of the NPRM).**

Punitive or exemplary damages should not be permitted in disparate-impact cases because a disparate-impact claim does not require that defendant act with the requisite level of intent.  The Fair Housing Act provides for the award of punitive damages.  *See* 42 U.S.C. § 3613(c)(1) ("if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages").  Punitive damages are "an expression of [ ] moral condemnation" and are typically awarded in cases in which a defendant's misconduct was "especially reprehensible."  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001) (internal citations omitted).  Courts have thus generally applied a rigorous standard in assessing whether an award of punitive damages in an FHA claim is proper.  *See, e.g., Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (allowing punitive damages under the FHA

only where "a defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of other"). For that reason, punitive damages are available only in "cases involving intentional discrimination." *Belcher v. Grand Reserve MGM, LLC*, 269 F. Supp. 3d 1219, 1246 (M.D. Ala. 2017) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)); *United States v. Hylton*, 944 F. Supp. 2d 176, 197 (D. Conn. 2013), *aff'd*, 590 F. App'x 13 (2d Cir. 2014) (same); *Sachs v. Nunziante*, CV 15-1825 (JFB) (AKT), 2016 WL 4506731, at *5 (E.D.N.Y. July 21, 2016) (same). Without more, an FHA disparate-impact claim, which does not require any showing of the defendant's state of mind, cannot meet such a standard. *See Kolstad*, 527 U.S. at 526 ("The terms 'malice' and 'reckless indifference' ultimately focus on the actor's state of mind.").[52]

### I.  The nature, propriety, and use of algorithmic models as related to the defenses in (c)(2) (p. 21 of NPRM).

The algorithmic model defenses set forth in (c)(2) are proper because where a defendant has relied on an algorithmic model that does not include FHA-protected characteristics as inputs, it cannot be found to have directly caused any resulting disparate impact. Under the NPRM and *Inclusive Communities*, the requisite "robust causal connection" is missing, and the defendant has not implemented an arbitrary or irrational practice. Moreover, as explained at length above, the algorithmic model defense, subject to the additional proposed changes, preserves the nature of the business of insurance. The defense properly allows homeowners and commercial habitational insurers to rely on models supporting "risk assessment" through risk-based pricing and underwriting as a defense to disparate-impact liability.

### J.  Whether it would be consistent with *Inclusive Communities* to provide a defense for housing authorities who can show that the policy being challenged is a reasonable approach and in the housing authority's sound discretion. (p. 23).

APCIA's members do not include housing authorities.

### K.  The terms used in this section of the rule [§ 100.500] and whether HUD should define those terms. Examples of terms that HUD would consider providing definitions to are "robust causal link"; "evidence that is not remote or speculative"; "algorithmic model"; and "material part". (p. 23).

If HUD continues to use the term "close proxies—which APCIA recommends against— HUD should define that term narrowly and precisely and should do so in a manner that does not

---

[52] We are aware of one unpublished decision affirming an award of punitive damages in a disparate-impact case under the FHA where the defendant engaged in egregious conduct: continuing to engage in discriminatory practices even after the district court found that it was violating the FHA. *See, e.g, Fair Hous. Ctr. of Wash. v. Breier-Scheetz Prop., LLC*, 743 F. App'x 116, 118 (9th Cir. 2018). In circumstances like those, however, a plaintiff should be required to make out a claim for disparate treatment—*i.e.*, intentional discrimination—in order to obtain punitive damages.

depend on mere correlation—the issue giving rise to concerns about disparate impact in the first place.

## VIII. CONCLUSION

APCIA supports HUD's proposed revisions to the Disparate Impact Rule's burden-shifting framework but respectfully requests that HUD also appropriately limit the application of disparate-impact liability to homeowners and commercial habitational insurance. The changes HUD has proposed to the Rule's burden-shifting framework are necessary to comply with the limitations on disparate-impact liability set forth by the Supreme Court in *Inclusive Communities*. Subject to the modifications it has proposed in these comments, APCIA urges HUD to finalize the proposed amendments to the Rule's burden-shifting framework. For the reasons set forth above, however, HUD should also adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance. Absent such an exemption, HUD should adopt a new defense for risk-based pricing and underwriting of homeowners and commercial habitational insurance and strengthen the algorithm defense. At a minimum, HUD should explain in detail in the preamble to the final rule that disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot succeed in light of the limitations in *Inclusive Communities*.

# APPENDIX I

## State Insurance Laws

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-3; ALA. CODE § 27-13-30 |
| Alaska | ALASKA STAT. § 21.39.030(a)(2) | ALASKA STAT. § 21.39.030(a)(1), (4); ALASKA STAT. § 21.36.090(c) | ALASKA STAT. § 21.39.040 |
| Arizona | ARIZ. REV. STAT. ANN. § 20-356(2); ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(B) | ARIZ. REV. STAT. ANN. § 20-356(1), (4), ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(C); ARIZ. REV. STAT. ANN. § 20-448(C) | ARIZ. REV. STAT. ANN. § 20-357 |
| Arkansas | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(a) | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(b); ARK. CODE ANN. § 23-67-210 | ARK. CODE ANN. § 23-67-211(a) |
| California | | CAL. INS. CODE § 1861.05(b) | CAL. INS. CODE § 1861.05(b)-(d); *see also* CAL. INS. CODE § 1860.1 |
| Colorado | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (2) | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (4); COLO. REV. STAT. ANN. § 10-3-1104(1)(f)(II) | COLO. REV. STAT. ANN. § 10-4-404; COLO. REV. STAT. ANN. § 10-4-406 |
| Connecticut | | CONN. GEN. STAT. § 38a-803(4) | CONN. GEN. STAT. § 38a-688; CONN. GEN. STAT. § 38a-663(9)-(10). |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Delaware | DEL. CODE ANN. tit. 18, § 2503(a)(3) | DEL. CODE ANN. tit. 18, § 2503(a)(2), (a)(5); DEL. CODE ANN. tit. 18, § 2503(b); DEL. CODE ANN. tit. 18, § 2504(c) | DEL. CODE ANN. tit. 18, § 2504 |
| District of Columbia | D.C. CODE § 31-2703(b) | D.C. CODE § 31-2703(a), (c); D.C. CODE § 31-2231.13(c), (d) | D.C. CODE § 31-2704 |
| Florida | FLA. STAT. § 627.062(2)(e)(6) | FLA. STAT. § 627.062(1), (2)(e)(6) | FLA. STAT. § 627.062; FLA. STAT. § 627.0645 |
| Georgia | GA. CODE ANN. § 33-9-4(4) | GA. CODE ANN. § 33-9-4(1), (7) | GA. CODE ANN. § 33-9-21, GA. CODE ANN. § 33-9-9; GA. CODE ANN. § 33-9-26 |
| Hawaii | HAW. REV. STAT § 431:14-103(a)(2) | HAW. REV. STAT. § 431:14-103(a)(1), (5); HAW. REV. STAT. § 431:13-103(a)(7)(B) | HAW. REV. STAT. § 431:14-104(a); HAW. REV. STAT. § 431:14-106(a) |
| Idaho | IDAHO CODE ANN. § 41-1437(1) | IDAHO CODE ANN. § 41-1405(1); IDAHO CODE ANN. § 41-1437(3) | |
| Illinois | 215 ILL. COMP. STAT. ANN. 5/456(1) | 215 ILL. COMP. STAT. ANN. 5/456(1)(d); 215 ILL. COMP. STAT. ANN. 5/424(3) | 215 ILL. COMP. STAT. ANN. 5/457 |
| Indiana | IND. CODE ANN. § 27-1-22-3(a)(1) | IND. CODE ANN. § 27-1-22-3(a)(2), (a)(4); IND. CODE ANN. § 27-4-1-4(a)(7) | IND. CODE ANN. § 27-1-22-4(a); IND. CODE ANN. § 27-1-22-5(a) |
| Iowa | | IOWA CODE ANN. § 515F.4; IOWA CODE ANN. § 507B.4(3)(g) | IOWA CODE ANN. § 515F.5 |
| Kansas | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(a) | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(c) | KAN. STAT. ANN. § 40-955 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Kentucky | KY. REV. STAT. ANN. § 304.13-031(1)(c) | KY. REV. STAT. ANN. § 304.13-031(1)(b); KY. REV. STAT. ANN. § 304.13-031(1)(e); KY. REV. STAT. ANN. § 304.12-080(1) | KY. REV. STAT. ANN. § 304.13-051 |
| Louisiana | LA. REV. STAT. ANN. § 22:1454(B)(1) | LA. REV. STAT. ANN. § 22:1454(A), (B)(2); LA. REV. STAT. ANN. § 22:1964(7)(c); LA. REV. STAT. ANN. § 22:34 | LA. REV. STAT. ANN. § 22:1451; LA. REV. STAT. ANN. § 22:1464 |
| Maine | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(C) | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(B), (G); ME. REV. STAT. ANN. tit. 24-A, § 2162(2) | ME. REV. STAT. ANN. tit. 24-A § 2304-A |
| Maryland | MD. CODE ANN., INS. § 11-205(c) | MD. CODE ANN., INS. § 11-205(d), (f); MD. CODE ANN., INS. § 27-212(e)(1) | MD. CODE ANN., INS. § 11-206 |
| Massachusetts | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(3); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(1) | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(2); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(3), (4) | MASS. GEN. LAWS ANN. ch. 174A, § 6; MASS. GEN. LAWS ANN. ch. 175A, § 6 |
| Michigan | MICH. COMP. LAWS ANN. § 500.2110(1); MICH. COMP. LAWS ANN. § 500.2403(1)(a), (d) | MICH. COMP. LAWS ANN. § 500.2110(3); MICH. COMP. LAWS ANN. § 500.2110a; MICH. COMP. LAWS ANN. § 500.2403(1)(c), (d) | MICH. COMP. LAWS ANN. § 500.2406; MICH. COMP. LAWS ANN. § 500.2408 |
| Minnesota | MINN. STAT. ANN. § 70A.04(4); MINN. STAT. ANN. § 70A.05(1) | MINN. STAT. ANN. § 70A.04(1), (4); MINN. STAT. ANN. § 70A.05(2) | MINN. STAT. ANN. § 70A.06 |
| Mississippi | MISS. CODE. ANN. § 83-2-3(1)(d), (2)(a) | MISS. CODE. ANN. § 83-2-3(1)(a), (d), (2)(b) | MISS. CODE. ANN. § 83-2-7 |
| Missouri | MO. ANN. STAT. § 379.318(1), (4) | MO. ANN. STAT. § 379.318(2), (4) | MO. ANN. STAT. § 379.321 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Montana | MONT. CODE ANN. § 33-16-201(2)(a) | MONT. CODE ANN. § 33-16-201(1)(a), (4); MONT. CODE ANN. § 33-18-210 | MONT. CODE ANN. § 33-16-203 |
| Nebraska | | NEB. REV. ST. § 44-7510(3) | NEB. REV. ST. § 44-7508 |
| Nevada | NEV. REV. STAT. ANN. § 686B.060(1); NEV. REV. STAT. ANN. § 686B.050(4) | NEV. REV. STAT. ANN. § 686B.050(1), (4); NEV. REV. STAT. ANN. § 686B.060(2); NEV. REV. STAT. ANN. § 686a-130(5) | NEV. REV. STAT. ANN. § 686B.070; NEV. REV. STAT. ANN. § 686B.090; NEV. REV. STAT. ANN. § 686B.110 |
| New Hampshire | N.H. REV. STAT. ANN. § 412:15(I)(d), (II)(a) | N.H. REV. STAT. ANN. § 412:15(I)(d); N.H. REV. STAT. ANN. § 412:15(II)(b) | N.H. REV. STAT. ANN. § 412:16 |
| New Jersey | N.J. STAT. ANN. § 17:29A-4(c); N.J. STAT. ANN. § 17:29A-7; N.J. STAT. ANN. § 17:29A-11 | N.J. STAT. ANN. § 17:29A-4; N.J. STAT. ANN. § 17:29A-7 | N.J. STAT. ANN. § 17:29A-6; N.J. STAT. ANN. § 17:29A-7 |
| New Mexico | N.M. STAT. ANN. § 59A-17-6(E); N.M. STAT. ANN. § 59A-17-7(A) | N.M. STAT. ANN. § 59A-17-6(A), (E); N.M. STAT. ANN. § 59A-17-7(B); N.M. STAT. ANN. § 59A-16-17(D) | N.M. STAT. ANN. § 59A-17-9 |
| New York | N.Y. INS. LAW § 2304(a) | N.Y. INS. LAW § 2303; N.Y. INS. LAW § 2304(b), (c) | N.Y. INS. LAW § 2305(a), (b) |
| North Carolina | N.C. GEN. STAT. ANN. § 58-40-20(e); N.C. GEN. STAT. ANN. § 58-40-25(1) | N.C. GEN. STAT. ANN. § 58-40-25(2); N.C. GEN. STAT. ANN. § 58-40-20(a), (e) | N.C. GEN. STAT. ANN. § 58-40-30; N.C. GEN. STAT. ANN. § 58-40-40; N.C. GEN. STAT. ANN. § 58-40-45 |
| North Dakota | N.D. CENT. CODE ANN. § 26.1-25-03(1)(a) | N.D. CENT. CODE ANN. § 26.1-25-03(1)(c) | N.D. CENT. CODE ANN. § 26.1-25-04 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Ohio | OHIO REV. CODE ANN. § 3935.03(C); OHIO REV. CODE ANN. § 3937.02(A) | OHIO REV. CODE ANN. § 3935.03(B); OHIO REV. CODE ANN. § 3937.02(C), (D); OHIO REV. CODE ANN. § 3901.21(M) | OHIO REV. CODE ANN. § 3935.04 |
| Oklahoma | | OKLA. STAT. ANN. tit. 36, § 902; OKLA. STAT. ANN. tit. 36, § 985 | OKLA. STAT. ANN. tit. 36, § 987 |
| Oregon | OR. REV. STAT. ANN. § 737.310(4) | OR. REV. STAT. ANN. § 737.310(1), (8); OR. REV. STAT. ANN. § 746.015(1) | OR. REV. STAT. ANN. § 737.205; OR. REV. STAT. ANN. § 737.325 |
| Pennsylvania | 40 PA. STAT. § 1183(a); 40 PA. STAT. § 1223(a)(3) | 40 PA. STAT. § 1183(c)-(d); 40 PA. STAT. § 1223(a)(2); 40 PA. STAT. § 1171.5(a)(7) | 40 PA. STAT. § 710-5(a); 40 PA. STAT. § 710-6; 40 PA. STAT. § 710-7 |
| Rhode Island | R.I. GEN. LAWS ANN. § 27-44-5(e)(1); R.I. GEN. LAWS ANN. § 27-6-4(3) | R.I. GEN. LAWS ANN. § 27-44-5(a), (d), (e)(2); R.I. GEN. LAWS ANN. § 27-6-4(2) | R.I. GEN. LAWS ANN. § 27-44-6(a) |
| South Carolina | S.C. CODE ANN. § 38-73-430(1); S.C. CODE ANN. § 38-73-330(3) | S.C. CODE ANN. § 38-73-430(3)-(4); S.C. CODE ANN. § 38-73-330(2) | S.C. CODE ANN. § 38-73-520 |
| South Dakota | S.D. CODIFIED LAWS § 58-24-6.1 | S.D. CODIFIED LAWS § 58-24-5; S.D. CODIFIED LAWS § 58-24-6; S.D. CODIFIED LAWS § 58-24-6.1; S.D. CODIFIED LAWS § 58-33-26 | S.D. CODIFIED LAWS § 58-24-10 |
| Tennessee | TENN. CODE ANN. § 56-5-103(d); TENN. CODE ANN. § 56-5-104(1) | TENN. CODE ANN. § 56-5-104(2) ; TENN. CODE ANN. § 56-5-103(a)(1), (d) | TENN. CODE ANN. § 56-5-105 |

5

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Texas | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(a) | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(b)-(c) | TEX. INS. CODE ANN. § 2251.101; TEX. INS. CODE ANN. § 2251.103 |
| Utah | UTAH CODE ANN. § 31A-19a-201(4)(a); UTAH CODE ANN. § 31A-19a-202(1)-(2) | UTAH CODE ANN. § 31A-19a-201(1), (4)(a); UTAH CODE ANN. § 31A-19a-202(3) | UTAH CODE ANN. § 31A-19a-203 |
| Vermont | VT. STAT. ANN. tit. 8, § 4685(d); VT. STAT. ANN. tit. 8, § 4686(1) | VT. STAT. ANN. tit. 8, § 4685(a), (d); VT. STAT. ANN. tit. 8, § 4686(2); VT. STAT. ANN. tit. 8, § 4724(7)(A) | VT. STAT. ANN. tit. 8, § 4688 |
| Virginia | VA. CODE ANN. § 38.2-1904(A), (B) | VA. CODE ANN. § 38.2-1904(A)(3) | VA. CODE ANN. § 38.2-1906 |
| Washington | WASH. REV. CODE ANN. § 48.19.030(3) | WASH. REV. CODE ANN. § 48.19.020; WASH. REV. CODE ANN. § 48.19.030(2)(b); WASH. REV. CODE ANN. § 48.18.480 | WASH. REV. CODE ANN. § 48.19.040; WASH. REV. CODE ANN. § 48.19.060 |
| West Virginia | W. VA. CODE § 33-20-3(a) | W. VA. CODE § 33-20-3(b), (c)(2); W. VA. CODE § 33-11-4(7)(c) | W.VA. CODE § 33-20-4 |
| Wisconsin | WIS. STAT. ANN. § 625.11(4); WIS. STAT. ANN. § 625.12(1) | WIS. STAT. ANN. § 625.12(2); WIS. STAT. ANN. § 625.11(1), (4) | WIS. STAT. ANN. § 625.13 |
| Wyoming | | WYO. STAT. ANN. § 26-14-105; WYO. STAT. ANN. § 26-13-112(c) | WYO. STAT. ANN. § 26-14-107 |

**APPENDIX II**

In this Appendix, APCIA sets forth additional background regarding the 2013 Disparate Impact Rule, the litigation brought by PCI and AIA challenging that Rule, and comments submitted by APCIA, PCI, and AIA to HUD at various stages of the proceedings.

**A.      The 2013 Disparate Impact Rule**

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011).  In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  *Id.*  The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  *Id.* at 70,924.

Representatives of the insurance industry submitted comments explaining why disparate-impact liability cannot lawfully be applied to homeowners insurance broadly defined to include property and casualty insurance generally.  The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways.  For instance, the Rule would prohibit conduct that state law requires or authorizes.  The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators.  Moreover, as the comments described, application of disparate-impact liability to insurance would adversely affect the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting and would inject racial considerations.  Finally, commenters noted that application of the Rule to homeowners insurance would violate the "filed-rate" doctrine, which bars private claims and collateral attacks based on insurance rates filed with state regulatory entities.

As noted above, HUD promulgated its final Disparate Impact Rule on February 15, 2013.  78 Fed. Reg. 11,460.  The final Rule did not exempt homeowners insurance or meaningfully address whether extension of disparate-impact liability to homeowners insurance would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act.  The final Rule's preamble merely asserted (without any support) that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude *HUD* from issuing regulations that may apply to insurance policies.  Rather, McCarran-Ferguson instructs *courts* on how to construe federal statutes, including the Act."  78 Fed. Reg. at 11,475 (emphasis added).  HUD thus did not consider whether the Rule conflicts with state laws and policies permitting and requiring risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that application of disparate-impact liability is inconsistent with established risk-based insurance practices.  HUD did not dispute that the use of risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk."  78 Fed. Reg. at 11,475 (quoting a comment).  To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-

1

based pricing and underwriting. HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."). HUD thus acknowledged the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of risk factors in fact is a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *See id.* at 11,475.

### B. The Litigation Brought By APCIA's Predecessors AIA And PCI

All of the national property casualty insurance trade associations filed lawsuits challenging the Final Rule. AIA, along with co-plaintiff the National Association of Mutual Insurance Companies ("NAMIC"), filed a complaint in the U.S. District Court for the District of Columbia. *See American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. June 26, 2013). PCI filed suit in the U.S. District Court for the Northern District of Illinois. *See Property Cas. Insurers Ass'n of Am. v. Carson*, No. 13-CV-8564 (N.D. Ill. Nov. 27, 2013).

The associations' lawsuits raised a number of complementary challenges to the Rule. The AIA and NAMIC lawsuit challenged the validity of disparate-impact claims generally under the FHA, and the district court initially granted summary judgment in their favor. Order Granting Motion for Summary Judgment, *American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. Nov. 3, 2014), ECF No. 46. HUD appealed, but before briefing began, the Supreme Court decided *Inclusive Communities*. The PCI suit focused on HUD's decision to apply the Disparate Impact Rule to homeowners insurance. On September 3, 2014, the court granted PCI's motion for summary judgment in part, concluding that HUD's explanation was arbitrary and capricious in several respects. *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-52 (N.D. Ill. 2014). The court rejected HUD's contention that it could disregard the McCarran-Ferguson Act entirely. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking. *Id.* at 1048. The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *[Doe v.] Mutual of Omaha*, 179 F.3d [557,] 563-64 [(7th Cir. 1999)], and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048. The court noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate-impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049. The court also determined that HUD had inadequately examined whether the filed-rate doctrine would bar application of the Rule. *Id.* at 1050. Finally, the court concluded that HUD had made "no effort to evaluate" the substance of the insurance industry's argument that the Rule would prevent the use of sound risk factors and thereby undermine the fundamental nature of the insurance business. *Id.* at 1051. Accordingly, the court remanded to HUD for further explanation of these issues.

### C. PCI's Post-Remand Comments

In September 2014, PCI informed HUD that it intended to submit additional comments addressing the issues that the District Court had instructed HUD to consider on remand. *See* Letter from PCI to HUD, at 1 (Sept. 25, 2014) (A.R. 4416). PCI then submitted comments further explaining how the Disparate Impact Rule would invalidate, impair, or supersede states' regulation of insurance and distort the homeowners insurance market. *See* Letter from PCI to HUD, at 1-18 (Jan. 26, 2015) (A.R. 4496-4513). PCI emphasized that the Rule's burden-shifting process would impose liability on homeowners insurers for providing and pricing insurance using sound risk-based methods. *Id.* at 8 (A.R. 4503). PCI explained that prohibiting those methods would violate the McCarran-Ferguson Act and the filed-rate doctrine, as well as harm the homeowners insurance industry. *See id.* at 9-18 (A.R. 4504-4513). PCI's comment also alerted HUD to the importance of the Supreme Court's upcoming consideration of the *Inclusive Communities* case. *See id.* at 5-6 (A.R. 4500-4501).[53]

### D. PCI's *Post-Inclusive Communities* Comment

Shortly after the Supreme Court issued its decision in *Inclusive Communities*, PCI submitted further comments explaining that HUD must consider the Supreme Court's newly articulated limitations on disparate-impact liability. *See* Letter from PCI to HUD (July 29, 2015) (A.R. 4615-4621).[54] PCI emphasized that *Inclusive Communities* prohibited application of the Rule to legitimate business practices, including risk-based homeowners insurance practices. *See id.* at 5-7 (A.R. 4619-4621).

### E. Post-*Inclusive Communities* Litigation In The AIA Case

On remand from the D.C. Circuit following the Supreme Court's decision in *Inclusive Communities*, AIA and NAMIC amended their complaint to add claims that HUD's Disparate-Impact Rule is inconsistent with limitations on FHA disparate-impact liability set out in *Inclusive Communities*, both as it applies to the business of insurance and as a general matter. Cross-motions for summary judgment were fully briefed, but the case is stayed pending anticipated further rulemaking by HUD. *See* Joint Status Report, *American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. July 16, 2018), ECF No. 94; Joint Status Report, *American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. Sept 11, 2019), ECF No. 111.

### F. HUD's Supplemental Explanation

As required by the district court in the *PCI* case, on October 5, 2016, HUD published a supplemental explanation for its decision to apply the FHA to homeowners insurance entitled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance." *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("Supplemental Explanation"). The Supplemental Explanation rejected insurers' request for an exemption from the Disparate Impact Rule, concluding that

---

[53] APCIA hereby incorporates by reference PCI's September 25, 2014 and January 26, 2015 letters submitted to HUD.

[54] PCI also incorporates this letter by reference.

insurers' concerns "can and should be addressed on a case-by-case basis." *Id.* Notably, however, HUD did not dispute that state law uniformly permits and often requires insurers to consider risk factors. *See id.* at 69,015. In fact, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice." *Id.* Even more significantly, HUD conceded that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.* HUD's primary rationale for denying an exemption for the use of risk factors was that insurers can later justify using such factors on a case-by-case basis under the Rule's burden-shifting framework. *See id.*

HUD also argued that an exemption for homeowners insurance is inappropriate in light of certain state anti-discrimination laws that may apply to insurance. 81 Fed. Reg. at 69,016. HUD reasoned that such an exemption would "deprive all states of federal support in addressing discriminatory insurance practices" and asserted that an exemption would therefore "be at odds with the purpose of [the] McCarran-Ferguson [Act]." *Id.* This reasoning is arbitrary and capricious. The McCarran-Ferguson Act is not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "*for the purpose of regulating the business of insurance*." 15 U.S.C. § 1012(b) (emphasis added). State antidiscrimination laws—which states may enforce themselves, if appropriate—are not enacted "for the purpose of regulating the business of insurance" and thus have no bearing on whether application of the Disparate Impact Rule to risk-based pricing and underwriting would violate the McCarran-Ferguson Act.

Even if a state's fair-housing law were identical to the FHA and would permit a disparate-impact challenge to risk-based pricing and underwriting in state court, any federal litigation under HUD's Disparate Impact Rule would still require federal courts applying federal law to second-guess the actuarial soundness of insurance practices regulated by state law—contrary to the express holding of *Mutual of Omaha*. *See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with state law—obviously would interfere with the administration of the state law."). HUD's previous reliance on snippets of discussion from out-of-circuit district court decisions and a state court decision, none of which addressed these issues,[55] provided no basis for disregarding the plain text of the McCarran-Ferguson Act and the Seventh Circuit's controlling decision in *Mutual of Omaha*. In sum, HUD cannot rely on state antidiscrimination laws to overlook the clear conflict between the Disparate Impact Rule and state insurance laws permitting risk-based pricing and underwriting.

HUD also asserted in passing in its 2016 Supplemental Explanation that "McCarran-Ferguson requires a fact-intensive inquiry." 81 Fed. Reg. at 69,016. But HUD offered no support for the proposition. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting. HUD relied on *Saunders v. Farmers Insurance Exchange (Saunders I)*, 440 F.3d 940, 946 (8th Cir. 2006). But that court, reviewing a Rule 12(b)(1) motion to dismiss for lack

---

[55] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

of subject-matter jurisdiction, merely held that "the nature of plaintiffs' price discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case returned to the Eighth Circuit and it was clear that the plaintiffs were relying on a disparate-impact theory, the court noted that "HUD has never applied a disparate-impact analysis to insurers," *Saunders v. Farmers Ins. Exch. (Saunders II)*, 537 F.3d 961, 964 n.3 (8th Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)), and that there was "doubt" as to whether it could, *id.* at 964. The court ultimately held that the plaintiffs' FHA challenge was foreclosed by the McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's administrative regime. *Id.* at 968. This hardly counsels against a categorical exemption for risk-based pricing and underwriting.

HUD did not dispute in the Supplemental Explanation that the filed-rate doctrine applies to insurance rates filed with state insurance commissions. Instead, HUD argued first that the filed-rate doctrine does not apply to FHA claims because they "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effects." 81 Fed. Reg. at 69,018 (quoting *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)). This argument fails for multiple reasons. An FHA claim that an insured is being charged more because of the insured's race seeks to "invalidat[e]" the rate charged and thus squarely implicates the filed-rate doctrine. *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011). A claimed discriminatory effect would occur through disparate rates, and it is difficult to imagine how the Rule could remedy such an effect other than by causing insurers to change their rates. Moreover, a court resolving an FHA claim under the Rule would, in fact, have to consider the reasonableness of the challenged rate at step two of the burden-shifting framework. In any event, it is well established that the filed-rate doctrine bars claims that do more than simply challenge the "reasonableness" of rates.[56]

HUD also argued in the 2016 Supplemental Explanation that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes." 81 Fed. Reg. at 69,018 (quoting *Saunders I*, 440 F.3d at 944). But HUD's position and the *Saunders* decision on which HUD relied are inconsistent with the weight of the case law holding that the filed-rate doctrine does bar challenges under *federal* laws to rates filed with *state* agencies. *See, e.g., Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994) (finding RICO claim barred, noting "courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies"); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (filed-rate doctrine "applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one").[57] This is all the more clear in a case

---

[56] *See, e.g., Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 415 & n.17 (1986) (filed-rate doctrine barred recovery of treble damages under antitrust laws even though antitrust claims do not challenge reasonableness of rates but rather method by which they were adopted); *Schilke*, 820 F. Supp. 2d at 836 (filed-rate doctrine foreclosed claims based on failure to disclose aspects of rates); *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 235-42 (3d Cir. 2012) (filed-rate doctrine barred antitrust challenge to rates).

[57] *See also H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992) ("Allowing a RICO action . . . would similarly disrupt the state administrative process and constitute a 'collateral attack on a rate order,' contrary to

5

involving state regulation of insurance, where the McCarran-Ferguson Act "overturn[s] the normal rules of pre-emption."  *PCI*, 66 F. Supp. 3d at 1025.

### G.     PCI's Renewed Legal Challenge

Following issuance of HUD's Supplemental Explanation, PCI sought leave to file an amended complaint to challenge that explanation.  The District Court granted leave, and on June 27, 2017, PCI filed its First Amended Complaint challenging HUD's application of the Disparate Impact Rule to homeowners insurance, including HUD's reasoning set forth in its Supplemental Explanation.  *See* First Amended Complaint, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. June 27, 2017), ECF No. 131.  On September 8, 2017, PCI filed a motion for summary judgment explaining the numerous ways in which HUD's Supplemental Explanation remained arbitrary and capricious.  *See* Motion for Summary Judgment, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. Sept. 8, 2017), ECF Nos. 136 & 137.  HUD sought an extension of time for its response, and the parties subsequently agreed to stay the litigation, ultimately agreeing to a continued stay of the case in light of HUD's reconsideration of the 2013 Disparate Impact Rule.  *See* Joint Status Report and Motion to Continue Stay, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. June 25, 2018), ECF No. 159; Status Report, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. Sept. 11, 2019), ECF No. 188.

### H.     Treasury Recommends That HUD Reconsider Its Prior Rule

In October 2017, the U.S. Department of Treasury issued a report entitled "A Financial System That Creates Economic Opportunities Asset Management and Insurance." [58]  Among other things, that report urged HUD to reconsider the Disparate Impact Rule, stating:

> Treasury recommends that HUD reconsider its use of the disparate-impact rule. In particular, HUD should consider whether the disparate-impact rule, as applied, is consistent with McCarran-Ferguson and existing state law. HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles. [59]

### I.     HUD's ANPRM

On June 20, 2018, HUD published an Advance Notice of Proposed Rulemaking ("ANPRM").  *See* 83 Fed. Reg. 28,560.  In the ANPRM, HUD indicated that it was considering what changes may be necessary to the 2013 Disparate Impact Rule in light of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015).  *See* 83 Fed. Reg. at 28,561.  HUD also invited public

---

state law.") (quoting *H.J., Inc. v. Nw. Bell Corp.*, 420 N.W.2d 673, 676 (Minn. Ct. App. 1988)); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1296 (D.S.C. 1992).

[58] *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities Asset Management and Insurance* (Oct. 2017), https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.

[59] *Id.* at 110.

comment on "other amendments to the Disparate Impact Rule that may be necessary or helpful." *Id.*

## J.    PCI's And AIA's Comments On ANPRM

In August 2018, PCI, AIA, and NAMIC submitted comprehensive comments on the ANPRM.  The associations all agreed that the Disparate Impact Rule had to be modified in light of *Inclusive Communities* and urged HUD to exempt homeowners insurance from the Rule.  The associations demonstrated that application of disparate-impact liability to homeowners insurance would, among other things, (1) violate the McCarran-Ferguson Act, (2) be fundamentally inconsistent with the business of insurance and (3) contravene the limits set forth in *Inclusive Communities*, including that disparate-impact liability may not be applied in a manner that requires pervasive consideration of race or that requires courts to second-guess legitimate business choices. PCI also maintained that the Disparate Impact Rule would violate the filed-rate doctrine.  AIA and NAMIC made the additional argument that the Disparate Impact Rule violates Executive Order 13132, titled "Federalism." 64 Fed. Reg. 43,255 (Aug. 10, 1999), which requires agencies to construe federal statutes to preempt state law only where there is "clear evidence" that Congress intended preemption of State law or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute.  § 4(a), 64 Fed. Reg. at 43,257.

**APPENDIX III**

§ 100.500 Discriminatory effect prohibited.

(a)     *General*. Liability may be established under the Fair Housing Act based on a specific policy's or practice's discriminatory effect on members of a protected class under the Fair Housing Act even if the specific policy or practice was not motivated by a discriminatory intent.

(b)     *Prima facie burden*. To allege a prima facie case based on an allegation that a specific, identifiable policy or practice has a discriminatory effect, a plaintiff or the charging party (collectively, ''plaintiff'') must state facts plausibly alleging each of the following elements:

  (1)     That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

  (2)     That there is a robust causal link between the challenged policy or practice and a disparate impact on members of a protected class that:

    (i)     shows the specific practice is the direct cause of the discriminatory effect, taking due regard for the factors that may bear on the housing opportunities and decisions of the protected class and the degree to which those factors are connected to the defendant's policies and practices; and

    (ii)     is based on more than statistical disparities or correlations; and

  (3)     That the alleged disparity caused by the policy or practice has an adverse effect on members of a protected class;

  (4)     That the alleged disparity caused by the policy or practice is significant; and

  (5)     That there is a direct link between the disparate impact and the complaining party's alleged injury.

(c)     *Failure to allege a prima facie case.* A defendant, or responding party, may establish that a plaintiff's allegations do not support a prima facie case of discriminatory effect under paragraph (b) of this section, if:

  (1)     The defendant shows that its discretion is materially limited or permitted by a third party such as through:

    (i)     A Federal, state, or local law; or

    (ii)     A binding or controlling court, arbitral, regulatory, administrative order, or administrative requirement;

1

(2)     Where a defendant shows that the alleged ~~plaintiff alleges that the cause of a~~ discriminatory effect results from ~~is~~ a model used by the defendant, such as a risk assessment algorithm or actuarial analysis, and the defendant:

   (i)      ~~Provides the material factors that make up the inputs used in the challenged model and s~~Shows that the~~se~~ factors used in the model do not rely in any material part on ~~factors that are substitutes or close proxies for protected classes~~ characteristics protected under the Fair Housing Act and that the model is empirically derived and is a demonstrably and statistically sound algorithm that accurately ~~predictive of credit risk~~ predicts risk or other similar valid objective~~s~~;

   (ii)     Shows that the challenged model is produced, maintained, or distributed by a recognized third party ~~that determines industry standards~~, the inputs and methods within the model are not determined by the defendant, and the defendant is using the model as intended by the third party; or

   (iii)    Shows that the model has been subjected to critical review and has been validated by an objective and unbiased neutral third party that has analyzed the challenged model and found that the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives, and that none of the factors used in the algorithm rely in any material part on ~~factors that are substitutes or close proxies for protected classes~~ characteristics protected under the Fair Housing Act; or

(3)     The defendant demonstrates that the plaintiff has failed to allege sufficient facts to meet plaintiff's burden under paragraph (b) of this section.

(4)     The defendant shows that its policy or practice relied on risk-based pricing or underwriting of homeowners or commercial habitational insurance.

(d)     *Burdens of proof for discriminatory effect.* If a case is not resolved at the pleading stage, the burden of proof to establish that a specific, identifiable policy or practice has a discriminatory effect, are as follows:

   *(1)     Plaintiff's burden.*

   (i)      A plaintiff must prove by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(~~2~~1) through (5) of this section; and

   (ii)     If the defendant rebuts a plaintiff's assertion that the policy or practice is arbitrary, artificial, and unnecessary under paragraph (b)(1) of this section by producing evidence showing that the challenged policy or practice advances a valid interest (or interests), the plaintiff must prove by the preponderance of the evidence that a less discriminatory policy or practice

2

exists that would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(2) *Defendant's burden.* The defendant may, as a complete defense:

    (i) Prove any element identified under paragraph (c)(1) or (2) of this section;

    (ii) Demonstrate that the plaintiff has not proven by the preponderance of the evidence an element identified under paragraph (d)(1)(i) of this section; or

    (iii) Demonstrate that the alternative policy or practice identified by the plaintiff under paragraph (d)(1)(ii) of this section would not serve the valid interest identified by the defendant in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(e) *Business of insurance laws.* Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance. In general, a challenged policy or practice will not be considered arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective where the policy or practice arises from risk-based pricing or underwriting of insurance. Nothing in this rule, however, shall be construed to exempt an insurer from intentional discrimination under the FHA in the event such insurer considers the race, color, religion, sex, handicap, familial status, or national origin in the sale, rental, or financing of dwellings or in other housing-related activities.

3