**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>Defendants. | No. 1:13-cv-08564<br>Judge Rebecca R. Pallmeyer |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BRIAN D. NETTER
Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director
Federal Programs Branch

KATHLEEN M. PENNINGTON
Assistant General Counsel
for Fair Housing Enforcement

JULIA GARRISON
Trial Attorney

*Of Counsel*

*/s/ Vinita B. Andrapalliyal*
VINITA B. ANDRAPALLIYAL (N.Y. Bar)
Trial Attorney
EMILY S. NEWTON
Senior Trial Counsel
United States Department of Justice
P.O. Box 883, Benjamin Franklin Station
Washington, DC 20044
Ph: (202) 305-0845
Email: Vinita.b.andrapalliyal@usdoj.gov

*Counsel for Defendants*

i

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.      The Discriminatory Effects Rule ............................................................................. 2

II.     Prior Proceedings Before This Court ...................................................................... 4

III.    *Inclusive Communities* ............................................................................................ 6

IV.    HUD's 2016 Supplemental Explanation ................................................................. 6

V.     HUD's 2020 Rule, Ensuing Litigation, Change in Administration, and 2021 Notice of Proposed Rulemaking ............................................................................... 7

VI.    Procedural History ................................................................................................... 8

STANDARD OF REVIEW ................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

I.      Given HUD's impending rulemaking, there is no need to decide PCI's claims now. ....................................................................................................................... 10

II.     HUD considered the impact of *Inclusive Communities* on the Rule as part of its reconsideration on remand. ................................................................................... 13

III.    HUD considered the agency's concerns based on McCarran Ferguson and provided reasonable bases for rejecting the industry's requested exemptions. ................ 15

      A.     HUD reasonably determined that any industry benefit from granting exemptions would not outweigh the costs in FHA administration and under-enforcement. ........................................................................................ 15

      B.     None of PCI's rejoinders justify upending HUD's reasonable determination to prefer case-by-case adjudication over exemptions for the industry. ...................................................................................................... 17

            1.     HUD explained that Doe v. Mutual of Omaha does not require a categorical exemption or safe harbor for "risk-based pricing and underwriting." ........................................................................................ 18

            2.     HUD considered the industry's request for a safe harbor for "risk-based" pricing and underwriting and provided reasonable bases for rejecting it. ........................................................................................... 21

3.  HUD reasonably considered state fair housing laws in rejecting exemptions for the industry based on McCarran-Ferguson concerns. .............................................................................................25

4.  HUD reasonably determined that the fact-intensive nature of the McCarran-Ferguson inquiry counseled against a categorical exemption. .............................................................................................27

IV.  HUD considered the industry's concerns based on the nature of insurance and provided rational bases for rejecting the industry's requested exemptions......................29

V.  HUD considered the industry's concerns based on the "first filed rate doctrine" and provided rational bases for rejecting an exemption for insurance pricing. ...............32

CONCLUSION .........................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Abbott Laby's v. Gardner,*
 387 U.S. 136 (1967) ..................................................................................................11

*Am. Petroleum Inst. v. EPA,*
 683 F.3d 382 (D.C. Cir. 2012) ............................................................................11, 12

*Ave. 6E Invs LLC v. City of Yuma.,*
 818 F.3d 493 (9th Cir. 2016) ...............................................................................14, 31

*Burbank Apartments Tenant Ass'n v. Kargman,*
 474 Mass. 107 (Mass. 2016) .....................................................................................23

*Chevron v. NRDC,*
 467 U.S. 837 (1984) ..................................................................................................18

*City of Portland v. United States,*
 969 F.3d 1020 (9th Cir. 2020) ...................................................................................18

*Cohen, v. Am. Sec. Ins. Co.,*
 735 F.3d 601 (7th Cir. 2013) .....................................................................................34

*Common Cause v. Trump,*
 506 F.Supp.3d 39 (D.D.C. 2020) ...............................................................................12

*Conf. of State Bank Supervisors v. Off. of Comptroller of Currency,*
 313 F. Supp. 3d 285 (D.D.C. 2018)............................................................................11

*Connectors Realty Grp. Corp. v. State Farm Fire & Cas. Co.,*
 No. 19 C 743, 2019 WL 5064699 (N.D. Ill. Oct. 9, 2019) .......................................14

*Dehoyos v. Allstate Corp.,*
 345 F.3d 290 (5th Cir. 2003) ..............................................................................*passim*

*Doe v. Mutual of Omaha,*
 179 F.3d 557 (7th Cir. 1999) .....................................................................................20

*FCC v. Prometheus Radio Project,*
 141 S. Ct. 1150 (2021) ...............................................................................................10

*Flores v. United Airlines,*
 426 F. Supp. 3d 520 (N.D. Ill. 2019) ........................................................................19

*Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n,*
 508 F.3d 366 (6th Cir. 2007) ...............................................................................24, 32

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) .............................................................................................6, 15

*Gunn v. Cont'l Cas. Co.*,
  968 F.3d 802 (7th Cir. 2020) ......................................................................................35

*Humana Inc. v. Forsyth*,
  525 U.S. 299 (1999) ................................................................................... 26, 27, 28

*In re Title Ins. Antitrust Cases*,
  702 F. Supp. 2d 840 (N.D. Ohio 2010) ......................................................................34

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
  920 F.3d 890 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2506 (2020).........................14

*Johnson v. City of Memphis*,
  770 F.3d 464 (6th Cir. 2014) ......................................................................................16

*Lumpkin v. Farmers Grp. (Lumpkin II)*,
  2007 U.S. Dist. LEXIS 98949 (W.D. Tenn. July 6, 2007) ...............................29, 30

*Lumpkin v. Farmers Grp., Inc. (Lumpkin I)*,
  2007 U.S. Dist. LEXIS 98994 (W.D. Tenn. Apr. 26, 2007)............................33, 34

*Mass. Fair Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*,
  496 F.Supp.3d 600 (D. Mass. 2020) ........................................................................ 7

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ..............................................................1, 10, 13

*Miami Nation of Indians of Ind., Inc. v. U.S. Dep't of the Interior*,
  255 F.3d 342 (7th Cir. 2001) ......................................................................................14

*Montgomery Cnty. v. Bank of Am. Corp.*,
  421 F. Supp. 3d 170 (D. Md. 2019)............................................................................31

*NAACP v. Am. Family Mut. Ins. Co.*,
  978 F.2d 287 (7th Cir. 1992) .................................................................................... 2

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) .................................................................................................. 9

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*,
  261 F. Supp. 3d 20 (D.D.C. 2017) ...................................................14, 19, 29, 29

*Nat'l Fair Hous. All. Inc. v. Prudential Ins. Co. of Am.*,
  208 F. Supp. 2d 46 (D.D.C. 2002) ......................................................... 22, 23, 32

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003) ...................................................................................................11

*Nebraskaland, Inc. v. Sunoco, Inc. (R & M),*
  2010 WL 5067962 (E.D.N.Y. Dec. 7, 2010)...........................................................12

*NLRB v. Bell Aerospace Co.,*
  416 U.S. 267 (1974) ..................................................................................................25

*Perryman v. Litton Loan Serv., LP,*
  2014 WL 4954674 (N.D. Cal. Oct. 1, 2014) ...........................................................33

*Pozzie v. HUD,*
  48 F.3d 1026 (7th Cir. 1995) ....................................................................................10

*Prop. Cas. Insurers Ass'n of Am. v. Donovan (PCI I),*
  66 F. Supp. 3d 1018 (N.D. Ill. 2014) ..............................................................*passim*

*Prop. Cas. Insurers Ass'n of Am. v. Carson (PCI II),*
  2017 WL 2653069 (N.D. Ill. June 20, 2017) ...................................................*passim*

*Rural Cellular Ass'n v. FCC,*
  588 F.3d 1095 (D.C. Cir. 2009) ................................................................................25

*Saunders v. Farmers Ins. Exch. (Saunders I),*
  440 F.3d 940 (8th Cir. 2006) ...........................................................................*passim*

*Saunders v. Farmers Ins. Exch. (Saunders II),*
  537 F.3d 961 (8th Cir. 2008) ..............................................................................29, 30

*Schermer v. State Farm Fire & Cas. Co.,*
  721 N.W.2d 307 (Minn. 2006)...................................................................................35

*Schilke v. Wachovia Mortg., FSB,*
  820 F. Supp. 2d 825 (N.D. Ill. 2011) ........................................................................33

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947)...................................................................................................18

*Sprint Spectrum L.P. v. City of Carmel,*
  361 F.3d 998 (7th Cir. 2004) ....................................................................................11

*Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.,*
  576 U.S. 519 (2015)...........................................................................................*passim*

*United Farm Bureau Mut. Ins. Co. v. Metro. Hum. Rels. Comm'n,*
  24 F.3d 1008 (7th Cir. 1994) ....................................................................................27

*United States v. Loy*,
   237 F.3d 251 (3d Cir. 2001) ....................................................................................11

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
   113 F. Supp. 3d 555 (D. Conn. 2015).................................................................27, 34

*Wyoming v. Zinke*,
   871 F.3d 1133 (10th Cir. 2017)..............................................................................11

**Statutes**

5 U.S.C. § 705 .............................................................................................................7

5 U.S.C. § 706(2) ........................................................................................................9

15 U.S.C. § 1012(b).............................................................................................1, 4, 26

42 U.S.C. § 3601 .........................................................................................................2

42 U.S.C. § 3604 .........................................................................................................2

42 U.S.C. § 3614a .......................................................................................................2

Pub. L. No. 90-284, 82 Stat. 81 (1968) ......................................................................2

Ariz. Admin. Code § 10-2-104(B)(4) ........................................................................26

Ga. Comp. R. & Regs. 186-2-.02(2)(d)(4)(iv) ..........................................................26

910 Ind. Admin. Code 2-2-4(d)(4) ............................................................................26

Kan. Admin. Regs. § 21-60-5(d)(5) ...........................................................................26

Ky. Rev. Stat. Ann. § 344.367 ...................................................................................26

Md. Code Regs. 14.03.04.04(F)(6) ............................................................................26

94-348-8 Me. Code R. § 4(D)(4)(d) ...........................................................................26

Ohio Rev. Code Ann. § 4112.02(H)(4) ......................................................................26

S.C. Code Ann. Regs. 65-211(A)(2)(r) ......................................................................26

Tenn. Code Ann. § 4-21-601(c) .................................................................................26

40 Tex. Admin. Code § 819.124(b)(4) .......................................................................26

Va. Code Ann. § 36-96.4(B)(2) .................................................................................26

Wis. Stat. Ann. § 106.50(2)(e) ........................................................................26

**Regulations**

24 C.F.R. § 100.500 ............................................................................*passim*

24 C.F.R. § 100.500(a) ............................................................................ 3

24 C.F.R. § 100.500(c)(2) ...................................................................3, 15, 36

24 C.F.R. § 100.500(c)(3) ...............................................................3, 15, 20, 33

78 Fed. Reg. 11,460  (Feb. 15, 2013) ....................................................7, 15, 16

81 Fed. Reg. 69,012 (Oct. 5, 2016) ...........................................................7, 13

85 Fed. Reg. 60,288 (Sept. 24, 2020) ............................................................ 7

86 Fed. Reg. 33,590 (June 25, 2021) .........................................................8, 12

**Other Authorities**

Stephen M. Dane, *Race Discrimination is Not Risk Discrimination: Why Disparate Impact
    Analysis of Homeowners Insurance Practices is Here to Stay*,
    33:6 BANKING & FIN. SERVS. POL'Y REP. (June 2014) .......................................31

https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-
    redressing-our-nations-and-the-federal-governments-history-of-discriminatory-housing-
    practices-and-policies/ .................................................................... 8

## INTRODUCTION

Property Casualty Insurers Association of America (PCI) challenges the Department of Housing and Urban Development's (HUD) 2013 Discriminatory Effects Rule and HUD's Supplemental Explanation of its decision respecting a part of the Rule. But HUD recently announced a Notice of Proposed Rulemaking to revisit this rule. The pendency of that policymaking process counsels in favor of deferring judicial review of PCI's claims.

In any event, in accordance with this Court's September 2014 decision, HUD's 2016 Supplemental Explanation carefully reconsidered concerns expressed by the homeowners insurance industry that insurers should be granted exemptions or safe harbors from the Rule based on the McCarran-Ferguson Act, 15 U.S.C. § 1012(b); the "filed rate doctrine"; and the nature of insurance. HUD determined, based on all of the evidence before it, that the industry's concerns did not warrant such exemptions. And HUD reasonably explained why any benefit to the industry from an exemption would be outweighed by the cost of under-enforcement of the Fair Housing Act (FHA), in contravention of the Act's goal of eradicating discriminatory housing practices. HUD further explained that any specific, remaining concerns from the industry would be best addressed on a case-by-case basis rather than through an overbroad exemption. HUD also clearly considered the impact of *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) (*Inclusive Communities*), which "implicitly adopted" HUD's approach in the Rule. *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016).

HUD's careful reconsideration and reasoned explanation meet the Administrative Procedure Act's (APA) requirements. PCI's procedural attacks on HUD's Supplement largely re-raise arguments that HUD expressly considered and reasonably rejected or attempt to resurrect claims this Court already denied. PCI's arguments thus do not undermine the deference owed to HUD's reasonable policy decision. Defendants are entitled to summary judgment.

1

# BACKGROUND[1]

## I. The Discriminatory Effects Rule

The Fair Housing Act, Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified at 42 U.S.C. §§ 3601–3619), was enacted "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. To that end, the FHA makes it unlawful:

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a); *see also id.* § 3604(f)(1) (adding prohibition of discrimination based on a "handicap"). The FHA also makes it unlawful, "because of" one of the prohibited bases, to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection" with such transactions. *Id.* § 3604(b), (f)(2). HUD has the authority to issue regulations interpreting the FHA. *Id.* § 3614a.

It is well-established that the FHA's prohibition on discrimination applies to the provision of homeowners insurance. *See, e.g.*, *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992). The FHA has also long been interpreted as providing for discriminatory effects liability. *See Inclusive Cmtys.*, 576 U.S. at 546.

Against this backdrop, HUD promulgated the 2013 Discriminatory Effects Rule (the Rule) in 2013. The Rule formalizes HUD's longstanding view that the FHA provides for discriminatory effects liability and provides a uniform test for determining when a policy or practice has an unjustified discriminatory effect in violation of the FHA. AR612, "Implementation of the Fair Housing Act's Discriminatory Effects Standard" (Feb. 15, 2013).

---

[1] Further background information can be found in Defendants' Memorandum in support of their Motion for Summary Judgment. ECF No. 31.

The Rule provides that "[l]iability may be established under the [FHA] based on a practice's discriminatory effect ... even if the practice was not motivated by a discriminatory intent." AR634; 24 C.F.R. § 100.500. More specifically:

> A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.500(a). The Rule sets out a three-step burden-shifting framework to prove that a practice has an unlawful discriminatory effect. At the first step, the claimant bears the burden of proving that the challenged practice "caused or predictably will cause a discriminatory effect" on a protected class. *Id*. § 100.500(c)(1). If this step is proven, the practice may still be lawful if it has a "legally sufficient justification." *Id*. § 100.500. A legally sufficient justification can be established if, at step two, the defending party proves that the "challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests," *id*. § 100.500(c)(2), and the claimant fails to prove, at step three, that the interest(s) "could be served by another practice that has a less discriminatory effect," *id*. § 100.500(c)(3).

Consistent with the longstanding interpretation of the FHA, HUD noted that the Rule would cover insurance practices. AR4. HUD identified objections raised by the insurance industry in the comments submitted during the rulemaking, including claims that: (i) the availability of disparate impact claims against the industry would interfere with state regulation of insurance, in violation of the McCarran-Ferguson Act[2] (Mc-F) and the "filed rate" doctrine[3]; (ii) the Rule was

---

[2] The McCarran-Ferguson Act states, in relevant part, that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... , unless such Act specifically relates to the business of insurance...." 15 U.S.C. § 1012(b).

[3] The judicially-crafted filed-rate doctrine generally precludes challenges to the reasonableness of rates charged by public utilities and other regulated entities when those rates must be filed with and approved by

incompatible with actuarially sound insurance principles; and (iii) special exemptions or safe harbors should be created for insurance practices. *See* AR626–27. HUD explained that these comments were misguided because an insurance practice would not be *per se* illegal simply by virtue of its differential effect on a protected class. *See* AR627. In this way, the Rule distinguishes between "unnecessary barriers proscribed by" the FHA and "valid policies and practices crafted to advance legitimate interests." *Id.* (internal citation omitted).[4]

HUD also rejected the insurance industry's comment that application of the Rule to insurance would impair state insurance regulation in violation of Mc-F and the "filed rate" doctrine. AR626–27. HUD explained that the "[R]ule does not alter the instruction of Mc-F or its application as described in" case law, noting that applicability of Mc-F "depends on the facts at issue and the language of the relevant State law relating to the business of insurance." AR627. HUD thus declined to grant the requested categorical exemptions and determined, instead, that the industry's concerns should be addressed on a case-by-case basis. AR623, 627.

## II.     Prior Proceedings Before This Court

In 2013, PCI filed a Complaint in this Court, challenging the Rule's application to homeowners insurance under the APA. Compl., ECF. No. 1. PCI claimed that the Rule's application to homeowners insurance violates Mc-F, Compl. ¶ 78; that the Rule was arbitrary and capricious because HUD failed to adequately consider the Rule's conflict with Mc-F, the filed-rate doctrine, and the nature of insurance, *id.* ¶¶ 83, 88, 93, 98; and that the Rule's burden-shifting framework was arbitrary, capricious, and contrary to law. *Id.* ¶¶ 105, 108.

After briefing and argument, this Court issued its decision in September 2014. *Prop. Cas.*

---

a government agency. *Saunders v. Farmers Ins. Exch. (Saunders I)*, 440 F.3d 940, 944 (8th Cir. 2006).

[4] Hereinafter, internal citations, quotations, or alterations are omitted unless otherwise noted.

4

*Insurers Ass'n of Am. v. Donovan (PCI I)*, 66 F. Supp. 3d 1018 (N.D. Ill. 2014). The Court granted Defendants' motion to dismiss PCI's Mc-F claim for lack of jurisdiction, finding that the claim was not ripe. *Id.* at 1042. The Court recognized that "[a] myriad of insurance practices may affect the provision and pricing of homeowners insurance," that one "can only speculate about what types of disparate impact claims" may be brought against insurers, and that "[v]ariations among state regulatory regimes" further "complicate any hypothetical McCarran-Ferguson analysis." *Id.* at 1039. As a result, "there are simply 'too many imponderables' to allow the Court to determine whether McCarran-Ferguson categorically applies to all disparate impact claims that may fall within the scope of PCI's McCarran-Ferguson challenge." *Id.* at 1040. The Court also granted summary judgment to Defendants on PCI's challenge to the Rule's burden-shifting framework, finding that the framework provided a "reasonable accommodation of the competing interests at stake" and that "HUD provided reasoned explanations for rejecting" challenges to it. *Id.* at 1053.

This Court granted summary judgment to PCI on its claims that the Rule's application to homeowners insurance was arbitrary and capricious because it found that HUD did not adequately consider the insurance industry's comments regarding Mc-F, the filed rate doctrine, and the nature of insurance. *Id.* at 1047–51. With respect to Mc-F, the Court recognized that HUD "ha[s] discretion to decide whether to proceed by case-by-case adjudication or rule-making," *PCI I*, 66 F. Supp. 3d at 1049, but found HUD's consideration wanting because "HUD made no attempt to determine whether the benefits of proceeding by case-by-case adjudications outweighed the benefits of including an exemption ... for insurers in the ... Rule." *Id.* at 1048. In particular, the Court concluded that HUD "made no attempt to evaluate how often [Mc-F] preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.* Similarly, the Court opined HUD failed to adequately consider the industry's comments about the

filed-rate doctrine. *Id*. at 1050. Finally, the Court concluded that HUD did not adequately consider the industry's concerns that the Rule would undermine the nature of insurance or, alternatively, provide a reasoned explanation to prefer a case-by-case approach. *Id*. at 1051. The Court remanded the case to HUD "for further explanation" consistent with the Court's opinion. *Id*.

## III.  *Inclusive Communities*

While the case was on remand, the Supreme Court issued its opinion in *Inclusive Communities*, 576 U.S. 519, affirming HUD's longstanding position that disparate impact claims are cognizable under the FHA. The Supreme Court explained that from its first decision recognizing disparate impact liability, *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), it had "put important limits" on that theory of liability. 576 U.S. at 531. *Griggs* articulated these limits as a "business necessity" defense that "does not prohibit hiring criteria with a 'manifest relationship' to job performance." *Id*. (quoting *Griggs*, 401 U.S. at 431–32). After holding that the FHA's language provided for disparate impact liability, the Court reiterated that under the FHA "disparate-impact liability *has always been* properly limited in key respects that avoid the serious constitutional questions." *Id*. at 541 (emphasis added). As an example, the Court cited the second step of the Rule's burden-shifting framework, which, like Title VII, provides "[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited ... to give housing authorities and private developers leeway to state and explain the valid interest served by their policies." 576 U.S. at 541 (citing 78 Fed. Reg. 11470). In the portion of the opinion discussing the limits on disparate impact liability, the Supreme Court twice cited the Rule in support of its analysis. *Id*. at 541–42 (citing 78 Fed. Reg. at 11,470, 11,476).

## IV.  HUD's 2016 Supplemental Explanation

After reconsideration of the issues as directed by the Court, and of the Supreme Court's decision in *Inclusive Communities*, HUD issued a supplement to its initial rulemaking on October

5, 2016. *See* AR1813 ("Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 Fed. Reg. 69,012 (Oct. 5, 2016)) (Supplement). The Supplement explicitly addressed the industry's concerns based on Mc-F, the "filed-rate doctrine," and the nature of insurance and explained why HUD concluded that those concerns do not warrant exemptions from the Rule but would be addressed better on a case-by-case basis. *See* AR1814. HUD reasoned that the requested exemptions would be "unworkable and inconsistent with the broad fair housing objectives and obligations" in the FHA, AR1813, and that those costs were not outweighed by any benefit the exemptions would provide the industry. AR1814.

## V.     HUD's 2020 Rule, Ensuing Litigation, Change in Administration, and 2021 Notice of Proposed Rulemaking

In September 2020, after notice and comment, HUD published a new final rule addressing disparate impact under the FHA. HUD, HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (2020 Rule), 85 Fed. Reg. 60288 (Sept. 24, 2020). In October 2020, after plaintiffs filed a lawsuit and a motion to stay the effective date of the 2020 Rule under 5 U.S.C. § 705, a district court granted the plaintiffs' motion and preliminarily enjoined Defendants from implementing and enforcing the 2020 Rule. *Mass. Fair Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F.Supp.3d 600 (D. Mass. 2020).

On January 26, 2021, President Biden issued a "Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies," directing the Secretary of HUD to,

> as soon as practicable, take all steps necessary to examine the effects of the [2020 Rule] ..., including the effect that amending the [2013 Rule] has had on HUD's statutory duty to ensure compliance with the Fair Housing Act. Based on that examination, the Secretary shall take any necessary steps, as appropriate and consistent with applicable law, to implement the Fair Housing Act's requirements that HUD administer its programs in a manner that affirmatively furthers fair housing and HUD's overall duty to administer the Act . . . including by preventing practices with an unjustified discriminatory effect.

7

https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-redressing-our-nations-and-the-federal-governments-history-of-discriminatory-housing-practices-and-policies/.

Pursuant to the President's directive, HUD began actively examining its discriminatory effects rules. On June 25, 2021, HUD published a Notice of Proposed Rulemaking proposing to recodify the Discriminatory Effects Rule and soliciting comments. HUD, Reinstatement of HUD's Discriminatory Effects Standard, 86 Fed. Reg. 33,590.

## VI.    Procedural History

In March 2017, PCI moved for leave to file an amended complaint to challenge HUD's Supplement, ECF No. 107, which Defendants opposed, ECF No. 122. In June 2017, the Court granted in part and denied in part the motion. *See Prop. Cas. Insurers Ass'n of Am. v. Carson (PCI II)*, 2017 WL 2653069, at *1 (N.D. Ill. June 20, 2017). The Court denied PCI leave to file an amended complaint as to (1) its claim that the Rule violates Mc-F, (2) its challenge to the Rule's burden-shifting framework, and (3) its claim that HUD failed to respond to comments regarding *Wards Cove*, because it had already adjudicated those claims. *PCI II*, 2017 WL 2653069, at *8. The Court also denied PCI leave to include a claim that the Rule's application to homeowners insurance is contrary to the FHA as interpreted in *Inclusive Communities* because the Court "expressly approved of disparate impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction." *Id.* at *9.

The Court granted PCI leave to include the four remaining procedural claims. *Id.* PCI's first claim is that HUD did not adequately consider the impact of *Inclusive Communities* in its Supplement. *See* Am. Compl., Count I, ECF No. 107-1. In its three remaining claims, PCI alleges that HUD's Supplement inadequately considered the industry's concerns based on Mc-F, the "filed-rate doctrine," and the business of insurance. *See* Am. Compl., Counts II–IV.

8

In September 2017, PCI moved for summary judgment. ECF No. 136. Later that month, HUD moved without opposition for an extension of time to file its response in light of the change in administration and still unconfirmed high-ranking officials. *See* ECF No. 140. The Court granted the motion and stayed the case for 60 days. ECF No. 141. The parties and the Court agreed to continue the stay as the incoming administration reevaluated the 2013 Rule, announced its intent to issue a new rule, finalized and issued the 2020 Rule, and contemplated next steps after a court preliminary enjoined the 2020 Rule. *See* ECF Nos. 150–59, 166, 168–69, 172–73, 176–77, 178–79, 184, 186, 188–89, 190–91, 192, 194–95, 196. The Court granted another stay as the administration changed once more and President Biden issued his Executive Order for HUD to revisit the 2020 Rule. ECF No. 213. After HUD informed the Court of its decision to send a notice of proposed rulemaking for OMB review, the Court lifted the stay and set a briefing schedule. ECF No. 216. PCI filed its renewed summary judgment motion on May 28, 2021. ECF No. 221.

## STANDARD OF REVIEW

PCI's claims are governed by the APA's "arbitrary and capricious" standard of review. 5 U.S.C. § 706(2). This standard "is a deferential one which presumes that agency actions are valid as long as the decision is supported by a rational basis." *Pozzie v. HUD*, 48 F.3d 1026, 1029 (7th Cir. 1995). A court must uphold an agency decision "unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). Under this narrow standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

**ARGUMENT**

This case is not ripe for review in light of HUD's ongoing rulemaking process. Nevertheless, PCI's claims are meritless. HUD's Supplement shows that HUD considered the Supreme Court's decision in *Inclusive Communities*—which "implicitly adopted HUD's approach" in the Rule, *Mhany Mgmt.*, 819 F.3d at 618—and reasonably concluded that nothing therein prevented HUD from rejecting the requested exemptions in light of the FHA's goal of "eradicat[ing] discriminatory [housing] practices." *Inclusive Cmtys.*, 576 U.S. at 521. The Supplement also shows that HUD carefully reconsidered the industry's concerns based on Mc-F, the nature of insurance, and the "filed-rate doctrine," and provided reasoned explanations for its determination that those concerns do not justify exemptions for the industry from potential discriminatory effects liability. *See generally* AR1813–20. PCI's procedural claims are reiterations of arguments HUD carefully considered and reasonably rejected or are repackaged claims that this Court has already denied. As such, PCI provides no reason for this Court to second-guess HUD's reasonable policy choice not to grant the insurance industry's requested exemptions.

**I.     Given HUD's impending rulemaking, there is no need to decide PCI's claims now.**

At the threshold, PCI's challenge to the instant Rule is unripe as a prudential matter. That is because HUD has announced a Notice of Proposed Rulemaking to recodify the Rule and has solicited comments regarding this intention. The outcome of this rulemaking process will directly implicate the issues in this litigation.

The ripeness doctrine "asks whether a federal court '*should* decide a case,'" *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 300 (D.D.C. 2018) (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)). It is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies … .'" *Nat'l Park Hosp. Ass'n v. Dep't of*

10

*Interior,* 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laby's v. Gardner,* 387 U.S. 136, 148–49 (1967)); *see also Sprint Spectrum L.P. v. City of Carmel,* 361 F.3d 998, 1002 (7th Cir. 2004). In determining whether a claim is ripe, courts look to two factors: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Laby's,* 387 U.S. at 148–49. Here, both factors counsel in favor of withholding review. Instead, as PCI conceded during the last administration, the best course of action is to allow the rulemaking process that could supersede this Rule to continue.

This case is not fit for review while HUD is receiving and considering public comments as to the challenged Rule because "the disputed matter that forms the basis for [the Court's] jurisdiction has thus become a moving target" and may be modified or be the subject of further explanation from HUD. *Wyoming v. Zinke,* 871 F.3d 1133, 1142–43 (10th Cir. 2017) (holding appeal prudentially unripe where regulation under review was subject to ongoing reconsideration). Deferring review would also promote the principle of judicial efficiency: the outcome of HUD's rulemaking and attendant explanation could supersede the instant Rule and the present challenge. *Id.*; *see also United States v. Loy,* 237 F.3d 251, 261 (3d Cir. 2001). Although the agency has proposed to recodify the instant Rule, the ultimate outcome of the rulemaking depends on the comments received and on additional agency deliberations. And even if the Rule is ultimately re-codified, HUD's reasoning for that "will substantially shape the important legal questions" that may remain. *Common Cause v. Trump,* 506 F.Supp.3d 39 (D.D.C. 2020).

Moreover, PCI has not identified any undue hardship from postponing review. The challenged Rule has been in effect for the better part of a decade, and PCI has repeatedly agreed to defer this litigation for the past four years, recognizing that the case should be stayed "[i]n light of HUD's plans to issue a[] [Notice of Proposed Rulemaking (NPRM)] and its need to continue to engage in the rulemaking process, including OMB's inter-agency review process." ECF No. 178

11

at 2; *see also* ECF No. 184 at 2, ECF No. 196. Deferring a ruling on these claims for HUD to conclude its current rulemaking would not appear to prejudice PCI in light of its agreement to the previous stays. Additional delay, by itself, does not constitute hardship under the prudential ripeness inquiry. *Common Cause*, 506 F. Supp. 3d at 53–54; *Nebraskaland, Inc. v. Sunoco, Inc. (R & M)*, 2010 WL 5067962, at *4 (E.D.N.Y. Dec. 7, 2010).That is especially true here, where HUD is moving expeditiously and has already published a Notice of Proposed Rulemaking, with comments due within 60 days of June 25. 86 Fed. Reg. 33,590.

Indeed, PCI can avail itself of the ongoing administrative comment process to present additional facts and argument to HUD regarding the wisdom of re-codifying the Rule, including any new arguments or claims it has developed during this additional four years it has been subject to the Rule. This suggests no hardship but instead a chance to shape the process. *See Am. Petroleum*, 683 F.3d at 387 ("[D]eclining jurisdiction over a dispute while there is still time for the challenging party to convince the agency to alter a tentative position' provides the agency 'an opportunity to correct its own mistakes and to apply its expertise,' potentially eliminating the need for (and costs of) judicial review.") (citation and quotation marks omitted).

## II.   HUD considered the impact of *Inclusive Communities* on the Rule as part of its reconsideration on remand.

Even if this Court reaches the merits of PCI's claims, Defendants are entitled to summary judgment. PCI first moves for summary judgment on its claim that HUD's reconsideration was arbitrary and capricious because HUD "fail[ed] to take *Inclusive Communities* into account or respond to comments addressing it when considering the need for an exemption for risk-based pricing and underwriting." Pl.'s Mem. 9, ECF No. 222. This claim fails for multiple reasons. To begin, HUD did not, as PCI contends, "ignore" *Inclusive Communities*. Instead, HUD cited the Supreme Court's opinion four times in its Supplement, *see* 81 Fed. Reg. 69,013 n.11; *id.* n.13; *id.*

12

at 69,014 n.24; *id.* at 69,015 n.42, demonstrating that HUD considered its impact.

Moreover, HUD was not required to further examine the decision where it clearly endorsed HUD's chosen approach. As this Court recognized, nothing in *Inclusive Communities* casts any doubt on the validity of the Rule or its application to homeowners insurance. *See PCI II*, 2017 WL 2653069, at *8 (rejecting PCI's claim that application of the Rule to homeowners insurance is contrary to the FHA as interpreted in *Inclusive Communities*). *Inclusive Communities* cited the Rule *in support* of its analysis, *see* 576 U.S. at 541–42, leading multiple courts to recognize that the Court "implicitly adopted HUD's approach" in the Rule. *Mhany Mgmt.*, 819 F.3d at 618; *see e.g., Ave. 6E Invs LLC v. City of Yuma.*, 818 F.3d 493, 513 (9th Cir. 2016).[5] And nothing in *Inclusive Communities* suggests that insurance should be exempt from disparate impact liability. *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 29 (D.D.C. 2017) ("There is a large body of case law holding that insurers … can be held liable under the FHA, and *Inclusive Communities* does not call those cases into question."); *see also Connectors Realty Grp. Corp. v. State Farm Fire & Cas. Co.*, 2019 WL 5064699, at *6 (N.D. Ill. Oct. 9, 2019) (applying FHA liability standards in suit against insurance company).

Nevertheless, PCI argues that *Inclusive Communities* identified limitations on application of disparate impact liability and that it was arbitrary and capricious for HUD not to address those limitations explicitly in its Supplement. Pl.'s Mem. 9–10. But the Court in *Inclusive Communities*

---

[5] The lone court of appeals to state that *Inclusive Communities* created "a more demanding test" for plaintiffs to demonstrate disparate impact under the FHA than did the 2013 Rule merely opined that the Court's reference to "robust causality" potentially suggested more safeguards for defendants than specifically mentioned in the Rule. The court did not invalidate HUD's burden-shifting framework as a whole and did not dispute that the FHA extends to the homeowners insurance industry. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2506 (2020). And this variance in the case law bolsters HUD's case-by-case approach to issues that may arise in the insurance context. *Cf.* AR1816–17 n.50.

explained that the limitations it discussed have long been part of disparate impact liability. *See* 576 U.S. at 40–46 (explaining that "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA. . . ."). HUD had thus already considered the relevant limitations in its initial rulemaking—and indeed incorporated them into the standard set forth in the regulation.[6] *See* AR613, 617–18.

PCI points to the Court's admonition that "housing authorities and private developers [must have] leeway to state and explain the valid interest their policies serve," *Inclusive Cmtys*, 576 U.S. at 521. Pl.'s Mem. 8. But the Rule "does this in the second step of the burden-shifting scheme," *PCI II*, 2017 WL 2653069, at *8, as *Inclusive Communities* expressly recognized. *See* 576 U.S. at 541 (citing 78 Fed. Reg. 11470). PCI also points to the Court's statement that "[a] disparate-impact claim relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity," *id.* at 521. Pl.'s Mem. 8. But "[t]he Supreme Court did not indicate that HUD's burden-shifting approach violates this principle." *PCI II*, 2017 WL 2653069, at *8. Rather, both the language of the Rule and its preamble explain that a showing of a statistical disparity alone would be insufficient to show disparate impact liability under the Rule. *See* 24 C.F.R. § 100.500 ("[T]he plaintiff ... has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."); AR612, 621 (same); AR630 (explaining that analysis of statistical data alone "does not end the inquiry" because a defendant "would have the opportunity to refute the existence of the alleged impact and establish a substantial, legitimate, nondiscriminatory interest for the challenged practice").

---

[6] To the extent there is any question on that front, any failure by HUD to have considered the limitations discussed in *Inclusive Communities* would be harmless error. As this Court has recognized, *see PCI II*, 2017 WL 2653069, at *8–9, the Rule complies with the limitations discussed by the Court and cited by PCI. *See, e.g., Miami Nation of Indians of Ind., Inc. v. U.S. Dep't of the Interior*, 255 F.3d 342, 351 (7th Cir. 2001).

PCI also points to the Court's statement that "policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers,'" *Inclusive Cmtys.*, 576 U.S. at 544 (quoting *Griggs*, 401 U.S., at 431); Pl.'s Mem. 9. But the Rule complies with this limitation too. The second and third steps of the Rule's burden-shifting approach protect a covered entity from liability based on "second-guess[ing]" a policy choice between "two reasonable approaches," 576 U.S. at 541, by imposing liability only where a challenged practice is unnecessary to achieve a substantial, legitimate, non-discriminatory interest or a plaintiff fails to show that the interest could be served by a less discriminatory-in-effect practice. *See* 24 C.F.R. § 100.500(c)(2)–(3); *see also Johnson v. City of Memphis*, 770 F.3d 464, 472 (6th Cir. 2014).

And finally, contrary to PCI's claim, Pl.'s Mem. 8–10, the Supreme Court did not indicate that HUD's burden-shifting regime would cause race (or any other protected characteristic) to be used "in a pervasive way," 576 U.S. at 542, and the Rule does not in fact do so. To the contrary, the Rule precludes race from being used by barring "facially neutral practices that have an *unjustified* discriminatory effect on the basis of a protected characteristic," 78 Fed. Reg. at 11,461 (emphasis added), consistent with the Court's recognition that disparate impact liability under the FHA does not cause race to be used in an impermissible way. *See, e.g.*, 576 U.S. at 538–41 (endorsing disparate impact liability, which the Court describes as making unlawful facially neutral practices that disproportionately affect minorities "without any sufficient justification"). The Rule thus complies with all of the limitations discussed in *Inclusive Communities*.

## III.   HUD considered the agency's concerns based on McCarran Ferguson and provided reasonable bases for rejecting the industry's requested exemptions.

### A.   HUD reasonably determined that any industry benefit from granting exemptions would not outweigh the costs in FHA administration and under-enforcement.

HUD's Supplement shows that it carefully reconsidered the effect of Mc-F on discriminatory effects claims against insurers and provided a reasoned explanation for preferring

15

case-by-case assessments of any Mc-F issues, rather than the industry-requested categorical exemptions or safe harbors.[7] This Court previously found HUD's Mc-F analysis wanting because "HUD made no attempt to determine whether the benefits of proceeding by case-by-case adjudications outweighed the benefits of including an exemption ... for insurers in the ... Rule." *PCI I*, 66 F. Supp. 3d at 1048. On remand, HUD conducted this very analysis and determined that "[t]he concerns raised by the insurance industry commenters *do not outweigh* th[e] loss of efficacy in the administration and enforcement of the [FHA]" sufficient to justify the requested exemptions. AR1814 (emphasis added). HUD instead found that "the case-by-case approach appropriately balances these concerns against HUD's obligation" to further fair housing. *Id.*

HUD explained that the Mc-F analysis is a "fact-intensive inquiry," AR1817, requiring consideration of numerous variables, including the particular insurance practice challenged, the type of disparate impact claim asserted, the particular relief sought, and the state in which the claim is brought, including the state's insurance regulations, as well as other state laws and policies. *See* AR1814, 1816–18; *see also PCI I*, 66 F. Supp. 3d at 1039–40. Given the many factors that impact the Mc-F analysis—including their variability across jurisdictions and over time, *see* AR1817— HUD determined that it would be administratively infeasible to craft exemptions to account for potential Mc-F issues and, in any event, "practically impossible to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application." AR1814. Conversely, any exemption HUD *could* create, including those requested by commenters, would "necessarily be overbroad," thereby "allowing some practices with unjustified discriminatory effects to go uncorrected," in contravention of the FHA's purposes. AR1816. HUD also reiterated that the Rule itself, through its burden-shifting framework,

---

[7] Hereinafter, Defendants at times use "exemptions" as shorthand for exemptions and safe harbors.

"takes into account an insurer's interest in the challenged practice." AR1814; *see also Inclusive Cmtys.*, 576 U.S. at 540–41 (recognizing that the second step of the burden-shifting framework provides adequate leeway for defendants to state and explain the valid interest their policies serve). HUD therefore concluded that the requested exemptions "would offer little added value for insurers not already provided by the Rule itself while foreclosing potentially meritorious claims in contravention of the [FHA]'s broad remedial goals and HUD's obligation to affirmatively further fair housing." AR1818. Rather than adopting this low-value proposition, HUD decided that its "longstanding case-by-case approach can adequately address any McCarran-Ferguson concerns and better serves" the FHA's goals and HUD's congressional mandate. *Id.*

HUD's cogent explanation in support of its preferred policy choice satisfies the APA. As this Court has recognized, "[r]ule-making ... is not always the best method for creating standards." *PCI I*, 66 F. Supp. 3d at 1048 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947)). Instead, "case-by-case determinations may be more beneficial than rule-making," where "a problem is 'so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule.'" *Id.* (quoting *Chenery*, 332 U.S. at 203). With so many "imponderables" at play, *id.* at 1040, HUD reasonably found that the case-by-case approach balances the competing policy concerns better than an overbroad exemption created through rulemaking. That determination should be upheld. *Chevron v. NRDC*, 467 U.S. 837, 842–45 (1984); *see also City of Portland v. United States*, 969 F.3d 1020, 1048 (9th Cir. 2020) (agency order not arbitrary and capricious where "objections to specific applications of the ... [o]rder may be made on a case-by-case basis").

### B. None of PCI's rejoinders justify upending HUD's reasonable determination to prefer case-by-case adjudication over exemptions for the industry.

While PCI claims that HUD's Supplement did not adequately consider the impact of Mc-F, Pl.'s Mem. 11, PCI's arguments reveal that its claim is actually based on its continued

disagreement with HUD's reasonable policy preference. *See* Pl.'s Mem. 9 (HUD should have "exempted risk-based pricing and underwriting"). PCI's arguments are largely thinly veiled attempts to re-litigate issues—namely, the reasonableness of the burden-shifting framework and the fact-dependent nature of Mc-F defenses—that this Court already decided in HUD's favor. They do not undermine HUD's rational policy choice to resolve Mc-F issues on a case-by-case basis.

### 1. *HUD explained that* Doe v. Mutual of Omaha *does not require a categorical exemption or safe harbor for "risk-based pricing and underwriting."*

<u>First</u>, PCI is incorrect in arguing that HUD's Supplement insufficiently addressed the reasoning in *Doe*. In explaining that the Mc-F analysis "depends on the relevant state law and other case-specific variables," HUD expressly discussed *Doe*. AR1816. HUD explained that *Doe* "does not foreclose all discriminatory effects claims against insurers as barred by McCarran-Ferguson" because, as the Fifth Circuit recognized, "'[i]n *Doe*, there was an actual *state insurance law* which purportedly conflicted with the application of the [ADA] to the particular question at issue.'" AR1816 (quoting *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 298 n.6 (5th Cir. 2003)). By contrast, "where no state law [or policy] is impaired," HUD explained, "McCarran-Ferguson will not bar a discriminatory effects claim against an insurer." AR1817; *see also Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 31 n.4 (rejecting Mc-F defense where defendant had "not identified any specific state insurance law that might contradict th[e] [particular] application of the FHA, or explained how the laws are incompatible").[8]

HUD also directly addressed PCI's incorrect contention that *Doe* requires a safe harbor for "risk-based pricing and underwriting" because a challenge to such practices under the Rule would

---

[8] Similarly, in *Flores v. United Airlines*, 426 F. Supp. 3d 520, 538 (N.D. Ill. 2019), the district court concluded, relying on *Doe*, that a plaintiff's Racketeer Influenced and Corrupt Practices Act (RICO) claims were barred under Mc-F in light of specific state insurance laws and insurance rate comparisons that would be at issue in those claims. *Id.* at 538–39.

impermissibly require courts to assess those practices' "actuarial soundness." *See* Pl.'s Mem. 6. As HUD explained, in the course of a discriminatory effects challenge, a plaintiff may show that a purportedly risk-based practice is in fact based on business judgment. *See* AR1818; *see also* Am. Compl. ¶ 54 ("Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly."). That showing would not require a court to assess the actuarial soundness of the practice and thus would not run afoul of *Doe*. HUD's determination on this issue is entirely consistent with this Court's own analysis of *Doe*. As the Court explained, "[w]hile some states require insurers to use risk-based pricing, other states merely permit risk-based pricing." *PCI I*, 66 F. Supp. 3d at 1039–40. Accordingly, *Doe* "would not necessarily preclude claims" challenging practices that "rest on business justifications rather than actuarially sound principles or state law requirements" because "it is not clear that such claims would raise the question of whether the insurer's practices are actuarially sound and consistent with state law." *Id.* at 1040.[9]

In addition, PCI points to no authority to support its assertion that courts would be required to assess the actuarial soundness of a given insurance practice at the third step of the burden-shifting framework. *See* Pl.'s Mem. 11. At step three, a plaintiff bringing a discriminatory effects claim must show that the defendant's legitimate interest "could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3). While HUD lists another risk-based practice as a possible alternative, AR1818, HUD did not indicate that another risk-based practice

---

[9] Even where a state may permit the use of risk-based practices generally, a claim challenging the use of a particular risk-based practice may not create a conflict sufficient to support a Mc-F defense because other state laws or policies, including a state's insurance code or fair housing laws, may not support using such a practice where it has a discriminatory effect. *See infra* I(B)(2). *Doe* would not preclude a court from looking to such state laws and policies to assess their compatibility with a discriminatory effects challenge. *See Doe*, 179 F.3d at 564 (explaining that a "prohibition of discrimination ... does not impair state regulation of insurance[] [because] no state wants insurance companies to refuse to insure disabled people").

is the *only* alternative. [10] And, even then, a court need not assess the actuarial soundness of the practice at step three. For example, it could be shown that an insurer opted for one of two risk-based practices for business reasons. In such a case, the actuarial soundness of the alternative risk-based practice would have been determined already by the insurer itself. The court's analysis would be limited to assessing the efficacy of the alternative risk-based practice in serving the insurer's business interests while having a less discriminatory effect—the type of "unremarkable task" regularly undertaken by courts. *Dehoyos*, 345 F.3d at 297 n.5 (rejecting similar argument because a court does not become a "super actuary" every time it "engag[es] in the unremarkable task of determining whether specific conduct falls within the ambit of federal civil rights law").

Lastly, while HUD maintained that *Doe* does not require it to have adopted the requested safe harbors, HUD also referenced *Doe* in noting that "the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied." AR1817 n.50. While this Court may be bound by *Doe*, *see PCI I*, 66 F. Supp. 3d at 1039 n.6, because the Mc-F inquiry may vary based on the state laws at issue and the jurisdiction in which the claim is brought, HUD reasonably concluded that it would be infeasible to tailor an exemption to account for all of these variations. HUD likewise determined that it would be contrary to the purposes of the FHA to create an overbroad exemption that would undermine discriminatory effects claims that may survive in one jurisdiction but not another. *See* AR1817 ("Given the variation in state insurance laws across more than fifty jurisdictions and over time, HUD declines to fashion a[n] ... exemption that would inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from [FHA] liability."). HUD therefore decided to

---

[10] For example, an insurer may adopt a purportedly risk-based practice for business reasons. At step three, an analysis of whether an alternative practice could serve the defendant's business interests would therefore assess, not its actuarial soundness, but its soundness as a business matter.

leave Mc-F issues to be addressed in future adjudications. PCI may disagree with HUD's determination, but its assertion that HUD did not consider *Doe* in making it is simply unfounded.

> 2. *HUD considered the industry's request for a safe harbor for "risk-based" pricing and underwriting and provided reasonable bases for rejecting it.*

Second, HUD reasonably rejected the industry's requests for exemptions or safe harbors for risk-based pricing and underwriting. PCI's arguments to the contrary are meritless.

*First*, PCI contends that by addressing more generally whether to exempt "all" insurance practices, HUD was "unresponsive" to comments on whether to exempt "risk-based" pricing and underwriting. Pl.'s Mem. 13. That is demonstrably false. HUD addressed head-on and repeatedly why a safe harbor for "risk-based factor[s]," in particular, would be inappropriate. AR1818.

Indeed, HUD specifically recognized that one commenter sought "safe harbors for recognized risk factors," AR1814; *see also* AR1815 (recognizing requests for "safe harbors for long-recognized risk-related factors"), but declined to create such safe harbors for several reasons. *See* AR1818. HUD explained that there is a "long, documented history of discrimination in the homeowners' insurance industry," including through the use of purported "'risk factors' ... that were subsequently banned as discriminatory." AR1818; *see* AR1815 (recounting this history). Providing a safe harbor for any "risk-based" practice could therefore create a loophole allowing insurers to designate as "risk-based" any number of practices, which decades of experience have shown are sometimes not, in fact, risk-based. See AR1815. Similarly, a safe harbor for "risk-based" practices could be used by insurers to insulate from liability practices that are not "purely risk-based." AR1818 (quoting *Nat'l Fair Hous. All Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60 (D.D.C. 2002)).[11] In this way, a safe harbor for "risk-based" practices would be

---

[11] As HUD explained, even practices that are largely risk-based, such as ratemaking, can incorporate elements of discretion under state law. AR1818. Many state statutes "mandating that rates [not] be …

overbroad and undermine the efficacy of the FHA. *See* AR1818. HUD further observed that a safe harbor for "risk-based" practices "would [also] be overbroad because it would foreclose claims where the plaintiff could prove the existence of a less discriminatory alternative." AR1819.

HUD not only explained why an exemption for "risk-based" practices, such as pricing and underwriting, generally would be inappropriate, but it also concluded that "[e]stablishing safe harbors for specific risk-related criteria would be overbroad, arbitrary, and quickly outdated." AR1815. Not only do state insurance laws not provide a uniform list of sanctioned risk-based practices, but such laws also change over time, altering the Mc-F analysis. *See* AR1817. And, as HUD noted, due to differences in state insurance laws, discriminatory effects challenges to similar practices have survived Mc-F defenses in some states but not others. *See* AR1817; *id.* n.56 (e.g., challenges to insurers' use of credit scores). Moreover, whether or not Mc-F preemption occurs will depend not only on the particular practice and insurance laws at issue, but also on the state-specific fair housing laws. *See id.* Accordingly, HUD determined that "even an exemption for specific insurance practices would be overbroad and quickly outdated." AR1818.

*Second*, PCI claims that the Supplement is internally inconsistent because HUD states that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based," AR1816, even though discriminatory effects liability may extend to risk-based practices under the Rule. *See* Pl.'s Mem. 14–15. PCI's claim is merely a veiled attempt to re-litigate this Court's decision upholding the Rule's burden-shifting framework. *PCI I*, 66 F. Supp. 3d at 1053. PCI repeatedly conflates insurers' potential liability under the burden-shifting framework with "prohibiting"

---

unfairly discriminatory, permit insurers … to rely on 'judgment factors' in ratemaking." *Id.* HUD decoded that challenges to practices that are not purely risk-based would not prevent insurers from "evaluat[ing] homeowners insurance risks fairly and objectively," *id.* (quoting *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 60), but declined to adopt an exemption that could immunize practices that are not purely risk-based. *Id.*

actuarial or risk-based practices. Pl.'s Mem. 3; *see also id.* at 16–17. Granted, a claimant may prevail on a discriminatory effects claim by showing that a particular risk-based practice could be substituted for one with a less discriminatory effect. But that does not prohibit the industry from generally continuing to use risk-based practices. Inherent in the burden-shifting framework—and in discriminatory effects liability generally—is the recognition that a defendant may engage in a substantial, legitimate, and non-discriminatory practice that may, nevertheless, result in an *unjustified* discriminatory effect because that interest could be served through less discriminatory means. *See Burbank Apartments Tenant Ass'n v. Kargman*, 474 Mass. 107, 126 (Mass. 2016) ("[V]iolating a regulation or breaking the law has never been a prerequisite to disparate impact liability." (citing *Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 376 n.5, 377 (6th Cir. 2007)). That is not internally inconsistent but is the "reasonable accommodation" HUD made in adopting the burden-shifting framework. *PCI I*, 66 F. Supp. 3d at 1053.

*Third*, PCI argues that HUD's reliance on the Rule's burden-shifting framework was arbitrary and capricious. Pl.'s Mem. 16. Again, this argument is foreclosed, as this Court expressly upheld the reasonableness of Rule's burden-shifting framework, *PCI I*, 66 F. Supp. at 1053, and noted that "the Supreme Court in *Inclusive Communities* ... did not identify any aspect of HUD's burden-shifting approach that required correction." *PCI II*, 2017 WL 2653069, at *9.[12]

The remainder of PCI's argument is essentially that HUD's decision not to provide an exemption for risk-based pricing and underwriting was arbitrary and capricious because 1) challenges to such practices *could* be preempted by Mc-F, *see* Pl.'s Mem. 16–17; and 2) insurers

---

[12] To the extent PCI repeats its argument that applying the burden-shifting framework to claims challenging risk-based practices will necessarily run afoul of *Doe*, it is incorrect for the above reasons. *See supra* Arg.III.B.1.

will have to "defend themselves under the burden-shifting framework ... even if they could prevail," thus incurring "unjustified expenses," Pl.'s Mem. 17. PCI's first argument mistakes HUD's APA obligations and its second restates arguments already rejected by this Court.

That Mc-F could preempt future discriminatory effects claims against insurers does not require HUD to provide a categorical exemption for risk-based pricing and underwriting based on that potentiality or intermittent occurrence. Instead, an agency is well within its discretion to leave certain issues to be addressed in the course of future adjudications. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[C]hoice between rulemaking and adjudication lies in the first instance within the [agency's] discretion.").

Nor was it arbitrary and capricious for HUD to prefer case-by-case adjudication over exemptions for the industry simply because insurers will incur costs defending themselves against discriminatory effects claims. *See* Pl.'s Mem. 17. PCI raised this issue previously, *see* ECF No. 21 at 22, and the Court rejected it, holding that the burden-shifting framework "reflects HUD's reasonable accommodation of the competing interests at stake—*i.e.,* the public's interest in eliminating discriminatory housing practices and defendants' (including insurer-defendants') interest in avoiding costly or frivolous litigation based on unintentional discriminatory effects of their facially neutral practices." *PCI I*, 66 F. Supp. 3d. at 1053.

HUD considered the costs to the industry in both the Rule and its Supplement, and determined, based on decades of experience, that the industry's claims of excessive litigation were inflated and that the potential for discriminatory effects liability under the Rule will not cause the crippling effects to the industry that it has been predicting for nearly 40 years. *See* AR624 ("Given how the discriminatory effects framework has been applied to date by HUD and by the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive

litigation exposure for respondents or defendants."); *see also id.* ("[T]he Federal Rules of Civil Procedure provide various means to dispose of meritless claims."); AR1816 (explaining that insurers have been alleging for over thirty years that discriminatory effects liability "makes it 'near impossible for an insurer to successfully defend himself'"). And HUD provided a reasoned explanation for its conclusion that the potential costs in administration and under-enforcement from an exemption exceeded costs to the industry. AR1814. HUD's "predictive judgment[]" about insurers' potential litigation costs and its reasonable determination based, in part, on that judgment, is entitled to deference. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).[13]

### 3. HUD reasonably considered state fair housing laws in rejecting exemptions for the industry based on McCarran-Ferguson concerns.

<u>Third</u>, it was not arbitrary and capricious, as PCI suggests, *see* Pl.'s Mem 19–20, for HUD to have relied on the fact that many states' fair-housing laws parallel the FHA's provision for discriminatory effects liability in concluding that exemptions were not justified based on the industry's Mc-F concerns. As HUD explained, "insurance practices are not governed solely by 'hermetically sealed' state insurance codes, but ... by a range of other state laws, including state fair housing laws." AR1817 (quoting *Humana Inc. v. Forsyth*, 525 U.S. 299, 312 (1999)). State fair housing laws are commonly interpreted in conformity with the FHA, including in their coverage of insurance and availability of disparate impact claims. *See id.* HUD rightly reasoned that in such states, there would likely not be a Mc-F issue. *Id.*

PCI argues that such laws are "irrelevant to the [Mc-F] analysis" because they were "not

---

[13] Contrary to PCI's claim, *see* Pl.'s Mem. 18, HUD also responded to the industry's concern that the burden of proof under the Rule would be especially "difficult for insurers because they do not collect data on race and ethnicity and state insurance laws may prohibit the collection of such data." *See* AR627. Further, this claim is foreclosed by this Court's decision upholding the burden-shifting framework, *PCI I*, 66 F. Supp. 3d at 1053, and the Supreme Court's decision implicitly adopting it, *Inclusive Cmtys.*, 576 U.S. 519.

enacted 'for the purpose of regulating' insurance." Pl.'s Mem. 19 (citing 15 U.S.C. § 1012(b)). That contention directly conflicts with *Humana* and its progeny, which look to other state laws in conducting the Mc-F analysis. *Humana* clarified that Mc-F will reverse-preempt federal law when the law "directly conflict[s] with state regulation," or when its application would "frustrate any declared state policy or interfere with a State's administrative regime." 525 U.S. at 301. To decide whether there was such a conflict, the Court considered both Nevada "statutory and common law," because Nevada's Unfair Insurance Practices Act is not "hermetically sealed" and must be read in light of other state insurance laws. *See id.* at 307, 312–13.

In accord with *Humana*, courts considering Mc-F defenses have looked to state laws other than those exclusively applicable to insurance, including state fair housing laws. *See, e.g., Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015) (finding that Connecticut's "similar (albeit broader) protection against housing discrimination as the FHA," was a "strong indication that application of the [FHA] will not impair Connecticut's regulation of the insurance industry"). Generally applicable state fair-housing laws frequently apply to insurance practices, given the common state practice of modeling such laws after the FHA. *See, e.g., United Farm Bureau Mut. Ins. Co. v. Metro. Hum. Rels. Comm'n*, 24 F.3d 1008, 1013–14 (7th Cir. 1994) (relying on precedent interpreting the FHA to hold that Indiana fair housing law covers insurance). Indeed, statutes and administrative codes in at least thirteen states explicitly provide that state fair-housing laws apply to insurance.[14] Because these laws place limits on the way insurance companies can deal with insureds—limits that are in many cases coextensive with the Rule—they

---

[14] Ariz. Admin. Code § 10-2-104(B)(4); Ga. Comp. R. & Regs. 186-2-.02(2)(d)(4)(iv); 910 Ind. Admin. Code 2-2-4(d)(4); Kan. Admin. Regs. § 21-60-5(d)(5); Ky. Rev. Stat. Ann. § 344.367; 94-348-8 Me. Code R. § 4(D)(4)(d); Md. Code Regs. 14.03.04.04(F)(6); Ohio Rev. Code Ann. § 4112.02(H)(4); S.C. Code Ann. Regs. 65-211(A)(2)(r); Tenn. Code Ann. § 4-21-601(c); 40 Tex. Admin. Code § 819.124(b)(4); Va. Code Ann. § 36-96.4(B)(2); Wis. Stat. Ann. § 106.50(2)(e).

can and do bear on the Mc-F analysis. *See* AR1817. PCI's contrary position—that state fair housing laws do not inform the Mc-F inquiry—would lead to the perverse result of reverse-preempting a federal claim in the name of deference to a state when the state's law and policy are entirely consistent with it. *See* AR1816. HUD rightly concluded that Mc-F does not command such a result.

### 4. *HUD reasonably determined that the fact-intensive nature of the McCarran-Ferguson inquiry counseled against a categorical exemption.*

<u>Fourth</u>, it was entirely reasonable for HUD to conclude that a categorical exemption for risk-based pricing and underwriting practices was inappropriate given the fact-intensive nature of the Mc-F inquiry. *See* AR1814, 1816. In arguing to the contrary—that "factual development is unnecessary to exempt risk-based pricing and underwriting," Pl.'s Mem. 20—PCI attempts to do an end-run around this Court's holding that its facial challenge to the Rule based on Mc-F is not ripe for review. *See PCI I*, 66 F. Supp. 3d at 1040. This Court already denied one attempt by PCI to re-litigate its dismissed Mc-F claim, *PCI II*, 2017 WL 2653069, at *8, and it should decline to entertain its renewed attempt through the guise of a procedural attack on HUD's Supplement.

To the extent the Court does entertain PCI's claim that Mc-F is a categorical bar to discriminatory effects claims challenging risk-based practices, HUD rightly concluded that PCI's position is at odds with *Humana* and belied by the numerous cases wherein courts have found that such discriminatory effects challenges were not barred by Mc-F. *See* AR1816. PCI relies repeatedly on its contention that because every state either permits or requires the use of actuarial risk factors, Mc-F will necessarily preempt discriminatory effects challenges to risk-based practices. *See* Pl.'s Mem. 11–12, 13–14. However, because Mc-F preempts federal law only where it would "directly conflict with state regulation," "frustrate a[] declared state policy," or "interfere with a State's administrative regime," *Humana*, 525 U.S. at 310, the Mc-F analysis depends upon

the actual state law and policies at issue, the particular claim being made, and other case-specific variables. *See Saunders v. Farmers Ins. Exch. (Saunders II)*, 537 F.3d 961, 967, 969 (8th Cir. 2008) (explaining that the "fact-intensive" Mc-F analysis requires courts to "focus … on the precise federal claims asserted" and "the availability of state remedies").

In particular, a "key issue in analyzing whether the McCarran-Ferguson Act reverse-preempts [an] application of the FHA is the *specific details* of the state insurance law that supposedly contradicts the FHA." *Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 34 n.4, (emphasis altered); *see also Dehoyos*, 345 F.3d at 298 (rejecting Mc-F defense where defendant "vaguely conjecture[ed] that … 'federal civil rights laws will interfere with and frustrate the abilities of states to regulate insurance rate making'"). Accordingly, it is not necessarily sufficient for a claimant to merely cite to the rate-making section of a state's insurance code to demonstrate Mc-F preemption. *Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 34 n.4. Likewise, PCI's general reference to state laws permitting or requiring a general industry methodology of using risk-based practices—not to mention lack of detail as to the precise claim at issue, the remedy requested, or the content of the remainder of the insurance code or the state's fair housing laws—cannot possibly be detailed enough to decide whether state laws would conflict with a discriminatory effects claim challenging a risk-based practice under the FHA for purposes of Mc-F.

That Mc-F would not necessarily preempt all discriminatory effects claims based on states' general sanctioning of risk-based practices is demonstrated by the cases in which courts have rejected Mc-F defenses. *See, e.g.*, AR1817 n.56 (citing *Lumpkin v. Farmers Grp. (Lumpkin II)*, 2007 U.S. Dist. LEXIS 98949 (W.D. Tenn. July 6, 2007) (holding that Mc-F did not preempt discriminatory effects claim challenging insurer's credit scoring program used in their automated underwriting systems to price homeowners' insurance policies); AR1816 (citing *Dehoyos*, 345

28

F.3d 290) (same)). If, as PCI contends, every state has a law either permitting or requiring the use of risk-based practices, then each of the these decisions rejecting Mc-F defenses to discriminatory effects claims implicitly recognizes that such laws are not sufficient to trigger Mc-F preemption.

PCI nevertheless argues that because "[s]tates permit insurers to discriminate between ... risk pools, prohibiting only '*unfairly* discriminatory' rates," or those that "discriminate between insureds posing the same risk," discriminatory effects liability under the Rule would necessarily be barred by Mc-F. Pl.'s Mem. 16. As HUD observed, however, that very argument has been rejected as "too broad[]." *Lumpkin II*, 2007 U.S. Dist. LEXIS 98949 at *19; *but see Saunders II*, 537 F.3d at 966 n.5 (suggesting in dicta that disparate impact challenge to underwriting criteria could arguably be viewed as FHA standard "supersed[ing]" state law). While a state may sanction the use of risk-based practices *generally*, the corpus of state law and policy, including other parts of states' insurance laws and states' fair housing laws, may not sanction particular risk-based practices if they have an unjustified discriminatory effect. *See* AR1817.[15]

In sum, none of PCI's arguments undermine HUD's reasonable determination and explanation to prefer a case-by-case approach to address any Mc-F issues.[16]

## IV. HUD considered the industry's concerns based on the nature of insurance and provided rational bases for rejecting the industry's requested exemptions.

Further, HUD "consider[ed] the substance of the insurance industry's concerns" that "exposing them to disparate impact liability would undermine the fundamental nature of

---

[15] Thus, in *Lumpkin II*, while "[i]n general," the Tennessee insurance code prohibited rates that were "unfairly discriminatory," the court ultimately rejected the Mc-F defense because other code provisions did "not permit credit scoring with disparate impact" and therefore the FHA and Tennessee insurance laws could be read "in harmony." 2007 U.S. Dist. LEXIS 98949 at *19–21.

[16] Moreover, to the extent PCI relies on *Doe* to argue that "factual development is unnecessary to exempt risk-based pricing and underwriting," Pl.'s Mem. 20, Defendants have already explained why that is incorrect, and this Court has already largely rejected that argument. *See PCI I*, 66 F. Supp. 3d at 1039–40.

insurance," *PCI I*, 66 F. Supp. 3d at 1051, and provided a reasonable explanation for its conclusion—based on decades of experience applying disparate impact liability—that it would not. *See* AR1816. Based in part on that conclusion, HUD also "provide[d] a reasoned explanation" for its conclusion that case-by-case review of insurers' arguments is preferable to providing the broad regulatory exemptions requested. *PCI I*, 66 F. Supp. 3d at 1051; *see generally* AR1816–18.

In its Supplement, HUD recognized commenters' concerns that if the Rule applied to insurance, "accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer," and that failure to grant the industry safe harbors for "long-recognized risk[] factors" would "subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market." AR1815. HUD explained that the premise of the commenters' concerns—that the Rule would prevent the use of actuarially sound risk factors—was unfounded. *See* AR1815. HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice," and explained that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." AR1816. "[P]ractices that an insurer can prove are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability." *Id.*

Instead, "[a]ll the Rule requires is that if an insurer's practices are having a discriminatory effect on its insureds and 'an adjustment … can still be made that will allow both [parties'] interests to be satisfied,' the insurer must make that change." *Id.* (quoting *Ave. 6E Invs., LLC*, 818 F.3d at 513). PCI's Brief acknowledges that insurers can still make risk-based decisions under the Rule: PCI qualifies its argument that "the Rule prohibits purely risk-based practices"[17] with the

---

[17] PCI's argument that risk-based decisions are "prohibited" also fails because it conflates discriminatory effects liability with a prohibition on risk-based practices. That a particular practice could have a discriminatory effect does not mean the industry must cease using that practice. *See, e.g.*, *Nat'l Fair Hous.*

admission that this is only "*if* a plaintiff proves the existence of a less discriminatory '*alternative risk-based practice.*'" Pl.'s Mem. 21 (emphasis added).

That application of the Rule to insurance will not prevent insurers from using risk-based decision-making is evidenced by the fact that insurers have been subject to potential discriminatory effects liability for decades, and such exposure has yet to prevent the insurance industry from using risk-based decision-making *See* AR1816; *see also* AR4410 (Stephen M. Dane, *Race Discrimination is Not Risk Discrimination: Why Disparate Impact Analysis of Homeowners Insurance Practices is Here to Stay*, 33.6 BANKING & FIN. SERVS. POL'Y REP. (June 2014)). Some state laws have subjected insurers to potential discriminatory effects liability, and such exposure has yet to prevent the industry from using risk-based decision-making, *see id*. Other industries that use risk-based decision-making, such as mortgage lending, are subject to potential discriminatory effects liability, and yet continue to use risk-based decision-making. *See id*; *see also Montgomery Cnty. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 184 (D. Md. 2019). Where decades of experience has belied the industry's claims of deleterious consequences, HUD reasonably concluded that "discriminatory effects liability does not threaten the fundamental nature of the insurance industry." AR1816; *see generally* AR4404–15 (Dane, BANKING & FIN. SERV. POL'Y REP.).

PCI thus re-raises the argument that HUD should have incorporated into the burden-shifting framework a requirement that the less discriminatory alternative be "equally effective" in serving a defendant's interests. *See* Pl.'s Mem. 21. This Court already rejected that argument in holding that HUD's burden-shifting approach was a "reasonable accommodation" of the competing interests at stake. *PCI I*, 66 F. Supp. 3d at 1053. As HUD has explained, it rejected the

---

*All.*, 208 F. Supp. 2d at 60 (finding discriminatory effects liability would not undermine insurer's ability to "evaluate homeowners insurance risks fairly and objectively").

"equally effective" standard, in part, because such precise determinations are inappropriate in the housing context. *See* AR625. And the Rule itself requires a showing that "the challenged practice *could be served* by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3) (emphasis added). There is thus no basis for PCI's contention that insurers will be required to adopt practices that would undermine the insurance market. *See* Pl.'s Mem. 22–23.[18]

## V.    HUD considered the industry's concerns based on the "first filed rate doctrine" and provided rational bases for rejecting an exemption for insurance pricing.

Finally, PCI also claims that HUD did not adequately address whether the filed-rate doctrine might bar discriminatory effects claims challenging insurance pricing. Pl.'s Mem. 23–24. But HUD's Supplement thoroughly addressed that very issue, explaining that "HUD does not anticipate that the filed rate doctrine will bar discriminatory effects claims involving insurance pricing." AR1818 ("HUD is not aware of any case ... in which a court has applied the filed rate doctrine to defeat a[] ... claim under the [FHA], although several courts have rejected such attempts"). For that reason, and because application of the doctrine, like Mc-F, is a "fact-intensive issue," AR1819 (quoting *Saunders I*, 440 F.3d at 945), HUD decided that a blanket exemption was unwarranted and that case-by-case review would "best accommodate[] the[] variations" in how courts apply the doctrine and in state regulatory regimes. *Id.*

The filed-rate doctrine "primarily serves two purposes." AR1819. It prevents litigants from securing more favorable rates than their non-litigant competitors and it "preserves the authority

---

[18] And despite PCI's assertion otherwise, Pl.'s Mem. 18, HUD also considered the Court's statement that *Graoch* "supports the insurance industry's argument that HUD should include exemptions from the ... Rule or create safe harbors in the Rule for insurance practices that plaintiffs would have no chance of successfully challenging under the burden-shifting framework." *PCI I*, 66 F. Supp. 3d at 1051. As set forth *supra*, *see* Arg. III.A, IV, after careful review, HUD decided that exemptions, even for specific risk-based factors, would be inappropriate. As HUD explained, whether a particular discriminatory effects challenge would lead to liability is not easy to determine given the many factors that go into the Mc-F analysis and the variability across states and jurisdictions. HUD therefore could not conclude that it would be "impossible" for a particular insurance practice to result in liability under the Rule. *Graoch*, 508 F.3d 376.

and expertise of the rate-regulating agency by barring a court from enforcing the statute in a way that substitutes the court's judgment as to the reasonableness of a regulated rate." *Saunders I*, 440 F.3d at 943.

Given the doctrine's purposes, HUD reasoned that "[t]he fit between the filed rate doctrine and discriminatory effects claims is attenuated, at best, because discriminatory effects claims 'do not challenge the reasonableness of the insurance rates' but rather their discriminatory effects." AR1819 (quoting *Lumpkin v. Farmers Grp., Inc. (Lumpkin I)*, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)); *see also Viens*, 113 F. Supp. 3d at 572–73. And, "[t]o the extent there is any conflict between the ... [FHA] and ... state ratemaking regulations, 'the Supremacy Clause tips any legislative competition in favor of the federal antidiscrimination statutes.'" *Id.* (quoting *Saunders I*, 440 F.3d at 944); *see also Perryman v. Litton Loan Serv., LP*, 2014 WL 4954674, at *8 (N.D. Cal. Oct. 1, 2014).

HUD also noted that the filed-rate doctrine "does not preclude injunctive relief or prohibit the Government from seeking civil or criminal redress," under the FHA because such remedies would not conflict with the doctrine's purpose of "preventing litigants from securing more favorable rates than their non-litigant competitors." AR1819 (quoting *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010)); *see also Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 837 (N.D. Ill. 2011). On these bases, HUD reasonably determined that the doctrine was unlikely to preclude discriminatory effects challenges to insurance pricing.

HUD also explained that, in any event, "abundant variations exist among the courts as to how the doctrine applies," and whether the doctrine would preclude a particular claim is a "'fact-intensive issue' that would [have to] include consideration of the particular state's ratemaking structures." AR1819 (quoting *Saunders I*, 440 F.3d at 945); *see also Gunn v. Cont'l Cas. Co.*, 968

33

F.3d 802, 804 (7th Cir. 2020). For example, HUD noted that "[s]tates vary considerably in the degree to which they regulate rate-setting." AR1819 n.92. Some states do not require insurance rates to be filed. *See* AR1819 n.92. And in Illinois, for example, while rates must be filed, "it is not at all clear that the [Illinois] Department [of Insurance] has the authority to approve or disapprove property-insurance rates." *Id.* (quoting *Cohen, v. Am. Sec. Ins. Co.*, 735 F.3d 601, 607 (7th Cir. 2013)). Given these variations, along with the unlikely application of the doctrine to bar FHA claims, HUD reasonably preferred a case-by-case approach to a wholesale exemption.

PCI's arguments do not undermine HUD's reasonable determination and explanation. PCI fails to point to a single case where the filed-rate doctrine was applied to defeat a claim under the FHA, and does not meaningfully contend with those, cited by HUD, that rejected such attempts.[19] *See* Pl.'s Mem. 23–24. PCI ignores that the filed-rate doctrine would not bar claims seeking injunctive relief or prevent the Government from seeking civil or criminal redress. *See id.* And PCI does not respond to HUD's showing that the doctrine is a fact-intensive inquiry that will vary by jurisdiction. *See id.* The two arguments PCI does make are meritless.

First, PCI insists that the filed-rate doctrine would bar a *federal* claim under the FHA, contrary to normal Supremacy Clause principles, by arguing that the "weight of the case law hold[s] that the filed-rate doctrine does bar *federal* challenges to rates filed with *state* agencies." Pl.'s Mem. 24 (emphasis added). But the cases on which PCI relies involve federal Racketeer Influenced and Corrupt Organizations (RICO) and Sherman Act claims, which the courts dismissed based on a "no-injury principle" unique to those statutes and which has no applicability here. *See Saunders I*, 440 F.3d at 944 (explaining that "the no-injury principle of *Keogh* applies to

---

[19] *See Dehoyos,* 345 F.3d at 297 n.5 (finding "unpersuasive" the argument that the filed-rate doctrine barred an FHA discriminatory effects claim); *Lumpkin I*, 2007 U.S. Dist. LEXIS 98994, at *20–22 (same).

deprive a RICO or antitrust plaintiff of standing under federal law to challenge a filed rate that must be charged under state law[,] ... [b]ut standing to sue under federal anti-discrimination statutes such as the [FHA] is far broader.").[20] As the Eighth Circuit explained in *Saunders I*, where two *federal* statutes are at issue, as they were in *Keogh* and *Square D*, courts will attempt to "harmonize[] ... [their] competing purposes." *Id.* Where that is not the case, normal preemption principles apply. *See id.* And in the case of state regulation of insurance, courts look to Mc-F, not the filed-rate doctrine, to decide whether enforcement of federal statutes is permitted. *Id.* at 945.

Second, PCI contends that a court resolving a discriminatory effects claim would "have to consider the reasonableness of the challenged rate at step two of the burden-shifting framework." Pl.'s Mem. 24. That contention is not only erroneous but, even if correct, would not necessarily violate the filed-rate doctrine. At step two, a court need only assess whether the defendant has shown that the "challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § § 100.500(c)(2). While state law may require an insurer to file its rates with the state, *how* the insurer decides its rates is informed by any number of practices. In reviewing a claim that a particular rate has a discriminatory effect, a court will therefore have to assess whether those *practices* are necessary to serve a defendant's legitimate interests, not whether the rate itself is reasonable. Moreover, as HUD explained, not all states require that rates be filed or, if filed, that they be approved by the state. Thus, even if a court were to assess the reasonableness of a rate at step two of the burden-shifting framework, that assessment would not necessarily run afoul of the filed-rate doctrine. PCI thus provides no reason to undermine HUD's determination that the filed-rate doctrine warrants no insurance-pricing exemption.

---

[20] The only case PCI cites that did not involve RICO or the Sherman Act "d[id] not implicate the Supremacy Clause." *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 321 (Minn. 2006).

## CONCLUSION

For these reasons, this Court should grant summary judgment in favor of Defendants.

Dated: July 9, 2021

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director
Federal Programs Branch

KATHLEEN M. PENNINGTON
Assistant General Counsel
for Fair Housing Enforcement

*/s/ Vinita B. Andrapalliyal*
VINITA B. ANDRAPALLIYAL (N.Y. Bar)
Trial Attorney
EMILY S. NEWTON
Senior Trial Counsel
United States Department of Justice
P.O. Box 883, Benjamin Franklin Station
Washington, DC 20044
Ph: (202) 305-0845
Email: Vinita.b.andrapalliyal@usdoj.gov

JULIA GARRISON
Trial Attorney

*Of Counsel*

*Counsel for Defendants*

37

## CERTIFICATE OF SERVICE

I hereby certify that, on July 9, 2021, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

/s/ Vinita B. Andrapalliyal
VINITA B. ANDRAPALLIYAL