**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <br><br> Defendants. | No. 1:13-cv-08564 <br> Judge Rebecca R. Pallmeyer |

**DEFENDANTS' 56.1 STATEMENT OF**
**UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, Defendants hereby submit this Statement of Undisputed Material Facts in connection with Defendants' Motion for Summary Judgment.[1]

---

[1] Defendants note that because this action is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the scope of review is confined to the purely legal question of whether the challenged Rule is "arbitrary [and] capricious" or "otherwise not in accordance with law," 5 U.S.C. § 706(2). *See Smith v. Office of Civilian Health & Med. Program of the Uniformed Servs.*, 97 F.3d 950, 954-55 (7th Cir. 1996). This review is based on the record before the agency at the time of its decision. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). A district court "may not undertake a *de novo* review of the agency's decision and its factual underpinnings." *Stauber v. Shalala*, 895 F. Supp. 1178, 1189-90 (W.D. Wis. 1995); *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994). Accordingly, resolution of Plaintiff's claims "does not require fact finding" by the Court. *See Nw. Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *see also Fla. Power*, 470 U.S. at 744 (noting that the "factfinding capacity of the district court is . . . typically unnecessary to judicial review of agency decisionmaking").

1.      Defendant Department of Housing and Urban Development (HUD) is the federal executive agency responsible for administering and interpreting the Fair Housing Act, Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42 U.S.C. §§ 3601–3619). *See* 42 U.S.C. § 3614a; *see also* 78 Fed. Reg. 11,460, 11,460 (Feb. 15, 2013).

2.      Defendant Marcia Fudge is the Secretary of Housing and Urban Development and is sued in her official capacity. *See* HUD, Marcia L. Fudge, Secretary of HUD, https://www.hud.gov/about/leadership/marcia_fudge (last accessed June 25, 2021).

**The Rulemaking**

3.      On November 16, 2011, HUD issued a Notice of Proposed Rulemaking ("NPRM"), in which HUD proposed to "add[] a new subpart . . . to its Fair Housing Act regulations . . . [to] confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect." 76 Fed. Reg. 70,921, 70,924 (Nov. 16, 2011).

4.      In that same NPRM, HUD proposed "establish[ing] a uniform standard of liability for facially neutral housing practices that have a discriminatory effect" to resolve "minor variation in how HUD and the courts have applied th[e] theory." 76 Fed. Reg. at 70,923.

5.      HUD proposed adopting an approach whereby "liability is determined by a burden-shifting approach" modeled after the well-established frameworks applicable to disparate impact claims brought under other antidiscrimination laws such as Title VII. 76 Fed. Reg. at 70,923.

6.      HUD issued its Final Rule on February 15, 2013, which made several changes to the wording of its proposed rule in response to comments suggesting a need for greater clarity, but it retained the basic substance of the proposal. 78 Fed. Reg. 11,460.

7.     In the preamble to that Rule, HUD announced that it was "formaliz[ing] its longstanding view that discriminatory effects liability is available under the Act and establishes uniform standards for determining when a practice with a discriminatory effect violates the Fair Housing Act." 78 Fed. Reg. at 11,463.

8.     HUD noted that its construction of the FHA to encompass disparate impact was consistent with the interpretation adopted by eleven courts of appeals. 78 Fed. Reg. at 11,476.

9.     In the preamble to the Rule, HUD observed that "for the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs [of the Rule] will simply be the costs of compliance with a preexisting statute, administrative practice and case law." 78 Fed. Reg. at 11,479.

10.     HUD adopted a three-part burden-shifting framework where: (1) the party bringing the claim of discrimination first bears the burden of proof to show that a practice actually or predictably results in a discriminatory effect; (2) if the first step is satisfied, the defendant or respondent has the burden of proving that the practice is "necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests"; and (3) if the second step is satisfied, the party bringing the claim may still prevail upon proving that the asserted interest "could be served by another practice that has a less discriminatory effect." 78 Fed. Reg. at 11,482 (quoting 24 C.F.R. § 100.500(b)–(c)).

11.     HUD noted that the Rule's framework was "not a significant departure from HUD's interpretation to date or that of the majority of federal courts." 78 Fed. Reg. at 11,480.

12.     HUD concluded that the three-part burden shifting framework adopted in the Rule was "the fairest and most reasonable approach to resolving" discriminatory effects claims under the FHA. 78 Fed. Reg. at 11,473–74.

**Comments Submitted During the Rulemaking**

13.     During the comment period, HUD received nearly 100 public comments in response to its proposed rule (many of which had multiple signatories) from entities representing a wide variety of interests, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, state Attorneys General, state housing finance agencies, public housing agencies, mortgage lenders, credit unions, banks, real estate agents, and law firms. AR9–610.

14.     Three trade associations representing the homeowner's insurance industry, including Plaintiff, also submitted comments. AR372–83 (Cmt. of Nat'l Ass'n of Mut. Ins. Cos.); 455–59 (Cmt. of Am. Ins. Ass'n); 553–56 (Cmt. of Prop. Cas. Insurers Ass'n of Am.).

15.     Six state Attorneys General submitted a joint comment during the rulemaking that strongly "commend[ed]" the Rule at issue, calling the availability of disparate impact claims "squarely aligned with the interest of our states" and noting that the Rule would complement the states' own "extensive efforts" to address the lingering "barriers to equal housing opportunities." AR560–61.

16.     HUD received comments that contended that the proposed burden-shifting framework was too favorable to the party bringing the claim and other comments that contended that it was too favorable to the party subject to the claim. *Compare, e.g.*, AR381–83 (Cmt. of Nat'l Ass'n of Mut. Ins. Cos.) (arguing that framework places too heavy a

burden on defendants), *with, e.g.*, AR481–483 (Cmt. of Nat'l Fair Hous. Alliance, et al.) ("We respectfully suggest that the burden of proof should be assigned to the defendant or respondent to show that there is no less discriminatory alternative. . . . In litigation involving insurance or lending – where private companies scrupulously protect proprietary information such as credit scores, actuarial data and risk assessment – there is an even stronger rationale for imposing the burden on the defendant, whose knowledge will be vastly superior to that of a plaintiff and who will uniquely possess information with respect to less discriminatory alternatives." ).

**HUD's Responses to Comments**

17.    HUD grouped the comments it received into 42 different issues and responded to each of those 42 issues in turn. *See* 78 Fed. Reg. at 11,465–79.

18.    HUD acknowledged and rejected comments from insurance groups based on the McCarran-Ferguson Act and the "filed-rate" doctrine because, "[b]y formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, undermine the states' regulation of insurance." 78 Fed. Reg. at 11,475 (internal quotation marks omitted).

19.    HUD noted that "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies," and that the Rule does "not alter the instruction of McCarran-Ferguson or its application," which "depends on the facts at issue and the language of the relevant State law relating to the business of insurance." 78 Fed. Reg. at 11,475 (internal quotation marks and brackets omitted).

20.     HUD acknowledged and rejected comments from insurance groups about the purported effect the Rule would have on the insurance industry, indicating that it found the concerns raised by the insurance groups to be "misplaced." 78 Fed. Reg. at 11,475.

21.     HUD noted that comments from the insurance industry about the effect of the Rule were based on an "incorrect" assumption "that once a discriminatory effect is shown, the policy or practice at issue is *per se* illegal." 78 Fed. Reg. at 11,475. HUD explained that the Rule distinguishes "unnecessary barriers proscribed by the [Act] from valid policies and practices crafted to advance legitimate interests," such that "even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification." *Id*.

22.     HUD acknowledged and rejected comments from insurance groups that requested that the insurance industry be exempted from the Rule, or that safe harbors be created for certain insurance practices. 78 Fed. Reg. at 11,475.

23.     HUD explained that it found the creation of special exemptions for the insurance industry to be "unnecessary" and that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475.

24.     In responding to comments that argued that the Rule would lead to increased litigation burdens for entities subject to the FHA, HUD explained that it "does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants." 78 Fed. Reg. at 11,472. HUD based this conclusion in part on "how the discriminatory effects framework has been applied to date by HUD and by the courts." *Id*.

25.     HUD acknowledged and rejected comments that it should alter the burdens of proof in the proposed burden-shifting standard, concluding that its chosen framework "is the fairest and most reasonable approach . . . because it does not require either party to prove a negative . . . [and] will ensure consistency in applying the discriminatory effects standard while creating the least disruption . . . ." 78 Fed. Reg. at 11,473–74.

26.     HUD acknowledged and rejected comments that it should adopt a burden-shifting framework identical to the one set forth in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). HUD explained that the burden-shifting standard in *Wards Cove*, which was adopted by the Supreme Court for use in Title VII claims but quickly abrogated by Congress, does not and should not govern FHA claims, "in light of the wider range and variety of practices covered by the Act that are not readily quantifiable." 78 Fed. Reg. at 11,472–73. HUD further explained that its choice "is consistent with … Congress's codification of the disparate impact standard in the employment context." Fed. Reg. at 11473.

27.     HUD acknowledged and rejected comments that it should remove the word "necessary" from the definition of a "legally sufficient justification." HUD explained that it rejected this suggestion because "HUD's substantial experience in administering the Fair Housing Act confirms that requiring a challenged practice with a discriminatory effect to be necessary best effectuates the broad, remedial goal of the Act" and "is also consistent with Congress's 1991 enactment of legislation codifying that, in the employment context, a practice that has a disparate impact must be consistent with 'business necessity' and must also be 'job related.'" 78 Fed. Reg. at 11,472 (citing 42 U.S.C. § 2000e-2(k)(1)(A)).

**PCI's Challenge to the 2013 Discriminatory Effects Rule**

<u>Initial Proceedings in District Court</u>

28. On November 27, 2013, PCI filed its original complaint, challenging the application of HUD's Disparate Impact Rule to the pricing of homeowners insurance. *See* ECF. No. 1.

29. The parties cross-moved for summary judgment, and HUD moved to dismiss. *See* ECF Nos. 21, 30.

30. On September 3, 2014, the Court issued a decision on the parties' motions. *See Prop. Cas. Ins. Ass'n of Am. v. Donovan* ("PCI"), 66 F. Supp. 3d 1018 (N.D. Ill. 2014).

31. The Court ruled in HUD's favor by ruling that the burden-shifting framework HUD adopted embodied a reasonable interpretation of the FHA, but it also ruled that some of HUD's responses to comments submitted by the insurance industry were arbitrary and capricious because they did not sufficiently consider or respond to the concerns raised regarding the McCarran-Ferguson Act, the filed-rate doctrine, and comments regarding the nature of the insurance industry. *Id*. at 1049–1051.

32. The Court remanded this case to HUD for further explanation on these issues. *Id*. at 1049–1050, 1054.

***Inclusive Communities* Decision**

33. While this case was on remand, the Supreme Court decided *Inclusive Communities*, which held that disparate impact claims are cognizable under the Act. *Texas Dep't of Hous. & Comm'y Affairs v. Inclusive Comm'ys. Project, Inc.*, 570 U.S. 519 (2019). The Court declined to consider what standards and burdens of proof should apply. *Inclusive Cmtys. Project, Inc.*, 573 U.S. 991 (2014), 2014 U.S. LEXIS 4912 at *1 ("Petition for

writ of certiorari to the United States Court of Appeals for the Fifth Circuit granted limited to Question 1 presented by the petition."); *See also Questions Presented in, Inclusive Cmtys Project, Inc.*, 573 U.S. 991, THE UNITED STATES SUPREME COURT 1, 1, https://www.supremecourt.gov/qp/13-01371qp.pdf.

**2016 Supplemental Explanation**

34. On October 5, 2016, HUD issued its Supplemental Explanation, titled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," which again concluded "that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act." 81 Fed. Reg. 69,012 (AR1813–1820).

35. While the finding remained the same, in its explanation, HUD provided additional responses to insurance industry comments. 81 Fed. Reg. 69,014–19.

HUD's Further Explanation Regarding McCarran-Ferguson

36. In response to comments about the McCarran-Ferguson Act, HUD explained why it rejected the comments requesting a categorical exemption for the insurance industry. [2] HUD stated that "McCarran-Ferguson does not require HUD to do so, and that categorical exemptions would undermine the Act's broad remedial purpose and contravene HUD's own statutory obligation to affirmatively further fair housing." *Id.* at 69,014.

37. HUD further stated that "the mere fact that a state has the authority to regulate insurance or has adopted ratemaking regulations does not suffice on its own to create the kind of conflict, frustration of purpose, or interference that triggers McCarran-Ferguson.

---

[2] Defendants have entered the 2016 Supplemental Explanation into the administrative record and respectfully refer the Court to that document for a full statement of its contents.

Rather, the inquiry . . . depends on the relevant state law and other case-specific variables." *Id.* at 69015–69016 (citing *Humana v. Forsyth*, 525 U.S. 299, 312 (1999); *Dehoyos v. Allstate,* 345 F.3d at 290 (5th Cir. 2003); *Doe v. Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999)).

38. In explaining that the Mc-F analysis "depends on the relevant state law and other case-specific variables," HUD expressly discussed *Doe*. AR1816. HUD explained that *Doe* "does not foreclose all discriminatory effects claims against insurers as barred by McCarran-Ferguson" because, as the Fifth Circuit recognized, "'[i]n *Doe*, there was an actual *state insurance law* which purportedly conflicted with the application of the [ADA] to the particular question at issue.'" AR1816 (quoting *Dehoyos.*, 345 F.3d at 298 n.6).

39. In addition, HUD noted that in some cases, "a discriminatory effects claims brought under the Fair Housing Act against insurers survive McCarran-Ferguson defenses even when an insurer points to a specific state law and alleges that it is impaired." *Id.* at 69,016 (citing *Lumpkin v. Farmers Grp.*, *(Lumpkin II),* No. 05-2868 Ma/V, 2007 U.S. Dist. LEXIS 98949, at *19 (W.D. Tenn. July 6, 2007) (rejecting a McCarran-Ferguson defense to a disparate impact challenge to credit scoring in insurance pricing, holding that disparate impact liability in that context did not impair the state's law mandating that "insurance rates cannot be 'unfairly discriminatory.'"); *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940 (8th Cir. 2006) (remanding the case "for further inquiry into several unknowns about the facts and Missouri law.")).

40. HUD further explained that variations in state insurance laws and their application have yielded disparate case law regarding whether a particular law is indeed reverse-

preempted by McCarran Ferguson. Therefore, HUD concluded that "a one-size-fits-all exemption that would inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from Fair Housing Act liability." *Id*. at 69,016 (internal citations omitted).

41. HUD also noted that other state laws, including state fair housing laws, bear on insurance companies' actions, which "indicat[es] that those states do not consider disparate impact liability to conflict with the nature of insurance. Categorical exemptions or safe harbors of the types requested by the commenters would deprive all states of federal support in addressing discriminatory insurance practices—even those states that welcome or depend on such support. This outcome would be at odds with the purpose of McCarran-Ferguson to support the autonomy and sovereignty of each individual state in the field of insurance." *Id*. at 69,016–17 (internal citations omitted). HUD then discussed multiple examples of state anti-discrimination laws that were found not to impair the state's regulation of insurance.

## HUD's Further Explanation Regarding the Filed Rate Doctrine

42. With regard to the filed rate doctrine, HUD declined to issue a blanket exemption for insurance pricing based on the filed-rate doctrine because the agency "does not anticipate that the filed-rate doctrine will bar discriminatory effects claims involving insurance pricing and preferred to instead institute case-by-case adjudication over the requested exemption" in light of the FHA's "broad remedial goals." *Id*. at 69,017–18.

43. HUD explained that it "is not aware of any case, and no commenter cited one, in which a court has applied the filed rate doctrine to defeat any sort of claim under the Act, although several courts have rejected such attempts." *Id*. at 69,018 and n.81 (internal

citations omitted) (citing *Saunders v. Farmers Ins. Exch*, 440 F.3d 940, 944–46 (8th Cir. 2006); *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 297 n.5 (5th Cir. 2003); *Lumpkin v. Farmers Grp., Inc. (Lumpkin I),* No. 05-2868 Ma/V, 2007 U.S. Dist. LEXIS 98994, at *20–22 (W.D. Tenn. Apr. 26, 2007)).

44. HUD continued, "[t]he fit between the filed rate doctrine and discriminatory effects claims is attenuated, at best, because discriminatory effects claims do not challenge the reasonableness of the insurance rates but rather their discriminatory effects. To the extent there is any conflict between the directives of the federal Fair Housing Act and those of state ratemaking regulations, the Supremacy Clause tips any legislative competition in favor of the federal antidiscrimination statutes." *Id*. at 69,018 (internal quotations and citations omitted) (emphasis in original).

45. HUD also noted that the case law varies in how the filed-rate doctrine applies. Further, "[e]ven where it does apply, a filed rate doctrine defense must be examined specifically in the context of the laws and regulatory structures at issue. This would be a fact-intensive issue that would include consideration of the particular state's ratemaking structures. The case-by-case approach best accommodates these variations." *Id*. at 69,018 (internal quotations and citations omitted).

<u>HUD's Further Explanation Regarding the Fundamental Nature of Insurance</u>

46. With regard to comments about the fundamental nature of insurance, which partially overlapped with the McCarran-Ferguson comments, HUD rejected commenters' request for a blanket exemption. HUD noted that granting the commenters' request "would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations. Insurers regularly engage in practices, such

as marketing," "claims processing and payment," certain underwriting policies, and even some elements of ratemaking "that do not involve risk-based decision making and to which the Act applies in equal force." *Id*. at 69,017.

47. HUD noted by way of example that "many of the state statutes referenced by commenters mandating that rates be reasonable, not excessive, inadequate, or unfairly discriminatory permit insurers, via the very same section of the insurance code, to rely on judgment factors in ratemaking." *Id*. Further, "price optimization practices, which a minority of states have started regulating, illustrate[] how non-actuarial factors, such as price elasticity of market demand, can impact insurance pricing in a manner similar to how such considerations affect pricing of products in non-actuarial industries." *Id*. (internal quotations citations omitted) (emphasis in original).

<u>HUD's Further Explanation Regarding "Risk-Based" Pricing</u>

48. HUD further declined to issue a "safe harbor for any risk-based factor or for the specific long-recognized factors suggested by one commenter." *Id*. HUD decided that "[c]reating a safe harbor for the use of any factor that an insurer could prove is in fact risk-based would be overbroad because it would foreclose claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice. Moreover, if HUD were to provide a safe harbor for the use of any factor that an insurer could prove is purely risk-based, entitlement to the safe harbor would inevitably necessitate a determination of whether the use of the factor is, in fact, risk-based," which would be no less burdensome than the effort needed to establish "a legally sufficient justification." *Id*.

49. Thus, HUD concluded that "an exemption for all provably risk-based factors would offer little added value for insurers not already provided by the Rule itself while foreclosing potentially meritorious claims in contravention of the Act's broad remedial goals and HUD's obligation to affirmatively further fair housing." *Id.*

50. HUD also rejected a commenter's suggestion to "[s]elect[] a few factors for exemption" because the commenter based the suggestion "on bare assertions about [the factors'] actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry." *Id.* HUD further opined that "[e]ven if such data were available and a full survey performed, safe harbors for specific factors would still be overbroad because the actuarial relevance of a given factor can vary by context. Also, while use of a particular risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be." *Id.* Finally, "the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve." *Id.* (internal quotations citations omitted).

**Renewed Proceedings in District Court**

51. Following HUD's Supplemental Explanation in 2016, PCI filed an amended complaint and moved for summary judgment. Dkt. 131; Dkt. 136.

**The 2020 Disparate Impact Rule**

52. After PCI moved for summary judgment, in 2018, HUD issued an advanced notice of proposed rulemaking ("ANPRM") stating that it was reviewing the 2013 Disparate Impact Rule, and the parties agreed to stay the case. Reconsideration of HUD's

Implementation of the Fair Housing Act's Disparate Impact Standard, 83 Fed. Reg. 28,560 (June 20, 2018); Dkt. Nos. 159, 188.

53. PCI submitted comments to the 2018 ANPRM. *See* https://www.regulations.gov/comment/HUD-2018-0047-0349; https://www.regulations.gov/comment/HUD-2018-0047-0384.

54. On August 19, 2019, HUD published an NPRM in the Federal Register. *See* HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84 Fed. Reg. 42,854 (Aug. 19, 2019).

55. APCIA[3] submitted comments to the 2019 NPRM. *See* https://www.regulations.gov/comment/HUD-2019-0067-3436.

56. HUD issued its final rule on September 24, 2020, with an effective date of October 26, 2020. HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 85 Fed. Reg. 60288 (Sept. 24, 2020).

57. Prior to the effective date of the 2020 rule, the U.S. District Court for the District of Massachusetts issued a preliminary injunction in *Massachusetts Fair Housing Center v. HUD*, staying HUD's implementation and enforcement of the rule. *Mass. Fair Hous. Ctr. v. HUD*, No. 20-11765-MGM, 2020 U.S. Dist. LEXIS 205633 (D. Mass. Oct. 25, 2020). Consequently, the 2020 Rule never took effect.

**HUD's 2021 Notice of Proposed Rulemaking**

58. On January 26, 2021, President Biden issued a memorandum directing the Secretary of HUD to, "as soon as practicable, take all steps necessary to examine the effects of the

---

[3] Per Plaintiff's Statement of facts, effective January 1, 2019, AIA merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association ("APCIA"). This submission will refer to APCIA, rather than PCI, in the context of any events following the January 1, 2019 merger.

[2020 Rule]." Joseph R. Biden, Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies, The White House (Jan. 26, 2021), https://www.whitehouse.gov/briefingroom/presidential-actions/2021/01/26/memorandum-on-redressing-our-nations-and-the-federal-governmentshistory-of-discriminatory-housing-practices-and-policies/.

59. On June 25, 2021, HUD published a notice of proposed rulemaking in the Federal Register entitled "Reinstatement of HUD's Discriminatory Effects Standard." 86 Fed. Reg. 33,590.

60. The comment period is 60 days. 86 Fed. Reg. 33,590. Once the comment period closes, HUD will consider all comments received on the NPRM, including from Plaintiffs, before promulgating a final rule.

Dated: July 9, 2021                Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director
Federal Programs Branch

KATHLEEN M. PENNINGTON       */s/ Vinita B. Andrapalliyal*
Assistant General Counsel             VINITA B. ANDRAPALLIYAL (N.Y. Bar)
for Fair Housing Enforcement     Trial Attorney

JULIA GARRISON              EMILY S. NEWTON
Trial Attorney                 Senior Trial Counsel
                        United States Department of Justice
*Of Counsel*                 P.O. Box 883, Benjamin Franklin Station
                        Washington, DC 20044
                        Ph: (202) 305-0845
                        Email: Vinita.b.andrapalliyal@usdoj.gov

                        *Counsel for Defendants*