**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <br><br> Defendants. | No. 1:13-cv-08564 <br><br> Judge Rebecca R. Pallmeyer |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE
56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

**INTRODUCTION**

Pursuant to Local Rule 56.1, Defendants hereby file this response to Plaintiff's Statement of Undisputed Material Facts in connection with Defendants' Opposition to Plaintiff's Motion for Summary Judgment.[1] To the extent that facts are undisputed, they are undisputed for purposes of

---

[1] At the outset, Defendants note that because this action is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the scope of review is confined to the purely legal question of whether the challenged Rule is "arbitrary [and] capricious" or "otherwise not in accordance with law," 5 U.S.C. § 706(2). *See Smith v. Office of Civilian Health & Med. Program of the Uniformed Servs.*, 97 F.3d 950, 954–55 (7th Cir. 1996). This review is based on the record before the agency at the time of its decision. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). A district court "may not undertake a *de novo* review of the agency's decision and its factual underpinnings." *Stauber v. Shalala*, 895 F. Supp. 1178, 1189-90 (W.D. Wis. 1995). Accordingly, resolution of Plaintiff's claims "does not require fact finding" by the Court. *See Nw. Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *see also Fla. Power*, 470 U.S. at 744 (noting that the "factfinding capacity of the district court is . . . typically unnecessary to judicial review of agency decisionmaking"). Moreover, to the extent that Plaintiff's proposed "undisputed material facts" are characterizations of the content of the 2011 Proposed Rule, the 2013 Final Rule, the 2016 Supplemental Explanation, the 2018 Advanced Notice of Proposed Rulemaking,

the parties' summary judgment motions only.

## INDIVIDUAL RESPONSES

### Plaintiff Property Casualty Insurers Association of America

**1.** Property Casualty Insurers Association of America ("PCI") is an Illinois-based trade association of property and casualty insurers representing more than 1,000 member companies. *See* Declaration of Robert Gordon ¶ 2; AR553.[2] PCI's members provide homeowners, property, and hazard insurance (collectively, "homeowners insurance"), subject to state insurance regulations, in every State of the United States. *See* Declaration of Robert Gordon ¶ 3.

> **Response:** Undisputed.

**2.** PCI's mission is to promote and protect the viability of a competitive private insurance market for the benefit of consumers and insurers. See Declaration of Robert Gordon ¶ 4. PCI advocates on behalf of its members on policy issues at the state and federal levels and provides its members with information relevant to legal and public-policy developments affecting the property and casualty insurance industry. See Declaration of Robert Gordon ¶ 4.

> **Response:** Undisputed.

### Defendants Department of Housing and Urban Development and Marcia L. Fudge

**5.[3]** Defendant Department of Housing and Urban Development is an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3531 *et seq.*, Pub. L. No. 89-117, 79 Stat. 451. *See* First Amended Complaint ¶ 18, Dkt. 131.

> **Response:** Undisputed.

**6.** Defendant Marcia L. Fudge, in her official capacity as the Secretary of Housing and Urban Development (as of March 10, 2021), is responsible for the Department's challenged actions. See First Amended Complaint ¶ 19.

> **Response:** Undisputed.

### Venue and Jurisdiction

---

the 2019 Notice of Proposed Rulemaking, or the 2020 Final Rule, Defendants respectfully refer the Court to those documents for a full and accurate statement of their contents.

[2] The "AR" citations refer to the Administrative Record, which has been filed in this action as exhibits to Dkt. 19 and Dkt. 134.

[3] Plaintiffs skipped numbers 3 and 4. For convenience, Defendants have matched their numbering.

7.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff PCI resides in this district and no real property is involved in this action. *See* Declaration of Robert Gordon ¶ 2.

>   **Response:** Undisputed that Plaintiff PCI resides in this district and that there is no real
>
>   property involved in this action. The remainder of this paragraph contains legal conclusions
>
>   rather than assertions of fact.

8.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because PCI brings this action under the Administrative Procedure Act and the McCarran-Ferguson Act. *See* First Amended Complaint ¶ 20.

>   **Response**: Undisputed that PCI brought this action under the Administrative Procedure
>
>   Act and the McCarran-Ferguson Act. However, the Court denied Plaintiff's motion for
>
>   leave to file an amended complaint as to Plaintiff's claim that the Rule violates the
>
>   McCarran Ferguson Act. Therefore, the only remaining claim is under the Administrative
>
>   Procedures Act. The remainder of this paragraph contains legal conclusions rather than
>
>   assertions of fact.

**HUD's Proposed Rule**

9.      On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard." 76 Fed. Reg. 70,921 (Nov. 16, 2011) (A.R. 1). The proposed rule purported to "confirm" that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose. 76 Fed. Reg. at 70,924 (A.R. 4).

>   **Response:** Undisputed that on November 16, 2011, HUD issued a Notice of Proposed
>
>   Rulemaking entitled "Implementation of the Fair Housing Act's Discriminatory Effects
>
>   Standard." Undisputed that the Notice of Proposed Rulemaking indicated that it would
>
>   "confirm that the Fair Housing Act may be violated by a housing practice that has a
>
>   discriminatory effect . . . regardless of whether the practice was adopted for a
>
>   discriminatory purpose." 76 Fed. Reg. at 70,924. The remainder of this paragraph consists

of Plaintiff's characterization of the rule. Defendants refer this Court to the Notice of Proposed Rulemaking for its full and accurate contents.

10.     The proposed rule cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." 76 Fed. Reg. at 70,924 (A.R. 4). The proposed rule did not discuss the McCarran-Ferguson Act. *Id.* The proposed rule noted that there had been "some variation in the application of the discriminatory effects standard" among the courts and set forth a three-step burden-shifting framework for determining whether a challenged practice violates the rule. 76 Fed. Reg. at 70,921 (A.R. 1).

> **Response:** Undisputed that "[t]he proposed rule cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." Undisputed that the proposed rule did not mention the McCarron-Ferguson Act by name, but this characterization is misleading. Although the proposed rule did not mention the McCarran-Ferguson Act by name, the Notice of Proposed Rulemaking (NPRM) cited to the Ninth Circuit's en banc decision in *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010), *see* 76 Fed. Reg. at 70,924, which construed the Fair Housing Act (FHA) to "prohibit[] . . . discrimination in both the denial and pricing of homeowner's insurance" under a disparate impact theory of liability, notwithstanding an insurer's invocation of the McCarran-Ferguson Act. *Ojo*, 600 F.3d at 1208. Undisputed that the NPRM noted that there had been "some variation in the application of the discriminatory effects standard" among the courts and that it set forth a proposed three-step burden-shifting framework for determining whether a challenged practice violates the FHA. 76 Fed. Reg. at 70,921.

**Comments by the Insurance Industry on HUD's Proposed Rule and HUD's Responses**

11.     In response to HUD's proposed rule, insurance industry groups submitted detailed comments to HUD, raising numerous objections. *See* Comments of the Property Casualty Insurers Association of America (Jan. 17, 2012) (A.R. 552-556); Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 371-383); Comments of the American Insurance Association (Jan. 17, 2011) (A.R. 454-459). Among other things, commenters explained

that for homeowners insurance, risk-based pricing might take into account such neutral, actuarially justified factors as, among many others, the types of construction materials used to build a house, history of previous losses, proximity to fire hydrants, and the presence of a security system. *See* Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 372, 376).

> **Response:** Undisputed that insurance industry groups submitted comments to HUD raising
>
> objections. The remainder of this paragraph consists of Plaintiff's characterization of the
>
> comments. Defendants refer this Court to the comments themselves for their full and
>
> accurate contents.

### The McCarran-Ferguson Act

12.     Comments from the insurance industry explained that the application of disparate-impact liability to homeowners insurance would violate the McCarran-Ferguson Act. (A.R. 554; A.R. 378-379).

> **Response:** Undisputed that insurance groups commented during the rulemaking as stated
>
> in this paragraph. The accuracy of these comments is solely a question of law, not of fact,
>
> and Defendants dispute it.

13.     In the final Rule, HUD responded by asserting that federal agencies need not consider whether their regulations comply with the McCarran-Ferguson Act because that Act is directed at courts, not agencies. Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460, 11,475 (Feb. 15, 2013) (A.R. 612, 627).

> **Response:** Undisputed that Defendants responded to comments from the insurance
>
> industry. Defendants dispute Plaintiff's characterization of HUD's response. HUD
>
> explained in the preamble to its Final Rule that "McCarran-Ferguson does not preclude
>
> HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-
>
> Ferguson instructs courts on how to construe federal statutes, including the Act. How the
>
> Act should be construed in light of McCarran-Ferguson depends on the facts at issue and
>
> the language of the relevant State law 'relat[ing] to the business of insurance.' Because this
>
> final rule does not alter the instruction of McCarran-Ferguson or its application as

described in *Ojo v. Farmers Group*, it will not interfere with any State regulation of the insurance industry." 78 Fed. Reg. at 11,475.

### The Incompatibility of Disparate-Impact Liability and Homeowners Insurance

14.    Comments from the insurance industry explained that the imposition of disparate-impact liability is fundamentally inconsistent with the business of insurance. (A.R. 554; A.R.376). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

**Response:** Undisputed that insurance groups commented during the rulemaking as stated in this paragraph. The accuracy of any factual assertions in the cited comments is not an issue before the Court, for the reasons set forth *supra* in footnote 1. The accuracy of these comments also involves a question of law, not of fact, and Defendants dispute it. Defendants dispute the characterization that HUD did not deny the assertion that the "the imposition of disparate-impact liability is fundamentally inconsistent with the business of insurance." HUD rejected, as "misplaced," the assertion by insurance groups that imposition of disparate impact liability is fundamentally inconsistent with the business of insurance and explained its reasoning for doing so. 78 Fed. Reg. at 11,475.

15.    HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11,475 (A.R. 627).

**Response:** Undisputed that Defendants responded to comments from the insurance industry. Defendants dispute Plaintiff's characterization of HUD's response as being so limited. *See, e.g.*, 78 Fed. Reg. at 11,475 ("[E]ven if a policy has a discriminatory effect, *it may still be legal* if supported by a legally sufficient justification.") (emphasis added); *id.* ("[The Rule] will not interfere with any State regulation of the insurance industry."); *id.* ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD."); *id.* (finding

"misplaced" the argument by insurers that the Rule would require them to charge all individuals the same rate).

**16.** Comments from the insurance industry explained that the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. (A.R. 376; A.R. 554). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that insurance groups commented during the rulemaking as stated in this paragraph. The accuracy of any factual assertions in the cited comments is not an issue before the Court. Undisputed that HUD did not deny the assertion, but misleading. *See* 78 Fed. Reg. at 11,475 (explaining why this assertion was not an appropriate basis for exempting insurers from coverage under the Rule).

**17.** HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that Defendants responded to comments from the insurance industry. Defendants dispute Plaintiff's characterization of HUD's response as being limited to its discussion of an insurer's opportunity to defend against liability in litigation or administrative proceedings. In fact, HUD devotes nearly two thirds of a page discussing comments related to the insurance industry. *See, e.g.*, 78 Fed. Reg. at 11,475 ("[E]ven if a policy has a discriminatory effect, *it may still be legal* if supported by a legally sufficient justification.") (emphasis added); *id.* ("[The Rule] will not interfere with any State regulation of the insurance industry."); *id.* ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD."); *id.* (finding "misplaced" the argument by insurers that the Rule would require them to charge all individuals the same rate).

18.     Comments from the insurance industry explained that insurers use actuarially justified risk factors to group policyholders for the purpose of treating those with similar risk profiles similarly. (A.R. 376). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that an insurance group commented during the rulemaking as stated in this paragraph. The accuracy of any factual assertions in the cited comment is not an issue before the Court, for the reasons set forth in the Introduction. Undisputed that HUD did not deny this assertion, but misleading. HUD agreed that *some* insurance practices are based on "actuarially justified risk factors," but disagreed that all insurance practices are actuarially based. *See* 78 Fed. Reg. at 11,475 (explaining why this assertion was not an appropriate basis for exempting insurers from coverage under the Rule).

19.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that Defendants responded to comments from the insurance industry. Defendants dispute Plaintiff's characterization that HUD's response was limited to discussing an insurer's opportunity to defend against liability in litigation or administrative proceedings. *See, e.g.*, 78 Fed. Reg. at 11,475 ("[E]ven if a policy has a discriminatory effect, *it may still be legal* if supported by a legally sufficient justification.") (emphasis added); *id*. ("[The Rule] will not interfere with any State regulation of the insurance industry."); *id*. ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD."); *id*. (finding "misplaced" the argument by insurers that the Rule would require them to charge all individuals the same rate); *id*. at 11,471 (explaining that the FHA "covers many different types of entities and practices" and therefore the Rule "does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context").

20.     Comments from the insurance industry explained that race and other protected class characteristics are not considered in the risk-assessment process. (A.R. 376). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that an insurance group commented during the rulemaking as stated in this paragraph. The accuracy of any factual assertions in the cited comment is not an issue before the Court. Undisputed that HUD did not deny this assertion, but immaterial. *See* 78 Fed. Reg. at 11,475 (explaining why this assertion was not an appropriate basis for exempting insurers from coverage under the Rule).

21.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that Defendants responded to comments from the insurance industry. Defendants dispute Plaintiff's characterization that HUD's response was limited to discussing an insurer's opportunity to defend against liability in litigation or administrative proceedings. *See, e.g.*, 78 Fed. Reg. at 11,475 ("[E]ven if a policy has a discriminatory effect, *it may still be legal* if supported by a legally sufficient justification.") (emphasis added); *id.* ("[The Rule] will not interfere with any State regulation of the insurance industry."); *id.* ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD."); *id.* (finding "misplaced" the argument by insurers that the Rule would require them to charge all individuals the same rate); *id.* at 11,471 (explaining that the FHA "covers many different types of entities and practices" and therefore the Rule "does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context")

22.     Comments from the insurance industry explained that, to eliminate statistical disparities among different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process, and insurers would have to charge everyone the same

rate regardless of risk. (A.R. 377). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that an insurance group commented during the rulemaking as stated in this paragraph. The accuracy of any factual assertions in the cited comment is not an issue before the Court, Defendants dispute that HUD did not deny insurance groups' assertion that the Rule would require insurers to charge everyone the same rate regardless of risk. *See id.* (rejecting assertion as "misplaced"); *see id.* 11,475 (noting that the mere existence of statistical disparities does not demonstrate a *per se* violation of the FHA).

**23.**    HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Defendants dispute Plaintiff's characterization of HUD's response as being so limited. *See, e.g.*, 78 Fed. Reg. at 11,475 ("[E]ven if a policy has a discriminatory effect, *it may still be legal* if supported by a legally sufficient justification.") (emphasis added); *id.* ("[The Rule] will not interfere with any State regulation of the insurance industry."); *id.* ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD."); *id.* (finding "misplaced" the argument by insurers that the Rule would require them to charge all individuals the same rate).

**24.**    Comments from the insurance industry explained that eliminating risk-based pricing would have significant negative consequences including "adverse selection." (AR378). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that an insurance group asserted that eliminating risk-based pricing would have significant negative consequences. Defendants dispute that HUD did not deny insurance groups' assertion. *See id.* (rejecting assertion as "misplaced"); *see id.* 11,475

(noting that the mere existence of statistical disparities does not demonstrate a *per se* violation of the FHA).

**25.**     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11,475 (A.R. 627).

**Response:** Defendants dispute Plaintiff's characterization that HUD's response was limited to discussing an insurer's opportunity to defend against liability in litigation or administrative proceedings. *See, e.g.*, 78 Fed. Reg. at 11,475 ("[E]ven if a policy has a discriminatory effect, *it may still be legal* if supported by a legally sufficient justification.") (emphasis added); *id.* ("[The Rule] will not interfere with any State regulation of the insurance industry."); *id.* ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD."); *id.* (finding "misplaced" the argument by insurers that the Rule would require them to charge all individuals the same rate).

**26.**     In the final Rule, HUD did not confirm that the legitimate use of actuarial risk factors is a legitimate business interest. 78 Fed. Reg. at 11,475 (A.R. 627).

**Response:** Undisputed, but misleading. The purpose of the rulemaking was not to decide whether any particular practice would qualify as a legitimate business justification, but to set up a legal framework for making that determination. *See* 78 Reg. Reg. at 11,471 ("[T]he Fair Housing Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis. Accordingly, the Final Rule does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context.").

<u>The Filed Rate Doctrine</u>

-11-

**27.** Comments from the insurance industry explained that application of the proposed rule to homeowners insurance would violate the filed-rate doctrine. (A.R. 378). In the final Rule, HUD acknowledged this comment, but did not respond to it. 78 Fed. Reg. at 11,474 (A.R. 626).

**Response:** Undisputed that an insurance group mentioned the "filed-rate" doctrine as part of a larger assertion that the proposed rule would impair state regulation of insurance. *See* AR378. However, the accuracy of this comment is solely a question of law, not of fact, and Defendants dispute it. Defendants also dispute the characterization of HUD's response. *See* 78 Fed. Reg. at 11,475 (discussing receipt of comment and rejecting it because the Rule "will not interfere with any State regulation of the insurance industry").

<u>An Exemption or Safe Harbor for Homeowners Insurance</u>

**28.** Comments from the insurance industry requested that HUD exempt homeowners insurance underwriting and pricing from the proposed rule in light of the inherent conflict between disparate-impact liability and risk-based insurance practices. (A.R. 555; A.R. 380).

**Response:** Undisputed that insurance groups commented during the rulemaking as stated in this paragraph. The accuracy of any factual assertions in the cited comments is not an issue before the Court. The accuracy of these comments also involves a question of law, not of fact, and Defendants dispute it.

**29.** Comments from the insurance industry requested, in the alternative, that HUD provide regulatory safe harbors for "long-recognized risk-related factors, such as use of prior insurance claims, age and condition of property, and distance from fire station." (A.R. 380).

**Response:** Undisputed that an insurance group commented as stated in this paragraph. The accuracy of any factual assertions in the cited comment is not an issue before the Court.

**30.** In the final Rule, HUD refused to grant an exemption for homeowners insurance. 78 Fed. Reg. at 11,475 (A.R. 627). HUD also refused to create a safe harbor for the use of any state-law-sanctioned risk factors. *Id.*

**Response:** Undisputed.

**31.** In response to insurance industry requests for an exemption for homeowners insurance or safe harbors for certain risk factors, HUD stated that "[c]reating exemptions or safe harbors related

to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act." 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed.

32. HUD also asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed.

33. Comments from the insurance industry explained that the failure to provide safe-harbor protection for the use of factors specifically allowed by state insurance regulators would subject homeowners insurers to baseless litigation and threaten the sound actuarial standards underpinning the homeowners-insurance market. (A.R. 380). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that an insurance group commented, generally, as stated in this
>
> Paragraph. The accuracy of any factual assertions in the cited comment is not an issue
>
> before the Court, for the reasons set forth in the Introduction. Furthermore, the accuracy of
>
> this comment – that "sound actuarial standards" would be threatened - involves a question
>
> of law, not of fact, and Defendants dispute it. Defendants also dispute this characterization
>
> of HUD's response. *See, e.g.,* 78 Fed. Reg. at 11,475 (rejecting assertion that the Rule
>
> would require insurers to eliminate risk-based pricing and finding concerns about the
>
> Rule's effect on insurers to be "misplaced"); *id.* at 11,472 (rejecting prediction that Rule
>
> would "subject the respondent or defendant to unnecessary and possibly frivolous
>
> investigations and litigation").

The Burden-Shifting Framework

34. Comments from the insurance industry explained that HUD's proposed three-step burden-shifting approach for resolving disparate-impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). (A.R. 381–382; A.R. 458). In the final rule, HUD asserted that *Wards Cove* does not govern FHA claims. 78 Fed. Reg. at 11,473 (A.R. 625).

> **Response:** Undisputed that insurance groups commented as stated in this paragraph. The
>
> accuracy of these comments is solely a question of law, not of fact, and Defendants dispute

it. Defendants do not dispute that HUD asserted that *Wards Cove* does not govern disparate impact claims under the FHA.

35.    Comments from the insurance industry explained that the framework improperly failed to require a plaintiff to challenge a "specific" practice and failed to require a plaintiff to show a "significant" disparate impact. (A.R. 381-382). In the final rule, HUD rejected a requirement that a plaintiff challenge a "specific" practice and rejected a "significance requirement" for disparate-impact liability. 78 Fed. Reg. at 11,468–69 (A.R. 620–621).

> **Response:** Undisputed that an insurance group commented as stated in this paragraph. The
>
> accuracy of these comments is a question of law, not of fact, and Defendants dispute it.
>
> Undisputed that HUD concluded that "the elements of a decision-making process may not
>
> be capable of separation for analysis, in which case it may be appropriate to challenge the
>
> decision-making process as a whole," as is "recognized in the employment context under
>
> Title VII." 78 Fed. Reg. at 11,467. Also undisputed that HUD decided "not to codify a
>
> significance requirement for pleading purposes," *i.e.*, explaining that, "[g]iven the
>
> numerous and varied practices and wide variety of private and governmental entities
>
> covered by the Act, it would be impossible to specify in the rule the showing that would
>
> be required to demonstrate a discriminatory effect in each of these contexts." *Id.* at 11,468.

36.    Comments from the insurance industry explained that the framework improperly required the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard. (A.R. 382). In the final rule, HUD rejected commenters' suggestions to remove the "necessary" requirement from the burden-shifting regime. 78 Fed. Reg. at 11,471 (A.R. 623).

> **Response:** Undisputed that an insurance group commented as stated in this paragraph. The
>
> accuracy of the comment is a question of law, not of fact, and Defendants dispute it.
>
> Defendants also do not dispute that HUD rejected commenters' suggestion.

37.    Comments from the insurance industry explained that the framework improperly shifted the burden of persuasion to the defendant. (A.R. 458; A.R. 382). In the final rule, HUD rejected suggestions that it keep the burden of proof on plaintiffs throughout the process of establishing a disparate-impact claim. 78 Fed. Reg. at 11,473–74 (A.R. 625–626).

-14-

**Response:** Undisputed that insurance groups commented as stated in this paragraph. The accuracy of these comments is a question of law, not of fact, and Defendants dispute it. Defendants do not dispute that the party subject to the claim of discrimination bears the burden of proof at the second step of the Rule's burden-shifting framework, but Defendants dispute the remainder of the comment, which is incorrect as to the burden in the other steps of the framework. 24 C.F.R. § 100.500(c)(2).

38.     Comments from the insurance industry explained that the framework improperly failed to require the plaintiff to prove that a proposed alternative practice would be "equally as effective" as the challenged practice. (A.R. 381–382). In the final rule, HUD rejected a requirement that an alternative "practice with a less discriminatory effect" must be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. 78 Fed. Reg. at 11,472–73 (A.R. 624–625). HUD's only explanation was that housing practices covered by the Act are "not readily quantifiable." 78 Fed. Reg. at 11,473 (A.R. 625).

**Response:** Undisputed that an insurance group commented as stated in this paragraph. The accuracy of this comment is a question of law, not of fact, and Defendants dispute it. Defendants do not dispute that HUD rejected the "equally effective" language of *Wards Cove* and used language stating that the alternative practice must serve the same "substantial, legitimate, nondiscriminatory interests" proven at the second step of the Rule's burden-shifting framework. Defendants dispute Plaintiff's characterization of HUD's response as being limited to the quoted explanation. *See, e.g.*, 78 Fed. Reg. at 11,473 (noting that the adopted "language already states that the less discriminatory alternative must serve the respondent's or defendant's interests, and the current language is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context, and with judicial interpretations of the Fair Housing Act").

39.     Comments from the insurance industry explained that insurers do not collect data on race and ethnicity and, therefore, insurers are unable to assess whether facially neutral risk-related

underwriting and rating factors have a disparate impact on protected classes. (A.R. 383). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

> **Response:** Undisputed that an insurance group commented, as part of its objection to HUD's proposed burden-shifting framework, that "insurers do not collect data on race and ethnicity," and this would make "burden of proof issues . . . particularly difficult for insurers." AR383. The accuracy of any factual assertions in the cited comment is not an issue before the Court. Defendants dispute this characterization of HUD's response. HUD rejected the argument that the framework is more difficult for insurers, because the "*charging party or plaintiff* must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect." 78 Fed. Reg. at 11,475 (emphasis added).

**HUD's Final Rule**

40. On February 15, 2013, HUD issued its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" (the "Disparate Impact Rule" or the "Rule"). 78 Fed. Reg. 11,460 (Feb. 15, 2013) (A.R. 612). The Rule purported to "formalize[]" HUD's view that the FHA's prohibition on discrimination may be violated by practices that have a discriminatory effect in the absence of a discriminatory intent. *Id*.

> **Response:** Undisputed that on February 15, 2013, HUD issued its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard." Undisputed that the preamble to the Rule stated that the Rule "formalized [HUD's] long-held recognition" that the FHA "prohibit[s] practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate." 78 Fed. Reg. at 11,460. The remainder of the paragraph consists of Plaintiff's characterization of the Rule and Defendants refer this Court to the text of the Rule for its full and accurate contents.

41. In adopting the Rule, HUD purported to apply its disparate-impact standard to homeowners insurance. 78 Fed. Reg. at 11,474–75 (A.R. 626–627). In adopting the Rule, HUD rejected requests by the insurance industry for an exemption from the Rule or safe harbor for risk factors. *Id*.

**Response:** Undisputed that the preamble to the Rule stated that the disparate impact standard would continue to apply to insurers. 78 Fed. Reg. at 11,475 ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD . . . ."). Also undisputed that the Rule did not create a blanket exemption or safe harbor for the insurance industry. 78 Fed. Reg. at 11,475 (A.R. 627) ("[c]reating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act. Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent.").

42.     The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 78 Fed. Reg. at 11,482 (A.R. 634) (adding 24 C.F.R. § 100.500(a)).

**Response:** Undisputed.

43.     The Rule provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification." 78 Fed. Reg. at 11,482 (A.R. 634) (adding 24 C.F.R. § 100.500).

**Response:** Undisputed.

44.     The Rule sets forth a three-step burden-shifting framework for determining whether the Rule has been violated. 78 Fed. Reg. at 11,482 (A.R. 634) (adding 24 C.F.R. § 100.500(c)(1)–(3)).

**Response:** Undisputed that the preamble to the Rule states that the Rule "formally establishes [a] three-part burden-shifting test for determining when a practice with a discriminatory effect violates the Fair Housing Act." 78 Fed. Reg. at 11,460.

**PCI's Challenge to the Disparate Impact Rule**

Initial Proceedings in the District Court

45.     On November 27, 2013, PCI filed its original complaint, challenging the application of HUD's Disparate Impact Rule to the pricing of homeowners insurance as arbitrary and capricious and otherwise contrary to law. *See* Dkt. No. 1.

**Response:** Undisputed that PCI filed a complaint containing the allegations as stated in this paragraph. The validity of these allegations is a question of law, not of fact, and Defendants dispute them.

46.     The parties cross-moved for summary judgment, and HUD also moved to dismiss for lack of jurisdiction, arguing that PCI lacked standing and that its claims were unripe. *See* Dkt. Nos. 21, 30.

**Response:** Undisputed except that Defendant's legal arguments are contained in Dkt. No. 31.

47.     In its motion, PCI demonstrated that the insurance laws in every State uniformly permit risk-based pricing and underwriting, Dkt. No. 21 at 8, 20–23; Dkt. No. 44 at 22 & n.12, and indeed that almost all state laws expressly require the use of risk-based pricing, Dkt. No. 21 at 9, 23–24. Specifically, PCI explained that state law permits insurers "to make rating and underwriting decisions on the basis of objective risk factors," Dkt. No. 21 at 2, and prohibits only unfairly discriminatory rates. Dkt. No. 21 at 8, 21–22. PCI similarly showed that the vast majority of States require insurers to file rates with state regulators for review or approval. *See* Dkt. No. 21 at 9, 24–25. PCI argued that it was arbitrary and capricious to deny an exemption because applying the Rule to homeowners insurance would invalidate, impair, or supersede these state laws, in violation of McCarran-Ferguson and the filed-rate doctrine, by imposing liability on insurers that use valid actuarial risk factors that happen to have a disparate impact if some other, less effective factor could be used.

**Response:** Undisputed that PCI made the arguments as stated in this paragraph. The validity of these arguments is a question of law, not of fact, and Defendants dispute them.

48.     On September 3, 2014, the Court issued a decision on the parties' motions. *See Prop. Cas. Ins. Ass'n of Am. v. Donovan* ("PCI"), 66 F. Supp. 3d 1018 (N.D. Ill. 2014). The Court dismissed without prejudice as unripe PCI's claim that the Rule violates the McCarran-Ferguson Act. *Id.* at 1040–42. The Court granted summary judgment in HUD's favor on PCI's claim that the Rule violates the requirements for disparate-impact liability established in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), ruling that the burden-shifting framework HUD adopted embodied a reasonable interpretation of the FHA. But the Court granted summary judgment to PCI on its remaining claims, concluding that HUD's explanation was arbitrary and capricious in several respects. *See PCI*, 66 F. Supp. 3d at 1046–52.

**Response:** Undisputed.

49.     The Court held that HUD's brief response to the insurance industry's detailed comments failed to provide a reasoned explanation for preferring case-by-case determination of McCarran-Ferguson preclusion claims instead of an exemption from the Rule for homeowners insurance. *Id.* at 1048. The Court criticized HUD for making "no attempt" to determine how often McCarran-

Ferguson preclusion would apply and whether McCarran-Ferguson would bar entire categories of disparate-impact claims against insurers. *Id.*

      **Response:** Undisputed.

50.     The Court found "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in [*Doe v.*] *Mutual of Omaha* [*Ins. Co.*], 179 F.3d [557,] 563–64 [(7th Cir. 1999)], and the Eighth Circuit's similar recognition in *Saunders* [*v. Farmers Ins. Exch.*], 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048. It noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049.

      **Response:** Undisputed.

51.     The Court explained that HUD must, on remand, provide a reasoned explanation for preferring case-by-case determination of McCarran-Ferguson preclusion issues instead of an exemption and that the required explanation must consider whether the costs and benefits of proceeding on a case-by-case basis outweighed the costs and benefits of an exemption or safe harbor for homeowners insurers. *PCI*, 66 F. Supp. 3d at 1048–49. The Court found arbitrary and capricious HUD's suggestion that homeowners insurers could defend their policies on a case-by-case basis as part of the burden-shifting framework of the Rule. *Id.* at 1051. The Court reached the same conclusion with respect to HUD's response to comments that applying the Rule to homeowners insurance would violate the filed-rate doctrine. *Id.* at 1050.

      **Response:** Undisputed that the court stated that HUD must, on remand, provide a reasoned explanation for preferring case-by-case determination of McCarran-Ferguson preclusion issues instead of an exemption. HUD disputes that the court required it to "consider whether the costs and benefits of proceeding on a case-by-case basis outweighed the costs and benefits of an exemption or safe harbor for homeowners insurers." The court, in fact stated that "HUD made no attempt to determine whether the *benefits* of proceeding by case-by-case adjudications outweighed the *benefits* of including an exemption or safe harbors for insurers in the Disparate Impact Rule…. HUD has failed to consider this important aspect of the issue." *PCI*, 66 F. Supp. 3d at 1048–49 (emphasis added).

The remainder of this paragraph contains conclusions of law, not assertions of fact, and Defendants dispute them. The Court did not find HUD's suggestion of a case-by-case

analysis to be arbitrary and capricious; rather, the Court found that HUD's failure to respond to the insurance industry's concerns or to provide a reasoned explanation was arbitrary and capricious. *PCI*, 66 F. Supp. 3d at 1051. Undisputed that the Court found that HUD "failed to give adequate consideration to NAMIC's comments regarding the filed-rate doctrine," and noted that "HUD's response (or lack thereof) to NAMIC's filed-rate doctrine argument alone does not make its actions arbitrary and capricious." *Id*. at 1049–1050.

52.    The Court also concluded that HUD had acted in an arbitrary and capricious manner by failing to address the substance of the homeowners insurance industry's arguments that the Rule would prevent the use of actuarially sound underwriting and risk-assessment factors and thereby undermine the fundamental nature of the insurance business. The Court explained:

> HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious. HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework. The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period.

*PCI*, 66 F. Supp. 3d at 1051.

    **Response:** Undisputed.

53.    The Court remanded the case to HUD for further proceedings, ordering HUD either to provide a reasoned explanation or to institute a new rule. *PCI*, 66 F. Supp. 3d at 1050, 1054.

    **Response:** Undisputed.

<u>Post-Remand Submissions</u>

54.    After remand, PCI asked HUD to reopen the comment period. (AR4416–4418). HUD did not officially reopen the comment period, but stated in the Supplemental Explanation that it was responding "to certain insurance industry comments" requesting "exemptions or safe harbors from liability." "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance." 81 Fed. Reg. 69,012 (Oct. 5, 2016) (AR1813–1820).

    **Response:** Undisputed.

**55.**     PCI submitted a comment letter to HUD addressing the issues identified in the Court's order. (AR4496–4513). The comments repeated PCI's request for an exemption for homeowners insurers because the Rule "would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers." (A.R. 4496).

> **Response:** Undisputed that PCI commented as stated in this paragraph. The accuracy of
>
> this comment is a question of law, not of fact, and Defendants dispute it.

**56.**     Specifically, PCI explained that calculating the risk of loss is fundamental to the business of insurance. (A.R. 4497–4498, 4511–4512). Without the ability to set rates based on neutral risk factors, "lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards." (A.R. 4497). PCI explained that because the "vast majority of states" require insurers to set rates based on "neutral actuarial factors," the Disparate Impact Rule's burden-shifting framework would violate the McCarran-Ferguson Act and "interfere with insurers' compliance with state law." (A.R. 4503–4504). Additionally, PCI noted that 49 States expressly permit or require insurers to group insureds based on risk and that the Rule's burden-shifting framework interferes with that express permission in violation of the McCarran-Ferguson Act. (A.R. at 4504–4505).

> **Response:** Undisputed that PCI commented as stated in this paragraph. The accuracy of
>
> these comments is a question of law, not of fact, and Defendants dispute it.

**57.**     Moreover, PCI's comment noted that 47 States and the District of Columbia "require insurers to file their rates with state insurance commissioners for review and approval." (A.R. 4507). Applying the Disparate Impact Rule to homeowners insurance would therefore violate the McCarran-Ferguson Act by "substituting the judgment of a federal court for that of state regulators" to invalidate state insurance laws. (AR 4507–4508). Similarly, the comment added that applying the Disparate Impact Rule to homeowners insurance would violate the filed-rate doctrine because it would allow "private lawsuits and government enforcement actions that question the permissibility of a filed rate." (A.R. 4508).

> **Response:** Undisputed that PCI commented as stated in this paragraph. The accuracy of
>
> these comments is a question of law, not of fact, and Defendants dispute it.

**58.**     PCI also asked HUD to clarify that plaintiffs must show that any alternative practice must be "equally effective" as the challenged practice. (A.R. 4512). PCI noted that, without that requirement, the Rule would drastically distort the homeowners-insurance market by undermining the fundamental nature of insurance: Insurers would refrain from using actuarially sound risk factors in the underwriting and pricing process to avoid liability, or be forced to use factors that are less effective in predicting risk, which in turn would cause adverse selection, motivating lower-risk customers to forgo insurance altogether. (A.R. at 4511–4512). PCI also explained that "[t]he burden-shifting framework established by the Rule would result in insurers facing potential

liability even for using actuarially justified risk factors. . . . [E]ven if every risk factor were proved necessary, plaintiffs could still prevail by showing [a less discriminatory alternative]." (A.R. 4503).

> **Response:** Undisputed that PCI commented as stated in this paragraph. The accuracy of this comment is a question of law, not of fact, and Defendants dispute it.

59.     PCI also alerted HUD to the importance of *Texas Department of Housing & Community Affairs v. Inclusive Communities* Project*, Inc.*, No. 13-1371, which was then pending before the Supreme Court and would specifically address disparate-impact liability under the FHA. (*See* A.R. 4501).

> **Response:** Dispute that the Plaintiffs "alerted" HUD to the importance of *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.* but submit that this dispute is immaterial. Otherwise, undisputed.

The Supreme Court's <em>Inclusive Communities</em> Decision

60.     While this case was before HUD on remand, the Supreme Court decided *Inclusive Communities*, upholding the validity of disparate-impact liability under the FHA but cabining its scope. *Texas Dep't of Hous. & Comm'y Affairs v. Inclusive Comm'ys. Project, Inc.*, 570 U.S. 519 (2019). The Court cautioned that the "FHA is not an instrument to force housing authorities to reorder their priorities," *id.* at 540, and explained that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,'" not the "displacement of valid governmental policies" or "legitimate objectives," *id.* at 540, 544. Accordingly, the Court emphasized the importance of limiting the scope of possible disparate-impact liability "so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 533. And it cautioned against a rule that would encourage the consideration of race "in a pervasive way" and thereby raise serious constitutional questions. *Id.* at 542.

> **Response:** This paragraph contains legal conclusions and interpretations, not assertions of fact and Defendants dispute them. Defendants dispute that the Court cabined or limited the scope of disparate impact under the FHA.

61.     The Court also articulated important limits on how disparate-impact claims may be litigated under the FHA. A claim may not be based "solely on a showing of a statistical disparity." *Inclusive Communities*, 576 U.S. at 540. Instead, plaintiffs must satisfy a "robust causality requirement," pointing to specific policies that caused a disparity, to ensure that defendants are not "held liable for racial disparities they did not create." *Id.* at 542. Moreover, defendants must have "leeway to state and explain the valid interest served by their policies" and "latitude to consider

-22-

market factors" without plaintiffs second-guessing "which of two reasonable approaches" a defendant should follow. *Id*. at 541–42.

> **Response:** This paragraph contains legal conclusions and interpretations, not assertions of
>
> fact. Defendants dispute that the Court established any new limits on disparate impact
>
> liability. *Inclusive Communities* 576 U.S. at 541 (stating that disparate impact liability "has
>
> always been properly limited.").

62.    In light of *Inclusive Communities*, PCI submitted additional supplemental comments to HUD, requesting an exemption to the Disparate Impact Rule for homeowners insurers in accordance with the Supreme Court's decision. (*See* A.R. 4615–4620). PCI argued that the "robust causality requirement" precludes suits against homeowners insurers. (A.R. 4616). Because homeowners insurers are regulated by a "panoply" of state laws, their discretion is "substantially limit[ed]" by state law and therefore is not the cause of any disparate impacts. (A.R. 4619). PCI further explained that homeowners-insurance markets, "with their dependence on actuarially sound, risk-based pricing, provide a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability." (A.R. 4616; 4619). PCI reiterated its previous comments explaining that the Rule would disrupt the homeowners insurance industry and impose needless costs on insurers and their customers. (A.R. 4618–4619). PCI explained, for example, that "to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. . . . This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability . . . ." (A.R. 4618) (internal citations omitted). PCI also argued that the Rule required insurers to compile data on protected characteristics of customers, which would improperly "inject racial considerations into every housing decision." (A.R. 4620).

> **Response:** Undisputed that PCI commented as stated in this paragraph. The accuracy of
>
> these comments is solely a question of law, not of fact, and Defendants dispute it. Injury-
>
> in-fact and traceability – essential elements of Article III standing – are conclusions of law
>
> rather than assertions of fact. Defendants dispute that PCI and its members have
>
> demonstrated a legally-sufficient injury-in-fact traceable to the Rule. Moreover,
>
> Defendants dispute, as a matter of law, the assertion by insurers that the Rule created new
>
> liability to which they were not already subject. *See* 78 Fed. Reg. at 11,461 ("HUD has
>
> long interpreted the Fair Housing Act to prohibit discriminatory practices in connection
>
> with homeowner's insurance, and courts have agreed with HUD."). Dispute that the

Disparate Impact Rule requires homeowners insurers to collect data on protected characteristics. Also dispute that PCI's argument about the "robust causality standard" is discussed at AR 4616; it is located at 4618–19.

### HUD's Supplemental Explanation

**63.** On October 5, 2016, HUD issued its Supplemental Explanation, titled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance." 81 Fed. Reg. 69,012 (A.R. 1813–1820). HUD did not modify the 2013 Rule. HUD concluded that there should be no "categorical exemptions or safe harbors for insurance practices" and that "concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis." *Id.* at 69,012 (A.R. 1813).

> **Response:** Undisputed that HUD published the supplemental notice on October 5, 2016 and that HUD concluded that "concerns regarding the application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis." Also undisputed that HUD declined to provide categorical exemptions or safe harbors for insurance practices, but Defendants note that HUD declined to do so because it concluded that such exemptions or safe harbors "are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act." 81 Fed. Reg. 69,012.

**64.** HUD made no effort to address the key holding of *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557, 564 (7th Cir. 1999). HUD mentioned *Mutual of Omaha* only once, for the uncontroversial point that the McCarran-Ferguson Act bars application of disparate-impact liability only when it would impair state law. *See* 81 Fed. Reg. at 69,015 (A.R. 1816). HUD never addressed *Mutual of Omaha's* holding that the McCarran-Ferguson Act prohibits a federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mut. of Omaha*, 179 F.3d at 564.

> **Response:** Disputed that HUD made no effort to address *Doe v. Mutual of Omaha Ins. Co.* HUD discussed *Mutual of Omaha* in the context of another appellate case, *Dehoyos v. Allstate*, which rejected a McCarran-Ferguson defense to a disparate impact claim "where the insurer did not identify a specific state law that was impaired." HUD continued stating

"[i]n so ruling, the Fifth Circuit reasoned that the Seventh Circuit's holding in *Doe v. Mutual of Omaha* does not foreclose all discriminatory effects claims against insurers as barred by McCarran-Ferguson." 81 Fed. Reg. at 69,015. HUD noted that not all discriminatory effects claims are barred by McCarran-Ferguson and that these cases should be decided on a case-by-case basis. Defendants dispute that the Rule would require a federal court to determine whether an insurer's practices are "actuarially sound and consistent with state law." Rather, the Rule requires a court to determine if there is a discriminatory effect.

**65.** HUD's only response to homeowners insurers' showing that the McCarran- Ferguson Act requires an exemption for risk-based pricing and underwriting was to argue that insurers could defend their practices under the Rule's burden-shifting framework. *See* 81 Fed. Reg. at 69015, 69017 (A.R. 1816, 1818). HUD stated that it was "impossible … to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application." 81 Fed. Reg. at 69013 (A.R. 1814). HUD noted that insurers' concerns focused specifically on applying the Rule to "sound actuarial underwriting principles" and "accurate risk-based pricing," which would "threaten[]" "accurate risk assessment" and "the sound actuarial standards underpinning the insurance market." 81 Fed. Reg. at 69,014 (A.R. 1815). But HUD responded by concluding only that it would not create an "exemption from discriminatory effects liability for all insurance practices or for *all* underwriting practices in order to accommodate the insurance industry's concerns." *Id.* (emphasis added); *see id.* at 69015 (A.R. 1816) ("[W]holesale exemptions for all insurance practices or all insurance underwriting practices would necessarily be overbroad . . . ."); *id.* at 69,017 (A.R. 1818) ("HUD declines to create a broad exemption"—for all insurance practices or all underwriting decisions"—"because doing so would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations[.]").

**Response:** Defendants dispute Plaintiff's characterization that HUD's only response to homeowners insurers was that they could defend their practices through the burden shifting framework. HUD also provided case law evidencing that anti-discrimination statutes have been applied to insurance. 81 Fed. Reg. at 69015. Undisputed that HUD stated that it was "impossible … to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application." *Id.* at 69013. Disputed that HUD noted that insurers' concerns focused specifically on applying

the Rule to "sound actuarial underwriting principles" and "accurate risk-based pricing," which would "threaten[]" "accurate risk assessment" and "the sound actuarial standards underpinning the insurance market." In fact, HUD noted "[a]lthough the commenters assert that a broad exemption for *all* insurance practices or *all* underwriting decisions is necessary to preserve 'sound actuarial underwriting' and the 'risk-based insurance unfair discrimination standard,' HUD declines to create a broad exemption of that sort because doing so would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations." *Id.* at 69017 (emphasis in original) HUD does not dispute that it considered an exemption for *all* insurance practices and *all* underwriting decisions, and notes that this was the request from commenters, as illustrated in the quoted passage above, but HUD disputes the characterization that this was its *only* conclusion. HUD also considered other partial exemptions. *See e.g. id.* at 69,017 ("HUD likewise declines to craft a safe harbor for any risk-based factor or for the specific "long-recognized" factors suggested by one commenter because it would be arbitrary and overbroad"… "Selecting a few factors for exemption, such as those suggested by the commenter, based on bare assertions about their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would also be arbitrary.").

66.     HUD did not dispute that state law uniformly permits and often requires insurers to consider actuarial risk factors. *See* 81 Fed. Reg. at 69,015 (A.R. 1816). Rather, it "recognize[d] that risk-based decision making is an important aspect of sound insurance practice" and asserted that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.* But despite disclaiming any intent to prohibit risk-based decisions, HUD also made clear that risk-based practices are not protected from liability if a "less discriminatory alternative" can be shown at step three of the burden-shifting framework, *id.*, and HUD again failed to require that such an alternative practice must be "equally effective" in predicting risk as the challenged practice. Although the Rule thus threatens to prohibit exactly the risk-based practices that HUD said would be protected, HUD did not resolve or even acknowledge this discrepancy in its logic.

**Response:** The first two sentences are undisputed, though HUD further explains in the supplemental notice that "[a]ll the Rule requires is that if an insurer's practices are having a discriminatory effect on its insureds and 'an adjustment . . . can still be made that will allow both [parties'] interests to be satisfied,' the insurer must make that change."]. *Id.* at 69,015. Whether it was improper for HUD to not require that an alternative practice be "equally effective" is a question of law and not an assertion of fact. Defendants dispute that HUD should have done so. It is further disputed that the Rule "threatens to prohibit exactly the risk-based practices that HUD said would be protected" and that there is any discrepancy in HUD's logic. HUD clearly stated "[u]nder the standard established by the Rule, practices that an insurer can prove are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability." *Id.* at 69,015.

67. HUD failed to address *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 375–76 (6th Cir. 2007), which noted that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success."

**Response:** Undisputed that HUD did not cite to *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 375–76 (6th Cir. 2007) in the 2016 Supplemental Notice; however, HUD cited to this case multiple times in the 2013 Rule, including in footnote 141, which states "*See Graoch*, 508 F.3d at 375 ("we cannot create categorical exemptions from [the Act] without a statutory basis" and "[n]othing in the text of the FHA instructs us to create practice-specific exceptions")."

68. HUD did not adequately consider the cost of case-by-case adjudication. HUD simply asserted that an exemption for risk-based insurance pricing would not reduce insurers' costs: "[T]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017 (A.R. 1818).

HUD did not address commenters' observations about the costs to insurers and courts at the third step of the burden-shifting process. (A.R. 382–383; A.R. 458).

> **Response:** Whether HUD "adequately consider[ed]" the cost of case-by-case adjudication is a legal conclusion and not an assertion of fact. Undisputed that HUD stated that: "[T]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69.017. Defendants note that HUD continued, stating "[t]hus, an exemption for all provably risk-based factors would offer little added value for insurers not already provided by the Rule itself while foreclosing potentially meritorious claims in contravention of the Act's broad remedial goals and HUD's obligation to affirmatively further fair housing." Undisputed that HUD did not specifically address commenter's observations about costs to insurers and courts at the third stage of the burden-shifting framework as evidence, but misleading as plaintiffs, not insurers, bear the burden at the third stage of the burden-shifting framework.

69. HUD also argued that an exemption is inappropriate in light of certain state antidiscrimination laws that may apply to homeowners insurance. 81 Fed. Reg. at 69,016 (A.R. 1817). HUD reasoned that an exemption would "deprive all states of federal support in addressing discriminatory insurance practices" and asserted that an exemption would therefore "be at odds with the purpose of [the] McCarran-Ferguson [Act]." *Id.* HUD also asserted in passing that "McCarran-Ferguson requires a fact-intensive inquiry." *Id.* But HUD did not explain why this would be the case for risk-based pricing and underwriting.

> **Response:** The first two sentences are undisputed. Defendants dispute the characterization in the third sentence that HUD's assertion was "in passing." HUD made this assertion after a paragraph explaining that while in some cases, cited by commenters, courts found McCarran-Ferguson to be a defense, in others, courts found that the Fair Housing Act claims survived a claimed McCarran-Ferguson defense "even when an insurer points to a

specific state law and alleges that it is impaired." *Id*. at 69,016. HUD then provided various examples of these cases to support its conclusion that McCarran-Ferguson requires "a fact-intensive inquiry that will vary state by state and claim by claim.

Thus, even those cases in which impairment was found support the case-by-case approach herein adopted by HUD because, in such cases, the finding was made only after considering the particularities of the challenged practices and the state law at hand. In *Saunders v. Farmers Insurance Exchange*, for example, prior to ruling that McCarran-Ferguson barred a discriminatory effects claim under the Act, the Eighth Circuit first remanded the case for further inquiry into several unknowns about the facts and Missouri law." *Id*. at 69,016. While undisputed that HUD did not tie this particular statement to risk-based pricing and underwriting, it clearly acknowledged that different states have different laws regulating insurance. Such a statement would necessarily apply to risk-based pricing and underwriting.

**70.** HUD did not address comments demonstrating that accurate risk assessment is critical to the business of insurance and that depriving insurers of the ability to accurately consider risk would cause adverse selection, motivating lower-risk customers to forgo insurance altogether.

**Response:** Disputed. HUD summarized and responded to a comment regarding accurate risk assessment and adverse selection in its Supplemental Explanation. *Id*. at 69,014. HUD stated that it "disagrees with the commenter's assertions about the consequences that would befall the insurance industry if HUD does not grant the requested safe harbors for 'long-recognized risk-related factors' or 'historically allowed' factors. Establishing safe harbors for specific risk-related criteria would be overbroad, arbitrary, and quickly outdated." *Id*. HUD also stated that it "recognizes that risk-based decision making is an important aspect of sound insurance practice, and nothing in the Rule prohibits insurers from making decisions that are in fact risk-based. Under the standard established by the Rule, practices

that an insurer can prove are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability. All the Rule requires is that if an insurer's practices are having a discriminatory effect on its insureds and 'an adjustment . . . can still be made that will allow both [parties'] interests to be satisfied,' the insurer must make that change. Risk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving risk-based decisions, such as mortgage lending, without the need for exemptions or safe harbors." *Id.* at 69,015.

**71.** HUD did not dispute that the filed-rate doctrine applies to insurance rates filed with state insurance commissions. HUD's Supplemental Explanation concluded that "applying the filed rate doctrine to prioritize state ratemaking over a federal statute would seem to stand the Supremacy Clause on its head." 81 Fed. Reg. at 69,018 (internal quotation marks omitted) (A.R. 1819). HUD disregarded decisions holding that the filed-rate doctrine bars challenges under federal statutes that interfere with state insurance regimes.

> **Response:** The first and second sentences are undisputed. HUD disputes the characterization in the third sentence that it disregarded federal court decisions regarding the filed rate doctrine. HUD stated in the Supplemental Explanation that "HUD is not aware of any case, and no commenter cited one, in which a court has applied the filed-rate doctrine to defeat any sort of claim under the Act, although several courts have rejected such attempts . . . . The fit between the filed rate doctrine and discriminatory effects claims is attenuated, at best, because discriminatory effects claims 'do not challenge the reasonableness of the insurance rates' but rather their discriminatory effects." *Id.* at 69,018. HUD continued to discuss other case law around the filed rate doctrine. "Because 'the law on the filed rate doctrine is extremely creaky,' abundant variations exist among the courts as to how the doctrine applies. Even where it does apply, a filed rate doctrine defense 'must be examined specifically in the context of the laws and regulatory structures at issue.' This

would be a 'fact-intensive issue' that would include consideration of the particular state's ratemaking structures. The case-by-case approach best accommodates these variations."

*Id.* at 69,018.

**72.** The Supplemental Explanation mentioned *Inclusive Communities* only in a few footnotes and did not address the limitations on disparate-impact liability articulated by the Supreme Court. *See* 81 Fed. Reg. at 69013 nn.11&13, 69014 n.24, 69015 n.42 (A.R. 1814–1816).

> **Response:** Undisputed that *Inclusive Communities* is cited in four footnotes. The remainder of this paragraph provides a legal conclusion, not an assertion of fact. Defendants dispute that *Inclusive Communities* imposed new limitations on disparate impact liability. *Inclusive Communities* 576 U.S. at 541 (stating that disparate impact liability "has always been properly limited.").

**U.S. Department of Treasury Report**

**73.** In October 2017, the U.S. Department of Treasury issued a report entitled "A Financial System That Creates Economic Opportunities Asset Management and Insurance." *See* U.S. Dep't of the Treasury, A Financial System That Creates Economic Opportunities Asset Management and Insurance (Oct. 2017) ("Treasury Report"), https://www.treasury.gov/presscenter/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf. Among other things, the report urged HUD to reconsider the Disparate Impact Rule, stating:

> Treasury recommends that HUD reconsider its use of the disparate-impact rule. In particular, HUD should consider whether the disparate-impact rule, as applied, is consistent with McCarran-Ferguson and existing state law. HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles.

Treasury Report at 110.

> **Response:** Undisputed.

**Renewed Proceedings In The District Court**

**74.** Following HUD's issuance of its Supplemental Explanation, PCI filed an amended complaint, Dkt. 131; *see also* Dkt. 129 (opinion and order on motion for leave to amend), and moved again for summary judgment, challenging HUD's continued refusal to grant an exemption for risk-based pricing and underwriting of homeowners insurance. Dkt. 136. PCI argued that the 2016 Supplemental Explanation, like the 2013 Rule itself, was arbitrary and capricious because it

failed to adequately consider the McCarran-Ferguson Act, the filed-rated doctrine, the effects of the Rule on the business of insurance, and the newly articulated limits on permissible disparate-impact liability under *Inclusive Communities*. *Id*.

> **Response:** Undisputed.

**HUD's 2018 Reconsideration of the Disparate Impact Rule**

<u>HUD's Advanced Notice of Proposed Rulemaking</u>

75.    On June 20, 2018, after PCI moved for summary judgment, HUD published an Advance Notice of Proposed Rulemaking ("ANPRM"). *See* Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 83 Fed. Reg. 28,560 (June 20, 2018). The ANPRM stated that "HUD is reviewing the Disparate Impact Rule to determine what changes, if any, may be necessary in light of the *Inclusive Communities* decision" and invited public comment on "other amendments to the Disparate Impact Rule that may be necessary or helpful." *Id*. at 28,561. The parties agreed to stay this case, Dkt. Nos. 159, 188.

> **Response:** Undisputed.

<u>Comments by The Insurance Industry on HUD's 2018 ANPRM</u>

76.    In response to HUD's ANPRM, PCI and American Insurance Association ("AIA") submitted comments on the ANPRM, agreeing that the Disparate Impact Rule had to be modified in light of *Inclusive Communities* and again urging HUD to exempt homeowners insurance from the Rule. *See* Ex. 6, Waxman Decl., Letter from PCI to HUD (August 19, 2018); Ex. 7, Waxman Decl., Letter from AIA and the National Association of Mutual Insurance Companies ("NAMIC") to HUD (August 20, 2018).[4] PCI and AIA reiterated arguments from PCI's prior comments to HUD, including that applying disparate-impact liability to homeowners insurance would violate the McCarran-Ferguson Act and undermine the business of insurance by creating problems of adverse selection and moral hazard. Ex. 6 at 2; Ex. 7 at 2.

> **Response:** Undisputed that PCI and AIA submitted comments as stated in the paragraph.
>
> However, the accuracy of these arguments is solely a question of law, not of fact, and
>
> Defendants dispute it. The dispute is immaterial because the 2018 ANPRM is not at issue
>
> in this case.

77.    PCI and AIA also set forth the numerous ways in which applying disparate-impact liability to homeowners insurance would contravene the limitations imposed in *Inclusive Communities*. For

---

[4] Effective January 1, 2019, AIA merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association ("APCIA"). This submission will refer to APCIA, rather than PCI, in the context of any events following the January 1, 2019 merger.

example, PCI explained that because "insurers make pricing and underwriting decisions based on demonstrable risk factors," applying the Disparate Impact Rule to homeowners insurers is inconsistent with *Inclusive Communities'* instruction that only "artificial, arbitrary, and unnecessary" practices may give rise to liability under the FHA. Ex. 6 at 21; *see also* Ex. 7 at 12.

**Response:** Undisputed that PCI and AIA stated these arguments in their comments. The validity of these arguments is solely a question of law, not of fact, and Defendants dispute it. Defendants dispute that *Inclusive Communities* imposed new limitations on disparate impact liability. *Inclusive Communities* 576 U.S. at 541 (stating that disparate impact liability "has always been properly limited."). The dispute is immaterial, however, because the 2019 proceeding are not at issue in this case.

78.    PCI also stated that homeowners insurers "do not consider, nor generally have, data regarding their customers' protected characteristics" and that "some risk factors may correlate to a disparity caused by other socioeconomic conditions outside the insurers' control." Ex. 6 at 21; *see also* Ex. 7 at 3. As such, risk-based pricing and underwriting do not satisfy *Inclusive Communities'* "robust causality requirement," 576 U.S. at 542. *See also* Ex. 6 at 21.

**Response:** Undisputed that PCI and AIA stated these arguments in their comments. The validity of these arguments is solely a question of law, not of fact, and Defendants dispute it. The dispute is immaterial, however, because the 2019 proceedings are not at issue in this case.

79.    Requiring homeowners insurers to collect and analyze sensitive data on protected characteristics to avoid disparate-impact liability would improperly "tend to perpetuate race-based considerations rather than move beyond them," 576 U.S. at 543; Ex. 6 at 22; *see also* Ex. 7 at 4.

**Response:** This paragraph is a legal conclusion, not an assertion of fact, and Defendants dispute it. Defendants also dispute the apparent premise of this statement: that the Disparate Impact Rule requires homeowners insurers to collect data on protected characteristics. Defendants dispute that collecting and analyzing data on protected traits would "perpetuate race-based considerations" as it is unsupported. Plaintiffs have not presented facts to show that collecting and analyzing data would infuse any race-based considerations into the

insurance industry rather than assist in removing them. The dispute is immaterial, however, because the 2019 proceedings are not at issue in this case.

**80.** Moreover, opening homeowners insurers to disparate-impact liability based on risk-based pricing and underwriting would place them in a "double bind of liability" in light of the "panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance." *See* Ex. 6 at 21. This is inconsistent with *Inclusive Communities'* instruction that the causality requirement is not satisfied where another "law substantially limits the [defendant's] discretion," 576 U.S. at 543; *see also* Ex. 6 at 21.

> **Response:** Defendants dispute, as a matter of law, the assertion by insurers that the Rule
>
> created new liability to which they were not already subject. *See* 78 Fed. Reg. at 11,461
>
> ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in
>
> connection with homeowner's insurance, and courts have agreed with HUD."). Moreover,
>
> Defendants dispute that the Rule would interfere with insurers' ability to consider
>
> actuarially justified risk factors. *See, e.g.*, 78 Fed. Reg. at 11,475 (rejecting, as "misplaced,"
>
> the assertion that the Rule would require insurers to eliminate risk-based pricing); *id.*
>
> ("[E]ven if a policy has a discriminatory effect, it may still be legal if supported by a legally
>
> sufficient justification."). The remainder of this paragraph is a legal conclusion, not an
>
> assertion of fact, and Defendants dispute it. The dispute is immaterial, however, because
>
> the 2019 proceedings are not at issue in this case.

<u>HUD's 2019 Notice of Proposed Rulemaking</u>

**81.** On August 19, 2019, the NPRM was published in the Federal Register. *See* HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84 Fed. Reg. 42,854 (Aug. 19, 2019). The 2019 NPRM proposed numerous changes to the 2013 Disparate Impact Rule "to bring HUD's disparate impact rule into closer alignment with the analysis and guidance provided in *Inclusive Communities* and understood by HUD[.]" *Id.* at 42,857.

> **Response:** Undisputed.

**82.** HUD failed to include an exemption for homeowners insurers from disparate-impact liability. 84 Fed. Reg. at 42,860. HUD's only response to homeowners insurers' comments that failing to exempt risk-based pricing and underwriting would undermine the business of insurance was that the "materially limited discretion" defense "would have a similar effect to a safe harbor"

and prevent insurers from being placed in a "double bind of liability" where they would be subject to liability under the Rule for actions taken to comply with other laws. *Id.*

> **Response:** Undisputed that HUD did not include an exemption for homeowners insurance in the 2019 Notice of Proposed Rulemaking. It is further undisputed that HUD provided the described justification for its choice to not provide an exemption. Defendants dispute that these were HUD's only responses to this point. HUD also stated that those provisions are consistent with *Inclusive Communities*, "where the actual cause of the disparate impact is another law and not the defendant's own independent decisions, a plaintiff has not shown that the defendant is the actual cause of the disparate impact." 84 Fed. Reg. at 42,860. Furthermore, Defendants dispute this paragraph to the extent it implies that HUD had an obligation to provide justification for the proposed changes. This was a notice of proposed rule-making, not a final rule. The plaintiffs in this case had the opportunity to respond to HUD's proposed rule and the proffered justifications via the comment process. Finally, whether HUD's justification was required or adequate is a question of law, not an assertion of fact. The dispute is immaterial, however, because the 2019 proceedings are not at issue in this case.

**83.** However, HUD made clear that its proposal was intended to "affirm[] in regulation HUD's past position . . . that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case." 84 Fed. Reg. at 42,860.

> **Response:** Undisputed.

<u>Comments by the Insurance Industry on HUD's 2019 NPRM</u>

**84.** On October 18, 2019, APCIA submitted comments on the NPRM, agreeing that HUD's proposed modifications of the burden-shifting framework were consistent with *Inclusive Communities* and again urging HUD to exempt homeowners insurance from the Rule. *See* Ex. 8, Waxman Decl., Letter from APCIA to HUD (Oct. 18, 2019).

**Response:** Undisputed that APCIA stated these arguments in their comments. The validity

of these arguments is solely a question of law, not of fact, and Defendants dispute it. The

dispute is immaterial, however, because the 2019 proceedings are not at issue in this case.

85.     APCIA reiterated the arguments, set forth in previous comments, that HUD should include in its final rule an exemption for homeowners insurers because applying disparate-impact liability to homeowners insurance would violate the McCarran-Ferguson Act and the filed-rate doctrine and would undermine the business of insurance. It also emphasized the critical role of accurate pricing in maintaining insurer solvency. Ex. 8 at 6, 5–18, 21–29.

**Response:** Undisputed that APCIA stated these arguments in their comments. The validity

of these arguments is solely a question of law, not of fact, and Defendants dispute it. The

dispute is immaterial, however, because the 2019 proceedings are not at issue in this case.

86.     APCIA also asked that HUD modify and clarify the defenses in the rule to address issues unique to risk-based insurance pricing underwriting and to more closely conform to *Inclusive Communities*. Ex. 8 at 31–35. For example, APCIA requested that HUD enact a new defense in § 100.500(c) for risk-based pricing and underwriting. *Id.* at 31.

**Response:** Undisputed that APCIA made these statements in their comments. The validity

of these statements is solely a question of law, not of fact, and Defendants dispute it. The

dispute is immaterial, however, because the 2019 proceedings are not at issue in this case.

The Enjoined 2020 Final Rule

87.     After the comment period closed on the 2019 NPRM, HUD submitted a draft rule to the Office of Information and Regulatory Affairs on May 7, 2020, for inter-agency review and consultation. *See* https://www.reginfo.gov/public/do/eoDetails?rrid=130337. For several months thereafter, HUD took no action. In August 2020, this Court lifted the stay in this case and then permitted summary-judgment briefing to resume "because after many months HUD has not yet adopted a new rule[.]" Dkt. No. 201; *see also* Dkt. No. 200.

**Response:** Undisputed that HUD submitted a draft rule to the Office of Information and

Regulatory Affairs, but disputed that for several months HUD took no action. In fact, HUD

engaged in the rulemaking process with the Office of Information and Regulatory Affairs.

Undisputed that this court lifted the stay in this case and permitted summary judgment

briefing. Defendants dispute that the URL citation supports the first sentence of the

paragraph. The dispute is immaterial, however, because the 2020 Rule is not at issue in this case.

**88.**     HUD issued its final rule on September 3, 2020 with an effective date of October 26, 2020. The final rule made several changes to the 2013 Disparate Impact Rule to conform to *Inclusive Communities*.

> **Response:** Disputed that HUD issued its final rule on September 3, 2020. HUD issued its final rule on September 24, 2020, with an effective date of October 26, 2020. 85 Fed. Reg. 60288. Undisputed that HUD made several changes to the 2013 Rule. The remainder of this paragraph contains a legal conclusion, not an assertion of fact. The dispute is immaterial, however, because the 2020 Rule is not at issue in this case.

**89.**     On October 25, 2020, a district court enjoined the new rule from taking effect. *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611–12 (D. Mass. 2020), appeal filed, No. 21-1003 (1st Cir. Jan. 4, 2021), appeal dismissed (Feb. 18, 2021). The original 2013 Disparate Impact Rule has therefore remained operative without interruption.

> **Response:** Undisputed.

<u>HUD's Proposed 2021 Rule</u>

**90.**     On January 26, 2021, President Biden issued a memorandum directing the Secretary of HUD to, "as soon as practicable, take all steps necessary to examine the effects of the [2020 Rule]." Joseph R. Biden, Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies, The White House (Jan. 26, 2021), https://www.whitehouse.gov/briefingroom/presidential-actions/2021/01/26/memorandum-on-redressing-our-nations-and-the-federal-governmentshistory-of-discriminatory-housing-practices-and-policies/.

> **Response:** Undisputed.

**91.**     On April 12, 2021, HUD submitted a proposed new rule for inter-agency review, entitled "Reinstatement of HUD's Discriminatory Effects Standard." Office of Mgmt. & Budget, Pending EO 12866 Regulatory Review, Reinstatement of HUD's Discriminatory Effects Standard (FR-6251) (Apr. 12, 2021), https://www.reginfo.gov/public/do/eoDetails?rrid=162113.

> **Response:** Undisputed, except that Defendants dispute that URL citation supports the paragraph.

**Harm to PCI and Its Members**

**92.** PCI (and now APCIA, *see supra* note 4) and its insurer members have been and continue to be injured by the Disparate Impact Rule. (A.R. 552–556; A.R. 371–383; A.R. 454– 459); Declaration of Robert Gordon ¶¶ 6–7; PCI, 66 F. Supp. 3d at 1043–44.

> **Response:** Injury-in-fact and traceability – essential elements of Article III standing – are
>
> conclusions of law rather than assertions of fact.

**93.** The Rule directly regulates homeowners insurers, including PCI's member companies. *See* 78 Fed. Reg. at 11,474–75 (A.R. 626–627); (A.R. 553) ("The issue the rule presents for insurers is whether non-racially motivated and sound actuarial underwriting principles recognized by state insurance regulators that permit accurate risk-based pricing for consumers can be prohibited by federal regulators who find them to have a 'disparate impact' and whether such HUD actions would violate a federal statute reserving the power to regulate insurance to the states."); (A.R. 554) ("HUD's reference to insurance in the preamble of the proposed rule suggests that it may use its disparate impact rule to become a federal regulator of insurance underwriting practices despite McCarran-Ferguson's explicit reservation of insurance regulatory powers to the states."); (A.R. 455–456) (The proposed rule "would seek to add regulation or enforcement at the federal level."); (A.R. 373); PCI, 66 F. Supp. 3d at 1043.

> **Response:** Undisputed that PCI's member companies are subject to the Rule, as well as
>
> the FHA, but assertions of harm made by insurers in comments submitted during the
>
> rulemaking process are not evidence of injury at the summary judgment stage. *See Am.*
>
> *Chemistry Council v. Dep't of Trans.*, 468 F.3d 810, 819–20 (D.C. Cir. 2006). Moreover,
>
> Defendants dispute, as a matter of law, the assertion by insurers that the Rule created new
>
> liability to which they were not already subject. *See* 78 Fed. Reg. at 11,461 ("HUD has
>
> long interpreted the Fair Housing Act to prohibit discriminatory practices in connection
>
> with homeowner's insurance, and courts have agreed with HUD.").

**94.** The ability to consider actuarially justified risk factors is critical to the business of insurance. (*See* A.R. 554) (Insurers "need … to distinguish between different types and degrees of risk. Indeed, risk discrimination is the foundation of insurance underwriting …."); (A.R. 376) ("The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly."); (A.R. 376) ("To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly. This practice is the very essence of risk-based pricing.").

**Response:** Undisputed that assessing risk is critical to the business of insurance. However, assertions of harm made by insurers in comments submitted during the rulemaking are not evidence of injury at the summary judgment stage. *See Am. Chemistry Council*, 468 F.3d at 819–20.

95.     If the Rule remains in effect, insurers' ability to consider actuarially justified risk factors in underwriting and rating insurance will be impaired. (A.R. 377) ("To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk."); *see also* Declaration of Peter Drogan ¶ 14.

**Response:** Assertions of harm made by insurers in comments submitted during the rulemaking are not evidence of injury at the summary judgment stage. *See Am. Chemistry Council*, 468 F.3d at 819–20. Moreover, Defendants dispute that the Rule would interfere with insurers' ability to consider actuarially justified risk factors. *See, e.g.*, 78 Fed. Reg. at 11,475 (rejecting, as "misplaced," the assertion that the Rule would require insurers to eliminate risk-based pricing); *id.* ("[E]ven if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."); *id.* ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD.").

96.     The Rule would thus prevent accuracy in pricing, result in adverse selection, and reduce the availability and affordability of insurance coverage, all of which would injure homeowners insurers. (A.R. 378) ("If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer."); Declaration of Ronald Zaleski[5] ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans").

---

[5] The declaration of Ronald Zaleski discusses Selective Insurance Company of America, which is now a member of APCIA. Declaration of Robert Gordon ¶ 8.

**Response:** Assertions of harm made by insurers in comments submitted during the rulemaking are not evidence of injury at the summary judgment stage. *See Am. Chemistry Council*, 468 F.3d at 819–20. Moreover, Defendants dispute, as a matter of law, that the Rule would interfere with insurers' ability to consider actuarially justified risk factors. *See* 78 Fed. Reg. at 11,475 (rejecting, as "misplaced," the assertion that the Rule would require insurers to eliminate risk-based pricing); *id.* ("[E]ven if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."); *id.* ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD.")

97.    To attempt to comply with the Rule, homeowners insurers would be required to incur expense collecting demographic data that they do not currently obtain from their customers and analyzing that data to determine whether their use of facially neutral underwriting and rating factors have a disparate impact. (A.R. 383) ("Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity. Without collecting such data indicative of protected classes, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes."); *see also* Declaration of Ronald Zaleski ¶ 11; Declaration of Peter Drogan[6] ¶ 7; Declaration of Michael Dawdy[7] ¶ 11; Declaration of Teresa Cracas[8] ¶¶ 6–7; PCI, 66 F. Supp. 3d at 1044. Insurers might not even be permitted to collect that data, given state prohibitions on "treating similar risks in a dissimilar manner." (A.R. 376, 383); Declaration of Teresa Cracas ¶ 10; Declaration of Michael Dawdy ¶ 11.

**Response:** Assertions of harm made by insurers in comments submitted during the rulemaking are not evidence of injury at the summary judgment stage. *See Am. Chemistry Council*, 468 F.3d at 819–20. Defendants dispute that the Disparate Impact Rule requires

---

[6] The declaration of Peter Drogan discusses Amica Mutual Insurance Company, which is now a member of APCIA. Declaration of Robert Gordon ¶ 8.

[7] The declaration of Michael Dawdy discusses State Auto Insurance Companies, which is now a member of APCIA. Declaration of Robert Gordon ¶ 8.

[8] The declaration of Teresa Cracas discusses Cincinnati Insurance Company, which is now a member of APCIA. Declaration of Robert Gordon ¶ 8.

homeowners insurers to collect data on protected characteristics. Defendants also dispute that state laws would necessarily prohibit the collection of demographic data because state prohibitions on treating "similar risks in a dissimilar manner" do not necessarily relate to an insurance company's ability to collect data.

98.     The Rule would impose significant new burdens on homeowners insurers required to justify their practices in litigation under the burden-shifting framework adopted in the Rule. (A.R. 382–383; A.R. 458); *see also* Declaration of Ronald Zaleski ¶ 18; Declaration of Peter Drogan ¶¶ 10–12; Declaration of Michael Dawdy ¶¶ 13–14; Declaration of Teresa Cracas ¶¶ 8– 11, 13.

**Response:** Assertions of harm made by insurers in comments submitted during the rulemaking are not evidence of injury at the summary judgment stage. *See Am. Chemistry Council*, 468 F.3d at 819–20. Moreover, Defendants dispute, as a matter of law, that the Rule imposes new burdens on insurers. *See* 78 Fed. Reg. at 11,474 ("HUD has long recognized, as have the courts, that the Act supports an effects theory of liability."); *id.* at 11, 475 ("HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD."); *id.* at 11,479 ("[F]or the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute, administrative practice, and case law."); *see also id* at 11,462 ("Rather, this final rule embodies law that has been in place for almost four decades and that has consistently been applied, with minor variations, by HUD, the Justice Department and nine other federal agencies, and federal courts.")

99.     PCI and its member companies have expended substantial resources analyzing the Rule and the steps that could be necessary to comply with the Rule. If the Rule is not set aside as applied to homeowners insurance, PCI and its member companies will continue to expend substantial

resources analyzing these issues. Declaration of Robert Gordon ¶ 7; Declaration of Teresa Cracas ¶ 12.

**Response:** Undisputed that PCI and its members have expended resources analyzing the Rule and potential compliance with the disparate impact liability standard embodied in the Rule, although Defendants are not in a position to say if those resources are "substantial." Defendants dispute that this conclusory assertion suffices, as a matter of law, to demonstrate Article III standing. Defendants also dispute, as a matter of law, that this expense is attributable to the Rule, because it has "long been the position of HUD, confirmed by federal courts, that practices with discriminatory effects may violate the Fair Housing Act." 78 Fed. Reg. at 11,481; *see also id.* at 11,479 ("[F]or the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute, administrative practice, and case law.") *see also id* at 11,462 ("Rather, this final rule embodies law that has been in place for almost four decades and that has consistently been applied, with minor variations, by HUD, the Justice Department and nine other federal agencies, and federal courts.")

100.    PCI's members, their policyholders, and consumers broadly "would have been better off if HUD had exempted homeowners insurers from the Disparate Impact Rule, created safe harbors in the Rule for long-recognized actuarial risk factors, and/or adopted the insurance industry's proposed burden-shifting framework for proving disparate impact claims." *PCI*, 66 F. Supp. 3d at 1045.

**Response:** Undisputed that the Court said in its analysis on plaintiff's standing that "PCI's members would have been better off if HUD had exempted homeowners insurers from the Disparate Impact Rule, created safe harbors in the Rule for long-recognized actuarial risk

factors, and/or adopted the insurance industry's proposed burden-shifting framework for proving disparate impact claims." *PCI*, 66 F. Supp. 3d at 1045.

Dated: July 9, 2021                                Respectfully submitted,

                                                   BRIAN D. NETTER
                                                   Deputy Assistant Attorney General

                                                   LESLEY FARBY
                                                   Assistant Branch Director
                                                   Federal Programs Branch

KATHLEEN M. PENNINGTON                             */s/ Vinita B. Andrapalliyal*
Assistant General Counsel                          VINITA B. ANDRAPALLIYAL (N.Y. Bar)
for Fair Housing Enforcement                       Trial Attorney
                                                   EMILY S. NEWTON
JULIA GARRISON                                     Senior Trial Counsel
Trial Attorney                                     United States Department of Justice
                                                   P.O. Box 883, Benjamin Franklin Station
*Of Counsel*                                       Washington, DC 20044
                                                   Ph: (202) 305-0845
                                                   Email: Vinita.b.andrapalliyal@usdoj.gov

                                                   *Counsel for Defendants*