**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Chief Judge Rebecca R. Pallmeyer |
| MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**BRIEF OF AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, CHICAGO AREA FAIR HOUSING ALLIANCE, CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., NATIONAL CONSUMER LAW CENTER AND NATIONAL FAIR HOUSING ALLIANCE AS *AMICUS CURIAE* IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGEMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. III

STATEMENT OF INTEREST ............................................................................................ 2

INTRODUCTION .............................................................................................................. 8

STANDARD OF REVIEW ................................................................................................ 10

ARGUMENT ..................................................................................................................... 11

I.    A BLANKET EXEMPTION FROM DISPARATE IMPACT LIABILITY WOULD NOT PROMOTE
EFFICIENCY AND WOULD BE OVER-INCLUSIVE. ....................................................... 12

    a.   *Determining Whether a Policy or Practice Is Risk-Based Requires an Intensive Case-
by-Case Analysis.* ................................................................................................... 13

    b.   *The Widespread Use of Price Optimization Illustrates the Inefficiency of Exempting the
Business of Homeowners Insurance from Discriminatory Effects Liability.* .......................... 15

II.    DISCRIMINATORY EFFECTS LIABILITY IS COMPATIBLE WITH THE BUSINESS OF
INSURANCE, AND HUD ADEQUATELY RESPONDED TO COMMENTS CLAIMING OTHERWISE. ..... 17

III.    THE PRESENCE OF SIGNIFICANT DIFFERENCES IN STATE LAW REGARDING BOTH
INSURANCE AND HOUSING DISCRIMINATION PROTECTIONS SUPPORTS HUD'S CASE-BY-CASE
APPROACH. ....................................................................................................................... 19

    a.   *Several States Subject Insurance-Related Practices to Disparate Impact Liability, so the
Imposition of Disparate Impact FHA Liability in Those States Would Not Impair State
Insurance Regulation.* ........................................................................................... 19

    b.   *States Vary in Their Application of the Filed-Rate Doctrine, which further Bolsters
HUD's Case-by-Case Approach.* ........................................................................... 21

IV.    PCIA DID NOT REQUEST A NARROW EXEMPTION FOR RISK-BASED PRACTICES DURING
THE NOTICE-AND-COMMENT PERIOD, MEANING HUD WAS NOT REQUIRED TO ADDRESS THIS
REQUEST. ......................................................................................................................... 25

CONCLUSION .................................................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Dehoyos v. Allstate Corp.*, 345 F.3d 290, 297 (5th Cir. 2003)..............................................20

*Adkins v. Morgan Stanley*, No. 12-CV-7667 (S.D.N.Y. filed Oct. 15, 2012)................................2

*Air Transp. Ass'n of Am. v. F.A.A.*, 169 F.3d 1, 7 (D.C. Cir. 1999).......................................26

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009) ...........................................22

*Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968 ..........................11

*Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1101 (W.D. Wash. 2007) ...........21, 24

*Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790,798-99 (Iowa 2011) ...................20

*Brown, et al. v. Artery Org., Inc.*, 654 F. Supp. 1106 (D.D.C. 1987) ......................................5

*Castillo v. Johnson,* No. CV-17-04688-PHX-DLR, 2019 WL 4222289 (D. Ariz. Sept. 5, 2019), ......21, 24

*Cent. Ala. Fair Hous. Ctr. v. Lowder Realty Co., Inc.*, 236 F.3d 629 (11th Cir. 2000)...................4

*Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 607 (7th Cir. 2013) ......................................23

*Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994) ...............................................................5

*Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 255-56 (Conn. 1999) ....20

*Consent Decree, Byrd v. First Real Estate Corp. of Ala.,* No. 5-CV-3087 (N.D. Ala. May 14, 1989)........5

*Corbin v. Allstate Corp.*, 2019 IL App (5th) 170296, 140 N.E.3d 810, *appeal denied,* 124 N.E.3d 464 (Ill. 2019)................................................................................................23

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ........................................................10

*Doe v. Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999), *cert. denied* 528 U.S. 1106 (2000) ...................12

*EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118 (D.C. Cir. 2015) ...............................26

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...............................................10

*Gelb v. Am. Tel. & Tel. Co.*, 813 F. Supp. 1022 (S.D.N.Y. 1993) ...........................................22

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)................................................................5

*Hills v. Gautreaux*, 425 U.S. 284 (1976) .......................................................................2

*Home Box Off., Inc. v. F.C.C.*, 567 F.2d 9 (D.C. Cir. 1977).................................................28

*Hoover v. HSBC Mortg. Corp. (USA),* 9 F. Supp. 3d 223 (N.D.N.Y. 2014) ..................................22

*Humana v. Forsyth*, 525 U.S. 299, 310 (1999) ...........................................................13, 20

*Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851 (7th Cir. 2003) ...............................10, 19

*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979))....................................................11

*Kennedy Park Homes Ass'n v. City of Lackawanna, N.Y.*, 436 F.2d 108 (2d Cir. 1970) ....................5

*Krukas v. AARP,* 376 F. Supp. 3d 1, 19 *(D.D.C. 2019)* ..................................................24, 25

*LeBlanc v. E.P.A.*, 310 F. App'x 770 (6th Cir. 2009)........................................................26

*Leo v. Nationstar Mortg. LLC*, 964 F.3d 213 (3d Cir. 2020)................................................22

*Lewis v. City of Chicago*, 560 U.S. 205 (2010)................................................................5

*Little, et al. v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394 (D.D.C. 2017).....................5

*Lumpkin v. Farmers* Grp., No. 05– 2868, 2007 U.S. Dist. LEXIS 98949 (W.D. Tenn. July 6, 2007).......15

*Mackey v. Nationwide Ins.*, 724 F.2d 419 (4th Cir. 1984) ...................................................24

*Malibu Inv. Co. v. Sparks*, 996 P.2d 1043 (Utah 2000) ......................................................20

*Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998)...........................................................22

*McGhee v. Sipes*, 334 U.S. 1 (1948) ...........................................................................4

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) .........................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...............10

*NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992)....................................2,5, 8

*Nat'l Fair Hous. All. v. Prudential Ins. Co.*, 208 F. Supp. 2d 46 (D.D.C. 2002) .........................6

*Nat'l Fair Hous. All. v. Travelers Indemnity Co.*, 261 F. Supp. 3d. 20 (D.D.C. 2017) ...................6

*Nat'l Fair Hous. All., et al. v. Carson*, No. 3:20-cv07388 (D.D.C. filed Oct. 22, 2020)............................ 7

*Open Communities All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ..................................................... 5, 7

*Park View Heights Corp. v. City of Black Jack*, 605 F.2d 1033, 1035 (8th Cir. 1979), *cert. denied*, 445 U.S. 905 (1980) ................................................................................................................................. 2

*Patel v. Specialized Loan Servicing*, LLC, 904 F.3d 1314, (11th Cir. 2018) ............................................. 22

*Perryman v. Litton Loan Servicing, LP*, No. 14-CV-02261-JST, 2014 WL 4954674 (N.D. Cal. Oct. 1, 2014)............................................................................................................................................ 24

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 747 (9th Cir.1996)............................................ 11

*Pink Dot, Inc. v. Teleport Commc'ns Grp.*, 89 Cal. App. 4th 407, 417 (2001)........................................... 21

*Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67 (4th Cir. 1994)............................................................. 26

*Price v. Gadsen Corp.*, No. 93-CV1784 N.D. Ala. filed Aug. 30, 1993) ...................................................... 5

*Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1048-50 (N.D. Ill. 2014.................... 9

*Prop. Cas. Insurers Ass'n of Am.*, 66 F. Supp. 3d at 1046 .................................................................. 10, 18

*Qwest Corp. v. Kelly*, 204 Ariz. 25, 36 (Ct. App. 2002)............................................................................. 21

*Satellite Sys., Inc. v. Birch Telecom of Oklahoma, Inc.*, 51 P.3d 585, 588 (Okla. 2002)........................... 22

*Saunders v. Farmers Ins. Exch.*, for instance, the Eighth Circuit held that the filed-rate doctrine was not a bar to damages claims under the FHA. 440 F.3d 940, 944 (8th Cir. 2006) ........................................... 23

*Saville v. Quaker Hill Place*, 531 A.2d 201, 205-06 (Del. 1987) ............................................................... 20

*Shelley v. Kraemer*, 334 U.S. 1 (1948).........................................................................................................4

*State of Ind., Civ. Rights Comm'n v. Cty. Line Park, Inc.*, 738 N.E.2d 1044 (Ind. 2000) ......................... 20

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. 519 (2015)........ 7, 9, 27

*Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, No. 95-309, 2006 WL 581260 (D. Md. Jan. 10, 2006)..... 5

*Toledo Fair Hous. Ctr., et al. v. Nationwide Ins. Co.*, 704 N.E. 2d 667 (C.P. Ohio 1997) ........................ 6

*Unemployment Co. Comm'n of Alaska v. Aragon*, 329 U.S. 143 (1946) .................................................... 26

*United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952) .......................................................... 26

*United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240 (2d Cir. 1977)................................... 11, 25

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978) .................. 25

*Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) .......................................................................... 20

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994).................................................................... 21

**Statutes**

42 U.S.C.A. § 7607 ...................................................................................................................................... 26

Cal. Gov't Code § 12955.8 (West 2012)...................................................................................................... 20

D.C. Code § 2-1401.03 (2012) .................................................................................................................... 20

N.C. Gen. Stat. § 41A-5(a)(2) (West 2009) ................................................................................................ 20

**Other Authorities**

Casualty Actuarial and Statistical Task Force of the National Association of Insurance Commissioners, Price Optimization White Paper (Nov. 19, 2015) ................................................................................. 15

Consumer Credit and Sales Legal Practice Series, including Credit Discrimination, Seventh Ed. (2018) .. 5

Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. (1994). ................................................................................................................... 8

Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix, 7, 10 (2014)......................... 16

NAIC, *2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty* II–PA–10–21 (2011) ................................................................................................................................................... 23

National Consumer Law Center & Center for Economic Justice, *Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the Economic Racial Divide* 4 (June 2007)................................ 15

*S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner)) .............................................................................. 14

## Regulations

24 C.F.R. § 100.500(c)(1) (2013) ............................................................................................... 13

85 Fed. Reg. 60, 288 (Sept. 24, 2020) ......................................................................................... 23

Florida Office of Insurance Regulation, *Use of Price Optimization in Premium Determination*, Informational Memorandum OIR-15-04M (May 14, 2015) ................................................... 16

Virginia Bureau of Insurance, *Compliance with Statutory Rate Standards in File-and-Use Lines of Insurance,* Virginia Administrative Letter 2016-03 (April 15, 2016) .................................... 17

## STATEMENT OF INTEREST

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan organization with more than 4 million members, activists, and supporters dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws. Since its founding in 1920, the ACLU has litigated numerous cases aimed at ending segregation and racial discrimination in all its forms, and it has appeared frequently as amicus curiae in cases implicating these issues. Of particular relevance to this case, the ACLU advocates for people who have historically been denied their civil rights to housing on the basis of race and membership in other protected classes. *See, e.g.*, *Park View Heights Corp. v. City of Black Jack*, 605 F.2d 1033, 1035 (8th Cir. 1979), *cert. denied*, 445 U.S. 905 (1980) (plaintiffs' counsel in Fair Housing Act challenge to zoning ordinance that blocked construction of integrated housing development); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) (plaintiffs' counsel in Fair Housing Act challenge to redlining in homeowners insurance business); *Adkins v. Morgan Stanley*, No. 12-CV-7667 (S.D.N.Y. filed Oct. 15, 2012) (plaintiffs' counsel in Fair Housing Act challenge to discrimination in mortgage securitization).

The American Civil Liberties Union of Illinois ("ACLU-IL") is a state affiliate of the national ACLU and a statewide, non-profit, non-partisan organization with more than 60,000 members dedicated to protecting and defending civil rights and civil liberties and promoting fairness and dignity for all people in Illinois. The ACLU-IL has long advocated for fair housing and racial justice in Illinois, including by initiating a landmark, class action lawsuit alleging that the Chicago Housing Authority engaged in racial discrimination in public housing policy, which went to the U.S. Supreme Court as *Hills v. Gautreaux*, 425 U.S. 284 (1976). ACLU-IL continues to engage in litigation and advocacy with legislative and government entities to combat housing

practices that have a disparate impact on people of color, people with criminal records, women, transgender people, and other marginalized groups.

Chicago Area Fair Housing Alliance ("CAFHA") is a non-profit membership association of organizations, governmental bodies, and individuals working to combat housing discrimination and promote equitable place-based opportunity through education, advocacy, and collaborative action. Through research, education, advocacy and organizing, CAFHA furthers fair housing rights and fights for housing justice. Several CAFHA member organizations have litigated cases raising disparate impact claims.

Chicago Lawyers' Committee for Civil Rights ("CLCCR") is a public interest law organization founded in 1969 that works to secure racial equity and economic opportunity for all. CLCCR provides legal representation through partnerships with the private bar and collaborates with grassroots organizations and other advocacy groups to implement community-based solutions that advance civil rights. As part of its Equitable Community Development and Housing practice, CLCCR advocates for equitable development and investment in historically disinvested communities of color, supporting the stabilization and improvement of housing opportunities. CLCCR also investigates complaints of housing discrimination throughout the Chicago metropolitan area, educates people about fair housing rights and obligations, and provides representation to individuals and groups to challenge discriminatory policies and practices based on race, national origin, and other protected classes with the goal of combatting housing segregation in our region. Throughout its history, CLCCR has litigated numerous discrimination cases under the Fair Housing Act ("FHA") and other federal civil rights statutes, many of which have raised disparate impact claims.

Lawyers' Committee for Civil Rights Under Law ("LCCRUL") is a non-partisan, non-profit organization that was formed in 1963 at the request of President John F. Kennedy to involve the private bar in providing legal services to address racial discrimination. The principal mission of LCCRUL is to secure, through the rule of law, equal justice under law, which involves working with communities across the nation to combat and remediate discriminatory housing practices. LCCRUL's objective is to use the skills and resources of the bar to obtain equal opportunity for minorities by addressing factors that contribute to racial justice and economic opportunity. Given the United States' history of racial discrimination, *de jure* segregation, and persistent *de facto* inequities, LCCRUL's primary focus is to represent the interests of racial and ethnic minorities – African Americans in particular – and other victims of discrimination, where doing so helps secure justice for all racial and ethnic minorities. LCCRUL and its affiliates have litigated numerous fair housing claims pursuant to the FHA, many of which have raised disparate impact claims. *See Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) (granting *Chevron* deference to the 2013 rule of the U.S. Department of Housing and Urban Development ("HUD") setting forth its interpretation of the FHA's disparate impact standard).

NAACP Legal Defense & Educational Fund, Inc. ("LDF") is a non-profit legal organization that, for more than seven decades, has helped African Americans secure their civil and constitutional rights. Throughout its history, LDF has challenged public and private policies and practices that deny African Americans housing opportunities and isolate African American communities. *See, e.g.*, *McGhee v. Sipes*, 334 U.S. 1 (1948) (companion case to *Shelley v. Kraemer*, 334 U.S. 1 (1948)); *Cent. Ala. Fair Hous. Ctr. v. Lowder Realty Co., Inc.*, 236 F.3d 629 (11th Cir. 2000) (racial steering); *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994) (racial

discrimination in public housing and assistance programs); *NAACP, et al. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) (redlining in homeowners insurance business); *Kennedy Park Homes Ass'n v. City of Lackawanna, N.Y.*, 436 F.2d 108 (2d Cir. 1970) (exclusionary zoning); *Open Communities All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) (federal government's means of calculating housing vouchers); *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, No. 95-309, 2006 WL 581260 (D. Md. Jan. 10, 2006) (federal government's obligation to affirmatively further fair housing); *Consent Decree, Byrd v. First Real Estate Corp. of Ala., No. 5-CV-3087* (N.D. Ala. May 14, 1989) (racial steering); *Price v. Gadsen Corp.*, No. 93-CV1784 N.D. Ala. filed Aug. 30, 1993) (unfair lending practices); *Brown, et al. v. Artery Org., Inc*., 654 F. Supp. 1106 (D.D.C. 1987) (redevelopment plans that unfairly eliminate affordable housing); *see also* LDF *et al.*, The Future of Fair Housing: Report on the National Commission of Fair Housing and Equal Opportunity (Dec. 2008). LDF has also long played an instrumental role in advancing the doctrine of disparate impact discrimination. *See, e.g.*, *Lewis v. City of Chicago*, 560 U.S. 205 (2010); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971); *Little, et al. v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394 (D.D.C. 2017).

National Consumer Law Center ("NCLC") is a national research and advocacy organization focusing on justice in consumer financial transactions, especially for low-income and elderly consumers. Since its founding as a non-profit Massachusetts corporation in 1969, NCLC has been a resource center addressing numerous consumer finance issues affecting equal access to fair credit in the marketplace. NCLC publishes a 21-volume Consumer Credit and Sales Legal Practice Series, including Credit Discrimination, Seventh Ed. (2018). NCLC also provides legal and technical consulting and assistance on consumer law issues to legal service, government, and private attorneys representing low-income consumers across the country.

NCLC attorneys have written and advocated extensively on all aspects of consumer law affecting low-income people, conducted trainings for tens of thousands of legal services and private attorneys, and provided extensive oral and written testimony to numerous Congressional committees on various topics. In addition, NCLC attorneys regularly provide comprehensive comments to federal agencies, including HUD, on the regulations under consumer laws that affect low-income consumers.

National Fair Housing Alliance ("NFHA") is a consortium of approximately 167 private, non-profit, fair housing organizations, state and local civil rights groups, and other organizations dedicated to fair housing advocacy. NFHA strives to eliminate housing discrimination and ensure equal housing opportunities for all people through leadership, homeownership, credit access, tech equity, education, member services, public policy, community development, and enforcement initiatives. NFHA is very interested in these issues because of its long history working to challenge public and private housing and housing-service providers that limit housing opportunities; and of specific relevance to the issues in this case, NFHA and its members have brought some of the preeminent cases dealing with discrimination allegations in the homeowners and commercial habitational insurance sectors. *See e.g.*, *Nat'l Fair Hous. All. v. Prudential Ins. Co.*, 208 F. Supp. 2d 46 (D.D.C. 2002); *Toledo Fair Hous. Ctr., et al. v. Nationwide Ins. Co.*, 704 N.E. 2d 667 (C.P. Ohio 1997); *Nat'l Fair Hous. All. v. Travelers Indemnity Co.*, 261 F. Supp. 3d. 20 (D.D.C. 2017). NFHA also provides fair housing compliance services to several national insurance and financial service companies.

All *amici* are committed to vigorous enforcement of the FHA and have actively used and/or supported disparate impact analysis in their efforts to ensure non-discrimination in all aspects of the housing market, including the provision of homeowners insurance. In addition, all

*amici* submitted comments in support of the HUD regulation at issue here. Most recently, when HUD attempted to replace the Rule, multiple *amici* filed, or were counsel on, lawsuits arguing that the new rule was inconsistent with the FHA. *Nat'l Fair Hous. All., et al. v. Carson*, No. 3:20-cv07388 (D.D.C. filed Oct. 22, 2020); *Open Communities All. et al. v. Carson*, No. 3:20-cv-01587 (D. Conn. filed Oct. 22, 2020).

In 2015, building on forty-five years of unanimous precedent from all eleven federal courts of appeals to have addressed the issue, the U.S. Supreme Court held that disparate impact claims are authorized by the text, structure, and history of the FHA. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. 519 (2015) ("*ICP*"). That decision is consistent with and alluded to HUD's long-standing interpretation of the FHA. Long before HUD formally promulgated its Discriminatory Effects Rule in 2013 – the subject of this Administrative Procedure Act challenge – facially neutral housing practices, including those related to the pricing and underwriting of homeowners insurance, had been struck down under disparate impact liability.

Homeowners insurance is an effective prerequisite to home mortgage credit. It is necessary, therefore, for protected groups to have equitable access to insurance to realize the dream of homeownership. Thus, disparate impact analysis has long provided an essential tool for identifying and ending patterns, practices, and policies that have a disproportionately negative impact on the ability of protected groups to participate in the market for owner-occupied homes.

Without disparate impact liability, there will be a significant hole in the effort to comprehensively address pervasive and covert housing discrimination, which would be inconsistent with Congressional intent.

*Amici*'s experience raising disparate impact claims under the FHA – including claims of discrimination by homeowners' insurance providers – and their consistent support of the HUD regulation provide the Court with a unique perspective on the issues in this case and will "assist the court beyond what the parties can provide." *See Chamberlain*, at *1.

## INTRODUCTION

It is well-established that home insurance is an integral component of home ownership. *N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 297 (7th Cir. 1992) ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."). Indeed, discrimination in access to housing insurance has played a sizable role in creating the race-based inequality in housing that exists today. *See generally*, Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. (1994). Insurance companies have deployed myriad practices to deny people of color access to insurance. *Id.* Though many of these policies began as explicit bars on people of color obtaining insurance, they have evolved into more covert forms of discrimination that still pervade our housing market. Combined with the discriminatory practices of other industries that make up the real estate market, these practices have resulted in stark disparities: as of 2020, 73.7% of white families own homes, whereas just 44% of Black families do. *Id.* This gap is the direct result of our country's shameful legacy of systemic discrimination against Black people, particularly in the realm of real estate and property ownership where homeowners' insurance is a prerequisite. *Id.* Though *de jure* segregation is no longer permitted, the vestiges of these discriminatory systems remain, such that the inequalities resulting from centuries of state-sanctioned racism persist. Black individuals and families have been historically precluded from accumulating wealth, such that policies that exclude people from housing based on income will have

discriminatory effects on Black communities. HUD rightfully recognized the need for tools to combat these more covert forms of discrimination by promulgating its 2013 HUD Discriminatory Effects Rule ("2013 Rule"). Just three years later, the Supreme Court in *ICP* affirmed the disparate impact standard as central to the goals of the FHA. *Inclusive Communities Project*, 576 U.S. 519.

But Plaintiff in the case at hand has attempted to erode HUD's decision to adopt a balanced, uniform disparate impact standard. Since 2013, Plaintiff has lobbed various challenges at the rule, claiming that the 2013 Rule was invalid purportedly because the FHA does not permit disparate impact liability, because the rule was contrary to law, and because HUD had not sufficiently considered all of Plaintiff's concerns, rendering HUD's action arbitrary and capricious. Plaintiff also filed an *amicus curiae* brief in *ICP*, reiterating its view that the FHA does not allow for disparate impact claims. Brief for the American Insurance Association, the National Association of Mutual Insurance Companies, and the Prop. Casualty Insurers Association of America as Amici Curiae Supporting Petitioners, *Inclusive Communities Project*, 576 U.S. 519. The Supreme Court decisively dismissed its first argument in *ICP*, and this court explicitly held that HUD's conclusions were not contrary to law. *Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1048-50 (N.D. Ill. 2014) This court did express concern that HUD had not sufficiently addressed all of Plaintiff's comments and thus remanded for further consideration, specifically asking HUD to consider Plaintiff's claims that the Rule was incompatible with 1) the McCarran-Ferguson Act; 2) the Filed-Rate Doctrine; and 3) the nature of insurance generally. *Id.* at 48-50. Thus, the question in this case is simply whether HUD adequately responded to Plaintiff's comments in their supplementary explanation. Plaintiff, of course, claims that HUD's supplementary explanation did not sufficiently respond to Plaintiff's

concerns—that HUD was mistaken in refusing to exempt the insurance industry, or at the very least its use of risk-based decision-making, from said liability. But in their attempts to invalidate HUD's rule at all costs, Plaintiff disregards longstanding principles of administrative and insurance law and, accordingly, summary judgment in favor of Defendants is warranted.

## STANDARD OF REVIEW

"Review of an agency's action under the arbitrary and capricious standard is narrow and highly deferential." *Prop. Cas. Insurers Ass'n of Am.*, 66 F. Supp. 3d at 1046. In evaluating whether an agency action violates 5 U.S.C. § 706(2)(A), "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Put another way, courts will uphold agency action so long as the agency has articulated a "rational connection between the facts found and the choice made," *id.*, and "the decision is not a clear error of judgment." *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858-59 (7th Cir. 2003) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 L.Ed.2d 377 (1989)); *See also Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) ("Our scope of review is narrow: we determine only whether the Secretary examined the relevant data and articulated a satisfactory explanation for his decision, including a rational connection between the facts found and the choice made.") (internal citations omitted). While a court may find that an agency that fails to meet this standard has acted in an "arbitrary and capricious manner," it may not simply substitute its judgment for the judgment of the agency. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Moreover, "HUD's interpretation is significant to the court's analysis because HUD's interpretation of the FHA 'ordinarily commands considerable deference,' as 'HUD [is] the federal agency primarily

assigned to implement and administer Title VIII.'" *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 747 (9th Cir.1996) (quoting *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20 (1979)).

When agencies act through the informal rule-making process, the APA requires them to consider comments received during the notice-and-comment period and to explain their reasons for not adopting the views set forth in substantive comments. *See* 5 U.S.C. § 553(c); *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977) ("It is not in keeping with the rational process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered."). But in evaluating whether the agency sufficiently responded to stakeholders' concerns in the notice and comment period, the courts "do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking." *Nova Scotia Food Prod. Corp.*, 568 F.2d at 252 (citing *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)).

## ARGUMENT

Applying this deferential standard to the case at hand, HUD's refusal to exempt the insurance industry was rational and reasonable in light of the administrative record, and Plaintiff's claims that this decision was arbitrary and capricious lacks support in both the law and fact. Indeed, declining to apply the FHA's disparate impact standard to the business of insurance would undermine Congress's intent and would enable insurers to continue the discriminatory practices that have excluded communities of color from homeownership for decades.

# I.  A Blanket Exemption from Disparate Impact Liability Would Not Promote Efficiency and Would Be Over-Inclusive.

PCIA unconvincingly argues that applying the 2013 Discriminatory Effects Rule's burden-shifting framework to the business of homeowners insurance would be inefficient because claims against insurance companies will categorically fail. Specifically, they claim that 1) reverse preemption under the McCarran-Ferguson Act, as interpreted by the Seventh Circuit in *Doe v. Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999), *cert. denied* 528 U.S. 1106 (2000), precludes federal courts from passing judgment on the actuarial soundness of risk-based practices, and (2) homeowners insurance policies and practices are inherently risk-based, such that disparate impact liability is incompatible with the nature of insurance. Pl.'s Am. Compl. at ¶ 47.

HUD addressed these points in full in both its 2016 Supplementary Rule, Federal Regulations for Department of Housing and Urban Development, 81 Fed. Reg. 69, 012 (Oct. 15, 2016) (to be codified at 4 C.F.R Pt.100), and its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment. Def.s' Opp'n to Mot. for Summ. J. 15-35. In addition to Plaintiff's incorrect assumption that disparate impact claims challenging risk-based policies would categorically fail, Plaintiff misses another crucial point: in order to narrowly exempt risk-based policies and practices, HUD would have to go through a case-by-case determination of whether a policy or practice is risk-based and entitled to the exemption. This process would be just as intensive as the current application of the burden-shifting framework under the 2013 Rule. The emerging area of price optimization underscores this point.

a. *Determining Whether a Policy or Practice Is Risk-Based Requires an Intensive Case-by-Case Analysis.*

The McCarran-Ferguson Act only restricts "those applications of federal law that directly conflict with state insurance laws, frustrate a declared state policy, or interfere with a State's administrative regime." *Humana v. Forsyth*, 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application."). HUD's burden-shifting standard consists of three steps: first, the plaintiff must demonstrate that the defendant's practice has a disparate impact on a protected group or perpetuates segregation. 24 C.F.R. § 100.500(c)(1) (2013). Second, if a plaintiff carries their burden, then the burden shifts to the defendant to show that the policy or practice is necessary to serve one or more substantial, legitimate, nondiscriminatory interests. 24 C.F.R. § 100.500(c)(2) (2013). Finally, the burden shifts back to the plaintiff to show that, even if the policy or practice is justified, a less discriminatory alternative would also serve the defendant's interests. 24 C.F.R. § 100.500(c)(3) (2013).

PCIA argues that such a burden-shifting framework would be inefficient, as it would require a lengthy, fact-intensive process to determine 1) whether a practice is based on a legitimate business purpose, and 2) if there are other, equally effective alternatives. But, as HUD points out, this argument overstates the comparative ease of the process of creating an exemption to liability for risk-based practices. 81 Fed. Reg 69,012; Def.s' Opp'n to Mot. for Summ. J. 16. HUD would need to outline narrow and highly-specific standardized rules to determine if a practice was exempt, as these actuarial practices are constantly changing and evolving. And whether a practice qualified for the exemption would itself be a lengthy, fact-intensive determination. 81 Fed. Reg 69,017 ("The arguments and evidence that would be necessary to

establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification."). HUD explained that the 2013 Rule's case-by-case approach best enables it to enforce the FHA, as it takes into consideration the variety of insurer practices, both present and future. The diversity and ingenuity of insurer practices makes it "practically impossible" to define the scope of exempted practices in order to avoid case-by-case disputes. Def.s' Opp'n to Mot. for Summ. J. 16. Thus, HUD has determined that categorical exemptions or safe harbors are "unworkable and inconsistent with its statutory mandate." *Id.* at 013.

The fact that insurers regularly engage in practices that combine risk-based decision making with more subjective factors supports this conclusion. For example, practices such as ratemaking, which are largely actuarially based, can nonetheless incorporate elements of non-actuarially based subjective judgment or discretion under law. 81 Fed. Reg. at 69,017. *See* Powers, in *Insurance Redlining* at 119 ("Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk." (quoting *S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner)) ("Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes."). Accordingly, creating a broad exemption for risk-based policies would be overinclusive and have the effect of shielding discriminatory practices that are unrelated to risk.

Even if practices are predominantly based on actuarial decision-making, that does not preclude them from having an illegal disparate impact. *See* National Consumer Law Center & Center for Economic Justice, *Credit Scoring and Insurance: Costing Consumers Billions and*

*Perpetuating the Economic Racial Divide* 4 (June 2007). Take, for example, credit scoring,

which is frequently accounted for in insurer's risk-based analyses. This is despite the fact that

multiple studies have concluded that credit scores are themselves a combination of historically

biased indices, such that reliance on them has the effect of exacerbating long standing race-based

economic inequality. As HUD noted in both its Supplemental Rule and Opposition, the court in

*Lumpkin v. Farmers Group* found that certain credit scoring practices have a disparate impact,

and that even if they have some predictive value, there are other, less discriminatory alternatives.

81 Fed. Reg. 69,016 (citing *Lumpkin v. Farmers* Grp., No. 05– 2868, 2007 U.S. Dist. LEXIS

98949, at *19 (W.D. Tenn. July 6, 2007)); Def.s' Opp'n to Mot. for Summ. J. 16. In other words,

an insurance practice can have an illegal disparate impact even if it is predominantly derived

from risk-based decision-making.  A broad exception for such practices would therefore protect

unlawful practices.

    b. *The Widespread Use of Price Optimization Illustrates the Inefficiency of Exempting the Business of Homeowners Insurance from Discriminatory Effects Liability.*

       Price optimization is a particularly pernicious example of a common homeowners

insurance practice that is not risk-based and thus is routinely subject to discriminatory effects

liability, McCarran-Ferguson notwithstanding.

       In recent years, insurers have begun using data-driven price optimization to set rates.

Data-driven price optimization occurs when the insurer engages in "data mining of insurance and

noninsurance databases of personal consumer information [, . . .] advanced statistical modeling

or both to select prices that differ from indicated rates at a very detailed or granular level." Nat'l

Ass'n of Ins. Comm'rs, *Price Optimization White Paper* 1 (Nov. 19, 2015) .[1] Put simply, this

---

[1] http://www.naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf.

practice allows insurers to charge the greatest amount possible without losing the consumer's business. *Id.* at 2. For example, an insurer's actuaries may determine a fair and reasonable price for an insurance product in a specific geographic area based on risk and expected loss. Using price optimization, the company may reject that price and set a price based on maximum profitability. Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix, 7, 10 (2014) (listing certain competitive adjustments that are often made to predicted loss costs during the rate-setting process). According to HUD, determining if a specific form of price optimization is sufficiently "risk-based" to qualify for Plaintiff's proposed liability exemption would in itself require exorbitant agency time and resources given the complicated nature of this technology. 81 Fed. Reg 69,016. Moreover, price optimization strategies can undoubtedly have an illegal disparate impact—even when combined with risk-based decision-making. To assume otherwise would be to simply take insurance adjusters and actuaries at their word that they will not discriminate against communities of color – an assumption that runs counter to the history of racially discriminatory practices that informed passage of the FHA.

Growing concern over the potential discriminatory effects of data-driven price optimization has led nineteen states to determine that data-driven price optimization constitutes illegal discrimination. *See* Florida Office of Insurance Regulation, *Use of Price Optimization in Premium Determination*, Informational Memorandum OIR-15-04M (May 14, 2015) ("[p]rice optimization involves analysis and incorporation of data not related to expected cost for risk characteristics…Therefore, the use of price optimization results in rates that are unfairly discriminatory in violation of Sections 627.062 and 627.0651, Florida Statutes.");[2] *see also* Virginia Bureau of Insurance, *Compliance with Statutory Rate Standards in File-and-Use Lines*

---

[2] https://www.floir.com/siteDocuments/OIR-15-04M.pdf.

*of Insurance,* Virginia Administrative Letter 2016-03 (April 15, 2016) (stating that it is a violation of Virginia state law to use "price optimization techniques intended to maximize overall retention, profitability, written premium or market share based on how much of a premium increase an individual policyholder is likely to tolerate before seeking coverage with other carriers.").[3]

State regulators' curtailing of price-optimization practices clarifies that the application of discriminatory effects liability to those practices would not impair state insurance law, nor would the creation of exemptions have a basis in law. Further, determining whether each use of price optimization was sufficiently risk-based would be inefficient in the extreme. HUD was right in 2013 to determine that both the Department and the courts could thoughtfully and appropriately evaluate these policies and practices through the application of the burden-shifting framework.

## II.     Discriminatory Effects Liability Is Compatible with the Business of Insurance, and HUD Adequately Responded to Comments Claiming Otherwise.

Applying the deferential arbitrary and capricious standard to the case at hand, HUD adequately responded to the Plaintiff's concern that the rule is fundamentally incompatible with the nature of insurance in its 2016 Final Rule. Since the first notice-and-comment period leading up to HUD's 2013 Rule, PCIA has claimed that the application of disparate impact liability would force insurers to introduce considerations in their processes that would undermine and potentially destroy the actuarial process. In its 2013 Rule, HUD explained that these concerns were "misplaced," as it would not make any policy or practice that causes a disparate impact *per se* illegal; defendants or respondents would still have the ability to justify their policy or practice at the second step of the burden shifting framework. *See* Final Rule, 78 Fed. Reg. at 11,460 (Feb.

---

[3] https://scc.virginia.gov/getattachment/10491abc-4ade-4431-8641-34d15f16b9a7/16-03.pdf.

15, 2013). More generally, HUD explained that broad exemptions, such as that requested for the business of insurance, would undermine Congress's intent in enacting the FHA, which was to root out the various forms of discrimination in housing and to provide for fair housing throughout the United States. *Id.* PCIA argued these explanations were insufficient, and this Court agreed, deeming the level of detail and specificity in HUD's explanation of its refusal to make broad exceptions arbitrary and capricious before remanding the rulemaking to HUD. *Prop. Cas. Insurers Ass'n of Am.*, 66 F. Supp. 3d at 1051 ("HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden shifting framework.").

HUD's subsequent rule, however, robustly addressed those concerns. *See* Final Rule, 81 Fed. Reg. at 69,017 (October 5, 2016). Contrary to Plaintiff's claims, HUD explained that the insurance industry is replete with practices in which insurers consider certain non-actuarial factors in making decisions, such as "marketing and claims processing and payment." *Id.* Moreover, HUD noted that ratemaking—frequently a risk-based decision-making process—often involves consideration of subjective factors outside of actuarial concerns. *Id.* HUD observed that the industry's long-time consideration of subjective, non-risk-based factors has not led to the inevitable demise of the entire industry. *Id.* Further undermining Plaintiff's argument—and as explained in greater detail below—is that some states have imposed the same requirement as HUD to avoid the imposition of unjustified discriminatory effects. Moreover, other risk-based industries, such as mortgage lending, are subject to disparate impact liability and have not had to forego risk-based analysis in their entirety in order to avoid FHA liability. In short, the concerns expressed in Plaintiff's comments are disconnected from how the insurance industry has actually operated in the decades that it has been subject to disparate impact liability under the FHA, and

HUD more than adequately addressed those concerns in both its 2016 Final Rule and Opposition to Plaintiff's Summary Judgment Motion. *Id-* Def.s' Opp'n to Mot. for Summ. J. 29..

In addition to explaining why a blanket exemption is undesirable, HUD further elaborated on the benefits of a case-by-case approach to assessing disparate impact claims. Specifically, a blanket exemption would prevent the development of alternative policies that serve both parties' interests, consistent with the third step of the burden-shifting framework. As HUD explained, it would be impossible for insurers to argue that, in every situation, there is no other policy which might serve their same interests, especially with changes in technology and the sophistication of risk analysis. *Id.* Undoubtedly, HUD has established a "rational connection between the facts found and the choice made," *Ind. Forest All.*, 325 F.3d at 858–59, thereby complying with the APA and establishing that this Court should grant summary judgment in Defendants' favor.

### III. The Presence of Significant Differences in State Law Regarding Both Insurance and Housing Discrimination Protections Supports HUD's Case-by-Case Approach.

*a. Several States Subject Insurance-Related Practices to Disparate Impact Liability, so the Imposition of Disparate Impact FHA Liability in Those States Would Not Impair State Insurance Regulation.*

PCIA ignores the heterogeneity of states' insurance laws, which—as HUD explains in their Opposition—necessitates a case-by-case determination in lieu of blanket exemptions. Def.s' Opp'n to Mot. for Summ. J. 19. Contrary to Plaintiff's claims, the McCarran-Ferguson Act does not preclude *all* disparate impact claims against insurers because insurance regulatory schemes vary dramatically by state. In fact, many states have regulations that complement disparate impact liability under federal law, such that McCarran-Ferguson reverse-preemption is entirely irrelevant. For example, California, North Carolina, and the District of Columbia expressly

provide by statute for disparate impact fair housing claims without exemptions for any particular type of business, including homeowners insurers. *See* Cal. Gov't Code § 12955.8 (West 2012); N.C. Gen. Stat. § 41A-5(a)(2) (West 2009); D.C. Code § 2-1401.03 (2012). Additionally, several states' highest courts have interpreted their state fair housing laws to encompass disparate impact claims, even if their statutes do not explicitly use that term or a close equivalent. *See, e.g., Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 255-56 (Conn. 1999); *Saville v. Quaker Hill Place*, 531 A.2d 201, 205-06 (Del. 1987); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790,798-99 (Iowa 2011); *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1050-51 (Utah 2000); *State of Ind., Civ. Rights Comm'n v. Cty. Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000). Whether a state's insurance law will preempt the FHA under the McCarran-Ferguson Act depends, in large part, on which state's law applies.

Furthermore, courts have indicated that a determination of McCarran-Ferguson reverse-preemption requires a case-specific factual inquiry. *See, e.g., Dehoyos v. Allstate Corp.*, 345 F.3d 290, 297 (5th Cir. 2003) (rejecting McCarran-Ferguson reverse-preemption after appellant failed to indicate any state laws or declared regulatory policies which would conflict with federal civil rights statutes); *see also Humana Inc. v. Forsyth*, 525 U.S. 299, 308 (1999) ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise."); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 5 (D.D.C. 1999) (rejecting defendant's argument for McCarran-Ferguson reverse-preemption after noting that Maryland law did not grant the state's Insurance Commissioner exclusive jurisdiction over discrimination claims). If anything, the relationship between state insurance regulatory regimes and federal law, as shaped by McCarran-Ferguson, actually *supports* HUD's rejection of PCIA's claim that the McCarran-Ferguson Act entitles them to

blanket exemptions. Even if state anti-discrimination law does not provide for disparate impact liability, the comments of Plaintiff and other industry groups did not establish that the imposition of disparate impact liability under federal law would invariably conflict with state law. Some state regulatory requirements establish a baseline, or floor, for anti-discrimination protections in housing. In many cases, the FHA appropriately raises the standard for compliance beyond that established by the state regulations. Because each state's statutory and regulatory regime is different and interacts differently with the FHA, it was entirely reasonable for HUD to adopt a case-by-case analysis.

  *b.* *States Vary in Their Application of the Filed-Rate Doctrine, which further Bolsters HUD's Case-by-Case Approach.*

  Contrary to PCIA's claims, the existence of the filed-rate doctrine does not support its stance that insurers should be entitled to categorical exemptions. As HUD explains in its Opposition to Plaintiff's Summary Judgment Motion, the applicability of the filed-rate doctrine varies by state, such that a case-by-case approach is far more appropriate to handle these varied legal and factual questions. Def.s' Opp'n to Mot. for Summ. J. 32.

  The filed-rate doctrine "bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable," *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994), but its application is anything but universal. Some state courts, for example, have not even adopted the filed-rate doctrine. *Castillo v. Johnson*, No. CV-17-04688-PHX-DLR, 2019 WL 4222289, at *4 (D. Ariz. Sept. 5, 2019) (citing *Pink Dot, Inc. v. Teleport Commc'ns Grp.*, 89 Cal. App. 4th 407, 417 (2001) and *Qwest Corp. v. Kelly*, 204 Ariz. 25, 36 (Ct. App. 2002)); *see also Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1101 (W.D. Wash. 2007) (observing the dearth of case law in Washington on the filed rate doctrine and the apparent lack of any decisions "discussing the application of the doctrine to challenges to

insurance rates, let alone title insurance rates, nor even rates set by a state regulatory agency.");

*Satellite Sys., Inc. v. Birch Telecom of Oklahoma, Inc.*, 51 P.3d 585, 588 (Okla. 2002) (noting

"the Oklahoma legislature has not expressed an intent, either explicitly or implicitly, that the

policies supporting a state rate tariff doctrine were intended to abolish a common law fraud

claim."). Other states vary as to exactly *what* issues the filed-rate doctrine covers. In fact, certain

courts have explicitly exempted consumer insurance from the doctrine's reach. *Bhasker v.*

*Kemper Cas. Ins. Co.*, 284 F. Supp. 3d 1191, 1230 (D.N.M. 2018) (refusing to apply the filed-

rate doctrine in a consumer-protection case as "the burden that the doctrine would impose on

defrauded consumers is substantial compared to the doctrine's underwhelming benefits in this

context"); *see also Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093 (N.D. Cal. 2013)

(holding that filed-rate doctrine did not bar mortgagor's claims against mortgagee, loan servicer,

and insurers); *Hoover v. HSBC Mortg. Corp. (USA),* 9 F. Supp. 3d 223 (N.D.N.Y. 2014)

(holding that filed-rate doctrine did not bar mortgagor's claim against force-placed insurance

provider). In these states, there is no question that the doctrine would not bar a disparate impact

claim against insurers.

  Moreover, the type of relief sought by the plaintiff or complainant in any given FHA

disparate impact case will also affect the degree to which the filed-rate doctrine is implicated.

*Marcus v. AT&T Corp.*, 138 F.3d 46, 62 (2d Cir. 1998) (holding that the filed-rate doctrine did

not bar a suit for injunctive relief in a price discrimination suit); *see also Gelb v. Am. Tel. & Tel.*

*Co.,* 813 F. Supp. 1022, 1033 (S.D.N.Y. 1993); *Leo v. Nationstar Mortg. LLC*, 964 F.3d 213,

216 (3d Cir. 2020) (differentiating between a focus on statutory damages versus an alleged

overcharge); *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009); *Patel v. Specialized*

*Loan Servicing, LLC*, 904 F.3d 1314, 1327 (11th Cir. 2018) ("*Alston* seems to be making the

rather unremarkable point that the reach of the filed-rate doctrine can be circumscribed by legislation that confers to individuals a private right of action."). HUD notes that, in disparate impact cases, it typically awards equitable remedies, absent extraordinary circumstances. 85 Fed. Reg. 60, 288 (Sept. 24, 2020). As one of the purposes of the filed-rate doctrine is to prevent discrimination among customers, relief predicated on a change to defendant's conduct rather than specific rates – such as in FHA challenges – is unlikely to undermine this purpose.

HUD also notes that six different rate regulatory systems exist across the country: prior approval, file and use, use and file, flex rating, modified prior approval, and no file. 81 Fed. Reg. 69,018 (Oct. 5, 2016); citing NAIC, *2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty* II–PA–10–21 (2011); *see also* Def.s' Opp'n to Mot. for Summ. J. 34. In *Cohen v. American Sec. Ins. Co.*, for instance, the Seventh Circuit observed that, under state law, it was unclear if the Illinois Department of Insurance could approve or disapprove of filed property insurance rates. 735 F.3d 601, 607 (7th Cir. 2013); *see also Corbin v. Allstate Corp.*, 2019 IL App (5th) 170296, 140 N.E.3d 810, *appeal denied*, 124 N.E.3d 464 (Ill. 2019). Without state agency approval, a defendant may not be able to credibly claim that a state's regulatory regime has condoned its filed rates – much less the practices which may produce such rates. Consequently, any filed-rate doctrine argument would be rendered inapplicable in such a jurisdiction, and it is clear that HUD's case-by-case approach would better vindicate the purposes of both the FHA and McCarran-Ferguson.

And even in states that have adopted the filed-rate doctrine, there is not universal agreement as to whether it actually bars claims under the FHA. In *Saunders v. Farmers Ins. Exch.*, for instance, the Eighth Circuit held that the filed-rate doctrine was not a bar to damages claims under the FHA. 440 F.3d 940, 944 (8th Cir. 2006) (finding "the Supremacy Clause tips

any legislative competition in favor of the federal anti-discrimination statutes."). Likewise, the court in *Castillo v. Johnson* questioned the propriety of barring federal claims, stating "it is unclear why the California Insurance Commissioner's regulatory authority would impede the otherwise appropriate reach of a federal statute." No. CV-17-04688-PHX-DLR, 2019 WL 4222289, at *5 (D. Ariz. Sept. 5, 2019), quoting *Perryman v. Litton Loan Servicing, LP*, No. 14-CV-02261-JST, 2014 WL 4954674, at *8 (N.D. Cal. Oct. 1, 2014) (finding that defendants' filed-rate doctrine argument would "seem to stand the Supremacy Clause on its head.").

Moreover, the *Saunders* court required a "specific showing" that the FHA would conflict with the state's regulation of insurance. 440 F.3d at 944 (citing *Mackey v. Nationwide Ins.,* 724 F.2d 419, 421 (4th Cir. 1984) (holding that "the presence of a general regulatory scheme does not show that any particular state law would be invalidated, impaired or superseded by the application of the Fair Housing Act and the Civil Rights Acts.")). This finding is consistent with courts around the country as they attempt to accommodate the purpose of the filed-rate doctrine with state and federal legislation. *See Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1102 (W.D. Wash. 2007) (finding "it is useful to examine whether the principles underlying the filed rate doctrine would be served by its application in this case."); see also *Castillo,* 2019 WL 4222289, at *4 ("When state-law regulatory authority provides the basis of the filed rate doctrine, the doctrine should be based on a careful analysis of the text and purpose of the underlying state law, rather than blanket application of the filed rate doctrine to all challenges which touch a regulated industry."). For example, in *Krukas v. AARP*, the U.S. District Court for the District of Columbia held the filed-rate doctrine applied only to claims "which, if successful, would undermine the critical policies underlying the filed-rate doctrine in the first place: nondiscrimination among customers and nonjusticiability as to the reasonableness

of a rate." 376 F. Supp. 3d 1, 19, 22 (D.D.C. 2019) (holding that the doctrine could not "be used as a shield to bar review of claims . . . just because those claims have *some* relation to filed rates for state insurance coverage"). When such claims challenge "allegedly wrongful conduct," rather than the reasonableness of rates themselves, the filed-rate doctrine does not apply. Likewise, where plaintiffs challenge homeowners' insurance practices, rather than the rates which may result from such practices, the filed-rate doctrine need not apply. *Id.*, at 26.

In sum, the applicability of the filed-rate doctrine will vary for a number of factors: the state in which the claim arises, the nature of the relief sought, the specific claims, and the identity of the plaintiff. Contrary to Plaintiff's claims, the doctrine does *not* provide a wholesale justification for categorical exemption. In fact, the array of questions raised by the interrelationship of state regulatory regimes and the filed-rate doctrine indicate that case-by-case determinations are the most appropriate, effective, and efficient means of adjudicating FHA disparate impact challenges to insurance practices. HUD has adequately explained how it came to this conclusion, and its preference for case-by-case adjudication is not arbitrary and capricious.

**IV.    PCIA Did Not Request a Narrow Exemption for Risk-Based Practices during the Notice-and-Comment Period, Meaning HUD was Not Required to Address This Request.**

As noted above, an agency must consider and respond to substantive comments made *during* the notice-and-comment-period. *Nova Scotia Food Prod. Corp.*, 568 F.2d at 252 (2d Cir. 1977). This obligation, however, does not require the agency to consider recommendations that were not actually made to the agency during the rulemaking process. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978) (rejecting plaintiff's arbitrary and capricious claim on the ground that the agency was not required to address issues

that hadn't been brought up in the notice-and-comment period); *Air Transp. Ass'n of Am. v. F.A.A.*, 169 F.3d 1, 7 (D.C. Cir. 1999) ("But even in the informal rulemaking context, we have cautioned that the most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation.") (emphasis in original). Nor does it require the agency to bring up arguments that were first brought up during litigation. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 137 (D.C. Cir. 2015) (holding that the court "may hear objections to [agency] rules or procedures only if the objections were 'raised with reasonable specificity during the period for public comment.'"), quoting 42 U.S.C.A. § 7607 (d)(7)(B); *Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994) ("As a general matter, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved."); *LeBlanc v. E.P.A.*, 310 F. App'x 770, 776 (6th Cir. 2009) ("A reviewing court may not consider arguments that were not previously raised before an administrative agency"); *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."); *Unemployment Co. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action.").

Here, the Plaintiff *never* requested the specific exemption from liability on the record that they are now seeking: an exemption from "risk-based pricing and underwriting of homeowners

insurance." Pl.'s Compl. ¶ at 55. No party had ever requested this *specific* form of exemption during the notice-and-comment period. In their comments in response to HUD's 2011 Notice of Proposed Rulemaking, Plaintiff urged HUD not to adopt what would become the 2013 HUD Discriminatory Effects Rule. Specifically, Plaintiff argued that the FHA did not allow for disparate impact liability, a view later discarded by the Supreme Court in *Texas Dep't of Hous. & Cmty. Aff's v. Inclusive Communities Project*. 576 U.S. 519, 534 (2015). Plaintiff also threatened legal action if HUD applied the disparate impact framework to the business of insurance. In making that threat, Plaintiff claimed that the application of the FHA to homeowners insurance is categorically preempted by the McCarran-Ferguson Act, a view rebutted above. But nothing in Plaintiff's comment limited that request solely to risk-based practices. And nothing in Plaintiff's comments actually requested an exemption for the insurance industry—it simply argued categorically that disparate impact liability was not a viable claim under the FHA. Property Casualty Insurers Ass'n of America, Docket No. FR-5508-P-01 (Jan. 17, 2012). One non-party, the National Association of Mutual Insurance Companies (NAMIC), requested that HUD recognize safe harbors for a limited number of factors that it characterized as having been recognized as being risk-based, but even that request was not for a *general* exemption for risk-based pricing and underwriting practices. Comments of the National Association of Mutual Insurance Companies, Docket No. FR-5508-P-01 (Jan. 17, 2012). It was only in their 2013 Complaint that the named Plaintiff echoed that view and framed their concern as a "request[]" for "exempt[ion]." Pl.'s Am. Compl. ¶ at 55. But even then, as with NAMIC's comment letter, the Plaintiff requested "regulatory safe harbors for long-recognized actuarial risk factors, such as age and condition of a property or distance from a fire station." *Id.* These are markedly different

policies which would require entirely different analyses, and the relief sought here would be vastly broader than creation of narrower safe harbors.

Nor does this analysis change based on the fact that Plaintiff, *outside of any rulemaking process*, asked HUD via letter in 2015 to recognize an exemption for risk-based practices. While the APA requires consideration of comments received as part of the notice-and-comment rulemaking process, nothing in the statute or caselaw requires the agency to address comments made outside of the notice-and-comment period. In fact, courts have often struck down actions by agencies because they considered *ex parte* communications, not because they failed to do so. *Home Box Off., Inc. v. F.C.C.*, 567 F.2d 9, 15 (D.C. Cir. 1977) ("Moreover, *ex parte* contacts violate fundamental notions of fairness implicit in due process."). Further, this Court's remand directed HUD to reconsider the comments submitted by Plaintiff in response to the 2011 Notice of Proposed Rulemaking. Specifically, it requested HUD to address why the case-by-case approach was preferable in light of the 1) McCarran-Ferguson Act; 2) the Filed-Rate Doctrine; and 3) the nature of insurance itself. It did not, however, require HUD to solicit and consider additional input. With its 2016 Final Rule, HUD did exactly what the court requested, responding in great depth and detail to the comments that Plaintiff actually submitted. HUD did not assess the views that Plaintiff may wish they had expressed in 2012– nor did it have an obligation to do so. As discussed above, even if Plaintiff would have requested an exemption for risk-based practices in its 2012 comments, HUD's decision not to act upon that view is both substantively justified and well-explained in the agency's 2016 Final Rule.

## CONCLUSION

For the foregoing reasons, Amici Curiae respectfully support Defendants' Motion for Summary Judgment on the grounds that Defendants' refusal to exempt insurers from disparate

impact liability was a well-reasoned decision, grounded in the agency's careful consideration of interested parties' comments.

Dated: July 16, 2021

                    /s/Aneel L. Chablani
                    Aneel L. Chablani
                    CHICAGO LAWYERS' COMMITTEE FOR
                    CIVIL RIGHTS UNDER LAW
                    100 North LaSalle Street, Suite 600
                    Chicago, IL 60602
                    Telephone: (312) 202-3658
                    achablani@clccrul.org

                    Olga Akselrod
                    Sandra Park
                    AMERICAN CIVIL LIBERTIES UNION
                    FOUNDATION
                    125 Broad Street, 18th Floor
                    New York, NY 10004
                    Telephone: (212) 549-2500
                    OAkselrod@aclu.org
                    spark@aclu.org

                    Thomas Silverstein
                    LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                    UNDER LAW
                    1500 K Street NW, Suite 900
                    Washington, DC 20005
                    Telephone: (202) 662-8316
                    tsilverstein@lawyerscommittee.org

                    Ajmel Quereshi
                    Megan Haberle
                    NAACP LEGAL DEFENSE & EDUCATIONAL
                    FUND, INC.
                    700 14th Street, NW, 6th Floor
                    Washington, DC 20005
                    Telephone: (202) 682-1300
                    aquereshi@naacpldf.org
                    mhaberle@naacpldf.org

Stuart T. Rossman
Andrea Bopp Stark
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
srossman@nclc.org
astark@nclc.org

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Avenue, NW Suite 650
Washington, DC 20004
Telephone: (202) 898-1661
MWilliams@nationalfairhousing.org

Nusrat Jahan Choudhury
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
Telephone: (312) 201-9740
nchoudhury@aclu-il.org


Attorneys for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2021, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

*/s/ Aneel L. Chablani*
Aneel L. Chablani
CHICAGO LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
100 North LaSalle Street, Suite 600
Chicago, IL 60602
Telephone: (312) 202-3658