**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,

*Plaintiff*,

v.

MARCIA FUDGE, in her official capacity as Secretary of Housing and Urban Development, *et al.*,

*Defendants.*

No. 1:13-cv-08564
Judge Rebecca R. Pallmeyer

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**


BRIAN NETTER
Deputy Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

KATHLEEN M. PENNINGTON
Assistant General Counsel
for Fair Housing Enforcement

JULIA GARRISON
Trial Attorney

*Of Counsel*

LESLEY FARBY
Assistant Branch Director
Federal Programs Branch

*/s/ Emily Newton*
EMILY SUE NEWTON (Va. Bar No. 80745)
Senior Trial Counsel
VINITA B. ANDRAPALLIYAL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Room 12104
Washington, D.C. 20005
Tel: (202) 305-8356 / Fax: (202) 616-8460
emily.s.newton@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

I. The Court Should Defer Adjudicating PCI's Claims During The Ongoing Rulemaking. .....2

II. HUD Adequately Considered The Impact Of Inclusive Communities On Remand. .....6

III. HUD Adequately Considered And Responded To PCI's Concerns Based On The Nature of Insurance. .....9

IV. HUD Adequately Considered And Responded To PCI's Concerns Based On The MFA. .....12

V. HUD Adequately Considered And Responded To PCI's Concerns Based On The Filed-Rate Doctrine. .....16

**CONCLUSION** .....20

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Glob. Tel Link Corp.*,
816 F. App'x 939 (5th Cir. 2020) ....18

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ....4

*Angelo v. Centene Mgmt. Co.*,
2021 WL 352434 (W.D. Tex. Feb. 2, 2021) ....17

*Bhasker v. Kemper Cas. Ins.*,
284 F. Supp. 3d 1191 (D.N.M. 2018) ....18

*Brown v. Ticor Title Ins.*,
982 F.2d 386 (9th Cir. 1992) ....17

*Cellular Plus v. Sup. Ct.*,
14 Cal. App. 4th 1224 (1993) ....18

*Chamber of Com. v. SEC*,
443 F.3d 890 (D.C. Cir. 2006) ....8

*Clark v. Prudential Ins.*,
2011 WL 940729 (D.N.J. Mar. 15, 2011) ....18

*Cohen, v. Am. Sec. Ins. Co.*,
735 F.3d 601 (7th Cir. 2013) ....17

*Coll v. First Am. Title Ins.*,
642 F.3d 876 (10th Cir. 2011) ....18

*Devia v. Nuclear Regul. Comm'n*,
492 F.3d 421 (D.C. Cir. 2007) ....4

*Doe v. Mutual of Omaha*,
179 F.3d 557 (7th Cir. 1999) ....15

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ....10

*FTC v. Standard Oil Co.*,
449 U.S. 232, 242 (1980) ....3

*Gunn v. Cont'l Cas. Co.*,
968 F.3d 802 (7th Cir. 2020) ....17, 19

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999) ... 16

*McCray v. Fid. Nat. Title Ins.*,
682 F.3d 229 (3d Cir. 2012) ... 1

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ... 2, 3

*People of the State of Ill. v. ICC*,
722 F.2d 1341 (7th Cir. 1983) ... 9

*Pers. Watercraft Indus. Ass'n v. Dep't of Com.*,
348 F.3d 540 (D.C. Cir. 1995) ... 8

*Prop. Cas. Insurers Ass'n of Am. v. Donovan (PCI I)*,
66 F. Supp. 3d 1018 (N.D. Ill. 2014) ... *passim*

*Prop. Cas. Insurers Ass'n of Am. v. Carson (PCI II)*,
2017 WL 2653069 (N.D. Ill. June 20, 2017) ... *passim*

*Qwest Corp. v. Kelly*,
204 Ariz. 25 (Ariz. Ct. App. 2002) ... 18

*Raines v. Byrd*,
521 U.S. 811 (1997) ... 3

*Rothstein v. Balboa Ins.*,
794 F.3d 256 (2d Cir. 2015) ... 18

*Simmonds v. INS*,
326 F.3d 351 (2d Cir. 2003) ... 5

*Simon v. KeySpan Corp.*,
694 F.3d 196 (2d Cir. 2012) ... 18

*Square D Co. v. Niagara Frontier Tariff Bureau*,
476 U.S. 409 (1986) ... 17

*Suitum v. Tahoe Reg'l Plan. Agency*,
520 U.S. 725 (1997) ... 4

*Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015) ... *passim*

*Vidimos, Inc. v. Wysong Laser Co.*,
179 F.3d 1063 (7th Cir. 1999) ... 9

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
113 F. Supp. 3d 555 (D. Conn. 2015) ....................15

*Whitman-Walker Clinic, Inc. v. HHS*,
485 F. Supp. 3d 1 (D.D.C. 2020)....................8

*Williams v. Union Fid. Life Ins.*,
329 Mont. 158 (S. Ct. Mont. 2005)....................17

*Wilson v. EverBank, N.A.*,
77 F. Supp. 3d 1202 (S.D. Fla. 2015)....................19

**Regulations**

24 C.F.R. § 100.500(c)(3) ....................15

76 Fed. Reg. 70921 (Nov. 16, 2011)....................8

86 Fed. Reg. 33,596 (June 25, 2021)....................4

**Other Authorities**

NAIC, 2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty II–PA–10–21 (2011)....................17

As the U.S. Department of Housing and Urban Development ("HUD") has explained, the history of discrimination in the homeowners insurance industry is long and well documented. AR1815. Thus, when Congress enacted the Fair Housing Act ("FHA") in 1968 and subsequently amended it, Congress included statutory exemptions for certain practices, but not insurance practices. *Id.* AR1814. In promulgating the Disparate Impact Rule in 2013 ("the 2013 Rule" or "the Rule"), HUD followed suit, rejecting insurers' requests for exemptions from disparate impact liability under the FHA. As explained, HUD is currently engaged in a rulemaking that would supplant the 2013 Rule and thus, this Court should defer adjudication of PCI's claims at this time. However, if this Court decides to proceed, it should reject PCI's claims because HUD provided reasoned justifications in the Supplemental Explanation it issued in 2016 ("the Supplement") for preferring case-by-case adjudication of disparate impact liability over the exemptions from liability that insurers requested.

HUD concluded that the Rule would not inhibit insurers from continuing to use their preferred risk-based practices, as they contended, in part based on the fact that disparate impact liability had been applied to insurance practices for over thirty years and had not prevented insurers from using risk-based practices during that time. HUD also explained that neither the McCarran-Ferguson Act ("the MFA") nor the filed-rate doctrine justified the requested exemptions because the resulting costs of under-enforcement of the FHA would have outweighed any benefit to insurers, who would still have needed to adjudicate the application of any such exemption. And HUD discussed how the Supreme Court's recent decision in *Inclusive Communities* buttressed its conclusion, by confirming the broad remedial purposes of the FHA, which would have been compromised by the requested exemptions.

PCI's Opposition does not undermine the reasonableness of HUD's conclusion or the agency's explanations for it. Instead, PCI's Opposition relies on the same hyperbolic predictions of the calamitous consequences of disparate impact liability that the industry has been making for nearly 40 years—

predictions that have not come to pass. It relies on over-simplifications of the state of the law that do not account for the variations in claims, state laws, and the application of the MFA and filed-rate doctrine in different jurisdictions that support the 2013 Rule's case-by-case approach. And it relies on the faulty view that HUD did not adequately consider a Supreme Court case that HUD cited multiple times in the Supplement and that this Court has already held *supports* the 2013 Rule. PCI's continued disagreement with HUD's chosen approach in the Rule is not sufficient to undermine it, where HUD "reasonably considered the relevant issues and reasonably explained [its] decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Defendants are entitled to summary judgment.

## I. The Court Should Defer Adjudicating PCI's Claims During The Ongoing Rulemaking.

The Court should defer adjudicating Plaintiff's claims that HUD did not adequately consider and address PCI's comments on a proposal that resulted in the 2013 Rule because HUD is currently considering, and will be addressing, comments on a proposal concerning the same rule. *See* Defs.' Mem. 10-12. It is HUD's responses to the comments it is considering now—which may adopt, reject, or expand on the reasoning in the Supplement that Plaintiff challenges—that will be operative when HUD issues a final rule. Where that is the case, both ripeness considerations favor deferring adjudication.

*First*, PCI's claims—all of which challenge HUD's responses to PCI's comments on a rulemaking in 2012—are not fit for judicial review given that HUD is in the midst of a rulemaking, the results of which will supersede the current record of review for PCI's claims. *See* Defs.' Mem. 11. PCI attempts to circumvent this fact by arguing that judicial review will not interfere with the administrative process because that process is "unlikely … [to] result in any meaningful change" to the Rule. Pl.'s Opp. 4. But PCI's speculation about what HUD is likely to do illustrates the point: we do not yet know what position HUD will adopt in the final rule. As a result, the parties are engaged in the very "abstract disagreements over administrative policies that the ripeness doctrine seeks to avoid." *Ohio Forestry Ass'n v. Sierra*

*Club*, 523 U.S. 726, 736 (1998).[1] And adjudicating PCI's claims now would "den[y] the agency an opportunity to correct its own mistakes and to apply its expertise," *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980), in contravention of the judiciary's duty to "exercise power only in the last resort," *Raines v. Byrd*, 521 U.S. 811, 819 (1997). PCI recognized as much for the better part of four years when it acquiesced in stays of this case based on the agency's prior proposed rule and "its need to continue to engage in the rulemaking process." Dkt. 178; *see also* Dkts. 184, 196. PCI's prediction that the current rulemaking will result in an outcome it dislikes, *see* Pl.'s Opp. 3, does not negate the same prudential considerations it recognized then from counseling in favor of deferring to the same administrative process now.

Moreover, Plaintiff's conjecture that HUD is unlikely to modify the *substance* of the 2013 Rule is largely beside the point given that Plaintiff brings here only *procedural* claims that the agency failed to adequately consider PCI's comments on the proposal in 2012. Regardless of the final rule HUD adopts, the pertinent facts for the claims at issue here, *i.e.*, HUD's responses to PCI's comments during prior rulemaking, will by definition be superseded when HUD issues a final rule, making adjudication of Plaintiff's claims now premature and wasteful. For instance, Plaintiff claims that HUD did not adequately consider *Inclusive Communities* in the Supplement. *See* Am. Compl., Count I, Dkt. 133; Pl.'s Mem. 8-10. Although the agency disputes that claim, HUD now has the opportunity to address that Supreme Court opinion anew in the final rule. The current proposed rule discusses the opinion at length and "invites comment" on the rule, providing PCI with an opportunity to raise the same or new issues, including whether *Inclusive Communities* simply formalized the longstanding interpretation of disparate impact liability under the FHA. *See* 86 Fed. Reg. 33,596 (June 25, 2021).[2] Regardless then, even "[i]f the

---

[1] Herein, all internal alterations, citations, and subsequent history are omitted unless otherwise indicated.

[2] PCI has not yet submitted comments on the current proposed rule. If it does not do so, it may be precluded from raising challenges to the new rule in federal court. *See PCI I*, 66 F. Supp. 3d at 1053

… rule is enacted as proposed," deferring adjudication of Plaintiff's claims "will narrow the legal issues involved in this dispute," "provide a more final and concrete setting for deciding any issues left on the table," and avoid the "inefficient and unnecessary piecemeal review" that the ripeness doctrine is meant to prevent. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387–88 (D.C. Cir. 2012).

For similar reasons, Plaintiff's claims are not fit for review because "[t]he court would benefit from further factual development of the issues." *Ohio Forestry*, 523 U.S. at 727. Plaintiff's only rejoinder is that its challenge "presents entirely legal issues." Pl.'s Opp. 4. But resolution of those legal issues—whether HUD adequately addressed various issues in response to insurers' comments—turns on the specific record context of HUD's responses to public comments during the notice-and-comment process. As mentioned, that process is ongoing, and the results of that process will supersede the very Supplement Plaintiff challenges. In these circumstances, deferring adjudication would avoid the "issuance of what could effectively become an advisory opinion," *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 426 (D.C. Cir. 2007), and one that will assuredly be based on an indeterminate record.

*Second*, PCI has not overcome these strong "institutional interests in … deferral," *id.* at 427, because it has failed to show that the 2013 Rule will cause its members to experience hardship, specifically, "an immediate and significant change in [the] conduct of [their] affairs with serious penalties attached to noncompliance," *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 743–44 (1997). If the 2013 Rule were going to cause PCI's members to make "immediate" and "significant" changes in their conduct, then of course, that would have happened by now, given that the Rule has been in effect for over eight years. Based on that fact alone, PCI cannot show that deferring review will cause its members to

(holding that PCI could not raise an issue that neither it nor the other members of the insurance industry raised during the notice-and-comment period).

suffer the requisite hardship now.[3]

PCI's attempts to do so simply magnify that fact. PCI contends that its members "incur costs and must make fundamental changes to their business each day that they are not exempt from the Rule," Pl.'s Opp. 2, but its submissions show otherwise. For instance, Plaintiff cites as an example that its members are each day "collecting demographic data they do not ordinarily obtain from customers." *Id.* (citing Pl.'s SOF ¶¶ 92, 97, 99). But nothing in the Rule requires PCI's members to collect such data. And the declarations PCI relies on show that its members *predicted* in 2014 that they would have to collect such data, but averred that they did not do so as of May 2014—fifteen months after the Rule went into effect. *See* Zaleski Decl. ¶ 11, Dkt. 222-6 (averring that his company "does not collect and compile [such] data"); Drogan Decl. ¶ 7, Dkt. 222-5 (same); Dawdy Decl. ¶ 7, Dkt. 222-4 (same); Cracas Decl. ¶ 6, Dkt. 222-3 (same). Plaintiff has confirmed (and emphasized) that "*insurers do not collect data on subscribers' race, ethnicity, or other protected characteristics*." Pl.'s Mem. 18 (citing Pl.'s SOF ¶¶ 62, 97). And PCI provides no evidence to suggest that its members would start doing so "immediate[ly]" if this case were deferred when they have not felt compelled to do so over the intervening eight years.[4]

Similarly, PCI contends that its members are subject to conflicting legal obligations, namely the

---

[3] For this reason, the only recent evidence Plaintiff submits—the declaration of Robert Gordon—does not satisfy the hardship prong, because it indicates that his company has already incurred compliance costs related to the 2013 Rule, ¶ 7, and does not indicate that deferring review at this time will result in any immediate and significant change in conduct. Similarly, the fact that the Court found that Plaintiff had standing to bring its claims in 2014 because the 2013 Rule "increase[d] [Plaintiff's members] exposure to disparate impact liability under the FHA," *PCI v. Donovan ("PCI I")*, 66 F. Supp. 3d 1018, 1043 (N.D. Ill. 2014), does not show that PCI's members will suffer the requisite hardship from deferring review now, where any increased exposure occurred in 2013, and, as discussed *infra*, Plaintiff has not provided any current evidence to show that its members would make any immediate or significant changes to avoid liability if the Court deferred adjudication. *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003) ("The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship.").

[4] PCI's argument that the Rule requires insurers "to consider race in a pervasive way," Pl.'s Opp. 8, is meritless, as it is premised on the claim that the Rule requires PCI's members to collect data they have confirmed they do not collect.

2013 Rule and state laws, Pl.'s Opp. 3 (citing Pl.'s SOF ¶¶ 22, 28, 47, 68, 98), such that they are faced with "the untenable choice 'between taking immediate action to their detriment and risking substantial future penalties for non-compliance,'" *id.* (quoting *Reich*, 57 F.3d at 1101). But again, to support that contention, PCI largely relies on declarations from 2014, all of which predict that PCI's members "would" in the future have to take actions to perform a disparate impact analysis under the Rule and to justify their policies in litigation. *See* Zaleski Decl. ¶ 18; Dawdy Decl. ¶¶ 13–14; Cracas Decl. ¶¶ 8–11, 13. But PCI offers no current evidence—as it must do on summary judgment—to show that its members have, or actually are, taking the actions predicted in 2014, or that they have been subject to *any* penalties for non-compliance in the intervening eight years, much less that they will "immediate[ly]" and "significant[ly" alter their behavior now to avoid such penalties if adjudication is deferred.

## II. HUD Adequately Considered The Impact Of *Inclusive Communities* On Remand.

If the Court does adjudicate PCI's claims now, it should grant summary judgment to Defendants on all of them. With respect to Count I, the Supplement shows that HUD adequately considered the impact of *Inclusive Communities* on the application of the disparate impact framework to insurance. As explained, the Supplement's multiple citations to *Inclusive Communities* show HUD was well aware of the Supreme Court opinion and considered its impact on the requested exemptions. *See* Defs.' Mem. 12-13. HUD was not required to set forth a further analysis of the opinion to justify the Rule when *Inclusive Communities* "did not identify any aspect of HUD's … approach [in the Rule] that required correction" and the Rule reflected the limitations on disparate impact liability identified in the opinion. *PCI v. Carson ("PCI II")*, 2017 WL 2653069, at *9 (N.D. Ill. June 20, 2017); *see also* Defs.' Mem. 13-15.

In opposition, PCI notes that HUD's inclusion of PCI's January 26, 2015, letter in the administrative record shows that HUD "received and considered" the arguments therein. Pl.'s Opp. 11 n.4. By extension, PCI concedes that HUD received and considered the arguments in its July 29, 2015 letter,

at AR4615, that the Rule does not comply with *Inclusive Communities*. PCI's argument then is not that HUD failed to consider those arguments on remand, but that HUD was required to respond to them explicitly in the Supplement. As explained, however, it would not have made sense for HUD to explicate all the ways in which the Rule complied with *Inclusive Communities* when the opinion cited the Rule favorably multiple times and suggested no reason to do so. In arguing otherwise, PCI conflates HUD's obligations on remand with an agency's duties to respond to comments during notice-and-comment.

In *PCI I*, this Court found that HUD did not adequately explain why it adopted the case-by-case approach in the Rule, rather than the exemptions requested by insurers, in light of insurers' comments during the rulemaking related to the MFA, the filed-rate doctrine, and the nature of insurance, 66 F. Supp. 3d at 1047-51. It thus "remand[ed] the case to HUD to explain its decision" to adopt the case-by-case approach, rather than the requested exemptions, or "adopt changes to the [Rule]." *Id.* at 1045. HUD complied with its obligations on remand by explaining in the Supplement why it continued to prefer the case-by-case approach. *See* AR1813-20. In doing so, it explained the impact of *Inclusive Communities* on the question for reconsideration: whether a case-by-case approach or exemptions were preferable for insurance. *See PCI I*, 66 F. Supp. 3d at 1045. In support of its decision not to grant the requested exemptions, HUD cited *Inclusive Communities*' discussion of the FHA's statutory exemptions, *see* AR1814 n.11, noting that Congress did not create one for insurance, *see id.* AR1814. It also cited *Inclusive Communities*' discussion of the FHA's broad remedial purposes, *see* AR1814 n.13, AR1815 n.24, and its recognition that disparate impact liability plays a role in uncovering discriminatory intent, *see* AR1816 n.42, in support of its conclusion that an exemption for insurance would be overbroad and undermine the FHA's purposes, *see* AR1816. The Supplement thus adequately explained how *Inclusive Communities* not only complied with, but supported, HUD's chosen approach in the Rule.

Plaintiff's insistence that HUD was required to go farther, and detail all the ways in which the

Rule complies with *Inclusive Communities*, appears to be based on its view that HUD was required to respond to the precise arguments raised in PCI's unsolicited letter to HUD on January 26, 2015, as if those comments had been submitted during notice-and-comment. *See* Pl.'s Opp. 6 (citing *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 46 (D.D.C. 2020)). That is incorrect. The comment period closed on January 17, 2012. *See* 76 Fed. Reg 70921 (Nov. 16, 2011). This Court did not direct HUD to re-open the rulemaking for comment, HUD was not required to do so under the circumstances, *see Chamber of Com. v. SEC*, 443 F.3d 890, 906 (D.C. Cir. 2006) (explaining that re-opening public comment on remand is unnecessary when the agency is relying on 'publicly available' information" that is "so obviously relevant" to a rule), and it did not do so, *see* Pl.'s SOF ¶ 54.[5] Thus, although HUD certainly "received and considered" PCI's letter and the arguments therein, Pl.'s Opp. 11 n.4, HUD was under no obligation to provide an explicit response to those comments submitted well after the comment period closed. *See, e.g., Pers. Watercraft Indus. Ass'n v. Dep't of Com.*, 48 F.3d 540, 542–43 (D.C. Cir. 1995).

Furthermore, for the reasons explained by Defendants and this Court, even if HUD were obliged to respond to PCI's particular comments, any failure to do so would be harmless error. *See* Defs.' Mem. 14 n.6. Plaintiff argues otherwise based on the Court's decision to permit Plaintiff to include Count I in its Amended Complaint. *See* Pl.'s Opp. 8. But the Court allowed Plaintiff to bring its limited claim that HUD did not adequately consider the impact of *Inclusive Communities*, "particularly with respect to how, if at all, *Inclusive Communities* affects the … issues the Court ordered [HUD] to consider on remand." *PCI II*, 2017 WL 2653069, at *9. As explained, HUD did that: it considered and explained how *Inclusive Communities* affected its reconsideration of the industry's requested exemptions

[5] Although PCI requested that HUD reopen the comment period, *see id.*, PCI has never challenged HUD's decision not to do so and thus, cannot do so now.

and the case-by-case approach taken in the Rule. Remanding again for HUD to *also* explain—as it already did in its Opposition to Plaintiff's Motion to Amend, *see* Dkt. 122 at 9-10, and here, Defs.' Mem. 13-15—how the Rule comports with *Inclusive Communities* generally would be a futile gesture where this Court has already found that it does, *PCI II*, 2017 WL 2653069, at *9. The APA "does not require futile gestures." *People of the State of Ill. v. ICC*, 722 F.2d 1341, 1348 (7th Cir. 1983).[6]

## III. HUD Adequately Considered And Responded To PCI's Concerns Based On The Nature of Insurance.

In the Supplement, HUD also provided a fulsome and well-reasoned explanation for rejecting insurers' requests for exemptions for all insurance practices and underwriting decisions, as well as for particular risk factors, from the Rule. *See* AR1815-16, AR1818-19. As explained, among other things, HUD noted that the Rule would not "threaten the fundamental nature of insurance," as commenters predicted, because insurers can continue to use risk-based factors, if they can show that those factors are, in fact, risk-based and that no less discriminatory alternative exists. AR 1818; *see* Defs.' Mem. 30. HUD based its conclusion, in part, on the fact that insurers had been subject to disparate impact liability for decades, yet continued to use the risk-based practices that they said would be undermined by such potential liability. *See* AR1818; Defs.' Mem. 31. On the other hand, HUD reasoned that no matter how crafted, exemptions for risk-based factors or practices would be overbroad and over time outdated, leaving practices with disparate impacts unchallenged in contravention of the purposes of the FHA. *See*

[6] The remainder of Plaintiff's argument on this claim is devoted to attempting to re-litigate claims this Court already rejected. Plaintiff *again* attacks the burden-shifting framework adopted in the Rule and argues that the Rule does not comport with the limitations on disparate impact liability discussed in *Inclusive Communities*. But this Court already held that the Rule's burden-shifting framework is "reasonable," *PCI I*, 66 F. Supp. 3d at 1053, and it rejected as "without merit" Plaintiff's claim that the Rule does not comply with *Inclusive Communities*, *see PCI II*, 2017 WL 2653069, at *8. Plaintiff's arguments are no more meritorious now, and they are foreclosed by this Court's prior opinions. *See Vidimos, Inc. v. Wysong Laser Co.*, 179 F.3d 1063, 1065 (7th Cir. 1999) (explaining that the law of the case doctrine bars arguments for reconsideration that are not based on new law, evidence, or other changed circumstances that would justify waiver of the doctrine).

AR1818. It thus declined again to adopt the requested exemptions.

In opposition, PCI argues that "HUD presents no facts to rebut PCI's claim that preventing accurate risk-based pricing and underwriting would result in adverse selection and consequently jeopardize the viability of the homeowners insurance industry." Pl.'s Opp. 18. That is incorrect. On remand, HUD provided sound and supported reasons for rejecting PCI's claim, including by explaining that insurers had been making the same claim for decades and yet, continued to use risk-based practices. *See* AR1816. As HUD explained, it had been applying disparate impact liability to insurers for "more than three decades"; some states had long applied disparate impact liability to insurers; and disparate impact liability had been applied in other industries that use risk-based practices, *id.*—all without "the deleterious consequences," Pl.'s Opp. 19, that insurers had long been predicting, *see* AR1816. Thus, far from an "*ipse dixit* conclusion," Pl.'s Opp. 19, HUD based its conclusion in part on decades of experience.

Eight more years of experience confirms that HUD's conclusion was sound. The only support Plaintiff provides for its claim that the Rule would "prevent[] accurate risk-based pricing and underwriting," *id.*, is the assertion of Ronald Zaleski in 2014, that "[e]ven if [Selective Insurance] could determine whether use of particular factors had a disparate impact, eliminating those factors in a risk and rate assessment would compromise the actuarial soundness of the risk-based rating plans … used by Selective," Dkt. 222-6 ¶ 20. Having not identified what the particular risk factors even are, one might reasonably question the credibility of Mr. Zaleski's prediction that elimination of said hypothetical risk factors would necessarily compromise the actuarial soundness of Selective's plans. And in any event, the other declarations Plaintiff submitted show that insurers continued to use risk-based practices after the Rule had been in effect for fifteen months, *see* Dawdy Decl., ¶ 8; Drogan Decl., ¶ 9, and Plaintiff's briefing indicates that its members continue to do so today, *see* Pl.'s Mem. 2-3, despite being subject to liability under a disparate impact theory for decades, *see* AR1818, and the Rule for eight

years. Having failed to show that the Rule has prevented insurers from using risk-based practices (it has not), Plaintiff understandably provides zero evidence that the Rule has resulted in the consequent "adverse selection" or threat to "the viability of the homeowners insurance" that Plaintiff claims would have resulted if insurers had been prevented from using such practices. Pl.'s Opp. 18.

Plaintiff otherwise repeats its argument that HUD did not adequately consider the Rule's impact on the fundamental nature of insurance because HUD did not consider the industry's request to exempt particular risk-based factors, as opposed to "all" of them. *Id.* at 19. As explained, that is demonstrably false, as shown by HUD's addressing that particular request head-on and repeatedly in the Supplement. *See* Defs.' Mem. 21-22.[7] HUD considered the industry's requests to provide exemptions for "any risk-based factor or for the specific 'long-recognized' factors" commenters pointed to, and rejected those requests based on its determination that such an exemption would be overbroad in contravention of the FHA's purposes for multiple reasons: (1) it "would foreclose claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice"; (2) it would "offer little added value for insurers not already provided by the Rule itself" because it would "inevitably necessitate a determination of whether the use of the factor is, in fact, risk-based," similar to the second step in the burden-shifting framework; and (3) it would insulate from challenge factors, the actuarial relevance of which can "vary by context" and "change over time." AR1818.[8] At

[7] PCI repeats this argument to support its MFA claim. *See* Pl.'s Opp. 13-14. It should be rejected for similar reasons.

[8] To the extent PCI attempts to support this claim by arguing that HUD did not adequately address insurers' requests to adopt the "equally effective" language from *Wards Cove*, Pl.'s Opp. 19, that argument is foreclosed by this Court's decision upholding the Rule's burden-shifting framework while acknowledging that HUD did not adopt the "equally effective" language from *Wards Cove*. *PCI I*, 66 F. Supp. 3d at 1052. PCI attempts to minimize HUD's justification for that decision in the Rule, *compare* Pl.'s Opp. 19, *with* AR625; regardless, HUD was not required to reiterate or buttress that explanation in the Supplement given that the Court already upheld its reasonableness and HUD's initial explanation for it in the Rule.

bottom, PCI simply disagrees with HUD's decision not to exempt insurance practices in the Rule, but that disagreement does not undercut the reasonableness of HUD's explanations for that decision.

## IV. HUD Adequately Considered And Responded To PCI's Concerns Based On The MFA.

HUD also reasonably explained its preference for the case-by-case approach it adopted in the Rule despite insurers' concerns based on the MFA. In *PCI I*, this Court instructed HUD to assess on remand "whether the benefits of proceeding by case-by-case adjudications outweighed the benefits of including an exemption … for insurers in the … Rule" in light of insurers' comments based on the MFA. *PCI I*, 66 F. Supp. 3d at 1048. As explained, HUD did just that, and it concluded that insurers' concerns based on the MFA "do not outweigh th[e] loss of efficacy in the … enforcement of the [FHA]" that would result if HUD were to grant the requested exemptions. AR1814; *see* Defs.' Mem. 15-17. It explained the costs of the exemptions on the one hand: they "would allow to go uncorrected at least some discriminatory insurance practices that can be subject to disparate impact challenges consistent with" the MFA, in contravention of the FHA's broad remedial purposes. AR1814. And it explained the limited utility of the requested exemptions on the other: given "the variety of practices and relevant state laws, as well as the substantial range of possible discriminatory effects claims," it was "practically impossible … to define the scope of insurance practices covered by an exemption … with enough precision to avoid case-by-case disputes over its application" in any event. *Id.* Given that imbalance, HUD reasonably concluded that "the case-by-case approach [in the Rule] appropriately balances the[] [industry's] concerns against HUD's obligation to give maximum force to the [FHA]." *Id.*

In opposition, Plaintiff faults HUD for allegedly "assum[ing] that there would be at least some unspecified number of cases in which disparate impact liability under the Rule would not violate" the MFA, Pl.'s Opp. 9, and for not determining precisely "how often" the MFA would bar disparate impact

challenges to insurance practices, *id.* at 11. But HUD did not simply assume that there would be instances where disparate impact claims against insurers would not run afoul of the MFA; it pointed to specific cases where courts had found that such disparate impact claims were not barred by the MFA to support its conclusion that "at least some discriminatory insurance practices … can be subject to disparate impact challenges consistent with" the MFA. AR1814; *see also id.* at 1816-17. And like this Court, HUD recognized that the myriad variations in potential discriminatory effects claims, insurer business practices, and state laws and policies made it "practically impossible for HUD to define the scope of insurance practices covered by an exemption … with enough precision to avoid case-by-case disputes over its application." AR1814; *see PCI I*, 66 F. Supp. 3d at 1040 (noting "many imponderables" could affect whether the MFA categorically applies to all disparate impact claims that may fall within the scope of PCI's MFA challenge).[9] Where an exemption would not avoid case-by-case disputes (and the attendant costs), and the FHA would be under-enforced in at least some instances in which the MFA would not preclude disparate impact claims against insurers, HUD need not have determined precisely how often the MFA would apply in order to have a reasonable basis to conclude that the costs of an exemption outweighed those of case-by-case adjudication. *See* AR1816-17.

The reasonableness of HUD's conclusion that the costs of any exemption outweighed those of case-by-case adjudication is further supported by the fact that insurers have been predicting, and consistently overstating, the costs of disparate impact liability for nearly 40 years. *See* Defs.' Mem. 24-25;

[9] Similarly, HUD explained that even if it were to provide an exemption for a certain risk-based factor, entitlement to the exemption "would inevitably necessitate a determination of whether the use of the factor is, in fact, risk-based," thereby limiting the benefit of any exemption. AR1818. PCI is incorrect that the MFA would necessarily preclude this inquiry. *See* Pl.'s Opp. 10. For instance, insurance practices that "rest on business justifications rather than actuarially sound principles or state law requirements" would not necessarily "raise the question of whether the insurer's practices are actuarially sound and consistent with state law." *PCI I*, 66 F. Supp. 3d at 1040. Put simply, deciding whether a practice is based on a business justification or a risk-based one does not require a court to assess whether a risk-based practice is actuarially sound.

AR1816. PCI's opposition is just a further example of this. For instance, in support of its position that the case-by-case approach in the Rule would impose "significant and unjustified expenses on the industry," PCI cites: (1) the alleged "uncontroverted evidence of these costs, including those associated with collecting data on customers' race and ethnicity"; (2) "the impact on the industry of being required to use less effective risk-based pricing practices as a result of successful challenges"; and (3) that "*each* adjudication … would … trigger McCarran-Ferguson." Pl.'s Opp. 13. On the first point, PCI has not shown any costs to the industry associated with collecting data on customers' race and ethnicity to date. As explained, the Rule does not require such data collection. And although PCI predicted seven years ago that the Rule would require its members to start collecting such data, PCI has confirmed that the industry does not, in fact, do so, even though the Rule has been in effect for eight years. *See* Pl.'s Mem. 18. On the second point, PCI has not cited one successful challenge or any other evidence showing that insurers have been required to use less effective risk-based practices, and, as explained, PCI's submissions indicate that its members continue to use their preferred risk-based practices. *See supra* § III.[10] On the third point, as the discussion above shows, it is simply not the case that each adjudication against insurers under the Rule would trigger the MFA. HUD noted that insurers had been claiming for "more than three decades" that disparate impact liability would result in calamitous consequences for the industry, *see* AR1816, and it was reasonable for HUD to conclude that those same predictions did not warrant the requested exemptions given that insurers had not substantiated those claims over that thirty-plus-year period (and have failed to do so even with the benefit of another eight years).[11]

---

[10] Moreover, as explained, there is no basis for PCI's contention that insurers will be required to adopt practices that would undermine the insurance market. Defs.' Mem. 32. Under the Rule, a plaintiff can prevail on a disparate impact claim only if s/he shows that "the challenged practice *could be served* by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3) (emphasis added).

[11] For similar reasons, there is no merit to PCI's argument that HUD did not consider that the "logical result of liability under the Rule would be to invalidate [the use of] risk-based practices." Pl.'s Opp.

Plaintiff otherwise faults HUD for relying on the fact-intensive nature of the MFA inquiry, including variations among state insurance and anti-discrimination laws, based on Plaintiff's view that "the very exercise of disparate-impact analysis under the Rule would trigger McCarran-Ferguson preclusion" based on the Seventh Circuit's reasoning in *Doe v. Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999). Pl.'s Opp. 16; *see also id.* 15-18. But Plaintiff's insistence that *Doe*—a case "controlling," *id.* at 10, only in the Seventh Circuit—required HUD to adopt nationwide exemptions fails to contend with HUD's explanation that other circuit courts have distinguished *Doe*, *see* Defs.' Mem. 18-20; AR1816-17, that some courts have questioned "whether McCarran-Ferguson applies at all to 'subsequently enacted civil rights legislation,'" AR1816 n.50 (quoting *Viens* v. *Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 572 (D. Conn. 2015)), and that, in any event, the "variation[] among the circuits … as to how McCarran-Ferguson should be applied" supports the case-by-case approach adopted in the Rule as opposed to a one-size-fits all solution, *see* Defs.' Mem. 20; AR1817 n.50.

PCI's argument that the very act of conducting a disparate-impact analysis under the Rule would result in MFA preclusion is based on its view that state practices are "uniform" insofar as they either permit or require insurers to use actuarial risk factors. Pl.'s Opp. 16. As this Court recognized, however, whether a state "require[s] insurers to use risk-based pricing" or "merely permit[s] risk-based pricing, but do[es] not require it," will alter the MFA analysis. *PCI I*, 66 F. Supp. 3d at 1039–40. HUD thus reasonably rejected PCI's view, explaining that it is belied by: (1) the numerous cases wherein courts have found that such disparate impact challenges were not barred by the MFA, *see* Defs.' Mem. 27; AR1816; (2) the fact that the same types of insurance practices had survived MFA defenses in some jurisdictions but not others due to variations in state laws, *see* AR1817; *id.* n.56; and (3) *Humana*

14. As explained, HUD considered the issue, *see supra* § III, and the Rule does not prohibit the use of such practices, *see* Defs.' Mem. 22-23, as evidenced by the fact that PCI's members continue to use them.

*Inc. v. Forsyth*, 525 U.S. 299 (1999), which requires a level of conflict between the federal law and a state's law, policy, or administration that is not always present and will vary depending on the particular claim being made, the actual state law or policy at issue, and other case-specific variables. *See* Defs.' Mem. 27-28. As this Court recognized, and HUD explained, the MFA inquiry is a fact intensive one, and whether the MFA precludes a disparate impact claim will indeed depend on the particular state laws at issue, including state anti-discrimination laws. *See PCI I*, 66 F. Supp. 3d at 1048; AR1819; Defs.' Mem. 26-29.

## V. HUD Adequately Considered And Responded To PCI's Concerns Based On The Filed-Rate Doctrine.

Lastly, as shown in Defendants' opening brief, HUD reasonably explained that the filed-rate doctrine did not justify the exemptions insurers sought for two reasons. *First*, in the majority of cases, the doctrine would not bar disparate impact claims under the Rule because such claims do not challenge the "reasonableness" of approved rates, the state-law doctrine would be preempted under the Supremacy Clause, and the doctrine would not preclude various forms of relief typically granted under the FHA. *Second*, in any event, the variations in state regulatory regimes, laws and policies, and courts' application of the doctrine made the case-by-case approach adopted in the Rule preferable. *See* Defs.' Mem. 32-36; AR1819. In opposition, PCI fails to address HUD's explanation (and the cases it relies on for it) related to the Supremacy Clause, as well as the availability of remedies under the FHA that would not implicate the filed-rate doctrine. And PCI's attempt to gloss over the myriad variations among jurisdictions that HUD relied on in adopting the case-by-case approach in the Rule simply magnifies the reasonableness of HUD's decision to reject insurers' requested exemptions.

PCI attempts to undermine HUD's reliance on the variations in state laws and how courts apply the filed-rate doctrine, *see* AR1819, by suggesting that the application of the doctrine is simple and uniform because the "vast majority of States require insurers to file rates with state regulators for review or approval," Pl.'s Opp. 19 (citing Pl.'s SOF ¶ 47), and so long as rates are filed, the extent of regulators'

review of them "does not matter," *id.* (citing *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 417 n.19 (1986)). There are several problems with PCI's argument. *First*, implicit in it is the concession that, as HUD pointed out, some states do *not* require insurers to file their rates with state regulators. *See* AR1819 n.92 (citing NAIC, 2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty II–PA–10–21 (2011) (listing "no file" states). Consequently, in those states, the filed-rate doctrine would not apply to a disparate impact claim under the Rule.

*Second*, numerous courts, including the Seventh Circuit, disagree with Plaintiff's view that merely filing a rate is sufficient to invoke the doctrine and instead require some sort of approval by the governing regulatory agency.[12] Indeed, courts regularly define a "filed rate" as "one approved by the governing regulatory agency." *Alexander v. Glob. Tel Link Corp.*, 816 F. App'x 939, 943 (5th Cir. 2020) ("Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers.").[13]

[12] *See Cohen v. Am. Sec. Ins.*, 735 F.3d 601, 607–08 (7th Cir. 2013) (explaining that doctrine applies "if the rates must be filed with the governing regulatory agency and the agency has the authority to set, approve, or disapprove them" and questioning applicability of doctrine where it was "not at all clear that the Department ha[d] the authority to approve or disapprove property-insurance rates"); *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 811 (7th Cir. 2020) (in Washington state, plaintiff's claims "may or may not be barred depending on whether they … 'would necessarily require courts to reevaluate' the commissioner's approval of [the filed] rates"); *Brown v. Ticor Title Ins.*, 982 F.2d 386, 393–94 (9th Cir. 1992) ("[I]f [the filed] rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge…. [T]he act of filing does not legitimize a rate arrived at by improper action."); *Angelo v. Centene Mgmt. Co.*, 2021 WL 352434, at *2 (W.D. Tex. Feb. 2, 2021) (explaining that "[w]hether a state agency has the authority to approve reasonable rates is critical to determining if the filed rate doctrine applies in any given case" and denying dismissal based on doctrine because "Defendants cite to no authority that the filed rate doctrine is applicable where rates are filed with an agency that lacks authority to approve or reject them"); *Williams v. Union Fid. Life Ins.*, 329 Mont. 158, 166 (S. Ct. Mont. 2005) (where "there [wa]s no evidence that [defendant]'s rates for credit life insurance were set, reviewed or filed by a federal regulatory authority," defendant was "not immunized under the filed rate doctrine").

[13] *See also Simon v. KeySpan Corp.*, 694 F.3d 196 (2d Cir. 2012); *Coll v. First Am. Title Ins.*, 642 F.3d 876 (10th Cir. 2011).

That agency approval would be required to invoke the doctrine is sensible given that a central reason for the doctrine is to prevent courts from "undermin[ing] agency rate-making authority by upsetting approved rates (the principle of 'nonjusticiability')." *Rothstein v. Balboa Ins.*, 794 F.3d 256, 261–62 (2d Cir. 2015). Moreover, to the extent certain jurisdictions agree with Plaintiff and hold that the filing of a rate is sufficient to invoke the doctrine, *see, e.g., McCray v. Fid. Nat. Title Ins.*, 682 F.3d 229, 237–39 (3d Cir. 2012), the split of authority on the issue confirms the variations in the law that HUD cited in the Supplement, *see* AR1819, and supports its rationale for adopting a case-by-case approach in the Rule.[14]

*Third*, by grossly over-simplifying when the filed-doctrine applies, PCI ignores the other, countless variations in the "laws and regulatory structures at issue," and in the ways courts apply the doctrine, that led HUD to prefer its case-by-case approach. AR1819. For instance, some states have not adopted the filed-rate doctrine. *See, e.g.*, *Qwest Corp. v. Kelly*, 204 Ariz. 25, 59 P.3d 789, 792 (Ariz. Ct. App. 2002) (noting "Arizona courts have not yet considered" whether to adopt a "filed rate doctrine" and deferring the question); *Cellular Plus v. Sup. Ct.*, 14 Cal. App. 4th 1224, 18 Cal. Rptr. 2d 308, 318 (1993) (rejecting the doctrine and allowing lawsuit challenging reasonableness of rates). In other states that have, the doctrine does not apply to insurers. *See Gunn*, 968 F.3d at 810 ("We have found no District of Columbia case or statute applying filed-rate principles in the insurance context."); *Clark v. Prudential Ins.*, 2011 WL 940729, at *12 (D.N.J. Mar. 15, 2011) (in Ohio, filed-rate doctrine does not apply outside context of public utilities or common carriers to insurers). In still others, courts have narrowed application of the doctrine based on competing state laws and policies. *See Gunn*, 968 F.3d at 811 (in Washington state, plaintiff's claims "may or may not be barred depending on whether they are deemed 'merely incidental'

---

[14] The varying interpretations of the scope of *Square D*, 476 U.S. 409, also show that Plaintiff's sole reliance on a footnote in *Square D*, *see* Pl.'s Opp. 19, to support its overbroad simplification of the state of the law is misplaced. As explained, that case was in the unique context of the Sherman Act and did not implicate Supremacy Clause issues. *See* Defs.' Mem. 34-35.

to the rates approved by the commissioner, consistent with consumer protection laws); *Bhasker v. Kemper Cas. Ins.*, 284 F. Supp. 3d 1191, 1234–35 (D.N.M. 2018) (declining to apply doctrine to bar consumer claim against insurers on ground that "[i]t is difficult to imagine the Supreme Court of New Mexico shielding insurers from virtually any liability claim alleging deceptive practices in the face of an expressly created private right of action for such claims simply to ensure that courts never bump up against an approved insurance rate"). The abundant variation in regulatory schemes, competing state laws, and application of the filed-rate doctrine across the country illustrates the fallacy of PCI's one-size-fits-all view and the reasonableness of HUD's contrary analysis that actually took those variations in account.

Next, PCI argues that a claim under the Rule would "very likely" "alleg[e] that a particular practice results in rate disparities based on race," and "it is difficult to imagine" how a court could provide a remedy without "invalidating the rate" in violation of the filed-rated doctrine. Pl.'s Opp. 19. One need not imagine. As the Supreme Court explained, when a practice has an unjustified disparate impact, a remedy can "concentrate on the elimination of the offending practice." *Inclusive Cmtys.*, 135 S. Ct. at 2524; *see* Defs.' Mem. 35. As HUD explained, a court could "'provide injunctive relief or prohibit the Government from seeking civil or criminal redress'"—neither of which would be precluded by the filed-rate doctrine. AR1819 (quoting and citing cases). And, as HUD also explained, "[t]o the extent there is any conflict between" the FHA and state laws related to the filed-rate doctrine, "'the Supremacy Clause tips any legislative competition in favor of the federal antidiscrimination statutes.'" *Id.* (same).

In opposition, PCI fails to contend with the substance of Defendants' Supremacy Clause arguments and the cases supporting them. *See* Defs.' Mem. 34-35. Instead, PCI misstates Defendants' position as "contending that the [filed-rate] doctrine bars only certain federal claims … like RICO and antitrust actions," Pl.'s Opp. (citing Defs.' Mem. 34-35), and argues that Defendants cannot rely on that argument because it was not in the Supplement. It was not in the Supplement for good reason:

that is not Defendants' argument. Instead, Defendants were responding in their opening brief to PCI's reliance on inapposite RICO and Sherman Act cases to argue that the state filed-rate doctrine would bar federal claims in contravention of the Supremacy Clause. As Defendants explained, those cases were dismissed based on a "no-injury principle" unique to RICO and Sherman Act claims and are of limited relevance in the FHA context. *See* Defs.' Mem. 34-35.

PCI also misstates Defendants' position as "disput[ing] that a federal court would ever have to consider the 'reasonableness' of insurance rates in a disparate-impact claim." Pl.'s Opp. 20. That is inaccurate. What Defendants dispute is PCI's claim that a court would "'*have to* consider the reasonableness of the challenged rate at step two of the burden-shifting framework.'" Defs.' Mem. 35 (quoting Pl.'s Mem. 24) (emphasis added). For the reasons explained, which PCI does not dispute, that is not the case. *See id.* at 24-25.[15] And PCI's unremarkable observation that courts have employed the filed-rate doctrine to bar damages claims that would effectively invalidate approved rates, *see* Pl.'s Opp. 20, does not undermine HUD's reasoning in the Supplement. Defendants do not dispute that such claims may implicate the filed-rate doctrine, but the cases PCI cites are again in the antitrust context or do not implicate the Supremacy Clause, *see id.*, so they have little bearing on FHA claims where a plaintiff's standing is far broader, Supremacy Clause issues do come into play, and remedies other than damages are available that would not run afoul of the filed-rate doctrine. *See* AR1819; Defs.' Mem. 33, 35.

## CONCLUSION

[15] To the extent PCI continues to argue that a claim under the Rule would necessarily challenge the reasonableness of filed rates, *see* Pl.'s Opp. 19, PCI does not contend with: the case law cited by HUD holding otherwise, *see* AR1819 n.84; cases showing that the filed-rate doctrine does not bar claims that do not challenge insurers' rates but the practices underlying those rates, *see, e.g., Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1233–34 (S.D. Fla. 2015); the fact that not all states require rates be filed and approved, *see* AR1819 (and, as discussed, the fact that not all states even recognize the filed-rate doctrine or apply it to insurance); and, as noted, do not meaningfully address the Supremacy Clause issue in its Opposition.

For the reasons stated in Defendants' opening brief and herein, the Court should deny Plaintiff's motion for summary judgment and grant Defendants'.

Dated: August 20, 2021

Respectfully submitted,

BRIAN NETTER
Deputy Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

LESLEY FARBY
Assistant Branch Director
Federal Programs Branch

*/s/ Emily Newton*
EMILY SUE NEWTON (Va. Bar No. 80745)
Senior Trial Counsel
VINITA B. ANDRAPALLIYAL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Room 12104
Washington, D.C. 20005
Tel: (202) 305-8356 / Fax: (202) 616-8460
emily.s.newton@usdoj.gov

*Counsel for Defendants*