**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:13-cv-08564 |
| MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Property Casualty Insurers Association of America ("PCI")* alleges as follows:

## NATURE OF THE ACTION

1.      This is an action under the Administrative Procedure Act ("APA"), which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be [among other things] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706.  Agency action must stand or fall based on the explanation and rationale actually given by the agency in its notice or decision.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

---

\* Effective January 1, 2019, the American Insurance Association merged with and into PCI.  Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association.

2.      The agency action at issue here is the United States Department of Housing and Urban Development's ("HUD's") promulgation of a regulation purporting to "formalize" HUD's belief "that liability under the Fair Housing Act ("FHA") may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin—"regardless of whether there was an intent to discriminate"—which HUD first adopted in 2013, and following a number of intervening events, reinstated on March 31, 2023.  *See* 78 Fed. Reg. 11,460, 11,460, 11,463 (Feb. 15, 2013) (the "2013 Rule") (attached as Exhibit 1); 88 Fed. Reg. 19,450 (Mar. 31, 2023) (the "2023 Reinstated Rule") (attached as Exhibit 2).  This lawsuit challenges HUD's application of this regulation—both the 2013 Rule and the substantively identical 2023 Reinstated Rule (jointly, the "Rule" or "Disparate Impact Rule")—to the underwriting, pricing, and provision of homeowners insurance and property and hazard insurance ("homeowners insurance") as arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

3.      As a matter of state law, homeowners insurers are required to charge rates that are not excessive, inadequate, or unfairly discriminatory.  Setting accurate and fair rates necessitates reliance on actuarial data from past losses that reveal differences in the risks posed by different pools of insureds.  Using this data, homeowners insurers can engage in risk segmentation by classifying insureds based on their risk profile and charging them different premiums.  Such risk-based underwriting and pricing is fundamental to the business of homeowners insurance, and the vast majority of states indeed mandate that insurers use actuarially significant risk factors.  *See* PCI Letter to HUD (Jan. 26, 2015), at 1 (attached as Exhibit 3), at 8; *see also id.* at Table 1 (showing statutes requiring risk-based pricing, organized by state).

4.      The Disparate Impact Rule would impair the ability of homeowners insurers to

price and underwrite insurance based upon risk.  Rather than allow insurers' decisions to be guided by objective actuarial risk data—as contemplated by state law—the Disparate Impact Rule would require insurers to attempt to determine whether their underwriting and pricing decisions have a disparate impact on customers falling within a protected class and certain geography. Insurers would then have to adjust rates, possibly in violation of state law.  The Rule would thus fundamentally change the business and regulation of insurance.

5.      Application of the Disparate Impact Rule to homeowners insurance thus also cannot be reconciled with the McCarran-Ferguson Act.  The McCarran-Ferguson Act, 15 U.S.C. §§ 1011- 1015, preserves the historic role of the states in regulating the business of insurance.  It prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance."  *Id*. § 1012(b).  The provision of homeowners insurance is extensively regulated by the states to ensure that insurance rates and practices are fair and reasonable.

6.      The Court previously concluded that HUD acted in an arbitrary and capricious manner by failing to respond adequately to comments submitted by the homeowners insurance industry during the rulemaking proceeding leading to promulgation of the Disparate Impact Rule.  The Court explained that "HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious.  HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework.  The ability of insurers to raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate

HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Prop. Cas. Ins. Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1051 (N.D. Ill. 2014). The Court also concluded that "HUD's one-paragraph response to the insurance industry's detailed concerns that applying the Disparate Impact Rule to homeowners insurance would violate the McCarran–Ferguson Act fails to provide a reasoned explanation to prefer case-by-case application of McCarran–Ferguson preclusion over rule-making." *Id.* at 1048. In addition, the Court held HUD did not adequately respond to the insurance industry's concerns that application of the rule to homeowners insurance would violate the "filed rate" doctrine, which precludes claims premised on rates that have been approved by a state regulator. The Court instructed HUD that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran–Ferguson comments." *Id.* at 1050. Accordingly, the Court ordered HUD to supplement its explanation of the Disparate Impact Rule by discussing the impact of the Rule on the homeowners insurance business and why they should not be exempted from its coverage.

7.      After remand, PCI requested that HUD reopen the comment period so that PCI could submit additional comments addressing the issues identified in the Court's order. *See* PCI Letter to HUD (Sept. 25, 2014) (attached as Exhibit 4).

8.      PCI next submitted to HUD a comment addressing the issues identified in the Court's order and reiterating the reasons why the Disparate Impact Rule was unlawful. *See* PCI Letter to HUD (Jan. 26, 2015). Among other points, the comment highlighted that 1) "the vast majority of states" require insurers to set rates based on "neutral actuarial factors," *id.* at 8; *see also id.* at Table 1; 2) the vast majority of states have expressly permitted insurers to group insureds based on risk, *id.* at 9; *see also id.* at Table 1; and 3) the vast majority of states "require

insurers to file their rates with state insurance commissioners for review and approval," *id.* at 12; *see also id.* at Table 1. The Disparate Impact Rule therefore violated the McCarran-Ferguson Act and the filed-rate doctrine.

9. Before HUD supplemented its explanation, the Supreme Court narrowly defined the scope of disparate-impact liability under the Fair Housing Act in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). The Supreme Court emphasized that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 2518. The Court also held plaintiffs must satisfy a "robust causality requirement" to establish a prima facie case beyond evidence of a mere statistical disparity. *Id.* at 2523. The Court specified that only "artificial, arbitrary, and unnecessary" practices should be eliminated by the Disparate Impact Rule. *Id.* at 2524. The Court warned against policies that would encourage the consideration of race "in a pervasive way," such as numerical quotas, as that would raise serious constitutional questions. *Id.* at 2523.

10. In light of this dispositive precedent, PCI submitted an additional comment to HUD explaining that homeowners insurers, due to their fundamental dependence on risk-based pricing, are precisely the types of actors whose practical business practices must be shielded from disparate-impact liability. *See* PCI Letter to HUD (July 29, 2015), at 2 (attached as Exhibit 5).

11. On October 5, 2016—nearly two years after this Court's remand order and over a year after the Supreme Court issued its decision in *Inclusive Communities*—HUD published its Supplemental Explanation. *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016) (the "Supplemental

Explanation") (attached as Exhibit 6). Yet the Supplemental Explanation offers no meaningful discussion of the intervening, controlling *Inclusive Communities* decision. This failure to take account of *Inclusive Communities* was arbitrary and capricious. Nor does the Supplemental Explanation make any mention of the comment letters PCI submitted after this Court's remand.

12.     This case has largely been on hold since HUD issued its Supplemental Explanation in response to this Court's remand order. In the intervening years, HUD has engaged in two new rulemaking processes based on the 2013 Rule.

13.     HUD first considered amending the 2013 Rule. Beginning in 2018, HUD sought public comment on potential amendments to the 2013 Rule, and the agency ultimately proposed a new rule amending the 2013 Rule on August 19, 2019. *See* 84 Fed. Reg. 42,854 (Aug. 19, 2019). PCI filed a comment in response to this 2019 notice of proposed rulemaking. On September 24, 2020, HUD published a final rule amending the 2013 Rule. 85 Fed. Reg. 60,288 (Sept. 24, 2020) (the "2020 Rule"). But the 2020 Rule was enjoined by another court before it went into effect, *see Massachusetts Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600 (D. Mass. 2020).

14.     HUD then determined that it would reinstate the 2013 Rule. Accordingly, HUD proposed a new rule reinstating the 2013 Rule on June 25, 2021. 86 Fed. Reg. 33,590 (June 25, 2021) (attached as Exhibit 7). PCI, again, filed a comment in response to this 2021 notice of proposed rulemaking, PCI Letter to HUD (Aug. 24, 2021) (attached as Exhibit 8), as well as a supplemental comment addressing the Supreme Court's June 30, 2022 decision in *West Virginia et al. v. Environmental Protection Agency*, 142 S. Ct. 2587 (2022), PCI Letter to HUD (Aug. 29, 2022) (attached as Exhibit 9). On March 31, 2023, HUD published the 2023 Reinstated Rule, a new final rule reinstating and maintaining the 2013 Rule.

15.     The 2023 Reinstated Rule went into effect on May 1, 2023.

16.     HUD's reaffirmed decision to apply the Disparate Impact Rule to risk-based pricing practices in the homeowners insurance industry remains arbitrary and capricious and otherwise contrary to law. HUD ignored the Court's instruction to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers. Rather, HUD cited—without support—that such wholesale bars would contravene the purpose of the McCarran-Ferguson Act. Nor did HUD adequately address the filed-rate doctrine, ignoring cases in which courts found that doctrine to bar federal challenges to state insurance law.

17.     Like the original reasoning that the Court found unlawfully insufficient, the Supplemental Explanation fails to provide an adequate "response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance." *Donovan*, 66 F. Supp. 3d at 1051. For that reason, too, the Supplemental Explanation and the Rule it justifies are arbitrary and capricious. In the Supplemental Explanation, HUD gives insufficient consideration to commenters' arguments that these particular underwriting and pricing practices should be exempt. To the extent that the Supplemental Explanation considers these concerns at all, it addresses insurance practices more broadly, without paying attention to the particular concerns raised about homeowners insurance and about risk-based pricing and underwriting in particular. And to the extent that it addresses the risk-based pricing of homeowners insurance, it contradicts itself and ignores comments that avoiding statistical disparities would require homeowners insurers to depart from risk-based pricing. The Supplemental Explanation similarly fails to consider how application of a federal disparate-impact standard would affect the business of homeowners insurance, which is

dependent on effective risk segmentation. Nor does it adequately explain why the cost, time, and inconvenience of individualized litigation outweighed crafting an exception for the risk-based pricing of homeowners insurance. It also wholly disregards the costs homeowners insurance companies would incur in collecting data on race and other protected characteristics, which some states outlaw.

18.     The Disparate Impact Rule is also contrary to law as established by *Inclusive Communities* in numerous respects. It compels the "pervasive" consideration of protected characteristics, stifles "practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system," and burdens actors who provide housing. *Inclusive Communities*, 135 S. Ct. at 2518.

19.     The burden-shifting provisions of the Disparate Impact Rule are also contrary to the limitations outlined in *Inclusive Communities* when applied to the homeowners insurance industry, which operates by classifying risks based on a broad range of actuarial data. For one, the Rule impermissibly permits plaintiffs to state a prima facie claim of disparate impact merely by pointing to a statistical disparity and without establishing a robust causal connection between a defendant's policies and a racial disparity. Second, the Rule requires homeowners insurers to show on a case-by-case basis that challenged underwriting or pricing practices are necessary to achieve a legitimate business goal. This ignores the fact that all actuarially based pricing and underwriting is necessary to the legitimate business of the private competitive market for insurance, as well as the fact that state law typically mandates the use of actuarially significant factors. The Rule thus would not simply invalidate those policies that are "artificial, arbitrary, and unnecessary," but would inhibit "profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 2518, 2524.

20.     Based on the facts set forth herein, the Court should declare that insofar as the Disparate Impact Rule purports to apply to the risk-based pricing of homeowners insurance, it was promulgated in contravention of the APA.

## PARTIES

21.     Property Casualty Insurers Association of America ("PCI") is an Illinois not-for-profit corporation with its headquarters in Chicago, Illinois.  It is a trade association of property and casualty insurers representing more than 1,000 member companies.  In 2015, PCI's members wrote over $202 billion in annual premiums and constituted 27% of the U.S. homeowners insurance market.  PCI's members sell homeowners insurance, subject to state insurance regulations, in every state of the United States.  PCI's mission is to promote and protect the viability of a competitive private insurance market for the benefit of consumers and insurers.  In bringing this lawsuit, PCI seeks to vindicate both its own interests and the interests of its members.

22.     Defendant Department of Housing and Urban Development ("HUD") is an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3531 *et seq.*, Pub. L. No. 89−117, 79 Stat. 451.  HUD is headquartered at 451 Seventh Street SW, Washington, DC 20410.

23.     Defendant Marcia L. Fudge is the Secretary of the Department of Housing and Urban Development and is being sued in her official capacity.  Secretary Fudge is charged with implementing the Fair Housing Act and is responsible for the Department's promulgation of the challenged regulations.  Her official address is 451 Seventh Street SW, Washington, DC 20410.

## JURISDICTION AND VENUE

24.     This action arises under the APA.  This Court has subject-matter jurisdiction over

this action pursuant to 28 U.S.C. § 1331 and is authorized to grant relief under 5 U.S.C. §§ 702, 705, 706.

26. Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff PCI resides in this district and no real property is involved in this action.

26. This Court can grant declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201, 2202.

## ALLEGATIONS

## I. THE PROVISION AND PRICING OF INSURANCE

27. Insurance is a means for transferring the risk of loss from one party, the insured, to another, the insurer. Insurers group insureds into separate risk pools based on differences in risk profile. In exchange for accepting an insured's risk, the insurer charges a rate appropriate for the insured's risk pool. The rate is based on numerous factors, including the probability and amount of potential loss, policy limits, deductibles, and the insurer's cost of doing business. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:6 (3d rev. ed. 2010). The probability and amount of potential loss is also central to underwriting decisions—*e.g.*, decisions about whether to insure a particular risk or class of risk. *Id.* at § 1:2.

28. Determinations about the probability and amount of potential losses are made by actuaries. Actuaries are credentialed professionals trained and skilled in the analysis, evaluation, and management of the financial implications of future contingent events, especially with respect to insurance. In setting property and casualty insurance rates, actuaries adhere to the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988, *available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf. These principles "provide the foundation for the development of actuarial procedures and standards of

practice" and, as such, provide essential guidance for insurers. *Id.*

29.    When forecasting the probability and amount of potential loss, insurers consider a host of actuarial factors that correlate with losses. *See* Michael J. Miller*, Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009). For homeowners insurance, these factors might include, among many others, exposure to certain perils such as wind or hail, the types of construction materials used to build a house, house size, history of previous losses, geographic location, and proximity to fire hydrants. In applying these factors, insurers thus consider risk, not race or other protected characteristics. As the United States Court of Appeals for the Seventh Circuit has explained, "[r]isk discrimination is not race discrimination." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) (Easterbrook, J.); *see also id.* at 298 ("[C]lassification of risks is important to insurance, and assigning higher rates to greater risks differs from assigning rates by race.").

30.    Reliance on neutral, actuarially justified factors to calculate the probability and amount of potential losses is fundamental to the ability of the insurance industry to correlate risks to rates. The insurance market operates most efficiently and fairly when each consumer pays a rate that accurately reflects the cost of providing insurance to that consumer and other similarly situated consumers. If insurers could not set rates based on neutral, actuarially justified factors and risk calculations, the insurance industry could not function. *See, e.g.,* Robert Detlefsen, *"Disparate Impact" Theory Provides No Support for Banning Credit Scoring in Insurance*, Legal Backgrounder, Apr. 8, 2005, at 1, *available at* http://www.wlf.org/upload/040805LBDetlefsen.pdf. If risk is not considered in setting prices, lower-risk customers are overcharged for insurance relative to the risk of loss that they pose. If this were to occur (notwithstanding state law discussed below), many lower-risk customers

would choose not to purchase insurance rather than pay too much for it. This problem of adverse selection would cause prices to rise. *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012).

31. The Court of Appeals for the Seventh Circuit has noted this very phenomenon:

> Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*Am. Family Mut. Ins. Co.*, 978 F.2d at 290 (noting the difference between disparate treatment claims and disparate-impact claims in addressing application of the McCarran-Ferguson Act).

32. Additionally, if insurers were forced to disregard the actual risk of insuring a property (again, notwithstanding state law to the contrary), as would be required by the Disparate Impact Rule, it would severely disrupt the insurance market. Insurers who wanted to provide coverage for high-risk properties would not be permitted to charge adequate rates if they disproportionately affected insureds who met the criteria of a protected class. They would have to set their overall prices higher than those of their competitors, which could not be sustained in a competitive market. This would either jeopardize the insurer's solvency or result in a legitimate business decision not to offer such coverage.

- 12 -

33.     The inability to set rates based on neutral, actuarially justified factors would also create an artificial subsidy for the purchase of hazard-prone or poorly constructed houses. For example, insurance rates on houses made of easily flammable materials would be similar to rates on houses built of safer materials, due to characteristics of the policyholder that are not correlated to risk of a property loss. This would remove an incentive for the construction of safer houses and the maintenance of existing homes. *See, e.g.*, Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. at 66-67.

## II.     STATE REGULATION OF INSURANCE

34.     Homeowners insurance is subject to extensive state regulation. State regulatory regimes typically mandate the use of risk-based pricing based on actuarially significant risk factors.

35.     State law generally prohibits insurers from charging excessive, inadequate, or unfairly discriminatory insurance rates. For purposes of insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted). As further explained in Principle 4 of Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988, *available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

36.     The National Association of Insurance Commissioners ("NAIC") is a standard-

setting and regulatory support organization created and governed by state insurance regulators. NAIC establishes standards, model laws, and best practices, conducts peer review, and coordinates regulatory oversight. NAIC's model code makes clear that an insurer is guilty of unfair discrimination when it makes underwriting and rating distinctions "between individuals or risks of the same class and of essentially the same hazard" or when underwriting and rating decisions are not supported by "the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience." Unfair Trade Practices Act § 4(G)(3) (Model Regulation Service, July 2008).

37.     Insurers therefore must take into account actuarially significant risk factors in making underwriting decisions and setting rates. These principles are consistently applied in state regulations and case law, as well as in model laws.

### A.     State Laws Permitting Consideration Of Actuarial Factors

38.     State laws make clear that insurers are expected to consider actuarially significant risk factors. For example, Illinois law prohibits "any unfair discrimination *between individuals or risks of the same class or of essentially the same hazard and expense element* because of the race, color, religion, or national origin of such insurance risks or applicants." 215 Ill. Comp. Stat. 5/424(3) (emphasis added). Rates may differ on the basis of sex, sexual preference, or marital status if such "classification or differentiation is based upon expected claim costs and expenses *derived by applying sound actuarial principles* to relevant and reasonably current company or intercompany studies, claim costs and expense experience." Ill. Admin. Code tit. 50, § 2603.40 (emphasis added).

39.     Similarly, Wisconsin law states: "One rate is unfairly discriminatory in relation to another in the same class if it clearly fails to reflect equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for

- 14 -

policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4).

40.     West Virginia law specifies that risk-classification standards "may measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses."  W. Va. Code § 33-20-3(c)(2).  Virginia law provides that "[n]o rate shall be unfairly discriminatory if a different rate is charged for the same coverage and the rate differential (i) is based on sound actuarial principles or (ii) is related to actual or reasonably anticipated experience."  Va. Code Ann. § 38.2-1904(A)(3).  Maine law states that "[n]o risk classification may be based upon race, creed, national origin or the religion of the insured," Me. Rev. Stat. Ann. tit. 24-A, § 2303(1)(G), but a risk classification "based upon size, expense, management, individual experience, purpose of insurance, location or dispersion of hazard, or any other reasonable considerations" is not unreasonable or unfairly discriminatory "provided such classifications and modifications apply to all risks under the same or substantially similar circumstances or conditions," id. § 2303(2).  See also Tenn. Code Ann. § 56-5-103(d) ("A rate is not unfairly discriminatory because different premiums result for policyholders with like loss exposures with different expenses, or like expenses but different loss exposures, so long as the rate reflects the differences with reasonable accuracy.").

41.     Many other states' laws are to similar effect.  See Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(a); Del. Code Ann. tit. 18, § 2503(b); Mich. Comp. Laws § 500.2109(1)(C); Cole v. State Farm Ins. Co., 128 P.3d 171, 177 (Alaska 2006) ("Alaska has other statutes that specifically protect insurance customers from discrimination. These statutes forbid "'unfair discrimination between insureds or property having like insuring or risk

characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("SDCL 58-33-26 states in pertinent part: No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. § 241. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc. of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

### B. State Laws Mandating Consideration Of Actuarial Factors

42.     Many states expressly require insurance companies to consider past loss and other actuarially relevant factors in developing insurance rates.  For example, Ind. Code Ann. § 27-1-22-3(a)(1) provides that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state … [and] to all other relevant factors, including trend factors, within and outside this state ….").  Wisconsin law similarly provides:

Due consideration shall be given to all of the following that apply:

(a)     Past and prospective loss and expense experience within and outside of this state.

(b)     Catastrophe hazards and contingencies.

(c)     Trends within and outside of this state.

(d)     Loadings for leveling premium rates over time or for dividends or savings to be allowed or returned by insurers to their policyholders, members or

subscribers.

(e)     Subject to s. 632.365, all other relevant factors, including the judgment of technical personnel.

Wis. Stat. Ann. § 625.12(1).

43.     Numerous other states have similar laws.  *See e.g.*, Ala. Code § 27-13-27(3)–(4) (requiring insurers to "[g]ive consideration to past experience within the state and without the state when necessary…[and to] all factors reasonably related to the kind of insurance involved"); Ariz. Rev. Stat. Ann. § 20-356(2) ("Due consideration shall be given to past and prospective loss experience within and outside this state, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers, to past and prospective expenses within and outside this state and to all other relevant factors within and outside this state."); Ark. Code Ann. § 23-67-209(a) ("Due consideration must be given to past and prospective loss and expense experience within and outside this state .…"); Colo. Rev. Stat. § 10-4-403(1)(c) ("[U]nfair discrimination exists if, after allowing for practical limitations, price differentials fail to reflect equitably the differences in expected losses and expenses.); Del. Code Ann. tit. 18, § 2503(a)(3)(a) ("Due consideration shall be given to past and prospective loss experience within and outside the State"); Ga. Code Ann. § 33-9-4(4) ("Consideration shall be given to the extent applicable to past and prospective loss experience … and to all other factors, including judgment factors, deemed relevant within and outside this state"); Idaho Code § 41-1437(1) ("due consideration shall be given to past and prospective loss experience … and to all other relevant factors"); La. Rev. Stat. Ann. § 22:1454(B)(1) ("Due consideration shall be given to past and prospective loss and expense experience within and outside the state"); Me. Rev. Stat. Ann. tit. 24-A, § 2303(1)(C) ("Due consideration must be given … to past and prospective loss

- 17 -

experience … [and] to all other relevant factors within and outside this State"); Md. Code Ann., Ins. § 11-205(c)(1), (8) (requiring insurers to consider "past and prospective loss experience" and "all … relevant factors within and outside the state"); Mich. Comp. Laws § 500.2110(1) ("In developing and evaluating rates … due consideration shall be given to past and prospective loss experience … to underwriting practice and judgment; and to all other relevant factors within and outside this state."); Minn. Stat. § 70A.05(1) ("Due consideration shall be given to past and prospective loss and expense experience within and outside this state, to a reasonable provision for catastrophe hazards and contingencies, to clearly discernible trends within and outside this state, ... and to all other relevant factors, including the judgment of underwriters and raters."); Miss. Code. Ann. § 83-2-3(2)(a) ("Due consideration shall be given to past and prospective loss and expense experience … and to all other relevant factors, including the judgment of the filer."); Mo. Rev. Stat. § 379.318(1) (requiring insurers to consider "past and prospective loss experience," "conflagration and catastrophe hazards," "past and prospective expenses," "a reasonable margin for underwriting profit and contingencies," and "all other relevant factors, including trend factors"); Ohio Rev. Code Ann. § 3935.03(C) ("Consideration shall be given to: (1) Past and prospective loss experience within and outside this state; … (6) All other relevant factors within and outside this state"); Or. Rev. Stat. § 737.310 ("(3) Rates for each classification of coverage shall be based on the claims experience of insurers within Oregon on that classification of coverage unless that experience provides an insufficient base for actuarially sound rates.…"). *See also* Mont. Code Ann. § 33-16-201(2)(a); Neb. Rev. Stat. § 44-7502; Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(a); N.J. Stat. Ann. §§ 17:29A-4(c), -11; N.M. Stat. Ann. § 59A-17-7; N.Y. Ins. Law § 2304(a); N.C. Gen. Stat. § 58-40-25(1); N.D. Cent. Code § 26.1-25-03(1); Okla. Stat. tit. 36, § 985; R.I. Gen. Laws § 27-44-5(e)(1); S.D. Codified

- 18 -

Laws § 58-24-6.1; Tenn. Code Ann. § 56-5- 104; Tex. Ins. Code Ann. § 2251.052; Utah Code

Ann. § 31A-19a-201; Wash. Rev. Code § 48.19.030.

### C. State Filed Rate Requirements

44. In many states, proposed rates must be filed with state regulators for review and

approval. *See, e.g.*, Ala. Code § 27-13-30; Alaska Stat. § 21.39.040(a), (c); Ark. Code Ann.

§ 23-67-211(a); Cal. Ins. Code § 1861.05(b), (c); Colo. Rev. Stat. §§ 10-4-404, 10-4-406; Del.

Code Ann. tit. 18, § 2504; Haw. Rev. Stat. § 431:14-104(a); Ky. Rev. Stat. Ann. § 304.13-051;

La. Rev. Stat. Ann. § 22:1451(B); Neb. Rev. Stat. § 44-7508; N.J. Stat. Ann. § 17:29A-6, -7;

N.D. Cent. Code § 26.1-25-04; Ohio Rev. Code Ann. § 3935.04; Wash. Rev. Code §

48.19.060.

### D. State Administrative Mechanisms For Reviewing Rates

45. In addition, many state regulatory regimes provide systems of administrative

redress to review allegedly improper rates. For example, Indiana law provides for rate review by

the insurance commissioner:

> (a) Upon the commissioner's motion, or upon written request by
> any insured affected thereby or by any licensed insurance
> producer or broker, if such request is made in good faith and states
> reasonable grounds, the commissioner, if the commissioner shall
> have reason to believe that any filing is not in compliance with
> the applicable provisions of section 3 of this chapter, or in the
> case of an alleged violation of section 6 of the chapter if the
> commissioner finds on the basis of the information on file with
> the department that there has been a prima facie showing of a
> violation of that section, shall hold a hearing upon not less than
> ten (10) days written notice to the rating organization or insurer
> which made the filing in issue, specifying the items and matters
> to be considered and stating in what manner and to what extent
> noncompliance is alleged to exist.

> *            *            *

- 19 -

> (b) If, after such hearing, the commissioner finds, based upon a preponderance of the evidence adduced at such hearing and made a part of the record thereof, that such filing is not in compliance with the provisions of section 3 of this chapter, the commissioner shall immediately issue a written order to the parties specifying in detail in what respects and upon what evidence such noncompliance exists and stating when, within a reasonable period thereafter, such filing shall be deemed no longer effective.

Ind. Code Ann. § 27-1-22-5(a)–(b).

46. Other states similarly permit review of insurance rates. *See* Ala. Code § 27-13-30 ("Whenever the commissioner shall find that rating systems theretofore approved by him, or which pursuant to Section 27-13-37 are effective without approval, provide for, result in or produce rates which are unreasonable or inadequate or which discriminate unfairly between risks in this state involving essentially the same hazards, he shall issue an order … directing that such rating systems be altered or revised …."); Alaska Stat. § 21.39.050(c); Ariz. Rev. Stat. Ann. § 20-358 (B) (includes a provision allowing "any person or organization aggrieved with respect to any filing or rating system which is in effect" to "make written application to the director" which may, after a hearing, result in disapproval of the rate); Del. Code Ann. tit. 18, § 2520 (permitting an appeal of filings by any aggrieved person or organization); Fla. Stat. § 627.0645(7); Ga. Code Ann. § 33-9-26; Haw. Rev. Stat. § 431:14-106(c), (e); Idaho Code § 41-1427; 215 Ill. Comp. Stat. 5/132.3; Iowa Code § 507.2; Md. Code Ann., Ins*.* § 11-208(d)-(e); Me. Rev. Stat. Ann. tit. 24-A, § 2306; Mich. Comp. Laws § 500.2416 (within thirty days); Minn. Stat. § 70A.11; Miss. Code. Ann. § 83-2-11; Mo. Ann. Stat. § 379.348; Mont. Code Ann. § 33-16-204; Neb. Rev. Stat. § 44-7508(13-15); N.H. Rev. Stat. Ann. §§ 412:19, 412:38; N.M. Stat. Ann. §§ 59A-17-13(B), 59A-17-30, 59A-17-33; N.Y. Ins. Law §§ 2319, 2320; N.C. Gen. Stat. § 58-40-100; N.D.

- 20 -

Cent. Code § 26.1-25-09; Ohio Rev. Code Ann. § 3937.04; Okla. Stat. tit. 36, §§ 989(B)–

990; Or. Rev. Stat. §§ 737.215, 737.225(3), 737.235, 737.340; R.I. Gen. Laws  § 27-44-14;

S.C. Code Ann. § 38-73-1030; S.D. Codified Laws § 58-24-29; Tenn. Code Ann. §§ 56-5-

109, 56-5-115; Tex. Ins. Code Ann. §§ 2251.105, 2251.1031, 2252.052; Utah Code Ann. §§

31A-19a-217, 31A-19a-218; Va. Code Ann. § 38.2-1909 ("The Commission may investigate

and determine, … whether rates in this Commonwealth for the classes of insurance to which

this chapter applies are excessive, inadequate or unfairly discriminatory or whether loss

experience and other factors within the Commonwealth are being properly used to determine

the rates."); Vt. Stat. Ann. tit. 8, §§ 4700, 4704; Wash. Rev. Code § 48.19.310; W. Va. Code

§ 33-20-9; Wyo. Stat. Ann. § 26-14-106(d)-(g).

> E.     **Laws Prohibiting Collection Of Data On Race and Other Protected**
>
> **Characteristics**

47.     In addition to other regulations concerning the provision of insurance, at least one

state prohibits the collection of information about protected characteristics.  *See* Md. Code Ann.,

Ins. § 27-501.

## III.     THE MCCARRAN-FERGUSON ACT

48.     Historically, insurance was largely immune from federal regulation because the

business of insurance was not considered "commerce" that could be regulated by Congress.

*See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868).  As a result, the states enjoyed a virtually

exclusive domain over the insurance industry, which is today one of the most heavily regulated

businesses in the country.  In 1944, the Supreme Court determined in *United States v. South-*

*Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state

lines was interstate commerce that Congress could regulate.  Congress responded in 1945 by

enacting the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, which ensured that the

Supreme Court's decision in *South-Eastern Underwriters* did not undermine state regulation of insurance. The extensive state regulation of the business of insurance discussed above is a result of this long history of exclusive state control of this area.

49. Section 1 of the McCarran-Ferguson Act, 15 U.S.C. § 1011, provides: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

50. Subsection 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." The Supreme Court has recognized that the McCarran-Ferguson Act "is, in effect, a clear-statement rule." *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993). Federal law cannot invalidate, impair, or supersede state regulation of insurance unless Congress states its intention to do so clearly and expressly.

51. Under the McCarran-Ferguson Act, federal law is reverse-preempted if it "directly conflict[s] with state regulation" or when "application of the federal law would . . . frustrate any declared state policy or interfere with a State's administrative regime." *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 563 (7th Cir. 1999) ("Direct conflict with state law is not required to trigger this prohibition; it is enough if the interpretation would 'interfere with a State's administrative regime.'").

52. The Act applies where federal law would impose liability for conduct permitted

by state law. *See, e.g., Ojo v. Farmers Gr.*, 356 S.W.3d 421, 434-35 (Tex. 2011) (disparate-impact challenge to use of credit scores reverse-preempted under McCarran-Ferguson Act because Texas's insurance law permits the use of credit scoring, despite any disparate impact that the use of credit scoring will produce, so long as the factors used in credit scoring are not themselves based on race); *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 968 (8th Cir. 2008) (disparate-impact claims under the Fair Housing Act impaired state law, which did not permit private cause of action for alleged discrimination by an insurer); *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 519 (6th Cir. 2010) ("We conclude that application of federal RICO in this case would impair Ohio's insurance regulatory scheme. The conduct at the heart of Plaintiffs' complaint implicates Ohio's law regarding payment of claims and the Ohio Department of Insurance is charged with administering the applicable state law. In this case, Plaintiffs have no common law remedy or private right of action. The state RICO statute is inapplicable and the damages available pursuant to federal RICO would far exceed the damages contemplated by the Ohio legislature when enacting its insurance regulatory scheme.").

53. The Seventh Circuit concluded in *NAACP v. American Family Insurance Co.* that the McCarran-Ferguson Act applies to the Fair Housing Act. *See* 978 F.2d at 293-95. Although the Court concluded that the McCarran-Ferguson Act does not reverse-preempt disparate *treatment* claims under the Fair Housing Act, the Court's analysis suggested that the outcome would be different for disparate-impact claims given "the nature of insurance" and its reliance on risk differentiation. *See id.* at 290 (describing problem of "adverse selection"); *id.* ("assum[ing] that the plaintiffs can establish disparate treatment and not just disparate impact of decisions made on actuarial grounds"); *id.* at 291 ("All we decide is whether the complaint states claims on which the plaintiffs may prevail if they establish that the insurer has drawn lines according to

race rather than actuarial calculations."); *id.* at 298 (noting difficulty applying "disparate impact paradigm" to insurance).

## IV.     THE FAIR HOUSING ACT

54.     Enacted as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Fair Housing Act ("FHA"), as amended, makes it unlawful, among other things, "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b); *see also id.* § 3604(f)(2) (prohibiting discrimination because of "handicap").

55.     The FHA does not reference homeowners insurance in any context.  Congress was silent on the subject of homeowners insurance in the FHA.

## V.     THE DISPARATE IMPACT RULE

### A.     HUD's Proposed Rule

56.     On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011).  In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  *Id.* at 70,921.  HUD asserted that the purpose of the proposed rule was "to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act."  *Id.*

57.     In the notice of proposed rulemaking, HUD cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  76 Fed. Reg. at 70,924.  The notice of proposed rulemaking did not reference the McCarran-

Ferguson Act, much less discuss how application of disparate-impact liability could possibly be reconciled with the historic consideration of actuarially significant risk-based factors in the pricing and underwriting of insurance.

### B. Comments From The Insurance Industry

58.      In response to HUD's unsupported assertion that its new Disparate Impact Rule would apply to the provision of homeowners insurance, the insurance industry submitted detailed comments explaining why doing so would be unlawful and ill-advised, including comments from PCI and two other insurance trade associations, the National Association of Mutual Insurance Companies ("NAMIC"), and the American Insurance Association ("AIA").  *See* Comments of the Property Casualty Insurers Ass'n of America, Docket No. FR-5508-P-01 (Jan. 17, 2012) ("PCI Comments"); Comments of the National Association of Mutual Insurance Companies, Docket No. FR-5508-P-01 (Jan. 17, 2012) ("NAMIC Comments"); Comments of the American Insurance Association, Docket No. FR-5508-P-01 (Jan. 17, 2011) ("AIA Comments").  The insurance industry commenters explained that application of disparate-impact liability to homeowners insurance is fundamentally inconsistent with consideration of actuarially sound risk-based factors and would violate the McCarran-Ferguson Act.  For example, PCI's Comments noted that "[e]very state has extensive laws and regulations governing insurance underwriting practices and those laws naturally recognize the need for insurers to distinguish between different types and degrees of risk.  Indeed, risk discrimination is the foundation of insurance underwriting and every state has considered at length the appropriate regulatory balance to prohibit unfair discrimination."  PCI Comments at 2.  Thus, imposing liability on insurers for their core practice of risk discrimination would be inappropriate and would impair state regulation of the insurance industry.  *See id.*  NAMIC's Comments further stated: "The foundation of the business of insurance, and in particular underwriting and rate-making, is

classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly. Race or other protected class characteristics are not part of the risk assessment process." NAMIC Comments at 5. They further noted (at p. 5):

> To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly. This practice is the very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material(s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system.

59.     NAMIC added that the use of factors to calculate risk would be limited by the application of disparate-impact liability because any factor could affect protected groups differently:

> Under HUD's proposed rule, . . . common underwriting factors could be jeopardized, even though they do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected. To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

NAMIC Comments at 5-6.

60.     The commenters also explained that eliminating risk-based pricing would have significant negative consequences: "adverse selection will increase, and coverage availability

will suffer.  Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect."  NAMIC Comments at 7.

61.     The insurance industry further commented that because state laws expressly contemplate consideration of actuarially significant risk factors, the application of disparate-impact liability would violate the McCarran-Ferguson Act.  The comments noted that "[c]lassifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance."  NAMIC Comments at 6; *see also* PCI Comments at 2.  As a matter of state insurance law, the term "[u]nfair discrimination" has a "specific meaning": "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer [in the insurance context]."  *Id.* (quoting Principal 4 of Casualty Actuarial Society's Statement of Ratemaking Principles).  The comments noted that courts have already held that the application of disparate-impact liability to insurers under the FHA would conflict with the laws of states such as Texas, Missouri, Nebraska, and Mississippi.  *Id.* at 8-9.

62.     In light of the inherent conflict between disparate-impact liability and actuarial risk based pricing and underwriting, the insurance comments requested that HUD exempt insurance underwriting and pricing from the Disparate Impact Rule.  *See* PCI Comments at 3; NAMIC Comments at 9.  In the alternative, commenters requested that HUD provide regulatory safe harbors for long-recognized actuarial risk factors, such as age and condition of a property or distance from a fire station.  *See* NAMIC Comments at 9.  Comments also requested that HUD exempt Fair Access to Insurance Requirements (FAIR) plans, which provide insurance to high-risk individuals who might otherwise be denied coverage.  *See id.*

63. Finally, the insurance comments explained that HUD's "three-step burden-shifting" approach for resolving disparate-impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), in numerous respects relevant to the insurance industry. At the first step of the process, HUD improperly omitted the requirement that any disparate impact be "significant." At the second step, HUD improperly shifted the burden of proof to the defendant and required a defendant to show that the challenged practice is "necessary" to serve a legitimate interest. And at the third step, HUD erred by omitting the requirement that any proffered alternative practice be "equally as effective" as the challenged practice at serving the defendant's legitimate business interests. *See* NAMIC Comments at 10-11; AIA Comments at 4.

### C. The 2013 Rule

64. On February 15, 2013, HUD promulgated the 2013 Rule, which, as noted above, was ultimately reinstated by the 2023 Reinstated Rule. The 2013 Rule purports to "formalize[]" HUD's view that the FHA's prohibition on discrimination may be violated by practices that have a discriminatory effect in the absence of a discriminatory intent. 78 Fed. Reg. at 11,460.

65. The 2013 Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* at 11,482. It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.*, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.*

66.     Under the 2013 Rule, the plaintiff or charging party has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* If the plaintiff or charging party meets that burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.*  If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.*

67.     HUD rejected a "significance requirement" for disparate-impact liability. *Id.* at 11,468.  HUD also declined to require that an alternative "practice that has a less discriminatory effect" be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. *Id.* at 11,473.  Accordingly, disparate-impact defendants may be liable under the HUD Rule for failing to adopt an alternative practice even when that practice is not as effective at serving their substantial, legitimate, nondiscriminatory interests.

68.     Nor did HUD offer any meaningful response to comments noting that the proposed burden-shifting rules are at odds with settled law.  Most notably, HUD never explained how the burden-shifting standards set for the Disparate Impact Rule can be reconciled with the Supreme Court's decision in *Wards Cove Packaging Co. v. Antonio*, 490 U.S. 642 (1989), or can sensibly be applied to the business of insurance.  HUD's failure to apply settled law on the burden of proof and the process for adjudicating a disparate impact claim deprives insurers of a viable opportunity to demonstrate even on case-by-case basis that risk-based underwriting and pricing is justified by legitimate, non-discriminatory business purposes.

## VI.    PCI'S CHALLENGE TO APPLICATION OF THE DISPARATE IMPACT RULE TO THE PRICING OF HOMEOWNERS INSURANCE

69.    On November 27, 2013, PCI filed its original complaint, challenging the application of HUD's Disparate Impact Rule to the pricing of homeowners insurance as arbitrary and capricious and otherwise contrary to law.  The parties cross-moved for summary judgment, and HUD also moved to dismiss for lack of jurisdiction, arguing that PCI lacked standing and that its claims were unripe.

70.    In its September 3, 2014 decision, the Court granted summary judgment for PCI on its claims that HUD failed to adequately address several of the insurance industry's comments submitted during rulemaking. *See Donovan*, 66 F. Supp. 3d at 1048-51.  The Court reasoned that HUD's one-paragraph response to the insurance industry's detailed comments failed to provide a reasoned explanation for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking. *Id.* at 1048.  The Court criticized HUD for making "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether entire categories of disparate-impact claims against insurers would be barred. *Id.* The Court reached the same conclusion with respect to HUD's response to comments regarding the operation of the filed-rate doctrine.  The Court explained that HUD must, on remand, provide a reasoned explanation for preferring case-by-case adjudication over rule-making, which would involve determining whether the benefits of proceeding through case-by-case adjudications outweighed the benefits of including an exemption or safe harbors for insurers. *Id.* at 1048-49.  The Court found arbitrary and capricious HUD's suggestion that insurers might defend their policies on a case-by-case basis as part of the burden-shifting framework of the Rule. *Id.* at 1051.

71.    The court also concluded that HUD had acted in an arbitrary and capricious manner by failing to address the substance of the homeowners insurance industry's arguments

that the Rule would prevent the use of actuarially sound underwriting and risk assessment factors and thereby undermine the fundamental nature of the insurance business itself.  The Court explained that "HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious.  HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework.  The ability of insurers to raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

72.     The Court dismissed without prejudice as unripe PCI's claim that the Rule violates the McCarran-Ferguson Act.  *Id.* at 1040-42.  The Court granted summary judgment in HUD's favor on PCI's claim that the Rule violates the requirements for disparate-impact liability established in *Wards Cove Packaging Co. v. Atonio*, 490 U.S. 642 (1989).  The Court held that the burden-shifting framework HUD adopted embodied a reasonable interpretation of the FHA, warranting deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  *See Donovan*, 66 F. Supp. 3d at 1052-53.

73.     The Court remanded the case to HUD for further proceedings.

## VII.     POST-REMAND PROCEEDINGS

### A.     PCI's Submission of Supplemental Comments

74.     Shortly after remand, PCI requested that HUD reopen the comment period.  *See* PCI Letter to HUD (Sept. 25, 2014).

75.     PCI next submitted to HUD a comment addressing the issues identified in the Court's order.  *See* PCI Letter to HUD (Jan. 26, 2015).  The comment repeated PCI's request for

an exemption for homeowners insurers because the Rule's application "would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers." *Id.* at 1.

76.　　PCI particularly emphasized that calculating the risk of loss is fundamental to the business of insurance, *id.* at 2, 16–17, and that because the "vast majority of states" require insurers to set rates based on "neutral actuarial factors," the Disparate Impact Rule would violate the McCarran-Ferguson Act and "interfere with insurers' compliance with state law," *id.* at 8–9; *see also id.* at Table 1 (showing statutes requiring risk-based pricing, organized by state).

77.　　Likewise, forty-seven states have expressly permitted insurers to group insureds based on risk, and the Disparate Impact Rule interferes with that express permission. *Id.* at 9–10; *see also id.* at Table 1.

78.　　PCI also pointed out the flaws in HUD's assertion that state fair housing laws permit disparate-impact claims against insurers: namely, unless such state fair housing laws specifically displace insurance laws that require or expressly permit risk-based pricing and underwriting practices, the insurance laws remain valid and are shielded by the McCarran-Ferguson Act. *Id.* at 10–11.

79.　　The comment noted that forty-seven states and the District of Columbia "require insurers to file their rates with state insurance commissioners for review and approval." *Id.* at 12; *see also id.* at Table 1. The Disparate Impact Rule would therefore violate the McCarran-Ferguson Act by "substituting the judgment of a federal court for that of state regulators." *Id.* at 12–13. Similarly, the comment added that the Disparate Impact Rule would violate the filed-rate doctrine because it would allow "private lawsuits and government enforcement actions that

question the permissibility of a filed rate." *Id.* at 13.

80. Finally, PCI explained that to the extent HUD intends to apply the Disparate

Impact Rule beyond the "provision and pricing of homeowners insurance" identified in the plain

text of the Rule, this would also be prohibited by the McCarran Ferguson Act. *Id.* at 15–16.

Homeowners insurance practices other than the provision and pricing of homeowners insurance

"do not have a substantial enough effect on homeownership" to constitute discriminatory

practices under the Fair Housing Act. *Id.* at 15 (citing 42 U.S.C. § 3604; *NAACP v. Am. Family*

*Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992) (Easterbrook, J.)). And because states regulate

such practices, subjecting the practices to the Disparate Impact Rule would violate the

McCarran-Ferguson Act. *Id.* at 16.

### B. The Supreme Court's Decision in *Inclusive Communities*

81. While this matter was before HUD on remand, the Supreme Court affirmed the

validity of disparate-impact liability under the FHA, but significantly narrowed its scope. *Tex.*

*Dep't of Housing and Cmty. Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507

(2015).

82. The Supreme Court observed that at the "heartland of disparate-impact liability"

lie suits against practices "that function unfairly to exclude minorities from certain

neighborhoods without sufficient justification." *Id.* at 2521–22. As such, it cautioned that the

"FHA is not an instrument to force housing authorities to reorder their priorities." *Id.* at 2522.

The Court explained that "[d]isparate-impact liability mandates the removal of artificial,

arbitrary, and unnecessary barriers, not the displacement of valid governmental policies." *Id.*

(internal quotation marks omitted). The Court noted that the "specter of disparate-impact

litigation" could discourage businesses from undertaking the very activities that ensure a well-

functioning housing market, which would undermine its very purpose as well as the free-market.

*Id.* at 2524.  To that end, the Court emphasized the importance of limiting the scope of possible disparate-impact liability "so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system."  *Id.* at 2518.  The Court identified several other key limitations:

83.     First, the Court concluded that the disparate-impact doctrine has been, and should continue to be, limited to avoid the serious constitutional questions that might arise under the FHA if "liability were imposed based solely on a showing of statistical disparity."  *Id.* at 2522.  Rather, plaintiffs must satisfy a "robust causality requirement" that "ensures that '[r]acial imbalance . . . does not , without more establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create."  *Id*. at 2523 (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 653 (1989)).  Plaintiffs must "point to a defendant's policy or policies causing th[e] disparity" so that defendants are not "held liable for racial disparities they did not create."  *Id.*.  Thus, showing "racial imbalance . . . without more" does not support a disparate-impact claim.  *Id.*

84.     Second, the Court emphasized that only policies that are "artificial, arbitrary, and unnecessary" should give rise to disparate-impact liability.  *Id.* at 2524.  The Court encouraged giving defendants "leeway to state and explain the valid interest served by their policies" and entrepreneurs the "latitude to consider market factors."  *Id.* at 2252–53.  This would avoid putting defendants "in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing in suburban communities."  *Id.* at 2253.  The Court instructed that plaintiffs should not be allowed to "second-guess which of two reasonable approaches" a defendant should follow.  *Id.* at 2522.

85.     Finally, in cabining FHA disparate-impact claims, the Court stressed the

importance of encouraging administrative efficiency while discouraging the consideration of race. The Court held that "adequate safeguards at the prima facie stage" are critical to avoid the use of race "in a pervasive way," such as the use of numerical quotas, which would raise serious constitutional questions. *Id.* at 2523; *see also id.* at 2524 (warning against interpreting disparate-impact liability to be "so expansive as to inject racial considerations into every housing decision," which would perversely tend to "perpetuate race-based considerations rather than move beyond them"). The Court also noted that "prompt resolution" of disparate-impact cases is important, *id.* at 2523, as is avoiding "onerous costs on actors who make housing available." *Id.* (internal quotation marks omitted).

### C.  PCI's Post-*Inclusive Communities* Submission of Supplemental Comments

86.    In the wake of the Supreme Court's *Inclusive Communities* decision, PCI submitted an additional supplemental comment to HUD, requesting an exemption to the Disparate Impact Rule for homeowners insurers in accordance with *Inclusive Communities*. *See* PCI Letter to HUD (July 29, 2015).

87.    PCI advised HUD that the Supreme Court's requirement of a "robust causality requirement" to state a disparate-impact claim precluded suits against homeowners insurers. *See id.* at 2. Because homeowners insurers are regulated by a "panoply" of state laws, their discretion is "substantially limit[ed]" and thus does not cause any disparate impacts. *Id.* PCI also noted that homeowners insurers exemplify the potential defendants that the Court had in mind when it required defendants to have "leeway to state and explain the valid interest served by their policy" and "latitude to consider market forces." *Id.* PCI explained that homeowners insurance markets, "with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability." *Id.*

88.     PCI also reiterated its prior comments explaining that application of the Rule would disrupt the homeowners insurance industry and interfere with the provision of such insurance.  To avoid liability for disparate impacts, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process.  This would cause adverse selection, "motivating lower risk customers to forego insurance altogether threatening insurers' viability, thus decreasing competition and the availability of insurance coverage."  *Id.* at 4.

89.     Finally, PCI noted that application of the Rule would impose needless costs on homeowners insurers.  *Id.*

**D.     HUD's Supplemental Explanation**

90.     On October 5, 2016—nearly two years after the Court's remand order and more than a year after the Supreme Court's decision in *Inclusive Communities*—HUD published the Supplemental Explanation, titled, "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance."  81 Fed. Reg. 69,012 (Oct. 5, 2016).  HUD styled this document as an attempt "to supplement its responses to certain insurance industry comments to HUD's proposed rule."  *Id.* at 69,012.

91.     Despite conceding that "risk-based decision making is an important aspect of sound insurance practice," *id.* at 69,015, HUD refused to amend the Rule, concluding there should be no "categorical exemptions or safe harbors for insurance practices" and that "concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis," *id.* at 60,912.

92.     Like HUD's responses to comments from the insurance industry during the initial rulemaking, the Supplemental Explanation does not meaningfully address comments regarding the application of the disparate-impact standard to the risk-based pricing of homeowners insurance.  The Explanation is arbitrary and capricious in numerous respects:

93. First, HUD fails entirely to examine the impact of the Supreme Court's decision in *Inclusive Communities* on the continuing validity of the application of the Disparate Impact Rule to the risk-based pricing of homeowners insurance. The Supplemental Explanation makes no mention of the broad limitations on FHA disparate-impact liability recognized by the Supreme Court. Indeed, it only cites *Inclusive Communities* in a few footnotes.

94. Second, nowhere in the Supplemental Explanation does HUD respond to this Court's observation that HUD had previously "made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Donovan*, 66 F. Supp. 3d at 1048. Rather, HUD claims that it was "impossible . . . to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application." 81 Fed. Reg. at 69,014. Thus, HUD ignores the Court's instructions on remand to determine whether there are any business practices for which disparate-impact challenges are wholly barred by McCarran-Ferguson preclusion, acknowledging instead that "[s]ome discriminatory effects claims against insurers will survive a McCarran-Ferguson defense depending on a host of case-specific variables." *Id.* at 69,015.

95. Moreover, HUD speculates that creating exemptions or safe harbors would "be at odds with the purpose of [the] McCarran-Ferguson [Act]." 81 Fed. Reg. 69,016. HUD reasons that such exemptions would "deprive all states of federal support in addressing discriminatory insurance practices—even those states that welcome or depend on such support." *Id.* HUD, however, cites no authority to show that a purpose of the McCarran-Ferguson Act is to provide states with federal support for their various anti-discrimination laws that might affect insurers. In fact, the Disparate Impact Rule could easily conflict with state insurance laws that prohibit

discrimination in the provision or pricing of insurance or that require insurers to rely on neutral, actuarial factors.

96.     Third, HUD provides an inadequate response to industry comments about how the filed-rate doctrine is inconsistent with disparate-impact challenges to state insurance laws.  HUD claims that "applying the filed rate doctrine to prioritize *state* ratemaking over a federal statute would seem to stand the Supremacy Clause on its head."  *Id.* at 69,018 (internal quotation marks omitted).  In support, HUD cites *Saunders v. Farmers Ins. Exch. (Saunders I)*, 440 F.3d 940 (8th Cir. 2006).  HUD fails to acknowledge, however, that in subsequent proceedings, the *Saunders* court in fact found that Missouri's filed-rate doctrine barred a disparate-impact claim under the FHA.  And HUD overlooks a number of decisions that have found no Supremacy Clause problems in holding that the filed-rate doctrine bars federal challenges to state rate statutes*. See, e.g., Taffet v. S. Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992); *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1296 (D.S.C. 1992); *see also Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994).

97.     Fourth, much of the Supplemental Explanation only addresses insurance practices in general, rather than explaining why HUD could not create an exemption for the risk-based pricing of homeowners insurance.  For example, HUD declines to issue "a broad exemption for all insurance practices or all underwriting decisions . . . because doing so would immunize a host of potentially discriminatory insurance practices that *do not* involve actuarial or risk-based calculations."  81 Fed. Reg. at 69,017 (emphasis added).  Even if true, this statement does not explain why HUD declined to exempt pricing practices that are demonstrably actuarial or risk-based.  The Rule's burden-shifting framework not only targets non-actuarial factors, but also

allows plaintiffs to force homeowners insurers to replace purely risk-based practices—which HUD concedes are legitimate—with "alternatives" that may not be as economically effective.

98.     Fifth, when HUD does attempt to narrow its analysis to risk-based homeowners insurance practices, its responses are internally inconsistent and fail to address the commenters' precise concerns.  HUD insists, for example, that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.* at 69,015.  But in the very next sentence, HUD states that "practices that an insurer can prove are risk-based, *and for which no less discriminatory alternative exists*, will not give rise to discriminatory effects liability." *Id.* (emphasis added).  This reaffirms that the Rule *will* prohibit homeowners insurers from making risk-based decisions whenever a plaintiff can force them to adopt an alternative practice.  HUD fails to acknowledge that its burden-shifting approach would undermine the very risk-based pricing practices it agrees are legitimate.

99.     Similarly, the Supplemental Explanation ignores comments explaining that insurers would have to curtail or even abandon risk-based pricing in order to prevent statistical disparities in homeowners insurance rates across protected groups.  *See* NAMIC Comments at 6 ("To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process.  *In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk.*  This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis." (emphasis added)).

100.     Finally, the Supplemental Explanation inadequately addresses the ample comments concerning the burdens homeowners insurers would face if forced into case-by-case

adjudication for every risk-based pricing practice allegedly linked to a disparate impact. Commenters contended that such adjudication would be costly, particularly given the burdens associated with collecting racial data. HUD's only response is that "the arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. This ignores the fact that the Rule's burden-shifting framework would require homeowners insurers not only to defend the legitimacy of their practices, but also to demonstrate that no less discriminatory alternative for those practices exists.

101.    HUD did not consider that case-by-case adjudication could proceed in multiple forums and that collecting the necessary data would expose insurers to liability under state antidiscrimination statutes. Although HUD recognizes the "variation in state insurance laws" across jurisdictions and time, it merely used this fact as a justification for not granting an exemption for specific insurance practices. 81 Fed. Reg. at 69,016.

102.    Rather, HUD defends its decision not to create an exception for homeowners insurance by concluding that "discriminatory effects liability has proven workable in other contexts involving risk-based decisions . . . without the need for exemptions or safe harbors." *Id.* But HUD identifies no support for the one example it cites: that of disparate-impact claims against mortgage lenders. *See id.* HUD relies on a 1994 "Policy Statement on Discrimination in Lending," which merely announced HUD's decision to apply disparate-impact liability to risk-based lending practices. *See* 59 Fed. Reg. 18,266 (Apr. 15, 1994). It said nothing of the decision's ultimate effect on homeowners or the mortgage lending industry. Next, HUD points to a document providing standard procedures for financial regulatory agencies to follow when

reviewing whether lenders engage in discriminatory practices.  *See* OFFICE OF THE COMPTROLLER

OF THE CURRENCY ET AL., INTERAGENCY FAIR LENDING EXAMINATION PROCEDURES (2009).  This

guide presents no information about the "workability" of disparate-impact liability in the

mortgage lending context.  Finally, the Explanation quotes a HUD official's assertion that in

order to investigate discrimination in insurance practices, the agency will use the same

techniques that it has used in other contexts.  *See Homeowners' Insurance Discrimination:*

*Hearings Before the S. Comm. on Banking, Housing & Urban Affairs*, 103d Cong. (1994), at 20.

Like the other sources HUD cites, this document does not support the assertion that applying

disparate-impact liability to risk-based pricing has proven "workable" for consumers, industries,

or regulators.

### E.     HUD's 2020 Rule

103.     Following HUD's publication of the Supplemental Explanation, this case

remained stayed for several years as HUD engaged in a new rulemaking process.  HUD

published an advance notice of proposed rulemaking on June 20, 2018, inviting public comment

on possible amendments to the 2013 Rule.  83 Fed. Reg. 28,560 (June 20, 2018).  On August 19,

2019, HUD proposed a new rule amending the 2013 Rule.  84 Fed. Reg. 42,854 (Aug. 19, 2019).

104.     On September 24, 2020, HUD promulgated the 2020 Rule, a new final rule that

amended the 2013 Rule.  Before the 2020 Rule could go into effect, however, it was enjoined by

another court.  *See Massachusetts Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F.

Supp. 3d 600 (D. Mass. 2020).  The 2013 Rule therefore remained in effect.

### F.     HUD's 2023 Reinstated Rule

105.     On June 25, 2021, HUD released a notice of proposed rulemaking stating that

HUD intended to reinstate the 2013 Rule.  86 Fed. Reg. 33,590 (June 25, 2021).

106.     On August 24, 2021, PCI submitted a comment in response to HUD's June 25,

2021 Notice of Proposed Rulemaking. PCI's comment reiterated the objections previously raised by the insurance industry and argued that the 2013 Rule could not be reconciled with *Inclusive Communities*.

107. On August 29, 2022, PCI submitted to HUD a supplemental comment addressing the Supreme Court's recent decision in *West Virginia et al. v. Environmental Protection Agency*, 142 S. Ct. 2587 (2022).

108. On March 31, 2023, HUD promulgated the 2023 Reinstated Rule, a new final rule that reinstated the 2013 Rule. In publishing the 2023 Reinstated Rule, HUD wrote, "After considering public comments, HUD in this final rule reinstates and maintains the 2013 rule and rescinds the 2020 rule." 88 Fed. Reg. at 19,450. The 2023 Reinstated Rule provides additional explanation and incorporates the Supplemental Explanation, stating that "HUD has reviewed the 2016 Supplemental Responses and believes the responses made there continue to accurately reflect HUD's interpretation of discriminatory effects law." *Id.* at 19,463 n.113.

109. The 2023 Reinstated Rule went into effect on May 1, 2023.

## VIII. THE DISPARATE IMPACT RULE IS INCONSISTENT WITH THE LIMITATIONS ON DISPARATE-IMPACT LIABILITY UNDER THE FAIR HOUSING ACT RECOGNIZED IN *INCLUSIVE COMMUNITIES*

110. The Rule is inconsistent with the limitations on disparate-impact liability recognized in *Inclusive Communities*.

111. First, the reasoning in HUD's Supplemental Explanation confirms that the Rule will be applied to a variety of risk-based practices, which will discourage businesses from undertaking the very activities that ensure a well-functioning housing market.

112. Second, the Supplemental Explanation confirms that in order to comply with the Rule and avoid costly case-by-case adjudication, homeowners insurers must collect racial data, often in violation of state law, to defend against disparate-impact claims.

113.     This ignores the limitation on disparate-impact liability to avoid the "serious constitutional questions" that will arise when race is "used and considered in a pervasive way and . . . inexorably lead governmental or private entities to use numerical quotas." *Inclusive Communities.*, 135 S. Ct. at 2523 (internal quotation marks omitted).  Nor is it consistent with the Court's determination that disparate-impact liability should not be "so expansive as to inject racial considerations into every housing decision," which would perversely tend to "perpetuate race-based considerations rather than move beyond them." *Id.* at 2524.  Moreover, this burdensome requirement conflicts with the Supreme Court's admonition against "impos[ing] onerous costs" on providers of housing and for "prompt resolution" of disparate-impact cases. *Id.* 2523.

114.     Third, under the burden-shifting test, a plaintiff may state a prima facie claim of disparate impact by identifying a statistical disparity or by challenging a homeowners insurer's entire decision-making process as creating a disparate impact.  Indeed, the Rule provides that a plaintiff need only show that the challenged practice "caused or predictably will cause" a disparate impact.

115.     This runs afoul of the Supreme Court's construction of disparate-impact liability under the Fair Housing Act in *Inclusive Communities*.  The Court emphasized that disparate-impact claims may not be premised on the simple existence of a racial disparity and must be subject to "a robust causality requirement." *Id.* at 2522–23.  Plaintiffs must point to a defendant's specific policy or policies causing a disparity to state a prima facie claim.  Thus, HUD's rule permitting plaintiffs to bring claims based on the mere existence of a statistical disparity or a lax causal connection between a defendant's actions and a disparity is contrary to law.

116.    Fourth, the Rule indicates that a defendant cannot defeat a disparate-impact challenge by pointing to a bona fide business justification for an insurance pricing practice. Once a prima facie case is established, the Rule requires the defendant to show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  Accordingly, the defendant's policy might give way to another, less discriminatory alternative.

117.    This exceeds the limitations that the Supreme Court placed on disparate-impact claims in *Inclusive Communities*.  The Court limited liability to policies that were "artificial, arbitrary, and unnecessary."  *Id.* at 2524.  The Court also instructed that housing authorities and private developers should have "leeway to state and explain the valid interest served by their policies" and entrepreneurs the "latitude to consider market factors."  *Id.* at 2252–53.  As the Rule invalidates policies that are not merely "artificial, arbitrary, and unnecessary" and does not give defendants latitude to explain why they support a valid interest, it is contrary to law.

118.    Similarly, under the Administrative Procedure Act, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof."  5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91 (1981).  Because a charge brought by HUD under the FHA may be heard in either an administrative or judicial proceeding, the burden-shifting standards established in the Disparate Impact Rule must satisfy the Administrative Procedure Act requirement that the proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof.

## IX.    PCI AND ITS MEMBERS CONTINUE TO BE INJURED BY THE DISPARATE IMPACT RULE

119.    As the Court previously determined, "PCI's members have suffered an 'injury in fact' because the Disparate Impact Rule increases their exposure to disparate impact liability

under the FHA." *Donovan*, 66 F. Supp. 3d at 1043. Indeed, the Court recognized that the "compliance costs reported by PCI's members alone are sufficient to satisfy the 'injury in fact' requirement of Article III standing." *Id.* at 1044.

120. The Rule, as supplemented, continues directly to regulate PCI's member companies and to rewrite the rules of risk-based pricing and underwriting without any exemptions or safe harbors. The Rule thus continues to generate substantial uncertainty in the industry and requires PCI's member companies to expend substantial resources assessing how the Rule could possibly apply to the business of insurance. Moreover, to even attempt to comply with the Rule, PCI member companies must still spend enormous amounts of money and time (and possibly subject themselves to liability) (a) retrospectively and prospectively collecting data that they do not currently obtain about whether their customers fall within a protected class, (b) analyzing their pricing and underwriting criteria in light of the newly collected data to try to identify factors that could have a disparate impact, and (c) adopting entirely new underwriting and pricing practices. If PCI members are forced to disregard actuarial risk data in favor of protected class data, they will be unable to price insurance as accurately and competitively as they currently do, resulting in lost business, decreased availability of insurance, and potential insolvency.

121. Application of the Rule to risk-based pricing and underwriting by PCI members continues to place those members in an impossible position of either complying with state law regarding the pricing and underwriting of insurance or complying with the Rule. It is not possible, for example, to comply with state laws that require that insurers take into consideration past loss and other actuarially relevant factors in developing insurance rates while simultaneously disregarding any risk factor that happens to correlate with any of the

classifications covered by the Rule.  This compliance exposure would injure PCI members.

122.    In addition, since the final Disparate Impact Rule was promulgated and supplemented, PCI has been required to devote a significant amount of time and resources— separate from time spent relating to this lawsuit—responding to the Rule for the benefit of its members and educating members about possible impacts of the Rule.

## CLAIMS FOR RELIEF

## COUNT I

**(Application of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Did Not Adequately Address The Supreme Court's Decision in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*)**

123.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

124.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

125.    In responding to comments from representatives of the insurance industry, the Supplemental Explanation does not adequately consider the impact of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), on the applicability of disparate-impact liability to risk-based pricing practices in the homeowners insurance context.

126.    HUD's failure to address the impact of this intervening, controlling precedent in the Supplemental Explanation was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## COUNT II

**(Application Of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Did Not Adequately Address The Conflict Between The Rule And The McCarran-Ferguson Act)**

127.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

128.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

129.    Comments submitted to HUD explained that extension of disparate-impact liability to insurance practices would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act.

130.    HUD failed to address this issue in the Disparate Impact Rule.  It did not consider whether its Rule would invalidate, impair, or supersede state laws regulating the business of insurance.  HUD instead asserted that the McCarran-Ferguson Act applies only to courts, not federal agencies.  78 Fed. Reg. at 11,475.  There is no support for this assertion, and HUD cited none.

131.    The Court criticized HUD for not evaluating "how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers."  *Donovan*, 66 F. Supp. 3d at 1048.  Yet HUD does not address this concern in its Supplemental Explanation, claiming that it is "impossible . . . to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application."  81 Fed. Reg. at 69,014.  Instead, the Supplemental Explanation asserts, without citing any support, that creating exemptions or safe harbors for entire categories of claims would "be at odds with the purpose of [the] McCarran-Ferguson [Act]."  *Id.* at 69,016.

132.    HUD was bound to comply with the McCarran-Ferguson Act and was required to consider statutory limits on its authority when issuing the Disparate Impact Rule.

133.    HUD's failure to adequately address whether the Disparate Impact Rule violates the McCarran-Ferguson Act was arbitrary, capricious, and an abuse of discretion, in violation of

5 U.S.C. § 706(2)(A).

## COUNT III

### (Application Of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Failed To Address The "Filed Rate" Doctrine)

134.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

135.     The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

136.     Comments submitted to HUD explained that application of the Disparate Impact Rule to homeowners insurance would violate the "filed rate" doctrine.

137.     HUD acknowledged these comments but failed to address whether application of the rule would violate the "filed rate" doctrine.

138.     The Court instructed HUD to "explain its decision regarding the filed-rate doctrine or institute a new rule." *Donovan*, 66 F. Supp. 3d at 1050.

139.     But HUD's Supplemental Explanation inadequately analyzes how the filed-rate doctrine affects disparate-impact challenges under the FHA to state insurance laws.  The Explanation argues that barring federal challenges to state insurance laws under the filed-rate doctrine would "seem to stand the Supremacy Clause on its head."  81 Fed. Reg. at 69,018. However, the Supplemental Explanation fails to address a number of cases that have found that the Supremacy Clause poses no bar to finding that the filed-rate doctrine prohibits federal challenges to state rate statutes.

140.     HUD's failure to adequately address whether the filed rate doctrine might bar federal challenges to state insurance laws was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

<u>**COUNT IV**</u>

**(Application Of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse Of Discretion Because Defendants Did Not Adequately Consider The Rule's Impact On Insurers And The Business of Insurance)**

141.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

142.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

143.    Comments submitted to HUD explained that the use of actuarial risk factors is critical to pricing and underwriting of homeowners insurance. Comments further explained that applying disparate-impact liability to the pricing and underwriting of homeowners insurance would limit insurers' ability to engage in risk-based pricing and underwriting.

144.    HUD failed to adequately address these concerns in the Disparate Impact Rule. HUD did not dispute that risk-based pricing and underwriting is of critical importance or that imposition of disparate-impact liability would prevent use of risk-based pricing and underwriting absent further justification. It stated only that insurers could attempt in case-by-case litigation to show that they have a legitimate business justification for their practices.

145.    The Court found arbitrary and capricious HUD's response to the insurance industry's concerns that exposing them to disparate-impact liability would undermine the fundamental nature of insurance. It criticized HUD for disregarding the arguments merely because insurers could reraise arguments on a case-by-case basis in subsequent proceedings. *Donovan*, 66 F. Supp. 3d 1051.

146.    The Supplemental Explanation does not respond to these concerns. It primarily addresses the Rule's broad effects on the insurance industry, rather than tailoring its analysis to risk-based pricing practices in the homeowners insurance context.

147.    To the extent that the Supplemental Explanation does respond to commenters'

concerns about the applicability of the Rule to risk-based pricing practices in the homeowners insurance context, its reasoning is internally inconsistent and does not address the commenters' precise arguments that avoiding statistical disparities would require homeowners insurers to depart from risk-based pricing.

148.    The Supplemental Explanation does not adequately consider commenters' concerns about how applying disparate-impact liability to the risk-based pricing of homeowners insurance would affect the homeowners insurance business, which depends on effective risk segmentation.  It thus does not consider the related impacts on homeowners insurers, consumers, and the free market.

149.    Nor does the Supplemental Explanation explain why the cost, time, and inconvenience of individualized litigation—including the expense of collecting racial data— outweighs crafting an exception for risk-based pricing of homeowners insurance.  Rather, the Explanation repeats without support that "an exemption for all provably risk-based factors would offer little added value for insurers."  81 Fed. Reg. at 69,017.

150.    None of the sources HUD cites in its Supplemental Explanation shows that applying disparate-impact liability to risk-based pricing has proven "workable" in other contexts.

151.    HUD's continued failure to adequately address commenters' concerns about the impact of the Disparate Impact Rule on the business of insurance was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## COUNT V

**(Application of the Disparate Impact Rule To Homeowners Insurance Is In Excess Of Statutory Jurisdiction, Authority, Or Limitations Or Is Not In Accordance With Law Because It Is Contrary To The FHA As Interpreted In the Supreme Court's Decision In *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*)**

152.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

- 50 -

153.     The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

154.     The Rule and Explanation undermine the homeowners insurance market and thereby burdens those who supply housing.

155.     The Rule and Explanation require homeowners insurers to consider race in setting rates.

156.     The Rule allows plaintiffs to state a prima facie claim of disparate impact based on an alleged statistical disparity alone, with no causal link between the challenged practice and the alleged disparity.

157.     The Rule does not merely invalidate policies that are "artificial, arbitrary, and unnecessary," but rather displaces any legitimate practice for which a less discriminatory alternative is available.

158.     The Rule does not give homeowners insurers sufficient latitude to explain why their policies support valid interests.

159.     The Rule places on defendants the burden of disproving the facts necessary to sustain plaintiffs' proposed orders.

160.     The Disparate Impact Rule and Explanation thus burden the homeowners insurance market and require insurers to pervasively consider race in their business activities. The Rule and Explanation also impermissibly shift the burden of persuasion to the defendant and fail to include the limitations expressly recognized by the Supreme Court.  They are thus in excess of HUD's statutory authority, jurisdiction, and limitations, and contrary to law as announced in *Inclusive Communities*.  The Rule and Explanation therefore should be invalidated. 5 U.S.C. §§ 706(2)(A), 706(2)(C).

## COUNT VI

**(Application of the Disparate Impact Rule To Homeowners Insurance Is In Excess Of Statutory Jurisdiction, Authority, Or Limitations Or Is Not In Accordance With Law Because It Violates The McCarran-Ferguson Act)**

161.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

162.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

163.    The McCarran-Ferguson Act provides as follows:

    A.    "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011.

    B.    "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

164.    The Fair Housing Act does not specifically relate to the business of insurance.

165.    The Disparate Impact Rule and the Supplemental Explanation construe the Fair Housing Act to subject the provision and pricing of homeowners insurance to disparate-impact liability.

166.    Subjecting the provision and pricing of homeowners insurance to disparate-impact liability would invalidate, impair, or supersede state laws, regulations, and policy determinations regulating the business of insurance and impose a barrier to the regulation of the business of insurance by the several states.

167.    Among other things, subjecting the provision and pricing of homeowners

insurance to disparate-impact liability would:

      A.    Invalidate, impair, or supersede state laws, regulations, and policy determinations expressly contemplating, and often requiring, the use of risk-based pricing and underwriting of homeowners insurance;

      B.    Invalidate, impair, or supersede state laws, regulations, and policy determinations forbidding the consideration or use of protected characteristics in the provision and pricing of homeowners insurance.

      C.    Invalidate, impair, or supersede state laws, regulations, and policy determinations providing for the review and approval of insurance pricing and underwriting decisions by state regulators;

      D.    Invalidate, impair, or supersede state laws, regulations, and policy determinations establishing state administrative forums for the resolution of disputes relating to insurance rates and other insurance practices; and

168.    The Disparate Impact Rule, as supplemented, thus violates the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), and is in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT VII

**(The Burden-Shifting Framework in the Disparate Impact Rule is Arbitrary and Capricious, an Abuse of Discretion, and Not in Accordance with Law)**

169.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

170.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

171.    In the absence of statutory direction to the contrary, the Supreme Court has held

that disparate impact liability must be premised on exacting standards in order to avoid unjustified, expensive, and time-consuming litigation.  Under those standards, a plaintiff must make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class.  *See Wards Cove Packaging Co.* v. *Antonio*, 490 U.S. 642, 658 (1989).  If a plaintiff makes this prima facie showing, the defendant need only present evidence that the challenged practice serves its legitimate goals.  *See id.* at 659.  The burden of persuasion remains on the plaintiff.  *See id*.  When a defendant produces such evidence, the plaintiff may prevail only if he or she can prove that the defendant refused to adopt an alternative practice that would have served its goals equally effectively without causing the disparate impact.  *See id.* at 660-61.

172.    Similarly, under the Administrative Procedure Act, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof."  5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91 (1981).  Because a charge brought by HUD under the FHA may be heard in either an administrative or judicial proceeding, the burden-shifting standards established in the Disparate Impact Rule must satisfy the Administrative Procedure Act requirement that the proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof.

173.    In violation of the Administrative Procedure Act and the Supreme Court's direction regarding burden-shifting in disparate impact cases, the Disparate Impact Rule purports to shift the "burden of proof" to the respondent or defendant once the complainant has met its prima facie burden of showing a disparate impact.  This would unfairly impose on insurers the burden of proving that their particular risk-based underwriting and pricing practices serve legitimate business goals, particularly where the conduct is authorized by governing state law.

That burden should properly rest on the party seeking fundamentally to alter the business of insurance by imposing disparate impact liability.

174.    The Disparate Impact Rule also disregards other limitations recognized by the Supreme Court.  The Disparate Impact Rule provides that a plaintiff need only show that the challenged practice "caused or predictably will cause" a disparate impact.  In contrast, the Supreme Court has held that a "significant[]" disparate impact is required to establish a prima facie case.  *Wards Cove*, 490 U.S. at 658.  This difference could be important in cases challenging insurance practices, where almost any risk-based underwriting and pricing decision will likely impact at least some groups differently.  Similarly, once a prima facie case is established, the Rule requires that the defendant or respondent show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  In contrast, the Supreme Court has expressly rejected reading a necessity requirement into a disparate impact framework, concluding that such a requirement would impose a degree of scrutiny impossible to meet.  *Id.* at 659 ("[T]here is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet[.]").  Insurers should not be required to show that each underwriting and pricing decision they make is by itself strictly "necessary," particularly where the use of risk-based underwriting and pricing as a whole is so plainly justified and where risk factors are identified and employed based on their relative, predicative qualities.  Moreover, although the Supreme Court has held that any "alternative practices" that a plaintiff might offer in lieu of allegedly an offending practice must be "equally effective," *see id.* at 661, HUD omitted that requirement from the Rule.  For insurers, however, any deviation from risk-based pricing and underwriting threatens to undermine the entire manner

in which insurance is provided.

175.    By impermissibly shifting the burden of persuasion to the defendant or respondent and failing to include the limitations required by settled law, the Disparate Impact Rule is arbitrary, capricious, and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT VIII

### (The Burden-Shifting Framework In The Disparate Impact Rule Is Arbitrary And Capricious Because Defendants Did Not Adequately Address Relevant Limitations)

176.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

177.    Comments submitted to HUD explained that HUD's proposed burden-shifting rules were contrary to law. Although HUD responded to many of these comments, it failed to offer any reasoned explanation for why it was not bound by the Supreme Court's decision in *Wards Cove Packaging Co.* v. *Antonio*, 490 U.S. 642 (1989), and other law.  For the reasons explained above, HUD's failure to apply the proper burden-shifting framework under the Disparate Impact Rule will unfairly penalize insurers forced to defend their authorized underwriting and pricing practices.

178.    HUD's failure to address whether and how the Disparate Impact Rule can be reconciled with *Wards Cove* and other law was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

179.    Declare invalid the application of the Disparate Impact Rule to the pricing and provision of homeowners insurance.

180.    Enjoin HUD and its officers from applying the Disparate Impact Rule to pricing and underwriting of homeowners insurance.

181.    Award Plaintiff its costs and reasonable attorneys' fees as appropriate; and

182.    Grant any such other relief that this Court deems just and appropriate.


Dated: May 3, 2023                          Respectfully submitted,

                                            PROPERTY CASUALTY INSURERS
                                            ASSOCIATION OF AMERICA

                                            /s/ *Seth P. Waxman*
                                            Seth P. Waxman (*pro hac vice*)
                                            Catherine M.A. Carroll (*pro hac vice*)
                                            WILMER CUTLER PICKERING HALE AND DORR LLP
                                            2100 Pennsylvania Avenue, NW
                                            Washington, DC 20037
                                            Tel.: (202) 663-6000
                                            Fax: (202) 663-6363
                                            E-mail: seth.waxman@wilmerhale.com

                                            Rowe W. Snider (# 03125194)
                                            Alyssa M. Gregory (# 6320588)
                                            LOCKE LORD LLP
                                            111 South Wacker Drive
                                            Chicago, IL 60606
                                            Tel.: (312) 443-0700
                                            Fax: (312) 896-0336
                                            Email: rsnider@lockelord.com

                                            *Attorneys for Plaintiff*