# Exhibit 8



August 24, 2021

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

**RE:     FR-6251-P-01 - Reinstatement of HUD's Discriminatory Effects Standard**

**Docket No: HUD-2021-0033**

The American Property Casualty Insurance Association ("APCIA") appreciates the opportunity to provide comments in response to the Notice of Proposed Rulemaking ("NPRM") titled "Reinstatement of HUD's Discriminatory Effects Standard," published by the Department of Housing and Urban Development ("HUD") on June 25, 2021,[1] to recodify the 2013 Disparate-Impact Rule ("2013 Rule").[2] APCIA is the primary national trade association for home, auto, and business insurers. Its members make up nearly 60 percent of the U.S. property casualty insurance market. It has the broadest cross-section of home, auto, and business insurers and reinsurers of any national property casualty trade association, with member companies ranging in size from large to small and operating in all 50 states. APCIA's members write $412 billion in annual premiums. APCIA and its members have a direct interest in whether and how disparate-impact liability under the Fair Housing Act ("FHA") applies to property and casualty insurance, including homeowners insurance and commercial habitational insurance.[3] APCIA respectfully requests that HUD exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from disparate-impact liability under the 2013 Rule.

As explained below, reinstating the 2013 Rule without the requested exemption would ignore key limitations on disparate-impact liability articulated by the Supreme Court in cases like *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-995 (1988), and *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 661 (1989)—and most recently in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc*., 576 U.S. 519 (2015) ("*Inclusive Communities*"), which  was decided two years after HUD promulgated the 2013 Rule. These

---

[1] 86 Fed. Reg. 33,590 (June 25, 2021).

[2] Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013); 24 C.F.R. § 100.500.

[3] Commercial habitational insurance is commercial insurance that covers various kinds of properties in which people live other than single-family homes and includes apartment buildings, condominium buildings, and other multiple-family dwellings. These comments generally refer to homeowners and commercial habitational insurance but also apply to any other form of property and casualty insurance the provision of which HUD asserts to be subject to the FHA, whether sold in the admitted, non-admitted, or surplus lines markets. Admitted insurers—subject to full state insurance regulation—write 99% of the homeowners market.

key limitations dictated by the Supreme Court include that the plaintiff must bear the burden of proving a *robust* causal link between a defendant's challenged practice and an alleged disparity,[4] that the disparity is *significant*, beyond mere correlation,[5] that there is a direct relation between the alleged injury and alleged injurious conduct,[6] and that the defendant's legitimate interests could be served by an alternative practice that is *equally effective* as the challenged practice in advancing the defendant's valid interests.[7] None of those limitations is reflected in the 2013 Rule. Accordingly, at a minimum, any recodification of a disparate-impact rule must include these elements to conform with established Supreme Court precedent. Irrespective of whether HUD revises the Rule to align with Supreme Court precedent, APCIA requests that HUD exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from the Rule because disparate-impact liability would threaten the industry, violate the McCarran-Ferguson Act, and conflict with the filed-rate doctrine. At the very least, HUD should adjust any disparate-impact rule to recognize and accommodate these unique aspects of homeowners and commercial habitational insurance. To that end, this comment proceeds in five parts.

Part I provides relevant background and explains how HUD's disparate-impact rulemaking intersects with the business and legal context of the homeowners insurance industry. This Part first explains the business of insurance, state regulation of the insurance industry, and the McCarran-Ferguson Act's preemption of federal laws or rules that undermine the state insurance regulatory schemes. It then provides a history of HUD's disparate-impact rulemaking and details the critical impact of *Inclusive Communities* and the pending litigation brought by APCIA.

Part II takes a closer look at the impact of *Inclusive Communities* on jurisprudence governing disparate-impact claims under the FHA, concluding that the 2013 Rule does not comport with that decision or the underlying precedent on which that decision relied.

Part III then explains why HUD's 2013 Rule also cannot comport with the unique business and legal aspects of the insurance industry. It explains why an exemption from disparate-impact liability is necessary for risk-based pricing and underwriting of homeowners and commercial habitational insurance in light of the fundamental nature of insurance, the dictates of the McCarran-Ferguson Act, and the filed-rate doctrine. That exemption is warranted because there would be few if any cases in which a plaintiff could meet the robust causation requirement mandated by *Inclusive Communities* or escape the preclusive effect of the McCarran-Ferguson Act, making case-by-case litigation senseless. Part III also explains why case-by-case adjudication of disparate-impact claims on risk-based pricing and underwriting is inappropriate and wasteful of judicial resources, as any claim premised on such practices will necessarily fail—further justifying an exemption.

In the event HUD rejects the exemptions detailed in Part III, Part IV then provides HUD an alternative. It explains the various ways HUD's 2020 Rule—and HUD's own reasoning in support of that rule, in conjunction with the various comments HUD received as part of that rulemaking process—better comported with *Inclusive Communities* and the business and legal

---

[4] *Inclusive Communities*, 576 U.S. at 521.
[5] *Id.* at 542; *see also Watson*, 487 U.S. at 994-995.
[6] *Watson*, 487 U.S. at 994-995.
[7] *Wards Cove Packing Co.*, 490 U.S. at 661.

realities of the insurance industry. This Part also explains why the Massachusetts district court's injunction with respect to the 2020 Rule was limited in scope and in no way justifies total reversion to the 2013 Rule, especially in light of HUD's own reasoning that the 2020 Rule was necessary to comport with binding Supreme Court caselaw. Part IV explains which provisions of the 2020 Rule are both prudent and necessary to align HUD's disparate-impact rulemaking with the law.

Finally, in the event HUD grants neither the exemption described in Part III nor the specific accommodations detailed in Part IV, Part V explains the minimal steps HUD must take to mitigate the harmful effects of subjecting risk-based insurance practices to disparate-impact liability. Part V asks HUD to, at the very least, acknowledge the business realities of the homeowners and commercial habitational insurance industry and not take additional steps to launch disparate-impact challenges to risk-based pricing and underwriting, as such challenges will necessarily fail as a matter of law.

## I. BACKGROUND

### A. The Business Of Insurance

Insurance is a means by which one party (the insured) transfers financial risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event her home is damaged, the insurer will pay for related repairs. Insurance rates are based on an insured's loss history and risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions—that is, decisions about whether to insure and how to price a particular risk or class of risk.[8]

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and to project their financial implications. Actuaries examine numerous factors that correlate with losses.[9] When underwriting property insurance for homeowners and commercial habitational risks, for example, underwriters have historically reviewed four categories of factors to assess the risk of property damage claims: (1) construction (e.g., frame, masonry, fire resistant, non-combustible, use of cladding, age and type of roof, age of wiring and plumbing system); (2) occupancy (e.g., habitational, manufacturing, office); (3) protection (e.g., alarms, sprinklers, smoke detectors, fire departments (paid or volunteer), water source and distance to fire station and water source, wind mitigation); and (4) exposure (e.g., the nature of the surrounding area, such as other buildings that may be more susceptible to loss, dry brush or woodlands v. paved parking areas, number of stories).[10] Other factors considered in underwriting and pricing insurance include, for instance, the value of the property and any history of previous losses related to the dwelling or similar units. *Homeowners and commercial habitational insurance actuaries do not consider FHA-*

---

[8] *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* §§ 1:2; 1:6 (3d ed. 2013).

[9] *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985).

[10] *See* Christopher J. Boggs, *Understanding Commercial Property Underwriting and 'COPE'*, Ins. J., Feb. 3, 2015, https://www.insurancejournal.com/news/national/2015/02/03/356085.htm.

*protected characteristics when evaluating these factors.* Indeed, they do not have that data and may be prohibited from collecting it.[11]

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that insured and similarly situated insureds—*i.e.*, a rate that accurately reflects the probability that future losses will occur and the likely cost of those losses.[12] If insurers could not set rates or make underwriting decisions based on objective risk factors that accurately predict loss, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of hazards.[13] Such a scheme would greatly reduce the financial incentive for insureds to mitigate risks, construct safer houses, and maintain existing houses.[14]

Accurate pricing is also critical to ensuring the solvency of insurers. An insurer is considered insolvent when it lacks the financial resources to make promised payments to insureds, beneficiaries and claimants.[15] If an insurer sets a price too low or fails to accurately account for the risks involved with policies, it may not have sufficient funds to pay claims that are made.[16]

Thus, without the ability to engage in risk-based pricing and underwriting, insurance companies would likely be compelled to consider a number of mitigating actions, from ceasing to underwrite certain types of risks (habitational risks, for example) to exiting whole lines of business (*e.g.*, property) entirely.

---

[11] *See* A.R. 376, *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014), ECF No. 19; *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶ 6, (insurer does not collect information on race or ethnicity); *id.* ECF No. 44-3 ¶ 11, (insurer does not collect data on policyholders' race or ethnicity); *id.* ECF No. 44-4 ¶ 11, (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); *id.* ECF No. 44-5 ¶ 7 (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates); *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013), ECF No. 27-2 ¶ 4, (insurer does not collect or retain electronic records of race, color, or national origin and does not have capabilities to store and use such information); *id.* ECF No. 27-3 ¶ 9 (insurer does not collect or consider race, color, religion, or national origin in underwriting and rating homeowners' insurance); *id.* ECF No. 27-5 ¶ 5 (prior to the Disparate-Impact Rule, insurer did not collect date on race, color, religion, national origin, sex, familial status, or handicap of its policyholders).

[12] *See N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

[13] See Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 44 (2012).

[14] Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J. at 66-67.

[15] Robert W. Klein, Ph.D., National Association of Mutual Insurance Companies, *Insurance Regulation and the Challenge of Solvency II: Modernizing the System of U.S. Solvency Regulation* (2012), https://www.namic.org/pdf/publicpolicy/insRegSolvII.pdf.

[16] *See, e.g.*, Zain Mohey-Deen & Richard J. Rosen, *The Risks of Pricing New Insurance Products: The Case of Long-Term Care*, Chicago Fed Letter, no. 397, 2018, https://www.chicagofed.org/publications/chicago-fed-letter/2018/397 ("Underpricing a new product was the major cause of the insolvency of Penn Treaty . . . at the time the tenth-largest [long-term] insurer.").

## B.      State Regulation Of Insurance

The states have traditionally regulated the insurance industry—from pricing, underwriting, and claims handling, to company capital requirements and solvency.[17]  "State regulation of insurance is comprehensive and includes rate and coverage issues."  *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).  Several features of state insurance regulation are relevant here.

First, state insurance law affirmatively permits risk-based pricing and underwriting.  Indeed, the vast majority of states not only permit risk-based pricing and underwriting but expressly require it by prohibiting insurers from charging "excessive, inadequate, or unfairly discriminatory rates."  As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer"—*i.e.*, if it is risk-based.[18]  For purposes of state insurance law, rates do not conform to this rating standard  if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences."[19]  With respect to the "unfairly discriminatory" component of this risk-based rating standard, state law prohibits rates that treat applicants and policyholders with similar risk profiles differently.[20]  Accordingly, state laws make clear that insurers must consider past losses and other relevant risk factors in developing insurance rates and that failing to take risk into account results in unfair discrimination.  *See infra* pp. 23-25.

Second, to protect consumers, state insurance commissioners review the rates charged by insurers.  The vast majority of states—49 out of 50 plus the District of Columbia—require insurers to file insurance rates with state regulators for review and/or approval.[21]  State regulators carefully review insurance rates—often with their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory.[22]

---

[17] Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress.  *See Paul v. Virginia*, 75 U.S. 168 (1868).  Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constitutes interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (1945), to ensure that the ruling would not undermine the states' long-standing regulation of insurance.

[18] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 2021), https://www.casact.org/sites/default/files/2021-06/Statement%20of%20Principles%20Regarding%20P%26C%20Casualty%20Insurance%20Ratemaking_2021.pdf.

[19] Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted).

[20] *Id.*; *see also infra* pp. 23-25.

[21] *See infra* p. 23-25.  As noted in footnote 3 *supra*, admitted insurers write 99% of the homeowners market.  Rate filing is also generally required for small-to-mid-market commercial habitational insurance.  A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

[22] *See, e.g.*, WIS. STAT. ANN. § 625.13 (1979) (amended 1983); *see also infra* pp. 23-25.

Third, under existing state laws, insurers are typically prohibited from taking FHA-protected characteristics into account,[23] and may not collect information about prospective insureds' membership in FHA-protected classes.[24]

One of the primary aims of state insurance regulation—and a central purpose of the prohibition against rates that are excessive, *inadequate*, or unfairly discriminatory—is to protect policyholders against the risk of insurer insolvency.[25] As part of solvency regulation, state regulators review insurers' capitalization, asset quality, reinsurance, and liquidity.[26] Insurers derive the funds needed to capitalize the business, purchase quality assets, purchase reinsurance, and facilitate overall liquidity not only from return on investments, the transfer of risk to reinsurers, and other surplus preservation strategies, but also from premiums retained after covered losses are paid. The aggregate difference between premiums collected and covered losses paid produces a significant portion of the surplus funding that ensures solvency and the insurer's ability to pay current and future claims. Rate regulation—including the requirement that rates accurately reflect an insured's risk profile—is thus an integral aspect of solvency regulation because it ensures that insurance companies charge premiums that are sufficient to cover current and future claims while ensuring that adequate surplus is available for capitalization, asset and reinsurance purchases, and liquidity.[27]

## C. The McCarran-Ferguson Act

In the McCarran-Ferguson Act, Congress stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." *Id.* § 1012(b). Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application . . . [would] frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999). A regulation requiring federal courts to "determine whether

---

[23] *See, e.g.*, CAL. INS. CODE § 679.71 (1973) (amended 2009) (prohibiting insurers from denying insurance or providing insurance on less favorable terms due to, among other things, an applicant's marital status, sex, race, color, religion, national origin, or ancestry); MD. CODE ANN. INS. § 27-501(c)(1) (1997) (amended 2020) (prohibiting insurers or insurance producers from inquiring about race, creed, color, or national origin in any manner of requesting general information related to an insurance application).

[24] *See, e.g.*, CAL. INS. CODE § 10141 (1969) (amended 2009).

[25] Shauhin Talesh, *Insurance Law As Public Interest Law*, 2 UC Irvine L. Rev. 985, 1005-06 (2012) ("As articulated by most states, the goals of insurance regulation include fair pricing of insurance, protecting insurance company solvency, preventing unfair practices by insurance companies, and ensuring the availability of insurance coverage.") (emphasis added); National Association of Insurance Commissioners, *The U.S. National State-Based System of Insurance Financial Regulation and the Solvency Modernization Initiative* § 2.3 (Aug. 14, 2013), https://www.naic.org/documents/committees_e_us_solvency_framework.pdf ("The state regulatory system in the United States has had over a 100 year history of solvency regulation.").

[26] *See, e.g.* National Association of Insurance Commissioners, Financial Analysis Handbook 25, 56, 63, 73 (2020), https://content.naic.org/sites/default/files/publication-fah-zu-financial-analysis-handbook.pdf (suggesting, among other factors, capitalization, asset quality, reinsurance, and liquidity as measures of solvency to be considered by state insurance regulators).

[27] Joshua Phares Ackerman, *The Unintended Federalism Consequences of the Affordable Care Act's Insurance Market Reforms*, 34 Pace L. Rev. 273, 283 (2014).

[challenged insurance practices] are actuarially sound and consistent with principles of state law" would violate the McCarran-Ferguson Act, as the Seventh Circuit concluded in *Mutual of Omaha*, 179 F.3d at 557.[28]

### D. The Fair Housing Act And The Disparate-Impact Rule

The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It further makes it unlawful "for any person or other entity whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). The FHA does not specifically relate to the business of insurance and thus is displaced by state laws regulating insurance, pursuant to McCarran-Ferguson, in the event of a conflict or interference with state law.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70,924.

Representatives of the insurance industry submitted comments explaining why disparate-impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate-Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, application of disparate-impact liability to risk-based pricing and underwriting of homeowners insurance would adversely affect the insurance industry by deterring the use of core insurance practices and would inject racial considerations. Finally, commenters noted that application of the Rule to homeowners insurance would violate the "filed-rate" doctrine, which bars private claims and collateral attacks based on insurance rates filed with state regulatory entities.

On February 15, 2013, HUD promulgated its final Disparate-Impact Rule, which remains in effect today. *See* 78 Fed. Reg. 11,460 (Feb. 15, 2013). The 2013 Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns

---

[28] Congress remains committed to the principle of leaving the regulation of insurance to the states. *See* Baird Webel, Cong. Research Serv., R44958 *Insurance Regulation: Legislation in the 115th Congress*, Summary (2018), https://crsreports.congress.gov/product/pdf/R/R44958 ("Since 1868, the individual states have been the primary regulators of insurance with the National Association of Insurance Commissioners (NAIC) acting to coordinate state actions and collect national data").

because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). No showing of intent to discriminate is required. The Rule also provides that disparate-impact litigation under the FHA should proceed under a burden-shifting framework. Under that framework, a plaintiff must first demonstrate that a housing-related practice has a disparate effect on an FHA-protected class. 24 C.F.R.§ 100.500(c)(1) (2013). The defendant must then show that the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Notwithstanding such a showing, the defendant may still be found liable if the plaintiff establishes "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). The alternative identified by the plaintiff need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. Thus, compliance with the Disparate-Impact Rule may require defendants to abandon sound, good-faith practices in favor of substitutes that are less effective at furthering the defendants' legitimate, nondiscriminatory interests.

In the final Rule, HUD declined to exempt risk-based pricing and underwriting of homeowners insurance or meaningfully address whether extension of disparate-impact liability would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. The Rule's preamble merely asserted (without any support) that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11,475. HUD thus did not consider whether the Rule conflicts with state laws and policies that permit or require risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that application of disparate-impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11,475 (quoting a comment). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-based pricing and underwriting. HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."). HUD thus acknowledged the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of risk factors in fact is a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *Id.*

### E.     Litigation Challenges To The 2013 Rule

All of the national property casualty insurance trade associations—including APCIA's predecessors American Insurance Association (AIA) and Property Casualty Insurers Association

of America (PCI)—filed lawsuits challenging the 2013 Rule.[29]  PCI filed suit in the U.S. District Court for the Northern District of Illinois.  *See PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. Nov. 27, 2013), ECF No. 1.  PCI's suit focused on HUD's decision to apply the Disparate-Impact Rule to homeowners insurance.  On September 3, 2014, the court granted PCI's motion for summary judgment in part, concluding that HUD's explanation for adopting the 2012 Rule was arbitrary and capricious in several respects.  *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-52 (N.D. Ill. 2014) (*PCI I*).

First, the court rejected HUD's contention that it could disregard the McCarran-Ferguson Act entirely and held that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims instead of granting an exemption for risk-based pricing and underwriting of homeowners insurance.  *Id.* at 1048.  In so holding, the court observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders* [*v. Farmers Ins. Exch.*], 537 F.3d [961,] 967 [(8th Cir. 2008)]."  *PCI I*, 66 F. Supp. 3d at 1048.  The court noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate-impact claims against insurers in light of the McCarran-Ferguson Act."  *Id.* at 1049.

Second, the court determined that HUD had inadequately examined whether the filed-rate doctrine would bar application of the Rule.  *Id.* at 1050.  And finally, the court concluded that HUD had made "no effort to evaluate" the substance of the insurance industry's argument that the Rule would prevent the use of sound risk factors and thereby undermine the fundamental nature of the insurance business.  *Id.* at 1051.  Accordingly, the court remanded to HUD for further explanation of these issues.[30]

### F.    PCI's Post-Remand Comments

In September 2014, PCI informed HUD that it intended to submit additional comments addressing the issues that the district court had instructed HUD to consider on remand.  *See* Letter from PCI to HUD, at 1 (Sept. 25, 2014) (A.R. 4416).  PCI then submitted comments further explaining how the Disparate-Impact Rule would invalidate, impair, or supersede states' regulation of insurance and distort the homeowners insurance market.  *See* Letter from PCI to HUD, at 1-18 (Jan. 26, 2015) (A.R. 4496-4513).  PCI emphasized that the Rule's burden-shifting process would impose liability on homeowners insurers for providing and pricing insurance

---

[29] Both predecessors of APCIA—the American Insurance Association ("AIA") and the Property Casualty Insurers Association of America ("PCI")—filed lawsuits under the Administrative Procedure Act challenging the 2013 Disparate-Impact Rule.  Effective January 1, 2019, AIA merged with and into PCI.  Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association.  Prior to the merger of AIA and PCI, comments were filed by each separate trade in response to the 2018 ANPRM.

[30] AIA, along with co-plaintiff the National Association of Mutual Insurance Companies ("NAMIC"), filed a complaint in the U.S. District Court for the District of Columbia.  *See American Ins. Ass'n v. Carson*, No. 13-cv-966 (D.D.C. June 26, 2013).  The lawsuit challenged the validity of disparate-impact claims generally under the FHA, and the district court initially granted summary judgment in their favor.  Order Granting Motion for Summary Judgment, *American Ins. Ass'n v. Carson*, No. 13-cv-966 (D.D.C. Nov. 3, 2014), ECF No. 46.  HUD appealed, but before briefing began, the Supreme Court decided *Inclusive Communities*.

using sound risk-based methods. *Id*. at 8 (A.R. 4503). PCI explained that prohibiting those methods would violate the McCarran-Ferguson Act and the filed-rate doctrine, as well as harm the homeowners insurance industry. *See id*. at 9-18 (A.R. 4504-4513). PCI's comments also alerted HUD to the importance of the Supreme Court's upcoming consideration of the *Inclusive Communities* case. *See id*. at 5-6 (A.R. 4500-4501).[31]

## G. The Supreme Court's Decision In *Inclusive Communities*

On June 25, 2015, the Supreme Court issued its decision in *Inclusive Communities*. *See* 576 U.S. 519. In that decision, the Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" *Id*. at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." *Id*. at 540. In order to ensure that disparate-impact claims are properly limited, the Court held that key "safeguards" must be put in place. *Id*. at 542.

First, the Court made clear that claims cannot rest on statistical disparity alone but must satisfy a "robust causality requirement." *Id*. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id*. (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). A plaintiff must therefore allege facts or produce statistical evidence demonstrating a causal connection between the challenged practice and the alleged disparity. *Inclusive Communities*, 576 U.S. at 543. Referring approvingly to the opinion below of Fifth Circuit Judge Edith Jones, the Court explained that where another "law substantially limits the [defendant's] discretion," causation cannot be established. *Id*.

Second, a defendant must have "leeway to state and explain the valid interest served by their policies." *Id*. at 541. Businesses, the Court stated, "must be given latitude to consider market factors." *Id*. at 541-542. And they must be allowed to maintain practices that are "necessary to achieve a valid interest." *Id*.

The Supreme Court cautioned that without these safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id*. at 542. "[I]nterpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id*. at 543. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id*. at 544. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id*. Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id*.

---

[31] APCIA hereby incorporates by reference PCI's September 25, 2014 letter (A.R. 4416) and January 26, 2015 letter (A.R. 4496) submitted to HUD.

## H.    PCI's Post-*Inclusive Communities* Comments

Shortly after the Supreme Court issued its decision in *Inclusive Communities*, PCI submitted further comments explaining that HUD must consider the Supreme Court's newly articulated limitations on disparate-impact liability.  *See* Letter from PCI to HUD (July 29, 2015) (A.R. 4615-4621).[32]  PCI emphasized that *Inclusive Communities* prohibited application of the Rule to legitimate business practices, including risk-based homeowners insurance practices.  *See id.* at 5-7 (A.R. 4619-4621).

## I.    HUD's Supplemental Explanation

As required by the district court in the *PCI I* case, on October 5, 2016, HUD published a supplemental explanation for its decision to apply the FHA to insurance practices entitled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance."  *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("2016 Supplemental Explanation").  HUD did not dispute that state law uniformly permits and often requires insurers to consider risk factors.  *See id.* at 69,015.  In fact, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice."  *Id.*  The 2016 Supplemental Explanation nevertheless rejected insurers' request for an exemption from the Disparate-Impact Rule, concluding that insurers can simply justify using risk-based factors on a case-by-case basis under the Rule's burden-shifting framework.  *See id.*  HUD thus insisted that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based."  *Id.*

HUD asserted that an exemption for insurance practices would be inappropriate because certain state anti-discrimination laws might apply to insurance, and an exemption would therefore "deprive all states of federal support in addressing discriminatory insurance practices," contrary to "the purpose of [the] McCarran-Ferguson [Act]."  81 Fed. Reg. at 69,016.  HUD also asserted in passing in its 2016 Supplemental Explanation that "McCarran-Ferguson requires a fact-intensive inquiry."  *Id.*

HUD did not dispute in the Supplemental Explanation that the filed-rate doctrine applies to insurance rates filed with state insurance commissions.  Instead, HUD argued that the filed-rate doctrine does not apply to FHA claims because they "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effects."  81 Fed. Reg. at 69,018 (quoting *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)).  HUD also argued in the 2016 Supplemental Explanation that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes."  *Id.* (quoting *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 944 (8th Cir. 2006) (*Saunders I*)).

---

[32] APCIA also incorporates this letter by reference.

## J.     Treasury Recommends That HUD Reconsider Its Prior Rule

In October 2017, the U.S. Department of Treasury issued a report entitled "A Financial System That Creates Economic Opportunities Asset Management and Insurance."[33] Among other things, that report urged HUD to reconsider the Disparate-Impact Rule, stating:

> Treasury recommends that HUD reconsider its use of the disparate-impact rule. In particular, HUD should consider whether the disparate-impact rule, as applied, is consistent with McCarran-Ferguson and existing state law. HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles.[34]

## K.     HUD's 2020 Rulemaking Revised The 2013 Rule

On August 19, 2019, HUD published a NPRM in the Federal Register. *See* 84 Fed. Reg. at 42,854. The NPRM proposed to make a number of important changes to the 2013 Rule to bring it into compliance with the limits set forth in *Inclusive Communities*. After soliciting and considering comments, on September 24, 2020, HUD published the 2020 Final Rule, "Implementation of the Fair Housing Act's Disparate Impact Standard," in the Federal Register. 85 Fed. Reg. at 60,288. In response to comments,[35] the Final Rule made several clarifying edits to the Proposed Rule but maintained the thrust of the Proposed Rule's improvements and alterations of the 2013 Rule.

As revised, the 2020 Rule made clear that disparate-impact claims are available under the FHA where a plaintiff proves a specific policy's or practice's discriminatory effect on members of a protected class. Consistent with *Inclusive Communities*, the 2020 Rule provided that plaintiffs bringing such claims must, to proceed past the pleading stage, plausibly allege facts supporting each of the following elements:

> (1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

> (2) That the challenged policy or practice has a disproportionately adverse effect on members of a protected class;

> (3) That there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect;

---

[33] *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities Asset Management and Insurance* (Oct. 2017), https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.

[34] *Id.* at 110.

[35] On August 19, 2018 and October 18, 2019, APCIA submitted extensive comments in response to HUD's Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28,560 (June 20, 2018) and Notice of Proposed Rulemaking, 84 Fed. Reg. 42,854 (Aug. 19, 2019), respectively. APCIA incorporates these August 19, 2018, and October 18, 2019, letters to HUD by reference.

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct relation between the injury asserted and the injurious conduct alleged.

24 C.F.R. § 100.500(b).

Next, the 2020 Rule addressed the burdens of proof typical of litigation and consistent with *Inclusive Communities*. The 2020 Rule provided additional guidance on the three-part burden shifting framework in the 2013 Rule, and (as with the Proposed Rule) clarified that the ultimate burden always lies with the plaintiff. Specifically, the 2020 Rule required:

(1) A plaintiff must prove by the preponderance of the evidence each of the elements in [24 C.F.R. § 100.500(b)].

(2) A defendant or responding party . . . may rebut a plaintiff's allegation . . . that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice advances a valid interest (or interests) and is therefore not arbitrary, artificial, and unnecessary.

(3) If a defendant rebuts a plaintiff's assertion . . . the plaintiff must prove by the preponderance of the evidence either that the interest (or interests) advanced by the defendant are not valid or that a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

24 C.F.R. § 100.500(c).

The 2020 Rule also set forth defenses available to defendants at both the pleading and post-pleading stages of litigation. At the pleading stage, a defendant could prevail (consistent with the Rules of Civil Procedure) by demonstrating that the plaintiff failed to establish one of the elements required for pleading a disparate-impact case, or by showing that "the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a:

(i) Federal, state, or local law;

(ii) Binding or controlling court, arbitral, administrative order or opinion; or

(iii) Binding or controlling regulatory, administrative or government guidance or requirement.

24 C.F.R. § 100.500(d)(1). After the pleading stage, a defendant could prevail by establishing that:

(i) The policy or practice is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly

situated individuals not part of the protected class, with respect to the allegations under paragraph (b). This is not an adequate defense, however, if the plaintiff demonstrates that an alternative, less discriminatory policy or practice would result in the same outcome of the policy or practice, without imposing materially greater costs on, or creating other material burdens for the defendant.

(ii) The plaintiff has failed to establish that a policy or practice has a discriminatory effect under paragraph (c) of this section.

(iii) The defendant's policy or practice is reasonably necessary to comply with a third party requirement, such as a:

(A) Federal, state, or local law;

(B) Binding or controlling court, arbitral, administrative order or opinion; or

(C) Binding or controlling regulatory, administrative, or government guidance or requirement.

24 C.F.R. § 100.500(d)(2). Finally, the 2020 Rule incorporated the NPRM's reference regarding the application of the McCarran-Ferguson Act to the FHA, *see* 24 C.F.R. § 100.500(e) ("Business of Insurance), adding a paragraph concerning remedies to align the 2020 Rule with the Supreme Court's guidance in *Inclusive Communities*:

In cases where liability is based solely on a discriminatory effect theory, remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons. In administrative proceedings under 42 U.S.C. § 3612(g) based solely on discriminatory effect theory, HUD will seek only equitable remedies, provided that where pecuniary damage is proved, HUD will seek compensatory damages or restitution; and provided further that HUD may pursue civil money penalties in discriminatory effect cases only where the defendant has previously been adjudged, within the last five years, to have committed unlawful housing discrimination under the Fair Housing Act, other than under this section.

24 C.F.R. § 100.500(f).

## L. The District Court Enjoins The 2020 Rule

On October 25, 2020, the United States District Court for the District of Massachusetts issued a preliminary injunction enjoining implementation of the 2020 Rule. *See Mass. Fair Hous. Ctr. v. United States Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600 (D. Mass 2020) (*MFHC*). As a result, the 2020 Rule never took effect, and the 2013 Rule remains in effect today.

The district court's injunction did not touch upon every aspect of the 2020 Rule, but rather tailored its analysis to specific provisions that the court found sufficiently problematic at the preliminary stage to conclude that plaintiffs had a likelihood of success. Specifically, the

14

district court determined that the "additional language" in 24 C.F.R. § 100.500(b)(1)—providing examples of a valid interest or legitimate objective "'such as a practical business, profit, policy consideration'"—was not found in any judicial decision. *MFHC*, 496 F. Supp 3d. at 610. It found the same as to the "'outcome prediction' defense" located at 24 C.F.R. § 100.500(d)(2)(i), and the requirement in § 100.500(c)(3) that plaintiffs must prove that their alternative policy would serve a defendant's interests in "an *equally effective manner without imposing materially greater costs* on, or creating *other material burdens* for, the defendant." *MFHC*, 496 F. Supp 3d. at 610. Finally, the court cited as problematic an unspecified and undefined "conflat[ion]" of plaintiffs' prima facie and pleading burdens. *Id.* at 611.

Although the district court otherwise criticized the 2020 Rule for lack of clarity, it cited no other specific provision as contrary to law. Instead, the district court specifically noted that the 2020 Rule's "arbitrary, artificial, and unnecessary" standard comes "directly from *Inclusive Communities*." *Id.* at 610. The court said nothing about the 2020 Rule's recognition that the FHA does not (and cannot) supplant state laws concerning insurance, nor the 2020 Rule's codification of *Inclusive Communities'* guidance with respect to remedies in disparate impact cases.

### M.  HUD Issues Notice Of Intent To Reinstate The 2013 Rule

On June 25, 2021, HUD published a Proposed Rule titled "Reinstatement of HUD's Discriminatory Effects Standard." 86 Fed. Reg. 33,590. The Proposed Rule seeks to reinstate, virtually without alteration, the 2013 Rule in full, notwithstanding the reasoning HUD promulgated one year before during the 2020 Rule's notice-and-comment process—a process that identified significant gaps between the 2013 Rule and the Supreme Court's directions in *Inclusive Communities*. The proposed Reinstatement cites the Massachusetts district court's preliminary injunction as justification for reverting to the 2013 Rule but ignores the limitations in the district court's opinion, which cited only specific provisions of the 2020 Rule as problematic at the preliminary-injunction stage, and in no way justified wholesale reversion to the 2013 Rule that the 2020 Rule aimed to improve and clarify.

### N.  PCI's Renewed Legal Challenge

As explained above, litigation is pending challenging the 2013 Rule in the United States District Court for the Norther District of Illinois. *See Property Cas. Insurers Ass'n of Am. v. Carson*, No. 13-CV-8564 (N.D. Ill. Nov. 27, 2013). After HUD issued its 2016 Supplemental Explanation, PCI amended its complaint to bring a renewed challenge to the 2013 Rule. Dkt. 129. PCI subsequently moved for summary judgment, focusing its challenge on the adequacy of HUD's explanation in the 2016 Supplement. PCI argued that the Supplement is arbitrary and capricious because it fails to meaningfully consider the Supreme Court's 2015 decision in *Inclusive Communities* or explain how, without an exemption for risk-based pricing and underwriting of homeowners insurance, the Rule is consistent with the McCarran-Ferguson Act, the fundamental business of insurance, or the filed-rate doctrine. Dkt. 221. HUD filed a cross-motion for summary judgment, arguing that the Supplement adequately addresses industry comments and the *PCI I* Court's concerns. Dkt. 231. Summary judgment briefing was completed on August 20, 2021, and both PCI and HUD's cross-motions remaining pending.

## II. THE 2013 DISPARATE-IMPACT RULE CANNOT BE SQUARED WITH *INCLUSIVE COMMUNITIES* OR THE BEDROCK DISPARATE-IMPACT JURISPRUDENCE THE SUPREME COURT CITED

HUD cannot reinstate the 2013 Rule as previously formulated because it is inconsistent with the limitations set forth in *Inclusive Communities* and longstanding anti-discrimination jurisprudence. HUD is incorrect in claiming that *Inclusive Communities* endorsed the 2013 Rule. Nor is HUD correct in claiming that the 2013 Rule is aligned with the longstanding limits on the burden-shifting framework that the *Inclusive Communities* Court reiterated. In particular, the burden-shifting framework of the 2013 Rule permits plaintiffs to prevail in a wider range of cases than they would have been able to advance under the foundational body of anti-discrimination caselaw under Title VII and the ADEA—a corpus of jurisprudence which HUD itself contends underpins *Inclusive Communities*' analysis. For these reasons, the Rule is contrary to longstanding Supreme Court precedent—especially as applied to risk-based pricing and underwriting of homeowners and commercial habitational insurance.

### A. *Inclusive Communities* Did Not Endorse The 2013 Rule

The NPRM alleges that "the [*Inclusive Communities*] Court did not call into question the 2013 Rule's framework for analyzing discriminatory effects claims, nor did it suggest that HUD should make any modifications to its framework. To the contrary, the Court cited HUD's 2013 Rule multiple times with approval." 88 Fed. Reg. at 33,592.

This vastly overstates the Supreme Court's treatment of the Rule. Indeed, the *Inclusive Communities* Court made only a few glancing mentions of the Rule, none of which could fairly be characterized as approvals of its substance. The first reference merely restated the three steps of the 2013 Rule. *Inclusive Communities*, 576 U.S. at 527 (specifying that "[t]he regulation also established a burden-shifting framework for adjudicating disparate-impact claims" and describing the requirements of each step of the test). The second reference noted that the Fifth Circuit reversed the district court based on the 2013 Rule. *Id.* at 528. The third reference stated that the second step of the HUD test is analogous to the "business necessity" defense under Title VII but does not state that the HUD and Title VII standards are in alignment. *Id.* at 541 (noting HUD's explanation that it did not use the phrase "business necessity" because that "phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities"). The final reference describes HUD's stated goals for the disparate-impact standard, but does not endorse HUD's burden-shifting framework. *Id.* at 542 (noting that "HUD itself recognized in its recent rulemaking, disparate-impact liability 'does not mandate that affordable housing be located in neighborhoods with any particular characteristic'").

None of these references amounts to an approval or endorsement of the Rule. Indeed, the validity of the 2013 Rule was not at issue in the case; in granting certiorari, the Supreme Court limited the scope of the case to the first question presented—whether disparate-impact claims are cognizable under the FHA. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 573 U.S. 991 (2014). Nowhere did the Court indicate that it was considering the validity of the 2013 Rule.

Accordingly, HUD's claim that the 2013 Rule was already determined to be consistent with *Inclusive Communities* is not accurate—as several courts have observed.[36]

**B.  The 2013 Rule's Burden-Shifting Framework Is Inconsistent With The Longstanding Precedent On Which *Inclusive Communities* Relied**

As explained in further detail below, each step of the 2013 Rule's burden-shifting framework diverges from the tests governing claims under related antidiscrimination statutes in ways that permit plaintiffs to plead and prevail on disparate-impact claims that violate the "safeguards" that *Inclusive Communities* set forth and that the Supreme Court has consistently articulated in interpreting the requirements of the burden-shifting framework for antidiscrimination cases.

*1.  The First Step Of The 2013 Rule's Burden-Shifting Framework Imposes A Significantly Lower Causation Standard Than The Supreme Court Has Required*

*Inclusive Communities* requires a showing of "robust causality" between a defendant's challenged policies and an alleged racial disparity. The Court explained that this requirement "protects defendants from being held liable for racial disparities they did not create." 576 U.S. at 542. Were the rule otherwise, insurers could be found liable for accurately pricing insurance based only on the risks a customer poses—the essence of the business of insurance—simply because the acts of a third party result in a disparity in the rates charged across different groups. For example, homeowners insurers assess the risk of future property loss by using risk-based factors like the proximity of a home to a fire station. But perhaps due to historic siting decisions by local governments, a municipality's fire departments might be located further from predominantly minority neighborhoods than predominantly non-minority locales. Were plaintiffs not required to make a "robust" showing of causality, a homeowners insurer could be held liable for a resulting disparity in homeowners insurance rates between minority and non-minority groups that is caused by a municipality's fire station siting decisions that the insurer had no role in creating or perpetuating.

Longstanding and foundational anti-discrimination jurisprudence is consistent with a "robust" causality requirement. *Id.* at 542. Specifically, Supreme Court cases foreclose claims based on any "predicted" differences between groups, as well as disparate-impact claims that rest on a showing of mere statistical difference. The 2013 Rule's first step erodes these long-standing causation standards by permitting plaintiffs to state claims for "predicted" harm; and allowing statistical disparities, standing alone, to establish causation.

The 2013 Rule allows plaintiffs to plead a prima facie case by showing a "predicted" statistical disparity, or a difference between groups hinging on a mere statistical disparity without more. 78 Fed. Reg. at 11,463. And nowhere does it prevent plaintiffs from prevailing in

---

[36] *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019); *Oviedo Town Ctr, II, L.L.P. v. City of Oviedo, Florida*, 759 Fed. App'x 828, 833-35 (11th Cir. 2018) (per curiam); *River Cross Land Co., LLC v. Seminole Cty.*, 2021 WL 2291344, at *22-24 (M.D. Fla. June 4, 2021*); County of Cook, Ill. v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018); *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

disparate-impact challenges on such forms of proof alone. But in the seminal Title VII anti-discrimination cases of *Wards Cove*, and *Watson*, the Supreme Court set out a causation test that forecloses claims based on "predicted" future disparities. In *Wards Cove*, the Court instructed that "[a] plaintiff must demonstrate that it is the application of a specific or particular . . . practice that *has created* the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case." 490 U.S. at 657 (emphasis added). And in *Watson*, the Supreme Court made clear that "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question *has caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group." 487 U.S. 994 (emphasis added). The Court thus articulated the standard under Title VII as a causal effect that "has" already occurred, clearly indicating that the Court did not contemplate claims for as-yet-unrealized disparities or challenges to practices that have not actually resulted in a cognizable disparity.

ADEA caselaw contains this same limitation. To prevail under the burden-shifting framework in those cases, a plaintiff must "'isolat[e] and identif[y] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 100 (2008) (quoting *Wards Cove*, 490 U.S. at 656). The fact that the disparities are meant to have *already* been "observed" further underscores that this standard requires proof of an existing disparate impact—not a future one. The burden-shifting test in anti-discrimination cases has thus long incorporated an inherent limit on causation by foreclosing claims for predicted or otherwise yet-to-be-observed disparities—claims that the 2013 Rule would allow under the first step of its burden-shifting test.

Additionally, the Supreme Court has repeatedly required a showing of more than a bare statistical difference to establish causality between a challenged practice and a disparate outcome. In *Inclusive Communities*, the Court explained that a disparate-impact claim challenges practices that have a '*disproportionately* adverse effect on minorities.'" 576 U.S. at 524 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (emphasis added). The Court also made clear that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact." *Id.* at 542 (quoting *Wards Cove*, 490 U.S. at 653). This formulation is consistent with the rigorous statistical requirements for showing discrimination that have been a foundation of anti-discrimination jurisprudence.

In *Watson*, the Court set out the standard for statistical evidence: "Our formulations . . . have consistently stressed that statistical disparities must be *sufficiently substantial* that they raise such an inference of causation." *Watson*, 487 U.S. at 994-995 (emphasis added). And in line with these directives, the Supreme Court has endorsed proof of a "statistically significant" difference between groups as sufficient to establish a Title VII violation. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-311 (1977). Further, the Supreme Court also cautioned that statistical evidence must focus on disparities between comparable groups because, otherwise, the analysis is "nonsensical." *Wards Cove*, 490 U.S. at 651.

Consistent with this precedent, agencies and lower courts have similarly required that something more than a bare statistical difference must be shown to establish an actionable disparate impact—a statistical difference must be significant, and must be between comparable populations to support an inference of a meaningful disparity. For example, a long-used rule-of-thumb in Title VII cases is that a ratio of the percentages of protected class versus non-protected

class groups to pass a job test of less than four-fifths (0.80) is insufficient to satisfy the plaintiff's burden to show a significant disparity. *See, e.g.*, 29 C.F.R. § 1607.4(D) (2016) (EEOC's guidelines originally adopted in 1979; *see* Adoption of Questions and Answers To Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11,996 (Mar. 2, 1979)); *see also Gilty v. Village of Oak Park*, 919 F.2d 1247, 1255 (7th Cir. 1990) (rejecting disparate-impact claim because plaintiff's statistics did not reflect eligibility rate for the specific job, nor did he establish a causal connection between the specific employment practice and the disparate impact); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020) (rejecting claim that employer's policy not to hire people with certain criminal convictions created a disparate impact on African-Americans because while national statistics show that African-Americans are more likely to have prior convictions than white people, the jobs in question required certain educational and technical credentials that made those national statistics irrelevant).

Nowhere does the 2013 Rule require that a statistical difference be significant or require a statistical difference between otherwise comparable groups. For example, the 2013 Rule would permit a plaintiff to state a claim by alleging that a particular risk-based practice has a disparate impact on racial minorities, even though it could be the case that there is no statistically significant difference in the rates charged to members of different racial groups resulting from that practice. That would not be a *disproportionate* impact on a protected class. *Inclusive Communities*, 576 U.S. at 524-525. Under established anti-discrimination caselaw, a plaintiff would be unable to show causality if their claim does not rest on a statistically significant difference between comparable populations, because that would undermine an "inference of causation," *Watson*, 487 U.S. at 995, let alone a "robust" showing of causality. *Inclusive Communities*, 576 U.S. at 542 ("[A] disparate impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity.") (emphasis added).

But the 2013 Rule would permit plaintiffs in this circumstance to at least set forth a prima facie case—if not completely prevail in litigation—by making a non-statistically significant showing of difference between populations that are not comparable in terms of objective risk factors. That would permit a showing of causation under circumstances that the Supreme Court has repeatedly found inadequate. It risks allowing defendants to be held "liable for racial disparities they did not create" based on a "mere correlation." *Id.* HUD's premise that step one of the burden-shifting test is consistent with the longstanding limits on disparate-impact liability that *Inclusive Communities* referenced is thus incorrect.

### 2. The Second Step Of The Rule's Burden-Shifting Test Is More Onerous For Defendants Than Inclusive Communities And Other Precedent Permit

At the second step of the 2013 Rule's burden-shifting framework, a defendant must prove that a challenged practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 78 Fed. Reg. at 11,482. The *Inclusive Communities* Court described this step as "analogous to the business necessity standard under Title VII." 576 U.S. at 541. Historically, the Supreme Court has explained that a defendant merely bears the burden of production—not proof—at this step of the business-necessity test. The 2013 Rule thus imposes a

heavier burden on defendants to defend a challenged practice than the Supreme Court has historically allowed.

The *Inclusive Communities* Court explained that the second step of the burden-shifting test provides an "important and appropriate means of ensuring that disparate-impact liability is properly limited." 576 U.S. at 541. Analogizing to Title VII, the Court described that stage as allowing defendants "leeway to state and explain the valid interest served by their policies." *Id.* *Inclusive Communities* did not address whether the defendant's burden was one of production or proof. But the Title VII case law it drew on has long held that while defendants must introduce a justification for their challenged practice at the second stage of a burden-shifting test, it is ultimately the plaintiff's burden to persuade a finder of fact to disregard a defendant's justifications.

Decades before *Inclusive Communities* was decided, the Court made clear in *Wards Cove* that the defendant's obligation at step two of the burden-shifting inquiry was one of *production*—not *proof.* "In this phase," the Court explained, referring to the second step of the burden-shifting framework, "the [defendant] carries the burden of producing evidence of a business justification for his [challenged] practice. The burden of persuasion, however, remains with the disparate-impact plaintiff." 490 U.S. at 659. The Court noted that this "conforms with the usual method for allocating persuasion and production burdens in the federal courts." *Id.* at 659-60. The Court went so far as to clarify that prior precedent that may be seen as contrary was incorrect: *Id.* at 660 ("We acknowledge that some of our earlier decisions can be read as suggesting otherwise. … But to the extent that those cases speak of an employer's "burden of proof" with respect to a legitimate business justification defense, … they should have been understood to mean an employer's production—but not persuasion—burden.").

By requiring defendants to prove rather than introduce a justification for their practices, the 2013 Rule upends an established understanding of how defendants in anti-discrimination cases may defend their challenged practices—an understanding that *Inclusive Communities* brought into its discussion of the limitations on disparate-impact liability. This is at odds with the vision of *Inclusive Communities* that the second step of the burden-shifting test would "limit" disparate-impact liability and provide adequate "leeway" for defendants to justify their practices. *Id.* at 541.

Fundamentally, requiring defendants not just to identify, but to prove, their substantial, legitimate, and non-discriminatory interest in their challenged policy threatens to place the onus on them to show why they should not be held liable for practices beyond those that are "artificial, arbitrary, and unnecessary" to achieve a valid policy. *Inclusive Communities*, 576 U.S. at 540. Doing so tips the balance in favor of increased disparate-impact liability, and thus risks stymying the "practical business choices" that the Supreme Court has consistently acknowledged in its anti-discrimination jurisprudence that defendants should be able to make. Accordingly, the second step of the 2013 Disparate-Impact Rule is inconsistent with significant and long-established safeguards established by the Supreme Court.

### 3. The Third Step Of The Burden-Shifting Framework Allows Plaintiffs To Propose Alternative Practices That Are Not Equally Effective At

***Furthering Defendants' Interests, Contrary To Established Limits Set***
***By The Supreme Court***

The 2013 Rule contemplates that even where a defendant meets its burden at the second step of the burden-shifting test, a plaintiff may still prevail at the third step by "proving that the [defendant's] substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect." 78 Fed. Reg. at 11,482. The Rule does not require that the proposed alternative be "equally effective" as the challenged practice at achieving the defendant's valid interests. That requirement, however, was mandated by the Supreme Court in *Wards Cove*, which specifically held that "any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring procedures in achieving petitioners' legitimate employment goals." 490 U.S. at 661.

The *Wards Cove* Court was clear about this limitation, explaining that because "'[c]ourts are generally less competent than employers to restructure business practices,' [they] should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit." 490 U.S. at 661 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578 (1978)). The Court also noted that "'factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.'" *Id.* (quoting *Watson*, 487 U.S. at 998).

Allowing a disparate-impact plaintiff challenging a risk-based homeowners insurance practice to prevail at the third step of the burden-shifting test by demonstrating the availability of an alternative that is less effective in predicting losses, as the 2013 Rule does, contravenes this precedent by allowing liability for practices beyond those that are "artificial, arbitrary, and unnecessary" to achieve a valid policy. *Inclusive Communities*, 576 U.S. at 540 (quoting *Griggs*, 401 U.S. at 431). Additionally, in the context of risk-based pricing and underwriting of homeowners and commercial habitational insurance, it also threatens the very activities that ensure a well-functioning housing market and a vibrant and dynamic free-enterprise system. *Inclusive Communities*, 576 U.S. at 533. As explained above, insurance markets function efficiently when insurance is priced in accord with risk-based factors. *See supra* pp. 5-6. The extensive state-law framework governing the pricing of insurance, which includes safeguards against insurer insolvency, is intended to promote such efficient operation. Requiring homeowners and commercial habitational insurers to substitute less-effective practices for risk-based pricing and underwriting may actually prevent insurers from undertaking the very activities that ensure a well-functioning housing market and threatens to upend the "vibrant and dynamic" insurance industry. *Inclusive Communities*, 576 U.S. at 533. Unless HUD clarifies that step three requires proof of an "equally effective" alternative, reinstatement of the 2013 Rule will "undermine[] [the] purpose [of the FHA] as well as the free-market system." *Id.*

For these reasons, the 2013 Rule exceeds the limits of the burden-shifting analysis as articulated by longstanding Supreme Court anti-discrimination jurisprudence and as incorporated and explained by the Supreme Court in *Inclusive Communities*.

**C.** **The 2013 Rule Lacks The Additional Safeguards That *Inclusive Communities* Announced Must Apply To Disparate-Impact Claims Under The FHA**

The *Inclusive Communities* Court warned that, without appropriate limits, disparate-impact suits could expand beyond the "heartland" of cases targeting artificial barriers to housing and instead involve courts in "second-guess[ing]" which of two reasonable approaches a defendant should follow when exercising its discretion. 576 U.S. at 540-41. To avoid that result, the Court announced that the "important and appropriate means of ensuring that disparate-impact liability is properly limited to give housing authorities and private developers leeway to state and explain the valid interest served by their policies." *Id.* at 541.

First, the *Inclusive Communities* Court made clear that when a "law substantially limits the [defendant's] discretion," causality cannot be shown. *Id.* at 543. That is the case here. Applying disparate-impact liability to risk-based pricing and underwriting by homeowners and commercial habitational insurers would leave them caught between conflicting federal and state legal regimes and thus place them in precisely the "double bind of liability" the Court instructed must be avoided. *Id.* at 542. As explained above, insurers are regulated by state laws that permit or require the use of risk-based pricing and underwriting and require the filing of rates with state administrative bodies for approval. *See supra* pp. 5-6. Those state laws mandate or expressly permit insurers to use neutral risk factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates for various risk classifications. State laws thus "substantially limit" the discretion of insurers in a manner that would make it impossible to ascribe any disparate effects of underwriting or pricing practices to insurers' independent choices. When companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that cause any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the "double bind of liability" the Court warned against. Without taking this into account, the Rule permits plaintiffs to show causation in challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance where, under a faithful application of *Inclusive Communities*, they should not be able to do so.

Second, the *Inclusive Communities* Court explained that "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." 576 U.S. at 543. But that is just what extending disparate-impact liability to homeowners and commercial habitational insurers would do. State law ensures that insurers price their products in accordance with risk-based factors. State law does not permit insurers to rely on, and homeowners and commercial habitational insurers do not rely on, classifications prohibited by the FHA. Yet exposing homeowners and commercial habitational insurers to disparate-impact liability would effectively require them to collect and analyze sensitive—and previously uncollected—data on the FHA-protected characteristics of their customers in a defensive effort to ensure that they will not be accused of causing prohibited disparate impacts. Exempting homeowners and commercial habitational insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none

22

currently exist, the application of disparate-impact liability to homeowners and commercial habitational insurers would, contrary to the teachings of *Inclusive Communities*, "perpetuate race-based considerations rather than move beyond them." *Id.*

Finally, *Inclusive Communities* cabined the remedies that should be sought in the typical disparate-impact case under the Rule. The Court explained that "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice." *Id.* at 544. The 2013 Rule omits any mention of a limitation on remedies, thereby inviting plaintiffs to seek additional remedies and permitting courts to award them.

Because applying disparate-impact liability to risk-based pricing and underwriting would run afoul of all of these limitations, HUD should grant an exemption for those activities.

## III. HUD SHOULD EXEMPT RISK-BASED PRICING AND UNDERWRITING OF HOMEOWNER'S INSURANCE FROM DISPARATE-IMPACT LIABILITY UNDER THE FHA

As it has requested previously, including in response to HUD's Advanced Notice of Proposed Rulemaking and Notice of Proposed Rulemaking for the 2020 Disparate-Impact Rule, APCIA respectfully urges HUD to adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance if it intends to reinstate the 2013 Rule. As explained below, such an exemption is necessary in light of the threat that disparate-impact liability poses to the business of insurance, the McCarran-Ferguson Act, and the filed-rate doctrine. An exemption is also justified because of the burdens that case-by-case litigation would impose on the homeowners and commercial habitational insurance industry and the consumers the industry serves.

### A. Disparate-Impact Liability Threatens The Business Of Insurance

The 2013 Rule conflicts with the fundamental, risk-based nature of homeowners and commercial habitational insurance, discussed above. *See supra* pp. 5-6. As members of the insurance industry commented during HUD's prior rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk."[37] The essence of risk-based insurance practices is "identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly."[38] Quantifying the impact of any risk factor is a purely mathematical and unbiased statistical exercise. Far from the "artificial, arbitrary, and unnecessary" practices that may incur liability under the FHA under *Inclusive Communities*, 576 U.S. at 540, the assessment of risk is designed to precisely identify "the expected value of all future costs associated with an individual risk transfer."[39]

But despite the neutrality of insurance practices with respect to all FHA-protected characteristics, the 2013 Rule threatens to penalize insurers for relying on sound risk factors that

---

[37] *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014), ECF No. 19-3, 19-5.
[38] *Id.*, ECF No. 19-3.
[39] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* at 57-58.

happen to disproportionately affect a class protected by the FHA.[40]  In addition to improperly holding defendants "liable for racial disparities they did not create," *Inclusive Communities*, 576 U.S. at 542 (citing *Wards Cove*, 490 U.S. at 653)—as discussed below— this would irreparably distort the market for homeowners and commercial habitational insurance.  Tying rates to risk factors ensures that prices accurately reflect an insurer's costs of covering particular classes of risk for similarly situated customers.[41]  Removing risk factors from the ratemaking calculus, or substituting less-effective factors, could make it prohibitively expensive for an insurer that is writing these risks at an inadequate rate to insure high-risk properties, perhaps eliminating coverage across the market.  It would also cause adverse selection, as customers with a low risk of loss would be charged more than necessary to cover their risk.  *See* Letter from PCI to HUD, at 2 (Jan. 26, 2015) (A.R. 4497) ("Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.").

The 2013 Rule's effects on homeowners and commercial habitational insurance pricing would also generate negative externalities beyond the insurance market.  Risk-based insurance pricing encourages safer practices.  For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials.  Eliminating risk factors from the pricing model could reduce such expedient disincentives.  *See, e.g.*, Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J. at 66-67.  Disallowing risk-based pricing inherently creates cross-subsidies from low-risk activities to high-risk activities, with the resulting unfairly discriminatory prices (as defined in state insurance law and regulations) creating moral hazards and forcing more low-risk activities and consumers out of the market.  *See id.* at 66-70, 111 (explaining that moral hazard occurs where insureds take "less than optimal care in protecting themselves against the insured risk" or "make less of an effort to minimize their loss should the risk occur," which poses an impediment to the efficiency of the insurance market).

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of risk factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect.  78 Fed. Reg. at 11,475.  The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious.  *See PCI I*, 66 F. Supp. 3d at 1051.  "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework."  *Id.*  "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period."  *Id.*

Despite the district court's holding, HUD has not, to date, meaningfully addressed the effect of disparate-impact liability on the fundamental nature of homeowners and commercial habitational insurance.  In its 2016 Supplemental Explanation, HUD brushed aside the industry's

---

[40] Scholars have predicted that "protected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications."  Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284.

[41] Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

concerns, concluding that they "date[] back more than three decades" during which HUD had taken the position that discriminatory-effects liability applies to insurance. 81 Fed. Reg. at 69,015. HUD also asserted that "[r]isk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving risk-based decisions." *Id.* HUD ultimately decided that "[a]fter careful reconsideration of the insurance industry comments in accordance with the court's decision . . . HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act." *Id.* at 69,012. It "continue[d] to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis." *Id.*

The NPRM makes no effort to assess the impact of disparate-impact liability on the availability of coverage or insurer solvency either, despite comments from the insurance industry repeatedly raising this concern over the years, and despite a 2017 report from the U.S. Treasury Department encouraging HUD to reconsider whether disparate-impact liability would disrupt the availability of homeowners insurance and whether it is, in fact, "reconcilable with actuarially sound principles." *See supra* p. 12. Rather, the NPRM proposes a "return to the 2013 Rule," 86 Fed. Reg. at 33,595, which ostensibly includes requiring insurers to defend their practices in litigation under the Rule on a case-by-case basis under the original burden-shifting framework.

But case-by-case adjudication under the burden-shifting framework would only exacerbate the deleterious consequences of disparate-impact liability on the business of insurance. Any alternative risk factor proposed by a plaintiff at the third step of the burden-shifting test would necessarily correspond to a different risk than the one identified as relevant by sound risk-based methodologies. As a result, the original risk of loss would still exist, and it would not be correctly reflected in the price of insurance. *See PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. May 16, 2014), ECF No. 44-4 ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans"). This would result in overcharging customers with a low risk of loss and likely driving many of them out of the market. The third step of the burden-shifting framework is accordingly a perfect example of the hazards of allowing plaintiffs to "second-guess which of two reasonable approaches" a defendant should adopt—a hazard that could undermine the insurance market entirely. *Inclusive Communities*, 576 U.S. at 541.

Moreover, the fact that risk-based insurance practices could withstand challenges under the 2013 Rule's burden-shifting framework does not remove the need for an express exemption. Forcing insurers to defend the use of risk factors in court would needlessly raise costs for the industry and customers and waste judicial resources. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 375 (6th Cir. 2007) ("[I]f *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice."); *id.* at 376 (seeing "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success").

### B.    The Disparate-Impact Rule Cannot Be Reconciled With The McCarran-Ferguson Act

HUD should also provide an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance because applying the 2013 Rule to invalidate, impair, or supersede state laws regulating insurance would violate the McCarran-Ferguson Act.  But rather than propose such an exemption, the NPRM avoids any analysis of McCarran-Ferguson.

The court hearing PCI's challenge to the 2013 Rule criticized HUD for failing to explain how the Rule could be squared with the McCarran-Ferguson Act.  The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations.  *See PCI I*, 66 F. Supp. 3d at 1048.  It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over an exemption.  *Id.*  The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis ... particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders*, 537 F.3d at 967."  *PCI I*, 66 F. Supp. 3d at 1048.  As discussed *supra* at p. 11, HUD also failed to address this concern in its Supplemental Explanation in 2016.

That same critique applies to the NPRM, which does not adequately address the McCarran-Ferguson Act.  In the NPRM, HUD does not mention McCarran-Ferguson, let alone grapple with the likelihood that McCarran-Ferguson Act would bar application of the Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance in all or most cases.  This is wholly insufficient under the district court's analysis.  *See PCI I*, 66 F. Supp. 3d at 1048.

Considering the 2013 Rule's clash with McCarran-Ferguson as the district court required confirms that subjecting homeowners and commercial habitational insurance to potential liability under the 2013 Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) improperly requiring federal courts to determine whether challenged insurance practices are actuarially sound, (ii) contravening state laws that permit or require insurers to engage in risk-based pricing and underwriting; and (iii) impairing state laws and regulations that provide for state administrative review of insurance rates.  The 2013 Rule's violation of the McCarran-Ferguson Act is most obvious in cases where an insurer's rates or underwriting guidelines are submitted to—and subject to review by—the states.  In those instances, there can be no dispute that the 2013 Rule is inapplicable in light of McCarran-Ferguson.  Indeed, had HUD actually consulted with state regulators as required by Executive Order 13132, rather than summarily and incorrectly declaring that reinstating the 2013 Rule "would not have federalism implications," 86 Fed. Reg. at 33,597, it could have reached no other conclusion but that the Rule's clash with state law will violate McCarran-Ferguson in all or nearly all cases challenging risk-based insurance practices.

### 1.    *Absent The Requested Exemption, The Rule Would Improperly Require Federal Courts To Determine Whether Challenged Practices Are Actuarially Sound*

Under the McCarran-Ferguson Act, federal laws that do not specifically relate to the business of insurance cannot be interpreted or applied in a way that would effectively usurp States' primary role in regulating insurance. *See Mutual of Omaha*, 179 F.3d at 564 (McCarran-Ferguson prohibits the federal courts from "regulating the . . . insurance industry" via litigation). In *Mutual of Omaha*, the Seventh Circuit explained that applying the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (except as required by federal laws specifically relating to insurance). *Id.* Indeed, the district court in the *PCI* case observed that "*Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." *PCI I*, 66 F. Supp. 3d at 1039; *see also id.* at 1028-29 (describing *Mutual of Omaha*). The court specifically rejected the argument previously made by HUD that the relevant language in *Mutual of Omaha* was dicta. *See id.* at 1039 n.6 ("*Mutual of Omaha* is binding on this Court.").

Applying the 2013 Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would similarly result in federal courts second-guessing the actuarial soundness of state-regulated insurance practices. For example, to determine whether a challenged practice serves a "substantial" interest, or to evaluate a plaintiff's proffered less-discriminatory alternative, a federal court would necessarily have to examine whether using a particular risk factor was legitimate, whether a practice is actuarially sound, and which of two practices is more predictive of loss. Thus, in every case under the Rule challenging a risk-based pricing or underwriting practice, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. And in cases where plaintiffs prevail, a federal court would be called upon to enjoin the insurer's state-law-approved risk-based practice in favor of an alternative that may not be equally effective at predicting loss, which would violate state laws prohibiting inadequate rates and unfair discrimination between individuals with comparable risk profiles. *Supra* at pp. 3-4. This displacement of responsibility for insurance regulation from States to federal courts, based on a law that does not even mention insurance, is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

As noted, the *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*." *PCI I*, 66 F. Supp. 3d at 1048. Despite the court's emphasis on *Mutual of Omaha*, HUD's NPRM again makes no effort to address the decision's key holding. HUD never addressed the clear holding of *Mutual of Omaha* that the *PCI* court noted and found applicable here: that the McCarran-Ferguson Act prohibits a federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564. And as explained, grappling with *Mutual of Omaha*'s key holding confirms that no possible explanation could justify denying the requested exemption because the 2013 Rule cannot be applied to risk-based pricing and underwriting of homeowners insurance consistent with McCarran-Ferguson.

## 2. *The Rule Would Conflict With State Laws Permitting Or Requiring Insurers To Engage In Risk-Based Pricing And Underwriting*

State insurance laws uniformly permit insurers to rely on risk factors in setting rates and making underwriting decisions. Under state insurance law, discrimination is prohibited only when it is "unfair." Unfair discrimination occurs only when insureds posing similar risks are treated differently. Differential treatment of insureds who pose different risks is uniformly allowed (and, indeed, required, as explained below). Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." WIS. STAT. ANN. § 625.11(4) (1969). As another example, Arizona law specifies:

> A rate is not unfairly discriminatory in relation to another in the same class if it reflects equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, if the rates reflect the differences with reasonable accuracy.

ARIZ. REV. STAT. ANN. § 20-383(D) (1980) (ameneded 1987); *see also, e.g.*, COLO. REV. STAT. ANN. § 10-4-403(1)(c) (1979) (amended 2006); MICH. COMP. LAWS ANN. § 500.2403(1)(d) (1956) (amended 1993); MINN. STAT. ANN. § 70A.04(4) (1969) (amended 1986); MO. ANN. STAT. § 379.318(4) (1972); NEV. REV. STAT. ANN. § 686B.050(4) (1971) (amended 1987); N.H. REV. STAT. ANN. § 412:15(I)(d) (2003) (amended 2021); N.M. STAT. ANN. § 59A-17-6(E) (1984) (amended 2007); N.C. GEN. STAT. ANN. § 58-40-20(e) (1977) (amended 1985); TENN. CODE ANN. § 56-5103(a), (d) (1983) (amended 1996). *See generally* Appendix I (attached).

The principle that discrimination is prohibited only if it is "unfair" is enshrined in both state insurance rating laws (like those quoted above) and state insurance unfair practices laws, which address both the pricing and provision of insurance more generally. *See* Appendix I; *see, e.g.*, IOWA CODE ANN. § 507B.4(3)(g)(2) (1955) (amended 2018) (specifying that it is an unfair trade practice to "[m]ak[e] or permit[] any unfair discrimination between insureds of the same class for essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance other than life or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.").

In addition, numerous states expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, CONN. GEN. STAT. § 38a-803(4) (1971) (amended 1999); N.H. REV. STAT. ANN. § 412:15(I)(d) (2003) (amended 2021); VA. CODE ANN. § 38.2-1904(A)(3) (1973) (amended 2015). For example, under Indiana law,

> Risks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in

hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

IND. CODE ANN. § 27-1-22-3(a)(2) (1967) (amended 2011). Many other state statutes contain very similar language expressly permitting the use of risk-based pricing. *See, e.g.*, ARIZ. REV. STAT. ANN. § 20-356(4) (1990); ARK. ANN. § 23-67-209(b); COLO. REV. STAT. ANN. § 10-4-403(4) (1979) (amended 2006); DEL. CODE ANN. tit. 18 § 2503(5) (1953) (amended 2018); MD. CODE ANN. INS. § 11-205(f) (1957) (amended 1997); ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(G) (1969) (amended 2007); MINN. STAT. ANN. § 70A.05(2) (1969); NEV. REV. STAT. ANN. § 686B.060(2) (1971) (amended 2017); TEX. INS. CODE ANN. § 2251.052(c) (2005); *see generally* Appendix I.[42]

As numerous courts have recognized, these laws ensure that insurance markets operate fairly. *See, e.g.*, *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any . . . of the terms and conditions of the insurance.'") (quoting ALASKA STAT. §§ 21.36.090(c), 21.36.120(c)); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance.") (quoting S.D. CODIFIED LAWS § 58-33-26). And as discussed *supra* at pp. 3-4, preventing unfair discrimination in insurance means that insureds are charged commensurate with the risks they pose. *See Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses."). And as explained *supra* at Part I.B., such accurate pricing is essential to the functioning of a market.

Moreover, the vast majority of states *require* insurers to set rates based on past losses, anticipated future losses, related loss expenses, and other neutral factors, which (taken together) form the foundation of risk-based pricing and underwriting as a mechanism for complying with state prohibitions against "unfair discrimination" and "inadequate" rates and their hedge against insurer solvency for the protection of insureds and claimants alike. *See* Appendix I; *see also PCI I*, 66 F. Supp. 3d at 1039 (noting that "some states require insurers to use risk-based pricing" and that others "merely permit risk-based pricing"). Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside of this state, to conflagration and catastrophe hazards, if any, ... [and] to all other relevant factors, including trend factors, within and outside this state . . . ." IND. CODE ANN. § 27-1-22-3(a)(1) (1967) (amended 2011). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this

---

[42] APCIA's identification of the specific state laws at issue distinguishes this case from *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003).

state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." WIS. STAT. ANN. § 625.12(1) (1975) (amended 2020). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, GA. CODE ANN. § 33-9-4(4) (1967) (amended 2008); MD. CODE ANN. INS. § 11-205(c) (1957) (amended 1997); MASS. GEN. LAWS ANN. ch. 174A, § 5(3) (1947) (amended 1996); N.J. STAT. ANN. § 17:29A-4(c) (1944) (amended 1979); N.Y. INS. LAW § 2304(a) (1984) (amended 2014); OHIO REV. CODE ANN. § 3935.03(C) (1953); S.C. CODE ANN. § 38-73-430(1) (1976) (amended 2004); TENN. CODE ANN. § 56-5104(1) (1983); WASH. REV. CODE ANN. § 48.19.030(3) (1947) (amended 1989); *see generally* Appendix I.

Indeed, as noted above, state insurance laws also make clear that failure to account for differences in expected losses constitutes prohibited "unfair discrimination." For example, Utah law provides that "[a] rate is unfairly discriminatory if price differentials fail to equitably reflect the differences in expected losses and expenses after allowing for practical limitations." UTAH CODE ANN. § 31A-19a-201(4)(a) (1985) (amended 1999); *see also, e.g.*, ARIZ. REV. STAT. ANN. § 20-383(D) (1980) (amended 1997); COLO. REV. STAT. § 10-4-403(1)(c) (1979) (amended 2006); MICH. COMP. LAWS ANN. § 500.2403(1)(d) (1956) (amended 1993); MINN. STAT. ANN. § 70A.04(4) (1969) (amended 1986); MO. ANN. STAT. § 379.318(4) (1972); NEV. REV. STAT. ANN. § 686B.050(4) (1971) (amended 1987); N.H. REV. STAT. ANN. § 412:15(I)(d) (2003) (amended 2021); N.M. STAT. ANN. § 59A-17-6(E) (1984) (amended 2007); N.C. GEN. STAT. ANN. § 58-4020(e) (1977) (amended 1985); TENN. CODE ANN. § 56-5-103(a), (d) (1983) (amended 1996).

States similarly prohibit insurers from charging "inadequate rates," thereby requiring insurers to take risk into account to remain solvent. *See* Appendix I (the same state laws prohibiting unfair discrimination, and thus permitting risk discrimination, also prohibit "inadequate" rates). For example, Texas insurance law provides that "[a] rate may not be excessive, *inadequate*, unreasonable, or unfairly discriminatory for the risks to which the rate applies. TEX. INS. CODE ANN. § 2251.052 (2005) (emphasis added). A rate is "inadequate if it "is insufficient to sustain projected losses and expenses to which the rate applies" and "continued use of the rate endangers the solvency of an insurer using the rate[]." *Id.* § 2251.051(c). Other state statutes contain similar requirements. *See, e.g.,* N.Y. INS. LAW § 2303 (1984) (amended 1990) ("Rates shall not be excessive, *inadequate*, unfairly discriminatory, destructive of competition or *detrimental to the solvency of insurers*.") (emphases added); COLO. REV. STAT. ANN. § 10-4-403 (1979) (amended 2006) ("Rates shall not be excessive, *inadequate*, or unfairly discriminatory" and "[c]oncerning inadequacy, rates are not inadequate unless clearly insufficient to sustain projected losses and expenses") (emphasis added); *see also* Appendix 1 (column 3). As explained by the Pennsylvania Superior Court:

> With or without regulation, it has always been in the public interest to have insurance premiums high enough to assure the payment of losses, and yet low enough to enable the public to secure protection upon the payment of a reasonable premium. To assure the availability of funds by insurers to pay losses, the state has long required insurance companies to be licensed, to maintain reserves and to submit to examination to determine solvency and

> compliance with the law. This has discouraged companies from
> charging 'inadequate' rates.

*Ins. Dep't v. City of Phila.*, 173 A.2d 811, 814 (Pa. 1961); *see also Engelman*, 692 A.2d at 480 (describing the prevention of inadequate insurance rates as one of the principal aims of the Maryland Insurance Code). Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits.[43] Yet undermining the states' efforts to guard against insurer insolvency by prohibiting inadequate rates is precisely what the 2013 Rule would do by re-interpreting the FHA to foreclose insurances practices expressly permitted or even required by state law.

In compliance with state insurance laws, insurers charge different rates to, and make different underwriting decisions about, customers who pose different risks or present different loss profiles. Despite these state-authorized differences, HUD's Disparate-Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a FHA-protected characteristic, thus creating a conflict between the Rule and the laws of the vast majority of the states. The McCarran-Ferguson Act ensures that federal laws of general applicability do not "'invalidate, impair, or supersede' [a] State's law." *Humana*, 525 U.S. at 307. To invalidate means "to render ineffective," and to supersede is "to displace (and thus render ineffective) while providing a substitute rule." *Id.* (internal quotation marks omitted). To impair a State's law is to "hinder its operation or frustrate [a] goal of that law." *Id.* at 311 (internal quotation marks and citation omitted). Application of the 2013 Rule to insurers would "invalidate, impair, or supersede" state law and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly permitted or required by state law. *Id.* at 310.

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *Humana*, 525 U.S. at 311; *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But, as explained *supra* pp. 26-27, far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that applying the 2013 Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would run afoul of the McCarran-Ferguson Act.

---

[43] *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal . . . laws."); *Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations).

### 3. *The Rule Would Conflict With State Laws And Regulations Providing For State Administrative Review Of Insurance Rates*

The overwhelming majority of states—49 of 50, plus the District of Columbia—require admitted insurers to file their rates with state insurance commissioners for review and approval. *See* Appendix I.[44] State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound risk factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, WIS. STAT. ANN. § 625.13 (1979) (amended 1983); N.J. STAT. ANN. § 17:29A-7 (1944); IND. CODE ANN. § 27-1-22-5 (1967) (amended 2003); GA. CODE ANN. § 33-9-26 (1933) (amended 1994); KAN. STAT. ANN. § 40-955 (a), (l) (1997) (amended 2011); MD. CODE ANN., INS. § 27-501(h)(2); MICH. COMP. LAWS ANN. § 500.2119 (1956) (amended 2012); N.J. STAT. ANN. § 17:22-6.14a1 (2012); VT. STAT. ANN. tit. 8, § 4688 (1983) (amended 1989); W. VA. CODE R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. CAL. INS. CODE § 1861.05(b) (1988) (amended 1993). Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, CONN. GEN. STAT. § 38a-689(a) (1982) (amended 2000); FLA. ADMIN. CODE ANN. r. 69O-170.013(1)(b); GA. CODE ANN. § 33-9-21(a) (1933) (amended 2020); KAN. STAT. ANN. § 40-955 (a), (l) (1997) (amended 2011); KY. REV. STAT. ANN. § 304.13-051(4) (1982) (amended 2010); ME. REV. STAT. ANN. tit. 24-A § 2938-A (1989) (amended 1995); MD. CODE ANN., INS., § 27-501(h)(2) (1997) (amended 2020); MICH. COMP. LAWS ANN. § 500.2119 (1956) (amended 2012); MO. CODE REGS. ANN. tit. 20, § 500-9.100; N.H. INS. 3306.01(a); N.J. STAT. ANN. § 17:22-6.14a1 (1971); N.M. STAT. ANN. § 59A-17-5.1 (2007); 28 TEX. ADMIN. CODE § 5.9342 (2005) (amended 2019); UTAH ADMIN. CODE R. R590-127; VT. STAT. ANN. tit. 8, § 4688 (1983) (amended 1989); W. VA. CODE R. § 114-74-4.

HUD's Disparate-Impact Rule would "interfere with a State's administrative regime" and impair, invalidate, or supersede these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired, invalidated, or superseded by the application of the Rule. *See, e.g.*, *Saunders v. Farmers Ins. Exch.*, 537 F. 3d 961, 968 (8th Cir. 2008) (*Saunders II*) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state regulator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to litigate in federal court

---

[44] As previously noted, admitted insurers account for 99% of homeowners policies. *See supra* note 3. Rate filing is also generally required for small-to-mid-market commercial habitational insurance. A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

whether every component of their rating and underwriting plans and other business practices "advances a valid interest." *See* Proposed § 100.500(d)(1)(i). Such interference with the states' insurance administration regimes is not permitted under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4. HUD Cannot Rely On Its Prior Justifications For Declining To Exempt Risk-Based Pricing And Underwriting Of Insurance

HUD previously justified denying an exemption for risk-based pricing and underwriting of insurance on the basis that certain state anti-discrimination laws might apply to insurance, and an exemption would therefore "deprive all states of federal support in addressing discriminatory insurance practices," contrary to "the purpose of [the] McCarran-Ferguson [Act]." 81 Fed. Reg. at 69,016. HUD cannot do so again to support its proposal to reinstate the 2013 Rule, as its justification is arbitrary and capricious. The McCarran-Ferguson Act is not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). State antidiscrimination laws—which states may enforce themselves, if appropriate—are not enacted "for the purpose of regulating the business of insurance" and thus have no bearing on whether application of the Disparate-Impact Rule to risk-based pricing and underwriting would violate the McCarran-Ferguson Act.

Moreover, even if a state's fair-housing law were identical to the FHA and would permit a disparate-impact challenge to risk-based pricing and underwriting in state court, any federal litigation under HUD's Disparate-Impact Rule would still require federal courts applying federal law to second-guess the actuarial soundness of insurance practices regulated by state law—contrary to the express holding of *Mutual of Omaha*. *See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law."). HUD's previous reliance on snippets of discussion from out-of-circuit district court decisions and a state court decision, none of which addressed these issues,[45] provided no basis for disregarding the plain text of the McCarran-Ferguson Act and the Seventh Circuit's controlling decision in *Mutual of Omaha*.

Nor can HUD decline to exempt risk-based pricing and underwriting practices of homeowners and commercial habitational insurance on the grounds that the McCarran-Ferguson analysis requires a fact-based inquiry, as it has previously argued. 81 Fed. Reg. at 69,016. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting. HUD relied on *Saunders I*, 440 F.3d at 946. But that court, reviewing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, merely held that "the nature of plaintiffs' price

---

[45] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case returned to the Eighth Circuit and it was clear that the plaintiffs were relying on a disparate-impact theory, the court noted that "HUD has never applied a disparate-impact analysis to insurers," *Saunders II*, 537 F.3d at 964 n.3 (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)), and that there was "doubt" as to whether it could, *Saunders II*, 537 F.3d at 964. The court ultimately held that the plaintiffs' FHA challenge was foreclosed by the McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's administrative regime. *Id.* at 968. This hardly counsels against a categorical exemption for risk-based pricing and underwriting.

\*　　　\*　　　\*

For all of these reasons, application of the Disparate-Impact Rule to homeowners and commercial habitational insurance would "invalidate, impair, or supersede" state laws governing insurance.

## C. Applying The Disparate-Impact Rule To Risk-Based Pricing And Underwriting Of Homeowners Insurance Is Inconsistent With The Filed-Rate Doctrine

HUD also must exempt risk-based pricing of homeowners and commercial habitational insurance[46] from the Rule to avoid conflict with the filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986); *PCI I*, 66 F. Supp. 3d at 1049. The doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).[47]

The doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g., McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 236-39, 242 (3d Cir. 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013); *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005), *aff'd*, 721 N.W.2d 307 (Minn. 2006); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*, No. 3775, 2002 WL 778272, at \*15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000); *see also, e.g.*, CAL. INS. CODE § 1860.1 (1947) ("No act done, action taken or agreement made pursuant to the

---

[46] The filed-rate doctrine applies to large commercial habitational insurance to the extent insurers file their rates. *See supra* pp. 3-4.

[47] The extent or the vigor of the agency's review of filed rates does not matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 n.19 (1986); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000).

authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates); *McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-cv-W-FJG, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

The district court in *PCI* found that HUD initially had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. *PCI I*, 66 F. Supp. 3d at 1050. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* As discussed *supra* at p. 11, HUD's Supplemental Explanation failed to adequately explain why the filed-rate doctrine would not bar challenges under the FHA to insurance rates filed with state agencies, as required in many states. After all, a challenge brought by an insured claiming that rates charged were higher because of the insured's race would require a court to assess the reasonableness of the rate filed with the state and, in successful challenges, invalidate it.

In the NPRM, HUD has again failed to address the filed-rate doctrine. But no amount of reasoned explanation could justify a failure to exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from the Rule, which would violate the filed-rate doctrine by allowing private lawsuits and federal government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Wegoland*, 27 F.3d at 19; *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted).

**D.**    **The Costs Of Subjecting Homeowners And Commercial Habitational Insurance To Disparate-Impact Liability Under The Burden-Shifting Framework Outweigh The Benefits, Warranting An Exemption**

In addition to the legal grounds for exempting homeowners and commercial habitational insurance from the Disparate-Impact Rule noted above,[48] the costs of subjecting the industry to case-by-case adjudication outweigh the benefits of doing so, warranting an exemption.

Requiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on insurers and their customers, making insurance less affordable

---

[48] Each of the arguments discussed *supra* provide an independent justification for why the Disparate Impact Rule cannot and should not be applied to homeowners and commercial habitational insurance. Nevertheless, HUD has previously maintained that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475. HUD has never explained how compliance with a federal statute or longstanding limitations articulated by the Supreme Court would be contrary to congressional intent.

for all. Under HUD's approach, in many cases insurers would have to defend each of the risk factors they use, perhaps even on a region-by-region basis, as different plaintiffs assert alleged disparate impacts among particular populations of insureds. HUD's response to this concern raised previously was that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. HUD provided no basis, however, for its counterintuitive assumption that it would cost as much to demonstrate eligibility for an exemption for risk-based pricing and underwriting as it would to litigate the actuarial soundness of a challenged practice on a case-by-case basis in multiple jurisdictions at different points in time.

HUD also previously supported its assertion that it could not grant an exemption by citing to *Graoch*. But HUD ignored the *Graoch* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. 508 F.3d at 376 (emphasis added). Indeed, the *Graoch* court identified homeowners insurance as an example of when application of the Disparate-Impact Rule is never appropriate. *Id.* at 375. The district court in the *PCI* case recognized that case law HUD itself previously relied upon makes clear that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI I*, 66 F. Supp. 3d at 1051 (quoting *Graoch*, 508 F.3d at 375-76).

Moreover, the Rule would require insurers to establish not merely that a practice is purely risk-based; it would also require insurers to litigate the third step of the burden-shifting approach, disputing that less discriminatory alternatives exist. This would be especially difficult for insurers because—as noted above, *see supra* pp. 3-4—they do not collect data on subscribers' race, ethnicity, or other FHA-protected characteristics and have no other means of anticipating disparities. And assuming they could collect the necessary data to defend themselves, it would introduce race or ethnicity as a pervasive factor, which the Court in *Inclusive Communities* warned against, and intrude upon policyholders who would be required to self-report race and ethnicity data. *PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶¶ 11–12; *id.* ECF No. 44-3 ¶ 14.

It is not enough to assert, as HUD has previously done, that the costs of case-by-case litigation outweigh the supposed benefits without evaluating how often plaintiffs would likely prevail on challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Indeed, given the precise mathematical, statistical, and economic analysis required to accurately price and underwrite insurance, *supra* pp. 3-4, plaintiffs challenging homeowners insurers' practices under the Rule likely would *not* be able to identify alternative less-discriminatory risk-based practices that will nevertheless allow the insurer to pursue their valid interest—that is, charging premiums that accurately reflect their costs of covering particular classes of risk for similarly situated customers.[49] Under these circumstances, APCIA's requested exemption is warranted.

---

[49] Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

**IV.** **IF HUD DOES NOT GRANT AN EXEMPTION, IT SHOULD MODIFY AND CLARIFY THE RULE TO ADDRESS ISSUES UNIQUE TO RISK-BASED INSURANCE PRICING AND UNDERWRITING AND TO MORE CLOSELY CONFORM TO *INCLUSIVE COMMUNITIES***

If it does not grant an exemption, HUD should incorporate a number of additional safeguards and clarifications to account for the unique aspects of risk-based insurance practices and to conform with *Inclusive Communities*.

**A.** **HUD Has Previously Recognized The Necessity Of Additional Safeguards And Clarifications To The Rule**

As an initial matter, HUD has *already* recognized the need to conform the 2013 Rule "to the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.* and to provide clarification regarding the application of the standard to State laws governing the business of insurance." 85 Fed. Reg. at 60,288. Specifically, in the 46-page Final Rule published on September 24, 2020, HUD thoroughly explained the policy and legal justifications for adopting several changes to the 2013 Rule, including the Supreme Court's requirements in *Inclusive Communities* that plaintiffs must plead sufficient facts demonstrating that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law" and a "robust causal link between the challenged policy or practice and the adverse effect on members of a protected class[.]" *Id.* at 60,332. And, as described below, HUD both addressed the burdens of proof in discriminatory-effect cases and established several defenses to conform the Rule to governing caselaw and best practices. In sum, HUD agreed with the many "comments in support of [the 2020 Rule]," and "agree[d] that it will bring clarity to litigants and further the Fair Housing Act's purpose. HUD also agree[d] that [the 2020 Rule] will benefit banks and landlords, while ensuring that disparate impact cases can continue consistent with Supreme Court precedent. . . . Lastly, HUD agree[d] with the comments that supported the change to § 100.5 and § 100.500(e) dealing with insurance." *Id.* at 60,292.

Now, citing an injunction from the United States District Court for the District of Massachusetts, HUD has proposed reversing course entirely—dismissing its one-year-old reasoning in full, and disregarding the several considered protections articulated and commended in the 2020 Rule. But the district court's injunction provides no basis for a total reversal of course. Rather, the district court—at a "very preliminary stage"—cited three specific provisions in the 2020 Rule that it held warranted an injunction, namely: the (i) "outcome prediction" defense; (ii) the requirement that a plaintiff's proffered less discriminatory alternative policy must serve the defendant's interests in an "*equally effective manner without imposing materially greater costs*" or otherwise "creating *other material burdens for*" the defendants; and (iii) an unidentified conflation of the plaintiff's prima facie burden and pleading burden. *MFHC*, 496 F. Supp. 3d at 610-611 (citations and quotation marks omitted). The district court did not cite any other flaw with the 2020 Rule, and in fact condoned the 2020 Rule's requirement that plaintiffs plead, at the outset, that a challenged policy is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective." *Id.* at 610 (quoting 24 C.F.R. § 100.500(b)(1)).

Accordingly, the district court's limited ruling does not justify wholesale rejection of HUD's prior reasoning in support of the 2020 Rule, especially with respect to the 2020 Rule's specific accommodations to the unique business of insurance. HUD's reversal of course with respect to those portions of the 2020 Rule not addressed by the district court amounts to an "unexplained inconsistency" in agency policy that alone is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016). If HUD does not grant the exemptions explained *supra* Part III, APCIA respectfully suggests that HUD retain those portions of the 2020 Rule left untouched by the district court's injunction, including without limitation: (1) the 2020 Rule's specific pleading standards, *see* 24 C.F.R. § 100.500(b); (2) the 2020 Rule's third-party requirement defenses, *see* 24 C.F.R. § 100.500(d)(1) and (d)(2)(iii); (3) the 2020 Rule's provision relating to the state laws governing insurance, *see* 24 C.F.R. § 100.500(e); (4) the 2020 Rule's clarifications regarding the allocation of burdens of proof, *see* 24 C.F.R. § 100.500(c); and (5) the 2020 Rule's limitation of remedies available in disparate impact litigation, *see* 24 C.F.R. § 100.500(f). APCIA further urges HUD to adopt additional safeguards to the 2020 Rule's regulatory scheme as identified below, including a defense particular to risk-based pricing and underwriting.

## B. HUD Should Retain And Expand The 2020 Rule's Specific Pleading Standards

The 2020 Rule established that a plaintiff challenging an allegedly discriminatory policy or practice must sufficiently plead facts demonstrating: "(1) [t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law; (2) [t]hat the challenged policy or practice has a disproportionately adverse effect on members of a protected class; (3) [t]hat there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect; (4) [t]hat the alleged disparity caused by the policy or practice is significant; and (5) [t]hat there is a direct relation between the injury asserted and the injurious conduct alleged." 24 C.F.R. § 100.500(b). As HUD explained in promulgating the 2020 Rule, these standards provide "greater clarity, in the wake of *Inclusive Communities*, regarding the requirements for bringing and defending against disparate impact claims," and further "clarify what evidence is needed in order to successfully challenge a policy or practice, which HUD believes will lead to a greater percentage of successful disparate impact claims while reducing the number of claims that are not appropriate under the disparate impact theory." 85 Fed. Reg. at 60,297. And as the district court explained when enjoining the 2020 Rule, the "arbitrary, artificial, and unnecessary" language incorporated into these standards "comes directly from *Inclusive Communities*, 576 U.S. at 540, 543, 544," *MFHC*, 496 F. Supp. 3d at 610, and other case law, *e.g.*, *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017) ("[Plantiffs] must still allege facts plausibly demonstrating that [the challenged policies] are arbitrary and unnecessary under the FHA.").

These pleading standards are as appropriate today as they were in 2020. They would provide courts and litigants alike with both the clarity and the protections demanded by *Inclusive Communities*—which specifically requires that plaintiffs make out a "prima facie case of disparate impact" and satisfy new "cautionary standards," including an initial showing of "robust

causality" lest a mere "statistical disparity" threaten respondents with costly litigation and compel their use of potentially unconstitutional "numerical quotas" or other explicit and suspect considerations of race. 575 U.S. at 542. Once again, HUD's own reasoning applies; HUD specifically recognized that *Inclusive Communities* "placed special emphasis on the importance of the plaintiff's prima facie burden," 84 Fed. Reg. at 42,855, including the "arbitrary, artificial, and unnecessary," and "robust causality" prime facie elements codified in the 2020 Rule, *id.* at 42,858-42,859. And HUD has already found that these standards provide "greater clarity" to plaintiffs, 86 Fed. Reg. at 33,594, contrary to the NPRM's wholly inconsistent *ipse dixit* that, somehow, the 2013 Rule "provides greater clarity" despite articulating *fewer* pleading standards.

APCIA reiterates that requiring plaintiffs to specifically plead a robust causal link between a challenged practice and a disparate impact to satisfy the standard mandated by *Inclusive Communities* is particularly important in suits involving insurance. That is so because there is often only a remote connection between the specific practices of homeowners and commercial habitational insurers and the housing opportunities and decisions of allegedly FHA-protected class members. *Supra* at pp. 3-4. In situations like that, it may be difficult, if not impossible, to meet the robust causation standard the *Inclusive Communities* Court held was necessary to ensure that disparate-impact liability does not raise constitutional concerns. *See* 576 U.S. at 543 (explaining that a plaintiff challenging the decision of a private developer to construct a new building in a particular location may not be able to show causation "because of the multiple factors that go into investment decisions about where to construct or renovate housing units"). The Court has also made clear that mere statistical disparities or correlation is insufficient to show that a challenged policy or practice was the cause of an existing disparate impact. *Id.* at 542. HUD should ensure that these concerns are reflected in any reinstatement of the 2013 Rule, by clarifying that the Rule does not reach practices with a mere "predicted" disparate impact but only ones that have occurred, that the causation analysis must consider whether a practice is too remote to give rise to liability, and that more than statistical correlation is required to establish causation.

## C.     HUD Should Retain And Expand The 2020 Rule's Third-Party Defense

The 2020 Rule permitted defendants to defeat a disparate-impact claim by "showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a: (i) Federal, state, or local law; (ii) Binding or controlling court, arbitral, administrative order or opinion; or (iii) Binding or controlling regulatory, administrative or government guidance or requirement." 24 C.F.R. § 100.500(d)(1). HUD promulgated this defense to comply with the fact that *Inclusive Communities* "favorably cit[ed] the lower court's concurring opinion that included as an element of a plaintiff's prima facie case a demonstration that the defendant's policy or practice is not a result of a law that substantially limits the defendant's discretion. If the defendant's discretion is limited in such a way, the Supreme Court identified this as a lack of causal connection between the policy or practice and the disparate impact, and therefore the case should be dismissed." 85 Fed. Reg. at 60,316. Indeed, *Inclusive Communities* left no doubt as to this conclusion, explicitly stating that the plaintiff "cannot show a causal connection between the Department's policy and a disparate impact" if "federal law substantially limited the Department's discretion." 576 U.S. at 543.

Yet, HUD now claims—against this reality—that "nothing in *Inclusive Communities* suggests this defense is required, let alone reasonable, for HUD to create." 86 Fed. Reg. at 33,595. That position cannot be squared with the text of *Inclusive Communities* nor with HUD's prior reasoning. HUD also now claims that the third-party defense is "inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid." *Id.* But HUD already considered, and rejected, this position, reasonably stating that "in the event that unlawful discriminatory practices are mandated by statute or court order, the most effective way to eliminate the unlawful discrimination is to remove or modify the underlying statute or order that mandated the unlawful discrimination. That also allows for a single legal proceeding to affect multiple actors, rather than requiring many lawsuits for all the entities affected by the statute or court order." 85 Fed. Reg. at 60,317. And this makes sense: no party should be held liable for actions compelled by law. Indeed, it was for this very reason that HUD introduced this defense in the first place, to avoid placing parties in a "'double bind of liability,' where they could be subject to suit under disparate impact for actions required for good faith compliance with another law." 84 Fed. Reg. at 42,860. HUD has offered no reason to depart from this considered approach in the 2020 Rule.

Not only should HUD retain the 2020 Rule's third-party defense, it should specifically clarify that the defense applies where state insurance law *permits* the challenged practice. As originally promulgated, the defense applies only if a "defendant shows that its discretion is materially limited by a third party such as through … [a] Federal, state, or local law." 84 Fed. Reg. at 42,854 (proposed 24 C.F.R. § 100.500(c)(1)(i)). A defendant's discretion to act is plainly limited where state law compels the defendant to engage in the challenged practice. In some cases, however, state law merely *permits* the challenged practice without compelling it. Where the state law at issue is a state insurance regulation, such permission ought to be sufficient given the limitations imposed by the McCarran-Ferguson Act.

As explained above, it is well established that, in light of the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1557 n.9 (8th Cir. 1989) (McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal … laws."); *Dexter Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). The mere fact that state law permits a practice might not, in most circumstances, preclude federal regulation of the practice. But insurance is different because of McCarran-Ferguson. Where a defendant can show that the practice challenged is permitted by state insurance law, it should be able to invoke a defense set forth in the Disparate-Impact Rule.

### D. HUD Should Retain The 2020 Rule's Provision Relating To The State Laws Governing Insurance

The 2020 Rule permitted defendants to defeat a disparate-impact claim by "showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a: (i) [f]ederal, state, or local law; (ii) [b]inding or controlling court, arbitral, administrative order or opinion; or (iii) [b]inding or controlling regulatory, administrative or government guidance or requirement." 24 C.F.R. § 100.500(e). HUD's proposal in the NPRM to erase that provision is unexplained and troubling, as the provision reiterates well-settled principles of law under the McCarran-Ferguson Act—as HUD itself previously explained. 84 Fed. Reg. at 42,860 ("business of insurance" works to "codif[y] the general applicability of the 'reverse preemption' provisions of the McCarran-Ferguson Act as it applies to the Fair Housing Act."). HUD's proposal to delete the provision implies an intention to improperly test the boundaries of HUD's ability to preempt state regulation of insurance. HUD should clarify that the Disparate-Impact Rule should not be construed by courts to modify or limit in any manner the McCarran-Ferguson Act's prohibition of federal laws impairing state insurance regulatory schemes, especially in light of the potential false inference plaintiffs or HUD may suggest by HUD's deletion of this provision.

### E. HUD Should Retain And Expand The 2020 Rule's Guidance With Respect To Burdens Of Proof

The 2020 Rule helpfully clarified the pleading and post-pleading burdens of proof in discriminatory impact cases—specifically, that defendants at step two bear a burden of production, not of proof. 24 C.F.R. § 100.500. Any reinstatement of the 2013 Rule should maintain that clarification. As HUD explained, the 2020 Rule's burden-shifting approach is "similar to the 2013 Rule's burden shifting approach, but provides more detail and clarity following the Supreme Court's decision in *Inclusive Communities*. The 2013 Rule inappropriately required the defendant to prove that the challenged practice was necessary to achieve a substantial, legitimate, nondiscriminatory interest." 85 Fed. Reg. at 60,320. Thus the 2020 Rule made clear that the burden of proving a disparate-impact case remains always where it should: with the plaintiff. Again, HUD explained this reasoning in full, noting that requiring only a burden of production at step two is consistent with the business necessity standard in Title VII caselaw—an analogy specifically endorsed by *Inclusive Communities*, 576 U.S. at 541—and that production "is a more logical burden for the defendant because the defendant may effectuate a defense by challenging other elements of the plaintiff's case, without reaching the issue of a valid interest." 85 Fed. Reg. at 60,320. Or, stated succinctly: "It is ultimately the plaintiff's burden to prove a case, and the plaintiff must do so by rebutting any evidence produced by the defendant." *Id.*

Additionally, HUD should make clear as it did in 2020 that, at the third step of the burden-shifting test, a plaintiff must prove their alternative policy would serve a defendant's interests in "an equally effective manner." 85 Fed. Reg. at 60,333. That requirement is compelled not only by *Inclusive Communities* but by longstanding Supreme Court interpretation of the requirements of the burden-shifting test in anti-discrimination litigation. In its notice of proposed rulemaking for the 2020 Rule, HUD noted that the requirement that a plaintiff's

alternative be "equally effective" in achieving a valid interest derived from "existing disparate-impact caselaw." 84 Fed. Reg. at 42,860 (citing *Wards Cove*, 490 U.S. at 661).

HUD has cited no reason to depart from this reasoning, nor does *Inclusive Communities* permit it to do so—as it specifically requires that defendants be given "leeway to state and explain" their policies, not prove them to avoid liability, and requires that a plaintiff's alternative be "equally effective" at achieving a valid interest. 576 U.S. at 541. Nor does the district court's recent injunction justify leaving these important safeguards out of the Rule. The court cast doubt on this requirement because it was not aware of the requirement being articulated in "any judicial decision." *MFHC*, 496 F. Supp 3d. at 610. But as noted, this requirement has been a critical component of the third step of the burden-shifting framework since articulated in *Wards Cove*.

Accordingly, consistent with *Inclusive Communities* and prior Supreme Court caselaw, HUD should clarify that the plaintiff always carries the burden of establishing that the challenged policy or practice is based on arbitrary, artificial, and unnecessary barriers, even if the plaintiff has alleged sufficient plausible facts to survive a motion to dismiss at the pleading stage.

## F.  HUD Should Retain The 2020 Rule's Remedies Provision

The 2020 Rule clarified that in discriminatory-effects cases, "remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons," and that HUD itself would seek only equitable remedies in administrative proceedings except in certain circumstances. 24 C.F.R. § 100.500(f). The 2020 Rule therefore restated the Supreme Court's explicit guidance in *Inclusive Communities* that, "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice." 576 U.S. at 544.

HUD has now proposed reversing course on this point as well, contradicting the clear language in *Inclusive Communities* and going so far as to say that "no part of *Inclusive Communities*" supported the 2020 Rule's remedies provision. 86 Fed. Reg. at 33,595. HUD also cites the fact that the Act provides "for a wide variety of remedies, including injunctive relief, actual damages, punitive damages, and civil penalties." *Id.* But this is a red herring; as HUD explained in promulgating the 2020 Rule, HUD did not, "and could not, make changes to the availability of punitive damages as a potential remedy in civil actions or civil money penalties in administrative proceedings." 85 Fed. Reg. at 60,303. Nor does APCIA suggest that HUD modify the remedies provided for in the Act. Rather, HUD should retain language in the 2020 Rule that codified the Supreme Court's explicit guidance in *Inclusive Communities* and committed to HUD's correct and necessary "understanding that relief in disparate impact cases should be focused on equitable remedies, such as eliminating or reforming a discriminatory practice, rather than monetary punishment, unless circumstances out of the ordinary warrant such." 85 Fed. Reg. at 60,304.

### G. HUD Should Codify A Defense For Risk-Based Pricing And Underwriting

In addition to retaining and expanding several portions of the 2020 Rule identified above, HUD should promulgate a defense that accounts for the unique concerns of the homeowners insurance industry. Specifically, for the reasons set forth above that support creation of a full exemption for risk-based pricing and underwriting, HUD should create a substantive defense for risk-based pricing and underwriting. If a defendant shows that it relied on risk-based pricing and underwriting, that should be a complete defense at Step 2 of the burden-shifting framework. The plaintiff should not have an opportunity to rebut the defense at Step 3.

As explained *supra* at pp. 26-34, allowing a plaintiff to litigate whether some other alternative risk factor would be less discriminatory but still "serve" the defendant's "interests"— albeit not in a manner that is equally effective at predicting loss—would impermissibly require federal courts to adjudicate the actuarial soundness of challenged insurance practices and even override state-law-approved risk-based practices. But that is precisely what the Seventh Circuit in *Mutual of Omaha* indicated a federal court cannot do in light of the McCarran-Ferguson Act. *See* 179 F.3d at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law," then federal courts would "find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do." *Id.*

A defendant seeking to invoke the defense would need to establish that it applies. The defense would be inapplicable if the defendant were not in fact engaging in risk-based pricing and underwriting. If, for example, an insurer determined rates based in part on a factor considered not for its predictive value, but for its ability to exclude members of a FHA-protected class, the defense would be unavailing. The defense would apply only to efforts to engage in risk-based pricing and underwriting. As noted at the outset, nothing in the Rule would be deemed to exempt an insurer from claims of disparate treatment, in the event such insurer did in fact consider a FHA-protected characteristic in the sale, rental, or financing of dwellings or in other housing-related activities subject to the FHA.

### V. AT A MINIMUM, HUD SHOULD MAKE CLEAR IN THE FINAL RULE THAT DISPARATE-IMPACT CHALLENGES ARE INCONSISTENT WITH RISK-BASED PRICING AND UNDERWRITING

As explained above, we believe HUD should grant a broad exemption from disparate-impact liability for risk-based pricing and underwriting of homeowners and commercial habitational insurance. Alternatively, HUD should incorporate a defense for risk-based pricing and underwriting. If HUD does not take either step, however, it should at a minimum make clear in the preamble to the final rule that (1) disparate-impact challenges to risk-based pricing and underwriting cannot succeed, and (2) HUD will not bring such challenges.

### A. HUD Should Acknowledge Key Aspects Of Insurers' Defenses

In light of the significant limitations on disparate-impact liability mandated by the Supreme Court in *Inclusive Communities*, as well as the restraints imposed by the McCarran-Ferguson Act, disparate-impact challenges to risk-based pricing of homeowners and commercial

habitational insurance cannot succeed. HUD should acknowledge the numerous barriers to such claims in the preamble to any final rule to avoid spawning unnecessary litigation. Specifically, HUD should acknowledge the following:

- Risk-based pricing and underwriting are not "arbitrary, artificial, and unnecessary" practices, *Inclusive Communities*, 576 U.S. at 540, but instead advance "substantial, legitimate, nondiscriminatory interests." *Id.* at 527. Risk-based pricing and underwriting are critical to the appropriate provision of insurance, to accuracy in pricing, and to maintaining solvency because both are driven by expected losses and related expenses and neither relies on factors that are substitutes protected classes.

- For the reasons explained above, disparate-impact challenges to risk-based pricing and underwriting cannot satisfy the "robust causal link" and "direct cause" requirement of the NPRM. Using legitimate risk factors does not *cause* a disparate impact; any impact is caused by socioeconomic factors outside the control of insurers.

- Disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance, requiring insurers to collect and analyze data on FHA-protected characteristics.

- State insurance regulations materially limit insurers' discretion to depart from risk-based pricing and underwriting, and insurers should not be held liable for complying with applicable state laws and regulations.

For all of the reasons noted above, disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot succeed on the merits. HUD should acknowledge these barriers expressly in any final rule. Doing so will make clear to litigants that the requirements laid out in *Inclusive Communities* and related caselaw apply to these kinds of challenges and generally will foreclose them. This will bring added clarity and certainty to an area of the law that has already been unsettled by HUD's original 2013 adoption of the Disparate-Impact Rule and its sudden reversal of course in promulgating, and then rescinding, the 2020 Rule.

**B.  HUD Should Also Commit Not To Bring Disparate-Impact Challenges To Risk-Based Pricing And Underwriting Of Homeowners And Commercial Habitational Insurance**

The FHA may be enforced by private parties, *see* 42 U.S.C. § 3613, or by HUD and the Attorney General, *see id.* §§ 3610, 3611, 3614. Government enforcement can move forward in administrative proceedings or federal court. *See id.* §§ 3612, 3614. For all of the reasons stated in these comments, HUD should commit not to institute disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Such claims will fail as a matter of law, and given the significant legal hurdles, are not an efficient use of HUD's resources.

Thus, regardless of whether HUD adopts an exemption or defense for risk-based pricing and underwriting of homeowners and commercial habitational insurance, it should commit in the final rule not to pursue disparate-impact challenges to those practices.

# APPENDIX I

**State Insurance Laws**

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-3; ALA. CODE § 27-13-30 |
| Alaska | ALASKA STAT. § 21.39.030(a)(2) | ALASKA STAT. § 21.39.030(a)(1), (4); ALASKA STAT. § 21.36.090(c) | ALASKA STAT. § 21.39.040 |
| Arizona | ARIZ. REV. STAT. ANN. § 20-356(2); ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(B) | ARIZ. REV. STAT. ANN. § 20-356(1), (4), ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(C); ARIZ. REV. STAT. ANN. § 20-448(C) | ARIZ. REV. STAT. ANN. § 20-357 |
| Arkansas | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(a) | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(b); ARK. CODE ANN. § 23-67-210 | ARK. CODE ANN. § 23-67-211(a) |
| California | | CAL. INS. CODE § 1861.05(b) | CAL. INS. CODE § 1861.05(b)-(d); *see also* CAL. INS. CODE § 1860.1 |
| Colorado | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (2) | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (4); COLO. REV. STAT. ANN. § 10-3-1104(1)(f)(II) | COLO. REV. STAT. ANN. § 10-4-404; COLO. REV. STAT. ANN. § 10-4-406 |
| Connecticut | | CONN. GEN. STAT. § 38a-803(4) | CONN. GEN. STAT. § 38a-688; CONN. GEN. STAT. § 38a-663(9)-(10). |

1

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Delaware | DEL. CODE ANN. tit. 18, § 2503(a)(3) | DEL. CODE ANN. tit. 18, § 2503(a)(2), (a)(5); DEL. CODE ANN. tit. 18, § 2503(b); DEL. CODE ANN. tit. 18, § 2504(c) | DEL. CODE ANN. tit. 18, § 2504 |
| District of Columbia | D.C. CODE § 31-2703(b) | D.C. CODE § 31-2703(a), (c); D.C. CODE § 31-2231.13(c), (d) | D.C. CODE § 31-2704 |
| Florida | FLA. STAT. § 627.062(2)(e)(6) | FLA. STAT. § 627.062(1), (2)(e)(6) | FLA. STAT. § 627.062; FLA. STAT. § 627.0645 |
| Georgia | GA. CODE ANN. § 33-9-4(4) | GA. CODE ANN. § 33-9-4(1), (7) | GA. CODE ANN. § 33-9-21, GA. CODE ANN. § 33-9-9; GA. CODE ANN. § 33-9-26 |
| Hawaii | HAW. REV. STAT § 431:14-103(a)(2) | HAW. REV. STAT. § 431:14-103(a)(1), (5); HAW. REV. STAT. § 431:13-103(a)(7)(B) | HAW. REV. STAT. § 431:14-104(a); HAW. REV. STAT. § 431:14-106(a) |
| Idaho | IDAHO CODE ANN. § 41-1437(1) | IDAHO CODE ANN. § 41-1405(1); IDAHO CODE ANN. § 41-1437(3) | |
| Illinois | 215 ILL. COMP. STAT. ANN. 5/456(1) | 215 ILL. COMP. STAT. ANN. 5/456(1)(d); 215 ILL. COMP. STAT. ANN. 5/424(3) | 215 ILL. COMP. STAT. ANN. 5/457 |
| Indiana | IND. CODE ANN. § 27-1-22-3(a)(1) | IND. CODE ANN. § 27-1-22-3(a)(2), (a)(4); IND. CODE ANN. § 27-4-1-4(a)(7) | IND. CODE ANN. § 27-1-22-4(a); IND. CODE ANN. § 27-1-22-5(a) |
| Iowa | | IOWA CODE ANN. § 515F.4; IOWA CODE ANN. § 507B.4(3)(g) | IOWA CODE ANN. § 515F.5 |
| Kansas | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(a) | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(c) | KAN. STAT. ANN. § 40-955 |

2

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Kentucky | KY. REV. STAT. ANN. § 304.13-031(1)(c) | KY. REV. STAT. ANN. § 304.13-031(1)(b); KY. REV. STAT. ANN. § 304.13-031(1)(e); KY. REV. STAT. ANN. § 304.12-080(1) | KY. REV. STAT. ANN. § 304.13-051 |
| Louisiana | LA. REV. STAT. ANN. § 22:1454(B)(1) | LA. REV. STAT. ANN. § 22:1454(A), (B)(2); LA. REV. STAT. ANN. § 22:1964(7)(c); LA. REV. STAT. ANN. § 22:34 | LA. REV. STAT. ANN. § 22:1451; LA. REV. STAT. ANN. § 22:1464 |
| Maine | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(C) | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(B), (G); ME. REV. STAT. ANN. tit. 24-A, § 2162(2) | ME. REV. STAT. ANN. tit. 24-A § 2304-A |
| Maryland | MD. CODE ANN., INS. § 11-205(c) | MD. CODE ANN., INS. § 11-205(d), (f); MD. CODE ANN., INS. § 27-212(e)(1) | MD. CODE ANN., INS. § 11-206 |
| Massachusetts | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(3); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(1) | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(2); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(3), (4) | MASS. GEN. LAWS ANN. ch. 174A, § 6; MASS. GEN. LAWS ANN. ch. 175A, § 6 |
| Michigan | MICH. COMP. LAWS ANN. § 500.2110(1); MICH. COMP. LAWS ANN. § 500.2403(1)(a), (d) | MICH. COMP. LAWS ANN. § 500.2110(3); MICH. COMP. LAWS ANN. § 500.2110a; MICH. COMP. LAWS ANN. § 500.2403(1)(c), (d) | MICH. COMP. LAWS ANN. § 500.2406; MICH. COMP. LAWS ANN. § 500.2408 |
| Minnesota | MINN. STAT. ANN. § 70A.04(4); MINN. STAT. ANN. § 70A.05(1) | MINN. STAT. ANN. § 70A.04(1), (4); MINN. STAT. ANN. § 70A.05(2) | MINN. STAT. ANN. § 70A.06 |
| Mississippi | MISS. CODE. ANN. § 83-2-3(1)(d), (2)(a) | MISS. CODE. ANN. § 83-2-3(1)(a), (d), (2)(b) | MISS. CODE. ANN. § 83-2-7 |
| Missouri | MO. ANN. STAT. § 379.318(1), (4) | MO. ANN. STAT. § 379.318(2), (4) | MO. ANN. STAT. § 379.321 |

3

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Montana | MONT. CODE ANN. § 33-16-201(2)(a) | MONT. CODE ANN. § 33-16-201(1)(a), (4); MONT. CODE ANN. § 33-18-210 | MONT. CODE ANN. § 33-16-203 |
| Nebraska | | NEB. REV. ST. § 44-7510(3) | NEB. REV. ST. § 44-7508 |
| Nevada | NEV. REV. STAT. ANN. § 686B.060(1); NEV. REV. STAT. ANN. § 686B.050(4) | NEV. REV. STAT. ANN. § 686B.050(1), (4); NEV. REV. STAT. ANN. § 686B.060(2); NEV. REV. STAT. ANN. § 686a-130(5) | NEV. REV. STAT. ANN. § 686B.070; NEV. REV. STAT. ANN. § 686B.090; NEV. REV. STAT. ANN. § 686B.110 |
| New Hampshire | N.H. REV. STAT. ANN. § 412:15(I)(d), (II)(a) | N.H. REV. STAT. ANN. § 412:15(I)(d); N.H. REV. STAT. ANN. § 412:15(II)(b) | N.H. REV. STAT. ANN. § 412:16 |
| New Jersey | N.J. STAT. ANN. § 17:29A-4(c); N.J. STAT. ANN. § 17:29A-7; N.J. STAT. ANN. § 17:29A-11 | N.J. STAT. ANN. § 17:29A-4; N.J. STAT. ANN. § 17:29A-7 | N.J. STAT. ANN. § 17:29A-6; N.J. STAT. ANN. § 17:29A-7 |
| New Mexico | N.M. STAT. ANN. § 59A-17-6(E); N.M. STAT. ANN. § 59A-17-7(A) | N.M. STAT. ANN. § 59A-17-6(A), (E); N.M. STAT. ANN. § 59A-17-7(B); N.M. STAT. ANN. § 59A-16-17(D) | N.M. STAT. ANN. § 59A-17-9 |
| New York | N.Y. INS. LAW § 2304(a) | N.Y. INS. LAW § 2303; N.Y. INS. LAW § 2304(b), (c) | N.Y. INS. LAW § 2305(a), (b) |
| North Carolina | N.C. GEN. STAT. ANN. § 58-40-20(e); N.C. GEN. STAT. ANN. § 58-40-25(1) | N.C. GEN. STAT. ANN. § 58-40-25(2); N.C. GEN. STAT. ANN. § 58-40-20(a), (e) | N.C. GEN. STAT. ANN. § 58-40-30; N.C. GEN. STAT. ANN. § 58-40-40; N.C. GEN. STAT. ANN. § 58-40-45 |
| North Dakota | N.D. CENT. CODE ANN. § 26.1-25-03(1)(a) | N.D. CENT. CODE ANN. § 26.1-25-03(1)(c) | N.D. CENT. CODE ANN. § 26.1-25-04 |

4

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Ohio | OHIO REV. CODE ANN. § 3935.03(C); OHIO REV. CODE ANN. § 3937.02(A) | OHIO REV. CODE ANN. § 3935.03(B); OHIO REV. CODE ANN. § 3937.02(C), (D); OHIO REV. CODE ANN. § 3901.21(M) | OHIO REV. CODE ANN. § 3935.04 |
| Oklahoma | | OKLA. STAT. ANN. tit. 36, § 902; OKLA. STAT. ANN. tit. 36, § 985 | OKLA. STAT. ANN. tit. 36, § 987 |
| Oregon | OR. REV. STAT. ANN. § 737.310(4) | OR. REV. STAT. ANN. § 737.310(1), (8); OR. REV. STAT. ANN. § 746.015(1) | OR. REV. STAT. ANN. § 737.205; OR. REV. STAT. ANN. § 737.325 |
| Pennsylvania | 40 PA. STAT. § 1183(a); 40 PA. STAT. § 1223(a)(3) | 40 PA. STAT. § 1183(c)-(d); 40 PA. STAT. § 1223(a)(2); 40 PA. STAT. § 1171.5(a)(7) | 40 PA. STAT. § 710-5(a); 40 PA. STAT. § 710-6; 40 PA. STAT. § 710-7 |
| Rhode Island | R.I. GEN. LAWS ANN. § 27-44-5(e)(1); R.I. GEN. LAWS ANN. § 27-6-4(3) | R.I. GEN. LAWS ANN. § 27-44-5(a), (d), (e)(2); R.I. GEN. LAWS ANN. § 27-6-4(2) | R.I. GEN. LAWS ANN. § 27-44-6(a) |
| South Carolina | S.C. CODE ANN. § 38-73-430(1); S.C. CODE ANN. § 38-73-330(3) | S.C. CODE ANN. § 38-73-430(3)-(4); S.C. CODE ANN. § 38-73-330(2) | S.C. CODE ANN. § 38-73-520 |
| South Dakota | S.D. CODIFIED LAWS § 58-24-6.1 | S.D. CODIFIED LAWS § 58-24-5; S.D. CODIFIED LAWS § 58-24-6; S.D. CODIFIED LAWS § 58-24-6.1; S.D. CODIFIED LAWS § 58-33-26 | S.D. CODIFIED LAWS § 58-24-10 |
| Tennessee | TENN. CODE ANN. § 56-5-103(d); TENN. CODE ANN. § 56-5-104(1) | TENN. CODE ANN. § 56-5-104(2) ; TENN. CODE ANN. § 56-5-103(a)(1), (d) | TENN. CODE ANN. § 56-5-105 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Texas | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(a) | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(b)-(c) | TEX. INS. CODE ANN. § 2251.101; TEX. INS. CODE ANN. § 2251.103 |
| Utah | UTAH CODE ANN. § 31A-19a-201(4)(a); UTAH CODE ANN. § 31A-19a-202(1)-(2) | UTAH CODE ANN. § 31A-19a-201(1), (4)(a); UTAH CODE ANN. § 31A-19a-202(3) | UTAH CODE ANN. § 31A-19a-203 |
| Vermont | VT. STAT. ANN. tit. 8, § 4685(d); VT. STAT. ANN. tit. 8, § 4686(1) | VT. STAT. ANN. tit. 8, § 4685(a), (d); VT. STAT. ANN. tit. 8, § 4686(2); VT. STAT. ANN. tit. 8, § 4724(7)(A) | VT. STAT. ANN. tit. 8, § 4688 |
| Virginia | VA. CODE ANN. § 38.2-1904(A), (B) | VA. CODE ANN. § 38.2-1904(A)(3) | VA. CODE ANN. § 38.2-1906 |
| Washington | WASH. REV. CODE ANN. § 48.19.030(3) | WASH. REV. CODE ANN. § 48.19.020; WASH. REV. CODE ANN. § 48.19.030(2)(b); WASH. REV. CODE ANN. § 48.18.480 | WASH. REV. CODE ANN. § 48.19.040; WASH. REV. CODE ANN. § 48.19.060 |
| West Virginia | W. VA. CODE § 33-20-3(a) | W. VA. CODE § 33-20-3(b), (c)(2); W. VA. CODE § 33-11-4(7)(c) | W.VA. CODE § 33-20-4 |
| Wisconsin | WIS. STAT. ANN. § 625.11(4); WIS. STAT. ANN. § 625.12(1) | WIS. STAT. ANN. § 625.12(2); WIS. STAT. ANN. § 625.11(1), (4) | WIS. STAT. ANN. § 625.13 |
| Wyoming | | WYO. STAT. ANN. § 26-14-105; WYO. STAT. ANN. § 26-13-112(c) | WYO. STAT. ANN. § 26-14-107 |