**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 1:13-cv-08564 |
| v. | ) ) | |
| | ) | Chief Judge Rebecca R. Pallmeyer |
| MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS**

## <u>TABLE OF CONTENTS</u>

Page

Plaintiff Property Casualty Insurers Association of America .......................................................... 1

Defendants Department of Housing and Urban Development and Marcia L. Fudge .................... 2

Venue and Jurisdiction .................................................................................................................... 2

HUD's Proposed Rule ..................................................................................................................... 3

Comments by The Insurance Industry on HUD's Proposed Rule and HUD's Responses ............ 3

    The McCarran-Ferguson Act ................................................................................................... 4

    The Incompatibility of Disparate-Impact Liability and Homeowners Insurance ..................... 4

    The Filed-Rate Doctrine ........................................................................................................... 6

    An Exemption or Safe Harbor for Homeowners Insurance ...................................................... 6

    The Burden-Shifting Framework .............................................................................................. 7

HUD's Final 2013 Rule ................................................................................................................... 9

PCI's Challenge to the Disparate Impact Rule ............................................................................. 10

    Initial Proceedings in the District Court ................................................................................. 10

    Post-Remand Submissions ..................................................................................................... 12

    The Supreme Court's *Inclusive Communities* Decision ......................................................... 14

    HUD's Supplemental Explanation ......................................................................................... 16

U.S. Department of Treasury Report ............................................................................................. 19

Renewed Proceedings In The District Court ................................................................................. 20

HUD's 2018 Reconsideration of the Disparate Impact Rule ........................................................ 20

    HUD's Advanced Notice of Proposed Rulemaking ............................................................... 20

    Comments by The Insurance Industry on HUD's 2018 ANPRM ........................................... 21

    HUD's 2019 Notice of Proposed Rulemaking ....................................................................... 22

    Comments by The Insurance Industry on HUD's 2019 NPRM .............................................. 23

    The Enjoined 2020 Final Rule ................................................................................................ 24

    HUD's Proposed 2021 Rule ................................................................................................... 24

The Final 2023 Rule ...................................................................................................................... 25

    Comments by The Insurance Industry on HUD's 2021 NPRM And HUD's Response ......... 25

    McCarran-Ferguson Act ......................................................................................................... 25

    Business of Insurance .............................................................................................................. 26

    Filed-Rate Doctrine ................................................................................................................ 30

    *Inclusive Communities* .......................................................................................................... 30

Alternatives to an Exemption .................................................................................. 33

*West Virginia v. EPA* .......................................................................................... 34

Harm to APCIA and Its Members ................................................................................ 34

Pursuant to Local Rule 56.1 of the United States District Court for the Northern District of Illinois, Plaintiff Property Casualty Insurers Association of America hereby submits the following statement of undisputed material facts. Because this case concerns a challenge under the Administrative Procedure Act ("APA"), review is based on the administrative record that was before the agency when it took the action at issue. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). This statement therefore principally addresses the record materials that were before the United States Department of Housing and Urban Development ("HUD") and the relevant portions of HUD's proposed rule, final rule, and supplemental explanation. Whether HUD's action was "not in accordance with law" or "arbitrary" and "capricious" under 5 U.S.C. § 706(2)(A) is a question of law. *See* Joint Status Report (Dkt. 16) at 4; *see also, e.g., Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (review of agency action under the APA is based entirely on the agency's record); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) ("[T]he question whether HHS acted in an arbitrary and capricious manner is a legal one[.]").

**Plaintiff Property Casualty Insurers Association of America**

1.      Property Casualty Insurers Association of America ("PCI") [1] is an Illinois-based trade association of property and casualty insurers representing more than 1,000 member companies. *See* Ex. 1 ¶ 2 (Declaration of Robert Gordon)[2]; A.R. 553.[3] PCI's members provide

---

[1] Effective January 1, 2019, the American Insurance Association merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association. This submission will refer to APCIA, rather than PCI, in the context of any events following the January 1, 2019 merger.

[2] Citations to "Ex." are citations to the Exhibits attached to the accompanying Declaration of Seth P. Waxman.

[3] The "A.R." citations refer to the Administrative Record, which has been filed in this action as exhibits to Dkt. 19, Dkt. 134, and which will be supplemented by the parties by September 29, 2023, pursuant to the Court's April 28, 2023 order, *see* Dkt. 273.

homeowners, property, and hazard insurance (collectively, "homeowners insurance"), subject to state insurance regulations, in every State of the United States. *See* Ex. 1 ¶ 3.

2. PCI's mission is to promote and protect the viability of a competitive private insurance market for the benefit of consumers and insurers. *See* Ex. 1 ¶ 4. PCI advocates on behalf of its members on policy issues at the state and federal levels and provides its members with information relevant to legal and public-policy developments affecting the property and casualty insurance industry. *See* Ex. 1 ¶ 4.

**Defendants Department of Housing and Urban Development and Marcia L. Fudge**

3. Defendant Department of Housing and Urban Development is an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3531 et seq., Pub. L. No. 89-117, 79 Stat. 451. *See* Second Amended Complaint ¶ 22, Dkt. 274.

4. Defendant Marcia L. Fudge, in her official capacity as the Secretary of Housing and Urban Development (as of March 10, 2021), is responsible for the Department's challenged actions. *See* Second Amended Complaint ¶ 23.

**Venue and Jurisdiction**

5. Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff PCI resides in this district and no real property is involved in this action. *See* Ex. 1 ¶ 2.

6. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because PCI brings this action under the Administrative Procedure Act and the McCarran-Ferguson Act. *See* Second Amended Complaint ¶ 24.

**HUD's Proposed Rule**

7.     On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard." 76 Fed. Reg. 70,921 (Nov. 16, 2011) (A.R. 1). The proposed rule purported to "confirm" that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose. 76 Fed. Reg. at 70,924 (A.R. 4).

8.     The proposed rule cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." 76 Fed. Reg. at 70,924 (A.R. 4). The proposed rule did not discuss the McCarran-Ferguson Act. *Id.* The proposed rule noted that there had been "some variation in the application of the discriminatory effects standard" among the courts and set forth a three-step burden-shifting framework for determining whether a challenged practice violates the rule. 76 Fed. Reg. at 70,921 (A.R. 1).

**Comments by The Insurance Industry on HUD's Proposed Rule and HUD's Responses**

9.     In response to HUD's proposed rule, insurance industry groups submitted detailed comments to HUD, raising numerous objections. *See* Comments of the Property Casualty Insurers Association of America (Jan. 17, 2012) (A.R. 552-556); Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 371-383); Comments of the American Insurance Association (Jan. 17, 2011) (A.R. 454-459). Among other things, commenters explained that for homeowners insurance, risk-based pricing might take into account such neutral, actuarially justified factors as, among many others, the types of construction materials used to build a house, history of previous losses, proximity to fire hydrants, and the

3

presence of a security system. *See* Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 372, 376).

The McCarran-Ferguson Act

10. Comments from the insurance industry explained that the application of disparate-impact liability to homeowners insurance would violate the McCarran-Ferguson Act. (A.R. 554; A.R. 378-379).

11. In the final Rule, HUD responded by asserting that federal agencies need not consider whether their regulations comply with the McCarran-Ferguson Act because that Act is directed at courts, not agencies. *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460, 11,475 (Feb. 15, 2013) (A.R. 612, 627).

The Incompatibility of Disparate-Impact Liability and Homeowners Insurance

12. Comments from the insurance industry explained that the imposition of disparate-impact liability is fundamentally inconsistent with the business of insurance. (A.R. 554; A.R. 376). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

13. HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11,475 (A.R. 627).

14. Comments from the insurance industry explained that the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. (A.R. 376; A.R. 554). In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11,475 (A.R. 627).

15.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11,475 (A.R. 627).

16.     Comments from the insurance industry explained that insurers use actuarially justified risk factors to group policyholders for the purpose of treating those with similar risk profiles similarly.  (A.R. 376).  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11,475 (A.R. 627).

17.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11,475 (A.R. 627).

18.     Comments from the insurance industry explained that race and other protected class characteristics are not considered in the risk-assessment process.  (A.R. 376).  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11,475 (A.R. 627).

19.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11,475 (A.R. 627).

20.     Comments from the insurance industry explained that, to eliminate statistical disparities among different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process, and insurers would have to charge everyone the same rate regardless of risk.  (A.R. 377).  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11,475 (A.R. 627).

21.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11,475 (A.R. 627).

22.     Comments from the insurance industry explained that eliminating risk-based pricing would have significant negative consequences including "adverse selection."  (A.R. 378).  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11,475 (A.R. 627).

23.     HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings.  78 Fed. Reg. at 11,475 (A.R. 627).

24.     In the final Rule, HUD did not confirm that the legitimate use of actuarial risk factors is a legitimate business interest.  78 Fed. Reg. at 11,475 (A.R. 627).

The Filed-Rate Doctrine

25.     Comments from the insurance industry explained that application of the proposed rule to homeowners insurance would violate the filed-rate doctrine.  (A.R. 378).  In the final Rule, HUD acknowledged this comment, but did not respond to it.  78 Fed. Reg. at 11,474 (A.R. 626).

An Exemption or Safe Harbor for Homeowners Insurance

26.     Comments from the insurance industry requested that HUD exempt homeowners-insurance underwriting and pricing from the proposed rule in light of the inherent conflict between disparate-impact liability and risk-based insurance practices.  (A.R. 555; A.R. 380).

27.     Comments from the insurance industry requested, in the alternative, that HUD provide regulatory safe harbors for "long-recognized risk-related factors, such as use of prior insurance claims, age and condition of property, and distance from fire station."  (A.R. 380).

28.     In the final Rule, HUD refused to grant an exemption for homeowners insurance. 78 Fed. Reg. at 11,475 (A.R. 627).  HUD also refused to create a safe harbor for the use of any state-law-sanctioned risk factors.  *Id.*

29.     In response to insurance industry requests for an exemption for homeowners insurance or safe harbors for certain risk factors, HUD stated that "[c]reating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act."  78 Fed. Reg. at 11,475 (A.R. 627).

30.     HUD also asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional intent."  78 Fed. Reg. at 11,475 (A.R. 627).

31.     Comments from the insurance industry explained that the failure to provide safe-harbor protection for the use of factors specifically allowed by state insurance regulators would subject homeowners insurers to baseless litigation and threaten the sound actuarial standards underpinning the homeowners-insurance market.  (A.R. 380).  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11,475 (A.R. 627).

The Burden-Shifting Framework

32.     Comments from the insurance industry explained that HUD's proposed three-step burden-shifting approach for resolving disparate-impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).  (A.R. 381-382; A.R. 458).  In the final rule, HUD asserted that *Wards Cove* does not govern FHA claims.  78 Fed. Reg. at 11,473 (A.R. 625).

33.     Comments from the insurance industry explained that the framework improperly failed to require a plaintiff to challenge a "specific" practice and failed to require a plaintiff to show a "significant" disparate impact.  (A.R. 381-382).  In the final rule, HUD rejected a

7

requirement that a plaintiff challenge a "specific" practice and rejected a "significance requirement" for disparate-impact liability.  78 Fed. Reg. at 11,468-11,469 (A.R. 620-621).

34.     Comments from the insurance industry explained that the framework improperly required the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard.  (A.R. 382).  In the final rule, HUD rejected commenters' suggestions to remove the "necessary" requirement from the burden-shifting regime.  78 Fed. Reg. at 11,471 (A.R. 623).

35.     Comments from the insurance industry explained that the framework improperly shifted the burden of persuasion to the defendant.  (A.R. 458; A.R. 382).  In the final rule, HUD rejected suggestions that it keep the burden of proof on plaintiffs throughout the process of establishing a disparate-impact claim.  78 Fed. Reg. at 11,473-11,474 (A.R. 625-626).

36.     Comments from the insurance industry explained that the framework improperly failed to require the plaintiff to prove that a proposed alternative practice would be "equally as effective" as the challenged practice.  (A.R. 381-382).  In the final rule, HUD rejected a requirement that an alternative "practice with a less discriminatory effect" must be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest.  78 Fed. Reg. at 11,472-11,473 (A.R. 624-625).  HUD's only explanation was that housing practices covered by the Act are "not readily quantifiable."  78 Fed. Reg. at 11,473 (A.R. 625).

37.     Comments from the insurance industry explained that insurers do not collect data on race and ethnicity and, therefore, insurers are unable to assess whether facially neutral risk-related underwriting and rating factors have a disparate impact on protected classes.  (A.R. 383).  In the final Rule, HUD did not deny this assertion.  78 Fed. Reg. at 11,475 (A.R. 627).

**HUD's Final 2013 Rule**

38.     On February 15, 2013, HUD issued its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" (the "Disparate Impact Rule" or the "Rule"). 78 Fed. Reg. 11,460 (Feb. 15, 2013) (A.R. 612). The Rule purported to "formalize[]" HUD's view that the FHA's prohibition on discrimination may be violated by practices that have a discriminatory effect in the absence of a discriminatory intent. *Id.*

39.     In adopting the Rule, HUD purported to apply its disparate-impact standard to homeowners insurance. 78 Fed. Reg. at 11,474-11,475 (A.R. 626-627). In adopting the Rule, HUD rejected requests by the insurance industry for an exemption from the Rule or safe harbor for risk factors. *Id.*

40.     The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 78 Fed. Reg. at 11,482 (A.R. 634) (adding 24 C.F.R. § 100.500(a)).

41.     The Rule provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification." 78 Fed. Reg. at 11,482 (A.R. 634) (adding 24 C.F.R. § 100.500).

42.     The Rule sets forth a three-step burden-shifting framework for determining whether the Rule has been violated. 78 Fed. Reg. at 11,482 (A.R. 634) (adding 24 C.F.R. § 100.500(c)(1)-(3)).

**PCI's Challenge to the Disparate Impact Rule**

<u>Initial Proceedings in the District Court</u>

43.     On November 27, 2013, PCI filed its original complaint, challenging the application of HUD's Disparate Impact Rule to the pricing of homeowners insurance as arbitrary and capricious and otherwise contrary to law.  *See* Dkt. 1.

44.     The parties cross-moved for summary judgment, and HUD also moved to dismiss for lack of jurisdiction, arguing that PCI lacked standing and that its claims were unripe.  *See* Dkt. Nos. 21, 30.

45.     In its motion, PCI demonstrated that the insurance laws in every State uniformly permit risk-based pricing and underwriting, Dkt. 21 at 8, 20-23; Dkt. 44 at 22 & n.12, and indeed that almost all state laws expressly *require* the use of risk-based pricing, Dkt. 21 at 9, 23-24. Specifically, PCI explained that state law permits insurers "to make rating and underwriting decisions on the basis of objective risk factors," Dkt. 21 at 2, and prohibits only unfairly discriminatory rates.  Dkt. 21 at 8, 21-22.  PCI similarly showed that the vast majority of States require insurers to file rates with state regulators for review or approval.  *See* Dkt. 21 at 9, 24-25. PCI argued that it was arbitrary and capricious to deny an exemption because applying the Rule to homeowners insurance would invalidate, impair, or supersede these state laws, in violation of McCarran-Ferguson and the filed-rate doctrine, by imposing liability on insurers that use valid actuarial risk factors that happen to have a disparate impact if some other, less effective factor could be used.

46.     On September 3, 2014, the Court issued a decision on the parties' motions.  *See Prop. Cas. Ins. Ass'n of Am. v. Donovan ("PCI")*, 66 F. Supp. 3d 1018 (N.D. Ill. 2014).  The Court dismissed without prejudice as unripe PCI's claim that the Rule violates the McCarran-

Ferguson Act. *Id.* at 1040-1042. The Court granted summary judgment in HUD's favor on PCI's claim that the Rule violates the requirements for disparate-impact liability established in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), ruling that the burden-shifting framework HUD adopted embodied a reasonable interpretation of the FHA. But the Court granted summary judgment to PCI on its remaining claims, concluding that HUD's explanation was arbitrary and capricious in several respects. *See PCI,* 66 F. Supp. 3d at 1046-1052.

47.    The Court held that HUD's brief response to the insurance industry's detailed comments failed to provide a reasoned explanation for preferring case-by-case determination of McCarran-Ferguson preclusion claims instead of an exemption from the Rule for homeowners insurance. *Id.* at 1048. The Court criticized HUD for making "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether McCarran-Ferguson would bar entire categories of disparate-impact claims against insurers. *Id.*

48.    The Court found "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *[Doe v.] Mutual of Omaha [Ins. Co.]*, 179 F.3d [557,] 563-564 [(7th Cir. 1999)], and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048. It noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049.

49.    The Court explained that HUD must, on remand, provide a reasoned explanation for preferring case-by-case determination of McCarran-Ferguson preclusion issues instead of an exemption and that the required explanation must consider whether the costs and benefits of proceeding on a case-by-case basis outweighed the costs and benefits of an exemption or safe

11

harbor for homeowners insurers. *PCI*, 66 F. Supp. 3d at 1048-1049. The Court found arbitrary and capricious HUD's suggestion that homeowners insurers could defend their policies on a case-by- case basis as part of the burden-shifting framework of the Rule. *Id.* at 1051. The Court reached the same conclusion with respect to HUD's response to comments that applying the Rule to homeowners insurance would violate the filed-rate doctrine. *Id.* at 1050.

50. The Court also concluded that HUD had acted in an arbitrary and capricious manner by failing to address the substance of the homeowners insurance industry's arguments that the Rule would prevent the use of actuarially sound underwriting and risk-assessment factors and thereby undermine the fundamental nature of the insurance business. The Court explained:

> HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious. HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework. The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period.

*PCI*, 66 F. Supp. 3d at 1051.

51. The Court remanded the case to HUD for further proceedings, ordering HUD either to provide a reasoned explanation or to institute a new rule. *PCI*, 66 F. Supp. 3d at 1050, 1054.

### Post-Remand Submissions

52. After remand, PCI asked HUD to reopen the comment period. (A.R. 4416-4418). HUD did not officially reopen the comment period but stated in the Supplemental Explanation that it was responding "to certain insurance industry comments" requesting "exemptions or safe

harbors from liability." *Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance*, 81 Fed. Reg. 69,012 (Oct. 5, 2016) (A.R. 1813-1820).

53.     PCI submitted a comment letter to HUD addressing the issues identified in the Court's order.  (A.R. 4496-4513).  The comments repeated PCI's request for an exemption for homeowners insurers because the Rule "would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers."  (A.R. 4496).

54.     Specifically, PCI explained that calculating the risk of loss is fundamental to the business of insurance.  (A.R. 4497-4498, 4511-4512).  Without the ability to set rates based on neutral risk factors, "lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards."  (A.R. 4497).  PCI explained that because the "vast majority of states" require insurers to set rates based on "neutral actuarial factors," the Disparate Impact Rule's burden-shifting framework would violate the McCarran-Ferguson Act and "interfere with insurers' compliance with state law." (A.R. at 4503-4504).  Additionally, PCI noted that 49 States expressly permit or require insurers to group insureds based on risk and that the Rule's burden-shifting framework interferes with that express permission in violation of the McCarran-Ferguson Act.  (A.R. at 4504-4505).

55.     Moreover, PCI's comment noted that 47 States and the District of Columbia "require insurers to file their rates with state insurance commissioners for review and approval." (A.R. at 4507).  Applying the Disparate Impact Rule to homeowners insurance would therefore violate the McCarran-Ferguson Act by "substituting the judgment of a federal court for that of state regulators" to invalidate state insurance laws.  (A.R. 4507-4508).  Similarly, the comment

13

added that applying the Disparate Impact Rule to homeowners insurance would violate the filed-rate doctrine because it would allow "private lawsuits and government enforcement actions that question the permissibility of a filed rate." (A.R. 4508).

56.    PCI also asked HUD to clarify that plaintiffs must show that any alternative practice must be "equally effective" as the challenged practice. (A.R. 4512). PCI noted that, without that requirement, the Rule would drastically distort the homeowners-insurance market by undermining the fundamental nature of insurance: Insurers would refrain from using actuarially sound risk factors in the underwriting and pricing process to avoid liability or be forced to use factors that are less effective in predicting risk, which in turn would cause adverse selection, motivating lower-risk customers to forgo insurance altogether. (A.R. at 4511-4512). PCI also explained that "[t]he burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. . . . [E]ven if every risk factor were proved necessary, plaintiffs could still prevail by showing [a less discriminatory alternative]." (A.R. 4503).

57.    PCI also alerted HUD to the importance of *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, No. 13-1371, which was then pending before the Supreme Court and would specifically address disparate-impact liability under the FHA. (*See* A.R. 4501).

The Supreme Court's *Inclusive Communities* Decision

58.    While this case was before HUD on remand, the Supreme Court decided *Inclusive Communities*, upholding the validity of disparate-impact liability under the FHA but cabining its scope. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015). The Court cautioned that the "FHA is not an instrument to force housing authorities to

14

reorder their priorities," *id.* at 540, and explained that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,'" not the "displacement of valid governmental policies" or "legitimate objectives," *id.* at 540, 544. Accordingly, the Court emphasized the importance of limiting the scope of possible disparate-impact liability "so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 533. And it cautioned against a rule that would encourage the consideration of race "in a pervasive way" and thereby raise serious constitutional questions. *Id.* at 542.

59. The Court also articulated important limits on how disparate-impact claims may be litigated under the FHA. A claim may not be based "solely on a showing of a statistical disparity." *Inclusive Communities*, 576 U.S. at 540. Instead, plaintiffs must satisfy a "robust causality requirement," pointing to specific policies that caused a disparity, to ensure that defendants are not "held liable for racial disparities they did not create." *Id.* at 542. Moreover, defendants must have "leeway to state and explain the valid interest served by their policies" and "latitude to consider market factors" without plaintiffs second-guessing "which of two reasonable approaches" a defendant should follow. *Id.* at 541-542.

60. In light of *Inclusive Communities*, PCI submitted additional supplemental comments to HUD, requesting an exemption to the Disparate Impact Rule for homeowners insurers in accordance with the Supreme Court's decision. (*See* A.R. 4615-4620). PCI argued that the "robust causality requirement" precludes suits against homeowners insurers. (A.R. 4616). Because homeowners insurers are regulated by a "panoply" of state laws, their discretion is "substantially limit[ed]" by state law and therefore is not the cause of any disparate impacts. (A.R. 4619). PCI further explained that homeowners-insurance markets, "with their dependence

15

on actuarially sound, risk-based pricing, provide a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability."  (A.R. 4616; 4619).  PCI reiterated its previous comments explaining that the Rule would disrupt the homeowners insurance industry and impose needless costs on insurers and their customers. (A.R. 4618-4619).  PCI explained, for example, that "to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process.… This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability …."  (A.R. 4618) (internal citations omitted).  PCI also argued that the Rule required insurers to compile data on protected characteristics of customers, which would improperly "inject racial considerations into every housing decision."  (A.R. 4620).

 HUD's Supplemental Explanation

 61. On October 5, 2016, HUD issued its Supplemental Explanation, titled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance."  81 Fed. Reg. 69,012 (A.R. 1813-1820).  HUD did not modify the 2013 Rule.  HUD concluded that there should be no "categorical exemptions or safe harbors for insurance practices" and that "concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis."  *Id*. at 69,012 (A.R. at 1813).

 62. HUD made no effort to address the key holding of *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557, 564 (7th Cir. 1999).  HUD mentioned *Mutual of Omaha* only once, for the uncontroversial point that the McCarran-Ferguson Act bars application of disparate-impact liability only when it would impair state law.  *See* 81 Fed. Reg. at 69,015 (A.R. 1816). HUD never addressed *Mutual of Omaha*'s holding that the McCarran-Ferguson Act prohibits a

federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mut. of Omaha*, 179 F.3d at 564.

63.     HUD's only response to homeowners insurers' showing that the McCarran-Ferguson Act requires an exemption for risk-based pricing and underwriting was to argue that insurers could defend their practices under the Rule's burden-shifting framework. *See* 81 Fed. Reg. at 69,015; *id.* at 69,017 (A.R. 1816, 1818). HUD stated that it was "impossible ... to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application." *Id.* at 69,013 (A.R. 1814). HUD noted that insurers' concerns focused specifically on applying the Rule to "sound actuarial underwriting principles" and "accurate risk-based pricing," which would "threaten[]" "accurate risk assessment" and "the sound actuarial standards underpinning the insurance market." *Id.* at 69,014 (A.R. 1815). But HUD responded by concluding only that it would not create an "exemption from discriminatory effects liability for *all* insurance practices or for *all* underwriting practices in order to accommodate the insurance industry's concerns." *Id.* (emphasis added); *see id.* at 69,015 (A.R. 1816) ("[W]holesale exemptions for all insurance practices or all insurance underwriting practices would necessarily be overbroad ... ."); *id.* at 69,017 (A.R. 1818) ("HUD declines to create a broad exemption"—"for *all* insurance practices or *all* underwriting decisions"—"because doing so would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations[.]").

64.     HUD did not dispute that state law uniformly permits and often requires insurers to consider actuarial risk factors. *See* 81 Fed. Reg. at 69,015 (A.R. 1816). Rather, it "recognize[d] that risk-based decision making is an important aspect of sound insurance practice" and asserted that "nothing in the Rule prohibits insurers from making decisions that are

in fact risk-based." *Id.* But despite disclaiming any intent to prohibit risk-based decisions, HUD also made clear that risk-based practices are *not* protected from liability if a "less discriminatory alternative" can be shown at step three of the burden-shifting framework, *id.*, and HUD again failed to require that such an alternative practice must be "equally effective" in predicting risk as the challenged practice. Although the Rule thus threatens to prohibit exactly the risk-based practices that HUD said would be protected, HUD did not resolve or even acknowledge this discrepancy in its logic.

65. HUD failed to address *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 375-376 (6th Cir. 2007), which noted that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success."

66. HUD did not adequately consider the cost of case-by-case adjudication. HUD simply asserted that an exemption for risk-based insurance pricing would not reduce insurers' costs: "[T]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017 (A.R. 1818). HUD did not address commenters' observations about the costs to insurers and courts at the third step of the burden-shifting process. (A.R. 382-383; A.R. 458).

67. HUD also argued that an exemption is inappropriate in light of certain state antidiscrimination laws that may apply to homeowners insurance. 81 Fed. Reg. at 69016 (A.R. 1817). HUD reasoned that an exemption would "deprive all states of federal support in addressing discriminatory insurance practices" and asserted that an exemption would therefore "be at odds with the purpose of [the] McCarran-Ferguson [Act]." *Id.* HUD also asserted in

passing that "McCarran-Ferguson requires a fact-intensive inquiry." *Id.* But HUD did not explain why this would be the case for risk-based pricing and underwriting.

68.     HUD did not address comments demonstrating that accurate risk assessment is critical to the business of insurance and that depriving insurers of the ability to accurately consider risk would cause adverse selection, motivating lower-risk customers to forgo insurance altogether.

69.     HUD did not dispute that the filed-rate doctrine applies to insurance rates filed with state insurance commissions. HUD's Supplemental Explanation concluded that "applying the filed rate doctrine to prioritize *state* ratemaking over a federal statute would seem to stand the Supremacy Clause on its head." 81 Fed. Reg. at 69,018 (internal quotation marks omitted) (A.R. 1819). HUD disregarded decisions holding that the filed-rate doctrine bars challenges under federal statutes that interfere with state insurance regimes.

70.     The Supplemental Explanation mentioned *Inclusive Communities* only in a few footnotes and did not address the limitations on disparate-impact liability articulated by the Supreme Court. *See* 81 Fed. Reg. at 69,013 nn.11&13, 69,014 n.24, 69,015 n.42 (A.R. 1814-1816).

**U.S. Department of Treasury Report**

71.     In October 2017, the U.S. Department of Treasury issued a report entitled "A Financial System That Creates Economic Opportunities Asset Management and Insurance." *See* U.S. Dep't of the Treasury, A Financial System That Creates Economic Opportunities Asset Management and Insurance (Oct. 2017) ("Treasury Report"), https://tinyurl.com/c6bdfka9. Among other things, the report urged HUD to reconsider the Disparate Impact Rule, stating:

> Treasury recommends that HUD reconsider its use of the disparate-impact rule. In particular, HUD should consider whether

the disparate-impact rule, as applied, is consistent with McCarran-Ferguson and existing state law.  HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles.

Treasury Report at 110.

**Renewed Proceedings In The District Court**

72.     Following HUD's issuance of its Supplemental Explanation, PCI filed an amended complaint, Dkt. 131; *see also* Dkt. 129 (opinion and order on motion for leave to amend), and moved again for summary judgment, challenging HUD's continued refusal to grant an exemption for risk-based pricing and underwriting of homeowners insurance.  Dkt. 136.  PCI argued that the 2016 Supplemental Explanation, like the 2013 Rule itself, was arbitrary and capricious because it failed to adequately consider the McCarran-Ferguson Act, the filed-rated doctrine, the effects of the Rule on the business of insurance, and the newly articulated limits on permissible disparate-impact liability under *Inclusive Communities.  Id.*[4]

**HUD's 2018 Reconsideration of the Disparate Impact Rule**

HUD's Advanced Notice of Proposed Rulemaking

73.     On June 20, 2018, after PCI moved for summary judgment, HUD published an Advance Notice of Proposed Rulemaking ("ANPRM").  *See Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard*, 83 Fed. Reg. 28,560 (June 20, 2018) (A.R. 5304).  The ANPRM stated that "HUD is reviewing the Disparate Impact Rule to determine what changes, if any, may be necessary in light of the *Inclusive Communities* decision" and invited public comment on "other amendments to the Disparate Impact Rule that

---

[4] Counts V through VIII of PCI's Second Amended Complaint encompass four additional claims that the parties agree are subject to dismissal under previous orders of the Court, including its order on PCI's motion for leave to file its First Amended Complaint.  *See* Dkt. 129; *see also* Dkt. 98.  PCI does, however, preserve those claims for appeal.

may be necessary or helpful." *Id.* at 28,561 (A.R. 5305). The parties agreed to stay this case, Dkts. 159, 188.

Comments by The Insurance Industry on HUD's 2018 ANPRM

74.     In response to HUD's ANPRM, PCI and the American Insurance Association ("AIA") submitted comments on the ANPRM, agreeing that the Disparate Impact Rule had to be modified in light of *Inclusive Communities* and again urging HUD to exempt homeowners insurance from the Rule. (*See* A.R. 6195) (comment of PCI); (A.R. 6471) (comment of AIA and the National Association of Mutual Insurance Companies ("NAMIC")). PCI and AIA reiterated arguments from PCI's prior comments to HUD, including the rule's inconsistency with *Inclusive Communities*, and that applying disparate-impact liability to homeowners insurance would violate the McCarran-Ferguson Act and undermine the business of insurance by creating problems of adverse selection and moral hazard. (A.R. 6196; A.R. 6472).

75.     PCI and AIA also set forth the numerous ways in which applying disparate-impact liability to homeowners insurance would contravene the limitations imposed in *Inclusive Communities*. For example, PCI explained that because "insurers make pricing and underwriting decisions based on demonstrable risk factors," applying the Disparate Impact Rule to homeowners insurers is inconsistent with *Inclusive Communities*' instruction that only "artificial, arbitrary, and unnecessary" practices may give rise to liability under the FHA. (A.R. 6214; *see also* A.R. 6482).

76.     PCI also stated that homeowners insurers "do not consider, nor generally have, data regarding their customers' protected characteristics" and that "some risk factors may correlate to a disparity caused by other socioeconomic conditions outside the insurers' control." A.R. 6215; *see also* A.R. 6473. As such, PCI argued that risk-based pricing and underwriting do

not satisfy *Inclusive Communities*' "robust causality requirement," 576 U.S. at 542. (*See also* A.R. 6215).

77.     PCI also informed HUD that requiring homeowners insurers to collect and analyze sensitive data on protected characteristics to avoid disparate-impact liability would improperly "tend to perpetuate race-based considerations rather than move beyond them," 576 U.S. at 543; (A.R. 6216; *see also* A.R. 6474).

78.     Moreover, PCI explained that opening homeowners insurers to disparate-impact liability based on risk-based pricing and underwriting would place them in a "double bind of liability" in light of the "panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance." (*See* A.R. 6215). PCI argued that this is inconsistent with *Inclusive Communities*' instruction that the causality requirement is not satisfied where another "law substantially limits the [defendant's] discretion," 576 U.S. at 543; (*see also* A.R. 6215).

HUD's 2019 Notice of Proposed Rulemaking

79.     On August 19, 2019, the NPRM was published in the Federal Register. *See HUD's Implementation of the Fair Housing Act's Disparate Impact Standard*, 84 Fed. Reg. 42,854 (Aug. 19, 2019) (A.R. 10,476). The 2019 NPRM proposed numerous changes to the 2013 Disparate Impact Rule "to bring HUD's disparate impact rule into closer alignment with the analysis and guidance provided in *Inclusive Communities* and understood by HUD[.]" *Id.* at 42,857 (A.R. 10,479).

80.     HUD failed to include an exemption for homeowners insurers from disparate-impact liability. 84 Fed. Reg. at 42,860 (A.R. 10,482). HUD's only response to homeowners insurers' comments that failing to exempt risk-based pricing and underwriting would undermine the business of insurance was that the "materially limited discretion" defense "would have a

similar effect to a safe harbor" and prevent insurers from being placed in a "double bind of liability" where they would be subject to liability under the Rule for actions taken to comply with other laws. *Id.*

81.     However, HUD made clear that its proposal was intended to "affirm[] in regulation HUD's past position … that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case." 84 Fed. Reg. at 42,860 (A.R. 10,482).

Comments by The Insurance Industry on HUD's 2019 NPRM

82.     On October 18, 2019, APCIA submitted comments on the NPRM, agreeing that HUD's proposed modifications of the burden-shifting framework were consistent with *Inclusive Communities* and again urging HUD to exempt homeowners insurance from the Rule. (*See* A.R. 21,408).

83.     APCIA reiterated the arguments, set forth in previous comments, that HUD should include in its final rule an exemption for homeowners insurers because applying disparate-impact liability to homeowners insurance would violate the McCarran-Ferguson Act and the filed-rate doctrine and would undermine the business of insurance. It also emphasized the critical role of accurate pricing in maintaining insurer solvency. (A.R. 21,413, 21,422-21,425, 21,428-21,436).

84.     In the event that HUD declined to exempt risk-based pricing and underwriting of homeowners insurance, APCIA asked that HUD modify and clarify the defenses in the rule to address issues unique to risk-based insurance pricing underwriting and to more closely conform to *Inclusive Communities*. (A.R. 21,438-21,442). For example, APCIA requested that HUD enact a new defense in § 100.500(c) for risk-based pricing and underwriting. (A.R. 21,438).

The Enjoined 2020 Final Rule

85.     After the comment period closed on the 2019 NPRM, HUD proceeded with its new rulemaking process.  In August 2020, this Court lifted the stay in this case and then permitted summary-judgment briefing to resume "because after many months HUD has not yet adopted a new rule[.]"  Dkt. 201; *see also* Dkt. 200.

86.     HUD issued its final rule on September 3, 2020, with an effective date of October 26, 2020.  The final rule made several changes to the 2013 Disparate Impact Rule to conform to *Inclusive Communities*.

87.     On October 25, 2020, a district court enjoined the new rule from taking effect. *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611-612 (D. Mass. 2020), *appeal filed*, No. 21-1003 (1st Cir. Jan. 4, 2021), *appeal dismissed* (Feb. 18, 2021). The original 2013 Disparate Impact Rule has therefore remained operative without interruption.

HUD's Proposed 2021 Rule

88.     On January 26, 2021, President Biden issued a memorandum directing the Secretary of HUD to, "as soon as practicable, take all steps necessary to examine the effects of the [2020 Rule]."  Joseph R. Biden, Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies, The White House (Jan. 26, 2021), (A.R. 28,144).

89.     HUD then "began a process to reconsider the 2020 Rule."  (A.R. 32,765).  In light of the new rulemaking process, the Court struck the parties' summary judgment motions without prejudice while HUD engaged in a new rulemaking process.  *See* Dkt. 248.

90.     On June 25, 2021, HUD published a proposed rule that would reinstate the 2013

Rule in full, with no exemption or safe harbor for homeowners insurance.  *Reinstatement of*

*HUD's Discriminatory Effects Standard*, 86 Fed. Reg. 33,590 (June 25, 2021) (A.R. 28,146).

**The Final 2023 Rule**

91.     On March 31, 2023, HUD promulgated the 2023 Rule.  *Reinstatement of HUD's*

*Discriminatory Effects Standard*, 88 Fed. Reg. 19,450 (Mar. 31, 2023) (A.R. 32,763).  It

reinstates the 2013 Rule in full and does not include an exemption or safe harbor for

homeowners insurance.  (A.R. 32,776.)

Comments by The Insurance Industry on HUD's 2021 NPRM And HUD's Response

92.     On August 24, 2021, APCIA filed comments regarding HUD's proposed

reinstatement of the 2013 Rule.  (A.R. 29,086-29,088).  In those comments, APCIA again

explained that "disparate-impact liability is inconsistent with established risk-based practices"

(A.R. 29,119) and again requested that HUD exempt risk-based pricing and underwriting of

homeowners and commercial habitational insurance from disparate-impact liability because the

cost of subjecting homeowners insurance to disparate-impact liability under the burden-shifting

framework outweighs the benefit and violates the McCarran-Ferguson Act and filed-rate

doctrine.  (A.R. 29,127-29,156).

McCarran-Ferguson Act

93.     Comments from the insurance industry explained that the application of disparate

impact liability to homeowners insurance violates the McCarran-Ferguson Act.  A.R. 29,157-

29,162.  APCIA commented that case-by-case adjudication is "senseless" where McCarran-

Ferguson precludes almost all (if not every) potential claim.  (*See* A.R. 29,113; *see also* A.R.

28,693) (comment from NAMIC explaining the rule "undermines or impairs the existing

application of the McCarran-Ferguson Act that established the states as the regulators over insurance and in particular the source for the definition of unfair discrimination, linking the definition to equal treatment and cost-based pricing").

94.     APCIA again evaluated the laws of all 50 states to demonstrate that the insurance laws in every State uniformly permit risk-based pricing and underwriting, that almost all state laws expressly require risk-based pricing, and that most States require insurers to file rates with state regulators for review or approval.  (A.R. 29,157-29,162; A.R. 29,137-29,145).  APCIA explained how the Rule would violate the McCarran-Ferguson Act by impairing, invalidating, or superseding those laws.  (*See* A.R. 29,138-29,143).

95.     In the final Rule, HUD asserted that McCarran-Ferguson Act preclusion can be addressed on a case-by-case basis and declined to adopt an exemption.  88 Fed. Reg. at 19,476 (A.R. 32,789).

<u>Business of Insurance</u>

96.     Commenters also explained that application of the Rule to risk-based pricing and underwriting threatens the fundamental business of insurance.  APCIA commented that "[i]f insurers could not set rates or make underwriting decisions based on objective risk factors that accurately predict loss, the insurance industry could not function properly."  (A.R. 29,115).  APCIA further explained that "compliance with the Disparate-Impact Rule may require defendants to abandon sound, good-faith practices in favor of substitutes that are less effective at furthering the defendants' legitimate, nondiscriminatory interests."  (A.R. 29,119).

97.     Other commenters from the insurance industry echoed APCIA's concerns about the Rule's effects on the fundamental business of insurance.  (*See* A.R. 28,194) ("The unique nature of the insurance industry based on the necessity of developing underwriting and rating

practices to evaluate and fairly distribute risk exposures places it in a position to have to change its entire approach to incorporate protected class considerations throughout its decision-making ….") (comment of American Family Insurance); (A.R. 28,681) ("Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is … at the very heart of the business of insurance.") (comment of Florida Insurance Council); (A.R. 28,694) ("To achieve a condition in which no statistical disparities would exist that could 'actually or predictably results in a disparate impact' in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process.") (comment of NAMIC).  These concerns were shared by state government officials.  (*See, e.g.*, A.R. 28,219) ("[P]recise determinations of risk on the side of the insurer … allow the insurance system to work well.") (comment of Michigan Senator Rick Outman).

98.    APCIA also drew HUD's attention to the significant costs of the Rule, noting that "[r]equiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on insurers and their customers, making insurance less affordable for all." (A.R. 29,146-29,147; *see also id.* at 29,136) ("Forcing insurers to defend the use of risk factors in court would needlessly raise costs for the industry and customers and waste judicial resources."); (A.R. 29,147) ("Under HUD's approach, in many cases insurers would have to defend each of the risk factors they use, perhaps even on a region-by-region basis, as different plaintiffs assert alleged disparate impacts among particular populations of insureds.").  APCIA noted that HUD had not justified these costs, in part because it had not "evaluat[ed] how often

plaintiffs would likely prevail on challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance." *Id.*

99.    Other commenters from the industry raised concerns about the Rule's costs as well. (A.R. 28,170) (noting that the Rule would "interfere with the ability of insurers to comply with state law and could dramatically increase compliance costs," which "could ultimately make insurance more expensive for consumers and policyholders") (comment of property casualty insurance underwriter); (A.R. 28,194) (explaining that the Rule would "significantly increase compliance and litigation costs and alt[e]r pricing structures that have increased the availability and affordability of insurance, ultimately making insurance more expensive for consumers and policyholders") (comment of American Family Insurance). These comments were echoed by federal government officials and homeowners. (*See* A.R. 29,551) ("HUD's proposal to expand disparate impact liability will … raise housing costs" and "the misalignment between HUD's 2013 rule and *Inclusive Communities* … will create even further unnecessary and costly litigation ….") (comment of U.S. Senator Pat Toomey); (A.R. 28,200) ("Applying disparate impact liability to homeowners' insurance under the 2013 Rule will increase insurance costs and almost certainly cause rates to go up.") (comment of Florida homeowner Bernadette DiLucido).

100.    APCIA accordingly requested that HUD "adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance if it intends to reinstate the 2013 Rule." (A.R. 29,134). Other commenters requested the same. (A.R. 28,679) (comment of Florida Insurance Council).

101.    In its final rule, HUD "decline[d] to provide an exemption for the insurance industry in whole or in part." (A.R. 32,776). HUD "disagree[d] that the fundamental nature of insurance warrants the exemptions requested by some commenters," and argued that such

comments "were premised upon the faulty assumption that the proposed rule generally prohibits risk-based factors." (A.R. 32,780). HUD stated that it "recognize[d] that risk-based decision making is an important aspect of sound insurance practices," and asserted that "nothing in this final rule prohibits insurers from making decisions that are in fact risk-based." *Id.*

102. HUD grounded its refusal to provide an exemption for risk-based pricing and underwriting in its belief that the Rule would not "generally prohibit[] risk-based practices" but would instead "merely provide[] a framework for determining if a particular policy or practice causes an unjustified and unlawful discriminatory effect." (A.R. 32,780). Key to HUD's logic was its assertion that insurers could substitute, for a practice challenged under the Rule, an "alternative risk-based practice" with a less discriminatory effect. (A.R. 32,781). HUD stated that it "believe[d] that it is possible for plaintiffs to prove a less discriminatory alternative." (A.R. 32,785). But HUD declined to require that plaintiffs challenging an insurer practice under the Rule prove the existence of an "equally effective" alternative practice. (A.R. 32,804).

103. In declining to adopt an exemption for risk-based pricing and underwriting, HUD stated that it "believes that a *broad* exemption would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations, such as marketing, claims processing, and payment." (A.R. 32,781) (emphasis added). HUD did not consider or address the narrow exemption commenters had requested for risk-based pricing and underwriting or explain whether it believed a narrow exemption would raise similar concerns. HUD further argued that certain insurance practices that were "not purely risk-based" could be challenged under the Rule. *Id.* HUD did not analyze whether it could accomplish its rulemaking objectives by subjecting to liability only those practices that are "not purely risk-based" and create discriminatory effects.

29

104.    Nor did HUD analyze how often plaintiffs would likely prevail on challenges to risk-based pricing and underwriting of homeowners insurance, or provide empirical data in support of its belief that "claims against insurers will not fail categorically" because "it is possible" for plaintiffs to succeed.  (A.R. 32,785).

Filed-Rate Doctrine

105.    APCIA also reiterated its previous comments explaining that the Rule is inconsistent with the filed-rate doctrine, which bars courts from assessing the reasonableness of rates that have been filed with regulatory commissions.  (A.R. 19,145-19,146).

106.    In issuing the 2023 Rule, HUD did not dispute that the filed-rate doctrine applies to insurance rates filed with insurance commissions.  Instead, HUD asserted that the filed-rate doctrine does not apply to disparate-impact claims because those claims "do not challenge the reasonableness of insurance rates, but rather their discriminatory effects."  88 Fed. Reg. at 19,478.  HUD further reasoned that the filed-rate doctrine must yield to the FHA under the Supremacy Clause.  88 Fed. Reg. at 19,478.

*Inclusive Communities*

107.    Commentators explained the Rule does not comply with *Inclusive Communities*. APCIA explained in its August 2021 comments that *Inclusive Communities* did not "approv[e] or endorse[]" the Rule.  (A.R. 29,127).  Instead, APCIA commented that the Rule would "permit plaintiffs to plead and prevail on disparate-impact claims that violate the 'safeguards' that *Inclusive Communities* set forth."  (A.R. 29,128).  For example, *Inclusive Communities* limited disparate-impact liability to practices "that are 'artificial, arbitrary, and unnecessary' to achieve a valid policy."  (A.R. 29,132; A.R. 29,149-29,152).  And *Inclusive Communities* made clear that "[u]nless HUD clarifies that [the burden-shifting framework] requires proof of an 'equally

effective' alternative, reinstatement of the 2013 Rule will 'undermine[] [the] purpose [of the FHA] as well as the free-market system.'"  (A.R. 29,132).

108.    APCIA and other commenters drew HUD's attention to a number of judicial decisions, including the Fifth Circuit's decision in *Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019), holding that the Rule conflicts with the Supreme Court's holding in *Inclusive Communities*.  (A.R. 29,127-29,129 & n.36); (*see also* A.R. 29,552) (comment of U.S. Senator Pat Toomey).  Following *Inclusive Communities*, one commenter noted, "[c]ourts are struggling with applying the *Inclusive Communities* standards into the framework of [the Rule.]"  (A.R. 29,021) (comment of National Leased Housing Association, *et al.*).  Instead, "courts seem to treat the *Inclusive Communities* safeguards as an alternative standard for determining disparate impact liability."  (A.R. 29,022).

109.    As APCIA explained, while "*Inclusive Communities* requires a showing of 'robust causality' between a defendant's challenged policies and an alleged racial disparity," (A.R. 29,128), the Rule "would permit a showing of causation under circumstances that the Supreme Court has repeatedly found inadequate," (A.R. 29,130).  "For example, the 2013 Rule would permit a plaintiff to state a claim by alleging that a particular risk-based practice has a disparate impact on racial minorities, even though it could be the case that there is no statistically significant difference in the rates charged to members of different racial groups resulting from that practice."  *Id.*  The Rule could therefore allow plaintiffs to prevail without meeting the robust causation requirement of *Inclusive Communities*, because their claim would "not rest on a statistically significant difference between comparable populations."  *Id.*  Similarly, *Inclusive Communities* "made clear that when a law 'substantially limits the [defendant's] discretion,' causality cannot be shown."  (A.R. 29,133).

31

110.    APCIA also explained that *Inclusive Communities* "direct[ed] that race-based considerations not be injected where they are properly absent."  (A.R. 29,133).  And APCIA informed HUD that the Rule would require parties to collect for the first time—and possibly in violation of applicable law—data on racial demographics in order to comply.  (A.R. 29,114-29,115) ("Homeowners and commercial habitational insurance actuaries do not consider FHA-protected characteristics when evaluating [risk-based] factors. Indeed, they do not have that data and may be prohibited from collecting it.").

111.    Other commenters shared this concern.  Selective Insurance Company and its affiliates noted that "[t]he 2013 Rule would require Selective and all other insurers to compile and track the personal data of every applicant and insured, including information concerning the individual's race, color, religion, national origin, sex, familial status and/or disability. …  We do not collect this data, and state regulation does not permit us to do so."  (A.R. 29,010-29,011).  And the Massachusetts Insurance Federation explained how the Rule effectively imposes a requirement to collect data on race:  "To avoid being blindsided and to defend against allegations against insurer practices that may 'actually or predictably results in a disparate impact' an insurer would need to somehow obtain, validate, record, and apply data on the 'race, color, religious creed, national origin, sex, age, ancestry, sexual orientation, children, marital status, veteran status, the receipt of public assistance or disability' of every policyholder and applicant. Short of denying coverage to all policyholders and applicants who refuse to provide and validate such data, insurers would have no way to ensure that their protected class data sets were accurate and complete.  As the proposed disparate impact standard does not consider intent, but rather resulting impact, an incomplete or erroneous data set would likely result in inaccurate

evaluations and potential discrimination liability for insurers that employed even the most vigorous compliance efforts." (A.R. 29,273).

112.    In the final rule, HUD responded that "the 2013 Rule is consistent with the *Inclusive Communities* holding." (A.R. 32,771). HUD further determined that "*Inclusive Communities* endorsed the 2013 Rule's framework." (A.R. 32,773). As to courts, including the Fifth Circuit, that have "impose[d] limitations greater than those described in the 2013 Rule," HUD determined that those courts "have misread *Inclusive Communities*." (A.R. 32,772). HUD therefore declined to make any changes to the Rule to comport with *Inclusive Communities*. HUD determined that it need not "add an 'artificial, arbitrary, and unnecessary' pleading standard or substantive element," (A.R. 32,775), rejected calls to recognize a statistical significance requirement, (A.R. 32,799), and disagreed that the Rule would "change industry practices" by requiring data collection, (A.R. 32,793).

Alternatives to an Exemption

113.    In the event HUD rejected an exemption, APCIA explained why HUD's 2020 Rule "better comported with *Inclusive Communities* and the business and legal realities of the insurance industry." (A.R. 29,113-29,114). Thus, APCIA commented that HUD should incorporate a number of safeguards and clarifications to account for the unique aspects of risk-based insurance practices and to conform with *Inclusive Communities*. (A.R. 29,148-29,154). HUD declined to do so. 88 Fed. Reg. at 19,479.

114.    Finally, APCIA requested that, at a minimum, HUD make clear in the Rule that disparate impact challenges are inconsistent with risk-based pricing and underwriting. (A.R. 29,154-29,156). HUD declined to do so. 88 Fed. Reg. at 19,458.

*West Virginia v. EPA*

115. On August 29, 2022, APCIA filed a supplemental comment addressing the
Supreme Court's decision in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). *See* Ex. 2. PCI
explained that the Supreme Court's reasoning in *West Virginia v. EPA* counsels heavily against
the Rule's application to risk-based pricing and underwriting practices of homeowners insurance.
Ex. 2 at 2-5. In subjecting those practices to the Rule's disparate impact standard, HUD exerts
regulatory authority over a broad swath of the economy when Congress not only did not clearly
mandate that exercise of authority, but also affirmatively entrusted that regulatory authority to
the States instead. *Id.* HUD did not mention *West Virginia v. EPA* in its Final Rule. *See* 88 Fed.
Reg. 19,450 (A.R. 32,763).

**Harm to APCIA and Its Members**

116. PCI (and now APCIA, *see supra* note 1) and its insurer members have been and
continue to be injured by the Disparate Impact Rule. (A.R. 552-556; A.R. 371-383; A.R. 454-
459); Ex. 1 ¶¶ 6-7; *PCI*, 66 F. Supp. 3d at 1043-1044.

117. The Rule directly regulates homeowners insurers, including APCIA's member
companies. *See* 78 Fed. Reg. at 11,474-11,475 (A.R. 626-627); (A.R. 553) ("The issue the rule
presents for insurers is whether non-racially motivated and sound actuarial underwriting
principles recognized by state insurance regulators that permit accurate risk-based pricing for
consumers can be prohibited by federal regulators who find them to have a 'disparate impact'
and whether such HUD actions would violate a federal statute reserving the power to regulate
insurance to the states."); (A.R. 554) ("HUD's reference to insurance in the preamble of the
proposed rule suggests that it may use its disparate impact rule to become a federal regulator of
insurance underwriting practices despite McCarran-Ferguson's explicit reservation of insurance

regulatory powers to the states."); (A.R. 455-456) (The proposed rule "would seek to add regulation or enforcement at the federal level."); (A.R. 373); *PCI*, 66 F. Supp. 3d at 1043.

118.     The ability to consider actuarially justified risk factors is critical to the business of insurance.  (*See* A.R. 554) (Insurers "need … to distinguish between different types and degrees of risk.  Indeed, risk discrimination is the foundation of insurance underwriting ...."); (A.R. 376) ("The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk.  Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly."); (A.R. 376) ("To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the very essence of risk-based pricing.").

119.     If the Rule remains in effect, insurers' ability to consider actuarially justified risk factors in underwriting and rating insurance will be impaired.  (A.R. 377) ("To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process.  In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk."); *see also* Ex. 3 ¶ 14 (Declaration of Peter Drogan[5]).

120.     The Rule would thus prevent accuracy in pricing, result in adverse selection, and reduce the availability and affordability of insurance coverage, all of which would injure homeowners insurers.  (A.R. 378) ("If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be

---

[5] The declaration of Peter Drogan discusses Amica Mutual Insurance Company, which is now a member of APCIA.  Ex. 1 ¶ 8.

threatened, adverse selection will increase, and coverage availability will suffer."); Ex. 4 ¶ 20

(Declaration of Ronald Zaleski[6]) (eliminating factors in a risk and rate assessment "would

compromise the actuarial soundness of the risk-based rating plans").

121.    To attempt to comply with the Rule, homeowners insurers would be required to

incur expense collecting demographic data that they do not currently obtain from their customers

and analyzing that data to determine whether their use of facially neutral underwriting and rating

factors have a disparate impact.  (A.R. 383) ("Unlike banks, real estate settlement practices or

rental real estate practices, insurers do not collect data on race and ethnicity.  Without collecting

such data indicative of protected classes, insurers could not assess whether its facially neutral

risk-related underwriting and rating factors have a disparate impact or discriminatory effect on

protected classes."); *see also* Ex. 4 ¶ 11; Ex. 3 ¶ 7; Ex. 5 ¶ 11 (Declaration of Michael Dawdy[7]);

Ex. 6 ¶¶ 6-7 (Declaration of Teresa Cracas[8]); *PCI*, 66 F. Supp. 3d at 1044.  Insurers might not

even be permitted to collect that data, given state prohibitions on "treating similar risks in a

dissimilar manner."  (A.R. 376, 383); Ex. 6 ¶ 10; Ex. 5 ¶ 11.

122.    The Rule would impose significant new burdens on homeowners insurers required

to justify their practices in litigation under the burden-shifting framework adopted in the Rule.

(A.R. 29,115-29,116; A.R. 382-383; A.R. 458); *see also* Ex. 5 ¶ 13 (explaining the Rule "makes

State Auto subject to different and conflicting obligations under state and federal law in terms of

what State Auto must do to legally use its Homeowners Rates without the threat of liability"); *id.*

at ¶ 14 (describing costs State Auto would incur to defend itself); Ex. 6 ¶ 10 (explaining that the

---

[6] The declaration of Ronald Zaleski discusses Selective Insurance Company of America, which is now a member of APCIA.  Ex. 1 ¶ 8.
[7] The declaration of Michael Dawdy discusses State Auto Insurance Companies, which is now a member of APCIA.  Ex. 1 ¶ 8.
[8] The declaration of Teresa Cracas discusses Cincinnati Insurance Company, which is now a member of APCIA.  Ex. 1 ¶ 8.

Rule "will inevitably create compliance risk due to existing state laws which forbid risk differentiation in insurance based on certain personal characteristics like race, color, religion or national origin."); *id.* at ¶¶ 8, 11, 13 (describing significant compliance costs); Ex. 4 ¶ 18; Ex. 3 ¶¶ 10-12.

123.    State regulators are already exercising the role that Congress envisioned for them and actively addressing protected-class concerns implicated in actuarially sound, risk-based pricing practices. *See, e.g.*, Colo. Rev. Stat. Ann. § 10-3-1104.9(1)(a)-(b), (8)(e) (addressing disparate impact concerns caused by use of external consumer data sources and algorithms); Ex. 7 (Delaware Senate Bill 184) (proposed bill addressing disparate impact concerns in risk-based pricing); Ex. 8 (Rhode Island House Bill 5734) (proposed bill addressing disparate impact concerns caused by use of external consumer data sources); Ex. 9 (D.C. Council Bill 25-0114) (proposed bill addressing algorithmic decisions disproportionately impacting protected classes); Ex. 10 (Draft minutes of August 11, 2022 meeting of National Association of Insurance Commissioners "NAIC" Special (EX) Committee on Race and Insurance) (reflecting D.C. Insurance Commissioner Wood's efforts researching "the use of certain underwriting factors … [to] review for unintentional bias" and Alaska Insurance Commissioner Wing-Heier's work considering algorithmic bias and regulatory approaches to address disparate impact); *see also* Ex. 11 (testimony of Dir. Chlora Lindley-Meyers, Missouri Department of Commerce and Insurance, on Behalf of NAIC, before the Subcommittee on Diversity of Inclusion of the House Financial Services Committee); Ex. 12 (California Insurance Commissioner Ricardo Lara Bulletin 2022-5) (emphasizing departmental priority to address racial bias and discrimination); Ex. 13 (notice of the State of Connecticut Insurance Department concerning "the Usage of Big Data and

Avoidance of Discriminatory Practices) (reminding insurance carriers of obligations to comply with anti-discrimination laws in utilizing technology and Big Data).

124.    APCIA and its member companies (as well as, formerly, PCI) have expended substantial resources analyzing the Rule and the steps that could be necessary to comply with the Rule.  If the Rule is not set aside as applied to homeowners insurance, APCIA and its member companies will continue to expend substantial resources analyzing these issues.  Ex. 1 ¶ 7; Ex. 6 ¶ 12.

125.    APCIA's members, their policyholders, and consumers broadly "would have been better off if HUD had exempted homeowners insurers from the Disparate Impact Rule, created safe harbors in the Rule for long-recognized actuarial risk factors, and/or adopted the insurance industry's proposed burden-shifting framework for proving disparate impact claims."  *PCI*, 66 F. Supp. 3d at 1045.

Dated: June 28, 2023                              Respectfully submitted,

                                                  PROPERTY CASUALTY INSURERS
                                                  ASSOCIATION OF AMERICA

                                                  By: /s/ *Seth P. Waxman*
                                                  Seth P. Waxman (*pro hac vice*)
                                                  Catherine M.A. Carroll (*pro hac vice*)
                                                  WILMER CUTLER PICKERING
                                                     HALE AND DORR LLP
                                                  2100 Pennsylvania Avenue, NW
                                                  Washington, DC 20037
                                                  Tel.: (202) 663-6000
                                                  Fax: (202) 663-6363
                                                  E-mail: seth.waxman@wilmerhale.com

                                                  Rowe W. Snider (# 03125194)
                                                  Alyssa M. Gregory (# 6320588)
                                                  LOCKE LORD LLP
                                                  111 South Wacker Drive
                                                  Chicago, IL 60606
                                                  Tel.: (312) 443-0700

Fax: (312) 896-0336
Email: rsnider@lockelord.com
*Attorneys for Plaintiff*