# EXHIBIT 2



August 29, 2022

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

**RE:** **Reinstatement of HUD's Discriminatory Effects Standard, Docket No. FR-6251-P-01**

On August 24, 2021, the American Property Casualty Insurance Association ("APCIA") provided comments to the Department of Housing and Urban Development ("HUD") concerning the agency's Notice of Proposed Rulemaking to recodify the 2013 Disparate-Impact Rule under authority purportedly granted to the agency by the Fair Housing Act ("FHA"). *See* Reinstatement of HUD's Discriminatory Effects Standard, 86 Fed. Reg. 33590 (June 25, 2021); Letter from APCIA to HUD (Aug. 24, 2021). As discussed in those comments, APCIA respectfully believes that the 2013 Rule cannot lawfully be reinstated absent an exemption from disparate-impact liability for risk-based pricing and underwriting of homeowners and commercial habitational insurance. A rule without such an exemption, APCIA explained, would violate the McCarran-Ferguson Act and the filed-rate doctrine and undermine the fundamental risk-based nature of insurance.

Following the submission of APCIA's comments, the Supreme Court issued its decision in *West Virginia et al. v. Environmental Protection Agency*, 142 S. Ct. 2587 (June 30, 2022), which provides further support for APCIA's arguments concerning the 2013 Rule. Specifically, *West Virginia v. EPA*'s invocation of the "major questions doctrine" counsels heavily against application of a disparate-impact standard to risk-based pricing and underwriting practices. APCIA thus submits these supplemental comments to urge HUD to address and account for *West Virginia v. EPA* during the rulemaking process.

**I.    Background**

In *West Virginia v. EPA*, the Supreme Court held that the EPA's Clean Power Plan rule exceeded the agency's statutory authority under the Clean Air Act. That statute authorizes the EPA to regulate new and existing power plants by setting "'standard[s] of performance' for their emission of certain pollutants into the air," which "must reflect the 'best system of emission reduction' that the Agency has determined to be 'adequately demonstrated.'" 142 S. Ct. at 2599 (quoting 42 U.S.C. §§ 7411(a)(1), (b)(1), (d)). For 50 years, the EPA had exercised that authority by setting technology-based "performance standards … that would reduce pollution by causing plants to operate more cleanly." *Id.* But the Clean Power Plan was grounded in a much "broader conception of EPA's authority": Rather than implement technology-based standards,

1

EPA determined "that the 'best system of emission reduction' for existing coal-fired power plants included a requirement that such facilities reduce their own production of electricity, or subsidize increased generation by natural gas, wind, or solar sources." *Id.* at 2599-2600.

The Supreme Court concluded that Congress did not intend to give the EPA such far-reaching authority to "substantially restructure the American energy market." *West Virginia v. EPA*, 142 S. Ct. at 2610. In so holding, the Court relied on the "major questions doctrine," under which courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *Id.* at 2609 (quoting *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)). To overcome that presumption, "something more than a merely plausible textual basis for the agency action is necessary"; "[t]he agency instead must point to 'clear congressional authorization' for the power it claims." *Id.*

No such authorization existed for the Clean Power Plan. To the contrary, the EPA "'claim[ed] to discover'" its "newfound" power in "vague language" of a "'long extant statute.'" *West Virginia v. EPA*, 142 S. Ct. at 2610. Indeed, given the established understanding prior to the Clean Power Plan that Congress "'intended a technology-based approach,'" *id.* at 2611, the EPA's action effected a "'fundamental revision'" of the statute that would enable the agency to exercise "unprecedented power over American industry." *Id.* at 2612. Absent far clearer statutory language, the Court found little reason to think that Congress assigned a decision of "such magnitude and consequence" to the EPA. That was particularly true, the Court explained, given that "'system-wide … trends in areas such as electricity transmission, distribution, and storage'" do not fall within the EPA's traditional "'technical and policy expertise.'" *Id.* at 2612 (quoting EPA, Fiscal Year 2016: Justification of Appropriation Estimates for the Committee on Appropriations 213 (2015)).

In a separate concurrence joined by Justice Alito, Justice Gorsuch explained that the Supreme Court's "cases supply a good deal of guidance about when an agency action involves a major question for which clear congressional authority is required." 142 S. Ct. at 2620. First, he wrote, "this Court has indicated that the doctrine applies when an agency claims the power to resolve a matter of great 'political significance,' or end an 'earnest and profound debate across the country.'" *Id.* (citations omitted). Second, the doctrine applies when an agency "seeks to regulate 'a significant portion of the American economy' or require 'billions of dollars in spending' by private persons or entities." *Id.* at 2621 (citations omitted). And third, the "doctrine may apply when an agency seeks to 'intrud[e] into an area that is the particular domain of state law.'" *Id.* "When an agency claims the power to regulate vast swaths of American life," Justice Gorsuch explained, "it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States." *Id.*

## II. *West Virginia v. EPA* Further Supports APCIA's Arguments Concerning The 2013 Rule

*West Virginia v. EPA* confirms that reinstatement of the 2013 Rule would be unlawful to the extent the Rule regulates or encroaches on the States' regulation of actuarially sound risk-based pricing and underwriting practices of insurers. Applying a disparate-impact standard to such practices would fundamentally alter the nature of the insurance business. Under the

Supreme Court's guidance, there is no basis to infer that Congress would have intended HUD to adopt regulations that are so burdensome to the insurance industry and would so fundamentally transform that wide swath of economic activity.

As APCIA explained in its initial comments, the 2013 Rule undermines the essential risk-based nature of homeowners and commercial habitational insurance. The foundation of risk-based insurance practices, APCIA wrote, is actuarially "'identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly.'" Letter from APCIA to HUD, at 23 (Aug. 24, 2021) (brackets in original). That is a "purely mathematical and unbiased statistical exercise" (*id.*)—one in which "[h]omeowners and commercial habitational insurance actuaries do not consider FHA-protected characteristics" (*id.* at 3-4). Indeed, actuaries "do not have that data and may be prohibited from collecting it." *Id.* at 4 & n.11.

Reinstating the 2013 Rule could penalize insurers for relying on sound, neutral risk factors if they happened to disproportionately affect a class protected by the FHA. This would distort the market for homeowners and commercial habitational insurance. Basing rates on risk factors ensures that prices accurately reflect an insurer's costs of covering particular types of risk for similarly situated customers. But to avoid liability under the Rule, insurers may need to remove any risk factors correlated with a protected class from the calculus (regardless of their correlation to the risk of future loss as universally required by state insurance codes), which could make it prohibitively expensive for insurers to insure high-risk properties, perhaps eliminating coverage across the market. *See* Letter from APCIA to HUD, at 24 (Aug. 24, 2021). It would also cause adverse selection; customers with a low risk of loss would be charged more than necessary to cover their risk, which would prompt them to exit the market and leave only high-risk customers behind. This phenomenon would ultimately threaten the very viability of the homeowners insurance market (including the availability and affordability of insurance) across the country. *See West Virginia v. EPA*, 142 S. Ct. at 2608 (major questions doctrine applies to assertions of "regulatory power over 'a significant portion of the American economy'" (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The 2013 Rule would have effects beyond the insurance market as well. As APCIA again explained in its comments, risk-based insurance pricing encourages safer practices. "For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials." Letter from APCIA to HUD, at 24 (Aug. 24, 2021). Omitting risk factors from the model could reduce such incentives. Indeed, disallowing risk-based pricing effectively causes low-risk activities to subsidize high-risk activities, creating moral hazards and forcing more low-risk activities and consumers out of the market. *See id.* (moral hazard occurs where insureds under-protect themselves against insured risk and loss, which poses an impediment to the efficiency of the insurance market). Again, the ultimate effect of this sequence of events would be to jeopardize the homeowners insurance market.

For these reasons, the 2013 Rule's far-reaching regulation of the insurance industry is an issue of profound "'economic and political significance,'" *West Virginia v. EPA*, 142 S. Ct. at 2608 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)), that threatens to push a market valued at hundreds of billions of dollars into chaos. That alone "provide[s] a 'reason to hesitate before concluding that Congress' meant to confer such authority" on HUD. *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159).

Moreover, as in the case of the EPA's Clean Power Plan, HUD "'has no comparative expertise' in making" the kinds of complex actuarial calculations that undergird sound homeowners insurance pricing and underwriting practices. *West Virginia v. EPA*, 142 S. Ct. at 2612-2613 (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019)). HUD simply does not possess the sort of "technical and policy expertise" required to regulate homeowners insurance. *Id*. at 2612. Just as the EPA could claim no specialized knowledge in "'system-wide … trends in areas such as electricity transmission, and storage," HUD can claim no particular knowledge about insurance pricing and rating practices or system-wide efficiencies of the insurance market. *Id.*

In addition, insurance regulation is "an area that is the particular domain of state law." *West Virginia v. EPA*, 142 S. Ct. at 2621 (Gorsuch, J., concurring). And under state insurance law, differential treatment of insureds who pose different risks is uniformly allowed—indeed, it is required. *See* Letter from APCIA to HUD, at 28-31 (Aug. 24, 2021) (discussing state insurance laws in detail). The importance of those state regulations is codified into federal law by the McCarran-Ferguson Act, which states that "the continued regulation and taxation by the several States of the business of insurance is in the public interest," 15 U.S.C. § 1011, and that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance," *id.* § 1012(b). The McCarran-Ferguson Act would thus be violated by a regulation requiring federal courts to "determine whether [challenged insurance practices] are actuarially sound and consistent with principles of state law." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999); *see also* Letter from APCIA to HUD, at 6-7, 26-31 (Aug. 24, 2021). Congress has thus already signaled in the McCarran-Ferguson Act whether it intended risk-based pricing and underwriting practices to be subject to state or federal regulation, and it unmistakably rejected the federal regulatory authority that HUD's 2013 Rule asserts. *Cf. West Virginia v. EPA*, 142 S. Ct. at 2614 (discussing how Congress repeatedly rejected proposals to enact programs like EPA's Clean Power Plan).

Against this backdrop, *West Virginia v. EPA* requires that HUD's application of a disparate-impact standard to the risk-based pricing and underwriting of homeowners' insurance be supported by "'clear congressional authorization' to regulate in that manner." 142 S. Ct. at 2614 (quoting *Utility Air*, 573 U.S. at 324). But no such clear authorization exists. The authority to impose disparate-impact liability lies in the FHA's prohibition of practices that "'otherwise make unavailable or deny[] a dwelling to any person because of race, color, religion, sex, familial status, or national origin.'" *See Texas Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 533-535 (2015) (quoting 42 U.S.C. § 3604(a)). That is broad, generalized language—which itself requires that liability be "properly limited in key respects" to avoid "the displacement of valid governmental policies" and "to give housing authorities and private developers leeway" to pursue "valid interest[s]." *Id.* at 540-541. Crucially, the statutory language makes no specific reference to insurance activities, as required by the major questions doctrine and the McCarran-Ferguson Act. It simply "is not plausible," then, that Congress intended the broad language of the FHA to authorize federal regulation of state-administered, actuarially sound risk-based pricing and underwriting practices—regulation that could have significant consequences on the national homeowners insurance market at large. *West Virginia v. EPA*, 142 S. Ct. at 2616. "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation." *Id.* For that reason,

and for the reasons provided in APCIA's initial comments, APCIA respectfully submits that any reinstatement of the 2013 Rule should include an exemption from disparate-impact liability for risk-based pricing and underwriting activities.