# EXHIBIT 9

_____                    _____
Councilmember Anita Bonds                    Councilmember Robert C. White, Jr.

_____                    _____
Councilmember Janeese Lewis George           Councilmember Charles Allen

                                             _____
                                             Councilmember Zachary Parker

A BILL

_____

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

_____

To prohibit users of algorithmic decision-making from utilizing algorithmic eligibility determinations in a discriminatory manner, to require corresponding notices to individuals whose personal information is used, and to provide for appropriate means of civil enforcement.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Stop Discrimination by Algorithms Act of 2023".

Sec. 2. Findings and declaration of policy.

The Council of the District of Columbia makes the following findings:

(a) It is the sense of the Council that technological advancements should support the dignity and well-being of the people of the District.

(b) Computers and data-derived decision-making tools play ever larger roles in modern life. As of 2019, 90 percent of U.S. adults regularly used the internet. Approximately 76 percent of households in the District of Columbia have a broadband internet subscription, and many who lack a home internet connection use smartphones to go online.

36     (c) When District residents engage in online activities like posting on social media,
37 searching web-based listings for an apartment, or submitting electronic job applications, they
38 generate personalized information that is harvested by data collectors. Data collectors can track
39 hundreds of categories of data about specific individuals including age, gender, employment
40 status and place of employment, income level, sexual orientation, national origin, and religion.
41     (d) Companies often use data from both online and offline sources to create algorithms,
42 which are tools that use machine learning and personal data to make educated guesses about an
43 individual's preferences, abilities, and future behavior. These algorithms are then incorporated
44 into decision-making processes that affect many aspects of life.
45     (e) Increasingly, algorithms determine an individual's opportunities to secure
46 employment, insurance, credit, housing, and public accommodations, as well as access to
47 information about those opportunities.
48     (f) Algorithms often rely on personal traits protected under the D.C. Human Rights Act.
49 And algorithmic decision-making can amplify discrimination based on race, gender, sexual
50 orientation, disability, age, source of income, credit information, and other protected traits when
51 algorithmic models replicate existing societal inequalities. Algorithmic decision-making systems
52 that fail to account for bias disproportionately harm marginalized communities.
53     (g) Despite their prevalence and the potential problems they pose, algorithms are poorly
54 understood by most individuals, in part because of the many entities involved and the lack of
55 accountability among those entities.
56     (h) This act seeks to protect individuals and classes of individuals from the harm that
57 results when algorithmic decision-making processes operate without transparency, rely on
58 protected traits and other personal data that are correlated with those traits, or disproportionately

59   limit access to and information about important life opportunities. The act combats these

60   challenges by:

61          (1) Encouraging transparency and accountability by requiring covered entities to

62   provide notice to individuals about how the covered entity uses personal information in

63   algorithmic decisions, including additional information when the algorithmic decision results in

64   an adverse action, audit its algorithmic determination practices for discriminatory processing or

65   impact, and report this information to the Office of the Attorney General;

66          (2) Prohibiting adverse algorithmic decision-making based on protected traits, or

67   that have the effect of making decisions based on such traits; and

68          (3) Creating public investigatory and enforcement authority, and an individual

69   right of action.

70   Sec. 3. Definitions.

71   The following words and terms when used in this act have the following meanings:

72   (1) "Adverse action" means a denial, cancellation, or other adverse change or assessment

73   regarding an individual's eligibility for, opportunity to access, or terms of access to important

74   life opportunities.

75   (2) "Algorithmic eligibility determination" means a determination based in whole or in

76   significant part on an algorithmic process that utilizes machine learning, artificial intelligence, or

77   similar techniques to determine an individual's eligibility for, or opportunity to access, important

78   life opportunities.

79   (3) "Algorithmic information availability determination" means a determination based in

80   whole or in significant part on an algorithmic process that utilizes machine learning, artificial

3

81   intelligence, or similar techniques to determine an individual's receipt of advertising, marketing,
82   solicitations, or offers for an important life opportunity.
83   (4) "Covered entity" means any individual, firm, corporation, partnership, cooperative,
84   association, or any other organization, legal entity, or group of individuals however organized,
85   including entities related by common ownership or corporate control, that either makes
86   algorithmic eligibility determinations or algorithmic information availability determinations, or
87   relies on algorithmic eligibility determinations or algorithmic information availability
88   determinations supplied by a service provider, and that meets one of the following criteria:
89   (A) Possesses or controls personal information on more than 25,000 District
90   residents;
91   (B) Has greater than $15 million in average annualized gross receipts for the 3
92   years preceding the most recent fiscal year;
93   (C) Is a data broker, or other entity, that derives 50 percent or more of its annual
94   revenue by collecting, assembling, selling, distributing, providing access to, or maintaining
95   personal information, and some proportion of the personal information concerns a District
96   resident who is not a customer or an employee of that entity; or
97   (D) Is a service provider.
98   (5) "Important life opportunities" means access to, approval for, or offer of credit,
99   education, employment, housing, a place of public accommodation as defined in section 102(24)
100  of the Human Rights Act of 1977, effective December 13, 1977 (D.C. Law 2-38; D.C. Official
101  Code § 2-1401.02(24)), or insurance.

4

| | |
|---|---|
| 102 | (6)(A) "Personal information" means any information held by a covered entity – |
| 103 | regardless of how the information is collected, inferred, derived, created, or obtained – that is |
| 104 | linked or reasonably linkable to an individual, household, or a personal device. |
| 105 | (B) Information is reasonably linkable to an individual, household, or personal |
| 106 | device if it can be used on its own or in combination with other information reasonably available |
| 107 | to the covered entity, regardless of whether such other information is held by the covered entity, |
| 108 | to identify an individual, household, or personal device. |
| 109 | (C) Examples of personal information include: |
| 110 | (i) Individually identifiable information such as a real name, alias, |
| 111 | signature, date of birth, union membership number, postal address, unique personal identifier, |
| 112 | online identifier, internet protocol address, media access control (MAC) address, unique device |
| 113 | identifier, email address, phone number, account name, social security number, military |
| 114 | identification number, driver's license number, vehicle identification number, passport number, |
| 115 | or other similar identifiers; |
| 116 | (ii) A person's race, national origin, religious affiliation, gender identity, |
| 117 | sexual orientation, marital status, or disability; |
| 118 | (iii) Commercial information, including records of personal property, |
| 119 | products or services purchased, obtained, or considered, or other purchasing or consuming |
| 120 | histories or tendencies; |
| 121 | (iv) Real-time or historical geolocation data more specific than a 50-mile |
| 122 | radius; |
| 123 | (v) Education records, as defined in 34 C.F.R. § 99.3 or any successor |
| 124 | regulation; |

125     (vi) Biometric data, including voice signatures, facial geometry,
126 fingerprints, and retina/iris scans;
127     (vii) Inferences drawn from any of the information identified in sub-
128 subparagraphs (i)-(vi) to create a profile about an individual reflecting the individual's
129 predispositions, behavior, habits, attitudes, intelligence, abilities, and aptitudes.
130   (7) "Service provider" means any entity that performs algorithmic eligibility
131 determinations or algorithmic information availability determinations on behalf of another entity.
132   Sec. 4. Prohibited practices.
133   (a) In general.
134    (1) A covered entity shall not make an algorithmic eligibility determination or an
135 algorithmic information availability determination on the basis of an individual's or class of
136 individuals' actual or perceived race, color, religion, national origin, sex, gender identity or
137 expression, sexual orientation, familial status, source of income, or disability in a manner that
138 segregates, discriminates against, or otherwise makes important life opportunities unavailable to
139 an individual or class of individuals.
140    (2) Any practice that has the effect or consequence of violating paragraph (1) of
141 this subsection shall be deemed to be an unlawful discriminatory practice.
142   (b) Exemptions.
143    (1) Nothing in subsection (a) shall limit the availability of the exemptions in
144 section 103 of the Human Rights Act of 1977, effective December 13, 1977 (D.C. Law 2-38;
145 D.C. Official Code § 2-1401.03).

146         (2) Nothing in this act shall prohibit covered entities from using individuals'
147 personal information to s part of an affirmative action plan, adopted pursuant to District or
148 federal law
149             (C)make algorithmic eligibility determinations or algorithmic information
150 availability determinations
151     Sec. 5. Relationships with service providers.
152     Any covered entity that relies in whole or in part on a service provider to conduct an
153 algorithmic eligibility determination or an algorithmic information availability determination
154 shall require by written agreement that the service provider implement and maintain measures
155 reasonably designed to ensure that the service provider complies with this act.
156     Sec. 6. Right to notice and disclosure.
157     (a) Notice requirement.
158     A covered entity shall:
159         (1) Develop a notice about how the covered entity uses personal information in
160 algorithmic eligibility determinations and algorithmic information availability determinations,
161 including:
162             (A) What personal information the covered entity collects, generates,
163 infers, uses, and retains;
164             (B) What sources the covered entity uses to collect, generate, or infer
165 personal information;
166             (C) Whether the personal information is shared, sold, leased, or exchanged
167 with any service providers for any kind of consideration, and if so, the names of those service
168 providers, including subsidiaries of the service providers;

| | |
|---|---|
| 169 | (D) A brief description of the relationship between the personal |
| 170 | information and the algorithmic information availability or algorithmic eligibility |
| 171 | determinations; |
| 172 | (E) How long the covered entity will hold the personal information; and |
| 173 | (F) The rights provided under this act; |
| 174 | (2) Ensure that the notice developed and made available under paragraph (1) of |
| 175 | this subsection: |
| 176 | (A) Is clear, concise, and complete; |
| 177 | (B) Does not contain unrelated, confusing, or contradictory materials; and |
| 178 | (C) Is in a format that is: |
| 179 | (i) Prominent and easily accessible; |
| 180 | (ii) Capable of fitting on one printed page; and |
| 181 | (iii) Provided in English, as well as in any non-English language |
| 182 | spoken by at least 500 individuals in the District of Columbia population. |
| 183 | (3) Within 30 days after changing its collection or use practices or policies in a |
| 184 | way that affects the content of the notice required by paragraph (1) of this subsection, update that |
| 185 | notice; |
| 186 | (4) Make the notice required under paragraph (1) of this subsection continuously |
| 187 | and conspicuously available: |
| 188 | (A) On the covered entity's website or mobile application, if the covered |
| 189 | entity maintains a website or mobile application; |
| 190 | (B) At the physical place of business or any offline equivalent the covered |
| 191 | entity maintains; and |

192         (5) Send the notice required under paragraph (1) of this subsection to an
193 individual before the first algorithmic information availability determination it makes about the
194 individual, by:
195         (A) Mail, if the personal information was gathered through the individual
196 contacting or contracting with the covered entity through mail;
197         (B) Email, if the personal information was gathered through the individual
198 contacting or contracting with the covered entity through email, or if the covered entity has the
199 individual's email address for another reason;
200         (C) Informing individuals through a "pop-up" notification upon navigation
201 to the covered entity's website or within the covered entity's mobile application; or
202         (D) Providing a clear and conspicuous link on the covered entity's
203 website's homepage, or the home screen of its mobile application, leading to the notice.
204     (b) A covered entity need not provide the notice described under subsection (a) of this
205 section if another covered entity has provided notice to the same individual for the same action
206 as part of a contracted arrangement with the covered entity.
207     (c) Prohibited acts.
208     A covered entity that is subject to paragraph (a)(1), with respect to any individual whose
209 personal information the covered entity holds as described in that paragraph, may not use any
210 personal information of the individual in an algorithmic eligibility determination unless the
211 covered entity has provided the individual with notice consistent with that paragraph.
212     (d) Adverse action disclosure requirements.

213    If a covered entity takes any adverse action with respect to any individual that is based in
214 whole or in part on the results of an algorithmic eligibility determination, the covered entity shall
215 provide the individual a written or electronic disclosure that includes:
216        (1) The covered entity's name, address, email address, and telephone number;
217        (2) The factors the determination depended on; and
218        (3) An explanation that the individual may:
219            (A) Access any personal information described in section 3(6)(A)-(C),
220 pertaining to that individual, that the covered entity used to make the determination;
221            (B) Submit corrections to that information; and
222            (C) If the individual submits corrections, request that the covered entity
223 conduct a reasoned reevaluation of the relevant algorithmic eligibility determination, conducted
224 by a human, based on the corrected data.
225    Sec. 7. Auditing for Discriminatory Processing and Reporting Requirement.
226    (a) Auditing requirement.
227    A covered entity shall annually audit its algorithmic eligibility determination and
228 algorithmic information availability determination practices to:
229        (1) Determine whether the processing practices discriminate in a manner
230 prohibited by section 4 of this act;
231        (2) Analyze disparate-impact risks of algorithmic eligibility determinations and
232 algorithmic information availability determinations based on actual or perceived race, color,
233 religion, national origin, sex, gender identity or expression, sexual orientation, familial status,
234 genetic information, source of income, or disability;

235    (3) Create and retain for at least 5 years an audit trail that records, for each
236 algorithmic eligibility determination:
237    (A) The type of algorithmic eligibility determination made;
238    (B) The data used in the determination, including the source of any such
239 data;
240    (C) The methodology used by the entity to establish the algorithm;
241    (D) The algorithm used to make the determination;
242    (E) Any data or sets of data used to train the algorithm;
243    (F) Any testing and results for model performance across different
244 subgroups or for discriminatory effects;
245    (G) The methodology used to render the determination; and
246    (H) The ultimate decision rendered;
247    (4) Conduct annual impact assessments of:
248    (A) Existing systems that render algorithmic eligibility determinations and
249 algorithmic information availability determinations; and
250    (B) Prior to implementation, new systems that render algorithmic
251 eligibility determinations and algorithmic information availability determinations;
252    (5) Conduct the audits under paragraphs (1), (2), and (3) of this subsection in
253 consultation with third parties who have substantial information about or participated in the
254 covered entity's algorithmic eligibility determinations and algorithmic information availability
255 determinations, including service providers; and
256    (6) Identify and implement reasonable measures to address risks of an unlawful
257 disparate impact identified in the audits and impact assessments conducted under paragraphs (1),

258  (2), and (3) of this subsection, including the risks posed by determinations made by the covered
259  entity's service providers.
260        (b)(1) Report.
261        A covered entity shall annually submit a report containing the results of the audit
262  mandated under this section to the Office of the Attorney General for the District of Columbia on
263  a form provided by the Office of the Attorney General. The report shall contain the following
264  information:
265              (A) The types of algorithmic eligibility determination and algorithmic
266  information availability determination that the covered entity makes;
267              (B) The data and methodologies that the covered entity uses to establish
268  the algorithms;
269              (C) The optimization criteria of the algorithms used to make the
270  determinations;
271              (D) Any data or sets of data used to train the algorithms, and the source or
272  sources of that data;
273              (E) The methodologies the covered entity uses to render the
274  determinations;
275              (F) Any performance metrics the entity uses to gauge the accuracy of the
276  assessments, including accuracy, confidence intervals, and how those assessments are obtained;
277              (G) The frequency, methodology, and results of the impact assessments or
278  risk assessments that the entity has conducted;
279              (H) Within the description of each of the above decisions, the rationale for
280  each of these decisions;

281           (I) Whether the covered entity has received complaints from individuals
282 regarding the algorithmic eligibility determinations and algorithmic information availability
283 determinations it has made; and
284           (J) If the covered entity has determined that one or more of the exemptions
285 referred to in section 4(b) apply to practices that would otherwise violate section 4(a), a
286 declaration and explanation of the covered entity's reliance on those exemptions.
287       (2) To the extent consistent with federal law or other District law, a covered entity
288 may, in place of the report required by paragraph (1) of this subsection, submit to the Office of
289 the Attorney General a report previously submitted to a federal, District, or other government
290 entity, if that report contains the required information or is supplemented with the missing
291 information.
292       (3) Nothing in this section shall affect Freedom of Information Act exemptions
293 that protect trade secrets and other information from public disclosure, as provided by section
294 204 of the District of Columbia Administrative Procedure Act, approved March 29, 1977 (D.C.
295 Law 1-96; D.C. Official Code § 2-534).
296     (d) The Attorney General for the District of Columbia, pursuant to the District of
297 Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C.
298 Official Code § 2-501 *et seq.*), may issue rules to implement the reporting provisions of this
299 section.
300     Sec. 8. Enforcement.
301     (a) Enforcement by Attorney General.
302     In any case in which the Attorney General for the District of Columbia has reason to
303 believe that any person has used, is using, or intends to use any method, act, or practice in

| | |
|---|---|
| 304 | violation of this act or a regulation promulgated under this act, or has failed to provide a notice, a |
| 305 | disclosure, or a report required by this act, the Attorney General for the District of Columbia may |
| 306 | commence appropriate civil action in the Superior Court of the District of Columbia for: |
| 307 | (1) A temporary or permanent injunction; |
| 308 | (2) Penalties as described in subsection (c)(1) of this section; |
| 309 | (3) Damages or restitution; or |
| 310 | (4) Any other relief that the court considers appropriate. |
| 311 | (b) Investigatory powers of Attorney General. |
| 312 | In the course of an investigation to determine whether to seek relief, the Attorney General |
| 313 | for the District of Columbia may subpoena witnesses, administer oaths, examine an individual |
| 314 | under oath, require sworn written responses to written questions, and compel production of |
| 315 | records, books, papers, contracts, and other documents. A subpoena issued pursuant to this |
| 316 | subsection shall be issued in compliance with the procedures specified in section 110a(b)-(e) of |
| 317 | the Attorney General for the District of Columbia Clarification and Elected Term Amendment |
| 318 | Act of 2010, effective October 22, 2015 (D.C. Law 21-36; D.C. Official Code § 1-301.88d(b)- |
| 319 | (e)). |
| 320 | (c) Attorney General actions for violations. |
| 321 | (1) Any covered entity or service provider that violates any provision of this act |
| 322 | shall be liable for a civil penalty of not more than $10,000 for each violation, which may be |
| 323 | recovered in a civil action brought in the name of the District of Columbia by the Attorney |
| 324 | General. |
| 325 | (2) Any civil penalty assessed for a violation under any provision of this act, and |
| 326 | the proceeds of any settlement of an action brought pursuant to this subsection, shall be |

327 deposited in the Litigation Support Fund established in section 106b of the Attorney General for
328 the District of Columbia Clarification and Elected Term Amendment Act of 2010, effective
329 October 22, 2015 (D.C. Law 21-36; D.C. Official Code § 1-301.86b).
330     (d) Civil actions for violations.
331     Any person aggrieved by a violation of this act may bring a civil action in any court of
332 competent jurisdiction, and the court may award an amount not less than $100 and not greater
333 than $10,000 per violation or actual damages, whichever is greater.
334     (e) Relief.
335     In a civil action brought under either subsection (c) or (d) of this section in which the
336 plaintiff prevails, the court may also award:
337         (1) Punitive damages;
338         (2) Reasonable attorney's fees and litigation costs; and
339         (3) Any other relief, including equitable or declaratory relief, that the court
340 determines appropriate.
341     (f) Injury in fact.
342     In a civil action brought under subsection (d) of this section, a violation of this act or a
343 regulation promulgated under this act with respect to an individual constitutes a concrete and
344 particularized injury to that individual.
345     Sec. 9. Fiscal impact statement.
346     The Council adopts the fiscal impact statement in the committee report as the
347 fiscal impact statement required by section 4a of the General Legislative Procedures Act of 1975,
348 approved October 16, 2006 (120 Stat. 2038; D.C. Official Code § 1-301.47a).
349     Sec. 10. Effective date.

350        This act shall take effect following approval by the Mayor (or in the event of
351    veto by the Mayor, action by the Council to override the veto), a 30-day period of congressional
352    review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved
353    December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the
354    District of Columbia Register.