UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PROPERTY CASUALTY INSURERS
  ASSOCIATION OF AMERICA,

      Plaintiff,

        v.

MARCIA L. FUDGE, in her official
  capacity as Secretary, Housing and Urban
  Development,

U.S. DEPARTMENT OF HOUSING AND
  URBAN DEVELOPMENT,

      Defendants.

Case No. 1:13-cv-08564
Chief Judge Rebecca R. Pallmeyer

**DEFENDANTS' COMBINED MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

SARAH HARRINGTON
Deputy Assistant Attorney General

JEANINE M. WORDEN
Associate General Counsel for Fair Housing
ALLEN LEVY
Acting Assistant General Counsel for Fair
Housing Enforcement
PAUL I. OSADEBE
JULIA DYKSTRA
Trial Attorneys
U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT

*Of Counsel*

LESLEY FARBY
Assistant Branch Director

/s/ James D. Todd, Jr.
JAMES D. TODD, JR.
VINITA B. ANDRAPALLIYAL
BRIAN C. ROSEN-SHAUD
United States Department of Justice
Benjamin Franklin Station
P.O. Box 883
Washington, DC 20044
(202) 514-3378
(202) 305-0845
(202) 305-7667
james.todd@usdoj.gov
vinita.b.andrapalliyal@usdoj.gov
brian.c.rosen-shaud@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATUTORY AND REGULATORY BACKGROUND ......................................3

PROCEDURAL BACKGROUND ........................................................................7

STANDARD OF REVIEW .................................................................................11

ARGUMENT .......................................................................................................12

I.     PCI Lacks Standing to Maintain its Claims .............................................12

    A.    PCI's Asserted Increased Exposure to Disparate-Impact Liability Meets None of the Standing Requirements ...................................13

    B.    PCI's Asserted Compliance Costs Meet None of the Standing Requirements ........17

II.    PCI's Facial Challenge is Not Ripe for Judicial Resolution .................19

    A.    PCI Cannot Satisfy the Constitutional Element of the Ripeness Requirement........20

    B.    PCI Fails to Satisfy the Prudential Elements of the Ripeness Requirement ...........21

        1.    PCI Cannot Show that its Facial Challenge Is Fit for Review....................21

        2.    PCI Has Not Shown Any Hardship that Would Result from Withholding Judicial Review........24

III.   PCI's Challenges Fail on the Merits .......................................................26

    A.    HUD Considered the Industry's Concerns Based on McCarran Ferguson and Provided Reasonable Bases for Rejecting the Industry's Requested Exemptions........27

    B.    None of PCI's Rejoinders Justify Upending HUD's Reasonable Determination to Prefer Case-By-Case Adjudication Over Exemptions for the Industry ........29

        1.    HUD explained that *Doe v. Mutual of Omaha* does not require a categorical exemption or safe harbor for "risk-based pricing and underwriting"........29

        2.    HUD considered the industry's request for a safe harbor for "risk-based" pricing and underwriting and provided reasonable bases for rejecting it........33

        3.    HUD reasonably considered state fair housing laws in rejecting exemptions for the industry based on McCarran-Ferguson concerns.........36

i

4.       HUD reasonably decided that the fact-intensive nature of the McCarran-Ferguson inquiry counseled against a blanket exemption ..........38

C.       HUD Considered the Industry's Concerns Based on the Nature of Insurance and Provided Rational Bases for Rejecting the Industry's Requested Exemptions..............................................................................................41

D.       HUD Considered the Industry's Concerns Based on the "Filed-Rate" Doctrine and Provided Rational Bases for Rejecting an Exemption for Insurance Pricing............................................................................................43

E.       HUD Properly Considered the Impact of *Inclusive Communities* on the Rule as Part of its Reconsideration on Remand and Again in the 2023 Rule ................46

IV.      If HUD's Consideration of *Inclusive Communities* and Additional Explanations Remain Insufficient, Remand, Not Vacatur, is the Appropriate Remedy............................49

CONCLUSION ....................................................................................................50

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*,
    444 F.3d 673 (D.C. Cir. 2006) .................................................................................................4

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ...................................................................................................20, 21

*Alliant Energy Corp. v. Bie*,
    277 F.3d 916 (7th Cir. 2002) .............................................................................................20

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ..........................................................................................50

*Am. Petrol. Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012) ...............................................................................20, 22, 23

*Atl. States Legal Found. v. EPA*,
    325 F.3d 281 (D.C. Cir. 2003) ..........................................................................................22

*Ave. 6E Invs., LLC v. Yuma*,
    818 F.3d 493 (9th Cir. 2016) .................................................................................6, 42, 47

*Avitia v. Metro. Club of Chicago, Inc.*,
    49 F.3d 1219 (7th Cir. 1995) ............................................................................................23

*Azam v. City of Columbia Heights*, No. 14-1044,
    2016 WL 424966 (D. Minn. Feb. 3, 2016), *aff'd*, 865 F.3d 980 (8th Cir. 2017) .........................6

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................................16

*Bethlehem Steel v. EPA*,
    536 F.2d 156 (7th Cir. 1976) ............................................................................................26

*Betsey v. Turtle Creek Assocs.*,
    736 F.2d 983 (4th Cir. 1984) ..............................................................................................4

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) .....................................................................................................49

*Borum v. Brentwood Vill., LLC*,
    218 F. Supp. 3d 1 (D.D.C. 2016) .......................................................................................6

*Charleston Hous. Auth. v. U.S. Dep't of Agric.*,
    419 F.3d 729 (8th Cir. 2005) ..............................................................................................4

*Choice Inc. of Tex. v. Greenstein*,
    691 F.3d 710 (5th Cir. 2012) ............................................................................................21

*City Comms., Inc. v. City of Detroit*,
  888 F.2d 1081 (6th Cir. 1989).................................................................14

*City of Portland v. United States*,
  969 F.3d 1020 (9th Cir. 2020).................................................................29

*Clean Air Implementation Project v. EPA*,
  150 F.3d 1200 (D.C. Cir. 1998).................................................................26

*Cohen v. Am. Sec. Ins. Co.*,
  735 F.3d 601 (7th Cir. 2013).................................................................45

*Connectors Realty Grp. Corp. v. State Farm Fire & Cas. Co.*, No. 19-cv-743,
  2019 WL 5064699 (N.D. Ill. Oct. 9, 2019), *on reconsideration*,
  2020 WL 13444239 (N.D. Ill., Aug. 14, 2020).................................................................47

*Crete Carrier Corp. v. EPA*,
  363 F.3d 490 (D.C. Cir. 2004).................................................................15

*Crosetto v. State Bar*,
  12 F.3d 1396 (7th Cir. 1993).................................................................25

*Ctr. for Energy & Econ. Dev. v. EPA*,
  398 F.3d 653 (D.C. Cir. 2005).................................................................17

*Dehoyos v. Allstate Corp.*,
  345 F.3d 290 (5th Cir. 2003).................................................................*passim*

*Delta Constr. v. EPA*,
  783 F.3d 1291 (D.C. Cir. 2015).................................................................17, 19

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020).................................................................49

*de Reyes v. Waples Mobile Home Park L.P.*,
  903 F.3d 415 (4th Cir. 2018).................................................................6

*Diamond Shamrock Corp. v. Costle*,
  580 F.2d 670 (D.C. Cir. 1978).................................................................22, 24

*DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*,
  887 F.2d 275 (D.C. Cir. 1989).................................................................20

*Doe v. Mutual of Omaha*,
  179 F.3d 557 (7th Cir. 19991).................................................................29, 31

*Duke Power Co. v. Carolina Envt'l Study Grp.*,
  438 U.S. 59 (1978).................................................................20

*E.F. Transit, Inc. v. Cook*,
  878 F.3d 606 (7th Cir. 2018).................................................................19

iv

*Elec. Priv. Info. Ctr. v. FAA*,
   892 F.3d 1249 (D.C. Cir. 2018) ........................................................................................ 18, 26

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ............................................................................................................ 11

*Firstmerit Bank, N.A. v. BMO Harris Bank*, No. 15-cv-9238,
   2016 WL 2622326 (N.D. Ill. May 9, 2016) ........................................................................ 26

*Flores v. United Airlines*,
   426 F. Supp. 3d 520 (N.D. Ill. 2019) ................................................................................. 30

*Flynn v. FCA US LLC*,
   39 F.4th 946 (7th Cir. 2022) ........................................................................................... 12, 16

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ............................................................................................. 14

*Ft. Wayne Patrolmen's Ben. Ass'n, Inc. v. City of Ft. Wayne*,
   625 F. Supp. 722 (N.D. Ind. 1986) .................................................................................... 20

*Ghaly v. INS*,
   48 F.3d 1426 (7th Cir. 1995) ............................................................................................... 11

*Gilbert v. Illinois State Bd. of Educ.*,
   591 F.3d 896 (7th Cir. 2010) ............................................................................................... 16

*Gov't Suppliers Consol. Servs., Inc. v. Bayh*,
   975 F.2d 1267 (7th Cir. 1992) ............................................................................................. 25

*Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Hum. Rels. Comm'n*,
   508 F.3d 366 (6th Cir. 2007) .......................................................................................... 4, 43

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971) ......................................................................................................... 5, 48

*Gunn v. Cont'l Cas. Co.*,
   968 F.3d 802 (7th Cir. 2020) ............................................................................................... 45

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) .............................................................................................................. 14

*Hinrichs v. Whitburn*,
   975 F.2d 1329 (7th Cir. 1992) ................................................................................. 19, 21, 26

*HUD v. Pfaff*, No. 10-93-84-8,
   1994 WL 592199 (HUD ALJ Oct. 27, 1994), *rev'd on other grounds*,
   88 F.3d 739 (9th Cir. 1996) .................................................................................................... 4

*Humana Inc. v. Forsyth*,
   525 U.S. 299 (1999) ......................................................................................................... 37, 39

*Huntington Branch, NAACP v. Town of Huntington*,
844 F.2d 926 (2d Cir. 1988) ..................................................................................4

*Huskey v. State Farm Fire & Casualty Co.*, No. 22-cv-7014,
2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) ...................................................30, 47

*In re Aiken Cnty.*,
645 F.3d 428 (D.C. Cir. 2011) ...............................................................................20

*In re Title Ins. Antitrust Cases*,
702 F. Supp. 2d 840 (N.D. Ohio 2010)....................................................................44

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
920 F.3d 890 (5th Cir. 2019)...................................................................................47

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
747 F.3d 275 (5th Cir. 2014)....................................................................................6

*Indep. Rt. to Life, Inc. v. Shepard*,
507 F.3d 545 (7th Cir. 2007)...................................................................................19

*Indiana Coal. for Pub. Educ. - Monroe Cnty. v. McCormick*,
338 F. Supp. 3d 926 (S.D. Ind. 2018) ....................................................................16

*Johnson v. City of Memphis*,
770 F.3d 464 (6th Cir. 2014)...................................................................................49

*Jones v. Griffith*,
870 F.2d 1363 (7th Cir. 1989)..................................................................................20

*Kathrein v. City of Evanston, Ill.*,
752 F.3d 680 (7th Cir. 2014)..........................................................................12, 15, 23

*Keep Chicago Livable v. City of Chicago*,
913 F.3d 618 (7th Cir. 2019)...................................................................................14

*La. Envt'l Action Network v. Browner*,
87 F.3d 1379 (D.C. Cir. 1996)............................................................................22, 24

*Langlois v. Abington Hous. Auth.*,
207 F.3d 43 (1st Cir. 2000) ......................................................................................4

*Larkin v. Fin. Sys. of Green Bay, Inc.*,
982 F.3d 1060 (7th Cir. 2020)...........................................................................12, 13

*Lehn v. Holmes*,
364 F.3d 862 (7th Cir. 2004)...................................................................................21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................................13

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ..............................................................................................22, 23

*Lumpkin v. Farmers Grp., Inc.*, No. 05-cv-2868,
  2007 U.S. Dist. LEXIS 98949 (W.D. Tenn. July 6, 2007) ......................................40

*Lumpkin v. Farmers Grp., Inc.*, No. 05-cv-2868,
  2007 U.S. Dist. LEXIS 98994 (W.D. Tenn. Apr. 26, 2007).................................44, 45

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*,
  496 F. Supp. 3d 600 (D. Mass. 2020) ........................................................................7

*Messenger v. Anderson*,
  225 U.S. 436 (1912) .................................................................................................23

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
  558 F.2d 1283 (7th Cir. 1977)....................................................................................4

*Meyers v. Nicolet Rest. of De Pere, LLC*,
  843 F.3d 724 (7th Cir. 2016).....................................................................................12

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016).........................................................................6, 36, 47

*Milwaukee Police Ass'n v. Bd. of Police & Fire Comm'rs of City of Milwaukee*,
  708 F.3d 921 (7th Cir. 2013)....................................................................................14

*Montgomery Cnty. v. Bank of Am. Corp.*,
  421 F. Supp. 3d 170 (D. Md. 2019) ..........................................................................42

*Mountain Side Mobile Estates P'ship v. HUD*,
  56 F.3d 1243 (10th Cir. 1995)....................................................................................4

*NAACP v. Am. Family Mut. Ins. Co.*,
  978 F.2d 287 (7th Cir. 1992)..........................................................................4, 23, 33

*Nationwide Mut. Ins. Co. v. Cisneros*,
  52 F.3d 1351 (6th Cir. 1995)...............................................................4, 16, 23, 32

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007)...................................................................................................11

*Nat'l Ass'n of Mutual Ins. Cos. v. HUD*, No. 1:13-cv-966,
  2023 WL 6142257 (D.D.C. Sept. 19, 2023) ..............................................................3

*Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*,
  208 F. Supp. 2d 46 (D.D.C. 2002) ................................................................4, 34, 42

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*,
  261 F. Supp. 3d 20 (D.D.C. 2017) ...............................................................6, 29, 39, 47

*Nat'l Org. for Women, Inc. v. Scheidler,*
 510 U.S. 249 (1994) ................................................................................................12

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
 538 U.S. 803 (2003) ...........................................................................................21, 22

*Nat. Res. Def. Council, Inc. v. EPA,*
 194 F.3d 130 (D.C. Cir. 1999) ................................................................................23

*Nat'l Treasury Emps. Union v. United States,*
 101 F.3d 1423 (D.C. Cir. 1996) ........................................................................19, 20

*NLRB v. Bell Aerospace Co.,*
 416 U.S. 267 (1974) ................................................................................................35

*Off. of Commc'n of the United Church of Christ v. FCC,*
 826 F.2d 101 (D.C. Cir. 1987) ................................................................................23

*Ogbolumani v. Napolitano,*
 557 F.3d 729 (7th Cir. 2009) ..................................................................................11

*Ohio Forestry Ass'n v. Sierra Club,*
 523 U.S. 726 (1998) ..........................................................................................19, 26

*Ojo v. Farmers Grp. Inc.,*
 600 F.3d 1205 (9th Cir. 2010) ..................................................................................4

*O'Sullivan v. City of Chicago,*
 396 F.3d 843 (7th Cir. 2005) ..................................................................................16

*Peick v. Pension Benefit Guarantee Corp.,*
 724 F.2d 1247 (7th Cir. 1983) ................................................................................11

*Perryman v. Litton Loan Serv., LP,*
 No. 14-cv-2261, 2014 WL 4954674 (N.D. Cal. Oct. 1, 2014) ...............................44

*Physicians Comm. for Responsible Med. v. Vilsack,*
 867 F. Supp. 2d 24 (D.D.C. 2011) ..........................................................................15

*Pozzie v. HUD,*
 48 F.3d 1026 (7th Cir. 1995) ..................................................................................11

*Prop. Cas. Ins. Ass'n of Am. v. Donovan*
 66 F. Supp. 3d 1018 (N.D. Ill. 2014) ............................................................. *passim*

*Prop. Cas. Ins. Ass'n of Am. v. Carson,* No. 1:13-cv-8564,
 2017 WL 2653069 (N.D. Ill. June 20, 2017) .................................................. *passim*

*Raines v. Byrd,*
 521 U.S. 811 (1997) ................................................................................................19

*Ramirez v. Webb*,
   599 F. Supp. 1278 (W.D. Mich. 1984), *aff'd*, 787 F.2d 592 (6th Cir. 1986) ............................. 17

*Reno v. Catholic Soc. Servs., Inc.*,
   509 U.S. 43 (1993) ............................................................................................................. 25

*Resident Advisory Bd. v. Rizzo*,
   564 F.2d 126 (3d Cir. 1977) .................................................................................................. 4

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) ........................................................................................... 36

*Rush v. Barham*,
   No. 3:13-cv-00723, 2014 WL 3540885 (N.D. Ind. July 17, 2014) ........................................ 21

*Saunders v. Farmers Ins. Exch.*,
   440 F.3d 940 (8th Cir. 2006) ....................................................................................... *passim*

*Saunders v. Farmers Ins. Exch.*,
   537 F.3d 961 (8th Cir. 2008) ........................................................................................ 39, 40

*Schermer v. State Farm Fire & Cas. Co.*,
   721 N.W.2d 307 (Minn. 2006) ............................................................................................ 46

*Schilke v. Wachovia Mortg., FSB*,
   820 F. Supp. 2d 825 (N.D. Ill. 2011) .................................................................................. 44

*Schirmer v. Nagode*,
   621 F.3d 581 (7th Cir. 2010) ............................................................................................... 15

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) .................................................................................................... 28, 29

*Sierakowski v. Ryan*,
   223 F.3d 440 (7th Cir. 2000) ............................................................................................... 14

*Sierra Club v. EPA*,
   754 F.3d 995 (D.C. Cir. 2014) ..................................................................................... 18, 26

*Silha v. ACT, Inc.*,
   807 F.3d 169 (7th Cir. 2015) ............................................................................................... 12

*Sprint Corp. v. FCC*,
   331 F.3d 952 (D.C. Cir. 2003) ............................................................................................ 24

*Spuhler v. State Collection Serv., Inc.*,
   983 F.3d 282 (7th Cir. 2020) ............................................................................................... 13

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ............................................................................................. 50

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015) ................................................................................ *passim*

*Texas v. EPA*,
726 F.3d 180 (D.C. Cir. 2013) ................................................................15, 17, 19

*Texas v. United States*,
523 U.S. 296 (1998) ..............................................................................21, 24

*Thomas v. Union Carbide Agr. Prods. Co.*,
473 U.S. 568 (1985) ........................................................................................21

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) ....................................................................................25, 26

*U.S. Sugar Corp. v. EPA*,
844 F.3d 268 (D.C. Cir. 2016) ..........................................................................49

*United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n*,
24 F.3d 1008 (7th Cir. 1994) ....................................................................16, 32, 37

*Vidimos, Inc. v. Wysong Laser Co., Inc.*,
179 F.3d 1063 (7th Cir. 1999) ..........................................................................23

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
113 F. Supp. 3d 555 (D. Conn. 2015) ............................................................37, 44

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ..............................................................................32, 33

*White v. United States*,
601 F.3d 545 (6th Cir. 2010) ......................................................................15, 17, 19

*Wis. Cent., Ltd. v. Shannon*,
539 F.3d 751 (7th Cir. 2008) ....................................................................12, 21, 26

## **Federal Statutes**

5 U.S.C. § 706 ....................................................................................................11

15 U.S.C. § 1012 ..................................................................................................5

42 U.S.C. § 3601 ..............................................................................................1, 3

42 U.S.C. § 3604 ..............................................................................................1, 3

42 U.S.C. § 3605 ..............................................................................................1, 3

42 U.S.C. § 3608 ................................................................................................1

42 U.S.C. § 3610 ............................................................................................3, 32

42 U.S.C. § 3611 ...................................................................................3, 32

42 U.S.C. § 3612 ...................................................................................3, 32

42 U.S.C. § 3614a ...........................................................................1, 3, 32

**State Statutes**

Ky. Rev. Stat. Ann. § 344.367 ...............................................................38

Ohio Rev. Code Ann. § 4112.02 ............................................................38

Tenn. Code Ann. § 4-21-601 ..................................................................38

Va. Code Ann. § 36-96.4 ........................................................................38

Wis. Stat. Ann. § 106.50 ........................................................................38

**Regulations**

24 C.F.R. § 100.500 *et seq.* (West 2013) ................................................4

24 C.F.R. § 100.500 ...........................................................31, 43, 46, 49

24 C.F.R. § 100.70 ...................................................................................1

Application of the Fair Housing Act's Discriminatory Effects Standard,
    81 Fed. Reg. 69012 (Oct. 5, 2016) .....................................................9

HUD, Rules & Regulations,
    54 Fed. Reg. 3232 (Jan. 23, 1989) ...........................................1, 16, 19

HUD's Discriminatory Effects Standard,
    88 Fed. Reg. 19450 (Mar. 31, 2023) ...................................................7

HUD's Implementation of the Fair Housing Act's Disparate Impact Standard,
    84 Fed. Reg. 42854 (Aug. 19, 2019) ...................................................6

HUD's Implementation of the Fair Housing Act's Disparate Impact Standard,
    85 Fed. Reg. 60288 (Sept. 24, 2020) ...................................................6

Implementation of the Fair Housing Act's Discriminatory Effects Standard,
    78 Fed. Reg. 11460 (Feb. 15, 2013) ....................................................4

Reinstatement of HUD's Discriminatory Effects Standard,
    86 Fed. Reg. 33590 (June 25, 2021) ....................................................7

**State Regulations**

40 Tex. Admin. Code § 819.124 .............................................................38

910 Ind. Admin. Code § 2-2-4 ..................................................................................38

Ariz. Admin. Code § 10-2-104 ...............................................................................38

Ga. Comp. R. & Regs. 186-2-.02 ............................................................................38

Md. Code Regs. 14.03.04.04 ....................................................................................38

94-348-8 Me. Code R. § 4 ........................................................................................38

Kan. Admin. Regs. § 21-60-5 ..................................................................................38

S.C. Code Ann. Regs. § 65-211 ...............................................................................38

### Other Authorities

Amicus Br. of Nat'l Ass'n of Mut. Ins. Cos.,
   *Nationwide* Mut. Ins. Cos., *Nationwide Mut. Ins. Co. v. Cisneros*, No. 95-714,
   1996 WL 33467765 (U.S. Jan. 3, 1996) ...............................................................32

Stephen M. Dane, *Race Discrimination is Not Risk Discrimination: Why Disparate Impact
   Analysis of Homeowners Insurance Practices is Here to Stay*,
   33.6 Banking & Fin. Servs. Pol'y Rep. (June 2014) ............................................42

**INTRODUCTION**

The Fair Housing Act ("FHA") 42 U.S.C. § 3601 *et seq*., prohibits certain housing practices and policies that discriminate because of race, color, religion, sex, family status, national origin or disability. *See, e.g., id*. § 3604(a), 3605(a). The Act's proscriptions apply both to intentional acts of discrimination and to facially neutral acts that have an unjustified discriminatory effect. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 532–35 (2015) ("*Inclusive Communities*").

The FHA grants the U.S. Department of Housing and Urban Development ("HUD") the authority to administer the FHA and to issue regulations interpreting it. *See* 42 U.S.C. §§ 3608, 3614a. Exercising that authority, HUD has interpreted the FHA to apply to home insurers since 1989, *see* HUD, Rules & Regulations, 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989), AR 56781, *codified at* 24 C.F.R. § 100.70(d)(4). No court has ever held that home insurers must be categorically exempt from the FHA's discriminatory-effects standard.

By 2013, eleven courts of appeals had adopted various burden-shifting frameworks and balancing tests for determining discriminatory-effects liability under the FHA. In 2013, HUD adopted the burden-shifting framework embraced by a majority of courts of appeals, and the agency reaffirmed this approach in 2023.

Plaintiff American Property Casualty Insurance Association ("PCI")[1] challenges HUD's 2023 Rule and asks this Court to be the first court ever to create a categorical FHA exemption for home insurers' ratemaking and underwriting decisions. PCI makes this bold ask even though this Court has already upheld the 2013 Rule's burden-shifting framework, which is the same as the 2023 Rule's framework, and held that any alleged violation of the McCarran-Ferguson Act's reverse preemption provision could only be adjudicated in the context of a concrete dispute

---

[1] Plaintiff was initially known as Property Casualty Insurance Association of America but has renamed itself as American Property Casualty Insurance Association. This brief refers to Plaintiff as PCI.

challenging the application of the 2013 Rule to a particular insurance practice, rather than in the abstract. *See Prop. Cas. Ins. Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1051–53, 1037–42 (N.D. Ill. 2014) ("*PCI I*"). While this Court remanded the matter to HUD for the agency to provide further explanation as to why case-by-case adjudication was preferable to providing exemptions or safe harbors related to home insurance, *see id*. at 1049, 1054, HUD provided that additional explanation in 2016 and did so again in 2023. That explanation is adequate.

Moreover, in the more than ten years that the 2013 Rule has been in effect, PCI has never come forward with any allegation or evidence of harm traceable to the Rule, much less an imminent injury that would likely be redressed by an order of this Court. PCI additionally fails to show that its abstract legal disagreements about a categorical exemption for its members or the adequacy of HUD's explanation are ripe for this Court's review. PCI fails to show that it would suffer any hardship were this Court to withhold review in favor of waiting for a concrete, fact-specific inquiry into whether the Rule could properly be applied to a party in a specific case or whether HUD's explanations for failing to provide a categorical exemption are adequate. The Court should thus enter judgment for Defendants on these threshold jurisdictional bases.

Even if this Court were to reach the merits of PCI's challenge, HUD has, in accordance with this Court's September 2014 decision, sufficiently explained why home insurers are not entitled to a categorical exemption from the FHA's discriminatory-effects standard in light of McCarran-Ferguson, the "filed rate" doctrine, and the nature of insurance. Based on all of the evidence before HUD, the agency reasonably determined that the industry's concerns did not warrant such exemptions. And HUD reasonably explained why any benefit to the industry from an exemption would be outweighed by the cost of under-enforcement of the FHA, in contravention of the Act's goal of eradicating discriminatory housing practices. HUD further explained that any specific, remaining concerns from the industry continue to be best addressed on a case-by-case basis rather than through an overbroad exemption. HUD also clearly considered the impact of *Inclusive Communities*, which several courts of appeals have ruled

"implicitly adopted" HUD's approach in the Rule.

HUD's careful reconsideration and reasoned explanation satisfy the Administrative Procedure Act's ("APA") requirements. PCI's procedural attacks on HUD's explanations re-raise arguments that HUD expressly considered and reasonably rejected or attempt to resurrect claims this Court already denied, and PCI's arguments do not overcome the deference owed to HUD's reasonable policy decision under APA record review principles. Indeed, another court recently held that the Rule does not conflict with the FHA as applied to insurers' underwriting and rating practices. *See Nat'l Ass'n of Mutual Ins. Cos. v. HUD*, No. 1:13-cv-966, 2023 WL 6142257, at *1 (D.D.C. Sept. 19, 2023) ("*NAMIC*"). This Court should thus grant Defendants' summary judgment motion and deny PCI's cross motion for summary judgment.

## STATUTORY AND REGULATORY BACKGROUND[2]

The Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*., makes it unlawful:

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a); *see also id*. § 3604(f)(1) (prohibiting actions that "otherwise make unavailable or deny[] a dwelling ... because of a handicap"). The FHA also makes it unlawful to "discriminate against any person ... in the provision of services or facilities in connection" with the sale or rental of a dwelling. *Id*. § 3604(b), (f)(2). The FHA further makes it unlawful "to discriminate against any person in making available ..., or in the terms or conditions of … providing other financial assistance[]" related to "purchasing, constructing, improving, repairing, or maintaining a dwelling." *Id*. § 3605. Congress granted HUD express authority to enforce and interpret the Act. *Id*. §§ 3610-12, 3614a.

The FHA has long been applied to home insurers. *See* 54 Fed. Reg. at 3285, AR 56781;

---

[2] Defendants' memorandum in support of their first Motion for Summary Judgment, ECF No. 31, provides further background.

3

*see also, e.g.*, *Ojo v. Farmers Grp. Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (en banc); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1360 (6th Cir. 1995); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 300–01 (7th Cir. 1992); *Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 55–58 (D.D.C. 2002). By 2013, eleven courts of appeals held that the FHA prohibits conduct that has an unjustified discriminatory effect on individuals protected by the Act, although the courts had adopted various approaches to determining liability.[3] HUD published a final rule in 2013 formally promulgating its long-held position that violations of the FHA could be established through evidence of disparate impact and, by adopting the burden-shifting approach of the majority of courts of appeals, provided a consistent nationwide framework for determining liability. *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460 (Feb. 15, 2013), AR 611–34, *codified at* 24 C.F.R. § 100.500 *et seq.* (West, 2013).

Consistent with the longstanding interpretation of the FHA, HUD noted that the 2013 Rule would cover insurance practices. AR 4. HUD identified objections raised by the insurance industry in the comments submitted during the rulemaking, including claims that: (i) the availability of disparate-impact claims against the industry would interfere with state regulation

---

[3] Five courts adopted a three-part burden-shifting approach, *see, e.g.*, *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49–50 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988), *aff'd in part*, 488 U.S. 15 (1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148–49 (3d Cir. 1977); *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 740–42 (8th Cir. 2005); *HUD v. Pfaff*, No. 10-93-84-8, 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994), *rev'd on other grounds*, 88 F.3d 739 (9th Cir. 1996); one applied a four-factor balancing-test, *see Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); two adopted a hybrid burden-shifting and balancing approach, *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 373 (6th Cir. 2007); *Mountain Side Mobile Estates P'ship v. HUD*, 56 F.3d 1243, 1252, 1254 (10th Cir. 1995), and one adopted a burden-shifting approach for private defendants and a balancing test for public defendants. *See Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 989 n.5 (4th Cir. 1984). The D.C. Circuit had not addressed which approach to take. *See, e.g.*, *2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 680 (D.C. Cir. 2006).

of insurance, in violation of McCarran-Ferguson[4] and the "filed rate" doctrine[5]; (ii) the Rule was incompatible with actuarially sound insurance principles; and (iii) special exemptions or safe harbors should be created for insurance practices. *See* AR 626–27. HUD explained that these comments were misguided because an insurance practice would not be *per se* illegal simply by virtue of its differential effect on a protected class. *See* AR 627. In this way, the Rule distinguished between "unnecessary barriers proscribed by" the FHA and "valid policies and practices crafted to advance legitimate interests." *Id.* (citation omitted).[6]

The 2013 Rule rejected home insurers' comments that application of the Rule to insurance would impair state insurance regulation in violation of McCarran-Ferguson and the "filed rate" doctrine. *See* AR 626–27. HUD declined to grant the requested categorical exemptions and instead decided that the industry's concerns should be addressed on a case-by-case basis. AR 623, 627.

In 2015, the Supreme Court held that discriminatory-effects claims are cognizable under the FHA. *See Inclusive Cmtys., supra.* In doing so, the Court clarified that "disparate-impact liability has always been properly limited in key respects," 576 U.S. at 540, and that the FHA "mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies," *id.* (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court highlighted the importance of the burden-shifting framework in determining FHA disparate-impact liability, and twice cited HUD's 2013 Rule in this part of its analysis. *Id.* at

---

[4] McCarran-Ferguson states, in relevant part, that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ..., unless such Act specifically relates to the business of insurance...." 15 U.S.C. § 1012(b).

[5] The judicially-crafted filed-rate doctrine generally precludes challenges to the reasonableness of rates charged by public utilities and other regulated entities when those rates must be filed with and approved by a government agency. *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 944 (8th Cir. 2006) (*"Saunders I"*).

[6] Hereinafter, internal citations, quotations, or alterations are omitted unless otherwise noted.

541–42 (citing 78 Fed. Reg. at 11470, 11476).[7] The Court also found that "[r]emedial orders in disparate-impact cases should concentrate on the elimination of the offending practice," *id*. at 544, but found that "race may be considered in certain circumstances and in a proper fashion," *id*. at 545; *see also id*. (finding that "mere awareness of race" is not problematic).

Since HUD's 2013 Rule became final, four courts of appeals affirmed or adopted the 2013 Rule's burden-shifting framework in addressing FHA discriminatory effects claims, including both courts that had previously adopted the same burden-shifting approach, and courts that had previously taken a different approach prior to the Rule. *See de Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415, 424 (4th Cir. 2018); *Ave. 6E Invs., LLC v. Yuma*, 818 F.3d 493, 512–13 (9th Cir. 2016); *Mhany Mgmt., Inc. v. Cnty. of Nassau* , 819 F.3d 581, 618–19 (2d Cir. 2016) (also noting that the 2013 Rule had a more restrictive burden-shifting framework than prior Second Circuit precedent); *Inclusive Cmtys.*, 747 F.3d at 282. Other courts have likewise relied on HUD's burden-shifting framework in addressing FHA discriminatory effects claims. *See, e.g., Nat'l Fair Hous. All. v. Travelers Indem. Co*., 261 F. Supp. 3d 20, 28–29 (D.D.C. 2017); *Borum v. Brentwood Vill., LLC*, 218 F. Supp. 3d 1, 21–22 (D.D.C. 2016).

In 2019, HUD proposed several changes to its 2013 Rule, *see* HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84 Fed. Reg. 42854 (Aug. 19, 2019), AR 10476–85, and published a final rule making substantial changes in 2020. *See* HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 85 Fed. Reg. 60288 (Sept. 24, 2020), AR 27876–921. Before the 2020 Rule went into effect, however, a district court stayed the effective date of the 2020 Rule and preliminarily enjoined HUD from enforcing the

---

[7] The Supreme Court affirmed the Fifth Circuit's judgment, which had directed the district court on remand to apply the 2013 Rule to the dispute. *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 282-83 (5th Cir. 2014). The Second Circuit later held that the Supreme Court implicitly adopted HUD's 2013 Rule. *See Mhany Mgmt., Inc*., 819 F.3d at 618; *see also Azam v. City of Columbia Heights*, No. 14-1044, 2016 WL 424966, at *10 (D. Minn. Feb. 3, 2016) (explaining the consistency between the three burden-shifting steps of the 2013 Rule and the limitations to disparate impact liability specified in *Inclusive Communities*), *aff'd*, 865 F.3d 980 (8th Cir. 2017).

2020 Rule. *See Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611–12 (D. Mass. 2020). As a result, the 2020 Rule never went into effect.

On June 25, 2021, HUD published a notice in the Federal Register explaining that HUD had reconsidered the 2020 Rule and proposed to reinstate the agency's 2013 Rule. *See* Reinstatement of HUD's Discriminatory Effects Standard, 86 Fed. Reg. 33590 (June 25, 2021), AR 28146–53. HUD received over 10,000 comments on its proposal, including one submitted by PCI on August 24, 2021, *see* Comment on FR-6251-P-01 Reinstatement of HUD's Discriminatory Effects Std., Dkt. No. HUD-2021-0033, AR 29112.

On March 31, 2023, HUD promulgated a final rule rescinding the 2020 Rule and reinstating the 2013 Rule, *see* Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. 19450 (Mar. 31, 2023) ("2023 Rule"), AR 32763–813. The 2023 Rule became effective on May 1, 2023. *See id.*

## PROCEDURAL BACKGROUND

Plaintiff Property Casualty Insurers Association of America ("PCI") initiated this action in 2013, challenging the 2013 Rule's application to homeowners' insurance under the APA. *See* Compl. PCI claimed that the 2013 Rule's application to homeowners' insurance violated McCarran-Ferguson, *see id.* ¶ 78; that the Rule was arbitrary and capricious because HUD failed to adequately consider the Rule's conflict with McCarran-Ferguson, the filed-rate doctrine, and the nature of insurance, *id.* ¶¶ 83, 88, 93, 98; and that the Rule's burden-shifting framework was arbitrary, capricious, and contrary to law. *Id.* ¶¶ 105, 108.

After briefing and argument, this Court issued its decision in September 2014. *See PCI I*, 66 F. Supp. 3d 1018. It found that PCI's McCarran-Ferguson claim presents a facial challenge to the Rule and found that the "no set of circumstances" standard is the appropriate standard for evaluating PCI's claim. *Id.* at 1035–36. The Court then granted Defendants' motion to dismiss PCI's McCarran-Ferguson claim for lack of jurisdiction, finding that the claim was not ripe. *See id.* at 1037–42. It recognized that "[a] myriad of insurance practices may affect the provision and

pricing of homeowners insurance," that one "can only speculate about what types of disparate impact claims" may be brought against insurers, and that "[v]ariations among state regulatory regimes" further "complicate any hypothetical McCarran-Ferguson analysis." *Id.* at 1039. As a result, "there are simply 'too many imponderables' to allow the Court to determine whether McCarran-Ferguson categorically applies to all disparate impact claims that may fall within the scope of PCI's McCarran-Ferguson challenge." *Id.* at 1040. The Court also granted summary judgment to Defendants on PCI's challenge to the Rule's burden-shifting framework, finding that the framework provided a "reasonable accommodation of the competing interests at stake" and that "HUD provided reasoned explanations for rejecting" challenges to it. *Id.* at 1053.

This Court granted summary judgment to PCI on its claims that the Rule's application to home insurance was arbitrary and capricious because it found that HUD had not adequately considered the insurance industry's comments regarding McCarran-Ferguson, the filed-rate doctrine, and the nature of insurance. *See id.* at 1047–51. With respect to McCarran-Ferguson, this Court recognized that HUD "ha[s] discretion to decide whether to proceed by case-by-case adjudication or rule-making," *id.* at 1049, but found HUD's consideration wanting because "HUD [had] made no attempt to determine whether the benefits of proceeding by case-by-case adjudications outweighed the benefits of including an exemption ... for insurers in the ... Rule." *Id.* at 1048. In particular, this Court concluded that HUD had "made no attempt to evaluate how often [McCarran-Ferguson] preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.* Similarly, the Court opined that HUD had failed to adequately consider the industry's comments about the filed-rate doctrine. *Id.* at 1050. Finally, this Court concluded that HUD did not adequately consider the industry's concerns that the Rule would undermine the nature of insurance or, alternatively, provide a reasoned explanation to prefer a case-by-case approach. *See id.* at 1051. This Court thus remanded the case to HUD "for further explanation" consistent with the Court's opinion. *Id.*

After reconsideration of the issues as directed by this Court, and of the Supreme Court's

decision in *Inclusive Communities*, HUD issued a supplement to its initial rulemaking in October 2016. *See* Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance, 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("2016 Supplement"), AR 1813. The 2016 Supplement explicitly addressed the industry's concerns based on McCarran-Ferguson, the "filed-rate doctrine," and the nature of insurance and explained why HUD found that those concerns do not warrant exemptions from the Rule but would be addressed better on a case-by-case basis. *See* AR 1814. HUD reasoned that the requested exemptions would be "unworkable and inconsistent with the broad fair housing objectives and obligations" in the FHA, AR 1813, and that any industry benefit the exemptions may provide did not outweigh those costs. AR 1814.

PCI moved for leave to file an amended complaint to challenge HUD's 2016 Supplement. *See* Pl.'s Mot. for Leave to File Proposed First Am. Compl., ECF No. 107. This Court granted in part and denied in part the motion. *See PCI v. Carson*, No. 1:13-cv-8564, 2017 WL 2653069, at *1 (N.D. Ill. June 20, 2017) (*"PCI II"*). The Court denied PCI leave to amend as to (1) its claim that the 2013 Rule violated McCarran-Ferguson, (2) its challenge to the Rule's burden-shifting framework, and (3) its claim that HUD failed to respond to comments regarding *Wards Cove*, because it had already adjudicated those claims. *See PCI II*, 2017 WL 2653069, at *8. The Court also denied PCI leave to include a claim that the 2013 Rule's application to homeowners insurance is contrary to the FHA as interpreted in *Inclusive Communities* because the Supreme Court "expressly approved of disparate impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction." *Id.* at *9.

This Court granted PCI leave to include four remaining procedural claims. *See id.* PCI claimed that HUD did not adequately consider the impact of *Inclusive Communities* in its 2016 Supplement. *See* First Am. Compl., Count I, ECF No. 107-1 ("FAC"). PCI also alleged that HUD's 2016 Supplement inadequately considered the industry's concerns based on McCarran-Ferguson, the "filed-rate doctrine," and the business of insurance. *See* FAC, Counts II–IV.

PCI again moved for summary judgment in 2017. *See* Pl.'s Mot. for Summ. J, ECF No.

136. HUD moved without opposition for an extension of time to file its response in light of the change in administration and still unconfirmed high-ranking officials. *See* Mot. for Extension, ECF No. 140. This Court granted the motion. *See* Minute Entry, ECF No. 141. The parties and this Court agreed to continue the stay as the new Administration reevaluated the 2013 Rule, announced its intent to issue a new rule, finalized and issued the 2020 Rule, and contemplated next steps after a court preliminarily enjoined the 2020 Rule. *See* Mots. & Minute Entries, ECF Nos. 150–59, 166, 168–69, 172–73, 176–79, 184, 186, 188–92, 194–96.

This Court continued the stay after the Administration changed once more and the President issued his Executive Order directing HUD to revisit the 2020 Rule. *See* Minute Entry, ECF No. 213. After HUD informed the Court of its decision to send a notice of proposed rulemaking for OMB review, this Court lifted the stay and set a briefing schedule. *See* Minute Entry, ECF No. 216. PCI filed a renewed summary judgment motion in 2021. *See* Pl.'s Renewed Mot. for Summ. J., ECF No. 221. Defendants again moved to stay, *see* Defs.' Mot. to Stay, ECF No. 226, and filed an opposition and cross motion for summary judgment, *see* Defs.' Mot. for Sum. J., & Opp'n to Pl.'s Mot. for Summ. J., ECF Nos. 231–32. In light of HUD's rulemaking, the Court struck the parties' respective summary judgment motions without prejudice, *see* Order, ECF No. 248, and continued the stay, *see, e.g.,* Minute Entries, ECF Nos. 250, 257.

This Court lifted the stay after HUD issued the 2023 Rule, and PCI filed a second amended complaint. *See* Pl.'s Second. Am. Compl. ("SAC"), ECF No. 274. Counts I through IV of PCI's SAC challenge the adequacy of HUD's consideration of *Inclusive Communities* and the adequacy of HUD's explanations about HUD's decision not to provide home insurers with a categorical exemption based on McCarran Ferguson, the filed-rate doctrine, and the nature of home insurance. *See* SAC, Counts I–IV. Solely for purposes of preserving claims for appeal, Counts V through VIII reasserted a number of claims that this Court had dismissed from PCI's original complaint, *see PCI I*, 66 F. Supp. 3d at 1042, and rejected as futile from PCI's proposed FAC, *see PCI II*, 2017 WL 2653069, at *8–9. *See* SAC Counts V–VIII. The parties agreed that

Counts V through VIII would be subject to dismissal under this Court's prior orders. *See* Jt. Status Rpt. at 2–3, ECF No. 272; Pl.'s Mem. in Supp. of Renewed Mot. for Summ. J. at 8, n.5, ECF No. 283 ("Pl.'s Mem."). PCI then filed its renewed motion for summary judgment on Counts I–IV, *see* Pl.'s Renewed Mot. for Summ. J., ECF No. 282.

## STANDARD OF REVIEW

PCI's claims are governed by the APA's "arbitrary and capricious" standard of review. 5 U.S.C. § 706(2). This standard "is a deferential one which presumes that agency actions are valid as long as the decision is supported by a rational basis." *Pozzie v. HUD*, 48 F.3d 1026, 1029 (7th Cir. 1995). A court must uphold an agency decision "unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). The agency need only provide "an adequate explanation for the decision;" "nothing more is required." *Ogbolumani v. Napolitano*, 557 F.3d 729, 734 (7th Cir. 2009). That bar is low: the agency's explanation "need not be compelling, or even convincing, to be sufficient." *Ghaly v. INS*, 48 F.3d 1426, 1431 (7th Cir. 1995). Under this narrow standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Moreover, PCI's claims present a facial challenge to HUD's Rule. *See PCI I*, 66 F. Supp. 3d at 1035–36. PCI does not challenge a particular, concrete application of the Rule to any of its members. Rather, it categorically challenges a broad range of potential applications of the Rule without relying on the facts of any particular application. *See id*. at 1036 (citing *Peick v. Pension Benefit Guarantee Corp*., 724 F.2d 1247, 1261 n.16 (7th Cir. 1983)). As a result, PCI can succeed only if no set of circumstances exist under which HUD's Rule could be properly applied

to a home insurer. *See id*. (citing *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 761 (7th Cir. 2008)).

## ARGUMENT

### I. PCI LACKS STANDING TO MAINTAIN ITS CLAIMS

As a threshold matter, PCI fails to maintain standing to bring its renewed motion for summary judgment. *See also Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994) ("Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation."). This Court previously concluded that PCI had standing when it decided the parties' original summary-judgment motions in 2014. *See PCI I*, 66 F. Supp. 3d at 1043–46. However, intervening changes in the law warrant reconsideration of that ruling. *See, e.g.*, *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 685 (7th Cir. 2014) (noting that an intervening change in the law weighs against relying on a court's earlier holding). Further, despite living with the Rule for over ten years, PCI fails to show an actual or imminent injury that its members have suffered or will suffer as a result of the Rule. This Court should thus review its determination that PCI has standing. *See Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) ("A federal court's ongoing obligation to assure itself of its jurisdiction means that revisiting such matters is almost always on the table.").

Article III of the United States Constitution limits federal-court jurisdiction to deciding "[c]ases" and "[c]ontroversies," and standing is an essential part of this limitation. *See, e.g.*, *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1063–64 (7th Cir. 2020). Standing ensures that litigants have a personal stake in the outcome, so that "courts do not decide abstract principles of law but rather concrete cases and controversies." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016). As the party invoking the court's jurisdiction, a plaintiff bears the burden of establishing standing. *See, e.g.*, *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). It "is a threshold question in every federal case because if the [plaintiffs] do not have standing to raise their claims," then "the court is without authority to consider the merits of the action." *Meyers*, 843 F.3d at 726.

To establish standing, a plaintiff must demonstrate an "injury in fact"—"an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Larkin*, 982 F.3d at 1064. A plaintiff also must show that the injury "is fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial ruling." *Id*. On summary judgment, a plaintiff must "suppl[y] evidence of 'specific facts' that, taken as true, show each element of standing." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 286 (7th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

In its 2014 decision, this Court identified two cognizable injuries-in-fact asserted by PCI: (1) increased exposure to disparate-impact liability and (2) future costs incurred in complying with the Rule, largely from collecting data on potentially disparate impact. *PCI I*, 66 F. Supp. 3d at 1043–44. The court concluded that those injuries were caused by the Rule because the Rule "exposed PCI's members to disparate impact claims in some jurisdictions where the circuit court had not yet recognized the viability of [disparate-impact] claims," under the FHA, *id.* at 1044, and because "PCI's members would have been better off if HUD had exempted homeowners insurers from the Disparate Impact Rule, created safe harbors in the Rule … and/or adopted the insurance industry's proposed burden-shifting framework for proving disparate-impact claims …" *Id.* at 1044–45. And the court determined that PCI's injuries would be redressable by a favorable decision from the Court. *See id.* at 1045–46. It did so on the basis that PCI was seeking remand to HUD "to explain its decision or adopt changes to the Disparate Impact Rule," which could redress its procedural claims, *id.* at 1045, and because Plaintiff was seeking a different burden-shifting framework, which could "decreas[e]" PCI's members' "exposure to disparate impact liability," *id.* at 1045–46. None of those bases for determining PCI has standing remains.

### A. PCI's Asserted Increased Exposure to Disparate-Impact Liability Meets None of the Standing Requirements

PCI has failed to submit sufficient evidence at the summary-judgment stage to establish

standing to maintain its claims on behalf of itself or its members. *See, e.g., City Comms., Inc. v. City of Detroit*, 888 F.2d 1081, 1086 (6th Cir. 1989). Each of the PCI member declarations that PCI relies on to establish standing dates back to 2014, *see* ECF Nos. 283-5–283-8, and each contains outdated and insufficient information for Plaintiff to maintain standing nearly ten years later during which time the Rule has always been in effect.[8] While one of the declarations complains of the anticipated costs associated with defending against a disparate-impact claim under the FHA, *see, e.g.*, Decl. Teresa C. Cracas ¶ 13, ECF No. 283-8, none provide any instances from the past ten years in which PCI's members actually incurred litigation costs as a result of the Rule, or even cases in which PCI's members expect to incur such costs. *See generally* ECF Nos. 283-5–283-8. This glaring omission is fatal to PCI's attempt to establish standing; PCI cannot stand on the conjectural or hypothetical injuries posited from nine years ago. *See Sierakowski v. Ryan*, 223 F.3d 440, 444 (7th Cir. 2000) (Where "prospects of future

---

[8] Nor has PCI satisfied the evidentiary burden to maintain standing on its own behalf. PCI also attaches a declaration signed in 2021 from its Senior Vice President of Policy Development and Research. *See* Decl. of Robert Gordon (Gordon Decl.), ECF No. 283-3. To the extent Plaintiff seeks to establish standing on behalf of itself through the Gordon Declaration, *see* SAC ¶ 21 (stating that Plaintiff "seeks to vindicate both its own interests and the interests of its members"), it falls far short of doing so. To establish organizational standing on its own behalf, a plaintiff organization must show that its resources or allocation of resources were impacted by the defendant's allegedly unlawful conduct. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019).

In his declaration, Gordon states that "PCI advocates on behalf of its members on policy issues at the state and federal levels and provides its members with information relevant to legal and public policy developments affecting the property and casualty insurance industry." Gordon Decl. ¶ 4. He also declares that "PCI and its member companies have expended substantial resources analyzing the Rule and potential compliance with the Rule. If the Rule is not set aside, PCI and its member companies will continue to expend substantial resources analyzing these issues." *Id.* ¶ 7. But the time a trade association spends "analyzing the issues" in a federal policy cannot constitute an injury to the organization. *See Keep Chicago Livable*, 913 F.3d at 624 (finding "legal clarity" on individual plaintiff's claims not sufficient to redress an injury to the organization itself); *Milwaukee Police Ass'n v. Bd. of Police & Fire Comm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) (holding that "mere desire for information" is not, by itself, a cognizable injury). Moreover, "an organization does not suffer an injury in fact where it expends resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015). PCI has not made such a showing and therefore fails to establish standing to sue on its own behalf.

injury are purely speculative," plaintiff "lacks the requisite personal stake in the outcome of this litigation to establish standing to seek injunctive relief."). Indeed, to establish standing for prospective or injunctive relief under the APA, PCI must show an actual or imminent injury. *See, e.g., Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010); *Physicians Comm. for Responsible Med. v. Vilsack*, 867 F. Supp. 2d 24, 28 (D.D.C. 2011). This it has entirely failed to do.

Even if PCI had alleged a cognizable injury-in-fact due to increased exposure to disparate-impact-liability (which it cannot), it could not show that any increased exposure is actually caused by the Rule rather than the FHA. Crucially, in 2015, the Supreme Court issued its decision in *Inclusive Communities*, which recognizes disparate-impact liability under the FHA as a matter of statutory interpretation. *See Inclusive Cmtys.*, 576 U.S. at 543; *see also PCI II*, 2017 WL 2653069, at *9 ("[T]he Supreme Court in *Inclusive Communities* expressly approved of disparate-impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction.").

As a result, PCI cannot show that any increased exposure to disparate-impact liability under the FHA is fairly traceable to the Rule as opposed to the FHA as interpreted by *Inclusive Communities*. *Cf. Crete Carrier Corp. v. EPA*, 363 F.3d 490, 493 (D.C. Cir. 2004); *see also Texas v. EPA*, 726 F.3d 180, 197–99 (D.C. Cir. 2013) (dismissing petitions for lack of standing because challenged regulations did not cause petitioners' claimed injuries; the injuries were caused by statute); *cf. also White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) ("Plaintiffs' alleged economic injuries due to restrictions on cockfighting are not traceable only" to the challenged federal statute because all fifty states had also banned cockfighting). This Court's earlier conclusion that PCI had established an injury-in-fact fairly traceable to the 2013 Rule because the Rule "[t]he increased exposure of PCI's members to disparate impact claims under the Rule" in "jurisdictions that had not previously recognized disparate impact claims against insurers" *PCI I*, 66 F. Supp. 3d 1043–45, has thus been superseded by an intervening Supreme Court decision. *See Kathrein*, 752 F.3d at 680 ("intervening change in the law underlying the

15

decision" justifies "abandonment of the law of the case").

Even putting the Supreme Court's intervening decision in *Inclusive Communities* and changes in PCI's request for relief to the side, PCI fails to allege any injury that is properly traceable solely to HUD's 2013 Rule or 2023 Rule and not also to the Fair Housing Act, other judicial precedent interpreting the Act, and other HUD regulations.[9] Almost every court of appeals recognizes that the FHA applies to insurers and that FHA violations may be established by showing an unjustified discriminatory effect. *See, supra*, at 4 n.3. And a HUD regulation has been in effect since 1989 that provides that the FHA applies to insurers, *see* 54 Fed. Reg. at 3240, AR 56736, along with other long-standing judicial precedent establishing that the Act's discriminatory effects standard can be applied to insurers despite the potential conflict with state laws regulating insurers. *See, e.g., Nationwide*, 52 F.3d 1351 (additional remedies under the FHA did not cause the Act to invalidate, impair, or supersede Ohio insurance law, and under McCarran-Ferguson, the FHA was not preempted); *United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n*, 24 F.3d 1008, 1016 (7th Cir. 1994) (since the State "does not require or condone redlining, or commit to insurers all decisions about redlining," application of the FHA was not precluded).

In other words, even in the absence of the 2013 and 2023 Rule (and most importantly, because of *Inclusive Communities*), PCI would still be subject to the FHA and established judicial precedents that set out various burden-shifting frameworks and would still be subject to suit by any aggrieved person. *Indiana Coal. for Pub. Educ. - Monroe Cnty. v. McCormick*, 338 F. Supp. 3d 926, 938 (S.D. Ind. 2018) ("[I]t does not suffice if the injury complained of is 'the result of the independent action of some third party not before the court'"), quoting *Bennett v.*

_____

[9] While the district court concluded differently in 2014, "a federal court's ongoing obligation to assure itself of its jurisdiction means that revisiting such matters is almost always on the table," *Flynn*, 39 F.4th at 953, and a "successor judge is significantly less constrained by the law of the case doctrine with respect to jurisdictional questions." *Gilbert v. Illinois State Bd. of Educ.*, 591 F.3d 896, 903 (7th Cir. 2010), quoting *O'Sullivan v. City of Chicago*, 396 F.3d 843, 849–50 (7th Cir. 2005).

*Spear*, 520 U.S. 154, 159 (1997). Thus, PCI fails to properly trace its alleged harms to the Rule.

Nor can PCI show that this purported injury would be redressed by vacating the rule as they request; *Inclusive Communities* and other precedential decisions concluding that disparate-impact liability exists under the FHA and extends to insurers do not depend on the existence of the Rule.[10] A plaintiff's injury cannot be redressed by a court order when two independent actions produce the same harm and only one is challenged. *See, e.g., Delta Constr. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015) ("[E]ven were we to vacate the EPA standards, the NHTSA standards would still increase the price of vehicles."); *Texas*, 726 F.3d at 198 (vacating an agency's action "would not redress the State petitioners' injury" because of a second, independent source of the harm); *accord White*, 601 F.3d at 552. Moreover, even if this Court were to vacate the 2023 Rule, litigants, including HUD, could still pursue disparate-impact claims against insurers based on the FHA, other judicial precedent, and HUD's other regulations and authority. PCI thus fails to establish that its alleged injuries are redressable.

### B.  PCI's Asserted Compliance Costs Meet None of the Standing Requirements

Nor do PCI's asserted future compliance costs from collecting data to defend against a disparate-impact claim confer standing. PCI contends that the Rule requires PCI's members to collect race-based data, *see, e.g.*, SAC ¶¶ 17, 100, Pl.'s Mem. at 15–16, ECF Nos. 283-5–283-8. But PCI fails to demonstrate an injury-in-fact because it has submitted no evidence that its members have actually collected any such data, let alone the burdens incurred from doing so, despite the fact that the 2013 Rule has been in effect for more than ten years. *See, e.g.*, ECF Nos.

---

[10] The court's prior conclusion that PCI's procedural claims were redressable because Plaintiff sought remand, *PCI I*, 66 F. Supp. 3d at 1045, is superseded by Plaintiff's Second Amended Complaint, which seeks vacatur, not remand. SAC, Prayer for Relief. "Where an agency rule causes the injury, … the redressability requirement may be satisfied by vacating the challenged rule[.]" *Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 657 (D.C. Cir. 2005). As established above, however, the 2023 Rule has not caused PCI's injuries; *Inclusive Communities* and other judicial precedents and regulations would maintain the status quo even in the absence of the Rule, even assuming that vacatur is a proper remedy for PCI's procedural claims, *see, supra*, § IV.

283-5–283-8 (merely describing anticipated future compliance costs). Simply put, the stale information provided in 2014 does not show an actual or imminent injury in 2023. *See Ramirez v. Webb*, 599 F. Supp. 1278, 1289 (W.D. Mich. 1984) (Where it appeared that "Plaintiffs were relying heavily on affidavits" describing injurious conduct from years past, "assuredly, such stale affidavits would not satisfy the imminence requirement."), *aff'd*, 787 F.2d 592 (6th Cir. 1986).

PCI cannot identify any text in the 2013 or 2023 Rules that require its members to collect race-based data; rather, these alleged harms arise only from PCI's misapprehension of the Rule's requirements. Standing cannot be predicated on a plaintiff's misapprehension of what the challenged regulation requires. *Cf. Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1254 (D.C. Cir. 2018) ("EPIC bears the burden to show that those services are authorized by this rule and cause the alleged injuries, which would be remedied by vacatur," but its "allegations do not establish an injury caused by the FAA's … rulemaking."); *Sierra Club v. EPA*, 754 F.3d 995, 1001 (D.C. Cir. 2014) (rejecting claims of injury based on the speculative reading of an EPA memorandum, where the memorandum could be interpreted differently and EPA indicated that it did so).

In fact, HUD has confirmed that the 2013 and 2023 Rules do not require PCI's members to collect race-based data. The agency expressly stated in the preamble to the 2023 Rule that it is "not requiring data collection." AR 56512. As HUD explained, "independent data gathering is not necessary to defend a lawsuit alleging discriminatory effects" as it is a plaintiff that has the "initial burden … to show a disparate impact." *Id*. HUD further explained that "[d]efendants need not present their own statistics in response to [a plaintiff's] step one evidence, but may defend in numerous other ways, including by showing that the data put forward by plaintiff is incorrect or wrongly analyzed, or by showing at step two that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest."[11] *Id*.

---

[11] PCI cursorily posits that race-based data would help some members at step three of the burden-shifting framework, to defend against a "purported less discriminatory alternative." Pl.'s

Further, even if PCI had established that collecting race-based data is necessary to defend insurers against disparate-impact claims under the FHA—which it hasn't—it cannot show that such data collection flows from the Rule as opposed to the statute and preexisting case law providing for disparate-impact liability under the statute. Nor can Plaintiff show that vacating the Rule would erase any obligations perceived by insurers to collect race-based data to defend disparate-impact claims brought under *Inclusive Communities* or the other cases recognizing disparate-impact claims under the FHA against insurers. PCI therefore fails to adequately trace to the Rule its alleged injury arising from the alleged requirement to collect race-based data or establish that its purported injury is redressable.[12] *Cf. Delta Constr.*, 783 F.3d at 1296; *Texas*, 726 F.3d at 198; *accord White*, 601 F.3d at 552.

## II. PCI's Facial Challenge is Not Ripe for Judicial Resolution

PCI cannot show that any of its claims are ripe for review. The Supreme Court has repeatedly held that it is the obligation of Article III courts to "exercise power only in the last resort," *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citations omitted), and that all lawsuits must be "ripe for court review" in order to be justiciable. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998); *see also Indep. Rt. to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007). The ripeness requirement "comports with [courts'] theoretical role as the governmental branch of last resort." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). Ripeness, in turn, contains constitutional and prudential elements. *See E.F. Transit, Inc. v. Cook*, 878 F.3d 606, 609–10 (7th Cir. 2018) (citing *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th

---

Mem. at 15–16. But as HUD notes, "businesses can look to publicly available datasets or studies related to their practices to see if their practices cause *or predictably will cause* a discriminatory effect" without resorting to collecting data from its own client pool. 88 Fed. Reg. at 19480 (emphasis added). Thus, analyzing a potentially less discriminatory alternative would not require collecting race-based data from an insurer's own business practices.

[12] PCI also challenges HUD's alleged failure to adopt Plaintiff's preferred blanket exemptions from the Rule. Pl.'s Mem at 7. But PCI never even identifies, must less substantiates, any harm arising from the case-by-case approach that HUD did adopt. *See generally* ECF Nos. 283-5–283-8. In the absence of any substantiated harm from the lack of blanket exemptions for insurers, Plaintiff lacks standing to challenge this aspect of the Rule.

Cir. 1992)); *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386–37 (D.C. Cir. 2012).

Constitutional ripeness turns on whether the plaintiff has established "an injury-in-fact that is imminent or certainly impending." *Am. Petrol. Inst.*, 683 F.3d at 386; *Ft. Wayne Patrolmen's Ben. Ass'n, Inc. v. City of Ft. Wayne*, 625 F. Supp. 722, 727 (N.D. Ind. 1986). Prudential ripeness balances "the fitness of the issues for judicial decision" against "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967); *see also PCI I*, 66 F. Supp. 3d at 1037–38. Ripeness is a threshold justiciability doctrine, and courts may address ripeness before or after considering other justiciability doctrines, including Article III standing. *See In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011). PCI bears the burden of establishing that each of its claims is ripe. *See Alliant Energy Corp. v. Bie*, 277 F.3d 916, 919 (7th Cir. 2002).

### A. PCI Cannot Satisfy the Constitutional Element of the Ripeness Requirement

First, although the 2013 HUD Rule has now been in effect for more than ten years, PCI has not demonstrated any concrete and particularized injury to its members stemming from either the 2013 or 2023 Rules. PCI's failure reinforces that whatever injury PCI feared would befall its members is certainly not actual or "imminent or certainly impending," *Am. Petrol. Inst.*, 683 F.3d at 386 (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1427–28), thus dooming any assertion that its claims are constitutionally ripe for review. *See Jones v. Griffith*, 870 F.2d 1363, 1366 (7th Cir. 1989) (disputes "must have ripened into a legal case before a federal court can act; the case must not lie merely in the future.").

"[T]he constitutional requirement for ripeness is injury in fact." *DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 297 (D.C. Cir. 1989); *Nat'l Treasury Emps. Union*, 101 F.3d at 1427 ("[r]ipeness … in fact shares the constitutional requirement of standing that an injury in fact be certainly impending.") (citing *Duke Power Co. v. Carolina Envt'l Study Grp.*, 438 U.S. 59, 81 (1978). For the reasons set forth in Section I, *see, supra,* at 12–19, PCI fails to

satisfy the constitutional element of the ripeness inquiry.

### B. PCI FAILS TO SATISFY THE PRUDENTIAL ELEMENTS OF THE RIPENESS REQUIREMENT

This Court should reaffirm its previous holding that PCI's request for a categorical exemption from the Discriminatory Effects Rule based on the McCarran Ferguson Act does not satisfy the prudential elements of the ripeness requirement, *see PCI I*, 66 F. Supp. 3d at 1037–42, and should additionally hold that none of PCI's remaining challenges is ripe. *See Wis. Cent.*, 539 F.3d at 759 ("[r]ipeness is predicated on the 'central perception ... that courts should not render decisions absent a genuine need to resolve a real dispute'") (quoting *Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004)).

In evaluating prudential ripeness, courts look to two factors: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Labs.*, 387 U.S. at 148–49). An issue is generally fit for judicial decision if any remaining questions are purely legal ones. *See Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985). But even when only purely legal questions remain, the plaintiff must still show that a delay in judicial review would cause undue hardship. *See Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012); *Rush v. Barham*, No. 3:13-cv-00723, 2014 WL 3540885, at *3 (N.D. Ind. July 17, 2014). PCI has failed to show that its facial challenge to the Rule is fit for review or that it would suffer any hardship if this Court withheld review of any of its claims.

### 1. PCI Cannot Show that its Facial Challenge Is Fit for Review

PCI fails to show that its facial challenge to HUD's Rule is fit for review. A plaintiff must show that its claims are fit for review even if they allegedly concern purely legal matters. *See Texas v. United States*, 523 U.S. 296, 300 (1998) (claim is not ripe if it rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all"); *Hinrichs*, 975 F.2d at 1333 (claim is not fit for judicial review if "the parties point only to hypothetical,

speculative, or illusory disputes as opposed to actual, concrete conflicts.").

After ten years of living with the 2013 Rule, PCI has failed to show that any aspect of its facial challenge to HUD's Rule is fit for judicial review. *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (concluding that plaintiff's challenge was purely legal, challenged regulation represented final agency action, but that case was not fit for judicial review); *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (rejecting as unripe a facial challenge to EPA regulations on the grounds that "even purely legal issues may be unfit for review" when they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all"); *La. Envt'l Action Network v. Browner*, 87 F.3d 1379, 1381–85 (D.C. Cir. 1996) (rejecting as unripe a facial challenge to EPA rules as violating the Clean Air Act). As the Supreme Court has explained:

> "Absent [a statutory provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."

*Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

PCI's abstract attacks on the alleged, but entirely unrealized, implications of the 2013 and 2023 Rules simply are not fit for judicial resolution. Unless and until the Rule is challenged in a concrete setting, such as a governmental or private plaintiff bringing an actual discriminatory effects claim against a home insurer, a reviewing court will likely lack the information necessary to determine how the Rule might (or might not) be properly applied, especially when taking into account how the McCarran Ferguson Act, the filed-rate doctrine, or the nature of insurance might apply to facts at hand in a real-world dispute. But in the absence of an actual case or controversy, the Court could do no more than "theoriz[e] about how [the] [R]ule will be applied and what its effect will be." *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 674 (D.C. Cir. 1978); c*f. Am.

*Petroleum Inst.*, 683 F.3d at 389.

Indeed, because this Court has already ruled that PCI's claims present a facial challenge to HUD's Rule, *see PCI I*, 66 F. Supp. 3d at 1036,[13] PCI must show that there is *no* set of circumstances in which HUD's Rule could be properly applied to an insurer's ratemaking or underwriting decisions for its claims to be ripe. *See Off. of Commc'n of the United Church of Christ v. FCC*, 826 F.2d 101, 106 (D.C. Cir. 1987). In contrast, if there is even a single instance where the Rule could be properly applied to a home insurer, PCI's claim is unripe. *See id.*; *see also Nat. Res. Def. Council, Inc. v. EPA*, 194 F.3d 130, 138 (D.C. Cir. 1999) (noting that if a plaintiff concedes that the challenged Rule may not be improperly applied in every circumstance, "its facial challenge collapses and it must wait until there is an actual enforcement proceeding to make a specific challenge that will be ripe."). "The case-by-case approach … is understandably frustrating to an organization such as respondent…. But this is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894.

PCI's purely hypothetical concerns—about an unspecified potential conflict between disparate-impact liability directly under the FHA or the Rule and various state rules regulating insurers—are likewise unripe for review.[14] Indeed, PCI's contention that FHA disparate-impact liability *might* conflict with a state law regulating insurance is precisely the speculative claim that the Sixth Circuit has rejected as unripe. *See Nationwide*, 52 F.3d at 1362–63. And in the

---

[13] Unlike its jurisdictional rulings, *see, supra*, at 12–13, this Court's prior ruling that PCI presents a facial challenge is the law of the case, *see Messenger v. Anderson*, 225 U.S. 436, 444 (1912); *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995), and none of recognized exceptions to the doctrine apply, *see Kathrein*, 752 F.3d at 685; *Vidimos, Inc. v. Wysong Laser Co., Inc.*, 179 F.3d 1063, 1065 (7th Cir. 1999).

[14] Home insurers such as PCI's members have been advancing similar claims for decades, and courts have rejected those claims. *See, e.g., Am. Family Mut. Ins. Co.*, 978 F.2d at 299–301 (declining to provide a categorical exemption from liability under the FHA to insurers based on McCarran Ferguson Act challenge); *see also id.* ("[W]e hold that the McCarran-Ferguson Act does not preclude HUD's interpretation of the Fair Housing Act.").

time since 2014, PCI still has not identified any such conflicts that have actually arisen.[15] Contrary to PCI's contentions, application of the FHA's disparate-impact standard or the 2013 or 2023 Rules to a particular insurance underwriting practice—in the context of an individual state law also governing that practice—would necessarily involve a highly fact-specific assessment of the effects of a challenged practice, the justifications for the practice, and the particular application and potential conflict of any relevant state law relating to the business of insurance. *See* AR 32790; AR 611–34. This is exactly the type of speculative claim rejected as by the Supreme Court unripe in *Texas v. United States*, 523 U.S. at 300.

This Court should thus reaffirm its prior conclusion that an insurance association's claims about the Rule's potential conflict with state laws are not ripe for resolution, *see PCI I*, 66 F. Supp. 3d at 1037–42*,* and also hold that PCI has failed to show that any of PCI's remaining challenges are fit for review. *Accord Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) ("[I]ssues … may not be fit for review where the agency retains considerable discretion to apply the new rule on a case-by-case basis, particularly where there is a complex statutory scheme or there are other difficult legal issues that are implicated by the agency action."). Thus, PCI's abstract challenge to HUD's Rule and its explanation presents "the classic institutional reason to postpone review" until an actual controversy arises, which is the "need to wait for 'a rule to be applied [to see] what its effect will be.'" *La. Envt'l Action Network*, 87 F.3d at 1385 (quoting *Diamond Shamrock*, 580 F.2d at 674).

### 2. PCI Has Not Shown Any Hardship that Would Result from Withholding Judicial Review

PCI also fails to show any harm that would result from withholding judicial review of any of its challenges to HUD's Rule. A plaintiff can establish hardship by showing that, even

---

[15] A 2021 comment from a fellow home insurer trade association acknowledges that "for the last eight years, there have … been no allegations or findings of homeowner insurer disparate impact … made or adjudicated since 2013." Ltr. fr. Thomas Karol, Nat'l Ass'n of Mutual Ins. Cos. to Kathleen Pennington, HUD, re: Dkt No. FR–6251–P–01, RIN 2529–AB02 (Aug. 23, 2021), AR 52410–20.

though the challenged law has not yet been enforced against it, "enforcement [is] certain and the only impediment to the case's ripeness is a delay before its eventual prosecution." *Crosetto v. State B*ar, 12 F.3d 1396, 1403 (7th Cir. 1993). A plaintiff can also establish hardship by showing that even though enforcement is not certain, the mere threat of future enforcement has a present "concrete" effect on the plaintiff's "day-to-day affairs" and that "*irremediably* adverse consequences [would] flow[ ] from requiring a later challenge." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57–58 (1993) (emphasis added); *Gov't Suppliers Consol. Servs., Inc. v. Bayh*, 975 F.2d 1267, 1275 (7th Cir. 1992) ("When present harms will flow from the threat of future actions, those present harms may mean a controversy is ripe for review."). However, if the plaintiff cannot show that enforcement is certain or that the challenged law causes plaintiff a present concrete hardship, then the action is not ripe and must be dismissed. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967).

In the present case, PCI cannot show any hardship that would result from withholding review of each of its challenges. Foremost, neither the 2013 nor 2023 Rule proscribes any conduct—for that is what the FHA itself does; instead, the 2013 and 2023 Rules set out a framework for determining liability. Moreover, PCI fails to identify any underwriting practice or other business practice in the last decade that the 2013 or 2023 Rules have actually prevented its members from employing. *See, e.g.*, AR 29112–66. Instead, despite the fact that the 2013 Rule has been in effect for the last ten years, PCI offers nothing more than a repeating series of assertions of harms that "would" or "would likely" come to pass at some undefined time in the future, as though the Rule is still somehow not yet in effect. *See id.* at 29112–66; *see also, e.g.*, SAC ¶ 120 (alleging only that "*if* PCI members are forced to disregard actuarial risk data …, they *will* be unable to price insurance accurately") (emphasis added); Pl. Ex. 4, ECF No. 283-5 ¶¶ 10, 11, 14 (only asserting harms that "*would*" come to pass at some undefined time in the future) (emphasis added); Pl. Ex. 5, ECF No. 283-6 ¶¶ 10, 18.

Nor has PCI otherwise shown any other actual, present hardship to its members arising

from the Rule. To be clear, the additional burden to a litigant of case-by-case adjudication is not a sufficient hardship to merit judicial review of an otherwise unripe claim. *See Ohio Forestry Ass'n*, 523 U.S. at 734–35; *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1205 (D.C. Cir. 1998). Nor is the potential hardship from having to establish preemption (or in the case of the McCarran Ferguson Act, reverse preemption) enough to show a matter is now ripe. *See PCI I*, 66 F. Supp. 3d at 1042 (citing *Wis. Central*, 539 F.3d at 761). Instead, like the plaintiffs in *Toilet Goods*, PCI has never demonstrated that the "impact of the [Rule has been] felt *immediately* ... in conducting [its] day-to-day affairs." *Toilet Goods*, 387 U.S. at 164 (emphasis added). Indeed, although PCI alleges that "[a]pplication of the Rule to risk-based pricing and underwriting by PCI members continues to place those members in an impossible position of either complying with state law regarding the pricing and underwriting of insurance or complying with the Rule," SAC ¶ 121, as noted above, *see, supra*, at 17–18, PCI has produced no specific record evidence that its members have changed their business practices. *See Bethlehem Steel v. EPA*, 536 F.2d 156, 162 (7th Cir. 1976) (noting importance of showing a substantial immediate impact under the hardship prong); *Firstmerit Bank, N.A. v. BMO Harris Bank*, No. 15-cv-9238, 2016 WL 2622326, at *4 (N.D. Ill. May 9, 2016).[16]

Accordingly, PCI has failed to demonstrate the sort of hardship that warrants review of its abstract claims. *See Hinrichs*, 975 F.2d at 1333 ("[c]ases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts"); *Firstmerit Bank*, 2016 WL 2622326, at *3 ("the facts surrounding Plaintiff's alleged injury are fraught with contingency"). In the absence of a live controversy, PCI's claims are not justiciable.

---

[16] PCI also agreed to stay this case for over four years even though the 2013 Rule was in effect the entire time, *see, e.g.*, ECF Nos. 150–59, 166, 168–69, 172–73, 176–79, 184, 186, 188–92, 194–96, which underscores the lack of hardship to Plaintiff in now withholding review. And, again, standing cannot be based on a plaintiff's misapprehension of what the challenged regulation requires. *See Elec. Priv. Info. Ctr.*, 892 F.3d at 1254; *Sierra Club*, 754 F.3d at 1001.

### III. PCI'S CHALLENGES FAIL ON THE MERITS

Even if this Court were to reach the merits of PCI's claims, PCI's challenges still fail. HUD's 2016 Supplement and 2023 Rule show that HUD carefully reconsidered the industry's concerns based on McCarran-Ferguson, the nature of insurance, and the "filed-rate doctrine," and provided reasoned explanations for the agency's determination that those concerns do not justify exemptions for the industry from potential discriminatory effects liability. *See generally* AR 1813–20; AR 32763–813. PCI's procedural claims are thus meritless reiterations of arguments HUD carefully considered and reasonably rejected or are repackaged claims that this Court has already denied. As such, PCI provides no reason for this Court to second-guess HUD's reasonable policy choice not to grant the insurance industry's requested exemptions. Additionally, HUD properly considered the effects of *Inclusive Communities*.

#### A. HUD Considered the Industry's Concerns Based on McCarran Ferguson and Provided Reasonable Bases for Rejecting the Industry's Requested Exemptions

HUD adequately reconsidered McCarran-Ferguson's effect on discriminatory-effects claims against insurers and provided a reasoned explanation for adopting a case-by-case approach to any McCarran-Ferguson issues.[17] This Court previously found HUD's McCarran-Ferguson analysis wanting because "HUD made no attempt to determine whether the benefits of proceeding by case-by-case adjudications outweighed the benefits of including an exemption ... for insurers in the ... Rule." *PCI I*, 66 F. Supp. 3d at 1048. On remand, HUD conducted this analysis and determined that "[t]he concerns raised by the insurance industry commenters *do not outweigh* th[e] loss of efficacy in the administration and enforcement of the [FHA]" sufficient to justify the requested exemptions. AR 1814 (emphasis added). HUD instead found that "the case-by-case approach appropriately balances these concerns against" HUD's duty to further fair housing. *Id.* HUD analyzed the issue again in its 2023 Rule. AR 32767; AR 32774; AR 32791.

HUD explained that McCarran-Ferguson analysis is a "fact-intensive inquiry," AR 1817,

---

[17] Defendants at times use "exemptions" as shorthand for exemptions and safe harbors.

requiring review of numerous variables, including the particular insurance practice challenged, the type of disparate-impact claim asserted, the particular relief sought, and the state in which the claim is brought, including the state's insurance regulations, as well as other state laws and policies. *See* AR 1814, 1816–18; *see also PCI I*, 66 F. Supp. 3d at 1039–40. Given the many factors that impact McCarran-Ferguson analysis—including their variability across jurisdictions and over time, *see* AR 1817—HUD determined that it would be administratively infeasible to craft exemptions to account for potential McCarran-Ferguson issues and, in any event, "practically impossible to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application." AR 1814.

Conversely, HUD found that any exemption would "necessarily be overbroad," thereby "allowing some practices with unjustified discriminatory effects to go uncorrected," in contravention of the FHA's broad remedial purposes. AR 1816. HUD also reiterated that the Rule itself, through its burden-shifting framework, "takes into account an insurer's interest in the challenged practice." AR 1814; *see also Inclusive Cmtys.*, 576 U.S. at 540–41 (recognizing that the second step of the burden-shifting framework provides adequate leeway for defendants to state and explain the valid interest their policies serve). HUD therefore concluded that the requested exemptions "would offer little added value for insurers not already provided by the Rule itself while foreclosing potentially meritorious claims in contravention of the [FHA]'s broad remedial goals and HUD's obligation to affirmatively further fair housing." AR 1818. HUD thus decided that its "longstanding case-by-case approach can adequately address any McCarran-Ferguson concerns and better serves" the FHA's goals and HUD's congressional mandate. *Id.*

HUD's explanation in support of its preferred policy choice satisfies the APA. As this Court has recognized, "[r]ule-making ... is not always the best method for creating standards." *PCI I*, 66 F. Supp. 3d at 1048 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947)). Instead, "case-by-case determinations may be more beneficial than rule-making," where "a problem is

28

'so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule.'" *Id.* (quoting *Chenery*, 332 U.S. at 203). With so many "imponderables" at play, *id.* at 1040, HUD reasonably found that the case-by-case approach balances the competing policy concerns better than an overbroad exemption created through rulemaking. That determination should be upheld. *See City of Portland v. United States*, 969 F.3d 1020, 1048 (9th Cir. 2020) (agency order not arbitrary and capricious where "objections to specific applications of the ... [o]rder may be made on a case-by-case basis").

### B. None of PCI's Rejoinders Justify Upending HUD's Reasonable Determination to Prefer Case-By-Case Adjudication Over Exemptions for the Industry

While PCI claims that the Rule did not adequately consider the impact of McCarran-Ferguson, *see* Pl.'s Mem. at 8–17, PCI's arguments are largely thinly veiled attempts to re-litigate issues—namely, the reasonableness of the burden-shifting framework and the fact-dependent nature of McCarran-Ferguson defenses—that this Court already decided in HUD's favor. They do not undermine HUD's rational policy choice to resolve McCarran-Ferguson issues on a case-by-case basis.

#### 1. HUD explained that *Doe v. Mutual of Omaha* does not require a categorical exemption or safe harbor for "risk-based pricing and underwriting"

Contrary to Plaintiff's contention, *see* Pl.'s Mem. at 16, HUD adequately considered *Doe v. Mutual of Omaha*, 179 F.3d 557 (7th Cir. 19991). HUD explained that *Doe* "does not foreclose all discriminatory-effects claims against insurers as barred by McCarran-Ferguson" because, as the Fifth Circuit recognized, "'[i]n *Doe*, there was an actual *state insurance law* which purportedly conflicted with the application of the [ADA] to the particular question at issue.'" AR1816 (quoting *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 298 n.6 (5th Cir. 2003)); AR 32787. By contrast, "where no state law [or policy] is impaired," HUD explained, "McCarran-Ferguson will not bar a discriminatory effects claim against an insurer." AR 1817; AR 32787 (similar); *see also Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 31 n.4 (rejecting McCarran-Ferguson Act defense where defendant had "not identified any specific state insurance law that might

contradict th[e] [particular] application of the FHA, or explained how the laws are incompatible"); *cf. Huskey v. State Farm Fire & Casualty Co.*, No. 22-cv-7014, 2023 WL 5848164, at *11 (N.D. Ill. Sept. 11, 2023) (Insurer "has not shown that Illinois law requires or condones claims-processing policies with racially disparate effects, so there is no direct conflict" between plaintiff's FHA disparate-impact claim and Illinois requiring preemption under McCarran-Ferguson).[18]

HUD also directly addressed PCI's incorrect contention that *Doe* requires a safe harbor for "risk-based pricing and underwriting" because a challenge to such practices under the Rule would impermissibly require courts to assess those practices' "actuarial soundness." *See* Pl.'s Mem. at 6. As HUD explained, in the course of a discriminatory-effects challenge, a plaintiff may show that a purportedly risk-based practice is in fact based on business judgment. *See* AR 1818; AR 32789; *see also* SAC ¶ 58 ("Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly."). That showing would not require a court to assess the actuarial soundness of the practice and thus would not run afoul of *Doe*. HUD's determination on this issue is entirely consistent with this Court's own analysis of *Doe*. As the Court explained, "[w]hile some states require insurers to use risk-based pricing, other states merely permit risk-based pricing." *PCI I*, 66 F. Supp. 3d at 1039–40. Accordingly, *Doe* "would not necessarily preclude claims" challenging practices that "rest on business justifications rather than actuarially sound principles or state law requirements" because "it is not clear that such claims would raise the question of whether the insurer's practices are actuarially sound and consistent with state law." *Id.* at 1040.[19]

---

[18] Similarly, in *Flores v. United Airlines*, 426 F. Supp. 3d 520 (N.D. Ill. 2019), the district court concluded, relying on *Doe*, that a plaintiff's Racketeer Influenced and Corrupt Practices Act (RICO) claims were barred under McCarran-Ferguson in light of specific state insurance laws and insurance rate comparisons that would be at issue in those claims. *See id.* at 538–39.

[19] Even where a state may permit the use of risk-based practices generally, a claim challenging the use of a particular risk-based practice may not create a conflict sufficient to

In addition, PCI points to no authority to support its assertion that courts would be required to assess the actuarial soundness of a given insurance practice at the third step of the burden-shifting framework. *See* Pl.'s Mem. at 16. At step three, a plaintiff bringing a discriminatory-effects claim must show that the defendant's legitimate interest "could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3). While HUD lists another risk-based practice as a possible alternative, AR 1818; AR 32789, HUD did not indicate that another risk-based practice is the *only* alternative.[20]

Lastly, while HUD maintained that *Doe* does not require it to have adopted the requested safe harbors, HUD also referenced *Doe* in noting that "the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied." AR1817 n.50; AR 32790 n.235. While this Court may be bound by *Doe*, *see PCI I*, 66 F. Supp. 3d at 1039 n.6, because the McCarran-Ferguson inquiry may vary based on the state laws at issue and the jurisdiction in which the claim is brought, HUD reasonably concluded that it would be infeasible to tailor an exemption to account for all of these variations. HUD likewise determined that it would be contrary to the purposes of the FHA to

---

support a McCarran-Ferguson defense because other state laws or policies, including a state's insurance code or fair housing laws, may not support using such a practice where it has a discriminatory effect. *See, infra, at* 36–38. *Doe* would not preclude a court from looking to such state laws and policies to assess their compatibility with a discriminatory-effects challenge. *See Doe*, 179 F.3d at 564 (explaining that a "prohibition of discrimination ... does not impair state regulation of insurance[] [because] no state wants insurance companies to refuse to insure disabled people").

[20] For example, an insurer may adopt a purportedly risk-based practice for business reasons. At step three, an analysis of whether an alternative practice could serve the defendant's business interests would therefore assess, not its actuarial soundness, but its soundness as a business matter.

And, even then, a court need not assess the actuarial soundness of the practice at step three. For example, it could be shown that an insurer opted for one of two risk-based practices for business reasons. In such a case, the actuarial soundness of the alternative risk-based practice would have been determined already by the insurer itself. The court's analysis would be limited to assessing the efficacy of the alternative risk-based practice in serving the insurer's business interests while having a less discriminatory effect—the type of "unremarkable task" regularly undertaken by courts. *Dehoyos*, 345 F.3d at 297 n.5 (rejecting similar argument because a court does not become a "super actuary" every time it "engag[es] in the unremarkable task of determining whether specific conduct falls within the ambit of federal civil rights law").

create an overbroad exemption that would undermine discriminatory-effects claims that may survive in one jurisdiction but not another. *See* AR1817; AR 32788 ("Given the variation in state insurance laws across more than fifty jurisdictions and over time, HUD declines to fashion a[n] ... exemption that would … inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from [FHA] liability."). HUD therefore decided to leave McCarran-Ferguson issues to be addressed in future adjudications. PCI may disagree with HUD's decision, but its assertion that HUD ignored *Doe* in making it is simply unfounded.

Contrary to PCI's contention, *see* Pl.'s Mem. at 10–11, 13, HUD's determination that McCarran-Ferguson issues should be addressed on a case-by-case basis remains reasonable after *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). As an initial matter, *West Virginia* is inapposite because HUD's rule is not a "novel" power that HUD is just recognizing in a decades-old statute. *Cf.* 142 S. Ct. at 2599, 2605. To the contrary, Congress granted HUD express authority to enforce and interpret the Act. *See* 42 U.S.C. §§ 3610-12, 3614a. Using that authority, HUD has long interpreted the FHA to apply to home insurers, at least since 1989, *see* AR 1027–112, and courts long have applied the Act's discriminatory-effects standard to insurers, *see, e.g.*, *United Farm Bureau Mut. Ins. Co.*, 24 F.3d at 1016; *Nationwide*, 52 F.3d 1351.[21]

In any event, *West Virginia* supports neither of PCI's arguments. First, the Rule does not intrude into "an area that is the particular domain of state law." Pl.'s Mem. at 11 (quoting *W. Va.*, 142 S. Ct. at 2621 (Gorsuch, J., concurring)). Quite simply, the *West Virginia* majority opinion does not endorse this limit on statutory authority, and so a statement in a concurring opinion does not limit HUD's authority. But even if the majority had endorsed such a limit, HUD's Rule would not cross this line. Rather, HUD reasonably determined that "any conflict with a specific

---

[21] Indeed, insurers themselves acknowledged in 1996 that the FHA's disparate-impact standard applies to insurers. *See* Amicus Br. of Nat'l Ass'n of Mut. Ins. Cos., *Nationwide Mut. Ins. Co. v. Cisneros*, No. 95-714, 1996 WL 33467765, at *14 (U.S. Jan. 3, 1996) (warning, as *amici* supporting a petition for *certiorari*, that "[t]he practical effect of the Sixth Circuit's decision is that property insurers will be forced to fend off FHA disparate impact challenges to underwriting and rating standards and rules").

state insurance law can and should be addressed on a case-by-case basis in the context of that state law." AR 32778. And in responding to comments about McCarran-Ferguson preemption, HUD reasonably explained that "the mere fact that a state has the authority to regulate insurance or has adopted ratemaking regulations does not on its own create the kind of conflict, frustration of purpose, or interference that triggers preemption under McCarran-Ferguson." AR 32787; *see also Am. Family. Mut. Ins. Co.*, 978 F.2d at 297 ("Although the McCarran-Ferguson Act gives states the final word on the regulation of insurance unless Congress specifically overrides their choices, Wisconsin's word is consistent with the Fair Housing Act."). Determining whether McCarran-Ferguson preempts a claim requires a fact-specific inquiry that incorporates the relevant state law, making HUD's selection of a case-by-case approach necessary and reasonable. AR 32778. Finally, HUD expressly determined that a discriminatory-effects claim will be preempted if a state insurance law is impaired, *see id.*, confirming that the Rule could not implicate *West Virginia* by overriding conflicting state insurance provisions.

Second, the Final Rule does not "substantially restructure" the homeowners' insurance industry. *See W. Va.*, 142 S. Ct. at 2610. As explained above, the insurance industry had been subject to a disparate-impact standard since the 1990s, *see*, *supra*, at 3–4, and in the absence of the Rule, the insurance industry would revert to the disparate-impact standard applicable in eleven circuit courts as of 2013, *see*, *supra* at 4 n.3.

### 2. HUD considered the industry's request for a safe harbor for "risk-based" pricing and underwriting and provided reasonable bases for rejecting it

HUD reasonably rejected the industry's requests for exemptions or safe harbors for risk-based pricing and underwriting. PCI's arguments to the contrary are meritless.

HUD addressed head-on and repeatedly why a safe harbor for "risk-based factor[s]" would be inappropriate. AR 1818; AR 32792. HUD specifically recognized that one commenter sought "safe harbors for recognized risk factors," AR 1814; *see also* AR 1815 (recognizing requests for "safe harbors for long-recognized risk-related factors"), but did not create such safe

harbors for several reasons. *See* AR 1818; AR 32792. HUD explained that there is a "long, documented history of discrimination in the homeowners' insurance industry," including through the use of purported "'risk factors' ... that were subsequently banned as discriminatory." AR 1818; AR 32782; *see also, e.g.*, AR 1815 (recounting this history). Providing a safe harbor for any "risk-based" practice could therefore create a loophole for insurers to designate as "risk-based" any number of practices, which decades of experience have shown are sometimes not, in fact, risk-based. *See* AR 1815; AR 32780.

Similarly, a safe harbor for "risk-based" practices could be used by insurers to insulate from liability practices that are not "purely risk-based." AR1818; AR 32781 (quoting *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 60).[22] In this way, the requested safe harbor would be overbroad and undermine the efficacy of the FHA. *See* AR 1818; AR 32781. HUD further observed that a safe harbor for "risk-based" practices "would be overbroad, foreclosing claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice." AR 32781; *see* AR1819.

HUD not only explained why an exemption for "risk-based" practices, such as pricing and underwriting, generally would be inappropriate, but it also concluded that creating safe harbors for specific risk-related criteria "would be overbroad and quickly outdated." AR 32788; *see* AR 1815. Not only do state insurance laws not provide a uniform list of sanctioned risk-based practices, but such laws also change over time, altering the McCarran-Ferguson analysis. *See* AR 1817; AR 32788. And, as HUD noted, due to differences in state insurance laws, discriminatory-effects challenges to similar practices have survived McCarran-Ferguson

---

[22] As HUD explained, even practices that are largely risk-based, such as ratemaking, can incorporate elements of discretion under state law. *See, e.g.*, AR 1818. Many state statutes "mandating that rates [not] be … unfairly discriminatory, permit insurers … to rely on 'judgment factors' in ratemaking." *Id.* HUD determined that challenges to practices that are not purely risk-based would not prevent insurers from "evaluat[ing] homeowners insurance risks fairly and objectively," *id.* (quoting *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 60), but declined to adopt an exemption that could immunize practices that are not purely risk-based. *See id.*

defenses in some states but not others. *See* AR 1817 n.56; AR 32788 n.214 (*e.g.*, challenges to insurers' use of credit scores). Moreover, whether McCarran-Ferguson preemption occurs will depend not only on the particular practice and insurance laws at issue, but also on state-specific fair housing laws. *See* AR 1817 n.56; AR 32788 n.214. HUD thus reasonably determined that "even an exemption for specific insurance practices would be overbroad and quickly outdated." AR 1817; AR 32788.

Next, PCI argues that HUD's decision not to provide an exemption for risk-based pricing and underwriting was arbitrary and capricious because (i) challenges to such practices *could* be preempted by McCarran-Ferguson, *see* Pl.'s Mem. at 12–14; and (ii) insurers will have to "defend [themselves] under the burden-shifting framework" even if they could prevail, thus incurring "unjustified expenses," Pl.'s Mem. at 14. PCI's first argument mistakes HUD's APA obligations and its second restates arguments already rejected by this Court.

That McCarran-Ferguson could preempt future discriminatory-effects claims against insurers does not require HUD to provide a categorical exemption for risk-based pricing and underwriting based on that potentiality or intermittent occurrence. Instead, an agency is well within its discretion to leave certain issues to be addressed in the course of future adjudications. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[C]hoice between rulemaking and adjudication lies in the first instance within the [agency's] discretion.").

And it was reasonable for HUD to prefer case-by-case adjudication over exemptions for the industry simply because insurers may incur costs defending themselves against discriminatory-effects claims. *See* Pl.'s Mem. at 14–16. PCI raised this issue previously, *see* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 22, ECF No. 21, and this Court correctly rejected it, holding that the burden-shifting framework "reflects HUD's reasonable accommodation of the competing interests at stake—*i.e.*, the public's interest in eliminating discriminatory housing practices and defendants' (including insurer-defendants') interest in avoiding costly or frivolous litigation based on unintentional discriminatory effects of their facially neutral practices." *PCI I*,

66 F. Supp. 3d. at 1053.

HUD reasonably considered the costs to the industry in both the Rule and its Supplement, and determined, based on decades of experience, that the industry's claims of excessive litigation were inflated and that the potential for discriminatory-effects liability under the Rule will not cause the crippling effects to the industry that it has been predicting for nearly 40 years. *See* AR 624 ("Given how the discriminatory effects framework has been applied to date by HUD and by the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants."); *see also id.* ("[T]he Federal Rules of Civil Procedure provide various means to dispose of meritless claims[.]"); AR 1816; AR 32781 (explaining that insurers have been alleging for over thirty years that discriminatory effects liability "makes it 'near impossible for an insurer to successfully defend himself'"). And HUD provided a reasoned explanation for its conclusion that the potential costs in administration and under-enforcement from an exemption exceeded costs to the industry. AR 1814; AR 32783. HUD's "predictive judgment[]" about insurers' potential litigation costs and its reasonable determination based, in part, on that judgment, is entitled to deference. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).[23]

### 3. HUD reasonably considered state fair housing laws in rejecting exemptions for the industry based on McCarran-Ferguson concerns

Contrary to PCI's contention, *see* Pl.'s Mem at 17, it was reasonable for HUD to have relied on the fact that many states' fair-housing laws parallel the FHA's provision for discriminatory-effects liability in deciding that exemptions were unjustified based on the industry's McCarran-Ferguson concerns. As HUD explained, "insurance practices are not governed solely by 'hermetically sealed' state insurance codes, but ... by a range of other state

---

[23] Contrary to PCI's claim, *see* Pl.'s Mem. at 15–16, HUD also reasonably found that the Rule does not require the collection of race-based data. *See* AR 32793. Further, this claim is foreclosed by this Court's decision upholding the burden-shifting framework, *see PCI I*, 66 F. Supp. 3d at 1053, and the Supreme Court's decision implicitly adopting it, *see Inclusive Cmtys.*, 576 U.S. at 541–42; *Mhany Mgmt.*, 819 F.3d at 618.

laws, including state fair housing laws." AR 1817; AR 32788 (quoting *Humana Inc. v. Forsyth*, 525 U.S. 299, 312 (1999)). State fair-housing laws are often interpreted in conformity with the FHA, including in their coverage of insurance and availability of disparate-impact claims. *See* AR 1817; AR 32788. HUD rightly reasoned that in such states, McCarran-Ferguson preemption issues would be inapposite. AR 1817; AR 32788.

PCI argues that such laws "have nothing to do with" the McCarran-Ferguson analysis. Pl.'s Mem. at 17. That contention directly conflicts with *Humana* and its progeny, which look to other state laws in conducting McCarran-Ferguson analysis. *Humana* clarified that McCarran-Ferguson will reverse-preempt federal law when the law "directly conflict[s] with state regulation," or when its application would "frustrate any declared state policy or interfere with a State's administrative regime[.]" 525 U.S. at 301. To decide whether there was such a conflict, the Court considered both Nevada "statutory and common-law," because Nevada's Unfair Insurance Practices Act is not "hermetically sealed" and must be read in light of other state laws. *See id.* at 307, 312–13.

In accord with *Humana*, courts considering McCarran-Ferguson defenses have looked to state laws other than those exclusively applicable to insurance, including state fair-housing laws. *See, e.g., Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015) (finding that Connecticut's "similar (albeit broader) protection against housing discrimination as the FHA," was a "strong indication that application of the [FHA] will not impair Connecticut's regulation of the insurance industry"). Generally applicable state fair-housing laws frequently apply to insurance practices, given the common state practice of modeling such laws after the FHA. *See, e.g., United Farm Bureau Mut. Ins. Co.*, 24 F.3d at 1013–14 (relying on precedent interpreting the FHA to hold that Indiana fair housing law covers home insurance). Indeed, statutes and administrative codes in at least thirteen states explicitly

provide that state fair-housing laws apply to home insurance.[24] Because these laws limit how home insurers can deal with insureds—limits that are in many cases coextensive with the Rule—they can and do bear on the McCarran-Ferguson analysis. *See, e.g.*, AR 1817. PCI's contrary position—that state fair-housing laws do not inform McCarran-Ferguson inquiry—would lead to the perverse result of reverse-preempting a federal claim in the name of deference to a state when the state's law and policy are entirely consistent with it. *See* AR 1816; AR 32789. HUD rightly concluded that McCarran-Ferguson does not command such a result.

### 4. HUD reasonably decided that the fact-intensive nature of the McCarran-Ferguson inquiry counseled against a blanket exemption

Contrary to PCI's contention, *see* Pl.'s Mem. at 12–14, it was reasonable for HUD to conclude that a categorical exemption for risk-based pricing and underwriting practices was inappropriate given the fact-intensive nature of the McCarran-Ferguson inquiry. *See* AR 1814, 1816; AR 32787. In arguing that "the fact-specific nature of a McCarran-Ferguson analysis is irrelevant to deciding whether case-by-case adjudication is appropriate," Pl.'s Mem. at 12—PCI attempts to do an end-run around this Court's correct holding that its facial challenge to the Rule based on McCarran-Ferguson Act is not ripe for review. *See PCI I*, 66 F. Supp. 3d at 1040. This Court already denied one attempt by PCI to re-litigate its dismissed McCarran-Ferguson Act claim, *see PCI II*, 2017 WL 2653069, at *8, and it should decline to entertain its renewed attempt through the guise of a procedural attack on HUD's 2023 Rule.

To the extent the Court does entertain PCI's claim that McCarran-Ferguson is a categorical bar to discriminatory-effects claims challenging risk-based practices, HUD rightly concluded that PCI's position is at odds with *Humana* and belied by several cases wherein courts

---

[24] *See* Ariz. Admin. Code § 10-2-104(B)(4); Ga. Comp. R. & Regs. 186-2-.02(2)(d)(4)(iv); 910 Ind. Admin. Code § 2-2-4(d)(4); Kan. Admin. Regs. § 21-60-5(d)(5); Ky. Rev. Stat. Ann. § 344.367; 94-348-8 Me. Code R. § 4(D)(4)(d); Md. Code Regs. 14.03.04.04(F)(6); Ohio Rev. Code Ann. § 4112.02(H)(4); S.C. Code Ann. Regs. § 65-211(A)(2)(r); Tenn. Code Ann. § 4-21-601(c); 40 Tex. Admin. Code § 819.124(b)(4); Va. Code Ann. § 36-96.4(B)(2); Wis. Stat. Ann. § 106.50(2)(e).

have found that such discriminatory-effects challenges were not barred by McCarran-Ferguson. *See* AR 1816; AR 32787. PCI repeatedly contends that because every state either permits or requires the use of actuarial risk factors, McCarran-Ferguson will necessarily preempt discriminatory-effects challenges to risk-based practices. *See* Pl.'s Mem. at 13–14. McCarran-Ferguson preempts federal law only where it would "directly conflict with state regulation," "frustrate a[] declared state policy," or "interfere with a State's administrative regime," *Humana*, 525 U.S. at 310. McCarran-Ferguson analysis turns on the applicable state law and policies, the particular claim being made, and other case-specific variables. *See Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 967, 969 (8th Cir. 2008) ("*Saunders II*") (explaining that the "fact-intensive" McCarran-Ferguson analysis requires courts to "focus ... on the precise federal claims asserted" and "the availability of state remedies").

In particular, a "key issue in analyzing whether McCarran-Ferguson reverse-preempts [an] application of the FHA is the *specific details* of the state insurance law that supposedly contradicts the FHA." *Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 34 n.4, (emphasis altered); *see also Dehoyos*, 345 F.3d at 298 (rejecting McCarran-Ferguson defense where defendant "vaguely conjectur[ed] that ... 'federal civil rights laws will interfere with and frustrate the abilities of states to regulate insurance rate making'"). Accordingly, it is not necessarily sufficient for a claimant to merely cite to the rate-making section of a state's insurance code to demonstrate McCarran-Ferguson preemption. *See Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 34 n.4. Likewise, PCI's general reference to state laws permitting or requiring a general industry methodology of using risk-based practices—not to mention lack of detail as to the precise claim at issue, the remedy requested, or the content of the remainder of the insurance code or the state's fair housing laws—cannot possibly be detailed enough to decide whether state laws would necessarily conflict with a discriminatory-effects claim challenging a risk-based practice under the FHA for purposes of McCarran-Ferguson reverse-preemption.

Indeed, cases in which courts rejected McCarran-Ferguson defenses show that McCarran-

Ferguson would not necessarily preempt all discriminatory-effects claims based on states' general sanctioning of risk-based practices is demonstrated by the cases in which courts have rejected McCarran-Ferguson defenses. *See, e.g.*, AR 1817 n.56; AR 32787 n.211 (citing *Lumpkin v. Farmers Grp., Inc.*, No. 05-cv-2868, 2007 U.S. Dist. LEXIS 98949 (W.D. Tenn. July 6, 2007) ("*Lumpkin II*") (holding McCarran-Ferguson did not preempt discriminatory-effects claim challenging insurer's credit scoring program); AR1816; AR 32787 (citing *Dehoyos*, 345 F.3d 290) (same)).

PCI nevertheless argues that the "Rule displaces state law, that States are already addressing protected-class concerns in risk-based pricing, and that HUD's Rule disrupts those efforts." Pl.'s Mem. at 12. As HUD observed, however, the argument that disparate-impact liability as applied to risk-based underwriting and pricing unequivocally conflicts with states' laws such that McCarran-Ferguson necessarily applies has been rejected as "too broad[]." AR 32787 (citing *Lumpkin II*, 2007 U.S. Dist. LEXIS 98949 at *19); *but see Saunders II*, 537 F.3d at 966 n.5 (suggesting in dicta that disparate impact challenge to underwriting criteria could arguably be viewed as FHA standard "supersed[ing]" state law). While a state may sanction the use of risk-based practices *generally*, the corpus of state law and policy, including other parts of states' insurance laws and states' fair housing laws, may not sanction particular risk-based practices if they have an unjustified discriminatory effect. *See* AR1817; AR 32787–88.[25]

In sum, HUD's selection of and explanation for a case-by-case approach to address McCarran-Ferguson issues were reasonable.[26]

---

[25] Thus, in *Lumpkin II*, while "[i]n general," the Tennessee insurance code prohibited rates that were "unfairly discriminatory," the court ultimately rejected the McCarran-Ferguson defense because other code provisions did "not permit credit scoring with disparate impact" and therefore the FHA and Tennessee insurance laws could be read "in harmony." 2007 U.S. Dist. LEXIS 98949 at *19–21.

[26] And to the extent PCI relies on *Doe* to argue that fact development is not needed to exempt risk-based pricing and underwriting, Pl.'s Mem. at 16, Defendants already explained why that is incorrect, and this Court has already largely rejected PCI's argument. *See PCI I*, 66 F. Supp. 3d at 1039–40.

**C. HUD Considered the Industry's Concerns Based on the Nature of Insurance and Provided Rational Bases for Rejecting the Industry's Requested Exemptions**

Contrary to Plaintiff's contentions, see Pl.'s Mem. at 19–22, HUD properly "consider[ed] the substance of the insurance industry's concerns" that "exposing them to disparate impact liability would undermine the fundamental nature of insurance," *PCI I*, 66 F. Supp. 3d at 1051, and provided a reasonable explanation for its conclusion—based on decades of experience applying disparate-impact liability—that it would not. *See* AR 1816; AR 32787. Based in part on that conclusion, HUD also "provide[d] a reasoned explanation" for deciding that case-by-case review of insurers' arguments is preferable to the broad regulatory exemptions requested. *PCI I*, 66 F. Supp. 3d at 1051; *see generally* AR 1816–18; AR 32787–89.

HUD recognized commenters' concerns that if the Rule applied to insurance, "accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer," and that failure to grant the industry safe harbors for "long-recognized risk[] factors" would "subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market." AR 1815; AR 32780. HUD explained that the premise of the commenters' concerns—that the Rule would prevent the use of actuarially sound risk factors—was unfounded. *See* AR 1815; AR 32780. HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice," and explained that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." AR 1816; AR 32780. "[P]ractices that actually are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability." AR 32780; *see also* AR 1816.

Instead, "the [R]ule simply requires that if an insurer's practices are having a discriminatory effect and 'an adjustment … can still be made that will allow both [parties'] interests to be satisfied,' the insurer must make that change." AR 32780; *see also* AR 1816 (quoting *Ave. 6E Invs., LLC*, 818 F.3d at 513). PCI's Brief acknowledges that insurers can still make risk-based decisions under the Rule: PCI qualifies its argument that "the Rule prohibits

41

purely risk-based practices"[27] with the admission that this is only "whenever a plaintiff presented a less-discriminatory alternative[.]" Pl.'s Mem. at 19.

That application of the Rule to insurance will not prevent insurers from using risk-based decision-making is evidenced by the fact that insurers have been subject to potential discriminatory-effects liability for decades, and such exposure has yet to prevent the insurance industry from using risk-based decision-making *See* AR 1816; AR 32787; *see also* AR 4410 (Stephen M. Dane, *Race Discrimination is Not Risk Discrimination: Why Disparate Impact Analysis of Homeowners Insurance Practices is Here to Stay*, 33.6 Banking & Fin. Servs. Pol'y Rep. (June 2014)). Some state laws have subjected insurers to potential discriminatory-effects liability, and such exposure has yet to prevent the industry from using risk-based decision-making. *See* AR 4410. Other industries that use risk-based decision-making, such as mortgage lending, are subject to potential discriminatory-effects liability, and yet continue to use risk-based decision-making. *See id*; *see also Montgomery Cnty. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 184 (D. Md. 2019)*.* Where decades of experience has belied the industry's claims of deleterious consequences, HUD reasonably concluded that "discriminatory effects liability does not threaten the fundamental nature of the insurance industry." AR 1816; AR 32781; *see generally* AR 4404–15 (Dane, Banking & Fin. Serv. Pol'y Rep.).

PCI thus essentially re-raises the argument that HUD should have incorporated into the burden-shifting framework a requirement that the less discriminatory alternative be "equally effective" in serving a defendant's interests. *See* Pl.'s Mem. at 20. But this Court already rejected that argument in holding that HUD's burden-shifting approach was a "reasonable accommodation" of the competing interests at stake. *PCI I*, 66 F. Supp. 3d at 1053. As HUD has

---

[27] PCI's argument that the Rule "imperil[s] effective-risk-based pricing and underwriting," Pl.'s Mem. at 20, also fails because it conflates discriminatory-effects liability with a ban on risk-based practices. The industry does not have to halt a specific practice just because of a potential discriminatory effect. *See, e.g.*, *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 60 (finding discriminatory-effects liability would not undermine insurer's ability to "evaluate homeowners insurance risks fairly and objectively").

explained, it rejected the "equally effective" standard, in part, because such precise determinations are inappropriate in the housing context. *See* AR 625; *see also* AR 32804. And the Rule itself requires a showing that "the challenged practice *could be served* by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3) (emphasis added). There is thus no basis for PCI's contention that insurers will be required to adopt practices that would undermine the insurance market, particularly given PCI's failure to show any ongoing harm from the Rule's ten years in existence. *See* Pl.'s Mem. at 19–22.[28]

### D. HUD Considered the Industry's Concerns Based on the "Filed-Rate" Doctrine and Provided Rational Bases for Rejecting an Exemption for Insurance Pricing

Contrary to PCI's contention, *see* Pl.'s Mem. at 18–19, HUD adequately addressed whether the filed-rate doctrine may bar discriminatory-effects claims challenging insurance pricing. The agency explained that "HUD does not anticipate that the filed rate doctrine will bar discriminatory effects claims involving insurance pricing." AR 1818; *see* AR 32791 ("HUD is not aware of any case ... in which a court has applied the filed rate doctrine to defeat a[] ... claim under the [FHA], although several courts have rejected such attempts"). For that reason, and because application of the doctrine, like McCarran-Ferguson, is a "fact-intensive issue," AR 1819; AR 32791 (quoting *Saunders I*, 440 F.3d at 945), HUD decided that a blanket exemption was unwarranted and that case-by-case review would "best accommodate[] the[] variations" in how courts apply the doctrine and in state regulatory regimes. AR 32791.

The filed-rate doctrine "primarily serves two purposes." AR 1819; AR 32790. It prevents litigants from securing more favorable rates than their non-litigant competitors and it "preserves

---

[28] And despite PCI's assertion otherwise, Pl.'s Mem. at 18, HUD also considered this Court's statement that *Graoch* "supports the insurance industry's argument that HUD should include exemptions from the ... Rule or create safe harbors in the Rule for insurance practices that plaintiffs would have no chance of successfully challenging under the burden-shifting framework." *PCI I*, 66 F. Supp. 3d at 1051. As HUD explained, whether a particular discriminatory effects challenge would lead to liability is not easy to determine given the many factors that go into the McCarran-Ferguson analysis and the variability across states and jurisdictions. HUD therefore could not conclude that it would be "impossible" for a particular insurance practice to result in liability under the Rule. *Graoch*, 508 F.3d at 376.

the authority and expertise of the rate-regulating agency by barring a court from enforcing the statute in a way that substitutes the court's judgment as to the reasonableness of a regulated rate." *Saunders I*, 440 F.3d at 943.

Given the doctrine's purposes, HUD reasoned that "[t]he fit between the filed rate doctrine and discriminatory effects claims is attenuated, at best, because discriminatory effects claims 'do not challenge the reasonableness of the insurance rates' but rather their discriminatory effects." AR 1819 (quoting *Lumpkin v. Farmers Grp., Inc.*, No. 05-cv-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007) ("*Lumpkin I*"); *see* AR 32790–91; *see also Viens*, 113 F. Supp. 3d at 572–73. And, "[t]o the extent there is any conflict between the ... [FHA] and ... state ratemaking regulations, 'the Supremacy Clause tips any legislative competition in favor of the federal antidiscrimination statutes.'" AR 1819 (quoting *Saunders I*, 440 F.3d at 944); *see also Perryman v. Litton Loan Serv., LP*, No. 14-cv-2261, 2014 WL 4954674, at *8 (N.D. Cal. Oct. 1, 2014); *see* AR 32791.

HUD also noted that the filed-rate doctrine "does not preclude injunctive relief or prohibit the Government from seeking civil or criminal redress" under the FHA because such remedies would not conflict with the doctrine's purpose of "preventing litigants from securing more favorable rates than their non-litigant competitors[.]" AR 1819; AR 32790–91 (quoting *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010)); *see also Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 837 (N.D. Ill. 2011). HUD thus reasonably decided that the doctrine was unlikely to preclude discriminatory-effects challenges to insurance pricing.

HUD also explained in its 2016 Supplement that, in any event, "abundant variations exist among the courts as to how the doctrine applies," and whether the doctrine would preclude a particular claim is a "'fact-intensive issue' that would [have to] include consideration of the particular state's ratemaking structures." AR 1819 (quoting *Saunders I,* 440 F.3d at 945); *see also Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 804 (7th Cir. 2020). For example, HUD noted that "[s]tates vary considerably in the degree to which they regulate rate-setting." AR 1819 n.92.

Some states do not require insurance rates to be filed. *See id*. And in Illinois, for example, while rates must be filed, "it is not at all clear that the [Illinois] Department [of Insurance] has the authority to approve or disapprove property-insurance rates." *Id.* (quoting *Cohen v. Am. Sec. Ins. Co.,* 735 F.3d 601, 607 (7th Cir. 2013)). Given this variation, along with the unlikely application of the doctrine to bar FHA claims, HUD reasonably preferred a case-by-case approach.

PCI's arguments do not undermine HUD's reasonable determination and explanation. PCI fails to point to a single case where the filed-rate doctrine was applied to defeat a claim under the FHA, and does not meaningfully contend with those, cited by HUD, that rejected such attempts.[29] *See* Pl.'s Mem. at 18–19. PCI ignores the fact that the filed-rate doctrine would not bar claims seeking injunctive relief or prevent the Government from seeking civil or criminal redress. *See id.* And PCI does not respond to HUD's showing that the doctrine is a fact-intensive inquiry that will vary by jurisdiction. *See id.* The two arguments PCI does make are meritless.

Instead, PCI insists that the filed-rate doctrine would bar a *federal* claim under the FHA, contrary to Supremacy Clause principles. *See* Pl.'s Mem. at 19 ("[P]recedent from this and other circuits hold[s] that the filed-rate doctrine *does* bar federal challenges to rates filed with state agencies."). But PCI relies on cases that involve federal Racketeer Influenced and Corrupt Organizations (RICO) and Sherman Act claims, which the courts dismissed based on a "no-injury principle" unique to those statutes and which has no applicability here. *See Saunders I*, 440 F.3d at 944 (explaining that "the no-injury principle of *Keogh* applies to deprive a RICO or antitrust plaintiff of standing under federal law to challenge a filed rate that must be charged under state law[,] ... [b]ut standing to sue under federal anti-discrimination statutes such as the [FHA] is far broader.").[30] As the Eighth Circuit explained in *Saunders I*, where two *federal*

_____

[29] *See Dehoyos,* 345 F.3d at 297 n.5 (finding "unpersuasive" contention that the filed-rate doctrine barred an FHA discriminatory-effects claim); *Lumpkin I*, 2007 U.S. Dist. LEXIS 98994, at *20–22.

[30] The only case PCI cites that did not involve RICO or the Sherman Act "d[id] not implicate the Supremacy Clause." *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 321 (Minn. 2006) (Page, J., dissenting). It is therefore distinguishable.

statutes are at issue, as they were in *Keogh* and *Square D*, courts will attempt to "harmonize[] ... [their] competing purposes." *Id.* Otherwise, normal preemption principles apply. *See id.* And in the case of state regulation of insurance, courts look to McCarran-Ferguson, not the filed-rate doctrine, to decide whether enforcement of federal statutes is permitted. *Id.* at 945.

PCI also contends that a court resolving a discriminatory-effects claim would "have to consider the reasonableness of the challenged rate at step two of the burden-shifting framework." Pl.'s Mem. at 18. That contention is not only erroneous but, even if correct, would not necessarily violate the filed-rate doctrine. At step two, a court need only assess whether the defendant has shown that the "challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests[.]" 24 C.F.R. § 100.500(c)(2). While state law may require an insurer to file its rates with the state, *how* the insurer decides its rates is informed by any number of practices. In reviewing a claim that a particular rate has a discriminatory effect, a court will therefore have to assess whether those *practices* are necessary to serve a defendant's legitimate interests, not whether the rate itself is reasonable. Moreover, as HUD explained, not all states require that rates be filed or, if filed, that they be approved by the state. Thus, even if a court were to assess the reasonableness of a rate at step two of the burden-shifting framework, that assessment would not necessarily run afoul of the filed-rate doctrine. PCI thus provides no reason to reject HUD's determination that the filed-rate doctrine does not warrant an insurance-pricing exemption.

### E.  HUD Properly Considered the Impact of *Inclusive Communities* on the Rule as Part of its Reconsideration on Remand and Again in the 2023 Rule

Contrary to Plaintiff's contention, *see* Pl.'s Mem. at 23–25, HUD properly considered the effect of *Inclusive Communities*.[31] As this Court recognized, nothing in *Inclusive Communities* casts any doubt on the validity of the Rule or its application to home insurance. *See PCI II*, 2017

---

[31] Indeed, HUD cited the Supreme Court's opinion hundreds of times in the 2023 Rule, including six pages devoted exclusively to "Comments Concerning *Inclusive Communities*," *see* AR 32770–75, demonstrating that HUD adequately considered its impact.

WL 2653069, at *8 (rejecting PCI's claim that application of the Rule to home insurance is contrary to the FHA as interpreted in *Inclusive Communities*). *Inclusive Communities* cited the Rule *in support* of its analysis, *see* 576 U.S. at 541–42, leading multiple courts to recognize that the Court "implicitly adopted HUD's approach" in the Rule. *Mhany Mgmt.*, 819 F.3d at 618; *see also, e.g., Ave. 6E Invs.*, 818 F.3d at 513.[32] And nothing in *Inclusive Communities* suggests that insurance should be exempt from disparate-impact liability. *See Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 29 ("There is a large body of case law holding that insurers … can be held liable under the FHA, and *Inclusive Communities* does not call those cases into question."); *see also Huskey*, 2023 WL 5848164, at *7–9 (applying FHA liability standards in suit against insurance company); *Connectors Realty Grp. Corp. v. State Farm Fire & Cas. Co.*, No. 19-cv-743, 2019 WL 5064699, at *6 (N.D. Ill. Oct. 9, 2019), *on reconsideration*, 2020 WL 13444239 (N.D. Ill., Aug. 14, 2020). In light of these judicial decisions, HUD's determination that it did not need to modify the Rule was reasonable.

Nevertheless, PCI contends that *Inclusive Communities* identified limitations on application of disparate-impact liability and that it was arbitrary and capricious for HUD not to address those limitations explicitly. *See* Pl.'s Mem. at 23–25. But the Court in *Inclusive Communities* explained that the limitations it discussed have long been part of disparate-impact liability. *See* 576 U.S. at 540–46 (explaining that "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA"). HUD had thus already considered the relevant limitations in its initial

---

[32] The lone court of appeals to state that *Inclusive Communities* created "a more demanding test" for plaintiffs to demonstrate disparate impact under the FHA than did the 2013 Rule merely opined that the Court's reference to "robust causality" potentially suggested more safeguards for defendants than specifically mentioned in the Rule. That court did not invalidate HUD's burden-shifting framework as a whole and did not dispute that the FHA extends to the homeowners insurers. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019). This variance in the case law only bolsters HUD's case-by-case approach to disparate-impact liability for insurers. *Cf.* AR 1816–17 n.50, AR 32787.

rulemaking—and indeed incorporated them into the standard set forth in the regulation.[33] *See* AR 613, 617–18; AR 32767, 32770–75.

PCI also points to the Court's warning against "solely [relying] on a showing of statistical disparity" to prove discriminatory impact," Pl.'s Mem. at 24 (quoting *Inclusive Cmtys*, 576 U.S. at 540). But "[t]he Supreme Court did not indicate that HUD's burden-shifting approach violates this principle." *PCI II*, 2017 WL 2653069, at *8. Rather, both the language of the Rule and its preamble explain that a showing of a statistical disparity alone would be insufficient to show disparate-impact liability under the Rule, and a plaintiff "point to a defendant's policy or policies causing that [statistical] disparity." *Inclusive Cmtys.*, 576 U.S. at 542; *see* 24 C.F.R. § 100.500 ("[T]he plaintiff ... has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."); AR 612, 621 (same); AR 32794 n.273 (same).

PCI further cites the Court's statement that "policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers,'" *Inclusive Cmtys.*, 576 U.S. at 543 (quoting *Griggs,* 401 U.S., at 431); Pl.'s Mem. at 24. HUD reasonably concluded that the Court was referencing a "short-hand formulation for the type of policy that traditionally has been held to create an unjustified discriminatory effect," rather than creating a new limitation. AR 32775. But even assuming that this language did create a new limitation, the Rule complies with it. The second and third steps of the Rule's burden-shifting approach protect a covered entity from liability based on "second-guess[ing]" a policy choice between "two reasonable approaches," 576 U.S. at 541, by imposing liability only where a challenged practice is unnecessary to achieve a substantial, legitimate, non-discriminatory interest or a plaintiff fails to show that the interest could be served by a less discriminatory-in-effect practice. *See* 24 C.F.R. § 100.500(c)(2)–(3); *Johnson v. City of Memphis*, 770 F.3d 464, 472 (6th Cir. 2014).

And finally, contrary to PCI's claim, *see* Pl.'s Mem. at 24–25, the Supreme Court did not

---

[33] As this Court has recognized, *see PCI II*, 2017 WL 2653069, at *8–9, the Rule complies with the liability limitations discussed by the Court and cited by PCI.

indicate that HUD's burden-shifting regime would "inject racial considerations" into housing decisions, 576 U.S. at 543, and the Rule does not in fact do so. Rather, the Rule precludes race from being used by barring "facially neutral practices that have an *unjustified* discriminatory effect on the basis of a protected characteristic," AR 32763 (emphasis added), consistent with the Court's recognition that disparate-impact liability under the FHA does not cause race to be used in an impermissible way. *See, e.g.*, 576 U.S. at 538–41 (endorsing disparate-impact liability, which the Court describes as making unlawful facially neutral practices that disproportionately affect minorities "without any sufficient justification"). The Rule thus complies with the limitations discussed in *Inclusive Communities*.

## IV. IF HUD'S CONSIDERATION OF *INCLUSIVE COMMUNITIES* AND ADDITIONAL EXPLANATIONS REMAIN INSUFFICIENT, REMAND, NOT VACATUR, IS THE APPROPRIATE REMEDY

Defendants have shown that HUD's 2023 Rule adequately considered *Inclusive Communities* and adequately explained why home insurers are not entitled to a categorical exemption from the Rule. *See, supra*, at 25–49. If, however, this Court finds that HUD's consideration of *Inclusive Communities* and its additional explanations about why home insurers are not entitled to a categorical exemption from the 2023 Rule insufficient, remand, rather than vacatur, remains the appropriate remedy. *See Biden v. Texas*, 142 S. Ct. 2528, 2544 (2022) ("[U]pon finding that the grounds for agency action are inadequate, 'a court may remand to the agency' …. [to] offer 'a fuller explanation of the agency's reasoning at the time of the agency action.'" (quoting *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020)). Courts "have therefore frequently remanded without vacating when a rule's defects are curable." *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016) (per curiam)*.* This is exactly what this Court correctly did in 2014, *see PCI I*, 66 F. Supp. 3d at 1054, and Plaintiff fails to offer a sufficient reason for a different remedy now.

Plaintiff nevertheless contends that vacatur of the Rule as applied to home insurers is now appropriate because of the alleged harm that "would flow … from leaving the Rule's application

to risk-based pricing and underwriting in place" Pl.'s Mem. at 26. But, as Defendants explained above, *see, supra*, at 12–19, Plaintiff has failed to show any actual or imminent harm that the Rule has caused to its members. Indeed, given that the Rule has been in effect for ten years and several courts have addressed FHA discriminatory-effects claims brought against home insurers over the last four decades and, contrary to PCI's contention, *see* Pl.'s Mem. at 26, vacating the Rule now should the Court find HUD's explanation inadequate would in fact be "an invitation to chaos." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Plaintiff fails to show that any deficiencies in the Rule are serious or that vacatur is necessary even though it has been living with the Rule for ten years. If HUD's explanations are inadequate, remand remains the proper remedy.

## CONCLUSION

For these reasons, this Court should grant summary judgment in favor of Defendants.

Dated: September 26, 2023

                                                 Respectfully Submitted,

                                                 SARAH HARRINGTON
                                                 Deputy Assistant Attorney General

JEANINE M. WORDEN                    LESLEY FARBY
Associate General Counsel for Fair Housing    Assistant Branch Director
ALLEN LEVY
Acting Assistant General Counsel for Fair      /s/ James D. Todd, Jr.
Housing Enforcement                    JAMES D. TODD, JR.
PAUL I. OSADEBE                     VINITA B. ANDRAPALLIYAL
JULIA DYKSTRA                     BRIAN C. ROSEN-SHAUD
Trial Attorneys                     United States Department of Justice
U.S. DEPARTMENT OF HOUSING       Benjamin Franklin Station
AND URBAN DEVELOPMENT         P.O. Box 883
                                           Washington, DC 20044
*Of Counsel*                      (202) 514-3378
                                           (202) 305-0845
                                         (202) 305-7667
                                         james.todd@usdoj.gov
                                         vinita.b.andrapalliyal@usdoj.gov
                                         brian.c.rosen-shaud@usdoj.gov

                                         *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that, on September 26, 2023, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

/s/ James D. Todd, Jr.
JAMES D. TODD, JR.