**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Chief Judge Rebecca R. Pallmeyer |
| MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**BRIEF OF AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, CHICAGO AREA FAIR HOUSING ALLIANCE, CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL CONSUMER LAW CENTER AND NATIONAL FAIR HOUSING ALLIANCE AS *AMICUS CURIAE* IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

STATEMENT OF INTEREST ................................................................................................ 1

INTRODUCTION ................................................................................................................... 3

STANDARD OF REVIEW ..................................................................................................... 6

ARGUMENT .......................................................................................................................... 7

    I.   Blanket Exemption from Disparate Impact Liability Would Not Promote Efficiency and Would be Over-Inclusive ......................................................................................... 7

        A.  The Insurance Industry's Long and Well Documented History of Discrimination Further Supports HUD's Decision not to Exempt the Business of Homeowners Insurance from Disparate Impact Liability ........................................................... 8

        B.  Determining Whether a Policy or Practice Is Risk-Based Requires an Intensive Case-by-Case Analysis ............................................................................................ 10

        C.  The Widespread Use of Price Optimization Illustrates the Inefficiency of Exempting the Business of Homeowners Insurance from Discriminatory Effects Liability ........ 12

    II.  Discriminatory Effects Liability Is Compatible with the Business and Practices of Insurance, and HUD Adequately Responded to Comments Claiming Otherwise ........... 15

    III. The Presence of Significant Differences in State Law Regarding Both Insurance and Housing Discrimination Protections Supports HUD's Case-by-Case Approach ........... 19

        A.  Several States Subject Insurance-Related Practices to Disparate Impact Liability, so the Imposition of Disparate Impact FHA Liability in Those States Would Not Impair State Insurance Regulation ............................................................................... 19

        B.  States Vary in Their Application of the Filed-Rate Doctrine, which Further Bolsters HUD's Case-by-Case Approach ............................................................................. 21

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009) ...................................................22

*Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968) ...........................7

*Bhasker v. Kemper Cas. Ins. Co.*, 284 F. Supp. 3d 1191 (D.N.M. 2018) ....................................21

*Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091 (W.D. Wash. 2007) ...................21, 23

*Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790 (Iowa 2011) .................19

*Castillo v. Johnson*, No. CV-17-04688-PHX-DLR, 2019 WL 4222289 (D. Ariz. Sept. 5, 2019) ..................................................................................................................................21, 23, 24

*Cohen v. American Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013) ...................................................22

*Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238 (Conn. 1999) ...19

*Corbin v. Allstate Corp.*, 2019 IL App (5th) 170296, 140 N.E.3d 810, appeal denied, 124 N.E.3d 464 (Ill. 2019) ...........................................................................................................................22

*Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) ............................................................19

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) .....................................................................6

*Doe v. Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999), cert. denied 528 U.S. 1106 (2000) ........7

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .........................................................6

*Gelb v. Am. Tel. & Tel. Co.*, 813 F. Supp. 1022 (S.D.N.Y. 1993) ................................................22

*Hoover v. HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223 (N.D.N.Y. 2014) ...............................21

*Humana, Inc. v. Forsyth*, 525 U.S. 299 (1999) ......................................................................10, 20

*Huntco Pawn Holdings, LLC v. U.S. Dep't of Defense*, 240 F. Supp. 3d 206 (D.D.C. 2016) ......18

*Huskey v. State Farm Fire & Casualty Co.*, 2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) .........20

*Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851 (7th Cir. 2003) .................................6, 18

*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979) ...................................................6

*Krukas v. AARP*, 376 F. Supp. 3d 1 (D.D.C. 2019) .......................................................24

*Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093 (N.D. Cal. 2013) ...........................21

*Leo v. Nationstar Mortg. LLC*, 964 F.3d 213 (3d Cir. 2020) ..........................................22

*Lumpkin v. Farmers Grp.*, No. 05– 2868, 2007 U.S. Dist. LEXIS 98949 (W.D. Tenn. July 6, 2007) ....................................................................................................................12

*Mackey v. Nationwide Ins.*, 724 F.2d 419 (4th Cir. 1984) ...........................................23

*Malibu Inv. Co. v. Sparks*, 996 P.2d 1043 (Utah 2000) ...............................................19

*Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998) ...................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ....6

*NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) ................................3, 9

*Nat'l Ass'n of Mutual Ins. Cos. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 13-966, 2023 WL 6142257 (D.D.C. 2023) .....................................................................................................5, 11

*Nat'l Fair Hous. All., et al. v. Carson*, No. 3:20-cv07388 (D.D.C. filed Oct. 22, 2020) ..............2

*Open Communities All.et al. v. Carson*, No. 3:20-CV-01587 (D. Conn. Filed Oct. 22, 2020) ......2

*Patel v. Specialized Loan Servicing*, LLC, 904 F.3d 1314 (11th Cir. 2018) ...............................22

*Perryman v. Litton Loan Servicing, LP,* No. 14-CV-02261-JST, 2014 WL 4954674 (N.D. Cal. Oct. 1, 2014) ..............................................................................................................23

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739 (9th Cir.1996) .....................................6

*Pink Dot, Inc. v. Teleport Commc'ns Grp.*, 89 Cal. App. 4th 407 (2001) ...................................21

*Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018 (N.D. Ill. 2014) ..............4, 15

*Qwest Corp. v. Kelly*, 204 Ariz. 25 (Ct. App. 2002) ....................................................21

iv

*Satellite Sys., Inc. v. Birch Telecom of Oklahoma, Inc.*, 51 P.3d 585, 588 (Okla. 2002) ............22

*Saunders v. Farmers Ins. Exch.*, 440 F.3d 940 (8th Cir. 2006) ...................................................23

*Saville v. Quaker Hill Place*, 531 A.2d 201 (Del. 1987) ..............................................................19

*State of Ind., Civ. Rights Comm'n v. Cty. Line Park, Inc.*, 738 N.E.2d 1044 (Ind. 2000) ...........19

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project,* 576 U.S. 519 (2015) ..................................................................................................................................2, 4, 27

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972) ....................................................9

*United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240 (2d Cir. 1977) ........................6, 7

*Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) ............................................................20

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994) ........................................................21

**Statutes**

5 U.S.C. § 706(2)(A) .....................................................................................................................6
5 U.S.C. § 553(c) ..........................................................................................................................6
Cal. Gov't Code § 12955.8 (West 2012).................................................................................... 19
D.C. Code § 2-1401.03 (2012).................................................................................................... 19
N.C. Gen. Stat. § 41A-5(a)(2) (West 2009) ............................................................................... 19

**Other Authorities**

Casualty Actuarial and Statistical Task Force of the National Association of Insurance Commissioners, Price Optimization White Paper (Nov. 19, 2015)...................................13

Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. (1994) ............................................................................3, 10

Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix, 7, 10 (2014) ...........13

NAIC, 2 *Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty* II–PA– 10–21 (2011) ....................................................................................................................23

National Consumer Law Center & Center for Economic Justice, *Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the Economic Racial Divide* 4

(June 2007) .................................................................................................................12

*S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert
    Hunter, former Texas Insurance Commissioner) ..............................................................9

**Regulations**

81 Fed. Reg. 69,012 (Oct. 15, 2016) .............................................................................8
88 Fed. Reg, 19, 450 (Mar. 31, 2023) ...........................................................................8
24 C.F.R. § 100.500(c) (2013) .....................................................................................10
Florida Office of Insurance Regulation, *Use of Price Optimization in Premium Determination*,
    Informational Memorandum OIR-15-04M (May 14, 2015) .............................................14
Virginia Bureau of Insurance, *Compliance with Statutory Rate Standards in File-and-Use Lines of
    Insurance*, Virginia Administrative Letter 2016-03 (April 15, 2016) ..............................14

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan organization dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws. The American Civil Liberties Union of Illinois ("ACLU-IL") is a state affiliate of the national ACLU and a statewide, non-profit, non-partisan organization with more than 50,000 members dedicated to protecting and defending civil rights and civil liberties and promoting fairness and dignity for all people in Illinois. Chicago Area Fair Housing Alliance ("CAFHA") is a non-profit membership association of organizations, governmental bodies, and individuals working to combat housing discrimination and promote equitable place-based opportunity through education, advocacy, and collaborative action. Chicago Lawyers' Committee for Civil Rights ("CLCCR") is a public interest law organization founded in 1969 that works to secure racial equity and economic opportunity for all. Lawyers' Committee for Civil Rights Under Law ("LCCRUL") is a non-partisan, nonprofit organization that was formed in 1963 at the request of President John F. Kennedy to secure equal justice for all through the rule of law, targeting the inequities confronting Black Americans and other people of color. National Consumer Law Center ("NCLC") is a national research and advocacy organization focusing on justice in consumer financial transactions, especially for low-income and elderly consumers. National Fair Housing Alliance ("NFHA") is a consortium of approximately 167 private, non-profit, fair housing organizations, state and local civil rights groups, and other organizations dedicated to fair housing advocacy.

---

[1] Full descriptions of the *amicus* party organizations and their historic and current Fair Housing Act work are included in the *Motion for Leave to file a Brief Amicus Curiae* (Doc. #287).

All *amici* are committed to vigorous enforcement of the Fair Housing Act ("FHA") and have actively used and/or supported disparate impact analysis in their efforts to ensure non-discrimination in all aspects of the housing market, including the provision of homeowners insurance. In addition, all amici submitted comments in support of the HUD regulation at issue here. In 2020, when HUD attempted to replace the 2013 Rule, multiple *amici* filed, or were counsel on, lawsuits arguing that the new rule was inconsistent with the FHA. *Nat'l Fair Hous. All., et al. v. Carson*, No. 3:20-CV-07388 (D.D.C. filed Oct. 22, 2020); *Open Communities All. et al. v. Carson*, No. 3:20-CV-01587 (D. Conn. filed Oct. 22, 2020). *Amici's* experience raising disparate impact claims under the FHA – including claims of discrimination by homeowners' insurance providers – and their consistent support of the HUD regulation provide the Court with a unique perspective on the issues in this case and will assist the court beyond what the parties can provide.

In 2015, building on forty-five years of unanimous precedent from all eleven federal courts of appeals to have addressed the issue, the U.S. Supreme Court held that disparate impact claims are authorized by the text, structure, and history of the FHA. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. 519 (2015) ("*ICP*"). That decision is consistent with and alluded to HUD's long-standing interpretation of the FHA. Long before HUD formally promulgated its Discriminatory Effects Rule in 2013 and reinstated the same in 2023 – the subject of this Administrative Procedure Act challenge – facially neutral housing practices, including those related to the pricing and underwriting of homeowners insurance, had been struck down under disparate impact liability where they are based on no legitimate business justification, yet operate to deprive people of color, persons with disabilities, families with children, and others on the basis of protected characteristics from the full range of housing products and services available.

Homeowners insurance is an effective prerequisite to home mortgage credit. It is necessary, therefore, for protected groups to have equitable access to insurance to realize the dream of homeownership. Thus, disparate impact analysis has long provided an essential tool for identifying and ending patterns, practices, and policies that have a disproportionately negative impact on the ability of protected groups to participate in the market for owner-occupied homes.

Without disparate impact liability, there will be a significant hole in the effort to comprehensively address pervasive and covert housing discrimination, which would be inconsistent with Congressional intent.

## INTRODUCTION

It is well-established that home insurance is an integral component of home ownership. *N.A.A.C.P. v. Am. Fam. Mut. Ins. Co*., 978 F.2d 287, 297 (7th Cir. 1992) ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."). Indeed, discrimination in access to housing insurance has played a sizable role in creating the race-based inequality in housing that exists today. See generally, *Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs*, 103d Cong. (1994). Insurance companies have deployed myriad practices to deny people of color access to insurance. *Id*. Though many of these policies began as explicit bars on people of color obtaining insurance, they have evolved into more covert forms of discrimination that still pervade our housing market. Combined with the discriminatory practices of other industries that make up the real estate market, these practices have resulted in stark disparities: as of 2020, 73.7% of white families own homes, whereas just 44% of Black families do. *Id.* This gap is the direct result of our country's shameful legacy of systemic discrimination against Black people, particularly in the realm of real estate and property ownership where homeowners' insurance is a prerequisite. *Id.*

Though de jure segregation is no longer permitted, the vestiges of these discriminatory systems remain, such that the inequalities resulting from centuries of state-sanctioned racism persist. Black individuals and families have been historically precluded from accumulating wealth, such that policies that exclude people from housing based on income will have discriminatory effects on Black communities. HUD rightfully recognized the need for tools to combat these more covert forms of discrimination by promulgating its 2013 HUD Discriminatory Effects Rule ("2013 Rule"). Just three years later, the Supreme Court in *ICP* affirmed the disparate impact standard as central to the goals of the FHA. *Inclusive Communities Project*, 576 U.S. 519.

Plaintiff in the case at hand has once again attempted to erode HUD's decision to adopt a balanced, uniform disparate impact standard and HUD has responded to those challenges in its 2016 Notice and again in its 2023 Rule. Since 2013, Plaintiff has lobbed what are essentially the same challenges at the rule, claiming that the 2013 Rule was invalid purportedly because the FHA does not permit disparate impact liability, because the rule was contrary to law, and because HUD had not sufficiently considered all of Plaintiff's concerns, rendering HUD's action arbitrary and capricious. Plaintiff has not made any new arguments, so, in effect, what is before this Court is an attempt to second-guess prior, well-grounded holdings. Plaintiff also filed an amicus curiae brief in *ICP*, reiterating its view that the FHA does not allow for disparate impact claims. Brief for the American Insurance Association, the National Association of Mutual Insurance Companies, and the Prop. Casualty Insurers Association of America as Amici Curiae Supporting Petitioners, *Inclusive Communities Project,* 576 U.S. 519. The Supreme Court decisively dismissed this argument in *ICP*, and this court explicitly held that HUD's conclusions were not contrary to law. *Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1048-50 (N.D. Ill. 2014) This court did express concern that HUD had not sufficiently addressed all of Plaintiff's comments and

thus remanded for further consideration, specifically asking HUD to consider Plaintiff's claims that the Rule was incompatible with 1) the McCarran-Ferguson Act; 2) the Filed-Rate Doctrine; and 3) the nature of insurance generally. *Id.* at 48-50. Thus, the question in this case is simply whether HUD adequately responded to Plaintiff's comments in their 2016 Notice and 2023 Rule. Plaintiff, of course, claims that HUD's supplementary explanation and extensive explanation in the 2023 Rule did not sufficiently respond to Plaintiff's concerns—that HUD was mistaken in refusing to exempt the insurance industry, or at the very least its use of risk-based decision-making, from said liability. But in their attempts to invalidate HUD's rule at all costs, Plaintiff disregards longstanding principles of administrative and insurance law, which is subject to extensive state to state variation that would render the creation of an exemption unworkable, and, consistent with the recent decision of the U.S. District Court for the District of Columbia, summary judgment in favor of Defendants is warranted. *See Nat'l Ass'n of Mutual Ins. Cos. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 13-966, 2023 WL 6142257 (D.D.C. 2023) (granting summary judgment to HUD and denying the plaintiff-trade association's motion for summary judgment in a challenge to the application of HUD's discriminatory effects rule to the business of homeowners insurance). Indeed, several states have long applied disparate impact liability to the business of homeowners insurance, a fact that is both consistent with the highly regulated nature of insurance as an industry and that illustrates that no parade of horribles is likely to result from HUD restating existing law.

## STANDARD OF REVIEW

"Review of an agency's action under the arbitrary and capricious standard is narrow and highly deferential." *Prop. Cas. Insurers Ass'n of Am.*, 66 F. Supp. 3d at 1046. In evaluating whether an agency action violates 5 U.S.C. § 706(2)(A), "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the

authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983). Put another way, courts will uphold agency action so long as the agency has articulated a "rational connection between the facts found and the choice made," *id.*, and "the decision is not a clear error of judgment." *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858-59 (7th Cir. 2003) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 L.Ed.2d 377 (1989)); See also *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) ("Our scope of review is narrow: we determine only whether the Secretary examined the relevant data and articulated a satisfactory explanation for his decision, including a rational connection between the facts found and the choice made.") (internal citations omitted).

While a court may find that an agency that fails to meet this standard has acted in an "arbitrary and capricious manner," it may not simply substitute its judgment for the judgment of the agency. See *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Moreover, "HUD's interpretation is significant to the court's analysis because HUD's interpretation of the FHA 'ordinarily commands considerable deference,' as 'HUD [is] the federal agency primarily assigned to implement and administer Title VIII.'" *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 747 (9th Cir.1996) (quoting *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20 (1979)).

When agencies act through the notice and comment rule-making process, the APA requires them to consider comments received during the notice-and-comment period and to explain their reasons for not adopting the views set forth in substantive comments. See 5 U.S.C. § 553(c); *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977) ("It is not in keeping with the rational process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered."). But in evaluating whether the agency sufficiently

responded to stakeholders' concerns in the notice and comment period, the courts "do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking." *Nova Scotia Food Prod. Corp.*, 568 F.2d at 252 (citing *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)).

## ARGUMENT

Applying this deferential standard to the case at hand, HUD's refusal to exempt the insurance industry was rational and reasonable given the administrative record, and Plaintiff's claims that this decision was arbitrary and capricious lacks support in both the law and fact. Indeed, declining to apply the FHA's disparate impact standard to the business of insurance would undermine Congress's intent and would enable insurers to continue the discriminatory practices that have excluded communities of color from homeownership for decades.

## I. Blanket Exemption from Disparate Impact Liability Would Not Promote Efficiency and Would be Over-Inclusive.

PCIA unconvincingly argues that applying the 2023 Disparate Effects Rule's burden-shifting framework to the business of homeowners insurance would be inefficient because claims against insurance companies will categorically fail. Specifically, they claim that 1) federal courts are precluded from passing judgment on whether insurance practices are actuarially sound and/or consistent with state law by the McCarran-Ferguson Act, as interpreted by the Seventh Circuit in *Doe v. Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999), cert denied 528 U.S. 1106 (2000), and 2) homeowner's insurance policies and practices are inherently risk-based, such that disparate impact liability is not compatible with the nature of insurance. Doc. #274 (Pl.'s 2nd Am. Compl.); Doc. # 283 (Pl.'s Mem. in Supp. Mot. Summ. J. at 8-9).

These challenges ignore that HUD would not be able to fulfill its obligations under the FHA were it to grant the exemptions sought by the insurance industry. HUD's mandate is to eradicate discrimination in all sectors of the housing industry and Congress did not create an exception to the statue for the insurance industry. The insurance industry's long and well documented history of engaging in discriminatory practices, which HUD described in detail in its 2016 Notice and 2023 Rule, require HUD to apply the disparate impact rule to the insurance industry.

Further, HUD addressed these points in full in both its 2016 Notice, Federal Regulations for Department of Housing and Urban development, 81 Fed. Reg. 69,012, (Oct. 15, 2016), and in its 2023 Rule, Federal Regulations for the Department of Housing and Urban Development, 88 Fed. Reg. 19,450, (Mar. 31, 2023). In addition to Plaintiff's incorrect assumption that disparate impact claims challenging risk-based policies would categorically fail, Plaintiff misses another important point: in order to narrowly exempt risk-based policies and practices, HUD would have to go through a case-by-case determination of whether a policy or practice is risk-based and entitled to the exemption. This process would be just as intensive as the current application of the burden shifting framework under the 2023 Rule.

A.   *The Insurance Industry's Long and Well Documented History of Discrimination Further Supports HUD's Decision not to Exempt the Business of Homeowners Insurance from Disparate Impact Liability*

HUD is correct in concluding that it cannot exempt the business of insurance from disparate impact liability without contravening the text and purpose of the Act because of historic discrimination in the insurance industry. Congress did not authorize an exception for insurance like it did for other practices, and Congress intended the Fair Housing Act to have a broad impact, eradicating discriminatory practices in all sectors of the housing industry. 88 Fed. Reg. 19,463-64;

- 8 -

*see also* 42 U.S.C. § 3601 (stating that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States"). HUD explains that the plain text and purpose of the Act make clear that it was meant to apply to all sectors of the housing industry by banning actions by and or outcomes created by any actor in the sector. *Id.* (citing *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992) (noting that Congress banned an outcome while not saying who the actor is and holding that the Act applies to insurers); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211 (1972) (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits))).

Discrimination in the insurance industry based on race and other protected traits is longstanding and well documented. 88 Fed. Reg. 19,467 (citing ; Insurance Redlining: Fact Not Fiction (Feb. 1979) [hereinafter Comm'n on Civil Rights] (report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the U.S. Commission on Civil Rights) (''The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written.''); Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. (1994) (noting the ''disparate impact on minority communities'' of property age and value requirements, and explaining that ''47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000'' and that ''40 percent of black households compared to 29 percent of white households live in homes build before 1950.'')). This history itself shows that, to fulfill the purpose of the Act, HUD must not exempt the business of insurance from disparate impact liability. As overt discrimination became unlawful, the insurance industry denied coverage or provided coverage on unfair terms by turning to facially race-neutral factors that were correlated more strongly with race or other protected traits than risk of loss, such as a

property's location, age, or whether the property owner planned to rent to Housing Choice Voucher holders. *Id.* at 19,468. Many of these factors were later banned as discriminatory. *Id.* at 19,469.

Disparate impact claims can be used to uncover masked discriminatory intent and or to counteract unconscious bias that lead to policies and practices that are more closely correlated with protected traits than they are with risk. *Id.* at 19,464. Thus, the insurance industry's long history of discrimination makes it necessary to subject insurance practices to disparate impact liability so more subtle discriminatory practices are not allowed to escape scrutiny.

### B. Determining Whether a Policy or Practice Is Risk-Based Requires an Intensive Case-by-Case Analysis.

The McCarran-Ferguson Act only restricts "those applications of federal law that directly conflict with state insurance laws, frustrate a declared state policy, or interfere with a state's administrative regime." *Humana v. Forsyth*, 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application."). HUD's burden-shifting standard consists of three steps: first, the plaintiff must demonstrate that the defendant's practice has a disparate impact on a protected group or perpetuates segregation. 24 C.F.R. § 100.500(c)(1) (2023). Second, if a plaintiff carries their burden, then the burden shifts to the defendant to show that the policy or practice is necessary to serve one or more substantial, legitimate, nondiscriminatory interests. 24 C.F.R. § 100.500(c)(2) (2023). Finally, the burden shifts back to the plaintiff to show that, even if the policy or practice is justified, a less discriminatory alternative would also serve the defendant's interests. 24 C.F.R. § 100.500(c)(3) (2023).

PCIA argues that such a burden-shifting framework would be inefficient, as it would require a lengthy, fact-intensive process to determine 1) whether a practice is necessary to serve a substantial, legitimate business purpose, and 2) if there is a less discriminatory alternative to the practice. But, as HUD points out, this argument overstates how easy the process of creating an exemption to liability for risk-based practices would be. 88 Fed. Reg. 19,474. HUD would need to outline narrow and highly specific rules to govern how an insurer could prove a practice was exempt. Whether a practice qualified for an exemption would itself be a lengthy, fact-intensive determination that would require the defendant to produce the same arguments and evidence that would be necessary at step two of the rule's burden-shifting framework. 88 Fed. Reg. 19,479. HUD explained that the 2023 Rule's case-by-case approach best allows it to enforce the FHA, as it considers the variety of insurance practices that might be subject to disparate impact liability, both present and future. The diversity and ingenuity of insurer practices makes it nearly impossible to define the scope of exempted practices in a way that would avoid case-by-case disputes. 88 Fed. Reg. 19,465. Thus, HUD has determined that categorical exemptions or safe harbors are "unworkable and inconsistent with its statutory mandate." *Id.*; *see also Nat'l Ass'n of Mutual Ins. Cos.*, No. 13-966, 2023 WL 6142257, at *10 (D.D.C. 2023) (*citing Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 408 (Mass. 2016).

The fact that insurers regularly engage in practices that combine risk-based decision-making with more subjective factors supports this conclusion. For example, practices such as ratemaking, which are largely actuarially based, can nonetheless incorporate elements of non-actuarially based subjective judgment or discretion under law. 88 Fed. Reg. at 19,468. *See* Powers, in *Insurance Redlining* at 119 ("Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or

- 11 -

measurable probability of risk." (quoting *S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner)) ("Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes."). Accordingly, creating a broad exemption for risk-based policies would be overinclusive and have the effect of shielding discriminatory practices that are unrelated to risk.

Even if practices are predominantly based on actuarial decision-making, that does not preclude a potential finding that they have an illegal disparate impact. *See* National Consumer Law Center & Center for Economic Justice, *Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the Economic Racial Divide* 4 (June 2007). Take, for example, credit scores, which are frequently accounted for in insurer's risk-based analyses. This is even though multiple studies have concluded that credit scores are themselves a combination of historically biased indices, such that reliance on them has the effect of exacerbating long standing race-based economic inequality. As HUD noted in both its 2016 Notice and 2023 Rule, the court in *Lumpkin v. Farmers Group* found that certain credit scoring practices have a disparate impact and that, even if they have some predictive value, there are other, less discriminatory alternatives. 88 Fed. Reg. 19,475 (citing *Lumpkin v. Farmers* Grp., No. 05– 2868, 2007 U.S. Dist. LEXIS 98949, at *19 (W.D. Tenn. July 6, 2007)). In other words, an insurance practice can have an illegal disparate impact even if it is predominantly derived from risk-based decision-making. A broad exception for such practices would therefore protect unlawful practices.

C. *The Widespread Use of Price Optimization Illustrates the Inefficiency of Exempting the Business of Homeowners Insurance from Discriminatory Effects Liability*

Price optimization is a particularly pernicious example of a common homeowners insurance practice that is not risk-based, and that McCarran-Ferguson would not shield from discriminatory effects liability.

In recent years, many insurers have begun to set rates using data-driven price optimization. Data-driven price optimization occurs when the insurer engages in "data mining of insurance and noninsurance databases of personal consumer information, … advanced statistical modeling or both to select prices that differ from the indicated rates at a very detailed or granular level." Nat'l Ass'n of Ins. Comm'rs, Price Optimization White Paper 1 (Nov. 19, 2015), http://www.naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf . Put simply, this practice allows insurers to charge the greatest possible rate without losing the consumer's business. *Id.* at 2. For example, an insurer's actuaries may determine a fair and reasonable price for an insurance product in a specific geographic area based on risk and expected loss. Using price optimization, the company may reject that price and set a price based on maximum profitability. Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix, 7, 10 (2014) (listing certain competitive adjustments that are often made to predicted loss costs during the rate-setting process). According to HUD, determining if a specific practice, such as price optimization, is sufficiently "risk-based" to qualify for Plaintiff's proposed liability exemption would in itself require consideration of the same arguments and evidence as would be required in the Rule's burden-shifting framework. 88 Fed. Reg 19,479. Moreover, price optimization strategies can undoubtedly have an illegal disparate impact—even when combined with risk-based decision-making. To assume otherwise would be to simply take insurance adjusters and actuaries at their word that they will not discriminate against communities of color – an

assumption that runs counter to the history of racially discriminatory practices that informed passage of the FHA. 88 Fed. Reg. 16,497-8 (detailing the history of racial discrimination in the insurance industry).

Growing concern over the potential discriminatory effects of data-driven price optimization has led 19 states to determine that data-driven price optimization constitutes illegal discrimination. *See* Florida Office of Insurance Regulation, *Use of Price Optimization in Premium Determination*, Informational Memorandum OIR-15-04M (May 14, 2015) ("[p]rice optimization involves analysis and incorporation of data not related to expected cost for risk characteristics . . . Therefore, the use of price optimization results in rates that are unfairly discriminatory in violation of Sections 627.062 and 627.0651, Florida Statutes.");[2] *see also* Virginia Bureau of Insurance, *Compliance with Statutory Rate Standards in File-and-Use Lines of Insurance*, Virginia Administrative Letter 2016-03 (April 15, 2016) (stating that it is a violation of Virginia state law to use "price optimization techniques intended to maximize overall retention, profitability, written premium or market share based on how much of a premium increase an individual policyholder is likely to tolerate before seeking coverage with other carriers.").

State regulators' curtailing of price optimization practices clarifies that the application of discriminatory effects liability to those practices would not impair state insurance law, nor would the creation of exemptions have a basis in law. Further, determining whether each use of price optimization was sufficiently risk-based would be inefficient in the extreme. HUD was right in 2013 and again in 2023 to determine that both the Department and the courts could thoughtfully

---

[2] https://www.floir.com/siteDocuments/OIR-15-04M.pdf.

and appropriately evaluate these policies and practices on a case-by-case basis using the burden-shifting framework.

## II. Discriminatory Effects Liability Is Compatible with the Business and Practices of Insurance, and HUD Adequately Responded to Comments Claiming Otherwise.

Applying the deferential arbitrary and capricious standard to the case at hand, HUD adequately responded to the Plaintiff's request to exempt risk-based pricing and underwriting of insurance from disparate-impact liability, and its concern that the rule is fundamentally incompatible with the nature of insurance. Since the first notice-and-comment period leading up to HUD's 2013 Rule, PCIA has claimed that the application of disparate impact liability would force insurers to introduce considerations in their processes that would undermine and potentially destroy the actuarial process. In its 2013 Rule, HUD explained that these concerns were "misplaced," as it would not make any policy or practice that causes a disparate impact *per se* illegal; defendants or respondents would still be able to justify their policy or practice at the second step of the burden shifting framework. *See* 2013 Rule, 78 Fed. Reg. at 11,460 (Feb. 15, 2013). More generally, HUD explained that broad exemptions, such as that requested for the business of insurance, would undermine Congress's intent in enacting the FHA, which was to root out the various forms of discrimination in housing and to provide for fair housing throughout the United States. *Id.* PCIA argued these explanations were insufficient, and this Court agreed, deeming the level of detail and specificity in HUD's explanation of its refusal to make broad exceptions arbitrary and capricious before remanding the rulemaking to HUD. *Prop. Cas. Insurers Ass'n of Am.*, 66 F. Supp. 3d at 1051 ("HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden shifting framework.").

HUD's 2016 Notice, however, robustly addressed those concerns. *See* 81 Fed. Reg. at 69,014-197 (October 5, 2016). Contrary to Plaintiff's claims, HUD explained that the insurance industry is replete with practices in which insurers consider certain non-actuarial factors in making decisions, such as "marketing and claims processing and payment." *Id.* at 16,017. Moreover, HUD noted that ratemaking—frequently a risk-based decision-making process—often involves consideration of subjective factors outside of actuarial concerns. *Id.* HUD observed that the industry's long-time consideration of subjective, non-risk-based factors has not led to the inevitable demise of the entire industry. *Id.* Further undermining Plaintiff's argument—and as explained in greater detail below—is that some states have imposed the same requirement as HUD to avoid the imposition of unjustified discriminatory effects. *Id.* at 69,015. Moreover, other risk-based industries, such as mortgage lending, are subject to disparate impact liability and have not had to forego risk-based analysis in their entirety to avoid FHA liability. *Id.* In addition to explaining why a blanket exemption is undesirable, HUD further elaborated on the benefits of a case-by-case approach to assessing disparate impact claims. *Id.* at 69,017-08. Specifically, a blanket exemption would prevent the development of alternative policies that serve both parties' interests, consistent with the third step of the burden-shifting framework. As HUD explained, it would be impossible for insurers to argue that, in every situation, there is no other policy which might serve their same interests, especially with changes in technology and the sophistication of risk analysis. *Id.* at 69,017.

In the 2023 Rule, HUD once again reiterated and expanded on its reasoning to decline to exempt the insurance industry in whole or in part from disparate-impact liability, including in direct response to Plaintiff's request for an exception to the Rule for risk-based pricing and underwriting of insurance. *See* 2023 Rule, 88 Fed. Reg. at 19,463-65. As a threshold matter, HUD

explained that it lacks the authority to create exemptions or safe harbors that are not in the text of the FHA, including because to do so would contravene the plain text, broad remedial purpose, and structure of the Act. *Id.* at 19,463. HUD emphasized that this is especially true with respect to insurance because of the critical role that it plays in housing. *Id.* at 19,464. Additionally, HUD explained that even if it had the authority to craft categorical exemptions for insurance, it would neither be workable nor consistent with the purposes of the FHA, including for the reasons described in its 2016 Notice. *Id.* HUD reiterated that the case-by-case approach provided in the 2023 Rule appropriately "weighs the relevant factors, which include HUD's obligation to enforce the Act, the diversity of potential discriminatory effects claims, the variety of insurer business practices, and the differing insurance laws of the states, as they currently exist or may exist in the future." *Id.* at 19,465.

In the 2023 Rule, HUD also explained that the fundamental nature of insurance does not warrant exemptions from disparate-impact liability for substantially the same reasons it provided in its 2016 Notice. *Id.* at 19,467-70. For example, HUD again made clear that the 2023 Rule does not prohibit risk-based practices but instead provides a "framework for determining if a particular policy or practice causes an unjustified effect." *Id.* at 19,467. It again stressed that risk-based decision making is not unique to insurance, and discriminatory-impact liability has proven workable in other contexts in which such practices are used, such as mortgage lending and, indeed, most housing-related decisions. *Id.* Moreover, as similarly explained in its 2016 Notice, HUD pointed to state laws providing for discriminatory effects liability, which further undermines any claim that such liability is fundamentally at odds with the insurance industry. *Id.* HUD again explained that a broad exemption would immunize a whole host of discriminatory insurance practices, including those that do not involve actuarial or risk-based calculations and underwriting

policies that are not purely risk-based. *Id.* at 19,468. HUD also rejected commenters' invitation to create safe harbors for specific factors, including because the relevance of such factors can vary by context, insurers may use factors in different ways, and the relevance of a factor may change over time. *Id.* at 19,469. Moreover, HUD explained that commenters' concerns about the negative consequences of the 2023 Rule were premised on the faulty assumption that the Rule precludes risk-based practices and undermined by the fact that insurers have been subject to disparate-impact liability for decades without these hypothetical consequences materializing. *Id.* at 19,470.

HUD also explained why Supreme Court precedent does not support an insurance exemption from discriminatory effects liability, *id.* at 19,470 and that claims against insurers will not fail categorically as a matter of law, *id.* at 19,71-72. Finally, HUD explained at length why the 2023 Rule would not upend state insurance regulatory systems, violate the McCarran-Ferguson Act, or run afoul of the filed-rate doctrine, including for the reasons discussed further above and below. *Id.* at 19,472-78.

In short, Plaintiff's request for an exemption for risk-based pricing and underwriting of insurance is not only unwarranted but contrary to the FHA, which HUD specifically and more than adequately addressed in the 2023 Rule. *See, e.g., Huntco Pawn Holdings, LLC v. U.S. Dep't of Defense*, 240 F. Supp. 3d 206, 220-21 (D.D.C. 2016) (explaining that the agency's response "to requests for exemptions *generally*," among other things, adequately addressed the plaintiff's specific requests for exemption (emphasis in original)). Moreover, the concerns expressed in Plaintiff's comments are disconnected from how the insurance industry has actually operated in the decades that it has been subject to disparate impact liability under the FHA, and HUD robustly addressed those concerns its 2016 Notice and again in the 2023 Rule. Undoubtedly, HUD has established a "rational connection between the facts found and the choice made," *Ind. Forest All.*,

325 F.3d at 858–59 (internal quotation marks omitted), thereby complying with the APA and establishing that this Court should grant summary judgment in Defendants' favor.

### III. The Presence of Significant Differences in State Law Regarding Both Insurance and Housing Discrimination Protections Supports HUD's Case-by-Case Approach.

*A. Several States Subject Insurance-Related Practices to Disparate Impact Liability, so the Imposition of Disparate Impact FHA Liability in Those States Would Not Impair State Insurance Regulation.*

PCIA ignores the heterogeneity of states' insurance laws, which—as HUD explains in its 2023 Rule reinstating the Disparate Effects Standard, 88 Fed. Reg. 19450 (Mar. 31 2023) — necessitates a case-by-case determination in lieu of blanket exemptions. Contrary to Plaintiff's claims, the McCarran-Ferguson Act does not preclude *all* disparate impact claims against insurers because insurance regulatory schemes vary dramatically by state. In fact, many states have regulations that complement disparate impact liability under federal law, such that McCarran-Ferguson reverse-preemption is entirely irrelevant. For example, California, North Carolina, and the District of Columbia expressly provide for by statute disparate impact fair housing claims without exemptions for any particular type of business, including homeowners insurers. *See* Cal. Gov't Code § 12955.8 (West 2012); N.C. Gen. Stat. § 41A-5(a)(2) (West 2009); D.C. Code § 2-1401.03 (2012). Additionally, several states' highest courts have interpreted their state fair housing laws to encompass disparate impact claims, even if their statutes do not explicitly use that term or a close equivalent. *See, e.g., Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 255-56 (Conn. 1999); *Saville v. Quaker Hill Place*, 531 A.2d 201, 205-06 (Del. 1987); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790,798-99 (Iowa 2011); *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1050-51 (Utah 2000); *State of Ind., Civ. Rights Comm'n v. Cty. Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000). Whether a state's insurance law will preempt the FHA under the McCarran-Ferguson Act depends, in large part, on which state's law applies.

Furthermore, courts have indicated that a determination of McCarran-Ferguson reverse-preemption requires a case-specific factual inquiry. *See, e.g.*, *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 297 (5th Cir. 2003) (rejecting McCarran-Ferguson reverse-preemption after appellant failed to indicate any state laws or declared regulatory policies which would conflict with federal civil rights statutes); *see also Humana Inc. v. Forsyth*, 525 U.S. 299, 308 (1999) ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise."); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 5 (D.D.C. 1999) (rejecting defendant's argument for McCarran-Ferguson reverse-preemption after noting that Maryland law did not grant the state's Insurance Commissioner exclusive jurisdiction over discrimination claims); *Huskey v. State Farm Fire & Casualty Co.*, 2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) (no direct conflict between Illinois law and plaintiff's disparate-impact claims; rather disparate-impact liability, as applied, seems to complement Illinois insurance law). If anything, the relationship between state insurance regulatory regimes and federal law, as shaped by McCarran-Ferguson, actually *supports* HUD's rejection of PCIA's claim that the McCarran-Ferguson Act entitles them to blanket exemptions. Even if state anti-discrimination law does not provide for disparate impact liability, the comments of Plaintiff and other industry groups did not establish that the imposition of disparate impact liability under federal law would invariably conflict with state law. Some state regulatory requirements establish a baseline, or floor, for anti-discrimination protections in housing. In many cases, the FHA appropriately raises the standard for compliance beyond that established by the state regulations. Because each state's statutory and regulatory regime is different and interacts differently with the FHA, it was entirely reasonable for HUD to adopt a case-by-case analysis.

B.      *States Vary in Their Application of the Filed-Rate Doctrine, which Further Bolsters HUD's Case-by-Case Approach.*

Contrary to PCIA's claims, the existence of the filed-rate doctrine does not support its stance that insurers should be entitled to categorical exemptions.  As HUD explains in its 2023 Rule the applicability of the filed-rate doctrine varies by state, such that a case-by-case approach is far more appropriate to handle these varied legal and factual questions. 88 Fed. Reg. at 19478.

The filed-rate doctrine "bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable," *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994), but its application is anything but universal. Some state courts, for example, have not even adopted the filed-rate doctrine. *Castillo v. Johnson*, No. CV-17-04688-PHX-DLR, 2019 WL 4222289, at *4 (D. Ariz. Sept. 5, 2019) (citing *Pink Dot, Inc. v. Teleport Commc'ns Grp.*, 89 Cal. App. 4th 407, 417 (2001) and *Qwest Corp. v. Kelly*, 204 Ariz. 25, 36 (Ct. App. 2002)); *see also Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1101 (W.D. Wash. 2007) (observing the dearth of case law in Washington on the filed rate doctrine and the apparent lack of any decisions "discussing the application of the doctrine to challenges to insurance rates, let alone title insurance rates, nor even rates set by a state regulatory agency."); *Satellite Sys., Inc. v. Birch Telecom of Oklahoma, Inc.*, 51 P.3d 585, 588 (Okla. 2002) (noting "the Oklahoma legislature has not expressed an intent, either explicitly or implicitly, that the policies supporting a state rate tariff doctrine were intended to abolish a common law fraud claim."). Other states vary as to exactly *what* issues the filed-rate doctrine covers. In fact, certain courts have explicitly exempted consumer insurance from the doctrine's reach. *Bhasker v. Kemper Cas. Ins. Co.*, 284 F. Supp. 3d 1191, 1230 (D.N.M. 2018) (refusing to apply the filed-rate doctrine in a consumer-protection case as "the burden that the doctrine would impose on defrauded consumers is substantial compared to the doctrine's underwhelming benefits in this context"); *see also Leghorn v. Wells Fargo Bank,*

- 21 -

*N.A.*, 950 F. Supp. 2d 1093 (N.D. Cal. 2013) (holding that filed-rate doctrine did not bar mortgagor's claims against mortgagee, loan servicer, and insurers); *Hoover v. HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223 (N.D.N.Y. 2014) (holding that filed-rate doctrine did not bar mortgagor's claim against force-placed insurance provider). In these states, there is no question that the doctrine would not bar a disparate impact claim against insurers.

Moreover, the type of relief sought by the plaintiff or complainant in any given FHA disparate impact case will also affect the degree to which the filed-rate doctrine is implicated. *Marcus v. AT&T Corp.*, 138 F.3d 46, 62 (2d Cir. 1998) (holding that the filed-rate doctrine did not bar a suit for injunctive relief in a price discrimination suit); *see also Gelb v. Am. Tel. & Tel. Co.,* 813 F. Supp. 1022, 1033 (S.D.N.Y. 1993); *Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 216 (3d Cir. 2020) (differentiating between a focus on statutory damages versus an alleged overcharge); *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009); *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1327 (11th Cir. 2018) ("*Alston* seems to be making the rather unremarkable point that the reach of the filed-rate doctrine can be circumscribed by legislation that confers to individuals a private right of action."). As one of the purposes of the filed-rate doctrine is to prevent discrimination among customers, relief predicated on a change to defendant's conduct rather than specific rates – such as in FHA challenges – is unlikely to undermine this purpose.

HUD also notes that six different rate regulatory systems exist across the country: prior approval, file and use, use and file, flex rating, modified prior approval, and no file. 81 Fed. Reg. 69,018 (Oct. 5, 2016); citing NAIC, *2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty* II–PA–10–21 (2011); *see also Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. 19450 (Mar. 31, 2023)*. In *Cohen v. American Sec. Ins. Co.*, for instance, the Seventh Circuit observed that, under state law, it was unclear if the

Illinois Department of Insurance could approve or disapprove of filed property insurance rates. 735 F.3d 601, 607 (7th Cir. 2013); *see also Corbin v. Allstate Corp.*, 2019 IL App (5th) 170296, 140 N.E.3d 810, *appeal denied*, 124 N.E.3d 464 (Ill. 2019). Without state agency approval, a defendant may not be able to credibly claim that a state's regulatory regime has condoned its filed rates – much less the practices which may produce such rates. Consequently, any filed-rate doctrine argument would be rendered inapplicable in such a jurisdiction, and it is clear that HUD's case-by-case approach would better vindicate the purposes of both the FHA and McCarran-Ferguson.

And even in states that have adopted the filed-rate doctrine, there is not universal agreement as to whether it actually bars claims under the FHA. In *Saunders v. Farmers Ins. Exch.*, for instance, the Eighth Circuit held that the filed-rate doctrine was not a bar to damages claims under the FHA. 440 F.3d 940, 944 (8th Cir. 2006) (finding "the Supremacy Clause tips any legislative competition in favor of the federal anti-discrimination statutes."). Likewise, the court in *Castillo v. Johnson* questioned the propriety of barring federal claims, stating "it is unclear why the California Insurance Commissioner's regulatory authority would impede the otherwise appropriate reach of a federal statute." No. CV-17-04688-PHX-DLR, 2019 WL 4222289, at *5 (D. Ariz. Sept. 5, 2019) (quoting *Perryman v. Litton Loan Servicing, LP*, No. 14-CV-02261-JST, 2014 WL 4954674, at *8 (N.D. Cal. Oct. 1, 2014) (finding that defendants' filed-rate doctrine argument would "seem to stand the Supremacy Clause on its head.")).

Moreover, the *Saunders* court required a "specific showing" that the FHA would conflict with the state's regulation of insurance. 440 F.3d at 944 (citing *Mackey v. Nationwide Ins.,* 724 F.2d 419, 421 (4th Cir. 1984) (holding that "the presence of a general regulatory scheme does not show that any particular state law would be invalidated, impaired or superseded by the application of the Fair Housing Act and the Civil Rights Acts.")). This finding is consistent with courts around

the country as they attempt to accommodate the purpose of the filed-rate doctrine with state and federal legislation. *See Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1102 (W.D. Wash. 2007) (finding "it is useful to examine whether the principles underlying the filed rate doctrine would be served by its application in this case."); see also *Castillo,* 2019 WL 4222289, at *4 ("When state-law regulatory authority provides the basis of the filed rate doctrine, the doctrine should be based on a careful analysis of the text and purpose of the underlying state law, rather than blanket application of the filed rate doctrine to all challenges which touch a regulated industry."). For example, in *Krukas v. AARP*, the U.S. District Court for the District of Columbia held the filed-rate doctrine applied only to claims "which, if successful, would undermine the critical policies underlying the filed-rate doctrine in the first place: nondiscrimination among customers and nonjusticiability as to the reasonableness of a rate." 376 F. Supp. 3d 1, 19, 22 (D.D.C. 2019) (holding that the doctrine could not "be used as a shield to bar review of claims . . . just because those claims have *some* relation to filed rates for state insurance coverage"). When such claims challenge "allegedly wrongful conduct," rather than the reasonableness of rates themselves, the filed-rate doctrine does not apply. Likewise, where plaintiffs challenge homeowners' insurance practices, rather than the rates which may result from such practices, the filed-rate doctrine need not apply. *Id.* at 26.

In sum, the applicability of the filed-rate doctrine will vary for a number of factors: the state in which the claim arises, the nature of the relief sought, the specific claims, and the identity of the plaintiff. Contrary to Plaintiff's claims, the doctrine does *not* provide a wholesale justification for categorical exemption. In fact, the array of questions raised by the interrelationship of state regulatory regimes and the filed-rate doctrine indicate that case-by-case determinations are the most appropriate, effective, and efficient means of adjudicating FHA disparate impact

challenges to insurance practices. HUD has adequately explained how it came to this conclusion, and its preference for case-by-case adjudication is not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, Amici Curiae respectfully support Defendants' Motion for Summary Judgment on the grounds that Defendants' refusal to exempt insurers from disparate impact liability was a well-reasoned decision, grounded in the agency's careful consideration of interested parties' comments.

Dated: October 3, 2023

*/s/Aneel L. Chablani*
Aneel L. Chablani
CHICAGOLAWYERS'COMMITTEE FOR CIVIL RIGHTS
100 North LaSalle Street, Suite 600
Chicago, IL 60602
Telephone: (312) 202-3658
achablani@clccrul.org

Olga Akselrod
Amanda M. Meyer
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
amandam@aclu.org
oakselrod@aclu.org

Jon Greenbaum
Thomas Silverstein
Brook Hill
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8316
jgreenbaum@lawyerscommittee.org
tsilverstein@lawyerscommittee.org

bhill@lawyerscommittee.org

Stuart T. Rossman, MA Bar#430640
Odette Williamson, MA Bar#634791
Jeremiah Battle, NJ Bar#039061991
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
srossman@nclc.org
owilliamson@nclc.org
jbattle@nclc.org

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Avenue, NW Suite 650
Washington, DC 20004
Telephone: (202) 898-1661
MWilliams@nationalfairhousing.org

Ameri Klafeta
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
Telephone: (312) 201-9740
aklafeta@aclu-il.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2023, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

*/s/ Aneel L. Chablani*
Aneel L. Chablani
CHICAGO LAWYERS' COMMITTEE FOR
CIVIL RIGHTS
100 North LaSalle Street, Suite 600
Chicago, IL 60602
(312) 202-3658