**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:13-cv-08564 |
| MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | Chief Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.     PCI's Claims Are Justiciable ...................................................................................... 2

     A.    PCI Has Standing ............................................................................................. 2

     B.    PCI's Claims Are Ripe.....................................................................................5

II.    HUD Failed To Adequately Address The Rule's Conflict With McCarran-Ferguson....... 8

     A.    HUD Failed To Support Its Assumption That Disparate-Impact Claims
          Against Risk-Based Practices Will Survive McCarran-Ferguson Preemption........9

     B.    HUD's Remaining Explanations For Refusing To Exempt Risk-Based
          Practices Were Unreasonable In Light Of McCarran-Ferguson............................16

     C.    The Arguments Of Amici States Cannot Rehabilitate HUD's Flawed
          Reasoning........................................................................................................19

III.   HUD Failed To Adequately Address The Rule's Conflict With The Filed-Rate
     Doctrine.............................................................................................................. 21

     A.    HUD Unreasonably Determined That Disparate-Impact Claims Challenging
          Risk-Based Practices Will Not Implicate The Filed-Rate Doctrine ....................22

     B.    HUD Unreasonably Determined That The Filed-Rate Doctrine Did Not Apply
          To Federal Challenges To State-Approved Rates....................................................25

IV.   HUD Failed To Adequately Address The Rule's Impact On The Business Of
     Insurance ............................................................................................................ 28

     A.    HUD's Reasoning Continues To Rest On The Misunderstanding That
          Insurers Can Readily Replace One Practice With Another That Is Less
          Effective At Predicting Risk ..........................................................................28

     B.    HUD Did Not Justify Its Failure To Exempt Risk-Based Practices In
          Light Of The Rule's Threat To The Business Of Insurance...............................29

V.    HUD Failed To Adequately Address The Rule's Conflict With Inclusive
     Communities....................................................................................................... 32

VI.   The Appropriate Remedy Is To Vacate The Rule As Applied To Risk-Based
     Pricing And Underwriting Of Homeowners Insurance .................................... 34

     CONCLUSION....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Association of Realtors v. Department of Health & Human Services*,
141 S. Ct. 2485 (2021) ................................................................................................. 15

*Allentown Mack Sales & Service, Inc. v. NLRB*,
522 U.S. 359 (1998) ........................................................................................................ 7

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ...................................................................................... 34

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ............................................................................. 23, 25

*Bethlehem Steel v. EPA*,
536 F.2d 156 (7th Cir. 1976) ......................................................................................... 7

*Boucher v. USDA*,
934 F.3d 530 (7th Cir. 2019) ........................................................................................ 18

*Carson v. Postal Regulatory Commission*,
938 F.3d 337 (D.C. Cir. 2019) ...................................................................................... 30

*Clarke v. Commodity Futures Trading Commission*,
74 F.4th 627 (5th Cir. 2023) ........................................................................................ 32

*County of Cook v. Wells Fargo & Co.*,
314 F. Supp. 3d 975 (N.D. Ill. 2018) ........................................................................... 33

*Dehoyos v. Allstate Corp.*,
345 F.3d 290 (5th Cir. 2003) ........................................................................................ 24

*Doe v. Mutual of Omaha Insurance Co.*,
179 F.3d 557 (7th Cir. 1999) .................................................................................... 9, 12

*El Paso Electric Co. v. FERC*,
76 F.4th 352 (5th Cir. 2023) ......................................................................................... 17

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) .................................................................................................. 17

*Fox Television Stations, Inc. v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002) .................................................................................... 17

*Free Enterprise Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................................................................6

*Ghaly v. INS*,
    48 F.3d 1426 (7th Cir. 1995) ...............................................................................8

*Harris v. FAA*,
    353 F.3d 1006 (D.C. Cir. 2004) ..........................................................................5

*Home Builders Association of Greater Chicago v. U.S. Army Corps of Engineers*,
    335 F.3d 607 (7th Cir. 2003) ...............................................................................7

*Hoosier Environmental Council v. Natural Prairie Indiana Farmland Holdings, LLC*,
    2023 WL 2571678 (N.D. Ind. Mar. 20, 2023) ...................................................34

*Humana Inc. v. Forsyth*,
    525 U.S. 299 (1999) ...........................................................................................20

*Huskey v. State Farm Fire & Casualty Co.*,
    2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) ...................................................11

*Inclusive Communities Project, Inc. v. Lincoln Property Co.*,
    920 F.3d 890 (5th Cir. 2019) .............................................................................33

*Lumpkin v. Farmers Group, Inc.*,
    2007 WL 6996777 (W.D. Tenn. July 6, 2007) .................................................24

*Lumpkin v. Farmers Group, Inc.*,
    2007 WL 6996584 (W.D. Tenn. Apr. 26, 2007) ................................................24

*Mexican Gulf Fishing Co. v. U.S. Department of Commerce*,
    60 F.4th 956 (5th Cir. 2023) ..............................................................................16

*Montgomery County v. Bank of America Corp.*,
    421 F. Supp. 3d 170 (D. Md. 2019) ..................................................................33

*NAACP v. American Family Mututal Insurance Co.*,
    978 F.2d 287 (7th Cir. 1992) .....................................................................3, 5, 6

*National Association of Home Builders v. U.S. Army Corps of Engineers*,
    417 F.3d 1272 (D.C. Cir. 2005) ..........................................................................5

*National Association of Mutual Insurance Cos. (NAMIC) v. HUD*,
    2023 WL 6142257 (D.D.C. Sept. 19, 2023) ..................2, 3, 6, 7, 15, 21, 29

*National Community Reinvestment Coalition v. CFPB*,
    2022 WL 4447293 (D.D.C. Sept. 23, 2022) .....................................................16

*National Fair Housing Alliance v. Deutsche Bank National Trust*,
   2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ........................................................33

*National Park Hospitality Association v. Department of Interior*,
   538 U.S. 803 (2003) ................................................................................................6

*Owner-Operator Independent Drivers Association, Inc. v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580 (7th Cir. 2011) ........................................................5, 6, 7, 8

*Perryman v. Litton Loan Servicing, LP*,
   2014 WL 4954674 (N.D. Cal. Oct. 1, 2014) ........................................................26

*PPL Wallingford Energy LLC v. FERC*,
   419 F.3d 1194 (D.C. Cir. 2005) ...........................................................................19

*Prometheus Radio Project v. FCC*,
   373 F.3d 372 (3d Cir. 2004) .................................................................................18

*Property Casualty Insurers Association of America v. Donovan*,
   66 F. Supp. 3d 1018 (N.D. Ill. 2014) ..........2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 15, 17, 19, 22, 29

*Property Casualty Insurers Association of Am. v. Carson*,
   2017 WL 2653069 (N.D. Ill. June 20, 2017) ..................................................32, 33

*Reno v. Flores*,
   507 U.S. 292 (1993) ................................................................................................7

*Reyes v. Waples Mobile Home Park Ltd. Partnership*,
   903 F.3d 415 (4th Cir. 2018) ...............................................................................33

*Saunders v. Farmers Insurance Exchange*,
   440 F.3d 940 (8th Cir. 2006) ...............................................................................25

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ...............................................................................3

*Sorenson Communications Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) .............................................................................17

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
   476 U.S. 409 (1986) ........................................................................................23, 26

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
   576 U.S. 519 (2015) ....................................................................................2, 33, 34

*Toilet Goods Association, Inc. v. Gardner*,
   387 U.S. 158 (1967) ................................................................................................8

*Town of Norwood v. New England Power Co.*,
    202 F.3d 408 (1st Cir. 2000)........................................................................22, 27

*U.S. Forest Service v. Cowpasture River Preservation Association*,
    140 S. Ct. 1837 (2020).......................................................................................15

*United States Sugar Corp. v. EPA*,
    844 F.3d 268 (D.C. Cir. 2016)..........................................................................34

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994)............................................................................22, 25

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)................................................................................14, 15

**Statutes, Rules, and Regulations**

5 U.S.C. § 706(2)(A)....................................................................................................7

15 U.S.C. § 1011.......................................................................................................14

15 U.S.C. § 1012.......................................................................................................14

42 U.S.C. § 3605(b)(1) .............................................................................................31

**Regulations**

*Application of the Fair Housing Act's Discriminatory Effects Standard to
    Insurance*, 81 Fed. Reg. 69,012 (Oct. 5, 2016)................................................22

*Reinstatement of HUD's Discriminatory Effects Standard*, 88 Fed. Reg. 19,450
    (Mar. 31, 2023) ....................................................22, 23, 24, 25, 26, 27, 30, 31, 32

**Other Authorities**

Hartwig, *The Insurance Industry's Commitment to Fairness in Insurance Pricing:
    A Survey of Historical and Current Research Concerning Risk-Based Pricing
    and Unfair Discrimination*, University of South Carolina Risk and
    Uncertainty Management Center and American Property Casualty Insurance
    Association (Aug. 2023), https://www.uscriskcenter.com/wp-
    content/uploads/2023/09/UnfairDiscrimination_WhitePaper.pdf ....................14, 18

**INTRODUCTION**

Nearly a decade after this Court held that HUD had failed to adequately justify a rule that would impose liability on homeowners insurers for risk-based pricing and underwriting practices with unintended discriminatory effects, the agency still comes up short. At each step of this protracted litigation and multiple rulemakings, PCI has explained why HUD's failure to exempt these risk-based practices is arbitrary and capricious. In first promulgating the Rule, HUD failed to consider how application of the Rule to risk-based pricing and underwriting of homeowners insurance fundamentally conflicts with the laws of every State in violation of the McCarran-Ferguson Act, contravenes the filed-rate doctrine, and threatens the very nature of homeowners insurance. Directed by this Court to return to the drawing board and account for these critical defects, HUD has never offered a satisfactory explanation for how the Rule remains reasonable in light of the ill consequences identified by commenters and the Court. Nor has HUD appropriately addressed the limitations on disparate-impact liability set by the Supreme Court in the years since HUD's initial rulemaking effort. Summary judgment must therefore enter in PCI's favor. *See* Dkt. 283 ("PCI MSJ").

In its brief, HUD expends considerable effort presenting justiciability arguments that are foreclosed by longstanding precedent and were rejected when presented to another court in a nearly identical procedural posture. Dkt. 295 ("HUD MSJ"). On the merits, HUD again fails to correct what this Court identified as the key deficiencies in its reasoning. Instead, HUD insists that its conclusory justifications meet the Administrative Procedure Act's requirements, without meaningfully grappling with the issues at hand. And HUD returns again and again to the false premise that the Rule itself has no practical effects on the homeowners insurance industry—a position that in any case undermines the agency's already-weak reasoning for applying the Rule to risk-based practices. All in all, HUD fails to justify the core defects PCI identified and

declines even to respond to many of the points PCI has put forward to demonstrate HUD's unreasonable decision-making. HUD has squandered each opportunity it has been given to get this rulemaking right. This Court should not give it another.

## ARGUMENT

## I. PCI's Claims Are Justiciable

HUD goes to great lengths to argue that PCI's claims are not justiciable. When HUD recently asserted virtually the same arguments in another case, that court correctly rejected them. *See National Ass'n of Mut. Ins. Cos. (NAMIC) v. HUD*, 2023 WL 6142257, at \*5-8 (D.D.C. Sept. 19, 2023). This Court should do the same.

### A. PCI Has Standing

This Court properly held that PCI has standing in 2014, shortly after PCI filed its complaint. *Property Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1043-1044 (N.D. Ill. 2014). What the Court said in 2014 remains true today: "[W]hen the plaintiff is 'an object of the action … at issue … there is ordinarily little question'" that he has standing. *Id.* at 1043. Here, PCI's member companies "provide homeowners insurance across the United States" and are therefore "among the 'objects' of the Disparate Impact Rule." *Id.* Their "increased exposure … to disparate impact claims under the Rule satisfies the 'injury in fact' requirement," and that injury is traceable to the Rule. *Id.* at 1043-1044. The redressability requirement is satisfied as well "[b]ecause there is 'some possibility' that granting PCI's requested relief … will prompt HUD to reconsider its decision that the Rule applies to homeowners insurers." *Id.* at 1045. "In the context of procedural challenges" like this one, nothing more is required. *Id.*

According to HUD (at 15), "PCI cannot show that any increased exposure to disparate-impact liability under the FHA is fairly traceable to the Rule as opposed to the FHA as interpreted by" the Supreme Court in *Texas Department of Housing & Community Affairs v.*

2

*Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).  But, as noted above, another district court recently rejected this exact argument, finding that it "curiously undersells the Disparate-Impact Rule."  *NAMIC*, 2023 WL 6142257, at *6.  As that court explained, the Rule purports to "provid[e] consistency nationwide," by going "beyond established law" in certain circuits.  *Id.* Indeed, the Seventh Circuit is one of those circuits:  Prior to the 2013 Rule's issuance, the Seventh Circuit "had expressly declined to decide whether disparate impact liability applies to the insurance industry under the FHA."  *PCI*, 66 F. Supp. 3d at 1043 (citing *NAACP v. American Fam. Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992)).  *Inclusive Communities* does not change the calculus, either.  In that case, the Supreme Court recognized limitations on disparate-impact liability, did not confirm the application of such liability to homeowners insurance, and did not even "purport to establish a uniform legal standard or framework."  *NAMIC*, 2023 WL 6142257, at *6.  Thus, the Rule does not, as HUD contends, "simply restate preexisting legal duties."  *Id.* "If it did, why promulgate it in the first place?"  *Id.*

Because PCI's members are objects of the Rule, PCI's standing is "self-evident" and no further "evidence … is necessary."  *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). If, however, further evidence were required, PCI has provided it.  In support of its motion for summary judgment, PCI submitted declarations detailing the expenses its members will incur to comply with the Rule, including by collecting data about applicants' protected status, which they have not previously done in part because state insurance laws and regulations generally prohibit it.  *See* Dkt. 283-5 to 283-8.  One of those declarants, for example, estimated that it will cost her employer (a PCI member) "approximately $250,000, and approximately 2700 hours in employee time to plan, organize, procure, process and model the data necessary to comply with the HUD rule."  Dkt. 283-8 at ¶11.  That cost is "ongoing," moreover, at an estimated rate of "$25,000 per

month" because the member company "will need to continuously monitor the data it collects." Dkt. 283-8 at ¶12. This Court previously "accept[ed] these declarants' representations as true," and held that the increased compliance costs discussed are independently sufficient to establish PCI's standing. *PCI*, 66 F. Supp. 3d at 1044.

Now, HUD says (at 18) that PCI's declarations are inadequate because they were signed in 2014. But HUD does not identify any meaningful differences between the 2023 and 2013 Rules that would render those declarations "stale," and there are none. And HUD entirely ignores that the declarations identify "ongoing" compliance costs (which, if anything, have only increased since 2014 due to inflation); it therefore does not matter that the Rule has (technically) been in effect in the years since the declarations were signed. *Contra* HUD MSJ 17.[1]

HUD further argues (at 18) that the Rule "do[es] not require PCI's members to collect race-based data," but the agency's say-so does not make it true. Defendants in a disparate-impact suit cannot, as a practical matter, be expected to show that a plaintiffs' data is "incorrect or wrongly analyzed" (HUD MSJ 18), without providing their own opposing data and related analysis. And such defendants certainly cannot be expected to simply wait until step two of the Rule's burden-shifting framework, when they bear the burden of proving that the challenged practice is necessary to achieve a valid interest. *Contra* HUD MSJ 18. In essence, HUD's position is that PCI's members should be expected to risk non-compliance and hope for the best in the event they are sued. That is not the law: Once PCI's members are exposed to possible liability under the Rule, they have every right to ensure that they are in compliance and have

---

[1]     The years since the Rule's original adoption have been full of regulatory uncertainty. In those years, (1) the Rule was held arbitrary and capricious, (2) HUD announced it was going to replace the Rule, (3) HUD ultimately did replace it, (4) HUD announced it was going to reverse course and change the Rule again, and (5) HUD ultimately did reverse course by opting to reinstate the Rule. *See* PCI MSJ 3-6. That uncertainty itself has been a source of harm, and it undermines HUD's heavy reliance on the Rule's ostensibly long tenure.

every available defense at their disposal. The costs incurred to take those measures "are sufficient to satisfy the 'injury in fact' requirement." *PCI*, 66 F. Supp. 3d at 1044 (collecting cases).

Finally, HUD again contends that any data-collection requirement or other compliance costs are traceable to the FHA and preexisting case law rather than to the Rule. But as noted, before the Rule was issued, the Seventh Circuit had "expressly declined" to hold that homeowners insurers were subject to disparate-impact liability under the FHA. *PCI*, 66 F. Supp. 3d at 1043; *see American Fam.*, 978 F.2d at 290. The increased compliance costs for PCI's members are thus plainly traceable to the Rule.

### B.    PCI's Claims Are Ripe

HUD's constitutional ripeness challenge relies entirely on the same arguments as its standing challenge. HUD MSJ 20-21. As just explained, those arguments lack merit.

As for prudential ripeness, the rule in APA cases is well-established: "[P]urely legal claims" like PCI's are "presumptively reviewable." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011); *see Harris v. FAA*, 353 F.3d 1006, 1012 (D.C. Cir. 2004) ("whether an agency decision is arbitrary and capricious is a purely legal question"). Such claims almost always satisfy both prudential ripeness requirements, and this case is no different.

*First*, PCI's claims are "fit for judicial decision" because arbitrary-and-capricious review turns on the sufficiency of the agency's reasoning; HUD's action "necessarily stands or falls on [the] administrative record." *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005). *Second*, "delay will cause some hardship" to PCI's members "because the [Rule] is in force the moment it becomes effective and a person made to live in the shadow of a law that she believes to be invalid should not be compelled to wait and

5

see if a remedial action is coming." *Owner-Operator*, 656 F.3d at 586. The "threat of enforcement" is "enough detriment to make a [claim] ripe." *Id.* at 586-587.

HUD's arguments to the contrary are again unpersuasive. As an initial matter, HUD's bottom-line contention (HUD MSJ 24) that PCI's members must "wait" for the Rule to be applied is not the law. Courts "normally do not require plaintiffs to 'bet the farm … by taking the violative action' before testing the validity of [a] law." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490 (2010). The alternative "case-by-case approach" urged by HUD does not apply to challenges to a "substantive rule"—that is, one "which as a practical matter requires the plaintiff to adjust his conduct immediately." *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003). HUD suggests (at 25) that the 2023 Rule is not substantive because it does not "proscribe[] any conduct," but that is wrong. The Rule applies disparate-impact liability to risk-based insurance practices that are permitted in all States and required by state law in most. And again, the Rule does not reflect preexisting law in many places, including the Seventh Circuit. *See American Fam.*, 978 F.2d at 290. HUD cannot reasonably dispute, then, that the Rule is a substantive rule that can be challenged prior to the initiation of a specific enforcement action. *See NAMIC*, 2023 WL 6142257, at *8 (confirming that 2023 Rule is a "substantive rule" because the "pressure to comply … or else get sued is a hardship 'felt immediately'").

In addition, HUD attaches misplaced significance to this Court's prior ruling that PCI is asserting a facial challenge. HUD MSJ 22-24. That ruling—made in the context of analyzing a statutory claim not presently at issue, *PCI*, 66 F. Supp. 3d at 1036-1037—does not mean that PCI's arbitrary-and-capricious claims are subject to the "no set of circumstances" test, or that they are unripe if there "is even a single instance where the Rule could be properly applied to a

6

home insurer." HUD MSJ 23. For one thing, the "no set of circumstances" standard is a not a ripeness test. It is a merits standard that governs claims that a government action, on its face, violates the Constitution or a statute. *See Reno v. Flores,* 507 U.S. 292, 301 (1993); *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 619-620 (7th Cir. 2003) (performing "no set of circumstances" test distinct from ripeness analysis). The "no set of circumstances" test is inapt, moreover, in the context of arbitrary-and-capricious claims like PCI's. Those claims do not involve whether the "agency's decreed result" is "within the scope of its lawful authority"; instead, they challenge "the *process* by which [the agency] reaches that result." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (emphasis added). Indeed, arbitrary-and-capricious claims are typically premised on the notion that agency regulations may be "well within the agenc[y's] scope of authority," but "not supported by the reasons … adduce[d]." *Id.* Applying the "no set of circumstances" standard to such claims makes little sense: A rule that is arbitrary and capricious due to the agency's failure to provide a reasoned explanation for its adoption is necessarily invalid in every application, and the APA requires courts to "set [it] aside." 5 U.S.C. § 706(2)(A). If successful, PCI's arbitrary and capricious claims would therefore establish that the Rule is invalid as applied to homeowners insurance.

Finally, HUD contends (at 26) that "PCI has produced no specific record evidence" that its members would face hardship from delaying review. But no such evidence is necessary when (as here) the challenged action is a substantive rule that, by definition, requires regulated parties to adjust their conduct. *See Owner-Operator*, 656 F.3d at 586-587; *NAMIC*, 2023 WL 6142257, at *8. Indeed, the Rule's substantive nature here distinguishes it from the agency actions at issue in the cases HUD cites. *See Bethlehem Steel v. EPA*, 536 F.2d 156, 162 (7th Cir. 1976) ("EPA

designations are merely a listing of areas for further study by the states; the petitioners are not required to do anything nor to refrain from doing anything."); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164-165 (1967) ("This is not a situation in which primary conduct is affected …. This regulation merely states that the Commissioner may authorize inspectors to examine certain processes or formulae[.]"). Regardless, even if PCI were required to provide "specific record evidence," it has met that requirement by providing declarations detailing the ongoing injuries its members face. *See supra* pp.3-4; *see also* Dkt. 283-5 to 283-8. It does not need to establish that those members already "have changed their business practices." HUD MSJ 26. The choice between changing one's behavior and risking enforcement is "enough detriment." *Owner-Operator*, 656 F.3d at 586-587.

## II. HUD Failed To Adequately Address The Rule's Conflict With McCarran-Ferguson

In reinstating the Rule, HUD again rebuffed this Court's instruction to account for "the *likelihood* that McCarran-Ferguson preclusion will apply" in disparate-impact suits challenging risk-based pricing and underwriting practices. *PCI*, 66 F. Supp. 3d at 1048 (emphasis added). Rather than comply with this Court's order, HUD argues only that, in some rare (unidentified) case, a disparate-impact challenge might escape McCarran-Ferguson preemption. That is no answer to PCI's challenge to the reasonableness of HUD's decision-making.

HUD fails to demonstrate that its refusal to grant a narrow exemption for risk-based pricing and underwriting was the product of reasoned decision-making. Instead, HUD asks this Court to rubber-stamp its explanation for ignoring the fundamental conflict between the Rule's application to risk-based practices and the McCarran-Ferguson Act. The agency insists it has done the bare minimum to satisfy arbitrary and capricious review—that its "explanation 'need not be compelling, or even convincing, to be sufficient.'" HUD MSJ 11 (quoting *Ghaly v. INS*, 48 F.3d 1426, 1431 (7th Cir. 1995)). True to its word, HUD offers an explanation that is neither

compelling nor convincing; more importantly, it is not sufficient. HUD strains to explain how an exemption would be "overbroad" in light of controlling law; how any disparate-impact challenge to risk-based practices would survive; and how the costs of the Rule are justified in light of the fact that, barring the exceptional case, disparate-impact challenges to risk-based practices will virtually always fail. These flaws render HUD's action arbitrary and capricious.

### A. HUD Failed To Support Its Assumption That Disparate-Impact Claims Against Risk-Based Practices Will Survive McCarran-Ferguson Preemption

HUD's decision-making remains arbitrary and capricious because it has failed to correct what this Court identified as the key deficiency in the agency's reasoning. When PCI first challenged the Rule's application to risk-based pricing and underwriting, the Court credited HUD's assumption that McCarran-Ferguson did not "preclude HUD from issuing regulations that may apply to insurance policies," but nonetheless found that HUD could not "simply disregard the *likelihood* that McCarran-Ferguson preclusion will apply." *PCI*, 66 F. Supp. 3d at 1048 (emphasis added). This Court directed HUD to "consider this important aspect of the issue" by "evaluat[ing] how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.* at 1049. This Court further observed that HUD's "lack of analysis" on this issue was "particularly glaring in light of the Seventh Circuit's reasoning" in *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999). *PCI*, 66 F. Supp. 3d at 1048. In *Mutual of Omaha*, the Seventh Circuit held that "requir[ing] federal courts to determine whether [challenged insurance practices] are actuarially sound and consistent with state law" violates McCarran-Ferguson. 179 F.3d at 564. Because "[s]tate regulation of insurance is comprehensive," such interference by federal courts would "step[] on the toes of state insurance commissioners." *Id.* In reinstating the Rule, therefore, HUD was bound to analyze how frequently disparate-impact challenges to risk-based practices

9

would be precluded by the McCarran-Ferguson Act, especially given *Mutual of Omaha*'s admonition against federal court intrusion into state insurance regulation.

It is not enough for HUD to insist that "application of McCarran-Ferguson depends on the facts at issue and the relevant State laws" without engaging in any "attempt to evaluate *how often* McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *PCI*, 66 F. Supp. 3d at 1048 (emphasis added). But that is precisely what HUD continues to do. HUD simply labels (at 33) McCarran-Ferguson a "fact-specific inquiry that incorporates the relevant state law," without unpacking the likelihood that this inquiry will nonetheless yield virtually identical results whenever risk-based practices are challenged under the Rule, rendering it "fact-specific" in name only. This Court ordered HUD to justify the Rule's application to risk-based practices by evaluating the likelihood that disparate-impact claims challenging those practices *will* succeed. HUD's insistence that such challenges *might* succeed in unspecified rare cases does not suffice, nor could it outweigh the grave threat that disparate-impact liability poses to the risk-based nature of insurance. *See infra* Part IV.

In fact, disparate-impact claims challenging risk-based practices will resoundingly fail. As commenters explained, PCI SOF ¶¶ 45, 94, disparate-impact liability for risk-based pricing and underwriting of homeowners insurance will conflict with the laws of every State because every State requires or permits risk-based practices. The States uniformly require or permit these practices because pricing and underwriting insurance policies according to factors that accurately predict the likelihood that an insured loss will occur is critical to maintaining insurer solvency and thus a healthy and competitive insurance market. *See* PCI SOF ¶ 83; A.R. 29,115-29,117; A.R. 29,141-29,142. Against these state laws, the "fact-intensive" nature of McCarran-Ferguson

10

preclusion does nothing to save the Rule's application to those practices. HUD cites (at 30) *Huskey v. State Farm Fire & Casualty Co.* in an effort to show that disparate-impact suits can survive McCarran-Ferguson preclusion in some States, even if they fail in essentially all others. 2023 WL 5848164, at *11 (N.D. Ill. Sept. 11, 2023). But *Huskey* involves a challenge to an insurer's claims-processing practices, not risk-based pricing and underwriting, *id.* at *2; the insurer in *Huskey* also failed to show that state law "require[d] or condone[d]" the practices at issue, and the court's review of those practices did not implicate determinations of "actuarial soundness," *id.* at *11. On both points, the claims-processing practices in *Huskey* are easily distinguished from the pricing or underwriting practices for which PCI seeks an exemption, as every State requires or permits risk-based classifications based on sound actuarial standards in order to safeguard insurer solvency. PCI SOF ¶¶ 45, 94.

Even if, hypothetically, the details of the McCarran-Ferguson analysis could differ at the margins by State (and HUD has not shown how they could), HUD fails meaningfully to evaluate whether the outcome of that analysis will vary—that is, whether challenges to risk-based practices could ultimately succeed in any jurisdiction, or how frequently. HUD argues (at 27) that it "determined that '[t]he concerns raised by the insurance industry commenters *do not outweigh* th[e] loss of efficacy in the administration and enforcement of the [FHA]' sufficient to justify the requested exemptions." But this Court explained that such a conclusion would be arbitrary absent a serious "attempt to evaluate how often McCarran-Ferguson preclusion would apply." *PCI*, 66 F. Supp. 3d at 1048. In response, HUD threw up its hands, stating (at 27-28) that "McCarran-Ferguson analysis is a 'fact-intensive inquiry'" that "requir[es] review of numerous variables." As this Court made clear, those well-worn excuses do not satisfy HUD's obligations under the APA given that McCarran-Ferguson preclusion will defeat "many (if not

most) disparate impact claims against insurers." *PCI*, 66 F. Supp. 3d at 1049. Writing as amici, the attorneys general of Illinois and certain other States similarly fail to analyze the likelihood that McCarran-Ferguson preclusion will defeat disparate impact claims. State of Illinois et al. Amicus Br., Dkt. 309 ("States Amicus Br."). Indeed, they concede that "in a state that … has insurance regulations that are inconsistent with disparate impact liability, those policy choices will reign supreme within its borders, regardless of what federal law provides." *Id.* at 14-15. In the face of evidence that insurance regulations in every State require or permit risk-based practices that are inconsistent with disparate-impact liability, HUD's failure to exempt risk-based practices was arbitrary and capricious.

HUD nonetheless speculates (at 28) that an exemption for risk-based practices will "foreclose[] potentially meritorious claims," because some lawsuits challenging these practices may be brought without creating a conflict with state insurance regulation and triggering McCarran-Ferguson preclusion. But HUD does not cite a single example of a suit that has avoided this inevitable conflict. Indeed, HUD admits (at 43 n.28) that it has no idea "whether a particular discriminatory effects challenge would lead to liability."

Still, HUD labors to invent a scenario in which a disparate-impact plaintiff challenging a risk-based pricing or underwriting practice could prevail without requiring a federal court to assess an alternative practice's actuarial soundness or consistency with state law. None exists. HUD concedes (at 31 & n.20) that the third step of the burden-shifting framework requires a federal court to judge whether an insurer can substitute the challenged practice for an alternative. And the court cannot make that determination without engaging in an analysis, forbidden by *Mutual of Omaha*, to find that the substitute practice is actuarially sound and consistent with state law. 179 F.3d at 564. HUD imagines (at 31 n.20) a scenario in which an insurer stipulates

that it picked "one of two risk-based practices for business reasons," but that is no answer to commenters' concerns. A court weighing a plaintiff's claims in this farfetched hypothetical scenario could not complete its analysis under the Rule's burden-shifting framework without determining that the risk-based practice urged by the plaintiff was actuarially sound and consistent with state law. Similar problems plague HUD's remaining efforts to describe a risk-based practice that would survive McCarran-Ferguson. HUD speculates that a plaintiff could avoid preclusion by showing that "a purportedly risk-based practice is in fact based on business judgment," HUD MSJ 30; that the practice is not entirely "risk-based" because it "incorporate[s] elements of discretion under state law," *id.* at 34 n.22; or that "other state laws or policies … [do] not support using such a practice where it has a discriminatory effect," *id.* at 30-31 & n.19. But in any of those scenarios, the federal court considering the plaintiff's challenge would have to find that the practice either is not actuarially sound or that it is inconsistent with state law— inquiries McCarran-Ferguson prohibits, *PCI*, 66 F. Supp. 3d at 1039.

HUD's concern (at 28) that an exemption would permit certain discriminatory effects "to go uncorrected" does not provide a reasonable justification for the Rule, as the FHA's "broad remedial purpose" does not transform every disparate impact into a viable federal claim. Congress limited the reach of otherwise expansive federal statutes like the FHA by enacting the McCarran-Ferguson Act and preserving for the States their traditional domain of insurance regulation. It is therefore unreasonable for HUD to deny insurers the requested exemption (at 28) on the basis that exempting risk-based pricing and underwriting practices would "foreclose[e] potentially meritorious claims." Congress has decided that claims interfering with state insurance regulation are barred.

HUD's decision to intrude on a long-recognized domain of comprehensive state regulation is all the more unreasonable in light of Supreme Court decisions vacating agency overreach under the major-questions doctrine.

*West Virginia v. EPA* is just the latest in a line of consistent cases that underscore the arbitrariness of HUD's regulatory approach. In *West Virginia*, the Supreme Court held that an agency could not promulgate a rule empowering itself "to order the wholesale restructuring of any industrial sector" based on a "novel reading" of a statute. 142 S. Ct. 2587, 2605 (2022). Instead, "courts 'expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.'" *Id.* Here, far from clearly assigning responsibility over homeowners insurance practices to HUD, Congress did precisely the opposite in the McCarran-Ferguson Act by constraining federal power to interfere in state insurance regulation except where Congress has expressly provided. *See* 15 U.S.C. §§ 1011, 1012. And for more than a century, state regulators have defined the parameters of prohibited insurance practices, including by outlawing discrimination among "risks of a like kind and hazard." Hartwig, *The Insurance Industry's Commitment to Fairness in Insurance Pricing: A Survey of Historical and Current Research Concerning Risk-Based Pricing and Unfair Discrimination* 4, University of South Carolina Risk and Uncertainty Management Center and American Property Casualty Insurance Association (Aug. 2023) ("Hartwig, *Unfair Discrimination*").

By determining to extend disparate-impact liability to risk-based pricing and underwriting without taking stock of the likelihood that such claims will unlawfully encroach on a traditional sphere of state authority and destabilize an industry, HUD has proceeded down that path not only without clear congressional authority, but despite Congress's clear preference to the contrary. Moreover, contrary to HUD's arguments (at 32), the Rule's application to risk-

14

based practices is decidedly "novel" in the sense *West Virginia* contemplates.  The Rule

"exposes … insurers to disparate-impact liability beyond what they otherwise would" face.

*NAMIC*, 2023 WL 6142257, at *6.  If the Rule were not necessary to apply disparate-impact

liability to risk-based practices, "why promulgate it in the first place?"  *Id.*  This concern was

raised in comments, *see* PCI SOF ¶ 115, yet HUD failed to consider it.

HUD's argument (at 32) that the Supreme Court has not endorsed limits on federal

agencies that "intrude into 'an area that is the particular domain of state law'" is as incorrect as it

is telling.  That very justification for vacating an agency rule has been employed routinely in

cases applying the major-questions doctrine.  *See Alabama Ass'n of Realtors v. Department of*

*Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (striking down eviction moratorium because

it "intrudes into an area that is the particular domain of state law"); *U.S. Forest Serv. v.*

*Cowpasture River Preserv. Ass'n*, 140 S. Ct. 1837, 1849-1850 (2020) ("Our precedents require

Congress to enact exceedingly clear language if it wishes to significantly alter the balance

between federal and state power and the power of the Government over private property.").

HUD tries to avoid this conclusion by asserting (at 33) that the Rule will not intrude on state

regulation because, through case-by-case adjudication, the Rule will not impose liability where a

court determines that federal law precludes it.  But as this Court observed, this excuse does not

render reasonable the agency's decision to require that homeowners litigate doomed claims case-

by-case.  *See PCI*, 66 F. Supp. 3d at 1048.

The Supreme Court has also emphasized that, "[w]hen an agency 'has no comparative

expertise' in making certain policy judgments … 'Congress presumably would not' task it with

doing so."  *West Virginia*, 142 S. Ct. at 2612-2613.  Here, HUD has no expertise that could

support its conclusion that disparate-impact challenges to risk-based practices would be

15

compatible with state insurance regulation. The McCarran-Ferguson Act recognizes that state regulators—not federal agencies—have expertise over the business of insurance. And as PCI has shown, "[s]tate regulators are already exercising the role that Congress envisioned for them and actively addressing protected-class concerns implicated in actuarially sound, risk-based pricing practices." PCI SOF ¶ 123.

### B. HUD's Remaining Explanations For Refusing To Exempt Risk-Based Practices Were Unreasonable In Light Of McCarran-Ferguson

None of the other reasons HUD offers for the Rule's application to risk-based practices withstands scrutiny.

*First*, in claiming that the failure to exempt risk-based insurance practices was reasonable in spite of the substantial costs insurers will face from case-by-case adjudication (at 33-36), HUD "'failed to consider an important aspect of the problem.'" *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023). In particular, HUD did not adequately "consider[] the costs and benefits associated with the regulation." *Id.*; *see also National Cmty. Reinvest. Coal. v. CFPB*, 2022 WL 4447293, at *23 (D.D.C. Sept. 23, 2022) (agency acted arbitrarily and capriciously when its cost explanations did not "account[] for the continued need to collect data" under the challenged rule). PCI has explained (PCI MSJ 14-16 and *supra* pp.3-5) that HUD arbitrarily ignored the reality that insurers will be saddled with substantial costs attempting to comply with the Rule. For example, insurers will be required to collect demographic data for the first time, including racial demographic data that state law may prohibit insurers from gathering, and demographic data on classifications such as sexual orientation and disability that may be impossible to collect in practice. And as PCI has explained, none of HUD's counterarguments offers defendants a realistic means to defend themselves at the third step of the burden-shifting framework. PCI MSJ 14-16.

Contrary to HUD's assertions (at 36 n.23, 38-40 & n.26), this Court has never held that HUD justified those costs. In fact, this Court ordered HUD to explain how those costs are reasonable by, among other things, analyzing how often plaintiffs will prevail in challenges to risk-based practices. *PCI*, 66 F. Supp. 3d at 1048. HUD never did. The reality is, such plaintiffs will almost never succeed because McCarran-Ferguson preclusion—or the limits on disparate-impact liability articulated in *Inclusive Communities*, *see infra* Part V—will bar their claims. And there is "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework" for "insurance practices that plaintiffs would have no chance of successfully challenging under the burden-shifting framework." *PCI*, 66 F. Supp. 3d at 1051.

HUD's "'predictive judgment[]' about insurers' potential litigation costs" (at 36) is entitled to no deference. "Though 'an agency's predictive judgments about the likely economic effects of a rule' are entitled to deference … 'deference to such … judgment[s] must be based on some logic and evidence, not sheer speculation.'" *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (citations omitted). "The overarching standard remains firmly in place: all agency action, even 'predictive judgment[s] based on the evidence' available, must be 'reasonable and reasonably explained.'" *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023) (quoting *FCC v. Prometheus Radio Proj.*, 141 S. Ct. 1150, 1160 (2021)). The D.C. Circuit, for instance, held that an agency acted arbitrarily and capriciously by justifying a rule based on discrimination concerns—despite its "predictive judgment that there would be more discrimination without the … Rule"—because even though "the court should ordinarily defer to the Commission's predictive judgments … the Commission has not shown a substantial enough probability of discrimination to deem reasonable a prophylactic rule as broad as" the one it promulgated. *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002). The

17

same is true here. HUD needed to "undergird its predictive judgment ... with some evidence for that judgment to survive arbitrary and capricious review." *Prometheus Radio Proj. v. FCC*, 373 F.3d 372, 409 (3d Cir. 2004). It did not. As explained above, HUD's account of how the Rule will affect insurers and whether plaintiffs will succeed in challenging risk-based practices under the Rule was contradicted by the administrative record before the agency. *See supra* Sections I.A, II.A. HUD's predictive judgment therefore carries no weight.

*Second*, HUD's insistence (at 34-35) that an exemption would be "quickly outdated" is likewise unsupported. Unlike HUD—which put forward no comprehensive analysis of how frequently disparate-impact claims will conflict with state insurance law—PCI has identified laws in every jurisdiction addressing the use of "long-recognized" actuarially sound risk factors and cited those laws in comments submitted to HUD. PCI SOF ¶¶ 45, 94. HUD asserts (at 34-35 & n.22) that state insurance laws "change over time," but neither in its rulemaking nor in its briefing has HUD cited variations in those laws that would alter the result of a disparate-impact challenge to risk-based practices in light of McCarran-Ferguson. And in fact, for more than a century, state laws have consistently prohibited insurers from "charging different rates to different persons with 'risks of a like kind and hazard,'" Hartwig, *Unfair Discrimination*, at 4 (quoting 1909 Kan. Sess. Laws 280), an approach that "ma[de] explicit in law the linkage between risk-based pricing as a necessary condition for fairness," *id.* at 17. The failure to "engage meaningfully" with PCI's evidence led HUD to "ignor[e] a crucial factor" undermining its justification for refusing to grant an exemption, "rendering the decision arbitrary and capricious." *Boucher v. USDA*, 934 F.3d 530, 553 (7th Cir. 2019). Because PCI raised objections that "attack[] ... underlying assumptions" of HUD's decision to refuse an exemption, and HUD did not "respond meaningfully," "its decision can hardly be classified as reasoned."

*PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198-1199 (D.C. Cir. 2005) (quotation marks omitted).

*Third*, by arguing (at 36-38) that the existence of state fair-housing laws justifies applying the Rule to risk-based practices in homeowners insurance, HUD gets McCarran-Ferguson preemption backwards. To the extent state fair-housing laws apply to risk-based pricing and underwriting of homeowners insurance, they are further evidence of the comprehensive nature of state insurance regulation, because it is the States that determine the metes and bounds of the anti-discrimination laws' application to risk-based practices and the appropriate balance to strike between conflicting considerations. Federal disparate-impact claims challenging risk-based practices interfere with those state decisions; they "would raise the question of whether the insurer's practices are actuarially sound and consistent with state law," and therefore be precluded by McCarran-Ferguson, *PCI*, 66 F. Supp. 3d at 1039-1040, even if they are brought in a State that has adopted its own fair-housing law coextensive with the FHA.

*Finally*, HUD's insinuation (at 34-35 & n.22) that risk-based practices are simply a smokescreen for disparate treatment—or even intentional discrimination—against insureds is groundless and beside the point. This insinuation is not supported by the record and cannot justify HUD's attempt to subject insurers to liability for the *unintended effects* of risk-based practices that are required or permitted under state law.

## C. The Arguments Of Amici States Cannot Rehabilitate HUD's Flawed Reasoning

The amicus brief of state attorneys general—which notably was not joined by any state insurance commissioners—contends that HUD acted reasonably in choosing case-by-case adjudication. States Amicus Br. 7. These Amici States are wrong.

First, contrary to the assertions of Amici States, applying the Rule to risk-based pricing and underwriting of homeowners insurance "categorically disturbs state-level regulation of the insurance industry." States Amicus Br. 10. It makes no difference that States may "vary in *the way they review and regulate*" insurers' risk-based practices or may allow rates to go into effect without scrutinizing every "judgment" made by an insurer. *Id.* at 9-10 (emphasis added). What matters is that all States—regardless of how they review or approve rates—require or permit those rates to be risk-based. PCI SOF ¶¶ 45, 94. Neither HUD nor Amici States have shown that federal lawsuits challenging risk-based rates are compatible with those state insurance regulatory regimes.

Second, Amici States are incorrect that McCarran-Ferguson preclusion can be avoided because in some States, disparate-impact liability under the FHA "complements state anti-discrimination laws and policies that extend to the homeowners insurance industry[.]" States Amicus Br. 7. Contrary to Amici States' argument (at 11-14), McCarran-Ferguson would preclude the Rule's application to risk-based practices even where a state law of general application (such as a general nondiscrimination law) might subject insurers to disparate-impact liability. Amici States argue that *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), requires a federal court to assess whether state insurance laws have been "harmonized" with state laws of general application that parallel federal disparate-impact suits, such that the court may allow the federal suit to proceed while avoiding a conflict between federal law and state insurance regulation. States Amicus Br. 14. But *Humana* did no such thing. In *Humana*, McCarran-Ferguson did not preclude the federal RICO suit at issue because that suit was consistent with Nevada's insurance laws—specifically, "statutory and common-law remedies *to check insurance fraud*." 525 U.S. at 311 (emphasis added). *Humana* therefore rested on a finding that the federal

20

claim did not conflict with the state legal framework specifically regulating insurance. *Humana* nowhere held that where the federal claim does conflict with state insurance law, that conflict can be excused based on some supposed "harmony" between the federal claim and other generally applicable state laws that do not speak specifically to the business of insurance.

Third, it is state regulators, not HUD or federal courts, who are best equipped to evaluate whether a State's general nondiscrimination laws can be "harmonized" with a State's laws prohibiting "unfair discrimination" in insurance. As commenters explained, in the insurance context, "unfair discrimination" means "treat[ing] applicants and policyholders with similar risk profiles differently." A.R. 29,116 (2021 PCI comment); *see also* A.R. 29,139-29,142 (same). The very "definition of unfair discrimination" in insurance is inextricably linked to "equal treatment and cost-based pricing." PCI SOF ¶ 93 (quoting NAMIC comment). These laws demonstrate that state insurance regulation depends on insurance rates that accurately reflect risk. While discrimination among equivalent risks is prohibited, setting different rates to account for "different types and degrees of risk" is "the foundation of insurance underwriting." PCI SOF ¶ 118 (quoting 2012 PCI comment). As the insurance commissioners of Idaho, Montana, Louisiana, and Oklahoma attest, state regulators have developed "the expertise to balance the concerns relating to ratemaking, underwriting, and unfair discrimination, and to reconcile all the concerns." Insurance Commissioners Amicus Br. 9, Dkt. 292. To the extent state laws of general application affect a State's framework for regulating insurance, *state* regulators are therefore best equipped to "harmonize" those laws—a task in which these regulators (including regulators in the amici States) are actively engaged. PCI SOF ¶ 123.

## III.   HUD Failed To Adequately Address The Rule's Conflict With The Filed-Rate Doctrine

HUD's analysis concerning the filed-rate doctrine remains inadequate as well. As noted

in PCI's motion (at 18-19), HUD's rulemaking offered two reasons the Rule did not implicate the filed-rate doctrine. Both were arbitrary.

### A. HUD Unreasonably Determined That Disparate-Impact Claims Challenging Risk-Based Practices Will Not Implicate The Filed-Rate Doctrine

HUD posited that the filed-rate doctrine is not implicated because disparate-impact claims "do not challenge the reasonableness of insurance rates, but rather their discriminatory effects." *Reinstatement of HUD's Discriminatory Effects Standard*, 88 Fed. Reg. 19,450, 19,478 n.244 (Mar. 31, 2023). But the filed-rate doctrine is not limited to claims that challenge only the "reasonableness" of rates. Rather, as this Court previously recognized, the doctrine "'forbids courts from *invalidating* or *modifying* [filed] rates,'" *PCI*, 66 F. Supp. 3d at 1049 (emphasis added)—which is plainly what disparate-impact claims against risk-based pricing and underwriting practices would seek to do.

This understanding is confirmed by the case law HUD itself cited. For example, in *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994)—which the Rule cites several times, *see* 88 Fed. Reg. at 19,478 & nn.245, 247—the Second Circuit explained that the filed-rate doctrine "holds that any 'filed rate' … is per se reasonable and *unassailable in judicial proceedings*." 27 F.3d at 18 (emphasis added). Likewise, HUD's 2016 Supplemental Explanation, on which the agency now relies, *see, e.g.*, HUD MSJ 44, cited *Town of Norwood v. New England Power Co.*, 202 F.3d 408 (1st Cir. 2000), where the First Circuit explained that "[i]t is the *filing* of the [rates], and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *Id.* at 419; *see Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance*, 81 Fed. Reg. 69,012, 69,108 (Oct. 5, 2016). The doctrine accordingly bars claims that "would require the *alteration*" of those rates. 202 F.3d at 420. HUD's failure to acknowledge that its own authorities undermine its position is textbook

22

arbitrary decisionmaking. *See, e.g.*, *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018).

HUD also failed substantively to address important Supreme Court precedent that undermines its position. Commenters (including PCI, *see* A.R. 29,145-29,146) cited *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 410 (1986), which held that the filed-rate doctrine barred claims "alleg[ing] that rates filed with the Interstate Commerce Commission … were fixed pursuant to an agreement forbidden by the Sherman Act." In other words, the claims challenged not the reasonableness of the rates but the manner in which they were adopted. *Id.* at 415 & n.17. The filed-rate doctrine nevertheless applied because the "ICC's approval had, in effect, established the lawfulness of the … rates." *Id.* at 416.

In the final Rule, HUD acknowledged in a footnote that "[c]ommenters relied on … *Square D*," but the agency never mentioned the case again in its analysis. 88 Fed. Reg. at 19,477 n.244. That is plainly insufficient. Nor is it enough for HUD to claim (at 44) "abundant variations exist among the courts as to how the doctrine applies." At minimum, the agency was required to acknowledge that *Square D*'s holding binds all lower courts and to analyze whether any supposed variation comported with that precedent. The agency's decision to instead ignore *Square D*'s implications entirely was arbitrary.

Even if the filed-rate doctrine were limited to claims that challenge rates' reasonableness, the Rule does require judicial scrutiny of reasonableness. As PCI explained (at 18-19), resolving a disparate-impact claim under the Rule requires courts to consider the reasonableness of the rates at issue at both steps two and three of the burden-shifting framework. Those inquiries in fact go beyond examination of reasonableness; they require an even more searching inquiry, under which a court must invalidate previously filed rates unless they are deemed *necessary*.

23

HUD cited two cases in the Final Rule in which the filed-rate doctrine was not applied to FHA claims, *see* 88 Fed. Reg. 19,478 n.248, but neither supports HUD's position.  In the first, *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003), the filed-rate argument was not fully considered because it was presented for the first time on appeal.  *Id.* at 295 n.4.  The court accordingly dismissed the argument in a footnote, explaining that the defendants had not even identified a rate-control law that was implicated by the claim.  *Id.* at 298 n.5.  Had they done so, however, the court "would have obligingly considered the purported conflict."  *Id.*  In the second case HUD invoked, *Lumpkin v. Farmers Group, Inc.* (*Lumpkin I*), 2007 WL 6996584 (W.D. Tenn. Apr. 26, 2007), the entire filed-rate analysis consisted of one unexplained assertion that the FHA claim would not impair the state's insurance rate controls.  *Id.* at *8.  HUD's parroting of that unelaborated, conclusory reasoning does not constitute reasoned decisionmaking.  *Dehoyos* and *Lumpkin I* thus cannot alone support HUD's categorical assertion that disparate-impact claims "do not challenge the reasonableness of insurance rates."  88 Fed. Reg. at 19,478.[2]

HUD fares no better before this Court.  In arguing why steps two and three of the Rule's burden-shifting framework do not implicate reasonableness, HUD says (at 46) that "how the insurer decides its rates is informed by any number of practices," and "[i]n reviewing a claim that a particular rate has a discriminatory effect, a court will … have to assess whether *those* practices are necessary to serve defendant's legitimate interests, not whether the rate itself is reasonable."  But HUD is simply wrong that "any number of practices" are relevant to ratemaking.  Rather, as PCI explained during HUD's rulemaking, "[i]nsurance rates are based on an insured's loss history" and on actuarial factors that accurately predict the "risk of future

---

[2]        As noted in PCI's motion for summary judgment (at 13-14 n.6), *Lumpkin I*'s superficial analysis of the filed-rate doctrine was then compounded in *Lumpkin v. Farmers Group, Inc.*, 2007 WL 6996777 (W.D. Tenn. July 6, 2007), when the court misapprehended Tennessee insurance law in its analysis of McCarran-Ferguson preclusion.

losses" and "their financial implications." A.R. 29,114 (2021 PCI comment); *see also* PCI SOF ¶ 94 ("almost all state laws expressly require risk-based pricing"). Moreover, HUD's purported distinction between the "practices" underlying the rate and the rate itself is illusory. By scrutinizing the "practices"—i.e., the actuarial considerations that go into calculating the rate— any court would necessarily be assessing whether the resulting rate is ultimately reasonable (and in fact, necessary). HUD's failure to appreciate that dynamic was arbitrary.

> **B.** **HUD Unreasonably Determined That The Filed-Rate Doctrine Did Not Apply To Federal Challenges To State-Approved Rates**

HUD's second reason for dismissing the filed-rate doctrine was that the doctrine must yield to the FHA under the Supremacy Clause. As commenters explained, that contention is irreconcilable with case law "holding that the filed-rate doctrine bars challenges under federal laws to rates filed with state agencies." 88 Fed. Reg. at 19,477; *see also* PCI MSJ at 19. This includes *Wegoland*—which (as noted, *supra* p.22), HUD invoked affirmatively in the Rule. In *Wegoland*, the Second Circuit observed that "courts have uniformly held, and we agree that the rationales underlying the filed rate doctrine apply strongly to regulation by state agencies." 27 F.3d at 20. HUD's failure to acknowledge that one of its own authorities undermined its reasoning is, again, the hallmark of arbitrariness. *See ANR Storage Co.*, 904 F.3d at 1026.

Commenters also specifically informed HUD that it was wrong previously to have relied on *Saunders v. Farmers Insurance Exchange*, 440 F.3d 940 (8th Cir. 2006) ("*Saunders I*"), in its Supremacy Clause analysis. 88 Fed. Reg. at 19,477. For one thing, HUD's reliance on *Saunders I* ignored the court of appeals' subsequent holding in *Saunders II* that McCarran-Ferguson preclusion applied. *See* PCI MSJ 4, 14, 22. For another, as commenters explained, *Saunders I*'s filed-rate-doctrine analysis is "inconsistent with the weight of case law." 88 Fed. Reg. at 19,477. HUD nonetheless cited no additional authority in the 2023 Rule. HUD did cite one other district

court case in its 2016 Supplemental Explanation.  *See* 88 Fed. Reg. at 19,478 nn.249-250.  But

that case—*Perryman v. Litton Loan Servicing, LP*, 2014 WL 4954674 (N.D. Cal. Oct. 1,

2014)—is particularly unhelpful, because the state insurance commissioner there "ha[d]

specifically disclaimed any authority to regulate the conduct challenged in the complaint."  *Id.* at

*8.  Indeed, the claim did not challenge any filed insurance rate at all, but rather the portion of

the rate that could be "passed on" to the plaintiff consistent with "the terms of her contract."  *Id.*

at *9.  *Perryman*, then, does not cast doubt on the prevailing view, articulated in *Wegoland* and

other cases, that the filed-rate doctrine bars federal challenges to rates filed with state agencies.

  HUD now argues (at 45) that the cases applying the filed-rate doctrine to state rate-setting

(including *Wegoland*) are distinguishable because they involved RICO and Sherman Act claims,

which HUD says implicate a "'no-injury principle' unique to those statutes."  That purported

distinction is not helpful to HUD.  The so-called "no-injury principle" is not a limitation or bar

on the filed-rate doctrine's application, and it has nothing to do with the Supremacy Clause.

Instead, the principle is a shorthand descriptor of how the filed-rate doctrine applies in RICO and

antitrust cases.  It refers to the fact that the substantive elements of RICO and Sherman Act

claims do not challenge the reasonableness of filed rates; instead, they challenge conduct related

to the rate-setting *process*.  Nonetheless, even though the reasonableness of the rates is not an

element of those claims, the filed-rate doctrine still applies at both the standing and remedial

phases because the plaintiff's claimed injury is that "he lost the benefit" of "lower rates," which

he alleges he would have enjoyed "but for the [antitrust] conspiracy" or racketeering conduct.

*Square D*, 476 U.S. at 415-416.  By operation of the filed-rate doctrine, the injury claimed in

such cases is not cognizable (i.e., it is "no injury" at all) because the plaintiff has no "legal right"

to a rate lower than the rate that was filed.  *Id.*

In disparate-impact claims under the Rule, the same result would apply when the injury plaintiffs assert is the payment of insurance rates with an alleged disparate impact. And indeed, the filed-rate doctrine would have broader application because the interference with filed rates is far more invasive under the Rule. As noted (*supra* pp.23-25), the substantive analysis of such a claim (unlike a RICO or antitrust claim) requires, at steps two and three of the burden-shifting framework, judicial scrutiny of the reasonableness of the filed rates themselves. Thus, the filed-rate doctrine would apply with full force.

Finally, in the Final Rule's discussion of the Supremacy Clause, HUD asserted that the filed-rate doctrine "does not preclude injunctive relief or prohibit the Government from seeking civil or criminal redress." 88 Fed. Reg. at 19,478. Now in its brief (at 44), the agency makes the same point, apparently independent of its Supremacy Clause argument. In any case, this argument is meritless. For one thing, the Rule is not limited to claims brought by the government or for injunctive relief, so the filed-rate doctrine's claimed inapplicability to those claims does not justify the agency's action here. Moreover, what HUD actually identifies is a case-specific carve-out of the filed-rate doctrine that has no relevance here. The carve-out has origins in antitrust cases involving "price-fixing conspiracies that conceivably could have been enjoined without tampering with the [filed] rates themselves," and where the government could take civil or criminal action against the conspiracies without changing the rates. *Town of Norwood*, 202 F.3d at 419-420. Where, however, such relief "would require the *alteration*" of the rates, the carveout is inapplicable. *Id.* at 420. Disparate-impact claims under the Rule fall into this latter category: If a court were to find that an insurer's risk-based pricing or underwriting practices led to discriminatory effects, the relief would be prohibiting use of the filed rates, which runs afoul of the filed-rate doctrine.

**IV.     HUD Failed To Adequately Address The Rule's Impact On The Business Of Insurance**

HUD still fails to justify the grave threat to the business of insurance posed by applying the Rule to risk-based pricing and underwriting.  HUD assures (at 43) that it reasonably determined that insurers would not be forced to abandon risk-based pricing and underwriting or adopt alternative practices "that would undermine the insurance market."  As comments explained, that outlook reveals a misunderstanding of risk-based practices and an unwillingness to confront real-world consequences of insurance pricing that does not accurately account for risk.  *See, e.g.*, PCI SOF ¶¶ 9, 14-22, 74-78, 96-104.  HUD's failure to grapple with the Rule's effect on the business of insurance is arbitrary and capricious.

**A.     HUD's Reasoning Continues To Rest On The Misunderstanding That Insurers Can Readily Replace One Practice With Another That Is Less Effective At Predicting Risk**

HUD begins its defense of the Rule by disclaiming any intent to undermine or preclude the "use of actuarially sound risk factors."  In fact, HUD asserts (at 41), the Rule does no such thing; the agency claims to have "recogniz[ed] that risk-based decision making is an important aspect of sound insurance practice" and explained that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based."  But HUD then explains (at 41) that it reasonably disregarded the insurance industry's concerns because "practices that actually are risk-based, *and for which no less discriminatory alternative exists*, will not give rise to discriminatory effects liability." (emphasis added).  That analysis exposes the fundamental misunderstanding that renders HUD's refusal to exempt risk-based practices unreasonable.

HUD's argument rests on the flawed assumption that it will have no impact on the business of insurance to require a risk-based practice to be replaced by a "less discriminatory alternative" practice that is less predictive of risk.  As PCI has explained, and the administrative

record makes clear, this result would upend the homeowners-insurance industry: applying the Rule to risk-based pricing and underwriting could force insurers "to abandon sound, good-faith practices in favor of substitutes that are less effective," putting insurers out of compliance with actuarial standards and state law. PCI SOF ¶ 96 (quoting 2021 PCI comment); *id.* ¶ 97 (discussing comments from NAMIC and others).

HUD unreasonably ignored these concerns in its rulemaking, and it continues to ignore them now. HUD claims inaccurately (at 42-43) that this Court has blessed its failure to require that any less discriminatory alternative be "equally effective" at predicting risk. But this Court never determined that it was reasonable for HUD to refuse to adopt an "equally effective" standard, or to apply a lesser standard to homeowners insurers—and thus require the industry to abandon risk-based practices in favor of alternative practices that are not "equally effective" at predicting risk. Rather, the Court held only that HUD was not required by the text of the FHA and caselaw applying disparate-impact liability to codify an "equally effective" standard in all cases where disparate-impact claims are brought against FHA-covered housing practices. *PCI*, 66 F. Supp. 3d at 1051-1053. In fact, the Court ordered HUD to "evaluate the substance of the insurance industry's concerns" that disparate-impact liability "would undermine the fundamental nature of insurance" and that providing insurers "an opportunity to raise their arguments as part of the burden-shifting framework" in place of a more demanding standard would not alleviate this threat. *Id.* at 1051. HUD failed to do so.

**B.    HUD Did Not Justify Its Failure To Exempt Risk-Based Practices In Light Of The Rule's Threat To The Business Of Insurance**

Even as HUD rehashes the same flawed explanations from its rulemaking, HUD does not attempt to refute any of PCI's arguments for why the Rule would threaten the business of insurance. Because HUD has "fail[ed] to respond to 'significant points' and consider 'all

relevant factors' raised by" PCI's comment, its action is arbitrary and capricious. *Carson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).

*First*, HUD argues (at 42-43) that "insurers have been subject to potential discriminatory-effects liability for decades" without abandoning risk-based practices and that PCI "fail[ed] to show any ongoing harm from the Rule's ten years in existence." HUD does not point to a single decision applying discriminatory-effects liability to risk-based pricing and underwriting practices during the years before the Rule was initially proposed, let alone "decades" of authority supporting such an application. And given that the Rule has been in legal limbo for the entirety of its episodic existence, it is hardly a surprise that ill effects of the Rule have yet to upend the industry. As explained at length above, there is no question that the Rule's application would dismantle the tools the industry relies on to comply with actuarial standards and state law. And PCI and other commenters have described the actual and imminent harm directly attributable to the Rule, including significant compliance costs. PCI SOF ¶ 98 (discussing 2021 PCI comment); *id.* ¶ 99 (discussing comments from insurers, underwriters, and public officials); *id.* ¶ 122 (discussing PCI member declarations). In its opening brief, PCI therefore described (at 26) the "considerable uncertainty and confusion the homeowners-insurance industry has experienced from being subject to a Rule that clashes with state laws and was declared arbitrary and capricious almost a decade ago." HUD's continued blank insistence that application of the Rule will not result in the concrete harms and credible fears PCI has articulated does not render its decision-making any more reasonable.

*Second*, in its opening brief, PCI explained (at 20-21) that HUD could not support its reasoning that disparate-impact liability "has proven workable in other contexts involving complex risk based decisions," 88 Fed. Reg. at 19,467, because HUD never explained how it

determined liability was workable in those contexts or how those contexts were comparable to homeowners insurance. HUD still offers no explanation. HUD cites only one decision permitting a disparate-impact claim to proceed against a mortgage lender, an industry that, unlike risk-based pricing and underwriting of homeowners insurance, is subject to longstanding federal regulation. *See, e.g.*, 42 U.S.C. § 3605(b)(1) (prohibiting discrimination in "[t]he making or purchasing of loans" under the FHA). HUD nowhere explains how homeowners insurers could do the same despite their operation within a comprehensive state regulatory regime that defines permissible and mandatory uses of risk-based practices.

*Third*, PCI explained (at 21 & n.10) that the jurisdictions HUD identifies as "specifically provid[ing] for discriminatory effects liability against insurers," 88 Fed. Reg. at 19,467 & n.153, do nothing of the kind. In its response, HUD simply repeats (at 42) that "[s]ome state laws have subjected insurers to potential discriminatory-effects liability[.]" But HUD points to no decision applying disparate-impact liability to risk-based pricing and underwriting of homeowners insurance, and therefore cannot support its argument (at 42) that "exposure" to such liability "has yet to prevent the industry from using risk-based decision-making."

*Finally*, in its opening brief, PCI explained (at 21-22) that it was not reasonable for HUD to refuse to exempt risk-based practices based on its concern that an exemption could permit "a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations." 88 Fed. Reg. at 19,468. But PCI sought—and amply justified—an exemption for risk-based pricing and underwriting of homeowners insurance, PCI SOF ¶¶ 92-112—not an exemption for "insurance practices that *do not involve* actuarial or risk-based calculations." 88 Fed. Reg. at 19,468 (emphasis added). If HUD believed that certain insurance practices were "not purely risk-based" and created discriminatory effects, HUD "failed to consider the obvious

alternative of subjecting those practices alone to liability under the Rule," while providing an exemption for risk-based pricing and underwriting of homeowners insurance. PCI MSJ at 21-22. HUD does not explain why it could not implement this targeted solution to the purported problem it identified. This refusal to grapple with "'significant and viable and obvious alternatives'" is "the epitome of arbitrary and capricious action." *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 641 (5th Cir. 2023).

## V. HUD Failed To Adequately Address The Rule's Conflict With *Inclusive Communities*

In reinstating the Rule, HUD simply asserted that *Inclusive Communities* reaffirmed, rather than undermined, its decision to expose homeowners insurers to disparate-impact liability for risk-based practices. 88 Fed. Reg. at 19,458-19,460. HUD now insists (at 46 n.31) that this bare reference "demonstrat[es] that HUD adequately considered" the impact of the Supreme Court's decision. But as PCI explained (MSJ at 23-25), *Inclusive Communities* articulated "significant limitations on disparate-impact liability" with which HUD failed to grapple. HUD's blindered determination to greenlight disparate-impact suits challenging risk-based practices is all the more unreasonable because, after *Inclusive Communities*, those suits will not succeed.

While this Court and others have held that *Inclusive Communities* did not invalidate HUD's statutory authority, no court has held that application of the burden-shifting framework for disparate-impact liability to risk-based practices is reasonable. This Court, in fact, observed that, even if HUD retains the statutory authority to implement the burden-shifting framework after *Inclusive Communities*, the Supreme Court decision may be "relevant" to PCI's arbitrary and capricious claim. *See Property Casualty Insurers Ass'n of Am. v. Carson*, 2017 WL 2653069, at *8 (N.D. Ill. June 20, 2017). And PCI explained in its opening brief (at 23) just why *Inclusive Communities* is relevant—it spelled out the "safeguards" that must cabin disparate-

impact liability so that race is not "used and considered in a pervasive way." 576 U.S. at 542.

Because no court can find a homeowners insurer liable for the alleged discriminatory effects of a

risk-based practice that is required or permitted by state law without disregarding the

"safeguards" *Inclusive Communities* requires, the Rule's application to those practices is

arbitrary and capricious.

HUD's claim (at 47-48) it had "already considered the relevant limitations" on disparate-

impact liability before *Inclusive Communities*, and had no need to revisit them thereafter, is

unreasonable given the "key limitations to disparate impact-liability" identified by the Supreme

Court, *see PCI*, 2017 WL 2653069, at *8. Courts have noted that *Inclusive Communities*

"undoubtedly announce[d] a more demanding test than that set forth in the HUD regulation,"

*Inclusive Cmtys. Proj., Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019), and that "the

standard announced in *Inclusive Communities* rather than the HUD regulation controls [the]

inquiry," *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.4 (4th Cir. 2018).

As a prime example, *Inclusive Communities* requires a practice to be "artificial, arbitrary,

and unnecessary" to incur disparate-impact liability. The very cases cited by HUD acknowledge

this important limitation, which HUD unreasonably refused to incorporate into the Rule.

*Compare Montgomery Cnty. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 181 (D. Md. 2019) ("To

state a claim for disparate impact in violation of the FHA … 'the challenged policy must be

artificial, arbitrary, and unnecessary.'"), *with* HUD MSJ 48 (calling the "artificial, arbitrary, and

unnecessary" requirement a "short-hand formulation" rather than "a new limitation"). Other

judges in this District have reached the same conclusions. *See County of Cook v. Wells Fargo &

Co.*, 314 F. Supp. 3d 975, 991 (N.D. Ill. 2018) (*Inclusive Communities* held that "the challenged

policy must be "artificial, arbitrary, and unnecessary."); *National Fair Hous. All. v. Deutsche*

*Bank Nat'l Tr.*, 2019 WL 5963633, at *16 (N.D. Ill. Nov. 13, 2019) ("A policy that causes a disparate impact must be 'artificial, arbitrary, and unnecessary'" to violate the FHA.").

HUD's failure to implement this safeguard outlined in *Inclusive Communities* underscores the arbitrariness of its decision not to exempt risk-based pricing and underwriting of homeowners insurance. Imposing disparate-impact liability for risk-based practices, without requiring the plaintiff to identify an "equally effective" alternative practice, goes far beyond liability for "artificial, arbitrary, and unnecessary barriers." And, as PCI explained in its opening brief (at 23-25), HUD also failed to consider several other limitations the Supreme Court announced in *Inclusive Communities*. By penalizing insurers for employing risk-based practices in compliance with state law, HUD's Rule would subject insurers to liability "for racial disparities they did not create," in violation of *Inclusive Communities*. 576 U.S. at 542. And by forcing insurers to collect racial demographic data, the Rule would impermissibly "inject racial considerations" into housing decisions. *Id.* at 543; *see supra* Section I.A.

## VI. The Appropriate Remedy Is To Vacate The Rule As Applied To Risk-Based Pricing And Underwriting Of Homeowners Insurance

If this Court determines that HUD again failed to justify application of its Rule to risk-based pricing and underwriting of homeowners insurance, the "presumptive" remedy is to vacate the Rule as applied to those practices. PCI MSJ 25. HUD does not demonstrate why it qualifies for the "unusual" exception to that rule. *Hoosier Env't Council v. Natural Prairie Ind. Farmland Holdings, LLC*, 2023 WL 2571678, at *4 (N.D. Ind. Mar. 20, 2023).

Remand without vacatur is appropriate only when (1) an agency could cure a rule's unlawful flaws on remand and (2) vacatur would impose significant and disruptive consequences—such as harm to public health and the environment, *United States Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016), or irrecoverable costs on an agency, *Allied-Signal, Inc.*

*v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). Here, HUD does not explain how it could substantiate its decision to fail to exempt risk-based pricing and underwriting of homeowners' insurance on a fifth try. Nor does HUD show how vacatur could "invite chaos" of the type that would support keeping in place a rule that is unlawful as it relates to these homeowners-insurance practices. Instead, HUD (at 49-50) simply points out that the Rule theoretically has been in place for a decade and that this Court previously granted the remedy of remand without vacatur. That argument ignores the reality that the Rule was declared "arbitrary and capricious" and then subject to repeated replacement rulemakings. The fact that the Rule has already been declared arbitrary and capricious and remanded only illustrates why additional delay after multiple failed attempts to justify it is prejudicial. Keeping the Rule in place invites the harms identified in PCI's opening brief (at 26-27).

## CONCLUSION

For these reasons, the Court should grant summary judgment in favor of PCI, deny summary judgment to HUD, and vacate the Rule as applied to risk-based pricing and underwriting of homeowners insurance.

Dated: November 7, 2023

Respectfully submitted,

PROPERTY CASUALTY INSURERS
ASSOCIATION OF AMERICA

*/s/ Seth P. Waxman*
Seth P. Waxman (*pro hac vice*)
Catherine M.A. Carroll (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Colleen Marie Campbell
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
Tel.: (720) 274-3135
Fax: (720) 274-3133
Email: colleen.campbell@wilmerhale.com

Rowe W. Snider (# 03125194)
Alyssa M. Gregory (# 6320588)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

*Attorneys for Plaintiff*