Persons interested in being placed on a mailing list for future NPRM's should contact the FAA's Office of Rulemaking, (202) 267–9677, for a copy of Advisory Circular No. 11–2A, Notice of Proposed Rulemaking Distribution System, which describes the application procedure.

**The Proposal**

The FAA is proposing an amendment to Title 14 Code of Federal Regulations (14 CFR) part 71 by amending Class E airspace designated as an extension to Class C airspace area for City of Colorado Springs Municipal Airport, Colorado Springs, CO. Airspace reconfiguration is necessary due to the decommissioning of the Black Forest TACAN. Also, the geographic coordinates of the airport would be updated to coincide with the FAA's aeronautical database. Controlled airspace is necessary for the safety and management of IFR operations at the Airport.

Class E airspace designations are published in paragraph 6003, of FAA Order 7400.9V, dated August 9, 2011, and effective September 15, 2011, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designation listed in this document will be published subsequently in this Order.

The FAA has determined this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. Therefore, this proposed regulation; (1) is not a ''significant regulatory action'' under Executive Order 12866; (2) is not a ''significant rule'' under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified this proposed rule, when promulgated, would not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the U.S. Code. Subtitle 1, section 106, describes the authority for the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in subtitle VII, part A, subpart I, section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it would amend controlled airspace at City of Colorado Springs Municipal Airport, Colorado Springs, CO.

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**The Proposed Amendment**

Accordingly, pursuant to the authority delegated to me, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1 [Amended]**

2. The incorporation by reference in 14 CFR 71.1 of the Federal Aviation Administration Order 7400.9V, Airspace Designations and Reporting Points, dated August 9, 2011, and effective September 15, 2011 is amended as follows:

*Paragraph 6003   Class E airspace designated as an extension to Class C surface areas.*

\*   \*   \*   \*   \*

**ANM CO E3   Colorado Springs, CO [Amended]**

City of Colorado Springs Municipal Airport, CO

(Lat. 38°48′21″ N., long. 104°42′03″ W.)

That airspace extending upward from the surface within 2.4 miles northwest and 1.2 miles southeast of the City of Colorado Springs Municipal Airport 025° bearing extending from the 5-mile radius of the airport to 8.9 miles northeast and within 1.4 miles each side of the airport 360° bearing extending from the 5-mile radius of the airport to 7.7 miles north of the airport.

Issued in Seattle, Washington, on November 8, 2011.

**William Buck,**

*Acting Manager, Operations Support Group, Western Service Center.*

[FR Doc. 2011–29635 Filed 11–15–11; 8:45 am]

**BILLING CODE 4910–13–P**

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–5508–P–01]**

**RIN 2529–AA96**

## Implementation of the Fair Housing Act's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, to which Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules implementing the Act, has long interpreted the Act to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate.

The reasonableness of HUD's interpretation is confirmed by eleven United States Courts of Appeals, which agree that the Fair Housing Act imposes liability based on discriminatory effects. By the time the Fair Housing Amendments Act became effective in 1989, nine of the thirteen United States Courts of Appeals had determined that the Act prohibits housing practices with a discriminatory effect even absent an intent to discriminate. Two other United States Courts of Appeals have since reached the same conclusion, while another has assumed the same but did not need to reach the issue for purposes of deciding the case before it.

Although there has been some variation in the application of the discriminatory effects standard, neither HUD nor any Federal court has ever determined that liability under the Act requires a finding of discriminatory intent. The purpose of this proposed rule, therefore, is to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

**DATES:** *Comment due date:* January 17, 2012.

**ADDRESSES:** Interested persons are invited to submit written comments regarding this proposed rule to the

---

[1] This preamble uses the term ''disability'' to refer to what the Act and its implementing regulations term a ''handicap.''

Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410. All communications should refer to the above docket number and title. There are two methods for submitting public comments.

1. *Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *http://www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *http://www.regulations.gov* Web site can be viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

2. *Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–0500.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

*No Facsimile Comments.* Facsimile (FAX) comments are not acceptable.

*Public Inspection of Public Comments.* All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an appointment to review the public comments must be scheduled in advance by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339. Copies of all comments submitted are available for inspection and downloading at *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–

0500, telephone number (202) 402–5188. Persons with hearing and speech impairments may contact this phone number via TTY by calling the Federal Information Relay Service at (800) 877–8399.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. History of Discriminatory Effects Liability Under the Fair Housing Act*

The Fair Housing Act declares it to be "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [2] Congress considered the realization of this policy "to be of the highest priority." [3] The language of the Fair Housing Act prohibiting discrimination in housing is "broad and inclusive";[4] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [5] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives recognized that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [6]

In keeping with the "broad remedial intent" of Congress in passing the Fair Housing Act,[7] and consequently the Act's entitlement to a "generous construction," [8] HUD, to which Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules to carry out the Act,[9] has repeatedly determined that the Fair Housing Act is directed to the consequences of housing practices, not simply their purpose. Under the Act, housing practices—regardless of any discriminatory motive or intent—cannot be maintained if they operate to deny protected groups equal housing opportunity or they create, perpetuate, or increase segregation without a legally sufficient justification.

Accordingly, HUD has concluded that the Act provides for liability based on

discriminatory effects without the need for a finding of intentional discrimination. For example, HUD's Title VIII Complaint Intake, Investigation and Conciliation Handbook (Handbook), which sets forth HUD's guidelines for investigating and resolving Fair Housing Act complaints, recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases.[10] In adjudicating charges of discrimination filed by HUD under the Fair Housing Act, HUD administrative law judges have held that the Act is violated by facially neutral practices that have a disparate impact on protected classes.[11] HUD's regulations interpreting the Fair Housing Act prohibit practices that create, perpetuate, or increase segregated housing patterns.[12] HUD also joined with the Department of Justice and nine other Federal enforcement agencies to recognize that disparate impact is among the "methods of proof of lending discrimination under the * * * Act" and provide guidance on how to prove a disparate impact fair lending claim.[13]

In addition, in regulations implementing the Federal National Mortgage Enterprises Financial Safety and Soundness Act, HUD prohibited mortgage purchase activities that have a discriminatory effect. In enacting these regulations,[14] which prescribe the fair lending responsibilities of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), HUD noted that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that disparate impact law "is applicable to all

---

[2] *See* 42 U.S.C. 3601.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 211 (1972) (internal citation omitted).

[4] *Id.* at 209.

[5] *Id.* at 211.

[6] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[7] *Havens Realty Corp.* v. *Coleman,* 455 U.S. 363, 380 (1982).

[8] *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731–732 (1995).

[9] *See* 42 U.S.C. 3608(a) and 42 U.S.C. 3614a.

[10] *See, e.g.,* Handbook at 3–25 (the Act is violated by an "action or policy [that] has a disproportionately negative effect upon persons of a particular race, color, religion, sex, familial status, national origin or handicap status"); *id.* at 2–27 ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[11] *See e.g., HUD* v. *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Ross,* 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter,* 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[12] *See* 24 CFR 100.70.

[13] *Policy Statement on Discrimination in Lending,* 59 FR 18,266, 18,268 (Apr. 15, 1994).

[14] *See* 24 CFR 81.42.

segments of the housing marketplace, including the GSEs.'' [15]

Moreover, all Federal courts of appeals to have addressed the question have held that liability under the Act may be established based on a showing that a neutral policy or practice either has a disparate impact on a protected group [16] or creates, perpetuates, or increases segregation,[17] even if such a policy or practice was not adopted for a discriminatory purpose.

The Fair Housing Act's discriminatory effects standard is analogous to the discriminatory effects standard under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e), which prohibits discriminatory employment practices. The U.S. Supreme Court held that Title VII reaches beyond intentional discrimination to include employment practices that have a discriminatory effect.[18] The Supreme Court explained that Title VII ''proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.'' [19]

It is thus well established that liability under the Fair Housing Act can arise where a housing practice is intentionally discriminatory or where it has a discriminatory effect.[20] A discriminatory effect may be found where a housing practice has a disparate impact on a group of persons protected by the Act, or where a housing practice has the effect of creating, perpetuating, or increasing segregated housing patterns on a protected basis.[21]

### B. Application of the Discriminatory Effects Standard Under the Fair Housing Act

While the discriminatory effects theory of liability under the Fair Housing Act is well established, there is minor variation in how HUD and the courts have applied that theory. For example, HUD has always used a three-step burden-shifting approach,[22] as do many Federal courts of appeals.[23] But some courts apply a multi-factor balancing test,[24] other courts apply a hybrid between the two,[25] and one court

applies a different test for public and private defendants.[26]

Another source of variation is in the application of the burden-shifting test. Under the burden-shifting approach, the plaintiff (or, in administrative proceedings, the complainant) must make a prima facie showing of either disparate impact or perpetuation of segregation. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant or respondent satisfies its burden, courts and HUD administrative law judges have differed as to which party bears the burden of proving whether a less discriminatory alternative to the challenged practice exists. The majority of Federal courts of appeals that use a burden-shifting approach place this burden on the plaintiff,[27] analogizing to Title VII's burden-shifting framework.[28] Other Federal courts of appeals have kept the burden with the defendant.[29] HUD has, at times, placed this burden of proving a less discriminatory alternative on the respondent and, at other times, on the complainant.[30]

### C. Scope of the Proposed Rule

This proposed rule establishes a uniform standard of liability for facially neutral housing practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The plaintiff or complainant first must bear the burden

---

[15] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR. 61,846, 61,867 (Dec. 1, 1995).

[16] See, e.g., Graoch Assocs. #33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 374 (6th Cir. 2007); Reinhart v. Lincoln County, 482 F.3d 1225, 1229 (10th Cir. 2007); Charleston Housing Auth. v. U.S. Dep't of Agric., 419 F.3d 729, 740–41 (8th Cir. 2005); Langlois v. Abington Hous. Auth., 207 F.3d 43, 49–50 (1st Cir. 2000); Simms v. First Gibraltar Bank, 83 F.3d 1546, 1555 (5th Cir. 1996); Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1543 (11th Cir. 1994); Keith v. Volpe, 858 F.2d 467, 484 (9th Cir. 1988); Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 938 (2d Cir. 1988), judgment aff'd, 488 U.S. 15 (1988); Resident Advisory Board v. Rizzo, 564 F.2d 126, 149–50 (3d Cir. 1977); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 988–89 (4th Cir. 1984); Metro. Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir. 1977).

[17] See, e.g., Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 378 (6th Cir. 2007); Hallmark Developers, Inc. v. Fulton County, Ga., 466 F.3d 1276, 1286 (11th Cir. 2006); Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 937 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 987 n.3 (4th Cir. 1984); Metro. Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290–1291 (7th Cir. 1977); United States. v. City of Black Jack, Missouri, 508 F.2d 1179, 1184–86 (8th Cir. 1974); see also Trafficante, 409 U.S. at 209–210.

[18] See Griggs v. Duke Power Co., 401 U.S. 424, 433–34 (1971).

[19] Id. at 431.

[20] See, e.g., 42 U.S.C. 3604(a), (b), (f)(1), (f)(2); 42 U.S.C. 3605; 42 U.S.C. 3606. Liability under the Fair Housing Act can also arise in other ways, for example, where a reasonable person would find a notice, statement, advertisement, or representation to be discriminatory, see 42 U.S.C. 3604(c), or where a reasonable accommodation is refused, see 42 U.S.C. 3604(f)(3). The Act also imposes an affirmative obligation on HUD and other executive departments and agencies to administer their programs and activities related to housing and urban development in a manner affirmatively to further the purposes of the Fair Housing Act. See 42 U.S.C. 3608(d); see also 3608(e)(5).

[21] A ''discriminatory effect'' prohibited by the Act refers to either a ''disparate impact'' or the ''perpetuation of segregation.'' See, e.g. Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 378 (6th Cir. 2007) (there are ''two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.'').

[22] See, e.g., HUD v. Pfaff, 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994); HUD v. Mountain Side Mobile Estates P'ship, 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); HUD v. Carter, 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); Twinbrook Village Apts., 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); see also Policy Statement on Discrimination in Lending, 59 FR. 18,266, 18,269 (Apr. 15, 1994) (applying three-step test without specifying where the burden lies at each step).

[23] See, e.g., Oti Kaga, Inc. v. S. Dakota Hous. Dev. Auth., 342 F.3d 871, 883 (8th Cir. 2003); Lapid –Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains, 284 F.3d 442, 466–67 (3d Cir. 2002); Langlois v. Abington Hous. Auth., 207 F.3d 43, 49–50 (1st Cir. 2000); Huntington Branch NAACP v. Town of Huntington, N.Y., 844 F.2d 926, 939 (2d Cir. 1988).

[24] See, e.g., Metro. Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir. 1977) (four-factor balancing test).

[25] See, e.g., Mountain Side Mobile Estates v. Sec'y HUD, 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (three-factor balancing test incorporated into burden shifting framework to weigh defendant's justification); Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 373 (6th Cir. 2007) (balancing test incorporated as elements of proof after second step of burden shifting framework).

[26] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. See e.g., Betsey v. Turtle Creek Assocs., 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[27] See, e.g., Gallagher v. Magner, 619 F.3d 823, 834 (8th Cir. 2010); Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 373–74 (6th Cir. 2007); Mountain Side Mobile Estates v. Sec'y HUD, 56 F.3d 1243, 1254 (10th Cir. 1995).

[28] See, e.g. Graoch, 508 F.3d at 373 (6th Cir. 2007) (''claims under Title VII and the [Fair Housing Act] generally should receive similar treatment''); Mountain Side Mobile Estates v. Sec'y HUD, 56 F.3d 1243, 1254 (10th Cir. 1995) (explaining that in interpreting Title VII, 'the Supreme Court has repeatedly stated that the ultimate burden of proving that discrimination caused a protected group has been caused by a specific * * * practice remains with the plaintiff at all times'') (internal citation omitted).

[29] See, e.g., Huntington Branch NAACP v. Town of Huntington, N.Y., 844 F.2d 926, 939 (2d Cir. 1988); Resident Advisory Board v. Rizzo, 564 F.2d 126, 146–48 (3d Cir. 1977).

[30] Compare, e.g., HUD v. Carter, 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), and Twinbrook Village Apts., 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), with HUD v. Mountain Side Mobile Estates P'ship, 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993) (complainant bears the burden of showing that a less discriminatory alternative exists), and HUD v. Pfaff, 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice has a necessary and manifest relationship to one or more of the defendant's or respondent's legitimate, nondiscriminatory interests. If the defendant or respondent satisfies its burden, the plaintiff or complainant may still establish liability by demonstrating that these legitimate nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect.[31]

HUD proposes this standard for several reasons. First, Title VII, enacted four years before the Fair Housing Act, has often been looked to for guidance in interpreting analogous provisions of the Fair Housing Act.[32] HUD's proposal is consistent with the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII.[33] Second, HUD's proposal is consistent with the discriminatory effects standard applied under the Equal Credit Opportunities Act (ECOA),[34] which borrows from Title VII's burden-shifting framework.[35] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which

---

[31] *See Graoch Associates #33, L.P.* v. *Louisville/ Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 373–74 (6th Cir. 2007); *Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995).

[32] *See, e.g., Trafficante,* 409 U.S. at 205; The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61,846, 61,868 (Dec. 1, 1995). Short form cite in n. 15.

[33] *See* 42 U.S.C. 2000e–2(k).

[34] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. *See* 15 U.S.C. 1691.

[35] *See* S. Rep. 94–589, 94th Cong., 2d Sess. (1976) ("judicial constructions of antidiscrimination legislation in the employment field, in cases such as *Griggs* v. *Duke Power Company,* 401 U.S. 424 (1971), *and Albemarle Paper Co.* v. *Moody* (U.S. Supreme Court, June 25, 1975) [422 U.S. 405], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 202.6(a), n. 2 (1997) ("The legislative history of [ECOA] indicates that the Congress intended an "effects test" concept, as outlined in the employment field cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971) and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 202, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e– 2).").

prohibits discrimination in residential real estate-related transactions.[36] The interagency *Policy Statement on Discrimination in Lending* analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without differentiation.[37] Under HUD's proposed framework, parties litigating a claim brought under both the Fair Housing Act and ECOA will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Third, by placing the burden of proving a necessary and manifest relationship to a legitimate, nondiscriminatory interest on the defendant or respondent and the burden of proving a less discriminatory alternative on the plaintiff or complainant, "neither party is saddled with having to prove a negative." [38]

## II. This Proposed Rule

### A. Subpart G—Discriminatory Effect

#### 1. Discriminatory Effect Prohibited (§ 100.500)

HUD proposes adding a new subpart G, entitled "Prohibiting Discriminatory Effects," to its Fair Housing Act regulations in 24 CFR part 100. Subpart G would confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The housing practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Subsection 100.500(d) clarifies that a legally sufficient justification does not defeat liability for a discriminatory intent claim once the intent to discriminate has been established.[39]

This proposed rule would apply to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.[40]

---

[36] *See* 59 FR 18,266.

[37] *See* 59 FR 18,266, 18,269 (Apr. 15, 1994).

[38] *Hispanics United of DuPage Cnty.* v. *Vill. of Addison, Ill.,* 988 F.Supp. 1130, 1162 (N.D. Ill. 1997).

[39] It is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. *See, e.g., Vill. of Arlington Heights* v. *Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977). But proof of intent to discriminate is not necessary to prevail on a discriminatory effects claim. *See, e.g., Black Jack,* 508 F.2d at 1184–85.

[40] *See* 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under

#### 2. Discriminatory Effect Defined (§ 100.500(a))

Under the Fair Housing Act and this proposed rule, a "discriminatory effect" occurs where a facially neutral housing practice actually or predictably results in a discriminatory effect on a group of persons (that is, a disparate impact), or on the community as a whole (perpetuation of segregation).[41] Any facially neutral action, *e.g.* laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule.

*Disparate Impact.* Examples of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act include a zoning ordinance restricting private construction of multifamily housing to a largely minority area (*see Huntington Branch,* 844 F.2d at 937); the provision and pricing of homeowner's insurance (*see Ojo* v. *Farmers Group, Inc.,* 600 F.3d 1205, 1207–8 (9th Cir. 2010) (en banc)); mortgage pricing policies that give lenders or brokers discretion to impose additional charges or higher interest rates unrelated to a borrower's creditworthiness (*see Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 253 (D. Mass. 2008)); credit scoring overrides provided by a purchaser of loans (*see Beaulialice* v. *Federal Home Loan Mortg. Corp.,* 2007 WL 744646, *4 (M.D. Fla. Mar. 6, 2007)); and credit offered on predatory terms, (*see Hargraves* v. *Capitol City Mortgage,* 140 F. Supp. 2d 7, 20–21 (D.D.C. 2000)). Further examples of such claims can be found in the following court cases: *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988), where the city's land-use decisions that prevented the construction of two housing developments for city residents displaced by a freeway had a greater adverse impact on minorities than on whites because two-thirds of the persons who would have benefited from the housing were minorities; (*Langlois,* 207 F.3d at 50, where public housing authorities' use of local residency preferences to award Section 8 Housing

---

Section 804, 805, 806, or 818," none of which distinguish between public and private entities); *see also Nat'l Fair Housing Alliance, Inc.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 59–60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, noting that a "distinction between governmental and non- governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[41] *See., e.g., Graoch Associates # 33, L.P.,* 508 F.3d at 378.

Choice Vouchers likely would result in an adverse impact based on race; *United States* v. *Incorporated Village of Island Park,* 888 F. Supp. 419, 447 (E.D.N.Y. 1995), where a housing program's preference for residents of the Village, most of whom were white, had a disparate impact on African-Americans; *Charleston Housing Auth.,* 419 F.3d at 741–42, where the housing authority's plan to demolish 50 low-income public housing units—46 of which were occupied by African Americans—would disproportionately impact African Americans based on an analysis of the housing authority's waiting list population, the population of individuals income-eligible for public housing, or the current tenant population; and *Smith* v. *Town of Clarkton, N.C.,* 682 F.2d 1055, 1065–66 (4th Cir. 1982), where the town's withdrawal from a multi-municipality housing authority effectively blocked construction of 50 units of public housing, adversely affecting African American residents of the county, who were those most in need of new construction to replace substandard dwellings).

*Perpetuation of Segregation.* A person or entity may be liable for a housing policy or practice that has a discriminatory effect on the community because the practice has the effect of creating, perpetuating, or increasing housing patterns that segregate by race, color, religion, sex, familial status, national origin, or disability. Examples of such claims can be found in the following court cases: *Huntington Branch,* 844 F.2d at 934, 937, where the town's zoning ordinance, which limited private construction of multifamily housing to a largely minority neighborhood, had the effect of perpetuating segregation "by restricting low-income housing needed by minorities to an area already 52% minority"; *Dews* v. *Town of Sunnyvale, Tex.,* 109 F. Supp. 2d 526, 567 (N.D. Tex. 2000), where the town's zoning ordinance that banned multifamily housing and required single-family lots of at least one acre had the effect of perpetuating segregation by keeping minorities out of a town that was 94 percent white; *Black Jack,* 508 F.2d at 1186, where a city ordinance preventing the construction of low-income multifamily housing "would contribute to the perpetuation of segregation in a community which was 99% white"; and *Inclusive Communities Projects, Inc.* v. *Texas Dep't of Housing & Community Affairs,* 749 F. Supp. 2d 486, 500 (N.D. Tex. 2010), where the state's disproportionate denial of tax credits for nonelderly housing in predominately white neighborhoods had a segregative impact on the community.

3. Legally Sufficient Justification (§ 100.500(b))

A housing practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification." A "legally sufficient justification" exists where the housing practice or policy: (1) Has a necessary and manifest relationship to the defendant's or respondent's legitimate, nondiscriminatory interests;[42] and (2) those interests cannot be served by another practice that has a less discriminatory effect.[43] A legally sufficient justification may not be hypothetical or speculative. In addition, a legally sufficient justification does not defeat liability for a discriminatory *intent* claim once the intent to discriminate has been established.

4. Burdens of Proof (§ 100.500(c))

The burden-shifting framework set forth in the proposed rule for discriminatory effect claims finds support in judicial interpretations of the Act, and is also consistent with the burdens of proof Congress assigned in disparate impact employment discrimination cases. *See* 42 U.S.C. § 2000e-2(k). In the proposed rule, the complainant or plaintiff first bears the burden of proving its prima facie case, that is, that a housing practice caused, causes, or will cause a discriminatory effect on a group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin.

Once the complainant or plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests.

If the respondent or defendant satisfies its burden, the complainant or plaintiff may still establish liability by demonstrating that these legitimate, nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect.

*B. Examples of Housing Practices With Discriminatory Effects*

Violations of various provisions of the Act may be established by proof of discriminatory effects. For example, under 42 U.S.C. subsections 3604(a) and 3604(f)(1), discriminatory effects claims may be brought under the Act's provisions that make it unlawful to "otherwise make unavailable or deny [ ] a dwelling" because of a protected characteristic. Discriminatory effects claims may be brought pursuant to subsections 3604(b) and 3604(f)(2) of the Act prohibiting discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic. For residential real estate-related transactions, discriminatory effects claims may be brought under section 3605, which bars "discrimination against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of" a protected characteristic. Discriminatory effects claims may also be brought under section 3606, prohibiting discrimination in the provision of brokerage services.

HUD's existing Fair Housing Act regulations provide examples of housing practices that may violate the Act, based on an intent theory, an effects theory, or both. The proposed rule adds examples of discriminatory housing practices that may violate the new subsection G because they have a discriminatory effect. The cases cited in Section II.A.2 of this preamble identify housing practices found by courts to create discriminatory effects that violate or may violate the Act. These cases are provided as examples only and should not be viewed as the only ways to establish a violation of the Act based on a discriminatory effects theory.

### III. Solicitation of Comments

The Department welcomes comments on the standards proposed in this rule, including whether a burden-shifting approach should be used to determine when a housing practice with a discriminatory effect violates the Fair Housing Act and, where proof is required of the existence or nonexistence of a less discriminatory alternative to the challenged practice, which party should bear that burden. These comments will help the Department in its effort to craft final regulations that best serve the broad, remedial goals of the Fair Housing Act.

---

[42] *See, e.g., Charleston Housing Auth.,* 419 F.3d at 741 ("[u]nder the second step of the disparate impact burden shifting analysis, the [defendant] must demonstrate that the proposed action has a manifest relationship to the legitimate non-discriminatory policy objectives" and "is necessary to the attainment of these objectives") (internal quotation marks omitted); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 988–89 (4th Cir. 1984); 24 CFR 100.125(c); 59 FR 18,266, 18,269; *see also* 60 FR at 61,868.

[43] *See, e.g., Oti Kaga, Inc.* v. *South Dakota Housing Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003).

## IV. Findings and Certifications

### Executive Order 12866, Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed this proposed rule under Executive Order 12866 (entitled "Regulatory Planning and Review"). The proposed rule has been determined to be a "significant regulatory action," as defined in section 3(f) of the Order, but not economically significant under section 3(f)(1) of the Order. The docket file is available for public inspection in the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at (202) 402–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule proposes to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

Discriminatory effects liability is consistent with the position of other Executive Branch agencies and has been applied by every Federal court of appeals to have reached the question. Given the variation in how the courts have applied that standard, HUD's objective in this proposed rule is to achieve consistency and uniformity in this area, and therefore reduce burden for all who may be involved in a challenged practice. Accordingly, the undersigned certifies that the proposed rule will not have a significant economic impact on a substantial number of small entities.

### Environmental Impact

This proposed rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

### Executive Order 13132, Federalism

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This proposed rule would not have federalism implications and would not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for Federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This proposed rule would not impose any Federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

### List of Subjects in 24 CFR Part 100

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD proposes to amend 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

1. The authority for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

2. In § 100.65, a new paragraph (b)(6) is added to as follows:

### § 100.65 Discrimination in terms, conditions and privileges and in services and facilities.

\* \* \* \* \*

(b) \* \* \*

(6) Providing different, limited, or no governmental services such as water, sewer, or garbage collection in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

3. In § 100.70, add a new paragraph (d)(5) to read as follows:

### § 100.70 Other prohibited conduct.

\* \* \* \* \*

(d) \* \* \*

(5) Implementing land-use rules, policies, or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

4. In § 100.120, amend paragraph (b) to read as follows:

### § 100.120 Discrimination in the making of loans and in the provision of other financial assistance.

\* \* \* \* \*

(b) Prohibited practices under this section include, but are not limited to:

(1) Failing or refusing to provide to any person, in connection with a residential real estate-related transaction, information regarding the availability of loans or other financial assistance, application requirements, procedures, or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin.

5. In part 100, add a subpart G as follows:

### Subpart G—Discriminatory Effect

### § 100.500 Discriminatory Effect Prohibited

Liability may be established under this subpart based on a housing practice's *discriminatory effect,* as defined in § 100.500(a), even if the housing practice is not motivated by a prohibited intent. The housing practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The burdens of proof for establishing a violation under this subpart are set forth in § 100.500(c).

(a) *Discriminatory effect defined.* A housing practice has a *discriminatory effect* where it actually or predictably:

(1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or

(2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* A *legally sufficient justification* exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3610, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (2) those interests cannot be served by another practice that has a less discriminatory effect. The burdens of proof for establishing each of the two elements of a *legally sufficient justification* are set forth in § 100.500(c)(2)–(c)(3).

(c) *Burdens of proof in discriminatory effects cases.*

(1) A complainant, with respect to claims brought under 42 U.S.C. 3610, or a plaintiff, with respect to claims brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice causes a *discriminatory effect.*

(2) Once a complainant or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the complainant or plaintiff may still prevail upon demonstrating that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less *discriminatory effect.*

(d) *Relationship to discriminatory intent.* A demonstration that a housing practice is supported by a *legally sufficient justification,* as defined in § 100.500(b), may not be used as a defense against a claim of intentional discrimination.

Dated: October 4, 2011.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2011–29515 Filed 11–15–11; 8:45 am]

**BILLING CODE 4210–67–P**

# DEPARTMENT OF DEFENSE

## Department of the Army, Corps of Engineers

## 33 CFR Chapter II

## USACE's Plan for Retrospective Review Under E.O. 13563

**AGENCY:** U.S. Army Corps of Engineers, DoD.

**ACTION:** Notice of intent and request for comments.

**SUMMARY:** The U.S. Army Corps of Engineers (USACE) is seeking public input on its plan to retrospectively review its Regulations implementing the USACE Regulatory Program at 33 CFR parts 320–332 and 334. Executive Order 13563, ''Improving Regulation and Regulatory Review'' (E.O.), issued on January 18, 2011, directs Federal agencies to review existing significant regulations and identify those that can be made more effective or less burdensome in achieving regulatory objectives. The Regulations are essential for implementation of the Regulatory mission; thus, USACE believes they are a significant rule warranting review pursuant to E.O. 13563. The E.O. further directs each agency to periodically review its existing significant regulations to determine whether any such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives. Section 404(e) of the Clean Water Act authorizes USACE to development general permits, including nationwide permits (NWPs), for minor activities in waters of the U.S. for a period of five years. Accordingly, every five years, USACE undergoes a reauthorization process for the NWP program and includes public notice and provides an opportunity for public hearing. Comments for the NWP program are submitted during the reauthorization process. Therefore, USACE is currently complying with the E.O. 13563 direction to periodically review its existing significant regulations. Other regulations will be reviewed on an as-needed basis in accordance with new laws, court cases, etc.

**DATES:** Written comments must be submitted on or before January 17, 2012.

**ADDRESSES:** You may submit comments, identified by docket number COE–2011–0028, by any of the following methods:

*Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Email: regulatory.review@usace.army.mil* Include the docket number, COE–2011–0028, in the subject line of the message.

*Mail:* U.S. Army Corps of Engineers, ATTN: CECW–CO–R (Ms. Amy S. Klein), 441 G Street NW., Washington, DC 20314–1000.

*Hand Delivery/Courier:* Due to security requirements, we cannot receive comments by hand delivery or courier.

*Instructions:* Direct your comments to docket number COE–2011–0028. All comments received will be included in the public docket without change and may be made available on-line at *http://www.regulations.gov,* including any personal information provided, unless the commenter indicates that the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI, or otherwise protected, through regulations.gov or email. The regulations.gov Web site is an anonymous access system, which means we will not know your identity or contact information unless you provide it in the body of your comment. If you send an email directly to the Corps without going through regulations.gov, your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, we recommend that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If we cannot read your comment because of technical difficulties and cannot contact you for clarification, we may not be able to consider your comment. Electronic comments should avoid the use of any special characters, any form of encryption, and be free of any defects or viruses.

*Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov.* All documents in the docket are listed. Although listed in the index, some information is not publicly available, such as CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form.

SHARE

## Document Details

Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of National Association of Mutual Insurance Companies

**Document ID:** HUD-2011-0138-0051   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

Attached are the comments of the National Association of Mutual Insurance Companies ("NAMIC") regarding implementation of the Fair Housing Act's discriminatory effects standard. (Docket No. FR-5508-P-01; RIN 2529-AA96) NAMIC believes it is premature in light of Supreme Court's pending consideration of Magner v. Gallagher for HUD to move forward with the proposed rule. NAMIC urges the Department to withdraw the proposed rule, pending the Supreme Court decision. Alternatively, HUD should suspend activity regarding the rule until the Supreme Court has ruled. NAMIC does not believe that Section 3604 supports inclusion of the disparate impact standards. At a minimum, NAMIC believes that pricing decisions and operations of FAIR plans should be excluded from the reach of the rule and regulatory safe harbors should be provided for recognized underwriting risk factors. NAMIC further believes that the McCarran-Ferguson Act precludes federal acts that would impair or supersede state laws and that application of the disparate impact standards would impair state unfair discrimination standards.

## Attachments:

— Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of Na...   **View Attachment:**

**Title:**
Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of National Association of Mutual Insurance Companies (Attachment)





NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410–0500.

Re: Docket No. FR–5508–P–01; RIN 2529–AA96
Implementation of the Fair Housing Act's Discriminatory Effects Standard

Dear Sir/Madam:

The National Association of Mutual Insurance Companies ("NAMIC") appreciates the opportunity to comment on the Department of Housing and Urban Development's ("HUD") proposed implementation of the Fair Housing Act's ("FHA") Discriminatory Effects Standard ("Proposed Rule").

NAMIC is the largest and most diverse property/casualty trade association in the country, with 1,400 regional and local mutual insurance member companies on main streets across America joining many of the country's largest national insurers who also call NAMIC their home. Member companies serve more than 135 million auto, home and business policyholders, writing in excess of $196 billion in annual premiums that account for 50 percent of the automobile/ homeowners market and 31 percent of the business insurance market. More than 200,000 people are employed by NAMIC member companies.

**Background**

The Fair Housing Act prohibits discrimination against any person in "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."[1]

HUD on November 16, 2011 proposed significant changes in the implementation of the Discriminatory Effects Standard.[2]  The proposed rule purportedly would harmonize existing standards for determining when a housing practice with a discriminatory effect violates the FHA. The proposed rule also discusses liability standards where a facially neutral housing practice has a discriminatory effect.

In its proposal, HUD asserts that it has long interpreted the FHA to permit disparate-impact claims, meaning claims of discrimination even where there has been no intent to discriminate and no claim that any person was subject to discriminatory treatment, and has held that the Act is violated by facially neutral practices that have a disparate impact on protected classes.[3] According to HUD, violations of various provisions of the FHA may be established by proof of discriminatory effects, and discriminatory effects claims may be brought pursuant to the FHA under subsections (b) and (f)(2) of 42 U.S.C. § 3604 ("Section 3604"), which prohibit discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic.

The recently proposed rule would solidify HUD's position on disparate-impact liability and prescribe standards for addressing disparate-impact claims. HUD proposes to add a new Subpart G, Prohibiting Discriminatory Effect, which would confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, as defined in 24 C.F.R. § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose and regardless of whether any individual person was subjected to discriminatory treatment.

As examples of practices that may have a disparate impact on a class of persons, HUD cites the provision and pricing of homeowner's insurance.  For support, HUD cites *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207-8 (9th Cir. 2010) (*en banc*). However, as discussed further below, the *Ojo* case clearly reveals that the application of the disparate impact test for FHA liability is inappropriate in the context of insurance.

### *Magner v. Gallagher*

The proposed rule is being advanced by HUD even as the U.S. Supreme Court is currently considering the question of whether disparate impact claims are cognizable

---

[1] 42 U.S.C. § 3604(b).

[2] 76 Fed. Reg. at 70,921.

[3] *See, e.g., Mountain Side Mobile Estates P'ship v. HUD*, 56 F.3d 1243, 1251 (10th Cir. 1995).

under Section 3604.[4] Oral argument is scheduled for February 27, 2012. In light of the direct bearing the decision of the court will have on the issues at hand, we respectfully request that HUD defer action on the proposed rule until the Supreme Court renders its decision in the case.

The Solicitor General on behalf of the United States filed an amicus brief in the case asking the Court to grant *Chevron* deference to the proposed rule. We believe that this position is misguided and that rather HUD should withdraw the proposed rule pending consideration of the context and limitations of the Supreme Court's decision. Although HUD asserts that the proposed rule reflects long-standing department policy, *Chevron* deference should not be accorded to a proposed rule. We believe the interests of the American public would be better served by awaiting the decision of the Supreme Court and drafting proposed regulations consistent with that decision. Specifically, the Court in *Magner* is asked to determine whether disparate impact claims are cognizable under the Fair Housing Act and, if such claims are cognizable, whether they should they be analyzed under the burden shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test. The questions before the Court lie at the heart of the issues addressed in the proposed regulation and action on the proposed regulation is premature in light of the pending Supreme Court decision.

## Statutory Construction

As a threshold matter, NAMIC disputes that the disparate impact standard is properly applicable under Section 3404 in any context. Section 3604 prohibits only *intentional* discrimination against individual persons. Section 3604 specifically proscribes conduct relating to the sale or rental of dwellings that is undertaken against an individual "because of" that person's membership in a class protected under the statute. Section 3604 makes it unlawful to "refuse to sell or rent" or "otherwise make unavailable or deny" housing to a person "because of" a protected characteristic, including race. HUD places the emphasis on the effect (deny or make unavailable), rather than on the "because of" standard. Such a reading fails to acknowledge the "because of" standard serves as a threshold test. The statutory language does not refer to conduct that "adversely affects" or "tends to deprive" members of a protected class - language that would substantiate the basis for disparate-impact causes of action - but enumerates actions that may not be taken "because of" the individual's protected class.[5]

---

[4] *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, No. 10-1032 (Docket) (U.S. Nov. 7, 2011).

[5] *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) (plurality opinion) (construing Title VII Section 703(a)(2)); *see also* Smith v. City of Jackson, 544 U.S. 228, 236 (2005) (plurality opinion) (construing ADEA Section 4(a)(2)).

In contrast, Section 3604(a) is textually distinct from other statutory provisions that permit claims for disparate impact, such as Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), Section 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(2), and Section 102 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(b). Each of these provisions prohibit conduct that "adversely affects" a protected class, using language the Court has recognized as authorizing claims of disparate impact.[6] Section 3604 therefore does not provide a cause of action for disparate-impact discrimination and recovery is limited to claims of disparate treatment. As such, we believe the proposed rule exceeds HUD's statutory authority, including in the application of the disparate impact test to insurance, as discussed below.

## Disparate Impact and Insurance

Disparate impact in the context of the proposed rule would be presumed to exist when a standard or practice has the effect of disproportionately harming members of a group defined by race, ethnicity, or sex – regardless of whether the challenged practice makes reference to these characteristics, or whether the resulting adverse group impact was intended. While the concept of disparate impact is problematic in the best of circumstances, its application in the context of insurance would be particularly difficult. While in 1992 the Seventh Circuit applied the FHA to insurance, the Court noted a distinction between "disparate treatment" (i.e., intentional unfair discrimination) and "disparate impact." The Court further noted that "risk discrimination is not race discrimination."[7]

The FHA has been applied to insurance through § 3604 and the existing HUD regulation – both of which use terminology indicating that discrimination consists of disparate *treatment* where there is *intentional* discrimination rather than merely discriminatory *effects*.[8] HUD asserts that the Department has long interpreted the FHA to permit disparate-impact claims. However, the Department fails to acknowledge that in 1988 the United States Solicitor General submitted an amicus brief before the Supreme Court arguing that a FHA violation requires proof of intentional discrimination. The parties in the case agreed to litigate under the disparate impact approach and while the Court did not disturb the theory, it specifically noted that "[W]e do not reach the question whether that test is the appropriate one."[9] The same year, President Ronald

---

[6] See *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429–31.

[7] *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992).

[8] *Id.* The Seventh Circuit applied the FHA and the 1989 HUD rules to insurance based on the conclusion that "Section 3604 is sufficiently pliable that its text can bear [HUD's] construction.

[9] *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988).

Reagan, upon signing the Fair Housing Amendments Act of 1988, issued a statement expressing the view that the FHA requires proof of intentional discrimination to establish a violation.[10] In implementing the new legislative amendments in 1989, the Department adopted expansive rules related to the standards for proving a violation, yet it specifically declined to opine whether the FHA allows a disparate impact approach or required proof of intentional discrimination.[11]  Under the Clinton Administration in 1994, several federal agencies issued a "Policy Statement on Discrimination in Lending" sanctioning the disparate impact approach, but acknowledged that the law on disparate impact was under development.[12]  Thus, while the Department asserts that its "administrative law judges have held that the Act is violated by facially neutral practices that have a disparate impact on protected classes," the proposed regulation would be the first formal regulatory promulgation to that effect.

The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly.  Race or other protected class characteristics are not part of the risk assessment process.  In addition, state insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance.  In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner.  Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk.  Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material (s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system. Under HUD's  proposed rule, however, these and other common underwriting factors could be jeopardized, even though they

---

[10] President Ronald Reagan, *Remarks on Signing the Fair Housing Amendments Act of 1988* (Sept. 13, 1988) ("I want to emphasize that this bill does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that Title 8 violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent. Title 8 speaks only to intentional discrimination.").

[11] 54 Fed. Reg. 3235 (Jan. 23, 1989)

[12] Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18266 (April 15, 1994).

do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected. To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk- based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance. "Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept. Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." [13] Under model legislation developed by the National Association of Insurance Commissioners, an insurer could be guilty of unfair discrimination by making underwriting and rating distinctions "between individuals or risks of the same class and essentially the same hazard" or when underwriting and rating decisions are unsupported by "the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience."[14]

Given the differences, it is the exception rather than the rule where the "unfairly discriminatory" standard and the concept of disparate impact could be applied simultaneously to a risk classification plan without conflict. The proposed rule's standard for disparate impact would at a minimum be inconsistent with the risk-based insurance "unfair discrimination" standard. At worst, by requiring an insurer to disregard the predictive value of a valid factor, HUD would be placing insurers in the untenable position of risking violation of state prohibitions against "unfairly discriminatory" insurance rates. If a state regulator has found that a rate, rating factor, or territory does not unfairly discriminate (as well as not making the rate excessive or inadequate),

---

[13] Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988. <http://www.casact.org/standards/princip/sppcrate.pdf>

[14] "Unfair Discrimination," Sec. G (3), Unfair Trade Practices Act, NAIC Model Regulation Service, January 1993, pp. 880-884.



HUD's intervention via a finding of disparate impact or "discriminatory effect" could reverse the state regulator ruling and even make the resulting application unfairly discriminatory under state law. As such, the proposed rule would serve to undercut and even contradict the unfair discrimination standard in state law. If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer. Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect.

In addition to the "unfairly discriminatory" standard, pricing for property/casualty insurance falls squarely within the "filed rate doctrine." The filed rate doctrine, which has a long history of common-law development, imposes a limitation on private claims for damages based on challenges to filed rates. State regulated insurers generally are required to file rates with state regulators. The application of the filed rate doctrine to property/casualty prices properly balances the interests in ensuring nondiscriminatory treatment of rate-payers. The filed rate doctrine "recognizes that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack competence to set . . . rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." [15] Imposing disparate impact analysis in the context of property/casualty pricing would similarly undermine the state-based regulatory regime. Indeed, a number of courts have recently found the disparate impact test may not be applied to insurance practices for precisely this reason, when addressing discrimination claims in the context of the McCarran-Ferguson Act.

### McCarran-Ferguson

The McCarran-Ferguson Act of 1945 [16] confirms the states' authority to regulate the "business of insurance," unless federal law specifically provides otherwise. State law governs the business of insurance and no act of Congress may interfere with state insurance law unless the federal act specifically relates to insurance. All states regulate the business of insurance within their borders, including the underwriting and rating practices of insurers. Although the courts have held that federal laws may *duplicate*

---

[15] *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 489 (2d Cir. 1998) (internal quotation marks omitted; alteration in original).

[16] 15 U.S.C.A. § 1011 *et seq.*

state laws,[17] McCarran-Ferguson bars any application of federal law that would invalidate, impair or supersede state laws regulating the business of insurance.[18]

One of the cases HUD cites as purported support for its proposed rule, *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207–8 (9th Cir. 2010) (en banc), plainly illustrates how the Department's overreach in applying disparate impact standards would undermine the states' regulation of insurance. In *Ojo*, the plaintiffs claimed that the use of credit-based insurance scoring had a disparate effect on minorities in violation of the FHA. The Ninth Circuit determined that the FHA does not specifically relate to insurance and that the relevant Texas law was enacted for the purpose of regulating insurance, and thus faced the question whether a ruling for the plaintiffs under the FHA might "invalidate, impair, or supersede" Texas law. The Ninth Circuit certified that question to the Texas Supreme Court. The Texas Supreme Court held: "In light of the fact that Texas only prohibits the use of credit score factors or rates *based on* race, or rates that differ *because of* race, we answer that application of the FHA to permit a cause of action for disparate impact resulting from the use of credit scoring in the field of insurance certainly might invalidate, impair, or supersede Texas law."[19] The court concluded that "[a]llowing a claim against Texas insurers for using completely race-neutral factors in credit scoring would frustrate the regulatory policy of Texas."[20]

The Eighth Circuit made a similar ruling in Saunders v. Farmers Insurance Exchange.[21] In that case, the court upheld the dismissal of class action disparate impact claims, citing the reverse-preemption impact of the McCarran-Ferguson Act, as well as the filed rate doctrine, which says that an insurer charging a rate that has been approved by the regulator cannot be sued for using that rate.[22] The court recognized that "a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime."

Other courts are in accord. A Nebraska federal court concluded that "it is difficult to envision how allowing [the plaintiff] to proceed" with a disparate-impact claim under

---

[17] *See American Family*, 978 F.2d 287.

[18] *See Saunders v. Farmers Ins. Exchange*, 537 F.3d 961 (8ᵗʰ Cir 2008).

[19] *Ojo v. Farmers Grp., Inc.*, _ S.W.3d _, No. 10-0245, 2011 WL 2112778, at *2 (Tex. May 27, 2011).

[20] *Id.* at *11.

[21] 537 F.3d 961 (8th Cir. 2008)

[22] *See Mackey v. Nationwide Ins. Co.*, 724 F.2d 419 (4th Cir. 1984); *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003); *Nationwide Mutual Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 19950; *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir. 1992); *Moore v. Liberty National Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001).

the FHA challenging the use of credit scores would not frustrate and/or interfere with Nebraska's administrative regime.[23]  Likewise, a Mississippi federal court held that it was "clear" that a disparate-impact claim under the FHA would impair a state regulation that allowed the use of insurance scores not "based in whole or in part on race" where the regulation "makes no reference to disparate impact."[24]

As these court decisions demonstrate, the disparate-impact analysis is inappropriate in the context of insurance.  NAMIC therefore urges HUD to exempt property/casualty coverage from the application of the newly proposed Subpart G, Prohibiting Discriminatory Effect standards.  Specifically, HUD should:

- exempt insurance pricing from the discriminatory effects standards.  The application of the FHA to insurance has been limited to the Act's prohibition on "denying or making unavailable" dwellings by making homeowners insurance unavailable.  The decision to not write insurance is an underwriting decision based on a number of factors related to the anticipated risk of loss.  Pricing is a separate issue and would be subject to the filed rate doctrine.

If the Department insists on the inclusion of property/casualty insurance, NAMIC strongly urges the Department to:

- provide regulatory safe harbors for long-recognized risk-related factors, such as use of prior insurance claims, age and condition of property, and distance from fire station.  Failure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market; and

- exempt Fair Access to Insurance Requirements ("FAIR") Plans.  State FAIR plans provide insurance to individuals or cover risks that would otherwise be denied insurance due to a related high-risk problem. FAIR plans generally utilize market survey data to determine rates and spread the cost of coverage through assessments on participating insurance companies or through assignment to risks to participating insurance companies.  Insurance companies participating in FAIR plans should be exempt from the discriminatory effects standards.  The state action doctrine would clearly apply since the operation of the FAIR plans facilitate private conduct that otherwise would not have occurred.

---

[23] *Taylor v. Am. Family Ins. Grp.*, No. 8:07CV493, 2008 WL 3539267, at *3 (D. Neb. Aug. 11, 2008).

[24] *McKenzie v. S. Farm Bureau Casualty Ins. Co.*, No. 3:06CV013, 2007 WL 2012214, at *3 (N.D. Miss., July 6, 2007).

## Burden of Proof

The proposed rule outlines a "three-step burden-shifting" approach to determining which party bears the burden of proof at each step of the process.

1. The plaintiff must first prove a prima facie case that the "practice caused, causes, or will cause a discriminatory effect on" a protected group.
2. Once the complainant or plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests.
3. If the respondent or defendant satisfies its burden, the complainant or plaintiff may still establish liability by demonstrating that these legitimate, nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect. (76 FR 70925, 70927).

The Supreme Court in *Wards Cove Packing Co. v. Atonio*[25] set forth a burden-shifting framework governing disparate-impact claims under non-Title VII statutes such as the FHA.[26] The *Wards Cove* burden-shifting framework involves a similar three-step process, but differs in significant respects. Under *Wards Cove*, the plaintiff must first make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class.[27] Second, the *Wards Cove* standard provides that if the plaintiff makes the prima facie showing, the defendant must come forward with evidence that the "challenged practice serves, in a significant way, [its] legitimate . . . goals."[28] Third, under *Wards Cove,* the plaintiff must then prove that the defendant refused to adopt an alternative practice that would have served its goals equally as effectively without causing the disparate impact.[29]

Although most lower courts have applied a burden- shifting approach in the FHA context, they generally have failed to adhere to the instruction of *Wards Cove.* The most common deviation is mistakenly shifting the burden of persuasion, as opposed to the burden of production, to the defendant at the second step in the analysis. The proposed rule replicates this error.

---

[25] 490 U.S. 642 (1989).

[26] *See Smith*, 544 U.S. at 240.

[27] *Wards* Cove, 490 U.S. at 658.

[28] *Id.* at 659.

[29] *Id.* at 660–61.



The proposed rule differs from the *Wards Cove* standard in several fundamental ways. In the first step, the proposed rule significantly lowers the standard for demonstrating a "discriminatory effect." In the second step, the proposed rule profoundly narrows the standard for allowing the defendant to rebut the presumption of unlawful discrimination that results from the plaintiff's showing of a discriminatory effect, by requiring the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard. In the third and final step, the proposed rule merely provides that the plaintiff may demonstrate that legitimate, nondiscriminatory interests "could be served by a policy that produces a less discriminatory effect." Unlike the Wards Cove standard, the third step in the Department's proposed rule gives no consideration to whether the preferred alternative practice is "equally as effective" as the challenged practice.

Moreover, the process of determining whether there exists an alternative practice that produces a "less discriminatory effect" would require an insurer to explicitly take race and ethnicity into account in its analysis. This would directly violate state insurance laws prohibiting "unfair discrimination," which proscribe the use of race and ethnicity and instead require insurers to rely solely on risk in developing underwriting and rating practices.

NAMIC urges HUD to follow the *Wards Cove* standards. Specifically, in step two the defendant must able to rebut the plaintiff's prima facie showing of unlawful discrimination by showing only that the challenged practice is significantly related to the achievement of its legitimate business goals. In step three, the plaintiff must bear the burden to identify an alternative "equally as effective as the challenged practice in serving the [defendant's] legitimate business goals" and "reduce[s] the . . . disparate impact of practices currently being used." This alternative must also be as effective in meeting the business reason as the challenged practice. In the case of an insurer's use of a predictive model, the plaintiff should bear the burden of proving that the alternative is as predictive. Similarly the plaintiff must bear the burden of proving that the alternative is not subject to patent or is otherwise proprietary, that it is not more expensive even if it is as effective, and that it is not more difficult to implement than the challenged practice. When the statutory text is silent on allocation of the burden of persuasion, the ordinary default rule is that the plaintiff bears the risk of proving their claims.[30] The FHA is silent on burden-shifting allocations and HUD should not attempt to use the regulatory process to shift the burden of persuasion to the defendant.

---

[30] *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009), *quoting Schaffer v. Weast*, 546 U.S. 49, 56 (2005); *see Smith*, 544 U.S. at 240.



    The burden of proof issues are particularly difficult for insurers. Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity. Without collecting such data indicative of protected class, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes. State insurance laws prohibit the use or consideration of prohibited factors like race and ethnicity and insurers should not be required to collect that data to protect themselves from disparate impact or discriminatory effects claims.

    NAMIC urges HUD to conform the burden of proof standards in Subpart G(4) ((§ 100.500(c)) to the *Wards Cove* standards.

**Conclusion**

    NAMIC believes it is premature in light of Supreme Court's pending consideration of *Magner v. Gallagher* for HUD to move forward with the proposed rule. NAMIC urges the Department to withdraw the proposed rule, pending the Supreme Court decision. Alternatively, HUD should suspend activity regarding the rule until the Supreme Court has ruled. NAMIC does not believe that Section 3604 supports inclusion of the disparate impact standards. At a minimum, NAMIC believes that pricing decisions and operations of FAIR plans should be excluded from the reach of the rule and regulatory safe harbors should be provided for recognized underwriting risk factors. NAMIC further believes that the McCarran-Ferguson Act precludes federal acts that would impair or supersede state laws and that application of the disparate impact standards would impair state unfair discrimination standards.

Sincerely,

*Robert Detlefsen*

Robert Detlefsen, Ph.D.
Vice President, Public Policy
National Association of Mutual Insurance Companies
122 C Street, NW, Suite 450
Washington, D.C. 20001
202-628-1558
www.namic.org

SHARE

## Document Details

### Comment Submitted by Stef Zielezienski, American Insurance Association

**Document ID:** HUD-2011-0138-0070  **Document Type:** Public Submission
**This is comment on**  Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:** HTML

#### Show Details

Attached please find in PDF format comments of the American Insurance Association in response to a proposed rule issued by the Department of Housing and Urban Development implementing the Fair Housing Act's discriminatory effects standard.

## Attachments:

| ─ Comment Submitted by Stef Zielezienski, American Insurance Association (Att... | View Attachment: PDF |
|---|---|

**Title:**
Comment Submitted by Stef Zielezienski, American Insurance Association (Attachment)





**American Insurance Association**

2101 L Street, NW

Suite 400

Washington, DC 20037

202-828-7100

Fax 202-293-1219

www.aiadc.org

January 17, 2011

<u>VIA FEDERAL eRULEMAKING PORTAL</u>

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW
Room 10276
Washington, DC 20410

Re: **24 CFR Part 100 [Docket No. FR-5508-P-01] RIN 2529-AA96,**
**Department of Housing and Urban Development Proposed Rule Implementing the Fair**
<u>**Housing Act's Discriminatory Effects Standard**</u>

Ladies and Gentlemen:

The American Insurance Association (AIA) appreciates the opportunity to submit comments on the Department of Housing and Urban Development's (HUD) notice published in the November 16, 2011, Federal Register, seeking public comment on a proposed rule regarding "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("Proposed Rule").[1] AIA represents approximately 300 major U.S. insurance companies that provide all lines of property-casualty insurance to U.S. consumers and businesses, writing more than $117 billion annually in premiums. Our members are subject to comprehensive regulation by the states, and they therefore have a substantial interest in any proposal that would seek to add

---

[1] 76 Fed. Reg. 70921 - 70927 (November 16, 2011).

regulation or enforcement at the federal level. More specifically, as many AIA members write homeowners' insurance, they have an important interest in any regulation pertaining to the Fair Housing Act (FHA). Consistent with those interests, AIA respectfully submits the following comments on the proposed rule.

## REFERENCES TO INSURANCE AND THE *"OJO V. FARMERS"* LITIGATION SHOULD BE DELETED FROM THE PREDICATE TO THE PROPOSED RULE.

The predicate to the Proposed Rule, describing the proposal's scope, includes in its list of examples of potential "Disparate Impact" discrimination, the following statement: "the provision and pricing of homeowner's insurance (see *Ojo v. Farmers Group, Inc.*, 600 F.3rd 1205, 1207-8 (9th Cir. 2010))."[2] As discussed more fully below, the inclusion of the homeowner's insurance example is inappropriate as it fails to describe the principles announced in the *Ojo* decision, ignoring the decision's discussion of the impact of state law pursuant to the McCarran-Ferguson Act. Under the McCarran Act's "reverse pre-emption" principle, state insurance law trumps the application of any federal law to state regulated insurance, except under very narrow circumstances, which are not met here.

In the *Ojo* litigation, the U.S. Circuit Court of Appeals for the Ninth Circuit (en banc) sought the opinion of the Texas Supreme Court on whether Texas insurance law prohibited disparate impact discrimination.[3] The case arose in relation to the use of credit scoring by the insurer in setting homeowner's insurance rates and premiums. The Ninth Circuit quoted the applicable McCarran-Ferguson Act language, as follows:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."[4]

The appeals court then set forth the decision-making standard:

> "If Texas law permits insurance companies to use credit scores even if the factors used to compute scores may have a racially disparate impact that could violate the FHA, then allowing Ojo to sue Defendants under FHA for this practice would

---

[2] *Id.* at 70924.
[3] *Ojo v. Farmers Group Inc*, 600 F.3d 1201(April 9, 2010).
[4] *Id.* at 1203.

2

impair Texas law... The outcome of this (case) turns on the extent to which Texas law permits insurance companies to use credit-score factors that may have a racially disparate impact that would constitute a FHA violation... *We agree to abide by the Supreme Court of Texas's decision in issuing our subsequent opinion in Ojo v. Farmers Group Inc.*[5]

Upon receiving the Ninth Circuit's certification of the state regulation question, the Texas Supreme Court determined that "the language of the [Texas] Insurance Code is inconsistent with a disparate impact theory of liability," holding that "Texas law does not prohibit an insurer from using race-neutral factors in credit-scoring to price insurance, even if doing so creates a racially disparate effect."[6]

Thus, since the *Ojo* litigation stands for the proposition that Texas insurance law reverse-pre-empts the FHA pursuant to the McCarran Ferguson Act, it is inappropriate for the HUD Proposed Rule to proceed as if that principle does not exist. As a result, we would strongly urge HUD to delete the insurance example from the rule's predicate.

## THE PROPOSED RULE INAPPROPRIATELY AND PREMATURELY ASSUMES THAT FHA COVERS DISPARATE IMPACT DISCRIMINATION CLAIMS.

The Proposed Rule assumes that the FHA covers disparate impact discrimination. This assumption, however, may be wrong. Indeed, it may well be that the FHA's jurisdiction is limited to deliberate discriminatory practices. As HUD knows, this question is currently before the U.S. Supreme Court in the *Magner* case.[7] In light of the currency of this issue, it obviously would have been better, procedurally and substantively, for HUD to have delayed its Proposed Rule until the Court had decided whether the FHA does, in fact, incorporate disparate impact discrimination situations and, if so, the proper analytical framework for deciding those cases.

However, since HUD has decided to publish its proposal during the pendency of the *Magner* litigation, we respectfully suggest that HUD promptly publish a supplemental Federal Register notice stating that the promulgation of any final regulation will be deferred until the Supreme Court's *Magner* decision is handed down. This approach would make certain that HUD is not regulating based on a hypothetical construction of the law. It would also spare HUD the

---

[5] *Id.* at 1204-05.
[6] *Ojo, et. al. v. Farmers Group Inc., et. al,* 54 Tex. Sup. Ct. J. 1068 (May 27, 2011).
[7] *Magner v. Gallagher,* 619 F.3d 823 (8th Cir. 2010), cert. granted, No. 10-1032 (Docket) (U.S. Nov. 7, 2011).

3

potential embarrassment of needing to amend its final regulation if the Supreme Court's decision is at variance with it.

## THE PROPOSAL'S ANALYTICAL FRAMEWORK FOR DETERMINING THE EXISTENCE OF ACTIONABLE DISPARATE IMPACT DISCRIMINATION IS CONFUSING AND INCONSISTENT WITH BOTH STATUTORY AND SUPREME COURT LAW.

The analytical framework that HUD proposes to use to determine whether there has been actionable disparate impact discrimination in individual cases is very difficult to understand and appears to be at variance with both the standard established for Title VII employment discrimination cases under the Civil Rights Act of 1991 and the alternative *Wards Cove*[8] analysis that has provided the basis for disparate impact analysis in non-Title VII employment related cases.[9]

We believe that the *Wards Cove* analysis provides the proper approach for FHA cases, and that the Title VII approach should be limited to employment cases arising under that title. Under the *Wards Cove* approach, the plaintiff in any FHA disparate impact case has the burden of persuasion *throughout* the entire process.[10] The plaintiff must prove that the challenged practice furthered no legitimate business goal identified by the defendant or that the plaintiff's proposed alternative business practice that would avoid the disparate impact would be "equally as effective as the challenged practice in serving the (defendant's) legitimate business needs." The proposed regulation, however, requires that a "necessary and manifest" business need be established.[11] This not only goes beyond *Wards Cove*, but also introduces a new and additional standard that is both "manifestly unfair" to the defendant and "manifestly unclear" in application. Under this analytical approach, it would not be enough to establish that the practice is "necessary" to the business; the defendant would be required to demonstrate that it was "manifestly" necessary. We do not believe that this is consistent with either Supreme Court or statutory law.

We believe that the Proposed Rule even goes beyond the 1991 Civil Rights Act. As we have stated, we believe that the disparate impact language in the Civil Rights Act of 1991 is limited to

---

[8] *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989)
[9] The Civil Rights Act of 1991 was enacted to, among other things, reverse the U.S. Supreme Court's decision in *Wards Cove*, as it applied to employment discrimination cases. Subsequent to the 1991 law, the *Wards Cove* analytical framework has been followed in non-Title VII disparate impact cases. *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (plurality opinion).
[10] *See Wards Cove* at 659-60.
[11] 76 *Fed. Reg.* at 70927.

4

Title VII employment discrimination cases, and should not be exported to the FHA. But, even if that language were to be so exported, we believe that HUD's proposed regulatory language goes beyond it, as well. The Civil Rights Act also uses the term "business necessity."[12] It does not add the "manifest" concept.

## CONCLUSION

In light of the Supreme Court's consideration of the *Magner* case, AIA strongly urges HUD, when finalizing any eventual regulation, to eliminate the references to homeowner's insurance in light of the principles enunciated in *Ojo*. We would also urge HUD to publish a supplemental notice in the Federal Register that it will delay any action on its proposal until the Supreme Court has ruled on *Magner* and then proceed in a manner consistent with that decision.

Respectfully submitted,

J. Stephen ("Stef") Zielezienski
Sr. Vice President & General Counsel
American Insurance Association

David F. Snyder
Vice President & Associate General Counsel, Public Policy
American Insurance Association

---

[12] 42 U.S.C. § 2000e-2(k)(1)(A): "An unlawful employment practice based on disparate impact is established under this subchapter only if—(1) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact... and the respondent fails to demonstrate that the challenged practice is... consistent with business necessity."



## Document Details

**Comment Submitted by Robert Woody, Property Casualty Insurers Association of America**

**Document ID:** HUD-2011-0138-0084  **Document Type:** Public Submission
**This is comment on** Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

Please find attached PCI's comments on HUD's proposed rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard

Attachments:

| Comment Submitted by Robert Woody, Property Casualty Insurers Association o... | View Attachment: PDF |
| --- | --- |

**Title:**
Comment Submitted by Robert Woody, Property Casualty Insurers Association of America (Attachment)





Shaping the Future of American Insurance

Robert Woody
Senior Counsel, Policy

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

RE:   Implementation of the Fair Housing Act's Discriminatory Effects Standard
      Proposed Rule [Docket No. FR-5508-P-01]

The Property Casualty Insurers Association of America (PCI) appreciates the opportunity
to provide comments in response to Department of Housing and Urban Development's
(HUD) proposed rule on the Fair Housing Act's (FHA) Discriminatory Effects Standard.
PCI is composed of more than 1000 member property casualty insurance companies
representing the broadest cross-section of insurers of any national trade association. PCI
members write over $174 billion in annual premium, representing 38.3 percent of the
nation's property casualty insurance.

The proposed rule seeks to ensconce in HUD's regulations a theory of legal liability
under which a housing practice that is found to have a "disparate impact" on a protected
class can be deemed to violate the FHA's proscription on racial discrimination in housing
practices even though the practice was not adopted for a racially discriminatory purpose.
The preamble to the proposed rule lists as one example of the types of activities that can
have a disparate impact and thus violate the FHA, "the provision and pricing of
homeowner's insurance." In support of that contention, the preamble cites the case of *Ojo
v. Farmers Group, Inc.*, 600 F.3d 1205, 1207-8 (9th Cir. 2010).

*As an initial matter, it is critical for HUD to recognize that homeowners' insurers do not
discriminate on the basis of race and, indeed, it would be illegal in all states for them to
do so.* The issue the rule presents for insurers is whether non-racially motivated and
sound actuarial underwriting principles recognized by state insurance regulators that
permit accurate risk-based pricing for consumers can be prohibited by federal regulators
who find them to have a "disparate impact" and whether such HUD actions would violate
a federal statute reserving the power to regulate insurance to the states.

**The Proposed Rule is Premature**. It is at best premature for HUD to propose this rule
when it raises key issues that are now pending before the U.S. Supreme Court in *Magner*

*v. Gallagher.*[1] In that case, the Court will decide whether disparate impact claims are cognizable under the FHA and if so, what burden shifting approach should be applied. The proposed rule assumes that disparate impact claims are cognizable under the FHA and adopts its own burden shifting approach. HUD should suspend any further action on this rule at least until the Supreme Court has ruled on these issues.

**FHA Does Not Create Liability Based on Disparate Impact Theory**. The Supreme Court granted certiorari in the *Magner* case in part to resolve a split in the circuits on the question of whether disparate impact claims are cognizable under the FHA. PCI believes that the better view is that they are not. The statutory language of Section 3604 of the FHA prohibits discrimination in housing "*because of* race, color, religion, sex, familial status, or national origin" (emphasis added). Other federal statutes, such as the Civil Rights Act and the Americans with Disabilities Act prohibit conduct that "adversely affects" a protected class, which language has been interpreted as permitting disparate impact claims. Had Congress intended to authorize disparate impact claims in the FHA, it knew how to do so, but chose not to. HUD does not have the authority to substitute its contrary views for the will of the Congress.

**Disparate Impact Theory in Insurance Context**. The application of the proposed disparate impact rule in the insurance context is especially problematic. In 1945, Congress passed the McCarran-Ferguson Act,[2] which among other things, declared that insurance is regulated by the states and not by the federal government. In so doing, McCarran-Ferguson provided that state laws preempt contrary federal laws ("reverse preemption") when: (1) the federal law does not expressly relate to the business of insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of the federal law might "invalidate, impair or supersede" state laws regulating insurance. Every state has extensive laws and regulations governing insurance underwriting practices and those laws naturally recognize the need for insurers to distinguish between different types and degrees of risk. Indeed, risk discrimination is the foundation of insurance underwriting and every state has considered at length the appropriate regulatory balance to prohibit unfair discrimination. HUD's reference to insurance in the preamble of the proposed rule suggests that it may use its disparate impact rule to become a federal regulator of insurance underwriting practices despite McCarran-Ferguson's explicit reservation of insurance regulatory powers to the states. There can be no question that, should HUD take such a position, it would prompt swift and vigorous legal challenge.

**HUD Misrepresents the Holding in the *Ojo* Case**. HUD's reference to the Ninth Circuit's decision in the *Ojo* case in support of its description of the FHA's application to insurance underwriting practices egregiously misrepresents the ultimate holding in the that case. The *Ojo* case involved an African-American plaintiff in Texas whose homeowners' insurance premiums were increased as a result of his credit scores and who alleged that this violated the FHA by virtue of a disparate impact on him and other racial minorities. Contrary to HUD's statement in the preamble, the Ninth Circuit did *not* opine

---

[1] 619 F.3d 823 (8th Cir. 2010), cert. granted, No 10-1032 (Docket) (U.S. Nov. 7, 2011).
[2] 15 U.S.C. § 1012.

000554

on whether "the provision and pricing of homeowners insurance" is among the activities "that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." While the Ninth Circuit did find in *Ojo* that the FHA prohibits racial discrimination in the provision of homeowners' insurance generally (while also noting a split among the Circuits on the question), its ruling did not comment on the legitimacy of the disparate impact theory of liability. Instead, the Court's analysis focused appropriately on whether the McCarran-Ferguson Act's reverse preemption rule operated to prevent any attempted application of a federal disparate impact standard to homeowners insurance.

The Ninth Circuit initially found that the first two prongs of the McCarran reverse preemption test were clearly met, but certified to the Texas Supreme Court the third-prong question of whether the application of the federal disparate impact test invalidated, impaired, or superseded Texas law and was therefore preempted pursuant to the McCarran-Ferguson Act. The Texas Supreme Court found that, while Texas law prohibits the use of credit scores *based on* race, or rates that differ *because of* race, a cause of action based only on non-racially motivated actions that produce a disparate impact pursuant to the FHA could invalidate, impair or supersede Texas law. *Ojo v. Farmers Group, Inc.*, 2011 WL 2112778, at *11 (Tex. Sup. Ct. 2011). Therefore, the third prong of the McCarran-Ferguson test was met and, contrary to the impression given in the preamble to the proposed rule, the plaintiff in *Ojo* did <u>not</u> prevail.

HUD's misrepresentation and misuse of the finding in the *Ojo* case raises an alarming specter that the agency may seek to enforce its disparate impact rules to prevent insurers from using racially neutral credit scoring information to price insurance risks. We note that the Texas statute at issue in *Ojo* was based on the Unfair Trade Practices Model Act published by the National Association of Insurance Commissioners (NAIC) and the Model Act Regarding Use of Credit Information in Personal Insurance published by the National Conference of Insurance Legislators (NCOIL). A large majority of states have adopted laws based on those models, so the McCarran analysis employed by the Ninth Circuit in *Ojo* has impact throughout the country.

<u>**Congress Does Not Want Federal Intrusion into Insurance Regulation**</u>.  Finally, we note that the Congress has considered on several occasions whether the federal government should interfere in the states' regulation of insurer underwriting practices with respect to questions of racial discrimination and has decided not to do so.  For example, in 1993 Congress considered, but did not adopt, H.R. 1188, the "Antiredlining in Insurance Disclosure Act," which would have required insurers to report to the Secretary of Commerce certain information about personal insurance broken down by zip code. Had the Congress felt that federal intrusion into the area was warranted, it could have authorized such intrusion. Because it has not, HUD must refrain from doing so as well.

Should HUD finalize its rule over our objections, we urge that the text of the regulation include an express exemption for insurance underwriting practices. At a minimum, HUD

3

should clarify in the final rule the misleading statement in the proposed rule's preamble that incorrectly implies that HUD has regulatory authority over insurers.

Again, PCI appreciates the opportunity to comment and would be pleased to provide any additional information HUD may require as it considers this important issue.

Sincerely,

*Robert W. Woody* (signature)

Robert W. Woody

4



# FEDERAL REGISTER

| Vol. 78 | Friday, |
|---------|---------|
| No. 32 | February 15, 2013 |

Part IV

## Department of Housing and Urban Development

24 CFR Part 100
Implementation of the Fair Housing Act's Discriminatory Effects Standard; Final Rule

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–5508–F–02]**

**RIN 2529–AA96**

## Implementation of the Fair Housing Act's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, which is statutorily charged with the authority and responsibility for interpreting and enforcing the Fair Housing Act and with the power to make rules implementing the Act, has long interpreted the Act to prohibit practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate. The eleven federal courts of appeals that have ruled on this issue agree with this interpretation. While HUD and every federal appellate court to have ruled on the issue have determined that liability under the Act may be established through proof of discriminatory effects, the statute itself does not specify a standard for proving a discriminatory effects violation. As a result, although HUD and courts are in agreement that practices with discriminatory effects may violate the Fair Housing Act, there has been some minor variation in the application of the discriminatory effects standard.

Through this final rule, HUD formalizes its long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalizes a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act. This final rule also adds to, and revises, illustrations of discriminatory housing practices found in HUD's Fair Housing Act regulations. This final rule follows a November 16, 2011, proposed rule and takes into consideration comments received on that proposed rule.

**DATES:** *Effective Date:* March 18, 2013.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500, telephone number 202–402–5188. Persons who are deaf, are hard of hearing, or have speech impairments may contact this phone number via TTY by calling the Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of Regulatory Action

*Need for the Regulation.* This regulation is needed to formalize HUD's long-held interpretation of the availability of "discriminatory effects" liability under the Fair Housing Act, 42 U.S.C. 3601 *et seq.,* and to provide nationwide consistency in the application of that form of liability. HUD, through its longstanding interpretation of the Act, and the eleven federal courts of appeals that have addressed the issue agree that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect. The twelfth court of appeals has assumed that the Fair Housing Act includes discriminatory effects liability, but has not decided the issue. Through four decades of case-by-case application of the Fair Housing Act's discriminatory effects standard by HUD and the courts, a small degree of variation has developed in the methodology of proving a claim of discriminatory effects liability. This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated. This rule formally establishes a three-part burden-shifting test currently used by HUD and most federal courts, thereby providing greater clarity and predictability for all parties engaged in housing transactions as to how the discriminatory effects standard applies.

*How the Rule Meets the Need.* This rule serves the need described above by establishing a consistent standard for assessing claims that a facially neutral practice violates the Fair Housing Act and by incorporating that standard in HUD's existing Fair Housing Act regulations at 24 CFR 100.500. By formalizing the three-part burden-shifting test for proving such liability under the Fair Housing Act, the rule provides for consistent and predictable application of the test on a national basis. It also offers clarity to persons seeking housing and persons engaged in housing transactions as to how to assess potential claims involving discriminatory effects.

*Legal Authority for the Regulation.* The legal authority for the regulation is found in the Fair Housing Act. Specifically, section 808(a) of the Act gives the Secretary of HUD the "authority and responsibility for administering this Act." (42 U.S.C. 3608(a)). In addition, section 815 of the Act provides that "[t]he Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this title. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section." (42 U.S.C. 3614a.) HUD also has general rulemaking authority, under the Department of Housing and Urban Development Act, to make such rules and regulations as may be necessary to carry out its functions, powers, and duties. (See 42 U.S.C. 3535(d).)

### B. Summary of the Major Provisions

This rule formally establishes the three-part burden-shifting test for determining when a practice with a discriminatory effect violates the Fair Housing Act. Under this test, the charging party or plaintiff first bears the burden of proving its prima facie case that a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic. If the charging party or plaintiff proves a prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, then the charging party or plaintiff may still establish liability by proving that the substantial, legitimate, nondiscriminatory interest could be served by a practice that has a less discriminatory effect.

This rule also adds and revises illustrations of practices that violate the Act through intentional discrimination or through a discriminatory effect under the standards outlined in § 100.500.

### C. Costs and Benefits

Because the rule does not change decades-old substantive law articulated by HUD and the courts, but rather formalizes a clear, consistent, nationwide standard for litigating discriminatory effects cases under the Fair Housing Act,[2] it adds no additional costs to housing providers and others engaged in housing transactions. Rather,

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap." Both terms have the same legal meaning. *See Bragdon* v. *Abbott,* 524 U.S. 624, 631 (1998).

[2] *See* nn. 12, 28, *supra,* discussing HUD administrative decisions and federal court rulings.

the rule will simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation associated with such claims by clearly allocating the burdens of proof and how such burdens are to be met.

## II. Background

The Fair Housing Act was enacted in 1968 (Pub. L. 90–284, codified at 42 U.S.C. 3601–3619, 3631) to combat and prevent segregation and discrimination in housing, including in the sale or rental of housing and the provision of advertising, lending, and brokerage services related to housing. The Fair Housing Act's "Declaration of Policy" specifies that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [3] Congress considered the realization of this policy "to be of the highest priority." [4] The Fair Housing Act's language prohibiting discrimination in housing is "broad and inclusive;" [5] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [6] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives reiterated that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [7] (See the preamble to the November 16, 2011, proposed rule at 76 FR 70922.)

The Fair Housing Act gives HUD the authority and responsibility for administering and enforcing the Act,[8] including the authority to conduct formal adjudications of Fair Housing Act complaints [9] and the power to promulgate rules to interpret and carry out the Act.[10] In keeping with the Act's "broad remedial intent," [11] HUD, as the following discussion reflects, has long interpreted the Act to prohibit practices that have an unjustified discriminatory effect, regardless of intent. (See also the

preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.)

In formal adjudications of charges of discrimination under the Fair Housing Act over the past 20 years, HUD has consistently concluded that the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent.[12] In one such formal adjudication, the Secretary of HUD reviewed the initial decision of a HUD administrative law judge and issued a final order stating that practices with an unjustified discriminatory effect violate the Act. In that case, the Secretary found that a mobile home community's occupancy limit of three persons per dwelling had a discriminatory effect on families with children.[13] When the housing provider appealed the Secretary's order to the United States Court of Appeals for the Tenth Circuit, the Secretary of HUD defended his order, arguing that statistics showed that the housing policy, while neutral on its face, had a discriminatory effect on families with children because it served to exclude them at more than four times the rate of families without children.[14] Similarly, on appeal of another final agency decision holding that a housing policy had a disparate impact on families with children,[15] the Secretary of HUD, in his brief defending the decision before the United States Court of Appeals for the Ninth Circuit, discussed in detail the text and legislative history of the Act, as well as prior pronouncements by HUD that proof of a discriminatory intent is not

required to establish liability under the Act.[16]

HUD has interpreted the Act to include discriminatory effects liability not only in formal adjudications, but through various other means as well. In 1980, for example, Senator Charles Mathias read into the Congressional Record a letter that the Senator had received from the HUD Secretary describing discriminatory effects liability under the Act and explaining that such liability is "imperative to the success of civil rights law enforcement." [17] In 1994, HUD joined with the Department of Justice and nine other federal regulatory and enforcement agencies in approving and adopting a policy statement that, among other things, recognized that disparate impact is among the "methods of proof of lending discrimination under the * * * [Fair Housing] Act." [18] In this Policy Statement on Discrimination in Lending (Joint Policy Statement), HUD and the other regulatory and enforcement agencies recognized that "[p]olicies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit," and provided guidance on how to prove a disparate impact fair lending claim.[19]

Additionally, HUD's interpretation of the Act is further confirmed by regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act (FHEFSSA), in which HUD prohibited Fannie Mae and Freddie Mac from engaging in mortgage purchase activities that have a discriminatory effect in violation of FHEFSSA.[20] In addressing a concern for how the impact theory might operate under FHEFFSA, HUD explained that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that this Fair Housing Act disparate impact law "is applicable to all segments of the housing marketplace, including the GSEs" (government-sponsored enterprises).[21] In

---

[3] 42 U.S.C. 3601.

[4] *Trafficante* v. *Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (internal citation omitted).

[5] Id. at 209.

[6] Id. at 211.

[7] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[8] *See* 42 U.S.C. 3608(a).

[9] *See* 42 U.S.C. 3610, 3612.

[10] *See* 42 U.S.C. 3614a.

[11] *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 380 (1982).

[12] *See, e.g., HUD* v. *Twinbrook Village Apts.*, No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Carlson*, No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD* v. *Ross*, No. 01–92–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter*, No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[13] *HUD* v. *Mountain Side Mobile Estates P'ship*, No. 08–92–0010–1, 1993 WL 307069 (HUD Sec'y July 19, 1993), aff'd in relevant part, 56 F.3d 1243 (10th Cir. 1995).

[14] Brief for HUD Secretary as Respondent, *Mountain Side Mobile Estates P'ship* v. *HUD*, No. 94–9509 (10th Cir. 1994).

[15] *HUD* v. *Pfaff*, No. 10–93–0084–8, 1994 WL 592199, at *17 (HUD ALJ Oct. 27, 1994), rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996).

[16] Brief for HUD Secretary as Respondent, *Pfaff* v. *HUD*, No. 94–70898 (9th Cir. 1996).

[17] 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary).

[18] Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994) ("Joint Policy Statement").

[19] *Id.*

[20] *See* 24 CFR 81.42 (2012).

[21] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61846, 61867 (Dec. 1, 1995).

promulgating this regulation, HUD also emphasized the importance of the Joint Policy Statement, explaining that "[a]ll the Federal financial regulatory and enforcement agencies recognize the role that disparate impact analysis plays in scrutiny of mortgage lending" and have "jointly recognized the disparate impact standard as a means of proving lending discrimination under the Fair Housing Act." [22]

Consistent with its longstanding interpretation of the Act, over the past two decades, HUD has regularly issued guidance to its staff that recognizes the discriminatory effects theory of liability under the Act. For instance, HUD's Assistant Secretary for Fair Housing and Equal Opportunity (FHEO) issued a memorandum in 1993 instructing HUD investigators to be sure to analyze complaints under the disparate impact theory of liability.[23] HUD's 1995 Title VIII Complaint Intake, Investigation and Conciliation Handbook (Enforcement Handbook), which set forth guidelines for investigating and resolving Fair Housing Act complaints, emphasized to HUD's enforcement staff that disparate impact is one of "the principal theories of discrimination" under the Fair Housing Act and required HUD investigators to apply it when appropriate.[24] HUD's 1998 version of the Enforcement Handbook, which is currently in effect, also recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases nationwide.[25]

In 1998, at Congress's direction, HUD published in the **Federal Register** previously-internal guidance from 1991 explaining when occupancy limits may violate the Act's prohibition of discrimination because of familial status, premised on the application of disparate impact liability.[26] More recently, HUD posted on its Web site guidance to its staff and others discussing how facially neutral housing

policies addressing domestic violence can have a disparate impact on women in violation of the Act.[27]

Although several of the HUD administrative decisions, federal court holdings, and HUD and other federal agency public pronouncements on the discriminatory effects standard just noted were discussed in the preamble to HUD's November 16, 2011, proposed rule, HUD has described these events in the preamble to this final rule to underscore that this rule is not establishing new substantive law. Rather, this final rule embodies law that has been in place for almost four decades and that has consistently been applied, with minor variations, by HUD, the Justice Department and nine other federal agencies, and federal courts. In this regard, HUD emphasizes that the title of this rulemaking, "Implementation of the Fair Housing Act's Discriminatory Effects Standard," indicates that HUD is not proposing new law in this area.

As discussed in the preamble to the proposed rule (76 FR 70921, 70923), all federal courts of appeals to have addressed the question agree that liability under the Act may be established based on a showing that a neutral policy or practice has a discriminatory effect even if such a policy or practice was not adopted for a discriminatory purpose.[28] There is minor variation, however, in how evidence has been analyzed pursuant to this theory. For example, in adjudications, HUD has always used a three-step burden-shifting approach,[29]

as do many federal courts of appeals.[30] One federal court of appeals applies a multi-factor balancing test,[31] other courts of appeals apply a hybrid between the two,[32] and one court of appeals applies a different test for public and private defendants.[33]

Another source of variation in existing law is in the application of the burden-shifting test. Under the three-step burden-shifting approach applied by HUD and the courts, the plaintiff (or, in administrative adjudications, the charging party) first must make a prima facie showing of either a disparate impact or a segregative effect. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant (or respondent) satisfies its burden, the third step comes into play. There has been a difference of approach among the various appellate courts and HUD adjudicators as to which party bears the burden of proof at this third step, which requires proof as to whether or not a less discriminatory alternative to the challenged practice exists. All but one of the federal courts of appeals that use a burden-shifting approach place the ultimate burden of proving that a less discriminatory alternative exists on the plaintiff,[34] with some courts analogizing to the burden-shifting framework established for Title VII of the Civil Rights Act of 1964 (Title VII), which addresses employment discrimination.[35] The remaining court of appeals places the burden on the

[22] Id.

[23] Memorandum from the HUD Assistant Secretary for Fair Housing & Equal Opportunity, The Applicability of Disparate Impact Analysis to Fair Housing Cases (Dec. 17, 1993).

[24] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 7–12 (1995).

[25] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 2–27 (1998) ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[26] *See* 63 FR 70256 (Dec. 18, 1998) (publishing "Keating Memo" regarding reasonable occupancy standards); Quality Housing and Work Responsibility Act of 1998, Public Law 105–276, 112 Stat. 2461, § 589 (Oct. 21, 1998) (requiring publication of Keating Memo).

[27] Memorandum from HUD Office of Fair Housing & Equal Opportunity, Assessing Claims of Housing Discrimination Under the Fair Housing Act & the Violence Against Women Act 5–6 (Feb. 9, 2011). *http://www.hud.gov/offices/fheo/library/11-domestic-violence-memo-with-attachment.pdf.*

[28] *See, e.g., Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007); *Reinhart v. Lincoln Cnty.,* 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc. v. Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Charleston Hous. Auth. v. U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois v. Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson v. Okaloosa Cnty., Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith v. Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 937–38 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 148 (3d Cir. 1977); *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 987–89 & n.3 (4th Cir. 1984); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1290–91 (7th Cir. 1977); *United States. v. City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

[29] *See, e.g., HUD v. Twinbrook Village Apts.,* No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD v. Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD v.*

*Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD v. Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *see also* Joint Policy Statement, 59 FR 18269.

[30] *See, e.g., Charleston,* 419 F.3d at 740–42; *Langlois,* 207 F.3d at 49–50; *Huntington Branch,* 844 F.2d at 939.

[31] *See, e.g., Metro. Hous. Dev. Corp.,* 558 F.2d at 1290 (applying a four-factor balancing test).

[32] *See, e.g., Graoch,* 508 F.3d at 373 (balancing test incorporated as elements of proof after second step of burden-shifting framework); *Mountain Side Mobile Estates v. Sec'y HUD,* 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (incorporating a three-factor balancing test into the burden-shifting framework to weigh defendant's justification);.

[33] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See, e.g., Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[34] *Compare Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly,* 658 F.3d 375, 382 (3d Cir. 2011) (burden of proving less discriminatory alternative ultimately on plaintiff), *and Gallagher v. Magner,* 619 F.3d 823, 834 (8th Cir. 2010) (same), *and Graoch,* 508 F.3d at 373–74 (same), *and Mountain Side Mobile Estates,* 56 F.3d at 1254 (same), *with Huntington Branch,* 844 F.2d at 939 (burden of proving no less discriminatory alternative exists on defendant).

[35] *See, e.g., Graoch,* 508 F.3d at 373 ("[C]laims under Title VII and the [Fair Housing Act] generally should receive similar treatment").

defendant to show that no less discriminatory alternative to the challenged practice exists.[36] HUD's administrative law judges have, at times, placed this burden of proof concerning a less discriminatory alternative on the respondent and, at other times, on the charging party.[37]

Through this rulemaking and interpretative authority under the Act, HUD formalizes its longstanding view that discriminatory effects liability is available under the Act and establishes uniform standards for determining when a practice with a discriminatory effect violates the Fair Housing Act.

## III. The November 16, 2011, Proposed Rule

On November 16, 2011, HUD published a proposed rule in the **Federal Register** (76 FR 70921) addressing the discriminatory effects theory of liability under the Act. Specifically, HUD proposed adding a new subpart G to 24 CFR part 100, which would formalize the longstanding position held by HUD and the federal courts that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose, and would establish uniform standards for determining when such a practice violates the Act.

In the proposed rule, HUD defined a housing practice with a "discriminatory effect" as one that "actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

A housing practice with a discriminatory effect would still be lawful if supported by a "legally sufficient justification." HUD proposed that a "legally sufficient justification" exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant; and (2)

those interests cannot be served by another practice that has a less discriminatory effect.

Consistent with its own past practice and that of many federal courts, HUD proposed a burden-shifting framework for determining whether liability exists under a discriminatory effects theory. Under the proposed burden-shifting approach, the charging party or plaintiff in an adjudication first bears the burden of proving that a challenged practice causes a discriminatory effect. If the charging party or plaintiff meets this burden, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of its legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that the legitimate, nondiscriminatory interest can be served by another practice that has a less discriminatory effect.

In the proposed rule, HUD explained that violations of various provisions of the Act may be established by proof of discriminatory effects, including 42 U.S.C. 3604(a), 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606 (see 76 FR 70923 n.20), and that discriminatory effects liability applies to both public and private entities (see 76 FR 70924 n.40).

HUD also proposed to revise 24 CFR part 100 to add examples of practices that may violate the Act under the discriminatory effects theory.

## IV. Changes Made at the Final Rule Stage

In response to public comment, a discussion of which is presented in the following section, and in further consideration of issues addressed at the proposed rule stage, HUD is making the following changes at this final rule stage:

### A. Changes to Subpart G

The final rule makes several minor revisions to subpart G in the proposed rule for clarity. The final rule changes "housing practice" to "practice" throughout proposed subpart G to make clear that the standards set forth in subpart G are not limited to the practices addressed in subpart B, which is titled "Discriminatory Housing Practices." The final rule replaces "under this subpart" with "under the Fair Housing Act" because subpart G outlines evidentiary standards for proving liability under the Fair Housing Act. The final rule also replaces the general phrase "prohibited intent" with

the more specific "discriminatory intent."

The final rule slightly revises the definition of discriminatory effect found in proposed § 100.500(a), without changing its meaning, to condense the definition and make it more consistent with terminology used in case law. Proposed § 100.500(a) provided that "[a] housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin." Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."

To clarify "legally sufficient justification" and in particular, what HUD meant in the proposed rule by "a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests," HUD is revising the definition found in proposed § 100.500(b) to read as follows: "(1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (ii) Those interests could not be served by another practice that has a less discriminatory effect. (2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative * * *." This revision to the definition of "legally sufficient justification" includes changing "cannot be served," the phrasing used in the proposed rule, to "could not be served."

This revised definition of "legally sufficient justification" also appears in § 100.500(c)(2) and, in essentially the same form, in § 100.500(c)(3). The final rule also replaces the word "demonstrating" with "proving" in § 100.500(c)(3) in order to make clear that the burden found in that section is one of proof, not production.

In addition to these changes, the final rule makes several minor corrections to § 100.500. The final rule substitutes "42

---

[36] *Huntington Branch,* 844 F.2d at 939.

[37] *Compare, e.g., HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), *and HUD* v. *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), *with HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (charging party bears the burden of showing that a less discriminatory alternative exists), *and HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

U.S.C. 3610'' with ''42 U.S.C. 3612'' in § 100.500(c)(1) because the procedures for a formal adjudication under the Act are found in 42 U.S.C. 3612. Also in § 100.500(c)(1), the final rule changes ''proving that a challenged practice causes a discriminatory effect'' to ''proving that a challenged practice caused or predictably will cause a discriminatory effect.'' This edit is required for consistency with the Fair Housing Act and § 100.500(a), which prohibit actions that predictably result in discrimination.

The final rule further corrects proposed § 100.500(c)(1) and (2) to replace ''complainant'' with ''charging party'' because in cases tried before HUD administrative law judges, the charging party—and not the complainant—has the same burden of proof as a plaintiff in court. Under the provisions of the Act governing adjudication of administrative complaints, an aggrieved person may file a complaint with the Secretary alleging a discriminatory housing practice, or the Secretary may file such a complaint,[38] but it is the Secretary who issues the charge of discrimination and prosecutes the case before the Administrative Law Judge, on behalf of the aggrieved person.[39] Any aggrieved person may intervene as a party in the proceeding,[40] in which case the intervener would bear the same burden of proof as the charging party or a plaintiff in a judicial action.

### B. Changes to Illustrations

The illustrations added in this rule, as well as the existing illustrations in part 100, represent HUD's interpretation of conduct that is illegal housing discrimination under the Fair Housing Act. Liability can be established for the conduct illustrated in part 100 through evidence of intentional discrimination, or based on discriminatory effects pursuant to the standards set forth in subpart G, depending on the nature of the potential violation.

In order to make clear that the Fair Housing Act violations illustrated in part 100 may be proven through evidence of intentional discrimination or discriminatory effects, as the evidence permits, and that any potential discriminatory effects violation must be assessed pursuant to the standards set forth in § 100.500, the final rule amends paragraph (b) of § 100.5 to add at the end the following sentence: ''The illustrations of unlawful housing discrimination in this part may be

established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.''

The final rule revises the illustrations of discriminatory housing practices in the proposed rule, rephrasing them in more general terms. The language of the added illustrations, which in the proposed rule included paraphrasing the definition of discriminatory effect from subpart G, is revised to eliminate the paraphrasing, which is unnecessary after the addition to paragraph (b) of § 100.5. This revision is also intended to eliminate any potential negative implication from the proposed rule that the existing illustrations in part 100 could not be proven through an effects theory. In addition to this general streamlining of the illustrations in the proposed rule, the final rule makes the following specific revisions to the illustrations.

In order to avoid redundancy in HUD's Fair Housing Act regulations, this final rule eliminates proposed § 100.65(b)(6). The substance of proposed § 100.65(b)(6), which covers ''Providing different, limited, or no governmental services such as water, sewer, or garbage collection'' is already captured by existing § 100.65(b)(4), which prohibits ''Limiting the use of privileges, services, or facilities associated with a dwelling,'' and existing § 100.70(d)(4), which prohibits ''Refusing to provide municipal services * * * for dwellings or providing such services differently.''

In response to public comment, the final rule adds ''enacting'' and ''ordinance'' to § 100.70(d)(5). These changes confirm that an ordinance is one type of land-use decision that is covered by the Act, under a theory of intentional discrimination or discriminatory effect, and that land-use decisions may discriminate from the moment of enactment. This final rule therefore revises proposed § 100.70(d)(5) to give the following as an illustration of a prohibited practice: ''Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.'' The final rule removes ''cost'' and ''terms or conditions'' from proposed § 100.120(b)(2) and adds them to § 100.130. This revision is not intended to make any substantive changes to HUD's interpretation of the Act's coverage, but rather is for organizational purposes only: § 100.120 addresses

discrimination in the making and provision of loans and other financial assistance, while § 100.130 addresses discriminatory terms or conditions. Other minor streamlining changes are made to existing § 100.120(b). Accordingly, this final rule revises § 100.120(b) to read as set forth in the regulatory text of the rule.

The final rule amends existing § 100.130(b)(2) to add ''or conditions'' and the term ''cost'' to the list of potentially discriminatory terms or conditions of loans or other financial assistance. It also adds new § 100.130(b)(3), which, in response to a public comment, illustrates that servicing is a condition of loans or other financial assistance covered by section 805.[41] Because, as noted above, at the final rule stage ''terms and conditions'' is removed from proposed § 100.120(b)(2), new § 100.130(b)(3) also addresses the provision of loans or other financial assistance with terms or conditions that have a discriminatory intent or effect. As a result of these changes, new § 100.130(b)(3) reads as follows: ''Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.''

### V. The Public Comments

The public comment period for the November 16, 2011, proposed rule closed on January 17, 2012. Ninety-six public comments were received in response to the proposed rule. Comments were submitted by a wide variety of interested entities, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, Attorneys General from several States, state housing finance agencies, public housing agencies, public housing trade associations, insurance companies, mortgage lenders, credit unions, banking trade associations, real estate agents, and law firms.[42] This section of the preamble, which addresses significant issues raised in the public

---

[38] 42 U.S.C. 3610(a)(1)(A).

[39] 42 U.S.C. 3610(g)(2)(A), 3612.

[40] 42 U.S.C. 3612(c).

[41] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate section 804 of the Act, 42 U.S.C. 3604.

[42] All public comments on this rule can be found at *www.regulations.gov*, specifically at *http://www.regulations.gov/#!searchResults;rpp=50;po=0;dktid=HUD-2011-0138.*

Case 1:13-cv-01564-PLF   Document 41-1   Filed 12/20/13   Page 38 of 129
Case 1:13-cv-00966-RJL   Document 17-2   Filed 04/22/14   Page 38 of 129   PageID #:7810

**Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations          **11465**

comments, organizes the comments by subject category, with a brief description of the issue (or set of related issues) followed by HUD's response.

Many comments were received in support of the rule generally and in support of the proposed discriminatory effects standard in particular. This summary does not provide a response to comments that expressed support for the proposed rule. Supportive comments included statements asserting that the rule: advances the goals of the Fair Housing Act; offers a well-reasoned standard for analyzing discriminatory effects claims; provides a national standard for courts, housing providers, municipalities and the financial and insurance industries; provides clarity to housing providers, housing seekers, and others; will decrease litigation by clarifying the burdens of proof; and will help address a lack of adequate housing for older persons even though age is not a protected characteristic under the Act because older persons may be affected by practices with a discriminatory effect based on disability. Commenters stated that the rule is particularly necessary to maintain protections against discriminatory and abusive practices in the mortgage industry, as the Fair Housing Act covers activities in residential real estate-related transactions that may not be covered by the Equal Credit Opportunity Act (ECOA).[43] A commenter stated that the rule's flexible standard is appropriate, as no rigid formula fits the variety of practices that exist in a rapidly evolving housing market.

Several commenters supported discriminatory effects liability under the Act in general, stating that it is widely agreed that discriminatory effects analysis is critically important to vigorous enforcement of the Fair Housing Act, and that the rule is consistent with HUD's longstanding interpretation and the interpretation of the federal courts of appeals. Commenters in support of the importance of the effects test proffered the following: if the effects approach were no longer available, "the proverbial door to equal housing opportunity will be slammed in the face of many victims"; the effects analysis is particularly important with respect to

the protection of persons with disabilities and in familial status cases; municipal land use decisions are more likely to have a discriminatory effect on minorities when they unreasonably attempt to restrict affordable housing; the effects analysis is important to environmental justice investigations; the discriminatory effects standard encourages housing providers to develop creative ways to achieve their economic objectives while promoting diversity; the effects standard gives HUD and fair housing advocates the tools to reveal the effects of racism, poverty, disability discrimination, and adverse environmental conditions on the health and well-being of individuals protected by the law; the rule provides practical administrative guidance for HUD attorneys and administrative law judges, as well as for the state and local fair housing agencies that share responsibility with HUD for adjudicating fair housing complaints; and the disparate impact standard is important in addressing discrimination in lending and denial of access to credit, which are often the results of neutral policies that have a disparate impact on protected groups.

Some commenters supported the proposed rule's allocation of the burden of proof, stating that the rule is practical and supported by longstanding precedent, and that it provides clear guidance to housing providers and government agencies in adopting rules and policies and an objective method for courts to evaluate discriminatory effect claims. A commenter stated that the perpetuation of segregation theory of effects liability is supported by the legislative history of Title VIII and the obligation to affirmatively further fair housing found in 42 U.S.C. 3608(d).

Following are the remaining issues raised by the public comments and HUD's responses.

## A. Validity of Discriminatory Effects Liability Under the Act

*Issue:* Some commenters opposed the rule because, in their view, the Act's text cannot be interpreted to include liability under a discriminatory effects theory. Commenters stated that the Fair Housing Act does not include an effects standard because it does not use the phrase "adversely affect," as in Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act. One of these commenters stated that the Fair Housing Act does not include any of the words in other statutes that have been interpreted as giving rise to disparate impact claims, such as "affect" and "tend to." A commenter found the

"otherwise make unavailable or deny" language in the Fair Housing Act unpersuasive evidence that Congress intended the Act to include an effects test because it is a catchall phrase at the end of a list of prohibited conduct, and it must be read as having a similar meaning as the specific items on the list.

Some commenters stated that the Act's prohibition of certain practices "because of," "on account of," or "based on" a protected classification necessitates a showing of discriminatory intent. A commenter stated that "because of" and "on account of," as used in every provision of the Act, require evidence of intent because the same phrases are used in two provisions of the Act that cannot plausibly be interpreted to employ discriminatory effects liability. In this regard, this commenter pointed to 42 U.S.C. 3631, which uses the phrase "because of" to create criminal liability for specific fair housing violations, and 42 U.S.C. 3617, which uses the phrase "on account of" to ban coercion and intimidation of those exercising fair-housing rights.

Other commenters expressed support for a rule setting out the discriminatory effects theory of liability. Some of these commenters stated that Congress intended that such liability exist and that the text of the Act readily supports this position. Commenters stated that discriminatory effects liability best effectuates Congress's broad, remedial intent in passing the Fair Housing Act and the Act's stated purpose of providing for fair housing, within constitutional limitations, throughout the country. Commenters pointed out, through examples of neutral practices with discriminatory results that they have encountered, that an effects theory of liability continues to be vital in achieving the Act's broad goal. Commenters stated that, consistent with HUD's interpretation of the Act, federal courts have unanimously held that liability may be established by proof of discriminatory effects.

*HUD Response:* As the preamble to the proposed rule and this final rule make clear, both HUD and the federal courts have long interpreted the Fair Housing Act to prohibit actions that have an unjustified discriminatory effect, regardless of whether the action was motivated by a discriminatory intent. Section 804(a) of the Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex,

---

[43] ECOA prohibits any creditor from discriminating in credit transactions on the basis of race, color, national origin, religion, age, sex, marital status, or public assistance program participation. *See* 15 U.S.C. 1691(a). By comparison, Section 805 of the Fair Housing Act prohibits any person whose business includes engaging in residential-related transactions from discriminating in such transactions on the basis of race, color, religion, sex, disability, familial status, or national origin. *See* 42 U.S.C. 3605.

familial status, or national origin.''[44] Similarly, section 804(f)(1) makes it unlawful ''[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap.''[45] This ''otherwise make unavailable or deny'' formulation in the text of the Act focuses on the effects of a challenged action rather than the motivation of the actor. In this way, the provisions are similar to the ''otherwise adversely affect'' formulation that the Supreme Court found to support disparate impact liability under Title VII and the ADEA.[46] And, indeed, the federal courts have drawn the analogy between Title VII and the Fair Housing Act in interpreting the Act to prohibit actions that have an unjustified discriminatory effect, regardless of intent.[47]

In addition, many of the Fair Housing Act's provisions make it unlawful ''to discriminate'' in certain housing-related transactions based on a protected characteristic.[48] ''Discriminate'' is a term that may encompass actions that have a discriminatory effect but not a discriminatory intent.[49] HUD's extensive experience in administering the Fair Housing Act and in investigating and adjudicating claims arising under the Act, which is discussed in this preamble and that of the proposed rule,[50] informs its conclusion that not only can the term ''discriminate'' be interpreted to encompass discriminatory effects liability, but it must be so interpreted in order to achieve the Act's stated purpose to provide for fair housing to the extent the Constitution allows.[51] Indeed, as far back as 1980, the HUD Secretary explained to Congress why discriminatory effects liability under the Fair Housing Act is ''imperative to the success of civil rights enforcement.''[52] Only by eliminating practices with an unnecessary disparate impact or that unnecessarily create, perpetuate, increase, or reinforce segregated housing patterns, can the Act's intended goal to advance equal housing opportunity and achieve integration be realized.[53] In keeping with the broad remedial goals of the Fair Housing Act,[54] HUD interprets the term ''discriminate,'' as well as the language in sections 804(a) and 804(f)(1) of the Act, to encompass liability based on the results of a practice, as well as any intended effect.

The ''because of'' phrase found in sections 804 and 805 of the Act[55] and similar language such as ''on account of'' or ''based on'' does not signal that Congress intended to limit the Act's coverage to intentional discrimination. Both section 703(a)(2) of Title VII[56] and section 4(a)(2) of the ADEA[57] prohibit certain actions ''because of'' a protected characteristic, yet neither provision requires a finding of discriminatory intent.[58] Moreover, the fact that the phrases ''on account of'' and ''because of'' appear in sections 817 and 831 of the Fair Housing Act[59] does not preclude finding discriminatory effects liability under the Act's other substantive provisions using the same language because, as discussed above, HUD bases its interpretation of those other provisions on other language not found in sections 817 and 831, such as the phrase ''otherwise make unavailable or deny a dwelling'' and the term ''discriminate.''

HUD's interpretation is confirmed by the fact that the Act's text contains three exemptions that presuppose that the Act encompasses an effects theory of liability. For one, section 805(c) of the Act allows ''a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.''[60] If the Act prohibited only intentional discrimination, it would not be unlawful to ''take into consideration factors other than'' protected characteristics in the first instance, and this exemption would be superfluous. Second, section 807(b)(1) of the Act states that ''[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.''[61] Since ''the number of occupants permitted to occupy a dwelling'' is not a protected classification under the Act, this provision makes sense only as authorizing occupancy limits that would otherwise violate the Act based on an effects theory.[62] Indeed, in 1991, HUD issued a memorandum to its staff explaining when occupancy limits would violate the Act based on disparate impact liability, and Congress later directed HUD to publish these guidelines in the **Federal Register**.[63] Third, section 807(b)(4) of the Act states that ''[n]othing in this title prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance.''[64] As with the two exemptions discussed above, this provision would be wholly unnecessary if the Act prohibited only intentional discrimination.

---

[44] 42 U.S.C. 3604(a).

[45] 42 U.S.C. 3604(f)(1).

[46] See Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971) (holding that Title VII includes a disparate impact standard); Smith v. City of Jackson, Miss., 544 U.S. 228, 235 (2005) (affirming that the holding in Griggs represented the best reading of Title VII's text); id. at 240 (holding that section 4(a)(2) of the ADEA includes a disparate impact standard); see also Nat'l Cmty. Reinvestment Coalition v. Accredited Home Lenders Holding Co., 573 F. Supp. 2d 70, 78 (D.DC 2008) (holding that the Fair Housing Act encompasses disparate impact liability because, among other reasons, language in the Act is analogous to language in the ADEA found by the Supreme Court to include disparate impact).

[47] See Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 146 (3d Cir. 1977) (''[I]n Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response.''); Graoch, 508 F.3d at 374 (quoting Griggs, 401 U.S. at 431) (''The Supreme Court held that Title VII, which uses similar language [to Title VIII], 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.' The same analysis justifies the existence of disparate-impact liability under the FHA.'').

[48] See 42 U.S.C. 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606.

[49] See, e.g., Alexander v. Choate, 469 U.S. 287, 299 (1985) (assuming without deciding that section 504 of the Rehabilitation Act of 1973, which prohibits ''subject[ing] to discrimination'' otherwise qualified handicapped individuals, ''reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped''); Board. of Ed. v. Harris, 444 U.S. 130, 140–41 (1979) (concluding that the term ''discrimination,'' as used in the 1972 Emergency School Aid Act, was ambiguous and proscribed actions that had a disparate impact).

[50] See supra nn. 12–27; preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.

[51] In enacting the Fair Housing Act, Congress expressed its desire to provide, within constitutional limitations, for fair housing throughout the United States. See 42 U.S.C. 3601.

[52] See 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias) (reading into the record letter of HUD Secretary).

[53] See supra nn. 3–7; infra nn. 65–69.

[54] See supra note 11.

[55] 42 U.S.C. 3604 and 3605.

[56] 42 U.S.C. 2000e–2(a)(2).

[57] 29 U.S.C. 623(a)(2).

[58] See Meacham v. Knolls Atomic Power Lab., 554 U.S. 84, 96 (2008) (explaining that, ''in the typical disparate-impact case'' under the ADEA, ''the employer's practice is 'without respect to age' and its adverse impact (though 'because of age') is 'attributable to a nonage factor' ''); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 147 (3d Cir. 1977) (''[T]he 'because of race' language is not unique to § 3604(a): that same language appears in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), yet a prima facie case of Title VII liability is made out when a showing of discriminatory effect (as distinct from intent) is established.'').

[59] 42 U.S.C. 3617 and 3631.

[60] 42 U.S.C. 3605(c).

[61] 42 U.S.C. 3607(b)(1).

[62] See City of Jackson, 544 U.S. at 238–39 (explaining that the ADEA's provision that allows an employer ''to take any action otherwise prohibited * * * where the differentiation is based on reasonable factors other than age discrimination'' would be ''simply unnecessary'' if the ADEA prohibited only intentional discrimination).

[63] See supra note 26.

[64] 42 U.S.C. 3607(b)(4).

The legislative history of the Act informs HUD's interpretation. The Fair Housing Act was enacted after a report by the National Advisory Commission on Civil Disorders, which President Johnson had convened in response to major riots taking place throughout the country, warned that "[o]ur Nation is moving toward two societies, one black, one white—separate and unequal."[65] The Act's lead sponsor, Senator Walter Mondale, explained in the Senate debates that the broad purpose of the Act was to replace segregated neighborhoods with "truly integrated and balanced living patterns."[66] Senator Mondale recognized that segregation was caused not only by "overt racial discrimination" but also by "[o]ld habits" which became "frozen rules,"[67] and he pointed to one such facially neutral practice—the "refusal by suburbs and other communities to accept low-income housing."[68] He further explained some of the ways in which federal, state, and local policies had formerly operated to require segregation and argued that "Congress should now pass a fair housing act to undo the effects of these past" discriminatory actions.[69]

Moreover, in the approximately 20 years between the Act's enactment in 1968 and its amendment in 1988, the nine federal courts of appeals to address the issue held that the Act prohibited actions with a discriminatory effect.[70] Congress was aware of this widespread judicial agreement when it significantly amended the Act in 1988.[71] At that time, the House Committee on the Judiciary specifically rejected an amendment that would have provided that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate."[72] Instead of adding this intent requirement to the Act, Congress chose to maintain the Act's operative text barring discrimination and making unavailable or denying housing, to extend those prohibitions to disability and familial status, and to establish the exemptions discussed above that presuppose the availability of a discriminatory effects theory of liability.[73] The failed attempt in 1988 to impose an intent requirement on the Act followed five other failed attempts, in 1980,[74] 1981,[75] 1983,[76] 1985,[77] and 1987.[78]

*Issue:* Two commenters stated that, when promulgating regulations implementing the Fair Housing Amendments Act of 1988, HUD stated in the preamble that the "regulations are not designed to resolve the question of whether intent is or is not required to show a violation" of the Act.[79] A commenter faulted HUD for failing to explain what the commenter perceived as a change in its official interpretation of the Act, and urged HUD to eliminate disparate impact liability from the rule. Some commenters stated that President Reagan, when signing the Fair Housing Amendments Act of 1988, expressed his opinion that the amendment "does not represent any congressional or executive branch endorsement of the notion, that [Fair Housing Act] violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent."[80] Some commenters also stated that, in 1988, the United States Solicitor General submitted an amicus brief to the U.S. Supreme Court in *Huntington Branch, NAACP* v. *Town of Huntington* asserting that a violation of the Fair Housing Act requires a finding of intentional discrimination.[81]

*HUD Response:* While HUD chose not to use the regulations implementing the Fair Housing Amendments Act of 1988 to opine formally on whether a violation under the Act may be established absent discriminatory intent, it has never taken the position that the Act requires a finding of intentional discrimination. On the contrary, through formal adjudications and various other means, including other regulations, interpretive guidance, and statements to Congress, HUD has consistently construed the Act as encompassing discriminatory effects liability.[82] HUD's prior interpretations of the Act regarding the discriminatory effects standard are entitled to judicial deference.[83] Neither President Reagan's signing statement nor the Solicitor General's amicus brief in *Huntington Branch* affects or overrides the longstanding, consistent construction of the Act by HUD, the agency with delegated authority to administer the Act and to promulgate rules interpreting it. Moreover, the Department of Justice both before and after *Huntington Branch* has taken the position that the Fair Housing Act includes discriminatory effects liability.[84]

## B. Definition of Discriminatory Effect, § 100.500(a)

In order to make it more concise and more consistent with terminology used in case law without changing its substance, this final rule slightly revises the definition of "discriminatory effect."

Proposed § 100.500(a) provided that "A housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of

[65] Report of the National Advisory Commission on Civil Disorders 1 (1968).

[66] 90 Cong. Rec. 3422 (1968).

[67] 114 Cong. Rec. 3421 (1968).

[68] *Id.* at 2277.

[69] *Id.* at 2669.

[70] *See, e.g., Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 935–36 (2d Cir.), aff'd, 488 U.S. 15 (1988); *Hanson* v. *Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur* v. *City of Toledo,* 782 F.2d 565, 574–75 (6th Cir. 1986); *United States* v. *Marengo Cnty. Comm'n,* 731 F.2d 1546, 1559 n.20 (11th Cir. 1984); *Smith* v. *Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Halet* v. *Wend Inv. Co.,* 672 F.2d 1305, 1311 (9th Cir. 1982); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184– 85 (8th Cir. 1974).

[71] *See, e.g.,* H.R. Rep. No. 100–711, at 2182 (1988) (citing courts of appeals decisions in discussing a policy that could have a "discriminatory effect" on minority households ("[b]ecause minority households tend to be larger"); 134 Cong. Rec. 23711–12 (1988) (Statement of Sen. Kennedy) (noting unanimity of courts of appeals as to the disparate impact test); Fair Housing Amendments Act of 1987: Hearings Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary, 100th Cong., 1st Sess. 529–557 (1987) (testimony of Prof. Robert Schwemm, Univ. of Ky. Law Sch.) (discussing "strong consensus" in federal courts of

appeals that the Fair Housing Act prohibited disparate impact discrimination).

[72] *See* H.R. Rep. No. 100–711, at 89–91 (1988) (dissenting views of Rep. Swindall).

[73] *See* Fair Housing Amendments Act of 1988, Pub. L. 100–430, 102 Stat. 1619 (1988).

[74] H.R. Rep. No. 96–865, at 2 (1980) (The Act "effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin, or religion."); 126 Cong. Rec. 31,164 (1980) (explaining that the addition of an intent requirement "would make a radical change in the standard of proof in title VIII cases") (statement of Sen. Bayh).

[75] 127 Cong. Rec. 22,156 (1981).

[76] 129 Cong. Rec. 808 (1983).

[77] S. 139, 99th Cong. § 6(e) (1985).

[78] 133 Cong. Rec. 7180 (1987).

[79] 54 FR 3232, 3235 (Jan. 23, 1989).

[80] Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988).

[81] *See* Brief for United States as Amicus Curiae, *Town of Huntington* v. *Huntington Branch, NAACP,* 488 U.S. 15 (1988) (No. 97–1961).

[82] *See, e.g.,* nn. 12–27, *supra.*

[83] *See, e.g., United States* v. *Mead Corp.,* 533 U.S. 218, 230 & n.12 (2001) (*Chevron* deference is warranted for formal adjudications).

[84] *See United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974); *see also* Brief for the United States as Amicus Curiae, *Magner* v. *Gallagher,* 132 S. Ct. 1306 (2012) (No. 10–1032).

persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.''

Commenters raised a number of issues with respect to the definition of ''discriminatory effect.''

*Issue:* Two commenters requested that HUD expand the definition of ''housing practice'' to include the language from the preamble to the proposed rule that provided examples of facially neutral actions that may result in a discriminatory effect, ''e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria,'' to make clear that the Act does not apply only to housing ''practices.''

*HUD Response:* The Act and HUD regulations define ''discriminatory housing practice'' broadly as ''an act that is unlawful under section 804, 805, 806, or 818.''[85] As HUD explained in the preamble to the proposed rule, any facially neutral actions, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act. Given the breadth of the definition of ''discriminatory housing practice,'' and the examples provided in the preamble to the proposed rule, HUD does not agree that it is necessary to provide those examples in the text of the regulation. The final rule does, however, replace ''housing practice'' with ''practice'' in order to make clear it applies to the full range of actions that may violate the Fair Housing Act under an effects theory.

*Issue:* A commenter stated that, in light of the Supreme Court's decision in *Wal-Mart Stores, Inc.* v. *Dukes,*[86] HUD should ''remove those aspects of the proposed rule that would give rise to disparate impact liability based on the exercise of discretion.''

*HUD Response:* HUD does not agree that the Supreme Court's decision in *Wal-Mart* means that policies permitting discretion may not give rise to discriminatory effects liability under the Fair Housing Act. The opinion in *Wal-Mart* did not address the substantive standards under the Fair Housing Act but instead addressed the issue of class certification under Title VII. Moreover, even in that context, the opinion in *Wal-Mart* does not shield policies that allow for discretion from liability under Title

VII. On the contrary, the Supreme Court confirmed that an employer who permits his managers to exercise discretion may be liable under Title VII pursuant to a disparate impact theory, ''since an employer's undisciplined system of subjective decision-making can have precisely the same effects as a system pervaded by impermissible intentional discrimination.''[87]

*Issue:* Some commenters asked HUD to remove the word ''predictably'' from the proposed definition. One commenter made this request out of concern that such a definition would make good faith compliance with the Act difficult, and another because claims based on a predictable impact are too speculative. Another commenter expressed support for the inclusion of ''predictably'' in the definition because discrimination cases often involve members of a protected class who predictably would be impacted by the challenged practice. As an example, the commenter stated that a challenge to a zoning or land use ordinance might focus on persons who would be excluded from residency by application of the ordinance.

*HUD Response:* HUD agrees with the latter commenter that the Act is best interpreted as prohibiting actions that predictably result in an unjustified discriminatory effect. HUD's interpretation is supported by the plain language of the Fair Housing Act, which defines ''aggrieved person'' as any person who ''believes that such person will be injured by a discriminatory housing practice that is about to occur,''[88] and which specifically authorizes HUD to take enforcement action and ALJs and courts to order relief with respect to discrimination that ''is about to occur.''[89] Moreover, courts interpreting the Fair Housing Act have agreed that predictable discriminatory effects may violate the Act.[90]

*Issue:* A commenter requested that the preamble or the text of the final rule make clear that reasonable data, such as data from the U.S. Census Bureau, data required by the Home Mortgage Disclosure Act (HMDA), and HUD data

on the occupancy of subsidized housing units, can be used to demonstrate that a practice predictably results in a discriminatory effect.

*HUD Response:* The purpose of the rule, as identified in the November 16, 2011, proposed rule, is to formalize a long-recognized legal interpretation and establish a uniform legal standard, rather than to describe how data and statistics may be used in the application of the standard. The appropriate use of such data is discussed in other federal sources, including the Joint Policy Statement.

*Issue:* Several commenters expressed concern that the proposed rule did not explain the degree to which a practice must disproportionately impact one group over another. A few commenters expressed the opinion that, in order for a practice to violate the Act, the practice must result in a significant or non-trivial discriminatory effect. A commenter wrote that members of a protected class must be impacted in a manner that is ''meaningfully different'' from any impact on other individuals. Another commenter suggested defining a disparate impact as a 20 percent difference between the relevant groups. Another stated that the impact should be ''qualitatively different.'' A commenter wrote that, in the lending context, a disparate impact should not exist where statistics only show that a protected class, on an aggregate basis, has not received as many loans as the general population. Another commenter stated concern that the rule would allow small statistical differences in the pricing of loans to be actionable.

*HUD Response:* As stated in the response to the preceding issue, this rule concerns the formalization of a long-recognized legal interpretation and burden-shifting framework, rather than a codification of how data and statistics may be used in the application of the standard. To establish a prima facie case of discriminatory effects liability under the rule, the charging party or plaintiff must show that members of a protected class are disproportionately burdened by the challenged action, or that the practice has a segregative effect. Whether a particular practice results in a discriminatory effect is a fact-specific inquiry. Given the numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts. HUD's decision not to codify a significance requirement for pleading purposes is consistent with the Joint

---

[85] 42 U.S.C. 3602(f); 24 CFR 100.20.

[86] 131 S. Ct. 2541 (2011).

[87] *Id.* at 2554 (internal brackets and quotation omitted).

[88] 42 U.S.C. 3602(i).

[89] *See* 42 U.S.C. 3610(g)(2)(A); 3612(g)(3); 3613(c)(1); 3614(d)(1)(A).

[90] *See, e.g., Pfaff* v. *HUD,* 88 F.3d at 745 (''‘Discriminatory effect’ describes conduct that actually or predictably resulted in discrimination.''); *United States.* v. *City of Black Jack,* 508 F.2d at 1184 (''To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect.'').

Policy Statement,[91] the statutory codification of the disparate impact standard under Title VII,[92] and the Consumer Financial Protection Bureau's interpretation of the disparate impact standard under ECOA.[93]

*Issue:* Two commenters stated that, in order to establish a prima facie case of discriminatory effect liability, a charging party or plaintiff should have to identify a specific practice and show that the alleged discriminatory effect is caused by that specific practice, with a commenter referring to *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989), in support of this position.

*HUD Response:* HUD addressed this issue at the proposed rule stage, and its analysis is not changed in this final rule. Under this rule, the charging party or plaintiff has the burden of proving that a challenged practice causes a discriminatory effect.[94] In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis. Moreover, as recognized in the employment context under Title VII, the elements of a decision-making process may not be capable of separation for analysis,[95] in which case it may be appropriate to challenge the decision-making process as a whole. For example, in a reverse redlining case, there may be multiple acts or policies which together result in a discriminatory effect.[96]

*Issue:* Commenters expressed concern with the definition of "discriminatory effect" because it included a practice that has "the effect of creating, perpetuating, or increasing segregated housing patterns" based on protected class. A commenter asked that "segregation" be removed from the proposed definition. Another commenter expressed concern that this portion of the definition would extend liability beyond the factual circumstances of the cases HUD cited as examples in the proposed rule's preamble because, according to the commenter, most of those cases raised at least a suggestion of intentional discrimination. A commenter stated that "perpetuating" should be more clearly defined so that the rule states, for example, whether the term requires an attempt to segregate further, or merely a practice that continues existing patterns of segregation. Another commenter expressed the related opinion that "not explicitly fostering integration" should never form the basis for liability under the Act.

*HUD Response:* As discussed in the preambles to both the proposed rule and this final rule, the elimination of segregation is central to why the Fair Housing Act was enacted.[97] HUD therefore declines to remove from the rule's definition of "discriminatory effects" "creating, perpetuating, or increasing segregated housing patterns."[98] The Fair Housing Act was enacted to replace segregated neighborhoods with "truly integrated and balanced living patterns."[99] It was structured to address discriminatory housing practices that affect "the whole community" as well as particular segments of the community,[100] with the goal of advancing equal opportunity in housing and also to "achieve racial integration for the benefit of all people in the United States."[101] Accordingly, the Act prohibits two kinds of unjustified discriminatory effects: (1) harm to a particular group of persons by a disparate impact; and (2) harm to the community generally by creating, increasing, reinforcing, or perpetuating

segregated housing patterns.[102] Recognizing liability for actions that impermissibly create, increase, reinforce, or perpetuate segregated housing patterns directly addresses the purpose of the Act to replace segregated neighborhoods with "truly integrated and balanced living patterns." For example, the perpetuation of segregation theory of liability has been utilized by private developers and others to challenge practices that frustrated affordable housing development in nearly all-white communities and thus has aided attempts to promote integration.[103]

Moreover, every federal court of appeals to have addressed the issue has agreed with HUD's interpretation that the Act prohibits practices with the unjustified effect of perpetuating segregation.[104] In one such case, for example, the court of appeals held that a zoning ordinance that prevents the construction of multifamily housing in areas that are primarily white may violate the Act by "reinforcing racial

---

[91] *See* Joint Policy Statement, 59 FR 18,266, 18,269 (Apr. 15, 1994) (defining "disparate impact" as "a disproportionate adverse impact" on applicants from a protected group).

[92] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i) (complaining party must demonstrate "that a respondent uses a particular employment practice that causes a disparate impact").

[93] *See* 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)-2 (discriminatory effect may exist when a creditor practice "has a disproportionately negative impact on a prohibited basis").

[94] *See* 24 CFR 100.500(c); *see also* 76 FR 70925.

[95] *See* 42 U.S.C. 2000e-2(k)(1)(B)(i) ("[T]he complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

[96] *See, e.g., Hargraves* v. *Capital City Mortg. Corp,* 140 F. Supp. 2d 7, 20–22 (D.D.C. 2000) (finding that "predatory lending" in African American neighborhoods, which included exorbitant interest rates, lending based on the value of the asset rather than a borrower's ability to repay, profiting by acquiring the property through default, repeated foreclosures, and loan servicing procedures with excessive fees, could disparately impact African Americans).

[97] *See* nn. 6–7, 65–69 and accompanying text, *supra;* 76 FR 70922.

[98] As discussed in the "Definition of Discriminatory Effect" section, the final rule amends the definition of "discriminatory effect" to make it more concise and more consistent with terminology used in case law, but its substance is unchanged.

[99] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 3422 (Feb. 20, 1968) (statement of Senator Mondale)).

[100] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits)).

[101] H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008).

[102] *See, e.g., Graoch,* 508 F.3d at 378 (there are "two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."); *Huntington Branch,* 844 F.2d at 937 ("the discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation * * * recognizing this second form of effect advances the principal purpose of Title VIII to promote, open, integrated residential housing patterns.") (internal citations and quotation marks omitted); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d at 1290 ("There are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted); *Hallmark Developers, Inc.* v. *Fulton County,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005) ("Of course there are two kinds of racially discriminatory effect which can be produced by a facially neutral decision. If the decision or action perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted).

[103] *See, e.g., Huntington Branch,* 844 F.2d at 937; *Arlington Heights,* 558 F.2d at 1291; *Black Jack,* 508 F.2d at 1184–86; *Summerchase Ltd. Pshp. I, et al.* v. *City of Gonzales, et al.,* 970 F. Supp. 522, 527–28 (M.D. La. 1997); *Dews,* 109 F. Supp. 2d at 567–68.

[104] *See supra* note 28.

segregation in housing.'' [105] For consistency with the terminology used in this case law, the final rule adds the term ''reinforces'' to the definition of ''discriminatory effect.''

In response to the comment regarding the facts of the cases HUD cited as examples in the proposed rule's preamble, HUD notes that those cases [106] are not exhaustive and therefore should not be viewed as the only ways that a violation of the Act may be established on a discriminatory effects theory. Moreover, even if the facts of a particular case suggest intentional discrimination, in many instances both an intent to discriminate and a discriminatory effect may exist, and a charging party or plaintiff may bring a claim alleging either or both intent and effect as alternative theories of liability. Regardless, as explained throughout this preamble, and in case law, discriminatory intent is not required for a violation of the Act under an effects theory.

### C. Legally Sufficient Justification, § 100.500(b)(1)

In response to comments, this final rule slightly revises the first prong of ''legally sufficient justification,'' as provided in the November 16, 2011, proposed rule, which is required to sustain a practice with a discriminatory effect under the Act.

Proposed § 100.500(b)(1) provided: ''A legally sufficient justification exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent * * * or defendant.''

Final § 100.500(b)(1) provides: ''A legally sufficient justification exists where the challenged practice: (1) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent * * * or defendant * * * A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative.''

Comments were received with respect to proposed § 100.500(b)(1), some agreeing with the standard as stated; some recommending that § 100.500(b)(1) set either a higher or lower standard of proof for defendants and respondents; and some suggesting that HUD provide definitions for certain terms or use slightly different terms to make the regulatory provision easier to understand and apply.

### 1. Substantial, Legitimate, Nondiscriminatory Interests, § 100.500(b)(1)

*Issue:* Although some commenters supported the use of the phrase ''legitimate, nondiscriminatory interest,'' a commenter asked that the final rule provide a definition of the phrase to ensure that the standard is applied uniformly. Commenters stated that the word ''substantial'' or ''clearly'' should modify the phrase ''nondiscriminatory interests,'' reasoning that justifying discrimination with an interest that may be of little or no importance to the defendant or respondent would run contrary to Congress's goal of providing for fair housing within constitutional limitations.

*HUD Response:* HUD agrees that, in order to effectuate the Fair Housing Act's broad, remedial goal, practices with discriminatory effects cannot be justified based on interests of an insubstantial nature. Accordingly, HUD is making clear in this final rule that any interest justifying a practice with a discriminatory effect must be ''substantial.'' A ''substantial'' interest is a core interest of the organization that has a direct relationship to the function of that organization. The requirement that an entity's interest be substantial is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.[107] HUD uses the more general standard of substantiality because there is no single objective, such as job-relatedness, against which every practice covered by the Fair Housing Act could be measured. The determination of whether goals, objectives, and activities are of substantial interest to a respondent or defendant such that they can justify actions with a discriminatory effect requires a case-specific, fact-based inquiry.

The word ''legitimate,'' used in its ordinary meaning, is intended to ensure that a justification is genuine and not false,[108] while the word ''nondiscriminatory'' is intended to ensure that the justification for a challenged practice does not itself discriminate based on a protected characteristic. HUD and federal courts interpreting the Fair Housing Act have

been applying these concepts without incident.[109]

*Issue:* Commenters requested that ''legitimate, nondiscriminatory interests'' be replaced or equated with ''business necessity.'' This would, in their view, be consistent with judicial interpretations of the Fair Housing Act, with HUD's regulations governing Fannie Mae and Freddie Mac, and with the Joint Policy Statement. Commenters stated that the Joint Policy Statement is well established and provides a clear, predictable standard to covered entities. Several commenters expressed concern that the proposed standard requiring a ''legitimate'' justification was weaker than, and would be interpreted as requiring less than, the ''business necessity'' standard.

*HUD Response:* In its adjudications under the Fair Housing Act, HUD has required respondents to prove that their challenged practices are justified by business necessity.[110] The other federal regulatory and enforcement agencies involved in the investigation of lending discrimination have taken the same approach.[111] The ''substantial, legitimate, nondiscriminatory interest'' standard found in § 100.500(b)(1) is equivalent to the ''business necessity'' standard found in the Joint Policy Statement. The standard set forth in this rule is not to be interpreted as a more lenient standard than ''business necessity.'' HUD chooses not to use the phrase ''business necessity'' in the rule because the phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities. Using the phrase ''business necessity'' might confuse litigating parties and the courts as to how the term might apply, for example, to a nonprofit organization that provides housing or housing-related services, or to a branch of state or local government carrying out its functions. The standards in § 100.500 apply equally to individuals, public entities, and for-

---

[105] *Huntington Branch,* 844 F.2d at 937–38.
[106] *See* 76 FR 70925.

---

[107] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i).
[108] *See, e.g.,* Legitimate Definition, Merriam-Webster's Dictionary, *http://www.merriam-webster.com/dictionary/necessary* (last visited Mar. 15, 2012) (defining ''legitimate'' as ''neither spurious nor false'').

---

[109] *See, e.g., Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d 898, 902 (8th Cir. 2005) (defendant must prove that challenged action is necessary to achieve ''legitimate, non-discriminatory policy objectives''); *Charleston Hous. Auth.* v. *U.S. Dept. of Agric.* 419 F.3d 729 (same).
[110] *See, e.g.,* 1998 Enforcement Handbook at 2–30 (instructing HUD investigators that a respondent's policy must be justified by a ''business necessity''); *HUD* v. *Carlson,* 1995 WL 365009, at *14 (HUD ALJ June 12, 1995) (''The Respondent has the burden to overcome the prima facie case by establishing a business necessity for the policy.''); Joint Policy Statement, 59 FR at 18269 (requiring a challenged policy or practice to be ''justified by 'business necessity' '').
[111] *See* Joint Policy Statement, 59 FR at 18269.

profit and nonprofit private entities because, as discussed below, neither the text of the Act nor its legislative history supports drawing a distinction among them. Accordingly, HUD has chosen terminology that, while equivalent to its previous guidance in the Joint Policy Statement, applies readily to all covered entities and all covered activities.

*Issue:* Some commenters expressed concern that the term "legitimate" allows for subjective review of a proffered justification.

*HUD Response:* HUD and courts have reviewed justifications proffered by covered entities for many years. While the review is very fact intensive, it is not subjective. Whether an interest is "legitimate" is judged on the basis of objective facts establishing that the proffered justification is genuine, and not fabricated or pretextual.[112] HUD and courts have engaged in this inquiry for decades without encountering issues related to the subjectivity of the inquiry. HUD therefore believes that concerns about subjective reviews of proffered justifications are not warranted.

*Issue:* A commenter requested that the final rule expressly state that increasing profits, minimizing costs, and increasing market share qualify as legitimate, nondiscriminatory interests. Similarly, another commenter asked that the final rule codify examples of tenant screening criteria such as rental history, credit checks, income verification, and court records that would be presumed to qualify as legally sufficient justifications.

*HUD Response:* HUD is not adopting these suggestions because the Fair Housing Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis. Accordingly, the final rule does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context.

2. Relationship Between Challenged Practice and Asserted Interest, § 100.500(b)(1)

*Issue:* Several commenters expressed concern with HUD's use of the term "manifest" in the proposed requirement that the challenged practice have a "necessary and manifest relationship" to one or more legitimate, nondiscriminatory interests of the respondent or defendant. Commenters

expressed uncertainty about what the term was intended to mean and how it would be interpreted by HUD or by federal courts. Two commenters expressed concern that the term "manifest" may involve a subjective evaluation and others did not understand the evidentiary concept embodied in the term. A commenter urged HUD to make clear in the language of the final rule, in addition to the preamble, that a justification may not be hypothetical or speculative.

*HUD Response:* In the proposed rule, the term "manifest" was used to convey defendants' and respondents' obligation to provide evidence of the actual need for the challenged practices, instead of relying on speculation, hypothesis, generalization, stereotype, or fear. HUD recognizes that some commenters were confused by the term "manifest." In response to these concerns, HUD is replacing the term "manifest" in the final rule with the requirement, added in § 100.500(b)(2), that "a legally sufficient justification must be supported by evidence and may not be hypothetical or speculative." This language is intended to convey that defendants and respondents, relying on a defense under § 100.500(b)(1), must be able to prove with evidence the substantial, legitimate, nondiscriminatory interest supporting the challenged practice and the necessity of the challenged practice to achieve that interest. This language is consistent with HUD's longstanding application of effects liability under the Fair Housing Act, is easy to understand, can be uniformly applied by federal and state courts and administrative agencies, and is unlikely to cause confusion or unnecessary litigation about its meaning. HUD notes that this language is also consistent with the application of the standard by other federal regulatory and enforcement agencies under both the Fair Housing Act and ECOA,[113] with the approach taken under Title VII,[114] and with the approach taken by a number of federal courts interpreting the Fair Housing Act.[115]

*Issue:* A commenter suggested that the phrase "necessary and manifest" should be defined.

*HUD Response:* As discussed above, HUD has removed the word "manifest" in the final rule in order to avoid any potential confusion. Thus, § 100.500(b)(1) is slightly revised at this final rule stage to state that a respondent or defendant seeking to defend a challenged practice with a discriminatory effect must prove that the practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the respondent or defendant. In the proposed rule, as well as this final rule, HUD uses "necessary" in its ordinary, most commonly used sense.

*Issue:* Some commenters suggested that HUD remove the word "necessary" to make the standard found in § 100.500(b)(1) consistent with the Title VII standard set out in the Supreme Court's opinion in *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989). Commenters suggested various standards without the word "necessary," including requiring that the challenged practice have "a legitimate business purpose," that the challenged practice have "a legitimate nondiscriminatory purpose," or that the challenged practice be "rationally related to a legitimate, nondiscriminatory goal."

*HUD Response:* HUD declines to adopt the commenters' suggestion to remove "necessary" from the rule. HUD's substantial experience in administering the Fair Housing Act confirms that requiring a challenged practice with a discriminatory effect to be necessary best effectuates the broad, remedial goal of the Act. Indeed, in 1994 HUD and ten other federal agencies notified lenders of the requirement to justify the discriminatory effect of a challenged lending practice under the Fair Housing Act and ECOA by showing that the practice is necessary to their business.[116] Moreover, in 1997, HUD

---

[112] *See* note 109, *supra.*

[113] *See* Joint Policy Statement, 59 FR at 18269 ("The justification must be manifest and may not be hypothetical or speculative.")

[114] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (the respondent must "*demonstrate* that the challenged practice is job related for the position in question and consistent with business necessity") (emphasis added).

[115] *See, e.g., Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 741 (8th Cir. 2005) (the challenged housing practice must have a "manifest relationship" to the defendant's objectives); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d at 149 ("a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant") (emphasis added); *Huntington Branch,*

*NAACP* v. *Town of Huntington,* 844 F.2d at 938, aff'd, 488 U.S. 15 (1988) (per curiam) (same).

[116] *See* Joint Policy Statement, 59 FR 18,269 (the second step of a disparate impact analysis under the Fair Housing Act and ECOA is to "determine whether the policy or practice is justified by 'business necessity.'") *id.* (giving an example of a policy that may violate the Fair Housing Act and ECOA since "the lender is unlikely to be able to show that the policy is compelled by business necessity"); *see also* Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of Thrift Supervision, National Credit Union Administration, The Interagency Fair Lending Examination Procedures app. at 28, August 2009, available at *http://www.ffiec.gov/pdf/fairappx.pdf.*

promulgated a regulation recognizing that section 805 of the Act [117] does not prevent consideration, in the purchasing of loans, of factors that are necessary to a business.[118] In addition, in 1988 the House Committee on the Judiciary, in advancing a bill amending the Fair Housing Act, recognized that liability should not attach when a justification is necessary to the covered entity's business.[119] HUD's view is also consistent with Congress's 1991 enactment of legislation codifying that, in the employment context, a practice that has a disparate impact must be consistent with "business necessity" and must also be "job related." [120] HUD also notes that a similar necessity requirement is found in ECOA, which requires that a challenged practice "meets a legitimate business need." [121] HUD's final rule therefore uses language that is consistent with its longstanding interpretation of the Fair Housing Act, comparable to the protections afforded under Title VII and ECOA, and fairly balances the interests of all parties.

*Issue:* A commenter expressed concern that requiring a "necessary" relationship may interfere with loss mitigation efforts, including those under the Home Affordable Modification Program (HAMP) and Home Affordable Refinance Program (HARP)—federal programs that encourage mortgage servicers to offer modifications of loans or refinances—because such efforts are voluntary and participation in them may not be perceived as "necessary."

*HUD Response:* Since at least the date of issuance of the Joint Policy Statement in 1994, lenders have been on notice that they must prove the necessity of a challenged practice to their business under both the Fair Housing Act and ECOA. This requirement has not prevented lenders or servicers from engaging in effective loss mitigation efforts. The mere fact that a policy is voluntarily adopted does not preclude it from being necessary to achieve a substantial, legitimate, nondiscriminatory interest. By formalizing the process of proving

business necessity in a rule that clearly allocates the burdens of proof among the parties, HUD is not changing substantive law, but merely clarifying the contours of an available defense so that lenders may rely upon it with greater clarity as to how it applies.

*Issue:* A commenter expressed the concern that requiring a respondent or defendant to prove necessity would subject the respondent or defendant to unnecessary and possibly frivolous investigations and litigation. Another commenter took the opposite position, stating that the rule would not create excessive litigation exposure for respondents or defendants because numerous procedural mechanisms exist to dispose of meritless cases. A commenter stated that, at the second stage of the burden-shifting analysis, a defendant should have the opportunity to demonstrate not only a legally sufficient justification, but also that the charging party or plaintiff did not satisfy its prima facie case because the challenged practice did not result in a discriminatory effect.

*HUD Response:* Given how the discriminatory effects framework has been applied to date by HUD and the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants. As discussed above, since at least 1994, when the Joint Policy Statement was issued, lenders have known that they must prove the necessity of a challenged practice to their business. Moreover, HUD believes that promulgation of this rule—with its clear allocation of burdens and clarification of the showings each party must make—has the potential to decrease or simplify this type of litigation. For example, with a clear, uniform standard, covered entities can conduct consistent self-testing and compliance reviews, document their substantial, legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation. A uniform standard is also a benefit to entities operating in multiple jurisdictions. To the extent that the rule results in more plaintiffs being aware of potential effects liability under the Fair Housing Act, it should have the same impact on covered entities, resulting in greater awareness and compliance with the Fair Housing Act. Additionally, as a commenter noted, the Federal Rules of Civil Procedure provide various means to dispose of meritless claims, including Rules 11, 12, and 56. Moreover, a respondent or defendant may avoid liability by rebutting the charging party's or plaintiff's proof of

discriminatory effect.[122] If the fact-finder decides that the charging party or plaintiff has not proven that the challenged practice resulted in a discriminatory effect, liability will not attach.

*Issue:* A commenter expressed concern that, under the proposed rule, a legally sufficient justification under § 100.500(b)(1) may not be hypothetical or speculative but a discriminatory effect under § 100.500(a) may be, creating an imbalance in the burden of proof in favor of the charging party or plaintiff.

*HUD Response:* This comment indicates a misunderstanding of what § 100.500 requires. Requiring the respondent or defendant to introduce evidence (instead of speculation) proving that a challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests in order to benefit from the defense to liability is not different in kind from requiring the charging party or plaintiff to introduce evidence (not speculation) proving that a challenged practice caused or will predictably cause a discriminatory effect. As discussed in this preamble, the language of the Act makes clear that it is intended to address discrimination that has occurred or is about to occur, and not hypothetical or speculative discrimination.

### D. Less Discriminatory Alternative, § 100.500(b)(2)

Some comments were received with respect to § 100.500(b)(2) of the proposed rule. With that provision, HUD proposed that a practice with a discriminatory effect may be justified only if the respondent's or defendant's interests cannot be served by another practice with a less discriminatory effect. In response to these comments, the final rule makes one slight revision to the proposed provision by substituting "could not be served" for "cannot be served."

*Issue:* A commenter requested that HUD replace "cannot be served" with "would not be served" because, under the Supreme Court's analysis in *Wards Cove,* a plaintiff cannot prevail by showing that a less discriminatory alternative could in theory serve the defendant's business interest. This commenter also stated that, in order for liability to attach, a less discriminatory alternative must have been known to and rejected by the respondent or

---

[117] 42 U.S.C. 3605.

[118] *See* 24 CFR 100.125(c); *cf. Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d, at 902 (the challenged practice must be "necessary to the attainment of" the defendant's objectives) (internal citation omitted); *see also Affordable Hous. Dev. Corp.* v. *City of Fresno,* 433 F.3d 1182, 1195 (9th Cir. 2006) (describing the Eighth Circuit's approach as "sound").

[119] H.R. Rep. No. 100–711, at 2191 (1988) ("The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity.").

[120] *See* 42 U.S.C. 2000e–2(k)(1)(A).

[121] 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)(2).

[122] *See, e.g., Dothard* v. *Rawlinson,* 433 U.S. 321, 331 (1977) (Title VII case explaining that a defendant is "free to adduce countervailing evidence of his own" in order to discredit a plaintiff's evidence of disparate impact).

defendant. Other commenters stated that, in order for liability to attach, the alternative practice must be equally effective as the challenged practice, or at least as effective as the challenged practice, with some of these commenters pointing to *Wards Cove* in support of this position. A number of other commenters, on the other hand, cited to Fair Housing Act case law for the proposition that liability should attach unless the less discriminatory alternative would impose an undue hardship on the respondent or defendant under the circumstances of the particular case.

*HUD Response:* HUD agrees that a less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative. For greater consistency with the terminology used in HUD's (and other federal regulatory agencies') previous guidance in the Joint Policy Statement,[123] the final rule replaces ''cannot be served'' with ''could not be served.'' A corresponding change of ''can'' to ''could'' is also made in § 100.500(c)(3) of the final rule. HUD does not believe the rule's language needs to be further revised to state that the less discriminatory alternative must be ''equally effective,'' or ''at least as effective,'' in serving the respondent's or defendant's interests; the current language already states that the less discriminatory alternative must serve the respondent's or defendant's interests, and the current language is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context,[124] and with judicial interpretations of the Fair Housing Act.[125] The additional modifier

''equally effective,'' borrowed from the superseded *Wards Cove* case, is even less appropriate in the housing context than in the employment area in light of the wider range and variety of practices covered by the Act that are not readily quantifiable. For a similar reason, HUD does not adopt the suggestion that the less discriminatory alternative proffered by the charging party or plaintiff must be accepted unless it creates an ''undue hardship'' on the respondent or defendant. The ''undue hardship'' standard, which is borrowed from the reasonable accommodation doctrine in disability law, would place too heavy a burden on the respondent or defendant.

In addition, HUD does not agree with the commenter who stated that *Wards Cove* requires the charging party or plaintiff to show that, prior to litigation, a respondent or defendant knew of and rejected a less discriminatory alternative,[126] or that *Wards Cove* even governs Fair Housing Act claims. HUD believes that adopting this requirement in the housing context would be unjustified because it would create an incentive not to consider possible ways to produce a less discriminatory result. Encouraging covered entities not to consider alternatives would be inconsistent with Congress's goal of providing for fair housing throughout the country.

*Issue:* Two commenters expressed concern that, under the proposed rule's language, the discriminatory effect of an alternative would be considered but a lender's concerns such as credit risk would be irrelevant.

*HUD Response:* HUD believes these commenters' concerns will not be realized in practice because a less discriminatory alternative need not be adopted unless it could serve the substantial, legitimate, nondiscriminatory interest at issue. The final rule specifically provides that the interests supporting a challenged practice are relevant to the consideration of whether a less discriminatory alternative exists. As stated in § 100.500(c)(3), the charging party or plaintiff must show that the less discriminatory alternative could serve the ''interests supporting the challenged practice.'' Thus, if the lender's interest in imposing the challenged practice relates to credit risk, the alternative would also need to effectively address the lender's concerns about credit risk.

### E. Allocations of Burdens of Proof in § 100.500(c)

In the proposed rule, HUD set forth a burden-shifting framework in which the plaintiff or charging party would bear the burden of proving a prima facie case of discriminatory effect, the defendant or respondent would bear the burden of proving a legitimate, nondiscriminatory interest for the challenged practice, and the plaintiff or charging party would bear the burden of proving that a less discriminatory alternative exists.

*Issue:* Some commenters stated that the plaintiff or charging party should bear the burden of proof at all stages of the proceedings, either citing *Wards Cove* in support of this position or reasoning that, in our legal system, the plaintiff normally carries the burden of proving each element of his claim. Other commenters asked HUD to modify § 100.500(c)(3) in order to place the burden of proving no less discriminatory alternative on the defendant or respondent. Those recommending that the burden allocation be modified in this way reasoned that the respondent or defendant is in a better position to bear this burden because of greater knowledge of, and access to, information concerning the respondent's or defendant's interests and whether a less discriminatory alternative could serve them. Several commenters stated that this is particularly true in the context of government decisions, as complainants and plaintiffs will generally be outside the political decision-making process, and in the context of insurance and lending decisions, where proprietary information and formulas used in the decision making process may be vigorously protected.

Commenters stated that complainants and plaintiffs may not have the capacity to evaluate possible less discriminatory alternatives. Some commenters also pointed out that assigning this burden to the respondent or defendant may avoid intrusive and expensive discovery into a respondent's or defendant's decision-making process, and would incentivize entities subject to the Act to consider less discriminatory options when making decisions. Commenters also stated that courts have placed this burden of proof on the defendant, others have placed it on the party for whom proof is easiest, and reliance on Title VII is inappropriate because of the unique nature of less discriminatory alternatives in Fair Housing Act cases.

*HUD Response:* HUD believes that the burden of proof allocation in § 100.500(c) is the fairest and most

---

[123] *See* Joint Policy Statement, 59 FR at 18269 (''Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.'')

[124] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (''the concept of 'alternative employment practice' '' under Title VII ''shall be in accordance with the law as it existed on June 4, 1989''); *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 425 (1975) (''[I]t remains open to the complaining party to show that other tests or selection devises, without a similarly undesirable racial effect, would also serve the employer's legitimate interest.'').

[125] *See, e.g., Darst-Webbe,* 417 F.3d at 906 (''plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the [challenged practice's] discriminatory impact''); *Huntington,* 844 F.2d at 939 (analyzing whether the ''[t]own's goal * * * can be achieved by less discriminatory means''); *Rizzo,* 564 F.2d at 159 (it must be analyzed whether an alternative ''could be adopted

that would enable [the defendant's] interest to be served with less discriminatory impact.'').

[126] *See Wards Cove Packing Co., Inc.* v. *Atonio,* 490 U.S. 642, 660–61 (1989).

reasonable approach to resolving the claims. As the proposed rule stated, this framework makes the most sense because it does not require either party to prove a negative. Moreover, this approach will ensure consistency in applying the discriminatory effects standard while creating the least disruption because, as discussed earlier in this preamble, HUD and most courts utilize a burden-shifting framework,[127] and most federal courts using a burden-shifting framework allocate the burdens of proof in this way.[128] In addition, HUD notes that this burden-shifting scheme is consistent with the Title VII discriminatory effects standard codified by Congress in 1991.[129] It is also consistent with the discriminatory effects standard under ECOA,[130] which borrows from Title VII's burden-shifting framework.[131] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which prohibits discrimination in residential real estate-related transactions.[132] Thus, under the rule's framework, in litigation involving claims brought under both the Fair Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Having the same allocation of burdens under the Fair Housing Act and ECOA will also provide for less confusion and more consistent decision making by the fact finder in jury trials.

With respect to expressed concerns about the ability of plaintiffs or complainants to demonstrate a less discriminatory alternative, plaintiffs in litigation in federal courts may rely on Rule 26(b)(1) of the Federal Rules of Civil Procedure for the discovery of information "that is relevant to any party's claim or defense," [133] and parties in an administrative proceeding may rely on Rule 26(b)(1) and a similar provision in HUD's regulations.[134] The application of those standards would plainly provide for the discovery of information regarding the alternatives that exist to achieve an asserted interest, the extent to which such alternatives were considered, the reasons why such alternatives were rejected, and the data that a plaintiff or plaintiff's expert could use to show that the defendant did not select the least discriminatory alternative. An appropriately tailored protective order can be issued by the court to provide access to proprietary information in the context of cases involving confidential business information, such as those involving insurance or lending, while providing to respondents and defendants adequate protection from disclosure of this information. Moreover, as noted above, in administrative adjudications, it is the charging party, not non-intervening complainants, who bear this burden of proof.

### F. Application of Discriminatory Effects Liability

Comments were received with respect to how the discriminatory effects standard would be applied and how it might impact covered entities. These comments expressed varying concerns, including the retroactivity of the rule, its application to the insurance and lending industries, and its impact on developing affordable housing.

*Issue:* A commenter stated that each of the cases listed in the proposed rule as examples of practices with a segregative effect involved a government actor, while another commenter asked HUD to clarify whether liability may attach to private parties.

*HUD Response:* Liability for a practice that has an unjustified discriminatory effect may attach to either public or private parties according to the standards in § 100.500, because there is nothing in the text of the Act or its legislative history to indicate that Congress intended to distinguish the manner in which the Act applies to public versus private entities.[135]

*Issue:* A commenter expressed the opinion that the Fair Housing Act does not grant HUD the power to promulgate retroactive rules, and therefore HUD should make clear that the final rule applies prospectively only.

*HUD Response:* This final rule embodying HUD's and the federal courts' longstanding interpretation of the Act to include a discriminatory effects standard will apply to pending and future cases. HUD has long recognized, as have the courts, that the Act supports an effects theory of liability. This rule is not a change in HUD's position but rather a formal interpretation of the Act that clarifies the appropriate standards for proving a violation under an effects theory. As such, it "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." [136]

*Issue:* A commenter stated that the most appropriate remedy for a violation of the Act under an effects theory is declaratory or injunctive relief. This commenter expressed the opinion that the use of penalties or punitive damages generally does not serve the underlying purpose of the Fair Housing Act to remedy housing discrimination.

*HUD Response:* HUD disagrees with the commenter. The Fair Housing Act specifically provides for the award of damages—both actual and punitive—and penalties.[137]

*Issue:* Commenters from the insurance industry expressed a number of concerns about the application of the proposed rule to insurance practices. Some commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act (15 U.S.C. 1011–1015) or the common law "filed rate doctrine." Some commenters stated that HUD's use of *Ojo* v. *Farmers Group, Inc.,* 600 F.3d 1205 (9th Cir. 2010), in the preamble of the proposed rule was not appropriate.

---

[127] *See supra* notes 29–33.

[128] *See supra* notes 34, 35.

[129] *See* 42 U.S.C. 2000e–2(k).

[130] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. *See* 15 U.S.C. 1691.

[131] *See* S. Rep. No. 94–589, at 4–5 (1976) ("[J]udicial constructions of antidiscrimination legislation in the employment field, in cases such as *Griggs* v. *Duke Power Company,* 401 U.S. 424 (1971), and *Albemarle Paper Co.* v. *Mood,* [422 U.S. 405 (1975)], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 1002.6(a) ("The legislative history of [ECOA] indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971) and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e– 2).").

[132] *See* Joint Policy Statement, 59 FR 18266. Indeed, the Joint Policy Statement analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without any differentiation. *See* 59 FR 18269.

[133] Fed. R. Civ. P. 26(b)(1).

[134] *See* 24 CFR 180.500(b) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the proceeding").

[135] *See* 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under section 804, 805, 806, or 818," none of which distinguish between public and private entities); *see also Nat'l Fair Hous. Alliance, Inc.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 59– 60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, and noting that a "distinction between governmental and non-governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[136] *Pope* v. *Shalala,* 998 F.2d 473, 483 (7th Cir. 1993) (quoting *Manhattan General Equip. Co.* v. *Comm'r,* 297 U.S. 129, 135 (1936)).

[137] *See* 42 U.S.C. 3612–14.

*HUD Response:* HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance,[138] and courts have agreed with HUD, including in *Ojo* v. *Farmers Group.*[139] Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect. By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo* v. *Farmers Group,* it will not interfere with any State regulation of the insurance industry.

*Issue:* Some commenters stated that liability for insurance practices based on a disparate impact standard of proof is inappropriate because insurance is risk-based and often based on a multivariate analysis. A commenter wrote that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk," or might be forced to violate state laws that require insurance rates to be actuarially sound estimates of the expected value of all future costs associated with an individual risk transfer.

*HUD Response:* HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is *per se* illegal. This is incorrect. Rather, as § 100.500 makes clear, the respondent or defendant has a full opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the [Act] from valid policies and practices crafted to advance legitimate interests." [140] Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

*Issue:* Some commenters asked HUD to exempt insurance pricing from the rule, exempt Fair Access to Insurance Requirements ("FAIR") plans, or establish safe harbors for certain risk-related factors.

*HUD Response:* Creating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act. Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent.[141]

*Issue:* Another commenter stated that the "burden of proof issues" are difficult for insurers because they do not collect data on race and ethnicity and state insurance laws may prohibit the collection of such data.

*HUD Response:* The burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect. The charging party or plaintiff must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect. If the charging party or plaintiff makes that showing, the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests.

*Issue:* A commenter expressed concern that the rule may create strict liability for entities complying with contractual obligations set by third parties, including the federal government.

*HUD Response:* The commenter misconstrues the discriminatory effects standard, which permits a defendant or respondent to defend against a claim of discriminatory effect by establishing a legally sufficient justification, as specified in § 100.500.

*Issue:* Another commenter expressed concern that the citation to *Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251 (D. Mass. 2008), in the preamble to the proposed rule suggested that liability could exist under the Act for the neutral actions of third parties and that such liability would be inconsistent with the Supreme Court's decision in *Meyer* v. *Holley,* 537 U.S. 280 (2003). This commenter requested that HUD revise the proposed rule to articulate the standard set forth in *Meyer.*

*HUD Response:* HUD does not agree with the commenter's suggestion. HUD recognizes that pursuant to *Meyer,* liability under the Act for corporate officers is determined by agency law. The proposed rule cited *Miller* as an example of how a lender's facially neutral policy allowing employees and mortgage brokers the discretion to price loans may be actionable under the Fair Housing Act. The decision in *Miller* is not inconsistent with the Supreme Court's ruling on agency in *Meyer,* and therefore HUD does not believe that the final rule needs to be revised in response to this comment.

*Issue:* Several commenters expressed concern that adoption of the proposed discriminatory effects standard would lead to lawsuits challenging lenders' use of credit scores, other credit assessment standards, or automated underwriting. A commenter stated that a lender's consideration of credit score or other credit assessment standards such as a borrower's debt-to-income ratio may have a disparate impact because of demographic differences. This commenter cited studies which indicate that borrowers who live in zip codes with a higher concentration of minorities are more likely to have lower credit scores and fewer savings. A commenter stated that credit scores are often used as the determining factor in a lender's origination practices and that certain underwriting software and investor securitization standards require a minimum credit score. The commenter further stated that HUD's Federal Housing Administration (FHA) program has recognized the value of credit scores in setting underwriting standards for FHA insured loans. According to the commenter, lenders have little ability or desire to override credit score standards, because manual underwriting is time consuming and staff-intensive. Another commenter expressed concern that, even if a lender was successful in defending its credit risk assessment practices under the burden-shifting approach, the lender would have to defend an expensive lawsuit and suffer harm to its reputation.

---

[138] *See, e.g.,* 24 CFR 100.70(d)(4) (Mar. 15, 1989) (defining "other prohibited sale and rental conduct" to include "refusing to provide * * * property or hazard insurance for dwellings or providing such * * * insurance differently" because of a protected class); 53 FR 44,992, 44,997 (Nov. 7, 1988) (preamble to proposed regulations stating that "discriminatory refusals to provide * * * adequate property or hazard insurance * * * has been interpreted by the Department and by courts to render dwellings unavailable").

[139] *See Ojo* v. *Farmers Group, Inc.,* 600 F.3d at 1208; *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir. 1993); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351, 1355–1360 (6th Cir. 1995). *But see Mackey* v. *Nationwide Ins. Cos.,* 724 F.2d 419, 423–25 (4th Cir. 1984) (pre-Fair Housing Amendments Act and regulations pursuant thereto holding that Act does not cover insurance).

[140] *Graoch,* 508 F.3d at 374–75.

[141] *See Graoch,* 508 F.3d at 375 ("we cannot create categorical exemptions from [the Act] without a statutory basis" and "[n]othing in the text of the FHA instructs us to create practice-specific exceptions").

Commenters from the lending industry also stated that the rule may have a chilling effect on lending in lower income communities. A commenter stated that the rule will create uncertainty in a skittish market, so lenders will be cautious about lending in lower income communities for fear of a legal challenge. Some of these commenters reasoned that underwriting requirements and risk requirements pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act (Pub. L. 111–203, approved July 21, 2010)), such as ability to repay, down payment requirements, and qualified residential mortgages, may result in a disparate impact because of demographic differences. Another commenter explained that the rule would eliminate in-portfolio mortgage loans at community banks, which provide mortgage credit to borrowers who may not qualify for a secondary market transaction.

*HUD Response:* HUD does not believe that the rule will have a chilling effect on lending in lower income communities or that it will encourage lawsuits challenging credit scores, other credit assessment standards, or the requirements of the Dodd-Frank Act. As discussed above, the rule does not change the substantive law; eleven federal courts of appeals have recognized discriminatory effects liability under the Act and over the years courts have evaluated both meritorious and non-meritorious discriminatory effects claims challenging lending practices.[142] As HUD has reiterated, the rule formalizes a substantive legal standard that is well recognized by both courts and participants in the lending industry for assessing claims of discriminatory effects. Indeed, in the lending context, at least since the issuance of the Joint Policy Statement nearly 18 years ago, non-depository lenders, banks, thrifts, and credit unions have been on notice that federal regulatory and enforcement agencies, including HUD and the Department of Justice, may apply a disparate impact analysis in their examinations and investigations under both the Fair Housing Act and ECOA. The regulations and Staff Commentary implementing ECOA also explicitly prohibit unjustified discriminatory effects.[143] Thus, neither a chilling effect nor a wealth of new lawsuits can be expected as a result of this rule. Rather, HUD anticipates that this rule will encourage the many lenders and other entities that already conduct internal discriminatory effects analyses of their policies to review those analyses in light of the now uniform standard for a legally sufficient justification found in § 100.500. Indeed, lender compliance should become somewhat easier due to the rule's clear and nationally uniform allocation of burdens and clarification of the showings each party must make.

*Issue:* Some commenters expressed concern that faced with the threat of disparate impact liability, lenders might extend credit to members of minority groups who do not qualify for the credit.

*HUD Response:* The Fair Housing Act does not require lenders to extend credit to persons not otherwise qualified for a loan. As discussed previously, the final rule formalizes a standard of liability under the Act that has been in effect for decades. HUD is unaware of any lender found liable under the discriminatory effects standard for failing to make a loan to a member of a minority group who did not meet legitimate nondiscriminatory credit qualifications.

*Issue:* Several other commenters expressed a concern that discriminatory effects liability might have a chilling effect on efforts designed to preserve or develop affordable housing, including pursuant to HUD's own programs, because much of the existing affordable housing stock is located in areas of minority concentration. A commenter stated that resources designed to support the development of affordable housing will be ''deflect[ed]'' away so as to respond to claims of disparate impact discrimination. Another commenter requested that HUD issue guidance to the affordable housing industry as they administer HUD programs.

Other commenters expressed concern about potential liability for administrators of the federal Low Income Housing Tax Credit (LIHTC) program. These commenters reasoned that the concentration of affordable housing stock in low-income areas, combined with federal requirements and incentives which encourage the deployment of tax credits in low-income communities, may result in discriminatory effects liability for agencies administering the LIHTC program. Several commenters asked HUD to specify in the final rule that the mere approval of LIHTC projects in minority areas alone does not establish a prima facie case of disparate impact under the Act or that locating LIHTC projects in low-income areas is a legally sufficient justification to claims of disparate impact discrimination. A commenter requested that HUD provide guidance to such agencies.

*HUD Response:* HUD does not expect the final rule to have a chilling effect on the development and preservation of affordable housing because, as discussed above, the rule does not establish a new form of liability, but instead serves to formalize by regulation a standard that has been applied by HUD and the courts for decades, while providing nationwide uniformity of application. The rule does not mandate that affordable housing be located in neighborhoods with any particular characteristic, but requires, as the Fair Housing Act already does, only that housing development activities not have an unjustified discriminatory effect.

Concerns of a chilling effect on affordable housing activities are belied by the prevalence of cases where the discriminatory effects method of proof has been used by plaintiffs seeking to develop such housing [144] and even by the less frequent instances where

---

[142] *Compare Ramirez* v. *GreenPoint Mortg. Funding, Inc.,* 633 F. Supp. 2d 922, 927–28 (N.D. Cal. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy that had a disparate impact on members of a protected class); *Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 258 (D. Mass. 2008) (denying defendants motion to dismiss and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation); and *Hoffman* v. *Option One Mortg. Corp.,* 589 F. Supp. 2d 1009, 1011–12 (N.D. Ill. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation), *with Nw* v. *HSBC Mortgage Corp.,* No. 07–CV–5434, 2010 WL 889256, *12 (E.D.N.Y. Mar. 10, 2010) (dismissing plaintiff's claim of disparate impact discrimination and finding that the claim was ''alleged with little more than buzzwords and conclusory labels'').

[143] *See* 12 CFR 1002.6(a); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ; *see also* Consumer Financial Protection Bureau Bulletin 2012–04 (Apr. 18, 2012) (''CFPB reaffirms that the legal doctrine of disparate impact remains applicable as the Bureau exercises its supervision and enforcement authority to enforce compliance with the ECOA.'').

[144] *See, e.g., Huntington Branch,* 844 F.2d at 926 (reversing district court and finding Fair Housing Act violations based on discriminatory effect of town's refusal to rezone site for affordable housing); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish,* 648 F. Supp. 2d 805 (E.D. La. 2009) (finding parish's subversion of attempts to develop affordable housing had a discriminatory effect in violation of the Fair Housing Act); *Dews* v. *Town of Sunnyvale,* 109 F. Supp. 2d 526 (N.D. Tex. 2000) (finding that developer established Fair Housing Act violation based on Town's treatment of development application under discriminatory effects method); *Sunrise Dev.* v. *Town of Huntington,* 62 F. Supp. 2d 762 (E.D.N.Y. 1999) (finding the plaintiff had established prima facie case of discriminatory effect and granting preliminary injunction requiring town to consider plaintiff's zoning application); *Summerchase Ltd. Pshp. I* v. *City of Gonzales,* 970 F. Supp. 522 (M.D. La. 1997) (denying defendant's motion for summary judgment on developer's claim that parish's denial of building permits for affordable housing development had a discriminatory effect in violation of the Fair Housing Act).

agencies administering affordable housing programs have been defendants.[145] Rather than indicating a chilling effect, existing case law shows that use of the discriminatory effects framework has promoted the development of affordable housing, while allowing due consideration for substantial, legitimate, nondiscriminatory interests involved in providing such housing. Moreover, recipients of HUD funds already must comply with a variety of civil rights requirements. This includes the obligation under Title VI of the Civil Rights Act of 1964 and its applicable regulations to refrain from discrimination, either by intent or effect, on the basis of race, color, or national origin; the obligation under the Fair Housing Act to affirmatively further fair housing in carrying out HUD programs; and HUD program rules designed to foster compliance with the Fair Housing Act and other civil rights laws. As discussed throughout this preamble, allegations of discriminatory effects discrimination must be analyzed on a case-by-case basis using the standards set out in § 100.500. HUD will issue guidance addressing the application of the discriminatory effects standard with respect to HUD programs.

*Issue:* Like commenters who requested "safe harbors" or exemptions for the insurance and lending industries, some commenters requested that the proposed rule be revised to provide "safe harbors" or exemptions from liability for programs designed to preserve affordable housing or revitalize existing communities. A commenter requested that the final rule provide safe harbors for state and local programs that have legitimate policy and safety goals such as protecting water resources, promoting transit orientated development, and revitalizing communities. Other commenters requested safe harbors or exemptions for entities that are meeting requirements or standards established by federal or state law or regulation, such as the Federal Credit Union Act, the Dodd-Frank Act, HAMP and HARP, or by government-sponsored enterprises or investors.

*HUD Response:* HUD does not believe that the suggested safe harbors or exemptions from discriminatory effects liability are appropriate or necessary. HUD notes that, in seeking these exemptions, the commenters appear to misconstrue the discriminatory effects

standard, which permits practices with discriminatory effects if they are supported by a legally sufficient justification. The standard thus recognizes that a practice may be lawful even if it has a discriminatory effect. HUD notes further that Congress created various exemptions from liability in the text of the Act,[146] and that in light of this and the Act's important remedial purposes, additional exemptions would be contrary to Congressional intent.

*Issue:* Several commenters expressed concern that in complying with the new Dodd-Frank Act mortgage reforms, including in determining that consumers have an ability to repay, a lender necessarily "will face liability under the Proposed Rule."

*HUD Response:* HUD reiterates that the lender is free to defend any allegations of illegal discriminatory effects by meeting its burden of proof at § 100.500. Moreover, if instances were to arise in which a lender's efforts to comply with the Dodd-Frank Act were challenged under the Fair Housing Act's discriminatory effects standard of liability, those same activities most likely would be subject to a similar challenge under ECOA and Regulation B, which also prohibit lending practices that have a discriminatory effect based on numerous protected characteristics.[147] The Dodd-Frank Act created the Consumer Financial Protection Bureau to combat both unfair and deceptive practices and discriminatory practices in the consumer financial industry, and it gave the Consumer Financial Protection Bureau authority to enforce ECOA.[148] *See* Dodd-Frank Act sections 1402–1403 (enacting section 129B of the Truth in Lending Act "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive," and, as part of that section, requiring the Consumer Financial Protection Bureau to create regulations that prohibit "abusive or unfair lending practices that promote disparities among consumers of equal credit worthiness but of different race, ethnicity, gender, or age"); *see also* Dodd-Frank Act section 1013(c) (establishing the Consumer Financial Protection Bureau's Office of Fair Lending and Equal Opportunity to provide enforcement of fair lending laws, including ECOA, and coordinate

fair lending efforts within the Bureau and with other federal and state agencies); *id.* section 1085 (transferring regulatory authority for ECOA to the Consumer Financial Protection Bureau).

*G. Illustrations of Practices With Discriminatory Effects*

Consistent with HUD's existing Fair Housing Act regulations, which contain illustrations of practices that violate the Act, the proposed rule specified additional illustrations of such practices. The November 16, 2011, rule proposed to add illustrations to 24 CFR 100.65, 100.70 and 100.120. The final rule revises these illustrations in the manner described below.

Because the illustrations in HUD's existing regulations include practices that may violate the Act based on an intent or effects theory, and proposed § 100.65(b)(6) describes conduct that is already prohibited in § 100.65(b)(4)—the provision of housing-related services—and § 100.70(d)(4)—the provision of municipal services—this final rule eliminates proposed § 100.65(b)(6). This will avoid redundancy in HUD's Fair Housing Act regulations, and its elimination from the proposed rule is not intended as a substantive change.

Commenters raised the following issues with respect to the proposed rule's illustrations of discriminatory practices.

*Issue:* A commenter stated that the examples specified by the proposed rule describe the types of actions that the commenter's "clients encounter regularly." Examples of potentially discriminatory laws or ordinances cited by commenters include ordinances in largely white communities that establish local residency requirements, limit the use of vouchers under HUD's Housing Choice Voucher program, or set large-lot density requirements. Commenters suggested that language should be added to proposed § 100.70(d)(5), which provides, as an example, "[i]mplementing land-use rules, policies or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" based on a protected class. Commenters stated that this example should include not just the word "implementing," but also the words "enacting" "maintaining," and/or "applying" because the discriminatory effect of a land-use decision may occur from the moment of enactment. A commenter suggested that the word "ordinances" should be added to the example to make clear that the Act applies to all types of exclusionary land-use actions.

---

[145] *Compare, e.g., In re Adoption of 2003 Low Income Housing Tax Credit Qualified Allocation Plan,* 369 N.J. Super. 2 (N.J. Sup. Ct. App. Div. 2004) *with Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs,* 749 F. Supp. 2d 48 (N.D. Tex. 2010).

[146] *See, e.g.,* 42 U.S.C. 3603(b)(1) (exempting from most of section 804 of the Act an owner's sale or rental of his single-family house if certain conditions are met).

[147] *See* 15 U.S.C. 1691 *et seq;* 12 CFR part 1002.

[148] *See* 12 U.S.C. 5491 *et seq.*

*HUD Response:* HUD reiterates that the illustrations contained in HUD's regulations are merely examples. The scope and variety of practices that may violate the Act make it impossible to list all examples in a rule. Nevertheless, HUD finds it appropriate to revise proposed § 100.70(d)(5) in this final rule in order to confirm that a land-use ordinance may be discriminatory from the moment of enactment. The final rule therefore changes "[i]mplementing land-use rules, policies, or procedures * * * " to "[e]nacting or implementing land-use rules, ordinances, policies, or procedures * * * ." It is not necessary to add "maintaining" or "applying" to § 100.70(d)(5) because the meaning of these words in this context is indistinguishable from the meaning of "implementing."

Because the illustrated conduct may violate the Act under either an intent theory, an effects theory, or both, HUD also finds it appropriate to replace "in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" because of a protected characteristic with "otherwise make unavailable or deny dwellings because of" a protected characteristic. As discussed in the "Validity of Discriminatory Effects Liability under the Act" section above, the phrase "otherwise make unavailable or deny" encompasses discriminatory effects liability. This revised language, therefore, is broader because it describes land-use decisions that violate the Act because of either a prohibited intent or an unjustified discriminatory effect. The final rule makes a similar revision to each of the illustrations so they may cover violations based on intentional discrimination or discriminatory effects.

*Issue:* A commenter requested that HUD add as an example the practice of prohibiting from housing individuals with records of arrests or convictions. This commenter reasoned that such blanket prohibitions have a discriminatory effect because of the disproportionate numbers of minorities with such records. The commenter stated further that HUD should issue guidance on this topic similar to guidance issued by the Equal Employment Opportunity Commission. Another commenter expressed concern that the rule would restrict housing providers from screening tenants based on criminal arrest and conviction records. This commenter also asked HUD to issue guidance to housing providers on appropriate background screening.

*HUD Response:* Whether any discriminatory effect resulting from a housing provider's or operator's use of criminal arrest or conviction records to exclude persons from housing is supported by a legally sufficient justification depends on the facts of the situation. HUD believes it may be appropriate to explore the issue more fully and will consider issuing guidance for housing providers and operators.

*Issue:* Several commenters suggested revisions to proposed § 100.120(b)(2), which specifies as an example "[p]roviding loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin." These commenters stated that proposed § 100.120(b)(2) does not contain language concerning the second type of discriminatory effect, i.e., creating, perpetuating or increasing segregation. They urged HUD to add language making clear that the provision of loans or other financial assistance may result in either type of discriminatory effect.

In addition, several commenters asked HUD to clarify that mortgage servicing with a discriminatory effect based on a protected characteristic may violate the Act.

*HUD Response:* As discussed above, proposed § 100.120(b)(2) is revised in the final rule to cover both intentional discrimination and discriminatory effects. HUD also agrees that residential mortgage servicing is covered by the Act. It is a term or condition of a loan or other financial assistance, covered by section 805 of the Act.[149] Accordingly, the final rule adds a § 100.130(b)(3), which provides an illustration of discrimination in the terms or conditions for making available loans or financial assistance, in order to show that discriminatory loan servicing (and other discriminatory terms or conditions of loans and other financial assistance) violate the Act's proscription on "discriminat[ing] * * * in the terms or conditions of [a residential real estate-related transaction]."

*Issue:* A commenter expressed concern that the language in proposed § 100.120(b)(2) would allow for lawsuits based only on statistical data produced under HMDA.

*HUD Response:* HUD and courts have recognized that analysis of loan level data identified though HMDA may indicate a disparate impact.[150] Such a showing, however, does not end the inquiry. The lender would have the opportunity to refute the existence of the alleged impact and establish a substantial, legitimate, nondiscriminatory interest for the challenged practice, and the charging party or plaintiff would have the opportunity to demonstrate that a less discriminatory alternative is available to the lender.

*Issue:* A commenter stated that HUD should not add any of the new examples unless the final rule makes clear that the specified practices are not *per se* violations of the Act, but rather must be assessed pursuant to the standards set forth in § 100.500. According to the commenter, the new examples may be misconstrued because they state only the initial finding described in § 100.500.

*HUD Response:* HUD agrees that, when a practice is challenged under a discriminatory effects theory, the practice must be reviewed under the standards specified in § 100.500. The final rule therefore adds a sentence to the end of § 100.5(b), which makes clear that discriminatory effects claims are assessed pursuant to the standards stated in § 100.500.

### H. Other Issues

*Issue:* A commenter requested that HUD examine the overall compliance burden of the regulation on small businesses, noting that Executive Order 13563 requires a cost-benefit analysis.

*HUD Response:* In examining the compliance burden on small institutions, the governing authority is the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* which provides, among other things, that the requirements to do an initial and final regulatory flexibility analysis "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Thus, the focus is on whether the rule—and not the underlying statute or preexisting administrative practice and case law—will have a significant economic impact. For this rule, the impact primarily arises from the Fair Housing Act itself, not only as interpreted by HUD, but also as interpreted by federal courts. Because this final rule provides a uniform burden-shifting test for determining

---

[149] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate § 804 of the Act. 42 U.S.C. 3604.

[150] *See City of Memphis and Shelby Cnty.* v. *Wells Fargo, N.A.,* No. 09–2857–STA, 2011 U.S. Dist.

LEXIS 48522 at *45 (W.D. Tenn. May 4, 2011); *Mayor and City Council of Baltimore* v. *Wells Fargo Bank, N.A.,* No. JFM–08–62, 2011 U.S. Dist. LEXIS 44013 (D. Md. April 22, 2011); *Steele* v. *GE Money Bank,* No. 08–C–1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2009); *Taylor* v. *Accredited Home Lenders, Inc.,* 580 F. Supp. 2d 1062 (S.D. Cal. 2008).

whether a given action or policy has an unjustified discriminatory effect, the rule serves to reduce regulatory burden for all entities, large or small, by establishing certainty and clarity with respect to how a determination of unjustified discriminatory effect is to be made.

The requirement under the Fair Housing Act not to discriminate in the provision of housing and related services is the law of the nation. We presume that the vast majority of entities both large and small are in compliance with the Fair Housing Act. Furthermore, for the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute, administrative practice, and case law. Compliance with the Fair Housing Act has for almost 40 years included the requirement to refrain from undertaking actions that have an unjustified discriminatory effect. The rule does not change that substantive obligation; it merely formalizes it in regulation, along with the applicable burden-shifting framework.

Variations in the well-established discriminatory effects theory of liability under the Fair Housing Act, discussed earlier in the preamble, are minor and making them uniform will not have a significant economic impact. The allocation of the burdens of proof among the parties, described in the rule, are methods of proof that only come into play if a complaint has been filed with HUD, a state or local agency or a federal or state court; that is, once an entity has been charged with discriminating under the Fair Housing Act. The only economic impact discernible from this rule is the cost of the difference, if any, between defense of litigation under the burden-shifting test on the one hand, and defense of litigation under the balancing or hybrid test on the other. In all the tests, the elements of proof are similar. Likewise, the costs to develop and defend such proof under either the burden-shifting or balancing tests are similar. The only difference is at which stage of the test particular evidence must be produced. There would not, however, be a significant economic impact on a substantial number of small entities as a result of this rule.

Executive Order 13563 (Improving Regulations and Regulatory Review) reaffirms Executive Order 12866, which requires that agencies conduct a benefit/cost assessment for rules that "have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities." As stated in Section VII of this preamble below, this rule is not "economically significant" within the meaning in Executive Order 12866, and therefore a full benefit/cost assessment is not required. This final rule does not alter the established law that facially neutral actions that have an unjustified discriminatory effect are violations of the Fair Housing Act. What this rule does is formalize that well-settled interpretation of the Act and provide consistency in how such discriminatory effects claims are to be analyzed.

## VI. This Final Rule

For the reasons presented in this preamble, this final rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability and establishes a uniform standard of liability for facially neutral practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The charging party or plaintiff in an adjudication first must bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice is necessary to achieve one or more of the defendant's or respondent's substantial, legitimate, nondiscriminatory interests. If the defendant or respondent satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that these substantial, legitimate, nondiscriminatory interests could be served by a practice that has a less discriminatory effect.

### A. Discriminatory Effect—Subpart G

#### 1. Scope

This final rule adds a new sentence to the end of paragraph (b) in § 100.5, which states: "The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500."

#### 2. Discriminatory Effect Prohibited (§ 100.500)

Consistent with HUD's November 16, 2011, proposed rule, this final rule adds a new subpart G, entitled "Discriminatory Effect," to its Fair Housing Act regulations in 24 CFR part 100. Section 100.500 provides that the Fair Housing Act may be violated by a practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Section 100.500(d) clarifies that a legally sufficient justification may not be used as a defense against a claim of intentional discrimination. It should be noted that it is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. This final rule applies to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.

#### 3. Discriminatory Effect Defined (§ 100.500(a))

Section 100.500(a) provides that a "discriminatory effect" occurs where a facially neutral practice actually or predictably results in a discriminatory effect on a group of persons protected by the Act (that is, has a disparate impact), or on the community as a whole on the basis of a protected characteristic (perpetuation of segregation). Any facially neutral action, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule. For examples of court decisions regarding policies or practices that may have a discriminatory effect, please see the preamble to the proposed rule at 76 FR 70924–25.

#### 4. Legally Sufficient Justification (§ 100.500(b))

Section 100.500(b), as set forth in the regulatory text of this final rule, provides that a practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification."

#### 5. Burden of Proof (§ 100.500(c))

Under § 100.500(c), the charging party or plaintiff first bears the burden of proving its prima facie case: that is, that a practice caused, causes, or predictably will cause a discriminatory effect on a

group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin. Once the charging party or the plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant. If the respondent or defendant satisfies its burden, the charging party or plaintiff may still establish liability by proving that these substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect.

### B. Illustrations of Practices With Discriminatory Effects

This final rule adds or revises the following illustrations of discriminatory housing practices:

The final rule adds to § 100.70 new paragraph (d)(5), which provides as an illustration of other prohibited conduct "[e]nacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings because of race, color, religion, sex, handicap, familial status, or national origin."

Section 100.120, which gives illustrations of discrimination in the making of loans and in the provision of other financial assistance, is streamlined, and paragraph (b)(2) now reads as set forth in the regulatory text of this final rule.

In § 100.130, the final rule also amends paragraph (b)(2) and adds new paragraph (b)(3). The words "or conditions" is added after "terms," and "cost" is added to the list of terms or conditions in existing paragraph (b)(2). New paragraph (b)(3) includes servicing as an illustration of terms or conditions of loans or other financial assistance covered by section 805 of the Act: "Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin."

### VII. Findings and Certifications

#### Regulatory Review—Executive Orders 13563 and 12866

Executive Order 13563 ("Improving Regulation and Regulatory Review")

directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability, and establishes uniform, clear standards for determining whether a practice that has a discriminatory effect is in violation of the Fair Housing Act, regardless of whether the practice was adopted with intent to discriminate. As stated in the Executive Summary, the need for this rule arises because, although all federal courts of appeals that have considered the issue agree that Fair Housing Act liability may be based solely on discriminatory effects, there is a small degree of variation in the methodology of proof for a claim of effects liability. As has been discussed in the preamble to this rule, in establishing such standards HUD is exercising its rulemaking authority to bring uniformity, clarity, and certainty to an area of the law that has been approached by HUD and federal courts across the nation in generally the same way, but with minor variations in the allocation of the burdens of proof.[151] A uniform rule would simplify compliance with the Fair Housing Act's discriminatory effects standard, and decrease litigation associated with such claims. By providing certainty in this area to housing providers, lenders, municipalities, realtors, individuals engaged in housing transactions, and courts, this rule would reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof, and how such burdens are to be met. Additionally, HUD believes the rule

may even help to minimize litigation in this area by establishing uniform standards. With a uniform standard, entities are more likely to conduct self-testing and check that their practices comply with the Fair Housing Act, thus reducing their liability and the risk of litigation. A uniform standard is also a benefit for entities operating in multiple jurisdictions. Also, legal and regulatory clarity generally serves to reduce litigation because it is clearer what each party's rights and responsibilities are, whereas lack of consistency and clarity generally serves to increase litigation. For example, once disputes around the court-defined standards are eliminated by this rule, non-meritorious cases that cannot meet the burden under § 100.500(c)(1) are likely not to be brought in the first place, and a respondent or defendant that cannot meet the burden under § 100.500(c)(2) may be more inclined to settle at the pre-litigation stage.

Accordingly, while this rule is a significant regulatory action under Executive Order 12866 in that it establishes, for the first time in regulation, uniform standards for determining whether a housing action or policy has a discriminatory effect on a protected group, it is not an economically significant regulatory action. The burden reduction that HUD believes will be achieved through uniform standards will not reach an annual impact on the economy of $100 million or more, because HUD's approach is not a significant departure from HUD's interpretation to date or that of the majority of federal courts. Although the burden reduction provided by this rule will not result in economically significant impact on the economy, it nevertheless provides some burden reduction through the uniformity and clarity presented by HUD's standards promulgated through this final rule and is therefore consistent with Executive Order 13563.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW., Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339.

#### Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires

[151] *See, e.g.,* the extensive discussion of the various options in *Graoch,* 508 F.3d at 371–375.

an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. For the reasons stated earlier in this preamble in response to public comment on the issue of undue burden on small entities, and discussed here, HUD certifies that this rule will not have significant economic impact on a substantial number of small entities.

It has long been the position of HUD, confirmed by federal courts, that practices with discriminatory effects may violate the Fair Housing Act. As noted in the preamble to the proposed rule (76 FR 70921) and this preamble to the final rule, this long-standing interpretation has been supported by HUD policy documents issued over the last decades, is consistent with the position of other Executive Branch agencies, and has been adopted and applied by every federal court of appeals to have reached the question. Given, however, the variation in how the courts and even HUD's own ALJs have applied that standard, this final rule provides for consistency and uniformity in this area, and hence predictability, and will therefore reduce the burden for all seeking to comply with the Fair Housing Act. Furthermore, HUD presumes that given the over 40-year history of the Fair Housing Act, the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. For the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute. The rule does not change that substantive obligation; it merely sets it forth in a regulation. While this rule provides uniformity as to specifics such as burden of proof, HUD's rule does not alter the substantive prohibitions against discrimination in fair housing law, which were established by statute and developed over time by administrative and federal court case law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Accordingly, the undersigned certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This final rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled ''Federalism'') prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This final rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

**List of Subjects in 24 CFR Part 100**

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

**PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT**

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

**Subpart A—General**

■ 2. In § 100.5, add the following sentence at the end of paragraph (b):

**§ 100.5  Scope.**

\*　　\*　　\*　　\*　　\*

(b) \* \* \* The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent,

consistent with the standards outlined in § 100.500.

\*　　\*　　\*　　\*　　\*

**Subpart B—Discriminatory Housing Practices**

■ 3. In § 100.70, add new paragraph (d)(5) to read as follows:

**§ 100.70  Other prohibited conduct.**

\*　　\*　　\*　　\*　　\*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

**Subpart C—Discrimination in Residential Real Estate-Related Transactions**

■ 4. In § 100.120, revise paragraph (b) to read as follows:

**§ 100.120  Discrimination in the making of loans and in the provision of other financial assistance.**

\*　　\*　　\*　　\*　　\*

(b) Practices prohibited under this section in connection with a residential real estate-related transaction include, but are not limited to:

(1) Failing or refusing to provide to any person information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing, failing to provide, or discouraging the receipt of loans or other financial assistance in a manner that discriminates in their denial rate or otherwise discriminates in their availability because of race, color, religion, sex, handicap, familial status, or national origin.

■ 5. In § 100.130, revise paragraph (b)(2) and add new paragraph (b)(3) to read as follows:

**§ 100.130  Discrimination in the terms and conditions for making available loans or other financial assistance.**

\*　　\*　　\*　　\*　　\*

(b) \* \* \*

(2) Determining the type of loan or other financial assistance to be provided with respect to a dwelling, or fixing the amount, interest rate, cost, duration or other terms or conditions for a loan or

other financial assistance for a dwelling or which is secured by residential real estate, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.

■ 6. In part 100, add a new subpart G to read as follows:

## Subpart G—Discriminatory Effect

### § 100.500   Discriminatory effect prohibited.

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (c)(3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of

proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

Dated: February 8, 2013.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2013–03375 Filed 2–14–13; 8:45 am]

**BILLING CODE 4210–67–P**



**Monday**
**January 23, 1989**

Part III

# Department of Housing and Urban Development

## Office of the Secretary
## Office of the Assistant Secretary for Fair Housing and Equal Opportunity

24 CFR Part 14 et al.
Implementation of the Fair Housing
Amendments Act of 1988; Final Rule

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## Office of the Secretary

## Office of the Assistant Secretary for Fair Housing and Equal Opportunity

**24 CFR Parts 14, 100, 103, 104, 105, 106, 109, 110, 115, and 121**

**[Docket No. R-89-1425; FR-2565]**

## Implementation of the Fair Housing Amendments Act of 1988

**AGENCY:** Office of the Secretary and Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** HUD is adopting regulations to implement the changes made in Title VIII of the Civil Rights Act of 1968 by the Fair Housing Amendments Act of 1988, which was enacted September 13, 1988 and will become effective on March 12, 1989. Title VIII has prohibited discrimination in the sale, rental, and financing of dwellings based on color, religion, sex, or national origin. The Fair Housing Amendments Act expands the coverage of Title VIII to prohibit discriminatory housing practices based on handicap and familial status, establishes an administrative and judicial enforcement mechanism for cases where discriminatory housing practices cannot be resolved informally, and provides for monetary penalties in cases where housing discrimination is found. The Fair Housing Amendments Act also establishes design and construction requirements for certain new multifamily dwellings for first occupancy on or after March 13, 1991 (30 months after the date of enactment) and an exemption from the prohibitions against discrimination on the basis of familial status for certain housing for older persons.

This final rule adopts new regulations describing the nature of conduct made unlawful with respect to the sale, rental and financing of dwellings or in the provision of services and facilities in connection therewith (24 CFR Part 100); establishing procedures for the investigation of complaints of discriminatory housing practices (24 CFR 103); and establishing procedures for administrative proceedings involving discriminatory housing practices (24 CFR Part 104).

HUD is also revising existing regulations issued under Title VIII to reflect the expanded coverage of Title VIII. In addition, HUD is amending the regulations providing for the recognition of substantially equivalent state and local fair housing laws (24 CFR Part 115) to provide for the new certification procedure established by the Fair Housing Amendments Act.

**DATE:** This rule will become effective on March 12, 1989. The incorporation by reference of the American National Standard for buildings and facilities providing accessiblity and usability for physically handicapped people (ANSI A117.1–1986) is approved by the Director of the Federal Register as of March 12, 1989.

**FOR FURTHER INFORMATION CONTACT:** Harry L. Carey ((202) 755–5570, Office of the General Counsel, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC, 20410–0500. (The telephone number set forth above is not a toll-free number.) The toll-free TDD number is 1–800–543–8294.

This rule will be available in braille and on tape for persons with vision impairments in the Office of the Rules Docket Clerk, Room 10276, Department of Housing and Urban Development, at the above location.

**SUPPLEMENTARY INFORMATION:** The information collection requirements contained in this rule have been submitted to the Office of Management and Budget (OMB) for review under the Paperwork Reduction Act of 1980. The OMB control number, when assigned, will be announced in a separate notice in the *Federal Register*. The public reporting burden for each of these collections of information is estimated to include the time for reviewing the instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Information on the estimated public reporting burdens is provided under the preamble heading, *Other Matters.* Send comments regarding these burden estimates or any other aspect of these collections of information, including suggestions for reducing this burden, to the Department of Housing and Urban Development, Rules Docket Clerk, 451 Seventh Street, SW., Room 10276, Washington, DC 20410; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

## Background

Title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601–3619) made it unlawful to discriminate in any aspect relating to the sale, rental or financing of dwellings or in the provision of brokerage services or facilities in connection with the sale or rental of a dwelling because of race, color, religion, sex, or national origin. Under the provisions of Title VIII, persons who believed that they had been subjected to, or were about to be subjected to, a discriminatory housing practice could file a complaint with the Secretary of Housing and Urban Development. Title VIII required the Department of Housing and Urban Development to investigate each complaint and, where the Department determined to resolve the matters raised in a complaint, to engage in informal efforts to conciliate the issues in the complaint.

However, where these informal efforts to conciliate a case were unsuccessful, Title VIII did not provide the Secretary with any administrative mechanism for redressing acts of discrimination against an individual. In addition, while the Secretary could refer a case involving a pattern or practice of discrimination to the Attorney General for the initiation of a civil action, Federal courts did not award individual relief to the victims of discrimination in such cases.

The Fair Housing Amendments Act of 1988 (Pub. L. 100–430, approved September 13, 1988) was enacted to strengthen the administrative enforcement provision of Title VIII, to add prohibitions against discrimination in housing on the basis of handicap and familial status, and to provide for the award of monetary damages where discriminatory housing practices are found. The amended law, referred to as the Fair Housing Act, will become effective on March 12, 1989.

The provisions in the Fair Housing Act describing the nature of conduct which constitutes a discriminatory housing practice have been revised to extend the protections of the Fair Housing Act to persons with handicaps and to families with children. In this respect, sections 804, 805, and 806 of the Fair Housing Act prohibit discrimination in any activities relating to the sale or rental of dwellings, in the availability of residential real estate-related transactions, or in the provision of services or facilities in connection therewith because of race, color, religion, sex, handicap, familial status, or national origin.

The Fair Housing Act also specifically makes it unlawful to refuse to permit, at the expense of the handicapped person, reasonable modifications to existing premises occupied or to be occupied by such a person if such modifications are necessary to afford such person full enjoyment of the premises (section 804(f)(3)(A)). With respect to rental housing, the Fair Housing Act provides that a landlord may, where reasonable, condition permission for a modification

on the renter's agreeing to restore the interior of the premises to the condition that existed before the modification, reasonalbe wear and tear excepted. The Act also makes it unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services to afford a handicapped person equal opportunity to use and enjoy a dwelling.

Further, the Fair Housing Act makes it unlawful to design and construct certain multifamily dwellings for first occupancy after March 13, 1991, in a manner that makes them inaccessible to persons with handicaps. All premises within such dwelling also are specifically required to contain several features of adaptive design so that the dwelling is readily accessible to and usable by persons with handicaps.

With respect to the new protection for families with children, the Fair Housing Act prohibits discrimination because of familial status (generally, the presence of children under 18 in a family) in the sale or rental of housing. However, the act provides an exemption from this prohibition for housing which qualifies as "housing for older persons".

Section 805 of the Fair Housing Act, as revised, prohibits discrimination related to "residential real estate-related transactions" rather than merely referring to "financing". In addition, the definition of the term residential real estate-related transaction specifically indicates that the Fair Housing Act applies to the selling, brokering and appraising of dwelling and to secondary mortgage market activities with respect to securities affected or supported by dwellings, as well as to the making and purchasing of loans and other financial assistance for dwellings. The Act, however, does not prohibit a person engaged in the business of furnishing appraisals from taking into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

Section 810 of the Fair Housing Act provides that any person who believes that he or she has been, or will be, subjected to a discriminatory housing practice because of race, color, religion, sex, handicap, familial status, or national origin may file a complaint with the Secretary of Housing and Urban Development. The section also authorizes the Secretary of Housing and Urban Development to file complaint on the Secretary's own initiative and to investigate housing practices in order to determine whether a complaint should be filed. Complaints must be filed not later than one year after an alleged discriminatory housing practice has occurred or terminated.

Upon the filing of a complaint, the Secretary is required to notify any respondent named in the complaint of the acceptance of the complaint and the discriminatory housing practice alleged in the complaint. The respondent may file, not later than 10 days after receipt of the notice of a complaint, an answer to the complaint. The Secretary is required to make an investigation of the alleged discriminatory housing practice and to complete the investigation within 100 days after the filing of the complaint, unless it is impracticable to do so.

At the end of each investigation, the Secretary is required to prepare a final investigation report. Under section 810(d), the final investigation report will be available to an aggrieved person or a respondent, upon request, at any time after the investigation is complete.

Section 810(b) of the Act directs the Secretary, to the extent feasible, to engage in efforts to conciliate the matters raised in the complaint at any time after the filing of the complaint.

Section 810(e) of the Act empowers the Secretary to authorize the Attorney General to file a civil action seeking appropriate preliminary or temporary relief pending final disposition of a complaint if, at any time after the filing of such complaint, the Secretary concludes that such action is necessary to carry out the purposes of the Act.

Whenever a complaint alleges a discriminatory housing practice within a State or locality which has a Fair Housing law or ordinance which has been certified by the Secretary as being substantially equivalent to the Fair Housing Act, the Secretary must refer the complaint to the agency administering such law or ordinance before taking any action with respect to the complaint. Except with the consent of a certified agency, or in other limited situations such as where a complaint is not being processed in a timely fashion or the State or local law or ordinance is found no longer to be substantially equivalent, the Secretary may not take any further action with respect to complaints referred to such agencies.

Section 810(f) of the Act permits the Secretary to certify an agency only where the Secretary determines that the rights protected by the agency, the procedures followed by the agency, the remedies available to the agency, and the availability of judicial review of the agency's actions are substantially equivalent to those created in the Fair Housing Act.

This section also provides that agencies which the Secretary has determined administer State and local fair housing laws which provide rights and remedies for discriminatory housing practices that were substantially equivalent to those contained in Title VIII of the Civil Rights Act of 1968, or agencies which had been recognized for interim referral of complaints under Title VIII, will be considered certified for a period not to exceed 48 months for the purpose of referring complaints under the Fair Housing Act with respect to matters for which they had been certified on the day before the date of enactment of the Fair Housing Act (i.e., September 12, 1988).

Section 810(g) of the Act requires the Secretary, in cases where the matters raised in a complaint cannot be resolved by conciliation, to determine, based upon the facts, whether reasonable cause exists to believe a discriminatory housing practice has occurred or is about to occur. Such a finding must be made by the Secretary within 100 days after the filing of a complaint or within 100 days after the Secretary has commenced action on a complaint which had been referred to a certified agency, unless it is impracticable to do so. Where the Secretary makes a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the Secretary must immediately issue a charge on behalf of the aggrieved person commencing a formal administrative proceeding before an administrative law judge.

Section 812(a) of the Act provides any complainant, aggrieved person, or respondent with an opportunity to elect not to proceed before an administrative law judge but to move the case to an appropriate Federal district court. Such an election must be made within 20 days after the receipt of the service upon such person of the charge filed by the Secretary. Upon notification that a person has elected to proceed to Federal district court, the Secretary will authorize the Attorney General to file a civil action on behalf of the aggrieved person. An action authorized by the Secretary must be brought within 30 days after the election is made.

Where no election is made, the case will be heard by an administrative law judge. Under section 812(c) of the Act, the Federal Rules of Evidence will apply to the presentation of evidence in the same manner that they apply to evidence presented in a civil action in Federal district court. Section 812(g) requires the administrative law judge to issue findings of fact and conclusions of law within 60 days after the end of a hearing.

Where the administrative law judge finds that a respondent has engaged in a

discriminatory housing practice, the Fair Housing Act provides for the issuance of an order for such relief as is appropriate, which may include actual damages and injunctive or other equitable relief. In order to vindicate the public interest, the order of an administrative law judge may assess a civil penalty against the respondent.

The decision of the administrative law judge can be reviewed by the Secretary. However, this review must be completed within 30 days after the decision is issued. Any final agency decision on the issue of discriminination is subject to review on appeal by the United States Courts of Appeals.

The Fair Housing Amendments Act directs the Secretary of Housing and Urban Development to issue regulations implementing the Fair Housing Act. Section 13 of the Fair Housing Amendments Act provides that "[I]n consultation with other appropriate Federal agencies, the Secretary shall, not later than the 180th day after the enactment of this Act, issue rules to implement title VIII as amended by this Act." That section also required the Secretary to give notice and opportunity for comment with respect to such rules.

On November 7, 1988, the Department published in the **Federal Register** (53 FR 44992) a proposed rule to provide the interpretation of the Secretary of Housing and Urban Development on the scope of the coverage provided and the nature of activities made unlawful by the Fair Housing Act. The proposed rule also contained the procedures which would be applicable to the receipt and processing of complaints and the initiation and conduct of formal enforcement proceedings.

Specifically, the Department proposed to add the three new parts to Subtitle B of Title 24 of the Code of Federal Regulations. The new Part 100 described the conduct made unlawful under the Fair Housing Act. The new Part 103 set forth the procedures for the receipt, investigation and conciliation of complaints and for the issuance of charges commencing formal administrative proceedings. The new Part 104 established rules for the conduct of administrative hearings before administrative law judges and provided rules of discovery in connection with such administrative proceedings.

It was further proposed that the existing departmental regulations authorizing the Secretary to collect racial, sex and ethnic data in departmental programs, located at 24 CFR Part 100, be redesignated as 24 CFR Part 121. These regulations were revised in the proposal to reflect the additional data requirements for HUD programs to meet the Department's responsibility to provide reports to Congress and to make available to the public data on persons eligible to participate and who are participating in HUD programs.

The proposed rule also made revisions in four existing departmental regulations implementing the Fair Housing Act to reflect the expansion of the coverage of the law to include handicap and familial status. Those regulations are: Fair Housing Administrative Meetings under Title VIII of the Civil Rights Act of 1968 (24 CFR Part 106), Fair Housing Advertising (24 CFR Part 109), Fair Housing Poster (24 CFR Part 110) and Certification of Substantially Equivalent Agencies (24 CFR Part 115).

The proposal provided a 30-day period for the submission of comments by the public, ending December 7, 1988. The Department received 6,425 public comments on the proposed rule by the end of the comment period. In addition, a substantial number of comments were received by the Department after the December 7 deadline. Even though those comments were not timely filed, they were reviewed to assure that any major issues raised were adequately addressed in comments that were received by the deadline.

Despite the extraordinary number of comments submitted (there were several thousand comments just from mobile home owners and operators of mobile home parks), each of the timely comments was read, and a list of all significant issues raised by those comments was compiled. All these issues were considered in the development of this rule.

In addition to consideration of public comments, HUD staff members met with representatives of several major interest groups who requested an opportunity to elaborate on the views expressed in their written comments. These staff members (with responsibility for the development of this rule) met with representatives of the National Apartment Association, the Society of Real Estate Appraisers, the American Institute of Real Estate Appraisers, the National Association of Home Builders, the Western Mobile Home Association, the Leadership Conference on Civil Rights, National Association for the Advancement of Colored People, NAACP Legal Defense Fund, Children's Defense Fund, American Civil Liberties Union, Mental Health Law Project, and representatives of various other Fair Housing Organizations. In each instance, the organization or organizations presented views identical to or consistent with positions taken in previously submitted written comments.

A record of each meeting was made, including the names of persons attending, the date, and a brief summary of the issues discussed. These meeting records appear in the Department's public comment file. The staff members also met with staff of the Senate Judiciary Committee.

## Part 100—Discriminatory Conduct Under the Fair Housing Act

Part 100 is a new part titled "Discriminatory Conduct Under The Fair Housing Act". The new Part 100:
—Indicates the conduct which is made unlawful under the Fair Housing Act;
—Includes guidance as to the responsibility of persons to permit reasonable modifications to dwellings and to make reasonable accommodations to rules and practices for persons with handicaps and further provides information as to the design and construction requirements applicable to certain new construction multifamily housing for first occupancy after March 13, 1991; and
—Describes the requirements which must be met for housing to be exempted from the prohibitions against discrimination based on familial status because it qualifies as housing for older persons.

The comments received with respect to Subparts A, B, and C of Part 100 raised several issues of general importance.

### Standard for Proving a Violation

The proposed rulemaking indicated that the descriptions of unlawful conduct contained in this part generally mirrored the language of the statutory prohibitions against discrimination under the Fair Housing Act. The proposed rule indicated that the specific prohibitions in each section of the regulations were amplified by examples of unlawful conduct provided in those sections. The preamble to the proposed rule stated that many of the practices so identified have been the subject of court decisions since the passage of Title VIII of the Civil Rights Act of 1968. The preamble further stated that other examples reflect the interpretation of HUD based on its experience since 1968 in the investigation of complaints of discriminatory housing practices. In addition, the preamble cautioned that the illustrations in Part 100 were only examples of the types of conduct made unlawful under the Fair Housing Act.

Although the Department viewed the illustrations of conduct unlawful under the Fair Housing Act in Part 100 to be descriptive of the types of conduct

prohibited, several commenters suggested that, in some instances, the illustrations could be read to suggest that the Department was using them to establish the legal standards for determining liability in the adjudication of matters under the Fair Housing Act.

Specifically, these commenters asserted that four illustrations in the proposed rule were susceptible to misinterpretation. With regard to §§ 100.70(c)(3), 100.75(c)(3) and 100.80(b)(3), they asserted that the use of the phrases "in order to discourage", "in order to deny" and "in order to preclude" could be viewed as limiting the types of activities which would constitute unlawful conduct. Similarly, these commenters asserted that, in § 170.70(d)(1), the phrase "to encourage, permit or reward" could also imply that intentional discriminatory conduct was necessary to establish that a discriminatory housing practice occurred. While the Department believes that the cited illustrations do not in any way imply the standard for determining the liability of persons, these regulations are not designed to resolve the question of whether intent is or is not required to show a violation and in order to assure that there will be no confusion as to the scope of Part 100, the illustrations in § 100.70(c)(3), 100.75(c)(3) and 100.80(b)(3) have been revised. The illustration in § 100.70(d)(1) has been deleted from the final rule for the reasons discussed in the following section of this preamble.

*Affirmative Fair Housing Activities*

Several commenters suggested that the proposed rule did not address affirmative efforts by localities to further the achievement of the goal of fair housing through the implementation of programs to promote integrated housing. Several commenters, including fair housing groups, persons and organizations involved in promoting fair housing and a number of local governments, interpreted certain illustrations of conduct made unlawful in the proposed rule as prohibiting the use of governmentally approved programs designed to promote greater housing opportunities for persons.

On the other hand, a comment from an association representing persons involved in the sale and rental of dwellings urged that the proposed rule be revised to make it clear that such practices are prohibited by the Fair Housing Act.

The Department does not believe that the proposed rule could be interpreted to make affirmative marketing programs, designed to make available information which broadens housing choices for persons, a violation of the Fair Housing Act.

The Department of Housing and Urban Development, shortly after the enactment of Title VIII of the Civil Rights Act of 1968, published regulations designed to promote greater opportunities for persons to participate in its housing programs. These Affirmative Fair Housing Marketing Regulations (24 CFR 200.600) implement the Department's policy of assuring that persons of similar income levels in a housing market area have a like range of housing choices available to them, regardless of race, color, religion, sex, or national origin.

The regulation provides for the development and implementation of an affirmative fair housing marketing plan. As part of this plan, participants in HUD housing programs must carry out an affirmative program to attract buyers or tenants, regardless of sex, of all minority and majority groups to the housing. In addition, the Department requires program participants to identify any groups of persons who are not likely to be aware of the available housing and to undertake special marketing efforts designed to make such persons aware of the available housing and their ability to obtain it on a nondiscriminatory basis.

Nothing in the amendments to the Fair Housing Act or their legislative history would support a conclusion that Congress sought to make choice-broadening activities, such as the Department's Affirmative Fair Housing Marketing Program, unlawful discriminatory housing practices.

Beyond these activities, both groups of commenters recommended that the final rule should indicate whether other practices designed to promote integrated housing patterns are permissible under the Fair Housing Act. Generally, these "pro-integrative" programs involve practices which are designed and operated to provide incentives for persons to make housing choices in a manner which results in the furtherance of integrated housing patterns.

The issue of programs designed to promote integrated housing patterns was considered by the Congress in connection with an amendment to the Fair Housing Amendments Act offered in the House which would have made it unlawful to use any preferences in the provision of any dwelling based on race, color, religion, gender or national origin. Before the amendment was defeated, Congressman Don Edwards, one of the chief sponsors of the Fair Housing Amendments Act, agreed to hold hearings on the subject of pro-integrative programs. (See 134 Cong. Rec. H4903 (daily ed. June 29, 1988).)

Very recently, on December 12, 1988, the House Committee on the Judiciary Subcommittee on Civil and Constitutional Rights held oversight hearings on Fair Housing. In this hearing, the subcommittee heard testimony concerning the issues raised in pro-integration efforts. In fact, much of the testimony involved activities which are the same as or similar to those referred to in the comments on the proposed rule.

In view of the legislative history concerning pro-integration programs and the Congressional action in this area, the Department has determined that it would not be appropriate to address the issue of pro-integration programs in this final rule.

Commenters pointed to several of the illustrations in the proposed rule which they believed could be read as indicating that the Department would view pro-integration activities as constituting unlawful conduct.

The Department believes that the illustrations contained in the proposed rule accurately reflect the types of activities which, when they result in choice limitations, would constitute unlawful conduct. However, in order to assure that the Department's rule implementing the Fair Housing Act does not impact on the consideration of the scope of permissible affirmative activities to promote integration, the Department has removed the illustrations that the commenters asserted could be construed as impacting either positively or negatively on the Congressional evaluation. Specifically, the illustrations in §§ 100.60(b)(5), 100.65(b)(2), 100.70(c)(1), 100.70(d)(1) and (2), 100.120(b)(1), (3), (4), (5), 6, and (7), 100.130(b)(1) and (4) and 100.135(d)(1), (2), and (3) have been removed. Further, the Department has rejected comments suggesting changes in § 100.70(a), and the addition of new illustrations in §§ 100.70(c), 100.75(c), 100.130(c), and 100.135(d) to indicate that pro-integration practices are unlawful.

In addition, several commenters requested that the provisions of the proposed rule regarding unlawful advertising practices in § 100.50(b)(4) be revised. The language in this section has been changed to mirror the language contained in section 804(c) of the Fair Housing Act relating to unlawful advertising with respect to the sale or rental of a dwelling.

*Protection of New Covered Classes*

In the preamble to the proposed rule, the Department indicated that it interpreted the protections afforded to

handicapped persons and families with children in the same manner as the protections provided to others under the Fair Housing Act. A number of commenters suggested that it was unreasonable to assume that Congress intended to provide the same protections to the new classes of persons afforded protection under the amendments. One commenter supported this position by suggesting that it would be more appropriate to utilize standards developed under the Equal Protection Clause of the Fourteenth Amendment to the Constitution in determining the nature of the protections provided to handicapped persons and families with children. This commenter indicated that, under such a standard, classifications based on race and sex would stand on a different footing from classifications based on handicap and familial status, and that differential treatment of the handicapped or families with children in some particular contexts could be justified by a rational relationship to legitimate interests, even where similar differential treatment based on race or sex could not be justified.

While it is true that the Congress, in enacting Title VIII of the Civil Rights Act of 1968, sought to assure that persons would be accorded equal protection of the law, the Constitutional underpinnings of the law are also rooted in the Commerce Clause.

In a memorandum on the constitutionality of the Fair Housing Law, the Department of Justice set forth the support in the Commerce Clause for the legislation, stating:

"Discrimination in housing affects this interstate commerce in several ways. The confinement of Negroes and other minority groups to older homes in ghettoes restricts the number of new homes which are built and consequently reduces the amount of building materials and residential financing which moves across state lines. Negroes, especially those in the professions or in business, are less likely to change their place of residence to another state when housing discrimination would force them to move their families into ghettoes. The result is both to reduce the interstate movement of individuals and to hinder the efficient allocation of labor among the interstate components of the economy.

"The Commerce Clause grants Congress plenary power to protect interstate commerce from adverse effects such as these. The power is not restricted to goods or persons in transit. It extends to all activities which affect interstate commerce, even if the goods or persons engaged in the activities are

not then, or may never be, traveling in commerce. The power exists even when the effects upon which it is based are minor, or when taken individually, they would be insignificant. It is sufficient if the effects, taken as a whole, are present in measureable amounts. And it does not matter that when Congress exercises its power under the Commerce Clause, its motives are not solely to protect commerce. It can as validly act for moral reasons." (footnotes omitted) 114 Cong. Rec. 2536–2537. (February 7, 1968)

The Department believes that the legislative history of the Fair Housing Act and the development of fair housing law after the protections of that law were extended in 1974 to prohibit discrimination because of sex (Congress amended sections 804, 805, and 806 by adding sex to the classes of persons protected under Title VIII, see section 808(b)(1) of the Housing and Community Development Act of 1974, Pub. L. 93–383) support the position that persons with handicaps and families with children must be provided the same protections as other classes of persons.

*Increased Liability*

A significant number of commenters asserted that providing protections to persons with handicaps and families with children would restrict their ability to establish reasonable rules relating to the availability and the use of facilities provided in connection with dwellings. These commenters also suggested that a regulation requiring full access of handicapped persons and children to all facilities provided in connection with dwellings, and requiring the rental of dwellings on upper floors of a high-rise building, would result in increased tort liability.

The Department does not believe that, in enacting the Fair Housing Amendments Act, the Congress sought to limit the ability of landlords or other property managers to develop and implement reasonable rules and regulations relating to the use of facilities associated with dwellings for the health and safety of persons. However, there is no support for concluding that it is permissible to exclude handicapped persons or families with children from dwellings on upper floors of a high-rise, based on the assertion that such dwellings per se present a health or safety risk to such persons. Further, to permit such a practice would render meaningless the provisions of the law requiring that all dwellings in buildings consisting of 4 or more units and having one or more elevators be accessible to and usable by handicapped persons.

A number of commenters also urged the Department, in its final rule, to provide that a high-rise building could be exempted from the familial status provisions of the Act if it were certified that the high-rise building did not provide a safe and healthy living environment for children. In support of this type of exemption, several commenters pointed to language contained in Section 201 of the Housing and Community Development Act of 1977 which directed that the Secretary of HUD "prohibit high-rise elevator projects for families with children unless there is no practicable alternative." (See section 8(c)(1) of the Housing Act of 1937 (42 USC 1437f(c)(1)).). There is nothing in the Fair Housing Act to indicate that Congress in any way sought to limit the ability of families with children to obtain dwellings in a building other than those specifically exempted under the Act. Further, the department does not believe that the language in the Housing and Community Development Act of 1977, requiring HUD approval of the use of high-rise projects for providing housing for families with children would support a provision in this final rule which would provide an exemption from coverage of the Fair Housing Act for such buildings. As a result, these comments have not been adopted.

However, there is nothing in the provisions of the Fair Housing Amendments Act or its legislative history that indicates that Congress sought to impose any new liability on the owners and managers of housing. This interpretation is supported by a colloquy between Senator Specter and Senator Kennedy regarding the issue of liability:

Mr. Specter. It is my understanding that, as a result of this bill, a property owner does not assume a greater degree of vicarious liability as a result of injuries that may be caused by the tenants in the expanded categories of protected classes established under this bill. I believe it would be useful for the manager to confirm that it is not the intent of Congress that property owners will incur greater vicarious tort liability as a result of this statute because of the physical or mental characteristics of the tenants covered by this bill.

Mr. Kennedy. The Senator is correct. Congress does not intend to alter vicarious or secondary State tort law through the provisions of this bill. There is no objective evidence to link concerns about increased liability with any of the protected classes, and none should be assumed. Thus, we are stating, as a matter of clarification, that there is no relationship between this bill and existing State vicarious and secondary liability tort laws. 134 Cong. Rec. S10549 (daily ed. Aug. 2, 1988).

Case Case 1:18-cv-01365 Document Document 10-1 Filed Filed 12/20/23 Page 71 Page ID 54:7834

## Subpart A—General

### Section 100.1 Authority.

The Fair Housing Amendments Act authorizes the Secretary of Housing and Urban Development to issue regulations implementing the provisions of the Fair Housing Act (42 U.S.C. 3600–3620). The regulations contained in Part 100 are being issued under the Secretary's authority for the administration and enforcement of the Fair Housing Act.

### Section 100.5 Scope.

The Fair Housing Act provides, within constitutional limitations, for fair housing throughout the United States. It provides that no person shall, on the basis of race, color, religion, sex, handicap, familial status, or national origin, be subjected to discrimination in the sale, rental or advertising for sale or rental of dwellings, in the provision of brokerage services, or in residential real estate-related transactions. Section 100.5(a) and (b) indicates that this part provides guidance as to the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of real estate-related transactions.

### Section 100.10 Exemptions.

The Fair Housing Act exempts certain types of housing from the coverage of the law. Section 807 of the Fair Housing Act provides that, under certain circumstances, religious organizations and private clubs may limit the sale, rental or occupancy of housing, owned or operated for other than a commercial purpose, to their members. Section 807 also provides that nothing in the provisions regarding familial status applies to housing for older persons. Section 803 of the Fair Housing Act provides that nothing in the Fair Housing Act, other than the prohibitions against discriminatory advertising, applies to the sale or rental by an owner of certain single family houses without the use of a real estate broker or to the rental of rooms in dwellings containing living quarters occupied by no more than four families, provided that the owner actually occupies one of the units. Section 100.10 of this part reflects these exemptions to the coverage of the law.

Section 100.10(a)(3) states that nothing in this regulation limits the applicability of any reasonable local, State or Federal restrictions on the maximum number of occupants permitted to occupy a dwelling unit. This paragraph incorporates into the regulation the

revisions to section 807 of the Fair Housing Act contained in section 6(d) of the Fair Housing Amendments Act of 1988. That provision is intended to allow reasonable governmental limitations on occupancy to continue as long as they are applied to all occupants, and do not operate to discriminate on the basis of race, color, religion, sex, handicap, familial status, or national origin. H.R. Rep. No. 711, 100th Congress, 2d Sess. 31 (1988) ("House Report"). No changes have been made in this section of the regulations.

A number of commenters indicated that the proposed rule did not adequately address the question of what occupancy standards, if any, can be used by persons in connection with the sale and rental of dwellings. Many of these commenters, generally persons involved in the rental of dwellings and associations representing owners and managers of rental dwellings, recommended that the final rule include a HUD-developed occupancy standard, and state that in the absence of a State or local occupancy code, owners or managers complying with the HUD standard would be considered to be in compliance with the Fair Housing Act with respect to the treatment of families with children. In the alternative, several commenters recommended that HUD indicate in the final rule that owners and managers of rental housing would be in compliance with the Fair Housing Act if they developed and implemented occupancy standards which are no less stringent than occupancy guidelines currently used in connection with HUD-assisted housing programs.

While the statutory provision providing exemptions to the Fair Housing Act states that nothing in the law limits the applicability of any reasonable Federal restrictions regarding the maximum number of occupants, there is no support in the statute or its legislative history which indicates any intent on the part of Congress to provide for the development of a national occupancy code. This interpretation is consistent with Congressional reliance on and encouragement for States and localities to become active participants in the effort to promote achievement of the goal of Fair Housing. Further, while the Department has developed occupancy guidelines for use by participants in HUD housing programs, these guidelines are designed to apply to the types and sizes of dwellings in HUD programs and they may not be reasonable for dwellings with more available space and other dwelling configurations than those found in HUD-assisted housing.

On the other hand, there is no basis to conclude that Congress intended that an owner or manager of dwellings would be unable in any way to restrict the number of occupants who could reside in a dwelling. Thus, the Department believes that in appropriate circumstances, owners and managers may develop and implement reasonable occupancy requirements based on factors such as the number and size of sleeping areas or bedrooms and the overall size of the dwelling unit. In this regard, it must be noted that, in connection with a complaint alleging discrimination on the basis of familial status, the Department will carefully examine any such nongovernmental restriction to determine whether it operates unreasonably to limit or exclude families with children.

Several commenters requested advice regarding the application of the Fair Housing Act to the sale of condominium and cooperative units and mobile homes by private persons.

As indicated in the proposed rule, the prohibitions against discrimination apply to all types of dwellings, including condominiums, cooperatives and mobile homes. Thus, discrimination in the sale or rental of such dwellings would be unlawful. However the Fair Housing Act provides a limited exemption for the sale of certain single family houses, and § 100.10(c) describes this statutory exemption. Specifically, this section indicates that the Fair Housing Act exempts from the provisions prohibiting discrimination any single family house sold by an owner, subject to certain conditions: the owner may not own or have an interest in more than three such houses at any one time; in the case of the sale of a single family house in which the owner was not the most recent occupant prior to its sale, the owner may not have made any other such sale within the preceding twenty-four months; and the unit must be sold or rented without the use of a real estate broker or agent, and without the use of any discriminatory advertisement.

Thus, the sale of a single family house, including the sale of a condominium or cooperative unit or a mobile home, by an owner would not be covered by the provisions of the Fair Housing Act, provided that the limitations in § 100.10(c) are met. However, it must be noted that the exemption in this section applies only to the *owner* of such a dwelling, and that the cooperative or condominium or mobile home park would be prohibited from engaging in any discriminatory conduct with respect to the dwelling notwithstanding the fact

that the conduct of the owner was not covered.

*Section 100.20 Definitions.*

Section 100.20 provides definitions to be used for terms in Part 100. The definition of the term "dwelling" in the proposed rule stated that the term include mobile home parks, condominiums and cooperatives. A number of comments aruged that cooperatives, condominiums and mobile homes are not "dwellings" within the meaning of the statutory definition of the term. The Department disagrees. The statutory definition of a dwelling is "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." This definition is clearly broad enough to cover each of the types of dwellings enumerated in the proposed rule: mobile home parks, trailer courts, condominiums, cooperatives, and time-sharing properties. Several commenters suggested that the definitions of the terms "dwelling" and "person" should be expanded to provide some illustrations, particularly in the areas relating to handicap and familiar status.

Other commenters recommended that the final rule should contain the same definitions as those provided in the Fair Housing Act. These commenters indicated that the addition of certain types of persons, or certain examples of dwellings, could be viewed as indicating a restriction not contemplated in the law.

The Department has determined that, on balance, the need to leave open the extent and scope of the terms defined in the Fair Housing Act outweighs the need to provide comprehensive examples in connection with this rulemaking. As a result, the definitions of the terms "dwelling" and "person" have been revised to read as set forth in the statute.

A number of commenters objected to the inclusion of the phrase "is about to occur" in the definition of the term "aggrieved person". These commenters suggested that the addition of this phrase was inappropriate in that it would make unlawful acts that have not occurred.

The definition of the term "aggrieved person", as any person who claims to have been injured by a discriminatory housing practice, or who believes that he or she will be injured by a discriminatory housing practice that is about to occur, is statutory and has not

been changed in the final rule. The phrase "is about to occur" applies to a number of situations in which it is clear to a person that, if he or she takes an action, he or she will be subjected to a discriminatory act which will result in an injury. In such cases, the Fair Housing Act does not require these persons to expose themselves to the injury involved with the actual act of discrimination before filing a comlaint.

A number of commeters suggested that the definition of aggrieved person be expanded to incorporate into the text of the rule the statement in the preamble to the proposed rule that an "aggrieved person includes a fair housing organization as well as a tester or other person who seeks information about the availability of dwellings to determine whether discriminatory housing practices are occurring." In addition, several commenters suggested that references to providers of group homes for handicapped persons also be added to the definition.

As indicated above, the Department has determined that the definitions in these regulations which are terms defined in the Fair Housing Act should contain the statutory language. However, the Department has consistently interpreted the provisions of the fair housing law to permit the filing of a complaint by any person or organization which alleges that a discriminatory housing practice has occurred or is about to occur and which will result in an injury to them.

The proposed rule defined the "broker" or "agent" as any person authorized to perform an action on behalf of another person regarding any matter related to the sale or rental of dwellings, including offers, solicitations or contracts, and the administration of matters regarding such offers, solicitations or contracts or any real estate-related transactions. Several commenters pointed out that the Fair Housing Act did not contain a definition of these terms. These commenters also pointed out that the specific definition of these terms, for the purpose of this regulation, could result in a limitation on the types of persons who would be considered as brokers or agents in connection with any other aspect of a housing transaction.

The Department did not intend, in the proposed rule, to establish a universal definition of the terms "broker" or "agent." However the Department believes that since these terms appear in numerous places throughout the rule, guidance is necessary with respect to the scope of persons who are considered to be brokers and agents, particularly when such persons are involved in the

sale or rental of dwellings. Therefore, a definition of the terms "broker" or "agent" has been retained in the final rule. In order to avoid confusion as to whether persons otherwise involved in housing transactions are acting as brokers or agents, the definition has been revised to provide that a broker or agent "includes" rather than "means" persons described in the definition.

Several persons indicated that the term "person in the business of selling or renting dwellings", which was included as a defined term in the proposed rule, was never used in the text of the rule. These commenters suggested that the definition of this term be deleted. These commenters are in error, since the term appears in the exemption for the sale or rental of a single family house by an owner, in § 100.10(c)(l)(ii). The definition, which is taken from section 803(c) of the Fair Housing Act, has been retained in the final rule.

The remaining definitions in the proposed rule have not been changed in the final rule.

**Subpart B—Discriminatory Housing Practices**

*Section 100.50 Real estate practices prohibited.*

Section 100.50 of the rule states that Subpart B provides the Department's interpretation of the conduct made unlawful under section 804 and section 806 of the Fair Housing Act. In general, these provisions describe conduct made unlawful with regard to any aspect related to the sale, rental, or advertising of dwellings and to the provisions of brokerage services and facilities in connection with the sale or rental of dwellings.

Section 100.50(b) describes the specific conduct made unlawful in relation to the sale or rental of dwellings. The conduct described in this section forms the basis for the subsequent sections in Subpart B. Each of the subsequent sections provides illustrations of the scope and applicability of the rule to specific sales, rental and brokerage activities.

While the illustrations are set forth under the section of Subpart B which is most applicable to the discriminatory conduct described, § 100.50 indicates that an action described in one section can constitute a violation under other sections as well. In addition, the illustrations of discriminatory conduct in this subpart are only examples of discriminatory conduct that violates the Fair Housing Act and are not intended to limit the scope of discrimination in

housing made unlawful under the Fair Housing Act.

With the exception of the revision of § 100.50(b)(4), which was discussed earlier in this preamble, no changes have been made in the text of § 100.50.

*Section 100.60   Unlawful refusal to sell or rent or to negotiate for the sale or rental.*

Section 100.60 describes the actions which constitutes a refusal to sell or rent a dwelling when a *bona fide* offer is made or a refusal to negotiate with persons for the sale or rental of a dwelling and which are unlawful when they are taken because of race, color, religion, sex, handicap, familiar status, or national origin.

As discussed earlier, the illustration contained in § 100.60 (b) (5) has been removed, and the subsequent illustration has been renumbered accordingly. No other changes have been made in this section of the final rule.

*Section 100.65   Discrimination in terms, conditions and privileges and in services and facilities.*

Section 100.65 provides that differences in the treatment of persons in connection with the provision of services and facilities or in the terms or conditions relating to the sale or rental of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin constitute discriminatory housing practices.

The illustrations in § 100.65(b) indicate that the coverage of this section extends beyond restrictions or differences in a lease or sales contract and the provision of different levels of maintenance. This section provides that denials of, or limitations on the use of privileges, services or facilities, relating to the sale or rental of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin are also discriminatory housing practices.

In order to indicate the broad range of conduct which would constitute different terms and conditions, the department has added another illustration to this section (§ 100.65(b)(5)) indicating that denying or limiting services or facilities to persons based on a person failing or refusing to grant sexual favors can constitute a discriminatory housing practice.

A large number of comments received from persons owning or managing rental housing and associations representing such persons disagreed with the Department's interpretation of the Fair Housing Act as precluding different security deposit require nents for

persons with handicaps and families with children. These comments generally took the position that mobility impaired persons in wheelchairs and small children would cause more damage to the interior of dwellings, thus justifying the need for additional security to cover the exposure of the owner or manager to make needed repairs when units occupied by such persons are vacated. Since the Department has determined that in enacting the Fair Housing Act, Congress sought to provide the same protections to persons with handicaps and families with children as were made available to other classes of protected persons, no change in the illustration in § 100.65(a)(1) has been made.

A number of commenters indicated that they customarily provided for reduced security deposits for elderly persons renting units and asked whether continuing such practice would place them in violation of the Fair Housing Act. As long as such a policy is based solely on age, is available to persons if there are children in the family, and is not otherwise operated in a manner that results in the exclusion of families with children, such a practice would not be unlawful.

Another commenter indicated that charges for the provision of water, electricity, refuse collection and other services have have been based on the number of persons who occupy a dwelling and asked whether such a policy would be permissible. In order to determine whether such a policy is permissible, it would be necessary to understand more fully why it was implemented and how it actually operates. Further, since policies such as this would require review on a case by case basis, the Department has determined that addressing this issue in the final rule would not be appropriate.

As discussed earlier in the preamble, the illustration in § 100.65(b)(2) has been removed, pending Congressional review of pro-integration programs.

*Section 100.70   Other prohibited sale and rental conduct.*

Section 100.70 provides that restricting or attempting to restrict the housing choices of persons, or engaging in any conduct relating to the sale or rental of a dwelling that otherwise makes unavailable or denies dwellings, because of race, color, religion, sex, handicap, familial status, or national origin, is a discriminatory housing practice.

Section 100.70(c) describes actions which result in limitations of housing choice that would violate the Fair Housing Act. These practices, which are

commonly referred to as "steering," include practices designed to discourage persons from seeking housing in a particular community, neighborhood, or development because of race, color, religion, sex, handicap, familial status, or national origin.

The illustrations in § 100.70(c)(1), (d)(1) and (d)(2) of the proposed rule have been removed in response to comments regarding Congressional activity in the area of affirmative action to promote integrated housing. In addition, it should be pointed out that the Department did not intend in the illustration in § 100.70(d)(2) of the proposed rule to imply that language or sign interpreters were required with respect to transactions involving a person who can not speak English or who has a hearing or vision impairment. The remaining illustrations in the section have been renumbered.

In the preamble discussion of § 100.70 in the proposed rule, it was stated, as an example, that a private developer's market-based decision to include only efficiency apartments in a new development would not violate the Fair Housing Act even though, "as a practical matter, such housing would be unavailable to families with children." A commenter pointed out that it would be possible for a single parent and child to live in an efficiency or one bedroom apartment, and that the example was not illustrative of a situation in which housing would be unavailable to families with children. The Department agrees with the commenter's assertion. However, even though the example may have been flawed, the Department wishes to reiterate that it does not interpret the Fair Housing Act as precluding the construction of apartment buildings with small units.

In order to clarify that an unlawful refusal to deal with brokers and agents includes a refusal based on the race, color, religion, sex, handicap, familial status, or national origin of the broker or agent as well as the race, color, religion, sex, handicap, familial status, or national origin of one or more of their clients the illustration in § 100.70(d)(2) has been revised.

A number of commenters suggested that the proposed rule did not address specifically situations in which families are discouraged from obtaining housing because of the presence or possible presence of children. As discussed earlier in this preamble, the illustrations provided in the final rule are intended to described discriminatory housing practices generally and are not intended to be exhaustive descriptions of all conduct made unlawful under the Fair

Housing Act. For this reason, the department has determined not to add a separate illustration with respect to steering conduct based on familial status. Further, the illustrations in § 100.70(c) (2) and (3) indicate conduct designed to discourage persons from obtaining a dwelling by exaggerating drawbacks or by communicating that certain persons are incompatible with existing residents is unlawful. The department believes that these illustrations make it clear that representing that certain housing would not be appropriate for, or would not be available to families with children would be prohibited under the Act.

Several commenters also noted that the proposed rule did not address discriminatory local land use, health and safety, and zoning rules that eliminate community housing opportunities. As indicated in the preamble discussion relating to Subpart D of this rule, the department has determined not to publish rules regarding issues relating to local government exercise of police powers in the areas of land use and zoning. However, as discussed in the preamble to the proposed rule, discrimination in the provision of those services and facilities which are prerequisites to obtaining dwellings, including refusals to provide municipal services or adequate property or hazard insurance because of race, color, religion, sex, handicap, familial status or national origin render housing unavailable in violation of the Fair Housing Act. In order to indicate that the refusal to provide, or the provision of different municipal services or facilities and property or hazard insurance for dwellings because of race, color, religion, sex, handicap, or national origin can constitute a violation of "the otherwise make unavailable or deny" provisions in the Act, the language in § 100.70(d) has been revised and a new illustration (§ 100.70(d)(4)) has been added. In addition, the illustration relating to discriminatory advertisements in § 100.70(d)(6) of the proposed rule has been removed, since such practices are more appropriate to the conduct made unlawful under § 100.75 of the rule.

*Section 100.75 Discriminatory advertisements, statements, and notices.*

Although the Fair Housing Advertising Regulations (24 CFR Part 109) apply to all advertising for dwellings, the Department believes that it is appropriate, in connection with regulations describing prohibited conduct related to the sale or rental of housing, to include additional guidance as to prohibited conduct regarding this specific area. Section 100.75 describes prohibited conduct related to advertisements, notices and statements by persons engaged in the sale or rental of housing or in the printing and publishing of such advertisements, notices and statements.

No comments raised substantial issues regarding this provision, and it has been included in the final rule as it was proposed.

*Section 100.80 Discriminatory representations on the availability of dwellings.*

Section 100.80 states that the provision of inaccurate or untrue information about the availability of dwellings for sale or rent because of race, color, religion, sex, handicap, familial status, or national origin constitutes a violation of the Fair Housing Act. A person who receives the inaccurate or untrue information need not be an actual seeker of housing in order to be the victim of a discriminatory housing practice under this section.

A number of commenters requested that the final rule specifically indicate that the provision of inaccurate information to "testers" because of race, color, religion, sex, handicap, familial status, or national origin is unlawful under the Fair Housing Act. These commenters also recommended that the final rule should state that "testers" who are provided inaccurate information are persons aggrieved by a discriminatory housing practice who may file a complaint with the Secretary.

In response to these comments, an additional illustration has been added to this section which indicates that the provision of false or inaccurate information regarding the availability of dwellings to any person, including testers, because of race, color, religion, sex, handicap, familial status, or national origin would be unlawful under the Fair Housing Act.

*Section 100.85 Blockbusting.*

Blockbusting consists of any effort, for profit, to induce or attempt to induce a person to sell or rent a dwelling by representations regarding the entry into a neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin, or with a handicap. Proposed § 100.85(b) stated that it was not necessary that there be in fact a profit realized as a result of blockbusting, as long as the availability of profit was a factor involved in the blockbusting activity. A number of commenters indicated that the term "blockbusting"

was archaic and could be misread as meaning only efforts to get people to move out of a block. In addition, these commenters suggested that the language "as long as the availability of profit was a factor" would be confusing, since most law in the area has focused on whether a profit-oriented business is involved as well as whether the actions were taken for profit.

The description of the conduct made unlawful under § 100.85 follows the statutory prohibitions against discrimination under section 804(e) of the Fair Housing Act. These practices have generally been referred to as blockbusting, and the term appears in the statute. The specific activities made unlawful under section 804(e) would not be limited merely because of the use of the term "blockbusting". Therefore, the Department has determined that, while another more current term also may aptly describe the type of activities covered by this section (e.g. panic selling and panic buying), changing the terminology in this area could result in substantial confusion as to whether the change in accepted terminology implied any change in the coverage of the provision. In addition, the Department believes that the language in the proposed rule regarding profit as a factor in unlawful blockbusting activities accurately describes the breadth of activities covered.

Because the illustration in § 100.85(c)(3) could be misinterpreted as implying that blockbusting activity involving uninvited solicitations for listings would violate the Act only if different or more intensive solicitation activity were involved, this illustration has been removed in the final rule. However, in order to make clear that such practices can constitute discriminatory housing practices, the illustration in § 100.85(c)(1) has been revised to include a specific reference to uninvited solicitation for listings which would constitute a violation of the Act.

*Section 100.90 Discrimination in the provision of brokerage services.*

Section 100.90 reflects the prohibition in the Fair Housing Act against denying any person access to, or membership or participation in, any multiple listing service, real estate brokers' organization or facility relating to the business of selling or renting dwellings on account of race, color, religion, sex, handicap, familial status, or national origin. This section also states that it is unlawful to discriminate against any person in the terms or conditions of such access, membership or participation because of race, color, religion, sex, handicap,

familial status, or national origin. Several commenters requested that the Department provide an additional example of unlawful conduct relating to restrictions on access to service through area limitations. In response to these commenters, a new illustration describing unlawful discrimination in establishing geographic boundaries or office or residence requirements because of race, color, religion, sex, handicap, familial status, or national origin has been added to this section.

## Subpart C—Discrimination in Residential Real Estate-Related Transactions

*Section 100.110 Discriminatory practices in residential real estate-related transactions.*

Section 100.110 indicates the general prohibition against discrimination in the availability of, or in the terms or conditions imposed in, any residential real estate-related transaction because of race, color, religion, sex, handicap, familial status, or national origin. The prohibitions against discrimination in Subpart C apply to any person or other entity whose business includes engaging in residential real estate-related transactions.

Several commenters recommended that the statement of general prohibition against discrimination in residential real-estate related transactions incorporate by reference, into the Fair Housing Act regulations, the regulatory implementation of the Equal Credit Opportunity Act by Federal financial regulatory agencies.

The Equal Credit Opportunity Act (15 U.S.C. 1691) makes it unlawful, in part, to discriminate against persons on the basis of race, color, religion, sex, national origin, marital status or age in any aspect related to a credit transaction.

The Equal Credit Opportunity Act provides for administrative enforcement by specified Federal financial regulatory agencies and empowers the Federal Trade Commission to provide for overall enforcement of the Act.

HUD has no enforcement authority under the Equal Credit Opportunity Act and no enforcement responsibility with respect to implementing regulations published by the Federal financial regulatory agencies under the Equal Credit Opportunity Act. As a result, the inclusion of such regulations in this section by reference would have no legal effect. This comment has been rejected.

*Section 100.115 Residential real estate-related transactions.*

This section incorporates into Part 100 the definition of the term "residential real estate-related transaction" contained in section 6(c) of the Fair Housing Amendments Act of 1988.

*Section 100.120 Discrimination in the making of loans and in the provision of other financial assistance.*

Section 100.120 states that it is unlawful for a person or entity engaged in residential real estate-related transactions to discriminate against persons because of race, color, religion sex, handicap, familial status, or national origin in making available loans or other financial assistance relating to dwellings. The prohibitions against discrimination in the making of loans and in the provision of other financial assistance reflects the language relating to discrimination in the financing of housing under Title VIII of the Civil Rights Act of 1968.

In connection with the development of § 100.120, the Department has been guided by its experience in connection with the past administration and enforcement of Title VIII. Since the definition of the term "residential real estate-related transactions" covers loans and other financial assistance which are secured by residential real estate, the definition expands the types of financing transactions which were previously covered by the nondiscrimination requirements of Title VIII. However, there is nothing in the legislative history of the Fair Housing Amendments Act of 1988 to indicate that the Congress intended that loans and other assistance secured by a dwelling be treated any differently than loans for the purchase, construction, improvement, repair, or maintenance of a dwelling. Thus, this section applies equally to both types of loans.

As discussed earlier in this preamble, the illustrations of the application of this section that were contained in § 100.120(b)(1), (3), (4), (5), (6), and (7) of the proposed rule have been removed, pending Congressional action on the issue of pro-integration activities.

*Section 100.125 Discrimination in the purchasing of loans.*

The principal change in the nature of the conduct made unlawful regarding loans and other assistance with respect to dwellings is the inclusion of loans relating to the purchase of such loans. In prohibiting discrimination in the purchasing of loans, Congress extended the coverage of the Fair Housing Act to conduct in the secondary mortgage

market. However, the House Report on the Fair Housing Amendments Act of 1988 states, with regard to this expanded coverage, "The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity (including requirements of Federal law) which relate to the financial security of the transaction or the protection against default or diminution in the value of the property." House Report at 30.

Section 100.125 sets forth the new coverage of secondary mortgage market activities under the Fair Housing Act. Since the protections provided under this section are new, the illustrations of discriminatory housing practices in this section focus on general areas of unlawful conduct under the Act. In this respect, the illustrations indicate that conduct made unlawful with regard to secondary mortgage market activities includes actions taken with respect to the purchase and pooling of mortgage loans as well as with respect to the terms and conditions of the sale of securities issued on the basis of such loans.

Commenters on this section were in general agreement with the overall content of the provisions in the proposed rule but recommended that certain language in the House Report, which they pointed out was also used by Senator Kennedy in a colloquy with Senator Sasser on the floor of the Senate, see 134 Cong. Rec. S10549 (daily ed. Aug. 2, 1988), be included in the text of the rule. Since there is a clear indication of congressional intent with respect to transactions involving the purchasing of loans, language relating to factors justified by business necessity have been added. Thus, this provision would not preclude considerations employed in normal and prudent transactions provided that no such factor may in any way relate to race, color, religion, sex, handicap, familial status or national origin.

One commenter representing mortgage bankers indicated that the term "purchasing" of housing loans in the mortgage banking business could involve a number of different and unrelated types of activities. This commenter described mortgage loan activities engaged in by mortgage bankers as involving the originating, selling and servicing of mortgages. This commenter pointed out that, in mortgage banking, the term "purchasing" has been used loosely to describe the purchase of rights to service mortgages. In this process, the equitable interest in the loan remains unaffected but the legal

title to the loan and the right to service the loan and retain servicing fees has been purchased. Based on this description, the commenter indicated its belief that such transactions would be outside the coverage of the Fair Housing Act because such transactions did not involve any financing decision by the purchaser (since the loan had been closed prior to the purchase of servicing rights) and suggested that the final rule define the term "purchase" in a manner to exclude such transactions from the Fair Housing Act.

Section 805 of the Civil Rights Act of 1968 made it unlawful "to deny a loan or other financial assistance to a person applying therefor * * * or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance * * *"

In amending this section of the Fair Housing Act, Congress revised the thrust of the prohibitions covered under Section 805 to protect persons from discrimination in residential real estate-related transactions which were defined to include "the purchasing of loans * * * secured by residential real estate."

Under the Fair Housing Act, the nature of discriminatory conduct no longer can be limited to matters relating to the actual provision of financing. Further, the fact that the interest transferred in the servicing transaction involves only the legal title to the loans would not be a basis for concluding that there has not been a residential real estate-related transaction. For these reasons the recommendation in the comment has not been adopted in the final rule.

*Section 100.130 Discrimination in the terms and conditions for making available loans or other financial assistance.*

Section 100.130 states that it is unlawful to impose different terms or conditions for the availability of a loan or other financial assistance for a dwelling or which is, or will be secured by a dwelling because of race, color, religion, sex, handicap, familial status, or national origin.

As discussed earlier in the preamble, the illustrations proposed in § 100.130(b) (1) and (4) have been removed from the final rule in order to avoid anticipating the results of ongoing congressional analysis of issues relating to pro-integrative programs. Other illustrations and the general provision regarding discriminatory conduct under this section were not the subject of significant comment and have been retained in the final rule.

A substantial number of commenters had significant concerns relating to the issue of "redlining" as it was discussed in the preamble to the proposed rule. Much of the concern relating to this discussion focused on the statement that financial transactions in many cases involve "legitimate business judgments and complex financial, economic and social issues and problems". Many of the commenters asserted that this statement could be read to indicate that proof of actual intent to discriminate would be required in order to establish unlawful redlining under the Fair Housing Act. Other commenters indicated that the quoted language could be read as creating other considerations beyond those necessary in the business of making a decision on a loan (i.e., economic and social issues and problems) which have not been traditionally evaluated in the investigation of fair housing complaints and which are not relevant to the making of loans.

The Department agrees with the commenters that economic and social issues and problems are not relevant in connection with the review and analysis of cases under the Fair Housing Act. However, the Department does not believe that the reference to legitimate business judgments implies that proof of intent to discriminate is or is not required in redlining cases. The language in the preamble was intended to indicate that, in the decision to provide loans or other financial assistance, a lender may consider factors justified by business necessity, provided that such factors are unrelated to race, color, religion, sex, handicap, familial status, or national origin. This articulation is consistent with the preamble discussion relating to the purchasing of loans and the revised text of § 100.125 of the final rule.

Several commenters urged that the prohibition against redlining be included in the rule text. However, in view of the removal of the illustrations in § 100.130(1) (b) and (4), the Department has determined that it would not be appropriate to add such an illustration.

*Section 100.135 Unlawful practices in the selling, brokering, or appraising of residential real property.*

The prohibitions against discrimination because of race, color, religion, sex, handicap, familial status, or national origin in connection with residential real estate-related transactions apply to the selling, brokering and appraising of residential real property. Section 100.135(a) of the proposed rule stated that it is unlawful for any person whose business includes

engaging in the selling, brokering or appraising of residential real property to discriminate against any person in making available such services, or in the terms or conditions of such services, because of race, color, religion, sex, handicap, familial status, or national origin. Paragraph (a) of the final rule has been revised for the sake of clarity. It states that it is unlawful for any person or other entity whose business includes engaging in the selling, brokering or appraising of residential real property to discriminate against any person in making available such services or in the performance of such services because of race, color, religion, sex, handicap, familial status or national origin.

For the purpose of this rule, the term "appraisal" means an estimate or opinion of the value of a specified residential real property made in a commercial context in connection with the sale, rental, financing or refinancing of a dwelling or with any other residential real estate-related transaction, whether the appraisal is oral or written, or transmitted formally or informally.

The Fair Housing Act provides a specific exemption related to appraisals, stating that nothing in the Act prohibits a person in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, sex, handicap, familial status, or national origin. However, the Department indicated in the preamble to the proposed rule its position that consideration of any factor because of race, color, religion, sex, handicap, familial status, or national origin *does* constitute a discriminatory housing practice.

Two professional organizations representing appraisers agreed with the description of the coverage of appraisal practices but suggested that the language used in the illustrations could be read as precluding, in certain instances, the use of observable, verifiable data that affect the market value of property in a particular area, such as the proximity of certain facilities or services. In this respect, they suggested that the illustrations in this section should be revised to reflect more clearly the fact that appraisers can consider any factors other than race, color, religion, sex, handicap, familial status, or national origin in the appraisal of residential real property.

The illustrations in § 100.135(d) (1), (2), and (3) have been removed in the final rule, pending the result of congressional action with respect to the issue of pro-integrative activities, and since the regulation incorporates the

statutory language on the use of other factors. In addition, paragraph (d) has been shortened and revised so that it will not inadvertently prohibit appraisers from considering factors which may lawfully be considered. Paragraph (d) of the final rule states that practices which are unlawful under §100.135 include, but are not limited to, using an appraisal of residential real property in connection with the sale, rental, or financing of any dwelling where the person knows or reasonably should know that the appraisal improperly takes into consideration race, color, religion, sex, handicap, familial status or national origin. The word "improperly" was added so that it will be absolutely clear that an appraisal may, for example, consider an adaptable physical environment as a positive factor in estimating the value of residential real property. However, the Department wishes to stress that it would not be proper or lawful, for example, to consider factors such as race, sex or national origin in appraising residential real property.

These commenters also indicated that the use of the term "commercial context" in §100.135(b) would lead to confusion within the appraisal industry as to the type of structures to which the nondiscrimination requirements in the Fair Housing Act apply.

The use of the term "commercial context" in the regulation was intended to indicate that the situations covered were directly related to conduct of the business of appraising and were not intended to diminish the rights of persons with respect to their private rights under the First Amendment. To avoid the possibility of confusion in this area, the word "business" has been substituted for "commercial" in this section.

## Subpart D—Prohibitions Against Discrimination Because of Handicap

### Section 100.200 Purpose.

Section 100.200 is unchanged from the proposed rule. It explains that the purpose of Subpart D is to effectuate the provisions concerning handicap in the Fair Housing Amendments Act of 1988. No comments were received on § 100.200.

### Section 100.201 Definitions.

Section 100.201 proposed definitions to be used for terms used only in Subpart D. The definitions in Subpart A also apply to Subpart D. Substantial comments were received on the definitions in the proposed rule that are discussed below. The other definitions have not been modified.

An editorial change has been made to the final definition of "accessible". The proposed rule stated that a public or common use area that complies with the appropriate requirements of ANSI A117.1 or another standard that affords handicapped persons access essentially equivalent to or greater than that required by ANSI A117.1 is "accessible". The final rule states more simply that a public or common use area that complies with the appropriate requirements of ANSI A117.1–1986 or a comparable standard is "accessible". The final sentence of the definitions of "accessible route" and "building entrance on an accessible route" have also been changed for the sake of consistency.

"ANSI A117.1" means the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people. The American National Standards Institute, Inc. (ANSI) is a private, national organization that publishes standards on a wide variety of subjects. The Secretariat that developed the 1986 edition of the ANSI standard was composed of the National Easter Seal Society, the President's Committee on Employment of the Handicapped, and HUD. The current version of these standards was published in 1986 and is referred to as "ANSI A117.1–1986".

The preamble of the proposed rule explained that whenever ANSI A117.1 is used in Subpart D, the reference is to the most recently published edition of ANSI A117.1 as of the date bids for construction of a particular building are solicited. A number of commenters suggested that this statement should appear in the text of the regulation. Other commenters objected that an "open-ended" reference to future ANSI standards represents an unlawful delegation of the Department's rulemaking authority. According to these commenters, HUD should refer to a specific edition of the AMSI standards in its rule and should incorporate future editions only through rulemaking proceedings. Because of this concern the definition of ANSI A117.1 in the final rule is defined as the 1986 edition of ANSI ("ANSI A117.1–1986."). The Department intends to propose to amend the definition of ANSI as future editions of ANSI are published.

"Building" means a structure, facility or the portion thereof that contains or serves one or more dwelling units. For example, a structure that serves one or more dwelling units includes a structure containing recreational facilities for residents of an apartment complex. A substantial number of comments were received on this definition as it applies

to townhouses. The application of Subpart D to townhouses is discussed in connection with the definition of the term "covered multifamily dwellings". The definition of "building" has not been changed from the proposed rule.

"Common use areas" means rooms, spaces or elements inside or outside a building that are made available for the use of residents of a building or the guests thereof. The proposed rule cited as examples of common areas hallways, lounges, lobbies, laundry rooms, refuse rooms and passageways among and between buildings. A number of commenters suggested that mailrooms and recreational areas be added to this list. Other commenters, including the National Apartment Association, argued that the definition should not include "public amenities" such as swimming pools, jacuzzis, hot tubs, saunas or exercise facilities. They suggest that the legislative history is silent with respect to such facilities.

The definition of common use areas in the rule is a close adaptation of the definition of the term "common use" in ANSI A117.1–1986. Since the Act makes specific reference to ANSI, the Department believes that Congress intended that the ANSI definition apply. Furthermore, the House Report states that the Act's requirement that the public and common use portions of covered multifamily dwellings be readily accessible to and usable by handicapped persons "means that hallways, lounges, lobbies, passageways among and between buildings and other common areas *and facilities* not contain barriers to entrance and use by handicapped persons." House Report at 26 (emphasis supplied). Mailrooms and recreational areas can fairly be read as falling within this description. Therefore, these two additional examples have been added to the list of common use areas because they fall within the definition. The list in the final rule is illustrative and not exclusive. In this regard, the Department notes that the House Report states that the Act does not require that all entrances to public and common use areas be made accessible to handicapped persons. Rather, the Act requires that "one regular entrance to such areas be accessible to handicapped persons for the same purpose for which it is used by others." *Id.* Further, the Act does not require that amenities be installed. "The intent of the language is that only if such amenities are provided, then they must be readily accessible to and usable by handicapped persons." *Id.*

A "covered multifamily dwelling" means buildings consisting of 4 or more

dwelling units if such buildings have one or more elevators; and ground floor dwelling units in other buildings consisting of 4 or more dwelling units. The preamble of the proposed rule explained that a single structure consisting of 5 two-story townhouses is not a "covered multifamily dwelling" if the units do not have elevators, because the entire dwelling unit is not on the ground floor. In contrast, a single-story townhouse is a covered multifamily dwelling. A number of commenters agreed with this interpretation; some reasoned that townhouses are not multifamily buildings because each unit typically has a separate outside entrance.

Other commenters objected to this interpretation, arguing that townhouses are covered because Congress intended that there be a broad interpretation of the Act. They believe that Congress intended to exempt otherwise covered dwellings from accessibility requirements only if *no* part of the dwelling unit touched the ground floor. These commenters cited in support of their position a statement made by Senator Kennedy during the Senate debate on the Act, in which he referred to the need to make the ground floor of multi-level housing accessible so that friends and relatives with mobility impairments can visit. Specifically, Senator Kennedy stated as follows: "This legislation does not affect the single-family home. What we are talking about is the multifamily dwelling with four or more units. You only have to meet these very simple [accessibility] requirements if you actually have an elevator, or, if you do not have an elevator, only the bottom floor *unit is* covered." 134 Cong. Rec. S. 10538 (daily ed. August 2, 1988) (emphasis added). Senator Kennedy's later reference to the importance of making units accessible so that friends and relatives can visit was in response to Senator Humphrey's proposal to limit the scope of the Act's accessibility requirements to 20 percent of the units. *Id.* The Department believes that the Senate debate referenced by these commenters supports its interpretation because Senator Kennedy spoke of "bottom floor units." The first floor of a multi-story townhouse is not a bottom floor unit because the entire unit is not on the bottom or ground floor.

Most significantly, the accessibility requirements of the Act itself extend only to "ground floor units" in buildings without elevators. The commenters' position would require reading "ground floor units" as "ground floor *portions of* units." The Act also requires that all premises within covered multifamily

dwellings have an accessible route into and through the dwelling. A "covered" townhouse of more than one story would in most cases require an elevator in order to provide an accessible route throughout. This result would make the Act's distinction between buildings with elevators and buildings without elevators meaningless. Beyond this, the House Report (at p. 25) makes it clear that the Act was not intended to require the installation of elevators.

For these reasons the Department continues to believe that townhouses consisting of more than one story are covered only if they have elevators and if there are four or more such townhouses. Accordingly, the definition of "covered multifamily dwellings" in the final rule is unchanged from the proposed rule.

"Dwelling unit" was defined in the proposed rule as "any building, structure or portion thereof, which is occupied as, or designed or intended for occupancy as, a residence by one person or family." 53 FR 45029 (November 7, 1988). A significant number of comments, including comments submitted by Senators Kennedy and Specter and Representative Edwards, were concerned that the phrase "one person or family" would be too restrictive in that individuals with handicaps may require a personal attendant to live with them, or may find it beneficial to live with another individual, who is or is not also handicapped. For example, an individual with a disability may live with an attendant who is not a member of his or her family. Other commenters were concerned that the definition of "dwelling unit" is too similar to the definition of "dwelling" in § 100.20. They found the similarity confusing. In order to accommodate these concerns the definition of "dwelling unit" has been revised substantially in the final rule. The final rule defines "dwelling unit" as "a single unit of residence for a family or one or more persons." The definition in the final rule also contains a more comprehensive list of examples of dwelling units in order to further clarify the types of units that may be covered. Examples of dwelling units include a single family home and an apartment unit within an apartment building. In other types of dwellings (as defined in § 100.20) in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep are "dwelling units". For example, dormitory rooms and sleeping accommodations intended for

occupancy as a residence in shelters for homeless persons are "dwelling units".

"First occupancy" means a building that has never before been used for any purpose. This definition is unchanged from the proposed rule. A number of commenters stated that HUD should state explicitly that substantial rehabilitation is not covered. The Department believes that the definition clearly excludes a substantially rehabilitated building because one could not reasonably argue that such a building "has never before been used for any purpose."

"Ground floor" means any floor of a building with a building entrance on an accessible route. A building may have more than one ground floor. This definition was the subject of considerable public comment. Many commenters interpreted the proposed rule as *requiring* that covered buildings have more than one ground floor. This is not what the Department proposed. Section 100.205(a) requires that covered multifamily dwellings for first occupancy after March 13, 1991, be designed and constructed to have *at least one* building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. The regulation does not require that any building have *more* than one ground floor; a covered building with one building entrance on an accessible route (*i.e.*, ground floor) satisfies the requirements of the regulation with regard to accessibility to the building. However, if a covered building in fact has more than one floor with a building entrance on an accessible route, then the rule requires that the units on *each* floor with an accessible building entrance satisfy the Act's accessibility requirements.

Other commenters correctly interpreted the proposed rule as requiring that there be one building entrance on an accessible route but nonetheless argued that *even if* a particular building, because of the terrain, has accessible entrances to more than one floor, the units on only one such floor should be required to meet the Act's accessibility requirements. The Department does not believe that Congress intended to exempt from the Act's accessibility requirements dwelling units that are on a floor of a building that can be entered through a building entrance on an accessible route. If a building does not have an elevator, then all of the units on accessible floors must meet the Act's accessibility requirements.

*Definition of "Handicap".* The term "handicap" means, with respect to a person, a physical or mental impairment which substantially limits one or more of such person's major life activities; a record of having such an impairment; or being regarded as having such an impairment. However, this term does not include current, illegal use of or addiction to a controlled substance. The term also does not include an individual solely because that individual is a transvestite. Paragraphs (a), (b), (c) and (d) of the definition clarify the key phrases in the definition: "physical or mental impairment"; "major life activities"; "has a record of such an impairment"; and "is regarded as having an impairment".

A substantial number of comments were received on the definition of "handicap" in the proposed rule. They fall generally into two different groups.

One group of commenters, including the National Association of Homebuilders and the National Association of Realtors, requested that paragraphs (a), (b), (c) and (d) of the definition in the proposed rule be deleted. These commenters are concerned that these paragraphs broaden the definition of handicap "far beyond" the intent of Congress as expressed in the plain language of the statute. Moreover, they are concerned that the definition of handicap is so broad that housing providers will be powerless to exclude handicapped persons with a tendency toward antisocial or dangerous behavior.

With the exception of current, illegal use of or an addiction to a controlled substance, the definition of "handicap" in the Act is very similar to the definition of the term "individual with handicaps" in the Rehabilitation Act of 1973. 29 U.S.C. 706. Congress intended that the definition of "handicap" in the Fair Housing Amendments Act be interpreted in a manner that is consistent with regulations interpreting the meaning of the similar provision found in section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794. House Report at 22; 134 Cong. Rec. S10492 (daily ed. August 1, 1988) (statement of Sen. Chafee); 134 Cong. Rec. H4689 (daily ed. June 23, 1988) (statement of Rep. Pelosi); 134 Cong. Rec. H4612 (daily ed. June 22, 1988) (statement of Rep. Schroeder).

Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified individuals with handicaps in programs or activities receiving federal financial assistance as well as in federally conducted programs and activities. The Department of Justice's section 504 coordination regulation for federally assisted programs is at 28 CFR Part 41. HUD's section 504 regulation for federally assisted programs is at 24 CFR Part 8. Paragraphs (a), (b), (c) and (d) of the definition of "handicap" closely follow the definitions of these key phrases used in regulations interpreting section 504. In light of the clear legislative history indicating that Congress intended that the definition of "handicap" be fully as broad as that provided by the Rehabilitation Act, the Department does not believe that it would be appropriate to delete paragraphs (a), (b), (c) and (d) from the definition.

Some of the commenters who requested this change appear erroneously to assume that a housing provider must admit any person who has a handicap as defined in the rule. This is not the case. Just because an applicant for housing has a handicap does not preclude a housing provider from lawfully rejecting that particular applicant. For example, alcoholism is considered a "physical or mental impairment" and therefore alcoholics frequently will fall within the definition of "handicap". However, the fact that alcoholism may be a handicap does not mean that housing providers must ignore this condition in determining whether an applicant for housing is qualified. On the contrary, a housing provider may hold an alcoholic to the same standard of performance and behavior (*e.g.*, tenant selection criteria) to which it holds others, even if any unsatisfactory performance or behavior is related to the applicant's alcoholism. In other words, while an alcoholic may not be rejected by a housing provider because of his or her alcoholism, the behavioral manifestations of the condition may be taken into consideration in determining whether or not he or she is qualified.

Thus, a housing provider may judge handicapped persons on the same basis it judges all other applicants and residents. A housing provider may consider for *all* applicants, including handicapped applicants, such concerns as past rental history, violations of rules and laws, a history of disruptive, abusive, or dangerous behavior. However, a housing provider may not treat handicapped applicants or tenants less favorably than other applicants or tenants. For example, a housing provider may not presume that applicants with handicaps are less likely to be qualified than applicants without handicaps.

Another group of commenters asked HUD to clarify that persons who are infected with the Human Immunodeficiency Virus ("HIV" or "AIDS virus") are understood to be persons with a "handicap" protected by the Act. The legislative history of the Act contains numerous statements that HIV-infected individuals are covered by the Act. *See* House Report at 22, n. 55; 134 Cong. Rec. H4922 (daily ed. June 29, 1988) (statement of Rep. Owens); 134 Cong. Rec. at H4221 (daily ed. June 29, 1988) (statement of Rep. Waxman); 134 Cong. Rec. H4612 (daily ed. June 22, 1988) (statement of Rep. Schroeder); 134 Cong. Rec. H4613 (daily ed. June 22, 1988) (statement of Rep. Coelho); 134 Cong. Rec. H4689 (daily ed. June 23, 1988) (statement of Rep. Pelosi). In addition, the Office of Legal Counsel of the U.S. Department of Justice issued an opinion dated September 17, 1988 concluding that section 504 of the Rehabilitation Act of 1973 protects symptomatic and asymptomatic HIV-infected individuals against discrimination in any covered program or activity on the basis of any actual, past or perceived effect of HIV infection that substantially limits any major life activity, so long as the HIV-infected individual is "otherwise qualified" to participate in the program or activity, as determined under the "otherwise qualified" standard set forth by the U.S. Supreme Court in *School Board of Nassau County v. Arline,* 107 S. Ct. 1123 (1987) (*Arline*). This opinion is significant because, as previously noted, the legislative history of the Fair Housing Amendments Act makes it clear that Congress intended the same definition of the term handicap that applies under section 504 to apply to the Fair Housing Act. In light of these authorities, the Department has added "Human Immunodeficiency Virus infection" to the illustrative list of "physical or mental impairments" in the final rule's definition of handicap.

"Interior" means the spaces, parts, components or elements of an individual dwelling unit. The comments received relative to this definition are discussed in connection with comments received on § 100.203 of the proposed rule relating to modifications of existing premises. The definition of "interior" has not been changed from the proposed rule.

"Premises" means the interior or exterior spaces, parts, components or elements of a building or a dwelling unit, including individual dwelling units and the public and common use areas of a building. The comments received relative to this definition are discussed in connection with the comments received on § 100.203 of the proposed rule relating to modifications of existing premises. The definition has not been changed from the proposed rule.

*Section 100.202 General prohibitions against discrimination because of handicap.*

Section 100.202 contains the general prohibitions against discrimination because of handicap and serves as the analytical foundation for the remaining sections of the subpart. The remaining sections of Subpart D explain in greater detail what conduct is discriminatory. Thus, whenever a person has violated any of the subsequent sections of Subpart D, that person has also violated § 100.202

Paragraph (a) is unchanged from the proposed rule. It restates the Fair Housing Amendments Act's mandate of nondiscrimination in the sale or rental of dwellings. Under paragraph (a), it is unlawful to discriminate against any person in the sale or rental of, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, a person residing in or intending to reside in that dwelling after it is so sold, rented, or made unavailable, or any person associated with that buyer or renter.

Paragraph (b) is also unchanged from the proposed rule. It restates that Act's ban of discrimination in the terms, conditions, or privileges of the sale or rental of a dwelling. Paragraph (b) makes it unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of that buyer or renter, a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available, or any person associated with that person.

*Land Use and Zoning Rules and Practices.* The thrust of the public comments received on the general prohibitions in paragraphs (a) and (b) is that the rule does not address explicitly discriminatory local land use, health and safety, and zoning rules that "eliminate" community housing opportunities for persons with disabilities. These commenters ask that the Department add to the regulation a prohibition on rules and practices which establish unique requirements for housing for persons with disabilities and which create barriers to the development of such housing. These commenters correctly point out that the House Report discusses such matters in considerable detail. Specifically, the House Report states that the prohibition against discrimination against those with handicaps was intended to apply to zoning decisions and practices: "The

Act is intended to prohibit the application of special restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." House Report at 24.

The Department does not believe that it would be appropriate to address the issue in these regulations. This concern is heightened since, under section 810(g)(2)(C) of the Fair Housing Act, as amended, if the Secretary determines that a matter involves the legality of any State or local zoning or other land use law or ordinance, the Secretary shall immediately refer the matter to the Attorney General for appropriate action under section 814 of the Fair Housing Act. Since the Secretary has no power to issue a charge of discrimination in matters involving zoning or other land use law, the Department believes that it is inappropriate to address this specific issue in these regulations. However, it should be noted that failing or refusing to provide municipal services for dwellings or providing such services differently because of race, color, religion, sex, handicap, familial status or national origin is a violation of § 100.70(c)(6) of these regulations.

*Applicant Selection Inquiries.* Paragraph (c) is an adaptation of the "pre-employment inquiries" provision in the section 504 regulations; it prohibits inquiries to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is sold, rented or made available, or any person associated with that person has a handicap or to make inquiry as to the nature or severity of a handicap of such person.

Paragraph (c) also states that it does not prohibit five types of inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps. Paragraph (c) resulted in considerable public comment.

Paragraph (c)(1) clarifies that a housing provider may inquire into an applicant's ability to meet the requirements of ownership or tenancy. Commenters generally considered this particular inquiry helpful in providing guidance to both housing providers and housing applicants.

Paragraph (c)(2) states that paragraph (c) does not prohibit inquiry to determine whether an applicant is qualified for a dwelling that is available only to persons with handicaps or to persons with a particular type of handicap. Paragraph (c)(3) provides that paragraph (c) does not prohibit an inquiry to determine whether an applicant for a dwelling is qualified for a

priority available to persons with handicaps or to persons with a particular type of handicap. These two inquiries where criticized by organizations representing persons with disabilities, including the Consortium for Citizens with Developmental Disabilities. These commenters fear that such inquiries will be abused by housing providers as a means of impermissibly inquiring about the extent or severity of a disability. Nonetheless, some of these commenters recognized that the ability to make these inquiries often is necessary to determine eligibility for government housing programs; for example, some Federal and State housing is designed for, and occupied by, persons with handicaps. Only persons with handicaps are eligible to live in such dwellings. Beyond this, as the Department explained in the proposed rule, the Fair Housing Amendments Act does not prohibit the exclusion of non-handicapped persons from dwellings. A privately owned unsubsidized housing facility may lawfully restrict occupancy to persons with handicaps. The owner or operator of such a housing facility must therefore be permitted to inquire of applicants to determine whether they have a handicap for the purpose of determining eligibility.

A housing provider may also choose to offer some or all of its units to persons with handicaps on a priority basis and may inquire whether applicants qualify for such a priority. For example, a housing provider may offer accessible units to persons with mobility impairments on a priority basis and may ask applicants whether they have a mobility impairment which would qualify them for such a priority but may not in such circumstances ask applicants whether they have other types of impairments.

After carefully considering the comments received the Department continues to believe that the inquiries permitted by paragraphs (c) (2) and (3) are consistent with the Act and that the benefits of permitting these inquiries outweigh the potential for abuse, because the circumstances in which such inquiries can be made are carefully circumscribed. A dwelling must either be available only to persons with handicaps or to persons with a particular type of handicap or the dwelling must genuinely be available on a priority basis to persons with a handicap or to persons with a particular type of handicap. Otherwise, such an inquiry cannot be made.

Paragraph (c)(4) provides that paragraph (c) does not prohibit inquiring

whether an applicant for a dwelling is a current illegal abuser of or addict to a controlled substance. The definition of "handicap" in the Fair Housing Amendments Act does not include current, illegal use of or addiction to a controlled substance. *See* House Report at 30. Paragraph (c)(4) was not the subject of substantial comment and is unchanged from the proposed rule.

Paragraph (c)(5) provides that paragraph (c) does not prohibit inquiring whether an applicant has been convicted of the illegal manufacture or distribution of a controlled substance. Section 807(b)(4) of the Fair Housing Act states that nothing in the Act prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance. Paragraph (c)(5) was not the subject of substantial comment and is unchanged from the proposed rule.

Paragraph (d) restates new section 804(f)(9) of the Fair Housing Act which provides that nothing in section 804(f) requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others. This paragraph was criticized by organizations representing disabled persons because it simply repeats the statutory language and provides no guidance concerning its proper implementation. Furthermore, the placement of the language contained in paragraph (d) was questioned, in that it follows a list of questions that housing providers are permitted to ask to determine the qualifications of applicants. These commenters fear that the absence of any detail beyond the statutory language might suggest that a housing provider need not follow any objective method for determining that an applicant "would constitute a direct threat to the health or safety of other individuals." At the same time, these commenters recognized that the preamble of the proposed rule contained considerable explanation of paragraph (d). 53 FR 45001–02 (November 7, 1988). The preamble discussion was considered by these commenters to be consistent with the intent of the statute. A number of commenters suggested that the preamble language be incorporated in the rule.

On the other hand, organizations representing housing providers are concerned that property owners or managers will not be able to determine whether or not an applicant poses a threat to the safety of others without substantial amounts of information and that they ultimately will be subject to increased liability. They ask that the regulations be revised expressly to permit a property owner or manager to inquire into a prospective tenant's "history of antisocial behavior or tendencies." Alternatively, it was suggested that HUD promulgate a regulation that absolves a property owner or manager of liability for any injury caused by reason of a condition of a person with a handicap.

The Department does not believe that it is necessary or appropriate to incorporate detailed preamble language discussing the Supreme Court decision in *School Board of Nassau County v. Arline*, 107 S Ct. 1123 (1987), into the regulation. This is especially true since the case law in this area continues to develop at a relatively rapid pace. However, the Department wishes to stress that it will interpret and enforce paragraph (d) consistent with the discussion in the preamble of the proposed rule and envolving case law.

The Department also does not believe that it would be appropriate to revise § 100.202 expressly to permit inquiries into "antisocial" behavior or "tendencies." Language such as this might well be seen as creating or permitting a presumption that individuals with handicaps generally pose a greater threat to the health or safety of others than do individuals without handicaps. Such a presumption is unwarranted and would run counter to the intent and purpose of the Act. House Report at 28. Likewise, a regulatory provision stating that housing providers shall not be liable for personal injury or property damages caused by reason of another person's handicap could also be seen as creating a presumption that persons with handicaps are more likely to pose a threat to persons or property that are other persons and would run counter to the intent of the Act, since Congress made no such presumption. For example, the House Committee on the Judiciary stated that it did not "foresee that the tenancy of any individual with handicaps would pose any risk, much less a significant risk, to the health or safety of others by the status of being handicapped * * *." *Id.*

For these reasons, § 100.202 is unchanged from the proposed rule.

*Section 100.203   Reasonable modifications of existing premises.*

Paragraph (a) implements section 804(f)(3)(A) of the Fair Housing Act, as amended. Under paragraph (a), it is illegal to refuse to permit a tenant with disabilities to make reasonable modifications, at his or her expense, of existing premises if the proposed modifications are necessary for the full enjoyment of the premises. In the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

Paragraph (a) allows reasonable modifications at the expense of the individual with handicaps to existing "premises". "Premises" is defined in § 100.201 to mean the interior or exterior parts, components or elements of a building or a dwelling unit, including the public and common use areas of a building. Thus, an individual with handicaps would be able, at his or her own expense, to make reasonable accommodations to lobbies, main entrances of apartment buildings, laundry rooms and other common and public use areas necessary to the full enjoyment of the premises. The Department proposed to define the term "premises" to encompass the public and common use areas because it appears that this is what Congress intended. The Act allows reasonable modifications of "existing premises" if necessary to afford the handicapped person full enjoyment of the premises. If the laundry room is not accessible, for example, a person with a mobility impairment will not have "full enjoyment" of the premises. "interior" is defined as the spaces, parts, components or elements of an individual dwelling unit.

*Restoration of Modifications to Public and Common Use Areas.* The Department specifically invited public comment on the definitions of the terms "premises" and "interior", especially in light of the fact that section 15 of the Fair Housing Amendments Act provides that, in the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter agreeing to restore the *interior* of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

Many of the comments received on this question were in agreement with the Department's definitions of these terms. For example, the American Institute of Architects stated that since the types of modifications made to the public and common use areas of a building's interior are on the order of those made to the exterior of the building, it would not be reasonable for the landlord to require the tenant to restore such

modifications to the preexisting condition.

Other commenters argued that public and common use areas should not be excluded from the restoration requirement, suggesting that the interpretation proposed by the Department will have the effect of forcing owners to take a narrow view of what constitutes a reasonable modification of a public or common use area.

After careful consideration, the Department continues to believe that the proposed rule's treatment of these issues is faithful to the statute. As the Department stated in the preamble of the proposed rule, reasonable modifications to public and common use areas will not detract significantly from the public and common use areas modified, and may be of benefit to other persons with and without handicaps.

Some commenters complained that the proposed rule did not discuss how a landlord's responsibilities under § 100.204 to make reasonable accommodations mesh with § 100.203. These commenters note that § 100.204 applies to services, and interpreted the proposed rule as assuming, for example, that if a laundry room is inaccessible, the only option open to the tenant is to pay for physical modifications necessary to make the room accessible. One commenter requested that the Department clarify that if the tenant chooses to ask a friend to do his or her laundry in the laundry room, the landlord must accommodate this situation by waiving any rule that prohibits non-tenants from gaining access to the laundry room. The Department agrees that this is the sort of accommodation required by § 100.204.

*"Security Deposits."* The final sentence of paragraph (a) of the proposed rule stated that a landlord may not increase for handicapped persons any customarily required security deposit for the purpose of securing payment for modifications. The Department invited public comment on this question as well, 53 FR 45003 (November 7, 1988), and received substantial comments on both sides of this issue.

A number of commenters stated their belief that a prohibition on an increased security deposit for handicapped persons who make modifications at their own expense is required by the Fair Housing Act. They point out that section 804(f)(2) of the Act makes it unlawful to discriminate in the terms, conditions, or privileges of the rental of a dwelling because of handicap and state that such deposits should not be necessary and would create an undue burden on persons with handicaps not intended by the Act.

On the other side of this issue, commenters speaking from the standpoint of housing providers urged the Department to provide that a landlord may require a reasonable additional security deposit to secure a renter's agreement to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted. These commenters point out that such a deposit is particularly necessary in case of the occupant's death, or abandonment of the unit without any notice. The National Association of Homebuilders stated that it is standard practice to require additional security deposits as a condition of a housing provider's granting permission for modifications to be made to a dwelling unit. These commenters argue that deposits are necessary so that all tenants, handicapped and non-handicapped alike, are treated equally and fairly.

Upon further consideration of this question, the Department has come to the view that this is not truly a question relating to a traditional security deposit. Security deposits are generally paid at the time a tenant moves in. A tenant with handicaps may request a landlord's permission to make modifications at any time. For example, a tenant may become disabled during his or her tenancy and then ask for permission to make modifications. At this point the tenant has already paid any customarily required security deposit. Further, the Department agrees that there is no basis for requiring that handicapped persons pay a higher customarily required security deposit than is paid by non-handicapped persons. However, the Department is mindful of the financial exposure of a landlord who may be required to permit a tenant to make extensive modifications to the interior of a dwelling unit that can reasonably be expected to interfere with the landlord's or the next tenant's use and enjoyment of the premises. The Department believes that there are specific instances where it would be reasonable for a landlord to condition permission for making modifications on the tenant paying into an interest bearing escrow account a reasonable amount of money to ensure that funds will be available to pay for those restorations that the tenant is legally required to make at the end of the tenancy. Accordingly, paragraph (a) of § 100.203 has been revised to reflect this view.

The third sentence of paragraph (a) continues to state that the landlord may not increase, for handicapped persons, any customarily required security deposit. A new fourth sentence states that, where it is reasonable to do so, the landlord may negotiate as part of a restoration agreement a provision requiring that the tenant pay into an interest bearing escrow account, over a reasonable time period, a reasonable amount of money not to exceed the cost of restoring the modifications. The interest in any such account shall accrue to the benefit of the tenant.

The language added to paragraph (a) balances the interests of a handicapped person seeking to make modifications to a dwelling unit so that he or she will be able to live in the unit with the interests of the landlord in assuring that all required restorations are made at the end of the tenancy at the expense of the tenant. The new language makes it clear that escrow payments may be negotiated only where it is reasonable to do so. Thus, a landlord may not routinely require that escrow payments be made. Rather, the landlord must make a case-by-case determination based upon such factors as the extent and nature of the proposed modifications, the expected duration of the lease, the credit and tenancy history of the individual tenant, and other information that may bear on the risk to the landlord that the premises will not be restored. It can be expected that generally a tenant making extensive modifications to a unit at his or her own expense will plan to live in that unit for more than a brief period of time. Both the amount and terms of the escrow payment are subject to negotiation between the landlord and the tenant. For example, if the proposed modifications which are subject to restoration are minor and the tenant has a good credit history or otherwise can provide reasonable assurances that he or she will be able to ensure that the restorations are carried out, then it would not be reasonable for the landlord to require any payment. On the other hand, if the tenant wishes to make extensive modifications that must be restored and has only a "fair" credit history, or other factors suggest that the tenant would not be able to ensure that the restorations are carried out, then it might be reasonable for a landlord to require a payment. Of course, the landlord may not require that the total amount to be paid exceed the reasonable cost of restoring the modifications that must be restored at the end of the tenancy. The Department expects that frequently a smaller amount will suffice to protect the interests of the landlord. Furthermore, landlords may not assume that persons with handicaps are less creditworthy

than persons without handicaps. Just because the facts warrant requiring *a payment* does not mean that the landlord may reasonably require that the full restoration costs be paid before the modifications are even made.

If a person with handicaps seeking to make modifications believes that a landlord is unreasonably withholding permission to make the requested modifications or has required an unreasonable escrow payment he or she may file a complaint with HUD.

The Department wishes to stress that the Fair Housing Act does not require a tenant to restore all modifications. For example, as example (2) in paragraph (b) makes clear, if a handicapped tenant seeks a landlord's permission to widen a doorway for a wheelchair to pass, it is unlawful for the landlord to refuse to permit the applicant to make the modification. Further, the landlord may not, in usual circumstances, condition permission for the modification on the applicant paying for the doorway to be narrowed at the end of the lease because a wider doorway will not interfere with the landlord's or the next tenant's use and enjoyment of the premises. However, if a tenant seeks, for example, to lower the kitchen cabinets to a height suitable for a person in a wheelchair, the landlord may condition permission on the tenant agreeing to restore the cabinets to their original height and, if it is reasonable to do so considering the financial resources and credit-worthiness of the tenant, may seek a reasonable escrow deposit. At the end of the lease the landlord may require that the tenant restore the cabinets to their original height unless the next occupant prefers that the cabinets remain where they are. If the next occupant does not wish that the modification be restored then the landlord must promptly return the tenant's escrow deposit, if any, in full. The landlord, in such a situation, may, where it is reasonable to do so, require that the new tenant establish a new interest bearing escrow account.

Comments from housing providers also asked that the rule state that housing providers have an "absolute right" to reject any proposed modifications if they are unreasonable and that the housing provider should have the authority to select or approve the party making the modifications. These commenters point out that prior approval is necessary so that the housing provider can be assured of quality workmanship done in accordance with local building code specifications.

Paragraph (a) makes it plain that the applicant or tenant must seek the landlord's approval before making modifications. A landlord, of course, is entitled to know what the proposed modifications are as well as reasonable assurances from the tenant that any required building permits will be obtained and that the work will be performed in a workmanlike manner. In order to address these concerns the Department has added a new paragraph (b) to § 100.204. It states that a landlord may condition permission for a modification on the renter providing a reasonable description of the proposed modifications as well as reasonable assurances that the work will be performed in a workmanlike manner and that any required building permits will be obtained. The description may be oral or written depending on the extent and nature of the proposed modifications. The Department does not believe it would not be possible, as some commenters suggested, to spell out a detailed approval procedure that would be applicable in all instances. What is reasonable will vary with the extent, location and nature of the modifications a particular tenant wishes to make. Some requested modifications will be simple and the approval process in such instances should be straightforward (e.g., installation of grab bars in a bathroom that already has the requisite blocking). Other requested modifications to the interior of a unit or public or common use area will be more complex. In such instances, the landlord may withhold permission until the tenant has described in reasonable detail the modifications to be made and identified to the landlord a responsible party to perform the work in question. However, since the tenant is paying for the modification, the landlord may not specify that only one particular contractor make the modifications. The modifications may be accomplished by any party reasonably able to complete the work in a workmanlike manner.

Paragraph (c) contains two examples that illustrate the application of paragraph (a). Some commenters felt the examples in paragraph (c) (paragraph (b) of the proposed rule) "raise more questions than they answer." These examples are intended to be illustrative and not exhaustive. The Department continues to believe that the regulation is clearer with these examples than without them. Therefore, they have been retained unchanged from the proposed rule.

### Section 100.204  Reasonable accommodations.

Section 100.204 implements section 804(f)(3)(B) of the Fair Housing Act which makes it unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services if necessary to afford a person with handicaps equal opportunity to use and enjoy a dwelling. The concept of "reasonable accommodation" is also used in regulations and case law interpreting section 504 of the Rehabilitation Act of 1973. *See*, 28 CFR 41.53; 24 CFR 8.11 and 8.33; *Southeastern Community College v. Davis*, 442 U.S. 397 (1979); *Alexander v. Choate*, 469 U.S. 287 (1985).

The principal comments received on this section discuss the relationship between §§ 100.204 and 100.203 relating to reasonable modifications of existing premises. These comments were discussed in connection with § 100.203.

Paragraph (a) closely follows the statutory language and is unchanged from the proposed rule. It states that it is unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas. A number of commenters were concerned that this language could be interpreted as requiring that housing providers provide a broad range of services to persons with handicaps that the housing provider does not normally provide as part of its housing. The Department wishes to stress that a housing provider is not required to provide supportive services, *e.g.*, counseling, medical, or social services that fall outside the scope of the services that the housing provider offers to residents. A housing provider is required to make modifications in order to enable a qualified applicant with handicaps to live in the housing, but is not required to offer housing of a fundamentally different nature. The test is whether, with appropriate modifications, the applicant can live in the housing that the housing provider offers; not whether the applicant could benefit from some other type of housing that the housing provider does not offer.

Paragraph (b) illustrates the application of paragraph (a) with two examples of reasonable accommodations. No substantial comments were received on these examples and they remain as they were proposed.

### Section 100.205  Design and construction requirements.

Section 100.205 implements section 804(f)(3)(C) of the Fair Housing Act which places accessibility requirements

on "covered multifamily dwellings" designed and built for first occupancy 30 months after enactment.

The term "covered multifamily dwellings" means buildings consisting of 4 or more dwelling units if the building has one or more elevators, and "ground floor" dwelling units in other buildings consisting of 4 or more dwelling units. The ground floor is any floor of a building with a building entrance on an accessible route. A building may have more than one ground floor. A "building" is a structure, facility or the portion thereof that contains one or more dwelling units.

*Unusual Terrain or Site Characteristics.* Paragraph (a) of the proposed rule provided that "covered multifamily dwellings" for first occupancy after March 13, 1991 be designed and constructed to have at least one building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. Paragraph (a) was the subject of considerable public comment.

Some commenters objected to the portion of paragraph (a) that exempts buildings from having an accessible building entrance where it is impractical to provide such an entrance because of the terrain or unusual characteristics of the site. These commenters argue that the statute contains an "absolute" requirement that "covered multifamily dwellings" for first occupancy after March 13, 1991 be made accessible. They believe that paragraph (a) introduces an exception not found in the Act.

Other commenters did not altogether object to an "impracticality" standard but considered the standard of "impracticality" proposed by the Department to be too broad. These commenters feel that the "impracticality" standard in paragraph (a) allows designers and builders to use their own standards and claim that because it is "impractical" to do so, they need not make their buildings accessible. In the view of these commenters, this "loophole" was not intended by Congress; they suggest that HUD establish a more specific standard. Some commenters stated that, where feasible, grading be made mandatory. Other commenters urged that the "impracticality" exemption accrue to dwellings where the *only* access is stairs which are higher than 10 feet. At this point they argue it is impractical for a ramp to be built.

Representative Barney Frank of Massachusetts submitted a comment stating his belief that the word "impractical" could be more of a loophole than was intended by Congress. Mr. Frank suggested tightening the standard by modifying the word "impractical" with adverbs such as "highly" or "extremely". Mr. Frank also stressed that it ought to be made clear that only unusual physical characteristics of the site would justify the invocation of the tighter standard of impracticality he suggested.

Other commenters argued for a broader standard than the one proposed by the Department. They did not interpret the proposed standard as relating in any way to the economic impact of designing and constructing a building on a particular site to have an accessible building entrance. These commenters argued that the Department should consider the economic impact of requiring at least one building entrance on an accessible route and not only whether access is physically impractical. These commenters noted that if the cost of providing an accessible entrance is too great, the project may become economically infeasible. They pointed out that Congress was sensitive to the impact of the Act's requirements on housing affordability. For example, the Act's accessibility provisions "carefully facilitate the ability of tenants with handicaps to enjoy full use of their homes without imposing unreasonable requirements on homebuilders, landlords and non-handicapped tenants." House Report at 27. These commenters suggest that economic loss beyond a *de minimis* amount is in many cases a viable and fair determinant of the impracticality of providing an accessible entrance.

Congress did not intend to impose an absolute standard that all covered multifamily dwelling units be made accessible without regard to the impracticality of doing so. Even though the statute itself does not contain an impracticality standard the legislative history makes it clear that Congress "was sensitive to the possibility that certain natural terrain may pose unique building problems." House Report at 27. For example, the House Report explicitly recognizes that in some locales it is common to construct housing on stilts because of flooding problems. A requirement that housing on such sites have an accessible entrance on an accessible route may be tantamount to prohibiting the construction of covered multifamily housing on such sites. This is not what Congress intended. The House Report further states that the "Committee does not intend to require that the accessibility requirements of this Act override the need to protect the physical integrity of multifamily housing that may be built on such sites." *Id.*

Further, the Department does not believe that it would be appropriate to constrain designers by adopting a highly specific building accessibility standard, as suggested by some commenters. For example, some commenters suggested that the rule state that, where feasible, grading be mandatory. A developer is required by paragraph (a) to design and construct one building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. As a practical matter, it may sometimes be necessary to provide grading for persons in wheelchairs so that the requirements of paragraph (a) will be met and in many cases it will be the least expensive means of doing so. However, in other instances, it may be possible to design and construct an accessible building entrance in some other fashion. Designers are free to use any reasonable design that obtains the required result. The Department does not believe that Congress intended to dictate the method a designer must use to provide an accessible entrance. Innovative designs that are accessible to handicapped persons should be encouraged.

Since the statute itself does not contain an exemption, the Department feels constrained to follow closely the intent of Congress on this issue as expressed in the Act's legislative history. The discussion in the House Report on this issue is of "unique building problems" along the order of examples (1) and (2) in paragraph (b). The impracticality standard in paragraph (a), however, does not go so far as to require that it be "impossible" to design and construct a building entrance on an accessible route, because the Department does not believe that Congress intended that the standard be limited to such extreme instances.

On balance, and after carefully considering the various comments received on this issue, the Department believes that, based upon specific language in the House Report, Congress intended to apply the test the Department proposed for determining when the burdens of providing an accessible entrance are too great. Only when the terrain or unusual site characteristics make it impractical to design and construct an accessible building entrance at a particular site did Congress consider the burdens of providing such an entrance to be unreasonable. Since the standard in paragraph (a) already takes into account the burdens of making a building

accessible, the Department does not believe that it would be faithful to the statute to revise the standard to refer to an open-ended "economic impracticality" standard unrelated to the sorts of unusual site problems Congress expressly considered relevant.

*Determining "First Occupancy" After March 13, 1991.* A number of commenters stated that while the proposed rule properly limits the Act's design and construction requirements to covered multifamily housing for first occupancy after March 13, 1991, it fails to indicate how it will be determined whether covered multifamily housing is "for first occupancy after March 13, 1991." These commenters are concerned that coverage of the design and construction requirements *must* be determinable at the beginning of planning and development, arguing that it is unreasonable to base this determination on the actual date of first occupancy since this date may be affected by a variety of unexpected and uncontrollable events occurring during the lengthy planning and development process. In order to accommodate these legitimate concerns on the part of the building industry, the Department has added a sentence to paragraph (a). It states that, for purposes of § 100.205, covered multifamily dwellings shall be deemed to be designed and constructed for first occupancy *on or before* March 13, 1991 if they are occupied by that date or if the *last* building permit or renewal thereof for the covered multifamily dwellings is issued by a State, County or local government on or before January 13, *1990.* In other words, if a developer obtains a building permit on or before January 13, 1990 (which is not renewed after that date) and completes construction under that permit, the building in question need not comply with the accessibility requirements of § 100.205. Thus, a developer will not be penalized if a strike or Act of God prevents occupancy by a certain time. The date of January 13, 1990 was selected because it is fourteen months before March 13, 1991. Fourteen months represents a reasonable median construction time for multifamily housing projects of all sizes based upon data contained in the "Marshall Valuation Service." The Department considered adopting different construction times for different sized projects but ultimately found this approach cumbersome from an administrative and enforcement standpoint. The Department chose the issuance of a building permit as the appropriate point in the process, since such permits are issued in writing by

governmental authorities. Such a standard has the advantage of being clear and objective. In addition, any project that actually achieves first occupancy before March 13, 1991 will be judged to have met this standard even if the last building permit or renewal thereof was issued after January 13, 1990.

*Accessibility Guidelines.* Paragraph (b) contains three examples that illustrate the application of paragraph (a). Some commenters stated that the examples illustrating the application of paragraph (a) may reduce noncompliance at the extremes but do not satisfactorily indicate what constitutes sufficient compliance in most day-to-day situations. The Department does not believe that it is feasible to publish more specific guidance at this time. However, the Department will endeavor to provide as much additional guidance as possible in the accessibility guidelines HUD plans to develop. Many commenters expressed a desire to have an opportunity to comment on these guidelines. HUD intends to publish these guidelines in the Federal Register for full public comment as soon as they are ready.

The only change made to these three examples is a minor change to example (1). In the proposed rule example (1) related to a developer who planned to construct six townhouses on a site with hilly terrain. Some commenters were confused by the reference to townhouses, in view of the Department's interpretation that four or more townhouses are not covered multifamily dwellings unless the entire unit is on the ground floor or unless the townhouses have an elevator. In order to avoid this confusion, the reference to townhouses has been deleted. Instead, the example refers simply to six units of covered multifamily dwelling units. The purpose of the example is to explicate site impracticality because of hilly terrain.

Example (3), which describes an instance where building accessibility can be achieved only at the cost of a 4.7 percent density loss, was the subject of criticism by builders. They argued that a 4.7 percent density loss may render a project economically infeasible. Even though this may well be the case in some situations, the Department does not believe, in light of the discussion above, that Congress necessarily intended that a reduction of five units in a 105-unit building would be sufficient to exempt that building from the accessibility requirements of the Act. A more stringent standard was intended. (However, this example was not intended to mean that *any* loss of

density, no matter how great, would be insufficient to establish site impracticality.)

Paragraph (c) requires that all covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route satisfy certain accessibility requirements set forth in paragraph (c). Paragraphs (c) (1) and (2) set forth the specific accessibility requirements for covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route. Many commenters complained that the guidance provided in paragraph (c) is inadequate. Some commenters made highly detailed suggestions that the Department will carefully consider as it develops accessibility guidelines to help builders understand and comply with the specific accessibility requirements of the Fair Housing Act. The guidelines would, of course, not be mandatory. Rather, they would provide technical assistance to persons who must comply with paragraph (c). Until these guidelines are published for public comment, designers and builders may be guided by the requirements of ANSI in meeting the specific accessibility requirements of the Act.

Paragraph (d) provides two examples that illustrate the application of paragraph (c). These examples were not the subject of substantial public comment and are unchanged from the proposed rule.

Paragraph (e) states that compliance with the appropriate requirements of ANSI A117.1 suffices to satisfy the requirements of paragraph (c)(3). Paragraph (e) implements section 804(f)(4) of the Fair Housing Act. This section does not require that designers and builders follow ANSI A117.1 exclusively. However, if designers and builders do follow ANSI A117.1, then they will have satisfied the requirements of paragraph (c)(3). House Report at 27. Paragraph (e) was not the subject of substantial public comment, closely follows the statutory language and is unchanged from the proposed rule.

Paragraphs (f) and (g) implement the provisions of the Fair Housing Amendments Act designed to encourage enforcement, by the States and local governments, of the provisions of the Act regarding adaptability and accessibility requirements for newly constructed multifamily dwellings. 134 Cong. Rec. S10456 (daily ed. August 1, 1988) (Memorandum of Senators Kennedy and Specter Regarding Their Substitute Amendment).

Paragraph (f) states that compliance with a duly enacted law of a State or

**3252** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

unit of general local government that includes the requirements of paragraphs (a) and (c) satisfies the requirements of paragraphs (a) and (c). Paragraph (f) was not the subject of substantial public comment and is unchanged from the proposed rule.

Paragraph (g)(1) was not the subject of substantial public comment and is unchanged from the proposed rule. It declares that it is the policy of HUD to encourage States and units of local government to include in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with paragraphs (a) and (c).

Paragraph (g)(2) states that a State or unit of general local government may review and approve newly constructed multifamily dwellings for the purpose of making determinations as to whether the requirements of paragraphs (a) and (c) are met. Paragraph (g)(2) was not the subject of substantial public comment and is unchanged from the proposed rule.

*Determinations of Compliance by State or Local Agencies.* Paragraph (h), which is unchanged from the proposed rule, states that determinations of compliance or noncompliance by a State or a unit of general local government under paragraph (f) or (g) are not conclusive in enforcement proceedings under the Fair Housing Act. Some commenters argued that this paragraph should be revised to state that determinations by State and local governments will be given substantial weight. These comments concede that neither the statute nor its legislative history indicates the weight to be given to such determinations. The Department believes it would be inappropriate to accord particular "weight" to determinations made by a wide variety of State and local government agencies involving a new civil rights law, without first having the benefit of some experience reviewing the accuracy of the determinations made by State and local authorities under the Fair Housing Act.

Paragraph (i) states that subpart D does not invalidate or limit any law of a State or political subdivision of a State that requires dwellings to be designed and constructed in a manner that affords handicapped persons greater access than is required by this subpart. Paragraph (i) was not the subject of substantial public comment. It is unchanged from the proposed rule.

## Subpart E—Housing for Older Persons

The Fair Housing Act prohibits discrimination because of familial status. However, the Act exempts "housing for older persons" from the prohibitions against discrimination because of familial status. The purpose of the prohibitions against discrimination because of familial status and the housing for older persons exemption is to protect families with children from discrimination in housing, without unfairly limiting housing choices for elderly persons. 134 Cong. Rec. S10465–66 (daily ed. August 1, 1988) (statement of Sen. Karnes). The statutory definition of "housing for older persons" comprises three categories of housing: (1) Housing provided under any State or Federal program that the Secretary of HUD determines is specifically designed and operated to assist elderly persons; (2) housing intended for, and solely occupied by, persons 62 years of age or older; and (3) housing intended for, and solely occupied by, at least one person 55 years of age or older per unit, provided that various criteria are met.

*Mobile Home Parks.* The Department received thousands of comments relating to the housing for older persons exemption. A significant portion of these comments came from people who live in mobile home parks which are currently restricted to adults. These commenters point out that mobile home park living is unique. Mobile home park residents typically own their own homes but rent the space. Frequently, there is relatively little space between homes. Many of these commenters state that they prefer to live in an all-adult atmosphere and that if children are admitted there will in most cases be no place for them to play. Furthermore, many commenters made it plain that they do not want or need special services or facilities. Rather, they want mobile home parks to provide an environment where they can be with others of their age group, while at the same time remaining independent and self-sufficient.

Some commenters asked that mobile home parks be exempted outright from the Fair Housing Act. Mobile home parks are covered by the Fair Housing Act. The Fair Housing Act makes it unlawful to refuse to sell or rent a "dwelling" because of race, color, religion, sex, handicap, familial status, or national origin. The statutory definition of "dwelling" includes vacant land which is offered for sale or lease for the construction or location thereon of a structure. In addition, the legislative history of the Fair Housing Amendments Act indicates that Congress intended

that mobile home parks would be covered by the Act, and specifically by the familial status provisions. *See* 134 Cong. Rec. S10551 (daily ed. Aug. 2, 1988) (colloquy between Sens. Wilson and Specter). Thus, the Department has no basis for exempting mobile home parks from the prohibition of discrimination against families with children.

Other commenters asked HUD to create an additional exemption for "over 40" or for "all-adult" mobile home parks. There is nothing in the Fair Housing Amendments Act or its legislative history to indicate that Congress intended that mobile home parks be afforded a housing for older persons exemption that is broader than the exemption that applies to other types of housing (*e.g.*, apartments and condominiums). To the contrary, the legislative history indicates that "mobile home parks ar eligible for the same exemptions as are other communities under the 'housing for older persons' provisions * * *" of the Act. *Id.* Therefore, mobile home parks are subject to the same rules that apply to other types of housing. More specific comments received on this subpart will be discussed in connection with the exemption for "55 or over" housing.

*"Dual Purpose Housing Facilities."* A number of commenters raised the question of whether it is permissible to operate a "dual purpose" housing facility. In a "dual purpose" housing facility specified units or sections would be designated for older persons and other units or sections would be open to everyone. For example, one commenter representing the interests of mobile home park owners suggested that regulations be promulgated to permit the operation of "dual purpose" properties, so that certain sections or units are not restricted to persons of a certain age and others are designated for housing for older persons. This commenter stated that the proposed rule did not address this question. However, this issue was addressed in the proposed rule. Section 100.70(c)(5) of the proposed rule (53 FR 45025, November 7, 1988) stated that it is unlawful to assign "any person to a particular section of a community, neighborhood or development or to a particular floor of a building because of * * * familial status * * *." This same prohibition appears as § 100.70(c)(4) of the final rule. As the Department explained in connection with public comments received on subpart A, the legislative history of the Fair Housing Act and the development of fair housing law after the protections of the Fair Housing Act

were extended in 1974 to prohibit discrimination because of sex support the position that persons with handicaps and families with children are entitled to the same protections as other classes of persons. For example, "dual housing" facilities segregated by race, color or religion clearly would violate the Fair Housing Act. Similarly, the Department believes that it is unlawful for a housing facility to segregate because of familial status.

*Section 100.300 Purpose.*

Section 100.300 explains that the purpose of subpart E is to effectuate the housing for older persons exemption in the Fair Housing Amendments Act. This section was not the subject of public comment and is unchanged from the proposed rule.

*Section 100.301 Housing for Older Persons Exemption.*

Section 100.301 provides the analytical framework for subpart E. Paragraph (a) implements the second sentence of section 807(b)(1) of the Fair Housing Act, as amended. It states that the prohibitions against discrimination because of familial status in this part do not apply to housing which satisfies the requirements of §§ 100.302 ("*State and Federal Elderly Housing Programs*"), 100.303 ("*62 or Over Housing*"), or 100.304 ("*55 or Over Housing*"). Paragraph (a) was not the subject of public comment and is unchanged from the proposed rule.

Paragraph (b) states that nothing in this part limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Paragraph (b) implements the first sentence of section 807(b)(1) of the Fair Housing Act. Many jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit; HUD also issues occupancy guidelines in its assisted housing programs. Reasonable limitations do not violate the Fair Housing Act as long as they apply equally to all occupants. A substantial number of comments were received asking that the Department adopt occupancy restrictions that housing providers can apply in jurisdictions that do not have governmentally-adopted occupancy restrictions, and in jurisdictions where the governmentally-adopted restrictions are tantamount to no restrictions. There comments are discussed in the preamble discussion relating to Subpart A.

*Section 100.302 State and Federal Elderly Housing Programs.*

Section 100.302 implements section 807(b)(2)(a) of the Fair Housing Act. Section 100.302 exempts housing provided under any Federal or State program that the Secretary determines is specifically designed and operated to assist elderly persons, as defined in the State or Federal program from the prohibitions against discrimination because of familial status in this part. Section 100.302 was not the subject of substantial public comment and is unchanged from the proposed rule. It should be noted that the eligibility requirements for housing for elderly persons in HUD-assisted and insured programs differ from the requirements in §§ 100.303 and 100.304. State or Federal definitions are not superseded by those established in this Part for other housing.

*Section 100.303 62 or Over Housing.*

Section 100.303 implements § 807(f)(2)(B) of the Act. It exempts from the prohibitions against discrimination because of familial status housing intended for, and solely occupied by, persons 62 years of age or older.

*Transition Provision.* Paragraph (a)(1) contains a transition provision to ensure that the interests of current residents of housing that excludes children will not be unduly disturbed by the Fair Housing Act. 134 Cong. Rec. S10456 (daily ed. August 1, 1988) (Memorandum of Sens. Kennedy and Specter Regarding Their Substitute Amendment). It provides that housing satisfies the requirements of § 103.303 even though there were persons residing in such housing on September 13, 1988 who are under 62 years or age, *Provided* That all new occupants thereafter are persons 62 years of age or older.

Section 6(d) of the Fair Housing Amendments Act provides that housing shall not fail to meet the requirements for housing for older persons by reason of "persons residing in such housing *as of the date of enactment of this Act [i.e.,* September 13, 1988]" who do not meet the age requirements of the housing for older persons exemption, provided that all new occupants meet the age requirements of the housing for older persons exemption. Section 13(a) of the Act provides that "[t]his Act and the Amendments made by this Act shall take effect on the 180th day beginning after the date of enactment of this Act." The date described in section 13(a) is March 12, 1989. Several commenters questioned whether the appropriate date for the transition provision in

§ 100.303(a)(1) is September 13, 1988 or March 12, 1989.

In the preamble of the proposed rule the Department explained that if section 6(d) of the Act is applied literally, then housing providers, in order to avail themselves of this transition provision, had to begin filling units in accordance with the age requirements of the housing for older persons exemption on September 13, 1988, which is before the effective date of the Act. The proposed rule adopted this interpretation, but in view of the consequences of such a determination, invited public comment on the question. Comments were received on both sides of the issue.

One group of commenters argued that the transition rule should become effective on March 12, 1989 instead of September 13, 1988 as proposed by the Department. Some of these commenters conceded that the proposed rule followed the plain meaning of the statute, but argued that this is a case where adherence to the statute's plain language will frustrate Congress' intent to provide a workable transition rule that ensures that the interests of current residents of housing that excludes children will not be unduly disturbed by passage of the bill. 134 Cong. Rec. S10456 (daily ed. August 1, 1988) (Memorandum of Sens. Kennedy and Specter Regarding Their Substitute Amendment). These commenters also stated that a March 12, 1989 transition date would be fairer.

A different group of commenters agreed with the Department's interpretation of the transition provision that appeared in the proposed rule as consistent with the plain meaning of the Act and Congressional intent. These commenters agreed with the Department's statement in the preamble of the proposed rule that the general language in section 13(a) was not intended to render the more specific language in section 6(d) a nullity. Moreover, under the interpretation of the Act in the proposed rule there is no inconsistency between sections 6(d) and 13(a) of the Fair Housing Act. The Act will take effect on March 12, 1989 and, by its terms, the housing for older persons exemption will be satisfied even though, on September 13, 1988, there were persons in the housing facility who did not meet the age requirements, provided that all new occupants after September 13, 1988 meet the age requirements. Some commenters added that under fundamental principles of statutory construction the more specific language of the Act prevails over more general language covering the same subject. *See e.g., Ginsberg & Sons. v.*

*Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."). Therefore, these commenters concluded that the more general language in section 13(a) describing the effective date of the Act as a whole should not be interpreted to delete the specific language in section 6(d) defining the appropriate date for the transition provision.

After carefully considering the comments received on this question, the Department has determined not to modify its interpretation of the transition provision that was included in the proposed rule because it appears that this is what Congress intended. The transition provision in section 805(b)(3) of the statute relating to persons residing in a housing facility who do not meet the age restrictions for housing for older persons is expressly limited to "persons residing in such housing as of the date of enactment of this Act." The same date (September 13, 1988) is, for the same reasons, referenced in § 100.304(d)(1) ("*55 or Over Housing*").

In addition, some commenters proposed that the rule state that a mobile home park may change its age requirements to either family, 55 or over or 62 or over, at any time—arguing that such a provision would be consistent with the legislative intent of the Act to stop discrimination against families with children and to allow for distinct housing opportunities for older persons. As previously explained, the Department sees no legal basis for providing special treatment or exceptions for mobile home parks in light of the legislative history to the contrary. Furthermore, the transition provision in section 807(b)(3)(A) makes specific reference to the date of enactment. In light of this temporal limitation in the statute the Department does not believe it would be faithful to the statute to create in this rule a procedure permitting a housing provider to change its age requirements at any time in order to exclude families with children.

A related issue raised by some commenters is the relationship between the Act and various State laws that regulate existing relationships between landlords and tenants. For example, under the California Mobilehome Residency Law, a rule or regulation of a mobile home park may be amended at any time with the consent of a homeowner, or without his or her consent upon written notice to him or her of not less than six months.

California Civil Code § 798.25 (1982 & Supp. 1988). These commenters pointed out that this and other notice requirements make it very difficult, and in some cases, impossible for mobile home park owners to avail themselves of the transition provision in section 807(b)(3)(A) of the Act. On October 21, 1988 the General Counsel of HUD, J. Michael Dorsey, issued a legal opinion on this question. In that opinion, Mr. Dorsey concludes that the Fair Housing Act does not preempt or supersede § 798.25 of the California Civil Code since there is no language in the Fair Housing Act, as amended, or its legislative history to support a conclusion that the Act was intended to invalidate or limit any State law, unless that State law requires or permits a discriminatory housing practice. 42 U.S.C. 3616 (as redesignated by the Act). Section 798.25 of the California Civil Code neither requires nor permits a discriminatory housing practice; it simply sets forth a procedure that a mobile home park must follow in order to change a rule or regulation. In addition, the comments submitted by Senators Kennedy and Specter and Representative Don Edwards state as follows:

> Since enactment of the 1988 Amendments to the Fair Housing Act, many mobile home parks have changed their status from an eighteen and older "adult" park, which is allowed under existing California law, but prohibited by the Fair Housing Amendments Act to a "housing for older persons" park in order to qualify for an exemption under the Act. Many of these parks have claimed that the Act preempts California law, and thus six months' notice of a change in policy is not required. This is an incorrect interpretation of the Act. It was not the intent of Congress to preempt this notice requirement, and the regulations should so specify. [Footnotes omitted.]

Paragraph (a)(2) states that housing satisfies the requirements of § 100.303 even though there are unoccupied units (at any time), provided that such units are reserved for occupancy by persons 62 years of age or over. Paragraph (a)(2) was not the subject of substantial comment and is unchanged from the proposed rule.

A new paragraph (a)(3) has been added to the final rule. It states that housing satisfies the requirements of § 100.303 even though there are units occupied by employees of the housing (and their family members residing in the same unit) who are under 62 years of age provided they perform substantial duties directly related to the management or maintenance of the housing. This paragraph was added by the Department in recognition of the fact

that it is common for a manager of a housing facility or maintenance worker to reside in one of the units. Frequently, such arrangements benefit the residents of the housing facility. The Department does not believe that Congress intended for a housing owner to lose its "62 or over" exemption simply because the manager of the facility or a maintenance worker resides there. However, the Department wishes to stress that any employees who live at the housing facility must perform substantial duties directly related to the management or maintenance of the housing in question. For example, if the employee works primarily at a different housing facility, then that employee does not satisfy the requirements of paragraph (b)(3) and the housing facility where that employee lives will not qualify for the "62 or over" exemption.

Paragraph (b) contains two examples that illustrate the application of paragraph (a). These examples were not the subject of substantial comment and are unchanged from the proposed rule.

*Section 100.304    55 or Over Housing.*

Section 100.304 implements section 807(b)(2)(C) of the Fair Housing Act, which exempts housing intended and operated for occupancy by at least one person 55 years of age or over per unit that satisfy certain criteria. This section of the proposed rule was the subject of many public comments. As an initial matter, a number of commenters asked that the Department clarify the meaning of the phrase "housing intended and operated for occupancy *by at least one person* 55 years of age or older, per unit \* \* \*" in paragraph (a).

Specifically, these commenters asked that HUD address the issue of the age of any other person occupying the unit along with a person 55 years of age or older per unit. A housing provider may use any non-discriminatory method of qualifying for the exemption that comports with applicable State and local laws. Since the Fair Housing Amendments Act does not prohibit discrimination because of age, nothing in the Act prohibits a housing provider seeking to qualify for the exemption for "55 or over" housing from setting age restrictions that are *more* stringent than those set forth in the Act. Thus, a housing provider *may*, for example, require that *all* residents be 55 years of age or older, provided that such a rule is consistent with applicable State and local laws. The other comments on § 100.304 fall within four areas.

First, some commenters stated that § 100.304(c)(1) should state that all units, upon initial occupancy, must be

occupied by at least one person 55 years of age or older. Under the Act, the exemption for housing for persons 55 years of age or older requires, among other things, that 80 percent of the dwellings have at least one resident who is 55 years of age or older *and* that the housing complex adhere to policies demonstrating an intent to provide housing to persons of that age group. Section 807(b)(2)(C). The Children's Defense Fund and other commenters state that Congress' purpose in permitting up to 20 percent of the units to be occupied solely by persons under the age of 55 was to prevent disruption of the lives of surviving spouses and cohabitants under age 55, when the over 55 member of a household dies or otherwise leaves the unit. *See* 134 Cong. Rec. H 6498 (daily ed. August 8, 1988) (statement of Representative Edwards); House Report at 31. Specifically, these commenters argue that the "55 or over" exemption was not meant to permit the owner of housing for older persons to "set aside" 20 percent of its units for *incoming* households (as opposed to surviving spouses or companions). These commenters feel that such a "set aside" is inconsistent with the exemption's requirement that the owner or manager demonstrate an intent to provide housing for persons 55 years of age or older.

These commenters correctly point out that statements in the legislative history discuss the need to permit up to 20 percent of the units to be occupied by persons all of whom are under 55 years old in 55 or over housing in order to accommodate persons such as surviving spouses under the age of 55 and nurses and other personnel to care for the elderly. 134 Cong. Rec. H 6498 (daily ed. August 8, 1988) (statement of Representative Edwards); House Report at 31. However, the Department does not believe that the examples that appear in the legislative history were intended to be exhaustive. Particularly, the Department is not of the view that these units for persons under 55 years of age cannot be occupied by *incoming* households (as opposed to surviving spouses or companions). Indeed, some incoming households may be persons under 55 related in some way to residents who are over 55 years old. For example, an elderly owner of a condominium might die and leave the condominium to a relative who is under 55 years old. If the 20 percent of the units available to persons under 55 years old were not open to incoming households then the recipient of the legacy would be in the anomalous situation of not being able to live in a condominium he or she owns. Further, the Department does not believe that the proposed rule can fairly be characterized as establishing a 20 percent "set-aside" for persons under 55 years of age. In order to be assured of preserving the exemption, an owner of "55 or over" housing will not, as a practical matter, be able to sell or rent a full 20 percent of the units to incoming persons, all of whom are under 55 years of age, because if the owner does so he or she will risk losing the exemption if some of the over-55 occupants die with surviving spouses who are under 55 years old. In this regard, a number of commenters expressed concern about the last sentence of example 1A in paragraph (e). This sentence indicates that a housing provider could rent a unit to persons (John and Mary in the example) all of whom are under 55 years old even if doing so would reduce the percentage of units occupied by at least one person 55 years of age or older to just a fraction above 80 percent. Although the housing provider in fact could rent to John and Mary without losing the "55 or over" exemption the Department agrees that doing so is not advisable under the circumstances described in the example. Since the owner would be just a fraction above the 80 percent minimum required to maintain the "55 or over" exemption, renting to John and Mary could lead to the owner losing the exemption if some of the over-55 occupants die with surviving spouses who are under 55. In order to avoid any confusion, therefore, the last sentence of example 1A in paragraph (e) of the proposed rule has been deleted in the final rule.

Beyond this, the owner must take care to publish and adhere to policies and procedures which demonstrate an intent to provide housing for persons 55 years of age or older. For example, this requirement would preclude an owner or manager from marketing 80 percent of the units for persons 55 years of age or older and marketing the remaining 20 percent in a radically different way (*e.g.*, young adults). The policies and procedures for the housing facility *as a whole* must demonstrate an intent to provide housing for persons 55 years of age or older. "In essence, this means that the housing in question must in its marketing to the public and in its internal operations, hold itself out as housing for persons aged 55 or older." 134 Cong. Rec. S10456 (Memorandum of Senators Kennedy and Specter Regarding Their Substitute Amendment). Accordingly, the Department has determined not to revise paragraph (d)(2).

The second major issue relating to 55 or over housing concerns paragraph (c)(1), which requires that at least 80% of the units in the housing facility be occupied by at least one person 55 years of age or older unit *except that a* newly constructed housing facility for first occupancy after March 12, 1989 need not comply with paragraph (c)(1) of this section until 25% of the units in the facility are occupied. The exception for partially occupied newly constructed housing facilities was proposed by HUD to deal with the practical problem of filling units in a new and unoccupied housing facility in a reasonable manner, consistent with the "55 or over" exemption. For example, it would be unreasonable for a large newly constructed housing facility that intends to qualify for the exemption to lose its right to claim the exemption simply because the first unit happens to be filled with persons all of whom are under 55 years of age. However, once a certain percentage of units has been filled the housing facility can reasonably be expected to comply with the percentage requirement in paragraph (c)(1). Thus, the Department proposed to require that a housing facility comply with the 80% requirement in paragraph (c)(1) once 25% of the units in the housing facility have been filled and invited comment on the question of whether the 25% point is too high or too low.

The National Association of Homebuilders, among other commenters, felt this percentage was too low to make a meaningful assessment of a particular housing facility. The National Multi Housing Council argued that a building should be eligible for the "55 and Over" exemption during initial occupancy so long as not more than 20 percent of the total units are occupied by non-qualifying residents. The Council argues that marketing and market conditions will vary widely throughout the country and suggest that it is unnecessary for HUD to attempt to fix a universal demarcation point on this subject. The Council proposes that the final rule permit an owner to sell or rent the first 20 percent of the units to non-qualifying occupants, if he or she wishes.

On the other hand, the Children's Defense Fund and the Leadership Conference on Civil Rights, among other commenters, objected to paragraph (c)(1) since the 25 percent point referenced in the proposed regulation is not contained in the Act or its legislative history. These commenters further argue that this 25 percent point of reference be deleted because it stems from what they

regard as an incorrect interpretation of the 55 or over exemption. In other words, if the 20 percent of the units for non-qualifying households were restricted to surviving spouses, nurses and companions there would be no need for the 25 percent point of reference for initial occupancy.

Since the Department has not adopted the narrow interpretation of the 20 percent limitation urged by some commenters, the Department continues to believe that the regulation must contain some point of reference so that everyone concerned will know how to calculate whether a housing facility has complied with the 80 percent requirement during initial occupancy. However, the Department does not believe it would be consistent with the intent of the statute to permit an owner or manager seeking to qualify for the "55 or Over" exemption to sell or rent the first 20 percent of the units to persons all of whom are under 55 years of age. Filling so many units with non-qualifying persons might create an impression that the housing is not intended for older persons. Further, the owner would not have any leeway to provide for units occupied by under 55 surviving spouses and nurses or companions. For these reasons, the Department has retained paragraph (c)(1) as it was proposed.

In addition, as in § 100.303(a)(3), a new paragraph (d)(3) has been added to § 100.304 of the final rule. It states that housing satisfies the requirements of this section even though there are units occupied by employees of the housing (and family members residing in the same unit) who are under 55 years of age provided they perform substantial duties directly related to the management or maintenance of the housing. Thus, as in § 100.303, units occupied by employees of the housing who do not meet the age threshold are not considered in determining a project's eligibility as housing for older persons.

*"Significant Facilities and Services"*. Third, the Department received a great many comments asking for clarification of the phrase "significant facilities and services designed to meet the physical or social needs of older persons." A large number of commenters viewed the definition in proposed paragraph (b)(1) as requiring facilities and services on the order of what one might expect to find in a facility for severely disabled elderly persons who are not able to care for themselves. Other commenters want to qualify for the "55 or Over" exemption and want to know precisely what services and facilities must be

provided in order to qualify for the exemption.

Paragraph (b)(1) of the proposed rule stated that "significant facilities and services specifically designed to meet the physical or social needs of older persons" include an accessible physical environment, congregate dining facilities, social and recreational programs, emergency and preventive health care or programs, continuing education, welfare, information and counseling, recreational, homemaker, outside maintenance and referral services, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them. The list of significant facilities and services designed to meet the physical or social needs of older persons in the proposed rule is drawn from section 202(f) of the Housing Act of 1959, 12 U.S.C. § 1701q, listing examples of facilities and services for older persons. The House Report (at p. 32) relies heavily upon the listing in section 202(f) of the Housing Act of 1959 in its discussion of such facilities. In addition, the proposed rule made it clear that the housing facility need not have all of these features to qualify for the exemption.

Based upon the reaction hundreds of commenters had to the proposed definition of "significant facilities and services designed to meet the physical or social needs of older persons" it appears that the presence early on in the definition of "congregate dining facilities" and an "accessible physical environment" may have created an impression that only housing for older persons who are not capable of living independently would satisfy the requirements of paragraph (b)(1). The Department wishes to stress that a housing facility may have significant facilities and services designed to meet the physical *or* social needs of older persons and still provide housing for active older persons who live very independently. A housing facility, for example, need *not* necessarily have congregate dining facilities or an accessible physical environment in order to qualify. In fact, many of the facilities and services on the list can readily be associated with active older persons. These include social and recreational programs, preventive health care, information and counseling, recreational services, and transportation to facilitate access to social services. Moreover, the list of services on this list was not intended to be exclusive. As a result of this reaction, the Department has reordered the list of services and

facilities in the final rule. In addition, "welfare" has been deleted from the list because it appears only to have relevance in the context of governmental programs for elderly persons which are covered by § 100.301.

The facilities and services designed to meet the physical or social needs of older persons must be "significant" in order to satisfy paragraph (b)(1). It is not possible for the Department to define precisely what services and facilities must be present before they are considered "significant." The services and facilities will necessarily vary based on the geographic location and the needs of the residents. However, it is clear, for example, that the installation of a ramp at the front entrance of a housing facility would not constitute a "significant" facility designed to meet the physical needs of older persons. Similarly, the provision of minor amenities—such as putting a couch in a laundry room and labeling it a recreation center—would not constitute a "significant" facility designed to meet the social needs of older persons. House Report at 32.

*"Important Housing Opportunities for Older Persons"*. Some commenters suggested that the Department establish a "precertification" procedure which would enable housing providers to seek HUD certification that a housing facility has "significant facilities and services designed to meet the physical or social needs of older persons" or that the housing facility satisfies the requirements of paragraph (b)(2). One commenter representing the interests of mobile home park owners argued that such a procedure would prevent many lawsuits and "frivolous" administrative complaints of discrimination from being filed. The Department does not believe at this early stage of the enforcement of the Fair Housing Amendments Act that there is a reasonable basis to conclude that many "frivolous" complaints will be filed unless a "pre-certification" procedure is established. Further, the Department does not believe that it has sufficient resources to support such a procedure. However, if experience with enforcement of the exemption for "55 or over" housing shows that such a procedure would be cost-effective the Department will consider adding a "pre-certification" procedure in the future.

The fourth area of major public comment concerns paragraph (b)(2) of the proposed rule. A housing facility may qualify for the "55 or over" exemption even if it does not satisfy the requirements of paragraph (b)(1). Under paragraph (b)(2), a housing facility that does not provide significant facilities

and services specifically designed to meet the physical or social needs of older persons may nonetheless qualify for the "55 or over" exemption. Such a housing facility must demonstrate that it is not practicable for it to provide significant facilities and services designed to meet the physical or social needs of older persons, and must also demonstrate that the housing facility is necessary to provide important housing opportunities for older persons.

The proposed rule contained eight factors, among others, that the Department proposed to consider in determining whether a housing facility satisfies the requirements of paragraph (b)(2). Paragraph (b)(2) was criticized by many commenters for not being sufficiently precise. These commenters state that listing eight factors is not sufficient, especially since the proposed rule did not state how many (or how few) of the factors must be fulfilled in order to obtain a waiver of the requirement of providing significant services and facilities.

Further, some commenters cited legislative history which they believe is helpful in construing the exception. Senator Kennedy stated that the exception was intended "to be narrowly used only when it can be demonstrated that the costs of providing the facilities and services would result in depriving low- and moderate-income persons of needed and desired housing. Independent and objective evidence must be provided to establish impracticability." 134 Cong. Rec. S10549 (daily ed. August 2, 1988) (statement of Sen. Kennedy). Representative Edwards explained that § 807(b)(2)(C)(i) was "not intended to provide a broad exemption * * *." 134 Cong. Rec. H6498 (daily ed. August 8, 1988) (statement of Representative Edwards). Mr. Edwards went on to explain the impracticability test as follows:

The fact that the facilities and services are expensive to provide is not alone sufficient to meet the standard of impracticability. This standard cannot be satisfied only by estimates of increased costs, business inefficiency or loss of profit. Independent and objective evidence must be provided to establish impracticability. Mere opinion that the provision of such facilities and services is impracticable is not sufficient.

*Id.*

With regard to the requirement that the housing qualify as an "important housing opportunity for older persons" Representative Edwards stated that it must be shown that "[a]ffordable housing for older persons of low or moderate incomes must not be

otherwise available in the community."
*Id.*

The Department agrees that additional guidance is needed and the Department has been guided by this legislative history in revising paragraph (b)(2) to provide for a somewhat more precise definition of this exception. The first sentence of paragraph (b)(2), which mirrors the statute, is unchanged from the proposed rule. The following sentence explicates this statutory test in a manner that is consistent with the legislative history regarding this exception. It states that an owner or manager, in order to satisfy the requirements of paragraph (b)(2), must demonstrate through credible and objective evidence that the provision of significant facilities and services designed to meet the physical or social needs of older persons would result in depriving older persons in the relevant geographic area of needed and desired housing. The Department believes that the revised standard is both clearer and consistent with the intent of Congress.

The eight factors in the proposed rule have been reduced to seven factors in the final rule. Specifically, the first and second factors that appeared in the proposed rule have been consolidated and clarified in the final rule. The seven relevant factors in the final rule are as follows:

(i) Whether the owner or manager of the housing facility has endeavored to provide significant facilities and services designed to meet the physical or social needs of older persons either by the owner or some other entity. Demonstrating that such services and facilities are more expensive to provide is not alone sufficient to demonstrate that the provision of such services is not practicable. The preceding sentence relating to the cost of providing significant services and facilities is based on the legislative history. *See* 134 Cong. Rec. H6498 (daily ed. August 8, 1988) (statement of Representative Edwards) ("The fact that the facilities and service [sic] are expensive to provide is not alone sufficient to meet the standard of impracticability.")

(ii) The amount of rent charged, if the dwellings are offered for rent. The price of the dwellings, if they are offered for sale.

(iii) The income range of the residents of the housing facility.

(iv) The demand for housing for older persons in the relevant geographic area.

(v) The range of housing choices for older persons within the relevant geographic area.

(vi) The availability of other similarly priced housing for older persons in the relevant geographic area. If similarly

priced housing for older persons with significant facilities and services is reasonably available in the relevant geographic area, then the housing facility does not meet the requirements of paragraph (b)(2). The second sentence is new and has been added to clarify the appropriate application of this factor.

(vii) The vacancy rate of the housing facility.

## Subpart F—Interference, Coercion or Intimidation

*Section 100.400   Prohibited interference, coercion or intimidation.*

Subpart F provides the interpretation of the Department as to the conduct which constitutes a discriminatory housing practice under section 818 of the Fair Housing Act.

Section 100.400(b) states that it is unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any person in the exercise or enjoyment of, any right granted or protected by Part 100. Such conduct can also involve harassment of persons because of race, color, religion, sex, handicap, familial status, or national origin.

The illustrations in this section also indicate that a broad range of activities can constitute a discriminatory housing practice. Threatening or intimidating actions include acts against the possessions of persons, such as damage to automobiles or vandalism, which limit a person's ability to have full enjoyment of a dwelling. In addition, the protections against discrimination reach any person, including persons selling or renting dwellings and persons engaged in activities promoting fair housing. Further, persons who are not involved in any aspect of the sale or rental of a dwelling are nonetheless prohibited from engaging in conduct to coerce, intimidate, threaten or interfere with persons in connection with protected activities, or from retaliating against any person involved in any way in a proceeding under the Fair Housing Act.

## Part 103—Fair Housing Complaint Processing

*Enforcement responsibility within HUD*

Generally, the proposed regulations placed the responsibility for the reasonable cause determination and the prosecutorial functions with the General Counsel, while retaining the investigation and conciliation functions with the Assistant Secretary for Fair Housing and Equal Opportunity.

Several commenters urged that the Department modify the rule to leave all aspects of Fair Housing enforcement responsibility with the Assistant Secretary for Fair Housing and Equal Opportunity. Among other arguments, the experience of the Assistant Secretary in administering the several civil rights-related responsibilities of HUD was cited—particularly the twenty years of experience in administering the Fair Housing Act itself. In addition, commenters pointed out that the Civil Rights Act of 1968 provided for the creation of a new HUD assistant secretary position—clearly intended to serve as the lead official for civil rights responsibilities of the Department.

The Department agrees with the commenters that full utilization of the Assistant Secretary's experience must be assured, and that the original Fair Housing Act indeed intended that there be appointed an assistant secretary specializing in civil rights concerns. Had the proposed rule suggested removal of the responsibilities of the Assistant Secretary for Fair Housing and Equal Opportunity and the awarding of those responsibilities to the General Counsel, the above-summarized arguments would be well-taken. No such proposal has been made, however. Under the enforcement scheme set out in the proposed rule, the responsibilities of the Assistant Secretary as they relate to Fair Housing enforcement have been retained. The Assistant Secretary continues to have full responsibility for complaint intake, investigations, conciliations and for all related communications with the parties concerning their procedural rights and obligations. Quite clearly, given the greatly increased enforcement authority provided by the Fair Housing Amendments Act and the addition of important newly protected classes, the responsibilities of the Assistant Secretary have been augmented greatly.

It proves too much, however, to argue that the creation of a new assistant secretary's position in the 1968 Act somehow implies a duty in the Secretary to delegate subsequently enacted authority to that single officer. First, we note that the 1968 statute creating the new assistant secretary did not provide for administration or judicial enforcement of the Act, but only for the investigation and attempted conciliation of complaints. More importantly, both the 1968 Act and the 1988 Amendments Act refer, in *all* their substantive provisions, to responsibilities of the *Secretary* of Housing and Urban Development. Nothing in either Act purports to require the Secretary to

delegate this responsibility to any particular officer or officers. It is clear, then, that an argument that the Secretary is legally bound to delegate his authority in a particular manner cannot be supported.

Commenters also argued that as a matter of policy, the delegation to the General Counsel is inappropriate. Commenters noted that the Assistant Secretary for Fair Housing and Equal Opportunity does not share responsibility with any other office of the Department relative to the Assistant Secretary's exercise of authority under other civil rights statutes. These commenters are correct—up to a point—although they ignore the fact of HUD General Counsel participation in any and all matters involving civil rights and equal opportunity at the stage where the Department becomes involved in formal enforcement, either through the initiation of administrative enforcement proceedings or the referral of matters to the Department of Justice for the initiation of civil actions.

Given the clear intention of the amended Act that a HUD reasonable cause determination will create a virtual certainty of litigation, either in an administrative tribunal or in a Federal District Court, it is not only rational and sensible but consistent with current delegations of authority in the area of civil rights to provide that responsibility for such determinations be in the hands of the Department's legal officer. Similarly, the delegation of authority to the General Counsel to conduct hearings before administrative law judges under the Fair Housing Act seems to the Department not only to be a rational decision, but a rather obvious one. Such a division of responsibility is consistent with the practice of other agencies whose administrative processes make a separation of functions necessary or desirable.

One commenter noted that proposed § 109.16(a) provided that the Assistant Secretary is to make reasonable cause determinations in advertising cases. The proposed rule intended to delegate all responsibility for reasonable cause determinations to the General Counsel. This section has been revised.

Under the final rule, the General Counsel is delegated the responsibility for making the reasonable cause determination and for prosecuting administrative cases under the 1988 Amendments. One commenter noted that the General Counsel also has the responsibility to defend against charges that HUD has violated the Fair Housing Act. While the number of such cases may be small, the commenter argued

that proposed procedures cast suspicion on the impartiality of the General Counsel in such matters. In the rare instances that complaints involving such circumstances are filed, the Secretary will delegate the General Counsel's responsibility for the reasonable cause determination and, where an administrative proceeding is conducted, HUD's prosecuting duties to another qualified employee of the Department. Since such circumstances will rarely, if ever, occur, the text of the rule has not been revised to reflect this eventuality.

The division of responsibility in the final rule has been modified slightly to transfer certain duties from the General Counsel to the Assistant Secretary. These include: (1) The ability to elect to have the claims asserted in a charge decided in a civil action where HUD is the complainant (§§ 103.410 and 104.410); (2) the duty to notify the aggrieved person and the respondent when a reasonable cause determination can not be made within described time periods (§ 104.400(c)); and (3) the duty to notify Federal, State and local licensing and regulatory agencies under § 104.935(a). In addition, the final rule has been revised to require the notification of the Assistant Secretary at certain points during the administrative proceeding (see e.g. §§ 104.700(a), 104.910(d), 104.920 and 104.930(d)).

*Statutory limitations on HUD's complaint processing authority.*

In several instances, commenters suggested revisions to the proposed rules that cannot be adopted because they conflict with statutory limitations contained in the Fair Housing Act. The statutorily impermissable proposals included:

1. Some commenters argued that the rules should require complainants to file their complaint within 60 days of the date that an alleged discriminatory practice has occurred or terminated. Section 810(a)(1)(A)(i) of the Act permit complainants to submit complaints not later than one year after an alleged discriminatory housing practice has occurred or terminated. (See Subpart A.)

2. Commenters argued that respondents should have from 20 to 30 days to respond to the complaint. Section 810(a)(1)(B)(iii) of the Act provides that each respondent may file an answer to the complaint not later than 10 days from the date of receipt of the notice. (See §§ 103.50(b)(3) and 103.55.)

3. Commenters argued that the final rule should not permit the referral of cases to agencies until they are found to be substantially equivalent under the

new law, or should be revised to permit the complainant to choose whether to permit the referral under such circumstances. Under section 810(f)(4), each agency certified for the purposes of Title VIII on the day before the enactment date must be considered certified with respect to those matters for which the agency was certified on that date. The transition period is 40 months from the date of enactment. Under section 810(f)(1), HUD is required to make these referrals. (See Part 115)

4. Several commenters urged HUD to retain the existing practice of making a threshold determination to resolve based on facts developed in the investigation before commencing conciliation. Such procedures would be contrary to section 810(b)(1) which requires HUD to engage in conciliation with respect to the complaint, to the extent feasible, during the period *beginning with the filing of the complaint and ending with the filing of the charge or dismissal by HUD.*

5. Commenters objected to § 103.330(b) which permits the nondisclosure of conciliation agreements, where the aggrieved person and the respondent request the nondisclosure and the Assistant Secretary determines that disclosure is not required to further any purpose of the Fair Housing Act. Under section 810(b)(4), nondisclosure is permitted under such circumstances.

6. Commenters objected to the requirement for the public disclosure of complaints dismissed based on a finding of no probable cause. Section 810(g)(3) requires public disclosure.

Subpart A—Purpose and Definitions

*Section 103.1 Purpose and applicability.*

*Applicability.* Except for complaints involving allegations of discriminatory housing practices occurring before and continuing after the effective date of the 1988 Amendments (March 12, 1989), the proposed rule provided that:

—Complaints alleging discriminatory housing practices that occurred before the effective date of the 1988 Amendments are governed by the procedures in Part 105.

—Complaints alleging discriminatory housing practices that occur on or after the effective date of the 1988 Amendments are governed by the procedures in Part 103.

For complaints alleging violations that occur before and continue after March 12, 1989, the proposed rule provided:

—Complaints filed after March 12, 1989 would be processed under Part 103.

—Complaints filed before March 12, 1989 would continue to be processed

under Part 105; however, the Department would provide the complainant with a reasonable opportunity to elect to have the complaint processed under Part 103 in lieu of the Part 105 procedures.

Commenters argued that the final rules must be revised to provide retroactive application of the Act's new remedies and enforcement procedures to all complaints pending on March 12, 1989, including those that do not involve continuing violations. Other commenters argued that the regulations should not apply to any complaints filed under part 105 prior to March 12, 1989.

HUD has reviewed its determination regarding the applicability of the 1988 Amendments. Upon reconsideration, HUD believes that the proposed rules unduly restrict the cases to which the new remedies under the 1988 Amendments will be applied. It is clear that Congress did not intend the Act to receive the restricted application proposed by HUD. Significantly, the plain language of section 815 places no limitation upon its applicability, but rather provides: "This Act and the amendments made by this Act shall take effect on the 180th day beginning after the date of enactment of the Act." At no point does the Act suggest that its provisions should receive less than the broadest application of the effective date provision.

The general rule of statutory construction is that remedial and procedural legislation not affecting vested rights must be applied to any claim cognizable under the prior law that is pending on the effective date or that is filed thereafter. *Bradley v. Richmond School Board,* 416 U.S. 696 715–16 (1974). While it is true that statutes that affect substantive rights ordinarily may not be applied retroactively, *United States v. Security Industrial Bank,* 459 U.S. 70, 79 (1982), this principle has no applicability here. The 1988 Amendments (except as to discriminatory housing practices involving handicap and familial status) do not create new legal duties or responsibilities. Rather, they merely provide a new process by which aggrieved persons may enforce existing rights protected under Title VIII. *I.e.,* The 1988 Amendments create new procedures for the filing, investigation and conciliation of complaints concerning discriminatory housing practices and strengthen the remedies available to victims of housing discrimination by providing for administrative hearings, and by increasing the availability of civil penalties, attorney's fees, etc. Because the new remedies and enforcement procedures do not affect vested rights,

retroactive application is entirely appropriate, unless a manifest injustice would result. *See, e.g., Bradley, supra.* (increased availability of attorney's fees); *Friel v. Cessna Aircraft Co.,* 751 F.2d 1037 (9th Cir. 1985) (extension of limitations period); *Montana Power Co., v. Federal Power Comm.,* 445 F.2d 739 (D.C. Cir. 1970) (change in tribunal); and *Grummitt v. Sturgeon Bay Winter Sports Club,* 354 F.2d 564 (7th Cir. 1965 (change in procedure)).

To bring the final rule into conformance with the Act and the well-settled law, Parts 103 and 105 have been revised. Under the final rule, Part 103 will be applicable to all complaints alleging discriminatory housing practices on account of race, color, religion, sex or national origin pending on March 12, 1989 or filed thereafter, and to all complaints alleging discriminatory housing practices on account of handicap or familial status occurring on or after March 12, 1989. Part 105 will have no continuing validity and will be removed.

One commenter asked for clarification whether complaints that allege discriminatory housing practices involving handicap and familial status that occur before March 12, 1989 and will continue after that date may be filed prior to March 12, 1989. Discriminatory housing practices involving handicap or familial status do not violate the Act until March 12, 1989. Since it will be impossible to predict whether an individual will continue a previous practice after the practice becomes a violation of the Act, HUD will not accept any complaints alleging such discrimination filed before March 12, 1989. To ensure that complainants are aware of their right to file if the practice continues, the rejection will be accompanied by an explanation of the complainant's right to refile after March 12, 1989.

*Applicability of Part 103 to State and local agencies.* Several commenters sought clarification concerning the applicability of various requirements in Part 103 (and Part 104) to complaints filed with or referred to State and local agencies. Part 103 contains the procedures for the investigation and conciliation by HUD of complaints filed under section 810 of the Act and Part 104 contains the rules of practice and procedure applied by HUD's ALJs in administrative proceedings adjudicating charges issued under Part 103. These parts do not, by themselves, impose any requirements on the processing of complaints at the State or local level. Part 115, on the other hand, sets forth the criteria for HUD's certification that a

State or local law is substantially equivalent, and its requirements parallel many of the requirements contained in Parts 103 and 104.

Some commenters urged language specifically stating that certain provisions (e.g., HUD procedures for the investigation of complaints) are not binding on State and local agencys. HUD believes that §§ 103.1, 104.10 and 115.1 clearly state the applicability of the parts and that further clarification is unnecessary.

*Complaint processing and Section 504.* Proposed § 103.1(c) provided that HUD will conduct investigations and conciliations in accordance with section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). One commenter argued that this paragraph should only apply when a complaint involves an allegation of discrimination that is based on handicap. The proposed section was designed to provide for the reasonable accommodation of persons with disabilities who are participants in the fair housing complaint process. The provisions of this section were not intended to be limited to complaints involving allegations of discrimination based on handicap. This section has been clarified in the final rule.

*Section 103.9   Definitions.*

In addition to revisions of aggrieved person, dwelling unit and person discussed in the comments to Part 100 above, comments on the definitions of personal service and receipt of notice were received.

One commenter argued that HUD should delete these proposed definitions and incorporate requirements for personal service and for receipt of service contained in the Federal Rules of Civil Procedure. Another commenter urged HUD to abandon certified mail as a permissible means of service on non-agency participants because service may be frustrated by an addressee's refusal to claim. HUD's current rules provide for the service of documents by certified mail or through personal service. (see § 105.18). These methods have not, as yet, presented significant practical difficulties in the processing of complaints and have been retained in the final rule.

Subpart B—Complaints

*Section 103.10   Submission of information.*

Proposed § 103.10 contains provisions governing the submission of information concerning alleged discriminatory housing practices and notes that, if the submitted information warrants, HUD may concurrently initiate compliance

reviews under other civil rights authorities. In response to commenters, the Age Discrimination Act of 1975 has been added to the list of civil rights authorities in this section and §103.5, and minor editorial change has been made for clarity.

*Section 103.15   Who may file complaints.*

Section § 103.15 permits any aggrieved person or the Assistant Secretary to file a complaint. One commenter noted that individuals who are subject to housing discrimination are likely to be low-income persons who cannot read, write, or express themselves articulately. The commenter suggested that § 103.15 be amended to require HUD personnel to provide full and comprehensive assistance throughout the complaint process, including assignment of an attorney. Similar revisions were requested for §§ 103.10(a), 103.30(b), 103.300(b), and 104.10(b). Section 103.15 also provides that a complaint may be filed with the assistance of an authorized representative of an aggrieved person, including any organization acting on behalf of an aggrieved person. One commenter would modify this provision to require HUD to notify the authorized representative acting on behalf of the aggrieved person, concerning the status of cases.

The Department agrees that it is vital that HUD provide full assistance to persons who wish to file a complaint and that HUD continue to provide assistance throughout the complaint processing procedure. Accordingly, the Department intends to pursue its current practice of providing appropriate assistance to such persons. In addition, HUD will, at the request of a complainant, provide information concerning the status of the complaint to an authorized representative in the same manner as such notification is provided to complainants. While the Department intends to provide such information, HUD does not believe that it is necessary to codify these policies in the regulations.

*Section 103.20   Persons against whom complaints may be filed.*

Under proposed § 103.20(a), a complaint may be filed against any person alleged to be engaged, to have engaged, or to be about to engage in a discriminatory housing practice. Commenters urged the deletion of language permitting complaints against respondents that are "about to engage" in a discriminatory housing practice. The cited language is a necessary adjunct to the definition of aggrieved

person found in the statute ("Aggrieved person means any person who * * * believes that such person will be injured by a discriminatory housing practice that is about to occur.") The cited regulatory provision is retained.

Proposed § 103.20(b) provides that a complaint may also be filed against any person who directs or controls or has the right to direct or control, the conduct of another person with respect to any aspect of the sale, rental, advertising, or financing of dwellings or the provision of brokerage services relating to the sale or rental of dwelling, if that other person, acting within the scope of his or her authority as employee or agent of the directing or controlling person, is engaged, has engaged or is about to engage in a discriminatory housing practice.

Commenters argued that the definition of agency relationships described in this paragraph is confusing, may be too narrow, and does not correspond to the standards established by case law. Other commenters suggested that this provision could be improved by the provision of examples drawn from case law and that problems concerning this section could be remedied by the deletion of the language "within the scope of his or her authority".

Paragraph (b) expands on the general provisions contained in § 103.20(a). This provision reflects HUD's current rules governing the types of persons against whom complaints may be filed (see § 105.13(b)). This Part 105 regulation was adopted in the final rule issued June 27, 1988 (53 FR 24184). In that rule, HUD explained that the provision was based on judicial precedent to the effect that persons involved in the sale, rental or financing of dwellings have a nondelegable duty to assure that all conduct relating to any aspect of the sale, rental or financing of dwellings complies with the Fair Housing Act and that a person who supervises, directs or employs other persons can be legally responsible for actions of such other persons which violate the Fair Housing Act. See *U.S. v. Youritan Construction Co.,* 370 F.Supp. 643 (N.D. Calif. 1973), modified as to relief and affirmed, 509 F.2d 623 (9th Cir. 1975); *Northside Realty v. U.S.,* 605 F.2d 1348 (5th Cir. 1979); *Marr v. Rife,* 503 F.2d 735 (6th Cir. 1974); *U.S. v. Northside Realty,* 474 F.2d 1164 (5th Cir. 1973); *Moore v. Townsend,* 525 F.2d 482 (7th Cir. 1975); *Johnson v. Jerry Pals, Real Estate,* 485 F.2d 528 (7th Cir. 1973); *Dillion v. AFBIC Development Corp.,* 420 F.Supp. 572 (S.D. Ala. 1976); and *U.S. v. Real Estate Development Corp.,* 347 F.Supp. 776 (N.D. Miss. 1972). Commenters on that rule asserted that

the judicial decisions did not establish a rule of liability without fault as the proposed rule (published October 16, 1984 (49 FR 40528)) suggested; and that the decided cases focused only on the liability of a broker for conduct of his or her salepersons, but did not manage absolute liability on the mere basis to direct or control without reference to instructions, policies, compliance programs, and other actions of the principal. In response to these comments, HUD announced that it was not its intent to impose absolute liability on any principal, but rather to follow the existing case law of the liability of the principal. As a result of this discussion, the language "acting within his or her authority" was added. The commenters on the proposed rule implementing the 1988 Amendments have presented no argument that convinces the Department that its current analysis of the case law on this point is incorrect.

*Section 103.25  Where to file complaints.*

Section 103.25 permits aggrieved persons to provide information to be contained in a complaint by telephone to HUD Regional and Field Offices. While some commenters have argued for the deletion of this procedure, HUD does not believe that the filing of complaints should be limited in the manner the commenters suggest. The final rule continues HUD's practice of reducing information provided by telephone to writing on the complaint form and sending the form to the aggrieved person for signature and affirmation.

A substantially equivalent agency complained that HUD's proposed procedures do not recognize that State and local agencies may have their own filing procedures and complaint formats. The agency argued that HUD's regulations should state that complaints may be filed with such agencies in accordance with their filing procedures and that complaints submitted on the agency forms will be accepted if they meet the requirements of § 103.30(c). These requirements are contained in the regulation at §§ 103.25(a)(3) and 103.30(b). The regulation is unchanged on this point.

*Section 103.30  Form and content of the complaint.*

In response to a commenter, §§ 103.30(a) and 103.55(a) have been amended to delete the requirement that complaints and answers must be attested to before a notary public or a duly authorized representative of the Assistant Secretary. This attestation burden is unnecessary. Section

810(a)(1)(D) requires only that complaints and answers be under oath and affirmation. Under 24 U.S.C. 1746, the oath and affirmation requirement is satisfied if the complainant (or respondent) signs the following statement: "I declare under penalty of perjury that the foregoing is true and correct."

*Section 103.42  Amendment of complaint.*

Section 103.42 has been revised to clarify that complaints may be reasonably and fairly amended at any time and that the list of circumstances under which complaints may be amended is illustrative only.

*Sections 103.45  Service of notice on aggrieved person and 103.50  Notification of respondent; joinder of additional or substitute respondents.*

Section 810(a)(1)(B)(i) of the Act requires the Secretary to serve notice upon the aggrieved person acknowledging the filing of a complaint and advising the person of the time limits and choice of forums provided under Title VIII. Section 810(a)(1)(B)(ii) of the Act requires the Secretary to serve a notice on the respondent within 10 days of the filing of the complaint (or within 10 days of the identification of a substitute or additional respondent). This notice must identify the alleged discriminatory housing practice and advise the respondent of the procedural rights and obligations of respondents under Title VIII, and include a copy of the complaint. These sections are implemented at §§ 103.45 and 103.50 respectively.

Commenters emphasized the importance of the notice to aggrieved persons and respondents and suggested various additions to and modifications of the proposed regulations. The suggested changes included the addition of a requirement for the service of copies of Title VIII, applicable regulations and forms, and revisions of the description of the procedural rights and obligations under Title VIII and related laws to provide greater detail.

The regulation at §§ 103.45 and 103.50 describes, in general terms, the notification that will be provided to aggrieved persons and respondents. HUD intends to develop forms consistent with these regulatory provisions that will define with greater detail the procedural rights and obligations of the parties under the complaint processing procedures, and that will describe the additional information that will be provided to assist the parties. While HUD does not believe that it is necessary to detail

these provisions in the regulations, HUD will take the comments on these sections into consideration in developing its notification forms.

*Section 103.55  Answer to complaint.*

One commenter argued that § 103.55 (Answer to complaint) should be revised to state that the respondent is under no obligation to file an answer and that a decision not to answer will have no impact on the respondent's position in the case. This section clearly provides that the filing of an answer is permissive. Since answers will generally expedite complaint processing, the regulations should not include provisions that would discourage their filing.

Subpart C—Referral of Complaints to State and Local Agencies

*Section 103.100  Notification and referral to substantially equivalent State or local agencies.*

Section 103.100 states the procedures for the notification and referral of complaints to substantially equivalent State and local agencies and provides for the notification of the aggrieved person and the respondent of the referrals, including the notification of the right of the aggrieved person to commence a civil action under section 813 of the Fair Housing Act. A commenter suggested that the notification under this section (and under § 103.115—Notification upon reactivation) also state that a suit may be filed in State court as well as Federal court. The proposed revision has not been made since State and local jurisdictions must provide such notifications to the complainant and the respondent as a requirement of certification (see § 115.3(a)(1) (ii) and (iii).

*Section 103.110  Reactivation of referred complaints.*

Under § 103.110, HUD will reactivate a referral complaint under three circumstances. Comments regarding each of these circumstances are discussed below.

*Consensual reactivation.* The complaint may be reactivated when a substantially equivalent State or local agency consents to the reactivation. In response to a comment, this section has been clarified to add that the Assistant Secretary may reactivate a complaint with the consent or at the request of the agency.

*Prompt processing.* The complaint may be reactivated if the substantially equivalent State or local agency fails to commence proceedings with respect to

the complaint within 30 days of the date that the agency received the notification and referral of the complaint, or the agency commenced proceedings within this 30-day period, but the Assistant Secretary determines that the agency has failed to carry the proceedings forward with reasonable promptness. HUD will not reactivate a complaint under these conditions, however, until the appropriate HUD Regional Office has conferred with the agency to determine the reason for the delay in the processing of the complaint. If the Assistant Secretary believes that the agency will proceed expeditiously following the conference, HUD may leave the complaint with the agency for a reasonable time.

While commenters supported the provision for consultation prior to reactivation, several changes were recommended. Commenters suggested that the regulations should provide for a written notice announcing the time and place for the conference and stating the reasons that the proceeding may be reactivated. Consultation contemplated under this section will be an informal process. In many instances, HUD anticipates that the consultation will be best accomplished through such measures as a telephone, rather than a face-to-face, consultation. To ensure that the procedures to be used are flexible and best suited to the certified agency, the procedures for consultation will be negotiated with each certified agency and incorporated in the memorandum of understanding. The proposed change is not included in the final rule.

In order to prevent arbitrary actions by the regional offices, commenters recommended that HUD establish criteria for determining when an agency has failed to act with reasonable promptness. Specific suggestions included placing an upper limit on the amount of time that HUD may leave a complaint with an agency; and establishing procedures for the identification and time limits for processing of specific types of cases that require a greater processing time (*i.e.*, systemic cases).

The determination that an agency has failed to act with reasonable promptness is one that must be made on a case-by-case basis through consultation with the certified agency. Given the numerous factors that must be considered (e.g., the subject matter, the number of aggrieved persons, the complexity of the issues involved in the complaint, the progress made by the agency since the referral of the case, the workload and resources available to the

certified agency, scheduling difficulties between the agency, the aggrieved person and the respondent, etc.), HUD does not believe that it would be worthwhile to set forth the list of all relevant factors that may reflect a determination that an agency has failed to act with reasonable promptness.

Some commenters have argued that HUD's failure to provide greater specificity with regard to the issue of reasonable promptness and the reactivation of complaints is contrary to the goal of the 1988 Amendments to achieve expeditious resolution of complaints. HUD notes, however, that certified agencies must meet various performance standards for initial and continued certification, including limitations on the time for processing of complaints (see § 115.4). HUD believes that these limitations and the provisions for reactivation for failure to act with reasonable promptness are sufficient to serve the purposes of the Act.

A commenter requested regulatory clarification defining what is meant by "commenced proceedings". Because the 1988 Amendments provide for conciliation beginning as early as the filing of the charge, this term, as used in the final rule, could mean the start of investigation or the start of conciliation. Since the initial investigation or conciliation activity to be conducted will vary from agency to agency, HUD has not defined commencement of proceedings in the regulation. This term will be defined in the memorandum of understanding with each agency and will be based on the individual agency's procedures.

*Decertification.* Complaints may also be reactivated if the Assistant Secretary determines that the agency no longer qualifies for recognition as a substantially equivalent State or local agency and may not accept interim referrals with respect to the alleged discriminatory housing practice. No comments were received on this issue.

*Section 103.115    Notification upon reactivation.*

Under § 103.115, the Assistant Secretary is required to notify the certified State or local agency, the aggrieved person and the respondent of the reactivation of a complaint. A commenter noted that HUD staff often will notify the parties that they do not need to continue to cooperate with the certified agency after reactivation. The commenter argued that the notification in § 103.115 should clearly indicate that the agency may continue to process the complaint after reactivation and that the parties should continue to cooperate with such efforts.

HUD recognizes the certified agency's responsibility under State and local law to continue processing complaints following reactivation. The final rule has been amended to assure that the parties are aware of these responsibilities.

Subpart D—Investigation Procedures

*Procedural steps prior to investigation and conciliation*

One commenter, a mortgage banking association, feared that individuals frustrated by the rejection of loan applications for legitimate underwriting reasons will use the fair housing complaint process to appeal their rejection. The commenter urged HUD to provide a screening process to eliminate those complaints that fall outside of the fair housing area. If a complaint, on its face, sets forth an allegation of a discriminatory housing practice, HUD is obligated to accept the complaint and process it under its procedures. HUD cannot, and has not, provided a "screening process" to eliminate such complaints.

*Section 103.200    Investigations.*

*HUD-initiated investigations.* Upon the filing of a complaint, the Assistant Secretary is required to initiate an investigation. In addition to investigations initiated by complaints, the 1988 amendments permit HUD to initiate an investigation of housing practices to determine whether a complaint should be filed under Subpart B (see section 810(a)(1)(A)(iii) of the Act). The proposed rule would permit such investigations upon the written direction of the Assistant Secretary.

While many commenters supported the provisions permitting HUD to initiate complaints, they opposed the requirement that these investigations may be initiated only upon the written direction of the Assistant Secretary. Commenters argued that the requirement is impractical, will delay investigations and should be stricken. As an alternative, the commenters suggested that the regulations provide that the Assistant Secretary may delegate authority to the regions to initiate investigations under certain circumstances.

HUD emphasizes that the requirement for prior approval applies only to those investigations that are initiated by HUD. In the absence of a complaint alleging a discriminatory housing practice made by an aggrieved person, HUD believes that the approval of the Assistant Secretary is necessary to ensure that sufficient grounds for investigation exist and to ensure the efficient utilization of

resources. While the text of the rule states that the *Assistant Secretary* will make such approvals, as the Department develops uniform internal standards to govern the initiation of investigations and gains experience with HUD-initiated investigations, the Assistant Secretary will make appropriate delegations of authority for the initiation of investigations to the regional offices. Such delegations of authority can be made by **Federal Register** notice without the necessity of a rulemaking procedure.

*Testing during investigations.* One commenter argued that section 103.200 should provide that HUD will conduct professional testing or will fund other groups to conduct testing during the investigation stage. In connection with this revision, the commenters urge HUD to establish (with the assistance of housing professionals) the standards for conducting tests, what the tests should measure and the criteria to be used in determining whether discrimination exists.

Testing has been sanctioned by court decisions as an appropriate and essential tool of fair housing enforcement, and HUD will consider evidence developed through testing or auditing by fair housing groups or representatives of an aggrieved person in its investigations. HUD staff, however, does not engage in testing. Funding for private entities conducting projects designed to enforce the Fair Housing Act and substantially equivalent fair housing laws will be permitted under the Fair Housing Initiatives Program (proposed rule published July 7, 1988 (53 FR 25576)).

*Section 103.205 Systemic processing.*

Section 103.205 provides for the systemic processing of complaints. One commenter objected to the inclusion of this provision. The commenter argued that HUD's processing should be limited to the specific complaint, not other fair housing issues.

Section 810 clearly contemplates the investigation of matters related to, but not specifically alleged in, the filed complaint. (E.g., section 810(g)(2)(B) provides that the charge need not be limited to the facts or grounds alleged in the filed complaint.) The purpose of systemic processing is to provide for the investigation of discriminatory housing practices that are pervasive or institutional in nature and for the processing of complaints that involve complex issues, involve novel questions of fact or law, or affect a large number of persons. HUD believes that the cited revision is inconsistent with the scope of HUD's investigative authority and would undermine HUD's ability to

address complex issues. The proposed change has not been made in the final rule.

*Section 103.215 Conduct of investigations.*

Section 103.215(a) continues HUD's existing practice of seeking the voluntary cooperation of persons to obtain access to information necessary to further the investigation. One commenter argued that this section serves no useful purpose. Much of the information obtained through HUD's investigations is provided through cooperative efforts rather than through procedural discovery techniques. In recognition of the success of these efforts, paragraph (a) is being retained.

Section 103.215(b) states that the Assistant Secretary and the respondent may conduct discovery in aid of the investigation by the same methods and to the same extent that parties may conduct discovery in an administrative hearing under Part 104, except that the Assistant Secretary would have the power to issue subpoenas as described in § 104.590 in support of the investigation or at the request of the respondent. One commenter argued that paragraph (b) does not comport with the statute and appears to unnecessarily complicate discovery. The commenter suggested the substitution of language directing that discovery and subpoenas be issued in the same manner as in civil actions in the United States District Court for the district in which the investigation is taking place.

The reference in the rule to the Part 104 procedures provides uniformity in discovery techniques while assuring compliance with the statutory requirement in section 811, which provide that discovery and subpoenas be issued in the same manner as civil actions in the United States for the district in which the investigation is taking place. (See §§ 104.500(a) and 104.590(a)). The rule is unchanged.

Another commenter argued that since HUD should be neutral with respect to the parties during the investigation, there is no reason to deny the aggrieved person the right to conduct discovery while providing this same right to the respondent. While HUD is neutral with respect to the parties, the parties' positions during the investigation are not equal. The respondent is the focus of an investigation aimed at determining whether he or she has committed a discriminatory housing practice and, thus, must be offered the ability to discover information in its own defense. The complaining party, on the other hand, by filing a complaint rather than pursuing its own civil action under

section 813, places the conduct of the investigation in HUD's hands and will not be allowed to conduct separate discovery. HUD notes that the Fair Housing Act does not foreclose a discovery avenue to aggrieved persons who have filed complaints, since the complainant may file a civil action under section 813(a) with regard to the alleged discriminatory housing practice and obtain discovery through the court proceeding.

Subpoenas issued by the Assistant Secretary would require the approval of the General Counsel before issuance. Some commenters argued that only one entity should be involved in the issuance of subpoenas during the investigation. These commenters would delete the references to General Counsel's approval of subpoena issuances. Subpoenas issued by HUD in furtherance of an investigation may be challenged or enforced through judicial proceedings. Since the legal sufficiency of the subpoena will be at issue, it is necessary to ensure that the issuance is justified. Accordingly, the rule continues to provide for review by the General Counsel. A minor clarifying change has been included limiting the General Counsel's review to legal issues.

*Section 103.220 Cooperation of Federal, State and local agencies.*

Section § 103.220 reflects provisions currently contained in Part 105 which permit the Assistant Secretary, in processing Fair Housing Act complaints, to seek the cooperation and utilize the services of State and local agencies and of other appropriate Federal agencies. Proposed § 103.220 also contained language designed to ensure that other Federal agencies are aware of their responsibility under section 808 (d) and (e) of the Act and under Executive Order No. 12259.

Upon review, HUD has concluded that proposed § 103.220 may generate confusion concerning the agencies' obligations to provide information during the investigation process and their duty to ensure that programs and activities are administered in a manner that will affirmatively further fair housing and their duty to cooperate with the Assistant Secretary in furthering the purposes of the Fair Housing Act, including the conduct of investigations. To clarify these provisions, § 103.220 has been revised to state that the Assistant Secretary, in processing Fair Housing Act complaints, may seek the cooperation and utilize the services of Federal, State or local agencies, including any agency having regulatory or supervisory authority over financial

**3264** **Federal Register** / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

institutions. Provisions governing other agencies' duties to affirmatively further fair housing and for cooperating in furthering the purposes of the Fair Housing Act have been moved to a new § 103.515 entitled "Actions by other agencies".

One commenter argued that this section does not clearly announce what type of cooperation HUD will generally expect of banking regulators, or what role these agencies will play in providing material for investigations. The commenter also asserted that it is unclear whether material generated by banking regulators or financial institutions in response to regulatory requirements and for purposes unrelated to the proposed rule would, contrary to existing banking policy, become public documents. Another commenter supported the aims of § 103.220 but suggested specific regulatory provisions designed to address the duty of other agencies to cooperate in investigations and procedures to be followed in pursuing discovery from such agencies.

HUD intends to review and upgrade its memoranda of understanding with covered agencies to cover our cooperative understandings concerning the provision of in formation to HUD under the Fair Housing Act, including information to be provided pursuant to investigations. All terms and conditions of HUD access will be addressed in these agreements. Accordingly, it is not necessary to provide more specific regulations in this area.

*Section 103.225 Completion of investigation.*

*Completion of investigation.* Section 103.230 states that the investigation will remain open until the reasonable cause determination is made. A commenter argued that the General Counsel, who is charged with making the reasonable cause determination, could remove a case from the Assistant Secretary's control by issuing a determination on reasonable cause before the complaint is fully investigated. This commenter felt that conciliation should be available until the complaint is transferred by the Assistant Secretary to the General Counsel for a reasonable cause determination and the General Counsel has filed a charge or dismissed the complaint. To remedy this problem, § 103.400(c)(1) has been revised to provide that the General Counsel shall make the reasonable cause determination only after the Assistant Secretary forwards the matter for consideration.

*Deadline for completion of investigation.* Section 810(a)(1)(B)(iv) and (C) provide that HUD must

complete investigations within 100 days after the filing of the compliant (or, when a complaint has been referred to a substantially equivalent State or local agency and reactivated, within 100 days after service of the notification of reactivation), unless it is impracticable to do so. If the investigation cannot be completed within this time limit, HUD is required to notify the aggrieved person and the respondent of the reasons for the delay. Section 810(g)(1) requires HUD to make the reasonable cause determination within the same 100-day time period, and to provide notification of the reasons for any delay. These requirements were included in §§ 103.225 and 103.400(c) of the proposed rule.

Several commenters requested deletion of the impracticability exception. The impracticability exception was a recognition by Congress that there may be circumstances where investigations may not be completed, and the reasonable cause determination made, within the prescribed 100-day period. While HUD intends to meet these deadlines whenever it is within its power to do so, it is concerned that the imposition of a strict 100-day deadline will not recognize the need for a lengthier investigation in complaints involving complex issues or recalcitrant respondents, and that respondents could argue for the dismissal of an otherwise meritorious complaint based on the failure to complete an investigation. Since HUD perceives that no valid fair housing-related goal would be served by imposing a strict 100-day deadline in all cases, the impracticability standard has been retained.

Other commenters argued that the regulation must clearly identify the circumstances under which it will be impracticable to complete the investigation or issue a reasonable cause determination within the 100-day period. These commenters suggested that impracticability be defined as extraordinary circumstances in the specific case and that the rule should state that the routine processing of other cases will not be grounds for a finding of impracticability. The range of circumstances that could legitimately cause delay in a case is numerous, and HUD is not prepared to identify all possible circumstances that would make it "impracticable" to take the described actions within the prescribed time period. Moreover, even if HUD were to articulate all such circumstances, it would not preclude the consideration of the demands upon HUD's resources caused by other docketed cases. Such a definition would fail to recognize that

even the best-managed case inventory system may not posses sthe excess capacity to respond to extraordinary demands upon resources.

*Section 103.230 Final investigative report (FIR).*

Requirements governing the contents of the investigative report are codified at § 103.230. Paragraph (a)(1) of this section provides that the investigative report will disclose the names and dates of contacts with witnesses, but will not disclose the names of witnesses that request anonymity. As noted in the rule, however, HUD may be required to disclose the names of such witnesses during the course of an administrative hearing under Part 104 or in a civil action under Title VIII. Commenters argued that the provision for nondisclosure of the identity of witnesses should be eliminated. The questioned provision merely continues HUD's current policy with regard to the disclosure of the identity of witnesses. Contrary to the allegations of the commenters, this policy has not undermined the credibility of HUD's investigations nor has it stifled conciliation efforts. The provision has been retained in the final rule.

One commenter argued that the regulations also should bar the disclosure of personal information about third parties and safeguard information that potentially could endanger the physical safety of the parties or of a third party. While HUD's final investigative report will avoid the inclusion of extraneous information, it is impossible for HUD to bar the disclosure of all information about third parties and to guarantee the individual safety of parties or of a third party. The proposed provision has not been included.

One commenter was concerned that the format for the investigative report may not provide an adequate basis for a reasonable cause determination. The investigative report will not be the only document available in connection with the making of a reasonable cause determination. The actual statements of witnesses and documentary evidence as well as the analysis of the investigation also will be considered. Internal procedures relating to these matters will be developed by HUD. Such procedures are not appropriate for inclusion in this rule.

Commenters urged that the FIR requirements be expanded to include a recommendation by the investigator on the reasonable cause determination and to include the facts and legal basis for the investigator's recommendation. As a

matter of internal policy, HUD anticipates that the views of the investigator with regard to the reasonable cause determination will be communicated to the General Counsel's office. HUD does not believe that it is necessary to incorporate this requirement in the regulation.

As required under section 810(d)(2) of the Act, § 103.230(c) provides that the Assistant Secretary shall make information derived from an investigation, including the final investigative report, available to the aggrieved person and the respondent, upon request, at any time following the completion of the investigation. In response to a commenter, the final rule has been revised to require HUD, following the completion of the investigation, to notify the aggrieved person and the respondent that the FIR is complete and will be provided or upon request. Under most circumstances, the notification will be provided with the charge, where a charge is issued under § 103.405, or with the notice of dismissal under § 104.400(a)(2).

Subpart E—Conciliation Procedures

*Section 103.310  Conciliation agreement.*

If conciliation is successful, the terms of the settlement are reduced to a written conciliation agreement. Section 810(b)(2) of the Act provides that a conciliation agreement shall be an agreement between the respondent and the complainant, and shall be subject to the approval of the Secretary. Section 103.310(b) incorporates these requirements and states that the Assistant Secretary will indicate HUD approval of the conciliation agreement by signing the agreement.

The final rule makes a minor revision to this provision. Under the proposed rule, if HUD is the complainant, the Assistant Secretary would execute the agreement only if the aggrieved person is satisfied with the relief provided to protect his or her interest. The final rule recognizes that there may be circumstances where HUD may file a complaint that identifies a class of aggrieved persons, rather than specific aggrieved persons. Under such circumstances it would be impossible to determine if all aggrieved persons in the class are satisfied with the relief accorded. Accordingly, the final rule permits the Assistant Secretary to execute the agreement if all aggrieved persons named in the compliant filed by HUD are satisfied with the relief provided to protect their interests.

Section 103.310(b)(2) would preserve the General Counsel's ability to issue a charge under § 103.405, where the aggrieved person and the respondent have executed a conciliation agreement that has not been approved by the Assistant Secretary.

Commenters argued that HUD should not be permitted to commence or continue the investigation once an agreement is reached between the aggrieved party and the respondent. The commenters argued that the retention of this provision would "chill" conciliation agreements between the aggrieved person and the respondent and would serve no purpose since the Assistant Secretary will have right to initiate complaints under the 1988 Amendments. HUD could lose the ability to initiate a new complaint if the time period for the filing of the complaint has passed. Moreover, it would be wasteful of administrative resources to require HUD to file another complaint and to maintain a second case file under these circumstances. The final rule does not adopt the commenter's suggestion.

*Section 103.315  Relief sought for aggrieved persons.*

Section 103.315 lists the types of relief that may be sought for the aggrieved person during conciliation. Under paragraph (a)(1), monetary relief in the form of damages, including damages caused by humiliation or embarrassment and attorneys fees. One commenter argued that monetary relief should be limited to "compensatory" damages. Another commenter argued against the provision of damages for humiliation or embarrassment, stating that such a practice would result in extraordinary and unreasonable damage awards.

HUD has left paragraph (a)(1) unchanged. Damages for humiliation and embarrassment and noncompensatory damages (i.e., punitive and exemplary damages) can be awarded in civil actions brought under Title VIII. Since respondents will seek a full release of all claims as a part of the conciliation, the regulation should permit negotiations that take such factors into account as a part of the settlement. Although monetary damages other than actual damages are usually not provided for in a conciliation agreement, it is HUD's intent that the rule not preclude the possibility of seeking punitive or exemplary damages for an aggrieved person in an appropriate situation.

Paragraph (a)(2) provides for other make-whole relief, including access to the dwelling at issue or to a comparable dwelling, the provision of services or facilities in connection with a dwelling,

or other specific relief. This provision has been amended to provide for "other equitable relief, including but not limited to" the listed actions. While one commenter felt that the provision for access to a comparable dwelling was redundant, HUD believes that the inclusion of this provision is appropriate to cover situations where the original dwelling at issue is no longer available.

Commenters argued that the provisions permitting the binding arbitration of disputes arising out of the complaint could be improved by the addition of a description of the rules and procedures that will be used in arbitration. This change has not been made. HUD wishes to keep the arbitration remedy as flexible as possible in order that individual aggrieved persons and respondents will have the opportunity to adopt the procedures that will best suit their circumstances.

*Section 103.320  Provisions sought for the public interest.*

Section 103.320 lists the types of provisions that may be sought for the vindication of the public interest. Commenters argued that the regulations should announce the standards that HUD will use in determining whether a conciliation agreement will adequately vindicate the public interest. No useful purpose would be served by listing every form of public interest that HUD may protect with conciliation agreement provisions. These provisions are often tailored to the circumstances of particular cases. The suggested change has not been adopted.

One commenter noted that civil penalties may be assessed in the administrative proceeding and the civil action. This commenter urged HUD to add a new provision permitting the seeking of civil penalties of up to $50,000 in conciliation. As noted above, HUD has not precluded the negotiation of damages in lieu of possible court-awarded punitive damages on behalf of the aggrieved person in conciliation, because such agreements are made in return for the full release by the aggrieved person of all claims against the respondent. However, since the public interest is vindicated by ensuring future compliance and by rectifying the effects of past discriminatory housing practices, rather than penalizing the respondent for such practices, civil penalties have not been added under §103.320.

One commenter argued that HUD should be permitted to seek compensation for private fair housing groups that have participated in

mediation or investigation before the complaint is filed. HUD recognizes that private fair housing groups often play a significant role in assisting and referring complaints on a Federal and State level, and in providing initial investigation and mediation assistance that is often useful in handling the complaint after it is filed. However, HUD does not believe that the conciliation agreement is an appropriate device for the recovery of such compensation on behalf of the fair housing group in any case where the group is not an aggrieved person. In other instances, HUD fears that attempts to recover compensation for such groups would be viewed as collusion between HUD and the groups.

*Section 103.330 Prohibitions and requirements with respect to disclosure of information obtained during conciliation, and § 103.300(a) Participation as conciliator and investigator.*

Under section 810(d), nothing said or done in the course of conciliation may be made public or used as evidence in a subsequent proceeding under Title VIII without the written consent of the persons concerned. Proposed § 103.330(a) implemented this provision with the additional statement that information disclosed during conciliation would not be used in the investigation of the complaint.

Upon reconsideration, HUD has decided to remove the additional statement concerning information disclosed during conciliation. By barring the use of conciliation statements or conduct "in an investigation", the proposed rule imposed greater restraints on the use of such information than are imposed under the statute. The statutory language represents a balance between the need to encourage candor in conciliation discussions and the need for a full development of the facts in the investigation and litigation of the complaint. The proposed language, in striking a different balance, may not conform to the statutory intent.

Although it is fairly obvious that statements made during conciliation might provide useful investigative leads, Congress did not preclude the use of such statements. The real concern of Congress was the effect on conciliation if statements made or conduct exhibited during conciliation were admissible in a later administrative proceeding or civil action.

By barring the investigative use of conciliation statements and conduct, HUD invites both complainants and respondents to argue that the investigation has somehow been "tainted" by information obtained

during the conciliation. This would invite wasteful litigation concerning whether HUD conducted its conciliation and investigation activities in accordance with its own regulations and would provide parties with an incentive to insulate themselves from the use of evidence at trial, by disclosing key facts during conciliation.

In the final rule, the prohibition against the use of conciliation information in investigations will be dropped. HUD notes that the use of such information in administrative hearings and civil actions will be governed by Rule 408 of the Federal Rules of Evidence. (See § 104.730) Rule 408 makes inadmissible at trial "evidence of conduct or statements made in compromise negotiations," but "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations."

As a related matter, § 103.300(c) limits the participation of officers, employees, and agents of HUD engaged in the investigation of a complaint under Part 103 in the conciliation of the same complaint or in any factually related complaint. While the original purpose of this general limitation was to ensure that information gathered during the conciliation process is not used in the investigation of the complaint, HUD continues to believe that conciliation of individual complaints can be best promoted where the investigation and conciliation functions are kept separate, so § 103.300(c) is being retained despite the adjustments made in § 103.330, discussed above.

Section 103.300(c) continues to recognize that there may be circumstances where a dual role for the HUD employee may be necessary. This section permits the investigator to suspend fact finding and engage in efforts to resolve the complaint by conciliation where the rights of the aggrieved person and the respondent can be protected and the prohibitions with respect to the disclosure of information obtained during conciliation can be observed. HUD emphasizes that such conciliations will generally occur where the investigator, during the course of investigation, is requested by the parties to conciliate and will rarely be initiated by the investigator.

One commenter, concerned that any suspension of fact finding would unduly delay the completion of the investigation, opposed this provision. The suspension of the investigation envisioned under this provision should not delay the investigation appreciably and should not prevent the Department from fulfilling its 100-day deadline for

investigation and the reasonable cause determination.

Section 103.330(b) provides an exception to the prohibition against disclosure of conciliation information. This section provides that conciliation agreements will be made public, unless the aggrieved person and the respondent request nondisclosure and the Assistant Secretary determines that disclosure is not required to further the purposes of the Fair Housing Act. One commenter suggested that the provision should note that one of the purposes to be considered in determining whether disclosure should be required is the education of people about their fair housing rights and remedies and to show that meaningful redress can result from reporting possible violations to HUD and utilizing the conciliation process. While HUD agrees that the cited factor is significant in determining whether disclosure of a conciliation agreement will further the purposes of the Fair Housing Act, HUD is required to consider other purposes in making the disclosure determination. The final rule has not been changed to highlight this purpose.

One commenter asked how conciliation agreements would be made public. Where the terms of a conciliation agreement do not otherwise provide, HUD intends to issue a press release setting out the fact of successful conciliation and outlining the major terms of the agreement. The statute also requires "public disclosure" in the case of any complaint where the Secretary has determined that no reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, and has dismissed the complaint. The Department intends to employ press releases for this purpose as well. Where a complaint is dismissed on a finding of no reasonable cause and the respondent specifies that even public disclosure absolving the respondent would be unwelcome, the Department will refrain from issuing a press release. However, HUD interprets the Amendments Act as requiring some form of public disclosure on the occasion of a dismissed complaint, and accordingly the Department's policy will be to disclose this information to the public if a specific request is received.

*Section 103.335 Review of compliance with conciliation agreements.*

Proposed § 103.335 stated that HUD may, from time to time, review compliance with the terms of any conciliation agreement. Whenever HUD has reasonable cause to believe that a

respondent has breached a conciliation agreement, HUD shall refer the matter to the Attorney General with a recommendation that a civil action be filed under section 814(b)(2) of the Act for the enforcement of the terms of the conciliation agreement.

One commenter argued that the language used in this section indicates that review of compliance agreements will be "haphazard and perfunctory." The commenter recommended the deletion of the phrase "from time to time" and would make compliance review mandatory and periodic (at least once a year) whether or not HUD has reasonable cause to believe that a breach has occurred.

Requiring HUD staff to monitor every conciliation agreement on a mandatory and periodic basis is not the most effective used of HUD's limited resources. Compliance reviews under this section will not be performed on a haphazard or perfunctory basis. Rather, compliance reviews will be performed on a random sampling basis, or if HUD has reason to believe that the signatories are not complying with the terms of a particular agreement. The final rule is unchanged.

Subpart F—Issuance of Charge

*Section 103.400 Reasonable cause determination.*

*Reasonable cause standard.* Proposed § 103.400(a) provided that if a conciliation agreement has not been executed by the complainant and the respondent and approved by the Assistant Secretary, the General Counsel, within specified time limits, shall determine, based on the totality of the factual circumstances known at the time of the decision, whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur. The reasonable cause determination shall be based on all the facts concerning the alleged discriminatory housing practice, provided by the complainant and respondent and otherwise, disclosed during the investigation. In making the reasonable cause determination, the General Counsel shall consider whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of a civil action in federal court.

A number of commenters objected to the reasonable cause standard announced in this section. Some argued that the standard is overly restrictive and may unduly limit the number of charges that will be issued by HUD. Others alleged that the meaning of the proposed standard is unclear and may

open the door for subjective decisions and may permit the consideration of irrelevant factors. (*I.e.,* Some commenters suggested that the proposed language would permit HUD to consider any matters that could have a bearing on a decision to bring a lawsuit, including: an assessment of the strength of the suit, the amount of anticipated damages, the government's resources that would be devoted to the proceeding, the availability of witnesses, docket scheduling, and other factors generally bearing on the exercise of prosecutorial discretion). Commenters argued that language of the statute and relevant legislative history limit HUD's assessment to the issue of liability alone.

Contrary to the allegations of the commenters, a fair reading of the regulation clearly demonstrates HUD's intent to limit the reasonable cause assessment to the issue of whether a discriminatory housing practice has occurred or is about to occur. HUD, by repetition in the regulation, expressed its position that the reasonable cause determination is to be based solely on the issue of liability. No less than three passages state this proposition. (*I.e.,* the regulation states that the determination will be "based on the totality of the factual circumstances"; that the reasonable cause determination "shall be based on all facts concerning the alleged discriminatory housing practice"; and "the General Counsel shall consider whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of the civil action." While the proposed language would foreclose the consideration of extraneous matters not related to the factual determination of liability, HUD has made an additional modification in the final rule to reflect HUD's intent that the reasonable cause determination is to be based *solely on* the facts determined during investigation.

The source of many commenters' dissatisfaction is the provision that requires the General Counsel to determine whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of a civil action. Rather than permitting consideration of the probability of winning the case, this standard is merely intended to require that the charge is well-grounded in the facts and that the conduct that is the subject of the complaint appears to constitute a violation of the Act.

Commenters suggested several alternative standards. These standards are, in some cases, identical to the standard contained in the proposed rule.

For example, some commenters proposed that the standard should be whether the information disclosed warrants the initiation of a civil action *or* an administrative proceeding under Part 104. In other cases, the alternative standards are substantially the same as the standard contained in the proposed rule (e.g., whether a reasonable and fair-minded trier of fact could conclude that a discriminatory housing practice has occurred or is about to occur, etc.). Accordingly, the proposed standards have not been incorporated in the final rule.

Other commenters argued that, in addition to the reasonable cause standard, HUD should make certain presumptions in favor of the aggrieved person when making the determination (e.g., to construe the facts in favor of the aggrieved person or to assume that the evidence offered by the aggrieved person is true) or that HUD should reserve all issues of material fact for determination at the hearing or trial. Such presumptions and reservations are inconsistent with HUD's duty to analyze and make a reasoned judgment concerning the alleged discriminatory housing practice and would obviate any need for a HUD investigation, as required by the statute. For this reason, the suggestions are rejected.

*Written reasonable cause determination.* Commenters argued that all determinations of reasonable cause or lack of reasonable cause must be in writing and set forth in an opinion which states the facts and legal conclusions. The commenters argued that such a requirement would discourage subjective determinations and establish accountability on the part of the fact finder and respect for the administrative process.

HUD has made minor changes to the final rule to clarify that all determinations will be made in writing and will set forth a brief summary of the factual basis of the determination. An extensive factual recitation will be unnecessary, since the complete investigative report will contain this information and will be available to the aggrieved person and the respondent. (The rules already provide that where a finding of reasonable cause is made, the charge will include a short and plain statement of the facts upon which the General Counsel has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur). The notification will not state the legal theory upon which the determination is made since the Department feels that such a statement would encourage needless litigation by

encouraging the participants to mount collateral attacks on the reasonable cause determination.

*Appeal of reasonable cause determination.* The regulation provides no right to appeal a reasonable cause determination. Commenters argued that such an appeal is necessary to permit review of errors of law or facts, and that failure to provide such an appeal is contrary to standard administrative procedure. Some commenters would limit appeals to determinations of no reasonable cause.

The statute does not contemplate a review of the reasonable cause determination. Section 810(g)(1) requires HUD to make the reasonable cause determination within a 100-day time period from the filing of the complaint and to take specified actions immediately (or promptly) after the determination is made. (The statute directs HUD to "immediately" issue a charge on behalf of the aggrieved person after reasonable cause is found (section 810(g)(2)) and to "promptly dismiss" the complaint and make public disclosure of the dismissal where no reasonable cause is found (section 810(g)(3)).) In light of these directions, HUD believes that it is significant that the Act does not specifically provide for an appeal of the reasonable cause determination, particularly where such procedures are specified within other sections. (See section 812(h), which provides for Secretarial review of the ALJ's initial decision.) Moreover, HUD believes that appeals of the determination of reasonable cause would be contrary to the legislative history of the 1988 Amendments, which supports the expeditious resolution of complaints. The additional review would delay the resolution of proceedings by civil action or administrative hearings under Part 104.

HUD notes that the failure to provide for the review of the reasonable cause determination will not preclude an aggrieved person from filing a civil action under section 813 of the Act. Nor will the dismissal prevent an aggrieved person from refiling a complaint based on newly discovered or previously unavailable information, provided the one-year time limit for the filing of a complaint is met. (In this regard, one commenter argued that the regulations should permit HUD to toll the statutory one-year statute of limitation for filing where a complaint is refiled. This change has not been made since there is no statutory authority for such an action.)

*Reasonable cause determination and State and local zoning cases.* Under proposed § 103.400(a)(1), if the General

Counsel determines that reasonable cause exists, the General Counsel shall immediately issue a charge on behalf of the aggrieved person, unless the matter involves the legality of a State or local zoning or other land use law or ordinance. If such a law or ordinance is involved, HUD is required to refer the matter to the Attorney General for appropriate action under section 814(b)(1) of the Act. One commenter argued that the rule should state that the referral of such a case will not be made until an investigation has been completed and conciliation has been attempted. It is HUD's intention to investigate complaints alleging discriminatory housing practices that involve the legality of a State or local law and to forward its investigation to the Department of Justice. This section has been revised to provide further clarity on this point. See § 103.400(a)(2) of the final rule.

*Adoption of a reasonable cause determination made by a certified agency.* Commenters argued that the final rule should state that a finding of reasonable cause by a substantially equivalent agency will automatically be adopted by HUD, and require the Secretary to issue a charge. Commenters argued that the failure to include this provision will deny complainants the full protection of the new law during the 40-month period that currently substantially equivalent agencies have to conform their procedures and remedies.

The 1988 Amendments require HUD to make referrals for up to 40 months following the date of enactment to agencies that are certified (including agencies that are certified for interim referrals under Part 115) on the date of enactment. As noted in the preamble to the proposed rule, it is unlikely that such agencies will immediately provide the full range of remedies accorded to complainants under the 1988 Amendments. Given the limited statutory authorization for reactivation provided under section 810(f)(2) of the Act, it does not appear that HUD has unilateral authority to reactivate the complaint to provide the full range of remedies available under the Act absent other circumstances.

Under the limited circumstance where HUD will be able to reactivate and where the State or local agency has issued a reasonable cause determination (the existence of such a determination is highly unlikely until the State or local agency has modified its existing procedures to conform to the 1988 Amendments), HUD cannot automatically adopt the local agency's determination. HUD must ensure that

the determination rests on a firm factual basis. While HUD may use the information gathered by such agencies (with appropriate supplementation through a HUD investigation) to make its independent evaluation of the factual circumstances surrounding the alleged discriminatory housing practice, the responsibility for making the reasonable cause determination cannot be delegated in such a manner.

*Deadline for reasonable cause determination.* Issues regarding 100-day deadline for the reasonable cause determination are discussed above.

*Participation of the Assistant Secretary in the reasonable cause determination.* Several commenters argued that the regulations should state that the reasonable cause determination will be made in consultation with the Assistant Secretary's office, and with due regard to the recommendations of the investigator. Another commenter feared that the investigation report, without further supporting data, may not be sufficient for the General Counsel to make the reasonable cause determination. The commenter asked whether the General Counsel would have access to the complete file, whether the General Counsel may send the case back for further investigation, and whether the General Counsel would be permitted to conduct his or her own independent investigation.

As noted under the discussion of the investigation report, the General Counsel will provide due deference to the recommendations of the Assistant Secretary and the investigator. There obviously will be communications between the two offices concerning this determination and access to files and additional investigative materials. Since such communications will be a matter of internal administrative procedures at HUD, it is not necessary to set forth the procedures in the regulation.

With regard to the investigation of additional matters, the final rule provides that the investigation will remain open until the reasonable cause determination is made. This provision was intended to permit the General Counsel to request the Assistant Secretary to make a further investigation where the investigative report is insufficient to determine whether reasonable cause exists, and to make direct inquiries to supplement the investigation.

Several commenters asserted that permitting the General Counsel to conduct his or her own investigation would be contrary to the intention of the legislation, would undermine the Assistant Secretary's investigative

function; may needlessly duplicate investigative activity; and would delay the disposition of cases. The General Counsel does not have the resources to engage in extensive fact-finding. Accordingly, where such fact-finding is required, the Assistant Secretary will be requested to conduct further investigation. Whenever there are minor issues capable of expeditious resolution, however, nothing prevents the General Counsel from resolving the issues through direct inquiries. The internal procedures for the conduct of such further inquiries will be worked out through agreements between the Assistant Secretary and the General Counsel.

*Section 103.405   Issuance of charge.*

Section 103.405 governs the issuance of the charge. Paragraph (a)(5) of this section provides that the charge need not be limited to the facts or grounds that are alleged in the complaint. A commenter argued that HUD should not be able to set forth new facts or new grounds in the charge. The commenter argued that HUD should be required to amend the complaint if new acts or grounds are found. Following the amendment, the respondent and aggrieved person should be given an opportunity to enter a conciliation agreement based upon the additional facts or grounds.

Section 810(g)(2)(B) expressly provides that the charge need not be based on the facts or grounds alleged in the complaint. Where additional grounds are discovered during the processing of the complaint, HUD intends to inform the respondent of the additional grounds and to seek information from the respondent concerning such matters. HUD will not require the amendment of the complaint as long as the record of the investigation clearly indicates that the respondent has been given notice and an opportunity to respond to the new allegations. The final rule at § 103.405(a)(3) has been amended to reflect this policy.

*Section 103.410   Election of civil action or provision of administrative proceeding.*

Section 103.410 governs the election of a civil action under section 810(o) or the provision of an administrative proceeding under Part 104.

One commenter stated that the rule should clarify whether the agreement of the complainant and the respondent is necessary for Part 104 procedure to apply. If no person makes a timely election to proceed with a civil action under section 810(o) of the Act, Part 104 will apply. The Department has made

minor revisions to the regulations to clarify this point.

Paragraph (e) of the proposed rule provided that the General Counsel shall be available for consultation concerning any legal issues raised by the Attorney General regarding how best to proceed in the event that commencement of a civil action would implicate Rule 11 of the Federal Rules of Civil Procedure. Numerous commenters claimed that paragraph (e) is unnecessary, serves no useful purpose, may be used by the Department of Justice (DOJ) to reduce its litigation caseload, is not required by statute, and should be deleted.

Following the reasonable cause determination and an election, the statute provides that the Attorney General shall commence and maintain a civil action not later than 30 days from the election (section 810(o)). While we believe that the need for such consultation will be infrequent, we do not believe that Congress intended to preclude the two Federal agencies from discussing an appropriate method of proceeding in light of new relevant factual information or court decisions. Allowing 20 days for the election, the Attorney General's complaint may be filed as many as 50 days following the issuance of the charge. During that time period, new facts may be discovered or court decisions rendered which demonstrate that there is no reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur. In such circumstances, it would be senseless for the Attorney General to institute a civil action. Under such circumstances, HUD will take such action as is necessary to supplement the investigative report (see section 810(b)(5)(B) which provides that a final investigative report may be amended if additional evidence is later discovered) and, if further evidence to support a finding is not developed, to void the reasonable cause determination *ab initio*. This procedure is designed for the sole purpose of assuring that all civil actions are supportable at the time of filing and, in line with the intention of Congress, to ensure that the Secretary is the official making the determination whether to proceed with a charge or civil action. At the same time, the procedure helps to ensure that the Secretary will have the necessary information to make the required decision.

Some commenters argued that the reference in paragraph (e) to Rule 11 of the Federal Rules of Civil Procedure is unnecessary. As discussed above, the purpose of the DOJ/HUD consultation is to examine new court decisions and newly discovered evidence that are

relevant to the reasonable cause determination. While the Rule 11 standard might be implicated if a civil action is filed where a new decision or evidence indicates a lack of a basis for a reasonable cause determination, HUD agrees that the specific reference to this rule of procedure should be excluded from the final rule. The final rule has been revised to emphasize that the General Counsel will be available for "consultation concerning any legal issues raised by the Attorney General as to how best to proceed in the event that a new court decision or newly discovered evidence is regarded as relevant to the reasonable cause determination."

Several commenters argued that DOJ must publish regulations or make public all proposed procedures for handling the civil actions authorized under section 812(o). DOJ's procedures for pursuing such actions are beyond the jurisdiction of the Secretary, and thus not appropriate for addressing in this rule.

Subpart G—Other Actions by the Department

*Section 103.500   Prompt judicial action.*

Proposed § 103.500(a) provided: "If at any time following the filing of a complaint, the General Counsel concludes that prompt judicial action is necessary to carry out the purposes of Part 103 or Part 104, the General Counsel will request that the Attorney General commence a civil action for appropriate temporary or preliminary relief pending the final disposition of the complaint."

One commenter objected to the language stating that the General Counsel would "request" the Attorney General to commence a civil action. The commenter argued that the language implies that following the request, it is within the Attorney General's discretion to file the civil action. The commenter noted that section 810(e) *requires* the Attorney General promptly to commence action after the Secretary *authorizes* the action. The statute does provide that when the Secretary authorizes the civil action, the Attorney General shall promptly commence and maintain such action and the final rule has been revised to track the statute.

Before making the determination to request such action, the proposed rule stated that the General Counsel would consult with the Assistant Attorney General for the Civil Rights Division. Commenters urged deletion of the consultation requirement. Commenters argued that the provision: (1) Adds time-consuming steps to the process of seeking emergency relief; (2) is not

necessary, since HUD is free to consult with DOJ at any time; (3) will be unnecessary when HUD acquires enforcement experience; and (4) is inconsistent with the statute and with the legislative intent to provide the simplest and fastest method to obtain emergency relief for discrimination victims.

The final rule is unchanged on this point. As noted above, once the general Counsel issues the authorization, the Attorney General is *required* to commence and maintain the action. In light of this mandate, it is crucial that authorized civil actions are justified on both the facts and the law. As noted in the preamble to the proposed rule, prior consultation will ensure that the civil action can be maintained by providing HUD with access to DOJ's extensive experience in seeking relief in different factual situations and in different forums.

Commenters' fears that the consultation requirement will impede the process of obtaining temporary and preliminary relief are unfounded. The consultation envisioned under this section will not be a time-consuming process. Rather, HUD and DOJ plan to consult through informal contacts between representative, of the two agencies. Moreover, HUD expects and intends that the conferences will expedite, rather than delay, proceedings by providing DOJ with important background information in individual proceedings before the issuance of an authorization and by providing DOJ with advance information concerning upcoming litigation. With such information, DOJ should be better prepared to act expeditiously to preserve the aggrieved person's rights when the authorization is issued. To emphasize this point, § 103.500(a) has been revised to provide that the purpose of the DOJ consultation is to ensure the prompt initiation of the civil action.

Section 103.500(b), which implements section 810(e)(2) of the Act, has been revised slightly to more closely reflect the statutory provision.

*Section 103.510 Other action by HUD.*

Section 103.510 addresses other actions that HUD may take with respect to matters asserted in a complaint. A commenter felt that the proposed rule's list of proceedings that may be initiated under other civil rights authorities was incomplete. The commenter urged the addition of the Age Discrimination Act of 1975 (42 U.S.C. 6101) and Executive Order 12259. The final rule has been amended to add the Age Discrimination Act. The cited executive order addresses HUD's authority to

coordinate the fair housing efforts of federal agencies, is not an enforcement authority, and has not been added.

**Part 104—Administrative Proceedings Under Section 812 of the Fair Housing Act**

*Statutory limitations applicable to administrative procedures*

In many instances, commenters suggested revisions to the proposed administrative procedures that cannot be adopted because they conflict with statutory requirements contained in the Fair Housing Act. The statutorily impermissible suggestions included:

1. The deletion of the provision contained in § 104.590(e) which states that HUD will pay witness fees and mileage if the party requesting the issuance of the subpoena is unable to pay. Section 811(b) of the Act requires HUD to pay the fees under such circumstances.

2. The increase or decrease of the amount of the ceiling on civil penalties that may be awarded. Section 812(g)(3) provides for civil penalty ceilings ranging from $10,000 to $50,000. These ceilings are reflected in § 104.910(b)(3).

3. The deletion of provisions contained in § 104.940 requiring HUD to pay attorney's fees to the extent provided under the Equal Access to Justice Act (5 U.S.C. 504). Section 812(p) imposes this liability on the United States.

4. The reconciliation of the proposed deadline for a petition for review of the final decision in a United States Court of Appeals (30 days from issuance of decision); and the date that findings of fact and the final decision become conclusive in connection with a petition for enforcement (45 days after the date of issuance of the decision, if no petition for review is filed). These time periods are imposed under sections 812 (i) and (*l*) of the Act.

Subpart A—General Information

*Section 104.20 Definitions*

Section 104.20 contains the definitions used in Part 104. In addition to the comments on definitions addressed above, a commenter urged HUD to define separately "hearing" and "hearing on the record". While "hearing" is defined and used in Part 104, the phrase "hearing on the record" does not appear in the part. While the commenter noted that a civil action under section 813 is barred after the commencement of "a hearing of the record" by the ALJ (see 813(a)(3)), it is inappropriate to prescribe by HUD regulation the limitations on the jurisdiction of the United States District

Court imposed under section 813 of the Act.

*Section 104.30 Computation of time.*

Section 104.30 governs the computation of time periods. A commenter suggested a clarification in § 104.30(a) to provide that the time computations relate only to filing and serving papers. The section is intended to apply to all computations of time (e.g., deadlines for the commencement of the hearing (§ 104.700); issuance of the initial decision (§ 104.910(d)); and the notification of appropriate governmental entities following the issuance of the final decision (§ 104.935(a)(2)). Accordingly, the proposed change has not been made.

*Section 104.40 Service and filing.*

Section 104.40 requires the filing of all documents in Washington, DC. One commenter argued that this provision places a burden on the aggrieved person, could have a chilling effect and is contrary to legislative intent to provide relief to persons in outlying areas. This commenter would revise § 104.40(a) to require filing in Washington, DC until the Assistant Secretary designates local addresses for filing. While HUD intends to conduct the hearing at a place in the vicinity in which the discriminatory housing practice is alleged to have occurred or to be about to occur (§ 104.700), all other administrative functions will be performed at the Office of the Administrative Law Judges in Washington, DC. Since service and filing can be accomplished by mail, HUD does not believe that this requirement will impose an undue burden on persons outside the Washington, DC area.

Subpart B—Administrative Law Judge

*Section 104.100 Designation.*

Section 104.100 provides that a presiding ALJ for the proceeding shall be appointed by HUD's Chief ALJ. One commenter argued that, consistent with statutory intent for the expeditious handling of complaints, the rules must include procedures for the appointment of the presiding ALJ. HUD believes that the deadlines for the commencement of the hearing are sufficient to ensure the timely appointment of a presiding ALJ and that there is no need to impose a regulatory deadline for appointments by the presiding ALJ.

The commenter also argued that the rules must prescribe the qualifications for ALJ. The qualifications for the appointment of ALJs are fully set forth in 5 U.S.C. 3105, which is specifically

cited at § 104.100. Section 104.100 is unchanged.

*Section 104.130   Ex parte communications.*

Section 104.130 governs the prohibitions of *ex parte* communications. One commenter argued that the listed sanctions for *ex parte* communications are too harsh, particularly where an aggrieved person is unrepresented by counsel and inadvertently makes an improper contact. To remedy this problem, the commenter would delete the list of sanctions from the regulations. This section places the decision to sanction and the choice of sanctions within the sound discretion of the ALJ. The rule clearly provides that the listed sanctions are illustrative and that the ALJ may provide for other, more appropriate, sanctions.

*Section 104.140   Separation of functions.*

Under § 104.140, no officer, employee or agent of the Federal government engaged in the performance of investigative, conciliatory, or prosecutorial functions in connection with the proceeding or any factually related proceeding under Part 104 may participate or advise in the decision of the ALJ, except as witness or counsel during the proceedings. One commenter would revise this section to provide that no officer, employee, or agent * * * may participate or advise in the decision of the ALJ, except as a witness or counsel *to a party* during the proceedings. Persons filing *amicus* briefs are not "parties" to the proceedings under § 104.200. The proposed change has not been made since it could have the effect of prohibiting participation by such persons.

Subpart C—Parties

*Section 104.200   In general.*

Under § 104.200 the parties to the proceedings are HUD, the respondent named in the charge and against whom relief is sought, and any intervenors. In accordance with section 812(c) of the Act, the proposed rule permitted the intervention by any aggrieved person. No other intervnention is permitted in the proceedings, although briefs of amicus curiae may be permitted at the discretion of the ALJ (§ 104.200(a) and (c)).

Commenters objected to the proposed rules governing intervention. One commenter noted that the proposed rule would permit any potential complainant to intervene without regard to the relevance of his or her concerns in the

case. HUD agrees that the proposed rules governing intervention are too broad and has revised this section to permit any aggrieved person to file a timely request for intervention (see discussion below on the timeliness of petitions for intervention). Intervention shall be permitted where the intervenor is the aggrieved person on whose behalf the charge is issued. Intervention shall also be permitted where the intervenor is an aggrieved person who claims an interest relating to the property or transaction that is the subject matter of the charge and the disposition of the action may, as a practical matter, impair or impede the aggrieved person's ability to protect that interest, unless the aggrieved person's interest is adequately represented by the existing parties. The revised provisions are based on the rules of intervention as of right under Rule 24 of the Federal Rules of Civil Procedure.

The commenters also noted that the rule would not permit non-aggrieved persons to intervene. The statute addresses intervention only by aggrieved persons (see section 812(c)). HUD is reluctant to expand the classes of persons that may be permitted to intervene, particularly in light of the statutory time limitations on the issuance of administrative decisions. HUD notes, however, that other persons may be permitted to submit briefs of amicus curiae under § 104.205(c).

*Section 104.210   Representation.*

Section 104.210 governs representation of the parties. Under § 104.210(b)(5), parties may be represented by an attorney admitted to practice before a Federal Court or before the highest court in any State. One commenter would permit representation only by attorneys who are admitted to practice before a Federal Court. Attorneys in good standing before State or Federal courts may be sufficiently qualified to represent the parties in a Part 104 proceeding. It is unnecessary to limit the parties' choice of representatives as proposed by the commenter.

Under § 104.210(d), the attorney or other representative must file a written notice of intent before withdrawal from the proceeding. One commenter urged HUD to limit the representative's ability to withdraw. The rule does not prescribe such limitations. To the extent that the commenter fears that withdrawals may be used to delay the proceeding, we note that such dilatory tactics would be prohibited under the standards of conduct (§ 104.220). The commenter suggested that the rule require, at a minimum, service of the written

notification of withdrawal on all parties. This service is already required under § 104.40.

One commenter argued that the regulations do not unambiguously provide that complainants may employ private counsel to represent their interests in the administrative hearings, in addition to the representation provided by HUD. The regulations clearly provide that aggrieved persons may intervene as parties (§ 104.200(b)) and that parties may be represented by counsel (§ 104.210(a)(5)). HUD does not believe that further clarification is necessary.

Subpart D—Pleadings and motions

*Section 104.410   The charge.*

The requirements governing the filing, service and contents of the charge are found at § 104.410. Paragraph (b)(2) of this section refers to "an election * * * to use the administrative procedure." A commenter observed that the administrative procedure will be used if no election is made to have the claim litigated in a civil action and may not be the result of a deliberate election by the parties. The final rule has been revised to clarify this point.

*Section 104.430   Requests for intervention.*

Within 30 days after the service of the charge, any aggrieved person may file a request for intervention and participate as a party to the proceeding. No other intervention was permitted under the proposed rule. Commenters suggested the revision of this section to permit intervention after the expiration of the 30-day period.

While the 1988 Amendments require the commencement of a hearing and the issuance of an initial decision within specified periods, the statute imposes no absolute deadline for intervention. To ensure that aggrieved persons will not be unnecessarily excluded from a proceeding, the final rule has been amended to permit the filing of a timely request for intervention after the 30-day period. In determining whether intervention will be permitted, the ALJ may consider such factors as: the progress of the litigation when intervention is sought; the delay in seeking intervention and the reasons for the delay; and the prejudice to other parties if intervention is permitted. All requests for intervention submitted within 30 days of the filing of the complaint will be considered to be timely filed.

*Section 104.450  Motions.*

Section 104.450(b) states that any party may file an answer to a written motion. Further responsive documents are prohibited, unless otherwise ordered by the ALJ. One commenter would clarify further that prohibited responsive documents would not include exhibits, memoranda, or briefs. The Department does not believe that it is necessary to list all types of responsive documents that would be excluded under this rule. The final rule is unchanged.

Subpart E—Discovery

*Section 104.500  Discovery*

Section 104.500 contains the general provisions governing discovery. Paragraph (d) provides that the frequency and sequence of the discovery methods are not limited, unless otherwise ordered by the ALJ or restricted under Subpart E. One commenter suggested that the final rule require that the ALJ hold an initial pretrial conference addressing discovery issues as a part of the prehearing procedures under Subpart G. At the pretrial conference, the parties would be required to describe the nature and amount of discovery to be undertaken. The discovery plans would be reduced to a written order and all discovery would be completed in accordance with the order. The commenter noted that this procedure is consistent with limitations on discovery imposed in the United States District Courts.

It is not necessary to provide a pretrial discovery conference and order for every proceeding. Where such a procedure is required to expedite the proceeding, however, a pretrial discovery conference may be conducted and a discovery order issued as a part of a prehearing conference under proposed § 104.610. The final rule is unchanged on this point.

Section 104.500(e) provides that all discovery must be completed 15 days before the date scheduled for the hearing. A commenter argued that this date was too close to the hearing. As an alternative, the commenter suggested that the rule provide that all discovery be completed within 80 days of the issuance of the charge.

The 15-day deadline was imposed to ensure that parties' final preparation for hearing will not be interrupted by late-filed discovery requests, and HUD continues to believe that the 15-day time period is a sufficient buffer. The Department notes that the proposed 80-day deadline would not always ensure more uninterrupted time for trial preparation, since hearings may be

commenced at any time within 120 days following the issuance of the charge.

Several commenters noted that the proposed rule will not always permit discovery from a non-intervening aggrieved person on whose behalf the complaint was filed and who is the real party in interest. The commenters argued that such persons should be required to comply with discovery requests (and that the results of this discovery should be admissible in the hearing) as if the aggrieved person were a party to the charge.

Because the administrative decision will depend upon the course of dealings between the respondent and the aggrieved person and the extent of damage will depend upon the injury suffered by the aggrieved person, HUD believes that it is appropriate to allow all forms of discovery to be used against nonintervening aggrieved persons. Accordingly, the final rule includes a new § 104.500(f) stating that for the purposes of obtaining discovery from a non-intervening aggrieved person, the term "party" as used in the subpart includes the aggrieved person on whose behalf the charge was issued.

*Section 104.510  Depositions.*

Section 104.510 governs depositions upon oral examination and written interrogatories. At the request of a commenter, paragraph (d), which explains the procedures and grounds for requesting suspension of a deposition, has been clarified to permit the suspension of a deposition for improper conduct in addition to improper questioning. (For example, a deposition may be suspended if the party makes improper objections or improper instructions to a witness during the deposition.)

*Section 104.520  Use of deposition at hearings.*

Section 104.520 governs the use of depositions at hearings. One commenter would amend this provision to deny third parties the right to use information contained in depositions. The 1988 Amendments contemplate that the administrative proceeding is a public proceeding. As such, HUD cannot preclude the use of information contained in the record of the proceeding. HUD notes, however, that the discovery of information and the use of discovered information may be limited in accordance with protective orders issued under §§ 104.570 and 104.740.

*Section 104.530  Interrogatories.*

The proposed rule permitted unlimited use of interrogatories. One commenter

suggested that the number of interrogatories that may be served without an ALJ order should be limited to 20 interrogatories. A rule limiting the number of interrogatories is consistent with practice in Federal courts and will force the parties to focus on pertinent issues when drafting interrogatories. HUD believes, however, that a 20-interrogatory limitation would unduly restrict discovery under this section. As revised, § 104.530 permits a party to serve up to 30 interrogatories on any other party without an ALJ order. Where necessary for full and complete discovery, the parties are permitted to serve additional interrogatories with an ALJ order.

*Section 104.570  Protective orders.*

One commenter argued that the ALJ must narrow discovery to specific matters raised by the complaint. Part 104 contemplates that discovery will be pursued through the voluntary efforts of the parties and that the ALJ will intervene in the process only where it is necessary to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense. Where necessary to protect the person or party, the ALJ may issue an appropriate protective order directing that certain irrelevant matters may not be the subject of discovery (see § 104.570(d)).

*Section 104.580  Failure to make or cooperate in discovery.*

Section 104.580 governs motions to compel discovery and the imposition of sanctions. One commenter requested the deletion of § 104.580(d)(1), which permits an inference to be drawn in favor of a requesting party if another party fails to comply with a discovery order issued by the ALJ. The cited provision provides the ALJ with an effective method of compelling compliance with orders by parties or persons who unjustifiably resist discovery. It is retained in the final rule.

Subpart F—Subpoenas

*Section 104.590  Subpoenas.*

Section 104.590 provides for the issuance of subpoenas in aid of administrative hearings. Paragraph (f) of the proposed rule addressed motions to quash or limit subpoenas. One commenter argued that all evidence must be allowed into discovery and urged the deletion of this provision. While Part 104 is designed to permit the discovery of any matter, not privileged, that is relevant to the subject matter involved in the proceeding, § 104.590 recognizes that there may be occasions

where a subpoena should be quashed because it is unreasonable and oppressive or for other good cause, or where the subpoena should be conditioned upon the discovering party's advancing the reasonable cost of producing subpoenaed books, papers or documents. The proposed provision is retained.

## Subpart G—Prehearing procedures

Subpart G governs prehearing statements (§ 104.600); prehearing conferences (§ 104.610); and settlement negotiations before a settlement judge (§ 104.620). Except for comments addressing the addition of a discovery conference discussed above, no commenters addressed this subpart.

## Subpart H—Hearing Procedures

### Section 104.720    Waiver of right to appear.

Section 104.720 permits the parties to waive the right to an oral hearing and present the matter for decision on a written record. Commenters urged the revision of this section to prohibit waiver unless non-party aggrieved persons agree to the waiver. Alternatively, the commenters would provide notice of the proposed waiver to non-party aggrieved persons and would permit such persons to intervene within 15 days of the notice.

Those aggrieved persons interested in participating in the proceeding as an intervenor and controlling the procedural conduct of the litigation as a party are permitted to intervene of right (aggrieved persons on whose behalf the charge is issued) or by permission of the ALJ (other aggrieved persons). Where such persons have not filed timely requests for intervention, or where their interest is not sufficient to justify intervention, HUD does not believe that any purpose would be served by a regulation permitting the person the right to control the conduct of selected aspects of the proceeding. Part 104 was drafted with the expectation that the HUD representative, in the absence of intervention by the aggrieved person on whose behalf the charge is issued, will keep that person informed of the course of the proceedings where necessary for the proper disposition of the charge. Therefore, provision for notification to such persons of this procedural step is not mandated by the rules.

### Section 104.740    In camera and protective orders.

Section 104.740, which governs in camera inspections and protective orders contains a minor editorial revision suggested by commenters.

### Section 104.750    Exhibits.

Section 104.750 provides for the prehearing exchange of exhibits to be offered into evidence. One commenter noted that some parties may attempt to use the requirement for the prehearing exchange of exhibits to prevent the use of rebuttal exhibits that have not been exchanged. At the request of the commenter, HUD has revised this section to exclude unanticipated rebuttal exhibits from the exchange requirement.

### Section 104.760    Authenticity.

At the request of a commenter, § 104.760 has been clarified to state that the authenticity of all documents submitted "and furnished to the parties as required under § 104.750" as proposed exhibits in advance of the hearing shall be admitted.

### Section 104.780    Record of hearing.

Under § 104.780, all oral hearings must be recorded and transcribed by a reporter designated by and under the supervision of the ALJ. One commenter observed that this section requires all hearings to be transcribed and argued that this requirement will be expensive. The commenter recommended that this section be revised to require transcripts only if requested by a party or an aggrieved party, or ordered by the ALJ. HUD believes that the provision of a transcript is necessary for the full and complete record in the case and to ensure the adequate review of the proceeding by the Secretary under § 104.930, and by the courts under section 812(i), and to permit court enforcement of the Administrative order under section 812(j).

## Subpart I—Dismissals and Decisions

### Section 104.900    Dismissal.

Under § 104.900, the ALJ is required to dismiss the proceeding:

—Where the complainant, the respondent or the aggrieved person on whose behalf the complaint was filed makes a timely election to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act (see §104.900(a)); or

—Where an aggrieved person has commenced a civil action under an Act of Congress or a State law seeking relief with respect to the discriminatory housing practice and the trial of the civil action has commenced. The commencement of a civil action for appropriate temporary or preliminary relief under section 810(e) or proceedings for such relief under section 813 of the Fair Housing Act do not affect administrative proceedings under Part

104. (see § 104.900(b)). At the suggestion of a commenter, this provision has been clarified to provide that the administrative proceeding will not be affected by such proceedings as a hearing on the temporary or preliminary relief or the issuance of a decision or order granting or denying such relief.

One commenter noted that Part 104 procedures are applicable where the respondent and the aggrieved person do not act (i.e., neither the respondent nor the aggrieved person elects the civil remedy). The commenter argued that Part 104 should include a procedure for an ALJ order by default. Even though the aggrieved person and the respondent may choose not to participate actively in a case, HUD's representative will be required to present sufficient evidence to make a prima facie case that a discriminatory housing practice has occurred or is about to occur. Accordingly, there are no provisions for default in the regulation.

### Section 104.910    Initial decision of administrative law judge.

Under § 104.910, if the ALJ determines that the respondent has engaged, or is about to engage in a discriminatory housing practice, the ALJ is required to issue an initial decision against the respondent and to order appropriate relief including damages; injunctive or other equitable relief; and civil penalties. The following issues were raised regarding relief.

Injunctive or such other equitable relief. Under proposed § 104.910(b)(2) the ALJ may impose injunctive or such other equitable relief as may be appropriate. One commenter argued that the regulations should discuss the types of affirmative relief (e.g., the posting of fair housing posters) that may be ordered by the ALJ. Given the range of affirmative remedial activities that may be accorded to overcome discriminatory housing practices, HUD believes that it would be counterproductive to undertake a listing of all types of such relief under this section.

The proposed rule provides that no order for injunctive or other relief may affect any contract, sale, encumbrance, or lease consummated before the issuance of the initial decision that involves a bona fide purchaser, encumbrancer, or tenant without actual knowledge of the charge.

Commenters noted that a considerable amount of the time may elapse between the filing of the complaint and the issuance of the charge, and from the issuance of the charge to the issuance of the initial decision. They argued that the

regulations do not provide a mechanism for providing third parties with notice that a complaint or charge has been filed. They charged that the failure to include such requirements threatens the efficacy of the equitable relief provisions. Commenters asserted that a respondent seeking to avoid the injunctive or other equitable relief will have sufficient time to contract for the sale, encumbrance or lease to another during this period. The commenters suggested the addition of provisions requiring the respondent to give actual notice to such persons. Alternatively, commenters suggested that the rule provide that, simultaneously with the issuance of the charge, the Secretary will exercise the authority under section 810(e) to secure an injunction which preserves the status of all property identified in the charge until final resolution of the charge.

HUD agrees that the proposed rule did not adequately address this issue. To remedy this problem, the final rule requires the respondent to give actual notice to third parties with whom the respondent engages in a contract, sale, encumbrance, or lease involving the property that is the subject of the charge. The copy of the charge would be provided before the respondent and the third party enter into the contract, sale, encumbrance or lease.

Commenters also recommended that the final rule should provide that the failure to give the notice would constitute a separate discriminatory housing practice. HUD does not believe that such actions constitute an actionable discriminatory housing practice. This change has not been made.

Some commenters suggested that the respondent be required to provide the notice to third parties following the issuance of the charge while others would require notice following the filing of the complaint. Section 812(g)(4) provides that no order shall affect the described transactions consummated before the order and involving a third party without actual notice of the *charge*. Accordingly, the notice will be required only after the issuance of the charge. The proposed change is included at §104.410(b)(3).

*Civil penalties.* Under § 104.910(b)(3), the ALJ may assess a civil penalty against the respondent. The amount of the civil penalty is subject to ceilings of $10,000 to $50,000. The ceiling will depend on the number of previous discriminatory housing practices the respondent has been adjudged to have committed within designated time periods in any administrative hearing or civil action permitted under the Fair

Housing Act or any State or local fair housing law, or in any licensing or regulatory proceeding conducted by a Federal, State or local governmental agency.

Under the proposed rule, if the ALJ determines that more than one respondent has been engaged or is about to engage in a discriminatory housing practice, the ALJ would be permitted to assess the civil penalty, up to the maximum permitted under the rule, against each respondent. One commenter argued that this provision penalizes the respondent who has not committed a prior act, simply for an association with another respondent that has committed such act. The commenter alleged that such a penalty is unfair. This section was intended to address civil penalties where multiple respondents are involved and to permit the ALJ to assess a civil penalty against each respondent. The section has been revised for clarity.

*Section 104.925 Resolution of the charge.*

The resolution of the charge prior to the issuance of a final decision by the ALJ is addressed in § 104.925. Commenters argued that the proposed language does not account for the possibility that some, but not all, of the aggrieved persons of whose behalf the charge is issued may agree to resolve the charge. The final rule has been revised to provide for such resolutions.

*Section 104.930 Final decision.*

Section 104.930 permits the Secretary to review the ALJ's initial decision and issue a final decision. The Secretary may affirm, modify or set aside, in whole or in part, the initial decision, or remand the initial decision for further proceedings. If no final decision is issued by the Secretary within 30 days after the initial decision, the initial decision of the ALJ would become the final decision of the Department.

The proposed rule does not place any time limitation for issuance of the ALJ decision on remand. Commenters claimed that this omission creates the possibility for substantial delay in decisionmaking which is contrary to the congressional goals of assuring expedited processing. The regulation has been revised to state that the ALJ is required to issue the decision on remand within 60 days of the date of issuance of the Secretary's decision, unless it is impracticable to do so. If the ALJ is unable to issue such a decision on remand within this time period (or within any succeeding 60-day period following the initial 60-day period), the ALJ is required to notify all parties and

the aggrieved person on whose behalf the charge was filed in writing of the reasons for the delay. This approach is consistent with section 812(g)(2) of the Act. All remanded proceedings will be conducted in accordance with the requirements of Part 104.

Section 812(h) provides that the Secretary may review any finding, conclusion or order issued by the ALJ. In accordance with this section, the final rule has not been revised to include a standard for Secretarial review of the initial decision, as suggested by one commenter.

*Section 104.940 Attorney's fees and costs.*

Several commenters addressed § 104.940, which provides for the recovery of fees and costs. While some commenters argued that the rules regarding attorney's fees and costs were proper and identical to those governing the Federal courts, others argued that the specificity of this section was unnecessary.

HUD continues to believe that the regulation should provide some regulatory direction concerning the amount of attorney's fees that may be awarded. There appears to be no specific objection to § 104.940(b)(1) which governs the payment of attorney's fees by HUD to the respondent (see section 812(p) which makes the Equal Access to Justice Act applicable to such payments) or to § 104.940(b)(2) which states that intervenors should be liable to the respondent for reasonable attorney's fees only to the extent that the intervenor's participation in the administrative proceeding was frivolous or vexatious, or was for the purposes of harassment. (see *Hughes v. Rowe*, 449 U.S. 5, 11 (1980) and *Christianberg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978)).

Numerous commenters raised the issue of the appropriate standard for the recovery of attorney's fees by prevailing intervenors. The Act provides in section 812(p) that the ALJ or the court may allow the prevailing party a reasonable attorney's fee. That statutory direction is applicable to prevailing intervenors. This entitlement to fees is identical to that provided in a private enforcement action under section 813 and an enforcement action by the Attorney General under section 814. The Department believes that such factors as the appropriateness, necessity and effectiveness of any work performed by a prevailing party are among the factors relevant to the factual determination by an ALJ or court as to whether or what amount of attorney's fees are

"reasonable". Similarly, the issue of whether the amount of fees sought by a prevailing party is reasonable given the participation of federal attorneys is a question of fact to be determined by the ALJ or the court. Accordingly, the rule is unchanged.

## Part 106—Fair Housing Administrative Meetings Under Title VIII of the Civil Rights Act of 1968

Part 106 establishes procedures for public meetings or conferences to gather information to assist the Assistant Secretary in achieving the aims of the Fair Housing Act for the promotion and assurance of equal housing opportunity under the Fair Housing Act. No substantive comments were received on the proposed part. It is adopted without change.

## Part 109—Fair Housing Advertising

The Fair Housing Advertising Regulations (Part 109) are being revised to reflect the expansion of the classes of persons protected under the Fair Housing Act from discriminatory advertising.

### General

The purpose of the HUD Fair Housing Advertising Regulations is to assist all advertising media, advertising agencies and advertisers in complying with the requirements of the Fair Housing Act with respect to advertisements for the sale, rental or financing of housing. These regulations also describe the matters which the Department will consider in evaluating compliance with the Fair Housing Act in connection with the investigation of complaints alleging discrimination in advertising.

Section 804(c) of the Fair Housing Act has been amended to expand the prohibitions or discrimination in advertising for the sale or rental of a dwelling. The amendment added "handicap" and "familial status" to the existing prohibitions of discrimination on the basis of race, color, religion, sex, or national origin.

The Department is revising the Fair Housing Advertising Regulations to reflect the expanded coverage of the Fair Housing Act with respect to discrimination in advertising. Following is a section-by-section description of the changes made in Part 109.

### Section 109.5 Policy.

This section describes the statutory provisions on which the Fair Housing Advertising Regulations are based. The two new protected coverages of the amended statute—"handicap" and "familial status"—have been added in

two places to the existing list of bases on which discrimination is prohibited. In addition, a reference to appraisal services has been inserted in the list of discriminatory practices specifically made unlawful under the Fair Housing Act. Because of the exemption in section 807(b) of the Fair Housing Act for "housing for older persons", a sentence has been added to § 109.5 to explain that the prohibitions of the act regarding familial status do not apply with respect to such housing.

In addition, references to Title VIII of the Civil Rights Act of 1968 have been changed to the new short title of the statute, the "Fair Housing Act", both in this section and throughout these regulations.

### Section 109.10 Purpose.

The Department has made only editorial changes in this section.

### Section 109.15 Definitions.

This section contains definitions of the major terms used in Part 109. The Department has added definitions of the terms "handicap" and "familial status" in paragraphs (h) and (i), respectively. These new definitions are the same as the definitions contained in the Fair Housing Act. In addition, the definition of "Secretary" has been eliminated since the term is not used in the regulations, a definition of "General Counsel" has been added, and the definitions of "person" and "discriminatory housing practice" have been revised to reflect statutory changes.

### Section 109.16 Scope.

This section explains the use of the criteria contained in Part 109 by the Department with regard to action on complaints alleging discriminatory advertising with respect to advertising media and persons placing advertisements. The Department has made changes in the introductory language of paragraph (a) and in the language of paragraphs (a)(1) and (a)(2) to reflect the changes in complaint processing brought about by the Fair Housing Act amendments. Under the new procedure, the General Counsel will make determinations as to whether there is reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur. Thus, § 109.16 would indicate that the General Counsel will consider the use or the failure to use the criteria in this part in making a determination of reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

### Section 109.20 Use of words, phrases, symbols, and visual aids.

Several commenters objected to the statement in the first sentence of proposed § 109.20 that the words, phrases, symbols, and forms set forth in this section have been used in advertising to "convey either overt or tacit discriminatory intent" and that therefore their use should be avoided, because that statement appears to focus solely on the intent that may lie behind discriminatory real estate advertising. The Department agrees that the language, which was already contained in § 109.20, could be construed as a limitation on the types of activities considered to constitute unlawful conduct. Since the Department wishes to maintain a neutral position on the issue of whether discriminatory intent is necessary for advertising to be considered violative of the Fair Housing Act, the statement has been revised. In addition, similar revisions have been made in § 109.20(e) and (f). These revisions also make it clear that this regulation does not prohibit the use of any of the words, phrases, symbols or visual aids in this section, but instead is intended to suggest that the use of such words, phrases and symbols can indicate a preference in particular contexts.

The undesignated introductory paragraph in § 109.20 has also been revised to state that the Department will consider whether, in a particular case, there is a need for "further proceedings on" the complaint, rather than a need for "seeking resolution of" the complaint. This change reflects the new complaint processing procedures under the amended act.

In paragraph (a), which provides examples of words descriptive of dwelling, landlord, and tenants which should not be used in advertising, the Department has added the phrase "adult building".

In paragraph (b), which lists examples of words indicative of persons in the protected groups covered by the Fair Housing Act, the Department has added specific provisions on words relating to handicap and familial status. In paragraph (b)(6), the rule provides that nothing in Part 109 restricts the inclusion of information about the availability of accessible housing in advertising of dwellings. In paragraph (b)(7), concerning familial status, the Department has included a statement making it clear that nothing in Part 109 would restrict advertisements of dwellings which are intended and operated for occupancy by older persons

and which constitute "housing for older persons" as defined in section 807(b) of the Fair Housing Act. In addition, paragraph (b)(8) has been revised and the word "exclusive" has been substituted for the words "ghetto" and "disadvantaged".

In paragraphs (c) and (d), the words "handicap" and familial status" have been added to the list of protected groups.

With regard to paragraph (e), one commenter expressed doubt that directions to real estate could imply a discriminatory preference. However, it has been the Department's experience that references to real estate location in terms of landmarks significant with respect to race, national origin or religion may indicate a preference to certain homeseekers or convey a negative implication to others. Accordingly, this paragraph has not been changed.

*Section 109.25 Selective use of advertising media or content.*

This section indicates examples of how the selective use of advertising media or content can be used exclusively with respect to particular housing developments or sites, with discriminatory results.

In paragraph (c), which concerns selective use of human models when conducting an advertising campaign, the Department has made changes in the last two sentences of the paragraph to provide an example of selective advertising with respect to familial status.

*Section 109.30 Fair housing policy and practices.*

This section discusses actions that advertisers can take which would be considered as evidence of compliance with the prohibitions against discrimination in advertising under the Fair Housing Act.

The Department has added the words "handicap" and "familial status" where appropriate in paragraphs (a) and (b). In addition, the Department has added language in paragraph (b), concerning use of human models, to indicate that models used in display advertising should represent families with children, when appropriate, as well as both majority and minority groups in the metropolitan area and both sexes.

Two commenters suggested that paragraph (a) be revised to provide that use of the equal housing opportunity logotype, without more, would be sufficient to indicate compliance with the advertising provisions of the Fair Housing Act. However, the use of the logotype (or the equal housing

opportunity statement or slogan) is only one indication of compliance, and such use would not preclude the use, in the same advertisement, or words, phrases, symbols, or forms which convey a discriminatory preference or limitation (see § 109.20). Accordingly, suggested change has not been made.

Minor editorial changes have been made in paragraphs (c) and (d) of § 109.30.

*Appendix to Part 109*

The appendix to Part 109 contains three tables intended to serve as a guide for the use of the Equal Housing Opportunity logotype, statement, slogan, and publisher's notice for advertising. The Department has added the words "handicap" and "familial status" where appropriate in the three tables.

**Part 110—Fair Housing Poster**

Part 110 sets forth the procedures established by the Secretary of Housing and Urban Development with respect to the display of a fair housing poster by persons subject to sections 804 through 806 of the Fair Housing Act. The Department has amended Part 110 to reflect the changes made by the Fair Housing Amendments Act of 1988. The major changes in the poster regulations are in § 110.25, Description of Posters. The legend of the poster has been revised to add "handicap" and "familial status" to the bases of illegal discriminatory acts. The legend has also been revised to show that discrimination in the appraising of housing is illegal. In addition to the above amendments, editorial modification has been made for clarification purposes and for consistency in terminology.

**Part 115—Recognition of Jurisdictions With Substantially Equivalent Laws**

Part 115 has been revised to comply with the requirements of the Fair Housing Act. This part: (1) Provides a revised process for certifying agencies as substantially equivalent in place of the recognition process as provided in the current Part 115; (2) defines the requirements for certification with the specificity required by the Act; (3) defines the effect of the Act on agencies recognized on September 12, 1988 as substantially equivalent under current Part 115; (4) requires that in order to become certified, agencies must provide protection against discrimination based on "handicap" and "familial status"; and (5) provides a prohibition against coercion, intimidation and threats.

To obtain certification State and local agencies must administer laws which

prohibit all discriminatory housing practices which are prohibited by the Act and must include as protected classes all classes protected by the Act. Discrimination on the basis of handicap is described in the statutory language and only those provisions of section 804 (f) of the Act which clearly do not apply to State or local agencies may be omitted from the law or ordinance the agency administers if certification is to be granted. Further, the remedies available to a certified agency must be substantially equivalent to the remedies available under the Act. Final agency actions must be subject to judicial review and aggrieved persons must have the right of access to a State or local court. The Act also requires that the procedures followed by a certified agency be shown to be substantially equivalent to those created by the Act. Such procedures as: Filing of complaints by the agency; acknowledgment of receipt of complaints and notice of procedural rights and obligations, completion of investigation and investigative report within 100 days and notice of cause for delay; provision for conciliation and a conciliation agreement which shall be made public under certain conditions; were provided as examples of procedural matters which must be included in the law or ordinance administered by a certified agency.

The regulations require that the law or ordinance provide for resolution of a complaint by a body empowered to grant relief substantially equivalent to the relief which may be granted by the Secretary under the Act.

The Department received a number of comments. These comments can be divided into five major categories: (1) Should procedures in Fair Housing laws of States and localities be required to mirror the Fair Housing Act rather than be "substantially equivalent" to the Act; (2) Should an agency be certified which protects less than all of the classes protected by the Act; (3) Should building codes and other laws or ordinances administered by State or local agencies other than the agency administering the fair housing law be considered in determining the adequacy of the law; (4) Should State or local fair housing laws be required to include an exemption from discrimination based on familial status for housing of the elderly; and (5) Should State and local agency enforcement mechanisms be required to be substantially equivalent to the Act. Significant comments in these areas were focused principally on §§ 115.3 and 115.3a of the proposed rule.

It appears that many commenters misunderstood the requirements in § 115.3(e) for a determination that a State or local law "on its face" satisfies the criteria for certification, indicating that they believed the ordinance or law standing alone must meet the criteria. Both the preamble and the proposed rule indicate that a determination as to whether a State or local law "on its face" is adequate, is not limited to an analysis of the literal text of the law but must take into account regulations, directives and rules of procedure of a State or local agency, as well as other relevant matters of State or local law or interpretations by competent authorities. However, in order to avoid any possible confusion as to matters which will be considered as part of a determination of the adequacy of a law "on its face," § 115.3(e) has been clarified by substituting the word "all" for the word "such" in the second sentence thereof.

*Procedures for Investigations*

Several commenters suggested that time limits, provisions for notices to complainants and respondents and similar procedural criteria are inappropriate, burdensome and may require substantial amendments to current laws or ordinances. Under section 804(f)(3)(A) the Secretary is required to determine that the procedures followed by an agency administering a fair housing law are substantially equivalent to those in the Act. The Department believes the procedural aspects which were contained in the proposed rule are essential to providing adequate procedural protections to persons and that the absence of such protections would substantially weaken a fair housing law. These requirements have been retained in the rule.

A number of commenters objected to the requirement that investigations be commenced within 30 days of the filing of a complaint and that the processing of such complaints be completed within one year of filing. Both the Act and the regulations refer to commencement of proceedings within 30 days of filing. The proposed regulations do not refer to a date for commencement of the investigation, and requiring that the disposition of the complaint be completed within one year of filing of the complaint is reasonable.

*Protected Classes*

A number of commenters urged that the final rule provide that State and local fair housing laws should be eligible for certification even though they do not include coverage of the new classes of persons protected by the Act, if they

meet all other requirements for recognition. Some commenters suggested in the alternative that certification should be permitted based on protections of a certain number of protected classes (e.g. coverage for five or six of the seven protected classes).

The Department believes that the legislative history of the Fair Housing Act supports the position in the proposed regulation that coverage of all protected classes is essential to a substantial equivalency certification.

In connection with the inclusion in section 810(f) of the Act of a provision relating to the grandfathering of substantially equivalent agencies, the House Judiciary Committee Report on the Fair Housing Amendments Act described the process as follows:

Presently, there are 36 states and 76 local agencies certified by the Secretary as substantially equivalent under existing federal law. Many of these states provide for some degree of administrative enforcement, as well as protecting handicapped persons and families with children. The Committee expects that many states will be able to maintain their substantial equivalency status within the time period provided.

In order to provide a reasonable transition period for states to adjust to the new law, agencies currently certified on the day before the date of enactment will continue to remain certified for 40 months. This allows most jurisdictions sufficient time to conform their laws to the new federal standards so that they may remain certified. The Committee recognizes that some jurisdictions may need additional time because of the infrequency of legislative sessions, and the Secretary may grant an additional 8 months for this purpose. Report p. 35.

Thus, it appears clear that Congress intended to provide grandfathered agencies time to broaden their protections to encompass the new protected classes. For this reason the final regulation retains the requirement that State and local laws provide protection to all the classes of persons protected under the Federal law.

*Enforcement Procedures*

Comments that the proposed regulations unreasonably require certified agencies to amend their laws to provide relief which they are currently not authorized to grant appear to be objections to the Act rather than to the regulations. The Fair Housing Amendments Act put "teeth" into the fair housing law. It grants the Department authority to take action against those who commit acts made unlawful by the Fair Housing Act. Consequently, those agencies to which the Department must refer complaints must administer laws which provide the State or local agency with the same

authority to take action against those who commit unlawful acts.

Some commenters in this area insisted that agencies be required to provide for administrative judges and alternative choices—administrative tribunal or civil court—by either complainant or respondent as well as an independent right to go immediately to civil court. We believe it is sufficient that a certified agency be authorized to obtain relief by whatever procedure its law or ordinance provides as long as those procedures provide rights and protections substantially equivalent to those in the Fair Housing Act. This articulation recognizes that it is possible that agencies will be authorized to provide more effective relief on behalf of aggrieved persons through judicial enforcement mechanisms, which are no more burdensome on complainants, without any administrative enforcement procedure. Under the final rule States and localities are permitted to provide such judicial enforcement mechanisms as an alternative to an administrative enforcement—civil action mechanism such as that in the Fair Housing Act.

*Building Codes*

Several commenters indicated that incorporating into the certification procedures a requirement that States and localities provide accessibility requirements for new construction which are substantially equivalent to section 804(f) of the Act was onerous and inconsistent with State and local fair housing enforcement procedures. These commenters pointed out that building code ordinances and mechanisms are not part of fair housing enforcement in most areas and that generally, enforcement of requirements is not handled in the same manner as fair housing cases. These commenters suggested that the requirement in § 115.3a(b)(3) be deleted.

The Department is aware that enactment of accessibility requirements will in some cases present problems for States and localities. However, the Department believes that the legislative history of the Act and particularly the discussion of the importance of the involvement of States and localities in the implementation of new construction accessibility requirements in the Statement of Managers in the Senate, 134 Cong. Rec. S10456 (daily ed. Aug. 1, 1988) supports the determination of the Department to require local construction requirements as part of the HUD certification process.

Protection against housing discrimination because of handicap including accessibility requirements has

been made a part of the Fair Housing Act and must be a part of a fair housing act of a State or locality which obtains certification. A certified agency must have authority and responsibility to receive and process complaints of discrimination based on handicap including complaints of violations of the accessibility standards.

*Housing for Older Persons*

The Fair Housing Act exempts from the familial status provisions certain housing for older persons. This exemption reflects the unique status of housing for older persons described in the House Report on the Fair Housing Amendments Act:

> The bill specifically exempts housing for older persons. The Committee recognizes that some older Americans have chosen to live together with fellow senior citizens in retirement-type communities. The Committee appreciates the interest and expectation these individuals have in living in environments tailored to their specific needs. (Report p. 21).

The Act delineates with specificity the nature of housing for older persons which is exempt from the prohibitions against discrimination because of familial status. In the proposed rule, the department indicated that it intended to require that the State or local law assure that no prohibition based on familial status applies to housing for older persons as a condition for certification. The preamble noted that, while HUD had not previously required States or localities to include in their laws or ordinances any exceptions or exemptions which the Federal law contains, in view of the Congressional concern that the prohibitions against discrimination because of familial status not impinge on housing for older persons, provisions providing for housing for older persons should be required in State or local fair housing laws.

Many commenters objected to the requirement that certified agencies administer a fair housing law which provides the same protections for housing for older persons as those contained in the Fair Housing Act. Some commenters pointed out that as a result of the proposed requirement their fair housing laws would have to be amended to limit existing protections for families with children in order to obtain certification.

While the Department believes that Congress intended to promote housing opportunities to address the needs of older persons, there is nothing in the statute or legislative history to indicate that Congress sought to limit the ability of States and localities to provide

additional protections. For this reason, the final rule has been revised to delete the requirement for an exemption for housing for older persons in State or local laws.

However, in order to reflect the congressional interest in the protection of housing opportunities for older persons, the final rule specifically indicates that State and local fair housing laws may include an exemption for housing for older persons. This provision is intended to encourage States and localities to consider the needs of older persons in connection with the development of fair housing laws.

In addition to the above comments some commenters objected to the provision that certified agencies administer a law requiring that conciliation agreements be made public. (Section 115.3(a)(2)(vi)).

The Department is aware that there are strong arguments for and against disclosure of conciliation agreements. However, Congress has chosen to require such disclosure (The Fair Housing Act (Sec. 810(b)(4))). Uniformity of procedures, in this regard, followed by the Department and certified agencies is preferable to dissimilar practices from State to State and locality to locality. Both complainants and respondents will have the knowledge that no matter the location of the discriminatory housing practice resulting in a Title VIII complaint, any conciliation agreement arising out of conciliation engaged in by the Department or any certified agency will be governed by the same disclosure rules.

Finally, in order to provide consistency in connection with State and local enforcement procedures, § 115.3(b)(1)(iv) has been amended to clarify that a certified agency must have authority to seek injunctive or other equitable relief in a court of competent jurisdiction, as an alternative to the stated authority to grant such relief. This change allows the agency an alternative similar to the alternatives provided in § 115.3(b)(1) (iii) and (v).

**Part 121—Collection of Data**

The Department is recodifying 24 CFR Part 100, entitled "Racial, Sex, and Ethnic Data", as a new Part 121 of Title 24. Part 100 was originally adopted in 1971 under the heading "Racial and Ethnic Data", to enable the Secretary of Housing and Urban Development to obtain information concerning minority-group identification to assist the Secretary in carrying out responsibility for administering the national policies prohibiting discrimination and providing

for fair housing. In 1975, in light of the 1974 amendment of Title VIII to prohibit discrimination on the basis of sex, Part 100 was amended to provide for obtaining information on sex, as well as minority-group, identification.

Section 562 of the Housing and Community Development Act of 1987 (Pub. L. 100–242, approved February 5, 1988) requires the Secretary of Housing and Urban Development to collect data on the racial and ethnic characteristics of persons eligible for, assisted, or otherwise benefitting under each community development, housing assistance, and mortgage and loan insurance and guarantee program administered by the Secretary, and to include a summary and evaluation of such data in the Secretary's annual report to the Congress.

Section 808(e)(6) of the Fair Housing Act, 42 U.S.C. 3608(e)(6), as added by section 7(b)(1)(D) of the Fair Housing Amendments Act of 1988, requires the Secretary to collect data on the race, color, religion, sex, national origin, age, handicap and family characteristics of persons and households who are applicants for, participants in, or beneficiaries or potential beneficiaries of, programs administered by the Department, to the extent that such persons and households are within the coverage of the civil rights laws and executive orders referred to in section 808(f) of the Fair Housing Act or specified by the Secretary by publication in the Federal Register and to the extent that the Secretary determines the data to be necessary or appropriate.

Since Part 100 is now being used for regulations setting forth the coverage of the Fair Housing Act, the regulations concerning collection of data have been moved to a new Part 121—Collection of Data. The Department proposed a revision of the provisions contained in the old Part 100 to provide a more specific regulatory framework for the Secretary to use in carrying out the new data collection and reporting responsibilities mandated by the legislation described above.

A number of commenters asserted that the Department has had authority for some time to collect the types of data which are needed for reporting to Congress but that it has failed to generate such data. These commenters offered various suggestions for the restructuring of Part 121 to accomplish that purpose.

The Department does not believe that any restructuring of Part 121 is necessary. The language of proposed § 121.2 was drawn largely from that

contained in section 808(e)(6) of the Fair Housing Act, described above, to enable HUD to meet the responsibilities mandated by that legislation. HUD remains committed to that objective and believes that the provisions of Part 121, as proposed, will enable HUD to achieve that purpose.

Accordingly, the Department has adopted Part 121 in this final rule with no changes from the proposed rule.

*Legislative review issues*

A number of commenters, including members of the House and Senate Banking Committees and two leading Senate Judiciary Committee proponents of the Fair Housing Amendments Act, asserted that the Department violated section 7(o) of the Department of HUD Act—HUD's legislative review statute—by failing to supply the Banking Committees with copies of HUD's proposed rule for 15 session days before the rule's publication.

Aside from the substantial constitutional question whether the section 7(o) rule-request process is valid and enforceable against HUD (See *INS v. Chadha*, 462 U.S. 910 (1983)), HUD had *no duty* to submit this rule for prepublication review for two reasons, either of which is dispositive:

—the explicit direction contained in the Fair Housing Amendments Act regarding publication of rules for comment, and for effect within 180 days of enactment, coupled with the then-pending adjournment of the Congress, made compliance with section 7(o)(2) impossible (and therefore unnecessary); and

—there was no timely request from either Committee for prepublication review of the rule, as required by section 7(o)(2) of the Department of HUD Act.

*Impossibility of compliance with section 7(o).* In the proposed rule, the Department compared the specific rule-production requirements set out in the Fair Housing Amendments Act with the legislative review requirements in section 7(o). The Department looked at the 1988 legislative calendar, which called for October 5, 1988 adjournment *sine die.* The Department looked at the September 13, 1988 approval date for the Fair Housing Amendment Act, and concluded that the Congress could not possibly have intended for HUD to adhere to the requirements of both Acts.

If the Department had waited for the opening of the new session to expose its rule to the required 15-session-day review, a *proposed* rule could not have been published before February 6, 1989. (HUD published its proposed rule at its earliest opportunity, after developing it

on an accelerated schedule. The Department could not possibly have completed the 15-day prepublication review *before* the Congress adjourned on October 22, 1988, notwithstanding the fact that adjournment was delayed beyond the earlier October 5 projection.)

HUD's long experience with section 7(o) compliance does not comport with the commenters' suggestion that HUD could have followed the dictates of *both* laws—the rapid-pace rulemaking requirements of the Amendments Act, and the leisurely, all-purpose dictates of section 7(o). The requirements of these two statutes could not be in greater conflict, and the Department followed the correct course in choosing the Amendment Act's particularity over section 7(o)'s generality.

Many of the same public commenters who insisted that prepublication review should have been afforded to the Banking Committees under section 7(o) also complained that the Department should have afforded the public a longer period for public comment on its published proposed rule. HUD notes that if both of these requests had been honored the public comment period would have expired approximately one month after the March 12, 1989 effective date of the Amendments Act, and that no rules for implementation of the rights granted by the Fair Housing Amendments Act could have been published for effect until at least June 1989.

*Lack of timely request for congressional review.* Beyond the question of statutory interpretation, prepublication review under section 7(o) was not required because the Banking Committees failed to make a timely request for such review. The following facts are relevant to this issue:

1. By letter of September 14, 1988, the General Counsel submitted to the Banking Committees of both Houses HUD's semiannual agenda of rules, as required by section 7(o). This agenda, normally submitted in October of each year, was provided to the Committees one month early because adjournment was scheduled for October 5, 1988. (Under section 7(o), the Committees have a period of 15 *session* days to review the agenda and request that particular HUD rules be submitted to the Committees for prepublication review.)

2. In the letter transmitting the semiannual agenda, the General Counsel asked for committee restraint in requesting proposed rules from the agenda, since the effect of any such request made during September would be to delay HUD publication of the requested rules until the following February. The General Counsel also

notified the Committees that HUD did not regard certain rules arising out of statutory enactments that contained their own rules-production deadlines as *subject* to the requirements of legislative review. "Notably," the General Counsel's letter continued, "the Fair Housing Amendments Act and the Indian Housing Act contain difficult production deadlines for rulemaking that coincide with congressional recess and adjournment periods. Since it is clearly not possible to honor these deadlines *and* those in the legislative review statute, we intend to focus our efforts on meeting the explicit production deadlines contained in these statutes."

3. The Committees' statutory review period for the submitted agenda expired on September 30, 1988. Neither the House nor the Senate Banking Committee made a timely response to HUD's semiannual agenda submission by that date.

By letter dated October 18, 1988 (and apparently forwarded to HUD six days later), the Secretary received a request from the Chairmen of the House and Senate Banking Committees that HUD "follow the requirements of section 7(o) and provide the proposed Fair Housing Amendments Act rules for review by the Committees before publication." A similar letter was received from Senators Kennedy and Specter of the Senate Judiciary Committee. In deference to these requests, the Banking Committees and Senators Kennedy and Specter were provided copies of the proposed rule shortly before its publication. The Department, however, did *not* delay the rule's publication for 15 session days, or for any other designated period, pending their review.

*Public comment period*

Section 13 of the 1988 Amendments requires the Department to provide an opportunity for public notice and comment. While HUD's general policy is to afford the public not less than 60 days for the submission of public comments (see 24 CFR 10.1), based on the 180-day production schedule and the requirement that a final rule be effective by March 12, 1989, the Department provided 30 days for public comment on this proposed rule.

The Department agrees with the commenter that the period available for public comment, coupled with the size and scope of the proposed rule, made public response difficult. Despite the abbreviated comment period, however, the rule attracted more than 6,400 timely comments—by far the greatest number in HUD's recent history. Many hundreds

of these comments reflected thoughtful consideration of the rule and the issues it raised, and lengthy analytical comments were received from virtually all major housing industry organizations, civil rights and handicapped rights groups, and other interested organizations. Hundreds of additional comments have been received since the close of the December 7, 1988 public comment period, and all of these have been read to determine whether any real issues were raised that were not treated in the timely comments. The Department is convinced that the public comment period permitted full exploration of the issues.

Equally important, as a result of providing less time for the receipt of public comments, the Department has been able to issue this final rule in advance of the law's March 12, 1989 effective date. It is vital that persons subject to the law's greatly increased penalties and newly proscribed conduct have as much advance notice as possible concerning the types of conduct made illegal under the amended statute. Issuance of this rule on or near the effective date of the statute would have ill-served housing suppliers subject to the law's requirements and to HUD regulations interpreting those requirements.

As indicated earlier, HUD found it impossible to follow both the regulation-writing requirements specified in the Amendments Act and the more general requirements of section 7(o) of the Department of HUD Act. Nevertheless, publication of this rule in January permits the Department to provide for a waiting period following publication before the final rule takes effect—a procedure that comports with HUD's rule on rules, 24 CFR Part 10, and meets the requirements of section 7(o)(3) of the Department of HUD Act, which requires 30 session days after publication before HUD final rules may become effective. While HUD does not believe that this rule, with its difficult statutory production schedule, is technically subject to the 30-session-day waiting period required by section 7(o)(3), we nevertheless believe that given the controversial issues involved, it is useful and helpful to provide the Congress with time to consider whether any facet of this rule making calls for a legislative response.

In summary, the Department believes that the public interest was well-served by HUD's early publication of a proposed rule, that the public comments received on that rule were of unusually high quality and were complete in their exploration of legal and policy issues,

and that early publication of the final rule—well before its scheduled effectiveness—also serves the public interest and provides the Congress time to assess whether the rule comports fully with congressional intent.

The Department regrets that resource constraints prevented the proposed rule's being made more widely available on tape. However, the Regulations Division of HUD (the Office of the Rules Docket Clerk) received no requests that the tape be made available for the specific use of any person outside the Washington, DC area.

*Codification of analysis of regulations*

One commenter recommended that the final regulations include, as an appendix, an analysis of the regulations, similar in form to the preamble to the proposed rule.

The Department has attempted to make the guidance provided by its rule text as helpful as possible, and has provided examples of conduct where appropriate to assist in understanding the text. In addition, we have added the analytical guidance contained in the preamble to the final rule as an appendix to the regulation. The preamble will, thus, be codified in the 1989 edition of the Code of Federal Regulations. This will assure the availability of the preamble to interested persons in the future.

*Regulatory Impact Analysis*

One commenter argued that a preliminary regulatory impact analysis should have been prepared based upon the proposed rule's impact on consumers. The Director of the Office of Management and Budget waived the requirement for the preparation of a preliminary Regulatory Impact Analysis under section 3 of the Executive Order based on a determination that compliance with the requirement for a preliminary Regulatory Impact Analysis may unduly delay the rule and may prohibit the issuance of a final rule effective by March 12, 1989. The proposed rule announced that the final Regulatory Impact Analysis would be prepared before the publication of the final rule.

Commenters argued that the effects of the proposed rule on consumers and the housing industry are significant and complex. Commenters also argued that HUD's finding that the proposed rule would not cause a major increase in costs or prices for consumers is incorrect. A commenter noted that the changing of all-adult communities to family communities will result in major expenditures which will require commensurate increases in rents.

Increased costs would include redesign of advertising, brochures, signs, etc., rewriting and reprinting of management documents, increased management and maintenance staff, the addition of playgrounds and play areas for children, higher repair and maintenance expenses because of children, higher potential legal liability and increased insurance rates. One commenter argued that a housing affordability analysis based upon current data should be conducted.

The Department agrees that this rule constitutes a "major rule" as defined in section 1(b) of Executive Order 12291 and has prepared a final Regulatory Impact Analysis as required by the Executive Order. This analysis is available in the Office of HUD's Rules Docket Clerk at the address cited above.

*Environment*

A Finding of No Significant Impact with respect to the environment has been made in accordance with HUD regulations in 24 CFR Part 50, which implements section 102(C) of the National Environmental Policy Act of 1969. The Finding of No Significant Impact is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, at the address listed above.

*Regulatory Flexibility Act*

Several commenters objected to HUD's finding that this rule making would not have a significant economic impact on small entities. The commenters argued that the date in the Steinfeld study (cited in the proposed rule) was over ten years old, and the study's assumptions did not reflect common construction practices. Because HUD did not update this data for OMB, neither HUD nor OMB have considered the major increases in costs or prices adversely impacting housing affordability for consumers, a commenter claimed. In contrast to the Steinfeld study, the commenter asserted that 1988 data indicates a 25 percent loss in profitability of garden-style multifamily units alone. The commenter asserted that it could find no basis for the minimal increases in costs contemplated by the Steinfeld study, unless exterior design site planning and construction considerations bearing on density loss were omitted from the calculations. The minimal expenditure of funds envisioned by HUD is therefore seriously flawed and the impact of the rule upon consumers is vastly understated.

In addition to these issues, commenters also felt that the proposed rule did not adequately consider the

fiscal impact on small governmental entities. The commenter stated that there will be an increase in costs to become certified a substantially equivalent, to make required changes, and to handle the increased caseload associated with the addition of handicap and familial status. The commenter noted that this will require additional FHAP funds to permit the increase in staff once local laws are amended.

Other commenters argued that the regulatory flexibility analysis should have considered the economic impact on communities and municapalities planned for senior citizens. (*I.e.,* The design of such homes on small lots with significant common areas and facilities and which have a direct effect on the demand for service from municipalities in which they are located. Such communities also have significantly reduced demand for schools and certain recreational activities). Each of these factors will have an impact on the organization of municipal governments and their budgets and facilities, a commenter asserted.

While all of these comments reflect what may well be realistic difficulties associated with compliance with the requirements of the Fair Housing Amendments Act, and while the economic impact of the statute may in fact be greater than HUD's preliminary analysis indicated, the Department fails to see what latitude exists for affording regulatory relief based upon the fact that some businesses or governmental entities affected by the statute's requirements are "small entities". The purpose of the Regulatory Flexibility Act is to establish, as a principle of regulatory issuance,

that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulations. (5 U.S.C. 601 note)

The Department has reviewed the objectives of the Fair Housing Amendments Act and finds that its principal objective is stepped-up law enforcement and the expansion of civil rights. There is no suggestion in the statute that HUD is being provided with discretion to apply the law's requirements differentially, depending upon whether a prospective respondent is a large corporation, or a small entity

within the meaning of the Regulatory Flexibility Act. While it is true that future regulation by HUD in such limited areas as compliance reporting or other record-maintenance functions may permit provisions calling for lesser burdens on small entities, the basic prohibitions, compliance procedures. discovery procedures, hearing rights, and other requirements of this final rule are not of a nature that invites regulatory flexibility. To the extent that small entities are subject to the Fair Housing Act's requirements, they are subject as well to the requirements of the rule—to the same extent and in the same manner that larger entities are so subject. Accordingly, HUD's Regulatory Impact Analysis and Regulatory Flexibility Analysis are concerned with the costs of compliance with the law, but having accomplished those analyses, the Department sees its discretion to alter the impact of this rule on small entities as extremely limited by the statute. There are no significant alternatives to the regulatory scheme provided for in the rule that are consistent with the objectives of the Fair Housing Amendment Act.

*"Takings" Analysis*

A commenter suggested that HUD should conduct a "takings analysis" in accordance with Executive Order 12630 of March 15, 1988, "Governmental Actions and Interference with Constitutionally Protected Property Rights".

A takings analysis involves assessing the economic impact of a proposed policy or action to determine, to the extent possible, what economic or property interests are likely to be affected by the proposed action of government.

The economic impact of this rule on identified property interests, according to many commenters, is expected to be significant, but this fact alone does not end the inquiry. Additionally, in accordance with Guidelines issued by the Attorney General relative to agency analyses under Executive Order 12630, consideration is to be given to:

. . . Whether the proposed policy or action carries benefits to the private property owner that offset or otherwise mitigate the adverse economic impact of the proposed policy or action; and

*Whether alternative actions are available that would achieve the underlying lawful*

*governmental objective* and would have a lesser economic impact (Emphasis Added)

As indicated earlier in our discussion of Regulatory Impact and Regulatory Flexibility Act considerations, the Department does not perceive any "alternative actions" available to the rule maker except to follow the expressed intention of the Congress and provide for enforcement of the Fair Housing Amendments Act. Nor does the Department regard the effects of this rule on private property rights as being sufficiently severe as to "effectively deny economically viable use of any distinct legally protected property interest of [a property owner], or to have the effect of, or result in, a permanent or temporary physical occupation, invasion, or deprivation." (The quoted phrase is part of the Attorney General's advisory to agencies with reference to determinations of policies having "takings" implications.)

Agencies conducting takings analyses are encouraged by the Executive Order and the accompanying Guidelines to strive, to the extent permitted by law, to undertake policies or actions in a way which minimizes their takings implications. This, the Department has done. Compliance with the Fair Housing Amendments Act will, in some circumstances, limit owner discretion concerning admissions policies and will require builders of multifamily housing to comply with additional construction-related criteria associated with accessibility by handicapped persons. There are other aspects of the Amendments Act that will have some economic impact and will thus affect property rights. None of these impacts, in the Department's view, rises to the level of a "taking" within the meaning of the Fifth Amendment of the United States Constitution.

*Paperwork Reduction Act*

The information collection requirements contained in this rule have been submitted to OMB for review under section 3504(h) of the Paperwork Reduction Act of 1980. Sections 100.304(c)(2), 103.30, 115.3(a)(i), 115.5, 115.7 and 115.9 of this proposed rule have been determined by the Department to contain collection of information requirements. Information on these requirements are provided as follows:

3282　　Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

TABULATION OF ANNUAL REPORTING BURDEN PROPOSED RULE—FAIR HOUSING AMENDMENTS ACT OF 1988

| Description of information collection and section of 24 CFR affected | Number of respondents | Number of responses per respondent | Total annual responses | Hours per response | Total hour |
|---|---|---|---|---|---|
| Policy and Procedures—Housing for Persons 55 years and older—§ 100.304(c)(2).............. | 1,231 | 1 | 1,231 | 1 | 1,231 |
| Housing Discrimination Complaint Forms HD-903 & 903A Spanish Version (2529-0011)—§§ 103.30 & 115.3(a)(1)........................ | 8,400 | 1 | 8,400 | 1 | 8,400 |
| Certification Request Documentation (2529-0025)—§§ 115.5, 115.7 & 115.9................. | 30 | 1 | 30 | 17 | 510 |
| Total annual burden.............................. | | | | | 10,141 |

Collections of information conducted or sponsored by HUD during the conduct of an administrative action or investigation against specific individuals or entities after a case file is opened are not covered by 5 CFR Part 1320—Controlling Paperwork Burdens on the Public (see 5 CFR 1320.3(c)). Accordingly, the tabulation above, does not include the information collection hours associated with §§ 104.420, 104.530, 104.540(b)(4), 104.540(c), 104.550(a), 104.550(b), 104.590, 104.600(b), 104.620(b)(2), 104.700(a), 104.720, 104.790(b), 104.910(d), 115.3(a)(ii), (iii) and (iv), and 115.4(b)(2)(i). No burden hours are reported for Part 110 since public disclosure of information originally supplied by the Federal Government to the recipient for the purposes of disclosure is not a collection of information. (See 5 CFR 1230.7(c)(2)). No burden hours are included for § 121.2 because information collection requirements on race, color, religion, sex, national origin, age, handicap, and family characteristics will be imposed under the regulations applicable to the specific HUD program.

*Impact on Family*

The General Counsel, as the Designated Official under Executive Order No. 12606—The Family, has determined that this rule, if implemented, may have a significant impact on family formation, maintenance and general well-being because the rule provides Federal law enforcement assistance to families confronting housing discrimination based on race, color, religion, national origin, familial status or handicap. However, review under the Order is not required because the statutory mandate leaves little effective discretion in the Department to lessen the family impact. In any event, the purpose of the statute is to have a positive impact on family values by offering a measure of protection to persons confronting illegal discrimination.

*Federalism*

The General Counsel, as the Designated Official under section 6(a) of Executive Order No. 12612—Federalism, has determined that the policies contained in this rule would, if implemented, have federalism implications and are subject to review under the Order. Specifically, the amended statute continues to provide for referral to State and local fair housing enforcement agencies. However, in the future the determination of substantial equivalency will depend upon State and local enforcement machinery that matches up with the much-strengthened Federal law. Accordingly, the effect of the amended Fair Housing Act will be to encourage States and localities to amend their laws to match the Federal enforcement machinery, or suffer the eventual loss of recognition as substantially equivalent State or local agencies and possible loss of function if citizens of the jurisdiction do not choose to file complaints with State or local officials. Additionally, jurisdictions losing equivalency status will lose eligibility for grant funds available to co-enforcers of fair housing laws.

While the rule would have federalism impacts, review under the Federalism Executive Order is not required because the implementation of the statute leaves little discretion with HUD to lessen these impacts. HUD's statutory mandate is clear—it must accept complaints nationwide, and refer complaints for processing (after the initial grandfather period) only to jurisdictions with substantially equivalent laws. Moreover, since the statute addresses the Federalism issue by declaring that certain conduct will be illegal and by providing machinery for referral to State and local authority under appropriate circumstances, further study of Federalism implications could not appreciably affect the approach taken in the implementing regulations.

*Other matters*

This rule was listed in the Department's Semiannual Agenda of

Regulations published October 24, 1988 (53 FR 41974, 42605) under Executive Order 12291 and the Regulatory Flexibility Act.

The Catalog of Federal Domestic Assistance program number and title is 14.400 Equal Opportunity in Housing.

List of Subjects

*24 CFR Part 14*

Equal access to justice, Lawyers, Claims

*24 CFR Part 100*

Fair housing, Incorporation by reference, Nondiscrimination

*24 CFR Part 103*

Administrative practice and procedure, Fair housing

*24 CFR Part 104*

Administrative practice and procedure, Fair housing

*24 CFR Part 105*

Administrative practice and procedure, Fair housing

*24 CFR Part 106*

Administrative practice and procedure, Fair housing

*24 CFR Part 109*

Advertising, Fair housing, Signs and symbols

*24 CFR Part 110*

Fair housing, Signs and symbols

*24 CFR Part 115*

Fair housing, Intergovernmental relations.

*24 CFR Part 121*

Fair housing, statistics, Reporting and Recordkeeping requirements.

Accordingly, Title 24 of the Code of Federal Regulations is amended as follows:

## PART 14—IMPLEMENTATION OF THE EQUAL ACCESS TO JUSTICE ACT IN ADMINISTRATIVE PROCEEDINGS

1. The authority citation for Part 14 is revised to read as follows:

**Authority:** Sec. 504(c)(1) of the Equal Access to Justice Act (5 U.S.C. 504(c)(1); sec. 7(d) of the Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

2. In §14.115, the phrase "or" at the end of paragraph (a)(8) is removed, the period at the end of paragraph (a)(9) is removed and in its place the phrase "; or" is added, and new paragraph (a)(10) is added to read as follows:

### § 14.115 Proceedings covered.

(a) * * *

(10) Title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3600–3620) and 24 CFR Part 104.

*     *     *     *     *

3. Part 100 is revised to read as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

### Subpart A—General

Sec.
100.1  Authority.
100.5  Scope.
100.10  Exemptions.
100.20  Definitions.

### Subpart B—Discriminatory Housing Practices

100.50  Real estate practices prohibited.
100.60  Unlawful refusal to sell or rent or to negotiate for the sale or rental.
100.65  Discrimination in terms, conditions and privileges and in services and facilities.
100.70  Other prohibited sale and rental conduct.
100.75  Discriminatory advertisements, statements and notices.
100.80  Discriminatory representations on the availability of dwellings.
100.85  Blockbusting.
100.90  Discrimination in the provision of brokerage services.

### Subpart C—Discrimination in Residential Real Estate-Related Transactions

100.110  Discriminatory practices in residential real estate-related transactions.
100.115  Residential real estate-related transactions.
100.120  Discrimination in the making of loans and in the provision of other financial assistance.
100.125  Discrimination in the purchasing of loans.
100.130  Discrimination in the terms and conditions for making available loans or other financial assistance.
100.135  Unlawful practices in the selling, brokering, or appraising of residential real property.

### Subpart D—Prohibitions Against Discrimination Because of Handicap

100.200  Purpose.
100.201  Definitions.
100.202  General prohibitions against discrimination because of handicap.
100.203  Reasonable modifications of existing premises.
100.204  Reasonable accommodations.
100.205  Design and construction requirements.

### Subpart E—Housing for Older Persons

100.300  Purpose.
100.301  Exemption.
100.302  State and Federal elderly housing programs.
100.303  62 or over housing.
100.304  55 or over housing.

### Subpart F—Interference, Coercion or Intimidation

100.400  Prohibited interference, coercion or intimidation.

**Authority:** Title VIII, Civil Rights Act of 1968, 42 U.S.C. 3600–3620; section 7(d), Department of HUD Act, 42 U.S.C. 3535(d).

### Subpart A—General

### § 100.1 Authority.

This regulation is issued under the authority of the Secretary of Housing and Urban Development to administer and enforce Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (the Fair Housing Act).

### § 100.5 Scope.

(a) It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States. No person shall be subjected to discrimination because of race, color, religion, sex, handicap, familial status, or national origin in the sale, rental, or advertising of dwellings, in the provision of brokerage services, or in the availability of residential real estate-related transactions.

(b) This part provides the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of residential real estate-related transactions.

(c) Nothing in this part relieves persons participating in a Federal or Federally-assisted program or activity from other requirements applicable to buildings and dwellings.

### § 100.10 Exemptions.

(a) This part does not:

(1) Prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted because of race, color, or national origin;

(2) Prohibit a private club, not in fact open to the public, which, incident to its primary purpose or purposes, provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental or occupancy of such lodgings to its members or from giving preference to its members;

(3) Limit the applicability of any reasonable local, State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling; or

(4) Prohibit conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance as defined in Section 102 of the Controlled Substances Act (21 U.S.C. 802).

(b) Nothing in this part regarding discrimination based on familial status applies with respect to housing for older persons as defined in Subpart E of this part.

(c) Nothing in this part, other than the prohibitions against discriminatory advertising, applies to:

(1) The sale or rental of any single family house by an owner, provided the following conditions are met:

(i) The owner does not own or have any interest in more than three single family houses at any one time.

(ii) The house is sold or rented without the use of a real estate broker, agent or salesperson or the facilities of any person in the business of selling or renting dwellings. If the owner selling the house does not reside in it at the time of the sale or was not the most recent resident of the house prior to such sale, the exemption in this paragraph (c)(1) of this section applies to only one such sale in any 24-month period.

(2) Rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his or her residence.

### § 100.20 Definitions.

As used in this part:

"Aggrieved person" includes any person who—

(a) Claims to have been injured by a discriminatory housing practice; or

(b) Believes that such person will be injured by a discriminatory housing practice that is about to occur.

"Broker" or "Agent" includes any person authorized to perform an action on behalf of another person regarding any matter related to the sale or rental of dwellings, including offers, solicitations or contracts and the administration of matters regarding such offers, solicitations or contracts or any residential real estate-related transactions.

"Department" means the Department of Housing and Urban Development.

"Discriminatory housing practice" means an act that is unlawful under section 804, 805, 806, or 818 of the Fair Housing Act.

"Dwelling" means any building, structure or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure or portion thereof.

"Fair Housing Act" means Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (42 U.S.C. 3600–3620).

"Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(a) A parent or another person having legal custody of such individual or individuals; or

(b) The designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

"Handicap" is defined in § 100.201.

"Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers, and fiduciaries.

"Person in the business of selling or renting dwellings" means any person who:

(a) Within the preceding twelve months, has participated as principal in three or more transactions involving the sale or rental of any dwelling or any interest therein;

(b) Within the preceding twelve months, has participated as agent, other than in the sale of his or her own personal residence, in providing sales or rental facilities or sales or rental services in two or more transactions involving the sale or rental of any dwelling or any interest therein; or

(c) Is the owner of any dwelling designed or intended for occupancy by, or occupied by, five or more families.

"Secretary" means the Secretary of the Department.

"State" means any of the several states, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

## Subpart B—Discriminatory Housing Practices

### § 100.50 Real estate practices prohibited.

(a) This subpart provides the Department's interpretation of conduct that is unlawful housing discrimination under section 804 and section 806 of the Fair Housing Act. In general the prohibited actions are set forth under sections of this subpart which are most applicable to the discriminatory conduct described. However, an action illustrated in one section can constitute a violation under sections in the subpart. For example, the conduct described in § 100.60(b)(3) and (4) would constitute a violation of § 100.65(a) as well as § 100.60(a).

(b) It shall be unlawful to:

(1) Refuse to sell or rent a dwelling after a *bona fide* offer have been made, or to refuse to negotiate for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin, or to discriminate in the sale or rental of a dwelling because of handicap.

(2) Discriminate in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with sales or rentals, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Engage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Make, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an

intention to make any such preference, limitation or discrimination.

(5) Represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that a dwelling is not available for sale or rental when such dwelling is in fact available.

(6) Engage in blockbusting practices in connection with the sale or rental of dwellings because of race, color, religion, sex, handicap, familial status, or national origin.

(7) Deny access to or membership or participation in, or to discriminate against any person in his or her access to or membership or participation in, any multiple-listing service, real estate brokers' association, or other service organization or facility relating to the business of selling or renting a dwelling or in the terms or conditions or membership or participation, because of race, color, religion, sex, handicap, familial status, or national origin.

(c) The application of the *Fair Housing Act* with respect to persons with handicaps is discussed in Subpart D of this part.

### § 100.60 Unlawful to sell or rent or to negotiate for the sale or rental.

(a) It shall be unlawful for a person to refuse to sell or rent a dwelling to a person who has made a *bona fide* offer, because of race, color, religion, sex, familial status, or national origin or to refuse to negotiate with a person for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin, or to discriminate against any person in the sale or rental of a dwelling because of handicap.

(b) Prohibited actions under this section include, but are not limited to:

(1) Failing to accept or consider a *bona fide* offer because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Refusing to sell or rent a dwelling to, or to negotiate for the sale or rental of a dwelling with, any person because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Imposing different sales prices or rental charges for the sale or rental of a dwelling upon any person because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Using different qualification criteria or applications, or sale or rental standards or procedures, such as income standards, application requirements, application fees, credit analysis or sale or rental approval procedures or other requirements, because of race, color, religion, sex, handicap, familial status, or national origin.

(5) Evicting tenants because of their race, color, religion, sex, handicap, familial status, or national origin or because of the race, color, religion, sex, handicap, familial status, or national origin of a tenant's guest.

### § 100.65 Discrimination in terms, conditions and privileges and in services and facilities.

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling.

(b) Prohibited actions under this section include, but are not limited to:

(1) Using different provisions in leases or contracts of sale, such as those relating to rental charges, security deposits and the terms of a lease and those relating to down payment and closing requirements, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Failing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Failing to process an offer for the sale or rental of a dwelling or to communicate an offer accurately because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Limiting the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of an an owner, tenant or a person associated with him or her.

(5) Denying or limiting services or facilities in connection with the sale or rental of a dwelling, because a person failed or refused to provide sexual favors.

### § 100.70 Other prohibited sale and rental conduct.

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.

(b) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.

(c) Prohibited actions under paragraph (a) of this section, which are generally referred to as unlawful steering practices, include, but are not limited to:

(1) Discouraging any person from inspecting, purchasing or renting a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, or because of the race, color, religion, sex, handicap, familial status, or national origin of persons in a community, neighborhood or development.

(2) Discouraging the purchase or rental of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, by exaggerating drawbacks or failing to inform any person of desirable features of a dwelling or of a community, neighborhood, or development.

(3) Communicating to any prospective purchaser that he or she would not be comfortable or compatible with existing residents of a community, neighborhood or development because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Assigning any person to a particular section of a community, neighborhood or development, or to a particular floor of a building, because of race, color, religion, sex, handicap, familial status, or national origin.

(d) Prohibited activities relating to dwellings under paragraph (b) of this section include, but are not limited to:

(1) Discharging or taking other adverse action against an employee, broker or agent because he or she refused to participate in a discriminatory housing practice.

(2) Employing codes or other devices to segregate or reject applicants, purchasers or renters, refusing to take or to show listings of dwellings in certain areas because of race, color, religion, sex, handicap, familial status, or national origin, or refusing to deal with certain brokers or agents because they or one or more of their clients are of a particular race, color, religion, sex, handicap, familial status, or national origin.

(3) Denying or delaying the processing of an application made by a purchaser or renter or refusing to approve such a person for occupancy in a cooperative or condominium dwelling because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

### § 100.75 Discriminatory advertisements, statements and notices.

(a) It shall be unlawful to make, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling which indicates any preference, limitation or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation or discrimination.

(b) The prohibitions in this section shall apply to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling. Written notices and statements include any applications, flyers, brochures, deeds, signs, banners, posters, billboards or any documents used with respect to the sale or rental of a dwelling.

(c) Discriminatory notices, statements and advertisements include, but are not limited to:

(1) Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Expressing to agents, brokers, employees, prospective sellers or renters or any other persons a preference for or limitation on any purchaser or renter because of race, color, religion, sex, handicap, familial status, or national origin of such persons.

(3) Selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin.

(d) 24 CFR Part 109 provides information to assist persons to advertise dwellings in a nondiscriminatory manner and describes the matters the Department will review in evaluating compliance with the Fair Housing Act and in investigating complaints alleging discriminatory housing practices involving advertising.

§ 100.80  Discriminatory representations on the availability of dwellings.

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to provide inaccurate or untrue information about the availability of dwellings for sale or rental.

(b) Prohibited actions under this section include, but are not limited to:

(1) Indicating through words or conduct that a dwelling which is available for inspection, sale, or rental has been sold or rented, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Representing that covenants or other deed, trust or lease provisions which purport to restrict the sale or rental of dwellings because of race, color, religion, sex, handicap, familial status, or national origin preclude the sale of rental of a dwelling to a person.

(3) Enforcing covenants or other deed, trust, or lease provisions which preclude the sale or rental of a dwelling to any person because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Limiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin.

(5) Providing false or inaccurate information regarding the availability of a dwelling for sale or rental to any person, including testers, regardless of whether such person is actually seeking housing, because of race, color, religion, sex, handicap, familial status, or national origin.

§ 100.85  Blockbusting.

(a) It shall be unlawful, for profit, to induce or attempt to induce a person to sell or rent a dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, familial status, or national origin or with a handicap.

(b) In establishing a discriminatory housing practice under this section it is not necessary that there was in fact profit as long as profit was a factor for engaging in the blockbusting activity.

(c) Prohibited actions under this section include, but are not limited to:

(1) Engaging, for profit, in conduct (including uninvited solicitations for listings) which conveys to a person that a neighborhood is undergoing or is about to undergo a change in the race, color, religion, sex, handicap, familial status, or national origin of persons residing in it, in order to encourage the

person to offer a dwelling for sale or rental.

(2) Encouraging, for profit, any person to sell or rent a dwelling through assertions that the entry or prospective entry of persons of a particular race, color, religion, sex, familial status, or national origin, or with handicaps, can or will result in undesirable consequences for the project, neighborhood or community, such as a lowering of property values, an increase in criminal or antisocial behavior, or a decline in the quality of schools or other services or facilities.

§ 100.90  Discrimination in the provision of brokerage services.

(a) It shall be unlawful to deny any person access to or membership or participation in any multiple listing service, real estate brokers' organization or other service, organization or facility relating to the business of selling or renting dwellings, or to discriminate against any person in the terms or conditions of such access, membership or participation, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Prohibited actions under this section include, but are not limited to:

(1) Setting different fees for access to or membership in a multiple listing service because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Denying or limiting benefits accruing to members in a real estate brokers' organization because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Imposing different standards or criteria for membership in a real estate sales or rental organization because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Establishing geographic boundaries or office location or residence requirements for access to or membership or participation in any multiple listing service, real estate brokers' organization or other service, organization or facility relating to the business of selling or renting dwellings, because of race, color, religion, sex, handicap, familial status, or national origin.

Subpart C—Discrimination in Residential Real Estate-Related Transactions

§ 100.110  Discriminatory practices in residential real estate-related transactions.

(a) This subpart provides the Department's interpretation of the conduct that is unlawful housing discrimination under section 805 of the Fair Housing Act.

(b) It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

§ 100.115  Residential real estate-related transactions.

The term residential "real estate-related transactions" means:

(a) The making or purchasing of loans or providing other financial assistance—

(1) For purchasing, constructing, improving, repairing or maintaining a dwelling; or

(2) Secured by residential real estate; or

(b) The selling, brokering or appraising of residential real property.

§ 100.120  Discrimination in the making of loans and in the provision of other financial assistance.

(a) It shall be unlawful for any person or entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available loans or other financial assistance for a dwelling, or which is or is to be secured by a dwelling, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Prohibited practices under this section include, but are not limited to, failing or refusing to provide to any person, in connection with a residential real estate-related transaction, information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

§ 100.125  Discrimination in the purchasing of loans.

(a) It shall be unlawful for any person or entity engaged in the purchasing of loans or other debts or securities which support the purchase, construction, improvement, repair or maintenance of a dwelling, or which are secured by residential real estate, to refuse to purchase such loans, debts, or securities, or to impose different terms or conditions for such purchases, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Unlawful conduct under this section includes, but is not limited to:

(1) Purchasing loans or other debts or securities which relate to, or which are secured by dwellings in certain communities or neighborhoods but not in others because of the race, color, religion, sex, handicap, familial status, or national origin of persons in such neighborhoods or communities.

(2) Pooling or packaging loans or other debts or securities which relate to, or which are secured by, dwellings differently because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Imposing or using different terms or conditions on the marketing or sale of securities issued on the basis of loans or other debts or securities which relate to, or which are secured by, dwellings because of race, color, religion, sex, handicap, familial status, or national origin.

(c) This section does not prevent consideration, in the purchasing of loans, of factors justified by business necessity, including requirements of Federal law, relating to a transaction's financial security or to protection against default or reduction of the value of the security. Thus, this provision would not preclude considerations employed in normal and prudent transactions, provided that no such factor may in any way relate to race, color, religion, sex, handicap, familial status or national origin.

### § 100.130 Discrimination in the terms and conditions for making available loans or other financial assistance.

(a) It shall be unlawful for any person or entity engaged in the making of loans or in the provision of other financial assistance relating to the purchase, construction, improvement, repair or maintenance of dwellings or which are secured by residential real estate to impose different terms or conditions for the availability of such loans or other financial assistance because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Unlawful conduct under this section includes, but is not limited to:

(1) Using different policies, practices or procedures in evaluating or in determining creditworthiness of any person in connection with the provision of any loan or other financial assistance for a dwelling or for any loan or other financial assistance which is secured by residential real estate because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Determining the type of loan or other financial assistance to be provided with respect to a dwelling, or fixing the amount, interest rate, duration or other terms for a loan or other financial assistance for a dwelling or which is secured by residential real estate, because of race, color, religion, sex, handicap, familial status, or national origin.

### § 100.135 Unlawful practices in the selling, brokering, or appraising of residential real property.

(a) It shall be unlawful for any person or other entity whose business includes engaging in the selling, brokering or appraising of residential real property to discriminate against any person in making available such services, or in the performance of such services, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) For the purposes of this section, the term appraisal means an estimate or opinion of the value of a specified residential real property made in a business context in connection with the sale, rental, financing or refinancing of a dwelling or in connection with any activity that otherwise affects the availability of a residential real estate-related transaction, whether the appraisal is oral or written, or transmitted formally or informally. The appraisal includes all written comments and other documents submitted as support for the estimate or opinion of value.

(c) Nothing in this section prohibits a person engaged in the business of making or furnishing appraisals of residential real property from taking into consideration factors other than race, color, religion, sex, handicap, familial status, or national origin.

(d) Practices which are unlawful under this section include, but are not limited to, using an appraisal of residential real property in connection with the sale, rental, or financing of any dwelling where the person knows or reasonably should know that the appraisal improperly takes into consideration race, color, religion, sex, handicap, familial status, or national origin.

### Subpart D—Prohibition Against Discrimination Because of Handicap

### § 100.200 Purpose.

The purpose of this subpart is to effectuate sections 6 (a) and (b) and 15 of the Fair Housing Amendments Act of 1988.

### § 100.201 Definitions.

As used in this subpart:

"Accessible", when used with respect to the public and common use areas of a building containing covered multifamily dwellings, means that the public or common use areas of the building can be approached, entered, and used by individuals with physical handicaps. The phrase "readily accessible to and usable by" is synonymous with accessible. A public or common use area that complies with the appropriate requirements of ANSI A117.1–1986 or a comparable standard is "accessible" within the meaning of this paragraph.

"Accessible route" means a continuous unobstructed path connecting accessible elements and spaces in a building or within a site that can be negotiated by a person with a severe disability using a wheelchair and that is also safe for and usable by people with other disabilities. Interior accessible routes may include corridors, floors, ramps, elevators and lifts. Exterior accessible routes may include parking access aisles, curb ramps, walks, ramps and lifts. A route that complies with the appropriate requirements of ANSI A 117.1–1986 or a comparable standard is an "accessible route".

"ANSI A117.1–1986" means the 1986 edition of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. Copies may be obtained from American National Standards Institute, Inc., 1430 Broadway, New York, New York 10018. Copies may be inspected at the Department of Housing and Urban Development, 451 Seventh Street, S.W., Room 10276, Washington, D.C., or at the Office of the Federal Register, 1100 L Street, N.W., Room 8401, Washington, D.C.

"Building" means a structure, facility or portion thereof that contains or serves one or more dwelling units.

"Building entrance on an accessible route" means an accessible entrance to a building that is connected by an accessible route to public transportation stops, to accessible parking and passenger loading zones, or to public streets or sidewalks, if available. A building entrance that complies with ANSI A117.1–1986 or a comparable standard complies with the requirements of this paragraph.

"Common use areas" means rooms, spaces or elements inside or outside of a building that are made available for the use of residents of a building or the guests thereof. These areas include hallways, lounges, lobbies, laundry rooms, refuse rooms, mail rooms,

recreational areas and passageways among and between buildings.

"Controlled substance" means any drug or other substance, or immediate precursor included in the definition in section 102 of the Controlled Substances Act (21 U.S.C. 802).

"Covered multifamily dwellings" means buildings consisting of 4 or more dwelling units if such buildings have one or more elevators; and ground floor dwelling units in other buildings consisting of 4 or more dwelling units.

"Dwelling unit" means a single unit of residence for a family or one or more persons. Examples of dwelling units include: a single family home; an apartment unit within an apartment building; and in other types of dwellings in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep. Examples of the latter include dormitory rooms and sleeping accommodations in shelters intended for occupancy as a residence for homeless persons.

"Entrance" means any access point to a building or portion of a building used by residents for the purpose of entering.

"Exterior" means all areas of the premises outside of an individual dwelling unit.

"First occupancy" means a building that has never before been used for any purpose.

"Ground floor" means a floor of a building with a building entrance on an accessible route. A building may have more than one ground floor.

"Handicap" means, with respect to a person, a physical or mental impairment which substantially limits one or more major life activities; a record of such an impairment; or being regarded as having such an impairment. This term does not include current, illegal use of or addiction to a controlled substance. For purposes of this part, an individual shall not be considered to have a handicap solely because that individual is a transvestite. As used in this definition:

(a) "Physical or mental impairment" includes:

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

(b) "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

(c) "Has a record of such an impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(d) "Is regarded as having an impairment" means:

(1) Has a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation;

(2) Has a physical or mental impairment that substantially limits one or more major life activities only as a result of the attitudes of other toward such impairment; or

(3) Has none of the impairments defined in paragraph (a) of this definition but is treated by another person as having such an impairment.

"Interior" means the spaces, parts, components or elements of an individual dwelling unit.

"Modification" means any change to the public or common use areas of a building or any change to a dwelling unit.

"Premises" means the interior or exterior spaces, parts, components or elements of a building, including individual dwelling units and the public and common use areas of a building.

"Public use areas" means interior or exterior rooms or spaces of a building that are made available to the general public. Public use may be provided at a building that is privately or publicly owned.

"Site" means a parcel of land bounded by a property line or a designated portion of a public right of way.

### § 100.202 General prohibitions against discrimination because of handicap.

(a) It shall be unlawful to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(1) That buyer or renter;

(2) A person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(3) Any person associated with that person.

(b) It shall be unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

(1) That buyer or renter;

(2) A person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(3) Any person associated with that person.

(c) It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person. However, this paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps:

(1) Inquiry into an applicant's ability to meet the requirements of ownership or tenancy;

(2) Inquiry to determine whether an applicant is qualified for a dwelling available only to persons with handicaps or to persons with a particular type of handicap;

(3) Inquiry to determine whether an applicant for a dwelling is qualified for a priority available to persons with handicaps or to persons with a particular type of handicap;

(4) Inquiring whether an applicant for a dwelling is a current illegal abuser or addict of a controlled substance;

(5) Inquiring whether an applicant has been convicted of the illegal manufacture or distribution of a controlled substance.

(d) Nothing in this subpart requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

### § 100.203 Reasonable modifications of existing premises.

(a) It shall be unlawful for any person to refuse to permit, at the expense of a handicapped person, reasonable

modifications of existing premises, occupied or to be occupied by a handicapped person, if the proposed modifications may be necessary to afford the handicapped person full enjoyment of the premises of a dwelling. In the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted. The landlord may not increase for handicapped persons any customarily required security deposit. However, where it is necessary in order to ensure with reasonable certainty that funds will be available to pay for the restorations at the end of the tenancy, the landlord may negotiate as part of such a restoration agreement a provision requiring that the tenant pay into an interest bearing escrow account, over a reasonable period, a reasonable amount of money not to exceed the cost of the restorations. The interest in any such account shall accrue to the benefit of the tenant.

(b) A landlord may condition permission for a modification on the renter providing a reasonable description of the proposed modifications as well as reasonable assurances that the work will be done in a workmanlike manner and that any required building permits will be obtained.

(c) The application of paragraph (a) of this section may be illustrated by the following examples:

*Example (1):* A tenant with a handicap asks his or her landlord for permission to install grab bars in the bathroom at his or her own expense. It is necessary to reinforce the walls with blocking between studs in order to affix the grab bars. It is unlawful for the landlord to refuse to permit the tenant, at the tenant's own expense, from making the modifications necessary to add the grab bars. However, the landlord may condition permission for the modification on the tenant agreeing to restore the bathroom to the condition that existed before the modification, reasonable wear and tear excepted. It would be reasonable for the landlord to require the tenant to remove the grab bars at the end of the tenancy. The landlord may also reasonably require that the wall to which the grab bars are to be attached be repaired and restored to its original condition, reasonable wear and tear excepted. However, it would be unreasonable for the landlord to require the tenant to remove the blocking, since the reinforced walls will not interfere in any way with the landlord's or the next tenant's use and enjoyment of the premises and may be needed by some future tenant.

*Example (2):* An applicant for rental housing has a child who uses a wheelchair.

The bathroom door in the dwelling unit is too narrow to permit the wheelchair to pass. The applicant asks the landlord for permission to widen the doorway at the applicant's own expense. It is unlawful for the landlord to refuse to permit the applicant to make the modification. Further, the landlord may *not,* in usual circumstances, condition permission for the modification on the applicant paying for the doorway to be narrowed at the end of the lease because a wider doorway will not interfere with the landlord's or the next tenant's use and enjoyment of the premises.

§ 100.204   Reasonable accommodations.

(a) It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

(b) The application of this section may be illustrated by the following examples:

*Example (1):* A blind applicant for rental housing wants live in a dwelling unit with a seeing eye dog. The building has a "no pets" policy. It is a violation of § 100.204 for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling.

*Example (2):* Progress Gardens is a 300 unit apartment complex with 450 parking spaces which are available to tenants and guests of Progress Gardens on a "first come first served" basis. John applies for housing in Progress Gardens. John is mobility impaired and is unable to walk more than a short distance and therefore requests that a parking space near his unit be reserved for him so he will not have to walk very far to get to his apartment. It is a violation of § 100.204 for the owner or manager of Progress Gardens to refuse to make this accommodation. Without a reserved space, John might be unable to live in Progress Gardens at all or, when he has to park in a space far from his unit, might have great difficulty getting from his car to his apartment unit. The accommodation therefore is necessary to afford John an equal opportunity to use and enjoy a dwelling. The accommodation is reasonable because it is feasible and practical under the circumstances.

§ 100.205   Design and construction requirements.

(a) Covered multifamily dwellings for first occupancy after March 13, 1991 shall be designed and constructed to have at least one building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. For purposes of this section, a covered multifamily dwelling shall be deemed to be designed and constructed

for first occupancy on or before March 13, 1991 if they are occupied by that date or if the last building permit or renewal thereof for the covered multifamily dwellings is issued by a State, County or local government on or before January 13, 1990. The burden of establishing impracticality because of terrain or unusual site characteristics is on the person or persons who designed or constructed the housing facility.

(b) The application of paragraph (a) of this section may be illustrated by the following examples:

*Example (1):* A real estate developer plans to construct six covered multifamily dwelling units on a site with a hilly terrain. Because of the terrain, it will be necessary to climb a long and steep stairway in order to enter the dwellings. Since there is no practical way to provide an accessible route to any of the dwellings, one need not be provided.

*Example (2):* A real estate developer plans to construct a building consisting of 10 units of multifamily housing on a waterfront site that floods frequently. Because of this unusual characteristic of the site, the builder plans to construct the building on stilts. It is customary for housing in the geographic area where the site is located to be built on stilts. The housing may lawfully be constructed on the proposed site on stilts even though this means that there will be no practical way to provide an accessible route to the building entrance.

*Example (3):* A real estate developer plans to construct a multifamily housing facility on a particular site. The developer would like the facility to be built on the site to contain as many units as possible. Because of the configuration and terrain of the site, it is possible to construct a building with 105 units on the site provided the site does not have an accessible route leading to the building entrance. It is also possible to construct a building on the site with an accessible route leading to the building entrance. However, such a building would have no more than 100 dwelling units. The building to be constructed on the site must have a building entrance on an accessible route because it is not impractical to provide such an entrance because of the terrain or unusual characteristics of the site.

(c) All covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route shall be designed and constructed in such a manner that—

(1) The public and common use areas are readily accessible to and usable by handicapped persons;

(2) All the doors designed to allow passage into and within all premises are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(3) All premises within covered multifamily dwelling units contain the following features of adaptable design:

(i) An accessible route into and through the covered dwelling unit;

(ii) Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

(iii) Reinforcements in bathroom walls to allow later installation of grab bars around the toilet, tub, shower, stall and shower seat, where such facilities are provided; and

(iv) Usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

(d) The application of paragraph (c) of this section may be illustrated by the following examples:

*Example (1):* A developer plans to construct a 100 unit condominium apartment building with one elevator. In accordance with paragraph (a), the building has at least one accessible route leading to an accessible entrance. All 100 units are covered multifamily dwelling units and they all must be designed and constructed so that they comply with the accessibility requirements of paragraph (c) of this section.

*Example (2):* A developer plans to construct 30 garden apartments in a three story building. The building will not have an elevator. The building will have one accessible entrance which will be on the first floor. Since the building does not have an elevator, only the "ground floor" units are covered multifamily units. The "ground floor" is the first floor because that is the floor that has an accessible entrance. All of the dwelling units on the first floor must meet the accessibility requirements of paragraph (c) of this section and must have access to at least one of each type of public or common use area available for residents in the building.

(e) Compliance with the appropriate requirements of ANSI A117.1–1986 suffices to satisfy the requirements of paragraph (c)(3) of this section.

(f) Compliance with a duly enacted law of a State or unit of general local government that includes the requirements of paragraphs (a) and (c) of this section satisfies the requirements of paragraphs (a) and (c) of this section.

(g)(1) It is the policy of HUD to encourage States and units of general local government to include, in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with paragraphs (a) and (c) of this section.

(2) A State or unit of general local government may review and approve newly constructed multifamily dwellings for the purpose of making determinations as to whether the requirements of paragraphs (a) and (c) of this section are met.

(h) Determinations of compliance or noncompliance by a State or a unit of general local government under

paragraph (f) or (g) of this section are not conclusive in enforcement proceedings under the Fair Housing Amendments Act.

(i) This subpart does not invalidate or limit any law of a State or political subdivision of a State that requires dwellings to be designed and constructed in a manner that affords handicapped persons greater access than is required by this subpart.

## Subpart E—Housing for Older Persons

### § 100.300 Purpose.

The purpose of this subpart is to effectuate the exemption in the Fair Housing Amendments Act of 1988 that relates to housing for older persons.

### § 100.301 Exemption.

(a) The provisions regarding familial status in this part do not apply to housing which satisfies the requirements of §§ 100.302, 100.303 or § 100.304.

(b) Nothing in this part limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.

### § 100.302 State and Federal elderly housing programs.

The provisions regarding familial status in this part shall not apply to housing provided under any Federal or State program that the Secretary determines is specifically designed and operated to assist elderly persons, as defined in the State or Federal program.

### § 100.303 62 or over housing.

(a) The provisions regarding familial status in this part shall not apply to housing intended for, and solely occupied by, persons 62 years of age or older. Housing satisfies the requirements of this section even though:

(1) There are persons residing in such housing on September 13, 1988 who are under 62 years of age, provided that all new occupants are persons 62 years of age or older;

(2) There are unoccupied units, provided that such units are reserved for occupancy by persons 62 years of age or over;

(3) There are units occupied by employees of the housing (and family members residing in the same unit) who are under 62 years of age provided they perform substantial duties directly related to the management or maintenance of the housing.

(b) The following examples illustrate the application of paragraph (a) of this section:

*Example (1):* John and Mary apply for housing at the Vista Heights apartment

complex which is an elderly housing complex operated for persons 62 years of age or older. John is 62 years of age. Mary is 59 years of age. If Vista Heights wishes to retain its "62 or over" exemption it must refuse to rent to John and Mary because Mary is under 62 years of age. However, if Vista Heights does rent to John and Mary, it might qualify for the "55 or over" exemption in § 100.304.

*Example (2):* The Blueberry Hill retirement community has 100 dwelling units. On September 13, 1988, 15 units were vacant and 35 units were occupied with at least one person who is under 62 years of age. The remaining 50 units were occupied by persons who were all 62 years of age or older. Blueberry Hill can qualify for the "62 or over" exemption as long as all units that were occupied after September 13, 1988 are occupied by persons who were 62 years of age or older. The people under 62 in the 35 units previously described need not be required to leave for Blueberry Hill to qualify for the "62 or over" exemption.

### § 100.304 55 or over housing.

(a) The provisions regarding familial status shall not apply to housing intended and operated for occupancy by at least one person 55 years of age or older per unit, *Provided That* the housing satisfies the requirements of § 100.304 (b)(1) *or* (b)(2) *and* the requirements of § 100.304(c).

(b)(1) The housing facility has significant facilities and services specifically designed to meet the physical or social needs of older persons. "Significant facilities and services specifically designed to meet the physical or social needs of older persons" include, but are not limited to, social and recreational programs, continuing education, information and counseling, recreational, homemaker, outside maintenance and referral services, an accessible physical environment, emergency and preventive health care of programs, congregate dining facilities, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them (the housing facility need not have all of these features to qualify for the exemption under this subparagraph); or

(2) It is not practicable to provide significant facilities and services designed to meet the physical or social needs of older persons *and* the housing facility is necessary to provide important housing opportunities for older persons. In order to satisfy this paragraph (b)(2) of this section the owner or manager of the housing facility must demonstrate through credible and objective evidence that the provision of significant facilities and services designed to meet the physical or social

needs of older persons would result in depriving older persons in the relevant geographic area of needed and desired housing. The following factors, among others, are relevant in meeting the requirements of this paragraph (b)(2) of this section—

(i) Whether the owner or manager of the housing facility has endeavored to provide significant facilities and services designed to meet the physical or social needs of older persons either by the owner or by some other entity. Demonstrating that such services and facilities are expensive to provide is not alone sufficient to demonstrate that the provision of such services is not practicable.

(ii) The amount of rent charged, if the dwellings are rented, or the price of the dwellings, if they are offered for sale.

(iii) The income range of the residents of the housing facility.

(iv) The demand for housing for older persons in the relevant geographic area.

(v) The range of housing choices for older persons within the relevant geographic area.

(vi) The availability of other similarly priced housing for older persons in the relevant geographic area. If similarly priced housing for older persons with significant facilities and services is reasonably available in the relevant geographic area then the housing facility does not meet the requirements of this paragraph (b)(2) of this section.

(vii) The vacancy rate of the housing facility.

(c)(1) At least 80% of the units in the housing facility are occupied by at least one person 55 years of age or older per unit *except that* a newly constructed housing facility for first occupancy after March 12, 1989 need not comply with this paragraph (c)(1) of this section until 25% of the units in the facility are occupied; and

(2) The owner or manager of a housing facility publishes and adheres to policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older. The following factors, among others, are relevant in determining whether the owner or manager of a housing facility has complied with the requirements of this paragraph (c)(2) of this section:

(i) The manner in which the housing facility is described to prospective residents.

(ii) The nature of any advertising designed to attract prospective residents.

(iii) Age verification procedures.

(iv) Lease provisions.

(v) Written rules and regulations.

(vi) Actual practices of the owner or manager in enforcing relevant lease provisions and relevant rules or regulations.

(d) Housing satisfies the requirements of this section even though:

(1) On September 13, 1988, under 80% of the occupied units in the housing facility are occupied by at least one person 55 years of age or older per unit, provided that at least 80% of the units that are occupied by new occupants after September 13, 1988 are occupied by at least one person 55 years of age or older.

(2) There are unoccupied units, provided that at least 80% of such units are reserved for occupancy by at least one person 55 years of age or over.

(3) There are units occupied by employees of the housing (and family members residing in the same unit) who are under 55 years of age provided they perform substantial duties directly related to the management or maintenance of the housing.

(e) The application of this section may be illustrated by the following examples:

*Example 1:* A. John and Mary apply for housing at the Valley Heights apartment complex which is a 100 unit housing complex that is operated for persons 55 years of age or older in accordance with all the requirements of this section. John is 56 years of age. Mary is 50 years of age. Eighty (80) units are occupied by at least one person who is 55 years of age or older. Eighteen (18) units are occupied exclusively by persons who are under 55. Among the units occupied by new occupants after September 13, 1988 were 18 units occupied exclusively by persons who are under 55. Two (2) units are vacant. At the time John and Mary apply for housing, Valley Heights qualifies for the "55 or over" exemption because 82% of the occupied units (80/98) at Valley Heights are occupied by at least one person 55 years old or older. If John and Mary are accepted for occupancy, then 81 out of the 99 occupied units (82%) will be occupied by at least one person who is 55 years of age or older and Valley Heights will continue to qualify for the "55 or over" exemption.

B. If only 78 out of the 98 occupied units had been occupied by at least one person 55 years of age or older, Valley Heights would still qualify for the exemption, but could not rent to John or Mary if they were both under 55 without losing the exemption.

*Example 2:* Green Meadow is a 1,000 unit retirement community that provides significant facilities and services specifically designed to meet the physical or social needs of older persons. On September 13, 1988, Green Meadow published and thereafter adhered to policies and procedures demonstrating an intent to provide housing for persons 55 years of age or older. On September 13, 1988, 100 units were vacant and 300 units were occupied only by people who were under 55 years old. Consequently, on September 13, 1988 67% of the Green Meadow's occupied units (600 out of 900)

were occupied by at least one person 55 years of age or older. Under paragraph (d)(1) of this section, Green Meadow qualifies for the "55 or over" exemption even though, on September 13, 1988, under 80% of the occupied units in the housing facility were occupied by at least one person 55 years of age or older per unit, provided that at least 80% of the units that were occupied after September 13, 1988 are occupied by at least one person 55 years of age or older. Under paragraph (d) of this section, Green Meadow qualifies for the "55 or over" exemption, even though it has unoccupied units, provided that at least 80% of its unoccupied units are reserved for occupancy by at least one person 55 years of age or over.

*Example 3:* Waterfront Gardens is a 200 unit housing facility to be constructed after March 12, 1989. The owner and manager of Waterfront Gardens intends to operate the new facility in accordance with the requirements of this section. Waterfront Gardens need not comply with the requirement in paragraph (c)(1) of this section that at least 80% of the occupied units be occupied by at least one person 55 years of age or older per unit *until* 50 units (25%) are occupied. When the 50th unit is occupied, then 80% of the 50 occupied units (*i.e.*, 40 units) must be occupied by at least one person who is 55 years of age or older for Waterfront Gardens to qualify for the "55 or over" exemption.

## Subpart F—Interference, Coercion or Intimidation

### § 100.400 Prohibited interference, coercion or intimidation.

(a) This subpart provides the Department's interpretation of the conduct that is unlawful under section 818 of the Fair Housing Act.

(b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this part.

(c) Conduct made unlawful under this section includes, but is not limited to, the following:

(1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

Case: Case: 1:15640-006cr-Relt #Dicur-2-Filed-12/70/23 Page/147 Page75Page100#:7889

(3) Threatening an employee or agent with dismissal or an adverse employment action, or taking such adverse employment action, for any effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction, because of the race, color, religion, sex, handicap, familial status, or national origin of that person or of any person associated with that person.

(4) Intimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, rights granted or protected by this part.

(5) Retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.

4. Part 103 is added to read as follows:

## PART 103—FAIR HOUSING—COMPLAINT PROCESSING

### Subpart A—Purpose and Definitions

Sec.
103.1    Purpose and applicability.
103.5    Other civil rights authorities.
103.9    Definitions.

**Subpart B—Complaints**

103.10    Submission of information.
103.15    Who may file complaints.
103.20    Persons against whom complaints may be filed.
103.25    Where to file complaints.
103.30    Form and content of complaint.
103.40    Date of filing of complaint.
103.42    Amendment of complaint.
103.45    Service of notice on aggrieved person.
103.50    Notification of respondent; joinder of additional or substitute respondents.
103.55    Answer to complaint.

**Subpart C—Referral of Complaints to State and Local Agencies**

103.100    Notification and referral to substantially equivalent State or local agencies.
103.105    Cessation of action on referred complaints.
103.110    Reactivation of referred complaints.
103.115    Notification upon reactivation.

**Subpart D—Investigation Procedures**

103.200    Investigations.
103.205    Systemic processing.
103.215    Conduct of investigation.
103.220    Cooperation of Federal, State and local agencies.
103.225    Completion of the investigation.
103.230    Final investigative report.

**Subpart E—Conciliation Procedures**

103.300    Conciliation.
103.310    Conciliation agreement.
103.315    Relief sought for aggrieved persons.
103.320    Provisions sought for the public interest.

103.325    Termination of conciliation efforts.
103.330    Prohibitions and requirements with respect to disclosure of information obtained during conciliation.
103.335    Review of compliance with conciliation agreements.

**Subpart F—Issuance of Charge**

103.400    Reasonable cause determination.
103.405    Issuance of charge.
103.410    Election of civil action or provision of administrative proceeding.

**Subpart G—Prompt Judicial Action**

103.500    Prompt judicial action.

**Subpart H—Other Action**

103.510    Other action by HUD.
103.515    Action by other agencies.

**Authority:** Title VIII, Civil Rights Act of 1968, 42 U.S.C. 3600–3620; section 7(d), Department of HUD Act, 42 U.S.C. 3535(d).

## Subpart A—Purpose and Definitions

### § 103.1    Purpose and applicability.

(a) This part contains the procedures established by the Department of Housing and Urban Development for the investigation and conciliation of complaints under section 810 of the Fair Housing Act, 42 U.S.C. 3610.

(b) This part applies to:

(1) Complaints alleging discriminatory housing practices because of race, color, religion, sex or national origin; and

(2) Complaints alleging discriminatory housing practices on account of handicap or familial status occurring on or after March 12, 1989.

(c) Part 104 governs the administrative proceedings before an administrative law judge adjudicating charges issued under § 103.405.

(d) The Department will reasonably accommodate persons with disabilities who are participants in complaint processing.

### § 103.5    Other Civil Rights authorities.

In addition to the Fair Housing Act, other civil rights authorities may be applicable in a particular case. Thus, where a person charged with a discriminatory housing practice in a complaint filed under section 810 of the Fair Housing Act is also prohibited from engaging in similar practices under Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–2000d–5), section 109 of the Housing and Community Development Act of 1974 (42 U.S.C. 5309), Executive Order 11063 of November 20, 1962, on Equal Opportunity in Housing (27 FR 11527–11530, November 24, 1962), section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), the Age Discrimination Act (42 U.S.C. 6101) or other applicable law, the person may also be subject to action by HUD or other Federal agencies under the rules, regulations, and procedures prescribed under Title VI (24 CFR Parts 1 and 2), section 109 (24 CFR 570.602)), Executive Order 11063 (24 CFR Part 107), section 504 (24 CFR Part 8), or other applicable law.

### § 103.9    Definitions.

As used in this part,

*Aggrieved person* includes any person who:

(a) Claims to have been injured by a discriminatory housing practice; or

(b) Believes that such person will be injured by a discriminatory housing practice that is about to occur.

*Assistant Secretary* means the Assistant Secretary for Fair Housing and Equal Opportunity in HUD.

*Attorney General* means the Attorney General of the United States.

*Complainant* means the person (including the Assistant Secretary) who files a complaint under this part.

*Conciliation* means the attempted resolution of issues raised by a complaint, or by the investigation of a complaint, through informal negotiations involving the aggrieved person, the respondent, and the Assistant Secretary.

*Conciliation agreement* means a written agreement setting forth the resolution of the issues in conciliation.

*Discriminatory housing practice* means an act that is unlawful under section 804, 805, 806 or 818 of the Fair Housing Act, as described in Part 100.

*Dwelling* means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, or any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

*Fair Housing Act* means Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3600–3620.

*General Counsel* means the General Counsel of HUD.

*HUD* means the United States Department of Housing and Urban Development.

*Person* includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustee in cases under Title 11 of the United States Code, receivers and fiduciaries.

*Personal service* means handing a copy of the document to the person to be served or leaving a copy of the document with a person of suitable age and discretion at the place of business,

residence or usual place of abode of the person to be served.

*Receipt of notice* means the day that personal service is completed by handing or delivering a copy of the document to an appropriate person or the date that a document is delivered by certified mail.

*Respondent* means:

(a) The person or other entity accused in a complaint of a discriminatory housing practice; and

(b) Any other person or entity identified in the course of investigation and notified as required under § 103.50.

*State* means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

*Substantially equivalent State or local agency* means a State or local agency certified by HUD under 24 CFR Part 115 (including agencies certified for interim referrals).

*To rent* includes to lease, to sublease, to let, and otherwise to grant for consideration the right to occupy premises not owned by the occupant.

## Subpart B—Complaints

### § 103.10  Submission of information.

(a) The Assistant Secretary will receive information concerning alleged discriminatory housing practices from any person. Where the information constitutes a complaint within the meaning of the Fair Housing Act and this part and is furnished by an aggrieved person, it will be considered to be filed under § 103.40. Where additional information is required for purposes of perfecting a complaint under the Fair Housing Act, HUD will advise what additional information is needed and will provide appropriate assistance in the filing of the complaint.

(b) HUD may also concurrently initiate compliance reviews under other appropriate civil rights authorities, such as E.O. 11063 on Equal Opportunity in Housing, Title VI of the Civil Rights Act of 1964, section 109 of the Housing and Community Development Act of 1974, section 504 of the Rehabilitation Act of 1973 or the Age Discrimination Act (42 U.S.C. 6101). The information may also be made available to any other Federal, State or local agency having an interest in the matter. In making available such information, steps will be taken to protect the confidentiality of any informant or complainant where desired by the informant or complainant.

### § 103.15  Who may file complaints.

Any aggrieved person or the Assistant Secretary may file a complaint no later than one year after an alleged discriminatory housing practice has

occurred or terminated. The complaint may be filed with the assistance of an authorized representative of an aggrieved person, including any organization acting on behalf of an aggrieved person.

### § 103.20  Persons against whom complaints may be filed.

(a) A complaint may be filed against any person alleged to be engaged, to have engaged, or to be about to engage, in a discriminatory housing practice.

(b) A complaint may also be filed against any person who directs or controls, or has the right to direct or control, the conduct of another person with respect to any aspect of the sale, rental, advertising or financing of dwellings or the provision of brokerage services relating to the sale or rental of dwellings if that other person, acting within the scope of his or her authority as employee or agent of the directing or controlling person, is engaged, has engaged, or is about to engage, in a discriminatory housing practice.

### § 103.25  Where to file complaints.

(a)(1) Aggrieved persons may file complaints in person with, or by mail to: Fair Housing, Department of Housing and Urban Development, Washington DC 20410, or any HUD Office. A list of Regional Offices (with addresses and areas of jurisdiction) and Field Offices (with addresses) is contained in an appendix to this part.

(2) Aggrieved persons may provide information to be contained in a complaint by telephone to any Regional or Field Office of HUD. HUD will reduce information provided by telephone to writing on the prescribed complaint form and send the form to the aggrieved person to be signed and affirmed as provided in § 103.30(a).

(3) Complaints may be filed in person or by mail with any substantially equivalent State or local agency. Complaints filed with a substantially equivalent State or local agency will be considered to be complaints dual filed with the agency under its own law, and with HUD under the Fair Housing Act.

(b) Generally, complaints will be processed through HUD's Regional Administrator having jurisdiction in the State in which the alleged discriminatory housing practice occurred. However, where a complaint has been identified for systemic processing under § 103.205, that complaint may be processed in the Office of the Assistant Secretary in Washington, DC.

### § 103.30  Form and content of complaint.

(a) Each complaint must be in writing and must be signed and affirmed by the aggrieved person filing the complaint or,

if the complaint is filed by HUD, by the Assistant Secretary. The signature and affirmation may be made at any time during the investigation. The affirmation shall state: "I declare under penalty of perjury that the foregoing is true and correct."

(b) The Assistant Secretary may require complaints to be made on prescribed forms. Complaint forms will be available in any HUD office or in any substantially equivalent State or local agency. Notwithstanding any requirement for use of a prescribed form, HUD will accept any written statement which substantially sets forth the allegations of a discriminatory housing practice under the Fair Housing Act (including any such statement filed with a substantially equivalent State or local agency) as a Fair Housing Act complaint. Personnel in these offices will provide appropriate assistance in filling out forms and in filing a complaint.

(c) Each complaint must contain substantially the following information:

(1) The name and address of the aggrieved person.

(2) The name and address of the respondent.

(3) A description and the address of the dwelling which is involved, if appropriate.

(4) A concise statement of the facts, including pertinent dates, constituting the alleged discriminatory housing practice.

### § 103.40  Date of filing of complaint.

(a) Except as provided in paragraph (b) of this section, a complaint is filed when it is received by HUD, or dual filed with HUD through a substantially equivalent State or local agency, in a form that reasonably meets the standards of § 103.30.

(b) The Assistant Secretary may determine that a complaint is filed for the purposes of the one-year period for the filing of complaints, upon the submission of written information (including information provided by telephone and reduced to writing by an employee of HUD) identifying the parties and describing generally the alleged discriminatory housing practice.

(c) Where a complaint alleges a discriminatory housing practice that is continuing, as manifested in a number of incidents of such conduct, the complaint will be timely if filed within one year of the last alleged occurrence of that practice.

### § 103.42  Amendment of complaint.

Complaints may be reasonably and fairly amended at any time. Such amendments may include, but are not limited to: amendments to cure technical

defects or omissions, including failure to sign or affirm a complaint, to clarify or amplify the allegations in a complaint, or to join additional or substitute respondents. Except for the purposes of notifying respondents under § 103.50, amended complaints will be considered as having been made as of the original filing date.

### § 103.45 Service of notice on aggrieved person.

Upon the filing of a complaint, the Assistant Secretary will notify, by certified mail or personal service, each aggrieved person on whose behalf the complaint was filed. The notice will:

(a) Acknowledge the filing of the complaint and state the date that the complaint was accepted for filing.

(b) Include a copy of the complaint.

(c) Advise the aggrieved person of the time limits applicable to complaint processing and of the procedural rights and obligations of the aggrieved person under this part and Part 104.

(d) Advise the aggrieved person of his or her right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to a complaint or charge based on the alleged discriminatory housing practice. The notice will also state that the time period includes the time during which an action arising from a breach of a conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

(e) Advise the aggrieved person that retaliation against any person because he or she made a complaint or testified, assisted, or participated in an investigation or conciliation under this part or an administrative proceeding under Part 104, is a discriminatory housing practice that is prohibited under section 818 of the Fair Housing Act.

### § 103.50 Notification of respondent; joinder of additional or substitute respondents.

(a) Within ten days of the filing of a complaint under § 103.40 or the filing of an amended complaint under § 103.42, the Assistant Secretary will serve a notice on each respondent by certified mail or by personal service. A person who is not named as a respondent in a complaint, but who is identified in the course of the investigation under Subpart D of this part as a person who

is alleged to be engaged, to have engaged, or to be about to engage in the discriminatory housing practice upon which the complaint is based may be joined as an additional or substitute respondent by service of a notice on the person under this section within ten days of the identification.

(b)(1) The notice will identify the alleged discriminatory housing practice upon which the complaint is based, and include a copy of the complaint.

(2) The notice will state the date that the complaint was accepted for filing.

(3) The notice will advise the respondent of the time limits applicable to complaint processing under this part and of the procedural rights and obligations of the respondent under this part and Part 104, including the opportunity to submit an answer to the complaint within 10 days of the receipt of the notice.

(4) The notice will advise the respondent of the aggrieved person's right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to a complaint or charge based on the alleged discriminatory housing practice. The notice will also state that the time period includes the time during which an action arising from a breach of a conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

(5) If the person is not named in the complaint, but is being joined as an additional or substitute respondent, the notice will explain the basis for the Assistant Secretary's belief that the joined person is properly joined as a respondent.

(6) The notice will advise the respondent that retaliation against any person because he or she made a complaint or testified, assisted or participated in an investigation or conciliation under this part or an administrative proceeding under Part 104, is a discriminatory housing practice that is prohibited under section 818 of the Fair Housing Act.

### § 103.55 Answer to complaint.

(a) The respondent may file an answer not later than ten days after receipt of the notice described in § 103.50. The respondent may assert any defense that might be available to a defendant in a court of law. The answer must be signed and affirmed by the

respondent. The affirmation must state: "I declare under penalty of perjury that the foregoing is true and correct."

(b) An answer may be reasonably and fairly amended at any time with the consent of the Assistant Secretary.

## Subpart C—Referral of Complaints to State and Local Agencies

### § 103.100 Notification and referral to substantially equivalent State or local agencies.

(a) Whenever a complaint alleges a discriminatory housing practice that is within the jurisdiction of a substantially equivalent State or local agency and the agency is certified or may accept interim referrals under 24 CFR Part 115 with regard to the alleged discriminatory housing practice, the Assistant Secretary will notify the agency of the filing of the complaint and refer the complaint to the agency for further processing before HUD takes any action with respect to the complaint. The Assistant Secretary will notify the State or local agency of the referral by certified mail.

(b) The Assistant Secretary will notify the aggrieved person and the respondent, by certified mail or personal service, of the notification and referral under paragraph (a) of this section. The notice will advise the aggrieved person and the respondent of the aggrieved person's right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to complaint or charge based on the alleged discriminatory housing practice. The notice will also state that the time period includes the time during which an action arising from a breach of a conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

### § 103.105 Cessation of action on referred complaints.

(a) After a complaint is referred under § 103.100, the Assistant Secretary will take no futher action with respect to the complaint, except as provided in § 103.110.

(b) A referral under § 103.100 does not prohibit the Assistant Secretary from taking appropriate action to review or investigate matters in the complaint that raise issues cognizable under other civil

Case: Case:1:18-cv-06066-RELt #DGt17-2dFiled40-12/2Til2/18:0Page08/120 Page 875Page 100 #:7892

rights authorities applicable to departmental programs (see § 103.5).

### § 103.110 Reactivation of referred complaints.

The Assistant Secretary may reactivate a complaint referred under § 103.100 for processing by HUD if:

(a) The substantially equivalent State or local agency consents or requests the reactivation;

(b) The Assistant Secretary determines that, with respect to the alleged discriminatory housing practice, the agency no longer qualifies for certification as a substantially equivalent State or local agency and may not accept interim referrals; or

(c) The substantially equivalent State or local agency has failed to commence proceedings with respect to the complaint within 30 days of the date that it received the notification and referral of the complaint; or the agency commenced proceedings within this 30-day period, but the Assistant Secretary determines that the agency has failed to carry the proceedings forward with reasonable promptness. HUD will not reactivate a complaint under this paragraph (c) of this section until the appropriate HUD Regional Office has conferred with the agency to determine the reason for the delay in processing of the complaint. If the Assistant Secretary believes that the agency will proceed expeditiously following the conference, the Assistant Secretary may leave the complaint with the agency for a reasonable time, notwithstanding the expiration of the 30-day period or a previous failure to carry the proceedings forward with reasonable promptness.

### § 103.115 Notification upon reactivation.

(a) Whenever a complaint referred to a State or local fair housing agency under § 103.100 is reactivated under § 103.110, the Assistant Secretary will notify the substantially equivalent State or local agency, the aggrieved person and the respondent of HUD's reactivation. The notification will be made by certified mail or personal service.

(b) The notification to the respondent and the aggrieved person will:

(1) Advise the aggrieved person and the respondent of the time limits applicable to complaint processing and the procedural rights and obligations of the aggrieved person and the respondent under this part and Part 104.

(2) State that HUD will process the complaint under the Fair Housing Act and that the State or local agency to which the complaint was referred may continue to process the complaint under State or local law.

(3) Advise the aggrieved person and the respondent of the aggrieved person's right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to a complaint or charge based on the alleged discriminatory housing practice under Part 104. The notices will also state that the time period includes the time during which an action arising from a breach of conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

## Subpart D—Investigation Procedures

### § 103.200 Investigations.

(a) Upon the filing of a complaint under § 103.40, the Assistant Secretary will initiate an investigation. The purpose of an investigation are:

(1) To obtain information concerning the events or transactions that relate to the alleged discriminatory housing practice identified in the complaint.

(2) To document policies or practices of the respondent involved in the alleged discriminatory housing practice raised in the complaint.

(3) To develop factual data necessary for the General Counsel to make a determination under § 103.400 whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, and to take other actions provided under this part.

(b) Upon the written direction of the Assistant Secretary, HUD may initate an investigation of housing practices to determine whether a complaint should be filed under Subpart B of this part. Such investigations will be conducted in accordance with the procedures described under this subpart.

### § 103.205 Systemic processing.

Where the Assistant Secretary determines that the alleged discriminatory practices contained in a complaint are pervasive or institutional in nature, or that the processing of the complaint will involve complex issues, novel questions of fact or law, or will affect a large number of persons, the Assistant Secretary may identify the complaint for systemic processing. This determination can be based on the face of the complaint or on information gathered in connection with an investigation. Systemic investigations may focus not only on documenting

facts involved in the alleged discriminatory housing practice that is the subject of the complaint but also on review of other policies and procedures related to matters under investigation, to make sure that they also comply with the nondiscrimination requirements of the Fair Housing Act.

### § 103.215 Conduct of investigation.

(a) In conducting investigations under this part, the Assistant Secretary will seek the voluntary cooperation of all persons to obtain access to premises, records, documents, individuals, and other possible sources of information; to examine, record, and copy necessary materials; and to take and record testimony or statements of persons reasonably necessary for the furtherance of the investigation.

(b) The Assistant Secretary and the respondent may conduct discovery in aid of the investigation to the same methods and to the same extent that parties may conduct discovery in an administrative proceeding under 24 CFR Part 104, except that the Assistant Secretary shall have the power to issue subpoenas described in 24 CFR 104.590 in support of the investigation or at the request of the respondent. Subpoenas issued by the Assistant Secretary must be approved by the General Counsel as to their legality before issuance.

### § 103.220 Cooperation of Federal, State and local agencies.

The Assistant Secretary, in processing Fair Housing Act complaints, may seek the cooperation and utilize the services of Federal, State or local agencies, including any agency having regulatory or supervisory authority over financial institutions.

### § 103.225 Completion of investigation.

The investigation will remain open until the reasonable cause determination is made under § 103.400, or a conciliation agreement is executed and approved under § 103.310. Unless it is impracticable to do so, the Assistant Secretary will complete the investigation of the alleged discriminatory housing practice within 100 days of the filing of the complaint (or where the Assistant Secretary reactivates the complaint, within 100 days after service of the notice of reactivation under § 103.115). If the Assistant Secretary is unable to complete the investigation within the 100-day period, the Assistant Secretary will notify the aggrieved person and the respondent, by certified mail or personal service, of the reasons for the delay.

## § 103.230  Final investigative report.

(a) At the end of each investigation under this part, the Assistant Secretary will prepare a final investigative report. The investigative report will contain:

(1) The names and dates of contacts with witnesses, except that the report will not disclose the names of witnesses that request anonymity. HUD, however, may be required to disclose the names of such witnesses in the course of an administrative hearing under Part 104 or a civil action under Title VIII of the Fair Housing Act;

(2) A summary and the dates of correspondence and other contacts with the aggrieved person and the respondent;

(3) A summary description of other pertinent records;

(4) A summary of witness statements; and

(5) Answers to interrogatories.

(b) A final investigative report may be amended at any time, if additional evidence is discovered.

(c) Notwithstanding the prohibitions and requirements with respect to disclosure of information contained in § 103.330, the Assistant Secretary will make information derived from an investigation, including the final investigative report, available to the aggrieved person and the respondent. Following the completion of investigation, the Assistant Secretary shall notify the aggrieved person and the respondent that the final investigation report is complete and will be provided upon request.

## Subpart E—Conciliation Procedures

### § 103.300  Conciliation.

(a) During the period beginning with the filing of the complaint and ending with the filing of a charge or the dismissal of the complaint by the General Counsel, the Assistant Secretary will, to the extent feasible, attempt to conciliate the complaint.

(b) In conciliating a complaint, HUD will attempt to achieve a just resolution of the complaint and to obtain assurances that the respondent will satisfactorily remedy any violations of the rights of the aggrieved person, and take such action as will assure the elimination of discriminatory housing practices, or the prevention of their occurrence, in the future.

(c) Generally, officers, employees, and agents of HUD engaged in the investigation of a complaint under this part will not participate or advise in the conciliation of the same complaint or in any factually related complaint. Where the rights of the aggrieved party and the respondent can be protected and the prohibitions with respect to the disclosure of information can be observed, the investigator may suspend fact finding and engage in efforts to resolve the complaint by conciliation.

### § 103.310  Conciliation agreement.

(a) The terms of a settlement of a complaint will be reduced to a written conciliation agreement. The conciliation agreement shall seek to protect the interests of the aggrieved person, other persons similarly situated, and the public interest. The types of relief that may be sought for the aggrieved person are described in § 103.315. The provisions that may be sought for the vindication of the public interest are described in § 103.320.

(b)(1) The agreement must be executed by the respondent and the complainant. The agreement is subject to the approval of the Assistant Secretary, who will indicate approval by signing the agreement. The Assistant Secretary will approve an agreement and, if the Assistant Secretary is the complainant, will execute the agreement, only if:

(i) The complainant and the respondent agree to the relief accorded the aggrieved person;

(ii) The provisions of the agreement will adequately vindicate the public interest; and

(iii) If the Assistant Secretary is the complainant, all aggrieved persons named in the complaint are satisfied with the relief provided to protect their interests.

(2) The General Counsel may issue a charge under § 103.405 if the aggrieved person and the respondent have executed a conciliation agreement that has not been approved by the Assistant Secretary.

### § 103.315  Relief sought for aggrieved persons.

(a) The following types of relief may be sought for aggrieved persons in conciliation:

(1) Monetary relief in the form of damages, including damages caused by humiliation or embarrassment, and attorney fees;

(2) Other equitable relief including, but not limited to, access to the dwelling at issue, or to a comparable dwelling, the provision of services or facilities in connection with a dwelling, or other specific relief; or

(3) Injunctive relief appropriate to the elimination of discriminatory housing practices affecting the aggrieved person or other persons.

(b) The conciliation agreement may provide for binding arbitration of the dispute arising from the complaint.

Arbitration may award appropriate relief as described in paragraph (a) of this section. The aggrieved person and the respondent may, in the conciliation agreement, limit the types of relief that may be awarded under binding arbitration.

### § 103.320  Provisions sought for the public interest.

The following are types of provisions may be sought for the vindication of the public interest:

(a) Elimination of discriminatory housing practices.

(b) Prevention of future discriminatory housing practices.

(c) Remedial affirmative activities to overcome discriminatory housing practices.

(d) Reporting requirements.

(e) Monitoring and enforcement activities.

### § 103.325  Termination of conciliation efforts.

(a) HUD may terminate its efforts to conciliate the complaint if the respondent fails or refuses to confer with HUD; the aggrieved person or the respondent fail to make a good faith effort to resolve any dispute; or HUD finds, for any reason, that voluntary agreement is not likely to result.

(b) Where the aggrieved person has commenced a civil action under an Act of Congress or a State law seeking relief with respect to the alleged discriminatory housing practice, and the trial in the action has commenced, HUD will terminate conciliation unless the court specifically requests assistance from the Assistant Secretary.

### § 103.330  Prohibitions and requirements with respect to disclosure of information obtained during conciliation.

(a) Except as provided in paragraph (b) of this section and § 103.230(c), nothing that is said or done in the course of conciliation under this part may be made public or used as evidence in a subsequent administrative hearing under Part 104 or in civil actions under Title VIII of the Fair Housing Act, without the written consent of the persons concerned.

(b) Conciliation agreements shall be made public, unless the aggrieved person and respondent request nondisclosure and the Assistant Secretary determines that disclosure is not required to further the purposes of the Fair Housing Act. Notwithstanding a determination that disclosure of a conciliation agreement is not required, the Assistant Secretary may publish tabulated descriptions of the results of all conciliation efforts.

## § 103.335  Review of compliance with conciliation agreements.

HUD may, from time to time, review compliance with the terms of any conciliation agreement. Whenever HUD has reasonable cause to believe that a respondent has breached a conciliation agreement, the General Counsel shall refer the matter to the Attorney General with a recommendation for the filing of a civil action under section 814(b)(2) of the Fair Housing Act for the enforcement of the terms of the conciliation agreement.

## Subpart F—Issuance of Charge

### § 103.400  Reasonable cause determination.

(a) If a conciliation agreement under § 103.310 has not been executed by the complainant and the respondent, and approved by the Assistant Secretary, the General Counsel, within the time limits set forth in paragraph (c) of this section, shall determine whether, based on the totality of the factual circumstances known at the time of the decision, reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur. The reasonable cause determination will be based solely on the facts concerning the alleged discriminatory housing practice, provided by complainant and respondent and otherwise, disclosed during the investigation. In making the reasonable cause determination, the General Counsel shall consider whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of a civil action in Federal court.

(1) In all cases not involving the legality of local zoning or land use laws or ordinances:

(i) If the General Counsel determines that reasonable cause exists, the General Counsel will immediately issue a charge under § 103.405 on behalf of the aggrieved person, and shall notify the aggrieved person and the respondent of this determination by certified mail or personal service.

(ii) If the General Counsel determines that no reasonable cause exists, the General Counsel shall: issue a short and plain written statement of the facts upon which the General Counsel has based the no reasonable cause determination; dismiss the complaint; notify the aggrieved person and the respondent of the dismissal (including the written statement of facts) by certified mail or personal service; and make public disclosure of the dismissal. Public disclosure of the dismissal shall be by issuance of a press release, except that the respondent may request that no

release be made. Notwithstanding a respondent's request that no press release be issued, the fact of the dismissal, including the names of the parties, shall be public information available on request.

(2) If the General Counsel determines that the matter involves the legality of local zoning or land use laws or ordinances, the General Counsel, in lieu of making a determination regarding reasonable cause, shall refer the investigative materials to the Attorney General for appropriate action under section 814(b)(1) of the Fair Housing Act, and shall notify the aggrieved person and the respondent of this action by certified mail or personal service.

(b) The General Counsel may not issue a charge under paragraph (a) of this section regarding an alleged discriminatory housing practice, if an aggrieved person has commenced a civil action under an Act of Congress or a State law seeking relief with respect to the alleged discriminatory housing practice, and the trial in the action has commenced. If a charge may not be issued because of the commencement of such a trial, the General Counsel will so notify the aggrieved person and the respondent by certified mail or personal service.

(c)(1) The General Counsel shall make the reasonable cause determination after the Assistant Secretary forwards the matter for consideration. The General Counsel shall make a reasonable cause determination within 100 days after filing of the complaint (or where the Assistant Secretary has reactivated a complaint, within 100 days after service of the notice of reactivation under § 103.115), unless it is impracticable to do so.

(2) If the General Counsel is unable to make the determination within the 100-day period specified in paragraph (c)(1) of this section, the Assistant Secretary will notify the aggrieved person and the respondent, by certified mail or personal service, of the reasons for the delay.

### § 103.405  Issuance of charge.

(a) A charge:

(1) Shall consist of a short and plain written statement of the facts upon which the General Counsel has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur;

(2) Shall be based on the final investigative report; and

(3) Need not be limited to facts or grounds that are alleged in the complaint filed under Subpart B of this part. If the charge is based on grounds that are alleged in the complaint, HUD will not issue a charge with regard to the

grounds unless the record of the investigation demonstrates that the respondent has been given notice and an opportunity to respond to the allegation.

(b) Within three business days after the issuance of the charge, the General Counsel shall:

(1) Obtain a time and place for hearing from the Chief Docket Clerk of the Office of Administrative Law Judges;

(2) File the charge along with the notifications described in § 104.410(b) with the Office of Administrative Law Judges;

(3) Serve the charge and notifications in accordance with 24 CFR 104.40; and

(4) Notify the Assistant Secretary of the filing of the charge.

### § 103.410  Election of civil action or provision of administrative proceeding.

(a) If a charge is issued under § 103.405, a complainant (including the Assistant Secretary, if HUD filed the complaint), a respondent, or an aggrieved person on whose behalf the complaint is filed may elect, in lieu of an administrative proceeding under 24 CFR Part 104, to have the claims asserted in the charge decided in a civil action under section 812(o) of the Fair Housing Act.

(b) The election must be made not later than 20 days after the receipt of service of the charge, or in the case of the Assistant Secretary, not later than 20 days after service. The notice of the election must be filed with the Chief Docket Clerk in the Office of Administrative Law Judges and served on the General Counsel, the Assistant Secretary, the respondent, and the aggrieved persons on whose behalf the complaint was filed. The notification will be filed and served in accordance with the procedures established under 24 CFR Part 104.

(c) If an election is not made under this section, the General Counsel will maintain an administrative proceeding based on the charge in accordance with the procedures under 24 CFR Part 104.

(d) If an election is made under this section, the General Counsel shall immediately notify and authorize the Attorney General to commence and maintain a civil action seeking relief under section 812(o) of the Fair Housing Act on behalf of the aggrieved person in an appropriate United States District Court. Such notification and authorization shall include transmission of the file in the case, including a copy of the final investigative report and the charge, to the Attorney General.

(e) The General Counsel shall be available for consultation concerning

any legal issues raised by the Attorney General as to how best to proceed in the event that a new court decision or newly discovered evidence is regarded as relevant to the reasonable cause determination.

### Subpart G—Prompt Judicial Action

#### § 103.500  Prompt judicial action.

(a) If at any time following the filing of a complaint, the General Counsel concludes that prompt judicial action is necessary to carry out the purposes of this part or 24 CFR Part 104, the General Counsel may authorize the Attorney General to commence a civil action for appropriate temporary or preliminary relief pending final disposition of the complaint. To ensure the prompt initiation of the civil action, the General Counsel will consult with the Assistant Attorney General for the Civil Rights Division before making the determination that prompt judicial action is necessary. The commencement of a civil action by the Attorney General under this section will not affect the initiation or continuation of proceedings under this part or administrative proceedings under Part 104.

(b) If the General Counsel has reason to believe that a basis exists for the commencement of proceedings against the respondent under section 814(a) of the Fair Housing Act (Pattern or Practice Cases), proceedings under section 814(c) of the Fair Housing Act (Enforcement of Subpoenas), or proceedings by any governmental licensing or supervisory authorities, the General Counsel shall transmit the information upon which that belief is based to the Attorney General and to other appropriate authorities.

### Subpart H—Other Action

#### § 103.510  Other action by HUD.

In addition to the actions described in § 103.500, HUD may pursue one or more of the following courses of action:

(a) Refer the matter to the Attorney General for appropriate action (e.g., enforcement of criminal penalties under section 811(c) of the Act).

(b) Take appropriate steps to initiate proceedings leading to the debarment of the respondent under 24 CFR Part 24, or initiate other actions leading to the imposition of administrative sanctions where HUD determines that such actions are necessary to the effective operation and administration of Federal programs or activities.

(c) Take appropriate steps to initiate proceedings under:

(1) 24 CFR Part 1, implementing Title VI of the Civil Rights Act of 1964;

(2) 24 CFR 570.912, implementing section 109 of the Housing and Community Development Act of 1974;

(3) 24 CFR Part 8, implementing section 504 of the Rehabilitation Act of 1973;

(4) 24 CFR Part 107, implementing Executive Order 11063; or

(5) The Age Discrimination Act, 42 U.S.C. 6101.

(d) Inform any other Federal, State or local agency with an interest in the enforcement of respondent's obligations with respect to nondiscrimination in housing.

#### § 103.515  Action by other agencies.

In accordance with section 808 (d) and (e) of the Fair Housing Act and Executive Order No. 12259, other Federal agencies, including any agency having regulatory or supervisory authority over financial institutions, are responsible for ensuring that their programs and activities relating to housing and urban development are administered in a manner affirmatively to further the goal of fair housing, and for cooperating with the Assistant Secretary in furthering the purposes of the Fair Housing Act.

5. A new Part 104 is added to read as follows:

## PART 104—ADMINISTRATIVE PROCEEDINGS UNDER SECTION 812 OF THE FAIR HOUSING ACT

### Subpart A—General Information

Sec.
104.10   Scope.
104.20   Definitions.
104.30   Time computations.
104.40   Service and filing.

#### Subpart B—Administrative Law Judge

104.100   Designation.
104.110   Authority.
104.120   Disqualification.
104.130   Ex Parte communications.
104.140   Separation of functions.

#### Subpart C—Parties

104.200   In general.
104.210   Representation.
104.220   Standards of conduct.

#### Subpart D—Pleadings and motions

104.400   In general.
104.410   The Charge.
104.420   Answer to charge.
104.430   Request for intervention.
104.440   Amendments and supplemental pleadings.
104.450   Motions.

#### Subpart E—Discovery

104.500   Discovery.
104.510   Depositions.
104.520   Use of Deposition at hearings.
104.530   Written interrogatories.

104.540   Production of documents and other evidence; entry upon land for inspection and other purposes; and physical and mental examinations.
104.550   Admissions.
104.560   Supplementation of responses.
104.570   Protective orders.
104.580   Failure to make or cooperate in discovery.

#### Subpart F—Subpoenas

104.590   Subpoenas.

#### Subpart G—Prehearing procedures

104.600   Prehearing statements.
104.610   Prehearing conference.
104.620   Settlement negotiations before a settlement judge.

#### Subpart H—Hearing procedures

104.700   Date and place of hearing.
104.710   Conduct of hearings.
104.720   Waiver of right to appear.
104.730   Evidence.
104.740   In camera and protective orders.
104.750   Exhibits.
104.760   Authenticity.
104.770   Stipulations.
104.780   Record of hearing.
104.790   Arguments and briefs.
104.800   End of hearing.
104.810   Receipt of evidence following hearing.

#### Subpart I—Dismissals and Decisions

104.900   Dismissal.
104.910   Initial decision of administrative law judge.
104.920   Service of initial decision.
104.925   Resolution of charge.
104.930   Final decision.
104.935   Action upon issuance of final decision.
104.940   Attorney's fees and costs.

#### Subpart J—Judicial Review and Enforcement of Final Decision

104.950   Judicial Review of Final Decision.
104.955   Enforcement of Final Decision.

Authority: Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); section 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

### Subpart A—General Information

#### § 104.10  Scope.

(a) *Applicability.* This part contains the rules of practice and procedure established by the Department of Housing and Urban Development for administrative proceedings before an Administrative Law Judge adjudicating the claims asserted in a charge issued under 24 CFR Part 103, where no party—the complainant, the respondent, or an aggrieved party—elects to have the claims decided in a civil action under section 812(o) of the Fair Housing Act.

(b) *General application of rules.* Hearings under this subpart shall be conducted as expeditiously and inexpensively as possible, consistent with the needs and rights of the parties

to obtain a fair hearing and a complete record.

(c) *Conduct of proceedings.* The Department will reasonably accommodate persons with disabilities who are participants in the hearing process or interested members of the general public.

### § 104.20 Definitions.

*Aggrieved person* includes any person who:

(a) Claims to have been injured by a discriminatory housing practice; or

(b) Believes that such person will be injured by a discriminatory housing practice that is about to occur.

*Attorney General* means the Attorney General of the United States.

*Complainant* means the person (including the Assistant Secretary for Fair Housing and Equal Opportunity) who filed the complaint under 24 CFR Part 103.

*Complaint* means a complaint filed under 24 CFR Part 103.

*Charge* means the statement of facts issued under 24 CFR 103.405 upon which HUD has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

*Discriminatory housing practice* means an act that is unlawful under section 804, 805, 806 or 818 of the Fair Housing Act.

*Fair Housing Act* means Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3600–3620.

*General Counsel* means the General Counsel of HUD.

*Hearing* means that part of an administrative proceeding that involves the submission of evidence, either by oral presentation or written submission, and includes the submission of briefs and oral arguments on the evidence and applicable law.

*HUD* means the United States Department of Housing and Urban Development.

*Party* means a person or agency named or admitted as a party to a proceeding. Party includes an aggrieved person who intervenes under § 104.430.

*Person* includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers and fiduciaries.

*Personal service* means handing a copy of the document to the person to be served or leaving a copy of the document with a person of suitable age and discretion at the place of business,

residence or usual place of abode of the person to be served.

*Prevailing party* has the same meaning as the term has in section 722 of the Revised Statutes of the United States (42 U.S.C. 1988).

*Respondent* means the person accused in a charge of discriminatory housing practice.

*State* means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

### § 104.30 Time computations.

(a) *In general.* In computing time under this part, the time period begins the day following the act, event, or default and includes the last day of the period, unless the last day is a Saturday, Sunday, or legal holiday observed by the Federal Government, in which case the time period includes the next business day. When the prescribed time period is seven days or less, intermediate Saturdays, Sundays, and legal holidays shall be excluded from the computation.

(b) *Modification of time periods.* Except for time periods required by statute, the administrative law judge may enlarge or reduce any time period required under this part where necessary to avoid prejudicing the public interest or the rights of the parties.

(c) *Entry of orders.* In computing any time period involving the date of the issuance of an order or decision by an administrative law judge, the date of issuance is the date the order or decision is served by the Chief Docket Clerk.

(d) *Computation of time for delivery by mail.* (1) Documents are not filed until received by the Chief Docket Clerk. However, when documents are filed by mail, three days shall be added to the prescribed time period.

(2) Service is effected at the time of mailing.

(3) When a party has the right or is required to take an action within a prescribed period after the service of a document upon the party, and the document is served by mail, three days shall be added to the prescribed period.

### § 104.40 Service and filing.

(a) *Generally.* Copies of all filed documents shall be served on all parties of record. All filed documents shall clearly designate the docket number, if any, and title of the proceeding. All documents to be filed shall be delivered or mailed to the Chief Docket Clerk, Office of Administrative Law Judges,

Room 2158, 451 Seventh Street, SW., Washington, DC 20410.

(b) *By parties.* Parties shall file all documents with the Office of Administrative Law Judges with a copy to all other parties of record. Service of documents upon any party may be made by personal service or by mailing a copy to the last known address. When a party is represented by an attorney, service shall be made upon the attorney. The person serving the document shall certify to the manner and date of service.

(c) *By the Office of Administrative Law Judges.* The Office of Administrative Law Judges shall serve all notices, orders, decisions and all other documents by mail to the last known address.

## Subpart B—Administrative Law Judge

### § 104.100 Designation.

Proceedings under this part shall be presided over by an administrative law judge appointed under 5 U.S.C. 3105. The presiding administrative law judge shall be designated by the chief administrative law judge at HUD.

### § 104.110 Authority.

The administrative law judge shall have all powers necessary to the conduct of fair and impartial hearings including, but not limited to, the power:

(a) To conduct hearings in accordance with this part.

(b) To administer oaths and affirmations and examine witnesses.

(c) To issue subpoenas in accordance with § 104.590.

(d) To rule on offers of proof and receive evidence.

(e) To take depositions or have depositions taken when the ends of justice would be served.

(f) To regulate the course of the hearing and the conduct of parties and their counsel.

(g) To hold conferences for the settlement or simplification of the issues by consent of the parties.

(h) To dispose of motions, procedural requests, and similar matters.

(i) To make initial decisions as described under Subpart I of this Part.

(j) To exercise such powers vested in the Secretary as are necessary and appropriate for the purpose of the hearing and conduct of the proceeding.

### § 104.120 Disqualification.

(a) *Disqualification.* If an administrative law judge finds that there is a basis for his or her disqualification in a proceeding, the Administrative law judge shall withdraw from the proceeding. Withdrawal is

accomplished by entering a notice in the record and by providing a copy of the notice to the chief administrative law judge.

(b) *Motion for recusal.* If a party believes that the presiding administrative law judge should be disqualified in a proceeding for any reason, the party may file a motion to recuse with the administrative law judge. The motion shall be supported by an affidavit setting forth the alleged grounds for disqualification. The administrative law judge shall rule on the motion. If the administrative law judge denies the motion, the administrative law judge shall incorporate a written statement of the reasons for the denial in the record.

(c) *Redesignation of administrative law judge.* If an administrative law judge is disqualified, the chief administrative law judge shall designate another administrative law judge to preside over further proceedings.

### § 104.130 Ex Parte communications.

(a) *General.* An ex parte communication is any direct or indirect communication concerning the merits of a pending proceeding, made by a party in the absence of any other party, to the administrative law judge assigned to the proceeding and which was neither on the record nor on reasonable prior notice to all parties. Ex parte communications do not include communications made for the sole purpose of scheduling hearings, requesting extensions of time, or requesting information on the status of cases.

(b) *Prohibition.* Ex parte communications are prohibited.

(c) *Procedure upon receipt.* If the administrative law judge receives an ex parte communication that the administrative law judge knows or has reason to believe is prohibited, the administrative law judge shall promptly place the communication, or a written statement of the substance of the communication, in the record and shall furnish copies to all parties. Unauthorized communications shall not be taken into consideration in deciding any matter in issue. Any party making a prohibited ex parte communication may be subject to sanctions including, but not limited to, exclusion from the proceeding, and adverse ruling on the issue that is the subject of the prohibited communication.

### § 104.140 Separation of functions.

No officer, employee, or agent of the Federal Government engaged in the performance of investigative, conciliatory, or prosecutorial functions

in connection with the proceeding shall, in that proceeding or any factually related proceeding other than part, participate or advise in the decision of the administrative law judge, except as a witness or counsel during the proceedings.

### Subpart C—Parties

### § 104.200 In general.

(a) *Parties.* Parties to the proceeding include:

(1) HUD. HUD files the charge under 24 CFR 103.405 seeking appropriate relief for an aggrieved party and vindication of the public interest.

(2) Respondent. A respondent is a person named in the charge issued under 24 CFR 103.405 against whom relief is sought.

(3) Intervenors. Any aggrieved person may file a request for intervention under § 104.430. Intervention shall be permitted if the request is timely and;

(i) The intervenor is the aggrieved person on whose behalf the charge is issued; or

(ii) The intervenor is an aggrieved person who claims an interest in the property or transaction that is the subject of the charge and the disposition of the charge may as a practical matter impair or impede the aggrieved person's ability to protect that interest, unless the aggrieved person is adequately represented by the existing parties.

(b) *Rights of parties.* Each party may appear in person, be represented by counsel, examine or cross-examine witnesses, introduce documentary or other relevant evidence into the record, and request the issuance of subpoenas.

(c) *Amicus Curiae.* Briefs of amicus curiae may be permitted at the discretion of the administrative law judge. Such participants are not parties to the proceeding.

### § 104.210 Representation.

(a) *Representation of HUD.* HUD is represented by the General Counsel.

(b) *Representation of other parties.* Other parties may be represented as follows:

(1) Individuals may appear on their own behalf.

(2) A member of a partnership may represent the partnership.

(3) An officer of a corporation, trust or association may represent the corporation, trust or association.

(4) An Officer or employee of any governmental unit, agency or authority may represent that unit, agency or authority.

(5) An attorney admitted to practice before a Federal Court or the highest court in any State. The attorney's

representation that he or she is in good standing before any of these courts is sufficient evidence of the attorney's qualifications under this section, unless otherwise ordered by the administrative law judge.

(c) *Notice of appearance.* Each attorney or other representative of a party shall file a notice of appearance. The notice must indicate the party of whose behalf the appearance is made. Any individual acting in a representative capacity may be required by the administrative law judge to demonstrate authority to act in that capacity.

(d) *Withdrawal.* An attorney or other representative of a party must file a written notice of intent before withdrawing from participation in the proceeding.

### § 104.220 Standards of conduct.

(a) *In general.* All persons appearing in proceedings under this part shall act with integrity and an ethical manner.

(b) *Exclusion.* The administrative law judge may exclude parties or their representatives for refusal to comply with directions, continued use of dilatory tactics, refusal to adhere to reasonable standards of orderly and ethical conduct, failure to act in good faith, or violations of the prohibitions against ex parte communications. If an attorney is suspended or barred from participation in a proceeding by an administrative law judge, the administrative law judge shall include in the record the reasons for the action. An attorney that is suspended or barred from participation may appeal to the chief administrative law judge. The proceeding will not be delayed or suspended pending disposition on the appeal, except that the administrative law judge shall suspend the proceeding for a reasonable time to enable the party to obtain another attorney.

### Subpart D—Pleadings and motions

### § 104.00 In general.

(a) *Form.* Every pleading, motion, brief, or other document shall contain a caption setting forth the title of the proceeding, the docket number assigned by the Office of Administrative Law Judges, and the designation of the type of document (*e.g.,* charge, answer or motion to dismiss).

(b) *Signature.* Every pleading, motion, brief, or other document filed by a party shall be signed by the party, the party's representative, or the attorney representing the party, and must include the signer's address and telephone number. The signature constitutes a

certification that the signer has read the document; that to the best of the signer's knowledge, information and belief there is good ground to support the document; and that it is not interposed for delay.

(c) *Timely filing.* The administrative law judge may refuse to consider any motion or other pleading that is not filed in a timely fashion and in compliance with this part.

### § 104.410 The charge.

(a) *Filing and service.* Within three days after the issuance of a charge under 24 CFR 103.405, the General Counsel shall file the charge with the Chief Docket Clerk in the Office of Administrative Law Judges and serve copies (with the additional information required under paragraph (b) of this section) on the respondent and the aggrieved person on whose behalf the complaint was filed.

(b) *Contents.* The charge shall consist of a short and plain written statement of the facts upon which the General Counsel has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur. The following notifications shall be served with the charge:

(1) The notice shall state that a complainant (including HUD, if HUD filed the complaint), a respondent, or an aggrieved person on whose behalf the complaint was filed may elect to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act, in lieu of an administrative proceeding under this part. The notice shall state that the election must be made not later than 20 days after the receipt of the service of the charge. Where HUD is the complainant, the Assistant Secretary must make the election not later than 20 days after the service of the charge. The notice shall state that the notification of the election must be served on the Chief Docket Clerk in the Office of Administrative Law Judges, the respondent, the aggrieved party on whose behalf the complaint was filed, the Assistant Secretary and the General Counsel.

(2) The notice shall state that if no person timely elects under paragraph (b)(1) of this section to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act, an administrative proceeding will be conducted. The notice shall state that if an administrative hearing is conducted:

(i) The parties will have an opportunity for a hearing at a date and place specified in the notice.

(ii) The respondent will have an opportunity to file an answer to the

charge within 30 days of the date of service of the charge.

(iii) The aggrieved person may participate as a party to the administrative proceeding by filing a timely request for intervention.

(iv) All discovery must be concluded 15 days before the date set for hearing.

(3) The notice shall state that if at any time following the service of the charge on the respondent, the respondent intends to enter into a contract, sale, encumbrance, or lease with any person regarding the property that is the subject of the charge, the respondent must provide a copy of the charge to the person before the respondent and the person enter into the contract, sale, encumbrance or lease.

### § 104.20 Answer to charge.

Within the 30 days after the service of the charge, a respondent contesting material facts alleged in a charge or contending that the respondent is entitled to judgement as a matter of law shall file an answer to the charge. An answer shall include:

(a) A statement that the respondent admits, denies, or does not have and is unable to obtain sufficient information to admit or deny, each allegation made in the charge. A statement of lack of information shall have the effect of a denial. Any allegation that is not denied shall be deemed to be admitted.

(b) A statement of each affirmative defense and a statement of facts supporting each affirmative defense.

### § 104.30 Request for intervention.

Upon timely application, any aggrieved person may file a request for intervention to participate as a party to the proceeding. Requests for intervention submitted within 30 days after the filing of the charge shall be considered to be timely filed.

### § 104.440 Amendments and supplemental pleadings.

(a) *Amendments*—(1) By right. HUD may amend its charge once as a matter of right prior to filing of the answer.

(2) *By leave.* Upon such conditions as are necessary to avoid prejudicing the public interest and the rights of the parties, the administrative law judge may allow amendments to pleadings upon motion of the party.

(3) *Conformance to the evidence.* When issues not raised by the pleadings are reasonably within the scope of the original charge and have been tried by the express or implied consent of the parties, the issues shall be treated in all respects as if they had been raised in the pleadings and amendments may be

made as necessary to make the pleading conform to evidence.

(b) *Supplemental pleadings.* The administrative law judge may, upon reasonable notice, permit supplemental pleadings concerning transactions, occurrences or events that have happened or been discovered since the date of the pleadings and which are relevant to any of the issues involved.

### § 104.450 Motions.

(a) *Motions.* Any application for an order or other request shall be made by a motion which, unless made during an appearance before the administrative law judge, shall be made in writing. Motions or requests made during an appearance before the administrative law judge shall be stated orally and made a part of the transcript. All parties shall be given a reasonable opportunity to respond to written or oral motions or requests.

(b) *Answers to written motions.* Within five days after a written motion is served, any party to the proceeding may file an answer in support of, or in opposition to the motion. Unless otherwise ordered by the administrative law judge, no further responsive documents may be filed.

(c) *Oral argument.* The administrative law judge may order oral argument on any motion.

### Subpart E—Discovery

### § 104.500 Discovery.

(a) *In general.* This subpart governs discovery in aid of administrative proceedings under this Part. Except for time periods stated in these rules, to the extent that these rules conflict with discovery procedures in aid of civil actions in the United States District Court for the District in which the investigation of the discriminatory housing practice took place, the rules of the United States District Court apply.

(b) *Scope.* The parties are encouraged to engage in voluntary discovery procedures. Discovery shall be conducted as expeditiously and inexpensively as possible, consistent with the needs of all parties to obtain relevant evidence. Unless otherwise ordered by the administrative law judge, the parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the proceeding, including the existence, description, nature, custody, condition, and location of documents or persons having knowledge of any discoverable matter. It is not grounds for objection that information sought will not be admissible if the information

sought appears reasonably calculated to lead to the discovery of admissible evidence.

(c) *Methods.* Parties may obtain discovery by one or more of the following methods:

(1) Deposition upon oral examination or written questions.

(2) Written interrogatories.

(3) Requests for the production of documents or other evidence, for inspection and other purposes, and physical and mental examinations.

(4) Requests for admissions.

(d) *Frequency and sequence.* Unless otherwise ordered by the administrative law judge or restricted by this subpart, the frequency or sequence of these methods is not limited.

(e) *Completion of discovery.* All discovery shall be completed 15 days before the date scheduled for hearing.

(f) *Not intervening aggrieved person.* For the purposes of obtaining discovery from a non-intervening aggrieved person, the term "party" as used in this subpart includes the aggrieved person on whose behalf the charge was issued.

§ 104.510  Depositions.

(a) *In general.* Depositions may be taken upon oral examination or upon written interrogatory before any person having the power to administer oaths.

(b) *Notice.* Any party desiring to take the deposition of a witness shall indicate to the witness and to all parties the time and place of the deposition, the name and post office address of the person before whom the deposition is to be taken, the name and address of the witness, and the subject matter of the testimony of the witness. Notice of the taking of a deposition shall be given not less than five days before the deposition is scheduled. The attendance of a witness may be compelled by subpoena under § 104.590.

(c) *Procedure at deposition.* Each witness deposed shall be placed under oath or affirmation, and other parties shall have the right to cross-examine. The questions propounded and all answers and objections made to the propounded questions shall be reduced to writing; read by or to, and subscribed by, the witness; and certified by the person before whom the deposition was taken.

(d) *Objections.* During a deposition, a party or deponent may request suspension of the deposition on grounds of bad faith in the conduct of the examination, oppression of a deponent or party, or improper questioning or conduct. Upon the request for suspension, the deposition will be adjourned. The objecting party or deponent must immediately move the

administrative law judge for a ruling on the objections. The administrative law judge may then limit the scope or manner of taking the deposition.

(e) *Payment of costs of deposition.* The party requesting the deposition shall bear all costs of the deposition.

§ 104.520  Use of deposition at hearings.

(a) *In general.* At the hearing, any part or all of a deposition, so far as admissible under the Federal Rules of Evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice of the taking of the deposition, in accordance with the following provisions:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness.

(2) The deposition of expert witnesses, may be used by any party for any purpose, unless the administrative law judge rules that such use is unfair or a violation of due process.

(3) The deposition of a party or of anyone who at the time of the taking of the deposition was an officer, director, or duly authorized agent of a public or private corporation, partnership, or association that is a party, may be used by any other party for any purpose.

(4) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the administrative law judge finds:

(i) That the witness is dead;

(ii) That the witness is out of the United States or more than 100 miles from the place of hearing, unless it appears that the absence of the witness was procured by the party offering the deposition;

(iii) That the witness is unable to attend to testify because of age, sickness, infirmity, or imprisonment;

(iv) That the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or

(v) Whenever exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open hearing, to allow the deposition to be used.

(5) If a part of a deposition is offered in evidence by a party, any other party may require the party to introduce all of the deposition that is relevant to the part introduced. Any party may introduce any other part of the deposition.

(6) Substitution of parties does not affect the right to use depositions previously taken. If a proceeding has

been dismissed and another proceeding involving the same subject matter is later brought between the same parties or their representatives or successors in interest, all depositions lawfully taken in the former proceeding may be used in the latter proceeding.

(b) *Objections to admissibility.* Except as provided in this paragraph, objection may be made at the hearing to receiving in evidence any deposition or part of a deposition for any reason that would require the exclusion of the evidence if the witness were present and testifying.

(1) Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the basis of the objection is one which might have been obviated or removed if presented at that time.

(2) Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties, and errors of any kind which might be obviated, removed or cured if promptly presented, are waived unless reasonable objection is made at the taking of the deposition.

(3) Objections to the form of written interrogatories are waived unless served in writing upon the party propounding the interrogatories.

§ 104.530  Written interrogatories.

(a) *Written interrogatories to parties.* Any party may serve on any other party written interrogatories to be answered by the party served. If the party served is a public or private corporation, a partnership, an association, or a governmental agency, the interrogatories may be answered by any authorized officer or agent who shall furnish such information as may be available to the party. A party may serve not more than 30 written interrogatories on another party without an order of the administrative law judge.

(b) *Responses to written interrogatories.* Each interrogatory shall be answered separately and fully in writing under oath or affirmation, unless the party objects to the interrogatory. If a party objects to an interrogatory, the response shall state the reasons for the objection in lieu of an answer. The answer and objections shall be signed by the person making them, except that objections may be signed by the counsel for the party. The party upon whom the interrogatories were served shall serve a copy of the answers and objections upon all parties within 15 days after service of the interrogatories.

## § 104.540  Production of documents and other evidence; entry upon land for inspection and other purposes; and physical and mental examinations.

(a) *In general.* Any party may serve on any other party a request to:

(1) Produce and permit the party making the request, or a person acting on the party's behalf, to inspect and copy any designated documents, or to inspect and copy, test, or sample any tangible things that are in the possession, custody, or control of the party upon whom the request is served;

(2) Permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, photographing, testing, or other purposes stated in paragraph (a)(1) of this section; or

(3) Submit to a physical or mental examination by a physician.

(b) *Contents of request.* The request shall:

(1) Set forth the items to be inspected by individual item or by category of items;

(2) Describe each item or category with reasonable particularity;

(3) Specify a reasonable time, place and manner for making the inspection and performing the related acts; and

(4) Specify the time, place, manner, conditions, and scope of the physical or mental examination, and the person or persons who will make the examination. A report of the examining physician shall be made in accordance with Rule 35(b) of the Federal Rules of Civil Procedure.

(c) *Response to request.* Within 15 days of the service of the request, the party upon whom the request is served shall serve a written response on the party submitting the request. The response shall state, with regard to each item or category:

(1) That inspection and related activities will be permitted as requested; or

(2) That objection is made to the request in whole or in part. If an objection is made, the response must state the reasons for the objection.

## § 104.550  Admissions.

(a) *Request for admissions.* A party may serve on any other party a written request for the admission of the genuineness and authenticity of any relevant document described in or attached to the request, or for the admission of the truth of any specified relevant matter of fact.

(b) *Response to request.* (1) Each matter for which an admission is requested is admitted unless, within 15 days after service of the request, the party to whom the request is directed serves on the requesting party:

(i) A written statement specifically denying the relevant matters for which an admission is requested;

(ii) A written statement setting forth in detail why the party cannot truthfully admit or deny the matters; or

(iii) Written objections to the request alleging that the matters are privileged or irrelevant, or that the request is otherwise improper.

(2) The party to whom the request is directed may not give lack of information or knowledge as a reason for failure to admit or deny, unless the party states that it has made a reasonable inquiry and that the information known or readily obtainable is insufficient to enable the party to admit or deny.

(c) *Sufficiency or response.* The party requesting admissions may move for a determination of the sufficiency of the answers or objections. Unless the administrative law judge determines that an objection is justified, the administrative law judge shall order that an answer be served. If the administrative law judge determines that an answer does not comply with the requirements of this section, the administrative law judge may order either that the matter is admitted or that an amended answer be served.

(d) *Effect of admission.* Any matter admitted under this section is conclusively established unless, upon the motion of a party, the administrative law judge permits the withdrawal or amendment of the admission. Any admission made under this section is made for the purposes of the pending proceeding only, is not an admission by the party for any other purpose, and may not be used against the party in any other proceeding.

(e) *Service of requests.* Each request for admission and each written response must be served on all parties and filed with the Office of administrative law judges.

## § 104.560  Supplementation of responses.

(a) *In general.* A party who responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information acquired after the response was made except:

(1) A party is under a duty to timely supplement responses with respect to any question directly addressed to:

(i) The identity and location of persons having knowledge of discoverable matters; and

(ii) The identity of each person expected to be called as an expert witness at the hearing, the subject matter on which the expert witness is expected to testify, and the substance of the testimony.

(2) A party is under a duty to timely amend a previous response if the party later obtains information upon the basis of which:

(i) The party knows the response was incorrect when made; or

(ii) The party knows the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is, in substance, a knowing concealment.

(b) *By order or agreement.* A duty to supplement responses may be imposed by order of the administrative law judge or by agreement of the parties.

## § 104.570  Protective orders.

Upon motion of a party or a person from whom discovery is sought or in accordance with § 104.580(c), the administrative law judge may make appropriate orders to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense as a result of the requested discovery request. The order may direct that:

(a) The discovery may not be had;

(b) The discovery may be had only on specified terms and conditions, including a designation of time and place for discovery;

(c) The discovery may be had by a method of discovery other than that selected by the party seeking discovery;

(d) Certain irrelevant matters may not be the subject of discovery, or that the scope of discovery be limited to certain matters;

(e) Discovery may be conducted with no one present other than persons designated by the administrative law judge;

(f) A trade secret or other confidential research, development or commercial information may not be disclosed, or may be disclosed only in a designated way; or

(g) To protect privileged matters, the administrative law judge may take such other action permitted under § 104.740.

## § 104.580  Failure to make or cooperate in discovery.

(a) *Motion to compel discovery.* If a deponent fails to answer a question propounded, or a party upon whom a request is made under §§ 104.530 through 104.550 fails to respond adequately, objects to a request, or fails to permit inspection as requested, the discovering party may move the administrative law judge for an order

compelling a response or an inspection in accordance with the request. The motion shall:

(1) State the nature of the request;

(2) Set forth the response or objection of the party upon whom the request was served;

(3) Present arguments supporting the motion; and

(4) Attach copies of all relevant discovery requests and responses.

(b) *Evasive or incomplete answers.* For the purposes of this section, an evasive or incomplete answer or response will be treated as a failure to answer or respond.

(c) *Administrative law judge ruling.* In ruling on a motion under this section, the administrative law judge may enter an order compelling a response or an inspection in accordance with the request, may issue sanctions under paragraph (d) of this section, or may enter a protective order under § 104.570.

(d) *Sanctions.* If a party fails to comply with an order (including an order for taking a deposition, the production of evidence within the party's control, a request for admission, or the production of witnesses) the administrative law judge may:

(1) Draw an inference in favor of the requesting party with regard to the information sought;

(2) Prohibit the party failing to comply with the order from introducing evidence concerning, or otherwise relying upon, testimony relating to the information sought;

(3) Permit the requesting party to introduce secondary evidence concerning the information sought;

(4) Strike any appropriate part of the pleadings or other submissions of the party failing to comply with such order; or

(5) Take such other action as may be appropriate.

## Subpart F—Subpoenas

### § 104.590 Subpoenas

(a) *In general.* This section governs the issuance of subpoenas in administrative proceedings under this part. Except for time periods stated in these rules, to the extent that this rule conflicts with procedures for the issuance of subpoenas in civil actions in the United States District Court for the District in which the investigation of the discriminatory housing practice took place, the rules of the United States District Court apply.

(b) *Issuance of subpoena.* Upon the written request of a party, the chief administrative law judge or the presiding administrative law judge may issue a subpoena requiring:

(1) The attendance of a witness for the purpose of giving testimony at a deposition;

(2) The attendance of a witness for the purpose of giving testimony at a hearing; and

(3) The production of relevant books, papers, documents or tangible things.

(c) *Time of request.* Requests for subpoenas in aid of discovery must be submitted in time to permit the conclusion of discovery 15 days before the date scheduled for the hearing. If a request for subpoenas of a witness for testimony at a hearing is submitted three days or less before the hearing, the subpoena shall be issued at the discretion of the chief administrative law judge or the presiding administrative law judge, as appropriate.

(d) *Service.* A subpoena may be served by any person who is not a party and is not less than 18 years of age. Service on a person shall be made by delivering a copy of the subpoena to the person and by tendering witness fees and mileage to that person. When the subpoena is issued on behalf of HUD, witness fees and mileage need not be tendered with the subpoena.

(e) *Amount of witness fees and mileage.* A witness summoned by a subpoena issued under this part is entitled to the same witness and mileage fees as a witness in proceedings in United States District Courts. Fees payable to a witness summoned by a subpoena shall be paid by the party requesting the issuance of the subpoena, or where the administrative law judge determines that a party is unable to pay the fees, the fees shall be paid by the Department.

(f) *Motion to quash or limit subpoena.* Upon a motion by the person served with a subpoena or by a party, made within five days of the service of the subpoena (but in any event not less than the time specified in the subpoena for compliance), the administrative law judge may:

(1) quash or modify the subpoena if it is unreasonable and oppressive or for other good cause shown; or

(2) condition denial of the motion upon the advancement, by the party on whose behalf the subpoena was issued, of the reasonable cost of producing subpoenaed books, papers or documents. Where the circumstances require, the administrative law judge may act upon such a motion at any time after a copy of the motion has been served upon the party on whose behalf the subpoena was issued.

(g) *Failure to comply with subpoena.* If a person fails to comply with a subpoena issued under this section, the party requesting the subpoena may refer the matter to the Attorney General for enforcement in appropriate proceedings under section 814(c) of the Fair Housing Act.

## Subpart G—Prehearing Procedures

### § 104.600 Prehearing statements.

(a) *In general.* Before the commencement of the hearing, the administrative law judge may direct parties to file prehearing statements.

(b) *Contents of statement.* The prehearing statement must state the name of the party or parties presenting the statement and, unless otherwise directed by the administrative law judge, briefly set forth the following:

(1) Issues involved in the proceeding.

(2) Facts stipulated by the parties and a statement that the parties have made a good faith effort to stipulate to the greatest extent possible.

(3) Facts in dispute.

(4) Witnesses (together with a summary of the testimony expected) and exhibits to be presented at the hearing.

(5) A brief statement of applicable law.

(6) Conclusions to be drawn.

(7) Estimated time required for presentation of the party's case.

(8) Such other information as may assist in the disposition of the proceeding.

### § 104.610 Prehearing conference.

(a) *In general.* Before the commencement or during the course of the hearing, the administrative law judge may direct the parties to participate in a conference to expedite the hearing.

(b) *Matters considered.* At the conference, the following matters may be considered:

(1) Simplification and clarification of the issues.

(2) Necessary amendments to the pleadings.

(3) Stipulations of fact and of the authenticity, accuracy, and admissibility of documents.

(4) Limitations on the number of witnesses.

(5) Negotiation, compromise, or settlement of issues.

(6) The exchange of proposed exhibits.

(7) Matters of which official notice will be requested.

(8) A schedule for the completion of actions discussed at the conference.

(9) Such other information as may assist in the disposition of the proceeding.

(c) *Conduct of conference.* The conference may be conducted by telephone, correspondence or personal attendance. Conferences, however, shall generally be conducted by a conference call, unless the administrative law judge determines that this method is impracticable. The administrative law judge shall give reasonable notice of the time, place and manner of the conference.

(d) *Record of conference.* Unless otherwise derected by the administrative law judge, the conference will not be stenographically recorded. The administrative law judge will reduce the actions taken at the conference to a written order or, if the conference takes place less than seven days before the beginning of the hearing, may make a statement on the record summarizing the actions taken at the conference.

### § 104.620  Settlement negotiations before a settlement judge.

(a) *Appointment of settlement judge.* The administrative law judge, upon the motion of a party or upon his or her own motion, may request the chief administrative law judge to appoint another administrative law judge to conduct settlement negotiations. The order appointing the settlement judge may confine the scope of settlement negotiations to specified issues. The order shall direct the settlement judge to report to the chief administrative law judge within specified time periods.

(b) *Duties of settlement judge.* (1) The settlement judge shall convene and preside over conferences and settlement negotiations between the parties and assess the practicalities of a potential settlement.

(2) The settlement judge shall report to the chief administrative law judge describing the status of the settlement negotiations, evaluating settlement prospects, and recommending the termination or continuation of the settlement negotiations.

(c) *Termination of settlement negotiations.* Settlement negotiations shall terminate upon the order of the chief administrative law judge issued after consultation with the settlement judge. The conduct of settlement negotiations shall not unduly delay the commencement of the hearing.

### Subpart H—Hearing Procedures

### § 104.700  Date and place of hearing.

(a) *Date.* The hearing shall commence not later than 120 days following the issuance of the charge under § 103.405, unless it is impracticable to do so. If the hearing cannot be commenced within

this time period, the administrative law judge shall notify in writing all parties, the aggrieved persons on whose behalf the charge was filed, and the Assistant Secretary, of the reasons for the delay.

(b) *Place.* The hearing will be conducted at a place in the vicinity in which the discriminatory housing practice is alleged to have occurred or to be about to occur.

(c) *Notification of time and place for hearing.* The charge issued under 24 CFR 103.405 will specify the time, date and place for the hearing. The administrative law judge may change the time, date or place of the hearing, or may temporarily adjourn or continue a hearing for good cause shown. If such a change is made or the hearing is temporarily adjourned, the administrative law judge shall give the parties at least five days notice of the revised time, date and place for the hearing, unless otherwise agreed by the parties.

### § 104.710  Conduct of hearings.

The hearing shall be conducted in accordance with the Administrative Procedure Act (5 U.S.C. 551–559).

### § 104.720  Waiver of right to appear.

If all parties waive their right to appear before the administrative law judge or to present evidence and arguments, it is not necessary for the administrative law judge to conduct an oral hearing. Such waivers shall be made in writing and filed with the administrative law judge. Where waivers are submitted by all parties, the administrative law judge shall make a record of the relevant written evidence submitted by the parties and pleadings submitted by the parties with respect to the issues in the proceeding. These documents shall constitute the evidence in the proceeding and the decision shall be based upon this evidence. Such hearings shall be deemed to commence on the first day that written evidence may be submitted for the record.

### § 104.730  Evidence.

The Federal Rules of Evidence apply to the presentation of evidence in hearings under this part.

### § 104.740  In camera and protective orders.

The administrative law judge may limit discovery or the introduction of evidence, or may issue such protective or other orders necessary to protect privileged communications. If the administration law judge determines that information in documents containing privileged matters should be made available to a party, the

administrative law judge may order the preparation of a summary or extract of the nonprivileged matter contained in the original.

### § 104.750  Exhibits.

(a) *Identification.* All exhibits offered into evidence shall be numbered sequentially and marked with a designation identifying the party offering the exhibit.

(b) *Exchange of exhibits.* One copy of each exhibit offered into evidence must be furnished to each of the parties and to the administrative law judge. If the administrative law judge does not fix a time for the exchange of exhibits, the parties shall exchange copies of exhibits at the earliest practicable time before the commencement of the hearing. Exhibits submitted as rebuttal evidence are not required to be exchanged before the commencement of the hearing if the submission of such evidence could not reasonably be anticipated at that time.

### § 104.760  Authenticity.

The authenticity of all documents furnished to the parties as required under § 104.750 and submitted as proposed exhibits in advance of the hearing shall be admitted unless a party files a written objection to the exhibit before the commencement of the hearing. Upon a clear showing of good cause for failure to file such a written objection, the administrative law judge may permit the party to challenge the authenticity.

### § 104.770  Stipulations.

The parties may stipulate to any pertinent facts by oral agreement at the hearing or by written agreement at any time. Stipulations may be submitted into evidence at any time before the end of the hearing. When received into evidence, the stipulation is binding on the parties.

### § 104.780  Record of hearing.

(a) *Hearing record.* All oral hearings shall be recorded and transcribed by a reporter designated by, and under the supervision of, the administrative law judge. The original transcript shall be a part of the record and shall constitute the sole official transcript. All exhibits introduced as evidence shall be marked for identification and incorporated as a part of the record. Transcripts may be obtained by the parties and by the public from the official reporter at rates not to exceed the applicable rates fixed by the contract with the reporter.

(b) *Corrections.* Corrections to the official transcript will be permitted upon motion of a party. Motions for correction must be submitted within five days of

the receipt of the transcript. Corrections of the official transcript will be permitted only where errors of substance are involved and upon the approval of the administrative law judge.

### § 104.790 Arguments and briefs.

(a) *Arguments.* Following the submission of evidence at an oral hearing, the administrative law judge may hear oral arguments at the hearing. The administrative law judge may limit the time permitted for such arguments to avoid unreasonable delay.

(b) *Submission of written briefs.* The administrative law judge may permit the submission of written briefs following the adjournment of the oral hearing. Written briefs shall be simultaneously filed by all parties and shall be due not later than 30 days following the adjournment of the oral hearing.

### § 104.800 End of hearing.

(a) *Oral hearings.* Where there is an oral hearing, the hearing ends on the day of the adjournment of the oral hearing or, where written briefs are permitted, on the date that the written briefs are due.

(b) *Hearing on written record.* Where the parties have waived an oral hearing, the hearing ends on the date set by the administrative law judge as the final date for the receipt of submissions by the parties.

### § 104.810 Receipt of evidence following hearing.

Following the end of the hearing, no additional evidence may be accepted into the record, except with the permission of the administrative law judge. The administrative law judge may receive additional evidence upon a determination that new and material evidence was not readily available before the end of the hearing, the evidence has been timely submitted, and its acceptance will not unduly prejudice the rights of the parties. However, the administrative law judge shall include in the record any motions for attorney's fees (including supporting documentation), and any approved corrections to the transcripts.

## Subpart I—Dismissals and Decisions

### § 104.900 Dismissal.

(a) *Election of judicial determination.* If the complainant, the respondent, or the aggrieved person on whose behalf a complaint was filed makes a timely election to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act, the administrative law judge shall dismiss the administrative proceeding.

(b) *Effect of a civil action on administrative proceeding.* An administrative law judge may not continue an administrative proceeding under this part regarding an alleged discriminatory housing practice after the beginning of the trial of a civil action commenced by the aggrieved person under an act of Congress or a State law seeking relief with respect to that discriminatory housing practice. If such a trial is commenced, the administrative law judge shall dismiss the administrative proceeding. The commencement and maintenance of a civil action for appropriate temporary or preliminary relief under section 810(e) or proceedings for such relief under section 813 of the Fair Housing Act does not affect administrative proceedings under this part.

### § 104.910 Initial decision of administrative law judge.

(a) *In general.* Within the time period set forth in paragraph (d) of this section, the administrative law judge shall issue an initial decision including findings of fact and conclusions of law upon each material issue of fact or law presented on the record. The initial decision of the administrative law judge shall be based on the record of the proceeding.

(b) *Finding against respondent.* If the administrative law judge finds that a respondent has engaged, or is about to engage, in a discriminatory housing practice, the administrative law judge shall issue an initial decision against the respondent and order such relief as may be appropriate. The relief may include, but is not limited to, the following:

(1) The administrative law judge may order the respondent to pay damages to the aggrieved person (including damages caused by humiliation and embarrassment).

(2) The administrative law judge may provide for injunctive or such other equitable relief as may be appropriate. No such order may affect any contract, sale, encumbrance or lease consummated before the issuance of the initial decision that involved a bona fide purchaser, encumbrancer or tenant without actual knowledge of the charge issued under § 104.405.

(3) To vindicate the public interest, the administrative law judge may assess a civil penalty against the respondent.

(i) The amount of the civil penalty may not exceed:

(A) $10,000, if the respondent has not been adjudged to have committed any prior discriminatory housing practice in any administrative hearing or civil action permitted under the Fair Housing Act or any State or local fair housing law, or in any licensing or regulatory

proceeding conducted by a Federal, State or local governmental agency.

(B) $25,000, if the respondent has been adjudged to have committed one other discriminatory housing practice in any administrative hearing or civil action permitted under the Fair Housing Act, or any State or local fair housing law, or in any licensing or regulatory proceeding conducted by a Federal, State, or local government agency, and the adjudication was made during the five-year period preceding the date of filing of the charge.

(C) $50,000, if the respondent has been adjudged to have committed two or more discriminatory housing practices in any administrative hearings or civil actions permitted under the Fair Housing Act or any State or local fair housing law, or in any licensing or regulatory proceeding conducted by a Federal, State, or local government agency, and the adjudications were made during the seven-year period preceding the date of the filing of the charge.

(ii) If the acts constituting the discriminatory housing practice that is the subject of the charge were committed by the same natural person who has previously been adjudged, in any administrative proceeding or civil action, to have committed acts constituting a discriminatory housing practice, the time periods set forth in paragraphs (b)(3)(i) (B) and (C) of this section do not apply.

(iii) In a proceeding involving two or more respondents, the administrative law judge may assess a civil penalty as provided under paragraph (b) of this section against each respondent that the administrative law judge determines has been engaged or is about to engage in a discriminatory housing practice.

(c) *Finding in favor of respondent.* If the administrative law judge finds that a respondent has not engaged, and is not about to engage, in a discriminatory housing practice, the administrative law judge shall make an initial decision dismissing the charge.

(d) *Date of issuance.* The administrative law judge shall issue an initial decision within 60 days after the end of the hearing, unless it is impracticable to do so. If the administrative law judge is unable to issue the initial decision within this time period (or within any succeeding 60-day period following the initial 60-day period), the administrative law judge shall notify in writing all parties, the aggrieved person on whose behalf the charge was filed, and the Assistant Secretary, of the reasons for the delay.

## § 104.920 Service of initial decision.

Simultaneously with the issuance of the initial decision, the administrative law judge shall serve the initial decision on all parties, the aggrieved person on whose behalf the charge was filed, the Assistant Secretary and the Secretary of HUD. The initial decision will include a notice stating that the initial decision will become the final decision of the Department unless the Secretary issues a final decision under § 104.930 within 30 days of the date of issuance of the initial decision.

## § 104.925 Resolution of charge.

At any time before the issuance of a final decision under § 104.930, the parties may submit an agreement resolving the charge. The agreement must be signed by the General Counsel, the respondent, and the aggrieved person upon whose behalf the charge was issued. The administrative law judge shall accept the agreement by issuing an initial decision based on the agreed findings. The submission of an agreement resolving the charge constitutes a waiver of any right to challenge or contest the validity of a decision entered in accordance with the agreement.

## § 104.930 Final decision.

(a) *Issuance of final decision by Secretary.* The Secretary of HUD may review any finding of fact, conclusion of law, or order contained in the initial decision of the administrative law judge and issue a final decision in the proceeding. The Secretary may affirm, modify or set aside, in whole or in part, the initial decision or remand the initial decision for further proceedings. The Secretary shall serve the final decision on all parties no later than 30 days from the date of issuance of the initial decision of the administrative law judge. The final decision shall be served on all parties, the aggrieved person on whose behalf the charge was filed, and the Assistant Secretary.

(b) *No final decision by Secretary.* If the Secretary of HUD does not serve a final decision within the time period described above, the initial decision of the administrative law judge will become the final decision of the Department. For the purposes of this part, such a final decision will be considered to have been issued 30 days following the date of issuance of the initial decision.

(c) *Public disclosure.* HUD shall make public disclosure of each final decision.

(d) *Decisions on remand.* If the Secretary remands the decision for further proceedings, the administrative law judge shall issue an initial decision

on remand within 60 days of the date of issuance of the Secretary's decision, unless it is impractical to do so. If the administrative law judge is unable to issue the initial decision within this time period (or within any succeeding 60-day period following the initial 60-day period), the administrative law judge shall notify in writing the parties, the aggrieved person on whose behalf the charge was filed, and the Assistant Secretary, of the reasons for the delay.

## § 104.935 Action upon issuance of a final decision.

(a) *Licensed or regulated businesses.* (1) If a final decision includes a finding that a respondent has engaged or is about to engage in a discriminatory housing practice in the course of a business that is subject to licensing or regulation by a Federal, State or local governmental agency, the Assistant Secretary will notify the governmental agency of the decision by:

(i) Sending copies of the findings of fact, conclusions of law and the final decision to the governmental agency by certified mail; and

(ii) Recommending appropriate disciplinary action to the governmental agency, including, where appropriate, the suspension or revocation of the license of the respondent.

(2) The Assistant Secretary will notify the appropriate governmental agencies within 30 days after the date of issuance of the final decision, unless a petition for judicial review of the final decision as described in § 104.950 has been filed before the issuance of the notification of the agency. If such a petition has been filed, the Assistant Secretary will provide the notification to the governmental agency within 30 days of the date that the final decision is affirmed upon review. If a petition for judicial review is timely filed following the notification of the governmental agency, the Assistant Secretary will promptly notify the governmental agency of the petition and withdraw his or her recommendation.

(b) *Notification to the Attorney General.* If a final decision includes a finding that a respondent has engaged or is about to engage in a discriminatory housing practice and another final decision including such a finding was issued under this part within the five years preceding the date of issuance of the final decision, the General Counsel will notify the Attorney General of the decisions by sending a copy of the final decisions in each administrative proceeding.

## § 104.940 Attorney's fees and costs.

Following the issuance of the final decision under § 104.930, any prevailing party, except HUD, may apply for attorney's fees and costs. The administrative law judge will issue an initial decision awarding or denying such fees and costs. The initial decision will become the final decision of HUD unless the Secretary reviews the initial decision and issues a final decision on fees and costs within 30 days. The recovery of reasonable attorney's fees and costs will be permitted as follows:

(a) If the respondent is the prevailing party:

(1) HUD will be liable for reasonable attorney's fees and costs to the extent provided under the Equal Access to Justice Act (5 U.S.C. 504) and HUD's regulations at 24 CFR Part 14; and

(2) An intervenor will be liable for reasonable attorney's fees and costs only to the extent that the intervenor's participation in the administrative proceeding was frivolous or vexatious, or was for the purpose of harassment.

(b) To the extent that an intervenor is a prevailing party, the respondent will be liable for reasonable attorney's fees unless special circumstances make the recovery of such fees and costs unjust.

## Subpart J—Judicial Review and Enforcement of Final Decision

### § 104.950 Judicial review of final decision.

(a) *Petition for review.* Any party adversely affected by a final decision under § 104.930 may file a petition in the appropriate United States Court of Appeals for review of the decision under section 812(i) of the Fair Housing Act. The petition must be filed within 30 days of the date of issuance of the final decision.

(b) *No petition for review.* If no petition for review is filed under paragraph (a) within 45 days from the date of issuance of the final decision, the findings of facts and final decision shall be conclusive in connection with any petition for enforcement described under § 104.955(a) filed thereafter by the General Counsel, and in connection with any petition for enforcement described under § 104.955(b).

### § 104.955 Enforcement of final decision.

(a) *Enforcement by HUD.* Following the issuance of a final decision under § 104.930, the General Counsel may petition the appropriate United States Court of Appeals for the enforcement of the final decision and for appropriate temporary relief or restraining order in accordance with section 812(j) of the Fair Housing Act.

(b) *Enforcement by others.* If before the expiration of 60 days from the date of issuance of the final decision under § 104.930, no petition for review of the final decision described under § 104.950 has been filed, and the General Counsel has not sought enforcement of the final decision as described in paragraph (a) of this section, any person entitled to relief under the final decision may petition the appropriate United States Court of Appeals for the enforcement of the final decision in accordance with section 812(m) of the Fair Housing Act.

## PART 105—FAIR HOUSING

6. The appendix to Part 105 is redesignated as the appendix to Part 103 and the remainder of Part 105 is removed.

## PART 106—FAIR HOUSING ADMINISTRATIVE MEETINGS UNDER THE FAIR HOUSING ACT

7. The title to Part 106 is revised as set forth above.

8. The authority citation for Part 106 is revised to read as follows:

**Authority:** Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

9. Section 106.1 is revised to read as follows:

### § 106.1 Purpose.

The purpose of this part is to establish procedures for public meetings or conferences that may be used to assist the Assistant Secretary in achieving the aims of the Fair Housing Act for the promotion and assurance of equal opportunity in housing with regard to race, color, religion, sex, handicap, familial status, or national origin, and, specifically, to carry out those responsibilities delegated to him or her by the Secretary of Housing and Urban Development under sections 808(e) (1), (2), and (3), and 809 of the Fair Housing Act.

10. Section 106.2 is revised to read as follows:

### § 106.2 Definitions.

As used in this part:

(a) "Assistant Secretary" means the Assistant Secretary for Fair Housing and Equal Opportunity in the Department of Housing and Urban Development.

(b) "Meeting" means a public meeting or conference held under the authority of the Fair Housing Act and this part.

(c) "Fair Housing Act" means Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing

Amendments Act of 1988, 42 U.S.C. 3600–3620.

11. Part 109 is revised to read as follows:

## PART 109—FAIR HOUSING ADVERTISING

Sec.
109.5   Policy.
109.10   Purpose.
109.15   Definitions.
109.16   Scope.
109.20   Use of words, phrases, symbols, and visual aids.
109.25   Selective use of advertising media or content.
109.30   Fair housing policy and practices.
Appendix I to Part 109—Fair Housing Advertising.

**Authority:** Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

### § 109.5 Policy.

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States. The provisions of the Fair Housing Act (42 U.S.C. 3600, *et seq.*) make it unlawful to discriminate in the sale, rental, and financing of housing, and in the provision of brokerage and appraisal services, because of race, color, religion, sex, handicap, familial status, or national origin. Section 804(c) of the Fair Housing Act, 42 U.S.C. 3604(c), as amended, makes it unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement, with respect to the sale or rental of a dwelling, that indicates any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination. However, the prohibitions of the act regarding familial status do not apply with respect to "housing for older persons", as defined in section 807(b) of the act.

### § 109.10 Purpose.

The purpose of this part is to assist all advertising media, advertising agencies and all other persons who use advertising to make, print, or publish, or cause to be made, printed, or published, advertisements with respect to the sale, rental, or financing of dwellings which are in compliance with the requirements of the Fair Housing Act. These regulations also describe the matters this Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising.

### § 109.15 Definitions.

As used in this part:

(a) "Assistant Secretary" means the Assistant Secretary for Fair Housing and Equal Opportunity.

(b) "General Counsel" means the General Counsel of the Department of Housing and Urban Development.

(c) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(d) "Family" includes a single individual.

(e) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers, and fiduciaries.

(f) "To rent" includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(g) "Discriminatory housing practice" means an act that is unlawful under section 804, 805, 806, or 818 of the Fair Housing Act.

(h) "Handicap" means, with respect to a person—

(1) A physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) A record of having such an impairment, or

(3) Being regarded as having such an impairment.

This term does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)). For purposes of this part, an individual shall not be considered to have a handicap solely because that individual is a transvestite.

(i) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) A parent or another person having legal custody of such individual or individuals; or

(2) The designee of such parent or other person having such custody, with the written permission of such parent or other person. The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual

Case: Case: 15-50604 Document: 00512 12/10/2013 Page: 134 Page: 77 Page ID#:7906

who has not attained the age of 18 years.

## § 109.16  Scope.

(a) *General.* This part describes the matters the Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising. Use of these criteria will be considered by the General Counsel as making determinations as to whether there is reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

(1) *Advertising media.* This part provides criteria for use by advertising media in determining whether to accept and publish advertising regarding sales or rental transactions. Use of these criteria will be considered by the General Counsel as making determinations as to whether there is reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

(2) *Persons placing advertisements.* A failure by persons placing advertisements to use the criteria contained in this part, when found in connection with the investigation of a complaint alleging the making or use of discriminatory advertisements, will be considered by the General Counsel in making a determination of reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

(b) *Affirmative advertising efforts.* Nothing in this part shall be construed to restrict advertising efforts designed to attract persons to dwellings who would not ordinarily be expected to apply, when such efforts are pursuant to an affirmative marketing program or undertaken to remedy the effects of prior discrimination in connection with the advertising or marketing of dwellings.

## § 109.20  Use of words, phrases, symbols, and visual aids.

The following words, phrases, symbols, and forms typify those most often used in residential real estate advertising to convey either overt or tacit discriminatory preferences or limitations. In considering a complaint under the Fair Housing Act, the Department will normally consider the use of these and comparable words, phrases, symbols, and forms to indicate a possible violation of the act and to establish a need for further proceedings on the complaint, if it is apparent from the context of the usage that

discrimination within the meaning of the act is likely to result.

(a) *Words descriptive of dwelling, landlord, and tenants.* White private home, Colored home, Jewish home, Hispanic residence, adult building.

(b) *Words indicative of race, color, religion, sex, handicap, familial status, or national origin*—(1) *Race*—Negro, Black, Caucasian, Oriental, American Indian.

(2) *Color*—White, Black, Colored.

(3) *Religion*—Protestant, Christian, Catholic, Jew.

(4) *National origin*—Mexican American, Puerto Rican, Philippine, Polish, Hungarian, Irish, Italian, Chicano, African, Hispanic, Chinese, Indian, Latino.

(5) *Sex*—the exclusive use of words in advertisements, including those involving the rental of separate units in a single or multi-family dwelling, stating or tending to imply that the housing being advertised is available to persons of only one sex and not the other, except where the sharing of living areas is involved. Nothing in this part restricts advertisements of dwellings used exclusively for dormitory facilities by educational institutions.

(6) *Handicap*—crippled, blind, deaf, mentally ill, retarded, impaired, handicapped, physically fit. Nothing in this part restricts the inclusion of information about the availability of accessible housing in advertising of dwellings.

(7) *Familial status*—adults, children, singles, mature persons. Nothing in this part restricts advertisements of dwellings which are intended and operated for occupancy by older persons and which constitute "housing for older persons" as defined in Part 100 of this title.

(8) *Catch words*—Words and phrases used in a discriminatory context should be avoided, e.g., "restricted", "exclusive", "private", "integrated", "traditional", "board approval" or "membership approval".

(c) *Symbols or logotypes.* Symbols or logotypes which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(d) *Colloquialisms.* Words or phrases used regionally or locally which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(e) *Directions to real estate for sale or rent (use of maps or written instructions).* Directions can imply a discriminatory preference, limitation, or exclusion. For example, references to real estate location made in terms of racial or national origin significant landmarks, such as an existing black

development (signal to blacks) or an existing development known for its exclusion of minorities (signal to whites). Specific directions which make reference to a racial or national origin significant area may indicate a preference. References to a synagogue, congregation or parish may also indicate a religious preference.

(f) *Area (location) description.* Names of facilities which cater to a particular racial, national origin or religious group, such as country club or private school designations, or names of facilities which are used exclusively by one sex may indicate a preference.

## § 109.25  Selective use of advertising media or content.

The selective use of advertising media or content when particular combinations thereof are used exclusively with respect to various housing developments or sites can lead to discriminatory results and may indicate a violation of the Fair Housing Act. For example, the use of English language media alone or the exclusive use of media catering to the majority population in an area, when, in such area, there are also available non-English language or other minority media, may have discriminatory impact. Similarly, the selective use of human models in advertisements may have discriminatory impact. The following are examples of the selective use of advertisements which may be discriminatory:

(a) *Selective geographic advertisements.* Such selective use may involve the strategic placement of billboards; brochure advertisements distributed within a limited geographic area by hand or in the mail; advertising in particular geographic coverage editions of major metropolitan newspapers or in newspapers of limited circulation which are mainly advertising vehicles for reaching a particular segment of the community; or displays or announcements available only in selected sales offices.

(b) *Selective use of equal opportunity slogan or logo.* When placing advertisements, such selective use may involve placing the equal housing opportunity slogan or logo in advertising reaching some geographic areas, but not others, or with respect to some properties but not others.

(c) *Selective use of human models when conducting an advertising campaign.* Selective advertising may involve an advertising campaign using human models primarily in media that cater to one racial or national origin segment of the population without a

complementary advertising campaign that is directed at other groups. Another example may involve use of racially mixed models by a developer to advertise one development and not others. Similar care must be exercised in advertising in publications or other media directed at one particular sex, or at persons without children. Such selective advertising may involve the use of human models of members of only one sex, or of adults only, in displays, photographs or drawings to indicate preferences for one sex or the other, or for adults to the exclusion of children.

§ 109.30  Fair housing policy and practices.

In the investigation of complaints, the Assistant Secretary will consider the implementation of fair housing policies and practices provided in this section as evidence of compliance with the prohibitions against discrimination in advertising under the Fair Housing Act.

(a) *Use of Equal Housing Opportunity logotype, statement, or slogan.* All advertising of residential real estate for sale, rent, or financing should contain an equal housing opportunity logotype, statement, or slogan as a means of educating the homeseeking public that the property is available to all persons regardless of race, color, religion, sex, handicap, familial status, or national origin. The choice of logotype, statement or slogan will depend on the type of media used (visual or auditory) and, in space advertising, on the size of the advertisement. Table I (see Appendix I) indicates suggested use of the logotype, statement, or slogan and size of logotype. Table II (see Appendix I) contains copies of the suggested Equal Housing Opportunity logotype, statement, and slogan.

(b) *Use of human models.* Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex, handicap, familial status, or national origin. If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with children. Models, if used, should portray persons in an equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status, or national origin, and is not for the exclusive use of one such group.

(c) *Coverage of local laws.* Where the Equal Housing Opportunity statement is used, the advertisement may also include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

(d) *Notification of fair housing policy*—(1) *Employees.* All publishers of advertisements, advertising agencies, and firms engaged in the sale, rental or financing of real estate should provide a printed copy of their nondiscrimination policy to each employee and officer.

(2) *Clients.* All publishers or advertisements and advertising agencies should post a copy of their nondiscrimination policy in a conspicuous location wherever persons place advertising and should have copies available for all firms and persons using their advertising services.

(3) *Publishers' notice.* All publishers should publish at the beginning of the real estate advertising section a notice such as that appearing in Table III (see Appendix I). The notice may include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

**Appendix I to Part 109—Fair Housing Advertising**

The following three tables may serve as a guide for the use of the Equal Housing Opportunity logotype, statement, slogan, and publisher's notice for advertising:

Table I

A simple formula can guide the real estate advertiser in using the Equal Housing Opportunity logotype, statement, or slogan.

In all space advertising (advertising in regularly printed media such as newspapers or magazines) the following standards should be used:

| Size of advertisement | Size of logotype in inches |
|---|---|
| ½ page or larger | 2×2 |
| ¼ page up to ½ page | 1×1 |
| 4 column inches to ⅛ page | ½×½ |
| Less than 4 column inches | (¹) |

¹ Do not use.

In any other advertisements, if other logotypes are used in the advertisement, then the Equal Housing Opportunity logo should be of a size at least equal to the largest of the other logotypes; if no other logotypes are used, then the type should be bold display face which is clearly visible. Alternatively, when no other logotypes are used, 3 to 5 percent of an advertisement may be devoted to a statement of the equal housing opportunity policy.

In space advertising which is less than 4 column inches (one column 4 inches long or two columns 2 inches long) of a page in size, the Equal Housing Opportunity slogan should be used. Such advertisements may be grouped with other advertisements under a caption which states that the housing is available to all without regard to race, color, religion, sex, handicap, familial status, or national origin.

Table II

Illustrations of Logotype, Statement, and Slogan. Equal Housing Opportunity Logotype:



Equal Housing Opportunity Statement: We are pledged to the letter and spirit of U.S. policy for the achievement of equal housing opportunity throughout the Nation. We encourage and support an affirmative advertising and marketing program in which there are no barriers to obtaining housing because of race, color, religion, sex, handicap, familial status, or national origin.

Equal Housing Opportunity Slogan: "Equal Housing Opportunity."

Table III

Illustration of Media Notice—Publisher's notice: All real estate advertised herein is subject to the Federal Fair Housing Act, which makes it illegal to advertise "any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or intention to make any such preference, limitation, or discrimination."

We will not knowingly accept any advertising for real estate which is in violation of the law. All persons are hereby informed that all dwellings advertised are available on an equal opportunity basis.

**PART 110—FAIR HOUSING POSTER**

12. The authority citation for Part 110 is revised to read as follows:

Authority: Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

13. Section 110.1 is revised to read as follows:

§ 110.1  Purpose.

The regulations set forth in this part contain the procedures established by the Secretary of Housing and Urban Development with respect to the display of a fair housing poster by persons subject to sections 804 through 806 of the Fair Housing Act, 42 U.S.C. 3604–3606.

14. In § 110.5, paragraphs (b), (e), (g) and (h) are revised to read as follows:

### § 110.5 Definitions.

\*   \*   \*   \*   \*

(b) "Discriminatory housing practice" means an act that is unlawful under section 804, 805, 806, or 818 of the Act.

\*   \*   \*   \*   \*

(e) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers and fiduciaries.

\*   \*   \*   \*   \*

(g) "Fair housing poster" means the poster prescribed by the Secretary for display by persons subject to sections 804–806 of the Act.

(h) "The Act" means the Fair Housing Act (The Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988), 42 U.S.C. 3600, et seq.

\*   \*   \*   \*   \*

15. In § 110.10, paragraph (a) introductory text and paragraph (c) is revised to read as follows:

### § 110.10 Persons subject.

(a) Except to the extent that paragraph (b) of this section applies, all persons subject to section 804 of the Act, Discrimination in the Sale or Rental of Housing and Other Prohibited Practices, shall post and maintain a fair housing poster as follows:

\*   \*   \*   \*   \*

(c) All persons subject to section 805 of the Act, Discrimination In Residential Real Estate-Related Transactions shall post and maintain a fair housing poster at all their places of business which participate in the covered activities.

\*   \*   \*   \*   \*

16. Section 110.15 is revised to read as follows:

### § 110.15 Location of posters.

All fair housing posters shall be prominently displayed so as to be readily apparent to all persons seeking housing accommodations or seeking to engage in residential real estate-related transactions or brokerage services as contemplated by sections 804 through 806 of the Act.

17. In § 110.25, paragraph (a) is revised to read as follows:

### § 110.25 Description of posters

(a) The fair housing poster shall be 11 inches by 14 inches and shall bear the following legend:



EQUAL HOUSING OPPORTUNITY

We do Business in Accordance With the Fair Housing Act

(The Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988)

IT IS ILLEGAL TO DISCRIMINATE AGAINST

ANY PERSON BECAUSE OF RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS (HAVING ONE OR MORE CHILDREN), OR NATIONAL ORIGIN

- In the sale or rental of housing or residential lots.
- In advertising the sale or rental of housing.
- In the financing of housing.
- In the appraisal of housing.
- In the provision of real estate brokerage services.
- Blockbusting is also illegal.

Anyone who feels he or she has been discriminated against should send a complaint to:

U.S. Department of Housing and Urban Development, Assistant Secretary for Fair Housing and Equal Opportunity, Washington, DC 20410

or

HUD Region or [Area Office stamp]

\*   \*   \*   \*   \*

18. Part 115 is revised to read as follows:

### PART 115—CERTIFICATION OF SUBSTANTIALLY EQUIVALENT AGENCIES

Sec.
115.1   Purpose.
115.2   Basis of determination.
115.3   Criteria for adequacy of law.
115.3a   Criteria for adequacy of law— discrimination because of handicap.
115.4   Performance standards.
115.5   Request for certification.
115.6   Procedure for certification.
115.7   Denial of certification.
115.8   Withdrawal of certification.
115.9   Conferences.
115.10   Consequences of certification.
115.11   Interim referrals.

Authority: Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development Act, 42 U.S.C. 3535(d)).

### § 115.1 Purpose.

(a) Section 810(f) of the Fair Housing Act, (The Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (the Act)) provides that: whenever a complaint alleges a discriminatory housing practice within the jurisdiction of a State or local public agency that has been certified by the Secretary as substantially equivalent, the Secretary shall refer the complaint to that certified agency before taking any action with respect to the complaint. Except with the consent of the certified agency, the Secretary, after referral is made, shall take no further action with respect to the complaint unless:

(1) The certified agency has failed to commence proceedings with respect to the complaint before the end of the 30th day after the date of referral;

(2) The certified agency, having commenced proceedings, fails to carry forward proceedings with reasonable promptness; or

(3) The Secretary determines that the certified agency no longer qualifies for certification.

The Secretary has delegated the exercise of functions and duties under section 810(f) of the Act to the Assistant Secretary for Fair Housing and Equal Opportunity (the Assistant Secretary).

(b) The purpose of this part is to set forth:

(1) The basis for agency certification.

(2) The procedure by which a determination to certify is made by the Assistant Secretary.

(3) The basis and procedure for withdrawal of certification.

(4) The consequences of certification.

### § 115.2 Basis of determination.

A determination to certify an agency as substantially equivalent involves a two-phase procedure. The determination requires examination and an affirmative conclusion by the Assistant Secretary on two separate inquiries:

(a) Whether the law, administered by the agency, on its face, provides that:

(1) The substantive rights protected by the agency in the jurisdiction with respect to which certification is to be made;

(2) The procedures followed by the agency;

(3) The remedies available to the agency; and

(4) The availability of judicial review of the agency's actions;

Are Substantially substantively equivalent to those created by and under the act; and

Case: Case: 08-56044 01/21/2013 Document: #D 8174 id: 2 Filed: 01/21/2013 Page: 08/147 Page:87 Page ID#:7909

(b) Whether the current practices and past performance of the agency demonstrate that, in operation, the law in fact provides rights and remedies which are substantially equivalent to those provided in the Act.

§ 115.3  Criteria for adequacy of law.

(a) In order for a determination to be made that a State or local fair housing agency administers a law which, on its face, provides rights and remedies for alleged discriminatory housing practices that are substantially equivalent to those provided in the Act, the law or ordinance must:

(1) Provide for an administrative enforcement body to receive and process complaints and provide that:

(i) Complaints must be in writing;

(ii) Upon the filing of a complaint the agency shall serve notice upon the complainant acknowledging the filing and advising the complainant of the time limits and choice of forums provided under the law;

(iii) Upon the filing of a complaint the agency shall promptly serve notice on the respondent or person charged with the commission of a discriminatory housing practice advising of his or her procedural rights and obligations under the law or ordinance together with a copy of the complaint;

(iv) A respondent may file an answer to a complaint.

(2) Delegate to the administrative enforcement body comprehensive authority, including subpoena power, to investigate the allegations of complaints and power to conciliate complaint matters, and require that:

(i) The agency commence proceedings with respect to the complaint before the end of the 30th day after receipt of the complaint;

(ii) The agency investigate the allegations of the complaint and complete the investigation in no more than 100 days after receipt of the complaint, unless it is impracticable.

(iii) If the agency is unable to complete the investigation within 100 days it shall notify the complainant and respondent in writing of the reasons for not doing so;

(iv) The agency make final administrative disposition of a complaint within one year of the date of receipt of a complaint, unless it is impracticable to do so. If the agency is unable to do so it shall notify the complainant and respondent, in writing, of the reasons for not doing so;

(v) Any conciliation agreement arising out of conciliation efforts by the agency shall be an agreement between the respondent and the complainant and shall be subject to the approval of the agency;

(vi) Each conciliation agreement shall be made public unless the complainant and respondent otherwise agree and the agency determines that disclosure is not required to further the purposes of the law or ordinance.

(3) Not place any excessive burdens on the complainant that might discourage the filing of complaints, such as:

(i) A provision that a complaint must be filed within any period of time less than 180 days after an alleged discriminatory housing practice has occurred or terminated;

(ii) Anti-testing provisions;

(iii) Provisions that could subject a complainant to costs, criminal penalties or fees in connection with filing of complaints.

(4) Not contain exemptions that substantially reduce the coverage of housing accommodations as compared to Section 803 of the Act (which provides coverage with respect to all dwellings except, under certain circumstances, single family homes sold or rented by the owner and units in owner-occupied dwellings containing living quarters for no more than four families).

(5) Be sufficiently comprehensive in its prohibitions to be an effective instrument in carrying out and achieving the intent and purposes of the Act, i.e., prohibit the following acts:

(i) Refusal to sell or rent based on discrimination because of race, color, religion, sex, familial status, or national origin;

(ii) Refusal to negotiate for a sale or rental based on discrimination because of race, color, religion, sex, familial status, or national origin;

(iii) Otherwise making unavailable or denying a dwelling based on discrimination because of race, color, religion, sex, familial status, or national origin;

(iv) Discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, based on discrimination because of race, color, religion, sex, familial status, or national origin;

(v) Advertising in a manner that indicates any preference, limitation, or discrimination because of race, color, religion, sex, familial status, or national origin;

(vi) Falsely representing that a dwelling is not available for inspection, sale, or rental because of discrimination because of race, color, religion, sex, familial status, or national origin;

(vii) Coercion, intimidation, threats, or interference with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise of enjoyment of any right granted or protected by section 803, 804, 805, or 806 of the Act;

(viii) Blockbusting based on representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, familial status, or national origin;

(ix) Discrimination in residential real estate-related transactions by providing that: It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, familial status, or national origin. Such transactions include:

(A) The making or purchasing of loans or the provision of other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or the making or purchasing of loans or the provision of other financial assistance secured by residential real estate; or

(B) The selling, brokering, or appraising of residential real property;

(x) Denying a person access to, or membership or participation in, a multiple listing service, real estate brokers' organization, or other service because of race, color, religion, sex, familial status or national origin.

(b) In addition to the factors described in paragraph (a) of this section, the provisions of the State or local law must afford administrative and judicial protection and enforcement of the rights embodied in the law.

(1) The agency must have authority to:

(i) Seek prompt judicial action for appropriate temporary or preliminary relief pending final disposition of a complaint if the agency concludes that such action is necessary to carry out the purposes of the law or ordinance;

(ii) Issue subpoenas;

(iii) Grant actual damages or arrange to have adjudicated in court at agency expense the award of actual damages to an aggrieved person;

(iv) Grant injunctive or other equitable relief, or be specifically authorized to seek such relief in a court of competent jurisdiction.

(v) Assess a civil penalty against the respondent, or arrange to have adjudicated in court at agency expense

the award of punitive damages against the respondent.

(2) Agency actions must be subject to judicial review upon application by any party aggrieved by a final agency order.

(3) Judicial review of a final agency order must be in a court with authority to grant to the petitioner, or to any other party, such temporary relief, restraining order, or other order as the court determines is just and proper; affirm, modify, or set aside, in whole or in part, the order, or remand the order for further proceedings; and enforce the order to the extent that the order is affirmed or modified.

(c) The requirement that the State or local law prohibit discrimination on the basis of familial status does not require that the State or local law limit the applicability of any reasonable local. State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.

(d) The State or local law may assure that no prohibition based on discrimination because of familial status applies to housing for older persons substantially as described in Part 100, Subpart E.

(e) A detemination of the adequacy of a State or local fair housing law "on its face" is intended to focus on the meaning and intent of the text of the law, as distinguished from the effectiveness of its administration. Accordingly, this determination is not limited to an analysis of the literal text of the law but must take into account all relevant maters of State or local law, *e.g.*, regulations, directives and rules of procedure, or interpretations of the fair housing law by competent authorities, as may be necessary.

(f) A law will be held to be not adequate "on its face" if it permits any part of the agency's decision making authority to be contracted out or delegated to a non-governmental authority. For the purposes of this paragraph, "decision making authority" shall include:

(1) acceptance of the complaint;

(2) Approval of the concilitation agreement;

(3) Dismissal of a complaint;

(4) Any action specified in Section 115.3(a)(2)(iv) or 115.3(b)(1).

(g) The State or local law must provide for civil enforcement of the law or ordinance by an aggrieved person by the commencement of an action in an appropriate court not less than 1 year after the occurrence or termination of an alleged discriminatory housing practice. The court should be empowered to:

(1) Award the plaintiff actual and punitive damages;

(2) Grant as relief, as it deems appropriate, any temporary or permanent injunction, temporary restraining order or other order;

(3) Allow reasonable attorney's fees and costs.

§ 115.3a  Criteria for adequacy of law—discrimination because of handicap.

(a) In addition to the provisions of § 115.3, in order for a determination to be made that a State or local fair housing agency administers a law which, on its face, provides rights and remedies for alleged discriminatory housing practices, based on handicap, that are substantially equivalent to those provided in the Act, the law or ordinance must be sufficiently comprehensive in its prohibitions to be an effective instrument in carrying out and achieving the intent and purposes of the Act, *i.e.*, it must prohibit the following acts:

(1) Advertising in a manner that indicates any preference, limitation, or discrimination because of handicap;

(2) Falsely representing that a dwelling is not available for inspection, sale, or rental based on discrimination because of handicap;

(3) Blockbusting, based on representations regarding the entry or prospective entry into the neighborhood of a person or persons with a particular handicap;

(4) Discrimination in residential real estate-related transactions by providing that: It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms and conditions of such a transaction, because of handicap. Residential and real estate-related transactions include:

(i) The making or purchasing of loans or the provision of other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or the making or purchasing of loans or the provision of other financial assistance secured by residential real estate; or

(ii) The selling, brokering, or appraising of residential real property;

(5) Denying a person access to, or membership or participation in, multiple listing services, real estate brokers' organizations, or other services because of handicap;

(6) Discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling to any buyer or renter because of a handicap of that buyer or renter, or of a person residing in or intending to reside in that dwelling after it is sold, rented, or made

available, or of any person associated with the buyer or renter;

(7) Discrimination against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with the dwelling, because of a handicap of that person, of a person residing in or intending to reside in the dwelling after it is sold, rented, or made available, or of any person associated with that person.

(b) For purposes of this section, discrimination includes—

(1) A refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by the handicapped person, if the modifications may be necessary to afford the handicapped person full enjoyment of the premises, except that, in the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter's agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted;

(2) A refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling; or

(3) In connection with the design and construction of covered multifamily dwellings for first occupancy after March 13, 1991, a failure to design and construct dwellings in such a manner that—

(i) The dwellings have at least one building entrance on an accessible route, unless it is impractical to do so because of the terrain or unusual characteristics of the site;

(ii) With respect to dwellings with a building entrance on an accessible route—

(A) The public use and common use portions of the dwellings are readily accessible to and usable by handicapped persons;

(B) All the doors designed to allow passage into and within all premises are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(C) All premises within covered multifamily dwelling units contain an accessible route into and through the dwelling; light switches, electrical outlets, thermostats, and other environmental controls are in accessible locations; there are reinforcements in the bathroom walls to allow later installation of grab bars; and there are

usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

(c) The law or ordinance administered by the State or local fair housing agency may provide that compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as "ANSI A117.1–1986") suffices to satisfy the requirements of paragraph (b)(3)(ii)(C) of this section.

(d) As used in this section, the term "covered multifamily dwellings" means buildings consisting of four or more units if such buildings have one or more elevators and ground floor units in other buildings consisting of four or more units.

### § 115.4  Performance standards.

(a) The initial and continued certification that a State or local fair housing law provides rights and remedies substantially equivalent to those provided in the Act will be dependent upon an assessment of the current practices and past performance of the appropriate State or local agency charged with administration and enforcement of the law to determine that, in operation, the law is in fact providing substantially equivalent rights and remedies. The performance standards set forth in paragraph (b) of this section will be used in making this assessment.

(b) A State or local agency must:

(1) Engage in comprehensive and thorough investigative activities; and

(2) Commence proceedings with respect to a complaint before the end of the 30th day after the receipt of the complaint, carry forward proceedings with reasonable promptness, and in accordance with the memorandum of understanding described in section 115.6 of this part, make final administrative disposition of a complaint within one year of the date of receipt of the complaint and, within 100 days of receipt of the complaint, complete the following proceedings:

(i) Investigation, including the preparation of a final investigative report containing—

(A) The names and dates of contacts with witnesses;

(B) A summary and dates of correspondence and other contacts with the aggrieved person and the respondent;

(C) A summary description of other pertinent records;

(D) A summary of witness statements; and

(E) Answers to interrogatories.

(ii) Conciliation activity.

(3) Conduct compliance reviews of all settlements, conciliation agreements and orders issued by or entered into to resolve discriminatory housing practices.

(4) Consistently and affirmatively seek and obtain the type of relief designed to prevent recurrences of such practices;

(5) Consistently and affirmatively seek the elimination of all prohibited practices under its fair housing law;

(c) Where the State or local agency has duties and responsibilities in addition to administration of the fair housing law, the Assistant Secretary may consider such matters as the relative priority given to fair housing administration, as compared to such other duties and responsibilities, and the compatibility or potential conflict of fair housing objectives with the agency's other duties and responsibilities.

### § 115.5  Request for certification.

(a) A request for certification under this part may be filed with the Assistant Secretary by the State or local official having principal responsibility for administration of the State or local fair housing law. The request shall be supported by the following materials and information:

(1) The text of the jurisdiction's fair housing law, the law creating and empowering the agency, any regulations and directives issued under the law, and any formal opinions of the State Attorney General or the chief legal officer of the jurisdiction that pertain to the jurisdiction's fair housing law.

(2) Organization of the agency responsible for administering and enforcing the law.

(3) Funding and personnel made available to the agency for administration and enforcement of the fair housing law during the current operating year, and not less than the preceding three operating years (or such lesser number during which the law was in effect).

(4) Data demonstrating that the agency's current practices and past performance comply with the performance standards described in § 115.4.

(5) Any additional information which the submitting official may wish to be considered.

(b) The request and supporting materials shall be filed with the Assistant Secretary for Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410. A copy of the request and supporting materials will be kept

available for public examination and copying at:

(1) The office of the Assistant Secretary, and

(2) the HUD Regional Office in whose jurisdiction the State or local jurisdiction seeking recognition is located, and

(3) the office of the State or local agency charged with administration and enforcement of the State or local law.

### § 115.6  Procedure for certification.

(a) Upon receipt of a request for certification filed under § 115.5, the Assistant Secretary may request further information that he or she considers relevant to the determinations required to be made under this part.

(b) If the Assistant Secretary determines, after application of the criteria set forth in §§ 115.3 and 115.3a, that the State or local fair housing law, on its face, provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in the Act, the Assistant Secretary shall inform the submitting State or local official in writing of that determination. Except under circumstances where the Assistant Secretary determines that interim referrals or other utilization of services under § 115.11 is appropriate, the Assistant Secretary shall publish a notice in the Federal Register which advises the public of the determination that the law, on its face, is substantially equivalent, and shall invite interested persons and organizations, during a period of not less than 30 days following publication of the notice, to file written comments relevant to the determination whether the current practices and past performance of the State or local agency charged with administration and enforcement of such law demonstrates that, in operation, the State or local law in fact provides rights and remedies which are substantially equivalent to those provided in the Act. The Federal Register notice shall also invite comments on the Department's determination as to the adequacy of the law on its face.

(c) If the Assistant Secretary determines, on the basis of the standards specified in § 115.4 and after considering the materials and information submitted pursuant to § 115.5, additional material obtained under paragraph (a) of this section, and any written comments filed under paragraph (b) of this section, that, in operation, a State or local fair housing law in fact provides rights and remedies which are substantially equivalent to

those provided in the Act, the Assistant Secretary shall offer to enter into a written agreement with the appropriate State or local agency providing for referral of complaints to the agency and for procedures for communication between the agency and HUD that are adequate to permit the Assistant Secretary to monitor the continuing substantial equivalency of the State or local law. The written agreement may, but need not, be incorporated in a Memorandum of Understanding as described in 24 CFR 111.104(a)(2). Upon execution of a satisfactory agreement, the Assistant Secretary shall publish notice of certification under this part in the Federal Register.

(d) During the period which begins on September 13, 1988 and ends January 13, 1992, each State or locality recognized as substantially equivalent under 24 CFR Part 115 (including any State or locality which had entered into an agreement for interim referrals under § 115.11, unless the State or locality is subsequently denied recognition under 24 CFR 115.7) for the purposes of the Fair Housing Act before September 13, 1988 shall, for the purposes of this paragraph, be considered certified under this part with respect to those matters for which the agency was previously recognized. If the Secretary determines in an individual case that a State or locality has not been able to meet the certification requirements within this 40-month period because of exceptional circumstances (such as the infrequency of legislative sessions in that jurisdiction), the Secretary may extend the period of temporary certification to no later than September 13, 1992.

(1) No State, locality or agency thereof shall be considered certified under this paragraph for the purpose of processing complaints alleging—

(i) Discrimination based on familial status;

(ii) Discrimination based on handicap; or

(iii) Coercion, intimidation or threats as described in § 115.3(a)(5)(vii).

(2) Certification under this paragraph is not a determination that the administrative or judicial remedies provided by the State or locality is substantially equivalent to those provided by the Act.

(e) Certification of a State or local fair housing agency under this part shall remain in effect until withdrawn under § 115.8.

(f) Not less frequently than annually, the Assistant Secretary will cause to be published in the Federal Register a notice which sets forth:

(1) An updated, consolidated list of all certified agencies;

(2) A list of all agencies whose certification under this part has been withdrawn since publication of the previous notice;

(3) A list of agencies with respect to which notice of denial of certification has been published under § 115.7(c) since issuance of the previous notice;

(4) A list of agencies with respect to which a notice for comment has been published under paragraph (b) of this section whose request for certification remains pending;

(5) A list of agencies for which notice of proposed withdrawal of certification has been published under § 115.8(c) whose proposed withdrawal remains pending; and

(6) A list of agencies with which an agreement for interim referrals or other utilization of services has been entered under § 115.11 and remains in effect.

### § 115.7 Denial of certification.

(a) If the Assistant Secretary determines, after application of the criteria set forth in §§ 115.3 and 115.3a, that a State or local fair housing law, on its face, fails to provide rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in the Act, the Assistant Secretary shall inform the submitting State or local official in writing of the reasons for that determination. The Assistant Secretary's advice may include specification of the manner in which the State or local law could be amended in order to provide substantially equivalent rights and remedies. The Assistant Secretary shall extend to the State or local official an opportunity to submit data, views, and arguments in opposition to the Assistant Secretary's determination and to request an opportunity for a conference in accordance with § 115.9. If no submission or request is made, no further action shall be required to be taken by the Assistant Secretary. If the State or local official submits materials but does not request a conference, the Assistant Secretary shall evaluate any arguments in opposition or other materials received from the State or local agency. If, after that evaluation, the Assistant Secretary is still of the opinion that the law, on its face, fails to provide rights and remedies for alleged discriminatory housing practices that are substantially equivalent to the rights and remedies provided in the Act, the Assistant Secretary shall inform the submitting State or local official in writing that certification is denied.

(b) If the Assistant Secretary determines, after considering the

materials and information submitted under § 115.5, any additional information obtained under § 115.6(a), an assessment of the current practices and past peformance of the agency in meeting the standards of § 115.4(b), and any written comments received under § 115.6(b), that it has not been demonstrated that, in operation, a State or local fair housing agency in fact provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to those provided in the Act, the Assistant Secretary shall communicate this determination in writing to the State or local agency and shall allow the agency not less than 15 days to submit data, views, and arguments in opposition and to request an opportunity for a conference in accordance with § 115.9. If a request for a conference is not received within the time provided, the Assistant Secretary shall evaluate any arguments in opposition or other materials received from the State or local agency and, if after that evaluation the Assistant Secretary is still of the opinion that certification should be denied, the Assistant Secretary shall inform the submitting State or local official in writing that certification is denied.

(c) Where comment on a request for certification was invited in accordance with § 115.6(b), notice of denial of certification under this section shall be published in the Federal Register.

### § 115.8 Withdrawal of certification.

(a) Not less frequently than every 5 years, the Assistant Secretary shall determine whether each agency certified under this part continues to qualify for certification. The Assistant Secretary shall take appropriate action with respect to any agency not so qualifying.

(b) The Assistant Secretary shall periodically review the administration of fair housing laws recognized under this part. If the Assistant Secretary finds, as a result of a periodic review, upon the petition of an interested person or organization, or otherwise, that taken as a whole, the agency's administration of its fair housing law or the law, on its face, no longer meets the requirements of this part, the Assistant Secretary shall propose to withdraw the certification previously granted.

(c) The Assistant Secretary shall propose withdrawal of certification unless review establishes that the current fair housing law administered by the certified agency meets the criteria of § 115.3 and that current practices and past performance of the agency meet the standards of § 115.4.

(d) Before the Assistant Secretary publishes notice of a proposed withdrawal of certification, the Assistant Secretary shall inform the State or local agency in writing of his or her intention to withdraw certification. The communication shall state the reasons for the proposed withdrawal and provide the agency not less than 15 days to submit data, views, and arguments in opposition and to request an opportunity for a conference in accordance with § 115.9.

(e) Notice of a proposed withdrawal shall be published in the **Federal Register**. The notice shall allow the State or local agency and other interested persons and organizations not less than 30 days in which to file written comments on the proposal.

(f) If a request for a conference in accordance with § 115.9 is not received within the time provided, the Assistant Secretary shall evaluate any arguments in opposition or other materials received from the State or local agency and other interested persons or organizations, and if after that evaluation the Assistant Secretary is still of the opinion that certification should be withdrawn, the Assistant Secretary shall withdraw certification and shall publish notice of the withdrawal in the **Federal Register**.

§ 115.9 **Conferences.**

(a) Whenever an opportunity for a conference is timely requested by a State or local agency in accordance with § 115.7 or § 115.8, the Assistant Secretary shall issue an order designating an officer who shall preside at the conference. The order shall indicate the issues to be resolved and any initial procedural instructions that might be appropriate for a particular conference. It shall fix the date, time and place of the conference. The date shall not be less than 20 days after the date of the order. The date and place shall be subject to change for good cause.

(b) A copy of the order shall be served on the State or local agency and:

(1) In the case of a denial of certification, on any person or organization that files a written comment in accordance with § 115.6(b); or

(2) in the case of a withdrawal of certification, on any person or organization that files a petition in accordance with § 115.8(a) or written comment in accordance with § 115.8(c). The agency and all such persons and organizations shall be considered to be participants in the conference. After service of the order designating the conference officer, and until the officer submits a recommended determination,

all communications relating to the subject matter of the conference shall be addressed to that officer.

(c) The conference officer shall have full authority to regulate the course and conduct of the conference. A transcript shall be made of the proceedings at the conference. The transcript and all comments and petitions relating to the proceedings shall be made available for inspection by interested persons.

(d) The conference officer shall prepare proposed findings and a recommended determination, a copy of which shall be served on each participant. Within 20 days after service, any participant may file written exceptions. After the expiration of the period for filing exceptions, the conference officer shall certify the entire record, including the proposed findings and recommended determination, and any exceptions to the findings and recommendations, to the Assistant Secretary, who shall review the record and issue a final determination within 30 days. Where applicable, this determination shall be published in the **Federal Register**.

§ 115.10 **Consequences of certification.**

(a) Where all alleged violations of the Act contained in a complaint received by the Assistant Secretary appear to constitute violations of a State or local fair housing law administered by an agency that has been certified as substantially equivalent, the complaint shall be referred promptly to the appropriate State or local agency, and no further action shall be taken by the Assistant Secretary with respect to such complaint, except as provided for by the Act, this Part, and by §§ 103.100 through 103.115 or § 105.20 through 105.22 of this chapter.

(b) Notwithstanding paragraph (a) of this section, no complaint based in whole or in part on allegations of discrimination on the basis of familial status or handicap shall be referred to any State, locality or agency thereof whose certification was granted in accordance with § 115.6(d) or section 810(f)(4) of the Act, without regard to whether the fair housing law administered by such certified agency appears to prohibit discrimination based on familial status or handicap.

(c) Notwithstanding paragraph (a) of this section, whenever the Secretary has reason to believe that a complaint shows a basis may exist for the commencement of proceedings against any respondent under section 814(a) of the Act, or for proceedings by any governmental licensing or supervisory authorities, the Secretary shall transmit the information upon which that belief is

based to the Attorney General, or to appropriate governmental licensing or supervisory authorities.

§ 115.11 **Interim referrals.**

If the Assistant Secretary determines after application of the criteria set forth in § 115.3, that a State or local fair housing law on its face provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to those provided in the Act, but that the law has not been in effect, or the appropriate State or local agency in operation, for a sufficient time to permit a demonstration of compliance with the performance standards described in § 115.4, the Assistant Secretary may enter into a written agreement with the State or local agency providing for referral of complaints to the agency on such terms and conditions as the Assistant Secretary shall prescribe, or providing for other utilization of the services of the State or local agency and its employees upon agreed terms, and providing further for procedures for communications between the agency and HUD that are adequate to permit the Assistant Secretary to monitor the agency's administration and enforcement of its law and to assist the Assistant Secretary in making the determination required in § 115.2(b). The agreement may provide for reactivation of referred complaints by the Assistant Secretary without regard to the limitations described in § 115.10. If such an agreement for interim referrals or other utilization of services is entered, the Assistant Secretary may defer final determination under § 115.6 or § 115.7 for a reasonable period determined by the Assistant Secretary to be necessary in order to permit a fair assessment of the agency's performance. In no event shall this period extend more than two years beyond the date of entry into the agreement for interim referrals or other utilization of services. This two-year limitation does not apply to agencies certified in accordance with § 115.6(d). However, an agreement under this section shall not be extended beyond the date of certification under § 115.6 or denial of recognition under § 115.7. Notice of entry into an agreement under this section shall be published in the **Federal Register**.

19. Part 121 is added to read as follows:

**PART 121—COLLECTION OF DATA**

Sec.
121.1 Purpose.
121.2 Furnishing of data by program participants.

**Authority:** Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); E.O. 11063, 27 FR 11527; sec. 602, Civil Rights Act of 1964 (42 U.S.C. 2000d–1); sec. 562, Housing and Community Development Act of 1987 (42 U.S.C. 3608a); sec. 2, National Housing Act, 12 U.S.C. 1703; sec. 7(d), Department of Housing and Urban Development Act, 42 U.S.C. 3535(d).

## § 121.1  Purpose.

The purpose of this part is to enable the Secretary of Housing and Urban Development to carry out his or her responsibilities under the Fair Housing Act, Executive Order 11063, dated November 20, 1962, Title VI of the Civil Rights Act of 1964, and section 562 of the Housing and Community Development Act of 1987. These authorities prohibit discrimination in housing and in programs receiving financial assistance from the Department of Housing and Urban Development, and they direct the Secretary to administer the Department's housing and urban development programs and activities in a manner affirmatively to further these policies and to collect certain data to assess the extent of compliance with these policies.

## § 121.2  Furnishing of data by program participants.

Participants in the programs administered by the Department shall furnish to the Department such data concerning the race, color, religion, sex, national origin, age, handicap, and family characteristics of persons and households who are applicants for, participants in, or beneficiaries or potential beneficiaries of, those programs as the Secretary may determine to be necessary or appropriate to enable him or her to carry out his or her responsibilities under the authorities referred to in § 121.1.

20. The text of the preamble to this rule beginning at the heading "BACKGROUND" and ending before the heading "*Legislative review issues*," is added as Appendix I to Subchapter A of Chapter I as follows:

**Appendix I to Subchapter A—Preamble to Final Rule Implementing Fair Housing Amendments Act of 1988 (Published January 19, 1989)**

Dated: January 12, 1989.

Samuel R. Pierce, Jr.,
*Secretary.*

[FR Doc. 89–1211 Filed 1–19–89; 8:45 am]

BILLING CODE 4210-32-M

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 107

### Small Business Investment Companies—Early Stage SBICs; Public Webinar

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Proposed rule; notice of public webinar.

**SUMMARY:** The U.S. Small Business Administration (SBA) announces that it is holding a public webinar regarding its Early Stage Small Business Investment Companies proposed rule, which was published on September 19, 2016. The webinar will describe the changes proposed in the rulemaking and answer questions regarding the proposed rule.

**DATES:** The webinar will be held on October 12, 2016, at 1 p.m. EST. Attendees must pre-register by October 10, 2016, at 11:59 p.m. EST.

**ADDRESSES:** Parties interested in attending the webinar must pre-register by sending an email request to SBA's Office of Investment and Innovation at *applySBIC@sba.gov,* as further described in section III of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Scott Schaefer, SBA Office of Investment and Innovation at (202) 205–6514 or *applySBIC@sba.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

The Early Stage SBIC program was launched in 2012 as a 5-year effort as part of President Obama's Startup America Initiative. The intent of the Early Stage SBIC program was to license and provide SBA-guaranteed leverage to Early Stage SBICs that would focus on making investments in early stage small businesses. Although 62 investment funds applied to the program, few satisfied SBA's licensing criteria. To date, SBA has only licensed five Early Stage SBICs.

On September 19, 2016, SBA published a proposed rule regarding the Early Stage Small Business Investment Company (SBIC) program (81 FR 64075), which proposes to make the Early Stage SBIC program a permanent part of the SBIC program. In addition, the rule proposes changes to the Early Stage SBIC Program with respect to licensing, non-SBA borrowing, and leverage eligibility.

The proposed Early Stage SBIC rule may be viewed at *https:// www.regulations.gov/document?D=SBA-2015-0002-0009.* The comment period for the proposed rule closes on October 19, 2016. In order to familiarize the public with the content of the Early Stage SBIC proposed rule, SBA will host a webinar on the proposed rule before the closing date. The webinar will be transcribed and become part of the administrative record for SBA's consideration when the Agency deliberates on the final Early Stage SBIC regulations.

### II. Webinar Schedule

| Webinar date and time | Registration closing date |
|---|---|
| October 12, 2016, 1 p.m. EST. | October 10, 2016, 11:59 p.m. EST. |

The session is expected to last no more than 1 hour.

### III. Registration

If you are interested in attending the webinar, you must pre-register by the registration closing date. To pre-register, send an email to *applySBIC@sba.gov.* In the body of the email, please provide the following: Participant's Name, Title, Organization Affiliation, Address, Telephone Number, and Email Address. You must submit your email by the applicable registration closing date listed in this notice.

Due to technological limitations, attendance is limited to 120 participants per session. If demand exceeds capacity for the webinar, SBA will hold another one. SBA will announce any additional sessions through a **Federal Register** document and on its Web site, *www.sba.gov/inv/earlystage.*

SBA will confirm the registration via email along with instructions for participating. SBA will post any presentation materials associated with the webinar on the day of the webinar by 10 a.m. EST at *www.sba.gov/inv/ earlystage.*

If there are specific questions you would like SBA to address in the webinar, SBA must receive them no later than October 9, 2016. Since the Early Stage SBIC regulations are in the proposed rulemaking stage, SBA will not be able to answer questions that are outside of clarification of the proposed rule.

**Mark L. Walsh,**

*Associate Administrator for Investment and Innovation.*

[FR Doc. 2016–24031 Filed 10–4–16; 8:45 am]

**BILLING CODE 8025–01–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Part 100

**[Docket No. FR–5508–N–03]**

### Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Reconsideration of public comments; implementation of the Fair Housing Act's Discriminatory Effects Standard.

**SUMMARY:** HUD is issuing this document to supplement its responses to certain insurance industry comments to HUD's proposed rule implementing the Fair Housing Act's ("Act") discriminatory effects standard. These commenters requested, *inter alia,* total or partial exemptions or safe harbors from liability under the Act's discriminatory effects standard. After careful reconsideration of the insurance industry comments in accordance with the court's decision in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan,* HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act. HUD continues to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis.

**DATES:** Supplemental Responses issued on October 5, 2016.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500; (202) 402–5188 (this is not a toll-free number). Persons with hearing or speech impairments may contact this number via TTY by calling the toll-free Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

### Background

Title VIII of the Civil Rights Act of 1968, as amended ("Fair Housing Act" or "Act"), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] On November 16,

---

[1] 42 U.S.C. 3601–3619.

2011, HUD issued a proposed rule seeking to formalize, through notice-and-comment rulemaking, HUD's longstanding interpretation of the Act as prohibiting practices with an unjustified discriminatory effect and to standardize the analytical framework for evaluating such cases.[2] In response to the proposed rule, HUD received nearly one hundred comments from a range of interested parties, including from three insurance trade associations requesting exemptions or safe harbors. The National Association of Mutual Insurance Companies ("NAMIC") and the American Insurance Association ("AIA") requested an exemption from discriminatory effects liability for all insurance practices. NAMIC also requested, in the alternative, exemptions for insurance pricing, for Fair Access to Insurance Requirements ("FAIR") plans, and/or safe harbors for recognized risk factors. The Property Casualty Insurers Association of America ("PCIAA") requested an exemption for all insurance underwriting practices.

On February 15, 2013, HUD published its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("Rule").[3] In the Rule, HUD declined to grant the requested exemptions or safe harbors for any insurance practices, explaining that the commenters' concerns could be addressed on a case-by-case basis. On November 27, 2013, PCIAA filed an action in the U.S. District Court for the Northern District of Illinois ("the court") alleging that HUD's Rule violated the McCarran-Ferguson Act[4] ("McCarran-Ferguson") and the Administrative Procedure Act.[5]

On September 3, 2014, the court issued a decision in *PCIAA* v. *Donovan*.[6] The court upheld the Rule's burden-shifting framework for analyzing discriminatory effects claims as a reasonable interpretation of the Fair Housing Act.[7] The court also held that a violation of McCarran-Ferguson can be adjudicated by a court only in the context of a concrete dispute challenging the application of the Rule to a particular insurance practice, and not in the abstract.[8] Distinguishing between adjudication and agency rulemaking, the court concluded that HUD had not adequately explained why case-by-case adjudication was preferable

to using its rulemaking authority to provide exemptions or safe harbors related to homeowners insurance.[9] The court remanded the matter to HUD for further proceedings consistent with its ruling.[10]

After careful reconsideration of the comments from insurance industry representatives and the court's opinion, HUD continues to believe that case-by-case adjudication is preferable to creating the requested exemptions or safe harbors for insurance practices. The Fair Housing Act's broad prohibitions on discrimination in housing are intended to eliminate segregated living patterns while moving the nation toward a more integrated society. When Congress enacted the Fair Housing Act in 1968 and amended it in 1988, it established exemptions for certain practices[11] but not for insurance. Rather, Congress stated that the Act is intended to provide for fair housing throughout the United States.[12] The Supreme Court has recognized the Act's broad remedial purpose.[13] Among other things, the Act requires HUD to affirmatively further fair housing in all of its housing-related programs and activities,[14] one of which is the administration and enforcement of the Act.[15] McCarran-Ferguson, enacted in 1945, restricts only those applications of federal law that directly conflict with state insurance laws, frustrate a declared state policy, or interfere with a State's

administrative regime.[16] For HUD to create the requested exemptions or safe harbors would allow to go uncorrected at least some discriminatory insurance practices that can be subject to disparate impact challenges consistent with McCarran-Ferguson and the filed rate doctrine. Thus, to create such exemptions or safe harbors would undermine the efficacy of the Act and run counter to the Act's purpose and HUD's statutory responsibilities. The concerns raised by the insurance industry commenters do not outweigh this loss of efficacy in the administration and enforcement of the Act. Rather, the case-by-case approach appropriately balances these concerns against HUD's obligation to give maximum force to the Act by taking into account the diversity of potential discriminatory effects claims, as well as the variety of insurer business practices and differing insurance laws of the states, as they currently exist or may exist in the future. Moreover, in light of the variety of practices and relevant state laws, as well as the substantial range of possible discriminatory effects claims, it is practically impossible for HUD to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application.

Accordingly, HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with HUD's statutory mandate. The discriminatory effects standard imposes liability only for those insurance practices that actually or predictably result in a discriminatory effect and that lack a legally sufficient justification.[17] It takes into account an insurer's interest in the challenged practice and, for the reasons explained below, any conflict with a specific state insurance law can and should be addressed on a case-by-case basis in the context of that state law. HUD provides the following supplemental responses to the public comments submitted by the three insurance trade associations that sought exemptions or safe harbors.

**Revised Responses to Insurance Industry Comments**

*Issue:* Two commenters requested exemptions from the Rule for all

---

[9] *Id.* at 1049.

[10] *Id.* at 1054.

[11] *See, e.g.,* 42 U.S.C. 3605(c) (exempting appraisal practices from disparate impact liability), 3607(b)(1) (exempting reasonable governmental occupancy limits from disparate impact liability), 3607(b)(4) (exempting practices related to certain controlled substance convictions from disparate impact liability); *see also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2520–21 (2015) (discussing these "exemptions from liability").

[12] *See* 42 U.S.C. 3601.

[13] *See Havens Realty Corp.* v. *Coleman,* 455 U.S. 363, 380 (1982) (recognizing Congress's "broad remedial intent" in passing the Act); *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972) (recognizing the "broad and inclusive" language of the Act); *see also Inclusive Cmtys.,* 135 S. Ct. at 2521 (describing the "central purpose" of the Act as "to eradicate discriminatory practices within a sector of our Nation's economy").

[14] *See* 42 U.S.C. 3608(e)(5).

[15] *See, e.g.,* 42 U.S.C. 3608 (the Secretary's administrative responsibilities under the Act), 3609 (education, conciliation, conferences, and reporting obligations to further the purposes of the Act), 3610 (investigative authority), 3611 (subpoena power), 3612 (administrative enforcement authority), 3614a (rulemaking authority), 3616 (authority to cooperate with state and local agencies in carrying out the Secretary's responsibilities under the Act), 3616a (authority to fund of state and local agencies and private fair housing groups to eliminate discriminatory housing practices prohibited by the Act).

[16] *Humana Inc.* v. *Forsyth,* 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[17] *See* 24 CFR 100.500(b).

---

[2] 76 FR 70921 (Nov. 16, 2011).

[3] 78 FR 11460 (Feb. 15, 2013).

[4] 15 U.S.C. 1011–1015.

[5] 5 U.S.C. 551–559.

[6] *Prop. Cas. Insurers Ass'n of Am.* v. *Donovan* (*PCIAA*), 66 F. Supp. 3d 1018 (N.D. Ill. 2014).

[7] *Id.* at 1051–53.

[8] *Id.* at 1037–42.

insurance practices, and a third commenter requested an exemption for insurance underwriting practices. All three of these insurance industry commenters raised McCarran-Ferguson in support of their requests for an exemption. One of these three commenters urged HUD to delete the insurance example from the Rule, stating that McCarran-Ferguson dictates that "state insurance law trumps the application of any federal law to state regulated insurance, except under very narrow circumstances, which are not met here." [18] Another questioned "whether non-racially motivated and sound actuarial underwriting principles recognized by state insurance regulators that permit accurate risk-based pricing for consumers can be prohibited by federal regulators who find them to have a 'disparate impact.'" [19]

The third commenter was concerned that "the disparate impact standards would impair state unfair discrimination standards," which have "historically been a cost based concept" prohibiting "underwriting and rating distinctions 'between individuals or risks of the same class and essentially the same hazard.'" [20] The commenter expressed concern that if the Rule is applied to homeowners insurance, "accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer." [21] This commenter also sought, in the alternative, "safe harbors for long-recognized risk-related factors," stating that "[f]ailure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market." [22]

*HUD Response:* HUD does not agree that it is necessary or appropriate to create an exemption from discriminatory effects liability for all insurance practices or for all underwriting practices in order to accommodate the insurance industry's concerns. McCarran-Ferguson does not require HUD to do so, and categorical exemptions would undermine the Act's

broad remedial purpose and contravene HUD's own statutory obligation to affirmatively further fair housing. HUD also declines to create safe harbors from discriminatory effects liability for the use of particular risk factors. HUD disagrees with the commenter's assertions about the consequences that would befall the insurance industry if HUD does not grant the requested safe harbors for "long-recognized risk-related factors" or "historically allowed" factors. Establishing safe harbors for specific risk-related criteria would be overbroad, arbitrary, and quickly outdated.

The Act's broad remedial purpose is "to provide . . . for fair housing throughout the United States." [23] Thus, the Act plays a "continuing role in moving the Nation toward a more integrated society." [24] Ensuring that members of all protected classes can access insurance free from discrimination is necessary to achieve the Act's objective because obtaining a mortgage for housing typically requires obtaining insurance, too. [25] Likewise, obtaining insurance may be a precondition to securing a home in the rental market. [26] Insurance is also critical to maintaining housing because fire, storms, theft, and other perils frequently result in property damage or loss that would be too costly to repair or replace without insurance coverage.

Yet the history of discrimination in the homeowners insurance industry is long and well documented, [27] beginning with insurers overtly relying on race to deny insurance to minorities and evolving into more covert forms of discrimination. [28] At times, agents were

given plainly discriminatory instructions, such as "'get away from blacks' and sell to 'good, solid premium-paying white people,'" or they simply were told, "We don't write Blacks or Hispanics." [29] Underwriting guidelines contained discriminatory statements, such as listing "population and racial changes" among "red flags for agents." [30] Minorities were offered inferior products, such as coverage for repairs rather than replacement, or were subject to additional hurdles during the quote and underwriting process.[31] Additionally, discrimination took the form of insurers redlining neighborhoods predominantly minority neighborhoods and disproportionately placing agents and offices in predominately white neighborhoods.[32] Minorities also were denied access to insurance through property-location and property-age restrictions, even when data had demonstrated that such restrictions are not justified by risk of loss.[33] This history of discrimination led to

---

[18] American Insurance Association, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[19] Property Casualty Insurers Association of America, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[20] National Association of Mutual Insurance Companies, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[21] *Id.*

[22] *Id.*

---

[23] 42 U.S.C. 3601; *see also* cases cited *supra* note 13.

[24] *Inclusive Cmtys.,* 135 S. Ct. at 2526.

[25] *NAACP v. Am. Family Mut. Ins. Co.,* 978 F.2d 287, 297 (7th Cir. 1992) ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable.").

[26] *See, e.g.,* Or. Rev. Stat. 90.222(1) ("A landlord may require a tenant to obtain and maintain renter's liability insurance in a written rental agreement."); Va. Code Ann. 55–248.7:2(B) ("A landlord may require as a condition of tenancy that a tenant have renter's insurance. . . .").

[27] Although the discussion that follows focuses on race and national origin discrimination because of their historic prevalence, examples of discrimination in insurance against other protected classes exist as well. *See, e.g., Nevels v. W. World Ins. Co.,* 359 F. Supp. 2d 1110, 1120–21 (W.D. Wash. 2004) (disability).

[28] *See generally, Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs,* 103d Cong. (1994) [hereinafter *1994 Hearings*]; *Insurance Redlining Practices: Hearings before the Subcom. on Commerce, Consumer Protection & Competitiveness of the H. Comm. on Energy and Commerce,* 103d Cong. (1993) [hereinafter *Mar. 1993 Hearings*]; *Insurance Redlining: Fact or Fiction: Hearing before the Subcom. On Consumer*

---

*Credit and Insurance of the H. Comm. on Banking, Finance & Urban Affairs,* 103d Cong. (1993) [hereinafter *Feb. 1993 Hearing*]; Insurance Redlining: Fact Not Fiction (Feb. 1979) [hereinafter Comm'n on Civil Rights] (report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the U.S. Commission on Civil Rights); President's National Advisory Panel on Insurance in Riot-Affected Areas, Meeting the Insurance Crisis of Our Cities (1968) [hereinafter Nat'l Advisory Panel].

[29] *See* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II); *see also, e.g.,* Nat'l Advisory Panel, *supra* note 28, at 116 (quoting an insurance broker as explaining, "No matter how good [a customer] is, they [the insurers] take that into consideration, the fact he is a Negro.").

[30] *Feb. 1993 Hearing, supra* note 28 at 19, 27 (statement of Gregory Squires, Prof. U. Wis. Milwaukee).

[31] *1994 Hearings, supra* note 28, at 15, 47–48 (statements of Deval Patrick, DOJ Ass't Attorney Gen. for Civil Rights); *id.* at 18–19, 51 (statements of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity).

[32] *Feb. 1993 Hearing, supra* note 28, at 7 (statement of John Garamendi, Cal. Ins. Comm'r) ("There may be some people that deny that redlining exists. They are not telling you the truth, or they just don't know what they are talking about. It is real, it does exist, and it is a very serious socioeconomic problem."); Comm'n on Civil Rights, *supra* note 28, at 5 (listing "[p]lacing agents selectively in order to reduce the opportunity to secure business in certain areas" among the types of documented redlining practices).

[33] *See, e.g.,* Comm'n on Civil Rights, *supra* note 28, at 34–39 ("The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written."); *1994 Hearings, supra* note 28, at 18 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (noting the "disparate impact on minority communities" of property age and value requirements, and explaining that "47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000" and that "40 percent of black households compared to 29 percent of white households live in homes build before 1950.").

minorities being unjustifiably denied insurance policies or paying higher premiums.[34]

HUD's long experience in administering the Act counsels that discriminatory effects liability does not threaten the fundamental nature of the insurance industry. HUD's position that discriminatory effects liability applies to insurance dates back more than three decades,[35] as does the industry's concern that such liability makes it "near impossible for an insurer to successfully defend himself." [36] HUD has maintained for decades that remedying discrimination in insurance, including discriminatory effects claims, requires examination of each allegedly discriminatory insurance practice on a case-by-case basis,[37] and HUD sees no reason to deviate now from this longstanding approach.

HUD recognizes that risk-based decision making is an important aspect of sound insurance practice, and nothing in the Rule prohibits insurers from making decisions that are in fact risk-based. Under the standard established by the Rule, practices that an insurer can prove are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability.[38] All the

Rule requires is that if an insurer's practices are having a discriminatory effect on its insureds and "an adjustment . . . can still be made that will allow both [parties'] interests to be satisfied," the insurer must make that change.[39] Risk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving risk-based decisions, such as mortgage lending, without the need for exemptions or safe harbors.[40] Moreover, some states provide for discriminatory effects liability against insurers under state laws, further undermining the industry's claim that providing for such liability as a matter of federal law threatens the fundamental nature of the industry.[41]

Consistent with the Act's broad scope and purpose, as well as HUD's own obligation to affirmatively further fair housing, HUD declines to foreclose viable discrimination claims by creating an overbroad exemption. For the reasons detailed below, wholesale exemptions for all insurance practices or all insurance underwriting practices would necessarily be overbroad, allowing some practices with unjustified discriminatory effects to go uncorrected. Wholesale exemptions also would invariably sweep within their scope potential intentional discrimination in the insurance market as well because "disparate-impact liability under the [Fair Housing Act] also plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." [42]

Some discriminatory effects claims against insurers will survive a McCarran-Ferguson defense depending on a host of case-specific variables, and therefore wholesale exemptions would be overbroad. McCarran-Ferguson

specifically provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." [43] As interpreted by the Supreme Court in *Humana* v. *Forsyth*, McCarran-Ferguson applies only when a particular application of a federal law directly conflicts with a specific state insurance regulation, frustrates a declared state policy, or interferes with a State's administrative regime.[44] Accordingly, the mere fact that a state has the authority to regulate insurance or has adopted ratemaking regulations does not suffice on its own to create the kind of conflict, frustration of purpose, or interference that triggers McCarran-Ferguson.[45] Rather, the inquiry required by *Humana* depends on the relevant state law and other case-specific variables.[46]

For example, in *Dehoyos* v. *Allstate*,[47] the Fifth Circuit rejected a McCarran-Ferguson defense to a disparate impact claim where the insurer did not identify a specific state law that was impaired. In so ruling, the Fifth Circuit reasoned that the Seventh Circuit's holding in *Doe* v. *Mutual of Omaha* [48] does not foreclose all discriminatory effects claims against insurers as barred by McCarran-Ferguson. Instead, the Fifth Circuit distinguished *Doe*, where McCarran-Ferguson was held to bar a claim of discrimination under the Americans with Disabilities Act [49] ("ADA"), by explaining that "[i]n *Doe*, there was an actual *state insurance law* which purportedly conflicted with the application of the [ADA] to the particular question at issue." [50] Thus,

---

[34] *See, e.g.* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II) ("[S]hocking anecdotal evidence was supported by 12 years of data submitted by Missouri State Insurance Commissioner Jay Angoff. . . . It shows that, in the cities of St. Louis and Kansas City, low-income minorities had to pay more money for less coverage than their white counterparts, despite the fact that losses in minority areas were actually less than those in white areas. This evidence directly challenges industry assertions that minorities are too risky to insure.").

[35] *Fair Housing Amendments Act of 1979: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 96th Cong. 79 (1979) (statement of Patricia Roberts Harris, Sec'y of HUD).

[36] *Fair Housing Act: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 20, 616 (1978) (statement of the Am. Ins. Ass'n.).

[37] *1994 Hearings, supra* note 28, at 19 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (discussing insurers' property age and value requirements and stating that "when practices with such racial impacts are not legally or otherwise justified, a case-by-case, Fair Housing Act analysis is warranted"); *id* at 50 (stating that "it is important to stress that the finding of a [Fair Housing Act] violation occurs on a case by case basis" for insurance practices that are "neutral on their face [but] have a disproportionate racial impact" and "cannot meet the established test of business necessity and . . . less discriminatory alternative").

[38] 24 CFR 100.500(b); *see also Toledo Fair Hous. Ctr.* v. *Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (Ohio Ct. Com. Pl. 1997) ("[T]he disparate-impact approach does not unduly undermine the business of selling insurance. Assuming . . . that the insurance industry is based on 'fair' risk discrimination, the disparate-impact approach will

not impede such fair discrimination if the insurer can show a business necessity.").

[39] *Ave. 6E Invs., LLC* v. *City of Yuma*, 818 F.3d 493, 513 (9th Cir. 2016).

[40] *See, e.g.*, Policy Statement on Discrimination in Lending, 59 FR 18266 (Apr. 15, 1994); *Interagency Fair Lending Examination Procedures* (Aug. 2009); *see also 1994 Hearings, supra* note 28, at 20 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) ("As in other areas of fair housing law enforcement, standards to determine [insurance] discrimination will . . . [include] disparate impact. . . . The investigative techniques we will utilize will include those that have grown from our long history investigative experience across the board . . . the kinds of tactics that we currently utilize . . . in lending discrimination investigations.").

[41] *See infra* notes 61 thru 64 and accompanying text.

[42] *Inclusive Cmtys.*, 135 S. Ct. at 2522.

[43] 15 U.S.C. 1012(b).

[44] *Humana*, 525 U.S. at 310 ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[45] *Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 295 (5th Cir. 2003) (disparate impact under the Act); *Nationwide Mut. Ins. Co.* v. *Cisneros*, 52 F.3d 1351, 1363 (6th Cir. 1995) (disparate treatment under the Act); *Moore* v. *Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1221 (11th Cir. 2001) (disparate treatment in life insurance).

[46] *See PCIAA*, 66 F. Supp. 3d at 1038 ("McCarran-Ferguson challenges to housing discrimination claims [depend on] the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred.").

[47] *Dehoyos*, 345 F.3d 290.

[48] 179 F.3d 557 (7th Cir. 1999).

[49] 42 U.S.C. 12101–12213.

[50] *Dehoyos*, 345 F.3d at 298 n.6. Although in HUD's view the Fifth Circuit persuasively distinguished the Seventh Circuit's holding in *Doe*,
Continued

where no state law is impaired, McCarran-Ferguson will not bar a discriminatory effects claim against an insurer.

Past cases demonstrate also that discriminatory effects claims brought under the Fair Housing Act against insurers survive McCarran-Ferguson defenses even when an insurer points to a specific state law and alleges that it is impaired. Although the commenters provided examples of cases in which state laws were found to be impaired by a particular discriminatory effects challenge, other cases provide examples of state laws that were not. For instance, in *Lumpkin* v. *Farmers Group*, the court rejected a McCarran-Ferguson defense to a disparate impact challenge to credit scoring in insurance pricing, holding that disparate impact liability in that context did not impair the state's law mandating that "insurance rates cannot be 'unfairly discriminatory.' " [51] In so ruling, the court held it erroneous to read a state law prohibiting "unfairly discriminatory" rates "too broadly" and rejected the insurer's argument that such state laws require that practices with an unjustified discriminatory effect must be permitted "as long as the rates are actuarially sound."[52] The court then cited other provision of the state's insurance code specifically dealing with credit scoring, concluding that they too were not impaired.[53]

McCarran-Ferguson requires a fact-intensive inquiry that will vary state by state and claim by claim. Thus, even those cases in which impairment was found support the case-by-case approach herein adopted by HUD because, in such cases, the finding of impairment was made only after considering the particularities of the challenged practices and the state law at hand. In *Saunders* v. *Farmers Insurance Exchange*, for example, prior to ruling that McCarran-Ferguson barred a discriminatory effects claim under the Act,[54] the Eighth Circuit first remanded the case for further inquiry into several

unknowns about the facts and Missouri law.[55]

The many ways in which one state's insurance laws can differ from another's, as well as the ways in which a single state's insurance laws can change over time, mean that even an exemption for specific insurance practices would be overbroad and quickly outdated. For example, variations in state insurance laws have resulted in discriminatory effects challenges to similar insurance practices surviving a McCarran-Ferguson defense in regard to some state laws but not others.[56] Past cases also demonstrate that the insurance laws of each state can change over time in significant ways,[57] and state insurance regulators respond to new practices as they become common and their effects become clear.[58] Given the variation in state insurance laws across more than fifty jurisdictions and over time, HUD declines to fashion a one-size-fits-all exemption that would inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from Fair Housing Act liability.

A one-size-fits-all exemption is also inappropriate in light of the fact that insurance practices are not governed solely by "hermetically sealed" state

insurance codes,[59] but are also governed by a range of other state laws, including state fair housing laws. Many state fair housing laws track the Act's applicability to insurance and provision of effects liability, indicating that those states do not consider disparate impact liability to conflict with the nature of insurance. Categorical exemptions or safe harbors of the types requested by the commenters would deprive all states of federal support in addressing discriminatory insurance practices— even those states that welcome or depend on such support. This outcome would be at odds with the purpose of McCarran-Ferguson to support the autonomy and sovereignty of each individual state in the field of insurance.[60] Connecticut's Discriminatory Housing Practices Act, for example, "provides similar (albeit broader) protection against housing discrimination as the [Fair Housing Act], which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary with Connecticut's overall regulatory scheme."[61] Similarly, a state court found that "the disparate-impact approach does not conflict with Ohio Insurance law" and thus allowed a disparate impact claim against an insurer to proceed under the state's fair housing law.[62] In another case where the court rejected a McCarran-Ferguson defense to a discriminatory effects claim against an insurer, the court explained that it was "not persuaded that California law would allow [the challenged] practice" and therefore "the Fair Housing Act complements California law in this regard."[63] Furthermore, the allocation of authority to enforce a state's protections against discrimination in insurance can impact whether McCarran-Ferguson is a viable defense to a discriminatory effects claim in a given state.[64] The case-by-case approach thus affirms state autonomy

---

the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied. This includes the Second Circuit's skepticism over whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation." *Viens* v. *Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 572 (D. Conn. 2015) (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir. 1982)).

[51] *Lumpkin* v. *Farmers Grp.* (*Lumpkin II*), No. 05–2068 Ma/V, 2007 U.S. Dist. LEXIS 98949, at *19 (W.D. Tenn. July 6, 2007).

[52] *Id.*

[53] *Id.* at *19–20.

[54] *Saunders* v. *Farmers Ins. Exch.* (*Saunders II*), 537 F.3d 961 (8th Cir. 2008).

[55] *Saunders* v. *Farmers Ins. Exch.* (*Saunders I*), 440 F.3d 940 (8th Cir. 2006). These variables included whether Missouri insurance law provided a private right of action to challenge the conduct at issue, and whether determinations by the state insurance agency were subject to judicial review. The court explained that "the mere fact of overlapping complementary remedies under federal and state law does not constitute impairment for McCarran-Ferguson purposes." *Id.* at 945.

[56] For example, in cases challenging the discriminatory effect of insurers' reliance on credit scores, the McCarran-Ferguson defense has failed in some states but succeeded in others. *Compare Dehoyos*, 345 F.3d 290 (McCarran-Ferguson defense fails) *and Lumpkin II*, 2007 U.S. Dist. LEXIS 98949 (same) *with Saunders II*, 537 F.3d 961 (McCarran-Ferguson defense succeeds) *and McKenzie* v. *S. Farm Bureau Cas. Ins. Co.*, No. 3:06CV013–B–A, 2007 U.S. Dist. LEXIS 49133 (N.D. Miss. July 5, 2007) (same). *See also PCIAA*, 66 F. Supp. 3d at 1039 ("Variations among state regulatory regimes . . . provide an additional variable that may complicate any hypothetical McCarran-Ferguson analysis.").

[57] *Compare Ojo* v. *Farmers Grp., Inc.*, 356 SW.3d 421 (Tex. 2011) (recognizing a McCarran-Ferguson defense to a credit scoring disparate impact claim based on the state legislature "expressly authoriz[ing] the use of credit scoring in setting insurance rates in 2003") *with Dehoyos*, 345 F.3d 290 (rejecting a McCarran-Ferguson defense to the same type of claim based on Texas law in effect before 2003).

[58] *See, e.g.*, Nat'l Ass'n of Ins. Comm'rs, *Price Optimization White Paper* (Nov. 19, 2015) *http:// www.naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf* [hereinafter *NAIC White Paper*] (discussing the responses of state regulators to the rising increase in use of price optimization practices by insurance providers).

[59] *Humana*, 525 U.S. at 312.

[60] *See* 15 U.S.C. 1011 (explaining the purpose of McCarran-Ferguson as "the continued regulation . . . by the several States of the business of insurance is in the public interest").

[61] *Viens*, 113 F. Supp. 3d at 573 n.20 (finding that McCarran-Ferguson does not bar an FHA disparate impact claim against an insurer related to a property located in Connecticut).

[62] *Toledo*, 94 Ohio Misc. 2d at 157.

[63] *Jones* v. *Travelers Cas. Ins. Co. of Am.*, Tr. of Proceedings Before the Honorable Lucy H. Koh U.S. District Judge, No. C–13–02390 LHK (N.D. Cal. May 7, 2015), ECF No. 269–1.

[64] *Toledo*, 94 Ohio Misc. 2d at 157 (recognizing discriminatory effects liability in homeowners insurance under state law in part because the Superintendent of Insurance lacks "primary jurisdiction" over such claims).

and furthers the Act's broad remedial goals by ensuring that HUD is not hindered in fulfilling its statutory charge to support and encourage state efforts to protect fair housing rights.[65]

The commenters' concerns about the incompatibility between HUD's Rule and the fundamental nature of insurance do not warrant the requested exemptions. Although the commenters assert that a broad exemption for *all* insurance practices or *all* underwriting decisions is necessary to preserve "sound actuarial underwriting" and the "risk-based insurance 'unfair discrimination' standard," HUD declines to create a broad exemption of that sort because doing so would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations. Insurers regularly engage in practices, such as marketing and claims processing and payment, that do not involve risk-based decision making and to which the Act applies in equal force.[66] In addition, a discriminatory effects claim also can challenge an insurer's underwriting policies as "*not purely risk-based*" without infringing on the insurer's "right to evaluate homeowners insurance risks fairly and objectively."[67] Even practices such as ratemaking that are largely actuarially-based can incorporate an element of non-actuarially-based subjective judgment or discretion under state law. Indeed, many of the state statutes referenced by commenters mandating that rates be reasonable, not excessive, inadequate, or unfairly discriminatory permit insurers, via the very same section of the insurance code, to rely on "judgment factors" in ratemaking.[68] The example of price optimization practices,[69] which a minority of states have started regulating, illustrates how non-actuarial factors, such as price

elasticity of market demand,[70] can impact insurance pricing in a manner similar to how such considerations affect pricing of products in non-actuarial industries.[71]

HUD likewise declines to craft a safe harbor for any risk-based factor or for the specific "long-recognized" factors suggested by one commenter because it would be arbitrary and overbroad. Creating a safe harbor for the use of any factor that an insurer could prove is in fact risk-based would be overbroad because it would foreclose claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice. Moreover, if HUD were to provide a safe harbor for the use of any factor that an insurer could prove is purely risk-based, entitlement to the safe harbor would inevitably necessitate a determination of whether the use of the factor is, in fact, risk-based. As stated above, if an insurance practice is provably risk-based, and no less discriminatory alternative exists, the insurer will have a legally sufficient justification under the Rule as is. The arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification. Thus, an exemption for all provably risk-based factors would offer little added value for insurers not already provided by the Rule itself while foreclosing potentially meritorious claims in contravention of the Act's broad remedial goals and HUD's obligation to affirmatively further fair housing.

Selecting a few factors for exemption, such as those suggested by the commenter, based on bare assertions about their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would also be arbitrary. Even if such data were available and a full survey performed, safe harbors for specific factors would still be overbroad because the actuarial relevance of a given factor can vary by context.[72] Also, while use of a particular

risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be. Furthermore, the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve.

In light of the long, documented history of discrimination in the homeowners' insurance industry, including the use of "risk factors" by insurers and regulators that were subsequently banned as discriminatory, as well as the fact-specific nature of McCarran-Ferguson analysis and the non-actuarial or hybrid nature of many insurance practices, HUD considers it inappropriate to craft any exemptions or safe harbors for insurance practices. HUD's longstanding case-by-case approach can adequately address any McCarran-Ferguson concerns and better serves the Act's broad remedial purpose and HUD's statutory obligation to affirmatively further fair housing, including by supporting fair housing efforts undertaken by states.[73]

*Issue:* One commenter requested that HUD "exempt insurance pricing from the discriminatory effects standards." The commenter argued that pricing is not covered by the Act because the Act only covers insurance practices that "make[ ] homeowners insurance unavailable" and pricing does not do so. The commenter also asserted that pricing is "subject to the filed rate doctrine" and should therefore be exempted because the filed rate doctrine precludes "private claims for damages based on challenges to filed rates.'"

*HUD Response:* HUD disagrees with the commenter's characterization of the Act as only covering insurance practices that make insurance unavailable, as well as with the commenter's premise that pricing does not do so. HUD also declines to craft an exemption for insurance pricing based on the filed rate doctrine because HUD does not anticipate that the filed rate doctrine will bar discriminatory effects claims involving insurance pricing. In light of the broad remedial goals of the Act and HUD's obligation to affirmatively further fair housing, HUD continues to prefer

---

[65] *See, e.g.,* 42 U.S.C. 3610(f); 24 CFR pt. 115 (HUD's Fair Housing Assistance Program); 42 U.S.C. 3608(d); 80 FR 42272 (July 16, 2015) (HUD's rule on Affirmatively Furthering Fair Housing).

[66] *See, e.g., Franklin* v. *Allstate Corp.,* No. C–06– 1909 MMC, 2007 U.S. Dist. LEXIS 51333 (N.D. Cal. July 3, 2007) (applying the Act to claims processing); *Burrell* v. *State Farm & Cas. Co.,* 226 F. Supp. 2d 427 (S.D.N.Y. 2002) (same).

[67] *Nat'l Fair Hous. Alliance* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 60 (D.D.C. 2002).

[68] *See, e.g.,* Ga. Code Ann. 33–9–4; Mont. Code Ann. 33–16–201; *see also NAIC White Paper, supra* note 58, at 1 ¶ 5 ("Making adjustments to actuarially indicated rates is not a new concept; it has often been described as 'judgment.'").

[69] The term "price optimization" can refer to "the process of maximizing or minimizing a business metric using sophisticated tools and models to quantify business considerations," such as "marketing goals, profitability and policyholder retention." *NAIC White Paper, supra* note 58, at 4 ¶ 14(a).

[70] The term "price elasticity of demand" refers to "the rate of response of quantity demanded due to a price change. Price elasticity is used to see how sensitive the demand for a good is to a price change." *Id.* at 4 ¶ 14(f) (internal quotations omitted).

[71] *Id.* at 9 ¶ 30 ("Price optimization has been used for years in other industries, including retail and travel. However, the use of model-driven price optimization in the U.S. insurance industry is relatively new.").

[72] For example, in some high-crime neighborhoods the higher-than-average risk of loss from theft could be offset by a lower-than-average

risk of other losses, such as those caused by weather. Therefore, the legitimacy of declining to issue insurance policies in all locations with high crime rates would depend on other features of those locations.

[73] *Cf. CROSSRDS* v. *MSP Crossroads Apts., LLC,* No. 16–233 ADM/KMM, 2016 U.S. Dist. LEXIS 86965 at *32 n.6 (D. Minn. July 5, 2016) (declining to adopt a per se rule that a certain category of disparate impact claims could not be brought in part because "HUD has indicated a preference for case-by-case review of practices alleged to cause a disparate impact").

case-by-case adjudication over the requested exemption.

In addition to Section 804(a),[74] which prohibits discrimination that "make[s] unavailable" a dwelling, there are several other provisions of the Act that can prohibit discriminatory insurance practices, including pricing.[75] One of those is Section 805(a),[76] which prohibits discrimination in the "terms or conditions" of "residential real estate-related transactions." Another is Section 804(b),[77] which prohibits discrimination in the "provision of services . . . in connection" with a dwelling. Indeed, HUD's fair housing regulations since 1989 have specifically stated that the Act prohibits "[r]efusing to provide . . . property or hazard insurance for dwellings *or providing such . . . insurance differently*" because of a protected characteristic.[78] Courts have applied the Act to insurance pricing,[79] as well as to other practices such as marketing and claims processing,[80] irrespective of whether the

discriminatory conduct occurred in conjunction with or subsequent to the acquisition of a dwelling.

HUD is not aware of any case, and no commenter cited one, in which a court has applied the filed rate doctrine to defeat any sort of claim under the Act, although several courts have rejected such attempts.[81] "The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable." [82] The doctrine primarily serves two purposes: First, preventing litigants from securing more favorable rates than their non-litigant competitors, and second, preserving for agencies rather than courts the role of ratemaking.[83]

The fit between the filed rate doctrine and discriminatory effects claims is attenuated, at best, because discriminatory effects claims "do not challenge the reasonableness of the insurance rates" but rather their discriminatory effects.[84] To the extent there is any conflict between the directives of the federal Fair Housing Act and those of state ratemaking regulations, "the Supremacy Clause tips any legislative competition in favor of the federal antidiscrimination statutes." [85] Unlike filed rate doctrine cases involving a conflict between *federal* ratemaking and a federal statute, applying the filed rate doctrine to prioritize *state* ratemaking over a federal statute "would seem to stand the Supremacy Clause on its head." [86] Moreover, the filed rate doctrine "does not preclude injunctive relief or prohibit the Government from seeking civil or

criminal redress," [87] which are types of relief often obtained for violations of the Act.[88]

Because "the law on the filed rate doctrine is extremely creaky," [89] abundant variations exist among the courts as to how the doctrine applies. Even where it does apply, a filed rate doctrine defense "must be examined specifically in the context of the laws and regulatory structures at issue." [90] This would be a "fact-intensive issue" [91] that would include consideration of the particular state's ratemaking structures.[92] The case-by-case approach best accommodates these variations.

For all the foregoing reasons, HUD does not agree that the filed rate doctrine, nor the commenter's assertions about the Act's scope, warrant an exemption for insurance pricing.

*Issue:* One commenter sought an exemption from discriminatory effects liability for FAIR plans because "the operation of FAIR plans facilitates private conduct that otherwise would not have occurred."

*HUD Response:* FAIR plans were first enacted by many states in response to the federal Urban Property Protection and Reinsurance Act of 1968,[93] which was passed by Congress to address the problem of inadequate property insurance availability in the nation's urban areas due to insurance redlining. FAIR plans operate as insurance pools that sell property insurance to

---

[74] 42 U.S.C. 3604(a).

[75] Depending on the circumstances, discriminatory insurance practices can violate 42 U.S.C. 3604(a), (b), (c), (f)(1), (f)(2), 3605, and 3617. *See, e.g., Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d at 1360 (holding that section 3604 of the Act prohibits discriminatory insurance underwriting); *Nevels,* 359 F. Supp. 2d at 1120–21 (recognizing that sections 3604(f)(1), 3604(f)(2), 3605 and 3617 of the Act cover insurance practices); *Nat'l Fair Hous. Alliance,* 208 F. Supp. 2d at 55–58 (holding that sections 3604(a), 3604(b), and 3605 of the Act prohibit discriminatory insurance underwriting practices); *Owens* v. *Nationwide Mut. Ins. Co.,* No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *16–17 (N.D. Tex. Aug. 2, 2005) (holding that section 3604(b) of the Act prohibits discriminatory insurance practices); *Francia* v. *Mount Vernon Fire Ins. Co.,* No. CV0840320395, 2012 Conn. Super. LEXIS 665 (Conn. Super. Ct. Mar. 6, 2012) (relying on section 3604(c) to interpret an analogous state law as prohibiting a discriminatory statement in an insurance quote).

[76] 42 U.S.C. 3605(a).

[77] 42 U.S.C. 3604(b).

[78] 24 CFR 100.70(d)(4) (emphasis added). As used in this regulation, the phrase "property or hazard insurance for dwellings" includes insurance purchased by an owner, renter, or anyone else seeking to insure a dwelling. *See* 42 U.S.C. 3602(b) (defining "dwelling" without reference to whether the residence is owner- or renter-occupied).

[79] *See, e.g., NAACP,* 978 F.2d at 301 ("Section 3604 of the Fair Housing Act applies to discriminatory denials of insurance, and *discriminatory pricing,* that effectively preclude ownership of housing because of the race of the applicant.") (emphasis added); *Dehoyos,* 345 F.3d at 293 (holding that a claim alleging discriminatory insurance pricing was not barred by McCarran-Ferguson).

[80] *See* sources cited *supra* note 66; *see also Owens,* 2005 U.S. Dist. LEXIS 15701, at *17 (Insurance practices are covered by the Act "whether the insurance is sought in connection with the maintenance of a previously purchased home or with an application to purchase a home."); *Lindsey* v. *Allstate Ins. Co.,* 34 F. Supp. 2d 636, 643 (W.D. Tenn. 1999) ("It would seem odd to construe a statute purporting to promote fair housing as prohibiting discrimination in providing property

insurance to those seeking a home, but allowing that same discrimination so long as it takes place in the context of renewing those very same insurance policies.").

[81] *See Saunders I,* 440 F.3d at 944–46 ("The district court erred in invoking the judicially created filed rate doctrine to restrict Congress's broad grant of standing to seek judicial redress for race discrimination."); *Dehoyos,* 345 F.3d at 297 n.5 (finding "unpersuasive" the argument that the filed rate doctrine barred a Fair Housing Act disparate impact claim); *Lumpkin v. Farmers Grp., Inc.* (*Lumpkin I*), No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98934, at *20–22 (W.D. Tenn. Apr. 26, 2007) (ruling that "the filed rate doctrine does not apply" to a Fair Housing Act disparate impact claim).

[82] *Wegoland Ltd.* v. *NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir. 1994).

[83] *Id.*

[84] *Lumpkin I,* 2007 U.S. Dist. LEXIS 98994, at *21; *see also Dehoyos,* 345 F.3d at 297 n.5 ("[T]he application of anti-discrimination laws cannot be reasonably construed to supplant the specific insurance rate controls of [states].").

[85] *Saunders I,* 440 F.3d at 944.

[86] *Perrymon v. Litton Loan Servicing, LP,* No. 14–cv–02261–JST, 2014 U.S. Dist. LEXIS 140479, at *20–22 (N.D. Cal. Oct. 1, 2014).

[87] *In re Title Ins. Antitrust Cases,* 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010); *see also Marcus* v. *AT&T Corp.,* 138 F.3d 46, 62 (2d Cir. 1998).

[88] *See* 42 U.S.C. 3612(g)(3), 3613(c), 3614(d).

[89] *Town of Norwood* v. *New England Power Co.,* 202 F.3d 408, 420 (1st Cir. 2000). The filed rate doctrine has also been described as a "weak and forcefully criticized doctrine." *Cost Mgmt. Servs.* v. *Wash. Natural Gas Co.,* 99 F.3d 937, 946 (9th Cir. 1996).

[90] *Munoz* v. *PHH Corp.,* 659 F. Supp. 2d 1094, 1099 (E.D. Cal. 2009).

[91] *Saunders I,* 440 F.3d at 945.

[92] For example, the Seventh Circuit has questioned the applicability of the filed rate doctrine to any claims involving property insurance in Illinois because "[a]lthough [a property insurance provider] is required to file its insurance rates with the Illinois Department of Insurance, it is not at all clear that the Department has the authority to approve or disapprove property-insurance rates." *Cohen* v. *Am. Sec. Ins. Co.,* 735 F.3d 601, 607 (7th Cir. 2013). States vary considerably in the degree to which they regulate rate-setting, with six different types of rate regulatory systems in use across the country: Prior approval; file and use; use and file; flex rating; modified prior approval; and no file. *See* NAIC, 2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty II–PA–10–21 (2011). As the classifications indicate, these rate regulatory systems vary with respect to whether or when an insurance company is required to file its rates with a state insurance agency before those rates can be used.

[93] Public Law 90–448, 82 Stat. 555 (1968).

individuals who are unable to purchase insurance in the voluntary market.

HUD declines to categorically exempt FAIR plans from discriminatory effects liability under the Act. To do so, without any consideration of the particular insurance practice or state requirements at issue, would be inconsistent with the broad remedial purpose of the Act and HUD's obligation to affirmatively further fair housing. Like state regulation of voluntary market insurance practices, state laws governing the provision and pricing of FAIR plans vary across jurisdictions. Variations in state regulation of FAIR plans include the types of coverage provided by such plans,[94] the amount of coverage allowed under such plans,[95] and the conditions under which an individual or property will qualify for such plans.[96] Additionally, even within a given state, FAIR plan regulations are subject to revision over time.

Given such variation and changeability, exempting all FAIR plans from application of the discriminatory effects standard would be overbroad and would deprive individuals of the protections afforded by the Fair Housing Act. Indeed, one state court has held "the disparate impact approach does not interfere with the Ohio FAIR Plan."[97] In light of this demonstrated compatibility, and because insurers retain some discretion in the operation of FAIR plans,[98] HUD determines that case-by-case adjudication is preferable to the requested exemption of FAIR plans.

---

[94] Compare, e.g., Conn. Agencies Regs. 38a–328–3(c) (defining "basic insurance" for purposes of the Connecticut FAIR plan to include liability coverage for any dwelling of up to three families) with Mass. Gen. Laws ch. 175c, § 1 (defining "basic property insurance" for purposes of the Massachusetts FAIR plan to include liability coverage for only non-owner occupied dwellings of up to four families) and 98–08 Wash. Reg. 4 (April 15, 1998) (excluding liability coverage from the definition of "essential property insurance" for purposes of the Washington FAIR plan).

[95] Compare, e.g., Mo. Rev. Stat. 379.825 (limiting maximum insurance coverage for a dwelling under the Missouri FAIR plan to $200,000) with 98–08 Wash. Reg. 5 (April 15, 1998) (limiting maximum insurance coverage for a dwelling under the Washington FAIR plan to $1.5 million).

[96] Compare, e.g., Ohio Rev. Cod. Ann. 3929.44(D) (requiring applicant to certify that two insurance companies declined to provide coverage for purposes of FAIR plan eligibility) with 215 Ill. Comp. Stat. 5/524(1) (restricting FAIR plan eligibility to applicants who have been declined insurance coverage by three companies).

[97] Toledo, 94 Ohio Misc. 2d at 157.

[98] See, e.g., Cal. Ins. Code 10094 (leaving discretion to governing committee of participating insurers to establish "reasonable underwriting standards" for determining whether a property for which FAIR plan coverage is sought is insurable; 215 Ill. Comp. Stat. 5/524(1) (same); Ohio Rev. Code. Ann. 3929.43(C) (same).

Dated: September 23, 2016.

**Gustavo Velasquez,**
*Assistant Secretary for Fair Housing and Equal Opportunity.*
[FR Doc. 2016–23858 Filed 10–4–16; 8:45 am]
**BILLING CODE 4210–67–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R04–OAR–2016–0489; FRL–9953–63–Region 4]**

### Air Plan Approval; Georgia: Volatile Organic Compounds

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve portions of two revisions to the Georgia State Implementation Plan submitted by the Georgia Department of Environmental Protection on July 25, 2014, and November 1, 2015. These revisions modify the definition of "volatile organic compounds" (VOC). Specifically, these revisions add two compounds to the list of those excluded from the VOC definition on the basis that these compounds make a negligible contribution to tropospheric ozone formation. This action is being taken pursuant to the Clean Air Act.

**DATES:** Written comments must be received on or before November 4, 2016.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R04–OAR–2016–0489 at *http://www.regulations.gov.* Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov.* EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit

*http://www2.epa.gov/dockets/commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** Sean Lakeman, Air Regulatory Management Section, Air Planning and Implementation Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303–8960. Mr. Lakeman can be reached by phone at (404) 562–9043 or via electronic mail at *lakeman.sean@epa.gov.*

**SUPPLEMENTARY INFORMATION:** In the Final Rules Section of this **Federal Register**, EPA is approving the State's implementation plan revision as a direct final rule without prior proposal because the Agency views this as a noncontroversial submittal and anticipates no adverse comments. A detailed rationale for the approval is set forth in the direct final rule. If no adverse comments are received in response to this rule, no further activity is contemplated. If EPA receives adverse comments, the direct final rule will be withdrawn and all public comments received will be addressed in a subsequent final rule based on this proposed rule. EPA will not institute a second comment period on this document. Any parties interested in commenting on this document should do so at this time.

Dated: September 23, 2016.

**V. Anne Heard,**
*Acting Regional Administrator, Region 4.*
[FR Doc. 2016–23971 Filed 10–4–16; 8:45 am]
**BILLING CODE 6560–50–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

### 43 CFR Part 8360

**[LLCO910000.L16300000.NU0000.16X]**

### Notice of Proposed Supplementary Rules for Public Lands in Colorado

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Proposed supplementary rules.

**SUMMARY:** The Bureau of Land Management (BLM) is proposing supplementary rules to protect natural resources and provide for public health and safety. The proposed supplementary rules would apply to all public lands and BLM facilities in Colorado.

**DATES:** You should submit your comments by December 5, 2016.

**ADDRESSES:** You may submit comments by the following methods: Mail or hand

VOLUME 33 NUMBER 6 JUNE 2014

# Banking & Financial Services

# POLICY REPORT

## FEATURES

**Race Discrimination Is Not Risk Discrimination: Why Disparate Impact Analysis of Homeowners Insurance Practices Is Here to Stay** . . . . . . . . . . . . . . . . . . 1
By Stephen M. Dane

**Bitcoin and the Secured Lender** . . . . . . . . . . 13
By Pamela J. Martinson and Christopher P. Masterson

## THE MONITOR

Bank Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Securities/Section 20/Broker-Dealer . . . . . . . . . . . . . 27
Futures/Derivatives/Swaps/Commodities . . . . . . . . . 31
Court Developments . . . . . . . . . . . . . . . . . . . . . . . . 35



# Banking & Financial Services Policy Report

**Editor-in-Chief**

Robert V. Hale
*San Francisco, CA*

**Publisher**

Richard Rubin

## Editorial Advisory Board

Bowman Brown, Partner
*Shutts & Bowen*
*Miami, FL*

Arnold G. Danielson, President
*Danielson Associates, Inc.*
*Rockville, MD*

Charles E. Dropkin, Partner
*Proskauer Rose LLP*
*New York, NY*

Walter A. Effross, Professor
*The American University*
*Washington College of Law*
*Washington, DC*

Melanie L. Fein, Attorney &
Financial Services Consultant
*Great Falls, VA*

Carl Felsenfeld, Professor
*Fordham University School of Law*
*New York, NY*

Douglas E. Harris,
General Counsel
*BrokerTec Futures Exchange, LLC*
*BrokerTec Clearing Company, LLC*
*Jersey City, NJ*

Michael J. Halloran, Partner
*Pillsbury Winthrop LLP*
*San Francisco, CA*

Edward I. Handelman,
Senior Attorney
*Citigroup Bank Regulatory Office*
*New York, NY*

Edward D. Herlihy, Partner
*Wachtell, Lipton, Rosen & Katz*
*New York, NY*

Dennis J. Lehr, Of Counsel
*Hogan & Hartson*
*Washington, DC*

Arthur W. Leibold Jr., Partner
*Dechert*
*Washington, DC*

David B. Lipkin
*Law Offices of David B. Lipkin*
*Bala Cynwyd, PA*

Edward J. McAniff, Partner
*O'Melveny & Myers*
*Los Angeles, CA*

Wilson Mitchell
*KPMG Banking Group*
*New York, NY*

John C. Murphy, Partner
*Cleary, Gottlieb, Steen & Hamilton*
*Washington, DC*

Edward L. Neumann,
Managing Director
*The Farragut Group*
*Arlington, VA*

Barnet Reitner, Partner
*Reitner & Stuart*
*San Luis Obispo, CA*

Paul Allan Schott, National
Director Bank Regulatory Services
*Pricewaterhouse Coopers*
*Washington, DC*

John E. Shockey, Partner
*Milbank, Tweed, Hadley & McCloy LLP*
*Washington, DC*

James C. Sivon, Partner
*Barnett and Sivon, P.C.*
*Washington, DC*

Jeffrey Spivack, Senior Manager
*Grant Thornton*
*New York, NY*

John Teolis, Partner
*Blake Cassels & Graydon*
*Toronto, Canada*

Thomas P. Vartanian, Partner
*Fried, Frank, Harris, Shriver &*
*Jacobson*
*Washington, DC*

John Villa, Partner
*Williams & Connolly*
*Washington, DC*

Charles K. Whitehead,
Associate Professor of Law
*Cornell Law School*
*Ithaca, NY*

Richard M. Whiting,
General Counsel
*The Financial Services Roundtable*
*Washington, DC*

## Editorial Office:

76 Ninth Avenue
New York, NY 10011
(212) 771-0600



Copyright © 2014 CCH Incorporated

**Banking & Financial Services Policy Report** (ISSN 1530-499X) is published monthly by Aspen Publishers, 76 Ninth Avenue, New York, NY 10011, (212) 771-0600. One year subscription (12 issues) costs $905. To subscribe, call 800-638-8437. For customer service, call 800-234-1660. Postmaster: Send address changes to **Banking & Financial Services Policy Report**, Aspen Publishers, Distribution Center 7201 McKinney Circle, Frederick, MD 21704. **Purchasing reprints:** For customized article reprints, please contact *Wright's Media* at 1-877-652-5295 or go to the *Wright's Media* website at *www.wrightsmedia.com.*

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

—From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations.



Aspen Publishers
**Banking & Financial Services Policy Report**
Distribution Center
7201 McKinney Circle
Frederick, MD 21704

Forwarding Service Requested

**TIMELY REPORT**
**Please Expedite**

To subscribe, call 1-800-638-8437 or order online at www.aspenpublishers.com

004403

# Race Discrimination Is Not Risk Discrimination: Why Disparate Impact Analysis of Homeowners Insurance Practices Is Here to Stay

**By Stephen M. Dane**

On February 15, 2013, the US Department of Housing and Urban Development (HUD) issued a final rule on implementation of the Fair Housing Act's Discriminatory Effects Standard (the Rule).[1] This regulation resolved some discrepancies among the federal courts of appeals regarding the proper analysis of disparate impact claims brought under the federal Fair Housing Act (FHA), which HUD, the US Department of Justice, and private individuals enforce through administrative and court proceedings.[2]

Although the Rule was merely intended to "formalize [HUD's] longstanding view" that disparate impact liability is available under the FHA and to establish a uniform standard for determining when a specific business practice violates the FHA, insurance publications and experts have expressed alarm that such a regulation would be applied to homeowners insurers. Industry lawyers claim that successful disparate impact claims against property insurers would "alter risk-based business practices" and "allow the government or private plaintiffs to substitute their business judgment" for that of insurers.[3] We are told that the Rule would "prevent insurance companies from using risk-based methods of rating and underwriting."[4] It is asserted that the HUD Rule "would effectively permit it to negate more than 150 years of public policy, regulatory principles, actuarial standards, and state-based regulation of insurance, and eliminate risk-based pricing of homeowners insurance."[5] This promulgation by HUD is seen as so unjustified that three property/casualty trade organizations

have filed two separate lawsuits seeking to have the Rule declared void and inapplicable to homeowners insurers.[6]

One would have thought Hurricane Katrina had made a re-appearance to wreak havoc on the property insurance industry.

This article explains why these fears are utterly unfounded. For one thing, nothing radically "new" happened when HUD issued its Rule. The homeowners insurance industry has been subject to the FHA since its enactment in 1968. HUD's position that insurers are subject to FHA enforcement was formalized when it published regulations in 1989 prohibiting discrimination by homeowners insurers based on race, religion, disability, familial status, and other protected characteristics, a regulation repeatedly upheld by the courts. The FHA has been consistently interpreted by the courts to include a disparate impact basis for liability, even before HUD's most recent Rule was adopted, so the insurance industry has been subject to disparate impact claims for decades. HUD officials told Congress in 1994 that insurance company practices with a disparate impact may violate the act if they cannot meet the established test of business justification. The Department of Justice has filed or supported disparate impact claims against insurers for decades. In addition to the federal government's efforts to enforce the FHA against insurers based on a disparate impact theory of liability, private litigants have also done so successfully.

Second, disparate impact analysis is not inconsistent with "the business of insurance." Some aspects of the business of insurance, such as underwriting and rate-making, do include the classification of risk. But insurers do a lot more to run their insurance businesses than assess "risk of loss" or engage in "risk-based" practices. Insurers direct sales teams and sales agents. They have marketing departments. They employ people to design

**Stephen M. Dane** is a partner in Relman, Dane & Colfax, PLLC, a civil rights law firm based in Washington, DC. He has been involved in insurance redlining and discrimination litigation since 1991. His firm also conducts disparate impact analyses for financial institutions to assist with their regulatory compliance. The author thanks his partner John P. Relman, who provided many valuable insights during the preparation of this article.

*Banking & Financial Services Policy Report* • **1**

004404

new products and add new product features. They operate claims departments. These ordinary business practices, which do not explicitly assess or classify risks, are no different for insurers than for other businesses subject to the FHA. Even those parts of the "business of insurance" involving risk assessment are compatible with disparate impact analysis. For example, nonactuarial intervention in underwriting is common, and could result in unjustified adverse impacts. Insurance actuaries who assess "risk" are constantly reviewing and modifying their algorithms, and before establishing a final pricing strategy they often take into account factors that include an element of judgment (*e.g.*, profitability levels, competitor prices, rating territory boundaries, trending assumptions, and so on). Indeed, some factors—such as race, religion, and national origin—are prohibited by state insurance laws even if they have an actuarial connection to risk of loss. There is enough flexibility in the industry's traditional assessment of risk to allow for disparate impact analysis, without conflicting with "the business of insurance."

Third, the business justification prong of the Rule itself preserves the viability of insurance business practices that are legitimately business justified. According to HUD's Rule, business practices with a disparate impact on a protected group "may still be lawful if supported by a legally sufficient justification," which is defined to include practices that are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."[7] So long as those interests cannot be served by another business practice with a less discriminatory effect—the burden of proof of which rests on the government or a fair housing plaintiff— such business practices are completely lawful under the Rule and the act. If any challenged insurance practices with no less discriminatory alternatives are based on legitimate risk-based underwriting or pricing, then they will suffer no liability under the FHA.

Fourth, many state laws allow disparate impact claims against homeowners insurers. Regardless of what HUD or the courts may think about the reach of the federal FHA, insurers in states that allow disparate impact claims as a matter of state law still remain exposed to such claims.

Finally, even when a disparate impact analysis of insurer business practices cannot, standing alone,

result in liability under the federal FHA, it is still relevant to the issue of "intent" and can be used by plaintiffs and the government in fair housing enforcement actions to support claims of intentional discrimination. A business practice with a known disparate impact, supported by little or no statistical analysis prior to implementation, can be combined with other evidence of discriminatory intent to support a finding of liability.

Disparate impact analysis is here to stay, either on the federal level under HUD's Rule, or at the state level in those states that recognize the doctrine. It remains relevant to claims of intentional discrimination even in the absence of HUD's Rule. A company's self-analysis of the disparate impact of its business practices is a responsible business practice in which lenders, governments, and others in the housing industry routinely engage. Homeowners insurers would be prudent to do the same, and those who fail to do so may find themselves on the wrong end of an enforcement action, regardless of HUD's Disparate Impact Rule.

## Disparate Impact Rule Reaffirms Preexisting Law

Since the FHA was amended in 1988, every court to consider the issue has held that the act prohibits acts of discrimination by homeowner's insurers.[8] Most of these decisions have gone no further than the language of 42 U.S.C. § 3604(a), which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of" a protected characteristic, such as race.[9] This is due, in part, to the link between the ability to obtain insurance and the ability to obtain housing— adequate insurance is necessary to the ownership or rental of housing.[10]

Section 3604(b) has also been interpreted to prohibit homeowners insurance discrimination. This provision makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services or facilities in connection therewith,* because of race . . . ."[11] HUD published a regulation under this section in 1989 that prohibits discrimination by homeowners insurers based on race, religion, disability, familial status, and other protected characteristics.[12] This regulation has repeatedly been

upheld by the courts.[13] The US Courts of Appeals for the Sixth, Seventh, and Ninth Circuits and several lower courts have all determined that homeowners insurance is clearly and simply a "service" rendered "in connection" with the sale or rental of a dwelling.[14] The Department of Justice has filed several enforcement actions against homeowners insurers.[15]

The 1988 amendments to the act also substantially rewrote 42 U.S.C. Section 3605 so that it, too, includes homeowner's insurance transactions. Prior to 1988, Section 3605 prohibited discrimination in mortgage "loan transactions," even those engaged in by insurers. When Congress passed the Fair Housing Amendments Act of 1988, it completely rewrote Section 3605 so that it is no longer limited only to loan transactions. That section now makes it unlawful to make unavailable, or to discriminate in the terms or conditions of, a "residential real estate–related transaction," which includes "the making or purchasing of loans or *providing other financial assistance for … purchasing, constructing, improving, repairing, or maintaining a dwelling.*" The new definition makes clear that Congress intended to prohibit discrimination in transactions, like insurance, that provide financial assistance for "repairing" or "maintaining" a dwelling. Accordingly, several courts have held that homeowners insurance falls within the scope of Section 3605's protections because it "provides the financial assistance necessary" to maintain, repair, or construct a dwelling.[16] This is also HUD's view of Section 3605.[17]

The applicability of HUD's fair housing regulations to homeowners insurers and all that entails is nothing new. The Act has regulated insurance behavior for more than 45 years. In this regard, HUD's issuance of a regulation that applies to insurers should come as no surprise to anyone.

What about disparate impact? Starting in 1974 and continuing through 2014, all 11 courts of appeals to consider the issue have adopted the disparate impact standard as a basis for liability under the FHA.[18] HUD itself has a long history of interpreting the FHA to encompass disparate impact claims, including claims against insurers. HUD officials testified before Congress in 1994 that insurance company practices "neutral on their face [but] hav[ing] a disproportionate racial impact … may violate the [Act] where they cannot meet the established test" of business

justification.[19] Under the new Section 3605, it is unlawful for a defendant to not "mak[e] available" a residential real-estate-related transaction because of race or any other prohibited basis. There is no implication of intent or motive in this phrase. A housing transaction can be "made unavailable" to an individual by operation of facially neutral rules just as much as by operation of rules that express their discriminatory intent. Clearly the language Congress used in the new Section 3605 could encompass practices with a disparate impact.

When HUD adopted the Disparate Impact Rule, it explicitly noted that the disparate impact standard of proof was already "well established."[20] The Rule is merely a formal adoption of the courts' and HUD's own long-held interpretation of the FHA.[21]

It should be noted here that HUD is not the only federal regulatory agency to adopt and apply the disparate impact standard of liability to financial institutions that regularly assess financial risk. Other federal agencies charged with implementing and administering the FHA have embraced the use of disparate impact analysis. Since at least 1994, all five federal financial regulatory agencies have used disparate impact analysis to assess liability under the various federal antidiscrimination laws they enforce, including the FHA.[22] Indeed, the disparate impact doctrine has been an integral part of Regulation B, which prohibits discrimination in underwriting and pricing in *lending* transactions, since it was promulgated in 1985.[23]

Moreover, disparate impact liability has been the basis for fair housing enforcement actions against insurers long before HUD issued its Rule. Over the past two decades the homeowners insurance industry has been the subject of significant private and public enforcement actions under the FHA. Virtually all of the major carriers, and several smaller ones, have been the subject of fair housing complaints based on claims of race discrimination in the underwriting, marketing, advertising, and sale of their products.

As a result, many historical homeowners insurance underwriting and pricing policies have been successfully challenged under the FHA on disparate impact grounds, including the age of the dwelling, the

minimum dwelling value, the ratio of a dwelling's market value to its replacement cost, and credit scoring.[24] The nation's largest homeowners insurers no longer use dwelling age or minimum market value as part of their underwriting processes. Many have also eliminated restrictions on the availability of full and guaranteed replacement cost policies, with companies finally making such policies available in African-American and minority neighborhoods. Insurers have abandoned explicitly race-based and geographically based marketing plans.[25]

These challenges to traditional underwriting and marketing practices have been supported both by the testing of agents conducted by fair housing organizations[26] and by statistical analyses demonstrating the racial impact of certain facially neutral criteria. Many of the challenged underwriting criteria were not supported by any company or industry empirical loss or claims data, so they could not be justified by business necessity.

Nothing radically "new" appeared when HUD issued its Disparate Impact Rule in 2013. What it announced in a formal regulation has been the law of the land, and has been applied to homeowners insurers, for decades.

## Disparate Impact Is Not Inconsistent with "the Business of Insurance"

A central tenet of the industry alarm about HUD's Disparate Impact Rule is the fervent assertion that the imposition of disparate impact liability is fundamentally inconsistent with the business of insurance. The foundation of the business of insurance, and in particular underwriting and rate-making, is the classification of risk. We are told that to eliminate statistical disparities among different demographic groups, many risk-based variables would have to be eliminated from the underwriting process, and insurers would have to charge everyone the same rate regardless of risk. The expressed fear is that a disparate impact analysis will effectively negate more than 150 years of public policy, regulatory principles, actuarial standards, state-based regulation of insurance, and risk-based pricing.

One problem with these assertions is that not all homeowners insurance business practices are actuarially based, or based on an assessment of risk. For example,

marketing and advertising campaigns, sales techniques, the placement of agent offices, insurance product design and benefits, the settlement of claims, renewal of policies, and other business practices are not based on actuarial analysis or modeling. Such business practices may have significantly different impacts on populations protected by the FHA, but they are not based on actuarial studies.[27]

Indeed, even insurance "underwriting guidelines," that is, those rules that determine whether an applicant is eligible to purchase homeowners insurance, may not be actuarially based:

> Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk.[28]

Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property.[29] "Historically, underwriters have relied on experience, market knowledge, intuition, and oral history more than statistical insights when evaluating risk."[30] Unlike insurance rates, insurance underwriting and eligibility guidelines are often not required to be filed, justified, or approved by state insurance regulators.[31] State insurance regulatory regimes are notorious for their lack of transparency and have actively resisted making publicly available any information regarding the availability and affordability of insurance in low-income and minority regions.[32] Several underwriting guidelines historically used by homeowners insurers were shown in the 1990s to have *not* been adopted as a result of any actuarial or other analysis of risk.[33] Accordingly, they have been largely abandoned by the industry.[34]

Nonactuarial intervention in underwriting is common. In the underwriting process, underwriters or systems assemble and review underwriting information. They then place an application into a tier. Often an underwriting score is calculated, although varying levels of review by human underwriters may also occur. The score and human review determine whether the application is accepted, rejected, or in need of further review. There is significant variation among insurers in the way this process is implemented, with agents

sometimes making case-by-case decisions, sometimes limited quality control, and the use of pooled industry data that is analyzed only to the point of meeting minimum regulatory scrutiny. Even when underwriting scores are available, half or more of underwriting decisions may be ultimately made by human underwriters.[35]

> Few, if any, underwriting decisions are truly binary. That's why insurers still need teams of people who know how to *balance the nuances of risk quality, emerging exposures, market contexts and competitive strategies as they make critical underwriting decisions*.[36]

This dependence on human judgment no doubt explains why some analyses of insurer behavior reveal questionable patterns that *cannot* be explained by risk of loss. For example, in *NAACP v. American Family Mutual Insurance Company*,[37] the government alleged that the company's loss data did *not* explain or otherwise justify its low overall market share of policies on homes in majority black census tracts in Milwaukee County, Wisconsin, nor the preponderance of repair-cost policies in those areas.[38]

Moreover, there is not agreement among actuaries as to how "risk" should be assessed in the pricing of homeowners insurance. For example, most homeowners insurance policies are sold as "all risk" policies, meaning that they cover a wide range of potential loss-causing perils, such as fire, theft, weather damage, burst pipes, and so on. Some experts contend that multi-peril rating "is critical for maintaining economic efficiency and actuarial equity," but some actuaries involved in pricing homeowners insurance are now suggesting "decomposing" the set of dependent variables by individual peril.[39] Current multi-peril rating practice is based on modeling each peril in isolation from the others, which requires an assumption that covered perils are independent from one another, and that sets of parameters from each peril are unrelated to one another. These assumptions are now being tested, however, as "it seems unlikely that perils are independent" of one another, and some studies have demonstrated a statistically significant dependence among perils. For this reason, actuaries are exploring alternative approaches to homeowners insurance rating systems.[40]

Even actuarially based insurance business practices are often derived, modified, or ignored for reasons

unrelated to risk. State rate regulatory laws generally permit the rate filer to consider management's business judgment and competition in the determination of the rates to be filed and charged to insureds. The Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking acknowledges that although the actuary's role is to derive an estimation of future costs resulting from the transfer of risk, "other business considerations are also a part of ratemaking," and include input from other disciplines such as marketing, underwriting, and finance.[41]

For example, despite what a company's actuaries may determine is a fair and reasonable rate for a specific insurance product in a specific geographic rating territory based on expected loss costs, company executives may reject that determination "for competitive reasons," that is, to beat a competitor's price and sell more policies. The actuarially determined rates might be rejected or modified by business executives to penetrate (or withdraw from) a specific market. Or they might be adjusted in response to agent input or customer responses.[42] These nonactuarial adjustments are frequently permissible under state law.

Moreover, there are some factors that can *never* be used to set prices, or to underwrite new business, *even if* those factors are shown to be "actuarially justified." Typical among these absolutely prohibited factors are race, color, religion, and national origin. Even if an insurer could prove through actuarial analysis that members of a protected racial group tended to show greater homeowner loss costs, claims, or risk—all other factors being equal—the insurer would still be prohibited by state law from refusing to sell insurance, or charging higher prices, to members of that racial population.

These absolute prohibitions are well known and have been embedded in state laws for decades. Homeowners insurers have successfully conducted "the business of insurance" by operating within these limitations, and have not gone out of business because they cannot use these factors.

It is apparent that the pricing and underwriting functions of homeowners insurers, even if based at some level on the actuarial analysis of appropriate data sets, can be and are adjusted by considerations unrelated to risk. The assertion that actuarial risk factors are the *only*

considerations that drive the "business of insurance" goes too far.

The point here is that the industry's reliance on "actuarial necessity" as the linchpin of the "business of insurance" is a cliché in this context—a sophisticated-sounding catchphrase that cannot possibly eliminate all possible applications of disparate impact analysis to homeowners insurance, such as those insurance business practices to which actuarial science does not speak, or on which actuarial science has no definitive answer. There is not, and never has been, an absolute homage to actuarial outcomes in the business or regulation of insurance. Actuarial risk assessment is certainly useful and desirable in many instances, but there are no absolutes here. HUD's Disparate Impact Rule can safely operate within traditional actuarial constraints without jeopardizing "the business of insurance." Certainly no court will rule, as a matter of law, that HUD's Disparate Impact Rule is inapplicable to all insurance business practices, especially those that are not based on actuarial or risk-based analysis.

## Disparate Impact Analysis Is Consistent with Risk Assessment

In any event, the entreaty that disparate impact is "incompatible" with the business of insurance is belied by the business justification prong of the Rule itself. Business practices with a disparate impact on a protected group "may still be lawful if supported by a legally sufficient justification," which is defined to include practices that are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."[43] Specifically, a business practice that has a disparate impact on a protected group is nevertheless legal under the FHA if it "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and there is no less discriminatory alternative available to achieve those interests.[44] Not every housing practice that has a disparate impact is illegal. Courts use the disparate impact framework only "to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests."[45] HUD has stated that "nothing in the [FHA] requires or encourages any practice that is inconsistent with sound actuarial and underwriting principles … ."[46]

The terms "actuarial justification" and "actuarial necessity" certainly *sound* like quintessential "legally sufficient justifications" under this standard. Depending

on the insurance practice at issue, a homeowners insurer—like any other provider of housing or housing services subject to the FHA—may indeed be in full compliance with the act even if its practice results in a disparate impact. But this can only be determined on a case-by-case basis and is dependent on the individual practice being challenged, the challenger's ability to prove some disparate impact in the first instance, the business interest at issue, and—in the case of insurers because of McCarran Ferguson[47]—the state law in which the practice arose.

Disparate impact is not a "gotcha" standard of liability intended to trap unwitting defendants, nor does it require quotas or set-asides. When an insurer, using evidence that is neither hypothetical nor speculative, can establish a legitimate, nondiscriminatory justification for a practice that may have a discriminatory effect, the insurer can prevail unless the plaintiff then demonstrates the existence of a less discriminatory alternative practice that achieves the same objective. If any challenged insurance practices with no less discriminatory alternatives are based on legitimate risk-based underwriting or pricing, then they will suffer no liability under the FHA.

It is sometimes claimed that having to live under the shadow of the Disparate Impact Rule poses an undue burden to insurers because insurers do not collect data about the race of their customers and they would therefore be required to collect demographic data that they do not currently obtain. But in this regard homeowners insurers are no different from other businesses that are subject to the FHA. Apartment managers do not record the race of housing applicants or tenants. Real estate sales agents do not record the race of their buyers. Although some lenders are required to collect and report racial and gender demographic data of loan applicants, they are not required to collect or report data about the other protected class characteristics (such as religion, disability, or familial status) to which the Disparate Impact Rule applies. In this respect there is no additional burden that is unique to "the business of insurance" that distinguishes it from any other housing industry subject to the Rule.

More fundamentally, this notion that the Disparate Impact Rule requires housing providers to collect and analyze racial or other demographic data about their

*customers* misconceives how many disparate impact claims are proven. For example, a challenge to an insurer's sales, marketing, or underwriting practices would require a comparison of the way a particular policy or practice will impact members of a protected class *in the relevant market* as compared to nonprotected potential customers in that market.[48]

Indeed, for disparate impact claims based solely on neighborhood racial composition, as distinct from disparate impact claims based on the race of applicants or existing customers, the relevant demographic data required for analysis is found in publicly available census and geographic data, not in customer files.[49] The race of an insurer's customers, as distinct from the racial composition of the neighborhoods within which it does business, is largely irrelevant to such geographic redlining claims.

Finally, HUD's Rule places the burden of proving disparate impact in the first instance, and a less discriminatory alternative at the back end, on the *plaintiff*, not the defendant insurer. For a plaintiff to make such a showing, the plaintiff must have a data source with the relevant demographic information (*e.g.*, race) to demonstrate the impact. If a fair housing plaintiff has a data source sufficient to prove that a specific insurance business practice has a disparate impact based on race, the insurer would also have access to the same data source. Moreover, the insurer's burden under HUD's Rule is merely to prove the "business justification" for the challenged practice. Certainly the insurer has a pre-existing source of data to meet this burden, and would not have to capture "more" data *post hoc*.[50]

HUD's Disparate Impact Rule therefore does not, as many insist, impose any additional data collection burden on homeowners insurers. To the contrary, the Rule does nothing more that promote the careful analysis of existing data so that no otherwise qualified segments of the market are unnecessarily excluded by unjustified assumptions about risk.

## Disparate Impact Analysis Is Alive and Well at the State Level

Another reason why disparate impact analysis is here to stay, regardless of HUD's federal Rule, is that it is embedded, implicitly or explicitly, in many state regulatory regimes. Disparate impact analysis is not exclusive to the federal government, nor does it necessarily

conflict with state laws. Many state civil rights laws are in complete harmony with federal civil rights policy, not just in areas of housing, but in all segments of the economy, including employment, banking, education, public accommodations, and others. Several states allow disparate impact fair housing claims, even against insurance companies. Indeed, many state fair housing laws have been deemed "substantially equivalent" to the federal FHA[51] and would apply the principles of disparate impact to homeowners insurers to the same extent as the federal FHA.

For example, California, North Carolina, and the District of Columbia allow disparate impact fair housing claims by statute in all contexts; there are no exemptions for homeowners insurers.[52] Several state supreme courts have interpreted their state fair housing laws to encompass disparate impact claims, even when their statutes do not explicitly use the term.[53] Lower state court decisions throughout the country embrace disparate impact as a matter of state law.

In *Toledo Fair Housing Center v. Nationwide Insurance Company*,[54] a class of homeowners and a local fair housing agency sued Nationwide Insurance solely under Ohio state law for alleged redlining. Specifically, plaintiffs alleged that two of Nationwide's underwriting guidelines had a disparate impact on homeowners in African-American neighborhoods, and therefore violated the state's fair housing law. Nationwide moved for summary judgment, arguing that a disparate impact approach would "undermine the insurance business" and would "conflict with the Ohio Insurance code." The court rejected both arguments, finding that "the disparate impact approach does not unduly burden the business of selling insurance" because the theory does not impede an insurer from showing a legitimate business justification. Moreover, the court further found that disparate impact liability against an insurer "does not conflict with the Ohio insurance code."[55]

This and similar cases and state statutes refute the concern that HUD's Disparate Impact Rule "conflicts" with the state insurance law of all 50 states. There may indeed be some situations in which McCarran Ferguson will reverse preempt a federal FHA claim challenging a specific insurance business practice in a specific state. But that determination can only be made on a case-by-case basis, and until a court is presented with such

004410

particularized facts, it will not invalidate the Rule in the abstract and immunize all insurance practices in all states.[56] The viability of disparate impact challenges to homeowner insurance practices under state law thus ensures that the concept will still be something insurers must address, regardless of the existence of HUD's Rule.

## Disparate Impact Analysis Is Relevant to Claims of Intentional Discrimination

Finally, disparate impact analysis must always be a concern of homeowners insurers because, regardless of whether it might be sufficient to support fair housing liability as a stand-alone theory, it is nevertheless relevant and admissible in enforcement actions that are based on claims of intentional discrimination.

Statistical evidence has long been recognized by the US Supreme Court as an important type of circumstantial evidence that can be used to prove intent. For example, in employment discrimination cases the Supreme Court has held that statistics showing an imbalance between the racial composition of an employer's work force compared to the racial composition of the general population is often "a telltale sign" of purposeful discrimination.[57] In some cases statistical evidence alone can support a finding of intent. Housing discrimination cases premised on allegations of discriminatory intent have successfully presented statistical evidence showing substantial imbalances in the defendant's treatment of customers.[58]

Evidence that an insurer's policy or practice has a substantial disparate impact on a protected class, when combined with direct or circumstantial evidence of discriminatory motive, is therefore relevant and admissible in a fair housing enforcement action.

## Conclusion

The Introduction to this article quoted a number of industry experts who decried the alleged seismic repercussions of HUD's Disparate Impact Rule, and its application to insurers. The same arguments have been rejected by courts as overly "sweeping" and "fanciful."[59]

Essentially, [Prudential's] argument turns on the purportedly unique nature of the insurance industry, which must "discriminate" based on an assessment of risk. However, this argument is unavailing in light of the availability of the "business justification" defense. Plaintiffs do not challenge Prudential's right to evaluate homeowners' insurance risks fairly and objectively. Rather, plaintiffs allege that the underwriting policies and practices employed by Prudential are *not* purely risk-based. Furthermore, defendants cannot point to anything in the FHA itself that would justify this Court in carving out an exception for a particular type of organization.[60]

The Fifth Circuit similarly observed that the insurance industry's "ominous" description of the way that disparate impact will force federal courts to act as "super actuaries" by substituting their judgment for the judgment of each of the 50 states "although colorful, is incorrect."[61] Courts are regularly called upon to evaluate whether a practice with a disparate impact is nevertheless justified by a business necessity. "[Allstate's] attempt to distinguish the business of insurance from other businesses is unpersuasive." Moreover, supposed conflicts between disparate impact theory and state insurance laws "are entirely conjectural."[62]

The Seventh Circuit made the same observations in *NAACP v. American Family*.[63] Insurers are no different from lenders when it comes to risk assessment. Like insurers, lenders must evaluate risks, such as whether to extend credit in the first instance, and if so at what rate of interest. The FHA indisputably applies to lenders, so "it is difficult to see risk classification as a principled ground to exclude insurers" from disparate impact analysis.[64] The court in *American Family* also famously wrote, "risk discrimination is not race discrimination,"[65] a line often quoted by industry apologists who object to the application of disparate impact analysis to homeowners insurance. But in the next sentence the court cautioned that "efforts to differentiate more fully among risks may produce classifications that could be generated by discrimination."[66]

Homeowners insurers have been operating profitably for decades in a world in which every circuit court that has addressed the issue, as well as HUD, has found that disparate impact liability exists under the FHA—without the calamitous results predicted by industry pundits. Disparate impact liability does not require the abandonment of legitimate, risk-based analyses. It is

absolutely compatible with the business of insurance. Responsible insurers would be prudent to incorporate compliance with it into their basic business models. It is a concept that is here to stay.

## Notes

1. 78 Fed. Reg. 11,460 (Feb. 15, 2013).

2. *See* 42 U.S.C. §§ 3610-3614.

3. P. Hancock, A. Glass, and R. Smerage, "HUD Proposal Would Impose 'Disparate Impact' Regulation on Property Insurance," *Legal Backgrounder*, Vol. 27, No. 11 (June 8, 2012), at pp.1, 3.

4. E. Tosaris, "The Disparate Impact Rule and Its Impact on State Insurance Regulation," *The Regulator* (Spring, 2013) at p.9.

5. S. Stead and L. Mirel, "Commentary: Will HUD's Disparate Impact Rule Have Say in Ratemaking?," available at *http://www.insurancejournal.com/news/national/2013/04/10/287803.htm.*

6. *American Insurance Ass'n et al. v. HUD*, Case No. 1:13–cv–00966 (D. D.C.); *Property Casualty Insurers Ass'n of America v. Donovan*, Case No. 1:13–cv–08564 (N.D. Ill.).

7. 24 C.F.R. § 100.500.

8. *See, e.g., Ojo v. Farmers Group, Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010); *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1360 (6th Cir. 1995), *cert. denied,* 516 U.S. 1140 (1996); *United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n,* 24 F.3d 1008 (7th Cir. 1994); *NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 301 (7th Cir. 1992); *Lumpkin v. Farmers Grp., Inc.,* No. 05–2868 Ma/V., 2007 WL 6996777, at *2 (W.D. Tenn. July 6. 2007); *Nevels v. Western World Ins. Co.,* 359 F. Supp. 2d 1110, 1117-1122 (W.D. Wash. 2004); *National Fair Housing Alliance v. Prudential Ins. Co.*, 208 F. Supp. 2d 46, 55-59 (D.D.C. 2002); *Lindsey v. Allstate Ins. Co.,* 34 F. Supp. 2d 636, 641-643 (W.D. Tenn. 1999); *Strange v. Nationwide Mut. Ins. Co.,* 867 F. Supp. 1209, 1212, 1213-1215 (E.D. Pa. 1994). Even before the Fair Housing Amendments Act of 1988, federal district courts had so held. *See, e.g., McDiarmid v. Econ. Fire & Cas. Co.,* 604 F. Supp. 105, 107 (S.D. Ohio 1984); *Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.,* 472 F. Supp. 1106, 1109 (S.D. Ohio 1979).

9. 42 U.S.C. § 3604(a) (emphasis added).

10. *Nationwide,* 52 F.3d at 1360 ("[T]he availability of property insurance has a direct and immediate effect on a person's ability to obtain housing."); *Nevels,* 359 F. Supp. 2d at 1119 ("Plaintiffs…, without liability insurance, face significant financial risk, and their ability to provide housing for disabled individuals is threatened."); *American Family,* 978 F.2d at 297-298, 300 ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."); *United Farm Bureau,* 24 F.3d at 1014 n.8 ("This undoubtedly could make owning and retaining real property unavailable…."); *Lindsey,* 34 F. Supp. 2d at 641-643 (FHA prohibits discriminatory refusal to underwrite homeowner's insurance); *United States v. Mass. Indus. Fin. Agency*, 910 F. Supp. 21, 27 (D. Mass. 1996)

("Few, if any, banks make home loans to uninsured borrowers. Thus, property insurers in effect have the power to make housing unavailable to potential buyers.").

11. 42 U.S.C. § 3604(b) (emphasis added).

12. 24 C.F.R. § 100.70(d)(4).

13. *American Family,* 978 F.2d at 300-301, *cert. denied*, 508 U.S. 907 (1993) (regulation applying FHA to insurers is a valid exercise of HUD's authority); *Ojo,* 600 F.3d at 1208 (9th Cir. 2010) (en banc) (holding that "HUD's construction of the FHA is reasonable" in "prohibit[ing] racial discrimination in both the denial and pricing of homeowner's insurance"); *Nationwide* 52 F.3d at 1354, *cert. denied*, 516 U.S. 1140 (1996) (deferring to HUD's regulation in holding that "insurance underwriting practices are governed by the Fair Housing Act").

14. *See, e.g., Ojo,* 600 F.3d at 1208; *American Family,* 978 F.2d at 298; *Lindsey,* 34 F. Supp. 2d at 642-643 (claims of discrimination by insurers in setting premiums and failing to renew policies are also covered by the Fair Housing Act, even though they do not directly affect the "availability" of housing).

15. *See, e.g., United States v. Am. Family Mut. Ins. Co.* (E.D. Wis. 1995); *United States v. Nationwide Mut. Ins. Co. et al.,* No. C2-97-291 (S.D. Ohio 1997); *United States v. Erie Insurance,* Case No. 08–cv–0945 (W.D.N.Y. 2008); *United States v. GuideOne Mutual Ins. Co.,* Case No. 3:09–cv–757 (W.D. Ky. 2009), all available at *http://www.justice.gov/crt/about/hce/caselist.php.*

16. *Prudential,* 208 F. Supp. 2d at 58; *Nevels,* 359 F. Supp. 2d at 1121-1122.

17. *See* Letter from Elizabeth K. Julian, HUD Acting Ass't Secretary for Policy and Initiatives, to Richard D. Rogers, Deputy Director, Illinois Dep't of Insurance (Jan. 26, 1996) (Julian 1/26/96 Letter).

18. *See generally* R. Schwemm, *Housing Discrimination: Law and Litigation* § 10:4 (2013) (citing cases from all 11 circuits holding that the FHA allows for disparate impact liability). The most recent reaffirmation that disparate impact analysis can lead to liability under the FHA is found in *Inclusive Communities Project, Inc. v. Texas Dep't Housing and Community Affairs,* ___ F.3d ___, 2014 WL 1257127 (5th Cir. 2014).

19. *Homeowners Insurance Discrimination: Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs,* 103d Cong. 50 (1994) (stmt. of Roberta Achtenberg, Ass't Sec'y for Fair Hous. & Equal Opportunity).

20. 78 Fed. Reg. 11,460, 11461-11462 (listing examples of HUD's adjudications, published and internal guidance, and litigation in support of disparate impact (Feb. 15, 2013)).

21. 76 Fed. Reg. 70,921-70,923 and nn.11, 16 (Nov. 16, 2011).

22. *See, e.g.,* Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending,* 59 Fed. Reg. 18,266 (Apr. 15, 1994) (available at *www.occ.treas.gov/news-issuances/federal-register/94fr9214.pdf*). *See also* Interagency Fair Lending Examination Procedures, at Appendix 26–28 (available at *http://www.federalreserve.gov/boarddocs/caletters/2009/0906/09-06_attachment.pdf*). The financial regulatory agencies are the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Board of Governors of the Federal Reserve



004412



System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration.

23. 12 C.F.R. § 202.6, n.2.

24. *See, e.g., United States v. Nationwide Mut. Ins. Co. et al.*, No. C2-97-291 (Dep't of Justice Mar. 10, 1997) (consent decree) (available at *http://www.justice.gov/crt/about/hce/documents/nationsettle.php*) (Department of Justice (DOJ) settlement with Nationwide Insurance under the Fair Housing Act eliminating age of dwelling as an underwriting criterion); *United States v. Am. Family Mut. Ins. Co.* and *NAACP v. Am. Family Mut. Ins. Co.* (Dep't of Justice July 13, 1995) (consent decree) (available at *http://www.justice.gov/crt/about/hce/documents/amfamsettle.php*) (DOJ settlement with American Family Mutual Insurance Company under the Fair Housing Act eliminating age of dwelling as an underwriting criterion); *Toledo Fair Hous. Ctr. et al. v. Nationwide Ins. Co. et al.*, 704 N.E.2d 667, 674-676 (Ohio Com. Pl. 1997) (plaintiffs survived summary judgment because Nationwide did not provide sufficient business justification in response to the racially disparate impact of age of dwelling standard demonstrated by plaintiffs' statistical expert, minimum dwelling value, and ratio of dwelling market value to replacement cost), 705 N.E. 2d 1 (Ohio Com. Pl. 1998) (settlement); *DeHoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) (credit scoring), 240 F.R.D. 269, 276 (W.D. Tex. 2007) (settlement); *Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46 (D.D.C. 2002) (market value of home, ratio between replacement cost and market value, credit scoring).

25. For a historical discussion of the intersection between race discrimination and homeowner's insurance, *see* Carol Heimer, "The Racial and Organizational Origins of Insurance Redlining," 10 *J. Intergroup Relations* 42 (1982), and Gregory Squires, "Racial Profiling, Insurance Style: Insurance Redlining and the Uneven Development of Metropolitan Areas," 25 *J. Urban Affairs* 4, 391-410 (2003). For a broader discussion of the many issues surrounding race discrimination and disparate impact claims brought under the Fair Housing Act against insurers, *see* Dana Kaersvang, "The Fair Housing Act and Disparate Impact in Homeowners Insurance," 104 Mich. L. Rev. 1993 (2006).

26. "Testers" are individuals who, without an intent to purchase homeowner's insurance, pose as potential purchasers for the purpose of collecting evidence of unlawful discrimination. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). *See generally* Shanna Smith and Cathy Cloud, "Documenting Discrimination by Homeowners Insurance Companies Through Testing," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory Squires ed., Urban Institute Press 1997).

27. *See, e.g.,* Robert W. Klein, "Availability and Affordability Problems in Urban Insurance Markets," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at pp.47-48 (identifying several non-risk-related barriers that can influence the availability and affordability of homeowners insurance in urban markets, including agent bias, prejudicial views of decisionmaking personnel, adverse selection,

agent commission structures, etc.); J. Schultz, "Homeowners Insurance Availability and Agent Location," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at p.83 (analyzing impact of agent locations on availability of insurance); Kaersvang, *supra,* n.33 at 2013–2017 (identifying several insurer business practices with a disparate impact that may not be justified by business necessity).

28. Testimony of J. Robert Hunter, former Texas Insurance Commissioner, before the US Senate Committee on Banking (quoted in D.J. Powers, "The Discriminatory Effects of Homeowners Insurance Underwriting Guidelines," in *Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at p.119.

29. Hunter Testimony, at 125-133, 137 (identifying several common underwriting guidelines that may result in a disparate impact on protected classes).

30. G. McGiffin, "Are Underwriters Smarter Than Predictive Models?", *Insurance Innovation Reporter* (Dec. 9, 2013) (discussing improved methods of predictive modeling and suggesting that "predictive modeling and statistical analysis might replace heuristics-based analysis that has long been the standard practice in underwriting"), available at *http://iireporter.com/are-underwriters-smarter-than-predictive-models*.

31. Powers, *supra,* n.28, at p.121 (only nine states require the filing of underwriting guidelines). Rate filings typically do not include underwriting guidelines, which are generally considered secret and proprietary, and in most states are *not* subject to filing requirements. Birny Birnbaum, *Insurers' Use of Credit Scoring for Homeowners Insurance In Ohio: A Report to the Ohio Civil Rights Commission*, at pp.1–2, 10 (Jan. 2003) (in contrast to rate filings, underwriting guidelines are not typically filed with the Ohio Department of Insurance); *id.* at pp.15-16 (in most states, insurer changes to underwriting guidelines receive no regulatory scrutiny).

32. D. Schwarcz, "Transparently Opaque: Understanding the Lack of Transparency in Insurance Consumer Protection," 61 *UCLA Law Review* 394, 396-397, 428 (2014); *see also* Annual Report of the People's Insurance Counsel Division of the Office of the Attorney General, State of Maryland, at p.5 (May 2012) (a review by Maryland's Attorney General of homeowners filings containing actuarial data determined that "in most instances [the] filings did not include adequate supporting actuarial data," and even after requesting additional information "in several cases the insurers' responses were unsatisfactory."), available at *http://www.oag.state.md.us/PIC/Annual_Report_2012.pdf*.

33. For example, one historical underwriting guideline that had been used by many large insurers like Nationwide, State Farm, and Allstate prior to disparate impact challenges prohibited the sale of dwelling replacement coverage insurance on dwellings whose "market value" was significantly less than their replacement cost. But in fact the insurers rarely retained any information on market values of homes, or any data showing higher rates of loss as the gap widened between the two values. Richard J. Ritter, "Racial Justice and the Role of the U.S. Department of Justice in Combating Insurance Redlining," in




*Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions* (Gregory D. Squires ed., 1997) at p.197. Moreover, the determination of "market value" was subjective, not subject to uniform standards, and was usually discarded. *Id. See also id.* at p.208 (the presumption that older homes pose higher risks may or may not be supported by the insurer's loss data).

34.  *See supra* n.24.

35.  D. Light, *Transforming Underwriting: From Risk Selection to Portfolio Management*, at pp.7, 12 (Celent, March 2004), available at *http://www.edmblog.com/weblog/files/insurance_transforming_underwriting_celent_up.pdf.*

36.  McGiffin, *supra* n.30.

37.  978 F.2d 287 (7th Cir. 1992).

38.  *See also* Klein, *supra* n.27 at p.73 (after studying a large data-set made available by the National Association of Insurance Commissioners, the author concludes that "the indicated relationship between race and the availability of insurance persists, *even imperfectly controlling for the risk of loss.*"); Ritter, *supra* n.33 at p.198 ("[I]nsurers may not have previously analyzed their loss experiences" in order to explain disparities in market share between minority neighborhoods and white neighborhoods).

39.  E. Frees, G. Meyers, and A. Cummings, "Predictive Modeling of Multi-Peril Homeowners Insurance," *Variance*, Vol. 6, No. 1, at p.12 (Casualty Actuarial Society 2012), available at *http://www.variancejournal.org/issues/?fa=article&abstrID=6918.*

40.  *Id. See also* "How Predictive Modeling Has Revolutionized Insurance," *Insurance Journal*, June 18, 2012 (proposing the way actuaries can improve loss prediction by using more refined data analysis, for both pricing and under-writing), available at *http://www.insurancejournal.com/news/national/2012/06/18/251957.htm*; 2013 Insurance Predictive Modeling Survey (Nov. 4, 2013) (reporting survey results indicating only 37 percent of homeowners insurers use predictive analytics), available at *http://news.advizorsolutions.com/index.php/insurance-industry-must-make-investments-in-predictive-analytics.*

41.  *http://www.casact.org/professionalism/standards/princip/sppcrate. pdf* at p.4. *See also* S. Dane, "The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories," 24 *J. Ins. Reg.* 21, 24–27 (2006) (discussing aspects of the homeowners insurance ratemaking function that allow for subjective and nonactuarial judgments, including but not limited to the delineation of rating territory boundaries).

42.  *See, e.g.*, M. Miller and M. Golden, *Introduction to Price Optimization*, at Slides 7 and 10 (listing certain Competitive Adjustments that are often made to indicated loss costs during the rate setting process), available at *http://www.naic.org/documents/committees_c_d_auto_insurance_study_group_140317_materials.pdf.*

43.  24 C.F.R. § 100.500.

44.  24 C.F.R. § 100.500(b). Once this showing is made, a plaintiff may still prevail if he or she can prove that the legitimate nondiscriminatory business interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. 24 C.F.R. § 100.500(c).

45.  *Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374–375 (6th Cir. 2007). *See also Prudential*, 208 F. Supp. 2d at 60 (insurers' ability to assess risk on legitimate grounds is preserved in light of the "business justification" element of disparate impact analysis).

46.  Julian 1/26/96 Letter, *supra* n.17.

47.  The McCarran Ferguson Act, 15 U.S.C. §§ 1011–1015, generally reverse preempts any law of Congress, not specifically related to insurance, that will "invalidate, impair, or supersede" state insurance codes. It has generally not prevented the enforcement of the federal Fair Housing Act because in almost all cases the courts have determined that the Act is "consistent with" the state law in which the claim arose. *See* cases cited *supra* n.8. *But see Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) (McCarran Ferguson reverse preempts disparate impact pricing claims in Missouri, but not necessarily claims of intentional discrimination).

48.  *See, e.g.*, R. Schwemm, *Housing Discrimination: Law and Litigation* § 10:6 (2013) (plaintiff's *prima facie* case in a disparate impact case "should generally focus on the relative impact of the defendant's policy on the local population"); S. Dane, Disparate "Impact Analysis in the Mortgage Lending Context," 115 *Banking L.J.* 900, 904–905 (1998) (defining the appropriate comparison populations is critical to proper disparate impact analysis).

49.  *See, e.g.*, Klein, *supra* n.27 at p.52 (using demographic data at the zip code level to measure differences in affordability and availability of insurance based on neighborhood racial composition); Ritter, *supra* n.33 at p.199 (analysis of loss data and loss ratios by census tract permits an assessment of the extent to which losses influence an insurer's market share).

50.  *See* Kaersvang, *supra* n.33 at 2013 ("If accurate classification of risk is as important to the insurance business as insurers claim, it seems unlikely that insurers would rely on risk-assessment factors without knowing how those factors correlate to risk.").

51.  *See* 42 U.S.C. § 3610(f) (allowing HUD to certify any state agency for referrals of complaints when the agency enforces fair housing rights that are "substantially equivalent" to the Fair Housing Act), list of equivalent state jurisdictions available at *http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/partners/FHAP/equivalency.*

52.  Cal. Gov't Code § 12955.8; N.C. Gen. Stat. § 41A-5(a)(2); D.C. Code § 2-1401.03. The Attorneys General from six states submitted a joint comment during HUD's rulemaking that commended disparate impact as "squarely aligned" with their states' interests in removing barriers to fair housing.

53.  *See, e.g.*, *Com'n on Human Rights & Opportunities v. Sullivan Associates*, 250 Conn. 763, 792–793 (1999); *Saville v. Quaker Hill Place*, 531 A.2d 201, 205–206 (Del. 1987); *Bowman v. City of Des Moines Mun. Housing Agency*, 805 N.W.2d 790, 798–799 (Iowa 2011); *Malibu Investment Co. v. Sparks*, 996 P.2d 1043, 1050–1051 (Utah 2000); *State Civ. Rights Com'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000) (dicta).



004414




54. 704 N.E. 2d 667 (C.P. Ohio 1997).

55. 704 N.E. 2d at 671.

56. *See, e.g.,* *Ojo,* 600 F.3d at 1208 (9th Cir. 2010) (the FHA allows disparate impact claims against insurers "in both the denial and pricing of insurance;" but McCarran Ferguson analysis must then be applied for the specific state in which the claim arose).

57. *International Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 340 n.20 (1977). *See, e.g., Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977) (whether a practice bears more heavily on one race than another provides "an important starting point" for determining whether discriminatory intent was a motivating factor); *Carroll v. Sears, Roebuck & Co.,* 708 F.2d 183,190 (5th Cir. 1983) (gross statistical disparities, standing alone, may justify an inference of discriminatory motive).

58. *See, e.g., Smith v. Anchor Bldg. Corp.,* 536 F.2d 231, 233–236 (8th Cir. 1976); *Jordan v. Dellway Villa of Tenn., Ltd.,* 661 F.2d 588, 589–590 (6th Cir. 1981); *Mayor of Baltimore v. Wells Fargo Bank,*

*N.A.,* 2011 U.S. Dist. LEXIS 44013, at n.4 (D. Md. 2011); *DeKalb County v. HSBC N. Am. Holdings,* 2013 U.S. Dist. LEXIS 185976 (N.D. Ga. 2013).

59. *Prudential,* 208 F. Supp. 2d at 60; *Dehoyos,* 345 F.3d at 297 n.5.

60. *Prudential,* 208 F. Supp. 2d at 60.

61. *DeHoyos,* 345 F.3d at 297 n.5.

62. *Dehoyos* at 299, n.7.

63. *NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 298 (7th Cir. 1992).

64. *NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 298 (7th Cir. 1992). *See generally* Kaersvang, *supra* n.33 at pp.2010–2011 (discussing the way empirical evidence undermines the argument that risk assessment by insurers differs from other risk assessment by lenders and others).

65. 978 F.2d at 290.

66. 978 F.2d at 290.



**PCI**

**Property Casualty Insurers**
**Association of America**

Advocacy. Leadership. Results.

ROBERT GORDON
SENIOR VICE PRESIDENT
POLICY DEVELOPMENT AND RESEARCH

September 25, 2014

The Honorable Julian Castro, Secretary
The Honorable John Trasviña, Assistant Secretary
U.S. Department of Housing and Urban Development
451 17th Street, S.W.
Washington, DC 20410

Dear Secretary Castro and Assistant Secretary Trasviña:

On September 4, 2014, the United States District Court for the Northern District of Illinois issued the enclosed Memorandum Opinion and Order granting in part the motion for summary judgment filed by Property Casualty Insurers Association of America ("PCI") in *Property Casualty Insurers Association of America v. Donovan*, No. 13-8564. The Court remanded the case to HUD for further proceedings.

In its opinion, the Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in its Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. The Court further directed HUD to explain why application of its Rule to homeowners insurance did not violate the filed-rate doctrine, which forbids courts from invalidating or modifying rates that have been filed with regulatory agencies. *Id.* at 43. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It noted that HUD's previous response to comments raising this issue was inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

PCI intends to submit additional comments to HUD to address the issues identified in the Court's order. If there is a deadline for submitting comments, please let me know.

Additionally, PCI requests that HUD re-open the public comment period to inform others that the Agency expects to fully consider the complex issues presented by application of the Disparate Impact Rule to homeowner's insurance. The case-by-case application of disparate impact liability to insurers presents significant legal and compliance uncertainty, subjects insurers to conflicting regulatory requirements, imposes significant expenses on the property and casualty industry, and interferes with State regulation of insurance. We respectfully suggest that HUD should solicit public comments on this important issue.

September 25, 2014
Page 2

Please contact me at (202) 639-0490 or Robert.Gordon@pciaa.net if you have any questions or information.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

cc:  Helen R. Kanovsky
     Jeanine Worden
     Kyle R. Freeny

# PCI

**Property Casualty Insurers** Association of America
444 North Capitol Street NW, Suite 801, Washington, DC 20001-1508

CAP DISTRICT
MD 207
26 SEP '14
PM 2 L

Hasler
09/26/2014
US POSTAGE $000.48□

FIRST-CLASS MAIL

ZIP 20001
011D12503838

To:

Ms. Helen R. Kanovsky
U.S. Department of Housing and Urban
Development
451 17th Street, S.W.
Washington, DC 20410

204103



**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

January 26, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

**Re:    Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's Discriminatory Effects Standard**

Dear Sir or Madam:

On September 4, 2014, Judge St. Eve of the U.S. District Court for the Northern District of Illinois issued the enclosed Memorandum Opinion and Order in *Property Casualty Insurers Association of America v. Donovan*, No. 13-8564 (*PCI*), remanding the case to the Department of Housing and Urban Development (HUD) for further consideration of whether HUD's Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional comments to HUD to address the issues identified in the Court's order and requested HUD to re-open the public comment period to inform others that the Agency expects to fully consider the complex issues presented by application of the Disparate Impact Rule to homeowners' insurance. For the reasons explained below, the Disparate Impact Rule cannot lawfully be applied to homeowners insurance. Application of the Rule to homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers. HUD should therefore exempt homeowners insurance from the Rule.[1]

---

[1] HUD has not yet opened a public comment period, and On November 3, 2014, Judge Leon of the U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the Disparate Impact Rule in American Insurance Association v. U.S. Department of Housing and Urban Development, No. 13-cv-00966 (D.D.C.). But PCI is submitting these comments now in an abundance of caution, given the remand from Judge St. Eve.

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

Regulations Division
January 26, 2015
Page 2

# I.    BACKGROUND

## A.    The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by a fire, the insurer will pay to repair her home. Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions, that is, decisions about whether to insure and how to price a particular risk or class of risk. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial implications. Actuaries examine numerous factors that correlate with losses. *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to that home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard. Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* Admin. Rec. 383; Decl. of Teresa C. Cracas ¶ 6 (stating that Cincinnati Insurance Company does not collect information on race or ethnicity); Decl. of Michael Dawdy ¶ 11 (State Auto Insurance Companies does not collect data on policyholders' race or ethnicity); Decl. of Ronald Joseph Zaleski, Sr. ¶ 11 (Selective Insurance Company of America does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); Decl. of Peter Drogan ¶ 7 (Amica Mutual Insurance Company does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers. *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on neutral risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.

Regulations Division
January 26, 2015
Page 3

*See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law— A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012). Such a pricing scheme would also greatly reduce the financial incentive for customers to reduce risks, construct safer houses, and maintain existing houses. Avraham, *The Economics of Insurance Law*, *supra* pp. 66-67.

### B.    State Regulation Of Insurance and The McCarran-Ferguson Act

The states have traditionally regulated the insurance industry, from the pricing of insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constituted interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to ensure that ruling would not undermine the states' long-standing regulation of insurance. Today, "State regulation of insurance is comprehensive and includes rate and coverage issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).

In the McCarran-Ferguson Act, Congress expressly stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application … frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

### C.    The Fair Housing Act and the Disparate Impact Rule

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). The Act makes no reference to either disparate impact or homeowners insurance.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70921 (Nov.

Regulations Division
January 26, 2015
Page 4

16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* at 70921. The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70924.

Representatives of the insurance industry submitted comments explaining why disparate impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes, whether by statute, regulation, or under the "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, the application of disparate impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.

HUD promulgated its final Disparate Impact Rule on February 15, 2013. 78 Fed. Reg. 11460. The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

## D. The Litigation Brought by PCI

On November 27, 2013, the Property Casualty Insurers Association of America (PCI) challenged both the Disparate Impact Rule as applied to the provision of homeowners insurance and HUD's process for issuance of the Rule, under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* On September 3, 2014, the Court granted in part PCI's motion for summary judgment.

004499

Regulations Division
January 26, 2015
Page 5

The Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. Those conflicts, the Court explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It held that HUD's response to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

**E.    The Supreme Court's Grant of Certiorari in the *Inclusive Communities* Case and Judge Leon's Vacating of the Disparate Impact Rule**

On October 2, 2014, the Supreme Court granted certiorari in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, No. 13-1371, to address the question whether disparate impact claims of any sort are cognizable under the FHA. Oral argument took place on January 21, 2015. PCI, the American Insurance Association, and the National Association of Mutual Insurance Companies submitted a brief amicus curiae supporting petitioners, explaining that the FHA does not recognize disparate impact liability. The brief also explains that interpreting the FHA to permit disparate-impact liability would upend fundamental tenets of the insurance business and contravene the McCarran-Ferguson Act.

On November 3, 2014, Judge Leon of the U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the Disparate Impact Rule in *American Insurance Association v. U.S. Department of Housing and Urban Development*, No. 13-cv-00966 (D.D.C.). Judge Leon held that "the FHA unambiguously prohibits *only* intentional discrimination." Op. at 17. On December 18, 2014, the government filed its notice of appeal.

The Supreme Court is scheduled to decide later this year whether the FHA permits imposition of disparate impact liability altogether. It should hold that the FHA does not. But even if the Court were to interpret the FHA as allowing disparate impact claims in certain circumstances, disparate impact liability must not be extended to homeowners insurance. Reading the FHA to permit disparate impact claims regarding homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of

Regulations Division
January 26, 2015
Page 6

homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers.

## II.  REQUEST FOR RELIEF

For the reasons set forth below, HUD should exempt homeowners insurance from its Disparate Impact Rule.

### A.  Disparate Impact Claims Are Not Cognizable Under The FHA

In *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, the Supreme Court is likely to rule that disparate impact claims are not cognizable under the FHA. As Judge Leon's recent decision in *American Insurance Association v. U.S. Department of Housing and Urban Development* indicates, a necessary consequence of that holding would be the vacating of the Disparate Impact Rule in its entirety. Whatever the Supreme Court ultimately decides, its opinion would be extremely important for HUD to consider before applying its Rule to insurers.

The Supreme Court is likely to hold that the FHA does not authorize disparate impact claims for several reasons. First, the FHA's terms indicate that it is limited to claims of intentional discrimination. The FHA prohibits various acts performed "*because of* race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604 (emphasis added). Accordingly, it only prohibits actions taken against persons because of their race or other protected characteristic. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (interpreting similar wording in Title VI of the Civil Rights Act to reach only intentional discrimination). Actions taken for other reasons that happen to affect different racial, gender, religious, or other groups differently are not prohibited by the FHA because they are not actions performed "because of race" or other protected characteristics. They are, by definition, actions taken "because of" other factors.

An example from the insurance context may help to illustrate this point. An insurer might charge different customers different rates based on whether or not their homes contain a fire extinguisher. This insurance pricing factor may mean that more people of a particular national origin may pay higher or lower insurance rates than others. But insurers would not be charging different rates "because of" national origin. Indeed, they could not do so, because insurers do not currently obtain data about the national origin, race, color, religion, or disability status of their policyholders. PCI Reply Br. at 7; Decl. of Teresa C. Cracas ¶ 6; Decl. of Michael Dawdy ¶ 11; Decl. of Ronald Joseph Zaleski, Sr. ¶ 11; Decl. of Peter Drogan ¶ 7.

Regulations Division
January 26, 2015
Page 7

The FHA's legislative history also indicates that it does not authorize disparate impact claims. During floor debates, no Representative or Senator suggested that the FHA could be used to impose disparate impact liability. Instead, the debates show Congress's intention to prohibit intentional discrimination. *See, e.g.*, 114 Cong. Rec. 5643 (1968) (Mondale: "The bill permits an owner to do . . . everything he could ever do with property, except refuse to sell it to a person solely on the basis of his color or his religion. That is all it does. It does not confer any right."); 114 Cong. Rec. 2283 (Brooke: "A person can sell his property to anyone he chooses, as long as it is by personal choice and not because of motivations of discrimination."); 114 Cong. Rec. 2530 (Tydings: the problem Congress intended to address was "the deliberate exclusion from residential neighborhoods on grounds of race"); 114 Cong. Rec. 3421 (Mondale: "[T]he basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it. It would not overcome the economic problem of those who could not afford to purchase the house of their choice."); 114 Cong. Rec. 3129 (Hatfield: the FHA prohibits a person being "denied the right to buy a home within a community according to his economic ability . . . merely because his skin is of a different color"); 114 Cong. Rec. 3252 (Scott: the FHA would ensure that individuals "can rent or buy the dwelling of their choice, if they have the money or credit to qualify").

**B.      Application of the Disparate Impact Rule to Homeowners Insurance Would Impair State Laws Regulating Insurance and Thus Violate the McCarran-Ferguson Act**

HUD must provide an exemption for homeowners insurance because application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. Op. at 42. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing

Regulations Division
January 26, 2015
Page 8

operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

### 1. State Laws Requiring Insurers To Engage in Risk-Based Pricing

The vast majority of states—40 of 50—require insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I, *infra.* Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, ... [and] to all other relevant factors, including trend factors, within and outside this state ...." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.,* Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5; N.J. Stat. Ann. § 17:29A-4; N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03; S.C. Code Ann. § 38-73-430; Tenn. Code Ann. § 56-5-304; Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I, *infra.*

In compliance with these laws, insurers charge different rates to different customers based on the required actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of 40 of the 50 states. Application of the Disparate Impact Rule to insurers would therefore "impair" and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly required by state law. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Moreover, the burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. For example, insurers would be liable if their use of an actuarially justified factor was not "*necessary* to achieve a legitimate interest." 24 C.F.R. § 100.500(c) (emphasis added). And even if every risk factor were proved necessary, plaintiffs could still prevail by showing that insurers' interests could be served by another practice with a less discriminatory effect, even if the alternative practice were less effective than the use of actuarial risk factors. *Id.*; Admin. Rec. at 625.

Regulations Division
January 26, 2015
Page 9

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *See id.* at 311; 24 C.F.R. § 100.500. *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would strip them of the ability to rely on state law and institutions that McCarran-Ferguson is designed to guarantee.

> ## 2. State Laws Permitting Insurers To Engage in Risk-Based Pricing and Underwriting
>
> ### a. State Insurance Laws

Every state has permitted insurers to charge different rates to different customers based on the customers' risk profiles. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Numerous other states use very similar language to expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). Under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(4); 18 Del.

Regulations Division
January 26, 2015
Page 10

Code § 2503; Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2); S.D. Codified Laws § 58-24-6; Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I, *infra*. As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal...laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted by the laws of 47 states. *See* Table I, *infra*.

### b.    State Fair Housing Laws

HUD noted during the *PCI* litigation that some states have fair housing laws and that some state courts look to the FHA for guidance in interpreting those laws. HUD Mem. ISO Mot. to Dismiss at 28. HUD suggested that some of these state laws might in theory be interpreted to permit disparate impact claims against insurers. *Id.* Even in

Regulations Division
January 26, 2015
Page 11

states with fair housing laws, if the fair housing law does not specifically displace the state's insurance laws discussed above, then those insurance laws would remain valid. HUD did not show—and did not even claim— that any state's fair housing law displaces its insurance laws. Accordingly, if these valid state insurance laws requiring or permitting insurers to engage in risk-based pricing and underwriting conflict with the Disparate Impact Rule, then HUD's Rule is impermissible under the McCarran-Ferguson Act. PCI submits, based on the statutes described above, below, and in Table I, that state insurance laws in all 50 states clearly do conflict with the Disparate Impact Rule.

### c.  Limitations on Use of Certain Risk Factors

HUD also noted during the *PCI* litigation that some states have laws restricting the discriminatory use of some factors in insurance pricing and underwriting, specifically credit history, geographic location, domestic violence victimization, and property age. HUD Mem. ISO Mot. to Dismiss at 26. As PCI pointed out in its responsive brief, these laws do not alleviate the conflict between the Disparate Impact Rule and state laws requiring or permitting insurers to engage in risk-based pricing and underwriting. Indeed, these laws prohibiting *discriminatory* use of certain risk factors permit insurers to rely on those factors so long as they do so in accordance with "sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience."  Colo. Rev. Stat. § 10-3-1104(1)(f) (XIV) (permitting insurers to take geographic location into account so long as it is related to anticipated loss experience); *see also, e.g.*, Ark. Code Ann. § 23-66-206(14)(C) (permitting insurers to consider geographic location so long as it is not a mere pretext for discrimination); Ind. Code § 27-2-17-5(b) (same); Wis. Admin. Code Ins. § 6.68(3)(a) (same); Ala. Admin. Code r. 482-1-127.06 (prohibiting insurers from making decisions based solely on credit score or using credit history for any unfairly discriminatory reason); Alaska Stat. § 21.36.460(c) (permitting insurers to use credit history so long as they use it in combination with other substantive factors); N.Y. Ins. Law § 2802 (same); W. Va. Code Ann. § 33-17A-6(h) (same); Del. Code Ann. tit 18, § 4124 (permitting insurers to base decisions on age of property if decisions are "for a business purpose which is not a mere pretext for unfair discrimination"); Va. Code Ann. § 38.2-508(5) (same).  These statutes thus delineate the extent to which insurers can use certain risk factors and which applications may be unfairly discriminatory.  Therefore, they highlight the conflict between the Disparate Impact Rule's application to insurance pricing that uses standard actuarial factors and state laws' approval of insurers' reliance on just those factors.

Regulations Division
January 26, 2015
Page 12

### 3. State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—47 of 50, plus the District of Columbia—require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I, *infra*. Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05.

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g., Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting

Regulations Division
January 26, 2015
Page 13

plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is unlawful under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4.    The Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the states' filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986).

The district court in *PCI* found that HUD had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. Op. at 44-45. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* at 45.

The filed-rate doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g.*, *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F3d 229, 236-39, 242 (3rd Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011);; *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005); *see also, e.g.*, Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 118 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates).

Applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Korte*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted). Nor does the extent or the vigor of an agency's review of filed rates matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

Regulations Division
January 26, 2015
Page 14

### 5. Displacement of the Regulation of Insurance from States to Federal Courts

HUD's basic response to the numerous indisputable conflicts between the Disparate Impact Rule and state laws regulating insurance described in the preceding sections is that the Rule's burden-shifting framework would allow defendant companies to raise these state-law considerations on a case-by-case basis. In response to a plaintiff's *prima facie* case, a company could rely on these state laws to show that its pricing or underwriting practices were "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Far from alleviating the conflict between the Disparate Impact Rule and state insurance regulation, this response only confirms that the Rule makes the conflict inescapable.

As the Seventh Circuit has explained, the McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (McCarran-Ferguson prohibits the federal courts from "regulating the ... insurance industry" via litigation). That is just what the Rule's burden-shifting framework would do. In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act (ADA) to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.*

HUD's Disparate Impact Rule would similarly lead to federal courts usurping core functions of the states' administrative regimes, including rate-making and underwriting, as well as all other insurance activities regulated by state law. State insurance commissioners currently regulate and supervise the insurance business, enforce insurance laws, and punish violators. *See, e.g.*, 1 Plitt et al., *Couch on Insurance* §§ 2:7-2:8. Under HUD's Rule, in order to avoid liability insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that "the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of that factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule

Regulations Division
January 26, 2015
Page 15

challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eight Circuit's similar recognition in *Saunders* that 'a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime." *Id.* That concern should preclude application of the Rule to risk-based pricing and underwriting of homeowners insurance.

## C.    Peripheral Insurance Activities Not Mentioned in HUD's Rulemaking

In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70924. During the course of the *PCI* litigation, however, HUD indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. HUD Reply Br. at 3. HUD should exempt from the Disparate Impact Rule all homeowners insurance practices, not just pricing and underwriting.

As an initial matter, the relevant provisions of the FHA do not apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership. As the Seventh Circuit has explained, 42 U.S.C. § 3604 only "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992). The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." That section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

Regulations Division
January 26, 2015
Page 16

In any event, regulating broad categories of insurance practices in federal court on the basis of a federal statute that does not specifically relate to insurance would violate the McCarran-Ferguson Act by displacing the regulation of such practices by state regulators and courts. States pervasively regulate such practices. *See, e.g.*, Wis. Stat. Ann. § 628.01-628.98 (regulating marketing); Utah Code Ann. 1953 §§ 31A-23a-101 *et. seq.* (same); R.I. Gen. Laws. § 27-3.2-4 (requirements for salespersons); Ind. Code § 27-4-1-4.5 (regulating claims settlement); N.Y. Ins. Law § 2601 (same); Alaska Stat. § 21.36.125 (same); Ga. Code Ann., §§ 33-6-30 *et. seq.* (same). To move the locus of this regulation from the states into federal courts on the basis of a statute that does not mention insurance would violate the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

PCI respectfully requests that HUD provide an exemption or safe harbor for insurance practices beyond just rate-setting and underwriting. That is the only approach consistent with the FHA and the controlling precedent of *Mutual of Omaha*.[2]

### D. Application of the Disparate Impact Rule to Homeowners Insurance Would Undermine the Fundamental Nature of Insurance

As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using of any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. Admin. R. at 377.

---

[2] Absent creating a wholesale exemption for the provision and pricing of homeowners insurance, HUD should recognize that use of actuarially-sound, risk-based pricing and underwriting practices always constitutes a legitimate business interest. HUD should also require that any alternative proffered by a plaintiff or by HUD be equally effective to the challenged practice or combination of practices.

Regulations Division
January 26, 2015
Page 17

This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. Op. at 46. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Thus, it was not enough for HUD to impose *prima facie* liability on core insurance practices and then allow insurers the possibility of justifying their practices during the "Sisyphean" process of burden-shifting litigation. *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 376 (6th Cir. 2007). Rather, HUD should consider the costs to insurers of being subjected to such litigation, especially under a burden-shifting framework that places a difficult burden on defendants (proving that insurance practices are "necessary" to a substantial interest) and allows plaintiffs to win if they can show that an alternative exists that has less disparate impact. Indeed, under the burden-shifting framework adopted by HUD, some actuarially justified practices will not only be burdensome to justify and therefore likely relinquished, but will actually be prohibited. HUD expressly rejected a burden-shifting framework that would require plaintiffs or HUD to show that a proposed alternative approach is "equally effective," Admin. Rec. at 625. As a result, some actuarially justified factors will be prohibited because some other, less predictive factor may be used as a substitute. Federal courts reviewing insurance practices in all 50 states are likely to reach inconsistent judgments about which neutral risk factors violate the Fair Housing Act under this framework. They may also hold insurers liable for using neutral risk factors deemed acceptable by state courts. Moreover, HUD should consider the potential effects—including adverse selection and decreases in coverage—of imposing a rule of law that declares many core insurance practices unlawful (unless proven innocent in unpredictable litigation) and directs insurers to avoid all disparate impacts on protected groups.

Regulations Division
January 26, 2015
Page 18

**E.   HUD Can and Should Exempt Homeowners Insurance from the Rule for the Reasons Set Forth Above**

HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." Admin. Rec. at 627. HUD based this assertion entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Groach* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the *Groach* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 290-91.

\*      \*      \*

The Supreme Court is expect to decide whether disparate impact claims are not cognizable under the Fair Housing Act. Regardless of the outcome of that case, however, application of the Disparate Impact Rule to homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, interfere with the fair and efficient operation of the market for homeowners insurance, and impose needless costs on providers of homeowners insurance and their customers. HUD should therefore exempt homeowners insurance from the Disparate Impact Rule.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

Enclosures



**Property Casualty Insurers
Association of America**

Advocacy. Leadership. Results.

July 29, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

> **Re:** **Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
> Discriminatory Effects Standard**
>
> ***Property Casualty Insurers Association of America v. Donovan*, 66 F.
> Supp.3d 1018 (N.D. Ill. 2014)**

Dear Sir or Madam:

On September 3, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued a memorandum opinion and order in *Property Casualty Insurers
Association of America v. Donovan*, 66 F. Supp.3d 1018 (N.D. Ill. 2014) (*PCI*), granting
summary judgment to PCI on its claims that the Department of Housing and Urban
Development's (HUD's) "application of the Disparate Impact Rule to homeowners
insurance was arbitrary and capricious." *Id.* at 1030. Judge St. Eve remanded the case to
HUD for further consideration of whether the Disparate Impact Rule (*Implementation of
the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15,
2013)) can lawfully be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the district court's remand decision
and requested that HUD re-open the public comment period to inform others that HUD
expects to fully consider the complex issues presented by application of the Disparate
Impact Rule (the "Rule") to homeowners insurance. On January 26, 2015, PCI submitted
the promised additional comments to HUD setting forth the following reasons that the
Disparate Impact Rule cannot lawfully be applied to homeowners insurance. PCI noted
that application of the Rule to homeowners insurance would (i) impair state regulation of
insurance in violation of the McCarran-Ferguson Act, (ii) fundamentally interfere with
the provision of homeowners insurance, and (iii) impose needless costs on providers of
homeowners insurance and their customers. Consistent with the relief PCI sought in the
district court and the direction given by that court on remand to HUD, PCI requested that
HUD exempt homeowners insurance from the Rule.

On June 25, 2015, the U.S. Supreme Court handed down its decision in *Texas
Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
No. 13-1371. The Supreme Court held that the Fair Housing Act (FHA) permits assertion

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

004615

Regulations Division
Page 2

of disparate-impact claims, but the Court emphasized that disparate-impact liability must be limited in key respects. The Supreme Court's explanation of those limitations further supports PCI's contention that homeowners insurance should be exempted from the Disparate Impact Rule. PCI thus submits these supplemental comments to take account of the Supreme Court's decision.[1]

## I. The Supreme Court's Decision

In *Texas Department of Housing and Community Affairs*, the Supreme Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" Slip Op. at 21 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." Slip Op. at 18. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 20, 22.

The first of those safeguards is "[a] robust causality requirement." *Id.* at 20. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). Referring approvingly to the opinion below of Fifth Circuit Judge Jones, the Court held up as a paradigmatic case of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policy." *Id.* at 18. Homeowners insurers exemplify the potential defendants the Court had in mind, in that the extensive state regulation of their industry provides a quintessential case of the "valid interest[s]" to which the Court made reference. Businesses, the Court also stated, "must be given latitude to consider market forces." *Id.* at 19. Again, homeowners insurance markets, with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* at

---

[1] HUD has not yet opened a public comment period. But PCI is submitting these comments now in an abundance of caution, given the remand from Judge St. Eve and HUD's statement in other litigation that it is "currently reviewing its regulation in light of the judgment" in *PCI*. Motion to Govern Future Proceedings and Response to Plaintiffs' Motion to Vacate and Remand, *American Insurance Ass'n v. United States Department of Housing and Urban Development*, No. 14-5321 (D.C. Cir. July 24, 2015).

Regulations Division
Page 3

20. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 21. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 21. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## II.     The McCarran-Ferguson Act Requires an Exemption from Disparate-Impact Claims for Homeowners Insurance

In her September 3, 2014 decision remanding the *PCI* case to HUD, Judge St. Eve ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. *PCI*, 66 F. Supp.3d at 1027. Those conflicts, Judge St. Eve explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. Judge St. Eve also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 1028. She held that HUD's responses to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 1029.

In our January 26, 2015 comments, PCI discussed three reasons why HUD must provide an exemption for homeowners insurance.

*First*, application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI*, 66 F. Supp.3d at 1027. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

The evaluation required by the district court shows that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage

Regulations Division
Page 4

in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

*Second*, application of the Disparate Impact Rule to homeowners insurance would interfere with the provision of homeowners insurance. As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." *PCI*, Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." *PCI*, Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. *PCI*, Admin. R. at 377. This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

*Third*, application of the Disparate Impact Rule to homeowners insurance would impose needless costs on providers of homeowners insurance and their customers.

### III. The Supreme Court's Reasoning Confirms that an Exemption for Homeowners Insurance Is Required

The two key safeguards the Supreme Court established on disparate-impact claims in *Texas Department of Housing and Community Affairs* provide further support for each of PCI's three arguments.

Most fundamentally, the Supreme Court's determination that FHA disparate-impact claims must satisfy "[a] robust causality requirement" confirms that the Disparate

Regulations Division
Page 5

Impact Rule cannot be applied to homeowners insurance without running afoul of the
McCarran-Ferguson Act and interfering in the lawful operation of homeowners insurance
markets. Slip Op. at 20. In describing the causality requirement, the Court identified as a
quintessential example of claims lacking the required causality element those where
another "law substantially limits the [defendant's] discretion." *Id.* at 21. That is
precisely the circumstance in which companies offering homeowners insurance find
themselves. Application of disparate-impact liability under the FHA to homeowners
insurers would leave them caught between conflicting federal and state legal regimes and
thus place them in just the "double bind of liability" the Court instructed must be
avoided. *Id.* at 19.

As PCI described at length in its January 26, 2015 comments, companies offering
homeowners insurance are regulated by a panoply of state laws requiring the use of
actuarially sound pricing methods for homeowners insurance, expressly delineating and
permitting the use of such methods, and requiring the filing of homeowners insurance
rates with state administrative bodies for approval. PCI January 26, 2015 Comments at
7-13. Those state laws mandate or expressly permit homeowners insurers to use neutral
actuarial factors (such as loss history, distance from a fire station, building material, etc.)
to determine risk and generally prohibit insurers from charging inadequate rates to
various risk classifications. They thus "substantially limit" the discretion of homeowners
insurance companies in a manner that would make it impossible to ascribe any apparently
disparate effects of the companies' underwriting or pricing practices to their independent
choices. As the Supreme Court emphasized, when companies' policies are subject to
legal constraints of these sorts, it is the companies' obligation to comply with those legal
requirements that is the cause of any resulting disparate effects, not the companies' own
decisions. Interpreting the FHA to permit disparate-impact claims against companies in
these circumstances would penalize them for following state law, placing them in the sort
of "double bind of liability" the Court warned against. That is just what the McCarran-
Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be defined in a way
that gives "latitude to consider market forces" also reinforces PCI's contention that
disparate-impact liability should not be permitted against homeowners insurers. Slip Op.
at 19. As PCI highlighted in its earlier comments, insurance markets run efficiently when
insurance is priced in accord with actuarially sound, risk-based factors. PCI January 26,
2015 Comments at 2-3, 16-17. This sends appropriate and socially beneficial market
signals about risk taking and risk mitigation. The extensive state-law framework
governing the pricing of homeowners insurance is intended to promote such efficient
operation. The "specter of disparate-impact litigation," however, as the Court
recognized, could actually discourage businesses from undertaking the very activities that
ensure a well-functioning housing market and in particular actuarially sound, risk-based
pricing. Slip Op. at 21. Unless that specter were vanquished, "the FHA would have

Regulations Division
Page 6

undermined its own purpose as well as the free-market system." *Id.* Under the McCarran
Ferguson Act regulation of the market for homeowners insurance is reserved to the states.
Exempting homeowners insurance from disparate-impact claims is necessary to ensure
that the threat of disparate-impact litigation does not impair states' legal regimes
governing the pricing of homeowners' insurance or hinder the efficient operation of
insurance market in accord with those state-law regimes.

Finally, the Supreme Court's caution that the FHA should not be interpreted to
promote the use of racial (or other suspect) classifications supports each of PCI's
arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial
considerations into every housing decision," the Court explained, would perversely "tend
to perpetuate race-based considerations rather than move beyond them." Slip Op. at 21.
But that is just what extending disparate-impact liability to homeowners insurers would
do.

State law ensures that homeowners insurers price their products in accordance
with risk-based, actuarially sound factors. State law does not permit reliance on, and
homeowners insurers do not rely on, racial (or other suspect) classifications in pricing
their products. Yet, the failure to exempt homeowners insurers from disparate-impact
liability would effectively require them to compile data on the racial (and other suspect)
characteristics of their customers in a defensive effort to ensure that they would not be
accused of causing prohibited disparate impacts in insurance provision. Exempting
homeowners insurance from disparate-impact liability would thus ensure compliance
with the Supreme Court's direction that race-based considerations not be injected where
they are properly absent. By introducing race-based considerations where none currently
exist, the application of disparate-impact liability to homeowners insurers would,
contrary to the McCarran-Ferguson Act, significantly undermine the state regulation of
unfair discrimination. It would also interfere with the provision of homeowners
insurance by imposing significant and needless costs on providers of homeowners
insurance and their customers.

*    *    *    *

Regulations Division
Page 7


     The Supreme Court's decision in *Texas Department of Housing and Community Affairs* strongly supports PCI's arguments that HUD should exempt homeowners insurance from the Disparate Impact Rule.  For all the reasons given above and in PCI's earlier comments, HUD should act promptly to establish such an exemption.

                  Sincerely,

                  Robert Gordon
                  Senior Vice President
                  Policy Development and Research

159979 (installation of non-data-loadable ELAC L99 P/N 3945128217).

(ii) Airbus mod 160577 (installation of data-loadable ELAC P/N 3945129100 unit with L101 software P/N 3945129112) or mod 162042 (installation of data-loadable ELAC L101 P/N 3945128218).

(2) An airplane on which any modification specified in paragraphs (k)(2)(i), (k)(2)(ii), or (k)(2)(iii) of this AD was done is not affected by the requirements of paragraph (h) of this AD, provided it is determined that no affected ELAC is installed as of the effective date of this AD.

(i) A modification specified in Airbus Service Bulletin A320–27–1267, Revision 00, dated September 27, 2017 (ELAC L101 P/N 3945128218 non-data-loadable).

(ii) A modification specified in Airbus Service Bulletin A320–27–1268, Revision 00, dated September 27, 2017 (ELAC P/N 3945129100 data-loadable with L101 software P/N 3945129112 for A320 NEO).

(iii) A modification specified in Airbus Service Bulletin A320–27–1269, Revision 00, dated September 27, 2017 (ELAC P/N 3945129100 data-loadable with L101 software P/N 3945129112).

**(l) Terminating Action for AD 2016–17–03**

Accomplishing the actions required by paragraph (h) of this AD or complying with any method of compliance specified in paragraph (k) of this AD terminates all requirements of AD 2016–17–03.

**(m) Other FAA AD Provisions**

The following provisions also apply to this AD:

(1) *Alternative Methods of Compliance (AMOCs):* The Manager, International Section, Transport Standards Branch, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19. In accordance with 14 CFR 39.19, send your request to your principal inspector or local Flight Standards District Office, as appropriate. If sending information directly to the International Section, send it to the attention of the person identified in paragraph (n)(2) of this AD. Information may be emailed to: *9-ANM-116-AMOC-REQUESTS@faa.gov.* Before using any approved AMOC, notify your appropriate principal inspector, or lacking a principal inspector, the manager of the local flight standards district office/certificate holding district office.

(2) *Contacting the Manufacturer:* For any requirement in this AD to obtain corrective actions from a manufacturer, the action must be accomplished using a method approved by the Manager, International Section, Transport Standards Branch, FAA; or EASA; or Airbus's EASA DOA. If approved by the DOA, the approval must include the DOA-authorized signature.

**(n) Related Information**

(1) Refer to Mandatory Continuing Airworthiness Information (MCAI) EASA AD 2018–0007R1, dated January 19, 2018, for related information. This MCAI may be found in the AD docket on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0556.

(2) For more information about this AD, contact Sanjay Ralhan, Aerospace Engineer, International Section, Transport Standards Branch, FAA, 2200 South 216th St., Des Moines, WA 98198; telephone 206–231–3223; fax 206–231–3398.

(3) For service information identified in this AD, contact Airbus, Airworthiness Office—EIAS, 1 Rond Point Maurice Bellonte, 31707 Blagnac Cedex, France; telephone +33 5 61 93 36 96; fax +33 5 61 93 44 51; email *account.airworth-eas@airbus.com;* internet *http://www.airbus.com.* You may view this service information at the FAA, Transport Standards Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. You may view this service information at the FAA, Transport Standards Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195.

Issued in Des Moines, Washington, on June 7, 2018.

**Michael Kaszycki,**

*Acting Director, System Oversight Division, Aircraft Certification Service.*

[FR Doc. 2018–12885 Filed 6–19–18; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 100**

**[Docket No. FR–6111–A–01]**

**RIN 2529–ZA01**

**Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard**

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Advance notice of proposed rulemaking.

**SUMMARY:** This advance notice of proposed rulemaking (ANPR) invites public comment on possible amendments to HUD's 2013 final rule implementing the Fair Housing Act's disparate impact standard, as well as the 2016 supplement to HUD's responses to certain insurance industry comments made during the rulemaking. HUD is reviewing the final rule and supplement to determine what changes, if any, are appropriate following the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,* which held that disparate impact claims were cognizable under the Fair Housing Act and discussed standards for, and the constitutional limitations on, such claims. As HUD conducts its review, it is soliciting

public comment on the disparate impact standard set forth in the final rule and supplement, the burden-shifting approach, the relevant definitions, the causation standard, and whether changes to these or other provisions of the rule would be appropriate. HUD is also issuing this ANPR in response to public comments submitted on its May 15, 2017, **Federal Register** document seeking input on ineffective regulations and an October 26, 2017, recommendation from the Department of the Treasury.

**DATES:** *Comment Due Date:* August 20, 2018.

**ADDRESSES:** Interested persons are invited to submit comments to the Office of the General Counsel, Rules Docket Clerk, Department of Housing and Urban Development, 451 Seventh Street SW, Room 10276, Washington, DC 20410–0001. Communications should refer to the above docket number and title and should contain the information specified in the "Request for Comments" section. There are two methods for submitting public comments.

*1. Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500. Due to security measures at all federal agencies, however, submission of comments by mail often results in delayed delivery. To ensure timely receipt of comments, HUD recommends that comments submitted by mail be submitted at least two weeks in advance of the public comment deadline.

*2. Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *http://www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make comments immediately available to the public. Comments submitted electronically through the *http://www.regulations.gov* website can be viewed by other commenters and interested members of the public. Commenters should follow instructions provided on that site to submit comments electronically.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified

above. Again, all submissions must refer to the docket number and title of the document.

*No Facsimile Comments.* Facsimile (fax) comments are not acceptable.

*Public Inspection of Comments.* All comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the public comments must be scheduled by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number). Copies of all comments submitted are available for inspection and downloading at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Krista Mills, Deputy Assistant Secretary, Office of Policy, Legislative Initiatives, and Outreach, Office Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW, Room 5246, Washington, DC 20410; telephone number 202–402–6577. Individuals with hearing or speech impediments may access this number via TTY by calling the toll-free Federal Relay Service during working hours at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act),[1] prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin. On February 15, 2013, HUD published a final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard." [2] The final rule codified HUD's interpretation that the Fair Housing Act creates liability for practices with an unjustified discriminatory effect, even if those practices were not motivated by discriminatory intent.[3] Relying in part on case law under the Fair Housing Act and Title VII of the Civil Rights Act of 1964 (prohibiting employment discrimination), HUD's Disparate Impact Rule established a burden-shifting framework for analyzing claims of disparate impact under the Fair Housing Act.[4] In 2016, HUD published a supplement to its responses to certain insurance industry comments made

during the rulemaking.[5] This ANPR uses the term "Disparate Impact Rule" to refer collectively to the 2013 final rule and 2016 supplement.

In 2015, in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,*[6] (*Inclusive Communities*), the Supreme Court held that disparate impact claims are cognizable under the Fair Housing Act. The Court's opinion referenced HUD's Disparate Impact Rule, but the Court did not extensively review the rule or rely on it for its holding. Rather, the Court undertook its own analysis of the Fair Housing Act and discussed the standards for, and constitutional limitations on, disparate impact claims. The Supreme Court's ruling in *Inclusive Communities* recognized the availability of disparate impact claims under the Fair Housing Act independent of HUD's Disparate Impact Rule. HUD is reviewing the Disparate Impact Rule to determine what changes, if any, may be necessary in light of the *Inclusive Communities* decision. As it conducts this review, HUD welcomes public comment on other amendments to the Disparate Impact Rule that may be necessary or helpful.

The request for comments contained in this ANPR is also consistent with HUD's efforts to carry out the Administration's regulatory reform efforts. On May 15, 2017, HUD published a **Federal Register** document pursuant to Executive Orders 13771, "Reducing Regulation and Controlling Regulatory Costs," and 13777, "Enforcing the Regulatory Reform Agenda," inviting public comments to assist HUD in identifying existing regulations that may be outdated, ineffective, or excessively burdensome.[7] In response, HUD received numerous comments asserting that the Disparate Impact Rule created uncertainty for commercial decisionmaking, as well as public policymaking, and that the rule is inconsistent with *Inclusive Communities.* On the other hand, HUD also received comments in support of the Disparate Impact Rule, asserting that it was cited in *Inclusive Communities* and is consistent with that decision. Additionally, in October 2017, the Secretary of the Treasury issued a report that explicitly recommended that HUD reconsider applications of the Disparate Impact Rule, especially in the context of the insurance industry.[8]

In light of *Inclusive Communities,* public comments submitted in response to HUD's May 15, 2017, **Federal Register** document, and the recommendation from the Department of the Treasury, HUD is seeking public comment on whether the Disparate Impact Rule should be revised for any considerations of law or policy raised in those fora or that are otherwise appropriate.

**II. This Advance Notice of Proposed Rulemaking**

HUD seeks public comment on appropriate changes, if any, to the Disparate Impact Rule. While the following list is not exhaustive, HUD is particularly interested in comments on the following questions:

1. Does the Disparate Impact Rule's burden of proof standard for each of the three steps of its burden-shifting framework clearly assign burdens of production and burdens of persuasion, and are such burdens appropriately assigned?

2. Are the second and third steps of the Disparate Impact Rule's burden-shifting framework sufficient to ensure that only challenged practices that are artificial, arbitrary, and unnecessary barriers result in disparate impact liability?

3. Does the Disparate Impacts Rule's definition of "discriminatory effect" in 24 CFR 100.500(a) in conjunction with the burden of proof for stating a prima facie case in 24 CFR 100.500(c) strike the proper balance in encouraging legal action for legitimate disparate impact cases while avoiding unmeritorious claims?

4. Should the Disparate Impact Rule be amended to clarify the causality standard for stating a prima facie case under *Inclusive Communities* and other Supreme Court rulings?

5. Should the Disparate Impact Rule provide defenses or safe harbors to claims of disparate impact liability (such as, for example, when another federal statute substantially limits a defendant's discretion or another federal statute requires adherence to state statutes)?

6. Are there revisions to the Disparate Impact Rule that could add to the clarity, reduce uncertainty, decrease regulatory burden, or otherwise assist the regulated entities and other members of the public in determining what is lawful?

---

[1] 42 U.S.C. 3601–3619, 3631.

[2] 78 FR 11460.

[3] *See* 24 CFR 100.5(b), 100.70(d)(5), 100.120(b), 100.130(b), and 100.500.

[4] *See* 24 CFR 100.500(c).

[5] *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016).

[6] 135 S. Ct. 2507 (2015).

[7] 82 FR 22344.

[8] *See U.S. Department of the Treasury Report: A Financial System That Creates Economic*

*Opportunities, Asset Management and Insurance* (Oct. 26, 2017), available at: *https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.*

## II. Findings and Certifications

*Environmental Impact*

This ANPR is exclusively concerned with nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), it is categorically excluded from environmental review under the National Environmental Policy Act (42 U.S.C. 4321–4347).

*Regulatory Review—Executive Orders 12866 and 13563*

Executive Order 12866 (Regulatory Planning and Review), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. Executive Order 13563 (Improving Regulations and Regulatory Review) directs executive agencies to analyze regulations that are "outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned. Executive Order 13563 also directs that, where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, agencies are to identify and consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public. This ANPR was reviewed by OMB and determined to likely result in a "significant regulatory action," as defined in section 3(f) of Executive Order 12866.

Dated: June 18, 2018.

**Anna Maria Farías,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2018–13340 Filed 6–18–18; 4:15 pm]

**BILLING CODE 4210–67–P**

---

## DEPARTMENT OF LABOR

## Occupational Safety and Health Administration

### 29 CFR Part 1926

**[Docket ID–OSHA–2007–0066]**

**RIN 1218–AC96**

### Cranes and Derricks in Construction: Operator Qualification

**AGENCY:** Occupational Safety and Health Administration (OSHA), Labor.

**ACTION:** Notice of proposed rulemaking; extension of public comment period.

**SUMMARY:** On May 21, 2018, OSHA published a notice of proposed rulemaking (NPRM) titled "Cranes and Derricks in Construction: Operator Qualification." The period for submitting public comments is being extended by 15 days to allow parties affected by the rule additional time to review the proposed rule and collect information and data necessary for comment.

**DATES:** *Comments:* The comment period for the proposed rule published in the **Federal Register** on May 21, 2018 (83 FR 23534), is extended. Submit comments to the proposed rule, including comments to the information collection requirements (described under the section titled "Agency Determinations"), hearing requests, and other information by July 5, 2018. All submissions must bear a postmark or provide other evidence of the date submitted.

**ADDRESSES:** Submit comments, hearing requests, and other material, identified by Docket No. OSHA–2007–0066, using any of the following methods:

*Electronically:* Submit comments and attachments, as well as hearing requests and other information, electronically at *http://www.regulations.gov,* the Federal e-Rulemaking Portal. This docket may include several **Federal Register** notices for active rulemakings; therefore it is necessary to select the correct notice, or its ID number, to submit comments for this rulemaking. After accessing the docket (OSHA–2007–0066), check the "proposed rule" box in the column headed "Document Type," find the document posted on the date of publication of this document, and click the "Submit a Comment" link. Additional instructions for submitting comments are available on the *http://www.regulations.gov* homepage.

*Facsimile:* OSHA allows facsimile transmission of comments that are ten pages or fewer in length (including attachments). Fax these documents to the OSHA Docket Office at (202) 693–1648. OSHA does not require submission of hard copies of these documents. For additional attachments that supplement comments submitted by facsimile (*e.g.,* studies, journal articles), commenters must submit these attachments to the OSHA Docket Office, Technical Data Center, Room N–3653, OSHA, U.S. Department of Labor, 200 Constitution Ave. NW, Washington, DC 20210. These attachments must clearly identify the sender's name, the date, subject, and the docket number (OSHA–2007–0066).

*Regular mail, express delivery, hand delivery, and messenger (courier) service:* Submit comments and any additional material to the OSHA Docket Office, RIN No. 1218–AC86, Technical Data Center, Room N–3653, OSHA, U.S. Department of Labor, 200 Constitution Ave. NW, Washington, DC 20210; telephone: (202) 693–2350, TTY number: (877) 889–5627. Contact the OSHA Docket Office for information about security procedures concerning delivery of materials by express delivery, hand delivery, and messenger service. The Docket Office will accept deliveries (express delivery, hand delivery, messenger service) during the Docket Office's normal business hours, 10:00 a.m. to 3:00 p.m., ET.

*Information Collection Requirements:* OSHA welcomes comments on the information collection requirements contained in this rule on the same basis as for any other aspect of the rule. Interested parties may also submit comments about the information collection requirements directly to the Office of Information and Regulatory Affairs, Attn: OMB Desk Officer for DOL–OSHA (RIN 1218–AC96), Office of Management and Budget, Room 10235, 725 17th Street NW, Washington, DC 20503, Fax: (202) 395–6881 (this is not a toll-free number), email: *OIRA_submission@omb.eop.gov. See* Paperwork Reduction Act section of this preamble for particular areas of interest.

*Instructions:* All submissions must include the agency's name, the title of the rulemaking (Cranes and Derricks in Construction: Operator Qualification), and the docket number (OSHA–2007–0066). Absent copyright protections or other restrictions, OSHA will place comments and other material, including any personal information, in the public docket without revision, and the comments and other material will be available online at *http://www.regulations.gov.* Therefore, commenters should not submit statements they do not want made available to the public, or submit comments that contain personal information (either about themselves or others) such as Social Security Numbers, birth dates, and medical data.

*Docket:* To read or download comments or other material in the electronic docket, go to *http://www.regulations.gov* or to the OSHA Docket Office at the above address. Some information submitted (*e.g.,* copyrighted material) is not available publicly to read or download through this website. All submissions, including copyrighted material, are available for inspection at the OSHA Docket Office. Contact the OSHA Docket Office for assistance in locating docket submissions.

**FOR FURTHER INFORMATION CONTACT:**

# PUBLIC SUBMISSION

**As of:** October 02, 2020
**Received:** August 19, 2018
**Status:** Posted
**Posted:** August 19, 2018
**Tracking No.** 1k2-94xu-aaz0
**Comments Due:** August 20, 2018
**Submission Type:** Web

**Docket:** HUD-2018-0047
FR-6111-A-01 Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**Comment On:** HUD-2018-0047-0001
FR-6111-A-01 Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**Document:** HUD-2018-0047-0349
Comment Submitted by Robert Gordon, Property Casualty Insurers Association of America

## Submitter Information

**Name:** Robert Gordon
**Address:**
    Chicago,  IL,  60631-3512
**Email:** robert.gordon@pciaa.net
**Organization:** Property Casualty Insurers Association of America

## General Comment

The Property Casualty Insurers Association of America hereby submits the attached comments in response to the Department of Housing and Urban Developments June 20, 2018 Advance Notice of Proposed Rulemaking regarding possible reconsideration of HUDs Fair Housing Act Disparate Impact Rule.

## Attachments

Comment Submitted by Robert Gordon, Property Casualty Insurers Association of America



**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

August 19, 2018

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410

RE: **Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, Docket No. FR-6111-A-01, RIN 2529-ZA01**

The Property Casualty Insurers Association of America ("PCI") appreciates the opportunity to provide comments in response to the Advance Notice of Proposed Rulemaking ("ANPRM") published by the Department of Housing and Urban Development ("HUD") on June 20, 2018[1] regarding possible reconsideration of HUD's Fair Housing Act ("FHA") Disparate Impact Rule.[2] PCI is a trade association that represents nearly 1,000 property and casualty insurance providers and 340 insurance groups. It has the broadest cross section of home, auto, and business insurers of any national property casualty trade association, with large and small member companies in all 50 states. PCI's members write $245 billion in annual premiums and account for 38% of the nation's property and casualty insurance market. PCI and its members have a direct interest in whether the Disparate Impact Rule applies to property and casualty insurance, including homeowners insurance.

In the ANPRM, HUD indicated that it is considering what changes may be necessary to the Disparate Impact Rule in light of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). *See* 83 Fed. Reg. at 28,561. HUD also invited public comment on "other amendments to the Disparate Impact Rule that may be necessary or helpful." *Id.* For the reasons set forth below, and consistent with the recommendation of the Department of the Treasury,[3] PCI strongly urges HUD to reconsider application of the Disparate Impact Rule to property and casualty insurance covered by the FHA, which we will refer to as "homeowners insurance" for purposes of these comments.[4]

---

[1] 83 Fed. Reg. 28,560 (June 20, 2018).

[2] The ANPRM defines the "Disparate Impact Rule" to encompass both HUD's February 15, 2013 final rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard," 78 Fed. Reg. 11,460 (Feb. 15, 2013), and HUD's October 5, 2016 supplemental explanation entitled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("Supplemental Explanation").

[3] *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities Asset Management and Insurance* at 109-110 (Oct. 2017), https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.

[4] We use the term "homeowners insurance" to mean any form of property and casualty insurance the provision of which HUD asserts to be subject to the FHA.

Property Casualty Insurers Association of America

8700 West Bryn Mawr Avenue, Suite 1200S, Chicago, IL 60631-3512
Telephone 847-297-7800

444 N. Capitol Street NW, Suite 801, Washington, D.C., 20001-1508
Telephone 202-639-0490

As explained below, HUD should create an express exemption or safe harbor for homeowners insurance so defined.

The Disparate Impact Rule—promulgated during the prior Administration—purported to "formalize" HUD's position "that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin—"regardless of whether there was an intent to discriminate." 78 Fed. Reg. 11,460, 11,460 (Feb. 15, 2013). Setting aside the merits of applying such a standard generally, it is clear that the Disparate Impact Rule cannot lawfully or reasonably be applied to the provision of homeowners insurance, which is based on purely objective analyses of actuarial risk and is extensively regulated by state insurance laws that—under the McCarran-Ferguson Act—take precedence over generally applicable federal laws such as the FHA. An exemption for homeowners insurance is required for at least four reasons:

**First**, application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act. The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, preserves the historic role of the states in regulating the business of insurance. It prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance." *Id.* § 1012(b). State insurance laws extensively regulate the pricing and underwriting of homeowners insurance. Application of the Rule to homeowners insurance would conflict with state insurance laws in every state. State insurance laws uniformly permit risk-based pricing and underwriting. As a matter of state insurance law, only "unfair discrimination" is prohibited—*risk* discrimination based on actuarial principles is uniformly permitted. "Risk discrimination is not race discrimination." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992). Indeed, almost all state laws expressly *require* the use of risk-based pricing. Moreover, the vast majority of states require insurers to file insurance rates with state regulators for review and/or approval. HUD's Disparate Impact Rule would invalidate, impair, or supersede these laws, and thus contravene McCarran-Ferguson. The Rule would require insurers to defend the actuarial soundness of their practices in federal court, which in and of itself amounts to impermissible federal regulation of the business of insurance. The Rule would also impose liability on any insurer using a valid actuarial risk factor that happens to have a disparate impact if some other, less effective factor could be used. Finally, the Disparate Impact Rule would intrude upon the state rate-setting process.

**Second**, application of the Disparate Impact Rule is fundamentally inconsistent with the business of insurance. Providers of homeowners insurance must be permitted to make pricing and underwriting decisions based on objective considerations of actuarial risk. Absent the ability to engage in actuarial risk segmentation, insurers would be forced to charge the same rates to insureds posing different levels of risk, not only undermining required risk-based pricing, but also creating adverse selection and moral hazard, undermining the availability and affordability of insurance, and potentially leading to the collapse of market segments. HUD's Disparate Impact Rule threatens to cause precisely these problems because it requires insurers to abandon actuarially sound methods in favor of substitutes that are less effective at furthering the businesses' legitimate, nondiscriminatory interests.

**Third,** application of the Disparate Impact Rule to homeowners insurance would contravene the limits imposed by the Supreme Court in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). The Court made clear in *Inclusive Communities* that disparate-impact liability under the FHA cannot be imposed based on effects the defendant did not cause, cannot be applied in a manner that requires the pervasive consideration of race, and cannot be applied in a way that would interfere with, or require courts to second-guess, legitimate business choices. As applied to the homeowners insurance industry, which depends on objective, actuarially-based underwriting and ratemaking processes, the Rule would violate each of the limits identified in *Inclusive Communities*.

**Finally**, application of the Disparate Impact Rule to homeowners insurance would violate the filed-rate doctrine. In most states, insurance rates are subject to review and approval by state regulators. The filed-rate doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). The doctrine applies to claims alleging disparate impact caused by insurance rates. *See, e.g., Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307 (Minn. 2006). The Disparate Impact Rule, however, would do precisely what the doctrine forbids by calling on courts to hold filed rates invalid.

For all of these reasons, as explained in detail below, HUD should modify the Disparate Impact Rule to exempt homeowners insurance.

PCI's comments are broken into four sections. Section I provides the relevant background regarding homeowners insurance, state insurance law, the McCarran- Ferguson Act, the FHA and the Disparate Impact Rule, PCI's lawsuit challenging the Rule, the Supreme Court's decision in *Inclusive Communities*, and subsequent proceedings before HUD regarding the Rule. Section II explains in detail why the Disparate Impact Rule cannot lawfully or reasonably be applied to homeowners insurance and why HUD can and should expressly exempt homeowners insurance from disparate-impact liability under the FHA. Section III responds to the list of six specific questions posed by HUD in the ANPRM. *See* 83 Fed. Reg. at 28,561. Section IV concludes the comments with PCI's request that HUD exempt homeowners insurance from disparate-impact liability under the FHA.

## I.     BACKGROUND

### A.     The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by fire, the insurer will pay to repair her home. Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions—that is, decisions about whether to insure and how to price a particular risk or class of risk. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial

implications. Actuaries examine numerous factors that correlate with losses. *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham*, Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to the home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard. Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* A.R. 376, *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014) (ECF No. 19); ECF No. 44-2 ¶ 6, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect information on race or ethnicity); ECF No. 44-3 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 ¶ 7, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers. *See NAACP*, 978 F.2d at 290; Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on objective, predictive, and permitted risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards. *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law— A Primer*, 19 Conn. Ins. L.J. 29, 44 (2012). Such a pricing scheme would greatly reduce the financial incentive for customers to reduce risks, construct safer houses, and maintain existing houses. Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L. J.at 66-67. It would also lead to overconsumption of risk, such as increased building in environmentally sensitive areas.

## B.    State Regulation of Insurance

The states have traditionally regulated the insurance industry, from the pricing and underwriting of insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constitutes interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to ensure that the ruling would not undermine the states' long-standing regulation of insurance.

Today, "[s]tate regulation of insurance is comprehensive and includes rate and coverage issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999). Several features of state insurance regulation are relevant here:

First, state insurance law affirmatively permits risk-based pricing and underwriting. Insurance law generally prohibits insurers from charging "excessive, inadequate, or unfairly discriminatory rates." As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."[5] For purposes of state insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted). For example, Wisconsin law provides that "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Other state laws include similar provisions. *See infra* p. 12-13. Many states prohibit unfair discrimination not just in statutes addressing rating but also in unfair trade practice laws governing insurance generally. As a matter of state insurance law, discrimination on the basis of risk is uniformly permitted.

Second, the vast majority of states not only permit risk-based pricing but expressly require it. State laws make clear that failing to take risk into account results in unfair discrimination. They also mandate that insurers consider past losses and other actuarially relevant factors in developing insurance rates. For example, the Indiana Code provides that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Other states have similar laws. *See infra* p. 13.

Third, state insurance commissioners review the rates charged by insurers to protect consumers. The vast majority of states require insurers to file insurance rates with state regulators for review and/or approval. *See, e.g.*, Ind. Code Ann. § 27-1-22-4(a) ("Every insurer shall file with the commissioner every manual of classifications, rules, and rates, every rating schedule, every rating plan, and every modification of any of the foregoing which it proposes to use."); Wis. Stat. Ann. § 625.13(1) ("[E]very authorized insurer and every rate service organization licensed under s. 625.31 which has been designated by any insurer for the filing of rates under s. 625.15(2) shall file with the commissioner all rates and supplementary rate information and all changes and amendments thereof made by it for use in this state within 30 days after they become effective."). State regulators carefully review insurance rates—often with their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13; *see also infra* p. 16.

### C.     The McCarran-Ferguson Act

In the McCarran-Ferguson Act, Congress expressly stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C.

---

[5] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4, https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

§ 1011.  Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application … [would] frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance.  *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

### D.       The Fair Housing Act and the Disparate Impact Rule

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).  The FHA does not specifically relate to the business of insurance and thus is displaced by state laws regulating insurance, pursuant to McCarran-Ferguson, in the event of a conflict or interference with state law.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011).  In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  *Id.* at 70,921.  The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  *Id.* at 70,924.

Representatives of the insurance industry submitted comments explaining why disparate-impact liability cannot lawfully be applied to homeowners insurance.  The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways.  For instance, the Rule would prohibit conduct that state law requires or authorizes.  The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, application of disparate-impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.  Finally, commenters noted that application of the Rule to homeowners insurance would violate the "filed-rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities.

HUD promulgated its final Disparate Impact Rule on February 15, 2013.  78 Fed. Reg. 11,460 (Feb. 15, 2013).  The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013).  It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

The Rule provides that disparate impact litigation under the FHA should proceed under a burden-shifting framework that could impose liability on defendants for maintaining legitimate business practices that incidentally produce discriminatory effects. Under that framework, a plaintiff must first demonstrate that a housing-related practice has a disparate effect on a protected class, regardless of whether there is any discriminatory motive for the practice. 24 C.F.R. § 100.500(c)(1). The defendant must then show that the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Notwithstanding such a showing, the defendant may still be found liable if the plaintiff establishes "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). The alternative identified by the plaintiff need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. Thus, compliance with the Disparate Impact Rule may require businesses to abandon sound, good-faith methods in favor of substitutes that are less effective at furthering the businesses' legitimate, nondiscriminatory interests.

Notwithstanding the insurance industry's comments, the final Rule did not exempt homeowners insurance or meaningfully address whether extension of disparate-impact liability to homeowners insurance would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. The final Rule's preamble merely asserted (without any support) that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude *HUD* from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs *courts* on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11,475 (emphasis added). HUD thus did not consider whether the Rule conflicts with state laws and policies permitting and requiring risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that application of disparate-impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of actuarial risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11,475 (quoting a comment). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-based pricing and underwriting. HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."). HUD thus acknowledged the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of actuarial risk factors in fact is a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *See id.* at 11,475.

E.     **The Litigation Brought by PCI**

On November 27, 2013, PCI filed an Administrative Procedure Act challenge to HUD's decision to apply the Disparate Impact Rule to homeowners insurance. *See Property Casualty Insurers Association of America v. Carson*, No. 13-8564 (N.D. Ill.). On September 3, 2014, the court granted PCI's motion for summary judgment in part, concluding that HUD's explanation

was arbitrary and capricious in several respects. *See Prop. Cas. Ins. Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-52 (N.D. Ill. 2014) ("*PCI*").

The court rejected HUD's contention that it could disregard the McCarran-Ferguson Act entirely. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking. *PCI*, 66 F. Supp. 3d at 1048. The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048. The court noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049. The court also determined that HUD had inadequately examined whether the filed-rate doctrine would bar application of the Rule. *Id.* at 1050. Finally, the court concluded that HUD had made "no effort to evaluate" the substance of the homeowners insurance industry's argument that the Rule would prevent the use of actuarially sound risk factors and thereby undermine the fundamental nature of the insurance business. *Id.* at 1051. Accordingly, the court remanded to HUD for further explanation of these issues.

### F.   PCI's Post-Remand Comments

In September 2014, PCI informed HUD that it intended to submit additional comments addressing the issues that the District Court had instructed HUD to consider on remand. *See* Letter from PCI to HUD, at 1 (Sept. 25, 2014) (A.R.4416). PCI then submitted comments further explaining how the Disparate Impact Rule would invalidate, impair, or supersede states' regulation of insurance and distort the homeowners insurance market. *See* Letter from PCI to HUD (Jan. 26, 2015) (A.R. 4496-4513). PCI emphasized that the Rule's burden-shifting process would impose liability on homeowners insurers for providing and pricing insurance using actuarially sound methods. *Id.* at 8 (A.R. 4503). PCI explained that prohibiting those methods would violate the McCarran-Ferguson Act and the filed-rate doctrine, as well as harm the homeowners insurance industry. *See id.* at 9-18 (A.R. 4504-4513). PCI's comment also alerted HUD to the importance of the Supreme Court's upcoming consideration of the *Inclusive Communities* case. *See id.* at 5-6 (A.R. 4500-4501).[6]

### G.   The Supreme Court's Decision in *Inclusive Communities*

On June 25, 2015, the Supreme Court issued its decision in *Inclusive Communities*. *See* 135 S. Ct. 2507. In that decision, the Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" *Id.* at 2524 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." *Id.* at

---

[6] PCI hereby incorporates by reference its September 25, 2014 and January 26, 2015 letters submitted to HUD. They are attached hereto as Exhibits 1 and 2.

2522. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 2523.

The first of those safeguards is "[a] robust causality requirement." 135 S. Ct. at 2523. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). Referring approvingly to the opinion below of Fifth Circuit Judge Edith Jones, the Court held up as paradigmatic cases of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 2524.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policies." 135 S. Ct. at 2522. Businesses, the Court also stated, "must be given latitude to consider market factors." *Id.* at 2523.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." 135 S. Ct. at 2523. "[I]nterpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## H. PCI's Post-*Inclusive Communities* Comment

Shortly after the Supreme Court issued its decision in *Inclusive Communities*, PCI submitted comments explaining that HUD must consider the Supreme Court's newly articulated limitations on disparate-impact liability. *See* Letter from PCI to HUD (July 29, 2015) (A.R. 4615-4621).[7] PCI emphasized that *Inclusive Communities* prohibited application of the Rule to legitimate business practices, including risk-based homeowners insurance practices. *See id.* at 5-7 (A.R. 4619-4621).

## I. HUD's Supplemental Explanation

On October 5, 2016, HUD published its Supplemental Explanation. *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016). The Supplemental Explanation rejected insurers' request for an exemption from the Disparate Impact Rule, concluding that insurers' concerns "can and should be addressed on a case-by-case basis." *Id.* HUD's only response to insurers' showing that the McCarran-Ferguson Act requires an exemption for risk-based pricing and underwriting was to argue that insurers could defend their practices in court under the Rule's burden-shifting framework. *See id.* at 69,015, 69,017. Notably, HUD did not dispute that state law uniformly permits and often

---

[7] PCI also incorporates this letter by reference. It is attached hereto as Exhibit 3.

requires insurers to consider actuarial risk factors. *See id.* at 69,015. In fact, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice.*" Id.* Even more significantly, HUD conceded that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.* HUD's sole rationale for denying an exemption for the use of actuarial risk factors was that insurers can later justify using such factors on a case-by-case basis under the Rule's burden-shifting framework. *See id.*

### J.     PCI's Renewed Legal Challenge

Following HUD's Supplemental Explanation, PCI promptly sought leave to file an amended complaint to challenge that explanation. The District Court granted leave, and on June 27, 2017, PCI filed its First Amended Complaint challenging HUD's application of the Disparate Impact Rule to homeowners insurance, including HUD's reasoning set forth in its Supplemental Explanation. *See* ECF No. 131. On September 8, 2017, PCI filed a motion for summary judgment explaining the numerous ways in which HUD's Supplemental Explanation remained arbitrary and capricious. *See* ECF Nos. 136 & 137. HUD sought an extension of time for its response, and the parties subsequently agreed to stay the litigation, ultimately agreeing to a continued stay of the case in light of HUD's publication of the ANPRM on June 20, 2018. *See* ECF No. 159. Per the parties' agreement, the case is currently stayed until October 19, 2018, at which time the parties shall file a joint status report. *See* ECF No. 160.

## II.    HUD SHOULD EXEMPT HOMEOWNERS INSURANCE FROM DISPARATE-IMPACT LIABILITY UNDER THE FHA

As explained below, application of the Disparate Impact Rule to homeowners insurance would (A) violate the McCarran-Ferguson Act; (B) undermine the fundamental nature of the business of insurance; (C) contravene the limits imposed by the Supreme Court in *Inclusive Communities*; and (D) violate the filed-rate doctrine. Accordingly, HUD should adopt an express exemption for homeowners insurance.

### A.     Application of the Disparate Impact Rule to Homeowners Insurance Would Violate the McCarran-Ferguson Act

HUD must provide an exemption for homeowners insurance because application of the Disparate Impact Rule to homeowners insurance would invalidate, impair, or supersede state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI*, 66 F. Supp. 3d at 1048. It concluded that HUD had acted arbitrarily and capriciously because "it [had] made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) improperly requiring federal courts to determine whether challenged insurance practices are actuarially sound, (ii) conflicting with state

laws permitting or requiring insurers to engage in risk-based pricing and underwriting; and (iii) impairing state laws and regulations providing for state administrative review of insurance rates.

## 1. The Rule Would Improperly Require Federal Courts To Determine Whether Challenged Practices Are Actuarially Sound

The McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Mutual of Omaha*, 179 F.3d at 564 (McCarran-Ferguson prohibits the federal courts from "regulating the … insurance industry" via litigation). In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.* Indeed, the district court in the *PCI* case observed that "*Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." 66 F. Supp. 3d at 1039; *see also id.* at 1028-29 (describing *Mutual of Omaha*). The court specifically rejected the argument previously made by HUD that the relevant language in *Mutual of Omaha* was dicta. *See id.* at 1039 n.6 ("*Mutual of Omaha* is binding on this Court.").

HUD's Disparate Impact Rule would similarly force federal courts to second-guess the actuarial soundness of particular state-regulated insurance practices. Under the Rule, in order to avoid liability, insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that a "challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of a particular risk factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice, in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*." 66 F. Supp. 3d at 1048. Despite the court's emphasis on *Mutual of Omaha*, HUD's Supplemental Explanation made no effort to address the decision's key holding. It mentioned *Mutual of Omaha* only once, and it did so simply to support the uncontroversial point that the McCarran-Ferguson Act bars application of disparate-impact liability only when it would conflict with state law. *See* 81 Fed. Reg. at 69,015. HUD never addressed the clear holding of *Mutual of Omaha* that the *PCI* court noted and found applicable here: that the McCarran-Ferguson

Act prohibits a federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564.

<strong>2.     The Rule Would Conflict with State Laws Permitting or Requiring<br>Insurers To Engage in Risk-Based Pricing and Underwriting</strong>

State insurance law uniformly permits insurers to rely on actuarial risk factors in setting rates and making underwriting decisions. Under state insurance law, only "unfair discrimination" is prohibited. Unfair discrimination occurs only when insureds posing similar risks are treated differently. Differential treatment of insureds posing different risks is uniformly allowed. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). As another example, Arizona laws specifies:

> A rate is not unfairly discriminatory in relation to another in the same class if it reflects equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, if the rates reflect the differences with reasonable accuracy.

Ariz. Rev. Stat. Ann. § 20-383(D); *see also, e.g.*, Colo. Rev. Stat. § 10-4-403(1)(c); Mich. Comp. Laws Ann. § 500.2403(1)(d); Minn. Stat. Ann. § 70A.04(4); Mo. Ann. Stat. § 379.318(4); Nev. Rev. Stat. Ann. § 686B.050(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); N.M. Stat. Ann. § 59A-17-6(E); N.C. Gen. Stat. Ann. § 58-40-20(e); Tenn. Code Ann. § 56-5-103(a), (d). *See generally* Table I (attached).

The principle that only "unfair" discrimination is prohibited is enshrined in both state insurance rating laws (like those quoted above) and state insurance unfair practices laws, which address both the pricing and provision of insurance more generally. *See* Table I (attached); *see, e.g.*, Iowa Code Ann. § 507B.4(3)(g) (specifying that it is an unfair trade practice to "[m]ak[e] or permit[] any unfair discrimination between insureds of the same class for essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance other than life or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.").

In addition, numerous states expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). For example, under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference

among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209(b); Colo. Rev. Stat. § 10-4-403(4); 18 Del. Code § 2503(5); Md. Code Ann., Ins. § 11-205(f); Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2) Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I (attached).[8]

As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g.*, *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Moreover, the vast majority of states *require* insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I (attached)*; see also PCI*, 66 F. Supp. 3d at 1039 (noting that "some states require insurers to use risk-based pricing" and that others "merely permit risk-based pricing"). Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5(3); N.J. Stat. Ann. § 17:29A-4(c); N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03(C); S.C. Code Ann. § 38-73-430(1); Tenn. Code Ann. § 56-5-104(1); Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I (attached).

Indeed, as noted above, state insurance laws also make clear that failure to account for differences in actuarially-expected losses constitutes prohibited "unfair discrimination." For

---

[8] PCI's identification of the specific state laws at issue distinguishes this case from *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003). *But see* 81 Fed. Reg. at 69,015, 69,018 (continuing to rely on *Dehoyos*).

example, Utah law provides that "[a] rate is unfairly discriminatory if price differentials fail to equitably reflect the differences in expected losses and expenses after allowing for practical limitations." Utah Code Ann. § 31A-19a-201(4)(a); *see also, e.g.*, Ariz. Rev. Stat. Ann. § 20-383(D); Colo. Rev. Stat. § 10-4-403(1)(c); Mich. Comp. Laws Ann. § 500.2403(1)(d); Minn. Stat. Ann. § 70A.04(4); Mo. Ann. Stat. § 379.318(4); Nev. Rev. Stat. Ann. § 686B.050(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); N.M. Stat. Ann. § 59A-17-6(E); N.C. Gen. Stat. Ann. § 58-40-20(e); Tenn. Code Ann. § 56-5-103(a), (d).

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1557 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal … laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted or even required by state law.

In compliance with state insurance laws, insurers charge different rates to different customers and make underwriting decisions based on actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks or risk-based underwriting practices would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of the vast majority of the states. The McCarran-Ferguson Act ensures that federal laws of general applicability do not "'invalidate, impair, or supersede' [a] State's law." *Humana*, 525 U.S. at 307. To invalidate means "to render ineffective," and to supersede is "to displace (and thus render ineffective) while providing a substitute rule." *Id.* (internal quotation marks omitted). Application of the Disparate Impact Rule to insurers would "invalidate, impair, or supersede" state law and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly permitted or required by state law. *Id.* at 310.

Moreover, under the Rule, insurers can be held liable for using actuarially sound risk factors in any case where a plaintiff can identify an alternative factor that would merely "serve the defendant's legitimate business interests." *PCI*, 66 F. Supp. 3d at 1052; *see* 24 C.F.R. § 100.500(c)(3). In its rulemaking, HUD declined to require that the alternative practice be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. The Rule would thus make homeowners insurers liable for risk-based pricing and underwriting practices they are permitted or required to use as a matter of state law. As explained above, states permit insurers to discriminate between risk pools, prohibiting only "unfairly discriminatory" rates—that is, rates that discriminate between insureds posing the same risk. But the Rule effectively prohibits distinctions based on actuarial risk, requiring courts to determine whether less predictive alternative factors

14

would have less of a disparate impact than challenged factors. This displaces states' prohibition of only "unfairly" discriminatory rates with a different federal standard under the FHA. At a minimum, it "impair[s]" state laws. *Humana,* 525 U.S. at 309-310. Application of the Rule to risk-based pricing and underwriting permitted or required as a matter of state law would not only directly conflict with state law but also "frustrate … declared state policy" and "interfere with a State's administrative regime." *Id.* at 310.

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *Humana*, 525 U.S. at 311; *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But, as explained above, far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would require federal courts to evaluate the actuarial soundness of challenged practices and would permit insurers to be held liable for use of actuarially sound practices.

In its Supplemental Explanation, HUD also argued that an exemption for homeowners insurance is inappropriate in light of certain state anti-discrimination laws that may apply to insurance. 81 Fed. Reg. at 69,016. HUD reasoned that such an exemption would "deprive all states of federal support in addressing discriminatory insurance practices" and asserted that an exemption would therefore "be at odds with the purpose of [the] McCarran-Ferguson [Act]." *Id.* This reasoning is arbitrary and capricious. The McCarran-Ferguson Act is not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "*for the purpose of regulating the business of insurance*." 15 U.S.C. § 1012(b) (emphasis added). State antidiscrimination laws—which states may enforce themselves, if appropriate—are not enacted "for the purpose of regulating the business of insurance" and thus have no bearing on whether application of the Disparate Impact Rule to risk-based pricing and underwriting would violate the McCarran-Ferguson Act.

Even if a state's fair-housing law were identical to the FHA and would permit a disparate impact challenge to risk-based pricing and underwriting in state court, any federal litigation under HUD's Disparate Impact Rule would still require federal courts applying federal law to second-guess the actuarial soundness of insurance practices regulated by state law—contrary to the express holding of *Mutual of Omaha. See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with state law—obviously would interfere with the administration of the state law."). HUD's reliance on snippets of discussion from out-of-circuit district court decisions and a state court decision, none of which addressed these issues,[9] provided

---

[9] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

no basis for disregarding the plain text of the McCarran-Ferguson Act and the Seventh Circuit's controlling decision in *Mutual of Omaha*. In sum, HUD cannot rely on state antidiscrimination laws to overlook the clear conflict between the Disparate Impact Rule and state insurance laws permitting risk-based pricing and underwriting.

HUD also asserted in passing in the Supplemental Explanation that "McCarran-Ferguson requires a fact-intensive inquiry." 81 Fed. Reg. at 69,016. But HUD offered no support for the proposition. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of actuarial risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting. HUD relied on *Saunders v. Farmers Insurance Exchange (Saunders I)*, 440 F.3d 940, 946 (8th Cir. 2006). But that court, reviewing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, merely held that "the nature of plaintiffs' price discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case returned to the Eighth Circuit and it was clear that the plaintiffs were relying on a disparate-impact theory, the court noted that "HUD has never applied a disparate impact analysis to insurers," *Saunders v. Farmers Ins. Exch. (Saunders II)*, 537 F.3d 961, 964 n.3 (8th Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)), and that there was "doubt" as to whether it could, *id.* at 964. The court ultimately held that the plaintiffs' FHA challenge was foreclosed by the McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's administrative regime. *Id.* at 968. This hardly counsels against a categorical exemption for the use of actuarial risk factors.

### 3. The Rule Would Conflict with State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—48 of 50, plus the District of Columbia— require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I (attached). Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05(b).

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate

review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g.*, *Saunders II*, 537 F.3d at 968 ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is not permitted under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

\* \* \*

For all of these reasons, application of the Disparate Impact Rule to homeowners insurance would "invalidate, impair, or supersede" state laws governing insurance in every state. Accordingly, application of the Rule to homeowners insurance would violate the McCarran-Ferguson Act. For that reason alone, HUD should grant an exemption for homeowners insurance.[10]

## B.    Application of the Disparate Impact Rule Is Fundamentally Inconsistent with the Business of Insurance

The Disparate Impact Rule conflicts with the fundamental, risk-based nature of homeowners insurance. In exchange for assuming a customer's risk, the insurer charges a rate derived from the likelihood and amount of potential losses. *See, e.g.*, 1 Steven Plitt et al., Couch

---

[10] In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70,924. HUD later indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. 81 Fed. Reg. at 69,017. HUD should exempt all homeowners insurance practices, not just pricing and underwriting. The relevant provisions of the FHA should not be construed to apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership—the relevant activity protected by the FHA. As the Seventh Circuit has explained, 42 U.S.C. § 3604 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP*, 978 F.2d at 301. The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." The section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

on Insurance § 1:6 (3d ed. 2013).[11]  Insurers also estimate their loss potential when determining whether to underwrite a particular type of hazard.  *See, e.g.*, *id.* § 1:2.  As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk."  A.R. at 376.  The essence of risk-based insurance practices is "identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly."  A.R. at 376.

Actuaries calculate the amount and probability of loss by reviewing objective risk factors. *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates,* Casualty Actuarial Society E-Forum at 284; Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. at 414.  As noted above, with respect to homeowners insurance, such factors may include, among others, the materials used to build a house, the house's proximity to fire hydrants, the presence of a security system in the house, the presence of a trampoline in the yard, and the history of losses associated with the house or similar units.  Quantifying the impact of any risk factor is a purely mathematical and unbiased statistical exercise.  Far from the "artificial, arbitrary, and unnecessary" practices that may incur liability under the FHA under *Inclusive Communities*, 135 S. Ct. at 2524, the actuarial assessment of risk is designed to precisely identify "the expected value of all future costs associated with an individual risk transfer."[12]  Insurers and actuaries do not consider the race of customers or potential customers, or any other protected characteristic, at any point during ratemaking, underwriting, or any other business operation.[13]

But despite the neutrality of insurance practices with respect to all protected characteristics, the Disparate Impact Rule could penalize insurers for relying on actuarially sound factors if they happened to disproportionately affect a protected class.[14]  In addition to improperly holding defendants "liable for racial disparities they did not create," *Inclusive Communities*, 135 S. Ct. at 2523 (*quoting Wards Cove*, 490 U.S. at 653)—as discussed below—this would irreparably distort the market for homeowners insurance.  Tying rates to risk factors ensures that prices accurately reflect an insurer's costs of covering particular classes of risk for particularly situated customers. Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.  Removing risk factors from the ratemaking calculus could make it prohibitively expensive to insure high-risk properties, perhaps eliminating coverage across the market.  It would also cause adverse selection, as customers with a low risk of loss would be charged more than necessary to cover their risk.  *See* Letter from PCI to HUD, at 2 (Jan. 26, 2015) (A.R. 4497) ("Lower-risk customers would be overcharged for

---

[11] Other factors that affect the provision and pricing of homeowners insurance include policy limits, deductibles, and the insurer's costs of doing business.  *Id.*

[12] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4, https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

[13] *See* ECF No. 44-2 at ¶ 6 (insurer does not collect information on race or ethnicity); ECF No. 44-3 at ¶ 11 (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 at ¶ 11 (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 at ¶ 7 (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

[14] Scholars have predicted that "protected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications."  Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284.

insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards."). As the Seventh Circuit has explained,

> Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*NAACP*, 978 F.2d at 290.

The Disparate Impact Rule's effects on homeowners insurance pricing would also generate negative externalities beyond the insurance market. Risk-based insurance pricing encourages safer practices. For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials. Eliminating risk factors from the pricing model could reduce such expedient disincentives. *See, e.g.*, Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. at 66-67. Disallowing risk-based pricing inherently creates cross-subsidies from low-risk activities to high-risk activities, with the resulting unfairly discriminatory prices creating moral hazards and forcing more low-risk activities and consumers out of the market.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11,475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. 66 F. Supp. 3d at 1051. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Despite the district court's holding, HUD's Supplemental Explanation continued to rely on the ability of insurers to defend their practices in litigation under the Rule. *See* 81 Fed. Reg. at 69,017. But as explained above, HUD has indicated that a purportedly less discriminatory alternative need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. HUD has thus made clear that under the Disparate Impact Rule, disparate-impact liability does, in

fact, extend to purely risk-based practices as long as there exists some other practice that produces less of a disparate impact, even if it is not "equally effective" as the challenged practice. Any replacement risk factor would necessarily correspond to a different risk than the one identified as relevant by sound actuarial methods. As a result, the original risk of loss would still exist, and it would not be correctly reflected in the price of insurance. *See* ECF No. 44-4 ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans"). This would result in overcharging customers with a low risk of loss and likely driving many of them out of the market. The third step of the burden-shifting framework is accordingly a perfect example of the hazards of allowing plaintiffs to "second-guess which of two reasonable approaches" a defendant should adopt. *Inclusive Communities*, 135 S. Ct. at 2522.

Moreover, the fact that actuarially sound homeowners insurance practices could withstand challenges under the Disparate Impact Rule's burden-shifting framework does not remove the need for an express exemption. Forcing insurers to defend the use of potentially any risk factor in court would needlessly raise costs for the industry and waste judicial resources. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 375 (6th Cir. 2007) ("[I]f no disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate impact challenges to that practice.").

For all of these reasons, the Disparate Impact Rule would fundamentally alter the business of insurance if applied to homeowners insurance.

## C. Application of the Disparate Impact Rule to Homeowners Insurance Would Contravene the Limitations Imposed in *Inclusive Communities*

Applying the Disparate Impact Rule to homeowners insurance would also run afoul of the limitations on disparate-impact liability articulated by the Supreme Court in the *Inclusive Communities* case. Although the Supreme Court in *Inclusive Communities* recognized that disparate-impact claims are cognizable under the FHA, the Court emphasized that they "must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Inclusive Cmtys.*, 135 S. Ct. at 2518. Only "artificial, arbitrary, and unnecessary" practices that are causally linked to a racial imbalance by robust evidence, beyond a mere correlation, may be subject to liability. *Id.* at 2522-24. These requirements ensure that defendants are not "held liable for racial disparities they did not create." *Id.* at 2523 (citing *Wards Cove*, 490 U.S. at 653). Moreover, the Court indicated that when a defendant articulates a "valid interest served by their policies," the plaintiff should not be allowed to "second-guess which of two reasonable approaches" a defendant should follow. *Id.* at 2522. The Court also cautioned against any disparate-impact framework that did not have "adequate safeguards at the prima facie stage" to prevent the use of race "in a pervasive way" or the injection of "racial considerations into every housing decision." *Id.* at 2523-24. The Court recognized that the absence of such safeguards would tend to "perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. And fundamentally, the Court expressed concern that the "specter of disparate-impact litigation" could discourage businesses from undertaking activities essential to a well-functioning housing market. *Id.* at 2524.

Applied to homeowners insurers, the Disparate Impact Rule reaches far beyond these limits. As explained above, insurers make pricing and underwriting decisions based on demonstrable risk factors—that is, based on objective, actuarially sound data about the likelihood and value of their customers' potential losses. This practice is not merely "practical." *Inclusive Cmtys.*, 135 S. Ct. at 2518. It is necessary for sustaining a viable homeowners insurance market. Homeowners insurers do not consider, nor generally have, data regarding their customers' protected characteristics, and the fact that some risk factors may correlate to a disparity caused by other socioeconomic conditions outside the insurers' control does not satisfy the "robust causality requirement" *Inclusive Communities* demands. *See* 135 S. Ct. at 2523. Yet the Disparate Impact Rule would subject homeowners insurers to liability for such imbalances that their legitimate, fundamental business practices "did not create." *Id.* at 2523. As long as plaintiffs could show that risk-based pricing or underwriting resulted in slightly different rates or coverage, on average, for members of different protected classes, they would arguably satisfy their prima facie burden. Indeed, HUD rejected a requirement that a disparate impact must be significant. 78 Fed. Reg. at 11,468.

Moreover, in describing the causality requirement, the Court identified as a quintessential example of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." 135 S. Ct. at 2524. That is precisely the circumstance in which companies offering homeowners insurance find themselves. Application of disparate-impact liability under the FHA to homeowners insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id.* at 2523. As explained above, companies offering homeowners insurance are regulated by a panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance, expressly delineating and permitting the use of such methods, and requiring the filing of homeowners insurance rates with state administrative bodies for approval. *See supra* p. 16. Those state laws mandate or expressly permit homeowners insurers to use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates for various risk classifications. They thus "substantially limit" the discretion of homeowners insurance companies in a manner that would make it impossible to ascribe any disparate effects of the companies' underwriting or pricing practices to their independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the sort of "double bind of liability" the Court warned against. That is also just what the McCarran-Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be limited in a way that gives "latitude to consider market factors" also reinforces PCI's contention that disparate-impact liability should not be permitted against homeowners insurers. 135 S. Ct. at 2523. As PCI has explained, insurance markets run efficiently when insurance is priced in accord with actuarially sound, risk-based factors. *See supra* at pp. 17-18. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation. The extensive state-law framework governing the pricing of homeowners insurance is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage

businesses from undertaking the very activities that ensure a well-functioning housing market and in particular actuarially sound, risk-based pricing. 135 S. Ct. at 2524. Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id*. Under the McCarran Ferguson Act, regulation of the market for homeowners insurance is reserved to the states. Exempting homeowners insurance from disparate-impact claims is necessary to ensure that the threat of disparate-impact litigation does not impair states' legal regimes governing the pricing of homeowners' insurance or hinder the efficient operation of insurance market in accord with those state-law regimes.

Moreover, even after insurers successfully defend the legitimacy of actuarial practices at the second step of HUD's burden-shifting process, the Disparate Impact Rule would still penalize them if plaintiffs identified a less effective practice that produced less of a disparate effect. Contrary to *Inclusive Communities*, this would essentially allow plaintiffs to "second-guess" and uproot insurers' sound business practices. Under the Rule, an insurer can be compelled to adopt a less effective alternative as long as it merely "serve[s]" the same interest as the challenged policy. 24 C.F.R. § 100.500(c)(3).

Finally, the Supreme Court's caution that the FHA should not be interpreted to promote the use of racial (or other suspect) classifications supports each of PCI's arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," the Court explained, would perversely "tend to perpetuate race-based considerations rather than move beyond them." 135 S. Ct. at 2524. But that is just what extending disparate-impact liability to homeowners insurers would do. State law ensures that homeowners insurers price their products in accordance with risk-based, actuarially sound factors. State law does not permit reliance on, and homeowners insurers do not rely on, prohibited classifications in pricing their products. Yet, the failure to exempt homeowners insurers from disparate-impact liability would effectively require them to collect and analyze sensitive data on the protected characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts. Exempting homeowners insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners insurers would, contrary to the teachings of *Inclusive Communities*, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners insurance by imposing significant and needless costs on providers of homeowners insurance and their customers.

For all of these reasons, application of the Disparate Impact Rule to insurance would run afoul of the limitations imposed by the Court in *Inclusive Communities*.

### D.     Application of the Disparate Impact Rule to Homeowners Insurance Would Violate the Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara*

*Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986); *PCI,* 66 F. Supp. 3d at 1049. The doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).[15]

The doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g.*, *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F3d 229, 236-39, 242 (3d Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013); *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005) , *aff'd*, 721 N.W.2d 307 (Minn. 2006); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*, No. 3375, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000); *see also, e.g.*, Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates); *McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-CV-W, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

The district court in *PCI* found that HUD initially had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. *PCI,* 66 F. Supp. 3d at 1050. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* In its Supplemental Explanation, HUD did address the filed-rate doctrine. It did not dispute that the doctrine applies to insurance rates filed with state insurance commissions. Instead, HUD argued first that the filed-rate doctrine does not apply to FHA claims because they "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effects." 81 Fed. Reg. at 69,018 (quoting *Lumpkin, v. Farmers Grp., Inc.*, No. 05-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)). This argument fails for multiple reasons. An FHA claim that an insured is being charged more because of the insured's race seeks to "invalidat[e]" the rate charged and thus squarely implicates the filed-rate doctrine. *Schilke*, 820 F. Supp. 2d at 835. A claimed discriminatory effect would occur through disparate rates, and it is difficult to imagine how the Rule could remedy such an effect other than by causing insurers to change their rates. Moreover, a court resolving an FHA claim under the Rule would, in fact, have to consider the reasonableness of the challenged rate at step two of the burden-shifting framework. In any event, it is well established that the filed-rate doctrine bars claims that do more than simply challenge the "reasonableness" of rates.[16]

---

[15] The extent or the vigor of the agency's review of filed rates does not matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

[16] *See, e.g., Square D. Co.*, 476 U.S. at 415 & n.17 (filed-rate doctrine barred recovery of treble damages under

HUD also argued that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes." 81 Fed. Reg. at 69,018 (quoting *Saunders I*, 440 F.3d at 944). But HUD's position and the *Saunders* decision on which HUD relied are inconsistent with the weight of the case law holding that the filed-rate doctrine does bar challenges under *federal* laws to rates filed with *state* agencies. *See, e.g., Wegoland*, 27 F.3d at 20 (finding RICO claim barred, noting "courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies"); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (filed-rate doctrine "applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one").[17] This is all the more clear in a case involving state regulation of insurance, where the McCarran-Ferguson Act "overturn[s] the normal rules of pre-emption." *PCI*, 66 F. Supp. 3d at 1025.

At bottom, applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Wegoland*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted).

*        *        *

For all of these reasons, the Disparate Impact Rule cannot and should not be applied to homeowners insurance. Applying the Rule to homeowners insurance runs afoul of the McCarran-Ferguson Act—a critical consideration that a federal court has previously faulted HUD for failing adequately to address. It also significantly interferes with the business of insurance, which requires consideration of actuarial risk. Application of the Rule to homeowners insurance flouts the important limitations on disparate-impact liability laid out by the Supreme Court in *Inclusive Communities*. Finally, the filed-rate doctrine bars application of the Rule to homeowners insurance.

Notwithstanding all these legal impediments, HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475. But HUD has never explained how compliance with a federal statute—the McCarran-Ferguson Act—would be contrary to congressional intent. Nor has it explained how arbitrarily and capriciously applying the Rule to the business of providing homeowners insurance, disregarding limitations imposed by the Supreme Court, or violating the filed-rate doctrine would further congressional intent. HUD based its assertion that it could not grant an exemption entirely

---

antitrust laws even though antitrust claims do not challenge reasonableness of rates but rather method by which they were adopted); *Schilke*, 820 F. Supp. 2d at 836 (filed-rate doctrine foreclosed claims based on failure to disclose aspects of rates); *McCray*, 682 F.3d at 235-42 (filed-rate doctrine barred antitrust challenge to rates).

[17] *See also H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992) ("Allowing a RICO action . . . would similarly disrupt the state administrative process and constitute a 'collateral attack on a rate order,' contrary to state law.") (quoting *H.J., Inc. v. Nw. Bell Corp.*, 420 N.W.2d 673, 676 (Minn. Ct. App. 1988)); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1296 (D.S.C. 1992).

on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Graoch* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the *Graoch* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 390-91. The district court in the PCI case recognized that case law HUD itself previously relied upon makes clear that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI*, 66 F. Supp. 3d at 1051 (quoting *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 375-76 (6th Cir. 2007)). In the Supplemental Explanation, however, HUD failed even to acknowledge *Graoch*.

Even if an insurer could successfully defend risk-based practices under the Rule's burden-shifting framework, HUD's denial of an exemption would still be arbitrary and capricious. Requiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on the industry. Under HUD's approach, every insurer would have to defend each of the actuarial risk factors it uses, perhaps even on a region-by-region basis as different plaintiffs assert alleged disparate impacts among particular populations of insureds. HUD's only response was that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. HUD provided no basis, however, for its counterintuitive assumption that it would cost as much to demonstrate eligibility for an exemption for risk-based pricing and underwriting as it would to litigate the actuarial soundness of a challenged practice.

Moreover, the Rule would require insurers to establish not merely that a practice is purely risk-based; it would also require insurers to litigate the third step of the burden-shifting approach, disputing that less discriminatory alternatives exist. This would be especially difficult for insurers because—as noted—they do not collect data on subscribers' race, ethnicity, or other protected characteristics and have no other means of anticipating disparities.[18] And assuming they could collect the necessary data to defend themselves, it would be very expensive and would intrude upon policyholders who would be required to self-report race and ethnicity data. ECF No. 44-2 ¶¶ 11–12; ECF No. 44-3 ¶ 14. HUD's prior Supplemental Explanation arbitrarily and capriciously failed to consider these added costs.

Accordingly, HUD can and should exempt homeowners insurance from disparate-impact liability under the FHA.

---

[18] *See* ECF No. 44-2 ¶ 6; ECF No. 44-3 ¶ 11; ECF No. 44-4 ¶ 11; ECF No. 44-5 ¶ 7. Insurers might not even be permitted to collect that data, given state prohibitions on "treating similar risks in a dissimilar manner." Letter from NAMIC to HUD, at 5, 12 (Jan. 17, 2012) (A.R. 376, 383); *see also* Md. Code Ins. § 27-501 (prohibiting solicitation of information about protected characteristics).

## III.    RESPONSES TO SPECIFIC ISSUES RAISED BY HUD

In the ANPRM, HUD indicated that it is "particularly interested" in responses to a number of listed questions.  83 Fed. Reg. at 28,561.  PCI's comments above, explaining the need for an exemption for homeowners insurance, address some of the listed questions.  Other questions, however, have not yet been fully addressed.  PCI responds below to each of the questions posed.

**1.    Does the Disparate Impact Rule's burden of proof standard for each of the three steps of its burden-shifting framework clearly assign burdens of production and burdens of persuasion, and are such burdens appropriately assigned?**

Clarity of Assignment of Burdens

Under the Disparate Impact Rule, the plaintiff has the initial burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.  24 C.F.R. § 100.500(c)(1).  If the plaintiff meets that burden, the defendant has the burden of proving that the challenged practice is necessary to achieve "one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2).  If the defendant meets its burden, the plaintiff "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3).

It is not immediately clear whether the burden that shifts to the defendant at the second step of the burden-shifting test is a burden of production or persuasion—that is, whether the defendant must merely set forth evidence that the challenged practice is necessary to achieve a substantial, legitimate, and nondiscriminatory interest, or whether the defendant must persuade a decisionmaker of that fact.  But by its plain terms, the Rule appears to shift the burden generally, which presumably would include the burden of persuasion. *See* 78 Fed. Reg. at 11,473-11,474.

Appropriateness of Assignment of Burdens

In the absence of statutory direction to the contrary, the Supreme Court has held that disparate-impact liability must be premised on exacting standards in order to avoid unjustified, expensive, and time-consuming litigation.  Under those standards, a plaintiff must make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class. *Wards Cove*, 490 U.S. at 658.  If a plaintiff makes this prima facie showing, the defendant need only present evidence that the challenged practice serves its legitimate goals. *See id.* at 659.  The burden of persuasion remains on the plaintiff. *See id.*  When a defendant produces such evidence, the plaintiff may prevail only if he or she can prove that the defendant refused to adopt an alternative practice that would have served its goals equally effectively without causing the disparate impact. *See id.* at 660-61.

The Disparate Impact Rule's three-step burden-shifting approach for resolving disparate impact claims conflicts with the Supreme Court's decision in *Wards Cove* in several respects relevant to the homeowners insurance industry.

At the first step of the process, HUD specifically, and improperly, omitted the requirement that any disparate impact be "significant." *See* 78 Fed. Reg. at 11,468-11,469.  The Rule provides

that a plaintiff need only show that the challenged practice "caused or predictably will cause" a disparate impact. This is less demanding than the showing required by *Wards Cove*.

At the second step, HUD improperly shifted the burden of persuasion to the defendant. That contravenes Supreme Court precedent. In outlining the framework for a disparate impact analysis (under Title VII) the Supreme Court held that that the burden of persuasion "must remain with the plaintiff, for it is he who must prove that it was 'because of such an individual's race, color,' etc., that he was denied a desired employment opportunity." *Wards Cove*, 490 U.S. at 660. The burden of proving that a practice does or does not serve legitimate interests should properly rest on the party seeking to alter business practices—particularly those that are authorized under state law—by imposing disparate-impact liability. Additionally, the Supreme Court has expressly rejected reading a "necessity" requirement into a disparate impact framework, concluding that such a requirement would impose a degree of scrutiny impossible to meet. *Id.* at 659 ("[T]here is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet[.]").

The third step of the burden-shifting framework is unlawful because plaintiffs do not need to show that any proffered alternative practice is "equally effective" as the challenged practice at serving the defendant's legitimate business interests. *See Wards Cove*, 490 U.S. at 661 (any "alternative practices" a plaintiff might offer must be "equally effective").

The Rule's burden-shifting provisions are also contrary to the limitations outlined in *Inclusive Communities*, especially when applied to the homeowners insurance industry, which operates by classifying risks based on a broad range of actuarial data.

First, the Rule impermissibly permits plaintiffs to state a prima facie claim of disparate impact merely by pointing to a statistical disparity and without establishing a robust causal connection between a defendant's policies and a racial disparity. But *Inclusive Communities* emphasized that disparate impact claims may not be premised on the simple existence of a racial disparity and must be subject to "a robust causality requirement." 135 S. Ct. at 2522-23. Accordingly, by permitting plaintiffs to bring claims based on the mere existence of a statistical disparity or a loose causal connection between a defendant's actions and a disparity, the Rule is contrary to law.

Second, the Rule requires homeowners insurance providers to show that their challenged practice is strictly "necessary" to achieving a legitimate business goal. The Rule thus would invalidate not simply those policies that are "artificial, arbitrary and unnecessary," but also legitimate business practices. The Rule would thereby inhibit "profit-related decisions that sustain a vibrant and dynamic free-enterprise system." 135 S. Ct. at 2518, 2524. The Rule thus exceeds the limitations the Supreme Court placed on disparate impact claims in *Inclusive Communities*.

The Rule is also inconsistent with the Administrative Procedure Act, which provides that "the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91 (1981). Because a charge brought by HUD under the FHA may be heard in either an administrative or judicial proceeding, the burden-shifting standards established in the Disparate Impact Rule must satisfy the Administrative Procedure Act's requirement that the

proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof. As explained above, the Rule requires defendants to show that the challenged practice is "necessary" to serve a legitimate interest at the second step of the burden-shifting test. This requires defendants to disprove the facts necessary to sustain plaintiffs' proposed order, and thus has the effect of improperly shifting the burden of persuasion to defendants in violation of the Administrative Procedure Act.

**2.      Are the second and third steps of the Disparate Impact Rule's burden shifting framework sufficient to ensure that only challenged practices that are artificial, arbitrary, and unnecessary barriers result in disparate impact liability?**

No. As discussed immediately above, the burden-shifting framework proposed in the Rule falls short of what would be required to ensure that the Rule permits challenges only to "artificial, arbitrary, and unnecessary barriers." *Inclusive Cmtys.*, 135 S. Ct. at 2524.

**3.      Does the Disparate Impacts Rule's definition of ''discriminatory effect'' in 24 CFR 100.500(a) in conjunction with the burden of proof for stating a prima facie case in 24 CFR 100.500(c) strike the proper balance in encouraging legal action for legitimate disparate impact cases while avoiding unmeritorious claims?**

No. Both the definition of "discriminatory effect" in 24 C.F.R. § 100.500(a) and the burden of proof for stating a prima facie case in 24 C.F.R. § 100.500(c)(1) afford inadequate protection to defendants. Subsection 100.500(a) provides that a practice has a discriminatory effect when "it actually or predictably results in a disparate impact." 24 C.F.R. § 100.500(a). Subsection 100.500(c)(1) provides that a plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* § 100.500(c)(1). These definitions are unreasonable in a number of respects.

First, inclusion of practices that merely "predictably" may result in a disparate impact is inappropriate. The FHA does not prohibit practices that simply *might* result in disparate impact. The statute provides that it is unlawful "*[t]o discriminate* against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b) (emphasis added). Imposing liability based on "predict[ions]" of possible disparate effects does not comport with the "robust causality" requirement the Supreme Court has demanded. *Inclusive Cmtys.*, 135 S. Ct. at 2523.

Second, the provisions fail to specify that the disparate impact must be "significant." The Supreme Court in *Wards Cove* held that a plaintiff must make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class. *See* 490 U.S. at 658. Absent such a requirement, the Disparate Impact Rule would improperly threaten to require the use of race "in a pervasive way" and inject "racial considerations into every housing decision." *Inclusive Cmtys.*, 135 S. Ct. at 2523-24.

Third, the provisions do not make clear that a plaintiff must challenge a specific practice of the defendant's. The Court in *Wards Cove* specified that "a plaintiff must demonstrate that it is the application of a *specific or particular* employment practice that has created the disparate impact

under attack." *Wards Cove*, 490 U.S. at 657 (emphasis added). A generalized challenge to an array of practices is not cognizable under *Wards Cove*. And it would cause insurers to be held liable for disparities they "did not create." *Inclusive Cmtys.*, 135 S. Ct. at 2523 (emphasizing need to demonstrate causation).

**4. Should the Disparate Impact Rule be amended to clarify the causality standard for stating a prima facie case under *Inclusive Communities* and other Supreme Court rulings?**

Yes. *Inclusive Communities* requires a "robust causality requirement." 135 S. Ct. at 2523. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove*, 490 U.S. at 653). The Rule, however, at most requires minimal causation. *See* 24 C.F.R. § 100.500(c)(1). Indeed, by imposing liability for practices that "predictably" might result in a disparate impact, *see* 24 C.F.R. §§ 100.500(a) & (c)(1), the Rule dispenses with any causation requirement. Moreover, as noted, the Rule does not require that it be a "specific" practice that causes the disparate impact, nor does it require the practice to have caused a "significant" disparate impact—both of which are importation protections under Supreme Court precedent.

**5. Should the Disparate Impact Rule provide defenses or safe harbors to claims of disparate impact liability (such as, for example, when another federal statute substantially limits a defendant's discretion or another federal statute requires adherence to state statutes)?**

Yes. As explained at length above, the Disparate Impact Rule should be amended to exempt homeowners insurance. Such an exemption is necessary because application of the Rule to homeowners insurance would (1) violate the McCarran-Ferguson Act; (2) undermine the fundamental nature of the business of insurance; (3) contravene the limits imposed by the Supreme Court in *Inclusive Communities*; and (4) violate the filed-rate doctrine. To the extent HUD elects to create a more generally worded exemption—such as for situations where "another federal statute substantially limits a defendant's discretion or another federal statute requires adherence to state statutes"—HUD should make clear that the exemption applies to homeowners insurance in light of the McCarran-Ferguson Act and state insurance laws.

**6. Are there revisions to the Disparate Impact Rule that could add to the clarity, reduce uncertainty, decrease regulatory burden, or otherwise assist the regulated entities and other members of the public in determining what is lawful?**

Yes. As explained at length above, the Disparate Impact Rule should be amended to exempt homeowners insurance. Such an exemption would provide much-needed clarity to, and reduce the uncertainty of, providers of homeowners insurance, who are permitted and required by state insurance laws to use actuarial risk factors to make pricing and underwriting decisions, yet face potential liability under the Rule for doing so. Providing for such an exemption would also prevent the massive regulatory burden that would be imposed if insurers were required to try to ascertain whether accepted actuarial risk factors have a disparate impact on certain groups (assuming insurers are even permitted to try to do so).

## IV.   CONCLUSION

For the reasons set forth above, PCI respectfully requests that HUD amend the Disparate Impact Rule to exempt homeowners insurance from disparate-impact liability under the FHA.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

cc:    Emily Newton

## TABLE I

### State Insurance Laws

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | Ala. Code § 27-13-27 | Ala. Code § 27-13-27 | Ala. Code § 27-13-3; Ala. Code § 27-13-30 |
| Alaska | Alaska Stat. § 21.39.030(a)(2) | Alaska Stat. § 21.39.030(a)(1), (4); Alaska Stat. § 21.36.090(c) | Alaska Stat. § 21.39.040 |
| Arizona | Ariz. Rev. Stat. Ann. § 20-356(2); Ariz. Rev. Stat. Ann. § 20-383(D); Ariz. Rev. Stat. Ann. § 20-384(B) | Ariz. Rev. Stat. Ann. § 20-356(1), (4); Ariz. Rev. Stat. Ann. § 20-383(D); Ariz. Rev. Stat. Ann. § 20-384(C); Ariz. Rev. Stat. Ann. § 20-448(C) | Ariz. Rev. Stat. Ann. § 20-357 |
| Arkansas | Ark. Code Ann. § 23-67-208(d); Ark. Code Ann. § 23-67-209(a) | Ark. Code Ann. § 23-67-208(d); Ark. Code Ann. § 23-67-209(b); Ark. Code Ann. § 23-67-210 | Ark. Code Ann. § 23-67-211(a) |
| California | | Cal. Ins. Code § 1861.05(b) | Cal. Ins. Code § 1861.05(b)-(d); see also Cal. Ins. Code § 1860.1 |
| Colorado | Colo. Rev. Stat. § 10-4-403(1)(c), (2) | Colo. Rev. Stat. § 10-4-403(1)(c), (4); Colo. Rev. Stat. § 10-3-1104(1)(f)(II) | Colo. Rev. Stat. § 10-4-404; Colo. Rev. Stat. § 10-4-406 |
| Connecticut | | Conn. Gen. Stat. § 38a-803(4) | Conn. Gen. Stat. § 38a-688; Conn. Gen. Stat. § 38a-663(9)-(10). |
| Delaware | 18 Del. Code § 2503(a)(3) | 18 Del. Code § 2503(a)(2), (a)(5); 18 Del. Code § 2503(b); 18 Del. Code § 2504(c) | 18 Del. Code § 2504 |

1

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| District of Columbia | DC Stat. § 31-2703(b) | DC Stat. § 31-2703(a), (c); DC Stat. § 31-2231.13(c), (d) | DC Stat. § 31-2704 |
| Florida | Fla. Stat. § 627.062(2)(e)(6) | Fla. Stat. § 627.062(1), (2)(e)(6) | Fla. Stat. § 627.062; Fla. Stat. § 627.0645 |
| Georgia | Ga. Code Ann. § 33-9-4(4) | Ga. Code Ann. § 33-9-4(1), (7) | Ga. Code Ann. § 33-9-21, Ga. Code Ann. § 33-9-9; Ga. Code Ann. § 33-9-26 |
| Hawaii | Hawaii Rev. Stat. § 431:14-103(a)(2) | Hawaii Rev. Stat. § 431:14-103(a)(1), (5); Hawaii Rev. Stat. § 431:13-103(a)(7)(B) | Haw. Rev. Stat. § 431:14-104(a); Haw. Rev. Stat. § 431:14-106(a) |
| Idaho | Idaho Code Ann.§ 41-1437(1) | Idaho Code Ann.§ 41-1405(1); Idaho Code Ann.§ 41-1437(3) | |
| Illinois | | 215 Ill. Comp. Stat. 5/424(3) | |
| Indiana | Ind. Code § 27-1-22-3(a)(1) | Ind. Code § 27-1-22-3(a)(2), (a)(4); Ind. Code § 27-4-1-4(a)(7) | Ind. Code § 27-1-22-4(a); Ind. Code § 27-1-22-5(a) |
| Iowa | | Iowa Code Ann. § 515F.4; Iowa Code Ann. § 507B.4(3)(g) | Iowa Code Ann. § 515F.5 |
| Kansas | Kan. Stat. Ann. § 40-953; Kan. Stat. Ann. § 40-954(a) | Kan. Stat. Ann. § 40-953; Kan. Stat. Ann. § 40-954(c) | Kan. Stat. Ann. § 40-955 |
| Kentucky | Ky. Rev. Stat. Ann. § 304.13-057 | Ky. Rev. Stat. Ann.§ 304.12-080(1) | Ky. Rev. Stat. Ann. § 304.13-051 |
| Louisiana | La. Rev. Stat. Ann. § 22:1454(B)(1) | La. Rev. Stat. Ann. § 22:1454(A), (B)(2); La. Rev. Stat. Ann. § 22:1964(7)(c); La. Rev. Stat. Ann. § 22:34 | La. Rev. Stat. Ann. § 22:1451; La. Rev. Stat. Ann. § 22:1464 |
| Maine | Me. Rev. Stat. Ann. 24-A, § 2303(1)(C) | Me. Rev. Stat. Ann. 24-A, § 2303(1)(B), (G); Me. Rev. Stat. Ann. 24-A, § 2162(2) | Me. Rev. Stat. Ann. 24-A § 2304-A |

2

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Maryland | Md. Code Ann., Ins. § 11-205(e) | Md. Code Ann., Ins. § 11-205(d), (f); Md. Code Ann., Ins. § 27-212(e)(1) | Md. Code Ann., Insurance § 11-206 |
| Massachusetts | Mass. Gen. Laws Ann. 174A, § 5(a)(3); Mass. Gen. Laws Ann. 175A, § 5(a)(1) | Mass. Gen. Laws Ann. 174A, § 5(a)(2); Mass. Gen. Laws Ann. 175A, § 5(a)(3), (4) | Mass. Gen. Laws Ann. 174A, § 6; Mass. Gen. Laws Ann. 175A, § 6 |
| Michigan | Mich. Comp. Laws Ann. § 500.2110(1); Mich. Comp. Laws Ann. § 500.2403(1)(a), (d) | Mich. Comp. Laws Ann. § 500.2110(3); Mich. Comp. Laws Ann. § 500.2110a; Mich. Comp. Laws Ann. § 500.2403(1)(c), (d) | Mich. Comp. Laws Ann. § 500.2406; Mich. Comp. Laws Ann. § 500.2408 |
| Minnesota | Minn. Stat. Ann. § 70A.04(4); Minn. Stat. Ann. § 70A.05(1) | Minn. Stat. Ann. § 70A.04(1), (4); Minn. Stat. Ann. § 70A.05(2) | Minn. Stat. Ann. § 70A.06 |
| Mississippi | Miss. Code. Ann. § 83-2-3(1)(d), (2)(a) | Miss. Code. Ann. § 83-2-3(1)(a), (d), (2)(b) | Miss. Code. Ann. § 83-2-7 |
| Missouri | Mo. Ann. Stat. § 379.318(1), (4) | Mo. Ann. Stat. § 379.318(2), (4) | Mo. Ann. Stat. § 379.321 |
| Montana | Mont. Code Ann. § 33-16-201(2)(a) | Mont. Code Ann. § 33-16-201(1)(a), (4); Mont. Code Ann. § 33-18-210 | Mont. Code Ann. § 33-16-203 |
| Nebraska | | Neb. Rev. St. § 44-7510(3) | Neb. Rev. St. § 44-7508 |
| Nevada | Nev. Rev. Stat. Ann. § 686B.060(1); Nev. Rev. Stat. Ann. § 686B.050(4) | Nev. Rev. Stat. Ann. § 686B.050(1), (4); Nev. Rev. Stat. Ann. § 686B.060(2); Nev. Rev. Stat. Ann. § 686a-130(5) | Nev. Rev. Stat. Ann. § 686B.070; Nev. Rev. Stat. Ann. § 686B.090; Nev. Rev. Stat. Ann. § 686B.110 |
| New Hampshire | N.H. Rev. Stat. Ann. § 412:15(I)(d), (II)(a) | N.H. Rev. Stat. Ann. § 412:15(I)(d); N.H. Rev. Stat. Ann. § 412:15(II)(b) | N.H. Rev. Stat. Ann. § 412:16 |

3

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| New Jersey | N.J. Stat. Ann. § 17:29A-4(c); N.J. Stat. Ann. § 17:29A-7; N.J. Stat. Ann. § 17:29A-11 | N.J. Stat. Ann. § 17:29A-4; N.J. Stat. Ann. § 17:29A-7 | N.J. Stat. Ann. § 17:29A-6; N.J. Stat. Ann. § 17:29A-7 |
| New Mexico | N.M. Stat. Ann. § 59A-17-6(E); N.M. Stat. Ann. § 59A-17-7(A) | N.M. Stat. Ann. § 59A-17-6(A), (E); N.M. Stat. Ann. § 59A-17-7(B); N.M. Stat. Ann. § 59A-16-17(D) | N.M. Stat. Ann. § 59A-17-9 |
| New York | N.Y. Ins. Law § 2304(a) | N.Y. Ins. Law § 2303; N.Y. Ins. Law § 2304(b), (c) | N.Y. Ins. Law § 2305(a), (b) |
| North Carolina | N.C. Gen. Stat. Ann. § 58-40-20(e); N.C. Gen. Stat. Ann. § 58-40-25(1) | N.C. Gen. Stat. Ann. § 58-40-25(2); N.C. Gen. Stat. Ann. § 58-40-20(a), (e) | N.C. Gen. Stat. Ann. § 58-40-30; N.C. Gen. Stat. Ann. § 58-40-40; N.C. Gen. Stat. Ann. § 58-40-45 |
| North Dakota | N.D. Cent. Code Ann. § 26.1-25-03(1)(a) | N.D. Cent. Code Ann. § 26.1-25-03(1)(c) | N.D. Cent. Code Ann. § 26.1-25-04 |
| Ohio | Ohio Rev. Code Ann. § 3935.03(C); Ohio Rev. Code Ann. § 3937.02(A) | Ohio Rev. Code Ann. § 3935.03(B); Ohio Rev. Code Ann. § 3937.02(C), (D); Ohio Rev. Code Ann. § 3901.21(M) | Ohio Rev. Code Ann. § 3935.04 |
| Oklahoma | | Okla. Stat. Ann. tit. 36, § 902; Okla. Stat. Ann. tit. 36, § 985 | Okla. Stat. Ann. tit. 36, § 987 |
| Oregon | Or. Rev. Stat. Ann. § 737.310(4) | Or. Rev. Stat. Ann. § 737.310(1), (8); Or. Rev. Stat. Ann. § 746.015(1) | Or. Rev. Stat. Ann. § 737.205; Or. Rev. Stat. Ann. § 737.325 |
| Pennsylvania | 40 Penn. Stat. § 1183(a); 40 Penn. Stat. § 1223(a)(3) | 40 Penn. Stat. § 1183(c)-(d); 40 Penn. Stat. § 1223(a)(2); 40 Penn. Stat. § 1171.5(a)(7) | 40 Pa. Stat. § 710-5(a); 40 Pa. Stat. § 710-6; 40 Pa. Stat. § 710-7 |

4

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Rhode Island | R.I. Gen. Laws Ann. § 27-44-5(e)(1); R.I. Gen. Laws Ann. § 27-6-4(3) | R.I. Gen. Laws Ann. § 27-44-5(a), (d), (e)(2); R.I. Gen. Laws Ann. § 27-6-4(2) | R.I. Gen. Laws Ann. § 27-44-6(a) |
| South Carolina | S.C. Code Ann. § 38-73-430(1); S.C. Code Ann. § 38-73-330(3) | S.C. Code Ann. § 38-73-430(3)-(4); S.C. Code Ann. § 38-73-330(2) | S.C. Code Ann.§ 38-73-520 |
| South Dakota | S.D. Codified Laws § 58-24-6.1 | S.D. Codified Laws § 58-24-5; S.D. Codified Laws § 58-24-6; S.D. Codified Laws § 58-24-6.1; S.D. Codified Laws § 58-33-26 | S.D. Codified Laws § 58-24-10 |
| Tennessee | Tenn. Code Ann. § 56-5-103(d); Tenn. Code Ann. § 56-5-104(1) | Tenn. Code Ann. § 56-5-104(2) ; Tenn. Code Ann. § 56-5-103(a)(1), (d) | Tenn. Code Ann. § 56-5-105 |
| Texas | Tex. Ins. Code Ann.§ 2251.051; Tex. Ins. Code Ann.§ 2251.052(a) | Tex. Ins. Code Ann. § 2251.051; Tex. Ins. Code Ann. § 2251.052(b)-(c) | Tex. Ins. Code Ann.§ 2251.101; Tex. Ins. Code Ann.§ 2251.103 |
| Utah | Utah Code Ann. § 31A-19a-201(4)(a); Utah Code Ann. § 31A-19a-202(1)-(2) | Utah Code Ann. § 31A-19a-201(1), (4)(a); Utah Code Ann. § 31A-19a-202(3) | Utah Code Ann.§ 31A-19a-203 |
| Vermont | Vt. Stat. Ann. tit. 8, § 4685(d); Vt. Stat. Ann. tit. 8, § 4686(1) | Vt. Stat. Ann. tit. 8, § 4685(a), (d); Vt. Stat. Ann. tit. 8, § 4686(2); Vt. Stat. Ann. tit. 8, § 4724(7)(A) | Vt. Stat. Ann. tit. 8, § 4688 |
| Virginia | Va. Code Ann. § 38.2-1904(A), (B) | Va. Code Ann. § 38.2-1904(A)(3) | Va. Code Ann. § 38.2-1906 |
| Washington | Wash. Rev. Code Ann. § 48.19.030(3) | Wash. Rev. Code Ann. § 48.19.020; Wash. Rev. Code Ann. § 48.19.030(2)(b); Wash. Rev. Code Ann. § 48.18.480 | Wash. Rev. Code Ann. § 48.19.040; Wash. Rev. Code Ann. § 48.19.060 |

5

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| West Virginia | W. Va. Code § 33-20-3(a) | W. Va. Code § 33-20-3(b), (c)(2); W. Va. Code § 33-11-4(7)(c) | W.Va. Code § 33-20-4 |
| Wisconsin | Wis. Stat. Ann. § 625.11(4); Wis. Stat. Ann. § 625.12(1) | Wis. Stat. Ann. § 625.12(2); Wis. Stat. Ann. § 625.11(1), (4) | Wis. Stat. Ann. § 625.13 |
| Wyoming | | Wyo. Stat. Ann. § 26-14-105; Wyo. Stat. Ann. § 26-13-112(c) | Wyo. Stat. Ann. § 26-14-107 |

6

# EXHIBIT 1



**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

ROBERT GORDON
SENIOR VICE PRESIDENT
POLICY DEVELOPMENT AND RESEARCH

September 25, 2014

The Honorable Julian Castro, Secretary
The Honorable John Trasviña, Assistant Secretary
U.S. Department of Housing and Urban Development
451 17th Street, S.W.
Washington, DC 20410

Dear Secretary Castro and Assistant Secretary Trasviña:

On September 4, 2014, the United States District Court for the Northern District of Illinois issued the enclosed Memorandum Opinion and Order granting in part the motion for summary judgment filed by Property Casualty Insurers Association of America ("PCI") in *Property Casualty Insurers Association of America v. Donovan*, No. 13-8564. The Court remanded the case to HUD for further proceedings.

In its opinion, the Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in its Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. The Court further directed HUD to explain why application of its Rule to homeowners insurance did not violate the filed-rate doctrine, which forbids courts from invalidating or modifying rates that have been filed with regulatory agencies. *Id.* at 43. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It noted that HUD's previous response to comments raising this issue was inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

PCI intends to submit additional comments to HUD to address the issues identified in the Court's order. If there is a deadline for submitting comments, please let me know.

Additionally, PCI requests that HUD re-open the public comment period to inform others that the Agency expects to fully consider the complex issues presented by application of the Disparate Impact Rule to homeowner's insurance. The case-by-case application of disparate impact liability to insurers presents significant legal and compliance uncertainty, subjects insurers to conflicting regulatory requirements, imposes significant expenses on the property and casualty industry, and interferes with State regulation of insurance. We respectfully suggest that HUD should solicit public comments on this important issue.

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

006232

September 25, 2014
Page 2

Please contact me at (202) 639-0490 or Robert.Gordon@pciaa.net if you have any questions or information.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

cc:     Helen R. Kanovsky
        Jeanine Worden
        Kyle R. Freeny

# EXHIBIT 2



**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

January 26, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

**Re:**  **Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
Discriminatory Effects Standard**

Dear Sir or Madam:

On September 4, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued the enclosed Memorandum Opinion and Order in *Property
Casualty Insurers Association of America v. Donovan*, No. 13-8564 (*PCI*), remanding the
case to the Department of Housing and Urban Development (HUD) for further
consideration of whether HUD's Disparate Impact Rule (*Implementation of the Fair
Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can
be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the Court's order and requested
HUD to re-open the public comment period to inform others that the Agency expects to
fully consider the complex issues presented by application of the Disparate Impact Rule
to homeowners' insurance.  For the reasons explained below, the Disparate Impact Rule
cannot lawfully be applied to homeowners insurance.  Application of the Rule to
homeowners insurance would impair state regulation of insurance in violation of the
McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners
insurance, and would impose needless costs on providers of homeowners
insurance and their customers.  HUD should therefore exempt homeowners insurance
from the Rule.[1]

---

[1] HUD has not yet opened a public comment period, and On November 3, 2014, Judge Leon of the
U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the
Disparate Impact Rule in American Insurance Association v. U.S. Department of Housing and Urban
Development, No. 13-cv-00966 (D.D.C.).  But PCI is submitting these comments now in an abundance of
caution, given the remand from Judge St. Eve.

Regulations Division
January 26, 2015
Page 2

## I.    BACKGROUND

### A.    The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by a fire, the insurer will pay to repair her home. Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions, that is, decisions about whether to insure and how to price a particular risk or class of risk. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial implications. Actuaries examine numerous factors that correlate with losses. *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to that home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard. Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* Admin. Rec. 383; Decl. of Teresa C. Cracas ¶ 6 (stating that Cincinnati Insurance Company does not collect information on race or ethnicity); Decl. of Michael Dawdy ¶ 11 (State Auto Insurance Companies does not collect data on policyholders' race or ethnicity); Decl. of Ronald Joseph Zaleski, Sr. ¶ 11 (Selective Insurance Company of America does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); Decl. of Peter Drogan ¶ 7 (Amica Mutual Insurance Company does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers. *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on neutral risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.

Regulations Division
January 26, 2015
Page 3

*See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty
Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—
A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012). Such a pricing scheme would also greatly
reduce the financial incentive for customers to reduce risks, construct safer houses, and
maintain existing houses. Avraham, *The Economics of Insurance Law*, *supra* pp. 66-67.

### B.    State Regulation Of Insurance and The McCarran-Ferguson Act

The states have traditionally regulated the insurance industry, from the pricing of
insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance
was largely immune from federal regulation because the business of insurance was not
considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75
U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States
v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of
insurance across state lines constituted interstate commerce susceptible to federal
regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to
ensure that ruling would not undermine the states' long-standing regulation of insurance.
Today, "State regulation of insurance is comprehensive and includes rate and coverage
issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).

In the McCarran-Ferguson Act, Congress expressly stated that "the continued
regulation and taxation by the several States of the business of insurance is in the public
interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress
shall be construed to invalidate, impair, or supersede any law enacted by any State for the
purpose of regulating the business of insurance ... unless such Act specifically relates to
the business of insurance." 15 U.S.C. § 1012(b). Thus, federal law must not be read to
authorize regulations that either "directly conflict with state regulation" of insurance or
whose "application ... frustrate any declared state policy or interfere with a State's
administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299,
310 (1999).

### C.    The Fair Housing Act and the Disparate Impact Rule

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any
person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the
provision of services or facilities in connection therewith, because of race, color, religion,
sex, familial status, or national origin." 42 U.S.C. § 3604(b). The Act makes no reference
to either disparate impact or homeowners insurance.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of
the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70921 (Nov.

Regulations Division
January 26, 2015
Page 4

16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* at 70921. The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70924.

Representatives of the insurance industry submitted comments explaining why disparate impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes, whether by statute, regulation, or under the "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, the application of disparate impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.

HUD promulgated its final Disparate Impact Rule on February 15, 2013. 78 Fed. Reg. 11460. The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

### D. The Litigation Brought by PCI

On November 27, 2013, the Property Casualty Insurers Association of America (PCI) challenged both the Disparate Impact Rule as applied to the provision of homeowners insurance and HUD's process for issuance of the Rule, under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* On September 3, 2014, the Court granted in part PCI's motion for summary judgment.

Regulations Division
January 26, 2015
Page 5

The Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. Those conflicts, the Court explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It held that HUD's response to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

E.   **The Supreme Court's Grant of Certiorari in the *Inclusive Communities* Case and Judge Leon's Vacating of the Disparate Impact Rule**

On October 2, 2014, the Supreme Court granted certiorari in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, No. 13-1371, to address the question whether disparate impact claims of any sort are cognizable under the FHA. Oral argument took place on January 21, 2015. PCI, the American Insurance Association, and the National Association of Mutual Insurance Companies submitted a brief amicus curiae supporting petitioners, explaining that the FHA does not recognize disparate impact liability. The brief also explains that interpreting the FHA to permit disparate-impact liability would upend fundamental tenets of the insurance business and contravene the McCarran-Ferguson Act.

On November 3, 2014, Judge Leon of the U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the Disparate Impact Rule in *American Insurance Association v. U.S. Department of Housing and Urban Development*, No. 13-cv-00966 (D.D.C.). Judge Leon held that "the FHA unambiguously prohibits *only* intentional discrimination." Op. at 17. On December 18, 2014, the government filed its notice of appeal.

The Supreme Court is scheduled to decide later this year whether the FHA permits imposition of disparate impact liability altogether. It should hold that the FHA does not. But even if the Court were to interpret the FHA as allowing disparate impact claims in certain circumstances, disparate impact liability must not be extended to homeowners insurance. Reading the FHA to permit disparate impact claims regarding homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of

Regulations Division
January 26, 2015
Page 6

homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers.

## II.     REQUEST FOR RELIEF

For the reasons set forth below, HUD should exempt homeowners insurance from its Disparate Impact Rule.

### A.     Disparate Impact Claims Are Not Cognizable Under The FHA

In *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, the Supreme Court is likely to rule that disparate impact claims are not cognizable under the FHA. As Judge Leon's recent decision in *American Insurance Association v. U.S. Department of Housing and Urban Development* indicates, a necessary consequence of that holding would be the vacating of the Disparate Impact Rule in its entirety. Whatever the Supreme Court ultimately decides, its opinion would be extremely important for HUD to consider before applying its Rule to insurers.

The Supreme Court is likely to hold that the FHA does not authorize disparate impact claims for several reasons. First, the FHA's terms indicate that it is limited to claims of intentional discrimination. The FHA prohibits various acts performed "*because of* race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604 (emphasis added). Accordingly, it only prohibits actions taken against persons because of their race or other protected characteristic. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (interpreting similar wording in Title VI of the Civil Rights Act to reach only intentional discrimination). Actions taken for other reasons that happen to affect different racial, gender, religious, or other groups differently are not prohibited by the FHA because they are not actions performed "because of race" or other protected characteristics. They are, by definition, actions taken "because of" other factors.

An example from the insurance context may help to illustrate this point. An insurer might charge different customers different rates based on whether or not their homes contain a fire extinguisher. This insurance pricing factor may mean that more people of a particular national origin may pay higher or lower insurance rates than others. But insurers would not be charging different rates "because of" national origin. Indeed, they could not do so, because insurers do not currently obtain data about the national origin, race, color, religion, or disability status of their policyholders. PCI Reply Br. at 7; Decl. of Teresa C. Cracas ¶ 6; Decl. of Michael Dawdy ¶ 11; Decl. of Ronald Joseph Zaleski, Sr. ¶ 11; Decl. of Peter Drogan ¶ 7.

Regulations Division
January 26, 2015
Page 7

The FHA's legislative history also indicates that it does not authorize disparate impact claims. During floor debates, no Representative or Senator suggested that the FHA could be used to impose disparate impact liability. Instead, the debates show Congress's intention to prohibit intentional discrimination. *See, e.g.*, 114 Cong. Rec. 5643 (1968) (Mondale: "The bill permits an owner to do . . . everything he could ever do with property, except refuse to sell it to a person solely on the basis of his color or his religion. That is all it does. It does not confer any right."); 114 Cong. Rec. 2283 (Brooke: "A person can sell his property to anyone he chooses, as long as it is by personal choice and not because of motivations of discrimination."); 114 Cong. Rec. 2530 (Tydings: the problem Congress intended to address was "the deliberate exclusion from residential neighborhoods on grounds of race"); 114 Cong. Rec. 3421 (Mondale: "[T]he basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it. It would not overcome the economic problem of those who could not afford to purchase the house of their choice."); 114 Cong. Rec. 3129 (Hatfield: the FHA prohibits a person being "denied the right to buy a home within a community according to his economic ability . . . merely because his skin is of a different color"); 114 Cong. Rec. 3252 (Scott: the FHA would ensure that individuals "can rent or buy the dwelling of their choice, if they have the money or credit to qualify").

**B.     Application of the Disparate Impact Rule to Homeowners Insurance Would Impair State Laws Regulating Insurance and Thus Violate the McCarran-Ferguson Act**

HUD must provide an exemption for homeowners insurance because application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. Op. at 42. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing

Regulations Division
January 26, 2015
Page 8

operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

### 1. State Laws Requiring Insurers To Engage in Risk-Based Pricing

The vast majority of states—40 of 50—require insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I, *infra.* Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, ... [and] to all other relevant factors, including trend factors, within and outside this state ...." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5; N.J. Stat. Ann. § 17:29A-4; N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03; S.C. Code Ann. § 38-73-430; Tenn. Code Ann. § 56-5-304; Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I, *infra.*

In compliance with these laws, insurers charge different rates to different customers based on the required actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of 40 of the 50 states. Application of the Disparate Impact Rule to insurers would therefore "impair" and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly required by state law. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Moreover, the burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. For example, insurers would be liable if their use of an actuarially justified factor was not "*necessary* to achieve a legitimate interest." 24 C.F.R. § 100.500(c) (emphasis added). And even if every risk factor were proved necessary, plaintiffs could still prevail by showing that insurers' interests could be served by another practice with a less discriminatory effect, even if the alternative practice were less effective than the use of actuarial risk factors. *Id.*; Admin. Rec. at 625.

Regulations Division
January 26, 2015
Page 9

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *See id.* at 311; 24 C.F.R. § 100.500. *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would strip them of the ability to rely on state law and institutions that McCarran-Ferguson is designed to guarantee.

> 2.   **State Laws Permitting Insurers To Engage in Risk-Based Pricing and Underwriting**
>
>    a.   **State Insurance Laws**

Every state has permitted insurers to charge different rates to different customers based on the customers' risk profiles. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Numerous other states use very similar language to expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). Under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(4); 18 Del.

Regulations Division
January 26, 2015
Page 10

Code § 2503; Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2); S.D. Codified Laws § 58-24-6; Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I, *infra*. As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal...laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted by the laws of 47 states. *See* Table I, *infra*.

### b.    State Fair Housing Laws

HUD noted during the *PCI* litigation that some states have fair housing laws and that some state courts look to the FHA for guidance in interpreting those laws. HUD Mem. ISO Mot. to Dismiss at 28. HUD suggested that some of these state laws might in theory be interpreted to permit disparate impact claims against insurers. *Id.* Even in

Regulations Division
January 26, 2015
Page 11

states with fair housing laws, if the fair housing law does not specifically displace the state's insurance laws discussed above, then those insurance laws would remain valid. HUD did not show—and did not even claim— that any state's fair housing law displaces its insurance laws. Accordingly, if these valid state insurance laws requiring or permitting insurers to engage in risk-based pricing and underwriting conflict with the Disparate Impact Rule, then HUD's Rule is impermissible under the McCarran-Ferguson Act. PCI submits, based on the statutes described above, below, and in Table I, that state insurance laws in all 50 states clearly do conflict with the Disparate Impact Rule.

### c.    Limitations on Use of Certain Risk Factors

HUD also noted during the *PCI* litigation that some states have laws restricting the discriminatory use of some factors in insurance pricing and underwriting, specifically credit history, geographic location, domestic violence victimization, and property age. HUD Mem. ISO Mot. to Dismiss at 26. As PCI pointed out in its responsive brief, these laws do not alleviate the conflict between the Disparate Impact Rule and state laws requiring or permitting insurers to engage in risk-based pricing and underwriting. Indeed, these laws prohibiting *discriminatory* use of certain risk factors permit insurers to rely on those factors so long as they do so in accordance with "sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience." Colo. Rev. Stat. § 10-3-1104(1)(f) (XIV) (permitting insurers to take geographic location into account so long as it is related to anticipated loss experience); *see also, e.g.*, Ark. Code Ann. § 23-66-206(14)(C) (permitting insurers to consider geographic location so long as it is not a mere pretext for discrimination); Ind. Code § 27-2-17-5(b) (same); Wis. Admin. Code Ins. § 6.68(3)(a) (same); Ala. Admin. Code r. 482-1-127.06 (prohibiting insurers from making decisions based solely on credit score or using credit history for any unfairly discriminatory reason); Alaska Stat. § 21.36.460(c) (permitting insurers to use credit history so long as they use it in combination with other substantive factors); N.Y. Ins. Law § 2802 (same); W. Va. Code Ann. § 33-17A-6(h) (same); Del. Code Ann. tit 18, § 4124 (permitting insurers to base decisions on age of property if decisions are "for a business purpose which is not a mere pretext for unfair discrimination"); Va. Code Ann. § 38.2-508(5) (same). These statutes thus delineate the extent to which insurers can use certain risk factors and which applications may be unfairly discriminatory. Therefore, they highlight the conflict between the Disparate Impact Rule's application to insurance pricing that uses standard actuarial factors and state laws' approval of insurers' reliance on just those factors.

Regulations Division
January 26, 2015
Page 12

### 3. State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—47 of 50, plus the District of Columbia—require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I, *infra*. Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05.

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g., Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting

Regulations Division
January 26, 2015
Page 13

plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is unlawful under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4. The Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the states' filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g., Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986).

The district court in *PCI* found that HUD had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. Op. at 44-45. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* at 45.

The filed-rate doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g., McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F3d 229, 236-39, 242 (3rd Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011);; *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005); *see also, e.g.,* Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 118 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates).

Applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g., Square D*, 476 U.S. at 417; *Korte*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted). Nor does the extent or the vigor of an agency's review of filed rates matter— the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

Regulations Division
January 26, 2015
Page 14

### 5. Displacement of the Regulation of Insurance from States to Federal Courts

HUD's basic response to the numerous indisputable conflicts between the Disparate Impact Rule and state laws regulating insurance described in the preceding sections is that the Rule's burden-shifting framework would allow defendant companies to raise these state-law considerations on a case-by-case basis. In response to a plaintiff's *prima facie* case, a company could rely on these state laws to show that its pricing or underwriting practices were "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Far from alleviating the conflict between the Disparate Impact Rule and state insurance regulation, this response only confirms that the Rule makes the conflict inescapable.

As the Seventh Circuit has explained, the McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (McCarran-Ferguson prohibits the federal courts from "regulating the … insurance industry" via litigation). That is just what the Rule's burden-shifting framework would do. In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act (ADA) to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.*

HUD's Disparate Impact Rule would similarly lead to federal courts usurping core functions of the states' administrative regimes, including rate-making and underwriting, as well as all other insurance activities regulated by state law. State insurance commissioners currently regulate and supervise the insurance business, enforce insurance laws, and punish violators. *See, e.g.*, 1 Plitt et al., *Couch on Insurance* §§ 2:7-2:8. Under HUD's Rule, in order to avoid liability insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that "the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of that factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule

Regulations Division
January 26, 2015
Page 15

challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eight Circuit's similar recognition in *Saunders* that 'a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime." *Id.* That concern should preclude application of the Rule to risk-based pricing and underwriting of homeowners insurance.

### C. Peripheral Insurance Activities Not Mentioned in HUD's Rulemaking

In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70924. During the course of the *PCI* litigation, however, HUD indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. HUD Reply Br. at 3. HUD should exempt from the Disparate Impact Rule all homeowners insurance practices, not just pricing and underwriting.

As an initial matter, the relevant provisions of the FHA do not apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership. As the Seventh Circuit has explained, 42 U.S.C. § 3604 only "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992). The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." That section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

Regulations Division
January 26, 2015
Page 16

In any event, regulating broad categories of insurance practices in federal court on the basis of a federal statute that does not specifically relate to insurance would violate the McCarran-Ferguson Act by displacing the regulation of such practices by state regulators and courts. States pervasively regulate such practices. *See, e.g.*, Wis. Stat. Ann. § 628.01-628.98 (regulating marketing); Utah Code Ann. 1953 §§ 31A-23a-101 *et. seq.* (same); R.I. Gen. Laws. § 27-3.2-4 (requirements for salespersons); Ind. Code § 27-4-1-4.5 (regulating claims settlement); N.Y. Ins. Law § 2601 (same); Alaska Stat. § 21.36.125 (same); Ga. Code Ann., §§ 33-6-30 *et. seq.* (same). To move the locus of this regulation from the states into federal courts on the basis of a statute that does not mention insurance would violate the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

PCI respectfully requests that HUD provide an exemption or safe harbor for insurance practices beyond just rate-setting and underwriting. That is the only approach consistent with the FHA and the controlling precedent of *Mutual of Omaha*.[2]

### D. Application of the Disparate Impact Rule to Homeowners Insurance Would Undermine the Fundamental Nature of Insurance

As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using of any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. Admin. R. at 377.

---

[2] Absent creating a wholesale exemption for the provision and pricing of homeowners insurance, HUD should recognize that use of actuarially-sound, risk-based pricing and underwriting practices always constitutes a legitimate business interest. HUD should also require that any alternative proffered by a plaintiff or by HUD be equally effective to the challenged practice or combination of practices.

Regulations Division
January 26, 2015
Page 17

This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. Op. at 46. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Thus, it was not enough for HUD to impose *prima facie* liability on core insurance practices and then allow insurers the possibility of justifying their practices during the "Sisyphean" process of burden-shifting litigation. *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 376 (6th Cir. 2007). Rather, HUD should consider the costs to insurers of being subjected to such litigation, especially under a burden-shifting framework that places a difficult burden on defendants (proving that insurance practices are "necessary" to a substantial interest) and allows plaintiffs to win if they can show that an alternative exists that has less disparate impact. Indeed, under the burden-shifting framework adopted by HUD, some actuarially justified practices will not only be burdensome to justify and therefore likely relinquished, but will actually be prohibited. HUD expressly rejected a burden-shifting framework that would require plaintiffs or HUD to show that a proposed alternative approach is "equally effective," Admin. Rec. at 625. As a result, some actuarially justified factors will be prohibited because some other, less predictive factor may be used as a substitute. Federal courts reviewing insurance practices in all 50 states are likely to reach inconsistent judgments about which neutral risk factors violate the Fair Housing Act under this framework. They may also hold insurers liable for using neutral risk factors deemed acceptable by state courts. Moreover, HUD should consider the potential effects—including adverse selection and decreases in coverage—of imposing a rule of law that declares many core insurance practices unlawful (unless proven innocent in unpredictable litigation) and directs insurers to avoid all disparate impacts on protected groups.

Regulations Division
January 26, 2015
Page 18

**E.    HUD Can and Should Exempt Homeowners Insurance from the Rule for the Reasons Set Forth Above**

HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." Admin. Rec. at 627. HUD based this assertion entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Groach* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the *Groach* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 290-91.

\*          \*          \*

The Supreme Court is expect to decide whether disparate impact claims are not cognizable under the Fair Housing Act. Regardless of the outcome of that case, however, application of the Disparate Impact Rule to homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, interfere with the fair and efficient operation of the market for homeowners insurance, and impose needless costs on providers of homeowners insurance and their customers. HUD should therefore exempt homeowners insurance from the Disparate Impact Rule.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

Enclosures

# EXHIBIT 3



**Property Casualty Insurers
Association of America**

Advocacy. Leadership. Results.

July 29, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

      **Re:**    **Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
Discriminatory Effects Standard**

               *Property Casualty Insurers Association of America v. Donovan*, **66 F.
Supp.3d 1018 (N.D. Ill. 2014)**

Dear Sir or Madam:

On September 3, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued a memorandum opinion and order in *Property Casualty Insurers
Association of America v. Donovan*, 66 F. Supp.3d 1018 (N.D. Ill. 2014) (*PCI*), granting
summary judgment to PCI on its claims that the Department of Housing and Urban
Development's (HUD's) "application of the Disparate Impact Rule to homeowners
insurance was arbitrary and capricious." *Id.* at 1030. Judge St. Eve remanded the case to
HUD for further consideration of whether the Disparate Impact Rule (*Implementation of
the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15,
2013)) can lawfully be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the district court's remand decision
and requested that HUD re-open the public comment period to inform others that HUD
expects to fully consider the complex issues presented by application of the Disparate
Impact Rule (the "Rule") to homeowners insurance. On January 26, 2015, PCI submitted
the promised additional comments to HUD setting forth the following reasons that the
Disparate Impact Rule cannot lawfully be applied to homeowners insurance. PCI noted
that application of the Rule to homeowners insurance would (i) impair state regulation of
insurance in violation of the McCarran-Ferguson Act, (ii) fundamentally interfere with
the provision of homeowners insurance, and (iii) impose needless costs on providers of
homeowners insurance and their customers. Consistent with the relief PCI sought in the
district court and the direction given by that court on remand to HUD, PCI requested that
HUD exempt homeowners insurance from the Rule.

On June 25, 2015, the U.S. Supreme Court handed down its decision in *Texas
Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
No. 13-1371. The Supreme Court held that the Fair Housing Act (FHA) permits assertion

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

004615
006254

Regulations Division
Page 2

of disparate-impact claims, but the Court emphasized that disparate-impact liability must be limited in key respects. The Supreme Court's explanation of those limitations further supports PCI's contention that homeowners insurance should be exempted from the Disparate Impact Rule. PCI thus submits these supplemental comments to take account of the Supreme Court's decision.[1]

## I.     The Supreme Court's Decision

In *Texas Department of Housing and Community Affairs*, the Supreme Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" Slip Op. at 21 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." Slip Op. at 18. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 20, 22.

The first of those safeguards is "[a] robust causality requirement." *Id.* at 20. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). Referring approvingly to the opinion below of Fifth Circuit Judge Jones, the Court held up as a paradigmatic case of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policy." *Id.* at 18. Homeowners insurers exemplify the potential defendants the Court had in mind, in that the extensive state regulation of their industry provides a quintessential case of the "valid interest[s]" to which the Court made reference. Businesses, the Court also stated, "must be given latitude to consider market forces." *Id.* at 19. Again, homeowners insurance markets, with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* at

---

[1] HUD has not yet opened a public comment period. But PCI is submitting these comments now in an abundance of caution, given the remand from Judge St. Eve and HUD's statement in other litigation that it is "currently reviewing its regulation in light of the judgment" in *PCI*. Motion to Govern Future Proceedings and Response to Plaintiffs' Motion to Vacate and Remand, *American Insurance Ass'n v. United States Department of Housing and Urban Development*, No. 14-5321 (D.C. Cir. July 24, 2015).

Regulations Division
Page 3

20. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 21. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 21. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## II.   The McCarran-Ferguson Act Requires an Exemption from Disparate-Impact Claims for Homeowners Insurance

In her September 3, 2014 decision remanding the *PCI* case to HUD, Judge St. Eve ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. *PCI*, 66 F. Supp.3d at 1027. Those conflicts, Judge St. Eve explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. Judge St. Eve also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 1028. She held that HUD's responses to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 1029.

In our January 26, 2015 comments, PCI discussed three reasons why HUD must provide an exemption for homeowners insurance.

*First*, application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI*, 66 F. Supp.3d at 1027. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

The evaluation required by the district court shows that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage

Regulations Division
Page 4

in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

*Second*, application of the Disparate Impact Rule to homeowners insurance would interfere with the provision of homeowners insurance. As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." *PCI*, Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." *PCI*, Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. *PCI*, Admin. R. at 377. This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

*Third*, application of the Disparate Impact Rule to homeowners insurance would impose needless costs on providers of homeowners insurance and their customers.

## III. The Supreme Court's Reasoning Confirms that an Exemption for Homeowners Insurance Is Required

The two key safeguards the Supreme Court established on disparate-impact claims in *Texas Department of Housing and Community Affairs* provide further support for each of PCI's three arguments.

Most fundamentally, the Supreme Court's determination that FHA disparate-impact claims must satisfy "[a] robust causality requirement" confirms that the Disparate

Regulations Division
Page 5

Impact Rule cannot be applied to homeowners insurance without running afoul of the McCarran-Ferguson Act and interfering in the lawful operation of homeowners insurance markets. Slip Op. at 20. In describing the causality requirement, the Court identified as a quintessential example of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21. That is precisely the circumstance in which companies offering homeowners insurance find themselves. Application of disparate-impact liability under the FHA to homeowners insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id.* at 19.

As PCI described at length in its January 26, 2015 comments, companies offering homeowners insurance are regulated by a panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance, expressly delineating and permitting the use of such methods, and requiring the filing of homeowners insurance rates with state administrative bodies for approval. PCI January 26, 2015 Comments at 7-13. Those state laws mandate or expressly permit homeowners insurers to use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates to various risk classifications. They thus "substantially limit" the discretion of homeowners insurance companies in a manner that would make it impossible to ascribe any apparently disparate effects of the companies' underwriting or pricing practices to their independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the sort of "double bind of liability" the Court warned against. That is just what the McCarran-Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be defined in a way that gives "latitude to consider market forces" also reinforces PCI's contention that disparate-impact liability should not be permitted against homeowners insurers. Slip Op. at 19. As PCI highlighted in its earlier comments, insurance markets run efficiently when insurance is priced in accord with actuarially sound, risk-based factors. PCI January 26, 2015 Comments at 2-3, 16-17. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation. The extensive state-law framework governing the pricing of homeowners insurance is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market and in particular actuarially sound, risk-based pricing. Slip Op. at 21. Unless that specter were vanquished, "the FHA would have

Regulations Division
Page 6

undermined its own purpose as well as the free-market system." *Id.* Under the McCarran Ferguson Act regulation of the market for homeowners insurance is reserved to the states. Exempting homeowners insurance from disparate-impact claims is necessary to ensure that the threat of disparate-impact litigation does not impair states' legal regimes governing the pricing of homeowners' insurance or hinder the efficient operation of insurance market in accord with those state-law regimes.

Finally, the Supreme Court's caution that the FHA should not be interpreted to promote the use of racial (or other suspect) classifications supports each of PCI's arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," the Court explained, would perversely "tend to perpetuate race-based considerations rather than move beyond them." Slip Op. at 21. But that is just what extending disparate-impact liability to homeowners insurers would do.

State law ensures that homeowners insurers price their products in accordance with risk-based, actuarially sound factors. State law does not permit reliance on, and homeowners insurers do not rely on, racial (or other suspect) classifications in pricing their products. Yet, the failure to exempt homeowners insurers from disparate-impact liability would effectively require them to compile data on the racial (and other suspect) characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts in insurance provision. Exempting homeowners insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners insurers would, contrary to the McCarran-Ferguson Act, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners insurance by imposing significant and needless costs on providers of homeowners insurance and their customers.

\*     \*     \*     \*

Regulations Division
Page 7


The Supreme Court's decision in *Texas Department of Housing and Community Affairs* strongly supports PCI's arguments that HUD should exempt homeowners insurance from the Disparate Impact Rule.  For all the reasons given above and in PCI's earlier comments, HUD should act promptly to establish such an exemption.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

# PUBLIC SUBMISSION

**As of:** October 02, 2020
**Received:** August 20, 2018
**Status:** Posted
**Posted:** August 21, 2018
**Tracking No.** 1k2-94yl-68da
**Comments Due:** August 20, 2018
**Submission Type:** API

**Docket:** HUD-2018-0047
FR-6111-A-01 Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**Comment On:** HUD-2018-0047-0001
FR-6111-A-01 Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**Document:** HUD-2018-0047-0384
Comment Submitted by Kannon K. Shanmugam on behalf of American Insurance Association (AIA) and the National Association of Mutual Insurance Companies (NAMIC)

---

## Submitter Information

**Name:** Kannon K. Shanmugam
**Address:**
    Washington,  DC,  20005
**Email:** kshanmugam@wc.com
**Organization:** AIA & NAMIC
**Government Agency Type:** Federal
**Government Agency:** HUD

---

## General Comment

See attached file(s)

---

## Attachments

Comment Submitted by Kannon K. Shanmugam

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

KANNON K SHANMUGAM
(202) 434-5050
kshanmugam@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

August 20, 2018

Via Federal eRulemaking Portal

Office of the General Counsel
Rules Docket Clerk
Department of Housing and Urban Development
451 Seventh Street, S.W., Room 10276
Washington, DC 20410

> Re:   Docket No. FR-6111-A-01:  Reconsideration of HUD's Implementation of
> the Fair Housing Act's Disparate Impact Standard

To whom it may concern:

I represent the American Insurance Association (AIA) and the National Association of Mutual Insurance Companies (NAMIC), two nonprofit trade associations whose members sell homeowner's insurance in every state in the nation.  In 2013, HUD promulgated a rule creating a burden-shifting framework for disparate-impact liability under the Fair Housing Act of 1968 (FHA), 42 U.S.C. § 3601 *et seq*.  *See* 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500).  In the preamble to this "Disparate-Impact Rule," HUD expressed its view that insurers may be liable on a disparate-impact theory for practices related to the provision and pricing of homeowner's insurance.  *Id.* at 11,475.

In June 2013, AIA and NAMIC filed suit against HUD in a federal district court in the District of Columbia, challenging the Disparate-Impact Rule under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.  Those proceedings were ongoing when the Supreme Court decided *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015).  In *Inclusive Communities*, the Supreme Court recognized disparate-impact liability under the FHA but laid out a series of safeguards necessary for such liability to be permissible.  After obtaining leave to amend their complaint, AIA and NAMIC moved for summary judgment in the District of Columbia litigation, arguing that the Disparate-Impact Rule was inconsistent with the safeguards set out by the Supreme Court.

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 2

Presumably in response to AIA and NAMIC's motion for summary judgment, HUD published an advanced notice of proposed rulemaking on June 20, 2018, seeking public comment on the changes necessary to the Disparate-Impact Rule in light of *Inclusive Communities*. *See* 83 Fed. Reg. 28,560. Consistent with the positions taken by AIA and NAMIC in the District of Columbia litigation, I write on behalf of AIA and NAMIC to submit the following comments.

As applied to homeowner's and other insurers, the Disparate-Impact Rule does not comport with the limitations on disparate-impact liability articulated in *Inclusive Communities* for at least four reasons. *First*, the rule injects pervasive consideration of race and other protected characteristics into insurers' ratemaking and underwriting decisions. *Second*, state law limits insurers' ability to consider race or other protected characteristics as part of the ratemaking and underwriting process, and the McCarran-Ferguson Act protects state insurance regulation from federal interference. *Third*, the Disparate-Impact Rule impermissibly allows claims to proceed based entirely on statistical evidence. *Fourth*, the Rule allows plaintiffs to displace the valid policies of the homeowner's insurers. For these reasons, HUD should exempt homeowner's and other insurers from disparate-impact liability under the Rule.[1]

1.    **The Disparate-Impact Rule Requires Insurers To Consider Race And Other Protected Characteristics Pervasively During The Ratemaking And Underwriting Process**

In *Inclusive Communities*, the Supreme Court stated that disparate-impact liability under the FHA cannot be construed to "cause race to be used and considered in a pervasive way." 135 S. Ct. at 2523. Such a construction, the Court explained, would violate the FHA, raise serious constitutional questions, undermine the purposes of the Act, and "set our Nation back in its quest to reduce the salience of race in our social and economic system." *Id.* at 2524. Applying the Disparate-Impact Rule in the unique context of homeowner's insurance would do precisely that.

a.    At its core, insurance is a means of both shifting and distributing financial risk. In order to ensure that their risk calculations are accurate, insurers must identify risk

---

[1] This submission focuses primarily on homeowner's insurance. The concerns it raises, however, extend beyond that specific context. Fair-housing advocates have invoked the Disparate-Impact Rule against other insurers, such as insurers that offer habitational insurance to landlords. *See National Fair Housing Alliance* v. *Travelers Indemnity Co.*, 261 F. Supp. 3d 20, 29 (D.D.C. 2017). Any exemption that HUD provides should therefore apply to all insurance products that would otherwise fall within the scope of the Disparate-Impact Rule.

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 3

characteristics, sort applicants into groups corresponding to differences in expected loss, and then allocate the grouped risks by establishing rates. Insurers perform this task by collecting and analyzing data regarding the risks they intend to classify. For homeowner's insurance, underwriting professionals and actuaries will take into account characteristics, such as the age of a home, its location, its replacement or repair cost, the presence of smoke detectors, and various permissible risk characteristics regarding applicants and policyholders. Homeowner's insurers then sort insurance applicants into categories corresponding to anticipated risk and allocate premium rates to the various groups.

Before HUD promulgated the Disparate-Impact Rule, insurers did not collect data concerning race or membership in other protected classes for the purpose of making underwriting or rating decisions. Indeed, at least one state explicitly prohibits them from collecting such data at all. *See* Md. Code Ann. Ins. § 27-501(c)(1). Insurers do not consider race or other protected characteristics when making underwriting and rating decisions. Instead, insurers identify and analyze risk factors related to individual properties, as just explained. Insurers next group the risks they have identified in a way that allows them to establish fair rates, consistent with the obligations imposed by state law. The viability of insurers' products depends on their accurate and impartial evaluation of risk. Membership in a protected class is not an actuarially significant factor within the meaning of state law or actuarial practice, and it plays no role in insurers' underwriting and rating decisions.

The Disparate-Impact Rule fundamentally alters that system. As one court has already recognized, in order to determine whether their practices are resulting in or perpetuating a disparate impact, insurers would need to "collect and analyze certain types of race-based data on their clients and prospective clients"—a practice that is "expressly prohibited in many states." *American Insurance Ass'n* v. *HUD*, 74 F. Supp. 3d 30, 44 & nn.27-28 (D.D.C. 2014), vacated and remanded on other grounds, No. 14-5321 (D.C. Cir. Sept. 23, 2015). Insurers would first need to analyze whether state law allows them to collect data on protected characteristics. If it did, they would need to decide how to collect the data from existing and prospective policyholders. Insurers would then need to determine how to store and manage the data they collected.[2] Insurers would next need to analyze what, if anything, state law allows them to do with the data about protected characteristics that

---

[2] To take those steps, insurers would have to expend substantial resources. Compliance departments, for example, may need to dedicate attorney time to determine whether and how insurers may collect data on race and other protected characteristics under state law. Information-technology personnel, for instance, may need to design and build any necessary systems to house the newly collected data—and insurers would have to buy any related materials, including computer hardware and software. And, of course, insurers would have to design and conduct surveys to collect the data.

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 4

they collect. Assuming that insurers could lawfully use data about the race and other protected characteristics of their insureds, they would need to use those data to identify any disparities between the various protected groups.

It is not hard to see how the Disparate-Impact Rule necessarily injects consideration of race and other protected characteristics into the currently protected-characteristic-neutral underwriting and ratemaking processes. And it puts insurers in an obvious bind. Any risk factor that disproportionately affects a protected group could trigger a disparate-impact claim under the Rule. At the same time, changing risk factors or rates because of the potential impact on protected groups could make the insurer's rates unfairly discriminatory, thereby violating sound insurance practice (by reflecting factors unrelated to risk of loss) and state law (by reflecting the insured's protected status). Of course, explicit consideration of race or other protected characteristics in underwriting or ratemaking could violate state and federal laws prohibiting differential treatment based on race or membership in a protected class (*i.e.*, disparate treatment); intentionally using race in ratemaking could even expose insurers to punitive damages, *see* Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(II), or criminal liability, *see* S.D. Codified Laws § 58-11-55. In states that require prior approval of rates, moreover, an insurer could be put in the untenable position of telling the state that it considered race or another protected characteristic explicitly in the ratemaking process.

b. Because it would require the consideration of race and other protected characteristics, construing the FHA to permit disparate-impact liability against insurers also would raise serious constitutional concerns. When a law or rule "compels race-based [decisions], it by definition raises a serious constitutional question." *Miller* v. *Johnson*, 515 U.S. 900, 923 (1995). And it is a "cardinal principle" of statutory construction that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems," a statute should be construed "to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988).

Applying the Disparate-Impact Rule to insurers raises serious constitutional concerns because—as explained above—the Rule compels insurers to "use[] and consider[] [race] in a pervasive way." *Inclusive Communities*, 135 S. Ct. at 2523.[3] By "plac[ing] a racial thumb on the scales[,] . . . [the Disparate-Impact Rule] require[s] [insurers] to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes." *Ricci* v. *DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring).

---

[3] The constitutional implications of the Disparate-Impact Rule are not limited to the context of race; by its terms, the Rule also implicates other constitutionally protected characteristics such as sex and religion. *See* 24 C.F.R. § 100.500(a).

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 5

That type of decisionmaking indisputably discriminates on the basis of race, *see id.* at 579-580 (majority opinion), and the Supreme Court has expressly reserved the question whether such racially discriminatory treatment, even if motivated by "a legitimate fear of disparate impact," could survive constitutional scrutiny, *id.* at 584. More broadly, the Disparate-Impact Rule, as it applies to insurers, violates the command "[a]t the heart of the Constitution's guarantee of equal protection" that "the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller*, 515 U.S. at 911 (internal quotation marks and citation omitted). Because the Disparate-Impact Rule requires insurers to take race and other protected characteristics into account when making rating and underwriting decisions, it "demand[s] the very racial stereotyping the Fourteenth Amendment forbids." *Id.* at 928.

By requiring insurers to take race and other protected characteristics into account in their decisionmaking when they otherwise would not, the Disparate-Impact Rule perversely *causes* insurers to adopt "race-based considerations rather than mov[ing] beyond them." *Inclusive Communities*, 135 S. Ct. at 2524. In so doing, the Rule undermines the very purpose of the Fair Housing Act by increasing, rather than reducing, the salience of race and other protected characteristics in housing decisions. The Rule should exclude homeowner's insurers from its coverage.

2.    **State Law Limits Insurers' Discretion To Consider Race And Other Protected Characteristics As Part of The Ratemaking And Underwriting Process**

As the Supreme Court explained in *Inclusive Communities*, disparate-impact liability under the FHA incorporates "[a] robust causality requirement" to prevent defendants from "being held liable for racial disparities they did not create." 135 S. Ct. at 2523. A disparate-impact claim under the statute thus cannot lie when a "law substantially limits the [defendant's] discretion," because the law breaks the "causal connection" between the challenged policy and the allegedly disparate impact. *Id.* at 2524. That limitation forecloses disparate-impact claims based on insurers' rating and underwriting decisions. The insurance laws of every state circumscribe insurers' ability to consider protected characteristics such as race when making rating and underwriting decisions. As a result, any disparate-impact claim based on underwriting and rating practices necessarily fails. Nor can HUD interpret the FHA to displace those valid state laws, as the McCarran-Ferguson Act protects state insurance policies from federal interference. The only solution is for HUD to exempt homeowner's insurers from the Rule's reach.

a.    In every state, the law restricts insurers' discretion to consider factors such as race, religion, and national origin. Most states' insurance laws address ratemaking and underwriting directly, specifying that "no risks may be grouped by classifications based in

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 6

whole or in part on race, color, creed, or national origin of the risk."[4] Other states' insurance laws prohibit insurers from considering membership in a protected class "when deciding whether to provide, renew, or cancel homeowners insurance."[5] And a third group of states has adopted insurance laws that generally prohibit "unfairly discriminatory" rates.[6] In each of the states in the third group, administrative interpretations or other sources of law make clear that insurers may not differentiate among their insureds on the basis of membership in a protected class.[7] In addition, many states have overlapping laws that expressly allow insurers to make distinctions based on "differences among risks that can be demonstrated to have a probable effect upon losses or expenses."[8]

---

[4] Ark. Code Ann. § 23-67-209(b); *see also* Alaska Stat. § 21.36.460(d)(4); Ariz. Rev. Stat. Ann. § 20-384; Cal. Ins. Code § 679.71; Colo. Rev. Stat. § 10-3-1104; Del. Code Ann. tit. 18, § 2304(22); Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(I); Haw. Rev. Stat. § 431:14-103; 215 Ill. Comp. Stat. 5/424(3); Iowa Code § 515F.4(3); Kan. Stat. Ann. § 40-954(c); Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Md. Code Ann. Ins. § 27-501; Minn. Stat. Ann. § 70A.5(2); Miss. Code Ann. § 83-2-3; Mont. Code Ann. § 33-18-210(5); Neb. Rev. Stat. Ann. § 44-7510(3); Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(b); N.J. Stat. Ann. § 17:29B-4(7)(c)-(d); N.M. Stat. Ann. § 59A-17-7; N.Y. Ins. Law § 2606; N.C. Gen. Stat. Ann. § 58-3-25(c); N.D. Cent. Code § 26.1-25-03; Okla. Stat. Ann. tit. 36, § 985; 40 Pa. Cons. Stat. Ann. § 1171.5(7); R.I. Gen. Laws § 27-44-5; S.C. Code Ann. § 38-75-1210(B)(1); Tex. Ins. Code Ann. § 544.002; Utah Code Ann. § 31A-19a-202(3); Vt. Stat. Ann. tit. 8, § 4724(7)(B); Wash. Rev. Code § 48.30.300; Wis. Stat. § 625.12; Wyo. Stat. Ann. § 26-14-105(b); D.C. Code § 31-2231.13(d).

[5] Mass. Gen. Laws Ann. ch. 175, § 4C; *see also* Conn. Gen. Stat. § 38a-816(12)-(13); Fla. Stat. § 626.9541; Ind. Code § 27-7-12-7; Ky. Rev. Stat. Ann. § 304.12-085; La. Stat. Ann. § 22:1964(7)(f); Mich. Comp. Laws § 500.2027; Mo. Rev. Stat. § 375.936(11)(g); S.D. Codified Laws § 58-11-55; Tenn. Code Ann. § 56-8-104(7)(F); Va. Code Ann. § 38.2-1904(A); W. Va. Code § 33-17A-6.

[6] *E.g.*, Idaho Code § 41-1405; *see also* Ala. Code § 27-13-27; Ohio Rev. Code Ann. § 3935.03; Or. Rev. Stat § 737.310.

[7] *See, e.g.*, Ala. Admin. Code r. 482-1-074-03; Idaho Admin. Code r. 18.01.51.011; Ohio Rev. Code. Ann. § 4112.02; Or. Admin. Rules 836-081-0010.

[8] W. Va. Code § 33-20-3(c)(2); *see also, e.g.*, Alaska Stat. § 21.39.030; Ariz. Rev. Stat. Ann. § 20-384; Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(1)(c); Conn. Gen. Stat. § 38a-686; Haw. Rev. Stat. § 431:14-103; Iowa Code § 515F.4; Kan. Stat. Ann. § 40-954; Ky. Rev. Stat. Ann. § 304.13-031; Me. Rev. Stat. tit. 24-A, § 2303(2); Minn. Stat. Ann. § 70A.5(2); Miss. Code Ann. § 83-2-3; Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(b); N.M. Stat. Ann. § 59A-17-7; N.D. Cent. Code § 26.1-25-03; Ohio Rev. Code Ann. § 3935.03; Utah Code Ann. § 31A-19a-202(3); Vt. Stat. Ann. tit. 8, § 4724(7)(B); Va. Code Ann. § 38.2-1904(A)(3); Wis. Stat. Ann. § 626.12(2); Wyo. Stat. Ann. § 26-14-105(b).

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 7

Because state law "substantially limits" insurers' discretion when it comes to rate-making and underwriting, it severs the causal connection between insurers' ratemaking and underwriting decisions and any resulting disparate impact. *Inclusive Communities*, 135 S. Ct. at 2524. Disparate-impact claims based on those decisions are therefore not cognizable. *Inclusive Communities*, 135 S. Ct. at 2524. For that additional reason, the Disparate-Impact Rule is unlawful as applied to insurers' underwriting and ratemaking practices.

b.    Given that state law often expressly prohibits insurers from considering race or other protected characteristics during the actuarial process, the Disparate-Impact Rule runs afoul of the McCarran-Ferguson Act, 15 U.S.C. 1011-1015. McCarran-Ferguson establishes a form of reverse preemption, authorizing state insurance law to prevail over general federal law despite the Supremacy Clause's ordinary operation. In relevant part, McCarran-Ferguson provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. 1012(b). Federal law "impair[s]" state law for purposes of McCarran-Ferguson if application of the federal law would frustrate declared state policy or interfere with a state's administrative regime. See *Humana, Inc.* v. *Forsyth*, 525 U.S. 299, 310 (1999). McCarran-Ferguson further provides that "silence on the part of the Congress shall not be construed to impose any barrier to the regulation . . . of such business by the several States." 15 U.S.C. 1011.

The FHA is a general federal law that triggers the reverse-preemption principle of the McCarran-Ferguson Act. The FHA does not specifically relate to the business of insurance, so it does not evince an intention to override the states' authority to regulate insurance within the meaning of McCarran-Ferguson. See, *e.g.*, *Ojo* v. *Farmers Group Inc.*, 600 F.3d 1205, 1209 (9th Cir. 2010) (en banc); *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 295 (7th Cir. 1992). As a result, HUD cannot construe the FHA in a way that would "invalidate, impair or supersede" state insurance laws. 15 U.S.C. 1012(b). To do so would bring the FHA and McCarran-Ferguson into conflict, and HUD cannot interpret the statute it administers to "limit[] the work of a second statute" that "it does not administer." *Epic Systems Corp.* v. *Lewis*, 138 S. Ct. 1612, 1629 (2018).

Interpreting the FHA to impose disparate-impact liability on homeowner's insurers, as HUD has done through the Disparate-Impact Rule, creates a conflict between the FHA and McCarran-Ferguson in many cases. In order to avoid disparate-impact liability under HUD's interpretation of the FHA, insurers would be compelled to collect data on protected characteristics, *but see* Md. Code Ann. Ins. § 27-501(c)(1); to consider that data, *but see, e.g.*, S.C. Code Ann. § 38-75-1210(B)(1); Tex. Ins. Code Ann. § 544.002, and to make classification and rating decisions that take into account membership in protected groups, *but see, e.g.*, Tenn. Code Ann. § 56-5-303 (a)(2)(d). With regard to these and other similar state laws,

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 8

disparate-impact liability would plainly contravene the reverse-preemption provision of the McCarran-Ferguson Act. Disparate-impact liability would more broadly impair both states' ability to base insurance regulation solely on insured risk and state insurance commissioners' authority to determine the adequacy and appropriateness of rates, also in contravention of McCarran-Ferguson. As the association of state insurance commissioners has warned, application of disparate-impact theory "makes impossible the operation of state laws establishing insurers' right to use rationally based, neutral risk-selection techniques." National Association of Insurance Commissioners Br. at 2, *Nationwide Mutual Insurance Co.* v. *Cisneros*, 516 U.S. 1140 (1996) (No. 95-714).

Notably, lower courts have recognized the conflict between imposition of disparate-impact liability on homeowner's insurers under the FHA and McCarran-Ferguson's protection of state insurance regulation. *See Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961, 967 (8th Cir. 2008); *Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351, 1361 (6th Cir. 1995); *NAACP*, 978 F.2d at 290-291; *see also Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 299 (5th Cir. 2003) (Jones, J., concurring in part and dissenting in part). In *Saunders* v. *Farmers Insurance Exchange*, for example, the Eighth Circuit affirmed the dismissal of a claim alleging a disparate impact in the pricing of homeowner's insurance, holding that McCarran-Ferguson barred the claim because the claim would interfere with Missouri's comprehensive regulatory regime. 537 F.3d at 967-968. The court noted that Missouri law required insurers to establish rates based on economic factors essential to insurer solvency, such as loss experience, and further permitted insurers to classify risks based on standards that "measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses." *Id.* at 967 (quoting Mo. Rev. Stat. § 379.318(2)). The court reasoned that allowing a federal court to "determine that the [i]nsurers' filed rates are unlawful using [the] different federal standard [of] disparate racial impact" would improperly interfere with state law and, in particular, with the ratemaking authority of the state insurance commissioner. *Id.* at 968.

The policy underlying McCarran-Ferguson underscores that Congress could not have intended to impose disparate-impact liability on homeowner's insurers in the FHA—or to give HUD the power to do so through rulemaking in the absence of a clear statutory authorization. HUD therefore should expressly exempt homeowner's insurers from liability under the Rule.

c. Because of its impact on state law, the Disparate-Impact Rule also violates Executive Order 13132, titled "Federalism." 64 Fed. Reg. 43,255 (Aug. 10, 1999). As is relevant here, Executive Order 13123 requires agencies to construe federal statutes to preempt state law only where there is "clear evidence" that Congress intended preemption of state law or where the exercise of state authority conflicts with the exercise of federal authority under the statute. § 4(a), 64 Fed. Reg. at 43,257; *see* Memorandum from OIRA

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 9

Administrator, *Guidance for Implementing E.O. 13132*, at 3 (Oct. 28, 1999) ("OIRA Guidance") (requiring state and federal authority to conflict "directly"). The Order further provides that, before promulgating a rule that preempts state law, the agency must consult with state and local officials during the regulatory process. § 6(c), 64 Fed. Reg. at 43,258.

The Disparate-Impact Rule, as applied to homeowner's insurers, necessarily preempts some state law. The Rule in effect requires insurers to consider protected characteristics to avoid disparate-impact liability. But in many cases, state law forbids insurers from doing so. *See* p. 5-6, *supra*. That means compliance with both federal and state law is impossible for homeowner's insurers—which means state law is preempted. *See Mutual Pharmaceutical Co.* v. *Bartlett*, 133 S. Ct. 2466, 2476-2477 (2013).

That creates two problems. The first is that Executive Order 13132 forbids HUD to construe the FHA to preempt state insurance law. The FHA lacks any "clear" indication—indeed, any indication at all—that Congress intended to preempt state insurance law by enacting the statute. § 4(a), 64 Fed. Reg. at 43,257. And the exercise of state authority over the insurance industry does not "directly conflict" with HUD's authority under the FHA, OIRA Guidance 3, because McCarran-Ferguson expressly preserves state control over insurance regulation. The second problem is that, despite the Disparate-Impact Rule's preemptive effect, HUD does not appear to have consulted with state officials about the Rule. *But see* E.O. 13132, § 6(c), 64 Fed. Reg. at 43,258. Quite the opposite: HUD contended that the Rule "does not . . . preempt state law within the meaning of the Executive Order." 78 Fed. Reg. at 11,481. HUD can remedy these two problems by exempting homeowner's insurers from the Disparate-Impact Rule.

3.   **The Disparate-Impact Rule Allows Claims To Proceed Based Entirely On Statistics**

As noted above, *Inclusive Communities* construed the FHA's disparate-impact standard to incorporate a "robust causality requirement [that] ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact." 135 S. Ct. at 2523 (internal quotation marks omitted). Another consequence of that causality requirement is that defendants may not be "held liable for racial disparities they did not create." *Id.* As a result, a disparate-impact claim under the FHA that "relies on a statistical disparity" cannot proceed "if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* That limitation is crucial. If racial disparity alone established a prima facie case of disparate impact, potential defendants would almost inexorably rely on "racial quotas"—"a result that Congress and [the Supreme] Court have rejected repeatedly in the past." *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 652-653 (1989); *accord Inclusive*

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 10


*Communities*, 135 S. Ct. at 2523.  The Disparate-Impact Rule flouts that statutory limita-tion.

       a.     In order to make a prima facie showing of disparate impact under the Rule, a plaintiff need only demonstrate that "a challenged practice caused or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1).  In the final version of the Rule, HUD made clear its view that a plaintiff need *not* identify a specific policy that is alleged to cause the disparity.  "Under th[e] rule," HUD wrote in the preamble, whether a party must "identify[] the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case ba-sis."  78 Fed. Reg. at 11,469.  HUD also confirmed that a plaintiff may establish a prima facie case of disparate impact under the Rule using only statistical evidence showing the existence of a disparity.  *Id.* at 11,478.

      The difference between disparate-impact claims authorized by the FHA and the dis-parate-impact claims envisioned by HUD's Rule is substantial.  The Disparate-Impact Rule envisions prima facie liability based entirely on a showing of statistical disparity, even if there is no evidence of causation.  *Inclusive Communities* forecloses that approach.  135 S. Ct. at 2523.

       b.     The difference between *Inclusive Communities* and HUD's Rule is signifi-cant, and it has an especially harsh effect on insurers.  If members of a protected class brought a claim under the Disparate-Impact Rule, they could succeed at the prima facie stage simply by pointing to the statistical disparity in insurers' rates, without any showing of causation.  The insurer then would face the burden of collecting evidence explaining why its rating classifications were necessary to achieve a substantial, legitimate, nondiscrimina-tory interest and explaining why another practice could not also serve that interest.  That process is expensive and time-consuming, even when the answer is relatively simple.  Under the more limited approach articulated by *Inclusive Communities*, however, such a claim should fail at the outset unless the plaintiffs could "point to a defendant's policy or policies causing that disparity."  135 S. Ct. at 2523.  Such a standard, unlike the much lower standard of the Disparate-Impact Rule, "protect[s] potential defendants against abusive disparate-impact claims."  *Id.* at 2524.

## 4.     The Disparate-Impact Rule Allows Plaintiffs To Displace Valid Policies

      Finally, *Inclusive Communities* dictates that "[g]overnmental or private policies are not contrary to the [FHA's] disparate-impact requirement unless they are artificial, arbi-trary, and unnecessary barriers."  135 S. Ct. at 2524 (internal quotation marks omitted).  The Supreme Court has explained that disparate-impact liability under the FHA is not a

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 11

tool for plaintiffs to force defendants to "reorder their priorities" or to "displace valid governmental and private priorities." *Id.* at 2522, 2524. Instead, the disparate-impact requirement is intended "solely" to remove artificial, arbitrary, and unnecessary barriers; claims that are no more than "an attempt to second-guess which of two reasonable approaches" a defendant should follow are not cognizable. *Id.* at 2522. The Disparate-Impact Rule ignores that limitation by imposing a flawed burden-shifting test.

      a.    Under the Disparate-Impact Rule, a plaintiff first has the burden to make a prima facie case of disparate-impact liability by demonstrating "that a challenged practice caused or predictably will cause a discriminatory effect," as that factor is interpreted by HUD. 24 C.F.R. § 100.500(c)(1). If the plaintiff meets that burden, the defendant must show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Once the defendant makes that showing, the plaintiff "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice *could be served* by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3) (emphasis added).

      Crucially, the Disparate-Impact Rule does not require that the plaintiffs' preferred alternative practice achieve the defendant's concededly valid interest as effectively as the challenged practice. In fact, HUD expressly rejected such a requirement. A commenter suggested that, "in order for [disparate-impact] liability to attach," HUD should require that "the alternative practice . . . be equally effective as the challenged practice, or at least as effective as the challenged practice." 78 Fed. Reg. 11,473. But HUD stated that it did "not believe the rule's language need[ed] to be" revised. *Id.*

      The Supreme Court's decision in *Inclusive Communities* shows that HUD was wrong. As written, the Disparate-Impact Rule allows private plaintiffs to "second-guess which of two reasonable approaches" a defendant should follow. *Inclusive Communities*, 135 S. Ct. at 2522. The Rule thus allows plaintiffs to displace all manner of valid policy choices rather than solely removing "artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (internal quotation marks omitted).

      b.    A hypothetical from the insurance context illustrates the problem. Consider a claim that an insurer's rates for customers of a particular religion in a certain city are disproportionately high. As explained above, the plaintiff could make out its prima facie case simply by showing a statistical disparity. The insurer might respond that adherents of the particular religion are concentrated in a certain part of the city, say, around their place of worship. If the homes in that part of the city rely on wood-burning stoves for heat, those homes face greater risk of fire damage, which leads the insurer reasonably to charge higher rates. By pointing to the risk of loss through fire, the insurer has shown that its

WILLIAMS & CONNOLLY LLP

August 20, 2018
Page 12

"challenged practice"—charging a higher rate—"is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests"—fairly reflecting the loss costs of the risk insured. 24 C.F.R. § 100.500(c)(2). Even after the insurer has made that showing, however, the plaintiff still might prevail under the Rule by pointing out that there are several fire stations near the insured properties and insisting that the insurer charge rates based on the proximity of fire stations, not the condition of the insured property. To be sure, the proximity of fire stations is relevant; it might mitigate the severity of loss through fire and therefore lowers the insurer's expected loss costs. But it is nowhere near as effective in furthering the insurer's legitimate goal of setting a rate that actually reflects the insured risk.

Under the Disparate-Impact Rule, the plaintiff's claim would succeed. But it should fail under the FHA, because the choice to set a rate based on the property's condition is not an "artificial, arbitrary, and unnecessary barrier[]." *Inclusive Communities*, 135 S. Ct. at 2524 (internal quotation marks omitted). As such, the choice between two valid factors for setting rates is properly left to the insurers and cannot be displaced by a plaintiff on disparate-impact grounds. The Disparate-Impact Rule, however, ignores that limitation and improperly authorizes disparate-impact claims that stretch far beyond the bounds of the statute.

\*     \*     \*     \*     \*

The clear upshot of the Supreme Court's decision in *Inclusive Communities* is that homeowner's insurers cannot be subject to disparate-impact liability under the FHA. But the Disparate-Impact Rule not only subjects insurers to disparate-impact liability; it singles them out as an example of parties that may be liable under the statute on a disparate-impact theory. HUD has no discretion here: to comply with *Inclusive Communities*, HUD must expressly exempt homeowner's and other insurers from disparate-impact liability under the Rule.

Yours sincerely,

Kannon K. Shanmugam

information on those standards, the means by which compliance with the standards is achieved, the impact of the standards on the cost of equipment, including the maintenance costs, and the effectiveness of the standards at achieving their intended purpose;

• Any available information on the distribution of CO emissions of natural or LP gas furnaces in use, or in other words, the number of gas furnaces that are not in compliance with the 400 ppm air-free standard at any given time and the degree to which they might be producing CO in excess of that standard. We also request information on the causes of equipment producing excessive CO and their frequency of occurrence, such as improper installation, changes in installation, poor maintenance of the equipment, and so forth; and

• Any available information on the relationship between excessive CO production and fuel consumption and complete/incomplete combustion in residential furnaces and boilers that are producing excessive CO emissions may also be consuming excessive fuel or not burning fuel completely.

• Any available information on methods of alerting consumers to the need to replace sensors or combination controls that have stopped working on their furnaces or boilers (such as an alphanumeric LED trouble or error code, a flashing light, or short-cycling of the appliance).

In addition, the Commission invites interested parties to submit any existing standards, or portions of them, for consideration as a consumer product safety standard. The Commission also invites interested persons to submit a statement of intention to modify or develop a voluntary consumer product safety standard addressing the risk of injury associated with CO poisoning from residential gas furnaces and boilers, including a description of the plan to develop or modify such a standard.

Please submit comments in accordance with the instructions in the **ADDRESSES** section at the beginning of this ANPR.

**Alberta E. Mills,**

*Secretary, U.S. Consumer Product Safety Commission.*

[FR Doc. 2019–17512 Filed 8–16–19; 8:45 am]

**BILLING CODE 6355–01–P**

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## 24 CFR Part 100

[Docket No. FR–6111–P–02]

RIN 2529–AA98

### HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin. HUD has long interpreted the Act to create liability for practices with an unjustified discriminatory effect, even if those practices were not motivated by discriminatory intent. This rule proposes to amend HUD's interpretation of the Fair Housing Act's disparate impact standard to better reflect the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,* and to provide clarification regarding the application of the standard to State laws governing the business of insurance. This rule follows a June 20, 2018, advance notice of proposed rulemaking, in which HUD solicited comments on the disparate impact standard set forth in HUD's 2013 final rule, including the disparate impact rule's burden-shifting approach, definitions, and causation standard, and whether it required amendment to align with the decision of the Supreme Court in *Inclusive Communities Project, Inc.*

**DATES:** *Comment Due Date:* October 18, 2019.

**ADDRESSES:** Interested persons are invited to submit comments to the Office of the General Counsel, Rules Docket Clerk, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0001. Communications should refer to the above docket number and title and should contain the information specified in the "Request for Comments" section. There are two methods for submitting public comments.

*1. Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500. Due to security measures at all Federal agencies, however, submission of comments by mail often results in delayed delivery. To ensure timely receipt of comments, HUD recommends that comments submitted by mail be submitted at least two weeks in advance of the public comment deadline.

*2. Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *https://www.regulations.gov/.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make comments immediately available to the public. Comments submitted electronically through the *https://www.regulations.gov/* website can be viewed by other commenters and interested members of the public. Commenters should follow instructions provided on that site to submit comments electronically.

*Note:* To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the document.

*No Facsimile Comments.* Facsimile (fax) comments are not acceptable.

*Public Inspection of Comments.* All comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m., weekdays, at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the public comments must be scheduled by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Copies of all comments submitted are available for inspection and downloading at *https://www.regulations.gov/.*

**FOR FURTHER INFORMATION CONTACT:** David H. Enzel, Deputy Assistant Secretary for Enforcement Programs, Office of Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW, Room 5204, Washington, DC 20410, telephone number 202–402–5557 (this is not a toll-free number). Individuals with hearing or speech impediments may access this number via TTY by calling the Federal Relay during working hours at 800–877–8339 (this is a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules to carry out the Act to HUD.[2] While the Supreme Court has held that the language of the Fair Housing Act prohibiting discrimination in housing is "broad and inclusive," [3] it has also cautioned that the language should not be construed to force defendants to "resort to the use of racial quotas" [4] or require courts to "second-guess" reasonable choices.[5] HUD has implemented prohibitions on discriminatory conduct under the Fair Housing Act at 24 CFR part 100, most recently to include the disparate impact standard in 2013. However, as the Supreme Court cautioned, there must be adequate safeguards around application of disparate impact analysis to avoid setting "our Nation back in its quest to reduce the salience of race in our social and economic system." [6]

On February 15, 2013, pursuant to its authority to administer the Fair Housing Act, HUD published a final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" [7] (final disparate impact rule). The final disparate impact rule codified HUD's interpretation that the Fair Housing Act creates liability for practices with an unjustified discriminatory effect and responded to public comments on the proposed rule.[8] Relying in part on case law under the Fair Housing Act and title VII of the Civil Rights Act of 1964 (prohibiting employment discrimination) and HUD's longstanding view that discriminatory

effects liability is available under the Fair Housing Act, HUD's final disparate impact rule established a burden-shifting framework for analyzing claims of disparate impact under the Fair Housing Act.[9] Specifically, the final rule provides that liability may be established under the Fair Housing Act when a challenged practice actually or predictably results in a disparate impact on a protected class of persons, even if the practice was not motivated by a discriminatory intent. The rule states that a practice that has a discriminatory effect may still be lawful if supported by a legally sufficient justification. Such a justification exists under the rule where the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant and those interests could not be served by another practice that has a less discriminatory effect. The rule also requires that the legally sufficient justification be supported by evidence and may not be hypothetical or speculative.

An unjustified discriminatory effect is established according to the following burdens of proof: (1) The charging party or the plaintiff has the burden of proving that a challenged practice caused, or predictably will cause, a discriminatory effect; (2) the respondent or defendant then has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant; and (3) if the respondent or defendant satisfies the burden of proof, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. Lastly, the rule provides that a demonstration that a practice is supported by a legally sufficient justification may not be used as a defense against a claim of intentional discrimination.

In 2016, HUD published a **Federal Register** document supplementing HUD's previous response to insurance industry comments HUD provided in its final disparate impact rule.[10] The comments HUD received were on its 2011 Fair Housing Act's discriminatory effects standard proposed rule. After reconsideration of the insurance industry comments, in accordance with

the court's decision in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan*,[11] HUD explained that the agency "continues to believe that case-by-case adjudication is preferable to creating the requested exemptions or safe harbors for insurance practices." HUD noted in support of its case-by-case adjudication preference that, given the diversity of State laws and potential discriminatory effect claims, "it is practically impossible for HUD to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application." [12] This proposed rule uses the term "Disparate Impact Rule" to refer collectively to the final disparate impact rule and 2016 supplement.

In 2015, in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,*[13] (*Inclusive Communities*), the Supreme Court held that disparate impact claims are cognizable under the Fair Housing Act. The Court's opinion referenced HUD's Disparate Impact Rule,[14] but the Court did not rely on it for its holding. Rather, the Court undertook its own analysis of the Fair Housing Act and discussed the standards for, and constitutional questions and necessary limitations regarding, disparate impact claims.[15]

In discussing disparate impact liability, the Court noted that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." [16]

The Court placed special emphasis on the importance of the plaintiff's prima facie burden, warning that, "[w]ithout adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas, and serious constitutional questions then could arise." [17] The Court held that, to allege a prima facie case, a plaintiff must specify a policy (or policies) as the cause of the disparity, to meet a "robust causality" requirement that "protects defendants from being held liable for

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap."

[2] *See* 42 U.S.C. 3608(a) and 42 U.S.C. 3614a.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972); *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731 (1995).

[4] *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,* 135 S. Ct. 2507, 2512 (2015).

[5] *Id.* at 2512 ("Here, the underlying dispute involves a novel theory of liability that may, on remand, be seen simply as an attempt to second-guess which of two reasonable approaches a housing authority should follow in allocating tax credits for low-income housing.").

[6] *Id.* at 2524.

[7] 78 FR 11460.

[8] *See* 24 CFR 100.5(b), 100.70(d)(5), 100.120(b), 100.130(b), and 100.500.

[9] *See* 24 CFR 100.500(c).

[10] *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016); 81 FR 69013.

[11] 66 F. Supp. 3d 1018 (N.D. Ill. 2014).

[12] *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016) for HUD's additional justification.

[13] 135 S. Ct. 2507 (2015).

[14] *See* 135 S. Ct. at 2514–2515, 2522.

[15] *See Id.* at 2519–2524.

[16] *Id.*

[17] *Id.* at 2523 (internal quotations removed).

racial disparities they did not create."[18] A one-time decision may not be a policy at all, and multiple factors leading to a decision may make it difficult to establish causation.[19]

The Court also prohibited disparate impact suits that would displace "valid governmental and private priorities[.]"[20] "Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision"[21] or "to second-guess" between "two reasonable approaches[.]"[22] If, for instance, a private developer is prevented from investing in housing for low-income individuals, or a government is prevented from ensuring compliance with health and safety codes, the purpose of the Fair Housing Act would be undermined.[23] The policy identified, therefore, must be an "artificial, arbitrary, and unnecessary barrier" to fair housing.[24]

Finally, the Court urged courts to ensure that their remedial orders "concentrate on the elimination of the offending practice" and "eliminate racial disparities through race-neutral means."[25] "Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions."[26]

Following the *Inclusive Communities* decision, on May 15, 2017, HUD published a **Federal Register** notice pursuant to Executive Orders 13771, "Reducing Regulation and Controlling Regulatory Costs," and 13777, "Enforcing the Regulatory Reform Agenda," inviting public comments to assist HUD in identifying existing regulations that may be outdated, ineffective, or excessively burdensome.[27] In response, HUD received numerous comments concerning the Disparate Impact Rule and *Inclusive Communities*. Some commenters wrote that the case supported HUD's rule as currently drafted while others felt HUD should

revisit its rule considering the analysis provided in the case. Commenters in support of the rule noted the *Inclusive Communities* case supported HUD's position that disparate impact claims are cognizable under the Fair Housing Act and that it did not require changes to HUD's framework, which standardized the "burden-shifting" approach used by HUD and 11 U.S. Courts of Appeals. Some commenters specifically thought the burden-shifting framework, the causality requirement, and the less discriminatory alternative step should be amended to better align with the case law. Some commenters also felt that HUD should revisit the application of disparate impact to the insurance industries. Additionally, in October 2017, the Secretary of the Treasury issued a report in response to Executive Order 13772, "Core Principles for Regulating the United States Finance System," issued on February 3, 2017.[28] The Treasury report identified Federal regulations, among other items, that promote or inhibit the U.S. financial system. The report explicitly recommended that HUD reconsider applications of the Disparate Impact Rule, especially in the context of the insurance industry.[29]

In light of *Inclusive Communities*, public comments submitted in response to HUD's May 15, 2017, **Federal Register** notice, and the recommendation from the Secretary of the Treasury, on June 20, 2018, HUD published in the **Federal Register** an advance notice of proposed rulemaking (ANPR) inviting comments on possible amendments to HUD's Disparate Impact Rule. HUD received 1,923 comments on the ANPR, and the comments have been considered during the drafting of this new rule. Some commenters wrote in support of disparate impact liability more broadly, citing the important part it has played in monitoring exclusionary housing practices for at least 30 years, while others described the disparate impact standard as inconsistent with the constitutional presumption against race-based decision-making. Similarly, some comments supported HUD's disparate

impact rule and others opposed the rule and felt that HUD's rule undermined the Fair Housing Act. Other commenters felt that the rule was plainly redundant or unnecessary given existing case law.

Commenters that supported HUD's current rule approved of HUD's burden-shifting framework requiring the defendant to prove that the practice is necessary. In addition, those commenters generally supported the rule's language that provided that a plaintiff could prevail by proving that an alternative practice could be used that has a less discriminatory effect. Commenters also referenced the importance of the HUD rule when it comes to the use of eminent domain and redevelopment.[30] Some commenters stated that *Inclusive Communities* was consistent with HUD's rule and that the Supreme Court did not state that any changes to the HUD rule were necessary or that HUD's rule created new obligations. Additionally, some comments noted that post-*Inclusive Communities* courts simultaneously have relied upon both the rule and *Inclusive Communities* as authorities for analyzing disparate impact claims, demonstrating there is no fundamental conflict between the two. Commenters that opposed HUD's current disparate impact rule requested that HUD revise the rule to be more consistent with *Inclusive Communities*. Many of those commenters specifically cited to the inconsistent effects of HUD's standards, the low level of proof and production, the limited causality requirement, the impact on the use of statistical disparities, and the consequences of allowing plaintiffs to show any alternative practice.

Commenters also provided feedback on the use of disparate impact for enforcement and the economic burden of the standard. Commenters wrote that providers should not be liable for disparities they did not create or intend. There were requests from the real estate, credit, property casualty insurer, and other industries for exemptions from the rule for insurance, risk-based pricing, and underwriting. The commenters cited concern with the rule's impact on costs and shifts of burden onto renters and insurance consumers. The commenters also noted increased litigation risks for providers and the possibility that the availability of insurance products and credit could be reduced. The commenters supported their position by pointing to the fact that underwriting is unrelated to protected characteristics and that compliance with

---

[18] *Id.* at 2523.

[19] *Id.*

[20] *Id.* at 2524.

[21] *Id.*

[22] *Id.* at 2512 ("Here, the underlying dispute involves a novel theory of liability that may, on remand, be seen simply as an attempt to second-guess which of two reasonable approaches a housing authority should follow in allocating tax credits for low-income housing.").

[23] *Id.*

[24] *Id.* at 2522, 2524 (internal quotation marks and citation omitted) *Id.* at 2522 (quoting *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431, 91 S. Ct. 849 (1971)). *Id.* at 2522. *Id.* at 2522.

[25] *Id.* at 2525.

[26] *Id.*

[27] 82 FR 22344.

[28] *See* U.S. Department of the Treasury Report: "A Financial System That Creates Economic Opportunities, Asset Management and Insurance (Oct. 26, 2017), available at: *https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf*.

[29] *See* U.S. Department of the Treasury Report: "A Financial System That Creates Economic Opportunities, Asset Management and Insurance" (Oct. 26, 2017), available at: *https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf*.

[30] Citing *Mount Holly Gardens Citizens in Action* v. *Twp. of Mount Holly*, 658 F.3d 375 (3d Cir. 2011).

the rule distorts market/risk-based pricing.

Lastly, some commenters stated that the States are better equipped to regulate certain industries and that the existing rule conflicts with State laws and violates the McCarran-Ferguson Act.[31] In contrast, other commenters stated that other Federal statutes should be read to be consistent with Federal civil rights laws and that Congress has the power to make exceptions and create "safe harbors" to the Fair Housing Act (as it did previously by excepting certain specific tenant selection practices from disparate impact liability) but Federal administrative agencies cannot. Those commenters generally noted no safe harbor should be provided and that HUD's case-by-case analysis should be retained to ensure consistency with HUD's statutory responsibility to enforce the Fair Housing Act.

All public comments can be viewed at the *www.regulations.gov website,* under docket number HUD–2018–0047. (See *https://www.regulations.gov/ docket?D=HUD-2018-0047*).

## II. This Proposed Rule

In response to comments received on HUD's May 15, 2017, notice and June 20, 2018, ANPR, this rule proposes to replace HUD's current discriminatory effects standard at § 100.500 with a new standard and incorporate minor amendments to §§ 100.5, 100.7, 100.70, and 100.120. These amendments are intended to bring HUD's disparate impact rule into closer alignment with the analysis and guidance provided in *Inclusive Communities* as understood by HUD and to codify HUD's position that its rule is not intended to infringe upon any State law for the purpose of regulating the business of insurance. HUD intends these regulations as an update to HUD's existing framework for evaluating administrative actions alleging a claim of disparate impact and to provide guidance to members of the public seeking to comply with the Fair Housing Act or in bringing a claim for disparate impact that meets the prima facie requirements outlined in *Inclusive Communities.*

### § 100.5   Scope

This rule proposes to amend § 100.5 to clarify that the new § 100.500 includes available defenses and rebuttals to allegations of discriminatory effect. The proposed rule would also clarify, in accordance with the language in *Inclusive Communities* warning

against the use of racial quotas,[32] that neither the discriminatory effect standard, nor any other item in HUD's part 100 regulations, requires or encourages the collection of data with respect to protected classes and that the absence of such collection will not result in any adverse inference against a party.

### § 100.7   Liability for Discriminatory Housing Practices

The proposed amendment to § 100.7 clarifies, consistent with the Supreme Court's decision in *Meyer* v. *Holley,* 537 U.S. 280 (2003), that there must be a principal-agent relationship under common law for there to be vicarious liability on the part of a person for a discriminatory housing policy or practice by that person's agent or employee. In addition, the proposed rule would add a new paragraph (c) to provide the scope of remedies available in administrative proceedings for discriminatory effect cases. New paragraph (c) states, to conform with the language of *Inclusive Communities,*[33] that the remedy should concentrate on eliminating or reforming the discriminatory practice and that, therefore, a remedy in administrative proceedings may include equitable remedies and, when proved, pecuniary damage, but clarifies, consistent with the Fair Housing Act, that punitive and exemplary damages are unavailable in administrative proceedings.[34]

HUD is specifically seeking feedback on the question of whether, and under what circumstances, punitive or exemplary damages may be appropriate in disparate impact litigation in Federal court.

### § 100.70   Other Prohibited Sale And Rental Conduct

Section 100.70 provides that it is unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating, for buying, or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood, or development. The section provides examples of such practices in paragraph (c). This rule proposes to amend the final example of a violation of the Fair Housing Act in paragraph (c)(5) to add that enactment or implementation of building codes,

permitting rules, and requirements should also be considered as other prohibited sale and rental conduct that could be considered as restricting or denying housing opportunities or otherwise making unavailable or denying dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin. HUD is adding these additional types of examples for clarity in connection with the changes HUD is making in § 100.500.

### § 100.120   Discrimination in the Making of Loans and in the Provision of Other Financial Assistance

Section 100.120 provides that it shall be unlawful for any person or entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available loans or other financial assistance for a dwelling, or which is or is to be secured by a dwelling, because of race, color, religion, sex, handicap, familial status, or national origin. The section provides examples of such practices in paragraph (b). This rule proposes to amend the first example in paragraph (b)(1), which provides that providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin violates the Fair Housing Act, by amending "inaccurate or different from that provided others" to requiring the information be "materially inaccurate or materially different from that provided others" to clarify, in accordance with the guidance in *Inclusive Communities,*[35] that informational disparities that are inconsequential do not violate the Fair Housing Act. The proposed change would also add a clause to paragraph (b)(1) clarifying that the Fair Housing Act is not violated when a person or entity provides accurate responses to requests for information related to an individual's particular circumstances.

### § 100.500   Discriminatory Effect Prohibited

Section 100.500 continues to provide that liability under the Fair Housing Act may be established based on a specific practice's discriminatory effect on members of a protected class, even if the specific practice was not motivated by a discriminatory intent. HUD seeks to amend this regulation to provide additional guidance in light of *Inclusive Communities;* this proposed revision represents HUD's interpretation of

---

[31] 15 U.S.C. 1011–1015.

[32] 135 S. Ct. at 2512.

[33] *Id.* at 2524.

[34] 42 U.S.C. 3612(g)(3).

[35] 135 S. Ct. at 2524.

disparate impact law under the Fair Housing Act. Paragraph (a) would be slightly amended to reflect the removal of a definition for discriminatory effect and the changes to the burden-shifting framework. The previous definition simply reiterated the elements of a disparate impact claim, which HUD believes is now adequately defined in more detail in the later sections, thus, making the definition unnecessary. New paragraphs (b) through (d) would provide a new burden-shifting framework and new paragraph (e) would address the application of the section to the business of insurance.

New Burden-Shifting Framework

The proposed new burden-shifting framework provides, in paragraph (b), that a plaintiff's allegations that a specific, identifiable, policy or practice has a discriminatory effect must plead facts supporting five elements. HUD notes that since *Inclusive Communities* many parties have failed to identify a "specific, identifiable practice." [36] It is insufficient to identify a program as a whole without explaining how the program itself causes the disparate impact as opposed to a particular element of the program. Plaintiffs must identify the particular policy or practice that causes the disparate impact. Plaintiffs will likely not meet the standard, and HUD will not bring a disparate impact claim, alleging that a single event—such as a local government's zoning decision or a developer's decision to construct a new building in one location instead of another—is the cause of a disparate impact, unless the plaintiff can show that the single decision is the equivalent of a policy or practice.[37] In unusual cases, a plaintiff may still be able to succeed at identifying a one-time decision, if the plaintiff can establish that the one-time decision is in fact a policy or practice.[38]

The first proposed element would require a plaintiff to plead that the challenged policy or practice is *arbitrary, artificial, and unnecessary* to achieve a valid interest or legitimate objective. *Inclusive Communities* requires plaintiffs to allege facts at the pleading stage supporting a prima facie claim of disparate impact and requires courts to analyze these claims "with care" to ensure that "the specter of disparate-impact litigation" does not prevent parties "from achieving legitimate objectives." [39] In accordance with this standard, this proposed rule would require plaintiffs to allege facts plausibly showing that the challenged practice is arbitrary, artificial, and unnecessary. This requirement is supported by *Ellis* v. *City of Minneapolis,* which dismissed the plaintiffs' disparate impact claim against the city's housing code for failure to plead facts showing how the housing code was arbitrary, artificial, and unnecessary.[40] In *Ellis,* the challenged housing code was, on its face, intended to require sanitary housing, and the plaintiffs made no attempt to explain how the housing code was arbitrary, artificial, and unnecessary to advance this goal.[41] HUD recognizes that plaintiffs will not always know what legitimate objective the defendant will assert in response to the plaintiff's claim or how the policy advances that interest, and, in such cases, will not be able to plead specific facts showing why the policy or practice is arbitrary, artificial, and unnecessary. In such cases, a pleading plausibly alleging that a policy or practice advances no obvious legitimate objective would be sufficient to meet this pleading requirement. However, in cases where a policy or practice has a facially legitimate objective, the plaintiff must allege facts at the pleading stage sufficient to support a plausible allegation that the policy is arbitrary, artificial, and unnecessary.[42]

If a plaintiff adequately alleges facts to support the assertion that the practice or policy is arbitrary, artificial, and unnecessary, only then does the defendant have the burden to identify a valid interest or interests that the challenged policy or practice serves,

which may then be rebutted by the plaintiff, as described below.[43]

The second proposed element would require a plaintiff to allege a *robust causal link* between the challenged policy or practice and a disparate impact on members of a protected class. Claims relying on statistical disparities must articulate how the statistical analysis used supports a claim of disparate impact by providing an appropriate comparison that shows that the policy is the actual cause of the disparity.[44]

The third proposed element would require a plaintiff to allege that the challenged policy or practice has an adverse effect *on members of a protected class.* This element would require a plaintiff to explain how the policy or practice identified has a harmful impact on members of a particular "race, color, religion, sex, familial status, or national origin." [45] Consistent with *Inclusive Communities,* it would be insufficient to allege only that the plaintiff is a member of a protected class and would be adversely affected or that members of a protected class are impacted as are all individuals. This element would require the plaintiff to show that the policy or practice has the "effect of discriminating against a protected class" as a group.[46]

The fourth proposed element would require a plaintiff to allege that the disparity caused by the policy or practice is *significant.* Where a disparity exists but is not material, a plaintiff will not have stated a plausible disparate impact claim. If a defendant were subject to liability for policies that have a negligible disparity, the defendant could be forced to "resort to the use of racial quotas" [47] to ensure that no subset of its data appears to present a disparate impact. *Inclusive Communities* specifically noted that courts must "examine with care whether a plaintiff has made out a prima facie showing of disparate impact, and prompt resolution is important . . ." to avoid injecting "racial considerations into every housing decision." [48] Therefore, a

---

[36] *See, e.g., Frederick* v. *Wells Fargo Home Mortg.,* 649 F. App'x 29, 30 (2d Cir. 2016) (Plaintiff challenging lender's denial of a mortgage application failed to identify the specific policy or practice that caused the disparate impact).

[37] *See, e.g., Barrow* v. *Barrow,* Civil Action No. 16–11493–FDS, 2017 U.S. Dist. LEXIS 103495, at *8 (D. Mass. July 5, 2017) (citing *Inclusive Communities,* 135 S. Ct. at 2523) ("[A] plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all.").

[38] *See* 135 S. Ct. at 2523–24 ("For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because of the multiple factors that go

into investment decisions about where to construct or renovate housing units.").

[39] 135 S. Ct. at 2523–24.

[40] *See Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1112–14 (8th Cir. 2017) (citing *Inclusive Communities,* 135 S. Ct. at 2524).

[41] *Id.*

[42] *See id.* at 1114 ("a plaintiff must, at the very least, point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity.).

[43] *See Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989) (holding that the defendant has the burden of producing evidence of the justification for the alleged policy or practice but making clear that the burden of persuasion to prove their case ultimately remains with the plaintiff).

[44] *See id.* (holding that a disparate impact claim is not adequately pled where the alleged disparity is the result of factors outside the defendant's control and does not support the assertion that the defendant's policy itself is the cause of the disparity).

[45] 42 U.S.C. 3604(a).

[46] *Anderson* v. *City of Blue Ash,* 798 F.3d 338, 364 (6th Cir. 2015).

[47] 135 S. Ct. at 2512.

[48] *Id.*

plaintiff would be required to show that the statistical disparity identified is material and caused by the challenged policy or practice, rather than attributable to chance.

The fifth proposed element would require a plaintiff to allege that the *complaining party's alleged injury* is directly caused by the challenge policy or practice. This element seeks to codify the proximate cause requirement under the Fair Housing Act that there be "some direct relation between the injury asserted and the injurious conduct alleged." [49]

If a party brings a claim under paragraph (b), HUD proposes that the defending party may rebut a claim at the pleading stage by asserting that a plaintiff has not alleged facts to support their prima facie claim as explained in paragraph (c).[50] Paragraph (c) also provides defendants with three methods through which to establish that plaintiffs have not alleged a disparate impact claim. HUD proposes to provide that the defendants may raise any of these defenses in paragraph (c) through a variety of procedural motions. For example, in a rule 12(b)(6) motion to dismiss, the defendant can make an argument under the paragraph (c) defense that the facts alleged in the complaint fail to allege sufficient facts to support a claim under paragraph (b). Another example is a rule 56 motion for summary judgment where the defendant could assert facts outside of the complaint to substantiate a defense under paragraph (c). For instance, on a rule 56 motion for summary judgment, the defendant may succeed where the defendant "shows that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law."

Paragraph (c)(1) provides that the defendant may show its discretion is materially limited by a third party— such as through a Federal law or a State or local law—or a binding or controlling court, arbitral, regulatory, administrative order, or administrative requirement. In cases where a State actor or municipality is the defendant, a State or local law, respectively, may not be considered materially limiting for purposes of this defense.[51] This defense would allow a defendant to show that

the complaining party has not shown a robust causality as required in *Inclusive Communities* and codified in paragraph (b)(2), by failing to show that the defendant's policy is the actual cause of the alleged disparate impact.[52] This defense partially overlaps with proposed paragraph (e) of this section, which clarifies that nothing in § 100.500 is intended to conflict with State insurance law. This defense applies to any Federal, State, or local law that limits the defendant's discretion. As discussed further in the Business of Insurance section below, § 100.500(e) applies only to State insurance law.

Paragraph (c)(2) provides that, where a plaintiff identifies an offending policy or practice that relies on an algorithmic model, a defending party may defeat the claim by: (i) Identifying the inputs used in the model and showing that these inputs are not substitutes for a protected characteristic and that the model is predictive of risk or other valid objective; (ii) showing that a recognized third party, not the defendant, is responsible for creating or maintaining the model; or (iii) showing that a neutral third party has analyzed the model in question and determined it was empirically derived, its inputs are not substitutes for a protected characteristic, the model is predictive of risk or other valid objective, and is a demonstrably and statistically sound algorithm.

HUD received comments expressing concern that complicated, yet increasingly commonly used, algorithmic models to assess factors such as risk or creditworthiness, should be provided a safe harbor. While disparate impact provides an important tool to root out factors that may cause these models to produce discriminatory outputs, these models can also be an invaluable tool in extending access to credit and other services to otherwise underserved communities. Therefore, HUD proposes these defenses to provide parties with three methods of defending their models where they can show their models achieve "legitimate objectives[.]" [53] They are intended to ensure that disparate impact liability is "limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." [54] This section is not intended to provide

a special exemption for parties who use algorithmic models, but merely to recognize that additional guidance is necessary in response to the complexity of disparate impact cases challenging these models. HUD proposes that a successful defense under this section would demonstrate the lack of a robust causal link between the defendant's use of the model and the alleged disparate impact, as described below.

The first defense allows a defendant to provide analysis showing that the model is not the actual cause of the disparate impact alleged by the plaintiff. It allows the defendant to break down the model piece-by-piece and demonstrate how each factor considered could not be the cause of the disparate impact and to show how each factor advances a valid objective. This defense simply lays out the steps that a defendant would take in defending its actions. A defendant will succeed under this defense where the plaintiff is unable to then show that the defendant's analysis is somehow flawed, such as by showing that a factor used in the model is correlated with a protected class despite the defendant's assertion.

The second defense provides that a defendant can show that use of the model is standard in the industry, it is being used for the intended purpose of the third party, and that the model is the responsibility of a third party. It is similar to the defense that the defendant's actions are materially limited by law, as discussed above, in that it recognizes that there are situations in which standard practice is so clearly established that the proper party responsible for the challenged conduct is not the defendant, but the party who establishes the industry standard. In these situations, the defendant may not have access to the reasons these factors are used or may not even have access to the factors themselves, and, therefore, may not be able to defend the model itself, even where a perfectly rational reason exists for its use. Further, if the plaintiff prevails, the plaintiff would only remove the model from use by one party, whereas suing the party that is actually responsible for the creation and design of the model would remove the disparate impact from the industry as a whole. A plaintiff may rebut this allegation by showing that the plaintiff is not challenging the standard model alone, but the defendant's unique use or misuse of the model, as the cause of the disparate impact.

The third defense is similar to the first and provides defendants with another method of showing that the model is not

---

[49] *Bank of Am. Corp.* v. *City of Miami*, 137 S. Ct. 1296, 1306 (2017).

[50] For example, the Supreme Court in *Wards Cove Packing Co.* dismissed a disparate impact claim against a firm that denied job applicants from a protected class at a higher rate than non-protected class members. Despite the statistical disparity, the plaintiffs had not identified an injury because a disproportionate number of *qualified* minorities were not denied employment. 490 U.S. at 650, 653.

[51] *See Mount Holly*, 658 F.3d 375 (3d Cir. 2011).

[52] 135 S. Ct. at 2524 ("[I]f [the plaintiff] cannot show a causal connection between the Department's policy and a disparate impact—for instance, because Federal law substantially limits the Department's discretion—that should result in dismissal of this case.").

[53] *Id.* at 2524.

[54] *Id.* at 2518.

the actual cause of the disparate impact. This defense allows defendants to prove through the use of a qualified expert that the model is not the cause of a disparate impact. A plaintiff may rebut this defense by showing that the third party is not neutral, that the analysis is incomplete, or that there is some other reason why the third party's analysis is insufficient evidence that the defendant's use of the model is justified.

Given the complicated nature of this issue, HUD is specifically soliciting comments on the nature, propriety, and use of algorithmic models as related to the defenses in (c)(2).

Paragraph (c)(3) provides that a defendant may make any additional claims that the plaintiff has failed to allege sufficient facts to support a prima facie case under paragraph (b).

If a party alleges facts sufficient to show a prima facie case under paragraph (b), a case proceeds beyond the pleading stage. Under paragraph (d)(1), HUD's proposed rule provides that the plaintiff has the burden of proving by a preponderance of the evidence each of the elements of the prima facie case, established not by statistical imbalances or disparities alone, but through evidence that is not remote or speculative. A plaintiff may now have access to discovery to establish facts supporting each allegation, including the allegation that the identified policy or practice is "arbitrary, artificial, and unnecessary." In addition, a defendant may show that the policy or procedure advances a valid interest. The plaintiff must counter this by proving by a preponderance of the evidence that a less discriminatory policy or practice would serve the interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant, consistent with existing disparate impact case law.[55]

Under paragraph (d)(2), the proposed rule provides that the defendant may rebut a plaintiff's case by proving any element identified under paragraph (c)(1) or (2). The defendant may also rebut a plaintiff's case by demonstrating that the plaintiff has not met the burden of proof laid out in paragraph (d)(1), either by failing to prove the elements of a prima facie case or by failing to identify an alternative practice that advances the valid interest identified by the defendant without creating materially greater costs or other material burdens for the defendant, and, therefore, has not in fact "made out a

prima facie case of disparate impact."[56] HUD is also particularly seeking input on whether it would be consistent with *Inclusive Communities* to provide a defense for housing authorities who can show that the policy being challenged is a reasonable approach and in the housing authority's sound discretion.

HUD specifically seeks comments on the terms used in this section of the rule and whether HUD should define these terms. Examples of terms that HUD would consider providing definitions to are "robust causal link," "evidence that is not remote or speculative," "algorithmic model," and "material part."

Business of Insurance

In response to comments requesting HUD consider its position on the application of disparate impact to insurance, HUD proposes adding new paragraph (e), which would provide that nothing in § 100.500 is intended to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance. This codifies the general applicability of the "reverse preemption" provisions of the McCarran-Ferguson Act as it applies to the Fair Housing Act.[57] The McCarran-Ferguson Act provides that provisions of Federal law in conflict with state insurance laws are preempted by state laws "unless such Act specifically relates to the business of insurance[.]"[58] This proposed language clarifies that the Fair Housing Act does not "specifically relate to the business of insurance" and affirms in regulation HUD's past position, as stated above, that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case. The Fair Housing Act, and, therefore, this regulation, will only be preempted where application of the Fair Housing Act would invalidate, impair, or supersede the State insurance law. Under these circumstances, the State insurance law governs.[59]

Proposed paragraph (e) does not provide the safe harbor for insurance, which some commenters requested. However, this proposed section and the complete defense where a defendant's discretion is materially limited by

compliance with Federal, State, or local law, would have a similar effect to a safe harbor, in appropriate circumstances, by ensuring that parties are never placed in a "double bind of liability" where they could be subject to suit under disparate impact for actions required for good faith compliance with another law.[60] Both provisions are also consistent with *Inclusive Communities'* robust causality requirement because, where the actual cause of the disparate impact is another law and not the defendant's own independent decisions, a plaintiff has not shown that the defendant is the actual cause of the disparate impact.[61]

This proposed paragraph applies where the defendant can show that imposing disparate impact liability under the Fair Housing Act would invalidate, impair, or supersede State insurance law. The "materially limited" defense is not restricted to State insurance law, but requires the defendant to show that the defendant's discretion is limited to comply with Federal, State, or local law.

## III. Additional Questions for Public Comment

In addition to the specific feedback sought elsewhere in the preamble, HUD explicitly requests public comment on the following questions in order to better inform HUD's regulatory impact analysis at the final rule stage.

1. How well do HUD's proposed changes to its disparate impact standard align with the decision and analysis in *Inclusive Communities* with respect to the proposed prima facie burden, including:

i. Each of the five elements in the new burden-shifting framework outlined in paragraph (b) of § 100.500.

ii. The three methods described in paragraph (c) of § 100.500 through which defendants may establish that plaintiffs have failed to allege a prima facie case.

2. What impact, using specific court cases as reference, did *Inclusive Communities* have on the number, type, and likelihood of success of disparate impact claims brought since the 2015 decision? How might this proposed rule further impact the number, type, and likelihood of success of disparate impact claims brought in the future?

3. How, specifically, did *Inclusive Communities*, and the cases brought since *Inclusive Communities*, expand upon, conflict, or align with HUD's 2013

---

[55] *Wards Cove,* 490 U.S. at 661.

[56] 135 S. Ct. at 2523.

[57] 15 U.S.C. 1012(b).

[58] *Id.*

[59] For a discussion of this issue, see *Ojo* v. *Farmers Grp.,* 600 F.3d 1205 (9th Cir. 2010), in which the Appeals Court concluded that the McCarran-Ferguson Act can reverse-preempt the Fair Housing Act, and certified to the Texas Supreme Court the question of whether the Fair Housing Act would conflict with Texas insurance law.

[60] 135 S. Ct. at 2523.

[61] *Id.* at 2524 ("[I]f the ICP cannot show a causal connection between the Department's policy and a disparate impact—for instance, because Federal law substantially limits the Department's discretion—that should result in dismissal of this case.").

final disparate impact rule and with this proposed rule?

4. How might the proposed rule increase or decrease costs and economic burden to relevant parties (*e.g.,* litigants, including private citizens, local governments, banks, lenders, insurance companies, or others in the housing industry) relative to the 2013 final disparate impact rule? How might the proposed rule increase or decrease costs and economic burden to relevant parties relative to *Inclusive Communities*?

5. How might a decision *not* to amend HUD's 2013 final disparate impact rule affect the status quo since *Inclusive Communities*?

6. What impact, if any, does the addition of paragraph (e) of § 100.500 regarding the business of insurance have on the number and type of disparate impact claims? What impact, if any, does the proposed paragraph (e) have on costs (or savings) and economic burden of disparate impact claims?

7. Is there any other data, information, or analysis the public can provide to assist HUD in assessing the impact of the proposed regulation relative to the 2013 disparate impact final rule and the 2015 Supreme Court decision in *Inclusive Communities*?

## IV. Findings and Certifications

*Regulatory Review—Executive Orders 12866 and 13563*

Pursuant to Executive Order 12866 (Regulatory Planning and Review), a determination must be made whether a regulatory action is significant and, therefore, subject to review by the Office of Management and Budget in accordance with the requirements of the order. Executive Order 13563 (Improving Regulations and Regulatory Review) directs executive agencies to analyze regulations that are "outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned." Executive Order 13563 also directs that where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, agencies are to identify and consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public.

The proposed rule has been determined to be a "significant regulatory action," as defined in section 3(f) of the Order, but not economically significant under section 3(f)(1) of the Order. The docket file is available for public inspection in the Regulations Division, Office of General Counsel, Department of Housing and Urban

Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–402–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service, toll-free, at 800–877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a substantial economic impact on a substantial number of small entities. This rule updates HUD's uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. HUD's objective in this proposed rule is to ensure consistency and uniformity, given the Supreme Court decision, and, thereby, provide clarity for the public. HUD's 2013 regulation codified the then prevailing case law for bringing a discriminatory effect claim and the rule provided clarity to all parties involved in a case. Currently, the courts and the public are forced to reconcile how to implement HUD's regulations consistent with *Inclusive Communities.* This rule will provide clarity, thus reducing burdens, for all parties by, consistent with HUD's prior rule, codifying the current framework for bringing a discriminatory effect claim consistent with new case law. Specifically, plaintiffs will have a framework to use for ensuring complaints meet all the requirements identified in *Inclusive Communities* for pleading a claim of discriminatory effect, and defendants will be able to use this framework to rebut such claims. Similarly, defendants will be more proactive in ensuring that their policies and practices comply with the defenses that are provided. It is HUD's intention that plaintiffs will bring claims that are better supported and defendants will be able to resolve unsupported claims of discriminatory effect more quickly; therefore, leading to the "prompt resolution" of disparate impact for all parties.[62] HUD believes all parties, including small entities, will benefit from the changes and clarifications in the rule by reconciling HUD's existing regulatory framework for discriminatory effect claims with

*Inclusive Communities* and subsequent case law. Similarly, all entities will especially benefit from this rule as it will allow for a quicker, less costly method of understanding their burden and responsibility under disparate impact law without the need to research and compile case law since *Inclusive Communities.*

Accordingly, the undersigned certifies that the proposed rule will not have a significant economic impact on a substantial number of small entities. Notwithstanding HUD's determination that this rule will not have a significant effect on a substantial number of small entities, HUD specifically invites comments regarding any less burdensome alternatives to this rule that will meet HUD's objectives as described in the preamble to this rule. HUD also requests comments on the potential burden or benefit the proposed regulations may have on potential claimants and the organizations that represent them, some of which are small businesses.

*Environmental Impact*

This proposed rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on State and local governments and is not required by statute, or (ii) preempts State law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This rule does not have federalism implications and does not impose substantial direct compliance costs on State and local governments or preempt State law within the meaning of the Executive order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and tribal governments and on the private sector. This rule would not impose any Federal mandates on any State, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

---

[62] 135 S. Ct. at 2523.

## List of Subjects in 24 CFR Part 100

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD proposes to amend 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

■ 2. In § 100.5, revise the last sentence in paragraph (b) and add paragraph (d) to read as follows:

### § 100.5 Scope.

\* \* \* \* \*

(b) \* \* \* Allegations of unlawful housing discrimination under this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, and defenses and rebuttals to such allegations may be made, consistent with the standards outlined in § 100.500.

\* \* \* \* \*

(d) Nothing in this part requires or encourages the collection of data with respect to race, color, religion, sex, handicap, familial status, or national origin. The absence of any such collection efforts shall not result in any adverse inference against a party.

■ 3. In § 100.7, revise paragraph (b) and add paragraph (c) to read as follows:

### § 100.7 Liability for discriminatory housing practices.

\* \* \* \* \*

(b) *Vicarious liability.* Where a principal-agent relationship exists under common law, a person may be held vicariously liable for a discriminatory housing policy or practice by the person's agent or employee.

(c) *Remedies in administrative proceedings.* The remedy in an administrative discriminatory effect case should concentrate on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons through neutral means, and may include equitable remedies, and, where pecuniary damage is proved, compensatory damages or restitution. Punitive or exemplary damages shall not be available as a remedy.

■ 4. In § 100.70, revise paragraph (d)(5) to read as follows:

### § 100.70 Other prohibited sale and rental conduct.

\* \* \* \* \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

■ 5. In § 100.120, revise paragraph (b)(1) to read as follows:

### § 100.120 Discrimination in the making of loans and in the provision of other financial assistance.

\* \* \* \* \*

(b) \* \* \*

(1) Failing or refusing to provide to any person information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information that is materially inaccurate or materially different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin; provided that nothing in this paragraph (b)(1) restricts providing accurate responses to requests for information related to an individual's particular circumstances.

\* \* \* \* \*

■ 6. Revise § 100.500 to read as follows:

### § 100.500 Discriminatory effect prohibited.

(a) *General.* Liability may be established under the Fair Housing Act based on a specific policy's or practice's discriminatory effect on members of a protected class under the Fair Housing Act even if the specific policy or practice was not motivated by a discriminatory intent.

(b) *Prima facie burden.* To allege a prima facie case based on an allegation that a specific, identifiable policy or practice has a discriminatory effect, a plaintiff or the charging party (collectively, ''plaintiff'') must state facts plausibly alleging each of the following elements:

(1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

(2) That there is a robust causal link between the challenged policy or practice and a disparate impact on members of a protected class that shows the specific practice is the direct cause of the discriminatory effect;

(3) That the alleged disparity caused by the policy or practice has an adverse effect on members of a protected class;

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct link between the disparate impact and the complaining party's alleged injury.

(c) *Failure to allege a prima facie case.* A defendant, or responding party, may establish that a plaintiff's allegations do not support a prima facie case of discriminatory effect under paragraph (b) of this section, if:

(1) The defendant shows that its discretion is materially limited by a third party such as through:

(i) A Federal, state, or local law; or

(ii) A binding or controlling court, arbitral, regulatory, administrative order, or administrative requirement;

(2) Where a plaintiff alleges that the cause of a discriminatory effect is a model used by the defendant, such as a risk assessment algorithm, and the defendant:

(i) Provides the material factors that make up the inputs used in the challenged model and shows that these factors do not rely in any material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act and that the model is predictive of credit risk or other similar valid objective;

(ii) Shows that the challenged model is produced, maintained, or distributed by a recognized third party that determines industry standards, the inputs and methods within the model are not determined by the defendant, and the defendant is using the model as intended by the third party; or

(iii) Shows that the model has been subjected to critical review and has been validated by an objective and unbiased neutral third party that has analyzed the challenged model and found that the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives, and that none of the factors used in the algorithm rely in any material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act; or

(3) The defendant demonstrates that the plaintiff has failed to allege sufficient facts under paragraph (b) of this section.

(d) *Burdens of proof for discriminatory effect.* If a case is not resolved at the pleading stage, the burden of proof to establish that a specific, identifiable policy or practice has a discriminatory effect, are as follows:

(1) *Plaintiff's burden.* (i) A plaintiff must prove by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(2) through (5) of this section; and

(ii) If the defendant rebuts a plaintiff's assertion that the policy or practice is arbitrary, artificial, and unnecessary under paragraph (b)(1) of this section by producing evidence showing that the challenged policy or practice advances a valid interest (or interests), the plaintiff must prove by the preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(2) *Defendant's burden.* The defendant may, as a complete defense:

(i) Prove any element identified under paragraph (c)(1) or (2) of this section;

(ii) Demonstrate that the plaintiff has not proven by the preponderance of the evidence an element identified under paragraph (d)(1)(i) of this section; or

(iii) Demonstrate that the alternative policy or practice identified by the plaintiff under paragraph (d)(1)(ii) of this section would not serve the valid interest identified by the defendant in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(e) *Business of insurance laws.* Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance.

Dated: July 29, 2019.

**Anna Maria Farías,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2019–17542 Filed 8–16–19; 8:45 am]

**BILLING CODE 4210–67–P**

---

# DEPARTMENT OF THE TREASURY

## Alcohol and Tobacco Tax and Trade Bureau

### 27 CFR Part 9

**[Docket No. TTB–2019–0006; Notice No. 184]**

**RIN 1513–AC42**

## Proposed Establishment of the Candy Mountain Viticultural Area and Modification of the Yakima Valley Viticultural Area

**AGENCY:** Alcohol and Tobacco Tax and Trade Bureau, Treasury.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Alcohol and Tobacco Tax and Trade Bureau (TTB) proposes to establish the 815-acre "Candy Mountain" viticultural area in Benton County, Washington. TTB also proposes to expand the boundary of the existing 1,093-acre Yakima Valley viticultural area by approximately 72 acres in order to avoid a partial overlap with the proposed Candy Mountain viticultural area. Both the existing Yakima Valley AVA and the proposed Candy Mountain AVA are located entirely within the existing Columbia Valley AVA. TTB designates viticultural areas to allow vintners to better describe the origin of their wines and to allow consumers to better identify wines they may purchase. TTB invites comments on these proposals.

**DATES:** TTB must receive your comments on or before October 18, 2019.

**ADDRESSES:** You may electronically submit comments to TTB on this proposal, and view copies of this document, its supporting materials, and any comments TTB receives on it within Docket No. TTB–2019–0006 as posted on *Regulations.gov* (*https://www.regulations.gov*), the Federal e-rulemaking portal. Please see the "Public Participation" section of this document below for full details on how to comment on this proposal via *Regulations.gov,* U.S. mail, or hand delivery, and for full details on how to view or obtain copies of this document, its supporting materials, and any comments related to this proposal.

**FOR FURTHER INFORMATION CONTACT:** Karen A. Thornton, Regulations and Rulings Division, Alcohol and Tobacco Tax and Trade Bureau, 1310 G Street NW, Box 12, Washington, DC 20005; phone 202–453–1039, ext. 175.

**SUPPLEMENTARY INFORMATION:**

## Background on Viticultural Areas

### TTB Authority

Section 105(e) of the Federal Alcohol Administration Act (FAA Act), 27 U.S.C. 205(e), authorizes the Secretary of the Treasury to prescribe regulations for the labeling of wine, distilled spirits, and malt beverages. The FAA Act provides that these regulations should, among other things, prohibit consumer deception and the use of misleading statements on labels, and ensure that labels provide the consumer with adequate information as to the identity and quality of the product. The Alcohol and Tobacco Tax and Trade Bureau (TTB) administers the FAA Act pursuant to section 1111(d) of the Homeland Security Act of 2002, codified at 6 U.S.C. 531(d). The Secretary has delegated various authorities through Treasury Department Order 120–01, dated December 10, 2013 (superseding Treasury Order 120–01, dated January 24, 2003), to the TTB Administrator to perform the functions and duties in the administration and enforcement of these provisions.

Part 4 of the TTB regulations (27 CFR part 4) authorizes TTB to establish definitive viticultural areas and regulate the use of their names as appellations of origin on wine labels and in wine advertisements. Part 9 of the TTB regulations (27 CFR part 9) sets forth standards for the preparation and submission of petitions for the establishment or modification of American viticultural areas (AVAs) and lists the approved AVAs.

### Definition

Section 4.25(e)(1)(i) of the TTB regulations (27 CFR 4.25(e)(1)(i)) defines a viticultural area for American wine as a delimited grape-growing region having distinguishing features, as described in part 9 of the regulations, and a name and a delineated boundary, as established in part 9 of the regulations. These designations allow vintners and consumers to attribute a given quality, reputation, or other characteristic of a wine made from grapes grown in an area to its geographic origin. The establishment of AVAs allows vintners to describe more accurately the origin of their wines to consumers and helps consumers to identify wines they may purchase. Establishment of an AVA is neither an approval nor an endorsement by TTB of the wine produced in that area.

### Requirements

Section 4.25(e)(2) of the TTB regulations (27 CFR 4.25(e)(2)) outlines the procedure for proposing an AVA and provides that any interested party may petition TTB to establish a grape-growing region as an AVA. Section 9.12 of the TTB regulations (27 CFR 9.12) prescribes standards for petitions for the establishment or modification of AVAs. Petitions to establish an AVA must include the following:

• Evidence that the area within the proposed AVA boundary is nationally or locally known by the AVA name specified in the petition;

• An explanation of the basis for defining the boundary of the proposed AVA;

• A narrative description of the features of the proposed AVA that affect viticulture, such as climate, geology,