# PUBLIC SUBMISSION

| |
|---|
| **As of:** October 02, 2020 |
| **Received:** October 18, 2019 |
| **Status:** Posted |
| **Posted:** October 22, 2019 |
| **Tracking No.** 1k3-9ct5-9ssz |
| **Comments Due:** October 18, 2019 |
| **Submission Type:** Web |

**Docket:** HUD-2019-0067
FR-6111-P-02 HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**Comment On:** HUD-2019-0067-0001
FR-6111-P-02 HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**Document:** HUD-2019-0067-3436
Comment Submitted by Brian Boynton, American Property Casualty Insurance Association

## Submitter Information

**Name:** Brian Boynton
**Organization:** American Property Casualty Insurance Association

## General Comment

The comments of the American Property Casualty Insurance Association are attached.

## Attachments

Comments of the American Property Casualty Insurance Association (Oct. 18, 2019)

021407

file://civ.doj.gov/Commons/FedProg/Area 05-HUD/2023 Discriminatory Effects Litig/NAMIC/Certified Admin Record Supp/2023 Final Rule Record Mate…    1/1



October 18, 2019

Office of General Counsel, Rules Docket Clerk
Department of Housing and Urban Development
451 Seventh Street, SW, Room 10276
Washington, DC 20410-0001

RE:    **HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, Docket No. FR-6111-P-02, RIN 2529-AA98**

The American Property Casualty Insurance Association ("APCIA") appreciates the opportunity to provide comments in response to the Notice of Proposed Rulemaking ("NPRM") titled "HUD's Implementation of the Fair Housing Act's Disparate Impact Standard" published by the Department of Housing and Urban Development ("HUD") on August 19, 2019.[1]  APCIA is the primary national trade association for home, auto, and business insurers.  Its members make up nearly 60 percent of the U.S. property casualty insurance market.  It has the broadest cross section of home, auto, and business insurers and reinsurers of any national property casualty trade association, with member companies ranging in size from large to small and operating in all 50 states.  APCIA's members write $412 billion in annual premiums.  APCIA and its members have a direct interest in whether and how disparate-impact liability under the Fair Housing Act ("FHA") applies to property and casualty insurance, including homeowners insurance and commercial habitational insurance.[2]  As explained below, APCIA supports the proposed rulemaking but respectfully requests that HUD take additional steps to appropriately limit the application of disparate-impact liability to homeowners and commercial habitational insurance.

## I.    EXECUTIVE SUMMARY

HUD's February 15, 2013 final rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" (the "Disparate Impact Rule")[3] provides "that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin— "regardless of whether there was an intent to discriminate"—and sets forth a specific framework

---

[1] 43 Fed. Reg. 42,854 (Aug. 19, 2019).

[2] Commercial habitational insurance is commercial insurance that covers various kinds of properties in which people live other than single-family homes and includes apartment buildings, condominium buildings, and other multiple-family dwellings.  These comments generally refer to homeowners and commercial habitational insurance but also apply to any other form of property and casualty insurance the provision of which HUD asserts to be subject to the FHA, whether sold in the admitted, non-admitted, or surplus lines markets.  Admitted insurers—subject to full state insurance regulation—write 99% of the homeowners market.

[3] 78 Fed. Reg. 11,460 (Feb. 15, 2013); *see* 24 C.F.R. § 100.500.

555 12th Street, NW, Suite 550, Washington, DC 20004 | 202-828-7100
8700 W. Bryn Mawr Avenue, Suite 1200S, Chicago, IL 60631-3512 | 847-297-7800

021408

for applying that disparate-impact standard.[4]  In the preamble to the 2013 Rule, HUD expressed its view that insurers may be liable on a disparate-impact theory for practices related to the provision and pricing of homeowner's insurance.[5]  HUD's August 19, 2019 NPRM "proposes to amend HUD's interpretation of the FHA's disparate-impact standard to better reflect the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, and to provide clarification regarding the application of the standard to State law governing the business of insurance."[6]

As explained in detail below, APCIA supports HUD's proposal to modify the 2013 Disparate Impact Rule to take into account the Supreme Court's decision in *Inclusive Communities* but also urges HUD to take specific steps to appropriately address the unique problems that would arise were the Rule applied in the context of homeowners and commercial habitational insurance.

### A. HUD's Proposed Modifications Of The Burden-Shifting Framework Are Consistent With *Inclusive Communities*

Two years after HUD promulgated the 2013 Disparate Impact Rule, the Supreme Court considered the application of disparate-impact liability under the FHA and recognized important limitations on the doctrine in its *Inclusive Communities* decision.  Those limitations were not reflected in the 2013 Rule, and HUD has properly proposed to amend the Rule to take the limitations into account.  APCIA supports HUD's proposal to amend the Rule's burden-shifting framework to comply with *Inclusive Communities*.  HUD's proposed changes largely conform to the Supreme Court's instructions, including its requirement that only "artificial, arbitrary, and unnecessary" practices that are causally linked to a racial imbalance by robust evidence, beyond a mere correlation, may be subject to liability.  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2522-24 (2015).  Subject to the specific suggested changes described below, HUD should finalize its proposed modifications of the Disparate Impact Rule as soon as possible to bring the Rule into conformity with binding precedent.

### B. HUD Should Exempt Risk-Based Pricing And Underwriting Of Homeowners And Commercial Habitational Insurance From Disparate-Impact Liability Under The FHA

In addition to modifying the Disparate Impact Rule's burden-shifting framework, HUD also should adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance.  An exemption is required for several reasons:

*First*, the application of disparate-impact liability to risk-based pricing and underwriting of homeowners and commercial habitational insurance—that is extensively regulated by the states—is inconsistent with the business of insurance.  Risk-based pricing and underwriting are critical to the functioning of the insurance market.  They ensure that insureds are charged an amount

---

[4] 78 Fed. Reg. at 11,460; *see also* 24 C.F.R. § 100.500.

[5] 78 Fed. Reg. 11,475.

[6] 43 Fed. Reg. 42,854.

appropriate for the risk they present, prevent adverse selection, and promote the broad availability of insurance. Preventing insurers from adequately accounting for risk by imposing disparate-impact liability would undermine these important objectives.

*Second*, application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would contravene the limitations set forth in *Inclusive Communities*, because, among other things, risk-based pricing and underwriting are not arbitrary, artificial or unnecessary practices, are not the cause of any alleged disparate impacts, and are permitted and mandated by state insurance regulation that limits insurers' discretion.

*Third*, application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would violate the McCarran-Ferguson Act by improperly requiring federal courts to determine whether challenged practices are actuarially sound; conflicting with state laws permitting or requiring insurers to engage in risk-based pricing and underwriting (*see* Appendix I); and conflicting with state laws and regulations providing for state administrative review of insurance rates.

*Finally*, the application of the Disparate Impact Rule to risk-based pricing of homeowners and commercial habitational insurance would violate the filed-rate doctrine, which prohibits claims against insurers based on rates filed with regulatory authorities.

## C.    If HUD Does Not Entirely Exempt Risk-Based Pricing And Underwriting, It Should Modify And Clarify The Defenses In The Rule

If risk-based pricing and underwriting of homeowners and commercial habitational insurance are not exempted entirely, HUD should clarify existing defenses under the Rule to ensure that the Rule does not run afoul of *Inclusive Communities* or the McCarran-Ferguson Act.

As an initial matter, HUD should adopt an express defense in § 100.500(c) for risk-based pricing and underwriting of homeowners and commercial habitational insurance under the Rule's burden-shifting framework. If a Defendant shows that it relied on risk-based pricing and underwriting, that should be a complete defense at Step 2 of the burden-shifting framework. The plaintiff should not have an opportunity to rebut the defense at Step 3.

HUD should likewise modify the defenses it has proposed to ensure that the Rule is not improperly applied to risk-based pricing and underwriting of homeowners and commercial habitational insurance:

*First*, HUD should clarify that the causation analysis under the Rule must consider whether a challenged practice is too remote to the alleged disparate impact to give rise to liability and that more than statistical correlation is required.

*Second*, HUD should specify that the "Limited Discretion" defense in § 100.500(c)(1) applies not only where state insurance law compels an insurer to engage in the challenged practice but also where state law <u>permits</u> the challenged practice.

3

*Third*, HUD should modify the algorithm defense in § 100.500(c)(2) in several ways. The opening portion of the defense should make clear that the defense applies whenever the cause of the alleged discriminatory effect is the use of an algorithmic model by the defendant, not just when the plaintiff has affirmatively "allege[d] that the cause of a discriminatory effect is a model used by the defendant." The first variation of the defense—set forth in proposed § 100.500(c)(2)(i)— should be revised to apply where "the model was empirically derived and is a demonstrably and statistically sound algorithm which accurately predicts risk or other similar valid objectives," as long as the model does not use race, color, religion, sex, handicap, familial status, or national origin ("FHA-protected characteristics") as factors.[7] Similarly, the third variation of the defense—set forth in proposed § 100.500(c)(2)(iii)—should be amended to delete the vague requirement that the model not rely on factors that are "close proxies" for protected classes. Further, to protect the proprietary nature of models and actuarial analyses, a defendant should be able to prove that its model was empirically derived, is a demonstrably and statistically sound algorithm that accurately predicts risk or other similar valid objectives, and does not rely on FHA-protected characteristics as factors without being required to produce the model itself or all of its inputs. Finally, the second variant of the algorithm defense—set forth in Proposed § 100.500(c)(2)(ii)—should not be limited to models developed by third parties "that determine[] industry standards."

*Fourth*, proposed § 100.500(d)(1)(i) should be clarified to require the plaintiff to prove, by the preponderance of the evidence, all of the elements of the *prima facie* case, including that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law." This change will conform with *Inclusive Communities'* specific requirement that the plaintiff always carries the burden of establishing that the challenged policy or practice is based on arbitrary, artificial, and unnecessary barriers, even if the plaintiff has alleged sufficient plausible facts to survive a motion to dismiss at the pleading stage.

### D. HUD Should Make Clear That Disparate-Impact Challenges Are Inconsistent With Risk-Based Pricing And Underwriting

At a minimum, HUD should make clear in the preamble to a final rule (1) that disparate-impact liability cannot apply to risk-based pricing and underwriting of homeowners and commercial habitational insurance and (2) that HUD will not seek to apply the Rule to those activities. As examples of proposed clarifications to the preamble, HUD should acknowledge that risk-based pricing and underwriting are not "arbitrary, artificial, or unnecessary" practices and instead "advance valid interests." HUD should also make clear that disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance, requiring insurers to collect and analyze data on FHA-protected characteristics.

---

[7] 78 Fed. Reg. at 11,460; *see also* 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(2)(i), (ii), (iii)).

4

## II. BACKGROUND

### A. The Business Of Insurance

Insurance is a means by which one party (the insured) transfers financial risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged, the insurer will pay for related repairs. Insurance rates are based on an insured's loss history and risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions—that is, decisions about whether to insure and how to price a particular risk or class of risk.[8]

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and to project their financial implications. Actuaries examine numerous factors that correlate with losses.[9] For homeowners and commercial habitational insurance, underwriters have historically reviewed four categories of factors to assess the risk of property damage claims: (1) Construction (e.g., frame, masonry, fire resistant, non-combustible, use of cladding, age and type of roof, age of wiring and plumbing system); (2) Occupancy (e.g., habitational, manufacturing, office), (3) Protection (e.g., alarms, sprinklers, smoke detectors, fire departments (paid or volunteer), water source and distance to fire station and water source, wind mitigation); and (4) Exposure (e.g., the nature of the surrounding area, such as other buildings that may be more susceptible to loss, dry brush or woodlands v. paved parking areas, number of stories).[10] Other factors considered in underwriting and pricing insurance include, for instance, the value of the property and any history of previous losses related to the dwelling or similar units. ***Homeowners and commercial habitational insurance actuaries do not consider FHA-protected characteristics when evaluating these factors.*** Indeed, they do not have that data and may be prohibited from collecting it.[11]

---

[8] *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* §§ 1:2; 1:6 (3d ed. 2013).

[9] *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985).

[10] *See* Christopher J. Boggs, *Understanding Commercial Property Underwriting and 'COPE'* (2015), https://www.insurancejournal.com/news/national/2015/02/03/356085.htm.

[11] *See* A.R. 376, *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014) (ECF No. 19); ECF No. 44-2 ¶ 6, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect information on race or ethnicity); ECF No. 44-3 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 ¶ 7, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates); ECF No. 27-2 ¶ 4, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or retain electronic records of race, color, or national origin and does not have capabilities to store and use such information); ECF No. 27-3 ¶ 9, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or consider race, color, religion, or national origin in underwriting and rating homeowners' insurance); ECF No. 27-5 ¶ 5, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (prior to the Disparate Impact Rule, insurer did not collect date on race, color, religion, national origin, sex, familial status, or handicap of its policyholders).

Many insurers also tailor their offerings for risks for which they have expertise and knowledge. Professional underwriters routinely avoid or exclude risks for which they lack expertise, knowledge, or actuarial data. Even where insurers rely on such professional underwriting judgment without undertaking an actuarial analysis of the type typically used in rate-making and pricing, they are required to consider similar factors bearing on risk of loss, and do not consider—and are prohibited from considering—race, color, religion, sex, or any other FHA-protected characteristics.

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that insured and similarly situated insureds.[12] If insurers could not set rates or make underwriting decisions based on objective, predictive, and permitted risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.[13] Such a scheme would greatly reduce the financial incentive for insureds to reduce risks, construct safer houses, and maintain existing houses.[14] Moreover, without the ability to appropriately rate risks according to specific and appropriate risk-characteristics, insurance companies would likely withdraw from specific lines of business or adversely select only choice risks, leading to less availability of insurance and a reduction of competition in the market. Accurate pricing is also critical to ensuring the solvency of insurers. An insurer is considered insolvent when it lacks the financial resources to make promised payments to insureds, beneficiaries and claimants.[15] If an insurer sets a price too low or fails to accurately account for the risks involved with policies, it may not have sufficient funds to pay claims that are made.[16]

## B.    State Regulation Of Insurance

The states have traditionally regulated the insurance industry—from pricing, underwriting, and claims handling, to company capital requirements and solvency.[17] Today, "[s]tate regulation

---

[12] *See N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

[13] *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 44 (2012).

[14] Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J.at 66-67.

[15] Robert W. Klein, Ph.D, *Insurance Regulation and the Challenge of Solvency II: Modernizing the System of U.S. Solvency Regulation* (2012), https://www.namic.org/pdf/publicpolicy/insRegSolvII.pdf.

[16] *See, e.g.,* Zain Mohey-Deen & Richard J. Rosen, *The Risks of Pricing New Insurance Products: The Case of Long-Term Care*, FEDERAL RESERVE BANK OF CHICAGO, https://www.chicagofed.org/publications/chicago-fed-letter/2018/397 ("Underpricing a new product was the major cause of the insolvency of Penn Treaty . . . at the time the tenth-largest [long-term] insurer.").

[17] Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. 168 (1868). Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constitutes interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to ensure that the ruling would not undermine the states' long-standing regulation of insurance.

of insurance is comprehensive and includes rate and coverage issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999). Several features of state insurance regulation are relevant here.

First, state insurance law affirmatively permits risk-based pricing and underwriting. Insurance law generally prohibits insurers from charging "excessive, inadequate, or unfairly discriminatory rates." As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."[18] For purposes of state insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences."[19]

Second, the vast majority of states not only permit risk-based pricing but expressly *require* it. State laws make clear that failing to take risk into account results in unfair discrimination. They also mandate that insurers consider past losses and other relevant risk factors in developing insurance rates. *See infra* p. 25.

Third, state insurance commissioners review the rates charged by insurers to protect consumers. The vast majority of states—49 out of 50 plus the District of Columbia—require insurers to file insurance rates with state regulators for review and/or approval.[20] State regulators carefully review insurance rates—often with their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory.[21]

Fourth, under existing state laws, insurers are typically **prohibited** from taking FHA-protected characteristics into account,[22] and may not even collect information about prospective insureds' membership in FHA-protected classes.[23]

---

[18] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 1988), https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

[19] Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted).

[20] *See infra* p. 27. As noted in footnote 2 *supra*, admitted insurers write 99% of the homeowners market. Rate filing is also generally required for small-to-mid-market commercial habitational insurance. A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

[21] *See, e.g.*, WIS. STAT. ANN. § 625.13; *see also infra* p. 27.

[22] *See, e.g.*, CAL. INS. CODE § 679.71 (prohibiting insurers from denying insurance or providing insurance on less favorable terms due to an applicant's marital status, sex, race, color, religion, national origin, or ancestry); MD. CODE ANN. INS. § 27-501(c)(1) (prohibiting insurers or insurance producers from inquiring about race, creed, color, or national origin in any manner of requesting general information related to an insurance application).

[23] *See, e.g.*, CAL. INS. CODE § 10141.

7

One of the primary aims of state insurance regulation is to protect policyholders against excessive insurer insolvency risk.[24] State regulators are concerned with how insurers deploy surplus, so insurers operating in their jurisdictions remain solvent. As part of solvency regulation, state regulators review insurers capitalization, asset quality, reinsurance and liquidity.[25] The surplus produced to capitalize the business, purchase quality assets, purchase reinsurance, and facilitate overall liquidity derives not only from return on investments, the transfer of risk to reinsurers, and other surplus preservation strategies, but also from premiums retained after covered losses are paid. The aggregate difference between premiums collected and covered losses paid produces a significant portion of the surplus that ensures solvency and the insurer's ability to pay current and future claims. This concern for solvency is embedded in state laws regulating the business of insurance, such as a prohibition against rates that are "excessive, *inadequate* or unfairly discriminatory." *See infra* § IV.B.2. Rate regulation is an integral aspect of solvency regulation because it ensures that insurance companies charge premiums that are sufficient to cover current and future claims.[26]

## C.    The McCarran-Ferguson Act

In the McCarran-Ferguson Act, Congress expressly stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance." *Id.* § 1012(b). Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application … [would] frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).[27]

---

[24] Shauhin Talesh, *Insurance Law As Public Interest Law*, 2 UC IRVINE L. REV. 985, 1005-06 (2012) ("As articulated by most states, the goals of insurance regulation include fair pricing of insurance, *protecting insurance company solvency*, preventing unfair practices by insurance companies, and ensuring the availability of insurance coverage.") (emphasis added); National Association of Insurance Commissioners, *The U.S. National State-Based System of Insurance Financial Regulation and the Solvency Modernization Initiative* § 2.3 (August 14, 2013), https://www.naic.org/documents/committees_e_us_solvency_framework.pdf ("The state regulatory system in the United States has had over a 100 year history of solvency regulation.").

[25] *See, e.g.* National Association of Insurance Commissioners, *Financial Analysis Handbook* 41, 51, 65, 69 (2019), https://www.naic.org/prod_serv/FAH-ZU-19.pdf (suggesting, among other factors, capitalization, asset quality, reinsurance, and liquidity as measures of solvency to be considered by state insurance regulators).

[26] Joshua Phares Ackerman, *The Unintended Federalism Consequences of the Affordable Care Act's Insurance Market Reforms*, 34 Pace L. Rev. 273, 283 (2014)

[27] Congress remains committed to the principle of leaving the regulation of insurance to the states. *See* Congressional Research Service, *Insurance Regulation: Legislation in the 115th Congress*, Summary (Oct. 19, 2018), https://crsreports.congress.gov/product/pdf/R/R44958 ("Since 1868, the individual states have been the primary regulators of insurance with the National Association of Insurance Commissioners (NAIC) acting to coordinate state actions and collect national data").

### D.     The Fair Housing Act And The 2013 Disparate Impact Rule

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). The FHA does not specifically relate to the business of insurance and thus is displaced by state laws regulating insurance, pursuant to McCarran-Ferguson, in the event of a conflict or interference with state law.

In 2013, HUD promulgated a rule authorizing disparate-impact claims under the FHA and providing a framework for such claims. *See* 78 Fed. Reg. 11,460 (Feb. 15, 2013). The "Disparate Impact Rule"—which remains in place today—provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). No showing of intent to discriminate is required.

The Rule provides that disparate-impact litigation under the FHA should proceed under a burden-shifting framework. Under that framework, a plaintiff must first demonstrate that a housing-related practice has a disparate effect on a FHA-protected class. 24 C.F.R.§ 100.500(c)(1). The defendant must then show that the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Notwithstanding such a showing, the defendant may still be found liable if the plaintiff establishes "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). The alternative identified by the plaintiff need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. Thus, compliance with the Disparate Impact Rule may require businesses to abandon sound, good-faith methods in favor of substitutes that are less effective at furthering the businesses' legitimate, nondiscriminatory interests. In the final Rule, HUD declined to exempt homeowners insurance or meaningfully address whether extension of disparate-impact liability to homeowners insurance would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act.[28]

### E.     The Supreme Court's Decision In *Inclusive Communities*

On June 25, 2015, the Supreme Court issued its decision in *Inclusive Communities*. *See* 135 S. Ct. 2507. In that decision, the Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" *Id.* at 2524

---

[28] Both predecessors of APCIA—the American Insurance Association ("AIA") and the Property Casualty Insurers Association of America ("PCI")—filed lawsuits under the Administrative Procedure Act challenging the 2013 Disparate Impact Rule. A description of that litigation and additional comments submitted by PCI and AIA is set forth in Appendix II to these comments. Effective January 1, 2019, AIA merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association. Prior to the merger of AIA and PCI, comments were filed by each separate trade in response to the 2018 ANPRM.

(quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." *Id.* at 2522. In order to ensure that disparate-impact claims are properly limited, the Court held that key "safeguards" must be put in place. *Id.* at 2523.

In addition to limiting challenges to "artificial, arbitrary and unnecessary" practices, the Court made clear that claims must satisfy "[a] robust causality requirement." *Id.* Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). Referring approvingly to the opinion below of Fifth Circuit Judge Edith Jones, the Court explained that where another "law substantially limits the [defendant's] discretion," causation cannot be established. *Inclusive Cmtys.*, 135 S. Ct. at 2524.

Another safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policies." *Id.* at 2522. Businesses, the Court also stated, "must be given latitude to consider market factors." *Id.* at 2523.

The Supreme Court cautioned that without these safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* "[I]nterpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

### F.    HUD's NPRM

On August 19, 2019, the NPRM was published in the Federal Register. *See* 84 Fed. Reg. at 42,854. The NPRM proposes to make a number of important changes to the current Disparate Impact Rule to bring it into compliance with the limits set forth in *Inclusive Communities*. We discuss below the proposed changes relevant to APCIA's comments.

*First*, the NPRM would amend current 24 C.F.R. § 100.500 to make clear that a disparate-impact plaintiff must, consistent with *Inclusive Communities*, meet a *prima facie* burden of plausibly alleging each of the following elements:

(1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

10

(2) That there is a robust causal link between the challenged policy or practice and a disparate impact on members of a protected class that shows the specific practice is the direct cause of the discriminatory effect;

(3) That the alleged disparity by the policy or practice has an adverse effect on members of a protected class;

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct link between the disparate impact and the complaining party's alleged injury.

84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(b)).

*Second*, the NPRM would revise the regulations to provide a disparate-impact defendant with a number of defenses. A defendant "may establish that a plaintiff's allegations do not support a prima facie case of discriminatory effect" if the defendant satisfies the requirements of one of three specified defenses:

- The initial defense applies if a defendant "shows that its discretion is materially limited by a third party such as through … [a] Federal, state, or local law … [or a] binding or controlling court, arbitral, administrative order, or administrative requirement." 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(1)). This materially limited discretion defense applies where a defendant faces external limits on its action and therefore cannot be found to have caused any disparate impact.

- The next defense applies "[w]here a plaintiff alleges that the cause of a discriminatory effect is a model used by the defendant, such as a risk assessment algorithm." 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(2)). This "algorithm defense" is available if the defendant:

  o "(i) Provides the material factors that make up the inputs used in the challenged model and shows that these factors do not rely in any material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act and that the model is predictive of credit risk or other similar valid objective"; or

  o "(ii) Shows that the challenged model is produced, maintained, or distributed by a recognized third party that determines industry standards, the inputs and methods within the model are not determined by the defendant, and the defendant is using the model as intended by the third party"; or

  o "(iii) Shows that the model has been subjected to critical review and has been validated by an objective and unbiased neutral third party that has analyzed the challenged model and found that the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives, and that none of the factors used in the algorithm rely in any

11

material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act";

- The final defense applies if the "defendant demonstrates that the plaintiff has failed to allege sufficient facts under paragraph (b)" as part of the plaintiff's *prima facie* case. 84 Fed. Reg. at 42,862 (proposed 24 C.F.R. § 100.500(c)(3)).

*Third*, the NPRM proposes to clarify which party has the burden of proof at different stages of the burden-shifting framework. It specifies that a "plaintiff must prove by a preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(2) through (5) of this section." 84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(d)(1)(i)). If the defendant "rebuts a plaintiff's assertion that the policy or practice is arbitrary, artificial, and unnecessary under paragraph (b)(1) of this section by *producing* evidence showing that the challenged policy or practice advances a valid interest (or interests)," then:

> the plaintiff must prove by the preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in an *equally effective* manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(d)(1)(ii)) (emphasis added). The burden of proof remains with the plaintiff throughout this process.

But the NPRM would also specify that the defendant "may, as a complete defense," make one of three showings:

> (1) prove the elements of the limited discretion defense or the algorithm defense, or

> (2) demonstrate that the plaintiff has not proven by a preponderance of the evidence the elements of the plaintiff's *prima facie* burden set forth in proposed § 100.500(b)(2)-(5);[29] or

> (3) demonstrate that "the alternative practice or policy identified by the plaintiff … would not serve the valid interest identified by the defendant in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant." 84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(d)(2)).

*Fourth*, the NPRM proposes to insert into the regulations the following statement:

> (e) Business of insurance laws. Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance.

---

[29] As explained below, we believe this should reference § 100.500(b)(1), not § 100.500(b)(2). HUD should correct this in the final rule.

84 Fed. Reg. at 42,863 (proposed 24 C.F.R. § 100.500(e)). The NPRM explains that this provision "clarifies that the Fair Housing Act does not 'specifically relate to the business of insurance,'" and therefore is preempted by state insurance laws to the extent it conflicts with them. 84 Fed. Reg. at 42,860.

The NPRM then re-affirms HUD's prior position declining to provide an exemption for homeowners insurance. The NPRM explains that "[p]roposed paragraph (e) does not provide the safe harbor for insurance, which some commenters requested." 84 Fed. Reg. at 42,860. To the contrary, the NPRM indicates that the proposal is intended to "affirm[] in regulation HUD's past position … that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case." *Id.* The NPRM acknowledges that the materially limited discretion defense "would have a similar effect to a safe harbor" and prevent insurers from being placed in a "double bind of liability" where they would be subject to liability under the Rule for actions required in order to comply with other laws. *Id.* But the NPRM proposes to require insurers to raise this defense on a case-by-case basis. The NPRM provides no substantive explanation for HUD's decision not to adopt an exemption for homeowners insurance. *See id.*

## III.    HUD'S PROPOSED MODIFICATIONS OF THE BURDEN-SHIFTING FRAMEWORK ARE CONSISTENT WITH *INCLUSIVE COMMUNITIES*

APCIA supports HUD's proposal to modify the burden-shifting framework set forth in the Disparate Impact Rule. The modifications suggested are fully consistent with—and indeed mandated by—the Supreme Court's 2015 decision in the *Inclusive Communities* case as well as the Court's prior decision in *Wards Cove*, 490 U.S. at 657.

Although the Supreme Court in *Inclusive Communities* recognized that disparate-impact claims are cognizable under the FHA, the Court emphasized that they "must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Inclusive Cmtys.*, 135 S. Ct. at 2518. Only "artificial, arbitrary, and unnecessary" practices that are causally linked to a racial imbalance by robust evidence, beyond a mere correlation, may be subject to liability. *Id.* at 2522-24. These requirements ensure that defendants are not "held liable for racial disparities they did not create." *Id.* at 2523 (citing *Wards Cove*, 490 U.S. at 653). Moreover, the Court indicated that when a defendant articulates a "valid interest served by their policies," the plaintiff should not be allowed to "second-guess which of two reasonable approaches" a defendant should follow. *Id.* at 2522. The Court also cautioned against any disparate-impact framework that did not have "adequate safeguards at the prima facie stage" to prevent the use of race "in a pervasive way" or the injection of "racial considerations into every housing decision." *Id.* at 2523-24. The Court recognized that the absence of such safeguards would tend to "perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. And fundamentally, the Court expressed concern that the "specter of disparate-impact litigation" could discourage businesses from undertaking activities essential to a well-functioning housing market. *Id.*

The various requirements imposed as part of the plaintiff's *prima facie* burden in proposed 24 C.F.R. § 100.500(b) are generally consistent with the Supreme Court's guidelines:

13

- In section 100.500(b), the NPRM would require that the plaintiff's claim focus on "a specific, identifiable policy." That requirement was set forth by the Court in *Wards Cove*. *See* 490 U.S. at 657 ("As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.").

- In section 100.500(b)(1), the NPRM requires a plaintiff to allege that the challenged policy or practice is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective." That tracks the Court's confirmation in Inclusive Communities that challenged policies are "not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" *Inclusive Cmtys.*, 135 S. Ct. at 2524; *see also id.* at 2522.

- Proposed § 100.500(b)(2) would require a "robust causal link" between the challenged practice and the alleged disparate impact. The Court in *Inclusive Communities* noted the importance of a "robust causality requirement." *Id.* at 2523.

- Proposed § 100.500(b)(3) would require that "the alleged disparity caused by the policy or practice [have] an adverse effect on members of the protected class." That requirement conforms with the Supreme Court's observation that "a plaintiff bringing a disparate impact claim challenges practices that have a 'disproportionately adverse effect on minorities.'" *Inclusive Cmtys.*, 135 S. Ct. at 2513 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

- Proposed § 100.500(b)(4) mandates that the disparity caused by a practice be "significant." In *Wards Cove*, the Supreme Court similarly recognized that any disparate impact must be significant. *See* 490 U.S. at 657 ("Respondents will also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a *significantly* disparate impact on employment opportunities for whites and nonwhites." (emphasis added)).

Additionally, the limited discretion defense proposed in § 100.500(c)(1) also finds direct support in *Inclusive Communities*. That defense would preclude disparate-impact liability where the defendant can show that "its discretion is materially limited by a … Federal, state, or local law; or … [a] binding or controlling court, arbitral, regulatory or administrative requirement." In *Inclusive Communities,* the Court explained that if "federal law substantially limits [a defendant's] discretion," then a plaintiff will be unable to "show a causal connection" between the challenged policy and a disparate impact. 135 S. Ct. at 2524.

Finally, the NPRM would clarify that if a defendant rebuts the plaintiffs' assertion that the challenged practice is arbitrary, artificial, or unnecessary by showing that it advances a valid interest, then the plaintiff "must prove by the preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in *an equally effective* manner without imposing materially greater costs on, or creating other material burdens for, the defendant." *See* proposed § 100.500(d)(1)(ii) (emphasis added). HUD previously

14

had declined to include this key requirement—that a proposed alternative practice be "equally effective"—in the Disparate Impact Rule. *See* 78 Fed. Reg. at 11,473. That requirement, however, was mandated by the Supreme Court in *Wards Cove*. *See* 490 U.S. at 661 ("Of course, any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring procedures in achieving petitioners' legitimate employment goals.").

For all of these reasons, APCIA agrees that the proposed modifications to the Disparate Impact Rule's burden-shifting framework are generally consistent with the Supreme Court's guidance and should be adopted.[30]

## IV. HUD SHOULD EXEMPT RISK-BASED PRICING AND UNDERWRITING OF HOMEOWNERS AND COMMERCIAL HABITATIONAL INSURANCE FROM DISPARATE- IMPACT LIABILITY UNDER THE FHA

Although APCIA appreciates the modifications that HUD has proposed to the burden-shifting framework under the Disparate Impact Rule, APCIA respectfully urges HUD to also adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance, particularly. As explained below, such an exemption is necessary in light of the nature of the business of insurance, the limitations imposed *by Inclusive Communities* and the NPRM, the McCarran-Ferguson Act, and the filed-rate doctrine.

### A. Application Of The Disparate Impact Rule Is Fundamentally Inconsistent With The Business Of Insurance

An exemption is appropriate because the Disparate Impact Rule conflicts with the fundamental, risk-based nature of homeowners and commercial habitational insurance. In exchange for assuming a customer's risk, the insurer charges a rate derived from the likelihood and amount of potential losses. *See, e.g.*, 1 Steven Plitt et al., Couch on Insurance § 1:6 (3d ed. 2013).[31] Insurers also estimate their loss potential when determining whether to underwrite a particular type of hazard. *See, e.g., id.* § 1:2. As members of the insurance industry commented during HUD's prior rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." A.R. at 376.[32] The essence of risk-based insurance practices is "identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly." *Id.*[33]

Actuaries calculate the amount and probability of loss by reviewing objective risk factors. *See* Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates,* Casualty

---

[30] HUD may wish to consider flipping the order of Proposed § 100.500(b)(2) (robust causal link) and Proposed § 100.500(b)(3) (adverse effect), given that the adverse effect is a necessary predicate to finding a causal link between that effect and the challenged practice.

[31] Other factors that affect the provision and pricing of homeowners insurance include policy limits, deductibles, and the insurer's costs of doing business. *Id.*

[32] *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014) (ECF No. 19).

[33] *Id.*

15

Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). With respect to homeowners and commercial habitational insurance, such factors may include, among others, the materials used to build a dwelling, the dwelling's proximity to fire hydrants and fire stations with employed or volunteer fire fighters, the presence of a security system in the dwelling, and the history of losses associated with the dwelling or similar units.[34] Quantifying the impact of any risk factor is a purely mathematical and unbiased statistical exercise. Far from the "artificial, arbitrary, and unnecessary" practices that may incur liability under the FHA under *Inclusive Communities*, 135 S. Ct. at 2524, the assessment of risk is designed to precisely identify "the expected value of all future costs associated with an individual risk transfer."[35] Insurers and actuaries do not consider the race of customers or potential customers, or any other characteristic protected by the FHA, at any point during ratemaking, underwriting, or any other business operation.[36]

But despite the neutrality of insurance practices with respect to all FHA-protected characteristics, the Disparate Impact Rule could penalize insurers for relying on sound risk factors if they happened to disproportionately affect a class protected by the FHA.[37] In addition to improperly holding defendants "liable for racial disparities they did not create," *Inclusive Communities*, 135 S. Ct. at 2523 (*quoting Wards Cove*, 490 U.S. at 653)—as discussed below—this would irreparably distort the market for homeowners and commercial habitational insurance. Tying rates to risk factors ensures that prices accurately reflect an insurer's costs of covering particular classes of risk for similarly situated customers. Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. Removing risk factors from the ratemaking calculus could make it prohibitively expensive for an insurer that is writing these risks at an inadequate rate to insure high-risk properties, perhaps eliminating coverage across the market. It would also cause adverse selection, as customers with a low risk of loss would be charged more than necessary to cover their

---

[34] For homeowners and commercial habitational insurance, underwriters have historically reviewed four categories of factors to assess the risk of property damage claims: (1) Construction, (2) Occupancy, (3) Protection, and (4) Exposure. *See supra* § II.A.

[35] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 1988), https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

[36] *See* ECF No. 44-2 ¶ 6, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect information on race or ethnicity); ECF No. 44-3 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data on policyholders' race or ethnicity); ECF No. 44-4 ¶ 11, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); ECF No. 44-5 ¶ 7, *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014) (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates); ECF No. 27-2 ¶ 4, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or retain electronic records of race, color, or national origin and does not have capabilities to store and use such information); ECF No. 27-3 ¶ 9, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (insurer does not collect or consider race, color, religion, or national origin in underwriting and rating homeowners' insurance); ECF No. 27-5 ¶ 5, *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013) (prior to the Disparate Impact Rule, insurer did not collect date on race, color, religion, national origin, sex, familial status, or handicap of its policyholders).

[37] Scholars have predicted that "protected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284.

16

021423

risk. *See* Letter from PCI to HUD, at 2 (Jan. 26, 2015) (A.R. 4497) ("Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.").   As the Seventh Circuit has explained,

> Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992).

The Disparate Impact Rule's effects on homeowners and commercial habitational insurance pricing would also generate negative externalities beyond the insurance market. Risk-based insurance pricing encourages safer practices. For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials. Eliminating risk factors from the pricing model could reduce such expedient disincentives. *See, e.g.*, Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 66-67 (2012). Disallowing risk-based pricing inherently creates cross-subsidies from low-risk activities to high-risk activities, with the resulting unfairly discriminatory prices creating moral hazards and forcing more low-risk activities and consumers out of the market.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of risk factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11,475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1051 (N.D. Ill. 2014) ("*PCI*"). "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Despite the district court's holding, HUD's NPRM continues to rely on the ability of insurers to defend their practices in litigation under the Rule. It proposes to "affirm[] in regulation HUD's past position ... that case-by-case adjudication is the proper way to resolve cases to

17

determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case." 84 Fed. Reg. at 42,860.

Allowing plaintiffs to mandate use of alternative risk factors via case-by-case adjudication would undermine the business of insurance. Any replacement risk factor would necessarily correspond to a different risk than the one identified as relevant by sound risk-based methodologies. As a result, the original risk of loss would still exist, and it would not be correctly reflected in the price of insurance. *See PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-4 ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans"). This would result in overcharging customers with a low risk of loss and likely driving many of them out of the market. The third step of the burden-shifting framework is accordingly a perfect example of the hazards of allowing plaintiffs to "second-guess which of two reasonable approaches" a defendant should adopt. *Inclusive Communities*, 135 S. Ct. at 2522.

Moreover, the fact that risk-based insurance practices could withstand challenges under the Disparate Impact Rule's burden-shifting framework does not remove the need for an express exemption. Forcing insurers to defend the use of potentially any risk factor in court would needlessly raise costs for the industry and customers more broadly and waste judicial resources. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 375 (6th Cir. 2007) ("[I]f no disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice.").

## B. Application Of The Disparate Impact Rule Would Contravene The Limitations Imposed In *Inclusive Communities* And Those Set Forth In The NPRM

HUD should adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance because under the limitations set forth in *Inclusive Communities* and in the NPRM, challenges to risk-based pricing and underwriting should fail in every case. In these circumstances, where any challenge must fail as a matter of law, litigants should not be put to the burden of litigating each matter on a case-by-case basis.

### 1. Risk-Based Pricing and Underwriting Are Not Arbitrary, Artificial, or Unnecessary

As noted above, under *Inclusive Communities* and the NPRM, a plaintiff can make out a *prima facie* case of disparate-impact discrimination under the FHA only by challenging a practice that is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective." Proposed § 100.500(b)(1); *see Inclusive Cmtys.*, 135 S. Ct. at 2524. A plaintiff challenging the use of risk-based pricing and underwriting could never make this showing. As explained above, insurers make pricing and underwriting decisions based on demonstrable risk factors—that is, based on objective data about the likelihood and value of their customers' potential losses. *See supra* § II.A. This practice is not merely "practical." *Inclusive Cmtys.*, 135 S. Ct. at 2518. It is essential for sustaining a viable insurance market. There is nothing "arbitrary" or "artificial" about

18

risk-based pricing and underwriting. Indeed, they are a fundamental aspect of the business of insurance necessary to maintain solvency for the protection of current and future insureds and claimants. By taking into account expected losses and loss-related expenses, insurers make coverage broadly available at appropriate prices while conforming to the state statutory mandate and regulatory admonition that rates must not be "excessive, inadequate or unfairly discriminatory." *See supra* §§ II.A & B, IV.A.

## 2. The "Robust Causal Link" Requirement Cannot Be Met

A plaintiff challenging risk-based pricing and underwriting of homeowners and commercial habitational insurance also cannot satisfy the "robust causal link" requirement set forth in the NPRM. *See* Proposed § 100.500(b)(2); *see also Inclusive Cmtys.*, 135 S. Ct. at 2523. This requirement "protects defendants from being held liable for racial disparities they did not create." *Id.* Homeowners and commercial habitational insurers do not consider, nor do they collect, data regarding their customers' FHA-protected characteristics. *See supra* § II.A. An insurer's reliance on risk-based pricing and underwriting is not "the direct cause" of any resulting disparate impact. Proposed § 100.500(b)(2). To the extent a plaintiff asserts disparate impact arising from risk-based pricing and underwriting, any alleged disparity among protected classes is the result of factors that are not within the control of insurers. For example, a prospective insured's proximity to a fire station staffed with employed (not volunteer) firefighters is highly correlated to future loss projections and proximity factors into pricing as a result. Predicating alleged disparate-impact liability based on this factor would compromise an important tool for ensuring the solvency of homeowners and commercial habitational insurers and their ability to pay current and future claims, while doing nothing to combat unlawful discrimination.

## 3. State Insurance Regulation Limits Insurers' Discretion

Disparate-impact challenges to risk-based pricing and underwriting also cannot succeed in light of the materially limited discretion defense proposed in the NPRM, as required by *Inclusive Communities*. As noted, under the proposed rule, a disparate-impact claim cannot proceed where a "defendant shows that its discretion is materially limited by … [a] Federal, state, or local law." Proposed § 100.500(c)(1)(i). This defense was mandated by *Inclusive Communities*, where the Court explained that when a "law substantially limits the [defendant's] discretion," causality cannot be shown. 135 S. Ct. at 2524. That is the case here. Application of disparate-impact liability to risk-based pricing and underwriting by homeowners and commercial habitational insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id*. at 2523. As explained above, insurers are regulated by state laws (including unfair trade practices laws) permitting and requiring the use of risk-based pricing and underwriting and requiring the filing of rates with state administrative bodies for approval. *See supra* § II.B; *infra* § IV.C.2. Those state laws mandate or expressly permit insurers to use neutral risk factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates for various risk classifications. State laws thus "substantially limit" the discretion of insurers in a manner that would make it impossible to ascribe any disparate effects of underwriting or pricing practices to insurers' independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the

19

companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the "double bind of liability" the Court warned against.

### 4. Risk-Based Pricing and Underwriting Are Necessary for the Insurance Market to Function

Application of disparate-impact liability to risk-based pricing and underwriting would also contravene the Supreme Court's instruction that the FHA must be limited in a way that gives "latitude to consider market factors." *Inclusive Cmtys.,* 135 S. Ct. at 2523. As explained above, insurance markets function efficiently when insurance is priced in accord with risk-based factors. *See supra* §§ II.A, IV.A. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation, providing an incentive to guard against risk and, thereby, avoiding the societal consequences of moral hazard. The extensive state-law framework governing the pricing of insurance, which includes safeguards against insurer insolvency, is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Inclusive Cmtys.*, 135 S. Ct. at 2524. Unless that specter is vanquished, the FHA will "undermine[] its own purpose as well as the free-market system." *Id*.

### 5. Application of Disparate Impact Would Unnecessarily Inject Racial and Other Demographics Considerations into Insurance

Finally, application of disparate-impact liability to risk-based pricing and underwriting would improperly promote consideration of racial (or other suspect) classifications. The Court in *Inclusive Communities* explained that "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." 135 S. Ct. at 2524. But that is just what extending disparate-impact liability to homeowners and commercial habitational insurers would do. State law ensures that homeowners insurers price their products in accordance with risk-based factors. State law does not permit reliance on, and homeowners and commercial habitational insurers do not rely on, classifications prohibited by the FHA. Yet, the failure to exempt homeowners and commercial habitational insurers from disparate-impact liability would effectively require them to collect and analyze sensitive—and previously uncollected—data on the FHA-protected characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts. Exempting homeowners and commercial habitational insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners and commercial habitational insurers would, contrary to the teachings of *Inclusive Communities*, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners and commercial habitational insurance by imposing significant and needless costs on insurers and their customers.

Because application of disparate-impact liability to risk-based pricing and underwriting would run afoul of all of these limitations, HUD should grant an exemption for those activities.

### C. Application Of The Disparate Impact Rule To Homeowners And Commercial Habitational Insurance Would Violate The McCarran-Ferguson Act

HUD should also provide an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance because application of the Disparate Impact Rule also would invalidate, impair, or supersede state laws regulating insurance and therefore violate the McCarran-Ferguson Act. But rather than propose such an exemption, the NPRM avoids any analysis of McCarran-Ferguson.

The court hearing the challenge to the 2013 Disparate Impact Rule brought by PCI criticized HUD for failing to explain how the Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *See PCI*, 66 F. Supp. 3d at 1048. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking. *Id.* The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048.

That critique also applies to the NPRM, which does not adequately address the McCarran-Ferguson Act. In the NPRM, HUD does not assess whether application of the McCarran-Ferguson Act would bar application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance in all or most cases. Instead, HUD proposes to add a provision confirming that nothing in the Rule "is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business if insurance. *See* Proposed § 100.500(e). APCIA appreciates HUD's acknowledgment of that point but respectfully submits that it is insufficient under the district court's analysis. *See PCI*, 66 F. Supp. 3d at 1048.

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners and commercial habitational insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) improperly requiring federal courts to determine whether challenged insurance practices are actuarially sound, (ii) invalidating state laws permitting or requiring insurers to engage in risk-based pricing and underwriting; and (iii) impairing state laws and regulations providing for state administrative review of insurance rates. The Disparate Impact Rule's violation of the McCarran-Ferguson Act is most obvious in cases where an insurer's rates or underwriting guidelines are submitted to—and subject to review by—the states. In those instances, there can be no dispute that the Disparate Impact Rule is inapplicable in light of McCarran-Ferguson.

1.      **The Rule Would Improperly Require Federal Courts to Determine Whether Challenged Practices Are Actuarially Sound**

The McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Mutual of Omaha*, 179 F.3d at 564 (McCarran-Ferguson prohibits the federal courts from "regulating the … insurance industry" via litigation). In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.* Indeed, the district court in the *PCI* case observed that "*Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." *PCI*, 66 F. Supp. 3d at 1039; *see also id.* at 1028-29 (describing *Mutual of Omaha*). The court specifically rejected the argument previously made by HUD that the relevant language in *Mutual of Omaha* was dicta. *See id.* at 1039 n.6 ("*Mutual of Omaha* is binding on this Court.").

Application of the Disparate Impact Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would similarly force federal courts to second-guess the actuarial soundness of particular state-regulated insurance practices. Under the Rule, in order to bring a challenge, a plaintiff would need to demonstrate that an alternative to the pricing or underwriting practice challenged would be "less discriminatory" and "would serve the defendant's identified interest in an equally effective manner." Proposed § 100.500(d)(1)(ii). A defendant could avoid liability by demonstrating that "the alternative practice … would not serve the valid interest identified by the defendant in an equally effective manner." *Id.* § 100.500(d)(2)(iii). Litigating these issues would necessarily involve an examination into whether use of a particular risk factor was legitimate, and federal courts would find themselves evaluating whether a practice is actuarially sound and which of two practices is more predictive of loss. Thus, in every case under the Rule challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts, on the basis of a law that does not mention insurance, is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

As noted, the *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*." *PCI*, 66 F. Supp. 3d at 1048. Despite the court's emphasis on *Mutual of Omaha*, HUD's NPRM again makes no effort to address the decision's key holding. HUD never addressed the clear holding of *Mutual of Omaha* that the *PCI* court noted and found applicable here: that the McCarran-Ferguson Act prohibits a federal court from determining

22

whether an insurer's practices "are actuarily sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564.

### 2. The Rule Would Conflict with State Laws Permitting or Requiring Insurers to Engage in Risk-Based Pricing and Underwriting

State insurance law uniformly permits insurers to rely on risk factors in setting rates and making underwriting decisions. Under state insurance law, only "unfair discrimination" is prohibited. Unfair discrimination occurs only when insureds posing similar risks are treated differently. Differential treatment of insureds posing different risks is uniformly allowed (and, indeed, required, as explained below). Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." WIS. STAT. ANN. § 625.11(4). As another example, Arizona laws specifies:

> A rate is not unfairly discriminatory in relation to another in the same class if it reflects equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, if the rates reflect the differences with reasonable accuracy.

ARIZ. REV. STAT. ANN. § 20-383(D); *see also, e.g.*, COLO. REV. STAT. ANN. § 10-4-403(1)(c); MICH. COMP. LAWS ANN. § 500.2403(1)(d); MINN. STAT. ANN. § 70A.04(4); MO. ANN. STAT. § 379.318(4); NEV. REV. STAT. ANN. § 686B.050(4); N.H. REV. STAT. ANN. § 412:15(I)(d); N.M. STAT. ANN. § 59A-17-6(E); N.C. GEN. STAT. ANN. § 58-40-20(e); TENN. CODE ANN. § 56-5-103(a), (d). *See generally* Appendix I (attached).

The principle that only "unfair" discrimination is prohibited is enshrined in both state insurance rating laws (like those quoted above) and state insurance unfair practices laws, which address both the pricing and provision of insurance more generally. *See* Appendix I; *see, e.g.*, IOWA CODE ANN. § 507B.4(3)(g) (specifying that it is an unfair trade practice to "[m]ak[e] or permit[] any unfair discrimination between insureds of the same class for essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance other than life or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.").

In addition, numerous states expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, CONN. GEN. STAT. § 38a-803(4); N.H. REV. STAT. ANN. § 412:15(I)(d); VA. CODE ANN. § 38.2-1904(A)(3). For example, under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in

23

hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

IND. CODE ANN. § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of risk-based pricing. *See, e.g.*, ARIZ. REV. STAT. ANN. § 20-356(4); ARK. CODE ANN. § 23-67-209(b); COLO. REV. STAT. ANN. § 10-4-403(4); DEL. CODE ANN. tit. 18 § 2503(5); MD. CODE ANN. INS. § 11-205(f); ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(G); MINN. STAT. ANN. § 70A.05(2); NEV. REV. STAT. ANN. § 686B.060(2); TEX. INS. CODE ANN. § 2251.052(c); *see generally* Appendix I.[38]

As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g.*, *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any . . . of the terms and conditions of the insurance.'""); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Moreover, the vast majority of states *require* insurers to set rates based on past losses, anticipated future losses, related loss expenses, and other neutral factors, which (taken together) form the foundation of risk-based pricing and underwriting as a mechanism for complying with state prohibitions against "unfair discrimination" and "inadequate" rates and their hedge against insurer solvency for the protection of insureds and claimants alike. *See* Appendix I; *see also PCI*, 66 F. Supp. 3d at 1039 (noting that "some states require insurers to use risk-based pricing" and that others "merely permit risk-based pricing"). Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." IND. CODE ANN. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." WIS. STAT. ANN. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, GA. CODE ANN. § 33-9-4(4); MD. CODE ANN., INS. § 11-205(c); MASS.

---

[38] APCIA's identification of the specific state laws at issue distinguishes this case from *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003).

GEN. LAWS ANN. ch. 174A, § 5(3); N.J. STAT. ANN. § 17:29A-4(c); N.Y. INS. LAW § 2304(a); OHIO REV. CODE ANN. § 3935.03(C); S.C. CODE ANN. § 38-73-430(1); TENN. CODE ANN. § 56-5-104(1); WASH. REV. CODE ANN. § 48.19.030(3); *see generally* Appendix I.

Indeed, as noted above, state insurance laws also make clear that failure to account for differences in expected losses constitutes prohibited "unfair discrimination." For example, Utah law provides that "[a] rate is unfairly discriminatory if price differentials fail to equitably reflect the differences in expected losses and expenses after allowing for practical limitations." UTAH CODE ANN. § 31A-19a-201(4)(a); *see also, e.g.*, ARIZ. REV. STAT. ANN. § 20-383(D); COLO. REV. STAT. § 10-4-403(1)(c); MICH. COMP. LAWS ANN. § 500.2403(1)(d); MINN. STAT. ANN. § 70A.04(4); MO. ANN. STAT. § 379.318(4); NEV. REV. STAT. ANN. § 686B.050(4); N.H. REV. STAT. ANN. § 412:15(I)(d); N.M. STAT. ANN. § 59A-17-6(E); N.C. GEN. STAT. ANN. § 58-40-20(e); TENN. CODE ANN. § 56-5-103(a), (d).

States similarly prohibit insurers from charging "inadequate rates," thereby requiring them to take into account risk in order to remain solvent. *See* Appendix I (the same state laws prohibiting unfair discrimination, and thus permitting risk discrimination, also prohibit "inadequate" rates). For example, Texas insurance law provides that "[a] rate may not be excessive, *inadequate*, unreasonable, or unfairly discriminatory for the risks to which the rate applies. TEX. INS. CODE ANN. § 2251.052 (emphasis added). A rate is "inadequate if it "is insufficient to sustain projected losses and expenses to which the rate applies" and "continued use of the rate endangers the solvency of an insurer using the rate[]." TEX. INS. CODE ANN. § 2251.051(c). Other state statutes contain similar requirements. *See, e.g.*, N.Y. INS. LAW § 2303 ("Rates shall not be excessive, *inadequate*, unfairly discriminatory, destructive of competition or *detrimental to the solvency of insurers*.") (emphases added); COLO. REV. STAT. ANN. § 10-4-403 ("Rates shall not be excessive, *inadequate*, or unfairly discriminatory" and "[c]oncerning inadequacy, rates are not inadequate unless clearly insufficient to sustain projected losses and expenses") (emphasis added); *see also* Appendix 1 (column 3). As explained by the Pennsylvania Superior Court:

> With or without regulation, it has always been in the public interest to have insurance premiums high enough to assure the payment of losses, and yet low enough to enable the public to secure protection upon the payment of a reasonable premium. To assure the availability of funds by insurers to pay losses, the state has long required insurance companies to be licensed, to maintain reserves and to submit to examination to determine solvency and compliance with the law. This has discouraged companies from charging 'inadequate' rates.

*Ins. Dep't v. City of Philadelphia*, 173 A.2d 811, 814 (Pa. 1961); *see also Engelman*, 692 A.2d at 480 (describing the prevention of inadequate insurance rates as one of the principal aims of the Maryland Insurance Code). Under the McCarran-Ferguson Act, a federal law must not be

25

interpreted as prohibiting practices that state insurance law permits.[39] Yet undermining the states' efforts to guard against insurer insolvency by prohibiting inadequate rates is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to foreclose insurances practices expressly permitted or even required by state law.

In compliance with state insurance laws, insurers charge different rates and make different underwriting decisions relative to customers posing different risks and/or presenting with different loss profiles. Despite these state-authorized differences, HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a FHA-protected characteristic, thus creating a conflict between the Rule and the laws of the vast majority of the states. The McCarran-Ferguson Act ensures that federal laws of general applicability do not "'invalidate, impair, or supersede' [a] State's law." *Humana*, 525 U.S. at 307. To invalidate means "to render ineffective," and to supersede is "to displace (and thus render ineffective) while providing a substitute rule." *Id.* (internal quotation marks omitted). To impair a State's law is to "hinder its operation or frustrate [a] goal of that law." *Id.* at 311 (internal quotation marks and citation omitted). Application of the Disparate Impact Rule to insurers would "invalidate, impair, or supersede" state law and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly permitted or required by state law. *Id.* at 310.

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *Humana*, 525 U.S. at 311; *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But, as explained above, far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Case-by-case adjudication in federal court would require federal courts to evaluate the soundness of challenged practices and would permit insurers to be held liable for use of sound risk-based practices.

### 3. The Rule Would Conflict with State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—49 of 50, plus the District of Columbia—require admitted insurers to file their rates with state insurance commissioners for review and approval.

---

[39] *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1557 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal … laws."); *Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations).

*See* Appendix I.[40]   Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, CONN. GEN. STAT. § 38a-689(a); FLA. ADMIN. CODE ANN. r. 69O-170.013(1)(b); GA. CODE ANN. § 33-9-21(a); KAN. STAT. ANN. § 40-955 (a), (l); KY. REV. STAT. ANN. § 304.13-051(4); ME. REV. STAT. ANN. tit. 24-A § 2938-A; MD. CODE ANN., INS., § 27-501(h)(2); MICH. COMP. LAWS ANN. § 500.2119; MO. CODE REGS. ANN. tit. 20, § 500-9.100; N.H. INS. 3306.01(a); N.J. STAT. ANN. § 17:22-6.14a1; N.M. STAT. ANN. § 59A-17-5.1; 28 TEX. ADMIN. CODE § 5.9342; UTAH ADMIN. CODE R. R590-127; VT. STAT. ANN. tit. 8, § 4688; W. VA. CODE R. § 114-74-4.   State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound risk factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, WIS. STAT. ANN. § 625.13; N.J. STAT. ANN. § 17:29A-7; IND. CODE ANN. § 27-1-22-5; GA. CODE ANN. § 33-9-26; KAN. STAT. ANN. § 40-955 (a), (l); MD. CODE ANN., INS. § 27-501(h)(2); MICH. COMP. LAWS ANN. § 500.2119; N.J. STAT. ANN. § 17:22-6.14a1; VT. STAT. ANN. tit. 8, § 4688; W. VA. CODE R. § 114-74-4.   For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner.  CAL. INS. CODE § 1861.05(b).

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair, invalidate, or supersede these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310.  The laws governing rate filing provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states.  If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired, invalidated, or superseded by the application of the Rule.  *See, e.g.*, *Saunders II*, 537 F.3d at 968 ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials.  If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'").   Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state regulator would not establish that the rate was lawful.  Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to litigate in federal court whether every component of their rating and underwriting plans and other business practices "advances a valid interest."  *See* Proposed § 100.500(d)(1)(i).  Such interference with the states' insurance administration regimes is not permitted under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

\*        \*        \*

For all of these reasons, application of the Disparate Impact Rule to homeowners and commercial habitational insurance would "invalidate, impair, or supersede" state laws governing

---

[40] As previously noted, admitted insurers account for 99% of homeowners policies.  *See supra* n.2.  Rate filing is also generally required for small-to-mid-market commercial habitational insurance.  A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

insurance in every state. Accordingly, application of the Rule to homeowners and commercial habitational insurance would violate the McCarran-Ferguson Act. For that reason alone, HUD should grant an exemption for homeowners and commercial habitational insurance.[41]

### D. Application Of The Disparate Impact Rule To Risk-Based Pricing Would Violate The Filed-Rate Doctrine

HUD also must exempt risk-based pricing of homeowners and commercial habitational insurance[42] from the Rule in order to avoid conflict with the filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986); *PCI*, 66 F. Supp. 3d at 1049. The doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).[43]

The doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g.*, *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 236-39, 242 (3d Cir. 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013); *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005), *aff'd*, 721 N.W.2d 307 (Minn. 2006); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*, No. 3775, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000); *see also, e.g.*, CAL. INS. CODE § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred

---

[41] In the preamble to HUD's 2011 proposed rule, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70,924. HUD later indicated that the Disparate Impact Rule might also apply to other insurance practices, such as claims processing or marketing. 81 Fed. Reg. at 69,017. The relevant provisions of the FHA, however, should not be construed to apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership—the relevant activity protected by the FHA. As the Seventh Circuit has explained, 42 U.S.C. § 3604 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *N.A.A.C.P.*, 978 F.2d at 301. The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." The section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners and commercial habitational insurers provide no such services, they are not covered by § 3604(b).

[42] The filed-rate doctrine applies to large commercial habitational insurance to the extent insurers file their rates. *See supra* n.2 and n.40.

[43] The extent or the vigor of the agency's review of filed rates does not matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates); *McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-CV-W-FJG, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

The district court in *PCI* found that HUD initially had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. *PCI*, 66 F. Supp. 3d at 1050. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* In the NPRM, HUD has again failed to address the filed-rate doctrine. That was arbitrary and capricious.

At bottom, applying the Disparate Impact Rule to homeowners and commercial habitational insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and federal government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Wegoland*, 27 F.3d at 19; *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted).

### E. HUD Has Authority To Exempt Homeowners And Commercial Habitational Insurance

For all of the reasons set forth above, the Disparate Impact Rule cannot and should not be applied to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Applying the Rule to risk-based pricing and underwriting would significantly interfere with the essential economic principles that underlie the business of insurance, which requires consideration of risk. It also would contravene the limitations on disparate-impact liability laid out by the Supreme Court in *Inclusive Communities*. Application of the Rule would further run afoul of the McCarran-Ferguson Act—a critical consideration that a federal court has previously faulted HUD for failing adequately to address. Finally, the filed-rate doctrine bars application of the Rule to the pricing of homeowners and commercial habitational insurance.

Notwithstanding all these legal impediments, HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475. But HUD has never explained how disregarding limitations imposed by the Supreme Court or complying with the McCarran-Ferguson Act would be contrary to congressional intent. Nor has it explained how arbitrarily and capriciously applying the Rule to the business of providing homeowners and commercial habitational insurance or violating the filed-rate doctrine would further congressional intent. HUD previously based its assertion that it could not grant an exemption entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human*

29

*Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Graoch* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Id.* (emphasis added). Indeed, the *Graoch* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 390-91. The district court in the PCI case recognized that case law HUD itself previously relied upon makes clear that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI*, 66 F. Supp. 3d at 1051 (quoting *Graoch*, 508 F.3d at 375-76). In the NPRM, however, HUD failed even to acknowledge *Graoch*.

Even if an insurer could successfully defend risk-based practices under the Rule's burden-shifting framework, HUD's denial of an exemption would still be arbitrary and capricious. Requiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on the industry and customers broadly, making insurance less affordable for all. Under HUD's approach, in many cases insurers would have to defend each of the risk factors they use, perhaps even on a region-by-region basis as different plaintiffs assert alleged disparate impacts among particular populations of insureds. HUD's only response previously was that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. HUD provided no basis, however, for its counterintuitive assumption that it would cost as much to demonstrate eligibility for an exemption for risk-based pricing and underwriting as it would to litigate the soundness of a challenged practice on a case-by-case basis in multiple jurisdictions at different points in time.

Moreover, the Rule would require insurers to establish not merely that a practice is purely risk-based; it would also require insurers to litigate the third step of the burden-shifting approach, disputing that less discriminatory alternatives exist. This would be especially difficult for insurers because—as noted—they do not collect data on subscribers' FHA-protected characteristics and have no other means of anticipating disparities. And assuming they could collect the necessary data to defend themselves, it would introduce race or ethnicity as a pervasive factor, which the Court in *Inclusive Communities* warned against, and intrude upon policyholders who would be required to self-report race and ethnicity data. *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶¶ 11–12; *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-3 ¶ 14.

Accordingly, HUD can and should exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from disparate-impact liability under the FHA.

30

## V.    IF HUD DOES NOT GRANT AN EXEMPTION, IT SHOULD MODIFY AND CLARIFY THE DEFENSES IN THE RULE TO ADDRESS ISSUES UNIQUE TO RISK-BASED INSURANCE PRICING AND UNDERWRITING AND TO MORE CLOSELY CONFORM TO *INCLUSIVE COMMUNITIES*

For all of the reasons set forth above, HUD should exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from disparate-impact liability under the FHA. If HUD elects not to recognize such an exemption, at a minimum it should incorporate a number of additional clarifications to the defenses in the proposed rule. The specific modifications and clarifications requested by APCIA are attached in Appendix III.

### A.    HUD Should Enact A New Defense In § 100.500(c) For Risk-Based Pricing And Underwriting

As an initial matter, HUD should add a new defense in proposed § 100.500 for defendants that can show that they were engaged in risk-based pricing and underwriting. Currently that section would recognize defenses where a defendant's discretion is materially limited by a third party, where the defendant relied on an algorithmic model, and where the plaintiff has failed to allege sufficient facts to meet its burden at the *prima facie* stage. HUD should add a fourth defense for use of risk-based pricing and underwriting.

For the reasons set forth above that support creation of a full exemption for risk-based pricing and underwriting, HUD should create a substantive defense for risk-based pricing and underwriting. If a Defendant shows that it relied on risk-based pricing and underwriting, that should be a complete defense at Step 2 of the burden-shifting framework. The plaintiff should not have an opportunity to rebut the defense at Step 3.

As explained above, allowing a plaintiff to litigate at Step 3 whether some other alternative risk factor would be less discriminatory but "equally effective" would impermissibly require federal courts to adjudicate the actuarial soundness of challenged insurance practices. But that is precisely what the Seventh Circuit in *Mutual of Omaha* indicated a federal court cannot do in light of the McCarran-Ferguson Act. *See* 179 F.3d at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law," then federal courts would "find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do." *Id.*

A defendant seeking to invoke the defense would need to establish that it applies. The defense would be inapplicable if the defendant were not in fact engaging in risk-based pricing and underwriting. If, for example, an insurer determined rates based in part on a factor considered not for its predictive value, but for its ability to exclude members of a FHA-protected class, the defense would be unavailing. The defense would apply only to efforts to engage in risk-based pricing and underwriting. As noted at the outset, nothing in the Rule would be deemed to exempt an insurer from claims of intentional disparate treatment, in the event such insurer did in fact consider a FHA-protected characteristic in the sale, rental, or financing of dwellings or in other housing-related activities subject to the FHA.

### B. HUD Should Ensure That Plaintiffs Satisfy The Robust Causation Standard Required By *Inclusive Communities* In § 100.500(b)(1)

Although the proposed Rule incorporates the "robust" causation requirement discussed in *Inclusive Communities*, causation plays a particularly important role in the context of insurance. Commercial insurers, for example, have no direct relationship with tenants or homeowners. They are not landlords, provide no financing to tenants or homeowners, and may not even provide direct insurance to the parties who might bring suit for alleged disparate-impact liability under the FHA. Such an insurer's policies or practices, therefore, are likely to be only remotely related to the housing opportunities and decisions of allegedly FHA-protected class members, as the connection between housing opportunities and decisions of allegedly affected class members would be separated by a host of factors unrelated to insurance. Indeed, the connection between housing opportunities and specific insurance practices across all types of homeowners and commercial habitational insurance is often remote. The Supreme Court in *Inclusive Communities* observed that in situations like that, it may be difficult, if not impossible, to meet the robust causation standard the Court held to be necessary to ensure that disparate-impact liability does not raise constitutional concerns. *See* 135 S. Ct. at 2523-24 (explaining that a plaintiff challenging the decision of a private developer to construct a new building in a particular location may not be able to show causation "because of the multiple factors that go into investment decisions about where to construct or renovate housing units"). The Court has also made clear that mere statistical disparities or correlation is insufficient to show that a challenged policy or practice was the cause of a disparate impact. HUD should ensure that these concerns are reflected in subsection (b)(1), by clarifying that the causation analysis must consider whether a practice is too remote to give rise to liability, and that more than statistical correlation is required.

### C. HUD Should Expand The "Limited" "Discretion" Defense In § 100.500(c)(1)

HUD should also amend the limited discretion defense set forth in proposed § 100.500(c)(1). As drafted, the defense could be read to apply only where state law <u>required</u> the challenged insurance practice. HUD should clarify that the defense also applies where state insurance law <u>permits</u> the challenged practice.

As proposed, the defense applies only if a "defendant shows that its discretion is materially limited by a third party such as through … [a] Federal, state, or local law." Proposed § 100.500(c)(1)(i). A defendant's discretion to act is plainly limited where state law <u>compels</u> the defendant to engage in the challenged practice. In some cases, however, state law may merely <u>permit</u> the challenged practice without compelling it. Where the state law at issue is a state insurance regulation, such permission ought to be sufficient given the limitations imposed by the McCarran-Ferguson Act.

As explained above, it is well established that, in light of the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d at 1557 n.9 (Under McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal … laws."); *Dexter*, 527 F.2d at 236 (same); *Boulware*, 2009 WL 3830640, at *8 (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public

insurance fraud prosecutions); *Chair King*, 1995 WL 1760037, at *5 (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). The mere fact that state law permits a practice might not, in most circumstances, preclude federal regulation of the practice. But insurance is different because of McCarran-Ferguson. Where a defendant can show that the practice challenged is permitted by state insurance law, it should be able to invoke a defense set forth in the Disparate Impact Rule.

### D.     HUD Should Modify The Algorithm Defense In § 100.500(c)(2)

HUD also should revise the algorithm defense proposed in the NPRM. *See* Proposed § 100.500(c)(2). The proposed defense—which lays out three different ways to fall within its scope—is important and appropriate. Where a defendant has legitimately relied on an algorithmic model, it cannot be found to have directly caused any resulting disparate impact. Under the NPRM and *Inclusive Communities*, the requisite "robust causal link" is missing. The defendant has not adopted some arbitrary or irrational practice. It has relied on an algorithmic model designed to engage, for example, in "risk assessment." *Id.* HUD therefore should retain the algorithm defense. At the same time, however, the defense should be refined in a number of respects:

First, the opening portion of the defense in proposed § 100.500(c)(2) should be modified. The defense should not be applicable only if the plaintiff has affirmatively "*allege[d]* that the cause of a discriminatory effect is a model used by the defendant." (Emphasis added.) Such a requirement would allow plaintiffs to engage in artful pleading and avoid triggering the defense. Instead, the defense should apply "if the cause of a discriminatory effect is a model used by the defendant." The provision should also be clarified to explicitly include actuarial analyses, to avoid disputes as to whether such analyses constitute a "model."

Second, the first variation of the defense—set forth in proposed § 100.500(c)(2)(i)— applies where a defendant identifies the factors used in the model, "shows that these factors do not rely in any material part on factors that are substitutes or close proxies for protected classes" under the FHA, and shows that "the model is predictive of credit risk or other similar valid objective." This variant of the defense should be revised to make clear that it applies where the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other similar valid objectives, as long as the model does not use FHA-protected characteristics as factors. There should be no inquiry into whether the facially valid factors in a predictive model are somehow deemed to be "substitutes or close proxies for protected classes." That portion of the defense is ambiguous and threatens to spawn unnecessary litigation. It is not clear what it means for "factors" to "rely in material part on factors that are substitutes or close proxies for protected classes." The clause injects significant uncertainty and invites needless litigation, as plaintiffs would invariably contend that nearly any factor is a "substitute" or "close proxy" for protected classes. It is also unnecessary, inasmuch as a defendant shown to have intentionally used a "substitute" for a protective class would remain potentially liable for intentional discrimination. The algorithm model defense should require a defendant to show that characteristics protected by the FHA are not used as factors in the model.

33

Third, the confusing and unnecessary requirement in the proposed rule that factors not be "proxies" for protected classes should also be eliminated from the third variant of the algorithm defense for these same reasons. *See* Proposed § 100.500(c)(2)(iii).

Fourth, for the first and third variants of the algorithm defense, the defendant should be able to prove the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives without requiring the model itself or all of the inputs be produced. Nor should the defendant be required to produce its model or algorithm to show that it does not take into account the FHA-protected characteristics. Computerized models, actuarial analysis, or algorithms are often highly proprietary and would, if publicly disclosed, potentially cause competitive harm and over time create an anti-competitive insurance market.

Fifth, the defense in Proposed § 100.500(c)(2)(ii) should not be limited to models from third parties "that determine[] industry standards." In many instances, algorithmic models are developed by reputable third parties that do not serve to determine industry standards. In some industries, however, standards are not set by the kinds of third parties that might develop an algorithmic model. In the homeowners and commercial habitational insurance industry, for example, there is no third party charged with determining industry standards that is in a position to develop a risk-based pricing and underwriting model. The Rule should be less prescriptive on this issue to permit its application in a wider range of cases, so long as the model at issue is in fact developed by a reputable third party. Moreover, many insurance companies have in-house expertise in modeling and development of algorithms for purposes of actuarial and underwriting analysis. So long as the model does not take account of protected characteristics, the defense should apply regardless of whether it was developed internally or by third parties.

### E.    Issues Relating To Burdens Of Proof

Proposed § 100.500(c)(3) appropriately allows a defendant to show that the plaintiff has failed to meet his or her burden of proof at the pleading stage for reasons other than those specifically discussed in (c)(1) (limited discretion) and (2) (use of algorithms or models). The Rule should clarify that it is plaintiff's *burden* to establish the elements of paragraph (b). To do so, it should be revised to state that it is a defense if the defendant "demonstrates that the plaintiff has failed to allege sufficient facts to [meet plaintiff's burden] under paragraph (b) of this section."

Proposed § 100.500(d)(1)(i) provides that, where the case is not resolved at the pleading stage, ultimately the "plaintiff must prove by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(2) through (5) of this section . . . ." As drafted, the provision omits a reference to paragraph (b)(1). Paragraph (b)(1) requires the plaintiff to plausibly allege that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law." This provision may have been omitted on the theory that if the defendant rebuts this showing, the plaintiff then has the burden of demonstrating that a less discriminatory policy or practice exists meeting the requirements of paragraph (d)(ii). However, consistent with *Inclusive Communities* and prior Supreme Court caselaw, the plaintiff always carries the burden of establishing that the challenged policy or

34

practice is based on arbitrary, artificial, and unnecessary barriers, even if the plaintiff has alleged sufficient plausible facts to survive a motion to dismiss at the pleading stage. *See Inclusive Cmtys.*, 135 S. Ct. at 2522. Thus, paragraph (d)(1)(i) should be modified to require the plaintiff to demonstrate by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(1) through (5).

## VI. AT A MINIMUM, HUD SHOULD MAKE CLEAR IN THE FINAL RULE THAT DISPARATE-IMPACT CHALLENGES ARE INCONSISTENT WITH RISK-BASED PRICING AND UNDERWRITING

As explained above, we believe HUD should grant a broad exemption from disparate-impact liability for risk-based pricing and underwriting of homeowners and commercial habitational insurance. Alternatively, HUD should revise the defenses in proposed § 100.500(c) to incorporate a defense for risk-based pricing and underwriting. If HUD does not take either step, however, it should at a minimum make clear in the preamble to the final rule that (1) disparate-impact challenges to risk-based pricing and underwriting cannot succeed, and (2) HUD will not bring such challenges.

### A. HUD Should Acknowledge Key Aspects Of Insurers' Defenses

In light of the significant limitations on disparate-impact liability proposed in the NPRM and mandated by the Supreme Court in *Inclusive Communities*, as well as the restraints imposed by the McCarran-Ferguson Act, disparate-impact challenges to risk-based pricing of homeowners and commercial habitational insurance cannot succeed. HUD should acknowledge the numerous barriers to such claims in the preamble to the final rule to avoid spawning unnecessary litigation. Specifically, HUD should acknowledge the following:

- Risk-based pricing and underwriting are not "arbitrary, artificial, or unnecessary" practices and instead "advance valid interests." Risk-based pricing and underwriting are critical to the appropriate provision of insurance and to maintaining solvency since both are driven by expected losses and related expenses and neither relies on factors that are substitutes or close proxies for protected classes.

- For the reasons explained above, disparate-impact challenges to risk-based pricing and underwriting cannot satisfy the "robust causal link" and "direct cause" requirement of the NPRM. Use of legitimate risk factors does not cause disparate impact; any impact is caused by socioeconomic factors outside the control of insurers.

- Disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance, requiring insurers to collect and analyze data on FHA-protected characteristics.

- State insurance regulations materially limit insurers' discretion to depart from risk-based pricing and underwriting, making applicable HUD's proposed limited discretion defense in § 100.500(c)(1) and undermining causation.

- The "algorithm" defense is generally applicable to homeowners and commercial habitational insurers who use models or actuarial analyses to make risk-based pricing and underwriting determinations, both of which are predictive of risk and do not consider factors that are characteristics of FHA-protected classes.

- Using a policy or practice less predictive of risk would not serve "valid interests" in an "equally effective" manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

For all of the reasons noted above, disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot succeed on the merits. HUD should acknowledge these barriers expressly in the final rule. Doing so will make clear to litigants that the requirements laid out in *Inclusive Communities* and in the NPRM apply to these kinds of challenges and generally will foreclose them. This will bring added clarity and certainty to an area of the law that was unsettled by HUD's 2013 adoption of the Disparate Impact Rule.

**B.    HUD Should Also Commit Not To Bring Disparate-Impact Challenges To Risk-Based Pricing And Underwriting Of Homeowners And Commercial Habitational Insurance**

The FHA may be enforced by private parties, *see* 42 U.S.C. § 3613, or by HUD and the Attorney General, *see id.* §§ 3610, 3611, 3614. Government enforcement can move forward in administrative proceedings or federal court. *See id.* §§ 3612, 3614. For all of the reasons stated in these comments, HUD should commit not to institute disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitation insurance. Such claims will fail as a matter of law, and given the significant legal hurdles, are not an efficient use of HUD's resources.

Thus, regardless of whether HUD adopts an exemption or defense for risk-based pricing and underwriting of homeowners and commercial habitation insurance, it should commit in the final rule not to pursue disparate-impact challenges to those practices.

**VII.   RESPONSES TO SPECIFIC ISSUES RAISED BY HUD**

We set forth below our responses to the particular issues raised by HUD in the NPRM. These responses should be read in light of the comments above, which addressed many of these issues.

A. **How well do HUD's proposed changes to its disparate impact standard align with the decision and analysis in *Inclusive Communities* with respect to the proposed prima facie burden, including:**

1. **Each of the five elements in the new burden-shifting framework outlined in paragraph (b) of § 100.500;**

As a preliminary matter, the requirement that a *prima facie* case be "based on an allegation that a specific, identifiable policy or practice has a discriminatory effect" incorporates the Supreme Court's instruction in *Inclusive Communities* that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to *a defendant's policy or policies* causing that disparity." 135 S. Ct. at 2523 (emphasis added). (It also aligns with the Court's requirement in *Ward's Cove* that "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." 490 U.S. at 657.)

As explained above in § III, subject to the additional changes proposed in this letter, the five elements of a *prima facie* case of disparate-impact liability proposed by HUD, are consistent with *Inclusive Communities* and heed the Court's caution against allowing "disparate-impact liability [to] displace valid governmental and private priorities, rather than solely "remov[ing] . . . artificial, arbitrary, and unnecessary barriers." *Inclusive Cmtys.*, 135 S. Ct. at 2524.

Element 1: The requirement that the challenged policy or practice be "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law" mirrors *Inclusive Communities'* instruction that policies are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." *Id.* It also reflects the Court's recognition of the importance of allowing businesspeople "latitude to consider market factors." *Id.* at 2523.

Element 2: The requirement of a "[r]obust causal link between the challenged policy or practice and a disparate impact on members of a protected class which shows the specific practice is the direct cause of the discriminatory effect" incorporates the Court's statement that a *prima facie* case of disparate impact includes a "robust causality requirement." *Id.* Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove*, 490 U.S. at 653).

Element 3: The requirement that "the alleged disparity caused by the policy or practice has an adverse effect on members of a protected class" conforms with the Supreme Court's statement that "a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities.'" *Inclusive Cmtys*, 135 S. Ct. at 2513 (citing *Ricci*, 557 U.S. at 577).[44]

Element 4: The requirement that a plaintiff show that "the alleged disparity caused by the policy or practice is significant" aligns with the Court's warning against allowing the Disparate

---

[44] As noted in footnote 30, HUD may wish to consider switching the order of elements 2 and 3.

Impact Rule to improperly require the use of race "in a pervasive way" and inject "racial considerations into every housing decision." *Inclusive Cmtys.*, 135 S. Ct. at 2523-24. Moreover, the requirement conforms with *Wards Cove's* holding that a plaintiff must make a *prima facie* showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class. *See Wards Cove*, 490 U.S. at 657.

Element 5: The requirement that "there is a direct link between the disparate impact and the complaining party's alleged injury" also conforms with the Supreme Court's statement that "a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities.'" *Inclusive Cmtys.*, 135 S. Ct. at 2513 (citing *Ricci*, 557 U.S. at 577).

> ## 2. The three methods described in paragraph (c) of § 100.500 through which defendants may establish that plaintiffs have failed to allege a prima facie case.

The defenses set forth in the proposed rule, subject to the proposed changes, are appropriate and align with the Supreme Court's decision in *Inclusive Communities*:

Materially limited discretion defense (§ 100.500(c)(1)): As noted above, this defense codifies the Supreme Court's instruction that where a "federal law substantially limits the [government's] discretion" a disparate-impact case should be dismissed. *Inclusive Cmtys.*, 135 S. Ct. at 2524.

Algorithmic defense (§ 100.500(c)(2)): The algorithmic defense is consistent with *Inclusive Communities'* emphasis on the importance of allowing actors the "latitude to consider market factors." *Id.* at 2523.

Failure to allege sufficient facts (§ 100.500(c)(2)): This defense supports the requirements of a plaintiff's prima facie case set forth above. It allows a defendant to obtain dismissal when it can show that the plaintiff failed to satisfy the various requirements of the Rule. As discussed above, the requirements for a prima facie case are fully consistent with *Inclusive Communities*. This proposed defense is thus fully consistent with that case as well.

> ## B. What impact, using specific court cases as reference, did *Inclusive Communities* have on the number, type, and likelihood of success of disparate impact claims brought since the 2015 decision? How might this proposed rule further impact the number, type, and likelihood of success of disparate impact claims brought in the future?

It is difficult to quantify the effect that *Inclusive Communities* has had on the number and type of disparate-impact claims brought. There is some indication that the Court's recognition of the important limitations on disparate-impact liability has reduced the number of non-meritorious cases proceeding in the courts. One study of the impact of the case concluded that *Inclusive*

*Communities* reduced the likelihood of success of FHA disparate-impact claims.[45] That study indicated that in the first two years following *Inclusive Communities*, defendants prevailed by a ratio of approximately 6 to 1.[46] The study further indicated that since the beginning of 2018, the rate fell to approximately 4 to 1, particularly in cases involving public landlords or lending institutions as defendants.[47] As the study observed,[48] within the past three years, when FHA disparate-impact claims have not succeeded, it is often due to one or more of the following: inability to satisfy the robust causality requirement,[49] insufficient evidence of a statistical disparity,[50] and failure to identify a particular challenged policy.[51]

As explained at length above, the proposed rule will promote the efficient resolution of non-meritorious claims at an earlier stage of litigation and will discourage plaintiffs from alleging non-meritorious claims in the first instance.

C. **How, specifically, did *Inclusive Communities*, and the cases brought since *Inclusive Communities*, expand upon, conflict, or align with HUD's 2013 final disparate impact rule and with this proposed rule?**

As explained in detail above, the proposed changes to the Disparate Impact Rule described in the NPRM, subject to the additional proposed changes in this letter, would bring the 2013 Rule into compliance with the limitations articulated by the Supreme Court in *Inclusive Communities*. The framework set forth in *Inclusive Communities* imposed more guardrails on the application of disparate-impact liability than the framework announced in the 2013 Rule. *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019) ("We read the Supreme Court's opinion in *[Inclusive Communities]* to undoubtedly announce a more demanding test than that set forth in the HUD regulation."). For example, the 2013 Rule did not include the requirement that a plaintiff challenge an "arbitrary, artificial, and unnecessary" policy or a "robust

---

[45] David L.Callies and Derek B. Simon, *Fair Housing and Discrimination After Inclusive Communities*, 33 PROB. & PROP. 43, 48 (2019).

[46] *Id.* at 47.

[47] *Id.*

[48] *Id.*

[49] *See Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs,* No. 3:08-CV-0546-D, 2016 WL 4494322, at *1 (N.D. Tex. Aug. 26, 2016) (holding that plaintiff had not proved that defendant's exercise of discretion—and not other factors—caused the statistical disparity); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 906 (5th Cir. 2019) (holding that plaintiff "had not provided facts linking the "no vouchers" policy to the "possible statistical disparity").

[50] *See, e.g, Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Fla.*, 759 F. App'x 828, 835 (11th Cir. 2018) (holding that plaintiffs' statistical evidence "does not establish a disparate impact, let alone any causal connection between the [challenged policy] and the disparate impact.").

[51] *See, e.g., City of Joliet, Ill. v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) (holding that disparate-impact claim failed because the challenged action—the condemnation of Evergreen Terrace— "is a specific decision, not part of a policy to close minority housing in [the city]."); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1113 (8th Cir. 2017) (dismissing FHA disparate-impact claim on summary judgment because plaintiffs merely "attempt to bootstrap numerous 'one-time decision[s]' together in order to allege the existence of a City policy to misapply the housing code").

39

causality requirement." Indeed, the 2013 Rule required a defendant to show that its challenged practice is strictly "necessary" to achieving a legitimate business goal and permitted a plaintiff to prevail even if the plaintiff's proposed alternative practice was not "equally effective." *See* 24 C.F.R. § 100.500(b)(1)(i), (ii); 78 Fed. Reg. at 11,473.

The Proposed Rule better aligns with *Inclusive Communities* and subsequent cases because the Proposed Rule incorporates the safeguards set forth in *Inclusive Communities*, as described above. Subsequent case law has confirmed the importance of the robust causality requirement to the disparate-impact inquiry. *See Ellis v. City of Minneapolis*, 860 F.3d 1106 (8th Cir. 2017); *Oviedo Town Ctr, II, L.L.P. v. City of Oviedo, Florida*, 759 F. App'x. 828, 833-35 (11th Cir. 2018). Subsequent case law has also focused on *Inclusive Communities*' aim of using the disparate-impact theory to dismantle "artificial, arbitrary, and unnecessary barriers." *See, e.g.*, *Ellis*, 860 F.3d at 1114 (requiring that a plaintiff's allegations "point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity" to establish a prima facie case of disparate impact). By including these requirements in the plaintiff's *prima facie* burden, the Proposed Rule implements the limitation set forth in *Inclusive Communities*.

> **D.      How might the proposed rule increase or decrease costs and economic burden to relevant parties (e.g. litigants including private citizens, local governments, banks, lenders, insurance companies, or others in the housing industry) relative to the 2013 disparate impact rule? How might the proposed rule increase or decrease costs and economic burden to relevant parties relative to *Inclusive Communities*?**

The Proposed Rule will decrease costs and economic burdens on litigants relative to the 2013 Disparate Impact Rule. First, it will reduce confusion among litigants by conforming HUD's disparate-impact standard to the standard set forth by the Supreme Court in *Inclusive Communities*. Second, the *prima facie* standard proposed by HUD will allow for the disposal of non-meritorious disparate-impact claims at an earlier stage of the litigation, which will reduce litigation costs for both plaintiffs and defendants.

> **E.      How might a decision *not* to amend HUD's 2013 final disparate impact rule affect the status quo since *Inclusive Communities*?**

As reflected in cases such as *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.4 (4th Cir. 2018), and *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016), courts have grappled with the differences between HUD's 2013 final Disparate Impact Rule and *Inclusive Communities* since 2015. Were HUD not to amend the 2013 Disparate Impact Rule, courts and litigants would continue to bear the burden of reconciling differences between the Rule and *Inclusive Communities*. Amending the 2013 Disparate Impact Rule as reflected in the NPRM would clarify the disparate-impact standard for courts and litigants, thus reducing the cost of litigation.

**F.** **What impact, if any, does the addition of paragraph (e) of § 100.500 regarding the business of insurance have on the number and type of disparate impact claims? What impact, if any, does the proposed paragraph (e) have on costs (or savings) and economic burden of disparate impact claims?**

The addition of paragraph (e) of § 100.500 will not impact the number and type of disparate-impact claims, nor will it impact the costs and economic burden of disparate-impact claims. As described at length above, HUD made clear in the NPRM that proposed paragraph (e) is intended to "affirm[] in regulation HUD's past position … that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case." 84 Fed. Reg. at 42,860. To succeed on a McCarran-Ferguson defense, then, defendants will be required to litigate the issue on a case-by-case basis, imposing significant and unnecessary burdens. HUD's mere acknowledgement of the McCarran-Ferguson Act does not alleviate this burden on defendants.

**G.** **Any other data, information, or analysis the public can provide to assist HUD in assessing the impact of the proposed regulation relative to the 2013 disparate impact final rule and the 2015 Supreme Court decision in *Inclusive Communities*.**

As explained in depth above, as compared to the 2013 Disparate Impact Rule, the proposed rule more closely aligns with the principles and explicit requirements set forth in *Inclusive Communities*. The proposed requirements for a *prima facie* case are consistent with *Inclusive Communities*. Additionally, the defenses provided in paragraph (c) of § 100.500 incorporate *Inclusive Communities'* guidance that where a "federal law substantially limits the [government's] discretion" a disparate-impact case should be dismissed and that actors should be given the "latitude to consider market factors." *Inclusive Cmtys.*, 135 S. Ct. at 2523-24. The proposed rule will reduce burdens on litigants and the courts by conforming to the *Inclusive Communities* standard and by allowing for the disposal of non-meritorious disparate-impact claims at earlier stages of the litigation.

**H.** **Whether, and under what circumstances, punitive or exemplary damages may be appropriate in disparate impact litigation in federal courts (question under § 100.7; pp. 12-13 of the NPRM).**

Punitive or exemplary damages should not be permitted in disparate-impact cases because a disparate-impact claim does not require that defendant act with the requisite level of intent. The Fair Housing Act provides for the award of punitive damages. *See* 42 U.S.C. § 3613(c)(1) ("if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages"). Punitive damages are "an expression of [ ] moral condemnation" and are typically awarded in cases in which a defendant's misconduct was "especially reprehensible." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001) (internal citations omitted). Courts have thus generally applied a rigorous standard in assessing whether an award of punitive damages in an FHA claim is proper. *See, e.g.*, *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (allowing punitive damages under the FHA

41

only where "a defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of other").  For that reason, punitive damages are available only in "cases involving intentional discrimination." *Belcher v. Grand Reserve MGM, LLC*, 269 F. Supp. 3d 1219, 1246 (M.D. Ala. 2017) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)); *United States v. Hylton*, 944 F. Supp. 2d 176, 197 (D. Conn. 2013), *aff'd*, 590 F. App'x 13 (2d Cir. 2014) (same); *Sachs v. Nunziante*, CV 15-1825 (JFB) (AKT), 2016 WL 4506731, at *5 (E.D.N.Y. July 21, 2016) (same).  Without more, an FHA disparate-impact claim, which does not require any showing of the defendant's state of mind, cannot meet such a standard.  *See Kolstad*, 527 U.S. at 526 ("The terms 'malice' and 'reckless indifference' ultimately focus on the actor's state of mind.").[52]

> **I.** **The nature, propriety, and use of algorithmic models as related to the defenses in (c)(2) (p. 21 of NPRM).**

The algorithmic model defenses set forth in (c)(2) are proper because where a defendant has relied on an algorithmic model that does not include FHA-protected characteristics as inputs, it cannot be found to have directly caused any resulting disparate impact.  Under the NPRM and *Inclusive Communities*, the requisite "robust causal connection" is missing, and the defendant has not implemented an arbitrary or irrational practice.  Moreover, as explained at length above, the algorithmic model defense, subject to the additional proposed changes, preserves the nature of the business of insurance.  The defense properly allows homeowners and commercial habitational insurers to rely on models supporting "risk assessment" through risk-based pricing and underwriting as a defense to disparate-impact liability.

> **J.** **Whether it would be consistent with *Inclusive Communities* to provide a defense for housing authorities who can show that the policy being challenged is a reasonable approach and in the housing authority's sound discretion. (p. 23).**

APCIA's members do not include housing authorities.

> **K.** **The terms used in this section of the rule [§ 100.500] and whether HUD should define those terms.  Examples of terms that HUD would consider providing definitions to are "robust causal link"; "evidence that is not remote or speculative"; "algorithmic model"; and "material part". (p. 23).**

If HUD continues to use the term "close proxies—which APCIA recommends against— HUD should define that term narrowly and precisely and should do so in a manner that does not

---

[52] We are aware of one unpublished decision affirming an award of punitive damages in a disparate-impact case under the FHA where the defendant engaged in egregious conduct: continuing to engage in discriminatory practices even after the district court found that it was violating the FHA.  *See, e.g*, *Fair Hous. Ctr. of Wash. v. Breier-Scheetz Prop., LLC*, 743 F. App'x 116, 118 (9th Cir. 2018).  In circumstances like those, however, a plaintiff should be required to make out a claim for disparate treatment—*i.e.*, intentional discrimination—in order to obtain punitive damages.

depend on mere correlation—the issue giving rise to concerns about disparate impact in the first place.

## VIII. CONCLUSION

APCIA supports HUD's proposed revisions to the Disparate Impact Rule's burden-shifting framework but respectfully requests that HUD also appropriately limit the application of disparate-impact liability to homeowners and commercial habitational insurance. The changes HUD has proposed to the Rule's burden-shifting framework are necessary to comply with the limitations on disparate-impact liability set forth by the Supreme Court in *Inclusive Communities*. Subject to the modifications it has proposed in these comments, APCIA urges HUD to finalize the proposed amendments to the Rule's burden-shifting framework. For the reasons set forth above, however, HUD should also adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance. Absent such an exemption, HUD should adopt a new defense for risk-based pricing and underwriting of homeowners and commercial habitational insurance and strengthen the algorithm defense. At a minimum, HUD should explain in detail in the preamble to the final rule that disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot succeed in light of the limitations in *Inclusive Communities*.

43

# APPENDIX I

**State Insurance Laws**

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-3; ALA. CODE § 27-13-30 |
| Alaska | ALASKA STAT. § 21.39.030(a)(2) | ALASKA STAT. § 21.39.030(a)(1), (4); ALASKA STAT. § 21.36.090(c) | ALASKA STAT. § 21.39.040 |
| Arizona | ARIZ. REV. STAT. ANN. § 20-356(2); ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(B) | ARIZ. REV. STAT. ANN. § 20-356(1), (4); ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(C); ARIZ. REV. STAT. ANN. § 20-448(C) | ARIZ. REV. STAT. ANN. § 20-357 |
| Arkansas | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(a) | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(b); ARK. CODE ANN. § 23-67-210 | ARK. CODE ANN. § 23-67-211(a) |
| California | | CAL. INS. CODE § 1861.05(b) | CAL. INS. CODE § 1861.05(b)-(d); *see also* CAL. INS. CODE § 1860.1 |
| Colorado | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (2) | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (4); COLO. REV. STAT. ANN. § 10-3-1104(1)(f)(II) | COLO. REV. STAT. ANN. § 10-4-404; COLO. REV. STAT. ANN. § 10-4-406 |
| Connecticut | | CONN. GEN. STAT. § 38a-803(4) | CONN. GEN. STAT. § 38a-688; CONN. GEN. STAT. § 38a-663(9)-(10). |

1

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Delaware | DEL. CODE ANN. tit. 18, § 2503(a)(3) | DEL. CODE ANN. tit. 18, § 2503(a)(2), (a)(5); DEL. CODE ANN. tit. 18, § 2503(b); DEL. CODE ANN. tit. 18, § 2504(c) | DEL. CODE ANN. tit. 18, § 2504 |
| District of Columbia | D.C. CODE § 31-2703(b) | D.C. CODE § 31-2703(a), (c); D.C. CODE § 31-2231.13(c), (d) | D.C. CODE § 31-2704 |
| Florida | FLA. STAT. § 627.062(2)(e)(6) | FLA. STAT. § 627.062(1), (2)(e)(6) | FLA. STAT. § 627.062; FLA. STAT. § 627.0645 |
| Georgia | GA. CODE ANN. § 33-9-4(4) | GA. CODE ANN. § 33-9-4(1), (7) | GA. CODE ANN. § 33-9-21, GA. CODE ANN. § 33-9-9; GA. CODE ANN. § 33-9-26 |
| Hawaii | HAW. REV. STAT § 431:14-103(a)(2) | HAW. REV. STAT. § 431:14-103(a)(1), (5); HAW. REV. STAT. § 431:13-103(a)(7)(B) | HAW. REV. STAT. § 431:14-104(a); HAW. REV. STAT. § 431:14-106(a) |
| Idaho | IDAHO CODE ANN. § 41-1437(1) | IDAHO CODE ANN. § 41-1405(1); IDAHO CODE ANN. § 41-1437(3) | |
| Illinois | 215 ILL. COMP. STAT. ANN. 5/456(1) | 215 ILL. COMP. STAT. ANN. 5/456(1)(d); 215 ILL. COMP. STAT. ANN. 5/424(3) | 215 ILL. COMP. STAT. ANN. 5/457 |
| Indiana | IND. CODE ANN. § 27-1-22-3(a)(1) | IND. CODE ANN. § 27-1-22-3(a)(2), (a)(4); IND. CODE ANN. § 27-4-1-4(a)(7) | IND. CODE ANN. § 27-1-22-4(a); IND. CODE ANN. § 27-1-22-5(a) |
| Iowa | | IOWA CODE ANN. § 515F.4; IOWA CODE ANN. § 507B.4(3)(g) | IOWA CODE ANN. § 515F.5 |
| Kansas | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(a) | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(c) | KAN. STAT. ANN. § 40-955 |

2

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Kentucky | KY. REV. STAT. ANN. § 304.13-031(1)(c) | KY. REV. STAT. ANN. § 304.13-031(1)(b); KY. REV. STAT. ANN. § 304.13-031(1)(e); KY. REV. STAT. ANN. § 304.12-080(1) | KY. REV. STAT. ANN. § 304.13-051 |
| Louisiana | LA. REV. STAT. ANN. § 22:1454(B)(1) | LA. REV. STAT. ANN. § 22:1454(A), (B)(2); LA. REV. STAT. ANN. § 22:1964(7)(c); LA. REV. STAT. ANN. § 22:34 | LA. REV. STAT. ANN. § 22:1451; LA. REV. STAT. ANN. § 22:1464 |
| Maine | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(C) | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(B), (G); ME. REV. STAT. ANN. tit. 24-A, § 2162(2) | ME. REV. STAT. ANN. tit. 24-A § 2304-A |
| Maryland | MD. CODE ANN., INS. § 11-205(c) | MD. CODE ANN., INS. § 11-205(d), (f); MD. CODE ANN., INS. § 27-212(e)(1) | MD. CODE ANN., INS. § 11-206 |
| Massachusetts | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(3); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(1) | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(2); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(3), (4) | MASS. GEN. LAWS ANN. ch. 174A, § 6; MASS. GEN. LAWS ANN. ch. 175A, § 6 |
| Michigan | MICH. COMP. LAWS ANN. § 500.2110(1); MICH. COMP. LAWS ANN. § 500.2403(1)(a), (d) | MICH. COMP. LAWS ANN. § 500.2110(3); MICH. COMP. LAWS ANN. § 500.2110a; MICH. COMP. LAWS ANN. § 500.2403(1)(c), (d) | MICH. COMP. LAWS ANN. § 500.2406; MICH. COMP. LAWS ANN. § 500.2408 |
| Minnesota | MINN. STAT. ANN. § 70A.04(4); MINN. STAT. ANN. § 70A.05(1) | MINN. STAT. ANN. § 70A.04(1), (4); MINN. STAT. ANN. § 70A.05(2) | MINN. STAT. ANN. § 70A.06 |
| Mississippi | MISS. CODE. ANN. § 83-2-3(1)(d), (2)(a) | MISS. CODE. ANN. § 83-2-3(1)(a), (d), (2)(b) | MISS. CODE. ANN. § 83-2-7 |
| Missouri | MO. ANN. STAT. § 379.318(1), (4) | MO. ANN. STAT. § 379.318(2), (4) | MO. ANN. STAT. § 379.321 |

3

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Montana | MONT. CODE ANN. § 33-16-201(2)(a) | MONT. CODE ANN. § 33-16-201(1)(a), (4); MONT. CODE ANN. § 33-18-210 | MONT. CODE ANN. § 33-16-203 |
| Nebraska | | NEB. REV. ST. § 44-7510(3) | NEB. REV. ST. § 44-7508 |
| Nevada | NEV. REV. STAT. ANN. § 686B.060(1); NEV. REV. STAT. ANN. § 686B.050(4) | NEV. REV. STAT. ANN. § 686B.050(1), (4); NEV. REV. STAT. ANN. § 686B.060(2); NEV. REV. STAT. ANN. § 686a-130(5) | NEV. REV. STAT. ANN. § 686B.070; NEV. REV. STAT. ANN. § 686B.090; NEV. REV. STAT. ANN. § 686B.110 |
| New Hampshire | N.H. REV. STAT. ANN. § 412:15(I)(d), (II)(a) | N.H. REV. STAT. ANN. § 412:15(I)(d); N.H. REV. STAT. ANN. § 412:15(II)(b) | N.H. REV. STAT. ANN. § 412:16 |
| New Jersey | N.J. STAT. ANN. § 17:29A-4(c); N.J. STAT. ANN. § 17:29A-7; N.J. STAT. ANN. § 17:29A-11 | N.J. STAT. ANN. § 17:29A-4; N.J. STAT. ANN. § 17:29A-7 | N.J. STAT. ANN. § 17:29A-6; N.J. STAT. ANN. § 17:29A-7 |
| New Mexico | N.M. STAT. ANN. § 59A-17-6(E); N.M. STAT. ANN. § 59A-17-7(A) | N.M. STAT. ANN. § 59A-17-6(A), (E); N.M. STAT. ANN. § 59A-17-7(B); N.M. STAT. ANN. § 59A-16-17(D) | N.M. STAT. ANN. § 59A-17-9 |
| New York | N.Y. INS. LAW § 2304(a) | N.Y. INS. LAW § 2304(b), (c) | N.Y. INS. LAW § 2305(a), (b) |
| North Carolina | N.C. GEN. STAT. ANN. § 58-40-20(e); N.C. GEN. STAT. ANN. § 58-40-25(1) | N.C. GEN. STAT. ANN. § 58-40-25(2); N.C. GEN. STAT. ANN. § 58-40-20(a), (e) | N.C. GEN. STAT. ANN. § 58-40-30; N.C. GEN. STAT. ANN. § 58-40-40; N.C. GEN. STAT. ANN. § 58-40-45 |
| North Dakota | N.D. CENT. CODE ANN. § 26.1-25-03(1)(a) | N.D. CENT. CODE ANN. § 26.1-25-03(1)(c) | N.D. CENT. CODE ANN. § 26.1-25-04 |

4

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Ohio | OHIO REV. CODE ANN. § 3935.03(C); OHIO REV. CODE ANN. § 3937.02(A) | OHIO REV. CODE ANN. § 3935.03(B); OHIO REV. CODE ANN. § 3937.02(C), (D); OHIO REV. CODE ANN. § 3901.21(M) | OHIO REV. CODE ANN. § 3935.04 |
| Oklahoma | | OKLA. STAT. ANN. tit. 36, § 902; OKLA. STAT. ANN. tit. 36, § 985 | OKLA. STAT. ANN. tit. 36, § 987 |
| Oregon | OR. REV. STAT. ANN. § 737.310(4) | OR. REV. STAT. ANN. § 737.310(1), (8); OR. REV. STAT. ANN. § 746.015(1) | OR. REV. STAT. ANN. § 737.205; OR. REV. STAT. ANN. § 737.325 |
| Pennsylvania | 40 PA. STAT. § 1183(a); 40 PA. STAT. § 1223(a)(3) | 40 PA. STAT. § 1183(c)-(d); 40 PA. STAT. § 1223(a)(2); 40 PA. STAT. § 1171.5(a)(7) | 40 PA. STAT. § 710-5(a); 40 PA. STAT. § 710-6; 40 PA. STAT. § 710-7 |
| Rhode Island | R.I. GEN. LAWS ANN. § 27-44-5(e)(1); R.I. GEN. LAWS ANN. § 27-6-4(3) | R.I. GEN. LAWS ANN. § 27-44-5(a), (d), (e)(2); R.I. GEN. LAWS ANN. § 27-6-4(2) | R.I. GEN. LAWS ANN. § 27-44-6(a) |
| South Carolina | S.C. CODE ANN. § 38-73-430(1); S.C. CODE ANN. § 38-73-330(3) | S.C. CODE ANN. § 38-73-430(3)-(4); S.C. CODE ANN. § 38-73-330(2) | S.C. CODE ANN. § 38-73-520 |
| South Dakota | S.D. CODIFIED LAWS § 58-24-6.1 | S.D. CODIFIED LAWS § 58-24-5; S.D. CODIFIED LAWS § 58-24-6; S.D. CODIFIED LAWS § 58-24-6.1; S.D. CODIFIED LAWS § 58-33-26 | S.D. CODIFIED LAWS § 58-24-10 |
| Tennessee | TENN. CODE ANN. § 56-5-103(d); TENN. CODE ANN. § 56-5-104(1) | TENN. CODE ANN. § 56-5-104(2) ; TENN. CODE ANN. § 56-5-103(a)(1), (d) | TENN. CODE ANN. § 56-5-105 |

5

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Texas | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(a) | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(b)-(c) | TEX. INS. CODE ANN. § 2251.101; TEX. INS. CODE ANN. § 2251.103 |
| Utah | UTAH CODE ANN. § 31A-19a-201(4)(a); UTAH CODE ANN. § 31A-19a-202(1)-(2) | UTAH CODE ANN. § 31A-19a-201(1), (4)(a); UTAH CODE ANN. § 31A-19a-202(3) | UTAH CODE ANN. § 31A-19a-203 |
| Vermont | VT. STAT. ANN. tit. 8, § 4685(d); VT. STAT. ANN. tit. 8, § 4686(1) | VT. STAT. ANN. tit. 8, § 4685(a), (d); VT. STAT. ANN. tit. 8, § 4686(2); VT. STAT. ANN. tit. 8, § 4724(7)(A) | VT. STAT. ANN. tit. 8, § 4688 |
| Virginia | VA. CODE ANN. § 38.2-1904(A), (B) | VA. CODE ANN. § 38.2-1904(A)(3) | VA. CODE ANN. § 38.2-1906 |
| Washington | WASH. REV. CODE ANN. § 48.19.030(3) | WASH. REV. CODE ANN. § 48.19.020; WASH. REV. CODE ANN. § 48.19.030(2)(b); WASH. REV. CODE ANN. § 48.18.480 | WASH. REV. CODE ANN. § 48.19.040; WASH. REV. CODE ANN. § 48.19.060 |
| West Virginia | W. VA. CODE § 33-20-3(a) | W. VA. CODE § 33-20-3(b), (c)(2); W. VA. CODE § 33-11-4(7)(c) | W.VA. CODE § 33-20-4 |
| Wisconsin | WIS. STAT. ANN. § 625.11(4); WIS. STAT. ANN. § 625.12(1) | WIS. STAT. ANN. § 625.12(2); WIS. STAT. ANN. § 625.11(1), (4) | WIS. STAT. ANN. § 625.13 |
| Wyoming | | WYO. STAT. ANN. § 26-14-105; WYO. STAT. ANN. § 26-13-112(c) | WYO. STAT. ANN. § 26-14-107 |

6

021456

**APPENDIX II**

In this Appendix, APCIA sets forth additional background regarding the 2013 Disparate Impact Rule, the litigation brought by PCI and AIA challenging that Rule, and comments submitted by APCIA, PCI, and AIA to HUD at various stages of the proceedings.

### A.    The 2013 Disparate Impact Rule

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70,924.

Representatives of the insurance industry submitted comments explaining why disparate-impact liability cannot lawfully be applied to homeowners insurance broadly defined to include property and casualty insurance generally. The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, application of disparate-impact liability to insurance would adversely affect the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting and would inject racial considerations. Finally, commenters noted that application of the Rule to homeowners insurance would violate the "filed-rate" doctrine, which bars private claims and collateral attacks based on insurance rates filed with state regulatory entities.

As noted above, HUD promulgated its final Disparate Impact Rule on February 15, 2013. 78 Fed. Reg. 11,460. The final Rule did not exempt homeowners insurance or meaningfully address whether extension of disparate-impact liability to homeowners insurance would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. The final Rule's preamble merely asserted (without any support) that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude *HUD* from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs *courts* on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11,475 (emphasis added). HUD thus did not consider whether the Rule conflicts with state laws and policies permitting and requiring risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that application of disparate-impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11,475 (quoting a comment). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-

1

based pricing and underwriting. HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."). HUD thus acknowledged the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of risk factors in fact is a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *See id.* at 11,475.

## B.     The Litigation Brought By APCIA's Predecessors AIA And PCI

All of the national property casualty insurance trade associations filed lawsuits challenging the Final Rule. AIA, along with co-plaintiff the National Association of Mutual Insurance Companies ("NAMIC"), filed a complaint in the U.S. District Court for the District of Columbia. *See American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. June 26, 2013). PCI filed suit in the U.S. District Court for the Northern District of Illinois. *See Property Cas. Insurers Ass'n of Am. v. Carson*, No. 13-CV-8564 (N.D. Ill. Nov. 27, 2013).

The associations' lawsuits raised a number of complementary challenges to the Rule. The AIA and NAMIC lawsuit challenged the validity of disparate-impact claims generally under the FHA, and the district court initially granted summary judgment in their favor. Order Granting Motion for Summary Judgment, *American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. Nov. 3, 2014), ECF No. 46. HUD appealed, but before briefing began, the Supreme Court decided *Inclusive Communities*. The PCI suit focused on HUD's decision to apply the Disparate Impact Rule to homeowners insurance. On September 3, 2014, the court granted PCI's motion for summary judgment in part, concluding that HUD's explanation was arbitrary and capricious in several respects. *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-52 (N.D. Ill. 2014). The court rejected HUD's contention that it could disregard the McCarran-Ferguson Act entirely. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking. *Id.* at 1048. The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *[Doe v.] Mutual of Omaha*, 179 F.3d [557,] 563-64 [(7th Cir. 1999)], and the Eighth Circuit's similar recognition in *Saunders [v. Farmers Ins. Exch.]*, 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI*, 66 F. Supp. 3d at 1048. The court noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate-impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049. The court also determined that HUD had inadequately examined whether the filed-rate doctrine would bar application of the Rule. *Id.* at 1050. Finally, the court concluded that HUD had made "no effort to evaluate" the substance of the insurance industry's argument that the Rule would prevent the use of sound risk factors and thereby undermine the fundamental nature of the insurance business. *Id.* at 1051. Accordingly, the court remanded to HUD for further explanation of these issues.

2

### C.  PCI's Post-Remand Comments

In September 2014, PCI informed HUD that it intended to submit additional comments addressing the issues that the District Court had instructed HUD to consider on remand.  *See* Letter from PCI to HUD, at 1 (Sept. 25, 2014) (A.R. 4416).  PCI then submitted comments further explaining how the Disparate Impact Rule would invalidate, impair, or supersede states' regulation of insurance and distort the homeowners insurance market.  *See* Letter from PCI to HUD, at 1-18 (Jan. 26, 2015) (A.R. 4496-4513).  PCI emphasized that the Rule's burden-shifting process would impose liability on homeowners insurers for providing and pricing insurance using sound risk-based methods.  *Id.* at 8 (A.R. 4503).  PCI explained that prohibiting those methods would violate the McCarran-Ferguson Act and the filed-rate doctrine, as well as harm the homeowners insurance industry.  *See id.* at 9-18 (A.R. 4504-4513).  PCI's comment also alerted HUD to the importance of the Supreme Court's upcoming consideration of the *Inclusive Communities* case.  *See id.* at 5-6 (A.R. 4500-4501).[53]

### D.  PCI's *Post-Inclusive Communities* Comment

Shortly after the Supreme Court issued its decision in *Inclusive Communities*, PCI submitted further comments explaining that HUD must consider the Supreme Court's newly articulated limitations on disparate-impact liability.  *See* Letter from PCI to HUD (July 29, 2015) (A.R. 4615-4621).[54]  PCI emphasized that *Inclusive Communities* prohibited application of the Rule to legitimate business practices, including risk-based homeowners insurance practices.  *See id.* at 5-7 (A.R. 4619-4621).

### E.  Post-*Inclusive Communities* Litigation In The AIA Case

On remand from the D.C. Circuit following the Supreme Court's decision in *Inclusive Communities*, AIA and NAMIC amended their complaint to add claims that HUD's Disparate-Impact Rule is inconsistent with limitations on FHA disparate-impact liability set out in *Inclusive Communities*, both as it applies to the business of insurance and as a general matter.  Cross-motions for summary judgment were fully briefed, but the case is stayed pending anticipated further rulemaking by HUD.  *See* Joint Status Report, *American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. July 16, 2018), ECF No. 94; Joint Status Report, *American Ins. Ass'n v. Carson*, No. 13-CV-966 (D.D.C. Sept 11, 2019), ECF No. 111.

### F.  HUD's Supplemental Explanation

As required by the district court in the *PCI* case, on October 5, 2016, HUD published a supplemental explanation for its decision to apply the FHA to homeowners insurance entitled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance."  *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("Supplemental Explanation").  The Supplemental Explanation rejected insurers' request for an exemption from the Disparate Impact Rule, concluding that

---

[53] APCIA hereby incorporates by reference PCI's September 25, 2014 and January 26, 2015 letters submitted to HUD.

[54] PCI also incorporates this letter by reference.

insurers' concerns "can and should be addressed on a case-by-case basis." *Id.* Notably, however, HUD did not dispute that state law uniformly permits and often requires insurers to consider risk factors. *See id.* at 69,015. In fact, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice." *Id.* Even more significantly, HUD conceded that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.* HUD's primary rationale for denying an exemption for the use of risk factors was that insurers can later justify using such factors on a case-by-case basis under the Rule's burden-shifting framework. *See id.*

HUD also argued that an exemption for homeowners insurance is inappropriate in light of certain state anti-discrimination laws that may apply to insurance. 81 Fed. Reg. at 69,016. HUD reasoned that such an exemption would "deprive all states of federal support in addressing discriminatory insurance practices" and asserted that an exemption would therefore "be at odds with the purpose of [the] McCarran-Ferguson [Act]." *Id.* This reasoning is arbitrary and capricious. The McCarran-Ferguson Act is not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "*for the purpose of regulating the business of insurance*." 15 U.S.C. § 1012(b) (emphasis added). State antidiscrimination laws—which states may enforce themselves, if appropriate—are not enacted "for the purpose of regulating the business of insurance" and thus have no bearing on whether application of the Disparate Impact Rule to risk-based pricing and underwriting would violate the McCarran-Ferguson Act.

Even if a state's fair-housing law were identical to the FHA and would permit a disparate-impact challenge to risk-based pricing and underwriting in state court, any federal litigation under HUD's Disparate Impact Rule would still require federal courts applying federal law to second-guess the actuarial soundness of insurance practices regulated by state law—contrary to the express holding of *Mutual of Omaha*. *See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with state law—obviously would interfere with the administration of the state law."). HUD's previous reliance on snippets of discussion from out-of-circuit district court decisions and a state court decision, none of which addressed these issues,[55] provided no basis for disregarding the plain text of the McCarran-Ferguson Act and the Seventh Circuit's controlling decision in *Mutual of Omaha*. In sum, HUD cannot rely on state antidiscrimination laws to overlook the clear conflict between the Disparate Impact Rule and state insurance laws permitting risk-based pricing and underwriting.

HUD also asserted in passing in its 2016 Supplemental Explanation that "McCarran-Ferguson requires a fact-intensive inquiry." 81 Fed. Reg. at 69,016. But HUD offered no support for the proposition. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting. HUD relied on *Saunders v. Farmers Insurance Exchange (Saunders I)*, 440 F.3d 940, 946 (8th Cir. 2006). But that court, reviewing a Rule 12(b)(1) motion to dismiss for lack

---

[55] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

4

of subject-matter jurisdiction, merely held that "the nature of plaintiffs' price discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case returned to the Eighth Circuit and it was clear that the plaintiffs were relying on a disparate-impact theory, the court noted that "HUD has never applied a disparate-impact analysis to insurers," *Saunders v. Farmers Ins. Exch. (Saunders II)*, 537 F.3d 961, 964 n.3 (8th Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)), and that there was "doubt" as to whether it could, *id.* at 964. The court ultimately held that the plaintiffs' FHA challenge was foreclosed by the McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's administrative regime. *Id.* at 968. This hardly counsels against a categorical exemption for risk-based pricing and underwriting.

HUD did not dispute in the Supplemental Explanation that the filed-rate doctrine applies to insurance rates filed with state insurance commissions. Instead, HUD argued first that the filed-rate doctrine does not apply to FHA claims because they "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effects." 81 Fed. Reg. at 69,018 (quoting *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)). This argument fails for multiple reasons. An FHA claim that an insured is being charged more because of the insured's race seeks to "invalidat[e]" the rate charged and thus squarely implicates the filed-rate doctrine. *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011). A claimed discriminatory effect would occur through disparate rates, and it is difficult to imagine how the Rule could remedy such an effect other than by causing insurers to change their rates. Moreover, a court resolving an FHA claim under the Rule would, in fact, have to consider the reasonableness of the challenged rate at step two of the burden-shifting framework. In any event, it is well established that the filed-rate doctrine bars claims that do more than simply challenge the "reasonableness" of rates.[56]

HUD also argued in the 2016 Supplemental Explanation that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes." 81 Fed. Reg. at 69,018 (quoting *Saunders I*, 440 F.3d at 944). But HUD's position and the *Saunders* decision on which HUD relied are inconsistent with the weight of the case law holding that the filed-rate doctrine does bar challenges under *federal* laws to rates filed with *state* agencies. *See, e.g., Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994) (finding RICO claim barred, noting "courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies"); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (filed-rate doctrine "applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one").[57] This is all the more clear in a case

---

[56] *See, e.g., Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 415 & n.17 (1986) (filed-rate doctrine barred recovery of treble damages under antitrust laws even though antitrust claims do not challenge reasonableness of rates but rather method by which they were adopted); *Schilke*, 820 F. Supp. 2d at 836 (filed-rate doctrine foreclosed claims based on failure to disclose aspects of rates); *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 235-42 (3d Cir. 2012) (filed-rate doctrine barred antitrust challenge to rates).

[57] *See also H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992) ("Allowing a RICO action . . . would similarly disrupt the state administrative process and constitute a 'collateral attack on a rate order,' contrary to

5

involving state regulation of insurance, where the McCarran-Ferguson Act "overturn[s] the normal rules of pre-emption." *PCI*, 66 F. Supp. 3d at 1025.

### G.   PCI's Renewed Legal Challenge

Following issuance of HUD's Supplemental Explanation, PCI sought leave to file an amended complaint to challenge that explanation. The District Court granted leave, and on June 27, 2017, PCI filed its First Amended Complaint challenging HUD's application of the Disparate Impact Rule to homeowners insurance, including HUD's reasoning set forth in its Supplemental Explanation. *See* First Amended Complaint, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. June 27, 2017), ECF No. 131. On September 8, 2017, PCI filed a motion for summary judgment explaining the numerous ways in which HUD's Supplemental Explanation remained arbitrary and capricious. *See* Motion for Summary Judgment, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. Sept. 8, 2017), ECF Nos. 136 & 137. HUD sought an extension of time for its response, and the parties subsequently agreed to stay the litigation, ultimately agreeing to a continued stay of the case in light of HUD's reconsideration of the 2013 Disparate Impact Rule. *See* Joint Status Report and Motion to Continue Stay, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. June 25, 2018), ECF No. 159; Status Report, *PCI v. Carson*, No. 13-CV-8564 (N.D. Ill. Sept. 11, 2019), ECF No. 188.

### H.   Treasury Recommends That HUD Reconsider Its Prior Rule

In October 2017, the U.S. Department of Treasury issued a report entitled "A Financial System That Creates Economic Opportunities Asset Management and Insurance." [58] Among other things, that report urged HUD to reconsider the Disparate Impact Rule, stating:

> Treasury recommends that HUD reconsider its use of the disparate-impact rule. In particular, HUD should consider whether the disparate-impact rule, as applied, is consistent with McCarran-Ferguson and existing state law. HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles. [59]

### I.   HUD's ANPRM

On June 20, 2018, HUD published an Advance Notice of Proposed Rulemaking ("ANPRM"). *See* 83 Fed. Reg. 28,560. In the ANPRM, HUD indicated that it was considering what changes may be necessary to the 2013 Disparate Impact Rule in light of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). *See* 83 Fed. Reg. at 28,561. HUD also invited public

---

state law.") (quoting *H.J., Inc. v. Nw. Bell Corp.*, 420 N.W.2d 673, 676 (Minn. Ct. App. 1988)); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1296 (D.S.C. 1992).

[58] *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities Asset Management and Insurance* (Oct. 2017), https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.

[59] *Id.* at 110.

comment on "other amendments to the Disparate Impact Rule that may be necessary or helpful." *Id.*

### J.      PCI's And AIA's Comments On ANPRM

In August 2018, PCI, AIA, and NAMIC submitted comprehensive comments on the ANPRM.  The associations all agreed that the Disparate Impact Rule had to be modified in light of *Inclusive Communities* and urged HUD to exempt homeowners insurance from the Rule.  The associations demonstrated that application of disparate-impact liability to homeowners insurance would, among other things, (1) violate the McCarran-Ferguson Act, (2) be fundamentally inconsistent with the business of insurance and (3) contravene the limits set forth in *Inclusive Communities*, including that disparate-impact liability may not be applied in a manner that requires pervasive consideration of race or that requires courts to second-guess legitimate business choices. PCI also maintained that the Disparate Impact Rule would violate the filed-rate doctrine.  AIA and NAMIC made the additional argument that the Disparate Impact Rule violates Executive Order 13132, titled "Federalism." 64 Fed. Reg. 43,255 (Aug. 10, 1999), which requires agencies to construe federal statutes to preempt state law only where there is "clear evidence" that Congress intended preemption of State law or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute.  § 4(a), 64 Fed. Reg. at 43,257.

**APPENDIX III**

§ 100.500 Discriminatory effect prohibited.

(a)     *General*. Liability may be established under the Fair Housing Act based on a specific policy's or practice's discriminatory effect on members of a protected class under the Fair Housing Act even if the specific policy or practice was not motivated by a discriminatory intent.

(b)     *Prima facie burden*. To allege a prima facie case based on an allegation that a specific, identifiable policy or practice has a discriminatory effect, a plaintiff or the charging party (collectively, ''plaintiff'') must state facts plausibly alleging each of the following elements:

    (1)     That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

    (2)     That there is a robust causal link between the challenged policy or practice and a disparate impact on members of a protected class that:

        (i)     shows the specific practice is the direct cause of the discriminatory effect, taking due regard for the factors that may bear on the housing opportunities and decisions of the protected class and the degree to which those factors are connected to the defendant's policies and practices; and

        (ii)     is based on more than statistical disparities or correlations; and

    (3)     That the alleged disparity caused by the policy or practice has an adverse effect on members of a protected class;

    (4)     That the alleged disparity caused by the policy or practice is significant; and

    (5)     That there is a direct link between the disparate impact and the complaining party's alleged injury.

(c)     *Failure to allege a prima facie case.* A defendant, or responding party, may establish that a plaintiff's allegations do not support a prima facie case of discriminatory effect under paragraph (b) of this section, if:

    (1)     The defendant shows that its discretion is materially limited or permitted by a third party such as through:

        (i)     A Federal, state, or local law; or

        (ii)     A binding or controlling court, arbitral, regulatory, administrative order, or administrative requirement;

1

(2)     Where a defendant shows that the alleged ~~plaintiff alleges that the cause of a~~ discriminatory effect results from ~~is~~ a model used by the defendant, such as a risk assessment algorithm or actuarial analysis, and the defendant:

    (i)     ~~Provides the material factors that make up the inputs used in the challenged model and s~~Shows that the~~se~~ factors used in the model do not rely in any material part on ~~factors that are substitutes or close proxies for protected classes~~ characteristics protected under the Fair Housing Act and that the model is empirically derived and is a demonstrably and statistically sound algorithm that accurately ~~predictive of credit risk~~ predicts risk or other similar valid objectives;

    (ii)    Shows that the challenged model is produced, maintained, or distributed by a recognized third party ~~that determines industry standards~~, the inputs and methods within the model are not determined by the defendant, and the defendant is using the model as intended by the third party; or

    (iii)   Shows that the model has been subjected to critical review and has been validated by an objective and unbiased neutral third party that has analyzed the challenged model and found that the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives, and that none of the factors used in the algorithm rely in any material part on ~~factors that are substitutes or close proxies for protected classes~~ characteristics protected under the Fair Housing Act; or

(3)     The defendant demonstrates that the plaintiff has failed to allege sufficient facts to meet plaintiff's burden under paragraph (b) of this section.

(4)     The defendant shows that its policy or practice relied on risk-based pricing or underwriting of homeowners or commercial habitational insurance.

(d)     *Burdens of proof for discriminatory effect.* If a case is not resolved at the pleading stage, the burden of proof to establish that a specific, identifiable policy or practice has a discriminatory effect, are as follows:

    *(1)     Plaintiff's burden.*

        (i)     A plaintiff must prove by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(~~2~~1) through (5) of this section; and

        (ii)    If the defendant rebuts a plaintiff's assertion that the policy or practice is arbitrary, artificial, and unnecessary under paragraph (b)(1) of this section by producing evidence showing that the challenged policy or practice advances a valid interest (or interests), the plaintiff must prove by the preponderance of the evidence that a less discriminatory policy or practice

2

exists that would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(2) *Defendant's burden.* The defendant may, as a complete defense:

    (i) Prove any element identified under paragraph (c)(1) or (2) of this section;

    (ii) Demonstrate that the plaintiff has not proven by the preponderance of the evidence an element identified under paragraph (d)(1)(i) of this section; or

    (iii) Demonstrate that the alternative policy or practice identified by the plaintiff under paragraph (d)(1)(ii) of this section would not serve the valid interest identified by the defendant in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(e) *Business of insurance laws.* Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance. In general, a challenged policy or practice will not be considered arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective where the policy or practice arises from risk-based pricing or underwriting of insurance. Nothing in this rule, however, shall be construed to exempt an insurer from intentional discrimination under the FHA in the event such insurer considers the race, color, religion, sex, handicap, familial status, or national origin in the sale, rental, or financing of dwellings or in other housing-related activities.

3

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Part 100

[Docket No. FR–6111–F–03]

RIN 2529–AA98

### HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** HUD has long interpreted the Fair Housing Act ("the Act") to create liability for practices with an unjustified discriminatory effect, even if those practices were not motivated by discriminatory intent. This rule amends HUD's 2013 disparate impact standard regulation to better reflect the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.* and to provide clarification regarding the application of the standard to State laws governing the business of insurance. This rule revises the burden-shifting test for determining whether a given practice has an unjustified discriminatory effect and adds to illustrations of discriminatory housing practices found in HUD's Fair Housing Act regulations. This Final rule also establishes a uniform standard for determining when a housing policy or practice with a discriminatory effect violates the Fair Housing Act and provides greater clarity of the law for individuals, litigants, regulators, and industry professionals.

**DATES:** *Effective Date:* October 26, 2020.

**FOR FURTHER INFORMATION CONTACT:** David H. Enzel, Deputy Assistant Secretary for Enforcement Programs, Office of Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW, Room 5204, Washington, DC 20410, telephone number 202–402–5557 (this is not a toll-free number). Individuals with hearing or speech impediments may access this number via TTY by calling the Federal Relay during working hours at 800–877–8339 (this is a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Fair Housing Act prohibits discriminatory housing practices on the basis of race, color, religion, sex, disability, familial status, or national origin. HUD has the authority and responsibility for administering and enforcing the Act, including the authority to conduct formal adjudications of Fair Housing Act complaints and the power to promulgate rules to interpret and carry out the Act.[1] Consistent with this responsibility, on February 15, 2013, HUD published a Final Rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("the 2013 Rule").[2] The 2013 Rule formalized HUD's longstanding interpretation that disparate impact liability is available under the Act.[3] The 2013 Rule also codified a burden-shifting framework for analyzing disparate impact claims under the Fair Housing Act, relying in part on existing case law under the Fair Housing Act, decisions by HUD's administrative law judges, and Title VII of the Civil Rights Act of 1964 (prohibiting employment discrimination).[4]

In 2015, the Supreme Court held that disparate impact claims are cognizable under the Fair Housing Act in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc., (Inclusive Communities)*.[5] *Inclusive Communities* recognized the availability of disparate impact claims under the Fair Housing Act independent of the 2013 Rule. The Court's opinion referenced the 2013 Rule, but the Court did not rely on it for its holding. Rather, the Court undertook its own analysis of the Fair Housing Act and engaged in a discussion of standards for disparate impact claims as well as cognizable constitutional limitations to such claims.

Following the *Inclusive Communities* decision, on May 15, 2017, HUD published a **Federal Register** notice that invited public comment to assist HUD in identifying existing regulations that may be outdated, ineffective, or excessively burdensome, pursuant to Executive Orders 13771, "Reducing Regulation and Controlling Regulatory Costs," and 13777, "Enforcing the Regulatory Reform Agenda."[6] In response, HUD received significant feedback concerning the 2013 Rule, with many commenters citing the Court's decision in *Inclusive Communities*. Additionally, in October 2017, the Secretary of the Treasury issued a report which explicitly recommended that HUD reconsider applications of the 2013 Rule, especially in the context of the insurance industry.[7] In response to these suggestions and the Court's decision in *Inclusive Communities,* HUD published an advance notice of proposed rulemaking (ANPR) in the **Federal Register** on June 20, 2018, inviting comments on possible amendments to the 2013 Rule.[8]

## II. The August 19, 2019, Proposed Rule

On August 19, 2019, HUD published a Proposed Rule in the **Federal Register** to replace HUD's disparate impact standard at § 100.500 with a new standard and incorporate minor amendments to §§ 100.5, 100.7, 100.70 and 100.120.[9] The proposed revisions included defenses that a defendant could utilize to rebut the plaintiff's case, by showing that the defendant's discretion was materially limited, that the defendant's use of a risk assessment algorithm was non-discriminatory, or that the plaintiff had failed to plead a prima facie case. Further, the Proposed Rule incorporated the 'artificial, arbitrary, and unnecessary' standard as discussed in *Inclusive Communities*. Specifically, the Proposed Rule explained that defendants may show that a challenged policy or practice advances a valid interest and is therefore not artificial, arbitrary, and unnecessary. Plaintiffs would then rebut this showing by proving that a less discriminatory policy or practice exists that would serve that interest. The proposed revisions also included an interpretation of the Fair Housing Act when in conflict with state laws regulating the business of insurance; clarification of vicarious liability; the provision and clarification of examples of acts that constitute discriminatory practices under disparate impact; and implementation of a burden-shifting framework that more closely aligns with the Court's decision in *Inclusive Communities*. For more information about HUD's Proposed Rule, see 84 FR 42854.

---

[1] *See* 42 U.S.C. 3608(a) and 42 U.S.C. 3614a.

[2] 78 FR 11460.

[3] *See* 24 CFR 100.5(b), 100.70(d)(5), 100.120(b), 100.130(b), and 100.500.

[4] *See* 24 CFR 100.500(c). In 2016, HUD also published a notice that supplemented its responses to certain comments made by the insurance industry during the rulemaking. *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016).

[5] 135 S. Ct. 2507 (2015).

[6] *See* 82 FR 22344.

[7] *See* Steven T. Mnuchin and Craig S. Phillips, *U.S. Department of the Treasury Report: A Financial System That Creates Economic Opportunities, Asset Management and Insurance, Treasury.gov* (Oct. 26, 2017), *https:// www.treasury.gov/press-center/press-releases/ Documents/A-Financial-System-That-Creates- Economic-Opportunities-Asset_Management- Insurance.pdf.*

[8] 83 FR 28560. HUD received and reviewed all 1,923 comments in promulgating HUD's August 19, 2019 Disparate Impact Proposed Rule.

[9] 84 FR 42854.

HUD received 45,758 comments on the Proposed Rule, which were considered and are discussed in Section IV of this preamble.

## III. Changes Made at the Final Rule Stage

In response to public comments, a discussion of which is presented in Section IV, and in further consideration of issues addressed at the proposed rule stage, HUD is publishing this Final Rule. This Final Rule implements the limitations discussed in *Inclusive Communities* and HUD furthers the goal of the Fair Housing Act by exercising its discretion to interpret the Fair Housing Act's disparate impact standard. HUD is therefore adopting the August 19, 2019 Proposed Rule with the following changes:

### A. Section 100.5 Unlawful Housing Discrimination Illustration

The Final Rule makes minor clarifying changes to proposed paragraph (b) to clarify the language in paragraph (b) regarding illustrations and allegations of unlawful housing discrimination. The Final Rule also adds a sentence at the end of paragraph (b) to align with the requirements in Executive Order 13891 that agency guidance documents and other actions are consistent with law and the agency's regulations.

The Final Rule maintains paragraph (d), which provides that this part does not require or encourage the collection of data, but removes the proposed second sentence of paragraph (d) because HUD determined that the first sentence of paragraph (d) is sufficiently clear. HUD also understands that there may be cases where collecting data may be required by laws outside this rule, and the second sentence created uncertainty and confusion.

### B. Section 100.7 Liability for Discriminatory Housing Practices

After considering and reviewing public comments, HUD decided not to adopt the proposed changes to § 100.7 and is not adopting as final the proposed clarifying changes to paragraph (b) on vicarious liability or paragraph (c) on remedies in administrative proceedings. However, HUD has moved and amended proposed paragraph (c) into § 100.500 paragraph (f). The new paragraph is discussed below.

### C. Section 100.120 Discrimination in the Making of Loans

The Final Rule does not include the example proposed in paragraph (b)(1). The Proposed Rule would have

amended the first example in paragraph (b)(1) and added a clause to the end of paragraph (b)(1) regarding information related to an individual's particular circumstances. HUD's proposed changes were meant to clarify that, in accordance with the guidance in *Inclusive Communities*, informational disparities must be material in order to violate the Fair Housing Act. HUD believes that the Final Rule's § 100.500 provides for that requirement and therefore the proposed example in paragraph (b)(1) is unnecessary.

### D. Section 100.500 Discriminatory Effect Prohibited Standard

Paragraph (b)—Pleading Stage

The Final Rule revises paragraph (b) of the Proposed Rule to clarify that the paragraph discusses the pleading stage and not the prima facie burden. The prima facie burden is the burden that the plaintiff must prove before the defendant is obligated to advance a valid interest or provide some other defense. At the pleading stage, the plaintiff must allege facts that state a plausible disparate impact claim.[10] Paragraph (b) of the Final Rule, therefore, lays out the elements that must be sufficiently pled to survive the pleading stage.

Paragraph (b)(1) is changed to make the phrase "artificial, arbitrary, and unnecessary" consistent with the language in *Inclusive Communities*. The order of paragraphs (b)(2) and (b)(3) is reversed because HUD finds it is clearer to state the requirement that an adverse effect must be shown before stating the requirement that the adverse effect be the direct cause. HUD notes that both of these elements require that the plaintiff show that the challenged policy or practice has an adverse effect on a protected class. However, paragraph (b)(2) requires this adverse effect to disproportionately affect protected class members, whereas paragraph (b)(3) requires that the causal link between the challenged policy or practice and the adverse effect be robust. New paragraph (b)(2), formerly paragraph (b)(3), is revised to be consistent with this order, and to add the word "disproportionately," to clarify that the plaintiff must show that protected class members are disproportionately more likely to be affected than individuals outside the protected class. New paragraph (b)(3), formerly paragraph (b)(2), is revised to be consistent with the change in order, and to clarify that HUD intends "robust causal link" to be

the same standard as "direct cause." Paragraph (b)(4) remains unchanged from the Proposed Rule. Paragraph (b)(5) is revised to more closely adhere to the language of *Bank of Am. Corp.* v. *City of Miami*,[11] which it is intended to codify.

Paragraph (c)—Burden Shifting

Paragraph (c) of the Proposed Rule provided defendants with affirmative defenses which would necessarily show that the plaintiff had not or could not successfully bring a prima facie case. Paragraph (d) of the Proposed Rule listed the burdens of proof and production throughout a disparate impact case and divided these burdens by plaintiff and defendant. While paragraph (d) included a burden shifting framework, this division did not show the three steps consecutively. For clarity, this Final Rule uses a structure that is more similar to § 100.500(c) of the 2013 Rule and codifies the burden shifting approach in § 100.500 (c) of this Final Rule. This section now flows logically from paragraph (b), which outlines the necessary elements of a pleading, to paragraph (c)(1), which states that the first step after the pleading stage is for the plaintiff to prove the elements provided in paragraph (b), which make up the prima facie case (elements 2–5). Paragraph (c)(2) then provides the defendant with the opportunity to advance any valid interest, and paragraph (c)(3) requires the plaintiff to advance a less discriminatory alternative to address any valid interest raised. Paragraph (c)(2) articulates the same standard for the defendant's valid interest that was implied but not explicitly stated in paragraph (d)(1)(ii) of the Proposed Rule. Paragraph (c)(3) is substantively identical to the burden on plaintiffs in paragraph (d)(1)(ii) of the Proposed Rule.

Paragraph (d)—Defenses

Paragraph (d) of the Final Rule now covers only defenses available to the defendant, and it articulates what defenses are available depending on the stage of litigation. It is largely based on paragraph (c) of the Proposed Rule.

Paragraph (d)(1) identifies defenses that a defendant may raise at the pleading stage by relying on the plaintiff's complaint or on any other material that would ordinarily be admissible at the pleading stage under the applicable rules of procedure. Defendants at this stage may argue that the plaintiff has failed to sufficiently plead one of the elements of the prima

---

[10] *See, e.g., Ashcroft* v. *Iqbal,* 556 U.S. 662 (2009); *Bell Atlantic Corp.* v. *Twombly,* 550 U.S. 544 (2007).

[11] 137 S. Ct. 1296 (2017).

**60290** **Federal Register** / Vol. 85, No. 186 / Thursday, September 24, 2020 / Rules and Regulations

facie case. Defendants may also argue that the policy or practice is reasonably necessary to comply with a third-party requirement which limits the defendant's discretion. HUD believes that this is an appropriate defense at the pleading stage where the defendant can show, as a matter of law, that the plaintiff's case should not proceed beyond the pleading stage when considered in light of a binding authority which limits the defendant's discretion in a manner which shows that the defendant's discretion could not have plausibly been the direct cause of the disparity.

The Final Rule adds paragraph (d)(1)(iii), which was not in the Proposed Rule, to account for binding requirements promulgated by an agency. This may include agency guidance because HUD recognizes, consistent with Executive Order 13891, that a defendant may be obligated to follow agency guidance when it is so binding, or guidance was incorporated into a binding authority, such as a contract. To that end, HUD has also added at this Final Rule stage that the defendant must show that the policy or practice is reasonably necessary to comply with a binding authority. The defendant should not be required to show that its policy is the only possible way to comply with the third party requirement, so long as its policy is reasonably necessary. Similarly, paragraph (d)(1)(iii) of this Final Rule adds that this defense requires the defendant to show that challenged action was reasonably necessary to comply with the restricting law or order, meaning that there may be other reasons the defendant may have chosen the course of action, and there may have been other ways of complying with the restricting law or order, as long as the challenged action was reasonably necessary to comply with the restricting law or order.

Paragraph (d)(2) of the Final Rule provides defenses that are available using evidence appropriate for the stage of litigation. Paragraph (d)(2)(i) supplements paragraph (c)(2) regarding valid interests advanced by the defendant. HUD notes that practices that predict outcomes, such as risk analysis, may lead to a result that appears, without taking into account external factors, to have a disparate impact because, due to factors outside the defendant's control, members of a protected class are disproportionately associated with a particular outcome, such as a higher risk pool. A defendant may show that the predictive analysis accurately assessed risk, which is a valid interest. A defendant may also show that a predictive model is accurate by showing that it is not overly restrictive on members of the protected class. If, for example, a plaintiff alleges that a lender rejects members of a protected class at higher rates than non-members, then the logical conclusion of such claim would be that members of the protected class who were approved, having been required to meet an unnecessarily restrictive standard, would default at a lower rate than individuals outside the protected class. Therefore, if the defendant shows that default risk assessment leads to less loans being made to members of a protected class, but similar members of the protected class who did receive loans actually default more or just as often as similarly situated individuals outside the protected class, then the defendant could show that the predictive model was not overly restrictive.

HUD considers this defense to be an alternative for the algorithm defenses in paragraph (c)(2) of the Proposed Rule. Those algorithm defenses were each intended, in different ways, to provide methods for the defendant to show that an algorithm did not cause a disparate impact. HUD has concluded that these defenses would likely have been unnecessarily broad in their effect, and HUD has determined this alternative would provide some defendants the opportunity to justify predictive models. HUD expects that there will be further development in the law in the emerging technology area of algorithms, artificial intelligence, machine learning and similar concepts. Thus, it is premature at this time to more directly address algorithms.

Paragraph (d)(2)(ii) of the Final Rule provides the defendant the opportunity to show that the plaintiff has failed to prove the prima facie case and replaces paragraph (d)(2)(ii) of the Proposed Rule. Paragraph (d)(2)(iii) mirrors the language in paragraph (d)(1) regarding limited discretion and is repeated here because, while the defendant may bring this defense at the pleading stage, the defendant may also bring this defense with evidence at later stages in litigation.

Paragraph (f)—Remedies in Discriminatory Effect Cases

Paragraph (f), added in the Final Rule, replaces proposed § 100.7(c) regarding damages. Rather than restricting administrative law judges, paragraph (f) is limited to restricting HUD itself in the types of damages HUD will seek where HUD is the party bringing a discriminatory effects case. The Final Rule also adds an exception that allows HUD to seek civil money penalties in discriminatory effects cases where the defendant has a history of intentional housing discrimination.

Paragraph (g)—Severability

The Final Rule also adds paragraph (g), which reflects HUD's intent that § 100.500 is severable and each part of the section is independently applicable.

## IV. Public Comments

The public comment period for the August 19, 2019, Proposed Rule closed on October 18, 2019. HUD received and reviewed 45,758 comments on the Proposed Rule from a wide variety of interested entities, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, state attorneys general, state housing finance agencies, public housing agencies, insurance companies, insurance trade associations, mortgage lenders, credit unions, banking trade associations, real estate agents, and law firms.[12] This section of the preamble addresses significant issues raised by the public comments and is organized by Proposed Rule section, with summaries of the issues followed by HUD's responses. There were also numerous comments received both in support of and opposition to the Proposed Rule generally, as well as comments that did not specifically address one specific section of the Proposed Rule. Those comments are organized into general categories and responded to accordingly.

Following are the issues raised by the public comments and HUD's responses.

*General Support*

HUD received comments expressing general support for the Proposed Rule. HUD also received comments that supported the Proposed Rule but wrote that HUD could further revise the Proposed Rule to be in line with *Inclusive Communities.* Commenters stated that the Proposed Rule would increase access to fair and affordable housing. One commenter thought that, if implemented, the Proposed Rule would take HUD one step closer to making communities a better place. Commenters also stated the Proposed Rule is effective in uncovering discrimination and ensuring disparate impact cases can be brought forward, while still being consistent with the Act. Commenters stated that the Proposed Rule would specifically incentivize

---

[12] All public comments on this rule can be found at *www.regulations.gov*, specifically at: *https://www.regulations.gov/docketBrowser?rpp=50&po=0&D=HUD-2019-0067.*

parties to work together and may reduce frivolous and arbitrary claims without creating a material burden on those who have legitimate claims.

Some commenters stated the Proposed Rule would help local governments that face challenges in protecting their citizens and implementing zoning laws, but also ensures that local governments are complying with all applicable state and federal laws; noting that sometimes it is hard to know what is or is not discrimination, especially when an act by government or private individuals appears neutral on its face. One commenter noted that the Proposed Rule appropriately considered changing technology. Other commenters supported the proposition in the Proposed Rule's preamble that neutral decision-making criteria should not lead to regulatory sanction due to disparate impact. Another commenter stated the Proposed Rule promotes the free market system and removes impediments to increased lending in needy communities.

Commenters also noted that the Proposed Rule is consistent with the Supreme Court's *Inclusive Communities* ruling, and that the current regulation is inconsistent with its limitations. Another commenter stated that both *Inclusive Communities* and the Proposed Rule strike a reasonable balance by enforcing fair housing rights without improperly second-guessing otherwise legitimate decisions by public and private entities. One commenter stated that the current regulation is legally inconsistent with case law and congressional intent, and that the 1991 Civil Rights Act amendments superseding *Wards Cove* [13] only applied to Title VII, not the Fair Housing Act; the Proposed Rule corrects this error. Another commenter supporting the Proposed Rule stated that arguably all cases brought since *Inclusive Communities* have been aligned with the Supreme Court's binding precedent in that case, and cases brought that did not meet its standard, or that were based on the 2013 Rule's 3-part test, have been dismissed.

Some commenters stated that courts have erroneously suggested that the 2013 Rule and *Inclusive Communities'* framework are the same, and conforming HUD's rule to *Inclusive Communities* will reduce confusion. Commenters cited differences between the rules, including that the 2013 Rule did not require plaintiffs to prove robust causality, nor did it require that a

challenged policy be "arbitrary, artificial, and unnecessary" to achieving a valid objective, which can include practical business and profitability. Commenters also stated that the Proposed Rule would be consistent with the limitations articulated in *Inclusive Communities* on disparate impact claims by including safeguards for defendants to prevent abusive use of disparate impact liability.

Commenters supported the change to the burden shifting framework. One commenter noted that the change is fair to all claimants and will permit and protect practical business choices and profit-related decisions. Commenters also supported HUD's revisions to the burden of proof necessary to prove a prima facie disparate impact case and to the affirmative defenses. Many commenters supported the proposed standard for proving a prima facie case, stating it would ensure that defendants are not sued for disparities that they did not create. Commenters also stated that the current HUD standard creates morally and legally untenable circumstances when seeking to determine actual discriminatory behavior, which the Proposed Rule would address. Some commenters wrote that disparate impact policies are currently used to require the consideration of race and perpetuate the theory that minorities are all poor and in need of housing. The commenters wrote that the 2013 Rule forced landlords, lenders and others involved in the housing industry to incorporate race into their decision-making processes to avoid disparate impact charges.

Other commenters supported the Proposed Rule, stating that without the Proposed Rule, parties would be forced to adopt or pursue policies under very different standards regarding what constitutes actionable discrimination, thus increasing uncertainty and leaving resolution exclusively to the courts. Commenters noted that the Proposed Rule would alleviate burden on industry having to manage two different standards. Other commenters stated the Proposed Rule appears to be an effective way to decrease the costs to affected parties litigating claims. Another commenter stated that the amendments help to safeguard assistance providers, because without additional protections, plaintiffs may claim discrimination effects that are caused by ripple effects too distant to link the injury to the defendant.

Commenters stated that they support provisions in the Proposed Rule that ensure valid disparate impact claims may not be based on statistical

disparities alone. One commenter wrote that parties should not be liable for statistical coincidences. Another commenter stated that the Proposed Rule would ensure that plaintiffs asserting claims against lenders must show that the program as a whole causes the disparate impact as opposed to a program's element. Another commenter stated the Proposed Rule would provide cost savings and more options to consumers.

Commenters stated that the Proposed Rule will reduce barriers for community and small banks so they can focus on lending and homebuying, and the Proposed Rule removes barriers generally for banks in the mortgage business. One commenter said the Proposed Rule is essential for smaller banks that do not have the resources to defend costly legal challenges that could drive banks out of the lending market. A commenter said that quantifying costs and benefits is difficult due to differing business plans of banks, but that a growing number of banks are exiting the mortgage business.

Other commenters stated that the proposed changes are a step towards fairness for property owners, and that they protect the rights of landlords and tenants. One commenter expressed that the current regulation creates too much risk for small landlords, making it tempting to exit the real estate business, and clearer standards would make it easier to hire, train, and retain real estate professionals, leading to a better experience for all parties. Some commenters stated that making business choices based on credit and economic factors is not inherently discriminatory and homeowners should be able to make rental decisions without fear of litigation. Another commenter stated that they have seen an increase in the number of threatened or actual claims by tenants or advocacy groups arguing that lease enforcement or business practices could be discriminatory due to a small possible correlation between a protected group and a harmful impact of that practice. Multiple commenters stated the Proposed Rule would provide greater clarity, predictability and certainty to processes and provide some assurance that the screening policies they develop are both fair and compliant with applicable law.

Commenters also supported HUD's changes to §§ 100.5, 100.7 and 100.120. One commenter noted that the change to § 100.5 would provide much needed balance and serve an important gate keeping function. Commenters also supported the changes to remedies in § 100.7, stating that the Proposed Rule properly focuses on eliminating the

---

[13] *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989).

**60292** Federal Register / Vol. 85, No. 186 / Thursday, September 24, 2020 / Rules and Regulations

offending practice, rather than money damages or penalties. As for § 100.120, one commenter stated that the proposed change would allow lenders to focus their compliance efforts on avoiding and preventing substantive inaccuracies rather than scrutinizing communications for complete uniformity across potential borrowers. The commenter also supported the clarification added to § 100.120(b)(1), which would allow lenders to provide accurate information to customer inquiries related to their individual situations without fear of triggering a regulatory violation.

Lastly, commenters supported the new language addressing insurance. Some commenters, while supporting the change, requested HUD provide further protections for the insurance industry, homeowners insurance, and commercial habitational insurance. Commenters supported the Proposed Rule's preservation of the state-led insurance regulation system. Commenters wrote that allowing plaintiffs to bring disparate impact claims against insurers serves to undermine the functioning state regulatory system, thereby leading to uncertainty in the marketplace, unnecessary litigation, and increases in premiums nationwide.

Commenters stated that the robust causal link element is consistent with Supreme Court disparate impact precedence and *Inclusive Communities,* and the Proposed Rule corrects the exclusion of this language from the 2013 Rule; it also protects defendants from liability when disparities exist that they didn't create, and disallows statistical disparities alone, that are not connected to the defendant's policy, to support a claim. Other commenters said the robust causality element rectifies conflict between the 2013 Rule and cases brought since *Inclusive Communities.*

*HUD Response:* HUD appreciates the comments in support of the Proposed Rule changes. HUD agrees that adopting the proposed changes as final will bring clarity to litigants and further the Fair Housing Act's purpose. HUD also agrees that it will benefit banks and landlords, while ensuring that disparate impact cases can continue consistent with Supreme Court precedent. HUD especially appreciates and agrees that clarity given existing case law is needed to assist both plaintiffs and defendants. Lastly, HUD agrees with the comments that supported the change to § 100.5 and § 100.500(e) dealing with insurance.

*General Opposition*

*Comment:* HUD's Proposed Rule weakens the 2013 Rule, which protects vulnerable communities, sets a *balanced standard, and should not be changed.*

Many commenters stated they believed the Proposed Rule would increase discrimination or segregation by removing the 2013 Rule, which commenters stated has been a valuable tool in fighting housing discrimination and is a sufficient and clear causation standard. Some commenters stated that HUD's Proposed Rule creates unwarranted loopholes to the Fair Housing Act that are likely to undermine, rather than advance, access to fair housing and the basic rights of all Americans. Several commenters suggested that the 2013 Rule should not be changed, with one commenter specifically stating that the 2013 Rule's flexibility allowed continued improvement and would allow communities to build on common understandings. Commenters stated further that choosing not to amend the 2013 Rule would have no impact on the status quo because *Inclusive Communities* did not disrupt the current regulation. Another commenter noted that the very nature of case law jurisprudence is that it is constantly growing and changing, to meet altered conditions on the ground and the nuances of impacted parties, entities and stakeholders, and not amending the 2013 Rule allows the law since *Inclusive Communities* to continue to develop in real world conditions, without HUD's interference and negative impact. One commenter stated that not enough time has passed since the Supreme Court's decision and the Proposed Rule. A commenter stated that the Proposed Rule would nearly obliterate disparate impact liability by shifting the burden to plaintiffs, limiting defendants' liability, and removing the "discriminatory effects" definition. Some commenters noted that all but one post-*Inclusive Communities* circuit court decision has recognized that the "robust causality requirement" was simply the long-standing requirement codified in the 2013 Rule. Commenters stated that given the absence of any directive from the Supreme Court to modify the burden-shifting test, several lower courts have interpreted *Inclusive Communities* as, at most, emphasizing the need to robustly evaluate plaintiffs' existing prima facie burden. One federal district court has disapprovingly characterized defendants as "strain[ing] to turn the Court's decision to their advantage, insisting that although it affirmed that such claims are cognizable, [the Supreme Court]

established 'rigorous, pleading-stage requirements.' "[14]

Commenters also cited cases showing that the defendant does not need to be responsible for the underlying disparity to be responsible for a disparate impact based on that disparity. Commenters noted that the standards used by *Inclusive Communities* were the same as those in *Wards Cove,* cited by *Inclusive Communities,* and are generally accepted standards.[15] Commenters stated that the existing doctrine is that a plaintiff who is able to identify a policy or practice and marshal a showing of causation has identified a robust cause of their alleged harm. Commenters stated the robust causality requirement refers only to the existence of a causal connection between the defendant's policy and a statistical disparity. Commenters stated that the Court's use of the word "robust" in "robust causal link" was a modification of the word "requirement." Commenters cited *Cty. of Cook* v. *Bank of Am. Corp.,* which found that *Inclusive Communities* was consistent with the circuit court's past causality analysis.[16]

Commenters stated that the Proposed Rule amounted to cutting off statistics-based claims altogether, by requiring the dispositive statistical analysis be performed before the relevant data can be gathered. Commenters also stated that requiring a robust causal link would create an additional, onerous obstacle for plaintiffs. Commenters stated that *National Fair Housing Alliance* v. *Travelers Indemnity Co.* concluded that plaintiffs continue to meet well-established pleading standards by pleading the existence of statistical evidence demonstrating a causal connection between the challenged policy and the disparities.[17] Commenters also noted the court in *Cty. Of Cook* v. *Bank of Am. Corp.* found a cognizable disparate impact claim where the complainants articulate both a statistical race-based disparity and a specific, multifaceted policy with a robust causal connection to that disparity and stated that the defendants have not shown that *Inclusive Communities* required more.[18]

Many commenters recommended that HUD, rather than implement the Proposed Rule, focus its efforts on enforcing the 2013 Rule, prohibiting housing discrimination, enforcing the ADA, expanding access to affordable

---

[14] *City of Cook* v. *Bank of Am. Corp.,* 2018 U.S. Dist. LEXIS 55138, at *25 (N.D. Ill. Mar. 30, 2018).

[15] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2523 (2015).

[16] 2018 U.S. Dist. LEXIS 55138.

[17] 261 F. Supp. 3d. 20, 31–34 (D.D.C. 2017).

[18] *Id.* at *29.

**Federal Register** / Vol. 85, No. 186 / Thursday, September 24, 2020 / Rules and Regulations **60293**

housing, and more robust fair housing education. Another commenter mentioned that HUD has a direct responsibility to ensure equal opportunity and freedom from discrimination, even if that discrimination is subtle or covert. Several commenters contended that disparate impact liability under the Fair Housing Act is critical for this end, and the 2013 Rule provides clear standards for assessing this responsibility in the market. Commenters stated that the current regulation strikes an appropriate balance or has been effective while other commenters mentioned the effects of policies, rather than intent, in supporting the current regulation. Commenters also suggested that HUD and DOJ amend its November 2016 Joint Statement to include the other types of discriminatory actions that restrict manufactured housing.

Commenters stated that disparate impact liability was vital for handling housing cases after natural disasters such as Hurricanes Katrina and Rita and led to more affordable rental housing in Louisiana and families receiving relief from discriminatory recovery policies. Commenters provided the following examples of the types of alleged discrimination or societal problems which would be harder to challenge or solve under the Proposed Rule: Landlords imposing unfair requirements in their properties; gentrification leading to demolition of properties and eviction of low income families of color; neighborhoods having unaddressed high crime rates and underfunded schools; unfair distribution of city services, parks, and maintenance; zoning rules that keep lower income families out of better funded neighborhoods and communities; facially neutral policies by banks and lending institutions which limit the availability of home mortgage products based on the value of the home being purchased, which disproportionately exclude minorities from access to mortgages; landlords who refuse to rent to those who use housing choice vouchers or who receive disability benefits; financial and real estate institutions adopting policies that result in the blight and deterioration of foreclosed homes in communities of color; segregation of protected classes; the growing wealth gap; decreasing home-ownership rates for minority populations; redlining; and unreasonable lease restrictions imposed by landlords. Another commenter suggested that the Proposed Rule would negatively impact federal, state, and local government budgets by increasing housing instability.

A commenter stated the Proposed Rule would impact public schools, which are dependent on community funding, creating disparities among schools. Some commenters opposed the Proposed Rule because they believe it could negatively impact the health and safety of people reliant on affordable housing, increase housing instability, harm the overall economy, and reduce access to better neighborhoods and schools.

One commenter stated that the proposed changes will bring uncertainty to the credit industry and put innovation at risk. Another commenter stated that the Proposed Rule threatened challenges to discriminatory zoning and land use planning decisions involving manufactured housing. The commenter stated that the 2013 Rule served a vital role in educating communities, including public officials, about the unintended consequences of local zoning and land use decisions, which can prohibit the availability of affordable housing, and was concerned that the Proposed Rule would deny the educational aspects that the 2013 Rule provides.

Some commenters provided statistical evidence of their claims, including data relating to housing displacement. One commenter stated that research has shown that housing interventions for low-income individuals improve health outcomes and reduce health care costs while families and children experiencing housing instability, including homelessness, have a greater risk of suffering detrimental physical and mental health effects, which increases with the frequency of instability. Commenters further stated that the Proposed Rule might specifically harm Housing Choice Voucher participants by limiting where they can live, which would increase reliance on public welfare and place an undue burden on states/localities to meet federal child welfare requirements. Other commenters believed that the Proposed Rule could allow landlords to exclude all veterans, exclude veterans who do not hold full-time jobs, or charge veterans fees not charged to other residents.

Commenters remarked that the Proposed Rule would only serve to make more people homeless when the administration is constantly speaking about the homeless epidemic. One commenter noted that the Proposed Rule would result in individuals losing their housing, which could in turn lead to increased homelessness and that excluding them from their original safety nets will not benefit society.

Commenters expressed concern for the ability of specific populations to maintain affordable housing, such as seniors, people living in low vacancy areas, individuals without access to stable housing, and individuals living in rural areas. One commenter wrote the Proposed Rule could allow landlords to exclude seniors who don't hold full-time jobs. Another commenter cited a study showing that 76% of adults age 50+ prefer to stay in their current homes and noted the aging population faces discrimination often closely related to the likelihood of their acquiring disabilities. Another commenter mentioned that it would be too burdensome for the elderly to prove they need basic accommodations, such as a grab bar in the bathroom. Another commenter pointed out that senior homelessness in their city has risen in the past year and policies basing occupancy on employment status can exacerbate this trend, which the Proposed Rule will not be effective to fight.

Some commenters expressed concern about the Proposed Rule's impact on housing opportunities for LGBTQ individuals and queer people of color because without disparate impact it would be extremely difficult to prove sexual orientation discrimination and that LGBTQ people are disproportionately likely to experience housing discrimination. One commenter cited HUD's research regarding discrimination against LGBTQ individuals. One commenter expressed concern that religious exemptions would allow federal insurance contractors to discriminate against LGBTQ people who are not protected by the Civil Rights Act.

Commenters also objected to the Proposed Rule because religious discrimination in housing provisions often come through facially neutral policies. One commenter remarked that the Proposed Rule undermines the path for legal redress for those in the Jewish community. Another commenter cited an example where an apartment management company required pool dress code compliance based on practices of the Orthodox Jewish community and a complaint against a homeowner's association that normally prohibited outdoor lights and decorations but allowed winter holiday decorations.

Commenters remarked that the Proposed Rule will also make it harder for individuals to avoid falling victim to discrimination based on sex. Commenters worry that communities composed largely of low-income people of color will experience more inequities,

such as less well-maintained roads and litter cleanup, as a result of the Proposed Rule. Another commenter remarked that low-income Americans receiving government benefits do not often receive their checks on the first of the month, which makes them late in paying their rents and vulnerable to evictions in cases where Landlords use neutral policies that all rent be paid on the first of the month.

Commenters stated that the Proposed Rule would increase harms to domestic violence survivors, and HUD fails to address the Proposed Rule's consequences regarding policies such as emergency transfer requirements, crime-free policies, nuisance ordinances, unjust tenant-screening policies, and source-of-income discrimination.

Commenters highlighted that HUD has recognized the 2013 Rule's applicability to discrimination against survivors of domestic violence, dating violence, sexual assault, and stalking face in "HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions, April 4, 2016", and "HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services, September 13, 2016." [19]

A commenter stated that the 2013 Rule has been used to protect non-English speakers' equal access to housing. Commenters stated that the Proposed Rule would harm people from a different national origin. One commenter noted that they have used the 2013 Rule to stop policies that blocked legal refugees from renting homes. Other commenters used the 2013 Rule to force cities to reconsider development policies that displaced immigrants. A commenter remarked that the Proposed Rule has unintended negative effects on persons like foreign university students and persons on fellowships, even fellows funded by the U.S. government, who end up making risky housing decisions to afford their stay.

Some commenters expressed concern that the Proposed Rule would make it more difficult for people with disabilities to request reasonable accommodations in order to use and enjoy housing and that it would make policy challenges, such as against a homeowner's association, more difficult to bring for people with disabilities. A commenter stated that the 2013 Rule has provided people with disabilities with recourse in the face of pervasive discrimination and barriers to accessible, equitable housing. According to a commenter, HUD has failed to analyze and disclose the consequences of curtailing disparate impact liability on people with disabilities that would arise under the Proposed Rule.

A commenter stated that the effect of the Proposed Rule would be to further isolate people with disabilities from family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment and stigmatize them as incapable or unworthy of participating in community life. One commenter remarked that people with disabilities, including people with mobility impairments, blindness, and deafness, already face barriers finding housing that is accessible and that the Proposed Rule would be yet another barrier. One commenter suggested that the Proposed Rule would allow lenders to discriminate based on borrowers' Social Security Disability Income. Another commenter stated housing providers hide behind insurance policies that have animal or breed restrictions to deny access to people with emotional support animals. Several commenters suggested that the Proposed Rule could allow landlords to exclude people with disabilities who do not hold full-time jobs. Commenters observed that the Proposed Rule would undermine the integration mandate in the Supreme Court's decision in *Olmstead* and implementation of the Americans with Disabilities Act (ADA).[20]

Commenters remarked that people in recovery from drug addiction and alcoholism are protected as people with disabilities under the Fair Housing Act. Some commenters remarked that in many cases, local governments use facially neutral but discriminatory zoning and land use tactics that prevent people with substance abuse disorders from being able to live in the supportive environment of a recovery home. Commenters believed the Proposed Rule would make it significantly harder to prove discrimination in housing for policies that seem neutral, but in practice unfairly exclude certain groups of people or segregate certain communities and further limit access to a critical recovery support.

Commenters stated that the intersection of protected classes compounds the negative impacts of the Proposed Rule, as often a person in one protected class belongs to another protected class, such as women who are victims of domestic violence. One commenter remarked that the intersection of race and gender is the most reliable factor in predicting eviction in Philadelphia (out of the Philadelphians that have evictions, 70% are women of color). Commenters believe that the Proposed Rule would exacerbate existing discriminatory outcomes for women of color since it would allow housing providers to evade awareness of the impact of their own discriminatory practices.

One commenter stated that the Proposed Rule could protect banks with tiered interest rate policies even though such policies may have a disparate impact on homebuyers in predominately minority neighborhoods with lower home values. Some commenters argued that the Proposed Rule would be financially burdensome or make compliance more difficult for small businesses. One commenter said the Proposed Rule undermines fair market competition because smaller companies or new entrants to the marketplace that cannot assert that they also establish industry standards will face a steep, potentially insurmountable barrier to compete in this space.

Commenters remarked that the Proposed Rule would make it more difficult for individuals with criminal records to obtain housing, because housing providers could have admissions policies such as blanket bans on people with criminal records, or with arrests and convictions that arise from the criminalization of homelessness and do not pose a safety concern. One commenter provided an example of how someone with a minor charge or misdemeanor that they had from 20+ years ago can impact their housing access. Another commenter cited statistics regarding the number of minorities incarcerated in Illinois and recidivism rates in support of the argument that stable housing is necessary for former offenders. A commenter noted that Cook County recently passed the Just Housing

---

[19] U.S. Department of Housing and Urban Development, *HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services, HUD.gov* (Sept. 13, 2016), *https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF; HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions, HUD.gov* (April 4, 2016), *https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.*

[20] 42 U.S.C. 12101 *et seq.; Olmstead* v. *L.C. by Zimring,* 527 U.S. 581 (1999).

Ordinance,[21] which acknowledges that background check policies have a discriminatory and disparate impact on Black and Latinx communities, as well as people with disabilities. The commenter believed this ordinance is an example of a local government dedicating its resources to the principles of the 2013 Rule and proposes HUD keep the 2013 Rule since it strengthens communities by allowing victims of all types of systemic discrimination to seek recourse and change policies. A commenter remarked that the Proposed Rule would limit the ability of advocates to negotiate with landlords to adopt more inclusive background policies. A commenter remarked that barriers to housing based on an individual's criminal record can also arise from children with criminal records, a disproportionate number of whom are children of color, which similarly affects families' ability to stay united in adequate housing. Another commenter observed that men of color are incarcerated at a higher rate, they disproportionately face more obstacles to housing than their white counterparts, and thus disparate impact is what currently protects them from the effect of institutionalized racism.

One commenter noted that the 2013 Rule and HUD guidance was instrumental in adopting a fair housing ordinance related to the use of criminal records in housing decisions. One commenter wrote that disparate impact theory is extremely important in small cities and rural areas as a viable means of enforcing fair housing rights, especially for protected classes. Another commenter specifically addressed the impact of the Proposed Rule on manufactured housing, related to disparate impacts from state actions on property used for manufactured housing. The comment cited HUD's role in the White House Council on Eliminating Barriers to Affordable Housing, and HUD's recent housing finance reform proposal,[22] which includes a section on eliminating such barriers to the use of manufactured housing as affordable housing. The commenter argued that HUD has broad preemption authority with respect to zoning and land use planning, which negatively impacts the availability of

affordable housing that goes together with preemption authority over disparate impact. The commenter encourages HUD to revise the Proposed Rule as it relates to discriminatory zoning and land use requirements, to preserve the ability of plaintiffs to pursue legitimate disparate impact cases in these instances, including where it affects the availability of manufactured housing.

Commenters wrote that the 2013 Rule's disparate impact analysis helps defend protected classes and those who are being discriminated against, ensuring equality in society and fair housing policy by using data-driven approaches to modify facially neutral yet discriminatory policies that impose unnecessary barriers to housing. Commenters noted that the 2013 Rule has been a valuable tool for victims, communities, fair housing practitioners, and the housing industry, in holding potential defendants accountable for unintentional and intentional discrimination, as well as combating implicit bias, and has been instrumental in helping to remedy or alleviate discriminatory practices, including historical patterns of segregation. Some commenters provided examples of cases where the 2013 Rule protected tenants from discriminatory housing practices, specifically shielding tenants who receive housing subsidies from being subjected to rental increases or denied insurance. Other commenters used personal and historic examples to highlight the effectiveness of the 2013 Rule in combatting discrimination.

One commenter stated that HUD is allowing public money to fund discrimination in violation of law and another commenter stated that the Proposed Rule constitutes a human rights violation. Another commenter stated the Proposed Rule would result in fewer investigations by HUD's Office of Fair Housing and Equal Opportunity (FHEO). Commenters stated that HUD should not adopt the Proposed Rule because the 2013 Rule is consistent with HUD's mission, including the statutory requirement to affirmatively further fair housing under the Fair Housing Act, the U.S. Constitution, and historic precedent interpreting disparate impact under the Fair Housing Act.

Some commenters cited the societal benefits of the 2013 Rule, including health equity, healthy families, a healthy environment, educational achievements, long-term earnings, and community integration of individuals with disabilities. In spite of the Fair Housing Act's passage and this national policy, one commenter stated that there

are over 4 million instances per year of discrimination impeding people's ability to secure affordable insurance products, access quality credit, rent affordable and safe housing, and obtain accessible housing units, which many commenters argued were able to be combated by the uniform standard of the 2013 Rule. These commenters also stated that the 2013 Rule is supported by the *Inclusive Communities* decision and furthers fair housing and fair lending. Several commenters highlighted the positive impact the 2013 Rule had on families with children, such as challenging restrictions on the number of occupants in a unit, as well as restrictions on the use of amenities, where discriminatory intent may not be shown. Another commenter cited data showing that there were 2,675 familial status discrimination complaints filed in 2017, the majority pertaining to rental market discrimination. Other commenters feel that without the 2013 Rule's legal remedies, the country is in danger of returning to the pre-1988 conditions in which one-quarter of rental housing was restricted against families with children. Commenters also stated that by making disparate impact cases harder to bring, the Proposed Rule would have an adverse effect on those impacted by historic patterns of segregation, which are still present today.

One commenter also noted that under the Act, HUD is currently tasked with determining the reasonableness of an occupancy standard considering factors such as size of bedroom and age of children, and that with the Proposed Rule, municipalities would not be required to explain how restrictions on bedroom occupancy related to a legitimate government objective. Another commenter supported the 2013 Rule because it allowed civil rights "watchdogs" to hold housing providers and others accountable, including a 2018 federal lawsuit that challenged a property management company's policy that was having a disparate impact on African Americans in Chicago. Other commenters stated that the 2013 Rule is balanced by providing a well-tailored pleading standard, a defense to disparate impact claims, and a three-step, burden-shifting process which addresses discrimination while preventing frivolous lawsuits. Another commenter stated that the 2013 Rule is critical in negotiations with housing providers even before any official complaint is filed.

Commenters stated that there is no need for the Proposed Rule to shift the balance of interest for parties to make cases more difficult to bring, as the

---

[21] Cook County Government, *Just Housing Amendment to the Human Rights Ordinance, cookcountyil.gov, https://www.cookcountyil.gov/content/just-housing-amendment-human-rights-ordinance.*

[22] Exec. Order No. 13,878, 84 FR 30853 (June 25, 2019); U.S. Department of Housing and Urban Development, *Housing Finance Reform Plan, HUD.gov* (Sept. 2019), *https://www.hud.gov/sites/dfiles/Main/documents/Housing-Finance-Reform-Plan0919.pdf.*

current regulations have not led to an increase in unwarranted Fair Housing Act litigation or compliance costs. With the exception of a lawsuit filed by insurance trade groups, commenters stated that none of the wide array of entities regulated by the 2013 Rule challenged its legality.

Some commenters believed that the Proposed Rule sought to legalize housing discrimination and segregation or seek to reframe disparate impact as classic disparate treatment. Another commenter stated that HUD has failed to ask how the Proposed Rule might increase or decrease housing inequality or segregation. In this world of rapid societal change, the standards for proving disparate impact under the Fair Housing Act should stay the same so that the Act's remedial purpose can be effectuated, and the 2013 Rule should not be changed. A commenter added that there has been less litigation because of *Inclusive Communities* and the 2013 Rule. The commenter stated that the 2013 Rule's clarity allows parties to make informed decisions about how policies or practices are impacting protected classes and cases are resolved quicker and more efficiently.

Commenters noted that the current and Proposed Rules are both too complicated and proposed HUD make Fair Housing Act regulations simpler so that individuals might have a chance to bring a successful claim. Examples suggested included simplified and clearer guidelines with examples for evidence required.

One commenter suggested that HUD's questions were soliciting positive responses from banks, landlords, or other similar defendants who welcome a rule drafted heavily in their favor, whereas the Proposed Rule would have a significant negative economic impact on protected class households as they will incur greater costs when seeking housing, loans and insurance, and such households will be unable to surmount the barriers created by the Proposed Rule. One commenter said both *Inclusive Communities* and the Proposed Rule make disparate impact claims more difficult and complicated, and therefore more expensive, and may discourage such claims because they appear to increase burdens and costs for complainants, shifting those costs from respondents. Another commenter asserted plaintiffs may review the Proposed Rule and not bring cases due to the conclusion that their claim against an insurance company will not be successful, which will greatly decrease litigation costs and risk of litigation cost to insurance companies;

however, it will do nothing to solve the real-world discrimination wrought by unfair and potentially discriminatory policies insurance companies use to perpetuate housing segregation.

*HUD Response:* HUD appreciates the insights provided. HUD disagrees that the Proposed Rule deviates from the agency's mission or the Fair Housing Act's purpose, or that it allows discrimination. HUD thoughtfully considered these comments and made several changes to provisions of the Proposed Rule in response, as discussed in more detail elsewhere. Further, HUD will continue its efforts to enforce the Fair Housing Act and other civil rights statutes within its purview. As discussed in HUD's Proposed Rule, the Supreme Court did not rule specifically on the validity of the 2013 Rule when it decided *Inclusive Communities,* but only on the issue of whether disparate impact theory is cognizable under the Fair Housing Act. As discussed further below, the Court's reference to HUD's 2013 Rule was only in passing. The changes being made by the Proposed and Final Rules are within HUD's discretion to interpret the Fair Housing Act, and are consistent with the direction of *Inclusive Communities* to ensure that the constitutional concerns raised by the Court are fully addressed. The Final Rule will afford the use of data-driven approaches to modify facially neutral yet discriminatory policies, while at the same time providing clarity to members of the public seeking to comply with the Fair Housing Act or bring a claim for disparate impact that meets the constitutional requirements outlined in *Inclusive Communities*. The changes made will also ensure a balanced approach to disparate impact litigation by providing a roadmap for plaintiffs and protecting against frivolous lawsuits while still allowing disparate impact liability to be used to hold violators accountable. The changes also provide guidance for litigants to assist in navigating the limitations that courts have placed on such claims.

HUD acknowledges commenters' concerns regarding changes being made to the 2013 Rule but notes that the Final Rule still recognizes disparate impact as a viable theory of discrimination, which can be used to hold violators accountable for discriminatory policies and practices. The Final Rule also allows municipalities and local governments to implement ordinances and laws that reflect the needs of their distinct communities while providing a tool to challenge policies that have a disparate impact on protected classes. HUD believes that the Final Rule will

better serve the 2013 Rule's purposes, including educating the public regarding the purpose and scope of disparate impact law, as it builds upon it by clarifying provisions in light of *Inclusive Communities*. It is important to note that with regard to commenters' statements surrounding the importance of disparate impact as a theory, the Final Rule does not remove the availability of disparate impact claims to address Fair Housing Act violations, and does not change the societal benefits of HUD's implementation of the Fair Housing Act. Rather, the Final Rule provides greater clarity on the use of disparate impact to address alleged violations in a manner that increases the rule's effectiveness so as to best eliminate discriminatory practices.

HUD's interpretation is consistent with *Inclusive Communities'* clarification that *Gallagher* v. *Magner* was "decided without the cautionary standards announced in this opinion[.]" [23] *Gallagher* argued that a Fair Housing Act violation can "arise from a statistical link between income and race[.]" [24] This standard is clearly inconsistent with the robust causality standard articulated in *Inclusive Communities*. In HUD's view, the 2013 Rule presents only a brief explanation of the requirements for prevailing on a disparate impact claim, and therefore invites speculation and does not provide sufficient clarity about the standard used by the courts.

This Final Rule, however, is clear and consistent with the language used in *Inclusive Communities*. It does not set a higher standard than the one currently used by most courts. The Final Rule aligns with *Inclusive Communities,* which stated that liability in disparate impact cases cannot be "imposed based solely on a showing of a statistical disparity." [25] The suggestion that "robust" was intended to modify the word "requirement" does not change HUD's conclusion that plaintiffs are required to show a robust causal link; for the causal link to serve as a robust requirement, it must itself be robust.

Further, as several commenters stated in support of the Proposed Rule, the clarification provided by the Final Rule provides a balanced approach to protect small banks, businesses and landlords while still providing a mechanism for addressing inequality and discrimination, including zoning and land use issues. HUD does not believe the Final Rule will have the suggested

---

[23] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2524 (2015).

[24] 619 F. 3d 823, 836 (8th Cir. 2010).

[25] *Inclusive Communities,* at 2512.

negative effects on the various constituencies and institutions cited in the comments because, as discussed throughout this preamble, HUD believes that this Final Rule still allows disparate impact claims to be brought when appropriate under law, and, therefore, these constituencies and institutions will still have disparate impact claims as a basis for relief under the disparate impact doctrine.

As to the comment regarding soliciting positive comments, HUD has submitted this Proposed Rule for public comments in good faith, has welcomed all comments and given all comments serious consideration. HUD made significant changes in this Final Rule in light of comments, such as removing the defense based on the existence of a model or algorithm.

HUD believes this Final Rule provides greater clarity, in the wake of *Inclusive Communities,* regarding the requirements for bringing and defending against disparate impact claims. This Final Rule is designed to clarify what evidence is needed in order to successfully challenge a policy or practice, which HUD believes will lead to a greater percentage of successful disparate impact claims while reducing the number of claims that are not appropriate under the disparate impact theory.

Further, as noted above, nothing in this Final Rule alters the myriad other mechanisms for protecting individuals against intentional housing discrimination.

This Rule does not alter the rights and protections available under the Fair Housing Act. For example, housing providers must make reasonable accommodations to policies or practices that interfere with the ability of a persons with a disability to have an equal opportunity for the full enjoyment of housing under that Act. This Rule does not change those protections. Further, a policy with widespread effect could still be successfully challenged under this Rule.

With regard to issues of sexual orientation and domestic violence, this Final Rule leaves unchanged HUD's regulatory protections, which are separate from the Fair Housing Act.[26]

With regard to lending and insurance practices, this Final Rule removes the proposed defense solely based on the defendant following a risk-assessment model or algorithm that had acceptable characteristics, thereby leaving such cases to be examined under the general

framework, with the same defenses available in other types of disparate impact cases.

With regard to age, legal protections under the Age Discrimination Act of 1975, for example, remain unaffected. The civil rights laws and authorities that apply to HUD programs are listed here: *https://www.hud.gov/program_offices/ fair_housing_equal_opp/fair_housing_ and_related_law.*

As to the complexity of the Proposed Rule, disparate impact claims often require the resolution of inherently complex matters. HUD's Final Rule clarifies the legal standards and procedures and aligns them with *Inclusive Communities,* the seminal Supreme Court ruling in this area.

HUD also notes that statistics-based claims, like all other claims, would be required to meet pleading standards under the FRCP. HUD recognizes that plaintiffs may not have access to statistical data needed to prove a claim. However, plaintiffs who are relying on statistical data to make a claim must be able to sufficiently plead the existence of statistics sufficient to meet pleading standards.

*Comment: The Proposed Rule contradicts HUD's prior findings and other relevant authorities.*

Some commenters stated that the Proposed Rule contradicted HUD's previous statements, including previous guidance regarding cognizable disparate impact claims related to criminal record screening and HUD's determination that exemptions and safe harbors undermine the Fair Housing Act's remedial purpose. One commenter specifically noted that in 2013, HUD found that regulated entities had successfully followed the existing rules since at least 1994, and the existing rules have permitted them to ''conduct consistent self-testing and compliance reviews, document their substantial, legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation.''

One commenter noted that the Proposed Rule did not account for existing case law or HUD's own prior positions, and HUD, therefore, did not rely on the administrative knowledge and experience which largely account for the presumption that Congress delegates interpretive lawmaking power to the agency. The commenters wrote that HUD is, therefore, not within the scope of HUD's delegated authority. Additionally, several commenters stated that, through the Proposed Rule, HUD is improperly substituting its judgment for that of Congress and the judiciary. Some commenters stated that HUD lacked the authority to make many of the changes

in the Proposed Rule because Congress ratified the Act in 1988 without disturbing disparate impact precedent and the current 3-step burden shifting framework. Commenters stated further that this rules out use of *Chevron* deference. Commenters noted that as HUD acknowledged in the 2013 Rule, HUD does not have the power to create disparate impact law.

Some commenters opposed the Proposed Rule because they stated that it ignores and is inconsistent with existing agency guidance dating back to 1993, such as the 1994 Joint Policy Statement on Discrimination in Lending, signed by HUD, the Department of Justice, and nine other federal regulatory and enforcement agencies.[27] That Statement applies to lending discrimination under both the Act and Equal Credit Opportunity Act (''ECOA'')[28] and describes general principles that these agencies would consider in identifying lending discrimination. Moreover, commenters stated the Proposed Rule deviates from the Statement in various ways—for example, by imposing a requirement to plead that a policy is artificial, arbitrary, and unnecessary; by deleting the requirement that a justification cannot be hypothetical or speculative; and by creating exemptions for the use of models. Commenters suggested that lending institutions subject both to ECOA and the Act would be left to reconcile two conflicting regimes and inconsistent agency positions, while the 2013 Rule was drafted explicitly to acknowledge and avoid this unnecessary burden. Another commenter stated that the Proposed Rule conflicts with the Consumer Financial Protection Bureau and federal regulators' guidance on disparate impact claims under ECOA, as well as with Title VII precedent (regarding the prohibition of employment discrimination).

*HUD Response:* HUD appreciates the comments regarding the interplay of the Proposed Rule and other HUD guidance, jurisprudence and findings, but generally believes that the changes from the 2013 Rule are in line with binding authorities and otherwise within HUD's discretion to make for the reasons set forth herein. We note that sub-regulatory guidance is generally not binding. As discussed by commenters supporting the changes, this Final Rule provides greater clarity to all parties

---

[26] *See, e.g.,* Violence Against Women Reauthorization Act of 2013: Implementation in HUD Housing Programs, 81 FR 80724.

[27] *Policy Statement on Discrimination in Lending,* 59 FR 18266 (April 15, 1994), available at: *https:// www.govinfo.gov/content/pkg/FR-1994-04-15/html/ 94-9214.htm.*

[28] 15 U.S.C. 1691 *et seq.*

**60298** Federal Register / Vol. 85, No. 186 / Thursday, September 24, 2020 / Rules and Regulations

involved in housing transactions regarding disparate impact liability. Further, HUD, as the agency charged with administering the Fair Housing Act,[29] has extensive experience administering the Fair Housing Act and in investigating and adjudicating claims arising under the Act, which provides it with the expertise to modify and create rules interpreting it. In addition, HUD has specific legal authority to issue rules and regulations to carry out the Fair Housing Act.[30] HUD disagrees that the Proposed Rule was designed to restrict the scope of judicial review on Fair Housing Act claims; HUD sought to clarify for all parties the burdens involved in bringing or defending against a disparate impact claim under the Act.

Where HUD departs from past authoritative positions, it does so consistent with the Supreme Court's opinion in *Inclusive Communities,* as discussed further elsewhere in these responses, and consistent with the position that disparate impact claims are cognizable under the Act. As to guidance for disparate impact claims under ECOA and Title VII, while those were relevant models at the time of the 2013 Rule, further consideration as well as the issuance of the Supreme Court's opinion in *Inclusive Communities* has led HUD to determine that it should use its discretion in interpreting Title VIII disparate impact law to change its regulations in a way that HUD believes will best advance the purpose of the Fair Housing Act.

*Comment: The Proposed Rule is not compliant with Inclusive Communities.*

Several commenters provided arguments regarding the scope and breadth of the Supreme Court's decision in *Inclusive Communities.* A commenter suggested that HUD contradicted itself when stating that the Proposed Rule will enable parties to understand their responsibilities without the need to research and compile case law since *Inclusive Communities,* while also admitting that the 2013 Rule codified then-prevailing case law for bringing a discriminatory effect claim and the 2013 Rule provided clarity to all parties involved in a case. Another commenter opposed the Proposed Rule because the Supreme Court held that the Fair Housing Act recognized disparate-impact liability and approved the framework for establishing that liability in HUD's 2013 Rule. Longstanding judicial and agency interpretation—and Congress's reaffirmation of that interpretation in the 1988 amendments

to the Fair Housing Act—were a central reason for the Supreme Court's recognition of disparate impact liability in *Inclusive Communities.*[31] The Court emphasized the continued importance to ''residents and policymakers [who] have come to rely on the availability of disparate-impact claims'' and quoted a brief filed by a number of states arguing that ''[w]ithout disparate impact claims, States and others will be left with fewer crucial tools to combat the kinds of systemic discrimination that the Fair Housing Act was intended to address.''[32]

One commenter stated that the 2013 Rule, *Inclusive Communities,* and subsequent case law align in that they all recognize the validity of disparate impact claims, but the Proposed Rule does not because it requires more burdensome standards for valid disparate impact claims than those imposed by the Supreme Court. The commenter recommended that HUD use the standards announced by the Court and be neither more nor less restrictive. One commenter wrote further that *Inclusive Communities* adopted the construction of the 2013 Rule, based on statutory interpretation and four decades of Federal jurisprudence. Commenters cited a brief filed by HUD in 2016 to note that *Inclusive Communities* was consistent with the 2013 Rule. Commenters stated that most circuit courts who have considered disparate impact in fair housing or other types of cases have relied on *Inclusive Communities,* and the 2nd and 10th Circuits have relied on HUD's interpretation or applied their own standards. A commenter continued by arguing that there are no recent cases that are inconsistent with either *Inclusive Communities* or the 2013 Rule.

Commenters stated further that the Supreme Court in *Inclusive Communities* discussed the 2013 Rule—including its requirements for making out a prima facie case and burden-shifting—without suggesting that the 2013 Rule required revision.[33] A commenter stated that the petitioner in *Inclusive Communities* was only granted certiorari on the question of whether the

Fair Housing Act permits disparate-impact claims, and not what the standards and burdens are for adjudicating such claims. Thus, the Court specifically declined to assert jurisdiction over questions regarding the appropriate standards and burdens.[34] Therefore, parties and the many amici who briefed the case spent little time contesting what the burdens and standards are in disparate-impact litigation.

A commenter also noted that *Inclusive Communities* referred to Title VII as an interpretive touchstone, but Title VII is not referenced in HUD's Proposed Rule. Later courts generally agree that *Inclusive Communities* dictates continuing reliance on preexisting Fair Housing Act and Title VII law in resolving granular questions about disparate impact liability.[35] Commenters provided examples in support of the contention that district courts have encountered no problems in continuing to apply the 2013 Rule and long-standing doctrine post-*Inclusive Communities,* including citations to 36 district court cases that have cited the 2013 Rule since *Inclusive Communities.*

Another commenter suggested that any agency guidance deviating from *Inclusive Communities* is not entitled to deference because the Supreme Court did not rely on the current regulation for its holding in *Inclusive Communities;* the Court undertook its own analysis of the Fair Housing Act and HUD has only limited authority to deviate from circuit precedent when ambiguous statutory provisions are at issue. Commenters suggested that the Proposed Rule goes beyond that authority and would raise constitutional concerns if followed, while the 2013 Rule is a cognizable theory under the Fair Housing Act and constitutional under the Fourteenth Amendment.

*HUD Response:* HUD notes and agrees with commenters who contend that *Inclusive Communities* primarily discussed whether disparate impact is cognizable under the Fair Housing Act; however, given the Court's fulsome explication of the constitutional limitations on disparate impact liability, HUD believes the 2013 Rule should be modified to provide further clarity in light of the explanation provided in *Inclusive Communities,* and to better reflect HUD's interpretation of the Fair Housing Act. HUD agrees with comments that the Final Rule

---

[29] *See* 42 U.S.C. 3608(a).

[30] *See* 42 U.S.C. 3614a.

[31] *Inclusive Communities,* at 2525.

[32] *Id.*

[33] *See, e.g., id.* at 2514–15 (describing prima facie case and burden-shifting in the 2013 Rule); *id.* at 2522–23 (describing defendants' burden ''to state and explain the valid interest served by their policies'' and HUD's decision in 2013 Rule not to use term ''business necessity'' in formulating defendant's burden); *id.* at 2523 (after describing concerns raised by specific claim at issue in case, observing with approval that HUD's 2013 Rule ''does not mandate that affordable housing be located in neighborhoods with any particular characteristic'') (quoting 78 FR 11476)

[34] See Sup. Ct. Rule 14(1)(a).

[35] *See de Reyes* v. *Waples Mobile Home Park L.P.,* 903 F.3d 415 (4th Cir. 2018); *Wetzel* v. *Glen St. Andrew Living Cmty., LLC,* 901 F.3d 856 (7th Cir. 2018); and *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20 (D.D.C. 2017).

implements standards consistent with those articulated by the Court. HUD also agrees with commenters, as discussed elsewhere, that Title VII continues to aid in understanding disparate impact liability under the Fair Housing Act but notes that the different subject matter necessarily requires distinctions between the areas of law, as recognized in *Inclusive Communities* itself. HUD notes that while courts may continue to cite to the 2013 Rule as guidance or to provide a framework for disparate impact law, that does not necessarily mean that the 2013 Rule is the only permissible interpretation of disparate impact liability under the FHA. As noted, one court of appeals has concluded that the 2013 Rule is in fact inconsistent with *Inclusive Communities,* because *Inclusive Communities* ''announce[d] a more demanding test than that set forth in the [2013] rule.'' [36]

HUD's past positions in litigation briefs are not binding on HUD in rulemaking. HUD issued an ANPR soliciting comments on whether HUD's 2013 Rule is inconsistent with *Inclusive Communities.*[37] HUD received numerous comments in response concerning the 2013 Rule and *Inclusive Communities.* Additionally, in October 2017, the Secretary of the Treasury issued a report that explicitly recommended that HUD reconsider applications of the 2013 Rule, especially in the context of the insurance industry.[38] Based on these comments, HUD concluded that the 2013 Rule did not adequately align with *Inclusive Communities* and did not properly reflect HUD's interpretation of Title VIII disparate impact law. Therefore, HUD issued the proposed disparate impact rule.

This conclusion is borne out by *Inclusive Communities'* three references to HUD's 2013 Rule. First, the Court summarized the burden-shifting test in HUD's 2013 Rule as part of its statement of the case's history and the basis of the Fifth Circuit's decision. Next, the Court referred to the ''leeway to state and explain the valid interest served by their policies,'' referring to this phase as

analogous to the business necessity defense under Title VII of the Civil Rights Act and noted that HUD did not use the term ''business necessity'' because that phrase would not be understood to cover the full scope of activities covered by the Fair Housing Act. The Court's third reference to the 2013 Rule notes that ''HUD itself recognized [that] disparate-impact liability does not mandate that affordable housing be located in neighborhoods with any particular characteristic,'' referring to the preamble of the 2013 Final Rule.[39] Outside of these references, *Inclusive Communities* nowhere mentions the 2013 Rule in connection with discussing the necessary limitations to disparate impact liability. In support of their argument that HUD's 2013 Rule contained the necessary limitations to disparate impact liability, some commenters pointed out that *Inclusive Communities* argued that ''disparate-impact liability has always been properly limited in key respects that avoid serious constitutional questions. . .'' [40] For these commenters, the phrase ''always'' implies that *Inclusive Communities* did not need to invent new limitations to disparate impact, but instead recognized limitations that were always there. HUD disagrees. *Inclusive Communities* recognized that limitations to disparate impact liability already existed, but elaborated on these restrictions, showing that such limitations are still subject to further development. Further, HUD, as the agency responsible for interpreting and enforcing fair housing law, has significant discretion to interpret ambiguities in Title VIII disparate impact liability. HUD has taken into consideration the factors discussed in *Inclusive Communities,* as well as other factors HUD has observed using its expertise in fair housing law, and has determined that disparate impact liability is properly considered through the lens of the restrictions articulated in this Final Rule.

Regardless, the fact that disparate impact liability has always been limited does not answer whether, in HUD's view and discretion, the 2013 Rule's scope of disparate impact liability was appropriate. HUD believes that a better way to evaluate the meaning of this phrase is to view it in terms of the broader context of the limitations outlined by *Inclusive Communities,* compared to the limitations contained in HUD's 2013 Rule. For example,

*Inclusive Communities* elaborates that ''[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies'' [41] and that ''[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest served by their policies.'' [42] HUD believes that neither the ''artificial, arbitrary, and unnecessary'' protections nor the ''valid interest'' protections are included in HUD's 2013 Rule.

In response to the suggestion that HUD should not rely on dicta in *Inclusive Communities,* HUD believes that the Court's discussion in *Inclusive Communities* of the limitations to disparate impact is an inherent part of the opinion and thus is not dicta. Dicta is generally ''a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.'' [43] In *Inclusive Communities,* a discussion of the limitations to disparate impact formed the analytical foundations of the Court's holding. The Supreme Court cited *Griggs* v. *Duke Power Co.*[44] and *Smith* v. *City of Jackson,*[45] which, respectively, ruled that disparate impact liability was authorized under Title VII of the Civil Rights Act of 1964 and under the Age Discrimination in Employment Act. The Supreme Court included these citations both to support the existence of disparate impact liability under the Fair Housing Act and to discuss necessary limitations on disparate impact liability, stating that ''these cases provide essential knowledge and instruction in the case at issue.'' [46] The Court stated in *Inclusive Communities* both that disparate impact liability is important in uncovering discrimination and that disparate impact liability is properly limited in key respects so as to avoid constitutional questions that might arise, ''*e.g.,* if such liability were imposed based solely on a showing of a statistical disparity.'' [47]

The discussion of limits to disparate impact liability is essential to discussing whether a statute authorizes such liability for at least two reasons. First, inherent to defining a cause of action is

---

[36] *Inclusive Cmtys. Project* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019); *see also Fair Housing Act—Segregative-Effect Claims,* 133 Harv. L. Rev. 1476, 1483 (2020).

[37] 83 FR 28560 (June 20, 2018).

[38] *See* Steven T. Mnuchin and Craig S. Phillips, *U.S. Department of the Treasury Report: A Financial System That Creates Economic Opportunities, Asset Management and Insurance, Treasury.gov* (Oct. 26, 2017), *https:// www.treasury.gov/press-center/press-releases/ Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.*

[39] 78 FR 11476 (Feb. 15, 2013).

[40] *Tex. Dep't of Hous. & Cnty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2522 (2015).

[41] *Id.* at 2522 (quoting *Griggs* at 431).

[42] *Id.* at 2522.

[43] *Coleman* v. *Greene,* 845 F.3d 73, 76 (3d Cir. 2017) (citing *United States* v. *Mallory,* 765 F.3d 373, 381 (3d Cir. 2014).

[44] 401 U.S. 424 (1971).

[45] 544 U.S. 228 (2005).

[46] *Inclusive Communities,* at 2511.

[47] *Inclusive Communities,* at 2511–2512.

defining the general contours of what a cause of action should look like. Second, the Fair Housing Act itself explains that its purpose is to provide for fair housing "within constitutional limitations" and the Court in *Inclusive Communities* noted that constitutional issues could arise if disparate impact liability were not properly limited. Thus, HUD believes that the question of limitations to disparate impact is "fairly included" in the question at issue in *Inclusive Communities.* Further, it seems unlikely that the disparate impact protections were mere dicta when the Court characterized this opinion as having "announced" "cautionary [disparate impact] standards." [49] Indeed, it appears that the Court predicated its narrow decision in *Inclusive Communities* upon the assumption of "adequate safeguards." Further, even if the applicable language *were* dicta, HUD believes it is appropriate to seriously consider statements made by the Court when exercising its discretion in interpreting Title VIII disparate impact law, instead of "idly ignor[ing] considered statements the Supreme Court makes in dicta." [50]

*Comment: A change under these circumstances without better explanation is arbitrary and capricious and will lead to increased costs.*

Commenters stated that the Proposed Rule would be arbitrary and capricious under the Administrative Procedure Act [51] (APA) because HUD offers no explanation for why the changes in the Proposed Rule are desirable, fails to acknowledge that it is changing long-standing practice at all, fails to identify any real-world problems or policy outcomes addressed by the changes, fails to consider adverse consequences and evidence of discrimination, and does not recognize that the Proposed Rule would have implications or costs for federal programs and the entities that administer them. *Inclusive Communities* does not mandate a new policy.

A commenter noted that Supreme Court precedent holds that while agencies may change existing rules, there must be a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy, as well as that this is especially difficult when a rule reflects longstanding practice of the agency and

the courts. According to the commenter, the 2013 Rule has been found to meet the objectives of Congress and thus the proposed abandonment of the agency's prior position results in a rule that cannot carry the force of law under *Encino Motors.* [52]

Commenters wrote the Proposed Rule would infringe on core judicial functions, including courts' discretion to consider the unique facts of each case, especially with regard to land use, lending and insurance claims. One commenter noted that in *Inclusive Communities,* the court said "no dire consequences have resulted from several decades of disparate impact cases," while another commenter stated that HUD's argument that entities may resort to racial quotas to avoid disparate impact liability under the 2013 Rule is not supported by any evidence. Other commenters opposed the Proposed Rule, asserting that because the 2013 Rule considered and rejected many of the very changes that the Proposed Rule now would make and, unlike the Proposed Rule, explained its reasoning in doing so. Commenters provided numerous examples, such as HUD's rejection of a suggestion that HUD delete "perpetuation of segregation" as a recognized discriminatory effect, reasoning that "the elimination of segregation is central to why the Fair Housing Act was enacted" and that "every federal court of appeals to have addressed the issue has agreed." [53] The commenters said that the Proposed Rule failed to explain, acknowledge, or identify these prior determinations. These commenters wrote that the Proposed Rule makes no attempt to justify any of its changes as good policy or as better interpretations of the law as it existed in 2013.

*HUD Response:* HUD acknowledges and appreciates these commenters' perspectives but disagrees and believes that in *Inclusive Communities,* the Supreme Court outlined its view of disparate impact litigation under the Fair Housing Act, and the Final Rule appropriately updates and clarifies all parties' burdens during disparate impact litigation consistent with *Inclusive Communities.* HUD provided detailed and reasoned responses in the Proposed Rule's preamble and has provided further details in this Final Rule. HUD is issuing this rule not because of the results of disparate impact cases over the prior decades or racial quotas but, because it believes clarification is

appropriate following the Supreme Court's decision. Where HUD is making changes to the 2013 Rule, HUD is doing so in light of developments since 2013 and upon further review of disparate impact case law under the Fair Housing Act. HUD analyzed the cost of this Final Rule and determined that the Final Rule would provide decreased costs through clarity and detailed explanation of a prima facie case, and that any costs or increased difficulty in bringing litigation are the result of the tightened standard in *Inclusive Communities,* and not due to HUD's rule. See HUD's Regulatory Impact analysis discussion of costs and benefits.

*Comment: HUD should eliminate the concept of disparate impact entirely.*

One commenter urged HUD to do away with the disparate impact theory altogether. Another commenter stated that disparate impact is a specious and unsupportable theory that relies on false logic because coincidence does not equal causation and discrimination does not occur every time outcomes are not equal.

*HUD Response:* HUD finds these positions to be inconsistent with *Inclusive Communities* and inconsistent with HUD's interpretation of the Fair Housing Act.

*Section 100.5 Scope*

*Comment: Change to language in § 100.5(b).*

One commenter stated that HUD's use of the language "defenses and rebuttals to such allegations may be made" in the Proposed Rule is proposing to support defendants against disparate impact claims by tying the safe harbor provision to the scope of the entire rule. Several commenters discussed how the proposed changes in § 100.5 might protect defendants and burden plaintiffs. Similarly, another commenter stated that when read alongside § 100.5(d), § 100.500(b)(2) imposes a legally impermissible undue burden on the plaintiff. Another commenter contended that if § 100.5(b) were adopted, it would extend HUD's proposed defenses for discriminatory effects cases to cases alleging discriminatory intent as well. Methods of proving discriminatory intent were well established in cases such as *McDonnell Douglas* and *Arlington Heights.* HUD cannot create a new method to prove intent cases. Another commenter stated that HUD should refrain from adding language that is redundant, confusing, or unnecessary.

Commenters suggested revising § 100.5(b) to read: "Liability for unlawful housing discrimination under this part may be established by a

---

[48] 42 U.S.C. 3601.

[49] *Id.* at 2524.

[50] *Coleman* v. *Greene,* 845 F.3d 73, 77 (3d Cir. 2017) (citing *In re McDonald,* 205 F.3d 606, 612 (3d Cir. 2000)).

[51] *See* 5 U.S.C. 706.

[52] *Encino Motorcars, LLC* v. *Navarro,* 136 S. Ct. 2117, 2125, 2137 (2016) (quoting *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 516 (2009)).

[53] 78 FR 11469 (Feb. 15, 2013).

practice's discriminatory effect, even if not motivated by discriminatory intent, and defenses and rebuttals to such allegations may be made, consistent with the standards outlined in § 100.500.''

*HUD Response:* HUD has revised the language of § 100.500(b) to make clear that it only applies to discriminatory effects. As discussed in HUD's Proposed Rule, HUD is not creating a safe harbor by its reference in § 100.5, but was pointing the public to the rule section that establishes the framework for litigating disparate impact claims consistent with *Inclusive Communities.* See the explanation of changes in Section III above.

*Comment: Support for proposed change to § 100.5(d).*

Several commenters supported the proposed change to § 100.5(d) and noted that collecting demographic data on all customers may indirectly lead to more civil rights violations and also alienate customers. Commenters also stated that collecting demographic information would be overly burdensome, increase liability for privacy risk and information theft, be unnecessary, and have a negative impact on business. Some commenters also noted that data collection may increase costs due to a greater need for new systems to manage and safeguard personal information as well as increased time and staff required to gather and store data. One commenter argued that the increased burden posed by greater information-gathering may increase underwriting costs and impact premiums paid by consumers.

Commenters argued more specifically that if insurance companies were required to collect demographic information it would be invasive to consumers. Commenters related personal experiences explaining that when clients are asked for personal information there is often a negative customer response, including customers becoming upset at the request and refusal by customers to provide information, which increases costs and liability for businesses. Some commenters argued that demographic information is irrelevant and unnecessary to obtaining home insurance, unrelated to risk, and has never affected a claim. Other commenters argued that overly burdensome data maintenance requirements can stifle a healthy real estate market. One commenter supported the Proposed Rule, noting that State agencies have systems in place to regulate the local insurance industry without additional Federally mandated data collection.

*HUD Response:* HUD appreciates the support from commenters and agrees that business and other requirements by state agencies are already in place to require information collection when relevant to businesses. HUD's Final Rule does not change or require information collection.

*Comment: HUD provides no reason for change in § 100.5(d).*

A commenter stated that HUD provides no explanation for § 100.5(d), which appears to have no purpose other than to assist corporate entities in obscuring the discriminatory impacts of their practices.

*HUD Response:* HUD's request for comments in the 2018 NPRM on its reduction of regulatory barriers indicated that the public sought clarification as to whether the new disparate impact standard in § 100.500 required data collection.[54] In addition, this change is consistent with *Inclusive Communities,* to make clear that disparate impact theory itself does not require data collection.

*Comment: Proposed Rule disincentivizes potential defendants from collecting information.*

Commenters contended that the Proposed Rule has the effect of discouraging data collection, which will inhibit the ability of housing providers, lenders, and local governments to demonstrate that their programs, policies and practices do not have a disparate impact or a discriminatory effect, and it disincentivizes them from voluntarily improving practices that may otherwise leave them vulnerable to litigation and greater liability. One commenter wrote that statistical evidence that shows the outputs of a decision-making process that disproportionately exclude a race or gender should be enough to shift the burden of explanation on the decision-maker. Some commenters also noted that the proposed language would generate confusion and hinder enforcement efforts due to the broad assertion regarding adverse inferences. A commenter stated that HUD needs to explain why discouraging demographic data collection would prevent the use of remedial orders that impose racial targets or quotas.

Commenters stated further that the Proposed Rule, by disincentivizing demographic data collection by housing providers and lenders, hampers Fair Housing Act enforcement by allowing the loss of access to critical evidence of discrimination and undermining its 'discriminatory effect' provisions. Commenters also noted that data is a

critical tool to demonstrate the impact of housing practices on protected groups, and failure to gather this data will obscure discriminatory impacts of housing practices, especially with the increased use of algorithms by housing providers or lenders and lack of access to algorithm data by monitors and concerned parties.

Commenters also noted that *Inclusive Communities* only discusses racial quotas, but this proposed section extends the data collection to include all protected classes, which disincentivizes data collection. Other commenters similarly stated that while the Supreme Court's decision discouraged collection of protected class information for fear that it would lead to quotas, it also acknowledged that awareness of race can help local housing authorities foster diversity and combat racial isolation with race-neutral tools and help entities design policies to ensure all groups have a fair opportunity to participate in programs. A commenter also stated that in *Wards Cove,*[55] the Supreme Court upheld data collection and noted that some employers maintain records disclosing the impact of selection procedures on opportunities by race, sex, or ethnic group, and the Court approved the use of such records by plaintiffs in litigation. This commenter further noted that while quotas are mentioned by the Court, neither *Inclusive Communities* nor *Wards Cove* include concerns that the collection of protected class information was relevant to the establishment of such quotas. One commenter noted that the Proposed Rule does not explain why data collection is equated with the establishment of racial quotas, since Federal data collection has been in place for decades and has not led to such quotas.[56]

*HUD Response:* The Final Rule does not contain a provision that discourages or prohibits covered parties from collecting data. The language retained from the Proposed Rule makes clear that there is no requirement in HUD's Fair Housing regulations, 24 CFR part 5, that specifically requires data collection. This is not a change from current practice and would not hinder the existing collection of data or the use of such data for either plaintiffs or defendants. In *Inclusive Communities,* the Supreme Court made clear that mere statistical evidence of disparities is not

---

[54] 84 FR 64549 (Nov. 22, 2019).

[55] *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989).

[56] *See* U.S. Equal Employment Opportunity Commission, Employer Information Report EEO–1, *EEOC.gov, https://www.eeoc.gov/employers/eeo1survey/.*

sufficient to state a prima facie claim. Thus, commenters' statements about data in itself being sufficient to shift a burden to a defendant is misplaced. Finally, the Supreme Court also has clearly indicated that quotas are unconstitutional. Thus, HUD does not believe that adverse consequences should exist merely for failing to collect data. The Final Rule has eliminated language from the Proposed Rule stating that no adverse inference should be drawn if a party does not collect data to ensure that the Final Rule is unambiguously neutral about whether a party collects data.

*Comment: Proposed rule inconsistent with other data collection requirements.*

Commenters stated the Proposed Rule is inconsistent with current HUD requirements regarding the collection and public reporting on data, as well as other Federal requirements, such as the Home Mortgage Disclosure Act's Regulation C, the ECOA's Regulation B, the Fair Housing Act's Incentives for Self-Testing and Self-Correction (42 U.S.C. 3614–1), the Community Development Block Grant (CDBG) program's demographic data collection requirement, and the Housing and Economic Reform Act of 2008, which required state housing finance agencies to collect and report demographic data.

Commenters stated that the Federal Rules of Evidence addresses admissibility of evidence and HUD's proposed § 100.5(d) would infringe upon it. A commenter stated that it raised constitutional concerns regarding the creation of permanent irrebuttable presumptions that conflict with the Due Process Clause of the U.S. Constitution's Fifth and Fourteenth Amendments. A commenter noted that a defendant failing to collect data about a protected class in violation of *some other* law, policy, or practice—apart from HUD's disparate impact rules—could result in an adverse inference. One commenter suggested that HUD should clarify in the Final Rule that nothing in this rule affects other existing legal requirements to collect data.

*HUD Response:* Many commenters interpreted HUD's language broader than drafted. The language in § 100.5(d) is limited to 24 CFR part 100 of the regulations and, as discussed above, clarifies that part 100 itself is not requiring or encouraging data collection. HUD is clarifying in this Final Rule, that neither § 100.500 nor any other provision in part 100 creates such requirement. However, nothing in this rule affects other existing legal requirements to collect data. As for the reference to the Fair Housing Act collection of information, that burden is

on HUD, and not the entities regulated by this rule, to collect information to ensure conformity with the Fair Housing Act.

HUD's Final Rule does not impact evidentiary rules, consistent with a "neutral" stance on data collection in the rule. Modification to the Final Rule makes this clear. Separately, data is collected in many other circumstances, as noted in several public comments, and such data could be used in litigation. HUD's Final Rule merely clarifies that the rule itself does not encourage or require collection of such data. Therefore, the regulatory language does not conflict with the Federal Rules of Civil Procedure ("FRCP") or any other law.

*Comment: Opposition to required collection of personal and private demographic information.*

Several commenters opposed the Proposed Rule because they argued it required the collection of personal and private demographic information from home insurance customers that is not currently collected. These commenters argued requiring the collection of demographic information could lead to lawsuits; increase premiums and business costs, which could be detrimental to small businesses; and lead to loss of business from individuals who do not want to provide personal demographic information. Commenters specifically noted asking about an individual's religion was irrelevant to home insurance.

*HUD Response:* These comments misperceived the Proposed Rule. HUD appreciates the comments but, as discussed above, nothing in the Proposed Rule nor this Final Rule requires collection of personal and private demographic data, thus, the inclusion of such language in § 100.5(d).

*Comment: Proposed revisions to § 100.5(d).*

One commenter recommended that HUD revise § 100.5(d) to clarify that while defendants are not required to collect such data, data may be necessary for a plaintiff to prove a prima facie case. Some commenters suggest alternatives related to data collection. One such comment suggested the Final Rule should specify that data collection is not required, and the absence of such collection will not result in an adverse inference against a party engaged in housing related business activity.

Other commenters stated that HUD should incentivize, encourage, or require providers to collect demographic data to promote the goals of the Fair Housing Act and for use by organizations ensuring compliance with the Fair Housing Act. Another

commenter added that where it is not required but legally permissible, HUD should encourage entities to monitor their practices for discriminatory effects and explore less discriminatory alternatives to mitigate impacts.

*HUD Response:* While HUD understands that requiring potential defendants to maintain data may be helpful for plaintiffs bringing a case, this Final Rule is intended to provide a legal framework for litigation. This rule provides that data collection is not required or encouraged as a result of this rule. However, the Final Rule does not preclude doing so and, as noted above, in some instances is required by other laws. As for the commenters who requested HUD require data collection, requiring data collection is outside the scope of this rulemaking. Neither the Fair Housing Act nor the *Inclusive Communities* decision supports tying a data collection requirement to HUD's discriminatory effects rule. Further, HUD believes that such requirement would be burdensome, especially on small organizations who do not possess the resources to collect such data. Additionally, such data collecting requirements would be duplicative in light of other data gathering requirements.

*Paragraph (b) Vicarious Liability*

*Comment: Change is unnecessary and unlawful.*

Some commenters stated the proposed change to § 100.7(b) would be unnecessary and without justification and would result in inadequate compliance and compensation. Commenters wrote that § 100.7(b) in the 2013 Rule was clear and consistent with long-established law governing vicarious liability under the Act. Some commenters stated that the proposed revision is inconsistent with more than four decades of case law, including Supreme Court case law characterizing Fair Housing Act cases as statutory torts, in *Curtis* v. *Loether* [57] and applying traditional agency principles in determining questions of vicarious liability, in *Meyer* v. *Holley*.[58]

Commenters objected to proposed § 100.7(b)'s omission of the reference to "agency law." Many commenters stated that this change will create confusion, because although vicarious liability most commonly arises out of the "principal-agent relationship," agency law can expand vicarious liability beyond that specific relationship or to certain circumstances where an agent is acting outside the course and scope of

---

[57] 415 U.S. 189 (1974).
[58] 537 U.S. 280 (2003).

her duties. Commenters also stated that if HUD intends to limit vicarious liability to "principal-agent relationships," rejecting other bases for vicarious liability, then it should explicitly state that purpose so that it may be reviewed by the courts.

Commenters noted that HUD previously stated in its Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act rule preamble that "under traditional principles of agency law, a housing provider may be held vicariously liable for: The discriminatory acts, of an employee or agent regardless of whether the housing provider knew of or intended the discriminatory conduct where the employee was acting within scope of his or her agency, or where the [discrimination] was aided by the agency relationship." [59] Commenters stated that the proposed revisions to § 100.7(b) contradicted its other preamble.

Several commenters expressed concern regarding the principal-agent relationship and liability, as well as potential forum shopping. Commenters stated that HUD amending the vicarious liability provision will create unnecessary confusion on whether its 2016 explanation of vicarious liability principles still applies, as *Meyer* will apply regardless of HUD's regulations and any amendment. Commenters also stated that HUD should explain the purpose of the change in the definition of "vicarious liability" because the definition appears to be identical to a deleted version. Other commenters stated that the vicarious liability should not be addressed in the Proposed Rule because HUD rules already adequately address needed liability issues.

Several commenters objected to the proposed § 100.7(b) omission of text imposing liability regardless of whether a defendant knew or should have known of the conduct that resulted in a discriminatory housing practice. Several commenters stated that this change incentivizes housing providers to remain willfully ignorant of legal requirements and what their employees are doing and to not be involved with the oversight and maintenance of their properties. Commenters also stated that the change seems to repudiate the proposition that, consistent with agency law, vicarious liability may still be imposed.

*HUD Response:* HUD appreciates these comments. The proposed changes were intended only to provide

clarification. After reviewing these comments, HUD has determined that the proposed change confused rather than clarified the issue. Therefore, HUD has decided not to make the proposed changes to this section.

*Paragraph (c) Remedies in Administrative Proceedings*

*Comment: Availability of punitive or exemplary damages.*

Commenters objected to prohibiting punitive or exemplary damages as a remedy in disparate impact cases. Commenters stated that both types of damages are appropriate when a defendant drags out litigation, rather than working to solve the problem. Commenters continued by stating that punitive damages should be available when a defendant clearly knows that their actions will harm a protected class and engages in them anyway, or in cases of reckless indifference. Commenters also said that defendants should be subject to punitive damages if the defendant does not make any effort to look for another way to accomplish legitimate business needs, while exemplary damages should be applied when there are unjust profits made in the process of discriminating against protected classes. Other commenters echoed the idea that punitive damages are necessary to deter future conduct and opined that the Proposed Rule eliminates effective tools that are necessary to cure vestiges of discrimination.

Commenters also stated that punitive and exemplary damages should be available in administrative pleadings and that all litigation costs should be covered for plaintiffs in administrative and judicial proceedings so that discrimination challenges are not cost prohibitive. Commenters additionally stated that HUD lacks the authority to bar punitive damages without other authorization.

Some commenters were supportive of the changes regarding punitive damages. Some commenters said that the Final Rule should clearly state that civil penalties are not an available remedy for disparate treatment cases, even when pursued in courts. Commenters stated that punitive damages should only apply to intentional discrimination and agreed with the Proposed Rule's statement that punitive damages are not authorized and are inappropriate in disparate impact cases because it aligns with Supreme Court precedent. Other commenters stated that it is inappropriate to impose punitive damages or award attorney's fees because disparate impact liability is built on the idea of unintentional

wrongdoing. Several commenters supported the proposed amendment to § 100.7 because they felt that punitive or exemplary damages have no place in disparate impact litigation, as any remedy for disparate impact claims should focus on eliminating the practice that is having an impermissible discriminatory effect. These commenters said that *Inclusive Communities* answered this question and stated specifically that remedial rather than punitive measures are appropriate due to the absence of intent in discriminatory effect cases.

Some commenters disagreed with the idea of punitive and exemplary damages being awarded in disparate impact cases. These commenters stated that, by definition, disparate impact claims involve unintentional torts, so defendants should not face punitive or exemplary damages in the absence of actual discriminatory intent, but rather that the remedy for a disparate impact violation should be correcting the practice rather than punishment. The application of such damages would undermine *Inclusive Communities,* which advises that businesses must be free to make practical business choices. Commenters suggested that HUD revise the Proposed Rule to bar such damages in administrative proceedings and make it clear that such damages are also unavailable in other litigation under the Act.

*HUD Response:* HUD revised the Final Rule, moving paragraph (c) in § 100.7 to paragraph (f) in § 100.500, and changing the language to explain the circumstances under which HUD, as a matter of policy, may request non-equitable damages, such as civil money penalties. This Final Rule does not, and could not, make changes to the statutory language of the Fair Housing Act with regard to the availability of punitive damages as a potential remedy in civil actions or civil money penalties in administrative proceedings.

This Final Rule also does not address in any manner remedies available in disparate treatment claims, regardless of the forum. Punitive damages are not authorized in administrative proceedings, but an administrative law judge may assess a civil penalty under certain circumstances.[60]

HUD reviewed comments and made changes to this Final Rule regarding damages in order to clarify that HUD is merely restating the Supreme Court's direction in *Inclusive Communities* regarding remedies and is explaining when HUD will itself request non-equitable remedies. These changes

---

[59] 81 FR 63054, 63065 (Sept. 14, 2016).

[60] *See* 42 U.S.C. 3612(g)(3).

reflect HUD's understanding that relief in disparate impact cases should be focused on equitable remedies, such as eliminating or reforming a discriminatory practice, rather than monetary punishment, unless circumstances out of the ordinary warrant such.

With regard to commenters requesting that the defendant provide litigation costs to plaintiffs, the Fair Housing Act allows attorney's fees and costs to be awarded to the prevailing party in administrative proceedings or civil actions, per the discretion of the Administrative Law Judge (ALJ) or court.[61] This Final Rule does not change this, and HUD defers to the courts for determining if such an award is appropriate. Further, HUD acknowledges commenters' position that punitive and exemplary damages are typically used by courts to deter future violations; however, HUD notes, as other commenters have also pointed out, that a finding of disparate impact liability does not require proof of discriminatory intent. In this context, HUD is clarifying that the goal of disparate impact liability is to eliminate or modify a facially neutral policy or practice because it has a discriminatory effect on members of one or more protected classes. As explained in more detail in response to other comments, HUD may still pursue civil money penalties in administrative proceedings if the particular circumstances warrant it.

In response to commenters who requested that HUD remove the availability of certain types of damages completely, HUD notes that the text of the Fair Housing Act explicitly lists remedies that are available for administrative law judges and courts to order, in their discretion, in cases in front of them. By this Final Rule, HUD is not modifying or challenging that judicial discretion, but merely stating Supreme Court direction and clarifying the types of damages HUD will prioritize in disparate impact cases.

Regarding commenters who argued that punitive damages should be available when a defendant knowingly acts in a manner that discriminates, HUD notes that this type of scenario would involve intentional discrimination rather than disparate impact, which does not involve intent but rather a discriminatory effect without a showing of intentional or targeted discrimination. This Final Rule does not affect how disparate treatment allegations are adjudicated under the Fair Housing Act.

*Comment: Issues with the proposed remedies language in general.*

Several commenters discussed the language used in the remedies section generally, some supporting and some opposing the language. Commenters suggested that HUD should impose more substantial penalties against actors responsible for policies that impact disabled individuals' ability to obtain or maintain housing. Commenters recommended that the Proposed Rule not limit individual liability because it leaves no incentive to comply with the Fair Housing Act.

Commenters stated that the new remedies language added into the Proposed Rule is too confusing and restrictive because it does not allow for addressing disparate impact that affects members of protected classes that are not included in the complaint. They also asserted that the language needs clarification of the difference between "neutral" and "non-neutral" means. Commenters stated that § 100.7(c) substantially narrows remedies available to victims of discrimination by allowing only pecuniary and out-of-pocket expenses, which is inconsistent with the APA and well-established case law.

Commenters stated that remedies should focus on eliminating the disparate impact and not allow for other remedies that simply reform practices.

*HUD Response:* In response to commenters who requested that HUD remove certain types of damages completely, HUD notes that the text of the Fair Housing Act explicitly lists the remedies available for administrative law judges and courts to impose, in their discretion, in cases in front of them. As previously noted, HUD is not modifying or challenging that judicial discretion, but merely stating Supreme Court direction and clarifying the types of damages HUD will prioritize in disparate impact cases. Regarding the comment stating that the Proposed Rule would not allow relief for individuals in protected classes outside those listed in a complaint, HUD acknowledges the commenter's position, but notes that any complaint brought under the Fair Housing Act must contain allegations of discrimination that are sufficient to plead a prima facie case; this requires that the plaintiff specify which protected class(es) are impacted by a challenged policy or practice. HUD notes that the Fair Housing Act allows a complaint to be "reasonably and fairly amended" at any time. This Final Rule does not alter that provision.

Finally, as stated above, because the goal of disparate impact liability is to ameliorate a policy or practice that has

a discriminatory effect on members of protected classes; removal of such a policy is a benefit to all individuals who are negatively affected by it regardless of whether they were specifically named in the complaint. HUD appreciates comments that expressed confusion regarding the specification that the remedy must be "neutral" and has concluded that such a distinction is unnecessary. Therefore, HUD has removed the phrase "through neutral means" from the Final Rule stage.

*Comment: Change is unnecessary and confusing.*

A commenter objected to proposed § 100.7(c) because it states unnecessarily that punitive damages are not available as a remedy in an administrative proceeding. Commenters also requested that HUD clarify what is meant when referring to administrative cases.

*HUD Response:* HUD agrees with comments stating that punitive damages are not authorized in administrative proceedings per the language found in the Fair Housing Act;[62] however, this Rule clarifies HUD's position on when it will seek civil penalties in discriminatory effects cases. As for the question on administrative cases, this refers to those cases that are filed with and heard by an administrative law judge, rather than via a civil action in a court of general jurisdiction. Administrative law is the law that governs the organization and powers of government agencies. As an example, these include complaints filed with HUD's Office of Fair Housing and Equal Opportunity under 42 U.S.C. 3610(a)(1)(A)(i) by members of the public, but also can include Secretary Initiated Complaints, which may lead to a hearing with and decision by an administrative law judge.

*Comment: Restricting Punitive Damages Contradicts the Fair Housing Act.*

Commenters objected to proposed § 100.7(c), arguing that it directly contradicts the Fair Housing Act, which provides that if a court finds that a discriminatory housing practice has occurred "the court may award to the plaintiff actual and punitive damages."[63] Commenters noted that although punitive damages will be rarer where the initial actor was a third party, the Act prohibits the agency from making that determination wholesale, rather than leaving it to be decided in individual cases.

*HUD Response:* As stated previously in response to commenters, the changes made by this Final Rule are to clarify

---

[61] *See* 42 U.S.C. 3612(p).

[62] 42 U.S.C. 3612 and 3613.
[63] 42 U.S.C. 3613(c)(1).

circumstances under which HUD intends to request non-equitable damages, such as civil money penalties. This Final Rule does not, and could not, make changes to the statutory language of the Fair Housing Act with regard to the availability of punitive damages as a potential remedy in civil actions or civil money penalties in administrative proceedings.

*Comment: Proposed Rule would drive more cases to Article III courts and damage tenant-landlord relations.*

Some commenters stated that not having punitive damages available in administrative proceedings would force plaintiffs to file in civil court in egregious cases, which is more time-consuming, expensive, and complicated. Commenters further wrote that problems that typically could be resolved through the administrative process, including conciliation or other settlement discussions, would be rendered less effective without the possibility of punitive damages. Commenters said that this would dissuade low-income individuals from pursuing relief, as well as place a greater burden on lower-income defendants. Because of HUD's relative expertise regarding fair housing, commenters stated that it is beneficial to all parties to go through HUD first instead of through the courts. Commenters also stated that the section would also lead to worse landlord-tenant relations.

*HUD Response:* HUD appreciates these comments but notes that punitive damages are not authorized in administrative proceedings by the Fair Housing Act.[64] This Final Rule does not alter the remedies that may be awarded by administrative law judges in administrative proceedings, including civil money penalties, but merely clarifies that HUD generally will seek equitable remedies in disparate impact cases, in line with the Supreme Court's decision in *Inclusive Communities*.

*Comment: Paragraph (c) is mis-codified.*

A commenter stated that § 100.7(c) is mis-codified: If "administrative discriminatory effect case" applies to proceedings under §§ 3610–3612, then this subsection should be placed in § 180.670, which governs remedies in cases decided by HUD's administrative law judges.

*HUD Response:* HUD agrees that § 100.7(c) could be included in § 180.670 but disagrees that it is miscodified. Paragraph (c) provides for parties reading 24 CFR part 100, Discriminatory Conduct Under the Fair Housing Act, that liabilities in

administrative proceedings should concentrate on eliminating or reforming the discriminatory practice. This language does not conflict with the language in § 180.670 and speaks to the scope of liability addressed in § 100.7. However, HUD does agree that some clarification could be helpful and is moving this paragraph into § 100.500(f) of the Final Rule.

*Section 100.120(b)(1)   Discrimination in the Making of Loans and in the Provision of Other Financial Assistance*

A commenter stated that the Proposed Rule's amendment to the list of generally applicable examples of prohibited lending discrimination would allow lenders to engage in certain types of intentional discrimination. For example, a lender could admit to intentionally giving a borrower inaccurate information due to the borrower's race, sex, or gender, and face no liability unless the victim could prove the information was material. A commenter stated the current lending discrimination rule does not have a materiality requirement or a safe harbor because it recognizes that conduct that violates the Fair Housing Act can be subtle, and suggested that at the application stage, for example, differential treatment may result as much from a failure to provide information or spend time with or coach a credit applicant as it occurs due to inaccurate information.

A commenter also asserted that persistent lending discrimination occurs in part because of the structural segmentation of the mortgage market, where loan originations are divided within the industry between: A low-cost prime sector serving mainly white borrowers, a sector insured by the Federal Housing Administration and disproportionately serving borrowers of color, and a subprime sector "that facilitated the frequent placement of black and Latino borrowers into higher-cost, higher-risk loans than white borrowers with similar characteristics." A commenter stated that limiting information about available credit types may violate the Fair Housing Act, Privacy Act, or ECOA. One commenter stressed that the protection set forth in the 2013 Rule which prohibits all differing or inaccurate information is necessary because there are numerous situations in which differing information may be dispersed in a manner that has a disparate impact.

Commenters wrote that the Proposed Rule gives defendants too much discretion to decide which information is materially different or inaccurate. Another commenter wrote that there is

no source supporting that "immaterially" inaccurate or different requirements are resulting in litigation or costly risk prevention programs that make this change necessary.

Commenters stated that, in contrast to what is stated in the Proposed Rule, *Inclusive Communities* makes no reference to either lending or informational disparities; the Proposed Rule does not explain the purpose of the addition of or its basis in *Inclusive Communities* or any other case law or legal authority; and the revisions are not in keeping with the opinion's guidance. One commenter wrote that the proposed change departs from *Inclusive Communities* and weakened the requirement to provide accurate information as required by the Fair Housing Act.

Commenters wrote that the language was too broad. One commenter noted that a bank providing borrower-specific information to similarly situated borrowers regardless of race does not reflect disparate treatment. In other words, variability is permitted based on relevant factors (of which race is not one). On the other hand, the exemption does not explicitly state variability is permitted based on relevant factors other than race (which is, obviously, part of "an individual's particular circumstances"). Commenters also noted that § 100.120(b)(1) would apply to disparate treatment cases, which *Inclusive Communities* did not address, and where the materiality inquiry is irrelevant and contrary to law, because if a mortgage creditor admitted that it intentionally provided inaccurate information (however relatively minor) to black applicants because of their race, no one would disagree that discrimination in violation of the Fair Housing Act had occurred. A commenter opposed the proposed changes to § 100.120(b)(1) because they would increase, rather than mitigate, confusion. The existing provision makes clear that it is illegal to provide information that is inaccurate or different from that provided others, because of a protected class.

Commenters also wrote that the Proposed Rule needs to clarify "materially" inaccurate or different information and what it means by "accurate" or "related to an individual's particular circumstances." The section would unnecessarily invite debates over the meaning of ambiguous regulatory text, causing confusion and an increase in burdens on litigants, courts, and entities. Another commenter requested examples or guidance regarding "materially inaccurate or materially different", stating that the lack of

---

[64] *See* 46 U.S.C. 3612.

guidance invites litigation or administrative review, which slows down the overall process. Another commenter stated that such statements would violate the APA and contravene the Act, which prohibits discrimination. One commenter suggested introducing the word "material" in describing disparities in information provided to different potential tenants, buyers, or lenders, and will leave a grey area in defining "material."

*HUD Response:* HUD does not believe that the proposed change would have permitted discrimination. HUD's addition of "materially inaccurate or materially different from that provided others" was meant to clarify, in accordance with the guidance in *Inclusive Communities*,[65] that informational disparities that are inconsequential do not violate the Fair Housing Act. In response to comments that materiality would matter only in discriminatory effect cases and concerns that the addition made things less clear, HUD has decided not to adopt the proposed change in the Final Rule. HUD still believes that disparities that are not material do not violate the Fair Housing Act, but HUD, in response to confusion by the public, agrees that the proposed change in § 100.120(b)(1) is not necessary.

*Section 100.500—Discriminatory Effect Prohibited*

(a) General

*Comment:* HUD's proposed removal of references to segregation is not an 'update' and goes against the Fair Housing Act.

Commenters objected to removing "perpetuation of segregation" from the definition of discriminatory effect in § 100.500(a). Some commenters stated that the removal of "perpetuation of segregation" is counter to the Supreme Court's ruling in *Inclusive Communities* and congressional intent and, without adequate explanation, is in violation of the APA. Commenters stated that its removal is an attempt to limit liability under the perpetuation of segregation theory, would increase burdens on plaintiffs, and marks a retreat from HUD's obligation to meaningfully combat segregation and a return to the "separate but equal" doctrine. Commenters stated that its absence will make it more difficult to combat increasing segregation.

Commenters stated that this change raises the question of whether, going forward, disparate impact analysis would even apply to policies that

perpetuate segregation. A commenter wrote that considering the longstanding and undisputed authorities both before and after the decision in *Inclusive Communities,* there can be no legitimate justification for reading the concept of perpetuation of segregation out of the Proposed Rule. The absence of any basis for deleting references to perpetuation of segregation is reason enough to withdraw the Proposed Rule, they contended. Commenters also stated that "practical business" and "profit" should be removed as examples of "valid interest" regarding the Proposed Rule, but references to perpetuation of segregation from § 100.500 should not be removed without explanation or discussion.

Commenters asserted that courts have uniformly recognized that practices leading to the "perpetuation of segregation" violate the Fair Housing Act,[66] including cases since *Inclusive Communities,*[67] and that the Supreme Court itself affirmed that the Second Circuit properly found disparate impact when a town's practices "significantly perpetuated segregation in the Town."[68] A commenter asserted further that the Supreme Court cited these opinions favorably in *Inclusive Communities,* and explicitly recognized "perpetuating segregation" as a basis for liability under the Fair Housing Act.[69]

Commenters also asserted that *Inclusive Communities* made clear that ending the perpetuation of segregation—

which harms society as a whole, not just individuals—is a core goal of the Fair Housing Act. They quoted the Supreme Court statement that "the [Fair Housing Act] aims to ensure that those [legitimate] priorities can be achieved without arbitrarily creating discriminatory effects *or* perpetuating segregation."[70] Commenters asserted that HUD provides no justification for removing language regarding segregation from the definition of discriminatory effects.

*HUD Response:* HUD does not agree that removal of the phrase "perpetuates segregated housing patterns" modifies any obligation under the Fair Housing Act. Specifically, HUD's removal of this phrase was part of HUD's streamlining of the regulation and is not meant to imply that perpetuation of segregation could never be a harm prohibited by disparate impact liability. A plaintiff need only prove in a case brought under disparate impact theory that a policy or practice has led to the perpetuation of segregation, which has a discriminatory effect on members of a protected class, in order for that policy or practice to be prohibited under this rule. More generally, HUD views "perpetuation of segregation" as a possible harmful result of unlawful behavior under the disparate impact standard.[71]

*Comment:* HUD removes "predictably" without explanation, despite past HUD findings, and case law.

Commenters noted that the proposed revision in § 100.500(a) deletes the portion of the 2013 Rule stating that a practice has a discriminatory effect "where it actually *or predictably* results" in a disparate impact. Some stated that HUD does not acknowledge this change, despite the fact that in promulgating the 2013 Rule, HUD explicitly found that actions that "predictably" result in discriminatory effects should be covered. Commenters noted that one case concerning a predictable result of perpetuating segregation—*United States* v. *City of Black Jack*—was described in *Inclusive Communities* as a "heartland" case.[72] Some commenters questioned whether the revision would prevent disparate impact cases for future harms.

*HUD Response:* HUD does not feel that any change to the proposed regulatory text is needed here. HUD recognizes that a claim based on a predictable disparate impact may succeed. This Rule's language does not

---

[65] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2524 (2015).

[66] *See, e.g., United States* v. *City of Black Jack,* 508 F.2d 1179, 1186 (8th Cir. 1974).

[67] *See, e.g., MHANY Management,* 819 F.3d 581, 620 (2d. Cir. 2016) (finding a zoning decision may violate the Fair Housing Act because it perpetuates segregation generally). Other courts have similarly acknowledged perpetuation of segregation as a continued basis for Fair Housing Act liability after *Inclusive Communities. See, e.g., Avenue 6E Invs.* v. *City of Yuma,* 818 F.3d 493, 503 (9th Cir. 2016) ("[A]s the Supreme Court recently reaffirmed [in *ICP*], the [Fair Housing Act] also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason."); *Nat'l Fair Hous. All.* v. *Bank of America, NA.,* ___ F. Supp. 3d ___, 2019 WL 3241126, at *15 (D. Md. July 18, 2019) (allowing claim to proceed past motion to dismiss where plaintiff pleaded facts sufficient to allege that defendant's policy "forestall housing integration and freeze existing racial segregation patterns"); *Nat'l Fair Hous. Alliance* v. *Travelers Indemnity Co.,* 261 F. Supp. 3d 20, 34 (D.D.C. 2017) (allowing claim to proceed past motion to dismiss where plaintiff pleaded facts sufficient to allege that defendant's policy "will exacerbate racial and sex-based disparities by having a disproportionate impact on African-American residents and members of women-headed households").

[68] *Town of Huntington, N.Y.* v. *Huntington Branch, N.A.A.C.P.,* 488 U.S. 15 (1988) (quoting 844 F.2d 926, 938 (2d Cir. 1988)).

[69] *Inclusive Communities,* at 2522.

[70] *Id.* at 2522 (emphasis added).

[71] *Id.*

[72] *Inclusive Communities,* at 2525 (citing 508 F.2d 1179, 1184 (8th Cir. 1974)).

027894

preclude such a claim, it merely does not recognize this specific type of claim. While *Inclusive Communities* does use the phrase "caused or predictably will cause a discriminatory effect" when discussing the prima facie burden for discriminatory effect plaintiffs, the Court was reciting HUD's 2013 Rule, not a separate authority. Further, the Court stated that disparate impact claims "relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement is important in ensuring that defendants do not resort to the use of racial quotas."

*Inclusive Communities'* citation of *Black Jack* as a heartland case does not mean that *Black Jack's* description of disparate impact doctrine is a complete picture of when disparate impact should apply, particularly since *Inclusive Communities* was the first time that the Supreme Court recognized disparate impact liability and articulated constitutional and prudential standards for when it should apply. Further, HUD is not aware of any reason why the scenario outlined under *Black Jack* would not also be subject to disparate impact liability under HUD's new disparate impact regulations. Finally, while *Black Jack* did include a "predictability" standard, the holding in *Black Jack* itself did not depend upon the "predictability" standard. Instead, the court found that it was "established that the ordinance [at issue] had a discriminatory effect."

*Comment: Proposed rule does not allow for underlying pattern of discrimination to support allegation of discriminatory effect.*

Commenters objected to the proposed standing requirements and asserted that a pattern of results that indicates an underlying pattern of discrimination should be a permissible way to show discrimination. Commenters stated that a plaintiff should not have to show a specific, identifiable cause if there is an underlying pattern with a discriminatory effect, but that the burden should be shifted to the defendant, because there may not be an identifiable "arbitrary, artificial, and unnecessary" practice or policy, but a culture with many factors that produce a discriminatory effect.

*HUD Response:* HUD disagrees that a plaintiff should be able to bring a discriminatory effects claim without alleging a specific, identifiable cause of the discrimination. It is not enough to allege a general culture of discrimination; rather, to sufficiently plead the existence of a discriminatory effect, a plaintiff must pinpoint the specific policy or practice that is alleged to lead to a discriminatory effect. As put by the Court in *Inclusive Communities,* requiring a plaintiff to point to a specific policy (or policies) causing disparity protects defendants from being held liable for racial disparities they did not create.[73]

*Comment: HUD uses undefined and unclear terms.*

Commenters stated that HUD's Proposed Rule uses vague language throughout § 100.500, allowing courts and defendants to find fault within the plaintiff's complaint. Commenters specifically questioned HUD's change from the term "specific policy" to the term "a practice." Commenters also opposed the proposed deletion of the definition of "discriminatory effect" from § 100.500(a) because it injects uncertainty into the rule, particularly as to what a plaintiff must show to proceed. Commenters noted that both the 2013 Rule and the Proposed Rule require the plaintiff to demonstrate a causal relationship between the challenged practice and a "discriminatory effect." However, "discriminatory effect" is defined in the 2013 Rule, while the Proposed Rule removes the regulatory definition.

*HUD Response:* HUD made several terminology changes to make the Final Rule more consistent with *Inclusive Communities* and with HUD's interpretation of disparate impact liability under Title VIII more generally. The reference to "specific policy" in § 100.500 is meant to include the practice or policy that forms the basis of a disparate impact claim. As a result, HUD believes that "specific policy" is an appropriate term to describe the breadth of disparate impact claims. However, HUD does not believe that there is a practical effect to adding the term "policy" in addition to the term "practice." Plaintiffs will still have to show that the harm they are alleging is the result of a policy or practice, rather than a one-time action not part of a policy or practice.[74]

HUD does not believe that it is proper to define every term in the regulation, as doing so would result in a rigid regulation that does not leave room for courts to exercise their discretion based on the facts before them. Specifically, when it comes to "discriminatory effect," HUD recognizes that harm can occur in a variety of ways and does not believe it is necessary to impose a definition on a fact-specific finding.

**(b) Prima Facie Burden (General)**

*Comment: Higher standard for administrative proceedings is unlawful.*

Commenters stated that HUD may not impose stricter standards for pleading the same claim in its administrative process than apply in federal court and must abide by the FRCP in administrative cases or it will violate congressional intent. Further, commenters noted that HUD's proposed pleading standard is inconsistent with HUD's regulations for administrative Fair Housing Act cases, which do not require the plaintiff to make out a *prima facie* case at the pleading stage.[75] Commenters also stated that the Proposed Rule's pleading requirements likely violate due process and equal protection because it places an impossible burden on person deprived of fair housing by requiring one to prove detailed, specific facts at the pleading stage. Commenters stated that HUD does not have the ability to reinterpret the contours of disparate impact liability previously established by the Supreme Court in *Bell Atl. Corp.* v. *Twombly*[76] and other cases. Commenters stated that the Supreme Court has explained that the question of what is required to plead a discrimination claim is controlled by FRCP 8(a)(2) and HUD does not have the authority to reinterpret these regulations. A commenter noted that this raises federalism issues because the Proposed Rule does not limit its reach to questions of pleading or inferences in federal court.

*HUD Response:* HUD is codifying in regulation the necessary requirements to prove a claim of discriminatory effect. This is no different from HUD's decision in the 2013 Rule to codify HUD's interpretation of disparate impact law at that time. It is within HUD's expertise given its role in implementing the Fair Housing Act. This necessarily overlaps with the duties of a plaintiff to bring a case under the FRCP. FRCP 8(a)(2) establishes the general rules of pleading, but the elements of a plaintiff is required to plead in the complaint are governed by the standards established by law, including regarding the proper scope of discriminatory effects liability. HUD's rule is consistent with the FRCP. Further, HUD is mindful of the Supreme Court's admonition that "prompt resolution of those cases is important."[77] HUD also notes that factual allegations are required at the pleading stage and proof at a later stage.

---

[73] *Id.* at 2507, 2523.
[74] *Id.* at 2523.

[75] See 42 U.S.C. 3610(1)(a)(i); 3610(g)(1); 3610(g)(2)(B)(i); 24 CFR 103.25; 103.400(a); 100.405(a)(1); and 103.400(a).
[76] 550 U.S. 544 (2007).
[77] 135 S. Ct. at 2512.

HUD does not intend to establish a standard which contradicts the FRCP.

*Comment: Prima facie burden will increase the difficulty of bringing a case.*

Several commenters noted that the multiple requirements of a prima facie case would increase the burden of establishing a prima facie case. A commenter claimed HUD ignored the importance of using statistics necessary to provide a prima facie case and stated that the new requirements would not even be met using Home Mortgage Disclosure Act (HMDA) data. Commenters stated that the Proposed Rule would permit banks to have facially neutral policies even if those policies had a clear discriminatory effect.

Commenters stated that the Proposed Rule's heightened burden of proof would make it difficult to challenge policies such as zero tolerance for crime policies, which commenters state disproportionally harm victims of domestic violence and communities of color, low-income households, and people with disabilities. Commenters noted that such a pleading burden is particularly difficult to meet when the defendant generally has in its sole possession the evidence relevant to whether its discriminatory policy is necessary to meet a legitimate purpose while the plaintiff can only speculate as to why the policy is necessary. Commenters cited cases in which only documents and depositions during discovery uncovered the arbitrary, artificial, and unnecessary policy causing the discriminatory effect, or where the defendant was unable to prove that their policy or practice was necessary.

Commenters suggested that HUD and the courts treat the Proposed Rule with flexibility and allow plaintiffs to await discovery to establish some of the elements in the proposed prima facie case. Other commenters suggested the burden should be shifted to the defendant to be more equitable, and that the defendant should have the same evidentiary standards as the plaintiff.

*HUD Response:* HUD appreciates these comments, but notes that the prima facie burden is a requirement of discriminatory effects law generally and HUD's codification of the prima facie burden does not itself result in a higher standard than what is required under *Inclusive Communities.* Please also see Section III above regarding changes to § 100.500(b), which are intended to clarify the requirements at the prima facie stage and further align the language with existing obligations. HUD also notes, as discussed further under (b)(1), that the pleading stage, when a

plaintiff does not yet have access to discovery, requires only that the plaintiff "sufficiently plead facts to support the prima facie case, and thus, the requirement to plead facts supporting a prima facie case is lower than some commenters suggested.

*Comment: Courts have incorrectly applied* Inclusive Communities.

Commenters suggested that courts following *Inclusive Communities* have misapplied the "robust causality" requirement, noting that cases have hinged on whether Plaintiffs could show a direct link between the statistical disparity and the Defendants' policy in cases such as *Inclusive Communities.* Commenters noted that the success rate of plaintiffs in disparate impact cases reaching the appellate level has plummeted over the years. One commenter stated that in circuit courts that have applied the 'robust causality' requirement at the pleading stage, plaintiffs' success, at least at the appellate level, generally does not appear to be significantly affected, although the number of cases is too small to draw sweeping conclusions.

*HUD Response: Inclusive Communities'* explanation of discriminatory effects liability expressly provided for a requirement of robust causality. Therefore, HUD believes that cases applying *Inclusive Communities* are correct to require a showing of "robust causality.''

*Comment: Prima facie burden is unnecessary, complicated, and vague.*

Commenters stated that the prima facie burden was unnecessarily complicated and vague. Commenters stated that this ambiguity and complication would cause unnecessary litigation and lead to unfair or unjustified dismissal of cases and would lead to inconsistent results in the courts. Commenters also stated that HUD made no attempt to justify the prima facie requirements but merely suggests that *Inclusive Communities* requires this change.

*HUD Response:* HUD appreciates these comments and notes that HUD has edited § 100.500(b) for clarity. HUD disagrees that this burden is ambiguous, and notes that the prima facie burden must necessarily be explained in general terms because application of the burden is extremely fact-specific and therefore dependent on the circumstances of each case. Alignment with *Inclusive Communities* and other controlling law is sufficient reason for HUD to use its discretion to adopt this regulation. HUD also agrees with other comments that the Supreme Court directs lower courts considering the sufficiency of allegations at the pleading stage to

"begin by taking note of the elements a plaintiff must plead to state a claim." [78] Section 100.500(b) provides parties with a list of such requirements.

*Comment: HUD improperly cited* Wards Cove.

Commenters said HUD improperly cites *Wards Cove,* a Title VII disparate impact case, to require an "actual cause" when *Wards Cove* did not use or rely on the phrase, and the Supreme Court noted that Title VII framework may not transfer to the fair housing context. Commenters noted that *Wards Cove* is a thirty-year old case.

*HUD Response:* HUD cited *Wards Cove* for the proposition that a disparate impact claim is not adequately pled where the alleged disparity is the result of factors outside the defendant's control and does not support the assertion that the defendant's policy itself is the cause of the disparity. *Wards Cove* held that the plaintiff is responsible for "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." [79] HUD equates being "responsible" for observed statistical disparities with being the actual cause of those disparities. HUD also notes that while *Wards Cove* is an old case, it remains persuasive authority, specifically with respect to the Fair Housing Act, which, unlike Title VII, has not had intervening amendments.

*Comment: The Proposed Rule's prima facie elements are consistent with* Inclusive Communities.

Commenters stated the 2013 Rule incorrectly allocates burdens because it uses the 1991 standard set by Congress for Title VII, which is not applicable to the Fair Housing Act. Other commenters expressed support for the "robust causality" requirement, the "legitimate business interest" standard, and "less discriminatory alternative or equally effective manner" element, and commenters stated their support for the proposed burden-shifting framework overall. Another commenter stated defendants should be allowed to provide evidence to support the reasons for their policies, defenses, and rebuttals. Another commenter stated § 100.500(b)(2) and (5) are consistent with proximate cause analysis under the Fair Housing Act and *Bank of America* v. *City of Miami.* [80]

*HUD Response:* HUD appreciates these comments.

---

[78] *Ashcroft* v. *Iqbal,* 556 U.S. 662, 675 (2009).

[79] *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642, 656, (1989).

[80] 137 S. Ct. 1296 (2017).

*Comment: HUD makes an unsupported claim about failing to identify a "specific, identifiable practice."*

A commenter stated that although HUD claims "many parties" have failed to identify a "specific, identifiable practice," HUD cites only a single, "unpublished, unprecedential" opinion to support this proposition.

*HUD Response:* HUD's Proposed Rule noted the failure of many parties to identify a specific, identifiable practice, only to warn potential plaintiffs of the requirement under *Inclusive Communities.* The following are additional cases in which the court found that the plaintiff failed to identify a specific policy or practice. These cases are provided only to show additional examples of courts finding plaintiffs failed to fulfill this element of the prima facie case. *See also Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1113 (8th Cir. 2017); *Carson* v. *Hernandez,* No. 3:17–CV–1493–L–BK, 2018 U.S. Dist. LEXIS 185782, at *6 (N.D. Tex. July 26, 2018); *Merritt* v. *Countrywide Fin. Corp.,* No. 09–cv–01179–BLF, 2016 U.S. Dist. LEXIS 194613, at *34 (N.D. Cal. June 29, 2016); *City of L.A.* v. *Wells Fargo & Co.,* No. 2:13–cv–09007–ODW(RZx), 2015 U.S. Dist. LEXIS 93451, at *21 (C.D. Cal. July 17, 2015); *Merritt* v. *Countrywide Fin. Corp.,* No. 09–cv–01179–BLF, 2015 U.S. Dist. LEXIS 125284, at *61 (N.D. Cal. Sep. 17, 2015).

*Comment: HUD conflates prima facie standards with pleading standards.*

Commenters stated that HUD's proposal conflates *prima facie* and burden-shifting standards with *pleading* standards, and that numerous courts have rejected this approach, including the Supreme Court in *Swierkiewicz* v. *Sorema N. A.*[81]

*HUD Response:* HUD appreciates these comments and has revised the Final Rule to clarify that HUD intends to establish a prima facie standard. However, HUD notes that *Swierkiewicz's* caution that "the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic," [82] must be read in light of the Court's heightened pleading standards in *Bell Atlantic Corp* v. *Twombly* and *Ashcroft* v. *Iqbal,* both of which the Court decided after *Swierkiewicz.* HUD's treatment of the pleading stage in disparate impact litigation is consistent with the Supreme Court's finding in *Twombly* that plaintiffs cannot survive the pleading stage by relying upon "labels and conclusions," a "formulaic recitation of the elements of a cause of action . . . ." or mere speculative factual allegations.[83] There must also be "a reasonable expectation that discovery will reveal evidence of [illegality] . . . ." [84]

*Comment: Require some evidence of discriminatory intent.*

Commenters suggested that the Final Rule should require a showing of some evidence of discriminatory intent, though not enough to satisfy the Constitutional standard of *Washington* v. *Davis,* to better align with disparate impact cases from the Third and Seventh Circuits. Commenters also suggested the Proposed Rule should be structured such that the plaintiff must "show or demonstrate" rather than "allege" the prima facie case.

*HUD Response:* On the issue of requiring a showing of discriminatory intent, the *Inclusive Communities* case is clear that a showing of disparate impact does not rely on intent, but is "in contrast to a disparate treatment case," which does rely on intent.[85] On the issue of the prima facie case at the pleading stage, it is, as in any case, the plaintiff's obligation to allege sufficient facts, which is reflected in this Final Rule at § 100.500(b). Of course, in the case in chief plaintiff will have the burden of proof on the allegations.

*Comment: Adding an element on statistical disparity.*

Commenters suggested that HUD add to the description of prima facie burden an "explicit recitation" of *Inclusive Communities'* holding that a disparate impact claim cannot be based solely on a showing of statistical disparity. Other commenters stated that in the 2013 Rule, HUD explicitly declined to include a statistical standard to prove a prima facie case due to the variety of practices covered by the Fair Housing Act.

*HUD Response:* HUD agrees that a disparate impact claim cannot be based solely on a showing of statistical disparity, but does not believe this should be explicitly stated in the rule because the elements already listed necessarily provide a standard which would not be met through a showing of statistical disparity alone. HUD also agrees with commenters that it would be impractical to establish a particular statistical standard to prove a prima facie case due to the numerous and varied practices covered by the Fair Housing Act.

*Comment: Using "specific identifiable policy or practice" is contrary to* Inclusive Communities *and case law.*

Commenters suggested that the Proposed Rule was exempting single decisions. Commenters provided examples of disparate impact claims targeting zoning and land use laws and decisions that unfairly exclude minorities from certain neighborhoods without sufficient justification, arbitrary and discriminatory ordinances barring the construction of certain types of housing units, and unconscious prejudices and disguised animus that escape easy classification as disparate treatment, may all fall under this classification. Commenters cited cases challenging single actions, including *MHANY Management, Inc.* v. *County of Nassau,*[86] and *Huntington Branch, NAACP* v. *Huntington,*[87] which specifically held that a one-time zoning decision can be a policy subject to disparate-impact challenge. Commenters noted that any repeated course of conduct could be traced back to a single decision.

A commenter objected to the preamble section applying *Barrow* v. *Barrow,*[88] which follows *Inclusive Communities,* for the proposition that most "one-time" zoning decisions would not provide a basis for a disparate impact claim or enforcement process, noting that *Barrow* was not a case about zoning.

Commenters noted further that HUD's 2013 Rule preamble also explained that every federal court of appeals to have addressed the issue agreed that the Fair Housing Act prohibits practices with the unjustified effect of perpetuating segregation. The preamble cited numerous cases from various circuits demonstrating that HUD's position was reasonable and firmly grounded in the law and its application by courts since 1968.[89]

Commenters also objected that the "specific, identifiable policy or practice" language was undefined and vague. Commenters stated it was unclear whether the Proposed Rule would prohibit claims against a developer if the rental of affordable units had occurred at one site or for one building as opposed to hundreds of units at multiple buildings. Commenters also stated that it was unclear whether

---

[81] 534 U.S. 506, 512 (2002).

[82] *Id.* at 512 (citation omitted).

[83] *Bell Atl. Corp.* v. *Twombly* at 555 (citations omitted).

[84] *Twombly* at 556.

[85] *Inclusive Communities,* 135 S.Ct. at 2513.

[86] 819 F.3d 581 (2d Cir. 2016).

[87] 844 F.2d 926 (2d Cir. 1988).

[88] Civil Action No. 16–11493–FDS, 2017 U.S. Dist. LEXIS 103495, at *8 (D. Mass. July 5, 2017).

[89] *See, e.g., Huntington Branch, N.A.A.C.P.,* at 937; *Metropolitan Housing Development Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977); *U.S.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

the Proposed Rule would prohibit claims against a county development agency if its policy had only resulted in one instance of applying residency and age preferences to a county-financed rental building. Moreover, commenters stated that the preamble suggests that HUD itself, as opposed to a private plaintiff, will *never* bring a disparate impact claim against a "single event" land-use decision. Other commenters stated the language in the Proposed Rule limits a plaintiff to addressing business practices but is silent on addressing government practices.

Some commenters supported the "specific, identifiable policy or practice" language because it is consistent with Supreme Court precedent, clarifies what plaintiffs must challenge, and furthers the speedy case resolution principle.

*HUD Response:* HUD disagrees with the suggestion that this language will immunize all one-time decisions from disparate impact analysis. Plaintiffs can establish disparate impact liability based upon a single event if it represented a policy; even if, as *Inclusive Communities* clarified, plaintiffs may "not easily" be able to make such a showing.[90] HUD would bring a case against a single event where HUD believed that the single event represented a policy.

As commenters have discussed and HUD agrees, single events can represent a policy or practice. Further, if a jurisdiction implements zoning policy through discretionary decisions, that policy of granting discretion could be subject to a disparate impact suit even if a particular decision may not be. HUD does not believe that this position contradicts its previous position in the 2013 Rule. Further, the 2013 Rule predates *Inclusive Communities,* which prompted the addition of this language.

HUD does not believe that *MHANY Mgmt.* was an example of a post-*Inclusive Communities* court recognizing a one-time decision as a policy. While *MHANY Mgmt.* involved a zoning decision, the court clarified that it took place after "many months of hearings and meetings" and "the change required passage of a local law . . ."[91] HUD believes that these circumstances—particularly the fact of a change in local law—could allow a court to interpret this "one-time decision" as a policy under HUD's formulation. HUD believes courts are capable of determining on a case-by-

case basis when a single event may have been the result of a policy, even if that task may be difficult. Further, *MHANY's* reference to the difficulty of distinguishing between a single event and a policy is within the Title VII and ADEA context and so it may have less relevance in the instance of disparate impact under the Fair Housing Act.

HUD also notes that while *Huntington Branch, NAACP* v. *Huntington* did involve a refusal to amend a zoning ordinance, the policy at issue was a zoning regulation "which restricts private multi-family housing projects to a largely minority 'urban renewal area . . .'"[92] Further, repeated application of a policy—the zoning regulation—can hardly be characterized as a one-time decision. A single decision on an ad hoc basis differs from a single policy under which multiple decisions are made.

As to the significance of *Barrow* v. *Barrow,* even though it is not a zoning decision, its ruling that a "single decision relevant to a single piece of property, without more, is not evidence of a policy contributing to a disparate impact"[93] illustrates the difference between such a single decision and a decision that would affect multiple properties and might be considered a policy.

Finally, HUD notes that *Ellis* v. *City of Minneapolis* supports HUD's perspective. *Ellis* repeats *Inclusive Communities'* caution that plaintiffs may lose their disparate impact case at the pleading stage for identifying a "one-time decision" that is not a policy and frames this protection as a "standard" for disparate impact cases.[94] It also repeats the significant reasons why *Inclusive Communities* adopted this standard, namely giving government entities "leeway to apply reasonable housing-code provisions without fear of inviting a costly lawsuit."[95] Further, *Ellis* refused to "bootstrap numerous 'one-time decision[s]' together in order to allege the existence of a City policy to misapply the housing code.[96] While plaintiffs asked the *Ellis* court to read one-time decisions as a policy that invalidated an official city policy, the *Ellis* court's reluctance to create a "policy" out of singular decisions is still instructive. Other courts after *Inclusive Communities* have also recognized this

limitation to disparate impact liability.[97]

**(b)(1) Arbitrary, Artificial and Unnecessary**

*Comment:* "*arbitrary, artificial, and unnecessary*" should be defined.

Commenters noted that the Proposed Rule does not explain what it means to be "artificial," "arbitrary," or "unnecessary" as a pleading requirement. Commenters asked that HUD define "arbitrary, artificial, and unnecessary." Other commenters suggested that HUD define the phrase "arbitrary, artificial, and unnecessary" as applying to a "policy that is not reasonably calculated to achieve a legitimate goal within the sound discretion of the policy-maker and that imposes an otherwise unexplained burden on housing opportunities for persons in protected classes." Further, commenters suggest HUD provide examples of policies HUD considers "arbitrary, artificial, and unnecessary" and suggests "zoning rules that artificially restrict the ability to develop multifamily housing" as one such example. Commenters also stated that HUD should use the Court's standard in *Inclusive Communities* and should

---

[90] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2523 (2015).

[91] *MHANY Management, Inc.* v. *County of Nassau,* 819 F.3d 581, 619 (2d Cir. 2016).

[92] *Huntington Branch, NAACP* v. *Huntington,* 844 F.2d 926.

[93] *Barrow* v. *Barrow,* Civil Action No. 16–11493–FDS, 2016 U.S. Dist. LEXIS 164330, at *16 (D. Mass. Nov. 29, 2016).

[94] *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1111 (8th Cir. 2017).

[95] *Id.* at 1114.

[96] *Id.* at 1113 (citing *Inclusive Communities*).

[97] *See City of Joliet* v. *New West, L.P.,* 825 F.3d 827, 830 (7th Cir. 2016); *Hylton* v. *Watt,* 2018 U.S. Dist. LEXIS 156082, *12–13 (D.D.C. Sept. 13, 2018) ("Moreover, to the extent Hylton focuses his claim on the FHFA's one-time, and limited, decision to fill the Ombudsman position with a then-current 'Agency Executive,' he has failed to identify a 'policy' sufficient to sustain a disparate impact claim. "As a general rule, a plaintiff 'cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact.'"); *Davis* v. *District of Columbia.,* 246 F. Supp. 3d 367, 394 (D.D.C. 2017) (quoting *Stout* v. *Potter,* 276 F.3d 1118, 1124 (9th Cir. 2002)). In other words, disparate impact ordinarily "looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment." *City of Joliet* v. *New West, L.P.,* 825 F.3d 827, 830 (7th Cir. 2016). Thus, as the Supreme Court has explained, "a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all." *Inclusive Communities,* 135 S. Ct. at 2523; *see also Breen* v. *Chao,* 253 F. Supp. 3d 244, 265–66 (D.D.C. 2017). Like the plaintiff in that hypothetical, Hylton has failed to identify any "policy" or "practice" that might even arguably have had an adverse effect on a protected group."); *Barrow* v. *Barrow,* 2016 U.S. Dist. LEXIS 164330, at *15–16 ("First, the complaint does not point to any specific policies of any of the defendants that result in racial discrimination. It alleges only that defendants, in various ways, acted to deprive plaintiff of the full value of her inheritance; there is no allegation of an unlawful practice or policy. A single decision relevant to a single piece of property, without more, is not evidence of a policy contributing to a disparate impact. *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2523 (2015).

revise § 100.500(b)(1) to read "create artificial, arbitrary, and unnecessary barriers."

*HUD Response:* HUD declines to define "arbitrary, artificial, and unnecessary" because of the wide variety of possible circumstances in which it may be used. Courts will continue to provide useful examples of this phrase as case law develops. HUD also declines to provide examples of "arbitrary, artificial, and unnecessary" policies because such policies would be too fact-specific to be of general use. HUD believes the addition of "barriers" in § 100.500(b)(1) would not be proper because the discussion of the "barrier" element is a consideration instead under (2), where the plaintiff must show that the policy or practice has a disproportionate adverse effect, *i.e.,* is a barrier.

*Comment: Proposed § 100.500(b)(1) is not supported by caselaw cited in the Proposed Rule.*

Some commenters opposed the Proposed Rule because it conflicts with prior case law by requiring plaintiffs to bear the burden of pleading and proving an "artificial, arbitrary, and unnecessary barrier" to fair housing in the prima facie stage. Commenters argued that this requirement is devoid of context because this language was raised by the Supreme Court as judicial dicta to allow defendants to argue that their policies have a valid interest, but the Court nowhere suggests that the plaintiffs are required to plead and prove it. Commenters also objected that the Proposed Rule would require plaintiffs to prove a negative, which contradicts HUD's determination in promulgating the 2013 Rule and the DOJ's position in litigation, and rebut the defendant's justification before the defendant had even advanced the justification. Commenters noted that this would also increase the cost of pleading a case. A commenter stated that "artificial" essentially means "pretextual." A commenter stated that requiring plaintiffs to show a policy is "arbitrary, artificial, *and* unnecessary" would allow policies that are only one of these three. A commenter stated that the 2013 Rule adequately prevented plaintiffs from bringing arbitrary, artificial, and unnecessary claims. Some commenters argued that *Griggs* [98] did not establish an "artificial, arbitrary, and unnecessary" pleading standard, and so the Supreme Court citing that language could not be interpreted as such. A commenter stated that *Inclusive Communities* requires defendants to state their own valid interest, rather than the plaintiff,

because under Title VII's business necessity standard the employer must affirmatively raise the defense. Commenters stated the Proposed Rule inappropriately requires plaintiffs to plead around an affirmative defense. Commenters asserted this approach broke from Congress's intent, affirmed by *Inclusive Communities,* for burden shifting in disparate impact claims, and Title VII case law.

Commenters also objected to the preamble's suggestion that *Ellis* v. *City of Minneapolis* [99] supports the proposed revisions, stating that *Ellis* does nothing more than apply well-established disparate-impact doctrine consistent with the 2013 Rule in holding that the plaintiffs failed to identify a specific policy with a robust causal link to the disparate impact. Commenters cited to a subsequent opinion explaining *Ellis* to support this proposition. [100]

Commenters noted this approach broke from Congress's intent, affirmed by *Inclusive Communities,* for burden shifting in disparate impact claims, and Title VII case law. Other commenters supported the "arbitrary, artificial, and unnecessary" language because it prevents abusive claims and the Proposed Rule asserts that a valid objective can be based on practical business considerations and/or profitability. Other commenters said this language is supported by Supreme Court precedent including *Inclusive Communities* and that it protects defendants' valid interests such as business or profit considerations. Commenters stated that "artificial, arbitrary, and unnecessary barriers" replaced the 2013 Rule's "nondiscriminatory interests" standard.

*HUD Response:* First, HUD notes that plaintiffs do not have to prove alleged facts at the pleading stage. As discussed in the Proposed Rule's preamble, plaintiffs merely have to plead facts supporting this claim sufficient to survive a motion to dismiss. Providing some sort of factual allegation to support the proposition that the policy challenged may plausibly be arbitrary, artificial, and unnecessary, or plausibly alleging that a policy or practice advances no obvious legitimate objective, would be sufficient to meet this pleading requirement.

*Inclusive Communities* made three references to the "arbitrary, artificial, and unnecessary" standard. [101] *Inclusive*

*Communities* never clarifies that the "artificial, arbitrary, and unnecessary" requirement is exempt from the requirement for pleading a prima facie case, and two of these three references were in the context of providing standards for disparate impact suits to avoid constitutional questions that arise with expansive disparate impact liability. *Inclusive Communities* provides that courts should "prompt[ly] resol[ve]" disparate impact cases and examine disparate impact claims "with care." Further, *Inclusive Communities* clarifies that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." [102] Removing this artificial, arbitrary, and unnecessary constraint as a screening mechanism would allow for an untimely resolution of disparate impact cases after expensive litigation and discovery, which is contrary to *Inclusive Communities.* Moreover, HUD believes that the "artificial, arbitrary, and unnecessary" standard gives valuable guidance about the qualitative nature of policies and practices that are suspect because otherwise, there would be a tendency to simply consider how much statistical disparity is too much— something the Supreme Court specifically directed parties to avoid as constitutionally suspect and which would constitute mere second guessing of reasonable approaches.

*Ellis* v. *Minneapolis* [103] supports HUD's interpretation. *Ellis* discussed the elements of a prima facie case, and explained that under *Inclusive Communities,* lower courts must examine "whether a plaintiff has made out a prima facie case of disparate impact." [104] This includes facts about causation between a policy and disparate impact, but *Ellis* does not limit a prima facie case to just that element.

[98] 401 U.S. 424 (1971).

[99] 860 F.3d 1106 (8th Cir. 2017).

[100] *Nat'l Fair Hous. Alliance,* 261 F. Supp. 3d at 33 (citing *Ellis* v. *City of Minneapolis, Minn.,* No. 14–CV–3045 (SRN/SER), 2016 WL 1222227, at *6 (D. Minn. Mar. 28, 2016)).

[101] First, in the context of discussing limitations to disparate impact to avoid constitutional

questions, the Court says that "Disparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." *Inclusive Communities,* at 2512 (citing *Griggs,* at 43). Second, *Inclusive Communities* states that "Governmental or private policies are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (citing *Griggs,* at 431). Third, *Inclusive Communities* states that if "standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers.'" *Id.* at 2524 (citing *Griggs* at 431).

[102] *Inclusive Communities,* at 2518.

[103] 860 F.3d 1106 (8th Cir. 2017).

[104] *Ellis,* at 1111 (quoting *Inclusive Communities* at 2523).

*Ellis* also discusses the "artificial, arbitrary, and unnecessary" constraint as a separate prong from the causality requirement, when it notes that the plaintiff's complaint is insufficient exactly because it lacks "factually supported allegations that [the housing-code provisions, the challenged policies] are arbitrary or unnecessary to health and safety." [105] Two Eighth Circuit cases advance HUD's interpretation of *Ellis*. First, *Khan* v. *City of Minneapolis* described *Ellis* as upholding "the district court's grant of judgment on the pleadings for the city, concluding that the landlords had failed to point to an artificial, arbitrary, and unnecessary policy that a Fair Housing Act disparate-impact claim could remedy." [106] This interprets *Ellis* as imposing an "artificial, arbitrary, and unnecessary" requirement in the pleading stage for disparate impact cases. Second, a district court cites *Ellis* in explaining that "[t]o plead a plausible disparate-impact claim, a plaintiff must plead the existence of an 'artificial, arbitrary, and unnecessary' " policy.[107]

HUD also notes that to the extent *Inclusive Communities* referenced Title VII disparate impact liability, it was "analogous" to disparate impact liability under Title VIII. Such analogies do not limit HUD's significant discretion to impose additional guardrails for Title VIII disparate impact liability that do not exist under Title VII, particularly when *Inclusive Communities* clarified that the opinion "announced" "cautionary standards" for disparate impact liability under the Fair Housing Act.[108]

*Griggs* certainly did not rule that the "artificial, arbitrary, and unnecessary" standard could not be an element of a prima facie case. Even if *Griggs* did not explicitly establish such an element, it explained that Congress provided for "the removal of artificial, arbitrary, and unnecessary barriers to

employment. . . ." [109] in establishing disparate impact liability. Further, in the context of Title VIII disparate impact liability, for which *Inclusive Communities* enacted more guardrails than Title VII disparate impact liability, it would be reasonable to conclude that the "artificial, arbitrary, and unnecessary" constraint should be an element of a prima facie case, even if it is not for Title VII. For instance, unlike *Griggs, Inclusive Communities* provides, after discussing "constitutional concerns" with expansive disparate impact liability, that "Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important." [110] Further, under a burden shifting approach someone must always plead a negative, consistent with general civil procedure in the United States. That seems more appropriately a burden on the plaintiff. It is also consistent with the Supreme Court's caution about not second-guessing two reasonable alternatives.

Additionally, the requirement for a plaintiff to plead a negative is not unique to HUD's disparate impact rule. For example, the Federal Driver's Privacy Protection Act creates a civil cause of action against a person from "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted. . . ." by the statute.[111] This requirement is "only satisfied if shown that obtainment, disclosure, or use was not for a purpose enumerated under" the statute.[112] It also prohibits State Departments of Motor Vehicles from disclosing personal information except for permissible uses.[113] Plaintiffs suing under this statute plead a negative, specifically that the disclosure at issue lacked a permissible purpose.[114]

HUD is not aware of courts that have responded to the requirement to prove a negative by ignoring that requirement. Courts are capable of tailoring the threshold for an acceptable prima facie showing to match the difficulty of making this type of showing.[115]

**(b)(2) Robust Causal Link**

*Comment: Meaning of "robust causal link" is unclear.*

Commenters expressed confusion about the meaning of § 100.500(b)(2). A commenter stated that the phrase "robust causal link" is unclear and that pointing to dicta in *Inclusive Communities* does not eliminate the confusion.

Commenters objected to the inconsistent terminology regarding causation in the Proposed Rule and its preamble, noting that HUD uses, interchangeably, four different causation phrases: "robust causality," "robust causal link," "direct causation," and "actual causation." Commenters stated the preamble explanation of § 100.500(b)(2) is unclear as to whether HUD is simply seeking to reflect established case law on proving discriminatory disparities or seeking to establish unprecedented requirements. Commenters stated that it is unclear from the text of proposed § 100.500(b)(2) whether a plaintiff must demonstrate both a 'robust causal link' and 'direct cause,' or whether a showing of 'direct cause' conclusively establishes the 'robust causal link.'

Commenters suggested that HUD should define "robust causal link" but avoid a definition that requires proof of actual or primary causation or that mandates a one-size-fits-all standard of causation. A commenter stated that any new definition of causality or 'robust' risks being overly prescriptive for what is necessarily a case- and context-sensitive question of fact. Commenters suggested that HUD should instead use "substantial causal relationship," meaning the relationship is important, valid, reliable, meaningful, not trivial or tiny. Commenters stated that failing to provide a definition would increase litigation costs and would reduce the ability of potential litigants to analyze the risk of litigation. Other commenters questioned whether HUD intended to adopt in proposed § 100.500(b)(2) "robustness" as defined by George Box, who the commenters stated invented the concept of "robustness" in 1953.

*HUD Response:* HUD appreciates these comments and has clarified in the Final Rule that HUD intends "robust causal" link to mean that the policy or practice is the direct cause of the discriminatory effect. HUD intends these two terms to be synonymous. HUD declines to further define or explain "robust causality" due to the fact-specific nature of the various cases that courts will decide on a case-by-case basis. HUD does not intend to adopt the

---

[105] *Ellis*, at 1112. While *Ellis* does use the word "or" instead of "and" and omits the word unnecessary here, HUD does not believe this suggests that plaintiffs need only plead that a policy is artificial, arbitrary, *or* unnecessary. Elsewhere *Ellis* discusses a policy being "arbitrary and unnecessary under the [Fair Housing Act]." (*Id.* at 1112). Every other reference (four in total) is to something being "artificial, arbitrary, and unnecessary." This includes the end, where *Ellis* concludes that plaintiffs had not pleaded a prima facie case because they did not meet the requirement in *Inclusive Communities* for a plaintiff to "at the very least point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity."

[106] 922 F.3d 872, 874 (8th Cir. 2019) (citing *Ellis* at 1109, 1114).

[107] *Hoyt* v. *City of St. Anthony Vill.,* 2019 U.S. Dist. LEXIS 85865, *17–18 (May 22, 2019).

[108] *Inclusive Communities,* at 2524.

[109] *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971).

[110] *Inclusive Communities* at 2523.

[111] 18 U.S.C. 2724(a).

[112] *Thomas* v. *George, Hartz, Lundeen, Fulmer, Johnstone, King & Stevens, P.A.,* 525 F.3d 1107, 1111 (11th Cir. 2018).

[113] 18 U.S.C. 2721.

[114] *See Welch* v. *Theodorides-Bustle,* 677 F. Supp. 2d 1283, 1287 (N.D. Fla. 2010).

[115] *See, e.g., Gill* v. *Whitford,* 138 S. Ct. 1916 (2018).

definition of "robustness" as defined by George Box.[116]

In addition, throughout the Final Rule and the preamble explaining any changes from the Proposed Rule, HUD has worked to use consistent terms to avoid confusion.

*Comment: Regarding* Lincoln Property.

Commenters objected to the proposed burden-shifting framework, particularly the robust causality pleading requirement, arguing that it is a misapplication of the causality requirements in *Inclusive Communities.* The commenters specifically cited *Inclusive Communities Project, Inc.* v. *Lincoln Property Co.,*[117] (*Lincoln Property*) as the source of that misapplication, stating that the Fifth Circuit created a burden of proof for the plaintiffs beyond what the Supreme Court required in *Inclusive Communities* by finding that it is insufficient to plead and prove that a defendant's challenged policy has a discriminatory impact based on race because of its interaction with pre-existing societal disparities if the defendant is not responsible for the underlying societal disparities. The commenters stated that HUD should specifically refute the higher standard of proof in *Lincoln Property*, otherwise HUD would open the door to more courts using higher burdens of proof for causality, making it even harder for plaintiffs to succeed in their disparate impact claims.

*HUD Response:* The "robust causality" requirement and other changes in the Final Rule are based on *Inclusive Communities* and are also supported by subsequent court of appeals decisions. HUD recognizes the concerns that commenters have with the *Lincoln Property* decision and does not intend to endorse this decision. HUD cites to *Lincoln Property* only as one of several cases which recognize the robust causality requirement articulated in *Inclusive Communities.* HUD agrees with the specific statements made in *Lincoln Property* that "the Supreme Court never explicitly stated that it adopted the HUD regulation's framework" [118] and "the Supreme Court's opinion in [*Inclusive Communities*] undoubtedly announce[s] a more demanding test than that set forth in the HUD regulation." [119] HUD

notes that *Ellis* [120] also provides support for the robust causality requirement, which includes it as a part of the "cautionary standards" announced in *Inclusive Communities.*

(b)(3) Adverse Effect on Members of a Protected Class

*Comment: HUD uses different phrases and causes confusion about the interaction of § 100.500 paragraphs (b)(2) and (b)(3).*

Commenters asked whether the concept in (b)(3), that the alleged disparity has "an adverse effect" on a protected class was already satisfied in § 100.500(b)(2), which requires pleading a "disparate impact on members of a protected class." In addition, commenters noted that § 100.500(a) uses the phrase "discriminatory effect on members of a protected class." Commenters stated that it is not apparent that *Inclusive Communities* requires a showing of "adverse effect" in addition to "discriminatory effect," which is required in § 100.500(b)(2).

*HUD Response:* HUD appreciates these comments and has revised the Final Rule to clarify HUD's intent. These elements ((b)(2) and (b)(3)) both require that the plaintiff show that there is a policy or practice with an adverse effect, but differ in that the new element (2) (formerly element (3)) requires a showing that the policy or practice has a *disproportionate* adverse effects on members of the protected class, whereas the new element (3) (formerly element (2)) requires a showing that the policy or practice has a *robust causal link* to such adverse effect. Section 100.500(a) does not set forth the elements of the prima facie case and is therefore not repetitive with elements of paragraph (b).

*Comment: Proposed Rule improperly excludes segregation claims.*

Commenters opposed the revisions in § 100.500(b)(3) because HUD removed language explicitly allowing segregation claims in § 100.500(a) of the 2013 Rule, noting the harm of segregation on individuals and society generally.

*HUD Response:* The Proposed Rule did not intend to, and the Final Rule does not limit claims that result in unlawful segregation. While the reference was removed from explicit mention, it was not excluded from the definition altogether. HUD believes that segregation may be the harmful unlawful result of a policy or practice that violates the disparate impact standard.

*Comment: HUD should clarify or change the* "adverse effect" *language.*

Commenters stated that the third element has arbitrary meaning for requiring proof of effect of discriminating against a protected class as a group, because it is unclear what proof a plaintiff may have to show that the policy or practice as a whole has the effect of discriminating against a protected class as a group. Commenters asked if it would be enough for a plaintiff to claim that she and two other members of the same protected class constitute a group.

Some commenters suggested that § 100.500(b)(3) should have a heightened standard. Some commenters suggested the plaintiff must show that the alleged disparity has an adverse impact on a *significant* number of individuals of a protected class, so that claims impacting a small number of individuals (regardless of the percentage they constitute) are not actionable.

Alternatively, commenters opposed an elevated degree of harm, which they suggested the language in § 100.500(b)(3) proposed. Commenters stated that distinguishing degrees of harms would likely be unsuccessful, but, if done, should include accepted definitions for terms such as "discriminatory", "adverse", and "prejudicial". Other commenters suggested the Proposed Rule be revised so that a plaintiff may show an adverse effect even where some members of the protected class are not impacted.

Finally, commenters said the Proposed Rule provided necessary guidance on what an adverse impact on a protected group is. Commenters stated it is uncontroversial that a plaintiff must show that the policy or practice has a "disproportionately adverse effect" on members of a protected class in order to bring a disparate impact claim.

*HUD Response:* HUD has revised this language to add the word "disproportionately" to clarify that it is not enough to simply state that some number of members of a protected class are affected, but that a plaintiff must show that the policy or practice disproportionately affects members of protected class compared to similarly situated non-members. The size of the group and the disparity necessary to show that the adverse effect is 'disproportionate' are fact-specific questions which will vary from case to case. This clarifying language also shows HUD is not intending to create an "adverse effect" standard separate from the "discriminatory effect" standard, but is merely codifying the requirement inherent in disparate impact claims. HUD is also not intending to create a

---

[116] George E.P. Box, *Science and Statistics,* Journal of the American Statistical Association (1976), *https://www.jstor.org/stable/2286841.*

[117] 920 F.3d 890 (5th Cir. 2019).

[118] 920 F.3d at 902.

[119] *Id.*

[120] *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1111 (8th Cir. 2017).

standard that would be inconsistent with *Inclusive Communities.* Therefore, HUD has determined not to implement language that would require the plaintiff to show a minimum number of people are affected. HUD also notes that it is clear that a plaintiff does not have to show that a policy or practice affects the entire group of protected class members, only that the effect is disproportionate on a cognizable portion of the protected class.

*Comment: Does not list Disability.* Commenters noted that the Proposed Rule's discussion of the third proposed element does not list Disability as a protected class.

*HUD Response:* In an explanation HUD provided in the Proposed Rule's preamble, HUD listed protected classes by quoting 42 U.S.C. 3604(a), which does not include disability because disability is protected in 42 U.S.C. 3604(f).[121] This omission was unintentional. HUD recognizes that disability is a protected class covered under the Fair Housing Act and under § 100.500.

(b)(4) Significant Disparity

*Comment: Regarding the definition of "significant."*

Commenters objected to the section's use of the term "significant." Commenters stated that without a definition, the term "significant" is "too vague to survive review." Commenters stated that failing to define the term would create litigation to define it, increasing litigation costs and reducing the ability of potential litigants to properly analyze the risk of litigating. Commenters stated that the requirement that a plaintiff show a "significant" disparity is a highly subjective and inherently vague standard that will usurp the court's fact-finding role. Commenters noted that imposing a new materiality standard would allow for some undefined quantum of housing discrimination and noted that the Fair Housing Act makes unlawful *all* prohibited practices described by the Act. Commenters stated that HUD is inferring a materiality requirement through the word "significant," which is not supported by *Inclusive Communities.* Commenters also expressed confusion and objected to the fact that the text of Proposed Rule § 100.500(b)(4) required a disparity to be "significant," but the explanation of that subsection stated that the disparity needs to be "material." Commenters noted that materiality is not a concept used in fair housing law, but is

commonly applied in the fraud or breach of contract contexts.

Other commenters supported the use of the term "significant." Commenters stated the requirement is consistent with disparate impact precedent, and directions provided by Federal regulators for assessing disparate impact risk. Commenters supported the Proposed Rule, which does not impose a cutoff on what is considered "significant," but clarifies negligible disparities are not enough. Commenters said a plaintiff must be required to show that the disparity caused by the defendant's policy is significant to prevent frivolous, abusive claims, which protects businesses.

Commenters suggested HUD define a "significant" disparity in a functional way, and suggested language defining significant as "qualitatively different." Other commenters suggested that HUD clarify that "significant" only means statistically significant. A commenter wrote that the Final Rule must specify whether it is referring to statistical significance (not product of chance) or practical significance (magnitude of disparity) or just "big or large" in the common, modern use of the term. A commenter noted that "significance" is a concept applied by courts regularly under the Fair Housing Act to refer to statistical significance. A comment suggested that HUD replace the proposed "significance" requirement at § 100.500(b)(4) with a balancing inquiry into the nature of the disparity and strength of the causal connection between the disparity and the challenged practice.

Conversely, some commenters opposed any attempt to define significance or materiality. The commenters stated that the Final Rule should allow these terms to be defined contextually, as they traditionally have been, and not create novel safe harbors for acts of discrimination artificially defined as "insignificant," "immaterial," or "negligible" or otherwise small.

Commenters suggested that courts should determine whether an effect constitutes a "significant disparity" rather than require the plaintiff to prove this as a part of the prima facie burden.

*HUD Response:* HUD agrees with commenters who believe an attempt to define "significant" is not helpful. The meaning of "significant" will vary from case to case and any attempt to define it would necessarily exclude fact-specific situations that HUD does not intended to exclude. HUD therefore declines to define "significant" in exclusively statistical terms, with a

balancing inquiry, or in any other way that may limit its application.

HUD believes it is clear that "significant" is a necessary element in Fair Housing Act cases broadly, but especially in disparate impact cases. HUD notes that several courts have, since *Inclusive Communities,* identified a significance requirement.[122] This significance requirement is not exclusively a statistical test or a test of the amount of impact a policy has, but can apply elements of both depending on the situation. HUD does not believe this allows for a "modicum" of discrimination to exist, but recognizes that a numerical disparity is not the same as unlawful discrimination and that some differences may be random and not discriminatory. HUD also believes that it is clear that the requirements of proving a prima facie case rests with the plaintiff, and that this case includes the burden to show that the disparity being challenged is sufficient to be legally cognizable.

Finally, HUD's use of the word "material" in the Proposed Rule's preamble was intended to emphasize that an immaterial difference would not be sufficient. HUD does not intend to import a materiality requirement separate from the significance requirement. HUD also recognizes that many differences are unexplainable. Further, HUD is mindful of the Supreme Court's caution against approaches that might inexorably lead to quotas.

(b)(5) Direct Cause of Plaintiff Injury

*Comment: Intensifies proximate cause.*

Commenters stated that the addition of the proposed element that there be a "direct link" between a disparate impact and an alleged injury intensifies how much proximate cause there must be to prove a disparate impact at the pleading stage of a lawsuit, before parties have access to discovery and would unjustifiably narrow both the kinds of discriminatory policies that can be challenged and the class.

Commenters stated that the direct link requirement is not supported by the Fair Housing Act. Commenters stated the Proposed Rule improperly requires direct causation, rather than "robust causation" as expressed in *Inclusive Communities* or "some direct relation" as expressed in *Bank of Am. Corp.* v.

---

[121] 84 FR 42858 (Aug. 19, 2019).

[122] *See, e.g., City of Miami Gardens,* 931 F.3d at 1297; *Schaw* v. *Habitat for Humanity of Citrus Cty., Inc.,* 938 F.3d 1259, 1274 (11th Cir. 2019); *Waisome* v. *Port Auth. of New York & New Jersey,* 948 F.2d 1370, 1376 (2d Cir. 1991); *City of Los Angeles* v. *Wells Fargo & Co.,* 2015 WL 4398858 (C.D. Cal. July 17, 2015), aff'd, 2017 WL 2304375 (9th Cir. May 26, 2017).

*City of Miami*,[123] and this can be satisfied by alleging facts or statistical evidence. Commenters also noted that the Eleventh Circuit held that the Fair Housing Act is written in far-reaching terms.[124] Commenters also stated that this element's inclusion was not clearly related to *Inclusive Communities.* Commenters asserted that the Fair Housing Act states that there only needs to be "some direct relation between the injury asserted and the injurious conduct alleged."

Other commenters stated that *Bank of Am. Corp.* v. *City of Miami,* which cites *Holmes* v. *Securities Investor Protection Corporation,* was wrongly decided because *Holmes* was a securities fraud case and did not specifically discuss the Fair Housing Act.[125] Other commenters stated that the plaintiff should be required to show proof of disparity and establish a direct or sole cause between the defendant's actions and the disparity to bring a prima facie case.

*HUD Response:* HUD appreciates these comments. HUD intends to align with Supreme Court precedent in *Bank of Am. Corp.* v. *City of Miami* and has made changes in the Final Rule to mirror the language used in this decision at § 100.500(b)(5), that is, there is a direct relation between the injury asserted and the injurious conduct alleged. HUD is not relying on *Inclusive Communities* for this element. HUD also agrees with commenters that HUD is not authorized to establish standing doctrine, but HUD is only restating language that aligns with Supreme Court precedent. Because *Bank of Am. Corp.* v. *City of Miami* is itself binding precedent, the decision's reliance on *Holmes* does not alter the analysis.

(c) Failure To Allege a Prima Facie Case (General)

*Comment: The structure of HUD's proposed pleading stage rebuttals available for defendants to use to refute the prima facie case will make it difficult for legitimate claims to go forward.*

Commenters objected to the defenses available under the Proposed Rule, stating that the defenses in the Proposed Rule skew the plausibility of a disparate impact claim in the defendants' favor by greatly increasing the difficulty of proving even meritorious claims. These commenters wrote that finalizing a rule with such defenses available would cause HUD to violate its statutory duty to affirmatively further fair housing.

Commenters also said that expanding the available defenses contravenes disparate impact jurisprudence, because exemptions have only been recognized where they are statutorily authorized, and courts have expressly rejected arguments to expand exemptions. Other commenters asserted that the defenses are inconsistent with case law.

*HUD Response:* HUD disagrees that this rulemaking violates HUD's duty to affirmatively further fair housing. Affirmatively furthering fair housing is an independent obligation relating to the manner in which HUD administers its programs, not an independent or heightened enforcement mechanism. HUD has broad discretion in defining that obligation and carries out that statutory duty through various other policies, including through the Proposed Rule published on January 14, 2020, at 85 FR 2041.

In addition, HUD believes that the Proposed Rule, including the defenses, is supported by case law. As recognized by the Supreme Court in *Inclusive Communities,* disparate impact is not set forth explicitly in statutory language. This Final Rule is intended to reflect a constant, logical set of pleading requirements consistent with prevailing case law.

*Comment: Support and opposition for the structure of HUD's process for rebutting the prima facie case.*

Some commenters supported the proposed defenses against a plaintiff's prima facie case, stating that the defenses in the Proposed Rule will discourage abusive disparate impact filings while still preserving cases that are at the core of disparate impact liability. Commenters noted the Proposed Rule was consistent with *Inclusive Communities* and FRCP 12(b)(6) precedent, which allows for dismissal of meritless claims at the pleading stage.

Other commenters objected to the Proposed Rule's framework providing explicit defenses as part of the pleading stage. Commenters stated that the preface cites nothing from *Inclusive Communities*—or any other case law or statute—that provides for this new framework. Commenters cited the three-step, burden-shifting framework included in *Inclusive Communities* and the Fourth Circuit's description of the burden-shifting framework in *de Reyes* v. *Waples Mobile Home Park L.P.*[126] Commenters said that the *de Reyes* court described the burden-shifting framework as requiring plaintiffs to prove a "robust causal connection" in their prima facie case and defendants to

prove legitimate nondiscriminatory interests while emphasizing that this causality requirement was not so strict as to obligate plaintiffs to show "any facially neutral rationale to be the primary cause for the disparate impact on the protected class . . ."

*HUD Response:* HUD believes that the proposed framework is consistent with existing case law. The *de Reyes* court explicitly decided the case under *Inclusive Communities,* not HUD's standard, and declined to decide whether the two were different. In *Inclusive Communities,* the Court stated that courts must examine "with care" whether a plaintiff has made a prima facie case of disparate impact. The Court also cited specific elements of a prima facie case, and HUD has codified these prima facie requirements in the Final Rule. Section 100.500(d) then specifies that a defendant can allege in the pleading stage as a defense that the plaintiff has failed to allege all elements of the prima facie requirements.

*Comment: HUD should provide additional clarity to the prima facie defenses.*

Commenters stated that § 100.500(c) should include a clarification that defendants may introduce evidence that the plaintiff has failed to make a prima facie case, and that the defendant is entitled to dismissal upon successful establishment of a listed defense. These commenters wrote that otherwise, some district courts may erroneously deny these defenses in connection with a Rule 12 motion to dismiss the complaint.

Commenters also suggested that HUD specify that judges should decide defenses against a prima facie case as a question of law, rather than a question of fact.

*HUD Response:* HUD has revised the regulatory text for defenses, in § 100.500(d). The revised text clarifies that defendants can, as part of a motion to dismiss, argue that the plaintiff has failed to sufficiently plead facts sufficient to state a prima facie case, which would allow a judge to dismiss the case before discovery. There are also defenses available under paragraph (d)(2) after the motion to dismiss stage that would require discovery and further findings by the court. HUD believes issues of law and fact are best left to the judiciary.

*Comment: Allowing defendants to get cases dismissed at the pleading stage violates the FRCP.*

Commenters stated that the Proposed Rule purports to specify how the burden-shifting framework would apply at the pleading stage of a case and would allow defendants to have a case

---

[123] 137 S. Ct. 1296 (2017).

[124] Commenters cited *City of Miami* v. *Wells Fargo & Co.,* 923 F.3d 1260, 1278, 1280 (11th Cir. 2019).

[125] *Id.*

[126] 903 F.3d 415 (4th Cir. 2018).

**60316** **Federal Register** / Vol. 85, No. 186 / Thursday, September 24, 2020 / Rules and Regulations

dismissed at the pleading stage by making certain affirmative showings, even when the complaint alleges all necessary elements of the claim. The commenter argues that this squarely contravenes the FRCP regarding motions to dismiss, summary judgment, and Rule 12(d), which HUD has no authority to repeal or modify. Other commenters assert that the Proposed Rule improperly encourages adoption of this prima facie burden by courts.

*HUD Response:* HUD has revised the regulatory text to clarify what elements are necessary to establish a prima facie case and what defenses are available at the pleading stage. The revised text only allows for a defense at the pleading stage if the plaintiff has failed to properly plead a prima facie case. However, a defendant may make this defense by showing, through the plaintiff's complaint or other information admissible at the pleading stage, that the plaintiff has failed to meet one of the elements. HUD especially notes that the defendant may show a failure to plead causation by showing that the defendant's alleged actions are reasonably necessary to comply with a third party requirement, such as a state law.

While the FRCP govern pleading requirements, HUD's disparate impact rule addresses the underlying definition of one specific cause of action under the Fair Housing Act, which HUD has the authority to implement. Specifically, HUD's Final Rule sets forth the standard for establishing a disparate impact claim (§ 100.500(a)), clarifies the prima facie burden for plaintiffs in a disparate impact case (§ 100.500(b)) and how a defendant can demonstrate that a plaintiff has failed to allege a prima facie case (§ 100.500(c)), and clarifies the burdens of proof in disparate impact cases (§ 100.500(d)).

Additionally, this follows the approach that HUD took in its 2013 Rule. HUD's 2013 Rule both established a burden-shifting framework and defined the content of a "prima facie showing of disparate impact" to mean "proving that a challenged practice caused or predictably will cause a discriminatory effect . . ." HUD's Final Rule also allocates the burden of proof and defines when disparate impact can occur. The main difference between HUD's 2013 Rule and the Final Rule is that HUD is now providing more precise guidance for when disparate impact may occur in response to *Inclusive Communities.*

HUD believes that *Inclusive Communities* makes it particularly important for courts to scrutinize whether each element of a prima facie disparate impact claim is sufficiently pled before allowing a claim to proceed, given the constitutional and prudential considerations that *Inclusive Communities* outlined and HUD has articulated. HUD believes allowing a defendant to demonstrate that a plaintiff has not pled the prima facie element of connecting the disparate impact with actions the defendant has taken is appropriate at the pleading stage.

*Comment: HUD does not have authority to create fact-specific safe harbors.*

Commenters stated that courts have declined to adopt exemptions and safe harbors from disparate impact liability as beyond their authority and cited to *Graoch Assoc.* v. *Louisville/Jefferson County Metro Human Relations Commission.*[127] Commenters stated that absent such instruction, HUD lacks the authority to evaluate the pros and cons of allowing disparate-impact claims challenging a particular housing practice and to prohibit claims that we believe to be unwise as a matter of social policy.

*HUD Response:* HUD is not creating a practice-specific exemption or safe harbor, and HUD's defenses are based on HUD's determination that a defendant who can prove the defense has necessarily shown that the defendant cannot be liable in the manner described by the plaintiff. HUD's Final Rule provides no specific action that insulates a party from liability in the manner of a "safe harbor" but instead elucidates the general parameters of the disparate impact theory consistent with Supreme Court precedent.

(c)(1) Prima Facie Case Not Established Because Defendant Discretion Is Materially Limited by a Third Party

*Comment: HUD should define "materially limited".*

Commenters asked for a definition of "materially limited" to clarify the defense's bounds. Commenters stated that it is uncertain whether "materially" refers to information that is germane to the criteria governing loan transactions or the nature of an inaccuracy or difference or the magnitude of the effect of that disparity. Commenters also noted that while the preamble suggests that the defense of "materially limited" discretion applies where a party must take action that would constitute a disparate-impact violation, its plain language sweeps much further. It is arguable that every action in heavily regulated industries such as insurance or lending is taken when the actor's "discretion is materially limited" in some way, thus eliminating the disparate impact argument entirely.

*HUD Response:* HUD has revised the regulatory text to permit this defense only when it is reasonably necessary to comply with a law or court order. HUD believes that this will clarify that the law or court order must lead directly to the defendant's policy or practice.

*Comment:* "*Materially limited by federal or state law*" *defense not supported by existing statute or case law.*

Many commenters expressed concern about the Proposed Rule's defense for defendants who can show their actions are materially limited by a third-party such as a law or court decision. Some commenters expressed that there is nothing in the Fair Housing Act or *Inclusive Communities* that would support such a defense. Others stated that allowing such a defense may prevent plaintiffs from being able to bring a claim against a state or local agency for a discriminatory practice. Commenters expressed support for parties being able to implead state or local governments if a state or local law is at issue.

Commenters also stated that this defense is much broader than HUD's previous position that HUD would only recognize defenses based on conflicts with state law in the context of the McCarran-Ferguson Act.[128] Commenters noted section 816 of the Fair Housing Act, which states that laws requiring or permitting discriminatory housing practices are invalid to that extent, and they stated that the statutory provision conflicted with HUD's proposal to create defenses that apply to only certain defendants.

*HUD Response:* In *Inclusive Communities,* the Supreme Court recognized that HUD's 2013 Rule had a 3-step process for disparate impact overall. First, the plaintiff must establish a prima facie showing of disparate impact. The defendant must then have the opportunity to prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. The plaintiff could still establish liability by showing that those interests can be served by another practice that has a less discriminatory effect. In *Inclusive Communities,* the Court expanded upon those steps, including by favorably citing the lower court's concurring opinion that included as an element of a plaintiff's prima facie case

---

[127] 508 F.3d 366 (6th Cir. 2007) ("Nothing in the text of the [Fair Housing Act] instructs us to create practice-specific exceptions.").

[128] 15 U.S.C. 1011–1015.

a demonstration that the defendant's policy or practice is not a result of a law that substantially limits the defendant's discretion.[129] If the defendant's discretion is limited in such a way, the Supreme Court identified this as a lack of causal connection between the policy or practice and the disparate impact, and therefore the case should be dismissed.

In addition, HUD does not believe there is a conflict with section 816. The framework of this Final Rule is to require that, where an alleged discriminatory policy or practice is the direct result of state or local legal requirements, entities merely complying with such laws should not be held responsible. Issues of impleaders, joinder, and identifying appropriate defendants are matters of civil procedure outside the scope of this rulemaking.

*Comment: HUD should alter the scope of the "materially limited" defense.*

Several commenters asked that HUD alter the scope of the defense where the defendant is materially limited by a third party. Some commenters suggested that the scope be narrowed by removing the words "such as" to clarify that this defense is available only when a defendant's discretion is materially limited by Federal, state, or local law or a binding court or other similar order, and not when there are limitations from other third parties. Others stated that the defense should only be available where a binding order or regulation rendered a less discriminatory alternative unavailable to the defendant.

Other commenters asked that the defense be expanded. Commenters suggested that defendants be allowed to demonstrate that the defendant acted to comply with applicable laws because the defendant's action is explicitly required or authorized by the statute, or because the action is permitted by the law or reasonably calculated to comply with the other law.

*HUD Response:* HUD believes that this defense should be permitted only when the policy or practice is legally mandated by a third party. However, those third parties can create the mandates through a variety of methods other than statutes or binding court orders. HUD believes that defendants should be able to argue that their actions are required, regardless of the form of mandate the third party uses. HUD is therefore leaving "such as" in the Final Rule.

HUD does not agree that language should be added explicitly discussing when a binding order rendered an alternative unavailable to the defendant. This issue would instead be covered by the defense for a policy or practice that was reasonably required by a law or court order.

HUD also disagrees with expanding the availability of the third-party defense to when actions are merely permitted by the law, as in those instances the policy or practice would not be mandated by the law or court order. In such cases, it would not be reasonably necessary to comply with a third-party requirement. If the defendant's action is not reasonably required to comply with the law or court order, then the defendant has not shown that the cause of the disparate impact is a binding third party.

*Comment: The proposed third-party defense eliminates defendants' liability for discriminatory actions.*

Commenters objected to the proposed defense that a defendant's actions are materially limited by a third party, because they stated that allowing such a defense would eliminate liability for bad actors by allowing them to blame other entities. Commenters pointed out that limited action of the government entity promulgating the requirement would shield the developer or landlord acting upon the governmental policy from liability, and thus no full relief would be available to the plaintiffs. Commenters stated that previous cases have held that where an agent discriminates by following the directions of a principal, both the principal and agent are liable for the discrimination.[130] Some commenters additionally asserted that the third-party defenses are inconsistent with the common law principle that there can be more than one proximate cause of injury.

Commenters expressed that many actions would result in a finding of no liability, such as discriminatory zoning decisions made in conformance with local law or the reliance on crime-free or nuisance ordinances in evictions of victims of domestic violence.

*HUD Response:* In disparate impact cases where liability is found, the Supreme Court has directed that the remedial order should concentrate on rectifying and changing the discriminatory practice.[131] Therefore, in the event that unlawful discriminatory practices are mandated by statute or court order, the most effective way to

eliminate the unlawful discrimination is to remove or modify the underlying statute or order that mandated the unlawful discrimination. That also allows for a single legal proceeding to affect multiple actors, rather than requiring many lawsuits for all the entities affected by the statute or court order.

Under the Fair Housing Act, individuals may make complaints about discriminatory policies or practices, including those mandated by statute, to HUD, and HUD has the authority to proceed against various actors, including governments. In addition, under section 813 of the Fair Housing Act, individuals have the ability to bring suit against defendants, including governmental entities, in district court. Principal-agent law is inappropriate to the relationship between the government and the governed. Nothing in the Final Rule suggests that a government can insulate itself by its own laws. Additionally, the third-party defense is not available under the language of the Final Rule in traditional principal-agent relationships.

*Comment: The proposed third-party defense inappropriate at motion-to-dismiss phase.*

Commenters asserted that the proposed defense at § 100.500(c)(1) is impossible to fairly adjudicate as part of the motion-to-dismiss inquiry, noting that HUD does not explain how this defense can fit into the practical realities of litigation. Commenters stated that if the complaint sufficiently alleges that the defendant is responsible for the challenged policy, and the defendant contends otherwise, this question cannot be resolved at the motion-to-dismiss stage and must instead be addressed through summary judgment or trial. Commenters stated that determining whether a defendant's discretion is limited should be deferred to the traditional second step when the burden shifts to the defendant to offer justification, rather than as part of the prima facie stage.

Other commenters noted that the Proposed Rule does not state whether the defenses under § 100.500(c) present questions of fact for resolution by a fact finder or questions of law for resolution by a judge. They stated that the Proposed Rule should make clear that the defenses under § 100.500(c) present questions of law for resolution by a judge and that a judge should make any subsidiary factual determinations bound up within the overall legal analysis.

*HUD Response:* In *Inclusive Communities,* the Supreme Court favorably cited the lower court

---

[129] *See Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2524 (2015) (citing 747 F.3d, at 283–84).

[130] *See Alexander* v. *Riga,* 208 F.3d 419, 4333 (3d Cir. 2000).

[131] See *Inclusive Communities* at 1224.

concurring opinion [132] that included, as an element of a plaintiff's prima facie case, a demonstration that it was the defendant's policy or practice, is not a result of a law, that substantially limits the defendant's discretion. [133] If the defendant's discretion is limited in such a way, there is no causal connection between the defendant's policy or practice and the disparate impact, and therefore the case should be dismissed. As a result, HUD believes that this defense is properly available to defendants at the pleading stage. However, HUD has also revised § 100.500(d) to clarify that the third-party defense is also available in the fact-finding stage of the litigation. As noted, HUD does not believe it is appropriate for HUD to seek to delineate legal and factual issues.

*Comment: HUD should provide examples.*

Commenters stated it would be helpful for HUD to articulate examples of laws and rules in (c)(1) that materially limit a covered party's discretion. For example, several Federal, State and local statutes, regulations, and guidance substantially limit the discretion of rental housing providers in using credit, rental, and criminal history in their selection of tenants. Housing providers following these mandated criteria may have a complete defense available to them, in some circumstances, where their compliance with mandated processes and practices result in disproportional effect against one or more protected classes.

*HUD Response:* HUD finds it difficult to provide specific examples, as each situation is fact specific. However, it is HUD's intent in this rule to provide protection for defendants with policies or practices that are reasonably required by state law or are within such a narrow range of discretion that there is no practical alternative.

*Comment: Clarification of separate defenses.*

Commenters suggested HUD add the word ''or'' at the end of § 100.500(c)(1) to clarify each of the defenses are independent and separately available as a complete defense to a disparate impact claim.

*HUD Response:* HUD has refined the ''defenses'' section of the regulatory text in § 100.500(d) to provide clarity on what defenses are available and at what stage of the litigation.

[132] *Inclusive Cmtys. Project, Inc.* v. *Tex. Dep't of Hous. & Cmty. Affairs,* 747 F.3d 275,283–84 (5th Cir. 2014).

[133] *Inclusive Communities,* at 2524.

(c)(2)—Defenses When Disparate Impact Results From Use of System or Risk-Assessment Algorithm

*Comment: HUD should amend the defense for use of algorithms or models created by third parties.*

HUD received many comments regarding the proposed § 100.500(c)(2), which provided certain defenses when the alleged cause of a discriminatory effect is a model used by the defendant. Some commenters objected to the proposed defense, stating that HUD did not have enough information on the nature, propriety, and use of algorithmic models to adequately propose a regulation on the topic. Commenters urged HUD to consult with other agencies to gain insight on the use of artificial intelligence. Other commenters noted that the relationship between algorithms and the laws regulating algorithms may create unpredictable and potentially dangerous outcomes. Some commenters asserted that the Proposed Rule only addressed algorithms in prescribing defenses for their use and failed to address their potential harms or unintended consequence. Commenters also asserted that allowing safe harbors for the use of algorithms would create devastating economic costs and increase discrimination.

Commenters also stated that the premise of the defense was flawed, as it provided a safe harbor for entire industries that rely on algorithms, particularly the insurance industry. Some commenters suggested that HUD lacks the statutory authority to create such safe harbors, and the proposed defense is counter to case law, including *Inclusive Communities.* Commenters stated that HUD should always require a case-by-case analysis of disparate impact claims rather than allowing blanket safe harbors which would hold defendants liable for their choices and allow defendants to demonstrate that the algorithm's use is a for a legitimate and nondiscriminatory purpose. Commenters wrote that the proposed defense defeats the purpose of the Fair Housing Act and effectively imposes an intent requirement in stark opposition of the disparate impact theory.

Commenters stated HUD has not identified the criteria that can be used to confirm whether particular models can be relied upon to produce nondiscriminatory risk assessments, and HUD should undertake additional analysis of models used in the housing industry to confirm whether these models yield useful, nondiscriminatory risk assessments or at a minimum attempt to establish neutral criteria the

housing providers and third parties that develop such models can use to assess whether they meet the safe harbor requirements in advance.

Commenters said that allowing a defense for ''industry standard'' algorithm would still allow for discriminatory impacts. Commenters asserted that none of the authorities that allow for self-testing create safe harbors for algorithms vetted by a third party that determines industry standards. Others stated that allowing safe harbors when algorithms are used will undermine trust in technology.

Commenters stated that allowing a blanket defense for the use of algorithms would be counter to HUD's own actions in recent litigation dealing with targeted advertising. Commenters asserted that insurance companies are free to adopt or modify third-party products or to use their own algorithms, and therefore there should be no defense for using an algorithm.

Commenters stated that the proposed defense language contained many phrases and terms that are unclear and undefined, which would lead to increased litigation costs. Other commenters stated that certain terms, such as ''industry standard'', should remain undefined to account for rapid business changes that may occur. Commenters asked for further guidance on how to evaluate assertions of the proposed third-party defense.

Others stated that the defense permitted the use of statistically sound algorithms based on biased data, potentially because of a concern that the technology industry is not diverse enough to create products without discriminatory outcomes. Commenters stated that data testing should be mandated to uncover otherwise invisible barriers to fair housing.

Others asserted that it would make disparate impact cases more difficult to win, even potentially rising to the point of violating the Equal Protection Clause. Some said that it would automatically exempt defendants from having to demonstrate that a policy is necessary to achieve a valid interest and it would increase the burden for plaintiffs to prove there is a less discriminatory alternative. Commenters also stated that defendants may combine the use of algorithms with subjective determinations, where the subjective determination results in a disparate impact, but the proposed defense may not effectively allow plaintiffs to assert such a claim.

Commenters asserted that the Proposed Rule would create an incentive to use third-party algorithms without evaluating and testing the

results and outputs of the algorithms, thus shifting responsibility for disparate impacts to third parties. Commenters pointed to cases such as *Miller* v. *Countrywide Bank, NA.*[134] Commenters asserted that third parties have incentives to secure repeat business rather than eliminating discriminatory effects or giving candid advice about potential impacts, and this defense will allow a wide array of practices facilitated by faulty algorithmic models without liability.

Commenters also questioned whether the proposed defense would afford any relief to plaintiffs. Some commenters asked HUD to clarify that the algorithm developer could be held liable for claims, even if the developer was not directly engaged in making or purchasing loans. Others stated that third-party vendors may try to claim that the discrimination was a result of user misuse, thus potentially leaving plaintiffs without any recourse. Commenters suggested that HUD require vendors to indemnify covered entities for discriminatory compliance issues.

Some commenters expressed concern that developers would attempt to rely on trade secret law to avoid disclosing information about the model, making it difficult or impossible to examine biases inherent in the data being used, particularly in the pleading stage before discovery. Commenters suggested HUD might add confidentiality protections to limit the disclosure of proprietary information to enable examinations. Others stated that HUD should require algorithmic models be published to provide transparency, including factors considered, weights assigned, and all elements that would contribute to a decision. Some commenters stated that plaintiffs with disabilities will not have access to the type of information necessary to challenge an algorithmic model.

Commenters stated that allowing a third-party to certify the algorithm's soundness would further frustrate plaintiffs' ability to evaluate the model, and such third parties are not always reliable. Some commenters suggested that the Proposed Rule contained language explicitly stating that experts cannot be deemed biased based on the fact that the expert has received payment or has prior history with litigation under the Fair Housing Act. Commenters stated that the Proposed Rule does not require the third parties to have fair housing experience, nor does it provide standards for the soundness certification. Commenters expressed concern that an algorithm

could still be discriminatory even if it is "statistically sound." Commenters stated that the proposed defense is unclear on whether the algorithm must be validated before or after initial use of the model. Commenters also asserted that HUD cannot mandate that a court accept an expert's testimony as conclusive fact. Commenters stated that it would be expensive for plaintiffs to disprove third-party verifications of models, requiring plaintiffs to gather data and retain expert analysis and testimony.

Commenters also stated that HUD failed to account for the additional burden that small entities would need to undertake to get their own algorithms validated by a third-party, and stated that larger companies, with their increased capacity for getting algorithms validated, would be able to create a higher barrier of entry for small businesses looking to develop algorithms.

Commenters stated that the Proposed Rule should focus more on any algorithm's outputs. Some stated the defense would be problematic without requiring independent audits to determine the accuracy and reliability of algorithmic-based decisions. Commenters stated that the proposed defense did not account for the way data combinations can produce negative impacts, particularly if artificial intelligence is allowed to "learn" to create proxies for otherwise prohibited factors.

Commenters stated that the standard that material factors in the algorithm not be substitutes or proxies for protected classes was inadequate, as close proxies can be used if they are not "material", and sometimes multiple components that are neutral on their face can be an indicator of membership in a protected class when combined. Commenters also stated that what is a close proxy for a protected class may even be mutable over time, and that there are variables that may not be "substitutes of close proxies" but are still influenced by a history of discrimination.

*HUD Response:* HUD appreciates all of the comments and suggestions. As noted in the Proposed Rule, HUD believes that this area was particularly difficult and specifically solicited input on this topic. After considering the comments, HUD has removed this language from the Final Rule. Instead, in § 100.500(d)(2)(i), HUD has included language allowing a defendant to demonstrate that the policy or practice being challenged is intended to predict the occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy

or practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class. HUD believes this results-based approach is consistent with a number of well-founded comments.

HUD believes that this language achieves many of the goals of the proposed defense while addressing many of the concerns raised by commenters. The defense eliminates the issue of whether the challenged policy or practice is the use of an algorithm and who created or reviewed the algorithm. The defense also does not rely on whether the inputs are proxies for protected classes, eliminating the necessity for examining all the components of the algorithm.

Instead, HUD believes that the Final Rule is improved by focusing the inquiry on whether the defendant has a valid interest in predicting an outcome and whether the ultimate outcome of the challenged policy or practice has a disparate impact on a protected class compared to similarly situated individuals outside of the protected class.

### (d) Burdens of Proof for Discriminatory Effect

*Comment: HUD should not have changed the 2013 Rule's burden of proof.*

Commenters stated that the Proposed Rule provided no explanation for changing the burdens of proof set out in the 2013 Rule and that the 2013 Rule's burden shifting framework is consistent with *Inclusive Communities,* which cited the 2013 Rule regarding burdens, and established law. One commenter stated that the proposed burden of proof is a high barrier that would make it virtually impossible to bring the bedrock and heartland housing discrimination cases that Justice Kennedy in *Inclusive Communities* expressly stated should be brought using disparate impact. Commenters noted that a district court expressly rejected the argument that the Supreme Court was changing the three-prong doctrine.[135]

Commenters stated that the 2013 Rule framework was consistent with *United States* v. *City of Black Jack,*[136] which was cited by *Inclusive Communities* and established a three-step test similar to that established for Title VII employment cases in *Griggs* v. *Duke Power.*[137] Commenters noted that when

---

[134] 571 F. Supp. 2d 251, 260 (D. Mass. 2008).

[135] *Smith* v. *City of Boston, Mass.,* 144 F. Supp. 3d 177, 211 n.43 (D. Mass. 2015).

[136] 508 F.2d 1179, 1186 (8th Cir. 1974).

[137] 401 U.S. 424 (1971).

Congress amended the Fair Housing Act in 1988, nine federal courts of appeals had endorsed *Black Jack's* basic holding that the statute prohibits actions with an unjustified disparate impact. Commenters cited to post-*Inclusive Communities* decisions in which courts have followed long-standing Fair Housing Act disparate impact jurisprudence. Commenters also stated that *Wards Cove's* reasoning suggests that putting such a burden on plaintiffs at the pleading stage is not appropriate, or that *Wards Cove's* reasoning is based largely on careful analysis of the practical realities of Title VII compliance, and not Fair Housing issues. Several commenters asserted that the Proposed Rule's defenses to disparate impact liability are unnecessary because defendants could already raise such defenses as legally sufficient justifications under the 2013 Rule. Commenters expressed preference for the 2013 Rule's analysis of disparate impact claims on a case-by-case basis and noted that the 2013 Rule's "business necessity defense" was already flexible enough to incorporate many of the defenses in the Proposed Rule.

Commenters objected to the requirement that a defendant merely has a burden of production concerning a valid interest and the specification that a plaintiff must prove a less discriminatory alternative. Commenters acknowledged that this requirement is drawn from *Wards Cove.* However, commenters asserted that these burden-shifting standards established by *Wards Cove* were quickly rejected by Congress in the Civil Rights Act of 1991. Commenters stated that nothing in *Inclusive Communities* now renders it more appropriate to import *Wards Cove* into the Fair Housing Act and that although *Inclusive Communities* includes one favorable citation to *Wards Cove,* it is to a portion that was not abrogated by the Civil Rights Act of 1991. Commenters noted HUD specifically rejected giving the defendant only a production burden, but not a persuasion burden, in the 2013 Rule because it is consistent with the burden of proof allocation in settled Fair Housing Act case law and with the standard under Title VII and the ECOA.

Other commenters stated that the plaintiff properly bears the burden of proof at all stages, and the persuasion burden does not shift to the defendant in the pleading stages.

*HUD Response:* HUD has revised the Final Rule's structure to clarify the burden shifting approach. This Final Rule is similar to the 2013 Rule's burden shifting approach, but provides more detail and clarity following the Supreme Court's decision in *Inclusive Communities.* The 2013 Rule inappropriately required the defendant to prove that the challenged practice was necessary to achieve a substantial, legitimate, nondiscriminatory interest.

In *Inclusive Communities,* the Supreme Court stated that the Fair Housing Act is not an instrument to force housing authorities to reorder their priorities, but rather to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects. The Supreme Court analogized to, rather than expressly adopted, the business necessity standard under Title VII.[138]

HUD finds that the analogy to the business necessity standard under Title VII is persuasive. Per *Wards Cove,* if a Title VII plaintiff establishes a prima facie case of discrimination, the burden of producing evidence of a legitimate business justification for those practices will shift to defendant, but the burden of persuasion will remain with the plaintiff at all times.[139] This is consistent with the concept in *Inclusive Communities* of giving housing authorities and developers "leeway to state and explain the valid interest served by their policies." The Proposed Rule would implement this standard in the fair housing context in its section on burden of proof.[140]

*Wards Cove* remains relevant law. Historically, disparate impact standards under Title VII have tracked standards under Title VIII Fair Housing Act liability. Thus, *Wards Cove* has implications for Title VIII Fair Housing Act liability. Congress did not amend Title VIII when it amended Title VII, so *Wards Cove* is still operative in Fair Housing Act cases. Further, while *Inclusive Communities* acknowledges that *Wards Cove* was "superseded," it still cites *Wards Cove* on the importance of a robust causality requirement and cites to the statutory change that only impacted Title VII as the reason for the superseding.[141] Thus, the Supreme Court still believes that *Wards Cove* is controlling for disparate impact fair housing cases even if not now controlling for Title VII cases.

HUD also notes that the burden of production is a more logical burden for the defendant because the defendant may effectuate a defense by challenging other elements of the plaintiff's case, without reaching the issue of a valid interest. If the defendant chooses to raise this particular defense, then the defendant must produce evidence to support such a defense. It is ultimately the plaintiff's burden to prove a case, and the plaintiff must do so by rebutting any evidence produced by the defendant.

As to the comment that *Smith* v. *City of Boston* rejected the reading of *Inclusive Communities* as changing the three-prong burden shifting test, those statements by the District Court in a footnote, which were part of a discussion of the role of the third prong in Title VII analysis (that plaintiffs can rebut a showing of business necessity by identify a less discriminatory alternative that meets the defendant's legitimate needs), were simply dicta, as that part of the burden shifting test was expressly not a factor in the actual holding because the defendant's case failed at an earlier stage.[142]

**(d)(1) Not Remote or Speculative**

*Comment:* "*remote or speculative*" *is vague and unnecessary.*

A commenter asserted that the "remote or speculative" standard is inherently vague and gives litigants no useful marker to evaluate evidence, particularly at the pleading stage. The commenters further agreed that it raises the standard a plaintiff must meet to prove their case at every stage of the proposed burden shifting test. A commenter stated that adding this language is unnecessary as administrative and judicial proceedings would necessarily exclude this type of evidence. Other commenters stated that HUD should define the term as "objective evidence that is measurable, valid, and reliable."

*HUD Response:* HUD has concluded that evidence which is remote or speculative would necessarily not be allowed under administrative and judicial rules of evidence. Thus, HUD has removed the term from the Final Rule, as it is unneeded and confusing.

**(d)(1)(i) Plaintiff's Evidentiary Burden**

*Comment: Plaintiff should* "*demonstrate*" *not* "*prove*".

Commenters suggested an alternative that plaintiffs should not be required to

---

[138] *Inclusive Communities,* at 2522.

[139] *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642, 644 (1989).

[140] *See also* the Proposed Rule, 84 FR 42858, footnote 43 (August 19, 2019).

[141] *See Inclusive Communities,* at 2523 ("A robust causality requirement ensures that "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. *Wards Cove* at 653 superseded by statute on other grounds, 42 U.S.C. § 2000e–2(k).").

[142] *Smith* v. *City of Boston,* 144 F. Supp. 3d 177, 211 fn. 43 (D. Mass. 2015)

''prove'' elements in paragraphs (b)(2) through (5), but should instead be required to ''demonstrate'' the elements through preponderance of evidence.

*HUD Response:* The regulation refers to burden of proof by preponderance of the evidence, which is the usual standard of proof for a plaintiff in civil cases.

### (d)(1)(ii) Less Discriminatory Policy

*Comment:* ''*Equally effective*'' *alternative not legally justified.*

Commenters noted that at least one post-*Inclusive Communities* case has rejected the argument that a less discriminatory alternative must be an equally effective means for achieving a legitimate interest. Other commenters stated this prong renders the ''less discriminatory alternative'' ineffective. Commenters also stated that the ''legally sufficient justification'' standard already existed under the 2013 Rule and HUD correctly implemented it in ''Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions.'' [143] Several commenters stated HUD considered and rejected elements of the Proposed Rule when HUD published the 2013 Rule, like the ''equally effective manner'' element and that the plaintiff must prove a practice lacks a legitimate justification.

*HUD Response:* The 2013 Rule provided that it is a defense to a plaintiff's prima facie case that there is a ''legally sufficient justification'' for the practice, and that the legitimate, nondiscriminatory interests that constitute the legally sufficient justification could not be served by a less discriminatory alternative practice.

The Proposed Rule would change the burden on the parties such that, if the defendant rebuts the plaintiffs' case by showing that the challenged practice advances a valid interest or interests, the plaintiff must then show that by a preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

This approach is consistent with *Inclusive Communities,* which noted,

''[I]t would be paradoxical to construe the Fair Housing Act to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable.'' [144]

The Final Rule, therefore, balances these interests involved by requiring that a less discriminatory alternative, if posed as a basis for discriminatory impact liability, is one that will not unduly harm defendants. HUD notes here that the costs or burdens to be considered and the nature of the less discriminatory alternative both incorporate an assumption of materiality. In order for plaintiffs to fail to meet their burden on this issue, the costs or burdens that would be imposed by the less discriminatory alternative must be material. The ''less discriminatory alternative'' prong would also have to be material and would be properly balanced against the defendant's legitimate interests.

*Comment:* ''*Less discriminatory alternative*'' *is too generous to plaintiffs.*

Commenters suggested that HUD eliminate the less discriminatory alternative requirement altogether. Commenters stated that allowing a plaintiff to rebut a defendant's showing that the challenged practice advances a valid interest where a defendant insurer can show that it utilized risk-based pricing and underwriting in accordance with state insurance laws, allows the plaintiff to rebut and then require the defendant to prove a material cost or burden is contrary to the holding in *Inclusive Communities.* The commenter asserted this process would force a federal court to weigh the relative merits of insurance rating methods, which is the purview of the states under the McCarran-Ferguson Act [145] and would greatly hinder the insurer's ability to make reasonable decisions inherent in a free economy. Other commenters stated that the Proposed Rule should require the plaintiff to prove the existence of a nondiscriminatory alternative that has actually been implemented in an operation similar to the defendant's.

*HUD Response:* HUD does not believe that these proposals would be consistent with *Inclusive Communities,* or the Fair Housing Act generally, and therefore declines to accept them. Generally, the ability of a plaintiff to raise the existence of a less discriminatory alternative that is equally as effective has been recognized consistently by courts in Title VII and Title VIII disparate impact cases. As far as

applicability to insurance specifically, Federal courts have ruled on the applicability of the Fair Housing Act in cases where States regulate insurance, and that case law would apply.[146] HUD itself has also opined on this issue and determined that a general waiver of disparate impact law for the insurance industry would be inappropriate.[147] After further consideration, HUD continues to believe that this determination was correct.

*Comment: Less discriminatory alternatives analysis is flawed.*

Commenters stated that the Proposed Rule's discussion of less discriminatory alternatives does not acknowledge that lowering a requirement like an income requirement may appear to reduce the discriminatory effect when comparing acceptance rates, but may appear to increase the discriminatory effect when comparing denial rates. The commenters stated that the Final Rule should provide guidance on how such a situation would apply in a less discriminatory alternative.

*HUD Response:* HUD declines to opine on fact-specific situations. Whether an alternative is less discriminatory is left to the sound judgment of a court. Parties may generally present arguments and evidence about the impact of a particular policy or practice and the proper perspective for considering it.

*Comment: HUD should provide additional defenses.*

Several commenters suggested that HUD provide an additional defense. Some commenters suggested a complete defense where a defendant shows inaccuracies or unreliability in the data methodology used to prove the existence of a disparity or where the defendant was not the actual cause of the disparate impact.

Commenters proposed an additional or alternative defense for owners that adopt a written policy that is not discriminatory on its face and is reasonably calculated to achieve a legitimate property management objective.

Other commenters proposed a defense where the challenged practice is consistent with any policy or practice that HUD has approved for the operation of Federally insured housing, is related to determining tenant eligibility or selection, and is reasonably calculated to enhance housing opportunities for persons who are

---

[143] U.S. Department of Housing and Urban Development, *HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions, HUD.gov* (April 4, 2016), *https:// www.hud.gov/sites/documents/HUD_ OGCGUIDAPPFHASTANDCR.PDF.*

[144] *Inclusive Communities,* at 2512.
[145] 15 U.S.C. 1011–1015.

[146] *E.g., Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351 (6th Cir. 1995); *Ojo* v. *Farmer's Group,* 600 F.3d 1205 (9th Cir. 2010).

[147] *See* ''Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance,'' 81 FR 69012 (Oct. 5, 2016).

members of protected classes or other vulnerable classes.

Commenters requested the Final Rule include language allowing reliance on a housing finance agency's analysis of local conditions as proof that a policy or practice is necessary.

*HUD Response:* HUD declines to adopt these proposed defenses. While HUD believes that each of these situations would generally not be situations in which the defendant would be found liable, HUD declines to provide a specific exception because HUD believes that there may be fact-specific situations which HUD cannot foresee but which may lead to liability in these situations. HUD notes that the Final Rule, while not providing these defenses specifically, provides more general defenses which defendants in similar situations could use to rebut a case alleging disparate impact such as reasonable steps to comply with a governmental request.

*Comment: Special defense for Public Housing Agencies (PHAs) exercising discretion.*

Commenters stated there should be no special defense for public housing agencies. Commenters said *Inclusive Communities* does not provide support for adding a separate defense for either PHAs or housing finance agencies and said HUD's current standard is sufficient to ensure that PHAs are afforded "leeway to state and explain the valid interest served by their policies." Commenters stated that such a question is fact specific. Some commenters supported a defense for housing authorities who demonstrate their actions or decisions were reasonable and made with sound discretion.

*HUD Response:* HUD's 2013 Rule did not have such a defense and HUD has determined a defense particularly for PHAs is not appropriate. HUD believes that the protections which are already in the proposed and Final Rule provide sufficient safeguards for PHAs.

### (d)(2) Defendant's Burden

*Comment: Regulatory Text is Repetitive.*

A commenter asserted that (d)(2) unnecessarily repeats that the respondent may assert the complainant has failed to support their allegations with a preponderance of the evidence.

*HUD Response:* HUD seeks to avoid unnecessary repetition but believes some repetition aids in ensuring that burdens and duties in disparate impact litigation are clear at all steps. HUD has made edits to the Final Rule to provide clarity and avoid repetition where possible.

*Comment: Suggestions specifically for the defendant's burden at 100.500(d)(2).*

Commenters requested that HUD clarify the Proposed Rule so that it is the plaintiff's burden to demonstrate "equally effective manner," "materially greater costs," and "material burden."

Commenters also stated that HUD should limit the scope of any "individualized assessments," because of the burden it creates for housing providers. Although not explicitly required in the Proposed Rule, the commenters state this should be clarified considering the mitigating evidence required by the courts in prior cases.

*HUD Response:* HUD has made clarifying edits to each party's burdens and believes that these burdens are clear. HUD notes that the less discriminatory alternative is the plaintiff's burden of proof, but the defendant has the burden of rebutting a plaintiff's proposed alternative if the defendant seeks to show that the alternative would impose materially greater costs or burden.

### (d)(2)(iii) Valid Business Interest

*Comment: The business interest defense conflicts with law, related agency practice, and places unequal burdens on the plaintiff versus the defendant.*

Commenters asserted that the business interest defense: Conflicts with the 2013 Rule, Title VII, and ECOA because it fails to require the business interest to be substantial, legitimate, or nondiscriminatory; does not require that the challenged policy is necessary to accomplishing the purported interest; and does not require that a defendant's evidence is material and not remote, speculative or hypothetical (while requiring plaintiffs' evidence to be so). Commenters stated that the Proposed Rule does not provide an explanation for altering the business interest defense, noting that *Inclusive Communities* provides no support for this revision, and suggested it would create a dramatic imbalance in the quality of evidence required for plaintiffs as opposed to defendants.

Commenters asserted that case law requires instead an assessment of whatever justifications the defendant advances and carefully weighing them against the degree of adverse effect the plaintiff has shown.[148]

Many commenters expressed concern that the Proposed Rule would contradict established precedent and exempt potential defendants from liability for implementing policies that produce profits because a less discriminatory policy must also be shown to produce substantially similar profits under the Proposed Rule. Commenters asserted that factors 'relevant to the justification' of a practice with a discriminatory impact 'could include cost and profitability,' but a practice cannot be justified simply because of cost or profit. Commenters stated that the alternative policy element is inadequate without a definition explaining "other material burdens" or "materially greater costs."

*HUD Response: Inclusive Communities* stated that defendants must be given leeway to "state and explain the valid interest served by their policies." [149] HUD mirrors this language by requiring defendants to provide a "valid interest." What is considered valid is a fact-specific question, but an interest that is intentionally discriminatory, non-substantial, or otherwise illegitimate would necessarily not be "valid." HUD does not believe this creates a "dramatic imbalance," but merely allows the defendant the opportunity to identify any valid reason for the policy being challenged. Profit is necessarily a valid interest for businesses. It was expressly recognized by the Supreme Court in *Inclusive Communities.* If a defendant produces evidence which is not persuasive, that evidence must be weighed appropriately.

HUD also declines to define "material." What is "material" is a fact-specific question which is heavily dependent on the type of defendant and the type of valid interest being raised. It is not the intent of this Final Rule that a defendant would be insulated from liability simply because a less discriminatory alternative shows an immaterial decrease in profits or burden. As the Proposed Rule states, the costs or burdens imposed must be material, and something more than a mere inconvenience to the business. What is material in a specific case will have to be determined by the court, and this analysis may consider the materiality of the harm which the disparate impact is causing. However, HUD does not find a prescribed balancing test to be consistent with *Inclusive Communities,* which stated "[i]t would be paradoxical to construe

---

[148] *Inclusive Communities,* 135 S. Ct. at 2522 ("The Act aims to ensure that [local housing] priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation . . . in order to prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping") (citing *Huntington*

---

*Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926 (2nd. Cir. 1988) .

[149] *Id.* at 2522.

the [Fair Housing Act] to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable." [150]

*Comment: Plaintiffs cannot prove that defendant's asserted interest is illegitimate.*

Commenters stated that the Proposed Rule does not set forth an opportunity for plaintiffs to prove that the defendant's asserted interest is illegitimate because the Proposed Rule immediately shifts to the third step and requires the plaintiff to prove that there is a less discriminatory alternative.

*HUD Response:* The Proposed Rule was drafted under the assumption that the plaintiff would necessarily have the opportunity to prove that the defendant's asserted interest is not valid. The Final Rule has been revised to make this explicit.

## 100.500(e)—Business of Insurance

*Comment: Proposed rule's interaction with State regulation of insurance.*

Commenters stated that proposed § 100.500(e) would create a safe harbor for insurance claims under the Fair Housing Act, or preempt all such possible claims that the McCarran-Ferguson Act has no reverse-preemptive effect on Federal law at all. A commenter asserted that insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law." This would force Federal courts to second-guess the actuarial soundness of particular state-regulated insurance practices, including whether there is a less discriminatory but equally effective alternative practice that would serve the defendant's identified interest. A commenter stated that this would violate the McCarran-Ferguson Act.[151] A commenter further stated that HUD has provided no evidence to support the need for an insurance industry exemption. Conversely, another commenter stated that the proposed section 100.500(e) does not mention the McCarran-Ferguson Act, but asserted that the proposed regulation uses parallel language and attempts to exempt the insurance industry from disparate impact liability. The commenter stated that there is no reason the insurance industry cannot comply with both the McCarran-Ferguson Act and the Fair Housing Act, because disparate impact liability is not incompatible with the insurance business, as the Final Rule is expressly written to accommodate

legitimate business practices, and exempting lenders from disparate impact liability would eliminate an important mechanism for plaintiffs to challenge intentional discrimination. Another commenter stated that HUD in the Proposed Rule declined to exempt homeowner's insurance or meaningfully address whether extending disparate impact liability to homeowner's insurance would interfere with State regulation of insurance in violation of the McCarran-Ferguson Act. Commenters also argued that states were better equipped to regulate the insurance industry.

Finally, some commenters asserted that the Proposed Rule conforms to the McCarran-Ferguson Act and noted court decisions have affirmed that the Fair Housing Act does not conflict with state insurance laws, and that the Fair Housing Act necessarily addresses the insurance industry by virtue of addressing the lending industry.

*HUD Response:* Relevant case law indicates that neither of the extreme positions—that all insurers should be shielded from all disparate impact liability, or that McCarran-Ferguson has no preemptive effect at all—is correct. Rather, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." [152] HUD is neutral as to the application of McCarran-Ferguson in specific cases. A federal law that does not relate specifically to the business of insurance is not to be construed to invalidate, impair, or supersede State law enacted for the purpose of regulating the business of insurance.[153]

The Proposed Rule and Final Rule make clear that HUD is only clarifying that its disparate impact rule is not specifically related to the business of insurance. State laws regulating insurance will supersede the Fair Housing Act in a discriminatory impact case if the application of the Fair Housing Act in that case would invalidate, impair, or supersede State law regulating insurance.[154] In the *Ojo* case, then, the dispositive question was "whether application of the [Fair Housing Act] to Ojo's case might invalidate, impair, or supersede" certain provisions of the Texas insurance code, in which case State law would prevail;

or on the other hand, could "complement" that State's law, in which case the Fair Housing Act's provisions would apply and a disparate impact suit would not be prevented. In *Ojo,* the court found that Texas law was unsettled, and certified the issue to the State Supreme Court for resolution.[155]

An example of a case where the Fair Housing Act was found to complement State insurance law, allowing a disparate impact suit to go forward, is *Nationwide Mutual Ins. Co.* v. *Cisneros.*[156] In that case, which was a geographic redlining case involving an allegation that an insurance policy was cancelled due to the insured's race and place of residence, the Ohio law at issue prohibited insurers from "making or permitting any unfair discrimination between individuals of the same class" involving "the same hazard in the amount of premium, policy fees, or rates charged." [157] The Sixth Circuit held that the presence of additional remedies under the Fair Housing Act did not cause the Fair Housing Act to invalidate, impair, or supersede Ohio insurance law, and under McCarran-Ferguson, the Fair Housing Act was not preempted. Similarly, in another redlining case, where the allegation was that the insurer declined to renew a policy based on the neighborhood in which the insured lived, *United Farm Bureau Mut. Ins. Co.* v. *Metropolitan Human Relations Comm'n,*[158] the court found that since the State "does not require or condone redlining, or commit to insurers all decisions about redlining," application of the Fair Housing Act was not precluded.

Examples of cases where a court found that the McCarran-Ferguson Act prevented the application of the Fair Housing Act include *Taylor* v. *Am. Family Ins. Group,*[159] in which the plaintiff alleged that defendant's policy of using an insured's credit score to set prices violated civil rights laws, including the Fair Housing Act. The state law allowed the use of credit information to create insurance scores for the purpose of assessing risk and setting premiums. The court found that allowing the plaintiff to challenge the defendant's credit-based insurance scoring system under federal civil rights statutes, including the Fair Housing Act, would impair the State-specific insurance laws and, therefore, the plaintiff's claims under those federal

[150] *Id.* at 2523.
[151] 15 U.S.C. 1011–1015.

[152] *Humana Inc.* v. *Forsyth,* 525 U.S. 299, 310 (1999).
[153] 15 U.S.C. 1012(b).
[154] *Ojo* v. *Farmers Group, Inc., et al.,* 600 F.3d 1205, 1209 (9th Cir. 2010).

[155] *Id.* at 1209–1210.
[156] 52 F.3d 1351 (6th Cir. 1995).
[157] *Id.* at 1361.
[158] 24 F.3d 1008 (7th Cir. 1994).
[159] 2008 U.S. Dist. LEXIS 61181 (D. Neb., Aug. 11, 2008).

**60324** **Federal Register** / Vol. 85, No. 186 / Thursday, September 24, 2020 / Rules and Regulations

statutes could not proceed under the McCarran-Ferguson Act.[160] In *Saunders* v. *Am. Family Mut. Ins. Co.*,[161] the plaintiffs alleged price discrimination. The court found the claims barred under McCarran-Ferguson based on the fact that the State provided an exclusive administrative remedy for insurance rate complaints, including under the State law that prohibited rates that are "excessive, inadequate, or unfairly discriminatory." The court found that if McCarran-Ferguson did not apply, the court would be forced to determine what a fair and non-discriminatory rate would have been, creating a conflict with the State's administrative regime.[162]

This rulemaking does not establish an insurance industry exemption. As required by Federal law, specifically the McCarran-Ferguson Act, the Final Rule recognizes that Federal law that does not specifically relate to insurance may be barred if it would impair, invalidate, or supersede the State's insurance laws and regulations, and that this result under McCarran-Ferguson is a potential defense to disparate impact liability under the Fair Housing Act. It will be for the courts in individual cases to decide if a particular application of disparate impact liability under the Fair Housing Act would invalidate, impair, or supersede State law.

*Comment: Practice of risk-based pricing and underwriting should be a complete defense to disparate impact claims.*

A commenter asserted that the practice of risk-based pricing and underwriting is an objective practice that is necessary for the insurance industry to function and should provide a complete defense to disparate-impact based claims. A commenter offered that if insurers could not set rates or make underwriting decisions based on objective, predictive, and permitted risk factors, the insurance industry could not function properly.

*HUD Response:* The applicability of Federal law to insurance industry practices is governed by the McCarran-Ferguson Act.[163] McCarran-Ferguson preemption,[164] insofar as it relates to the applicability of disparate impact liability, has to do only with whether Federal law impairs, invalidates, or supersedes State law; it says nothing about risk-based pricing or any specific insurance practice per se. If the State law requires risk-based pricing regardless of other considerations, and the insurance practice involved is in accordance with that requirement, a claim that risk-based pricing results in disparate impact would likely impair, invalidate, or supersede State law and would be preempted. However, in cases where risk-based pricing is not required, the court would have to do a further examination as to whether application of disparate impact liability would impair, invalidate, or supersede State law or the State's administrative regime. If the State law itself prohibits discrimination in pricing or underwriting, application of disparate impact liability may be held not to impair State law because it is complementary.[165] A similar result may occur if the State law is silent on risk-based pricing. Due to the potential variability of State laws, a blanket defense for insurance matters is outside the authority of HUD under the Fair Housing Act.

*Comment: Robust causal link cannot be satisfied by an insurer's reliance on risk-based pricing and underwriting.*

A commenter asserted that insurers' use of risk-based pricing and underwriting results in the practice not being a direct cause of any resulting disparate impact. Thus, the commenter stated that a plaintiff challenging risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot satisfy the "robust causal link" requirement of proposed § 100.500(b)(2) and is the result of factors that are not within the control of insurers. Relatedly, commenters asserted that State laws thus "substantially limit" the discretion of insurers in a manner that would make it impossible to ascribe any disparate effects of underwriting or pricing practices to insurers' independent choices.

*HUD Response:* While HUD does not agree categorically that there can never be a robust causal link between the use of risk-based pricing and an adverse effect on members of a protected class, that could be true in many cases. Further it may be a defense under the Final Rule that the actions of the insurer were a reasonable attempt at compliance with State law. While it may be true that in most cases the risk-based factors will be facially neutral, the basis for liability under a disparate impact claim is that practices that are not obviously discriminatory can nonetheless have an unjustified discriminatory impact on a protected class.

However, while this may be true of a required risk-based pricing regime in general, the specific risk factors chosen, and the weights given them, may be within insurers' control. If the choice of specific risk factors among permissible alternatives is the cause of a disproportionate adverse effect on the protected population as compared to similarly situated members of a non-protected class with respect to the claim being made, then the causal link between the choice of a specific factor or factors and a disparate impact on a protected class conceivably could be shown. This is a case-based decision that is not amenable to a broad regulatory solution. Therefore, HUD declines to adopt a provision that risk-based pricing can never be the cause of a disparate impact under the Fair Housing Act.

*Comment: Proposed rule exempts the insurance industry from disparate impact liability.*

Commenters expressed concern that the Proposed Rule exempts the insurance industry from disparate impact liability, noting that courts interpret the Fair Housing Act and McCarran-Ferguson Act in such a way as to avoid conflict and allow for efficient adjudication of claims.

*HUD Response:* Proposed § 100.500(e) includes the standards of the McCarran-Ferguson Act, 15 U.S.C. 1012(b). Under court decisions, the Fair Housing Act applies to insurance when application of the Fair Housing Act would not invalidate, impair, or supersede State laws enacted for the purpose of regulating the business of insurance. For instance, this could include situations where the State law is silent or where the State law also prohibits racial discrimination. On the other hand, if a State law explicitly permitted an insurance policy or practice and an insurer were following that policy or practice, it would be up to a court to determine whether application of the Fair Housing Act would impair, invalidate, or supersede the State regulatory regime.

*Comment: A safe harbor under the McCarran-Ferguson Act would be inappropriate.*

A commenter asserted that the provision dealing with recognition of state insurance laws would improperly

---

[160] *McKenzie* v. *S. Farm Bureau Cas. Ins. Co.*, 2007 U.S. Dist. LEXIS 49133 (N.D. Miss. July 6, 2007) has a similar factual situation. In that case, the court held that since the State enacted a regulation authorizing the activity about which plaintiff complained (using credit history to set rates), a Fair Housing Act challenge is untenable because of the McCarran-Ferguson Act (15 U.S.C. 1011–1015).

[161] 2007 U.S. Dist. LEXIS 18804 (W.D. Mo., March 16, 2007).

[162] *Id.* at *27–28.

[163] 15 U.S.C. 1011–1015.

[164] 12 U.S.C. 1012(b).

[165] *Ojo* v. *Farmers Group, Inc., et al.*, 600 F.3d 1205, 1209 (9th Cir. 2010) (If Texas law prohibits the use of credit-score factors that would violate the Fair Housing Act on the basis of a disparate-impact theory, then the Act would complement—rather than displace and impair—Texas law).

shield insurers from disparate impact liability. Commenters stated that the McCarran-Ferguson Act requires a particularized inquiry into the specific details of state insurance law that are affected by a claim under the Fair Housing Act, and the ways in which application of the Fair Housing Act might disrupt state insurance regulation. Commenters asserted that a safe harbor under the McCarran-Ferguson Act would be inappropriate, and that *Ojo* does requires a "particularized inquiry."

*HUD Response:* Section 100.500(e) and McCarran-Ferguson do not create a blanket shield against Fair Housing Act liability for the insurance business.[166] Rather, this rulemaking simply applies long-standing McCarran-Ferguson jurisprudence to the Fair Housing Act, acknowledging neither the Fair Housing Act nor the rule overrides state insurance laws. Beyond that, courts must make a case-by-case determination whether or not a finding of liability under the Fair Housing Act would invalidate, impair, or supersede any State law enacted for the purpose of regulating the business of insurance.

*Comment: Insurance exemption should be located in a different section.*

A commenter stated that because the proposed business of insurance addition would not amend 24 CFR 100.70(d)(4), which stipulates that the provision of property insurance is a covered practice under the Fair Housing Act, but rather amends § 100.500, which defines disparate impact liability itself, this opens the door to arguments that any enforcement of disparate impact liability would have effects on state insurance law and thus be preempted.

*HUD Response:* The issue of the applicability of Federal law to insurance is governed by the McCarran-Ferguson Act and cases interpreting it, regardless of whether the related language is in § 100.70(d)(4) or § 100.500(e). The arguments that the McCarran-Ferguson Act always precludes application of the Fair Housing Act when it implicates State insurance law has been rejected by Federal courts.[167] Likewise, it is clear that in many cases, a Fair Housing Act case will be precluded under the McCarran-Ferguson Act.[168] The issue, which must be decided by courts on a case-by-case basis, is whether allowing a plaintiff to proceed on claims under the Fair Housing Act would impair,

invalidate, or supersede State law.[169] Addressing the advisability of § 100.70(d)(4), which also applies to disparate treatment claims, is beyond the scope of this rulemaking.

*Comment:* Inclusive Communities *did not address insurance, so neither should the Proposed Rule.*

Some commenters expressed concern about the Proposed Rule's inclusion of provisions specific to the insurance industry, arguing that the Supreme Court did not specifically address the business of insurance in the *Inclusive Communities* decision. Commenters expressed concern that the Proposed Rule will make recovery from insurance companies based on disparate impact nearly impossible.

*HUD Response: Inclusive Communities* did not deal with insurance, and so, of course, does not address that issue. However, *Inclusive Communities* did address the issue of causality where there are intervening factors; a significant factor is compliance with other laws. Consistent with the McCarran-Ferguson Act, states broadly regulate the insurance industry. This rulemaking does not interpret the McCarran-Ferguson Act or require any particular outcome in a specific case, but does seek to set forth an appropriate framework for analysis in light of existing precedent from case law. As otherwise noted, various courts have held the Fair Housing Act to not be preempted by the McCarran-Ferguson Act.

*Comment: HUD does not have authority to interpret the McCarran-Ferguson Act's applicability to the Fair Housing Act.*

Commenters argued that HUD does not have authority to change the standard for McCarran-Ferguson preemption from conflict preemption to the "material limitation" standard, because HUD's 2013 Rule left McCarran-Ferguson Act questions for courts to decide. Another commenter argued HUD does not have authority to interpret the McCarran-Ferguson Act and noted the interactions of the Fair Housing Act and the McCarran-Ferguson Act is the subject of conflicting court decisions.

*HUD Response:* The Final Rule does not interpret the McCarran-Ferguson Act and HUD is neutral regarding its application in specific cases. HUD acknowledges that different courts have reached differing results on differing facts. However, in accordance with case law, analysis under the McCarran-

Ferguson Act is required in cases where insurance practices are alleged to have a disparate impact in violation of the Fair Housing Act, and the Final Rule reflects this fact. The McCarran-Ferguson Act's language itself, as well as the majority of case law interpreting its application to the Fair Housing Act and other civil rights statutes has, consistent with the proposed regulation, held that where the Federal law does not invalidate, impair, or supersede a particular provision of State insurance law permitting an insurance policy or practice or the related State administrative regime, the Federal law may apply, and where the Federal law would have the invalidating effect, it may not be construed to so apply.[170]

*Comment: HUD should clarify that the Final Rule does not prohibit, restrict, or conflict with practices based on state law.*

A commenter stated that § 100.500(e) recognizes the "supremacy of state law in the field of insurance regulation," but HUD should make it clear that the Final Rule will not be construed to prohibit or restrict practices based on, or not inconsistent with, state insurance law. Another commenter stated that, consistent with *Inclusive Communities,* language should be added to note that where the actual cause of a disparate impact is another law rather than the defendant's decision, a plaintiff cannot establish that the defendant is the actual cause of the disparate impact. The commenter suggested a new clause should be added to the end of proposed § 100.500(e), stating that nothing in this section "is intended to impose liability for any action permitted by state law."

*HUD Response:* As has been discussed elsewhere in this preamble, Federal courts have decided issues of the applicability of the Fair Housing Act

---

[166] See, e.g., *Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 298–299 (5th Cir. 2003).

[167] See, e.g., *id.; Ojo* v. *Farmer's Group,* at 1209.

[168] See, e.g., *Saunders* v. *Am. Family Mut. Ins. Co.,* 2007 U.S. Dist. LEXIS 18804 (W.D. Mo., March 16, 2007).

[169] See, e.g., *Taylor* v. *Am. Family Ins. Group,* 2008 U.S. Dist. LEXIS 61181 (D. Neb., August 11, 2008).

[170] See *Ojo* v. *Farmers Group, Inc., et al.,* 600 F.3d 1205 (9th Cir., 2010); *Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 297 (5th Cir. 2003) (because Appellants do not identify a state law or policy that would be impaired by the application of the federal statutes, suit under Fair Housing Act and other civil rights laws not barred); *Moore* v. *Liberty Nat'l Life Ins. Co.,* 267 F.3d 1209, 1221 (11th Cir., 2001) (stating that McCarran-Ferguson does not apply to a civil rights suit because "the federal rule does not contradict directly the terms of the state statute or render it impossible to effect or implement that statute"); *Nationwide Mutual Ins. Co.* v. *Cisneros,* 52 F.3d 1351 (6th Cir., 1995); *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 302 (7th Cir. 1992) (reversing lower court to the extent that it held that Fair Housing Act is inapplicable to property and casualty insurance written or withheld in connection with the purchase of real estate). *But see Taylor* v. *Am. Family Ins. Group,* 2008 U.S. Dist. LEXIS 61181 (D. Neb., August 11, 2008) (involving the setting of rates using credit scores, preempting a disparate impact claim); *Doe* v. *Mutual of Omaha,* 179 F.3d 557 (7th Cir. 1999) (Americans with Disabilities Act case preempted when it would interfere with the State's administrative regime).

to State insurance matters in consideration of the McCarran-Ferguson Act. This rule does not intend to alter that jurisprudence. Therefore, HUD declines to provide addition clarifications or restrictions; HUD believes that this is a job for the courts.

*Comment: Home insurance should only be regulated by the States.*

A commenter stated that State regulation of insurance is comprehensive and includes rate and coverage issues and prohibition of unfairly discriminatory rates. Further, State laws permit, and the majority require, risk-based pricing. The commenter stated that, conversely, State laws make clear that failing to take risk into account results in unfair discrimination. Insurers are typically prohibited from taking protected characteristics into account or collecting such information. Finally, the commenter noted that state insurance commissioners review the rates charged by insurers to protect consumers.

*HUD Response:* HUD acknowledges the general scheme of insurance rating and regulations. HUD does not supplant State regulation of the insurance industry in this rulemaking. Housing laws vary from State to State and different facts present themselves in different cases, as do the conditions under which Federal law may or may not be applicable. The effect on Fair Housing Act claims by State insurance law and regulation is determined by the McCarran-Ferguson Act and related case law. Federal regulation cannot take account of all possible variations of State law, and each case has to be evaluated by a court based on the particulars of the Fair Housing Act claim and the specific State law.

*Comment: Risk based pricing can never be "arbitrary, artificial, and unnecessary" under proposed § 100.500(b)(1).*

A commenter asserted that it is essential for a viable market that insurers make pricing and underwriting decisions based on risk factors, which therefore would be arbitrary, artificial, and unnecessary. Based on this, the commenter stated that risk-based pricing and underwriting should be exempt from disparate impact liability.

*HUD Response:* HUD does not believe it can be stated categorically that no disparate impact plaintiff could ever meet the "arbitrary, artificial, and unnecessary" showing with respect to risk-based pricing and underwriting. This is because there is no uniform or unchanging approach to risk-based pricing and underwriting. For example, the specific risk factors used, in cases where those are within the discretion of

the insurer, would have to be considered. Accordingly, HUD declines to adopt a position that risk-based pricing and underwriting for insurance can never be arbitrary, artificial, and unnecessary.

*Comment: The Proposed Rule would overly burden the insurance industry.*

Commenters argued that the application of disparate impact to risk-based pricing would make it more difficult for the insurance industry to accurately price for risk.

*HUD Response:* HUD does not believe that the possibility of disparate impact standards within the prudential safeguards set forth in this Final Rule will unreasonably affect the ability to price risk in the insurance business. It does not appear that this has been the case over a large number of years where disparate impact liability was potentially applicable in a broader way to insurance.

*Comment: Suggestions for Section 100.500(e).*

Some commenters suggested that, if an exemption for the insurance industry is not granted, HUD should explicitly incorporate a complete defense for actuarial risk-based pricing and underwriting in order to better align the Proposed Rule with the *Inclusive Communities* decision, state law, and the McCarran-Ferguson Act. They asserted that case-by-case adjudication in federal court would permit insurers to be held liable for use of sound risk-based practices. Commenters made similar statements regarding the filed-rate doctrine, which bars courts from reexamining the reasonableness of rates that have been filed and accepted by insurance regulators.

*HUD Response:* As discussed above, HUD does not believe that the variety of laws and factual circumstances in the insurance business allow for field preemption of the Fair Housing Act.[171] Similarly, a complete defense for actuarial risk-based price and underwriting, as a business practice is in HUD's view unduly broad. For instance, not all States appear to require risk-based pricing. According to information provided by another commenter, Nebraska, Oklahoma, and Wyoming do not require risk-based

pricing.[172] Likewise, not all states require state review and approval of filed rates.[173] Nevertheless, in appropriate circumstances, the McCarran-Ferguson bar or the more general defense under paragraph (d)(1)(i) for following state law may be applicable. The filed-rate requirement, when applicable, is generally aimed at competition issues and in any event does not necessarily answer the variety of issues that could arise under the Fair Housing Act. An exemption for it would be the effective equivalent of a field preemption. HUD declined to accept this approach for the reasons noted above.

*Comment: State laws already prohibit discrimination.*

One commenter stated that variables like race and disability are irrelevant, and home insurance should simply be excluded from the disparate impact standard. The commenter also asserted that application of disparate impact liability would unnecessarily inject racial and other demographic considerations into insurance and State laws that already prohibit use of protected class information. Further, applying disparate impact liability would require insurers to collect sensitive data on protected classes in an effort to ensure that insurers will not be held liable under disparate impact theory.

*HUD Response:* As described elsewhere herein, the Final Rule contains a number of safeguards, as contemplated by *Inclusive Communities,* to avoid injecting race or other protected class status into ordinary governmental and business decision-making processes. The Final Rule expressly provides that it does not create a data collection obligation, and (d)(2)(iii)(A) requires a reasonable relationship between the law and the policy or practice said to flow from it, appropriate to address this issue.

*Comment: Proposed § 100.500(c) defenses for actions permissible under state insurance law.*

Some commenters noted that the limited discretion defense set forth in § 100.500(c)(1)(i) (paragraph (d)(1)(i) in this Final Rule) may apply only where state law requires the challenged insurance practice and therefore, HUD should clarify that the defense also applies where state insurance law permits the challenged practice.

*HUD Response:* HUD believes this Final Rule strikes an appropriate

---

[171] *Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 298–299 (5th Cir. 2003) (rejecting a field preemption approach to analyzing the applicability of the McCarran-Ferguson Act); *Property Cas. Insurers Ass'n of Am.* v. *Donovan,* 66 F. Supp. 3d 1018, 1025 (N.D. Ill. 2014) (stating that "In *Humana Inc.* v. *Forsyth,* 525 U.S. 299 . . . [citations omitted], the Supreme Court rejected the view that the McCarran-Ferguson Act created 'any sort of field preemption'").

[172] *See* Appendix 1; available at *https://www.regulations.gov/document?D=HUD-2019-0067-3436* (last visited February 3, 2020).

[173] *Id.*

balance between what is required and permitted. HUD notes that in many contexts, what is permitted by law is incredibly broad. In other instances, what is permitted is so narrow as to effectively be a requirement. HUD believes the Final Rule language in (d)(1)(i) and (d)(2)(iii)(A), requiring a reasonable relationship between the law and the policy or practice said to flow from it, appropriately addresses the issue.

*Comment: Defendants' burden of proof would interfere with the McCarran-Ferguson Act.*

Commenters stated that requiring a defendant to prove a material cost or burden (under proposed § 100.500(d)(1)(ii)) (paragraph (c)(3) in this Final Rule) would force a Federal court to weigh the relative merits of a different insurance rating method, which is left to the purview of the States under the McCarran-Ferguson Act, and it would hinder the insurer's ability to make reasonable business decisions inherent in a free economy.

*HUD Response:* HUD agrees that the Proposed Rule provides a framework that allows for the McCarran-Ferguson Act to be appropriately raised when relevant. Whether a given Fair Housing Act claim conflicts with State insurance laws such that it can be said to impair, invalidate, or supersede such laws is a case-by-case determination. HUD also agrees that its Fair Housing regulation at 24 CFR 100.70(d)(4) correctly interprets the Fair Housing Act as applicable to property or hazard insurance.

Other General Comments

*Comment: Issues with language used in the section.*

Several commenters expressed concerns about the language used in the Proposed Rule. Commenters pointed out concerns with the terms "building codes" and "permitting rules." One commenter was concerned that adding the terms "building codes" and "permitting rules" to the language would have a detrimental effect on governmental efforts to advance up-to-date building code adoption and enforcement, as well as create new legal risks for communities seeking to improve building codes and strengthen disaster resilience, thereby competing with other regulatory requirements and governmental initiatives. Another commenter stated that there is no legal basis or regulatory precedent supporting the addition of the terms "building codes" and "permitting rules," citing to the *Inclusive Communities* decision,

which the commenter asserted did not overrule *Gallagher* v. *Magner*.[174]

One commenter stated that HUD should further explain the addition of local and building ordinances to this section.

*HUD Response:* HUD thanks commenters for their perspectives. HUD notes that the Supreme Court in its decision in *Inclusive Communities* expressly stated that *Gallagher* v. *Magner* was decided without the cautionary standards announced in *Inclusive Communities*.[175] While each case must be decided on its particular facts, under this Final Rule, HUD expects that valid policies will be upheld and ones that are arbitrary, artificial, and unnecessary will be subject to remedy. HUD's identification of particular items is not intended to impact the general analysis under § 100.500. The listing of items is § 100.70(d)(5) is representative only and not exclusive but does not neglect particular areas where HUD has observed problematic policies and practices in Fair Housing Act enforcement.

*Comment: Statute of Limitations.*

Commenters suggest a statute of limitations for disparate impact claims arising from lending decisions. Some suggested that HUD include language clarifying that a lending decision is a "discrete act," which should trigger the running of the statute of limitations. Commenters said HUD should restate verbatim the Fair Housing Act's statute of limitations. Commenters also requested that HUD provide further clarity regarding the tolling period for the statute of limitations on claims.

*HUD Response:* HUD appreciates these comments, but declines to repeat statute of limitations requirements set forth in statutes. This Final Rule does not modify the statute of limitations regarding claims under the Fair Housing Act, which are generally applicable to both disparate treatment and disparate impact cases. Whether a claim is time-barred is a fact-specific question which is dependent on the details of the case and most appropriate for the court or other administrative authority considering the case to determine. Similarly, whether an action constitutes a "discrete act" under the Fair Housing Act, or whether it is a "continuing violation" is also regularly litigated and is a fact-specific question dependent on the details of a case. Therefore, HUD does not choose to establish a regulation

regarding the tolling period or issues related thereto for the statute of limitations in this disparate impact rule.

*Comment: Proposed Rule fails to have an adequate cost-benefit analysis.*

Several commenters argued that a more robust discussion of the costs associated with the Proposed Rule should be completed by HUD prior to issuing the Final Rule. Commenters stated that the Proposed Rule did not contain an adequate analysis of the costs and benefits of the Proposed Rule. One commenter stated that HUD did not consider quantitative and qualitative measures of costs and benefits, and did not attempt to tailor its rule to impose the least burden on society, consistent with obtaining regulatory objectives. Another commenter stated that the Proposed Rule fails to consider the benefits created by the availability of disparate-impact claims, which the commenter asserted are threatened by insurmountable litigation burdens and imposes unsupported safe harbors in the Proposed Rule. One commenter also argued that the Proposed Rule did not have crucial sources of data and research that would allow a full assessment of any harms from the Proposed Rule's promulgation, while another commenter argued that entities will now bear the costs of reconciling existing authorities with a seemingly inconsistent HUD rule. Commenters also asked HUD to explain the Proposed Rule's economic impact, including clarifying what HUD meant when it said the Proposed Rule would result in more affordable housing.

*HUD Response:* HUD acknowledges commenters' arguments, but disagrees. HUD's intent in promulgating this Final Rule is to exercise its discretion to further the purpose of the Fair Housing Act and to ensure that HUD's interpretation of disparate impact liability is in line with HUD's understanding of Title VIII disparate impact law and with the Supreme Court's decision in *Inclusive Communities*, as well as Executive Orders 13771 and 13777. Accordingly, this Final Rule does not create any new requirements, but merely provides clarification of how disparate impact liability is effectuated under the Fair Housing Act. HUD has prepared an RIA for this rule which provides a cost-benefit analysis of this rule, but notes here that, in well-pleaded, fully litigated cases, the same result would be reached even in the absence of HUD's discriminatory effects rule. However, this Final Rule should result in greater clarity for litigants, regulators and industry professionals when making and challenging facially neutral policies

---

[174] 619 F.3d 823 (8th Cir. 2010).

[175] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2524 (2015).

that may have a discriminatory effect on one or more protected classes.

Clarity about the applicable legal requirements increases compliance with the Act and furthers its nondiscrimination purposes. This clarity should also reduce litigation cost and duration by reducing uncertainty. The Final Rule is accordingly expected to encourage more housing development activity in all areas of local communities.

*Comment: Regulatory Flexibility analysis was inadequate.*

A commenter also objected to the Proposed Rule because HUD failed to provide and publish in the **Federal Register** a statement providing the ''*factual basis* for its determination'' that the Proposed Rule would not have a significant economic impact on a substantial number of small entities. Commenters stated that, among other things, HUD provided no description or estimate of the number of small entities to which the Proposed Rule would apply; it provided no estimate of the economic impacts on those entities; and it provides no disclosure of its assumptions. The commenter asserted that examining both the beneficial and adverse impacts would have resulted in a finding of significant economic impact on a substantial number of small entities. In particular, the commenter stated that small entities that rely on disparate impact litigation to ensure the vindication of their rights will face a higher burden to bring claims and will therefore suffer lost business opportunities, frustration of their missions, and un-remedied violations of their civil rights because of HUD's proposed strict burdens and standards. Similarly, small businesses that have developed tools to help entities comply with existing disparate impact law would suffer the cost of lost revenue due to decreased competitive advantage and the additional cost of developing new software to satisfy HUD's new framework with respect to housing credit, in addition to maintaining software that complies with the existing frameworks applicable to credit generally.

*HUD Response:* HUD notes that a regulatory impact analysis is not required if the rule will not have a significant economic impact on a substantial number of small entities. HUD certified that this Proposed Rule would not have such an impact because it is merely updating HUD's uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. HUD also noted that no such analysis was performed with respect to the 2013

Rule, which was developed in the absence of Supreme Court guidance and at a time when there was substantial questions, as indicated by the dissent in *Inclusive Communities,* over the existence of the disparate impact theory under the Fair Housing Act. It is HUD's position that this Final Rule will reduce burdens on parties by providing clarity regarding the burdens involved in a disparate impact case. Despite this certification, however, HUD also invited commenters to provide less burdensome alternatives to the Proposed Rule that would meet HUD's objectives. HUD has revised this Final Rule in light of comments. HUD has also considered comments submitted in response to the question regarding how the Proposed Rule might increase or decrease costs and economic burden for relevant parties. HUD does not believe the Final Rule will result in an adverse impact on lawyers and consultants because a clear law is easier to follow by ordinary citizens.

*Comment: Impacts on low-income renters.*

A commenter stated that HUD should republish the Proposed Rule with estimates of its impacts on low-income renters and Federal affordable housing programs and solicit public comments on those estimates and their implications. This commenter stated that, as drafted, the Proposed Rule did not sufficiently address or justify all changes and their effects on low-income renters. Other commenters were concerned that the Proposed Rule would weaken disparate impact liability by allowing neutral policies that have a discriminatory effect to remain.

*HUD Response:* HUD's requests for comments elicited feedback on the potential impact of the Proposed Rule on low-income individuals, including voucher holders. HUD appreciates and considered these comments as they raised several issues affecting cities across the nation such as gentrification, increased housing cost burden, and lack of available affordable housing for voucher holders. However, HUD believes it has promulgated an effective Final Rule to challenge discriminatory practices while not having unintended adverse consequences on the creation of decent, safe and affordable housing.

*Comment: The Proposed Rule would make challenges to zoning and land use decisions more difficult, and so it should be withdrawn.*

Commenters asserted that cases involving state action impacting property, such as local zoning and land use decision, should be treated uniquely. Another commenter recommends HUD include a method to

identify local efforts to limit housing options earlier in the burden-shifting framework. A comment urged HUD to withdraw the Proposed Rule because the current disparate impact standard is the primary tool used to challenge local zoning and land use planning rules that exclude manufactured housing. Commenters suggested that HUD's approach to such cases conform to relevant and recent court decisions, including the *Knick* v. *Township of Scott, Pennsylvania* decision.[176] One comment recommended a study be conducted for the adverse impacts of actions such as land use and zoning decisions and tax credit policies rather than focusing solely on real estate transactions and lending.

*HUD Response:* HUD disagrees that local zoning and land use decisions should have more unique treatment. Disparate impact liability is available under this Final Rule to challenge facially neutral policies and practices that relate to dwellings, including land use policies. There is no basis under the Fair Housing Act for unique treatment of zoning and land use planning rules, on the one hand, or with respect to manufactured housing on the other hand. The case of *Knick* v. *Township of Scott, Pennsylvania* involves a Fourth Amendment search issue and a Fifth Amendment taking issue and is inapposite to this rulemaking.[177] HUD appreciates commenters' input regarding recommendations for future studies into issues affecting housing; however, such studies are outside the scope of this rulemaking.

*Comment: The Proposed Rule implicates federalism.*

Commenters asserted that HUD failed to consider and evaluate the federalism implications of the Proposed Rule. Because of this alleged failure, according to one commenter, HUD violated the APA and Section 6 of Executive Order 13132.

*HUD Response:* HUD acknowledges the commenter's perspective but disagrees. Executive Order 13132 prohibits an agency from publishing any rule that has federalism implications if the rule imposes substantial direct compliance costs on State and local governments and is not required by statute or preempts State law. As discussed in responses to previous comments, this rulemaking does neither of these. HUD is codifying in regulation statutory requirements to prove or defend a case of discriminatory effect. This is no different from HUD's decision in the 2013 Rule to codify HUD's

---

[176] 139 S. Ct. 2162 (2019).

[177] *Id.* at 2167.

interpretation of disparate impact law at that time. HUD has specific authority to promulgate regulations under the Fair Housing Act.

*Comment: Fails to consider studies about lending and insurance practices.*

A commenter asserted that HUD's failure to consider both the direct and quantifiable harms as well as indirect and non-quantifiable harms under the Proposed Rule would result in more entrenched residential segregation, exclusion of protected groups from housing, and discrimination in home purchasing and rental markets.

*HUD Response:* HUD notes that, as stated previously, disparate impact liability is a valuable and powerful tool to challenge facially neutral policies that have an unlawful discriminatory effect on one or more protected groups. However, HUD also recognizes that, consistent with *Inclusive Communities,* disparate impact liability must be properly limited to avoid both constitutional infirmities and to avoid second guessing a legitimate governmental and business decision. Both of those issues would also have direct and indirect quantifiable and non-quantifiable harm to housing choice. As such, HUD thoughtfully considered all changes being made to the 2013 Rule to provide a rule consistent with *Inclusive Communities* and the Fair Housing Act, including the remedies to which persons in protected classes are entitled and the important of fairness and certainty in the housing market.

*Comment: HUD should allow expert witnesses.*

Commenters stated that expert witnesses should be allowed for both parties, and that the Proposed Rule should allow for rebuttal of those witnesses.

*HUD Response:* The manner and type of particular evidence is a matter of civil procedure outside of the scope of the Final Rule as revised. In the case of an administrative change, during an investigation into discrimination allegations, both parties are provided the opportunity to provide evidence and witnesses to HUD (or a substantially equivalent State agency). After an investigation, if HUD files a charge of discrimination, the Fair Housing Act allows parties to present evidence, cross-examine witnesses and obtain the issuance of subpoenas by HUD during an administrative hearing.[178] Thus, HUD declines to include expert witness specific provisions in the Final Rule because they are not necessary in light

of other more general treatment of expert witnesses.

*Comment: HUD should expand the Proposed Rule to add additional protections for specific groups.*

Commenters stated that HUD should create regulations that apply specifically to discrimination based on disability, since the nature of proof for such cases is distinct. Commenters also proposed that HUD add additional protections for individuals facing discrimination based on source of income and criminal records. Others suggested that HUD add former offenders and convicted felons to the protected class list. Another comment requested that Lesbian, Gay, Bisexual, Transgender, and Queer individuals be added to the list of protected classes.

*HUD Response:* HUD appreciates the perspective provided by commenters who argued that HUD should expand upon the regulations to provide more guidance in disability cases as well as adding protected classes. To the extent that the commenters requested that HUD add protected classes to the Fair Housing Act, HUD lacks the authority to do so. Congress enacted the Fair Housing Act and expressly included race, color, national origin, sex and religion as protected classes, as well as the Fair Housing Amendments Act, which added disability and familial status as protected classes. Disparate impact is a theory of relief under the Fair Housing Act and upheld by the Supreme Court in its decision in *Inclusive Communities.* HUD is therefore not "creating law," but merely providing clarity regarding how the Fair Housing Act is to be interpreted as it relates to disparate impact, in light of the Court's decision in *Inclusive Communities.* Regarding commenters' request for HUD to create regulations that apply specifically to persons with disabilities, HUD notes that it has regulations specifically regarding persons with disabilities in 24 CFR part 8 and part 100, subpart D. Nothing in the Final Rule precludes its use in the context of disability.

*Comment: HUD should, in general, provide definitions throughout the rule.*

Commenters stated that HUD's Proposed Rule used many terms without firm definitions, which would cause confusion and complicate implementation of the rule. Commenters stated that providing definitions now, instead of waiting for courts to create them in case law, would promote compliance and avoid additional litigation. Commenters said unclear definitions created uncertainty about how the rule will function. Commenters pointed to the words "significant,"

"robust," and "material" as meaning the same thing, but are used interchangeably, which causes confusion about whether the intent is for them to be different. Commenters suggested that HUD instead use "substantial," meaning of important value, rather than "significant," which refers to statistical significance. Using "substantial" would avoid unnecessary legal disputes over the different terms throughout the Proposed Rule.

*HUD Response:* Prior to 2013, disparate impact as a theory of liability was largely developed through the courts and that has continued to a significant extent even after the 2013 Rule. Further, definitions are typically highly litigated since discriminatory effect cases tend to be highly fact specific. HUD has made changes to the regulatory text to distinguish "robust causality" as discussed in *Inclusive Communities,* use "significant" for purposes of pleading that the disparity caused by the policy or practice is significant, and use "material" with regard to the alternative proposed policy or practice burden and costs. This notice elsewhere makes clear that "significant" is not used exclusively in the statistical sense of the term. HUD believes these changes provide clarity and further discusses them above.

*Comment: HUD should provide more guidance for implementing the Proposed Rule.*

Commenters asked HUD for additional guidance on specific practices that would be prohibited or allowed under the Proposed Rule. Commenters stated that sub-regulatory guidance would be able to clarify concepts with examples of safe harbors or asked specific questions about whether particular practices would be considered illegal under the Proposed Rule. Commenters also asked for a sample form or template for pro se plaintiffs regarding the elements.

*HUD Response:* HUD has sought to provide a comprehensive framework for the Final Rule for considering a wide range of potential applications. Issues of disparate impact are particularly fact specific. Accordingly, HUD declines to provide additional examples of any specific situations which may succeed or fail under disparate impact liability, including specific safe harbors, particular practices, or a compliant template for disparate impact. These types of decisions are well within the competency of administrative law judges and courts to evaluate on a case by case basis within the Final Rule's framework. Under Executive Order 13891, sub-regulatory guidance does not generally have the force of law and

---

[178] *See* 42 U.S.C. 3612(c).

would not in the context of this Final Rule to the extent it added objections have binding effect. Further, with regard to the creation of a sample form or template, HUD provides an online complaint form that allows individuals to provide a brief description of their allegations to HUD to start the process of filing a discrimination complaint.[179] Housing discrimination complaints that are received by HUD are then reviewed by a fair housing specialist, who will assist in the drafting and filing of an official complaint. HUD's process does not require that a party be represented by an attorney and provides individuals the opportunity to speak directly to a fair housing specialist for any questions they have throughout the process.

HUD will review existing guidance for conformity with this Final Rule and other applicable authorities and remove inconsistent items. The issue of whether additional guidance is warranted will be considered as the rule is put into practice.

*Comment: HUD should take a more data-driven approach.*

A commenter recommended looking at the number of Fair Housing Act disparate impact claims filed in Federal court, before and after the 2013 Rule, and after the Supreme Court's decision in *Inclusive Communities*. The commenter specifically noted that nationwide, very few disparate impact claims were filed since 2013, and those that were brought were resolved at an early stage. The commenter also stated that a local survey showed that the overall number of cases since 2013 has not increased, and that the *Inclusive Communities* decision in 2015 has not affected the number of claims brought under a disparate impact theory.

Similarly, several commenters noted that HUD should use a more data driven approach to disparate impact liability and provided a number of suggestions. Another commenter stated that it is appropriate for HUD to look to information or data available to assess the Proposed Rule's impact, including how many discriminatory effect claims were meritorious.

Commenters asserted that they believe HUD's attorneys have been studying the number, type, and likelihood of success of disparate impact claims since 2015, and it would be helpful for HUD to publish its findings based on that research and solicit public feedback concerning the quality of that research and HUD's conclusions.

*HUD Response:* HUD appreciates the suggestions for improving disparate impact regulations in the future, including using a data-driven approach. Data is an important element in many disparate impact claims, and parties are of course free to use data within the framework of this Final Rule in individual cases. HUD has in the past and will continue to review cases as they move through both the administrative and civil court processes in order to ensure the Final Rule is working as intended. As it has always done, HUD will be sure to continuously evaluate claims of discriminatory effect and intentional discrimination in its efforts to uphold the promise of and enforce the Fair Housing Act.

*Comment: Recordkeeping requirements should be added.*

A commenter recommend that Federal financial assistance recipients and all complexes with more than 15 tenants should be required to maintain applications and housing decisions on file for five years, and such information should be made available for review during litigation for use in determining disparate impact of business decisions in order to enforce the Fair Housing Act.

*HUD Response:* This Final Rule does not alter recordkeeping requirements for HUD housing programs, and entities receiving Federal financial assistance are responsible for maintaining records in a manner that is compliant with the relevant guidelines of the programs in which they participate. Further, this Final Rule makes no changes to rules related to civil and administrative procedures relative to records retention, litigation, or the Fair Housing Act's requirement to provide documents and other evidence during an investigation.

*Comment: Social Vulnerability Index should be adopted.*

One commenter suggested HUD adopt the "Social Vulnerability Index"[180] as a tool to ensure fair and just access to housing. The commenter proposed the following three-point inquiry to determine whether the impact of an individual's actions or institution's policy creates an adverse impact: (1) Does it happen more frequently to members of one group than others? (2) Is there a differential impact on members of one group than another? (3) Is it more difficult for members of one group to overcome than another?

*HUD Response:* The Final Rule provides a framework for evaluating whether non-intentional, unlawful discrimination occurs under the Fair Housing Act as interpreted by *Inclusive Communities*. The "social vulnerability index" appears inconsistent with applicable law.

*Comment: 2016 guidance on use of criminal background checks should be withdrawn.*

Multiple commenters stated that HUD's 2016 guidance threatened disparate impact liability for providers who use criminal screening to disqualify prospective residents to protect other residents. Commenters also stated that HUD should limit the scope of any "individualized assessments" regarding criminal records because of the burden it creates for housing providers. Although not explicitly required in the Proposed Rule, the commenters stated that this should be clarified considering the mitigating evidence required by the courts in prior cases.

*HUD Response:* HUD intends to review its existing guidance for consistency with the Final Rule.

*Comment: The Proposed Rule should consider the Takings Clause of the U.S. Constitution when discussing state action.*

A commenter suggested the application of disparate impact regulations in cases involving state action impacting property should differ from other circumstances, especially when such state action violates the Takings Clause. This commenter recommended that the Proposed Rule be withdrawn or revised to ensure an appropriate balance with respect to local zoning ordinances that create barriers to affordable housing.

*HUD Response:* HUD appreciates the commenter's suggestion but declines to carve out a separate portion of the Final Rule for government action. Unlike the situation that led to the Supreme Court's decision in *Knick* v. *Township of Scott, Pennsylvania*,[181] cited by the commenter, the disparate impact rule and the Takings Clause of the U.S. Constitution are not mutually exclusive. An individual may challenge a zoning ordinance as having a discriminatory effect on a protected class group, while the owner of the affected property may challenge the same ordinance under the Takings Clause. It is also HUD's position that the changes being made do not create an imbalance that would prevent an individual's ability to challenge a zoning or land use ordinance as having a discriminatory effect based on protected class status.

*Comment: Exceptions to requirements.*

---

[179] U.S. Department of Housing and Urban Development, *File a Complaint, HUD.gov, https://www.hud.gov/program_offices/fair_housing_equal_opp/online-complaint.*

[180] U.S. Department of Health and Human Services, *CDC's Social Vulnerability Index (SVI)*, ATSDR Agency for Toxic Substances and Disease Registry (Sept. 12, 2018), *https://svi.cdc.gov/*.

[181] 139 S. Ct. 2162 (2019).

A commenter recommended that landlords renting four or fewer units should not be subject to the Proposed Rule; another suggests HUD add an exemption for private landlords who do not receive funds under any HUD program.

*HUD Response:* HUD does not have the authority to create new exceptions under the Fair Housing Act. Contained within the Fair Housing Act is an exemption for a single-family house sold or rented by an owner if that owner does not own more than three houses.[182] Another exemption applies to rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.[183]

*Comment: HUD should define and provide examples of discriminatory intent.*

Another commenter suggested that HUD should define discriminatory intent and provide examples to clarify when a claim should not be brought under disparate impact but under discriminatory intent. This commenter also suggested that HUD clarify that policies which allow for the exercise of discretion cannot be challenged under disparate impact law because allowing discretion is not the harm, but the intentional discrimination that results from this discretion is the harm.

*HUD Response:* Intentional discrimination is outside the scope of this rulemaking and not included in any way under this Final Rule. Nothing impairs a party's ability to bring a claim that includes both intentional discrimination and disparate impact allegations. As discussed above, a single discretionary action typically is not a policy or practice. As noted by the commenter, this does not mean that such single action may not be unlawful under the Fair Housing Act.

*Comment: Property management companies should not have the ability to impose minimum income amounts on prospective tenants.*

A commenter opposed property management companies' ability to impose minimum income amounts on prospective tenants. The commenter believes that if a tenant can pay rent, then they may be able to use other government assistance, such as SNAP food assistance, and should not be excluded from renting.

*HUD Response:* While there may be some instances where certain policies

---

[182] 42 U.S.C. 3603(b)(1).
[183] 42 U.S.C. 3603(b)(2).

and practices regarding tenant finances could constitute unlawful disparate impact, such a claim should be considered under this Final Rule's framework. A blanket rule on this issue is inconsistent with *Inclusive Communities.* HUD also notes that socio-economic status is not a protected class under the Fair Housing Act.

## V. Findings and Certifications

*Regulatory Review—Executive Orders 12866 and 13563*

Executive Order 13563 (''Improving Regulation and Regulatory Review'') directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 (''Regulatory Planning and Review''), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. This rule was determined to be a ''significant regulatory action'' as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This Final Rule continues to hold to the longstanding interpretation that the Fair Housing Act includes disparate impact liability, and continues to establish uniform, clear standards for determining whether a practice that has a disparate impact is in violation of the Fair Housing Act, regardless of whether the practice was adopted with intent to discriminate.

As stated in the Background section, the need for this updated rule arises in part because *Inclusive Communities,* which held that disparate impact claims are cognizable under the Fair Housing Act, established guidelines and warned of constitutional limitations to the doctrine. These guidelines and warnings were not available to HUD when HUD drafted the 2013 Rule. Further, *Inclusive Communities* used standards with specific phrases such as ''robust causal link'' and ''artificial, arbitrary, and unnecessary'' which were not previously part of established discriminatory effect jurisprudence and were not included in the 2013 Rule. The Final Rule is therefore more consistent with the now binding Supreme Court

precedent than the 2013 Rule. Further, the 2013 Rule provided a three-step burden shifting framework, but provided few details regarding how these burdens are met, and provided no analysis of how a prima facie disparate impact case would be met or of how a defendant may rebut such a case.

As discussed in the preamble to this Final Rule, HUD is exercising its discretionary rulemaking authority to bring uniformity, clarity, and certainty by updating this rule. This Final Rule aligns with the guidelines and language used in *Inclusive Communities* and provides further detail than the 2013 Rule regarding the elements required to plead a case and the defenses available in responding to a case. This would simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation cost, duration and uncertainty associated with such claims. This Final Rule will reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof and how such burdens are to be met.

This Final Rule also provides clarity on how the Fair Housing Act applies in light of the McCarran-Ferguson Act. As discussed in the preamble and in the Proposed Rule, this question has been the subject of controversy and debate. HUD's opinion as reflected by this Final Rule aligns itself with the judicial consensus HUD has observed.

HUD reviewed comments made in response to HUD's questions for public comment in the Proposed Rule, especially to aid HUD in its regulatory impact analysis. These questions and HUD's responses are discussed in the section IV of this Final Rule's preamble. HUD notes that that these comments and HUD's own further deliberation aided HUD in drafting the Final Rule to be consistent with *Inclusive Communities* and HUD's interpretation of the disparate impact standard generally. HUD believes that the Final Rule accurately reflects the standard provided in *Inclusive Communities.* Accordingly, while this Final Rule is a significant regulatory action under Executive Order 12866 in that it establishes uniform standards for determining whether a housing action or policy has a discriminatory effect on a protected group, it is not an economically significant regulatory action. The burden reduction that HUD believes will be achieved through updating these standards will not reach an annual impact on the economy of $100 million or more, because HUD's approach is not a significant departure

from, but in fact aligns with, the Supreme Court's holding in *Inclusive Communities.* Although the burden reduction provided by this Final Rule will not result in an economically significant impact on the economy, it nevertheless provides some burden reduction through the uniformity and clarity presented by HUD's standards promulgated through this Final Rule and is therefore consistent with Executive Order 13563.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This Final Rule updates HUD's uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. Given the recent Supreme Court decision, HUD's objective in this rule is to ensure consistency and uniformity, and therefore reduce burden for all who may be involved in a challenged practice.

Accordingly, the undersigned certifies that the rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This Final Rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency

meets the consultation and funding requirements of section 6 of the Executive Order. This Final Rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This Final Rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

List of Subjects in 24 CFR Part 100

Civil Rights, Fair Housing, Individuals with disabilities, Mortgages, Reporting and Recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

**PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT**

■ 1. The authority for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

■ 2. In § 100.5, amend paragraph (b) by revising the second sentence, adding a third sentence, and adding paragraph (d) to read as follows:

**§ 100.5  Scope.**

\*     \*     \*     \*     \*

(b) \* \* \* The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, and defenses and rebuttals to allegations of unlawful discriminatory effect may be made, consistent with the standards outlined in § 100.500. Guidance documents and other administrative actions and documents issued by HUD shall be consistent with the standards outlined in § 100.500.

\*     \*     \*     \*     \*

(d) Nothing in this part requires or encourages the collection of data with respect to race, color, religion, sex, handicap, familial status, or national origin.

■ 3. In § 100.70, add a new paragraph (d)(5) to read as follows:

**§ 100.70  Other prohibited sale and rental conduct.**

\*     \*     \*     \*     \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

■ 4. Revise § 100.500 to read as follows:

**§ 100.500  Discriminatory effect prohibited.**

(a) *General.* Liability may be established under the Fair Housing Act based on a specific policy's or practice's discriminatory effect on members of a protected class under the Fair Housing Act even if the specific practice was not motivated by a discriminatory intent.

(b) *Pleading stage.* At the pleading stage, to state a discriminatory effects claim based on an allegation that a specific, identifiable policy or practice has a discriminatory effect, a plaintiff or charging party (hereinafter, "plaintiff") must sufficiently plead facts to support each of the following elements:

(1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

(2) That the challenged policy or practice has a disproportionately adverse effect on members of a protected class;

(3) That there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect;

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct relation between the injury asserted and the injurious conduct alleged.

(c) *Burdens of proof in discriminatory effect cases.* The burdens of proof to establish that a policy or practice has a discriminatory effect, are as follows:

(1) A plaintiff must prove by the preponderance of the evidence each of the elements in paragraphs (b)(2) through (5) of this section.

(2) A defendant or responding party (hereinafter, "defendant") may rebut a plaintiff's allegation under (b)(1) of this section that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice advances a valid interest (or

interests) and is therefore not arbitrary, artificial, and unnecessary.

(3) If a defendant rebuts a plaintiff's assertion under paragraph (c)(1) of this section, the plaintiff must prove by the preponderance of the evidence either that the interest (or interests) advanced by the defendant are not valid or that a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(d) *Defenses.* The following defenses are available to a defendant in a discriminatory effect case.

(1) *Pleading stage.* The defendant may establish that a plaintiff has failed to sufficiently plead facts to support an element of a prima facie case under paragraph (b) of this section, including by showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a:

(i) Federal, state, or local law;

(ii) Binding or controlling court, arbitral, administrative order or opinion; or

(iii) Binding or controlling regulatory, administrative or government guidance or requirement.

(2) *After the pleading stage.* The defendant may establish that the plaintiff has failed to meet the burden of proof to establish a discriminatory effects claim under paragraph (c) of this section, by demonstrating any of the following:

(i) The policy or practice is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class, with respect to the allegations under paragraph (b). This is not an adequate defense, however, if the plaintiff demonstrates that an alternative, less discriminatory policy or practice would result in the same outcome of the policy or practice, without imposing materially greater costs on, or creating other material burdens for the defendant.

(ii) The plaintiff has failed to establish that a policy or practice has a discriminatory effect under paragraph (c) of this section.

(iii) The defendant's policy or practice is reasonably necessary to comply with a third party requirement, such as a:

(A) Federal, state, or local law;

(B) Binding or controlling court, arbitral, administrative order or opinion; or

(C) Binding or controlling regulatory, administrative, or government guidance or requirement.

(e) *Business of insurance laws.* Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance.

(f) *Remedies in discriminatory effect cases.* In cases where liability is based solely on a discriminatory effect theory, remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons. In administrative proceedings under 42 U.S.C. 3612(g) based solely on discriminatory effect theory, HUD will seek only equitable remedies, provided that where pecuniary damage is proved, HUD will seek compensatory damages or restitution; and provided further that HUD may pursue civil money penalties in discriminatory effect cases only where the defendant has previously been adjudged, within the last five years, to have committed unlawful housing discrimination under the Fair Housing Act, other than under this section.

(g) *Severability.* The framework of the burdens and defenses provisions are considered to be severable. If any provision is stayed or determined to be invalid or their applicability to any person or circumstances invalid, the remaining provisions shall be construed as to be given the maximum effect permitted by law.

**Anna Maria Farías,**
*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2020–19887 Filed 9–23–20; 8:45 am]

**BILLING CODE 4210–67–P**



# Presidential Documents

Memorandum of January 26, 2021

## Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies

### Memorandum for the Secretary of Housing and Urban Development

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Background and Policy.* Diverse and inclusive communities strengthen our democracy. But our Nation's history has been one of great struggle toward this ideal. During the 20th century, Federal, State, and local governments systematically implemented racially discriminatory housing policies that contributed to segregated neighborhoods and inhibited equal opportunity and the chance to build wealth for Black, Latino, Asian American and Pacific Islander, and Native American families, and other underserved communities. Ongoing legacies of residential segregation and discrimination remain ever-present in our society. These include a racial gap in homeownership; a persistent undervaluation of properties owned by families of color; a disproportionate burden of pollution and exposure to the impacts of climate change in communities of color; and systemic barriers to safe, accessible, and affordable housing for people of color, immigrants, individuals with disabilities, and lesbian, gay, bisexual, transgender, gender non-conforming, and queer (LGBTQ+) individuals.

Throughout much of the 20th century, the Federal Government systematically supported discrimination and exclusion in housing and mortgage lending. While many of the Federal Government's housing policies and programs expanded homeownership across the country, many knowingly excluded Black people and other persons of color, and promoted and reinforced housing segregation. Federal policies contributed to mortgage redlining and lending discrimination against persons of color.

The creation of the Interstate Highway System, funded and constructed by the Federal Government and State governments in the 20th century, disproportionately burdened many historically Black and low-income neighborhoods in many American cities. Many urban interstate highways were deliberately built to pass through Black neighborhoods, often requiring the destruction of housing and other local institutions. To this day, many Black neighborhoods are disconnected from access to high-quality housing, jobs, public transit, and other resources.

The Federal Government must recognize and acknowledge its role in systematically declining to invest in communities of color and preventing residents of those communities from accessing the same services and resources as their white counterparts. The effects of these policy decisions continue to be felt today, as racial inequality still permeates land-use patterns in most U.S. cities and virtually all aspects of housing markets.

The Congress enacted the Fair Housing Act more than 50 years ago to lift barriers that created separate and unequal neighborhoods on the basis of race, ethnicity, and national origin. Since then, however, access to housing and the creation of wealth through homeownership have remained persistently unequal in the United States. Many neighborhoods are as racially segregated today as they were in the middle of the 20th century. People of color are overrepresented among those experiencing homelessness. In addition, people of color disproportionately bear the burdens of exposure

to air and water pollution, and growing risks of housing instability from climate crises like extreme heat, flooding, and wildfires. And the racial wealth gap is wider than it was when the Fair Housing Act was enacted, driven in part by persistent disparities in access to homeownership. Although Federal fair housing laws were expanded to include protections for individuals with disabilities, a lack of access to affordable and integrated living options remains a significant problem.

The Federal Government has a critical role to play in overcoming and redressing this history of discrimination and in protecting against other forms of discrimination by applying and enforcing Federal civil rights and fair housing laws. It can help ensure that fair and equal access to housing opportunity exists for all throughout the United States. This goal is consistent with the Fair Housing Act, which imposes on Federal departments and agencies the duty to "administer their programs and activities relating to housing and urban development . . . in a manner affirmatively to further" fair housing (42 U.S.C. 3608(d)). This is not only a mandate to refrain from discrimination but a mandate to take actions that undo historic patterns of segregation and other types of discrimination and that afford access to long-denied opportunities.

Accordingly, it is the policy of my Administration that the Federal Government shall work with communities to end housing discrimination, to provide redress to those who have experienced housing discrimination, to eliminate racial bias and other forms of discrimination in all stages of home-buying and renting, to lift barriers that restrict housing and neighborhood choice, to promote diverse and inclusive communities, to ensure sufficient physically accessible housing, and to secure equal access to housing opportunity for all.

**Sec. 2.** *Examining Recent Regulatory Actions.* The Secretary of Housing and Urban Development (HUD) shall, as soon as practicable, take all steps necessary to examine the effects of the August 7, 2020, rule entitled "Preserving Community and Neighborhood Choice" (codified at parts 5, 91, 92, 570, 574, 576, and 903 of title 24, Code of Federal Regulations), including the effect that repealing the July 16, 2015, rule entitled "Affirmatively Furthering Fair Housing" has had on HUD's statutory duty to affirmatively further fair housing. The Secretary shall also, as soon as practicable, take all steps necessary to examine the effects of the September 24, 2020, rule entitled "HUD's Implementation of the Fair Housing Act's Disparate Impact Standard" (codified at part 100 of title 24, Code of Federal Regulations), including the effect that amending the February 15, 2013, rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" has had on HUD's statutory duty to ensure compliance with the Fair Housing Act. Based on that examination, the Secretary shall take any necessary steps, as appropriate and consistent with applicable law, to implement the Fair Housing Act's requirements that HUD administer its programs in a manner that affirmatively furthers fair housing and HUD's overall duty to administer the Act (42 U.S.C. 3608(a)) including by preventing practices with an unjustified discriminatory effect.

**Sec. 3.** *General Provisions.* (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) You are authorized and directed to publish this memorandum in the *Federal Register*.

THE WHITE HOUSE,
*Washington, January 26, 2021*

[FR Doc. 2021–02074
Filed 1–28–21; 8:45 am]
Billing code 4210–67–P

Procedures'', prior to any FAA final regulatory action.

## Lists of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

## The Proposed Amendment

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of Federal Aviation Administration Order 7400.11E, Airspace Designations and Reporting Points, dated July 21, 2020, and effective September 15, 2020, is amended as follows:

*Paragraph 6005  Class E Airspace Areas Extending Upward From 700 Feet or More Above the Surface of the Earth.*

\*     \*     \*     \*     \*

## ASO AL E5  Tuscaloosa, AL [Amend]

Tuscaloosa National Airport, AL

(Lat. 33°13′14″ N, long. 87°36′41″ W)

That airspace extending upward from 700 feet above the surface within a 9.4-mile radius of Tuscaloosa National Airport and within 4.0 miles each side of the 117° bearing from the airport extending from the 9.4-mile radius to 11.8 miles southeast of the airport and within 2.0 miles each side of the of the 041° bearing extending from the 9.4-mile radius to 11.5 miles northeast of the airport and within 4.0 miles each side of the 296° bearing extending from the 9.4-mile radius to 10.8 miles northwest of the airport and within 2.0 miles each side of the 221° bearing extending from the 9.4-mile radius to 11.8 miles southwest of the airport.

Issued in College Park, Georgia, on June 21, 2021.

**Andreese C. Davis,**

*Manager, Airspace & Procedures Team South, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2021–13492 Filed 6–24–21; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–6251–P–01]**

**RIN 2529–AB02**

## Reinstatement of HUD's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** In 2020, HUD published a rule titled ''HUD's Implementation of the Fair Housing Act's Disparate Impact Standard'' (''2020 Rule''). Prior to the effective date of the 2020 rule, the U.S. District Court for the District of Massachusetts issued a preliminary injunction in *Massachusetts Fair Housing Center* v. *HUD,* staying HUD's implementation and enforcement of the rule. Consequently, the 2020 Rule never took effect. After reconsidering the 2020 Rule, HUD is proposing to recodify its previously promulgated rule titled, ''Implementation of the Fair Housing Act's Discriminatory Effects Standard'' (''2013 Rule''), which, as of the date of publication of this Proposed Rule, remains in effect due to the preliminary injunction. HUD believes the 2013 Rule better states Fair Housing Act jurisprudence and is more consistent with the Fair Housing Act's remedial purposes.

**DATES:** Comment due date: August 24, 2021.

**ADDRESSES:** Interested persons are invited to submit written comments regarding this rule to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410. All communications should refer to the above docket number and title. There are two methods for submitting public comments.

1. Electronic Submission of Comments. Interested persons may submit comments electronically through the Federal eRulemaking Portal at *www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *www.regulations.gov* website can be

viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

2. Submission of Comments by Mail. Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500.

Note: To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

No Facsimile Comments. Facsimile (FAX) comments are not acceptable.

Public Inspection of Public Comments. All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an appointment to review the public comments must be scheduled in advance by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339. Copies of all comments submitted are available for inspection and downloading at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Kathleen M. Pennington, Acting Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410–0500, email *HUDDisparateImpact2021@hud.gov* or telephone number 202–402–3330 (this is not a toll-free number). Persons with hearing and speech impairments may contact this phone number via TTY by calling the Federal Relay Service at 800–877–8399 (this is a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Title VIII of the Civil Rights Act of 1968, as amended (''Fair Housing Act'' or ''Act''), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities because of race, color, religion, sex, disability, familial status, or national origin.[1] Through the Fair

---

[1] 42 U.S.C. 3601–3619, 3631. This preamble uses the term ''disability'' to refer to what the Act and its implementing regulations term a ''handicap'' because that is the preferred term. *See, e.g., Hunt*

Housing Act, Congress codified its remedial purpose, providing that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [2] The Act's protections are meant to be "broad and inclusive." [3] Congress passed the Act in the wake of the assassination of Dr. Martin Luther King, Jr., recognizing that "residential segregation and unequal housing and economic conditions in the inner cities" were "significant, underlying causes of the social unrest" [4] and that both open and covert race discrimination were preventing integrated communities.[5] As the Supreme Court reiterated more recently, the Act's expansive purpose is to "eradicate discriminatory practices within a sector of the Nation's economy" and to combat and prevent segregation and discrimination in housing.[6] Congress considered the realization of this policy "to be of the highest priority." [7]

The Act gives HUD the authority and responsibility for administering and enforcing the Act, including the authority to conduct formal adjudications of complaints and to promulgate rules to interpret and carry out the Act.[8] Through that authority, HUD proposes this rulemaking.

*Discriminatory Effects Law Under the Fair Housing Act Prior to HUD's 2013 Rule*

HUD's 2013 Rule broke no new ground, but instead largely codified longstanding judicial and agency consensus regarding discriminatory effects law. Courts had long found that discrimination under the Act may be established through evidence of discriminatory effects, *i.e.,* facially neutral practices with an unjustified discriminatory effect. Indeed, all federal courts of appeals to have addressed the question had held that liability under the Act could be established by a showing that a neutral policy or practice either has a disparate impact on a protected group or creates, perpetuates, or increases segregation, even if such a

policy or practice was not adopted for a discriminatory purpose.[9] As the Sixth Circuit explained, the Act "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." [10]

HUD had for decades—consistent with this judicial consensus— concluded that facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent, violate the Act.[11] For example, in 1994, HUD, along with nine other agencies and the Department of Justice, issued a joint policy statement that recognized disparate impact liability under the Act.[12]

Although there had been some minor variation in the application of the discriminatory effects framework prior to the 2013 Rule, HUD and the federal appellate courts were largely in agreement. HUD has always used a three-step burden-shifting approach,[13]

as did many federal courts of appeals prior to the 2013 Rule.[14] Thus, HUD's 2013 Rule simply codified a familiar standard.

*HUD's 2013 Discriminatory Effects Rule*

In February 2013, after notice and public comment, and taking decades of caselaw into consideration, HUD published the 2013 Rule, which "formalize[d] its long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalize[d] a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act." [15] In promulgating the 2013 Rule, HUD noted the Act's "broad remedial intent;" [16] HUD's prior positions, including that discriminatory effects liability was "imperative to the success of the civil rights law enforcement;" [17] and the consistent application of discriminatory effects liability in the four previous decades (with minor variations) by HUD, the Department of Justice, nine other federal agencies, and federal courts.[18]

Among other things, the 2013 Rule codified a three-part burden-shifting framework consistent with frameworks on which HUD and courts had long relied: (1) The plaintiff or charging party is first required to prove as part of the prima facie showing that a challenged practice caused or predictably will cause a discriminatory effect; (2) if the plaintiff or charging party makes this prima facie showing, the defendant or respondent must then prove that the challenged practice is necessary to achieve one or more substantial,

v. *Aimco Props., L.P.,* 814 F.3d 1213, n.1 (11th Cir. 2016) (noting the term disability is generally preferred over handicap).

[2] 42 U.S.C. 3601.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972).

[4] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 529 (2015) (citing Report of the National Advisory Commission on Civil Disorders 91 (1968) (Kerner Commission Report).

[5] *Id.* at 529 (citing Kerner Commission Report).

[6] *Id.* at 539.

[7] *Trafficante,* 409 U.S. at 211 (1972).

[8] *See* 42 U.S.C. 3608(a), 3612, 3614a.

[9] *See, e.g., Graoch Assocs. # 33, L.P.* v. *Louisville/ Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (citing *Arthur* v. *City of* Toledo, 782 F.2d 565, 575 (6th Cir. 1986)); *Hallmark Developers, Inc.* v. *Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006) (citing *Hous. Investors, Inc.* v. *City of Clanton, Ala.,* 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999)); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988) (citing *Metro Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), aff'd, 488 U.S. 15 (1988) (per curium); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987 n.3 (4th Cir. 1984) (citing *Metro Hous. Dev. Corp* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977)); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) (citing *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U.S. 205, 209–10 (1972)); *United States.* v. *City of Black Jack, Missouri,* 508 F. 2d 1179, 1184–86 (8th Cir. 1974).

[10] *Graoch Assocs. #33, L.P.,* 508 F.3d at 374 (quoting *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971) (a Title VII case)).

[11] 78 FR, 11460, 11461 (Feb. 15, 2013] (citing, e.g., *HUD* v. *Twinbrook Village Apts.,* No. 02–00025600– 0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Carlson,* No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD* v. *Ross,* No. 01–92–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter,* No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[12] 78 FR 11460, 11461 (citing *Policy Statement on Discrimination in Lending,* 59 FR 18266, 18269 (Apr. 15, 1994)).

[13] *See, e.g., HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *Twinbrook*

*Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *see also Policy Statement on Discrimination in Lending,* 59 FR. 18266, 18269 (Apr. 15, 1994) (applying three-step test without specifying where the burden lies at each step).

[14] *See, e.g., Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Lapid –Laurel, L.L.C.* v. *Zoning Bd. of Adjustment,* 284 F.3d 442, 466–67 (3d Cir. 2002); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Huntington Branch NAACP* v. *Town of Huntington,* 844 F.2d 926, 939 (2d Cir. 1988).

[15] 78 FR 11460.

[16] *See also* 2011 Notice of Proposed Rulemaking, 76 FR 70911, 70922 (Nov. 16, 2011) ("In keeping with the 'broad remedial intent' of Congress in passing the Fair Housing Act, and consequently the Act's entitlement to a 'generous construction' HUD . . . has repeatedly determined that the Fair Housing Act is directed to the consequences of housing practices, not simply their purpose.") (citing *Havens Realty* v. *Coleman,* 455 U.S. 363, 380 (1982); *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731–732 (1995) (internal citations removed)).

[17] 78 FR 11460, 11461 (citing 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary)).

[18] 78 FR 11460, 11461–62.

legitimate, nondiscriminatory interests of the defendant or respondent; and (3) if the defendant or respondent meets its burden at step two, the plaintiff or charging party may still prevail by proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.[19]

*The 2015 Inclusive Communities Supreme Court Decision*

In 2015, the Supreme Court confirmed that the Act provides for discriminatory effects liability in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*[20] The Court was asked to answer two questions: (1) Whether disparate-impact claims are cognizable under the Act, and (2) if they are, what standards and burdens of proof should apply?[21] The Court declined to consider the second question.[22]

The Court found that Congress's use of the phrase "otherwise make unavailable" in § 804(a) and the term "discriminate" in § 805(a) parallel language that the Court had previously held to provide for discriminatory effects liability under other civil rights statutes.[23] Moreover, the Court held that Congress's 1988 amendment of the Act without altering the relevant text of §§ 804(a) or 805(a) indicated that Congress "accepted and ratified the unanimous [pre-1988] holdings of the [c]ourts of [a]ppeals finding disparate-impact liability." [24] The Court further held that Congress's addition of provisions that presuppose disparate impact liability as part of the 1988 amendments further provided "convincing confirmation of Congress's understanding that disparate-impact

liability exists under the FHA." [25] The Court further observed that disparate impact claims are "consistent with the FHA's central purpose" of "eradicat[ing] discriminatory practices within a sector of our [n]ation's economy." [26]

As the Court recognized: "Much progress remains to be made in our Nation's continuing struggle against racial isolation. . . . But since the passage of the Fair Housing Act in 1968 and against the backdrop of disparate-impact liability in nearly every jurisdiction, many cities have become more diverse. The FHA must play an important part in avoiding the Kerner Commission's grim prophecy that our Nation is moving toward two societies, one black, one white—separate and unequal. The Court acknowledges the Fair Housing Act's continuing role in moving the Nation toward a more integrated society." [27]

In reaching this holding, the Court explained that from its first decision to recognize disparate impact liability, in *Griggs* v. *Duke Power Co.*, it "put important limits" on the scope of liability.[28] For example, with respect to employment discrimination claims under Title VII of the Civil Rights Act, *Griggs* explained that an employer can justify a practice that has a disparate impact with a "business necessity" defense, such that Title VII "does not prohibit hiring criteria with a 'manifest relationship' to job performance." [29] Similarly, after holding that the Act provided for disparate impact liability, the *Inclusive Communities* Court noted that, under the Act, "disparate-impact liability has always been properly limited in key respects." [30] Quoting *Griggs*, the Court explained that it has always been true that disparate impact liability under the Act "mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." [31]

The Court then sketched out some of these long-standing limitations on the scope of disparate-impact liability, including: (i) The requirement that "housing authorities and private developers [have] leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard under Title VII;" and (ii) the requirement that a "claim that relies on a statistical disparity must fail

if the plaintiff cannot point to a defendant's policy or policies causing that disparity." [32]

HUD accounted for these same well-settled limitations in the 2013 Rule, which requires a charging party or plaintiff to challenge a specific practice causing the alleged discriminatory effect and permits a defendant to defend a practice that causes such an impact by demonstrating that it is necessary to achieve a substantial, legitimate, nondiscriminatory interest. The Court did not call into question the 2013 Rule's framework for analyzing discriminatory effects claims, nor did it suggest that HUD should make any modifications to that framework. To the contrary, the Court cited HUD's 2013 Rule multiple times with approval.[33] For instance, the Court noted that the burden-shifting framework of *Griggs* and its progeny, adopted by HUD in the 2013 Rule, adequately balanced the interests of plaintiffs and defendants by giving housing providers the ability "to state and explain the valid interest served by their policies." [34] Multiple courts have since read *Inclusive Communities* as affirming or endorsing the 2013 Rule's burden-shifting test.[35]

---

[19] 78 FR 11460, 11482; *see, e.g., Inclusive Cmtys. Project, Inc.*, 576 U.S. at 527 (overviewing the 2013 Rule's burden shifting framework).

[20] *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 519, 532–35.

[21] *See* Petition for a Writ of Certiorari, *in Tex. Dep't of Hous. & Cmty. Affairs et al.*, v. *Inclusive Cmtys. Project, Inc.*, 573 U.S. 991, No. 13–1371, 2014 U.S. S. Ct. Briefs LEXIS 1848, at *9; *See Questions Presented in, Tex. Dep't of Hous. & Cmty. Affairs et al.*, v. *Inclusive Cmtys Project, Inc.*, 573 U.S. 991, The United States Supreme Court 1, 1, *https://www.supremecourt.gov/qp/13-01371qp.pdf*.

[22] *Inclusive Cmtys. Project, Inc.*, 573 U.S. 991 (2014), 2014 U.S. LEXIS 4912 at *1 ("Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit granted limited to Question 1 presented by the petition."); *See also Questions Presented in, Inclusive Cmtys Project, Inc.*, 573 U.S. 991, The United States Supreme Court 1, 1, *https://www.supremecourt.gov/qp/13-01371qp.pdf*.

[23] *Inclusive Cmtys. Project, Inc.*, at 534 (citing *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971); *Bd. of Educ.* v. *Harris*, 444 U.S. 130 (1979); *Smith* v. *City of Jackson*, 544 U.S. 228 (2005)).

[24] *Id.* at 536.

[25] *Id.* at 537.

[26] *Id.* at 539 (citing 42 U.S.C. 3601).

[27] *Id.* at 546–47 (internal citations and quotations omitted).

[28] *Id.* at 531.

[29] *Id.* (quoting *Griggs*, 401 U.S. at 431–32).

[30] *Id.* at 540.

[31] *Id.* (quoting *Griggs*, 401 U.S. at 431).

[32] *Id.* at 541, 542.

[33] *Id.* at 527 (explaining the 2013 Rule, its burden shifting framework, and how the second prong is analogous to Title VII's requirement that a challenged practice be job related), 528 (noting the Court of Appeals for the Fifth Circuit relied on HUD's 2013 Rule), 541 (citing the 2013 Rule in explaining that disparate impact liability is properly limited to give housing authorities and private developers leeway to state and explain the valid interest served by their policies via step two of the burden shifting framework); 542 (approvingly noting that HUD recognized in its 2013 Rule that disparate impact liability "does not mandate that affordable housing be located in neighborhoods with any particular characteristic").

[34] *Id.* at 540–541.

[35] *See, e.g., MHANY Mgmt. Inc.* v. *Cnty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) ("The Supreme Court implicitly adopted HUD's approach"); *Ave 6E Invs., LLC* v. *City of Yuma*, 818 F.3d 493, 512–513 (9th Cir. 2016) (citing the 2013 Rule in describing the three-prong analytical structure set forth in *Inclusive Communities*); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.*, 261 F. Supp. 3d 20, 28–29 (D.D.C. 2017) (stating that the Supreme Court "carefully explained that disparate-impact liability has always been properly limited" and that "disparate-impact liability under the FHA can be proven under a burden-shifting framework analogous to that used in employment discrimination cases.") (internal citations and quotations omitted); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson*, No. 13–CV–8564, 2017 U.S. Dist. LEXIS 94502, at *28–*30 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework a reasonable interpretation of the Act, finding that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman*, 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in

*HUD's 2016 Notice: Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance*

In 2016, HUD published a notice (''2016 Notice'') supplementing its response to certain comments concerning homeowners insurance received during rulemaking for the 2013 Rule.[36] The notice responded to an order issued in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan.* In that case, the U.S. District Court for the Northern District of Illinois had issued a decision upholding the 2013 Rule's burden-shifting framework for analyzing discriminatory effects claims,[37] while remanding for further consideration of certain comments concerning homeowners insurance.[38] In its 2016 Notice, HUD stated, *inter alia,* that ''[a]fter careful reconsideration of the insurance industry comments in accordance with the court's decision . . . HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act. HUD continues to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis.''[39]

*HUD's 2020 Disparate Impact Rule*

On June 20, 2018, HUD published an Advance Notice of Proposed Rulemaking (''ANPRM''), inviting public comment on ''what changes, if any'' should be made to the 2013 Rule.[40] HUD then published a Notice of Proposed Rulemaking on August 19, 2019 (''2019 Proposed Rule''). In the 2019 Proposed Rule, HUD proposed to ''amend HUD's interpretation of the Fair Housing Act's disparate impact standard to better reflect the Supreme Court's 2015 ruling in *Inclusive Communities,* and to provide clarification regarding the application of the standard to State

laws governing the business of insurance.''[41]

In response to the 2019 Proposed Rule, HUD received approximately 45,000 comments, most of which opposed the proposed changes and many of which raised significant legal and policy concerns with the 2019 Proposed Rule. Commenters objected that the proposed changes did not align with caselaw and made discriminatory effects claims effectively impossible to plead and prove in many instances, thus contravening the core holding of *Inclusive Communities.*[42] HUD's own experience investigating, charging, and litigating discriminatory effects cases aligned with these comments, as will be detailed later.

On September 24, 2020, HUD published the 2020 Rule, which, *inter alia,* removed the definition of discriminatory effect, added pleading elements that made it far more difficult to initiate a case, altered the burden-shifting framework, created new defenses, and limited available remedies in disparate impact claims.[43] Some of these changes are described more fully below, along with HUD's explanation for why it now believes they are unwarranted.

*Massachusetts Fair Housing Ctr. v. HUD Order Staying Implementation of the 2020 Rule.*

Following publication of the 2020 Rule, HUD was sued in three separate federal courts—*Massachusetts Fair Housing Ctr., et al.* v. *HUD,* No. 3:20–cv–11765 (D. Mass.); *National Fair Housing Alliance, et al.* v. *HUD,* No. 3:20-cv-07388 (N.D. Cal.); *Open Communities, et al.* v. *HUD,* No. 3:20–cv–01587 (D. Conn.). The plaintiffs in each case contended that the 2020 Rule was invalid because it was inconsistent with the Act and that its promulgation violated the Administrative Procedure Act (''APA''). Prior to the effective date of the 2020 Rule, the U.S. District Court for the District of Massachusetts in *Massachusetts Fair Housing Ctr.* v. *HUD* issued a preliminary injunction staying the implementation and postponing the effective date of the 2020 Rule. The district court ordered HUD to ''preserve the status quo pursuant to the regulations in effect as of the date of this Order.''[44]

In its order, the district court preliminarily found that many

significant changes made by the 2020 Rule were likely not supported by *Inclusive Communities* or other case law. Similarly, the court concluded that the 2020 Rule did not appear to bring clarity to the discriminatory effects framework, but rather introduced new concepts that had never been part of disparate-impact caselaw without fully explaining their meaning. In support of its conclusions, the court pointed to numerous provisions in the 2020 Rule as problematic, including § 100.500(b) (''requiring at 'the pleadings stage,' among other things, that plaintiffs 'sufficiently plead facts to support' . . . '[t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law'''); § 100.500(c)(2) (permitting defendants to '''rebut a plaintiff's allegation under (b)(1) . . . that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice' merely '*advances a valid interest*'''; § 100.500(c)(3) (requiring ''at the third step of the burden-shifting framework that the plaintiff prove 'a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an *equally effective manner without imposing materially greater costs* on, or creating *other material burdens* for, the defendant''' (emphasis in original)); § 100.500(d)(1) and (d)(2)(iii) (''conflating of a plaintiff's prima facie burden and pleading burden''); and § 100.500(d)(2)(i) (the outcome prediction defense).[45]

The district court stated that the ''practical business, profit, policy consideration'' language, the ''outcome prediction'' defense, changes to the third element of the burden-shifting framework, and the conflating of a plaintiff's prima facie burden and pleading burden, ran the risk of ''effectively neutering'' discriminatory effects liability under the Act, and were all likely unsupported by *Inclusive Communities* or other judicial decisions.[46] The district court also stated that the 2020 Rule's use of ''new and undefined terminology, altered burden-shifting framework, and perplexing defenses'' accomplished ''the opposite of clarity'' and was likely ''arbitrary and capricious.''[47] The court stated that ''[t]here can be no doubt that the 2020 Rule weakens, for housing

---

[Inclusive Communities].''); *but see Inclusive Cmtys. Project v. Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019) (noting that ''debate exists regarding whether in *ICP* the Supreme Court adopted the [2013] regulation's approach or modified it'' but that it believed that *ICP* ''announced a more demanding test'' through the announcement of ''safeguards'' to incorporate into the burden shifting framework, such as a ''robust causality' requirement'').

[36] 81 FR 69012, 69012.

[37] *Prop. Cas. Insurers Ass'n of Am.* v. *Donovan,* 66 F. Supp. 3d 1018, 1051–53 (N.D. Ill. 2014).

[38] *Id.* at 1049, 1054.

[39] 81 FR 69012, 69012.

[40] 83 FR 28560.

[41] 84 FR 42854.

[42] *See, e.g.,* 85 FR 60317, 60319 (overview of some of the comments making these points).

[43] 85 FR 60288.

[44] *Mass. Fair Hous. Ctr.* v. *HUD,* No. 20–11765–MGM, 2020 U.S. Dist. LEXIS 205633, at *20–21 (D. Mass. Oct. 25, 2020).

[45] *Id.* at *9, *10 n.2, *17–18.

[46] *Id.* at *17–18.

[47] *Id.* at *18–*19.

discrimination victims and fair housing organizations, disparate impact liability under the Fair Housing Act. . . . In addition, the 2020 Rule arms defendants with broad new defenses which appear to make it easier for offending defendants to dodge liability and more difficult for plaintiffs to succeed. In short, these changes constitute a massive overhaul of HUD's disparate impact standards, to the benefit of putative defendants and to the detriment of putative plaintiffs.'' [48] The court stated that the 2020 Rule's ''massive changes . . . pose a real and substantial threat of imminent harm'' to the Massachusetts Fair Housing Center by raising the burdens and costs of pursuing claims under a discriminatory effects theory.[49]

## II. HUD'S Reconsideration of the 2020 Rule

On January 26, 2021, President Biden issued a Memorandum ordering the Department to ''take all steps necessary to examine the effects of the [2020 Rule], including the effect that amending the [2013 Rule] has had on HUD's statutory duty to ensure compliance with the Fair Housing Act'' and ''take any necessary steps . . . to implement the Fair Housing Act's requirements that HUD administer its programs in a manner that . . . furthers . . . HUD's overall duty to administer the Act [] including by preventing practices with an unjustified discriminatory effect.'' [50]

Consistent with the President's Memorandum, HUD has reconsidered the 2020 Rule and proposes that the 2013 Rule be recodified. In so proposing, HUD considered prior public comments on the various rulemakings described above, HUD's responses to those comments, HUD's 2016 supplemental explanation regarding the 2013 Rule's applicability to the insurance industry, legal precedent including *Inclusive Communities,* the *Massachusetts Fair Housing Center* court's order, and HUD's own experience with discriminatory effects cases over 40 years.

In HUD's experience, the 2013 Rule sets a more appropriately balanced standard for pleading, proving, and defending a fair housing case alleging a policy or practice has a discriminatory effect. The 2013 Rule provides greater clarity about what each party must show by relying on concepts that have a long history in judicial and agency precedent. It appropriately balances the

need to ensure that frivolous claims do not go forward with a realistic understanding of the practical challenges to litigating these claims. With regard to the 2020 Rule, HUD's experience investigating and prosecuting discriminatory effects cases informs that many of the points made by commenters and the Massachusetts District Court are, in HUD's opinion, correct, including that the changes the 2020 Rule makes, such as amending pleading standards, changing the burden shifting framework, and adding defenses, all favoring respondents, will at the very least introduce unnecessary confusion and will at worst make discriminatory effects liability a practical nullity.

HUD now proposes to recodify the 2013 Rule's discriminatory effects standard and invites comments on this proposal. HUD believes that this standard is more consistent with the Act's purpose, prior caselaw under the Act, including *Inclusive Communities,* other civil rights authorities, including the Equal Credit Opportunity Act and Title VII, and HUD's prior interpretations of the Act. While HUD previously stated that the 2020 Rule was simply intended to implement the Supreme Court's opinion in *Inclusive Communities,* HUD now believes that *Inclusive Communities* maintained the fundamentals of long-established disparate-impact precedent rather than changing them. Moreover, based on HUD's experience investigating and litigating discriminatory effects cases, HUD believes that the practical effect of the 2020 Rule's amendments is to severely limit HUD's and plaintiffs' use of the discriminatory effects framework in ways that substantially diminish that framework's effectiveness in accomplishing the purposes that *Inclusive Communities* articulated.

By comparison, in HUD's experience, the 2013 Rule has provided a workable and balanced framework for investigating and litigating discriminatory effects claims that is consistent with the Act, HUD's own guidance, *Inclusive Communities,* and other jurisprudence.

As noted above, the Court in *Inclusive Communities* heavily relied on *Griggs,* which is the foundation of Title VII disparate impact jurisprudence, to illustrate the well-settled principles of disparate impact under the Act, all of which are fully consistent with the 2013 Rule.[51] In *Griggs,* the Court explained that, under Title VII, ''[w]hat is required by Congress is the removal of artificial,

arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.'' [52] Quoting from its foundational decision in *Griggs,* the Supreme Court in *Inclusive Communities* observed that ''[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies.'' [53] This quotation from a seminal decision of longstanding disparate impact doctrine is properly read as maintaining existing law, not profoundly changing it. As *Inclusive Communities* explicitly stated, ''disparate-impact liability *has always been* properly limited in key respects'' (emphasis added), making clear that it was not adding additional pleading or proof requirements or calling for a significant departure from pre-existing precedent under the Act and Title VII.[54] Furthermore, reading *Inclusive Communities* to support a heightened pleading standard is contradicted by the fact that the ''heartland'' cases cited by the Court would not have survived a motion to dismiss under that standard because plaintiffs in those cases did not have specific facts to plausibly allege that a policy or practice was arbitrary, artificial, or unnecessary until after discovery.[55] Finally, because *Inclusive Communities* considered a judgment reached after discovery and bench trial, the Court had no occasion or opportunity to consider the proper pleading standards for cases brought under the Act. The parties did not brief or argue such questions to the Court, making it particularly unlikely that the Court intended to reach them.

For these reasons and others, HUD believes that *Inclusive Communities'* quotation of *Griggs'* decades-old ''artificial, arbitrary, and unnecessary'' formulation is best construed as

---

[48] *Id.* at *10.
[49] *Id.* at *19.
[50] *See* 86 FR 7487, 7488.

[51] *See generally Inclusive Cmtys. Project, Inc.,* 576 U.S. 519 (2015).

[52] *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 430–31 (1971).
[53] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 540 (quoting *Griggs,* 401 U.S. at 431); *see also Inclusive Cmtys. Project, Inc.,* 576 U.S. at 544 (cautioning against proof standards that ''displace valid governmental and private priorities, rather than solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers' '') (quoting *Griggs,* 401 U.S. at 431) (alterations in original).
[54] *Id.* at 540.
[55] *See, e.g., Town of Huntington, NY* v. *Huntington Branch, NAACP,* 488 U.S. 15 (1988); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184, 1187–88 (8th Cir. 1974) (specific facts produced during the case supported the court's determination that the policy was one of those ''artificial, arbitrary, and unnecessary'' practices that is properly invalidated under disparate impact doctrine); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish,* 641 F. Supp. 2d 563, 567–568 (E.D. La. 2009) (relying on information gathered after the pleadings to find disparate impact).

maintaining continuity with longstanding disparate-impact jurisprudence, as reflected in the 2013 Rule. Accordingly, HUD proposes to recodify the 2013 Rule.

HUD believes other changes the 2020 Rule made create problems that could be cured by a return to the 2013 Rule. For example, the 2020 Rule eliminated the 2013 Rule's definition of "discriminatory effect," stating that the definition was unnecessary because it "simply reiterated the elements of a disparate impact claim." [56] In eliminating this definition, the 2020 Rule erased "perpetuation of segregation" as a recognized type of discriminatory effect distinct from disparate impact, contrary to well established precedent.[57] HUD now proposes to reaffirm that perpetuation of segregation remains, as it always has been, a basis for contending that a policy has an unlawful discriminatory effect. HUD now believes that for clarity, a discriminatory effects rule should explicitly state that perpetuation of segregation is a type of discriminatory effect, distinct from disparate impact.

The 2020 Rule also eliminated from the Act's prohibitions policies or practices that could "predictably result[] in a disparate impact on a group of persons," *i.e.*, those for which the disparate impact has not yet manifested but will predictably do so.[58] As HUD stated in 2013, the Act prohibits discrimination that is predictable because it defines an "aggrieved person" as any person who "believes that such person will be injured by a discriminatory housing practice *that is about to occur.*" [59] And consistent with the Act's plain language, courts have found that predictable discriminatory effects may violate the Act: "[t]o establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect." [60] The 2020 Rule did not adequately explain how the Act and caselaw construing it can be read to require waiting until harm is inflicted before an action with predictable discriminatory effects can be challenged, nor does HUD perceive that any such explanation would be availing, given the plain language of the Act and the caselaw interpreting it. Thus, HUD proposes to recodify the 2013 Rule to correct this error.

In addition, the 2020 Rule created new and confusing defenses at both the pleading and post-pleading stage, including that the challenged policy or practice is "reasonably necessary to comply with a third-party requirement." [61] The 2020 Rule's preamble stated that this defense would not require a showing that the challenged policy is the only way to comply with such a requirement, only that the policy serves that purpose.[62] HUD now believes that this defense is inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid. The defense would preclude many otherwise proper discriminatory effects claims, because, for example, a plaintiff may not have any practical means of knowing whether some other party's policies also contributed to the defendant's practice. Nothing in *Inclusive Communities* suggests this defense is required, let alone reasonable, for HUD to create. Accordingly, HUD proposes to eliminate these provisions by recodifying the 2013 Rule.

The 2020 Rule also created a new "outcome prediction" defense, which would in practice exempt most insurance industry practices (and many other housing-related practices that rely on outcome predictions, such as lending practices) from liability under a disparate impact standard. This is inconsistent with HUD's repeated finding, including in the 2020 Rule, that "a general waiver of disparate impact law for the insurance industry would be inappropriate." [63] Although unclear, it appears that this defense would suggest using comparators that are, in HUD's experience, inappropriate. At the very least, the defense introduces unnecessary confusion into the doctrine.

The 2020 Rule limited remedies in discriminatory effects cases in three respects. It specified that "remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons." [64] It prohibited HUD in administrative proceedings from pursuing anything but "equitable remedies" except that "where pecuniary damage is proved, HUD will seek compensatory damages or restitution." [65] And it restricted HUD from seeking civil penalties in discriminatory effects cases unless the respondent had been adjudged within the last 5 years to have committed intentional unlawful housing discrimination under the Act.[66] HUD believes that these limitations have no basis in law and run contrary to public interest and the purpose of the Act. While the 2020 Rule cited *Inclusive Communities* as supporting these limitations,[67] no part of *Inclusive Communities* suggested such limitations.[68] Moreover, they are in conflict with the plain language of the Act, which provides in all cases for a wide variety of remedies, including injunctive relief, actual damages, punitive damages, and civil penalties.[69]

---

[56] 84 FR 42854; 85 FR 60288, 60306–07, 60332.

[57] *See, e.g., Graoch Assocs. # 33, L.P.,* 508 F.3d at 378 (6th Cir. 2007) (there are "two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."); *Ave. 6E Invs. v. City of Yuma,* 818 F.3d 493, 503 (9th Cir. 2016) ("[A]s the Supreme Court recently reaffirmed [in *ICP*], the FHA also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason.") (emphasis added); *see also Huntington Branch, NAACP v. Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988); *Nat'l Fair Hous. All. v. Bank of Am., NA.,* 401 F. Supp. 3d 619, 641 (D. Md. 2019) (allowing claim to proceed past motion to dismiss where plaintiff pleaded facts sufficient to allege that defendant's policies "forestall housing integration and freeze existing racial segregation patterns"); *Hallmark Devs., Inc. v. Fulton Cnty.,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005).

[58] 84 FR 42854; 85 FR 60288, 60306–07, 60322.

[59] 42 U.S.C. 3602(1)(2) (emphasis added).

[60] *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 539–40 (2015) (describing *City of Black Jack,* 508 F.2d at 1184 as "at the heartland of disparate-impact liability").

[61] 85 FR 60288, 60316–17.

[62] 85 FR 60288, 60290.

[63] 85 FR 60321 (citing "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance" 81 FR 69012).

[64] 85 FR 60288, 60333.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *See Inclusive Cmtys. Project,* 576 U.S. at 544–45 (noting considerations for courts on how to properly construct remedial orders (*i.e.*, be consistent with the Constitution, concentrate on the elimination of the offending practice, strive to be race-neutral), but in no way suggesting that remedial orders should be the sole or favored remedy in disparate impact cases, or that civil penalties in administrative proceedings are somehow inappropriate).

[69] *See, e.g.,* 42 U.S.C. 3601 note ("Nothing in the Fair Housing Act as amended by this Act limits any . . . remedy available under the Constitution or any other Act of the Congress not so amended"); 42 U.S.C. 3612(g)(3) ("If the administrative law judge finds that a respondent has engaged . . . in a discriminatory housing practice, such administrative law judge shall promptly issue an order for such relief as may be appropriate, which may include actual damages suffered by the aggrieved person and injunctive or other equitable relief. Such order may, to vindicate the public

Continued

Whereas Congress has chosen to limit the remedies available in disparate-impact cases under Title VII,[70] it has made no such choice with respect to the Act. Thus, HUD proposes to eliminate these provisions by recodifying the 2013 Rule.

In sum, HUD now believes that the 2013 Rule is preferable to the 2020 Rule. It believes the 2013 Rule is more consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities,* as well as the Act's broad remedial purpose. Based on its experience interpreting and enforcing the Act, HUD also believes the 2020 Rule, if put into effect, threatens to limit the effectiveness of the Act's discriminatory effects doctrine in ways that are inconsistent with the doctrine continuing to play its critical role in ''moving the Nation toward a more integrated society.'' [71] On the other hand, HUD believes that the 2013 Rule provided clarity, consistency, and a workable, balanced framework, recognized by the Supreme Court, under which to analyze discriminatory effects claims, and under which HUD can better ensure it has the tools to further its ''duty to administer the Act [ ] including by preventing practices with an unjustified discriminatory effect.'' [72]

## III. This Proposed Rule

For the reasons described above, HUD proposes to amend §§ 100.5 and 100.500 to recodify the discriminatory effects regulation specified in the 2013 Rule. As HUD has stated, the 2013 Rule was consistent with *Inclusive Communities.*[73] The vast majority of courts that considered this issue

subsequent to *Inclusive Communities* also found that the 2013 Rule was consistent with *Inclusive Communities.*[74] HUD thus proposes this rule because it believes the 2013 Rule accurately reflects the discriminatory effects framework under the Act, whereas the 2020 Rule does not.

HUD does not propose to amend § 100.70. The 2020 Rule made changes unrelated to § 100.500 by simply adding examples to an already non-exhaustive list of prohibited activities under the Act at § 100.70(d)(5).[75] Specifically, it noted that enacting or implementing ''building codes,'' ''permitting rules,'' or ''requirements'' that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of a protected class is prohibited.

## IV. Findings and Certifications

*Regulatory Review—Executive Orders 13563 and 12866*

Executive Order 13563 (''Improving Regulation and Regulatory Review'') directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 (''Regulatory Planning and Review''), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (''OMB'') in accordance with the requirements of the order. This proposed rule was determined to be a

''significant regulatory action'' as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

Because the 2020 Rule never took effect, and therefore did not affect the obligations of any regulated entities, this proposed rule is only recodifying the 2013 Rule and will have no impact on regulated entities except to affirm that the 2013 Rule remains in effect. Furthermore, the 2013 Rule itself had little direct effect on regulated entities because it only ''formalize[d] the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability'' and ''[was] not a significant departure from HUD's interpretation to date or that of the majority of federal courts.'' [76] Therefore, HUD does not believe that deeper analysis is needed on the impact of this rule. However, HUD invites comment on this question.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339 (this is a toll-free number).

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (''RFA'') (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule amends the Code of Federal Regulations to accurately reflect HUD's discriminatory effects regulation as it currently exists. As a result, all entities, big and small, have a responsibility to comply with the law.

As discussed above, this Proposed Rule would continue to apply the 2013 Rule, which has been in effect uninterrupted for over seven years. HUD concludes, as it did when it published the 2013 Rule, that the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. All entities, large and

---

interest, assess a civil penalty against the respondent. . .''); 42 U.S.C. 3612(p) (''[i]n any administrative proceeding brought under this section, or any court proceeding arising therefrom, or any civil action under section 812, the administrative law judge or the court . . . in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fees and costs.''); 42 U.S.C. 3613(c)(1) (''in a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred . . . the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order . . . .'').

[70] 42 U.S.C. 2000e–5(g)(1).

[71] *Inclusive Cmtys. Project,* 576 U.S. at 547.

[72] 86 FR 7487, 7488.

[73] *See, e.g.,* Defendants' Opposition to Plaintiff's Motion for Leave to Amend Complaint, *Prop. Cas. Ins. Assoc. of Am.* v. *Carson and the U.S. Dep't of Hous. and Urb. Dev.,* No. 1:13–cv–08564 (N.D. Ill. 2017); Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, *Am. Ins. Assoc.* v. *U.S. Dep't of Hous. and Urb. Dev. et al.,* No. 1:13–cv–00966 (RJL) (D.D.C. 2016).

[74] *See, e.g., MHANY Mgmt. Inc.* v. *County of Nassau,* 819 F.3d 581, 618–619 (2d Cir. 2016) (deferring to HUD's [2013] regulation, noting that ''the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]''); *Ave. 6E Invs., LLC,* 818 F.3d at 512–13 (9th Cir. 2016) (citing *Inclusive Communities* and the 2013 Rule at 100.500(c) for the same proposition); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (citing *Inclusive Communities* and HUD's 2013 Rule at 100.500(c) as standing for the same proposition); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* No. 13–CV–8564, 2017 U.S. Dist. LEXIS 94502, at *29–30 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that ''in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction.''); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the ''burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*].'').

[75] 85 FR 60326.

[76] 78 FR 11460, 11480.

small, have been subject to the Fair Housing Act for over fifty years and subject to the 2013 Rule for over seven years. For the minority of entities that have failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute and regulation. This proposed rule does not change that substantive obligation; it merely recodifies the regulation that more accurately reflects the law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Furthermore, HUD anticipates that this Proposed Rule would eliminate confusion for all entities, including small Fair Housing Advocacy organizations, by ensuring HUD's regulation accurately reflects the current standards. Accordingly, the undersigned certifies that this Proposed Rule would not have a significant economic impact on a substantial number of small entities. HUD invites comments on this certification. HUD specifically invites comments on the number of small entities which commenters believe may be affected by this regulation.

*Environmental Impact*

This proposed rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This proposed rule would not have federalism implications and would not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) ("UMRA") establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector.

This proposed rule would not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

**List of Subjects in 24 CFR Part 100**

Aged, Civil rights, Fair housing, Incorporation by reference, Individuals with disabilities, Mortgages, and Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD proposes to amend 24 CFR part 100 as follows:

**PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT**

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

**Subpart A—General**

■ 2. In § 100.5, revise paragraph (b) and remove paragraph (d) to read as follows:

**§ 100.5   Scope.**

\*     \*     \*     \*     \*

(b) This part provides the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of residential real estate-related transactions. The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.

\*     \*     \*     \*     \*

**Subpart G—Discriminatory Effect**

■ 3. Revise § 100.500 to read as follows:

**§ 100.500   Discriminatory effect prohibited.**

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

Dated: June 17, 2021.

**Jeanine Worden,**

*Acting Assistant Secretary, Office of Fair Housing and Equal Opportunity.*

[FR Doc. 2021–13240 Filed 6–24–21; 8:45 am]

**BILLING CODE 4210–67–P**

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** kr6-skcs-z41b
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0007
Mass Mail Campaign 2: Comment Submitted by Sharon Schuler, Total as of 8/24/2021: 14

## Submitter Information

## General Comment

Thank you for the invitation to submit public comments in response to the Notice of Proposed Rulemaking issued by the U.S. Department of Housing and Urban Development (HUD) and titled Reinstatement of HUDs Discriminatory Effects Standard.

I am familiar with the disparate impact regulation issued by HUD in 2013and with the U.S. Supreme Courts Inclusive Communities decision in 2015, which upheld the concept of disparate impact liability but articulated some important limitations on its application. If HUDs current proposal is adopted, the 2013 version of the rule would be reinstated, once again applying disparate impact to homeowners and habitational insurers without the limitations recognized by the U.S. Supreme Court. This result would make the insurance industry less able to accurately price for risk and penalize many Americans.

As a property casualty insurance underwriter, it is my job to evaluate risk and determine which risks a company should agree to insure, and at what price. Risk-based pricing is fair and objective because it is based on data, and it is fundamental to the property casualty industry.

The property casualty insurance market works best when every insured pays a rate that accurately reflects the cost of providing insurance to policyholders that are similarly situated from a risk perspective. The new layer of federal regulation that HUD has asserted over homeowners, property, and hazard insurance conflicts with the McCarran Ferguson Act and would require insurers to charge different rates for members of protected classes than for policyholders that are not members of a protected class but who have a similar risk profile. This result would violate state insurance law and regulations that prohibit as unfairly discriminatory charging different rates for consumers with similar risk profiles.

Risk-based insurance underwriting is objective, but application of HUDs disparate impact rule to insurers threatens risk-based pricing because it would require insurers to consider information, such as race, which is data that insurers do not collect. In doing so, the reinstated rule would conflict with state laws that require rates to be based upon neutral, actuarially sound, risk-predictive factors. This would interfere with the ability of insurers to comply with state law and could dramatically increase compliance costs. Increased compliance costs could ultimately make insurance more expensive for consumers and policyholders.

For these reasons, I urge HUD to exempt actuarial risk-based pricing and underwriting of homeowners insurance from the Disparate Impact Rule.

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** krm-hz2o-0fgu
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0016
Comment Submitted by American Family Insurance

## Submitter Information

## General Comment

See attached file(s)

## Attachments

AFI HUD Comment

July 30, 2021

<u>Via Federal eRulemaking Portal</u>

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 Seventh Street, S.W., Room 10276
Washington, DC 20410

> Re: Docket No. HUD-2021-0033
> Docket Name: FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

To whom it may concern:

American Family Insurance (AFI) is the nation's thirteenth-largest property/casualty insurance company and the eighth largest writer of homeowners insurance. Based in Madison, Wisconsin, we are owned solely by our policyholders and supporting them is our top priority. American Family serves millions of policyholders through a suite of auto, homeowners, life, business, and farm/ranch insurance products. We appreciate this opportunity to provide comment on HUD's recent proposal to reinstate the 2013 rule despite the limitations set forth by the US Supreme Court in its 2015 *Inclusive Communities* decision.

In the context of homeowners insurance, the 2013 Disparate Impact Rule does not comport with the standards and limitations articulated in *Inclusive Communities*. Further, the application of the rule to homeowners insurance violates the McCarran-Ferguson Act which leaves regulation of the "business of insurance" to the states in this circumstance where it hasn't been preempted by a federal law that "specifically relates to the business of insurance".

Insurance carriers are allowed by state insurance laws and regulations to consider a number of factors and characteristics in underwriting and rating insurance so that risk is fairly distributed and shared and the resulting premiums are adequate to cover exposures while not being excessive. Our premiums are determined based on loss costs and expenses related to providing coverage and servicing our policyholders and we must support all of our rate filings with actuarial, statistical and experience data. We do not collect "protected class" characteristics as they do nothing to further our ability to accurately rate and set premium and while definitions vary to some extent from state to state, our actions must not be unfairly discriminatory and we are generally prohibited from using factors such as race, religion and ethnicity as rating or

underwriting classifications. Including such factors would add a new layer of federal regulation and interfere with the ability of insurers to comply with state law, significantly increase compliance and litigation costs and altar pricing structures that have increased the availability and affordability of insurance, ultimately making insurance more expensive for consumers and policyholders.

Citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971) at 431, the *Inclusive Communities* court made clear that the focus of the disparate-impact rule should be "removal of artificial, arbitrary, and unnecessary barriers". (*Id* at 2524) The highly regulated practices of homeowner insurers are anything but artificial or arbitrary.

To avoid any issue related to the use of prohibited protected class-based factors insurers have historically not gathered that information from prospective insureds. The burden shifting structure of the Disparate Impact Rule necessitates the gathering of such prohibited information to evaluate and analyze whether there is a disparate impact to any protected class through the use of developed rating factors and underwriting practices, thus promoting the thing that the S. Ct. cautioned against in saying that "[d]ifficult questions might arise if disparate-impact liability under the FHA caused race to be used and considered in a pervasive and explicit manner to justify governmental or private actions that, in fact, tend to perpetuate race-based considerations rather than move beyond them. Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." (*Id* at 2524)

*Inclusive Communities* makes necessary other changes to the rule that are of a more general nature; the requirement that plaintiffs allege facts at the pleading stage that demonstrate a causal connection and not only rely on a statistical disparity and that the plaintiff's showing of an alternative practice to achieve the defendant's intended and legitimate business outcomes be as effective as the challenged practice. Both of these mandates support the proposition clearly stated by the Supreme Court that disparate impact liability under the FHA is not a tool for plaintiffs to force defendants to "reorder their priorities" or to "displace valid governmental and private priorities." (*Id* at 2522 and 2524) and further that "[d]isparate impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a free-enterprise system." (*Id* at 2523 (quoting *Wards Cove Packing Co., v. Antonio,* 490 U.S. 642, 653 (1989)).

To conclude, *Inclusive Communities* mandates changes that must be made to the Disparate Impact Rule to limit its use and clarify the focus on "removal of artificial, arbitrary, and unnecessary barriers" and to uphold the ability of entities to make practical business choices. Notwithstanding any changes to the Rule, homeowners' insurance carriers must be exempted from the Rule. The unique nature of the insurance industry based on the necessity of developing underwriting and rating practices to evaluate and fairly distribute risk exposures places it in a position to have to change its entire approach to incorporate protected class considerations throughout its decision-making where historically it has been able to avoid such consideration. This accomplishes exactly what the Supreme Court identified as the risk associated with using the disparate impact rule in a way that would tend to perpetuate race-based considerations rather than move beyond them. Insurance carriers already operate under the watchful eye of state Departments of Insurance that limit consideration of protected class

characteristics like race when making rating and underwriting decisions. Since the McCarran-Ferguson Act protects state insurance policies from federal interference, it is not only appropriate, but required that HUD exempt homeowners' insurers from the Disparate-Impact Rule.

Respectfully Submitted,

David C. Holman,
Chief Strategy Officer & Secretary
American Family Mutual Insurance Company, S.I.

Susan Anderson,
General Counsel
Homesite Group Incorporated

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ks0-neki-5k9q
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0018
Comment Submitted by Bernadette DiLucido

---

## Submitter Information

---

## General Comment

My name is Bernadette DiLucido, and I am writing because I understand that the Department of Housing and Urban Development is once again revisiting the disparate impact rule, first introduced during the Obama Administration in 2013. The rule was then superseded by a Trump Administration change after a long rulemaking and review process.

Now, HUD is now considering reverting to the 2013 rule to again have Disparate Impact liability extend to homeowners' insurance without the limitations outlined by the US Supreme Court in 2015. In submitting this comment, I would like to make clear that I oppose this reversion to the old rule and hope that this action is reconsidered.

Applying disparate impact liability to homeowners' insurance under the 2013 Rule will increase insurance costs and almost certainly cause rates to go up. This rule essentially would require insurers to determine rates with to the proverbial one hand tied behind their backs, most certainly decreasing accuracy in rates. Decreasing insurer's ability to be accurate will lead to higher costs which ultimately will lead to higher rates.

My husband I have recently purchased a home in Florida and as we are moving towards retirement this would be a financial burden that we would not be able to handle.

I urge you to set aside efforts to reinstate the 2013 rule and instead make sure that homeowner's insurance is exempted from any application of disparate impact liability provisions. We simply cannot afford arbitrary increases in homeowners' insurance rates. This is unfair to policyholders and will result in higher insurance costs for Americans.

Sincerely,
Bernadette DiLucido
bernadette.dilucido@augustinian.org
720 Ash Avenue Collingdale, PA 19023

---

## Attachments

DiLucido

Disparate Impact Rule

 Federal Docket HUD-2021-0033

RE: Disparate Impact Rule – "Reinstatement of Discriminatory Effects Standard"

My name is Bernadette DiLucido, and I am writing because I understand that the Department of Housing and Urban Development is once again revisiting the disparate impact rule, first introduced during the Obama Administration in 2013. The rule was then superseded by a Trump Administration change after a long rulemaking and review process.

Now, HUD is now considering reverting to the 2013 rule to again have Disparate Impact liability extend to homeowners' insurance without the limitations outlined by the US Supreme Court in 2015. In submitting this comment, I would like to make clear that I oppose this reversion to the old rule and hope that this action is reconsidered.

Applying disparate impact liability to homeowners' insurance under the 2013 Rule will increase insurance costs and almost certainly cause rates to go up. This rule essentially would require insurers to determine rates with to the proverbial one hand tied behind their backs, most certainly decreasing accuracy in rates. Decreasing insurer's ability to be accurate will lead to higher costs which ultimately will lead to higher rates.

 My husband I have recently purchased a home in Florida and  as we are moving towards retirement this would be a financial burden that we would not be able to handle.

 I urge you to set aside efforts to reinstate the 2013 rule and instead make sure that homeowner's insurance is exempted from any application of disparate impact liability provisions. We simply cannot afford arbitrary increases in homeowners' insurance rates. This is unfair to policyholders and will result in higher insurance costs for Americans.


Sincerely,

Bernadette DiLucido

bernadette.dilucido@augustinian.org

720 Ash Avenue Collingdale, PA 19023

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ks0-typn-zsnn
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0025
Comment Submitted by Senator Rick Outman, District 33, State of Michigan

---

## Submitter Information

---

## General Comment

Thank you for the opportunity to submit a public comment regarding the Disparate Impact Rule. I believe this rule change is unnecessary and could ultimately hurt policyholders through higher prices.

As a State Senator representing Michigan's 33rd Senate District, I strongly feel that insurance regulations are best handled by state authorities, who know and understand local conditions. It is this in-depth level of understanding on the side of the regulator, along with precise determinations of risk on the side of the insurer, that allow the insurance system to work well.

Risk-based pricing should be objective and not subject to fleeting changes in policy. This disparate impact rule was first proposed in 2013, then after a long process a standard was put in place in 2020. Now, less than a year later, changes are again being proposed to go back to the 2013 standards. This isn't good for policyholders and it isn't good for the insurance industry.

Insurance regulators in my state know and understand the risks relevant to homeowners in our region. So do the insurance companies that expend considerable effort to accurately assess risk and set premium prices that are competitive, fair, and protect the solvency of insurers so that they can help homeowners when it is needed.

This rule, applying disparate impact liability to homeowner's insurance, will cause problems for underwriting that I am concerned will ultimately result in higher premium costs for policyholders.

I encourage HUD to disregard this change and allow for accurate risk-based pricing that is fair to homeowners.

Sincerely,

Senator Rick Outman
District 33

---

## Attachments

028217

080521 HUD ltr



**RICK OUTMAN**
33RD DISTRICT
P.O. BOX 30036
LANSING, MI 48909-7536
PHONE: (517) 373-3760
FAX: (517) 373-8661
senroutman@senate.michigan.gov

**THE SENATE**
**STATE OF MICHIGAN**

August 5, 2021

Federal Docket HUD-2021-0033
RE: Disparate Impact Rule – "Reinstatement of Discriminatory Effects Standard"

Thank you for the opportunity to submit a public comment regarding the Disparate Impact Rule. I believe this rule change is unnecessary and could ultimately hurt policyholders through higher prices.

As a State Senator representing Michigan's 33rd Senate District, I strongly feel that insurance regulations are best handled by state authorities, who know and understand local conditions. It is this in-depth level of understanding on the side of the regulator, along with precise determinations of risk on the side of the insurer, that allow the insurance system to work well.

Risk-based pricing should be objective and not subject to fleeting changes in policy. This disparate impact rule was first proposed in 2013, then after a long process a standard was put in place in 2020. Now, less than a year later, changes are again being proposed to go back to the 2013 standards. This isn't good for policyholders and it isn't good for the insurance industry.

Insurance regulators in my state know and understand the risks relevant to homeowners in our region. So, do the insurance companies that expend considerable effort to accurately assess risk and set premium prices that are competitive, fair, and protect the solvency of insurers so that they can help homeowners when it is needed.

This rule, applying disparate impact liability to homeowners' insurance, will cause problems for underwriting that I am concerned will ultimately result in higher premium costs for policyholders.

I encourage HUD to disregard this change and allow for accurate risk-based pricing that is fair to homeowners.

Sincerely,

Senator Rick Outman
District 33

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** kso-wekq-dt8c
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0198
Comment Submitted by Florida Insurance Council

## Submitter Information

## General Comment

See attached file.

## Attachments

HUD-2021-0033 Comment Letter FL Insurance Council



P.O. Box 749 * Tallahassee, FL 32302-0749 * TEL: 850.386.6668 * Fax: 850.386.7371

August 23, 2021

<u>Via Federal eRulemaking Portal</u>

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 Seventh Street, SW
Room 10276
Washington, DC 20410- 0500

Re: Docket No. HUD-2021-0033 Docket Name: FR-6251-P-01 Reinstatement of Discriminatory.
Effects Standard

To Whom It May Concern:

The Florida Insurance Council (FIC) is Florida's largest insurance trade association, acting as the voice of Florida's insurance community. FIC was established in 1962 to represent insurers in legislative, regulatory, judicial, and executive branch forums. FIC represents over 300 businesses in Florida, which collectively write over $50 billion a year in life, health, property, and casualty policies for Florida residents and companies.

FIC and its members appreciate the opportunity to provide the following comments on the proposed rule. We respectfully request that HUD decline to reinstate its 2013 rule or exempt risk-based pricing and the underwriting of insurance from application of disparate impact liability.

On January 26, 2021, President Biden directed the Secretary of HUD to examine the "effect [of] amending the [2013 Rule] … on HUD's statutory duty to ensure compliance with the [Fair Housing Act]." And on June 25, 2021, HUD issued a notice of proposed rulemaking titled "Reinstatement of HUD's Discriminatory Effects Standard." 86 Fed. Reg. 33,590 (June 25, 2021).

In its notice of proposed rulemaking, HUD noted that its 2013 rule "broke no new ground, but instead largely codified longstanding judicial and agency consensus regarding discriminatory effects law." Id. at 33,591. HUD explained that the United States Supreme Court in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project Inc.* (*Inclusive Communities*) "sketched out some … long-standing limitations" on disparate-impact liability in its decision. Accordingly, HUD stated that it "proposes to recodify the 2013 Rule's discriminatory effects standard and invites comments on this proposal."

FIC and its members believe that HUD is simply wrong in its position that the proposed recodification of the 2013 rule is consistent with *Inclusive Communities* as it pertains to the

Page **1** of **6**

business of insurance. In fact, the contrary is true – it clearly conflicts with the U.S. Supreme Court opinion in that regard. Although the proposed rule may have some consistency with location of housing such as in *Inclusive Communities*, the principles espoused by Justice Kennedy in *Inclusive Communities* clearly support the exemption of the business of insurance from the rule and its application. Decisions on location of housing and the principles of insuring housing are distinctly different – HUD attempts to infuse itself, and the holding in *Inclusive Communities,* into the business of insurance when it is not qualified or authorized by the judicial or legislative branch to do so. Furthermore, the *Inclusive Communities* ruling does not apply to insurance.

The background set out by Justice Kennedy in the *Inclusive Communities* case sets the framework for why HUD is incorrect in its conclusion that the recodification of the 2013 rule on disparate impact standards is consistent with the case relating to insurance. The syllabus from Justice Kennedy's decision, which relies on quotes from the opinion, states:

> Recognition of disparate-impact liability under the FHA plays an important role in uncovering discriminatory intent: it permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment.
>
> But disparate-impact liability has always been properly limited in key respects to avoid serious constitutional questions that might arise under the FHA, e.g., if such liability were imposed based solely on a showing of a statistical disparity…An important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest their policies serve, an analysis that is analogous to Title VII's business necessity standard...A robust causality requirement is important in ensuring that defendants do not resort to the use of racial quotas…**Policies, whether governmental or private, are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers."** Griggs, 401 U. S., at 431....Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision…**These limitations are also necessary to protect defendants against abusive disparate-impact claims**. (emphasis added)

Some of the consequences of applying the proposed reinstatement of the disparate impact rule to homeowners' insurance include:

- conflict with state regulatory framework;
- inequitable shifting of the burden of proof onto insurers;
- the conflict between the rule and the McCarran-Ferguson Act;
- the conflict between the rule and the filed rate doctrine;
- conflict between the rule and *Inclusive Communities*;
- abusive use of litigation by plaintiffs;
- inaccurate pricing affecting claim paying capabilities;
- conflict with risk transfer – basics of insurance;
- insolvency; and
- potential for unintentional racial quotas.

**Rule Inapplicable To The Fundamental Nature of Insurance**

Simply put, the holding and principles enunciated in the *Inclusive Communities* opinion are inapposite to the fundamentals of insurance. Because of the nature and definition of insurance, *Inclusive Communities* should not apply and thus insurance should be exempted from the proposed rule. Not only is the proposed rule in conflict to *Inclusive Communities*, but the rule relies on principles inapplicable to insurance.

HUD's proposal to reinstate the disparate impact rule focuses in large part on the fact that the rule furthers the aim of the Fair Housing Act (FHA). Yet, it makes almost no mention of the serious way that disparate-impact liability would threaten the business of insurance.

For example, the rule currently permits plaintiffs to prevail on disparate-impact claims if they can show that an insurer could use an alternative risk-based pricing and underwriting practice even if the alternative is less effective than the challenged practice in predicting loss. 78 Fed. Reg. at 11,473. However, the proposed rule does not recognize the consequence that requiring insurers to adopt less-effective practices would prevent insurers from accurately pricing insurance or that inaccurate pricing would inevitably cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' solvency, including their ability to pay current and future claims.

State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." (*See* section 627.062, Florida Statutes relating to Rate Standards). Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance.

"Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept. Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."

The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly. Accordingly, state insurance laws largely reflect the principles underpinning property casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly. This practice is the very essence of risk-based pricing. Accurate risk-based pricing and underwriting is fundamental to the business of insurance. Recognizing this, state law requires use of accurate pricing models, and HUD's proposed rule could potentially render it impossible for insurers to comply with both federal and state law (*See* section 627.062, Florida Statutes relating to Rate Standards). Contrary to HUD's position, the proposed rule would undermine the fundamental nature of the insurance industry.

028681

Homeowner insurers set premium solely on the risk exposure to be insured. Age, building codes, construction type etc. are all the risk factors that drive insurability, regardless of race, religion, etc. Price and risk must be compatible and if not, the risk of insurer insolvency and a negative impact on an insurer's claims paying capacity is real. Whether a building project is presently situated in any given area without regard to future risk is easily demonstrated as in facts such as in *Inclusive Communities,* but insurance is the pricing of the transfer of risk - an unknown future event - based on objective data and history from which insurers can best price the risk - to the benefit of all policyholders.

## Insurer Compliance with the Reinstated Rule Will be Unworkable

Section 100.500(a) of the proposed rule provides that "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." To ensure that an insurer does not employ any practice that "actually or predictably results" in disparate impact "because of race, color, religion, sex, handicap, familial status, or national origin", an insurer would by definition need to know and consider the race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, as well as the undefined "segregated housing patterns."

Insurers would be required to ask each existing policyholder and each policy applicant for their self-identified race, color, religion, sex, handicap, familial status, or national origin. Short of denying coverage to all policyholders and applicants who refuse to provide and validate such data, insurers would have no way to ensure that their protected class data sets were accurate and complete. As the proposed disparate impact standard does not consider intent, but rather resulting impact, an incomplete or erroneous data set would likely result in inaccurate evaluations and potential discrimination liability for insurers that employed even the most vigorous compliance efforts.

In fact, the Court in *Inclusive Communities* went so far as to justify the robust causality requirement as a way of preventing resort to racial quotas – the obvious concern being disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance by incentivizing or compelling insurers to collect and analyze data on protected characteristics to be able to mount a defense in the event of a disparate-impact challenge.

If an insurer can achieve and maintain a perfect data set of policyholder race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, and understand segregated housing patterns, these dual goals of the reinstated regulation may operate in conflict. Under the proposed rule, an insurer could be liable for discrimination if they have a practice of considering the pricing or provision or a homeowner policy based on race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant. Under the same rule, an insurer would be liable if they perpetuate segregated housing patterns.

028682

### The Burdens of Proof Under the Proposed Rule are Inequitably Shifted to the Defendant

The U.S. Supreme Court made clear that disparate impact requires adequate safeguards at the prima facie stage. The 2013 rule that purports to address burdens of proof do not include these safeguards and create an unlevel playing field in favor of the charging party.

Section 2(c) of the proposed § 100.500 provides that the charging party has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect. That section does not set any standards for the level of proof or what can or cannot be used. This contrasts with the requirement that the respondent or defendant then has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant, which requires a legally sufficient justification, which must be supported by evidence and may not be hypothetical or speculative.

By inference, the plaintiff proof need not be supported by evidence and may be hypothetical or speculative. This means that a plaintiff may allege that the defendant's practice will "result in a disparate impact" without evidence, but the defendant may not provide a justification to a proposed result that includes speculation but must provide evidence that the result cannot occur. This is clearly in conflict with the U.S. Supreme Court's decision in *Inclusive Communities* that "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."

If the respondent or defendant satisfies that burden of proof, the charging party or plaintiff may still prevail upon proving – without evidence and using hypotheticals or speculation - that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. Note that this standard does not require that the other practice be equally practical or productive or have any economic limitations. There is no requirement that the other practice be reasonable, simply that it has "less discriminatory effect."

### McCarran-Ferguson Act

HUD's notice of proposed rulemaking does not mention the McCarran-Ferguson Act, and for obvious reasons – the rule injects the federal government into a regulatory role in an area that has been reserved to the states by the McCarron-Ferguson Act. The rule would make every challenge to a risk-based practice a direct conflict with and implicate McCarran-Ferguson preclusion in every case. Litigation of a disparate-impact challenge under the proposed rule obligates federal courts to examine the actuarial soundness of risk-based practices and potentially to invalidate risk-based insurance pricing or underwriting policies that are permitted or required under state insurance law, which necessarily "impairs" a state's insurance scheme.

Insurers must conform to state regulatory framework for existence, yet the federal government and the HUD rule would essentially create two conflicting regulatory schemes. For example, Florida Statutes, Section 627.062 "Rate Standards" sets out the state insurance scheme for "excessive, inadequate, or unfairly discriminatory" rates (along with the rest of the Florida Insurance Code). Although the state statute controls insurance company pricing and authority for insurers to write insurance in Florida, it would arguably conflict with "alternative" practices allowed by the rule. This is particularly true given the rate "adequacy" requirement in Florida law and the fact that "alternative pricing" is less effective in predicting loss. The result is less accurate pricing of premiums in violation of state mandated or permitted rating standards.

Page 5 of 6

In the same vein, a disparate-impact challenge under the rule is contrary to the filed rate doctrine which prohibits courts from reexamining the reasonableness of rights filed by a regulated entity with its regulator. Application of the rule to homeowners' insurers would require federal courts to examine, after the fact, whether the use of approved rates had a disproportionate impact on members of a protected class.

## Conflict With *Inclusive Communities*

HUD's notice of proposed rulemaking insists that the rule is consistent with *Inclusive Communities*, which applied longstanding limitations on disparate-impact liability. However, HUD fails to grapple with not only the inapplicability to insurance but also the significant differences between the terms of the rule and the limits articulated by the U.S. Supreme Court.

The rule's burden-shifting test necessarily conflicts with the express limitations on disparate-impact liability articulated by the U.S. Supreme Court in *Inclusive Communities* and will subject FIC member insurers to potentially costly litigation and discovery.

The rule burden-shifting test currently permits plaintiffs to set forth disparate-impact claims based on bare statistical disparities. In fact, the Court stated that such claims under the FHA are "properly limited... e.g., if such liability were imposed based solely on a showing of a statistical disparity". Additionally, this cannot be reconciled with the "robust causal link" and "direct cause" requirements set forth by *Inclusive Communities*. The use of legitimate risk factors does not itself cause a disparate impact, as disparity is not a risk factor of loss. Insurance does not price the present-day impact but future events. We know from Florida experience that hurricanes do not intend disparate impact – it causes disparate loss based on risk relevant factors - factors outside the insurer's control but which are relevant to fair risk-based pricing.

Additionally, at the second step of the rule's burden-shifting framework governing disparate-impact challenges, homeowners insurers would demonstrate that their risk-based practice is not "arbitrary, artificial, or unnecessary" and instead "advance[s] valid interests." Specifically, risk-based pricing is by definition a valid interest because it is either required or permitted by nearly every state's insurance laws. (*see* section 627.062, Florida Statutes et. seq.) Fundamentally, it is the core purpose of insurance – the transfer of risk for related premium. To the extent homeowners insurers can be held liable despite that valid interest, the rule conflicts with the limits set by *Inclusive Communities*.

## Conclusion

For the foregoing reasons, the Florida Insurance Council and its member insurers hereby request that HUD decline to reinstate the 2013 Discriminatory Effects Standard or that HUD exempt actuarial risk-based pricing and underwriting of insurance from application of disparate impact liability under the FHA.

Sincerely,

Cecil Pearce
President

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** kso-x4ks-kffv
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0200
Comment Submitted by Thomas Karol

---

## Submitter Information

---

## General Comment

Please accept the attached comments from the National Association of Mutual Insurance Companies.

---

## Attachments

HUDComment8_23



317.875.5250 | [F] 317.879.8408
3601 Vincennes Road, Indianapolis, Indiana 46268

202.628.1558 | [F] 202.628.1601
20 F Street N.W., Suite 510 | Washington, D.C. 20001

August 23, 2021

Kathleen M. Pennington
Acting Associate General Counsel for Fair Housing
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW
Washington, DC        20410–0500

**Re: Department of Housing and Urban Development, 24 CFR Part 100 [Docket No. FR–6251–P–01] RIN 2529–AB02, Reinstatement of HUD's Discriminatory Effects Standard Proposed Rule ("Proposed Rule")**

Acting Associate General Counsel Pennington:

The National Association of Mutual Insurance Companies (NAMIC) is respectfully submitting comments on the Proposed Rule. NAMIC is the largest property/casualty insurance trade group with a diverse membership of more than 1,400 local, regional, and national member companies, including seven of the top 10 property/casualty insurers in the United States. NAMIC members lead the personal lines sector representing 66 percent of the homeowner's insurance market and 53 percent of the auto market.

NAMIC and NAMIC's members are adamantly opposed to discrimination based on protected classes and unfair discrimination in general, and we support legislative and regulatory policies to prevent these practices.  The elimination of racism improves every aspect of our relationships, institutions, and business communities.

**There Remains No Need for The Proposed Rule to Apply to Insurance**

There is no evidence that there were actionable disparate impact cases involving the pricing or provision of housing insurance prior to 2013, and with insurers being subject to the 2013 rule for the last eight years, there have similarly been no allegations or findings of homeowner insurer disparate impact have been made or adjudicated since 2013. As NAMIC has repeatedly made clear to HUD in



www.namic.org

comments and in court proceeding challenging this rule, every state has effective and strong civil and criminal insurance anti-discrimination laws, regulations, and enforcement divisions, and there has been not a single allegation that these civil and criminal insurance anti-discrimination laws, regulations and enforcement division have in any way been insufficient.  In fact, the rule undermines or impairs the existing application of the McCarran-Ferguson Act that established the states as the regulators over insurance and in particular the source for the definition of unfair discrimination, linking the definition to equal treatment and cost-based pricing.

A.  **The Proposed Rule Disrupts the Business of Insurance**

As NAMIC commented on the original proposed rule in 2012, State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance.  "Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept.  Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."

Also, in comments to HUD on the proposed rule in 2012 and subsequently, NAMIC has continuously tried to help HUD understand that the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly.  NAMIC has informed HUD that race or other protected class characteristics are not part of the risk assessment process.  HUD understands that state insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance.  In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner. Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk.  Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the



www.namic.org

very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material (s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system among many other facially neutral factors.

Under this Reinstated Discriminatory Effects Standard, these and other common underwriting factors could be jeopardized, even though they do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected.  To achieve a condition in which no statistical disparities would exist that could "actually or predictably results in a disparate impact" in the average rate paid by different demographic groups, many if not most risk- based variables would have to be eliminated from the underwriting process.  In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. But this would be patently unfair since it will result in those receiving more in claim payments paying less while those receiving less in claim payments would pay more.  This will be the case within a protectected class as well as between protected classes since the likelihood of loss is not monolithic by race or ethnicity.  This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

### B.  Insurer Compliance with the Reinstated Rule Will be Unworkable

In the Reinstatement, HUD blithely states "this proposed rule…. will have no impact on regulated entities …. Therefore, HUD does not believe that deeper analysis is needed on the impact of this rule."  NAMIC respectfully and vigorously disagrees.
§ 100.500 (a) of the proposed reinstated rule provides that "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." To ensure that an insurer does not employ any practice that "actually or predictably results" in disparate impact "because of race, color, religion, sex, handicap, familial status, or national origin", an insurer would by definition need to know and consider the race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, as well as the undefined "segregated housing patterns."

www.namic.org

The primary impediment to any practical compliance by insurers is the fact that insurance companies that price and provide homeowner insurance do not have any data on the race, color, religion, handicap, or national origin of policyholders or applicants. These companies are precluded by at least one state law for asking for such data. To avoid being blindsided and to defend against allegations against insurer practices that may "actually or predictably results in a disparate impact" an insurer would need to somehow obtain, validate, record, and apply data on the race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant. Insurers would be required to ask each existing policyholder and each policy applicant for their self-identified race, color, religion, sex (gender identity?), handicap, familial status, or national origin. Short of denying coverage to all policyholders and applicants who refuse to provide and validate such data, insurers would have no way to ensure that their protected class data sets were accurate and complete. As the proposed disparate impact standard does not consider intent, but rather resulting impact, an incomplete or erroneous data set would likely result in inaccurate evaluations and potential discrimination liability for insurers that employed even the most vigorous compliance efforts.

This need for this perfect data set will also require that an insurer trying to comply must validate and update the data set when a policyholder later self identifies as a different race, color, religion, sex, handicap, familial status, or national origin.

But there's more. The reinstated rule would also subject insurers to liability for insurance practices that – inadvertently and without intent – "actually or predictably" create, increase, reinforce, or perpetuate segregated housing patterns. This would require a compliance oriented insurer to have the same unrealistic protected class data sets defined above, AND to then to understand the undefined "segregated housing patterns" sufficiently to guarantee that the an insurance policy renewed or provided to a policyholder or applicant of a defined race, color, religion, handicap, familial status, or national origin of every policyholder and applicant could not actually or predictably create, increase, reinforce, or perpetuate segregated housing patterns related to race, color, religion, handicap, familial status, or national origin of every policyholder and applicant.

If an insurer can achieve and maintain a perfect data set of policyholder race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, and understand segregated housing patterns, these dual goals of the reinstated regulation may operate in conflict. Under the proposed rule, an insurer could be liable for discrimination if they have a practice of considering the pricing or provision or a homeowner policy based on race, color, religion, sex,



www.namic.org

handicap, familial status, or national origin of every policyholder and applicant. Under the same rule, an insurer would be liable if they perpetuate segregated housing patterns.

Assuming Insurer X has an application for a homeowner policy from a Protected Group A, it would be discrimination for Insurer X to consider national origin intentionally or operate in any way that resulted in a disparate manner. But at the same time under disparate impact liability under the 2013 Rule, Insurer X could be liable if the home in question was in an area that was perpetuating Protected Group A housing patterns. By requiring the insurer to avoid practices that "actually or predictably creates, increases, reinforces, or perpetuates segregated housing patterns", HUD would require the insurer to make an intentional or disparate practice based upon a prohibited factor.

Insurers would also have great compliance difficulty in continually defining and addressing the requisite statistical discrepancy that would be the basis of possible disparate impact claims under the proposed rule. While there are varying accepted standards of applicable statistical discrepancy that may be permissible and impermissible – i.e. X% variance from statistics is allowed, but X+1% is discriminatory - but the completely undefined factor is the geographic statistical base upon which the insurer's practice must comply. Is the insurer required to track and comply with government, academic or independent protected class statistics of Ward 8, south Baltimore, Baltimore city, metropolitan Baltimore, Maryland, the greater Baltimore Washington Metropolitan area, the Mid-Atlantic states or nationally? Or is the statistical focus on the business of the area in which the insurer operates, or on the business line the insurer offers, or some combination of geographic regions and the insurer's business.

Without some definition of the geographic, business or some other definitive statistical base upon which an insurer could being to establish a compliance program, even the most perfectly accurate and evolving protected class data base and comprehensive analysis of segregated housing by an insurer would not enable compliance with the proposed rule.

These are just some of impractical results of applying the proposed regulation to the pricing and provision of homeowners insurance.  Others not detailed here would include the vast expense required of insurers to collect and maintain the protected class data, the liability of insurers for any breach of the confidentiality of that data potential impact of insurers leaving the market as unworkable, too expense and too risky.



www.namic.org

### C. The 2013 Rule Does Not Included the 2015 Disparate Impact Requirements Set by the U.S. Supreme Court

HUD's self-congratulatory reinstatement and approval of its own work is a combination of revisionist history and selective memory. HUD proposed the rule in 2012 to try to impose its views on burdens of proof requirements to federal courts that chose to apply the burdens of proof that each court determined most appropriate.  There was not a "judicial consensus" as HUD claims in the Reinstatement, which is clear from HUD's 2011 proposed rule statement that "This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated."

In the Reinstatement, "HUD believes the 2013 Rule is more consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities*", which amazingly purports HUD's clairvoyance in proposing a rule in 2011 that would include judicial precedent set out by the Supreme Court in 2015. This continues in the Reinstatement - "As HUD has stated, the 2013 Rule was consistent with Inclusive Communities."  HUD also claims that the Supreme Court "cited HUD's 2013 Rule multiple times with approval". While provisions of the Rule were cited in one paragraph by the Court, there is nothing in the reference that can reasonably be interpreted as approval. In fact, HUD's Reinstatement later acknowledges that the "Court had no occasion or opportunity to consider the proper pleading standards."

What the Supreme Court did do in Inclusive Communities is define a number of specific limitation and restrictions that are not included in the 2013 Rule or its Reinstatement. HUD is fully aware that NAMIC has been challenging these deficiencies in the 2013 Rule in federal court since 2015; a case in which HUD has requested and been granted dozens of stays for HUD to examine and reexamine the 2013 rule which has remained in effect and which "HUD does not believe that deeper analysis is needed on the impact of this rule."

The 2013 Rule does not and has not included protections and limitations set down by the U.S. Supreme Court in Inclusive Communities.  But disparate-impact liability has always been properly limited in key respects to avoid serious constitutional questions that might arise under the FHA, e.g., if such liability were imposed based solely on a showing of a statistical disparity.

A disparate-impact claim relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement is important in ensuring that defendants do not resort to the use of racial quotas.

www.namic.org

Policies, whether governmental or private, are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." Griggs, 401 U. S., at 431. Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and "would almost inexorably lead" governmental or private entities to use "numerical quotas," and serious constitutional questions then could arise. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice, and courts should strive to design race-neutral remedies. Remedial orders that impose racial targets or quotas might raise difficult constitutional questions.

A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact. The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims.

Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely "remov[ing] . . . artificial, arbitrary, and unnecessary barriers." Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that "arbitrar[ily] . . . operate[s] invidiously to discriminate on the basis of rac[e]." Ibid. If additional measures are adopted, courts should strive to design them to eliminate racial disparities through race-neutral means.

D. **The Proposed Rule Burdens of Proof are Inequitably Tilted to the Charging Party**

As noted, the U.S, Court has made clear that disparate impact requires adequate safeguards at the prima facie stage.  The 2013 Rule that purports to address burdens of proof do not include these safeguards and create an unlevel playing field in favor of the charging party.

Section 2(c) of the proposed § 100.500 provides that the charging party has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect. That section does not set any standards for the level of proof or what can or cannot be used. This contrasts with the requirement that the respondent or defendant then has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant, which requires a legally sufficient justification, which must be supported by evidence and may not be hypothetical or speculative.



www.namic.org

By inference, the plaintiff proof need not be supported by evidence and may be hypothetical or speculative. This means that a plaintiff may allege that the defendant's practice will "result in a disparate impact" without evidence, but the defendant may not provide a justification to a proposed result that includes speculation but must provide evidence that the result cannot occur. This is clearly in conflict with the Supreme Court ruling that "A plaintiff who fails to allege <u>facts</u> at the pleading stage or produce statistical <u>evidence</u> demonstrating a causal connection cannot make out a prima facie case of disparate impact."

If the respondent or defendant satisfies that burden of proof, the charging party or plaintiff may still prevail upon proving – without evidence and using hypotheticals or speculation - that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. Note that this standard does not require that the other practice be equally practical or productive or have any economic limitations. There is no requirement that the other practice be reasonable, simply that it has "less discriminatory effect."  It also removes the Supreme Court's requirement that the charging party not resort to reverse discrimination.

### E.  The Proposed Rule Remedies are Concurrently Overbroad and Inadequate

Therein is another unfair burden imposed upon the defendant. As written, the rule does not exonerate the defendant upon adopting this other practice.  As written, the defendant is still found liable for discrimination for an inadvertent practice and then ordered to adopt a less discriminatory practice. And a less discriminatory practice is still a discriminatory practice that subjects the defendant to further liability.

The purpose of such a section is properly to implement the Supreme Courts direction that "Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice". The other practice should not merely reduce the level of the disparate impact – leaving the defendant prejudged for the next allegation – but should be a replacement practice only if it actually or judicially predictably results in the elimination of the discriminatory effect.

In the instance of an insurer, if the insurer has by non-speculative evidence proven that the practice is necessary to achieve one or more of their substantial, legitimate, nondiscriminatory interests – and is therefore not artificial, arbitrary, and unnecessary, then the insurer should be found not liable for disparate impact discrimination if the insurer replaces the practice with a operational and economically reasonable replacement practice that the court judicially determines to actually or



predictably result in the elimination of the proposed discriminatory effect.

**Conclusion**

Insurer liability for any civil or criminal liability is an extremely serious matter, and for the mutual insurance company members of NAMIC, such liability can threaten the ability of the mutual insurance company to continue to provide the requisite protection of its collective policyholders. Discrimination liability includes a particular toxicity in these present times and even an unsupported allegation of such heinous conduct will do permanent and last damage to a mutual insurance company. Mutual insurance companies are often small market companies operating in a single county, with many specializing in niche markets such as churches, pharmacists, jewelers, and lumber dealers. Improperly drafted regulations that encourage baseless allegations of discrimination or that deny a innocent mutual insurance company the ability to comply or defend result in a taint that may immeasurably harm the company and policyholders.

As NAMIC has described above and in its many prior submissions to HUD, the 2013 Rule and the Proposed Rule are not necessary and operate to disrupt the fundamentals of the insurance business. Existing federal, state and local laws and regulations have proven to prevent insurer discrimination and no examples of any deficiencies in these many provisions has been offered by HUD or other proponents of the 2013 Rule. Causing insurers to obtain and use protected class factors that are unrelated to the principles of risk-based pricing is contrary to the business of insurance. While perhaps well intentioned, the Reinstated Rule will be unworkable for insurers and compliance with the convoluted and conflicting provisions will be complex, expensive, intrusive on policyholder's privacy and unreasonable. It conflicts with impairs and supersedes the congressional authorization of the states to regulate the business of insurance under the McCarran-Ferguson Act and the mandate to the states to define unfair discrimination.

The Reinstated Rule purports to include the protections and limitation set down by the U.S. Supreme Court but it does not. The burdens of proof are tilted to favor the allegations and hamstring any defense. The proposed remedies provide unreasonable latitude to revise the business of insurers without any consideration of practicality or economics, and as written, and allow remedies that mitigate discrimination, rather than eliminate discrimination as directed by the Supreme Court. In fact, the proposed remedies enable reverse discrimination by overturning the state statutory prohibition of unfair discrimination as that standard requires insurers to base treatment on expected losses and costs.



I would be most happy to address any questions you may have by contacting me at tkarol@namic.org. Thank you for your time and consideration.

Thomas J. Karol
General Counsel Federal

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-ar86-9dc1
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0235
Comment Submitted by Selective Insurance Company of America

## Submitter Information

## General Comment

See attached file(s)

## Attachments

SICA Submission HUD 2013 Rule



**Jeff Beck**
*Senior Vice President, Government & Regulatory Affairs*
Selective Insurance Company of America
40 Wantage Avenue
Branchville, NJ 07890
Tel: (973) 948-1311
Email: jeff.beck@selective.com

August 24, 2021

**VIA E-SUBMISSION: www.regulations.gov**

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

  RE: **Reinstatement of HUD's Discriminatory Effects Standard
     Docket No. FR-6251-P-01**

Dear Regulations Division:

Selective Insurance Company of America, and its affiliate property and casualty insurance companies, join in the American Property Casualty Insurance Association's ("APCIA") comment on the Notice of Proposed Rulemaking ("NPRM"), titled "Reinstatement of HUD's Discriminatory Effects Standard ("2013 Rule")," published by the Department of Housing and Urban Development ("HUD") on June 25, 2021.

Our additional comments emphasize points APCIA raised in its letter, specifically the 2013 Rule's impact on the affordability and availability of homeowners' and commercial habitational insurance ("HO Insurance"). We respectfully reiterate the request that HUD exempt risk-based pricing and underwriting of HO Insurance from its final rule.

### a. The 2013 Rule is preempted by the McCarran-Ferguson Act

As an initial matter, the McCarran-Ferguson Act ("MFA") preempts the 2013 Rule's regulation of HO Insurance. The MFA provides that no act of Congress "shall be construed to invalidate, impair, or supersede" any state law regulating the business of insurance. State laws regulate HO Insurance rates, so the MFA precludes HUD from invoking authority under the Fair Housing Act ("FHA"), an act of Congress, to subject state HO Insurance rates to the 2013 Rule's disparate impact liability framework. The United States Supreme Court in <u>Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.</u>, 576 <u>U.S.</u> 519 (2015) ("<u>Inclusive Communities</u>") did not invalidate the MFA or expand disparate impact liability to HO Insurance rate regulation.

### b. The 2013 Rule undermines the fundamental tenets of insurance

Notwithstanding the MFA's preemption, we must carefully consider the 2013 Rule's impact on insurers' ability to select and price HO Insurance effectively. The 2013 Rule would require Selective and all other insurers to compile and track the personal data of every applicant

and insured, including information concerning the individual's race, color, religion, national origin, sex, familial status and/or disability. This requirement raises several significant issues.

We do not collect this data, and state regulation does not permit us to do so. For example, Maryland prohibits insurers from soliciting information about any insured's race, creed, color, or national origin. Md. Ins. Code § 27-501(c)(1). Given this information's personal and political sensitivity, we believe insurance applicants and policyholders would consider questions on these points unwelcome or objectionable. The cost of soliciting, collecting, and protecting this data would also be significant and need to be incorporated into rate loads.

Further, in most jurisdictions where we write HO Insurance, the laws specifically provide that insurance rates may not be excessive or unfairly discriminatory. They require that insurers file proposed rates with state regulators for review and approval. State regulators approve the statistical data we use in risk-based pricing to ensure our rating plans meet their various state legal and regulatory requirements. As part of the rate submission process, our actuaries certify that our rates comply with the applicable laws and regulations of the specific jurisdiction to the best of their knowledge. The insurance regulator's approval confirms that our rates are not excessive or unfairly discriminatory against any group or individual with specific characteristics.

### c. The 2013 Rule would stifle the HO Insurance marketplace

Our industry is predicated on setting rates and affecting underwriting decisions based on relevant and objective risk factors that accurately predict loss. Restricting that ability would result in a severe decrease in the availability of insurance and market competition, leading to higher and unaffordable prices and an increased likelihood of insurer insolvency. In sum, the reinstatement of the 2013 Rule would be a waste of judicial resources, and, as the U.S. Supreme Court noted in the Inclusive Communities decision, the FHA would have undermined its purpose, as well as the free-market system.

\*   \*   \*

We appreciate the Regulations Division of the Office of the General Counsel's time and attention to this important issue and our opportunity to comment.

Sincerely,

Jeff Beck
*Senior Vice President, Government & Regulatory Affairs*

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-b7c9-rsdm
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0237
Comment Submitted by Nixon Peabody LLP

## Submitter Information

## General Comment

Please see attached comments regarding the Proposed Rule "Reinstatement of HUD's Discriminatory Effects Standard," [Docket No. FR-6251-P-01], RIN 2529-AB02, submitted on behalf of the National Leased Housing Association ("NLHA"), the Council for Affordable and Rural Housing ("CARH"), the National Apartment Association ("NAA"), National Affordable Housing Management Association ("NAHMA"), and the National Multifamily Housing Council ("NMHC").

## Attachments

Comments on Proposed Reinstatement of HUD 2013 Disparate Impact Rule Docket No. FR-6251-P-01 RIN 2529-AB02



Nixon Peabody LLP
799 9th Street NW
Suite 500
Washington, DC 20001-5327
**Attorneys at Law**
nixonpeabody.com
@NixonPeabodyLLP

**Harry J. Kelly**
Partner

T / 202.585.8712
F / 866.947.3557
hkelly@nixonpeabody.com

August 24, 2021

*Via E-Mail (www.regulations.gov)*

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh Street, S.W., Room 10276
Washington, DC 20410

**RE: Reinstatement of HUD's Discriminatory Effects Standard
[Docket No. FR-6251-P-01] RIN 2529-AB02**

Dear Sir or Madam:

On behalf of our clients, the National Leased Housing Association ("NLHA"), the Council for Affordable and Rural Housing ("CARH"), the National Apartment Association ("NAA"), National Affordable Housing Management Association ("NAHMA"), and the National Multifamily Housing Council ("NMHC") (jointly, the "Housing Associations"), and their tens of thousands of members – owners, managers, developers, and investors in the nation's multifamily housing industry – we provide these comments to the Proposed Rule in "Reinstatement of HUD's Discriminatory Effects Standard," [Docket No. FR-6251-P-01], RIN 2529-AB02, published at 86 Fed. Reg. 33590 (June 25, 2021) (the "2021 Proposal").

The nation's housing providers represented here support the goals of the Fair Housing Act ("FHAct") and are fully committed to creating communities that provide equal housing opportunity for all. However, continued uncertainty and confusion related to disparate effects, or disparate impact, liability under the FHAct has resulted in operational, legal and broad business challenges for the housing industry. Unfortunately, the Proposal will do little to address the needs of housing providers and America's renters or improve the predictability and results of fair housing efforts. Most importantly, the 2021 Proposal fails to seize the opportunity to clarify lingering questions about how guidance from the Supreme Court's landmark decision in *Texas Dept. of Hous. & Comm. Affairs v. The Inclusive Communities Project, Inc.* ("*Inclusive Communities*"), 576 U.S. 519 (2015) should be incorporated into the rule. Because it fails to address these important legal developments since the issuance of its original disparate impact rule in 2013, the 2021 Proposal renders the U.S. Department of Housing and Urban Development's ("HUD") disparate impact policies largely irrelevant and will lead courts and litigants to develop a separate body of case law that follows the requirements of the *Inclusive Communities* decision. Instead of simply reinstating the 2013 rule, the Housing Associations therefore urge HUD to resolve this tension by revising and

Regulations Division
August 24, 2021
Page 2

reissuing a rule and supporting guidance that helps housing providers execute necessary and ordinary business practices without running afoul of fair housing requirements.

**Background**

As noted above, the theory of disparate impact liability under the FHAct has been in flux for the last ten years. After proposing to adopt disparate impact rules in 2011, HUD issued its final disparate impact rules in 2013. 24 CFR §100.500 (the "2013 Rule"), *published at* 78 Fed. Reg. 11460. Thereafter, some courts began to adopt those regulations as governing their adjudication of disparate impact cases under the FHAct. See *The Inclusive Communities Project, Inc. v. Texas Dept. of Hous. & Comm. Affairs,* 747 F.3d. 275, 276-77(2014).

Shortly after HUD published its final disparate impact rule, the U.S. Supreme Court accepted a certiorari petition in the *Inclusive Communities* case, where the plaintiff contended that application of facially neutral principles for allocating low income housing tax credits in Texas nevertheless had a disparate impact on housing opportunities for minorities and persons in other protected classes. In the court's 2015 decision, authored by Justice Kennedy, the Court affirmed that disparate impact liability did in fact exist under the FHAct. However, Justice Kennedy focused much of his decision on what he referred to as "safeguards" that were needed to prevent "abusive" disparate impact cases. 576 U.S. at 544. He pointed to constitutional objections that might arise if disparate impact relied solely on showing statistical imbalances. Id. at 540. He also warned against practical consequences, such as placing government and private interests in a "double-bind" (id. at 542), where any decision they make could be attacked as discriminatory, or where other "valid interests" might be frustrated, if appropriate safeguards were not put in place. Id. at 541. These safeguards include, among other things, a "robust causality requirement," demonstrating that the "defendant's policy or policies caus[ed] that disparity." Id. at 542. He also insisted that, to avoid "displac[ing] valid governmental and private priorities," disparate impact cases should focus "solely [on] 'removing . . . artificial, arbitrary, and unnecessary barriers." Id. at 544, *quoting Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

The Supreme Court's decision in *Inclusive Communities* fundamentally altered the analysis of disparate impact cases. As a result, it also rendered HUD's 2013 Rule obsolete because the 2013 Rule did not address the safeguards identified by the Supreme Court. Indeed, while the Supreme Court cited to the 2013 Rule (id. at 527), it did not formally endorse it.

Although initially HUD took the position that its 2013 Rule was completely consistent with the *Inclusive Communities* decision, HUD eventually changed its position. In 2019, HUD proposed a new set of disparate impact regulations which attempted to update the 2013 Rule to reflect the changes introduced by the *Inclusive Communities* decision. 84 Fed. Reg. 42854 (the "2019 Proposal"). Among other things, the 2019 Proposal expressly identified the safeguards discussed in the *Inclusive Communities* decision, and revised the parties' respective burdens of proof to correspond with that decision's requirements. Parties participating in these comments also filed comments with respect to the 2019 Proposal. See Letter to Office of the General Counsel from Harry J. Kelly ("Comment Letter") dated October 17, 2019 (Attachment A

4828-3284-0695.1

Regulations Division
August 24, 2021
Page 3

hereto).  At that time, the Housing Associations acknowledged the need to address the inconsistencies between HUD's rule and subsequent legal outcomes and were generally supportive of the 2019 Proposal. However, the Comment Letter identified additional elements that needed to be incorporated into the 2019 Proposal to more fully adhere to the *Inclusive Communities* guidance and improve compliance efforts.

In September 2020, HUD published a new final disparate impact rule (the "2020 Rule") that went much further than the 2019 Proposal, imposing additional pleading obligations on plaintiffs.  85 Fed. Reg. 60288 (Sept. 24, 2020).  The changes made by the 2020 Rule were sweeping in nature and addressed issues outside the scope of the Supreme Court's guidance in *Inclusive Communities*.  Before that rule took effect, however, a federal district court entered an injunction staying implementation and enforcement of the 2020 Rule.  *Mass. Fair Hous. Ctr. V. HUD*, No. 20-11765-MGM, 2020 U.S. Dist. LEXIS 205633 (D. Mass. October 25, 2020).  Among other things, the district court pointed out that the 2020 Rule incorporated a number of new terms and procedural requirements that were not found in the *Inclusive Communities* guidance and that would only make disparate impact analysis more difficult in the future.  Id. at *9-19.  It found that "these changes constitute a massive overhaul of HUD's disparate impact standards, to the benefit of putative defendants and to the detriment of putative plaintiffs."  Id. at 10.  As a result, the court entered its order enjoining implementation and enforcement of the 2020 Rule.

While questions remain about whether the 2019 Proposal and the 2020 Rule fairly addressed the concepts adopted in the *Inclusive Communities* decision, they rightly acknowledged that the 2013 Rule was no longer viable and needed to be updated to reflect the consequences of that decision.  The 2021 Proposal, on the other hand, would essentially reinstate the 2013 Rule without any significant changes to reflect *Inclusive Communities* and decisions since that time.  As explained in the following section of these comments, it is inadequate to reimpose the 2013 Rule without making necessary changes reflecting those changes wrought by *Inclusive Communities*.  Courts, housing providers and the public need a national disparate impact regulation that provides uniformity and equal treatment of all persons involved in disparate impact proceedings.  Without proper review and revision of HUD's policy, courts and litigants will continue to develop disparate impact law outside of the HUD regulatory framework, creating challenges for timely and consistent fulfillment of fair housing requirements.

**Discussion**

1. **The 2013 Rule is the wrong starting point for HUD's efforts as it does not provide a framework to address the safeguards imposed by the *Inclusive Communities* decision.**

As explained below, courts and litigants have struggled to implement the *Inclusive Communities* decision.  To reduce this confusion, HUD must take the lead in making changes to the 2013 Rule that incorporate the safeguards announced there.  This can be done through modest changes to the 2013 Rule that do not unfairly tip the scales towards either party.  To be sure, Justice Kennedy vindicated the concept of disparate impact in FHAct cases and felt that it

4828-3284-0695.1

Regulations Division
August 24, 2021
Page 4

served an important role in permitting "plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment."  576 U.S. at 540.  But he was also unmistakably concerned about "abusive" disparate impact cases that would frustrate the "valid interests" of public agencies and private entities. Necessarily, *Inclusive Communities* will limit the claims of some plaintiffs, but if HUD takes the lead in implementing the safeguards, only "abusive" claims will be restricted.

Unfortunately, Justice Kennedy's opinion did not offer a framework that would allow courts and litigants to systematically address these issues.  Our review of a number of cases suggests that in the absence of such a framework, courts and litigants have struggled to address the concepts *Inclusive Communities* requires.  In the process, courts have increasingly turned away from HUD's disparate impact regulations, apparently because it offers them no way to address the safeguards that *Inclusive Communities* now requires them to consider.  The following discussion summarizes the results of our analysis:

    a. **Courts are struggling with applying the _Inclusive Communities_ standards into the framework of HUD's 2013 DI rules.**  The *Inclusive Communities* decision clearly identified a number of safeguards to prevent abusive disparate impact cases, but it did not provide detailed explanations of those safeguards or provide a framework for how those safeguards should be applied by the courts.  Since the *Inclusive Communities* decision, courts have been trying to develop a method of applying the safeguards in a way that would allow appropriate cases to proceed while sifting out "abusive" cases.  As a result, *Inclusive Communities* left it for the courts to flesh out and give meaning to the safeguards it adopted. The process has not been easy or simple.

For example, in *Woda Cooper Dev., Inc. v. City of Warner Robins*, the Middle District of Georgia summarized the struggle that courts have experienced in analyzing a plaintiff's disparate impact claim under the FHAct.  In response to the defendants' questioning of the merits of plaintiff's disparate impact claim, the court expressed, "To a point, that is understandable—since the Supreme Court's decision in [*Inclusive Communities*], courts have struggled to determine just what it takes to allege a disparate impact theory of liability."  *Woda Cooper Dev., Inc. v. City of Warner Robins*, Civil Action No. 5:20-CV-159 (MTT), 2021 WL 1093630, *1, at *7 (M.D. Ga. Mar. 22, 2021).  But, while acknowledging that a robust causal connection is one of the safeguards identified in *Inclusive Communities*, the district court continued, "Just what 'robust causality' means is very much a work in progress."  Id. (citing *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 903-09 (5th Cir. 2019) (reviewing the efforts to define "robust causality"); *see also Inclusive Cmtys. Project, Inc., v. Tex. Dep't of Hous. & Cmty. Affairs*, Civil Action No. 3:08-CV-0546-D, 2016 U.S. Dist. LEXIS 114562, *1 (N.D. Tex. Aug. 26, 2016) ("other circuits 'have applied multiple different legal standards to similar [disparate impact] claims under the FHA'").  Simply put, the safeguards identified by the Supreme Court are not self-executing and require further elaboration, both with respect to what they require and how they should by implemented as courts consider disparate impact claims.  That means that HUD should use the current rulemaking process to not merely reinstate its 2013 Rule, but to provide guidance to courts, administrative law judges, housing

Regulations Division
August 24, 2021
Page 5

providers and renters about how the *Inclusive Communities* safeguards apply to disparate impact cases.

b. **Courts have alternated between following the HUD regulations and applying the ICP safeguards**. In some cases, the courts struggled with a basic issue of whether to apply HUD's disparate impact rule at all. Thus, the courts acknowledge the existence of the HUD regulations but in many cases, courts seem to treat the *Inclusive Communities* safeguards as an alternative standard for determining disparate impact liability. *See, e.g., Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.4 (4th Cir. 2018) ("the standard announced in [*Inclusive Communities*]… controls our inquiry"); *City of Los Angeles v. Wells Fargo & Co.*, Case No. 2:13-cv-09007-ODW(RZx), 2015 U.S. Dist. LEXIS 93451, *1 (C.D. Cal. July 17, 2015) (basing its decision on how *Inclusive Communities* has instructed lower courts); *Ellis v. City of Minneapolis*, 860 F.3d 1106 (8th Cir. 2017) (exclusively applying the *Inclusive Communities* safeguards to determine whether the Plaintiffs pled a prima facie case of disparate impact under the FHAct). No doubt, the courts' decision to ignore the 2013 Rule reflects the fact that since the 2013 Rule does not explicitly incorporate the *Inclusive Communities* safeguards, the 2013 Rule is largely irrelevant to determining how to decide a disparate impact case at this point. *See. Lincoln Prop. Co.*, 920 F.3d at 902 ("Although it affirmed our decision, the Supreme Court never explicitly stated that it adopted the HUD regulation's framework"). If a court has to choose between following HUD regulations or the Supreme Court, they will follow the Supreme Court. This suggests that if HUD wants its regulations to be something more than window-dressing, it needs to modify the regulations to affirmatively address the safeguards announced in the *Inclusive Communities* decision.

c. **Courts need additional guidance about how and when to apply the *Inclusive Communities* safeguards.** Federal procedural rules allow parties to file a motion to dismiss which challenges the sufficiency of a complaint by arguing that even if all the facts in the complaint are true, they fail to state a legal claim. In that situation, it seems at least some of the safeguards – most often, the "robust causation" requirement – may properly be the basis of a motion to dismiss at an early phase of the case. Indeed, in explaining that "[a] plaintiff who fails to allege facts at the pleading stage . . . demonstrating a causal connection cannot make out a prima facie case of disparate impact," Justice Kennedy seemed to invite early scrutiny of plaintiff's theory of causation, as some courts have acknowledged. *Ellis*, 860 F.3d at 1112 (adopting Justice Kennedy's "causal connection" requirement); *see also Winfield v. City of New York*, 15CV5236-LTS-DCF, 2016 WL 6208564, *1, at *6 (S.D.N.Y. Oct. 24, 2016) (citing Justice Kennedy's "causal connection" guidance). But even here, courts appear to be struggling with whether they are to subject disparate impact plaintiffs' causation theories to early scrutiny or to treat those theories like any other portion of the plaintiff's burden of proof. See id. (noting that *Inclusive Communities* "did not alter the plausibility standard for pleading, which requires only the plaintiff plead allegations that plausibly give rise to an inference that the challenged policy causes a disparate impact") (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015)). Rather, they are asking whether the plaintiff's pleadings – including its theory of causation – if taken as true, are sufficient to make out a prima facie case, as in any other motion to dismiss. This suggests that HUD's basic burden-shifting framework –

Regulations Division
August 24, 2021
Page 6

where the burden is initially on the plaintiff to make out a prima facie case – is still valid, but that courts need additional guidance about how to address the plaintiff's burden at the motion to dismiss phase, especially with respect to the *Inclusive Communities* safeguards.

2. **To avoid obsolescence and to promote the goals of uniformity in resolving disparate impact cases, HUD must update its 2013 Rule to reflect the *Inclusive Communities* holding.**

The discussion of case law above indicates that HUD's current disparate impact rule is legally obsolete and will become increasingly irrelevant unless HUD updates it to reflect the outcome of the *Inclusive Communities* decision. Because it fails to address the concerns raised in the *Inclusive Communities* decision, it does not provide a useful framework to resolve disparate impact cases. Reinstating an obsolete rule will do nothing to promote HUD's goal of achieving a uniform mechanism to resolve disparate impact disputes. Rather, it will continue to encourage courts and litigants to develop alternative approaches to handling disparate impact cases outside the framework originally established by HUD.

In order to properly update its disparate impact rule, HUD should clarify what each party must show to meet its burden. Fortunately, much can be accomplished with minimal edits, but those edits are necessary to address the Supreme Court's guidance, including the following changes:

a. **HUD must revise the plaintiff/complainant's burden of proof to expressly include satisfaction of the safeguards announced in *Inclusive Communities***. HUD must acknowledge that while *Inclusive Communities* confirmed that disparate impact liability exists under the FHAct, it also recognized that "abusive" disparate impact cases could frustrate legitimate goals of public and private decision makers. Unavoidably, these will add to the pleading burdens on plaintiffs, but that is exactly what the Supreme Court intended when it imposed additional requirements on plaintiffs to prevent those abusive lawsuits.

First, HUD's disparate impact rules should expressly adopt the "robust causality requirement," which requires a plaintiff to demonstrate that the disparate impact suffered was caused by the policy it challenges, as part of the plaintiff's burden of proof. The current rule does mention causation in the most general way:

> The charging party . . . or the plaintiff . . . has the burden of proving that a challenged practice caused or predictably will cause a discriminatory impact.

24 CFR §100.500(c)(1)(2019). Justice Kennedy made clear that to satisfy his "robust causality requirement," something more than a vague causal relationship is needed. The current HUD standard would presumably be satisfied even if multiple policies or practices caused the alleged discriminatory impact, so long as the challenged policy or practice was one of those causes. That is not consistent with Justice Kennedy's "robust causality requirement," which is not met where multiple factors could have caused a particular harm and is inconsistent with his warning that defendants should not be "held liable for racial disparities they did not create." 576 U.S. at 542. Justice Kennedy was

Regulations Division
August 24, 2021
Page 7

imposing a "sole cause" standard which should be reflected in HUD's regulations. See, e.g., 576 U.S. at 543 (warning that "[i]t may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units.") The current rule does not reflect the "sole cause" nature of Justice Kennedy's "robust causality" requirement and must be amended to do so.

Likewise, on multiple occasions, Justice Kennedy confirmed that to prevail, a disparate impact plaintiff must show that the challenged policy or practice constitutes "an artificial, arbitrary and unnecessary barrier[]" to housing opportunities for persons in a protected class. 576 U.S. at 540, 544. Clearly, this was not dicta – the "artificial, arbitrary and unnecessary" standard was a critical mechanism for sorting abusive disparate impact cases from legitimate ones. Indeed, he explained that "the [FHAct] aims to ensure that [the] priorities [of housing providers] can be achieved *without arbitrarily creating discriminatory effects* or perpetuating segregation." Id. at 540 (emphasis added). And in his conclusion, he warned that without the safeguards he recommended, "disparate impact liability might displace valid governmental and private priorities, rather than *solely* "remov[ing] . . . artificial, arbitrary and unnecessary barriers." Id. at 544 (emphasis added), *quoting Griggs*, 401 U.S. at 431. Clearly, Justice Kennedy felt that courts had to focus "solely" on attacking artificial, arbitrary and unnecessary barriers, to prevent intrusion into otherwise legitimate public and private decision-making.

To incorporate these concepts, HUD should make modest revisions to its description of the plaintiff's burden to read as follows:

> The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice (i) is the sole and proximate cause or reasonably predicted ~~caused or predictably will~~ cause of a discriminatory impact and (ii) imposes an artificial, arbitrary, and unnecessary burden on housing opportunities for persons in protected classes.

b. **The burden on the defendant/respondent should be revised to reflect the lower "valid interest" safeguard stated in *Inclusive Communities*.** In its current regulation, HUD has adopted a strict burden of proof for a defendant or respondent. They must demonstrate that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interest of the respondent or defendant." 24 CFR §100.500(c)(2). This is part of the larger "legally sufficient justification" standard applicable in HUD's disparate impact regulations. Id., §100.500(b). That multi-part burden imposes a stringent obligation on parties defending disparate impact claims and is inconsistent with the lower standard stated in *Inclusive Communities*. There, Justice Kennedy stated that to meet its burden, a defendant only had to "state and explain *the valid interest* served by its policies." 576 U.S. at 541 (emphasis added). He explained that this "step of the analysis is analogous to the business necessity standard under Title VII and provides a defense against disparate-impact liability." Id. He further explained that, while there were differences between fair housing and fair employment requirements, "housing authorities and private developers [should] be allowed to maintain a policy *if it is necessary to achieve a valid interest*." Id. Kennedy acknowledged HUD's "substantial,

4828-3284-0695.1

Regulations Division
August 24, 2021
Page 8

legitimate, nondiscriminatory interest" provisions in the *Inclusive Communities* decision, but did not expressly adopt that standard, opting instead for the "valid interest" test, which focuses on business necessity only. To the extent that the "valid interest" test sets a lower standard for defendants' burden of proof, it should replace the more stringent "substantial, legitimate, nondiscriminatory interest" test in the 2013 Rule.

Both the "legally sufficient justification" provision and the "substantial, legitimate, nondiscriminatory interest" provision impose burdens on defendants and respondents that exceed the "valid interest" test set out in *Inclusive Communities*. For that reason, the "legally sufficient justification" provision in §100.500(b) should be deleted, and the description of the defendant's burden in §100.500(c)(2) should be revised as follows:

> (2) Once the charging party or plaintiff satisfied the burden of proof set forth in Paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more ~~substantial, legitimate, nondiscriminatory~~ valid interests of the respondent or defendant.

    c. **HUD should clarify the circumstances in which it is appropriate to seek dismissal of disparate impact claims**. In *Inclusive Communities*, Justice Kennedy observed that "prompt resolution [of disparate impact] cases is important," and suggested that "[a] plaintiff who fails to allege facts at the pleading stage . . . demonstrating a causal connection cannot make out a prima facie case of disparate impact." 576 U.S. at 543. As noted above, some courts (and HUD itself, in its 2020 Rule) suggested that this language imposes an additional burden on plaintiffs in particular to demonstrate at an early point the "robust causality requirement" that the Supreme Court called for. Other courts, on the other hand, state that while *Inclusive Communities* may have imposed stricter causation requirements on disparate impact plaintiffs, it did not alter the timing or methods courts have used to assess the sufficiency of a plaintiffs' claims. To eliminate misunderstanding, HUD should confirm how and when courts should assess the sufficiency of the plaintiff's allegations in disparate impact cases – including allegations concerning causation – and to make clear that disparate impact claims may be dismissed at the pleading stage if the plaintiff fails to allege any fact essential to meeting its burden of proof.

    d. **HUD should revisit the 2019 Proposal to determine whether other modifications proposed there are appropriate to meet the requirements of *Inclusive Communities*.** As noted above, the Comment Letter supported the 2019 Proposal's attempt to develop a full response to the guidance provided by *Inclusive Communities*. For example, the 2019 Proposal lists a number of defenses available to defendants and modifies the burden on the plaintiffs, in the final stage of HUD's three-part burden-shifting analysis, to respond by demonstrating that there is an alternative to the challenged policy or practice that serves the defendant's interest in "an equally effective manner without imposing materially greater costs on, or creating material burdens for, the defendant." See 84 Fed. Reg. at 42863. Although not discussed substantively in *Inclusive Communities*, what the plaintiff must show in the final burden-shifting phase remains an issue: Must the plaintiff demonstrate merely that a less discriminatory alternative

Regulations Division
August 24, 2021
Page 9

exists, or must that alternative be at least as effective and no more expensive or burdensome than the defendant's original solution, as the 2019 Proposal suggested?

Many of the issues and changes addressed in the 2019 Proposal are consistent with the goals expressed in *Inclusive Communities* to avoid improper intrusions into policy choices by public and private decision-makers. We urge HUD to review the 2019 Proposal again to fully determine what other changes are needed to update HUD's disparate impact regulations to appropriately reflect the outcome of the *Inclusive Communities* decision. We also encourage HUD to review the attached Comment Letter, which reflects additional suggestions for modifying its 2013 Rule. Those suggestions are pertinent to improving HUD's disparate impact regulations in general and in particular adhering more closely to the guidance provided by *Inclusive Communities*.

## <u>Conclusion</u>

After many years of stability, fair housing laws have been increasingly volatile, especially including disparate impact liability. Therefore, HUD should focus its efforts on achieving a long-term and predictable fair housing requirements, and should begin that task by revising its 2013 Rule to reflect what the Supreme Court has said in *Inclusive Communities* and what federal courts have said since. Modest changes, such as those suggested here, will do much to reinvigorate HUD's disparate impact regulation and make it a tool that agency officials, courts and litigants can use to properly deliver the goals of the FHAct in the future.

We appreciate the opportunity to present these comments to you. If you have any questions or would like additional information on any topic addressed here, please do not hesitate to contact me.

Very truly yours,

Harry J. Kelly
Partner

HJK

4828-3284-0695.1

# ATTACHMENT A



**NIXON PEABODY LLP**
**ATTORNEYS AT LAW**

**NIXONPEABODY.COM**
**@NIXONPEABODYLLP**

**Harry J. Kelly**
*Partner*
T 202-585-8712
hkelly@nixonpeabody.com

799 9th Street NW
Suite 500
Washington, DC 20001-4501
202-585-8000

VIA E-MAIL (http://www.regulations.gov)

Office of the General Counsel
Rules Docket Clerk
U.S. Department of Housing and Urban Development
451 Seventh Street, SW
Room 10276
Washington, DC 20410-0001

Re:     Comments on HUD's Implementation of the Fair Housing Act's Disparate Impact
        Standard – Proposed Rule
        Docket No. FR-6111-P-02
        RIN 2529-AA98

Dear Sir or Madam:

On behalf of our clients, the National Leased Housing Association ("NLHA"), the Council for
Affordable and Rural Housing ("CARH"), the National Apartment Association ("NAA"), and
the National Multifamily Housing Council ("NMHC") (jointly, the "Housing Associations"), and
their thousands of members – owners, managers, developers, and investors in the nation's
multifamily housing industry – we provide this response to the Proposed Rule (the "Proposed
Rule") in "HUD's Implementation of the Fair Housing Act's Disparate Impact Standard,"
Docket No. FR-6111-P-02, published at 84 Fed. Reg. 42854 (the "Proposal").

The Housing Associations strongly commend the U.S. Department of Housing and Urban
Development ("HUD") for its effort to revise its existing rule for disparate impact claims under
the Fair Housing Act (the
"Act"). 24 CFR § 100.500 (the "Current Rule"), to update it and incorporate important guidance
from the U.S. Supreme Court's decision in *Tex. Dept. of Hous. & Comm. Affairs v. Inclusive
Cmtys. Project, Inc.*, __ U.S. ___, 135 S. Ct. 2507 (2015). [1] The Proposed Rule will correct a
number of errors and deficiencies in the Current Rule, helping to prevent "abusive" disparate
impact cases while preserving the "heartland" of disparate impact liability to combat "arbitrary,
artificial and unnecessary burdens" on housing opportunities. 135 S. Ct. at 2522. The changes
will also promote the important goals of uniformity and predictability in disparate impact

---

[1]     The Housing Associations previously submitted comments (the "2018 Comments") to the Advance Notice of
        Proposed Rulemaking issued by HUD on June 20, 2018. 83 Fed. Reg. 28560 (the "2018 Notice"), which
        requested public input on proposals to overhaul the Current Rule. Dkt. No. HUD-2018-0047-0310, tracking
        no. 1k2-94wj-kdgr.

4836-6710-1096.1

Office of the General Counsel
October 17, 2019

outcomes. Although these comments strongly endorse the Proposed Rule, they also recommend some clarifications and additions to the Proposed Rule, to make it more effective and reduce unnecessary litigation, and respond to a series of questions raised by HUD in the Proposal, as explained in more detail below.

## I. Background

In their 2018 Comments, the Housing Associations recognized that disparate impact can serve an important purpose in the "heartland" of cases it was meant to address – such as exclusionary zoning practices – but that the Current Rule needed extensive revision. They pointed out, among other things, that the Current Rule did not reflect many of the "safeguards" announced in the Supreme Court's *Inclusive Communities* decision. As a result, the Current Rule could lead to exactly the sort of "abusive" disparate impact claims that the Supreme Court warned against.

To correct the errors and deficiencies in the Current Rule, the 2018 Comments proposed a "Framework" for a revised disparate impact rule, that set out the elements of a disparate impact claim and made clear that at all times, the party asserting disparate impact claims had the burden to prove those claims. Among other things, the 2018 Comments also urged HUD to adopt safe harbors that would permit housing providers to adopt essential tenant selection and property management policies without fear of subsequent litigation and to identify specific defenses to disparate impact claims.

## II. Comments on Proposed Rule

### A. The Housing Associations Congratulate HUD On The Improvements Reflected in the Proposed Rule.

By adopting many of the components of the Framework proposed in the 2018 Comments, HUD's Proposed Rule marks a dramatic improvement over the Current Rule. Among other things, the Proposed Rule identifies a series of elements to a disparate impact claim under the Act that a disparate impact claimant must prove. This includes showing facts that the challenged practice is "arbitrary, artificial and unnecessary" to achieve a valid business or policy goal and establishing that a "robust causal link" exists between the challenged policy and the alleged discriminatory effect, and that the "alleged disparity caused by the policy or practice is significant," among other elements. *See* Proposed Rule, § 100.500(a).[2] The elements derive directly from the "safeguards" enunciated in the *Inclusive Communities* decision.

By adopting these changes, HUD will discourage the sort of "abusive" disparate impact cases that the Supreme Court warned against, including actions that do nothing more than "second-guess" otherwise legitimate decisions by government agencies and private entities. 135 S. Ct. at

---

[2]    As explained below, some of the elements announced in the Proposed Rule should be clarified to avoid additional litigation that would jeopardize the gains in efficiency and predictability promoted by the Proposed Rule. As explained in Section C below, the Housing Associations recommend that HUD provide additional clarification for these elements and other components in the Proposed Rule.

Office of the General Counsel
October 17, 2019

2522, 2524. As the Supreme Court recognized, housing providers make critical decisions every day about property operations and management. In adopting the "safeguards" discussed in *Inclusive Communities*, the Supreme Court struck a balance between the legitimate needs of housing providers to manage their properties safely and successfully and the rights of persons in protected classes to challenge "arbitrary, artificial and unnecessary" practices that have a discriminatory effect.

The changes made by the Proposed Rule will help to implement the balance struck in *Inclusive Communities*. For example, it will reduce that fear that housing providers may face liability for applying neutral screening procedures before admitting new tenants. A residential lease is essentially a long term license to occupy a dwelling in exchange for compliance with the lease provisions, including timely payment of rent and respect for the right of peaceful enjoyment of the premises by other tenants. A housing provider must, therefore, adopt policies on matters such as a prospective tenant's credit and criminal history in order to determine whether the prospective tenant poses reasonable risks. No housing provider wants to deal with eviction proceedings if they can be avoided by applying neutral credit screening procedures in advance, and no housing provider wants to rent a unit to a person whose criminal background raises a bona fide concern about the safety and security of people and property at the premises.

An example of the burdens that HUD's Current Rule imposes on legitimate property management issues is the guidance (the "OGC Guidance") issued by HUD's Office of General Counsel ("OGC") in April 2016. Invoking the Current Rule, OGC warned that adopting crime screening policies could lead to disparate impact claims to the extent they tended to disqualify a disproportionate number of persons in protected classes. *See* OGC Guidance at https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF. Among other things, the OGC Guidance suggested that in order to utilize crime screening data, it was necessary to perform an "individualized assessment of relevant mitigating information" to determine whether to admit a renter with an adverse criminal history. OGC Guidance at 7. According to OGC, this would require housing providers to assess other factors, such as the facts surrounding the criminal conduct, the age of the renter when the criminal conduct occurred, and evidence of rehabilitation activities, before making a screening decision. The requirement to perform an individualized assessment of mitigating factors imposes delay and expense on housing providers, and requires them to exercise psychological expertise outside the job description of most tenant selection personnel. Leaving aside these obvious burdens, the OGC Guidance had a chilling effect on housing providers' duty to meet a fundamental obligation to other tenants – to promote their physical safety and assure them of the right of peaceful enjoyment of their premises.

By requiring plaintiffs to prove basic elements of a disparate impact claim – such as that the challenged practice is "arbitrary, artificial and unnecessary" – the Proposed Rule makes it far less likely that housing providers who make bona fide efforts, such as performing crime screening to protect their tenants, their staff and their properties, will face "abusive" disparate

3

Office of the General Counsel
October 17, 2019

impact claims.[3]  The Proposed Rule will help to strike the balance sought by the *Inclusive Communities* decision and properly focus on the "heartland" of disparate impact liability, as the Supreme Court intended.

### B.  HUD Should Consider Additional Safe Harbors and Defenses To Disparate Impact Claims.

In the Framework included in their 2018 Comments, the Housing Associations urged HUD to adopt additional safe harbors and defenses that would provide confidence to housing providers that reasonable property management practices would not subject them to disparate impact claims.  The Housing Associations commend HUD for adopting several safe harbors and specific defenses for parties opposing disparate impact claims in the Proposed Rule.  The Proposed Rule demonstrates that HUD made a serious effort to design safe harbors that protect legitimate decisions of government agencies and private firms, while preserving disparate impact liability in appropriate cases.  Still, some additional modifications to the Proposed Rule would improve its equity and efficiency:

1.  **Statistical Algorithms and Models.**  Most notably, the Housing Associations applaud the proposal to permit public agencies and private firms to utilize mathematical algorithms to assess risk in appropriate cases.  This is an extraordinarily helpful and prescient initiative.  Statistical models are widely used in a variety of economic sectors to provide important insights into risk issues that experience and anecdotes simply cannot supply.  Thanks to advances in information gathering and analysis, and developing technologies such as artificial intelligence, an enormous amount of information is available to assist government agencies and private firms to assess a variety of appropriate housing-related risks, such as credit, crime and casualty risks.  The Proposed Rule recognizes that modeling risk issues is an essential task for agencies and businesses, that accurate risk assessments benefit everyone, and that agencies and businesses should be allowed to use the best available information and statistical modeling techniques to make accurate assessments of risk.  HUD's Proposed Rule recognizes the important principle that neutral facts, processed through a neutral model, produce a nondiscriminatory outcome.  The possibility that some individuals, even a number of individuals, may be adversely effected by a particular outcome should not provide grounds to reject the validity or utility of information that modern algorithms generate.  Indeed, in most instances, statistical modeling techniques will ***reduce*** bias in housing decisions – algorithms that are factually accurate and properly designed and used will minimize the possibility of bias (conscious or unconscious) that otherwise might improperly tilt risk decisions.  While the Housing Associations have some recommendations for improving the Proposed Rule's treatment of algorithms (*see* Section

---

[3]  HUD should clarify that performing such "individualized assessments" of mitigating factors constitutes a "material burden" for purposes of proposed §100.500(d)(1)(ii) and (2)(iii), as discussed in more detail in Section C(1)(e), below.  Indeed, HUD should take this opportunity to confirm that housing providers are never required to undertake such individualized assessments of mitigating factors to avoid disparate impact claims. *See* Section C(3) below.

4

Office of the General Counsel
October 17, 2019

C(2) below), they applaud HUD's willingness to create a safe harbor for use of sophisticated risk assessment techniques.

2. **Safe Harbor for Compliance with Applicable Law.** The Proposed Rule also creates a safe harbor where a defendant shows that its discretion is materially limited by applicable law or by a binding judicial or administrative order or requirement. *See* Proposed Rule, §100.500(c)(1). This is similar to a proposed safe harbor included in the Housing Association's Framework, where "the challenged policy or practice was required by, or reasonably calculated to comply with, an otherwise valid law or regulation of local, state or federal government." 2018 Comments, Framework at 2. The Proposed Rule is narrower, however, because the protection provided by §100.500(c)(1) only applies where the housing provider's "discretion is material limited" by some outside legal duty. A housing provider should know that it is also protected where it takes action that on its face is authorized by or intended to comply with applicable laws. This is not a speculative issue: In *Burbank Tenants Assn. v. Kargman*, the Massachusetts Supreme Judicial Court concluded that an owner was still subject to a potential disparate impact claim, even though it had complied with all applicable HUD requirements for not renewing its Section 8 contract. 48 N.E.3d 394, 408-11 (Mass. 2016) (ultimately rejecting disparate impact claim because plaintiffs failed to satisfy *Inclusive Communities'* "robust causality requirement").

HUD therefore should clarify that housing providers who comply with otherwise valid Federal, state and local laws should not be subject to disparate impact claims, and should encourage them to take innovative action to meet their legal obligations, rather than narrowly restrict this safe harbor to those circumstances where the housing provider would have to provide its "discretion is materially limited" by outside legal issues. To do this, we recommend that proposed §100.500(c)(1) be revised as follows (new text in italics):

> (1) The defendant shows that *(x) the challenged policy or practice is authorized by or is reasonably calculated to comply with, or (y)* its discretion is material limited by a third party such as through : . . .

3. **Additional Safe Harbors and Defenses.** HUD should also consider adopting additional safe harbors and defenses that were discussed in the Framework attached to the Housing Associations' 2018 Comments, including the following:

   a. The challenged practice would be lawful if it is consistent with any policy or practice that HUD has approved for the operation of federally-insured housing as defined in 24 C.F.R. § 5.100.

   b. The challenged policy or practice is related to determining tenant eligibility or selection, and is reasonably calculated to enhance housing opportunities for persons who are members of protected classes under the Act or state or local fair housing laws, members of the military or veterans, homeless persons, persons with AIDS/HIV, LGBTQ persons, or persons whose income is at or below the

5

Office of the General Counsel
October 17, 2019

> maximum income allowed to qualify for Section 8 rental assistance or for a unit in a low income housing tax credit or HUD-insured property.

    c. A written policy or practice adopted prior to any challenge and made available to prospective and current tenants that

        i. Identifies a goal of the policy or practice that is not facially discriminatory and that is beneficial to the defendant's housing operations;

        ii. Explains that the policy or practice is reasonably calculated to achieve the goal; and

        iii. Concludes that the policy or practice imposes no greater substantive burden on members of a protected class than it imposes on the population generally.

Again, the Housing Associations believe that the changes made by the Proposed Rule will allow housing providers to adopt policies with confidence that they will not face subsequent disparate impact scrutiny. The additional changes proposed here will provide further clarity and allow housing providers even greater certainty that the policies they adopt will comply with the Act's requirements.

### C. Recommendations for Additional Clarifications and Improvements.

While the Housing Associations commend HUD for making much-needed changes to the Current Rule, HUD should consider some additional clarifications and improvements that would make the Proposed Rule more efficient, such as the following:

1. **HUD should clarify key terms in the Proposed Rule.** While HUD properly adopted a series of elements that a disparate impact claimant must prove, those elements contain key words and phrases that have not been defined. In the absence of definitions, those terms will have to be defined through litigation, a time-consuming and expensive process that undermines the goals of uniformity and efficiency reflected in the Proposed Rule. The Housing Associations urge HUD to provide additional definitions for the following terms:

    a. *"Arbitrary, artificial and unnecessary"* (Proposed Rules, sec. 100.500 (b)(1)): This term is derived from the *Inclusive Communities* decision and prior Supreme Court decisions involving disparate impact claims. In *Inclusive Communities*, the Supreme Court described as "arbitrary" zoning policies that barred the construction of multifamily housing. *See* 135 S. Ct. at 2522. Similarly, it explained that the Act "aims to ensure that [legitimate] priorities can be achieved without *arbitrarily* creating discriminatory effects or perpetuating segregation. Id. (emphasis added). HUD should define the phrase "*arbitrary, artificial and unnecessary*" as applying to a policy that is not reasonably calculated to achieve a legitimate goal within the sound discretion of the policy-maker and that

6

Office of the General Counsel
October 17, 2019

imposes an otherwise unexplained burden on housing opportunities for persons in protected classes. It should also provide examples of policies that are arbitrary, artificial and unnecessary (such as zoning rules that artificially restrict the ability to develop multifamily housing) and those that are not, such as otherwise valid statistical models and algorithms that are used to make legitimate risk assessments (such as those discussed in proposed §100.500(c)(2)).

b. *"Robust causal link"* (Proposed Rule, §100.500(b)(2)): This phrase also derives from *Inclusive Communities*, which, among its proposed safeguards, called for a "[r]obust causality requirement." Id. at 2523. As the Supreme Court warned, "a disparate impact claim that relies on statistical disparity must fail if it cannot point to a defendant's policy or policies *causing that disparity*." Id. at 2523 (emphasis added). Without such a causality requirement, government agencies and private firms would "almost inexorably" come to rely on improper racial quotas to avoid liability, which could raise "serious constitutional questions." Id. Determining causation in housing related matters is challenging, among other reasons, "because of the multiple factors that go into investment decisions about where to construct or renovate housing units." Id. at 2523-24. In other words, causation is not shown where a disparate impact is the effect of multiple causes, only one of which is the challenged practice. HUD should clarify the Proposed Rule to say that, to demonstrate a "robust causal link," a claimant must show that the challenged practice is both the "direct *and sole* cause of the discriminatory effect."

c. *"Significant"* disparity (Proposed Rule, §100.500(b)(4). The Proposed Rule would require a claimant to prove that "the alleged disparity caused by the policy or practice is significant," but it doesn't explain how "significance" should be measured. Indeed, one of the most persistent issues with disparate impact theory is determining how much of a disparity is sufficient to trigger liability. Because of the variety of ways in which a policy may affect housing opportunities, it is unlikely that a single numerical or percentage threshold for a "significant" impact can be established in advance. For example, what does it mean to say that an arbitrary zoning decision makes constructing a multifamily property twice as difficult as it would be without the rule? And even if it was possible to establish a threshold, what should the threshold be – is 5% more difficulty sufficient? Is 50% appropriate? Is 90% the right number? A strictly quantitative measure of significance is not likely to yield principled, consistent, and predictable results.

Instead of searching for a strict quantitative threshold, HUD should define a *"significant"* disparity in a functional way: A disparity is "significant" if it affects individual members of a protected class, in a qualitatively different manner than it affects individual members of the population at large. Suppose that a housing provider adopts a credit score requirement and that a higher percentage of minority applicants have substandard credit scores compared to nonminority applicants. If the evidence indicates that the housing provider rejects all

7

Office of the General Counsel
October 17, 2019

applicants, regardless of their minority/nonminority status, with the same substandard credit scores, the disparity would not be deemed to be significant. In other words, if the housing provider treats all persons with substandard credit scores similarly, regardless of their protected class status, the fact that more minorities may happen to be rejected would not constitute a "significant" disparity.

d. *"Valid interest"* (Proposed Rule, §§100.500(d)(1)(ii) and (2)(iii)): Under the Current Rule, if a disparate impact claimant establishes a prima facie case, the burden shifts to the defendant to demonstrate, as part of showing a "legally sufficient justification," that "the challenged policy is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant. 24 CFR §100.500(c)(2). The Proposed Rule properly jettisons both the "legally sufficient justification" and "substantial, legitimate, nondiscriminatory" requirements. Both of these standards set multiple criteria that a defendant had to satisfy to support its policy, which opened the opportunity for litigation on multiple fronts. More important, these multifaceted standards made it extremely difficult for a well-intentioned housing provider to know whether – until it was forced to defend its policies in court – the policies satisfied the acid test set out in the Current Rule.

Instead, the Proposed Rule adopts the language from *Inclusive Communities*, explaining the burden that a disparate impact defendant must satisfy:

> An important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the ***valid interest*** served by their policies.

135 S. Ct. at 2522 (noting incomplete analogies to "business necessity" test in employment discrimination cases) (emphasis added). In establishing that a housing owner only must show that the challenged policy satisfies a "valid interest," HUD properly moves its disparate impact rule away from the burdensome standard in the Current Rule now and towards harmony with *Inclusive Communities*. To complete the process, HUD should make clear that to prove a "valid interest," a housing provider is not required to demonstrate a "substantial, legitimate, nondiscrimination interest" in the challenged policy and instead is only required to show that the challenged policy (1) is reasonably calculated to achieve a generally recognized property management goal (including profitable operation of the property) and (2) does not on its face discriminate against a protected class.

e. *"Materially greater costs"* and *"material burden"* (Proposed Rule, §§100.500(d)(1)(ii) and (2)(iii)): The Proposed Rule significantly overhauls the provisions in the Current Rule that, after the defendant meets the "substantial, legitimate, nondiscriminatory interest" test, shifts the burden back to the plaintiff

8

Office of the General Counsel
October 17, 2019

to show a "less discriminatory" alternative. §100.500(c)(3). The error in the Current Rule was brought into stark relief in *MHANY Mgmt. v. Cty. of Nassau,* No. 05-cv-2301, 2017 U.S. Dist. LEXIS 153214 at *20-26 (E.D.N.Y Sept. 19, 2017), where the district court concluded that a plaintiff satisfied this standard by demonstrating that a less discriminatory "alternative" existed, even though that "alternative" was not "equally effective" as the challenged policy. Wisely, the Proposed Rule makes clear that a less discriminatory alternative must be "equally effective" as the challenged policy, eliminating the possibility that a housing provider may be compelled to adopt policies that do not meet their reasonable operation and management needs.

More important, the Proposed Rule requires that a less discriminatory alternative must not "impos[e] materially greater costs on, or creat[e] other material burdens for, the defendant." To avoid uncertainty and unnecessary litigation in the future, HUD should clarify what "materiality" means in these contexts. Specifically, HUD should clarify that a cost increase or a burden is "material" if it imposes a cost or burden that, but for the disparate impact claim, would not be incurred by a housing provider. For example, as discussed in more detail below, it would be a "material burden" to require a housing provider, who has already performed an individualized credit or crime screening analysis, to undertake an additional "individualized assessment" of possible mitigating factors before disqualifying a substandard applicant. In such a case, the owner clearly has a "valid interest" to assess credit- and crime-related risks before entering into a lease with an applicant. To the extent that the owner has obtained reliable information about a specific applicant that indicates the applicant poses a substandard risk, and uses the information as intended, no additional individualized assessment should be required. Any such individualized assessment should be deemed to pose a "material burden" on the housing provider, because it reflects a cost that, but for a threat of disparate impact liability, it would not have to incur. HUD should make clear that any such costs are "material burdens" that an owner should not be required to prove.[4]

2. **HUD should provide additional clarification about the use of algorithms and mathematical models.** As noted above, statistical algorithms and models can benefit everyone by allowing accurate assessment of risks encountered in the housing sector. There are some provisions of the Proposed Rule, however, that need to be clarified so

---

[4] Arguably, to the extent that the "equally effective manner," "materially greater costs," and "material burden" provisions of proposed §100.500(d)(2) impose burdens on the defendant, they go beyond what *Inclusive Communities* allows. In that case, the Supreme Court indicated that the only burden imposed on the defendant in a disparate impact case is to show a "valid interest." 135 S. Ct. at 2522, 2523. To the extent that §100.500(d)(2) suggests that the defendant also has a duty to show that a less discriminatory alternative is "equally effective," that it imposes no "materially greater costs," or that it raises no "material burden" on the defendant, it violates the *Inclusive Communities* holding. HUD should make clear that at all times, the burden is solely on the plaintiff to show a less discriminatory alternative exists, including proving that the alleged alternative is equally effective and imposes no material costs or burdens on the defendant. The defendant always has the ability to *rebut* any such showing, but it should not bear the burden of *proving* them itself.

9

Office of the General Counsel
October 17, 2019

that the full benefit of risk modeling is available to government agencies and private firms alike.

For example, proposed § 100.500(c)(2)(i) allows a defendant to rebut a disparate impact claim based on use of an algorithm, if it can show that the factors used in the model "do not rely in any material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act . . . ." The term "substitutes or close proxies for protected classes" is not defined and ultimately begs the question – if a factor is not somehow closely correlated with a protected class, how can it raise a disparate impact question in the first place? The question should never be whether there is a correlation between a statistical factor used in a model and a protected class. Rather, the question should be whether there is a statistically valid reason to use a specific factor in order to assess the specific risk involved. If there is, and if there happens to be a coincidence between that factor and members of a protected class, then the only question should be whether adverse decisions based on the statistical model somehow are applied differently to persons in the protect class than they are applied to persons who are not in that protected class. As noted above, if a model yields the same negative credit scores for two individuals, one in a protected class and one who is not, and both are rejected, it is hard to see how there is a disparate impact on the person in the protected class.[5]

Similarly, proposed section 100.500(c)(2)(ii) – which provides a defense for models "produced, maintained, or distributed by a recognized third party that determines industry standards" – should also be clarified. There are a large number of entities in the housing sector – including the Housing Associations themselves – that make important contributions to policy and operational issues. Indeed, one of the remarkable aspects of the housing industry is the diversity of perspectives that are reflected in housing policy in this country. Given this wide variety of perspectives, it is not clear which of these organizations, if any, would qualify as "a recognized third party that determines industry standards." HUD is wise to try to provide a defense for neutral algorithmic models that are widely used in the housing industry, but it needs to provide additional guidance to explain when such models should be allowed. If HUD chooses to retain language that looks at the reputation of the producer of the model, it need to provide additional information to explain how that status is determined. Instead, HUD may want to focus less on the industry reputation or leadership of the third party that produces the model, and more on the acceptance of the model itself across the industry (which could be demonstrated by the number of firms that use the model).

3. **HUD should clarify that having made a fact-based individualized decision on the basis of neutral criteria, a housing provider is not require to perform any further "individualized assessment."** Because it is in the process of overhauling its disparate impact regulations generally, HUD should take this opportunity to limit the scope of

---

[5] And of course, if the two individuals receive the same negative score, but the person in the protected class is rejected while the person not in the protected class is admitted, it is hard to see how that should be treated as a case of disparate impact instead of a case of intentional disparate treatment, subject to the rules applicable to such cases.

Office of the General Counsel
October 17, 2019

"individualized assessments," such as consideration of mitigating information, in the context of disparate impact claims. Although, as explained below, the concept emerged in the context of other fair housing issues, individualized assessments have crept into disparate impact cases and guidance as a sort of uncodified element of the defendant's proof. That is, in addition to showing that it has a "valid interest" in a specific policy or practice, a housing provider must also show that before that policy is applied adversely against a member of a protected class, the provider has considered other possibly mitigating information about that individual. Nothing in disparate impact theory itself – and certainly nothing in *Inclusive Communities* – requires housing providers to bear an additional duty to consider individual mitigating information, at least where they have obtained reliable adverse individual information in the first place, such as a substandard credit score or crime screening report.

As noted earlier, the 2016 OGC Guidance on crime screening demonstrates how individualized assessments distort the process established by the Current Rule. According to the OGC Guidance, before rejecting a prospective renter based on adverse criminal history, a housing provider must consider other mitigating factors, such as the specific facts and circumstances of the subject criminal activity, the age of the renter at the time the criminal conduct occurred, and subsequent rehabilitation activities. *See* OGC Guidance at 7. Leaving aside the fact that some of this information may not be available to a housing provider under any circumstances, it is clear that acquiring this information will impose additional costs on a housing provider that it would not otherwise incur. Moreover, such an individualized assessment inevitably imposes delays which could result in loss of other prospective renters who decide to look elsewhere for housing. Further, even assuming all of the information required by HUD was obtainable, a meaningful "assessment" of this information requires a degree of psychological insight that most property management professionals do not possess. Finally, the OGC Guidance discusses individualized assessments in the context of demonstrating that a less discriminatory alternative exists. *See* OGC Guidance at 7. But even under the Current Rule, that burden belongs to the plaintiff, not the defendant. *See* §100.500(c)(3). HUD has never explained how under the OGC Guidance, a plaintiff's duty to demonstrate a less discriminatory alternative somehow metamorphoses into an additional element for the defendant to prove. HUD should make clear that individualized assessments of mitigating information are never part of the housing provider's burden under either the Current Rule or the Proposed Rule.[6]

---

[6] Outside of the disparate impact context, an "individualized assessment" requirement has also been imposed where, for example, a housing provider bases a decision to disqualify an applicant, evict a tenant, or take other adverse action on the basis of non-personalized stereotypes, such as situations invoking the so-called "direct threat" exception to a housing provider's duty to make reasonable accommodations. *See* 24 CFR §100.202(d)(establishing "direct threat" exception); *see also Boston Housing Authority v. Bridgewaters*, 898 N.E.2d 848, 855 (Mass. 2009) (a landlord could not utilize the "direct threat" exception to evict a tenant because of a diagnosis of Tourette disorder, even where the tenant had exhibited violence towards other tenants; before eviction, landlord was required to perform an individualized assessment to determine whether the individual's behavior could be stabilized by a reasonable accommodation); *see also* FHEO Notice-2013-01 at 4 (breed–specific bans on assistance animals not allowed; "determining that an assistance animal poses a

11

Office of the General Counsel
October 17, 2019

As a result of establishing specific elements of disparate impact claims and squarely placing the burden on the claimant to prove those elements, HUD moved aggressively to bring its disparate impact regulation into harmony with the rules announced by the Supreme Court in its *Inclusive Communities* decision. With the modifications and clarifications discussed elsewhere in these comments, the Proposed Rule should be adopted by HUD.

### D. Responses to HUD's specific requests for comments

In addition to seeking comments on the Proposed Rule itself, the Proposal identified a number of additional matters for which HUD sought public input. *See* 884 Fed. Reg. at 42860-61. While several of those questions are addressed in the course of the preceding comments, the Housing Associations provide the follow responses to the questions posed in the body of the Proposal by HUD.

a) First, HUD asked whether, and under what circumstances, punitive or exemplary damages may be appropriate in disparate impact litigation in Federal court. 84 Fed. Reg. at 42857. The Housing Associations respond that punitive and exemplary damages should never be awarded in disparate impact cases because by definition, disparate impact claims involve unintentional acts. Defendants should not face punitive/exemplary damages in the absence of evidence of actual discriminatory intent.

b) HUD also asked for comments "regarding any less burdensome alternatives to this rule that will meet HUD's objectives as described in the preamble to this rule." 84 Fed. Reg. at 42861, The Housing Associations respond that the only alternative to the Proposed Rule – completely eliminating its disparate impact regulation – would not reduce burdens. A uniform, national disparate impact rule that correctly reflects the safeguards identified in the *Inclusive Communities* decision is preferable to allowing courts and other decision-makers to resolve remaining issues on a case-by-case basis, which is likely to result in balkanization of disparate impact jurisprudence.

c) HUD also requested comments on the potential burden or benefit the proposed regulations may have on potential claimants and the organizations that represent them, some of which are small businesses. Id. The Housing Associations respond that subject to the recommendations contained in these comments, the Proposed Rule strikes a reasonable balance between competing interests and helps to bring HUD's disparate impact rules into harmony with the *Inclusive Communities* holding.

---

direct threat . . . must be based on an individualized assessment . . . about the specific animal's actual conduct – not on mere speculation or fear" about the harm an animal may cause or that other animals have caused). In these cases, an "individualized assessment" is used to confirm that the housing provider is basing its decision on concrete information, rather than stereotypes and unsubstantiated fears. Those are different situations from cases where, for example, an owner has done its due diligence and confirmed that verified credit or criminal history information relating to a specific individual raises a bona fide risk concerning that individual. In such cases, where the housing provider has demonstrated its "valid interest" and based its decision on individualized information, no further "individualized assessment" should be required.

12

Office of the General Counsel
October 17, 2019

   d) HUD also asked about the nature, propriety, and use of algorithmic models as related to the defenses in proposed §100.500(c)(2). Id. at 42860. The Housing Associations endorse the use of algorithms as risk assessment tools and commend HUD for creating a defense to disparate impact claims based on them. *See* Section C(2), above.

In addition to these requests, Section III of the Proposal includes requests for comments on a variety of questions. Id. at 42860. The Housing Associations provide the following responses to those questions:

1. *How well do HUD's proposed changes to its disparate impact standard align with the decision and analysis in <u>Inclusive Communities</u> with respect to the proposed prima facie burden, including:*

    i. *Each of the five elements in the new burden-shifting framework outlined in paragraph (b) of § 100.500.*

    ii. *The three methods described in paragraph (c) of § 100.500 through which defendants may establish that plaintiffs have failed to allege a prima facie case.*

     **Response 1**: As explained above, the Proposed Rule aligns closely with the *Inclusive Communities* decision. We believe that the specific elements included in proposed §100.500(b) are urgently needed to clarify what a disparate impact claimant must prove to validate its claim and are essential to assure that HUD's disparate impact rule harmonizes with what *Inclusive Communities* requires. Likewise, the defenses and safe harbors reflected in proposed §100.500(c) are consistent with both the elements of a disparate impact claim identified in *Inclusive Communities* and the steps housing providers can take to show that the disparate impact claimant has not established those elements. Elsewhere in these comments, we suggest relatively minor changes and clarification what would bring the Proposed Rule into even closer harmony with *Inclusive Communities*.

2. *What impact, using specific court cases as reference, did <u>Inclusive Communities</u> have on the number, type, and likelihood of success of disparate impact claims brought since the 2015 decision? How might this proposed rule further impact the number, type, and likelihood of success of disparate impact claims brought in the future?*

     **Response 2**: While mindful of HUD's disparate impact rules, courts necessarily have treated *Inclusive Communities* as the most authoritative guidance on disparate impact liability under the Act. Courts have heeded the "safeguards" included identified in Inclusive Communities, and seem to be distinguishing those cases in the "heartland" of disparate impact, such as exclusionary zoning practices (*see MHANY Mgmt. v. Cty. of Nassau*, above), from cases dealing with exercises of reasonable business decisions. *See, e.g., Burbank Tenant Assn.*, above (Mass. 2016)(holding that plaintiffs had failed to satisfy "robust causality requirement" of *Inclusive Communities*, where evidence did not indicate plaintiffs would actually suffer as a result of non-renewal of Section 8 lease).

13

Office of the General Counsel
October 17, 2019

Yet even in these cases – and in many others – courts have struggled with applying the safeguards identified in *Inclusive Communities* in a systematic manner. In some cases, the courts seem to cherry-pick some concepts from that case while ignoring others, to reach the outcome they want. One advantage to the Proposed Rule is that it attempts to codify the safeguards identified in *Inclusive Communities* into a set of elements that a disparate impact claimant must prove. This will encourage courts, other decision-makers, and litigants to address each element of a disparate impact claim thoroughly and consistently.

3. *How, specifically, did* <u>Inclusive Communities</u>, *and the cases brought since Inclusive Communities, expand upon, conflict, or align with HUD's 2013 final disparate impact rule and with this proposed rule?*

**Response 3:** The Current Rule attempted to establish a simplified framework for addressing disparate impact claims. Unfortunately, by minimizing issues such as causation and other safeguards, the Current Rule encouraged expansive applications of disparate impact unhinged from the "heartland" of disparate impact cases that, as the OGC Guidance demonstrated, undermined legitimate policy decisions by public and private entities and threatened "abusive" disparate impact claims. The clearest example of how the Current Rule required correction is the handling of the claims in the *Inclusive Communities* litigation, before and after the Supreme Court's decision. In its decision, rendered between the decision of the district court and the Supreme Court, the Fifth Circuit expressly adopted the Current Rule to affirm the district court's decision that the state agency's tax credit allocation policies had a disparate impact on minorities in violation of the Act. *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 282 (5th. Cir. 2014). After the Supreme Court's decision, the district court on remand reversed its original decision and found that there was no disparate impact-based liability, specifically finding that the plaintiffs had not established the "robust causality requirement" identified in *Inclusive Communities*. *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-0546-D, 2016 U.S. Dist. LEXIS 114562 at *41 (N.D. Tex. 2016 Aug. 26, 2016). By incorporating the safeguards identified by the Supreme Court's decision in *Inclusive Communities* – subject to the improvements and clarification discussed elsewhere in these comments – the Proposed Rule will eliminate the errors in the Current Rule and direct future disparate impact cases towards the "heartland" the Supreme Court directed.

Since the *Inclusive Communities* decision, at least some courts have attempted to create their own set of disparate impact elements based on the principles discussed in that case. *See, e.g., City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1319 (S.D. Fla. 2016) (adopting four-prong disparate impact standard); *Cobb Cty. v. Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1346 (N.D. Ga. 2016) (adopting most of *City of Miami* four-part standard). In both cases, the courts dismissed the disparate impact claims for failing to meet one or more of the prongs they established, including failing to show that challenged policy was "arbitrary, artificial and unnecessary" and

Office of the General Counsel
October 17, 2019

failing to meet a "robust" or "substantial" causality requirement. Perhaps the most significant aspect of these cases is that the courts created their own disparate impact tests, completely ignoring the Current Rule to adjudicate the plaintiffs' claims. That suggests that the courts recognized that the Current Rule does not reflect the safeguards identified in the *Inclusive Communities* decision. The cases also serve as a warning that unless HUD revises the Current Rule, courts will continue to experiment with different disparate impact standards derived from the *Inclusive Communities* decision, resulting in the same sort of balkanized rules that prevailed before the Current Rule was put in place. Adopting the Proposed Rule, with the modifications suggested here, will discourage further improvisation by courts and encourage the development of uniform national standards and outcomes in disparate impact cases, which were two of the principle goals in issuing a disparate impact regulation in the first place.

4. *How might the proposed rule increase or decrease costs and economic burden to relevant parties (e.g., litigants, including private citizens, local governments, banks, lenders, insurance companies, or others in the housing industry) relative to the 2013 final disparate impact rule? How might the proposed rule increase or decrease costs and economic burden to relevant parties relative to* Inclusive Communities?

> **Response No. 4**: Neither the *Inclusive Communities* decision or the Proposed Rule should be seen as placing a thumb on the scales of justice. The issue is not whether the *Inclusive Communities* decision or the Proposed Rule promote or restrict the likelihood of success of disparate impact claims. Rather, the question should be whether the Proposed Rule captures the spirit of the *Inclusive Communities* decision, which vindicated the use of disparate impact liability in fair housing cases, but identified a number of safeguards to prevent "abusive" disparate impact cases. In this respect, both the *Inclusive Communities* decision and the Proposed Rule strike a reasonable balance between enforcing fair housing rights without improperly "second-guessing" otherwise legitimate decisions by public and private entities.

5. *How might a decision not to amend HUD's 2013 final disparate impact rule affect the status quo since* Inclusive Communities?

> **Response No. 5:** As discussed above, since the *Inclusive Communities* decision, the proper scope of disparate impact liability has remained in controversy. As the OGC Guidance on crime screening demonstrates, the failure to incorporate the safeguards identified by the Supreme Court leaves open the possibility of imposing liability on housing providers for pursuing policies that are reasonable efforts to achieve neutral and otherwise legitimate goals (in the case of crime screening, promoting the safety and security of housing). In general, courts have focused on whether the challenged practice imposes an "arbitrary, artificial and unnecessary" barrier to housing opportunities, and whether the plaintiff has demonstrated "robust causation" between the challenged policy and the alleged discriminatory impacts. Often, however, the courts and other decision-makers have struggled to work through the other

15

Office of the General Counsel
October 17, 2019

safeguards, sometimes giving emphasis to one safeguard or another, without approaching them as elements of a disparate impact claim in a systematic manner. If HUD chooses not to amend its disparate impact rule, courts and other decision-makers will not have the advantage of a framework to consider each of the elements of a disparate impact claim (and the applicable defenses) in an orderly and thorough manner that the Proposed Rule offers. As noted in Response 3 above, if the Current Rule is not revised, courts may decide that it does not accurately reflect the holding of the Supreme Court's *Inclusive Communities* decision, and will devise case-by-case solutions, which are likely to lead to increasingly divergent outcomes and frustrate the goals of uniformity and predictability that the Proposed Rule promotes.

6. *What impact, if any, does the addition of paragraph (e) of § 100.500 regarding the business of insurance have on the number and type of disparate impact claims? What impact, if any, does the proposed paragraph (e) have on costs (or savings) and economic burden of disparate impact claims?*

   **Response No. 6:** While we assume insurance interests are in the best position to comment on this question, the Housing Associations note that HUD's policies with respect to disparate impact should be focused primarily on whether or not they conform with the *Inclusive Communities* decision and other leading precedents

7. *Is there any other data, information, or analysis the public can provide to assist HUD in assessing the impact of the proposed regulation relative to the 2013 disparate impact final rule and the 2015 Supreme Court decision in Inclusive Communities?*

   **Response No. 7:** We commend HUD for creating a defense for use of neutral algorithmic models that can be used to assess risks in a nondiscriminatory manner. *See* Section C(2), above. At the moment, HUD has not identified the criteria that can be used to confirm whether particular models can be relied upon to produce nondiscriminatory risk assessments. HUD should undertake additional analysis of models used in the housing industry to confirm whether these models yield useful, nondiscriminatory risk assessments or at a minimum attempt to establish neutral criteria the housing providers and third parties that develop such models can use to assess whether they meet the safe harbor requirements in advance.

16

Office of the General Counsel
October 17, 2019

## Conclusion

The Housing Associations commend HUD for taking bold action to overhaul its Current Rule and to offer a Proposed Rule that reflects key aspects of the *Inclusive Communities* decision and the 2018 Comments. While they offer some additional suggestions for clarifications and improvements, the Housing Associations believe the Proposed Rule is properly focused on eliminating the defects in the Current Rule, incorporating the guidance provided by the *Inclusive Communities* decision, and crafting a uniform, national disparate impact rule that strikes a proper balance between the interests of all parties concerned.

Very truly yours,

Harry J. Kelly

029044

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-fe6i-wkx8
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0244
Comment Submitted by American National Property And Casualty Company

---

## Submitter Information

---

## General Comment

Please see attached letter submitted on behalf of American National Property And Casualty Company.

---

## Attachments

2021-08-24 FINAL ANPAC HUD Comment Letter



**AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY**

Service Center: One Moody Plaza, Galveston, TX 77550

August 24, 2021

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

**RE:**      **Reinstatement of HUD's Discriminatory Effects Standard**
         **Docket No. FR-6251-P-01**

Thank you for the opportunity to comment on the Notice of Proposed Rulemaking ("NPRM") titled "Reinstatement of HUD's Discriminatory Effects Standard" published on June 25, 2021. This NPRM proposes to recodify the 2013 version of the Department of Housing and Urban Development's ("HUD") Disparate Impact Rule (the "2013 Rule") promulgated under the Fair Housing Act ("FHA").

American National Property And Casualty Company is a subsidiary of American National Insurance Company ("American National"). American National, founded in 1905 and headquartered in Galveston, Texas, and its subsidiaries offer a broad line of products and services, including life insurance, annuities, health insurance, credit insurance, pension products, and personal and commercial property and casualty insurance. The American National companies operate in all 50 states, insuring over 5 million policyholders.

We respectfully ask that HUD amend the proposed rule to exempt insurance underwriting and rating practices from disparate impact liability.

The federal government has historically respected the primary and leading role of state governments in regulating the business of insurance. The McCarran-Ferguson Act of 1945 prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance."[1] The result has been highly regulated but competitive insurance marketplaces that protect consumers and encourage innovation.

State laws extensively regulate the pricing and underwriting of insurance to ensure that rates are appropriate and that insurers do not unfairly discriminate between consumers. For example, California prohibits premium rates that are unfairly discriminatory,[2] specifically prohibiting rates that consider "the race, language, color, religion, national origin, ancestry, age, political affiliation, or sexual orientation of any person."[3] California also considers

---

[1] 15 U.S.C. §1012(b).
[2] Cal. Ins. Code §1861.05(a).
[3] 10 CCR §2632.4(a).

rates to be unfairly discriminatory if price differences "fail to reflect equitably the difference in expected losses and expenses."[4]  All states have passed similar laws or regulations reflecting these principles.[5]  The 2013 Rule proposed by HUD would challenge insurance rates reviewed and approved by state regulators under state laws. This would inevitably invalidate, impair, or supersede these laws, violating McCarran-Ferguson and expanding the enforcement of the FHA beyond its original purpose.

The ability of insurance companies to objectively rate risks based on the probability of future losses is the cornerstone of a healthy insurance system.  Without risk-based insurance premiums, low-risk consumers would pay unjustifiably high premiums to subsidize other, more risky consumers.  This can lead to adverse selection – those at low risk of a claim purchase less insurance or decide not to purchase at all because of the cost, while more risky consumers purchase cheaper insurance with higher limits.  As a result, claims increase in frequency and severity while premiums become insufficient to pay for claims and the stability of the insurance system is threatened.  Without an exemption in the proposed rule for insurance underwriting and rating, insurers could be faced with an impossible choice: either stick with state-approved rates based on objective risk-based pricing and face disparate impact litigation, or consider factors like race and ethnicity when rating policies and face adverse selection and state regulatory liability.

Finally, applying disparate impact liability to the business of insurance would also violate important constitutional principles recognized in the U.S. Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*[6]  The Court made clear in *Inclusive Communities* that disparate impact liability under the FHA cannot be imposed based on effects the defendant did not cause, cannot be applied in a manner that requires the pervasive consideration of race, and cannot be applied in a way that would interfere with, or require courts to second-guess, legitimate business choices.  As discussed above, the busines of insurance depends on risk-based, non-discriminatory underwriting and rate-making processes.  If applied to insurance, the 2013 Rule would necessarily violate each of these *Inclusive Communities* limitations. HUD should acknowledge this in its final rule and exempt insurance from disparate impact liability.

For the foregoing reasons, American National Property And Casualty Company respectfully requests that HUD amend its proposed rule to exempt the business of insurance.

Sincerely,

*Timothy A. Walsh*

Timothy A. Walsh
President & Chief Executive Officer
American National Property And Casualty Company

---

[4] CAL. INS. CODE §11732.5.  See also, 1 CALIFORNIA INSURANCE LAW & PRACTICE §6A.04[4] ("While this definition has not been formally adopted for use in the evaluation of property-casualty rates under Proposition 103, in practice it is followed by the Department and its actuaries in their assessment of insurer rates, rating plans, and rating factors.").

[5] The Casualty Actuarial Society Statement of Ratemaking Principles explains that "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."  Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 1988), https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

[6] 576 U.S. 519 (2015).

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-gmhm-kwi4
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0251
Comment Submitted by American Property Casualty Insurance Association

---

## Submitter Information

---

## General Comment

Please see the attached comment from the American Property Casualty Insurance Association

---

## Attachments

APCIA Comment Letter re Reinstatement of HUD's Discriminatory Effects Standard (HUD-2021-0033)



August 24, 2021

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

**RE:** **FR-6251-P-01 - Reinstatement of HUD's Discriminatory Effects Standard**

  **Docket No: HUD-2021-0033**

  The American Property Casualty Insurance Association ("APCIA") appreciates the opportunity to provide comments in response to the Notice of Proposed Rulemaking ("NPRM") titled "Reinstatement of HUD's Discriminatory Effects Standard," published by the Department of Housing and Urban Development ("HUD") on June 25, 2021,[1] to recodify the 2013 Disparate-Impact Rule ("2013 Rule").[2] APCIA is the primary national trade association for home, auto, and business insurers. Its members make up nearly 60 percent of the U.S. property casualty insurance market. It has the broadest cross-section of home, auto, and business insurers and reinsurers of any national property casualty trade association, with member companies ranging in size from large to small and operating in all 50 states. APCIA's members write $412 billion in annual premiums. APCIA and its members have a direct interest in whether and how disparate-impact liability under the Fair Housing Act ("FHA") applies to property and casualty insurance, including homeowners insurance and commercial habitational insurance.[3] APCIA respectfully requests that HUD exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from disparate-impact liability under the 2013 Rule.

  As explained below, reinstating the 2013 Rule without the requested exemption would ignore key limitations on disparate-impact liability articulated by the Supreme Court in cases like *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-995 (1988), and *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 661 (1989)—and most recently in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) ("*Inclusive Communities*"), which was decided two years after HUD promulgated the 2013 Rule. These

---

[1] 86 Fed. Reg. 33,590 (June 25, 2021).

[2] Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013); 24 C.F.R. § 100.500.

[3] Commercial habitational insurance is commercial insurance that covers various kinds of properties in which people live other than single-family homes and includes apartment buildings, condominium buildings, and other multiple-family dwellings. These comments generally refer to homeowners and commercial habitational insurance but also apply to any other form of property and casualty insurance the provision of which HUD asserts to be subject to the FHA, whether sold in the admitted, non-admitted, or surplus lines markets. Admitted insurers—subject to full state insurance regulation—write 99% of the homeowners market.

key limitations dictated by the Supreme Court include that the plaintiff must bear the burden of proving a *robust* causal link between a defendant's challenged practice and an alleged disparity,[4] that the disparity is *significant*, beyond mere correlation,[5] that there is a direct relation between the alleged injury and alleged injurious conduct,[6] and that the defendant's legitimate interests could be served by an alternative practice that is *equally effective* as the challenged practice in advancing the defendant's valid interests.[7] None of those limitations is reflected in the 2013 Rule. Accordingly, at a minimum, any recodification of a disparate-impact rule must include these elements to conform with established Supreme Court precedent. Irrespective of whether HUD revises the Rule to align with Supreme Court precedent, APCIA requests that HUD exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from the Rule because disparate-impact liability would threaten the industry, violate the McCarran-Ferguson Act, and conflict with the filed-rate doctrine. At the very least, HUD should adjust any disparate-impact rule to recognize and accommodate these unique aspects of homeowners and commercial habitational insurance. To that end, this comment proceeds in five parts.

Part I provides relevant background and explains how HUD's disparate-impact rulemaking intersects with the business and legal context of the homeowners insurance industry. This Part first explains the business of insurance, state regulation of the insurance industry, and the McCarran-Ferguson Act's preemption of federal laws or rules that undermine the state insurance regulatory schemes. It then provides a history of HUD's disparate-impact rulemaking and details the critical impact of *Inclusive Communities* and the pending litigation brought by APCIA.

Part II takes a closer look at the impact of *Inclusive Communities* on jurisprudence governing disparate-impact claims under the FHA, concluding that the 2013 Rule does not comport with that decision or the underlying precedent on which that decision relied.

Part III then explains why HUD's 2013 Rule also cannot comport with the unique business and legal aspects of the insurance industry. It explains why an exemption from disparate-impact liability is necessary for risk-based pricing and underwriting of homeowners and commercial habitational insurance in light of the fundamental nature of insurance, the dictates of the McCarran-Ferguson Act, and the filed-rate doctrine. That exemption is warranted because there would be few if any cases in which a plaintiff could meet the robust causation requirement mandated by *Inclusive Communities* or escape the preclusive effect of the McCarran-Ferguson Act, making case-by-case litigation senseless. Part III also explains why case-by-case adjudication of disparate-impact claims on risk-based pricing and underwriting is inappropriate and wasteful of judicial resources, as any claim premised on such practices will necessarily fail—further justifying an exemption.

In the event HUD rejects the exemptions detailed in Part III, Part IV then provides HUD an alternative. It explains the various ways HUD's 2020 Rule—and HUD's own reasoning in support of that rule, in conjunction with the various comments HUD received as part of that rulemaking process—better comported with *Inclusive Communities* and the business and legal

---

[4] *Inclusive Communities*, 576 U.S. at 521.
[5] *Id.* at 542; *see also Watson*, 487 U.S. at 994-995.
[6] *Watson*, 487 U.S. at 994-995.
[7] *Wards Cove Packing Co.*, 490 U.S. at 661.

2

029113

realities of the insurance industry. This Part also explains why the Massachusetts district court's injunction with respect to the 2020 Rule was limited in scope and in no way justifies total reversion to the 2013 Rule, especially in light of HUD's own reasoning that the 2020 Rule was necessary to comport with binding Supreme Court caselaw. Part IV explains which provisions of the 2020 Rule are both prudent and necessary to align HUD's disparate-impact rulemaking with the law.

Finally, in the event HUD grants neither the exemption described in Part III nor the specific accommodations detailed in Part IV, Part V explains the minimal steps HUD must take to mitigate the harmful effects of subjecting risk-based insurance practices to disparate-impact liability. Part V asks HUD to, at the very least, acknowledge the business realities of the homeowners and commercial habitational insurance industry and not take additional steps to launch disparate-impact challenges to risk-based pricing and underwriting, as such challenges will necessarily fail as a matter of law.

I.    BACKGROUND

A.    The Business Of Insurance

Insurance is a means by which one party (the insured) transfers financial risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event her home is damaged, the insurer will pay for related repairs. Insurance rates are based on an insured's loss history and risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions—that is, decisions about whether to insure and how to price a particular risk or class of risk.[8]

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and to project their financial implications. Actuaries examine numerous factors that correlate with losses.[9] When underwriting property insurance for homeowners and commercial habitational risks, for example, underwriters have historically reviewed four categories of factors to assess the risk of property damage claims: (1) construction (e.g., frame, masonry, fire resistant, non-combustible, use of cladding, age and type of roof, age of wiring and plumbing system); (2) occupancy (e.g., habitational, manufacturing, office); (3) protection (e.g., alarms, sprinklers, smoke detectors, fire departments (paid or volunteer), water source and distance to fire station and water source, wind mitigation); and (4) exposure (e.g., the nature of the surrounding area, such as other buildings that may be more susceptible to loss, dry brush or woodlands v. paved parking areas, number of stories).[10] Other factors considered in underwriting and pricing insurance include, for instance, the value of the property and any history of previous losses related to the dwelling or similar units. *Homeowners and commercial habitational insurance actuaries do not consider FHA-*

---

[8] *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* §§ 1:2; 1:6 (3d ed. 2013).
[9] *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985).
[10] *See* Christopher J. Boggs, *Understanding Commercial Property Underwriting and 'COPE'*, Ins. J., Feb. 3, 2015, https://www.insurancejournal.com/news/national/2015/02/03/356085.htm.

*protected characteristics when evaluating these factors.* Indeed, they do not have that data and may be prohibited from collecting it.[11]

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that insured and similarly situated insureds—*i.e.*, a rate that accurately reflects the probability that future losses will occur and the likely cost of those losses.[12] If insurers could not set rates or make underwriting decisions based on objective risk factors that accurately predict loss, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of hazards.[13] Such a scheme would greatly reduce the financial incentive for insureds to mitigate risks, construct safer houses, and maintain existing houses.[14]

Accurate pricing is also critical to ensuring the solvency of insurers. An insurer is considered insolvent when it lacks the financial resources to make promised payments to insureds, beneficiaries and claimants.[15] If an insurer sets a price too low or fails to accurately account for the risks involved with policies, it may not have sufficient funds to pay claims that are made.[16]

Thus, without the ability to engage in risk-based pricing and underwriting, insurance companies would likely be compelled to consider a number of mitigating actions, from ceasing to underwrite certain types of risks (habitational risks, for example) to exiting whole lines of business (*e.g.*, property) entirely.

---

[11] *See* A.R. 376, *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014), ECF No. 19; *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶ 6, (insurer does not collect information on race or ethnicity); *id.* ECF No. 44-3 ¶ 11, (insurer does not collect data on policyholders' race or ethnicity); *id.* ECF No. 44-4 ¶ 11, (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); *id.* ECF No. 44-5 ¶ 7 (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates); *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013), ECF No. 27-2 ¶ 4, (insurer does not collect or retain electronic records of race, color, or national origin and does not have capabilities to store and use such information); *id.* ECF No. 27-3 ¶ 9 (insurer does not collect or consider race, color, religion, or national origin in underwriting and rating homeowners' insurance); *id.* ECF No. 27-5 ¶ 5 (prior to the Disparate-Impact Rule, insurer did not collect date on race, color, religion, national origin, sex, familial status, or handicap of its policyholders).

[12] *See N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

[13] See Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 44 (2012).

[14] Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J. at 66-67.

[15] Robert W. Klein, Ph.D, National Association of Mutual Insurance Companies, *Insurance Regulation and the Challenge of Solvency II: Modernizing the System of U.S. Solvency Regulation* (2012), https://www.namic.org/pdf/publicpolicy/insRegSolvII.pdf.

[16] *See, e.g.*, Zain Mohey-Deen & Richard J. Rosen, *The Risks of Pricing New Insurance Products: The Case of Long-Term Care*, Chicago Fed Letter, no. 397, 2018, https://www.chicagofed.org/publications/chicago-fed-letter/2018/397 ("Underpricing a new product was the major cause of the insolvency of Penn Treaty . . . at the time the tenth-largest [long-term] insurer.").

### B.    State Regulation Of Insurance

The states have traditionally regulated the insurance industry—from pricing, underwriting, and claims handling, to company capital requirements and solvency.[17] "State regulation of insurance is comprehensive and includes rate and coverage issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999). Several features of state insurance regulation are relevant here.

First, state insurance law affirmatively permits risk-based pricing and underwriting. Indeed, the vast majority of states not only permit risk-based pricing and underwriting but expressly require it by prohibiting insurers from charging "excessive, inadequate, or unfairly discriminatory rates." As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer"—*i.e.*, if it is risk-based.[18] For purposes of state insurance law, rates do not conform to this rating standard if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences."[19] With respect to the "unfairly discriminatory" component of this risk-based rating standard, state law prohibits rates that treat applicants and policyholders with similar risk profiles differently.[20] Accordingly, state laws make clear that insurers must consider past losses and other relevant risk factors in developing insurance rates and that failing to take risk into account results in unfair discrimination. *See infra* pp. 23-25.

Second, to protect consumers, state insurance commissioners review the rates charged by insurers. The vast majority of states—49 out of 50 plus the District of Columbia—require insurers to file insurance rates with state regulators for review and/or approval.[21] State regulators carefully review insurance rates—often with their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory.[22]

---

[17] Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. 168 (1868). Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constitutes interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (1945), to ensure that the ruling would not undermine the states' long-standing regulation of insurance.

[18] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 2021), https://www.casact.org/sites/default/files/2021-06/Statement%20of%20Principles%20Regarding%20P%26C%20Casualty%20Insurance%20Ratemaking_2021.pdf.

[19] Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted).

[20] *Id.*; *see also infra* pp. 23-25.

[21] *See infra* p. 23-25. As noted in footnote 3 *supra*, admitted insurers write 99% of the homeowners market. Rate filing is also generally required for small-to-mid-market commercial habitational insurance. A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

[22] *See, e.g.*, WIS. STAT. ANN. § 625.13 (1979) (amended 1983); *see also infra* pp. 23-25.

Third, under existing state laws, insurers are typically prohibited from taking FHA-protected characteristics into account,[23] and may not collect information about prospective insureds' membership in FHA-protected classes.[24]

One of the primary aims of state insurance regulation—and a central purpose of the prohibition against rates that are excessive, *inadequate*, or unfairly discriminatory—is to protect policyholders against the risk of insurer insolvency.[25]  As part of solvency regulation, state regulators review insurers' capitalization, asset quality, reinsurance, and liquidity.[26]  Insurers derive the funds needed to capitalize the business, purchase quality assets, purchase reinsurance, and facilitate overall liquidity not only from return on investments, the transfer of risk to reinsurers, and other surplus preservation strategies, but also from premiums retained after covered losses are paid.  The aggregate difference between premiums collected and covered losses paid produces a significant portion of the surplus funding that ensures solvency and the insurer's ability to pay current and future claims.  Rate regulation—including the requirement that rates accurately reflect an insured's risk profile—is thus an integral aspect of solvency regulation because it ensures that insurance companies charge premiums that are sufficient to cover current and future claims while ensuring that adequate surplus is available for capitalization, asset and reinsurance purchases, and liquidity.[27]

### C. The McCarran-Ferguson Act

In the McCarran-Ferguson Act, Congress stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest."  15 U.S.C. § 1011.  Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance  . . . unless such Act specifically relates to the business of insurance."  *Id.* § 1012(b).  Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application  . . . [would] frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance.  *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).  A regulation requiring federal courts to "determine whether

---

[23] *See, e.g.*, CAL. INS. CODE § 679.71 (1973) (amended 2009) (prohibiting insurers from denying insurance or providing insurance on less favorable terms due to, among other things, an applicant's marital status, sex, race, color, religion, national origin, or ancestry); MD. CODE ANN. INS. § 27-501(c)(1) (1997) (amended 2020) (prohibiting insurers or insurance producers from inquiring about race, creed, color, or national origin in any manner of requesting general information related to an insurance application).

[24] *See, e.g.*, CAL. INS. CODE § 10141 (1969) (amended 2009).

[25] Shauhin Talesh, *Insurance Law As Public Interest Law*, 2 UC Irvine L. Rev. 985, 1005-06 (2012) ("As articulated by most states, the goals of insurance regulation include fair pricing of insurance, protecting insurance company solvency, preventing unfair practices by insurance companies, and ensuring the availability of insurance coverage.") (emphasis added); National Association of Insurance Commissioners, *The U.S. National State-Based System of Insurance Financial Regulation and the Solvency Modernization Initiative* § 2.3 (Aug. 14, 2013), https://www.naic.org/documents/committees_e_us_solvency_framework.pdf ("The state regulatory system in the United States has had over a 100 year history of solvency regulation.").

[26] *See, e.g.* National Association of Insurance Commissioners, Financial Analysis Handbook 25, 56, 63, 73 (2020), https://content.naic.org/sites/default/files/publication-fah-zu-financial-analysis-handbook.pdf (suggesting, among other factors, capitalization, asset quality, reinsurance, and liquidity as measures of solvency to be considered by state insurance regulators).

[27] Joshua Phares Ackerman, *The Unintended Federalism Consequences of the Affordable Care Act's Insurance Market Reforms*, 34 Pace L. Rev. 273, 283 (2014).

[challenged insurance practices] are actuarially sound and consistent with principles of state law" would violate the McCarran-Ferguson Act, as the Seventh Circuit concluded in *Mutual of Omaha*, 179 F.3d at 557.[28]

### D. The Fair Housing Act And The Disparate-Impact Rule

The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It further makes it unlawful "for any person or other entity whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). The FHA does not specifically relate to the business of insurance and thus is displaced by state laws regulating insurance, pursuant to McCarran-Ferguson, in the event of a conflict or interference with state law.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70,924.

Representatives of the insurance industry submitted comments explaining why disparate-impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate-Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, application of disparate-impact liability to risk-based pricing and underwriting of homeowners insurance would adversely affect the insurance industry by deterring the use of core insurance practices and would inject racial considerations. Finally, commenters noted that application of the Rule to homeowners insurance would violate the "filed-rate" doctrine, which bars private claims and collateral attacks based on insurance rates filed with state regulatory entities.

On February 15, 2013, HUD promulgated its final Disparate-Impact Rule, which remains in effect today. *See* 78 Fed. Reg. 11,460 (Feb. 15, 2013). The 2013 Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns

---

[28] Congress remains committed to the principle of leaving the regulation of insurance to the states. *See* Baird Webel, Cong. Research Serv., R44958 *Insurance Regulation: Legislation in the 115th Congress*, Summary (2018), https://crsreports.congress.gov/product/pdf/R/R44958 ("Since 1868, the individual states have been the primary regulators of insurance with the National Association of Insurance Commissioners (NAIC) acting to coordinate state actions and collect national data").

because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). No showing of intent to discriminate is required. The Rule also provides that disparate-impact litigation under the FHA should proceed under a burden-shifting framework. Under that framework, a plaintiff must first demonstrate that a housing-related practice has a disparate effect on an FHA-protected class. 24 C.F.R. § 100.500(c)(1) (2013). The defendant must then show that the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Notwithstanding such a showing, the defendant may still be found liable if the plaintiff establishes "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). The alternative identified by the plaintiff need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. Thus, compliance with the Disparate-Impact Rule may require defendants to abandon sound, good-faith practices in favor of substitutes that are less effective at furthering the defendants' legitimate, nondiscriminatory interests.

In the final Rule, HUD declined to exempt risk-based pricing and underwriting of homeowners insurance or meaningfully address whether extension of disparate-impact liability would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. The Rule's preamble merely asserted (without any support) that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11,475. HUD thus did not consider whether the Rule conflicts with state laws and policies that permit or require risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that application of disparate-impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11,475 (quoting a comment). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-based pricing and underwriting. HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."). HUD thus acknowledged the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of risk factors in fact is a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *Id.*

E.    **Litigation Challenges To The 2013 Rule**

All of the national property casualty insurance trade associations—including APCIA's predecessors American Insurance Association (AIA) and Property Casualty Insurers Association

of America (PCI)—filed lawsuits challenging the 2013 Rule.[29] PCI filed suit in the U.S. District Court for the Northern District of Illinois. *See PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. Nov. 27, 2013), ECF No. 1. PCI's suit focused on HUD's decision to apply the Disparate-Impact Rule to homeowners insurance. On September 3, 2014, the court granted PCI's motion for summary judgment in part, concluding that HUD's explanation for adopting the 2012 Rule was arbitrary and capricious in several respects. *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-52 (N.D. Ill. 2014) (*PCI I*).

First, the court rejected HUD's contention that it could disregard the McCarran-Ferguson Act entirely and held that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims instead of granting an exemption for risk-based pricing and underwriting of homeowners insurance. *Id.* at 1048. In so holding, the court observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders* [*v. Farmers Ins. Exch.*], 537 F.3d [961,] 967 [(8th Cir. 2008)]." *PCI I*, 66 F. Supp. 3d at 1048. The court noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate-impact claims against insurers in light of the McCarran-Ferguson Act." *Id.* at 1049.

Second, the court determined that HUD had inadequately examined whether the filed-rate doctrine would bar application of the Rule. *Id.* at 1050. And finally, the court concluded that HUD had made "no effort to evaluate" the substance of the insurance industry's argument that the Rule would prevent the use of sound risk factors and thereby undermine the fundamental nature of the insurance business. *Id.* at 1051. Accordingly, the court remanded to HUD for further explanation of these issues.[30]

## F.    PCI's Post-Remand Comments

In September 2014, PCI informed HUD that it intended to submit additional comments addressing the issues that the district court had instructed HUD to consider on remand. *See* Letter from PCI to HUD, at 1 (Sept. 25, 2014) (A.R. 4416). PCI then submitted comments further explaining how the Disparate-Impact Rule would invalidate, impair, or supersede states' regulation of insurance and distort the homeowners insurance market. *See* Letter from PCI to HUD, at 1-18 (Jan. 26, 2015) (A.R. 4496-4513). PCI emphasized that the Rule's burden-shifting process would impose liability on homeowners insurers for providing and pricing insurance

---

[29] Both predecessors of APCIA—the American Insurance Association ("AIA") and the Property Casualty Insurers Association of America ("PCI")—filed lawsuits under the Administrative Procedure Act challenging the 2013 Disparate-Impact Rule. Effective January 1, 2019, AIA merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association. Prior to the merger of AIA and PCI, comments were filed by each separate trade in response to the 2018 ANPRM.

[30] AIA, along with co-plaintiff the National Association of Mutual Insurance Companies ("NAMIC"), filed a complaint in the U.S. District Court for the District of Columbia. *See American Ins. Ass'n v. Carson*, No. 13-cv-966 (D.D.C. June 26, 2013). The lawsuit challenged the validity of disparate-impact claims generally under the FHA, and the district court initially granted summary judgment in their favor. Order Granting Motion for Summary Judgment, *American Ins. Ass'n v. Carson*, No. 13-cv-966 (D.D.C. Nov. 3, 2014), ECF No. 46. HUD appealed, but before briefing began, the Supreme Court decided *Inclusive Communities*.

using sound risk-based methods. *Id*. at 8 (A.R. 4503). PCI explained that prohibiting those methods would violate the McCarran-Ferguson Act and the filed-rate doctrine, as well as harm the homeowners insurance industry. *See id*. at 9-18 (A.R. 4504-4513). PCI's comments also alerted HUD to the importance of the Supreme Court's upcoming consideration of the *Inclusive Communities* case. *See id*. at 5-6 (A.R. 4500-4501).[31]

### G. The Supreme Court's Decision In *Inclusive Communities*

On June 25, 2015, the Supreme Court issued its decision in *Inclusive Communities*. *See* 576 U.S. 519. In that decision, the Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" *Id*. at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." *Id*. at 540. In order to ensure that disparate-impact claims are properly limited, the Court held that key "safeguards" must be put in place. *Id*. at 542.

First, the Court made clear that claims cannot rest on statistical disparity alone but must satisfy a "robust causality requirement." *Id*. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id*. (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). A plaintiff must therefore allege facts or produce statistical evidence demonstrating a causal connection between the challenged practice and the alleged disparity. *Inclusive Communities*, 576 U.S. at 543. Referring approvingly to the opinion below of Fifth Circuit Judge Edith Jones, the Court explained that where another "law substantially limits the [defendant's] discretion," causation cannot be established. *Id*.

Second, a defendant must have "leeway to state and explain the valid interest served by their policies." *Id*. at 541. Businesses, the Court stated, "must be given latitude to consider market factors." *Id*. at 541-542. And they must be allowed to maintain practices that are "necessary to achieve a valid interest." *Id*.

The Supreme Court cautioned that without these safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id*. at 542. "[I]nterpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id*. at 543. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id*. at 544. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id*. Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id*.

---

[31] APCIA hereby incorporates by reference PCI's September 25, 2014 letter (A.R. 4416) and January 26, 2015 letter (A.R. 4496) submitted to HUD.

### H. PCI's Post-*Inclusive Communities* Comments

Shortly after the Supreme Court issued its decision in *Inclusive Communities*, PCI submitted further comments explaining that HUD must consider the Supreme Court's newly articulated limitations on disparate-impact liability. *See* Letter from PCI to HUD (July 29, 2015) (A.R. 4615-4621).[32] PCI emphasized that *Inclusive Communities* prohibited application of the Rule to legitimate business practices, including risk-based homeowners insurance practices. *See id.* at 5-7 (A.R. 4619-4621).

### I. HUD's Supplemental Explanation

As required by the district court in the *PCI I* case, on October 5, 2016, HUD published a supplemental explanation for its decision to apply the FHA to insurance practices entitled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance." *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("2016 Supplemental Explanation"). HUD did not dispute that state law uniformly permits and often requires insurers to consider risk factors. *See id.* at 69,015. In fact, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice." *Id.* The 2016 Supplemental Explanation nevertheless rejected insurers' request for an exemption from the Disparate-Impact Rule, concluding that insurers can simply justify using risk-based factors on a case-by-case basis under the Rule's burden-shifting framework. *See id.* HUD thus insisted that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.*

HUD asserted that an exemption for insurance practices would be inappropriate because certain state anti-discrimination laws might apply to insurance, and an exemption would therefore "deprive all states of federal support in addressing discriminatory insurance practices," contrary to "the purpose of [the] McCarran-Ferguson [Act]." 81 Fed. Reg. at 69,016. HUD also asserted in passing in its 2016 Supplemental Explanation that "McCarran-Ferguson requires a fact-intensive inquiry." *Id.*

HUD did not dispute in the Supplemental Explanation that the filed-rate doctrine applies to insurance rates filed with state insurance commissions. Instead, HUD argued that the filed-rate doctrine does not apply to FHA claims because they "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effects." 81 Fed. Reg. at 69,018 (quoting *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)). HUD also argued in the 2016 Supplemental Explanation that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes." *Id.* (quoting *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 944 (8th Cir. 2006) (*Saunders I*)).

---

[32] APCIA also incorporates this letter by reference.

### J.     Treasury Recommends That HUD Reconsider Its Prior Rule

In October 2017, the U.S. Department of Treasury issued a report entitled "A Financial System That Creates Economic Opportunities Asset Management and Insurance."[33]  Among other things, that report urged HUD to reconsider the Disparate-Impact Rule, stating:

> Treasury recommends that HUD reconsider its use of the disparate-impact rule.  In particular, HUD should consider whether the disparate-impact rule, as applied, is consistent with McCarran-Ferguson and existing state law.  HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles.[34]

### K.     HUD's 2020 Rulemaking Revised The 2013 Rule

On August 19, 2019, HUD published a NPRM in the Federal Register.  *See* 84 Fed. Reg. at 42,854.  The NPRM proposed to make a number of important changes to the 2013 Rule to bring it into compliance with the limits set forth in *Inclusive Communities*.  After soliciting and considering comments, on September 24, 2020, HUD published the 2020 Final Rule, "Implementation of the Fair Housing Act's Disparate Impact Standard," in the Federal Register. 85 Fed. Reg. at 60,288.  In response to comments,[35] the Final Rule made several clarifying edits to the Proposed Rule but maintained the thrust of the Proposed Rule's improvements and alterations of the 2013 Rule.

As revised, the 2020 Rule made clear that disparate-impact claims are available under the FHA where a plaintiff proves a specific policy's or practice's discriminatory effect on members of a protected class.  Consistent with *Inclusive Communities*, the 2020 Rule provided that plaintiffs bringing such claims must, to proceed past the pleading stage, plausibly allege facts supporting each of the following elements:

> (1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

> (2) That the challenged policy or practice has a disproportionately adverse effect on members of a protected class;

> (3) That there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect;

---

[33] *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities Asset Management and Insurance* (Oct. 2017), https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.

[34] *Id.* at 110.

[35] On August 19, 2018 and October 18, 2019, APCIA submitted extensive comments in response to HUD's Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28,560 (June 20, 2018) and Notice of Proposed Rulemaking, 84 Fed. Reg. 42,854 (Aug. 19, 2019), respectively.  APCIA incorporates these August 19, 2018, and October 18, 2019, letters to HUD by reference.

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct relation between the injury asserted and the injurious conduct alleged.

24 C.F.R. § 100.500(b).

Next, the 2020 Rule addressed the burdens of proof typical of litigation and consistent with *Inclusive Communities*. The 2020 Rule provided additional guidance on the three-part burden shifting framework in the 2013 Rule, and (as with the Proposed Rule) clarified that the ultimate burden always lies with the plaintiff. Specifically, the 2020 Rule required:

(1) A plaintiff must prove by the preponderance of the evidence each of the elements in [24 C.F.R. § 100.500(b)].

(2) A defendant or responding party . . . may rebut a plaintiff's allegation . . . that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice advances a valid interest (or interests) and is therefore not arbitrary, artificial, and unnecessary.

(3) If a defendant rebuts a plaintiff's assertion . . . the plaintiff must prove by the preponderance of the evidence either that the interest (or interests) advanced by the defendant are not valid or that a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

24 C.F.R. § 100.500(c).

The 2020 Rule also set forth defenses available to defendants at both the pleading and post-pleading stages of litigation. At the pleading stage, a defendant could prevail (consistent with the Rules of Civil Procedure) by demonstrating that the plaintiff failed to establish one of the elements required for pleading a disparate-impact case, or by showing that "the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a:

(i) Federal, state, or local law;

(ii) Binding or controlling court, arbitral, administrative order or opinion; or

(iii) Binding or controlling regulatory, administrative or government guidance or requirement.

24 C.F.R. § 100.500(d)(1). After the pleading stage, a defendant could prevail by establishing that:

(i) The policy or practice is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly

situated individuals not part of the protected class, with respect to the allegations under paragraph (b). This is not an adequate defense, however, if the plaintiff demonstrates that an alternative, less discriminatory policy or practice would result in the same outcome of the policy or practice, without imposing materially greater costs on, or creating other material burdens for the defendant.

(ii) The plaintiff has failed to establish that a policy or practice has a discriminatory effect under paragraph (c) of this section.

(iii) The defendant's policy or practice is reasonably necessary to comply with a third party requirement, such as a:

(A) Federal, state, or local law;

(B) Binding or controlling court, arbitral, administrative order or opinion; or

(C) Binding or controlling regulatory, administrative, or government guidance or requirement.

24 C.F.R. § 100.500(d)(2). Finally, the 2020 Rule incorporated the NPRM's reference regarding the application of the McCarran-Ferguson Act to the FHA, *see* 24 C.F.R. § 100.500(e) ("Business of Insurance), adding a paragraph concerning remedies to align the 2020 Rule with the Supreme Court's guidance in *Inclusive Communities*:

In cases where liability is based solely on a discriminatory effect theory, remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons. In administrative proceedings under 42 U.S.C. § 3612(g) based solely on discriminatory effect theory, HUD will seek only equitable remedies, provided that where pecuniary damage is proved, HUD will seek compensatory damages or restitution; and provided further that HUD may pursue civil money penalties in discriminatory effect cases only where the defendant has previously been adjudged, within the last five years, to have committed unlawful housing discrimination under the Fair Housing Act, other than under this section.

24 C.F.R. § 100.500(f).

## L. The District Court Enjoins The 2020 Rule

On October 25, 2020, the United States District Court for the District of Massachusetts issued a preliminary injunction enjoining implementation of the 2020 Rule. *See Mass. Fair Hous. Ctr. v. United States Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600 (D. Mass 2020) (*MFHC*). As a result, the 2020 Rule never took effect, and the 2013 Rule remains in effect today.

The district court's injunction did not touch upon every aspect of the 2020 Rule, but rather tailored its analysis to specific provisions that the court found sufficiently problematic at the preliminary stage to conclude that plaintiffs had a likelihood of success. Specifically, the

district court determined that the "additional language" in 24 C.F.R. § 100.500(b)(1)—providing examples of a valid interest or legitimate objective "'such as a practical business, profit, policy consideration'"—was not found in any judicial decision. *MFHC*, 496 F. Supp 3d. at 610. It found the same as to the "'outcome prediction' defense" located at 24 C.F.R. § 100.500(d)(2)(i), and the requirement in § 100.500(c)(3) that plaintiffs must prove that their alternative policy would serve a defendant's interests in "an *equally effective manner without imposing materially greater costs* on, or creating *other material burdens* for, the defendant." *MFHC*, 496 F. Supp 3d. at 610. Finally, the court cited as problematic an unspecified and undefined "conflat[ion]" of plaintiffs' prima facie and pleading burdens. *Id.* at 611.

Although the district court otherwise criticized the 2020 Rule for lack of clarity, it cited no other specific provision as contrary to law. Instead, the district court specifically noted that the 2020 Rule's "arbitrary, artificial, and unnecessary" standard comes "directly from *Inclusive Communities*." *Id.* at 610. The court said nothing about the 2020 Rule's recognition that the FHA does not (and cannot) supplant state laws concerning insurance, nor the 2020 Rule's codification of *Inclusive Communities'* guidance with respect to remedies in disparate impact cases.

### M.     HUD Issues Notice Of Intent To Reinstate The 2013 Rule

On June 25, 2021, HUD published a Proposed Rule titled "Reinstatement of HUD's Discriminatory Effects Standard." 86 Fed. Reg. 33,590. The Proposed Rule seeks to reinstate, virtually without alteration, the 2013 Rule in full, notwithstanding the reasoning HUD promulgated one year before during the 2020 Rule's notice-and-comment process—a process that identified significant gaps between the 2013 Rule and the Supreme Court's directions in *Inclusive Communities*. The proposed Reinstatement cites the Massachusetts district court's preliminary injunction as justification for reverting to the 2013 Rule but ignores the limitations in the district court's opinion, which cited only specific provisions of the 2020 Rule as problematic at the preliminary-injunction stage, and in no way justified wholesale reversion to the 2013 Rule that the 2020 Rule aimed to improve and clarify.

### N.     PCI's Renewed Legal Challenge

As explained above, litigation is pending challenging the 2013 Rule in the United States District Court for the Norther District of Illinois. *See Property Cas. Insurers Ass'n of Am. v. Carson*, No. 13-CV-8564 (N.D. Ill. Nov. 27, 2013). After HUD issued its 2016 Supplemental Explanation, PCI amended its complaint to bring a renewed challenge to the 2013 Rule. Dkt. 129. PCI subsequently moved for summary judgment, focusing its challenge on the adequacy of HUD's explanation in the 2016 Supplement. PCI argued that the Supplement is arbitrary and capricious because it fails to meaningfully consider the Supreme Court's 2015 decision in *Inclusive Communities* or explain how, without an exemption for risk-based pricing and underwriting of homeowners insurance, the Rule is consistent with the McCarran-Ferguson Act, the fundamental business of insurance, or the filed-rate doctrine. Dkt. 221. HUD filed a cross-motion for summary judgment, arguing that the Supplement adequately addresses industry comments and the *PCI I* Court's concerns. Dkt. 231. Summary judgment briefing was completed on August 20, 2021, and both PCI and HUD's cross-motions remaining pending.

## II. THE 2013 DISPARATE-IMPACT RULE CANNOT BE SQUARED WITH *INCLUSIVE COMMUNITIES* OR THE BEDROCK DISPARATE-IMPACT JURISPRUDENCE THE SUPREME COURT CITED

HUD cannot reinstate the 2013 Rule as previously formulated because it is inconsistent with the limitations set forth in *Inclusive Communities* and longstanding anti-discrimination jurisprudence. HUD is incorrect in claiming that *Inclusive Communities* endorsed the 2013 Rule. Nor is HUD correct in claiming that the 2013 Rule is aligned with the longstanding limits on the burden-shifting framework that the *Inclusive Communities* Court reiterated. In particular, the burden-shifting framework of the 2013 Rule permits plaintiffs to prevail in a wider range of cases than they would have been able to advance under the foundational body of anti-discrimination caselaw under Title VII and the ADEA—a corpus of jurisprudence which HUD itself contends underpins *Inclusive Communities*' analysis. For these reasons, the Rule is contrary to longstanding Supreme Court precedent—especially as applied to risk-based pricing and underwriting of homeowners and commercial habitational insurance.

### A. *Inclusive Communities* Did Not Endorse The 2013 Rule

The NPRM alleges that "the [*Inclusive Communities*] Court did not call into question the 2013 Rule's framework for analyzing discriminatory effects claims, nor did it suggest that HUD should make any modifications to its framework. To the contrary, the Court cited HUD's 2013 Rule multiple times with approval." 88 Fed. Reg. at 33,592.

This vastly overstates the Supreme Court's treatment of the Rule. Indeed, the *Inclusive Communities* Court made only a few glancing mentions of the Rule, none of which could fairly be characterized as approvals of its substance. The first reference merely restated the three steps of the 2013 Rule. *Inclusive Communities*, 576 U.S. at 527 (specifying that "[t]he regulation also established a burden-shifting framework for adjudicating disparate-impact claims" and describing the requirements of each step of the test). The second reference noted that the Fifth Circuit reversed the district court based on the 2013 Rule. *Id.* at 528. The third reference stated that the second step of the HUD test is analogous to the "business necessity" defense under Title VII but does not state that the HUD and Title VII standards are in alignment. *Id.* at 541 (noting HUD's explanation that it did not use the phrase "business necessity" because that "phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities"). The final reference describes HUD's stated goals for the disparate-impact standard, but does not endorse HUD's burden-shifting framework. *Id.* at 542 (noting that "HUD itself recognized in its recent rulemaking, disparate-impact liability 'does not mandate that affordable housing be located in neighborhoods with any particular characteristic'").

None of these references amounts to an approval or endorsement of the Rule. Indeed, the validity of the 2013 Rule was not at issue in the case; in granting certiorari, the Supreme Court limited the scope of the case to the first question presented—whether disparate-impact claims are cognizable under the FHA. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 573 U.S. 991 (2014). Nowhere did the Court indicate that it was considering the validity of the 2013 Rule.

Accordingly, HUD's claim that the 2013 Rule was already determined to be consistent with *Inclusive Communities* is not accurate—as several courts have observed.[36]

**B.      The 2013 Rule's Burden-Shifting Framework Is Inconsistent With The Longstanding Precedent On Which *Inclusive Communities* Relied**

As explained in further detail below, each step of the 2013 Rule's burden-shifting framework diverges from the tests governing claims under related antidiscrimination statutes in ways that permit plaintiffs to plead and prevail on disparate-impact claims that violate the "safeguards" that *Inclusive Communities* set forth and that the Supreme Court has consistently articulated in interpreting the requirements of the burden-shifting framework for antidiscrimination cases.

*1.      The First Step Of The 2013 Rule's Burden-Shifting Framework Imposes A Significantly Lower Causation Standard Than The Supreme Court Has Required*

*Inclusive Communities* requires a showing of "robust causality" between a defendant's challenged policies and an alleged racial disparity. The Court explained that this requirement "protects defendants from being held liable for racial disparities they did not create." 576 U.S. at 542. Were the rule otherwise, insurers could be found liable for accurately pricing insurance based only on the risks a customer poses—the essence of the business of insurance—simply because the acts of a third party result in a disparity in the rates charged across different groups. For example, homeowners insurers assess the risk of future property loss by using risk-based factors like the proximity of a home to a fire station. But perhaps due to historic siting decisions by local governments, a municipality's fire departments might be located further from predominantly minority neighborhoods than predominantly non-minority locales. Were plaintiffs not required to make a "robust" showing of causality, a homeowners insurer could be held liable for a resulting disparity in homeowners insurance rates between minority and non-minority groups that is caused by a municipality's fire station siting decisions that the insurer had no role in creating or perpetuating.

Longstanding and foundational anti-discrimination jurisprudence is consistent with a "robust" causality requirement. *Id.* at 542. Specifically, Supreme Court cases foreclose claims based on any "predicted" differences between groups, as well as disparate-impact claims that rest on a showing of mere statistical difference. The 2013 Rule's first step erodes these long-standing causation standards by permitting plaintiffs to state claims for "predicted" harm; and allowing statistical disparities, standing alone, to establish causation.

The 2013 Rule allows plaintiffs to plead a prima facie case by showing a "predicted" statistical disparity, or a difference between groups hinging on a mere statistical disparity without more. 78 Fed. Reg. at 11,463. And nowhere does it prevent plaintiffs from prevailing in

---

[36] *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019); *Oviedo Town Ctr, II, L.L.P. v. City of Oviedo, Florida*, 759 Fed. App'x 828, 833-35 (11th Cir. 2018) (per curiam); *River Cross Land Co., LLC v. Seminole Cty.*, 2021 WL 2291344, at *22-24 (M.D. Fla. June 4, 2021); *County of Cook, Ill. v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018); *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

disparate-impact challenges on such forms of proof alone. But in the seminal Title VII anti-discrimination cases of *Wards Cove*, and *Watson*, the Supreme Court set out a causation test that forecloses claims based on "predicted" future disparities. In *Wards Cove*, the Court instructed that "[a] plaintiff must demonstrate that it is the application of a specific or particular . . . practice that *has created* the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case." 490 U.S. at 657 (emphasis added). And in *Watson*, the Supreme Court made clear that "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question *has caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group." 487 U.S. 994 (emphasis added). The Court thus articulated the standard under Title VII as a causal effect that "has" already occurred, clearly indicating that the Court did not contemplate claims for as-yet-unrealized disparities or challenges to practices that have not actually resulted in a cognizable disparity.

ADEA caselaw contains this same limitation. To prevail under the burden-shifting framework in those cases, a plaintiff must "'isolat[e] and identif[y] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 100 (2008) (quoting *Wards Cove*, 490 U.S. at 656). The fact that the disparities are meant to have *already* been "observed" further underscores that this standard requires proof of an existing disparate impact—not a future one. The burden-shifting test in anti-discrimination cases has thus long incorporated an inherent limit on causation by foreclosing claims for predicted or otherwise yet-to-be-observed disparities—claims that the 2013 Rule would allow under the first step of its burden-shifting test.

Additionally, the Supreme Court has repeatedly required a showing of more than a bare statistical difference to establish causality between a challenged practice and a disparate outcome. In *Inclusive Communities*, the Court explained that a disparate-impact claim challenges practices that have a '*disproportionately* adverse effect on minorities.'" 576 U.S. at 524 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (emphasis added). The Court also made clear that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact." *Id.* at 542 (quoting *Wards Cove*, 490 U.S. at 653). This formulation is consistent with the rigorous statistical requirements for showing discrimination that have been a foundation of anti-discrimination jurisprudence.

In *Watson*, the Court set out the standard for statistical evidence: "Our formulations . . . have consistently stressed that statistical disparities must be *sufficiently substantial* that they raise such an inference of causation." *Watson*, 487 U.S. at 994-995 (emphasis added). And in line with these directives, the Supreme Court has endorsed proof of a "statistically significant" difference between groups as sufficient to establish a Title VII violation. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-311 (1977). Further, the Supreme Court also cautioned that statistical evidence must focus on disparities between comparable groups because, otherwise, the analysis is "nonsensical." *Wards Cove*, 490 U.S. at 651.

Consistent with this precedent, agencies and lower courts have similarly required that something more than a bare statistical difference must be shown to establish an actionable disparate impact—a statistical difference must be significant, and must be between comparable populations to support an inference of a meaningful disparity. For example, a long-used rule-of-thumb in Title VII cases is that a ratio of the percentages of protected class versus non-protected

class groups to pass a job test of less than four-fifths (0.80) is insufficient to satisfy the plaintiff's burden to show a significant disparity. *See, e.g.*, 29 C.F.R. § 1607.4(D) (2016) (EEOC's guidelines originally adopted in 1979; *see* Adoption of Questions and Answers To Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11,996 (Mar. 2, 1979)); *see also Gilty v. Village of Oak Park*, 919 F.2d 1247, 1255 (7th Cir. 1990) (rejecting disparate-impact claim because plaintiff's statistics did not reflect eligibility rate for the specific job, nor did he establish a causal connection between the specific employment practice and the disparate impact); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020) (rejecting claim that employer's policy not to hire people with certain criminal convictions created a disparate impact on African-Americans because while national statistics show that African-Americans are more likely to have prior convictions than white people, the jobs in question required certain educational and technical credentials that made those national statistics irrelevant).

Nowhere does the 2013 Rule require that a statistical difference be significant or require a statistical difference between otherwise comparable groups. For example, the 2013 Rule would permit a plaintiff to state a claim by alleging that a particular risk-based practice has a disparate impact on racial minorities, even though it could be the case that there is no statistically significant difference in the rates charged to members of different racial groups resulting from that practice. That would not be a *disproportionate* impact on a protected class. *Inclusive Communities*, 576 U.S. at 524-525. Under established anti-discrimination caselaw, a plaintiff would be unable to show causality if their claim does not rest on a statistically significant difference between comparable populations, because that would undermine an "inference of causation," *Watson*, 487 U.S. at 995, let alone a "robust" showing of causality. *Inclusive Communities*, 576 U.S. at 542 ("[A] disparate impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity.") (emphasis added).

But the 2013 Rule would permit plaintiffs in this circumstance to at least set forth a prima facie case—if not completely prevail in litigation—by making a non-statistically significant showing of difference between populations that are not comparable in terms of objective risk factors. That would permit a showing of causation under circumstances that the Supreme Court has repeatedly found inadequate. It risks allowing defendants to be held "liable for racial disparities they did not create" based on a "mere correlation." *Id.* HUD's premise that step one of the burden-shifting test is consistent with the longstanding limits on disparate-impact liability that *Inclusive Communities* referenced is thus incorrect.

### 2. The Second Step Of The Rule's Burden-Shifting Test Is More Onerous For Defendants Than *Inclusive Communities* And Other Precedent Permit

At the second step of the 2013 Rule's burden-shifting framework, a defendant must prove that a challenged practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 78 Fed. Reg. at 11,482. The *Inclusive Communities* Court described this step as "analogous to the business necessity standard under Title VII." 576 U.S. at 541. Historically, the Supreme Court has explained that a defendant merely bears the burden of production—not proof—at this step of the business-necessity test. The 2013 Rule thus imposes a

heavier burden on defendants to defend a challenged practice than the Supreme Court has historically allowed.

The *Inclusive Communities* Court explained that the second step of the burden-shifting test provides an "important and appropriate means of ensuring that disparate-impact liability is properly limited." 576 U.S. at 541. Analogizing to Title VII, the Court described that stage as allowing defendants "leeway to state and explain the valid interest served by their policies." *Id*. *Inclusive Communities* did not address whether the defendant's burden was one of production or proof. But the Title VII case law it drew on has long held that while defendants must introduce a justification for their challenged practice at the second stage of a burden-shifting test, it is ultimately the plaintiff's burden to persuade a finder of fact to disregard a defendant's justifications.

Decades before *Inclusive Communities* was decided, the Court made clear in *Wards Cove* that the defendant's obligation at step two of the burden-shifting inquiry was one of *production*—not *proof*. "In this phase," the Court explained, referring to the second step of the burden-shifting framework, "the [defendant] carries the burden of producing evidence of a business justification for his [challenged] practice. The burden of persuasion, however, remains with the disparate-impact plaintiff." 490 U.S. at 659. The Court noted that this "conforms with the usual method for allocating persuasion and production burdens in the federal courts." *Id*. at 659-60. The Court went so far as to clarify that prior precedent that may be seen as contrary was incorrect: *Id*. at 660 ("We acknowledge that some of our earlier decisions can be read as suggesting otherwise. … But to the extent that those cases speak of an employer's "burden of proof" with respect to a legitimate business justification defense, … they should have been understood to mean an employer's production—but not persuasion—burden.").

By requiring defendants to prove rather than introduce a justification for their practices, the 2013 Rule upends an established understanding of how defendants in anti-discrimination cases may defend their challenged practices—an understanding that *Inclusive Communities* brought into its discussion of the limitations on disparate-impact liability. This is at odds with the vision of *Inclusive Communities* that the second step of the burden-shifting test would "limit" disparate-impact liability and provide adequate "leeway" for defendants to justify their practices. *Id*. at 541.

Fundamentally, requiring defendants not just to identify, but to prove, their substantial, legitimate, and non-discriminatory interest in their challenged policy threatens to place the onus on them to show why they should not be held liable for practices beyond those that are "artificial, arbitrary, and unnecessary" to achieve a valid policy. *Inclusive Communities*, 576 U.S. at 540. Doing so tips the balance in favor of increased disparate-impact liability, and thus risks stymying the "practical business choices" that the Supreme Court has consistently acknowledged in its anti-discrimination jurisprudence that defendants should be able to make. Accordingly, the second step of the 2013 Disparate-Impact Rule is inconsistent with significant and long-established safeguards established by the Supreme Court.

### 3. The Third Step Of The Burden-Shifting Framework Allows Plaintiffs To Propose Alternative Practices That Are Not Equally Effective At

***Furthering Defendants' Interests, Contrary To Established Limits Set
By The Supreme Court***

The 2013 Rule contemplates that even where a defendant meets its burden at the second step of the burden-shifting test, a plaintiff may still prevail at the third step by "proving that the [defendant's] substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect." 78 Fed. Reg. at 11,482. The Rule does not require that the proposed alternative be "equally effective" as the challenged practice at achieving the defendant's valid interests. That requirement, however, was mandated by the Supreme Court in *Wards Cove*, which specifically held that "any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring procedures in achieving petitioners' legitimate employment goals." 490 U.S. at 661.

The *Wards Cove* Court was clear about this limitation, explaining that because "'[c]ourts are generally less competent than employers to restructure business practices,' [they] should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit." 490 U.S. at 661 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578 (1978)). The Court also noted that "'factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.'" *Id.* (quoting *Watson*, 487 U.S. at 998).

Allowing a disparate-impact plaintiff challenging a risk-based homeowners insurance practice to prevail at the third step of the burden-shifting test by demonstrating the availability of an alternative that is less effective in predicting losses, as the 2013 Rule does, contravenes this precedent by allowing liability for practices beyond those that are "artificial, arbitrary, and unnecessary" to achieve a valid policy. *Inclusive Communities*, 576 U.S. at 540 (quoting *Griggs*, 401 U.S. at 431). Additionally, in the context of risk-based pricing and underwriting of homeowners and commercial habitational insurance, it also threatens the very activities that ensure a well-functioning housing market and a vibrant and dynamic free-enterprise system. *Inclusive Communities*, 576 U.S. at 533. As explained above, insurance markets function efficiently when insurance is priced in accord with risk-based factors. *See supra* pp. 5-6. The extensive state-law framework governing the pricing of insurance, which includes safeguards against insurer insolvency, is intended to promote such efficient operation. Requiring homeowners and commercial habitational insurers to substitute less-effective practices for risk-based pricing and underwriting may actually prevent insurers from undertaking the very activities that ensure a well-functioning housing market and threatens to upend the "vibrant and dynamic" insurance industry. *Inclusive Communities*, 576 U.S. at 533. Unless HUD clarifies that step three requires proof of an "equally effective" alternative, reinstatement of the 2013 Rule will "undermine[] [the] purpose [of the FHA] as well as the free-market system." *Id.*

For these reasons, the 2013 Rule exceeds the limits of the burden-shifting analysis as articulated by longstanding Supreme Court anti-discrimination jurisprudence and as incorporated and explained by the Supreme Court in *Inclusive Communities*.

### C. The 2013 Rule Lacks The Additional Safeguards That *Inclusive Communities* Announced Must Apply To Disparate-Impact Claims Under The FHA

The *Inclusive Communities* Court warned that, without appropriate limits, disparate-impact suits could expand beyond the "heartland" of cases targeting artificial barriers to housing and instead involve courts in "second-guess[ing]" which of two reasonable approaches a defendant should follow when exercising its discretion. 576 U.S. at 540-41. To avoid that result, the Court announced that the "important and appropriate means of ensuring that disparate-impact liability is properly limited to give housing authorities and private developers leeway to state and explain the valid interest served by their policies." *Id.* at 541.

First, the *Inclusive Communities* Court made clear that when a "law substantially limits the [defendant's] discretion," causality cannot be shown. *Id.* at 543. That is the case here. Applying disparate-impact liability to risk-based pricing and underwriting by homeowners and commercial habitational insurers would leave them caught between conflicting federal and state legal regimes and thus place them in precisely the "double bind of liability" the Court instructed must be avoided. *Id.* at 542. As explained above, insurers are regulated by state laws that permit or require the use of risk-based pricing and underwriting and require the filing of rates with state administrative bodies for approval. *See supra* pp. 5-6. Those state laws mandate or expressly permit insurers to use neutral risk factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates for various risk classifications. State laws thus "substantially limit" the discretion of insurers in a manner that would make it impossible to ascribe any disparate effects of underwriting or pricing practices to insurers' independent choices. When companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that cause any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the "double bind of liability" the Court warned against. Without taking this into account, the Rule permits plaintiffs to show causation in challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance where, under a faithful application of *Inclusive Communities*, they should not be able to do so.

Second, the *Inclusive Communities* Court explained that "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." 576 U.S. at 543. But that is just what extending disparate-impact liability to homeowners and commercial habitational insurers would do. State law ensures that insurers price their products in accordance with risk-based factors. State law does not permit insurers to rely on, and homeowners and commercial habitational insurers do not rely on, classifications prohibited by the FHA. Yet exposing homeowners and commercial habitational insurers to disparate-impact liability would effectively require them to collect and analyze sensitive—and previously uncollected—data on the FHA-protected characteristics of their customers in a defensive effort to ensure that they will not be accused of causing prohibited disparate impacts. Exempting homeowners and commercial habitational insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none

currently exist, the application of disparate-impact liability to homeowners and commercial habitational insurers would, contrary to the teachings of *Inclusive Communities*, "perpetuate race-based considerations rather than move beyond them." *Id.*

Finally, *Inclusive Communities* cabined the remedies that should be sought in the typical disparate-impact case under the Rule. The Court explained that "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice." *Id.* at 544. The 2013 Rule omits any mention of a limitation on remedies, thereby inviting plaintiffs to seek additional remedies and permitting courts to award them.

Because applying disparate-impact liability to risk-based pricing and underwriting would run afoul of all of these limitations, HUD should grant an exemption for those activities.

## III. HUD SHOULD EXEMPT RISK-BASED PRICING AND UNDERWRITING OF HOMEOWNER'S INSURANCE FROM DISPARATE-IMPACT LIABILITY UNDER THE FHA

As it has requested previously, including in response to HUD's Advanced Notice of Proposed Rulemaking and Notice of Proposed Rulemaking for the 2020 Disparate-Impact Rule, APCIA respectfully urges HUD to adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance if it intends to reinstate the 2013 Rule. As explained below, such an exemption is necessary in light of the threat that disparate-impact liability poses to the business of insurance, the McCarran-Ferguson Act, and the filed-rate doctrine. An exemption is also justified because of the burdens that case-by-case litigation would impose on the homeowners and commercial habitational insurance industry and the consumers the industry serves.

### A. Disparate-Impact Liability Threatens The Business Of Insurance

The 2013 Rule conflicts with the fundamental, risk-based nature of homeowners and commercial habitational insurance, discussed above. *See supra* pp. 5-6. As members of the insurance industry commented during HUD's prior rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk."[37] The essence of risk-based insurance practices is "identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly."[38] Quantifying the impact of any risk factor is a purely mathematical and unbiased statistical exercise. Far from the "artificial, arbitrary, and unnecessary" practices that may incur liability under the FHA under *Inclusive Communities*, 576 U.S. at 540, the assessment of risk is designed to precisely identify "the expected value of all future costs associated with an individual risk transfer."[39]

But despite the neutrality of insurance practices with respect to all FHA-protected characteristics, the 2013 Rule threatens to penalize insurers for relying on sound risk factors that

---

[37] *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014), ECF No. 19-3, 19-5.
[38] *Id.*, ECF No. 19-3.
[39] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* at 57-58.

happen to disproportionately affect a class protected by the FHA.[40]  In addition to improperly holding defendants "liable for racial disparities they did not create," *Inclusive Communities*, 576 U.S. at 542 (citing *Wards Cove*, 490 U.S. at 653)—as discussed below— this would irreparably distort the market for homeowners and commercial habitational insurance.  Tying rates to risk factors ensures that prices accurately reflect an insurer's costs of covering particular classes of risk for similarly situated customers.[41]  Removing risk factors from the ratemaking calculus, or substituting less-effective factors, could make it prohibitively expensive for an insurer that is writing these risks at an inadequate rate to insure high-risk properties, perhaps eliminating coverage across the market.  It would also cause adverse selection, as customers with a low risk of loss would be charged more than necessary to cover their risk.  *See* Letter from PCI to HUD, at 2 (Jan. 26, 2015) (A.R. 4497) ("Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.").

The 2013 Rule's effects on homeowners and commercial habitational insurance pricing would also generate negative externalities beyond the insurance market.  Risk-based insurance pricing encourages safer practices.  For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials.  Eliminating risk factors from the pricing model could reduce such expedient disincentives.  *See, e.g.*, Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J. at 66-67.  Disallowing risk-based pricing inherently creates cross-subsidies from low-risk activities to high-risk activities, with the resulting unfairly discriminatory prices (as defined in state insurance law and regulations) creating moral hazards and forcing more low-risk activities and consumers out of the market. *See id.* at 66-70, 111 (explaining that moral hazard occurs where insureds take "less than optimal care in protecting themselves against the insured risk" or "make less of an effort to minimize their loss should the risk occur," which poses an impediment to the efficiency of the insurance market).

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of risk factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect.  78 Fed. Reg. at 11,475.  The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious.  *See PCI I*, 66 F. Supp. 3d at 1051.  "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.*  "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Despite the district court's holding, HUD has not, to date, meaningfully addressed the effect of disparate-impact liability on the fundamental nature of homeowners and commercial habitational insurance.  In its 2016 Supplemental Explanation, HUD brushed aside the industry's

---

[40] Scholars have predicted that "protected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications."  Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284.

[41] Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

concerns, concluding that they "date[] back more than three decades" during which HUD had taken the position that discriminatory-effects liability applies to insurance. 81 Fed. Reg. at 69,015. HUD also asserted that "[r]isk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving risk-based decisions." *Id.* HUD ultimately decided that "[a]fter careful reconsideration of the insurance industry comments in accordance with the court's decision . . . HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act." *Id.* at 69,012. It "continue[d] to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis." *Id.*

The NPRM makes no effort to assess the impact of disparate-impact liability on the availability of coverage or insurer solvency either, despite comments from the insurance industry repeatedly raising this concern over the years, and despite a 2017 report from the U.S. Treasury Department encouraging HUD to reconsider whether disparate-impact liability would disrupt the availability of homeowners insurance and whether it is, in fact, "reconcilable with actuarially sound principles." *See supra* p. 12. Rather, the NPRM proposes a "return to the 2013 Rule," 86 Fed. Reg. at 33,595, which ostensibly includes requiring insurers to defend their practices in litigation under the Rule on a case-by-case basis under the original burden-shifting framework.

But case-by-case adjudication under the burden-shifting framework would only exacerbate the deleterious consequences of disparate-impact liability on the business of insurance. Any alternative risk factor proposed by a plaintiff at the third step of the burden-shifting test would necessarily correspond to a different risk than the one identified as relevant by sound risk-based methodologies. As a result, the original risk of loss would still exist, and it would not be correctly reflected in the price of insurance. *See PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. May 16, 2014), ECF No. 44-4 ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans"). This would result in overcharging customers with a low risk of loss and likely driving many of them out of the market. The third step of the burden-shifting framework is accordingly a perfect example of the hazards of allowing plaintiffs to "second-guess which of two reasonable approaches" a defendant should adopt—a hazard that could undermine the insurance market entirely. *Inclusive Communities*, 576 U.S. at 541.

Moreover, the fact that risk-based insurance practices could withstand challenges under the 2013 Rule's burden-shifting framework does not remove the need for an express exemption. Forcing insurers to defend the use of risk factors in court would needlessly raise costs for the industry and customers and waste judicial resources. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 375 (6th Cir. 2007) ("[I]f *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice."); *id.* at 376 (seeing "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success").

**B.** **The Disparate-Impact Rule Cannot Be Reconciled With The McCarran-Ferguson Act**

HUD should also provide an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance because applying the 2013 Rule to invalidate, impair, or supersede state laws regulating insurance would violate the McCarran-Ferguson Act. But rather than propose such an exemption, the NPRM avoids any analysis of McCarran-Ferguson.

The court hearing PCI's challenge to the 2013 Rule criticized HUD for failing to explain how the Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *See PCI I*, 66 F. Supp. 3d at 1048. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over an exemption. *Id*. The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis ... particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders*, 537 F.3d at 967." *PCI I*, 66 F. Supp. 3d at 1048. As discussed *supra* at p. 11, HUD also failed to address this concern in its Supplemental Explanation in 2016.

That same critique applies to the NPRM, which does not adequately address the McCarran-Ferguson Act. In the NPRM, HUD does not mention McCarran-Ferguson, let alone grapple with the likelihood that McCarran-Ferguson Act would bar application of the Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance in all or most cases. This is wholly insufficient under the district court's analysis. *See PCI I*, 66 F. Supp. 3d at 1048.

Considering the 2013 Rule's clash with McCarran-Ferguson as the district court required confirms that subjecting homeowners and commercial habitational insurance to potential liability under the 2013 Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) improperly requiring federal courts to determine whether challenged insurance practices are actuarially sound, (ii) contravening state laws that permit or require insurers to engage in risk-based pricing and underwriting; and (iii) impairing state laws and regulations that provide for state administrative review of insurance rates. The 2013 Rule's violation of the McCarran-Ferguson Act is most obvious in cases where an insurer's rates or underwriting guidelines are submitted to—and subject to review by—the states. In those instances, there can be no dispute that the 2013 Rule is inapplicable in light of McCarran-Ferguson. Indeed, had HUD actually consulted with state regulators as required by Executive Order 13132, rather than summarily and incorrectly declaring that reinstating the 2013 Rule "would not have federalism implications," 86 Fed. Reg. at 33,597, it could have reached no other conclusion but that the Rule's clash with state law will violate McCarran-Ferguson in all or nearly all cases challenging risk-based insurance practices.

> **1.** ***Absent The Requested Exemption, The Rule Would Improperly Require Federal Courts To Determine Whether Challenged Practices Are Actuarially Sound***

Under the McCarran-Ferguson Act, federal laws that do not specifically relate to the business of insurance cannot be interpreted or applied in a way that would effectively usurp States' primary role in regulating insurance. *See Mutual of Omaha*, 179 F.3d at 564 (McCarran-Ferguson prohibits the federal courts from "regulating the . . . insurance industry" via litigation). In *Mutual of Omaha*, the Seventh Circuit explained that applying the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id*. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (except as required by federal laws specifically relating to insurance). *Id*. Indeed, the district court in the *PCI* case observed that "*Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." *PCI I*, 66 F. Supp. 3d at 1039; *see also id*. at 1028-29 (describing *Mutual of Omaha*). The court specifically rejected the argument previously made by HUD that the relevant language in *Mutual of Omaha* was dicta. *See id*. at 1039 n.6 ("*Mutual of Omaha* is binding on this Court.").

Applying the 2013 Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would similarly result in federal courts second-guessing the actuarial soundness of state-regulated insurance practices. For example, to determine whether a challenged practice serves a "substantial" interest, or to evaluate a plaintiff's proffered less-discriminatory alternative, a federal court would necessarily have to examine whether using a particular risk factor was legitimate, whether a practice is actuarially sound, and which of two practices is more predictive of loss. Thus, in every case under the Rule challenging a risk-based pricing or underwriting practice, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. And in cases where plaintiffs prevail, a federal court would be called upon to enjoin the insurer's state-law-approved risk-based practice in favor of an alternative that may not be equally effective at predicting loss, which would violate state laws prohibiting inadequate rates and unfair discrimination between individuals with comparable risk profiles. *Supra* at pp. 3-4. This displacement of responsibility for insurance regulation from States to federal courts, based on a law that does not even mention insurance, is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

As noted, the *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*." *PCI I*, 66 F. Supp. 3d at 1048. Despite the court's emphasis on *Mutual of Omaha*, HUD's NPRM again makes no effort to address the decision's key holding. HUD never addressed the clear holding of *Mutual of Omaha* that the *PCI* court noted and found applicable here: that the McCarran-Ferguson Act prohibits a federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564. And as explained, grappling with *Mutual of Omaha*'s key holding confirms that no possible explanation could justify denying the requested exemption because the 2013 Rule cannot be applied to risk-based pricing and underwriting of homeowners insurance consistent with McCarran-Ferguson.

### 2. *The Rule Would Conflict With State Laws Permitting Or Requiring Insurers To Engage In Risk-Based Pricing And Underwriting*

State insurance laws uniformly permit insurers to rely on risk factors in setting rates and making underwriting decisions. Under state insurance law, discrimination is prohibited only when it is "unfair." Unfair discrimination occurs only when insureds posing similar risks are treated differently. Differential treatment of insureds who pose different risks is uniformly allowed (and, indeed, required, as explained below). Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." WIS. STAT. ANN. § 625.11(4) (1969). As another example, Arizona law specifies:

> A rate is not unfairly discriminatory in relation to another in the same class if it reflects equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, if the rates reflect the differences with reasonable accuracy.

ARIZ. REV. STAT. ANN. § 20-383(D) (1980) (ameneded 1987); *see also, e.g.*, COLO. REV. STAT. ANN. § 10-4-403(1)(c) (1979) (amended 2006); MICH. COMP. LAWS ANN. § 500.2403(1)(d) (1956) (amended 1993); MINN. STAT. ANN. § 70A.04(4) (1969) (amended 1986); MO. ANN. STAT. § 379.318(4) (1972); NEV. REV. STAT. ANN. § 686B.050(4) (1971) (amended 1987); N.H. REV. STAT. ANN. § 412:15(I)(d) (2003) (amended 2021); N.M. STAT. ANN. § 59A-17-6(E) (1984) (amended 2007); N.C. GEN. STAT. ANN. § 58-40-20(e) (1977) (amended 1985); TENN. CODE ANN. § 56-5103(a), (d) (1983) (amended 1996). *See generally* Appendix I (attached).

The principle that discrimination is prohibited only if it is "unfair" is enshrined in both state insurance rating laws (like those quoted above) and state insurance unfair practices laws, which address both the pricing and provision of insurance more generally. *See* Appendix I; *see, e.g.*, IOWA CODE ANN. § 507B.4(3)(g)(2) (1955) (amended 2018) (specifying that it is an unfair trade practice to "[m]ak[e] or permit[] any unfair discrimination between insureds of the same class for essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance other than life or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.").

In addition, numerous states expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, CONN. GEN. STAT. § 38a-803(4) (1971) (amended 1999); N.H. REV. STAT. ANN. § 412:15(I)(d) (2003) (amended 2021); VA. CODE ANN. § 38.2-1904(A)(3) (1973) (amended 2015). For example, under Indiana law,

> Risks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in

> hazards or expense provisions, or both. Such standards may measure any
> difference among risks that can be demonstrated to have a probable effect upon
> losses or expenses.

IND. CODE ANN. § 27-1-22-3(a)(2) (1967) (amended 2011). Many other state statutes contain very similar language expressly permitting the use of risk-based pricing. *See, e.g.*, ARIZ. REV. STAT. ANN. § 20-356(4) (1990); ARK. ANN. § 23-67-209(b); COLO. REV. STAT. ANN. § 10-4-403(4) (1979) (amended 2006); DEL. CODE ANN. tit. 18 § 2503(5) (1953) (amended 2018); MD. CODE ANN. INS. § 11-205(f) (1957) (amended 1997); ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(G) (1969) (amended 2007); MINN. STAT. ANN. § 70A.05(2) (1969); NEV. REV. STAT. ANN. § 686B.060(2) (1971) (amended 2017); TEX. INS. CODE ANN. § 2251.052(c) (2005); *see generally* Appendix I.[42]

As numerous courts have recognized, these laws ensure that insurance markets operate fairly. *See, e.g.*, *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any . . . of the terms and conditions of the insurance.'") (quoting ALASKA STAT. §§ 21.36.090(c), 21.36.120(c)); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance.") (quoting S.D. CODIFIED LAWS § 58-33-26). And as discussed *supra* at pp. 3-4, preventing unfair discrimination in insurance means that insureds are charged commensurate with the risks they pose. *See Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses."). And as explained *supra* at Part I.B., such accurate pricing is essential to the functioning of a market.

Moreover, the vast majority of states *require* insurers to set rates based on past losses, anticipated future losses, related loss expenses, and other neutral factors, which (taken together) form the foundation of risk-based pricing and underwriting as a mechanism for complying with state prohibitions against "unfair discrimination" and "inadequate" rates and their hedge against insurer solvency for the protection of insureds and claimants alike. *See* Appendix I; *see also PCI I*, 66 F. Supp. 3d at 1039 (noting that "some states require insurers to use risk-based pricing" and that others "merely permit risk-based pricing"). Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, ... [and] to all other relevant factors, including trend factors, within and outside this state . . . ." IND. CODE ANN. § 27-1-22-3(a)(1) (1967) (amended 2011). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this

---

[42] APCIA's identification of the specific state laws at issue distinguishes this case from *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003).

state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1) (1975) (amended 2020). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4) (1967) (amended 2008); Md. Code Ann. Ins. § 11-205(c) (1957) (amended 1997); Mass. Gen. Laws Ann. ch. 174A, § 5(3) (1947) (amended 1996); N.J. Stat. Ann. § 17:29A-4(c) (1944) (amended 1979); N.Y. Ins. Law § 2304(a) (1984) (amended 2014); Ohio Rev. Code Ann. § 3935.03(C) (1953); S.C. Code Ann. § 38-73-430(1) (1976) (amended 2004); Tenn. Code Ann. § 56-5104(1) (1983); Wash. Rev. Code Ann. § 48.19.030(3) (1947) (amended 1989); *see generally* Appendix I.

Indeed, as noted above, state insurance laws also make clear that failure to account for differences in expected losses constitutes prohibited "unfair discrimination." For example, Utah law provides that "[a] rate is unfairly discriminatory if price differentials fail to equitably reflect the differences in expected losses and expenses after allowing for practical limitations." Utah Code Ann. § 31A-19a-201(4)(a) (1985) (amended 1999); *see also, e.g.*, Ariz. Rev. Stat. Ann. § 20-383(D) (1980) (amended 1997); Colo. Rev. Stat. § 10-4-403(1)(c) (1979) (amended 2006); Mich. Comp. Laws Ann. § 500.2403(1)(d) (1956) (amended 1993); Minn. Stat. Ann. § 70A.04(4) (1969) (amended 1986); Mo. Ann. Stat. § 379.318(4) (1972); Nev. Rev. Stat. Ann. § 686B.050(4) (1971) (amended 1987); N.H. Rev. Stat. Ann. § 412:15(I)(d) (2003) (amended 2021); N.M. Stat. Ann. § 59A-17-6(E) (1984) (amended 2007); N.C. Gen. Stat. Ann. § 58-4020(e) (1977) (amended 1985); Tenn. Code Ann. § 56-5-103(a), (d) (1983) (amended 1996).

States similarly prohibit insurers from charging "inadequate rates," thereby requiring insurers to take risk into account to remain solvent. *See* Appendix I (the same state laws prohibiting unfair discrimination, and thus permitting risk discrimination, also prohibit "inadequate" rates). For example, Texas insurance law provides that "[a] rate may not be excessive, *inadequate*, unreasonable, or unfairly discriminatory for the risks to which the rate applies. Tex. Ins. Code Ann. § 2251.052 (2005) (emphasis added). A rate is "inadequate if it "is insufficient to sustain projected losses and expenses to which the rate applies" and "continued use of the rate endangers the solvency of an insurer using the rate[]." *Id.* § 2251.051(c). Other state statutes contain similar requirements. *See, e.g.,* N.Y. Ins. Law § 2303 (1984) (amended 1990) ("Rates shall not be excessive, *inadequate*, unfairly discriminatory, destructive of competition or *detrimental to the solvency of insurers*.") (emphases added); Colo. Rev. Stat. Ann. § 10-4-403 (1979) (amended 2006) ("Rates shall not be excessive, *inadequate*, or unfairly discriminatory" and "[c]oncerning inadequacy, rates are not inadequate unless clearly insufficient to sustain projected losses and expenses") (emphasis added); *see also* Appendix 1 (column 3). As explained by the Pennsylvania Superior Court:

> With or without regulation, it has always been in the public interest to have insurance premiums high enough to assure the payment of losses, and yet low enough to enable the public to secure protection upon the payment of a reasonable premium. To assure the availability of funds by insurers to pay losses, the state has long required insurance companies to be licensed, to maintain reserves and to submit to examination to determine solvency and

> compliance with the law. This has discouraged companies from
> charging 'inadequate' rates.

*Ins. Dep't v. City of Phila.*, 173 A.2d 811, 814 (Pa. 1961); *see also Engelman*, 692 A.2d at 480 (describing the prevention of inadequate insurance rates as one of the principal aims of the Maryland Insurance Code). Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits.[43] Yet undermining the states' efforts to guard against insurer insolvency by prohibiting inadequate rates is precisely what the 2013 Rule would do by re-interpreting the FHA to foreclose insurances practices expressly permitted or even required by state law.

      In compliance with state insurance laws, insurers charge different rates to, and make different underwriting decisions about, customers who pose different risks or present different loss profiles. Despite these state-authorized differences, HUD's Disparate-Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a FHA-protected characteristic, thus creating a conflict between the Rule and the laws of the vast majority of the states. The McCarran-Ferguson Act ensures that federal laws of general applicability do not "'invalidate, impair, or supersede' [a] State's law." *Humana*, 525 U.S. at 307. To invalidate means "to render ineffective," and to supersede is "to displace (and thus render ineffective) while providing a substitute rule." *Id.* (internal quotation marks omitted). To impair a State's law is to "hinder its operation or frustrate [a] goal of that law." *Id.* at 311 (internal quotation marks and citation omitted). Application of the 2013 Rule to insurers would "invalidate, impair, or supersede" state law and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly permitted or required by state law. *Id.* at 310.

      HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *Humana*, 525 U.S. at 311; *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But, as explained *supra* pp. 26-27, far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that applying the 2013 Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would run afoul of the McCarran-Ferguson Act.

---

[43] *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal . . . laws."); *Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations).

### 3. The Rule Would Conflict With State Laws And Regulations Providing For State Administrative Review Of Insurance Rates

The overwhelming majority of states—49 of 50, plus the District of Columbia—require admitted insurers to file their rates with state insurance commissioners for review and approval. *See* Appendix I.[44]  State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound risk factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, WIS. STAT. ANN. § 625.13 (1979) (amended 1983); N.J. STAT. ANN. § 17:29A-7 (1944); IND. CODE ANN. § 27-1-22-5 (1967) (amended 2003); GA. CODE ANN. § 33-9-26 (1933) (amended 1967); KAN. STAT. ANN. § 40-955 (a), (l) (1997) (amended 2011); MD. CODE ANN., INS. § 27-501(h)(2); MICH. COMP. LAWS ANN. § 500.2119 (1956) (amended 2012); N.J. STAT. ANN. § 17:22-6.14a1 (2012); VT. STAT. ANN. tit. 8, § 4688 (1983) (amended 1989); W. VA. CODE R. § 114-74-4.  For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. CAL. INS. CODE § 1861.05(b) (1988) (amended 1993).  Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, CONN. GEN. STAT. § 38a-689(a) (1982) (amended 2000); FLA. ADMIN. CODE ANN. r. 69O-170.013(1)(b); GA. CODE ANN. § 33-9-21(a) (1933) (amended 2020); KAN. STAT. ANN. § 40-955 (a), (l) (1997) (amended 2011); KY. REV. STAT. ANN. § 304.13-051(4) (1982) (amended 2010); ME. REV. STAT. ANN. tit. 24-A § 2938-A (1989) (amended 1995); MD. CODE ANN., INS., § 27-501(h)(2) (1997) (amended 2020); MICH. COMP. LAWS ANN. § 500.2119 (1956) (amended 2012); MO. CODE REGS. ANN. tit. 20, § 500-9.100; N.H. INS. 3306.01(a); N.J. STAT. ANN. § 17:22-6.14a1 (1971); N.M. STAT. ANN. § 59A-17-5.1 (2007); 28 TEX. ADMIN. CODE § 5.9342 (2005) (amended 2019); UTAH ADMIN. CODE R. R590-127; VT. STAT. ANN. tit. 8, § 4688 (1983) (amended 1989); W. VA. CODE R. § 114-74-4.

HUD's Disparate-Impact Rule would "interfere with a State's administrative regime" and impair, invalidate, or supersede these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310.  The laws governing rate filing provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states.  If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired, invalidated, or superseded by the application of the Rule.  *See, e.g.*, *Saunders v. Farmers Ins. Exch.*, 537 F. 3d 961, 968 (8th Cir. 2008) (*Saunders II*) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'").  Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state regulator would not establish that the rate was lawful.  Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to litigate in federal court

---

[44] As previously noted, admitted insurers account for 99% of homeowners policies. *See supra* note 3.  Rate filing is also generally required for small-to-mid-market commercial habitational insurance. A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

whether every component of their rating and underwriting plans and other business practices "advances a valid interest." *See* Proposed § 100.500(d)(1)(i). Such interference with the states' insurance administration regimes is not permitted under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4. HUD Cannot Rely On Its Prior Justifications For Declining To Exempt Risk-Based Pricing And Underwriting Of Insurance

HUD previously justified denying an exemption for risk-based pricing and underwriting of insurance on the basis that certain state anti-discrimination laws might apply to insurance, and an exemption would therefore "deprive all states of federal support in addressing discriminatory insurance practices," contrary to "the purpose of [the] McCarran-Ferguson [Act]." 81 Fed. Reg. at 69,016. HUD cannot do so again to support its proposal to reinstate the 2013 Rule, as its justification is arbitrary and capricious. The McCarran-Ferguson Act is not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). State antidiscrimination laws—which states may enforce themselves, if appropriate—are not enacted "for the purpose of regulating the business of insurance" and thus have no bearing on whether application of the Disparate-Impact Rule to risk-based pricing and underwriting would violate the McCarran-Ferguson Act.

Moreover, even if a state's fair-housing law were identical to the FHA and would permit a disparate-impact challenge to risk-based pricing and underwriting in state court, any federal litigation under HUD's Disparate-Impact Rule would still require federal courts applying federal law to second-guess the actuarial soundness of insurance practices regulated by state law— contrary to the express holding of *Mutual of Omaha*. *See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law."). HUD's previous reliance on snippets of discussion from out-of-circuit district court decisions and a state court decision, none of which addressed these issues,[45] provided no basis for disregarding the plain text of the McCarran-Ferguson Act and the Seventh Circuit's controlling decision in *Mutual of Omaha*.

Nor can HUD decline to exempt risk-based pricing and underwriting practices of homeowners and commercial habitational insurance on the grounds that the McCarran-Ferguson analysis requires a fact-based inquiry, as it previously argued. 81 Fed. Reg. at 69,016. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting. HUD relied on *Saunders I*, 440 F.3d at 946. But that court, reviewing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, merely held that "the nature of plaintiffs' price

---

[45] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case returned to the Eighth Circuit and it was clear that the plaintiffs were relying on a disparate-impact theory, the court noted that "HUD has never applied a disparate-impact analysis to insurers," *Saunders II*, 537 F.3d at 964 n.3 (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)), and that there was "doubt" as to whether it could, *Saunders II*, 537 F.3d at 964. The court ultimately held that the plaintiffs' FHA challenge was foreclosed by the McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's administrative regime. *Id.* at 968. This hardly counsels against a categorical exemption for risk-based pricing and underwriting.

*     *     *

For all of these reasons, application of the Disparate-Impact Rule to homeowners and commercial habitational insurance would "invalidate, impair, or supersede" state laws governing insurance.

### C.     Applying The Disparate-Impact Rule To Risk-Based Pricing And Underwriting Of Homeowners Insurance Is Inconsistent With The Filed-Rate Doctrine

HUD also must exempt risk-based pricing of homeowners and commercial habitational insurance[46] from the Rule to avoid conflict with the filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986); *PCI I*, 66 F. Supp. 3d at 1049. The doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).[47]

The doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g., McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 236-39, 242 (3d Cir. 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013); *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005), *aff'd*, 721 N.W.2d 307 (Minn. 2006); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*, No. 3775, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000); *see also, e.g.*, CAL. INS. CODE § 1860.1 (1947) ("No act done, action taken or agreement made pursuant to the

---

[46] The filed-rate doctrine applies to large commercial habitational insurance to the extent insurers file their rates. *See supra* pp. 3-4.

[47] The extent or the vigor of the agency's review of filed rates does not matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 n.19 (1986); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000).

authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates); *McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-cv-W-FJG, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

The district court in *PCI* found that HUD initially had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. *PCI I*, 66 F. Supp. 3d at 1050. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* As discussed *supra* at p. 11, HUD's Supplemental Explanation failed to adequately explain why the filed-rate doctrine would not bar challenges under the FHA to insurance rates filed with state agencies, as required in many states. After all, a challenge brought by an insured claiming that rates charged were higher because of the insured's race would require a court to assess the reasonableness of the rate filed with the state and, in successful challenges, invalidate it.

In the NPRM, HUD has again failed to address the filed-rate doctrine. But no amount of reasoned explanation could justify a failure to exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from the Rule, which would violate the filed-rate doctrine by allowing private lawsuits and federal government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Wegoland*, 27 F.3d at 19; *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted).

### D. The Costs Of Subjecting Homeowners And Commercial Habitational Insurance To Disparate-Impact Liability Under The Burden-Shifting Framework Outweigh The Benefits, Warranting An Exemption

In addition to the legal grounds for exempting homeowners and commercial habitational insurance from the Disparate-Impact Rule noted above,[48] the costs of subjecting the industry to case-by-case adjudication outweigh the benefits of doing so, warranting an exemption.

Requiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on insurers and their customers, making insurance less affordable

---

[48] Each of the arguments discussed *supra* provide an independent justification for why the Disparate Impact Rule cannot and should not be applied to homeowners and commercial habitational insurance. Nevertheless, HUD has previously maintained that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475. HUD has never explained how compliance with a federal statute or longstanding limitations articulated by the Supreme Court would be contrary to congressional intent.

for all. Under HUD's approach, in many cases insurers would have to defend each of the risk factors they use, perhaps even on a region-by-region basis, as different plaintiffs assert alleged disparate impacts among particular populations of insureds. HUD's response to this concern raised previously was that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. HUD provided no basis, however, for its counterintuitive assumption that it would cost as much to demonstrate eligibility for an exemption for risk-based pricing and underwriting as it would to litigate the actuarial soundness of a challenged practice on a case-by-case basis in multiple jurisdictions at different points in time.

HUD also previously supported its assertion that it could not grant an exemption by citing to *Graoch*. But HUD ignored the *Graoch* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. 508 F.3d at 376 (emphasis added). Indeed, the *Graoch* court identified homeowners insurance as an example of when application of the Disparate-Impact Rule is never appropriate. *Id.* at 375. The district court in the *PCI* case recognized that case law HUD itself previously relied upon makes clear that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI I*, 66 F. Supp. 3d at 1051 (quoting *Graoch*, 508 F.3d at 375-76).

Moreover, the Rule would require insurers to establish not merely that a practice is purely risk-based; it would also require insurers to litigate the third step of the burden-shifting approach, disputing that less discriminatory alternatives exist. This would be especially difficult for insurers because—as noted above, *see supra* pp. 3-4—they do not collect data on subscribers' race, ethnicity, or other FHA-protected characteristics and have no other means of anticipating disparities. And assuming they could collect the necessary data to defend themselves, it would introduce race or ethnicity as a pervasive factor, which the Court in *Inclusive Communities* warned against, and intrude upon policyholders who would be required to self-report race and ethnicity data. *PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶¶ 11–12; *id.* ECF No. 44-3 ¶ 14.

It is not enough to assert, as HUD has previously done, that the costs of case-by-case litigation outweigh the supposed benefits without evaluating how often plaintiffs would likely prevail on challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Indeed, given the precise mathematical, statistical, and economic analysis required to accurately price and underwrite insurance, *supra* pp. 3-4, plaintiffs challenging homeowners insurers' practices under the Rule likely would *not* be able to identify alternative less-discriminatory risk-based practices that will nevertheless allow the insurer to pursue their valid interest—that is, charging premiums that accurately reflect their costs of covering particular classes of risk for similarly situated customers.[49] Under these circumstances, APCIA's requested exemption is warranted.

---

[49] Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

**IV.** **IF HUD DOES NOT GRANT AN EXEMPTION, IT SHOULD MODIFY AND CLARIFY THE RULE TO ADDRESS ISSUES UNIQUE TO RISK-BASED INSURANCE PRICING AND UNDERWRITING AND TO MORE CLOSELY CONFORM TO *INCLUSIVE COMMUNITIES***

If it does not grant an exemption, HUD should incorporate a number of additional safeguards and clarifications to account for the unique aspects of risk-based insurance practices and to conform with *Inclusive Communities*.

**A.** **HUD Has Previously Recognized The Necessity Of Additional Safeguards And Clarifications To The Rule**

As an initial matter, HUD has *already* recognized the need to conform the 2013 Rule "to the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.* and to provide clarification regarding the application of the standard to State laws governing the business of insurance." 85 Fed. Reg. at 60,288. Specifically, in the 46-page Final Rule published on September 24, 2020, HUD thoroughly explained the policy and legal justifications for adopting several changes to the 2013 Rule, including the Supreme Court's requirements in *Inclusive Communities* that plaintiffs must plead sufficient facts demonstrating that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law" and a "robust causal link between the challenged policy or practice and the adverse effect on members of a protected class[.]" *Id.* at 60,332. And, as described below, HUD both addressed the burdens of proof in discriminatory-effect cases and established several defenses to conform the Rule to governing caselaw and best practices. In sum, HUD agreed with the many "comments in support of [the 2020 Rule]," and "agree[d] that it will bring clarity to litigants and further the Fair Housing Act's purpose. HUD also agree[d] that [the 2020 Rule] will benefit banks and landlords, while ensuring that disparate impact cases can continue consistent with Supreme Court precedent. . . . Lastly, HUD agree[d] with the comments that supported the change to § 100.5 and § 100.500(e) dealing with insurance." *Id.* at 60,292.

Now, citing an injunction from the United States District Court for the District of Massachusetts, HUD has proposed reversing course entirely—dismissing its one-year-old reasoning in full, and disregarding the several considered protections articulated and commended in the 2020 Rule. But the district court's injunction provides no basis for a total reversal of course. Rather, the district court—at a "very preliminary stage"—cited three specific provisions in the 2020 Rule that it held warranted an injunction, namely the (i) "outcome prediction" defense; (ii) the requirement that a plaintiff's proffered less discriminatory alternative policy must serve the defendant's interests in an "*equally effective manner without imposing materially greater costs*" or otherwise "creating *other material burdens for*" the defendants; and (iii) an unidentified conflation of the plaintiff's prima facie burden and pleading burden. *MFHC*, 496 F. Supp. 3d at 610-611 (citations and quotation marks omitted). The district court did not cite any other flaw with the 2020 Rule, and in fact condoned the 2020 Rule's requirement that plaintiffs plead, at the outset, that a challenged policy is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective." *Id.* at 610 (quoting 24 C.F.R. § 100.500(b)(1)).

Accordingly, the district court's limited ruling does not justify wholesale rejection of HUD's prior reasoning in support of the 2020 Rule, especially with respect to the 2020 Rule's specific accommodations to the unique business of insurance. HUD's reversal of course with respect to those portions of the 2020 Rule not addressed by the district court amounts to an "unexplained inconsistency" in agency policy that alone is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016). If HUD does not grant the exemptions explained *supra* Part III, APCIA respectfully suggests that HUD retain those portions of the 2020 Rule left untouched by the district court's injunction, including without limitation: (1) the 2020 Rule's specific pleading standards, *see* 24 C.F.R. § 100.500(b); (2) the 2020 Rule's third-party requirement defenses, *see* 24 C.F.R. § 100.500(d)(1) and (d)(2)(iii); (3) the 2020 Rule's provision relating to the state laws governing insurance, *see* 24 C.F.R. § 100.500(e); (4) the 2020 Rule's clarifications regarding the allocation of burdens of proof, *see* 24 C.F.R. § 100.500(c); and (5) the 2020 Rule's limitation of remedies available in disparate impact litigation, *see* 24 C.F.R. § 100.500(f). APCIA further urges HUD to adopt additional safeguards to the 2020 Rule's regulatory scheme as identified below, including a defense particular to risk-based pricing and underwriting.

### B.    HUD Should Retain And Expand The 2020 Rule's Specific Pleading Standards

The 2020 Rule established that a plaintiff challenging an allegedly discriminatory policy or practice must sufficiently plead facts demonstrating: "(1) [t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law; (2) [t]hat the challenged policy or practice has a disproportionately adverse effect on members of a protected class; (3) [t]hat there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect; (4) [t]hat the alleged disparity caused by the policy or practice is significant; and (5) [t]hat there is a direct relation between the injury asserted and the injurious conduct alleged." 24 C.F.R. § 100.500(b). As HUD explained in promulgating the 2020 Rule, these standards provide "greater clarity, in the wake of *Inclusive Communities*, regarding the requirements for bringing and defending against disparate impact claims," and further "clarify what evidence is needed in order to successfully challenge a policy or practice, which HUD believes will lead to a greater percentage of successful disparate impact claims while reducing the number of claims that are not appropriate under the disparate impact theory." 85 Fed. Reg. at 60,297. And as the district court explained when enjoining the 2020 Rule, the "arbitrary, artificial, and unnecessary" language incorporated into these standards "comes directly from *Inclusive Communities*, 576 U.S. at 540, 543, 544," *MFHC*, 496 F. Supp. 3d at 610, and other case law, *e.g.*, *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017) ("[Plantiffs] must still allege facts plausibly demonstrating that [the challenged policies] are arbitrary and unnecessary under the FHA.").

These pleading standards are as appropriate today as they were in 2020. They would provide courts and litigants alike with both the clarity and the protections demanded by *Inclusive Communities*—which specifically requires that plaintiffs make out a "prima facie case of disparate impact" and satisfy new "cautionary standards," including an initial showing of "robust

causality" lest a mere "statistical disparity" threaten respondents with costly litigation and compel their use of potentially unconstitutional "numerical quotas" or other explicit and suspect considerations of race. 575 U.S. at 542. Once again, HUD's own reasoning applies; HUD specifically recognized that *Inclusive Communities* "placed special emphasis on the importance of the plaintiff's prima facie burden," 84 Fed. Reg. at 42,855, including the "arbitrary, artificial, and unnecessary," and "robust causality" prime facie elements codified in the 2020 Rule, *id.* at 42,858-42,859. And HUD has already found that these standards provide "greater clarity" to plaintiffs, 86 Fed. Reg. at 33,594, contrary to the NPRM's wholly inconsistent *ipse dixit* that, somehow, the 2013 Rule "provides greater clarity" despite articulating *fewer* pleading standards.

APCIA reiterates that requiring plaintiffs to specifically plead a robust causal link between a challenged practice and a disparate impact to satisfy the standard mandated by *Inclusive Communities* is particularly important in suits involving insurance. That is so because there is often only a remote connection between the specific practices of homeowners and commercial habitational insurers and the housing opportunities and decisions of allegedly FHA-protected class members. *Supra* at pp. 3-4. In situations like that, it may be difficult, if not impossible, to meet the robust causation standard the *Inclusive Communities* Court held was necessary to ensure that disparate-impact liability does not raise constitutional concerns. *See* 576 U.S. at 543 (explaining that a plaintiff challenging the decision of a private developer to construct a new building in a particular location may not be able to show causation "because of the multiple factors that go into investment decisions about where to construct or renovate housing units"). The Court has also made clear that mere statistical disparities or correlation is insufficient to show that a challenged policy or practice was the cause of an existing disparate impact. *Id.* at 542. HUD should ensure that these concerns are reflected in any reinstatement of the 2013 Rule, by clarifying that the Rule does not reach practices with a mere "predicted" disparate impact but only ones that have occurred, that the causation analysis must consider whether a practice is too remote to give rise to liability, and that more than statistical correlation is required to establish causation.

## C.    HUD Should Retain And Expand The 2020 Rule's Third-Party Defense

The 2020 Rule permitted defendants to defeat a disparate-impact claim by "showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a: (i) Federal, state, or local law; (ii) Binding or controlling court, arbitral, administrative order or opinion; or (iii) Binding or controlling regulatory, administrative or government guidance or requirement." 24 C.F.R. § 100.500(d)(1). HUD promulgated this defense to comply with the fact that *Inclusive Communities* "favorably cit[ed] the lower court's concurring opinion that included as an element of a plaintiff's prima facie case a demonstration that the defendant's policy or practice is not a result of a law that substantially limits the defendant's discretion. If the defendant's discretion is limited in such a way, the Supreme Court identified this as a lack of causal connection between the policy or practice and the disparate impact, and therefore the case should be dismissed." 85 Fed. Reg. at 60,316. Indeed, *Inclusive Communities* left no doubt as to this conclusion, explicitly stating that the plaintiff "cannot show a causal connection between the Department's policy and a disparate impact" if "federal law substantially limited the Department's discretion." 576 U.S. at 543.

Yet, HUD now claims—against this reality—that "nothing in *Inclusive Communities* suggests this defense is required, let alone reasonable, for HUD to create." 86 Fed. Reg. at 33,595. That position cannot be squared with the text of *Inclusive Communities* nor with HUD's prior reasoning. HUD also now claims that the third-party defense is "inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid." *Id.* But HUD already considered, and rejected, this position, reasonably stating that "in the event that unlawful discriminatory practices are mandated by statute or court order, the most effective way to eliminate the unlawful discrimination is to remove or modify the underlying statute or order that mandated the unlawful discrimination. That also allows for a single legal proceeding to affect multiple actors, rather than requiring many lawsuits for all the entities affected by the statute or court order." 85 Fed. Reg. at 60,317. And this makes sense: no party should be held liable for actions compelled by law. Indeed, it was for this very reason that HUD introduced this defense in the first place, to avoid placing parties in a "'double bind of liability,' where they could be subject to suit under disparate impact for actions required for good faith compliance with another law." 84 Fed. Reg. at 42,860. HUD has offered no reason to depart from this considered approach in the 2020 Rule.

Not only should HUD retain the 2020 Rule's third-party defense, it should specifically clarify that the defense applies where state insurance law *permits* the challenged practice. As originally promulgated, the defense applies only if a "defendant shows that its discretion is materially limited by a third party such as through … [a] Federal, state, or local law." 84 Fed. Reg. at 42,854 (proposed 24 C.F.R. § 100.500(c)(1)(i)). A defendant's discretion to act is plainly limited where state law compels the defendant to engage in the challenged practice. In some cases, however, state law merely *permits* the challenged practice without compelling it. Where the state law at issue is a state insurance regulation, such permission ought to be sufficient given the limitations imposed by the McCarran-Ferguson Act.

As explained above, it is well established that, in light of the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1557 n.9 (8th Cir. 1989) (McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal … laws."); *Dexter Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). The mere fact that state law permits a practice might not, in most circumstances, preclude federal regulation of the practice. But insurance is different because of McCarran-Ferguson. Where a defendant can show that the practice challenged is permitted by state insurance law, it should be able to invoke a defense set forth in the Disparate-Impact Rule.

### D. HUD Should Retain The 2020 Rule's Provision Relating To The State Laws Governing Insurance

The 2020 Rule permitted defendants to defeat a disparate-impact claim by "showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a: (i) [f]ederal, state, or local law; (ii) [b]inding or controlling court, arbitral, administrative order or opinion; or (iii) [b]inding or controlling regulatory, administrative or government guidance or requirement." 24 C.F.R. § 100.500(e). HUD's proposal in the NPRM to erase that provision is unexplained and troubling, as the provision reiterates well-settled principles of law under the McCarran-Ferguson Act—as HUD itself previously explained. 84 Fed. Reg. at 42,860 ("business of insurance" works to "codif[y] the general applicability of the 'reverse preemption' provisions of the McCarran-Ferguson Act as it applies to the Fair Housing Act."). HUD's proposal to delete the provision implies an intention to improperly test the boundaries of HUD's ability to preempt state regulation of insurance. HUD should clarify that the Disparate-Impact Rule should not be construed by courts to modify or limit in any manner the McCarran-Ferguson Act's prohibition of federal laws impairing state insurance regulatory schemes, especially in light of the potential false inference plaintiffs or HUD may suggest by HUD's deletion of this provision.

### E. HUD Should Retain And Expand The 2020 Rule's Guidance With Respect To Burdens Of Proof

The 2020 Rule helpfully clarified the pleading and post-pleading burdens of proof in discriminatory impact cases—specifically, that defendants at step two bear a burden of production, not of proof. 24 C.F.R. § 100.500. Any reinstatement of the 2013 Rule should maintain that clarification. As HUD explained, the 2020 Rule's burden-shifting approach is "similar to the 2013 Rule's burden shifting approach, but provides more detail and clarity following the Supreme Court's decision in *Inclusive Communities*. The 2013 Rule inappropriately required the defendant to prove that the challenged practice was necessary to achieve a substantial, legitimate, nondiscriminatory interest." 85 Fed. Reg. at 60,320. Thus the 2020 Rule made clear that the burden of proving a disparate-impact case remains always where it should: with the plaintiff. Again, HUD explained this reasoning in full, noting that requiring only a burden of production at step two is consistent with the business necessity standard in Title VII caselaw—an analogy specifically endorsed by *Inclusive Communities*, 576 U.S. at 541—and that production "is a more logical burden for the defendant because the defendant may effectuate a defense by challenging other elements of the plaintiff's case, without reaching the issue of a valid interest." 85 Fed. Reg. at 60,320. Or, stated succinctly: "It is ultimately the plaintiff's burden to prove a case, and the plaintiff must do so by rebutting any evidence produced by the defendant." *Id.*

Additionally, HUD should make clear as it did in 2020 that, at the third step of the burden-shifting test, a plaintiff must prove their alternative policy would serve a defendant's interests in "an equally effective manner." 85 Fed. Reg. at 60,333. That requirement is compelled not only by *Inclusive Communities* but by longstanding Supreme Court interpretation of the requirements of the burden-shifting test in anti-discrimination litigation. In its notice of proposed rulemaking for the 2020 Rule, HUD noted that the requirement that a plaintiff's

alternative be "equally effective" in achieving a valid interest derived from "existing disparate-impact caselaw." 84 Fed. Reg. at 42,860 (citing *Wards Cove*, 490 U.S. at 661).

HUD has cited no reason to depart from this reasoning, nor does *Inclusive Communities* permit it to do so—as it specifically requires that defendants be given "leeway to state and explain" their policies, not prove them to avoid liability, and requires that a plaintiff's alternative be "equally effective" at achieving a valid interest. 576 U.S. at 541. Nor does the district court's recent injunction justify leaving these important safeguards out of the Rule. The court cast doubt on this requirement because it was not aware of the requirement being articulated in "any judicial decision." *MFHC*, 496 F. Supp 3d. at 610. But as noted, this requirement has been a critical component of the third step of the burden-shifting framework since articulated in *Wards Cove*.

Accordingly, consistent with *Inclusive Communities* and prior Supreme Court caselaw, HUD should clarify that the plaintiff always carries the burden of establishing that the challenged policy or practice is based on arbitrary, artificial, and unnecessary barriers, even if the plaintiff has alleged sufficient plausible facts to survive a motion to dismiss at the pleading stage.

### F.     HUD Should Retain The 2020 Rule's Remedies Provision

The 2020 Rule clarified that in discriminatory-effects cases, "remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons," and that HUD itself would seek only equitable remedies in administrative proceedings except in certain circumstances. 24 C.F.R. § 100.500(f). The 2020 Rule therefore restated the Supreme Court's explicit guidance in *Inclusive Communities* that, "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice." 576 U.S. at 544.

HUD has now proposed reversing course on this point as well, contradicting the clear language in *Inclusive Communities* and going so far as to say that "no part of *Inclusive Communities*" supported the 2020 Rule's remedies provision. 86 Fed. Reg. at 33,595. HUD also cites the fact that the Act provides "for a wide variety of remedies, including injunctive relief, actual damages, punitive damages, and civil penalties." *Id.* But this is a red herring; as HUD explained in promulgating the 2020 Rule, HUD did not, "and could not, make changes to the availability of punitive damages as a potential remedy in civil actions or civil money penalties in administrative proceedings." 85 Fed. Reg. at 60,303. Nor does APCIA suggest that HUD modify the remedies provided for in the Act. Rather, HUD should retain language in the 2020 Rule that codified the Supreme Court's explicit guidance in *Inclusive Communities* and committed to HUD's correct and necessary "understanding that relief in disparate impact cases should be focused on equitable remedies, such as eliminating or reforming a discriminatory practice, rather than monetary punishment, unless circumstances out of the ordinary warrant such." 85 Fed. Reg. at 60,304.

### G. HUD Should Codify A Defense For Risk-Based Pricing And Underwriting

In addition to retaining and expanding several portions of the 2020 Rule identified above, HUD should promulgate a defense that accounts for the unique concerns of the homeowners insurance industry. Specifically, for the reasons set forth above that support creation of a full exemption for risk-based pricing and underwriting, HUD should create a substantive defense for risk-based pricing and underwriting. If a defendant shows that it relied on risk-based pricing and underwriting, that should be a complete defense at Step 2 of the burden-shifting framework. The plaintiff should not have an opportunity to rebut the defense at Step 3.

As explained *supra* at pp. 26-34, allowing a plaintiff to litigate whether some other alternative risk factor would be less discriminatory but still "serve" the defendant's "interests"— albeit not in a manner that is equally effective at predicting loss—would impermissibly require federal courts to adjudicate the actuarial soundness of challenged insurance practices and even override state-law-approved risk-based practices. But that is precisely what the Seventh Circuit in *Mutual of Omaha* indicated a federal court cannot do in light of the McCarran-Ferguson Act. *See* 179 F.3d at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law," then federal courts would "find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do." *Id.*

A defendant seeking to invoke the defense would need to establish that it applies. The defense would be inapplicable if the defendant were not in fact engaging in risk-based pricing and underwriting. If, for example, an insurer determined rates based in part on a factor considered not for its predictive value, but for its ability to exclude members of a FHA-protected class, the defense would be unavailing. The defense would apply only to efforts to engage in risk-based pricing and underwriting. As noted at the outset, nothing in the Rule would be deemed to exempt an insurer from claims of disparate treatment, in the event such insurer did in fact consider a FHA-protected characteristic in the sale, rental, or financing of dwellings or in other housing-related activities subject to the FHA.

### V. AT A MINIMUM, HUD SHOULD MAKE CLEAR IN THE FINAL RULE THAT DISPARATE-IMPACT CHALLENGES ARE INCONSISTENT WITH RISK-BASED PRICING AND UNDERWRITING

As explained above, we believe HUD should grant a broad exemption from disparate-impact liability for risk-based pricing and underwriting of homeowners and commercial habitational insurance. Alternatively, HUD should incorporate a defense for risk-based pricing and underwriting. If HUD does not take either step, however, it should at a minimum make clear in the preamble to the final rule that (1) disparate-impact challenges to risk-based pricing and underwriting cannot succeed, and (2) HUD will not bring such challenges.

### A. HUD Should Acknowledge Key Aspects Of Insurers' Defenses

In light of the significant limitations on disparate-impact liability mandated by the Supreme Court in *Inclusive Communities*, as well as the restraints imposed by the McCarran-Ferguson Act, disparate-impact challenges to risk-based pricing of homeowners and commercial

habitational insurance cannot succeed. HUD should acknowledge the numerous barriers to such claims in the preamble to any final rule to avoid spawning unnecessary litigation. Specifically, HUD should acknowledge the following:

- Risk-based pricing and underwriting are not "arbitrary, artificial, and unnecessary" practices, *Inclusive Communities*, 576 U.S. at 540, but instead advance "substantial, legitimate, nondiscriminatory interests." *Id.* at 527. Risk-based pricing and underwriting are critical to the appropriate provision of insurance, to accuracy in pricing, and to maintaining solvency because both are driven by expected losses and related expenses and neither relies on factors that are substitutes protected classes.

- For the reasons explained above, disparate-impact challenges to risk-based pricing and underwriting cannot satisfy the "robust causal link" and "direct cause" requirement of the NPRM. Using legitimate risk factors does not *cause* a disparate impact; any impact is caused by socioeconomic factors outside the control of insurers.

- Disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance, requiring insurers to collect and analyze data on FHA-protected characteristics.

- State insurance regulations materially limit insurers' discretion to depart from risk-based pricing and underwriting, and insurers should not be held liable for complying with applicable state laws and regulations.

For all of the reasons noted above, disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot succeed on the merits. HUD should acknowledge these barriers expressly in any final rule. Doing so will make clear to litigants that the requirements laid out in *Inclusive Communities* and related caselaw apply to these kinds of challenges and generally will foreclose them. This will bring added clarity and certainty to an area of the law that has already been unsettled by HUD's original 2013 adoption of the Disparate-Impact Rule and its sudden reversal of course in promulgating, and then rescinding, the 2020 Rule.

### B. HUD Should Also Commit Not To Bring Disparate-Impact Challenges To Risk-Based Pricing And Underwriting Of Homeowners And Commercial Habitational Insurance

The FHA may be enforced by private parties, *see* 42 U.S.C. § 3613, or by HUD and the Attorney General, *see id.* §§ 3610, 3611, 3614. Government enforcement can move forward in administrative proceedings or federal court. *See id.* §§ 3612, 3614. For all of the reasons stated in these comments, HUD should commit not to institute disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Such claims will fail as a matter of law, and given the significant legal hurdles, are not an efficient use of HUD's resources.

Thus, regardless of whether HUD adopts an exemption or defense for risk-based pricing and underwriting of homeowners and commercial habitational insurance, it should commit in the final rule not to pursue disparate-impact challenges to those practices.

# APPENDIX I

## State Insurance Laws

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-3; ALA. CODE § 27-13-30 |
| Alaska | ALASKA STAT. § 21.39.030(a)(2) | ALASKA STAT. § 21.39.030(a)(1), (4); ALASKA STAT. § 21.36.090(c) | ALASKA STAT. § 21.39.040 |
| Arizona | ARIZ. REV. STAT. ANN. § 20-356(2); ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(B) | ARIZ. REV. STAT. ANN. § 20-356(1), (4), ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(C); ARIZ. REV. STAT. ANN. § 20-448(C) | ARIZ. REV. STAT. ANN. § 20-357 |
| Arkansas | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(a) | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(b); ARK. CODE ANN. § 23-67-210 | ARK. CODE ANN. § 23-67-211(a) |
| California | | CAL. INS. CODE § 1861.05(b) | CAL. INS. CODE § 1861.05(b)-(d); *see also* CAL. INS. CODE § 1860.1 |
| Colorado | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (2) | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (4); COLO. REV. STAT. ANN. § 10-3-1104(1)(f)(II) | COLO. REV. STAT. ANN. § 10-4-404; COLO. REV. STAT. ANN. § 10-4-406 |
| Connecticut | | CONN. GEN. STAT. § 38a-803(4) | CONN. GEN. STAT. § 38a-688; CONN. GEN. STAT. § 38a-663(9)-(10). |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Delaware | DEL. CODE ANN. tit. 18, § 2503(a)(3) | DEL. CODE ANN. tit. 18, § 2503(a)(2), (a)(5); DEL. CODE ANN. tit. 18, § 2503(b); DEL. CODE ANN. tit. 18, § 2504(c) | DEL. CODE ANN. tit. 18, § 2504 |
| District of Columbia | D.C. CODE § 31-2703(b) | D.C. CODE § 31-2703(a), (c); D.C. CODE § 31-2231.13(c), (d) | D.C. CODE § 31-2704 |
| Florida | FLA. STAT. § 627.062(2)(e)(6) | FLA. STAT. § 627.062(1), (2)(e)(6) | FLA. STAT. § 627.062; FLA. STAT. § 627.0645 |
| Georgia | GA. CODE ANN. § 33-9-4(4) | GA. CODE ANN. § 33-9-4(1), (7) | GA. CODE ANN. § 33-9-21, GA. CODE ANN. § 33-9-9; GA. CODE ANN. § 33-9-26 |
| Hawaii | HAW. REV. STAT § 431:14-103(a)(2) | HAW. REV. STAT. § 431:14-103(a)(1), (5); HAW. REV. STAT. § 431:13-103(a)(7)(B) | HAW. REV. STAT. § 431:14-104(a); HAW. REV. STAT. § 431:14-106(a) |
| Idaho | IDAHO CODE ANN. § 41-1437(1) | IDAHO CODE ANN. § 41-1405(1); IDAHO CODE ANN. § 41-1437(3) | |
| Illinois | 215 ILL. COMP. STAT. ANN. 5/456(1) | 215 ILL. COMP. STAT. ANN. 5/456(1)(d); 215 ILL. COMP. STAT. ANN. 5/424(3) | 215 ILL. COMP. STAT. ANN. 5/457 |
| Indiana | IND. CODE ANN. § 27-1-22-3(a)(1) | IND. CODE ANN. § 27-1-22-3(a)(2), (a)(4); IND. CODE ANN. § 27-4-1-4(a)(7) | IND. CODE ANN. § 27-1-22-4(a); IND. CODE ANN. § 27-1-22-5(a) |
| Iowa | | IOWA CODE ANN. § 515F.4; IOWA CODE ANN. § 507B.4(3)(g) | IOWA CODE ANN. § 515F.5 |
| Kansas | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(a) | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(c) | KAN. STAT. ANN. § 40-955 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Kentucky | KY. REV. STAT. ANN. § 304.13-031(1)(c) | KY. REV. STAT. ANN. § 304.13-031(1)(b); KY. REV. STAT. ANN. § 304.13-031(1)(e); KY. REV. STAT. ANN. § 304.12-080(1) | KY. REV. STAT. ANN. § 304.13-051 |
| Louisiana | LA. REV. STAT. ANN. § 22:1454(B)(1) | LA. REV. STAT. ANN. § 22:1454(A), (B)(2); LA. REV. STAT. ANN. § 22:1964(7)(c); LA. REV. STAT. ANN. § 22:34 | LA. REV. STAT. ANN. § 22:1451; LA. REV. STAT. ANN. § 22:1464 |
| Maine | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(C) | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(B), (G); ME. REV. STAT. ANN. tit. 24-A, § 2162(2) | ME. REV. STAT. ANN. tit. 24-A § 2304-A |
| Maryland | MD. CODE ANN., INS. § 11-205(c) | MD. CODE ANN., INS. § 11-205(d), (f); MD. CODE ANN., INS. § 27-212(e)(1) | MD. CODE ANN., INS. § 11-206 |
| Massachusetts | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(3); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(1) | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(2); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(3), (4) | MASS. GEN. LAWS ANN. ch. 174A, § 6; MASS. GEN. LAWS ANN. ch. 175A, § 6 |
| Michigan | MICH. COMP. LAWS ANN. § 500.2110(1); MICH. COMP. LAWS ANN. § 500.2403(1)(a), (d) | MICH. COMP. LAWS ANN. § 500.2110(3); MICH. COMP. LAWS ANN. § 500.2110a; MICH. COMP. LAWS ANN. § 500.2403(1)(c), (d) | MICH. COMP. LAWS ANN. § 500.2406; MICH. COMP. LAWS ANN. § 500.2408 |
| Minnesota | MINN. STAT. ANN. § 70A.04(4); MINN. STAT. ANN. § 70A.05(1) | MINN. STAT. ANN. § 70A.04(1), (4); MINN. STAT. ANN. § 70A.05(2) | MINN. STAT. ANN. § 70A.06 |
| Mississippi | MISS. CODE. ANN. § 83-2-3(1)(d), (2)(a) | MISS. CODE. ANN. § 83-2-3(1)(a), (d), (2)(b) | MISS. CODE. ANN. § 83-2-7 |
| Missouri | MO. ANN. STAT. § 379.318(1), (4) | MO. ANN. STAT. § 379.318(2), (4) | MO. ANN. STAT. § 379.321 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Montana | MONT. CODE ANN. § 33-16-201(2)(a) | MONT. CODE ANN. § 33-16-201(1)(a), (4); MONT. CODE ANN. § 33-18-210 | MONT. CODE ANN. § 33-16-203 |
| Nebraska | | NEB. REV. ST. § 44-7510(3) | NEB. REV. ST. § 44-7508 |
| Nevada | NEV. REV. STAT. ANN. § 686B.060(1); NEV. REV. STAT. ANN. § 686B.050(4) | NEV. REV. STAT. ANN. § 686B.050(1), (4); NEV. REV. STAT. ANN. § 686B.060(2); NEV. REV. STAT. ANN. § 686a-130(5) | NEV. REV. STAT. ANN. § 686B.070; NEV. REV. STAT. ANN. § 686B.090; NEV. REV. STAT. ANN. § 686B.110 |
| New Hampshire | N.H. REV. STAT. ANN. § 412:15(I)(d), (II)(a) | N.H. REV. STAT. ANN. § 412:15(I)(d); N.H. REV. STAT. ANN. § 412:15(II)(b) | N.H. REV. STAT. ANN. § 412:16 |
| New Jersey | N.J. STAT. ANN. § 17:29A-4(c); N.J. STAT. ANN. § 17:29A-7; N.J. STAT. ANN. § 17:29A-11 | N.J. STAT. ANN. § 17:29A-4; N.J. STAT. ANN. § 17:29A-7 | N.J. STAT. ANN. § 17:29A-6; N.J. STAT. ANN. § 17:29A-7 |
| New Mexico | N.M. STAT. ANN. § 59A-17-6(E); N.M. STAT. ANN. § 59A-17-7(A) | N.M. STAT. ANN. § 59A-17-6(A), (E); N.M. STAT. ANN. § 59A-17-7(B); N.M. STAT. ANN. § 59A-16-17(D) | N.M. STAT. ANN. § 59A-17-9 |
| New York | N.Y. INS. LAW § 2304(a) | N.Y. INS. LAW § 2303; N.Y. INS. LAW § 2304(b), (c) | N.Y. INS. LAW § 2305(a), (b) |
| North Carolina | N.C. GEN. STAT. ANN. § 58-40-20(e); N.C. GEN. STAT. ANN. § 58-40-25(1) | N.C. GEN. STAT. ANN. § 58-40-25(2); N.C. GEN. STAT. ANN. § 58-40-20(a), (e) | N.C. GEN. STAT. ANN. § 58-40-30; N.C. GEN. STAT. ANN. § 58-40-40; N.C. GEN. STAT. ANN. § 58-40-45 |
| North Dakota | N.D. CENT. CODE ANN. § 26.1-25-03(1)(a) | N.D. CENT. CODE ANN. § 26.1-25-03(1)(c) | N.D. CENT. CODE ANN. § 26.1-25-04 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Ohio | OHIO REV. CODE ANN. § 3935.03(C); OHIO REV. CODE ANN. § 3937.02(A) | OHIO REV. CODE ANN. § 3935.03(B); OHIO REV. CODE ANN. § 3937.02(C), (D); OHIO REV. CODE ANN. § 3901.21(M) | OHIO REV. CODE ANN. § 3935.04 |
| Oklahoma | | OKLA. STAT. ANN. tit. 36, § 902; OKLA. STAT. ANN. tit. 36, § 985 | OKLA. STAT. ANN. tit. 36, § 987 |
| Oregon | OR. REV. STAT. ANN. § 737.310(4) | OR. REV. STAT. ANN. § 737.310(1), (8); OR. REV. STAT. ANN. § 746.015(1) | OR. REV. STAT. ANN. § 737.205; OR. REV. STAT. ANN. § 737.325 |
| Pennsylvania | 40 PA. STAT. § 1183(a); 40 PA. STAT. § 1223(a)(3) | 40 PA. STAT. § 1183(c)-(d); 40 PA. STAT. § 1223(a)(2); 40 PA. STAT. § 1171.5(a)(7) | 40 PA. STAT. § 710-5(a); 40 PA. STAT. § 710-6; 40 PA. STAT. § 710-7 |
| Rhode Island | R.I. GEN. LAWS ANN. § 27-44-5(e)(1); R.I. GEN. LAWS ANN. § 27-6-4(3) | R.I. GEN. LAWS ANN. § 27-44-5(a), (d), (e)(2); R.I. GEN. LAWS ANN. § 27-6-4(2) | R.I. GEN. LAWS ANN. § 27-44-6(a) |
| South Carolina | S.C. CODE ANN. § 38-73-430(1); S.C. CODE ANN. § 38-73-330(3) | S.C. CODE ANN. § 38-73-430(3)-(4); S.C. CODE ANN. § 38-73-330(2) | S.C. CODE ANN. § 38-73-520 |
| South Dakota | S.D. CODIFIED LAWS § 58-24-6.1 | S.D. CODIFIED LAWS § 58-24-5; S.D. CODIFIED LAWS § 58-24-6; S.D. CODIFIED LAWS § 58-24-6.1; S.D. CODIFIED LAWS § 58-33-26 | S.D. CODIFIED LAWS § 58-24-10 |
| Tennessee | TENN. CODE ANN. § 56-5-103(d); TENN. CODE ANN. § 56-5-104(1) | TENN. CODE ANN. § 56-5-104(2) ; TENN. CODE ANN. § 56-5-103(a)(1), (d) | TENN. CODE ANN. § 56-5-105 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Texas | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(a) | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(b)-(c) | TEX. INS. CODE ANN. § 2251.101; TEX. INS. CODE ANN. § 2251.103 |
| Utah | UTAH CODE ANN. § 31A-19a-201(4)(a); UTAH CODE ANN. § 31A-19a-202(1)-(2) | UTAH CODE ANN. § 31A-19a-201(1), (4)(a); UTAH CODE ANN. § 31A-19a-202(3) | UTAH CODE ANN. § 31A-19a-203 |
| Vermont | VT. STAT. ANN. tit. 8, § 4685(d); VT. STAT. ANN. tit. 8, § 4686(1) | VT. STAT. ANN. tit. 8, § 4685(a), (d); VT. STAT. ANN. tit. 8, § 4686(2); VT. STAT. ANN. tit. 8, § 4724(7)(A) | VT. STAT. ANN. tit. 8, § 4688 |
| Virginia | VA. CODE ANN. § 38.2-1904(A), (B) | VA. CODE ANN. § 38.2-1904(A)(3) | VA. CODE ANN. § 38.2-1906 |
| Washington | WASH. REV. CODE ANN. § 48.19.030(3) | WASH. REV. CODE ANN. § 48.19.020; WASH. REV. CODE ANN. § 48.19.030(2)(b); WASH. REV. CODE ANN. § 48.18.480 | WASH. REV. CODE ANN. § 48.19.040; WASH. REV. CODE ANN. § 48.19.060 |
| West Virginia | W. VA. CODE § 33-20-3(a) | W. VA. CODE § 33-20-3(b), (c)(2); W. VA. CODE § 33-11-4(7)(c) | W.VA. CODE § 33-20-4 |
| Wisconsin | WIS. STAT. ANN. § 625.11(4); WIS. STAT. ANN. § 625.12(1) | WIS. STAT. ANN. § 625.12(2); WIS. STAT. ANN. § 625.11(1), (4) | WIS. STAT. ANN. § 625.13 |
| Wyoming | | WYO. STAT. ANN. § 26-14-105; WYO. STAT. ANN. § 26-13-112(c) | WYO. STAT. ANN. § 26-14-107 |

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-gudr-uuw0
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0252
Comment Submitted by ACLU

## Submitter Information

## General Comment

See attached file(s)

## Attachments

2021.8.23_ACLU DI Comment

August 24, 2021

**SUBMITTED VIA REGULATIONS.GOV**

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 Seventh Street SW, Room 10276
Washington, DC 20410

      **Re:**    **Reinstatement of HUD's Discriminatory Effects Standard,
              Docket No. FR-6251-P-01**

Dear Secretary Fudge:

     We write to you on behalf of the American Civil Liberties Union Foundation ("ACLU") in response to the above-docketed notice concerning the proposed reinstatement of the previously promulgated rule titled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("2013 Rule"), as interpreted by the U.S. Department of Housing and Urban Development ("HUD"). The 2013 Rule has continued to be crucial to the ongoing fight for equal access to housing in the United States.[1] It serves the American public by requiring housing providers, financial institutions, insurance companies, municipalities, and other major corporations to eliminate policies that appear neutral yet wrongly and unnecessarily keep people from the opportunities they need to be successful in life. We strongly support the proposed reinstatement of the 2013 Rule.

     For over 100 years, the ACLU has been our nation's guardian of liberty, working in courts, legislatures, and communities to defend and preserve the individual rights and liberties that the Constitution and the law of the United States guarantee to everyone in the country. With more than three million members, activists, and supporters, the ACLU is a nationwide organization that fights tirelessly in all 50 states, Puerto Rico, and Washington, D.C., for the principle that every individual's rights must be protected equally under the law, regardless of race, religion, gender, sexual orientation, gender identity or expression, disability, national origin, or record of arrest or conviction.

     As a nation, we have a shared interest in ensuring that housing opportunities are available to every individual, regardless of their personal background or characteristics. The FHA prohibits intentional discriminatory acts *and* facially "neutral" policies that disproportionately limit housing opportunities based on race, color, national origin, religion, sex, familial status, and disability. Fully realizing the promise of the FHA for every person in the United States is central to HUD's mission.

---

[1]    In 2020, HUD published a rule titled "HUD's Implementation of the Fair Housing Act's Disparate Impact Standard" ("2020 Rule"), which was enjoined by a federal district court prior to its effective date. *Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (holding that the 2020 Rule's "new and undefined terminology, altered burden-shifting framework, and perplexing defenses accomplish the opposite of clarity").

1

Disparate-impact legal theories have been essential to the ACLU's fight to protect access to fair housing and housing finance. The ACLU and many of its state affiliates have brought disparate-impact claims under the FHA to challenge myriad discriminatory policies and practices—including overly restrictive tenant-screening policies and unjust municipal ordinances—across the country.

The 2013 Rule is consistent with a long, well-settled line of precedent establishing FHA liability for practices that have a discriminatory effect. For more than forty years, courts have interpreted the FHA to authorize disparate-impact claims, including the 2015 Supreme Court decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project*, 576 U.S. 519 (2015) ("*Inclusive Communities*"). In *Inclusive Communities*, the Supreme Court quoted and cited to HUD's 2013 Rule at length without any suggestion that its opinion was in tension with that rule. The central premise of *Inclusive Communities* is that disparate-impact claims are necessary to prohibit policies that may not be readily challenged under disparate treatment theories even though, particularly when overlaid on preexisting and long-standing disparities, they unnecessarily exclude members of protected classes from housing.

In contrast, absent any legal justification, the 2020 Rule significantly narrowed disparate-impact liability for discriminatory conduct and was enjoined when a federal court concluded that its key provisions could not be "found in any judicial decision" and were "inadequately justified."[2] Discriminatory barriers to equal housing opportunity remain deeply entrenched and pervasive in this country. While there has been limited progress, equal access to housing is far from a reality, and the 2013 Rule remains an essential tool in the fight against housing discrimination. It is critically important that HUD focus on the robust and vigorous enforcement of the 2013 Rule to remove unjust and unnecessary barriers to housing in all communities. The ACLU urges HUD to immediately finalize the proposed reinstatement of the 2013 Rule.

I.      **The 2013 Rule Correctly Implements the Fair Housing Act and Is Consistent with Decades of Case Law, Including *Inclusive Communities*.[3]**

Unlike the 2020 Rule, the 2013 Rule provides a clear and straightforward burden-shifting test that is consistent with decades of Title VII and FHA precedent, including *Inclusive*

---

[2]      *Id.* at 610–11.

[3]      The 2020 Rule was scheduled to take effect on October 26, 2020, but on October 25, 2020, a federal district court issued a nationwide injunction against implementation or enforcement of the rule and postponing the effective date. *Id.* Currently, under the order, the 2013 Rule remains the status quo. *See id.* Another case—filed by two fair housing nonprofit organizations with representation by the ACLU, ACLU of Connecticut, Lawyers' Committee for Civil Rights Under Law, Poverty & Race Action Council, and Cohen Milstein Sellers & Toll PLLC—also challenged the 2020 Rule as violating the APA and FHA and requested it be enjoined from implementation and enforcement. Pls.' Compl., *Open Cmtys. All. v. Carson*, No. 20-01587 (D. Conn. Oct. 22, 2020). The plaintiffs' injuries include, among other things, that the 2020 Rule would chill their enforcement actions, frustrate their data collection projects to document segregation, increase the burden to complete their planned HUD-funded activities, and force them to reshape their future funding strategies. The case has been stayed pending HUD's administrative review of the 2020 Rule. Order, *Open Cmtys. All.*, No. 20-01587 (D. Conn. Mar. 3, 2020).

The ACLU also signs onto the National Fair Housing Alliance's comments with respect to the 2013 Rule's correct implementation of the FHA and consistency with decades of case law, including the Supreme Court's decision in *Inclusive Communities*.

*Communities*, and that properly accommodates the competing interests at stake.[4] Moreover, the 2013 Rule appropriately applies a case-by-case analysis to insurance providers.

### a. The 2013 Rule is Consistent with Decades of Case Law.

The 2013 Rule codified the three-part burden-shifting framework that had long been applied by federal appellate courts adjudicating disparate-impact claims.[5] Under the 2013 Rule, first, a plaintiff proved that a challenged practice caused a discriminatory effect (stage one); next, the burden moved to the defendant to persuade the decisionmaker that the challenged practice was necessary to achieve certain interests (stage two); and finally, if the defendant did so, the plaintiff had the opportunity to prove that the defendant's "substantial, legitimate, nondiscriminatory interests . . . could be served by another practice that has a less discriminatory effect" (stage three).[6]

As HUD explained in promulgating the 2013 Rule, the burden-shifting standard it adopted was consistent with the federal appellate case law, which had gravitated away from a balancing test, and which "does not require either party to prove a negative."[7] HUD also rejected comments arguing that plaintiffs should have to prove that a less discriminatory alternative under the third prong would be "equally effective" as the challenged practice.[8] In doing so, HUD explained that the 2013 Rule already required that the less discriminatory alternative must serve the respondent's or defendant's interests, that such language is consistent with Congressional and judicial interpretations of the disparate impact standard, and that such a requirement is not appropriate in the housing context where the practices covered by the FHA are "not readily quantifiable."[9] At that time, HUD also considered and rejected many of the very changes that the 2020 Rule included, *see infra* Section II, while explaining its reasoning in great detail.[10]

Importantly, the 2013 Rule is entirely consistent with the Supreme Court's decision in *Inclusive Communities*. In *Inclusive Communities*, the Supreme Court affirmed HUD's position that disparate-impact claims are cognizable under the FHA and did not suggest that HUD failed to correctly state the law in any way. Rather than announce any changes in the law, the Supreme Court stated that its description of disparate-impact liability was a description of existing

---

[4]       *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1053 (N.D. Ill. 2014) ("HUD's framework is largely consistent with the framework courts have developed on their own for analyzing disparate impact claims.").

[5]       *See, e.g., Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49–51 (1st Cir. 2000) (holding defendant has the burden of proffering a "valid," "rational," "substantial," and "legitimate" justification, as well as the burden of showing a less discriminatory alternative); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977); *Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974); *Mountain Side Mobile Ests. P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243 (10th Cir. 1995).

[6]       24 C.F.R. §§ 100.500(c)(1)-(3) (2013).

[7]       U.S. Dep't of Hous. & Urban Dev. (HUD), *Implementation of the Fair Housing Act's Discriminatory Effects Standard* ("2013 Rule"), 78 Fed. Reg. 11,460, 11,474 (2013).

[8]       *Id.* at 11,473.

[9]       *Id.*

[10]      *Id.* at 11,469–73.

doctrine.[11] Notably, the Supreme Court cited to and discussed the 2013 Rule at length with apparent approval on multiple occasions, including with respect to aspects of the burden-shifting framework for disparate-impact claims.[12] The Supreme Court also emphasized that one of the central purposes of the FHA was to combat residential segregation and to promote a more integrated society.[13]

Following the Supreme Court's decision in *Inclusive Communities,* other federal courts of appeal have affirmed the use of the burden-shifting framework articulated in the 2013 Rule. In *Avenue 6E Investments, LLC v. City of Yuma*, for example, the Ninth Circuit cited the 2013 Rule as authority for the proper burden-shifting framework without noting any inconsistencies between the 2013 Rule and *Inclusive Communities*.[14] Moreover, the Second Circuit held that the Supreme Court implicitly endorsed the standards of the 2013 Rule in *Inclusive Communities*.[15] Out of more than forty federal appellate and district court decisions in disparate-impact FHA cases following *Inclusive Communities*, only one decision—that of the Fifth Circuit in *Inclusive Communities Project v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019)—found *any* inconsistency between the 2013 Rule and the Supreme Court's decision in *Inclusive Communities.* Accordingly, reinstatement of the 2013 Rule would be fully consistent with decades of FHA jurisprudence and the FHA's purpose and mandate.

   b.   The 2013 Rule Appropriately Applies a Case-by-Case Analysis to Insurance
        Providers.

Courts have long held that the FHA reaches discrimination in housing insurance. As the Seventh Circuit bluntly stated, "No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."[16] Insurance companies have deployed myriad practices that have denied access to or increased costs of insurance for people of color and Black people in particular.[17] These practices range from explicit bars to obtaining insurance to more covertly

---

[11]     *Inclusive Cmtys.*, 576 U.S. at 539–40.

[12]     *Id.* at 525–28.

[13]     *Id.*

[14]     818 F.3d 493, 510 (9th Cir. 2016).

[15]     *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 618–20 (2d Cir. 2016).

[16]     *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 296 (7th Cir. 1992); *see also Ojo v. Farmers Grp. Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1360 (6th Cir. 1995); *United Farm Bureau Mut. Ins. Co. v. Metro. Hum. Rels. Comm'n*, 24 F.3d 1008, 1016 (7th Cir. 1994); *Nevels v. W. World Ins. Co., Inc.*, 359 F. Supp. 2d 1110. 1117–22 (W.D. Wash. 2004); *Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 55–59 (D.D.C. 2002); *Lindsey v. Allstate Ins. Co.*, 34 F. Supp. 2d 636, 641-43 (W.D. Tenn. 1999); *Strange v. Nationwide Mut. Ins. Co.*, 867 F. Supp. 1209, 1212, 1214–15 (E.D. Pa. 1994).

[17]     In addition to discriminating based on race, insurance industry practices have discriminated based on other FHA-protected characteristics. *See, e.g.*, *Fuller v. Tchrs. Ins. Co.*, No. 06-cv-00438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007) (denying a motion to dismiss FHA claim based on insurer cancelling policy because home was in use for people recovering from drug and alcohol addiction); *Nevels*, 359 F. Supp. 2d at 1118–19 (denying motion to dismiss FHA claim against insurers who cancelled policies of adult home owners because plaintiffs provided care and residence for individuals with disabilities) (citing *Wai v. Allstate Ins. Co*., 75 F. Supp. 2d 1, 6–8 (D.D.C. 1999)); *Nat'l Fair Hous. All. v. Travelers Indem. Co*., 261 F. Supp. 3d 20 (D.D.C. 2017) (holding that plaintiffs sufficiently pled that failure to provide insurance to properties that rent to Section 8 voucher holders had a disparate impact on Black people and women); Women's Law Project & Pennsylvania Coalition Against Domestic Violence, *Insurance Discrimination Against Victims of Domestic Violence*, 4-7 (1998), https://www.womenslawproject.org/wp-

4

discriminatory practices (such as barring insurance for homes exceeding a certain age or below a minimum value or using credit scoring in underwriting), which disproportionately impact communities of color that have long faced barriers to accumulating wealth through centuries of systematically discriminatory practices.[18]

When HUD codified the 2013 Rule that is a critical tool in combatting more covert forms of discrimination and further issued a supplementary rule in 2016, HUD concluded that the disparate-impact standard appropriately applied to the insurance industry. In so doing, HUD properly rejected industry claims that the disparate-impact standard is incompatible with the actuarial process and that a broad exemption for insurance should apply.

> **i.** *Discriminatory Effects Liability Is Compatible with the Business of Insurance, and HUD Adequately Responded to Insurance Industry Comments.*

Insurance industry trade groups have argued that the application of disparate-impact liability is fundamentally incompatible with the nature of insurance and the actuarial process. HUD has addressed these concerns in detail through its rulemaking process.

In its 2013 Rule, HUD explained that insurance industry concerns were "misplaced," as the disparate-impact standard would not make any policy or practice that causes a disparate impact *per se* illegal; rather, defendants or respondents would still have the ability to justify their policy or practice at the second step of the burden-shifting framework.[19] More generally, HUD explained that broad exemptions, such as that requested for the business of insurance, would undermine Congress's intent in enacting the FHA, which was to root out the various forms of discrimination in housing and to provide for fair housing throughout the United States.[20]

In litigation following the 2013 Rule's promulgation, industry trade groups argued that these explanations were insufficient, and a federal district court agreed, deeming the level of detail and specificity in HUD's explanation of its refusal to make broad exceptions arbitrary and capricious before remanding the rulemaking to HUD.[21] HUD's subsequent rule, however, robustly addressed those concerns.[22] HUD explained that the insurance industry is replete with practices in which insurers consider certain non-actuarial factors in making decisions, such as

---

content/uploads/2019/09/Insurance-Discrimination-2019-Final.pdf (detailing widespread insurance industry practice of discrimination against domestic violence victims).

[18]    *See generally* Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. (1994); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 704 N.E.2d 667, 674 (Ohio Ct. Com. Pl. 1997) (denying summary judgment to insurers in FHA claim based on practices of denying insurance based on maximum age or minimum insurance amount, which plaintiffs' expert determined respectively allowed less than 10 percent or 17 percent of homeowners in Black neighborhoods to qualify for insurance v. 69 percent or 39 percent of homeowners in white neighborhoods); *Prudential Ins. Co. of Am.*, 208 F. Supp. 2d at 50 (denying motion to dismiss in FHA case based on allegations of having minimum underwriting requirements that include the market value and age of home, rating territories according to zones reflecting racial composition, not selling insurance in D.C., and using applicant credit scores to determine eligibility).

[19]    *See* 2013 Rule, 78 Fed. Reg. at 11,460 (Feb. 15, 2013).

[20]    *Id.*

[21]    *See, e.g.*, *Donovan*, 66 F. Supp. 3d at 1051.

[22]    *See* HUD, *Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance* ("2016 Supplemental Rule"), 81 Fed. Reg. 69,012, 69,017 (October 5, 2016).

"marketing and claims processing and payment."[23] Moreover, HUD noted that ratemaking—frequently a risk-based decision-making process—often involves consideration of subjective factors outside of actuarial concerns.[24] HUD observed that the industry's long-time consideration of subjective, non-risk-based factors has not led to the inevitable demise of the entire industry.[25] Moreover, other risk-based industries, such as mortgage lending, are subject to disparate-impact liability and have not had to forego risk-based analysis in its entirety to avoid FHA liability. In addition to explaining why a blanket exemption is undesirable, HUD elaborated on the benefits of a case-by-case approach for assessing disparate-impact claims. Specifically, a blanket exemption would prevent the development of alternative policies that serve both parties' interests, consistent with the third step of the burden-shifting framework. As HUD explained, it would be impossible for insurers to argue that, in every situation, there is no other policy which might serve their same interests, especially with changes in technology and the sophistication of risk analysis.[26]

ii.    *A Blanket Exemption from Disparate-Impact Liability Would Not Promote Efficiency and Would Be Overinclusive.*

Insurance industry groups have argued that applying the 2013 Rule's burden-shifting framework to the business of homeowners insurance would be inefficient because claims against insurance companies will categorically fail, claiming that disparate-impact liability is inherently incompatible with the inherently risk-based nature of insurance. But this argument overstates the comparative ease of the process of creating an exemption to liability for risk-based practices.

As HUD addressed in 2016, it would need to outline narrow and highly specific standardized rules to determine if a practice was exempt, as actuarial practices are constantly changing and evolving. Indeed, the diversity and ingenuity of insurer practices makes it practically impossible to define the scope of exempted practices to avoid case-by-case disputes. Moreover, whether a practice qualified for the exemption would itself be a lengthy, fact-intensive determination. "The arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification."[27] The 2013 Rule's case-by-case approach best enables HUD to enforce the FHA, as it takes into consideration the variety of insurer practices, present and future. Thus, HUD determined categorical exemptions or safe harbors are "unworkable and inconsistent with its statutory mandate."[28]

The fact that insurers regularly engage in practices that combine risk-based decision making with more subjective factors supports this conclusion. For example, practices such as ratemaking, which are largely actuarially based, can nonetheless incorporate elements of non-

---

[23]    *Id.*
[24]    *Id.*
[25]    *Id.*
[26]    *Id.*
[27]    *Id.*
[28]    *Id.* at 69,013.

6

actuarially based subjective judgment or discretion under law.[29] Accordingly, creating a broad exemption for risk-based policies would be overinclusive and have the effect of shielding discriminatory practices that are unrelated to risk.

Price optimization is a particularly pernicious example of a common homeowners insurance practice that is not risk-based and thus is routinely subject to disparate-impact liability. In recent years, insurers have begun using data-driven price optimization to set rates, involving "data mining of insurance and noninsurance databases of personal consumer information[, . . .] advanced statistical modeling or both to select prices that differ from indicated rates at a very detailed or granular level."[30] Put simply, this practice allows insurers to charge the greatest amount possible without losing the consumer's business.[31] For example, an insurer's actuaries may determine a fair and reasonable price for an insurance product in a specific geographic area based on risk and expected loss. Using price optimization, the company may reject that price and set a price based on maximum profitability.[32] According to HUD, determining if a specific form of price-optimization is sufficiently "risk-based" to qualify for a broad *per se* exemption would require exorbitant agency, time, and resources given the complicated nature of this technology.[33] And price optimization strategies can undoubtedly have an illegal disparate impact—even when combined with risk-based decision-making. To assume otherwise would be to simply take insurance adjusters and actuaries at their word that they will not discriminate against communities of color—an assumption that runs counter to the history of racially discriminatory practices that informed passage of the FHA.[34]

Even if practices are predominantly based on actuarial decision-making, that does not preclude them from having an illegal disparate impact.[35] Take, for example, credit scoring, which is frequently accounted for in insurer's risk-based analyses. This is even though multiple studies have concluded that credit scores are themselves a combination of historically biased indices, such that reliance on them has the effect of exacerbating long standing race-based economic inequality. As HUD noted in its Supplemental Rule, the court in *Lumpkin v. Farmers*

---

[29]      *Id.* at 69,017. *See* D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Underwriting Guidelines*, at 119 ("Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk.") (quoting S. Comm. on Banking, Hous., and Urban Affairs, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner) ("Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes.").

[30]      Nat'l Ass'n of Ins. Comm'rs, *Price Optimization White Paper*, at 1 (Nov. 19, 2015), http://www.naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf.

[31]      *Id.* at 2.

[32]      Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix, 7, 10 (2014) (listing certain competitive adjustments that are often made to predicted loss costs during the rate-setting process).

[33]      2016 Supplemental Rule, 81 Fed. Reg. at 69,016.

[34]      Growing concern over the potential discriminatory effects of data-driven price optimization has led numerous states to determine that data-driven price optimization constitutes illegal discrimination. *See, e.g.*, Fla. Office of Insurance Regulation, *Use of Price Optimization in Premium Determination*, Informational Memorandum OIR-15-04M (May 14, 2015), https://www.floir.com/siteDocuments/OIR-15-04M.pdf.; Va. Bureau of Insurance, *Compliance with Statutory Rate Standards in File-and-Use Lines of Insurance,* Virginia Administrative Letter 2016-03 (April 15, 2016), https://scc.virginia.gov/getattachment/10491abc-4ade-4431-8641-34d15f16b9a7/16-03.pdf.

[35]      *See* Nat'l Consumer Law Ctr. & Ctr. for Econ. Just., *Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the Economic Racial Divide*, at 4 (June 2007), https://www.nclc.org/images/pdf/pr-reports/report-insurance-scoring-2007.pdf.

*Group* found that certain credit scoring practices have a disparate impact, and that even if they have some predictive value, there are other, less discriminatory alternatives.[36] In other words, an insurance practice can have an illegal disparate impact even if it is predominantly derived from risk-based decision-making. A broad exception would therefore protect unlawful practices.

> **iii.** *The Presence of Significant Differences in State Law Regarding Both Insurance and Housing Discrimination Protections Supports HUD's Case-by-Case Approach.*

Insurance industry trade groups have argued that reverse preemption under the McCarran-Ferguson Act, as interpreted by the Seventh Circuit,[37] precludes federal courts from passing judgment on the actuarial soundness of risk-based practices. Yet the McCarran-Ferguson Act only restricts "those applications of federal law that directly conflict with state insurance laws, frustrate a declared state policy, or interfere with a State's administrative regime,"[38] and the heterogeneity of state insurance laws thus necessitates a case-by-case determination in lieu of the blanket exemptions that insurance industry trade groups have sought. Indeed, the McCarran-Ferguson Act does not preclude *all* disparate-impact claims against insurers because many states have regulations that complement disparate-impact liability under federal law, such that McCarran-Ferguson reverse-preemption is entirely irrelevant. For example, California, North Carolina, and the District of Columbia expressly provide by statute for disparate-impact fair housing claims without exemptions for any particular type of business, including homeowner insurers.[39] Whether a state's insurance law will preempt the FHA under the McCarran-Ferguson Act depends, in large part, on which state's law applies.

Furthermore, courts have indicated that a determination of McCarran-Ferguson reverse-preemption requires a case-specific factual inquiry.[40] If anything, the relationship between state insurance regulatory regimes and federal law, as shaped by McCarran-Ferguson, actually *supports* HUD's rejection of claims that the McCarran-Ferguson Act entitles insurance to blanket exemptions. Even if state anti-discrimination law does not provide for disparate impact liability,

---

[36] 2016 Supplemental Rule, 81 Fed. Reg. at 69,016 (citing *Lumpkin v. Farmers Grp.*, No. 05– 2868, 2007, U.S. Dist. LEXIS 98949, at *19 (W.D. Tenn. July 6, 2007).

[37] *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999), cert. denied, 528 U.S. 1106 (2000).

[38] *Humana, Inc. v. Forsyth*, 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[39] *See* Cal. Gov't Code § 12955.8 (West 2012); N.C. Gen. Stat. § 41A-5(a)(2) (West 2009); D.C. Code § 2-1401.03 (2012). Additionally, several states' highest courts have interpreted their state fair housing laws to encompass disparate impact claims, even if their statutes do not explicitly use that term or a close equivalent. *See, e.g.*, *Comm'n on Hum. Rts. & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 255–56 (Conn. 1999); *Saville v. Quaker Hill Place*, 531 A.2d 201, 205–06 (Del. 1987); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790, 798–99 (Iowa 2011); *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1050–51 (Utah 2000); *State of Ind., Civ. Rts. Comm'n v. Cnty. Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000).

[40] *See, e.g.*, *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 297 (5th Cir. 2003) (rejecting McCarran-Ferguson reverse-preemption after appellant failed to indicate any state laws or declared regulatory policies which would conflict with federal civil rights statutes); *see also Forsyth*, 525 U.S. at 308 ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise."); *Wai*, 75 F. Supp. 2d at 5 (rejecting defendant's argument for McCarran-Ferguson reverse-preemption after noting that Maryland law did not grant the state's insurance commissioner exclusive jurisdiction over discrimination claims).

the comments of insurance industry groups did not establish that the imposition of disparate impact liability under federal law would invariably conflict with state law. Some state regulatory requirements establish a baseline, or floor, for anti-discrimination protections in housing. In many cases, the FHA appropriately raises the standard for compliance beyond that established by the state regulations. Because each state's statutory and regulatory regime is different and interacts differently with the FHA, it was entirely reasonable for HUD to adopt a case-by-case analysis.

## II. The 2020 Rule Violates the Administrative Procedure Act and the Fair Housing Act and Should Be Rescinded.

### a. HUD's Changes to FHA Regulations with the 2020 Rule Are Arbitrary, Capricious, and Contrary to Law.

At least five distinct changes included in the 2020 Rule would render it virtually impossible for most victims of discrimination to prevail in HUD's administrative enforcement process when alleging that they have been injured by a policy or practice with an unjustified discriminatory effect. Each of the changes is arbitrary and capricious and contrary to law.

First, the 2020 Rule eliminated the 2013 Rule's definition of "discriminatory effect," which confirmed that liability can be established under the FHA where a policy or practice *either* results in a disparate impact on a group of persons, *or* "creates, increases, reinforces, or perpetuates segregated housing patterns."[41] Courts have long recognized a theory of liability based on the perpetuation of segregation as distinct from the disparate impact theory of liability.[42] In its Preamble to the 2020 Final Rule, HUD claimed that its removal of the phrase "perpetuates segregated housing patterns" did not change any obligation under the FHA, since perpetuation of segregation could still be "a harm prohibited by disparate impact liability."[43] But, permitting evidence of a segregative effect to serve as proof of injury in support of a disparate impact claim is not the same as recognizing an independent claim of perpetuation of segregation.

Next, the 2020 Rule imposed a much higher pleading standard that requires plaintiffs to, among other things, credibly allege facts demonstrating that a challenged policy or practice is "arbitrary, artificial, and unnecessary" to achieve *any* "valid interest"—including "profit." This pleading requirement essentially shifts the burden to the plaintiff to show that a defendant has no valid interest in the challenged policy. However, decades of precedent have established that it is a defendant's burden to demonstrate a valid interest to avoid a disparate impact claim.[44]

---

[41]    24 C.F.R. § 100.500(a).

[42]    *See, e.g., Huntington Branch, N.A.A.C.P.*, 844 F.2d at 937, *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988) ("The discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation."); *Arlington Heights*, 558 F.2d at 1291; *Black Jack*, 508 F.2d at 1184–86.

[43]    85 Fed. Reg. at 60,306.

[44]    *See, e.g., Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49–51 (1st Cir. 2000) (holding defendant has the burden of proffering a "valid," "rational," "substantial," and "legitimate" justification, as well as the burden of showing a less discriminatory alternative). *See also Huntington Branch*, 844 F.2d 926; *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977); *Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415 (4th Cir. 2018); *Inclusive Cmtys. Project v. Lincoln Prop. Co.*, 920 F.3d 890 (5th Cir. 2019); *Arthur v. City of Toledo*, 782 F.2d 565

Additionally, HUD does not explain why plaintiffs should be required to allege that a defendant's policy or practice falls into all three categories. For example, a policy may be arbitrary and unnecessary without being "artificial"—i.e., a pretext to cover up discriminatory intent.

Third, the 2020 Rule abandoned the well-established burden-shifting standard for disparate impact claims. Under the 2013 Rule, after a plaintiff proved that a challenged practice caused a discriminatory effect, the burden moved to the defendant to persuade the decisionmaker that the challenged practice was necessary to achieve certain interests, and if the defendant did so, the plaintiff had to prove that the defendant's "substantial, legitimate, nondiscriminatory interests . . . could be served by another practice that has a less discriminatory effect."[45] The 2020 Rule decimated this burden-shifting standard, replacing it with a confusing, nonlinear series of "showings" that a plaintiff must make to first plead and then prove its prima facie case. For example, under the 2020 Rule, a defendant may rebut the allegation by producing evidence showing the policy "advances a valid interest (or interests)," without a requirement of persuasion as to justify their interest.[46]

Moreover, under the 2020 Rule, if a defendant produces such evidence, the analysis stops there. Unlike the 2013 Rule, the 2020 Rule offered no opportunity for a plaintiff to then suggest that a less discriminatory policy exists. In other words, the 2020 Rule offered no pathway for a plaintiff to move from stage two to stage three: It is simply silent on what happens after a defendant rebuts the first element—whether the case ends; whether the plaintiff then reverts to stage one to allege (and then prove) the remaining elements; or something else. Then, assuming plaintiffs can even reach a third stage in the burden-shifting framework to raise less discriminatory alternatives, the 2020 Rule obligates them to prove that the less discriminatory alternative is "equally effective" as the challenged practice and does not "impos[e] materially greater costs on, or creat[e] other material burdens for, the defendant."[47]

Fourth, the 2020 Rule added two new exemptions to liability for defendants in discriminatory effects cases, separate from the burden-shifting standard laid out in 24 C.F.R. § 100.500(b)–(c). The first exemption allows defendants to establish either that a plaintiff failed to plead facts in support of a prima facie case, or that a plaintiff failed to establish that a policy or practice has a discriminatory effect, if the defendant shows it was "reasonably necessary to comply with a third party requirement."[48] The 2020 Rule lists three such requirements, including "[f]ederal, state, or local law"; "[b]inding or controlling court, arbitral, administrative order or opinion"; and "[b]inding or controlling regulatory, administrative or government guidance or requirement."[49] This defense denies plaintiffs any opportunity to address whether, despite the third party's requirement, there were less discriminatory options available to the defendant.

---

(6th Cir. 1986); *Arlington Heights*, 558 F.2d 1283; *Black Jack*, 508 F.2d 1179; *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016); *Mountain Side Mobile Ests. P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243 (10th Cir. 1995).

45    24 C.F.R. § 100.500(c)(1)–(3) (2013).
46    *Id.* § 100.500(c)(2).
47    *Id.* § 100.500(c)(3) (2020).
48    *Id.* § 100.500(d)(1), (2)(iii).
49    *Id.*

The second exemption applies when "[t]he policy or practice is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class . . ."[50] Following the assertion of this defense, the plaintiff has the opportunity to "demonstrate[] that an alternative, less discriminatory policy or practice would result in the same outcome of the policy or practice, without imposing materially greater costs on, or creating other material burdens for the defendant."[51] HUD explained in its preamble to the 2020 Rule that that the "similarly situated individuals" analysis would protect predictive models that are "accurate" because they are "not overly restrictive on members of the protected class."[52] HUD reasoned that a lender who rejects people in a protected class at higher rates than people not in a protected class could avoid liability through the prediction exemption by showing that approved borrowers from the protected class default more or just as often as approved borrowers not in the protected class, which HUD claimed would show that the lender did not hold members in the protected class to a higher standard in order to obtain a loan.

This predictive model exemption is problematic for several reasons. First, the FHA does not grant HUD authority to create safe harbors, exemptions, or exceptions from discriminatory effects liability, and no court has ever held that entire categories of policies or practices that might otherwise be subject to challenge are exempt from such liability. Despite this, HUD's 2020 Rule impermissibly created exemptions for predictive models that have no basis in the FHA or any other source of authority.[53] The proposed Rule would shield a wide range of discriminatory policies and practices. Many discriminatory models would qualify for liability exemption because of the Rule's novel "similarly situated individuals" analysis, for which there is no basis as a matter of law or as a matter of fact. For example, a predictive model that disparately impacts borrowers of color because it charges higher rates to those attending colleges that are predominantly attended by students of color is not any less discriminatory because borrowers of color from Ivy League schools default at the same or similar rates as approved white borrowers. In many situations, it will also be difficult for plaintiffs to demonstrate that an alternative, less discriminatory policy would result in the *same* outcome, without imposing materially greater costs or other material burdens. Moreover, the 2020 Rule's exemption for predictive technology was adopted without providing the public an opportunity to object to it. With respect to the use of predictive technologies, HUD had proposed a very different—and also problematic—defense in its 2019 Proposed Rule that drew numerous concerns from commentators.[54] In response to those concerns, HUD simply eliminated the proposed defense in its 2020 Rule and replaced it with completely new language that had not been vetted through

---

[50]     *Id.* § 100.500(d)(2)(i).

[51]     *Id.*

[52]     85 Fed. Reg. at 60,290.

[53]     Pls.' Compl., *Open Cmtys. All. v. HUD*,
https://www.aclu.org/sites/default/files/field_document/oca_v._carson_-_filed_complaint_0.pdf

[54]     The 2019 Proposed Rule created a defense that would apply "[w]here a plaintiff alleges that the cause of a discriminatory effect is a model used by the defendant, such as a risk assessment algorithm," and the defendant is able to show that the model's inputs do not rely on substitutes or close proxies for protected classes, but is predictive of a valid objective; that the model is produced, maintained, or distributed by a recognized third party—not the defendant; and that the model has been subjected to critical review and validated by a third party." 84 Fed. Reg. at 42,862.

public comment and was not a "logical outgrowth" of the Proposed 2019 Rule, thereby violating the procedures required by the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).[55] Had the exemption gone through proper notice and comment, commenters could have had the opportunity to address the lack of statutory authorization for such an exemption, the vague and confusing wording of the exemption, and the wide range of potentially harmful policies that it would inoculate from liability.

Finally, the 2020 Rule sharply limited the circumstances in which HUD will seek civil money penalties against defendants in discriminatory effects cases. Under the FHA, an administrative law judge may assess a civil penalty against the respondent, with the amount depending on the respondent's history of violations: The penalty cannot exceed $10,000 if the respondent has no prior history of discriminatory housing practices, $25,000 if the respondent committed one other discriminatory housing practice during the prior five-year period, and $50,000 if the respondent committed two or more discriminatory housing practices during the prior seven-year period.[56] The 2020 Rule, by contrast, stated that "HUD will seek only equitable remedies" in disparate effects cases and will pursue civil money penalties "only where the defendant has previously been adjudged, within the last five years, to have committed unlawful housing discrimination under the [FHA]."[57] A reasonable interpretation of this section conveys that HUD will always decline to request penalties available under the statute if it is the defendant's first offense and liability is based on a disparate effects claim, or if the defendant has two or more prior offenses, but they were more than five years prior to the complaint—even if they were committed less than seven years ago or by the same person.

The five changes described above conflict with longstanding liability standards for FHA claims, making the 2020 Rule contrary to law. HUD also failed to articulate valid reasons for changing these standards and failed to address the impact of the changes, making the 2020 Rule arbitrary and capricious. Furthermore, the changes run counter to HUD's duty to "affirmatively further fair housing" ("AFFH")—a duty that requires HUD to address segregation and other barriers to fair housing in its own policies and practices. With the 2020 Rule, HUD abdicated its statutory responsibilities by eliminating perpetuation of segregation as a basis for liability and making it much more difficult—impossible in some situations—to bring a successful disparate impact claim. The 2020 Rule exempted from disparate-impact liability practices that perpetuate segregation or have a discriminatory impact on protected classes. Reinstatement of the 2013 Rule is critical to combatting pervasive housing discrimination, meeting HUD's AFFH obligation, and fulfilling the very purpose and intent of the FHA.

> b.     The 2020 Rule Failed to Address the Numerous Comments Describing the Negative Impacts that Would Result from the Proposed Changes.

In promulgating the 2020 Rule, HUD "acknowledge[d]," but did not address, the numerous comments offering detailed descriptions of the negative impacts the Rule would have

---

[55]     *See Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986).

[56]     42 U.S.C. § 3612(g)(3).

[57]     24 C.F.R. § 100.500(f).

on plaintiffs' ability to successfully challenge housing discrimination.[58] At most, "HUD also agree[d] that [the Rule] will benefit banks and landlords," indicating that HUD understood that the 2020 Rule could hurt plaintiffs who are suing banks and landlords for discrimination. Yet again, the 2020 Rule failed to account for the impact of its changes, and specifically, for the impact of making it harder to bring disparate impact claims.[59] Because it failed to address comments raising significant and reasonable concerns that changes to the disparate impact standard would undermine the purpose of the FHA, the 2020 Rule was formed through a deficient process.

### III. Reinstatement of the 2013 Rule is Necessary to Address Myriad Forms of Housing Discrimination and to Fully Implement the Biden Administration's Civil Rights Agenda.

HUD's reinstatement of the 2013 Rule is critical to challenging systemic inequalities, such as persistent residential segregation, housing and lending discrimination against historically marginalized groups, the unnecessary institutionalization of people with disabilities, and housing instability suffered by survivors of domestic violence.

#### i. Discrimination through Housing Technologies

Reinstatement of the 2013 Rule is an important step in providing the necessary safeguards to avoid and address actions that perpetuate and exacerbate longstanding housing segregation in the United States. Governments and corporations, at the national, state, and local level, are increasingly using computer software, statistical models, assessment instruments, and other algorithmic tools to make decisions about access to housing and credit. Housing discrimination has evolved along with new and expanding uses of technology,[60] such as machine learning-based mortgage and lending models,[61] algorithms for determining eligibility for and

---

[58] *See, e.g.*, National Fair Housing Alliance, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 2 (Oct. 18, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3079 ("The cumulative effect of these proposed changes would be to require dismissal of what should be meritorious disparate impact claims" and "would eliminate the duty and incentive of regulated entities to seek out less discriminatory alternatives"); Open Communities Alliance, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 2, 4 (Oct. 18, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3356at (same); American Civil Liberties Union, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "ACLU Comment") (Oct. 17, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3539 (same); Lawyers' Committee for Civil Rights Under Law, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (Oct. 18, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3244 (same). *See also* 85 Fed. Reg. 60,288.

[59] *Id.* at 60,292.

[60] *See, e.g.*, Patrick Sisson, *Housing discrimination goes high tech*, Curbed, Dec. 17, 2019, https://archive.curbed.com/2019/12/17/21026311/mortgage-apartment-housing-algorithm-discrimination; Robert Bartlett et al., *Consumer-Lending Discrimination in the FinTech Era* (Nov. 2019), https://faculty.haas.berkeley.edu/morse/research/papers/discrim.pdf

[61] *See, e.g.*, Jennifer Miller, *Is an Algorithm Less Racist than a Loan Officer?*, N.Y. Times, Sept. 18, 2020, https://www.nytimes.com/2020/09/18/business/digital-mortgages.html?searchResultPosition=1.

allocating housing services,[62] online advertising,[63] and tenant screening algorithms.[64] Too often, these technologies amplify and exacerbate racial, gender, disability, economic, and intersectional inequity in accessing to housing. Bias is often baked into the outcomes the algorithms are asked to predict. For example, algorithms that attempt to predict risk often use "arrest" as a proxy for "likelihood to compromise safety in housing." Given the realities of disproportionate and unjust policing of communities of color, the idea that an arrest, without more information about context, can indicate a future housing safety risk, is inherently biased. Likewise, bias is in the data used to train the AI—data that is often discriminatory or unrepresentative for people of color, women, or other marginalized groups—and can rear its head throughout the AI's design, development, implementation, and use. For example, if an algorithm is given "successful tenant" profiles compromised entirely of men within a particular income bracket with the goal of having the algorithm learn to evaluate future tenants, it will learn to look for characteristics common to that demographic when evaluating new tenants and potentially exclude people who fall into other demographic categories or who have other life experiences, possibly including protected classes. And because of the black box nature of these systems and insufficient notice to impacted people when they are utilized, it is often difficult or impossible for people to learn about housing discrimination in these systems.

Concerns that algorithms and other technologies enable and perpetuate widescale housing discrimination are not theoretical. For example, a 2017 ProPublica investigation uncovered that Facebook's advertisement targeting function allowed users to request that housing advertisements not be shown to people who fell into protected classes under the FHA.[65] HUD's own investigations resulted in the same conclusion and, given the 2013 Rule, HUD brought a complaint to enforce compliance with the FHA.[66] Similarly, researchers from the University of Berkeley found that FinTech lending companies using algorithms to generate decisions on loan pricing discriminated against borrowers of color. They concluded that this algorithmic discrimination resulted in a collective overcharge of $765 million each year for home and refinance loans. The researchers also found that both in-person and online lenders rejected a total of 1.3 million creditworthy applicants of color between 2008 and 2015.[67]

The 2013 Rule provided a workable basic framework through which Courts could analyze claims brought by individuals seeking redress for housing discrimination resulting from the use of algorithms and artificial intelligence technologies, including tenant screening

---

[62] *See, e.g.*, Catriona Wilkey et al., *Coordinated Entry Systems: Racial Equity Analysis of Assessment Data*, Oct. 2019, https://c4innovates.com/wp-content/uploads/2019/10/CES_Racial_Equity_Analysis_Oct112019.pdf.

[63] *See, e.g.*, Charge of Discrimination, *HUD v. Facebook*, FHEO No. 01-18-0323-8 (HUD Mar. 28, 2019), https://www.hud.gov/sites/dfiles/Main/documents/HUD_v_Facebook.pdf; Muhammad Ali et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Skewed Outcomes* (2019), https://arxiv.org/abs/1904.02095; Julia Angwin et al., *Facebook (Still) Letting Housing Advertisers Exclude Users by Race*, ProPublica, Nov. 21, 2017, https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin;

[64] *See, e.g.*, Kaveh Waddell, *How Tenant Screening Reports Make It Hard for People to Bounce Back from Tough Times*, Consumer Reports, March 11, 2021, https://www.consumerreports.org/algorithmic-bias/tenant-screening-reports-make-it-hard-to-bounce-back-from-tough-times/.

[65] Angwin et al., *supra* note 63.

[66] *See, e.g.*, Charge of Discrimination, *HUD v. Facebook*, *supra* note 63.

[67] Sisson, *supra* note 60.

algorithms.[68] Reinstatement of the 2013 Rule is a first step to addressing the harm that these systems can cause, and far from giving algorithmic systems an exemption from liability as the 2020 Rule had done, HUD should strengthen enforcement of disparate impact protections by proactively monitoring and investigating the use of predictive technologies in housing.

### ii. Discrimination through Reentry Barriers

Reinstatement of the 2013 Rule is critical to ensuring FHA compliance and recourse for individuals and communities who are excluded from housing opportunities due to contact with the criminal legal system. Tenant screening and eviction policies have been and continue to be a formidable barrier to housing and reentry, and several jurisdictions have "crime-free housing" ordinances requiring housing providers to conduct criminal background checks and reject or evict tenants for alleged criminal conduct.[69] HUD Secretary Fudge recently acknowledged the barriers to reentry that millions of people in the United States face and emphasized that "too many people exit prisons and jails in America without a stable home to return to."[70] Housing instability and exclusion can follow people throughout their lives because of overbroad and discriminatory arrest and conviction record policies that mean "people face housing denials based on their criminal records years or decades"[71] after serving a term of incarceration, after receiving a conviction that did not result in incarceration, and even when they were simply arrested and their case did not result in a conviction.[72] These housing denials occur "even when their criminal history does not indicate that they present a substantial risk to persons or property."[73] These arrest and criminal records policies have the effect of perpetuating housing segregation in the United States.[74] A robust disparate impact rule is essential to fulfilling the

---

[68]     *See, e.g.*, *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Solutions, LLC*, 369 F. Supp. 3d 362 (D. Conn. 2019) (denying motion to dismiss FHA disparate-impact and disparate treatment claims based on tenant screening algorithm).

[69]     *See, e.g.*, Housing Equality Ctr. of Penn., *Nuisance and Crime-Free Housing Ordinances*, https://www.equalhousing.org/fair-housing-topics/nuisance-and-crime-free-housing-ordinances/#:~:text=Crime%2Dfree%20ordinances%20may%20define,Housing%20Act%20in%20several%20circumstances; ACLU, *I Am Not a Nuisance: Local Ordinances Punish Victims of Crime*,

https://www.aclu.org/other/i-am-not-nuisance-local-ordinances-punish-victims-crime; Leora Smith, *When the Police Call Your Landlord*, Atlantic, Mar. 13, 2020, https://www.theatlantic.com/politics/archive/2020/03/crime-free-housing-lets-police-influence-landlords/605728/; Emily Werth, *The Cost of Being "Crime Free": Legal and Practical Consequences of Crime Free Rental Housing and Nuisance Property Ordinances*, Aug. 2013, https://www.povertylaw.org/wp-content/uploads/2019/09/cost-of-being-crime-free.pdf (discussing the features of crime-free and nuisance property ordinances); Ann Cammett, Confronting Race and Collateral Consequences in Public Housing, 39 Seattle U. L. Rev. 1123, 1137–38 (2016) (identifying restrictions on housing opportunities as one of the most significant obstacles to successful reentry); Jesse Kropf, Note, *Keeping "Them" Out: Criminal Record Screening, Public Housing, and the Fight Against Racial Caste*, 4 Geo. J.L. & Mod. Critical Race Persp. 75 (2012).

[70]     HUD, *Letter Outlining HUD Actions to Address Reentry Housing Needs and Increase Public Safety*, June 23, 2021, https://www.hud.gov/sites/dfiles/PA/documents/SOHUD_reentry_housing_letter.pdf

[71]     *Id.*

[72]     HUD, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*, Apr. 4, 2016, https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

[73]     HUD, Letter Outlining HUD Actions to Address Reentry Housing Needs and Increase Public Safety, June 23, 2021, https://www.hud.gov/sites/dfiles/PA/documents/SOHUD_reentry_housing_letter.pdf

[74]     NYU Law, *New Barriers: Deborah Archer's Research Reveals How Today's Crime-Free Housing Ordinances Uphold the Legacy of Segregation*, https://www.law.nyu.edu/news/deborah-archer-crime-free-housing-

Biden Administration's articulated vision of "taking a comprehensive approach to addressing the housing needs of returning citizens and people with criminal records" through the FHA's protections.

Unlike the 2020 Rule, the 2013 Rule provided a workable and helpful basic framework for addressing unjust policies that denied housing based on prior arrest and conviction records. In 2016, HUD recognized that "as many as 100 million U.S. adults" have some sort of criminal record and that "their ability to access safe, secure and affordable housing is critical to their successful reentry to society."[75] HUD further emphasized that tenant screening policies that incorporate arrest and conviction record screening likely have a disparate impact on Black and Latinx renters due to the history of structural racism in the criminal legal system in the United States. Accordingly, HUD concluded that "[w]hile having a criminal record is not a protected characteristic under the [FHA], criminal history-based restrictions on housing opportunities violate the Act if, without justification, their burden falls more often on renters or other housing market participants of one race or national origin over another."[76] HUD further explained that "[a] housing provider must [] be able to prove through reliable evidence that its policy or practice of making housing decisions based on criminal history actually assists in protecting resident safety and/or property," and that a tenant screening policy that fails to consider the nature, severity, and recency of the alleged conduct is unlikely to satisfy this standard.[77]

Numerous courts have found both the 2013 Rule and the accompanying 2016 Guidance helpful and workable in analyzing how disparate impact claims "apply to situations where a housing provider takes an adverse action based on an individual's criminal history."[78] Specifically, courts have found the rule useful in (i) identifying policies and practices around arrest and conviction records subject to challenge; (ii) evaluating and establishing whether there is a causal connection between the identified policy and impact; and (iii) assessing business justification defenses and less discriminatory alternatives. Several post-*Inclusive Communities* decisions have applied long-standing FHA disparate impact jurisprudence in conjunction with the 2013 Rule codifying these decisions to cases challenging housing policies on arrest and conviction records.[79]

The 2013 Rule and 2016 Guidance have also assisted in providing clarity about the showing required at the pleading and merits stages in cases claiming disparate impact liability based on housing policies that consider arrest and conviction records. For example, in *Fortune*

---

ordinances-segregation; Liam Dillion et al., *Black and Latino renters face eviction, exclusion amid police crackdowns in California*, LA Times, Nov. 19, 2020, https://www.latimes.com/homeless-housing/story/2020-11-19/california-housing-policies-hurt-black-latino-renters.

[75]     HUD, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*, *supra* note 72.

[76]     *Id.*

[77]     *Id.*

[78]     *Conn. Fair Hous. Ctr.*, 369 F. Supp. 3d at 378.

[79]     *See*, *e.g.*, *Sams v. Ga West Gate LLC*, No. cv-415-282, 2017 WL 436281, at *5 (S.D. Ga. Jan. 30, 2017) (citing *ICP* and the causality requirements codified under the 2013 Rule in denying motion to dismiss disparate impact claims based on apartment complex's criminal records policy); *Jones v. City of Faribault*, No. 18-1643 (JRT/HB), 2021 WL 1192466, at *17 (D. Minn. Feb. 18, 2021) (applying the 2013 Rule's burden-shifting test and specifically using *the ICP* causality requirement in evaluating the first prong of the test).

*Society v. Sandcastle Housing Development Fund Corp*, the Court applied the three-part burden-shifting test, codified in the 2013 Rule, and explained that *prima facie* disparate impact claims only require a showing that an outwardly neutral practice that caused or could predictably cause an adverse impact but that to prevail on the merits, there must be a showing that there is a less discriminatory alternative that addresses a defendant's legitimate business interests.[80] In doing so, the 2013 Rule effectively balances each side's interests.

Reinstatement of the 2013 Rule would provide needed clarity on the basic framework to evaluate disparate-impact claims as applied to policies that unjustly deny housing based on arrest and conviction records as well as necessary protection for Black and Brown communities that suffer ongoing and devastating discrimination due to contact with the criminal legal system.

### iii.  Perpetuation of Racial Segregation

The 2013 Rule has played a vital role in "moving the Nation toward a more integrated society" and combatting the perpetuation of residential segregation through exclusionary zoning and other land-use restrictions.[81] Specifically, the 2013 Rule provides a tool for enforcing the FHA's protections against facially neutral conduct that perpetuates existing patterns of residential segregation by race without any legitimate basis.[82] Courts have consistently recognized that "housing segregation both perpetuates and reflects this country's basic problems regarding race relations: educational disparities, police-community relations, crime levels, wealth inequality, and even access to basic needs such as clean water and clean air."[83] Considering the major impact of residential segregation on an individual's opportunities, the 2013 Rule helps to fulfill the FHA's objectives in creating a just and equitable society.

Today, residential segregation in the United States persists at alarming rates and inflicts far-reaching and lasting harms on communities of color and low-income families. Despite growing diversity in population, many cities across the country remain deeply segregated.[84] Segregation in neighborhoods correlates with high rates of school segregation and contributes to negative educational and socioeconomic outcomes for low-income students and students of color.[85] Schools in segregated neighborhoods, for example, suffer from high dropout rates, poor test results, and limited educational achievements.[86] Persistent segregation of neighborhoods also inhibits property value appreciation in predominantly Black neighborhoods as compared to predominantly white neighborhoods, even when the characteristics of the homes and

---

[80]     388 F. Supp. 3d 145, 172–73 (E.D.N.Y. 2019); *see also Conn. Fair Hous. Ctr.*, 369 F. Supp. 3d at 377–78 (denying motion to dismiss disparate-impact claim against entity offering a criminal tenant screening product and explaining that a *prima facie* case only requires a neutral practice that causes adverse impact).

[81]     *Inclusive Cmtys.*, 576 U.S. at 546–47.

[82]     *Mhany Mgmt*, 819 F.3d at 619–20.

[83]     *Avenue 6E Investments*, 818 F.3d at 503.

[84]     Aaron Williams & Armand Emamjomeh, *America is more diverse than ever – but still segregated*, Wash. Post (May 10, 2018), https://www.washingtonpost.com/graphics/2018/national/segregation-us-cities/.

[85]     Urban Institute, *Segregated Neighborhoods, Segregated Schools?* (Nov. 28, 2018), https://www.urban.org/features/segregated-neighborhoods-segregated-schools.

[86]     Margery Austin Turner & Karina Fortuny, The Urban Institute, *Residential Segregation and Low-Income Working Families* (Feb. 2009), https://www.urban.org/sites/default/files/publication/32941/411845-Residential-Segregation-and-Low-Income-Working-Families.PDF.

neighborhoods are otherwise the same.[87] Research has further found that residential segregation may influence discriminatory policing in neighborhoods that are predominantly minority residents.[88]

Reinstatement of the 2013 Rule is critical to addressing the continuing harm of residential segregation. In promulgating its 2013 Rule, HUD considered and rejected the suggestion to delete "perpetuation of segregation" as a recognized discriminatory effect."[89] HUD reasoned that the "elimination of segregation is central to why the [FHA] was enacted" and that "every federal court of appeals to have addressed the issue has agreed."[90] Accordingly, the ACLU urges HUD to reinstate its 2013 Rule and make clear that perpetuation of segregation is a component of disparate-impact liability.

### iv. *Discrimination Based on National Origin Against Immigrants and Language Minorities*

Disparate impact liability has been a vital tool for holding housing providers accountable for excluding people of particular national origins, under the guise of excluding immigrants. The statuses of being a non-citizen, an immigrant, or unable to communicate in English are not statutorily enumerated as protected classes under the FHA. This statutory gap allows housing providers to establish barriers to housing access based on criteria, such as language ability or having a Social Security Number. These criteria work to exclude people based on immigration status but are frequently closely correlated with being of Latinx or Asian national origin. In 2017, the National Fair Housing Alliance reported elevated rates of housing discrimination complaints from Latinx complainants experiencing housing harassment or displacement from housing because of immigration status.[91]

Courts have applied the disparate-impact theory of liability to such policies and practices, allowing challenges to discriminatory practices to proceed where proving intent to discriminate based on national origin would be extremely difficult. For example, in *de Reyes v. Waples Mobile Home Park Ltd. P'ship*, the Fourth Circuit held that a group of immigrant plaintiffs adequately stated a national origin disparate-impact claim against a landlord who began requiring a Social Security Number or other evidence of lawful immigration status to renew their leases.[92]

---

[87]     Richard D. Kahlenberg & Kimberly Quick, *The Government Created Housing Segregation. Here's How the Government Can End It.*, The American Prospect, July 2, 2019, https://prospect.org/article/government-created-housing-segregation-heres-how-government-can-end-it.

[88]     Emily Badger, *Baltimore shows how historic segregation shapes biased policing today*, Wash. Post (Aug. 10, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/08/10/baltimore-shows-how-historic-segregation-shapes-biased-policing-today/.

[89]     2013 Rule, 78 Fed. Reg. at 11,469.

[90]     *Id.*

[91]     Nat'l Fair Hous. Alliance, *Making Every Neighborhood a Place of Opportunity: 2018 Fair Housing Trends Report* at 80 (2018), *available at* https://nationalfairhousing.org/wp-content/uploads/2018/04/NFHA-2018-Fair-Housing-Trends-Report_4-30-18.pdf.

[92]     *See de Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 431–32 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2026 (2019) (citing plaintiffs' allegations that in the relevant housing market, "being an illegal immigrant . . . correlates with being Latino (a protected class) . . . . we must infer that Congress intended to permit disparate-impact liability for policies aimed at illegal immigrants when the policy disparately impacts a protected class . . . ."). *See also Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1194–97 (M.D. Ala. 2011), *vacated as moot*,

Consistent with these precedents, HUD's own guidance recognizes that discrimination based on language can have a discriminatory impact based on national origin, and that this would violate the FHA.[93] In this 2016 guidance, HUD stated that "[a] requirement involving citizenship or immigration status will violate the [FHA] when it has the purpose or unjustified effect of discriminating on the basis of national origin."[94]

Despite such precedent and guidance, the 2020 Rule substantially increased a plaintiff's burden to allege a *prima facie* case and created absolute defenses that are inconsistent with the FHA and the broad construction it has been given by the Supreme Court and other courts. Reinstatement of the 2013 Rule is vital to ensure that the most vulnerable and marginalized communities have an avenue to enforce their fair housing rights.

### v. Gender-Based Housing Discrimination Against Women and Women-Headed Families

Women of all identities, particularly those who face violence and who have families to support, should be protected under the FHA. Property owners, housing providers, and local governments are increasingly enforcing discriminatory policies that not only bar women from accessing housing, but also evict them from their homes.[95] The ACLU urges HUD to reinstate the 2013 Rule and advance housing policies that strengthen—not undermine—the existing disparate impact theory that allows for stable, safe, and affordable housing for all.

### 1. Discrimination Against Domestic Violence Survivors

Domestic violence is a leading cause of homelessness for women in the United States.[96] Over 90% of homeless women report having experienced domestic abuse or sexual violence in their lives, while over 50% of homeless women report that domestic violence was the immediate cause of their homelessness.[97] Access to housing is absolutely critical for survivors, as lack of

---

No. 11-16114-CC (11th Cir. May 17, 2013) (finding likelihood of success on the merits of challenge to state law limiting ability to occupy mobile homes based on immigration status would have an unjustified discriminatory impact on Latinos, who were overrepresented among mobile home residents in the state and among the state's non-citizen population).

[93]     HUD, *Office of General Counsel Guidance on Fair Housing Act Protections for Persons with Limited English Proficiency*, at 3 (Sept. 15, 2016), https://archives.hud.gov/news/2016/pr16-135-lepmemo091516.pdf; 24 C.F.R. § 1.4(b)(2)(i).

[94]     *Id.*

[95]     ACLU Women's Rights Project, *Chronic Nuisance and Crime-Free Ordinances: Endangering the Right of Domestic Violence Survivors to Seek Police Assistance*, https://www.aclu.org/sites/default/files/assets/aclu_nuisance_ordinance_issue_summary_-_final.pdf; *see also* Amanda K. Gavin, Comment, *Chronic Nuisance Ordinances: Turning Victims of Domestic Violence into "Nuisances" in the Eyes of Municipalities*, 119 Penn. St. L. Rev. 257, 257–58 (2014).

[96]     *See* ACLU Women's Rights Project, *Domestic Violence and Homelessness* (2006), http://www.aclu.org/pdfs/dvhomelessness032106.pdf; *see also* U.S. Conference of Mayors, *A Status Report on Hunger and Homelessness in America's Cities: A 25-City Survey* (Dec. 2014); *see also* Baker et al., *Domestic Violence, housing instability, and homelessness: A review of housing policies and program practices for meeting the needs of survivors*, 15 Aggression & Violent Behavior 430 (2010).

[97]     Monica McLaughlin & Debbie Fox, National Network to End Domestic Violence, *Housing Needs of Victims of Domestic Violence, Sexual Assault, Dating Violence, and Stalking* (2019), https://nlihc.org/sites/default/files/AG-2019/06-02_Housing-Needs-Domestic-Violence.pdf.

safe and affordable housing options is regularly reported as a primary barrier to escaping abuse.[98] Homelessness can also be a precursor to additional violence, because a survivor is at the greatest risk of violence when separating from an abusive partner.[99] HUD's 2013 Rule ensures adequate protections for domestic violence survivors who denied housing because they accessed emergency services, defended themselves, or experienced abuse in their homes.

In particular, the FHA has provided significant protections against unjust landlord policies that penalize survivors because of the abuse they experienced—including unjust policies that hold survivors responsible for abuse in their homes or noise or property damage arising from the violence. Because the vast majority of survivors are women, policies that discriminate against survivors have an unlawful disparate impact on women. The 2013 Rule is critical to preventing landlords, housing providers, municipalities, and other actors from adopting discriminatory policies and practices that disproportionately harm survivors. Notably, the disparate impact framework has been an effective tool in HUD's efforts to combat the following deeply flawed policies:

- Some landlords and housing providers evict or threaten to evict domestic violence survivors in accordance with "one-strike" or "crime-free" policies that punish survivors because of the abuse they experienced in their home.[100] These policies result in survivors and their children being evicted and rendered homeless for violence done to them or by their abusers.[101] The 2013 Rule remains critical for combatting these unjust policies.[102]

- Some landlords evict survivors and their children from housing for reasons directly related to domestic violence, like noise complaints during abusive attacks, damage to the rental unit caused by abusive partners, and economic abuse. The Violence Against Women Act ("VAWA") does not protect the housing of survivors who live in apartments that are not subsidized by the federal government. The 2013 Rule helps to protect survivors who live in private apartments or state-funded subsidized housing from eviction due to abuse.

- In many jurisdictions, nuisance or crime-free ordinances coerce landlords to evict or threaten to evict households based on calls for police or emergency assistance or for criminal activity occurring at tenants' homes, disproportionately harming domestic violence victims.[103] Research has also demonstrated that nuisance and crime-free ordinances disproportionately

---

[98] *See* Charlene K. Baker et al., *Domestic violence, housing instability, and homelessness: A review of housing policies and program practices for meeting the needs of survivors*, 15 Aggression & Violent Behavior 430, 430–39 (2010), https://b.3cdn.net/naeh/416990124d53c2f67d_72m6b5uib.pdf.

[99] *See id.* at 431.

[100] *See, generally*, *Warren v. Ypsilanti Hous. Auth.*, Case No. 4:02-cv-40034 (E.D. Mich. 2003) (defendant agreed to cease evicting survivors of domestic violence under its "one-strike policy").

[101] *See id.*; *see also* Federal Consent Decree, *Alvera v. C.B.M. Group*, Civil No. 01-857-PA (D. Or. Nov. 5, 2001), https://www.aclu.org/legal-document/alvera-v-cbm-group-federal-consent-decree.

[102] *See id.*

[103] *See, e.g.*, *Somai v. City of Bedford*, Case No. 1:19-cv-00373-KBB (N.D. Ohio 2020) (defendant agreed to repeal its criminal activity nuisance ordinance that penalized survivors of domestic violence based on calls for police or emergency assistance).

impact communities of color, low-income households, and people with disabilities.[104] In 2016, HUD issued guidance on how the 2013 Rule is an important tool for challenging the devastating consequences of nuisance ordinances on survivors and other vulnerable and marginalized communities.[105]

Not only do these policies increase the risk of homelessness for survivors, but they prevent survivors from obtaining stable housing in the first place. A landlord may choose not to rent to applicants because they are domestic violence survivors.[106] This can take the form of intentional discrimination, or it can take the form of unintentional discrimination that the FHA can only eradicate through disparate impact theory. The 2013 Rule is critical to combatting housing discrimination against survivors of gender-based violence.

## 2. Discrimination Against Families with Children

Moreover, the 2013 Rule affords significant protections to families, particularly women with children.[107] Research has consistently shown that the majority of primary caregivers are women.[108] Moreover, nearly one out of four mothers are raising their children on their own.[109] The 2013 Rule is critical to preventing landlords and housing providers from implementing overly restrictive policies that unreasonably limit families' housing choices.[110]

Advocates have relied on the 2013 Rule to challenge unjust policies that harm families, such as overly restrictive occupancy requirements. Under the FHA, for example, HUD is tasked with determining if an occupancy standard is reasonable. HUD considers factors such as the size of bedroom and unit and age of the children. This analysis is extremely important because it prevents discrimination based on familial status, a protected class under the FHA.[111] Similarly, the FHA's disparate-impact theory has been used to challenge housing policies that overly restrict the use of facilities that are overwhelmingly enjoyed by children, such as pools or

---

[104] ACLU & New York Civil Liberties Union, *More Than a Nuisance: The Outsized Consequences of New York's Nuisance Ordinances* (2018), https://www.nyclu.org/sites/default/files/field_documents/nyclu_nuisancereport_20180809.pdf.

[105] HUD, *Office of General Counsel Guidance on Application of FHA Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services* (2016), available at https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF.

[106] 1985 N.Y. Op. Att'y Gen. 45 (Nov. 22, 1985); Anti-Discrimination Ctr. of Metro N.Y., *Adding Insult to Injury: Housing Discrimination Against Survivors of Domestic Violence* (Aug. 2005), http://www.antibiaslaw.com/sites/default/files/all/DVReport.pdf; *see also* Equal Rights Ctr., *No Vacancy: Housing Discrimination Against Survivors of Domestic Violence in the District of Columbia* (Apr. 2008).

[107] *See* 42 U.S.C. §§ 3601-19.

[108] National Partnership for Women & Families, *The Female Face of Family Caregiving* (Nov. 2018), http://www.nationalpartnership.org/our-work/resources/economic-justice/female-face-family-caregiving.pdf.

[109] A.W. Geiger et al., Pew Research Center, *6 Facts About U.S. Moms* (May 8, 2019), https://www.pewresearch.org/fact-tank/2019/05/08/facts-about-u-s-mothers/.

[110] *See* Lauren Brasil, *Occupancy Policies and the FHA: How Many is Too Many?*, Fair Housing Project (Dec. 4, 2018), available at https://www.fairhousingnc.org/newsletter/occupancy-policies-and-the-fair-housing-act-how-many-is-too-many/.

[111] *See Housing Opps. Project for Excellence, Inc. v. Key Colony No. 4 Condo. Assoc.*, 510 F. Supp. 2d 1003 (S.D. Fla. 2007) (holding that residents had successfully stated a disparate impact claim because the restrictive occupancy rules had discouraging effects on families with more than two children).

courtyards, can be considered discriminatory under the FHA.[112] For example, a landlord's policy against congregating in common areas may have a discriminatory impact on families with children when evidence shows that children are more likely than adults to play, or congregate, in such places.[113] The 2013 Rule has been the foundation to preventing overly restrictive landlord policies that negatively impact families, particularly women with children.

*vi. Access to Housing and* Olmstead *Compliance for People with Disabilities*

A 2017 report entitled *Priced Out: The Housing Crisis for People with Disabilities*, co-authored by the Technical Assistance Collaborative, a policy group focused on affordable and permanent supportive housing for very low-income people with disabilities, and the Consortium for Citizens with Disabilities Housing Task Force, concluded:

> In 2016, millions of adults with disabilities living solely on Supplemental Security Income (SSI) found that renting even a modest unit in their community would require nearly all of their monthly income. In hundreds of higher-cost housing markets, the average rent for such basic units is actually much greater than the entirety of an SSI monthly payment.[114]

As a result, "non-elderly adults with significant disabilities in our nation are often forced into homelessness or segregated, restrictive, and costly institutional settings such as psychiatric hospitals, adult care homes, nursing homes, or jails."[115]

Compounding this concern, people with many types of disabilities, including people with mobility impairments, people who are blind, and people who are deaf or hard of hearing, face additional barriers securing affordable housing that is also accessible.

These concerns make it critical to ensure that protections against disability-based discrimination in housing are not weakened. Complaints of disability discrimination already comprise the largest percentage of housing discrimination complaints received by both public and private fair housing enforcement organizations since the early 2000s.[116] The inability to preserve housing will not only put people with disabilities at risk of homelessness and institutionalization, but will likely increase costs to state and local governments, which will incur the costs of institutionalization, shelter placements, and emergency department visits.

The availability of rental subsidies has been critical to ensure the availability of affordable and accessible housing for people with disabilities. Such subsidies are a key aspect of

---

[112]     *See id.*

[113]     *Khalil v. Farash Corp.*, 260 F. Supp. 2d 582, 589 (W.D.N.Y. 2003).

[114]     Technical Assistance Collaborative, *Priced Out in the United States* (2017), http://www.tacinc.org/knowledge-resources/priced-out-v2/.

[115]     Gina Schaak, *et al.*, *Priced Out:  The Housing Crisis for People with Disabilities* (Technical Assistance Collaborative and Consortium for Citizens with Disabilities Housing Task Force, Dec. 2017), at 8, http://www.tacinc.org/media/59493/priced-out-in-2016.pdf.

[116]     National Fair Housing Alliance, *The Case for Fair Housing, 2017 Fair Housing Trends Report* (Apr. 2017), at 27, https://nationalfairhousing.org/wp-content/uploads/2017/04/TRENDS-REPORT-4-19-17-FINAL-2.pdf.

implementing the Americans with Disabilities Act's integration mandate and the Supreme Court's *Olmstead* decision. The ADA requires public entities to administer services to people with disabilities in the most integrated setting appropriate. Supported housing units scattered in buildings throughout the community are necessary to implement the ADA's integration mandate. To make this type of supported housing available, state and local governments typically rely on rental subsidies that help support people with disabilities to live in their own apartments or homes, secured through the ordinary housing market.

But many housing providers discriminate against people who rely on disability benefits and use rental subsidies. And many covered entities attempt to bar "group homes" for people with mental disabilities. Reinstatement of the 2013 Rule is critical to advancing access to housing for people with disabilities, and fulfilling the obligation of public entities to comply with the ADA's integration mandate.

## IV.    Conclusion

The promise of housing equality is still unfulfilled in the United States, and disparate impact liability is an essential tool for combating the insidious housing discrimination that persists in our communities. Before finalizing the 2013 Rule, HUD engaged in a thoughtful and thorough process, considering decades of federal court jurisprudence. The Supreme Court in *Inclusive Communities* affirmed disparate-impact liability without suggesting that the 2013 Rule was inconsistent in any way with existing doctrine. Moreover, reinstatement of the 2013 Rule is critical to advancing access to housing opportunities for vulnerable and historically marginalized communities throughout the country.

Thank you for the opportunity to comment.

Sincerely,

Ronald Newman
National Political Director
ACLU National Political Advocacy Department

Linda S. Morris
Sandra S. Park
ACLU Women's Rights Project

Amreeta S. Mathai
Olga Akselrod
ACLU Racial Justice Program

Ricca Prasad
Ruth Bader Ginsburg Center for Liberty

029186

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-k01p-p93z
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0263
Comment Submitted by Massachusetts Insurance Federation

## Submitter Information

## General Comment

See attached file(s)

## Attachments

MIF Comments on Docket No FR 6251 P 01 Reinstatement of HUDs Discriminatory Effects Standard

<u>*Via Email*</u>

August 24, 2021

Regulations Division, Office of General Counsel
United States Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410

> *Re:* *Docket No. FR-6251-P-01 "Reinstatement of HUD's Discriminatory Effects Standard"*

To whom it may concern:

The Massachusetts Insurance Federation (Federation) welcomes the opportunity to provide comments opposing the proposed restatement of the 2013 Discriminatory Effects Standard. The Federation's members represent more than 60 percent of all homeowners' insurance policies in the Commonwealth of Massachusetts. Since many various interests filed suit to halt this rule in 2013, and the years that followed, the Federation respectfully asks the United States Department of Housing and Urban Development (HUD) to decline restating this rule. Similar to the perspective in 2013, the property-casualty insurance industry strongly believes that this rule is contrary to the long-standing tradition of state-based insurance regulation, a tradition founded in federal and state statutes.

For the past three-quarters of a century, the McCarran-Ferguson Act has guided the Federal Government's limited role in insurance regulation, as it codified the right of states to be the primary regulator of property-casualty insurance. The McCarran-Ferguson Act enabled states to be incubators of regulatory policies that match the unique climate and structural risks with the demands of consumers throughout the country. This proposed restatement would provide another layer of complex oversight, potentially redundant or conflicting regulation, consumer confusion, and unnecessarily burdens insurers and thus their policyholders. Policyholders in the Commonwealth already have robust regulation by the Division of Insurance to ensure that premiums are not excessive or unfairly discriminatory. This is not unique to Massachusetts, as regulators across the nation scrutinize insurance products to certify that all rating factors are actuarially justified. In Massachusetts, violation of these rules results in the prospect of significant penalties by the Division of Insurance, The Office of the Attorney General, and/or through civil action by individual consumers or class actions.

The words chosen by state regulators as foundational principles in regulating insurance were not by accident. Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." The foundation of the business of insurance, and in particular underwriting and rate-making, is the ability to classify insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly. Race or other protected class characteristics are not part of the risk assessment process. State insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance. In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner. Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk. Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing. Specifically, under Massachusetts law, an insurance company cannot consider "race, color, religious creed, national origin, sex, age, ancestry, sexual orientation, children, marital status, veteran status, the receipt of public assistance or disability" when deciding whether to provide, renew or cancel a home insurance policy.

The current law in Massachusetts, and similar laws throughout the country, illustrate perhaps the most important argument against this proposed restatement—insurers will now need to collect data relevant to prohibited factors in their state to ensure compliance with a disparate impact standard. Consumers should not be required or even asked for this information, as it could undo the decades long efforts in underwriting and rating to develop rates based on blind data and not implicit or explicit biases. The primary impediment to any practical compliance by insurers in Massachusetts is the fact that most insurance companies that price and provide homeowner insurance do not have any data on the "race, color, religious creed, national origin, sex, age, ancestry, sexual orientation, children, marital status, veteran status, the receipt of public assistance or disability" of policyholders or applicants.

To avoid being blindsided and to defend against allegations against insurer practices that may "actually or predictably results in a disparate impact" an insurer would need to somehow obtain, validate, record, and apply data on the "race, color, religious creed, national origin, sex, age, ancestry, sexual orientation, children, marital status, veteran status, the receipt of public assistance or disability" of every policyholder and applicant. Short of denying coverage to all policyholders and applicants who refuse to provide and validate such data, insurers would have no way to ensure that their protected class data sets were accurate and complete. As the proposed disparate impact standard does not consider intent, but rather resulting impact, an incomplete or erroneous data set would likely result in inaccurate evaluations and potential discrimination liability for insurers that employed even the most vigorous compliance efforts.

This is precisely the type of adverse federal regulation that the Supreme Court of the United States warned against in the *Inclusive Communities* ruling. Writing for the majority, Justice Anthony Kennedy wrote "*Policies, whether governmental or private, are not contrary to the*

disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." *Griggs*, 401 U. S., at 431. **Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision. These limitations are also necessary to protect defendants against abusive disparate-impact claims** (emphasis added)." Decisions related directly to the development and location of housing are radically different than regulating the fundamentals of insurance underwriting and pricing, and to inject insurance into this proposed restatement will certainly inject a test on prohibited factors into every housing decision, against the recommendations of the Court.

As illustrated in the warning from the Supreme Court and through the practical explanation of what types of data will need to be collected by insurers, this rule will shift the burden of proof so dramatically for property-casualty insurance companies that they will unnecessarily face increased litigation and compliance costs. A broad interpretation of "abusive disparate-impact claims" and the requirement that insurers utilize a more favorable, and not risk-based, pricing model will lead to speculative litigation by entrepreneurial attorneys in federal courts throughout the country. Policyholders are never well-served when frivolous litigation is rewarded through regulatory expansion that expends the funds of insurers otherwise intended to protect their personal assets in the face of catastrophes.

Massachusetts consumers have learned the hard lesson of regulatory overreach in the property-casualty insurance market. At the beginning of the 2000s Massachusetts was in a 30-year cycle of trying to use regulations to preserve a broken-system of auto insurance rating, whereby the Commonwealth's Division of Insurance fixed and established rates for the market. As noted by Sharon Tennyson of Cornell University, who has completed numerous studies on the deleterious effect of overregulation in Massachusetts auto insurance market:

> "These forces were much in evidence under the fix-and-establish regulatory system that was in place in Massachusetts for 30 years. The state-determined rate grid that formed the basis for pricing by all insurers in the state provided substantial cross-subsidies across drivers. Attempts to preserve the cross-subsidies led to additional regulation of the market forces that might work to counteract them – including the definitions of the driver rate classes, the underwriting criteria used by insurers, residual market rates and deficits, and the exit of insurers from the market. As described previously, the regulations created many market distortions including reduced competition and increased claims costs. Yet, though these problems became clear by the late 1980s the regulations remained in force until 2008. This provides proof of the staying power of even unworkable regulations."

The proposed restatement, if implemented, will likely lead to similar unintended consequences, which will needlessly cause additional overregulation, until a point that the United States' home insurance market looks remarkably like the Massachusetts' auto insurance market circa 2003—high costs and little competition. It is in the interest of all policyholders that HUD abandon this mission of regulatory overreach.

Massachusetts policyholders are now beneficiaries of a competitive but well-regulated insurance market.  This proposed restatement will not enhance the experience of the Commonwealth's policyholders, but rather will institute redundant, unclear, and/or conflicting rules that will increase costs in a manner that is redistributed across all homeowners and renters in Massachusetts.   For these reasons, as well as those additional arguments presented by our colleagues at the National Association of Mutual Insurers and the American Property Casualty Insurance Association, we respectfully encourage the Department to withdraw this proposed rule.

Respectfully submitted,

Christopher Stark
Executive Director
Massachusetts Insurance Federation

JACK REED, RHODE ISLAND
ROBERT MENENDEZ, NEW JERSEY
JON TESTER, MONTANA
MARK WARNER, VIRGINIA
ELIZABETH WARREN, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
CATHERINE CORTEZ MASTO, NEVADA
TINA SMITH, MINNESOTA
KYRSTEN SINEMA, ARIZONA
JON OSSOFF, GEORGIA
RAPHAEL G. WARNOCK, GEORGIA

PATRICK J. TOOMEY, PENNSYLVANIA
RICHARD C. SHELBY, ALABAMA
MIKE CRAPO, IDAHO
TIM SCOTT, SOUTH CAROLINA
MIKE ROUNDS, SOUTH DAKOTA
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA
BILL HAGERTY, TENNESSEE
CYNTHIA M. LUMMIS, WYOMING
JERRY MORAN, KANSAS
KEVIN CRAMER, NORTH DAKOTA
STEVE DAINES, MONTANA

LAURA SWANSON, STAFF DIRECTOR
BRAD GRANTZ, REPUBLICAN STAFF DIRECTOR

**United States Senate**

COMMITTEE ON BANKING, HOUSING, AND
URBAN AFFAIRS
WASHINGTON, DC 20510–6075

August 26, 2021

The Honorable Marcia Fudge
Secretary
U.S. Department of Housing and Urban Development
451 7th Street SW
Washington, D.C. 20410

Dear Secretary Fudge:

I write to oppose the Department of Housing and Urban Development's (HUD) flawed proposed rule, "Reinstatement of HUD's Discriminatory Effects Standard" ("HUD's proposal") (Docket No. FR-6251-P-01), which would revert HUD's disparate impact regulations to those from HUD's 2013 disparate impact rule ("HUD's 2013 rule"). First, this proposal will likely harm housing consumers, particularly in the affordable housing market. Second, it willfully disregards the U.S. Supreme Court's 2015 decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities*, which outlined legal guardrails that govern disparate impact liability under the Fair Housing Act.[1]

From a policy standpoint, HUD's proposal to expand disparate impact liability will choke access to credit, raise housing costs, and reduce fair and affordable housing for all Americans. Lenders may exit the mortgage business just to avoid increased disparate impact litigation. One unfair disparate impact lawsuit could put a community bank out of business.[2] Further, the misalignment between HUD's 2013 rule and *Inclusive Communities*, discussed below, will create even further unnecessary and costly litigation over what guardrails govern disparate impact. This handout to trial lawyers could harm any and every housing provider, regardless of the provider's good intentions or who it serves. Ultimately, all types of housing consumers may suffer.

---

[1] 135 S. Ct. 2507 (2015).

[2] *See*, e.g., Minnesota Bankers Association, Comment Letter on Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (Aug. 20, 2018), https://www.regulations.gov/comment/HUD-2018-0047-0381 ("A strong, family-owned, community bank in Minnesota recently sold after the government used statistics to make a disparate treatment case against them under Regulation B using a disparate impact theory. Although there was no evidence in that case of discrimination, intentional or otherwise and although the government's theory was unsupported by the law, the court mistakenly allowed the case to proceed on the basis of tortured data, forcing the bank to settle rather than face a lengthy, prohibitively expensive, court fight against a government agency with unlimited resources. Soon after settling, the bank was sold to a regional bank. Because the cost of a court battle alone is enough to push a community bank out of business, it is imperative that there be strong gatekeeping of disparate impact claims.").

In contrast, as *Inclusive Communities* outlined, limiting disparate impact liability allows "employers and other[s] . . . to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system."[3] It also protects judges from "second-guess[ing]" a defendant's choice between "two reasonable approaches."[4] Finally, it avoids forcing "race to be used and considered in a pervasive way" that would almost inevitably result in the adoption of quotas.[5]

HUD's proposal is also legally flawed because reinstating HUD's 2013 rule disregards the Supreme Court's precedent in *Inclusive Communities*. As the U.S. Court of Appeals for the Fifth Circuit has noted, *Inclusive Communities* "announce[d] a more demanding test [for disparate impact] than that set forth in [HUD's 2013] rule."[6] Unlike HUD's 2013 rule, HUD's 2020 disparate impact rule incorporates the legal guardrails in *Inclusive Communities* for disparate impact liability. HUD's proposal discards these standards, which included requiring plaintiffs to:

- Establish "robust causality" between a plaintiff's policy and the alleged harm;[7]
- Identify a specific policy or policies that caused the disparity, not just a one-off decision or general racial disparities in outcomes;[8] and
- Prove that the policy is an "arbitrary, artificial, and unnecessary barrier" to fair housing.[9]

Further, under *Inclusive Communities,* disparate impact cases need "adequate safeguards at the prima facie stage."[10] Courts must carefully examine if a "plaintiff has made out a prima facie case and prompt resolution of these cases is important."[11] This discourages non-meritorious suits from reaching the costly discovery phase, which could force plaintiffs to settle rather than fight a non-legitimate claim.

HUD attempts to justify reinstatement of its 2013 rule by arguing, in part, that *Inclusive Communities* cited HUD's 2013 rule with approval and that HUD's 2013 rule incorporates any existing limits on disparate impact liability.[12] Such argument ignores the legal rationale for HUD's 2020 disparate impact rule (the need for guardrails) and gives the public the impression that the Supreme Court took a position it did not with respect to HUD's 2013 rule.

---

[3] *Inclusive Communities*, 135 S. Ct. at 2518.
[4] *Id.* at 2512.
[5] *Id.* at 2523 (*quoting Wards Cove Packing Co. v. Atonio*, 490 U. S. 642, 653 (1989).
[6] *Inclusive Communities Project v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019).
[7] *Inclusive Communities*, 135 S. Ct. at 2523.
[8] *Id.*
[9] *Id.* at 2512; 2524.
[10] *Id.* at 2523.
[11] *Id.*
[12] Reinstatement of HUD's Discriminatory Effects Standard, 86 Fed. Reg. 33,590, 33,594 (proposed June 25, 2021).

In short, HUD's proposal is flawed as a policy and legal matter. I too want to fight housing discrimination and expand affordable housing. But willfully disregarding Supreme Court precedent to achieve a predetermined, politically motivated outcome that will likely harm consumers advances neither goal.

Sincerely,

Pat Toomey
Ranking Member