## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–6251–F–02]**

**RIN 2529–AB02**

### Reinstatement of HUD's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, U.S. Department of Housing and Urban Development (HUD).

**ACTION:** Final rule.

**SUMMARY:** The Fair Housing Act prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities. This prohibition extends to practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate. In 2013, HUD published a rule which formalized a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect. In 2020, HUD published a rule that would have altered the standards set forth in the 2013 rule. However, a preliminary injunction prevented the 2020 rule from ever going into effect. On June 25, 2021, HUD published a proposed rule to recodify the 2013 rule. After considering public comments, HUD in this final rule reinstates and maintains the 2013 rule and rescinds the 2020 rule.

**DATES:** *Effective:* May 1, 2023.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410–0500, or telephone number 202–402–3330 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

*The Fair Housing Act and Its Goals*

Title VIII of the Civil Rights Act of 1968, as amended ("Fair Housing Act" or "Act"), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities because of race, color, religion, sex (including sexual orientation and gender identity), disability, familial status, or national origin.[1] Through the Act, Congress expressed its intent to eradicate discrimination and proclaimed that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [2] The Act's protections are meant to be "broad and inclusive." [3] Congress passed the Act in the wake of the assassination of Dr. Martin Luther King, Jr., recognizing that "residential segregation and unequal housing and economic conditions in the inner cities" were "significant, underlying causes of the social unrest" [4] and that both open and covert race discrimination were preventing integrated communities.[5] As the Supreme Court reiterated more recently, the Act's expansive purpose is to "eradicate discriminatory practices within a sector of the Nation's economy" and to combat and prevent segregation and discrimination in housing.[6] Congress considered the realization of this policy "to be of the highest priority." [7]

The Act gives HUD the authority and responsibility for administering and enforcing the Act, including the authority to conduct formal adjudications of complaints and to promulgate rules to interpret and carry out the Act.[8] Through that authority, HUD promulgates this rule.

*Discriminatory Effects Law Under the Fair Housing Act Prior to HUD's 2013 Rule*

HUD's 2013 rule, titled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("2013 Rule"), broke no new ground, but instead largely codified longstanding judicial and agency consensus regarding discriminatory effects law. Courts had long found that discrimination under the Act may be established through evidence of discriminatory effects, *i.e.,* facially neutral practices with an unjustified discriminatory effect. Indeed, before HUD's issuance of the 2013 rule, all federal courts of appeals to have addressed the question had held that liability under the Act could be established by a showing that a neutral policy or practice either has a disparate impact on a protected group or creates, perpetuates, or increases segregation, even if such a policy or practice was not adopted for a discriminatory purpose.[9] As the Sixth Circuit explained, the Act "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." [10]

Consistent with this judicial consensus, HUD has for decades concluded that facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent, violate the Act.[11] For example, in 1994, HUD, along with nine other agencies and the Department of Justice, issued a

---

[1] 42 U.S.C. 3601–3619, 3631. This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap." *See, e.g., Hunt* v. *Aimco Props., L.P.,* 814 F.3d 1213, n.1 (11th Cir. 2016) (noting the term disability is generally preferred over handicap).

[2] 42 U.S.C. 3601.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972).

[4] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 529 (2015) (citing Report of the National Advisory Commission on Civil Disorders 91 (1968) (Kerner Commission Report).

[5] *Id.* at 529 (citing Kerner Commission Report).

[6] *Id.* at 539.

[7] *Trafficante,* 409 U.S. at 211 (1972).

[8] *See* 42 U.S.C. 3608(a), 3612, 3614a. The Supreme Court has recognized HUD's rulemaking authority in the specific context of this rule. *See Inclusive Cmtys. Project,* 576 U.S. at 527–28, 542; *see also id.* at 566–67 (Alito, J., dissenting) ("Congress also gave [HUD] rulemaking authority and the power to adjudicate certain housing claims").

[9] *See, e.g., Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (citing *Arthur* v. *City of Toledo, 782 F.2d 565, 575 (6th Cir. 1986)); Hallmark Developers, Inc.* v. *Fulton Cnty.,* 466 F.3d 1276, 1286 (11th Cir. 2006) (citing *Hous. Investors, Inc.* v. *City of Clanton, Ala.,* 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999)); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988) (citing *Metro Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), *aff'd,* 488 U.S. 15 (1988) *(per curium); Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987 n.3 (4th Cir. 1984) (citing *Metro Hous. Dev. Corp* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977)); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) (citing *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209–10 (1972)); *United States.* v. *City of Black Jack,* 508 F. 2d 1179, 1184–86 (8th Cir. 1974).

[10] *Graoch Assocs. #33, L.P., 508 F.3d* at 374 (quoting *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971) (a Title VII case)).

[11] 78 FR 11460, 11461 (Feb. 15, 2013) (*citing, e.g., HUD* v. *Twinbrook Vill.Apts.,* HUDALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Carlson,* No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD* v. *Ross,* No. 01–92–0466–18, 1994 WL 324637, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral practices which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter,* No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

joint policy statement that recognized disparate impact liability under the Act.[12] Although there had been some minor variation in the application of the discriminatory effects framework prior to the 2013 Rule, HUD and the federal appellate courts were largely in agreement. HUD has always used a three-step burden-shifting approach,[13] as did many federal courts of appeals prior to the 2013 Rule.[14]

*HUD's 2013 Discriminatory Effects Rule*

In February 2013, after notice and public comment, and considering decades of case law, HUD published the 2013 Final Rule.[15] The 2013 Rule ''formalize[d] [HUD's] long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalize[d] a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act.'' [16] In promulgating the 2013 Rule, HUD noted the Act's ''broad remedial intent;'' [17] HUD's prior positions, including that discriminatory effects liability was ''imperative to the success of civil rights law enforcement;'' [18] and the consistent application of discriminatory effects liability in the four previous decades (with minor variations) by HUD, the Department of Justice, nine other federal agencies, and federal courts.[19]

Among other things, the 2013 Rule codified a three-part burden-shifting framework consistent with frameworks on which HUD and courts had long relied: (1) The plaintiff or charging party is first required to prove as part of the prima facie showing that a challenged practice caused or predictably will cause a discriminatory effect; (2) if the plaintiff or charging party makes this prima facie showing, the defendant or respondent must then prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the defendant or respondent; and (3) if the defendant or respondent meets its burden at step two, the plaintiff or charging party may still prevail by proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.[20]

*The 2015 Inclusive Communities Supreme Court Decision*

In 2015, the Supreme Court confirmed that the Act provides for discriminatory effects liability in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*[21] The State of Texas presented two questions to the Court (1) Whether disparate-impact claims are cognizable under the Act, and (2) if they are, what standards and burdens of proof should apply,[22] but the Court declined to consider the second question.[23] On the first question, the Court found that disparate-impact claims are cognizable, concluding that Congress's use of the phrase ''otherwise make unavailable'' in Section 804(a) of the Act and the term ''discriminate'' in Section 805(a) are each parallel to language that the Court had previously held to provide for discriminatory effects liability under other civil rights statutes.[24]

In reaching this holding, the Court explained that from its first decision to recognize disparate impact liability, in *Griggs* v. *Duke Power Co.,* it ''put important limits'' on the scope of liability.[25] For example, with respect to employment discrimination claims under Title VII of the Civil Rights Act of 1964, *Griggs* explained that an employer can justify a practice that has a disparate impact with a ''business necessity'' defense, such that Title VII ''does not prohibit hiring criteria with a 'manifest relationship' to job performance.'' [26] Similarly, after holding that the Act provided for disparate impact liability, the *Inclusive Communities* Court noted that, under the Act, ''disparate-impact liability has always been properly limited in key respects . . .'' [27] Quoting *Griggs,* the Court explained that it has always been true that disparate impact liability under the Act ''mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies.'' [28]

The Court then sketched out some of these long-standing limitations on the scope of disparate-impact liability, including: (1) The requirement that ''housing authorities and private developers [have] leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard under Title VII;'' and (2) the requirement that a ''claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity.'' [29]

*HUD's 2016 Notice: Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance*

In 2016, HUD published a document (''2016 Notice'') supplementing its response to certain comments concerning homeowners' insurance received during rulemaking for the 2013 Rule in accordance with the district court's decision in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan.*[30] In that Notice, HUD stated, among other things, that ''[a]fter careful reconsideration of the insurance industry comments in accordance with the court's decision . . . HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair

---

[12] 78 FR 11460, 11461 (citing 1994 Joint Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994)).

[13] *See, e.g., HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *Twinbrook Vill. Apts.,* HUDALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *see also* 1994 Joint Policy Statement on Discrimination in Lending, 59 FR. 18266, 18269 (Apr. 15, 1994) (applying three-step test without specifying where the burden lies at each step).

[14] *See, e.g., Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Lapid-Laurel* v. *Zoning Bd. of Adjustment,* 284 F.3d 442, 466–67 (3d Cir. 2002); *Huntington Branch NAACP* v. *Town of Huntington,* 844 F.2d 926, 939 (2d Cir. 1988).

[15] 78 FR 11459.

[16] 78 FR 11460.

[17] *See also* 2011 Notice of Proposed Rulemaking, 76 FR 70922 (Nov. 16, 2011) (''In keeping with the 'broad remedial intent' of Congress in passing the Fair Housing Act, and consequently the Act's entitlement to a 'generous construction' HUD . . . has repeatedly determined that the Fair Housing Act is directed to the consequences of housing practices, not simply their purpose.'') (citing *Havens Realty Corp* v. *Coleman,* 455 U.S. 363, 380 (1982); *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731–732 (1995) (internal citations removed)).

[18] 78 FR 11460, 11461 (citing 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary)).

[19] 78 FR 11460, 11461–62.

[20] 78 FR 11460, 11482; *see, e.g., Inclusive Cmtys. Project, Inc.,* 576 U.S. at 527 (overviewing the 2013 Rule's burden shifting framework).

[21] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 519, 519, 532–35.

[22] *See* Petition for a Writ of Certiorari, in *Tex. Dep't of Hous. & Cmty. Affairs et al.,* v. *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991, 2014 U.S. S. Ct. Briefs LEXIS 1848, at *9; *See Questions Presented in, https://www.supremecourt.gov/qp/13-01371qp.pdf.*

[23] *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991 (2014), 2014 U.S. LEXIS 4912 at *1 (''Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit granted limited to Question 1 presented by the petition.''); *See also Questions Presented in, Inclusive Cmtys Project, Inc.,* 573 U.S. 991.

[24] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 534 (citing *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971); *Bd. of Educ.* v. *Harris,* 444 U.S. 130 (1979); *Smith* v. *City of Jackson,* 544 U.S. 228, 233 (2005).

[25] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 531.

[26] *Id.* (quoting *Griggs,* 401 U.S. at 431–32).

[27] *Id.* at 540.

[28] *Id.* (quoting *Griggs,* 401 U.S. at 431).

[29] *Id.* at 541, 542.

[30] 81 FR 69012–13.

**19452** **Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

housing objectives and obligations embodied in the Act'' and that ''commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis.'' [31]

*HUD's 2020 Disparate Impact Rule*

On June 20, 2018, HUD published an Advance Notice of Proposed Rulemaking (''ANPRM''), inviting public comment on ''what changes, if any'' to the 2013 Rule were necessary as a result of *Inclusive Communities*.[32] HUD then published a Notice of Proposed Rulemaking on August 19, 2019 (''2019 Proposed Rule'') proposing to change the 2013 Rule.[33]

In response to the 2019 Proposed Rule, HUD received approximately 45,000 comments, most of which opposed the proposed changes and many of which raised significant legal and policy concerns with the 2019 Proposed Rule. Commenters objected that the proposed changes did not align with case law, created problematic defenses, and made discriminatory effects claims effectively impossible to plead and prove in many instances, thus contravening the core holding of *Inclusive Communities*.[34] On September 24, 2020, HUD published a final rule titled ''HUD's implementation of the Fair Housing Act's Disparate Impact Standard'' (''2020 Rule''), which, among other things removed the definition of discriminatory effect, added demanding pleading elements that made it far more difficult to establish a case, altered the burden-shifting framework, created new defenses, and limited available remedies in disparate impact claims.[35]

*Massachusetts Fair Housing Ctr. v. HUD Order Staying Implementation of the 2020 Rule*

Following publication of the 2020 Rule, HUD was sued in three separate federal courts—: *Massachusetts Fair Housing Ctr., et al.* v. *HUD,* No. 3:20–cv–11765 (D. Mass.); *Nat'l Fair Hous. All., et al.* v. *HUD,* No. 3:20–cv–07388 (N.D. Cal.); *Open Cmtys., et al.* v. *HUD,* No. 3:20–cv–01587 (D. Conn.). The plaintiffs in each case contended that the 2020 Rule was invalid because it was inconsistent with the Act and its promulgation violated the Administrative Procedure Act (''APA''). Prior to the effective date of the 2020 Rule, the U.S. District Court for the

District of Massachusetts in *Massachusetts Fair Housing Ctr.* v. *HUD* issued a preliminary injunction staying the implementation and postponing the effective date of the 2020 Rule.[36] Because of this preliminary injunction, the 2020 Rule never took effect, and the 2013 Rule remained in effect.

In its order, the district court preliminarily found that many significant changes made by the 2020 Rule were likely not supported by *Inclusive Communities* or other case law. Similarly, the court concluded that the 2020 Rule did not appear to bring the clarity to the discriminatory effects framework that it was intended to foster, but rather introduced new concepts that had never been part of disparate impact case law without fully explaining their meaning. In support of its conclusions, the court identified numerous provisions in the 2020 Rule as problematic, including § 100.500(b) (''requiring at 'the pleadings stage,' among other things, that plaintiffs 'sufficiently plead facts to support' . . . '[t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law' ''); § 100.500(c)(2) (permitting defendants to '' 'rebut a plaintiff's allegation under (b)(1) . . . that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice' merely '*advances a valid interest*' '') (emphasis in original); § 100.500(c)(3) (requiring ''at the third step of the burden-shifting framework that the plaintiff prove 'a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an *equally effective manner without imposing materially greater costs* on, or creating *other material burdens* for, the defendant' '' (emphasis in original)); § 100.500(d)(1) and (d)(2)(iii) (''conflating of a plaintiff's prima facie burden and pleading burden''); and § 100.500(d)(2)(i) (the outcome prediction defense).[37]

The district court found that the ''practical business, profit, policy consideration'' language, the ''outcome prediction'' defense, changes to the third element of the burden-shifting framework, and the conflating of a plaintiff's prima facie burden and pleading burden, ran the risk of ''effectively neutering'' discriminatory effects liability under the Act, and were

all likely unsupported by *Inclusive Communities* or other judicial decisions.[38] The district court also stated that the 2020 Rule's use of ''new and undefined terminology altered the burden-shifting framework, and perplexing defenses'' accomplished ''the opposite of clarity'' and were likely ''arbitrary and capricious.'' [39] The court stated that ''[t]here can be no doubt that the 2020 Rule weakens, for housing discrimination victims and fair housing organizations, disparate impact liability under the Fair Housing Act. . . . In addition, the 2020 Rule arms defendants with broad new defenses which appear to make it easier for offending defendants to dodge liability and more difficult for plaintiffs to succeed. In short, these changes constitute a massive overhaul of HUD's disparate impact standards, to the benefit of putative defendants and to the detriment of putative plaintiffs.'' [40]

*HUD's Reconsideration of the 2020 Rule and the 2021 Notice of Proposed Rulemaking*

On January 26, 2021, President Biden issued a Memorandum ordering the Department to ''take all steps necessary to examine the effects of the [2020 Rule], including the effect that amending the [2013 Rule] has had on HUD's statutory duty to ensure compliance with the Fair Housing Act'' and ''take any necessary steps . . . to implement the Fair Housing Act's requirements that HUD administer its programs in a manner that . . . furthers . . . HUD's overall duty to administer the Act [] including by preventing practices with an unjustified discriminatory effect.'' [41]

Consistent with the President's Memorandum, HUD began a process to reconsider the 2020 Rule. On June 25, 2021, after reviewing prior public comments on the previous rulemakings described above, HUD's responses to those comments, HUD's 2016 supplemental explanation regarding the 2013 Rule's applicability to the insurance industry, legal precedent including *Inclusive Communities,* the *Massachusetts Fair Housing Center* court's order, and HUD's own experience with discriminatory effects cases over 40 years, HUD promulgated a proposed rule titled ''Reinstatement of HUD's Discriminatory Effects Standard'' (''proposed rule'') that proposed to recodify the 2013 Rule.[42] The proposed

---

[31] *Id.*

[32] 83 FR 28560.

[33] 84 FR 42854.

[34] *See, e.g.,* 85 FR 60317, 60319 (overview of some of the comments making these points).

[35] 85 FR 60288.

[36] *Mass. Fair Hous. Ctr.* v. *United States HUD,* 496 F. Supp. 3d 600, 611 (D. Mass. Oct. 25, 2020).

[37] *Id.* at 605–07, n.2, 610–11.

[38] *Id.* at 611.

[39] *Id.*

[40] *Id.* at 607.

[41] *See* 86 FR 7487, 7488.

[42] 86 FR 33590.

rule advocated returning to the 2013 Rule because HUD believed that the 2013 Rule established a workable framework that was more consistent with existing case law and the purpose of the Act than the 2020 Rule.

As HUD described in the proposed rule, in HUD's experience, the 2013 Rule set a more appropriately balanced standard for pleading, proving, and defending a fair housing case alleging that a policy or practice has a discriminatory effect. HUD believed that the 2013 Rule provided greater clarity about what each party must show by relying on concepts that have a long history in judicial and agency precedent and that it appropriately balanced the need to ensure that frivolous claims do not go forward with a realistic understanding of the practical challenges to litigating these claims. With regard to the 2020 Rule, HUD's experience investigating and prosecuting discriminatory effects cases informed its views that many of the points made by commenters and the District Court in *Massachusetts Fair Housing Center* were, in HUD's opinion, correct. In particular, the changes the 2020 Rule made, such as amending pleading standards, changing the burden shifting framework, and adding defenses, all operated to tip the scales in favor of respondents, introduced unnecessary confusion, may have precluded otherwise valid claims, and, at worst would have made discriminatory effects liability a practical nullity.

HUD further stated its belief that the 2013 Rule was more consistent with the Act's purpose; prior case law under the Act, including *Inclusive Communities;* other civil rights authorities, including the Equal Credit Opportunity Act and Title VII; and HUD's prior interpretations of the Act. In its 2020 Rule, HUD noted that the rule was intended to better reflect *Inclusive Communities,* but HUD now believes that the 2020 Rule was itself inconsistent with the holding of *Inclusive Communities,* which maintained the fundamentals of long-established disparate-impact precedent rather than changing them. Moreover, based on HUD's experience investigating and litigating discriminatory effects cases, HUD believed that the practical effect of the 2020 Rule's amendments was to severely limit HUD's and plaintiffs' use of the discriminatory effects framework in ways that would substantially diminish that framework's effectiveness in accomplishing the purposes that *Inclusive Communities* articulated.

By comparison, in HUD's experience, the 2013 Rule provided a workable and balanced framework for investigating and litigating discriminatory effects claims that is consistent with the Act, HUD's own guidance, *Inclusive Communities,* and other jurisprudence.

HUD noted that *Inclusive Communities* heavily relied on *Griggs,* which is the foundation of Title VII disparate impact jurisprudence, to illustrate the well-settled principles of disparate impact under the Act, and HUD believed *Inclusive Communities* to be fully supportive of the 2013 Rule. *Inclusive Communities* explained that in *Griggs,* "[w]hat is required by Congress [in Title VII cases] is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."[43] Quoting from its foundational decision in *Griggs,* the Supreme Court in *Inclusive Communities* observed that "[d]isparate impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies."[44] HUD proposed that this quotation from a seminal decision of longstanding disparate impact doctrine is properly read as maintaining existing law, not changing it. HUD highlighted that *Inclusive Communities* explicitly stated, "disparate-impact liability *has always been* properly limited in key respects" (emphasis added), making clear that the Court was not adding additional pleading or proof requirements or calling for a significant departure from pre-existing precedent under the Act and Title VII.[45] Furthermore, HUD stated that reading *Inclusive Communities* to support a heightened pleading standard is contradicted by the fact that the "heartland" cases cited by the Court would not have survived a motion to dismiss under that standard because plaintiffs in those cases did not have specific facts to plausibly allege that a policy or practice was arbitrary, artificial, or unnecessary until after discovery.[46] Finally, HUD explained

that because *Inclusive Communities* considered a judgment reached after discovery and bench trial, the Court had no occasion or opportunity to consider the proper pleading standards for cases brought under the Act. The parties did not brief or argue such questions to the Court, making it particularly unlikely that the Court intended to reach them.

For these reasons and others, HUD proposed that *Inclusive Communities'* quotation of *Griggs'* decades-old "artificial, arbitrary, and unnecessary" formulation would be best construed as maintaining continuity with longstanding disparate-impact jurisprudence, as reflected in the 2013 Rule.[47] HUD stated in the proposed rule its belief that other changes the 2020 Rule made would create problems that could be cured by a return to the 2013 Rule. For example, the 2020 Rule eliminated the 2013 Rule's definition of "discriminatory effect," stating that the definition was unnecessary because it "simply reiterated the elements of a disparate impact claim."[48] In eliminating this definition, the 2020 Rule erased "perpetuation of segregation" as a recognized type of discriminatory effect distinct from disparate impact, which was contrary to well established precedent. HUD proposed to reaffirm that perpetuation of segregation remains, as it always had been, a basis for contending that a policy has an unlawful discriminatory effect.

HUD described how the 2020 Rule also eliminated from the Act's prohibitions policies or practices that could "predictably result[] in a disparate impact on a group of persons," *i.e.,* those for which the disparate impact has not yet manifested but will predictably do so. HUD noted, as it stated in 2013, that the Act prohibits discrimination that is predictable because it defines an "aggrieved person" as any person who "believes that such person will be injured by a discriminatory housing practice that is about to occur."[49] HUD noted that courts have found that predictable discriminatory effects may violate the Act: "[t]o establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory

[43] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 578.
[44] *Id.* at 540.
[45] *Id.*
[46] *See, e.g., Town of Huntington, NY* v. *Huntington Branch,* NAACP, 488 U.S. 15 (1988); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184, 1187–88 (8th Cir. 1974) (specific facts produced during the case supported the court's determination that the policy was one of those "artificial, arbitrary, and unnecessary" practices that is properly invalidated under disparate impact doctrine); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish,* 641 F. Supp. 2d 563, 567–

568 (E.D. La. 2009) (relying on information gathered after the pleadings to find disparate impact).
[47] 86 FR 33594–5.
[48] 84 FR 42858.
[49] 42 U.S.C. 3602(i)(2).

**19454** Federal Register / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

effect."[50] HUD stated in the proposed rule that the 2020 Rule did not adequately explain how the Act and case law construing it can be read to require waiting until harm is inflicted before an action with predictable discriminatory effects can be challenged, nor did HUD perceive that any such explanation would be availing, given the plain language of the Act and the case law interpreting it.

In addition, in the 2021 proposed rule, HUD recognized and agreed with concerns that the 2020 Rule created new and confusing defenses at both the pleading and post-pleading stage, including the new defense allowing a defendant to show that the challenged policy or practice is "reasonably necessary to comply with a third-party requirement."[51] The 2020 Rule's preamble stated that this defense would not require a showing that the challenged policy is the only way to comply with such a requirement, only that the policy serves that purpose. In the 2021 proposed rule, HUD stated that this new defense was inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid. HUD expressed its concern that the defense would preclude many otherwise proper discriminatory effects claims, because, for example, a plaintiff may not have any practical means of knowing whether some other party's policies also contributed to the defendant's practice. HUD reasoned that nothing in *Inclusive Communities* suggests this defense is required, let alone reasonable, for the agency to create.

HUD noted further in the proposed rule that the 2020 Rule also created a new "outcome prediction" defense which HUD believed would in practice exempt most insurance industry practices (and many other housing-related practices that rely on outcome predictions, such as lending practices) from liability under a disparate impact standard.[52] In the proposed rule, HUD stated that it considered this defense to be inconsistent with HUD's repeated finding, including in the 2020 Rule, that "a general waiver of disparate impact law for the insurance industry would be inappropriate." HUD reconsidered the defense and explained in the proposed rule that it believed the defense was unclear and would suggest that comparators be used, which were, in

HUD's experience, inappropriate. HUD stated that at the very least, the defense would introduce unnecessary confusion into the doctrine.

In the proposed rule, HUD explained that the 2020 Rule inappropriately limited remedies in discriminatory effects cases in three respects. It specified that "remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons." It prohibited HUD in administrative proceedings from pursuing anything but "equitable remedies" except that "where pecuniary damage is proved, HUD will seek compensatory damages or restitution." And it restricted HUD from seeking civil penalties in discriminatory effects cases unless the respondent had been adjudged within the last 5 years to have committed intentional unlawful housing discrimination under the Act. In the proposed rule, HUD proposed that these limitations have no basis in law and run contrary to public interest and the purpose of the Act. While the 2020 Rule cited *Inclusive Communities* as supporting these limitations, HUD noted that no part of *Inclusive Communities* suggested such limitations. Moreover, HUD viewed these limitations as in conflict with the plain language of the Act, which provides in all cases for a wide variety of remedies, including injunctive relief, actual damages, punitive damages, and civil penalties. HUD clarified that whereas Congress explicitly has limited the remedies available in disparate impact cases under Title VII, it has chosen not to do so in cases brought under the Act.

In sum, HUD stated in the proposed rule that it believed that the 2013 Rule would be preferable to the 2020 Rule. It believed the 2013 Rule would be more consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities*, as well as the Act's broad remedial purpose. Based on its experience interpreting and enforcing the Act, HUD also believed the 2020 Rule, if put into effect, threatened to limit the effectiveness of the Act's discriminatory effects doctrine in ways that are inconsistent with the doctrine continuing to play its critical role in "moving the Nation to a more integrated society."[53] Furthermore, HUD stated that it believed that the 2013 Rule provided clarity, consistency, and a workable, balanced framework, recognized by the Supreme Court, under which to analyze discriminatory effects

claims, and under which HUD could better ensure it has the tools to further its "duty to administer the Act [ ] including by preventing practices with an unjustified discriminatory effect."[54]

## II. This Final Rule

HUD received 10,113 comments in response to the proposed rule. HUD reviewed and carefully considered these comments and, as explained in the responses to the comments below, HUD has decided to recodify the 2013 Rule. HUD has confirmed that the concerns it expressed in the proposed rule are consistent with the public comments received in response to the proposed rule, HUD's previous rulemakings and notices, and relevant discriminatory effects case law under the Act, including cases using the 2013 Rule and the 2020 Rule.

HUD continues to believe that, as compared to the 2020 Rule, the 2013 Rule more accurately describes discriminatory effects law in a manner that is consistent with both the Act and the Supreme Court's ruling in *Inclusive Communities*. As in the 2013 Rule, this final rule does not impose any new liability, but merely provides a consistent, nationwide framework for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act. HUD believes the 2013 Rule best aligns with Fair Housing Act jurisprudence and is most consistent with the Act's remedial purposes. As described in greater detail below, HUD believes that the 2013 standard is consistent with and was implicitly endorsed by *Inclusive Communities*.

Moreover, even if the 2020 Rule were a permissible approach to discriminatory effects law and HUD had no doubts about the legality or appropriateness of the 2020 Rule under the Act, HUD would recodify the 2013 Rule as an exercise of the discretion Congress gave HUD to make rules under the Act.[55] The 2013 Rule's framework is practical and, in contrast to the novel and complicated 2020 Rule, has worked well in discriminatory effects cases. The 2013 Rule's framework adequately balances the interests of plaintiffs[56] and defendants and encourages the latter to seek a less discriminatory alternative

---

[50] *See Inclusive Cmtys. Project, Inc.*, 576 U.S. at 539–40 (describing *City of Black Jack*, 508 F.2d at 1184 as "at the heartland of disparate-impact liability").

[51] 24 CFR 100.500(d)(1); 85 FR 60333.

[52] 24 CFR 100.500(d)(2)(i), 85 FR 60319, 60333.

[53] *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 547.

[54] 86 FR 33594.

[55] *See generally* 42 U.S.C. 3614a.

[56] In the HUD administrative hearing process, HUD is referred to as the charging party and the housing providers who are alleged to have violated the Act are referred to as respondents. *See* 24 CFR 100.500. Rather than repeat those terms throughout this preamble, HUD uses the terms plaintiff and defendant to include the charging party and respondent.

when a policy or practice causes a discriminatory effect, without imposing an excessive burden on their substantial, legitimate, non-discriminatory interests. As described in greater detail below, HUD declines to create any exemptions or safe harbors in this rule or to proscribe specific conduct that per se has an unjustified discriminatory effect. As *Inclusive Communities* recognized in affirming that discriminatory effects claims are cognizable under the Act, "the [Fair Housing Act] must play an important part in avoiding the Kerner Commission's grim prophecy that '[o]ur Nation is moving toward two societies, one black, one white—separate and unequal.'"[57] For the reasons discussed in HUD's 2013 Rule, in the proposed rule, and below in response to the public comments, HUD rescinds the 2020 Rule and recodifies the 2013 Rule.

HUD adopts one amendment made by the 2020 Rule to HUD's general fair housing regulations at § 100.70(d)(5). This amendment provides additional illustrations of prohibited activities under the Fair Housing Act generally, though it is not specific to discriminatory effects cases. HUD proposed keeping these additional examples in the proposed rule and received no public comments specifically opposing these additions. In this final rule's amendatory instructions, HUD includes instructions to "republish" § 100.70(d)(5) without change from the 2020 Rule to clearly show that HUD is adopting this language in this final rule.

## III. Public Comments

*General Comments in Support*

Commenters generally supported the proposed rule, which would reinstate the 2013 Rule. Commenters stated that the proposed rule is consistent with President Biden's memorandum directing agencies to redress America's history of housing discrimination and the 1994 interagency fair lending guidance under the Act and the Equal Credit Opportunity Act. Commenters also stated that the proposed rule is an important and appropriate exercise of HUD's rulemaking authority.

Among the supportive comments were those stating that the proposed rule: is appropriately broad, inclusive, and will be instrumental in ensuring optimal compliance with the Act and in challenging covert or latent discrimination that can be intentionally

or unintentionally embedded in facially neutral policies and practices; is critical for ensuring equal opportunity under the Act; would help secure equal opportunity in a wide variety of housing areas, including in land use and zoning, affordable and public housing, environmental permitting, air quality, and utility burdens; would be effective in protecting against housing discrimination based on all of the Act's protected characteristics, as well as related groups such as persons without English language proficiency or who are survivors of domestic violence or sexual assault; would advance sustainable homeownership and affordable housing programs; would benefit both real estate professionals and consumers; may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping; is essential to challenging blanket refusals to accept Housing Choice Vouchers, which are disproportionately used by people of color, households with children, and persons with disabilities; and would address de facto and de jure discrimination in housing policies, construction, and tenancy.

Commenters noted that the proposed rule's burden-shifting framework is consistent with long-standing case law, including *Inclusive Communities,* and well-established agency practice. Commenters explained that the proposed rule contains the traditional burden shifting framework for disparate impact claims, which was endorsed by the Supreme Court in *Inclusive Communities* and is consistent with the framework for disparate impact claims under Title VII and the Equal Credit Opportunity Act.

Commenters stated that out of more than 40 federal appellate and district court decisions in disparate-impact fair housing cases following *Inclusive Communities,* very few, other than *Inclusive Communities Project* v. *Lincoln Prop. Co.,*[58] found any inconsistency between the 2013 Rule and the Supreme Court's *Inclusive Communities* decision. Commenters pointed to *Avenue 6E Investments, LLC* v. *City of Yuma,*[59] which cited the 2013 Rule as authority for the proper burden-shifting framework without noting any inconsistencies between that rule and *Inclusive Communities,* and *Mhany Mgmt., Inc.* v. *Cnty. of Nassau,*[60] which found that the Supreme Court implicitly endorsed the 2013 Rule's framework in

*Inclusive Communities.*[61] Commenters also noted that the court in *Mhany Mgmt., Inc.* v. *Cnty. of Nassau,* as well as numerous other cases successfully utilized the 2013 Rule's burden shifting framework to reach decisions.

Commenters supporting the proposed rule stated that it provides a clear, simple, and effective standard that would promote consistency between judicial and administrative venues and throughout the housing industry. Commenters explained that this standard would maintain continuity for regulated entities and enable them to better comply with the Act, since this regulatory framework has been in place since 2013. Commenters described the framework as pragmatic, fostering fair and sound business practices and finding the appropriate balance between fair housing concerns and business necessities.

Commenters expressed support for the burden-shifting framework, describing it as clear, easy to follow, practical, and striking the appropriate balance between competing interests. Commenters stated that the 2013 Rule settled the law on several important issues, including whether the burden-shifting framework is appropriate and which party bears the burden of demonstrating the business necessity for a particular policy and the existence of a less discriminatory alternative. A commenter noted that the 2013 Rule is a fair and accurate codification of longstanding jurisprudence of discriminatory effects liability under the Act and posed no significant departure from previous HUD interpretation or the weight of judicial authority. Commenters noted that plaintiff's burden under the proposed rule is not easy to meet, which eliminates the danger of an onslaught of groundless litigation. A commenter described the proposed rule as balancing the need to prevent frivolous claims from moving forward with a process that allows potentially meritorious claims to be substantiated or disproved. A commenter compared the proposed rule's three-tiered framework to the 2020 Rule's five-tiered test, noting that the former provides a clear way to challenge policies that may unnecessarily restrict housing, while the latter is vague and allows discrimination to continue unchallenged. Comments also stated that the 2020 Rule conflicted with decades of legal precedent, including

---

[57] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 546 (quoting Report of the National Advisory Commission on Civil Disorders 91 (1968) (Kerner Commission Report at 1).

[58] *Inclusive Communities Project* v. *Lincoln Prop. Co,* 920 F.3d 890 (5th Cir. 2019).

[59] *Avenue 6E Investments, LLC* v. *City of Yuma,* 818 F.3d 493, 510 (9th Cir. 2016).

[60] *Mhany Mgmt., Inc.* v. *Cnty. of Nassau.* 819 F.3d 581, 618–20 (2d Cir. 2016).

[61] *Avenue 6E Investments, LLC* v. *City of Yuma,* 818 F.3d 493, 510 (9th Cir. 2016); *Mhany Mgmt., Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–20 (2d Cir. 2016).

the Supreme Court's decision in *Inclusive Communities* and that discriminatory effects claims that sought to challenge neutral policies that actually caused discrimination would not survive under the test contained in the 2020 Rule.

*General Comments in Opposition*

Other commenters generally opposed the proposed rule, suggesting that HUD withdraw it and retain the 2020 Rule. A commenter stated that the 2020 Rule thoroughly explained its reasoning and was consistent with *Inclusive Communities.* Another commenter described the proposed rule as unclear and overly burdensome. Commenters also suggested that the proposed rule lacks limitations on how and where it applies, thus adding a new layer of complexity and uncertainty to discriminatory effects law. A commenter stated that the proposed rule would harm the people it purports to benefit by applying a complex, court-created legal framework to a public policy issue and requiring all issues to be resolved in expensive litigation in federal court. Another commenter stated that the proposed rule will not create a uniform mechanism to resolve discriminatory effects disputes but will instead encourage courts to develop alternative approaches to handling such cases. A commenter stated that HUD and others have used the 2013 Rule to bully housing providers into expanding access to housing even if landlords cite legitimate business reasons for restricting housing based on certain admission or occupancy policies.

*HUD Response:* HUD disagrees with the commenters who opposed the proposed rule. As discussed in the preamble to the proposed rule and elsewhere in this preamble, HUD believes that this final rule establishes the appropriate, balanced framework for assessing claims of discriminatory effects and is entirely consistent with *Inclusive Communities* and long-standing judicial precedent. In contrast, HUD finds that the 2020 rule, if retained, would limit liability in a manner inconsistent with the Act's purpose and judicial precedent. HUD further believes that some of the standards announced in the 2020 rule might lead some courts to develop alternative approaches to assessing discriminatory effects claims that are inconsistent with the text and broad remedial purposes of the Act. HUD believes that the framework in the proposed rule sets out a consistent nationwide approach to evaluating discriminatory effects claims and adopts the majority view of judicial opinions

interpreting the Act. As a result, this final rule affords housing providers the opportunity to maintain policies and practices so long as they do not have an unjustified discriminatory effect because of a protected characteristic. And it does not require allegations of discriminatory effects to be resolved in federal court. Rather, housing providers may avoid potential litigation and liability by reviewing their policies and practices to ensure that they do not have an unjustified discriminatory effect. The discriminatory effects framework is not intended to force housing providers to take any particular course of action but rather to ensure that an important goal of the Act—to safeguard fair housing throughout the country—is accomplished.

*General Comments Concerning Clarity*

*Issue:* Commenters disagreed about the clarity that would result from setting aside the 2020 Rule. A commenter stated that the 2020 Rule should be retracted because it created a legal landscape in which HUD, other federal regulators, and courts would have different standards for analyzing discriminatory effects claims, and because it created confusion that would disadvantage housing discrimination victims. However, other commenters asked HUD to retain the 2020 Rule so as to avoid confusion and uncertainty because different forms of the rule have been promulgated and retracted over the last several years. A commenter stated that HUD should recognize the practical implications of repeatedly and drastically changing policies and justification for those policies and requested that HUD solidify clear and consistent long-term standards in order to minimize confusion and uncertainty for federal funding recipients. The commenter said it makes little sense to change procedures with each new administration and that reinstating the 2013 Rule will provoke litigation and disputes between courts rather than provide clarity. Another commenter noted a particular concern about confusion for businesses and damage to their ability to know and comply with the law since litigation concerning the 2020 Rule is pending.

*HUD Response:* HUD agrees with the commenters who stated that the 2020 Rule introduced a new standard that is incompatible with the standards used by courts and other federal regulators, creating confusion and uncertainty. In contrast, this final rule will provide clarity consistent with well-established judicial and agency interpretations of the Act by eliminating the novel and undefined standards introduced by the

2020 Rule. HUD also notes that the 2020 Rule never went into effect and has never been enforced by HUD. HUD has considered potential reliance interests and believes that no significant reliance was created by the 2020 rule, because unlike a regulation that even briefly governed conduct or supplied benefits, the 2020 Rule never did so. While HUD proposed revising the rule in 2019 and subsequently issued a final rule in 2020, the 2013 Rule, which is recodified in this final rule, is and has been the only promulgated rule governing the standard for discriminatory effects liability that has ever taken effect since the Act became law in 1968. HUD agrees that the 2020 Rule introduced a new standard that is incompatible with the Act and with the standards used by courts and other federal regulators. Had HUD used the 2020 Rule, while other federal agencies and courts used rules analogous to the 2013 Rule or created their own rules in response to *Inclusive Communities,* there would be substantial confusion in discriminatory effects jurisprudence. HUD believes that it is important that those affected by or accused of discrimination know what standard governs their housing related activities and that that standard does not unnecessarily vary depending on the forum in which a case is decided. Having differing standards would increase litigation costs for the parties and likely result in the dismissal of claims in some forums that are upheld in others. Restoring the 2013 Rule will help ensure the consistency of federal discriminatory effects law and will avoid the confusion caused by the 2020 Rule.

This final rule sets out a usable and uniform framework that is fully consistent with the requirements established by courts, as well as the text and purpose of the Act.

*Comments Concerning Harmony Between Other State and Federal Civil Rights Statutes*

*Issue:* A commenter noted that the Rule will bring HUD's regulations back into conformity with state civil rights laws.

*HUD Response:* HUD acknowledges that many state courts and agencies that interpret and enforce civil rights laws utilize a burden-shifting framework that is similar to this final rule and that HUD's 2020 Rule created confusion and conflicting standards.[62] HUD believes that it is important for plaintiffs to have

[62] *See e.g., Tetro* v. *Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.,* 173 F.3d 988, 993 (6th Cir. 1999) (explaining that state civil rights statute is interpreted consistently with analysis used for federal civil rights statute).

access to consistent relief in state and federal jurisdictions.

*Issue:* Commenters applauded the rule for being consistent with other civil rights laws and their discriminatory effects liability frameworks, including Title VII and ECOA. A commenter also noted that courts, including the Supreme Court in *Inclusive Communities,* have often drawn on Title VII's jurisprudence when interpreting the Act and vice versa because of the similarities between the statutes' texts, structures, purposes, and dates of enactment. The commenter expressed support for the rule because it aligns with judicial precedent that interprets the Act and Title VII similarly. The commenter also stated that the proposed rule furthers the principle that language that is similar across statutes should be given similar meaning.

*HUD Response:* HUD agrees that the rule is consistent with other civil rights laws and their discriminatory effects liability frameworks, including Title VII of the Civil Rights Act of 1964, as amended (Title VII),[63] and the Equal Credit Opportunity Act (ECOA).[64] HUD acknowledges that courts have generally interpreted these statutes consistently and agrees that HUD should do the same to promote consistency and clarity, particularly for entities whose actions must be compliant with both ECOA and the Act.

HUD notes that the preamble to the 2013 Rule explained in great detail how its framework operates harmoniously with other civil rights laws, including Title VII and ECOA, and best effectuated the important goals of the Fair Housing Act.[65] As HUD noted in the 2013 Rule, the discriminatory effects framework borrowed from Title VII and *Griggs* is the fairest and most reasonable approach for resolving disparate impact claims, in part because it does not require either party to prove a negative, and it provides the parties the opportunity to obtain adequate information in discovery to meet their burdens.[66]

### Comments Concerning Massachusetts Fair Housing Center

*Issue:* Commenters stated that although the district court in *Massachusetts Fair Housing Center*[67] stayed implementation of the 2020 Rule, it did not require HUD to totally abandon the 2020 Rule. The

commenters stated that the decision primarily addressed three elements of the 2020 Rule—the outcome prediction defense, the requirement that plaintiffs present an equally effective alternative, and the conflation of the plaintiff's prima facie burden and their pleading burden. The commenters also stated that the court acknowledged the requirement that a plaintiff must plead that a challenged policy is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective," may have some grounding in case law. The commenters also stated that the court did not address the 2020 Rule's recognition that the Act does not and cannot supplant state laws concerning insurance, or its codification of *Inclusive Communities'* guidance on remedies.

Other commenters stated that *Massachusetts Fair Housing Center* criticized the 2020 Rule for introducing onerous pleading standards, defenses that lacked precedent in case law, for conflicting with the remedial purpose of the Act, and for likely being arbitrary and capricious.

*HUD Response:* While the *Massachusetts Fair Housing Center* court enjoined HUD from implementing or enforcing the 2020 Rule in any manner and ordered HUD to "preserve the status quo pursuant to the regulations in effect as of the date of this Order," [68] HUD is not basing its decision to abandon the 2020 Rule and recodify the 2013 Rule on the *Massachusetts Fair Housing Center* order. Rather, HUD declines to retain any part of the 2020 Rule's substantive disparate impact language based on its own interpretation of and decades of experience in implementing the Act. HUD also finds other aspects of the 2020 Rule that the court left unaddressed or uncriticized to be equally troublesome.

### Comments Concerning Inclusive Communities

*Issue:* Commenters supported reinstatement of the 2013 Rule because it is consistent with *Inclusive Communities.* Commenters stated that the Court cited the 2013 Rule with approval, noting each step in the 2013 Rule's burden-shifting framework without critique. Commenters also noted that multiple courts since *Inclusive Communities,* including courts of appeals, have read *Inclusive Communities* as affirming or implicitly adopting the 2013 Rule's burden-shifting test *and* have applied the 2013

Rule's framework.[69] A commenter pointed out that the district court in *Inclusive Communities* stated on remand that, "[a]s a result of the Fifth Circuit's decision adopting the HUD regulations, and the Supreme Court's affirmance (without altering the burden-shifting approach), the following proof regimen now applies to *ICP's* disparate impact claim under the [Act]." [70] A commenter also cited multiple district court decisions that have incorporated the language of *Inclusive Communities* when applying the 2013 Rule's framework.[71] Another commenter noted that *Inclusive Communities* endorsed "heartland" cases,[72] all of which used burden shifting frameworks consistent with the proposed rule. Commenters also stated that the 2020 Rule did not meaningfully address *MHANY Management, Inc., de Reyes v. Waples Mobile Home Park Limited Partnership,*

[69] *See. e.g., Mhany Mgmt., Inc.* v. *Cnty. of Nassau at 618–20; Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* 759 F. App'x 828, 834–35 (11th Cir. 2018); *de Reyes* v. *Waples Mobile Home Park L.P.,* 903 F.3d 415, 426 n.6, 428 (4th Cir. 2018); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29–30 (D.D.C. 2017); *Nat'l Fair Hous. All.* v. *Bank of Am., N.A.,* 401 F. Supp. 3d 619, 631–632 (D. Md. 2019); *See, e.g., River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *66–69, 72–73, 75–76 (M.D. Fla. June 4, 2021); *Jones* v. *City of Faribault,* No. 18–1643 (JRT/HB), 2021 U.S. Dist. LEXIS 36531, at *48–49 (D. Minn. Feb. 18, 2021); *Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Sols., LLC,* 478 F. Supp. 3d 259, 296 (Aug. 7, 2020) (and related decisions, *see CoreLogic,* No. 3:17–cv–705 (VLB), 2020 WL 401776 (D. Conn. Jan. 24, 2020)); *Borum* v. *Brentwood Vill., LLC,* 2020 U.S. Dist. LEXIS 54840, at *13 (D.D.C. Mar. 30, 2020); *NFHA* v. *Deutsche Bank Nat'l Trust,* 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019); *Yellowstone Women's First Step House Inc.* v. *City of Costa Mesa,* 2019 U.S. Dist. LEXIS 221209, at *4 (C.D. Cal. Nov. 4, 2019); *Mass. Fair Hous. Ctr.,* 496 F. Supp. 3d at 611.

[70] *Inclusive Cmtys. Project, Inc.* v. *Tex. Dep't of Hous. & Cmty. Affairs,* 2015 WL 5916220 at *3 (N.D. Tex. 2015).

[71] *Prince George's Cty.* v. *Wells Fargo & Co.,* 397 F. Supp. 3d 752, 766 (D. Md. 2019); *Fortune Soc'y* v. *Sandcastle Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145, 172–173 (E.D.N.Y. 2019); *Conn. Fair Hous. Ctr.* v. *Corelogic Rental Prop. Sols., LLC,* 369 F. Supp. 3d 362, 377–78 (D. Conn. 2019); *Nat'l Fair Hous. All.* v. *Fannie Mae* ("*Fannie Mae*"), 294 F. Supp. 3d 940, 947 (N.D. Cal. 2018); *Paige* v. *N.Y.C. Hous. Auth.,* 2018 U.S. Dist. LEXIS 137238, at *9 (S.D.N.Y. Aug. 14, 2018); *R.I. Comm'n for Hum. Rights* v. *Graul,* 120 F. Supp. 3d 110, 123–24 (D.R.I. 2015); *Price* v. *Country Brook Homeowners Ass'n,* 2021 U.S. Dist. LEXIS 228914, at *5–6 (S.D. Ohio Nov. 30, 2021); *Pickett* v. *City of Cleveland,* No. 1:19 CV 2911, 2020 U.S. Dist. LEXIS 259242, at *9 (N.D. Ohio Sep. 29, 2020); *Winfield* v. *City of N.Y.,* No. 15CV5236–LTS–DCF, 2016 U.S. Dist. LEXIS 146919, at *18–19 (S.D.N.Y. Oct. 24, 2016); *Alexander* v. *Edgewood Mgmt. Corp.,* Civil Action No. 15–01140 (RCL), 2016 U.S. Dist. LEXIS 145787, at *6–7 (D.D.C. July 22, 2016).

[72] *See e.g. United States* v. *City of Black Jack, Mo.,* 508 F.2d 1179, 1184 (8th Cir. 1974); *Huntington Branch, NAACP* v. *Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988); *Greater New Orleans Fair Housing Action Center* v. *St. Bernard Parish,* 641 F. Supp. 2d 563, 567–568 (E.D. La. 2009).

[63] 78 FR 11468–11471.

[64] *Id.*

[65] *Id.*

[66] 78 FR 11474.

[67] *Mass. Fair Hous. Ctr.* v. *United States HUD,* 496 F. Supp. 3d 600, 603 (D. Mass. Oct. 25, 2020).

[68] *Id.* at 612.

or *Avenue 6E Investments, LLC* v. *City of Yuma,* which found that the 2013 Rule remained valid after *Inclusive Communities.* A commenter added that in *Property Casualty Insurance Association of America* v. *Carson,*[73] a lawsuit directly challenging the validity of the 2013 Rule, the district court held that *Inclusive Communities* affirmed HUD's burden-shifting approach and did not identify any aspect of the approach that required correction.

Other commenters opposed the proposed rule, stating that it is inconsistent with *Inclusive Communities.* In support of this, commenters noted that the 2013 Rule preceded *Inclusive Communities* and stated that the 2013 Rule does not adequately incorporate the holdings of that case. Commenters requested that HUD retain the 2020 Rule or incorporate additional language from the *Inclusive Communities* decision into this final rule. Commenters stated that although *Inclusive Communities* mentioned the 2013 Rule, it did not endorse the rule. Others stated that the 2013 Rule does not align with the Supreme Court's caution against injecting racial considerations into every housing decision and perpetuating race-based considerations rather than moving beyond them. A commenter said that compliance with the rule, as opposed to *Inclusive Communities,* will lead to costly litigation. Commenters noted that the Supreme Court specifically limited the scope of *Inclusive Communities* to the first question presented (whether disparate impact claims were cognizable under the Act) so references to the 2013 Rule cannot be viewed as approving the 2013 framework. Commenters further stated that the Court in *Inclusive Communities* did not state that the 2013 Rule incorporates the appropriate limits of disparate impact liability.

Another commenter stated that courts, such as the court in *Woda Cooper Dev., Inc.* v. *City of Warner Robins,* Civ. No. 5:20–CV–159 (MTT), 2021 WL 1093630, *1, at *7 (M.D. Ga. Mar. 22, 2021), have struggled to apply the 2013 Rule's framework in the wake of *Inclusive Communities,* with some choosing to ignore the rule entirely. The commenter stated that *Inclusive Communities* identified a number of safeguards to prevent abusive disparate impact cases but did not provide detailed

explanations of those safeguards or guidance on how courts should apply those safeguards. The commenter urged HUD to elaborate on those safeguards in the final rule.

*HUD Response:* HUD agrees with the commenters who stated that the 2013 Rule is consistent with the *Inclusive Communities* holding. The Court in *Inclusive Communities* did not call into question the 2013 Rule's framework for analyzing discriminatory effects claims, nor did it suggest that HUD should make any modifications to that framework. To the contrary, the Court cited HUD's 2013 Rule several times with approval.[74] For instance, the Court noted that the burden-shifting framework of *Griggs* and its progeny, adopted by HUD in the 2013 Rule and retained in this final rule, adequately balanced the interests of plaintiffs and defendants by giving housing providers the ability "to state and explain the valid interest served by their policies." [75] The Court also discussed the history of HUD's promulgation of the 2013 Rule, noted that lower courts had relied on it, and repeatedly cited its three-part burden shifting test.[76] Notably, other courts have recognized these findings and relied on the 2013 Rule's burden shifting framework without difficulty since *Inclusive Communities* was decided.[77] Moreover, HUD agrees that *Inclusive Communities'* discussion approving the holdings of the "heartland cases" supports reinstating the 2013 Rule.[78] HUD also agrees that the 2020 Rule did not adequately address the well-considered and thorough reasoning of *MHANY*

*Mgmt., de Reyes,* and *Avenue 6E Investments, LLC,* each of which found that the 2013 Rule remained valid after *Inclusive Communities.*[79]

HUD disagrees with the commenters who stated that the 2020 Rule should be retained because it is consistent with and incorporates the "safeguards" described in *Inclusive Communities.* As discussed above, in *Inclusive Communities,* the Court did not express any disapproval of the 2013 Rule's framework or specify that it lacked any safeguards. Rather, the Court observed that "disparate-impact liability *has always been* properly limited in key respects," making clear that it was not calling for any significant departure from pre-existing precedent under the Act or the 2013 Rule.[80] HUD believes that had the Court intended to overhaul disparate impact jurisprudence, the Court would have done so expressly, rather than citing the 2013 Rule favorably. Moreover, HUD notes that the Court declined to accept certiorari on the proper standard for assessing disparate impact cases.[81] And, as noted above, multiple courts have since read *Inclusive Communities* as affirming or endorsing the 2013 Rule's burden-

---

[73] *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction.")

[74] *Inclusive Cmtys. Project,* 576 U.S. at 527, 535–536, 541.

[75] *Id.* at 541.

[76] *Id.* at 527–28.

[77] *Supra* at n.69. *See also* Robert G. Schwemm, Housing Discrimination Law and Litigation § 10:5 (August 2022) ("[t]he basic structure and language of the HUD and *Inclusive Communities* standards are nearly identical" and "th[e] slight semantic variation [in the second step of the burden shifting framework] may not signal any real substantive difference . . ."; *de Reyes* v. *Waples Mobile Home Park L.P.,* 903 F.3d 415 fn4 (4th Cir. 2018) (while not relying on the 2013 Rule, the court noted that "[t]he HUD regulation is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities,* and indeed, some courts believe the Supreme Court implicitly adopted the HUD framework altogether").

[78] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 539; *See e.g. Huntington* v. *Huntington Branch, NAACP,* 488 U.S. at 16–18; *United States* v. *City of Black Jack, Mo.,* 508 F.2d 1179, 1184, 1187–88 (8th Cir. 1974) (specific facts produced during the case supported the court's determination that the policy was one of those "artificial, arbitrary, and unnecessary" practices that is properly invalidated under disparate impact doctrine.); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Par.,* 641 F. Supp. 2d 563, 567–568 (E.D. La. 2009) (relying on information gathered after the pleadings to find illegal disparate impact).

[79] *See, e.g., de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415, 424, 432 n.10 (4th Cir. 2018) (noting that "[i]n *Inclusive Communities,* the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework [and proceeding to outline the same framework as under the 2013 Rule]; further disagreeing that the HUD regulation and guidance conflict with *Inclusive Communities* and cannot be relied upon, and thus "afford[ing] the HUD regulation and guidance the deference it deserves") (citations omitted]; *MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–619 (2d Cir. 2016) (deferring to HUD's [2013] regulation, noting that "'the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]'"); *Avenue 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 512–513 (9th Cir. 2016) (citing *Inclusive Communities* and the 2013 Rule at 100.500(c) for the same proposition); *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (citing *Inclusive Communities* and HUD's 2013 Rule at 100.500(c) as standing for the same proposition); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the three-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*]").

[80] *See Inclusive Cmtys. Project,* 576 U.S. at 540 (emphasis added).

[81] *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991 (2014), 2014 U.S. LEXIS 4912 at *1 ("Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit granted limited to Question 1 presented by the petition."); *See also Questions Presented in, Inclusive Cmtys Project, Inc.,* 573 U.S. 991.

**Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations **19459**

shifting framework.[82] Even if the Court did not endorse the 2013 Rule in *Inclusive Communities,* it did not discard or significantly alter preexisting disparate impact jurisprudence. The 2013 Rule adopts the majority view of preexisting law. HUD believes that to the extent that some courts have attempted to impose limitations greater than those described in the 2013 Rule, they have misread *Inclusive Communities.* Moreover, the 2013 Rule did not inject racial considerations into housing decisions, and nothing in *Inclusive Communities* indicates that the Court believed the Rule improperly did so. Accordingly, HUD continues to believe that the burden-shifting test articulated in the 2013 Rule is the most appropriate framework for litigating discriminatory effects claims consistent with the Act and *Inclusive Communities.*

*Issue:* Commenters cited *Lincoln Property, Oviedo, River Cross Land Co., County of Cook, Ill.* v. *Wells Fargo & Co,* and *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.* as evidence that several courts have held that the 2013 Rule was inconsistent with *Inclusive Communities.*[83] By contrast, other commenters stated that out of more than 40 federal appellate and district court decisions in disparate impact cases following *Inclusive Communities,*[84]

only *Lincoln Property,* an appellate decision, and district courts bound by *Lincoln Property,* found any inconsistency between the 2013 Rule and *Inclusive Communities.*[85]

*HUD Response:* HUD disagrees that the cases the commenters cited compel the conclusion that this rule is inconsistent with *Inclusive Communities.* As HUD has previously stated on many occasions, including in the preamble to the 2020 Rule, the 2013 Rule is consistent with *Inclusive Communities.*[86] The vast majority of courts to consider this issue subsequent

to *Inclusive Communities,* including at least three federal appellate courts, have agreed.[87] Multiple courts have specifically read *Inclusive Communities* to have affirmed or endorsed the 2013 Rule's burden-shifting framework.[88] For example, in *River Cross,* one of the decisions commenters characterized as demonstrating incompatibility between the 2013 Rule and *Inclusive Communities,* the court in fact recognized that *Inclusive Communities*

[82] *See, e.g., Prop. Cas. Insurers Ass'n,* 2017 WL 2653069, at *9 (N.D. Ill. June 20, 2017) ("[T]he Supreme Court in *Inclusive Communities* expressly approved of disparate-impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction."); *MHANY Mgmt., Inc.,)* (explaining that in *Inclusive Communities,* "[t]he Supreme Court implicitly adopted HUD's approach"); *de Reyes* v. *Waples Mobile Home Park Limited Partnership,* 903 F.3d 415 (4th Cir. 2018); *See Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* 759 F. App'x 828, 834– 35 (11th Cir. 2018) (citing *Schwarz* v. *City of Treasure Island,* 544 F.3d 1201 (11th Cir. 2008)); *Nat'l Fair Hous. All.* v. *Bank of Am., N.A.,* 401 F. Supp. 3d 619, 631–632 (D. Md. 2019) (explaining that the Supreme Court in *Inclusive Communities* "[h]ave[ed] closely to regulations promulgated by HUD in 2013").

[83] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo, Florida,* 759 Fed. App'x 828, 833–35 (11th Cir. 2018) (per curiam); *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *22–24 (M.D. Fla. June 4, 2021); *Cnty. of Cook, Ill.* v. *Wells Fargo & Co.,* 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

[84] *See, e.g., de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018); *MHANY Mgmt. Inc.* v. *Cnty., of Nassau,* 819 F.3d 581 (2d Cir 2016); *Avenue 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493 (9th Cir. 2016); *Prince George's Cnty.* v. *Wells Fargo & Co.,* (397 F. Supp. 3d 752, 766 (D. Md. 2019); *Fortune Soc'y* v. *Sandcastle Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145, 172–173 (E.D.N.Y. 2019); *Conn. Fair Hous. Ctr.* v. *Corelogic Prop. Sols. LLC,* 369 F. Supp. 3d 362, 377–78 (D. Conn. 2019); *National Fair Hous All.* v. *Fed. Nat'l Mortg. Ass'n,*

294 F. Supp. 3d 940, 947 (N.D. Cal 2018); *City of Philadelphia* v. *Wells Fargo & Co.,* No. 17–cv–2203, 2018 WL 424451, at *4 (E.D. Pa. Jan. 16, 2018); *Paige* v. *New York City Hous. Auth.,* No. 17–cv– 7481, 2018 WL 3863451, at *3–4 (S.D.N.Y. Aug. 14, 2018); *Rhode Island Comm'n for Human Rights* v. *Graul,* 120 F. Supp. 3d 110, 123–24 (D.R.I. 2015); *Sams* v. *Ga West Gate LLC,* No. cv–415–282, 2017 WL 436281, at *5 (S.D. Ga. Jan. 30, 2017); *Winfield* v. *City of New York,* No. 15–cv–5236, 2016 WL 6208564, at *5 (S.D.N.Y. Oct. 24, 2016); *Alexander* v. *Edgewood Mgmt. Corp.,* No. 15–01140, 206 WL 5957673, at *2–3 (D.D.C. July 25, 2016); *Hall* v. *Philadelphia Hous. Auth.,* No. 17–5753, 2019 WL 1545183, at *5 & n.5 (E.D. Pa. Apr. 9, 2019); *Jackson* v. *Tryon Park Apartments, Inc.,* No. 6:18–cv–06238, 2019 WL 331635, at *1 (W.D.N.Y. Jan. 25, 2019); *Johnson* v. *Johnson,* No. 4:18–CV–04138–RAL, 2018 WL 5983508, at *2 (D.S.D. Nov. 14, 2018); *Ekas* v. *Affinity Prop. Mgmt.,* No. 3:16–cv–1636, 2017 WL 7360366, at *3 (D. Ore. Dec. 7, 2017); *Alms Residents Ass'n* v. *U.S. Dep't of Hous. & Urban Dev.,* No. 1:17–cv–605, 2017 WL 4553401, at *11 (S.D. Ohio Oct. 12, 2017); *Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* No. 6:16–cv–1005, 2017 WL 3621940, at *4 (M.D. Fla. Aug. 23, 2017), *aff'd,* 759 Fed. App'x 828 (11th Cir. ); *National Fair Housing. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017); *Prop. Cas. Insurers Assoc.* v. *Carson,* 2017 WL 2653069 at *9 (N.D. Ill. June 20, 2017) ("[T]he Supreme Court in *Inclusive Communities* expressly approved of disparate-impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction"); *Martinez* v. *Optimus Props., LLC,* Nos. 2:16–cv–08598–SVW–MRW, 2017 WL 1040743, at *2 (C.D. Cal. Mar. 14, 2017); *Borum* v. *Brentwood Vill., LLC,* 218 F. Supp. 3d 1, 21–22 (D.D.C. 2016); *Khodeir* v. *Sayyed,* No. C 15–4763, 2016 WL 5817003, at *6 (S.D.N.Y. Sept. 28, 2016); *Crossroads Residents Organized for Stable and Secure ResiDencieS* v. *MSP Crossroads Apartments LLC,* No. C 16–233, 2016 WL 3661146, at *8 (D. Minn. July 5, 2016); *Azam* v. *City of Columbia Heights,* No. C No. 14–1044, 2016 WL 424966, at *10 (D. Minn. Feb. 3, 2016).

[85] *See Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019). For district court decisions bound by *Lincoln Prop., see, e.g., Treece* v. *Perrier Condominium Owners Ass'n, Inc.,* —F. Supp. 3d—, No. 17–10153, 2021 WL 533720 (E.D. La. Feb. 12, 2021); *Inclusive Cmtys. Project, Inc.* v. *Heartland Community Ass'n,* 399 F. Supp. 3d 657 (N.D. Tex. 2019).

[86] *See* 85 FR 60299 (noting that the 2013 Rule is one but not the only "permissible interpretation of disparate impact liability under the FHA"). *See also* Defendants' Opposition to Plaintiff's Motion for Leave to Amend Complaint, *Prop. Cas. Ins. Assoc. of Am.* v. *Carson and the U.S. Dep't of Hous. and Urb. Dev.,* No. 1:13–cv–08564 (2017); Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, *Am. Ins. Assoc.* v. *U.S. Dep't of Hous. and Urb. Dev. et al.,* No. 1:13– cv–00966 (RJL) (D.D.C. 2016).

[87] *See, e.g., de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415, 424, 432 n.10 (4th Cir. 2018) (noting that "[i]n *Inclusive Communities,* the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework [and proceeding to outline the same framework as under the 2013 Rule]; further disagreeing that the HUD regulation and guidance conflict with *Inclusive Communities* and cannot be relied upon, and thus "afford[ing] the HUD regulation and guidance the deference it deserves") (citations omitted); *MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–619 (2d Cir. 2016) (deferring to HUD's [2013] regulation, noting that "the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]"); *Avenue 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 512–513 (9th Cir. 2016) (citing *Inclusive Communities* and the 2013 Rule at 100.500(c) for the same proposition); *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (citing *Inclusive Communities* and HUD's 2013 Rule at 100.500(c) as standing for the same proposition); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*]").

[88] *See, e.g., MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618 (2d Cir 2016) ("the Supreme Court implicitly adopted HUD's approach"); *6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 512–513 (9th Cir. 2016) (citing the 2013 Rule in describing the three-prong analytical structure set forth in *Inclusive Communities*); *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (stating that the Supreme Court "carefully explained that disparate-impact liability has always been properly limited" and that "disparate-impact liability under the FHA can be proven under a burden-shifting framework analogous to that used in employment discrimination cases.") (internal citations and quotations omitted); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework a reasonable interpretation of the Act, finding that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*]."); *Jackson* v. *Tryon Park Apartments, Inc.,* No. 6:18–CV–06238 EAW, 2019 U.S. Dist. LEXIS 12473, at *11 (W.D.N.Y. Jan. 25, 2019) (noting that "the Supreme Court's 2015 *Inclusive Communities Project* ruling uph[eld] [HUD's 2013] regulation").

**19460** *Federal Register* / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

approvingly cited the 2013 Rule, applied the 2013 Rule, and found it to be easily reconciled with *Inclusive Communities.*[89] HUD has determined that the small number of courts that reached contrary conclusions misinterpreted the scope of the *Inclusive Communities* holding, and HUD declines to adopt the minority views of these courts.

In light of the views of a majority of courts and HUD's experience applying the Act, HUD finds that the Fifth Circuit's conclusions in *Lincoln Property* do not require it to change course.[90] In that case, the majority of a divided panel acknowledged that *Inclusive Communities* reviewed and affirmed the Fifth Circuit's earlier judgment in that case, remanding to the trial court to apply the 2013 Rule's burden-shifting framework, and that the Court did not explicitly call into question the 2013 Rule's requirements. Nonetheless, the *Lincoln Property* court found that because the Supreme Court in *Inclusive Communities* had not explicitly stated that it was adopting the 2013 Rule's framework, whether the Court accepted the framework or modified it remained unresolved.[91] The court construed language from *Inclusive Communities* as calling for courts to make it more difficult to plead a discriminatory effects claim in some fashion, but acknowledged that *Inclusive Communities* provided no clear direction as to how it was thus changing the law. While acknowledging that other appellate courts had interpreted *Inclusive Communities* to have "implicitly adopted the 2013 framework," the panel's review of certain passages from *Inclusive Communities* and of subsequent decisions from the Fourth, Eighth, and Eleventh Circuits [92] led the panel to conclude simply that *Inclusive Communities* "announce[d] a more demanding test than that set forth in the HUD regulation" but "did not clearly delineate its meaning or requirements." [93] Finding no consensus even among those who believed

*Inclusive Communities* made some change, it concluded that the claim at issue in that case was not properly pleaded under any of several possible standards it could apply, making it unnecessary to state with more specificity how, in its view, *Inclusive Communities* had changed the law.

HUD believes *Lincoln Property's* language concerning a more demanding standard is not a reason to change the standard it promulgated in 2013. As stated earlier, HUD disagrees that anything in *Inclusive Communities* is inconsistent with the 2013 Rule's requirements for discriminatory effects claims. Rather, HUD agrees with the Fourth Circuit that the 2013 Rule "is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities,*" and with its observation that "some courts believe the Supreme Court implicitly adopted the HUD framework altogether." [94] But even if the Fifth Circuit were correct in identifying inconsistencies between the 2013 Rule and *Inclusive Communities, Lincoln Property* does not provide persuasive reasoning for HUD to modify the 2013 Rule, because the court only found ambiguity in the law after *Inclusive Communities* rather than specifying the way in which HUD needed to change course. Additionally, the other circuit courts that have analyzed the robust causation discussion in *Inclusive Communities* have either defined it in a way that is consistent with this final rule or were similarly non-specific in explaining robust causality's meaning.[95]

HUD notes that, while acknowledging that other appellate courts had interpreted *Inclusive Communities* to have "implicitly adopted the 2013 framework," the Fifth Circuit panel's review of certain passages from *Inclusive Communities* as well as subsequent decisions from the Fourth, Eighth, and Eleventh Circuits,[96] led the panel to conclude that *Inclusive Communities* "undoubtedly

announce[d] a more demanding test than that set forth in the HUD regulation." [97] HUD believes that in two of these decisions, the courts gave more deference to the 2013 Rule than the commenters recognized.[98] Additionally, in the district court decisions cited by the commenters, and in *Lincoln Property's* progeny, HUD believes that the courts misread *Inclusive Communities* as creating heightened pleading standards.[99] Even *Lincoln Property* only requires a plaintiff to *plausibly* demonstrate a robust causal connection between a discriminatory practice and an alleged disparate impact.[100] HUD adopts the view of courts that found *Inclusive Communities* endorsed the 2013 Rule's framework.

HUD also notes that *Lincoln Property*—a suit between private parties—was decided without the benefit of input from HUD on what effect, if any, *Inclusive Communities* had on Fair Housing Act disparate impact claims. As the agency to which Congress has delegated the responsibility to interpret and enforce the Fair Housing Act, HUD believes that its reasonable reading of any ambiguities in the meaning of the Act following *Inclusive Communities* is entitled to deference.[101] Thus, to the extent *Lincoln Property* identified such an ambiguity and came to conclusions that conflict with those HUD has reached, HUD declines to adopt the court's conclusions. Any risk that litigants in the Fifth Circuit would be subject to a different standard than litigants elsewhere is created by the *Lincoln Property* decision, not by HUD's promulgation of this rule.

---

[89] *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *66–69, 72–73, 75–76 (M.D. Fla. June 4, 2021).

[90] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890 (5th Cir. 2019).

[91] *Id.* at 902.

[92] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902–05 (5th Cir. 2019) (citing *de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018); *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1114 (8th Cir. 2017); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* 759 Fed. App'x 828 (11th Cir. 2018)) (pinpoint citations omitted).

[93] *See Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019).

[94] *Reyes,* 903 F.3d at 424 n.4 (collecting cases).

[95] *See de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415, 424–27 (4th Cir. 2018) (explaining that identifying policy that causes disparity establishes robust causation); *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1111 (8th Cir. 2017) (quoting *Inclusive Cmtys.,* but not defining robust causation beyond identifying the connection between a challenged policy and a disparate impact); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* 759 F. App'x 828, 834–36 (11th Cir. 2018) (plaintiff must make statistical showing sufficient to connect challenged policy and disparate impact).

[96] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902–05 (5th Cir. 2019) (citing *de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018); *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1114 (8th Cir. 2017); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* 759 Fed. App'x 828 (11th Cir. 2018)) (pinpoint citations omitted).

[97] *See Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019).

[98] *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *66–69, 72–73, 75–76 (M.D. Fla. June 4, 2021); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* No. 6:16–cv–1005, 2017 WL 3621940, at *4 (M.D. Fla. Aug. 23, 2017) (utilizing 2013 Rule to analyze disparate impact claim)

[99] For example, the pleading standards used in *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo, Florida,* 759 Fed. App'x at 833–35, and *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *22–24, are not inconsistent with the 2013 Rule. In addition, both *Cnty. of Cook, Ill.* v. *Wells Fargo & Co.,* 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018) and *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d at 22, incorrectly relied on dicta when they stated that *Inclusive Communities* created higher pleading standards in disparate impact cases.

[100] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d at 899 (5th Cir. 2019).

[101] *National Cable & Telecommunications Assn.* v. *Brand X internet Services,* 545 U.S. 967, 980 (2005) (holding that agency interpretation of statute can override prior judicial interpretation when the statute is ambiguous and agency interpretation is reasonable).

In short, HUD does not believe that the cases cited by the commenters support revisions to the rule.

*Issue:* Commenters stated that the proposed rule conflicts with what they characterized as *Inclusive Communities'* holding that a "robust causality requirement . . . protects defendants from being held liable for racial disparities they did not create." Some commenters asked HUD to expressly add a robust causality requirement to the final rule, while others asked HUD to retain the 2020 Rule, stating that it appropriately reflected *Inclusive Communities'* robust causality requirement.

Some commenters urged HUD to adopt the view that, in stating that disparate impact claims may not be established simply by demonstrating a "statistical disparity" in outcomes, *Inclusive Communities* held that such claims must meet a higher causation standard than in the proposed rule. Other commenters stated that the proposed rule does not require proximate cause or a direct link between the policy and the discriminatory effect, which, they said, *Inclusive Communities* requires. Commenters said that if plaintiffs are not required to establish "robust causality" or "direct proximate cause," defendants would be liable in cases where discrimination does not actually exist. Commenters also stated that without an explicit robust causality requirement, race will be used in a pervasive way, leading to the use of numerical quotas and raising constitutional questions. Commenters stated that the requirement is necessary so that regulated entities can make practical business choices and profit-related decisions. A commenter suggested revising the proposed rule to provide that to establish robust causality, the plaintiffs have the burden of proving that a challenged practice is the sole and proximate cause, or reasonably predicted cause, of a discriminatory effect.

Commenters who supported the proposed rule said that it incorporates *Inclusive Communities'* protections for defendants who may fear liability for disparities their policies did not create. Commenters noted that the proposed rule does not permit liability based on statistical disparities alone.

*HUD Response:* The 2013 Rule and this final rule contain a robust causality requirement by requiring the plaintiff to prove at the first step of the framework that a challenged practice caused or predictably will cause a discriminatory effect. As discussed above, in HUD's view, the framework in this final rule, which includes the requirement that the

challenged practice causes a discriminatory effect, is consistent with *Inclusive Communities.* The *Inclusive Communities* Court did not announce a heightened causality requirement for disparate impact liability, a requirement which would find no support in the statutory text or case law. Rather, in considering a district court opinion where the trial court had found a violation of the Act without ever requiring the plaintiff to identify a causal link between a specific policy and the challenged disparate impact, the Court merely reiterated that plaintiffs must identify a causal link between the challenged practice and the alleged disparate impact that is sufficiently robust to permit that connection to be scrutinized at each stage of the case. The 2013 Rule, and this final rule require exactly that. The 2013 Rule and this final rule do not use the precise words "robust causality" and (as explained elsewhere in this preamble) nothing in *Inclusive Communities* requires these words. What *Inclusive Communities* requires is that a court's examination of causality be robust. Both the 2013 Rule and this final rule implicitly incorporate this requirement by requiring a plaintiff to link a specific practice to a current or predictable disparity. Ultimately, the error identified both by the Fifth Circuit and then by the Supreme Court in *Inclusive Communities* came from the district court's failure to fully apply the 2013 Rule's framework, not the 2013 Rule's framework itself. Through its framework this rule ensures that, as required by *Inclusive Communities,* defendants are not held liable for racial disparities they did not create.[102] The rule thus already requires a showing of causation, not just correlation, between the policy or practice and the disparate impact, and so is fully consistent with *Inclusive Communities.*

HUD also believes that the rule's burden-shifting framework does not preclude businesses from making business and profit-motivated choices, even if they cause a discriminatory effect, so long as they do not create an *unjustified* discriminatory effect. Once a plaintiff meets its burden of proving that a policy causes a disparate impact because of a protected characteristic, the burden then shifts to the defendant to prove that the policy is necessary to

serve the defendant's substantial, legitimate, nondiscriminatory interest. This safeguard allows housing providers and others to make practical business choices and profit-related decisions. The third step of the framework then shifts the burden back to the plaintiff to prove that an alternative policy would have a less discriminatory effect than the challenged policy. This rule balances the interests of the parties by allowing defendants to implement policies that meet their needs, as long as there is no unjustified discriminatory effect, while providing plaintiffs the opportunity to identify policies that serve those needs with less discriminatory effects based on protected characteristics.

HUD notes further that although the 2013 Rule has been in effect for ten years—with similar judicial precedent effective even longer, it is unaware of any case applying the 2013 Rule in a manner that would impose quotas.

*Issue:* Commenters requested that HUD include in the final rule a requirement that plaintiffs plead that the challenged policy is "artificial, arbitrary, and unnecessary" in addition to the traditional elements of a disparate impact claim, as the 2020 Rule did. Commenters stated that *Inclusive Communities* required this additional element when the Court stated that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers' " to "avoid the serious constitutional questions that might arise under the Act, for instance, if such liability were imposed based solely on a showing of a statistical disparity."[103] Another commenter explained that the district court in *Massachusetts Fair Housing Center* did not invalidate the "arbitrary, artificial, and unnecessary" language in the 2020 Rule, but rather noted that it came from *Inclusive Communities* and other case law, like *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1112 (8th Cir. 2017).

Other commenters disagreed, stating that if such a requirement were added to the rule, it would be impossible to challenge discriminatory policies absent facts showing discriminatory intent, thus negating *Inclusive Communities'* holding that violations of the Act may be established through proof of disparate impact. The commenters explained that pleading that a policy is "artificial" is essentially pleading that a policy is pretextual—a showing required in cases alleging intentional discrimination, not discriminatory effects. Commenters also noted that the phrase "artificial, arbitrary, and

---

[102] *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 542 (describing robust causality as requiring that a plaintiff draw a connection between the defendant's challenged policy causing the alleged disparity, noting that this ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create.)

[103] *Id.* at 540.

**19462** Federal Register / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

unnecessary'' originated in *Griggs* and pointed out that in applying this phrase in Fair Housing Act cases, courts have applied it consistent with the 2013 Rule's burden shifting framework, essentially using it as short-hand for the three-step framework, not as a separate, independent element. As examples, these commenters cited *City of Black Jack*,[104] which *Inclusive Communities* describes as a heartland case, as well as *Graoch Assocs. #33, L.P.* v. *Louisville/ Jefferson Cty. Metro Human Relations Comm'n.*[105] A commenter stated that the three-step burden-shifting framework, and especially the defense at the second step—that the policy was necessary to achieve a legitimate interest—already ensures that as the *Inclusive Communities* Court described, ''disparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies.''

*HUD Response:* HUD declines to add an ''artificial, arbitrary, and unnecessary'' pleading standard or substantive element to this final rule. As previously explained, HUD does not construe *Inclusive Communities* to require the agency to add specific elements or pleading standards for disparate impact cases that go beyond what ''has always'' been required.[106] Rather, when the *Inclusive Communities* Court quoted *Griggs'* decades-old formulation that disparate impact claims require the removal of artificial, arbitrary, and unnecessary barriers, it did so as part of restating the safeguards and requirements that it found (and HUD agrees) have always been a part of disparate impact jurisprudence. In this context, the Court quoted *Griggs'* short-hand formulation for the type of policy that traditionally has been held to create an unjustified discriminatory effect at the end of the burden shifting analysis. HUD believes that *Inclusive Communities,* following *Griggs* as well as earlier Fair Housing Act cases, went on to describe policies invalidated by longstanding precedent as either ''arbitrary'' or ''artificial'' as a shorthand for those found to violate the Fair Housing Act under traditional jurisprudence.[107] HUD does not believe

this language, when read in context, is best read to require the agency to impose a requirement for plaintiffs and the charging party to plead and prove, in addition to the traditional elements, that policies are artificial *and* arbitrary *and* unnecessary. HUD notes, moreover, that the source of this language is *Griggs,* a decades-old case at the bedrock of disparate impact jurisprudence, and notes that *Griggs* did not require plaintiffs to establish that the practice at issue met each of these three descriptors, let alone that such evidence be pleaded in a complaint. In addition, HUD believes that reading *Inclusive Communities* or other cases to support a heightened pleading standard for plaintiffs, such as in the 2020 Rule, is contradicted by the fact that the ''heartland'' cases cited favorably by the Court would not have survived a motion to dismiss under that standard because plaintiffs in those cases did not allege facts that would plausibly support a claim that a policy or practice was arbitrary, artificial, and unnecessary to the extent those terms are construed as requiring more than satisfaction of the traditional elements. Simply put, in HUD's experience implementing the Fair Housing Act, plaintiffs likely would not have had access to such facts until after discovery.[108] HUD further believes that adding such a standard would also conflict with the text and broad remedial purpose of the Act which provides ''within constitutional limitations, for fair housing throughout the United States.'' [109] HUD thus concludes that a heightened pleading and proof standard would frustrate the clearly expressed intent to use the maximum allowable power under the law to secure equal housing opportunity. Finally, HUD observes that *Inclusive Communities* did not specify how courts and agencies should apply a new pleading and proof standard, nor did it come close to clearly stating that it intended to create new elements. To the extent this leaves ambiguity in the law, as a matter of policy, HUD believes it is preferable to retain existing standards that have decades of case law and administrative actions specifying their content rather than impose ones that are undefined and untested.

*Comments on Bank of America*

*Issue:* Commenters stated that the proposed rule is inconsistent with *Bank of America Corp.* v. *City of Miami,*[110] a 2017 Supreme Court case which held that ''proximate cause under the [Act]

requires some direct relation between the injury asserted and the injurious conduct alleged.'' A commenter suggested that HUD add the phrase ''some direct relation'' to the proposed rule's burden of proof standard. Another commenter suggested revising the proposed rule to provide that in order to establish a ''robust causal link,'' the plaintiffs have the burden of proving that a challenged practice is the sole and proximate cause, or reasonably predicted cause, of a discriminatory effect.'' Another commenter suggested that HUD state that the causation analysis must consider whether a practice is too remote to give rise to liability.

*HUD Response:* HUD believes that it is not required to add language to this rule to ensure consistency with *Bank of America.* In that case, which involved a municipality suing a lender on the theory that predatory lending practices had caused foreclosures which in turn eventually led to damages to the municipality such as reduced tax revenues, the Supreme Court held that, because actions for damages under the Act are akin to tort actions, such suits are ''subject to the common-law requirement that loss is attributable to the proximate cause, and not to any remote cause.'' [111] The Court declined to further explain the proximate cause requirement as applied to Fair Housing Act claims and did not suggest that such a requirement would otherwise alter analyses under the Act. For example, HUD believes that *Bank of America* has no impact on the ability of organizational plaintiffs to prove standing by tracing their injuries to the challenged policy.[112]

HUD believes, although the *Bank of America* decision was in the context of a disparate impact claim, it is not inherently specific to and does not create an additional burden for disparate impact claims. To the contrary, HUD believes that the proximate cause requirement *Bank of America* described for standing applies to all Fair Housing Act cases, not just disparate-impact claims, and so HUD does not believe it is appropriate to add a proximate-cause requirement to the regulatory requirements that are specific to disparate-impact claims. More broadly, this rule does not purport to address the requirements for Fair Housing Act standing, and neither *Bank of America* nor any other case requires HUD to add such considerations to this rule. Accordingly, HUD believes that

---

[104] *City of Black Jack,* 508 F.2d at 1184–1185.

[105] *Graoch Assocs. #33, L.P.,* 508 F.3d 366, 374– 75 (6th Cir. 2007) (''We use the burden-shifting framework described above—and especially the final inquiry considering the strength of the plaintiff's statistical evidence and the strength of the defendant's business reason—to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests.'').

[106] *Inclusive Cmtys,* 576 U.S. at 540.

[107] *Inclusive Cmtys. Project,* 576 U.S. at 539–541.

[108] *Supra* at n. 78.

[109] 42 U.S.C. 3601.

[110] 137 S. Ct. 1296 (2017).

[111] *Id.* at 1305.

[112] *Havens Realty Corp.* v. *Coleman,* 455 U.S. 363 (1982).

adding the suggested language to this final rule, which purports only to set out the framework for analyzing the merits of disparate impact claims, is unnecessary. Nothing in this rule creates a conflict with *Bank of America* or bars a court from applying its requirements. This rule simply does not touch on that subject matter.

HUD additionally observes that, in its view, *Bank of America* applies to claims such as the one in that case that involve unusual claims in which the policy challenged has an unusually attenuated connection to the alleged harm to the plaintiff. HUD does not construe *Bank of America* as having a larger impact on longstanding principles of Fair Housing Act standing.

*Discriminatory Effects as Applied to Insurance*[113]

*Issue:* Commenters asked HUD to exempt homeowners insurance—in whole or in part, as well as risk-based pricing and underwriting in particular—from liability for any unjustified discriminatory effects, advancing a number of reasons. Among other things, commenters stated that the fundamental nature of insurance does not allow discriminatory effects liability; such claims cannot succeed as a matter of law; and the McCarran-Ferguson Act[114] bars claims. A commenter said that applying the rule to insurers is unnecessary because there have been no allegations or findings of unlawful discriminatory effects against an insurer prior to or since 2013. Other commenters disagreed, stating that HUD should not create exceptions for any industry, including insurance, because such categorical exemptions are unworkable and inconsistent with the Act's purpose, which is broad and inclusive. Commenters also stated that exemptions would allow some discriminatory practices to go uncorrected.

*HUD Response:* HUD declines to provide an exemption for the insurance industry in whole or in part. HUD responds below to the specific reasons commenters advanced for exempting homeowners insurance. However, as a threshold matter, HUD lacks the

authority to create exemptions that are not in the text of the Act. When Congress passed the Act in 1968 and amended it in 1988, it established exemptions for certain practices but not for insurance.[115] Furthermore, courts have routinely applied the Act to insurers and have found that discriminatory effects liability applies to insurers under the Act.[116] Moreover, nothing in this rule precludes insurers from raising a defense based on the McCarran-Ferguson Act[117] or from

arguing that claims cannot succeed as a matter of law in particular cases. What HUD is declining to do, and what it believes it has no authority to do, is provide a single industry or a set of specific practices a blanket exemption from liability from all claims regardless of whether those claims otherwise would satisfy the rule's (and the Act's) requirements.

As further explained above and below, the Fair Housing Act was intended to have a very broad impact on housing and communities across the country. The plain text, purpose, and structure purpose, structure, and plain language of the Act make clear that the Act was intended to apply to all sectors of the housing industry so that each would have common duties under the Act. For example, the plain text of the Act does not refer to an actor, but rather a prohibited action, meaning that all actors in all sectors of the housing industry are subject to the Act.[118] With regard to purpose, the Act was enacted to replace segregated neighborhoods with "truly integrated and balanced living patterns." [119] It was structured to address discriminatory housing practices that affect "the whole community" as well as particular segments of the community,[120] with the goal of advancing equal opportunity in housing, and to "achieve racial integration for the benefit of all people in the United States." [121]

---

[113] Many of the issues raised by commenters regarding the application to insurance in response to the proposed rule were also raised in commenting on the 2013 rule. HUD's 2016 Supplemental Responses covers these issues in depth. "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance." 81 FR 69012. In considering these comments, HUD has reviewed the 2016 Supplemental Responses and believes the responses made there continue to accurately reflect HUD's interpretation of discriminatory effects law.

[114] 15 U.S.C. 1011 *et.seq.*

[115] *See Sierra Club* v. *EPA,* 719 F.2d 436, 453 (D.C. Cir. 1983) ("The agency relies on its general authority under section 301 of the Act to 'prescribe such regulations as are necessary to carry out [its] functions under [the Act]' . . . EPA's construction of the statute is condemned by the general rule that when a statute lists several specific exceptions to the general purpose, others should not be implied."); *see, e.g., Colorado Pub. Int. Rsch. Grp., Inc.* v. *Train,* 507 F.2d 743, 747 (10th Cir. 1974) rev'd on other grounds, 426 U.S. 1 (1976) ("Another cardinal rule of statutory construction is that where the legislature has acted to except certain categories from the operation of a particular law, it is to be presumed that the legislature in its exceptions intended to go only as far as it did, and that additional exceptions are not warranted."); *Nat. Res. Def. Council, Inc.* v. *Costle,* 568 F.2d 1369, 1377 (D.C. Cir. 1977) (courts cannot manufacture a "revisory power" granting agency authority to act "inconsistent with the clear intent of the relevant statute"); *Alabama Power Co.* v. *Costle,* 636 F.2d 323, 357 (D.C. Cir. 1979) ("[T]here exists no general administrative power to create exemptions to statutory requirements based upon the agency's perceptions of costs and benefits."); *see also Graoch,* 508 F.3d at 375. ("[n]othing in the text of the FHA instructs us to create practice-specific exceptions.").

[116] *See Ojo* v. *Farmers Group, Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010) (finding that the Act applies to insurers; *NAACP* v. *Am. Fam. Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir. 1992) (finding that the Act applies to insurers); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351, 1355–1360 (6th Cir. 1995) (finding that HUD's interpretation of the Act as applying to insurers was reasonable); *but see Mackey* v. *Nationwide Ins. Cos.,* 724 F.2d 419, 423–25 (4th Cir. 1984) (pre-Fair Housing Amendments Act and regulations pursuant thereto holding that Act does not cover insurance); *see also Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 293 (5th Cir. 2003) (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system used by an insurer had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens* v. *Am. Empire Surplus Lines Ins. Co.,* 113 F. Supp. 3d 555, 558 (D. Conn. 2015) (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 60–61, 63 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost" policy had an unjustified discriminatory effect).

[117] The McCarran-Ferguson Act specifically provides that "[n]o Act of Congress shall be

construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. 1012(b). As interpreted by the Supreme Court in *Humana* v. *Forsyth,* McCarran-Ferguson applies only when a particular application of a federal law directly conflicts with a specific state insurance regulation, frustrates a declared state policy, or interferes with a State's administrative regime. *Humana* v. *Forsythe,* 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[118] *E.g.* 42. U.S.C. 3604(a) ("it shall be unlawful to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of" a protected trait); *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 298 (7th Cir. 1992) (noting that Congress banned an outcome while not saying who the actor is and holding that the Act applies to insurers); *see also Ojo* v. *Farmers Group Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010) (deferring to HUD's reasonable interpretation of the statutory language that the Act applies to insurance).

[119] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 3422 (Feb. 20, 1968) (statement of Senator Mondale)).

[120] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits)).

[121] H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008).

The Supreme Court in *Inclusive Communities* similarly noted that the Act "was enacted to eradicate discriminatory practices within a sector of our Nation's economy" and discussed that the viability of disparate impact claims is "consistent" with the Act's "central purpose." [122] In order to "eradicate" discriminatory practices within the housing sector, as the Court acknowledged was the purpose of the Act, it would logically flow that the Act was intended to apply to all sectors of the housing industry. Notably, the court used strong language, saying the purpose was to "eradicate," rather than weaker language like "reduce," making clear that the Act was meant to reach all sectors, otherwise eradication would not be possible. Nor did the Court suggest that any portion of the housing sector was not reached by the Act.

In HUD's experience, insurance plays a significant role in the housing industry and in securing equal opportunity in housing in communities nationwide. Home seekers must be able to access mortgage insurance and homeowners insurance in order to become home owners. Multifamily housing owners and managers must be able to obtain property and hazard insurance in order to obtain financing and manage the risks of their operations. These examples show how different sectors of the housing economy interact, and how the exclusion of one sector of the housing economy from the Act's coverage would pose a barrier to equal opportunity in housing. In its fair housing investigations, HUD has encountered housing providers who will not rent to individuals with disabilities because of insurance-related concerns. [123] HUD is also aware that multifamily housing providers face barriers obtaining insurance when they attempt to lease to low-income families, including people of color and individuals with disabilities who use voucher programs to pay rent. [124]

Because of the pivotal role insurance plays in all types of housing, an exemption or safe harbor would undermine and be contrary to the Act's broad purposes.

Even if HUD had authority to exempt insurance categorically, HUD finds that such an exemption for a single industry would neither be workable nor consistent with the purpose of the Act. HUD makes this determination for the reasons it stated in its 2016 Supplemental Notice regarding this subject, some of which is reiterated here, as well as for the following additional reasons. Congress has stated that the Act is intended to provide for fair housing throughout the United States, [125] and the Supreme Court has recognized the Act's broad remedial purpose. [126] The Act's prohibitions on discrimination in housing are intended to eliminate segregated living patterns and move the nation toward a more integrated society. [127] Among other things, the Act requires HUD to affirmatively further fair housing in all of its housing-related programs and activities, [128] one of which is the administration and enforcement of the Act. [129] HUD finds that wholesale exemptions for insurance practices would contravene the text and purposes of the Act, and, as explained further below, would also likely be overbroad in most if not all instances, as such an

exemption would allow some practices with unjustified discriminatory effects to go uncorrected. HUD also finds that wholesale exemptions would also likely be to immunize potential intentional discrimination in the insurance market, because as the court in *Inclusive Communities* stated, "disparate-impact liability under the [Fair Housing Act] also plays a role in uncovering discriminatory intent." [130] As the Court found in that case, the availability of disparate-impact claims, "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." [131]

HUD notes that multiple court decisions have long found discriminatory effects claims against insurance practices to be actionable. [132] And even if the commenters were correct that the industry's practices generally will not give rise to discriminatory effects liability, that fact does not provide a sufficient justification for exempting the entire industry from liability in all circumstances, even where there is a practice with an unjustified discriminatory effect. Especially in light of the broad remedial purposes of the Act, HUD finds that the final rule strikes the appropriate balance for insurance industry practices. Furthermore, HUD notes that some types of discrimination are more difficult than others to prove, and this is particularly true when individuals who are denied a service or quoted a particular price for a service in a residential real estate-related transaction would typically have no way of knowing the specific reasons for a denial or pricing decision. Simply because claims are difficult to prove and may not end up in litigation does not mean that the underlying conduct can

---

[122] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 539.

[123] *See. e.g.* Charge, *HUD* v. *McClendon,* No. 09–04–1103–8, (2005), *https://www.hud.gov/sites/documents/DOC_14391.PDF* (alleging that landlord "informed Complainant that she needed to seek housing elsewhere at a place for persons with moderate to severe disabilities because the property insurance only covered mild disabilities"); *HUD* v. *Twinbrook Vill. Apts.,* HUDALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 HUD ALJ LEXIS 82, (HUD ALJ Nov. 9, 2001) (respondent requested that complainants obtain insurance to cover any liability resulting from injury associated with ramps installed to make unit accessible).

[124] *See e.g. Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying motion to dismiss allegations that defendant's policy of declining to insure properties with Section 8 voucher tenants has an unjustified discriminatory effect); *Viens* v. *Am. Empire Surplus*

*Lines Ins. Co.,* 113 F. Supp. 3d 555, 558 (D. Conn. 2015) (denying motion to dismiss allegations that defendant insurer's underwriting criteria charging higher premiums or denying coverage to landlords who rent to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect).

[125] *See* 42 U.S.C. 3601.

[126] *See Havens Realty Corp.,* 455 U.S. at 380 at 209 (recognizing Congress's "broad remedial intent" in passing the Act); *Trafficante,*409 U.S. at 209 (recognizing the "broad and inclusive" language of the Act); *see also Inclusive Cmtys. Project Inc.,* 576 U.S. at 539 (describing the "central purpose" of the Act as "to eradicate discriminatory practices within a sector of our Nation's economy").

[127] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 546–47; 114 Cong. Rec. 2276, 3422 (1968) (Statement of Sen. Mondale) (the purpose of the Act was to replace "ghettos" with "truly integrated and balanced living patterns."); 114 Cong. Rec. 2276, 9559 (1968) (Statement of Congressman Celler) (there is a need to eliminate the "blight of segregated housing"); 114 Cong. Rec. 2276, 9591 (1968) (Statement of Congressman Ryan) (the Act is a way to "achieve the aim of an integrated society").

[128] 42 U.S.C. 3608(e)(5).

[129] *See, e.g.,* 42 U.S.C. 3608 (the Secretary's administrative responsibilities under the Act), 3609 (education, conciliation, conferences, and reporting obligations to further the purposes of the Act), 3610 (investigative authority), 3611 (subpoena power), 3612 (administrative enforcement authority), 3614a (rulemaking authority), 3616 (authority to cooperate with state and local agencies in carrying out the Secretary's responsibilities under the Act), 3616a (authority to fund of state and local agencies and private fair housing groups to eliminate discriminatory housing practices prohibited by the Act).

[130] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 540.

[131] *Id.*

[132] *See Dehoyos,* 345 F.3d at 293 (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d at 558 (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 48–49, 60–61 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost:" policy had an unjustified discriminatory effect).

or should be exempted from regulation in all instances.

HUD finds that the concerns raised by the insurance industry do not outweigh these fundamental considerations. This rule sets out a framework by which liability under the Act may be determined; liability arises only for those insurance practices that actually or predictably result in a discriminatory effect and lack a legally sufficient justification. The framework takes into account any defendant's legitimate interest in the challenged practice—including an insurance defendant. As discussed below, HUD finds that any conflict with a specific state insurance law can and should be addressed on a case-by-case basis in the context of that state law.

In sum, the case-by-case approach set out in this final rule appropriately weighs the relevant factors, which include HUD's obligation to enforce the Act, the diversity of potential discriminatory effects claims, the variety of insurer business practices, and the differing insurance laws of the states, as they currently exist or may exist in the future. Given these considerations, HUD believes that it would be impossible for the agency to define the scope of insurance practices covered by an exemption with enough precision to avoid case-by-case disputes over its application. Accordingly, HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with HUD's statutory mandate.

*Issue:* Commenters stated that if HUD does not provide an exemption for insurance practices, insurers would be forced to evaluate whether their practices lead to segregation and to learn what statistical disparities are permissible.

*HUD Response:* HUD disagrees. Any obligation to evaluate practices comes from the language of the Act itself, not this final rule. As explained above, this final rule does not impose any new liability upon insurers, so it will not require insurers to start new reviews of their practices. Any such obligation to review their practices arose long before the 2013 Rule was promulgated and originates from the statutory language.[133] Judicial precedent applying

disparate impact analysis to insurance companies long predates the 2013 Rule, let alone this rule.[134] Any costs entities may now choose to incur will not be due to any new requirement, and in any case will simply be the ordinary costs of complying with any preexisting statute, administrative practice, and case law governing nondiscrimination in housing and housing-related practices. In any event, evaluating and re-evaluating current practices are not unreasonably burdensome activities for a business or industry to undertake. As explained elsewhere, many other industries, such as lending, engage in risk-based practices and show that it is possible to consistently evaluate and re-evaluate their policies and practices to endeavor to avoid those that may cause unjustified discriminatory effects. Yet those industries have not suffered the dire consequences that the insurance industry claims it will suffer. HUD does not believe the insurance industry stands on different footing from other industries in that respect such as to warrant differential treatment.

*Issue:* Commenters, citing *NAACP* v. *Am. Family Mut. Ins. Co.*,[135] asked HUD to exempt all homeowners insurance practices from liability for unjustified discriminatory effects, stating that the Act covers only insurance practices that make housing unavailable, thus effectively precluding homeownership. Homeowners insurance practices, they stated, do not make housing unavailable. In addition, citing *Southend Neighborhood Improvement Assoc.* v. *St. Clair*,[136] commenters stated that section 804(b)'s prohibition against discrimination in the provision of services in connection with the sale or rental of a dwelling applies only to

services generally provided by governmental units, such as police and fire protection or garbage collection, not insurance.

*HUD Response:* HUD declines to exempt homeowners insurance from liability for the reasons stated previously and explained more fully below. Neither *NAACP* nor *Southend Neighborhood Improvement Ass'n* support such an exemption. The commenters are incorrect in stating that insurance practices cannot make housing unavailable or that the Act only covers insurance practices that make housing unavailable. A discriminatory practice that precludes a person from obtaining homeowners or renters insurance may indeed make housing unavailable to that person, as insurance is usually required as a condition for obtaining a mortgage or a lease. Moreover, while section 804(a) prohibits discrimination that "make[s] unavailable" a dwelling, other provisions in the Act may prohibit insurance practices, including pricing, regardless of whether they make housing unavailable.[137] For example, section 805(a) [138] prohibits discrimination in the "terms or conditions" of "residential real estate-related transactions," and section 804(b) [139] prohibits discrimination in the "terms, conditions or privileges of sale or rental of a dwelling or in the provision of services . . . in connection therewith." Indeed, since 1989, HUD's fair housing regulations have specifically prohibited "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently" because of a protected characteristic.[140]

---

[133] 42 U.S.C. 3601 *et. seq.; see, e.g., Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 293 (5th Cir. 2003); *see also Owens* v. *Nationwide Mut. Ins. Co.,* Civ. No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *44–53 (N.D. Tex. Aug. 2, 2005); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 60–61 (D.D.C. 2002); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

[134] *See Dehoyos,* 345 F.3d 290, 293 (5th Cir. 2003) (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d 555, 558 (D. Conn. 2015) (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 48–49, 60–61 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost" policy had an unjustified discriminatory effect).

[135] *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, (7th Cir. 1992).

[136] *Southend Neighborhood Improvement Assoc.* v. *St. Clair,* 743 F.2d 1207 (7th Cir. 1984).

[137] Depending on the circumstances, discriminatory insurance practices can violate 42 U.S.C. 3604(a), (b), (c), (f)(1), (f)(2), 3605, and 3617. *See, e.g., Cisneros,* 52 F.3d at 1360 (holding that HUD's interpretation that section 3604 of the Act prohibits discriminatory insurance underwriting is reasonable); *Nevels v. W. World Ins. Co.,* 359 F. Supp. 2d 1110, 1119–23 (W.D. Wash 2004) (recognizing that sections 3604(f)(1), 3604(f)(2), 3605 and 3617 of the Act cover insurance practices); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d at 55–58 (holding that sections 3604(a), 3604(b), and 3605 of the Act prohibit discriminatory insurance underwriting practices); *Owens v. Nationwide Mut. Ins. Co.,* Civ. No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *16–17 (N.D. Tex. Aug. 2, 2005) (holding that section 3604 of the Act prohibits discriminatory insurance practices); *Francia v. Mount Vernon Fire Ins. Co.,* No. CV084032039S, 2012 Conn. Super. LEXIS 665, at *24–25 (Conn. Super. Ct. Mar. 6, 2012) (relying on section 3604(c) to interpret an analogous state law as prohibiting a discriminatory statement in an insurance quote).

[138] 42 U.S.C. 3605(a).

[139] 42 U.S.C. 3604(b).

[140] 24 CFR 100.70(d)(4) (emphasis added). As used in this regulation, the phrase "property or
Continued

**19466**     **Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

Courts have applied the Act's provisions to various insurance practices, including insurance pricing,[141] marketing and claims processing, irrespective of whether the discriminatory conduct occurred when the unit became available or in conjunction with or subsequent to the acquisition of a dwelling.[142]

In addition, HUD finds that the commenters have misconstrued the referenced cases. HUD notes, for example, that *NAACP* did not hold that the Act *only* prohibits insurance practices that effectively preclude homeownership; rather, the court, in considering whether the Act prohibited intentional insurance redlining practices, concluded that it did, and affirmed HUD regulations which "include, among the conduct prohibited by section 3604: 'Refusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently because of race.' "[143] In that case, the plaintiff brought suit under both section 804(a), asserting that the insurer made housing unavailable, and section 804(b), asserting that the insurer discriminated in the provision of services in connection with the sale or rental of a dwelling.[144] The Seventh Circuit, in discussing the viability of plaintiff's claims, stated that § 804 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant."[145] The

court could not read section 804(b) as requiring a showing that housing was otherwise made unavailable as that language is not present in section 804(b); rather it is in section 804(a). Accordingly, the court's quote cannot be read as applying to the section 804(b) claim especially because it was talking about the plaintiff's claims generally, including its section 804(a) claim, which has the "make unavailable" language. Thus, *NAACP* cannot be fairly read to hold that the Act only applies when insurance practices make housing unavailable.

Furthermore in *NAACP*, the Seventh Circuit also clarified its earlier statement regarding governmental services in *Southend Neighborhood Improvement Ass'n.*[146] In *NAACP*, the court stated, "[w]e once suggested in passing, [in *Southend*] that 'service' in section 3604 means 'services generally provided by governmental units,' but the subject was not before us—and the suggestion that section [804] is limited to governments is hard to reconcile with another plain-statement principle requiring Congress to be especially clear if it wants to regulate the conduct of state and local governments. . .So it is hard to understand section [804] as restricted to garbage collection and like services."[147]

*Issue:* Commenters stated that an exemption for insurance practices is warranted because the judicial and legislative branches have not specifically authorized HUD to become involved in insurance.

*HUD Response:* Congress authorized HUD to interpret and enforce the Act, and as discussed above, provided no exemption for insurance practices.[148] As also discussed above, courts have routinely applied the Act to insurance practices and have found that, as with other housing-related practices, insurers may be liable for practices that create discriminatory effects under the Act.[149]

In promulgating this final rule, HUD is exercising the authority Congress gave it.[150] Any liability originates from the Act itself, not HUD or the rule.

Fundamental Nature of Insurance

*Issue:* Commenters requested an exemption for insurance practices because of the fundamental nature of the industry, alleging that the proposed rule would fundamentally and problematically alter insurance practices. Commenters said that the foundation of the business of insurance is the ability to classify insurance policyholders by risk and that insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly. Commenters stated that the industry is predicated on setting rates and making underwriting decisions based on relevant, mathematical, and objective risk factors that accurately predict loss. Commenters said that risk-based pricing has been a bedrock principle of state insurance regulation for more than 150 years, acting as a primary tool for ensuring rates are adequate, not excessive, not unfairly discriminatory, accurately predictive of risk, and protective of the solvency of insurers. Commenters stated that the insurance market functions best when each insured pays a rate that accurately reflects the cost of providing insurance to similarly-situated policy holders. Commenters stated that although professional underwriters routinely avoid or exclude risks for which they lack expertise, underwriting judgment, or actuarial data, they still are required to consider similar factors bearing on risk of loss and do not consider protected traits.

Commenters noted that risk-based pricing is the primary tool to ensure that rates are not unfairly discriminatory, as defined by state insurance codes. Commenters stated that in the context of insurance, unfair discrimination means treating similar risks in a dissimilar manner, which is different from discrimination under the Act. They stated that a rate is unfairly discriminatory if the premium differences do not correspond to expected losses and average expenses.

Commenters stated that the proposed rule would force insurers to eliminate

---

hazard insurance for dwellings" includes insurance purchased by an owner, renter, or anyone else seeking to insure a dwelling. 42 U.S.C. 3602(b) (defining "dwelling" without reference to whether the residence is owner- or renter-occupied).

[141] *See, e.g., NAACP,* 978 F.2d at 301 ("Section 3604 of the Fair Housing Act applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant."); *Dehoyos,* 345 F.3d at 293 (holding that a claim alleging discriminatory insurance pricing was not barred by McCarran-Ferguson).

[142] *See, e.g., Franklin* v. *Allstate Corp.,* No. C–06–1909 MMC, 2007 U.S. Dist. LEXIS 51333, at *17–19 (N.D. Cal. July 3, 2007) (applying the Act to claims processing); *Burrell* v. *State Farm & Cas. Co.,* 226 F. Supp. 2d 427 (S.D.N.Y. 2002) (same); *see also Owens* v. *Nationwide Mut. Ins. Co.,* Civ. No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *17 (N.D. Tex. Aug. 2, 2005) (Insurance practices are covered by the Act "whether the insurance is sought in connection with the maintenance of a previously purchased home or with an application to purchase a home."); *Lindsey* v. *Allstate Ins. Co.,* 34 F. Supp. 2d 636, 643 (W.D. Tenn. 1999) ("It would seem odd to construe a statute purporting to promote fair housing as prohibiting discrimination in providing property insurance to those seeking a home, but allowing that same discrimination so long as it takes place in the context of renewing those very same insurance policies.").

[143] *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 290, 300 (7th Cir. 1992).

[144] *Id.* at 297.

[145] *Id.* at 301.

[146] *Id.* at 299.

[147] *Id.*

[148] 42 U.S.C. 3610; 42 U.S.C 3612; 42 U.S.C 3614a (HUD has the authority to make rules to carry out the Act).

[149] *See Dehoyos,* 345 F.3d at 293 (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d at 558 (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified

discriminatory effect); *Nat'l Fair Hous. Alliance* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 48–49, 60–61 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost:" policy had an unjustified discriminatory effect).

[150] 42 U.S.C. 3614a.

actuarially sound risk-based practices, which is central to the effective determination of insurance premiums, in favor of substitutes that are less effective at furthering an insurer's legitimate, nondiscriminatory interests. A commenter stated that the proposed rule would penalize insurers for relying on sound risk factors that disproportionately affect a protected class, because they would be held liable for disparities they did not create. A commenter stated that the rule will require uniform rates, regardless of risk. Commenters disagreed with the proposed framework's case-by-case analysis. For example, commenters stated that insurers implement polices accounting for risk factors through actuarially sound methodologies, and that it would be impossible for a plaintiff to identify a less discriminatory alternative because any alternative would necessarily correspond to a different risk than the factor at issue, identified through actuarially sound methodology. As a result, if the plaintiff's alternative was adopted, the risk challenged in the lawsuit would no longer be reflected in the price of insurance, resulting in overcharging low-risk customers and likely driving them from the markets.

Other commenters disagreed, stating that the proposed rule appropriately applies to insurance. A commenter stated that application of the 2013 Rule and 2016 Supplement [151] to insurance is consistent with sound actuarial practices because it accommodates underwriting decisions that satisfy the shifting burden framework. Commenters explained that ratemaking, though largely actuarially based, can incorporate elements of non-actuarially based subjective judgments. Commenters cited ratemaking, price optimization, and credit scoring as examples of insurance practices that are not entirely risk-based. Commenters further noted that consideration of these non-purely risk-based factors had not led to the demise of the industry. A commenter indicated that over the past few decades, the insurance industry has removed barriers that restrict

homeowners insurers from writing policies in communities of color and, in response to disparate-impact challenges, some insurers have refined underwriting and pricing systems to eliminate arbitrary barriers to the availability of adequate homeowners coverage, resulting in business growth. Commenters concluded that subjecting insurers to disparate impact liability does not ''threaten the fundamental nature of the insurance industry.'' Commenters noted that other risk-based industries, such as mortgage lending, are subject to liability for unjustified discriminatory effects under the Act and have not had to forego risk-based analysis to avoid liability under the Act.

*HUD Response:* HUD disagrees that the fundamental nature of insurance warrants the exemptions requested by some commenters, whose comments were premised upon the faulty assumption that the proposed rule generally prohibits risk-based practices. It does not. This final rule does not declare any activity per se unlawful. It merely provides a framework for determining if a particular policy or practice causes an unjustified and unlawful discriminatory effect. HUD recognizes that risk-based decision making is an important aspect of sound insurance practices, and nothing in this final rule prohibits insurers from making decisions that are in fact risk-based. Under the framework established by this rule, practices that actually are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability. The rule simply requires that if an insurer's practices are having a discriminatory effect and ''an adjustment . . . can still be made that will allow both [parties'] interests to be satisfied,'' the insurer must make that change.[152]

Risk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving complex risk-based decisions, such as mortgage lending, without the need for exemptions or safe harbors. Indeed, all businesses covered by the Act make risk-based decisions. For example, landlords assess risk when they select tenants, set rental rates, and decide whether to require deposits. The Act requires that such risk-based determinations not be based on protected characteristics, in whole or in part. Moreover, some states specifically provide for discriminatory effects liability against insurers under state laws, further undermining the claim

that providing for such liability as a matter of federal law threatens the fundamental nature of the industry.[153]

Unfortunately, the history of discrimination in the homeowners insurance industry is long and well documented,[154] beginning with insurers overtly relying on race to deny insurance to persons of color and evolving into more covert forms of discrimination.[155] For example,

---

[151] On October 5, 2016, HUD issued supplemental responses to insurance industry comments in accordance with the court's decision in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan*, which upheld the rule's burden-shifting framework for analyzing discriminatory effects claims as a reasonable interpretation of the Fair Housing Act, but that HUD had not adequately explained why case-by-case adjudication was preferable to using its rulemaking authority to provide exemptions or safe harbors related to homeowners insurance. 81 FR 69012; *Prop. Cas. Insurers Ass'n of Am.* v. *Donovan (PCIAA),* 66 F. Supp. 3d 1018, 1049–54 (N.D. Ill. 2014).

[152] *Avenue 6E Invs., LLC,* 818 F.3d at 513.

[153] *Viens,* 113 F. Supp. 3d at 573 n.20 (stating that Connecticut ''provides a similar (albeit broader) protection against housing discrimination as the [Act]'' and finding that McCarran-Ferguson does not bar an FHA disparate impact claim against an insurer related to a property located in Connecticut).; *Jones* v. *Travelers Cas. Ins. Co. of Am.,* Tr. of Proceedings Before the Honorable Lucy H. Koh U.S. District Judge, No.5:13-cv-02390 LHK (N.D. Cal. May 7, 2015), ECF No. 236 (holding that California law complements the Act and denying an insurer's motion to for summary judgement); *Toledo Fair Hous. Ctr.* v. *Nationwide Mut. Ins. Co,* 94 Ohio Misc. 2d at 157–159 (recognizing discriminatory effects liability in homeowners insurance under state law in part because the Superintendent of Insurance lacks ''primary jurisdiction'' over such claims).

[154] Although the discussion that follows focuses on race and national origin discrimination because of their historic prevalence, examples of discrimination in insurance against other protected classes exist as well. *See e.g., Nevels* v. *W. World Ins. Co.,* 359 F. Supp. 2d 1110 (W.D. Wash. 2004) (disability).

[155] *See generally, Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. (1994)* [hereinafter 1994 Hearings]; *Insurance Redlining Practices: Hearings before the Subcom. on Commerce, Consumer Protection & Competitiveness of the H. Comm. on Energy and Commerce, 103d Cong. (1993)* [hereinafter Mar. 1993 Hearings]; *Insurance Redlining: Fact or Fiction: Hearing before the Subcom. On Consumer Credit and Insurance of the H. Comm. on Banking, Finance & Urban Affairs, 103d Cong. (1993)* [hereinafter Feb. 1993 Hearing]; *Insurance Redlining: Fact Not Fiction [Feb. 1979]* [hereinafter Comm'n on Civil Rights] (report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the U.S. Commission on Civil Rights); *President's National Advisory Panel on Insurance in Riot-Affected Areas, Meeting the Insurance Crisis of Our Cities (1968)* [hereinafter Nat'l Advisory Panel]. Further, as the 2016 Supplement stated at times, agents were given plainly discriminatory instructions, such as ''get away from blacks' and sell to 'good, solid premium-paying white people,''' or they simply were told, ''We don't write Blacks or Hispanics.'' *See* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II); *see also,* e.g., Nat'l Advisory Panel, at 116 (quoting an insurance broker as explaining, ''No matter how good [a customer] is, they [the insurers] take that into consideration, the fact he is a Negro.''). Underwriting guidelines contained discriminatory statements, such as listing ''population and racial changes'' among ''red flags for agents.'' Feb. 1993 Hearing at 19, 27 (statement of Gregory Squires, Prof. U. Wis. Milwaukee). Minorities were offered inferior products, such as coverage for repairs rather than replacement, or were subject to additional hurdles during the quote and underwriting process. 1994 Hearings at 15, 47–48 (statements of Deval Patrick, DOJ Ass't Attorney Gen. for Civil Rights); *id.* at 18–19, 51 (statements of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity). Additionally,

Continued

minorities were denied access to insurance through property-location and property-age restrictions, even when data demonstrated that such restrictions were not justified by risk of loss.[156] This history of discrimination led to persons of color being unjustifiably denied insurance policies or paying higher premiums.[157] As described more fully

in other responses, HUD believes that discriminatory effects liability continues to play an important role in preventing unjustifiable discrimination, including in the insurance industry.

Furthermore, HUD's long experience in administering the Act counsels that discriminatory effects liability does not threaten the fundamental nature of the insurance industry. Putting aside the length of time insurers have been subject to discriminatory effects liability under the statute itself, the industry has been subject to the 2013 Rule for ten years and the calamitous results commenters claimed would come to pass have not occurred. HUD's position that discriminatory effects liability applies to insurance dates back more than three decades, as does the industry's concern that such liability makes it "near impossible for an insurer to successfully defend himself." [158] HUD has maintained for decades that remedying discrimination in insurance, including in cases involving discriminatory effects claims, requires examination of each allegedly discriminatory insurance practice on a case-by-case basis, and HUD sees no reason to deviate now from this longstanding approach.

Based on its experience in administering and enforcing the Fair Housing Act, HUD believes that a broad exemption would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations, such as marketing, claims processing, and payment. In addition, a discriminatory effects claim can challenge an insurer's underwriting policies as "not purely risk-based" without infringing on the insurer's "right to evaluate homeowners insurance risks fairly and objectively." [159] For example, plaintiffs have challenged insurer policies that deny insurance to landlords because they rent to Section 8 voucher holders.[160] Even practices such as

ratemaking that are largely actuarially-based can incorporate an element of non-actuarially-based subjective judgment or discretion under state law. Indeed, many of the state statutes referenced by commenters that mandate that rates be reasonable, not excessive, not inadequate, or unfairly discriminatory, permit insurers, in the very same section of the insurance code, to rely on "judgment factors" in ratemaking. The example of price optimization practices, which some states have started regulating, illustrates how non-actuarial factors, such as price elasticity of market demand, can impact insurance pricing in a manner similar to the pricing of products in non-actuarial industries.[161] The term "price optimization" can refer to "the process of maximizing or minimizing a business metric using sophisticated tools and models to quantify business considerations," such as "marketing goals, profitability and policyholder retention." [162] The term "price elasticity of demand" refers to "the rate of response of quantity demanded due to a price change. Price elasticity is used to see how sensitive the demand for a good is to a price change." [163] Therefore, by using these practices, insurers are already using factors unrelated to risk to help determine price. Relying on factors unrelated to risk, therefore, has not doomed their business model.

HUD likewise declines to craft a safe harbor for any specific risk-based factor because it would be overbroad, foreclosing claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice.

For HUD to select a few factors for per se exemption as a matter of law based on commenters' bare assertions about

---

[156] *See, e.g.,* Comm'n on Civil Rights, *supra* n. 155 at 34–39 ("The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written."); 1994 Hearings, *supra* n. 155, at 18 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (noting the "disparate impact on minority communities" of property age and value requirements, and explaining that "47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000" and that "40 percent of black households compared to 29 percent of white households live in homes build before 1950.").

[157] *See, e.g.,* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II) ("[S]hocking anecdotal evidence was supported by 12 years of data submitted by Missouri State Insurance Commissioner Jay Angoff. . . . It shows

that, in the cities of St. Louis and Kansas City, low-income minorities had to pay more money for less coverage than their white counterparts, despite the fact that losses in minority areas were actually less than those in white areas. This evidence directly challenges industry assertions that minorities are too risky to insure.").

[158] *Fair Housing Act: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary,* 95th Cong. 20, 616 (1978) (statement of the Am. Ins. Ass'n.).

[159] *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 60 (D.D.C. 2002).

[160] Transcript of Proceedings Before the Hon. Lucy H. Koh at 29–33, *Jones* v. *Travelers Cas. Ins. Co. of Am,* (N.D.Cal. 2015) (No.5:13-cv-02390) ECF No. 236 (denying defendants motion for summary judgement on a claim alleging that defendant's policy of failing to insure properties that lease to Section 8 participants has an unlawful

discriminatory effect because plaintiffs have "presented evidence purportedly establishing a correlation between members of protected classes and Section 8 tenants" and that plaintiffs have presented sufficient evidence that, presents a "factual question for the trier of fact as to whether [defendant] has legitimate, non-discriminatory justifications."); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 28–29 (D.D.C. 2017) (denying motion to dismiss claim alleging that defendant's policy of refusing to insure properties that are rented to Section 8 voucher holders had an unlawful discriminatory effect).

[161] Nat'l Ass'n of Ins. Comm'rs, Price Optimization White Paper (Nov. 19, 2015) *https://content.naic.org/sites/default/files/inline-files/committees_c_catf_related_price_optimization_white_paper.pdf* [hereinafter NAIC White Paper] at 9 ¶ 30 ("Price optimization has been used for years in other industries, including retail and travel. However, the use of model-driven price optimization in the U.S. insurance industry is relatively new.").

[162] *Id.* at 4 ¶ 14(a) (discussing the responses of state regulators to the rising increase in use of price optimization practices by insurance providers).

[163] *Id.* at 4 ¶ 14(f) (internal quotations omitted).

---

discrimination took the form of insurers redlining predominantly minority neighborhoods and disproportionately placing agents and offices in predominately white neighborhoods. 1994 Hearings at 15, 47–48 (statements of Deval Patrick, DOJ Ass't Attorney Gen. for Civil Rights); *id.* at 18–19, 51 (statements of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity). Minorities also were denied access to insurance through property-location and property-age restrictions, even when data had demonstrated that such restrictions are not justified by risk of loss. *See, e.g.,* Comm'n on Civil Rights, at 34–39 ("The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written."); 1994 Hearings, at 18 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (noting the "disparate impact on minority communities" of property age and value requirements, and explaining that "47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000" and that "40 percent of black households compared to 29 percent of white households live in homes build before 1950."); *see also* Transcript of Proceedings Before the Hon. Lucy H. Koh at 29–33, *Jones* v. *Travelers Cas. Ins. Co. of Am,* (N.D .Cal. 2015) (No.5:13-cv-02390) ECF No. 236 (denying defendants motion for summary judgement on a claim alleging that defendant's policy of failing to insure properties that lease to Section 8 participants has an unlawful discriminatory effect because plaintiffs have "presented evidence purportedly establishing a correlation between members of protected classes and Section 8 tenants" and that plaintiffs have presented sufficient evidence that, presets a "factual question for the trier of fact as to whether [defendant] has legitimate, non-discriminatory justifications."); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 28–29 (D.D.C 2017) (denying motion to dismiss claim alleging that defendant's policy of refusing to insure properties that are rented to Section 8 voucher holders had an unlawful discriminatory effect). In addition, HUD, for example, has issued charges against insurers for intentionally discriminating on the basis of religion by imposing less favorable policy terms on people of a particular religion, and on the basis of sex and familial status when an insurer refused to issue a mortgage insurance policy until the policyholder returned from maternity leave.

their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would also be arbitrary. Even if such data were available and a full survey performed, safe harbors for specific factors would still be overbroad because the actuarial relevance of a given factor can vary by context.[164] In addition, while use of a particular risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be. Furthermore, the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve.

The Act's broad remedial purpose is "to provide . . . for fair housing throughout the United States."[165] Thus, the Act plays a "continuing role in moving the Nation toward a more integrated society."[166] Ensuring that members of all protected classes can access insurance free from discrimination is necessary to achieve the Act's objective because obtaining a mortgage for housing typically requires obtaining insurance.[167] Likewise, obtaining insurance may be a precondition to securing a home in the rental market.[168] Insurance is also critical to maintaining housing because fire, storms, theft, and other perils frequently result in property damage or loss that would be too costly to repair or replace without insurance coverage.

In light of the long, documented history of discrimination in the homeowners insurance industry,[169] including the use of "risk factors" by insurers and regulators that were subsequently banned as discriminatory[170] and the non-actuarial or hybrid nature of many insurance practices, HUD considers it inappropriate to craft any exemptions or safe harbors for insurance practices. HUD's longstanding case-by-case approach can adequately address any concerns and better serves the Act's broad remedial purpose and HUD's statutory obligation to affirmatively further fair housing, including by supporting fair housing efforts undertaken by states.[171]

*Issue:* Commenters opposed the rule or requested an exemption because they believe the rule would force insurers to consider protected traits that are prohibited in the rating and underwriting process and are not risk predictive, contrary to *Inclusive Communities'* caution against injecting race into housing decisions. Commenters wrote that insurance works best when it is blind to protected traits, as they have no relationship to ratemaking or underwriting and that state insurance law prohibits them from using such data to make decisions concerning eligibility, underwriting, and pricing. Commenters also stated that the rule will require insurers to charge different rates for members of different protected classes but similar risk profiles, violating state insurance laws and regulations and compromising insurers' ability to set fair, accurate, and non-discriminatory rates and reliably predict the probable financial consequences of risk. Commenters stated that an insurer could be liable for considering a protected trait or not considering that trait.

*HUD Response:* HUD disagrees that this final rule will force insurers to consider protected traits of individuals in the rating and underwriting process. Instead, to ensure compliance, a regulated entity may wish to examine whether a facially neutral policy or practice causes an unjustified discriminatory effect, as defined by the regulation. This is no different from the analysis that any other entity regulated by the Fair Housing Act, such as mortgage lenders and housing providers, might want to perform to ensure compliance. *Inclusive Communities* rejected the argument that such an analysis would raise equal-protection concerns, reasoning that "awareness of race" can help "local housing authorities [that] choose to foster diversity and combat racial isolation with race-neutral tools."[172]

Such awareness of the impact of facially neutral actions can also benefit other housing providers and entities covered by the Act, including insurers, to achieve the goals that many commenters stated they share, *i.e.,* achieving a more equitable and just society. This sort of awareness of race (and other protected classes), combined with an understanding of how its own policies, practices, and assessment tools impact those protected classes, can inform the covered entity on whether its approach actually or predictably results in a discriminatory effect. HUD notes that awareness of protected traits and the impact of policies based on protected traits is different from considering or making decisions *based upon* a protected trait, which would constitute discriminatory treatment. Commenters pointed to no state law, and HUD knows of no state law, that prohibits insurers from examining their own underwriting factors and practices to determine whether these factors and practices unjustifiably cause a disparate impact on protected classes or otherwise serve as a proxy for race. This kind of self-examination is encouraged, generally, by this final rule, is consistent with *Inclusive Communities* and the Act, and is intended not to lead to liability under the Act but rather to protect entities from liability.[173] Indeed, lenders and others covered by the Act regularly engage in such self-examination without threat to their business models. In sum, the industry has been subject to the 2013 Rule for ten years, and iterations of the same burden-shifting framework as imposed by courts for even longer, and none of these dire outcomes predicted by the industry have come to pass.

*Issue:* Commenters stated that prohibiting risk-based pricing and underwriting, and forcing insurers to consider protected traits, would lead to negative consequences. Commenters stated that the proposed rule could lead to serious and damaging unintended consequences for the industry including, interfering with underwriting; destabilizing insurance coverage; threatening insurer solvency; distorting the market; collapsing the industry; and increasing insurance costs and premium rates, having a negative impact on policyholders and small businesses. As another example, commenters stated that the inability to rate risks will make it prohibitively expensive to insure high-risk properties so insurers will withdraw specific lines of business or insure only low-risk

---

[164] For example, in some high-crime neighborhoods the higher-than-average risk of loss from theft could be offset by a lower-than-average risk of other losses, such as those caused by weather. Therefore, the legitimacy of declining to issue insurance policies in all locations with high crime rates would depend on other features of those locations.

[165] 42 U.S.C. 3601; *See Havens Realty Corp.,* 455 U.S. at 380 (recognizing Congress's "broad remedial intent" in passing the Act); *Trafficante,* 409 U.S. at 209 (recognizing the "broad and inclusive" language of the Act); *see also Inclusive Cmtys. Project Inc.,* 576 U.S. at 538 (describing the "central purpose" of the Act as "to eradicate discriminatory practices within a sector of our Nation's economy").

[166] *Inclusive Cmtys. Project Inc.,* 576 U.S. at 547.

[167] *NAACP,* 978 F.2d at 297 ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable.").

[168] *See, e.g.,* Or. Rev. Stat. 90.222(1) ("A landlord may require a tenant to obtain and maintain renter's liability insurance in a written rental agreement.").

[169] *See* sources cited *supra* note 155.

[170] *See* sources cited *supra* note 155.

[171] *Cf. Crossroads Residents Organized for Stable and Secure ResiDencieS,* , 2016 U.S. Dist. LEXIS 86965 at *32 n.6 (declining to adopt a per se rule that a certain category of disparate impact claims could not be brought in part because "HUD has indicated a preference for case-by-case review of practices alleged to cause a disparate impact").

[172] *Inclusive Cmtys. Project Inc.,* 576 U.S. at 545.

[173] *See* 24. CFR. 100.140 (discussing voluntary self-testing conducted by lenders).

**19470** **Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

properties. Commenters stated, citing to *NAACP*, that charging the same rates to individuals posing different levels of risk results in lower-risk individuals subsidizing higher risks, eliminating incentives for insureds to mitigate risk, forcing low-risk consumers out of the market [174] and diminishing insurers' ability to broadly spread risk.

*HUD Response:* HUD disagrees with the commenters' views on the final rule's impact on the fundamental nature of insurance and that such negative consequences will come to pass. Each example is premised upon the faulty assumption that the rule prohibits risk-based practices or would require insurers to use protected traits. As explained in further detail above, it does not. The rule merely provides a framework for determining if a particular policy or practice causes an unlawful discriminatory effect. Furthermore, as noted above, insurers have been subject to discriminatory effects liability since well before the 2013 Rule and have been subject to the 2013 Rule for ten years, yet to HUD's knowledge the commenters' fears have not come to pass.[175] Certainly, no commenter has provided any evidence that such fears have materialized.

*Whether Inclusive Communities Supports an Insurance Exemption*

*Issue:* Commenters cited *Inclusive Communities* in support of their request for an exemption for risk-based insurance practices. Commenters stated that applying the rule to insurance would run afoul of the limitations on disparate impact liability articulated in *Inclusive Communities,* and affect their ability to accurately price for risk, making risk assessment more expensive, penalizing consumers, and adversely impacting the insurance market. Some commenters, citing *Inclusive Communities'* discussion of "legitimate business practices," asserted that risk-based insurance practices are examples of legitimate business practices and

merit an exemption. Commenters stated that restricting insurers' use of objective risk-based factors would run afoul of *Inclusive Communities* because it would undermine the Act's purpose and the free-market system by making insurers fearful of liability, restrict innovation, and hold insurers liable for disparities they did not create, irreparably distorting the market.

Other commenters opposed an exemption for insurers, with a commenter specifically noting that *Inclusive Communities* did not discuss exemptions from liability. One commenter noted in *Nat'l Fair Hou. All.* v. *Travelers Indemnity Co.,* the court rejected defendants' argument that *Inclusive Communities* introduced new standards such that insurers could not be held liable, stating that the refusal to provide insurance to Section 8 voucher holders remained the "type of clear, non-speculative, connection . . . that *Inclusive Communities* requires to make out a prima facie claim of disparate impact."[176]

*HUD Response:* HUD finds no support in *Inclusive Communities* for exempting the insurance industry from discriminatory effects liability. As discussed above, *Inclusive Communities* did not introduce any new limitations to discriminatory effects law, did not address the application of the 2013 Rule or disparate impact principles to risk-based homeowners insurance practices, and did not discuss or suggest exemptions to liability for insurers or anyone else. *Inclusive Communities* discusses "business necessity,"[177] and "legitimate needs"[178] in the context of the Title VII disparate impact framework, which, like this rule, provides that a practice that is deemed a "business necessity" may still violate the statute if the plaintiff proves there is a less discriminatory alternative.[179] Rather than support an exemption for risk-based insurance practices, this language supports the framework of this final rule. The Court in *Inclusive Communities* also stated that governmental entities "must not be prevented from achieving legitimate objectives."[180] This requirement is

consistent with the final rule which, at the second step allows the defendant to show that a challenged practice serves a substantial, legitimate, non-discriminatory interest, so as to defeat a disparate impact claim unless the plaintiff can prove there is a less discriminatory alternative that serves that substantial, legitimate, nondiscriminatory interest.

*Issue:* Commenters stated that because the facts in *Inclusive Communities* involve decisions on the location of housing, which are distinguishable from the facts and decisions in insurance cases, the principles of *Inclusive Communities* are inapplicable to the insurance industry. This distinction, they said, supports an exemption for insurance.

*HUD Response:* HUD agrees that *Inclusive Communities* had different facts than a case involving insurance. That does not mean that *Inclusive Communities* supports an exemption or safe harbor for insurance. *Inclusive Communities* did not limit the use of discriminatory effects claims to any particular industry [181] and provides no support for exempting insurance practices. The Court's holding that discriminatory effects claims are cognizable under the Act applies to all such claims under the Act, and does not exclude practices particular to any industry, including insurance. HUD notes that the potential application of disparate-impact analysis to the insurance industry long predated *Inclusive Communities,* which generally reaffirmed disparate-impact doctrine.

*Whether Other Supreme Court Precedent Supports an Exemption*

*Issue:* Commenters stated that *Wards Cove* and *Watson* require an exemption for insurance because they set a higher burden of proof for plaintiffs than the proposed rule does.

*HUD Response:* HUD disagrees with the commenters. Neither *Wards Cove* nor *Watson* provide a basis for an exemption for insurance practices. Both cases, which involve Title VII claims, were decided prior to the Supreme Court's controlling precedent in *Inclusive Communities,* with which the final rule is consistent. And as explained more fully below, neither case necessitates a revision to plaintiff's burden of proof in Fair Housing Act cases. Simply stated, they provide no basis to exempt insurance practices.

---

[174] Some commenters quoted the Seventh Circuit in *NAACP* in support of their statement that considering protected traits would lead to adverse consequences: "putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out.

[175] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 546 (the Court noted that the existence of disparate impact claims "for the last several decades 'has not given rise to . . . dire consequences.'"). To HUD's knowledge, insurers continue to use risk-based pricing. Commenters provided no evidence that over the past ten years this rule has resulted in an increased risk of insurer solvency, that it has caused any insurers to go out of business, that it has caused rates to increase, or that it has caused insurers to withdraw from insuring certain types of properties.

[176] *Nat'l Fair Hous. All.* v. *Travelers Indemnity Co.,* 261 F. Supp. 3d at 30 (D.D.C. 2017).

[177] *Inclusive Cmtys. Project Inc.,* 576 U.S. at 541.

[178] *Id.,* at 533.

[179] For instance, the court stated explained, describing the rule for Title VII that "[b]efore rejecting a business justification—or a governmental entity's analogous public interest—a court must determine that a plaintiff has shown that there is "an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs." *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 533.

[180] *Inclusive Cmtys. Project, inc.,* 576 U.S. at 544.

[181] The Court stated "the issue here is whether, under a proper interpretation of the FHA, housing decisions with a disparate impact are prohibited," and did not limit the holding to certain fact patterns. *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 530.

*Whether Claims Against Insurers Will Fail as a Matter of Law*

*Issue:* Commenters stated that insurance practices should be exempt because challenges to risk-based pricing and underwriting will fail as a matter of law under *Inclusive Communities* and *Graoch.* They stated that insurance claims will fail as a matter of law because *Inclusive Communities* mandates the removal only of ''artificial, arbitrary, or unnecessary barriers'' and risk-based pricing does not create such barriers and because plaintiffs would be unable to identify less-discriminatory practices that will allow the insurer to pursue their valid interest. According to the commenters, this is because it is grounded in mathematics, is objective and fair, and advances substantial, legitimate, nondiscriminatory interests. Other commenters stated that making sure that insurance rates accurately reflect the risk of future loss is a valid interest and that *Inclusive Communities* requires that businesses have ''leeway to state and explain the valid interest served by their policies.'' In addition, commenters said that the *Graoch* court held that categorical bars are justified when plaintiffs have no chance of success, a holding that commenters argued the proposed rule ignores.

Commenters further stated that all insurance claims will fail as a matter of law because there can never be a robust causal link between legitimate risk factors and any disparate impact. According to them, risk-based factors do not consider protected characteristics, and they are mandated or approved by state law, limiting insurer discretion. These commenters stated that any disparate impact caused by socioeconomic factors is beyond the control of insurers. Moreover, they stated that because state laws limit insurer discretion, these laws make it impossible to ascribe any discriminatory effects in underwriting and pricing to an insurer's own choices.

A commenter suggested that if HUD does not exempt or provide a defense for insurers, HUD should state in the final rule that disparate impact claims against risk-based pricing and underwriting practices cannot succeed. Commenters also asked HUD to commit not to bring disparate-impact challenges to risk-based insurance practices.

*HUD Response:* HUD disagrees with the commenters who claimed that lawsuits against insurers based on a discriminatory effects theory will necessarily fail as a matter of law and that therefore insurers are entitled to an exemption.[182] As discussed in detail above, courts have found that insurers are subject to discriminatory effects liability under the Act. HUD also declines to commit not to bring discriminatory effects challenges against insurers or to specify that any claims based on insurance practices will necessarily fail. As discussed at length, insurance practices may be subject to disparate impact liability and insurers may be proper defendants in lawsuits alleging disparate impact under the Act. Indeed, the Act requires HUD to file charges of discrimination if reasonable cause exists to believe discrimination occurred.[183]

*Graoch* provides no basis for such an exemption. First, the *Graoch* court stated that ''we cannot create categorical exemptions from [the Act] without a statutory basis'' and ''[n]othing in the text of the [Act] instructs us to create practice-specific exceptions. Absent such instruction, we lack the authority to evaluate the pros and cons of allowing disparate-impact claims challenging a particular housing practice and to prohibit claims that we believe to be unwise as a matter of social policy.'' [184] While the *Graoch* court said that ''categorical bars are justified when . . . plaintiffs have no chance of success,'' [185] it did not find such a situation and in fact noted the possibility of success on a claim against a landlord seeking to withdraw from a Section 8 program. It made no finding that challenges against insurance practices—which were not the subject of the lawsuit—were impossible under the Act.[186] To the extent that *Graoch* is

relevant, it establishes a high bar—the literal impossibility of making out a particular type of claim—that would have to be established before a categorical bar would be appropriate. And in HUD's belief, it is, in fact, possible for a claim against an insurer to succeed, as demonstrated by several court opinions, so the standard set out by *Graoch* is not met.[187]

Some comments are premised on the faulty assumption that *Inclusive Communities* introduced different standards for discriminatory effects claims. As explained above, *Inclusive Communities* described and endorsed the same disparate impact framework that this rule sets out. In that case, the Supreme Court explained, that policies and practices that are artificial, arbitrary, and unnecessary are invalid under the Act when the longstanding disparate impact elements as set forth in this rule are satisfied. However, the Court *did not* require plaintiffs to show that a policy or practice is artificial, arbitrary, and unnecessary *in addition to* proving an unjustified discriminatory effect. Rather, the Court, in quoting ''artificial, arbitrary, and unnecessary'' from the decades-old case *Griggs,* was describing the types of policies that will fail under the rule's traditional shifting

---

[182] *See Dehoyos,* 345 F.3d at 293; *see also; Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46,48 (D.D.C. 2002); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

[183] 42 U.S.C. 3610(g)(2)(A) (''If the Secretary determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the Secretary shall . . . immediately issue a charge on behalf of the aggrieved person'').

[184] *Graoch,* 508 F.3d at 375.

[185] *Id.* at 376.

[186] The *Graoch* court did not identify homeowners insurance as an example of where application of the disparate impact rule is never appropriate. The court *in dicta* incorrectly read *NAACP* v. *Am. Family Mut. Ins. Co.* to hold ''that insurers never can face disparate-impact liability for 'charging higher rates or declining to write insurance for people who live in particular areas.' '' *Graoch,* 508 F.3d at 375. HUD believes that the *Graoch* court read *NAACP* incorrectly. *NAACP* overturned a dismissal of a claim under the Act, holding that it ''is reversed to the extent it holds that the Fair Housing Act is inapplicable to property and casualty insurance written or withheld in connection with the purchase of real estate.'' *NAACP,* 978 F.2d at 302. The plaintiff in that case made claims of disparate treatment and disparate impact. *Id.* at 290. In discussing the two,

the *NAACP* court stated that it must presume that plaintiffs can prevail under a disparate treatment theory because the Supreme Court had not yet decided whether disparate impact is a viable legal theory under Title VIII and because of the nature of insurance. *Id.* The court ultimately narrowed the holding to state ''[a]ll we decide is whether the complaint states claims on which the plaintiffs may prevail if they establish that the insurer has drawn lines according to race rather than actuarial calculations.'' *Id.* at 291. Further, *NAACP* was about redlining in insurance and does not describe any/all practices of the insurance industry. *Id.* at 290. So, even if *Graoch's* reading were correct, the holding, and *Graoch's* description of the holding is limited to one practice used by insurers.

[187] HUD is unaware of any trial on the merits of a discriminatory effects claim against an insurer, but notes that many have survived a motion to dismiss and subsequently settled. *See Dehoyos,* 345 F.3d at 293 (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d at 558 (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect*); Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 48–50, (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a ''replacement cost'' policy had an unjustified discriminatory effect).

**19472** **Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

burden framework, which is consistent with this final rule. In other words, if a practice with a discriminatory effect is not necessary to achieve a substantial and legitimate interest, or when an alternative, less discriminatory practice exists, the challenged practice is invalid under the Act because it is artificial, arbitrary, or unnecessary. Insurance practices, like other practices related to housing, may sometimes create artificial, arbitrary, and unnecessary barriers. Further, as part of the disparate impact framework set forth in this rule, insurers, like all defendants, are provided the opportunity to show a valid interest supporting any practice challenged under the Act. Therefore, a specific exemption for insurers is unwarranted.

HUD finds that claims against insurers will not fail categorically as a matter of law. HUD believes, contrary to commenters' assertions, it is possible for plaintiffs to establish a causal connection between an insurance practice and a discriminatory effect. HUD also believes that it is possible for plaintiffs to prove a less discriminatory alternative. HUD notes that the fact that risk-based pricing does not facially consider protected characteristics provides no support for the contention that plaintiffs cannot—or should be precluded from the opportunity to—prove that a particular policy that defendants claim is risk-based causes an unjustified discriminatory effect. A violation of the Act based on a discriminatory effects claim requires proof of an unjustified discriminatory effect because of a trait protected by the Act, not proof of intentional discrimination. The fact that state laws mandate that rates be actuarially sound, or risk-based, does not necessarily negate causation because insurers may not in fact be using risk factors that are actuarially sound or the least discriminatory set of risk factors that would achieve that end. Specifically, an actuarially sound practice may nonetheless cause an unjustified discriminatory effect if a less discriminatory alternative is available that also is actuarially sound and otherwise complies with state law. As other examples, commenters referenced ratemaking, price optimization, and credit scoring as examples of largely actuarially based practices that can incorporate elements of non-actuarially based subjective judgment or discretion, and thus cause an unjustified discriminatory effect. HUD finds this comment persuasive. HUD acknowledges that there may be scenarios where plaintiffs will be unable

to show causation or demonstrate the existence of a less discriminatory alternative, but it is incorrect to say that all claims will fail as a matter of law. Thus, HUD declines to grant a categorical exemption on this basis.

*State Regulation*

*Issue:* Commenters stated that insurance practices should be exempted from discriminatory effects liability, with some advocating for retention of the 2020 Rule, because, according to the commenters, states are better at regulating insurance and should be the primary or sole regulators, and federal regulation creates a patchwork of rules, leading to higher costs. Commenters stated that the state regulatory system is comprehensive; protects consumers; effectively and efficiently regulates the insurance industry; ensures that premiums are actuarially justified and not excessive, inadequate, or unfairly discriminatory; and has increased affordability and availability over the past 150 years. Commenters stated that one of the primary aims of state regulation is to protect insurer solvency by ensuring that insurance providers charge premiums that adequately cover current and future claims and provide adequate surplus for capitalization, asset and reinsurance purchases and liquidity. Commenters also stated that state regulations already preclude the type of discrimination they believe the rule addresses, though others noted that unfair discrimination under insurance laws is not the same as discrimination under the Act. Commenters said that state regulators understand the unique conditions in their state affecting market and consumer needs; are structured so as to promote consistency and sufficiently flexible to promote innovation; and have always set the right regulations for local conditions. Commenters said that interfering with a system that works well will have negative effects, undermining state insurance regulations and consumer protection laws and upending the commonsense structure of state regulation. Commenters stated that federal regulation would subvert the role of state regulators and undermine the accuracy of risk-based pricing, leading to premium increases.

Commenters, citing to *Cole* v. *State Farm Insurance Co.* (Alaska 2006) and *Cain* v. *Fortis Insurance Co.* (S.D. 2005), stated that courts have recognized that state laws ensure that the insurance market functions fairly.[188] A commenter

stated that every state has effective civil and criminal insurance anti-discrimination laws, regulations, and enforcement divisions.

Other commenters, however, warned that a broad exemption for the homeowners insurance industry could go beyond underwriting practices to exclude unregulated practices like marketing, claims processing, and claims payment from disparate impact liability.

*HUD Response:* HUD disagrees with commenters who say that this final rule will upend the state regulatory system or create insurer insolvency. The rule recodifies the rule that has been in effect since 2013—and that itself codified jurisprudence which has included application to insurers for decades—during which time no such upending has occurred. The rule makes no change to the status quo, and so there is no basis for claims that it will upend anything. As discussed above, the rule does not prohibit risk-based pricing or modify the ability of states to regulate insurers as they have done for decades. And Congress has delegated authority to HUD to regulate under the Act.[189]

State regulators may effectively and efficiently ensure that premiums are actuarially justified and not excessive, inadequate, or unfairly discriminatory as defined by state insurance codes.[190] However, as commenters arguing for the exemption themselves recognize, "unfairly discriminatory" as defined by insurance codes, is related to treating similar risks differently, which is wholly distinct from housing practices that are unlawful because they discriminate because of the protected characteristics under the Act. State insurance codes generally require only that policies and practices are aimed at a legitimate objective without regard to whether that objective discriminates because of a protected characteristic or whether a less discriminatory

---

[188] *Cole* v. *State Farm Ins. Co.*, 128 P.3d 171 (Alaska 2006); *Cain* v. *Fortis Ins. Co.*, 694 NW 2d 709 (S.D. 2005).

[189] 42 U.S.C. 3614a.

[190] Commenters overstate *Cole* and *Cain* as "recogiz[ing] that state laws ensure that the insurance market functions fairly." In *Cole*, while recognizing that Alaska's state insurance laws prohibit certain discrimination, the court engaged in a further analysis of Alaska's human rights law, implicitly recognizing that the state insurance law may leave gaps to be filled by other anti-discrimination laws. *Cole*, 128 P.3d at 175–78. The case said nothing about how the state insurance code ensured that the insurance market functioned fairy. *Cain* also says nothing about how state insurance regulation ensures market functions fairly. *Cain*, 694 NW 2d at 714 (rejecting the policy holder's argument that she was discriminated against under South Dakota's unfair trade practices act by the health insurance company when it denied her coverage for gastric bypass surgery, analyzing whether she was discriminated against using Black's Law Dictionary's definition of discrimination).

alternative exists to achieve that objective. As an example, many state statutes mandating reasonable rates that are not excessive, inadequate, or unfairly discriminatory, permit insurers, via the very same section of the insurance code, to rely on discretionary "judgment factors" in ratemaking.[191] These judgment factors, although permissible under the insurance code, may result in unlawful discrimination under the Act. Moreover, it is the responsibility of HUD—not of state regulators—to promulgate regulations related to compliance with the Act.[192]

*McCarran-Ferguson Act*

*Issue:* Commenters stated that HUD should exempt all insurance practices, or at least risk-based pricing and underwriting, because imposing the rule on insurers would violate the McCarran-Ferguson Act. Commenters stated that the McCarran-Ferguson Act established the states as the primary regulator of insurance and that state insurance laws preempt federal laws, such as the Act, when (1) the federal law does not expressly relate to the business of insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of federal law might "invalidate, impair, or supersede" state laws regulating insurance. Commenters stated that the Act is not expressly related to the business of insurance and therefore its application to insurers would be inconsistent with the McCarran-Ferguson Act.

Commenters, citing *Humana Inc.* v. *Forsyth*[193] stated that the rule contravenes the McCarran-Ferguson Act because it could invalidate or conflict with risk-based insurance pricing or underwriting policies that are permitted or required under state law. Commenters stated that state insurance laws permit or require risk-based pricing and underwriting, so any claim under the Act will always be preempted. Commenters said insurers would be caught between conflicting state and federal law and forced to either comply with state approved rates based on objective risk factors permitted or required by state law or comply with the Act by considering protected traits. Commenters stated that under state laws, insurers make underwriting decisions based on actuarial risk factors, and that risk-based differences in charges could affect demographic

groups differently. Commenters also stated that the majority of states require insurers to set rates based on neutral actuarial factors, requiring insurers to take risk into account to remain solvent. Commenters said that permitting the showing of a less discriminatory alternative at step three of the burden shifting framework requires insurers to adopt alternate risk-based practices that are less effective and will result in less accurate pricing, in violation of state law. Commenters stated that the rule violates McCarran-Ferguson because a federal court may be called upon to enjoin the insurer's state-approved risk-based practice in favor of an alternative that may not be equally effective at predicting loss. Commenters stated that this violates state laws prohibiting inadequate rates and unfair discrimination between individuals with comparable risk profiles and would force insurers to use factors that are prohibited in the underwriting process.

Commenters, citing *Humana,* stated that federal law must not be read to authorize regulations that, if applied, would "frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance.[194] Commenters further stated that the rule impermissibly interferes with the state regulatory system for various reasons. The proposed rule, they stated, would interfere with a state's administrative regime by substituting the judgment of a federal court for state regulators. They also cited *Saunders II,*[195] in support of the assertion that it is improper to empower federal courts to reject rates that were reviewed and approved by state regulators under state law. Commenters stated that even if a federal court does not reject the rate, allowing such a claim to proceed in federal court would render insufficient the assurance of lawfulness that the state approval provides. Commenters noted that the *Saunders II* court stated that "HUD has never applied a disparate-impact analysis to insurers" and expressed doubt that it could.[196] Commenters also cited *Ojo* v. *Farmers Insurance Company,*[197] which found that the McCarran-Ferguson Act barred a disparate impact claim against Farmers because it would frustrate Texas's regulatory policy, which does not prohibit an insurer from using race neutral factors in credit scoring to price

insurance, even if it creates a disparate impact. A commenter pointed to *Dehoyos* v. *Allstate Corp,*[198] which stated that "a disparate impact claim goes to the heart of the risk adjustment that underlies the insurance business" to show that the proposed rule would interfere with a state's administrative regime.[199] Commenters stated that because unfair discrimination as defined by state insurance laws is different than discrimination prohibited by the Act, the rule disrupts states' regulatory regimes.

Commenters also cited to *Mutual of Omaha,*[200] stating that the proposed rule contravenes the McCarran-Ferguson Act because it allows courts—rather than states—to determine if rates are actuarially sound. Commenters stated that in *Mutual of Omaha,* the Seventh Circuit held that the McCarran-Ferguson Act preempted application of the Americans with Disabilities Act because it would require insurers to litigate whether the challenged insurance practices were actuarially sound, thus stepping on the toes of state regulators. Specifically, commenters stated that steps two and three of the burden shifting framework would force federal courts to second guess the actuarial soundness of state-regulated insurance. Commenters stated that under *Mutual of Omaha,* a case-by-case approach to whether McCarran-Ferguson preempts the Act's application is inappropriate because of the uniformity in state laws permitting or requiring the use of risk factors and because second guessing state regulators itself is improper, regardless of outcome.

Commenters stated that state anti-discrimination laws are irrelevant to whether the McCarran-Ferguson Act preempts a case under the Act, because McCarran-Ferguson asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted for the purpose of regulating the business of insurance, and state antidiscrimination laws are not enacted for such purpose. Commenters said that even if a state's fair-housing law were identical to the Act and would permit a disparate-impact challenge to risk-based practices in state court, any federal litigation under the rule would still require federal courts to second-guess the actuarial soundness of insurance practices regulated by state law——

[191] *See e.g.,* Ga. Code Ann. 33–9–4; Mont. Code Ann. 33–16–201; *see also NAIC White Paper, supra* note 161 at 1 ¶ 5 ("Making adjustments to actuarially indicated rates is not a new concept; it has often been described as 'judgment.' ").

[192] 42 U.S.C. 3614a.

[193] *Humana Inc.* v. *Forsyth,* 525 U.S. 299 (1999).

[194] *Id.* at 310.

[195] *Saunders* v. *Farmers Ins. Exch. (Saunders II),* 537 F.3d 961 (8th Cir. 2008).

[196] *Id.*

[197] *Ojo* v. *Farmers Grp., Inc.,* 356 SW.3d 421 (Tex. 2011).

[198] *Dehoyos* v. *Allstate Corp.,* 345 F.3d 290 (5th Cir. 2003)

[199] The commenter also said that the opinion is likely to be adopted by other courts.

[200] *Doe* v. *Mut. of Omaha,* 179 F.3d 557 (7th Cir. 1999).

**19474** Federal Register / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

contrary to the express holding of *Mutual of Omaha.*

Other commenters stated that the proposed rule does not undermine the state regulation of insurance and thus presents no conflict with McCarran-Ferguson. They stated that state authority to regulate insurance does not, on its own, create a conflict with federal law; rather this is a fact-specific determination that depends on the relevant state law, the conflict claimed and other case-specific variables. Commenters stated that many states have regulations that complement disparate-impact liability under the Act and, even if they do not, that does not necessarily mean there is a conflict with state law. Commenters cited *Dehoyos, Humana,* and *Wai* [201] to show that the need for a fact-specific inquiry depends on the relevant state law, the conflict claimed, and other case-specific variables. Commenters stated that the District of Columbia, California, and North Carolina, for example, expressly provide by statute for disparate impact claims. Commenters said that given the variation in state insurance laws, an exemption for insurers is inappropriate, and a case-by-case evaluation is the better approach.

*HUD Response:* HUD believes that the McCarran-Ferguson Act neither creates nor justifies a wholesale exemption for insurers from liability for policies and practices that have an unjustified discriminatory effect. Some discriminatory effects claims against insurers will be preempted under McCarran-Ferguson but others will not, depending on a host of case-specific variables, so wholesale exemptions would be overbroad. The McCarran-Ferguson Act provides that ''[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance.'' [202] As interpreted by the Supreme Court in *Humana,* McCarran-Ferguson applies to preempt federal law only when a particular application of that law

directly conflicts with a specific state insurance regulation, frustrates a declared state policy, or interferes with a State's administrative regime. [203] That is, McCarran-Ferguson preemption is assessed on an application-by-application basis and does not operate at the wholesale level commenters sought here. Accordingly, the mere fact that a state has the authority to regulate insurance or has adopted ratemaking regulations does not on its own create the kind of conflict, frustration of purpose, or interference that triggers preemption under McCarran-Ferguson. [204] Rather, the inquiry required by *Humana* depends on the relevant state law and other case-specific variables. [205]

For example, in *Dehoyos* v. *Allstate,* the Fifth Circuit rejected a McCarran-Ferguson defense to a disparate impact claim where the insurer did not identify a specific state law that was impaired. [206] The Fifth Circuit reasoned that the Seventh Circuit's holding in *Doe* v. *Mutual of Omaha* that McCarran-Ferguson barred a particular claim of discrimination under the Americans with Disabilities Act did not foreclose *all* discriminatory effects claims against insurers. [207] Instead, the Fifth Circuit distinguished *Doe,* by explaining that ''[i]n *Doe,* there was an actual state insurance law which purportedly conflicted with the application of the ADA to the particular insurance question at issue.'' [208] Thus, where no state law is impaired, McCarran-Ferguson will not require preemption of

a discriminatory effects claim against an insurer.

HUD finds that whether in fact a particular policy or practice would create a conflict so as to preempt the Act is highly fact specific and depends on the particular state law and fair housing allegations in question. Accordingly, HUD has determined that a case-by-case approach is necessary and justified. McCarran-Ferguson, by its nature, requires such case-by-case analyses and contains no requirement that HUD provide categorical exemptions. McCarran-Ferguson requires a fact-intensive inquiry that will vary state by state and by claim. Even those cases in which an impermissible impairment under McCarran-Ferguson was found support the case-by-case approach herein adopted by HUD rather than the wholesale exemption sought by some commenters. For example, in *Saunders* v. *Farmers Insurance Exchange,* prior to ruling that McCarran-Ferguson barred a discriminatory effects claim under the Act, [209] the Eighth Circuit remanded the case for further inquiry into the facts and Missouri law. [210]

Precedent also demonstrates that, in some instances, state law may not preempt discriminatory effects claims against insurers even when an insurer points to a specific state law and alleges that it is impaired. Although the commenters provided examples of cases in which state laws were found to preempt particular discriminatory effects claims, other cases provide examples of state laws that were not. For instance, in *Lumpkin* v. *Farmers Group (Lumpkin II),* the court rejected a McCarran-Ferguson defense to a disparate impact challenge to credit scoring in insurance pricing, holding that disparate impact liability in that context did not impair the state's law mandating that ''insurance rates cannot be 'unfairly discriminatory.' '' [211] In so ruling, the court held it erroneous to read a state law prohibiting ''unfairly discriminatory'' rates ''too broadly'' and rejected the insurer's argument that such state laws require that practices with an unjustified discriminatory effect

[201] *See, e.g., Dehoyos,* 345 F.3d at 297–300 (rejecting McCarran-Ferguson reverse-preemption after appellant failed to indicate any state laws or declared regulatory policies which would conflict with federal civil rights statutes); *see also Humana Inc.,* 525 U.S. at 308 (1999) (''We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise.''); *Wai* v. *Allstate Ins. Co.,* 75 F. Supp. 2d 1, 5 (D.D.C. 1999) (rejecting defendant's argument for McCarran-Ferguson reverse-preemption after noting that Maryland law did not grant the state's insurance commissioner exclusive jurisdiction over discrimination claims).

[202] 15 U.S.C. 1012(b).

[203] *Humana,* 525 U.S. at 310 (''When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.'').

[204] *Dehoyos* v. *Allstate Corp,* 345 F.3d 290 (5th Cir. 2003) (disparate impact under the Act); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351 (6th Cir. 1995) (disparate treatment under the Act); *Moore* v. *Liberty Nat'l Life Ins. Co.,* 267 F.3d 1209 (11th Cir. 2001) (disparate treatment in life insurance).

[205] *See PCIAA,* 66 F. Supp. 3d at 1038 (''McCarran-Ferguson challenges to housing discrimination claims [depend on] the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred.'').

[206] *Dehoyos,* 345 F.3d at 293, 299.

[207] *Id.* at 298 n.6.

[208] *Id.* Although in HUD's view the Fifth Circuit persuasively distinguished the Seventh Circuit's holding in *Mutual of Omaha,* the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied. This includes the Second Circuit's skepticism over whether McCarran-Ferguson applies at all to ''subsequently enacted civil rights legislation.'' *Viens,*113 F. Supp. 3d at 572 (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir. 1982)).

[209] *Saunders* v. *Farmers Ins. Exch.* (*Saunders II*), 537 F.3d 961, 963 (8th Cir. 2008).

[210] *Saunders* v. *Farmers Ins. Exch.* (*Saunders I*), 440 F.3d 940 (8th Cir. 2006). These variables included whether Missouri insurance law provided a private right of action to challenge the conduct at issue, and whether determinations by the state insurance agency were subject to judicial review. The court explained that ''the mere fact of overlapping complementary remedies under federal and state law does not constitute impairment for McCarran-Ferguson purposes.'' *Id.* at 945–46

[211] *Lumpkin* v. *Farmers Grp.* (*Lumpkin II*), No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98949, at *19–21 (W.D. Tenn. July 6, 2007).

must be permitted "as long as the rates are actually sound."[212] The court then cited other provisions of the state's insurance code specifically dealing with credit scoring, concluding that they too were not impaired.[213]

The many ways in which one state's insurance laws can differ from another's, as well as the ways in which a single state's insurance laws can change over time, mean that even an exemption for specific insurance practices would be overbroad and quickly outdated. For example, variations in state insurance laws have resulted in discriminatory effects challenges to similar insurance practices surviving a McCarran-Ferguson defense in some states but not in others.[214] Precedent also demonstrates that the insurance laws of each state can change over time in significant ways,[215] and state insurance regulators respond to new practices as they become common and their effects become clear.[216] Given the variation in state insurance laws across more than 50 jurisdictions and over time, HUD declines to fashion a one-size-fits-all exemption that would be overbroad, quickly outdated, and inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from liability under the Act that would not be precluded by McCarran-Ferguson.

A one-size-fits-all exemption is also inappropriate because insurance practices are not governed solely by "hermetically sealed" state insurance codes,[217] but are also governed by a range of other state laws, including state fair housing laws. Many state fair

housing laws track the Act's applicability to insurance and provision of effects liability, indicating that those states do not consider disparate impact liability to conflict with the nature of insurance. Categorical exemptions or safe harbors of the types requested by some commenters would deprive all states of this federal support in addressing discriminatory insurance practices—even those states that welcome or depend on such support.[218] This outcome would be at odds with the purpose of McCarran-Ferguson to support the autonomy and sovereignty of each individual state in the field of insurance.[219] Connecticut's Discriminatory Housing Practices Act, for example, "provides similar (albeit broader) protection against housing discrimination as the [Act], which is [a] strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary with Connecticut's overall regulatory scheme." [220] Similarly, a state court found that "the disparate-impact approach does not conflict with Ohio Insurance law" and thus allowed a disparate impact claim against an insurer to proceed under the state's fair housing law.[221] In another case where the court rejected a McCarran-Ferguson defense to a

discriminatory effects claim against an insurer, the court explained that it was "not persuaded that California law would allow [the challenged] practice" and therefore " the [] Act complements California law in this regard." [222] Furthermore, the allocation of authority to enforce a state's protections against discrimination in insurance can impact whether McCarran-Ferguson is a viable defense to a discriminatory effects claim in a given state.[223] The case-by-case approach thus affirms state autonomy and furthers the Act's broad remedial goals by ensuring that HUD is not hindered in fulfilling its statutory charge to support and encourage state efforts to protect fair housing rights.[224]

Furthermore, HUD finds that comments claiming there is necessarily always a conflict with state laws in violation of the McCarran-Ferguson Act rest on the false presumption that this final rule prohibits the use of risk-based pricing or would require insurers to consider protected traits of individual insureds in making decisions. As described in greater detail above, it does not. HUD also disagrees with commenters who stated that even if a state fair housing law prohibits practices having an unjustified discriminatory effect, the rule contravenes McCarran-Ferguson. As courts have found, and HUD agrees, in such circumstances there would be no conflict between the federal and state law at issue.[225] Step three of the burden-shifting framework, allowing plaintiffs to prove a less discriminatory alternative, also does not necessarily interfere with the state regulation of insurance. All the rule requires is that if an insurer's practices have a discriminatory effect and "an adjustment . . . can still be made that will allow both [parties'] interests to be

---

[212] *Id.*

[213] *Id.*

[214] For example, in cases challenging the discriminatory effect of insurers' reliance on credit scores, the McCarran-Ferguson defense has failed in some states but succeeded in others. *Compare Dehoyos,* 345 F.3d 290 (McCarran-Ferguson defense fails) and *Lumpkin II,* 2007 U.S. Dist. LEXIS 98949 (same) with *Saunders II,* 537 F.3d 961 (McCarran-Ferguson defense succeeds) and *McKenzie v. S. Farm Bureau Cas. Ins. Co.,* No. 3:06CV013–B–A, 2007 U.S. Dist. LEXIS 49133 at *11 (N.D. Miss. July 5, 2007) (same); *see also PCIAA,* 66 F. Supp. 3d at 1039 ("Variations among state regulatory regimes . . . provide an additional variable that may complicate any hypothetical McCarran-Ferguson analysis.").

[215] *Compare Ojo* v. *Farmers Grp., Inc.,* 356 SW.3d 421, 430 (Tex. 2011) (recognizing a McCarran-Ferguson defense to a credit scoring disparate impact claim based on the state legislature "expressly authoriz[ing] the use of credit scoring in setting insurance rates in 2003") with *Dehoyos,* 345 F.3d 290 (rejecting a McCarran-Ferguson defense to the same type of claim based on Texas law in effect before 2003).

[216] *See, e.g.,* NAIC White Paper, *supra* note 161 ¶¶ 39–42 (discussing the responses of state regulators to the rising increase in use of price optimization practices by insurance providers).

[217] *Humana,* 525 U.S. at 312.

[218] A commenter stated that this argument for failing to grant an exemption was arbitrary and capricious because the McCarran Ferguson Act is not intended to promote "federal support" for state enforcement of anti-discrimination laws and because state anti-discrimination laws are irrelevant to the McCarran-Ferguson analysis which only asks whether the application of federal law would invalidate, impair, or supersede state laws enacted for the purpose of regulating business insurance. HUD disagrees. First, state anti-discrimination laws are relevant to McCarran-Ferguson because they help inform whether there is a conflict with state law. *See Viens,* 113 F. Supp. 3d at 573 n.20 (the Connecticut Fair Housing Act "provides similar (albeit broader) protection against housing discrimination as the FHA, which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary"). Second, the commenter misconstrues HUD's point. HUD is not saying that the McCarran-Ferguson Act is intended to promote federal support for state enforcement. HUD is explaining that state laws inform whether there is a conflict between state and federal law and that where the state laws are interpreted consistently with the federal law, this regulation is helpful to states enforcing their own state anti-discrimination laws.

[219] *See* 15 U.S.C. 1011 (explaining the purpose of McCarran-Ferguson as "the continued regulation . . . by the several States of the business of insurance in the public interest").

[220] *Viens,* 113 F. Supp. 3d at 573 (finding that McCarran-Ferguson does not bar an FHA disparate impact claim against an insurer).

[221] *Toledo Fair Hous. Ctr.* v. *Nationwide Mut. Ins. Co,* 94 Ohio Misc. 2d 151, 157 (Ohio Cnty. Ct. 1997).

[222] *Jones* v. *Travelers Cas. Ins. Co. of Am.,* Tr. of Proceedings Before the Honorable Lucy H. Koh U.S. District Judge, No. C–13–02390 LHK (N.D. Cal. May 7, 2015), ECF No. 269–1.

[223] *Toledo,* 94 Ohio Misc. 2d at 157 (recognizing discriminatory effects liability in homeowners insurance under state law in part because the Superintendent of Insurance lacks "primary jurisdiction" over such claims).

[224] *See, e.g.,* 42 U.S.C. 3610(f); 24 CFR pt. 115 (HUD's Fair Housing Assistance Program); 42 U.S.C. 3608(d) (obligation to affirmatively further fair housing).

[225] *Viens,* 113 F. Supp. 3d at 573 n.20 (the Connecticut Fair Housing Act "provides similar (albeit broader) protection against housing discrimination as the FHA, which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary"); *see also NAACP,* 978 F.2d 287, 295 (7th Cir. 1992) ("Having stood on the text to show that the McCarran-Ferguson Act governs the construction of the Fair Housing Act, American Family needs to show that the Fair Housing Act conflicts with state law. Duplication is not conflict.").

satisfied,'' the insurer must make that change.[226] It does not require insurers to violate state laws.

HUD disagrees with *Mutual of Omaha* to the extent it implied that any claim requiring a court to assess the actuarial soundness of a policy and/or whether a policy or practice is consistent with state law necessarily interferes with a state administrative regime. HUD notes that in promulgating a rule of nationwide effect it is not bound to follow the decision of a single appellate court, but may reasonably conclude that the Act allows for a different result.[227] HUD believes courts should continue to decide through a case-by-case assessment whether requiring a court to assess actuarial soundness or consistency with state law necessarily interferes with an administrative regime, as this is an underdeveloped area of the law and case law could evolve differently in the circuits.

In any event, disparate impact claims challenging insurance practices do not necessarily require courts to ascertain whether a practice complies with state law or is actuarially sound. Therefore, not all claims even implicate the reasoning of *Mutual of Omaha*.[228] As the Court in *PCI* explained, ''[w]hile some states require insurers to use risk-based pricing, other states merely permit risk-based pricing.'' [229] Accordingly, *Mutual of Omaha* does not necessarily preclude claims that challenge practices that rest on subjective business judgments, rather than actuarially sound principles or state law requirements because in adjudicating such claims, the court would not necessarily need to ascertain whether the insurer's practices are actuarially sound and/or consistent with

state law. For example, a plaintiff may not dispute that an insurer's practice complies with state law, but rather may show that there are alternative practices that also comply with state law that do not cause a discriminatory effect. Such a claim would not require the court to evaluate whether the challenged practice complies with state law or is actuarially sound and thus would not run afoul of *Mutual of Omaha*. The analysis of the challenged practice instead focuses on whether or not it produces a discriminatory effect and, if the insurer states a legitimate interest justifying the practice, the plaintiff may show that there is a less discriminatory alternative that would serve defendant's substantial, legitimate, nondiscriminatory interest. While another risk-based practice could be a possible alternative at step three, it is not necessarily the only alternative. And, even if the alternative is a risk-based practice, a court may not need to assess the actuarial soundness of the alternative practice. For example, the evidence might show that an insurer opted for one of two risk-based practices which were both equally actuarially sound and compliant with state law, even though one produced a greater discriminatory effect. In such a case, the actuarial soundness of the alternative risk-based practice and its compliance with state law would already have been determined by the insurer itself. The court's analysis, therefore, would be limited to assessing the efficacy of the alternative risk-based practice in serving the insurer's business interests—the type of ''unremarkable task'' regularly undertaken by courts.[230] As the court in *PCI* stated, *Mutual of Omaha* called into question the viability of some disparate impact claims. HUD agrees, but notes that while *Mutual of Omaha* may prevent some claims from going forward due to the McCarran Ferguson Act in Seventh Circuit district courts, it does not necessarily preclude all claims. The Act's purpose is broad and inclusive, and because *Mutual of Omaha* would not prevent all claims against insurers from proceeding even in its own circuit, HUD believes it is important not to foreclose meritorious claims by creating a wholesale exemption; indeed, doing so would run counter to the Act's purposes. HUD believes that case-by-case adjudication is appropriate to balance the purpose of the Act and to

account for any differences that emerge in the circuits.

Finally, HUD disagrees that the rule will lead to a deluge of lawsuits. The industry has been subject to the 2013 Rule for ten years and a HUD regulation on insurance for well over 30 years [231] and commenters have provided no evidence of an uptick in lawsuits. And as explained above, the insurance industry was subject to disparate impact liability long before the 2013 Rule, with many courts using a framework similar to the rule. Therefore, because the statute itself is the source of liability and the rule merely provides a framework for assessing the evidence, the rule cannot be the cause of any increase in lawsuits going forward.

*Issue:* Commenters stated that applying the rule to insurance is contrary to Congressional intent because of the McCarran-Ferguson Act. A commenter noted that the McCarran-Ferguson Act specifically exempts the Sherman, Clayton, and Federal Trade Commission Acts but not the Fair Housing Act, so under the statutory canon of construction *expressio unius est exclusio alterius,*[232] Congressional intent was to exclude only the specified statutes from pre-emption. Therefore, commenters stated, an exemption for the insurance industry from the rule is justified.

*HUD Response:* HUD disagrees. Even assuming that at least some Fair Housing Act claims are pre-empted by McCarran-Ferguson, that does not mean that all disparate impact claims under the Act are categorically preempted. The fact that a statute is not specifically exempted from application of the McCarran-Ferguson Act simply means that the McCarran-Ferguson *analysis* may be applied on a case-by-case basis to claims brought under that non-exempt statute; it does not mean that McCarran-Ferguson categorically bars all such claims. The Supreme Court explained this in *Humana,* when it held that the McCarran Ferguson Act did not create a federal exemption and that claims under Racketeer Influenced Corrupt Organizations Act (''RICO''),[233] which like the Act is not explicitly listed as exempt from preemption, were not barred by McCarran-Ferguson.[234] Thus,

[226] *Avenue 6E Invs.,* 818 F.3d at 513.

[227] *Nat'l Cable & Telecomm.s Assn.* v. *Brand X internet Services,* 545 U.S. 967, 982, 983–84 (2005) (''A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. . ..'' ''the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes. In all other respects, the court's prior ruling remains binding law (for example, as to agency interpretations to which Chevron is inapplicable). The precedent has not been ''reversed'' by the agency, any more than a federal court's interpretation of a State's law can be said to have been ''reversed'' by a state court that adopts a conflicting (yet authoritative) interpretation of state law.'').

[228] *Mut. of Omaha,* 179 F.3d 557, 564 (7th Cir. 1999) (''requiring a federal court to decide whether an insurance policy is consistent with state law—obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws.'')

[229] *PCIAA,* 66 F. Supp. 3d at 1039–41.

[230] *Dehoyos,* 345 F.3d at 297 n.5 (rejecting similar argument because a court does not become a ''super actuary'' every time it ''engag[es] in the unremarkable task of determining whether specific conduct falls within the ambit of federal civil rights law'').

[231] 24 CFR 100.70(D)(4).

[232] ''*Expressio unius est exclusion alterius*'' means the expression of one thing is the exclusion of the other. *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 844 (2018).

[233] 18 U.S.C. 1961 *et seq.*

[234] *Humana Inc.,* 525 U.S. at 309–310 (''[w]e reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise.'' Ultimately, the court held that

HUD has determined that the arguments put forth by commenters regarding congressional intent and *expressio unius est exclusio alterius* to justify an exemption from discriminatory effects liability are unpersuasive.[235]

*Issue:* Commenters made various comments concerning the impact of *Inclusive Communities* on the McCarran Ferguson Act, including that *Inclusive Communities* did not invalidate McCarran-Ferguson or expand disparate impact liability to insurance; that applying the rule to insurance would bring about an undesirable "specter" of litigation in conflict with *Inclusive Communities;* and that the rule would increase the likelihood of a conflict between the Act and state laws regulating insurance because the rule does not conform to *Inclusive Communities.*

*HUD Response:* As discussed above, HUD believes that *Inclusive Communities* had no impact on the application of this final rule to insurance practices. *Inclusive Communities* also had no impact related to the application of the McCarran-Ferguson Act. HUD agrees that *Inclusive Communities* did not invalidate the McCarran-Ferguson Act, as the Court did not address insurance or McCarran-Ferguson. Nor did *Inclusive Communities* expand liability for unjustified discriminatory effects to insurers, who were subject to such liability long before the decision.[236] Moreover, since there is no conflict between this rule and *Inclusive Communities,* as discussed above, there is no likelihood of the rule leading to litigation in conflict with that precedent or with state laws.

*Issue:* Commenters requested that HUD retain the provision in the 2020 Rule that recognized the McCarran-Ferguson Act. Another commenter disagreed, stating that the 2020 Rule attempted to undermine the nuanced position HUD took in 2016, when it

stated that there is a circuit split as to whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation"[237] This commenter also stated that HUD had no authority to interpret McCarran-Ferguson in the 2020 Rule.

*HUD Response:* HUD declines to retain the portion of the 2020 Rule that references the McCarran-Ferguson Act because it was confusing. While the 2020 Rule did not mention the McCarran-Ferguson Act in its regulatory text, it borrowed from some of the statute's language, stating that "[n]othing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance."[238] HUD expressed in its 2019 Proposed Rule that this language was meant to "codify the general applicability of the 'reverse preemption' provisions of the McCarran-Ferguson Act as it applies to the Fair Housing Act" and "clarify that the Fair Housing Act does not 'specifically relate to the business of insurance.'"[239] In comments to that proposed rule, commenters stated that this language would create an exemption for insurance practices or preempt all such possible claims. HUD responded in the 2020 Rule that it was "neutral" as to McCarran-Ferguson's application in specific cases and pointed to cases in which the Act had been not preempted and cases in which it had been preempted.[240] HUD repeated that it was not exempting the insurance industry and was "only clarifying that its disparate impact rule is not specifically related to the business of insurance."[241]

HUD believes that some commenters appear to have misread the 2020 Rule to provide a complete exemption from disparate impact liability for insurers. It is plain from reading the 2020 Rule that it neither provided an exemption nor specified that McCarran-Ferguson reverse preemption always applies to insurance practices. It simply stated that the Fair Housing Act was not intended to "invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance." HUD has reconsidered the 2020 Rule and concludes that this provision does not clarify how the Act and the McCarran-Ferguson Act interact. Nothing in the McCarran-Ferguson Act requires HUD to make this statement and it is not HUD's responsibility to

interpret the McCarran-Ferguson Act. HUD has decided this statement is unnecessary and confusing, as evidenced by commenters' misreading of the provision, and declines to retain it.

As HUD stated in 2016, the agency has adopted a case-by-case approach on McCarran-Ferguson reverse preemption, as that law requires. This approach is appropriate given the variations in jurisprudence across circuits that currently exist and may continue to evolve over time.[242] HUD continues to believe that a case-by-case approach is appropriate. It therefore declines to incorporate the 2020 Rule's language into this final rule. HUD leaves it to the courts to decide, as they encounter individual cases, whether the McCarran-Ferguson Act preempts application of the Act in each case.

*Filed-Rate Doctrine*

*Issue:* Commenters stated that insurance practices merit an exemption because the proposed rule would violate the filed-rate doctrine, which prohibits federal courts from reexamining rates filed by a regulated entity and subject to the review and approval of a regulatory agency, as these rates are "presumed reasonable and unassailable in judicial proceedings brought by ratepayers."[243] Commenters stated that the Eighth Circuit decision in *Saunders* v. *Farmers Ins. Exch.,* on which HUD relied in the 2016 Supplement, is inconsistent with the weight of case law holding that the filed-rate doctrine bars challenges under federal laws to rates filed with state agencies.[244] Commenters stated that the proposed rule would upend the protections afforded the filed-rate doctrine, threatening the health, solvency, and competitiveness of the insurance market.

*HUD Response:* HUD disagrees that this final rule conflicts with the filed-rate doctrine. The doctrine primarily serves two purposes: preventing litigants from securing more favorable rates than their non-litigant competitors,

---

"[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[235] Although in HUD's view the Fifth Circuit persuasively distinguished the Seventh Circuit's holding in *Mutual of Omaha,* the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied. *Dehoyos,* 345 F.3d at 298 n.6. This includes the Second Circuit's skepticism over whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation." *Viens,* 113 F. Supp. 3d at 572 (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir. 1982)).

[236] *See, supra* Comments Concerning *Inclusive Communities.*

[237] 81 FR 69012, 69016 n.50 (Oct. 5, 2016).

[238] 85 FR 60288, 60333.

[239] 84 FR 42854, 42860.

[240] 85 FR 60288, 60323

[241] *Id.*

[242] *Dehoyos,* 345 F.3d at 298 (finding McCarran-Ferguson does not preclude plaintiff's claims); *Mut. of Omaha,* 179 F.3d at 564 (finding McCarran Ferguson precludes plaintiff's claim); *Viens,* 113 F. Supp. 3d at 572 (expressing skepticism over whether McCarran-Ferguson applies to all "subsequently enacted civil rights legislation.") (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir. 1982).)

[243] Commenters cited *Wegoland Ltd.* v. *NYNEX Copr.,* 27 F.3d 17, 18 (2d. Cir. 1994) and *Goldwasser* v. *Ameritech Corp.,* 222 F.3d 390, 402 (7th Cir. 2000) in support of their assertion.

[244] Commenters relied on *Taffet* 967 F.2d 1483, 1494 (11th Cir. 1992)), *Square D,* 476 U.S. 409,417 (1986), *Wegoland Ltd.* v. *NYNEX Copr.,* 27 F.3d 17, 18 (2d. Cir. 1994); *Goldwasser,* and *Saunders II,* 537 F. 3d 961, 968 (8th Cir. 2008).

and preserving for agencies rather than courts the role of ratemaking.[245] HUD is not aware of any case, and no commenter cited one, in which a court has applied the filed-rate doctrine to defeat a claim under the Act, although several courts have rejected such attempts, including for discriminatory effects claims.[246] For example, *Wegoland Ltd.* held that "[t]he [filed-rate] doctrine bars suits against regulated utilities *grounded on the allegation that the rates charged by the utility are unreasonable.*"[247] (emphasis added). Whether a rate causes an unjustified discriminatory effect is a different issue than whether it is reasonable; discriminatory effects claims do not challenge the reasonableness of insurance rates but rather their discriminatory effects.[248]

Multiple courts examining the filed-rate doctrine in the context of Fair Housing Act claims have found the doctrine inapplicable, noting that the Supremacy Clause, rather than the filed-rate doctrine, applies.[249] Unlike filed-rate doctrine cases involving a conflict between *federal* ratemaking and a federal statute, applying the filed-rate doctrine to prioritize *state* ratemaking over a federal statute "would seem to stand the Supremacy Clause on its head."[250] Moreover, the filed-rate doctrine "does not preclude injunctive relief or prohibit the Government from

seeking civil or criminal redress,"[251] which are types of relief often obtained for violations of the Act.[252] A filed-rate doctrine defense requires an examination of the facts in context of the laws and ratemaking structure at issue.[253] The case-by-case approach best accommodates these variations.[254]

As discussed above, HUD disagrees that the rule would threaten the health, solvency, and competitiveness of the market because no conflict exists with the filed-rate doctrine. Furthermore, insurers have been subject to the 2013 Rule for ten years, and disparate impact liability generally even longer, and the market effects alleged by commenters have not come to pass.

*Case-by-Case Adjudication Cost for Insurers*

*Issue:* Commenters opposed the rule's application to the insurance industry because case-by-case litigation in federal court is costly and, they contended, these costs outweigh the benefits. A commenter stated that even if a case is resolved in favor of the insurer, another suit with slightly altered facts may quickly follow. Commenters asserted that insurers would have to defend various risk factors on a regional basis, with courts possibly reaching inconsistent judgments. Commenters stated case-by-base adjudication would be a waste of judicial resources. Commenters also stated that requiring insurers to defend risk-based practices in court will make insurance less affordable. According to commenters, the costs are unjustified because rates are risk-based as required by state insurance law and have been approved by state regulators, and plaintiffs may bring claims that are hypothetical and speculative. Commenters stated that the vagueness and uncertainty of the rule threatens insurer insolvency.

Other commenters stated that the 2013 Rule, 2016 Supplement, and proposed rule appropriately state that a case-by-case analysis is the correct approach for assessing whether discriminatory effects are unjustified for all industries, including insurers. Commenters explained that to create an exemption, HUD would need to outline highly specific standardized rules, which would not be possible as actuarial practices are constantly changing and evolving.

*HUD Response:* As demonstrated by the relatively few cases filed against insurance companies in the decades-long history of disparate impact liability and in the ten years since the 2013 Rule was promulgated, there is no reason to believe that a continued case-by-case approach will lead to increased litigation, increased expenses in defending against claims of unjustified discriminatory effects, insurer insolvency, or increased premiums for customers. Nor did commenters provide support for these assertions.

HUD also disagrees with comments predicting that the proposed rule would create increased compliance costs. As discussed above, insurers have been subject to discriminatory effects liability since well before the 2013 Rule and have been subject to the 2013 Rule for ten years, yet commenters have not demonstrated that the 2013 Rule has led to significantly higher compliance costs.[255] Prior to the 2013 Rule, in adjudications, HUD always used a three-step burden-shifting approach,[256] as did many federal courts of appeals,[257] but one federal court of appeals applied a multi-factor balancing test,[258] other courts of appeals applied a hybrid between the two,[259] and one court of appeals applied a different test for public and private defendants.[260] By formalizing the three-part burden-shifting test for proving such liability under the Act, the 2013 Rule provided for consistent and predictable

[245] *Wegoland Ltd.* v. *NYNEX Corp.,* 27 F.3d 17, 18–19 (2d Cir. 1994).

[246] *See Saunders I,* 440 F.3d at 946 ("The district court erred in invoking the judicially created [filed-rate] doctrine to restrict Congress's broad grant of standing to seek judicial redress for race discrimination."); *Dehoyos,* 345 F.3d at 297 n.5 (finding "unpersuasive" the argument that the [filed-rate] doctrine barred a Fair Housing Act disparate impact claim); *Lumpkin* v. *Farmers Grp., Inc. (Lumpkin I),* No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98994, at *20–22 (W.D. Tenn. Apr. 26, 2007) (ruling that "the [filed-rate] doctrine does not apply" to a Fair Housing Act disparate impact claim).

[247] *Wegoland Ltd.* v. *NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir. 1994).

[248] *Lumpkin I,* 2007 U.S. Dist. LEXIS 98994, at *21; *Dehoyos,* 345 F.3d at 297 n.5 ("[T]he application of anti-discrimination laws cannot be reasonably construed to supplant the specific insurance rate controls of [states]."); *c.f. Taffet* 967 F.2d at 1490–1495 (stating that the claim should be precluded because it would focus on the reasonableness of the rate and stating "[a]ccordingly, a court reviewing the reasonableness of a utility rate 'shall not substitute its judgment for that of the [rate-approving entity] if there is any evidence to support its findings.' ").

[249] *See, e.g., Saunders I,* 440 F.3d at 944; *Perryman* v. *Litton Loan Servicing, LP,* No. 14–cv–02261–JST, 2014 U.S. Dist. LEXIS 140479, at *20–22 (N.D. Cal. Oct. 1, 2014). As one court has stated, the filed-rate doctrine is a "weak and forcefully criticized doctrine." *Cost Mgmt. Servs.* v. *Wash. Natural Gas Co.,* 99 F.3d 937, 946 (9th Cir. 1996).

[250] *Perryman* v. *Litton Loan Servicing, LP,* No. 14–cv–02261–JST, 2014 U.S. Dist. LEXIS 140479, at *20–22 (N.D. Cal. Oct. 1, 2014).

[251] *In re Title Ins. Antitrust Cases,* 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010); *see also Marcus* v. *AT&T Corp.,* 138 F.3d 46, 62 (2d Cir. 1998).

[252] *See* 42 U.S.C. 3612(g)(3), 3613(c), 3614(d).

[253] *Munoz* v. *PHH Corp.,* 659 F. Supp. 2d 1094, 1099 (E.D. Cal. 2009).

[254] *Saunders I,* 440 F.3d at 945.

[255] *Inclusive Cmtys.Project, Inc.,* 576 U.S. at 546 (the Court noted that the existence of disparate impact claims "for the last several decades 'has not given rise to . . . dire consequences.' ").

[256] *See, e.g., HUD* v. *Twinbrook Vill. Apts.,* HUDALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 HUD ALJ LEXIS 82, at *46 (HUD ALJ Nov. 9, 2001); *HUD* v. *Pfaff,* 1994 HUD ALJ LEXIS 69, at *19 (HUD ALJ Oct. 27, 1994) rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 HUD ALJ LEXIS 44, at *37 (HUD ALJ Mar. 22, 1993); *HUD* v. *Carter,* 1992 HUD ALJ LEXIS 72, at *15 (HUD ALJ May 1, 1992); *see also* 1994 Joint Policy Statement on Discrimination in Lending, 59 FR 18269.

[257] *See, e.g., Charleston Hous. Auth.* v. *U.S.D.A.,* 419 F.3d 729,740–42 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Huntington Branch* v. *NAACP of Huntington,* 844 F.2d 926, 939 (2d. Cir. 1988).

[258] *See, e.g., Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283,1290 (7th Cir. 1977) (applying a four-factor balancing test).

[259] *See, e.g., Graoch,* 508 F.3d at 373 (balancing test incorporated as elements of proof after second step of burden-shifting framework); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1252–1254 (10th Cir. 1995) (incorporating a three-factor balancing test into the burden-shifting framework to weigh defendant's justification).

[260] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See, e.g., Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

application of the test on a national basis. Reduced compliance costs would be expected to result because housing providers could look to a uniform standard at HUD and in the various courts across the country. It also offered clarity to persons seeking housing and persons engaged in housing transactions as to how to assess potential claims involving discriminatory effects. HUD now recodifies the burden shifting framework of the 2013 Rule, continuing the clarity, consistency, and predictability that accompanied that rule.

*Issue:* Commenters stated that HUD has provided no basis for the statement that it would cost as much for an insurer to demonstrate eligibility for an exemption for risk-based practices as it would to litigate the actuarial soundness of a challenged practice on a case-by-case basis in multiple jurisdictions at different points in time.

*HUD Response:* It appears that commenters may be referencing HUD's discussion from its 2016 Supplement of granting safe harbors for specific risk-based factors. In 2016, HUD did not discuss the cost to insurers of demonstrating eligibility for a general exemption for "risk-based practices." Rather, HUD discussed how the *arguments and evidence* that insurers would need to demonstrate to show they qualified for an exemption would be the same as the arguments and evidence that they would need to meet their burden at step two.[261] As HUD explained, if HUD were to provide a safe harbor for the use of any factor that an insurer could prove is purely risk-based, entitlement to the safe harbor would inevitably necessitate the insurer to establish it qualifies for the defense, *i.e.,* that the use of the factor is, in fact, risk-based.[262] If an insurance practice is provably risk-based, and a plaintiff cannot establish that a less discriminatory alternative exists, the insurer will have a legally sufficient justification under this final rule. The arguments and evidence that would be necessary to establish whether a

practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification. Consequently, on the one hand an exemption for all provably risk-based factors would offer little added value for insurers, in terms of avoiding litigation costs. On the other hand, an exemption would foreclose potentially meritorious claims in contravention of the Act's broad remedial goals and HUD's obligation to affirmatively further fair housing.

*Other Comments Related to Insurance*

*Issue:* Commenters urged HUD to retain the 2020 Rule for numerous reasons. Commenters said that different forms of this rule have been enacted and retracted over the past few years, leading to confusion and that reinstating the 2013 Rule would be a step backwards. A commenter stated that in 2013, HUD expanded the scope of the Act to cover the insurance industry. Commenters stated that the 2020 Rule did not apply to insurance, so this rule should not create liability for homeowners insurers. Commenters noted that retracting the 2020 Rule so soon after it was promulgated was problematic for policy holders and the insurance industry, as risk-based pricing should not be subject to fleeting changes in policy.

Other commenters stated that it makes practical sense for insurers to be covered by the proposed rule given a long and well documented history of discrimination in the insurance industry. Commenters noted that the insurance industry has been subject to discriminatory effects liability for several decades. A commenter noted that in the more than twenty years since the Act was amended, courts that have considered the issue have consistently held that the Act prohibits acts of discrimination by homeowners insurers.

*HUD Response:* HUD declines to retain the 2020 Rule and notes that the 2020 Rule also did not exempt insurers. Commenters appear to misunderstand HUD's prior rules. Insurance practices have long been subject to liability under a disparate impact theory; that liability did not begin with the 2013 Rule and did not end with 2020 Rule, which contained no exception for such practices. Indeed, since 1989, HUD's fair housing regulations have explicitly prohibited "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently" because of a

protected characteristic.[263] And the 2020 Rule explicitly stated that it "does not establish an insurance industry exemption." [264] Moreover, since the 2020 Rule never went into effect, there have been no changes in policy. In promulgating this final rule, HUD is recodifying a standard that has been in effect for ten years, has proven workable, and is supported by decades of caselaw both before and following its enactment.

*Issue:* A commenter requested that the rule include a specific defense for risk-based ratemaking, as provided in the 2020 Rule. Other commenters stated that HUD should add a substantive defense for risk-based practices whereby if a defendant can show it relied on risk-based practices at step two of the burden-shifting framework, the plaintiff should not have the opportunity to rebut the defense at step three.

*HUD Response:* HUD notes that the 2020 Rule did not in fact provide defenses specific to risk-based ratemaking and it declines to add such a defense now. Step two of the burden-shifting framework already provides a defense for substantial, legitimate nondiscriminatory interests, which will allow a defendant to prevail absent the plaintiff's ability to show a less discriminatory alternative. Eliminating the third step would remove the requirement for insurers to adopt the least discriminatory alternative that serves their substantial, legitimate, nondiscriminatory interest, undermining the purpose of the Act. In sum, by suggesting that the third step be eliminated, the commenter is asking for an exemption from liability for policies and practices having a discriminatory effect, which may have a legally sufficient justification, but for which a less discriminatory alternative may exist, which as explained above, HUD declines to do.

*Issue:* Commenters noted that in 2017, the U.S. Department of Treasury recommended that HUD reconsider whether its 2013 Rule is consistent with the McCarran-Ferguson Act, whether the disparate impact rule would have a disruptive effect on the availability of insurance, and whether the rule is reconcilable with actuarially sound principles.[265]

---

[261] *See* 81 FR 69012, 69017.

[262] HUD went on to further explain that "selecting a few factors for exemption . . . based on bare assertions about their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would . . . be arbitrary. Even if such data were available and a full survey performed, safe harbors for specific factors would still be overbroad because the actuarial relevance of a given factor can vary by context. Also, while use of a particular risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be. Furthermore, the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve." 81 FR 69017.

[263] 24 CFR 100.70(d)(4); 54 FR 3232, 3285 (Jan. 23, 1989).

[264] 85 FR 60288, 60324 (Oct. 6, 2020) ("This rulemaking does not establish an insurance industry exemption.")

[265] U.S. Dept. of Treasury, A Financial System that Creates Economic Opportunities: Asset Management and Insurance (2017) (formerly available at *https://home.treasury.gov/news/*

Continued

**19480** **Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

*HUD Response:* As discussed above in greater detail, HUD has considered these issues and finds that the 2013 Rule and its framework, as adopted in this rule, is consistent with the McCarran Ferguson Act, is reconcilable with actuarially sound principles, and would not have a disruptive effect on the availability of insurance. Treasury believes that HUD, in its reconsideration of the 2013 Rule, has addressed the concerns Treasury noted in the 2017 report regarding the Rule's application to the insurance industry. Treasury no longer has the concerns expressed in that report.

*Issue:* Commenters stated that the 2013 Rule and 2016 supplement adequately considered the issue of application to insurance and adequately addressed the industry's concerns. Other commenters stated that the 2016 Supplemental Explanation failed to adequately explain why the filed-rate doctrine would not bar challenges to insurance rates under the Act.

*HUD Response:* While these comments are outside the scope of this final rule, since HUD is now re-finalizing the 2013 Rule and responding to the current comments received in response to its 2021 Notice of Proposed Rulemaking, HUD agrees with the commenters who stated that the 2013 Rule and 2016 Supplement adequately considered the 2013 Rule's application to insurance and adequately addressed the industry's concerns. And this final rule thoroughly responds to comments from the insurance industry, including those concerning the filed-rate doctrine.

Section 100.5(d): Data Collection

*Issue:* Commenters disagreed about whether to include the 2020 Rule's language that nothing in HUD's fair housing regulations requires or encourages the collection of data relevant to characteristics protected by the Act. Some commenters opposed including such a provision, stating that: its inclusion was unnecessary and unwise; data collection can be used to identify policies and practices that may have a discriminatory effect; and discouraging data collection would have a grave effect on discriminatory effects litigation.

Other commenters asked HUD to include such a provision, stating that otherwise, the rule's burden shifting framework necessitates data collection, which will create unnecessary costs and be especially burdensome and expensive for insurers because they do not already collect this data.

Commenters stated that without the provision, the rule would expose businesses to liability risks by requiring them to obtain and store personal and potentially sensitive information about an individual's protected characteristics. Another commenter stated that requiring the collection of data would inappropriately shift the burden of proof from a plaintiff to a defendant.

Commenters also expressed concern that the only way for insurers to collect data regarding protected characteristics would be through self-reporting, which may result in incomplete or erroneous data, making compliance with the rule difficult. A commenter stated that disparate-impact challenges to risk-based practices in insurance would improperly inject race into the business of insurance by incentivizing or compelling insurers to collect and analyze data on protected characteristics to be able to mount a defense in the event of a disparate impact challenge. Commenters stated that insurers may be prohibited under state law from collecting protected trait data. Commenters added that: insurance company employees will be uncomfortable asking current or potential policy holders for information about their membership in a protected class; collecting demographic data regarding protected traits would invade customer's privacy; and asking about protected class characteristics could discourage applicants for insurance from seeking quotes.

*HUD Response:* HUD believes that this final rule need not include data collection language. HUD agrees that data collection can play an important role in assessing whether a policy or practice may have an unjustified discriminatory effect. HUD also agrees with the Court in *Inclusive Communities,* when it acknowledged that "awareness of race" can help industries "[that] choose to foster diversity and combat racial isolation with race-neutral tools." [266] This supports the idea that this Rule should not discourage the collection of this information. But HUD is also not requiring data collection. The purpose of this final rule is to recodify a long-recognized legal framework, not to describe how data and statistics may be collected, obtained, or used in the application of the framework.

HUD notes further that while data collection can be a means to identify practices that have or predictably will have a discriminatory effect, there are

other ways of identifying such practices that do not require examining a business' own client pool. For example, businesses can look to publicly available datasets or studies related to their practices to see if their practices cause or predictably will cause a discriminatory effect. As HUD explained regarding the use of criminal records, "[a]cross the United States, African Americans and Hispanics are arrested, convicted and incarcerated at rates disproportionate to their share of the general population. Consequently, criminal records-based barriers to housing are likely to have a disproportionate impact on minority home seekers." [267] A business need not collect data from its own clients to ascertain that relying on criminal records in its policies or practices likely has a discriminatory effect on certain populations. In addition, independent data gathering is not necessary to defend a lawsuit alleging discriminatory effects. Plaintiffs must meet their initial burden at step one to show a disparate impact. Defendants need not present their own statistics in response to this step one evidence, but may defend in numerous other ways, including by showing that the data put forward by plaintiff is incorrect or wrongly analyzed, or by showing at step two that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. This is true for all defending parties, including insurers, who bear no increased burden.

Moreover, concerns about how the rule would change industry practices—in particular what commenters say is the insurance industry practice of not collecting demographic data—do not square with the fact that current industry practice is based on a rule that has been in place, uninterrupted, since 2013, and based on the underlying law that has been in place for decades prior. Businesses that have not collected data over the past several decades will not be facing any change in the laws regulating their practices with HUD's recodification of the 2013 Rule.

*Issue:* Commenters requested that HUD clarify expectations and provide protections for lenders that collect demographic data for use in fair lending self-testing.

*HUD Response:* As discussed above, HUD believes that demographic data can be helpful in assessing whether a policy has an unjustified discriminatory effect. HUD notes further that lenders

---

*featured-stories/a-financial-system-that-creates-economic-opportunities-asset-management-and*).

[266] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 542.

[267] "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" at 2 (April 4, 2016) (internal citations omitted).

routinely collect data on protected characteristics as part of their Home Mortgage Disclosure Act reporting obligations. However, HUD is not requiring either collection of demographic data or self-testing. It is unclear what "protections" commenters meant for HUD to provide to lenders who collect demographic data and use that data to engage in self-testing. HUD notes that the self-testing privilege as described in 42 U.S.C. 3614–1 already applies to lenders. This self-testing privilege will not provide a lender (or any other entity) with an exemption from liability under the Act, but if a complaint is made to HUD against a lender alleging practices that have an unjustified discriminatory effect, HUD is prohibited from obtaining self-testing results covered by this self-testing privilege to investigate a lender's compliance with the Act. Of note, HUD will not absolve a lender of potential liability merely because the lender collects demographic data and does self-testing. Doing so would abdicate HUD's basic obligation to enforce the Act by ceding substantive compliance authority from HUD to private lenders.

*Section 100.500: The Discriminatory Effects Rule*

Section 100.500(a): Removing "Predictably" From the Definition of Discriminatory Effect

*Issue:* Commenters asked HUD to remove the word "predictably" from the proposed rule's definition of discriminatory effects in § 100.500(a), asserting that it violates the Act. A commenter stated that the plain language of section 804(b) does not include practices that might result in a discriminatory effect. Other commenters asserted that the "predictably results" language violates *Inclusive Communities'* "robust causality" requirement. According to one commenter, this "new" robust causality standard requires a plaintiff to prove that a practice already caused the discriminatory effect, not just that a practice will predictably do so. Commenters similarly suggested that *Inclusive Communities'* bar on claims that are based solely on statistical evidence rules out claims based on predictable or hypothetical impacts.

Other commenters wrote in favor of retaining the "predictably" language in the rule. Commenters pointed out that courts, including *Inclusive Communities,* have interpreted the "predictably" language in the proposed rule to contain a "robust causality" requirement, including a bar on claims that are based solely on statistical

evidence of discriminatory effects. One commenter noted that the robust causality requirement that *Inclusive Communities* discusses is simply the 30-year-old requirement that a plaintiff, to prevail in a disparate impact challenge, must show that the disparate impact is causally related to, not merely correlated with, the identified practices of the defendant. Another commenter noted that in the very first case in which an appeals court recognized discriminatory effects liability, the 8th Circuit required the plaintiff to bear the burden of showing that defendants' conduct actually or predictably resulted in a discriminatory effect. One commenter noted that HUD in 2013 explained how the "predictably" language was supported by the plain language of the Act and case law, and HUD ignored this justification when it attempted to remove the language in the 2020 Rule.

One commenter acknowledged that "predictability" is a necessary element to assess the disparate impact of a policy and an issue that *Inclusive Communities* did not address. Other commenters noted multiple cases in which courts have utilized the proposed rule's predictably standard in practical, effective ways, such as in *Georgia Conference of the NAACP* v. *City of LaGrange,* and *Fortune Society* v. *Sandcastle.*[268]

A commenter noted that caselaw and practical common-sense support that one need not wait until actual harm is inflicted before an action can be challenged. Another commenter noted that removing the predictably standard would unnecessarily increase the risk of harm to communities by taking away the ability to make claims for reasonable, foreseeable harm.

*HUD Response:* HUD declines to remove "predictably" from this final rule's definition of discriminatory effects. As explained in the 2013 Rule, the plain language of the Act supports the inclusion of this language. The Act defines an "aggrieved person" as anyone who, among other things, "believes that such person *will be* injured by a discriminatory housing practice that is *about to occur.*"[269] Furthermore, the Act explicitly authorizes HUD to take enforcement action and Administrative Law Judges (ALJs) and courts to order relief with respect to discrimination that "*is about*

*to occur.*"[270] In addition, courts interpreting the Act have agreed that predictable discriminatory effects may violate the Act.[271] HUD further believes it would be contrary to HUD's duty to affirmatively further fair housing if it could not take action to prevent the harm of a predictable discriminatory effect and instead had to first allow individuals to be subjected to discrimination before any enforcement action could be taken. As explained above, the Court in *Inclusive Communities* did not announce a new "robust causality" requirement. Nor did it indicate any intention to exclude from liability cases that allege predictable discriminatory effects. Rather, the Court simply described the longstanding requirement that a plaintiff must establish a causal connection between the policy or practice and the discriminatory effect. *Inclusive Communities* explained that a plaintiff raising a "disparate-impact claim relying on a statistical disparity" must "point to a defendant's policy or policies causing that disparity."[272] Consistent with *Inclusive Communities,* this final rule requires—whether for a disparity that has already occurred or one that will occur—that the plaintiff point to a defendant's policy or policies that cause the disparity, and not rely on a statistical disparity alone.[273]

*Issue:* Commenters also objected to the "predictably results" language in proposed § 100.500(a) and the "predictably will cause" language at § 100.500(c)(1)) saying that it is inconsistent with case law under Title VII and the Age Discrimination in Employment Act (ADEA). They stated that the Title VII cases *Wards Cove Packing Co.* v. *Atonio*[274] and *Watson* v. *Fort Worth Bank & Trust*[275] preclude

268 *Ga. State Conf. of the NAACP* v. *LaGrange,* 940 F.3d 627 (11th Cir. 2019); *Fortune Soc'y* v. *Sandcastle Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145 (E.D.N.Y. 2019).

269 42 U.S.C. 3602(i)(2) (emphasis added).

270 42 U.S.C. 3610(g)(2)(A), 3613(c)(1), 3614(d)(1)(A) (emphasis added).

271 *See, e.g., United States* v. *City of Black Jack, Mo.,* 508 F.2d 1179, 1184 (8th Cir. 1974) ("To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually *or predictably results* in racial discrimination; in other words, that is has a discriminatory effect.") (emphasis added); *Fortune Soc'y* v. *Sandcastle Towers Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145 (E.D.N.Y. 2019).

272 *Inclusive Cmtys. Project, Inc.*576 U.S. at 542.

273 *See* 24 CFR100.500(c)(1) (The . . . plaintiff . . . has the burden of proving *that a challenged practice caused or predictably will cause* a discriminatory effect)(emphasis added); 100.500(c)(a)(A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons . . . because of race, color, religion, sex, handicap, familial status, or national origin).

274 *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989).

275 *Watson* v. *Fort Worth Bank & Trust,* 487 U.S. 977 (1988).

discriminatory effects claims based on policies which predictably, rather than actually, cause a discriminatory effect. Commenters stated that in *Wards Cove,* the Supreme Court stated that ''[a] plaintiff must demonstrate that it is the application of a specific or particular . . . practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case.'' [276] Commenters quoted *Watson,* which said that ''the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'' Similarly, a commenter cited *Meacham* v. *Knolls Atomic Power Lab'y* [277] for the proposition that plaintiffs in cases brought under the ADEA must prove an existing disparate impact—not a future one.

*HUD Response:* HUD believes that the commenters' reliance on these Title VII and ADEA cases is misplaced because these cases only considered the question of whether certain policies already had had a disparate impact, not whether they would ''predictably'' have one in the future. [278] Furthermore, the Act explicitly defines an aggrieved person as including ''any person who believes that such person will be injured by a discriminatory housing practice that is about to occur'' [279] Finally, courts interpreting the Act have agreed that predictable discriminatory effects may violate the Act. [280]

---

[276] *Wards Cove Packing Co.,* 490 U.S. at 657.

[277] *Meacham* v. *Knolls Atomic Power Lab'y* 554 U.S. 84 (2008).

[278] See *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989) (examining whether the employer's policy or practice caused documented racial disparities at different positions at a cannery, not whether the employer's policy or practice would predictably cause disparities at different positions at the cannery); *Watson* v. *Fort Worth Bank & Trust,* 487 U.S. 977 (1988) (examining whether a bank's subjective promotion practices had a disparate impact on black employees, not whether the bank's practice would predictably have a disparate impact on black employees); *Meacham* v. *Knolls Atomic Power Lab'y,* 554 U.S. 84 (2008) (examining a case where the employer was alleged to have utilized a policy that a caused a disparate impact on ADEA protected employees, not where the employer was alleged to have utilized a policy that predictably would cause a disparate impact on ADEA protected employees).

[279] See 42 U.S.C. 3602(i)(2); *compare* 42 U.S.C. 2000e; 29 U.S.C. 630.

[280] See, e.g., *Pfaff* v. *HUD,* 88 F.3d at 745, 745 (9th Cir. 1996) (''Discriminatory effect' describes conduct that actually or predictably resulted in discrimination.''); *United States.* v. *City of Black Jack,* 508 F.2d at 1184 (''To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect.''); *Fortune Soc'y,* 388 F. Supp.

---

**Section 100.500(a): Perpetuation of Segregation in the Definition of Discriminatory Effect**

*Issue:* Commenters disagreed about the proposed rule's inclusion of perpetuation of segregation as a type of unlawful discriminatory effect. Some commenters stated that including liability for practices that perpetuate segregation is too broad and may have a chilling effect on the development of affordable housing. One commenter said that prohibiting practices that perpetuate, create, increase, or reinforce segregated housing patterns based on protected classes was a more stringent standard than *Inclusive Communities* announced. Another commenter stated that this language would expand liability to cover any action or any absence of action that reinforces or perpetuates segregated housing patterns, which is inconsistent with *Inclusive Communities'* requirement that plaintiffs demonstrate that the challenged practice is a direct cause of the disparate impact.

In contrast, other commenters stated that including the perpetuation of segregation provision is crucial to combatting segregation (including segregation based on disability and race), which is still a major problem today and can have devastating impacts on communities. Commenters said if HUD did not include this language, it would mean that HUD had adopted the view that perpetuation of segregation was not a central or relevant concern of disparate impact, that perpetuation of segregation was no longer a basis for liability under the Act, and/or that perpetuation of segregation liability would be collapsed into disparate impact liability, and only be evidence of a disparate impact claim, rather than an independent means of establishing a violation in and of itself. Commenters noted that reinstating the perpetuation of segregation language was important to eliminate the confusion that the 2020 Rule had caused through its removal, and to clarify that perpetuation of segregation is a distinct type of discriminatory effect under the Act. Commenters gave examples of activities which may unlawfully perpetuate segregation, including facially neutral zoning decisions whose real but disguised purpose is to exclude people of color, and the demolition or displacement of affordable housing

---

3d 145; *Conn. Fair Hous. Ctr* v. *CoreLogic Rental Prop. Sols., LLC,* No. 18–cv–705, 2021 U.S. Dist. LEXIS 60197, at *51 (D. Conn. Mar. 30, 2021); *Jones* v. *City of Faribault,* No. 18–1643 (JRT/HB), 2021 U.S. Dist. LEXIS 36531, at *55 (D. Minn. Feb. 18, 2021).

---

leading to severely limited opportunities for people of color. Commenters said that removing the perpetuation of segregation provision would conflict with *Inclusive Communities.* One commenter stated that federal appellate courts have long recognized perpetuation of segregation as a distinct basis for discriminatory effects liability. [281] Commenters stated that the 2020 Rule, which eliminated perpetuation of segregation, conflicted with HUD's duty to affirmatively further fair housing, which is a central goal of the Act.

*HUD Response:* HUD agrees with the latter commenters that perpetuation of segregation is prohibited by the Act and, as such, should be included in the definition of discriminatory effects in this rule. The elimination of segregation is a central goal of the Act, one that was highlighted by *Inclusive Communities* and has long been recognized by other courts. [282] *Inclusive Communities* also recognized that practices that perpetuate segregation independently violate the Act. [283] HUD also notes that every

---

[281] See *Mhany Mgmt., Inc.* v. *Cnty. Of Nassau,* 819 F.3d 618 (2d Cir. 2016) (finding that a discriminatory effect violating the Act could be shown by a disparate impact on a minority group or a segregative effect); see also *Avenue 6E Investments, LLC,* 818 F.3d 493 (9th Cir. 2016) (explaining that the City's action to prevent the project in question from being built had the effect of perpetuating segregation).

[282] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 528–531. See, e.g., *Avenue 6E Invs.* v. *City of Yuma,* 818 F.3d 493, 503 (9th Cir. 2016) (''[A]s the Supreme Court recently reaffirmed [in *ICP*], the FHA also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason.'') (emphasis added); *Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson County Metro Hum. Rels. Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (there are ''two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.''); see also *Huntington Branch, NAACP* v. *Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988); *Metro. Housing Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977); *Nat'l Fair Hous. All.* v. *Bank of Am.,* 401 F. Supp. 3d 619, 641 (D. Md. 2019) (''Perpetuation of segregation is, in effect, an alternate avenue of pleading disparate impact under the FHA.'') (citing *Graoch,* 508 F.3d at 378); *Hallmark Developers, Inc.* v. *Fulton Cnty.,* 386 F. Supp. 2d 1464, 1383 (N.D. Ga. 2005); *Dews* v. *Town of Sunnyvale,* 109 F. Supp. 2d 526, 569 (N.D. Tex. 2000) (ruling that the defendant-town's zoning restrictions were racially motivated in violation of various civil rights laws and also had both a disparate impact and segregative effect that violated the Act).

[283] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 540 (''[T]he FHA aims to ensure that those priorities can

---

federal court of appeals to have addressed the issue has agreed with HUD's interpretation in the 2013 Rule.[284] HUD finds that the rule is consistent with *Inclusive Communities'* causation requirement because it plainly requires that a practice ''causes or will cause'' a discriminatory effect. While *Inclusive Communities* did not directly address a claim brought under a ''perpetuation of segregation'' theory, it [285] discusses disparate impact's long-standing limits, including its causation requirement, as in harmony with its aim to prohibit ''perpetuating segregation.'' HUD believes that eliminating the perpetuation of segregation language will cause inconsistency between HUD's rule and judicial precedent and create the mistaken impression that HUD believes that practices that perpetuate segregation are not practices which create discriminatory effects.

HUD also disagrees that the final rule would chill the development of affordable and fair housing, including in predominantly minority neighborhoods. Commenters did not provide, and HUD is not aware of, any support for the proposition that this rule would have such an effect. Instead, this rule provides a framework for plaintiffs to

challenge discriminatory housing decisions. And *Inclusive Communities* specifically noted that HUD's discriminatory effects rule recognized that disparate impact liability does not mandate that affordable housing be located in neighborhoods with any particular characteristic.[286] Eliminating the provision on perpetuation of segregation would also be inconsistent with HUD's duty to affirmatively further fair housing, which applies, *inter alia*, to HUD's program of administering, implementing, and enforcing the Fair Housing Act.[287]

In sum, HUD declines to eliminate the provision on perpetuation of segregation because doing so would lead to uncertainty over the state of the law, the provision is consistent with *Inclusive Communities* and well established caselaw, and doing so would undermine one of the core goals of the Act, *i.e.*, ending the perpetuation of segregation.[288]

Section 100.500: Racial Quotas or Unfair Advantages to Plaintiffs

*Issue:* Commenters expressed concern that the proposed rule's framework would cause them to adopt quotas to avoid unlawful disparities. One commenter stated that this is because the rule does not require any causal connection between the policy and any disparity and would therefore pose the risk that financial services and businesses would adopt a quota-based approach to avoid disparities. Another commenter similarly suggested that the proposed rule does not contain a robust causality requirement, stating that *Inclusive Communities* emphasized a robust causality requirement to prevent housing providers and businesses from resorting to racial quotas. Another commenter asserted that to align the rule with *Inclusive Communities'* robust causality requirement and therefore reduce the incentive for housing providers to use racial quotas, while still maintaining the essence of the 2013 Rule, HUD should modify the final rule to say that ''discrimination on a group

of persons is predictable through a robust causal link by the challenged policy or practice.''

In contrast, a commenter stated that the proposed rule would not require businesses to consider race or quotas. Other commenters stated that by requiring that a plaintiff prove that the challenged practice caused or predictably will cause a disparate impact rather than imposing liability based on statistical disparities alone or general societal discrimination, this rule addresses any concerns that disparate impact liability would cause defendants to resort to quotas.

*HUD Response:* HUD disagrees that this final rule will incentivize quotas. While the Court expressed concern in *Inclusive Communities* that ''without adequate safeguards at the prima facie stage,'' disparate-impact liability might lead to the use of ''numerical'' or ''racial quotas,[289] this rule already contains these ''adequate safeguards.'' In particular, the rule requires plaintiffs to demonstrate that ''a challenged *practice caused* or predictably *will cause''* (emphasis added) a discriminatory effect. Furthermore, it defines ''a practice that has a discriminatory effect'' as one where the practice ''*actually or predictably results* in a disparate impact'' (emphasis added) or in segregation cases, where the practice ''creates, increases, reinforces or perpetuates segregated housing patterns.'' As explained previously in this preamble, this connection between the challenged practice and the discriminatory effect is the causality that *Inclusive Communities* spoke of when discussing how safeguards would prevent the use of racial quotas.[290] And it was in the context of the *Inclusive Communities* district court's failure to require this connection (by finding the defendant liable based solely on discrepancies in outcomes, without requiring the plaintiff to show that a particular practice caused those outcomes) that the Fifth Circuit remanded the matter with instructions to follow the 2013 Rule,[291] a judgment

be achieved without arbitrarily creating discriminatory effects or perpetuating segregation''). *See also id.* at 539–540 (citing *United States* v. *City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974) and *Huntington Branch, N.A.A.C.P.* v. *Town of Huntington,* 844 F.2d 926, 934 (2d Cir.), *aff'd in part,* 109 S. Ct. 276 (1988), which were ''perpetuation of segregation'' cases and described as ''heartland'' disparate-impact liability cases).

[284] *See, e.g., Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson Cnty. Met. Hum.n Rels. Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007); *Reinhart* v. *Lincoln Cnty.,* 482 F.3d 1225, 1229–1232 (10th Cir. 2007); *Hallmark Devs. s, Inc.* v. *Fulton Cnty., Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Jackson* v. *Okaloosa Cnty., Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937–38 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 148 (3d. Cir. 1977); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987–89, n.3 (4th Cir. 1984); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290–91 (7th Cir. 1977); *United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

[285] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 540–41. (''[D]isparate-impact liability has always been properly limited in key respects . . . for instance, if such liability were imposed based solely on a showing of a statistical disparity. Disparate impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies. The FHA is not an instrument to force housing authorities to reorder their priorities. Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.'') (internal citations omitted).

[286] *Id.* at 542 (quoting 78 FR 11476).

[287] *See, e.g.,* 42 U.S.C. 3608(e)(5) (The Secretary of Housing and Urban Development shall—administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter); *Thompson* v. *United States HUD,* 348 F. Supp. 2d 398, 417 (D. Md. 2005) (finding that HUD's duty to affirmatively further fair housing under § 808(e) holds HUD's actions to a ''high standard'' which includes ''to have a commitment to desegregation'').

[288] *Inclusive Cmtys. Project, Inc..* at 540 (''[t]he FHA aims to ensure that those [legitimate] priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.'').

[289] *Id.* at 542–43.

[290] *See id.* at 540–43 (explaining that a robust causality requirement means that a plaintiff must ''point to a defendant's policy causing [a] disparity'' and ''allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection'' between the policy and the disparity/imbalance, as opposed to simply relying on a statistical disparity or racial imbalance alone, and noting that this requirement safeguards against defendants being held liable for disparities they did not create, which might encourage the use of racial quotas).

[291] *See Inclusive Cmtys. Project, Inc.* v. *Tex. Dep't of Hous. and Cmty. Affairs,* 747 F.3d 275 (5th Cir 2014) (remanding the matter for application of
Continued

the Supreme Court ultimately affirmed. Crucially, therefore, far from invalidating the 2013 Rule for failing to require this connection, the Fifth Circuit and Supreme Court decisions both support HUD's position that that applying the 2013 Rule's framework is the correct method of ensuring that disparate impact liability does not improperly require the use of racial quotas.[292]

Further, HUD's discussion above regarding the insurance underwriting processes explains the difference between being aware of protected traits to avoid discrimination (consistent with this final rule, *Inclusive Communities,* and the Act) and violating the Act by making decisions based upon a protected trait.[292]

In addition, it is unclear how the commenter's proposed alternative language, that "discrimination on a group of persons is predictable through a robust causal link by the challenged policy or practice" would improve the rule or disincentivize quotas. On the contrary, HUD believes modifying the rule to incorporate this language would create confusion about the causal link between the policy and the effect discussed by *Inclusive Communities.* For example, it is unclear what "by" means in the proposed sentence, and the sentence does not make clear that the *practice must cause* (predictably or actually) *the discriminatory effect.* HUD further believes incorporating the "robust causal link" language is unnecessary and could confuse people about a heightened standard that *Inclusive Communities* did not create, as detailed elsewhere in this preamble.

*Issue:* Commenters stated that the proposed rule would create an uneven playing field in favor of plaintiffs through the requirements and burdens placed on defendants, as compared to plaintiffs. Some commenters stated that the proposed rule requires defendants to show that their policy will *not* cause a disparate impact on a protected group. Other commenters said the proposed rule allows plaintiffs to use hypothetical or speculative evidence, or no evidence at all, to show that a practice causes a discriminatory effect, while at the same time requiring defendants to meet their burden at step two with evidence that is not hypothetical or speculative, thus placing the entire burden of proof on defendants. A commenter said the rule

allows plaintiffs to raise hypothetical or speculative impacts at step one (because of the "predictably results" language), while barring defendants from raising hypothetical or speculative defenses at step two.

On the other hand, commenters supported HUD's continuation of the 2013 Rule's framework, stating that the 2020 Rule unjustifiably favors defendants because plaintiffs must meet a preponderance of the evidence standard to prove discrimination, but defendants are only required to show that a policy advances a legitimate interest. The commenters stated that this conflicts with well-established case law placing the burden on the defendant to prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.

*HUD Response:* HUD believes that the burdens and requirements in the rule are appropriately balanced, and that the concerns that the rule is tipped in favor of plaintiffs are based on misunderstandings of the rule.

First, the rule does not require a defendant to show that its policy or practice does not cause a disparate impact. In fact, this rule does not require any party to prove a negative. While a defendant may choose to present evidence that the defendant's policy does not cause a discriminatory effect to rebut the plaintiff's evidence that it does, the plaintiff has the ultimate burden of proving that a defendant's policy caused (or predictably will cause) a discriminatory effect.

Nor does this rule place a greater evidentiary burden on defendants than on plaintiffs or otherwise shift the burden of proof entirely onto defendants. Under the rule, the plaintiff must prove through evidence (not speculation) that a challenged practice caused or predictably will cause a discriminatory effect (step one). Assuming the plaintiff meets this burden, the defendant must prove through evidence (not speculation) that a challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests (step two). If the plaintiff fails to meet its step one burden, defendant prevails, and if the defendant fails to meet its step two burden, the plaintiff prevails. It is the plaintiff—not the defendant—who carries the burden at two of the three steps in the burden shifting framework, including the final one. As HUD said in the 2013 Rule: "Requiring the respondent or defendant to introduce evidence (instead of speculation) proving that a challenged

practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests in order to benefit from the defense to liability is not different in kind from requiring the plaintiff to introduce evidence (not speculation) proving that a challenged practice caused or will predictably cause a discriminatory effect. As discussed in this preamble, the language of the Act makes clear that it is intended to address discrimination that has occurred or is about to occur, and not hypothetical or speculative discrimination."

Although commenters specifically called out evidence that could support a complaint concerning a "predictable" disparate impact as "hypothetical" or "speculative" under the rule, this is incorrect. In the final rule's framework, neither the plaintiffs nor defendant may rely on hypothetical or speculative evidence. All parties must rely on evidence that is sufficiently rigorous and not speculative, and there is no requirement that either side rely solely on existing evidence of the already existing effects of defendants' adopted policy. For example, lenders routinely assess proposed policy changes using current data to determine whether, if adopted, the policy would have a disparate impact in the future. Data analysis like this—of the effects that a policy will have, rather than the effects a policy already has had—is neither "hypothetical" nor "speculative" and could be used by either a plaintiff or a defendant to support or rebut a predictable effects claim at step one. And just as a plaintiff can rely on evidence that the defendant's policy will predictably have certain effects, a defendant can rely on evidence that a proffered less discriminatory alternative to its policy will not work.

Moreover, characterizing the *impact* of a "predictable effects" showing at step one as "hypothetical or speculative" is incorrect. Even if the impact has not yet occurred, this final rule still requires that plaintiffs prove that it predictably will occur. If plaintiffs show only that the discriminatory impact is "hypothetical," or "speculative," they will not prevail. Defendants may prove that a policy or practice with a discriminatory effect was necessary to meet a substantial, legitimate, interest. Hypothetical or speculative defenses articulated in support of a policy or practice will not be sufficient, because defendants know the actual reason for the policy or practice at issue. Allowing defendants to present different reasons than their actual reasons for implementing policies with

---

HUD's 2013 Rule); *id* at 283–84 (concurring) (highlighting specifically the problem of the lower courts analysis as accepting plaintiffs relying on statistical evidence of disparity alone without a connection to an offending policy).

[292] *See supra* at *Discriminatory Effects as Applied to Insurance.*

**Federal Register**/Vol. 88, No. 62/Friday, March 31, 2023/Rules and Regulations **19485**

discriminatory effects would allow pretextual reasons to justify discriminatory policies, thus defeating the important role of discriminatory effects liability in uncovering discriminatory intent,[293] and would permit, rather than remove, arbitrary and artificial barriers to housing.

Finally, HUD agrees with commenters who noted that the burden shifting framework in this rule strikes the appropriate balance between the interests of plaintiffs and defendants, and that the 2020 Rule upset this balance. For example, it required defendants to identify only a legitimate interest rather than an interest that is also substantial and nondiscriminatory. It removed the requirement that the defendant's challenged practice be necessary to achieving that legitimate interest. Additionally, the defendants' burden was reduced from one of proof to one of production. HUD notes that these changes were neither consistent with nor justified by the text of the Act or case law interpreting it.[294] And to the extent the Act and case law provide discretion, HUD exercises its policy judgment to maintain the 2013 Rule's burden shifting framework for the reasons stated above.

*Section 100.500(a) and (c)(1): Clarifying Causation*

*Issue:* Commenters suggested HUD provide guidance to help clarify causation in the final rule or modify the causation standard in the rule to make it more detailed or specific. Some commenters asked HUD to clarify that a challenged practice may be too remote from the alleged discriminatory effect to give rise to liability. Other commenters criticized the proposed rule for not making clear that a plaintiff must identify a *specific* policy or practice that caused the alleged disparate impact (as opposed to challenging a more general array of practices), with some saying that *Wards Cove* requires this. Other

commenters suggested that the rule specify that the discriminatory impact be "significant" because *Wards Cove* and *Inclusive Communities* require it. According to the commenters, the latter's warning that race should not be used in a pervasive way or injected into every housing decision necessitates a "significant" discriminatory impact. Others suggested the rule needs to be clearer on what evidence is required to show causation and should establish statistical standards, with one commenter stating that the rule should require some threshold of showing credible, localized, statistical proof that a challenged practice has a discriminatory effect. A commenter said clarification is needed because HUD's 2016 Guidance on criminal records, by pointing to historic nationwide incarceration rates, shows that HUD has interpreted the proposed rule to allow the plaintiff to meet the initial burden using sweeping generalizations about statistics and impact with little or no showing of statistically valid discriminatory impact. The commenter further stated that courts have interpreted the initial burden under Title VII, including in *Wards Cove,* as much higher than the burden articulated in the rule, including requiring that the practice has an adverse impact on a specific protected class that is qualitatively different from other classes and that can be demonstrated to have a materially different impact based on statistics for the relevant geographic area.

In contrast, other commenters stated that the proposed rule already contains a sufficiently clear causation requirement. A commenter wrote that the 2013 Rule and federal jurisprudence have appropriately rejected any potential single test to define "discriminatory effect" through evaluating statistical evidence of causation, citing *Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly, Bonasera* v. *City of Norcross,* and *Langlois* v. *Abington Hous. Auth.*[295] and noted that further defining "discriminatory effect" (including that a disparate impact is "significant") is inappropriate because of the wide variety of policies and practices challenged.

*HUD Response:* HUD believes that revising the causation requirement in this final rule is inappropriate. The final rule already requires plaintiffs to show a causal link between the challenged

practice and the alleged discriminatory result. That requirement, in turn, necessitates consideration of whether a challenged practice is too remote from the alleged discriminatory effect for liability to arise under the Act.

In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis. As has been recognized in the employment context under Title VII after *Wards Cove,* the elements of a decision-making process may not be capable of separation for analysis,[296] in which case it may be appropriate to challenge the decision-making process as a whole. For example, in a reverse redlining case, there may be multiple acts or policies that together result in a discriminatory effect.[297] Finally, in some instances, the absence of a policy may amount to a practice.[298] And while *Wards Cove* limited plaintiffs' ability in an employment matter to aggregate multiple practices in showing that a practice or practices cause a disparate impact until Congress amended Title VII, *Inclusive Communities* did not endorse a wholesale application of *Wards Cove* to disparate impact cases under the Act. Indeed, the Court only cited *Wards Cove* for an uncontroversial and undisturbed portion of its holding, *i.e.,* that simply pointing to racial imbalances within a company is insufficient to show that a policy caused a disparate impact. And *Inclusive Communities* explicitly noted when it cited *Wards Cove* that the "robust causality" requirement it attributed to *Wards Cove* did not incorporate any part

[293] *See Inclusive Cmtys. Project, Inc.,* 576 U.S, at 540 (describing discriminatory effects liability as playing a role in uncovering discriminatory intent).

[294] *See, e.g., MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–619 (2d Cir 2016) (deferring to HUD's [2013] regulation, noting that "the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]"); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [Inclusive Communities].").

[295] *Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3d Cir. 2011); *Bonasera* v. *City of Norcross,* 342 F. App'x 581, 585 (11th Cir. 2009); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 50 (1st Cir. 2000).

[296] *See* 42 U.S.C. 2000e–2(k)(1)(B)(i) ("[T]he complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

[297] *See, e.g., Hargraves* v. *Capital City Mortg. Corp,* 140 F. Supp. 2d 7, 18–22 (D.D.C. 2000) (finding that "predatory lending" in African American neighborhoods, which included exorbitant interest rates, lending based on the value of the asset rather than a borrower's ability to repay, profiting by acquiring the property through default, repeated foreclosures, and loan servicing procedures with excessive fees, could disparately impact African Americans).

[298] *See, e.g., Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 258 (D. Mass. 2008) ("Where the allocation of subjective decisionmaking authority is at issue, the 'practice' amounts to the *absence* of a policy, that allows racial bias to seep into the process. Allowing this 'practice' to escape scrutiny would enable companies responsible for complying with anti-discrimination laws to 'insulate' themselves by 'refrain[ing] from making standardized criteria absolutely determinative.'") (citing *Watson,* 487 U.S. at 990).

**19486**    **Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

of the opinion that was superseded by Title VII's statutory amendments:

A robust causality requirement ensures that 'without more, establish a prima facie case of disparate impact'' and thus protects defendants from being held liable for racial disparities they did not create.' *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642, 653 (1989), superseded by statute *on other grounds,* 42 U.S.C. 2000e–2(k) (emphasis added).[299]

HUD further declines to set statistical standards, including statistical thresholds, to require localized statistics, or note a ''significance'' requirement. HUD continues to believe, as it did in 2013, consistent with courts, that analyzing causation in these matters on a case-by-case basis is the best approach, especially given the wide variety of policies, practices, and discriminatory effects at issue in these types of cases.[300] Courts have recognized a variety of circumstances—both under the Act and Title VII—in which using national statistics, rather than local statistics, is appropriate.[301]

HUD's 2016 Guidance recognizes this, while also noting that ''state or local statistics should be presented where available and appropriate based on a housing provider's market area or other facts particular to a given case.'' [302] The Supreme Court has recognized that a case-by-case approach is appropriate in the Title VII context when it comes to statistical thresholds and requirements and levels of significance.[303] And, as HUD noted in 2013, the decision not to codify a significance requirement is consistent with the 1994 Joint Policy Statement on Discrimination in Lending, the statutory codification of the disparate impact standard under Title VII, and the Consumer Financial Protection Bureau's interpretation of the disparate impact standard under ECOA.[304]

### Section 100.500(c)(1): When Multiple Factors Produce Discriminatory Effects

*Issue:* Commenters stated that the ''actually or predictably results'' language in step one ignores situations in which multiple factors may produce discriminatory effects.

*HUD Response:* This rule requires plaintiffs to prove that the challenged policy caused or predictably will cause the alleged discriminatory effect. Therefore, plaintiffs are required to show that the policy they challenge is

a cause of a discriminatory effect. The rule does not require the challenged policy to be the sole factor that causes or predictably will cause the discriminatory effect. Such an approach is consistent with HUD's position that in disparate treatment cases, the Fair Housing Act is violated even if discriminatory animus was *only one of the factors* motivating the defendant's actions.[305]

[299] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 542.

[300] *See, e.g., Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Sols.,* LLC, 478 F. Supp. 3d 259, 296 (D. Conn. 2020) (noting the appropriateness of a case-by-case approach which considers not only statistics but all the surrounding facts and circumstances in judging the significance or substantiality of disparities in a Fair Housing Act disparate impact case) (citing *Chin* v. *Port Auth. of New York & New Jersey,* 685 F.3d 135, 153 (2d. Cir. 2012)); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 50 (1st Cir. 2000) (*describing the issue of impact as ''fact-bound'' and applying Supreme Court's Watson holding that* ''no single test controls in measuring disparate impact'' to the Title VIII case before it). Courts have held the same in the Title VII context.

[301] *See, e.g., Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Sols.,* 478 F. Supp. 3d 259, 292 (D. Conn. 2020) (''National or state general population statistics may be used as the appropriate comparison groups in at least three situations: First, national or state statistics are appropriate where there is no reason to suppose that the local characteristics would differ from the national statistics . . . . Second, studies based on general population data and potential applicant pool data'' may be the ''initial basis of a disparate impact claim, especially in cases [where] the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as discriminatory . . . . Third, national or state general statistics are appropriate where actual applicant data is not available'') (internal citations omitted); *Dothard* v. *Rawlinson,* 433 U.S. 321, 330 (1977) (''[R]eliance on general population demographic data was not misplaced where there was no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those of the national population.''); *Griggs,* 401 U.S. at 430 (relying on general population data in finding disparate impact of diploma requirement on Black applicants); *EEOC* v. *Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus.,* 186 F.3d 110, 119–120 (2d Cir. 1999) (finding that actual applicant pool data was based upon too

small a sample size and use of general population and potential applicant data was thus appropriate); *El* v. *SEPTA,* 418 F. Supp. 2d 659, 668–69 (E.D. Pa. 2005) (finding that plaintiff proved prima facie case of disparate impact under Title VII based on national data from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S., which showed that People of Color were substantially more likely than whites to have a conviction), *aff'd on other grounds,* 479 F.2d 232 (3d Cir. 2007).

[302] ''Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions'' at 3 (April 4, 2016).

[303] *See, e.g., Watson* v. *Fort Worth Bank & Trust,* 487 U.S. 977, 995–96 n.3 (1988) (''We have emphasized the useful role that statistical methods can have in Title VII cases, but we have not suggested that any particular number of ''standard deviations'' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination. Nor has a consensus developed around any alternative mathematical standard. Instead, courts appear generally to have judged the ''significance'' or ''substantiality'' of numerical disparities on a case-by-case basis . . . . [W]e believe that such a case-by-case approach properly reflects our recognition that statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.''') (internal citations omitted); *See also Jones* v. *City of Bos.,* 752 F.3d 38, 52–53 (1st Cir. 2014) (outlining the difficulty in applying a rule to assess ''practical significance'' when analyzing causation in disparate impact cases, including outlining criticisms of EEOC's four-fifths rule to show ''practical significance'').

[304] 78 FR 11460, 11468–9.

[305] *See, e.g., HUD* v. *Cox et. al,* HUDALJ 09–89–1641–1, 1991 HUD ALJ LEXIS 106, at *21 (HUD ALJ 1991) (''The Secretary need not prove that race was the sole factor motivating Respondents. He need only demonstrate by a preponderance of the evidence that race was one of the factors that motivated Respondents; that is, that race did in fact play a part in their decisional process.''); *HUD* v. *Robert and Mary Jane Denton,* HUDALJ 05–90–0406–1, 1992 HUD ALJ LEXIS 60, at * 18–26 (HUD ALJ 1992) (finding that the mixed motive analysis from Title VII applies to the Act); *Community Services, Inc.* v. *Wind Gap Mun. Auth.,* 421 F.3d 179, 177 (3rd Cir. 2005) (to prevail in a disparate treatment claim under the Fair Housing Act, ''a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action''); *Hamm* v. *Gahnna, Ohio,* 109 Fed. Appx. 744, 747 (6th Cir. 2004) (to establish intentional discrimination under the Fair Housing Act, ''a plaintiff must present evidence showing that an impermissible 'discriminatory purpose' was a motivating factor in the defendant's decision'') (internal quotations and citations omitted); *Hadeed* v. *Abraham,* 103 Fed. Appx. 706, 707 (4th Cir. 2004) (reviewing Fair Housing Act claim based on the ''a motiving factor'' standard); *Moore* v. *Townsend,* 525 F.2d 482, 485 (7th Cir. 1975) (race is an ''impermissible consideration'' and it need only be established that race ''played some part in the refusal to deal''); *Hanson* v. *Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986) (Fair Housing Act is violated if race ''was a consideration and played some role in a real estate transaction''); *Green* v. *Century 21,* 740 F.2d 460, 464 (6th Cir. 1984) (Fair Housing Act is violated if race was ''an effective reason'' for defendant's refusal to sell); *Jordan* v. *Dellway Villa of Tenn., Ltd.,* 661 F.2d 588, 594 (6th Cir. 1981) (plaintiff is to recover if race ''played a part'' in his rejection); *Marable* v. *H. Walker & Assoc.,* 644 F.2d 390, 395 (5th Cir. 1981) (race may not be ''one significant factor considered by the defendant in dealing with the plaintiff''); *Robinson* v. *12 Lofts Realty, Inc.,* 610 F.2d 1032, 1042–43 (2nd Cir. 1979) (Fair Housing Act is violated if race ''is even one of the motivating factors,'' and racial motivation must not ''play any role in the decision to deny [plaintiff's] application''); *Payne* v. *Bracher,* 582 F.2d 17, 18 (5th Cir. 1978) (race is not to be considered ''in any way''); *U.S.* v. *Mitchell,* 580 F.2d 789, 791 (5th Cir. 1978) (Fair Housing Act is violated if race ''was a consideration and played some role in the real estate transaction''); *Smith* v. *Anchor Bldg. Corp.* 536 F.2d 231, 233 (8th Cir. 1976) (race is an ''impermissible factor''); *Williams* v. *Matthews Co.,* 499 F.2d 819, 826 (8th Cir. 1974) (same); *U.S.* v. *Pelzer Realty Co., Inc.,* 484 F.2d 438, 443 (5th Cir. 1973) (race need only be ''one significant factor'' that the defendant considered); *Steven* v. *Dobs, Inc.* 483 F.2d 82, 84 (4th Cir. 1973) (liability is established if race was ''an important element'' in the defendant's decision.).

Section 100.500(c)(2): Proving That the Challenged Practice Is Necessary To Achieve One or More Substantial, Legitimate, Non-Discriminatory Interests

*Issue:* A commenter characterized the proposed rule as requiring defendants to show "hefty" evidence at step two that the policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest, placing an almost insurmountable burden on defendants.

*HUD Response:* HUD disagrees that the rule places an insurmountable or unreasonable burden on defendants. Whether a defendant's own policy or practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the defendant is well within the knowledge of that defendant, who is uniquely able to meet this burden. Furthermore, the rule does not specify what evidence is necessary to meet this burden; it merely states that a legally sufficient justification must be supported "by evidence." [306]

As HUD explained in 2013, the requirement that a defendant prove with evidence the substantial, legitimate, nondiscriminatory interest supporting the challenged practice and the necessity of the challenged practice to achieve that interest is consistent with HUD's longstanding application of an effects framework under the Act, and is similar to the approach taken by other federal regulatory and enforcement agencies under ECOA [307] and Title VII. [308] This requirement is furthermore consistent with most federal courts' interpretations of the Act after *Inclusive Communities.* [309] Nowhere has HUD

[306] Some commenters mischaracterized the rule as prohibiting hypothetical or speculative evidence. What the rule prohibits is a hypothetical or speculative *justification* for the challenged practice. *See* 100.500(b)(2) ("A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative.").

[307] *See* 1994 Joint Policy Statement on Discrimination in Lending, 59 FR at 18269 ("The justification must be manifest and may not be hypothetical or speculative.").

[308] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (the respondent must "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity.").

[309] *See, e.g., Alexander* v. *Edgewood Mgmt. Corp.,* Civil Case No. 15–1140, 2019 U.S. Dist. LEXIS 111068 (D.D.C. June 25, 2019) ("If the plaintiff's prima facie burden is met, the burden shifts to the defendant to prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.") (citing *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. at 2514– 15); *Borum* v. *Brentwood Vill. LLC,* Civil Action No.: 16–1723 (RC), 2020 U.S. Dist. LEXIS 54840 at *13–14 (D.D.C. March 30, 2020) (deferring to HUD's 2013 Rule, including at 24 CFR 100.500(c)(2)); *Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* 2017

U.S. Dist. LEXIS 134930 (M.D. Fla. Aug. 23, 2017) (citing HUD's regulation and sating "[t]he burden then shifts to the defendant to prove that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." Such interests must be supported by evidence and may not be hypothetical or speculative.") (internal citations omitted)) (affirmed by *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo, Florida,* 759 Fed. App'x 828 (11th Cir. 2018)); *NFHA* v. *Deutsche Bank Nat'l Trust,* No. 18 CV 839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ("After a plaintiff establishes a prima facie showing of disparate impact, the burden shifts to the defendant to prove that the challenged practice is necessary to achieve . . . [a] legitimate, nondiscriminatory interest[.]") (citing *Inclusive Cmtys Project, Inc.,* 135 S. Ct. at 2514–15); *Fair Hous. Ctr. of Wash.* v. *Breier-Scheetz Props., LLC,* 743 F. App'x 116, 118 (9th Cir. 2018) (upholding summary judgment for plaintiff because defendant never justified its challenged policy as "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests") (citing HUD's rule and *Inclusive Cmtys Project, Inc.,* 135 S. Ct. at 2522); *Mhany Mgmt.* v. *Cty. of Nassau,* 819 F.3d 581 (2d. Cir. 2016) (announcing HUD's burden shifting framework as the proper framework for evaluating disparate impact claims, noting that the second step was already in line with the circuit's prior case law); *Treece* v. *Perrier Condo. Owners Ass'n,* 519 F. Supp. 3d 342, 353–54 (E.D. La. 2021) (explaining that "after ICP", once a plaintiff makes a prima facie case, including robust causation, the[] burden shift[s] to the defendant to show the challenged practice is necessary to achieve one or more of the defendant's substantial, legitimate, nondiscriminatory interests") (citing *Inclusive Cmtys. Project* v. *Lincoln Prop. Co.,* 920 F.3d 890, 901–02) (5th Cir. 2019); *Fair Hous. Rights Ctr.* v. *Morgan Props. Mgmt. Co.,* LLC, Civil Action No. 16–4677, 2018 U.S. Dist. LEXIS 108905, at *31 (E.D. Pa. June 29, 2018) ("If a disproportionate burden is established, the burden shifts to the defendant to establish whether it has a legitimate, non-discriminatory reason for its actions.. If the defendant can establish that reason, it must then also establish that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.") (internal citations omitted); *de Reyes* v. *Waples Mobile Home Park L.P.,* 903 F.3d 415, 426 n.6, 428 (4th Cir. 2018) ("In *Inclusive Communities,* the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework . . . Under the second step, the defendant has the burden of persuasion to 'state and explain the valid interest served by their policies.' [*Inclusive Cmtys. Project, Inc.*135 S. Ct.] at 2522 (stating that this step is analogous to Title VII's business necessity standard."); *Price* v. *Country Brook Homeowners Ass'n,* Civil Action No. 1:21–cv–113, 2021 U.S. Dist. LEXIS 228914, at *6 (S.D. Ohio Nov. 30, 2021) ("Further, the Supreme Court recognized the U.S. Department of Housing and Urban Development's ("HUD") burden-shifting framework that is used to analyze disparate impact claims . . . [where at the second step,] the defendant to prove that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest.") (citing *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. at 2514–15).

seen this approach present an insurmountable burden on defendants, except where appropriate: when defendants do not have a legally sufficient justification.

*Issue:* Commenters disagreed about whether the defendant's burden at step two in § 100.500(c)(2) should be a burden of proof or production based on *Inclusive Communities* and *Wards Cove.* Some commenters stated that the proposed rule places a more onerous burden on defendants than what *Inclusive Communities* requires and that defendants should have only a burden of production at step two. Commenters said that although in *Inclusive Communities,* the Court did not address defendants' burden, it analogized it to the business necessity defense of Title VII under *Wards Cove,* which is one of production. They stated that the Court also made clear in *Wards Cove* that the defendant's obligation was only a burden of production and that this "conforms to the usual method for allocating persuasion and production burdens." They said that the *Inclusive Communities* Court instructed that disparate impact claims must be limited to give insurers latitude to consider market factors. Another commenter focused on the *Inclusive Communities* statement that "housing authorities and private developers [are provided] leeway to state and explain the valid interest served by their policies" and concluded that a defendant need only explain how its policy interests are reasonably served by the particular practice, rather than prove it.

Other commenters supported the proposed burden of proof on defendants. These commenters noted that *Wards Cove* is no longer good law because the Civil Rights Act of 1991 specifically placed the step two burden of proof on defendants under Title VII. Commenters stated that the proposed rule contains the necessary protections for defendants, allowing them "leeway to state and explain the valid interest served," consistent with *Inclusive Communities.* Commenters pointed out that *Inclusive Communities* specifically described defendants' burden as a burden of proof rather than production, and as "important and appropriate."

*HUD Response:* As HUD noted in 2016, in over 25 years of case law since *Wards Cove,* no circuit court of appeals had ever applied the *Wards Cove* burden-shifting framework to the Act. [310] Since then, only one circuit court of appeals has applied *Wards Cove's* holding that step two requires a defendant to produce, rather than prove, its interest. HUD believes that the court's explanation in that case of why it applied *Wards Cove* to the Fair Housing Act case before it is

[310] "Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment" at 42 n.32, *American Insurance Association.* v. *Carson and the U.S. Dep't of Hous. and Urb. Dev.,* No. 1:13–cv–00966–RJL (D.D.C. August 30, 2016).

**19488** **Federal Register**/Vol. 88, No. 62/Friday, March 31, 2023/Rules and Regulations

unpersuasive[311] and notes that it conflicts with the other circuits.[312] Moreover, as explained above, *Inclusive Communities'* sole reference to *Wards Cove* was limited to a discussion that was *not* overruled by statute, and had nothing to do with the burden under step two; it instead related to the causation analysis required as part of a plaintiff's prima facie case under § 100.500(c)(1).[313] Far from endorsing a burden limited to production, *Inclusive Communities* explicitly noted and approved of the requirement that defendants "prove" the necessity of their policies.[314] And contrary to what some commenters wrote, *Inclusive Communities* did *not,* analogize the business necessity defense to *Wards Cove's* Title VII standard (which is a burden of production); instead, *Inclusive Communities* analogized the business necessity defense to Title VII's modern standard (which is a burden of proof).[315] Further, *Inclusive Communities* specifically and favorably cited HUD's 2013 Rule as "properly limit[ing] disparate impact liability . . . to give housing authorities and private

developers leeway to state and explain the valid interest served by their policies."[316]

*Issue:* Commenters suggested revising the requirement that defendants show a policy is "necessary" in step two to something less burdensome. One commenter suggested HUD should require a defendant to show only that the challenged policy is rationally-related to a legitimate, nondiscriminatory interest of the defendant. Another urged HUD to require that a defendant show its practice simply serves a valid interest of the defendant. Other commenters stated that in *Wards Cove,* the Supreme Court expressly rejected a "necessity" requirement, concluding that such a requirement would impose a degree of scrutiny impossible to meet.

Other commenters disagreed, stating that the proposed rule is consistent with *Inclusive Communities,* which requires defendants to prove that the challenged practice is necessary to achieve a valid interest. They cited the Court's statement that a housing provider should be allowed to maintain a policy if it is "necessary to achieve a valid interest" and noted a lower standard would conflict with well-established disparate impact jurisprudence, including under Title VII. A commenter also noted that in 2013 HUD specifically rejected a suggestion to remove "necessary" from the rule, because "necessary" is clear, uniform, in compliance with the 1994 interagency guidance, and effectuated the Act's broad remedial goal.

*HUD Response:* HUD declines to change the defendant's burden in step two because doing so would be inconsistent with longstanding judicial and agency interpretations and because HUD believes that the defendant's burden in step two best effectuates the broad, remedial goals of the Act.[317] Moreover, the Court in *Ward's Cove* never expressly rejected a "necessity" requirement, but rather rejected a standard which required a showing that the challenged practice is *essential or indispensable to the employer's business.*[318] The proposed rule does not require a defendant to show that a challenged practice is essential or indispensable, but only that it is

necessary to achieve *a* substantial, legitimate, nondiscriminatory interest of that business.

Furthermore, the Court in *Inclusive Communities* specifically cited to the 2013 Rule's explanation of step two of the burden shifting approach as being analogous to the business necessity standard of Title VII when explaining that "this step of the analysis" of disparate impact liability is "an important and appropriate means of ensuring that disparate impact liability is properly limited." The opinion continued that housing authorities must prove their policies are "necessary" to achieve a valid interest, which mirrors the necessity requirement of this final rule.[319]

*Issue:* Commenters requested that HUD provide additional guidance in the final rule concerning what may constitute substantial, legitimate, nondiscriminatory interests. A commenter cited the 1994 Interagency Policy Statement on Discrimination in Lending, which describes factors that may be relevant to the legally sufficient justification, including cost and profitability. The commenter stated that the Policy Statement contains helpful guidance for lenders and urged HUD to reference the Policy Statement in this final rule.

Others stated that the proposed rule's failure to recognize practical business considerations, including profit making, as valid interests conflicts with *Inclusive Communities,* which stated that disparate impact liability must be limited to ensure that "regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system" and warned against "second-guessing" between "two reasonable approaches." They said that defendants must be given latitude to consider market factors.

In contrast, other commenters claimed that it is best to maintain a case-by-case approach so that no justification is automatically deemed a substantial, legitimate, non-discriminatory interest despite its disparate impact on a protected class.

Commenters expressed that profit should not be a legally sufficient justification and that the proposed rule makes clear that there are no automatically valid objectives, such as maximizing profit. Commenters stated that allowing defendants to justify discriminatory policies under the guise of profit would render the discriminatory effects framework completely toothless, because it would

---

[311] *Sw. Fair Hous. Council, Inc.* v. *Maricopa Domestic Water Improvement Dist.,* 17 F.4th 950, 960 (9th Cir. Nov. 12, 2021). The *Maricopa* case justified its application of the *Wards Cove* burden shifting framework to the Fair Housing Act by stating, first, that "[i]n *Wards Cove Packing Co.* v. *Atonio* the Supreme Court developed a three-step burden-shifting framework to address [disparate impact] claims." *Id.* HUD notes, however, this statement is incorrect, and that the burden shifting framework for Title VII cases was developed in 1975, in *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 425 (1975). Additionally, HUD notes that the *Wards Cove* framework was abrogated by the Civil Rights Act of 1991, which restored the *Albemarle* standard. Public Law 102–166, 105, 105 Stat. 1071, 1074 (1991), amending 42 U.S.C. 2000e–2. Also, the opinion states that "the Supreme Court has applied the [*Ward's Cove*] framework across federal antidiscrimination statutes," 17 F.4th at 960, but cites only a single instance in which the Supreme Court applied the *Wards Cove* framework to another federal antidiscrimination statute: *Smith* v. *City of Jackson,* 544 U.S. 228, 240 (2005) (applying *Wards Cove* to the ADEA). As HUD discusses earlier, the Supreme Court has acknowledged that the ADEA has a narrower scope than Title VII, and no other court has applied this standard, so HUD declines to adopt this reading of the Fair Housing Act's protections.

[312] *Mhany Mgmt.* v. *Cty. of Nassau,* 819 F.3d 581 (2d Cir. 2016); *Inclusive Cmtys. Project, Inc.* v. *Heartland Cmty. Ass'n,* 824 F. App'x 210 (5th Cir. 2020); *de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018).

[313] *See Inclusive Cmty's Project Inc.,* 576 U.S. at 542 ("[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact").

[314] *Id.* at 541. (describing the second step of HUD's burden shifting analysis as "important" and "appropriate" and as requiring that defendants "prove" their policies are necessary to achieve a valid interest).

[315] *Id.* (This step of the analysis is analogous to the business necessity standard under Title VII and provides a defense against disparate-impact liability") (citing HUD's 2013 Rule at 78 FR 11470).

[316] *Id.* ("[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest served by their policies. This step of the analysis is analogous to the business necessity standard under Title VII and provides a defense against disparate-impact liability") (citing HUD's 2013 Rule at 78 FR 11470).

[317] *See supra* n. 17, n. 126.

[318] *Wards Cove Packing Co.,* 490 U.S. at 659.

[319] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 541.

**Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations **19489**

make for-profit businesses virtually immune from challenges to their policies or practices that cause a discriminatory effect. A commenter stated that almost all discriminatory policies can be justified by profit. Commenters also stated that a profit defense would be inconsistent with disparate impact jurisprudence; run counter to HUD's mission; and encourage the continuation of profitable, but discriminatory policies. A commenter explained that courts have appropriately rejected profit and market factors as substantial, legitimate, nondiscriminatory interests in the lending arena, limiting the legitimate business justification defense to a lender's use of objective variables and practices to ascertain creditworthiness. A commenter gave as examples cases in which lenders had engaged in practices not related to creditworthiness, like subjective markup pricing, that caused disparate impacts, to show profit should not be considered a legally sufficient justification.[320]

*HUD Response:* HUD does not believe listing specific valid interests is necessary or appropriate and declines to alter the text of this rule. In promulgating the 2013 Rule, HUD did not state that profit or other business considerations could never be substantial, legitimate, nondiscriminatory interests; rather, HUD declined to explicitly name

increasing profits, minimizing costs, and increasing market shares as *per se* substantial, legitimate, nondiscriminatory interests. HUD explained that the Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis.[321] HUD agrees that factors that may be relevant to a defendant's step two burden *could include* cost and profitability, as HUD and other agencies stated in the 1994 Interagency Policy Statement on Discrimination in Lending. However, recognizing interests as *per se* legitimate would undermine the effectiveness of disparate impact liability as a tool for rooting out policies that appear to be neutral but have been adopted for discriminatory reasons. HUD notes that *Inclusive Communities* highlighted disparate impact's important role in uncovering such disguised animus that escapes easy classification as disparate treatment.[322] Accordingly, this rule, like the 2013 Rule, does not list interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every defendant in any context. But the rule still allows regulated entities to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system and does not require second guessing between two reasonable approaches. HUD thus concludes that creating per se defenses would erroneously weaken the rule and result in the dismissal of cases where the practices are not actually necessary to achieve a valid interest and, more concerning, where the seemingly valid interests put forward by defendants are acting to disguise a defendant's underlying actions that are motivated by discriminatory intent.

*Issue:* Commenters stated that under *Inclusive Communities,* defendants are only required to show that the challenged practice is related to a *valid interest,* not that the practice is necessary or related to a *substantial interest.* Other commenters disagreed and stated that replacing the "substantial legitimate non-discriminatory interest" standard with a much lower and overly broad "valid interest" standard would make it too easy for defendants to rebut allegations of discrimination, allowing insubstantial business, profit, or policy considerations to defeat meritorious

disparate impact claims, and would make it virtually impossible for plaintiffs to make a step three showing.

*HUD Response:* Nothing in *Inclusive Communities* suggests that the Court endorsed lowering the burden for defendants in step two of the discriminatory effects framework. When *Inclusive Communities* discussed the ability of defendants to state a "valid interest", it referred specifically to HUD's 2013 Rule and the second step of the burden shifting analysis [323] which requires that defendant show that its policy is necessary to achieve a substantial, legitimate, and nondiscriminatory interest.[324] HUD believes the Court in *Inclusive Communities,* like other courts and HUD itself, used "valid" as shorthand for the same concept that the 2013 Rule describes as "substantial, legitimate, and non-discriminatory." [325]

To the extent that commenters nonetheless ask HUD to substitute a "valid interest" standard out of a belief that the Court intended a lower standard rather than one synonymous with the existing step two standard, HUD believes that it would be inappropriate to do so. HUD notes that such a standard would not accord with the majority of judicial opinions concerning the Act, and so it would introduce unnecessary confusion.[326] Furthermore,

[320] *See Miller* v. *Countrywide Bank NA,* 571 F. Supp. 2d 251 (D. Mass. 2008); *see also Ramirez* v. *GreenPoint Mortg. Funding, Inc.,* 268 FRD. 627 (N.D. Cal. 2010); *Guerra* v. *GMAC, L.L.C.,* 2009 WL 449153 (E.D. Pa. Feb. 20, 2009); *Taylor* v. *Accredited Home Lenders, Inc.,* 580 F. Supp. 2d 1062 (S.D. Cal. 2008); *Ware* v. *Indymac Bank,* 534 F. Supp. 2d 835 (N.D. Ill. 2008); *Garcia* v. *Countrywide Fin. Corp.,* No. 07–1161 (C.D. Cal. Jan. 15, 2008), available at *www.nclc.org/unreported; Newman* v. *Apex Fin. Grp.,* 2008 WL 130924 (N.D. Ill. Jan. 11, 2008); *Martinez* v. *Freedom Mortg. Team,* 527 F. Supp. 2d 827 (N.D. Ill. 2007); *Jackson* v. *Novastar Mortg., Inc.,* 2007 WL 4568976 (W.D. Tenn. Dec. 20, 2007). *Cf. Tribett* v. *BNC Mortg.,* 2008 WL 162755 (N.D. Ill. Jan. 17, 2008) (consumer can refile complaint with more specificity); Complaint, *United States* v. *Countrywide Fin. Corp., Countrywide Home Loans, Inc. & Countrywide Bank,* No. CV–11–10540 (C.D. Cal. Dec. 21, 2011) (charging over 200,000 Hispanic and African American borrowers higher interest rates, fees, and costs for mortgage loans than non-Hispanic white borrowers and steering them into subprime loans), *available at www.justice.gov;* Stipulated Final Judgment & Order, *Fed. Trade Comm'n* v. *Golden Empire Mortg., Inc.,* No. CV09–03227 (C.D. Cal. Sept. 24, 2010) (charging Hispanic consumers higher prices for mortgages than similarly situated non-white consumers), *available at www.ftc.gov;* Order to Cease & Desist, Order for Restitution, and Order to Pay, *In re First Mariner Bank Balt., Md.,* No. FDIC–07–285b & FDIC–08–358k (Fed. Deposit Ins. Corp. Mar. 22, 2009), *available at www.fdic.gov;* Complaint, *United States* v. *AIG Fed. Sav. Bank,* No. 1:99-mc-09999 (D. Del. Mar. 4, 2010) (wholesale mortgage brokers charged higher fees to African American borrowers), *available at www.justice.gov.*

[321] 78 FR 11471.

[322] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 540.

[323] *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 541 (explicitly citing 78 FR 11470 (where HUD states that 'the "substantial, legitimate, nondiscriminatory interest" standard found in § 100.500(b)(1) is equivalent to the "business necessity" standard' and that 'the requirement that an entity's interest be substantial is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related') when explaining this '"[t]his step of the analysis" which gives defendants leeway to state and explain "the valid interest" served by their policies).

[324] *Id.* at 527 (describing that the second step of the burden shifting framework requires a defendant to "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and is "analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related") (quoting 24 CFR 100.500(c)(2) and 78 FR 11470).

[325] *See, e.g., Inclusive Cmtys. Project, Inc.,* 576 U.S. at 541 (describing that defendants having leeway to state a "valid interest" as part the second step of the burden shifting framework, citing HUD's explanation of the 2nd step of the framework in the 2013 Rule, which describes the interest as substantial, legitimate, and nondiscriminatory at 78 FR 11470); *Treece* v. *Perrier Condo. Owners Ass'n,* 519 F. Supp. 3d 342, 353–54 (E.D. La. 2021) (referring to the defendant's "substantial, legitimate, nondiscriminatory interests" and "valid interest[s]" interchangeably); *supra* at *Whether Claims Against Insurers Will Fail as a Matter of Law* ("Further, as part of the disparate impact framework set forth in this rule, insurers, like all defendants, are provided the opportunity to show a valid interest supporting any practice challenged under the Act").

[326] *See supra* n. 309, 312, 314, 316.

**19490** Federal Register/Vol. 88, No. 62/Friday, March 31, 2023/Rules and Regulations

as HUD stated in its 2013 Rule, "in order to effectuate the Act's broad, remedial goal, practices with discriminatory effects cannot be justified based on interests of an insubstantial nature." [327]

Section 100.500(c)(3): Proving an Alternative Practice That Could Serve the Interest With a Less Discriminatory Effect

*Issue:* Commenters asked HUD to place the evidentiary burden at step three on defendants, rather than plaintiffs. They cited to studies showing the difficulty plaintiffs have had succeeding with discriminatory effects claims over time, as well as Second Circuit precedent and the State of California's fair housing statute, which place the burden on defendants.[328] Commenters stated that this revision is necessary because issues of segregation and discrimination in housing and lending have not abated since the 2013 Rule and, in fact, housing is more unaffordable, many cities have seen increasing displacement of communities of color, and borrowers of color are substantially more likely than white borrowers to be denied conventional loans. These commenters also cited to the growing role of data analytics and online platforms in the housing sale and rental market, increasing risks that segments of society will be steered away from or denied housing in a way that is immune to examination of intent, and resulting in even more segregated housing patterns. These commenters cited a 2021 Harvard study finding that the gap between whites and African Americans in homeownership rate stands at 28.1 percentage points, with the gap between whites and Hispanics at 23.8 percentage points.[329]

*HUD Response:* HUD declines to place the step three burden on defendants. As explained in 2013, this rule's burden-shifting scheme is consistent with the majority view of courts interpreting the Act as well as the Title VII discriminatory effects standard codified by Congress in 1991, and the discriminatory effects standard under ECOA, which borrows from Title VII's burden-shifting framework. As HUD has explained, all but one of the federal

appeals courts to address the issue have [330] placed the burden at the third step on the plaintiff. HUD additionally notes the significant overlap in coverage between ECOA, which prohibits discrimination in any aspect of a credit transaction, and the Fair Housing Act, which prohibits discrimination in housing and residential real estate-related transactions. Thus, under the rule's framework, in litigation involving claims brought under both the Fair Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent methods of proof to claims based on the same underlying facts. Having the same allocation of burdens under the Fair Housing Act and ECOA will provide for less confusion and more consistent decision making by courts. Moreover, HUD continues to believe that this framework makes the most sense because it does not require either party to prove a negative.

*Issue:* Commenters criticized step three of the proposed rule, stating that it enables plaintiffs to prevail even if the less discriminatory alternative practice they present is unreasonable, less practical, less productive or less effective. Commenters asked HUD to revise step three to permit plaintiffs to prevail only if there is an alternative that is equally effective, is no more costly, or can be implemented at a reasonable cost, and does not impose an undue burden on a defendant or otherwise adversely affect the defendant's non-discriminatory policies and valid interests. Otherwise, commenters said, there would be no limit on what constitutes a reasonable alternative practice allowing plaintiffs to second-guess which of two reasonable approaches should be adopted.

Commenters stated that their proposed revisions to heighten a plaintiff's burden in step three are required by or consistent with *Inclusive Communities,* which held that the Act is not a tool for plaintiffs to force defendants to reorder their priorities or to displace valid governmental and private priorities, and that disparate impact liability must be limited so that employers and other regulated entities are able to make practical business choices and profit-related decisions. A commenter said that step three of the proposed rule is moot in light of *Inclusive Communities'* recognition that re-writing governmental policies exceeds the courts' remedial powers.

Commenters further stated that an equally effective standard for prevailing at step three of the analysis is required

by *Wards Cove.* According to the commenters, *Wards Cove* explicitly requires that a plaintiff demonstrate an alternative policy is an "equally effective" alternative and warns that courts should proceed with care before mandating alternative practices.[331] Commenters said that *Wards Cove* further noted that cost is relevant in determining whether an alternative is equally effective.

Other commenters supported retaining step three of the proposed rule, stating that the "less discriminatory alternative" requirement is consistent with judicial precedent and Congressional intent. They stated that an "equally effective alternative" requirement is not appropriate in the housing context where the practices covered by the Act are "not readily quantifiable."

Commenters stated that the step three burden articulated by the 2020 Rule should not be retained for various reasons. Commenters said that the 2020 Rule's requirement that plaintiffs identify an equally effective alternative created too high a burden on plaintiffs; put defendant's financial gain above ensuring access to fair housing; departed from established precedent and the core purpose of the Act without justification; lowered the burden for defendants, such that clearly meritorious claims would be dismissed and the effectiveness of disparate impact liability as an incentive to identify less discriminatory alternative practices would be severely weakened; and improperly required plaintiffs to prove that any alternative is equally effective and does not impose materially greater costs. A commenter explained that if the 2020 Rule were retained, with its increased burdens on plaintiffs at step three and reduced burdens on defendants at step two, meritorious claims would be dismissed because it would shift much of the defendant's burden of proof at step two to the plaintiff to disprove at step three, insulating from scrutiny many policies that have an unjustified discriminatory effect. A commenter noted that the 2020 Rule's language was neither consistent with nor required by *Inclusive Communities.* One commenter explained that under the 2020 Rule's reformulation of step three, even a policy with the most flagrantly discriminatory effects would pass legal muster so long as a less discriminatory alternative is even slightly more costly or burdensome, and even if the

[327] 78 FR 11470.

[328] *MHANY Mgmt.,* 819 F.3d at 617–19 (holding the 2013 Rule abrogated Second Circuit precedent placing the burden at the final stage on the defendant); Cal. Code Regs. tit. 2, § 12062 (Lexis Advance through Register 2022, No. 34, August 26, 2022).

[329] *See, e.g.,* Joint Ctr. for Housing Studies of Harvard Univ., The State of the Nation's Housing: 2021, at 3 *available at http://www.jchs.harvard.edu/sites/default/files/Harvard_JCHS_State_Nations_Housing_2021.pdf.*

[330] 78 FR 11462.

[331] *Wards Cove,* 490 U.S. at 661 (quoting *Furnco Construction Corp.* v. *Waters,* 438 U.S. 567, 578 (1978)).

alternative was still significantly profitable. A commenter pointed out that the term "other material burdens" in the 2020 Rule is undefined, broad and subjective, and forces plaintiffs to obtain information that is squarely in the purview of the defendant.

*HUD Response:* HUD declines to modify step three of the proposed framework or adopt the 2020 standard. As HUD explained in the 2013 Rule, the framework in this rule does not allow plaintiffs to impose untenable policies upon defendants because it still requires the less discriminatory alternative to "serve the defendant's [substantial, legitimate, nondiscriminatory stated] interests."[332] This rule's step three continues to be consistent with the 1994 Joint Policy Statement on Discrimination in Lending,[333] with the purpose of the Act and its goal to "eradicate discriminatory practices within a sector of the Nation's economy,"[334] and with judicial interpretations of the Act, including *Inclusive Communities.*[335] HUD also

notes that a requirement that alternative policies be "equally effective" did not appear in *Inclusive Communities,* despite citation to the proposed source of the requirement, *Wards Cove,* and significant discussion of the checks on liability that have always been part of Fair Housing Act jurisprudence. HUD further notes that its position is supported by the *Massachusetts Fair Housing Center* court, which criticized the 2020 Rule's inclusion of this requirement as "run[ning] the risk of effectively neutering disparate impact liability" and described it as onerous and inadequately justified.[336] HUD, based on its own experience, agrees with the district court. Moreover, as discussed elsewhere in this preamble, *Wards Cove* construed Title VII, and the portions cited by commenters were barely tried, even in that context, having been superseded by the Civil Rights Act of 1991. In order to avoid unnecessary confusion and uncertainty, HUD declines to abandon a well-established standard in favor of a virtually untested one.

As to other concerns that commenters suggested required revisions to step three, HUD notes that an unreasonable alternative practice that creates an undue burden on defendant would not satisfy plaintiff's three-step burden. Nor will a proposed less discriminatory alternative fail simply because there will be some amount of increased cost associated with the alternative policy. And nothing in the rule suggests that reasonable, valid policies and priorities of defendants will be second guessed or forced to be reordered. Step one of the burden shifting framework ensures that the only policies which will be examined further are ones that cause a disparate impact because of a protected characteristic. Step three ensures that any alternative policy proposed is less discriminatory and actually serves the interest the defendant has already identified in step two. Moreover, HUD disagrees that *Inclusive Communities* rendered step three moot by stating that re-writing governmental policies exceeds the remedial powers of courts. *Inclusive Communities* did not say this. Indeed, there is no statement in *Inclusive Communities* indicating that courts lack the authority to invalidate policies that cause unjustified discriminatory effects.

In sum, HUD believes this provision and the structure of the burden shifting framework provide sufficient protections for defendants' business interests.

*Issue:* A commenter stated that step three of the proposed rule conflicts with *Inclusive Communities* because defendants can still be held liable despite establishing that their practices are substantial, legitimate, and nondiscriminatory at step two. One commenter criticized step three as unnecessary and inviting uncertainty and continued litigation. The commenter wrote that if the challenged practice is not artificial, arbitrary, and unnecessary, plaintiffs should not be permitted to substitute their proposed practices or business judgment for defendants' practices and judgment.

*HUD Response:* HUD disagrees. First, step two of the burden shifting framework requires the defendant to establish that its practice is necessary to achieve a substantial, legitimate, nondiscriminatory *interest* of the defendant—not that the defendant establish that the practice itself is substantial, legitimate and nondiscriminatory. By step two of the analysis, the plaintiff has *already* established that the practice itself causes or predictably will cause a discriminatory effect. Assuming the defendant meets its step two burden, the plaintiff then must establish that a less discriminatory alternative practice exists that still serves defendant's cited interest. HUD finds nothing in *Inclusive Communities* indicating that it is appropriate to cut off the inquiry after the second step.

Without step three, defendants with practices that have a discriminatory effect will have little incentive to examine their policies to determine if there are less discriminatory options to achieve their goals, thus allowing practices having unjustified discriminatory effects to continue unchecked. The suggestion that there should be no third step would eliminate a full assessment as to whether the same interest could be served in a less discriminatory way. The third step allows the plaintiff to offer an alternative policy that is less discriminatory and that still accomplishes the legitimate interest identified by the defendant. If the third step were eliminated, "artificial, arbitrary, and unnecessary barriers" would remain in place despite the fact that they are unnecessary to achieve the defendant's stated purpose.

*Issue:* A commenter said that the third step removes the Supreme Court's

[332] 78 FR 11473.

[333] 59 FR 18269.

[334] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 539.

[335] *See, e.g., MHANY Mgmt.* v. *City of Nassau,* No. 05–cv–2301 (ADS)(ARL), 2017 U.S. Dist. LEXIS 153214, at *25 (E.D.N.Y. Sep. 19, 2017) ("contrary to Garden City's assertions, courts have not imposed a heightened standard on plaintiffs at the third step in disparate impact cases under 24 CFR 100.500. Indeed, courts have followed the plain language of the [regulation.]") (citing *Inclusive Communities Project,* 135 S. Ct. at 2518 ("'[B]efore rejecting a . . . public interest[,] a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs'"); *see also Keller* v. *City of Fremont,* 719 F.3d 931, 949 (8th Cir. 2013) ("[W]hether plaintiffs can show that 'a viable alternative means was available to achieve the legitimate policy objective without discriminatory effects.'") (quoting *Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010)); *Theodora Rescue Comm.* v. *Volunteers of Am. of Washington,* No. C14–0981RSL, 2014 U.S. Dist. LEXIS 157279, at *11 (W.D. Wash. Nov. 6, 2014) ("Even if the Court assumes that the Ninth Circuit will ultimately allow plaintiffs to rebut a showing of business necessity simply by identifying an alternative act or practice that would serve the identified interests with less discriminatory impact, plaintiff has not made that showing.") (internal citations omitted); *Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo, Florida,* Case No. 6:16–cv–1005–Orl–37GJK, 2017 U.S. Dist. LEXIS 134930, at *11 (M.D. Fla. Aug. 23, 2017) ("If the defendant satisfies its burden, the plaintiff may still prevail by proving that the defendant's interests could be served by another practice that has a less discriminatory effect.") (citing 24 CFR 100.500(c)(3)); *Inclusive Communities Project, Inc.* v. *Lincoln Prop. Co.,* No. 3:17–CV–206–K, 2017 U.S. Dist. LEXIS 130818, at *20 (N.D. Tex. Aug. 16, 2017) ("If the defendant meets its burden, the plaintiff must then show that the defendant's interests could be served by another practice that has a less discriminatory effect" (citing 24 CFR 100.500(c)(3)). *See also Darst-Webbe Tenant Ass'n Bd.* V. *St. Louis Hous. Auth.,* 417 F.3d 898, 906 (8th Cir. 2005) ("plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the

[challenged practice's] discriminatory impact"); *Huntington,* 844 F.2d at 939 (analyzing whether the "[t]own's goal . . . can be achieved by less discriminatory means"); *Rizzo,* 564 F.2d at 149 (it must be analyzed whether an alternative "could be adopted that would enable [the defendant's] interest to be served with less discriminatory impact.").

[336] *Mass. Fair Hous. Ctr.,* 496 F. Supp. 3d at 611.

**19492** **Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations

requirement that the plaintiff not resort to reverse discrimination.

*HUD Response:* The commenter did not explain what it meant by reverse discrimination or how step three might cause a plaintiff to resort to such discrimination. It is possible that the commenter meant that the need to satisfy the third step causes the defendant to resort to reverse discrimination. However, there is nothing in step three, or any other part of the proposed rule that requires the plaintiff or anyone else to resort to any type of discrimination. To the contrary, step three encourages defendants to utilize practices that have the least discriminatory effect because of any protected characteristic.

Section 100.500(f) (2020 Rule Only): Limiting Damages and Other Penalties in Discriminatory Effects Cases

*Issue:* Commenters criticized the proposed rule for omitting provisions in the 2020 Rule that limit HUD's authority to seek damages and penalties in discriminatory effects cases. The commenters stated that the 2020 Rule was consistent with *Inclusive Communities'* statement that "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution" and that "remedial orders should concentrate on the elimination of the offending practice." One commenter suggested this means that the rule must only allow remedial orders that completely eliminate rather than only minimize the discriminatory effect. Commenters stated further that punitive or exemplary damages should not be allowed in discriminatory effects cases, noting that courts have applied a rigorous standard in assessing whether an award of punitive damages is proper. Commenters stated that because a discriminatory effects claim does not require a showing of defendant's state of mind, this type of claim cannot meet the standard for punitive damages.

*HUD Response:* HUD believes that limiting or suggesting favored remedies in this rule would be contrary to the plain language of the Act and its broad remedial purpose. The Act explicitly provides for punitive and compensatory damages, civil penalties (in cases brought by the Attorney General), and injunctive relief in federal court, and actual damages, injunctive and equitable relief and civil penalties in administrative hearings.[337] HUD does not believe that *Inclusive Communities* can be read to suggest that remedial orders should be the sole or favored

remedy in discriminatory effects cases or that civil penalties are somehow inappropriate.[338] Rather, the Court merely addressed what courts must keep in mind *when remedial* orders are issued. Nor does HUD believe *Inclusive Communities* can be read to limit remedial orders to only those that *completely* eliminate discriminatory effects. Moreover, well-established criteria in statute and in decades of judicial precedent set forth when penalties and punitive damages may be appropriate, thus preventing arbitrary awards. In any case, the availability of various remedies does not mean that they will be sought or granted in all cases; remedies are considered on a case-by-case basis.

*Comments Regarding Other Defenses and Safe Harbors*

*Issue:* Commenters stated that HUD should add a defense similar to the 2020 Rule's third-party defense allowing defendants to rebut plaintiff's prima facie case by showing that their discretion was materially limited by a third party. They said such a defense is necessary to protect defendants from being held liable for discriminatory conduct mandated by law. As an example, a commenter asserted that independent mortgage banks must follow guidelines set by federal agencies, including the government sponsored enterprises, the Department of Veterans Affairs, the Federal Housing Administration, and the Department of Agriculture, which may cause a disparate impact. The commenter stated that these mortgage banks should be granted a safe harbor in such situations. A commenter stated that *Inclusive Communities* requires a third-party defense because it stated that causation does not exist where the defendant's discretion is substantially limited and cited to a concurring opinion in the appellate court decision that included as an element of plaintiff's prima facie case that the defendant's policy or practice is not a result of a law that substantially limits defendant's discretion.

Commenters also stated that a third-party defense is necessary to protect insurers that conform to state laws and regulations on insurance in compliance with McCarran-Ferguson. They said that HUD cannot now say that the third-party defense is inconsistent with the Act when it said in the 2020 Rule that "in the event that unlawful discriminatory practices are mandated

by statute or court order, the most effective way to eliminate the discrimination is to remove or modify the underlying statute or order that mandated the unlawful discrimination." They also stated that HUD's proposal to remove the 2020 defense implies that HUD intends to improperly test the boundaries of its ability to preempt state regulations.

Other commenters supported HUD's proposal not to retain the third-party defense from the 2020 Rule, arguing that the defense would allow defendants to evade liability for illegal acts by showing that they complied with third party requirements that are themselves discriminatory. Commenters stated that the defense would deny plaintiffs the ability to address whether less discriminatory alternatives exist to the defendant's chosen method of meeting the third-party requirement. Commenters also stated that such a defense is contrary to the Act's preemption clause because it would prioritize compliance with local ordinances over federal civil rights obligations, even where there may be less discriminatory ways to comply with the third party's requirement, and even in exclusionary zoning cases. In addition, a commenter stated that a third-party defense would impede efforts to prevent algorithm-driven discrimination. Another commenter characterized the 2020 Rule's third-party defense as unnecessarily confusing and vague. A commenter stated that whether a party's discretion is limited by a third party should be addressed at the second step of the burden shifting framework, not at the pleading stage.

*HUD Response:* HUD disagrees that a third-party defense should be included in this rule. First, *Inclusive Communities* does not suggest that such a defense is necessary or appropriate. *Inclusive Communities* stated that if a plaintiff "cannot show a causal connection . . .—for instance, because federal law substantially limits the Department's discretion—that should result in dismissal of this case." As this passage suggests, if federal law requires defendants to act in a certain manner, plaintiffs may not be able to show that defendants' actions are the cause of a discriminatory effect. Such an argument already is available to defendants under this rule in appropriate cases and does not require revisions to this rule. And as noted in the 2013 Rule, the discriminatory effects standard already permits a defendant to defend against a claim of discriminatory effects by establishing a legally sufficient justification, as specified in § 100.500.

---

[337] 42 U.S.C. 3612(g)(3), 3613(c), 3614(d).

[338] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 544–45 (identifying considerations for court when designing remedial orders).

Thus, independent mortgage banks, for example, who follow federal guidelines, have multiple opportunities under the rule to defend their practices: first, at the prima facie stage, if federal guidelines, rather than the challenged practices are the cause of the discriminatory effect, and also at the second step of the burden shifting framework, by showing that the practice is truly necessary to comply with the federal guidelines.

That does not mean that, as the 2020 Rule allowed, any time defendants are subject to a third-party requirement, the plaintiff's case will necessarily fail. As other commenters explained, there may be multiple ways of complying with a third-party requirement, some of which have an unjustified discriminatory effect and some of which do not. In those cases, the defendant caused the effect by opting for one way of complying with a third-party requirement over another that does not cause such an effect. A third-party defense such as was included in the 2020 Rule would allow defendants to avoid the requirement to utilize a less discriminatory alternative to comply with a third party requirement.[339] Indeed, if the defense could be raised at the pleading stage (as permitted by the 2020 Rule), disparate impact claims could be dismissed based on mere assertions of third party requirements, without plaintiffs having any opportunity to challenge these assertions with the benefit of discovery. Without discovery, some plaintiffs would have no means of ascertaining whether the third-party obligation actually exists, and if so, whether it is the actual, legitimate reason for defendant's policy or practice, whether that obligation actually requires the defendant to implement the policy at issue or if there is a less discriminatory way to do so. This would essentially eliminate any meaningful inquiry into steps two and three of the burden shifting framework whenever the defendant asserts that its policy was required by a third party. Such a defense is inappropriate because it presumes that discrimination may be permitted without consideration of whether the third-party requirement is itself discriminatory or whether there are non-discriminatory ways to comply with that third-party requirement.

Moreover, such a defense would be inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid.[340]

*Issue:* Commenters supported HUD's proposed removal of the "outcome prediction" defense that was inserted into the 2020 Rule, which was designed to shield certain policies based on algorithms from disparate impact liability with a "results-based approach." Commenters stated that the final rule's framework was the appropriate method of analyzing discriminatory effects claims involving algorithmic and machine learning technologies. A commenter noted that disparate impact litigation is a key mechanism for redressing discrimination in light of the increase of algorithms, which bring risks for perpetuating or amplifying patterns of discrimination through biased development, biased inputs, or bias arising from automatic adaptations from artificial intelligence. Another commenter stated that the potential for disparate impact liability protects borrowers and encourages lenders using these technologies to innovate in ways that expand access to credit. A commenter stated that the rule should clarify in the preamble that the Act applies to entities that rely on algorithms.

Commenters expressed numerous concerns about the defense. Commenters stated that this defense would have the practical effect of foreclosing many disparate impact claims based on algorithms and models and would shield such defendants from liability. Commenters stated that in creating this defense, the 2020 Rule impermissibly created exemptions for predictive models in the lending and insurance industry that have no basis in the Act or any other source of authority, because the Act does not grant HUD authority to create safe harbors or exceptions from discriminatory effects liability, and no court has ever held that entire categories of policies or practices that might otherwise be subject to challenge are exempt from such liability. Commenters also noted that HUD had previously explained why categorical exemptions from disparate impact liability are undesirable.

A commenter noted that the defense would shield a wide range of discriminatory policies and practices, because many discriminatory models would qualify for an exemption because of the 2020 Rule's novel "similarly situated individuals" analysis, for

which there is no basis as a matter of law or as a matter of fact. As one commenter explained, it would be easy for defendants to show that a challenged policy or practice is intended to predict an outcome because that is what any predictive model claims to do, and it would be easy to show that the prediction represents a valid interest. Another commenter stated that the defense is based on an outdated academic theory of discrimination that relies on statistical disparities to absolve defendants of liability, without acknowledging the possibility that the defendant's policies contributed to the disparities.

Commenters noted that the defense would make it very difficult for plaintiffs to demonstrate that an alternative, less discriminatory policy would result in the *same* outcome, without imposing materially greater costs or other material burdens because there is no standard or agreed upon definition of algorithmic predictive performance or accuracy. Commenters also stated that the defense would make it difficult for plaintiffs to prevail because of the proprietary nature of algorithms; without knowing what the algorithm is and how it works, it is nearly impossible to demonstrate what the 2020 Rule requires: that the practice has a disproportionately adverse effect on members of the protected class, that there is a robust causal link between the algorithm and this adverse effect, and that this effect is significant.

Commenters also described the defense as ambiguous and difficult for parties and courts to apply. Another commenter described this and other defenses as confusing and harmful, noting that the defense would obfuscate discrimination in lender models and algorithmic systems.

Moreover, commenters noted that the defense was promulgated without public notice and comment and was not a "logical outgrowth" of the 2019 Proposed Rule, thereby violating the APA.

*HUD Response:* HUD agrees with the commenters that the defense is not appropriate to include in this rule. Upon HUD's consideration of these comments and in light of HUD's experience interpreting and handling cases under the Act, HUD has determined that the outcome prediction defense is unclear and not found in any case law.[341] The rule properly describes

---

[339] *Inclusive Cmtys. Project, Inc.,* 576 at 533 (analogizing to Title VII, the court said that "before rejecting a business justification—or, in the case of a governmental entity, an analogous public interest—a court must determine that a plaintiff has shown that there is "an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.")) (internal citations omitted).

[340] 42 U.S.C. 3615.

[341] *Massachusetts Fair Hous. Ctr.* v. *HUD,* 2020 U.S. Dist. LEXIS 205633 (D. Mass. Oct. 25, 2020) (case no 20–11765–MGM) (calling the added defenses from the 2020 Rule "perplexing" and "accomplish[ing] the opposite of clarity" and
Continued

the framework to be used in cases involving algorithms and machine learning in housing and housing-related transactions. The defense, if retained, could in practice improperly exempt many housing-related practices that are increasingly reliant upon algorithms and automated processes that rely on outcome predictions, such as lending practices, from liability under a disparate impact standard. The defense would be inconsistent with HUD's repeated finding, including in the 2020 Rule, that "a general waiver of disparate impact law for the insurance industry would be inappropriate." [342] And although unclear, with its novel "compared to similarly situated individuals not part of the protected class" language, it appears that this defense would suggest using comparators that are, in HUD's experience, inappropriate, and would fail to consider the reasons why disparities are observed. At the very least, the defense introduces unnecessary confusion into disparate effects doctrine.

*Issue:* In addition to insurers, various other commenters requested safe harbors or exemptions. Commenters stated HUD should develop safe harbors for those who "followed rules set out by HUD in developing their operating policies." Another commenter seemed to similarly request specific protections for public housing agencies (PHAs) that have policies that are consistent with HUD rules for operation for federally assisted housing, are in compliance with otherwise legitimate laws, are approved for use in federally insured housing, or are for the purpose of eligibility criteria for enhancing housing opportunities for protected classes or other under-housed persons.

Commenters suggested that HUD should have, as a safe harbor, a process where HUD provides concrete guidance to housing providers so that the housing providers do not have to wait until litigation to discover that their policy may violate the Act. Another commenter requested a safe harbor for entities that implement written policies that identify non-discriminatory goals, explain how the policy is reasonably calculated to achieve that goal, and conclude that the policy does not impose a greater burden on members of protected classes than it does on the wider population. Some commenters

requested a safe harbor for credit unions that limit membership based on statutory requirements, explaining that while a disparate impact claim already would fail under the proposed rule because credit unions are legally unable to lend outside their membership, litigating these cases, even by just filing a motion to dismiss, is costly, particularly for small credit unions. They stated further that *Inclusive Communities* stated that where a causal connection between a policy and a disparate impact cannot be shown because federal law substantially limits discretion of the defendant, dismissal is appropriate.

Other commenters said no safe harbors should be provided for policies and practices that have discriminatory effects by limiting housing opportunities for protected groups. Commenters stated that the 2013 Rule, 2016 Supplement, and this rule appropriately apply a case-by-case disparate impact analysis to all housing related industries and agreed that this approach is consistent with the Act.

*HUD Response:* HUD agrees with commenters that advocate for a case-by-case approach rather than safe harbors. As explained above, HUD believes that it does not have the authority to create exemptions that do not appear in the statute. Moreover, even if a court were to find that HUD had such authority, HUD believes that a case-by-case approach appropriately implements HUD's obligations to enforce the Act to redress discrimination that exists in an entire sector of the economy and to affirmatively further fair housing. Moreover, safe harbors are unnecessary as regulated entities can defend themselves utilizing the second step of the burden shifting framework. Regulated entities may also use the burden shifting framework to assess their own existing policies and practices as well as new policies and practices that are under consideration in order to ascertain whether they may cause an unjustified discriminatory effect. HUD also emphasizes that entities' purported compliance with program specific rules does not guarantee compliance with the Fair Housing Act, and that the Fair Housing Act's mandate is to refrain from discrimination—including refraining from using policies or practices with unjustified discriminatory effects. The rule provides clarity as to how HUD and a court would analyze such a claim, allowing regulated entities to better comply with their obligations under the Act and prevent unjustified discriminatory effects in the first place. HUD notes further that *Inclusive Communities* provides no support for

any exemptions; the passage cited by commenters merely explains that courts dismiss lawsuits pursuant to the pleading standards in the Federal Rules of Civil Procedure.

*Comments Regarding Additional Explanations, Examples and Guidance*

*Issue:* Commenters suggested that HUD should provide additional examples of practices that can have unjustified discriminatory effects in the rule, its Preamble, or in future guidance. They suggested that HUD: note in the rule that policies or practices that result in the benign neglect of people with disabilities can have discriminatory effects; provide examples of specific zoning ordinances or other policies that restrict manufactured housing and may have a discriminatory effect; and discuss criminal records screening practices as examples of policies that may have an unjustified discriminatory effect on protected classes. One commenter suggested that HUD should outline less discriminatory alternatives to eviction in cases where a housing provider has a policy of evicting the household for certain types of lease violations.

*HUD Response:* HUD declines to insert examples of practices that may specifically have unlawful discriminatory effects into this rule. This rule is designed to provide a framework to help entities and courts assess whether a policy or practice may have an unjustified discriminatory effect, not to establish a list of practices that may be unlawful under a discriminatory effects theory. HUD has already issued Guidance on some topics, including certain criminal records screening practices [343] and certain zoning practices [344]—that may have unjustified discriminatory effects on protected classes.

While HUD believes the rule provides a sufficiently clear framework under which specific practices can be evaluated, HUD will consider issuing more guidance as it deems appropriate.

*Issue:* A commenter urged HUD to consider providing separate guidance related to the use of algorithms, artificial intelligence, and machine learning.

*HUD Response:* HUD appreciates this request and believes that the rule provides the appropriate framework for

noting that the outcome prediction defense was "not, as far as the court is aware, found in any judicial decision").

[342] 85 FR 60321 (citing "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance" 81 FR 69012)); *see also* 78 FR 11460, 11475.

[343] *See* "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" (April 4, 2016).

[344] *See* "Joint Statement of the Department of Housing and Urban Development and the Department of Justice[:] State and Local Land Use Laws and Practices and the Application of the Fair Housing Act" at 5 (November 10, 2016).

**Federal Register** / Vol. 88, No. 62 / Friday, March 31, 2023 / Rules and Regulations **19495**

evaluating discriminatory effects liability for all claims under the Act, including as applied to algorithms, artificial intelligence, and machine learning. However, given the rapid evolution in this field, HUD will consider in the future whether to adopt more detailed guidance expanding on those particular types of claims.

*Issue:* A commenter asked HUD to specify that a one-off action, like the decision of a private developer to construct a new building in one location rather than another, is insufficient to establish disparate impact liability. Other commenters opposed this change, noting that a single zoning decision or single application of a zoning standard often results in or is, in fact, a community's policy or practice and can have wide discriminatory impacts. They noted that a "single event" limitation would essentially sanction many discriminatory zoning actions, even where *Inclusive Communities* specifically called suits targeting "zoning laws and other housing restrictions . . . that function to unfairly exclude minorities from certain neighborhoods without any sufficient justification . . . [as] resid[ing] at the heartland of disparate impact liability."

*HUD Response:* HUD believes that a so-called "one-off" action may, in certain cases, be sufficient to establish a practice that has an unjustified discriminatory effect. As noted throughout this preamble, HUD continues to find that discriminatory effects claims should be assessed on a case-by-case basis. A "one-off" exception would tend to protect siting decisions that may have been influenced by a community's desire to keep out people of a certain race, or against people with disabilities. And HUD agrees with commenters that this limitation may pose obstacles to meritorious zoning cases. HUD notes that an individual siting decision by a private housing developer, or a single zoning decision by a locality, will not result in an unjustified discriminatory effect liability so long as the developer or locality has a legally sufficient justification for that decision. HUD believes this fully protects localities and the individual siting decisions of private housing developers. Furthermore, while the Court in *Inclusive Communities* noted in dicta that it would be difficult to prove that a developer's one-time decision to build in one location rather than another was a policy that caused a disparate impact, it did not go so far to say that such a scenario could never succeed under a disparate impact theory.

*Issue:* A commenter suggested that in the preamble to the final discriminatory effects rule and in separate guidance, HUD should outline potentially less discriminatory alternatives to eviction in cases where a housing provider has a policy of evicting the household for certain types of lease violations.

*HUD Response:* As discussed above, HUD believes that each discriminatory effects claim should be assessed on a case-by-case basis, including what less discriminatory alternatives might exist. HUD declines to provide additional guidance in this regulation but will consider in the future whether such guidance may be appropriate.

*Issue:* Commenters asked HUD to make revisions to various guidance documents including the 2016 Office of General Counsel Guidance entitled "Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" (2016 Guidance) and a 2011 internal HUD memorandum for HUD's Fair Housing and Equal Opportunity headquarters and field staff entitled "Assessing Claims of Housing Discrimination against Victims of Domestic Violence under the Fair Housing Act (FHAct) and the Violence Against Women Act (VAWA)". Other commenters stated that the 2016 Guidance provided clarity.

*HUD Response:* While guidance is beyond the scope of this rulemaking, HUD will consider at a later date whether any revisions to guidance documents may be necessary or helpful.

### Comments Regarding Effects of the Proposed Rule

*Issue:* Commenters stated that regulated entities will face increased litigation risks under the proposed rule. They said that the "specter of disparate-impact litigation" could discourage businesses from undertaking the activities that ensure a well-functioning housing market, undermining the Act's purpose and the free-market system. A commenter stated that the 2013 Rule created an uncertain legal environment where any adverse impact that a practice may have on a protected group invited the threat of a lawsuit over its discriminatory effect. As an example, this commenter stated that people of color are more likely to be tenants than homeowners, so the proposed rule invites tenant advocates to assert that any rule or policy that is adverse to actual or prospective renters may have a discriminatory effect while citing little or no statistical or evidentiary basis. Commenters stated that reinstating the 2013 Rule will increase litigation costs, with one commenter saying that this is due to unclear, overly burdensome, and duplicative standards, saying that HUD itself recognized this in the 2019 Proposed Rule. A commenter also noted that the proposed rule would impose additional burdens on entities administering Community Development Block Grant disaster relief funding.

*HUD Response:* HUD disagrees that this rule will increase litigation risks in a manner that interferes with the free-market system and undermines the purpose of Act. This rule does not restrict valid free-market activity, but rather only regulates policies that have unjustified discriminatory effects and encourages businesses to develop and implement policies that achieve their substantial legitimate purposes in the least discriminatory manner. HUD believes the rule will further the goal of a vibrant, integrated, and open housing market. Furthermore, the rule does not create any new liability or burdens for businesses or declare any activity per se unlawful. It merely prescribes a method for evaluating liability under the Act. HUD believes that litigation and burdens concerning the Act is more properly attributable to the Act, rather than the rule. HUD notes that commenters' concerns are undermined by the fact that the rule has been in place since 2013 and in HUD's experience, no such increased litigation has occurred.

*Issue:* A commenter critiqued the rule for increasing the threat of challenges to certain types of landlord practices that the commenter characterized as justified by practical business decision making. For instance, the commenter stated, the rule allows landlords to be sued for occupancy restrictions that are stricter than state or local codes even though these restrictions advance housing providers' legitimate interests in limiting wear and tear, minimizing operational costs, and addressing issues with safety, overcrowding, and noise in multifamily properties. According to the commenter, advocates have increasingly used the rule to challenge occupancy restrictions with HUD and state agencies. The commenter also said that the rule allows lawsuits against landlords who purchase buildings that are largely populated by persons with certain protected characteristics and institute new rules that are facially neutral but have a disparate impact on protected classes, such as requiring existing tenants to provide valid government issued identification or requiring tenants to pay rent through direct deposit from a bank account. The commenter also mentioned the 2016 Guidance on criminal records, alleging that it has invited costly challenges to

all criminal records screening, and requires property owners to set up a "mini parole board" to review applicants with criminal records, even if there are legitimate reasons not to rent to persons with certain types of criminal records, including lesser offenses like disorderly conduct, illegal drug use, and nuisance conduct. Finally, the commenter stated that advocates are using the 2013 Rule against landlords who choose not to participate in the Section 8 program. The commenter described one class action case in which it represented the new owner of a building who decided to not accept Section 8 vouchers and wanted to raise rents to pay for costly improvements to the building, which allegedly had a discriminatory effect on residents with disabilities, African Americans and Hispanics who used Section 8 vouchers or could not afford higher rent. The commenter said that the claim survived a summary judgment motion because of the possibility that the plaintiffs might be able to show a less discriminatory alternative, such as raising rents less, doing less to improve the property, or looking for some public funding or subsidies to allow the owners to get a return on investment without discontinuing participation in Section 8 and raising rents.

*HUD Response:* HUD disagrees that the commenter's concerns merit revising the rule. The examples provided by the commenter are well within the types of cases that may or may not state a valid claim under the Act and may be decided through the rule's framework. While the practices cited by the commenter that have a discriminatory effect on protected classes may advance legitimate interests, these practices are still illegal if, for example, they are not necessary to achieve substantial, legitimate, nondiscriminatory interests of the defendant or there is a different practice that advances that same interest but has a less discriminatory effect. This is the essential framework of discriminatory effects liability that has developed in case law, whether the rule exists or not. For example, as noted in the 2013 Rule, even decades prior to the rule, unreasonable restrictions on occupancy that impose a discriminatory effect on families with children will result in liability.[345] Furthermore, the 2016 Guidance on criminal records sets out this well-established discriminatory effects framework. It does not require a "mini parole board" but rather posits that an individualized review of a person with a criminal record is likely to have a less discriminatory effect than

a policy that imposes an automatic categorical ban. To the extent the commenter disagrees with that assessment, its quarrel is with the Guidance's particularized application of this rule and not with the more general principles this rule sets out.

In sum, HUD believes that this rule strikes a reasonable balance, in accordance with the Act and with caselaw, between allowing policies that permit landlords to advance their interests, even if those policies disproportionately adversely impact protected classes, while requiring landlords to demonstrate that their policies are necessary to advance those interests.

*Issue:* A commenter stated that the proposed rule violates the constitutional principle of separation of powers because § 100.500(c) is an attempt by HUD to dictate rules of judicial procedure and evidence to the judicial branch. The commenter said the rule would unnecessarily produce complication throughout the federal courts because they have no obligation to use a standard dictated by the executive branch, and different courts will decide to follow the rule (or not) in different ways. The commenter requested that HUD rescind all provisions that address judicial standards of review, rules of procedure, and evidence. The commenter continued that HUD's reliance on Congress's delegation of certain authority under section 3608(a) is improper because that statutory provision does not mention the judiciary, standards of review, rules of procedure or evidence, or any directives for HUD to assume a role that is clearly the province of the judiciary.

*HUD Response:* The final rule sets out a framework for analyzing and proving cases under a theory of discriminatory effects and does not amend or establish rules of judicial or civil procedure or evidence. It remedies concerns expressed by many commenters that the 2020 Rule infringed upon the judicial branch by, for example, setting pleading standards, establishing a confusing burden that appeared to contradict the Federal Rules of Civil Procedure, and defining "plausibility" in such a way as to preclude substantively meritorious claims. HUD agrees that it does not have the authority to amend pleading standards, to modify the defenses under Federal Rule of Civil Procedure 12, or the rules of evidence. It does, however, have authority to "make rules . . . to carry out" the Act, including the power of the prohibition of discrimination in

housing.[346] That is precisely what HUD is doing here.

*Comments Regarding the Administrative Procedure Act*

*Issue:* Commenters disagreed about whether the proposed rule violates the Administrative Procedure Act (APA). A commenter stated that HUD's reasoning for the proposed rule, that "the practical effect of the 2020 Rule's amendments is to severely limit HUD's and plaintiffs' use of the discriminatory effects framework in ways that substantially diminish that frameworks' effectiveness," does not satisfy APA requirements because HUD neither provided the essential facts on which its conclusion was based nor explained how those facts justified that conclusion, instead making a conclusory statement. Another commenter stated that reverting to the 2013 Rule, which was promulgated before *Inclusive Communities,* without adequately explaining the reversal would violate the APA.

Other commenters stated that the 2020 Rule violated the APA and that the proposed rule would rightfully reinstate the standard set forth in the 2013 Rule. Commenters stated that changes made by the 2020 Rule were arbitrary and capricious and contrary to law. Commenters also stated that the 2020 Rule failed to explain why it was deviating from legal standards and failed to address that courts have easily applied existing disparate impact case law and *Inclusive Communities.* Commenters also stated that the 2020 Rule violated the APA by failing to address numerous comments about the negative effects the rule would have, namely on plaintiffs' ability to successfully challenge housing discrimination in accordance with the Act.

*HUD Response:* HUD believes that the proposed rule and this final rule fully comply with the requirements of the APA. HUD disagrees with the assertion that HUD did not explain its proposed rule in light of *Inclusive Communities.* The proposed rule directly and thoroughly explained HUD's reason for believing that the 2013 Rule was consistent with and in fact supported by *Inclusive Communities.* The proposed rule also explained why HUD believed that the 2020 Rule was deficient. There, HUD provided a number of different reasons why it was proposing to change course from the position it had taken in 2020 and was proposing recodification of the 2013 Rule, not just that "the practical effect of the 2020 Rule's

---

[345] 78 FR 11461–11462.

[346] 42 U.S.C. 3614a.

amendments was to severely . . . diminish the [discriminatory effects] framework's effectiveness.'' [347] While the commenter characterized this statement as conclusory, HUD explained that this belief was ''based on HUD's experience investigating and litigating discriminatory effects cases.'' [348] HUD further explained that its experience informed ''it that many of the points made by commenters opposing the 2020 Rule and the Massachusetts District Court are correct, including that the changes the 2020 Rule makes, such as amending pleading standards, changing the burden shifting framework, and adding defenses, all favoring respondents, will at the very least introduce unnecessary confusion and will at worst make discriminatory effects liability a practical nullity.'' [349] Further, the APA requires in relevant part that a proposed rule make reference to the legal authority under which the rule is proposed and include either the terms or substance of the proposed rule or a description of the issues involved, all of which HUD did in the proposed rule.[350] Now, in this final rule, HUD has again explained that the Act vests HUD with the requisite authority, and has further explained why, having reconsidered the 2020 Rule, HUD is finalizing its proposal to recodify the 2013 Rule.[351]

Furthermore, this final rule explains HUD's position after consideration of the comments HUD received on the proposed rule. As explained in the proposed rule, the facts that spurred HUD's decision to recodify the 2013 Rule include the consistent concerns expressed through thousands of public comments regarding the effect of the 2020 Rule's changes on disparate impact jurisprudence and protected classes, the concerns raised by the court in *Massachusetts Fair Housing Center,* HUD's own experience in interpreting and applying the Act, which indicated that these criticisms are correct, and HUD's determination after examining case law that several provisions of the 2020 Rule were inconsistent with the purpose of the Act and judicial and agency precedent.[352] HUD expounds upon its reasoning in this final rule in responding to specific comments.

HUD is not ignoring facts or circumstances that underlay HUD's 2020 Rule; rather, HUD is acknowledging its change in position,

drawing on its experience in different ways than it did in the 2020 Rule, drawing on case law that did not exist when the 2020 Rule was promulgated, relying on other case law that the 2020 Rule downplayed and/or ignored, and drawing on new public comments about the final version of the 2020 Rule that did not exist when HUD decided to issue the 2020 Rule.

*Comments Regarding HUD's Findings and Certifications*

*Issue:* Commenters stated that HUD inappropriately and incorrectly assumed that reinstating the 2013 Rule ''would not have federalism implications,'' and asserted that HUD should have consulted with state regulators as required by Executive Order 13132 and acknowledged that the rule would interfere with state law in violation of McCarran-Ferguson in all or nearly all cases.

*HUD Response:* HUD stands by its certification that this rule—like the 2013 Rule it recodifies and the 2020 Rule it rescinds—does not have federalism implications. These commenters' assertion that this rule is inconsistent with Executive Order 13132 is based solely on the assertion that this rule would interfere with states' ability to regulate insurance in violation of McCarran-Ferguson. As discussed extensively above, HUD disagrees with this assertion and finds that this rule does not interfere with state insurance laws and is consistent with McCarran-Ferguson. Therefore, this rule has no federalism implications. The existing relationship between the Act and McCarran-Ferguson, and therefore the Act and state insurance law, remains the same before and after this rule. Section 6 of Executive Order 13132 only requires consultation with the states when there are federalism implications, when a regulation has ''substantial direct effect on the States''; therefore, HUD has no obligation to consult with state regulators.

*Issue:* Commenters stated that the proposed rule would have an impact on regulated entities and that the proposed rule does not pass a basic cost benefit analysis. Another commenter stated that the proposed rule would eliminate economic burdens that the 2020 Rule imposed by removing ambiguity and uncertainty that would have led to expensive litigation and dispute resolution and would have imposed these expenses on plaintiffs, state governments, the public, and attorneys general.

*HUD Response:* HUD agrees that 2020 Rule would have been burdensome if it had not been enjoined and that the

proposed rule does not impose a significant economic impact, as further explained in HUD's certification. HUD stands by its certification that this rule will not have a significant economic impact. Because the rule does not change decades-old substantive law articulated by HUD and the courts, but rather formalizes a clear, consistent, nationwide standard for litigating discriminatory effects cases under the Fair Housing Act, it adds no additional costs to housing providers and others engaged in housing transactions. Rather, HUD believes that the rule will simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation associated with such claims by clearly allocating the burdens of proof and how such burdens are to be met.

*Other Comments*

*Issue:* A commenter stated that the proposed rule is unnecessary because credit unions have already carefully structured their policies to comply with the Act.

*HUD Response:* HUD appreciates the efforts of regulated entities to comply with the Act and its implementing regulations. However, HUD disagrees that any alleged current compliance provides a basis for retracting the rule or providing exemptions, particularly where policies may change in the future. HUD believes—and many commenters have stated—that this rule is a necessary tool for ensuring both new and continued compliance.

*Issue:* A commenter asserted that plaintiffs sometimes use the disparate impact framework to bring costly and lengthy litigation which is resolved without a court finding. A commenter suggested HUD include an extensive examination of disparate impact cases relating to residential lending activity from the standpoint of any actual discriminatory findings and court judgments and provide an accounting of cases brought in class action form, examining and reporting any monetary awards actually being delivered to the purported class.

*HUD Response:* This comment is outside the scope of the proposed rule because it is a criticism of plaintiffs who bring cases based on a disparate impact theory of liability and/or the disparate impact theory itself, rather than the final rule. HUD does not believe that conducting such an examination or finding that most disparate impact cases settle before a judicial determination, would inform any changes HUD should or should not make to the proposed rule. For these reasons, HUD declines to

---

[347] 86 FR 33593, 33594.

[348] *Id.*

[349] *Id.*

[350] See 5 U.S.C. 553(b)(1)–(3).

[351] *Supra* at n. 8.

[352] 86 FR 33593–33595.

conduct such an examination in this final rule.

## IV. Severability

Consistent with the requirements of the Administrative Procedure Act, HUD has carefully responded to all public comments received in response to its notice of proposed rulemaking. HUD has determined that the discriminatory effects standard and burden-shifting framework in this rule appropriately implement, and are fully consistent with, the Fair Housing Act and governing law, including *Inclusive Communities*. Furthermore, HUD's decision to not create exemptions for any industry covered by the Fair Housing Act is also fully consistent with the plain language of the Act and governing law, including the McCarran-Ferguson Act. As explained in 2013, 2016, and 2020, as well as in greater detail above, HUD is declining to provide any exemptions, including for the insurance industry, in whole or in part, including because HUD lacks the authority to create such exemptions under the Act.[353] Further, declining to provide exemptions for certain industries furthers congressional intent by effectuating the Act's broad remedial purpose.[354]

Through this rule, HUD is taking two separate actions. First, HUD rescinds the 2020 Rule, removing 24 CFR 100.500

and the second and third sentences of 24 CFR 100.5(b), thus nullifying the 2020 Rule and eliminating any and all legal effect that the 2020 Rule could have. Second, HUD adds a new 24 CFR 100.500 and a new second sentence to 24 CFR 100.5(b). The new language in both sections is identical to the language in those sections of the Code of Federal Regulations that took effect on March 18, 2013, which HUD refers to throughout this preamble as "the 2013 Rule." HUD intends the language promulgated today to be the only operative rule.

HUD intends these separate actions to be legally severable. In particular, in the event that any portion of § 100.500 or § 100.5(b) of this final rule is held to be invalid or unenforceable, HUD intends that the rescission of the 2020 Rule be unaffected. HUD believes that it would be more consistent with the plain language and legislative history of the Act for the Code of Federal Regulations to contain no language regarding discriminatory effects liability and for litigants to rely on existing jurisprudence than for any provision of the 2020 Rule to remain in effect. HUD has made this determination for all the reasons described elsewhere in this preamble, including that the 2020 Rule is inconsistent with such jurisprudence. In addition to rescinding the 2020 Rule for the reasons described more fully in this preamble, HUD's rescission will serve to resolve three pending lawsuits, all of which challenge the 2020 Rule as arbitrary and capricious and inconsistent with *Inclusive Communities* and other case law.[355] Moreover, having no rule in place at all regarding discriminatory effects would be workable, as precedent proves; for decades prior to the 2013 Rule, there was no HUD rule on discriminatory effects liability, and litigants relied on caselaw.

HUD also intends that the rule be treated as severable in its applications to certain industries. Litigation brought by the insurance industry regarding the 2013 Rule is ongoing.[356] One of those cases, decided in the context of the 2013 Rule, has already upheld the rule's burden-shifting framework for analyzing discriminatory effects claims as a reasonable interpretation of the Act, but also held that HUD had not adequately explained why case-by-case

adjudication was preferable to using its rulemaking authority to provide exemptions or safe harbors related to homeowners insurance.[357] To resolve that suit, HUD issued the 2016 Supplemental Explanation.[358] The plaintiff filed an amended complaint and that litigation is pending. HUD believes, as described in greater detail above, that discriminatory effects liability can be properly applied to the insurance industry and that doing so is fully consistent with the Act's plain language and broad remedial purpose. However, should a court decide that the insurance (or any other) industry or certain types of insurance (or other) claims should be exempt from the Rule, HUD intends that this final rule remain in effect and apply to all other actors and claims covered by the Act. Moreover, in the event of such a court decision, this final rule would still function sensibly with respect to others covered by the Act, as nothing in this final rule's applicability to the insurance (or any other) industry affects its applicability to others covered by the Act.

## V. Findings and Certifications

*Regulatory Review—Executive Orders 13563 and 12866*

Executive Order 13563 ("Improving Regulation and Regulatory Review") directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget ("OMB") in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

In its proposed rule, HUD invited comments on whether any further analysis was needed to assess the impact of the rule, given the fact that the rule would simply be retaining the status quo and would therefore have no

---

[353] See *Sierra Club* v. *EPA*, 719 F.2d 436, 453 (D.C. Cir. 1983) ("The agency relies on its general authority under section 301 of the Act to 'prescribe such regulations as are necessary to carry out [its] functions under [the Act]' . . . . EPA's construction of the statute is condemned by the general rule that when a statute lists several specific exceptions to the general purpose, others should not be implied."); *Colorado Pub. Int. Rsch. Grp., Inc.* v. *Train*, 507 F.2d 743, 747 (10th Cir. 1974), *rev'd on other grounds*, 426 U.S. 1 (1976) ("Another cardinal rule of statutory construction is that where the legislature has acted to except certain categories from the operation of a particular law, it is to be presumed that the legislature in its exceptions intended to go only as far as it did, and that additional exceptions are not warranted."); *Nat. Res. Def. Council, Inc.* v. *Costle*, 568 F.2d 1369, 1377 (D.C. Cir. 1977) (courts cannot manufacture a "revisory power" granting agency authority to act "inconsistent with the clear intent of the relevant statute"); *Alabama Power Co.* v. *Costle*, 636 F.2d 323, 357 (D.C. Cir. 1979) ("[T]here exists no general administrative power to create exemptions to statutory requirements based upon the agency's perceptions of costs and benefits."); *see also Graoch*, 508 F.3d at 375 ("[n]othing in the text of the FHA instructs us to create practice-specific exceptions.").

[354] *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 539 (stating that the FHA "was enacted to eradicate discriminatory practices within a sector of our Nation's economy" and noting that the viability of disparate impact claims is "consistent" with the Act's "central purpose"); H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008) (explaining that the goal of the Act was to advance equal opportunity in housing and to "achieve racial integration for the benefit of all people in the United States.").

[355] *Massachusetts Fair Hous. Ctr., et al.* v. *HUD*, 496 F. Supp. 3d 600 (D. Mass. 2020); *Nat'l Fair Hous. All., et al.* v. *HUD*, No. 3:20–cv–07388 (N.D. Cal.); *Open Cmtys., et al.* v. *HUD*, No. 3:20–cv–01587 (D. Conn.).

[356] *Nat'l Ass'n. of Mut. Ins. Cos.* v. *HUD*, No. 1:13–cv–00966 (D.D.C); *Prop. Cas. Ins.. Ass'n. of Am.* v. *Fudge*, 1:13–cv–08564 (N.D. Ill.).

[357] *Prop. Cas. Ins. Ass'n of Am.* v. *Donovan*, 66 F. Supp. 3d 1018, 1049–54 (N.D. Ill. 2014).

[358] 81 FR 69012–13.

new impact on regulated entities. Specifically, HUD explained: "[b]ecause the 2020 Rule never took effect, and therefore did not affect the obligations of any regulated entities, this proposed rule is only recodifying the 2013 Rule and will have no impact on regulated entities except to affirm that the 2013 Rule remains in effect. Furthermore, the 2013 Rule itself had little direct effect on regulated entities because it only "formalize[d] the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability" and "[was] not a significant departure from HUD's interpretation to date or that of the majority of federal courts." HUD stated further that it did not believe that additional analysis was needed on this point but invited comment.

Some commenters stated that the rule does not pass a cost benefit analysis, but they did not explain why this was so. Nor did they address HUD's explanation in the proposed rule as to why a deeper assessment of the impact of the rule was unnecessary. HUD continues to believe that this rule will provide significant benefits, while having no new impact on regulated entities, for the reasons explained earlier and summarized below.

As explained in 2013, a "uniform rule would simplify compliance with the Fair Housing Act's discriminatory effects standard, and decrease litigation associated with such claims. By providing certainty in this area to housing providers, lenders, municipalities, realtors, individuals engaged in housing transactions, and courts, this rule would reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof, and how such burdens are to be met. With a uniform standard, entities are more likely to conduct self-testing and check that their practices comply with the Fair Housing Act, thus reducing their liability and the risk of litigation. A uniform standard is also a benefit for entities operating in multiple jurisdictions. Also, legal and regulatory clarity generally serves to reduce litigation because it is clearer what each party's rights and responsibilities are, whereas lack of consistency and clarity generally serves to increase litigation. For example, once disputes around the court-defined standards are eliminated by this rule, non-meritorious cases that cannot meet the burden under § 100.500(c)(1) are likely not to be brought in the first place, and a respondent or defendant that cannot meet the burden under § 100.500(c)(2)

may be more inclined to settle at the pre-litigation stage." [359] And as HUD explains both in this rule and the proposed rule, *Inclusive Communities* did not disrupt this long-standing case law or the 2013 Rule; rather, it affirmed it, citing to HUD's 2013 Rule multiple times with approval. The Court articulated long-standing limitations on the scope of disparate impact liability, which HUD had already accounted for in the 2013 Rule.

When deciding whether to enact this rule, HUD also considered whether any part of the 2020 Rule should be retained, which is evidenced by our discussion of various parts of the 2020 Rule elsewhere. It decided that no substantive portion of the 2020 Rule should be incorporated into this rule. Only three additional illustrations of discriminatory practices under the Act at § 100.70(d) are incorporated from the 2020 Rule, which were not specifically objected to by commenters and present no substantive change from the 2013 Rule. The 2020 Rule would impose significant costs to the agency, the public, and regulated entities while affording little, if any, benefit. As described in further detail elsewhere in this preamble, the 2020 Rule introduced new and confusing standards, including standards not found anywhere in case law, that were largely untested. Accordingly, the 2020 Rule would require regulated entities to spend more resources attempting to ascertain what the 2020 Rule means and how to defend against any potential claims, as well as increased spending that could last for years as courts try to interpret what the 2020 Rule means. Relatedly, entities that are covered by the Fair Housing Act have a serious reliance interest in the 2013 Rule, which has been in place for ten years. Conversely, these entities should have little to no reliance interest in the 2020 Rule, which never went into effect.

Furthermore, HUD's experience investigating and litigating discrimination cases under various regulatory frameworks informs that the 2020 Rule would make it significantly more difficult, almost impossible, to bring a discriminatory effects claim, and significantly more difficult to provide sound guidance to housing providers attempting to comply with the Act, at great cost to the agency in terms of its mission and its resources. Extra staff time would need to be spent to determine how to apply the 2020 rule to current cases being investigated and new cases that will be filed, and to determine how to address various

guidance documents for the public and grantees which have been issued based on the 2013 Rule. Additionally, allowing unlawful discrimination to go unchecked and unremedied because of burdensome and confusing pleading and proof standards would come at great cost to the public who, as the Act mandates, are entitled to equal access to housing throughout the country.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act ("RFA") (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule amends the Code of Federal Regulations to accurately reflect HUD's discriminatory effects regulation as it currently exists. As a result, all entities, big and small, have a responsibility to comply with the law.

As discussed above, this Rule will continue to apply the 2013 Rule, which has been in effect uninterrupted for ten years. HUD concludes, as it did when it published the 2013 Rule, that the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. All entities, large and small, have been subject to the Fair Housing Act for over fifty years and subject to the 2013 Rule for ten years. For the minority of entities that have failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will be the costs of compliance with a preexisting statute and regulation. This rule does not change substantive obligations; it merely recodifies the regulation that more accurately reflects the law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Furthermore, HUD anticipates that this rule will eliminate confusion for all entities, including small Fair Housing Advocacy organizations, by ensuring HUD's regulations accurately reflect current standards. Accordingly, the undersigned certifies that this rule will not have a significant economic impact on a substantial number of small entities. HUD invited comment on this certification in the proposed rule. HUD did not receive any comments providing analysis of the number of small entities which commenters believe may be affected by this regulation. Some commenters stated that application of discriminatory effects law to the

---

[359] *Id.*

business of insurance would harm small businesses. HUD has responded to these comments in this rule.

*Environmental Impact*

This rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) ("UMRA") establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

**List of Subjects in 24 CFR Part 100**

Aged, Civil rights, Fair housing, Incorporation by reference, Individuals with disabilities, Mortgages, and Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

**Subpart A—General**

■ 2. Amend § 100.5 by revising paragraph (b) and removing paragraph (d) to read as follows:

### § 100.5   Scope.

\*   \*   \*   \*   \*

(b) This part provides the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of residential real estate-related transactions. The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.

\*   \*   \*   \*   \*

**Subpart B—Discriminatory Housing Practices**

■ 3. In § 100.70, paragraph (d)(5) is republished to read as follows:

### § 100.70   Other prohibited sale and rental conduct.

\*   \*   \*   \*   \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

**Subpart G—Discriminatory Effect**

■ 4. Revise § 100.500 to read as follows:

### § 100.500   Discriminatory effect prohibited.

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns

because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

**Marcia L. Fudge,**
*Secretary.*

[FR Doc. 2023–05836 Filed 3–27–23; 4:15 pm]

**BILLING CODE 4210–67–P**

# Meeting The Insurance Crisis Of Our Cities

A Report by The President's National Advisory Panel
on Insurance in Riot-Affected Areas



032814



# MEETING THE
# INSURANCE CRISIS
# OF OUR CITIES

A Report by
**THE PRESIDENT'S NATIONAL
ADVISORY PANEL ON INSURANCE
IN RIOT-AFFECTED AREAS**

# FOREWORD

In his address to the nation on civil disorders, delivered on July 27, 1967, President Johnson sounded a call for action: "Let us clear the streets of rubble and quench the fires that hatred set. Let us feed and care for those who have suffered at the rioter's hands."

"What can be done," the President asked, "to help innocent people and vital institutions escape serious injury?"

"What is the proper public role in helping cities repair the damage that has been done?"

How best can we insure "steady progress in meeting the needs of all our people"?

On the same date, President Johnson appointed the National Advisory Commission on Civil Disorders to investigate the origins of the disorders and to make recommendations for measures to prevent or contain them in the future.

Deciding that a separate and expert group could deal more expeditiously with the insurance problems of urban core residents and businessmen, the Commission, after consulting with the President, appointed on August 10, 1967, the National Advisory Panel on Insurance in Riot-Affected Areas.

The Panel was asked by the Commission to seek answers to questions raised by the difficulties and high costs of obtaining insurance in areas where riots occurred or might be a threat. In this regard, it was pointed out that the recent disorders had served to highlight problems of availability of insurance that had long existed as a corollary to urban blight. Further, it was recognized that insurance of the riot peril is directly affected by the degree to which law and order are maintained, but that this subject goes far beyond insurance problems and is a major part of the inquiry of the Commission itself.

Our members include a Governor and a former Governor, the Mayor of Washington, the presidents of a leading stock insurance company and a leading mutual insurance company, the president of a life insurance company that invests heavily in center city property, and an Assistant Attorney General of the United States. We believe that this composite of private and public experience has furnished a balanced view. We have attempted to give full weight to the various interests that must be drawn together to meet the problem of providing adequate and reasonably priced insurance in urban core areas.

Our first task was to provide leadership to prevent the insurance situation from deteriorating. On September 15, therefore, we set forth a preliminary program, calling upon state insurance commissioners, the insurance industry, and others to halt further contraction of the urban insurance market. On October 26, we suggested the possibilities for and invited comment on a comprehensive program, including expanded urban area plans, industry pooling, government backup, tax measures, and other steps.

At public hearings held on November 8 and 9, we considered the views of consumers, residents and businessmen of inner city areas, insurance brokers, industry representatives, and government officials. They gave us the benefit of their insights into urban core problems, and this was most helpful to us in developing the program recommended in this report.

ii

*Robert Haur*

We gathered information from across the country. We conducted interviews in various cities, systematically surveyed urban homeowners and businessmen, and requested written information from a variety of interested parties: state regulators, insurers and reinsurers, agents and brokers, bankers, savings and loan associations, mortgage brokers, city officials, police and fire departments, and others.

People from all walks of life have responded to our questions and contributed to our work. We acknowledge here our sincere thanks and appreciation to them for the cooperation we have received. Their help has been essential to the preparation of this report.

Most of all, we wish to express our deep appreciation for the dedicated effort put forth by the Panel's staff. Only the remarkable productivity of their work enabled us to prepare this report in the short time of a few months. Our warm gratitude goes to Stanford Ross, the Executive Director of the Panel, who directed this highly resourceful and imaginative staff effort, and to each of his colleagues.

After four months of intensive study, we believe that we have identified the nature and causes of the urban insurance problem and the steps necessary for a solution. In doing so, we have verified beyond doubt the existence of a problem of critical proportions that requires immediate action.

There is a close relationship between urban blight and insurance. Insuring property in decaying urban areas is difficult. Yet the failure to insure such properties only increases the blight. Good property that is not insured becomes deteriorating property.

The cities must be revitalized. Insurance is a basic force in this effort. In combination with other measures, insurance will help to improve the deplorable conditions of our inner cities. Our findings and recommendations, therefore, deal with a significant aspect of the broad inquiry undertaken by the National Advisory Commission on Civil Disorders.

Executing the program we recommend will contribute toward the goal expressed by President Johnson—"cities richer in opportunity; cities more full of promise; cities of order, progress, and happiness."

<div align="right">

RICHARD J. HUGHES
WILLIAM W. SCRANTON
FRANK L. FARWELL
GEORGE S. HARRIS
A. ADDISON ROBERTS
WALTER E. WASHINGTON
FRANK M. WOZENCRAFT

</div>

January 1968

032817

## THE COVER

The cover picture is an aerial view of a riot-torn center city area of Detroit on July 23, 1967. Fire-bombed businesses and homes are in flames, and the threat to undamaged property is patent. The picture shows graphically one aspect of the insurance crisis of our cities.

iv

## THE PANEL

### Chairman
RICHARD J. HUGHES
*Governor of New Jersey*

### Vice Chairman
WILLIAM W. SCRANTON
*Former Governor of Pennsylvania*

FRANK L. FARWELL
*President, Liberty Mutual
Insurance Company*

GEORGE S. HARRIS
*President, Chicago Metropolitan
Mutual Assurance Company*

A. ADDISON ROBERTS
*President, Reliance Insurance
Company*

WALTER E. WASHINGTON
*Commissioner,
District of Columbia
Former Chairman,
New York City Housing Authority*

FRANK M. WOZENCRAFT
*Assistant Attorney General
In Charge of
Office of Legal Counsel
United States Department of Justice*

## THE STAFF

*Executive Director:*
STANFORD G. ROSS

*Assistant Director:*
RONALD B. LEWIS

*Operations Director and Associate
General Counsel:*
RICHARD TEBERG

*General Counsel:*
JAMES J. McLAUGHLIN

*Assistant General Counsel:*
DAVID BLISS

*Editorial Consultant:*
MARTIN BLUMENSON

*Research Director and Special Counsel:*
HERBERT S. DENENBERG

*Staff Consultants:*
J. D. HAMMOND
DENNIS F. REINMUTH
GEORGE REJDA

*Special Consultants:*
JUAN B. APONTE
MIGUEL A. VALENCIA

v

# CONTENTS

|                                                                                          | Page |
| ---------------------------------------------------------------------------------------- | ---- |
| Foreword                                                                                 | ii   |
|                                                                                          |      |
| CHAPTER I—BASIC FINDINGS AND RECOMMENDATIONS                                             | 1    |
| The Insurance Problem                                                                    | 1    |
|   Insurance: A Necessity for Homeowners and Businessmen                        | 1    |
|   Insurance: An Essential Force in Revitalizing Our Cities                     | 1    |
|   The Urban Core Insurance Crisis                                              | 2    |
|     Unavailability and High Cost                                     | 2    |
|     Impact of the Riot Peril                                         | 3    |
|     Factors Underlying the Crisis                                    | 5    |
|   Stop-Gap Measures                                                            | 7    |
|   The Urgent Need for a Comprehensive Program                                  | 7    |
|                                                                                          |      |
| Summary of Recommendations                                                               | 8    |
|   A. FAIR Plans                                                                | 9    |
|   B. State Pools or Other Facilities                                           | 11   |
|   C. National Insurance Development Corporation                                | 13   |
|   D. Tax Deferral Measures                                                     | 14   |
|   E. Other Necessary Steps                                                     | 15   |
|                                                                                          |      |
| CHAPTER II—THE INSURANCE ENTERPRISE AND THE URBAN CORE MARKET                            | 17   |
|                                                                                          |      |
| The Nature of Insurance                                                                  | 17   |
|                                                                                          |      |
| Limitations of the Insurance Process                                                     | 18   |
|                                                                                          |      |
| Major Types of Property Insurance                                                        | 18   |
|   Fire Insurance and Allied Lines                                              | 18   |
|   Crime Insurance                                                              | 20   |
|   Relative Importance of Major Lines                                           | 20   |

vi

|  | Page |
|---|---|
| Structure of the Industry | 22 |
| In General | 22 |
| Characteristics of Insurance Companies | 23 |
| Marketing | 24 |
| In General | 24 |
| Marketing Insurance in the Urban Core | 25 |
| Underwriting | 28 |
| In General | 28 |
| Underwriting Property in the Urban Core | 29 |
| Rating | 32 |
| In General | 32 |
| Urban Core Rating Problems | 33 |
| Reinsurance | 35 |
| In General | 35 |
| Relation to Urban Core Market Problems | 39 |
| Profits | 40 |
| In General | 40 |
| Relation to Urban Core Insurance Problems | 47 |
| State Regulation | 48 |
| In General | 48 |
| Regulation in Practice | 49 |
| State and National Problems | 51 |
| Conclusion | 52 |
| CHAPTER III—PRESENT RESPONSES TO URBAN CORE INSURANCE PROBLEMS | 55 |
| In General | 55 |
| Urban Area Plans | 56 |
| The Boston Plan | 56 |
| The Michigan Fire Insurance Inspection Plan | 61 |
| The Cleveland Fire Insurance Inspection Plan | 64 |
| The Voluntary Inspection and Advisory Committee for Milwaukee Core Area Fire Insurance | 66 |
| The Buffalo and New York City Fire and Extended Coverage Inspection Plan | 68 |
| The Pennsylvania and Delaware Sub-Standard Plan | 70 |
| The Louisiana Owner-Occupied Insurable Dwelling Program | 71 |
| The Minnesota Core Area Plan | 71 |
| The Oakland, San Francisco, and Los Angeles County | |

vii

## CHAPTER III—PRESENT RESPONSES TO URBAN CORE INSURANCE PROBLEMS—Continued

| | Page |
|---|---|
| Fire and Extended Coverage Insurance Inspection Plan | 72 |
| The North Carolina Fire and Extended Coverage Plan for Properties in Beach Area of Zone 1 | 73 |
| The Wichita Agents' Plan | 74 |
| The Chicago Home Inspection Plan | 75 |
| The Watts Pool | 75 |
| Other State Responses | 79 |
| Proposals for State Pools | 79 |
| State and Municipal Liability for Riot Damage | 80 |
| Proposals of State Commissioners | 81 |
| Industry Proposals | 82 |
| Proposals for Federal Legislation | 84 |
| Conclusion | 85 |

## CHAPTER IV—RECOMMENDED PROGRAM TO SOLVE URBAN CORE INSURANCE PROBLEMS

| | Page |
|---|---|
| | 87 |
| A. FAIR Plans: Major Expansion of Urban Area Plans | 87 |
| B. State Pools or Other Facilities, Where Needed, for Insurable Properties Declined under FAIR Plans | 95 |
| C. National Insurance Development Corporation to Carry Out Vital but Unfulfilled Insurance Functions | 99 |
| D. Tax Deferral Measures to Increase Capacity for Insuring Urban Core Properties | 105 |
| E. Other Necessary Steps to Meet Special Problems of the Urban Core Insurance Market | 107 |
| Precedents for the Panel's Program | 109 |

## APPENDICES

| | Page |
|---|---|
| A. Materials on the Availability and Cost of Insurance in the Urban Core | 115 |
| Statements of Urban Core Residents and Their Representatives | 115 |
| Survey of Six Cities | 126 |
| Cities Surveyed | 126 |
| Size and Nature of Sample | 126 |

viii

|  | Page |
|---|---|
| Survey Results | 127 |
|     Insurance for Businesses | 128 |
|     Insurance for Dwellings | 142 |
| Other Studies | 149 |
|     Crime Commission Survey | 149 |
|     Congressional Hearings | 150 |
|     Massachusetts Study | 151 |
|     Cleveland Study | 151 |
|     New York Study | 151 |
|     Survey by the National Association of Insurance Commissioners | 151 |
|     Watts Study | 152 |
|     National Institute of Public Affairs Study | 152 |
| Some Aspects of the Cost of Insurance | 152 |
| B. Methods of Obtaining Information | 161 |
| C. Other Staff Assistance | 165 |

032823

## ORGANIZATION OF REPORT

Chapter I is a summary of the entire report, containing the basic findings and recommendations of the Panel.

The detailed recommendations of the Panel are presented in Chapter IV.

Chapters II and III and Appendix A, prepared by the Panel's staff, present necessary background and supporting material for the Panel's recommended program. They place the inner city insurance problem and the steps required to meet that problem in broader perspective.

Chapter II is a description of the major aspects of the property insurance enterprise in the United States as they relate to urban insurance problems. Chapter III analyzes the present responses to deal with the insurance problems of the urban core. Appendix A provides additional detail on those problems.

x

## Chapter 1

# BASIC FINDINGS AND RECOMMENDATIONS

### The Insurance Problem

There is a serious lack of property insurance in the core areas of our nation's cities. For a number of years, many urban residents and businessmen have been unable to purchase the insurance protection they need. Now, riots and the threat of riots are aggravating the problem to an intolerable degree. Immediate steps must be taken to make insurance available to responsible persons in all areas of our cities.

### Insurance: A Necessity for Homeowners and Businessmen

Insurance is a basic necessity for a property owner. By paying a premium that represents a relatively small amount compared to the value of his home or business, an owner acquires protection against the possibility that his property may be damaged or destroyed. The opportunity for every responsible individual to obtain security for his savings and investments is vital in a free society. This requires fair access to insurance.

Without insurance, the savings of millions of individual citizens are exposed to the risk of loss from natural and man-made hazards they cannot control.

Society cannot erase the suffering of the innocent victims of fire, windstorm, theft, or riot. But it can at least provide the opportunity to obtain insurance to safeguard their capital, and thereby prevent a disastrous occurrence from becoming a permanent tragedy.

### Insurance: An Essential Force in Revitalizing Our Cities

Insurance is essential to revitalize our cities. It is a cornerstone of credit. Without insurance, banks and other financial institutions will not—and cannot—make loans. New housing cannot be constructed, and existing housing cannot be repaired. New businesses cannot be opened, and existing businesses cannot expand, or even survive.

Without insurance, buildings are left to deteriorate; services, goods, and jobs diminish. Efforts to rebuild our nation's inner cities cannot move forward. Communities without insurance are communities without hope.

1

## The Urban Core Insurance Crisis

*Unavailability and High Cost.* A great deal of evidence confirms that there is a serious lack of property insurance in our nation's inner cities. Residents and businessmen from urban core areas throughout the nation have stated that they cannot purchase the property insurance they need. Some say they cannot find insurance at all. Others say that they cannot obtain insurance at prices they are able to afford. Some who now have insurance are afraid that their insurance will be cancelled in the near future or not renewed. Many do not make legitimate claims for fear of losing the insurance they have.

In Newark, New Jersey, when a butcher was asked whether he had any insurance, he answered: "No, sir. Nobody wants to insure us. No insurance—everyone I see. I [would] give my right hand [for it]."

A Detroit, Michigan, homeowner told us:

"I was paying $85 previously for three years' coverage, and now they told me [it would cost] the same amount of money for one year."

The owner of a shoe repair store in Omaha, Nebraska, was asked whether he had insurance on his merchandise, and responded:

"No sir, not a penny * * *. [T]en days after the riot, automatically all insurance was dropped out."

These are not isolated voices.* Insurance problems have affected whole communities. At our hearings, the president of a leading savings and loan association in the Watts area of Los Angeles testified:

*A full presentation of statements received by the Panel is contained in Appendix A.

2

"Real estate activity is practically at a standstill. Residents in this curfew area, wanting to purchase property outside the area, find it almost impossible because of their inability to sell the property they presently occupy. The sale of these properties is dependent upon financing through reputable financial institutions, which are reluctant to do so because adequate fire insurance coverage is not available. * * *"

"The problems now being faced by residents of ghettos in this country are the result of long periods of discrimination, and we should not permit the results of discrimination to be used as an excuse for doing nothing. The problems of the ghetto must be solved, and we submit that a lack of adequate insurance coverage adversely affects the economy of a community."

Adequate insurance is unavailable not only in our major cities but in other areas as well. One insurance company executive said:

"[W]e emphasize that the problem is not alone that of the core areas of a limited number of metropolitan centers, but also that of hundreds of towns and cities of every size throughout America."

In order to determine the intensity of the problem, we conducted a systematic survey including personal interviews of approximately 1,500 homeowners and 1,500 businessmen in poverty areas of Boston, Cleveland, Detroit, Newark, Oakland, and St. Louis.

The survey disclosed that over 40 percent of businessmen and close to 30 percent of homeowners had serious property insurance problems.

Over 20 percent of the businessmen and 6 percent of the homeowners surveyed

did not have basic fire insurance coverage. In Boston, over 35 percent of the businessmen surveyed had no fire insurance, and in Detroit over 12 percent of the homeowners were without it.

Of those who were uninsured, 35 percent of the businessmen and over 50 percent of the homeowners said that insurance was unavailable. Close to 30 percent of the uninsured businessmen and homeowners said that insurance cost too much.

Nearly 50 percent of the businessmen surveyed had no burglary and theft insurance. In Boston the figure was 74 percent.

Of those businessmen without burglary and theft insurance, nearly 30 percent said they wanted it but it cost too much; nearly 25 percent said they wanted it but could not get it at any price.\*

*Impact of the Riot Peril.* Recent riot losses have further constricted the supply of insurance in our inner cities. Regardless of whether the management of the insurance industry anticipates rioting in the future, it feels that it must—in the interest of its policyholders and stockholders—prepare for even the remote possibility of extraordinary losses from civil disorders.

This theme has been repeatedly emphasized by a broad spectrum of insurance company spokesmen. The president of the American Insurance Association, an organization representing 170 companies, testified at our hearings:

"It is not enough merely to hope that riots will not recur and that, if they do, the damage will not be beyond the capacity of insurers to absorb in their normal operations. Watts served notice on all of us, and still the public and

---

\*The complete results of the survey are presented in Appendix A.

insurers were largely unprepared for what happened in 1967. The lesson is all too clear. I hope that we will profit by this costly experience and not be lulled into complacency and nonaction by wishful thinking that losses cannot reach catastrophic proportions."

The general manager of the American Mutual Insurance Alliance, an organization of 122 companies, told the Panel:

"Some companies are especially concerned over their exposure to the continuing threat of sporadic civil disorders. These companies are being asked to maintain existing insurance in urban areas, and so far they are doing so. But they may not be able to continue doing so, out of concern for their solvency, unless some method can be found to neutralize this excessive riot exposure. \* \* \*"

"[W]e have to recognize the possibility, however remote, that future disorders could develop large enough dimensions to threaten the future ability of insurers to meet their obligations to policyholders."

The president of the National Association of Independent Insurers, an organization representing 350 companies, testified:

"[O]ur industry does not possess either the power to forestall future riots or the ability to predict the scope and severity of any which may occur. We must therefore reckon with the possibility—whether imminent or remote—that more riots may occur, and that they might conceivably produce insurance losses far surpassing the financial capacity of the companies involved to absorb."

The industry is not the only knowl-

3

edgeable group that sees in recent riots a formidable threat to the supply of insurance and the solvency of the insurance business. Thus, the National Association of Insurance Commissioners—an organization of the insurance commissioners of the 50 states—on the basis of the studies of a select committee on the insurance problems of civil disorders has recently reported:

"The hazard of loss from riot or civil disorders viewed in the context of recent events poses grave underwriting, rating and capacity problems for the private property and casualty insurance industry. Civil unrest has manifest itself throughout many parts of our nation. Its future course is uncertain. This fact has apparently led major insurer managements and underwriters to conclude that they must either be individually relieved, in whole or in part, from exposure to these perils or guard themselves by careful control on writings in areas regarded as vulnerable. These conditions and attitudes constitute not only a deterrent to the development of programs designed to expand the availability of fire and extended coverage insurance in most cities, but threaten to result in even more serious constriction of such markets."

Insured property losses from riots in the summer of 1967 were under $75 million, far less than the $715 million loss caused by Hurricane "Betsy" in 1965 and less than 3 percent of the total property losses that will be paid for 1967. Nevertheless, the sum approximated 13 percent of the entire underwriting profit of the insurance industry in 1966.

Riot losses have further burdened those lines of insurance already relatively unprofitable and those segments of the industry already the most heavily committed to writing urban core business. Thus, even though the Panel has no doubt that the insurance industry has the financial strength to absorb losses even greater than those sustained in the summer of 1967, we believe that the industry is justifiably concerned about the threat—no matter how unlikely—of future riot losses.

Another aspect of the industry's concern, in view of the civil disorders, is uncertainty about whether it can obtain enough reinsurance—insurance purchased by insurance companies to protect themselves against excessive loss. One of the largest reinsurers in the world has informed the Panel that reinsurance will continue to be available, but at higher rates and on more restrictive terms. The insurance executive wants security against catastrophic loss just like any other businessman. As one insurance executive described the situation at our hearings:

"Still another threat to the solvency of our companies is the probability * * * that reinsurers in our country and other countries—particularly in England and the Continent—will restrict or withdraw their riot coverage. If this happens, it will mean that primary underwriters will not be able to spread their catastrophic losses for the riot peril. Such an event is in contradiction to our basic operating procedures and would further expose the solvency of the primary insurers. * * *"

"It is an inescapable fact, gentlemen, that a direct relationship exists between insurance market inadequacies and the financial capacities of our insurance companies. Our industry just

4

does not have, nor can it be expected to have, the financial structure to cope with widespread civil disorder. It cannot continue to expose its very solvency no matter how remote the recurrence of widespread rioting may be."

Executives of our nation's most respected insurance companies have stated that without some financial assistance from government to protect them against catastrophic riot losses, they will be unable to continue offering property insurance in the center city. They stress that this is a matter of urgency. As one said at our hearings:

"[W]e believe that the best and only way to induce insurance companies to provide coverage on all otherwise insurable risks is to relieve them of the exposure to catastrophic riot loss * * *. In other words, in the absence of such governmental backup, the Urban Areas Plan could result in risks which are found on inspection to be "insurable" still not finding a market because of the magnitude of the riot exposure alone."

The insurance problems created by riots cannot be allowed to jeopardize the availability of property insurance in center city areas. But the problem of providing adequate and reasonable insurance in the urban core cannot be solved merely by supplying financial assistance to protect insurance companies against catastrophic riot losses. It is clear that adequate insurance was unavailable in the urban core even before the riots. Our survey indicates that property insurance problems are severe in St. Louis—where there were no riots—as well as in Detroit; in Oakland—where riots were minor—as well as in Newark. We are dealing with an inner city insurance

problem that is broad in scope and complicated in origin, and riots are only one aspect of it.

*Factors Underlying the Crisis.* For a variety of reasons explained in detail in Chapter II, the insurance industry believes that providing insurance to homeowners and businessmen in the urban core is generally unprofitable. As a result, the insurance enterprise does not function well to meet insurance needs in these areas.

The number of insurance agents and brokers selling insurance to residents and businessmen in urban core areas is relatively small. The effort to place the business may be more time-consuming and the results less lucrative than with business from other city areas and the suburbs. Agents and brokers who seek business in urban core areas find that their applications for insurance are screened carefully by the insurance companies with which they deal. An agent who submits too many applications that a company considers too risky may have his agency contract terminated.

Many agents simply avoid urban core business. An agent in Kansas City, Missouri, told the Panel:

"Probably less than 1 percent of our premium volume comes from the areas which are generally thought to be trouble spots or potential trouble spots. One reason for this truthfully is probably that I know it is hard to place this business and not only do not solicit it but actually discourage it."

An agent in Washington, D.C., said:

"We don't have any trouble with business in blighted areas because we stay away from it. It's bad business."

The basic factor underlying the shortage of insurance in urban core areas is

**5**

that insurance companies generally regard any business in those areas as relatively unprofitable. Instead of basing their decisions to insure solely on the merits of individual properties, many companies consider the application of an inner city homeowner or businessman on the basis of the neighborhood where his property is located.

Underwriting materials sent to the Panel in response to requests for information reveal clearly that business in certain geographic territories is restricted. For example, one underwriting guide states:

"An underwriter should be aware of the following situations in his territory:

1. The blighted areas.

2. The redevelopment operations.

3. Peculiar weather conditions which might make for a concentration of windstorm or hail losses.

4. The economic makeup of the area.

5. The nature of the industries in the area, etc."

"This knowledge can be gathered by drives through the area, by talking to and visiting agents, and by following local newspapers as to incidents of crimes and fires. A good way to keep this information available and up to date is by *the use of a red line* around the questionable areas on territorial maps centrally located in the Underwriting Division for ease of reference by all Underwriting personnel." (Italics added.)

A New York City insurance agent at our hearings put it more pointedly:

"[M]ost companies mark off certain areas * * * to denote a lack of interest in business arising in these areas. In

New York these are called K.O. areas—meaning knock-out areas; in Boston they are called redline districts. Same thing—don't write the business."

The companies' motives for restricting the supply of insurance in urban core areas are not hard to find. Every company has a limited capacity to accept risks, and every company legitimately seeks to maximize profits on the insurance it writes. In doing so, company underwriters are given incentives for choosing the least hazardous risks in relation to the amount of premium charged. Thus, in attempting to select only better risks, they find it easier to block out areas considered to be blighted than to evaluate properties individually.

In considering center city properties to be relatively poor risks, insurance companies may have in mind that buildings in these areas may be older and less fire resistant than new buildings in other areas or the suburbs. They may have defective heating and electrical systems. Narrow and congested streets may hamper firemen. The density of construction and the closeness of properties may invite the spread of individual fires into conflagrations. Damage from heat, smoke, and water may be widespread.

Companies may also feel that environmental hazards generally exist. Property in excellent condition may be exposed to nearby fire risks. It may be vulnerable to unusual crime hazards. Newly-arrived residents from rural areas may be unaccustomed to the requirements of urban living. Overcrowding increases tension and antisocial behavior.

The added risk of riots, even though regarded as a remote possibility, has now prompted some companies to state that continued deterioration of the present

6

situation would make them positively unwilling to provide any insurance in urban core areas.

Yet none of these factors may be of significance with respect to any individual property. What could be regarded as generally reasonable procedures may be arbitrary and discriminatory when applied in any particular case. Applications for insurance must be considered on their individual merits if everyone is to have fair access to insurance.

**Stop-Gap Measures**

In response to the urgency of the center city insurance problem, this Panel, on September 15, 1967, called for state regulators and the insurance industry to prevent mass cancellations and nonrenewals and to halt a further constriction of the market. As a first step toward increasing the availability of insurance in center cities, we also urged the adoption and expansion of "Urban Area Plans." Under these plans, individual properties are insured unless a physical inspection discloses demonstrable reasons why the property itself cannot be insured.*

Encouraging developments are taking place. State insurance commissioners, in consultation with the industry, have taken actions to maintain existing insurance coverage. Thus, in Michigan and New Jersey, for example, commissioners have extended a moratorium against cancellations and nonrenewals and have begun to work with the industry on steps to enlarge the supply of insurance in urban core areas. Some states—for example, Illinois and Kansas—have adopted Urban Area Plans; others, such as New

*Existing Urban Area Plans and other responses to urban core insurance problems are described in Chapter III.

Jersey and Connecticut, are working to develop these and similar methods to overcome the insurance crisis. The National Association of Insurance Commissioners has made its concern a matter of record and has encouraged action to meet the problems.

Insurance companies have generally acted responsibly while awaiting the development of a more basic solution to the problem. They have not engaged in mass cancellations or nonrenewals. They have endeavored to maintain existing markets.

Despite these constructive efforts, there is great uncertainty over the future of the inner city insurance market. In some cases, the moratoria on cancellations and nonrenewals imposed by state insurance departments in the wake of the summer's riots are by their terms limited in time. Clearly, critical problems remain to be solved.

**The Urgent Need for a Comprehensive Program**

We believe that further steps must be taken immediately. We recommend that a comprehensive and affirmative program be placed into operation at once. The resources and talents of the insurance industry and of local, state and federal governments must be marshalled to assure property owners everywhere fair access to insurance.

Unless bold and cooperative action is taken without delay, the problems of insurance availability will only become more serious, and solutions will be even more difficult to achieve.

Some representatives of insurance companies have said that if the underlying problems of urban blight were corrected, insurance would be readily avail-

7

able. But if insurance were more readily available for property that is adequately maintained, the underlying problems of urban blight would be more readily corrected.

Owners of well-maintained homes and businesses in urban core areas should not be asked to wait for better days to come. Indeed, they will not wait—those who can will move out at the first opportunity. Those who do not move will have less incentive to keep up their properties. Insurance must be made available now.

Yet any workable program must take other realities into account. Insurance companies are legitimately interested in profits and in maintaining their financial safety and stability. They therefore seek to avoid high risks. The states are already burdened with urgent demands on their resources. The federal government's responsibilities already more than match its tax revenues.

We believe that a successful program can be designed to operate within the context of the existing structure of the insurance industry and the existing pattern of state regulation and taxation of the insurance industry.

We believe also that federal measures

should support rather than supplant local efforts. Action by the federal government should encourage and assist those with front-line responsibilities.

We are convinced that the solution of the insurance problem of the center cities lies in the cooperative efforts of all who are involved. No single interested segment—the insurance industry, local, state and federal governments, or the residents and businessmen of the urban core—can, acting alone, ameliorate the complex and interdependent conditions that cause this problem.

All must accept a measure of responsibility. By doing so, the insurance crisis can be met.

The principal alternative to this approach is for government itself to provide insurance directly. We believe that so marked a departure from the free enterprise insurance system is unjustified at this time. We have confidence in the strength of the insurance industry and the abilities of the state insurance departments. We feel that they can, with limited federal assistance, meet the challenge posed by the critical insurance needs of our center cities.

## Summary of Recommendations*

We propose a five-part program of mutually supporting actions to be undertaken immediately by all who have a responsibility for solving the problem:

—We call upon the insurance industry to take the lead in establishing volun-

tary plans in all states to assure all property owners fair access to property insurance.

—We look to the states to cooperate with the industry in establishing these plans; and to supplement the plans, to whatever extent may be necessary, by organizing insurance pools and taking

*Chapter IV explains these recommendations in greater detail and contains information that will be helpful for those who have the responsibility of implementing them.

8

other steps to facilitate the insuring of urban core properties.

—We urge that the federal government enact legislation creating a National Insurance Development Corporation (NIDC) to assist the insurance industry and the states in achieving the important goal of providing adequate insurance for inner cities. Through the NIDC, the state and federal governments can provide backup for the remote contingency of very large riot losses.

—We recommend that the federal government enact tax deferral measures to increase the capacity of the insurance industry to absorb the financial costs of the program.

—We suggest a series of other necessary steps to meet the special needs of the inner city insurance market—for example, programs to train agents and brokers from the core areas; to assure the absence of discrimination in insurance company employment on racial or other grounds; and to seek out better methods of preventing losses and of marketing insurance in low income areas.

The fundamental thrust of our program is cooperative action. Thus, only those companies that participate in plans and pools at the local level, and only those states that take action to implement the program, will be eligible to receive the benefits provided by the National Insurance Development Corporation and by the federal tax deferral measures. We firmly believe that all concerned must work together to meet the urban insurance crisis. Everyone must contribute; no one should escape responsibility.

Our specific recommendations for a five-part program are:

## A. FAIR Plans

We recommend that the insurance industry, in cooperation with the states, institute in all states plans establishing fair access to insurance requirements (FAIR Plans).

A FAIR Plan assures every property owner in a state:

—Inspection of his property;

—Written notice of any improvements or loss prevention measures that may be required to make his property insurable; and

—Insurance if the property is adequately maintained according to reasonable insurance standards.

FAIR Plans make these assurances applicable to:

—All dwellings and commercial risks, including buildings and contents;

and for these basic lines of insurance:

—Fire and extended coverage (damages from wind, hail, explosion, riot, civil commotion, aircraft, vehicle, and smoke);

—Vandalism and malicious mischief; and

—Burglary and theft.

FAIR Plans envision a substantial expansion of Urban Area Plans that have been in operation on a limited scale since 1960. Urban Area Plans generally cover only residential properties in limited geographical areas, offer only fire and extended coverage insurance, and have procedural inadequacies. Experience with Urban Area Plans demonstrates their promise, but also exposes their limitations. FAIR Plans will fulfill that promise.

One of the most notable extensions FAIR Plans will make over Urban Area

9

Plans is to provide burglarly and theft insurance as well as fire and extended coverage. What is commonly termed "burglary and theft insurance" encompasses a multitude of different coverages, each presenting difficult underwriting problems. This line of insurance has been a very minor part of total industry writings. It has been much more expensive to market, and increasing crime rates are making it even more expensive. The problems of burglary and theft insurance have received relatively little study, and the potential for improvement is great. While the ultimate answer to the problem lies in the reduction of crime and in loss prevention, FAIR Plans can provide the incentive to insurance companies to develop innovations in the burglary and theft line that will make the basic coverages more available to the public.

The major differences between Urban Area Plans and FAIR Plans have led us to formulate the new name, which has the added merit of conveying to the public the overriding purpose of the Plans.

We believe that FAIR Plans will:

—End the practice of "red-lining" neighborhoods and eliminate other restrictive activities;

—Secure for all property owners equitable access to all basic lines of property insurance; and

—Encourage property improvement and loss prevention by responsible owners.

FAIR Plans will also furnish accurate information to local and state governments on neighborhoods and on the condition of individual properties in poverty areas. We strongly urge forceful action at local levels to remedy the known environmental hazards of these areas. Action should include the development and enforcement of effective building and fire codes, the provision of more adequate police and fire protection, and the improvement of health, safety and related local services.

If the information produced by FAIR Plans leads to constructive governmental action, environmental hazards, which generate many of the insurance problems that make the FAIR Plans necessary, will be removed. Thus, FAIR Plans contain, in themselves, a broader implication. They serve as a stimulus to cure the basic conditions which have created the need for FAIR Plans at this time.

We recognize that the successful operation of FAIR Plans depends to a large extent on a sincere effort on the part of each insurance company to accept center city insurance risks.

We are confident that the insurance industry will take the steps required to help solve what is not only a complex and troublesome insurance problem, but a profound social problem.

FAIR Plans establish minimum standards that are essential to overcome center city insurance problems. Every state will develop and implement a plan in conformance with its own local institutions, and every state may, indeed, establish criteria beyond those suggested by the Panel.

The rates for insuring properties are an important aspect of FAIR Plans. Since the regulation of insurance rates is a state function, the states will bear the responsibility for the rates payable for properties insured under FAIR Plans.

We urge that, insofar as possible, the level of rates generally applicable in a state also apply to properties insured under FAIR Plans. Surcharges, if needed, should be permitted only for

10

demonstrable hazards of the property itself. Wherever possible, there should be no additional rate for environmental hazards.

We recognize the need for flexible and adequate rates. A risk must bear an appropriate rate; if a property is significantly more hazardous than average, it must yield a commensurately higher premium. Nevertheless, we hope that the states will consider placing a maximum limit on surcharges. Excessive or discriminatory rates must not be permitted to undermine the goals of the FAIR Plan.

## B. State Pools or Other Facilities

We recommend that states, in cooperation with the insurance industry, form pools of insurance companies (or other facilities) to make insurance available for insurable properties that do not receive coverage under the FAIR Plans.

State pools will supplement FAIR Plans. Some owners of well-maintained property will be unable to obtain insurance even after an inspection under the FAIR Plan. Although the property itself is in good condition, it may be adjacent to an extremely high fire risk, exposed to unusual crime hazards, or subject to other environmental hazards which presently make property uninsurable.

Owners of these properties, usually declined by individual insurance companies, must have fair access to insurance. The responsible owner who cares for his property must not be penalized because of his neighborhood. He must not be denied insurance for reasons beyond his control. To do so not only treats him unfairly, but encourages the spread of urban blight.

It is important to recognize the distinction between this property and un-insurable property that itself is in hazardous condition and cannot or will not be repaired by the owner. Uninsurable property of this latter sort should not be insured, but should, instead, be the object of renewal programs designed to revitalize blighted areas.

We recommend that state insurance pools be formed where necessary to insure well-maintained property, regardless of its location. A pool is an association of insurance companies that agree to share income, expenses and losses according to a predetermined arrangement. A pool may be voluntary if all but an insignificant part of the industry participates. In some states it may have to be mandatory to obtain the broad industry participation that is necessary.

State pools will:

—Guarantee to the property owner insurance if his property meets insurable standards, even when his property is subjected to environmental hazards;

—Provide a method of spreading equitably throughout the insurance industry the risks from environmental hazards unacceptable to a single company;

—Create a convenient facility for government financial assistance if it is needed to provide insurance for these risks.

Some states may well choose a different method to achieve the same results expected from pools. They may elect some other arrangement more suitable to their own local institutions—for example, a state insurance company to underwrite the properties directly or a state insurance fund to provide reinsurance for these risks. The point is, state pools or

11

some other facility may be needed to achieve the goals of the FAIR Plans.

In some states, properties adversely affected by environmental hazards may be insignificant in number. They may be insured without the necessity of organizing a state pool. Diligent effort exercised by property owners and social responsibility exercised by state officials and the insurance industry—for example, by modifying underwriting standards—may succeed in providing adequate insurance through the FAIR Plans alone.

States that are uncertain whether a pool is necessary may wish to wait a year or two until they evaluate the data developed under their FAIR Plan. In this case, they would have the benefit of the experience of those states that have moved forward more rapidly with pool arrangements.

We recognize that very little is known about insuring core area risks under a pool arrangement. The experience of the Watts Pool is helpful; but since that pool is restricted to fire insurance at highly surcharged rates for commercial properties in a limited geographic area, it is not necessarily a model that can be used generally. Pooling, however, is a standard insurance arrangement, and there is every reason to expect that it can function effectively to handle center city insurance problems.

The underwriting standards of the pool should be set by the state insurance department after consulting with the insurance industry. All properties meeting reasonable standards of insurability should be accepted regardless of environmental hazards.

It is recognized that deductibles and other limits on liability may be needed

in making insurance available through a pool.

Rates for property insured in the pool will be regulated by the states. Each state will determine its own appropriate pattern of rates. We recognize that flexible rates may be necessary. But we urge that the pool charge no additional rate for environmental hazards, and that, if surcharges are needed, they be subjected to a maximum limit in order to keep the premium costs within the means of the urban core resident.

It may well be that intensive loss prevention and educational campaigns, deductibles and other similar insurance devices, as well as prudent pool management, can make the pool profitable over a reasonable period of time.

We recognize, however, that the rates charged for pool risks and the type of risks undertaken by the pool may make recurring losses inevitable. Handling these losses might be resolved in a number of ways. If rates are adequate throughout a state to permit substantial profits by companies generally, companies might be assessed some portion of their underwriting income on non-pool property. Or, a state might itself provide funds from premium taxes or general revenues and subsidize to a certain extent the risks in the pool. Just as a state provides funds for other programs designed to revitalize core areas, it could consider its insurance pool as a related undertaking.

Another alternative for covering pool losses is for the state pool to apply to the National Insurance Development Corporation for financial backing against losses. In this event, federal as well as state funds would be available to spread the cost of subsidization.

12

## C. National Insurance Development Corporation

We recommend that the federal government charter a National Insurance Development Corporation (NIDC) to undertake responsibility for a variety of vital but unfulfilled functions in support of the actions of private industry and states in the operations of FAIR Plans and state pools.

The National Insurance Development Corporation would have no shareholders, but rather directors appointed by the President and representing all the parties vitally interested in the inner city insurance problem—residents of urban cores, insurance industry representatives, state officials (including state regulators), federal officials, and members of the public. It would not seek to make a profit but to discharge important functions in making insurance more widely available to the public.

The Corporation would discharge these functions:

—Provide reinsurance against the risk of extraordinary loss from civil disorders, and thereby remove the burden from a single group of persons or segment of the insurance industry;

—Provide a source of reinsurance for state pools;

—Assess the performance of FAIR Plans, state pools, and other insurance programs designed to deal with the problems of the inner cities, by gathering information, analyzing data, and preparing studies for the benefit of the public, the industry, and government.

At the present time, standard insurance policies in many lines of insurance include coverage against loss from riots. We strongly believe that the insurance industry should continue to include this riot coverage in all lines of insurance in which it presently exists.

We believe that the riot risk should, however, be neutralized as a factor hampering the underwriting of insurance in center cities and the placement of private reinsurance. Accordingly, the NIDC would issue riot reinsurance to member companies which are participating fully in FAIR Plans and, where they exist, in state pools.

Any company desiring this riot reinsurance would pay a premium to the NIDC. The premiums paid in will provide a fund from which to pay losses should they occur. The companies would retain the primary coverage of riot damage. The NIDC reinsurance would cover only the contingency of very large losses.

Maintaining law and order is primarily a state and local responsibility. Thus, any state desiring reinsurance for riot risks located in that state would be required to accept a state layer of financial backup of some kind in the event that disorders actually take place in that state.

To the extent that losses on reinsured policies exceed the fund accumulated by company premiums and state contributions, the NIDC would have authority to borrow from the Federal Treasury amounts needed to pay for losses in excess of its assets up to whatever limit may be prescribed by Congress. The borrowings would be repaid by subsequent accumulations of premiums or by Congressional appropriations.

In addition, we recognize that there is great uncertainty as to how state pools

13

will function, and how their financial aspects will be handled. We feel strongly, however, that pools should be undertaken now where they are required to meet urban core insurance problems. To aid the operation of state pools, the NIDC could receive direct appropriations for the purpose of helping the pools achieve their important objectives.

Finally, we recognize that our proposed program, like all new measures, will not be put into operation without difficulties. The program needs to be monitored to see that it is accomplishing its objectives, and this might best be undertaken by the NIDC.

The monitoring function includes:

—Collecting statistics on the operation of FAIR Plans and the state pools.

—Conducting surveys and studies in cooperation with state insurance departments and the insurance industry to assure that the program is achieving its objectives.

—Gathering statistics and preparing studies of reinsurance—especially alien reinsurance—and of direct insurance placed abroad.

—Publishing the results of studies and surveys and providing information and analysis to the public, the insurance industry, and state and federal governments.

—Making recommendations for any changes needed in the program to achieve its purposes.

## D. Tax Deferral Measures

We recommend federal legislation authorizing tax deferral measures to permit insurance companies participating in FAIR Plans and, where they exist, in

state pools, to accumulate, as quickly as possible, more adequate reserves for "catastrophe losses."

Federal tax measures would operate as follows:

—The federal government would defer tax on any amount placed by insurance companies in special reserves to meet catastrophe losses. Any company desiring tax deferral must participate in FAIR Plans and, where they exist, in state pools.

—That portion of the special reserve that would otherwise have been paid in taxes to the federal government would instead be invested in interest-free, non-transferable United States Treasury securities. Should the companies incur catastrophe losses, these securities could be redeemed for cash, which would then be available to pay the losses.

—Limits would be placed on the amount of funds that could be accumulated in the tax-deferred reserves. Funds set aside in pools and in special reserves which are later returned to the companies for general use would become taxable at the time of the return.

The states would authorize, within these limits, whatever reserves and premiums they determined to be desirable and appropriate. This action would trigger the federal tax deferral.

The Panel believes that when sufficient reserves are accumulated, the financial backup of government against catastrophe losses may no longer be necessary. Tax deferral measures therefore contain the promise of phasing out governmental support and restoring the entire enterprise to private hands.

14

## E. Other Necessary Steps

We recommend other measures to meet special problems of the urban core insurance market, specifically:

1. *Manpower Training Programs* to be sponsored by government to train residents of blighted areas as agents and brokers with special competence to handle the insurance needs of center city areas.

2. *Recruitment and Training Programs* to be expanded by insurance companies in order to attract residents of center city areas to fill personnel needs at all levels of the business.

3. *More Economical Methods of Marketing Insurance* to be studied by the insurance industry; for example, new forms of contracts, as well as new marketing and underwriting techniques designed to improve the insurance market in center cities.

4. *Better Procedures to Handle Policyholder Complaints* to be developed by state insurance departments in order to have better records of complaints, cancellations, nonrenewals, and other statistics that measure insurance company performance.

5. *Research Programs* to be established by the insurance industry in cooperation with state pools and government to develop new loss prevention techniques and other methods of improving the insurance market in center city areas.

6. *More Refined Statistics* to be compiled by rating bureaus and insurance companies on loss experience in order to facilitate rate regulation and loss prevention.

7. *Lending Programs* to be accelerated in the urban core with particular attention to providing needed funds to small businessmen and other property owners for removal and control of fire and crime hazards.

8. *Contractors' Bid and Performance Bonds for Urban Core Businessmen* to be made more readily available to encourage construction work in these areas.

15

## Chapter II

## THE INSURANCE ENTERPRISE AND THE URBAN CORE MARKET

Insurance is first of all a business. Property owners seeking to protect themselves against financial loss purchase a policy from an insurance company. Insurance companies and their shareholders legitimately expect to make a profit by selling the policy.

But insurance is more than a business. A society based on private ownership of property requires an insurance enterprise that functions effectively. The social purposes achieved by insurance are vital to the growth and prosperity of America.

Insurance is a complex enterprise. The purpose of this chapter is to describe the major aspects of the property insurance business in the United States as they relate to urban core problems. A description of how insurance operates requires an analysis of many interrelated elements. An understanding of these elements is essential for a proper evaluation of the nature and causes of the insurance crisis of our cities and for developing a program to meet that crisis.

## The Nature of Insurance

By making a payment, called a premium, a property owner purchases protection against the risk of having his home or business damaged or destroyed by a natural phenomenon or human act. He is thereby insured.

The premium an insured pays is a relatively small amount compared to the value of his home or business. If a loss actually occurs for which the owner is insured, he makes a claim for reimbursement to the extent of his loss. The repayment he then receives enables him to repair and restore his property.

If a person wishes to purchase or improve property and seeks a loan for this purpose, he must assure his creditor that the property is insured. Otherwise, the lender has no security for the amount of his loan in the event that the property is destroyed.

Thus, insurance provides financial protection and psychological security to the individual homeowner and businessman, and satisfies a primary requirement for credit.

The insured purchases a policy from and pays his premium to an insurance company. The premiums collected by the company from the insureds create a fund large enough to pay the unfortunate few who actually suffer losses.

17

It is certain that some insureds will suffer losses; but most will not. What the company does is to distribute the losses of the few among the relatively large group of people who pay premiums. In effect, the small premium paid by each insured is his share of the total losses of the group.

## Limitations of the Insurance Process

Life is full of risks, avoidable and unavoidable. Risks may result in financial losses, large or small. Insurance, like prevention, is one way to protect against these losses.

Private insurance companies are unable to insure against every kind of loss. Losses incapable of exact identification are uninsurable. In this category are small theft and pilferage losses sustained by retail merchants, who cannot always ascertain and differentiate them from losses the result of, for example, bookkeeping errors.

Small and recurring losses, even if capable of exact identification, are uneconomical to insure, for the benefits do not justify the expense of insurance. Individual owners and businessmen absorb these losses by budgeting for them in the same way as for normal operating expenses. In insurance terminology, this is called self-assumption.

Self-assumption may be only partial. It can be combined with insurance through the use of deductibles—the property owner assumes a small specified amount of loss before the insurance company pays. Thus, minor windstorm losses are generally subject to a $50 deductible. The loss of $50 of shingles remains with the owner; the loss of a $1,000 roof is covered by $950 of insurance.

If a risk is expected to produce large and frequent losses, it is also uninsurable. Insurance is only practical when the probability of loss (and hence the premium charged) is relatively small. People do not want to pay $500 for $1,000 worth of insurance. Many face this pattern with respect to theft insurance.

Risks of widespread catastrophic loss are also uninsurable, for should they occur, an insurance company would lack the funds to reimburse the insureds. Thus, there is no insurance by private companies for damages from war or revolution.

Since an insurer must predict future losses with some precision, it finds some risks uninsurable because it has no way of predicting their occurrence. When risks are both incalculable in nature and possibly catastrophic in scope, an insurance company cannot take the chance of accepting the liability. An example is the unlimited risk involved in the possibility of a major nuclear accident resulting from an atomic reactor.

The insurance process depends to a large degree on statistics and actuarial calculations, but it is not a science. What is considered insurable is essentially a matter of judgment on the part of the insurer. Whether the insurer is correct will ultimately affect its financial stability and the service it provides.

If premiums are commensurate with the risks being covered, the industry is operating on a financially sound basis. When it is socially desirable or necessary to insure a risk that cannot be handled by the private insurance process, a government program may be necessary.

This may be the case if the expected losses are regarded as too great to be assumed by private insurers, or if the premiums are beyond the financial capacity of the potential insureds. In cases where public policy demands that the protection nonetheless be provided, this can be accomplished by coordinated efforts on the part of private companies, by the government itself, by a government program administered by the private industry, or by private enterprise with governmental backing. There are precedents for all varieties of insurance programs that supplement the private insurance enterprise to achieve basic social goals.

## Major Types of Property Insurance

The property insurance coverages important to urban insurance problems have traditionally been marketed on a mass basis by private insurance companies.

### Fire Insurance and Allied Lines

*In General.* Except for property depreciation and obsolescence, which are regarded as normal

**18**

operating expenses, fire represents the greatest single cause of physical loss to property. In 1966, fires were responsible for more than $1.9 billion of property damage in the United States. It is estimated for 1967 the figure may approximate $2 billion.

Fire insurance is considered the basic form of protection for buildings and their contents. It is the foundation for other coverages that are obtained either by amendments, called endorsements, to the fire policy, or by a broader policy coverage—for example, all risks—that includes fire within a larger category of risks.

*Extended Coverage Endorsement.* The most important endorsement to a fire insurance policy is called extended coverage. Although priced separately, it is generally an integral part of the fire insurance policy and is usually sold as a unit together with fire coverage.

The extended coverage endorsement provides protection against damages arising from windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, and smoke.

By far the most important of these risks has been windstorm, which includes hurricanes, tornadoes, and hail storms. Of approximately 200 catastrophic losses of $1 million or more that have occurred since January 1, 1953, involving fire and extended coverage policies, all but 11 were caused by windstorm. Hurricane "Betsy" in 1965 alone accounted for $715 million in insured property losses—a sum far larger than the total premiums collected that year for extended coverage.

The other risks covered have been of lesser importance, except for the riot and civil commotion coverage, which has become significant in recent years. The approximate $50 to $75 million total of insured losses in 1967 from riots represent about 10 to 15 percent of total extended coverage premiums.

The coverage granted by a particular endorsement is defined technically and is not always apparent from the name of the perils listed. For example, "smoke" is carefully defined in the extended coverage endorsement and excludes damage from fireplaces and industrial apparatus.

Riot, together with civil commotion, is not specifically defined. The endorsement usually indicates only that:

> Loss by riot, riot attending a strike or civil commotion shall include direct loss by acts of striking employees of the owner or tenant

of the described building while occupied by said striking employees and shall also include direct loss from pillage and looting occurring during and at the immediate place of a riot, riot attending a strike or civil commotion.

Policyholders must thus look to state law for a definition of riot. In some states, riot is defined for insurance purposes by statute; in others, the definition has been developed by the courts through case law. In most, the definition is much like the following:

> 'A tumultous disturbance of the peace by three persons or more assembling of their own authority with an intent mutually to assist one another against anyone who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner to the terror of the people, whether the act intended were of itself lawful or unlawful;' quoted from 8 R.C.L. 330 in *Symonds v. State*, 66 Okla. Cr. 49, 54, 88 P. 2d 970, 973 (1939).

Although insurance policies cover losses caused by riots, virtually all property insurance contracts specifically exclude losses caused by insurrection. Like the terms "riot" and "civil commotion," the term "insurrection" is not defined in the standard policy. Hence, the policyholder must look to statutory or common law definitions.

The cases that have interpreted "insurrection" in its insurance context have generally defined it to mean an organized and violent uprising against lawful authority, with the intention of overthrowing and replacing the existing government. A leading case holds: "to constitute an insurrection or rebellion within the meaning of these policies, there must have been a movement accompanied by action specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof" (*Home Ins. Co.* v. *Davila*, 212 F.2d 731, 736 (C.A. 1, 1954)).

Insurance companies have made no attempt to avoid paying claims arising from the recent disorders by calling them acts of insurrection.

*Vandalism and Malicious Mischief Endorsement.* When property is destroyed by persons acting willfully but without the open defiance of authority and the tumult associated with riot, the loss is generally considered to be caused by vandal-

**19**

ism or malicious mischief. This endorsement is important in borderline situations that might fall short of meeting the definition of riot. It also takes care of other kinds of losses, for example, a brick thrown through a window of a home by a juvenile.

*Allied Lines.* The two endorsements, extended coverage and vandalism and malicious mischief, are called allied lines of the fire insurance coverage, because they are usually sold with the fire policy. Other allied lines are, for example, sprinkler leakage insurance and earthquake insurance.

*Package Policies.* Package policies are often written to cover a variety of liability and other risks in addition to fire and allied lines. They are usually multiple line policies, in that they include fire and marine lines as well as casualty lines. Package policies represent a development in direct response to demands for more complete protection in a simplified format. They are a convenient way of providing fire and allied lines coverage and represent the direction of future market developments. Written for homeowners, commercial establishments, and institutions, they increased—in terms of premiums collected—about eightfold between 1957 and 1966.

Package policies are most commonly used to insure low-hazard property and are less important in blighted areas of a city than in other areas or the suburbs. One of the reasons is that companies carefully assess the basic coverages in blighted areas and are unwilling to add coverages that may increase exposure without a truly commensurate premium.

## Crime Insurance

*Burglary and Theft Lines.* Reported and unreported crime losses to property have been estimated at almost $4 billion a year. Whatever the real magnitude of property losses from criminal activity, crime insurance is viewed by those exposed to loss as an essential protection. Losses from criminal acts are insured under burglary and theft policies. Coverage is provided under these policies for burglary (breaking and entering), robbery (forcible taking from a person), theft or larceny (unlawful taking of property, including embezzlement) and similar acts that cause destruction and disappearance of property under circumstances that indicate criminal activity. Fidelity coverages

protect against loss from the dishonesty of employees and of others in positions of trust.

Burglary and theft are defined in different ways by various insurance contracts. Insurance policies establish their own contractual definitions for crime, which may differ from definitions commonly employed for purposes of the criminal law.

Burglary and theft insurance may be written as a separate policy or be included in a broader package or multiple peril policy. Special burglary and theft contracts have been designed for homeowners and tenants. The homeowners policy, for example, specifically covers burglary and theft.

A businessman might want protection against only some kinds of criminal acts depending upon the nature of his business and how large a premium he wants or is able to pay. Each kind of coverage carries its own price. The size of stock or inventory, the amount of money kept on the premises during and after business hours, and various other factors are important in determining desired coverages.

For example, a grocer generally wants a mercantile open stock burglary policy to protect his merchandise. He may also want a mercantile robbery policy, which covers the loss of money, securities, and other valuable property.

A storekeeper's burglary and robbery policy has been created to cover seven different kinds of protection in a single contract. It includes, for example, protection against burglary, robbery, employee dishonesty, and damage to premises.

*Plate Glass.* Plate glass protection, though usually not considered crime insurance, is often sought in conjunction with it to protect against store window breakage. Glass insurers normally replace the broken glass instead of paying claims in cash, and the insurance may be purchased more for this convenience than for the financial protection which characterizes most insurance transactions.

## Relative Importance of Major Lines

Fire insurance produces the largest premium volume of the property lines. In 1966, fire premiums were $1.6 billion compared with $479 million for extended coverage, $197 million for other allied lines (including vandalism and malicious mischief), $110 million for burglary and theft, and $42 million for plate glass. Fire and other prop-

20

TABLE 1. NET PROPERTY-LIABILITY INSURANCE PREMIUMS WRITTEN,[1] 1964–66

[In millions]

|  | 1964 | 1965 | 1966 |
|---|---|---|---|
| Auto bodily injury liability | $3, 515 | $3, 871 | $4, 280 |
| Auto property damage liability | 1, 372 | 1, 553 | 1, 766 |
| Physical damage (auto) | 2, 509 | 2, 861 | 3, 258 |
| Liability (other than auto) | 1, 111 | 1, 137 | 1, 205 |
| Fire insurance | 1, 534 | 1, 548 | 1, 606 |
| Extended coverage | 490 | 481 | 479 |
| Other allied lines | 188 | 186 | 197 |
| Homeowners multiple peril | 1, 333 | 1, 523 | 1, 703 |
| Commercial multiple peril | 371 | 509 | 649 |
| Workmen's compensation | 1, 868 | 2, 042 | 2, 348 |
| Inland marine | 455 | 489 | 520 |
| Ocean marine | 248 | 262 | 295 |
| Surety and fidelity | 392 | 409 | 448 |
| Burglary and theft | 111 | 110 | 110 |
| Boiler and machinery | 103 | 91 | 91 |
| Glass | 42 | 41 | 42 |

[1] Net premiums written represent premium income retained by insurance companies, direct or through reinsurance, less payments made for business reinsured.

SOURCE: *Best's Aggregates and Averages*, 1967, pp. 141–144, 209–212.

erty insurance is also included in multiple peril policies, which for both dwellings and commercial properties accounted for $2.4 billion in 1966. Premium volume for all property-liability lines is presented in Table 1.

Tables 2 and 3 show comparative proportions of these lines over time by considering them as percentages of the total premium volume of stock and mutual insurance companies, respectively. Fire represented 8.69 percent of the stock companies' overall premium volume and 4.91 percent of the mutual companies' in 1966. When fire, extended coverage, and other allied lines are included, these figures increase to 12.15 percent and 7.5 percent respectively. Burglary and theft represented only 0.64 percent of stock premium volume and 0.21 percent of mutual premium volume. The comparable percentages for plate glass were 0.24 and 0.11.

TABLE 2. STOCK COMPANY PREMIUMS WRITTEN BY SELECTED LINES, 1957–1966

[In millions]

| Year | Total premiums | Fire | Percent | Extended coverage | Percent | Other allied lines | Percent | Burglary and theft | Percent | Glass | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1966 | $15, 197 | $1, 321 | 8. 69 | $394 | 2. 59 | $132 | 0. 87 | $98 | 0. 64 | $36 | 0. 24 |
| 1965 | 13, 855 | 1, 272 | 9. 18 | 398 | 2. 87 | 126 | . 91 | 98 | . 71 | 35 | . 25 |
| 1964 | 12, 648 | 1, 259 | 9. 95 | 406 | 3. 21 | 130 | 1. 03 | 100 | . 79 | 36 | . 28 |
| 1963 | 11, 881 | 1, 288 | 10. 84 | 415 | 3. 50 | 142 | 1. 20 | 106 | . 89 | 39 | . 33 |
| 1962 | 11, 599 | 1, 356 | 11. 70 | 441 | 3. 80 | 141 | 1. 21 | 104 | . 90 | 36 | . 31 |
| 1961 | 10, 783 | 1, 337 | 12. 40 | 449 | 4. 16 | 123 | 1. 14 | 104 | . 97 | 37 | . 35 |
| 1960 | 10, 527 | 1, 387 | 13. 18 | 480 | 4. 56 | 122 | 1. 16 | 106 | 1. 01 | 42 | . 40 |
| 1959 | 9, 931 | 1, 434 | 14. 44 | 532 | 5. 35 | 110 | 1. 10 | 107 | 1. 08 | 35 | . 35 |
| 1958 | 9, 077 | 1, 363 | 15. 01 | 526 | 5 79 | 105 | 1. 15 | 100 | 1. 10 | 34 | . 37 |
| 1957 | 8, 640 | 1, 336 | 15. 45 | 511 | 5. 92 | 97 | 1. 12 | 106 | 1. 23 | 41 | . 47 |

SOURCE: *Best's Aggregates and Averages*, 1967, pp. 34–35.

21

TABLE 3. MUTUAL COMPANY PREMIUMS WRITTEN BY SELECTED LINES, 1957–66

[In millions]

| Year | Total premiums | Fire | Per-cent | Ex-tended cover-age | Per-cent | Other allied lines | Per-cent | Bur-glary and theft | Per-cent | Glass | Per-cent |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1966 | $5,788 | $284 | 4.91 | $84 | 1.46 | $65 | 1.13 | $12 | 0.21 | $6 | 0.11 |
| 1965 | 5,196 | 276 | 5.31 | 83 | 1.61 | 60 | 1.16 | 11 | .22 | 6 | .12 |
| 1964 | 4,767 | 275 | 5.76 | 84 | 1.77 | 59 | 1.23 | 11 | .23 | 6 | .13 |
| 1963 | 4,447 | 284 | 6.38 | 87 | 1.95 | 54 | 1.22 | 12 | .26 | 6 | .13 |
| 1962 | 4,038 | 267 | 6.60 | 82 | 2.02 | 53 | 1.31 | 11 | .26 | 6 | .14 |
| 1961 | 3,945 | 282 | 7.14 | 91 | 2.30 | 47 | 1.19 | 10 | .26 | 5 | .14 |
| 1960 | 3,723 | 280 | 7.52 | 94 | 2.52 | 43 | 1.15 | 10 | .27 | 5 | .15 |
| 1959 | 3,475 | 276 | 7.93 | 101 | 2.90 | 38 | 1.10 | 9 | .27 | 5 | .14 |
| 1958 | 3,120 | 263 | 8.45 | 100 | 3.22 | 36 | 1.15 | 9 | .29 | 5 | .15 |
| 1957 | 2,890 | 258 | 8.94 | 98 | 3.37 | 34 | 1.17 | 8 | .28 | 5 | .17 |

SOURCE: *Best's Aggregates and Averages*, 1967, p. 191.

About 70 percent of insured Detroit and Newark riot losses were paid under fire and extended coverage contracts, according to a study by the National Insurance Actuarial and Statistical Association. The next largest losses were under commercial multiple peril and inland marine policies, in that order. Losses were much lighter under burglary and theft, homeowners multiple peril, glass, automobile physical damage, and other allied lines.

Burglary and theft premiums tend to be higher than fire and allied lines premiums for equivalent amounts of insurance. This reflects the higher frequency of crime losses and the higher expenses associated with the marketing of burglary and theft insurance.

The relatively high cost of burglary and theft insurance creates underwriting problems. It makes the protection attractive only to those most exposed to loss. This raises loss ratios and in turn premiums, which makes it still less attractive to the

less exposed risks. This cycle, if allowed to proceed unchecked, may make the burglary and theft perils virtually uninsurable. When only the most exposed want the coverage, premiums soon become too high even for them.

There are, however, underwriting techniques such as deductibles, packaging of coverages, and requirements for protective devices that can overcome some of the tendencies toward uninsurability. Much can be done by research, loss prevention, and policy design, to make the line more readily available at a lower price.

Plate glass insurance generally protects against relatively small and budgetable losses, in contrast to the other two lines. The maximum probable plate glass loss is rarely, if ever, catastrophic. As a result, plate glass generates relatively little premium volume and is not considered as important to the typical insured as the other two lines.

## Structure of the Industry

### In General

By any yardstick, the insurance industry is one of the largest enterprises in the United States. It has assets of more than $208.2 billion. Its premium income in 1966 was almost $50 billion.

The insurance enterprise is divided into two main branches: life insurance and property-

liability insurance. Our focus is on the latter.

At the end of 1966, the property-liability insurance industry had assets of about $41 billion. It premium income in 1966 was $22 billion.

Automobile insurance, which is outside the scope of our inquiry, represented the single largest segment—over $9 billion of total premium volume—of this branch of the industry in 1966. Propert

22

lines, of special importance to the urban core insurance problem, were the next largest segment with premiums of over $5 billion in 1966.

## Characteristics of Insurance Companies

There are approximately 3,000 insurance companies with home offices in every state and in the District of Columbia. Some are giants, some are small family firms, and some are controlled affiliates of industrial businesses.

Insurance companies vary greatly in the manner of their operation. The pattern of the insurance industry can be understood by considering these characteristics of companies: (1) the lines of insurance they write, (2) their intercorporate relationships, (3) their legal form of organization, (4) their marketing methods and strategy, (5) their pricing policies, (6) their regulatory status, and (7) their reinsurance activities.

*Lines of Insurance Written.* Companies are described by the types—or "lines"—of insurance they write. A company writing only life, automobile, or fire insurance is described, accordingly, as a life, automobile, or fire insurance company. In recent years, companies increasingly have tended to write all or most of the property-liability lines—and they are called multiple-line companies.

Insurance coverages have developed in separate lines for a host of historical and legal reasons. Laws still generally prohibit a single company from writing both life and property-liability insurance; a company wishing to do both must form a subsidiary or related corporation to carry on a branch of the business. Most of the largest property-liability insurers have life affiliates.

*Intercorporate Relationships.* To broaden their markets and to accomplish other legal and financial objectives, companies often operate as members of a group or fleet of companies doing business under common ownership or management. The importance of groups may be gauged from the fact that the twenty largest groups write over half of the total premium volume of the entire industry.

Insurers have recently started to form holding companies to expand their operations into other fields. A corporate parent may now be involved in insurance, mutual funds, consumer finance, and other businesses related, as well as unrelated, to insurance.

*Legal Form of Organization.* Insurers are organized as stock companies, mutuals, reciprocals, or Lloyd's associations.

*Stock companies.* A stock company is a corporation owned and controlled by stockholders who seek a profit on their investment. Stock companies number about 800 and are the largest factor in the property-liability business. They account for about 70 percent of aggregate premiums and 75 percent of assets of the entire industry. Fourteen of the twenty largest property-liability insurance groups are organized as stock companies. Shares of most of the large stock companies are traded in the over-the-counter securities market.

*Mutuals.* A mutual is a corporation owned and controlled by its policyholders. There are about 2,000 mutuals. Mutuals account for 27 percent of the premium volume and 24 percent of the assets of the property-liability industry. Five of the largest twenty groups are organized as mutuals. The majority are small, local organizations supplying the needs of special or local groups.

*Reciprocals.* A reciprocal is a unincorporated association owned and subject to control by its policyholders. It differs from a mutual primarily because it is unincorporated and managed, under a contract called a subscribers' agreement, by an attorney-in-fact. There are about sixty reciprocals. One is among the twenty largest groups. Most of the business written by reciprocals is automobile insurance.

*Lloyd's associations.* A Lloyd's association is a group of individuals issuing policies, with each member personally liable for a stated share of the insurance issued. The ones organized in the United States are relatively small and not an important factor in the American insurance industry.

Lloyd's of London, on the other hand, is one of the world's largest property-liability insurers and a very important factor in the United States insurance market. Not actually an insurance company, it is an organization somewhat analogous to a closely-held stock exchange. The members of Lloyd's write insurance as individuals and assume unlimited personal responsibility for any risk they accept. In addition to the personal liability of the individual members, a system of security is provided by special members' deposits, a trust fund into which premiums must be deposited, an underwriting reserve, guarantee policies backing each member—in A m e r i c a n terminology, surety bonds—and a central deposit fund.

The 6,000 individual members of Lloyd's are organized into 300 syndicates. Each Lloyd's syndicate takes all or a portion of a risk for its individual members, and in the latter case, other syndicates may take the remainder.

In addition to writing marine insurance and direct coverage, Lloyd's of London is one of the world's largest sources of reinsurance—insurance bought by insurance companies.

*Marketing Methods and Strategy.* Most stock companies and some mutuals, called agency companies, sell their insurance through independent agents, who are businessmen owning their own agencies and risking their own capital. Agency companies account for about 80 percent of the property-liability insurance business written.

Independent agents usually represent several companies and work on a commission basis. They write policies, collect premiums, and perform other functions for their companies and clients. They are said to own their renewals—that is, the insurer has no interest in policies placed by an agent if he chooses to transfer the insureds to another company.

Other insurers, called non-agency companies, use a direct-writing system that utilizes employees and exclusive agents, and sometimes only mail-order solicitation. These employees and agents generally receive salaries; sometimes they are paid commissions, or they may be compensated by a combination of both.

Brokers, persons who represent the applicant for insurance rather than the company, also produce business for companies. Brokers are paid by the company on a commission basis. Some insurers depend on both exclusive agents and brokers.

The term "producer" is often used to describe all of these people who bring applications for insurance to a company.

Some insurers market all their lines nationally to virtually all classes of consumers. Others direct their marketing efforts toward particular targets,

for example, druggists, army officers, senior citizens, and the like. Some specialize in substandard business and write heavily in urban core areas; others seek only low hazard business.

*Pricing Policies.* Many companies price their insurance according to the standard rates set by a rating bureau. Sometimes called bureau rates, they are based on the pooled experience of all the member and subscribing companies.

Companies not making rates through bureaus are called independents. Companies connected with a bureau but using different rates are sometimes called rate deviation companies.

Companies that pay their policyholders dividends when losses and expenses are less than premiums collected are called participating companies. The dividend in effect constitutes a partial refund of the price paid for the insurance.

Some companies, usually small mutuals, have the right to assess their policyholders if losses exceed income. This in effect amounts to an additional premium payment. The larger mutuals are usually non-assessable.

*Regulatory Status.* An admitted company is one authorized by a state insurance department to do business in that state. A non-admitted company is not so authorized; it does business in that state through "surplus line" brokers, who are authorized by law to place business with non-admitted companies when admitted companies cannot provide the insurance needed.

Companies organized under a state's laws are called domestic companies, those organized under the laws of other states are called foreign, and those organized under the laws of other countries are called alien.

*Reinsurance Activities.* Companies that write insurance for the public are called primary insurers. Some primary insurers also write reinsurance. Companies that insure only insurance companies are called professional reinsurers.

## Marketing

### In General

The property owner seeking to buy insurance and the company seeking to sell insurance must

be brought together. The central figure wh· brings both parties together is the producer—th· agent or broker.

Agents and brokers generally work for com·

24

missions. They are paid a percentage of the premiums they write. Employee agents may work for a salary rather than commissions, but they sometimes look to bonuses or promotions. Income for agents and brokers goes up when they write an abundance of insurance on good risks.

Commission and brokerage fees are an important expense item for insurers. Stock companies allocated about 18 percent of premiums for commissions in 1966; mutual companies, about 9 percent. For fire insurance, stock companies paid 24.7 percent of premiums for commissions; mutual companies, 15.4 percent.

The property owner's problem is deceptively simple—he wants insurance in the amount he believes he needs at a cost he feels he can afford. But the risk he presents must be properly evaluated, and the appropriate policy and company must be found to meet his needs. As a practical matter, the technicality of the contract and the complexity of the insurance arrangement make him highly dependent on the skill and good faith of his agent or broker.

The insurance company's problem is complicated because it must obtain what it conceives to be a proper aggregation or "book" of risks. The larger the number of risks insured, the more reliable the calculation of anticipated losses is likely to be. The better dispersed or spread the risks, the less is the chance of excessive or catastrophic loss in a particular area. Ultimately, the success or failure of the company depends on the business produced by the marketing system.

The producer's problem is to satisfy the needs of both the consumer and the insurance company. But he also has his own personal motivation—he wants to maximize his income. If he brings in better than average risks or a larger volume of business, he can expect to make more money himself.

## Marketing Insurance in the Urban Core

The amount of insurance written in inner city areas depends in part upon the number of producers in those areas and upon their capacity to satisfy the needs of the individual homeowners and businessmen there.

Facts are unavailable on exactly how many agents write insurance in inner city or blighted

areas. Most insurance companies do not have reliable statistics on where agents actually seek business.

The following statement of an insurance executive is typical:

We have no information as to location either by number * * * [or] nature of agency forces in blighted areas. Our agents are licensed to write at large, and they may or may not write in such described areas. Consequently, we have no knowledge of any particular problems with such agencies.

Available evidence indicates that the number of insurance agents in blighted areas is small and that the number of Negro insurance agents is even smaller. A survey of 108 property-liability companies indicated that the number of Negro agents was practically nil.

According to a community leader in the Dorchester area of Boston who was asked whether there were many Negro insurance agents in the area: "I don't think there are too many. I know of one. There might perhaps be two or three others, but I'm not aware of them."

Not only are there relatively few agents in urban core areas, but the marketing system requires that the business they write be screened carefully. A Negro agent in Cleveland explained his situation in this way:

[M]y difficulty is in trying to get a company that will license me to sell business, period. I think this is largely because they feel that anyone of my race would probably be selling in the ghetto areas, and they don't want that * * *.

Q. Have you ever had in your experience any specific instances where that was stated to you by a particular company?

A. Well, they don't state it to you in those words, but I have had them make an appointment to come and see me about an agency appointment, and they walk in and start talking about, "We are not placing any agents now, we are getting rid of agents." And I say, "Well, why did you come to see me in the first place if you weren't interested?"

Q. In other words, they take action upon your letter which does not reveal, of course, your race?

A. That's right.

Q. And the refusal occurs after the company is aware of your race?

A. Yes, that is my feeling. I have had that happen perhaps a couple of dozen times.

Q. Within your experience, have you been in contact with other Negro agents who have encountered the same difficulties?

A. Yes.

Q. Do you have any present recollection of how many times you have encountered such experiences by other agents?

A. I know of five or six agents who would like to have companies to represent and seem to be unable to get them.

Q. These are other Negro agents?

A. Yes. I understand that some white agents are having difficulty too, but this for them has occurred mainly in the last couple years. But for me it occurred when I first started even five years ago or four years ago or three years ago, when I tried very hard to get companies.

Q. Are your clients primarily colored?

A. Yes.

Q. Do they primarily reside in the central core area?

A. Yes, primarily, and the east side of Cleveland, yes. Not the central core area, no. The majority of my business is done with people buying homes, where we handle the home owner's policy, and then we sell them whatever else we can, auto and life.

Q. This is an area in which in a relatively recent period of time they have had an influx of Negro residents, is that not so?

A. Yes * * * it is an area opening up to Negro buyers, we might say.

The Insurance Commissioner of California, in describing the Watts area of Los Angeles at our hearings, stated:

[T]here are not many [agents] indigenous to the area. * * *

And one thing I think, purely as an aside, that the insurance industry should be doing on a voluntary basis, is attempting to develop a better indigenous agency force within these [urban core] areas. They could do something in that area to create better markets for the Negro agents and brokers.

If an agent writes risks considered by company underwriters to be extra hazardous for the pre-

mium, or if his risks produce excessive losses, he may have his agency contract terminated by the company.

An agent in Detroit said:

I was recently cancelled by the company that I did represent.

Q. What reason did they give?

A. Loss ratio.

Q. How bad was your loss ratio?

A. Oh, I imagine it got up to probably better than 50 percent—probably 85 percent, something like that. The first year I had a very good loss ratio—practically no losses. And then the next year I had a few and then all of sudden it looked like every time I wrote a policy, somebody would come along and start a fire. You would think it was perpetrated or something, but maybe it really wasn't. Nevertheless, the losses were there.

An insurance agent in Cleveland described his situation:

Q. Do you have authority to bind your companies?

A. Yes.

Q. Are there limitations on that authority?

A. Well, the limitations are merely to select good risks that you don't feel will be creating a claim because the agent's contract with the company is contingent upon a decent claim ratio.

Agents themselves avoid urban core business. Most agents receive additional compensation if there are few losses on their business. They therefore try to avoid any business that is likely to produce losses and thus reduce their contingent commissions.

There are other problems with urban core business from the standpoint of agents. If a higher than standard premium for a risk has to be charged, an agent may have to spend time explaining why to the client, who may be resentful. It is easier to write and service one $50,000 policy than five $10,000 policies—the commission income to the agent may be about the same, and the expenses much less. Even after the policy is issued, there may be more problems on renewal or because of cancellation.

An independent agent in Kansas City said:

It has been my experience reflecting back over the past five to ten years that even with

26

my limited experience the loss ratios on that business which I did write and areas in which the companies normally do not like to write has been excessively bad. Unfortunately, this led to the feeling in our agency that economically it was not feasible to handle this type of insurance.

An agent in Detroit stated:

I haven't much of a problem because I've steered away from these areas since I started selling insurance twelve years ago.

An independent agent in Rochester, New York said:

My office has steered away from all business in blighted areas, eliminating a great concern and holding to a minimum our problems * * *

A Los Angeles agent summarized his attitude toward writing insurance in the Watts area:

We avoid the writing of property insurance in the 'curfew area' [Watts] as much as possible because of: (1) Difficulties in placement, (2) The complicated procedure of the Industry Facility [Watts Pool], and (3) the high cost.

We are not looking for problems or unprofitable operations. Commissions on business for the 'curfew area' and time spent in placing business have resulted in avoidance of these clients. The problem exists to a very large extent on all types of commercial buildings.

Many agents said they wrote only "accommodation" business in the urban core; that is, if the insured had other desirable business, the agency would provide the urban core coverage as a favor. For example, a Stockton, California agent said:

We are not at present writing any business in the blighted areas other than accomodation and then only if there is substantial other business.

Some companies discourage their producers from soliciting insurance business from persons with incomes below a stated minimum. Low income may simply mean low market potential. But it may also be related to characteristics they associate with persons of low income. Whatever the reasons, the effect is to reduce the number of agents doing business in urban core areas.

Generally speaking, direct writing companies

try to maintain lower rates than their agency counterparts. Normally, lower prices directly benefit the consumer. But lower prices also may create the need to select better risks, which could then be a factor limiting business in the urban core.

Surplus lines brokers are specially authorized to place business with non-admitted companies when admitted companies refuse to write it. They can be of great assistance to an insured by finding an insurance company for hard-to-place risks at higher than standard rates. They place much fire insurance, but little crime insurance and even less plate glass.

Even the surplus lines markets pose problems for agents and brokers. The executive vice president of a large surplus lines brokerage firm stated the following view:

The deterioration in company interest or ability to cope with substandard insurance problems has discouraged most reputable agents and brokers from concerted effort to handle this type of insurance. Add to this the high service and administrative cost of handling this type of insurance and you find very little incentive for solicitation or brokering.

The commission structure of the insurance industry poses some further problems. This is most apparent in regard to burglary and theft coverage for businesses. Commissions on that line are among the highest paid by the industry. They average approximately 25 percent, compared to 15-20 percent or less for fire and other lines. The higher commissions have been justified on the grounds that the burglary and theft line is unusually difficult to sell and the typical premium is small. In fact, neither is the case in the urban core or elsewhere. Burglary and theft insurance is in great demand in the urban core and it is no longer a small premium policy.

As a result of the high commissions, the expenses of marketing this line are high. At the Panel's hearings, the vice president of a large insurer was asked:

Q. Does part of the burglary and theft problem relate to the fact that expense ratios on some burglary and theft lines run over 50 percent?

A. It certainly is directly related to that, yes.

27

# Underwriting

## In General

Underwriting is the process by which an insurer decides to accept or reject an application for insurance. The goal of underwriting is to produce a safe and profitable distribution of business for the company. The underwriter is the company's control over the marketing system. He determines whether or not an agent's production is sound and helps decide whether the agent should be continued or terminated.

In making decisions, the underwriter follows basic guides established by the management of the company. These deal with lines to be written, geographical areas and perils to be avoided, and maximum exposures acceptable in particular areas. For example, disastrous windstorm losses along parts of the Atlantic coast in recent years have prompted some insurers to withdraw entirely from certain localities.

The acceptance and rejection of risks also involves decisions to cancel or not renew policies in force. Cancellation or nonrenewal, however, is done on the basis of actual experience with a particular risk while experience is not generally available in the case of a new risk.

*Basic Factors.* In analyzing a risk, the underwriter takes into consideration the physical features of the property and the personal characteristics of the applicant. In fire insurance, many of the basic considerations are physical: type of construction, fire protection available, water supply, proximity to fire hazards, location, and occupancy.

The underwriter also evaluates what is called the moral hazard and attempts to screen out those individuals who are likely to cause a loss intentionally in order to collect the insurance proceeds. He tries to safeguard against insuring dishonest individuals who might inflate a claim beyond the loss actually incurred or who might submit a claim for a loss not actually occurring. He also tries to avoid insuring persons who would be careless toward the insured risk simply because they have insurance.

Moral hazard is an especially important factor in underwriting burglary and theft insurance. The insurer is highly dependent on the insured in determining the exact nature and amount of any loss that occurs.

*Objectives.* The underwriter strives to show a profit for his company by carefully selecting the risks to insure. He seeks better than average risks—those with a lower expectation of losses. The lower the losses and expenses of the insurer, the greater the ability to attract better than average risks through lower prices. A favorable expense position often justifies lower prices, making possible selective underwriting.

The more surplus an insurer has, the easier it is for him to accept more business. The larger the surplus of a company, the larger the risks it can write.

There is a direct relationship between underwriting and rates. If the underwriter decides that the premium for a risk is inadequate, and if his rating rules permit him to do so, he may charge a higher rate. If his rating rules do not so permit, he may decline the risk. Some risks, of course, are unacceptable at any rate.

Although a certain type of risk may be profitable, the underwriter may reject it if its acceptance increases the insurer's exposure to loss beyond the limit of its capacity to absorb loss. For example, a small insurer may be unable to accept a million dollar building. Or, a desirable dwelling may be declined if a company has already accepted several buildings in the same block—a conflagration would extend the insurer beyond its financial capacity.

To obtain additional capacity, the insurer transfers some of its potential liability on the policies it writes by purchasing reinsurance. In this way the company can accept more risks and write a larger premium volume.

The underwriter must gauge the value of the property to be insured. He generally tries to avoid overinsuring or underinsuring the property. He has no desire to insure for $50,000 a building or stock of goods worth $25,000—he would be suspicious of the moral hazard presented. Nor might he wish to insure a building worth $20,000 for only $10,000; since the probability of partial loss is higher than total loss, underinsurance results in an inadequate premium. He may, however, prefer or even require underinsurance—in order to limit the extent of his liability—when he feels that the chances of loss are high, yet he is unable, for other reasons, to decline the business.

28

Underwriters are judged by the profitability of the business they accept. In the long run, their compensation depends on their performance. Underwriters with a record of a consistently good loss ratio, that is, whose insured risks incur few losses, are rewarded. As a result, underwriters seek the safer risks, and try to eliminate those applicants whose exposure to loss is excessive for the rate. Insurance people often say that the best underwriters are basically pessimists.

### Underwriting Property in the Urban Core

Insurers generally consider applications from urban core areas to be undesirable business, and insurance companies and their agents and brokers freely admit it.

At the Panel's public hearings, when an executive of a major insurance company was asked whether underwriters were instructed to take into account the special problems of a blighted area, he replied:

> Yes. We have no specific red-line area which says under no circumstances may you write in this area, but most prudent companies certainly try to guide their staff in identifying areas and hazards which are beyond normal contemplated by the rate structure * * *.

Another executive, replying to a similar question, said:

> We only inspect in the high risk areas of our big cities, and these are, of course, what you call red-line districts.

Underwriting materials supplied by insurance companies in response to our requests for information reveal clearly that business in certain geographic areas or territories is restricted. The following are all from the twenty largest property-liability insurance groups in the country. There is reason to believe that many smaller companies follow even more restrictive practices.

One underwriting guide states:

> An underwriter's knowledge of the Branch Office or Production Office territory is vital to his effective operation and, on the other hand, it is the most intangible underwriting tool available.
>
> An underwriter should be aware of the following situations in his territory:
>
> 1. The blighted areas.

2. The redevelopment operations.
3. Peculiar weather conditions which might make for a concentration of windstorm or hail losses.
4. The economic makeup of the area.
5. The nature of the industries in the area, etc.

> This knowledge can be gathered by drives through the area, by talking to and visiting agents, and by following local newspapers as to incidents of crimes and fires. A good way to keep this information available and up to date is by *the use of a red line* around the questionable areas on territorial maps centrally located in the Underwriting Division for ease of reference by all Underwriting personnel. (Italics added)

Many underwriting guides include the general statement that each risk should be considered on its own merits. The more specific instructions, however, are often quite to the contrary. For example, this specific underwriting instruction:

> Deteriorating neighborhoods automatically provide claims problems due to vandalism, poor housekeeping, and inadequate maintenance. Overcrowding of dwellings as well as ramshackle conversions of old, large dwellings into inexpensive apartments create abnormal loss possibilities. These areas tend to expand.
>
> Avoid new business and reunderwrite renewal business which is being surrounded by neighborhoods of this type.

Underwriting material from other companies proposes more modest restrictions. For example, according to one company:

> Each risk must be considered on its individual merits usually evaluated by an inspection. Acceptance or rejection should be based on these determined characteristics. This policy prohibits rejection or cancellation which is capricious based on ethnic background, or (apart from classes like plate glass) solely on location.

Another insurer, in a "selectivity guide," describes conditions which give "cause to consider special underwriting problems." This company requires that information on problem areas be subject to "full communication, understanding, and a written record." It cautions further that "nothing shall preclude or discourage the conversion of this information into more usable form

29

for application to day-to-day underwriting procedures * * *."

Among the problem areas specified are the following:

> Towns, cities or defined localities where depressed economic situations create vacancy and unoccupancy, poor maintenance and housekeeping, depressed living conditions and latent or active moral hazards as evidenced by theft, larceny and major crime incidence.

> Specific sections of metropolitan areas where age, neglect, poor maintenance, a large proportion of the properties (habitational, commercial and institutional) have deteriorated, or their proximity to physically good properties requires immediate and current underwriting information, not only from physical inspection but evaluation of burglary and other crime exposures. Generally, these recordings should be according to street address and include (1) the already affected so-called "blighted" area, and (2) the peripheral "caution" area into which the actual physical and moral deterioration might spread during the life of our policy.

Agents and brokers are more explicit about underwriting restrictions they perceive. A New York City broker said:

> * * * [M]ost companies mark off certain areas of the city to denote a lack of interest in business arising in these areas. In New York these are called K.O. areas—meaning knockout areas, in Boston they are called redline districts. Same thing—don't write the business.

> The companies explain their policy by describing these areas as blighted, substandard, disadvantaged, high risk and by other cliches. The implication is that chances of loss far outweigh the chances of profit in these areas solely because of the condition of the risk.

> *       *       *       *       *

> Without condescension, however, I must concede that there is some degree of merit in the arguments posed by the companies in not writing some of this business. I must concede further that the property-casualty companies are in business to make a profit and not to make love * * *.

Another agent from Detroit wrote that he knew

of one company that had ruled out 50 percent of the community:

> Anyone residing in this blocked-out area is not eligible for property or auto insurance, and this includes whites and Negroes.

A Grand Rapids, Michigan, agent wrote that many companies "black out" the inner city.

A Cambridge, Massachusetts, agent wrote:

> * * * [O]ne of the seven companies in our office specifically telephoned us to request that we not submit to them any new risk in the so-called riot or blighted areas of Boston.

A South Bend, Indiana, agent received the following instructions from one of his companies:

> * * * [W]e cannot underwrite against racial disturbances * * * [We] will insist that your writings be confined to areas where there is minimum likelihood of such disturbances * * *

An agent in Omaha, Nebraska, described his view of company underwriting by location:

> Now there have been some years we have experienced no difficulty getting residential coverage which is considered part of the core or ghetto area. There are other sections in the older part of it that is taboo. If you get any coverage you are real lucky. But it is almost a complete ban in some sections of the city or in the older area here.

Companies restrict particular classes of business as well as geographic areas. The underwriting bulletin of one company states:

> We continue to hear of companies withdrawing completely from difficult areas, withdrawing binding privileges on certain difficult classes such as bowling alleys, restaurants, supermarkets, and taverns, and now have positive proof that some companies are drastically reducing commissions on this business as a most emphatic means of curtailing production.

> We have no desire to adopt the reduced commission technique for all risks in a difficult class. At the same time, we do expect everyone in the field to be alert to individual situations where increased rate is an absolute necessity.

Riots have tended to strike certain kinds of businesses—so-called ("target risks." Among them are drug, liquor, grocery, and clothing stores, laundries, and dry cleaners. This strongly influences underwriters, who are also aware of the fact that riot losses to residential property were rela-

tively slight in Los Angeles and Newark and not overly severe in Detroit.

A well-established underwriting technique is to issue lists of "Do not solicit risks," or "prohibited risks." One company's "Do not solicit" list includes boarding and lodging houses, bowling alleys, match factories, taverns, and tents.

Another important underwriting technique is to restrict the amount of coverage of the policy, or to raise the rate. These alternatives are summarized in an underwriting letter on the subject of "Watts-Type Riots":

The form and rate should reflect the individual situation and this will sometimes require the use of non-standard forms and other than tariff rates developed by one or more of the following techniques:

1. "Substandard risk rating" plans.
2. Excess rate filings.
3. Limitation of term to one year.
4. Reduced commissions.
5. Restricted perils.

These techniques have been available in most states for some time. Their use looms more important as market conditions become more difficult. They cannot make every risk insurable and are not a substitute for firm underwriting decisions.

A businessman in the urban core of Omaha, Nebraska, received the following letter from an insurance company:

For a number of years we have carried insurance on the contents of your liquor store and you have been an excellent insured. Due to the location of your store, however, and the more than probably uncontrollable damage which might occur at any time, due to riot, we do not feel that we can carry insurance in this case.

Because of our previous fine association, however, we feel we can continue on a part of this coverage. And enclosed herewith is an endorsement reducing your coverage from $34,000 to $1,000.

Agents also complain of the application of this kind of underwriting restriction. When interviewed, an Omaha, Nebraska, agent described how riot coverage was taken out of policies issued:

Now, there are some companies that will cover us in here [urban core] but it is still a most difficult area to get coverage and nor-

mally you will have to take a reduced coverage if you get it. * * *

If they will cover it, it will be probably with restrictive clauses.

Q. At the present time are you getting riot exclusion clauses on them?

A. Many of them. And we have been able to replace the fire and extended, but it has a riot [exclusion] clause in it.

A St. Paul, Minnesota, agent mailed us a letter and endorsement which some companies are using on all new and renewal business in the urban core. The company asks the insured to sign a letter which reads:

The company shall not be liable for loss: (a) by pillage and looting resulting from riot and civil commotion * * *.

A Youngstown, Ohio, agent described another technique for limiting coverage: "All companies insist on a $50 deductible clause on policies written in these questionable areas."

Larger deductibles are often used for especially hazardous exposures. A representative of a Washington, D.C., liquor dealers' association described a $7500 policy for which the standard rate was $376 but which is unavailable at that price. He said a liquor dealer would have to pay $1050 and there would be a $1000 deductible.

Some substandard rating plans, often used to insure urban core property, have specific provisions for use of deductibles. Deductibles can be a desirable underwriting technique. Insurance works most efficiently on large losses, and becomes expensive and inefficient for the handling of small losses. Thus, insurers often admit they have not given the deductible principle sufficient attention in the design of burglary and theft policies, where it could be used to reduce premiums and make the risk more readily and more soundly insurable.

Other underwriting restrictions can also have positive results. The underwriter may show an insured how to prevent loss and save property and lives. He may point to the need for fire extinguishers, safer heating equipment, burglar alarms, iron bars, and other protective devices. The underwriter may advise the insured on how to use safer methods of sending messengers to the bank or of timing deposits.

A Washington, D.C., agent reported:

Companies are requiring many new safety features and burglary equipment which may prove expensive for small businesses. * * *

31

A community leader in Columbus, Ohio, stated:

> Insurance companies are requiring installation of burglary alarms and fire detection systems for most business in order to qualify for even limited insurance coverage.

Underwriting decisions take place not only when the policy is written but periodically throughout the life of the contract. A claim under the policy may call for underwriting action. Claims of loss on an insured property are a possible indication of unprofitable business. They may lead to post-claims underwriting decisions to cancel or not renew risks.

The underwriting guide of one company states: "Sound underwriting judgment should determine when a policy should be cancelled for claims reasons." The same manual then catalogues the kinds of claims that raise the need for considering cancellation. But the guide adds: "In other situations where a claim indicates an undesirable condition, cancellation or other action should be taken regardless of the number of losses."

Another insurer gives its views on cancellations and nonrenewal as follows:

> [S]elections continue to deteriorate. We must not accept new business in undesirable localities or in unstable areas which are experiencing manifest or potential changes in character. Likewise, we must continually review our book of business to determine which accounts no longer meet our established underwriting standards.

A New York broker described this aspect of underwriting as follows:

> Where a company is providing coverage in the normal way, recall or cancellation after inception for "underwriting reasons" is not an uncommon thing. In fact, when summer disorders became popular about three years ago, recall was an automatic reaction on the part of too many companies * * * The disorders on the West Coast were the signal for underwriters all over the country to run for cover.

Although insurance companies have catalogued a list of restrictions on underwriting urban core business, responses to the Panel's requests for information established that companies have virtually no separate statistical information on their experience in urban core areas.

One insurer wrote:

> Our property underwriting procedure considers each risk on its own merits. In most instances, therefore we have no information on an area basis.

Another company responded:

> The * * * Group has no data available, which would provide premiums, losses, or exposure for areas within a city.

An insurance company president said at the Panel's hearings:

> It is my personal guess that the urban areas plan is producing quite a loss for the insurance companies, but I can't prove that.

Although the property-liability insurance industry in its underwriting practices is saying that inner city business generally is bad and to be avoided, it cannot show the extent to which this judgment is accurate.

Underwriters traditionally handle uncertainty by erring on the side of pessimism, and they may be treating urban core business more harshly than it deserves. Without reliable underwriting data, there may be too much room for underwriters to base decisions on subjective and irrelevant considerations. The industry would be in a better position to underwrite fairly and reasonably, and to make this clear to the public, if it maintained reliable loss statistics by area. The industry has recently taken some steps in this direction.

## Rating

### In General

The rate is the price charged for a unit of insurance. Thus, if the rate for fire insurance is fifteen cents per 100 dollars of insurance, the premium for $10,000 of coverage is fifteen dollars.

Rating and underwriting are closely related. The underwriter's decision is based primarily on three factors: a description of the risk to be insured, the appropriate rate to be charged for a described category of risks, and the contractual provisions of the policy to be written. He brings

these three basic considerations together by classifying the hazard in accordance with the company's rating system and insurance policy forms.

Information on the nature of the risk is generally obtained from the agent and from credit reports and underwriting inspections. The policy forms may be prescribed by statute or designed by the insurer. The rating system of the company may be designed by a bureau, or by the insurer itself.

If the underwriter works only with a standard rate—that is, if only one rate may be charged on all risks similarly exposed, or said to be in the same class—he decides whether to accept or reject a particular risk on the basis of whether or not that rate is adequate for the coverage contemplated. If the underwriter works with a more flexible schedule of rates, his decision also involves selecting the appropriate rate to be charged. A rate may also be made adequate by restricting the policy form. In all cases, the underwriter tries to determine whether the rate that can be charged justifies the exposure to loss that the company is being asked to accept.

Rates are expected to generate sufficient premium income not only to pay for the insurer's losses and expenses, but also to produce a profit for the company. The process of setting rates requires that the amounts of future losses and operating expenses be estimated with a fair degree of accuracy.

Statistics on past losses and expenses furnish a helpful guide in many cases. But natural occurrences vary in frequency and area; and in a rapidly changing society, the patterns of manmade events in the future may well differ from those of the past. An example of the latter is the riot risk. Further, costs and expenses may go up, especially if the economy is experiencing some degree of inflation. Thus, the rating process must allow for considerable uncertainty, and all rating decisions are to some degree matters of judgment.

Rating must also rely on some rough approximations. Property is classified and rated by general characteristics. All two-story dwellings in a city, for example, may be subject to the same rate regardless of where they are located in a city. These general classifications are usually so broad that they include a considerable range of risks with approximately, but not precisely, the same loss exposure.

The problems of rating are not only of concern to the companies. The consumer, too, has an important interest in rating; it determines the price he pays for his insurance. The discretion inherent in rating helps make rates one of the greatest sources of friction among consumers, companies, and state insurance departments.

## Urban Core Rating Problems

*Problems of Class Rating.* Urban core properties present difficult rating problems. In most instances, territories used for rating purposes encompass an entire city, a county, or even a larger area. This means that the best—least hazardous—property in a given classification is charged the same rate as the most hazardous property. A system employing these broad categories is called class rating. Underwriters working with a limited capacity to accept risks and a fixed rate for all within a class of properties, attempt to accept only the better risks.

Rate flexibility has been introduced in some areas in an attempt to meet the problems of class rating. To allow for substandard conditions of risk, surcharges may be added to the rate. The excerpt from the Ohio dwelling schedule reprinted in Table 4 shows a typical plan.

This plan permits surcharges for specified deficiencies. For example, there may be a surcharge of 10 cents per $100 of insurance on a dwelling if it has an unsafe arrangement of heating devices. There may be further surcharges for wiring, conversion, physical condition, and housekeeping, up to a maximum of 50 cents per hundred.

An $8,000 frame dwelling (with $2,000 in contents) in Cleveland being insured for fire, extended coverage, and vandalism and malicious mischief, would require an annual standard premium of $37.00. However, the 50 cent maximum condition charge would add $50 and thereby produce a surcharged premium of up to $87.00. Thus, in this example, the surcharges could result in a premium increase of up to 135 percent. For a brick building under similar circumstances, the standard premium would be $30, and therefore the 50 cents per hundred surcharge would increase the premium to $80, an increase of 167 percent.

Another important method of achieving rate flexibility is the use of "Schedule ER" [Excess Rates] type rating plans which are in effect in about half of the states. These plans permit the underwriter to set higher rates based on hazards or

**33**

TABLE 4. CHARGES FOR SUB-STANDARD CONDITIONS PROMULGATED BY OHIO INSPECTION BUREAU

The following charges per $100 of insurance, when applicable, shall be added to the annual premium for both buildings and contents for dwellings, flats, apartments, private boarding and roominghouses, private garages and outbuildings.

[NOTE 1.—When any of the conditions indicated in this item apply, properties shall be submitted to the insuring company for review of the charges. NOTE 2.—Charges under Subitems *a*, *b*, *c*, *d*, and *e* are cumulative.]

| | Dwellings private garages and out-buildings | Flats and apartments boarding and rooming houses |
|---|---|---|
| *a.* Heating: Unsafe arrangement of heating devices, including chimneys, stovepipes and gas vents | $0.10 | $0.25 |
| *b.* Wiring: Unsafe or inadequate electric wiring, non-standard extensions, overloading, overfusing, etc | .10 | .25 |
| *c.* Conversion: Subdivision or conversion of the original living spaces into multiple units with overcrowded occupancy, inadequate sanitary facilities, unsafe arrangement of cooking devices, etc | .10 | .50 |
| *d.* Physical condition: Building not in good repair, roof or chimneys deteriorating, wood surfaces unpainted or decaying, garages or porches not well maintained | .10 | .25 |
| *e.* Housekeeping: Yards, basements, hallways or attics not kept clean and free from rubbish and litter | .10 | .25 |

SOURCE: Ohio Inspection Bureau Dwelling Schedule.

conditions not taken into account by bureau (standard) rate schedules. Such conditions include block congestion, high valued buildings without adequate fire protection services, and buildings with large open areas susceptible to the spread of fire and to riot exposure. If necessary, the underwriter under these plans may also restrict the scope of protection by, for example, special exclusions.

The use of an ER plan, unlike the Ohio dwelling schedule described above, requires the written consent of the insured and permits complete rate flexibility. It does not catalogue specific deficiencies and charges. Premiums under an ER plan are subject to disapproval by the rating bureau and the state insurance commissioner.

Rate flexibility raises problems of its own. The surcharged rate may or may not be more appropriate for the risk than the standard rate. The substandard conditions permitting the surcharge may or may not, over a period of time, result in a higher incidence of loss. Although it may be logical to expect a higher incidence of loss because of the hazardous conditions, there are no insurance data available to confirm this expectation. When all is said and done, the apparent precision of a surcharge plan may only obscure the fact that the higher rate still reflects an underwriter's judgment that may not be an accurate forecasting of the potential loss.

Rates for insurance involve basic considerations of achieving equity among the various individuals affected. The property owners subjected to surcharges may well be those who are least able to pay the additional premiums. Surcharges that are not based on demonstrable hazards are unfair. One broker, for example, described what she considered to be a widespread practice:

If the inspector finds a seam in the plaster or peeling paint, the cost of insurance is more than doubled and the fire hazard has not been increased whatsoever.

Some would prefer to eliminate surcharges altogether. This may not be possible, however, in a competitive insurance market. If one company attempted to spread increased costs evenly, its competitors would be able to undercut it in low-hazard areas. For example, if an insurer attempted to use a 10¢ rate in all areas instead of a 5¢ rate in low-hazard areas and a 15¢ rate in high-hazard areas, its competitors could answer with a 5¢ rate in low-hazard areas. The insurer charging the 10¢ rate would, therefore, tend to lose the low-hazard risks and get only the high-hazard risks. Further, its 10¢ rate would then be inadequate because it would be too low for the high-hazard risks with which it would be left.

In addition to the demands of competition, the rating laws require that rates be equitable. That

34

is, rates should reflect anticipated loss exposure and expense requirements. Each class of insureds should pay its share of losses and expenses.

In a real sense, the problem of rating inner city properties is part of the larger problem of underwriting them. Underwriters generally consider the rate in urban core areas to be inadequate, even for well-maintained property. Thus, they are hesitant to accept blighted area property even if the rate is considered adequate, for they dislike high-hazard business and they prefer to err on the side of safety. One company described the situation as follows:

> Rate levels for casualty, fire, marine, and multiple-peril lines are not immediately responsive during short periods of change, and do not contemplate abnormal or unusual conditions which may arise. It is therefore of particular importance that location of risk be afforded prime underwriting consideration for all lines of insurance * * *

> [W]e expect you will decline new business and review existing business from areas which have deteriorated and will no longer meet our established standards.

The loss experience of the Watts Pool has been low, although it has only been in existence for a short time and its experience could therefore change. Also, some insurance companies have reported only small losses under business written through urban area plans. The development of loss statistics on urban core areas will facilitate more precision both in underwriting and rating. It will also provide a better basis for effective loss prevention activity.

*Rating Problems of the Riot Peril.* The riot peril has compounded the problems of rating in the urban core. As many insurers view it, this peril presently constitutes an incalculable catastrophe risk. Many insurers believe an increase of 1 to 4 percent, distributed over fire and other riot-affected lines, is called for. An increase of that order could generate approximately $50,000,000 to well over $100,000,000 each year, an amount adequate to cover riot losses of the 1965–1967 level.

Only a few rating bureaus have in fact requested increases as a result of recent riots. The rating bureau with jurisdiction over burglary and theft and glass insurance has not. Many of the bureaus which have not yet done so, have indicated they are awaiting the advice of their national advisory organization—the Fire Insurance Research and Actuarial Association (FIRAA).

The rating laws generally require that any requested rate increase be based on statistical data. Actual riot loss experience can justify increases, but not predictions as to the possibility of future riot losses. At least sixteen states do not even authorize projection factors, whereby rate increases take into account the fact that loss levels may be increasing and will continue to increase in the future.

Increases, if justified by actual riot losses, might be across the board or only on those classes of risks or in those areas most subject to riot damage. All areas may be regarded as subject to riot damage, not just urban core areas. Another possibility is to vary the increases as between classes of risks and areas depending upon an evaluation of the potentiality for riot damage in each case.

A possibility other than a general rate increase is a special earmarked "loading" in the rate for riot losses. There is at present generally a 1 percent loading in the fire and extended coverage premium for all catastrophes, including riots. Recent riot losses are regarded by some as justifying increasing this loading in some states.

These problems of rating for the riot peril are part of the more general problems of insurance rating, which are the basic responsibility of the states.

·

## Reinsurance

### In General

Insurance companies typically assume risks far in excess of their assets. To protect themselves from the possibility of excessive financial loss from those risks, insurance companies purchase insurance called reinsurance.

If an insurer's actual losses and expenses do not exceed those that were expected at the time of underwriting its "book" of risks, the insurer's

premium income should be adequate to pay losses and expenses. In practice, however, actual losses seldom precisely match expectations, particularly in any single year. Fluctuations are expected and the underwriting process makes allowance for some uncertainty. Abnormal fluctuations, resulting from an unusually large number of ordinary losses or from large losses from a catastrophic event (like Hurricane Betsy in 1965 or the fire at Chicago's McCormick Place in 1967), present a risk that primary insurers seek to cover by purchasing reinsurance.

The recent riot losses are generally regarded by insurers as the kind of catastrophic and unpredictable losses which require reinsurance. Industry estimates of insured losses from the three largest riots are $38 million in Watts in 1965, $49 million in Detroit in 1967, and $10 million in Newark in the same year. (The Insurance Department of Michigan estimated insured riot losses in Detroit to be around $33 million.) Other insured riot losses in 1967 are estimated at $10 to $15 million, and none was in excess of $1 million. Thus, insured riot losses in 1967 approximate $50 to $75 million.

Insurers normally purchase reinsurance coverages for a combination of reasons—to stabilize their underwriting results, protect their capital, and enlarge their capacity to provide insurance. They negotiate for reinsurance on a risk-by-risk basis (called facultative), or arrange in advance for business to be placed as it develops (called treaty). Under some reinsurance contracts, the reinsurer takes over a specified pro rata share of the premiums and losses of the primary writing company (called quota share and surplus share). Under another form of contract, the primary insurer bears all losses up to a certain point, and the reinsurer assumes losses over this retention, but only up to a specified limit (called excess of loss). Excess of loss reinsurance includes catastrophe reinsurance which covers loss to many insureds in a single incident, as by windstorm or riot.

The availability of reinsurance influences the capacity of primary insurers to underwrite the risks of the general public. It permits underwriting a larger volume of risks than would otherwise be possible and it enables an insurer to accept a large amount of exposure in a particular area or kind of area.

For example, two of the twenty largest insurers reported a total loss exposure of over $6 billion in the ten largest cities of the United States. One company had an exposure to loss of $2.3 billion in Los Angeles alone—equal to almost forty times its policyholders surplus. (These figures appear in Table 5.)

Thus, the capacity of primary insurers to insure more properties in inner city areas and to continue to insure property owners everywhere against the riot risk is in important respects influenced by their ability to purchase reinsurance for these risks.

*Availability of Reinsurance.* There is no centralized reinsurance market. Primary insurers seek reinsurance wherever the sources seem most promising at any given time. One of the world's largest and oldest reinsurers, Lloyd's of London—which

TABLE 5. EXPOSURE TO LOSS UNDER PROPERTY INSURANCE CONTRACTS IN 10 LARGE CITIES OF 2 LEADING INSURANCE GROUPS

| City | Total exposure | | Exposure as a percent of policyholders surplus | |
|---|---|---|---|---|
| | Company I | Company II | Company I | Company II |
| New York | $1,950,000,000 | $465,000,000 | 394 | 798 |
| Chicago | 1,110,000,000 | 1,519,000,000 | 224 | 2610 |
| Los Angeles | 1,335,000,000 | 2,308,000,000 | 270 | 3967 |
| Philadelphia | 450,000,000 | 195,000,000 | 91 | 335 |
| Detroit | 675,000,000 | 683,000,000 | 136 | 1173 |
| Baltimore | 130,000,000 | 324,000,000 | 26 | 556 |
| Houston | 500,000,000 | 192,000,000 | 101 | 330 |
| Cleveland | 650,000,000 | 257,000,000 | 131 | 442 |
| Washington | 690,000,000 | 38,000,000 | 139 | 65 |
| St. Louis | 470,000,000 | 411,000,000 | 95 | 707 |
| Total | 7,960,000,000 | 6,392,000,000 | 1608 | 10983 |

SOURCE: Questionnaire to Twenty Largest Property-Liability Insurance Groups, The National Advisory Panel on Insurance in Riot-Affected Areas.

36

has carried on business since the late 17th century—accounts for about 30 percent of the reinsurance written for United States companies. Its practices have a substantial influence on other reinsurers. There are other alien reinsurers, for example, in Switzerland, but they are relatively unimportant in the American market.

In recent years, especially since World War II, American reinsurers have grown rapidly. They now play a substantial role in reinsurance. In 1966, they provided about 65 percent—about 40 percent by professional reinsurers, and 25 percent by primary insurers—of the total reinsurance written for United States insurers.

Domestic reinsurers also have increased their sales of reinsurance abroad. Reinsurance sold to foreign countries, however, is less than that purchased from abroad—$125.3 million sold as compared to $353.9 million purchased in 1966. It has been growing at a faster rate, however; in the last decade, reinsurance sold by United States companies abroad increased about fourfold, while reinsurance purchased by United States companies from reinsurers abroad increased only 1.7 times.

Primary insurers in the United States have also increased rapidly their share of the reinsurance market—from about 7 percent in 1950, to over 25 percent in 1966. A number of primary insurers

have established new reinsurance departments within the last few years. But their reinsurance operations have been much less profitable than those of professional reinsurers.

The supply of reinsurance is essentially uncontrolled and unaffected by government. The capital available to provide reinsurance is entirely private and is drawn there by the rate of return it can earn. Thus, the availability of reinsurance is related to its profitability and not necessarily to the needs of the public.

In recent years, both primary insurers and professional reinsurers have had adverse experience in the reinsurance business. There has been a series of catastrophe losses from windstorm, riot, and fire, and ordinary losses have been heavy. Windstorm has been the dominant cause of catastrophe loss—those in excess of $1 million—on fire and extended coverage policies for the industry. Riot losses, although widely publicized, have been a relatively small cause of catastrophe losses. Seventeen of the twenty largest groups of property-liability companies responded to the Panel's questionnaire, and the distribution of catastrophe losses for those companies is shown in Table 6. Table 7 shows the same figures for fifteen professional reinsurers.

TABLE 6. REPORTED GROSS CATASTROPHE LOSSES BY CAUSE AS A PERCENTAGE OF TOTAL REPORTED GROSS CATASTROPHE LOSSES (FOR EACH OF 17 PRIMARY INSURERS), 1960–1967

[In percent]

| Company | Fires | Riots | Hurricanes | Hail and windstorms | Tornadoes | Total wind losses |
|---|---|---|---|---|---|---|
| C1 | 11. 5 | 3. 4 | 69. 3 | 10. 7 | 5. 1 | 85. 1 |
| C2 | . 4 | 4. 7 | 66. 4 | 17. 5 | 11. 0 | 94. 9 |
| C3 | — | 1. 5 | 58. 5 | 19. 6 | 20. 4 | 98. 5 |
| C4 | 8. 3 | 5. 1 | 70. 5 | 9. 1 | 7. 0 | 86. 6 |
| C5 | — | 1. 1 | 50. 1 | 17. 2 | 31. 6 | 98. 9 |
| C6 | — | 7. 2 | 76. 2 | 10. 7 | 5. 9 | 92. 8 |
| C7 | — | 29. 7 | 23. 1 | — | 47. 2 | 70. 3 |
| C8 | . 3 | 8. 4 | 60. 0 | 21. 5 | 9. 8 | 91. 3 |
| C9 | 2. 0 | 8. 5 | 68. 0 | 14. 4 | 7. 1 | 89. 5 |
| C10 | . 5 | 10. 1 | 61. 6 | 11. 8 | 16. 0 | 89. 4 |
| C11 | . 7 | 6. 6 | 55. 2 | 19. 4 | 18. 1 | 92. 7 |
| C12 | — | 3. 6 | 34. 7 | 33. 7 | 28. 0 | 96. 4 |
| C13 | . 4 | 9. 8 | 89. 8 | (¹) | (¹) | 89. 8 |
| C14 | — | 22. 2 | 77. 8 | — | — | 77. 8 |
| C15 | 3. 7 | 9. 7 | 54. 8 | 19. 8 | 12. 0 | 86. 6 |
| C16 | 3. 5 | 6. 0 | 55. 0 | 16. 1 | 19. 4 | 90. 5 |
| C17 | 2. 4 | 5. 4 | 64. 9 | 16. 7 | 10. 6 | 92. 2 |

¹ Not available.

SOURCE: Questionnaire to 20 largest property-liability insurance groups, The National Advisory Panel on Insurance in Riot-Affected Areas.

TABLE 7. REPORTED GROSS CATASTROPHE LOSSES BY CAUSE AS A PERCENTAGE OF TOTAL REPORTED GROSS CATASTROPHE LOSSES (FOR EACH OF 15 PROFESSIONAL REINSURERS), 1960–1967

[In percent]

| Company | Fires | Riots | Hurricanes | Hail and windstorms | Tornadoes | Total wind losses |
|---|---|---|---|---|---|---|
| P1 | 3.9 | 7.3 | 65.7 | (¹) | 23.1 | 88.8 |
| P2 | 9.2 | 10.2 | 71.7 | 2.4 | 6.5 | 80.6 |
| P3 | 4.4 | 9.7 | 53.4 | 9.7 | 22.8 | 85.9 |
| P4 | .1 | 1.6 | 72.1 | 7.4 | 18.8 | 98.3 |
| P5 | 12.8 | 71.1 | 1.5 | — | 14.6 | 16.1 |
| P6 | — | 5.3 | 65.5 | 12.8 | 16.4 | 94.7 |
| P7 | 1.0 | 2.3 | 43.6 | 11.3 | 41.8 | 96.7 |
| P8 | — | 2.1 | 60.9 | 11.4 | 25.6 | 97.9 |
| P9 | 10.2 | 18.4 | 71.4 | (¹) | (¹) | 71.4 |
| P10 | — | — | 96.0 | — | 4.0 | 100.0 |
| P11 | 1.1 | 3.0 | 80.6 | — | 15.3 | 95.9 |
| P12 | — | 4.5 | 81.9 | 5.5 | 8.1 | 95.5 |
| P13 | 5.1 | 8.1 | 76.5 | .1 | 10.2 | 86.8 |
| P14 | 11.4 | 6.9 | 71.3 | — | 10.4 | 81.7 |
| P15 | — | — | 100.0 | — | — | 100.0 |

¹ Not available.

SOURCE: Questionnaire to professional reinsurers, The National Advisory Panel on Insurance in Riot-Affected Areas.

For a variety of reasons, primary insurers have made heavier demands for reinsurance in recent years. In addition to their adverse experience with recent catastrophes, they have been called upon to insure greater concentrations of property, and they have had to contend with rising property values stemming from economic growth and inflation, and with increased vulnerability of some property to destruction, characteristic of some modern construction. At the same time, higher prices and requirements for larger risk retentions have constricted the amount of reinsurance the primary insurers are able to buy.

Eighteen of the twenty largest property-liability insurance groups, asked to indicate the likelihood of one or more specific developments resulting from the riot risk, answered as follows:

Number of
companies
indicating
each specified
result  Specified result

12____ Contraction of market for ceding of catastrophe coverage by your company.
12____ Efforts to increase rates by your company.
10____ Contraction of market for ceding pro rata coverage by your company.
7_____ Contraction of direct insurance writings by your company.
6_____ Contraction of the market for ceding of excess of loss other than catastrophe coverage by your company.
5_____ Contraction of pro rata coverage assumed by your company.
5_____ Contraction of catastrophe coverage assumed by your company.
3_____ Contraction of excess of loss other than catastrophe coverage assumed by your company.
1_____ Don't know.

Fifteen professional reinsurers replied to the same question as follows:

Number of
companies
indicating
each specified
result  Specified result

10____ Contraction of market for ceding catastrophe coverage by your company.
7_____ Efforts to increase rates by your company.
4_____ Contraction of catastrophe market for ceding excess insurance other than catastrophe.
3_____ Contraction of market for ceding pro rata coverage by your company.
2_____ Contraction of pro rata coverage assumed by your company.
1_____ Contraction of excess of loss other than catastrophe coverage assumed by your company.

38

Interviews with company executives also indicate that the riot risk will have an adverse effect on the reinsurance market. Many are concerned that the situation may get worse.

Thus, the supply of reinsurance apparently has tightened and this in turn has tightened the primary insurance market. For without adequate reinsurance, insurers must limit more than otherwise their premium writings to prevent the assumption of liabilities beyond their financial capacity.

Reinsurance is a relatively important expense item for insurers. Reinsurance is normally sold on an annual basis, and it is customary to renegotiate the price and other terms every year. Primary insurers are, therefore, vulnerable on short notice to a tightening of the reinsurance market. This is particularly significant if they are undertaking long-range plans for growth which depend to some extent upon reinsurance to provide additional capacity.

*Alternatives to Reinsurance.* Because of the increasing restrictions in the availability of reinsurance, primary insurers have tried to expand their own financial capacity to retain risks and to diminish their d e p e n d e n c y on reinsurance by increasing their capital and surplus and by the accumulation of more adequate catastrophe reserves. Fourteen of the sixteen reinsurers responding to our question said that the present income tax structure was a major obstacle inhibiting them from building up adequate voluntary reserves for catastrophe losses.

Another alternative to reinsurance is insurance company pooling. By spreading risks among themselves, companies in pools aggregate the member insurers' individual capacities to cover risks. The result is a broader spreading of risks resembling the results achieved by reinsurance.

Pools require that the members be skilled in risk selection and not contribute disproportionately to pool losses. Many pools presently in existence have been formed to insure, for example, liability and property damage arising out of nuclear accident; shipping, aviation, and railroad risks; and special kinds of property such as cotton, grain, and movie film. There have been numerous instances, however, in which pool arrangements have been abandoned because of unfavorable performance on the part of some members. For example, whereas a few years ago there were forty facultative reinsurance pools in the United States, today there are only four or five.

### Relation to Urban Core Market Problems

Primary insurers will have to expand their capacities to undertake more extensive underwriting of risks in inner city areas. They can do so by (1) purchasing reinsurance from private reinsurers or from a newly-created government reinsurance facility, (2) pooling, and (3) accumulating more adequate catastrophe reserves.

The need for the industry to continue insuring the riot risk also establishes new demands for reinsurance. The potential losses from this risk have become demonstrably greater in recent years. In the light of the amount of insured losses from civil disorders in the summer of 1967, the primary insurers understandably want more reinsurance.

In 1965, riot losses were less than 1 percent of the fire and extended coverage premiums for seventeen of the eighteen primary companies responding to the Panel's questionnaire. In 1967, only five of these companies sustained so low a loss. This is illustrated in Table 8.

At the same time, reinsurers are less willing to provide protection against catastrophe risks. Lloyd's of London has stated:

Catastrophe [reinsurance] contracts, once they have been running for a period, are rated on 'results'. 'Results' show the skill of the reassured in conducting his direct business for which he is entitled to recognition. Undoubtedly rates and deductibles are higher than they were immediately before Hurricane Betsy.

Nine of twelve professional reinsurers surveyed by the Panel indicated that before 1965, they regarded the riot risk as being absorbed without premium. Now, they are generally not only seeking substantial premiums, but restricting the amount of the risk they will accept. On the question of riot reinsurance, a memorandum from Lloyd's dated November, 1967, states:

Whilst the market at the present time is still prepared to shoulder these liabilities [riot peril], there must soon be realistic action—for example, as regards the premium element.

If primary insurers cannot obtain reinsurance to the extent they desire, their own capacity to

TABLE 8. FREQUENCY DISTRIBUTION OF COMPANIES BY PERCENTAGE OF NET CATASTROPHE RIOT LOSSES TO TOTAL FIRE AND EXTENDED COVERAGE PREMIUMS [1]

| Net riot losses as percentage of fire and extended coverage premiums | Number of companies | | Percentage of companies | |
|---|---|---|---|---|
| | 1965 | 1967 | 1965 | 1967 |
| Less than 1 percent | 17 | 5 | 94.4 | 27.8 |
| 1 but less than 2 percent | 1 | 4 | 5.6 | 22.2 |
| 2 but less than 3 percent | — | 3 | — | 16.7 |
| 3 but less than 4 percent | — | 2 | — | 11.1 |
| 4 percent or over | — | 4 | — | 22.2 |
| Total | 18 | 18 | 100.0 | 100.0 |

[1] Data on fire and extended coverage premiums earned in 1967 not available so 1966 premiums used.

SOURCE: Questionnaire to 20 largest and property-liability insurance groups. The National Advisory Panel on Insurance in Riot-Affected Areas.

insure becomes more limited, and the number of risks they can underwrite diminishes. Yet the availability of insurance must keep pace with American economic growth and prosperity. In the program recommended by the Panel, we have taken account of the need for greater insurance capacity in the interest of increasing the availability of insurance in the center cities.

# Profits

### In General

An evaluation of the profitability of the insurance industry, and in particular of the stock insurers, is necessary for an understanding of the industry's reaction to the emergence of the riot risk and to demands upon the industry for writing more insurance in urban core areas.

Profits are needed to attract capital, to support growth, and to provide greater financial safety. For these reasons, the availability of insurance relates directly to the profits of the property insurance industry. If profits are low, companies will seek to raise rates, establish more stringent underwriting standards, or withdraw from the insurance business. Any of these alternatives may reduce the ability of a property owner to obtain insurance. Rate increases raise the cost of insurance to property owners. Stricter underwriting standards reduce the number of risks that companies will accept at standard rates. The reduction in the number of companies writing insurance is also likely to increase rates and possibly restrict underwriting standards. The result is more risks without insurance or covered at surcharged rates.

Profits also are directly related to the industry's capacity to absorb catastrophe losses—infrequent losses of large dimensions—such as those produced by the riots of recent months or the windstorms of the past years. Unless a rate has a proper allowance for an accumulation of contingency reserves, catastrophe losses deal a severe blow to profits, and may even impair the solvency of the company.

Insurer profits are a function of many factors: loss experience, operational expenses, price and rate level changes, and investment results. The results of underwriting and rating decisions are slow to unfold. They are best assessed over an extended period of time such as five to ten years.

The insurance business generates profits from two sources: underwriting profit from the premium payments of the insureds, and investment profit from the assets held by the company.

*Underwriting Profits.* The insurance industry generally takes the position that it must seek a underwriting profit without regard to investment income. A figure of 5 percent of premiums is frequently mentioned as a target; but there is no generally accepted standard. Most importantly, there are alternative ways of measuring underwriting profits for varying legal and financial purposes.

40

There are several approaches to measuring underwriting profits for property-liability insurance companies. Three of the most common are: (1) combined loss and expense ratio; (2) statutory underwriting profits; and (3) adjusted statutory underwriting profits.

*Combined loss and expense ratio.* This method is commonly used to evaluate the profit of a line of insurance and overall underwriting results. The combined loss and expense ratio is the sum of the loss ratio (losses and loss adjustment expenses incurred over premiums earned) and the expense ratio (expenses incurred over premiums written).

A ratio above 100 percent indicates the percentage by which losses and expenses have exceeded premiums; a ratio of less than 100 percent indicates the percentage by which losses and expenses have been lower than premiums. An aggregate combined loss and expense ratio for all lines of insurance can be used as a measure of profitability of overall company underwriting operations.

Table 9 compares the aggregate loss and expense ratios of stock and mutual insurers. Over the last ten years, the mutuals have had more profitable underwriting results. With the same or lower premium rates, the mutuals have used less of their premium income to pay losses and expenses. In

fact, if many mutual insurers had not elected to lower their initial rates in anticipation of expected excesses of premiums over losses and expenses, the combined ratios for the mutuals might have been even lower. Some stock insurers also charge lower-than-standard rates, but this is a less common practice.

A principal reason for the more profitable underwriting results of mutual insurers is their lower expense ratios. For all lines over the last ten years, the mutual expense ratio was nine points lower than the corresponding stock insurer ratio. If allowances were made for the difference in the premium bases, the mutuals would have had an even more marked expense advantage.

The loss ratios in Table 9 show that mutuals paid out more in claims per dollar of earned premium income than did stock insurers. However, if mutual premiums were adjusted to the stock insurer rate level, an adjustment for which the necessary data are not available, it would probably indicate a lower loss ratio for mutuals than for stock insurers. The lower loss ratio can be explained by the fact that mutuals as a group have been more selective in their underwriting than stock insurers. In part, this greater selectivity has been made possible because lower premiums

TABLE 9. AGGREGATE LOSS AND EXPENSE RATIOS OF STOCK AND MUTUAL PROPERTY-LIABILITY COMPANIES, 1957–1966

[In percent]

| Year | Stock companies | | | Mutual companies | | |
|---|---|---|---|---|---|---|
| | Loss ratio [1] | Expense ratio [2] | Combined loss and expense ratio | Loss ratio [1] | Expense ratio [2] | Combined loss and expense ratio |
| 1966 | 66.1 | 31.8 | 97.9 | 70.9 | 24.2 | 95.1 |
| 1965 | 69.1 | 32.8 | 101.9 | 73.1 | 25.0 | 98.1 |
| 1964 | 68.0 | 33.9 | 101.9 | 73.4 | 25.9 | 99.3 |
| 1963 | 66.3 | 34.7 | 101.0 | 71.4 | 26.5 | 97.9 |
| 1962 | 64.5 | 34.5 | 99.0 | 66.7 | 25.7 | 92.4 |
| 1961 | 64.4 | 35.0 | 99.4 | 63.6 | 25.6 | 89.2 |
| 1960 | 63.6 | 34.8 | 98.4 | 64.3 | 25.6 | 89.9 |
| 1959 | 62.5 | 35.3 | 97.8 | 64.7 | 25.3 | 90.0 |
| 1958 | 63.7 | 36.3 | 100.0 | 64.9 | 25.5 | 90.4 |
| 1957 | 66.2 | 36.7 | 102.9 | 65.5 | 25.8 | 91.3 |
| 1957–1966 | 65.6 | 34.4 | 100.0 | 68.5 | 25.4 | 93.9 |

[1] Losses incurred over premiums earned.
[2] Expenses incurred over premiums written.

SOURCE: *Best's Aggregates and Averages,* 1958–1967.

41

Case: 1:13-cv-00855-DD Document #: 31-42 Filed: 03/20/13 Page 104 of 403 PageID #: 38428

charged by mutuals have enabled them to select a better than average group of risks.

Table 10 shows combined loss and expense ratios for various lines of insurance for stock and mutual companies over the last ten years. The figures indicate generally unfavorable experience for the fire, extended coverage, and burglary and theft lines for stock insurers. In most years, the combined loss and expense ratios for these lines exceed 100%. The mutual insurers' experience has

generally been favorable for fire and allied lines but it is also relatively unfavorable for burglary and theft.

*Statutory underwriting profits.* A second measure of profits is statutory underwriting profit; losses and expenses incurred are subtracted from premiums earned.

This calculation produces profits or losses described as "statutory" because it is prescribed by law. By this method premiums earned are deter

TABLE 10. COMBINED LOSS AND EXPENSE RATIOS FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS FOR SELECTED LINES OF INSURANCE, 1957–1966

[In percent]

| | 1957–1966 | 1966 | 1965 | 1964 | 1963 | 1962 | 1961 | 1960 | 1959 | 1958 | 1957 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STOCK INSURERS** | | | | | | | | | | | |
| Straight fire insurance | 102.0 | 100.4 | 102.1 | 103.5 | 109.7 | 103.0 | 100.8 | 99.9 | 98.9 | 100.7 | 101. |
| Extended coverage | 103.9 | 89.3 | 127.3 | 108.6 | 97.5 | 105.3 | 113.4 | 106.2 | 95.3 | 92.4 | 104. |
| Other allied lines | 90.8 | 89.6 | 96.1 | 87.9 | 93.2 | 93.0 | 91.9 | 82.1 | 85.7 | 88.4 | 99. |
| Homeowners multiple peril | 104.5 | 99.9 | 107.2 | 112.1 | 108.0 | 105.2 | 104.4 | 98.3 | 91.3 | 97.4 | 99. |
| Commercial multiple peril | 95.9 | 93.2 | 97.4 | 94.7 | 95.1 | 92.7 | 92.6 | 103.2 | 103.8 | 116.3 | 123. |
| Glass | 103.1 | 101.1 | 104.0 | 107.4 | 104.9 | 104.1 | 106.0 | 100.9 | 102.3 | 101.0 | 99. |
| Inland marine | 100.1 | 102.1 | 102.7 | 98.9 | 100.4 | 95.3 | 98.5 | 97.5 | 97.9 | 101.4 | 107. |
| Miscellaneous bodily injury liability | 94.3 | 97.4 | 94.6 | 92.5 | 91.0 | 89.0 | 92.7 | 94.7 | 96.5 | 99.7 | 98. |
| Automobile bodily injury liability | 105.2 | 103.7 | 104.8 | 105.5 | 103.0 | 102.3 | 103.3 | 102.8 | 105.5 | 110.4 | 114. |
| Automobile property damage liability | 102.6 | 103.0 | 106.7 | 109.1 | 104.5 | 101.9 | 98.2 | 97.2 | 97.7 | 101.3 | 105. |
| Automobile collision | 97.7 | 95.5 | 101.9 | 105.5 | 101.0 | 97.6 | 93.9 | 93.0 | 92.5 | 95.1 | 100. |
| Automobile fire, theft, and comprehensive | 93.9 | 83.4 | 93.5 | 94.5 | 93.1 | 95.5 | 94.3 | 94.2 | 92.7 | 100.2 | 106. |
| Burglary and theft | 101.8 | 105.3 | 104.6 | 105.6 | 102.7 | 99.2 | 101.6 | 102.9 | 97.7 | 101.9 | 96. |
| **MUTUAL INSURERS** | | | | | | | | | | | |
| Straight fire insurance | 85.3 | 86.2 | 87.4 | 89.0 | 93.9 | 83.3 | 82.3 | 82.0 | 84.5 | 82.4 | 81. |
| Extended coverage | 91.4 | 81.5 | 108.3 | 101.7 | 86.7 | 95.0 | 93.6 | 96.1 | 82.6 | 82.1 | 88. |
| Other allied lines | 88.3 | 79.4 | 100.5 | 102.8 | 88.9 | 99.0 | 88.8 | 85.4 | 71.1 | 75.1 | 77. |
| Homeowners multiple peril | 97.8 | 95.9 | 104.6 | 106.9 | 101.9 | 95.6 | 91.1 | 90.8 | 79.3 | 81.4 | 84 |
| Commercial multiple peril | 88.9 | 86.5 | 92.0 | 92.0 | 87.3 | 77.4 | 81.4 | 93.5 | 97.2 | 95.9 | 107 |
| Glass | 98.5 | 101.0 | 99.1 | 106.8 | 103.0 | 95.3 | 98.3 | 96.1 | 95.9 | 92.4 | 92 |
| Inland marine | 89.7 | 92.4 | 91.0 | 90.5 | 89.5 | 84.6 | 87.5 | 92.8 | 88.3 | 87.8 | 92 |
| Miscellaneous bodily injury liability | 87.6 | 92.3 | 88.8 | 87.9 | 86.1 | 79.1 | 85.0 | 90.6 | 88.7 | 90.0 | 89 |
| Automobile bodily injury liability | 101.8 | 102.6 | 102.8 | 105.6 | 104.4 | 97.3 | 96.5 | 97.0 | 102.3 | 104.5 | 104 |
| Automobile property damage liability | 99.6 | 101.7 | 104.0 | 106.7 | 103.5 | 97.0 | 94.2 | 94.5 | 95.3 | 96.4 | 97 |
| Automobile collision | 90.4 | 92.9 | 97.3 | 100.8 | 95.7 | 89.7 | 84.8 | 84.2 | 82.5 | 81.7 | 87 |
| Automobile, fire, theft, and comprehensive | 89.3 | 79.4 | 87.3 | 90.5 | 91.9 | 92.5 | 89.7 | 90.1 | 88.7 | 92.4 | 9 |
| Burglary and theft | 99.5 | 110.0 | 100.7 | 103.4 | 103.4 | 93.2 | 94.0 | 99.2 | 92.5 | 96.0 | 9 |

SOURCE: *Best's Aggregates and Averages*, 1967, pp. 141-144 and 209-212.

42

mined on a pro-rata basis but most of the expenses are charged off at the inception of the policy.

*Adjusted statutory underwriting profits.* A third measure of profitability is adjusted statutory underwriting profit, so called because the procedure amounts to an adjustment of the statutory figure properly to reflect the incidence of expenses. This method is frequently employed by financial analysts.

*Comparison of statutory and adjusted statutory methods.* Table 11 shows underwriting profit and loss by statutory and adjusted statutory methods. The table illustrates that the impact of the adjustment is to increase the indicated profit. This is so because the period under review has been one of increasing premium writings, and therefore one during which expenses are overstated by the statutory method.

Stock insurers had cumulative statutory losses of over $1 billion in the last ten years. However, with adjustment, they made a cumulative profit of $11 million for the ten-year period.

The impact of the adjustment is less for mutual companies. One reason for this is the lower expense ratio of the mutuals. Mutuals show a ten-year profit of over $2 billion by either method. There was a general decline in profitability in most recent years, however. The record of the mutual insurers would have been even more impressive if many had not elected to reduce their initial premium rates.

*Investment Profit.* Insurers keep the bulk of their assets in investment securities and, thus, they generate an investment profit through interest, dividends, and capital gains.

Table 12 shows for both stocks and mutuals the investment income and total investment profit or loss over the last ten years.

Investment income, shown in column 1 of Table 12, excludes realized and unrealized capital gain. Investment profit or loss, on the other hand, shown in column 2, includes investment income as well as realized capital gains, and unrealized capital gains due to changes in the market value of common stocks and changes in the amortized value of bonds.

The investment income of stock insurers has exceeded that of mutual insurers because the stock companies have more assets. Capital gains have influenced the investment profit of stock insurers much more than the profit of mutual insurers because stock insurers invest a larger proportion of their assets in common stocks.

Comparisons of stock and mutual underwriting results are complicated by the fact that these two types of insurers have differing legal and financial structures.

TABLE 11. UNDERWRITING PROFIT OR LOSS OF STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS, 1957–66

[In millions]

| Year | Stock insurers | | Mutual insurers | |
|------|------------------|----------------------------------|------------------|--------------------------------|
| | Statutory profit | Adjusted statutory profit [1] | Statutory profit | Adjusted statutory profit [1] |
| 1966 | +$103 | +$306 | +$228 | +$275 |
| 1965 | −425 | −253 | +51 | +96 |
| 1964 | −348 | −235 | −2 | +33 |
| 1963 | −219 | −116 | +31 | +89 |
| 1962 | +3 | +113 | +307 | +308 |
| 1961 | +30 | +64 | +402 | +420 |
| 1960 | +66 | +164 | +351 | +369 |
| 1959 | +71 | +210 | +306 | +336 |
| 1958 | −93 | 0 | +263 | +291 |
| 1957 | −361 | −242 | +216 | +243 |
| 10-year total | −1,173 | +11 | +2,153 | +2,460 |

[1] The adjusted statutory underwriting profit is calculated by multiplying premiums earned by (100% minus the combined loss and expense ratio).

SOURCE: Data based on figures from *Best's Aggregates & Averages*, 1958–1967, *passim.*

43

Case: 1:13-cv-01569 Document #: 314-2 Filed: 03/20/17 Page 106 of 403 PageID #:38459

TABLE 12. FINANCIAL RESULTS FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS, 1957–1966

[In millions]

| Column | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Stock | | | | | | Mutual | | | |
| Year | Net invest-ment income [1] | Invest-ment profit or loss [2] | Operating gain on statutory basis [3] | Operating gain on adjusted basis [4] | Total realized gain [5] | Net invest-ment income [1] | Invest-ment profit [2] | Operating gain on statutory basis [3] | Operating gain on adjusted basis [4] | Total realized gain [5] | Dividends to policy-holders |
| 1966 | $806 | −$852 | $998 | $1,202 | $1,517 | $291 | $91 | $519 | $566 | $597 | $253 |
| 1965 | 852 | 1,466 | 428 | 599 | 847 | 253 | 332 | 304 | 349 | 397 | 228 |
| 1964 | 782 | 1,821 | 435 | 547 | 738 | 226 | 448 | 224 | 259 | 303 | 228 |
| 1963 | 721 | 2,017 | 502 | 605 | 766 | 206 | 318 | 237 | 295 | 314 | 233 |
| 1962 | 673 | −230 | 676 | 786 | 888 | 192 | 92 | 498 | 500 | 517 | 194 |
| 1961 | 621 | 2,516 | 650 | 685 | 860 | 175 | 369 | 578 | 595 | 609 | 215 |
| 1960 | 592 | 655 | 658 | 757 | 836 | 160 | 175 | 510 | 529 | 533 | 211 |
| 1959 | 534 | 1,021 | 605 | 744 | 825 | 137 | 167 | 444 | 473 | 475 | 203 |
| 1958 | 489 | 2,074 | 396 | 489 | 585 | 118 | 280 | 382 | 409 | 414 | 195 |
| 1957 | 461 | −166 | 100 | 219 | 280 | 108 | 60 | 324 | 352 | 354 | 199 |
| 1966–1957 | 6,621 | 10,622 | 5,448 | 6,633 | 8,142 | 1,867 | 2,332 | 4,020 | 4,327 | 4,513 | 2,159 |

[1] Gross investment income minus investment expenses but before taxes and excluding realized and unrealized capital gains and losses.

[2] Includes net investment income and realized and unrealized gains and losses.

[3] Net investment income plus statutory underwriting profit (excluding realized and unrealized capital gains and losses).

[4] Net investment income plus adjusted underwriting profit (excluding realized and unrealized capital gains and losses).

[5] Net investment income plus adjusted underwriting profit plus realized capital gains.

SOURCE: Best's Aggregates and Averages, 1958–1967, passim.

44

032868

*Overall Profitability.* The underwriting and investment operations combined make up the total profit picture for any one insurer and for the industry as a whole. Charts 1 and 2 display graphically investment income, investment profit, and statutory underwriting profit and loss for stock and mutual companies since 1957. They show the relative volatility of underwriting profits as compared to the steady growth of investment income. Investment profits (investment income plus realized and unrealized capital gains), on the other hand, are even more volatile than underwriting profits.

A comparison of Tables 11 and 12 shows that stock companies more than offset their underwriting losses with investment income. The figures in columns 3 and 8 labeled "Operating Gain on Statutory Basis" in Table 12 indicate that in no year did the property-liability insurance industry incur an operating loss. The same results are reached on an adjusted basis (columns 4 and 9).

This is true not only for the ten-year period shown in Table 12 but for every year beginning with 1913, the earliest year for which aggregate data are readily available.

Columns 5 and 10 include totals of investment income, realized (but not unrealized) capital gains, and adjusted underwriting profit. Column 11 indicates the amount of dividends paid to policyholders by mutuals—over $2 billion during 1957–1966.

*Rate of Return.* The rate of return on investment is a common financial measure. It can be calculated in a number of ways depending both on the definition of return and the definition of the investment base to which the return is related. Table 13 shows the return measured in four different ways: (1) operating return on a statutory basis: investment income, plus statutory underwriting profit, are divided by policyholders surplus; (2) return on adjusted basis plus realized capital gains: investment income, plus adjusted underwriting



**CHART 1**

**STOCK UNDERWRITING AND INVESTMENT RESULTS**

1957–1966

45





CHART 2

MUTUAL UNDERWRITING AND INVESTMENT RESULTS

1957-1966

TABLE 13. RETURNS ON INVESTMENT FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS
1957-66

| | Stock | | | | | Mutual |
|---|---|---|---|---|---|---|
| Column | 1 | 2 | 3 | 4 | 5 | 6 |
| Year | Policy-holders surplus | Operating return on statutory basis [1] | Return on adjusted basis plus realized capital gains [2] | Return on statutory basis plus all capital gains [3] | Return on adjusted basis plus all capital gains [4] | Policy-holders surplus |
| | Millions | Percent | Percent | Percent | Percent | Millions |
| 1966 | $12,007 | 8.3 | 12.6 | −3.7 | −2.1 | $2,896 |
| 1965 | 13,660 | 3.1 | 6.2 | 7.6 | 8.9 | 2,814 |
| 1964 | 13,691 | 3.2 | 5.4 | 10.8 | 11.6 | 2,689 |
| 1963 | 12,642 | 4.0 | 6.1 | 14.2 | 15.0 | 2,527 |
| 1962 | 11,146 | 6.1 | 8.0 | −2.0 | −1.1 | 2,448 |
| 1961 | 11,719 | 5.5 | 7.3 | 21.7 | 22.0 | 2,323 |
| 1960 | 9,495 | 6.9 | 8.8 | 7.6 | 8.6 | 1,960 |
| 1959 | 9,381 | 6.5 | 8.8 | 11.6 | 13.1 | 1,802 |
| 1958 | 8,619 | 4.6 | 6.8 | 23.0 | 24.1 | 1,647 |
| 1957 | 7,073 | 1.4 | 4.0 | −7.5 | −5.8 | 1,424 |
| 1966–57 weighted average | — | 5.0 | 7.4 | 8.6 | 9.7 | — |

46

032870

Case: 1:13-cv-00855-4 Document #: 31-42 Filed: 03/20/13 Page 109 of 403 Page ID #:33473

TABLE 13. RETURNS ON INVESTMENT FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS 1957–66—Continued

| Column | Mutual—Continued | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7 | | 8 | | 9 | | 10 | |
| Year | Operating return on statutory basis [1] | | Return on adjusted basis plus realized capital gains [2] | | Return on statutory basis plus all capital gains [3] | | Return on adjusted basis plus all capital gains [4] | |
| | Before dividends | After dividends | Before dividends | After dividends | Before dividends | After dividends | Before dividends | After dividends |
| | Percent | Percent | Percent | Percent | Percent | Percent | Percent | Percent |
| 1966 | 17.9 | 9.2 | 20.6 | 11.7 | 11.0 | 2.3 | 12.6 | 3.9 |
| 1965 | 10.8 | 2.7 | 14.1 | 6.0 | 13.6 | 5.5 | 15.2 | 7.1 |
| 1964 | 8.3 | −0.1 | 11.3 | 2.8 | 16.6 | 8.1 | 17.9 | 9.4 |
| 1963 | 9.4 | +0.1 | 12.4 | 3.2 | 13.8 | 4.6 | 16.1 | 6.9 |
| 1962 | 20.3 | 12.4 | 21.1 | 13.2 | 16.3 | 8.3 | 16.3 | 8.4 |
| 1961 | 24.9 | 15.6 | 26.2 | 17.0 | 33.2 | 24.0 | 34.0 | 24.7 |
| 1960 | 26.0 | 15.3 | 27.2 | 16.4 | 26.8 | 16.0 | 27.7 | 16.9 |
| 1959 | 24.6 | 13.3 | 26.4 | 15.1 | 26.3 | 15.0 | 27.9 | 16.6 |
| 1958 | 23.2 | 11.3 | 25.1 | 13.3 | 33.0 | 21.2 | 34.7 | 22.8 |
| 1957 | 22.8 | 8.8 | 24.9 | 10.9 | 19.4 | 5.4 | 21.3 | 7.3 |
| 1966–57 weighted average | 17.8 | 8.2 | 20.0 | 10.4 | 19.9 | 10.3 | 21.3 | 11.7 |

[1] Investment income plus statutory underwriting profit divided by policyholders surplus.

[2] Investment income, plus realized capital gains and losses, plus adjusted underwriting profit or loss divided by policyholders surplus.

[3] Investment income, plus realized and unrealized gains and losses, plus statutory underwriting profit or loss divided by policyholders surplus.

[4] Investment income, plus realized and unrealized gains and losses, plus adjusted underwriting profit or loss divided by policyholders surplus.

SOURCE: Computed from *Best's Aggregates and Averages, 1958–1967*, passim.

profit, plus realized (but not unrealized) capital gains, all divided by policyholders surplus; (3) return on statutory basis plus all capital gains: investment income, plus statutory underwriting profit, plus realized and unrealized capital gains, all divided by policyholders surplus; and (4) return on adjusted basis plus all capital gains: the same as (3) but using adjusted rather than statutory underwriting profit.

These four returns appear in columns 2–5 for stocks and 7–10 for mutuals. The mutuals show all returns before and after dividends.

Table 13 reveals that both the stock and mutual insurers have generated profit over the last ten years on the funds provided by owners and policyholders. The mutual companies have been more profitable than the stocks.

However, mutual insurer returns, after dividends to policyholders, are closer to the stock company returns.

The inclusion of capital gains in the calculations raises the ten-year average return on investment more for the stock companies because their assets are more heavily invested in common stocks than are mutual company assets. However, associated with this higher rate of return is a much greater variability in the annual rates.

## Relation to Urban Core Insurance Problems

Given this overall profit picture, it is not difficult to see why insurance companies are reluctant to write urban core business. They view it as undesirable business, for it most directly affects the most unprofitable lines. The emergence of the riot risk makes urban core business even more undesirable, because it threatens solvency as well as profitability. It adds a new catastrophe to windstorm and other perils.

The riot losses had their greatest impact on the fire and extended coverage lines. These are among the most unprofitable of all insurance lines. Affected by a long series of catastrophic windstorm losses, they have registered high loss ratios.

Fire and extended coverage losses have had their greatest impact on the stock insurers because they write proportionately more of this kind of cov-

032871

erage than their mutual counterparts. Stocks write about 80 percent of all fire and extended coverage premiums. Also, stocks are more vulnerable to adverse effects from these lines, since they write more fire and extended coverage premiums per dollar of policyholders surplus than mutuals. In 1966, for example, stocks wrote fifteen cents of fire and extended coverage premium per dollar of surplus while the mutuals wrote only twelve cents per dollar of surplus. The stocks also have a higher loss ratio on fire and extended coverage than the mutuals. In 1966, the stock fire and extended coverage loss ratios were 59.6 and 46.7 percent respectively while mutual ratios were 51.7 and 44.5, respectively.

Further, the stock companies most adversely affected are the large ones. In 1966, of the 800 stock companies in existence, 150—each writing at least $2 million in fire premium—wrote about 90 percent of all stock fire premiums. The top 20 stock groups wrote about 55 percent of all fire insurance

premiums and about 60 percent of all stock fire premiums.

The mutuals write less fire and extended coverage than stocks, both proportionately and in absolute amounts. They have lower combined loss and expense ratios because of lower expenses and more selective underwriting. The survey of the twenty largest groups of property-liability insurers conducted by the Panel found that the twelve largest stock companies reported net incurred riot catastrophe losses during 1965–1967 ten times larger than the six largest non-stock companies (five mutuals and one reciprocal). These comparisons include losses paid to reinsureds, and deduct recoveries from reinsurers.

In brief, riot losses in particular and urban core business in general most directly affect relatively unprofitable property insurance lines—lines already burdened with heavy catastrophe losses and exposures. Further, these lines are written most heavily by the least profitable segment of the insurance business.

## State Regulation

### In General

The insurance industry is subject to extensive governmental regulation. Each state has voluminous laws establishing the terms on which insurance companies may do business in the state.

Rules limit the organization, reorganization, and liquidation of insurance companies. Each state provides extensive criteria governing the day-to-day operations of insurance companies, including such matters as the lines of insurance they can write, the rates they may charge, the policy forms they must use, the investments they may undertake, the capital and surplus they must maintain, the reserves they must establish, the reports they must file, and the trade practices they must avoid.

The extensive regulation of insurance companies is no accident. The public's interest in a properly functioning insurance system requires governmental supervision.

*Fair Dealing.* The insurance contract is a technical legal document, establishing a complex business arrangement. The average consumer is ill-equipped to evaluate the contract or the likelihood

of its performance. In most cases, the policyholder understands neither the terms of the contract nor the activities of the insurer standing behind it. Without regulation, there is no assurance of fair policy forms and trade practices.

*Financial Integrity.* Because of the complexities of the insurance process, insurance ventures, in the absence of careful regulation, would provide tempting opportunities for financial speculation, or even fraud. Premiums are paid to the insurer at the outset, but the obligations of the insurer to pay losses may not arise for many years. Consequently, insurers are like trustees—they hold other people's money. If the insurance protection purchased is in fact to be available when losses occur, the safety and solvency of the insurer must be preserved.

*Prices.* Another major function of regulation is to protect the insurance consumer against having to pay excessive or unfair premiums. Most states provide that rates shall not be "excessive, inadequate, or unfairly discriminatory." State regulation can not guarantee that insurance will be within the insured's means, but it can help prevent

48

rates from being excessive in relation to the risk assumed by the company.

In order to have sufficient statistical data to make rates, insurers are allowed to pool statistics and make rates together. This in a sense is a legalized form of price-fixing, but it is regulated by the state insurance departments.

A significant segment of the industry claims that rate regulation is, in fact, contributing to an inadequate insurance supply. According to a survey of the insurance industry in April, 1967, conducted by the National Association of Insurance Commissioners in eleven states representing the most important types of rate regulation: (1) Almost one-third of the companies indicated some tightening of their fire insurance underwriting because of rate regulation; and almost one-half reported that they had either intentionally reduced their operations or expanded their operations less than they had originally planned because of the effects of rate regulation; (2) Many companies said they believed an adequate supply of insurance was less likely under the most common form of regulatory laws than under other types of laws permitting freer competition; and (3) A large proportion of insurers reported inadequate rates, and with some exceptions, more insurers claimed rate inadequacies in states with rigid rate regulatory laws than in states with more flexible laws.

According to this industry viewpoint, greater price flexibility would increase the supply of insurance. At the same time, however, it might permit unfair price discrimination based on such factors as underwriting and pricing by area alone.

Price flexibility in special situations is now achieved in a variety of ways: (1) The state insurance commissioner may approve substandard risk rating plans. These plans may include deductibles and carry a schedule of special charges. (2) Most states have consent-to-rate provisions under which an insured may agree in writing to accept a higher-than-standard rate. Most of these consent-to-rate provisions require that such rates be approved in each individual case by the state insurance department. (3) Excess, or surplus lines, insurance written by companies not licensed (admitted) to do business in a state, is usually controlled by surplus lines statutes. These statutes are directed mainly toward the agent or broker who places the business. Prices are flexible; but, by

definition, the non-admitted market lacks some of the regulatory safeguards protecting the admitted market.

*Availability.* In addition to these traditional functions, state regulation has increasingly recognized the interest of consumers in obtaining fair access to needed insurance coverages. The insurance enterprise is increasingly being treated as a public utility in the sense that the industry has a duty to offer basic coverages on equal terms to all those who need it.

This trend is obvious with respect to workmen's compensation and automobile insurance. All states now attempt to guarantee a market for both of these lines by assigned risk plans or assigned risk pools. These plans and pools furnish insurance to qualified applicants who can not obtain protection in the regular market. More recently, some commissioners have acted vigorously to maintain an adequate urban core property insurance market, even in the absence of specific statutory mandates to do so.

### Regulation in Practice

In most states, regulation is carried out by an insurance department headed by a commissioner. The department may be an independent regulatory agency or part of another state agency. The commissioner is appointed directly by the governor in about thirty states. In about eight states he is appointed by someone other than the governor. In about twelve states he is himself an elected official. In one he is a civil servant.

It may go too far to describe the commissioner as "a combination judge, prosecuting attorney, and hangman," as one noted expert on insurance regulation has said. But it is no exaggeration to say that the commissioner wields enormous influence over a powerful and important industry. His legal powers over the insurance industry are extensive, and so are his powers of moral suasion. The state insurance commissioner, in a real sense, determines the content of state regulation by the way he administers his authority.

In some respects, however, it is easy to credit the commissioners with more power than they may in practice have, especially when considering a newly emerging responsibility for availability in urban core areas. Thus, the insurance commis-

49

Case: 1:13-cv-08564 Document #: 31:34-42 Filed: 03/20/23 Page 162 of 140 Page ID #: 33456

sioner has only limited authority to regulate cancellations, non-renewals, and refusals to write. He may promulgate directives and rely on moral suasion. He may pressure insurance companies to enter urban area plans and pools. He may exact voluntary concessions and commitments from companies. But whether such approaches can be effective over the long run is an open question.

The commissioner's control over insurance company underwriting policy is quite limited. Even the authority to prohibit mass cancellations is unclear. The Attorney General of Michigan ruled on August 11, 1967, that cancellations during a riot period would be illegal, but this ruling has not been tested in the courts, and it was not meant to apply after a riot.

Although recent statutory enactments and contractual provisions have restrained individual automobile cancellations, no legislative restraints exist for property coverages.

It is not clear whether state regulators have adequate authority to control restrictive underwriting and to prohibit red-lining, blackout maps, keepout areas, and other area underwriting practices. A commissioner may attempt to act under laws relating to "unfair or deceptive practices" and "methods and practices" not in the interests of the policyholders. But the present statutory framework may be inadequate to provide protection against practices that unfairly deny a policyholder needed insurance.

Many commissioners are hampered in their regulatory activities by limited financial resources and personnel. As a result, commissioners in recent years have attempted to identify the crucial regulatory areas and to concentrate on them. For example, there has been recent emphasis on higher capital and surplus requirements, as one of the most important methods of assuring company solvency and safety.

The lack of resources affects the ability of the state insurance departments to keep abreast of consumer needs. When an insurance consumer is unable to obtain needed insurance, when he is asked to pay excessive rates, when his policies are cancelled or not renewed; when he has any problem relating to the availability of insurance, he normally seeks help first from his agent, broker or company.

If this proves unsatisfactory, he may in some instances resort to the courts. But even if there is a

legal remedy, the costs of legal advice and litigation are likely to be prohibitive.

The consumer may turn to his trade union, a community action group, or similar organization. Many private groups of this nature have been resourceful in aiding their members with insurance problems. But many consumers lack knowledge of insurance and not all have access to these sources of assistance.

Some consumers look to their city governments. Even though city officials are interested in the fundamental causes of insurance market problems and are sympathetic toward relieving them, they usually lack the time, inclination or legal authority to become directly involved. A survey conducted by the Panel disclosed that most city governments simply refer complaints to the state insurance department.

The response of insurance departments to consumers' problems varies from state to state. Most states have a separate complaint division in the department, but their offices are generally located only in one city. Some understaffed departments have delegated authority for investigating complaints to insurance agents.

Most state insurance departments feel a strong responsibility to hear and resolve consumer complaints. Some state departments maintain informal placement facilities to help secure insurance for some problem risks. But most try to avoid becoming an insurance consulting service or an alternative marketing conduit.

Some departments do not keep adequate complaint records, which can be important indicators of the nature and extent of consumer problems. Complaints made in writing are filed, but telephone messages are rarely recorded and sometimes not even accepted. As a result, it is more difficult to use complaints as a basis for developing corrective measures.

Most consumers are probably unaware that state insurance departments exist to help them. In fact, those who need the help of the department most are often the least likely to know of its existence; and passive procedures, simply receiving complaints, will not lead to an adequate urban market. Consumer protection requires aggressive actions— for example, publicity and educational campaigns, and surveys to test the adequacy of the insurance market.

50

Read

**State and National Problems**

Besides renewed concern with problems within their states, insurance commissioners have also been taking a more careful look at interstate aspects of their problems. The National Association of Insurance Commissioners (NAIC), an organization of all fifty state insurance commissioners, has moved recently to coordinate state efforts more fully.

With fifty states regulating insurance, sometimes in different ways and often without power to act beyond their borders, regulatory conflicts and vacuums are bound to arise. Mail order insurance, for example, has been an especially troublesome problem.

For another example, reinsurance—a vital aspect of the industry—is not examined in any depth at the state level. Information and data concerning reinsurance are practically non-existent. State law relating to reinsurance mainly concerns its impact on the financial statement and the effect on solvency. Also, because reinsurance is heavily international, it is questionable whether the states can be expected to exercise effective control over it.

The lack of regulation of reinsurance has been justified on the theory that reinsurer and reinsured are both knowledgeable and can protect their own interests. The lack of basic information, however, cannot be justified. The primary insurers are heavily dependent on the reinsurance market. There should be adequate information about that market to be sure it performs its function, and to be able to discover and prevent market inadequacies before their impact becomes critical. The December 1967 meeting of the NAIC devoted some attention to proposals for a study of reinsurance. An NAIC official at that meeting noted that there was a lack of information about reinsurance, and that prior investigators have been unable to obtain needed data. A study of life reinsurance was initiated.

Perhaps the most conspicuous aspect of governmental regulation of insurance is its almost exclusive control by the fifty states. There is probably no other major industry that has so little involvement with the federal government.

The reason for the pattern of state regulation goes back to a decision by the United States Supreme Court in 1869, in *Paul* v. *Virginia*, 8 Wall. 168, that insurance contracts were not articles of commerce, and that therefore the insurance industry and state regulation of it were not sub-

ject to federal jurisdiction. This decision remained the law until 1944, when the Supreme Court, in *United States* v. *South Eastern Underwriters Association*, 322 U.S. 533, held that Congress had the power to regulate insurance under the Commerce Clause of the Constitution.

By then, however, the roots of the insurance industry in the states were deep. Within nine months of the Supreme Court decision, the Congress passed the McCarran-Ferguson Act ("Public Law 15"), declaring that continued regulation and taxation of insurance by the states were in the public interest and generally exempting the industry from federal antitrust laws.

Over the years, many critics, including some in Congress, have appraised state regulation and found it wanting, at least in some respects. In 1958, for example, a Senate Sub-Committee on Antitrust and Monopoly launched an investigation to determine "whether the states have faithfully honored the mandate of the McCarran-Ferguson Act * * * by regulating the insurance industry in the public interest." It concluded that the basic weaknesses of state regulation pointed out in an early 1923 study were still apparent. Among its other conclusions were that:

> The compensation paid insurance commissioners in most states is grossly inadequate to attract and retain qualified people.

> Many states are both understaffed in their insurance departments and poorly staffed in terms of qualification of their personnel.

> The budgets of insurance departments are generally inadequate for the responsibilities placed on them.

> The admission and licensing of foreign insurers has not been conducted in as efficient and direct manner as the public interest dictates.

> The evidence gathered on state action for enforcement of statutes on restraint of trade, monopoly, and unfair trade practices indicate lax supervision * * *.

Recently, a report on automobile insurance problems by the staff of the Antitrust Sub-Committee of the Committee of the Judiciary of the House of Representatives observed that while some individual commissioners were performing outstanding jobs, "a number of factors point to the inadequacy of State insurance regulation."

As with governmental regulation of any indus-

51

try, the basic question is whether the regulation stifles or encourages the industry's incentive and ability to meet the needs of the public. Insurance is currently the subject of intense public concern. There are critical problems with automobile liability insurance, life insurance, and property insurance. The problems in each of these insurance areas are complex and the answer to the effect and adequacy of state regulation may differ depending on which of these insurance problems is being considered. As a practical matter, each of these problems may well have to be resolved within its own terms on a pragmatic basis.

It is important to recognize that while the regulation of insurance is extensive, the content of the regulation has by no means been static. As the insurance business has grown in response to the changing needs of the public, the pattern of regulation has had to adapt to new problems presented. As the current crises in various insurance areas are resolved, a basic underlying question is whether the increasing prevalence of problems that are national in scope and importance can be handled by the states. Further, to the extent that solutions call for some sort of national approach, the question becomes what form it should take—specifically, what role should the federal government play. Our recommendations have attempted to answer this difficult and controversial question with respect to the inner city property insurance problems. We basically believe in the abilities of the state insurance commissioners to take the primary responsibility for attacking these problems, and that any federal role should be supplementary to this effort.

The National Association of Insurance Commissioners has recently urged a cooperative effort by the insurance industry and all levels of government to solve this critical problem. The NAIC stated:

> The existence of stable and continuous markets for those property coverages ordinarily required for residential and mercantile financing is essential to orderly economic development and any consideration of the insurance problems of urban areas must be seen in that perspective.

> The broadest possible distribution of the financial burden of the riot and civil commotion hazard at the local, state and national levels is necessary to the end that the underwriting deterrent, which unlimited exposure to these perils creates, may be alleviated.

> In this situation and for such temporary period until civil conditions stabilize, it is recognized that unusual measures will be necessary. These may include required special civil disorder loading of all property premiums, pooling of the premium funds so produced, and of the risk in whole or in part at both the state and national levels.

> The NAIC calls upon the property and casualty insurance industry, as a whole, to come forward promptly with a voluntary plan to accomplish these objectives. Failing the prompt creation of workable, voluntary solutions, the NAIC recognizes the need for and is not opposed to reasonable plans statutorily created or implemented by the state and/or federal governments to secure such objectives.

We welcome this constructive statement and believe that our recommendations provide the necessary cooperative program to meet the insurance crisis of our cities.

## Conclusion

The insurance enterprise is a private business that seeks to make a profit by providing essential protections to property owners. Homeowners and businessmen in urban core areas require the protection provided by fire and allied coverage and crime insurance in the same way as any other property owners.

Yet the insurance enterprise has not functioned

well to provide coverage in the urban core. The reasons for this are varied and mutually reinforcing, and it is clear that changes must be made in the operations of the insurance process in order supply the insurance needs of urban core resident and businessmen.

Thus, under present arrangements, agents a not writing sufficiently in urban core areas, ar

**52**

indeed, are discouraged from writing there. The insurance marketing system has an inherent tendency to avoid urban core business.

The underwriting process discourages the acceptance of urban core risks. Inner city risks have not received equal treatment with those from other city areas and the suburbs. The underwriting function has taken place in general without careful verification of the actual extent of particular inner city hazards.

The same pattern prevails with respect to rating. Rates are set in a manner which discourages insuring inner city risks. Far more data and concern for the impact of rates on inner city homeowners and businessmen are required to overcome these imperfections of the present system.

But to point out that the insurance enterprise works inadequately in serving the urban core market is not to condemn any individual insurance companies. An analysis of the profits of these companies shows clearly that their underwriting of business must be cautious so as to avoid excessive losses.

In addition, primary insurance companies are under pressure from reinsurers, and this limits their capacity to write in the urban core areas. The reinsurance available to insurers relates directly to the amount of inner city risks which may be underwritten and to the industry's ability to continue to cover the riot risk.

Any attack on the insurance crisis of the inner city must take into account the details of the insurance process and how it operates. The Panel's recommended program has been developed with these detailed workings in mind. It has taken account of the present regulatory pattern and has attempted to preserve this traditional pattern while facilitating the ability of the states, the industry, and the federal government to cooperate to meet the insurance needs of our cities.

53

## Chapter III

# PRESENT RESPONSES TO URBAN CORE INSURANCE PROBLEMS

## In General

The insurance problems of urban core residents have led to efforts in a good number of communities to seek solutions.

Some state insurance departments have assisted individuals who have complained that insurance was unavailable. As part of their regular operations, they have informally encouraged companies to write more heavily in urban core areas.

In some areas, the industry, in cooperation with state and local officials, has voluntarily set up formal arrangements to induce greater writing of insurance in urban core areas. These are usually called Urban Area Plans—or sometimes, the Boston Plan, after the first one developed. Most of these plans are of relatively recent origin, and their operations have been neither well-understood nor widely publicized. This chapter describes all of the Urban Area Plans now in existence.

In one instance, the response to urban core insurance problems has been a pool of insurance company resources. After the Watts riot in 1965, the industry, at the request of the California Insurance Department, set up a voluntary arrangement to provide insurance to businessmen in the Watts area of Los Angeles. Although highly limited in scope, the Watts pool has received considerable attention because of the possibilities it suggests for helping to solve urban core area insurance problems.

Many states have considered legislation to create assigned risk pools or similar arrangements that would compel companies to write policies for those inner city risks meeting basic standards set by the state. In Michigan, for example, the Insurance Department has drafted a plan of this type which the Governor has placed before the State Legislature with a request for prompt enactment. In New Jersey the Insurance Department has held several meetings with the industry to work out agreement on a pool plan. In New York, Connecticut, Ohio, Texas, and other states, plans of this nature are receiving active consideration.

Concern with urban core insurance problems is not limited to the state and local levels. In the present session of Congress, more than 200 insurance bills, incorporating a variety of goals and approaches, have been introduced. Several Congressional committees have held hearings and have undertaken the preparation of appropriate legislation.

The insurance industry has also come forward in recent months with suggestions for dealing with urban core insurance problems, principally at the public hearings held by the Panel.

This chapter describes the principal actions that have already taken place, and those additional ones that have been proposed to solve urban core insurance problems. This material provides important background for consideration of the Panel's recommended program.

032879

*Real*

# Urban Area Plans

On December 1, 1967, Urban Area Plans were in effect, formally or informally, in thirteen states: California, Delaware, Illinois, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, New York, North Carolina, Ohio, Pennsylvania, and Wisconsin.

In some cases, the plan covers only a specified city or area; in others, it applies to the entire state. While the plans differ somewhat in detail—sometimes in very important details—their operating patterns are basically the same.

Generally, the plans provide that, upon request, the local rating (inspection) bureau will inspect a property and prepare an inspection report without cost to the property owner. The report includes information on pertinent structural and occupancy features of the building for which insurance is sought and on relevant features of nearby structures. The purpose of the inspection is to distinguish between properly maintained properties and those that have hazards which affect their insurability.

A copy of the inspection report is sent to the insurance company designated by the persons requesting the inspection. Based on information in the report, the company makes a decision. It may decide to:

1. Insure the property.

2. Insure the property if certain conditions it considers unfavorable are corrected.

3. Decline to insure the property.

The decision is reported to the rating bureau and made known to the property owner. Under some plans, a decision declining to write coverage is also reported directly to the state insurance department.

Under almost all plans, the rating bureau informs the state insurance department periodically of the decisions made by each individual company as reported to the bureau under the plan. These reports vary in detail from plan to plan, but generally they are designed to inform the department on the number of risks under the plan that each company has (1) accepted, (2) accepted on condition that certain improvements be made, and (3) declined. In this way, the state insurance department can monitor the operation of the plan and the performance of each participating company. It also places the department in a position to inquire

why a company received only a few or no applications for insurance under the plan.

There are two principal types of Urban Area Plans:

1. Those requiring an inspection by the rating bureau, or a waiver of the inspection, before insurance can be declined or written above standard rates.

2. Those providing for an inspection only upon the request of the insurance company or producer; but no inspection is required before insurance is written above standard rates.

Other differences in existing Urban Area Plans are best understood in the light of the background, operation, and requirements of each individual plan.

## The Boston Plan

The Urban Area Plan originated in 1960 in Boston, Massachusetts. It was designed to relieve a severe shortage of fire and extended coverage insurance in an area of the city known as Roxbury.

*Background of the Boston Plan.* Before the plan was adopted, the insurance industry considered all of Roxbury as "blighted" and regarded all residential properties there as substandard. To support this conclusion the industry could point out that Roxbury had the highest rate of fire loss of any locality in Massachusetts.

By 1960, most, if not all, standard rate companies had already ceased providing insurance protection for residential property in Roxbury regardless of its condition. Even companies that specialized in providing insurance at rates in excess of standard—to compensate for increased fire hazards—had started to withdraw from the area.

To assist Roxbury residents in obtaining property insurance, some members of the Massachusetts Legislature proposed adopting an assigned risk plan. This plan would have required companies to provide insurance. In response to this proposed legislation, the New England Insurance Rating Association undertook a study to find alternative ways of providing property insurance.

The essential reason for an inadequate insurance market in Roxbury, the Association found, was the failure of the companies to distinguish between

**56**

good and bad risks. Agents and brokers did not inspect properties in Roxbury for the companies, perhaps because inspections were thought to be distasteful or uneconomic; it may also have been that some agents and brokers preferred to receive the higher commissions available from writing policies at rates in excess of standard.

An all-industry committee, representing the Rating Association, the mutual and stock companies, and agents and brokers, was formed to develop a solution. The committee agreed that (1) there should be a thorough inspection report on all properties within the problem area, and (2) no company writing fire insurance in the State of Massachusetts should reject a risk solely because of the area in which it was located.

The committee proposed that the inspections be performed by the staff of the New England Insurance Rating Association and without charge to the property owner. The New England Insurance Rating Association is a nonprofit association which provides its affiliated insurance companies with various services and bills them for its costs in proportion to the amount of premiums they write in the State of Massachusetts.

This Association had already been inspecting mercantile and commercial property in Massachusetts for fire and extended coverage rating purposes. Its staff of inspectors was, therefore, trained and experienced in detecting fire hazards.

The committee also proposed that a company, agent, or broker be required to obtain an inspection by the New England Insurance Rating Association, before fire and extended coverage insurance could be written at more than standard rates. The standard rate included a long-existing district charge in Roxbury of five to fifteen cents per hundred dollars of coverage to compensate for the conflagration risk.

The committee considered allowing the companies to add an additional amount to the premium rate for specific fire hazards found by the inspectors. But they rejected this surcharge rating plan on the theory that surcharges provided neither a sufficient incentive to the property owner to correct the condition nor adequate compensation to the companies for taking the risk. Instead, the committee preferred a plan which would provide insurance only to those who removed the fire hazard from their property.

Further, the committee proposed that the companies report on an action sheet to the Rating Association their decision to (1) accept a risk, (2)

accept it if certain specified conditions were corrected, or (3) decline a risk.

If a company agreed to write the coverage after certain conditions were improved, it had to designate specifically in the action report what the property owner needed to do before coverage would be provided. If the company declined to provide coverage, it had to state in the action report the reasons for its decision.

Each month, the Rating Association would transmit to the Massachusetts Insurance Department the decisions of each company in response to the applications for insurance submitted under the plan.

Based on the information in these reports, the Insurance Department could determine whether individual companies were discriminating against property owners in Roxbury by unreasonably refusing to provide coverage.

The Massachusetts Insurance Department approved the proposal and requested each insurance company admitted to write fire and extended coverage business in Massachusetts to affirm to the Department that it would cooperate in the plan. The companies did so by sending formal letters stating their commitment.

The plan became operational on October 3, 1960. *Problems with the Original Plan.* The plan started slowly. From October 3, 1960, to the year end, only 273 requests for inspections were received by the Rating Association. After inspection, 149 of these risks were declined. The situation improved somewhat in 1961, when 1,632 requests for inspections were received and only 289 of the risks declined.

Notwithstanding this improvement, several problems were evident. Most residents simply did not know about the plan. Neither agents nor brokers informed them of the plan or encouraged them to use it. And it appeared that some agents and brokers were taking advantage of the lack of public knowledge to continue to obtain the higher commissions available from writing policies at rates in excess of standard. Those few residents and community leaders of Roxbury who were aware of the program were suspicious of its purpose and unenthusiastic about its potential.

Late in 1961, several steps were taken to correct these problems:

1. An educational program was undertaken to inform residents of the availability and operation of the plan. For example, a

**57**

032881

brochure prepared by the Rating Association was widely distributed to the residents of Roxbury, and Rating Association personnel spoke at civic and church meetings. Newspapers contributed to the publicity.

Educational efforts have continued since then on a limited scale. The Boston Redevelopment Authority, for example, now distributes a one-page explanation of the program, and Rating Association personnel still, but only occasionally, speak about the plan at civic and church meetings.

2. The plan was revised to permit property owners to ask for an inspection. Orginally, only an agent, broker, or company could request an inspection, and this was required to be in writing. To facilitate requests, the property owner was allowed to ask for an inspection, and the requirement for a written request was abandoned.

3. A change in procedure was made. Only after three companies declined an application for insurance at standard rates could a policy be written at rates in excess of standard. This prevented agents and brokers from turning down applications for insurance without company knowledge.

4. When it became widely known that the Massachusetts Insurance Department was considering suspending the license of a particular broker who was not complying with the requirements of the plan, agents and brokers began to cooperate more fully in carrying out the objectives of the plan.

Following the adoption of these changes in the plan, the number of requested inspections increased while the proportion of declined risks decreased:

| Year | Applications received [1] | Risks declined [1] | Percentage of risks declined |
|---|---|---|---|
| 1962 | 4,452 | 581 | 13 |
| 1963 | 3,959 | 284 | 7 |
| 1964 | 3,760 | 285 | 8 |
| 1965 | 3,735 | 186 | 5 |
| 1966 | 3,920 | 176 | 4 |
| 1967—January through August | 2,773 | 94 | 3 |

[1] Information received from the Rating Association.

The plan has been widely publicized as applicable to dwellings and their contents only in Roxbury. Nevertheless, the Rating Association will also inspect properties anywhere in Massachusetts if the property owner complains of trouble in obtaining fire and extended coverage insurance, including coverage on mercantile and commercial property.

On September 21, 1967, the plan was publicized as being applicable to the North Dorchester area of Boston, a community contiguous to Roxbury. Now, the Insurance Department generally will disapprove an application to write a policy in this area at an excess rate unless the property has been inspected and three declinations at standard rates are on file with the Rating Association.

*Day-to-Day Operation of the Boston Plan.* Two Rating Association employees inspect properties under the plan on a full-time basis.

Requests for inspections are generally received by telephone, often from the property owner. After a request is received, a time for inspection is set when the building owner or his representative can accompany the inspector. The inspection is generally made within one or two days after the request is received, but it can be scheduled sooner if necessary to meet the needs of the property owner.

Inspections are usually made during the Rating Association's normal working hours. Occasionally, when a property owner cannot afford to take time off from his work and cannot arrange for someone else to accompany the inspector through the property during the Rating Association's working hours, the inspectors are willing to rearrange their schedule to accommodate the needs of the owner.

The presence of the building owner, or his representative, during the inspection is considered essential to the purposes of the program, for two reasons.

First, it is necessary to go inside the building to make a meaningful inspection, and for this, the Rating Association must be sure it has the property owner's unqualified consent.

Second, the purpose of the plan in Boston is to have the building owner make the necessary improvements, inside and out, to remove any fire hazards found during the inspection.

The inspector looks into every room for accumulated rubbish, overloaded wiring, broken plaster, overcrowded living conditions, and other hazards. He checks the general upkeep of the building, both inside and out. He also inspects the exterior of the

58

032882

surrounding structures to determine whether they pose a potential hazard of fire that might spread to the property being inspected.

If any of the surrounding properties is a fire trap, there is, of course, little if anything the person seeking insurance can do to correct the situation; and it is almost certain that he will be unable to obtain insurance at standard rates. Indeed, he may not be able to buy insurance at any price.

When there is no problem with the surrounding buildings, necessary improvements in the applicant's property can usually be made at nominal cost.

Table 1 is a compilation of the reasons given by companies for declining to write coverage on 104 residential and commercial risks inspected under the Boston Plan. It was prepared from a probability sample drawn from the Roxbury area. It shows that the most frequent reasons given for declination are "rubbish accumulations" and "interior of building in disrepair or poorly maintained." It also shows that property is often considered uninsurable because of the condition of adjoining property ("exposing building in poor condition").

The inspector explains what needs to be repaired and how the repairs can be made, and encourages the building owner to make them. In most cases, the building owner has been willing to meet the inspector's requests.

If the inspector notes an immediate fire hazard, he calls the fire department, which will help to remove the hazard.

Frequently, when the inspector believes that needed minor repairs to a property will be made within a short period of time, he will hold up sending the inspection report to a company. Since there are no provisions for surcharging the owner if the property has hazards that need to be removed, the inspector thus saves the insurance companies from having to report to the Rating Association that certain conditions need correction before they will write coverage at standard rates.

Whether or not the inspector has held up the inspection report, the owner, after making the requested improvements, notifies the Rating Association, and a time is set to reinspect the property.

The inspector makes no promise that the property owner will obtain insurance at standard rates. Nor does he recommend, when the inspection report goes to the insurance company, whether or not the property should be insured at standard rates.

After the company receives the inspection report, it informs the Rating Association whether it will accept or decline the risk or whether other improvements must be made before it will accept the risk.

If the company conditions its acceptance of a risk on the completion of certain improvements, the Rating Association inspector will explain to the owner what needs to be done and how it can be done.

The companies have confidence in the inspectors and generally rely fully on their inspection reports in determining whether to provide coverage. Only very occasionally do the companies send their own representatives to look at a property inspected by the Rating Association.

*Cost of the Boston Plan.* The Assistant Executive Manager of the Rating Association said that the total cost, direct and indirect, of an inspection is now about five dollars. Instead of assessing the property owner, the Rating Association includes the cost in its total costs, which are shared by the member insurance companies in proportion to the total premiums they write in Massachusetts.

*Controls Over the Boston Plan.* The Massachusetts Insurance Department exercises general supervision over the operation of the plan by reviewing the reports sent to it each month by the Rating Association. So far, the Department has never taken any formal action against a company for failure to participate in the plan.

The Department also checks with the Rating Association when a consent-to-rate application in Roxbury does not identify three companies as having declined the risk at standard rates under the Plan.

For the most part, however, the Rating Association supervises the day-to-day operation of the plan and company performance. Both the Insurance Department and the Rating Association seem more genuinely interested in helping property owners to obtain insurance than in assuring that individual companies fully participate in the plan.

*Results Under the Boston Plan.* According to the Rating Association, from October 3, 1960, through August 31, 1967, approximately 25,000 requests for inspections were received; only 2,040 risks were reported declined.

Fire losses in Roxbury have, according to all reports, substantially declined since 1960.

How many are repeats? 59

TABLE 1. REASONS FOR DECLINING INSURANCE ON 104 PROPERTIES INSPECTED UNDER THE BOSTON PLAN

| Reasons for declination | Total | | Residential | | Nonresidential | | Property both residential and nonresidential | |
|---|---|---|---|---|---|---|---|---|
| | Num-ber | Percent | Num-ber | Percent | Num-ber | Percent | Num-ber | Percent |
| 1. Admission refused to entire building | 2 | 1.9 | — | — | 1 | 6.3 | 1 | 1.9 |
| 2. Poor condition of basic building structure | 9 | 8.7 | — | — | 3 | 18.8 | 6 | 11.1 |
| 3. Building in poor repair or run down | 28 | 27.0 | 7 | 20.6 | 4 | 25.0 | 17 | 31.5 |
| 4. Outbuildings in poor repair, rundown condition or congested occupancy | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 5. Rubbish accumulations: | | | | | | | | |
| (a) yard and alley | 32 | 30.8 | 8 | 23.5 | 3 | 18.8 | 21 | 38.9 |
| (b) adjacent yard | 19 | 18.3 | 5 | 14.7 | 2 | 12.5 | 12 | 22.2 |
| (c) porches or under porches | 2 | 1.9 | — | — | 1 | 6.3 | 1 | 1.9 |
| (d) basement | 55 | 52.9 | 12 | 35.3 | 6 | 37.5 | 37 | 68.5 |
| (e) attic | 1 | 1.0 | — | — | — | — | 1 | 1.9 |
| (f) hallways | 3 | 2.9 | — | — | — | — | 3 | 5.6 |
| (g) occupied areas of this building | 24 | 23.1 | 5 | 14.7 | 4 | 25.0 | 15 | 27.8 |
| (h) vacant areas of this building | 12 | 11.5 | — | — | 1 | 6.3 | 11 | 20.4 |
| 6. Exposing building in poor condition | 29 | 27.9 | 9 | 26.5 | 1 | 6.3 | 19 | 35.2 |
| 7. Exposure considered excessively severe | 17 | 16.3 | 7 | 20.6 | 1 | 6.3 | 9 | 16.7 |
| 8. Metal or tile chimneys not acceptable | 3 | 2.9 | 1 | 2.9 | 2 | 12.5 | — | — |
| 9. Heating arrangements within building not acceptable | 27 | 26.0 | 3 | 8.8 | 3 | 18.8 | 21 | 38.9 |
| 10. Use of glass jug oil receptacles not satisfactory | 3 | 2.9 | 1 | 2.9 | — | — | 2 | 3.7 |
| 11. Oil stored in hallways | 11 | 10.6 | — | — | — | — | 11 | 20.4 |
| 12. Electric wiring in doubtful condition, overloaded or insufficient wall outlets | 30 | 28.8 | 5 | 14.7 | 4 | 25.0 | 21 | 38.9 |
| 13. Interior of building in disrepair or poorly maintained | 49 | 47.1 | 12 | 35.3 | 5 | 31.3 | 32 | 59.3 |
| 14. Restaurant occupancy | 5 | 4.8 | — | — | 3 | 18.8 | 2 | 3.7 |
| 15. Broker did not work in behalf of his insured | 6 | 5.8 | 2 | 5.8 | 1 | 6.3 | 3 | 5.6 |
| 16. Unsafe arrangement of spray paint booth | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 17. Broken or boarded windows | 10 | 9.6 | 1 | 2.9 | 4 | 25.0 | 5 | 9.3 |
| 18. Areas of broken plaster | 13 | 12.5 | 5 | 14.7 | 3 | 18.8 | 5 | 9.3 |
| 19. Charred timbers in basement | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 20. Class of occupancy | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 21. Hallways in need of paint | 2 | 1.9 | — | — | — | — | 2 | 3.7 |
| 22. Vacant areas | 6 | 5.8 | — | — | — | — | 6 | 11.1 |
| 23. Fire damaged | 4 | 3.8 | — | — | — | — | 4 | 7.4 |
| 24. Nightclub occupancy | 1 | 1.0 | — | — | — | — | 1 | 1.9 |
| 25. Luncheonette occupancy | 2 | 1.9 | — | — | — | — | 2 | 3.7 |
| 26. Drycleaning system unapproved | 1 | 1.0 | — | — | — | — | 1 | 1.9 |
| 27. Boxed cornice in need of repair | 2 | 1.9 | 1 | 2.9 | — | — | 1 | 1.9 |
| Number of Properties | 104* | **— | 34* | **— | 16* | **— | 54* | **— |

*Totals would exceed number of properties because of multiple responses.

**Percentage totals would add to more than 100 percent because of multiple responses.

SOURCE: Survey by the National Advisory Panel on Insurance in Riot-Affected Areas.

Clearly, companies are now more willing to write coverage in Roxbury. At the outset of the plan, a one-year policy for $25,000 was often split among ten companies. Now, a single company is generally willing to provide coverage of $10,000 to $15,000, and some companies will even provide coverage for three years.

The success of the Boston Plan has been aided greatly by the work of the Boston Redevelopment Authority. This agency has replaced a substantial amount of condemned property with new low-cost housing and has helped many owners improve their property with grants and low-cost loans.

Some upper-middle income families are now moving into the area and renovating their properties. In some parts of Roxbury, run-down room-

032884

ing houses and vacant, open, and abandoned buildings stand near homes valued at $40,000.

Whether the insurance industry would have supported the Boston Plan as it has if the area had continued to decay is an open question. On the other hand, it seems clear that the plan has made an important contribution to the overall community development effort by offering a meaningful incentive for owners to improve their properties and thereby to improve their neighborhood.

## The Michigan Fire Insurance Inspection Plan

The Michigan Fire Insurance Inspection Plan began operations on January 1, 1966. It is closely patterned on the Boston Plan. There is one major difference. The standard rate for fire and extended coverage may be increased for specific fire hazards noted during the inspection.

Those who support a surcharge for specific fire hazards say it has three principal advantages. First, it compensates the company for providing insurance on property with certain hazards that increase the probability of fire or the amount of the loss in the event of a fire. Second, the higher premium charge purportedly gives property owners an incentive to remove fire hazards. Third, the surcharge permits insurance without the delay necessitated by repairs.

*Background of the Michigan Plan.* Like the Boston Plan, the Michigan Fire Insurance Inspection Plan (Michigan Plan) was initiated as the result of public complaints about the availability of insurance at standard rates. Hearings were held by the Detroit Common Council as early as 1962 to determine whether these complaints were justified, but the insurance industry considered the results inconclusive.

In mid-1965, the Acting Insurance Commissioner of Michigan moved to establish an inspection plan in Detroit similar to the Boston Plan. He appointed a committee representing the Michigan Inspection Bureau (an organization resembling the New England Insurance Rating Association), the mutual and stock insurance companies, insurance agents, and the City of Detroit's Common Council, Housing Commission, and Department of Buildings and Safety Engineering. Less than three months later, the committee had drafted an urban area plan and had agreed to put it into effect on January 1, 1966.

Before and after the plan became operational, it was publicized in the press, on radio and television, and through speeches by staff members of the Michigan Inspection Bureau and the Michigan Insurance Department. More than 20,000 copies of a brochure were distributed to explain the plan. The Bureau and the Department made substantial efforts to explain the operation of the plan to the companies and, with the help of the companies, to their agents.

*Details of the Michigan Plan.* The rules of the Michigan Plan apply to Detroit and two suburbs, Hamtramck and Highland Park. All property and liability insurance companies admitted to do business in Michigan, except for a few factory mutuals, have signed pledges not to decline an application for fire and extended coverage insurance on habitational property in these areas without an inspection.

Inspections are made without cost to the property owner by the Michigan Inspection Bureau (MIB).

Although the Michigan Plan applies only to real property—dwellings and apartments—the MIB also makes inspections to help tenants get insurance on personal property—the furniture and other contents in a home.

The Michigan Plan requires that a property be inspected and that the application for insurance be declined by three companies before a policy can be written at more than standard rates, except that condition charges may be assigned by the MIB inspector.

Within the Michigan Plan area, the standard rate for fire and extended coverage insurance may be increased for certain fire hazards noted by the MIB inspector in his report. A company, however, is not required to charge more than the standard rate. The amount of additional charge and the conditions that may be charged are set forth in a surcharge rating plan filed with the Michigan Insurance Department.

If three companies decline to write insurance on a risk under the Michigan Plan, the insurance may be written by a company charging more than the standard rate plus applicable condition charges. Generally, these companies file a rating plan with the Insurance Department, which allows them to charge three times the standard rate. Companies charging these higher rates are referred to as "substandard companies." Alternatively, the insurance

61

may be written under a consent-to-rate plan or in the nonadmitted market.

Outside the plan area, a company may, on information received from its agents, add a surcharge to the standard rate. Insurance may also be written outside the plan area by a "substandard" company, under the consent-to-rate procedure without an inspection or three company declinations of the risk or under the surplus lines laws.

The Michigan Plan specifically states that any building meeting the requirements of the applicable city building and sanitation codes, as well as other legal requirements, will "generally be considered acceptable for insurance against the perils of Fire and those of the Extended Coverage Endorsement." An MIB inspector stated, however, that very few of the properties he inspects meet all the applicable city ordinances and that the companies are nevertheless willing to provide fire and extended coverage insurance at standard rates if there are no violations which pose fire hazards.

*Problems with the Original Plan.* Because of the time spent in obtaining three declinations, this requirement was considered detrimental to those who needed immediate coverage. Moreover, some property owners knew their property was in poor condition and had no intention of repairing it. Therefore, to save time and inspection costs, the plan was amended on January 28, 1966, to allow property owners and mortgagees to waive the right to an inspection and three declinations before paying more than the standard rate.

The waiver also allows an owner whose property would be insured if certain defects were corrected, to obtain insurance without making the requested improvements. Under the plan, a conditional acceptance by a company is not counted as a declination. The owner thus either has to make the improvements or go without insurance if he does not waive his "rights" under the plan.

To make certain that the property owner fully understands his right to a free inspection and three declinations, he must sign the waiver at the MIB office. There, a MIB employee carefully explains the provisions of the Michigan Plan. If a personal visit to the MIB office is too great a hardship on the property owner, an explanation is given over the telephone.

The MIB staff estimates that less than half of the people who sign waivers are aware of the plan before they come to the MIB offices. Apparently, many owners are merely told by their insurance agents that they must sign the waiver before they can get fire and extended coverage insurance. Some agents do not look at the property to determine its condition; they automatically tell the owner to sign the waiver.

Over ninety percent of the property owners who appear at the MIB offices to sign waivers do not ask for an inspection after the MIB explanation. At that point, an owner may feel that he has gone to enough trouble already, or he may need immediate coverage and does not want to remain uninsured while waiting for an inspection. Some owners are aware that their property would not be found insurable after an inspection; others may prefer not to have their property inspected.

Some persons ask for an inspection at the same time they sign a waiver. In this way they get immediate coverage at a rate above standard, and, if their property is well maintained, coverage at lower rates after the inspection.

A mortgagee may also sign a waiver when the policy on a mortaged property is in his name. Since the owner must pay the premium, the mortgagee may be less interested than the owner in obtaining fire and extended coverage insurance at a low cost. To protect the owner, the MIB requires the mortgagee to have notified the owner of the expiration of his insurance and to have mentioned the availability of an inspection under the plan before the MIB will accept a waiver from the mortgagee.

*Day-to-Day Operation of the Michigan Plan.* An inspection may be requested by the property owner, an agent, or a company. The plan states that the application must be made in writing, but the MIB will accept a request for inspection by telephone. If the owner requests an inspection, he must tell the MIB where to send a copy of the inspection report, since copies of the report go only to an insurance company.

The MIB has three full-time inspectors for the Michigan Plan. After a request for inspection is received from an owner, agent, or company, a time is set when the owner or his representative can accompany the MIB inspector through the property. Inspections are generally made during the normal working hours of the MIB, but can be made at other hours to accommodate the owner or his representative. Normally, the inspection is made within 4 or 5 days after the request is re-

62

ceived. One full-time employee of the MIB schedules inspection appointments.

At the agreed time, one of the inspectors, accompanied by the owner or his representative, goes through the building to be insured. The inspector checks the exterior and interior of the property. He looks through all rooms, if possible, watching mainly for broken windows, litter, overloaded wiring, improper fuses, unsafe heating conditions, and overcrowded living conditions. If he finds any of these conditions, he explains to the owner, or his representative, how they should be corrected and assigns condition charges for the defects.

After the interior inspection is completed, the inspector takes a picture of the exterior. The insurance companies originally wanted the MIB to include the market value of the property in its inspection report to allow the companies to determine whether the property owner was seeking sufficient insurance to cover the value of the property. The MIB believed that this was an inappropriate job and compromised by agreeing to provide a picture of the property to the companies.

The inspector also examines the exterior of the nearby structures to determine whether any pose a significant hazard of fire which might spread to the property being inspected.

The MIB inspector does not explain to the owner to what extent a condition charge will raise his insurance premiums. Instead, he emphasizes the safety factors. Reportedly this is done because companies are not required to demand the permitted surcharge.

Unfortunately, many property owners do not understand the intricacies of insurance rating. As a consequence, they may not realize how much they can save by making the requested improvements and having the surcharge eliminated. This is particularly unfortunate when the requested repairs are inexpensive—for example, removing rubbish or replacing oversized fuses.

The MIB inspectors do not report their findings to city officials. The inspector tries to have immediate fire hazards removed, but he makes no attempt to get assistance from the city government. He refrains from doing so because the MIB believes that if property owners thought the inspectors might report their findings to city officials, owners would refuse to allow them inside their property, and no meaningful inspections could then be performed.

Unlike in Boston, the inspector generally does not hold up a report to allow the owner an opportunity to make the suggested repairs to this property. With a surcharge plan, a company may be willing to provide insurance even if the conditions are uncorrected.

After the inspection, a copy of the report and the photograph are promptly sent to the insurance company designated by the owner or insurance agent. The company has three choices. It may: (1) agree to provide coverage at the standard or surcharged rate; (2) agree to provide coverage if the defects found during the inspection are corrected; or (3) decline to provide coverage.

The companies report their decisions to the MIB on an action sheet. If a company conditionally accepts a risk, it explains in the action sheet specifically what defects must be corrected before coverage can be provided. The company or its agent explains to the owner what needs to be done. If the company declines a risk it must state its reasons in the action sheet.

As a matter of practice, companies rarely write coverage with a surcharge under the Michigan Plan. They usually insist that hazardous conditions be remedied.

A leading insurance company executive in Detroit said there are two reasons the companies do not provide coverage at the surcharged rate: (1) the surcharge does not fully compensate for the risk; and (2) if the owner were to correct the defect shortly after the policy was written at the surcharge rate, it would cost more to refund him his pro-rata portion of the surcharge than it was worth.

If the owner repairs his property to meet the conditions of the insurance company, he can ask the MIB to reinspect the property. In this way the company can be sure that the defects are properly corrected. A new inspection report is then sent to the insurance company.

Every three months the MIB reports to the Michigan Insurance Department on the number of risks accepted, conditionally accepted, or declined by each company that received an application for insurance under the Plan.

The insurance companies apparently have confidence in the MIB inspection reports. No one with whom we spoke was aware that any company made spot-checks on the accuracy of the MIB's reports.

63

*Costs of the Michigan Plan.* The manager of the MIB estimates the direct costs of each inspection under the Michigan Plan average about $10. This includes salaries of employees assigned to the plan full-time, automobile expenses, and film for pictures. The cost is included in the total operating costs of the MIB, which are shared by the member companies in proportion to their total premium volume in the state.

*Controls over the Michigan Plan.* The Michigan Insurance Department monitors the operation of the Michigan Plan by reviewing the quarterly reports filed with it by the MIB. It thus has an indication of those companies that are cooperating under the plan and those that are not.

For the most part, however, the MIB handles the day-to-day supervision of company performance under the plan. In some respects, the supervision by the MIB and the Michigan Insurance Department is similar. Both review policies written at more than the standard rate to be sure that either a waiver of the inspection or an inspection report and three declinations are on file.

Both the Insurance Department and the MIB reportedly have, on occasion, called companies to encourage their greater participation in the plan. As with the Boston Plan, we obtained the impression that both the MIB and the Michigan Insurance Department were more concerned with obtaining insurance for owners than with securing the full cooperation of all companies.

*Results under the Michigan Plan.* The MIB reported that it had received from January 1966 to the end of September 1967, the following action reports from companies:

| | Number | Percent |
|---|---|---|
| Accepted at standard or surcharge rates after first inspection | 2,519 | 36.5 |
| Accepted after reinspection | 929 | 13.5 |
| Total accepted | 3,448 | 50.0 |
| Would accept if certain conditions were corrected | 1,131 | 16.4 |
| Declined | 2,312 | 33.6 |
| Total action reports to MIB | 6,891 | 100.0 |

The following list is a compilation by the MIB of the reasons given by companies for declining to write coverage during the period from January 1, 1966, to December 31, 1966. Generally, more than one reason was given for declining a property.

## MICHIGAN FIRE INSURANCE INSPECTION PLAN
### REASONS FOR DECLINATION

| Reasons | Times used |
|---|---|
| 1. Not satisfied with information concerning identity of building owner | 12 |
| 2. Applicant uninterested in purchasing insurance to value | 48 |
| 3. Admission refused to part of building | 72 |
| 4. Poor condition of basic building structure | 1,092 |
| 5. Metal smokestacks or masonry chimney in unsatisfactory condition | 296 |
| 6. Porches in poor condition | 247 |
| 7. Rubbish accumulations (outside) | 365 |
| 8. Rubbish accumulations (inside) | 1,032 |
| 9. Exposing buildings in poor condition or severe exposure | 403 |
| 10. Heating arrangements unacceptable | 179 |
| 11. Oil storage unacceptable | 12 |
| 12. Ashes in combustible receptables | 47 |
| 13. Electric wiring unsafe, overfused, or in doubtful condition | 1510 |
| 14. Living conditions unsatisfactory | 238 |
| 15. Roof surfacing unacceptable | 117 |
| 16. Water heater or cooking device unsafe | 24 |
| 17. Reasons other than physical condition of property | 437 |

*Waivers.* The right to inspection and three declinations was waived on 11,316 properties between January, 1966, and the end of September 1967—or almost twice the number of properties on which companies reported to the MIB their decision on inspection reports. Waivers on 4,004 (35.4%) of these properties were by owner-occupants. The remaining 7,312 (64.6%) waivers were by absentee owners.

## The Cleveland Fire Insurance Inspection Plan

The Cleveland Fire Insurance Inspection Plan (Cleveland Plan) was put into effect on April 15, 1966. Unlike the Boston and Michigan Plans, the Cleveland Plan requires no inspection or waiver of an inspection before an owner is insured at above standard rates.

The proponents of this type of urban area plan say that its principal advantage is that it does not disturb the market for high-hazard insurance—insurance at prices in excess of the standard rates to compensate for additional hazards. Indeed, the official outline of the plan states: "It is *not* designed to be used as, or substitute for, or an instrument of, the high hazard insurance market presently available." (emphasis in original)

64

*Background of the Cleveland Plan.* In March, 1965, the Director of the Ohio Insurance Department asked the Ohio Inspection Bureau (OIB) to conduct an investigation of the insurance market in the Mount Pleasant, Wade Park-Superior, Glenville, and Hough areas of Cleveland.

After auditing all policies written and cancelled by its members in Cleveland for a thirty-day period, and after separating those referred to in the specified areas of the city for the purpose of comparison, the OIB found that 14.2 percent of the fire and extended coverage policies in the area under study were written at greater than manual rates, whereas only 3.1 percent of the policies written in other parts of Cleveland were written at greater than manual rates. The survey also disclosed that the area under study accounted for 22.6 percent of the policies written in the city and 23.9 percent of the cancellations. The study, however, did not examine refusals to renew policies, a frequent complaint in the inner city and a practice that insureds generally equate with cancellation.

After the study, the Ohio Insurance Director concluded that an urban area plan should be adopted in Cleveland.

The Cleveland Plan was designed in cooperation with insurance companies, agents, the Ohio Inspection Bureau, local civic and action groups, and various agencies of the city of Cleveland responsible for health, police and fire protection, and urban renewal.

The plan was publicized in the newspapers and in a brochure prepared by the Ohio Inspection Bureau.

*Details of the Cleveland Plan.* To avoid designating any particular area as a problem, the Cleveland Plan includes the entire city.

All companies admitted in Ohio and writing fire and extended coverage insurance have now agreed not to refuse an application for fire and extended coverage insurance on a class-rated dwelling or apartment building in Cleveland without an inspection.

An inspection may be requested only in writing and only by an insurance agent or company.

Inspections under the Cleveland Plan are performed without cost to the property owner by the Ohio Inspection bureau, an organization similar to the New England Fire Insurance Rating Association.

Unlike the requirements of the Boston and Michigan Plans, an inspection by the bureau is not

necessary before an agent can place a customer with a "substandard" company, on a consent-to-rate basis, or in the non-admitted market. In addition, the company may add surcharges based on only the agent's inspection of the risk.

*Day-to-Day Operation of the Cleveland Plan.* After a request for an inspection is received, the inspection process under the Cleveland Plan is much like that under the Boston and Michigan Plans.

A time must be set when the owner can accompany the inspector. Normally, the inspection takes place within three to five days.

During the inspection of both the exterior and interior of the property, the inspector points out to the property owner or his representative the defects that might be subject to condition charges to be set by the company—for example, broken windows, overloaded wiring, unsafe heating units, and overcrowded living conditions. He also explains how these defects can be corrected. But, as under other plans, he does not indicate whether or not insurance coverage will be offered.

The inspector also makes an inspection of the exterior of the nearby properties and takes a photograph of the property to be insured. After the inspection, a copy of the inspection report and a photograph of the property are sent to the designated company. The company returns an action sheet to the OIB indicating whether it (1) accepts the risk; (2) will accept it if certain deficiencies are removed; or (3) declines the risk.

If the company conditionally accepts a risk, it states in the action report the defects in the property that must be improved before it will provide insurance. The company or its representative then advises the property owner what specific improvements need to be made.

If the property owner makes the required improvements, he notifies the OIB, and it reinspects the property to assure the company that the conditions have been properly corrected.

If the risk is declined, the company must state the reasons for its decision in the action report.

If one company declines a risk under the Cleveland Plan, the OIB will, if requested, send a copy of the inspection report to another company.

The owner can obtain a copy of the inspection report for submission to a company, but so far no one has ever requested a copy.

Each month the OIB reports to the Ohio Insurance Department on the requests for inspec-

**65**

tions it has received, the number of inspections performed, and the decisions made by each insurance company to: (1) accept a risk; (2) accept a risk on condition that certain conditions be corrected; or (3) decline a risk.

*Costs of the Cleveland Plan.* The manager of the OIB estimates that the direct costs of the program from April to December, 1966, totalled about $9,000, or approximately $30 per inspection—substantially more than that under other plans for which cost data were available. Part of the reason for the high cost is undoubtedly the low volume of inspections. In Detroit, for example, an inspector is able to inspect several properties on one trip, but this is impossible in Cleveland where only a few requests are received for inspections in widely separated areas.

*Results under the Cleveland Plan.* Between April 15, 1966, and September 30, 1967, the OIB informed the Ohio Insurance Department that companies had reported their decisions on 330 risks. Of these, seventy-four (22 percent) were accepted; eighty-five (26 percent) were accepted on condition that certain conditions be improved; and 169 (51 percent) were declined.

In view of the high percentage of conditional acceptances and declinations, it appears that the companies are as reluctant in Ohio to use the surcharge rating plan in connection with the urban area plan as in Michigan.[*]

### The Voluntary Inspection and Advisory Committee for Milwaukee Core Area Fire Insurance

The Voluntary Inspection and Advisory Committee for Milwaukee Core Area Fire Insurance (Milwaukee Plan) began operations on October 24, 1966. It is a less formal plan than those previously discussed and has several distinct operating characteristics.

*Background of the Milwaukee Plan.* The problem of obtaining insurance in the Milwaukee urban core was first investigated in 1963, by a committee appointed by the Wisconsin Insurance Commissioner. The committee of seven—one representing the Fire Insurance Rating Bureau, five representing insurance companies, and one representing insurance agents—met with civic and action groups as well as with local and state political

figures. It concluded that if landlords and tenants kept their property in adequate condition, there would be no insurance problem.

The Milwaukee urban core insurance problem was again raised during the fall of 1966. At that time, the State Insurance Commissioner appointed a three-man committee representing the insurance companies and the Fire Insurance Rating Bureau to develop a solution to the insurance problems of the Milwaukee urban core. Within three weeks, the committee formulated the Milwaukee Plan.

The Plan was publicized in the newspapers and carefully explained to local civic and political leaders who were likely to receive complaints about urban core insurance problems. Operations began on October 24, 1966.

*Requirements of the Milwaukee Plan.* The Milwaukee Plan is designed to aid all property owners in the Milwaukee urban core to obtain fire and extended coverage insurance. It covers dwelling, mercantile and commercial property, and provides help for both the building owner and the tenant.

The use of the plan is entirely voluntary. No inspection under the Milwaukee Plan is required before insurance can be written at rates in excess of standard or in the non-admitted market.

Under the plan, a property owner who can not obtain fire and extended coverage insurance makes contact with the Fire Insurance Rating Bureau, which is similar to the New England Insurance Rating Association discussed previously.

The Rating Bureau normally requests the property owner to seek insurance from at least three agents. If after this the owner is still unable to obtain insurance, the Rating Bureau will inspect the property without cost to the property owner.

The procedures followed by the Rating Bureau in aranging for and performing inspections are like those under other urban area plans. The property owner seeking insurance, or his representative, must accompany the inspector during the inspection. The inspector points out hazardous conditions that might make the property uninsurable at standard rates—for example, deficiencies in wiring or heating, poor general maintenance, or overcrowding. Written recommendations are then made for needed corrections.

The building owner is not required to be present during an inspection to assist a tenant in obtaining insurance on his personal property. This is a departure from other plans that provide coverage for tenants.

---

[*]An illustration of the Ohio surcharge rating plan is discussed in Chapter II at pp. 33–34.

032890

If the property is well maintained, or if the hazardous conditions are found to have been corrected on reinspection, the Rating Bureau will assist the property owner obtain insurance. The Rating Bureau first calls the insurance company that cancelled or failed to renew the insurance on the risk and requests a reconsideration of the decision. According to Rating Bureau reports, all insurance companies thus requested have renewed coverage on property believed by the Rating Bureau to be in insurable condition.

If the company that had previously insured the property is already providing insurance on a considerable number of properties in the area, or is no longer in business, or no longer admitted in Wisconsin, the Rating Bureau calls member companies in alphabetical order. This procedure equitably distributes the urban core risks. As of December 1, 1967, the Rating Bureau had called only twenty-five members to replace coverage previously written by another company.

A company may refuse to provide insurance under the plan. But if a company declines to provide insurance on a property that the Rating Bureau believes is insurable at standard rates, the three-man committee appointed by the Insurance Commissioner will meet with the company's executives to discuss the situation. As of December 1, 1967, this had not been necessary. The Rating Bureau reported that each company it had called about an insurable risk had agreed to provide at least a portion of the insurance sought by the property owner.

A dwelling is normally insured with one company. High-value commercial property may be insured by several companies in order to limit individual exposure in any location. When one company called by the Rating Bureau is willing to provide only a portion of the insurance on a risk, the Rating Bureau calls the next company on its alphabetical list of members. This process continues until the amount of needed insurance is placed.

The Insurance Rating Bureau is performing the job of placing insurance that is normally carried out by an insurance agent or broker. The Rating Bureau, however, receives no commission. Nor does it service the policy after issue. Thus, an agent must be found to receive the commission and service the policyholder. Some companies simply select an agent to receive the commission on business directed to it by the Rating Bureau. Other companies ask the property owner to choose an agent. Still others give the commission to an agency within the local office of the insurance company which, in effect, allows the company to retain the commission.

The Rating Bureau will not ask one of its affiliated companies to insure a property unless it believes the property is insurable at standard rates. Although surcharges can be added for specific hazards, the Rating Bureau normally insists that hazards found by the inspector, unless minor, be removed before it will directly help the owner obtain insurance. If significant hazards are not removed, the Rating Bureau will tell the owner only how he can attempt to obtain insurance from a "substandard" company, on a consent-to-rate basis, or from an insurer in the non-admitted market.

*Results under the Milwaukee Plan.* The Milwaukee Plan started slowly. From its inception on October 24, 1966, to June 1, 1967, the Rating Bureau received complaints from only thirty-six persons. It was able to help twenty-two of these obtain insurance. But since the Milwaukee riots last summer, the Rating Bureau has received far more complaints.

From October 24, 1966, to November 16, 1967, the Rating Bureau, under the Milwaukee Plan, received inquiries from 140 persons. Of these, forty were apparently able to obtain insurance after being advised by the Rating Bureau to make contact with a new sales source—they did not subsequently ask for an inspection. Of the remaining one hundred, eighty-eight persons stated they were unable to obtain any, or a sufficient amount of, fire and extended coverage insurance, and twelve indicated that they could obtain insurance only at higher than standard rates.

Inspections were made of eighty-one residential buildings and seventeen commercial buildings. Inspections on other properties were pending at the time the report was made. Recommendations for improvements were made for eighty-nine of these properties. Although only twenty residential and only two commercial building owners satisfactorily complied with all of the Rating Bureau's recommendations, the Bureau was able to help forty-seven persons obtain insurance. The deficiencies in the remaining properties were regarded as too hazardous for the Rating Bureau to request one of its members to provide insurance unless the deficiencies were corrected.

67

### The Buffalo and New York City Fire and Extended Coverage Inspection Plan

The Buffalo and New York City Fire and Extended Coverage Insurance Inspection Plan (New York Plan) was inaugurated on April 1, 1967. While its literal procedural requirements are similar to the Cleveland Plan, its day-to-day operations are more nearly like the Boston and Michigan Plans.

*Background of the New York Plan.* The New York Plan was initiated after the New York Insurance Department investigated the problems of obtaining insurance in blighted areas. In its report of March 7, 1967, to the Governor on fire insurance in congested areas, the Insurance Department concluded that the market for fire insurance in certain areas of New York City and Buffalo was inadequate. The reason for the inadequacy was attributed to the practice of underwriting class-rated property by area rather than by individual risk. Evidence developed during the investigation and public hearings showed many good risks in areas that were considered blighted. Believing that some method of inspecting these risks needed to be developed, the Department suggested the adoption of an urban area plan.

With the help of representatives of the New York Fire Insurance Rating Organization, insurance companies, and agents and brokers, a plan was drawn up. It received considerable publicity in the press and in radio spot announcements, and the New York Fire Insurance Rating Organization sent a letter explaining the plan to every broker and agent in New York City and Buffalo.

*Details of the New York Plan.* The New York Plan includes Buffalo and the five boroughs of New York City.

All property and casualty companies admitted to do business in the State of New York have agreed not to refuse an application for fire and extended coverage insurance in the plan area without an inspection.

An unusual characteristic of the New York Plan is a specific provision that in addition to insurers, no broker or agent shall decline an application for fire and extended coverage insurance without an inspection.

The plan covers all class-rated property in New York City and Buffalo. This includes home and apartment buildings, even if there is also mercantile occupancy, as well as one-story mercantile buildings without dwellings; and fire and extended coverage insurance on tenants' household contents. The plan requires the building owner or his representative to accompany the inspector through the property, together with the tenant, if insurance is sought on the tenant's contents.

The New York Plan does not, itself, require an inspection before a policy can be written at more than the standard rate as do the Boston and Michigan Plans. Nevertheless, the plan does, in fact, operate similarly to the Boston and Michigan Plans because of the operation of the rating laws in New York.

In New York, there are three ways to write insurance above the manual rate:

1. *Surplus Lines.* Insurance can be written in the surplus lines market after an agent has diligently tried, but without success, to obtain coverage in the admitted market. Generally, the agent must request an inspection to meet this test.

2. *Consent to Rate.* An insured can consent to be rated above manual, but he is told precisely how much he is paying over manual. If the owner is aware of the inspection program, his signed consent to a higher rate can be viewed as a waiver of the inspection. This procedure, however, lacks the safeguards for the consumer of the waiver under the Michigan Plan, where the individual is told of his right to an inspection at the time he signs a waiver.

3. *Substandard Rating Plan.* On January 4, 1965, the Insurance Department authorized surcharges on class-rated property for specified conditions. These surcharges can be assigned only by the New York Fire Insurance Rating Organization (NYFIRO) after an inspection. Moreover, a company must impose the surcharges set by NYFIRO, and the surcharged condition must be repaired before the manual rate is permitted. In most other states with a surcharge plan, the charges can be set by the company, if it wishes, after inspection by an agent or other person on behalf of the company.

The Insurance Department reportedly had hoped that the Substandard Rating Plan would expand the market for fire insurance because it offered higher premiums for insurance on property in substandard condition. In practice, however, the plan was rarely used. During 1965 and 1966, only about 480 properties were inspected.

Even where it was used, the Insurance Department's investigation (referred to above) disclosed that insurance was offered by the companies at the surcharged rate in less than half the cases.

The Insurance Department was persuaded that the substandard plan would be used more often if owners were more certain of obtaining coverage after inspection. This could be accomplished, the Department believed, through an urban area plan backed by Departmental supervision of company performance under the plan.

*Day-to-Day Operation of the New York Plan.* Inspections under the plan are performed by the New York Fire Insurance Rating Organization (NYFIRO), an organization similar to the New England Insurance Rating Association described above.

NYFIRO has 18 inspectors in New York City who devote full time to inspecting property under the plan in the city. In Buffalo, one man is assigned full time to perform inspections, and other members of the staff do inspections on a part-time basis.

An inspection must be requested in writing by an agent, broker, or company; it cannot be requested by the property owner. The inspection and post-inspection procedures are similar to those under the other plans described, except in one respect. That is, if the company declines the risk, copies of the inspection report and action sheet setting forth the reasons for declination are sent to the owner as well as to the New York Department of Insurance. In addition, a copy of the report goes to NYFIRO.

No one voiced concern that the inspection system and the filing of a copy of a report with a state agency might be used as a means of enforcing the building and sanitation codes.

Moreover, there is no evidence that property owners avoid inspection out of fear that it will lead to discovery of a building or sanitation code violation.

Copies of other action reports, where the company agrees to accept the risk as is or after certain conditions are improved, are filed with NYFIRO.

NYFIRO is required to maintain copies of the action reports on file. It must also submit semi-annual reports to the New York State Insurance Department setting forth, by individual company, (1) the number of risks under the plan which have been inspected; (2) the number of risks accepted; (3) the number of risks accepted on condition that certain improvements be made; and (4) the number of risks declined.

*Results under the New York Plan.* The statistics on the operation of the plan, between April 3, 1967 and September 29, 1967, as reported by NYFIRO to the Insurance Department, are indicated in Table 2.

The results of the New York Plan set it apart from other Urban Area Plans. The percentage of conditional acceptances and declinations is very low, and the percentage of coverage written at the manual or surcharged rate is high.

The reason for this difference is not clear. It may be because the companies are aware that the New York Insurance Department is notified immediately of declinations under the New York Plan.

Or, it may be because apartment buildings are the predominant type of property inspected under the New York Plan. They require a substantial amount of insurance and consequently carry a large dollar premium.

Or, it may be because company officials feel that the premium rate, which frequently includes a substantial surcharge, is adequate to allow them to underwrite the risks involved.

To test the frequency and amount of the sur-

TABLE 2.—OPERATIONAL STATISTICS OF THE NEW YORK PLAN: INSPECTIONS, REINSPECTIONS, AND ACTIONS ON APPLICATIONS FOR INSURANCE, APRIL 3, 1967—SEPTEMBER 29, 1967.

| | New York City | Buffalo | Total | Percent |
|---|---|---|---|---|
| Number of risks inspected | 5,454 | 827 | 6,281 | |
| Number of reinspections | 359 | 103 | 462 | |
| Cumulative actions taken by all participating companies: | | | | |
| Number of acceptances | 4,840 | 606 | 5,446 | 83.6 |
| Number of declinations | 362 | 61 | 423 | 6.5 |
| Number of conditional acceptances | 516 | 128 | 644 | 9.9 |
| Total number of actions | 5,718 | 795 | 6,513 | 100.0 |

69

charge, a member of the Panel's staff reviewed 115 files, selected at random, on property inspected in the New York City area. The results were as follows:

1. Two buildings were vacant and subject to a standard 8.00 per hundred premium rate, but no surcharge.

2. Three properties inspected were specifically rated and not subject to the plan.

3. In three cases, the owner did not keep an appointment or refused inspection.

4. The statistics on the remaining 107 properties were as follows:

| | | | |
|---|---|---|---|
| No surcharge | | | 17 |
| 1.1–1.4 times standard | | | 2 |
| 1.5–1.9 | " | " | 11 |
| 2.0–2.4 | " | " | 25 |
| 2.5–2.9 | " | " | 12 |
| 3.0–3.4 | " | " | 11 |
| 3.5–3.9 | " | " | 11 |
| 4.0–4.4 | " | " | 10 |
| 4.5–4.9 | " | " | 5 |
| 5.0–5.4 | " | " | 2 |
| 5.5–5.9 | " | " | 0 |
| 6.6 times standard and above | | | 1 |

The unweighted average rate for inspected property was 2.5 times the standard rate. The unweighted average rate for surcharged property was 2.9 times the standard rate.

According to information received from the New York State Insurance Department the rates under the consent-to-rate plan have been somewhat higher, averaging about 3.75 times the standard rate on all consent-to-rate applications received in 1967 for all classes of property.

It would seem that property owners who had previously used the consent-to-rate procedure would now obtain an inspection under the plan to determine whether they could get insurance at a lower cost. This does not seem to have occurred.

Only 471 fewer consent-to-rate applications were filed in New York State for both class and specific rated property in the first nine months of 1967 as compared with the same period in 1966:

| | |
|---|---|
| January through September 1966 | 2,634 |
| January through September 1967 | 2,163 |

#### The Pennsylvania and Delaware Sub-Standard Plan

The Pennsylvania and Delaware Sub-Standard Plan (Sub-Standard Plan) operates much like the

New York Plan, except that insurance companies report their decision on whether to accept or reject a risk only to their agents. By auditing the policies written, the Middle Department Association of Fire Underwriters (Middle Department) determines whether property with conditions for which a surcharge was added has been insured. The Middle Department is similar to the New England Insurance Rating Association and performs the inspections under the Sub-Standard Plan.

*Background of the Sub-Standard Plan.* Following the Philadelphia riot in the summer of 1964, the Pennsylvania Insurance Department began to receive complaints by urban renewal officials, real estate agents, mortgage brokers, and others that adequate fire insurance coverage was unavailable. There were indications that similar problems existed in other parts of Pennsylvania and in sections of Delaware. In response to these complaints both the Pennsylvania and Delaware Insurance Departments approved the adoption by the Middle Department of a voluntary plan designed to eliminate the problem. The plan was put into effect on March 1, 1965, and was modified on September 1, 1965.

*Requirements of the Sub-Standard Plan.* The Sub-Standard Plan covers all class rated dwellings and apartment buildings in Pennsylvania and Delaware, but most applications for inspections are received from the urban core of the major cities in these states.

An inspection under the program may be requested by an agent, a broker, or by or on behalf of a property owner. After receipt of a request the inspection procedure is much like that under the other plans discussed in this chapter.

After inspection the report is given to the agent or company. The applicable surcharges for certain specified conditions—for example, unsafe heating conditions, cooking devices, wiring, or poor physical condition—are noted in the report, since surcharges can only be added by the Middle Department. The company, after examining the report, then notifies the agent whether or not it will accept the risk. It is not, however, required to notify the Middle Department of its decision.

The Middle Department, as a service to its members, audits the policies they write to determine whether the appropriate rate has been charged. During this audit it notes those policies written with a surcharge. In this way the Middle Depart-

70

ment is able to check whether a policy is subsequently written on a property for which the Middle Department, after an inspection, has assigned a surcharge. The Middle Department does not attempt to check whether policies are written on property which it considers insurable at the standard rate.

*Results under the Sub-Standard Plan.* From March 1, 1965, to September 30, 1967, the Middle Department reported having completed 15,482 inspections in Pennsylvania and Delaware. Of these, 6,604 (42 percent) properties were found eligible for insurance at the standard rate, surcharges were added to the rate on 6,741 (44 percent) properties, and 2,137 (14 percent) of the inspections made could not be satisfactorily completed.

Of the 6,741 properties for which surcharges were authorized by the Middle Department, 3,290 (46.5 percent) were written by the companies at the surcharged rate. Information on the remaining properties is unavailable.

### The Louisiana Owner-Occupied Insurable Dwelling Program

The Louisiana Owner-Occupied Insurable Dwelling Program (Louisiana Plan) was inaugurated on April 1, 1967. The Plan differs from other Urban Area Plans in two significant aspects: (1) It aplies only to owner-occupied dwellings; and (2) inspections under the plan are made by an insurance agent or other person designated by the company.

*Background of the Louisiana Plan.* The Louisiana Plan was put into effect after the State Legislature directed the Louisiana Rating and Fire Prevention Bureau (Rating Bureau) to devise a plan to assist in providing fire and extended coverage on owner-occupied dwellings. The Rating Bureau is similar to the New England Insurance Rating Association.

The legislative directive was prompted by continuing complaints that many persons in Louisiana, particularly along the seacoast, were unable to obtain fire and extended coverage insurance at reasonable rates.

*Requirements of the Louisiana Plan.* The Plan covers all owner-occupied dwellings in Louisiana. No inspection is required before insurance can be

written at more than standard rates. Instead, the Plan is invoked by an agent whenever he deems it appropriate.

If an agent experiences difficulty in obtaining insurance on an owner-occupied dwelling he, or someone designated by the insurance company, inspects the property without cost to the owner. During the inspection, the owner is told what conditions might prompt the addition of a surcharge to the insurance premium—for example, overloaded wiring, improper fuses, or overcrowded living conditions.

A copy of the inspection report is sent to the company, which sends an action report to the agent and the Rating Bureau on its decision to: (1) accept the risk; (2) accept it on condition that certain improvements be made; or (3) decline the risk. The company may modify the policy form (as well as the rate) if necessary to take into account the special hazards of the property. If the company refuses the risk, it must explain its reasons, or list the conditions that must be improved before it will provide coverage.

The Plan provides that any applicant may request the Rating Bureau to inspect his property if he believes his application has been declined because of incorrect information developed by the inspection.

The action reports are kept on file in the Bureau, and are subject to examination by the Commissioner of Insurance.

The Bureau files quarterly reports with the State Insurance Department on the decisions reported to it by each of its member companies.

*Results under the Louisiana Plan.* From April 1, 1967, to December 8, 1967, the Rating Bureau reported that 253 properties had been inspected under the Plan. Of these 207 (82 percent) were accepted, thirty (12 percent) were declined, and sixteen (6 percent) were accepted on condition that certain improvements be made.

### The Minnesota Core Area Plan

The Minnesota Core Area Plan (Minnesota Plan) was initiated June 12, 1967. It is similar to the Milwaukee Plan, except that the Minnesota State Insurance Department, rather than the local rating bureau, seeks to help the property owner obtain insurance.

*Background of the Minnesota Plan.* The Min-

266-225 O - 68 - 6

032895

nesota Plan was initiated by sixteen insurance companies in cooperation with the Minnesota Insurance Department after extensive newspaper publicity highlighted the unavailability of insurance in the Summit-University area of the Twin Cities. The companies initially agreed that they would underwrite fire and extended coverage insurance on any insurable property in the Twin Cities. Two other companies later signed pledges to support this program, and the Minnesota Insurance Department has made it clear that it expects all admitted companies to cooperate.

*Requirements of the Minnesota Plan.* The Minnesota Plan covers all Minnesota metropolitan core areas, although this fact has never been widely publicized. As of September 28, 1967, it had been used only in the Twin Cities.

Like the Milwaukee and Cleveland Plans, the Minnesota Plan is entirely voluntary. No inspection is required before the insurance can be written at rates in excess of standard or in the non-admitted market.

In general, a property owner whose fire and extended coverage insurance has been cancelled or has not been renewed is expected to make contact with three different agents to try to obtain insurance. If the owner is still unable to get insurance, he can file an application for inspection with the Minnesota Insurance Department.

Inspections under the plan are made without cost to the property owner by the Fire Underwriters Inspection Bureau, which is similar to the New England Insurance Rating Association discussed previously.

The inspection procedures under the Minnesota Plan are like those of most other plans, except that after the inspection a copy of the inspection report is sent to the Deputy Insurance Commissioner of Minnesota rather than to an insurance company. The Deputy Commissioner attempts to get coverage at standard rates for the property owner. If he fails, he may try to get the owner coverage in a "substandard" company.

*Results under the Minnesota Plan.* As of September 28, 1967, the Minnesota Deputy Commissioner said he had received only ten requests for inspection under the program. In only five cases was it necessary to obtain an inspection before he was able to assist the owner in obtaining fire and extended coverage insurance. In only one of the five cases where an inspection was made was he unable to obtain coverage at standard rates.

The small number of requests received under the Minnesota Plan may be due to a lack of knowledge of its existence. Although the plan has received a limited amount of newspaper publicity, field interviews disclosed that at least one agent who wrote a considerable amount of insurance in the Summit-University area had never heard of it. This agent reported that he had little problem in providing protection to area residents under a homeowners policy. When he did, he placed the business with a "substandard" company.

The Fire Underwriters Inspection Bureau reportedly plans to start collecting statistics on policies written by "substandard" companies to help the Minnesota Insurance Department better evaluate whether property owners are obtaining insurance at reasonable rates.

## The Oakland, San Francisco, and Los Angeles County Fire and Extended Coverage Insurance Inspection Plan

The Oakland, San Francisco, and Los Angeles County Fire and Extended Coverage Insurance Inspection Plan (California Plan) was put into effect on July 19, 1967. The requirements and operating procedures of the plan are similar to those of the Cleveland Plan.

*Background of the California Plan.* The California Plan was adopted after the introduction in the California Legislature of assigned risk legislation to require companies to make insurance available to California property owners. The California Plan was offered by the insurance industry as an alternative way of providing insurance to those who had experienced difficulty in acquiring fire and extended coverage insurance.

*Requirements of the California Plan.* The California Plan covers buildings exclusively occupied as dwellings in Oakland, San Francisco, and Los Angeles County, except for properties in the so-called brush fire areas which are inspected under other plans developed specifically to deal with the brush fire risk.

Application for an inspection may be made only by an agent, broker, or company.

Inspections are made by the Pacific Fire Rating Bureau, an organization similar to the New England Insurance Rating Association.

After the request for inspection is received, a time is set when the property owner or his rep-

72

resentative can accompany the inspector through the property. During the inspection, the inspector points out the risks that might give rise to extra charges for fire and extended coverage insurance.

The Pacific Fire Rating Bureau does not set the amount of the surcharge as in New York, Pennsylvania and Delaware. Each company is free to apply its own surcharge rating plan and set the amount it will charge for specific hazards. The rate is subject to review by the Commissioner of Insurance.

After the inspection, a copy of the report and a photograph of the property are sent to the designated company. The company may: (1) agree to provide coverage at the standard or surcharged rate, (2) agree to write the coverage if certain fire hazards are removed, or (3) decline to write the coverage. In all cases, the company completes an action report promptly and notifies the owner or his representative of its decision.

If the company conditionally accepts a risk, either the company or its representative informs the property owner of the conditions that must be improved before the company will provide coverage. This information is also included in the action report.

If the company declines a risk, it states the reasons for its decision in its action report.

Copies of the action reports are returned to the Pacific Fire Rating Bureau where they are kept on file and are subject to examination by the California Commissioner of Insurance.

The Bureau has agreed to submit quarterly reports to the Commissioner of Insurance setting forth, by individual company: (1) the number of risks inspected under the plan; (2) the number of risks accepted; (3) the number of risks conditionally approved and reinspections made; and (4) the number declined.

As under the Cleveland Plan, no inspection under the plan is required before writing insurance at more than standard rates. Nor is an inspection under the plan required before going to the nonadmitted market.

It is specifically stated in the outline of the California Plan, as in the Cleveland Plan, that the plan is not designed to be used as a substitute for the high hazard insurance market presently available.

*Results under the California Plan.* Between June 19, 1967, and September 29, 1967, the Pacific

Fire Rating Bureau obtained the following action reports:

|  | San Francisco | Oakland | Los Angeles |
|---|---|---|---|
| Accepted | 3 | 0 | 2 |
| Accepted if certain improvements made | 1 | 0 | 0 |
| Declined | 7 | 0 | 1 |

The Bureau was awaiting replies from companies on five inspection reports in San Francisco and two in Oakland at the time of its report.

### The North Carolina Fire and Extended Coverage Plan For Properties in Beach Area of Zone 1

The North Carolina Fire and Extended Coverage Plan (North Carolina Plan) was initiated September 18, 1967. While the Plan is similar to other Urban Area Plans, it is designed principally to assist owners of beach and seacoast properties in obtaining fire and extended coverage insurance.

*Background of the North Carolina Plan.* The North Carolina Plan was proposed by the insurance industry in response to an amendment to the North Carolina insurance law adopted this year, authorizing the Insurance Commissioner to approve a voluntary industry plan designed to provide fire and extended coverage insurance on insurable beach area properties. If no acceptable plan was submitted to the Commissioner by the industry, the amendment authorized him, after public hearings, to develop such a plan.

The act was adopted as the result of complaints that insurance companies unjustifiably refused or were reluctant to write fire and extended coverage insurance on beach area properties. The North Carolina Legislature believed that this was tending to impede the normal economic growth and wellbeing of the areas.

Under the new law, the Insurance Commissioner is required to file periodic reports with the Legislative Research Commission and is authorized to adopt reasonable rules and regulations to carry out the provision.

That act also provides that an insurance company must notify the Insurance Commissioner, within twenty days, of its reasons for cancellation, failure to renew, or refusal to provide fire and ex-

73

tended coverage insurance on beach properties, unless the reason is non-payment of premium, transfer of ownership of property, cancellation by the insured, termination of an agency, or other reasons acceptable to the Commissioner. The act further provides that any agent licensed to write fire and extended coverage insurance in North Carolina who refuses to accept an application for insurance and submit it to a company he represents must, if requested by the property owner, report the reason to the Insurance Commissioner within twenty days.

*Requirements of the North Carolina Plan.* The plan applies to all buildings in Beach Area, Zone 1 which is defined as "All localities South and East of the Inland Waterway from the South Carolina line to Fort Macon (Beaufort Inlet), thence South and East of Core, Pamlico, Roanoke and Currituck Sounds to the Virginia line, being those properties of land generally known as the Outer Banks".

Inspection under the plan is made by the North Carolina Fire Insurance Rating Bureau, which is similar to the New England Rating Association.

Like the Cleveland plan, no inspection is required before an owner is insured at rates above standard. The inspection and reporting procedures under the North Carolina Plan are also similar to the Cleveland Plan.

*Results Under the North Carolina Plan.* As of November 27, 1967, 200 member companies of the North Carolina Fire Insurance Rating Bureau had signed statements of participation in the Plan. Together, they represent 85 percent of the companies writing fire and allied lines in the state.

From September 18, 1967 to November 27, 1967, forty inspections were made under the Plan. Because some applications for insurance involved more than one company, fifty-two action reports were returned to the Bureau indicating thirty-two (62 percent) acceptances, eight (15 percent) declinations, and twelve (23 percent) acceptances on condition that certain improvements be made.

### The Wichita Agents' Plan

The Wichita Agents' Plan (Wichita Plan) began operations on December 1, 1967. It differs from other plans designed to resolve inner city insurance problems in that it marshals the efforts of insurance agents to obtain insurance rather than relying on an inspection by a rating bureau.

*Background of the Wichita Plan.* Following the riot in Wichita last summer, the Kansas Insurance Department began receiving complaints from city officials that property owners in the riot-affected area were experiencing difficulty in obtaining fire and extended coverage insurance. The Department investigated the complaints and found that the owners of two commercial establishments had been unable to obtain insurance. After a request from the Department, the Insurance Agents' Association in Wichita obtained fire and extended coverage insurance for these owners.

Partly to prevent the development of a serious insurance problem and partly in response to this Panel's recommendation on September 15, 1967, that urban area plans be widely implemented, the Insurance Department asked the insurance agents to help it develop a program for the State of Kansas. Together, they devised the Wichita Plan.

The Plan has already been receiving publicity. The Insurance Department has explained it to many state and city officials and has called on the insurance industry to cooperate in carrying it out. The companies have also been asked to explain the plan to their local branch offices and to instruct the branches to cooperate fully.

*Requirements of the Wichita Plan.* The Wichita Plan applies to all property risks in the state of Kansas.

The Plan provides that if an agent experiences difficulty in obtaining insurance through the companies he represents on a risk that has been cancelled or not renewed, he will request a governing committee of insurance agents to help him locate a market for the risk. The governing committee is composed of agents appointed by officers of the Wichita Association of Independent Agents.

After receiving a request for assistance, the governing committee inspects the property. The committee informs the owner of any improvements it believes are necessary to make the property insurable at standard rates.

Following the inspection the committee attempts to obtain insurance on the property at standard rates. If this is not possible, it attempts to obtain insurance at a higher rate under a consent to rate plan or through a "substandard" company.

If the governing committee is successful, the property owner's agent is entitled to receive a portion of the commission. The remainder is kept by the agent representing the company which ac-

74

cepted the risk. Under Kansas law the division of the commission is mutually agreed upon by the agents involved.

If the governing committee is unsuccessful in obtaining coverage, it provides the Kansas Insurance Department with (1) a description of the property and its location, (2) the reasons why it was unsuccessful, (3) an opinion on whether the particular property merits insurance, and (4) any other pertinent information.

### The Chicago Home Inspection Plan

The Chicago Home Inspection Plan (CHIP Plan) became effective December 1, 1967. It covers all class rated dwelling and apartment houses in Chicago. The plan was proposed by the insurance industry as an alternative to an assigned risk plan being considered by the Illinois Legislature.

Inspections are performed by the Illinois Inspection Bureau, which is similar to the New England Insurance Rating Association. The procedures for inspection and reporting under the CHIP Plan are much like those under the Cleveland Plan.

Efforts have been made to give wide publicity to the plan. Its procedures have been explained to city officials and copies of a brochure prepared by the inspection bureau have been distributed to property owners. In addition, the inspection bureau has mailed a letter explaining the plan to every Chicago insurance agent and broker.

From December 1, to December 23, 1967, ten applications for inspection of properties were recieved. Of these, five were in adequate condition and five were considered uninsurable by inspection bureau personnel.

## The Watts Pool

Within four months after the riots in the Watts area of Los Angeles in August, 1965, the California insurance industry voluntarily pooled its resources through a separate facility to make fire and extended coverage insurance available to merchants in Watts.

The official title of this facility is "The Insurance Industry Facility," but it is more commonly referred to as the "Watts Pool." It is designed to be a source of last resort for businessmen who cannot get fire and extended coverage insurance elsewhere.

One hundred and ten insurance companies now share an agreed percentage of the premium income, expenses, and losses on policies written by the Watts Pool. In this way, no single company must bear the full brunt of loss on an individual property.

### Background of the Watts Pool

Immediately following the Watts riots, the California Insurance Department began receiving complaints that companies were cancelling their policies in the area. The Department had received about twenty complaints when the California Insurance Commissioner called a group of insurance company executives into his office to discuss the problem. At the time, the Commissioner had reason to believe that companies were about to cancel their policies and withdraw from the area.

At the meeting he asked the companies to stay on all current risks and to continue writing new business in the area. He also appointed a nine-man committee, which became known as the Insurance Industry Committee, to help him handle complaints.

From September through December 1965, this committee handled complaints forwarded to it by the California Insurance Department. Each member was assigned a portion of the complaints. Inspections of problem properties were made, and the members tried to place the needed coverage. If immediate coverage was necessary while the committee was trying to locate a normal market, a general agent wrote coverage on the property, sight unseen, at ten times the standard rate.

Although the committee was able to place risks in almost all cases, it soon became evident that a more formal outlet for particularly difficult risks was necessary. The Committee finally decided to create a pool, a suggestion of the Commissioner

75

they had rejected on September 2nd. The pool became operational in January 1966.

Even after the pool was formed, the Insurance Industry Committee remained fairly active until around March, 1966, when the staff of the pool assumed most of the day-to-day work.

Between September 2, 1965, and March 14, 1966, the Committee handled 199 cases referred to it by the Insurance Department. The Committee obtained coverage at standard rates or below in seventy-nine cases; obtained partial or total coverage at above standard rates in eight-seven cases; and verified by physical inspection that property was uninsurable in eleven cases. The remaining twenty-two cases were in the process of being resolved.

### Details of the Operation of the Watts Pool

The Watts Pool operates under the general supervision of the Insurance Industry Committee, the members of which are appointed by the Commissioner of Insurance.

Providing only fire and extended coverage insurance on retail mercantile businesses located in the forty-six square-mile area surrounding Watts that was designated as the curfew area during the August, 1965 riot, the pool operates as follows: various insurance companies agree to reinsure a certain percentage of the coverage written by the pool through its "fronting" company, the United States Liability Insurance Company, which issues policies. The United States Liability Insurance Company is liable for only a portion of any loss. The 110 participating companies, which together write about 98 percent of the property insurance in California, have not all taken a share of the reinsurance in proportion to their California business, and the difference is made up largely by Lloyd's of London, which has a 23 percent participation.

Initially, the capacity of the facility—the amount of risks it could undertake—was $10 million. It was raised to $25 million in January, 1967.

The facility is managed by a general agent, that charges a management fee of $22\frac{1}{2}$ percent of gross premiums. Another 5 percent is taken by the producer. There are no other expenses, thus giving the pool a $27\frac{1}{2}$ percent expense ratio.

At present, the pool has two professional employees who act as co-managers of the pool. They do most of the work previously handled by the Committee in screening complaints and in placing the insurance either in normal markets or in the pool.

The pool also has an inspector. The accounting, policy-writing, and other paper work is handled by the general agent as a part of its normal business.

*Some Objections to the Insurance Industry Facility*

*Agents and brokers.* Insurance agents and brokers dislike the procedural rules of the pool that require them to make contact with several companies before the pool will provide coverage. They also object to having their commission limited to 5 percent of the premium. They believe, too, that the pool takes too long to provide coverage.

As a consequence, agents and brokers are reluctant to use the pool. Insofar as this feeling causes agents and brokers to seek insurance in the voluntary market, it reserves the pool for those who actually need it. But insofar as it encourages agents and brokers to turn owners away without trying to obtain insurance for them, it is detrimental to the interest of property owners.

*Insurance companies.* Insurance companies have also raised objections to the pool. If they do not ordinarily write insurance in the Watts area, they object to participating in the pool because they are unfamiliar with the area. If they do write insurance in Watts, they object to participating in the pool because they feel they are already over-committed there.

Some also say that they believe the $22\frac{1}{2}$ percent management fee, along with the 5 percent commission to the producer, is too high.

But principally, they are wary of any arrangement that commits them to accept a risk without giving them the opportunity to make the underwriting decision.

For these reasons, the Insurance Industry Committee and the California Insurance Commission have had difficulty in persuading companies to take even a small percentage of participation in the pool for more than one year. The Committee must arrange annually for the insurance companies to agree to participate in the pool.

**76**

*Procedure for Obtaining Insurance through the Pool.* The property handled by the pool typically goes through the following process:

After an insurance agent or broker has tried unsuccessfully to obtain insurance in both the admitted and the non-admitted market, he helps the property owner prepare a letter to the California Insurance Department requesting coverage by the pool. This letter is reviewed by the insurance department and forwarded to the pool on behalf of the Insurance Industry Committee.

One of the co-managers of the pool makes contact with the producer and requests him to set out in a letter the names of the companies from which he has tried to obtain coverage and the names of the companies he represents. There is no set number of companies from which the pool management expects the producer to obtain declinations. The procedure is designed only to assure that the producer has made a bona-fide attempt to place coverage.

If the co-manager believes that the producer has not used sufficient diligence in trying to obtain insurance, he will ask him to make contact with other companies. In some cases, he will telephone a company directly to help the producer place the business.

Occasionally, the co-manager will try to get the property owner to find another producer—since some producers do not represent a sufficient cross-section of the industry—to be sure that insurance is not available in the voluntary market. If the property owner refuses, the pool will consider providing the insurance.

At some point in this process, which is fairly flexible and informal, an inspection is made by the pool's inspector. The inspection report provides the co-manager with information that may help him get the property insured in the voluntary market. If this is impossible, the inspection report is used to determine the premium rate for the property and whether the property meets the pool's underwriting standards. As of September 1, 1967, the pool had rejected only fifteen properties.

After the pool has decided to accept a risk, the agent is notified and billed for the coverage. Since the pool grants no credit, the premium must be received before a policy is issued.

Policies are normally written for twelve months. A thirty-day binder is issued if that portion of the premium is paid, thus giving the property owner time to obtain the remaining premium charge.

The entire procedure is repeated when a policy is renewed to be sure that the agent tries to place the business in the normal markets.

The process usually takes from two to four weeks, and sometimes longer.

While the procedure outlined above is typical, the pool's management bends the procedural rules for obtaining coverage to fit the needs of the situation. For example, little pressure is exerted to get liquor stores covered in the normal markets because experience indicates that this coverage is unavailable.

Pool personnel now initially handle all complaints referred to the Insurance Industry Committee by the California Insurance Department. Between September 2, 1965, and September 15, 1967, the Insurance Department referred 1,271 complaints to the Committee, an average of about fifty-three complaints per month.

Complaints had fallen to an average of about 30 to 36 per month by July 1967, but they jumped to 68 in August, possibly reflecting the insurance industry's reaction to the summer's disturbances in other parts of the nation.

Of the total number of complaints, only about 770 (60 percent) have at one time or another been satisfied by coverage from the pool. The remaining properties have been insured in the normal markets, have been deemed uninsurable, or were regarded as ineligible for pool coverage.

## Limitations on Risks

To limit its liability on any one risk and also to make the limited capacity of the pool available to as many persons as possible, the pool established certain limitations on the amount of coverage it would provide on any single risk. Initially, the pool limited its coverage to $250,000 per location. This was reduced to $150,000 in January, 1967. Extensive efforts have been made to limit liability in any one block, and on September 5, 1967, the highest liability in any city block was $288,500.

In January, 1967, coverage was also limited to $25,000 on the stock, furniture and fixtures of pawnshops, liquor stores, and jewelry stores. The pool management believes that these businesses can be operated with an inventory of less than $25,000 in one location, and consequently feels no responsibility to write higher coverage in view of the particularly large risks of loss presented.

**77**

While these coverage limitations may seem small, a great many policies in the pool are for less than $10,000. For risks needing insurance above the pool's limits, the pool management frequently is able to obtain coverage for the owner in the normal market.

## Liability in Force

On September 15, 1967, the facility had 480 policies in force, covering 2.15 percent of the approximately 22,300 eligible mercantile risks in the 46-square mile area of South Central Los Angeles known as the "curfew area."

The pool's in-force liability was $12,947,000. Demand for coverage by the pool reached a peak in April, 1967, when $14,606,000 was in force. The declining demand for pool coverage, however, may be reversing itself due to the disorders that occurred elsewhere in the summer of 1967.

The type of risks covered by the pool are as follows:

|  | Percent |
|---|---|
| Liquor Stores | 40 |
| Food Stores | 12 |
| Furniture Stores | 9 |
| Wearing Apparel Stores | 5 |
| Pawn Shops | 4 |
| Vacant Buildings | 4 |
| Drug Stores | 3 |

The remaining coverage is written on various types of retail mercantile establishments, including restaurants, auto repair shops, beauty and barber shops, pool halls, churches, training centers, dry cleaners, and similar establishments.

## Pool Rates

The pool has developed its own special rating schedule which is designed to take into account the risk of loss from a riot. The rates were determined largely by judgment since there was no experience on which to draw.

The pool rate is set by starting with the rate established by the Pacific Fire Rating Bureau for the type of coverage requested : building, furniture and fixtures, or stock. A surcharge is then added to this rate based on the occupancy of the building. The occupancy rate for frame buildings (called "D" Class) is as follows:

| Occupancy | Charge |
|---|---|
| 1. Liquor stores or any type of store with a liquor department; jewelry stores, pawn shops | $1.25 |
| 2. Appliance, furniture, drug, hardware, variety, auto supply stores, discount houses | 1.00 |
| 3. Food markets, sporting goods, wearing apparel, dry cleaners, office equipment, and business machines | .75 |
| 4. Not otherwise classified | .50 |

The surcharge is reduced for other types of buildings. Buildings constructed of masonry and wood ("C" class) are surcharged only 75 percent of the rate for a "D" class building. A reinforced concrete floor and roof building ("B" class) is surcharged only 50 percent of the rate for a "D" class building. A structural steel frame building with concrete floors and roof ("A" class) is surcharged only 25 percent of the rate for a "D" class building.

In a multiple-occupancy building, the surcharge for the highest rated occupancy is used. In other words, a stationery store located in a "D" class building with a jewelry store would pay a $1.25 surcharge instead of the $.50 surcharge that would otherwise apply.

These rates may be further modified by credits or debits which take into consideration various risk characteristics. The schedule is as follows:

| Risk characteristics | Range of modification | |
|---|---|---|
| | Credit | Debit |
| A. Management.—Cooperation in matters of safeguarding and proper handling of property insured | $0.50 | $0.50 |
| B. Building features.—Age, condition and unusual structural features | .50 | .50 |
| C. Premises and equipment.—Care and condition | .50 | .50 |
| D. Ownership.—Absentee or owner occupied—reputation in the community | .50 | .50 |

The amount of debit or credit is determined by the inspector's assessment of the situation on a five-point scale ranging from excellent to poor:

| | | |
|---|---|---|
| Excellent | subtract | $0.50 |
| Good | subtract | .25 |
| Average | no change | |
| Fair | add | .25 |
| Poor | add | .50 |

The total debits cannot exceed $1.00 and the total credits cannot reduce the surcharge by more than 50 percent. In other words, the maximum

78

surcharge for occupancy as modified for risk characteristics is $2.25 per hundred—for example, on a liquor store in a "D" class building. The minimum surcharge is .0625 per hundred—for example, on an unclassified occupant who receives the maximum amount of credit in a class "A" building.

In practice, this can mean, for example, that a standard .372 per hundred rate on a "D" class building can be raised by $2.25 or 2.622 per hundred, or a rate that is over seven times standard. If $30,000 in coverage is sought (the average size of a pool policy), the premium would be increased from $111.60 per year to $786.60 per year. If this increase is passed on to a tenant, it would mean a rent increase of about $55 per month.

The maximum surcharge for occupancy and risk is rarely charged.

A member of the Panel's staff reviewed a random sample of around 12 percent of the policies in force. The rates charged in excess of standard were roughly as follows:

|  |  |  | Percent |
|---|---|---|---|
| 2-2.9 times standard | | | 33 |
| 3-3.9 | " | " | 28 |
| 4-4.9 | " | " | 27 |
| 5-5.9 | " | " | 9 |
| 6-6.9 | " | " | 3 |

The above figures are based on the manual rate for both fire and extended coverage.

### Losses

From the pool's formation until September 1, 1967, losses on thirty-two claims aggregated about $55,000. This reportedly represented a loss ratio of 17.4 percent on earned premiums of over $315,000.

The only major loss, around $25,000, was caused by a fire bomb which totally destroyed a furniture store.

## Other State Responses

### Proposals for State Pools

In several states, consideration is being given to pooling insurance company resources in the state to meet urban core insurance problems. In New Jersey, for example, the State Insurance Commissioner has been meeting with insurance industry representatives to design a workable state insurance pool. In New York, a proposal for a mandatory pool of insurance companies has recently been put forward by the Governor and the Superintendent of Insurance.

A detailed state pool plan has been developed by the State Insurance Commissioner of Michigan. The Michigan legislature now has before it this proposal, which calls for a mandatory pooling of insurance company resources to provide fire and extended coverage insurance for insurable property—regardless of any environmental hazards or exposure to riot losses—that is not voluntarily insured under an urban area plan.

This proposed legislation would expand the existing urban area plan—which covers only dwelling risks in Detroit and two suburbs and excludes tenants' personal property—to cover all dwelling, mercantile, and commercial risks in Michigan, including the personal property of tenants, except property used for farm purposes.

The proposed legislation requires risks included under the urban area plan to be inspected by the rating bureau or other agency designated by the Commissioner before insurance could be written under Michigan's consent-to-rate law or in the non-admitted market—unless the owner signs a statement waiving his rights under the plan. The owner's agent must make a sworn statement that the owner has been fully advised of his rights to an inspection and furnished with a written statement of those rights.

The inspection and reporting procedures under the expanded plan would be the same as those now used, except that a copy of the report would go to the owner or his agent on request.

If, after inspection, the owner cannot obtain insurance after making a diligent effort, he could apply for fire and extended coverage insurance from the state pool of insurance companies.

The law would require all insurance companies licensed to provide fire and extended coverage insurance in Michigan (with certain technical

79

exceptions) to participate in the pool as a condition of their authority to continue to do business in the state. Each member of the pool would participate in the premiums, expenses, profits, and losses of the pool proportionately to the ratio of premiums received for fire and extended coverage insurance in Michigan. In other words, a company writing 1 percent of the total fire and extended coverage insurance written in Michigan, whether or not such coverage was included under a package policy, would be assigned a 1 percent participation in the state pool.

Managed by a board of nine directors to be elected by its members, the pool would function under a "plan of operation"—to be approved by the insurance commissioner—designed to assure a fair, equitable, and non-discriminatory operation, and to provide for agents' commissions and other matters. If no appropriate plan was formulated within ninety days of the enactment of the law, the commissioner would be authorized to adopt a plan.

The proposed legislation would limit the capacity of the pool. Annual premiums could not exceed 25 percent of the total fire and extended coverage premiums in the state written by authorized insurers during the previous calendar year—but excluding premiums written by the pool.

The bill spells out two principal criteria for judging risks:

1. The property must be free of building code violations affecting fire and extended coverage insurance underwriting; and

2. The property must be free of any occupancy characteristics violating public policy.

Beyond this, the pool management is responsible for underwriting standards. But these must be approved by the commissioner. If he disapproves, he would set the underwriting criteria of the pool.

If the pool refuses a risk, the owner would be given a written statement indicating the measures he needs to take to make his property insurable. The property owner could appeal the pool's decision to the insurance commissioner, who could require the pool to accept the risk.

The pool would charge the standard rate for policies written in the voluntary market, plus any applicable surcharges for specified hazardous conditions found during the inspection. Pool deficits or profits would be used to help set rates throughout the state for voluntary business.

The proposed legislation also gives the insurance commissioner authority to adopt rules and regulations necessary to implement the law. The bill further provides that the commissioner need not establish a pool so long as he is satisfied that the companies are voluntarily making insurance generally available for all qualified property throughout the state.

### State and Municipal Liability for Riot Damage

Generally, in the absence of a special statute, state and local governments are not liable for damages resulting from riots and civil disorders. At the present time, sixteen states have statutes providing for varying degrees of governmental financial liability. Enacted during the nineteenth century, the impetus for these laws originally came from lynch mobs and Civil War draft riots. The statutes for many years were dormant; but claims have now been filed under a number of them to recover for damages caused by the civil disorders in the summer of 1967.*

The philosophical basis for these laws rests on the English Statute of Winchester, enacted in 1285. This held the residents of a neighborhood collectively responsible to a considerable extent for crimes committed in their community. In upholding the constitutionality of the Illinois statute in *Chicago* v. *Sturges* (222 U.S. 313 (1911)), the Supreme Court referred to the English tradition and further stated:

> The law in question is a valid exercise of the police power of the State of Illinois. It rests upon the duty of the State to protect its citizens in the enjoyment and possession of their acquisitions, and is but a recognition of the obligation of the State to preserve social order and the property of the citizen against the violence of a riot or a mob.

Not all types of riot damage and injury are compensable. Minnesota, Nebraska and Ohio hold cities liable only for personal injuries. Connecticut, Kansas and Wisconsin provide for recovery of losses for both personal injury and property damage. The remaining states provide recovery

---

*The sixteen states with these statutes are Connecticut, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Missouri, Montana, Nebraska, New Hampshire, New Jersey, Pennsylvania, Rhode Island, South Carolina, and Wisconsin.

032904

for only property damage, and Maine, Massachusetts and Rhode Island limit recovery to three-fourths of the value of damaged property in excess of fifty dollars.

In four states, Connecticut, Kansas, Kentucky and Maryland, no recovery is allowed if it is satisfactorily shown that the officials used all reasonable diligence to prevent or suppress the riot. In other states, cities may be held liable regardless of the action taken by officials.

New Hampshire, New Jersey, Pennsylvania, Rhode Island, South Carolina and Wisconsin specifically deny recovery to a participant in the disorder. New Jersey, Pennsylvania, Wisconsin and Rhode Island deny recovery if the claimant was negligent in failing to take measures to protect himself or his property.

The laws of all states except Pennsylvania affect every city and municipality therein. In Pennsylvania, recovery for riot damage is provided only in the city of Philadelphia and in Allegheny and Northhampton Counties.

There are other variations in the laws of the different states, and the application of these laws to the extensive damage resulting from recent riots is still open to question. Although Philadelphia paid about one half of the amount of each valid claim resulting from the riots there in 1964, other cities such as Boston, Chicago and Newark are now contesting liability on various grounds. Even if the statutes are held applicable to some claims there will still remain questions whether they apply to insured losses and thus permit an insurance company to recover from the states the losses it has paid to its policyholders; none of the statutes specifically deals with this problem.

There is also the question whether states will continue to maintain these laws in force. California repealed its law in 1963; Illinois repealed its law in August 1967; and repeal is being considered in other states.

## Proposals of State Commissioners

The National Association of Insurance Commissioners (NAIC) appointed on August 25, 1967, a select committee of its members to make recommendations to it concerning insurance problems raised by civil disorders. On November 9, 1967, the NAIC placed in the record of our hearings the following resolution that it had adopted:

WHEREAS, many urban areas have implemented property inspection plans (such as the Boston Plan) for relief of insurance shortages; the following is recommended:

That the states consider the creation or implementation of urban areas inspection plans and/or consider assigned risk pools for property insurance, on a voluntary or compulsory basis, if the conditions present in the state indicate that such programs would help meet the social need of providing a property insurance market for insurable property.

On December 5,1967, the NAIC urged the industry to adopt a voluntary program to assure a stable and continuous market for property insurance in urban areas. Doing this, it said, might require unusual measures including "special civil disorder loading of all property premiums, pooling of the premium funds so produced, and of the risk in whole or in part at both the state and national levels." If a workable, voluntary plan was not adopted, it said "reasonable plans statutorily created or implemented by the state and/or federal governments to secure such objectives" might be needed.

The NAIC also recommended to us at our hearings a detailed plan to defer federal income taxes on funds held in reserve to meet possible catastrophe losses. The proposal, the NAIC urged, would help the industry accumulate funds more rapidly to pay catastrophe losses, and thus would make it more financially feasible for the industry to provide insurance protection in areas where companies might suffer catastrophe losses from civil disorders or other insured perils. Specifically, the NAIC suggested that federal income taxes be deferred on funds set aside in reserves in the amount and to the extent required by state law. Funds placed in these reserves would come from premium income and could be used only to pay catastrophic losses, and losses resulting from

81

the insolvency of other fire and casualty companies. While being held in the reserve accounts, the funds could be invested only in accordance with state requirements. Under the NAIC proposal, these funds would be fully taxable when returned to the company for general use.

## Industry Proposals

In response to our request, insurance companies individually and through their associations presented suggestions for developing a program to meet urban core insurance problems.

### Urban Area Plans

Industry representatives generally agreed they had an obligation to contribute to a viable insurance market in which all property owners maintaining their property in insurable condition are able to obtain insurance protection. To accomplish this, they generally advocated the expansion of Urban Area Plans wherever needed to cover both dwelling and commercial risks.

### State and National Pools

The industry representatives conceded that where the Urban Area Plans did not operate to meet fully the needs of urban core residents, mechanisms to spread the risk of loss widely might be needed to supply the market.

Most industry representatives did not believe pools would be needed to provide fire and extended coverage insurance. But if protection was also to be provided for losses from burglary and theft, they believed that perhaps both pools and some governmental financial assistance would be needed.

One company suggested specifically a national pool with government financial backing to insure all properties not insured under an Urban Area Plan for reasons beyond the control of the owner. The lines of insurance to be written by the national pool would include: fire and extended coverage, homeowners multiple peril, commercial multiple peril, inland marine, liability other than automobile, glass, and burglary and theft. Each participating company would be free to reinsure whatever portion of a line it wished with the pool.

The company further suggested that the national pool pay 2 percent of the premiums it re-

ceived to the federal government in return for reinsurance to reimburse the pool in the event its annual losses and expenses (not including the reinsurance premium) exceeded 103 percent of its earned premiums. Provision would be made for repaying out of future profits any reinsurance payments made by the federal government.

Most industry representatives, however, believed that if pools were required to solve the problems they should be operated on a state-by-state basis. Some suggested consideration of having state pools administered by a regional or national management in the interest of efficiency.

Industry representatives also suggested that participation in the pools be voluntary, but that participation be a necessary condition to obtaining any governmental assistance to protect companies from catastrophic riot losses. Few specific suggestions were made regarding the organization or operation of such pools. It was generally agreed that the specific details would have to be worked out later, probably at the state and local levels.

### Governmental Reinsurance for the Riot Peril

With a single exception, all industry spokesmen who appeared at our hearings agreed that some governmental assistance was needed to help the industry provide insurance protection against riot damage, and even the exception did not oppose such a program, but only expressed doubt that his company needed it. If this protection were not provided, industry spokesmen generally said companies would have no choice but to reduce in one way or another the amount of insurance written in inner city areas to avoid losses in these areas in the event of future civil disorders.

They suggested that this protection be provided through reinsurance of the riot peril purchased from the federal government in return for a small percentage of the premium on the lines which they reinsured. They further suggested that

82

this reinsurance be provided on a state-by-state basis.

Three different suggestions were made for the method of providing this reinsurance.

The American Mutual Insurance Alliance (AMIA), a national trade association representing 122 mutual property and casualty companies, suggested that approximately 1 to 3 percent of the annual premiums collected in each state on each reinsured line be paid to an interstate reinsurance facility. This facility, to be managed by a governing committee of state insurance commissioners and representatives of the industry and federal government, would pay all claims arising out of riot damage on reinsured lines up to an annual maximum of $150 million. After that, the federal government would provide additional protection up to a maximum of $500 million. If riot losses exceeded that amount in any one year, the companies would pay the remainder of the claims. To assist the reinsurance facility in meeting its financial commitment before a $150 million fund was built up, the AMIA suggested the facility be permitted to borrow funds from the United States Treasury, the loans to be repaid with interest in subsequent years.

The AMIA also suggested that the premiums for reinsurance from the interstate facility would be provided by the states either through assessment upon property insurers or by appropriation from state revenues. To provide the states with time to adopt needed enabling legislation, the AMIA suggested that during the first three years, reinsurance be offered in any state where companies writing 75 percent of the state's property insurance premiums participated in the interstate facility. After three years, the reinsurance protection would be unavailable in any state which had not joined the facility.

The American Insurance Association (AIA), a national trade association representing 170 stock property and casualty companies, suggested another approach. Under its proposal, insurance companies would purchase, through a state pool, riot reinsurance protection from the federal government for each line of insurance in each state for which this protection was desired. In return for an appropriate premium, the federal government would reimburse the companies for all riot losses in excess of 3 percent of their annual premiums earned on reinsured lines in the state where the loss occurred.

To help eliminate the riot peril from a company's decision whether or not to insure in a particular area, the AIA suggested that any company that did not experience riot losses of 3 percent of its reinsured lines be required to pay up to that amount into the state pool before the federal government would be called upon to make payments. These funds would be used by the state pool to reimburse companies which suffered riot losses in excess of .3 percent of their annual earned premium in the state. In this way, all companies acquiring riot reinsurance in the state would stand to lose up to 3 percent of their annual premium volume on reinsured lines, even though some of these companies may not have suffered losses of that amount from the riot.

It was generally conceded that this riot reinsurance protection should be available only to companies that participated fully in Urban Area Plans and other plans designed to provide a viable urban core insurance market.

One company proposed a plan similar in approach to that suggested by the AIA, but with somewhat different details. Under this proposal, the federal government would reimburse companies which participated in the national pool for 95 percent of their riot losses which exceeded 2 percent of the annual premiums earned on reinsured lines in the state in which the losses occurred. A company having less than $2 million in assets would also be eligible for this protection, even if it did not participate in the national pool. In return for reinsurance protection, a company would pay, through the national pool, one tenth of one percent of its annual earned premiums on reinsured lines.

The National Association of Independent Insurers, an association of 350 property and casualty insurers of all types—stocks, mutuals and reciprocals—also favored development of a governmental reinsurance program for the riot peril. It made no specific suggestion, but recommended a task force of representatives of the various segments of the industry to work out the details.

## Tax Measures

Most insurance industry representatives favored some form of tax deferment plan which would allow them to accumulate catastrophe reserves at a faster rate, but no specific proposals were presented.

83

## Proposals for Federal Legislation

More than 200 bills were introduced in the Congress in 1967 to deal with various property insurance problems.

Some call for studies to determine the extent to which insurance is available for protection against losses arising from civil disorders and to determine whether legislation is needed to assure the availability of this protection.

Some bills provide for compensating insurance companies for losses incurred in "major civil disorders," the President to determine when a major civil disorder has taken place, and the insurance companies to be reimbursed for claims arising out of the disorder from funds appropriated for that purpose.

A number of proposals would authorize grants to states for assistance to homeowners and businesses suffering uninsured property losses from riots or other civil disorders. Under one approach the federal government would pay one-half of the cost of rehabilitating damaged property and the state and property owner would share equally the remainder. Other bills would provide assistance to property owners through disaster relief funds to be made available by appropriations.

Still other legislation proposes that the federal government offer reinsurance or direct insurance against losses from riots up to a set maximum face value amount, the purpose being to make insurance against the riot peril available at "reasonable rates." Where these "reasonable rates" are regarded as actuarially unsound, appropriated funds would from time to time be added to accumulated premiums to pay possible losses. If these funds were insufficient to pay claims, the administrator of the program would be authorized to borrow funds from the United States Treasury.

Many proposals deal with an aspect of the center city insurance problem—protecting small businessmen against losses from criminal activity, including losses resulting from riots or other civil disorders. The purpose is generally to provide crime insurance at "reasonable rates" to businessmen who use appropriate loss prevention techniques to safeguard their property. Some bills en-

visage direct protection by the government, but specify that every effort is to be made, including the offer of reinsurance by the government, to encourage the private insurance industry to provide the protection. They generally limit the amount of insurance or reinsurance offered by the government to a specific maximum figure. In some cases, funds for paying losses are to be paid out of a revolving fund consisting of accumulated premiums and funds to be appropriated when the legislation is enacted. In other cases, the administrator of the program would be authorized to borrow additional money from the United States Treasury if needed to meet losses.

One recent proposal would provide federal reinsurance for riot losses on various lines of insurance to companies participating fully in state-wide urban area plans designed to assist all property owners to obtain fire and extended coverage insurance. In addition, lending programs would provide funds needed by property owners to make their property insurable.

In this proposal, the program is to be administered by the federal government with the advice of an advisory panel selected from the insurance industry, state and local governments, and the general public.

Losses on reinsured lines would be paid from accumulated premiums for reinsurance. If these were insufficient, the administrator of the program would be authorized to borrow from the United States Treasury amounts sufficient to meet claims.

The Executive Branch of the federal government has commented on some of these Congressional proposals, but has taken no position pending the completion of the Panel's work. At our hearings, the Special Assistant to the President for Consumer Affairs, and representatives of the Department of Housing and Urban Development, the Department of Commerce and the Small Business Administration pointed out various considerations which have aided us in developing our recommended program. The Panel has received the full cooperation of all parts of the Executive Branch during the course of its work.

84

# Conclusion

The principal actions that have been taken thus far to deal with urban core insurance problems—Urban Area Plans—provide important insights into what is needed to solve the insurance problems of the urban core residents. The plans disclose the necessity of assuring conscientious efforts at the local level to cause individual properties to be judged on their merits. They suggest a promising approach for obtaining insurance at reasonable rates for property owners in all areas of a city.

But it is equally important to recognize the limitations of the present Urban Area Plans. Our survey showed that the Roxbury section of Boston has the highest rate of uninsured and underinsured property of any of the six poverty areas surveyed. The data from our survey also disclosed major insurance problems in Cleveland, Detroit, and Oakland, which have Urban Area Plans of more recent origin.

The survey does not suggest that the Urban Area Plans have failed or not been beneficial. For example, in Boston, according to all reports, almost no one was able to obtain insurance at standard rates in 1960 when the plan was initiated, and over the last six years thousands of property owners have been able to do so under the plan. But the survey does clearly suggest that additional steps beyond present Urban Area Plans are needed to meet the insurance problems of urban core residents and businessmen.

These plans need to be expanded to cover more property owners and to provide additional lines of insurance. Moreover, the procedural requirements of the plans need to be improved to provide more assistance and better protection for the insurance consumer, to disclose more precise information on the nature and extent of the urban core

insurance problems, and to develop more refined techniques for insuring urban core properties.

Even with these improvements, there are likely in many cities to remain some insurable properties which cannot be fully insured in the voluntary market due to environmental hazards or other reasons. The experience gained under the Watts Pool has shown that the technique of pooling insurance industry resources can be effectively utilized to insure this type of property. Some states are now considering greatly expanded pools to provide protection to all owners of insurable property who cannot obtain coverage in the voluntary market.

The many thoughtful legislative proposals made by the state insurance commissioners, industry spokesmen, and members of Congress illustrate several different ways the federal government could contribute to a solution of urban core insurance problems. We generally agree with the goals underlying these various proposals for federal legislation and believe our program meets such goals. But we believe that greater efforts should be made to marshal the resources of others concerned—property owners, the insurance industry, state and local government—before relying on the federal government and its resources.

Most importantly, we believe that the primary focus of any legislation should be on developing a comprehensive program to meet the needs of all property owners—the tenant as well as the home owner, the large as well as the small businessman. This program should help property owners obtain fire and extended coverage, vandalism and malicious mischief, and burglary and theft insurance. Each of these lines is important to property owners and lenders, and vital to the flow of private resources and efforts into the inner cities.

85

## Chapter IV

# RECOMMENDED PROGRAM TO SOLVE URBAN CORE INSURANCE PROBLEMS

Drawing on the background and supporting material provided by the discussion of the insurance enterprise, the urban core insurance market, and the present responses to urban core insurance problems, this part of the report describes in detail the Panel's recommended program. The discussion here is intended to be helpful to those with the responsibility for implementing the program.

## A. FAIR Plans: Major Expansion of Urban Area Plans

### 1. Potential of Urban Area Plans

The Urban Area Plan can have many advantages. It can inform property owners about repairs, if any, they need to make to reduce their risk and obtain needed insurance. It can offer a useful and inexpensive method of furnishing insurance companies with valuable underwriting information on the physical condition of risks. It can generate information useful for code enforcement and loss prevention purposes. It can discourage companies from drawing a red line around urban core areas and refusing to provide coverage there without considering the condition of a particular risk. It can keep state insurance departments informed of the nature of the problems that the urban core property owner has in obtaining insurance.

In the Urban Area Plans currently in operation, this potential has not yet been realized. The plans

should be revised and expanded to assure every property owner fair access to the property insurance he needs.

The broader and more inclusive type of plan we believe necessary to meet the insurance needs of property owners should have a distinctive name which conveys to the public its nature and purpose.

*The Panel Recommends:*

**The insurance industry, in cooperation with the states, should institute in all states plans establishing Fair Access to Insurance Requirements (FAIR Plans).**

### 2. Area Served

Most Urban Area Plans now in existence are limited, either by their terms or in practice, to specified cities or to areas within cities. Their restricted scope is the result of special efforts to make insurance available in those areas with the most acute problems. However, property owners outside the boundaries of the present Urban Area Plans may also experience difficulty in obtaining insurance. Since the principal objective of the FAIR Plan is to assure that no property owner is denied insurance without a fair evaluation of the underwriting risks of his individual property, the Plan's procedures should be available to all property owners in a state. This avoids designating any particular area as a prob-

lem and assures all property owners equal treatment regardless of where they live.

Where property owners can obtain needed insurance protection without using the FAIR Plan, the existence of the Plan costs the insurance industry neither time nor expense to operate. But when a property owner is experiencing difficulty in obtaining insurance, the benefits of the FAIR Plan should be available to him before his general area becomes a problem.

We recognize that some areas exposed to natural hazards, such as seashores, pose different problems which states may wish to handle separately. Some states may prefer to concentrate their efforts on solving the problem of providing adequate insurance in urban core areas only. Therefore, we believe that the states should have the option of excluding seashore areas and similar properties which involve special insurance problems and policy considerations unrelated to those of the urban core.

*The Panel Recommends:*

**FAIR Plan inspections and procedures should be available to all property owners in a state; except that a state may exclude seashore or similar properties.**

### 3. Eligible Property

Most Urban Area Plans now assist only owners of homes and apartment buildings. We have found that owners of mercantile and commercial buildings in the urban core also have difficulty in obtaining insurance.

The growth of new businesses and the expansion of existing ones in the inner city are essential to revitalize these areas. This can occur only if adequate insurance protection is available.

The same reasons adequate insurance is unavailable for dwellings explain why it is unavailable for mercantile and commercial property—there is a failure to distinguish between good and bad risks in an area regarded as "blighted." The problem, always chronic, has now become acute, as insurance companies have increasingly become reluctant to provide insurance in areas that might possibly be damaged by riots.

The application of the FAIR Plan to mercantile and commercial risks, together with other measures we recommend, would alleviate this problem.

Manufacturing risks and automobiles are excluded. Manufacturing plants require more specialized underwriting and are usually insured without difficulty and without regard to the extra hazards of their location. Automobile insurance underwriting involves many special factors not related to the location or physical condition of the property. These types of insurance have not been part of our study.

*The Panel Recommends:*

**FAIR Plans should apply to all dwelling, mercantile, and commercial property except manufacturing plants and automobiles.**

### 4. Eligibility of Tenants

Most Urban Areas Plans assist only the owner of a building to obtain insurance. Inspectors nonetheless have often helped tenants obtain insurance on their property, even though the plan does not specifically provide for it. It is doubtful, however, that many tenants know that such unofficial assistance is available.

Many residents and businessmen in the urban core are tenants. They cannot be excluded from the benefits of the plans without discrimination against the very people who may need help the most.

*The Panel Recommends:*

**FAIR Plans should assist both building owners and tenants in obtaining insurance on buildings and contents.**

### 5. Absence of Owner During Inspection

Where a plan provides for helping a tenant obtain coverage, it usually requires the building owner or his representative, as well as the tenant, to be present during the inspection. Requiring the presence of the building owner or his representative has the advantage of assuring that the owner is made aware of certain unsafe conditions of his building which should be corrected; it also helps assure the inspector access to all parts of the building. But the experience under the Milwaukee Plan has demonstrated that the availability of insurance to a tenant need not necessarily be conditioned on the willingness of the building owner to be present during an inspection.

88

*The Panel Recommends:*

**The absence of the building owner or his representative during an inspection should not preclude a tenant seeking insurance from obtaining an inspection under the FAIR Plan.**

## 6. Lines of Insurance

Urban Area Plan inspections are now available to assist property owners in obtaining only fire and extended coverage insurance. As noted earlier, this is the most basic property insurance. But it is not the only critically important line of insurance that needs to be available in the urban core.

At a minimum, basic protection against losses from crime and vandalism should also be available. The availability of these lines of insurance is essential to rebuilding and revitalizing the urban core.

The urban core poses special problems for the crime insurance underwriter. It may be necessary to redesign crime policies—by appropriate use of deductibles, requirements for protective devices, and other underwriting controls—in order to make such policies economically sound from the point of view of the insurer and the insured. More research on and experience with crime insurance in the urban core is essential. FAIR Plans should be able to offer at least a basic opportunity to those wishing to purchase crime insurance, while at the same time providing the impetus for the necessary research and innovation.

*The Panel Recommends:*

**FAIR Plans should assist property owners in obtaining:**

**—Fire and extended coverage insurance;**

**—Vandalism and malicious mischief insurance; and**

**—Burglary and theft insurance.**

**A state insurance department may decide to include additional lines or kinds of insurance in the FAIR Plan administered in that state.**

## 7. Importance of Agents and Brokers

Insurance involves a complicated business transaction. Most people need the help of an insurance agent or broker to obtain the appropriate insurance, and, indeed, most insurance companies sell insurance only through agents and brokers.

A significant practical problem in existing Urban Area Plans is that inner city property owners may be unable to find an insurance agent or broker who is willing to assist them in obtaining insurance, or even in obtaining an inspection. Many agents and brokers have little desire to handle business in the urban core. Their business arrangements with insurance companies sometimes make it uneconomic for them to write urban core business.

*Business Arrangements.* Each agent licensed to write insurance by a state must develop his own arrangements to place insurance with particular companies. Agents normally can write insurance for only those companies with which they have a formal arrangement. Some agents represent several companies, while others represent only one.

Theoretically, a broker can place insurance with any company. As a matter of practice, however, a broker normally deals with only a few general agents who represent several companies. A broker doing a substantial amount of business may develop direct contacts with a few companies, but only if he provides a substantial and profitable premium volume.

A primary consideration for an agent or broker is the preservation of his relationship with the companies or general agents with whom he places insurance. Without outlets for his clients' insurance, the agent or broker is out of business. As a result, although the agent or broker is usually an independent businessman, his independence is restricted by rules imposed by the companies or general agents he represents.

For example, unless an agent or broker produces a substantial amount of premium volume for a company or general agency, he may find that it will cease accepting any business from him.

Moreover, substantial losses on the properties insured through a particular agent or broker in relation to the amount of premiums he produces may also prompt companies or general agents to cease accepting his business.

*Compensation Structure.* Most agents or brokers are paid a commission that is a percentage of the premiums their customers pay. The actual percentage varies from company to company and for different lines of insurance.

Agents representing only one company may be paid a salary. But the salary generally depends on the amount of premium volume the agent produces.

89

He, too, is under pressure to write a large volume of business.

Since the compensation structure for agents and brokers is based upon their volume of premiums rather than time spent, the amount of time an agent can afford to spend on helping a client to obtain insurance is limited.

The values of most homes in the urban core area, as well as of their contents, are low, and the premiums for the amount of insurance the owner wants to buy are normally small. Yet many insurance companies, as a result of tightening their underwriting standards, have required agents and brokers to provide them with a detailed inspection report on property in the inner city and, in some cases, a photograph of the property. Even then the company may decline the risk. In that case, to receive any compensation for his efforts, the producer must try another company. The Urban Area Plan relieves the agent or broker from performing a detailed property inspection, but it too can involve extra paper work with no increase in commission. As a consequence, many agents and brokers refuse to take applications for insurance in the inner city. It is more profitable to devote their time to business in other areas.

Most agents also have contingency commission agreements with the companies they represent. If the losses on the business an agent writes are substantially less than the premiums earned, the agent receives additional compensation. This financial stake gives him a strong incentive to avoid writing insurance on properties he believes might sustain losses. Losses cost him a portion of his commission. And if the losses become large in relation to the premiums he has written, the company or general agent may cease accepting business from him altogether.

Existing Urban Area Plans do not protect the agent from loss of his contingent commissions, nor do they keep him from being penalized by a company or general agent for having a high loss ratio.

A few companies have recognized that the contingent commission agreements may operate to discourage their agents from processing applications for insurance in the inner city. They have relieved their agents of these agreements in urban plan areas. But companies have rarely sought to encourage their agents to write business in the inner city. Indeed, some have actively discouraged their agents from accepting business there.

We believe that all responsible agents should accept as much business in the inner city as possible.

A company imposes penalties on agents accepting business with high losses, ostensibly to eliminate agents with poor underwriting judgment. Under the Urban Area Plan, the company relies on an inspection report from the rating bureau rather than on the judgment of its agent. Therefore, the agent should not be penalized if the business happens to yield losses. He should instead be encouraged to provide an adequate urban core insurance market.

*The Panel Recommends:*

**FAIR Plans should provide that**

**a. No insurance company shall direct any agent or broker or other producer not to solicit business through the Plan; and no agent, broker, or other producer shall be penalized in any way by an insurance company for submitting applications to it for insurance under the Plan.**

**b. Losses on property insured under the Plan shall not reduce the agent's or broker's contingent commission income from premiums written on other property; and such losses shall not be included in calculating losses on business submitted by the agent or broker.**

## 8. Acceptance of Applications by Agents and Brokers

Since the agent is not to be penalized for submitting applications for insurance through the Plan, and since the inspection will be performed by the rating bureau, an agent should not be permitted to turn down an application for insurance without an inspection. Agents are licensed by the state to sell insurance, and they enjoy a public privilege. They should meet their responsibility to help all property owners obtain insurance.

*The Panel Recommends:*

**No agent or broker should be permitted to refuse an application for a line of insurance which he is licensed to write.**

## 9. All-Industry Placement Facility

Some companies avoid writing insurance in the inner city by not appointing agents who are likely

90

to receive applications from that area and by discouraging agents from accepting applications from the area. The task of meeting the insurance needs of urban core owners thus falls on a relatively small group of companies.

It is prudent business judgment for an insurance company to spread the risks it has insured. If it insures only risks in a small geographic area, it can suffer large losses as the result of a single local catastrophe.

Most Urban Area Plans do not now provide a mechanism for distributing the applications for insurance from the urban core among the insurance companies admitted to do business in the state. A mechanism of this sort is necessary to prevent particular companies from holding back from these areas.

*The Panel Recommends:*

**Any agent or broker should be permitted to submit an application for insurance, along with an inspection report, to an All-Industry Placement Facility, licensed to do business with all companies participating in a FAIR Plan; and this facility will seek to place the insurance.**

## 10. Commission Paid by the Facility

The All-Industry Placement Facility will perform the task ordinarily performed by an agent or broker in seeking out a company to provide insurance. If an agent or broker could obtain the same commission from using the placement facility as he obtains from the companies he normally places business with, he might rely on the facility rather than canvass his normal market. We do not intend that the facility be a substitute for the agent's normal market. To avoid this, the commission paid on business written through the facility should be less than the normal commissions paid by insurance companies.

Nevertheless, the commission should not be reduced to such an extent as to discourage the agent from seeking out inner city business.

A balance must be struck so that the use of the facility is sufficiently attractive to the producer to encourage him to seek out business in the inner city, while leaving a further incentive for him to place the business through his normal markets when he believes this is practicable.

Each FAIR Plan can best determine what commission arrangement will best strike this balance.

For example, one Plan might make commissions 85 percent* of normal commissions, others might use other figures. The difference between the usual commission and that paid on regular business can be used to help defray the expenses of the All-Industry Placement Facility. A slightly reduced commission should not, however, discourage the producer from seeking inner city business in view of the assistance that will be provided by the placement facility on hard-to-place risks.

*The Panel Recommends:*

**The commission allowable to an agent, broker, or other producer submitting an application for insurance through the All-Industry Placement Facility should be somewhat less than the normal commission rate paid by the company that accepts the application. If the company normally pays no commission, an appropriate commission rate should be established.**

## 11. When an Inspection Should Be Required

*Type of Plan.* There are two types of Urban Area Plans:

1. Those requiring an inspection by the Rating Bureau, or a waiver of the inspection, before insurance can be declined or written above standard rates. For the purpose of this discussion, this type of plan will be referred to as a "mandatory inspection plan."

2. Those providing an inspection only on request of the insurance company or agent; but no inspection is required before insurance is written above standard rates. For the purpose of this discussion, this type of plan will be called the "selective inspection plan."

Each type of plan has advantages and disadvantages. A selective inspection plan is the least costly to administer. It helps provide insurance for those property owners who are sufficiently sophisticated about the intricacies of insurance costs and about the insurance marketing and regulatory system to know when and where to complain. But as the facts gathered in the course of the Panel's work show, most people lack this knowledge. Consequently, they receive little help. They are frequently sold insurance at prices in excess of the standard rate even though their property presents no unusual risk. Thus, while selective inspection

*Figure is illustrative only.

91

plans serve to help those who complain, they do little to provide insurance in the urban core at reasonable prices.

Mandatory inspection plans have the advantage of giving every property owner who has difficulty obtaining insurance at standard rates an opportunity to have his property inspected by an impartial and disinterested expert. If the property has defects which present significant risks, they are specifically pointed out to the owner, so that he has an opportunity to correct them. This may not only save him money on insurance premiums but, more significantly, may help prevent a fire that could take the lives of the owner and his family. If he does not correct the defects in a state with a surcharge rating plan, he will pay an extra insurance premium for only the specific defects that go uncorrected.

Moreover, the required inspection plan provides a record on properties that may be appropriate targets for community development programs. Further, statistics developed under the required inspection plans will aid the state insurance departments to develop better information on loss experience and thereby facilitate rate regulation and loss prevention.

The Panel recognizes that the required inspection plan tends to disrupt part of the present market for insurance sold at more than standard rates—the high hazard or so-called substandard market. It deprives this market of properties that are insurable at the FAIR Plan rates. We do not believe, however, that it will totally disrupt this market. There will still remain properties in poor condition that cannot be insured under the FAIR Plan and might be uninsurable even in the state pools. These risks may then be appropriate for the high hazard insurance market until corrective action can be taken to improve or demolish the property.

*Waivers.* All Urban Area Plans now allow an owner to waive his rights under the plan in one way or another. The waiver is susceptible to considerable abuse. As noted in the discussion of the waiver provisions under the Michigan Plan, some agents, without knowledge of the actual condition of their clients' property, try to get their clients to sign waivers. As a result, much of the advantage of the inspection program is lost. Moreover, the statistics developed under the plan are less meaningful.

We do not believe that an owner should be required to have his property thoroughly inspected by a private organization as a condition to obtaining insurance. On the other hand, we do not believe that a waiver provision should be included in the FAIR Plans. If the owner will not allow the inspector into his property—and experience in Boston, Buffalo, and New York indicates that this is a relatively rare occurrence—at least an exterior inspection should be included in the FAIR Plans.

*The Panel Recommends:*

**No risk should be written at a rate in excess of the applicable FAIR Plan rate, or by a non-admitted company, unless the property has been declined by an admitted company at the FAIR Plan rate, based on information from an inspection report under the FAIR Plan.**

### 12. Requests for Inspection

Some existing Urban Area Plans allow the property owner to request an inspection. Indeed, the Minnesota Plan requires the property owner to make the request. Other plans allow only the producer or the company to request an inspection.

An advantage of permitting the property owner to request an inspection is that he can obtain an inspection even when he cannot locate an agent or broker to request one for him. While this problem should be greatly alleviated under the FAIR Plan, other advantages accrue from allowing the property owner to request an inspection. First, he may wish to deal with a company that has or wants no agents in his area. Second, he may have more confidence in the inspection system if it is keyed to him rather than to the company. This seemed important to property owners in Boston, where the original plan was amended to allow property owners to request inspections.

Some plans require a written request for an inspection. Experience under plans that have no such requirement, or where it is not enforced, has demonstrated that the requirement is unnecessary. Omitting it facilitates rapid operation of the inspection plans.

*The Panel Recommends:*

**A property owner or his representative, an insurance agent or broker, or an insurance company should be entitled to request a FAIR Plan inspection. The request need not be in writing.**

92

## 13. Inspections

Inspections under existing Urban Area Plans are made by the local rating bureau. This organization normally inspects and sets the rates for fire and extended coverage insurance for each mercantile and commercial building in metropolitan areas. It therefore has been the logical choice to inspect dwelling properties under the Urban Area Plans. Since the expenses of the bureau are shared by the affiliated insurance companies in the state in proportion to the amount of premiums they each receive in the state, using the rating bureau to perform inspections under Urban Area Plans spreads the costs of core area inspections throughout the state's insurance industry. The expansion of the plans may require other or additional means of spreading the costs of inspections. Individual property owners have not been charged for the inspections, and this should continue to be the case under FAIR Plans.

Because some bureaus may lack the facilities to perform inspections outside of the larger metropolitan centers they normally serve and because crime insurance is not within the jurisdiction of rating bureaus now involved in Urban Area Plans, some state insurance departments may wish to designate another agency to perform the FAIR Plan inspections or to make appropriate divisions of responsibility between different agencies. We believe the state insurance departments should have this flexibility.

It should be recognized that some insurance companies and some producers may request inspections even when they are not necessary to determine insurability. Provision should be made in the Plan to provide that, subject to review by the state insurance department, such company or producer be charged the cost for unwarranted inspections under the Plan.

*The Panel Recommends:*

**Inspections under FAIR Plans should be made without cost to the property owner by the local rating bureau or any other agency designated by the state insurance department. Subject to review by the state insurance department, a company or producer may be charged for unwarranted inspections under the Plan.**

## 14. Procedure After Inspections

We have found that under existing Urban Area Plans, when a company receives an inspection report, it is generally faithful to its commitment to provide insurance without regard to the area in which the property is located.

We have also found that the reporting procedures under the plans provide valuable information. Under a few plans, the state insurance department is provided with a copy of the inspection report if a company declines to provide coverage. In this way, the insurance department can discuss the risk with the company if the company seems to have given an inadequate reason for its refusal. This procedure appears to us to offer the greatest promise of assuring that all participating companies will discharge their responsibility to help provide an adequate insurance market in the inner city. Moreover, it provides a record of problem property that cannot be insured and that may need to become the target of other programs designed to revitalize inner cities.

A copy of the report should also be given to the insurance department when the insurance company agrees to write the risk on condition that certain hazards be removed. In this manner, the department can keep a current check on the existing conditions that give rise to insurance problems.

The property owner should also receive a copy of the report whenever the company does not provide coverage, together with an explanation of either (1) the conditions that must be corrected before coverage will be written or (2) the reasons why the company will not provide insurance. This explanation will help the property owner repair his property to bring it up to insurable condition. The explanation should also advise the property owner of his right to appeal any adverse decision to the insurance commissioner.

*The Panel Recommends:*

**After the FAIR Plan inspection report is received, the company should determine whether the property meets reasonable underwriting standards at the applicable premium rate. The company may then:**

**a. Write the coverage;**

**b. Agree to write the coverage if certain improvements are made, which are specifically noted in an action report; or**

93

c. Decline to write the coverage, the reasons for declination to be clearly specified in an action report.

In all cases, the company should notify the inspection bureau or other agency designated by the insurance department of its decision and return the inspection and action reports to the designated agency. These reports should be kept on file with that agency.

If the company declines the risk or agrees to write it on condition that the property be improved as specified, the company should also send a copy of the inspection and action reports to the applicant for insurance and the insurance department. The company should inform the applicant of his right to appeal to the state insurance commissioner.

### 15. Amounts of Insurance

Present Urban Area Plan statistics indicate that a risk has been accepted if any insurance is written on the property. But in some cases the insurance may be significantly less than the owner requested, and inadequate to protect his investment.

There are a number of reasons why an individual insurance company may wish to provide coverage for less than the full value of the property being insured. Whatever the reason, when the property owner's agent or broker lacks the connections with a sufficient number of companies to apportion the risk among several companies, the property owner may be left exposed to considerable loss. Indeed, where the owner has a substantial mortgage on his property, he may stand to lose his entire equity in the property if he is unable to obtain coverage for the full insurable value of his property.

To help prevent this, we believe that the insurance industry, through the All-Industry Placement Facility, should assist the owner in obtaining insurance for the full insurable value of his property.

We nevertheless recognize the possible need for deductibles, percentage participation clauses, requirements for protective measures, and other common underwriting devices to avoid excess claims adjustment expenses and to encourage loss prevention measures by the owner. For example, special deductibles and policy limitations may be appropriate for burglary and robbery coverage on liquor stores and pawnshops.

*The Panel Recommends:*

Insurance coverage should be available to the full insurable value of a property. If any single company will not underwrite the full insurable value, the All-Industry Placement Facility will assist the owner and his agent or broker in obtaining the desired coverage from other participating companies. Less than full coverage may be provided only where deductibles, percentage participation clauses, and other common underwriting devices are needed to meet special problems of insurability.

### 16. Records

All policies written under the FAIR Plan should be separately coded so that statistical records may be kept for purposes of rating, loss prevention, and other studies of the operation of the Plan. At present, too little is known about the causes and the extent of hazards in the inner cities.

Better information needs to be developed about the causes of fires in inner city areas so that they can be reduced or eliminated, and so that appropriate insurance rates can be determined and appropriate underwriting techniques employed.

New statistics must also be maintained on crime losses to determine the best and most effective loss prevention devices to deter crime and keep losses to a minimum.

The FAIR Plan should issue annual reports on its operation so that all interested parties may judge its results.

The rating bureau or other agency designated by the insurance department should send quarterly reports, in addition to the annual report, on the operation of the Plan to the insurance department. These reports should also be sent to each city in which the Plan operates, as they will be useful to those charged with the responsibility of administering building and safety codes.

*The Panel Recommends:*

The inspection bureau should submit to the insurance department and to each city in which the plan operates quarterly reports setting forth by individual company the number of risks inspected under the FAIR Plan, the number of risks accepted, the number of risks conditionally approved and reinspections made, the number of risks declined, and other information as the insurance department

94

may request. These reports, as well as an annual report on the operation of the Plan, should be made public.

Daily reports for policies written under the FAIR Plan should be separately coded so that proper statistical records can be kept.

## 17. Regulation

We believe that the Plans should be regulated by the state insurance departments and that their operation should receive much more supervision than have the Urban Area Plans.

One criticism of the Urban Area Plans is that they do not provide coverage promptly. While waiting for coverage, the property owner must suffer the risk of loss or pay an insurance premium that may bear no relationship to the degree of risk presented by his property. Every effort should be made to provide prompt inspections of property and prompt decisions by the insurance companies.

In some states it may be desirable to extend the period of notice for cancellation by companies so as to give property owners an opportunity to determine whether coverage can be placed under the FAIR Plan or the state pool.

The state insurance department may also wish to establish additional procedural requirements to assure the successful operation of the Plan in the light of local needs.

*The Panel Recommends:*

**FAIR Plans should be subject to regulation by the state insurance departments. An insurance department may promulgate rules and regulations applicable to the Plan to limit cancellations, assure prompt issuance of policies, and establish other procedural requirements to assure the successful operation of the Plan.**

## 18. Rates

Each state has developed its own laws regarding the regulation of premium rates for insurance. We believe that the states should continue to regulate them.

We believe, however, that the level of rates generally applicable in the state should also be applicable under the FAIR Plan and that, to the extent practicable, no additional rate should be charged for environmental hazards.

Surcharges, if needed, should be permitted only for demonstrable hazards of the property itself. Care must be exercised by state regulators to assure that any conditions being surcharged are in fact additional hazards and not merely a means of obtaining an unjustified general increase in the premium rate in the blighted area.

*The Panel Recommends:*

**Rates under FAIR Plans should be regulated by the states. To the extent practicable, no additional rate should be charged for environmental hazards. Surcharges, if allowed, should be carefully limited to demonstrable hazards and a maximum should be established.**

## 19. Public Education

We have found that many property owners are unaware of the existence of Urban Area Plans in their community. Indeed, we discovered that many agents and brokers are unaware of the plans. Property owners must know that the FAIR Plan exists before it can meet their needs.

*The Panel Recommends:*

**A cooperative and continuing public education program should be undertaken by the insurance industry, local officials, news media, rating bureaus, and state insurance departments to assure that FAIR Plans are given the full publicity they need.**

## B. State Pools or Other Facilities, Where Needed, for Insurable Properties Declined Under FAIR Plans

Under the FAIR Plans, the individual insurance companies make the underwriting decision as to which properties will be insured. This is entirely appropriate and, if an adequate insurance market for insurable properties will then result, can be sufficient to meet inner city insurance problems. There must, however, be governmental supervision to assure that all responsible property owners who meet reasonable underwriting standards have the opportunity to obtain needed insurance protection.

In this section we suggest various methods by which a state can supervise and supplement its

95

FAIR Plan to assure that the property insurance needs of its citizens are being met. In many instances our recommended program here is less detailed than our discussion of the FAIR Plans themselves. There may be a variety of means by which a state can take vigorous action to meet any property insurance needs beyond those handled through its FAIR Plan. We believe that the states should continue to have the primary responsibility for choosing the means most appropriate to meet their particular needs.

In some states governmental supervision of the FAIR Plans in operation may be adequate to meet the insurance needs of the public. In other states, a special facility may be needed.

## 1. State Pool

We believe this facility in most instances can be efficiently created by insurance companies combining their resources to form a state pool. This arrangement utilizes the existing talents and resources of the private insurance industry to the fullest extent.

*Alternatives.* Some states may believe that providing insurance for problem risks can be better handled through a different method more suitable to local institutions. For example, a state could develop a state insurance fund to provide reinsurance for companies directly writing problem risks, or a state insurance company to underwrite problem properties directly.

If a state does use an alternative method to support and supplement its FAIR Plan, the issues discussed below in the context of state pools will nevertheless be generally relevant. The underlying problems to be solved will be the same whatever mechanism is decided upon.

*Insurable Properties.* It is difficult to draw the line between those properties which a state pool should insure and those it should not. The problem is complicated by a lack of detailed knowledge of specific hazards which present significant insurance risks and, consequently, significant risks to the lives and property of the owners and other residents in the community.

Generally speaking, compliance with all building and sanitation code provisions should not be an automatic prerequisite to obtaining insurance. Some building and sanitation code violations present obvious fire hazards, and some may make a

property an open target for crime. But others have no bearing on insurance risks. Violators of these latter ordinances should, of course, be subject to the penalties provided by law; but we do not believe they should also incur the additional penalty of being deprived of insurance protection.

Without attempting to specify where the line for state pool help in providing insurance should be drawn, the Panel believes that all well-maintained property in the hands of responsible owners should be insurable without regard to environmental hazards.

*Environmental Hazards.* Some responsible owners of well-maintained property may be unable to obtain insurance even after an inspection under the FAIR Plan. Although the property itself is in good condition, it may be next door to a firetrap or other extra-hazardous building, exposed to unusual crime risks, or subject to other environmental hazards. Insurance for this property should, nevertheless, be available.

The responsible property owner who keeps his property in good condition should not be unfairly penalized because of his neighborhood. If he is denied insurance for reasons beyond his control, he will lose an incentive to give his property the care it needs. The result can only be a decline in the area and a further spread of urban blight. Looking at it another way, the responsible owner who wants to rehabilitate or improve his property should have the incentive of knowing that his property will be insured when it is in adequate condition. This can help to reverse the spread of urban blight.

The insurance industry in the past has ordinarily declined this type of property. In some states, FAIR Plans may now enable this property to be insured without the necessity of resorting to a state pool. The All-Industry Placement Facility licensed to do business with all participating FAIR Plan companies holds particular promise as a means of fairly and equitably distributing these problem risks on a voluntary basis.

In other states the volume of problem risks may make handling them under the FAIR Plan unfeasible. These states may want to establish pools to distribute environmental risks more equitably throughout the insurance industry. A pool also has the advantage of being a convenient means through which the government can participate, if necessary, in helping to insure environmental risks.

*Uninsurable Properties.* State pools cannot guarantee access to insurance for all property.

96

There will be property in the hands of irresponsible owners that cannot be insured on any terms. There will also undoubtedly be a category of property that cannot, as a practical matter, be insured—property that is itself in hazardous condition and cannot or will not be repaired by the owner. We do not suggest that this property be insured. We believe that these hazards to life and surrounding property should be the target of renewal programs designed to revitalize blighted areas.

*Lines of Insurance, Areas Served, and Eligible Property.* The purpose of recommending a state pool is to supplement the FAIR Plans by providing needed insurance coverage where the FAIR Plans alone are not sufficient to provide it. We believe that fire and extended coverage, vandalism and malicious mischief, and burglary and theft insurance—the lines of insurance most essential to rebuilding and revitalizing the urban core—should be available under the FAIR Plan throughout the state. A state may determine that additional kinds of or lines of insurance should be included. A state in cooperation with the insurance industry is free to specify where and what type of coverage will be offered by its pool in order to meet the particular insurance needs of its citizens that are not being met through its FAIR Plan.

Some states may wish to create a state pool for fire and extended coverage insurance, including the vandalism and malicious mischief endorsement, before creating a pool for burglary and theft insurance. This would represent a useful step forward. It would be preferable to delaying the creation of a pool until complete data have been gathered on all of the insurance problems of the state's citizens.

Other states may find that the FAIR Plan is adequate to meet its citizens' insurance needs for one kind or one line of insurance but not for another. In that event a state might create a pool for only those kinds or lines of insurance necessary to provide needed coverage.

Some states may also find that the FAIR Plan is adequate to meet the insurance needs of its citizens except those located in specific areas. Consequently, the state may wish to limit the areas in which the state pool will provide coverage.

While a state pool could be used to provide insurance on seashore and similar properties, a state may prefer to exclude these properties in order to concentrate its efforts and resources on the urban core insurance problems.

The pools should apply to those dwelling, mercantile, and commercial risks that are not covered adequately by FAIR Plans, and they should, if necessary, provide coverage for both buildings and contents.

The Panel is hopeful that most of the basic insurance needs of our nation's property owners can be met through voluntary efforts under the FAIR Plans. To the extent this is impossible, additional action should be taken to meet these needs and provide the required coverage.

*The Panel Recommends:*

**State pools or other similar facilities should be established to assure, to the extent needed and practicable, the availability of:**

**—Fire and extended coverage insurance;**

**—Vandalism and malicious mischief insurance; and**

**—Burglary and theft insurance;**

**for all insurable dwelling, mercantile and commercial property, including both building and contents.**

### 2. Further Study of Problems

Some states may recognize that their existing insurance problems are substantial and may wish to establish pools immediately. States that are uncertain whether a pool is necessary may wish to evaluate the data developed under their FAIR Plans for one or two years before deciding whether to establish a pool. During this time these states can evaluate the nature and extent of their own insurance problems; they can review the operations and experience of pools in those states that have moved forward more rapidly. Additional data should also then be available on loss experience and loss prevention techniques. All this information should help a state establish reasonable underwriting criteria and determine whether a pool is necessary to provide insurance at reasonable prices to all responsible property owners who adequately maintain their property.

*The Panel Recommends:*

**Within two years, a state will certify to the National Insurance Development Corporation (as described in part (C) below) whether a problem of availability of property insurance remains for property that meets reasonable underwriting standards without regard to environmental hazards. If a problem does remain, the insurance industry and**

97

032921

the state have one additional year in which to form a pool (or other similar facility) for providing the needed insurance. This action will be a condition to continued availability of reinsurance from the NIDC against the risk of extraordinary riot losses in that state.

## 3. Pool Organization and Management

There are many different ways in which a state pool might be organized. Membership in the pool might be voluntary in those states where all but an insignificant portion of the industry are willing to cooperate to form a pool. Other states may want to assure broad industry participation in the pool by requiring membership.

Some states may wish to place a maximum limitation on the amount of insurance to be written by the state pool, as is now done under the Watts Pool.

Other states, however, may wish to allow the state pool to provide insurance to the full extent needed, whatever its amount.

Some states may want the pool management to limit the number of risks insured by the state pool by attempting to place any risk offered to the pool in the voluntary insurance market. Other states may believe that the state pool would benefit from insuring a broad range of properties and consequently be willing to insure some properties that might have been placed in the normal insurance markets.

Procedures also need to be developed for submitting problem risks to the state pool. The All-Industry Placement Facility may be one promising possibility. Its advantage lies in making certain that the normal market has been exhaustively and unsuccessfully canvassed before a risk is sent to the state pool. Some states may desire to have the insurance companies that declined risks submit them directly to the pool, a procedure that could be faster than going through the All-Industry Placement Facility.

Not enough is presently known about the operation of pools in the urban core for the Panel to make any detailed recommendations on their organizational structure. We believe that each state should have the opportunity to develop whatever type of pool it deems appropriate and desirable.

We also believe that each state should determine whether its pool will be managed by representatives of the participating companies alone, or whether there will be state government or other representation.

### The Panel Recommends:

**Where a state pool or other facility is needed, each state should develop the organizational structure, operating procedures, and management policies it deems necessary to meet promptly the basic insurance needs of its citizens.**

## 4. Agents' and Brokers' Commission

In our discussion of FAIR Plans, we pointed out that the commission structure should encourage agents and brokers to seek insurance for property owners through their normal market channels. The same considerations apply here. Commissions should not be reduced to an extent under the state pool—which is not a "normal market channel"—that discourages producers from handling urban core business that might be placed with the pool.

In the discussion of the Watts Pool and elsewhere, it was noted that a commission structure that is too low can operate to the detriment of the consumer. Where commissions are too low, the producer will lack an adequate incentive to perform the job needed to provide insurance for center city property.

### The Panel Recommends:

**The commission for agents or brokers on policies written by the state pool or similar facility should be somewhat less than the average commission paid by the insurance industry in the state for policies written at standard rates.**

## 5. Operation of the State Pools

The states have various means available to assure the adequacy of state pools in meeting the public's needs, while at the same time assuring their fairness to the participating insurance companies. The states, for example, will determine:

—the underwriting standards for admitting business into the pools;

—the limits of the pools' capacity;

—the rates to be charged for business placed outside the pools; and

—the premium taxes to be assessed on insurance companies throughout each state.

98

With these and other variables, the states have sufficient powers to assure the successful operation of the pools.

We believe that state pools should be designed to offer needed insurance protection for all well-maintained properties in the hands of responsible owners at reasonable prices regardless of environmental hazards.

We recommend that the pool charge no additional rate for environmental hazards. We recognize, however, that some states may depart from this recommendation because of financial limitations or other valid reasons. Yet we believe that it is incumbent on the states and on the insurance industry to try to provide needed insurance on well maintained property without penalizing the owner because of environmental risks over which he has no control. Should an additional charge for environmental hazards prove necessary, we recommend that it be kept to the absolute minimum possible so as to keep insurance premium costs within the financial reach of the urban core resident.

Some states may decide that the most appropriate method for limiting losses in the pool would be for the state to provide a direct financial backup to the pool.

Alternatively, if insurance rates are adequate throughout a state to permit sufficient profits by companies generally, companies might be assessed some portion of their underwriting premiums. Special credits might be given to companies providing insurance on problem risks that might otherwise have been placed in the pool. This would avoid an excessive financial burden on those companies that actively underwrite urban core properties and would encourage other companies to seek this business.

After a state has established a workable pool, it might reinsure a share of non-riot (as well as riot) losses with the National Insurance Development Corporation. The terms on which such reinsurance would be available could be negotiated by the state and the National Insurance Development Corporation.

None of these financing measures may be necessary. It may well be that intensive loss prevention and education campaigns, deductibles and other similar insurance devices, as well as prudent pool management, may keep pool losses within limits that can be absorbed, through premiums, by the pool itself. But if this is not possible, then some

additional form of financial support will be necessary.

*The Panel Recommends:*

**A state pool or similar facility, where needed, should offer insurance for all well maintained properties regardless of environmental hazards. To the extent possible, no additional rate should be charged for environmental hazards.**

**If necessary, the states, in cooperation with the National Insurance Development Corporation, should institute a program to provide financial support to state pools (or similar facilities) to pay any significant losses and expenses in excess of the pools' premium income and accumulated profits.**

### 6. Records

Each state pool should maintain adequate records to detail its income, expenses and losses, and the causes of loss. The information developed on loss experience and causes of loss should be made available to the National Insurance Development Corporation as well as to the state insurance departments and cities in which the pool operates. Information on loss experience, cause of loss, and loss prevention techniques can then be developed on a nationwide scale. Such information would be a valuable aid in developing techniques for insuring properties in urban core areas, as well as in developing techniques to protect lives and property from loss.

The pool should issue detailed quarterly reports on its operations and a full annual report analyzing the experience of the year.

*The Panel Recommends:*

**State pools should maintain adequate records and issue quarterly and annual reports on their operation, to be sent automatically to state insurance departments and cities in which the pools operate, and made available to the National Insurance Development Corporation.**

## C. National Insurance Development Corporation To Carry Out Vital But Unfulfilled Insurance Functions

A number of vital insurance functions remain to be fulfilled even after FAIR Plans and state pools are in operation.

99

Despite constructive actions by state insurance departments in encouraging companies to offer insurance in urban areas and developing special programs to expand the insurance market there; and despite the fact that most insurance companies have acted responsibly and have continued to offer existing levels of insurance in the urban core, the recent civil disorders have further constricted the already tight market in inner cities. Some insurance companies are already considering how to avoid future losses in areas that past experience has indicated might conceivably be damaged from riots.

Testimony before the Panel during public hearings underscored the need of insurance companies for some form of backup to protect against catastrophic riot losses. The acute withdrawal of insurance protection that might otherwise result would have tragic consequences for urban core property owners.

## 1. Formation of the National Insurance Development Corporation

To eliminate the riot risk as an impediment to the active participation of companies in the urban core insurance market, and to preserve coverage against the riot peril in the standard lines of insurance in which it presently exists, protection must be provided against extraordinary riot losses. We believe this protection can be best provided by marshalling the resources of the insurance industry and adding to this the assistance of state and federal governments. As the medium for bringing the essential elements together, we propose that a National Insurance Development Corporation (NIDC) be organized pursuant to federal legislation. The NIDC could distribute the risk of extraordinary loss from civil disorders—a problem of importance to all Americans—throughout American society.

The NIDC will also provide an organizational framework for performing a number of vital functions in support of FAIR Plans and state pools. It can gather essential information on inner city insurance markets and provide loans to help state and federal governments reduce the number of problem risks in the urban core. When its assets are sufficient, it can provide funds to assist the operations of state pools.

*The Panel Recommends:*

**The Federal Government should organize a National Insurance Development Corporation to take responsibility for a number of vital but unfulfilled functions in support of the actions of private industry and states in the operation of FAIR Plans and state pools.**

## 2. Organizational Structure and Management

The National Insurance Development Corporation would have no shareholders. It would not seek to make a profit but would use its assets to make insurance more widely available to the public. The NIDC would be managed by a board of directors appointed by the President. The board would be composed of representatives of the public, the insurance industry, the states, and the federal government. The non-government representatives would be subject to confirmation by the Senate.

For example, there might be nineteen directors: six directors could be chosen from the public; four from the states—perhaps two governors and two state insurance commissioners; three from the insurance industry; and six from the federal government—representatives of the Department of the Treasury; the Department of Justice; the Department of Housing and Urban Development; the Department of Commerce; the Small Business Administration; and the Office of Economic Opportunity.

The day-to-day operating functions of the NIDC should be carried out by an Executive Director appointed by the President, confirmed by the Senate, and working under the general supervision of the board of directors.

This form of organization would provide the NIDC with a broad spectrum of knowledge, experience, and points of view. It would also provide a meaningful working ground for each segment of society which must share the responsibility for meeting the insurance needs of our nation's cities.

*The Panel Recommends:*

**The NIDC would be managed by a board of directors and an executive director appointed by the President of the United States. The executive director would be responsible for the day-to-day operations of the NIDC and operate under the general supervision of the board of directors.**

### 3. Coverage Offered by the NIDC

The NIDC would offer participating insurance companies reinsurance against catastrophic losses arising from riots. By thus reinsuring the companies' primary liability for damage from civil disorders, the NIDC would provide the protection the insurance industry finds necessary to write insurance actively on inner city property.

NIDC reinsurance would be offered only to those companies fully participating in FAIR Plans and, where they exist, in state pools. We believe that companies unwilling to carry out to the full their social responsibility in meeting the insurance problems of our cities, should be ineligible for governmental assistance designed to alleviate these problems.

NIDC reinsurance would be available for all lines of insurance for which participating companies pay reinsurance premiums. This broad coverage will assure the continuation of riot protection in all lines of insurance in which it presently exists.

Property insurance protection always involves establishing a maximum amount of liability to be borne by the insurer. The coverages written by the primary insurer establish an overall limit of liability for itself and its reinsurers. The primary insurer has a basic retention of liability and then seeks to reinsure all or a part of the remainder of its liabilities. Depending upon the amount of premium the primary insurer is willing to retain, and the nature and extent of the reinsurance it seeks, various reinsurance arrangements are possible.

From the reinsurer's standpoint, the maximum exposure it will accept will depend on the amount of premium it receives, the type of reinsurance that is written, the exposure to loss, and other variables. In general, a reinsurer accepts a maximum liability that is safely within its financial capacity, which may involve an outer limit below that of the underlying policies reinsured. Such maximum limits may be set by government reinsurance programs just as in the case of private reinsurance. Whether this should be done, and if done, what the precise limits should be, depends upon an assessment of all the elements of the reinsurance arrangement, including what is necessary to accomplish its basic purposes.

Thus, two of the principal questions that must be

resolved in establishing the reinsurance arrangement are:

    1. What level of losses should the participating companies retain?

    2. What amount and type of reinsurance should be provided?

The reinsurance, for example, might apply to 90 percent* of each member company's riot losses in excess of, say 3 percent* of the company's annual premiums earned on reinsured lines in the state in which a riot occurs. This form of reinsurance is referred to as "stop-loss reinsurance".

The industry would participate, for example, in 10 percent* of the losses above the stop-loss point to give it a financial interest in the settlement of claims.

With this proposed riot reinsurance, the insurance industry will have new incentives to provide property insurance—including protection against civil disorders—to all property owners.

#### The Panel Recommends:

**The NIDC should offer stop-loss riot reinsurance to companies that fully participate in FAIR Plans and, where they exist, in state pools, for all lines of insurance for which the company pays reinsurance premiums. Companies would retain a small percentage participation above the stop-loss point, to assure the responsible settlement of claims.**

### 4. Premiums

To obtain reinsurance, a company will pay a premium to the NIDC. The amount of the premium, for example, could be 2 percent* of its annual premiums earned in each state for each line of insurance for which it desires reinsurance protection. These premiums, held by the NIDC, would create a fund to pay reinsured losses.

If, for example, the property insurance companies in the thirteen states which now have Urban Area Plans had paid a 2 percent premium in 1966 for reinsurance on all lines of coverage providing riot protection, the NIDC would have received approximately $50.2 million.** If the

---

*Figures are illustrative only.
** Figures calculated from premiums on the following lines of insurance: fire, extended coverage, other allied lines, homeowners (85% of premiums used), commercial multiple peril (65% of premiums used), inland marine, glass, and burglary and theft. The figures would be considerably larger if automobile physical damage were included.

property insurance companies in all states had paid the same reinsurance premium in 1966 on all lines of insurance providing riot protection, the NIDC would have received approximately $94.2 million.

In addition, if a state actually suffers a riot, each participating company in that state could also be assessed an additional premium if the NIDC pays any riot losses there. This assessment would be made only on companies that had not sustained riot losses in that state equal to the 3 percent* retention. The assessment would not exceed 3 percent* of a company's annual premiums earned in the state in which the riot occurred, less any riot losses paid in that state by the company, and would be made for only those lines of insurance which were reinsured.

The purpose of the assessment is to neutralize the riot risk as a factor in insurance company underwriting decisions. If a riot occurs in any area of the state, each participating company may be called upon to pay up to 3 percent* of its annual earned premiums on lines reinsured in that state, whether or not it provided insurance in the riot-affected area.

We believe that companies should pay reinsurance premiums on a state-by-state basis, and that losses should also be calculated in the same way. To do otherwise would disadvantage companies that write insurance in more than one state, by requiring them to absorb larger losses before obtaining the benefits of reinsurance.

We also believe that within a state, the 3 percent* retention should apply to all reinsured lines combined, and not to each particular line, to avoid processing and paying claims at too low a level.

*The Panel Recommends:*

(a) **Insurance companies should pay reinsurance premiums to the NIDC equal to a percentage of the annual premiums earned in each state for which the company desires riot reinsurance protection; and**

(b) **Companies should be assessed an additional reinsurance premium of up to the stop-loss percentage of the premiums earned for each reinsured line of insurance in a state in which the NIDC pays any riot losses, less any riot losses actually paid in that state by the company.**

*Figures are illustrative only.

102

## 5. State Participation

Maintaining law and order is primarily a local responsibility. We believe, therefore, that a state should assume a portion of the financial burden in the event that riots occur in that state. Further, the states regulate and collect substantial taxes from the insurance industry. Thus, any state that as part of its pattern of dealing with the insurance enterprise desires reinsurance from the NIDC for riot risks in that state, should pass appropriate legislation making provision for a state government layer of financial backup. This action should be taken within a reasonable period, say one year, after federal legislation is enacted to authorize federal backup of the NIDC (as described below) and should be retroactive to the date of enactment of the federal statute. If such state action is not taken within the one year period, then the insurance industry in that state would be ineligible for future riot reinsurance coverage from the NIDC on new policies; existing policies would, however, continue to be covered until the expiration of their term. Upon renewal, they would be treated as new policies and not be reinsured by the NIDC.

The state would assume responsibility for the first layer of losses within its jurisdiction after the reinsurance premiums collected from insurance companies for risks in that state were exhausted. This layer could be, for example, 5 percent* of the industry's annual property insurance premiums earned in that state. The state, however, would not be called upon to replace any reinsurance premiums paid by the state's insurance industry. It would instead pay only the actual losses, up to its limit, in excess of the premiums paid for reinsured lines in that state.

Funds for the state backup might be provided from existing or augmented premium taxes assessed on a state's insurance companies, or the funds might be provided from general revenues. A state might also wish to share its responsibility with units of local government to assure their continued cooperation in the maintenance of law and order and the prevention and control of riots.

We believe that it is equitable for a state in which a riot actually occurs to assume a portion greater than the other states of the financial burden for the losses resulting from the riot. Under our proposal, a state would not be called upon to make any

payment unless a riot actually occurs in that state, and then only if reinsurance premiums from that state are inadequate to pay the claims.

*The Panel Recommends:*

**Any state desiring reinsurance from the NIDC for risks in that state must pass appropriate legislation making provision for a state government layer of financial backup of the NIDC within one year after federal legislation is enacted authorizing federal financial backup of the NIDC. This commitment would be retroactive and would be a condition for the insurance industry in that state obtaining NIDC riot reinsurance on policies issued after the one-year period.**

## 6. Federal Participation

Thus far, our proposal has provided two sources of funds for the NIDC: reinsurance premiums; and state contributions for riots that actually occur. We do not believe this nation will experience riots that cause damage approaching the magnitude of these funds. Nevertheless, it is incumbent upon us to provide assurance that assistance will be available in the event of catastrophic riot losses which exceed the funds paid in to the NIDC.

This assurance can be provided by the federal government's giving the NIDC the authority to borrow from the United States Treasury the amounts needed to meet claims in excess of its assets, up to whatever limit might be prescribed by the Congress. This will assure immediate payments on reinsured riot losses. The loan would be of indefinite duration and would be repaid either from future reinsurance premium income received by the NIDC or, if necessary, by Congressional appropriations.

*The Panel Recommends:*

**Federal legislation should be enacted to provide that in order to permit immediate payment of reinsured riot losses, in excess of accumulated premiums of the NIDC and the states' contributions, the NIDC should have authority to borrow from the United States Treasury amounts needed to pay for losses in excess of its assets.**

**At the end of each year, the NIDC will use any assets in excess of liabilities to repay any federal government payments which it has received.**

*Example of the Operation of the NIDC Reinsurance Program.*

The NIDC reinsurance program would operate as follows:

Assume, for example, that during the first year of the NIDC's operation, insurance companies, after forming FAIR Plans, seek riot reinsurance in only sixteen states, and pay premiums into the NIDC of $40,000,000.*

If a riot occurs in one of these states, the companies would pay property owners for their insured losses. The companies paying losses would be reimbursed by the NIDC for 90 percent of their riot losses in excess of 3 percent of their annual premiums earned on all reinsured lines in that state (the retention). The NIDC would pay these losses from (1) its premium income (including assessments); (2) state backup; and (3) federal backup.

More specifically, assume a riot occurred in City A of State X and that the riot damage insured by member companies was $10,000,000. Members would assume losses equal to 3 percent of their annual premiums earned in State X plus 10 percent of the losses above the retention. Assume that the annual premiums earned in State X amounted to $100,000,000; 3% of that amount equals $3,000,-000; 10 percent of the remaining $7,000,000 equals $700,000, for a total industry loss of $3,700,000.

The NIDC would then assume 90 percent of each member's losses in excess of the retention. This would be $6,300,000.

The NIDC would first pay out of its assets the amount of premiums (including assessments) contributed by its members to reinsure against riot losses in State X. Assume this to be $2,300,000.

This would leave $4,000,000 in additional reinsured losses to be paid through the NIDC.

State X, by adopting appropriate legislation (which would be required within one year from the formation of the NIDC) would be responsible for paying losses through the NIDC of up to 5 percent of the annual premiums earned by the property insurance industry in State X. Assume the 5 percent figure to equal $5,000,000. The state would pay the NIDC only $4,000,000, which would be enough to pay what remains of the NIDC's liability. The state might be called on to pay an additional $1,000,000 if another riot should occur in State X during that year.

---

*All figures and percentages in the example are illustrative only.

After reimbursement from the state, the NIDC would have $37,700,000 in assets ($40,000,000 −$2,300,000 −$4,000,000 +$4,000,000).

Suppose that in the same year a riot then occurred in City B of State Y and member-company insured losses total $83,000,000. Member companies would absorb losses equal to 3 percent of their annual premiums earned in State Y plus 10 percent of the losses above the retention. Assume $100,000,000 total earned premiums in State Y, so the 3 percent equals $3,000,000; added to this would be 10 percent of the remaining $80,000,000 of loss or $8,000,000, for a total industry loss of $11,000,000.

The NIDC would assume 90 percent of each member's losses in excess of the retention, or $72,000,000.

State Y, by adopting appropriate legislation, would reimburse the NIDC for reinsured losses of 5 percent of the annual premiums earned on property insurance in that state, or $5,000,000.

The remaining losses to be paid by the NIDC would be $67,000,000. The NIDC would use its assets, $37,700,000, to reimburse the member companies, and would borrow $29,300,000 from the federal government in order to make immediate payments to the companies that had sustained losses in State Y.

This loan from the federal government would be repaid from future reinsurance premiums paid to the NIDC or by monies appropriated by the federal government.

If State Y had not adopted appropriate legislation (either before or after the riot), the federal government would have to pay an additional $5,000,000. In this case, riot coverage in State Y issued after the first year, would not be eligible for reinsurance from the NIDC.

### 7. Investment of Money Accumulated in the NIDC

It may well be that the NIDC will accumulate a substantial amount of money. Consistent with NIDC's basic purpose of not seeking profits but of accomplishing social purposes, this money can and should be put to a variety of socially desirable uses.

For example, part of the funds could be made available to state or federal agencies to help urban core property owners rehabilitate their property to meet reasonable insurance underwriting standards. Funds could also be made available to the state

and local governments for the purpose of furthering police and fire protection, building and safety code enforcement, urban renewal, and similar programs. Such uses of funds would do much to help reduce the insurance risks in the urban core and help rebuild and revitalize these areas.

*The Panel Recommends:*

**The NIDC should be authorized to use its funds for socially desirable purposes related to its basic functions.**

### 8. Possible Aid to State Pools

As we have stated previously, we recognize that there is great uncertainty as to how state pools will function, and that their financing is subject to a number of variables.

The NIDC will be one possible source of support for state pools. When the NIDC has accumulated sufficient reserves, some of its assets might be available to reinsure state pools against significant non-riot losses as well as riot losses. The terms on which funds could be available would be negotiated between the states and the NIDC.

The need for the development of pools may intensify so rapidly that there will be no opportunity for the NIDC to accumulate reserves. To overcome the reluctance of the industry and the states to organize state pools, the NIDC might receive direct appropriations or loans from the federal government to help state pools achieve their results by offering them reinsurance on the non-riot as well as the riot risk.

A state pool which demonstrates that it is meeting the insurance needs of inner city areas would be eligible for this reinsurance. The state pool would also have to demonstrate that it was being prudently managed and that the state had made provision, to the full extent of its capacity to do so, for the financing of the pool.

Thus, a state might show that it was providing for the basic financing of the risks in the pool by the premium level throughout the state, the premium level for properties in the pool, direct subsidization, or some other manner. The NIDC would then supply a source of federal funds to back up this fully mobilized industry-state effort.

A small initial federal appropriation for this purpose might allow the NIDC to provide funds for a few states which move early to attack the problem aggressively. As experience is gained, this

104

would benefit all the states and provide the basis for determining whether additional appropriations are necessary.

Since the NIDC would be carrying out an expenditure of federal funds in discharging this function, the federal directors of the NIDC might need special powers in connection with these programs. Thus, a majority of the federal directors might have a veto on any reinsurance for state pools to make sure that they felt it was a prudent use of federally appropriated money. Nonetheless, the entire Board of Directors, including the state, industry, and public representatives, would be basically setting the terms of new uses of the NIDC backup.

Such a program would allow the states and the insurance industry to move forward more quickly in fully carrying out the objective of assuring all property owners equitable access to property insurance without regard to location or environmental hazards.

*The Panel Recommends:*

**The NIDC should be authorized to provide reinsurance to state pools for non-riot as well as riot losses.**

### 9. Responsibility to Assess Program

There are always uncertainties and difficulties connected with implementing new and wide-ranging programs. We are fully aware that the program we recommend may prove to be no exception. For this reason, the program must be monitored to assure that it is accomplishing its goals. This will require a staff to perform at least the following functions:

—Gather statistics on the operation of FAIR Plans and the state pools.

—Conduct surveys and studies in cooperation with state insurance departments and the insurance industry to assure that the program is working well to achieve its objectives.

—Gather statistics and prepare studies of reinsurance—especially alien reinsurance—and of direct insurance placed with alien companies. Very little is known about this vitally important part of the insurance industry which has significant bearing on the capacity of the industry to provide insurance and the rates it charges.

—Publish the results of studies and surveys and provide information and analysis to the public, the insurance industry, and state and federal governments.

—Make recommendations for any changes needed in the program to achieve its purposes.

The NIDC will be in a unique position to perform these functions. It can work in cooperation with the state insurance departments and the insurance industry in developing information on the types of hazards which present significant insurance risks and in developing effective and inexpensive loss prevention techniques.

The NIDC should help answer these and other questions relating to the problems of providing basic insurance protection in our cities at reasonable cost.

*The Panel Recommends:*

**The NIDC should monitor the operation of the Panel's recommended program, conduct studies and surveys in cooperation with state insurance departments and the insurance industry, and make recommendations for any changes needed in the program to achieve its purposes.**

### 10. Modification of the NIDC

The special income tax measures we propose (see section D) should help the insurance industry accumulate sufficient catastrophe reserves to eliminate the need for the special governmental financial backup of the riot peril provided through the NIDC. It would then be desirable to modify the functions of NIDC to provide for the full task of insuring the riot peril to be borne by the private insurance industry.

*The Panel Recommends:*

**The functions of the NIDC should be modified as soon as possible to eliminate the special government financial backing of the riot peril.**

### D. Tax Deferral Measures To Increase Capacity for Insuring Urban Core Properties

To aid the rapid development of our recommended program, we believe that the reserves of the state pools and the NIDC should be built up as quickly as possible. Further, we believe that individual insurance companies should be permitted

**105**

to accumulate reasonable contingency reserves for extraordinary losses from all insured perils.

Additional catastrophe reserves would assist the industry in meeting the basic insurance needs of the urban core.

The accumulation of these reserves would facilitate the growth and development of the American insurance market. It would also provide state insurance departments with more flexibility to require special contingency reserves for protecting against large losses. Finally, it may permit the industry to insure without government assistance new risks involving possible catastrophic loss—for example, the forthcoming supersonic transports.

An impediment to developing substantial catastrophe reserves at the present time is the operation of the existing federal income tax laws. Federal income taxes are based on the annual earnings of a company. Insured catastrophes such as windstorms, floods, earthquakes and riots, however, know no yearly bounds; they may occur at intervals of a few years or of several decades. They are predictable neither as to time of occurrence nor as to amount of probable loss.

Premiums to cover catastrophe risks are now taxed as income during non-catastrophe years. These taxes reduce the amounts that can be accumulated during these years to pay claims in future years when extraordinary losses actually occur. As a result, American insurance companies have relied more on reinsurance than they would otherwise do if they could develop greater contingency reserves.

Premiums paid to purchase reinsurance are now deductible from an insurance company's taxable income. We believe that funds added to contingency reserves should also be deductible in computing federal income taxes in the year the funds are added, provided a portion of such reserves—an amount equal to the tax benefit involved—are invested in special interest-free United States Treasury securities. Federal taxes on income added to the reserve would thus be deferred as long as the funds are held in the contingency reserve. The funds would then be available to pay losses, or if they are returned to the company's general funds, they would be taxable in the year they are returned.

Within such limits as may be prescribed by the federal law, each state under this proposal will authorize whatever reserves and premiums it determines to be desirable and appropriate. Thus,

limits will be placed on the amount of funds that can be accumulated in the tax-deferred reserves and restrictions placed on the circumstances under which these reserves will be available to pay catastrophe losses or, alternatively, to be returned to a company's general accounts.

These measures should allow substantial reserves to be accumulated. The portion of the reserves not invested in special securities would produce an investment return. In addition, it has been suggested to us that insurance companies should be allowed to obtain the benefits of investment return on the funds invested in special federal securities. We would not go so far.

Equitable tax treatment would be provided by requiring that the portion of the additions to the contingency reserves that would otherwise have been paid in taxes, be invested in special, interest-free United States Treasury securities. In this manner, the federal government will have the use of amounts that otherwise would have been paid in taxes. At the same time, the securities would be redeemable on demand whenever insurance companies needed funds to pay extraordinary losses. The securities could also be used to pay any taxes due whenever funds set aside in the catastrophe reserve accounts are returned to the companies to be used for other purposes.

We believe this approach equitably balances the need to allow the property insurance industry to accumulate catastrophe reserves, with the need to preserve the integrity of the federal tax structure. An approach similar to the one we recommend, designed to assist mortgage guarantee insurance companies in developing adequate contingency reserves, has recently been adopted by the Congress.

We also believe that the states should consider deferring some state taxes, at least on the amount of the premium referable to the catastrophe risk, to help facilitate the accumulation of catastrophe reserves.

Such tax deferral measures should be available only to those companies that elect to participate in FAIR Plans and, where they exist, in state pools.

When sufficient company reserves are accumulated, the financial backup by government we have proposed for the riot peril may no longer be necessary. The accumulation of reserves therefore holds the promise of phasing out this governmental support and restoring the full task of insuring the

106

riot and other unmeasurable perils to private resources.

*The Panel Recommends:*

**The federal government should enact legislation authorizing deferral of federal income taxes on amounts set aside by insurance companies in special reserves to meet extraordinary losses. Such legislation should provide for the following:**

**1. Any company desiring tax deferral would be required as a condition to participate in FAIR Plans and, where they exist, in state pools.**

**2. The portion of a company's reserve that would otherwise have been paid in taxes to the federal government will be invested in United States Treasury securities. These securities will be interest-free and non-transferable. Should the company incur catastrophe losses, these securities will be available to be redeemed for cash.**

**3. States will place limits on the amount of funds to be accumulated in the tax deferred reserves, within the limits established by the federal law, and will determine the restrictions on the circumstances under which the reserves can be used to pay losses or can be returned to the companies, within the limits established by the federal tax law.**

**4. Funds set aside in special reserves which are returned to the companies for general use will be taxable at the time of return.**

**The states should also consider deferring certain state taxes to facilitate the accumulation of catastrophe reserves.**

## E. Other Necessary Steps to Meet Special Problems of the Urban Core Insurance Market

The program we have recommended is designed to provide insurance to responsible owners who maintain their property in insurable condition. There are additional, related center city problems which require resolution by the insurance industry and government.

### 1. Manpower Training Programs

Manpower training programs should be developed by the Office of Economic Opportunity and the Department of Labor in cooperation with the insurance industry to train residents of urban core areas as agents and brokers. These persons should be specially trained to handle the insurance needs of inner city areas.

One program might provide that the agent being trained to help inner city property owners be paid a salary instead of commissions. Devoting his full time to studying how best to meet the insurance needs of owners of low-value dwellings and businesses, he could take the time that is often necessary to assist property owners to improve their properties and to obtain needed insurance.

These agents and brokers could do much to publicize FAIR Plans and other aspects of the program we recommend and could assist property owners who mistakenly believe that insurance is unavailable.

After an appropriate training period, these agents and brokers would have the knowledge and experience to establish their own agencies.

### 2. Recruitment and Training Programs

Recruitment and training programs should be expanded by the insurance industry to attract residents of inner city areas to fill personnel needs at all levels of the business. In addition to providing new job opportunities to inner city residents, the insurance industry would open up new channels of communication that would help correct basic misunderstandings between the industry and urban core residents.

### 3. More Economical Methods of Marketing Insurance

More economical methods of marketing insurance should be encouraged. The insurance industry should study new forms of contracts and new marketing and underwriting techniques that may improve the insurance market in inner cities. A reduction in expenses in handling inner city insurance business would make a greater percentage of the premium charged available to cover losses; it could make the inner city a profitable area in which to seek business without an increase in premiums charged.

032931

### 4. Better Procedures to Handle Consumer Complaints

Better procedures to handle consumer complaints should be developed by state insurance departments.

Consumer complaints can be an important indicator of the nature and extent of insurance availability problems and can provide needed information on potential trouble spots before serious problems develop. More adequate records need to be maintained on consumer complaints and the consumer needs to be better informed on where and when to make a complaint.

Complaints made in writing are now generally filed by the state insurance departments; but in many cases complaints received by telephone are not recorded, and sometimes not even accepted.

Most insurance departments have a separate complaint division, but its offices are usually located in only one city. Many consumers are unaware that the state insurance department exists. In fact, those who need help the most are often the least likely to know of its existence.

Because of inadequate records and the failure to receive complaints from consumers with insurance problems, it is often difficult to use complaints as a basis for general regulatory corrective measures.

New steps must be taken to publicize the services of state insurance departments and to better inform citizens about their rights as insurance consumers. New methods and procedures need to be developed by state insurance departments to obtain, record, analyze, and help resolve consumer complaints. The staffs of the state pools and the special agents and brokers we propose, should provide assistance to the state insurance departments in performing this task.

### 5. Research Programs

Research programs should be established by the insurance industry in cooperation with government and state pools to develop new loss prevention techniques and other methods of improving the insurance markets in inner city areas. Far too little is known about the conditions that pose significant fire hazards and how these conditions can be inexpensively corrected. Far too little is known

about loss prevention techniques that will reduce or even eliminate losses from crime. Significant efforts in these areas would minimize insurance losses and help protect lives and property from the ravages of fire and crime.

### 6. More Refined Statistics

More refined statistics should be compiled by rating bureaus and insurance companies on loss experience to facilitate rating, rate regulation, underwriting, and loss prevention.

Additional premiums are now being charged for insurance on property that seems unusually exposed to loss from fire or crime; but little is known about precisely what conditions might lead to loss and whether the additional premiums being charged are appropriate. The rating bureaus and the insurance industry, in cooperation with state insurance departments and the NIDC, should collect data on property insured at a higher than standard rate. Information should be obtained on the type of conditions leading to a greater premium charge. This information should then be correlated with the reasons for actual loss to determine whether additional premiums are being charged for the appropriate conditions. More specific information on the cause of loss would also facilitate the development of appropriate loss prevention techniques.

This information will help state insurance departments regulate insurance rates and protect the interest of the insurance consumer. It will also help the states to set appropriate underwriting standards for state pools and determine the rates to be charged by the pool.

### 7. Lending Programs

Lending programs in the urban core should be stepped up. The Small Business Administration should give particular attention to providing needed funds to small businessmen in inner city areas for the removal and control of fire and crime hazards.

The Federal Reserve Board, the Federal Deposit Insurance Corporation, the Comptroller of the Currency, and the Federal Home Loan Bank Board should review their policies to determine methods of expanding the availability of credit

108

in inner city areas for needed property improvements.

Other state and federal agencies administering programs affecting credit or providing financial assistance for property improvements should also review their programs to determine where revision or expansion could facilitate property improvements and reverse the spread of urban blight.

### 8. Contractors' Bonds for Urban Core Businessmen

Contractors' bonds for urban core businessmen should be made more readily available.

A contractor bidding on a construction project is generally required to obtain a bid bond. This bond protects the principal against default by the contractor on his bid. If the contractor wins the bid, he generally is then required to obtain a performance bond. This bond operates to guarantee that the project will be completed. Obtaining these necessary bonds is often difficult, if not impossible, for the small contractor who seeks to perform construction work in urban core areas. This restricts the ability of these contractors to expand their business, and reduces competition for construction work in the urban core.

Various approaches to provide these bonds are possible. For example, the NIDC might consider providing reinsurance to surety companies that offer these contractors bid and performance bonds at reasonable rates.

*To Summarize these Supplementary Measures, The Panel Recommends:*

1. **Manpower training programs should be developed by the Office of Economic Opportunity and the Department of Labor in cooperation with the insurance industry, to train residents of the inner city as agents and brokers with special competence to handle the insurance needs of the inner city.**

2. **Recruitment and training programs should be expanded by the insurance industry to attract inner city residents to fill personnel needs at all levels of the business.**

3. **Better procedures to handle consumer complaints should be developed by the state insurance departments.**

4. **More economical methods of marketing insurance should be studied by the insurance industry.**

5. **Research programs should be established by the insurance industry in cooperation with state pools, state insurance departments, and the NIDC to develop new loss prevention techniques and other methods of improving the inner city insurance market.**

6. **More refined statistics should be compiled by rating bureaus and insurance companies on loss experience and causes of loss to facilitate rating, rate regulation, underwriting, and loss prevention.**

7. **Lending programs should be accelerated in the urban core with particular attention to providing needed funds to small businessmen and other property owners for removal and control of fire and crime hazards. State and federal regulatory authorities that influence the granting of credit or that administer loans and grants should review their policies, procedures and programs to determine where revision or expansion could assist property improvement in the inner city.**

8. **Contractors' bid and performance bonds for urban core businessmen should be made more readily available.**

## Precedents for the Panel's Program

The program recommended by the Panel draws upon knowledge and experience developed at the national and state levels to meet other critical insurance problems. Although insurance in the United States is a private enterprise, many problems have arisen over the years that have been beyond the capabilities of the industry to handle without governmental assistance. When the public interest has required insurance to further basic social objectives, pragmatic programs have been developed by which government has joined with industry to attain those goals. The approach has generally been to utilize the resources of the private insurance industry to the maximum extent. This private effort is then backed by governmental resources to fulfill purposes that can be achieved only by the partnership of government and private enterprise.

109

In this concluding section, the major precedents that we have found most relevant to the urban core insurance problem are described.

## War Damage Corporation

When war damage threatened the lives and properties of Americans shortly after Pearl Harbor, the risk of catastrophic loss was so great that it was far beyond the financial capacity of the private insurance industry to bear. In response to public demand, the federal government established the War Damage Corporation to insure American property owners against losses that could have resulted from bombardment or other enemy attack.

Under the program established, the insurance industry in 1942 sold more than eight million war damage policies in ninety days through its normal channels. It also handled premium collection and claims settlement. Receiving a modest agent's fee (5 percent) and expense reimbursement (3½ percent), the participating insurance companies agreed to share 10 percent of the profits and losses, up to $20 million. All profits and losses beyond those limits were to be assumed by the War Damage Corporation.

The War Damage Corporation was financed by the insurance premiums it received and by the sale of $1 million in stock to the Reconstruction Finance Corporation (RFC). The RFC had the authority, if needed, to borrow from the United States Treasury and to purchase additional stock.

The program was highly successful. It met a vital need for giving a concerned public security against the risk of loss from the war. In the end, it was also profitable. Claims for damages totaled only $1¼ million—for the most part from losses in the Aleutian Islands, Hawaii, and the Pacific Islands. When the War Damage Corporation was dissolved in June, 1947, it paid $210 million to the United States Treasury and around $20 million to the insurance industry.

## Nuclear Liability Insurance

The growing industrial uses of atomic energy more recently presented the possibility of enormous liability claims from nuclear accidents which private insurance companies alone were unable to cover. When the fear of uninsured catastrophic losses threatened to impede the development and use of atomic energy by private industry, the Congress enacted the Price-Anderson Act in 1957.

The act established a cooperative industry-government insurance program. The insurance industry pooled its resources to provide amounts of insurance greater than any single company could offer, while the government assumed a layer of liability above that.

All private users of atomic energy are now required to purchase liability insurance to the extent that it is available on reasonable terms from private insurers and to the extent that it is deemed necessary. Above this limit, the Atomic Energy Commission provides the private user with an "indemnity agreement" for an additional $500 million.

No premium commensurate with the risk is paid to the government for its indemnity agreement. The insureds are so few and the maximum potential losses so large that an attempt to allocate potential costs among those exposed to loss would make the cost prohibitive. The Commission, however, is authorized to collect a fee from any person with whom an indemnification agreement is executed.

So far the claims paid by the insurance industry have been minor, and no claims have been paid by the federal government.

## Federal Deposit Insurance Corporation—Federal Savings and Loan Insurance Corporation

The bank and savings and loan association failures during the economic crises of the 1930's jarred the confidence of the public and threatened to undermine the entire financial structure of the nation. The unpredictability of fluctuations in the economy and the possibility of massive bank failures placed insurance for these losses well beyond the capabilities of the private insurance industry. Yet a limited guarantee of deposits was deemed necessary to preserve these financial institutions and the public's confidence in the banking system.

To provide the needed protection, the Congress established the Federal Deposit Insurance Corporation (FDIC) in 1933 to insure depositors against the insolvency of banks and to foster loss prevention by supervising banks and examining them. The Federal Savings and Loan Insurance Corporation (FSLIC) was established in 1934 to provide

110

similar protection for depositors in savings and loan associations.

Both the FDIC and the FSLIC are self supporting from annual assessments (premiums) received from insured financial institutions. The FDIC has built up reserves of more than $3¼ billion; the FSLIC has accumulated reserves of almost $700 million. The FDIC may borrow up to an additional $3 billion from the United States Treasury to meet its liabilities, and the FSLIC may borrow up to $750 million. Neither has had to exercise this authority. Relatively minor losses have been paid from reserves accumulated from premium income.

### Federal Mortgage Guarantee Insurance Programs

The depression years fostered another insurance program designed to spur a troubled economy.

In 1934, almost one-third of the 4,000,000 families on public relief were connected with the building trades. Virtually no repairs had been made to existing housing since 1929 and almost no new housing was being constructed. Although capital was available, the banks were not lending funds on real estate mortgages.

To encourage the flow of private resources into repairing and building housing and thus to provide needed jobs and better housing for millions of Americans, the Congress enacted the National Housing Act in 1934. This act created the Federal Housing Administration (FHA) to insure creditors against mortgage losses.

The FHA insures against the possibility of loss to a lender in the event that the market value of a mortgaged property is less than the outstanding indebtedness at the time of foreclosure. The annual premimum for this insurance—½ of one percent of the outstanding balance of the loan—is paid by the borrower.

One of the central features of the program is the option of the FHA Administrator to pay claims with debentures guaranteed by the United States Government. This makes it unnecessary to liquidate foreclosed property in times of financial stress in order to pay claims. When the economy recovers, the properties may be sold and the bonds redeemed. The option allows the program to cope with recession and constitutes a major safeguard against catastrophe losses in a manner which could not be accomplished by private insurance companies acting alone.

The program has been an economic and social success. The FHA has repaid the federal funds advanced during its early years to meet operating expenses and has built up reserves of over $1.1 billion under the various types of mortgage insurance programs it now administers. While doing so, the FHA has been able to reform mortgage lending practices, broaden the opportunities for home ownership, and raise the standard of housing throughout the nation.

### Foreign Credit Insurance

Various risks involved in international commercial transactions have been considered uninsurable by the private insurance industry. The risk of unfavorable political action by a foreign government—for example, expropriation of property and "freezing" of foreign currencies—is ordinarily unpredictable, and the risk of loss therefrom is usually deemed to be uninsurable. In foreign commercial sales of substantial size, the risk of insolvency or protracted default by a foreign buyer is also considered difficult to insure.

In 1962, the Congress adopted a program of foreign credit insurance to provide insurance against these risks and thereby to foster the expansion of United States exports. The program is a cooperative industry-government effort under which the insurance industry provides coverage for the risks it can bear, and the government reinsures losses above that level through a federal agency, the Export-Import Bank.

The policies are written by a specially formed association of sixty insurance companies named the Foreign Credit Insurance Association (FCIA). Insurance policies issued by the FCIA cover both the commercial risk and the political risk. For commercial risks, FCIA bears the first $150,000 in losses on each insured short-term loan and shares pro rata in losses above that figure on each insured one-to-five year loan, up to total annual losses of $2.5 million. Losses beyond that limit are reinsured by the Export-Import Bank. In return for providing reinsurance, the Export-Import Bank receives a pro rata share of the direct premium. An additional portion of the premium collected by the FCIA is paid to the Export-Import Bank for bearing the entire political risk.

Although the Export-Import Bank has the authority to borrow from the United States Treas-

111

ury, it has not yet been required to do so. During the fiscal year 1965–66, premiums and guarantee funds amounted to $3 million while only approximately $1 million in losses were paid.

## State Automobile and Workmen's Compensation Insurance

The states have developed considerable experience in assuring their citizens needed insurance protection in two major areas: workmen's compensation and automobile liability.

Workmen's compensation insurance programs grew out of state-enacted changes in the common law recovery rights of employees for job-related injuries. Generally speaking, workmen's compensation laws establish the right of an employee to recover from his employer whether or not the injury was caused by anyone's fault. These laws require the employer to carry insurance unless it is reasonably certain that he has sufficient assets to meet potential liability claims.

Having required employers to carry insurance, it was incumbent on the states to make insurance protection available even to high risk employers which the private insurance industry was reluctant to insure. Several states created a state insurance fund to cover all risks. In other states, a state insurance fund competes with the private insurance market. In still other states, the required insurance is provided through a state pooling of insurance company resources. In some others, it is provided by assigning to individual insurance companies risks difficult to place.

States have also sought ways to assure that an innocent injured party in an automobile accident could recover damages from the person at fault.

Some states require their drivers to carry automobile liability insurance as a condition to obtaining a driver's license. Other states have created uninsured motorists funds from amounts collected from drivers who do not have insurance. All states have recognized the necessity to provide a mechanism to assure that a driver can buy automobile liability insurance for the protection of innocent victims of automobile accidents. This has been accomplished by a voluntary or mandatory system for equitably assigning applications for insurance by high risk drivers to individual insurance companies.

## Conclusion

There are many instances in addition to those described where state and federal governments have taken a measure of responsibility for an insurance program that the private insurance industry could not handle alone. The reasons for governmental aid have generally been the unpredictability of losses, the possibility of catastrophe losses beyond private insurance resources, or the likelihood that premium charges would be too great for those members of the public who needed the insurance.

In most cases, the imperative leading to the development of a federal government program of assistance has been the presence of a problem national in scope, and a legitimate concern by the insurance industry with potentially vast losses. In virtually every instance, however, the disaster that people feared and sought insurance against has not occurred, and the government program has not cost federal tax dollars.

Programs originally established through governmental appropriations, like the FHA mortgage insurance fund and the FDIC, have reimbursed the originally appropriated funds with interest and have now developed substantial reserves with which to pay losses in the event they occur. The War Damage Corporation returned far more to the United States Treasury than it originally was given. Under the nuclear liability insurance program and the foreign credit insurance program, the insurance industry has been able to cover losses within the private framework without the expenditure of government funds.

We have every conviction that a similar pattern will develop here. There is a public concern about the potential damage that could result from riots and civil disorders; but we are convinced that responsible action will prevent or contain such occurrences in the future. The program we have designed will then operate on a self-supporting basis and generate reserves for the payment of any substantial losses should they occur.

Some have asserted that those who seek to develop an insurance scheme to deal with riots are predicting the certainty of their occurrence. Nothing could be further from the truth. We believe instead that providing insurance in center city areas will be the stimulus that is needed to attract private resources and effort to improve and rebuild these areas—to provide goods, services, and jobs

112

for their residents and to foster the development of better housing. This in turn will help alleviate the conditions that have led to civil disorders.

This result cannot be obtained solely by providing protection against the riot peril. It is clear that the lack of adequate property insurance in the urban core antedated the recent riots by many years. The civil disorders have only accentuated the problem. The problem exists in every major city and in many smaller cities throughout the country, whether or not they have suffered the ravages of riots.

Meeting the insurance crisis of our cities requires more than riot reinsurance and government aid. It requires that the full resources of property owners, the insurance industry, and local, state, and federal governments be brought together to achieve a solution. That is what our program is designed to do.

113

## Appendix A

# MATERIALS ON THE AVAILABILITY AND COST OF INSURANCE IN THE URBAN CORE

This appendix presents some detailed materials on the availability and cost problems of the urban core insurance market. Interviews with numerous urban core residents and businessmen make it clear that complaints about the difficulties of obtaining insurance are widespread and intense. Wherever they went, our field investigators found the same basic situation: people with insurance problems.

We attempted to define the problems more precisely by requesting data from 74 individual insurers and the leading insurance trade associations. In the aggregate they account for almost all of the insurance written in the United States. We received useful information, but the companies and associations were generally unable to report their experience in urban core areas. We sought information from every state insurance department. The responses were helpful in establishing that problems existed throughout the nation, and in some cases were of major proportions; but this

provided no statistical basis for measuring the problems. Some studies that have examined aspects of the urban core insurance problems, as described later in this appendix, have been helpful; and the written information supplied by a variety of persons has been useful in corroborating the existence of a critical problem.

In an attempt to measure more closely the exact extent of the problem, the Panel conducted a systematic survey, using scientific sample survey techniques, of the insurance problems of urban core residents and businessmen in six major cities. The results are set out in detail in this appendix. The survey provides important new data on the availability and cost of insurance in urban core areas, and, in conjunction with the other information received, suggests the critical magnitude of the problem. It is, to date, the only comprehensive survey ever made on the cost and availability of insurance in the urban core.[**]

## Statements of Urban Core Residents and Their Representatives

Numerous residents and businessmen in urban core areas throughout the nation, as well as those who represent and serve them, have stated that they cannot purchase the property insurance protection they need. Here, in their own words, is what some of these people have said.[*]

[*]The following quotations are taken from the official transcripts of hearings held by the Panel, interviews conducted by our field investigators, and letters both unsolicited and received in response to our questionnaires. All these materials are in the official files of the Panel.

The owner of a hot dog stand in the Roxbury area of Boston, Massachusetts:

[I pay] $400 for $5,000 fire insurance. Burglary and theft insurance? We haven't had that for years because of the price that was quoted us. Too expensive. Plate glass coverage? That's prohibitive also.

[**]A full description of the Panel's methods of gathering information may be found in Appendix B.

115

An insurance broker in Boston:

Many of the companies have refused to take insurance in certain of these areas. In fact, some years ago they informed me that some of these areas were redlined, a circle around it with a red line, and inside of there they take nothing no matter how good it is or how well protected that property may be. * * *

Sometimes when I bring a policy in to be written, they say, "This is for colored," as if to say if he is, they might not write him up or feel he is not too responsible or something of that nature. No matter how good he is, they take that into consideration, the fact he is a Negro. Many of the companies do apparently * * *.

Some of them [agents] were doing a good business years ago and have lost all their accounts. They can't place insurance anymore. It's a really bad situation.

A real estate and insurance broker in Boston:
Can't obtain it [insurance].

The director of a community aid organization in Boston:

* * * the people simply are not able to get it [insurance].

The owner of a candy and food store in Boston:
We can't get any. That's the trouble. * * *
I can't get any. I've tried several times.

The owner of a small grocery and liquor store in Boston:

I never put in a claim. * * * I didn't put in for anything. We paid for the broken windows ourself because we don't want to get difficulty from the insurance [company].

A real estate broker in Boston:

Every bank requires insurance before they will take a mortgage. * * * a lot of banks stopped taking mortgages because the buyers couldn't be covered by insurance or that the insurance policies would be cancelled after the mortgage was placed.

* * * Practically impossible to get [burglary and theft insurance]. Household furniture, goods, very few people can obtain it * * *.

Any property within the red line area, no broker was supposed to write it. But the thing about a redline area, it is not even limited. The property outside of the red line but bordering the red line becomes affected, so it spreads out into a much wider area than just the redline area.

A real estate broker in Boston:

Lloyd's of London doesn't really turn you down completely. He just charges you excessive rates. * * * It's 80 percent co-insurance clause, and if you want to pay for the full rate, then they sock you good.

The consumer director of a social agency in the Dorchester area of Boston:

The home owners, especially the Negro home owners, cannot get coverage for their buildings; and sometimes the Negro businessman has the same problem. He is either paying, if he does get coverage, he is probably paying exorbitant rates compared to other areas for the same type of deal.

A Boston lawyer:

* * * the whole area was redlined both for standard risk insurance in the fire and public liability areas.

A real estate and insurance broker in Boston:

I have been forced to self-insurance because of the rates. * * * I can't afford an insurance at 2½, three times the rate because in the type of units we operate, I'm lucky to make $600 a year. By the time you take out a few dollars for maintenance and so forth, I can't afford to spend $350 for insurance. I'd go out of business. * * *

To rehabilitate, I have to re-borrow; and to re-borrow, I have to re-insure; so, therefore, I have to take the insurance at excess rates. So, naturally rather than pay $600 for an insurance policy on a six-family house, I don't bother to rehabilitate because by the time I spend the money and spend the $600 a year on insurance, I haven't made any money, and I can't operate without a profit.

An official with a social agency in Boston:

The rate is so high actually that the insurance companies charge, that the individuals have a little store, and the insurance would be so high, that it doesn't pay. * * * the insurance is sometimes higher than the business they are doing. Believe me, it's a high insurance.

116

From Providence, the President of the Rhode Island AFL–CIO:

* * * would-be purchasers of homes * * * have been refused insurance in numerous instances. * * * The very thing we need to do, and what working men want to do, so that they can own their homes, is defeated. * * *

A Brooklyn, New York, insurance broker:

* * * the market for all kinds of insurance, personal and commercial, is tighter than traffic on the Long Island Expressway at 8:30 in the morning. Naturally, most brokers servicing the [urban core] area have had to resort to markets not under the supervision of the State Insurance Department—the excess and surplus markets—where rates are arbitrarily established and applied, often three to five times above manual rates.

A Brooklyn, New York, real estate broker:

Homeowners are, for the most part, under-insured, and the non-availability of insurance is not limited to areas that were affected by the riots, but in my opinion, any area that is predominantly occupied by non-white groups.

The president of a real estate board in the Bedford-Stuyvesant area of Brooklyn, New York:

[The average homeowner is] not even able to place a sufficient amount of insurance to protect the mortgage. * * * [The only way to get any insurance is] to resort to the excess companies whose rates are four times manual [standard] rates.

A New York City agent:

[Business is] difficult to place. Companies accepting very limited amounts and only from · their good producers. Getting worse.

A mortgage broker in New York City:

Our Corporation presently * * * [has] 176 mortgages of which approximately 50% are underinsured.

An agent in New Rochelle, New York:

We have noticed that it is difficult to place any new business in areas where the riot problem might occur.

An insurance agent in Rochester, New York:

* * * the tightness of the market certainly exists. * * *

A Rochester agent:

The fire market is better than for burglary, theft, glass and liability; actually, there are no markets for burglary and glass. This situation has existed for the last three years.

The mayor of Rochester:

The preservation of the commercial centers within the urban center is dependent to a large degree upon the ability of the store owner to obtain adequate insurance coverage at reasonable rates.

A Newark, New Jersey, grocer:

[Insurance] on the stock of a store? You can't get it anywhere. * * * you need fire insurance around here. You can't get it around here. * * * [Everybody is] complaining they can't get insurance.

The owner of a toy store in Newark:

[Burglary and theft,] I can't get it.

A storekeeper in Newark:

[I pay] * * * about $600 a year for $8,500 [insurance].

An insurance broker in Newark:

[It would cost] * * * $250 a year for $1,000 of coverage with a $100 deductible.

An insurance agent in Newark:

[The cost:] a five hundred percent increase in the premium.

Another insurance agent in Newark:

[In one area, the price went from] $70 a year premium to a present quote of $510 annually.

Still another agent in Newark:

We want these people to have a chance to protect their life investment. [Their house] * * * is their life's savings. It does not seem like much on the outside, but this is a whole life of savings. [They have] * * * sacrificed [to buy it] and they can't protect it at any price. * * * Contents too. We can't get any of that.

From the chief of Economic Development of the City Government of Newark:

The insurance situation in Newark is extremely serious.

The owner of a gas station and garage in Newark:

After we had the riot here, I was cancelled out on my fire insurance policies.

Q. * * * Then what happened after you were cancelled?

A. * * * I could get it again if I wanted to pay a bigger rate.

Q. How much bigger a rate?

A. Almost double.

Q. * * * Do you have any burglary and theft coverage?

117

A. No.

Q. Did you ever have?

A. I did.

Q. What happened?

A. They were cancelled out after I put in a claim about three, four years ago for some minor thing that we collected on.

Q. About how much was the claim?

A. Oh, sixty, seventy dollars.

Q. Did you ever try to obtain burglary and theft after that?

A. Yes, we did.

Q. What rates were you offered at that time?

A. I was told plain up and down I couldn't get it, period.

Q. Did you ever carry plate glass insurance?

A. Yes, that was also cancelled * * * after I also put in a claim.

Q. For how much?

A. This one here, $15.

Q. Did you try to obtain insurance after that?

A. I did. Can't get it.

Q. Were you offered it at a higher rate?

A. No. Just can't get it * * * Not available. That is, in this particular area. Burglary insurance also. I can't get it.

Q. You talked to other businessmen about this problem, have you not? * * * What have they said?

A. Same problem I got.

Q. That is, cancellation?

A. Cancellation. Can't get it * * * I couldn't sell my business now if I wanted to give it away.

From the Mayor of Philadelphia, Pennsylvania:

The problem is * * * broader than simply cancellations. It extends much deeper into the field of non-renewals and an extreme reluctance, if not outright refusal initially, to write such insurance in major segments of our cities * * *

Far from being the result of blighting influences, the inability to obtain adequate and reliable insurance is in itself a serious cause of blight. It holds back developers and discourages private rehabilitation by making virtually impossible mortgage financing, mortgage insurance, and rehabilitation loans.

In short, it has an adverse effect on all of our efforts, public and private, to go forward with improved housing and commercial development.

An agency in Baltimore, Maryland:

I find it increasingly difficult in writing property insurance in Baltimore City on dwellings, small businesses and certain institutions. * * *

It is even worse on low cost housing when it is not owner-occupied. * * *

Another great problem is the cancellation of fire insurance on Negro churches. Certain of the large companies are turning down churches although the property is in excellent condition and the experience has almost been perfect.

Small shops, beauty parlors, cleaning and dying establishments, restaurants, painting shops, grocery stores and taverns are almost prohibitive. * * *

I am glad to know that somebody is interested in the plight of these people. I sincerely hope something may be done right away to help them.

In Washington, D.C., when a tenant of an apartment requested coverage on her personal property, she was informed: "We don't insure in your area".

Another Washington, D.C., resident, concerned that her television set might be stolen, said:

I can't get any insurance to cover my TV. I wanted something to cover the TV in case it got taken and the police can't find it. I wanted to be able to get the money to buy another one.

I saw two or three different agencies. One said they didn't have theft insurance. Another said they had it, but the price was so high, it would not be worth the money I put into it.

I was sold fire insurance for $5 and something per month for one year. What I wanted was theft, but they don't have it. I wanted theft insurance because they were stealing TVs around me. If mine was stolen, I wouldn't be able to buy another one.

From a trade association in Washington, D.C.:

Restaurants have problems and are unable to obtain fire and extended coverage. Our organization represents twenty large chains and we are thinking about self-insurance because we cannot obtain insurance. * * *

A questionnaire to 300 liquor stores indicated that 40 percent have no insurance or negligible amounts. Lloyd's of London writes insurance at three times regular rates. The regular rate for a $7500 policy is $376, but you can't get it. Lloyd's wants $1050 and the policy has a 20 percent deductible. Llody's is a slow payer.

From a banker in Washington, D.C.:

* * * placing any property insurance in center-city areas, including and excluding blighted areas, is not an easy matter. Companies are concerned about risks that are exposed to any type of factor that could be called adverse. Our city has not experienced a riot per se, but underwriters are conscious of the threat.

A Washington, D.C. insurance agent:

Being a downtown agency, all of these problems apply to us. They seem insurmountable. * * *

Our estimate of the number of cancellations in the blighted areas and the number of clients for whom we were unable to furnish insurance are probably 90 percent or more.

In Nashville, Tennessee, a savings and loan officer:

In this particular area, we have had a problem getting adequate fire insurance on people's homes, the cheaper type dwellings which tend to predominate the area, particularly on $5,000 or below.

Some of these people, especially in this class who have a $5,000 mortgage or less, they have a rather limited budget, and to make an increase of a note payment of $5 to $10 [for higher insurance costs], while it might not mean much to some people, it means a lot to these people. It throws their budget all out of line.

A Nashville insurance agent:

It has always been a little hard to get the companies to go along with commercial risks in this particular area.

I have not been able to provide burglary coverage for that area for some time.

* * * there has been a tremendous increase in vandalism and burglary, hold-ups, and that sort of thing. And that has made it almost impossible for the insurance companies to live with.

A banker in Nashville:

[The insurance companies] * * * now charge more for one year's premium than they previously charged for three years.

It is almost impossible for anyone here to get insurance and we cannot lend them any money if they cannot get insurance.

An insurance agent in Nashville:

It is now practically impossible to obtain multi-peril policies in the ghetto areas. * * *

I have had repeated requests for insurance from residents of the area, homeowners who have lived in houses for 40 or 50 years whose insurance has been cancelled or whose insurance has tripled [in cost].

A grocer in Nashville:

The banks are not going to finance me any more, and the sole reason is because I am in a ghetto—and it's not really a ghetto, if you look at it—but I am in an income area that has the taint of a riot and exorbitant insurance costs. * * * And yet the banks say that I have to have the insurance if I am going to continue to have that mortgage.

A Nashville real estate broker:

* * * we have experienced difficulty all along in finding major [insurance] companies that would service our clients at standard rates. We have had some difficulty all along on that. * * *

* * * we had wholesale cancellations of policies.

A Nashville insurance agent:

The company has told me for five or six years that we can't get an adequate rate for the hazard we are assuming. That is where the problem is.

In Nashville, the acting director of the Metropolitan Action Commission, an agency sponsoring and carrying out social programs:

* * * insurance was available, but at extremely high rates, several times that of the manual rate, and for a shorter period of time. In other words, there are persons who are seeking this insurance, and find that they are paying more for one year now than they previously paid for three years, and the extent of the coverage is less. * * *

By protection, I mean insurance that they need to sustain themselves and their businesses. Now, several businessmen that I have talked to now have the feeling that maybe it

isn't worth it to remain in business, and if this is true, if this happens, then the possibilities of jobs for youth and adults in the ghetto area will be even further reduced.

The Fire Chief of Nashville:

The foremost insurance problem will center in all probability in the areas of arbitrary cancellations or the exercise of exceptions contained in the policies issued.

The Mayor of Atlanta, Georgia:

It may be stated generally that low income families because of the condition of their housing or property must pay excessively high rates for property insurance.

An insurance agent in Mississippi:

Our problems lie in the low valued dwellings both protected and unprotected. We have practically no market.

An insurance agent in Cleveland, Ohio:

Now, when anything comes in from the Hough area, I don't care if a judge lives there, you know, we don't want this insurance business.

* * * there are many rehabilitation programs going on in the city of Cleveland now on paper that are held up for one reason: insurance. Held up because lending institutions do not want to loan money unless there is some guarantee that there is some kind of insurance going to be placed on the property.

* * * more and more companies are pulling out of the problem areas.

A delicatessen owner in Cleveland:

I think I was paying around $119 * * * and about 1964 or 1965 they went up on my rates. They wanted to charge $450, $500 a year for insurance. And I said it was ridiculous. * * * I just let it go. * * * I take a chance and pray nothing happens.

The director of a neighborhood social organization in Cleveland:

There hasn't been a standard rate in these areas, to my knowledge, in the last four years, at least.

* * * burglary, plate glass insurance, vandalism is very, very difficult to get.

A city councilman in Cleveland:

I discovered that I was paying a much higher rate [for my insurance]. * * *And I had less coverage.

I began to pay more attention to complaints which came to me about insurance being can-

celled and persons who couldn't get insurance, and I started checking it out.

* * * while fire insurance rates are high, theft and burglary insurance in those same areas is virtually impossible to obtain.

An insurance agent in Cleveland:

* * * even standard risks, what would have been a few years ago a standard risk, is now—the companies just don't seem to want comercial business * * * because it is in the central city, congested area, not necessarily poverty area, but congested area where there is a lot of burglaries and different types of things. And naturally they are steering away from it.

I feel for the people who have bought buildings, and all of a sudden their insurance is cancelled after having claim-free years for eight or ten years, all of a sudden it is cancelled and they can't get insurance except by paying excessive rates. I have had a lot of them come to me, but I couldn't do anything for them.

The manager of a grocery store in Cleveland:

I think we still have fire insurance, but they told us we wouldn't get any more.

The Director of the Ohio Department of Welfare:

Before the Hough riots, it was difficult to secure most types of insurance on homes and businesses.

The reason generally given was the high risk of fires in the central areas of the city. This applied to homes as well as to businesses.

Special to business, was the difficulty of getting insurance on plate glass; burglary; hold-up; security bonds on employees, trucks and automobiles.

Insurance companies are requiring installation of burglary alarm and fire detection systems for most business in order to qualify for even limited insurance coverage.

Cancellations are general after a fire to any premises. If the area is one where companies are desirous of getting out of, cancellations come when the present policies expire.

The general practice is to charge penalty rates to all new or renewed policies. Most of these policies are written by second-rate or specialty companies.

The only change I have noted is that any kind of insurance on any real or personal

120

property is getting to be more difficult if not, in many cases, prohibitive or impossible.

An agency in Youngstown, Ohio:

The tightness of the market for burglary and theft coverages is becoming exceeding tight and difficult to place.

Another agency in Youngstown:

The placing of fire insurance as well as burglary and theft coverage in city areas has become increasingly more difficult.

An insurance agency in Cincinnati, Ohio:

We have had a few cancellations and a great many declinations to write business which has been offered this agency as a result of a distressed situation brought about by cancellation by some other carrier. * * * the market is * * * very tight for fire, burglary and theft coverages, especially in the central areas of the city. * * * the risks particularly hard to handle are hardware stores, clothing stores, automatic laundries, drug stores and dry cleaners.

An agent in Cincinnati:

The market in Cincinnati tightened considerably after our riots in June, 1967.

The city manager of Toledo, Ohio:

It is certainly important to all the community that property insurance be available throughout the urban area. For if insurance is unavailable and, as is often the case, if mortgage money is also difficult to obtain, this means an acceleration in the decline of a particular neighborhood or area. This can be a big drawback in attempts to rebuild the older areas of the central city, when such rebuilding is essential to the vitality of our urban areas.

The owner of a commercial building in Detroit, Michigan:

I own a building of seven stores. I have had them insured for about twenty years. * * * Last year I had a registered letter from the insurance company saying that it was cancelled. I wondered why. I called and asked why. They told me that that area was undesirable for insurance. * * * So I asked them why. I got no reply. * * * I haven't had any fire or anything to amount to anything since I have been there. * * * I could never understand why they cancelled my insurance, because they had no trouble getting paid. But they never explained to me.

The owner of an art gallery in Detroit:

We contacted Mr. * * * and he said he would insure us if we got a burglar alarm, which we agreed to do, and if we made sure that our gates were locked, which we agreed to do also. He did in fact give us the insurance. But the next three or four weeks * * * we received a notice with our check * * * back from the insurance company [saying] that we were not insurable.

The director of a social agency in Detroit:

I think that all of the inner city, lower socio-economic, mainly black communities, are designated as blighted. * * * the problem of insurance is tremendous for these people. They have a fire, they lose everything in the fire.

* * * I do not know anybody who got insurance in that neighborhood in the last year. I do not know any home owner who got insurance in the last year in that community.

A homeowner in Detroit:

The policy was for 80-some dollars for one year, and I had paid 70-some dollars previously for three years. But I didn't say anything about that. I went ahead. I paid it.

Now, after the civil disorders, I got a letter from the agency telling me that the * * * company had canceled me out. And I would have to send them $101 to be insured with [another] company. And I have mailed that. And that is only for one year, which is almost four times as much as * * * [I previously paid].

An insurance agent in Detroit:

* * * there should be more Negroes representing these companies. * * * The amount of good property and good business in the city serviced by agents in the suburbs—they are not doing the city any good, because the money is not [coming in and] allowing the city to grow. This is encouraging the deterioration of the city, because it is taking away the very blood from the city, the money from the city.

A newspaper editor in Detroit:

We have had continued complaints from our readers concerning what they consider discriminatory practices as far as insurance companies are concerned, particularly in the area of fire insurance.

121

032945

* * * the specific complaint was the unexplainable cancellation or the inability to get property * * * [insurance].

* * * these are the areas, the older homes, the older communities are being taken over primarily by Negroes. * * * The risk pattern, as far as overcrowding of areas and the homes which are not built with certain fire-prevention codes being followed, plus the * * * failure of the city to see that building codes are enforced in the inner city and core city areas—these are the areas that have been taken over by the Negroes, and when a community becomes Negro, your municipal agencies do not enforce the codes. The insurance companies being aware of this, they become a little bit more concerned about whether or not they should insure the property.

* * * most of your older houses—most of them are frame, and do not have the kind of fire precautions that most recent engineering has learned to eliminate in building new homes. When the average Negro has to buy a home two years or older, he is buying a house which is more subject to fire, and so there is a higher incidence of fire. He is victimized by this. He is saying, "This means because I am black." The insurance company says, "It just happens there are more fires in this particular area." How can you convince the Negro of this?

An insurance agent in Detroit:

Some agencies, because of company limitations, just would not or could not provide insurance in these areas, essentially because of the area itself. * * * So some of the better-kept properties were penalized * * * because they were in this area, they were just lumped in, and the companies would not insure them.

* * * the agents themselves did not want to insure these properties, for fear they would burn, and [this would] jeopardize their loss ratio. They didn't feel the same kind of compunction to insure the properties that we do. We feel, as Negro agents, and 90 percent of our clientele is Negro, that we had to try to provide a market for them, because if we didn't, no one would.

* * * in some places they consider almost all of Detroit the inner city. * * * The cost [of crime coverage] is phenomenal.

Another insurance agent in Detroit:

* * * cannot get insurance, not even at the standard or substandard rate sometimes.

A priest in Detroit:

* * * many wonderful people live in the neighborhood, keep up their housing excellently, cannot get insurance because they come under the generalization * * * that rules them out, and therefore they suffer.

* * * the inarticulate, the hopeless, the ones who are on a shoestring, the ones who are renting, who have no [insurance] protection whatever—they lose everything.

From a mortgage banker in Detroit:

Currently, we are finding it very difficult to obtain adequate coverage on properties located in the riot affected areas. We have experienced some difficulty with cancellation of coverage but our big problem is obtaining renewal policies upon expiration of the policy in force. The agent and company of record will not renew and it has become very difficult to obtain a source for placing the coverage on the part of the property owner and this office.

An insurance agent in Detroit:

Burglary and theft coverages are almost impossible to place. It always was difficult. The riots have made a major difference.

From another insurance agent in Detroit:

* * * the extent of the problem is serious to an extreme point of 95 percent at least. I would say that about 95 percent of the people are unable to obtain adequate insurance at the standard rate, and about 75 percent are unable to obtain insurance at all.

This has been going on prior to the riot, although the riot has made it a more serious problem.

Cancellations and refusals have been going on at a tremendous rate, I would say to the extent of 65 percent. Very often, almost any time anyone needs insurance it would have to be paid at a surcharge rate, 99 percent I would say. These problems have been getting more serious.

A banker in Detroit:

We have been experiencing more cancellations of hazard insurance policies on properties located in what is termed "high risk areas" even though the mortgagor has not sustained any loss. The mortgagor is then forced to seek out insurance companies that issue high

risk insurance, and many times they call on our bank to assist them in obtaining this insurance. This creates a hardship on the mortgagors because they are forced to pay rates that are three and four times larger than rates on the same type of property located in another location.

A mortgage broker in Detroit:

We generally feel it is more difficult now than three years ago to obtain adequate insurance protection for residential properties in blighted areas.

A real estate agent in Detroit:

In simple language, it is becoming next to impossible to place insurance coverages in any area that is presently beginning to become or has become resegregated.

An insurance agent in Detroit:

Lenders will not place mortgages on properties unless insurance is obtainable. We are often able to assist in obtaining Hi-Risk Sub-Standard Insurance, but buyers will not, and cannot, afford the hi rates!

A mortgage broker in Detroit:

Seventy-five percent of all available buyers for this type of property cannot afford a $100 per month mortgage payment and still support their family on their $4,500 to $6,500 annual salaries. In essence, what this implies is that fewer people can afford large payments created by higher cost of fire insurance, and this therefore creates an abundance of buyers with a definite lack of housing that they can afford to buy.

In Detroit, an association of dry cleaning and laundry establishments reported that 323 member establishments were uninsured or in the process of having their insurance canceled:

The effect of the riot of 1967 * * * has closed, or is closing, the insurance market of which we speak to practically all of our members in the inner city.

The Mayor of Detroit:

It is my conviction that the availability of adequate insurance is essential to the future of any city. When a section of a city is denied insurance it is denied a future. Business cannot exist without insurance. Where it is unavailable, few merchants * * * will operate without it. When it is available only at extremely high rates, few can afford to operate with such costly overhead. In either case, local

business will be severely curtailed or wiped out, and local consumers will be left with limited shopping opportunities.

Immediate action is clearly necessary to prevent the continued deterioration of "hard to insure" areas. Easing the conditions and terms under which insurance protection will be available is one of the quickest and most effective steps we can take to deal with this problem.

The Mayor of Grand Rapids, Michigan:

We recently held a meeting with over one hundred businessmen from the riot affected area. One of the most frequently voiced complaints was that their fire and extended coverage insurance had been canceled.

An insurance agent in South Bend, Indiana:

We've had numerous cases of non-renewals of existing business and almost a total rejection of new business in that general area.

* * * all of the companies I have access to have turned down the risk, they would not accept it. * * * There was no reason given in this case.

The executive director of a social agency in South Bend:

The rates are substantially higher than what we normally would consider to be a fair rate for the coverage.

* * * we've had a couple of people who have mentioned that if their insurance coverage became any higher [in cost] that it might seriously affect their ability to do business at all. * * *

I have been told by many [businessmen] that they are unable to get glass breakage coverage at all. This is just a prohibited item.

An attorney in South Bend:

[My client's policy] came up for renewal and was renewed and then he received a letter telling him that it had been cancelled and no reason given.

In Chicago, Illinois, an insurance agent:

A $14,000 fire loss was not submitted because of fear of cancellation. The policy was for $1 million which was written at manual rates.

Another insurance agent in Chicago:

Burglary and theft coverages are impossible to place in high risk areas. Grocery stores, liquor, and furniture stores are difficult to place.

**123**

A Chicago insurance agency:

Thus far our problems have been pretty much limited to having our carriers request reduction in their lines of insurance at expiration, even though almost without exception no losses have occurred.

An agent in Rockford, Illinois:

Although our problems are not particularly acute at this time, we nevertheless anticipate requests for non-renewal and declination in the future. Historically, insurance markets which tighten particular coverages in metropolitan areas have pursued the same underwriting procedures in non-metropolitan communities. The consensus of this office indicates that market problems will face us in the relatively near future.

A mortgage banker in Kansas City, Missouri:

Not only is fire and extended coverage getting very hard to obtain but we are also being wholesale cancelled on existing policies. Homeowners [policies] are almost imposible to obtain in these areas that would normally be considered middle-class residential areas if it wasn't for the race of the residents.

An insurance broker in Kansas City:

We are in a position to place most business at three or four times the going rate, some times as much as five and six times the going rate.

An insurance agency in Kansas City:

All coverages previously in effect have been declined in advance of renewal date—so we are unable to renew. Our problem is not with excessive rates, we are just unable to handle any of the business we formerly did in these areas.

We have * * * no market among any company we represent for new business in predominantly Negro and center city areas. * * * We did have a reasonably good volume in these areas, now we have none.

The Mayor of Kansas City, Missouri:

Inability to secure fire or other property insurance inside a city today is to some degree evidence that civilization in that city is breaking down.

An agent in St. Louis, Missouri:

Market is tight. Companies are strict.

The Mayor of St. Louis, Missouri:

I believe the situation is critical for those who own any type of property in depressed areas.

An Omaha, Nebraska, storekeeper:

* * * the premium is tripled and I cannot afford it.

An Omaha real estate broker:

* * * for the average small businessman any major loss either from a break-in or from a riot, from anything like that, is just curtains * * * almost bankruptcy. We are not financially strong enough to sustain a substantial loss without the insurance.

We must have coverage if we stay in business. * * * There are businesses that are moving out of the area because they cannot get coverage and there are other businesses who can't get into the area because of the difficulty of getting insurance coverage. Their property, we can't sell, depreciates in value, simply because we can't get it [insurance].

The owner of a shoe-repair business in Omaha:

I was turned down [for insurance] because I was in this district. * * * I would be glad to take one [a policy] tomorrow morning. We are just out.

The owner of a hardware store in Omaha:

First of all we were cancelled on our glass policies. * * * Then we were cancelled on fire. We replaced it at three times the amount of the cost with everything excluded except fire.

The owner of a drug and package liquor store in Omaha:

* * * [I was] cancelled out. * * * Everything has been cancelled.

A grocer in Omaha:

We were cancelled out on plate glass. * * * Burglary and theft—unobtainable in this area.

An insurance agent in Omaha:

Straight burglary policies in that area are practically unobtainable. * * * Plate glass is practically an impossibility to write in that particular area.

The Fire Chief of St. Paul, Minnesota:

The method of establishing insurance rates doesn't really benefit the occupants of the urban areas as much as the occupants of the suburban areas and the rural areas who do very little in preventing or combating fire losses in the blighted areas.

124

In San Antonio, Texas, an insurance agent:

Since we normally do not write coverage in blighted areas we have had no real problems. These areas not only produce unsatisfactory loss experience and real placement problems, generally they produce premium collection problems for the agent. For the most part we have stayed away from these areas.

An insurance broker in Oakland, California:

Serious social and insurance problems exist in many urban areas, including the San Francisco Bay area, where there are substantial segments of economically depressed persons which often are predominantly of minority races.

* * * The market is extremely tight * * * for theft, vandalism, riot and fire insurance in these areas.

An agency in Stockton, California:

* * * generally liquor stores and restaurants are "tight," especially in slum areas.

Another agency in Stockton:

Burglary and theft coverages are becoming increasingly difficult to place—not because of riots or civil disorders, but because of adverse loss experience for the past several years.

An insurance broker in Los Angeles, California:

Our major market area is south central Los Angeles * * * the Watts area or the McCone area. The problems since mid-1965 in residential coverage can be summarized as increased selectivity of risks by the companies, inspection reports and photos to accompany applications, increase in minimum limits for low valued dwellings, total withdrawal from the market area by the carriers (and this latter on geographical lines), increasing cancellations at company election, withdrawal of binding authority and declinations to issue multi-peril package policies.

In commercial risks the above conditions are existent and amplified by even broader demands for acceptable risks * * * e.g. will accept coverage on furniture and equipment but exclude stock, even for basic fire coverage.

In our view the market for the coverages mentioned is very tight at manual rates and extremely limited in the surcharge market * * *.

Since late 1965, our best estimate would be 150 to 200 clients in our market area have been

unable to replace or renew wanted coverages through this office.

From an agency in Los Angeles:

The problem of placing Commercial Property Coverage in my area is acute and getting worse. By my area, I mean the so-called Curfew area * * *.

Another agency in Los Angeles:

* * * the market generally for fire, burglary and theft coverages in this area has tightened. Not only in so-called blighted areas but in many of our more affluent and prosperous areas.

A Los Angeles agency:

* * * we are unable to purchase the amount of insurance desired or necessary to equal present day replacement or depreciated value of the property to be insured. * * *

Burglary and Theft coverage are very difficult * * *.

An agency, Los Angeles:

We are unable to provide any coverage for Plate Glass, Burglary, Money and Securities. This is not available in any Insurance Market that we tried.

* * * if you try hard, you can, somehow, obtain Fire Insurance and other lines. But no Burglary, Plate Glass or Holdup.

From an insurance agency in San Diego, California:

We have found some tightness of market in burglary and theft coverages, also glass, but in most cases this was overcome if we wrote other businesses for an insured.

From an agent in Burbank, California:

Companies shied away from blighted areas even before riots.

A member of the Governor's Committee on Youth writing from Compton, California:

* * * procuring insurance in every category is excessively difficult. * * *

In the business world of this area, the insurance coverage is saddening. * * *

Most of the merchants carry only partial coverage because of excessive charges, while the burglary, hold-up and plate glass insurance is almost prohibitive. * * *

The surcharges are assessed on original or renewal basis. Many merchants with three year policies are not being allowed to renew.

125

032949

A vice-president of the United States Savings and Loan League wrote:

> The lending operations of our member savings and loan associations have been substantially, if not entirely, curtailed so far as additional loans are concerned in center city properties which might come to be considered as areas affected by the possibility of future riots or civil disorders. This applies particularly to declining neighborhoods, even though the individual property may be insurable so far as normal fire and extended coverage underwriting policies are concerned.
>
> The greatest problem facing our business in this respect is maintaining insurance on properties which were financed a number of years ago and where the decline in the area has substantially changed. We have had reports from associations in almost all the major

metropolitan areas which have been adversely affected in this respect and are finding it extremely difficult to maintain insurance coverage on such properties. In many instances the only recourse has been to call on Lloyds of London, Ltd., which generally will cover these risks on a premium basis, roughly two and one-half times the standard board rates.

The President of the National Association of Real Estate Brokers said:

> * * * many retail sales have fallen through when the buyer could not obtain adequate insurance to protect his investment. Since the summer of unrest, reports from members of our organization in many communities reveal that it is almost completely impossible to obtain insurance on commercial and business properties. This has caused many small businesses to close.

## Survey of Six Cities

### Cities Surveyed

The Panel conducted a systematic survey of property insurance problems encountered by residents and businessmen in Boston, Cleveland, Detroit, Newark, Oakland, and St. Louis.

Disorders of varying intensity have occurred in the first five cities; St. Louis, which has experienced no recent disorders, was chosen for the purpose of comparison.

The Panel's survey defined urban core areas of five of the six cities by reference to maps of poverty areas prepared by the United States Bureau of the Census. These areas represent major concentrations of poverty in metropolitan areas based on five characteristics: percent of all housing units in dilapidated condition or lacking some or all plumbing facilities; percent of families with cash incomes under $3,000; percent of children under eighteen years old not living with both parents; percent of males twenty-five years old and over with less than eight years of school completed; and percent of unskilled males (laborers and service workers) aged fourteen or older in the employed civilian labor force.

For Boston, instead of using a similarly defined poverty area, the Panel surveyed Roxbury—the area initially covered by the Urban Area Plan. Roxbury lies almost entirely within the Boston poverty area (except for an area of several blocks which is inconsequential for the purpose of this survey).

For the purpose of comparison, a non-poverty area in Oakland was selected in addition to the poverty area in that city. Oakland also has an unusual city ordinance that requires business establishments to take precautions against burglary losses.

### Size and Nature of Sample

About 3,000 personal interviews were conducted in the six cities. About 1,500 dwelling units, including single family units, apartment houses, and larger units, were sampled, as were about 1,500 businesses and institutions, including schools, churches, and public buildings.

In the case of dwelling units, only the owner was interviewed; for businesses and institutions, owners and tenants were interviewed.

126

## Survey Results

The survey established that the residents and businessmen had substantial insurance problems—primarily shortages of insurance and high costs.

The problems are more serious for businesses than for dwellings, more acute for burglary and theft than for fire insurance. They are more serious in some urban core areas than in others, but substantial in every case.

The problems are serious not only in Detroit and Newark, which experienced major riots, but in the other cities surveyed. The general problems in some areas may even be more severe than the survey indicates, because of recent moratoria on cancellations.

Over 40 percent of businessmen in the six areas reported fire or burglary and theft insurance problems.* (See Table 1). About 28 percent had no insurance because it was unavailable or cost too much. Another 8 percent, who had no availability or cost problem, were underinsured. And about 5

---

*The term businessman will be used to include institutions for purposes of summarizing results. Summary figures in the tables and text are for poverty areas only, unless otherwise noted. This report uses unweighted arithmetic means to summarize findings for the poverty areas studied. Appropriate weighting factors were not available to permit computation of weighted averages. Summary figures indicating whether an uninsured had problems relating to cost or availability were compiled by so categorizing responses to the question, "Why don't you carry * * * insurance?" The following were considered to relate to availability: "It is unavailable;" "I have been refused insurance in the last three years;" "I have been canceled within the past three years;" and "Conditions are impossible to satisfy." The following was considered to relate to cost: "It is too expensive." Such answers as "No agent has contacted me" or "Don't know" were not considered problems reported.

---

percent—who had no availability, cost, or underinsurance problem—said they paid excess rates.

Over 30 percent of businessmen in the six poverty areas had fire insurance problems. (See Table 2). About the same percentage had problems relating to burglary and theft insurance and plate glass insurance.

Businessmen in Boston had the most serious insurance problems of those in the cities surveyed. Over 61 percent of Roxbury businessmen had problems relating to fire and extended coverage or burglary and theft insurance. (See Table 3). About half were uninsured for one of these two basic lines while around another 14 percent were either underinsured or paying more than manual rates. Over 40 percent of businessmen in Cleveland, Detroit, and Newark had an insurance problem relating to the two basic lines. This figure was 34.3 percent in St. Louis and around 25 percent in both areas of Oakland.

The Oakland figures indicate insurance problems are not confined to poverty areas.

About 30 percent of owners of dwellings in the six poverty areas reported fire insurance problems. (See Table 4). Over 5 percent had no insurance because of availability or cost. Another 14 percent, who had no availability or cost problems, were underinsured. Of those remaining, about 9 percent said they paid excess rates.

Almost 37 percent of owners of dwellings in Roxbury had fire insurance problems and in the other poverty areas at least 20 percent of the dwelling owners reported fire insurance problems. (See Table 3). In the non-poverty area of Oakland, only 9 percent had problems.

TABLE 1. BUSINESS ESTABLISHMENTS AND INSTITUTIONS—PERCENT REPORTING EITHER FIRE OR BURGLARY AND THEFT INSURANCE PROBLEMS BY OWNERSHIP STATUS FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| Item | Poverty areas | | | Nonpoverty area | | |
|---|---|---|---|---|---|---|
| | Total | Owners | Tenants | Total | Owners | Tenants |
| (1) Uninsured because of problems of cost or availability | 28.2 | 21.2 | 32.9 | 20.8 | 18.2 | 22.1 |
| (2) Insured, but having less insurance than wanted | 7.7 | 8.4 | 7.1 | 1.0 | 3.0 | —* |
| (3) Paying more than manual rates but without other cost, availability, or underinsurance problems | 5.2 | 5.9 | 4.2 | 4.0 | 6.1 | 2.9 |
| Total (1) through (3) | 41.1 | 36.1 | 44.1 | 25.8 | 27.3 | 25.0 |

*Dashes in this and subsequent tables represent less than 0.05 percent.
NOTE: In Tables 1-40, the figures are unweighted arithmetic means.

SOURCE FOR TABLES 1-40: Survey conducted by the National Advisory Panel on Insurance In Riot-Affected Areas.

127

TABLE 2. BUSINESS ESTABLISHMENTS AND INSTITUTIONS—PERCENT REPORTING INSURANCE PROBLEMS BY LINE OF INSURANCE AND OWNERSHIP STATUS FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| Item | Poverty areas | | | Nonpoverty area | | |
|---|---|---|---|---|---|---|
| | All | Owners | Tenants | All | Owners | Tenants |
| **FIRE** | | | | | | |
| Uninsured: | | | | | | |
| 1. Problems of cost | 5.6 | 2.6 | 7.6 | 2.0 | — | 2.9 |
| 2. Problems of availability | 7.6 | 4.2 | 10.0 | 2.0 | — | 2.9 |
| Insured: | | | | | | |
| 3. Having less insurance than wanted | 10.5 | 12.7 | 8.9 | 2.0 | 6.1 | — |
| 4. Paying more than manual rates | 8.4 | 9.6 | 7.3 | 6.9 | 6.1 | 7.4 |
| Total (1) through (4) | 32.1 | 29.1 | 33.8 | 12.9 | 12.2 | 13.2 |
| **BURGLARY AND THEFT** | | | | | | |
| Uninsured: | | | | | | |
| 1. Problems of cost | 13.8 | 11.5 | 15.1 | 13.9 | 12.1 | 14.7 |
| 2. Problems of availability | 11.8 | 8.2 | 14.3 | 3.0 | 3.0 | 2.9 |
| Insured: | | | | | | |
| 3. Having less insurance than wanted | 4.2 | 3.5 | 4.7 | 1.0 | — | 1.5 |
| 4. Problem of availability | 4.1 | 5.2 | 3.2 | 5.9 | 3.0 | 7.4 |
| Total (1) through (4) | 33.9 | 28.4 | 37.3 | 23.8 | 18.1 | 26.5 |
| **PLATE GLASS** | | | | | | |
| Uninsured: | | | | | | |
| 1. Problems of cost | 11.5 | 10.3 | 12.3 | 7.9 | 15.2 | 4.4 |
| 2. Problems of availability | 14.2 | 11.0 | 16.4 | 4.0 | 9.1 | 1.5 |
| Insured: | | | | | | |
| 3. Having less insurance than wanted | 1.6 | 2.1 | 1.4 | 2.0 | — | 2.9 |
| 4. Problems of availability | 3.6 | 4.1 | 3.0 | 4.0 | 3.0 | 4.4 |
| Total (1) through (4) | 30.9 | 27.5 | 33.1 | 17.9 | 27.3 | 13.2 |

## A. Insurance for Businesses

### Do Businessmen Have Insurance?

*Fire and Extended Coverage.* Businessmen were asked: "Do you carry a package policy covering fire and extended coverage and burglary and theft, or do you carry fire and extended coverage insurance?" Less than half in the poverty areas had a package policy and 20 percent were uninsured completely. The percentage of uninsured was as high as 35 percent in Boston and as low as 6.9 percent in the non-poverty area of Oakland. The percent of those uninsured was over 20 percent in four of the six poverty areas. (See Table 5.)

The percentage of uninsured was more than 18 points higher among tenants (27.4 percent) than owners (9.3 percent).

Package policies were most commonly found in the Oakland non-poverty area (73.2 percent), while only 22 percent had package policies in Boston.

*Burglary and Theft.* Businessmen were asked: "Do you carry burglary and theft insurance?" Forty-eight percent were uninsured for burglary and theft. (See Table 6). The percent of uninsured was as high as 74 percent in Boston and as low as 30 percent in the poverty area of Oakland. It was 21 percent in the nonpoverty area of Oakland.

In the six poverty areas studied, tenants were more often uninsured (51.5 percent) than owners (43.1 percent). In Boston, almost 80 percent of

128

TABLE 3. DWELLINGS, BUSINESS ESTABLISHMENTS, AND INSTITUTIONS—PERCENT REPORTING INSURANCE PROBLEMS BY LINE OF INSURANCE FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| | Poverty areas | | | | | | Non-poverty area— |
| | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland | Oakland |
|---|---|---|---|---|---|---|---|
| **DWELLING UNITS** | | | | | | | |
| Fire and extended coverage: | | | | | | | |
| Uninsured: | | | | | | | |
| 1. Problems of cost | 1.3 | 1.5 | 5.2 | — | 2.5 | — | — |
| 2. Problems of availability | 2.6 | 5.2 | 6.3 | 3.1 | 4.6 | 0.3 | — |
| Insured: | | | | | | | |
| 3. Having less insurance than wanted | 20.6 | 13.5 | 6.6 | 21.4 | 7.6 | 13.7 | 6.8 |
| 4. Paying more than manual rates | 12.4 | 11.3 | 8.0 | 9.2 | 8.6 | 6.5 | 2.3 |
| Total (1) through (4) | 36.9 | 31.5 | 26.1 | 33.7 | 23.3 | 20.5 | 9.1 |
| **BUSINESS ESTABLISHMENTS AND INSTITUTIONS** | | | | | | | |
| Fire, extended coverage, and burglary and theft: | | | | | | | |
| 5. Uninsured because of problems of cost or of availability | 48.2 | 33.8 | 27.9 | 22.0 | 24.8 | 12.5 | 20.8 |
| 6. With underinsurance but without problems of cost or availability | 4.8 | 5.2 | 8.6 | 13.4 | 6.6 | 7.4 | 1.0 |
| 7. Paying more than manual rates but without other cost, availability, or underinsurance problems | 8.9 | 4.2 | 5.6 | 5.9 | 2.9 | 3.7 | 4.0 |
| Total (5) through (7) | 61.9 | 43.2 | 42.1 | 41.3 | 34.3 | 23.6 | 25.8 |

NOTE: Plate glass insurance is not included.

TABLE 4. DWELLING UNITS—PERCENT REPORTING FIRE AND EXTENDED COVERAGE INSURANCE PROBLEMS BY OWNERSHIP STATUS FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| Item | Poverty | | | Nonpoverty | | |
| | Total | Occupants | Non-occupants | Total | Occupants | Non-occupants |
|---|---|---|---|---|---|---|
| 1. Uninsured because of problems of cost or availability | 5.5 | 4.5 | 7.1 | — | — | — |
| 2. Insured, but having less insurance than wanted | 13.9 | 11.0 | 17.0 | 6.8 | 6.3 | 11.1 |
| 3. Paying more than manual rates, but without other cost, availability, or underinsurance problems | 9.3 | 6.6 | 14.3 | 2.3 | 2.5 | — |
| Total (1) through (3) | 28.7 | 22.1 | 38.4 | 9.1 | 8.8 | 11.1 |

129

032953

TABLE 5. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Do you carry a package policy covering fire, extended coverage, burglary and theft or do you carry fire and extended coverage insurance (FEC)?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | With package | With FEC | Unin-sured | Other [1] | Number of interviews | Package | FEC | Unin-sured | Other [1] | Number of interviews | Package | FEC | Unin-sured | Other [1] |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 247 | 22.3 | 42.5 | 35.2 | — | 111 | 28.8 | 50.5 | 20.7 | — | 136 | 16.9 | 36.0 | 47.1 | — |
| Cleveland | 213 | 44.6 | 34.3 | 21.1 | — | 77 | 54.6 | 37.7 | 7.8 | — | 136 | 39.0 | 32.4 | 28.7 | — |
| Detroit | 233 | 50.6 | 27.9 | 21.4 | — | 91 | 55.0 | 31.9 | 13.2 | — | 142 | 47.9 | 25.4 | 26.8 | — |
| Newark | 186 | 51.1 | 38.7 | 10.2 | — | 82 | 56.1 | 40.2 | 3.7 | — | 104 | 47.1 | 37.5 | 15.4 | — |
| St. Louis | 242 | 40.5 | 33.1 | 24.4 | 2.0 | 98 | 46.9 | 43.9 | 7.1 | 2.0 | 144 | 36.1 | 25.7 | 36.1 | 2.1 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 272 | 61.2 | 30.7 | 8.1 | — | 87 | 61.7 | 34.9 | 3.4 | — | 185 | 60.9 | 28.8 | 10.3 | — |
| Nonpoverty | 101 | 73.2 | 19.9 | 6.9 | — | 33 | 79.8 | 20.2 | — | — | 68 | 70.0 | 19.7 | 10.3 | — |
| All poverty areas | 1,393 | 45.1 | 34.5 | 20.1 | .3 | 546 | 50.5 | 39.9 | 9.3 | .3 | 847 | 41.3 | 31.0 | 27.4 | .3 |

[1] In this and subsequent tables, Other includes nonresponses, refusal to answer questions, and don't know.

NOTE: This and subsequent tables report on 6 poverty areas and 1 nonpoverty area (in Oakland).

032954

### TABLE 6. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Do you carry burglary and theft insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 247 | 25.5 | 74.1 | 0.4 | 111 | 31.5 | 67.6 | 0.9 | 136 | 20.6 | 79.4 | — |
| Cleveland | 213 | 53.5 | 46.0 | .5 | 77 | 58.5 | 41.6 | — | 136 | 50.7 | 48.5 | 0.7 |
| Detroit | 233 | 55.8 | 44.2 | — | 91 | 62.6 | 37.4 | — | 142 | 51.4 | 48.6 | — |
| Newark | 186 | 58.1 | 37.6 | 4.3 | 82 | 61.0 | 31.7 | 7.3 | 104 | 55.8 | 42.3 | 1.9 |
| St. Louis | 242 | 42.6 | 55.8 | 1.6 | 98 | 46.9 | 49.0 | 4.1 | 144 | 39.6 | 60.4 | — |
| Oakland: | | | | | | | | | | | | |
| Poverty | 272 | 68.7 | 30.5 | .7 | 87 | 67.8 | 31.2 | — | 185 | 69.2 | 29.7 | 1.1 |
| Nonpoverty | 101 | 79.2 | 20.8 | — | 33 | 84.9 | 15.2 | — | 68 | 76.5 | 23.5 | — |
| All poverty areas | 1,393 | 50.7 | 48.0 | 1.3 | 546 | 54.7 | 43.1 | 2.1 | 847 | 47.9 | 51.5 | .6 |

tenants were uninsured and in all but one poverty area over 42 percent of the tenants were uninsured.

Oakland, which has an unusual city ordinance requiring merchants to meet minimum security standards for the protection of their property, had the lowest rate of uninsureds.

*Plate Glass Insurance.* Businessmen were asked: "Do you carry plate glass insurance?" Almost two-thirds were uninsured for plate glass. In five of the six poverty areas, the percent of uninsureds was over 55 percent. In the nonpoverty area of Oakland, about 32 percent were uninsured, the lowest percentage in any area surveyed. (See Table 7).

Relatively more tenants (67.7 percent) were uninsured than owners (58.4 percent). In three

poverty areas over 77 percent of tenants were uninsured.

## Why Don't Businessmen Have Insurance?

*Fire Insurance.* We asked those who were uninsured why they did not carry fire insurance: 35.4 percent said it was a problem of availability; 29.1 percent said the insurance cost too much; and 34.4 percent indicated they did not need insurance, that they had discontinued it voluntarily, or that no agent had called on them. (See Table 8).

*Burglary and Theft Insurance.* We asked those who were uninsured why they did not carry bur-

### TABLE 7. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Do you carry plate glass insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 247 | 21.9 | 78.1 | .— | 111 | 26.1 | 73.9 | — | 136 | 18.4 | 81.6 | — |
| Cleveland | 213 | 28.2 | 71.8 | — | 77 | 39.0 | 61.1 | — | 136 | 22.1 | 77.9 | — |
| Detroit | 233 | 36.9 | 63.1 | — | 91 | 38.5 | 61.5 | — | 142 | 35.9 | 64.1 | — |
| Newark | 186 | 40.9 | 55.9 | 3.2 | 82 | 37.8 | 56.1 | 6.1 | 104 | 43.3 | 55.8 | 1.0 |
| St. Louis | 242 | 29.8 | 67.4 | 2.9 | 98 | 41.8 | 53.1 | 5.1 | 144 | 21.5 | 77.1 | 1.4 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 272 | 50.7 | 48.2 | 1.1 | 87 | 54.0 | 44.8 | 1.1 | 185 | 49.2 | 49.7 | 1.1 |
| Nonpoverty | 101 | 68.4 | 31.7 | — | 33 | 69.7 | 30.3 | — | 68 | 67.6 | 32.4 | — |
| All poverty areas | 1,393 | 34.7 | 64.1 | 1.2 | 546 | 39.5 | 58.4 | 2.1 | 847 | 31.7 | 67.7 | .6 |

131

TABLE 8. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If you do not carry fire insurance, what are the reasons?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Other | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Other | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 87 | 33.3 | 34.5 | 32.2 | — | 23 | 39.1 | 30.4 | 30.4 | — | 64 | 31.2 | 35.9 | 32.8 | — |
| Cleveland | 46 | 23.9 | 54.4 | 21.7 | — | 7 | — | 85.7 | 14.3 | — | 39 | 28.2 | 48.7 | 23.0 | — |
| Detroit | 50 | 24.0 | 50.0 | 26.0 | — | 12 | 25.0 | 58.3 | 16.7 | — | 38 | 23.7 | 47.3 | 29.0 | — |
| Newark | 19 | 36.8 | 42.1 | 21.1 | — | 3 | 33.3 | 66.7 | — | — | 16 | 37.5 | 37.5 | 25.0 | — |
| St. Louis | 59 | 20.3 | 27.1 | 50.9 | 1.7 | 7 | 28.5 | 14.3 | 57.2 | — | 52 | 19.2 | 28.8 | 50.0 | 1.9 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 22 | 36.4 | 4.5 | 54.5 | 4.5 | 3 | 33.3 | — | 66.7 | — | 19 | 36.8 | 5.3 | 52.6 | 5.3 |
| Nonpoverty | 7 | 28.6 | 28.6 | 42.8 | — | — | — | — | — | — | 7 | 28.6 | 28.6 | 42.8 | — |
| All poverty areas | 283 | 29.1 | 35.4 | 34.4 | 1.1 | 55 | 26.5 | 42.6 | 30.9 | — | 228 | 29.4 | 33.9 | 35.4 | 1.2 |

132

glary and theft insurance: 28.6 percent said it was a problem of cost; 23.5 percent said it was a problem of availability; 41.9 percent said the insurance was unnecessary or gave another reason for not carrying it. (See Table 9).

*Plate Glass Insurance.* We asked those who were uninsured why they did not carry plate glass insurance: 17.6 percent said it was a problem of cost; 21.1 percent said it was a problem of availability; 54.3 percent, including some who had no plate glass exposure, said it was unnecessary or gave another reason for not carrying it. (See Table 10).

## Do Businessmen Who Are Insured Have The Amount of Insurance Wanted?

*Fire and Extended Coverage.* To determine whether businessmen were unable to obtain adequate insurance or, by contrast, were purchasing more than they felt they needed, we asked: "If fire insurance is carried, do you have amount wanted, less than amount wanted, or more than amount wanted?"

About 14 percent had less than they wanted, and about 3 percent more than they wanted.

There was little difference between tenants and owners in most areas. (See Table 11.)

Almost half of those who had less fire insurance than they wanted said company restrictions were the cause. About 40 percent said they carried less than they wanted because it was too expensive. (See Table 12).

*Burglary and Theft Insurance.* Businessmen who carried burglary and theft insurance were asked whether they had the desired amounts. About 8 percent said they did not. This figure ran as high as 12 percent in Detroit, and as low as 1 percent in the nonpoverty area of Oakland. (See Table 13).

*Plate Glass Insurance.* Almost all businessmen who had plate glass insurance said they had the right amount. About 4 percent said they did not. (See Table 14).

## How Do Businessmen Obtain Insurance?

To provide another indicator of the fire insurance market problems of businessmen, we asked whether they had contacted more than one agent.

About 18 percent said yes. Only 8.5 percent contacted more than one agent in the nonpoverty area of Oakland, while in Boston this figure was 27.5 percent. (See Table 15).

We also asked businessmen whether their property was inspected by an agent or company before they obtained the insurance. In Boston, where the Urban Area Plan applies to commercial as well as residential property, the question was specifically related to inspections under the plan.

The highest percentage of inspections was reported in the nonpoverty area of Oakland, the lowest in Boston. (See Table 16.) The results were surprising, since the Boston Plan goes back to 1960. But some property owners may have been unaware of inspections that took place; and some may have interpreted other inspections, for example, by the fire department, as an insurance inspection.

Boston businessmen whose property had not been inspected were asked why. About half said they were unaware of the Boston Urban Area Plan, while about 30 percent said they obtained insurance without it. (See Table 17).

We asked those whose properties had been inspected whether inspection resulted in obtaining the fire insurance they wanted. About 85 percent said yes, 14 percent said no. (See Table 18).

We then asked whether the inspection report had called for property improvement. About 13 percent said yes. This figure was highest in Boston (25.7 percent) and lowest in the nonpoverty area of Oakland (3.3 percent). (See Table 19.)

The next question was whether the required improvements were made. About 77 percent said yes.

## How Much Do Businessmen Pay for Insurance?

Businessmen were asked whether they paid more or less than the regular (or standard) rate for fire and extended coverage insurance. About 25 percent said more, while about 8 percent said less. (See Table 20.)

As a check on the validity of these responses, businessmen were asked whether they had to sign an affidavit, waiver, or other statement to obtain the insurance. These generally would be required under consent-to-rate laws to obtain insurance at more than regular rates. About 7 percent indi-

**133**

## TABLE 9. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

### What are the reasons for not carrying burglary and theft insurance?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number uninsured | Problem of cost | Problem of availability | No problem reported | Other | Number uninsured | Problem of cost | Problem of availability | No problem reported | Other | Number uninsured | Problem of availability | Problem of availability | No problem reported | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 183 | 30.6 | 27.3 | 39.3 | 2.7 | 75 | 36.0 | 22.7 | 40.0 | 1.3 | 108 | 26.9 | 30.6 | 38.9 | 3.7 |
| Cleveland | 98 | 33.7 | 29.7 | 36.6 | — | 32 | 30.3 | 18.2 | 51.5 | — | 66 | 35.3 | 35.3 | 29.4 | — |
| Detroit | 103 | 35.0 | 23.3 | 36.0 | 5.8 | 34 | 32.4 | 20.6 | 44.1 | 2.9 | 69 | 36.2 | 24.6 | 31.9 | 7.2 |
| Newark | 70 | 20.0 | 35.7 | 40.0 | 4.3 | 26 | 11.5 | 34.6 | 46.2 | 7.7 | 44 | 25.0 | 36.4 | 36.4 | 2.2 |
| St. Louis | 135 | 20.0 | 19.2 | 48.9 | 11.9 | 48 | 22.9 | 10.4 | 47.9 | 18.8 | 87 | 18.4 | 24.2 | 49.4 | 8.0 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 83 | 32.5 | 6.0 | 50.6 | 10.8 | 28 | 14.3 | 7.1 | 60.7 | 17.9 | 55 | 41.8 | 5.5 | 45.5 | 7.3 |
| Nonpoverty | 21 | 66.7 | 14.3 | 9.5 | 9.5 | 5 | 80.0 | 20.0 | — | — | 16 | 62.5 | 12.5 | 12.5 | 12.5 |
| All poverty areas | 672 | 28.6 | 23.5 | 41.9 | 5.9 | 243 | 24.6 | 18.9 | 48.4 | 8.1 | 429 | 30.6 | 26.1 | 38.6 | 4.7 |

## TABLE 10. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

### What are the reasons for not carrying plate glass insurance?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number uninsured | Problem of cost | Problem of availability | No problem reported | Other | Number uninsured | Problem of cost | Problem of availability | No problem reported | Other | Number uninsured | Problem of cost | Problem of availability | No problem reported | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 193 | 28.1 | 34.4 | 35.4 | 2.1 | 82 | 32.1 | 28.4 | 37.0 | 2.5 | 111 | 25.2 | 37.7 | 34.2 | 1.8 |
| Cleveland | 153 | 9.9 | 28.3 | 61.8 | — | 47 | 10.6 | 14.9 | 74.4 | — | 106 | 9.5 | 34.3 | 56.2 | — |
| Detroit | 147 | 21.1 | 21.1 | 53.1 | 4.8 | 56 | 12.5 | 28.6 | 55.4 | 3.6 | 91 | 26.4 | 16.5 | 51.6 | 5.5 |
| Newark | 104 | 17.3 | 27.9 | 50.0 | 4.8 | 46 | 10.9 | 21.7 | 63.0 | 4.3 | 58 | 22.4 | 32.8 | 39.7 | 5.2 |
| St. Louis | 163 | 14.7 | 9.8 | 55.8 | 19.6 | 52 | 19.2 | 3.8 | 40.4 | 36.5 | 111 | 12.6 | 12.6 | 63.1 | 11.7 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 131 | 14.5 | 5.3 | 69.5 | 10.7 | 39 | 18.0 | 10.3 | 59.0 | 12.8 | 92 | 13.0 | 3.3 | 74.0 | 9.8 |
| Nonpoverty | 32 | 25.0 | 12.5 | 56.2 | 6.3 | 10 | 50.0 | 30.0 | 20.0 | — | 22 | 13.6 | 4.5 | 72.7 | 9.1 |
| All poverty areas | 891 | 17.6 | 21.1 | 54.3 | 7.0 | 322 | 17.2 | 18.0 | 54.9 | 10.0 | 569 | 18.2 | 23.0 | 53.2 | 5.6 |

134

## TABLE 11. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If fire insurance is carried, do you have amount wanted, less than wanted or more than wanted?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 160 | 73.7 | 25.7 | 0.6 | 88 | 74.4 | 24.5 | 1.1 | 72 | 72.8 | 27.2 | — |
| Cleveland | 168 | 85.1 | 13.1 | 1.8 | 71 | 85.9 | 11.3 | 2.8 | 97 | 84.5 | 14.4 | .1 |
| Detroit | 183 | 84.9 | 11.7 | 3.4 | 79 | 84.8 | 11.4 | 3.8 | 104 | 84.9 | 12.0 | 3.0 |
| Newark | 167 | 78.6 | 17.8 | 3.6 | 79 | 71.1 | 24.9 | 4.0 | 88 | 85.1 | 11.5 | 3.4 |
| St. Louis | 178 | 86.2 | 9.8 | 4.0 | 89 | 88.4 | 8.1 | 3.5 | 89 | 83.9 | 11.5 | 4.6 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 250 | 92.1 | 5.4 | 2.5 | 84 | 90.2 | 7.3 | 2.5 | 166 | 93.1 | 4.4 | 2.5 |
| Nonpoverty | 94 | 97.8 | 2.1 | — | 33 | 93.9 | 6.1 | — | 61 | 100.0 | — | — |
| All poverty areas | 1,106 | 83.4 | 13.9 | 2.7 | 490 | 82.5 | 14.5 | 2.9 | 616 | 84.0 | 13.6 | 2.3 |

## TABLE 12. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If you carry less fire insurance than you want, what are the reasons?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of underinsureds | Too expensive | Company restrictions | Other | Number of underinsureds | Too expensive | Company restrictions | Other | Number of underinsureds | Too expensive | Company restrictions | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 40 | 52.5 | 32.5 | 15.0 | 21 | 66.7 | 14.3 | 19.0 | 19 | 36.8 | 52.6 | 10.6 |
| Cleveland | 22 | 27.3 | 54.5 | 18.2 | 8 | 12.5 | 50.0 | 37.5 | 14 | 35.7 | 57.1 | 7.2 |
| Detroit | 21 | 33.3 | 52.4 | 14.3 | 9 | 22.2 | 77.8 | — | 12 | 41.7 | 33.3 | 25.0 |
| Newark | 29 | 24.1 | 65.5 | 10.4 | 19 | 26.3 | 63.2 | 10.5 | 10 | 20.0 | 70.0 | 10.0 |
| St. Louis | 17 | 52.9 | 47.1 | — | 7 | 71.4 | 28.6 | — | 10 | 40.0 | 60.0 | — |
| Oakland: Poverty | 13 | 46.2 | 46.2 | 7.7 | 6 | 50.0 | 50.0 | — | 7 | 42.9 | 42.9 | 14.3 |
| All poverty areas | 142 | 39.4 | 49.7 | 10.9 | 70 | 41.5 | 47.3 | 11.2 | 72 | 36.2 | 52.7 | 11.2 |

NOTE: Nonpoverty area of Oakland is not included because of small number of underinsureds.

## TABLE 13. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If burglary and theft insurance is carried, do you have desired amounts?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 88.9 | 6.4 | 4.8 | 35 | 88.6 | 5.7 | 5.8 | 28 | 89.3 | 7.1 | 3.6 |
| Cleveland | 114 | 92.1 | 7.9 | — | 45 | 97.8 | 2.2 | — | 69 | 88.4 | 11.6 | — |
| Detroit | 130 | 88.5 | 11.5 | — | 57 | 87.7 | 12.3 | — | 73 | 89.1 | 11.0 | — |
| Newark | 108 | 88.0 | 9.3 | 2.8 | 50 | 88.0 | 8.0 | 4.0 | 58 | 87.9 | 10.3 | 1.7 |
| St. Louis | 103 | 89.3 | 8.7 | 1.9 | 46 | 93.5 | 2.2 | 4.3 | 57 | 86.0 | 14.0 | — |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 91.4 | 5.9 | 2.7 | 59 | 91.5 | 6.8 | 1.7 | 128 | 91.4 | 5.5 | 3.1 |
| Nonpoverty | 80 | 98.7 | 1.3 | — | 28 | 100.0 | — | — | 52 | 98.1 | 1.9 | — |
| All poverty areas | 705 | 89.7 | 8.3 | 2.0 | 292 | 91.2 | 6.2 | 2.6 | 413 | 88.7 | 9.9 | 1.4. |

135

TABLE 14. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If plate glass insurance is carried, do you have desired amounts?

| City | Total | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 54 | 94.4 | 5.6 | — | 29 | 96.5 | 3.4 | — | 25 | 92.0 | 8.0 | — |
| Cleveland | 60 | 98.4 | — | 1.7 | 30 | 100.0 | — | — | 30 | 96.7 | — | 3.3 |
| Detroit | 86 | 91.9 | 4.7 | 3.5 | 35 | 97.1 | 2.9 | — | 51 | 88.2 | 5.9 | 5.9 |
| Newark | 76 | 93.4 | 6.6 | — | 31 | 90.3 | 9.7 | — | 45 | 95.5 | 4.4 | — |
| St. Louis | 72 | 95.8 | 1.4 | 2.8 | 41 | 95.1 | 2.4 | 2.4 | 31 | 96.8 | — | 3.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 138 | 92.0 | 7.2 | .7 | 47 | 87.2 | 10.6 | 2.1 | 91 | 94.5 | 5.5 | — |
| Nonpoverty | 69 | 97.1 | 2.9 | — | 23 | 100.0 | — | — | 46 | 95.7 | 4.3 | — |
| All poverty areas | 486 | 94.3 | 4.2 | 1.5 | 213 | 94.4 | 4.8 | .8 | 273 | 94.0 | 4.0 | 2.0 |

TABLE 15. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Did you contact more than 1 agent to buy your fire insurance?

| City | Total | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 160 | 27.5 | 70.0 | 2.4 | 88 | 31.8 | 65.9 | 2.2 | 72 | 22.2 | 75.0 | 2.8 |
| Cleveland | 168 | 12.0 | 87.5 | .5 | 71 | 11.3 | 88.7 | — | 97 | 12.4 | 86.6 | 1.0 |
| Detroit | 183 | 13.1 | 82.0 | 4.9 | 79 | 7.6 | 91.2 | 1.3 | 104 | 17.3 | 75.0 | 7.7 |
| Newark | 167 | 16.8 | 77.2 | 6.0 | 79 | 20.2 | 75.9 | 3.9 | 88 | 13.6 | 78.4 | 7.9 |
| St. Louis | 178 | 23.0 | 74.2 | 2.8 | 89 | 21.3 | 73.0 | 5.6 | 89 | 24.7 | 75.3 | — |
| Oakland: | | | | | | | | | | | | |
| Poverty | 250 | 14.8 | 81.2 | 4.0 | 84 | 11.9 | 86.9 | 1.2 | 166 | 16.3 | 78.3 | 5.4 |
| Nonpoverty | 94 | 8.5 | 91.4 | — | 33 | 12.1 | 87.9 | — | 61 | 6.6 | 93.4 | — |
| All poverty areas | 1,106 | 17.9 | 78.7 | 3.4 | 490 | 17.4 | 80.3 | 2.3 | 616 | 17.8 | 78.1 | 4.1 |

136

## TABLE 16. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Have you ever had your property inspected by an agent or company as a condition for obtaining fire insurance? If in Boston, has your property ever been inspected under the Boston Plan as a condition for obtaining fire insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 247 | 28.3 | 67.6 | 4.0 | 111 | 31.5 | 63.1 | 5.4 | 136 | 25.7 | 71.3 | 2.9 |
| Cleveland | 213 | 56.8 | 33.8 | 9.4 | 77 | 63.7 | 33.8 | 2.6 | 136 | 52.9 | 33.8 | 13.2 |
| Detroit | 233 | 55.8 | 21.9 | 22.3 | 91 | 61.5 | 20.9 | 17.6 | 142 | 52.1 | 22.5 | 25.4 |
| Newark | 186 | 75.8 | 18.8 | 5.4 | 82 | 79.2 | 15.8 | 4.8 | 104 | 73.1 | 21.2 | 5.8 |
| St. Louis | 242 | 67.4 | 24.8 | 7.9 | 98 | 82.6 | 9.2 | 8.1 | 144 | 56.9 | 35.4 | 7.7 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 272 | 70.2 | 27.2 | 2.6 | 87 | 80.5 | 18.4 | 1.1 | 185 | 65.4 | 31.3 | 3.2 |
| Nonpoverty | 101 | 90.1 | 4.0 | 5.9 | 33 | 97.0 | 3.0 | — | 68 | 86.8 | 4.4 | 8.8 |
| All poverty areas | 1,393 | 59.1 | 32.4 | 8.5 | 546 | 66.5 | 26.9 | 6.6 | 847 | 54.4 | 35.9 | 9.7 |

## TABLE 17.—BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If your property was not inspected under the Boston Plan, why wasn't it? [1]

| City | Total [1] | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Not aware of plan | Got insurance without it | Other | Number | Not aware of plan | Got insurance without it | Other | Number | Not aware of plan | Got insurance without it | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston only | 167 | 46.7 | 31.1 | 27.6 | 70 | 44.3 | 35.7 | 30.0 | 97 | 48.5 | 27.8 | 25.7 |

[1] Total may exceed 100 percent because of multiple responses.

## TABLE 18. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If your property was inspected by an insurance agent or company, did the inspection result in getting the fire insurance you wanted? If inspected under the Boston Plan, did it result in getting the fire insurance you wanted?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number responses | Yes | No | Other | Number responses | Yes | No | Other | Number responses | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 70 | 61.4 | 34.3 | 4.3 | 35 | 80.0 | 20.0 | — | 35 | 42.9 | 48.6 | 8.6 |
| Cleveland | — | — | — | — | — | — | — | — | — | — | — | — |
| Detroit | — | — | — | — | — | — | — | — | — | — | — | — |
| Newark | 141 | 89.4 | 10.6 | — | 65 | 92.3 | 7.7 | — | 76 | 86.8 | 13.2 | — |
| St. Louis | 163 | 94.5 | 4.9 | .6 | 81 | 96.3 | 3.7 | — | 82 | 92.7 | 6.1 | 1.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 191 | 93.2 | 4.7 | 2.1 | 70 | 92.9 | 5.7 | 1.4 | 121 | 93.4 | 4.1 | 2.5 |
| Nonpoverty | 91 | 98.9 | 1.1 | — | 32 | 96.9 | 3.1 | — | 59 | 100.0 | — | — |
| All poverty areas | 565 | 84.6 | 13.6 | 1.8 | 251 | 90.4 | 9.3 | .3 | 314 | 78.9 | 18.0 | 3.1 |

**137**

## TABLE 19. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If the property was inspected, did the inspection require property improvement?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 70 | 25.7 | 68.6 | 5.7 | 35 | 34.3 | 62.9 | 2.9 | 35 | 17.1 | 74.3 | 8.6 |
| Cleveland | 121 | 10.7 | 89.3 | — | 49 | 8.2 | 91.8 | — | 72 | 12.5 | 87.5 | — |
| Detroit | 130 | 8.5 | 91.5 | — | 56 | 12.5 | 87.5 | — | 74 | 5.4 | 94.6 | — |
| Newark | 141 | 12.8 | 87.2 | — | 65 | 16.9 | 83.1 | — | 76 | 9.2 | 90.7 | — |
| St. Louis | 163 | 9.8 | 87.1 | 3.1 | 81 | 9.9 | 88.9 | 1.2 | 82 | 9.8 | 85.4 | 4.9 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 191 | 12.6 | 86.4 | 1.0 | 70 | 14.3 | 85.7 | — | 121 | 11.6 | 86.8 | 1.7 |
| Nonpoverty | 91 | 3.3 | 96.7 | — | 32 | — | 100.0 | — | 59 | 5.1 | 94.9 | — |
| All poverty areas | 816 | 13.4 | 85.0 | 1.6 | 356 | 16.0 | 83.3 | .7 | 460 | 10.9 | 86.6 | 2.5 |

cated that they had signed such a statement. (See Table 21). The difference may mean that more people believe they are paying excess rates than is the case, or it may mean that people are unaware of the significance of waivers they are asked to sign.

## What Problems Are Encountered After Insurance Is Obtained?

Market conditions were also tested by measuring the impact of cancellation on the three lines of insurance studied. The measurements are somewhat understated for the figures pertaining to fire and extended coverage, because they exclude policyholders who were cancelled but were able to replace their insurance. For all lines of insurance, non-renewals are excluded.

Cancellations can be analyzed according to two different measures: (1) the cancellation rate of those currently or previously insured; and (2) the cancellation rate of uninsureds.

The first measure indicates the number of insureds over a three year period affected by cancellation. The second measure indicates the number uninsured because of cancellation.

## TABLE 20. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If you carry fire and extended coverage insurance, do you pay the regular rate, less than regular, or more than regular?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 160 | 41.5 | 4.9 | 53.6 | 88 | 40.6 | 5.7 | 53.6 | 72 | 42.5 | 3.7 | 53.7 |
| Cleveland | 168 | 63.7 | 8.0 | 28.2 | 71 | 68.7 | 7.8 | 23.5 | 97 | 59.6 | 8.1 | 32.2 |
| Detroit | 183 | 77.4 | 4.7 | 17.9 | 79 | 76.7 | 7.2 | 16.1 | 104 | 78.1 | 2.7 | 19.2 |
| Newark | 167 | 73.8 | 3.7 | 22.4 | 79 | 67.7 | 2.9 | 29.4 | 88 | 80.3 | 4.5 | 15.2 |
| St. Louis | 178 | 70.5 | 14.3 | 15.2 | 89 | 71.2 | 15.2 | 13.6 | 89 | 69.8 | 13.3 | 16.9 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 250 | 74.0 | 13.8 | 12.2 | 84 | 78.7 | 4.3 | 17.0 | 166 | 80.8 | 7.7 | 11.5 |
| Nonpoverty | 94 | 89.4 | 1.2 | 9.4 | 33 | 90.0 | — | 10.0 | 61 | 89.1 | 1.8 | 9.1 |
| All Poverty Areas | 1,106 | 66.8 | 8.2 | 24.9 | 490 | 67.3 | 7.1 | 25.5 | 616 | 68.5 | 6.7 | 24.8 |

138

## TABLE 21. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Did you have to sign an affidavit or waiver, or any statement to obtain your fire insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 160 | 17.5 | 79.4 | 3.1 | 88 | 17.0 | 79.5 | 3.4 | 72 | 18.1 | 79.2 | 2.8 |
| Cleveland | 168 | 3.0 | 92.9 | 4.1 | 71 | 1.4 | 94.3 | 4.2 | 97 | 4.1 | 91.8 | 4.1 |
| Detroit | 183 | 6.6 | 89.6 | 3.8 | 79 | 1.3 | 97.5 | 1.3 | 104 | 10.6 | 83.7 | 5.8 |
| Newark | 167 | 6.6 | 86.2 | 7.2 | 79 | 5.1 | 89.8 | 5.1 | 88 | 8.0 | 82.9 | 9.1 |
| St. Louis | 178 | 3.4 | 91.0 | 5.6 | 89 | 2.2 | 91.0 | 6.7 | 89 | 4.5 | 91.0 | 4.5 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 250 | 2.8 | 92.0 | 5.2 | 84 | 3.6 | 91.7 | 4.8 | 166 | 2.4 | 92.2 | 5.4 |
| Nonpoverty | 94 | 3.2 | 96.7 | — | 33 | 3.0 | 97.0 | — | 59 | 3.3 | 96.7 | — |
| All poverty areas | 1,106 | 6.7 | 88.5 | 4.8 | 490 | 5.1 | 90.6 | 4.3 | 616 | 8.0 | 86.8 | 5.2 |

*Impact of Cancellations on Insureds.* The ratio of cancellations applies to those insured at any time during the last three years.

There were no reported fire cancellations in Oakland. Elsewhere the proportion of cancellations ranged from 2 to 10 percent of the insured group. (See Line 6 of Table 22.)

The cancellation rates for burglary and theft were at least 10 percent in all areas other than Oakland. (See Line 8 of Table 23.)

The plate glass cancellation rates ranged from less than 6 percent in the Oakland poverty area to over 27 percent in Boston. (See Line 8 of Table 24.)

*Cancellation as a Cause of Being Uninsured.* In four of the six poverty areas, those who were uninsured because of cancellation during the last three years ranged from 18 to 21 percent for fire and extended coverage (see Line 4 of Table 22), 5 to 13 percent for burglary and theft (see Line

## TABLE 22. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Estimated cancellation rates for fire and extended coverage insurance for business firms and institutions in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|---|---|---|---|---|---|---|---|
| 1. Total number of business firms and institutions currently insured | 160 | 168 | 183 | 167 | 178 | 250 | 1,106 |
| 2. Total number of uninsured business firms and institutions | 87 | 45 | 50 | 19 | 59 | 22 | 282 |
| 3. Number of uninsured business firms and institutions reporting cancellations within the last 3 years | 18 | 8 | 9 | 4 | 5 | — | 44 |
| | | | | Percent | | | |
| 4. $\dfrac{\text{Total number of uninsured reporting cancellations}}{\text{Total number of uninsured}} \times 100$  [(Item 3)÷(Item 2)]×100 | 20.7 | 17.8 | 18.0 | 21.1 | 8.5 | — | 14.4 |
| 5. $\dfrac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured} + \text{Total number uninsured}} \times 100$  [[(Item 3)÷[(Item 1)+(Item 2)]×100 | 7.3 | 3.8 | 3.9 | 2.2 | 2.1 | — | 3.2 |
| 6. $\dfrac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured} + \text{Total number uninsured reporting cancellations}} \times 100$  [[(Item 3)÷[(Item 1)+(Item 3)]]×100 | 10.1 | 4.5 | 4.7 | 2.3 | 2.7 | — | 4.1 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

6 of Table 23), and 8 to 10 percent for plate glass (see Line 6 of Table 24).

*Relation of Claims and Cancellation.* About 8 percent of insured businesses reported that their premiums had been raised after they submitted a burglary or theft claim (see Table 25) ; 5 percent reported cancellation after submitting a claim. (See Table 26).

Businessmen were also asked how fear of cancellation influenced their submission of burglary and theft claims. About 9 percent reported that they had not submitted at least one claim within the last three years because of fear of cancellation. This ranged from 4 percent in the Oakland poverty area to 16 percent in Detroit. (See Table 27). About 8 percent of businessmen reported they had not submitted a plate glass claim because of fear of cancellation.

In order to better evaluate responses relating to the effect of cancellations, policyholders were asked how many burglary and theft claims they had submitted in the last three years. About 76 percent reported none, while 22 percent reported one or more.

## TABLE 23. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Estimated cancellation rates for burglary and theft insurance for business firms and institutions in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|---|---|---|---|---|---|---|---|
| 1. Total number of business firms and institutions currently insured.... | 63 | 114 | 130 | 108 | 103 | 187 | 705 |
| 2. Total number of uninsured business firms and institutions.......... | 183 | 98 | 103 | 70 | 135 | 83 | 672 |
| 3. Number of insured business firms and institutions that reported cancellations within the last 3 years............................... | 3 | 6 | 6 | 6 | 9 | 5 | 35 |
| 4. Number of uninsured business firms and institutions reporting cancellations within the last 3 years................................ | 9 | 6 | 12 | 9 | 2 | — | 38 |
| 5. Total number of business firms and institutions that had burglary and theft insurance within the last 3 years: (Item 1) + (Item 4)................................................ | 72 | 120 | 142 | 117 | 105 | 187 | 743 |
| | Percent | | | | | | |
| 6. $\dfrac{\text{Total number of uninsureds reporting cancellations}}{\text{Total number of uninsureds}} \times 100$ [(Item 4) ÷ (Item 2)] ×100................................. | 4.9 | 6.1 | 11.7 | 12.9 | 1.5 | — | 6.2 |
| 7. $\dfrac{\text{Total number of insureds re-} + \text{Total number of uninsureds re-}}{\text{porting cancellations}\qquad\text{porting cancellations}} \times 100$ $\dfrac{}{\text{Total number insureds} + \text{Total number uninsureds}}$ [[(Item 3)+(Item 4)] ÷ [(Item 1)+(Item 2)]] ×100................. | 4.9 | 5.7 | 7.7 | 8.4 | 4.6 | 1.9 | 5.5 |
| 8. $\dfrac{\text{Total number of insureds re-} + \text{Total number of uninsureds re-}}{\text{porting cancellations}\qquad\text{porting cancellations}} \times 100$ $\dfrac{}{\text{Total number that had insurance}}$ [[(Item 3)+(Item 4)] ÷ [(Item 5)]] ×100.......................... | 16.7 | 10.0 | 12.7 | 12.8 | 10.5 | 2.7 | 10.9 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

## TABLE 24. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Estimated cancellation rates for plate glass insurance for business firms and institutions in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|---|---|---|---|---|---|---|---|
| 1. Total number of business firms and institutions currently insured | 54 | 60 | 86 | 76 | 72 | 138 | 486 |
| 2. Total number of uninsured business firms and institutions | 193 | 153 | 147 | 104 | 163 | 131 | 891 |
| 3. Number of insured business firms and institutions that reported cancellations within the last 3 years | 1 | 0 | 4 | 2 | 3 | 7 | 17 |
| 4. Number of uninsured business firms and institutions reporting cancellations within the last 3 years | 19 | 12 | 13 | 8 | 3 | 1 | 56 |
| 5. Total number of business firms and institutions that had plate glass insurance within the last 3 years (Item 1) + (Item 4) | 73 | 72 | 99 | 84 | 75 | 139 | 542 |
| | | | | Percent | | | |
| 6. $\dfrac{\text{Total number of uninsureds reporting cancellations}}{\text{Total number of uninsureds}} \times 100$ [(Item 4) ÷ (Item 2)] × 100 | 9.8 | 7.8 | 8.8 | 7.7 | 1.8 | .8 | 6.1 |
| 7. $\dfrac{\text{Total number of insureds reporting cancellations} + \text{Total number of uninsureds reporting cancellations}}{\text{Total number insureds} + \text{Total number uninsureds}} \times 100$ [(Item 3) + (Item 4)] ÷ [(Item 1) + (Item 2)]] × 100 | 8.1 | 5.6 | 7.3 | 5.6 | 2.6 | 3.0 | 5.4 |
| 8. $\dfrac{\text{Total number of insureds reporting cancellations} + \text{Total number of uninsureds reporting cancellations}}{\text{Total number that had insurance}} \times 100$ [(Item 3) + (Item 4)] ÷ (Item 5)] × 100 | 27.4 | 16.7 | 17.2 | 11.9 | 8.0 | 5.8 | 14.5 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

## TABLE 25. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Have your premiums for burglary and theft insurance been raised within the last 3 years after submitting a claim?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 4.8 | 90.5 | 4.8 | 35 | — | 94.3 | 5.7 | 28 | 10.7 | 85.7 | 3.6 |
| Cleveland | 114 | 6.1 | 93.0 | .9 | 45 | 4.4 | 93.3 | 2.2 | 69 | 7.2 | 92.7 | — |
| Detroit | 130 | 11.5 | 88.5 | — | 57 | 8.8 | 91.2 | — | 73 | 13.7 | 86.3 | — |
| Newark | 108 | 9.3 | 81.0 | 10.3 | 50 | 10.0 | 80.0 | 10.0 | 58 | 8.6 | 81.0 | 10.3 |
| St. Louis | 103 | 6.8 | 87.4 | 5.8 | 46 | 8.7 | 80.4 | 10.8 | 57 | 5.3 | 93.0 | 1.8 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 7.5 | 87.2 | 5.3 | 59 | 6.8 | 91.5 | 1.7 | 128 | 7.8 | 85.2 | 7.0 |
| Nonpoverty | 80 | 5.0 | 93.7 | 1.3 | 28 | 3.6 | 96.4 | — | 52 | 5.8 | 92.3 | 1.9 |
| All poverty areas | 705 | 7.6 | 87.9 | 4.5 | 292 | 6.5 | 88.4 | 5.1 | 413 | 8.9 | 87.3 | 3.8 |

141

TABLE 26. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Has your burglary and theft insurance been canceled within the last 3 years after submitting a claim?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 4.8 | 90.5 | 4.8 | 35 | 5.7 | 88.6 | 5.7 | 28 | 3.6 | 92.9 | 3.6 |
| Cleveland | 114 | 5.3 | 94.7 | — | 45 | 4.4 | 95.6 | — | 69 | 5.8 | 94.2 | — |
| Detroit | 130 | 4.6 | 95.4 | — | 57 | 5.3 | 94.7 | — | 73 | 4.1 | 96.0 | — |
| Newark | 108 | 5.6 | 92.6 | 1.9 | 50 | 6.0 | 90.0 | 4.0 | 58 | 5.2 | 94.8 | — |
| St. Louis | 103 | 8.7 | 88.4 | 2.9 | 46 | 17.4 | 78.3 | 4.3 | 57 | 1.8 | 96.5 | 1.8 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 2.7 | 95.2 | 2.1 | 59 | 1.7 | 98.3 | — | 128 | 3.1 | 93.8 | 3.1 |
| Nonpoverty | 80 | 3.8 | 96.2 | — | 28 | 3.6 | 96.4 | — | 52 | 3.8 | 96.2 | — |
| All poverty areas | 705 | 5.3 | 92.8 | 1.9 | 292 | 6.8 | 90.9 | 2.3 | 413 | 3.9 | 94.7 | 1.4 |

TABLE 27. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Have you had, within the last 3 years, a burglary or theft claim which you did not submit because of fear of cancellation?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 7.9 | 87.3 | 4.8 | 35 | 11.4 | 82.9 | 5.7 | 28 | 3.6 | 92.9 | 3.6 |
| Cleveland | 114 | 7.0 | 93.0 | — | 45 | — | 100.0 | — | 69 | 11.6 | 88.4 | — |
| Detroit | 130 | 16.1 | 83.8 | — | 57 | 19.3 | 80.7 | — | 73 | 13.7 | 86.3 | — |
| Newark | 108 | 13.0 | 85.2 | 1.9 | 50 | 20.0 | 78.0 | 2.0 | 58 | 6.9 | 91.4 | 1.7 |
| St. Louis | 103 | 3.9 | 93.2 | 2.9 | 46 | 4.3 | 91.3 | 4.3 | 57 | 3.5 | 94.7 | 1.8 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 3.7 | 95.2 | 1.1 | 59 | 1.7 | 98.3 | — | 128 | 4.7 | 93.8 | 1.6 |
| Nonpoverty | 80 | 5.0 | 95.0 | — | 28 | — | 100.0 | — | 52 | 7.7 | 92.3 | — |
| All poverty areas | 705 | 8.6 | 89.6 | 1.7 | 292 | 9.5 | 88.5 | 2.0 | 413 | 7.3 | 91.2 | 1.5 |

# B. Insurance for Dwellings

### Do Homeowners Have Insurance?

Owners of houses and apartment buildings in poverty areas were asked: "Do you have a package policy covering fire and extended coverage and burglary and theft, or do you carry only fire and extended coverage insurance?" Almost half had no package policy; and about 7 percent of them had no fire and extended coverage insurance. The results varied from poverty area to poverty area, with Detroit having the highest rate of uninsured (12.2 percent) and Oakland the lowest (1.6 percent). (See Table 28.)

Absentee owners are more often uninsured (8.9 percent) than owners who occupy their property (5.2 percent). While the percentage of uninsured may seem low, it is much higher than in the nonpoverty area of Oakland, where all dwelling units had at least fire and extended coverage insurance. Moreover, in the nonpoverty area of Oakland 83 percent of property owners had a package policy, whereas only 50 percent had such policies in the poverty areas we surveyed.

## TABLE 28. DWELLINGS

Do you have a package policy covering fire and extended coverage and burglary and theft or do you carry fire and extended coverage insurance (FEC)?

| City | Total | | | | | Owner-occupants | | | | | Absentee owners | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Interviews | Home-owners package | FEC | Unin-sured | Other | Number of Interviews | Home-owners package | FEC | Unin-sured | Other | Number of Interviews | Home-owners package | FEC | Unin-sured | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 233 | 39.9 | 55.3 | 4.7 | | 174 | 46.0 | 50.0 | 4.0 | | 59 | 22.0 | 71.2 | 6.8 | |
| Cleveland | 327 | 40.7 | 50.8 | 8.3 | .2 | 194 | 52.1 | 42.3 | 5.7 | | 133 | 24.1 | 63.2 | 12.0 | .7 |
| Detroit | 288 | 55.2 | 32.6 | 12.2 | | 256 | 58.2 | 29.7 | 12.1 | | 32 | 31.2 | 56.3 | 12.5 | |
| Newark | 98 | 58.2 | 38.8 | 3.0 | | 53 | 79.2 | 17.0 | 3.8 | | 45 | 33.3 | 64.4 | 2.3 | |
| St. Louis | 197 | 49.7 | 41.1 | 9.1 | | 123 | 68.3 | 26.8 | 4.9 | | 74 | 18.9 | 64.8 | 16.2 | |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 306 | 57.5 | 40.9 | 1.6 | | 202 | 67.8 | 31.7 | .5 | | 104 | 37.5 | 58.7 | 3.8 | |
| Nonpoverty | 88 | 83.0 | 17.0 | — | | 79 | 87.3 | 12.7 | — | | 9 | 44.4 | 55.6 | — | |
| All poverty areas | 1,449 | 50.2 | 43.3 | 6.5 | | 1,002 | 61.9 | 32.9 | 5.2 | | 447 | 27.8 | 63.1 | 8.9 | .1 |

TABLE 29. DWELLINGS

If you do not carry fire insurance, what are the reasons?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Number of uninsureds | Problem of cost | Problem of availability | No problem reported |
| | | percent | percent | percent | | percent | percent | percent | | percent | percent | percent |
| Boston | 11 | 27.3 | 54.5 | 18.1 | 7 | 28.6 | 57.1 | 14.3 | 4 | 25.0 | 50.0 | 25.0 |
| Cleveland | 26 | 19.2 | 65.4 | 15.4 | 11 | 18.2 | 63.6 | 18.2 | 15 | 20.0 | 66.7 | 13.3 |
| Detroit | 35 | 42.9 | 51.4 | 5.7 | 31 | 38.7 | 54.8 | 6.5 | 4 | 75.0 | 25.0 | — |
| St. Louis | 18 | 22.2 | 50.0 | 27.8 | 6 | 33.3 | 50.0 | 16.7 | 12 | 25.0 | 50.0 | 25.0 |
| All | 90 | 27.9 | 55.3 | 16.8 | 55 | 29.7 | 56.4 | 13.9 | 35 | 36.3 | 47.9 | 15.8 |

NOTE: Newark and Oakland have been excluded because of small number of uninsureds.

## Why Don't Homeowners Have Insurance?

We asked those who were uninsured why they did not carry fire and extended coverage insurance; 55 percent indicated it was a problem of availability and 28 percent said that the insurance cost too much. The remaining 17 percent had either voluntarily cancelled their insurance or had not tried to obtain it. (See Table 29).

## Do Homeowners Who Are Insured Have the Right Amount of Insurance?

We asked, "If fire insurance is carried, do you have the amount wanted?" Overall, 15 percent of those in the poverty areas said they had less fire insurance than they wanted. In Newark, over 40 percent of the absentee owners said they had less fire insurance than they wanted.

In the nonpoverty area of Oakland, only 7 percent of property owners said they had less coverage than desired and close to 5 percent had more insurance than they wanted. (See Table 30).

Over half of those who had less fire insurance than they wanted said it was too expensive to buy the desired amounts, and about one-third mentioned company restrictions as the reason for being underinsured. In Detroit and Newark over 58 percent of those who owned their own homes gave company restrictions as the reason for underinsurance. (See Table 31).

TABLE 30. DWELLINGS

If fire insurance is carried, do you have amount wanted, less than wanted, or more than wanted?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 222 | 75.0 | 21.8 | 3.2 | 167 | 74.5 | 23.1 | 2.4 | 55 | 75.9 | 18.5 | 5.5 |
| Cleveland | 300 | 83.7 | 15.0 | 1.3 | 183 | 86.6 | 11.7 | 1.7 | 117 | 78.9 | 20.2 | .9 |
| Detroit | 253 | 89.7 | 7.5 | 2.8 | 225 | 89.7 | 7.6 | 2.7 | 28 | 89.3 | 7.1 | 3.6 |
| Newark | 95 | 74.0 | 22.8 | 3.2 | 5 | 91.9 | 6.1 | 2.0 | 44 | 52.4 | 42.8 | 4.7 |
| St. Louis | 179 | 88.3 | 8.4 | 3.4 | 117 | 88.0 | 7.7 | 4.3 | 62 | 88.7 | 9.7 | 1.6 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 301 | 84.5 | 14.2 | 1.3 | 201 | 84.9 | 14.0 | 1.1 | 100 | 83.5 | 14.4 | 2.1 |
| Nonpoverty | 88 | 88.4 | 7.0 | 4.6 | 79 | 88.4 | 6.4 | 5.2 | 9 | 87.5 | 12.5 | — |
| All poverty areas | 1,350 | 82.5 | 15.0 | 2.5 | 944 | 85.7 | 11.7 | 2.6 | 406 | 78.1 | 18.7 | 3.2 |

## TABLE 31. DWELLINGS

If you carry less fire insurance than you want, what are the reasons?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of under-insureds | Too ex-pensive | Company restrictions | Other | Number of under-insureds | Too ex-pensive | Company restrictions | Other | Number of under-insureds | Too ex-pensive | Company restrictions | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 48 | 51.1 | 31.9 | 17.0 | 38 | 50.0 | 31.6 | 18.4 | 10 | 50.0 | 30.0 | 20.0 |
| Cleveland | 44 | 54.5 | 34.1 | 11.4 | 21 | 38.1 | 47.6 | 14.3 | 23 | 69.6 | 21.7 | 8.6 |
| Detroit | 19 | 36.8 | 52.6 | 10.5 | 17 | 29.4 | 58.8 | 11.8 | 2 | 100.0 | — | — |
| Newark | 21 | 61.9 | 38.1 | — | 3 | 33.3 | 66.7 | — | 18 | 66.7 | 33.3 | — |
| St. Louis | 15 | 73.3 | 13.3 | 13.3 | 9 | 77.7 | 11.1 | 11.1 | 6 | 66.7 | 16.7 | 16.7 |
| Oakland: Poverty | 42 | 50.0 | 26.2 | 23.8 | 28 | 53.6 | 14.3 | 32.1 | 14 | 42.9 | 50.0 | 7.1 |
| All poverty areas | 189 | 54.6 | 32.7 | 12.7 | 116 | 47.0 | 38.4 | 14.6 | 73 | 66.0 | 25.3 | 8.7 |

Note: The nonpoverty area of Oakland is excluded because of the small number of underinsured.

### How Do Homeowners Obtain Insurance?

To determine what additional problems property owners in poverty areas have in obtaining insurance, we asked them whether they had to make contact with more than one agent or broker to buy their insurance. Overall close to 15 percent said they had made contact with more than one producer. (See Table 32).

### Was Property Inspected?

We also asked how many property owners had had their properties inspected as a condition of obtaining insurance. In areas lacking Urban Area Plans, inspections are normally carried out by the producer or the company.

In Boston, Cleveland, and Detroit we asked whether properties were inspected under the local Urban Area Plan. The responses contrasted with independent and more accurate data we had secured on inspections actually performed under these plans. They indicate that the property owner was often unaware whether his property was being inspected under the plan. Therefore, we believe that the responses to the question in these cities should be interpreted to indicate whether the owner believed his property was inspected before he obtained insurance, either under the plan or otherwise.

About 50 percent of the property owners said they had their properties inspected in the poverty areas, only 25 percent of owners said they had their property inspected in the nonpoverty area of Oakland. (See Table 33).

## TABLE 32. DWELLINGS

Did you contact more than 1 agent to buy your fire insurance?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 222 | 18.5 | 79.3 | 2.3 | 167 | 16.1 | 82.0 | 1.8 | 55 | 25.4 | 71.0 | 3.6 |
| Cleveland | 300 | 11.0 | 88.7 | .3 | 183 | 3.3 | 96.2 | .6 | 117 | 23.1 | 76.9 | — |
| Detroit | 253 | 7.1 | 92.9 | — | 225 | 7.6 | 92.4 | — | 28 | 3.6 | 96.4 | — |
| Newark | 95 | 31.6 | 67.4 | 1.1 | 51 | 18.0 | 80.4 | 2.0 | 44 | 48.1 | 52.1 | — |
| St. Louis | 179 | 11.7 | 85.5 | 2.8 | 117 | 8.5 | 88.9 | 2.6 | 62 | 17.7 | 79.0 | 3.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 301 | 8.3 | 90.4 | 1.3 | 201 | 6.5 | 91.5 | 2.0 | 100 | 12.0 | 88.0 | — |
| Nonpoverty | 88 | 4.5 | 95.5 | — | 79 | 5.1 | 94.9 | — | 9 | — | 100.0 | — |
| All poverty areas | 1,350 | 14.7 | 84.1 | 1.3 | 944 | 10.0 | 88.6 | 1.4 | 406 | 21.7 | 77.2 | 1.1 |

145

## Table 33. Dwellings

Have you ever had your property inspected under the (Boston) (Cleveland) (Michigan) fire insurance inspection plan? If not located in Boston, Cleveland, or Detroit, has your property been inspected by an insurance agent or company in connection with a request for fire insurance?

| City | Total | | | | Owners-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 233 | 39.5 | 45.5 | 15.1 | 174 | 36.2 | 50.0 | 13.8 | 59 | 49.1 | 32.2 | 18.6 |
| Cleveland | 327 | 44.0 | 51.1 | 4.9 | 194 | 40.7 | 55.2 | 4.1 | 133 | 48.9 | 45.1 | 6.0 |
| Detroit | 288 | 42.4 | 41.3 | 16.3 | 256 | 42.6 | 41.4 | 16.0 | 32 | 40.6 | 40.6 | 18.8 |
| Newark | 98 | 67.3 | 32.7 | — | 53 | 60.4 | 39.6 | — | 45 | 75.6 | 24.4 | — |
| St. Louis | 197 | 52.8 | 38.6 | 8.6 | 123 | 47.2 | 48.8 | 4.0 | 74 | 62.1 | 21.6 | 16.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 306 | 56.2 | 42.5 | 1.3 | 202 | 57.9 | 41.1 | 1.0 | 104 | 52.9 | 45.2 | 1.9 |
| Nonpoverty | 88 | 25.0 | 72.8 | 2.2 | 79 | 22.8 | 75.9 | 1.3 | 9 | 44.4 | 44.4 | 11.2 |
| All poverty areas | 1,449 | 50.4 | 42.0 | 7.7 | 100 | 47.5 | 46.1 | 6.5 | 447 | 54.9 | 34.9 | 10.2 |

In Boston, Cleveland, and Detroit we asked owners who had not had their property inspected why it had not been inspected under the plan. The response indicated that a substantial number of owners were unaware of the existence of the plan; and an additional 67 percent said they had not needed an inspection to obtain insurance. (See Table 34).

We asked those whose properties had been inspected whether inspection had resulted in their obtaining the insurance they wanted. Over 75 percent answered affirmatively. (See Table 35).

We also asked property owners whether they were required to make property improvements as the result of the inspection before obtaining insurance. Twenty-two percent indicated they were. (See Table 36).

We then asked these owners whether they had made the requested improvements, and about 85 percent said they had. (See Table 37).

When the property owner failed to make the requested improvements, we asked why. Most indicated that they obtained insurance without making the improvements, although a substantial number did not respond to the question.

### How Much Do Homeowners Pay for Insurance?

To determine the property owners' knowledge and reaction to the price they were paying for insurance we asked whether they paid more or less than regular (or standard) rates for fire and extended coverage insurance.

About 23 percent of those in poverty areas, as

## TABLE 34. Dwellings

If property was not inspected under the (Boston) (Cleveland) (Michigan) plan, why wasn't it?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Not aware of plan | Got insurance without it | Other | Number of responses | Not aware of plan | Got insurance without it | Other | Number of responses | Not aware of plan | Got insurance without it | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 108 | 22.2 | 69.4 | 8.4 | 89 | 24.7 | 69.7 | 5.6 | 19 | 10.5 | 68.4 | 21.1 |
| Cleveland | 180 | 29.4 | 62.8 | 7.8 | 116 | 30.2 | 64.7 | 5.1 | 64 | 28.1 | 59.4 | 12.5 |
| Detroit | 119 | 16.8 | 68.1 | 15.1 | 106 | 17.0 | 69.8 | 13.2 | 13 | 15.4 | 53.8 | 30.8 |
| All poverty areas | 407 | 22.8 | 66.8 | 10.4 | 311 | 24.0 | 67.9 | 8.0 | 96 | 18.0 | 60.5 | 21.5 |

146

## TABLE 35. DWELLINGS

If your property was inspected under the (Boston) (Cleveland) (Michigan) plan, did the inspection result in getting the fire insurance you wanted? If not located in Boston, Cleveland, or Detroit, did the inspection result in getting the fire insurance you wanted?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 92 | 79.3 | 20.6 | — | 63 | 77.8 | 22.2 | — | 29 | 82.8 | 17.2 | — |
| Cleveland | 144 | 57.6 | 37.5 | 4.9 | 79 | 59.5 | 38.0 | 2.5 | 65 | 55.4 | 36.9 | 7.7 |
| Detroit | 122 | 68.9 | 31.1 | — | 109 | 69.7 | 30.3 | — | 13 | 61.5 | 38.5 | — |
| Newark | 66 | 89.4 | 10.6 | — | 32 | 90.6 | 9.4 | — | 34 | 88.2 | 11.8 | — |
| St. Louis | 104 | 79.8 | 16.3 | 3.8 | 58 | 87.9 | 10.3 | 1.7 | 46 | 69.5 | 23.9 | 6.5 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 172 | 83.7 | 9.9 | 6.4 | 117 | 83.8 | 10.3 | 6.0 | 55 | 83.6 | 9.1 | 7.3 |
| Nonpoverty | 22 | 95.5 | 4.5 | — | 18 | 94.4 | 5.6 | — | 4 | 100.0 | — | — |
| All poverty areas | 700 | 76.5 | 21.0 | 2.5 | 458 | 78.2 | 20.1 | 1.7 | 242 | 73.5 | 22.9 | 3.6 |

opposed to 4 percent in the Oakland nonpoverty area, said that they were paying more than regular rates. About 4 percent in the poverty areas and about 9 percent in the Oakland nonpoverty area said they were paying less. (See Table 38).

The foregoing responses should not necessarily be interpreted to mean that property owners actually paid more than the regular rate for their insurance, since the question is highly technical.

Owners normally would sign a waiver, affidavit, or similar statement indicating their consent or knowledge that they are paying more than the regular rate. The smaller percentage who indicated that they had signed these statements (see Table 39) may be evidence that more people believe they are paying more than rgular rates than is probably the case, or that people are not fully aware of the meaning of waivers signed.

## TABLE 36. DWELLINGS

If the property was inspected under the (Boston) (Cleveland) (Michigan) plan did the inspection require property improvement? If not located in Boston, Cleveland, or Detroit, did the inspection require property improvement?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 92 | 27.2 | 65.2 | 7.6 | 63 | 20.6 | 68.2 | 11.1 | 29 | 41.4 | 58.6 | — |
| Cleveland | 144 | 16.0 | 81.2 | 2.8 | 79 | 15.2 | 82.3 | 2.6 | 65 | 16.9 | 80.0 | 3.0 |
| Detroit | 122 | 19.6 | 74.6 | 5.7 | 109 | 19.2 | 76.1 | 4.6 | 13 | 23.1 | 61.5 | 15.4 |
| Newark | 66 | 42.4 | 54.5 | 3.0 | 32 | 34.4 | 65.6 | — | 34 | 50.0 | 44.1 | 6.0 |
| St. Louis | 104 | 11.5 | 77.9 | 10.6 | 58 | 10.3 | 81.0 | 8.6 | 46 | 13.0 | 73.9 | 13.1 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 172 | 15.7 | 78.5 | 5.8 | 117 | 15.4 | 79.5 | 5.1 | 55 | 16.4 | 76.4 | 7.3 |
| Nonpoverty | 22 | 9.1 | 81.8 | 9.1 | 18 | 11.1 | 83.3 | 5.6 | 4 | — | 75.0 | 25.0 |
| All poverty areas | 700 | 22.1 | 72.0 | 5.9 | 458 | 19.2 | 75.5 | 5.3 | 242 | 26.8 | 65.8 | 7.5 |

147

## TABLE 37. DWELLINGS

If property improvement was required by inspection, did you make this improvement?

| City | Total | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston_____ | 25 | 92.0 | 8.0 | — | 13 | 92.3 | 7.7 | — | 12 | 91.7 | 8.3 | — |
| Cleveland_____ | 23 | 87.0 | 13.0 | — | 12 | 91.7 | 8.3 | — | 11 | 81.1 | 18.2 | — |
| Detroit_____ | 24 | 79.2 | 20.8 | — | 21 | 90.5 | 9.5 | — | 3 | — | 100.0 | — |
| Newark_____ | 28 | 85.7 | 14.3 | — | 11 | 100.0 | — | — | 17 | 76.5 | 23.5 | — |
| St. Louis_____ | 12 | 83.3 | 16.7 | — | 6 | 100.0 | — | — | 6 | 66.7 | 33.3 | — |
| Oakland: Poverty_____ | 27 | 85.2 | 14.8 | — | 18 | 94.4 | 5.6 | — | 9 | 66.7 | 33.3 | — |
| All poverty areas____ | 139 | 85.4 | 14.6 | — | 81 | 94.8 | 5.2 | — | 58 | 63.9 | 36.1 | — |

NOTE: The nonpoverty area of Oakland is excluded because of the small number of respondents.

## TABLE 38. DWELLINGS

If you carry fire and extended coverage insurance, do you pay the regular rate, less than regular, or more than regular?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston_____ | 222 | 62.1 | 6.7 | 31.2 | 167 | 62.8 | 8.0 | 29.2 | 55 | 60.0 | 4.0 | 36.0 |
| Cleveland_____ | 300 | 66.4 | 4.9 | 28.7 | 183 | 82.1 | 2.4 | 15.5 | 117 | 48.1 | 7.7 | 44.3 |
| Detroit_____ | 253 | 85.2 | 1.0 | 13.8 | 225 | 86.1 | 1.1 | 12.8 | 28 | 77.2 | — | 22.8 |
| Newark_____ | 95 | 65.2 | 1.4 | 33.3 | 51 | 79.1 | 3.0 | 17.9 | 44 | 52.5 | — | 47.5 |
| St. Louis_____ | 179 | 73.3 | 5.8 | 21.0 | 117 | 86.7 | 3.3 | 10.0 | 62 | 55.6 | 8.8 | 35.6 |
| Oakland: | | | | | | | | | | | | |
| Poverty_____ | 301 | 85.7 | 1.5 | 12.7 | 201 | 88.4 | — | 11.6 | 100 | 80.3 | 4.5 | 15.2 |
| Nonpoverty_____ | 88 | 87.7 | 8.8 | 3.5 | 79 | 86.9 | 9.4 | 3.7 | 9 | 100.0 | — | — |
| All poverty areas_ | 1,350 | 73.0 | 3.6 | 23.4 | 944 | 80.9 | 2.9 | 16.2 | 406 | 62.3 | 4.2 | 33.5 |

## TABLE 39. DWELLINGS

Did you have to sign an affidavit, or waiver, or any statement to obtain your fire insurance?

| City | Total | | | | Owner-occupants | | | | Absentee-owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston_____ | 222 | 5.4 | 88.7 | 5.9 | 167 | 3.6 | 92.0 | 4.8 | 55 | 11.0 | 80.0 | 9.1 |
| Cleveland_____ | 300 | 4.3 | 94.3 | 1.3 | 183 | 5.5 | 93.0 | 1.6 | 117 | 2.6 | 96.6 | .9 |
| Detroit_____ | 253 | 8.7 | 89.3 | 2.0 | 225 | 8.4 | 89.8 | 1.8 | 28 | 10.7 | 85.7 | 3.6 |
| Newark_____ | 95 | 20.0 | 73.7 | 6.3 | 51 | 14.0 | 82.3 | 4.0 | 44 | 27.3 | 64.0 | 9.1 |
| St. Louis_____ | 179 | 10.1 | 84.9 | 5.0 | 117 | 12.8 | 81.2 | 6.0 | 62 | 4.8 | 92.0 | 3.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty_____ | 301 | 2.7 | 89.4 | 8.0 | 201 | 2.5 | 91.0 | 6.5 | 100 | 3.0 | 86.0 | 11.0 |
| Nonpoverty_____ | 88 | 1.1 | 95.5 | 3.4 | 79 | 1.3 | 96.2 | 2.5 | 9 | — | 88.9 | 11.1 |
| All poverty areas_____ | 1,350 | 8.5 | 86.7 | 4.8 | 944 | 7.8 | 88.2 | 4.1 | 406 | 9.9 | 84.1 | 6.2 |

148

Case: 1:13-cv-08564 Document #: 334-2 Filed: 08/20/23 Page 268 of 400 PageID #:8539

## What Problems are Encountered After Insurance is Obtained?

The impact of cancellation on owners of dwellings can be measured in two ways:

*Impact of Cancellation on Insureds.* The ratio of insureds who were cancelled ranged from 2 to 3

percent computed on a three-year base. (See Line 6 of Table 40). There were no cancellations in Oakland.

*Cancellation as a Cause of Being Uninsured.* About 30 percent of those without insurance were uninsured because of cancellations during the last three years. (See Line 4 of Table 40).

### TABLE 40. DWELLINGS

Estimated cancellation rates for fire and extended coverage insurance for dwelling units in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|---|---|---|---|---|---|---|---|
| 1. Total number of dwelling units currently insured...... | 222 | 300 | 253 | 95 | 179 | 301 | 1,350 |
| 2. Total number of uninsured dwelling units............ | 11 | 26 | 35 | 3 | 18 | 5 | 98 |
| 3. Number of uninsured dwelling units reporting cancellations within the last 3 years.................... | 4 | 10 | 9 | 2 | 3 | — | 28 |
| | Percent | | | | | | |
| 4. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number of uninsured}} \times 100$ (Item 3÷Item 2)×100.......................... | 36.4 | 38.5 | 25.7 | 66.7 | 16.7 | — | 30.7 |
| 5. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured+Total number uninsured}} \times 100$ [Item 3÷(Item 1+Item 2)]×100................. | 1.7 | 3.1 | 3.1 | 2.0 | 1.5 | — | 1.9 |
| 6. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured + Total number uninsured reporting cancellations}} \times 100$ [(Item 3)÷(Item 1+Item 3)]×100.................. | 1.8 | 3.2 | 3.4 | 2.1 | 1.6 | — | 2.0 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

## Other Studies

Various aspects of the urban core insurance problem have been examined by others. These are summarized in this section.

### Crime Commission Survey

The President's Commission on Law Enforcement and the Administration of Justice (known as the Crime Commission) conducted in 1966 a study entitled "Insurance Problems of Business and Organizations in High Crime Rate Areas."

It concluded there was a serious shortage of insurance in the urban core areas it studied.

*Nature and Size of Sample.* The study interviewed a random sample of 768 business firms and organizations selected in eight police precincts—two in Boston, two in Chicago, and four in Wash-

ington, D.C. It was designed to examine the insurance problems of businesses and organizations in high crime rate areas. It gave special attention to burglary and theft insurance and considerably less consideration to fire and extended coverage. It did not look into the problems of homeowners, and did not include any city affected by a major riot.

*Summary of Conclusions.* The study found that about 50 percent of the businesses and institutions surveyed were uninsured for burglary and theft insurance, while about 16 percent were uninsured for fire and extended coverage insurance.

The study also found that those who had insurance were not fully utilizing it. Twenty-five percent of the insured businesses and organizations had losses for which they had not filed claims. The

149

two principal reasons for not filing claims were fear of cancellation and fear of higher rates.

These basic findings, although conducted a year earlier, in different areas than those surveyed by the Panel, and with a more limited sample, are consistent with the comparable results of the Panel's more comprehensive survey.

## Congressional Hearings

Recent hearings by three Congressional committees have produced evidence of an inadequate supply of insurance in urban core areas.

The first hearings were conducted by the Senate Select Committee on Small Business.[*] The hearings examined the impact of crime on small business and looked into the availability of burglary and theft insurance in some detail.

A member of the committee asked a Washington, D.C. restaurant owner whether he had burglary and theft insurance:

No; I had burglary insurance when I opened up, I got insurance for a couple of years from two companies. And each one canceled me out, and I have not been able to get any since then.

Q. Canceled you out after you had a couple of robberies?

A. No; I did not report any robberies, I had not had any, they just sent me a notice that "your insurance is canceled."

The owner of a Washington, D.C., liquor store was asked whether he had burglary insurance:

Yes, sir; we did.

Q. Do you still have it?

A. No, sir; they canceled it.

Q. When was it canceled?

A. I think about two years ago. * * *

Q. Why was it canceled?

A. I don't know. They have never paid any burglaries as far as I am concerned since I went into the business, not one cent for burglary.

Other witnesses also testified that burglary and theft insurance was generally not available in high crime areas.

The committee later reported:

It is a fact that small businessmen in high-crime-rate localities often cannot obtain insurance against losses resulting from robbery, burglary, and acts of vandalism.

It is a fact that their policies are often canceled after the first claim is made for recovery of money stolen or property damaged.

It is a fact that in high crime areas, certain kinds of insurance, if available at all, cost more than the small businessman can afford to pay.[*]

Hearings were also conducted by the Senate Committe on Commerce to consider a resolution calling for a study of the availability of insurance protection against riots.[**] These hearings also indicated serious insurance problems in urban core areas.

A representative of the Mayor's Development Team in Detroit stated:

This problem of insurance available only at prohibitive rates or totally unavailable in some areas is not unique to Detroit; it has arisen in other cities throughout the country. Nor is the problem a new one in Detroit; it has been with us for many years. * * *

There is some evidence that such a "redline" does exist. Several people in the industry and in related work have admitted it to be a fact, but have declined to furnish us with written statements for the record.

The hearing record includes a study of insurance problems encountered in Seattle, Washington, thus indicating the problem is not confined to riot areas.

The most recent of the Congressional hearings, held in September, 1967, by the Subcommittee on Small Business of the Senate Committee on Banking and Currency, produced further evidence of an inadequate supply of insurance in urban core areas.[***]

The Executive Director of the Menswear Retailers of America told the subcommittee that 25 percent of the membership experienced difficulty in obtaining certain types of coverage, principally burglary, theft, and plate glass coverage. He also

[*]"A Review of the Impact of Crime on Small Business," Hearings Before the Select Committee on Small Business, United States Senate, April 24–26, 1967 (90th Congress, 1st Session).

[*]"Impact of Crime on Small Business," Report of the Select Committee on Small Business, United States Senate, on the Impact of Crime on Small Business in the Washington, D.C., Area, September 18, 1967 (90th Congress, 1st Session), p. 11.

[**]"Riot Insurance," Hearings Before the Committee on Commerce, United States Senate, on S.J. Res. 102, August 29, 1967 (90th Congress, 1st Session).

[***]Hearings before the Subcommittee on Small Business of the Committee on Banking and Currency on a bill to establish a Small Business Crime Protection Insurance Corporation and for other purposes, United States Senate, September 13 and 15, 1967 (90th Congress, 1st Session).

150

reported that rates have gone up on these coverages 20 to 30 percent in the past three years.

A representative of the New Jersey Furniture Association testified that in New Jersey "in any area which may be or has been designated a riot area, property insurance of any kind is either totally unobtainable or obtainable only at vastly increased cost."

Other trade associations that testified included the Associated Retail Bakers of America, the National Association of Retail Grocers, and the National Liquor Store Association. All said there was a serious shortage of insurance.

## Massachusetts Study

On October 23, 1967, the Insurance Department of Massachusetts reported on the availability of fire insurance in urban core areas of Boston, including the South End, Roxbury, and North Dorchester.

Department inspectors interviewed 224 property owners and found only about 5 percent uninsured.

They reported the following figures:

| Type of risk | Insured | | At what rates— | | | |
|---|---|---|---|---|---|---|
| | Yes | No | Manual | Excess | Surplus | Un-known |
| Dwellings........ | 115 | 7 | 82 | 1 | 8 | 24 |
| Mercantile....... | 93 | 9 | 55 | 4 | 18 | 16 |
| Total...... | 208 | 16 | 137 | 5 | 26 | 40 |

The survey reported that uninsured property owners did not have insurance for the following reasons: (1) could not afford insurance; (2) insured did not renew; (3) previously refused; (4) previously cancelled; (5) refused to pay above bureau (standard) rates; and (6) other miscellaneous reasons.

The survey also found no indications of mass cancellations, industry withdrawal from the area, or inability by those insured to purchase the amount of insurance desired.

The 5 percent figure is consistent with the Panel's findings for homeowners; but our survey of businessmen in Roxbury based on a considerably larger sample indicates that 35 percent of those interviewed did not have fire insurance.

## Cleveland Study

In 1965, the Ohio Department of Insurance studied the problem of availability of fire and extended coverage insurance in various center city areas of Cleveland.

The Department concluded that insurance companies were not cancelling or refusing fire coverage; that 90 percent of all policies carried standard rates; that no racial discrimination was proven; and that some properties were manifestly uninsurable because of physical condition or loss exposure.

## New York Study

In 1967, the New York Insurance Department studied fire insurance availability in certain low-income areas of Buffalo and New York City.

The study concluded that the market for fire insurance on residential properties in these areas was inadequate and that many property owners found it difficult or impossible to obtain needed insurance. The study found no evidence of discrimination on grounds of race, color, creed or national origin.

The primary cause of the problem was found to be the practice of underwriting residential properties without inspection of individual properties. Underwriters assumed that all business in low-income areas was bad, and therefore denied coverage to risks, good and bad alike.

As a result of this study, New York implemented a mandatory inspection plan in Buffalo and New York City. This plan is described in Chapter III.

## Survey by the National Association of Insurance Commissioners

A subcommittee of the National Association of Insurance Commissioners (NAIC) in 1966 surveyed the insurance commissioners of all jurisdictions on the availability of fire and extended coverage insurance on dwellings.

The commissioners indicated some problem of restricted markets in twenty-seven states. Eleven commissioners indicated a problem in rural and urban areas, six commissioners in urban areas only, and ten in rural areas only.

151

Most of the problem properties were low-value and substandard risks.

## Watts Study

The University of California conducted a survey of the insurance problems in Watts several months after the riots had subsided in 1965. Although this survey was not a probability sample, the responses of the 198 merchants interviewed are nonetheless useful as evidence of the fire and burglary and theft insurance problem. The study concluded that a serious availability problem existed.

## National Institute for Public Affairs Study

A survey of seven cities conducted by the staff of the National Institute for Public Affairs during the summer of 1967 concluded there was a serious problem of insurance availability in urban core areas.

Urban core areas were visited in Baltimore; Boston; Cleveland; Jackson and Lexington, Mississippi; New York City; and Philadelphia.

The study found numerous complaints about property insurance unavailability in most of these cities. Urban core residents also complained of arbitrary cancellations and excessive rates.

## Some Aspects of the Cost of Insurance

Consumer complaints about the high cost of property insurance were a recurring theme of our field interviews. Our survey showed that 28 percent of homeowners and 29 percent of businessmen who did not have fire and extended coverage insurance said they were without insurance because it was too expensive; 29 percent of businessmen gave the same reasons for not having burglary and theft insurance.

As discussed in Chapter II, the price that companies charge for insurance is a product of rating systems, underwriting judgments, and a host of other business and financial considerations that relate to the profitability and financial stability of the individual insurers. On the other hand, an individual consumer's judgment that insurance is too high or beyond his means reflects his personal assessment of his income, wealth, need for insurance, and benefits derived from insurance, not to mention a variety of even more subjective factors including social and economic value judgments.

In an attempt to shed some additional light on the consumer reaction to the cost of insurance, we looked at the premiums now being charged for typical homes or stores in various geographic areas for the lines of insurance covered in our study. We then compared, by using price indexes, the increase in premium costs in these lines to the price increases for other goods and services.

### Increasing Cost of Property Insurance

Using 1959 insurance premiums as the base for comparison (1959=100), 1966 fire insurance premiums rose faster (119.7) than the overall con-

sumer price index (111.4); burglary and theft insurance premiums rose even more rapidly (139.3) than the much-publicized increases in medical costs (122.3), automobile bodily injury liability coverage (120.3) and automobile property damage liability coverage (131.9). (See Table 41).

Increases in property insurance costs are based on national averages. In some areas, there has been a small decline in insurance costs while in others the increase has been substantially greater than the average, particularly for burglary and theft coverage in areas that have experienced a considerable increase in crime since 1959. Some representative examples of changes in premium costs in certain major cities are set forth in Tables 42–49.

### Representative Premiums

*Fire and Extended Coverage—Dwellings.* The cost of fire and extended coverage insurance to the homeowner typically consumes only a relatively small proportion of his income and constitutes only a relatively small amount compared to the property value protected by the insurance.

For example, in eight cities we studied, the highest standard rate premium in 1967 for a homeowners package policy covering an $8,000 frame dwelling with $2,000 in contents was $75 in New York City. The lowest premium for the same amount of insurance was $19 in New York City, assuming only fire and extended coverage and vandalism and malicious mischief is purchased on a brick dwelling. In both cases, the premiums are lower than they were in 1960.

152

TABLE 41. DWELLINGS

Comparison of selected insurance rate level, consumer price level, and medical care indexes, 1959–66

[1959—100]

| Year | Consumer price index | Medical care price index | Fire insurance rate level index | Burglary and theft rate level index | Private passenger | |
|---|---|---|---|---|---|---|
| | | | | | Auto bodily injury liability rate level index | Auto property damage liability rate level index |
| 1959 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 1960 | 101.6 | 103.5 | 99.9 | 103.2 | 98.1 | 96.8 |
| 1961 | 102.7 | 106.6 | 100.3 | 105.8 | 100.2 | 95.8 |
| 1962 | 103.8 | 109.4 | 101.9 | 115.3 | 103.0 | 97.3 |
| 1963 | 105.1 | 112.1 | 102.8 | 118.1 | 105.6 | 99.7 |
| 1964 | 106.5 | 114.4 | 108.0 | 121.6 | 108.0 | 106.5 |
| 1965 | 108.3 | 117.1 | 116.0 | 128.1 | 115.0 | 122.2 |
| 1966 | 111.4 | 122.3 | 119.7 | 139.3 | 120.3 | 131.9 |

NOTE: All indexes are based on 1959 for purposes of comparison.

SOURCES: Data supplied by the Department of Labor, Bureau of Labor Statistics; Fire Insurance Research and Actuarial Association; and National Bureau of Casualty Underwriters.

On the other hand, the premium for a like amount of fire and extended coverage and vandalism and malicious mischief on a frame dwelling in Chicago increased between 1960 and 1967 from $26 to $39 (50 percent) and in Detroit from $27 to $37 (37 percent). (See Tables 42 and 43.)

Many homeowners in the urban core pay two to three times standard rates, and rates may run as high as ten times standard.

*Fire and Extended Coverage—Businesses.* The annual premiums for fire, extended coverage, and vandalism and malicious mischief insurance for typical retail business firms in eight large cities for 1960 and 1967 are given in Table 44. These firms, and their characteristics for insurance rating purposes, were selected as being reasonably representative of businesses in urban core areas. With few exceptions, premiums have increased between 1960 and 1967. Premium increases in Newark and Philadelphia have been greater than in the other six cities examined.

The rates are standard rates based on a building in average condition and are generally derived by application of a schedule. The application of this schedule could easily result in premiums varying 10 to 20 percent or more above or below those indicated—depending on whether the building was above or below the average assumed for the study.

Further, location, building defects, or environmental hazards may make insurers unwilling to write a particular risk at less than two to five, and sometimes even ten times the standard rate.

The Panel's study of the Watts Pool (described in Chapter III), for example, concluded that over 67 percent of its insureds were paying rates in excess of three times standard or manual rates. The Panel's study of rates paid under New York's Urban Area Plan (described in Chapter III) found that 67 percent of insureds were paying rates in excess of two times standard or bureau. Other evidence indicates that rates charged under the consent-to-rate plan in New York have averaged about 3.75 times standard or bureau rates.

*Burglary and Theft—Businesses.* Many small retail businessmen have made especially strong complaints about the increase in the cost of burglary and theft coverage, particularly owners of marginal businesses in high crime areas who place a high priority on burglary and theft coverage.

The annual premiums in 1960 and 1967 for a mercantile open stock burglary policy for representative retail establishments in the District of Columbia and eight states which include major cities are illustrated in Table 45. This policy covers merchandise against loss by burglary. It is an important part of the burglary and theft protection required by most retailers.

Premiums have increased sharply in all cities, particularly in Boston (Suffolk County). For example, in 1960, the representative pawnbroker's premium was $725 for a $30,000 mercantile open stock burglary policy; this had increased around 140 percent to $1,737 by 1967.

153

## TABLE 42. DWELLINGS

1967 approximate annual bureau (standard or regular) premiums for $8,000 dwelling building and $2,000 contents fire, extended coverage, and vandalism and malicious mischief insurance (FEV) and $8,000 homeowners (HO)* (Package), Form I or Form A.

| City and district | Protection class | Frame construction | | | | Brick construction | | | |
| | | FEV* | Homeowners package | | | FEV* | Homeowners package | | |
| | | | Type of deductible d | | | | Type of deductible d | | |
| | | | None | Wind and hail | All peril | | None | Wind and hail | All peril |
| Boston, A | 2 | $66 | n/a | $51 | * $46 | $66 | n/a | $46 | * $41 |
| Boston, B | 2 | 67 | n/a | 51 | * 46 | 67 | n/a | 46 | * 41 |
| Boston, C | 2 | 71 | n/a | 55 | * 50 | 71 | n/a | 50 | * 45 |
| Boston, balance of city | 2 | 61 | n/a | 47 | * 42 | 61 | n/a | 42 | * 37 |
| Chicago | 2 | 39 | n/a | n/a | 32 | 25 | n/a | n/a | 28 |
| Detroit | 2 | b 37 | 47 | 37 | * 31 | b 37 | 47 | 37 | * 31 |
| Washington, D.C. | 2 | b 32 | 41 | 34 | * 30 | b 21 | 34 | 28 | * 23 |
| Los Angeles | 2 | * 25 | 61 | n/a | 40 | * 22 | 61 | n/a | 40 |
| Los Angeles | 4 | * 29 | 64 | n/a | 43 | * 25 | 61 | n/a | 40 |
| Newark | 2 | f 33 | n/a | 32 | 30 | * 29 | n/a | 28 | 26 |
| New York (Manhattan) | ** | 29 | 75 | * 64 | n/a | 19 | 70 | * 60 | n/a |
| Philadelphia | 2 | b 27 | n/a | 27 | * 23 | b 24 | n/a | 26 | * 21 |

* $50 straight deductible applicable to all perils unless otherwise indicated.
b $50 straight deductible applicable to all wind and hail losses only.
c $50 disappearing deductible applicable to all perils.
d $50 disappearing deductible applicable unless otherwise indicated.
e Except fire and lightning.
f $50 disappearing deductible applicable to fire and all extended coverage perils.
g $50 straight deductible applicable to fire, wind and hail.
*Either Homeowners Form I or Form A is used in most States. They both provide physical damage coverage for dwelling, appurtenant private structures, unscheduled personal property on and away from premises, and additional living expense—all against loss by fire, the extended coverage perils, vandalism and malicious mischief, and theft. In addition, coverage is provided for personal liability, personal medical payments, and physical damage to property of others.

The basic limits of liability for these coverages are:

| Coverage | Limit of liability |
| A. Dwelling building | $8,000. |
| B. Appurtenant structures | $800. |
| C. Personal property | $3,200 on premises; $1,000 off. |
| D. Additional living expense | $800. |
| E. Personal liability | $25,000. |
| F. Medical payments | $500. |
| G. Physical damage | $250. |

**NYC public fire protection has never been graded since its rates are based upon its own classified loss experience.
n/a—Not available.
SOURCE: Fire insurance rating bureaus.

## TABLE 44. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) premiums for fire, extended coverage, and vandalism and malicious mischief insurance on building and contents for typical retail firms in selected cities in the United States, 1960–67

| Location | Drugstore | | | | Furniture store | | | | Grocery store | |
| | $40,000 on Building | | $20,000 on Contents | | $40,000 on Building | | $36,000 on Contents | | $40,000 on Building | |
| | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 |
| Boston | $212 | $252 | $244 | $244 | $256 | $308 | $464 | $464 | $212 | $252 |
| Chicago | 242 | 250 | 217 | 235 | 242 | 250 | 552 | 603 | 242 | 250 |
| Detroit | 162 | 186 | 179 | 183 | 174 | 190 | 365 | 396 | 162 | 186 |
| District of Columbia | 106 | 114 | 100 | 102 | 120 | 130 | 292 | 302 | 106 | 114 |
| Los Angeles | 116 | 142 | 114 | 142 | 130 | 160 | 220 | 270 | 116 | 142 |
| Newark | 234 | 365 | 214 | 278 | 334 | 545 | 513 | 680 | 234 | 365 |
| New York | 201 | 234 | 154 | 187 | 226 | 262 | 439 | 538 | 201 | 234 |
| Philadelphia | 192 | 262 | 240 | 308 | 192 | 262 | 433 | 554 | 192 | 262 |

154

## TABLE 43. DWELLINGS

1960 approximate annual bureau (standard or regular) premiums for $8,000 dwelling building and $2,000 contents fire, extended coverage, and vandalism and malicious mischief insurance (FEV) and $8,000 homeowners (HO)* (Package) Form I or Form A

| City and district | Protection class | Frame construction | | | | Brick construction | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | FEV * | Homeowners package | | | FEV * | Homeowners package | | |
| | | | Type of deductible * | | | | Type of deductible * | | |
| | | | None | Wind and hail | All peril | | None | Wind and hail | All peril |
| Boston, A | 2 | $53 | n/a | $47 | $43 | $53 | n/a | $47 | $43 |
| Boston, B | 2 | 54 | n/a | 47 | 43 | 54 | n/a | 47 | 43 |
| Boston, C | 2 | 58 | n/a | 51 | 47 | 58 | n/a | 51 | 47 |
| Boston, balance of city | 2 | 48 | n/a | 44 | 40 | 48 | n/a | 44 | 40 |
| Chicago | 3 | b 26 | 33 | n/a | 25 | b 20 | 29 | n/a | 21 |
| Detroit | 2 | 27 | 40 | 32 | 28 | 24 | 40 | 32 | 28 |
| Washington, D.C. | 2 | 29 | 41 | 34 | 30 | 18 | 34 | 28 | 23 |
| Los Angeles | 3 | 18 | 44 | d 42 | n/a | 15 | 41 | d 39 | n/a |
| Lor Angeles | 4 | 19 | 44 | d 42 | n/a | 16 | 41 | d 39 | n/a |
| Newark | 2 | 28 | n/a | 32 | 30 | 25 | n/a | 28 | 26 |
| New York (Manhattan) | ** | 24 | 97 | d 90 | n/a | 20 | 83 | d 77 | n/a |
| Philadelphia, A | 2 | 22 | n/a | 28 | 23 | 20 | n/a | 26 | 22 |
| Philadelphia, B | 2 | 24 | n/a | 29 | 25 | 22 | n/a | 27 | 23 |

* $50 straight deductible applicable to wind and hail unless otherwise indicated.
b No deductible applicable.
c $50 disappearing deductible applicable unless otherwise indicated.
d $50 straight deductible.
*Either homeowners Form I or Form A is used in most states. They both provide physical damage coverage for dwelling, appurtenant private structures, unscheduled personal property on and away from premises, and additional living expenses—all against loss by fire, the extended coverage perils, vandalism and malicious mischief, and theft. In addition, coverage is provided for personal liability, personal medical payments and physical damage to property of others.

The basis limits of liability for these coverages are:

| Coverage | Limit of liability |
|---|---|
| A. Dwelling building | $8,000. |
| B. Appurtenant structures | $800. |
| C. Personal property | $3,200 on premises, $1,000 off. |
| D. Additional living expense | $800. |
| E. Personal liability | $10,000. |
| F. Medical payments | $250. |
| G. Physical damage | $250. |

**NYC public fire protection has never been graded since its rates are based upon its own classified loss experience.
n/a = Not available.

SOURCE: Fire insurance rating bureaus.

## TABLE 44. BUSINESS ESTABLISHMENTS—Continued

Approximate annual bureau (standard or regular) premiums for fire, extended coverage, and vandalism and malicious mischief insurance on building and contents for typical retail firms in selected cities in the United States, 1960–67—Continued

| Location | Grocery store | | Jewelry store | | | | Liquor store | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | $24,000 on Contents | | $40,000 on Building | | $40,000 on Contents | | $40,000 on Building | | $20,000 on Contents | |
| | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 |
| Boston | $240 | $240 | $212 | $252 | $440 | $440 | $212 | $252 | $200 | $200 |
| Chicago | 320 | 354 | 242 | 250 | 534 | 590 | 242 | 250 | 287 | 315 |
| Detroit | 197 | 201 | 156 | 186 | 348 | 366 | 162 | 186 | 179 | 183 |
| District of Columbia | 100 | 99 | 106 | 114 | 217 | 223 | 106 | 114 | 109 | 108 |
| Los Angeles | 134 | 151 | 116 | 142 | 204 | 252 | 116 | 142 | 126 | 142 |
| Newark | 231 | 264 | 234 | 365 | 428 | 556 | 234 | 365 | 192 | 220 |
| New York | 234 | 316 | 201 | 234 | 308 | 375 | 201 | 234 | 154 | 207 |
| Philadelphia | 288 | 369 | 192 | 262 | 481 | 615 | 192 | 262 | 240 | 308 |

NOTE: All premiums are based on 80-percent coinsurance rates.

SOURCE: Fire insurance rating bureaus.

155

## TABLE 45. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) premiums for mercantile open stock burglary insurance for typical retail establishments, 1960 and 1967

| Location | Drug store, $7,500 | | Furniture store, $15,000 | | Grocery store, $3,000 | | Jewelry store, $15,000 | | Liquor store, $7,500 | | Pawnbroker, $30,000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 |
| Boston area: | | | | | | | | | | | | |
| Middlesex County | $162 | $405 | $197 | $493 | $47 | $118 | $290 | $726 | $135 | $338 | $404 | $1,008 |
| Norfolk County | 162 | 287 | 197 | 349 | 47 | 84 | 290 | 514 | 135 | 239 | 404 | 713 |
| Suffolk County including | | | | | | | | | | | | |
| Boston | 291 | 699 | 352 | 850 | 85 | 204 | 521 | 1,251 | 242 | 582 | 725 | 1,737 |
| Remainder | 162 | 351 | 197 | 428 | 47 | 103 | 290 | 630 | 135 | 293 | 404 | 874 |
| Chicago area: | | | | | | | | | | | | |
| Cook County including | | | | | | | | | | | | |
| Chicago | 491 | 467 | 602 | 518 | 145 | 136 | 889 | 836 | 413 | 389 | 1,234 | 1,161 |
| Remainder of Illinois | 216 | 268 | 262 | 327 | 63 | 78 | 386 | 481 | 180 | 224 | 536 | 668 |
| Detroit area: | | | | | | | | | | | | |
| Detroit City Metropolitan | | | | | | | | | | | | |
| District | 216 | 388 | 262 | 472 | 63 | 113 | 386 | 695 | 180 | 324 | 536 | 965 |
| Remainder of Michigan | 162 | 258 | 197 | 315 | 47 | 76 | 290 | 464 | 135 | 216 | 404 | 643 |
| District of Columbia | 237 | 603 | 287 | 734 | 69 | 164 | 425 | 1,080 | 197 | 502 | 590 | 1,499 |
| Los Angeles area: | | | | | | | | | | | | |
| Los Angeles County excluding | | | | | | | | | | | | |
| Catalina Island | 356 | 562 | 434 | 683 | 104 | 145 | 637 | 1,006 | 296 | 468 | 886 | 1,397 |
| Alameda County | 216 | 499 | 272 | 608 | 63 | 146 | 386 | 894 | 180 | 416 | 536 | 1,241 |
| San Francisco County | 237 | 499 | 287 | 608 | 69 | 146 | 425 | 894 | 197 | 416 | 590 | 1,241 |
| Remainder of State | 259 | 499 | 316 | 608 | 75 | 146 | 464 | 894 | 216 | 416 | 644 | 1,241 |
| Newark area: | | | | | | | | | | | | |
| Atlantic County | 216 | 434 | 262 | 529 | 63 | 127 | 386 | 778 | 180 | 362 | 536 | 1,081 |
| Bergen County | 146 | 248 | 177 | 303 | 43 | 72 | 261 | 444 | 122 | 207 | 362 | 617 |
| Camden County | 237 | 434 | 287 | 529 | 69 | 127 | 425 | 778 | 197 | 362 | 575 | 1,081 |
| Essex County including | | | | | | | | | | | | |
| Newark | 259 | 552 | 316 | 302 | 76 | 161 | 464 | 989 | 122 | 460 | 643 | 1,373 |
| Remainder of New Jersey | 129 | 284 | 157 | 302 | 37 | 72 | 231 | 444 | 108 | 207 | 321 | 617 |
| New York area: | | | | | | | | | | | | |
| Bronx County | 291 | 680 | 352 | 828 | 85 | 199 | 521 | 1,219 | 269 | 567 | 725 | 1,692 |
| Erie County | 146 | 371 | 177 | 451 | 43 | 108 | 261 | 664 | 135 | 309 | 404 | 922 |
| Kings County | 259 | 596 | 316 | 726 | 85 | 174 | 521 | 1,068 | 242 | 497 | 644 | 1,483 |
| Monroe County | 118 | 201 | 151 | 244 | 31 | 59 | 194 | 359 | 90 | 167 | 269 | 499 |
| Nassau County | 118 | 217 | 131 | 264 | 31 | 63 | 194 | 388 | 90 | 181 | 269 | 539 |
| New York County | 118 | 356 | 216 | 433 | 52 | 104 | 319 | 637 | 149 | 297 | 444 | 785 |
| Onondaga County | 118 | 142 | 131 | 173 | 31 | 42 | 194 | 255 | 90 | 119 | 269 | 354 |
| Queens County | 216 | 464 | 262 | 564 | 63 | 135 | 386 | 830 | 197 | 386 | 530 | 1,153 |
| Richmond County | 178 | 337 | 216 | 411 | 52 | 99 | 319 | 604 | 149 | 281 | 444 | 839 |
| Westchester County | 108 | 190 | 131 | 231 | 31 | 55 | 194 | 340 | 90 | 158 | 269 | 472 |
| Remainder of New York | 108 | 253 | 131 | 308 | 31 | 74 | 194 | 454 | 99 | 211 | 269 | 630 |
| Philadelphia area: | | | | | | | | | | | | |
| Allegheny County | 259 | 557 | 316 | 679 | 76 | 163 | 464 | 998 | 216 | 465 | 644 | 1,386 |
| Philadelphia County | 356 | 516 | 434 | 629 | 104 | 151 | 637 | 923 | 296 | 430 | 886 | 1,218 |
| Remainder of Pennsylvania | 108 | 193 | 131 | 235 | 31 | 56 | 194 | 380 | 90 | 161 | 269 | 480 |
| Cleveland area: | | | | | | | | | | | | |
| Cuyahoga County | 388 | 543 | 434 | 679 | 113 | 195 | 638 | 973 | 324 | 452 | 965 | 1,351 |
| Remainder of Ohio | 178 | 284 | 216 | 346 | 52 | 87 | 319 | 510 | 149 | 237 | 444 | 690 |

NOTE: The data do not reflect rate credits discounts for protective devices.

SOURCE: National Bureau of Casualty Underwriters.

156

### TABLE 46. BUSINESS ESTABLISHMENTS

Insurance cost per thousand dollars of sales for representative businesses insured in the Watts Pool

| A<br>Business | B<br>Insurance coverage [1] | C<br>Annual premium | D<br>Sales to Inventory [2] | E<br>Estimated net sales [3] | F<br>Insurance cost per $100 net sales [4] |
|---|---|---|---|---|---|
| Liquor [1] | $15,000 Stock<br>$7,500 FFE | $507 | 8.0 | $120,000 | $0.42 |
| Liquor [2] | $15,000 Stock<br>$10,000 FFE | 664 | 8.0 | 120,000 | .54 |
| Furniture | $50,000 Stock | 744 | 4.5 | 225,000 | .33 |
| Food | $25,000 Stock | 502 | 16.0 | 400,000 | .13 |
| Shoes | $36,670 Stock | 737 | 3.3 | 121,000 | .61 |
| Men's Clothing | $69,000 Stock | 1,194 | 3.5 | 241,500 | .49 |
| Drug | $13,500 Stock | 221 | 5.0 | 67,500 | .33 |
| Drug | $10,000 Stock | 132 | 5.0 | 50,000 | .26 |
| Appliance | $42,500 Stock | 1,114 | 5.5 | 233,750 | .48 |

[1] Coverage limited to fire and extended coverage; FFE: Furniture, fixtures, and equipment.

[2] From Dun and Bradstreet. This ratio was used to estimate net sales upon basis of firm's average inventory. The ratio was developed from nationwide experience and a conservative figure was used.

[3] Stock in Column B × Column D.

[4] [Column C divided by Column E] × 100.

NOTE: These samples did not include coverage on buildings because most buildings in Watts are not tenant-owned.

SOURCE: Insurance Information Institute.

The highest premium for a grocery store—covering a $3,000 inventory—is in Boston: $204; the lowest, in Onondaga County, New York, is $42.

Again, these are standard rates. Insurance may actually be unavailable, or available only at higher rates—typically from 1.5–3 times the standard rates, and usually with a substantial deductible.

### Insurance Premiums as a Cost of Doing Business

Studies have been made to compare the cost of insurance for business firms with their annual sales. For example, the Watts Pool undertook a random sampling of fire and extended coverage insurance premiums paid by firms that it insured and concluded that the premiums were less than 1 percent of the annual sales of the firms studied. (See Table 46).

The National Cash Register Company also published a report that shows total insurance costs of a business as a percentage of annual sales volume for selected businesses. It found that for most businesses insurance premiums are less than 1 percent of sales. (See Table 47).

### Insurance Premiums as a Percent of Insured Inventory

Another and more meaningful method of analyzing insurance costs to a business firm is to compare premiums to the property values protected by the insurance. We did this for five representative small firms.

In order to analyze the relationship of insurance costs to a firm's annual sales and insured inventory, some assumptions must be made regarding the amount of inventory carried, stock turnover ratios, and estimated annual gross sales. For purposes of analysis, it was assumed that a firm carried fire and extended coverage insurance equal to 80 percent of inventory value and open stock burglary protection equal to the minimum co-insurance requirements.

The estimated annual gross sales for five small retail firms was determined by multiplying the average inventory on hand by the number of times the inventory is sold and replaced. Based on turnover ratios obtained from the Accounting Corporation of America, and considered representative for small firms, the estimated gross annual sales for five small firms are as follows:

| Inventory | | Stock turnover ratios | | Estimated gross annual sales |
|---|---|---|---|---|
| Drug | $25,000 × | 4.13 | = | $103,250 |
| Furniture | 45,000 × | 4.35 | = | 195,750 |
| Grocery | 30,000 × | 15.05 | = | 451,500 |
| Jewelry | 50,000 × | 2.50 | = | 125,000 |
| Liquor | 25,000 × | 6.78 | = | 169,500 |

157

## TABLE 47. BUSINESS ESTABLISHMENTS

Insurance costs as a percentage of annual sales volume for selected retail businesses

| Business | Annual sales | Ratio of insurance costs to average annual sales (percent) |
|---|---|---|
| Appliance and radio-TV | Net sales below $250,000 | 0.96 |
| Bakeries | Gross sales under $25,000 | .90 |
| Book stores | Sales under $50,000 | .70 |
| Cocktail lounges | Gross receipts under $25,000 | 1.10 |
| Confectionery stores | Average sales under $100,000 | .54 |
| Drugstores [1] | Sales under $40,000 | .90 |
| Garages | Gross receipts under $25,000 | 1.25 |
| Grocery stores | Gross sales under $50,000 | .37 |
| Liquor stores | Gross sales under $50,000 | .51 |
| Meat markets | Annual sales $50,000 to $100,000 | .37 |
| Men's wear stores | Gross sales under $100,000 | .60 |
| Prescription pharmacies | Average sales $176,181 | .80 |
| Photographic studios and supply shops | Average gross sales $25,000 to $50,000 | .94 |
| Drive-in restaurants | Assumed sales of $100,000 | 1.00 |
| Specialty foods | Average sales under $50,000 | .49 |
| Sporting goods stores | Sales less than $75,000 | .80 |
| Taverns | Gross under $50,000 | .85 |
| Variety stores | Average gross sales $25,000-$50,000 | .94 |

SOURCE: *Expenses in Retail Businesses*, National Cash Register Company, undated.  [1] Insurance on building is not included.

*Fire and Extended Coverage Insurance—Business.* The relationship between fire and allied lines coverage premiums and insured inventory are given in Table 48. For the purpose of comparison these costs are also shown as a percentage of sales. In Boston, for example, the typical small retail drug store pays $1.22 for each $100 of insured stock although premiums are less than one-half of 1 percent of the annual sales. If the standard rate is doubled, the figures in the table would be doubled. For example, the same Boston drug store would pay $2.44 for each $100 of insured stock although the premium would still be less than one-half of 1 percent of gross sales.

*Burglary and Theft Insurance—Business.* Mercantile open stock burglary premiums as a percent of insured inventory and annual gross sales are given in Table 49. In Boston, for example, the

## TABLE 48. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) fire, extended coverage, and vandalism and malicious mischief contents premiums as a percent of annual gross sales and insured inventory for typical retail firms in selected cities in the United States, 1967

| Location | Drugstore: $30,000 coverage, $103,250 estimated annual gross sales | | | Furniture store: $35,000 coverage, $193,750 estimated annual gross sales | | | Grocery store: $24,000 coverage, $451,500 estimated annual gross sales | | |
|---|---|---|---|---|---|---|---|---|---|
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
| Boston | $244 | 0.24 | 1.22 | $464 | 0.24 | 1.29 | $240 | 0.05 | 1.00 |
| Chicago | 235 | .23 | 1.18 | 603 | .31 | 1.68 | 354 | .08 | 1.49 |
| Detroit | 183 | .18 | .92 | 396 | .20 | 1.10 | 201 | .04 | .84 |
| District of Columbia | 102 | .10 | .51 | 302 | .15 | .84 | 99 | .02 | .41 |
| Los Angeles | 142 | .14 | .71 | 270 | .14 | .75 | 151 | .03 | .63 |
| Newark | 278 | .27 | 1.39 | 680 | .35 | 1.89 | 264 | .06 | 1.10 |
| New York | 187 | .18 | .94 | 538 | .27 | 1.49 | 316 | .07 | 1.32 |
| Philadelphia | 308 | .30 | 1.54 | 554 | .28 | 1.54 | 369 | .08 | 1.54 |

## TABLE 48. BUSINESS ESTABLISHMENTS—Continued

Approximate annual bureau (standard or regular) fire, extended coverage, and vandalism and malicious mischief contents premiums as a percent of annual gross sales and insured inventory for typical retail firms in selected cities in the United States, 1967—Continued

| Location | Jewelry store: $40,000 coverage, $125,000 estimated annual gross sales | | | Liquor store: $20,000 fire and extended coverage, $109,500 estimated annual gross sales | | |
|---|---|---|---|---|---|---|
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
| Boston | $440 | 0.35 | 1.10 | $200 | 0.12 | 1.00 |
| Chicago | 590 | .47 | 1.48 | 315 | .19 | 1.58 |
| Detroit | 366 | .29 | .92 | 183 | .11 | .92 |
| District of Columbia | 223 | .18 | .56 | 108 | .06 | .54 |
| Los Angeles | 252 | .20 | .63 | 142 | .08 | .71 |
| Newark | 556 | .44 | 1.39 | 220 | .13 | 1.10 |
| New York | 375 | .30 | .94 | 207 | .12 | 1.04 |
| Philadelphia | 615 | .49 | 1.54 | 308 | .18 | 1.54 |

NOTE: All premiums are based on 80 percent coinsurance rates.   SOURCE: Based on data in Table 44.

## TABLE 49. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) mercantile open stock burglary bureau (standard) premiums as a percent of annual gross sales and insured inventory for typical retail firms in selected cities in the United States, 1967

| Location | Drugstore: $7,500 mercantile open stock burglary, $103,250 estimated annual gross sales | | | Furniture store: $15,000 mercantile open stock burglary, $195,750 estimated annual gross sales | | | Grocery store: $3,000 mercantile open stock burglary, $451,500 estimated annual gross sales | | |
|---|---|---|---|---|---|---|---|---|---|
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
| Boston | $699 | 0.68 | 9.32 | $850 | 0.43 | 5.67 | $204 | 0.05 | 6.80 |
| Chicago | 467 | .45 | 6.23 | 518 | .26 | 3.45 | 136 | .03 | 4.53 |
| Detroit | 388 | .38 | 5.17 | 472 | .24 | 3.15 | 113 | .03 | 3.77 |
| District of Columbia | 603 | .58 | 8.04 | 734 | .37 | 4.89 | 164 | .04 | 5.47 |
| Los Angeles | 562 | .54 | 7.49 | 683 | .35 | 4.55 | 145 | .03 | 4.83 |
| Newark | 552 | .53 | 7.36 | 302 | .15 | 2.01 | 161 | .04 | 5.37 |
| New York | 596 | .58 | 7.95 | 726 | .37 | 4.84 | 174 | .04 | 5.80 |
| Philadelphia | 516 | .50 | 6.88 | 629 | .32 | 4.19 | 151 | .03 | 5.03 |

## TABLE 49. BUSINESS ESTABLISHMENTS—Continued

| Location | Jewelry store: $15,000 mercantile open stock burglary, $125,000 estimated annual gross sales | | | Liquor store: $7,500 mercantile open stock burglary $109,500 estimated annual gross sales | | |
|---|---|---|---|---|---|---|
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
| Boston | $1,251 | 1.00 | 8.34 | $582 | 0.34 | 7.76 |
| Chicago | 836 | .67 | 5.57 | 389 | .23 | 5.19 |
| Detroit | 695 | .56 | 4.63 | 324 | .19 | 4.32 |
| District of Columbia | 1,080 | .86 | 7.20 | 502 | .30 | 6.69 |
| Los Angeles | 1,006 | .80 | 6.71 | 468 | .28 | 6.24 |
| Newark | 989 | .79 | 6.59 | 460 | .27 | 6.13 |
| New York | 1,068 | .85 | 7.12 | 497 | .29 | 6.63 |
| Philadelphia | 923 | .74 | 6.15 | 430 | .25 | 5.73 |

NOTE: Insurance amounts are based on coinsurance limits. The data do not reflect rate credits or discounts for protective devices.   SOURCE: Based on Data in Table 45.

032983

typical small drug store pays $9.32 for each $100 of insured inventory although the premiums are less than 1 percent of annual sales. If the standard rate is doubled, the figures in Table 49 would be doubled. For example, a Boston drug store would pay $18.64 for each $100 of insured inventory; this would amount to 1.36 percent of gross sales.

Thus, open stock burglary premiums generally represent not only a larger amount than fire and allied lines premiums, but also a larger percent of insured inventory. For example, for a drug store paying standard rates doubled, the open stock burglary premium is $1398 compared with $488 for fire and allied lines, and as a percentage of insured inventory it is 18.64 percent as against 2.44 for fire and allied lines.

# Appendix B

## Methods of Obtaining Information

The information presented in this report was obtained from a variety of sources. This appendix describes the fact-gathering methods of the Panel.

The Panel decided early in its deliberations that it should attempt to complete its study and make recommendations by the end of 1967. Urban core insurance problems were of immediate and practical concern to a large segment of the public, and the Panel felt it could best fulfill its task by reporting promptly.

The research undertaken was designed with this target date in mind. Requests for information were sent at an early stage to knowledgeable parties who might have information relating to the work of the Panel. By general announcement in the press, all interested parties were also invited to submit their views to the Panel.

Although the amount of time available for the preparation of the report was limited, a good deal of material was assembled that had never been developed heretofore.

The details of the Panel's methods of obtaining information are as follows:

### Hearings and Meetings of the Panel

The Panel held seven meetings during the course of its work to determine the nature of the urban property insurance problem and to arrive at a recommended program to meet the problem. Five of these meetings lasted a long working day; two were of shorter duration. These meetings were held as closed executive sessions to facilitate the deliberations. At all but one meeting, witnesses presented their views to the Panel during a portion of the meeting. At the conclusion of one such meeting, held in Newark, New Jersey, on October 25, 1967, members of the Panel visited riot-affected areas of the city and discussed with residents and businessmen the property insurance problems they were encountering. The Panel and the staff talked frequently by telephone so that there was continuous communication throughout their work.

In addition, the Panel held public hearings on November 8 and 9, 1967, in Washington, D.C. At these hearings, residents and businessmen from center cities, agents and brokers, insurance industry representatives, state regulators, and federal government officials all presented their views. A number of other interested persons filed statements for the record.

### Field Interviews

The Panel also interviewed witnesses in urban core areas across the United States. The cities visited included: Atlanta, Georgia; Boston, Massachusetts; Cedar Rapids, Iowa; Chicago, Illinois; Cleveland, Ohio; Columbus, Ohio; Detroit, Michigan; Lansing, Michigan; Lincoln, Nebraska; Los Angeles, California; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; Nashville, Tennessee; New York, New York; Newark, New Jersey; Omaha, Nebraska; Philadelphia, Pennsylvania; St. Paul, Minnesota; San Francisco, California; South Bend, Indiana; and Washington, D.C. Telephone interviews were held with witnesses in many additional cities.

## Scientific Survey of Six Cities

The Panel systematically surveyed the insurance problems of homeowners, businessmen, and institutions in Boston, Cleveland, Detroit, Newark, Oakland, and St. Louis. Appendix A contains a complete presentation of the survey results.

*Selection of Urban Core Areas to be Surveyed.* The Panel decided to survey poverty areas, as defined by the Census Bureau, for each of the cities selected other than Boston. In Boston, Roxbury was selected in order to cover the area first served by the Boston Plan. Roxbury, except for several blocks, lies within the poverty area of Boston.

All of these cities, except St. Louis, have experienced riots of varying intensity. Included are Detroit and Newark which experienced two of the most destructive riots during 1965–1967. St. Louis was selected for the purpose of comparison.

Oakland, in addition to having experienced civil disorders, was also selected because of its unique city ordinance requiring merchants to take minimum security precautions to prevent burglary losses. A non-poverty area in Oakland was also selected for purposes of comparison.

*Selection of the Sample of Dwelling Unit Owners.* It was decided to survey owners of dwellings but not tenants. This decision reduced considerably the utility as a sampling frame of the information contained in the census report on city block statistics.

Under the circumstances it was decided to make a systematic selection of blocks within the poverty and nonpoverty areas already selected, prepare lists of owners of residential properties in the selected blocks and subsample them systematically. To obtain the sample of blocks, all blocks, except those which the street maps identified as park areas, were numbered in a serpentine order. Then a sample of about fifty blocks was selected in each poverty area and twenty-five blocks from the Oakland nonpoverty area.

*Selection of Sample of Business Establishments and Institutions.* It was decided to use the same sample of blocks both for dwelling units and for business establishments and institutions. When the listings for business establishments and institutions were completed, additional listings were required. In order to complete an adequate number of interviews, the original sample of blocks was supplemented with a sample of street sections. To select this sample, those parts of the principal streets (which contained the highest concentration of business establishments) were subdivided into sections of about the same length. Then a random sample of street sections was obtained. The selected street sections were listed and the resulting lists subsampled systematically.

*Field Work.* A contract was entered into with Survey and Research Service, Inc. of Cambridge, Massachusetts to perform the field work in Boston; and with Marketing Research of Cleveland to perform the field work in Cleveland and to supervise the field work in Detroit, Newark, Oakland, and St. Louis. Marketing Research of Cleveland in turn entered into contracts with four firms to do the field work in four of the cities—DVD Market Research Service (Detroit), Andrews Research Incorporated of New York City (Newark), Peters Marketing Research Inc. (St. Louis), and Mrs. Emma F. Kenney of Berkeley, California (Oakland).

Specific instructions on how to prepare listings, subsample the listings, and handle nonresponses were sent together with the questionnaires, maps, selected blocks and street sections to the firms contracted. Constant communication was maintained between members of the staff and the directors of the firms in charge of the field work.

*Nature of Data.* About 3,000 interviews were completed. The distribution of interviews appears in the following table.

DISTRIBUTION OF THE SAMPLE BY CITIES AND KIND OF PROPERTY

| City | Total number of cases | Number of dwelling units | Number of business firms and institutions |
|---|---|---|---|
| Boston | 480 | 233 | 247 |
| Cleveland | 540 | 327 | 213 |
| Detroit | 521 | 288 | 233 |
| Newark | 284 | 98 | 186 |
| St. Louis | 439 | 197 | 242 |
| Oakland: | | | |
| Poverty | 578 | 306 | 272 |
| Nonpoverty | 189 | 88 | 101 |
| Total | 3,031 | 1,537 | 1,494 |

In order to test the effect of non-response on the survey data, a special tabulation was prepared on the difference in response between cases inter-

viewed in the first attempt and those interviewed on call backs. The differences were not significant for most of the data, and in those cases where they were significant, they demonstrated a greater insurance problem than responses on first attempts.

Special tabulations had to be prepared in order to measure the degree of bias which could be introduced by combining the data obtained from the different samples (i.e. of blocks and street sections in business areas). A special tabulation for business establishments and institutions in Boston for both samples—sample of blocks and sample of street sections—showed no significant differences. Accordingly, the data from both samples was simply combined in all the cities.

*Summary Figure.* Since the main purpose of the survey was to estimate proportions of individuals having different types of insurance problems, it was considered that a simple arithmetic mean of the proportions observed in each city would be a useful method of presenting the data in summary form. However, in most cases the data are shown for individual cities as well.

*Sampling Error.* Crude measures of sampling error can be obtained by using simple random sampling formulas. Standard sets of statistical tables may be used to estimate sampling errors of proportions for each poverty and non-poverty area, based on sample size and level of confidence.

As the poverty areas included in this survey were not selected at random no inference based on probability theory can be made for all poverty areas in the United States.

## Written Requests for Information

The staff mailed to sixteen different groups specific requests for information to seek out what they knew about the insurance problems of center cities.

Some of this material is specifically referred to in the report. All of it was used as general background material in writing this report.

1. *Insurance Commissioners.* The insurance commissioners of every state were asked for their views on the nature of the insurance problem in center cities and for any statistical data or studies they kept on the problem.

2. *City Officials.* The mayors of the fifty largest cities in the United States and the mayors of thirty-seven other cities in which civil disorders occurred in the first seven months of 1967, were asked to give their views on the insurance problems in their cities and their methods of handling insurance complaints.

3. *Property and Liability Insurance Companies.* Canvassed for detailed information on experience in center city areas and other operational information were the twenty largest groups of property and liability insurance companies, as ranked by premium volume; plus thirty-five of the 176 largest stock companies; fifteen of the eighty-three largest mutual companies; and four of the twelve largest reciprocals—selected at random from the "Ranking of Companies and Groups," published in the *National Underwriter* of May 26, 1967.

The twenty top companies in order of total premium volume were: Aetna Life and Casualty; Travelers; State Farm; Allstate; Hartford; Continental Insurance; Continental National American; Insurance Company of North America; Firemens Fund American; Liberty Mutual; Connecticut General-Aetna; Home; United States Fidelity and Guarantee; Nationwide; Royal-Globe; Kemper; Farmers; Employers; Employers Insurance of Wausau; and St. Paul.

4. *Rating Bureaus.* A request for information went to all fire insurance rating bureaus. The request concerned rating problems relating to urban core insurance business.

5. *Reinsurance Companies.* Thirty-five representative professional reinsurers were asked for information relating to reinsurance market difficulties caused by civil disorders.

6. *Reinsurance Intermediaries.* A request for information was sent to a selected list of eighty-one reinsurance intermediaries asking for their views on the marketing problems resulting from civil disorders.

7. *Agents and Brokers.* Requests for information were sent to agents and brokers whose names were compiled from telephone directories of eight major cities. In addition, associations of agents and brokers also cooperated in distributing the requests to their membership. The National Association of Insurance Agents arranged for state agents associations to distribute the Panel's requests on a random basis to 1,235 agents in California, Connecticut, District of Columbia, Illinois, New Jersey, New York, and Ohio. The Mutual Agents' Association distributed 125 questionnaires at their annual convention. The National Association of Insurance Brokers similarly distributed approximately 200 copies of the request.

8. *Banks and Savings and Loan Associations.* Requests went to all banks and savings and loan associations located in fifty-seven cities where disorders occurred during the first seven months of 1967 for information on the difficulties encountered in their lending operations as a result of property insurance problems. The list of banks was drawn from the *International Bankers Directory* (First 1967 Edition, Rand McNally). The Federal Home Loan Bank Board provided the list of savings and loan associations.

9. *Mortgage Bankers.* All the mortgage brokers in fifty-seven cities where disorders occurred in the first seven months of 1967 were asked to detail any difficulties they encountered as a result of inability to obtain insurance on property. The list of mortgage brokers was drawn from the roster of members of the Mortgage Bankers Association of America, dated October 1, 1966.

10. *Real Estate Brokers.* A request for information was sent to seventy-one real estate brokers from several problem areas in and around Detroit, concerning the impact of insurance availability on real estate transactions. A request also went to local Board Presidents of the National Advisory Council of the National Association of Real Estate Brokers.

11. *Trade Associations.* Requests for information went to sixty-one trade associations, 135 national Negro business associations, fifteen associations

of financial institutions, and to a selected list of trade associations chosen from the yellow pages of eight major cities.

12. *Community Leaders and Civil Rights Organizations.* Two hundred and seventy-five requests were sent to Negro leaders and civil rights leaders asking for their personal views and the views of their organizations on property insurance problems in center cities.

13. *Negro Life Insurance Companies.* A request for information went to all members of the National Insurance Association, a group of Negro life insurance companies, which are heavy investors in urban core properties.

14. *Unions.* To a group of 100 unions selected from the "Directory of National and International Labor Unions in the United States, 1965" (Bulletin No. 1493 of the U.S. Department of Labor, Bureau of Labor Statistics) went requests for information on the property insurance problems of union members in center city areas.

15. *Police Chiefs.* To the police chiefs of the fifty largest cities in the United States, as well as thirty-seven other cities where disorders occurred in the first seven months of 1967, went requests for information on local crime prevention programs.

16. *Fire Chiefs.* The fire chiefs in the same cities were asked for their fire loss statistics in center city areas and for related information.

# Appendix C

## Other Staff Assistance

In addition to the professional staff listed at the beginning of the report, the following consultants assisted the Panel on a part-time basis, ranging in individual cases from a few days to several weeks of work:

Bickelhaupt, David L.
Crane, Frederick G.
Dickerson, O. D.
Elliott, Curtis M.
Ferrari, J. Robert.
Fletcher, Linda B.
Gerdes, Victor
Hamburg, Morris
Hartman, Gerald R.
Hofflander, Alfred E.
Kimball, Spencer L.
Norgaard, Richard
Longley-Cook, L. H.
Mayerson, Alan L.
Mehr, Robert I.
Pfeffer, Irving
Ralston, August
Rokes, Willis P.
Roos, Nestor
Schultz, Raymond
Schultz, Robert
Stone, Gary

Weese, Sam H.
Wenck, Thomas L.
Wickman, James
Williams, C. Arthur, Jr.

In addition, the following did data tabulation work:

Johnstone, William F.
Miranda, Rosando
Perez, Federico

Student research assistants were:

Becker, William J.
Guardenier, William
Wardwell, Nathaniel P.
Woloshin, Rene

The supporting staff was headed by Mrs. Phyllis S. Danahy who was Personal Assistant to the Executive Director. Secretaries were: Dorothy Gooding, Joyce Roberson, Anastasia Soter, and Billie Whitted. Mrs. Margaret Frye, Mr. Ross' personal secretary, also contributed to the work on occasion.

Administrative support for the Panel was provided by The National Advisory Commission on Civil Disorders. Colonel Norman J. McKenzie, the Executive Officer of the Commission, served the Panel in the same capacity.

U. S. GOVERNMENT PRINTING OFFICE : 1968 O - 266-325

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $1.00

032989

Case: 1:13-cv-08564 Document #: 317-4 Filed: 12/20/23 Page 228 of 403 PageID #:8552

A Financial System
That Creates Economic Opportunities
**Asset Management and Insurance**



OCTOBER 2017

035219



U.S. DEPARTMENT OF THE TREASURY

# A Financial System
# That Creates Economic Opportunities
# Asset Management and Insurance

**Report to President Donald J. Trump**

Executive Order 13772 on Core Principles
for Regulating the United States Financial System

**Steven T. Mnuchin**

*Secretary*

**Craig S. Phillips**

*Counselor to the Secretary*



035221

## Staff Acknowledgments

Secretary Mnuchin and Counselor Phillips would like to thank Treasury staff members for their contributions to this report. The staff's work on the report was led by Jared Sawyer and Dan Dorman, and included contributions from Joseph Dickson, Rebekah Goshorn, Sharon Haeger, Alex Hart, Gerry Hughes, W. Moses Kim, Daniel McCarty, Bimal Patel, Bill Pelton, Frank Ragusa, Jessica Renier, Bruce Saul, Steven Seitz, Brian Smith, James Sonne, Mark Uyeda, and Darren Vieira.

# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Introduction  3

    Scope of This Report  3

    Review of the Process for This Report  4

    Asset Management Industry in the United States  4

    Insurance Industry in the United States  5

    Summary of Issues and Recommendations  6

Asset Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Introduction  13

    The Regulatory Structure of the Asset
    Management Industry  18

    Systemic Risk and Stress Testing  29

    Efficient Regulation and Government Processes  32

    International Engagement  55

    Economic Growth and Informed Choices  64

Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    Introduction  73

    The Regulatory Structure of the Insurance Industry  80

    Systemic Risk and Solvency  97

    Efficient Regulation and Government Processes  104

    International Engagement  130

    Economic Growth and Informed Choices  140

Appendices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

    Appendix A: Participants in the Executive Order
    Engagement Process  147

    Appendix B: Regulatory and Legislative Recommendations  153

035224

## Acronyms and Abbreviations

| Acronyms and Abbreviations | Term |
| --- | --- |
| '40 Act | Investment Company Act of 1940 |
| Advisers Act | Investment Advisers Act of 1940 |
| AUM | Assets Under Management |
| Banking Report | June 2017 Report published by Treasury on Banks and Credit Unions |
| BHC | Bank Holding Company |
| BICE | Best Interest Contract Exemption |
| CFPB | Consumer Financial Protection Bureau |
| CFTC | Commodity Futures Trading Commission |
| Code | Internal Revenue Code |
| Compact | Interstate Insurance Product Regulation Compact |
| CPO | Commodity Pool Operator |
| CTA | Commodity Trading Advisor |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DOL | U.S. Department of Labor |
| ECP | Exempt Commercial Purchasers |
| ERISA | Employee Retirement Income Security Act |
| ETF | Exchange Traded Fund |
| EU | European Union |
| Exchange Act | Securities Exchange Act of 1934 |
| Executive Order | Executive Order 13772 on Core Principles for Regulating the United States Financial System |
| FASB | Financial Accounting Standards Board |
| FDIC | Federal Deposit Insurance Corporation |
| FEMA | Federal Emergency Management Agency |
| FIO | Federal Insurance Office |
| FINRA | Financial Industry Regulatory Authority |
| FRB | Board of Governors of the Federal Reserve System |
| FSB | Financial Stability Board |
| FSOC | Financial Stability Oversight Council |

| | |
|---|---|
| G-20 | Group of 20 |
| GAAP | Generally Accepted Accounting Principles |
| GAO | U.S. Government Accountability Office |
| GDP | Gross Domestic Product |
| G-SIFI | Global Systemically Important Financial Institution |
| G-SIB | Global Systemically Important Bank |
| G-SII | Global Systemically Important Insurer |
| HHS | U.S. Department of Health and Human Services |
| HUD | U.S. Department of Housing and Urban Development |
| IAIS | International Association of Insurance Supervisors |
| IASB | International Accounting Standards Board |
| iCBCM | Cross-Border Crisis Management Group for Insurers |
| ICS | Insurance Capital Standard |
| IFRS | International Financial Reporting Standards |
| IIPRC | Interstate Insurance Product Regulation Commission |
| IOSCO | International Organization of Securities Commissions |
| IRA | Individual Retirement Account or Individual Retirement Annuity |
| IRS | Internal Revenue Service |
| ISLHC | Insurance Savings and Loan Holding Company |
| L&H | Life and Health |
| LTC | Long-term Care |
| McCarran-Ferguson | The McCarran–Ferguson Act of 1945, 15 U.S.C. §§ 1011-1015 |
| MMMF | Money Market Mutual Fund |
| NAIC | National Association of Insurance Commissioners |
| NARAB | National Association of Registered Agents and Brokers |
| NARAB II | National Association of Registered Agents and Brokers Reform Act of 2015 |
| NAV | Net Asset Value |
| NBNI G-SIFI | Non-Bank, Non-Insurer Global Systemically Important Financial Institution |
| NFA | National Futures Association |
| NIPR | National Insurance Producer Registry |

| | |
|---|---|
| NRRA | Nonadmitted and Reinsurance Reform Act of 2010 |
| OCC | Office of the Comptroller of the Currency |
| OLA | Orderly Liquidation Authority |
| OMB | Office of Management and Budget |
| ORSA | Own Risk and Solvency Assessment |
| P&C | Property and Casualty |
| PLMA | Producer Licensing Model Act |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | Securities Act of 1933 |
| Secretary | U.S. Treasury Secretary Steven T. Mnuchin |
| SR Letters | Supervision and Regulation Letters |
| SRO | Self-regulatory Organization |
| SSB | Standard-setting Body |
| Treasury | U.S. Department of the Treasury |
| TRIA | Terrorism Risk Insurance Program Reauthorization Act of 2015 |
| TRIP | Terrorism Risk Insurance Program |
| UDAAP | Unfair, Deceptive and Abusive Acts and Practices |
| U.S./EU Covered Agreement | Bilateral Agreement Between the United States of America and the European Union On Prudential Measures Regarding Insurance and Reinsurance |

# Executive Summary



# Introduction

President Donald J. Trump established the policy of his Administration to regulate the United States financial system in a manner consistent with a set of Core Principles. These principles were set forth in Executive Order 13772 on February 3, 2017. This report is prepared by the U.S. Department of Treasury (Treasury), under the direction of Secretary Steven T. Mnuchin, in response to the Executive Order. This report, as with the prior reports and the subsequent report described below, will identify any laws, treaties, regulations, guidance, reporting and record keeping requirements, and other government policies that promote or inhibit federal regulation of the U.S. financial system in a manner consistent with the Core Principles.

The Core Principles are:

A. Empower Americans to make independent financial decisions and informed choices in the marketplace, save for retirement, and build individual wealth;

B. Prevent taxpayer-funded bailouts;

C. Foster economic growth and vibrant financial markets through more rigorous regulatory impact analysis that addresses the systemic risk and market failures, such as moral hazard and information asymmetry;

D. Enable American companies to be competitive with foreign firms in domestic and foreign markets;

E. Advance American interests in international financial regulatory negotiations and meetings;

F. Make regulation efficient, effective, and appropriately tailored; and

G. Restore public accountability within federal financial regulatory agencies and rationalize the federal financial regulatory framework.

# Scope of This Report

The financial system encompasses a wide variety of institutions and services and, accordingly, Treasury is delivering a series of four reports related to the Executive Order covering:

- The depository system, covering banks, savings associations, and credit unions of all sizes, types and regulatory charters (the Banking Report,[1] which was publicly released on June 12, 2017);

---

1.   U.S. Department of the Treasury, *A Financial System That Creates Economic Opportunities: Banks and Credit Unions* (June 2017).

- Capital markets: debt, equity, commodities and derivatives markets, central clearing and other operational functions (the Capital Markets Report,[2] which was publicly released on October 6, 2017);

- The asset management and insurance industries, and retail and institutional investment products and vehicles (**this report**); and

- Nonbank financial institutions, financial technology, and financial innovation.

On April 21, 2017, President Trump issued two Presidential Memoranda to the Secretary of the Treasury (Secretary). One calls for Treasury to review the Orderly Liquidation Authority (OLA) established in Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank). The other calls for Treasury to review the process by which the Financial Stability Oversight Council (FSOC) determines that a nonbank financial company could pose a threat to the financial stability of the United States and that such entity shall be subject to supervision by the Board of Governors of the Federal Reserve System (Federal Reserve) and enhanced prudential standards, as well as the process by which the FSOC designates financial market utilities as systemically important. While some of the issues described in this report are relevant to OLA and FSOC designations, Treasury will submit separate reports on those topics to the President.

This report covers the asset management and insurance industries. Specifically, the report examines issues related to the regulatory structure of financial entities and products in each of these sectors.

## Review of the Process for This Report

For this report, Treasury leveraged the engagement process for the Banking Report, connecting with more stakeholders and focusing on asset management and insurance issues. As directed by the Executive Order, Treasury consulted with the member agencies of the FSOC. Treasury also consulted extensively with a wide range of other stakeholders, including trade groups, financial services firms, consumer and other advocacy groups, academics, legal experts, and others with relevant knowledge. Treasury also reviewed a wide range of data, research, and published material from both public and private sources.

Treasury incorporated the widest possible range of perspectives in evaluating approaches to the regulation of the U.S. financial system according to the Core Principles. For a list of organizations and individuals providing input to Treasury for the preparation of this report, see **Appendix A**.

## Asset Management Industry in the United States

The U.S. asset management industry is the global leader in promoting vibrant capital markets and diverse investment and savings opportunities for investors and businesses. An asset manager manages assets on behalf of investors, businesses, and other institutions using different types of funds

---

2.    U.S. Department of the Treasury, *A Financial System That Creates Economic Opportunities: Capital Markets* (Oct. 2017).

and other investment structures. U.S. asset managers range in size from a few million dollars to over five trillion dollars in assets under management. In the United States alone, registered investment companies, a type of investment fund, held almost $20 trillion of assets under management, representing the investments of more than 95 million individuals.[3] Further demonstrating the strength of the U.S. asset management industry, nine of the top 10 largest global asset managers are headquartered in the United States.

Retail and institutional investors and businesses use asset managers to manage their investments. The diversity of the products and services offered by asset managers allows for investment customization based on risk appetite, investment objectives, and investment horizon. In the United States, the most popular fund structures for retail investors include mutual funds, exchange-traded funds (ETFs), and money market mutual funds. Popular investment structures for institutional investors include private equity funds, hedge funds, venture capital funds, and managed accounts. Some investors prefer active management of their funds, which can be characterized as investment managers making investments in an effort to outperform the market, while a growing share of investors prefer passive management, which seeks to generate a return that emulates an index or benchmark.

The industry has experienced robust growth in recent years, thanks to asset appreciation, strong demand from U.S. households, the aging of the U.S. population, and the rise of defined contribution retirement plans.

The Securities and Exchange Commission (SEC) is the primary regulator of the asset management industry, but other regulators, such as the Commodity Futures Trading Commission (CFTC) and state securities regulators, also have responsibilities with respect to asset management. Specific regulatory requirements depend on the product offerings and the nature of the services being provided.

## Insurance Industry in the United States

The United States is the world's largest insurance market, delivering property and casualty, life, and health insurance coverage to American consumers and businesses. Policyholders — both individual and commercial — utilize diverse insurance products to safeguard themselves, their property, and their businesses against unexpected events. In 2016, U.S. direct written premiums represented a 29% world market share.[4]

The industry is stratified based on size, product offerings, ownership structure, and geographic footprint. For example, some insurers operate in a single state, while others write policies across the globe. Insurers also differ by ownership structure. While some insurers are public companies,

---

3.    Investment Company Institute, *2017 Investment Company Fact Book*, at 6, available at: *https://www.ici.org/ pdf/2017_factbook.pdf* ("ICI Fact Book").

4.    Based on global total direct written premiums. Swiss Re Institute, *Sigma, World Insurance in 2016: the China Growth Engine Steams Ahead* (July 5, 2017), available at: *http://media.swissre.com/documents/ sigma3_2017_en.pdf*.

others are mutually owned by their policyholders. At year-end 2016, U.S. insurers included 780 life and health insurers, 2,655 property and casualty insurers, and 1,095 health insurers.[5]

The financial health of the industry has continued to improve since the financial crisis. In 2016, the U.S. insurance industry's direct written premiums totaled $1.3 trillion, which represent a roughly 15% increase over 2009 levels.[6] The industry also employs more than 2.8 million people.[7]

The United States maintains a state-based system for insurance regulation. Both solvency and market conduct laws and regulations are set by state legislators and state insurance commissioners. Treasury's Federal Insurance Office (FIO), established by Dodd-Frank, serves as the central insurance authority in the federal government. While not serving a regulatory function, FIO represents the United States in international insurance forums, provides insurance policy expertise for the federal government, addresses foreign market access issues, and assists the Secretary in administering the Terrorism Risk Insurance Program. The Federal Reserve also supervises certain savings and loan holding companies that own insurance companies as well as insurance companies designated for Federal Reserve supervision by the FSOC.

## Summary of Issues and Recommendations

Treasury's review of the regulatory framework for both asset management and insurance firms has identified significant opportunities for reform consistent with the Core Principles:

- Ensuring appropriate evaluation of systemic risk and solvency;

- Promoting efficient regulation and rationalizing the regulatory framework to decrease regulatory burdens and maximize product and service offerings;

- Rationalizing U.S. engagement in international forums to promote the U.S. asset management and insurance industries, and encourage firm competitiveness; and

- Enhancing consumer access to a variety of relevant products and services.

As stated above, Treasury's recommendations to the President are focused on identifying laws, regulations, and other government policies that ensure the regulation of the financial system is in accordance with the Core Principles.

A list of all of Treasury's recommendations in this report is in **Appendix B**, including the recommended action, method of implementation (Congressional and/or regulatory action), and identification of the Core Principles addressed.

Following is a summary of the themes and recommendations in the report.

---

5. SNL Financial; A.M. Best, *Best's Aggregates & Averages* (2016), available at: *http://www3.ambest.com/ aggavg/toc/archive.aspx*.

6. SNL Financial.

7. Sean Kevelighan, Steven Weisbart, and James Lynch, *Insurance: Leading Through Disruption*, available at: *https://www.treasury.gov/initiatives/fio/Documents/(1)_Marketplace_Update_-_III.pdf*.

## Systemic Risk, Solvency, and Stress Testing

The financial crisis led to questions — both domestically and internationally — about how to address financial stability and create a regulatory framework to mitigate systemic risk. Through the passage of Dodd-Frank[8] and efforts of the Financial Stability Board (FSB) and other international bodies, a framework emerged that assessed systemic risk posed by specific financial entities. This framework took an entity-centric and bank-centric approach to addressing systemic risk. Tools, including stress testing and risk management programs, were then implemented to address entities posing a heightened risk to the stability of the financial system. Asset management firms and insurance companies have been evaluated for systemic risk and subjected to some enhanced regulatory standards.

Treasury's position is that entity-based evaluations of systemic risk are generally not the best approach for mitigating risks arising in the asset management and insurance industries. Treasury broadly supports shifting to an activities-based framework, which would identify certain business activities as having higher systemic risk characteristics. An appropriate regulatory framework would then be established by primary regulators to address elevated engagement in those activities. These recommendations are made in recognition of the fundamental differences in business and legal structures between banking, asset management, and insurance.

Treasury rejects the need for stress testing of asset management firms. Stress testing is a regulatory tool that can be a part of systemic risk evaluation. Treasury recognizes the possibility of liquidity risk that may arise during mutual fund redemptions, but believes a strong liquidity risk management framework is a more effective approach to addressing the concern.

Finally, Treasury supports the ongoing domestic work on insurance capital and liquidity standards. To ensure an efficient and effective regulatory framework, state insurance commissioners and the Federal Reserve must collaborate with the goal of developing implementable and harmonious capital standards that minimize unnecessary regulatory burdens. Further, Treasury supports robust liquidity risk management programs for insurers, similar to Treasury's approach to the asset management industry, and will encourage the state insurance commissioners and the Federal Reserve to make progress in this area.

These recommendations are consistent with the Core Principles. They are designed to foster economic growth and vibrant financial markets through more rigorous regulatory impact analysis that addresses systemic risk and solvency. Further, implementing these recommendations would help rationalize the regulatory approach to systemic risk, solvency, and stress testing in the asset management and insurance industries, thus leading to more efficient, effective, and appropriately tailored regulation.

## Efficient Regulation and Government Processes

Ensuring efficient regulation and government processes is an important component of an effective financial regulatory framework. The asset management industry operates within a regulatory framework that, at its core, consists of laws with origins dating to the 1930s and 1940s. Since that

---

8. Public Law No. 111-203.

time, SEC regulations and guidance as well as statutory changes have tried to keep up with new market participants, products, and services. Further, market events, such as the financial crisis, have resulted in the addition of new regulatory requirements, which adds complexity for the industry.

The insurance sector has operated under state laws and regulations for over 150 years. Since the passage of McCarran-Ferguson in 1945, the federal government has repeatedly recognized the primacy of state insurance regulation. Over time, state laws have evolved; new products, like cyber and terrorism insurance, have been developed; and insurers have entered new and foreign markets.

While regulation of each of these industries is important to protect consumers and the markets, a recalibration of regulation and government processes is important from time to time to ensure an effective and efficient framework.

Treasury recommends several changes in the regulatory structure for the asset management and insurance sectors. For example, the SEC should implement regulations to standardize and simplify the approval process for ETFs. If adopted, this rule would remove the need to obtain individualized exemptive relief from the SEC for "plain vanilla" ETFs. Other recommendations include modernizing fund disclosure material through electronic delivery of shareholder material, and harmonizing and rationalizing the fund reporting requirements to eliminate overlapping and duplicative requirements.

For insurers, Treasury is committed to realigning FIO's operations through five pillars of focus. This realignment will help promote the state-based insurance regulatory system in the United States, and make FIO's work more effective. Treasury recommendations also include encouragement of uniform product approval processes and standards at the state level, which will expedite the speed of bringing new products to market. Further, Treasury supports the National Association of Insurance Commissioners' work to establish uniform state laws for protecting customer data. Such state laws must be uniform and implemented expeditiously to reduce compliance costs for multistate insurers and ensure the protection of customer data.

These recommendations are consistent with the Core Principles. The implementation of these recommendations would rationalize our financial regulatory framework to make it more efficient and effective. These changes will empower Americans to make independent and informed financial decisions that will enable them to save for retirement, build individual wealth, and protect businesses and individuals from unexpected events.

## International Engagement

International regulatory forums addressing financial services policy have grown in importance since the financial crisis. These forums address issues of financial stability, regulatory fragmentation, and market access. Some of these forums, such as the FSB, serve a broad mandate — financial stability. Others, such as the International Organization of Securities Commissions and the International Association of Insurance Supervisors, are specific to the asset management and insurance industries, respectively. As noted, the United States has nine of the 10 largest asset managers in the world. Further, the United States represents the world's largest single-country insurance market by a significant margin. Because of the increased globalization of asset management and insurance,

and the ongoing international regulatory dialogue, the United States must remain engaged and speak with a strong voice at international forums to promote U.S. interests.

Treasury recommends continued U.S. engagement in international forums as international regulatory issues are debated and standards are crafted. Such engagement should enable the promotion of the U.S. asset management and insurance industries; a coordinated approach by the U.S. members of international forums; and placement of the appropriate domestic bodies in international forums to address ongoing policy formulation.

To facilitate the work in international forums, Treasury will work to increase transparency of the domestic policymaking and international standard-setting process, and ensure robust domestic stakeholder discussions to inform policy priorities.

These recommendations are consistent with the Core Principles. Their implementation would enable American companies to be competitive with foreign firms in domestic and foreign markets, and advance American interests in international financial regulatory negotiations and meetings. Further, the implementation of these recommendations would help restore public accountability in the policymaking of federal financial regulatory agencies.

## Promoting Economic Growth and Informed Choices

One of the key features of the asset management industry is the vast array of choices available to investors. To date, more than 9,500 mutual funds and 1,700 ETFs operate in the United States.[9] For individual investors, mutual funds and ETFs offer easy access to professional management and portfolio diversification. Investors can select among stock (equity) funds, bond (fixed-income) funds, and funds that invest in multiple asset classes, such as balanced funds and target date funds. Within these categories, there are even more choices. For example, an investor can select from stock funds that invest in all types of companies or stock funds that invest only in companies in a particular sector, with particular financial fundamentals, in a specific market capitalization bracket, or within a country or defined geographic region.

In addition to funds, the asset management industry provides advisory services to individual accounts, through which an investor can purchase, sell, and hold securities and money market instruments. The myriad of product choices available to investors stems from the strength and considerable competition across the U.S. asset management industry. The accessibility of asset management services and products to investors facilitates capital formation and economic growth.

As with any investment, results are not guaranteed and there is risk that investors may lose some or all of their original investment. For these reasons, investors should receive effective and informative disclosure, so they may make informed choices when investing in the capital markets. In this manner, investors can decide, based on their individual risk tolerances, between the safety of principal and the possibility of earning higher returns.

The financial regulatory framework can directly affect economic growth and how American consumers make financial choices. As Americans build wealth and plan for retirement, the regulation

---

9.    ICI Fact Book, at 22.

of investment products and services can lead to an increase in investment-related costs or loss of investment opportunities.

Treasury supports current efforts at the Department of Labor (DOL) to reexamine the implications of the revised fiduciary rule and related exemptions adopted by the DOL in April 2016 (the Fiduciary Rule). A delay in full implementation of the Fiduciary Rule is appropriate until the relevant issues are evaluated and addressed to best serve retirement investors. Treasury supports the SEC's engagement on this topic, and encourages the DOL and SEC to work with the states to evaluate the impacts of a fiduciary rule across markets.

Treasury recognizes the increasingly important role of the life insurance industry and its products in securing retirement income. Treasury recommends strengthening consumer access and choice with respect to annuities as investments options within employer-sponsored retirement plans such as 401(k) plans. Treasury will also convene an inter-agency task force to develop policies to complement reforms at the state level relating to the regulation of long-term care insurance.

Regulation can also negatively impact growth of the U.S. economy by failing to provide incentives for investment or even penalizing certain types of investments. For example, in the persistent low interest rate environment, U.S. insurance companies have sought higher-yielding investments, including infrastructure investments. Infrastructure projects present an appealing opportunity to insurers given the benefits of higher yields and longer durations that may improve profitability and asset-liability management, particularly for life insurers. Infrastructure investment is also attractive to property and casualty insurers that historically have been among the largest investors in municipal bonds. Infrastructure is a top priority for the Trump administration, and investments by insurers can play a role in stimulating infrastructure spending.

To promote robust investment in American infrastructure, Treasury recommends a reevaluation of state insurance capital requirements and how those requirements may be better calibrated to encourage insurer infrastructure investment.

These recommendations are consistent with the Core Principles. The implementation of these recommendations would empower Americans to make informed financial choices, build wealth, and save for retirement. Further, their implementation would promote economic growth by ensuring U.S. financial firms are globally competitive and investors have access to a full range of investment options.

# Asset Management



# Introduction

The U.S. asset management industry is a critical component of the nation's vibrant financial system. The asset management industry plays a key role in capital formation and credit intermediation, facilitates the flow of capital from investors to corporations and governments, and enables the growth of retirement savings for millions of Americans. Through mutual funds and exchange-traded funds (ETFs), an individual can assemble a diversified portfolio of investments, providing exposure to a variety of asset classes, at a very low cost. These financial products form the cornerstone for many 401(k) plans, individual retirement accounts, and 529 college savings plans.

The asset management industry makes it possible for all Americans to participate in the capital markets. In 2016, U.S. registered investment companies owned 31% of U.S. corporate equity, 19% of U.S. and foreign corporate bonds, 13% of U.S. Treasury and government agency securities, and 23% of U.S. municipal securities.[10] Notably, U.S. money market mutual funds also play a key role in cash management for businesses as well as individuals, managing 22% of U.S. nonfinancial businesses' short-term assets.[11]

A key feature of asset management is the separation of the assets of the investment adviser from the assets being managed. Asset managers are separate legal entities from their funds. Losses or liabilities incurred by one fund are not the responsibility of other funds within the same fund complex. For other assets managed by asset managers outside of funds, custody rules impose a number of requirements to safeguard those assets.

Asset management encompasses a broad number of entities and participants, including:

- **Investment companies** (also known as **investment funds**) are pooled vehicles whose primary activities are investing, reinvesting, or trading in securities, such as stocks, bonds, money market instruments, and other assets. **Registered investment companies** are investment companies that have registered with the Securities and Exchange Commission (SEC) and are subject to additional regulatory oversight.

- **Mutual funds** are the most common form of registered investment company. A mutual fund offers a "redeemable security," meaning an investor purchases and redeems shares directly with the fund at a net asset value (NAV) that is set each day based on the market value of the fund's assets.

- **Closed-end funds** typically raise capital in an initial public offering and investors purchase and sell shares of the fund on the secondary market at market prices, which may differ from the fund's NAV.

- **Exchange-traded funds (ETFs)** are a particular type of registered investment company. ETFs enter into contractual relationships with "authorized participants," typically large broker-dealers, who are permitted to purchase and redeem fund shares directly from the ETF. All other investors purchase and sell ETF shares at market prices that may differ from the ETF's NAV.

---

10.   ICI Fact Book, at ii.

11.   Id. at page 13.

- **Private funds** are pooled investment vehicles not required to register as investment companies with the SEC. Generally, they are either limited in the number of investors allowed or have investor qualification requirements.[12] Hedge funds, venture capital funds, and private equity funds are types of private funds.

- A **fund complex** or **fund family** is a group of funds that are related and/or share a common investment adviser.

- **Investment advisers** are fiduciaries in the business of providing investment advice.[13] Investment advisers manage the portfolios of investment companies and/or private funds. Some investment advisers provide investment advice to individual clients. A **registered investment adviser** is an investment adviser registered with the SEC or a state securities regulator.

- A **commodity pool operator** (CPO) is an individual or organization that operates a commodity pool and solicits funds for that commodity pool. A commodity pool is an enterprise in which funds contributed by a number of persons are combined for the purpose of trading futures or options on futures, retail off-exchange foreign exchange contracts, or swaps, or to invest in another commodity pool.[14]

- A **commodity trading advisor** (CTA) is an individual or organization that, for compensation or profit, advises others directly or indirectly on the value of or the advisability of trading futures contracts, options on futures, retail off-exchange foreign exchange contracts or swaps.[15]

### Trends and Industry Outlook

In 2016, assets held by U.S. registered investment companies amounted to almost $20 trillion and represented the investments of more than 95 million individuals.[16] Gross assets held by private funds with SEC-registered investment advisers totaled $11 trillion.[17] SEC-registered investment advisers reported approximately $70 trillion in regulatory assets under management.[18] The industry has experienced robust growth in recent years, thanks to asset appreciation, strong demand from U.S. households, the aging of the U.S. population, and the rise of defined contribution retirement

---

12. See, e.g., 15 U.S.C. § 80a-3(c)(1) and (c)(7).

13. 15 U.S.C. § 80b-2(a)(11); see SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963).

14. See *https://www.nfa.futures.org/registration-membership/who-has-to-register/cpo.html*.

15. See *https://www.nfa.futures.org/registration-membership/who-has-to-register/cta.html*.

16. ICI Fact Book, at 9.

17. Division of Investment Management, U.S. Securities and Exchange Commission, *Private Funds Statistics, Fourth Calendar Quarter 2016* (July 7, 2017), available at: *https://www.sec.gov/divisions/investment/private-funds-statistics/private-funds-statistics-2016-q4.pdf*.

18. Amount of regulatory assets under management provided by SEC staff based on analysis of Form ADV data; amount excludes assets managed by state-registered investment advisers.

plans. Globally, investable assets in the asset management industry are expected to approach or exceed $100 trillion by 2020.[19]

Figure 1: Top 20 Worldwide Asset Managers in 2016 ($ billions)

| Rank | Firm name | Primary Domicile | AUM |
|---|---|---|---|
| 1 | BlackRock | United States | $5,148 |
| 2 | Vanguard Group | United States | $3,965 |
| 3 | State Street Global Advisors | United States | $2,468 |
| 4 | Fidelity Investments | United States | $2,131 |
| 5 | J.P. Morgan Asset & Wealth Management | United States | $1,771 |
| 6 | BNY Mellon Investment Management | United States | $1,648 |
| 7 | PIMCO | United States | $1,609 |
| 8 | AXA Group | France | $1,503 |
| 9 | Capital Group | United States | $1,479 |
| 10 | Goldman Sachs Group | United States | $1,379 |
| 11 | Prudential Financial | United States | $1,264 |
| 12 | Amundi | France | $1,141 |
| 13 | Legal & General Group | U.K. | $1,105 |
| 14 | BNP Paribas | France | $1,062 |
| 15 | Wellington Management Group | United States | $979 |
| 16 | Northern Trust Asset Management | United States | $942 |
| 17 | TIAA | United States | $907 |
| 18 | Natixis Global Asset Management | France | $877 |
| 19 | HSBC Holdings | U.K. | $831 |
| 20 | Invesco | United States | $813 |

Note: As of December 2016
Source: Pensions & Investments, Treasury analysis

Investors are shifting from actively managed funds to passively managed funds as investors become increasingly conscious of the impact of management fees on long-term wealth creation and preservation.[20] Actively managed funds typically seek to outperform the market or a particular index or benchmark, whereas passively managed funds emulate an index or benchmark. In addition,

---

19. The Boston Consulting Group, *Global Asset Management 2017: The Innovator's Advantage* (2017), available at: *http://image-src.bcg.com/Images/BCG-The-Innovators-Advantage-July-2017_tcm9-163905.pdf*; see also PricewaterhouseCoopers, *Asset Management 2020: A Brave New World* (2014), available at: *https://www.pwc.com/gx/en/asset-management/publications/pdfs/pwc-asset-management-2020-a-brave-new-world-final.pdf*.

20. Morningstar, *U.S. Investors Favored Passive Funds over Active by a Record Margin in 2016* (Jan. 11, 2017), available at: *https://corporate.morningstar.com/US/documents/AssetFlows/AssetFlowsJan2017.pdf*.

ETFs — active and passive — are expected to continue to grow as the level of product sophistication continues to increase. Institutions have increasingly used ETFs to achieve specific asset-class or geographic exposures, and retail investors, particularly younger investors, employ ETFs as a low-cost alternative to both active and passive mutual funds.[21] Together, the option to invest in actively or passively managed funds, or a combination of both, provides investors customization options to meet investment objectives.

Figure 2: Asset Growth in Exchange-Traded Funds: 1998-2017 ($ billions)



Note: Data are through July 2017
Source: Morningstar Direct

---

21. Greenwich Associates, *Active Strategies, Indexing and the Rise of ETFs* (Q3 2017), available at: *https://www.ishares.com/us/literature/whitepaper/2017-greenwich-global-research-report-web-en-us.pdf*; BlackRock, *ETF Pulse Survey*, available at: *https://www.ishares.com/us/about-etfs/etf-pulse* (survey conducted in Sept. 2016).

Although the largest asset managers have had continued growth in assets under management (AUM), fees charged to investors have decreased. On average, expense ratios for stock and bond funds have declined substantially over the past 20 years.[22] Substantial asset flows are going to fewer asset managers and global competition for AUM has placed downward pressure on margins, with the effect of making it more difficult for smaller asset managers as well as new entrants to the market. For example, the five largest fund families increased their overall percentage of net assets to 47% in 2016, up from 36% in 2005.[23] Moreover, implementation of compliance regimes under the current regulatory framework has put continued pressure on margins, has favored the largest asset managers by disproportionately affecting smaller asset managers, and reduced the ability of asset managers to reinvest for innovation and long-term growth.

Figure 3: Asset Growth in Mutual Funds, Money Market Funds, and Exchange-Traded Funds: 1993-2017 ($ billions)



Note: Data are through July 2017
Source: Morningstar Direct

22. Investment Company Institute, *Trends in the Expenses and Fees of Funds, 2016* (May 2017), available at: *https://www.ici.org/pdf/per23-03.pdf* (finding the average stock fund expense ratio fell from 1.04% in 1996 to 0.63% in 2016 and the average bond fund expense ratio declined from 0.84% to 0.51% during the same period).

23. ICI Fact Book, at 18.

# The Regulatory Structure of the Asset Management Industry

The SEC, along with state securities regulators, constitute the primary regulators of the asset management industry in the United States. Other federal agencies, such as the Commodity Futures Trading Commission (CFTC), the Department of Labor (DOL), and the Internal Revenue Service (IRS), as well as self-regulatory organizations (SROs) such as the Financial Industry Regulatory Authority (FINRA) and the National Futures Association (NFA) also affect the asset management industry. In addition, federal, state, and local prosecutors engage in criminal enforcement of the securities laws.

## Securities and Exchange Commission

The SEC's mission is to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation. Broadly, the SEC has jurisdiction over investment companies,[24] investment advisers, brokers and dealers, securities offerings in the primary and secondary markets, municipal advisors, transfer agents, and security-based swap dealers. The SEC is responsible for selectively reviewing the disclosures and reports of registered investment companies. The SEC also oversees 21 national securities exchanges, 10 credit rating agencies, and seven active registered clearing agencies, as well as FINRA. Although FINRA does not regulate mutual funds directly, it regulates the broker-dealers that sell mutual funds.[25] In addition, ETFs are subject to the listing standards of the relevant national securities exchange.

## State Securities Regulators

State securities regulators are generally responsible for regulating investment advisers with less than $100 million in assets under management. States may also require the licensing of certain financial professionals, including registered representatives and investment adviser representatives. States are preempted from regulating securities offerings by registered investment companies.[26] States also retain the authority to investigate and to bring enforcement actions against persons who engage in fraudulent behavior.

---

24.  A common trust fund or similar fund maintained by a bank, subject to certain conditions, is excluded from SEC jurisdiction. See 15 U.S.C. § 80a-3(c)(3) and (11). Such collective investment funds are regulated by the banking regulators. See Office of the Comptroller of the Currency, *Comptroller's Handbook, Collective Investment Funds* (May 2014), available at *https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/collective-investment-funds/pub-ch-collective-investment.pdf.*

25.  In this capacity, FINRA administers rules on mutual fund advertising; sales practices, including the sales loads that broker-dealers may charge; the incentives provided to registered representatives; and the execution of mutual fund portfolio transactions. See *http://www.finra.org/industry/mutual-funds.*

26.  15 U.S.C. § 77r.

## Other Regulatory Agencies

### Commodity Futures Trading Commission

The CFTC is an independent federal regulatory agency with exclusive jurisdiction over the markets for futures, options on futures, and swaps. The CFTC regulates any asset manager that operates as a CPO or as a CTA. The CFTC also oversees the NFA. The NFA reviews all disclosure documents from CPOs and CTAs, as well as CPO annual pool financial statements.

### Internal Revenue Service

Most registered investment funds have elected to have pass-through tax treatment under subchapter M of the Internal Revenue Code, which is administered by the IRS. Subchapter M requires that the fund comply with a number of conditions, including that at least 90% of the fund's gross income be derived from investing in securities or publicly traded partnerships, and that the fund satisfy certain diversification requirements.

### Department of Labor

The DOL enforces the Employee Retirement Income Security Act of 1974 (ERISA). ERISA imposes fiduciary obligations on asset managers that provide services to employee benefit plans, such as a defined benefit pension plan. In addition to fiduciary obligations, these asset managers are subject to the prohibited transaction provisions of ERISA.

## Reporting and Disclosure

Investment advisers primarily are regulated under the Investment Advisers Act of 1940 (Advisers Act). Investment advisers who have more than $100 million in assets under management or advise a registered investment company are generally required to register with the SEC.[27] In 2010, Dodd-Frank amended the Advisers Act, in general, to require advisers to hedge funds and other private funds to register with the SEC unless exempted by the Advisers Act from registration.[28]

Investment advisers register with the SEC by filing a form that contains extensive information about the adviser.[29] The SEC uses such information to prepare for, conduct, and implement a risk-based examination program of investment advisers. This information is also aggregated by the SEC staff to obtain census data, monitor industry trends, and assess emerging risks.[30] Information filed by investment advisers must be updated on an annual basis, and certain information must be

---

27. 15 U.S.C. § 80b-3. Certain exceptions to registration may apply, such as an investment adviser whose only clients are insurance companies or that is a foreign private adviser. Id.

28. Dodd-Frank exempted from registration investment advisers that solely advise venture capital funds and investment advisers that solely advise private funds if the adviser has AUM in the United States of less than $150 million. See Dodd-Frank §§ 407 and 408. Although not required to register with the SEC, exempt reporting advisers are subject to certain reporting obligations. 17 C.F.R. § 275.204-4.

29. See Form ADV, 17 C.F.R. § 279.1. Form ADV is a joint form that is also used to register as an investment adviser with the state securities regulators for advisers not eligible for SEC registration.

30. See Form ADV and Investment Advisers Rules (Aug, 25, 2016) [81 Fed. Reg. 60418 (Sept. 1, 2016)].

promptly revised if the information previously filed becomes inaccurate.[31] This information is also publicly available on the Investment Adviser Public Disclosure website.[32]

Investment companies are primarily regulated under the Investment Company Act of 1940 ('40 Act), unless exempt from registration by the '40 Act. The securities offered and sold by registered investment companies to the public must also be registered in compliance with Securities Act of 1933 (Securities Act).[33] Registered investment companies are also subject to the Securities Exchange Act of 1934 (Exchange Act). Registered investment companies are subject to extensive SEC rules adopted to implement these statutes.

To enable investors to make informed decisions, the federal securities laws and SEC regulations require a fund that is making a public offering to disclose information about its offering in a prospectus at the time of sale to the public and then provide additional information subsequently in semiannual reports to shareholders. The prospectus describes the fund's objectives, fees and expenses, performance, investment strategies, risk factors, and management. The fund's shareholder information provides current financial information, including performance, and portfolio holdings.

## Leverage, Liquidity, and Custody

The '40 Act limits the ability of mutual funds to engage in leveraged transactions, such as short sales, purchases of securities on margin, and derivative transactions, unless those transactions are covered by liquid assets or offsetting transactions.[34] Additionally, SEC guidelines provide that mutual funds must limit their holdings of illiquid securities to 15% of net assets to meet the '40 Act requirement that a security be redeemed by its holder within seven days of receipt of a redemption request.[35] In October 2016, the SEC formalized this requirement into its rules.[36] The holder of a mutual fund is entitled to receive approximately the proportionate share of the fund's current net assets or its cash equivalent. The value of securities held by a mutual fund is defined as the market value, when market quotations are readily available, or fair value, as determined by its board of directors, if they are not. SEC rules define the net asset value (NAV) for use in computing the price of a redeemable security.[37] The calculation of the NAV is required for any changes in the fund's portfolio no later than the first business day following the trade date.[38]

---

31.   17 C.F.R. § 275.204-1(a).

32.   See *www.adviserinfo.sec.gov*.

33.   Typically, an investment company will file a joint registration statement under the Securities Act and the '40 Act. See Form N-1A, 17 C.F.R. §§ 239.15A and 274.11A. Some investment companies may elect not to make a public offering of their securities and, in such circumstances, will register only under the '40 Act.

34.   15 U.S.C. § 80a-18; see also Securities Trading Practices of Registered Investment Companies (Apr. 18, 1979) [44 Fed. Reg. 25128 (Apr. 27, 1979)].

35.   Revisions to Guidelines to Form N-1A (Mar. 12, 1992) [57 Fed. Reg. 9828 (Mar. 20, 1992)].

36.   Investment Company Liquidity Risk Management Programs (Oct. 13, 2016) [81 Fed. Reg. 82142 (Nov. 18, 2016)] (adopting new Rule 22e-4(b)(iv)).

37.   17 C.F.R. § 270.2a-4.

38.   Id.

For mutual funds, the '40 Act restricts certain transactions between a mutual fund and its investment adviser, which prevent the adviser from managing the fund for the adviser's own benefit. Finally, the '40 Act requires investment companies to safeguard custody of fund assets, including verification of the assets by an independent public accountant.[39] Similarly, most other assets managed by an SEC-registered investment adviser are also subject to custody in practice and are kept on a segregated basis from the asset manager.[40] These provisions help to ensure that the assets of investors are not commingled with the assets of the investment adviser.

## Historical Performance during Periods of Financial Stress

The performance of the asset management industry during periods of financial stress demonstrates that the types of industry-wide "runs" that occur in the banking industry during a systemic crisis have not materialized in the asset management industry outside of money market mutual funds. One reason for this outcome is structural; fund assets are financed with the capital of shareholders and redemptions constitute market value return of that capital from the fund itself.

Mutual funds are owned by many investors, each with their own time horizons for investing, their own risk preferences, and their own investment goals. Since the turn of the century, aggregate net flows — either total net redemptions or subscriptions — into equity and debt funds have rarely exceeded more than 1% and 2% of total assets under management on a monthly basis, respectively (see Figure 4). This trend continued through the financial crisis, when mass redemptions would have been most likely. The chart below outlines monthly net flows into or out of U.S. equity and bond funds.

---

39.   15 U.S.C. § 80a-17(f); 17 C.F.R. §§ 270.17f-2 and 270.17f-4.

40.   15 U.S.C. § 80b-18b; 17 C.F.R. § 275.206(4)-2.

035249

Figure 4: Equity and Bond Mutual Fund Net Flow Rates: 1993-2017 (percent)



U.S.-registered bond mutual fund net flow rate (taxable and municipal)

U.S.-registered equity mutual fund net flow rate (international equity, sector equity, U.S. equity)

Note: Data are through July 2017
Source: Morningstar Direct

## History of Fund Activity and Closures

One feature that distinguishes the asset management industry is the ease by which funds are formed and terminated, without any disruption to the financial markets. Fund sponsors routinely create new funds to meet investor demand, and they merge or liquidate funds that do not attract sufficient investor interest. In 2016, 676 mutual funds and ETFs opened, while 688 funds merged or were liquidated (see Figure 5).[41] This occurred without a material impact on the industry or the financial markets.

---

41.   Morningstar Direct.

Figure 5: Number of New and Merged/Liquidated Open-Ended Mutual Funds and Exchange-traded Funds 2000-2017 (through Oct. 5, 2017)



Source: Morningstar Direct

## Disruptive Market Events and Asset Management

When disruptive events occur in the asset management industry, significant redemptions at individual funds or fund complexes have not led to material market dislocations or longer term systemic consequences to the economy. An example of this dynamic was on display following the unexpected departure of key personnel from PIMCO in September 2014 (see Figure 6).[42] Specifically, the PIMCO Total Return Fund, directly managed by Bill Gross, experienced fund outflows of $120 billion.[43] The roughly $60 billion in net redemptions during September and October 2014 alone were the largest amount of money ever withdrawn from a fund during a two month period.[44] Despite these outsized redemption levels, the fund's returns were above the average return of core bond funds.[45] More importantly, investors were able to redeem investments made at PIMCO and transfer business to other investment managers in an orderly manner without any material impact to PIMCO, the other investment managers, or the financial markets more broadly.

---

42. In 2014, PIMCO lost both of its co-chief investment officers, Bill Gross and Mohammed El-Erian.

43. Stephen Foley and Alistair Gray, *Pimco Fund Outperforms Bill Gross a Year After 'Bond King' Left, The Financial Times* (Sept. 23, 2015).

44. Morningstar, *PIMCO Recap: Flows, Ratings, and Firm-Level Views, Weighing in on PIMCO Six Weeks After Bill Gross' Sudden Departure* (Nov. 10, 2014), available at: *http://morningstardirect.morningstar.com/client-comm/MorningstarPIMCORecapFlowsRatingsFirmLevelViews.pdf.*

45. Morningstar, *PIMCO Update June 2015* (June 4, 2015), at 7, available at: *http://corporate.morningstar.com/US/documents/ResearchPapers/COMBINED_PIMCO_June2015%20_FINAL.pdf.*

Figure 6: PIMCO Taxable Bond Mutual Fund Monthly Net Flows and Total U.S. Taxable Bond Mutual Fund Monthly Net Flows (excluding PIMCO)



Note: Data are through July 2017
Source: Morningstar Direct

## Rising Costs and Regulatory Burden

Although total AUM continues to rise across the asset management industry, so do costs. The costs of asset management are expected to soar by 2022. The reasons for rising costs are diverse, with commercial cost pressures increasing as firms expand distribution networks and costs rise for product development, technology, and data management. However, one of the most important drivers of these rising costs is the cost of complying with an increased regulatory burden since the financial crisis. For example, in a recent study of global asset managers, banks, and brokers, participants highlighted perceptions that regulations are increasing costs and that compliance spending at a typical firm is expected to double over the next five years. Respondents reported that while they spend 4% of total revenue on compliance, they expect those costs to rise to up to 10% of total revenue by 2022.[46] Many of these costs are passed along to individual retail investors in the form of expenses higher than they would be if compliance costs had been the same.

---

46. Duff & Phelps, *Global Regulatory Outlook 2017*, at 4, available at: *https://www.duffandphelps.com/assets/pdfs/publications/compliance-and-regulatory-consulting/2017-global-regulatory-outlook-viewpoint.pdf*.

The pace of regulatory expansion, reach, and complexity of regulation affecting funds in the asset management industry has been significant over the past nine years. Additional rules and regulations such as the SEC money market mutual fund rule reforms, enhanced fund reporting, liquidity rulemaking, the DOL fiduciary rule, new SRO rules, and requirements related to Dodd-Frank and other compliance regimes, have resulted in a median increase in compliance costs of an estimated 20% over the past five years.[47] Other regulators, such as the CFTC, have added regulatory burdens on the asset management industry, as has compliance with the reporting of cost basis of mutual fund shares under new IRS rules. Moreover, the global nature of the largest asset management firms also creates the need to comply with foreign laws and regulations. These regulatory compliance costs come in the form of legal expenses, preparation of new policies and procedures, creation of internal controls, technology expenditures, increased use of third-party service providers, rising vendor charges, increased oversight costs, and higher overall requirements for staffing and training. Moreover, these costs do not capture the opportunity costs associated with these efforts, including diversion of resources from efforts to boost portfolio return, risk management, and improved customer service.[48]

The directive outlined in Executive Order 13772 provided Treasury the opportunity to initiate a much-needed review of the regulation impacting the asset management industry. Appropriately tailoring regulation, rationalizing the existing regulatory framework, and reducing redundancy would go far to foster the goals of efficient allocation of capital, strong job creation, and lasting economic growth.

---

47. Letter from Paul Schott Stevens, President and CEO, Investment Company Institute, to Secretary Steven T. Mnuchin (Apr. 25, 2017) (based on a survey of 42 member firms accounting for 46% of registered fund assets).

48. See, e.g., KPMG International, *The Costs of Compliance, 2013 KPMG/AIMA/MFA Global Hedge Fund Survey*, available at: *https://home.kpmg.com/content/dam/kpmg/pdf/2014/07/Cost-of-Compliance.pdf.*

# Asset Management:
# Findings and Recommendations



# Systemic Risk and Stress Testing

## Systemic Risk and the Asset Management Industry

In the wake of the financial crisis, federal regulators and the Financial Stability Oversight Council (FSOC) have evaluated systemic risk as it pertains to the asset management industry. The Office of Financial Research also published a report in September 2013 titled *Asset Management and Financial Stability*.[49] Particular focus was placed on mutual funds and other pooled investment vehicles. The FSOC conducted a review of the asset management industry, which led to a focus on asset management products and activities rather than entity-specific evaluation for Federal Reserve supervision and enhanced prudential standards.[50]

FSOC's evaluation of systemic risks over the past several years shows fundamental differences between asset managers and prudentially regulated institutions such as banks. Asset management is an agency-based business model, as opposed to the principal-based business model of banks. This means that asset managers manage on behalf of clients (whether a mutual fund, other pooled investment vehicle, or individual account), but they do not generally own the investments themselves.[51] Furthermore, asset managers are legally separated from the funds — the assets and liabilities of the manager are distinct from assets and liabilities of the funds. The bank business model directly subjects the bank to the risks and obligations of its assets and liabilities.

To the extent that systemic risks arise from the asset management industry, prudential regulation of asset management is unlikely to be the most effective regulatory approach for mitigating these risks. Generally, asset managers and investment funds, in contrast to banks, are not highly leveraged and do not engage in maturity and liquidity transformation to the same degree that banks do through the use of bank deposits and other forms of credit. Any decline in the value of a fund's assets results in a corresponding reduction in the investor's investment, whereas a bank's obligation to its depositors and creditors remains the same even if the bank suffers losses on its asset exposures.

### *Existing SEC Regulation*

Mutual funds are already subject to long-established regulations that reduce the risks that individual funds present to the broader financial system. Moreover, since the financial crisis, the SEC has promulgated a number of new rules designed to further address risks in this sector.

Registered investment companies have long been subject to a number of requirements under the '40 Act and SEC rules and guidance implementing the '40 Act that help to mitigate the risks of a potential "run" on the fund, including:

---

49. Office of Financial Research, *Asset Management and Financial Stability* (Sept. 2013), available at: *https://www.financialresearch.gov/reports/files/ofr_asset_management_and_financial_stability.pdf*.

50. Financial Stability Oversight Council, *Update on Review of Asset Management Products and Activities* (Apr. 18, 2016), available at: *https://www.treasury.gov/initiatives/fsoc/news/Documents/FSOC%20Update%20on%20Review%20of%20Asset%20Management%20Products%20and%20Activities.pdf*.

51. An exception to this statement would be the seeding of a new fund by an asset manager, which generally constitutes a de minimis investment.

035257

- **Leverage Limitations:** Mutual funds are statutorily prohibited from taking on borrowings that exceed one-third of the portfolio's assets (i.e., a mutual fund must have $3 of assets for every $1 dollar of debt, or a 300% asset coverage requirement).[52]

- **Diversification of Portfolio Holdings:** A diversified mutual fund or closed-end fund is required to invest more than 75% of its total assets in cash and cash items, government securities,[53] securities of other registered investment companies, and other securities that are limited to not more than 5% of any one issuer.[54] All mutual funds and closed-end funds are required by federal tax law to meet certain diversification requirements to be eligible for pass-through tax treatment. With respect to half of the fund's assets, the fund may hold no more than 5% in the securities of any one issuer.[55] With respect to the other half of the fund's assets, the limit is 25%. As a result, the minimum diversification of a mutual fund is 25% of its assets in each of two issuers, and 5% of its assets in each of 10 additional issuers.

- **Custody of Assets:** Mutual funds are required to maintain strict custody of fund assets separate from the assets of the fund manager. This requirement is designed to safeguard fund assets from theft or misappropriation. Nearly all mutual funds use bank custodians for domestic securities, and the custody agreements are constructed to be robust and thorough.[56]

- **Liquidity:** At least 85% of a mutual fund's portfolio must be invested in "liquid securities," which are defined as assets that can be disposed of within seven days at a price approximating market value.[57]

- **Daily Valuation of Fund Assets:** Mutual funds must value their portfolio holdings on a daily basis, based on market values readily available. There are certain provisions for obtaining fair value if no current market price is available for a particular price or if the market price is unavailable.[58]

Since 2014, the SEC has adopted numerous additional rules impacting the asset management industry, which provide additional transparency and mitigate potential systemic risks, including:

---

52. 15 U.S.C. § 80a-18. Closed-end funds are also subject to a 300% asset coverage requirement, but are not subject to the limitation of only borrowing from a bank.

53. Government securities include any security issued or guaranteed as to principal or interest by the United States or by a person controlled or supervised by and acting as an instrumentality of the U.S. government. See 15 U.S.C. § 80a-2(a)(16). Securities issued by the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are government securities as long as they satisfy such criteria.

54. 15 U.S.C. § 80a-5(b).

55. 26 U.S.C. §§ 851-855 (Subchapter M of the Internal Revenue Code).

56. 15 U.S.C. § 80a-17(f); 17 C.F.R. 270.17f-1 (broker-dealer custody); 17 C.F.R. § 270.17f-2 (self-custody); 17 C.F.R. § 270.17f-4 (securities depositories); 17 C.F.R. § 270.17f-5 (foreign banks); 17 C.F.R. § 270.17f-6 (futures commission merchants); and 17 C.F.R. § 270.17f-7 (foreign securities depositories).

57. Revisions of Guidelines to Form N-1A (Mar. 12, 1992) [57 Fed. Reg. 9828 (Mar. 20, 1992)].

58. See 15 U.S.C. § 80a-2; 17 C.F.R. §§ 270.2a-4 and 270.22c-1.

- Enhancing portfolio reporting by mutual funds, including derivatives disclosure;[59]
- Requiring implementation of liquidity risk management programs by mutual funds;[60]
- Moving institutional prime money market funds to a floating NAV and permitting the imposition of liquidity fees and redemption gates for money market mutual funds;[61]
- Providing additional tools to allow funds to effectively pass on costs stemming from investor purchase and redemption activity;[62]
- Improving disclosures provided by registered investment advisers;[63] and
- Shortening the securities transaction settlement cycle from three days to two days.[64]

*Recommendations*

Treasury's position is that entity-based systemic risk evaluations of asset managers or their funds are generally not the best approach for mitigating risks arising from asset management. Rather than focus on entity-based evaluations, primary federal regulators should focus on potential systemic risks arising from asset management products and activities, and on implementing regulations that strengthen the asset management industry as a whole. Treasury recommends that while the FSOC maintains primary responsibility for identifying, evaluating, and addressing systemic risks in the U.S. financial system, the FSOC look to the SEC to address systemic risks through regulation within and across the asset management industry in the United States.

## Stress Testing and the Asset Management Industry

The promulgation of a statutory requirement for stress testing of large investment advisers and mutual funds came about, in part, because of the success of the initial supervisory stress test exercise led by the Federal Reserve for the largest bank holding companies in the midst of the financial crisis.[65] Dodd-Frank requires certain nonbank financial companies to conduct annual stress tests.[66] Stress testing is required for registered investment companies and registered investment advisers having more than $10 billion in consolidated assets. According to information provided by the Investment Company Institute, more than 400 funds had $10 billion in assets or more as of July 31, 2017.

Under Dodd-Frank, each federal primary financial regulatory agency, in coordination with the Federal Reserve and the Federal Insurance Office (FIO), as appropriate, must "issue consistent

---

59.   Investment Company Reporting Modernization (Oct. 13, 2016) [81 Fed. Reg. 81870 (Nov. 18, 2016)].

60.   Investment Company Liquidity Risk Management Programs (Oct. 13, 2016) [81 Fed. Reg. 82142 (Nov. 18, 2016)].

61.   Money Market Fund Reform; Amendments to Form PF (July 23, 2014) [79 Fed. Reg. 47736 (Aug. 14, 2014)].

62.   Investment Company Swing Pricing (Oct. 13, 2016) [81 Fed. Reg. 82084 (Nov. 18, 2016)].

63.   Form ADV and Investment Advisers Act Rules (Aug. 25, 2016) [81 Fed. Reg. 60418 (Sept. 1, 2016)].

64.   Securities Transaction Settlement Cycle (Mar. 22, 2017) [82 Fed. Reg. 15564 (Mar. 29, 2017)].

65.   Governor Daniel K. Tarullo, *Stress Testing after Five Years* (June 25, 2014), available at: *https://www.federalreserve.gov/newsevents/speech/tarullo20140625a.htm*.

66.   See Dodd-Frank § 165(i)(2) (codified at 12 U.S.C. § 5365).

and comparable regulations" to implement the stress tests.[67] As with bank stress testing, the methodologies established by the SEC are required to include three sets of conditions: (1) baseline, (2) adverse, and (3) severely adverse scenarios. Results are required to be reported to both the SEC and the Federal Reserve, and the company is required to publish a summary of the results. In 2014, the then-SEC Chair indicated that the SEC staff was evaluating how to tailor stress testing for the asset management industry.[68] To date, however, no stress testing rule has been proposed by the SEC.

Prudential stress testing for asset management raises significant implementation challenges. The challenge in applying prudential stress-testing to asset managers was recognized by the SEC's chief economist in 2016, when he expressed a number of concerns with these statutory stress-testing requirements, including how to engage in such testing when fluctuations in asset values are passed through to fund investors by design.[69]

Where appropriate, the SEC has imposed regulations on mutual funds to address potential risks that funds might face as a result of stressed market conditions, including revised rules for money market mutual funds and new liquidity risk management requirements for other mutual funds.[70]

*Recommendations*
While Treasury endorses the principle of appropriate risk management in the asset management industry, it does not support prudential stress testing of investment advisers and investment companies as required by Dodd-Frank. Treasury supports legislative action to amend Dodd-Frank to eliminate the stress testing requirement for investment advisers and investment companies.

In the alternative, Treasury supports the view that the stress testing provisions of Rule 2a-7 for money market mutual funds and Rule 22e-4 on liquidity risk management programs, discussed in the next section, satisfy the spirit of Dodd-Frank's stress testing requirements.

# Efficient Regulation and Government Processes

## Liquidity Risk Management

Liquidity can be defined as the ability by a financial market participant to quickly liquidate assets as needed and without a significant impact on price to meet immediate, short-term financial obligations with cash. Since the financial crisis, regulators have correctly focused on liquidity risk in global financial markets. This concern stems from deep scars left by the liquidity crunch during the financial crisis, in which stressed market conditions led rapidly to liquidity crises at various market participants as concerned counterparties and investors withdrew credit and funding, which

---

67. 12 U.S.C. § 5365(i)(2)(C).
68. Chair Mary Jo White, *Enhancing Risk Monitoring and Regulatory Safeguards for the Asset Management Industry* (Dec. 11, 2014), available at: *https://www.sec.gov/news/speech/2014-spch121114mjw.*
69. Rob Tricchinelli, *SEC Vexed by Asset Manager Stress Test Rule*, Bloomberg BNA (Feb. 8, 2016), available at: *https://www.bna.com/sec-vexed-asset-n57982067065/.*
70. 17 C.F.R. § 270.2a-7(g)(8) (money market funds); 17 C.F.R. § 270.22e-4(b)(1)(i)(B) (liquidity risk management programs).

precipitated further liquidity-driven asset sales, or "fire sales." An example of how stressed liquidity conditions can present risks is the failure of Bear Stearns in 2008, which stemmed in part from the rapid withdrawal of credit lines and funding by the firm's creditors and counterparties as the firm experienced losses due to its exposure to subprime mortgages.

Policymakers and regulators responded to such concerns, particularly the risk that firms do not have enough capital and liquid resources to survive stressed markets, through a number of regulations promulgated since the crisis — for example, bank capital and liquidity rules addressed in Treasury's Banking Report. For asset management, policymakers have focused on how to address the risks of rapid investor redemptions and their potential impact on fund investors and market conditions. For example, the 2015 closure of the Third Avenue Focused Credit Fund highlighted how a fund might inadequately manage its liquidity risk, with implications for investors who might be unable to redeem their shares in the fund, and market conditions that are potentially impacted by a fund's asset sales to meet its redemption requests.

### Regulations for Liquidity Risk

The regulatory framework for liquidity risk management of registered investment companies has been established through SEC guidance and the requirements of the '40 Act, as well as more recent liquidity rules, such as Rule 22e-4 under the '40 Act.[71] Private funds, such as hedge funds, private equity funds, and venture capital funds, typically have specific contractual provisions governing an investor's ability to take all or part of an investment out of the fund.

The '40 Act requires mutual funds generally to redeem shares at their proportionate share of a fund's NAV within seven days of tender.[72] Thus, asset managers have a responsibility to manage the liquidity of the fund's investment portfolios in a manner consistent with their redemption obligations. Many investors expect to receive redemption proceeds sooner as some mutual funds represent in their prospectuses that they will pay redemption proceeds in fewer than seven days. In recognition of the redemption obligation, the SEC has long-standing guidelines containing a liquidity standard that generally limits a mutual fund's aggregate holdings of "illiquid assets" to no more than 15% of the fund's net assets.[73] In October 2016, the SEC adopted Rule 22e-4, which formalized the 15% limitation on illiquid investments and requires notification to the SEC if the level of illiquid investment assets exceeds 15% of its net assets.[74]

Under the 15% guidelines, a portfolio security or other asset is considered illiquid if it cannot be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment.[75] The 15% guidelines have generally caused funds

---

71. Investment Company Liquidity Risk Management Programs (Oct. 13, 2016) [81 Fed. Reg. 82142 (Nov. 18, 2016)] ("SEC Liquidity Release").

72. See 15 U.S.C. §§ 80a-2(a)(32) and 80a-22(e).

73. Revisions of Guidelines to Form N-1A (Mar. 12, 1992) [57 Fed. Reg. 9828 (Mar. 20, 1992) ("Form N-1A Guidelines Release"); Statement Regarding "Restricted Securities" (Oct. 21, 1969) [35 Fed. Reg. 19989 (Dec. 31, 1970)].

74. See SEC Liquidity Release. The liquidity risk management program rules become effective on December 1, 2018 for all funds except funds that would qualify as smaller entities, whose compliance date is June 1, 2019.

75. Form N-1A Guidelines Release.

to limit their exposures to particular types of securities that cannot be sold within seven days and that the SEC and staff have indicated may be illiquid, depending on the facts and circumstances. To the extent that a fund's holdings of illiquid securities exceeds 15%, the guidelines have been interpreted as preventing the fund from acquiring any additional illiquid assets.[76]

Fund managers frequently base their portfolio decisions on evaluation of asset types and certain information about the assets, such as issuer type, issuer domicile, duration, credit quality, and currency. This approach is appropriate because instruments with similar characteristics are often highly comparable and substitutable from a liquidity perspective. In addition, fund managers use their judgment in evaluating asset liquidity. Even within an asset class, such as fixed-income, the liquidity of issues can differ considerably depending on factors such as credit quality and industry. Internal policies and procedures require a certain amount of flexibility to account for market and issuer-specific dynamics.

In addition to making important changes to codify and strengthen the 15% limit on illiquid investments, Rule 22e-4 requires all mutual funds (except for money market mutual funds) and certain ETFs to adopt a liquidity risk management program. Funds would be required to monitor the liquidity risk of their portfolio and determine a minimum percentage of their assets that must be invested in highly liquid investments. Under the rule, mutual funds must use a specific, uniform scheme for classifying, reviewing, and reporting the liquidity of each portfolio holding on a monthly basis and providing aggregated information to the public on a quarterly basis. Each fund is required to classify each of its portfolio investments into one of four defined liquidity categories, known as "buckets." These buckets are intended to take into account relevant market-, trading-, and investment-specific considerations, including, among other things, market depth and whether sales of an investment would significantly change the market value of the investment.[77]

The rule has resulted in funds assessing the adequacy of their liquidity management practices. However, concerns have arisen regarding the rule's approach to measuring liquidity risk, and the costs involved in implementing the rule. The rule mandates an overly prescriptive asset classification or bucketing methodology despite the fluid, and sometimes subjective, nature of liquidity. This uniform bucketing requirement may not help funds improve their current liquidity risk management programs. As a result, funds may continue to use their current methodologies for classifying the liquidity of their investments alongside the costly mandated bucketing methodology.

*Recommendations*

Treasury supports robust liquidity risk management programs and believes they are imperative to effective fund management and the health of the financial markets. For this reason, Treasury supports the 15% limitation on illiquid assets. However, Treasury rejects any highly prescriptive regulatory approach to liquidity risk management, such as the bucketing requirement. Instead, Treasury supports the SEC adopting a principles-based approach to liquidity risk management rulemaking and any associated bucketing requirements. Consistent with these recommendations,

---

76. Open-End Fund Liquidity Risk Management Programs; Swing Pricing; Re-Opening of Comment Period for Investment Company Reporting Modernization Release (Sept. 22, 2015) [80 Fed. Reg. 62274, 622284 n. 92 (Oct. 15, 2015)].

77. SEC Liquidity Release.

the SEC should take appropriate action to postpone the currently scheduled December 2018 implementation of Rule 22e-4's bucketing requirement.

### Swing Pricing

"Swing pricing" is the process of adjusting the NAV of fund shares to effectively pass on the costs from purchase or redemption activity to the investors associated with that activity. Mutual funds calculate a daily NAV, typically as of 4 p.m. Eastern Time, which is the price at which an investor can purchase or redeem fund shares. SEC rules require that an investor request to purchase or redeem mutual fund shares be at a price based on the next NAV calculated after the receipt of the request.[78]

Some have expressed concerns that investor redemptions could dilute the interests of non-redeeming shareholders, particularly in times of stressed liquidity conditions.[79] In this scenario, changes in portfolio holdings to satisfy redemptions can occur several business days after the redemption request. If these activities and their associated costs are not reflected in the NAV at redemption, the costs of providing liquidity to the first redeeming investors could be borne by remaining investors in the fund. In other words, the transaction costs may be lower for earlier redeeming investors than for later, creating a "first-mover advantage." This concern has risen due to the significant growth in assets managed by funds with less-liquid investments, such as fixed-income funds, emerging market debt funds, open-end funds with alternative strategies, and emerging market equity funds.

It has been suggested that swing pricing could protect existing investors from dilution associated with such purchase-and-redemption activity and may be a useful tool to manage liquidity risks. Pooled investment vehicles in certain foreign jurisdictions, including France, Hong Kong, Ireland, Italy, Mexico, the Netherlands, Singapore, and the United Kingdom, currently use various forms of swing pricing to mitigate shareholder dilution associated with other shareholders' capital activity.[80]

In October 2016, the SEC finalized a rule that would permit mutual funds to use swing pricing on a voluntary basis.[81] The SEC also adopted amendments to require certain disclosures by funds using swing pricing. The rule changes become effective in November 2018.

Although Treasury recognizes the theoretical possibility of a first-mover advantage, empirical evidence demonstrating the inadequacy of existing liquidity management practices for mutual

---

78.   17 C.F.R. § 270.22c-1.

79.   Financial Stability Board, *Policy Recommendations to Address Structural Vulnerabilities from Asset Management Activities* (Jan. 12, 2017), at 11-12, available at: *http://www.fsb.org/wp-content/uploads/FSB-Policy-Recommendations-on-Asset-Management-Structural-Vulnerabilities.pdf*.

80.   International Organization of Securities Commissions, *Liquidity Management Tools in Collective Investment Schemes: Results from an IOSCO Committee 5 Survey to Members* (Dec. 2015), at 4, available at: *https://www.iosco.org/library/pubdocs/pdf/IOSCOPD517.pdf*.

81.   Investment Company Swing Pricing (Oct. 13, 2016) [81 Fed. Reg. 82084 (Nov. 18, 2016)]. Closed-end funds, unit investment trusts, ETFs, and money market mutual funds are not permitted to use swing pricing.

funds and other registered investment companies is unsubstantiated.[82] Treasury observes that, given current distribution practices of U.S. mutual funds, there may be practical difficulties with implementing swing pricing. Unlike foreign jurisdictions, most U.S. funds are sold through intermediaries, including broker-dealers, insurance companies, and retirement plan record-keepers, which aggregate and net purchases and redemptions in a particular fund. Purchase-and-redemption information from these distribution channels may not be known until well after NAV is determined.

Treasury encourages further analysis of whether, and to what extent, swing pricing is implemented by funds. Particular concern should be focused on investor protection and whether funds are appropriately setting the amount of the swing as justified by relevant trading costs.

## Derivatives

Derivatives are essential financial tools that enable portfolio managers of investment companies to manage and hedge risk, enhance portfolio liquidity, gain or reduce exposure to certain asset classes, manage or equitize cash, and reduce transaction costs. While derivatives can be used for speculative activities, funds often use derivatives to mitigate their risks.

### Regulation of Derivatives

The SEC's regulation of derivatives stems from a 1979 general statement of policy regarding the '40 Act's treatment of senior securities.[83] The use of senior securities by funds is subject to certain prohibitions and limits on leverage (or asset coverage).[84] While the SEC found that derivatives transactions may be considered senior securities and therefore subject to the '40 Act limitations, the SEC staff has also allowed funds to engage in derivatives activities over the years through "no-action" letters as long as they met certain other key conditions.[85] This approach has been developed through a patchwork of more than 30 no-action letters issued by the SEC staff, which apply the 1979 statement of principles to various types of derivatives and other transactions on an instrument-by-instrument basis.[86]

---

82. See, e.g., Sheheryar Malik and Peter Linder, *IMF Working Paper On Swing Pricing and Systemic Risk Mitigation* (July 2017), at footnote 6, available at: *http://www.imf.org/en/Publications/WP/Issues/2017/07/18/On-Swing-Pricing-and-Systemic-Risk-Mitigation-44957*.

83. Securities Trading Practices of Registered Investment Companies (Apr. 18, 1979) [44 Fed. Reg. 25128 (Apr. 27, 1979)].

84. The '40 Act limits the ability of funds to obtain leverage or incur obligations to persons other than the fund's common shareholders through the issuance of senior securities, defined, in part, as bonds, debentures, notes, or similar obligations or instruments constituting a security and evidencing indebtedness. The '40 Act prohibits a mutual fund from issuing or selling any senior security, other than a borrowing from a bank, and subject to a requirement to maintain 300% asset coverage.

85. Division of Investment Management, U.S. Securities and Exchange Commission, *Registered Investment Company Use of Senior Securities − Select Bibliography* (last modified June 17, 2016), available at: *https://www.sec.gov/divisions/investment/seniorsecurities-bibliography.htm*.

86. Use of Derivatives by Registered Investment Companies and Business Development Companies (Dec. 11, 2015) [80 Fed. Reg. 80884, 80887 (Dec. 28, 2015)].

In December 2015, the SEC proposed new derivatives rules to modernize and refresh the regulation of funds' derivatives activities.[87] The proposed rule would permit mutual funds, ETFs, and closed-end funds to enter into derivatives transactions, notwithstanding the '40 Act's restrictions on the issuance of senior securities, provided the funds comply with the conditions in the proposed rule. The proposed rule would impose the following conditions:

- Comply with one of two portfolio limitations, either the exposure-based portfolio limit or the risk-based portfolio limit, each of which is designed to limit the fund's leverage obtained through derivatives;

- Segregate an amount of qualifying coverage assets (limited to cash and cash equivalents) for derivatives, so funds could meet their obligations in a stress scenario; and

- For funds that engage in more than a limited amount of derivatives transactions or use certain complex derivatives transactions, establish a formalized derivatives risk management program.

While the proposed rule's comprehensive approach to the regulation of funds' derivatives activities is an improvement from the current piecemeal approach, the proposal has several key concerns.

First, portfolio limits could unnecessarily restrict funds from using derivatives, even for hedging or other risk mitigating purposes. Limiting the risk management and liquidity tools available to fund managers would result in less efficient asset management, higher transaction costs, and lower returns. The result could be the closure of certain funds, or forced changes to investment strategies that would disrupt current business practices and reduce investor choice.

Second, the proposed rule's use of gross notional amount as a measure for derivatives exposure is problematic. The proposed rule's exposure-based portfolio limit would require a fund to limit its aggregate exposure to 150% of the fund's net assets calculated based on the aggregate gross notional amount of the fund's derivatives transactions. However, a high gross notional exposure of a fund's portfolio is not necessarily correlated with leverage or risk levels. A recent study conducted by economists at the SEC's Division of Economic and Risk Analysis noted that similar notional amounts of derivatives across different underlying asset classes generally do not represent similar units of risk.[88] High gross notional amounts could lead to a fund being more risky, less risky, or equally risky compared with a fund that has no derivatives exposure. Using the gross notional amount as a measure for derivatives exposure risks does not take into account the beneficial effects of using derivatives in portfolio management. Absent a clearly defined connection between gross notional amounts of derivatives and leverage, and evidence that derivatives used for leverage create unacceptable levels of risk, the SEC's proposed rule is problematic.

Third, while it is important for funds to manage the risks of their derivatives obligations, the rule's limiting of qualifying coverage assets to cash and cash equivalents could require funds to hold more of those assets than they would otherwise, potentially reducing investment returns and causing tracking errors for funds that follow indexes.

---

87. Id.

88. Daniel Deli et al., *Use of Derivatives by Registered Investment Companies* (Dec. 2015), available at: *https://www.sec.gov/dera/staff-papers/white-papers/derivatives12-2015.pdf*.

In October 2016, the SEC also adopted new reporting requirements for registered investment companies that would support its effort to modernize derivatives regulations.[89] Pursuant to Form N-PORT, almost all funds would report information about their monthly portfolio holdings to the SEC in a structured data format, including extensive information on derivatives investments. Funds would be required to disclose certain characteristics and terms of their investments in derivatives to enable a better understanding of the profit-and-loss profile of such investments and the exposures created by such investments. The compliance date for the enhanced fund reporting is June 1, 2018.

*Recommendations*

While Treasury supports the SEC's goal of modernizing the regulation of derivatives for funds, Treasury has concerns with certain aspects of the proposed rule. Treasury recommends the SEC consider a derivatives rule that would include a derivatives risk management program and an asset segregation requirement, but reconsider what, if any, portfolio limits should be part of the rule. Any portfolio limits, if adopted, should be based on significantly more risk-adjusted measures of a fund's derivatives than the current proposal. The SEC should also reconsider the scope of assets that would be considered qualifying coverage assets for purposes of the asset segregation requirement. Treasury further recommends that the SEC examine the derivatives data that will be reported by funds starting next year and publish analysis based on empirical data regarding their use of derivatives.

## Exchange Traded Funds

Since the introduction of ETFs in 1993, investor interest has continued to grow.[90] Although early ETFs tracked only broad-based U.S. equity indexes, ETFs are now available to investors in many asset classes.[91] The large variety of ETFs enables an investor to easily hold a diversified investment portfolio, customized to the investor's risk tolerance. Many ETFs have lower expense ratios and may be more tax efficient than traditional mutual funds, features that can be attractive to investors.

Given their growing market share and expanding diversity of product offerings, ETFs broaden the array of choices available to investors. Unlike mutual funds, ETFs trade like stocks on a stock exchange, and the price of the ETF changes throughout the day. The purchase and sale of individual ETF shares in the market are similar to the purchase and sale of single stocks, and the market price of the shares varies during the trading day due to various factors, including the underlying prices of the ETF's assets and the demand for the ETF. ETFs can be actively or passively managed. ETFs do not issue or redeem their shares at a NAV; instead, they issue and redeem large blocks of shares called creation units, with authorized participants, while other investors pay the ETF market price.

---

89. Investment Company Reporting Modernization (Oct. 13, 2016) [81 Fed. Reg. 81870 (Nov. 18, 2016)].

90. This discussion focuses on ETFs that are registered investment companies. Other exchange traded products involve pooled investment vehicles that are not registered under the '40 Act, because they invest in precious metals, futures, or derivative contracts, or other assets not constituting securities. In addition, financial institutions may issue exchange-traded notes, which are senior debt instruments whose returns are based on reference assets, but are not pooled investment vehicles. See Request for Comment on Exchange-Traded Products (June 12, 2015) [80 Fed. Reg. 34729 (June 17, 2015)] ("ETF Request for Comment").

91. ICI Fact Book, at 59.

ETF sponsors enter into contractual relationships with financial institutions known as authorized participants. Only authorized participants may purchase and redeem shares directly from the ETF, and they do so only in creation units, which generally hold 25,000 to 200,000 ETF shares. To purchase a creation unit, an authorized participant deposits a basket of securities and other assets (a "purchase basket") with the ETF. The authorized participant receives the creation unit in return for the purchase basket, and can hold or split up the creation unit and sell the ETF shares in the secondary market. To redeem, the authorized participant acquires a large block of the ETF shares on the secondary market and delivers the shares to the ETF. In return, the ETF typically provides a basket of certain securities and other assets (a "redemption basket") to the authorized participant. The makeup of purchase and redemption baskets is identified daily by the ETF, generally reflects the ETF's portfolio holdings, and equals the aggregate NAV of the ETF shares comprising a creation unit.

Arbitrage plays an important role in the purchase and redemption of ETFs. An ETF's market price fluctuates during the trading day, so the intraday market price might not equal the fund's NAV at the end of the day. Thus, authorized participants have economic incentives to reduce the difference between the intraday market price and the NAV, because they can trade directly with the ETF at the NAV as well as on the market. As a result, the market value of the ETF moves back in line with the ETF's NAV per share, so other investors are able to buy ETF shares at a price closer to the ETF's NAV per share.

The ETF arbitrage mechanism depends in part on the transparency of the ETF's portfolio and the liquidity of the underlying securities. Transparency of the ETF portfolio facilitates the arbitrage mechanism by assisting authorized participants in deciding whether to purchase or redeem creation units based on the relative values of ETF shares in the secondary market and the securities comprising the ETF portfolio. The liquidity of securities comprising an ETF's portfolio facilitates the arbitrage mechanism because arbitrageurs must be readily able to purchase and sell the securities comprising the purchase and redemption baskets.

### Regulation of ETFs

For an ETF to begin trading on a national exchange, the ETF must first file an application with the SEC to obtain an exemptive relief order, which exempts the ETF from certain provisions of the '40 Act and other SEC rules. As of the end of 2016, the total number of ETFs in the marketplace had grown to more than 1,700,[92] and exemptive relief orders apply to each ETF.

The exemptive relief process can involve significant time and expense in addition to the expense of creating a new ETF, including registering the fund as an investment company and registering the offering of its securities under the Securities Act. Depending on the particular ETF, some exemptive relief orders have unique provisions and require additional scrutiny. To the extent that an ETF requires a change in exchange listing standards, a separate rule change process is required and handled by the SEC's Division of Trading and Markets in addition to the exemptive relief order

---

92.  Id.

process managed by the SEC's Division of Investment Management.[93] These divisions within the SEC, which administer different underlying statutes, can apply different criteria and requirements in obtaining approvals, which can also change over time.

The SEC proposed a rule in 2008 to streamline this unpredictable, lengthy, and expensive ETF approval process. The 2008 rule would have generally codified the exemptive relief orders previously issued by the SEC and would have permitted new ETFs to operate without obtaining exemptive relief orders under specified conditions.[94] The rule would have limited actively managed ETFs to those that provide portfolio transparency to market participants, thereby promoting an effective arbitrage mechanism and reducing significant premiums and discounts in secondary market transactions. Under the proposed rule, actively managed ETFs would have been permitted to continue to seek exemptive order relief through applications to the SEC.[95] This proposal was never finalized by the SEC.

The proposed rule would have permitted ETFs to operate without exemptive relief orders from the following provisions of the '40 Act:

- **Issuance of "redeemable securities":** The rule would provide exemptive relief from Sections 2(a)(32) and 5(a)(1) of the '40 Act,[96] allowing ETFs to register as open-end investment companies despite limiting redemptions solely to creation units while excluding individual ETF shares.

- **Trading of ETF shares at negotiated prices:** The rule would provide exemptive relief from Section 22(d) of the '40 Act[97] and Rule 22c-1[98] thereunder. This would allow ETF shares to be purchased and sold at market prices in secondary market transactions and not at a price listed in a prospectus or based on the NAV.

- **In-kind transactions between ETFs and affiliates:** The rule would provide exemptive relief from Section 17(a)(1) and Section 17(a)(2) of the '40 Act,[99] allowing certain affiliated entities of an ETF (including but not limited to entities that own more than 5% of its voting securities) the ability to purchase and redeem creation units through in-kind transactions.

---

93. 17 C.F.R. § 240.19b-4. Certain ETFs are eligible for relief under generic listing standards previously approved for an exchange. In such situations, only a notice is required to be filed with the SEC within five business days after commencement of trading. See ETF Request for Comment, 80 Fed. Reg. at 34737-38.

94. Exchange-Traded Funds (Mar. 11, 2008) [73 Fed. Reg. 14618 (Mar. 18, 2008)].

95. At the same time, the SEC proposed Rule 12d1-4, which codified much of the anti-pyramiding exemptive relief generally obtained by ETFs, but eliminated many of the conditions imposed in previously issued exemptive orders and would have allowed investment companies to invest in ETFs in excess of the current limits imposed by the '40 Act. Id.

96. 15 U.S.C. §§ 80a-2(a)(32) and 80a-5(a)(1).

97. 15 U.S.C. § 80a-22(d).

98. 17 C.F.R. § 270.22c-1.

99. 15 U.S.C. § 80a-17(a)(1) and (a)(2).

- **Additional time for delivering redemption proceeds:** The rule would provide exemptive relief from Section 22(e) of the '40 Act,[100] allowing an ETF that includes foreign securities in its redemption basket for a period not exceeding 12 days, upon the tender of a creation unit for redemption.

ETFs relying on the proposed rule would have been required to adhere to the following conditions, which were designed to be consistent with the '40 Act and preserve investor protections:

- **Transparency of index and portfolio holdings:** The ETF would either need to disclose on its website the identities and weightings of the component securities and other assets held by that ETF, or have a stated investment objective of obtaining investment returns that correspond to the returns of a securities index. The ETF's disclosures must be accessible by the public and free of charge. Intraday changes to portfolio holdings or advance notice of portfolio trades would not be required.

- **Listing of ETF shares on a national securities exchange and dissemination of the intraday value of purchase and redemption baskets:** The ETF shares would need to be approved for listing and trading on a national securities exchange, which discloses at regular intervals and during the trading day the intraday value of the securities comprising the purchase and redemption baskets, calculated on a per-share basis.

- **Marketing of ETF shares:** ETFs under this rule would be required to identify themselves in any sales literature as ETFs and explain that they neither sell nor redeem individual ETF shares. ETFs would also need to disclose the prior business day's NAV and the closing market price of ETF shares in secondary market transactions, as well as other data.

*Recommendations*

Treasury recommends that the SEC move forward with a "plain vanilla" ETF rule that allows entrants to access the market without the cost and delay of obtaining exemptive relief orders, subject to conditions the SEC determines appropriate and in the public interest. To this end, the SEC should either re-propose or propose a new rule on ETFs for public comment.

Adopting a plain vanilla ETF rule would not only reduce cost and delay for new entrants, it would also enable ETF sponsors to avoid the potential for costly updates to existing exemptive relief orders when introducing new products, and help reduce uneven treatment between ETFs. Likewise, a plain vanilla ETF rule would enable the SEC staff to focus efforts on more novel and more difficult ETF exemptive relief applications and timely responses to these requests.

Additionally, to streamline the ETF process and reduce inefficiency, the SEC should consider establishing a single process for ETF and related approvals rather than allowing SEC divisions to set multiple and sometimes conflicting requirements.

## Business Continuity and Transition Planning

Business continuity planning plays an important role in allowing investment companies and investment advisers to operate during times of disruption. These plans outline how investment advisers

---

100. 15 U.S.C. § 80a-22(e).

would minimize investor impact in the event of a major disruption. For example, such plans may designate alternate work sites in case of a natural disaster or other disturbance. Disruptive events can include natural disasters, cyberattacks, acts of terrorism, technology failures, and departures or unavailability of key employees. Business continuity planning helps to ensure that critical functions and activities can continue to operate in adverse conditions; it can also mitigate negative effects and facilitate a return to normal operations.

As the SEC staff has observed, fund complexes and their service providers have developed and continually improved their business continuity plans for decades.[101] These efforts have been tested in recent times, during the terrorist attacks on September 11, 2001, natural disasters such as Hurricane Katrina in 2005 and Hurricane Sandy in 2012, and the economic disruptions of the financial crisis, which included the rapid and unexpected exit of major market participants.

According to the SEC, investment advisers, both during routine times as well as during non-routine disruptions, generally transition client accounts without a significant impact to themselves, their clients, or the financial markets.[102] This can be attributed to the agency relationship of advisers managing the assets on behalf of their clients and the custody and asset segregation requirements of the '40 Act and the Advisers Act and the SEC rules thereunder.[103] As a result, transitioning accounts from one adviser to another is largely a streamlined process that may not even involve the legal transfer or sale of assets.[104]

Business continuity plans have long been required under investment advisers' general fiduciary obligations to investors.[105] The SEC in 2003 adopted Rule 206(4)-7 under the Advisers Act and Rule 38a-1 under the '40 Act to require investment advisers and investment companies to maintain business continuity plans as part of their compliance policies and procedures.[106] These rules require investment advisers and funds to adopt and implement written compliance policies and procedures, including business continuity plans to the extent they are relevant. As principles-based rules, they provide investment advisers and investment companies with flexibility to implement a business continuity plan appropriate for that particular entity. Since then, the SEC staff has provided continued guidance on business continuity planning. The SEC staff has examined fund complexes and their critical service providers' business continuity plans and capabilities following disruptive events, and published their findings and guidance in 2016.[107] The SEC examination

101. Division of Investment Management, U.S. Securities and Exchange Commission, *IM Guidance Update 2016-04, Business Continuity Planning for Registered Investment Companies* (June 2016), available at: *https://www.sec.gov/investment/im-guidance-2016-04.pdf.*

102. Adviser Business Continuity and Transition Plans (June 28, 2016) [81 Fed. Reg. 43530, 43535 (July 5, 2016)] ("Business Continuity Proposing Release").

103. See 15 U.S.C. § 80a-17(f); 15 U.S.C. § 80b-18b.

104. Business Continuity Proposing Release, 81 Fed. Reg. at 43535.

105. See Compliance Programs of Investment Companies and Investment Advisers (Dec. 17, 2003) [68 Fed. Reg. 74714, 74716 (Dec. 24, 2003)] ("Compliance Rules Release").

106. Id.

107. Division of Investment Management, U.S. Securities and Exchange Commission, *Guidance Update - Business Continuity Planning for Registered Investment Companies* (June 2016), available at: *www.sec.gov/investment/im-guidance-2016-04.pdf.*

staff published observations after reviewing investment advisers' business continuity plans in the aftermath of Hurricane Sandy in August 2013.[108] Also in August 2013, the CFTC staff, SEC staff, and FINRA published best practices and lessons learned from Hurricane Sandy in relation to business continuity plans.[109]

In June 2016, the SEC proposed a new Rule 206(4)-4 under the Advisers Act that would require registered investment advisers to adopt and implement written business continuity and transition plans "reasonably designed to address operational and other risks related to a significant disruption in the investment adviser's operations."[110] The rule has not been finalized. The proposed rule would require policies and procedures concerning: (1) business continuity after a significant business disruption, and (2) business transition in the event the investment adviser is unable to continue providing investment advisory services to clients.[111] The proposed rule contains a number of prescriptive requirements for the content of business continuity and transition plans.[112]

In proposing the rule, the SEC cited concerns that business continuity planning was inconsistent among investment advisers and, in some instances, not sufficiently robust. The costs of compliance with the proposed rule could be significant. The SEC estimated that each registered investment adviser would initially spend between $11,000 and $1.3 million to upgrade systems and comply with other provisions of the proposed rule, and approximately 25% of those amounts for maintenance each subsequent year. These costs would not only be borne by the 12,000 investment advisers currently in operation, but also ultimately their clients, as the costs are likely to be passed on by the advisers.

### Recommendations

Treasury strongly endorses the principle of effective and robust business continuity planning by investment advisers and investment companies. With the existing principles-based rule already in place, there is no compelling need for additional rulemaking in this area. Treasury recommends that the current SEC proposal be withdrawn.

Treasury further recommends that the SEC and its staff continue to work with investment companies, investment advisers, and other relevant parties to recommend improvements to their business continuity plans, to the extent that such plans are determined not to be sufficiently robust, and to address new issues as they arise.

---

108. Office of Compliance Inspections and Examinations, U.S. Securities and Exchange Commission, *National Exam Program Risk Alert* (Aug. 27, 2013), available at: *https://www.sec.gov/about/offices/ocie/business-continuity-plans-risk-alert.pdf.*

109. CFTC Division of Swap Dealers and Intermediary Oversight, SEC National Examination Program, and FINRA, *Joint Observations of Business Continuity Planning* (Aug. 2013), available at: *https://www.sec.gov/about/offices/ocie/jointobservations-bcps08072013.pdf.*

110. Business Continuity Proposing Release, 81 Fed. Reg. at 43530.

111. Id. at 43537.

112. Id. at 43534-35.

035271

## Money Market Mutual Fund Reform

A money market mutual fund (MMMF) is a type of open-end investment company that seeks to maintain a stable NAV of $1 per share.[113] MMMFs invest in short duration, low risk securities such as U.S Treasuries and high quality commercial paper to provide investors with liquidity and higher returns than can otherwise be found in other cash equivalent investments. The combination of principal stability, liquidity, and competitive yields has made MMMFs popular with retail and institutional investors as a cash management vehicle.

MMMFs were first established in the early 1970s as a solution to the Federal Reserve's then-Regulation Q, which at the time prohibited bank demand deposits from paying interest and capped the rate of interest on other types of bank accounts at 5.25%.[114] MMMFs are typically used by investors seeking short-term, liquid, and cash-like investments with the potential for some incremental yield relative to cash held at a bank.

During the fall of 2008, many MMMFs experienced large-scale redemptions and other money market funds saw reduced liquidity for the securities of otherwise credit-worthy issuers.[115] Due to illiquidity concerns across the market, some MMMFs were not able to satisfy investor redemption requests. In September 2008, the Reserve Primary Fund's exposure to Lehman Brothers led the fund to "break the buck," or fall below the value of $1 per share.

The federal government subsequently intervened in the money market, specifically through the Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility. The facility was introduced to help MMMFs that held asset-backed commercial paper (ABCP) meet investors' demands for redemptions, and to foster liquidity in the ABCP market and money market mutual funds more generally.

In addition, in September 2008, Treasury established a Temporary Guarantee Program for Money Market Funds to guarantee the share price of any publicly offered eligible MMMF that applied to and paid a fee for participation in the program.[116] The program was designed to address temporary dislocations in the credit markets. President Bush approved Treasury's use of the assets of the Exchange Stabilization Fund to guarantee payments under the program.[117]

In 2010, the SEC undertook a series of reforms to Rule 2a-7, which governs MMMFs. The reforms included: (1) daily and weekly liquidity minimums of 10% and 30% of total assets respectively, (2) general liquidity requirements, which require portfolio managers to determine

---

113. See *https://www.federalreserve.gov/regreform/reform-glossary.htm* (money-market mutual fund).

114. Investment Company Institute, *Report of the Money Market Working Group* (Mar. 17, 2009), at 21, available at: *https://ici.org/pdf/ppr_09_mmwg.pdf.*

115. Division of Risk, Strategy, and Financial Innovation, U.S. Securities and Exchange Commission, *Responses to Questions Posed by Commissioners Aguilar, Paredes, and Gallagher* (Nov. 30, 2012), at 7, available at: *https://www.sec.gov/news/studies/2012/money-market-funds-memo-2012.pdf* (noting that prime money market fund assets fell by 24%, or $498 billion, during the period September 2, 2008 to October 7, 2008).

116. See U.S. Department of the Treasury, *Press Release* (Sept. 29, 2008), available at: *https://www.treasury.gov/press-center/press-releases/Pages/hp1161.aspx.*

117. Id. Section 131 of the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343 (codified at 12 U.S.C. § 5236), subsequently limited the establishment of any future guaranty program for MMMFs.

whether they have additional liquidity needs beyond the rule's minimum requirements to meet reasonably foreseeable shareholder redemptions, (3) portfolio maturity limits of weighted average maturity of 60 days or less, and weighted average life of 120 days or less, (4) stress testing requirements, requiring funds to determine how they would perform in stressed market conditions, (5) portfolio holdings disclosure requirements for the funds to file a report with the SEC on a monthly basis, and (6) new Rule 22e-3, which permits fund boards to suspend redemptions and payment of redemption proceeds.[118]

In 2014, the SEC, following the issuance of proposed recommendations by the FSOC, undertook additional reforms, the pillar of which requires "prime" (non-government) institutional MMMFs to float the NAV of their shares instead of letting the funds maintain the stable $1 NAV per share. In addition, boards of directors were given discretion to lower "gates" on redemptions, or charge fees of up to 2% if market stress causes a fund's weekly liquid assets to fall below 30%. Retail and government MMMFs were exempted from the rule.[119] The compliance date for the floating NAV requirement and liquidity fees and gates was October 14, 2016.

By October 31, 2016, prime and tax-exempt MMMFs experienced a decrease in assets of $1 trillion since the beginning of the year, and government MMMFs saw an increase in assets of $968 billion during the same period.[120]

## Dual SEC and CFTC Registration

In 2012, the CFTC adopted rules that required certain investment companies and investment advisers to register with the CFTC as commodity pool operators (CPOs), even if already required to register with the SEC.[121] Commodity pools are collective investment vehicles designed to trade in commodity interests, including futures, options on futures, retail foreign exchange transactions, and swaps.

### *Registered Investment Companies*

Prior to the 2012 CFTC amendments, investment companies registered with the SEC, and their principals or employees, were effectively exempt from the CFTC's definition of CPOs. The 2012 amendments, however, narrowed the universe of SEC-registered investment companies and their advisers that could be exempt from the CPO definition to funds whose commodity transactions (other than for bona fide hedging purposes) do not require aggregate initial margin and premiums in excess of 5% of their portfolio's liquidation value, and where the aggregate net notional value of commodity transactions does not exceed 100%.[122] Under the 2012 amendments, SEC-registered investment companies must also refrain from marketing themselves as vehicles for trading in the

---

118.  Money Market Fund Reform (Feb. 23, 2010) [75 Fed. Reg. 10060 (Mar. 4, 2010)].

119.  Money Market Fund Reform; Amendments to Form PF (July 23, 2014) [79 Fed. Reg. 47736 (Aug. 14, 2014)].

120.  Division of Investment Management, U.S. Securities and Exchange Commission, *Money Market Fund Statistics* (Aug. 18, 2017), at 4, available at: *https://www.sec.gov/divisions/investment/mmf-statistics/mmf-statistics-2017-7.pdf*.

121.  Commodity Pool Operators and Compliance Trading Advisors: Compliance Obligations (Feb. 8, 2012) [77 Fed. Reg. 11252 (Feb. 24, 2012)] ("CPO/CTA Compliance Obligations").

122.  17 C.F.R. § 4.5

commodity futures, commodity options, or swaps markets to qualify for exemption from the CPO definition.

The CFTC took action in this area in response to a petition filed by the National Futures Association (NFA). The CFTC said one reason for promulgating the amendments was that certain SEC-registered investment companies were offering "de facto" commodity pools while claiming an exemption under the Commodity Exchange Act (CEA).[123] In its petition to the CFTC, the NFA expressed concern that three SEC-registered investment companies were being marketed to retail customers as commodity futures investments, but were not subject to CFTC and NFA regulation.[124] In response to public comment that many SEC-registered funds would be swept into the CPO definition under the amendments, the CFTC stated that its oversight of these investment companies was necessary despite the fact that they were already registered with the SEC.[125]

According to the Investment Company Institute, as of early 2016, 101 advisers to SEC-registered investment companies were required to dually register with the CFTC after the amendments and be subject to separate reporting and regulatory obligations imposed by the CFTC and NFA. Even though the CFTC presented the de facto commodity pool issue as one of the principal reasons for its 2012 amendments, the CFTC's expanded jurisdiction now captures many funds that do not resemble, or compete with, traditional commodity pools.[126] These funds must comply with the separate regulatory regime administered by the CFTC and NFA, including obligations for disclosure, shareholder reports, financial statements, recordkeeping, and periodic reports under the CEA. Although the CFTC provided limited relief to investment companies subject to dual registration and regulation by the SEC and CFTC, funds and their advisers must still demonstrate compliance with the conditions of such exemptions.[127]

*Recommendations*

Treasury recommends amending the CFTC rules so an investment company registered with the SEC and its adviser are exempt from dual registration and regulation by the CFTC as a CPO. To address concerns of de facto commodity pools operating without sufficient oversight, the CFTC and the SEC should work together to identify a single regulator for these entities, with the goal that oversight of these entities will either remain with the SEC or be transferred to the CFTC

---

123. CPO/CTA Compliance Obligations, at 11254.

124. Letter from Thomas W. Sexton, III, Senior Vice President and General Counsel, NFA, to David Stawick, Office of the Secretariat, CFTC (Aug. 18, 2010), available at: *https://www.nfa.futures.org/news/newsPetition. asp?ArticleID=3630*.

125. CPO/CTA Compliance Obligations, 77 Fed. Reg. at 11254.

126. The ICI indicated that the 101 investment advisers served approximately 500 funds that were no longer eligible for the CPO exclusion.

127. Harmonization of Compliance Obligations for Registered Investment Companies Required to Register as Commodity Pool Operators (Aug. 12, 2013) [78 Fed. Reg. 52,308 (Aug. 22, 2013)]. For example, for relief under certain exemptions, the CFTC can make its own independent assessment as to whether disclosures from a registered investment company satisfy its obligations under the federal securities laws as well as any informal SEC staff guidance. See 17 U.S.C. § 4.12(c). In 2017, the CFTC updated its recordkeeping requirements under the CEA, including amendments that would provide better alignment of CFTC provisions with SEC provisions, but the separate CFTC regulatory structure remains for dually registered entities. See Recordkeeping (May 23, 2017) [82 Fed. Reg. 24479 (May 30, 2017)].

and NFA. Treasury further recommends that the CFTC and the SEC cooperate to share information provided by their respective regulated entities so disclosures made to one agency can address the information needs of the other agency to monitor the markets for securities and derivatives transactions.[128]

### Advisers to Private Funds

Advisers to private funds are now generally subject to SEC oversight, after Title IV of Dodd-Frank eliminated the applicable exemption from registration under the '40 Act for such advisers.[129] After the 2012 amendments, certain advisers to private funds are also required to register with the CFTC as CPOs. Specifically, if private funds are offered to investors who are "qualified eligible persons" or accredited investors under the SEC's Regulation D, both the funds and their advisers must register with the CFTC as CPOs.[130] As a result, certain advisers to private funds are required to register with the SEC as an investment adviser and also register with the CFTC as CPOs.

By comparison, the regulatory treatment of investment advisers that could potentially be categorized as commodity trading advisors (CTAs) is less onerous, and includes provisions designed to prevent dual registration requirements with not only the SEC, but also with the CFTC as CTAs. Dodd-Frank contained provisions stating that SEC-registered investment advisers are not required to register with the CFTC as CTAs if they are not advising commodity pools engaged primarily in trading commodity interests. Conversely, a CFTC-registered CTA is not required to register with the SEC as an investment adviser, unless its predominant business is giving securities-related advice.[131] Dodd-Frank did not include similar provisions designed to prevent dual registration requirements for CPOs.

Under the 2012 CFTC rule, many private fund advisers are required to dually register with the SEC as investment advisers and the CFTC as CPOs. In the 2012 rulemaking, the CFTC rejected commenter suggestions to provide a limited exemption from the CPO registration requirement for SEC-registered investment advisers that are not primarily engaged in trading commodity interests, finding that dual registration was "not irreconcilable" with Dodd-Frank.[132] The CFTC provided no analysis of why SEC regulation of investment advisers was inadequate and merely responded that "regulation is necessary to ensure a well-functioning market and to provide investor protection."[133]

Thus, absent the availability of a different exemption such as the de minimis exemption, advisers to private funds are subject to dual registration with the SEC as investment advisers and the CFTC as CPOs, and must comply with the separate regulatory regime under the CFTC and NFA.

---

128. This recommendation also applies with respect to private fund advisers.

129. See Dodd-Frank § 403.

130. CPO/CTA Compliance Obligations, 77 Fed. Reg. at 11264. The CFTC retained a de minimis exemption for entities with less than 5% exposure to commodity interests. Id. at 11261.

131. Dodd-Frank §§ 403 and 749.

132. CPO/CTA Compliance Obligations, 77 Fed. Reg. at 11261-62.

133. Id. at 11262.

*Recommendations*

Treasury recommends amendments to the CFTC rules that would exempt private funds and their advisers from registration as CPOs if the advisers are subject to regulatory oversight by the SEC. Treasury also recommends that the CFTC review and determine what, if any, exemptions should be made available for SEC-exempt reporting advisers.

## Modernizing the Delivery of Registered Fund Disclosures

The Securities Act, the Exchange Act, and the '40 Act impose an extensive set of disclosure requirements on registered investment companies so that investors can make informed investment decisions.[134] For example, when purchasing shares of a mutual fund, an investor must be provided with a prospectus that contains information about the fund's objectives, fees and expenses, performance, investment strategies, risk factors, performance, and management.[135] Mutual funds, ETFs, and closed-end funds are required to send a semiannual report to investors, which contains updated financial information, a list of the fund's portfolio securities, and other information.[136] The regulatory default is to provide these disclosures in paper by mail unless consent has been obtained for electronic delivery. Unfortunately, paper disclosures are often discarded by fund shareholders.[137] Delivering these disclosures in paper comes at a significant expense, which are paid out of fund assets.

Promoting transparency in financial markets and providing appropriate disclosure is a fundamental part of investor protection. Transparency of fund information remains critical to a dynamic asset management industry and investor trust and well-being. However, regulatory requirements must adapt appropriately to advances in technology and increased access to the Internet across the United States. As shown in Figure 7, 84% of U.S. adults have access to the Internet,[138] and 92% of all mutual fund-owning households have access.[139]

---

134. See, e.g., 15 U.S.C. §§ 77e(b), 78m(a), 78o(d), and 80a-29.

135. See, e.g., Form N-1A, 17 C.F.R. §§ 239.15A and 274.11A.

136. 17 C.F.R. §§ 270.30e-1 and 270.30e-2.

137. Office of Investor Education and Advocacy, U.S. Securities and Exchange Commission, *Mandatory Disclosure Documents Telephone Survey* (July 30, 2008), at 78, available at: *https://www.sec.gov/pdf/disclosuredocs.pdf* (finding that 50% never, very rarely, or rarely read fund shareholder reports).

138. Andrew Perrin and Maeve Duggan, Pew Research Center, Americans' Internet Access: 2000-2015 (June 26, 2015), available at: *http://www.pewinternet.org/2015/06/26/americans-internet-access-2000-2015/*.

139. ICI Fact Book, at 129.

Figure 7: American Adults Who Use the Internet: 2000-2015 (percent)



Source: Pew Research Center surveys

In 2009, the SEC amended its rules to provide mutual funds with a new option for satisfying prospectus delivery obligations.[140] Under the rule, a fund could give key information to investors in a summary prospectus and post the complete statutory prospectus, the statement of additional information, and the two most recent shareholder reports on a website.[141] Funds that elect to use a summary prospectus must send the statutory prospectus to the investor upon request. According to SEC staff, the vast majority of funds now use a summary prospectus.

In May 2015, the SEC proposed Rule 30e-3 under the '40 Act that would permit a mutual fund to transmit shareholder reports through a website.[142] A fund relying on the proposed rule would be required to comply with certain conditions, including making the shareholder report and other information publicly accessible and free of charge on a website, providing notice to shareholders of the availability of the shareholder report online, and allowing shareholders to request paper copies by mail. The website materials must be presented in a format convenient for reading online and printing on paper and permit a person to retain an electronic version. Most notably, the proposed rule would permit the use of implied consent to delivery by website in the absence of further instruction from the shareholder. The rule has not been finalized by the SEC.

---

140. Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-End Management Investment Companies (Jan. 13, 2009) [74 Fed. Reg. 4546 (Jan. 26, 2009)].

141. 17 C.F.R. § 230.498.

142. Investment Company Reporting Modernization (May 20, 2015) [80 Fed. Reg. 33590 (June 12, 2015)].

The delivery of fund reports and other materials by electronic means, such as a website, would enable significant cost savings. Electronic delivery could also enable a greater level of detail and information to reach investors through an online platform that would likely enhance the user experience and provide greater educational value for investors. For fund shareholder reports alone, such a change could save investors up to $2 billion over the next 10 years while reducing significant environmental waste.[143]

*Recommendations*

Treasury recommends that the SEC finalize its proposed rule to modernize its shareholder report disclosure requirements and permit the use of implied consent for electronic disclosures. The SEC should explore other areas for which the delivery of information to investors through an electronic medium using implied consent is appropriate and consistent with investor protection. As part of this effort, Treasury encourages consideration of innovative uses of new technology to enhance the delivery of information to fund investors.

Notwithstanding the benefits of electronic delivery, Treasury recognizes that not all persons have access to the Internet. In addition, some investors will prefer to receive their disclosures in paper rather than electronically. Consistent with the Core Principles, Treasury strongly believes that investors should retain the choice to continue receiving paper disclosures.

## Asset Management Reporting and Disclosure Requirements

Ensuring the prudent, efficient, and effective collection of data by financial regulators is critical to their role of overseeing the financial markets. The asset management industry is subject to a significant number of reporting obligations, which provide regulatory and public transparency into their activities.

Reporting obligations are imposed both at the asset manager level and the fund level. These obligations come from a variety of sources, including the securities laws, the derivatives laws, and SRO rules.

Investment advisers must report certain information on Form ADV to register with either the SEC or the states, and once registered, must update the form annually.[144] In 2016, the SEC adopted amendments to Form ADV, which included enhanced disclosure requirements on separately managed accounts advised by asset managers.[145] Investment advisers to private funds also need to provide information on Form PF.[146] Form PF contains specific disclosure requirements for large hedge fund advisers, large liquidity fund advisers, and large private equity advisers. If the registered investment adviser is also a publicly traded company, the adviser will have additional reporting

---

143. ICI Viewpoints, *The SEC's Online-Delivery Gift to Fund Shareholders* (Apr. 4, 2016), available at: *https://www. ici.org/viewpoints/view_16_sec_shareholder_gift.*

144. 15 U.S.C. § 80b-3(c); 17 C.F.R. § 275.204-1.

145. Form ADV and Investment Adviser Act Rules (Aug. 25, 2016) [81 Fed. Reg. 60418 (Sept. 1, 2016)].

146. 17 C.F.R. § 275.204(b)-1.

obligations under the federal securities laws to file audited financial statements and other information with the SEC.[147]

Registered investment companies are subject to many ongoing disclosure requirements. Mutual funds, which are engaged in a continuous offering, must update their prospectuses and registration statements on an annual basis.[148] Funds other than MMMFs are required to report portfolio holdings on a quarterly basis.[149] The portfolio holdings data will be significantly enhanced by recently adopted Form N-PORT, which will require reporting on a monthly basis once it becomes effective.[150] In addition, funds will be required to report aggregate purchase and sales of fund shares on Form N-PORT.[151] As part of its rulemaking to modernize fund reporting, the SEC introduced an annual requirement to provide census-like information on a new form, Form N-CEN. Registered investment companies are required to report their proxy voting record through Form N-PX on an annual basis.[152]

The SEC requires MMMFs to disclose information pursuant to a specially tailored reporting regime.[153] The SEC requires MMMFs to report their portfolio holdings monthly and to publicly disclose monthly holdings on the fund's website.[154] MMMFs also have a requirement to report to the SEC within one business day after the occurrence of a material event, such as a default, insolvency of a portfolio security, or imposition of liquidity fees.[155]

Asset managers and investment companies are subject to reporting obligations that generally apply to any market participant. Funds must report significant stakes in public companies by filing Schedule 13D or 13G.[156] Asset managers, registered investment companies, and private funds may also be required to file Form 13H under the large trader reporting rules.[157] Asset managers who exercise investment discretion over at least $100 million in equity securities traded on national securities exchanges must report positions quarterly on Schedule 13F.[158]

Asset managers who are commodity pool operators or commodity trading advisers have additional reporting obligations. CPOs and CTAs register with the CFTC through the National Futures Association, an SRO.[159] Although Form PF is a joint form for investment advisers to private funds,

---

147. See 15 U.S.C. §§ 78(m) and 78o(d) and rules thereunder.

148. 15 U.S.C. § 77j(a)(3).

149. Registered investment companies are required to disclose publicly their schedule of investments on Form N-Q after the first and third quarters of their fiscal year and on Form N-CSR after the second and fourth quarters of their fiscal year.

150. Investment Company Reporting Modernization (Oct. 13, 2016) [81 Fed. Reg. 81870 (Nov. 18, 2016)].

151. Id.

152. 17 C.F.R. § 270.30b1-4.

153. Money Market Fund Reform (Feb. 23, 2010) [75 Fed. Reg. 10060 (Mar. 4, 2010)].

154. 17 C.F.R. §§ 270.30b1-7 and 270.2a-7(h)(10).

155. 17 C.F.R. § 270.30b1-8.

156. 17 C.F.R. § 240.13d-1.

157. See Large Trader Reporting (July 27, 2011) [76 Fed. Reg. 46960 (Aug. 3, 2011)].

158. 17 C.F.R. § 240.13f-1.

159. See https://www.nfa.futures.org/registration-membership/who-has-to-register/index.html.

CPOs, and CTAs, asset managers have asserted that under some circumstances they must still make reports on Forms CPO-PQR, CTA-PR, PQR, and PR. To the extent that the asset manager is filing SEC reports on the same pooled investment vehicle, there may be some duplication. The SEC, CFTC, and NFA have undertaken efforts to harmonize reporting obligations, but in outreach meetings with Treasury, asset managers indicated that differences remained in reporting with respect to definitional terms, methodologies, and timing.

Duplicative reporting requirements can add considerable burden and costs to funds that are passed on to investors. Reporting requirements can be particularly challenging to the extent that an asset manager serves as investment adviser to mutual funds, ETFs, private funds, and separately managed accounts. With new reporting requirements, asset managers and funds are working toward meeting reporting deadlines, but are faced with time-consuming operational complexities of integrating and developing new systems to pull information from different sources, coordinating with third party service providers, and testing to ensure that information is accurate.

Among the more troubling aspects of reporting are multiple types of required reporting formats that essentially request the same information, but in a slightly different manner or based on different timing, for example, when some reports are based on calendar year while others use fiscal year. The cumulative effect of these duplicative and onerous regulatory requirements serves to artificially inflate costs, which are passed on to the individual investor. Cost of reporting requirements also serve as barriers to entry for new competitors, thereby depriving investors of more choices.

*Recommendations*

Treasury strongly endorses the principle of transparency and investor protection as it pertains to the asset management industry and financial markets more broadly. Thorough reporting of fund holdings and other key financial data is essential to a well-functioning financial system.

However, given the immense data reporting requirements added over the past few years, the SEC, the CFTC, SROs, and other regulators should work together to rationalize and harmonize the reporting regimes. Where possible, duplicative forms should be combined and any unnecessary or inconsistent data collection should be eliminated. Treasury recommends that regulators continue to update reporting requirements to utilize structured data where appropriate.

## Information Security

Information security and protection is of paramount importance in an increasingly digital global financial system. The collection of data by federal agencies and regulators into a single system or data repository administered by one or multiple entities can raise serious information security concerns if not adequately protected. A security breach could expose firms or funds in the asset management industry to predatory trading practices or the replication of proprietary fund investment strategies, among other concerns. A security breach also has the potential to result in material loss of value for shareholders and individual investors in affected funds.

A Government Accountability Office (GAO) report released in July 2017 noted that the SEC "improved the security controls over its key financial systems and information" from a previous GAO audit but had not fully implemented prior GAO recommendations focused on protecting fund information and the systems and networks in which that data is administered. Furthermore, GAO uncovered additional data security control deficiencies impacting the "confidentiality, integrity, and availability of its information systems."[160]

Cybersecurity intrusions to non-public information maintained by federal financial regulators have already occurred. In September 2017, the SEC announced that a software vulnerability in the test filing component of its EDGAR system was exploited and resulted in access to non-public information, which may have provided the basis for illicit gains through trading.[161]

Treasury recommends that all regulatory agencies that collect any form of data from registered firms in the asset management industry redouble efforts to ensure the information security measures are meeting and exceeding standards set by Congress and the recommendations of other federal oversight bodies such as the GAO.

### The Volcker Rule

Section 619 of Dodd-Frank is commonly referred to as the Volcker Rule. Five federal regulatory agencies are responsible for implementing the rule: the Federal Reserve, Federal Deposit Insurance Corporation (FDIC), Office of the Comptroller of the Currency (OCC), SEC, and CFTC. Treasury has a statutory role to coordinate the rulemaking. The Volcker Rule was discussed in detail in Treasury's June 2017 Report published by Treasury on Banks and Credit Unions (Banking Report).

In the Banking Report, Treasury recommended substantial amendment to the Volcker Rule. Treasury recommended that the proprietary trading restrictions of the Volcker Rule not apply to banking entities with greater than $10 billion in assets unless they exceed a threshold amount of trading assets and liabilities. Treasury also identified ways of reducing the complexity of the rule to decrease regulatory burden, such as simplifying the definition of proprietary trading and allowing banking entities to more easily hedge their risks and conduct market-making activities. Treasury

---

160. U.S. Government Accountability Office, *Information Security: SEC Improved Control of Financial Systems but Needs to Take Additional Actions* (July 2017).

161. Chairman Jay Clayton, *Statement on Cybersecurity* (Sept. 20, 2017), available at: *https://www.sec.gov/news/public-statement/statement-clayton-2017-09-20.*

also recommended changes to the compliance program requirements to decrease regulatory burden, and increased coordination among the five responsible regulatory agencies.

Some provisions of the Volcker Rule have a particular impact on the asset management industry. In the Banking Report, Treasury recommended modifying the covered fund provisions of the rule to decrease regulatory burden, including by refining the definition of "covered fund" and extending the seeding period exemption from one year to three years. Treasury further recommended that banking entities other than depository institutions and their holding companies should be permitted to share a name with funds they sponsor, provided that the separate identity of the fund is clearly disclosed to investors. Finally, the Volcker Rule's application on affiliates and subsidiaries of "banking entities" is predicated on the Bank Holding Company Act's definition of "control," which may not be appropriate for certain funds.

Since the publication of Treasury's Banking Report, the FSOC has considered potential improvements to the Volcker Rule;[162] the three federal banking regulators announced that they would not take action under the Volcker Rule for certain foreign funds for one year;[163] the Federal Reserve issued new guidance on the procedures banking entities can follow to request extensions of the one-year seeding period for covered funds;[164] and the OCC issued a request for public comment on potential changes to the Volcker Rule.[165]

*Recommendations*

Treasury recommends regulators take further action to reduce the burden of the Volcker Rule on asset managers and investors. The relevant agencies should continue to refrain from enforcing the Volcker Rule's proprietary trading restrictions against foreign private funds that are not "covered funds" under the rule until a permanent solution to the identified challenges is implemented. The agencies should also forbear on enforcement of the restriction on funds sharing names with banking entities, consistent with the recommendation in Treasury's Banking Report under Executive Order 13772. Treasury also recommends that Congress revise the definition of "banking entity" to encompass only insured depository institutions, their holding companies, foreign banking organizations, and affiliates and subsidiaries of such entities, defined as those in which there is 25% or more voting equity or voting power on the investment committee.[166]

---

162. U.S. Department of the Treasury, *Press Release* (July 28, 2017), available at: *https://www.treasury.gov/initiatives/fsoc/council-meetings/Documents/7-28-17%20FSOC%20readout.pdf*.

163. *Joint Press Release* (July 21, 2017), available at: *https://www.federalreserve.gov/newsevents/pressreleases/bcreg20170721a.htm*.

164. Division of Supervision and Regulation, Board of Governors of the Federal Reserve System, *Procedures for a Banking Entity to Request an Extension of the One-Year Seeding Period for a Covered Fund* (July 24, 2017), available at: *https://www.federalreserve.gov/supervisionreg/srletters/sr1705.htm*.

165. Proprietary Trading and Certain Interests in and Relationships with Covered Funds (Volcker Rule); Request for Public Input (Aug. 1, 2017) [82 Fed. Reg. 36692 (Aug. 7, 2017)].

166. See 12 U.S.C. § 1841(a)(2)(A).

# International Engagement

The United States features the most vibrant capital markets in the world. Fourteen of the 20 largest global asset managers, in terms of assets under management, are based in the United States, and the world's 20 largest mutual funds are managed by U.S. asset managers. Market-based intermediation through asset management entities enhances the efficiency, and contributes to the overall resilience, of the domestic and international financial systems. Because these successful U.S. businesses are multinational companies, appropriate regulatory cooperation across jurisdictions is vital to promote a global level playing field for these firms. The U.S. regulators and private sector participants are actively engaged in bilateral and multilateral forums to promote consistent regulatory standards across borders.

Figure 8: Top 50 Worldwide Mutual Funds, Money Market Funds, and Exchange-Traded Funds

| Rank | Name | Domicile | Total Net Assets ($ millions) |
|---|---|---|---|
| 1 | Vanguard Total Stock Market Index Fund | United States | 596,476 |
| 2 | Vanguard S&P 500 ETF Index Fund | United States | 338,259 |
| 3 | Vanguard Total International Stock Index Fund | United States | 295,121 |
| 4 | SPDR S&P 500 ETF | United States | 242,542 |
| 5 | Vanguard Institutional Index Fund | United States | 229,582 |
| 6 | Vanguard Total Bond Market Index Fund | United States | 185,539 |
| 7 | American Funds The Growth Fund of America | United States | 167,278 |
| 8 | American Funds EuroPacific Growth Fund | United States | 149,890 |
| 9 | JPMorgan U.S. Government Money Market Fund | United States | 142,072 |
| 10 | Vanguard Total Bond Market II Index Fund | United States | 133,884 |
| 11 | Fidelity Government Cash Reserves | United States | 130,878 |
| 12 | Fidelity 500 Index Fund | United States | 122,893 |
| 13 | iShares Core S&P 500 ETF | United States | 121,908 |
| 14 | Fidelity Contrafund Fund | United States | 116,093 |
| 15 | American Funds American Balanced Fund | United States | 115,903 |
| 16 | American Funds The Income Fund of America | United States | 107,503 |
| 17 | American Funds Capital Income Builder | United States | 106,279 |
| 18 | Vanguard Wellington Fund | United States | 101,663 |
| 19 | Vanguard Prime Money Market Fund | United States | 96,140 |
| 20 | Fidelity Investments Money Market Funds Government Portfolio | United States | 95,018 |
| 21 | American Funds Washington Mutual Investors Fund | United States | 93,681 |
| 22 | JPMorgan Liquidity Funds - U.S. Dollar Liquidity Fund | Luxembourg | 93,625 |
| 23 | American Funds Capital World Growth and Income Fund | United States | 93,100 |
| 24 | Vanguard Developed Markets Index Fund | United States | 92,798 |

Figure 8: Top 50 Worldwide Mutual Funds, Money Market Funds, and Exchange-Traded Funds *continued*

| Rank | Name | Domicile | Total Net Assets ($ millions) |
|------|------|----------|-------------------------------|
| 25 | PIMCO Income Fund | United States | 92,007 |
| 26 | American Funds Fundamental Investors | United States | 89,502 |
| 27 | Vanguard Total International Bond Index Fund | United States | 88,550 |
| 28 | American Funds Investment Company of America | United States | 88,381 |
| 29 | Vanguard Mid Cap Index Fund | United States | 87,954 |
| 30 | Fidelity Government Money Market Fund | United States | 85,294 |
| 31 | Goldman Sachs Financial Square Government Fund | United States | 85,007 |
| 32 | Franklin Income Fund | United States | 83,129 |
| 33 | Vanguard Emerging Markets Stock Index Fund | United States | 81,755 |
| 34 | Metropolitan West Total Return Bond Fund | United States | 79,765 |
| 35 | BlackRock Liquidity Funds FedFund | United States | 79,259 |
| 36 | iShares MSCI EAFE ETF | United States | 78,691 |
| 37 | Vanguard Small Cap Index Fund | United States | 77,622 |
| 38 | Vanguard Federal Money Market Fund | United States | 76,194 |
| 39 | PIMCO Total Return Fund | United States | 73,295 |
| 40 | American Funds New Perspective Fund | United States | 71,360 |
| 41 | AustralianSuper Balanced | Australia | 67,931 |
| 42 | Dreyfus Government Cash Management Fund | United States | 67,290 |
| 43 | Dodge & Cox Stock Fund | United States | 67,181 |
| 44 | Vanguard Growth Index Fund | United States | 66,398 |
| 45 | Federated Government Obligations Fund | United States | 66,249 |
| 46 | Vanguard REIT Index Fund | United States | 64,623 |
| 47 | Dodge & Cox International Stock Fund | United States | 64,392 |
| 48 | Vanguard Short Term Investment Grade Fund | United States | 62,089 |
| 49 | Wells Fargo Government Money Market Fund | United States | 60,768 |
| 50 | Amundi Cash Corporate | France | 59,612 |

Source: Morningstar Direct
Note: Assets as of 7/2017

## Multilateral Standard Setting Framework

The International Organization of Securities Commissions (IOSCO) is the international body that brings together the world's securities regulators and is recognized as the international standard-setter for the securities sector. IOSCO develops and promotes adherence to internationally recognized

standards for securities regulation. Its members are 215 securities regulators, including the SEC and the CFTC, from 115 jurisdictions.[167]

IOSCO works closely with the Financial Stability Board (FSB) on the international regulatory reform agenda. The FSB was established in 2009 as the successor to the Financial Stability Forum, with a broadened mandate to promote financial stability.[168] The FSB membership consists of 70 representatives from 25 jurisdictions and 10 international organizations and standard-setting bodies (SSBs).[169] Treasury, the Federal Reserve, and the SEC are the U.S. members of the FSB.[170] The CFTC is not a member, but participates in select FSB activities. It is important to note, in the context of multilateral standard setting, that entities such as IOSCO and FSB have no legal authority or jurisdiction over the United States.

The FSB's objective is to enhance cooperation at the international level regarding the work of national financial authorities and international SSBs to develop and promote the implementation of effective regulatory, supervisory, and other financial-sector policies. In collaboration with other international financial institutions, the FSB works to identify and propose measures for vulnerabilities affecting financial systems in the interest of global financial stability.[171]

Because the objectives of the FSB are broadly worded, the FSB has wide parameters in which to operate. In some cases, the FSB has gone beyond its core mission of enhancing global financial stability into areas where the connection has been more tenuous. For example, the FSB has had extensive work streams on measures to address firm-level misconduct risk, monitor compensation structures, and evaluate governance frameworks that appear more supervisory in nature than related to financial stability. A second example is the FSB's efforts to work on climate-related financial disclosures, on which the FSB convened a task force of private individuals to develop voluntary disclosure standards. Treasury strongly believes that the FSB's objectives should be focused on its mission of enhancing global financial stability.

One of the Core Principles is to advance American interests in international financial regulatory negotiations and meetings. To this end, U.S. engagement in the FSB and international financial regulatory SSBs remains important to promote financial stability, level the playing field for U.S. financial institutions, and prevent unnecessary and overly burdensome regulatory standard-setting that could stifle financial innovation. While the FSB has a wide mandate to evaluate whether various vulnerabilities could create global financial stability risk and should be addressed through regulatory action, Treasury's position is that the FSB's activities should be limited to its purpose of monitoring and enhancing global financial stability. Wherever possible, financial stability risk assessments and standards should be tailored to industry sectors and undertaken by the appropriate

---

167. See *https://www.iosco.org/about/?subsection=about_iosco*.

168. See *http://www.fsb.org/about/#history*.

169. Financial Stability Board, *3rd Annual Report* (July 25, 2016), available at: *http://www.fsb.org/wp-content/uploads/FSB-3rd-Annual-Report.pdf*.

170. Americans may also participate in the plenary based on their roles in other capacities. For example, the president of the Federal Reserve Bank of New York currently serves as chairman of the Committee on the Global Financial System and participates in the FSB plenary in that capacity.

171. See *Charter of the Financial Stability Board* (June 2012), available at: *http://www.fsb.org/wp-content/uploads/FSB-Charter-with-revised-Annex-FINAL.pdf*.

Figure 9: Selected International Bodies Comprising the International Financial Architecture



1 International Association of Insurance Supervisors
2 International Organization of Securities Commissions
Source: GAO (2014), Treasury analysis, based on international organization websites and U.S. federal agencies

Figure 9: Selected International Bodies Comprising the International Financial Architecture *continued*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Standard-setting bodies (SSBs)

**Basel Committee on Banking Supervision (Basel Committee)**

*Banking*

Develops capital, liquidity, and leverage standards (Basel 2, 2.5, 3)

Develops framework for global systemically important banks (G-SIBs) (with FSB)

Develops margin requirements for non-centrally cleared derivatives (with IOSCO)

Monitor Compliance with Basel standards

**International Organization of Securities Commissions (IOSCO)**

*Securities*

Develop, implement, and promote adherence to standards of regulation, oversight, and enforcement

Enhance investor protection and promote confidence in securities markets integrity

Exchange information to develop markets, strengthen infrastructure, and implement appropriate regulation

**International Association of Insurance Supervisors (IAIS)**

*Insurance*

Develops framework for global systemically important insurance companies (G-SIIs)

Develops Insurance Core Principles

**International Accounting Standards Board (IASB)**

*Accounting*

Develop high quality, understandable, enforceable, and globally accepted accounting standards

**International Association of Deposit Insurers (IADI)**

*Deposit Insurance*

Develop principles for strengthening national deposit insurance arrangements

**Committee on Payment and Settlement Systems (CPSS)**

*Payment and Settlement*

Develop principles for financial market infrastructures (with IOSCO)

Monitor financial market infrastructures (with IOSCO)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

035287

standard-setter with the necessary technical supervisory expertise (e.g., IOSCO for asset management and the International Association of Insurance Supervisors (IAIS) for insurance).

## Multilateral Work on Asset Management

Global systemically important financial institutions (G-SIFIs) are defined by the FSB as financial institutions whose distress or disorderly failure, because of their size, complexity and systemic interconnectedness, would cause significant disruption to the wider financial system and economic activity. The FSB's initial attention on too-big-to-fail institutions was the catalyst to establish a framework focused on financial institutions, known as the entity-based approach. As the FSB developed this framework, the need for a differentiated approach to diverse sectors within the financial system became clear. This was particularly true in the areas of insurance and asset management.

In 2014 and 2015, the FSB undertook two rounds of consultations on proposed methodologies for identifying nonbank, non-insurer global systemically important financial institutions (NBNI G-SIFIs). These methodologies proposed to evaluate the global footprint of asset management firms, broker-dealers, and finance companies. The FSB's 2014 consultation on asset management asked for public feedback on a number of methods for identifying NBNI G-SIFIs that were generally based on size of assets under management.[172] There was considerable push back to this approach, as it would have, in effect, singled out U.S. mutual funds as the only funds that would be subject to further review for NBNI G-SIFI designation, and did not adequately take into account the underlying risks of the funds or their fund managers.

In March 2015, the FSB issued a second consultative document that suggested a revised methodology for identifying NBNI G-SIFIs that also used size as the initial screening method for funds.[173] The consultation suggested two options for funds: (1) $100 billion in net assets under management, or (2) $200 billion in gross assets under management unless it could be demonstrated that the fund is not a dominant player in its markets. Asset managers would be subject to consideration if they held $100 billion on their balance sheets or had $1 trillion of assets under management. As with the 2014 consultation, the initial screening criteria would have effectively centered on large U.S. mutual funds and U.S. asset managers as candidates for G-SIFI designation.

Subsequently, the FSB and IOSCO concluded that working on activities, rather than specific entities, would be a more appropriate way to monitor and address any systemic risk in the asset management sector. The FSB's initial NBNI G-SIFI methodologies for the asset management industry were never finalized or approved. More recently, in January 2017, the FSB acknowledged

---

172. Financial Stability Board and IOSCO, *Consultative Document, Assessment Methodologies for Identifying Non-Bank Non-Insurer Global Systemically Important Financial Institutions: Proposed High-Level Framework and Specific Methodologies* (Jan. 8, 2014), available at: *http://www.fsb.org/wp-content/uploads/r_140108.pdf.*

173. Financial Stability Board and IOSCO, *2ⁿᵈ Consultative Document, Assessment Methodologies for Identifying Non-Bank Non-Insurer Global Systemically Important Financial Institutions: Proposed High-Level Framework and Specific Methodologies* (Mar. 4, 2015), available at: *http://www.fsb.org/wp-content/uploads/2nd-Con-Doc-on-NBNI-G-SIFI-methodologies.pdf.*

that asset managers and investment funds pose very different structural issues from banks and insurance companies because asset managers act as agents who are appointed by investors in accordance with pre-defined investment strategies.[174]

Instead of an entities-based approach, the FSB, in consultation with IOSCO, set out 14 policy recommendations to address the structural vulnerabilities from asset management activities that could potentially present financial stability risks.[175] The FSB identified four structural vulnerabilities associated with asset management activities posing potential financial stability risks: (1) liquidity mismatch between fund investments and redemption terms for open-end funds, (2) leverage within investment funds, (3) operational risk and challenges at asset managers in stressed conditions, and (4) securities lending activities of asset managers and funds. The FSB viewed liquidity mismatch and leverage as the key vulnerabilities on which to focus.

In July 2017, IOSCO proposed to reaffirm and enhance the guidance set out in the 2013 Liquidity Report as proposed in a new consultation on liquidity risk management for funds.[176] IOSCO has been asked to complete its work on the liquidity recommendations by the end of 2017 and on leverage measures by the end of 2018.

Around the same time, the FSB issued another assessment covering shadow banking, including asset management, and announced that it would continue to hold open the option to focus on any residual entity-based source of systemic risk.[177] Specifically, the FSB recommended that all member authorities establish a systematic process for ensuring that any entities or activities that could pose material financial stability risks are brought within the regulatory perimeter. The FSB reiterated that it and IOSCO "will re-visit the proposed [NBNI G-SIFI] methodologies after IOSCO completes its work to operationalize the FSB recommendations to address asset management structural vulnerabilities, with a focus on any residual entity-based sources of systemic risk from distress or disorderly failure that cannot be effectively addressed by market-wide activities-based policies."[178]

---

174. Financial Stability Board, *Policy Recommendations to Address Structural Vulnerabilities from Asset Management Activities* (Jan. 12, 2017), at 8, available at: *http://www.fsb.org/wp-content/uploads/FSB-Policy-Recommendations-on-Asset-Management-Structural-Vulnerabilities.pdf* ("FSB Policy Recommendations"). The limited historical evidence of systemic risks arising from investment funds cited by the FSB includes few examples – the 1998 collapse of leveraged hedge fund Long-Term Capital Management (LTCM) and issues with money market mutual funds (MMMFs) during the 2008 financial crisis. LTCM occurred during a period during which private funds and their investment advisers were generally exempt from SEC registration and reporting requirements; that situation has been rectified and the SEC and Office of Financial Research now receive extensive data on private funds. MMMFs are distinctly different in operation than other types of funds, and the SEC's recent structural reforms of MMMFs significantly addressed the risks they could pose.

175. Id. at 39-41.

176. International Organization of Securities Commissions, *Consultation on CIS Liquidity Risk Management Recommendations* (July 2017), available at: *https://www.iosco.org/library/pubdocs/pdf/IOSCOPD573.pdf*. The consultation period ended in September 2017.

177. Financial Stability Board, *Assessment of Shadow Banking Activities, Risks and the Adequacy of Post-Crisis Policy Tools to Address Financial Stability Concerns* (July 3, 2017), available at: *http://www.fsb.org/wp-content/uploads/P300617-1.pdf*.

178. Id. at 18.

## Improving Transparency and Accountability

While international standards are not binding on the United States and must be separately implemented by domestic regulators, FSB members and stakeholders can benefit from increased transparency and accountability in the international standard setting process. Although the FSB has published consultative drafts of some proposed policy documents, these consultations are not subject to requirements comparable to the Administrative Procedure Act. Also, FSB consultative drafts and other policy papers generally do not disclose whether the responsible party for drafting such papers is from the FSB secretariat or from an FSB member agency.



Figure 10: The G-20 Initiated Financial Reform Process

Source: GAO (2014), based on international organization website information

Additionally, the FSB's meetings with industry are generally invitation-only during public consultation periods, and without public records of its discussions. Commenters on FSB policy recommendations can request confidential treatment, which further restricts the ability of the public to benefit from responses of commenters. Thus, the public may not have full insight as to the analysis and data that FSB is considering. There is also no FSB requirement to conduct pre-implementation economic analysis.[179] Unlike in the United States, where agencies conducting a rulemaking must examine all relevant data provided by interested persons after the notice and comment period has ended and articulate a basis for their actions, the FSB is not required to do so.

---

179. Treasury supports the FSB's efforts to evaluate the effects of financial regulatory reforms. See Financial Stability Board, *Framework for Post-Implementation Evaluation of the Effects of the G20 Financial Regulatory Reforms* (July 3, 2017), available at: *http://www.fsb.org/wp-content/uploads/P030717-4.pdf.*

## Use of "Shadow Banking"

FSB reports and other reports often use the term "shadow banking" to describe credit intermediation involving entities and activities (fully or partly) outside of the regular banking system. Notwithstanding the inclusion of a footnote disclaimer[180] that appear in select FSB documents, Treasury prefers to transition to a different term, "market based finance." Applying the term "shadow banking" to registered investment companies is particularly inappropriate as the word "shadow" could be interpreted as implying insufficient regulatory oversight, or disclosure. Registered investment companies, as described in this report, are regulated by the SEC and provide extensive public and regulatory transparency of fund portfolio holdings on a quarterly, monthly and, in some cases, daily basis.

*Recommendations*

Treasury strongly supports continued U.S. participation in international SSBs such as the FSB and IOSCO to promote U.S. interests. Moreover, Treasury believes that the U.S. should play a leading role in those SSBs, particularly with respect to financial market supervision and asset management where our firms and markets are the largest in the world. U.S. agencies that have seats on the FSB, IOSCO, or other international SSBs, as well as staff members from U.S. regulators assigned to work with these entities, should more effectively coordinate their representation on behalf of the United States.

Treasury recommends further improvements to the FSB and SSB processes to better promote transparency, accountability, and appropriate representation with respect to policymaking. We encourage the FSB to expand its practice of posting summaries of the comments raised in the consultation process and changes made to address such comments.[181]

Treasury recommends that U.S. representatives to FSB and IOSCO review the particular processes used by each international SSB and work to ensure that they utilize a collaborative process that includes, where appropriate, economic analysis and subject-matter expertise at the relevant SSB. Processes for international SSBs should be thorough, fair, and provide appropriate opportunity for public input and discussion. Those processes should include clear definition of issues to be addressed, rigorous examination of evidence, and reasoned analysis and explanations.

Treasury recommends that the FSB transition away from using the term "shadow banking" in its monitoring of credit intermediation outside of the regular banking sector.

---

180. The standard footnote, as used in the FSB's 2016 Shadow Banking Monitoring Report states that: "The FSB defines shadow banking as 'credit intermediation involving entities and activities (fully or partly) outside of the regular banking system.' Some authorities and market participants prefer to use other terms such as 'market-based finance' instead of 'shadow banking.' The use of the term 'shadow banking' is not intended to cast a pejorative tone on this system of credit intermediation. However, the FSB uses the term 'shadow banking' as this is the most commonly employed and, in particular, has been used in earlier G20 communications." Treasury notes that some FSB documents, such as press releases, do not contain the full disclaimer.

181. See, e.g., Financial Stability Board, *Guidance on Central Counterparty Resolution and Resolution Planning: Overview of Responses to the Public Consultation* (July 24, 2017), available at: *http://www.fsb.org/wp-content/uploads/P250717-3.pdf*. References to specific comment letters in the summaries could further improve transparency.

Finally, and more specific to the work on asset management and insurance, the U.S. members of the FSB should work to revise the G-SIFI framework so it appropriately takes into account the differentiated ways that sectors are structured and manage risks. Reliance on the technical supervisory expertise at the SSBs is important to this tailoring effort.

# Economic Growth and Informed Choices

The asset management industry plays an important role in facilitating the flow of resources from investors into the capital markets. A significant amount of such resources is provided by retirement savings. Having a broad array of choices permits retirement investors to select investments that match their particular risk tolerances. Robust capital markets can promote economic growth, including job creation, infrastructure development, and increased standards of living. Regulatory burdens that impede capital formation or reduce investment choices can lessen the efficiency of the market in allocating capital and potentially lower economic growth.

## Standards of Conduct for Financial Professionals

The standards of conduct applicable to financial professionals derive from numerous sources – principally, the SEC, the Department of Labor (DOL), state securities and insurance regulators, and self-regulatory organizations such as the Financial Industry Regulatory Authority (FINRA). As a practical matter, different standards of conduct apply to financial professionals depending upon the customers that they are servicing, the types of services being provided, and the products being offered.

## ERISA and the DOL Fiduciary Rule

The Employee Retirement Income Security Act of 1974 (ERISA) imposes fiduciary obligations on a person who engages in specified activities with respect to an employee benefit plan or its assets, including rendering investment advice for a fee or compensation. Title I of ERISA imposes an affirmative prudence and loyalty obligation on fiduciaries to an employee benefit plan and also prohibits fiduciaries from engaging in prohibited transactions involving conflicts of interest with respect to the plan. Title II of ERISA, which was codified in the Internal Revenue Code (Code), imposes excise taxes on fiduciaries and other disqualified persons who engage in prohibited transactions involving conflicts of interest with respect to a plan or IRA. Pursuant to Reorganization Plan No. 4 of 1978, the DOL has regulatory and interpretive authority with respect to the Code's prohibited transaction rules, including the definition of fiduciary, and can issue administrative exemptions from the prohibited transaction rules and excise taxes.

ERISA broadly provides that a person is a fiduciary to the extent "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or property" of the plan or IRA.[182] Under the prior regulatory definition of fiduciary adopted in 1975, a person was deemed to be a fiduciary to a plan or IRA with respect to any particular instance of advice only if he or she satisfied a five-part test. Fiduciary status attached to a person who (1) rendered investment advice

---

182. ERISA § 3(21)(A) and Code § 4975(e)(3).

(2) on a regular basis, (3) pursuant to a mutual understanding that the advice (4) would serve as a primary basis for investment decisions and (5) would be individualized. Under this definition, fiduciary status frequently did not attach to investment advice provided to employee benefit plans or IRA owners.[183]

In April 2016, the DOL amended its definition of fiduciary and adopted several related administrative exemptions from the prohibited transaction provisions in ERISA and the Code (collectively, the Fiduciary Rule). The new definition of fiduciary expanded the scope of persons defined to be fiduciaries, for purposes of (1) the fiduciary prudence and loyalty obligation provisions of ERISA that apply to plans, (2) the prohibited transaction rules of ERISA that apply to plans, and (3) the prohibited transaction rules of the Code that apply to plans and IRAs.[184] In adopting the Fiduciary Rule, the DOL emphasized changes in the U.S. retirement savings landscape since the enactment of ERISA, particularly the shift from employer sponsored defined benefit pension plans to participant-directed defined contribution plans, such as 401(k) plans. The DOL also noted the widespread growth of assets in IRAs, identifying that individuals are increasingly responsible for managing their own retirement savings. In this context, the DOL expressed concerns that financial professionals often operate within compensation structures that do not align with their customers' interest and that create incentives and other conflicts of interest to steer customers into particular products that are more costly or complex than similar available products.[185]

Under the Fiduciary Rule, certain types of fees and compensation, such as commissions, 12b-1 fees,[186] and revenue sharing payments, received by financial professionals covered by the new definition of fiduciary may be considered "prohibited transactions" under ERISA and the Code. These compensation arrangements are commonly used by financial professionals who provide services, including advice, to IRAs and IRA owners. To permit fiduciaries to receive these types of otherwise prohibited compensation, sell only a limited range of products, and not be subject to an obligation to provide ongoing advice, the DOL adopted new administrative exemptions, most notably the Best Interest Contract Exemption (BICE).[187] The BICE requires, among other conditions, adherence to certain impartial conduct standards, including providing advice in the retirement investor's best interest, charging no more than reasonable compensation, and avoiding misleading statements. The BICE also imposes certain disclosure obligations and, for IRAs, requires a written contract that acknowledges fiduciary status and prohibits the inclusion of provisions that would limit or disclaim liability or waive rights to participate in a class action or similar type of legal

---

183. For example, broker-dealers might be outside the definition of fiduciary if they provided advice on a one-time basis or if their customer agreed that the advice would not be the primary basis for investment decisions.

184. Definition of the Term "Fiduciary"; Conflict of Interest Rule-Retirement Investment Advice (Apr. 1, 2016) [81 Fed. Reg. 20945 (Apr. 8, 2016)].

185. 81 Fed. Reg. at 20949-20951 (summarizing the DOL's analysis of harm caused by conflicts of interest).

186. Refers to payments made pursuant to a plan adopted under '40 Act Rule 12b-1.

187. Best Interest Contract Exemption (Apr. 1, 2016) [81 Fed. Reg. 21002 (April 8, 2016)].

proceeding.[188] Compliance with certain conditions of the BICE, including the requirement to enter into a written contract, is not required for advice to place plan assets or IRA assets in an investment vehicle where only "level fees" are charged, such as an asset-based fee.

### Securities and Insurance Laws

Financial professionals, including those advising on securities investments in IRA accounts, have been long subject to rules under federal and state securities laws that impose standards of conduct designed to protect retail investors. Although investment advisers and broker-dealers frequently offer the same or substantially similar services when providing personalized investment advice for securities transactions, they have been regulated through two different federal statutes that take different approaches to investor protection.

Investment advisers are fiduciaries under either the Investment Advisers Act of 1940 (the Advisers Act) or state securities laws.[189,190] This designation does not, however, necessarily result in fiduciary status under ERISA. Broker-dealers are regulated under the Securities Exchange Act of 1934 and generally subject to the suitability standard under rules of FINRA as well as other FINRA requirements, and are subject to FINRA inspections and enforcement.[191] Similarly, under most state insurance laws and regulations, insurance agents must comply with suitability standards when recommending annuity products to consumers.[192]

There has been considerable discussion over the years as to whether broker-dealers and investment advisers should be subject to the same standard of conduct. As the SEC has noted,[193] studies have

---

188. This condition would prevent financial institutions relying on the BICE from including arbitration limitations in the written contract. However, on August 30, 2017, the DOL formally announced that it will not pursue a claim against any fiduciary based on failure to satisfy the BICE if the sole reason for the failure is inclusion of an arbitration limitation. See U.S. Department of Labor, *Field Assistance Bulletin No. 2017-03, Enforcement Policy on Arbitration Limitations in the Best Interest Contract Exemption and Principal Transactions Exemptions* (Aug. 30, 2017), available at: *https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2017-03*. The Treasury and IRS have confirmed that a similar enforcement policy applies to IRAs under the Code. U.S. Internal Revenue Service, *Non-Applicability of Excise Taxes Under Section 4975 to Conform with DOL Temporary Enforcement Policy on Fiduciary Duty Rule, Announcement 2017-4*, available at: *https://www.irs.gov/pub/irs-drop/a-17-04.pdf*.

189. As a fiduciary, an adviser's duty includes an obligation to act in the best interest of its clients, including duties of loyalty and care, and to avoid or mitigate any conflicts of interest with clients. See Staff of U.S. Securities and Exchange Commission, *Study on Investment Advisers and Broker-Dealers* (Jan. 2011), available at: *https://www.sec.gov/news/studies/2011/913studyfinal.pdf*.

190. In 1996, the National Securities Markets Improvement Act allocated oversight of investment advisers between the SEC and state securities regulators, with the SEC responsible for investment advisers with $25 million or more in assets under management or who advise a registered investment company. Dodd-Frank subsequently raised this threshold to $100 million.

191. Under the suitability standard, a broker-dealer must have reasonable grounds for believing that the investment is suitable for the customer based upon information about the customer and the customer's individual needs and circumstances. FINRA Rule 2111, available at: *http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=9859*.

192. See National Association of Insurance Commissioners, *Suitability in Annuity Transactions Model Regulation*, available at: *http://www.naic.org/store/free/MDL-275.pdf*.

193. See, e.g., Duties of Brokers, Dealers, and Investment Advisers (Mar. 1, 2013) [78 Fed. Reg. 14848, 14849 (March 7, 2013)].

found that retail customers are often not aware of a financial professional's status as a broker-dealer or investment adviser or the different regulatory approaches for these entities and the different duties that flow from them.[194] Section 913(g) of Dodd-Frank provided the SEC with discretionary authority to adopt rules that require the standard of conduct for broker-dealers, when providing personalized investment advice to a retail customer, to be no less stringent than for investment advisers. However, Section 913(g) also clarified that if the SEC adopted a uniform standard, a broker-dealer's receipt of commission-based compensation or sale of a limited range of products would not be considered a violation as applied to a broker or dealer, and that the uniform standard would not require a broker or dealer to have a continuing duty of care or loyalty to the customer after providing personalized investment advice about securities.[195]

### Status of the Fiduciary Rule

On February 3, 2017, President Trump issued a memorandum (the Presidential Memorandum) directing the DOL to re-examine the Fiduciary Rule to determine whether it may adversely affect the ability of Americans to gain access to retirement information and financial advice.[196] Specifically, the President directed that the DOL consider (1) whether the anticipated applicability of the final rule has harmed or is likely to harm investors due to a reduction of Americans' access to certain retirement savings offerings, retirement product structures, retirement savings information, or related financial advice; (2) whether the anticipated applicability of the final rule has resulted in dislocations or disruptions within the retirement services industry that may adversely affect investors or retirees; and (3) whether the final rule is likely to cause an increase in litigation, and an increase in the prices that investors and retirees must pay to gain access to retirement services. The President directed that if the DOL makes an affirmative determination as to any of the above three considerations, or the DOL concludes for any other reason, after appropriate review, that the Fiduciary Rule, prohibited transaction exemptions (PTEs), or both are inconsistent with the priority of the Administration "to empower Americans to make their own financial decisions, to facilitate their ability to save for retirement and build the individual wealth necessary to afford typical lifetime expenses, such as buying a home and paying for college, and to withstand unexpected financial emergencies,"[197] then the DOL shall publish for notice and comment a proposed rule rescinding or revising the Fiduciary Rule, as appropriate and as consistent with law.

Subsequently, the DOL extended the applicability date of the new fiduciary definition and the impartial conduct standards from April 10 to June 9, 2017 and set January 1, 2018 as the

---

194. See, e.g., Angela A. Hung, et al, RAND Institute for Civil Justice, *Investor and Industry Perspectives on Investment Advisers and Broker-Dealers* (2008), available at: *https://www.sec.gov/news/press/2008/2008-1_randiabdreport.pdf*. The same report also found, based on a survey, that retail customers were generally satisfied with their financial professional, be it a representative of a broker-dealer or an investment adviser.

195. It should be noted that since 1975, IRA advisers, including registered investment advisers, broker dealers, and insurance agents, who met the conditions of the 1975 DOL rule were subject to uniform standards under the prohibited transaction provisions of the Code.

196. Memorandum from President Trump for the Secretary of Labor on Fiduciary Duty Rule (Feb. 3, 2017) [82 Fed. Reg. 9675 (February 7, 2017)].

197. Id. at section I(b).

compliance date for all remaining provisions of the Fiduciary Rule.[198] The DOL later proposed to extend the compliance date for the full Fiduciary Rule to July 1, 2019.[199] The DOL released a request for information seeking public comments on the Fiduciary Rule, with comments due on September 15, 2017.[200]

In June 2017, SEC Chairman Jay Clayton issued a statement requesting comments on the standard of care under the federal securities laws that should apply to investment advisers and broker-dealers serving retail investors, including retirement investors.[201] Chairman Clayton's statement noted Secretary of Labor Alexander Acosta's prior statement that the two agencies should engage constructively with each other in this area.[202]

### Treasury's Stakeholder Engagement and Perspective

Treasury supports the current efforts at the DOL to re-examine the implications of the Fiduciary Rule. Treasury believes it is appropriate to delay full implementation of the Fiduciary Rule until the relevant issues, including costs of the rule and exemptions, are evaluated and addressed to best serve investors, and believes that such assessment and resolution of standard of conduct issues should include participation by the SEC and other regulators.

A review of the DOL rulemaking record demonstrates stakeholders' serious concerns that the Fiduciary Rule will have unintended consequences and is likely to (1) harm investors due to a reduction of Americans' access to certain retirement savings offerings, retirement product structures, retirement savings information, or related financial advice; (2) result in dislocations or disruptions within the retirement services industry that may adversely affect investors and retirees; and (3) cause an increase in litigation, and an increase in the prices that investors and retirees must pay to gain access to retirement services. As part of the process for preparing this report, Treasury has heard similar and other specific stakeholder concerns that the Fiduciary Rule may (1) raise incremental costs for financial service providers that will be passed on to retirement investors; (2) create an uneven playing field in the market for certain financial products, strategies, and business

---

198. Definition of the Term "Fiduciary"; Conflict of Interest Rule – Retirement Advice; Best Interest Contract Exemption (Prohibited Transaction Exemptions 2016-01); Class Exemption for Principal Transactions in Certain Assets Between Investment Advice Fiduciaries and Employee Benefit Plans and IRAs (Prohibited Transaction Exemption 2016-02); Prohibited Transaction Exemptions 75-1, 77-4, 80-83, 83-1, 84-24 and 86-128 (Apr. 3, 2017) [82 Fed. Reg. 16902 (Apr. 7, 2017)] (to be codified at 29 C.F.R. Part 2510).

199. Extension of Transition Period and Delay of Applicability Dates; Best Interest Contract Exemption (PTE 2016–01); Class Exemption for Principal Transactions in Certain Assets Between Investment Advice Fiduciaries and Employee Benefit Plans and IRAs (PTE 2016–02); Prohibited Transaction Exemption 84– 24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters (PTE 84-24) (Aug. 28, 2017) [82 Fed. Reg. 41365 (Aug. 31, 2017)].

200. Request for Information Regarding the Fiduciary Rule and Prohibited Transaction Exemptions (June 29, 2017) [82 Fed. Reg. 31278 (July 6, 2017)].

201. Chairman Jay Clayton, *Public Comments from Retail Investors and Other Interested Parties on Standards of Conduct for Investment Advisers and Broker-Dealers* (June 1, 2017), available at: *https://www.sec.gov/news/ public-statement/statement-chairman-clayton-2017-05-31*.

202. See Secretary Alexander Acosta, *Deregulators Must Follow the Law, So Regulators Will Too*, Wall Street Journal (May 23, 2017), at A19.

models over others that could influence recommendations based on ease of compliance rather than the investor's best interest; (3) result in higher fees for IRA investors; and (4) create different compliance requirements based on the tax treatment of different accounts, which could create unintended imbalances in the market between those accounts.

In the ever changing investment advice landscape, some stakeholders also noted that industry has been working to improve investment advice but may need more time to implement changes, including the adoption of new products and solutions, and the implementation of new technologies that can deliver low-cost advice and education. Finally, other stakeholders contend that the Fiduciary Rule should be implemented without changes to prevent exposing consumers to losses that will compound over time. Treasury encourages DOL to consider these stakeholder comments along with the many other public comments it receives as it continues to evaluate the Fiduciary Rule.

Treasury believes that conflicts of interest should be addressed in a manner that preserves, to the extent possible, access to a wide range of asset classes, investment products, business models, distribution channels, and other relevant features of financial services that benefit American workers and their families – those that may already have significant investment assets, those just starting to save, those who may already have a high level of financial sophistication, and those just beginning to learn or who choose to rely on others for investment advice. Accordingly, Treasury believes that conflicts of interest should be addressed in a manner that does not disrupt the free functioning of the markets and access to financial services.

Notwithstanding the similar tax treatment accorded to 401(k) plans and IRAs, Treasury has heard suggestions that it is not clear that, as a matter of public policy, the DOL should be the regulator of financial professionals for IRAs or that the ERISA fiduciary standards that apply to plans should also be applied to IRAs through the BICE.[203] Moreover, the DOL's Fiduciary Rule by statutory design regulates only IRAs and not other retail accounts, creating the possibility that many financial professionals will elect to adopt different practices for accounts that are nearly identical except that some are eligible for favorable tax rules and others are not. This aspect of the Fiduciary Rule creates potential marketplace imbalances and opportunities for unnecessary duplication due to different rule sets seeking to address the same concerns, although there were and continue to be inconsistencies among other regulators.

Financial professionals involved in securities are already extensively regulated and examined by the SEC and state securities regulators and, in the case of broker-dealers, by FINRA. Since 2015, SEC staff has placed a special priority on examining investment advisers and broker-dealers on

---

203. See, e.g., Statement of Bradford P. Campbell before the House Committee on Education and the Workforce, Hearing on "Regulatory Barriers Facing Workers and Families Saving for Retirement" (May 18, 2017), available at: *https://edworkforce.house.gov/uploadedfiles/testimony_campbell.pdf*.

matters of importance for investors saving for retirement.[204] Treasury believes that the SEC has the ability to address investor protection concerns through a variety of means, such as requiring, directly or indirectly through FINRA, appropriate supervisory and compliance programs by retirement service providers and regulation of marketing and disclosure materials used by them. The SEC also oversees FINRA and is authorized by law to cooperate with the states to effectuate greater uniformity in securities matters.[205] The SEC's jurisdiction extends to financial professionals for both IRAs and other investment accounts, and state insurance regulators, where granted the necessary authority from state legislatures, can apply the same rules for annuities held both within and outside of IRAs. Within the federal regulatory framework, Treasury believes that the SEC and DOL should work together to address standards of conduct for financial professionals who provide investment advice to IRA and non-IRA accounts.

Treasury also recommends that the DOL and the SEC engage with state insurance regulators regarding the impact of standards of care on the annuities market. Because annuities are the only financial services product that can provide a guaranteed lifetime income stream, and because longevity risk (the risk of outliving one's assets) has become a key retirement concern, annuities are an important contributor to the Core Principle of empowering Americans to save for retirement. Given the size and scale of the annuities market,[206] federal regulators should coordinate with the states in order to achieve consistent standards of conduct across product lines.[207]

In summary, Treasury encourages the SEC, the DOL, and the states to work together to implement a regulatory framework appropriately tailored to both preserve investor choice and protect retirement investors in an efficient and effective manner.

---

204. Office of Compliance Inspections and Examinations, U.S. Securities and Exchange Commission, *Retirement-Targeted Industry Reviews and Examinations Initiative (June 22, 2015),* available at: *https://www.sec.gov/about/offices/ocie/retirement-targeted-industry-reviews-and-examinations-initiative.pdf*; see also U.S. Securities and Exchange Commission, *Press Release 2017-7* (Jan. 12, 2017), available at: *https://www.sec.gov/news/pressrelease/2017-7.html* (announcing that senior investors and retirement investments continue to be on the SEC exam priority list for 2017).

205. See 15 U.S.C. § 77s(d).

206. Individual annuity sales in 2016 totaled $222.1 billion. LIMRA Secure Retirement Institute, *Individual Annuities* (2016, 4th Quarter).

207. The NAIC is considering incorporation of a best interest standard into its model regulation on annuity suitability. See NAIC Annuity Suitability (A) Working Group, *Meeting Summary* Report (Aug. 6, 2017), available at: *http://www.naic.org/meetings1708/cmte_a_2017_summer_nm_materials.pdf?1503696953048.*

# Insurance



# Introduction

The U.S. insurance industry is the largest, most competitive, and most diverse in the world. The industry provides important retirement planning tools for individuals, and its products allow both commercial and individual policyholders to obtain protection for a range of risks. Relying on the financial security provided by this risk transfer, policyholders are able to direct resources that they otherwise would have to reserve for such uncertainties to productive economic activity, such as capital investment.

Figure 11: Total Direct Written Premiums for L&H and P&C Insurance Sectors ($ billions)



Source: SNL Financial

At year-end 2016, the U.S. insurance industry included 2,655 property and casualty (P&C) insurers, 780 life and health (L&H) insurers, and 1,095 health insurers,[208] which generated 29% of global total direct written premiums.[209] In 2016, the U.S. insurance industry's direct written premiums totaled $1.3 trillion, as shown in Figure 11.[210] The industry employs more than 2.8

---

208. SNL Financial; A.M. Best, *Best's Aggregates & Averages* (2016), available at *http://www3.ambest.com/aggavg/toc/archive.aspx*.

209. Swiss Re Institute Sigma, *World Insurance in 2016: the China Growth Engine Steams Ahead* (2017), available at *http://media.swissre.com/documents/sigma3_2017_en.pdf*.

210. SNL Financial. Life and health insurers' premiums generally consist of those generated from sales of annuities and life insurance; property and casualty insurers' premiums generally consist of those generated from sales of auto, home, and commercial property and liability insurance. Figures exclude results from insurers that are licensed to write only health insurance.

million people.[211] Further, with total assets exceeding $8.5 trillion, insurers are major participants in the economy through their investments, and play a notable role with respect to infrastructure investment.[212] For example, holdings of U.S. insurers currently account for more than 10% of the $3.8 trillion municipal bond market. Local, regional, and national insurers and reinsurers participate in the diverse U.S. insurance market. Recognizing its vitality, non-U.S. insurers also increasingly participate in the U.S. market (for example, through primary insurance operations and reinsurance). Similarly, U.S. insurers increasingly recognize opportunities for growth overseas, both in established and developing economies.

The primary insurance marketplace can be categorized in several different ways, one of which is by line of business. Typically the insurance lines of business are categorized as follows[213]:

- **Property and Casualty (P&C) insurance.** Property and casualty insurers offer protection to policyholders for financial loss associated with damage to physical property and loss from legal liability. This includes automotive, home, and commercial property and liability insurance. Figure 12 shows the top 10 largest U.S. P&C insurance groups ranked by total personal and commercial lines' direct written premiums, including their market share, for 2016.

- **Life and Health (L&H) insurance.** Life insurers offer life insurance and annuities, and some may also be licensed to issue insurance coverage for losses associated with accidents or disability. L&H insurers offer their products to both individuals and groups. Figure 13 shows the top 10 largest U.S. L&H insurance (life insurance and annuities only) groups ranked by direct written premiums, including their market share, for 2016.

Like the banking sector, the primary insurance marketplace can be categorized by size and type of organization. The insurance industry includes insurers licensed in only one state, licensed in all 50 states, and licensed throughout the United States and around the globe. Insurers can also be categorized by whether they are organized as a stock or mutual insurance company, whether they own a depository institution, whether they are evaluated by FSOC for supervision by the Federal Reserve, or whether they are identified by the Financial Stability Board (FSB) as a global systemically important insurer (G-SII).

The insurance marketplace can also be categorized as "admitted" or "nonadmitted." Carriers in the admitted market (sometimes referred to as "standard" insurers) qualify by filing an application with the insurance department of each jurisdiction where they conduct business, receiving approval, and complying with each state's insurance laws and regulations, including requirements for filing and approval of policy forms and rates.

---

211. Sean Kevelighan, Steven Weisbart, and James Lynch, *Insurance: Leading Through Disruption*, available at: *https://www.treasury.gov/initiatives/fio/Documents/(1)_Marketplace_Update_-_III.pdf*

212. SNL Financial. Includes L&H and P&C U.S. legal entity insurers.

213. In addition to the P&C and L&H sectors described below, a third U.S. insurance sector is health insurance. The health insurance sector includes companies licensed solely as health insurers or Health Maintenance Organizations, and also generally includes government programs such as Medicare and Medicaid. A detailed analysis of the health sector is not included in this report.

Figure 12: U.S. Combined Lines Direct Premiums Written by P&C Insurance Groups ($ billions)



Source: SNL Financial (includes all lines of business)

Carriers in the nonadmitted market (sometimes referred to as "surplus lines" insurers) are less strictly regulated than carriers in the admitted market, and are exempt from form and rate requirements. The purpose of surplus lines is to permit access to products that are not otherwise available through admitted lines. There are approximately 200 insurers approved or eligible to sell surplus lines coverage in the United States.[214] In 2016, premiums in the surplus lines market totaled more than $25 billion.[215] As shown in Figure 14, excess and surplus lines premiums grew steadily between 2011 and 2015 with increasing market share; in 2016, excess and surplus lines premiums flattened, leading to a slight decrease in market share.

---

214. Government Accountability Office, *Property and Casualty Insurance Effects of the Nonadmitted and Reinsurance Reform Act of 2010* (Jan. 2014), at 1, available at: *http://www.gao.gov/assets/670/660245.pdf.*

215. See Business Insurance, *Excess and Surplus Lines Premiums Up in 2016,* available at: *http://www.businessinsurance.com/article/20170124/NEWS06/912311565/ Excess-and-surplus-lines-premiums-up-in-2016-stamping-offices.*

Figure 13: U.S. Direct Premiums Written by L&H Insurance Groups ($ billions)



Source: SNL Financial (includes all lines of business)

Risks typically written in the surplus lines market include: (1) nonstandard risks (e.g., those with unusual underwriting requirements), (2) unique risks that admitted carriers do not offer, and (3) capacity risks for which an insured seeks a higher level of coverage than admitted insurers are willing to provide.[216] For example, surplus lines insurers may write policies to cover a research laboratory working on an unproven drug, a special sporting event, or liabilities arising from environmental impairment.[217]

---

216. Government Accountability Office, *Property and Casualty Insurance Effects of the Nonadmitted and Reinsurance Reform Act of 2010* (Jan. 2014), at 9 (text box), available at: *http://www.gao.gov/assets/670/660245.pdf*.

217. Id. at 7.

Figure 14: U.S. Excess & Surplus Lines Direct Premiums Written and Market Share



Excess & surplus lines direct premiums written (left axis)
Excess & surplus lines market share (right axis)

Source: SNL Financial

Reinsurers, i.e., insurance companies that specialize in assuming risks from other insurance companies, are also critical to a well-functioning insurance marketplace. U.S. insurers depend on reinsurers — domiciled in the United States and abroad — to support the issuance of new policies, minimize loss fluctuations, and limit or diversify risk.[218] In 2017, global reinsurer capital was approximately $605 billion, including $86 billion of capital markets reinsurance, both of which are record levels.[219] Globally, in 2016, the top 50 reinsurers had gross written premiums of $225.3 billion.[220]

---

218. Reinsurance is a contract of indemnity between commercial parties – an insurer (i.e., the "cedent" or "ceding insurer") and one or more reinsurers (i.e., "assuming insurers") – by which, in exchange for a premium, a specified portion of the risks under one or more insurance policies written by the cedent are transferred (ceded) to the reinsurers.

219. Aon Benfield, *Reinsurance Market Outlook June and July 2017 Update*, at 2.

220. See *www3.ambest.com/bestweek/DisplayBinary.aspx?TY=P&record_code=265357&URatingId=2666445*.

Figure 15: Composition of Investment Portfolio for P&C Insurance Sector

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Bonds** | 65.4% | 62.5% | 61.5% | 62.1% | 61.3% |
| **Preferred Stocks** | 0.9% | 0.8% | 1.0% | 0.9% | 0.7% |
| **Common Stocks** | 18.3% | 21.4% | 21.5% | 21.1% | 21.8% |
| **Mortgage Loans** | 0.4% | 0.5% | 0.7% | 0.8% | 0.9% |
| **Real Estate** | 0.7% | 0.7% | 0.7% | 0.8% | 0.8% |
| **Contract Loans** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Derivatives** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Cash & Short Term Investments** | 6.0% | 5.6% | 5.9% | 5.8% | 5.8% |
| **Other Investments** | 8.3% | 8.4% | 8.7% | 8.5% | 8.6% |
| **Total Cash & Invested Assets** | 100% | 100% | 100% | 100% | 100% |

Source: SNL Financial

Figure 16: Composition of General Account Investment Portfolio for the L&H Insurance Sector[*]

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Bonds** | 74.7% | 74.7% | 73.9% | 73.8% | 73.5% |
| **Preferred Stocks** | 0.2% | 0.2% | 0.3% | 0.3% | 0.2% |
| **Common Stocks** | 2.1% | 2.1% | 2.1% | 2.0% | 2.2% |
| **Mortgage Loans** | 9.9% | 10.1% | 10.3% | 10.9% | 11.2% |
| **Real Estate** | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| **Contract Loans** | 3.7% | 3.7% | 3.6% | 3.4% | 3.3% |
| **Derivatives** | 1.2% | 1.1% | 1.6% | 1.5% | 1.6% |
| **Cash & Short Term Investments** | 3.1% | 2.7% | 2.8% | 2.8% | 2.6% |
| **Other Investments** | 4.4% | 4.7% | 4.9% | 4.7% | 4.7% |
| **Total Cash & Invested Assets** | 100% | 100% | 100% | 100% | 100% |
| **Share of Total General Account Assets** | 94.9% | 94.7% | 94.7% | 94.7% | 94.5% |
| **General Account Assets / Total Assets** | 63.6% | 61.2% | 61.3% | 61.8% | 62.3% |
| **Separate Account Assets / Total Assets** | 36.4% | 38.8% | 38.7% | 38.2% | 37.7% |

[*] L&H insurers maintain a General Account and Separate Accounts. Separate Accounts, as the name implies, are held apart from the general investment account of an insurer and hold and invest proceeds from the sales of products for which policyholders retain the investment risks.

Source: SNL Financial

In some cases, the federal government is also a direct participant in the insurance marketplace. For instance, the Federal Crop Insurance Corporation provides reinsurance to commercial writers of crop insurance; Treasury, through the Terrorism Risk Insurance Program (TRIP), provides a backstop for insured commercial P&C losses resulting from a "certified act of terrorism;" and the Federal Emergency Management Agency, through the National Flood Insurance Program, offers residential and commercial flood insurance.

State governments also participate in the insurance marketplace. To ensure their residents have access to necessary insurance products, some states serve as insurers of last resort for individuals who cannot obtain insurance in the voluntary market. Florida, for instance, has created a P&C insurer that provides homeowners insurance to coastal homeowners who would otherwise be unable to purchase such insurance.[221] Such residual market coverage is typically offered in most states for workers' compensation, personal automobile liability, and property insurance.

The insurance industry as a whole is an important participant in U.S. capital markets. The U.S. insurance industry held approximately $5.5 trillion in cash and invested assets at the end of 2016.[222] In addition, insurers held $3.8 trillion in the bond market and $432 billion in the stock market at year-end 2016.[223] Figures 15 and 16 show asset allocations for the P&C and L&H sectors, respectively, for the last five years. Infrastructure investments are particularly attractive to life insurers due to their long durations and stable cash flows.

## Trends and Industry Outlook

The U.S. insurance industry is in sound financial condition, with L&H sector capital and surplus reaching a record $380.7 billion at year-end 2016, a 3.7% increase over the prior year, while the P&C sector reported year-end 2016 policyholder surplus of $712.3 billion, up 3.6% from 2015 and also a record high.[224] During the period from 2010 through 2016, the surplus bases of the L&H and P&C sectors experienced annual average growth rates of 3.9% and 4.7% respectively. This solid capital base allows insurers to invest in the capital markets and in their own growth with confidence that they can absorb unexpected adverse developments in the general economy and in the insurance markets they serve.

Despite its strong balance sheet, the industry has faced headwinds, which have dampened its operating performance in recent years. The L&H sector's earnings peaked at $42.3 billion in 2013, followed by three years of lower earnings in a fairly close range. The "low for long" interest rate environment has been a significant drag on the investment income of both sectors, although this negative impact is more pronounced for L&H insurers. Other factors affecting L&H operating results include slow sales growth (less than 2% annually[225]) and strained underwriting performance.

---

221. Citizens Property Insurance Corporation, *Who We Are*, available at: *https://www.citizensfla.com/who-we-are*.

222. National Association of Insurance Commissioners, *Capital Markets Special Report*, available at: *http://naic.org/capital_markets_archive/160606.htm*.

223. *SNL Financial*. Common stock investments total does not include affiliated investments.

224. Unless otherwise noted, the source for all data in the "Trends and Outlook" section is SNL Financial.

225. McKinsey & Company, *Rethinking US Life Insurance Distribution* (May 2016), at 5, available at: *http://www.mckinsey.com/industries/financial-services/our-insights/rethinking-us-life-insurance-distribution*.

035307

After three consecutive years of underwriting profit, the P&C sector recorded an underwriting loss in 2016 and its net income fell to $44.4 billion, a 24% drop from 2015 and 38% lower than peak net income of $71.6 billion in 2013. In the commercial lines segment, profit margins are under pressure from the effects of soft prices, lack of organic growth, and competition from alternative sources of capital such as hedge funds, foreign investors, and the capital markets.[226] The auto insurance segment is facing sharp increases in the frequency and severity of claims, as auto insurance losses and expenses have exceeded premiums for 10 consecutive years.[227]

Going forward, in addition to low interest rates, both sectors will be challenged by rapidly changing technology, shifts in consumer expectations and preferences, cybersecurity risks, and regulatory uncertainty. Some of the keys to success for the industry and individual companies include the ability to execute strategic decisions quickly and effectively, understand and harness technology, and maintain pricing discipline and superior risk management during periods of stress and volatility.

## The Regulatory Structure of the Insurance Industry

### The Primacy of State Regulation

The 50 states, the District of Columbia, and the five U.S. territories are the primary regulators of the business of insurance in the United States. For over 150 years, the U.S. state-based insurance regulatory system has promoted the primary objective of protecting policyholders.

State legislatures enact insurance laws, which are implemented and enforced by state regulators primarily through adoption of rules and regulations governing the conduct of insurers and the rights of consumers. Insurance regulators operate within the state executive branches, either as stand-alone offices or as divisions of larger departments. Most insurance commissioners are either appointed by the governor for a set term or serve at the pleasure of the governor; however, in 11 states, the commissioner is elected by popular vote.[228]

Broadly speaking, state regulation is divided into prudential regulation (frequently referred to as "solvency" regulation) and marketplace regulation. Prudential regulation consists of oversight of an insurer's financial condition and its ability to satisfy policyholder claims. State statutes require insurers to meet minimum capital standards and financial reporting requirements, and regulate financial aspects of an insurer's operations such as establishing reserves for payment of future claims, selecting and managing investments, obtaining reinsurance, conducting risk management, and engaging in transactions with affiliates. The state where an insurer is incorporated is primarily responsible for its financial oversight as well as for sanctioning or taking other remedial actions if the insurer operates in an unsafe and unsound manner.

---

226. PriceWaterhouseCoopers, *Top Insurance Industry Issues in 2017 (2017),* at 17, available at: *https://www.pwc.com/us/en/insurance/publications/assets/pwc-2017-insurance-top-issues.pdf.*

227. Insurance Information Institute, *Personal Automobile Insurance: More Accidents, Larger Claims Drive Costs Higher* (October 2016), at 4, available at: *http://www.iii.org/sites/default/files/docs/pdf/auto_rates_wp_092716-62.pdf.*

228. National Association of Insurance Commissioners, *State Commissioners Elected/Appointed*, available at: *http://www.naic.org/documents/members_state_commissioners_elected_appointed.pdf.*

Marketplace regulation governs an insurer's business conduct, such as the pricing of premiums, advertising, minimum standards governing the terms of insurance policies, payment of claims, and licensing of insurance agents and brokers, together with general issues of consumer protection and access to insurance. Each state where an insurer operates regulates the insurer's market conduct in that state. Accordingly, although many insurers operate on a multistate or national basis, each state regulates its own insurance markets, and this regulation may not be uniform from state to state.

Reinsurers are regulated by the states through direct regulation of licensed reinsurers and their reinsurance transactions. State insurance regulators directly regulate reinsurers domiciled in their state, as well as U.S. reinsurers that are licensed in their state but domiciled elsewhere. Reinsurers and primary insurers are subject to the same set of solvency laws and regulations. State insurance regulators also indirectly regulate reinsurance transactions through the credit for reinsurance regulations, which, among other things, require insurers to meet certain prescribed financial statement account criteria.

Under the McCarran-Ferguson Act passed by Congress in 1945,[229] state laws governing the business of insurance are not invalidated, impaired, or superseded by any federal law unless the federal law specifically relates to the business of insurance.[230] McCarran-Ferguson states that "the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several states."[231]

State regulation of the insurance industry is coordinated through the National Association of Insurance Commissioners (NAIC), a voluntary organization whose membership consists of the chief insurance regulatory officials of the 50 states, the District of Columbia, and the five U.S. territories.[232] The NAIC was originally formed in 1871, and reorganized in 1999 as a nonprofit corporation. The NAIC describes itself as "the U.S. standard-setting and regulatory support organization" through which "state insurance regulators establish standards and best practices, conduct peer review and coordinate their regulatory oversight."[233] The NAIC also provides centralized support services and programs to assist states in exercising certain statutory responsibilities.[234]

Although the NAIC is not itself a regulator or government authority, it plays a central role in state insurance regulation and policy through its development of model laws and regulations for

---

229. The McCarran–Ferguson Act, 15 U.S.C. §§ 1011-1015.

230. Id. at § 1012(b).

231. In limited circumstances, Congress has determined that national or international interests require legislation that mandates uniformity of state insurance laws or regulations, while keeping regulation at the state level. For example, the Nonadmitted and Reinsurance Reform Act of 2010 sets uniform standards for surplus lines insurers and reinsurers while also providing that the laws of an insurer or reinsurer's state of domicile control.

232. National Association of Insurance Commissioners, *About the NAIC*, available at: *http://naic.org/index_about. htm*.

233. National Association of Insurance Commissioners, *2016 Annual Report: Inspiring Innovation* (Apr. 8, 2017).

234. For example, the NAIC developed and maintains the Interstate Insurance Product Regulation Commission, a centralized life insurance product approval process for participating states; the National Insurance Producer Registry, a national electronic database of licensed insurance agents; and the System for Electronic Rate and Form Filing, an electronic form and rate filing system for insurance products.

consideration by the states,[235] helping state regulators conduct peer review, and coordinating regulatory oversight of the insurance sector. The NAIC also provides regulatory, actuarial, legal, and technical resources and expertise to state insurance departments.

The Financial Regulation Standards and Accreditation Program of the NAIC is an important component of prudential oversight by state insurance regulators.[236] Accreditation is a certification given to a state insurance department once it has demonstrated that it has met and continues to meet an assortment of legal, financial, and organizational standards as determined by a committee of its peers. A state becomes accredited by adopting specified NAIC model laws and regulations in the form adopted by the NAIC or in a substantially similar manner.[237] All 50 states, the District of Columbia, and Puerto Rico are accredited as of July 2017.[238]

## Federal Government Involvement in the Business of Insurance

Although the states have been and remain the primary regulators of the insurance industry, the federal government has long had a significant impact on insurers and the business of insurance. This role can take several forms, but some of the more significant impacts include:

- Prudential regulation, including the Federal Reserve's regulation of FSOC-designated insurers and savings and loan holding companies that own insurance companies;

- Monitoring and reporting on the insurance industry, and developing federal policy on prudential aspects of international insurance matters through the Federal Insurance Office (FIO), including the negotiation of "covered agreements;"

- The regulation of financial products or markets which include, but are not limited to, insurance, such as the SEC's regulation of securities and the CFTC's regulation of derivatives;

- Taxation of insurers and their products through the IRS under Treasury's supervision; and

- Federal insurance programs, including the Federal Emergency Management Agency's administration of the National Flood Insurance Program and Treasury's administration of the Terrorism Risk Insurance Program.

The next section provides a brief overview of some of the key federal entities that have a role in regulating the business of insurance.

---

235. Model laws and regulations become effective only if and when they are officially enacted or promulgated by a state. Actual laws and regulations may vary, sometimes significantly, from NAIC models.

236. National Association of Insurance Commissioners, *Accreditation* (Jan. 6, 2017), available at: *http://www.naic.org/cipr_topics/topic_accreditation.htm*. See also National Association of Insurance Commissioners, *Financial Regulation Standards and Accreditation Program* (August 2017), available at: *http://www.naic.org/documents/cmte_f_frsa_pamphlet.pdf*.

237. National Association of Insurance Commissioners, *New or Revised Financial Solvency Regulation-Related Model Laws and Regulations Status Regarding Consideration for Accreditation as of August 10, 2017*, available at: *http://www.naic.org/documents/committees_f_related_model_law_stat_accred.pdf*.

238. National Association of Insurance Commissioners, *Financial Regulation Standards and Accreditation Program – Accredited U.S. Jurisdictions*, available at: *http://www.naic.org/cmte_f_accredited_states.htm*.

## Financial Stability Oversight Council

The Financial Stability Oversight Council (FSOC) was established by Dodd-Frank[239] and is charged with three purposes. Generally, those are to: (1) identify risks to the financial stability of the United States, (2) promote market discipline, and (3) respond to threats to the financial stability of the United States.[240] The FSOC consists of 10 voting members — including an independent member with insurance expertise — and five nonvoting members — including a state insurance commissioner and the FIO Director.[241]

Section 113 of Dodd-Frank authorizes the FSOC to designate a nonbank financial company for supervision by the Federal Reserve and enhanced prudential standards if the FSOC determines that the company's material financial distress — or the nature, scope, size, scale, concentration, interconnectedness, or mix of its activities — could pose a threat to U.S. financial stability.[242] A "nonbank financial company" is defined to include insurance companies.[243]

The FSOC also has the authority to examine specific activities of potential systemic importance.[244] Section 120 of Dodd-Frank permits the FSOC to provide for more stringent regulation of a financial activity by issuing recommendations to the primary financial regulatory agencies to apply new or heightened standards and safeguards for a financial activity.[245] To issue such a recommendation, the FSOC must determine that the conduct, scope, nature, size, scale, concentration, or interconnectedness of such activity could create or increase the risk of significant liquidity, credit, or other problems spreading among, for example, U.S. financial markets.[246]

## Federal Insurance Office

Title V of Dodd-Frank established the Federal Insurance Office in Treasury.[247] Title V vested FIO with authority to monitor all aspects of the insurance sector except health insurance, monitor the extent to which traditionally underserved communities and consumers have access to affordable insurance products, represent the United States on prudential aspects of international insurance matters, including at the International Association of Insurance Supervisors, assist the Secretary in negotiating covered agreements, consult with the states regarding insurance matters of national importance and prudential insurance matters of international importance, and perform such other

---

239. 12 U.S.C. § 5321.

240. 12 U.S.C. § 5322. Specifically, the FSOC is charged: (1) to identify risks to the financial stability of the United States that could arise from the material financial distress or failure, or ongoing activities, of large, interconnected bank holding companies or nonbank financial companies, or that could arise outside the financial services marketplace; (2) to promote market discipline, by eliminating expectations on the part of shareholders, creditors, and counterparties of such companies that the U.S. government will shield them from losses in the event of failure; and (3) to respond to emerging threats to the stability of the U.S. financial system.

241. 12 U.S.C. § 5321. The Secretary serves as the Chairperson of the FSOC.

242. 12 U.S.C. § 5323(a).

243. 12 U.S.C. § 5311(a)(4).

244. 12 U.S.C. § 5330(a).

245. Id.

246. Id.

247. 31 U.S.C. § 313(a).

related duties and authorities as may be assigned to FIO by the Secretary.[248] FIO also assists the Secretary in administering TRIP.[249]

## Federal Regulators and Agencies Involved in Insurance

### Board of Governors of the Federal Reserve System

The Federal Reserve serves a central role in the financial system overseeing monetary policy through the Federal Open Market Committee as well as operating, through the Federal Reserve Banks, key components of the payment, clearing, and settlement system. Its mission also includes maintaining the stability of the financial system. The Federal Reserve also regulates bank holding companies, savings and loan holding companies, state-chartered member banks and, in certain instances, nonbank financial companies.

The Federal Reserve regulates nonbank financial companies with significant insurance activities that have been designated by the FSOC pursuant to Section 113 of Dodd-Frank.[250] For these insurers, the Federal Reserve is required by Section 165 of Dodd-Frank to establish enhanced prudential standards, including more stringent risk-based capital requirements and stress tests.[251] Title III of Dodd-Frank also transferred to the Federal Reserve the supervisory functions related to savings and loan holding companies and their non-depository subsidiaries that were performed by the Office of Thrift Supervision until July 2011.[252] The Federal Reserve acts as the group-wide supervisor for these firms, some of which are primarily engaged in the business of insurance.[253]

### Securities and Exchange Commission

The mission of the Securities and Exchange Commission (SEC) is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation. Broadly, the SEC has jurisdiction over brokers and dealers, securities offerings in the primary and secondary markets, investment companies, investment advisers, credit rating agencies, and security-based swap dealers. Some insurance products are subject to registration with the SEC under the Securities Act[254] and

---

248. 31 U.S.C. § 313(c). In addition, Dodd-Frank assigns specific duties to the Director of FIO. Pursuant to Title I, the Director serves as a nonvoting member of the FSOC. Under Title II, the affirmative approval of the Director, along with a vote of two-thirds of the members of the Federal Reserve then serving, is required before the Secretary may make a determination on whether to seek the appointment of the Federal Deposit Insurance Corporation as receiver of an insurance company.

249. For purposes of this report, TRIP refers to the program, as it is administered through regulations found in 31 C.F.R. Part 50.

250. 12 U.S.C. § 5323(a).

251. 12 U.S.C. § 5365.

252. 12 U.S.C. § 5412.

253. Id.

254. 15 U.S.C. § 77a et seq. Section 3(a)(8) of the Securities Act exempts any insurance policy or annuity contract issued by a corporation subject to the supervision of a state insurance commissioner. However, courts and the SEC have determined that certain insurance products are not within the scope of Section 3(a)(8). See, e.g., Definition of "Annuity Contract or Optional Annuity Contract," Securities Act Release No. 6558 (Nov. 21, 1984), [49 Fed. Reg. 46750 (Nov. 28, 1984)]; *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65 (1959); *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202 (1967).

to other federal securities laws. Also, the separate accounts underlying variable life insurance policies and annuity contracts are generally regulated as investment companies under the Investment Company Act of 1940 ('40 Act).[255]

### Federal Deposit Insurance Corporation

The Federal Deposit Insurance Corporation (FDIC) works to maintain stability and public confidence in the nation's financial system by insuring deposits, examining and supervising state-chartered banks that are not members of the Federal Reserve System for safety and soundness and consumer protection, working to make large and complex financial institutions resolvable, and acting as the receiver of failed banks.[256] The FDIC has in place rules and regulations that govern the actions of FDIC-insured institutions, including rules and regulations regarding capital adequacy for supervised institutions.[257] Pursuant to Title II of Dodd-Frank, the FDIC may also be appointed receiver of insurance companies that are determined to pose a significant risk to the nation's financial stability if the Secretary, in consultation with the President, makes certain determinations following the recommendation of the Federal Reserve and the Director of the Federal Insurance Office.

### Office of the Comptroller of the Currency

The Office of the Comptroller of the Currency (OCC) charters, regulates, and supervises all national banks and federal savings associations, as well as federal branches and agencies of foreign banks. The purpose of the OCC is to ensure that supervised institutions operate in a safe and sound manner, provide fair access to financial services, treat customers fairly, and comply with applicable laws and regulations. In coordination with other U.S. banking regulators and international standard setters, the OCC identifies and develops policies to address emerging risks to bank capital. Title III of Dodd-Frank abolished the Office of Thrift Supervision and transferred the supervision and regulation of federally chartered savings associations, including those affiliated with insurers, to the OCC.[258]

### Consumer Financial Protection Bureau

In limited circumstances, the Consumer Financial Protection Bureau (CFPB) can regulate insurers or their activities. Created by Title X of Dodd-Frank, the CFPB has authority, which was previously divided among seven agencies, over 18 enumerated federal consumer financial laws. It regulates the offering and provision of consumer financial products and services under federal

---

255. Investment Company Act of 1940, 15 U.S.C. §§ 80a-1-80a-64.
256. Banking Act of 1933, Public Law 73-66, 48 Stat. 162.
257. See 12 C.F.R. Part 324.
258. 12 U.S.C. § 5412.

consumer financial laws, develops consumer financial education initiatives, and researches and monitors the market for financial services.[259]

### U.S. Department of Housing and Urban Development

The mission of the Department of Housing and Urban Development (HUD) is to create strong, sustainable, inclusive communities and quality affordable homes for all. To that end, the Federal Housing Administration (FHA) within HUD provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories. FHA insures mortgages on single family and multifamily homes (including manufactured homes) and hospitals. It is the largest insurer of mortgages in the world, insuring over 38 million properties since its inception in 1934.[260] Among other things, HUD is vested with the authority to engage in formal adjudications of housing discrimination claims pursuant to the Fair Housing Act.

### U.S. Department of Health and Human Services

The Department of Health and Human Services (HHS) administers the Medicaid and Medicare programs, which together pay approximately two-thirds of the costs of long-term care in the United States.[261] HHS has also adopted and enforces the "Standards for Privacy of Individually Identifiable Health Information," also known as the HIPAA Privacy Rule,[262] which established a set of national standards for the protection of certain health information required under the Health Insurance Portability and Accountability Act of 1996.

### Commodity Futures Trading Commission

The Commodity Futures Trading Commission (CFTC) was established in 1974 as an independent federal regulatory agency with exclusive jurisdiction over the markets for commodity futures and options on futures. The CFTC's jurisdiction also extends to many other types of derivative contracts, including futures contracts on energy products, metals, financial assets and indexes, interest rates, and other financial, commercial, or economic contingencies. In 2010, Dodd-Frank amended the Commodity Exchange Act — governing futures markets and the CFTC's authorities — to, among other things, expand the CFTC's jurisdiction to include swaps, or derivative contracts that are based not on underlying assets or commodities, but on the exchange of financial instruments. Derivatives are used extensively by insurers (typically larger insurers), generally for hedging commercial risk. Accordingly, CFTC regulations can significantly affect insurers' ability to efficiently hedge and manage their business risks in financial markets.

---

259. 12 U.S.C. §§ 5491 and 5493. The CFPB has, with regard to federal consumer financial laws, supervisory and enforcement authority over: (1) banks, thrifts, and credit unions with assets over $10 billion, as well as their affiliates; (2) all nonbank residential mortgage originators, brokers, and servicers; (3) all payday lenders; (4) all nonbank private student lenders; (5) larger participants in markets for other consumer financial products or services as determined by CFPB rulemaking; and (6) other firms where the CFPB has reasonable cause to determine their conduct poses risks to consumers related to the offering or provision of consumer financial products or services. 12 U.S.C. §§ 5514 and 5515.

260. See U.S. Department of Housing and Urban Development, *The Federal Housing Administration (FHA)*, available at: *https://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/fhahistory*.

261. Peter Gallanis, et al., *State of the Long-Term Care Insurance Industry: NOLHGA Presentation to the NAIC* (Mar. 30, 2017), available at: *http://www.naic.org/documents/cmte_e_mlwg_related_state_of_ltc_industry.pdf*.

262. 45 C.F.R. § 160; 45 C.F.R. § 164 Subparts A and E.

### Internal Revenue Service

Section 7801 of the Internal Revenue Code (Code) provides the Secretary with full authority to administer and enforce internal revenue laws. The Code affords certain life insurance and annuity products favorable tax treatment that makes those products more attractive to some consumers. Examples include tax-free death benefits under life insurance policies and tax-deferred growth of cash values within life insurance and annuities. The Internal Revenue Service also administers provisions of the Code that are unique to taxation of L&H and P&C insurers.

The following chart provides examples of involvement in insurance by the entities described above as well as other federal regulators and agencies.

## Other Federal Regulators and Agencies Involved in Insurance

| Agency | Examples of Involvement |
|---|---|
| **Board of Governors of the Federal Reserve System (Federal Reserve)** | The Federal Reserve regulates nonbank financial companies with significant insurance activities that have been designated by the FSOC pursuant to Section 113 of Dodd-Frank. The Federal Reserve also has a supervisory role with respect to savings and loan holding companies (SLHCs), including insurer-owned savings and loan holding companies, and their non-depository subsidiaries. The Federal Reserve acts as the group-wide supervisor for these firms, some of which are primarily engaged in the business of insurance. |
| **Commodity Futures Trading Commission (CFTC)** | Dodd-Frank amended the Commodity Exchange Act – governing futures markets and the CFTC's authorities – to, among other things, expand the CFTC's jurisdiction to include swaps, or derivative contracts that are based not upon underlying assets or commodities, but upon the exchange of financial instruments. Derivatives are used extensively by insurers (typically larger insurers) generally for hedging commercial risk. |
| **Consumer Financial Protection Bureau (CFPB)** | In limited circumstances, the CFPB can regulate insurers or their activities. Created by Title X of Dodd-Frank, the CFPB regulates the offering and provision of consumer financial products and services under federal consumer financial laws, develops consumer financial education initiatives, and researches and monitors the market for financial services. |
| **Export-Import Bank of the United States** | Wholly-owned federal government corporation that provides financing for export operations where private financing is unavailable; support includes export credit insurance that insures accounts receivable against commercial or political risk.[1] |
| **Federal Aviation Administration** | Issues insurance for air operations that the President decides are necessary in the interest of air commerce or national security or to carry out the foreign policy of the United States; subject to indemnities from the agency or department sponsoring the flights.[2] |
| **Federal Communications Commission** | Regulates the telemarketing of insurance products under the Telephone Consumer Protection Act (including its Do Not Call Registry).[3] |
| **Federal Crop Insurance Corporation in the U.S. Department of Agriculture** | Administers the Federal Crop Insurance Program, under which the federal government reinsures commercial writers of crop insurance.[4] |
| **Federal Deposit Insurance Corporation (FDIC)** | The FDIC may be appointed receiver of systemically important insurance companies that are determined to pose a significant risk to the nation's financial stability if the Secretary, in consultation with the President, makes certain determinations following the recommendation of the Federal Reserve and the Director of the Federal Insurance Office. |
| **Federal Emergency Management Agency in the U.S. Department of Homeland Security** | Administers the National Flood Insurance Program.[5] |

## Other Federal Regulators and Agencies Involved in Insurance *continued*

| Agency | Examples of Involvement |
|---|---|
| **Federal Housing Finance Agency in the U.S. Department of Housing and Urban Development** | Establishes requirements for the issuers of private mortgage insurance.[6] |
| **Federal Maritime Administration** | Can issue marine war risk insurance on an emergency, stand-by basis which becomes effective simultaneously with the automatic termination of ocean marine commercial war risk insurance policies; sets insurance requirements for vessels or technology financed by the Federal Ship Financing Program.[7] |
| **Federal Trade Commission** | Has jurisdiction over deceptive insurance advertising practices when not regulated by state law.[8] |
| **Internal Revenue Service (IRS)** | Section 7801 of the Internal Revenue Code (Code), provides the Secretary with full authority to administer and enforce internal revenue laws. The Code affords certain life insurance and annuity products favorable tax treatment that makes those products more attractive to some consumers. Examples include tax-free death benefits under life insurance policies and tax-deferred growth of cash values within life insurance and annuities. The IRS also administers provisions of the Code that are unique to taxation of L&H and P&C insurers. |
| **Nuclear Regulatory Commission** | Sets regulations for insurance requirements for nuclear reactors and other facilities pursuant to the Price-Anderson Act.[9] |
| **Office of the Comptroller of the Currency (OCC)** | The OCC identifies and develops policies to address emerging risks to bank capital. Title III of Dodd-Frank abolished the Office of Thrift Supervision and transferred the supervision and regulation of federally chartered savings associations, including those owned by insurers, to the OCC. |
| **Office of Finance and Insurance Industries in the U.S. Department of Commerce** | Deploys policy, promotion, and analysis work to expand U.S. financial services exports, attract investment to the United States, and facilitate the growth and development of new and inclusive segments of finance, including in the area of insurance. |
| **Overseas Private Investment Corporation** | Government corporation providing political risk insurance to support investment by U.S. businesses in emerging markets.[10] |
| **Securities and Exchange Commission (SEC)** | Unless otherwise exempted, insurance products constitute securities and are subject to registration with the SEC under the Securities Act and to other federal securities laws. The separate accounts underlying variable life insurance policies and annuity contracts are generally regulated as investment companies under the '40 Act. |
| **United States Trade Representative** | Authorized jointly with Treasury to enter into covered agreements with foreign governments respecting insurance.[11] |

## Other Federal Regulators and Agencies Involved in Insurance *continued*

| Agency | Examples of Involvement |
|---|---|
| **U.S. Department of Health and Human Services (HHS)** | HHS administers the Medicaid and Medicare programs, which together pay approximately two-thirds of the costs of long-term care in the United States. HHS has also adopted and enforces the "Standards for Privacy of Individually Identifiable Health Information," also known as the HIPAA Rule, which established a set of national standards for the protection of certain health information required under the Health Insurance Portability and Accountability Act of 1996. |
| **U.S. Department of Homeland Security** | Sets insurance requirements under the SAFETY Act, under which companies licensed to provide anti-terrorism products and services are released from liability in excess of insurance limits.[12] |
| **U.S. Department of Housing and Urban Development (HUD)** | The Federal Housing Administration (FHA) within HUD provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories. FHA insures mortgages on single family and multifamily homes (including manufactured homes) and hospitals. |
| **U.S. Department of Labor** | Administers major disability compensation programs for coal miners, longshoremen and harbor workers, energy employees, and federal workers; regulates compliance with the Employee Retirement Income Security Act (ERISA). |

1. Fixing America's Surface Transportation Act, Public Law 114-94, 129 Stat. 1312 (2015).

2. 49 U.S.C. §§ 44301 et seq.

3. 47 U.S.C. § 227; 47 CFR § 64.1200.

4. Federal Crop Insurance Act (7 U.S.C. § 1505 Management of Corporation); CFR, Title 7- Agriculture, Subtitle B-Regulations of the Department of Agriculture, Chapter IV - Federal Crop Insurance Corporation (general administrative regulations of the FCIC) codified in 7 CFR 400; regulations pertaining to private sector plans of insurance submissions are published in Subpart V, 7 CFR 400.700-722.

5. 42 U.S.C. Chapter 50.

6. Housing and Economic Recovery Act of 2008, Public Law 110-289 (2008).

7. 46 U.S.C. Chapter 539 (Public Law 109-304) (war risk insurance provisions); 46 CFR Part 308 (implementing regulations).

8. Federal Trade Commission v. Travelers Health Association, 363 U.S. 293 (1960); McCarran-Ferguson Act, 15 U.S.C § 1012(b).

9. 42 U.S.C. § 2210.

10. Foreign Assistance Act of 1961 (as amended), 22 U.S.C. § 2191.

11. Dodd-Frank, Title V (Public Law 111-203, 124 Stat. 1376).

12. Homeland Security Act of 2002, Public Law 107-296.

Source: Treasury internal analysis

### The Financial Crisis, Insurers, and Dodd-Frank

The financial crisis was precipitated by ill-designed public policies, inadequate oversight, and numerous events, including a decline in housing prices, an increase in mortgage delinquencies, and deterioration in the value of mortgage-backed securities. As the crisis spread throughout the financial system, some of the largest financial institutions suffered significant losses. Like other parts of the financial sector, the insurance industry was affected in several ways, including by the extension of extraordinary government assistance to American International Group, or AIG. The crisis also contributed to the failure of financial guaranty insurers, and caused a number of insurers to seek federal emergency liquidity assistance, including for the purpose of stabilizing capital levels for variable annuity products. This prompted policymakers to develop reforms at the domestic and international level to remedy weaknesses in the financial system that were exposed during the crisis.

Net income for both the L&H and P&C sectors fell dramatically from pre-crisis levels in 2008, but this decline was mainly due to realized capital losses on insurers' investment portfolios rather than underwriting activities. As a result, asset values dropped and capital and surplus accounts were negatively impacted by losses. However, solvency concerns and failures in the industry were relatively limited. From 1980 to 2010, there were 291 failures of life insurance companies in the United States, but the peak period for failures was from 1989 to 1994 (when a total of 152 life insurers failed), not during the financial crisis.[263] P&C insurer failures followed a similar pattern, with overly competitive pricing and increases in reserves cited as possible causes.[264] In 2008 and 2009, there were 18 life insurance company receiverships and nine liquidations,[265] while the P&C sector experienced 19 receiverships and 11 liquidations.[266] By the end of 2009, capital and surplus levels for both sectors of the U.S. insurance industry had recovered to pre-crisis levels, while financial leverage was slightly lower than pre-crisis, where it has remained through 2016. Figure 17 presents selected financial data for the L&H and P&C sectors, showing their financial performance and condition in the years around, and following, the financial crisis.

---

263. Stephen Robb, Society of Actuaries, *Comparative Failure Experience in the U.S. and Canadian Life Insurance and Banking Industries from 1980 to 2010* (Mar. 2013), available at: *https://www.soa.org/research-reports/2013/research-2013-comparative-failure-experience/.*

264. David F. Bradford, editor, *The Economics of Property-Casualty Insurance* (1998), available at: *http://www.nber.org/chapters/c6941.pdf.* A 1990 report issued by the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations entitled *Failed Promises: Insurance Company Insolvencies* found that the then current system of solvency regulation was inadequate due to the insurance industry's rapid expansion, underpricing, inadequate oversight, inadequate loss reserves, poor reinsurance transactions, and fraud (U.S. House of Representatives, Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, *Failed Promises: Insurance Company Insolvencies,* 101st Cong., 2nd Sess., Committee Print 101-P (Washington: GPO 1990)).

265. In a receivership, a court-appointed receiver has custodial responsibility for the property of an insurer, including tangible and intangible assets and rights in cases where the insurer cannot meet its financial obligations. In a liquidation, the insolvent insurer's operations are concluded, and its assets are distributed among policyholders, creditors, and shareholders, according to the hierarchy of claims established by state law.

266. Government Accountability Office, *Impact of and Regulatory Response to the 2007-2009 Financial Crisis* (June 2013), at 17, available at: *https://www.gao.gov/assets/660/655612.pdf.*

Figure 17: Selected Financial Data - U.S. Insurance Industry

**L&H Insurance Sector ($ billions)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Premiums, Consideration, & Deposits** | 565.93 | 597.01 | 608.19 | 493.01 | 561.96 |
| **Net Investment Income** | 161.53 | 168.04 | 162.19 | 156.62 | 164.14 |
| **Net Income** | 37.01 | 31.63 | (52.31) | 21.53 | 28.05 |
| **Total Assets** | 3,005.42 | 3,086.62 | 3,178.98 | 3,230.48 | 3,356.50 |
| **Policyholders' Surplus** | 253.10 | 266.94 | 251.77 | 290.69 | 306.43 |
| **Leverage** | 11.87 | 11.56 | 12.63 | 11.11 | 10.95 |

Source: SNL Financial

**P&C Insurance Sector ($ billions)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Net Premiums Written** | 448.91 | 446.94 | 440.35 | 423.08 | 426.22 |
| **Net Investment Income** | 53.14 | 56.50 | 53.13 | 48.40 | 48.10 |
| **Net Income** | 66.45 | 63.62 | 3.71 | 32.20 | 37.22 |
| **Total Assets** | 1,452.52 | 1,506.30 | 1,447.81 | 1,491.67 | 1,548.38 |
| **Policyholders' Surplus** | 497.08 | 529.13 | 461.76 | 517.97 | 561.78 |
| **Leverage** | 2.92 | 2.85 | 3.14 | 2.88 | 2.76 |

Source: SNL Financial

In response to the crisis, Congress passed Dodd-Frank in 2010. Dodd-Frank is enormous in its scale, reach, and complexity. Given its scale, it is difficult to summarize the totality of Dodd-Frank. Key characteristics of Dodd-Frank with significant implications for the insurance industry include:

- **Mitigation of Systemic Risk:** Title I of Dodd-Frank established the FSOC for the oversight of systemic risks. Among other responsibilities and authorities, the FSOC can designate nonbank financial companies for Federal Reserve supervision, and can designate financial market utilities as systemically important. Dodd-Frank also requires the Federal Reserve to adopt enhanced prudential standards for U.S. bank holding companies having total assets of at least $50 billion, along with certain foreign banking organizations and designated nonbank financial companies.

- **Resolution Planning:** Title II of Dodd-Frank established a non-bankruptcy mechanism for resolving financial companies, including insurance companies, whose failure and resolution under otherwise applicable federal or state law would have serious adverse effects on U.S. financial stability. To do so in the case of an eligible insurance company, the affirmative approval of the FIO Director, along with a vote of two-thirds of the members of the Federal Reserve then serving, is required before the Secretary may make a determination on whether to seek the appointment of the FDIC as receiver of such insurance company. In most cases, however, Dodd-Frank allows state resolution mechanisms to operate so long as state insurance regulators act within 60 days. If state insurance regulators fail to act, Title II allows the FDIC to resolve the affected insurance company under applicable state law.

- **Elimination of the Office of Thrift Supervision:** Title III of Dodd-Frank eliminated the Office of Thrift Supervision and transferred its duties to the OCC, the Federal Reserve, and the FDIC.[267] Among other things, this transfer of powers and duties made the Federal Reserve the group-wide supervisor for insurance parent companies with insured depository institutions.[268]

- **Creation of the Federal Insurance Office:** Title V of Dodd-Frank established FIO in Treasury.

- **Derivatives:** Title VII of Dodd-Frank created a new structure for regulating over-the-counter derivatives, which are used by insurers and their affiliates to hedge their investments and other business risks.

- **Securities Act Exemption:** Section 989J of Dodd-Frank (the "Harkin Amendment") directs the SEC to treat certain life insurance and annuity products as exempt securities under the Securities Act, subject to specified conditions.

---

267. 12 U.S.C. § 5412.

268. Id.

035321

# Insurance:
# Findings and Recommendations

# Systemic Risk and Solvency

## Systemic Risk and the Insurance Industry

The financial crisis exposed gaps in the regulation of the insurance industry, including a lack of regulatory oversight of non-insurance activities undertaken by insurance companies. For example, AIG Financial Products Corporation and AIG Securities Lending Corporation — two non-insurance affiliates of AIG — led to the near-failure of AIG, which threatened the financial stability of the United States.

Section 113 of Dodd-Frank authorizes the FSOC to designate a nonbank financial company to be subject to supervision by the Federal Reserve and enhanced prudential standards if the company's material financial distress — or the nature, scope, size, scale, concentration, interconnectedness, or mix of its activities — could pose a threat to U.S. financial stability.[269] Three of the four companies initially designated by the FSOC under Section 113 were insurers. AIG and Prudential Financial were designated by the FSOC in 2013; MetLife was designated in 2014.[270] In March 2016, a federal court order rescinded the FSOC designation of MetLife, which has been appealed by the the FSOC and remains pending. In September 2017, the FSOC announced that it rescinded the designation of AIG.[271]

As noted earlier, Dodd-Frank also authorizes the FSOC to examine activities of potential systemic importance. The FSOC has previously issued proposed recommendations under its Section 120 authority with respect to the regulation of money market mutual funds,[272] but has not used this authority to address risks in the insurance industry.

Many stakeholders have argued that entity-based systemic risk evaluations of individual insurers may not be the best approach for mitigating risks arising from the insurance industry. These commenters state that such evaluations may not take into account the fundamental differences between insurers' business models and those of depository institutions. Finally, stakeholders noted that entity-based systemic risk evaluations are targeted toward only a limited number of firms and therefore may not be best for mitigating systemic risk, particularly in cases where activities or practices are undertaken by a significant number of industry participants.

*Recommendations*

Treasury's position is that entity-based systemic risk evaluations of insurance companies generally are not the best approach for mitigating risks arising from the insurance industry. Rather than focus on entity-based systemic risk evaluations, insurance regulators should focus on potential risks arising from insurance products and activities, and on implementing regulations that strengthen the insurance industry as a whole. Also, while the FSOC maintains primary responsibility for

---

269. 12 U.S.C. § 5323(a)(1).

270. See U.S. Department of the Treasury, *Financial Stability Oversight Council*, available at: *https://www.treasury.gov/initiatives/fsoc/designations/Pages/default.aspx*.

271. Id.

272. Notice Seeking Comment on Asset Management Products and Activities (Dec. 18, 2014), [79 Fed. Reg. 77488 (Dec. 24, 2014)].

identifying, evaluating, and addressing systemic risks in the U.S. financial system, the states are the primary regulators of the insurance industry in the United States, and insurance regulation at the federal level should be conducted in coordination with the states.

### International Association of Insurance Supervisors

In many ways, the international response to the financial crisis mirrored that of the United States. In April 2009, the Group of 20 (G-20) established the Financial Stability Board (FSB) to monitor and make recommendations about the global financial system. A key initiative of the FSB is the identification of systemically important financial institutions (SIFIs), which are defined as financial institutions whose distress or disorderly failure, because of their size, complexity, and systemic interconnectedness, would cause significant disruption to economic activity and the wider financial system. Among other things, the International Association of Insurance Supervisors (IAIS) is charged by the FSB with recommending insurers that should be identified as SIFIs (i.e., global systemically important insurers, or G-SIIs).

In 2013, the IAIS developed an assessment methodology to inform its recommendation to the FSB of insurers that may be eligible for identification as G-SIIs. In July 2013, the FSB — in consultation with the IAIS and national authorities — identified an initial list of nine G-SIIs. An annual process for potential identification was subsequently conducted, with nine G-SIIs being identified in each year.

In November 2016, the FSB announced its G-SII list, and in 2017 the IAIS announced its intention to explore an activities-based approach to address systemic risk as a possible complement to the G-SII entity-based assessment approach.[273] Unlike an entity-based approach, which focuses on the extent to which any single insurance company poses a threat to the broader financial system, an activities-based approach examines risk across insurers to assess vulnerabilities that may be relevant to financial stability.[274]

In January 2017, the IAIS established the Systemic Risk Assessment Task Force with responsibility to assess and measure systemically risky activities through an activities-based approach and improve cross-sectoral consistency in systemic risk measurement. The work plan of the task force involves publication of an initial consultation paper in 2017, followed by a second, more detailed, consultation paper in late 2018. These consultations would each seek stakeholder input on the development of an activities-based assessment.

#### Recommendations

Treasury recommends that FIO and the other U.S. members of the IAIS support the IAIS' work on the activities-based approach. Such an approach is a more appropriate method of assessing potential systemic risk in the global insurance market. The U.S. members of the IAIS should advocate for the development of an activities-based framework that is proportionate and appropriately

---

273. International Association of Insurance Supervisors, *Systemic Risk and Insurance, Presentation at Annual Global Seminar* (June 29, 2017), available at: *https://www.iaisweb.org/file/67325/2-alberto-corinti-170611-sratf-presentation-to-stakeholders*.

274. Id.

tailored to the U.S. insurance market. In recognition of the activities-based approach, the IAIS should reassess its existing G-SII policy measures, including how to improve the IAIS' 2014 guidance on liquidity management and planning.[275]

Treasury also recommends that FIO and the other U.S. members of the IAIS take steps to improve the IAIS G-SII assessment methodology and consider how to increase transparency with respect to the assessment methodology's development. U.S. members of the IAIS should advocate that the IAIS enhance its work on cross-sectoral consistency with other financial sectors — such as through work with the Basel Committee on Banking Supervision — which will allow the IAIS to better assess the potential global systemic risk of insurers.

## Preserving Solvency: Capital Initiatives

Insurers assume risk from policyholders that may give rise to future payment obligations, which makes capital a particularly important consideration for insurer solvency.[276] For long duration business lines (e.g., life insurance) insurers are exposed to potentially significant levels of interest rate risk because the markets for assets to back these obligations are limited to investments that may mature before the maturation of the obligations they offset. Therefore, capital serves as a safety net in cases where actual payments exceed reserves. Similarly, short duration business lines (e.g., property insurance) rely on capital to serve as a buffer for unexpected, often catastrophe-related, losses that may exceed reserves.

Insurance regulation in the United States includes the supervision of both the nature and extent of an insurer's capital. As insurance markets become more global, supervisors in the United States and elsewhere are increasingly aware of the need to understand the financial viability of insurers that are based elsewhere but operate in their markets. One way to enhance understanding among supervisors in different jurisdictions may be through a commonly understood, quantitative capital standard that would be applied at the group level. With respect to insurance, a "group" refers to two or more insurance legal entities that coexist as part of a corporate family by virtue of ownership or affiliation.

While some foreign jurisdictions currently have a group capital requirement that is applicable to insurers, no such standard exists in the United States. The current state-based solvency regulation framework in the United States applies capital requirements only at the insurance legal-entity level. State and federal authorities have recently taken steps toward the development of insurance group capital frameworks.

There are currently three distinct organizations working on development of group-wide capital initiatives that could be applicable to U.S. insurers: (1) the NAIC and state insurance regulators, (2) the Federal Reserve, and (3) the IAIS.[277]

---

275. See *https://www.iaisweb.org/page/supervisory-material/financial-stability-and-macroprudential-policy-and-surveillance//file/47800/liquidity-guidance-final*.

276. Reserves for claims and future payment obligations are treated as liabilities by insurers.

277. The group capital standard in development at the IAIS includes involvement by U.S. members of the IAIS.

### State Regulator Capital Initiatives

At the state level, insurance regulators impose minimum capital requirements on a legal entity basis but have not, to date, developed a capital assessment for insurance groups. In late 2015, state insurance regulators, through the NAIC, expressed the intention to construct a U.S. group capital calculation using a risk-based capital aggregation approach. The states' approach would use existing regulatory capital calculations for all entities within the holding company structure, rather than developing replacement or additional standards.[278]

### Federal Reserve Capital Initiatives

In June 2016, the Federal Reserve published an advance notice of proposed rulemaking on Capital Requirements for Supervised Institutions Significantly Engaged in Insurance Activities.[279] The advance notice invites comment on two approaches to group capital requirements for these institutions: (1) a "building block approach" that uses existing legal entity capital requirements as the basis for measuring insurance depository institution holding companies (e.g., savings and loans holding companies, or SLHCs) and (2) a "consolidated approach" for insurance companies designated by the FSOC.

The proposed building block approach would sum capital resources and sum capital requirements across different legal entities in the group to arrive at one group-level amount for each. Capital requirements would generally be the sum of the capital requirements at each regulated insurance or depository institution's subsidiary, based on the regulatory capital rules of each respective subsidiary's lead insurance or banking regulator.[280] The Federal Reserve's proposed building block approach is conceptually similar to the aggregation approach being considered by the NAIC and state regulators.

The proposed consolidated approach would categorize all consolidated assets and insurance liabilities into risk segments tailored to account for the liability structure and other unique features of the insurance group. It would then apply risk factors to the amounts in each risk segment. The approach would be based on U.S. generally accepted accounting principles (GAAP), with appropriate adjustments for regulatory purposes. The consolidated approach would also allow for supervisory stress testing.

*Recommendations*

The group capital initiatives by the NAIC, the states, and the Federal Reserve should be harmonized, to the extent possible, to mitigate duplicative and unnecessary regulatory burdens for U.S.

---

278. For example, this approach would use risk-based capital for U.S. legal entity insurers, jurisdiction-appropriate calculations for non-U.S. legal entities, and Basel Committee on Banking Supervision requirements for banking entities. For legal entities without existing capital requirements (i.e., non-regulated financial services entities), a standard would need to be adopted. For multi-national insurers, this approach may need to address how to aggregate jurisdictional requirements of multiple countries that differ in design and calibration.

279. Capital Requirements for Supervised Institutions Significantly Engaged in Insurance Activities (June 9, 2016), [81 Fed. Reg. 38631 (June 14, 2016)].

280. Additionally, adjustments may be needed to address other exposures, e.g., to harmonize permitted accounting practices that vary across states.

insurers. The Secretary will direct FIO to consult with the state insurance regulators, the NAIC, and the Federal Reserve on their respective group capital initiatives to produce the best outcomes for U.S. insurers, U.S. policyholders, and the U.S. insurance market. The Secretary will also direct FIO to coordinate this work. FIO will then advocate for the U.S. approach to group capital in international forums.

### IAIS Capital Initiatives

The work of the state regulators, the NAIC, and the Federal Reserve being conducted will influence the United States' position with respect to group capital initiatives in development at the IAIS. The IAIS Insurance Capital Standard (ICS) is being developed as part of the Common Framework for the Supervision of Internationally Active Insurance Groups (ComFrame).[281] ComFrame aspires to provide a more uniform approach to group capital through a risk-based group capital standard that is understood by supervisors across jurisdictions. The ICS has several foundational building blocks: (1) a valuation basis for assets and liabilities, (2) a capital requirement that considers all relevant and material risks and is calibrated at a sufficient level, and (3) criteria to determine qualifying capital resources that are available to meet that capital requirement.[282] The ICS is also intended to replace the Basic Capital Requirement as the foundation for the Higher Loss-Absorbency Requirement.[283] The Higher Loss-Absorbency Requirement is subject to further review and improvement, and is scheduled to be implemented beginning in 2022, once revised, and apply to any G-SIIs identified in 2020.

While adoption of the ICS by the IAIS is not scheduled until late 2019, the work product in development highlights potential issues that suggest the remaining work will be complex and challenging. First, the IAIS needs to determine the way forward once the ICS development process is complete. In an effort to do so, the IAIS recently called for more options in Version 1.0 with respect to valuation methodologies and capital resources to be tested than had originally been envisioned.

---

281. The IAIS defines an Internationally Active Insurance Group (IAIG) as a large, internationally active group that includes at least one insurance activity where: (1) premiums are written in not fewer than three jurisdictions (including the home jurisdiction), and gross premiums written outside the home jurisdiction are not less than 10% of the group's total gross written premiums, and (2) based on a rolling three-year average, total assets are not less than $50 billion, or gross written premiums are not less than $10 billion. See IAIS, *Common Framework for the Supervision of Internationally Active Insurance Groups, Revised DRAFT*, at 2 (Sept. 2014), available at: *https://www.iaisweb.org/page/supervisory-material/common-framework//file/58726/revised-comframe-draft-2014*.

282. IAIS, *Consultation on Risk-based Global Insurance Capital Standard (ICS) Version 1.0 Public Consultation Document*, available at: *https://www.iaisweb.org/page/consultations/closed-consultations/risk-based-global-insurance-capital-standard--second-consultation//file/61557/2016-risk-based-global-insurance-capital-standard-ics-consultation-document*. The IAIS began field testing the ICS in 2013, with the process evolving through annual iterations to include testing of these three components.

283. International Association of Insurance Supervisors, *Basic Capital Requirement for G-SIIs* (Oct. 23, 2014); International Association of Insurance Supervisors, *Higher Loss Absorbency Requirement for Globally Systemic Important Issuers (G-SIIs)*, (Oct. 5, 2015), available at: *https://www.iaisweb.org/page/supervisory-material/financial-stability-and-macroprudential-policy-and-surveillance*.

Another key issue is comparability. Comparability involves the valuation of assets and liabilities, which can affect the consistency of outcomes across jurisdictions. The valuation method preferred by the majority of members is a market-adjusted valuation, similar to that used in the European Union's Solvency II insurance regulatory regime, which makes certain adjustments to attempt to mitigate the volatility and inconsistency of a pure market-based valuation. Nevertheless, concerns persist among some industry stakeholders as to whether the market adjustments currently being tested by the IAIS sufficiently reduce the potential adverse non-economic volatility impacts or whether they sufficiently reflect the manner in which insurers manage risks.

With respect to valuation, the IAIS is also considering financial reporting that uses GAAP, with jurisdictionally specific adjustments to increase comparability. This approach has the advantage of basing the ICS valuation on amounts that have been determined and presented based on published guidance by accounting standard setters, and have been subjected to independent audit. The adoption of a financial reporting-based approach also needs to consider the differences between GAAP developed by the Financial Accounting Standards Board (FASB), which is used in the United States, and International Financial Reporting Standards (IFRS) developed by the International Accounting Standards Board (IASB), which is used by many other countries.

*Recommendations*

It is critical that the U.S. members of the IAIS present a consistent, unified approach to ICS development. Such standards should recognize the diverse approaches to solvency regulation taken by various jurisdictions around the globe. A core goal should be to ensure that the ICS initiative accommodates the U.S. insurance business model and the existing state-based regulatory system. Such standards should also be developed in a manner that recognizes the variety of supervisory approaches to valuation and accounting requirements, and definitions of what constitutes capital.

The IAIS should reexamine its current timeline to deliver ICS Version 2.0 in 2019. Treasury recommends that the IAIS postpone ICS Version 2.0 until a later date to allow further consultation with IAIS members and stakeholders on the development of an ICS that is implementable in all major insurance markets. Additionally, the valuation methodology of the ICS will be affected by the ongoing work of the IASB and the FASB. A delay in implementation of the ICS would enable the IAIS to incorporate these potential accounting changes within the ICS, which could result in an improved global capital standard.

## Preserving Solvency: Liquidity Initiatives

Understanding liquidity risk is a critical component of insurance solvency regulation and oversight. Generally, liquidity can be defined as the ability of a financial market participant to quickly liquidate assets, without substantial price concessions, to meet immediate, short-term financial obligations. Potential cash outflows in a stress environment can cause liquidity issues, and may lead to asset sales at distressed prices. Such a scenario not only has solvency-related implications for an individual insurer, but potentially for broader financial markets as well. Significantly tighter access to credit, for example, would have a significant impact on the ability to secure short-term debt financing among other spillover effects.

PriceWaterhouseCoopers has outlined several core aspects of liquidity which, in Treasury's view, provides a structured approach to any evaluation of liquidity that may be undertaken by policymakers.[284]

### State Regulator Liquidity Initiatives

In August 2017, the NAIC launched its Macro-Prudential Initiative, which will consider, among other things, liquidity needs of large life insurers.[285] Particularly, the NAIC's Financial Stability Task Force created a new Liquidity Assessment Subgroup.[286] In its proposal to create the subgroup, the Financial Stability Task Force explained that state regulators currently have little substantive data on insurers' liquidity risk, do not require liquidity stress testing, and thus have no common measure to assess insurers' level of liquidity risk. This raised concerns regarding how larger insurers would perform under liquidity stress, and how such an event might impact the broader financial markets.[287] The new subgroup is charged with constructing a liquidity stress framework based on a review of existing data related to liquidity risk, as well as gaps in that data that do not fully address regulatory needs.[288]

### Federal Reserve Liquidity Initiatives

Pursuant to Section 165 of Dodd-Frank, in June 2016 the Federal Reserve issued a Proposed Rule on Enhanced Prudential Standards for Systemically Important Insurance Companies that seeks to mitigate liquidity risks at systemically important insurance companies, and account for differences between bank holding companies and systemically important insurance companies.[289] The proposal would require a systemically important insurance company designated by the FSOC to implement a number of provisions to manage its liquidity risk, and includes requirements to: (1) meet key internal control requirements with respect to liquidity risk management, (2) generate comprehensive cash-flow projections, (3) establish and monitor liquidity risk tolerance, and (4) maintain a contingency funding plan to manage liquidity stress events when normal sources of funding may not be available.[290] The proposed rule also would introduce liquidity stress-testing requirements and would require the company to maintain liquid assets that are sufficient to meet

---

284. PriceWaterhouseCoopers LLP., *Global Financial Markets Liquidity Study* (Aug. 2015), available at: *http://www.pwc.se/sv/pdf-reports/global-financial-markets-liquidity-study.pdf.*

285. National Association of Insurance Commissioners, *Financial Stability (EX) Task Force: Meeting Summary Report* (August 6, 2017), available at: *http://www.naic.org/meetings1708/cmte_ex_financial_stability_tf_2017_summer_nm_summary.pdf.*

286. Id.

287. National Association of Insurance Commissioners, *FSTF Proposal for Liquidity Assessment Subgroup* (August 6, 2017), available at: *http://naic.org/meetings1708/cmte_ex_financial_stability_tf_2017_summer_nm_materials_3.pdf.*

288. Id.

289. Enhanced Prudential Standards for Systemically Important Insurance Companies (June 9, 2016), [81 Fed. Reg. 38610 (June 14, 2016)]. Among other things, Section 165 requires that enhanced prudential standards include liquidity requirements.

290. Id.

net cash outflows for 90 days over the range of liquidity stress scenarios used in internal stress testing.[291]

### *IAIS Liquidity Initiatives*

In 2014, the IAIS set forth guidance to group-wide supervisors on the direction of liquidity management planning for G-SIIs.[292] The principles defined by the IAIS as part of an effective liquidity management plan include: (1) development of a policy statement on the near- and long-term risk tolerance, (2) explanation of the corporate governance structure that will oversee the liquidity management, (3) a method for analyzing an insurer's liquidity risk through various time horizons and scenarios, and (4) annual reporting by G-SIIs to their group-wide supervisor.[293] The guidance, which is meant to complement existing liquidity arrangements, outlines the key supervisory features that would be expected of a G-SII.[294] In a 2016 report, *Systemic Risk from Insurance Product Features,* the IAIS studied the extent to which certain product features could pose substantial liquidity risk.[295] The IAIS also noted that the updated methodology for the assessment of G-SIIs[296] was revised to more appropriately account for certain liquidity features in insurance products. Moving forward, the IAIS Systemic Risk Assessment Task Force is expected to perform an activities-based assessment of liquidity risk in the global insurance sector.

*Recommendations*

Treasury supports robust liquidity risk management programs for insurers and encourages state insurance regulators, the NAIC, and the Federal Reserve to continue their work on addressing potential liquidity risk in the insurance sector. The Secretary will direct FIO to monitor developments in liquidity management and liquidity stress testing, and to encourage state insurance regulators, the NAIC, and the Federal Reserve to continue to make progress on domestic liquidity risk initiatives. The Secretary will also direct FIO to advocate for improvements to the existing IAIS standards regarding liquidity management and planning.

## Efficient Regulation and Government Processes

### Role of State and Federal Regulation

The state-based insurance regulatory system has a 150-year record of protecting the rights of policyholders and regulating insurers. For the most part, the system has been effective. This is due, in

---

291.  Id.

292.  International Association of Insurance Supervisors, *Guidance on Liquidity Management and Planning* (October 22, 2014), available at: *https://www.iaisweb.org/file/47800/liquidity-guidance-final.*

293.  Id.

294.  Id.

295.  International Association of Insurance Supervisors, *Systemic Risk from Insurance Product Features* (June 16, 2016), available at: *http://www.iaisweb.org/file/61174/systemic-risk-from-insurance-product-features.*

296.  Id.

part, to the knowledge and experience of state legislators and regulators who are well-positioned to tailor regulation to the activities of their stakeholders and respond to their citizens' unique needs.

Treasury endorses the state-based regulatory model for the U.S. insurance industry and recommends narrowing the scope of federal involvement as detailed throughout this section. Treasury also recognizes the importance of the federal government's involvement in the administration of key insurance programs that provide stability, certainty, and opportunity to Americans and their businesses. There are, however, areas for improvement of these programs, which are detailed below.

Despite the strengths of the state-based insurance regulatory system, stakeholders voiced concerns that the system exhibits a degree of inefficiency by virtue of inconsistent laws and regulations among the states. This section recommends that states and the NAIC take targeted action to make regulation efficient, effective, and appropriately tailored, as contemplated by the Core Principles.

Stakeholders also expressed that lawmakers, regulators, and policymakers have missed opportunities to collaborate at both the federal and state levels. Such collaboration would advance American interests abroad, make regulation more efficient, and foster economic growth. Treasury therefore recommends enhanced collaboration, both between the state and federal governments, and within the federal government.

Finally, Treasury recognizes that the increasingly international dimension of the insurance business mandates a federal presence that advances American interests in international negotiations and meetings. Treasury recommends robust engagement in international standard-setting bodies to ensure that the U.S. insurance stakeholders and the federal government are well-represented and that those representatives more effectively coordinate their positions and policies prior to major international meetings.

### The Revised Role of the Federal Insurance Office

Among other things, FIO was established to address the lack of insurance industry expertise in the federal government, assist in the administration of certain government insurance programs and activities, and provide a U.S. federal government perspective in an increasingly globalized industry. To better align FIO with its statutory framework and to ensure consistency with the long-established U.S. policy of state-based insurance regulation, Treasury has crafted five pillars that will guide FIO's mission:

- Promote the U.S. state-based insurance regulatory system and advocate for the U.S. insurance sector in international forums and negotiations, and in foreign markets.

- Provide insurance policy expertise and advice to the federal government, state insurance regulators, and industry through the publication of comprehensive research and analysis, consultation on emerging issues, and evaluation of federal insurance programs.

- Provide coordinated and collaborative leadership on insurance issues that engage the federal government and state insurance regulators, including through enhanced coordination between the federal government and state insurance regulators.

- Protect the U.S. financial system and economy by advising the Secretary and the FSOC on insurance-related matters that may pose a threat to U.S. financial stability.

- Protect America's financial security by promoting access to insurance products and administering the Terrorism Risk Insurance Program.

These five pillars are being established to advance the Core Principles of Executive Order 13772. First, they will enable U.S. insurance companies to be more competitive in foreign markets, where U.S. firms actively participate and, in some cases, see opportunity for continued expansion. Second, they will advance U.S. interests in various international forums by ensuring appropriate and coordinated advocacy for the U.S. state-based insurance regulatory system, the U.S. insurance sector, and U.S. policyholders, which will enable the United States to be more effective in developing insurance policy. Finally, the pillars are intended to ensure that regulation is efficient, effective, and appropriately tailored by enhancing the collaboration between state and federal agencies and improving consultation with state insurance regulators, while providing expertise for research and analysis. Additional examples of FIO's revised role can be found throughout the insurance section of this report.

*Recommendations*

To ensure FIO is accountable to these core pillars, Treasury is committed to FIO's increased transparency and stakeholder engagement, and will implement mechanisms to achieve these objectives. For example, Treasury is committed to making its international negotiating posture and actions more accessible to various stakeholders through both public and private forums. Additionally, Treasury and FIO are committed to more regular and consistent engagement with state insurance regulators and stakeholders on developing issues of importance to the insurance industry, state regulators, and U.S. policyholders.

### The Federal Reserve's Regulation of Insurer Savings and Loan Holding Companies

Business groups primarily engaged in the business of insurance that own insured depository institutions may be subject to supervision by the Federal Reserve. Pursuant to Regulation Q, the Federal Reserve acts as the group-wide supervisor for savings and loan holding companies (SLHCs) in cases where: (1) an insurance underwriting company is the ultimate parent company of a SLHC affiliate, or (2) a SLHC holds 25% or more of its total consolidated assets in insurance underwriting subsidiaries.[297] In these cases, SLHCs may be referred to as insurance SLHCs, or ISLHCs.

Federal Reserve supervision includes an evaluation of the impact of material subsidiaries and business units on the consolidated and banking entities.[298] The Federal Reserve's supervisory regime

---

297. 12 C.F.R. § 217.2. Most ISLHCs are organized as mutual insurance companies that are structured in a manner such that the parent company is an operating insurance company, not a holding company without other business operations.

298. Federal Reserve reviews include discovery reviews, targeted reviews, and enhanced continuous monitoring reviews; annual rating of an institution, reviews of corporate governance, enterprise risk management, compliance, and internal audit; requirements for capital and liquidity; and reviews of investments and investment risk management.

includes substantial recordkeeping and reporting requirements.[299] For example: Federal Reserve Forms Y-6 and Y-11 require substantial financial reporting, Form FR Y-8 requires that affiliated transactions be reported to the Federal Reserve, and enterprise risk management and corporate governance practices are reported to the Federal Reserve pursuant to Form F and SR Letters. These compliance requirements impose significant costs on ISLHCs.

Federal Reserve supervision also includes continuous examination of the financial condition of ISLHCs through a number of discovery and targeted reviews. These examinations also generate significant costs. ISLHCs must pay an annual assessment for Federal Reserve supervision and examinations.[300]

State insurance regulators impose the same or similar recordkeeping, reporting, and examination requirements.[301] Like the Federal Reserve, state insurance regulators require extensive annual financial reports,[302] require reports on affiliated transactions,[303] evaluate risk management and corporate governance, [304] apply risk-based capital requirements,[305] conduct annual financial condition analyses, and conduct periodic financial condition examinations that can last years.[306] Such examinations must be conducted at least once every five years. State insurance regulators are reimbursed by insurers for costs associated with their examinations.

---

299. Section 5000 (BHC Inspection Program) includes references to records that an ISLHC must provide access to in an examination. See *https://www.federalreserve.gov/boarddocs/supmanual/bhc/5000p1.pdf*. Federal Reserve supervision of ISLHCs is guided by its Supervision Manuals and Supervision and Regulation Letters (SR Letters). See *https://www.federalreserve.gov/publications/supmanual.htm* (supervisory manual); *https://www.federalreserve.gov/supervisionreg/srletters/srletters.htm* (SR Letters).

300. This assessment is based on total consolidated assets. For example, one stakeholder represented to Treasury that its most recent annual Federal Reserve assessment cost $5.3 million, compared to the $1.5 million cost of its most recent full scope financial condition examination conducted by state insurance regulators.

301. The relative consistency of states' work product is maintained through the NAIC's Financial Regulation Standards and Accreditation Program; currently, all 50 states are accredited under this program.

302. See, e.g., National Association of Insurance Commissioners, *Form B* and *Annual Statements*; *Annual and Quarterly Statement Blanks, 2016 Edition* (2017); and *Annual and Quarterly Statement Instructions, 2016 Edition* (2017).

303. See, e.g., National Association of Insurance Commissioners, *Annual Statements*; *Annual and Quarterly Statement Blanks, 2016 Edition* (2017); and *Annual and Quarterly Statement Instructions, 2016 Edition* (2017).

304. See, e.g., National Association of Insurance Commissioners, *ORSA and Form F*; NAIC, Risk Management and Own Risk Solvency Assessment Model Act, available at: *http://www.naic.org/store/free/MDL-505.pdf*; NAIC Insurance Holding Company System Model Regulation with Reporting Forms and Instructions, available at: *www.naic.org/store/free/MDL-450.pdf*.

305. National Association of Insurance Commissioners, *Financial Analysis Handbook* (2016), available at: *www.naic.org/prod_serv/FAH-ZU-16-02.pdf*.

306. State insurance regulator supervision is primarily guided by the NAIC's *Financial Condition Examiner's Handbook*, and its *Financial Analysis Handbook 2016 Edition*. State insurance regulators also apply corrective measures (in the case of a breach of various levels of capital requirements); require enterprise risk reporting, conduct and/or participate in supervisory colleges (for large multi-state groups); require annual independent audits of financial statements, audit committees, and internal audit functions; and have in place regulatory requirements for approval of material intercompany transactions and extraordinary dividends.

The duplicative supervision of ISLHCs at the state and federal levels is costly and inefficient. The duplicative supervisory, recordkeeping, and reporting requirements of ISLHCs by the Federal Reserve and state insurance regulators may also contribute to an unlevel playing field for these insurers as compared to insurers that do not own insured depository institutions.

*Recommendations*

To reduce duplicative and inefficient oversight, Treasury recommends that the Federal Reserve leverage information procured from ISLHCs by state regulators and the NAIC, including information regarding an ISLHC's ultimate parent company. The Federal Reserve should also harmonize its financial reporting and recordkeeping requirements with corresponding state regulatory requirements. To this end, Treasury recommends that the Federal Reserve, state insurance regulators, and NAIC establish formal procedures and take steps that will better coordinate the supervision and examinations of insurers regulated by both state insurance regulators and the Federal Reserve.

Treasury also recommends that the Federal Reserve reassess whether its ISLHC examinations are appropriately tailored and proportionate to the unique business model of each ISLHC, and the size, organizational structure, and potential risks posed by each ISLHC.

### The Consumer Financial Protection Bureau

Title X of Dodd-Frank expressly excludes the "business of insurance" from the list of financial products and services within the CFPB's jurisdiction.[307] Dodd-Frank also prohibits the CFPB from exercising enforcement authority over "a person regulated by a State insurance regulator."[308] A "person" is defined to be "any person that is engaged in the business of insurance and subject to regulation by any State insurance regulator, but only to the extent that such person acts in such capacity."[309]

There are, however, a limited number of exceptions where the CFPB may exercise its authority over the business of insurance and persons regulated by state insurance regulators:

- If an insurer offers a financial product or service to the extent that the insurer is engaged in the offering or provision of a consumer financial product or service[310] (e.g., debt protection contracts that are administered by insurers on behalf of a bank[311]);

---

307. 12 U.S.C. § 5481(15)(C). The "business of insurance" is defined by Dodd-Frank as "the writing of insurance or the reinsuring of risk by an insurer, including all acts necessary to such writing or reinsuring and the activities relating to the writing of insurance or the reinsuring of risks conducted by persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons." 12 U.S.C. § 5481(3).

308. 12 U.S.C. § 5517(f)(1).

309. 12 U.S.C. § 5481(22). A "person" is defined to include both individuals and entities.

310. 12 U.S.C. § 5517(f)(2).

311. James C. Sivon and Adam D. Maarec, *The CFPB and the Business of Insurance: An Analysis of the Scope of the CFPB's Authority Over Insurance Sales,* 68 Consumer Fin. L.Q. Rep 190, 192.

- To supervise and enforce violations of federal consumer laws[312] (e.g., violations of the Real Estate Settlement Procedures Act that relate to insurers[313]);

- If persons knowingly or recklessly provide substantial assistance in an Unfair, Deceptive, or Abusive Acts and Practices (UDAAP) violation[314] (i.e., if an insurer knowingly or recklessly supports a covered person or service provider in violation of the UDAAP provisions of Dodd-Frank[315]); or

- To request information from a person regulated by a state insurance regulator in connection with the CFPB's rulemaking, investigative, subpoena, or hearing powers.[316]

Despite the general exclusions, these statutory exceptions create considerable uncertainty concerning what the CFPB can examine or regulate. Insurers are concerned that, if the CFPB interprets the exceptions broadly, it could potentially regulate insurers or the business of insurance in a manner more expansive than the statutory exceptions intend. Such regulatory actions could also be duplicative of actions undertaken by state insurance regulators.

*Recommendations*

Treasury recommends that Congress clarify the "business of insurance" exception to ensure that the CFPB does not engage in the oversight of activities already monitored by state insurance regulators.

### The U.S. Department of Housing and Urban Development

Congress enacted Title VIII of the Civil Rights Act of 1968 — commonly known as the Fair Housing Act (FHA) — to "provide, within constitutional limitations, for fair housing throughout the United States."[317] To accomplish this, the FHA made it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin."[318] The FHA also makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," (i.e., disparate treatment) because of those same protected characteristics.[319] HUD is vested with the authority to engage in formal adjudications of housing discrimination claims, as

---

312. 12 U.S.C. §§ 5517(f)(2), 5514(e), 5515(d), 5516(e), and 5517(n). See also 12 U.S.C. § 5481(12).

313. James C. Sivon and Adam D. Maarec, *The CFPB and the Business of Insurance: An Analysis of the Scope of the CFPB's Authority Over Insurance Sales,* 68 Consumer Fin. L.Q. Rep 190, 192.

314. 12 U.S.C. § 5536(a)(3). This authority may be applied to insurers only to the extent that the company provides non-insurance services to a covered person or service provider.

315. 12 U.S.C. §§ 5531, 5536.

316. 12 U.S.C. § 5517(n)(2).

317. 12 U.S.C. § 3604(a).

318. 12 U.S.C. § 3604(b)

319. Id. Twenty years later, Congress amended the FHA to also include sex, familial status, and handicap as protected characteristics.

well as the authority to issue rules — following a notice and comment period — to effectuate the goals of the FHA.[320]

In 2011, HUD proposed a rule that would also impose a duty to avoid practices that are neutral by legal and regulatory definitions but with discriminatory effects (i.e., disparate impact).[321] This, among other things, would require entities covered by the rule to assess whether adverse fair housing consequences result from any business practice, even if such practices have no explicit discriminatory features.

HUD has expressed its intention to apply the disparate impact rule to the insurance industry.[322] If this application leads to collection and evaluation of data on protected classes under insurance policies, this could be challenging as state insurance regulations ordinarily prohibit the consideration of protected characteristics in the evaluation and pooling of risk,[323] and such data collection is expressly prohibited by insurance laws of at least one state.[324] To the extent that otherwise non-discriminatory underwriting practices result in disparate outcomes, the rule could also impose unnecessary burdens on insurers and force them to alter practices in a manner that may not be actuarially sound.[325]

### Recommendations

Treasury recommends that HUD reconsider its use of the disparate impact rule. In particular, HUD should consider whether the disparate impact rule, as applied, is consistent with McCarran-Ferguson and existing state law. HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles.

---

320. 12 U.S.C. § 3612.

321. 24 C.F.R. § 100.500.

322. See, e.g., Implementation of the Fair Housing Act's Discriminatory Effects Standard; Final Rule (Feb. 8, 2013) [78 Fed. Reg. 11459, 11475 (Feb. 15, 2013)].

323. See, e.g., 215 Ill. Comp. Stat. 5/424(3); Alaska Stat. § 21.36.090; Ky. Rev. Stat. Ann. § 304.12–085; Mass Gen. Laws Ann. ch. 175 § 4C; Me. Rev. Stat. tit. 24–A, § 2303(1)(G); Okla. Stat. Ann. tit. 36, § 985; S.C. Code Ann. § 38–75–1210(B)(1); Tenn. Code Ann. § 56–5–303(a)(2)(d); and Tex. Ins. Code Ann. § 544.002.

324. Md. Code Ann. Ins. § 27-501(c)(1). See also *American Insurance Association v. U.S. Department of Housing and Urban Development,* 74 F. Supp. 3d 30 at 46 (D.D.C. 2014). In *Property Casualty Insurers Association of America v. Donovan,* the U.S. District Court for the Northern District of Illinois held that HUD had failed to give adequate consideration to the arguments that the rule, as applied to insurers, (1) violates the McCarran-Ferguson Act, (2) violates the "filed rate" doctrine, and (3) is inconsistent with the "fundamental nature of insurance." The case was remanded to HUD for consideration of those issues. *Property Casualty Insurers Association of America v. Donovan,* 66 F. Supp. 3d 1018 (N.D. Ill. 2014). On October 5, 2016, after reconsideration of the insurance industry comments in accordance with the court's decision in *Donovan,* HUD determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act. [81 Fed. Reg. 69012-02 (Oct. 5, 2016)].

325. See *American Insurance Association v. U.S. Department of Housing and Urban Development,* 74 F. Supp. 3d 30 at 46 (D.D.C. 2014).

### The Securities and Exchange Commission

Because variable annuities are non-exempt securities, they generally must be registered with the SEC[326] and sold with a prospectus, i.e., a disclosure document containing detailed information about the product, its features, and associated risks. A variable annuity prospectus can range from 100 to 300 pages in length and contains dense legal, actuarial, and regulatory language not readily understood by retail investors. In addition, securities laws require preparation and delivery of an annual prospectus update[327] that repeats much of the information contained in the original prospectus, without a roadmap to help investors identify the relevant changes.

For almost a decade, the insurance industry has advocated for: (1) a user-friendly summary prospectus that explains key information about the annuity contract, and (2) a streamlined annual update document that is available online at any time, for both new investors and investors who already own annuity contracts.[328] Even though it adopted a summary prospectus for mutual funds in 2009,[329] the SEC has yet to act with respect to variable annuities.

In its report to Congress on objectives for fiscal year 2018, the SEC's Office of the Investor Advocate characterized the variable annuity summary prospectus initiative as a promising idea that appears noncontroversial but has languished behind other rulemaking priorities.[330] In addition, in May 2015 the SEC proposed Rule 30e-3, which would allow mutual funds to provide statutorily required shareholder reports on the Internet.[331] In the variable annuity context, this proposal would lower costs while improving the effectiveness of disclosure by allowing variable annuity contract owners to access and search the voluminous information they currently receive in paper form for each investment fund underlying their contracts.[332]

In addition to securities regulation, the SEC directs accounting and auditing practices and policies for publicly held companies in the United States. To develop financial accounting and reporting standards, the SEC Office of the Chief Accountant works with the independent FASB, which sets financial accounting and reporting standards for public and private companies and nonprofit organizations that follow GAAP.[333] The SEC and FASB also take into account standards set by the

---

326. See SEC Form N-4, available at: *https://www.sec.gov/about/forms/formn-4.pdf.*

327. 17 C.F.R. § 230.485(b).

328. See, e.g., Letter from the Committee of Annuity Insurers to the Honorable Walter J. Clayton III (July 11, 2017), available at: *https://www.annuity-insurers.org/wp-content/uploads/2017/07/EV_Chairman-Clayton-Letter-on-behalf-of-the-Committee-of-Annuity-Insurers.pdf* ("Clayton Letter").

329. Enhanced Disclosure and New Prospectus Delivery Option For Registered Open-End Management Investment Companies (Jan. 13, 2009) [74 Fed. Reg. 4545 (Jan. 26, 2009)], available at: *http://www.sec.gov/rules/final/2009/33-8998.pdf.*

330. Office of the Investor Advocate, *Report on Objectives Fiscal Year 2018*, at 1, available at: *https://www.sec.gov/files/sec-office-investor-advocate-report-on-objectives-fy2018.pdf.*

331. See supra at 49.

332. In an informal survey conducted in 2015, several members of the Committee of Annuity Insurers indicated that they send approximately one billion pages per year to contract owners to meet their statutory obligation to deliver annual and semi-annual fund reports. Letter from the Committee of Annuity Insurers to the Honorable Mary Jo White (July 22, 2016), at 4, available at: *https://www.sec.gov/comments/s7-08-15/s70815-612.pdf.*

333. See Office of the Chief Accountant, About the Office, U.S. Securities and Exchange Commission, available at: *https://www.sec.gov/page/oca-section-landing.*

IASB, which develops IFRS and has the mission of developing a single set of globally accepted accounting standards.[334]

Some insurers have expressed concern that the SEC may accept FASB and IFRS standards without sufficiently taking their unique business models into account.[335]

*Recommendations*

Treasury believes that a variable annuity summary prospectus and streamlined annual update would offer substantial benefits to consumers and insurers. Moreover, allowing online access to annual prospectus updates and annual and semiannual underlying fund reports would both lower expenses and improve the quality of disclosure by making it readily accessible and searchable. Accordingly, Treasury recommends that the SEC prioritize annuity-related disclosure reform by proposing a rule permitting a variable annuity summary prospectus and a streamlined prospectus update, while continuing to provide appropriate disclosure to investors. The SEC should also move forward with finalization of Rule 30e-3. Finally, the SEC should take steps to improve the efficiency and effectiveness of the regulation of insurance products under its jurisdiction.[336]

To develop accounting standards that appropriately reflect insurers' unique business models, Treasury also encourages the SEC to enhance its engagement with the insurance sector, including state insurance regulators and the NAIC. Specifically, the SEC should engage with insurance regulators and stakeholders to assess how FASB and IFRS standards could affect the insurance industry.

## Terrorism Risk Insurance Program

### *Data Collection*

Treasury, through FIO, is required to collect information annually concerning the effectiveness of the Terrorism Risk Insurance Program ("TRIP" or "Program"). This information, in turn, forms the

---

334. In addition to GAAP, all insurers utilize an accounting standard known as Statutory Accounting Principles (SAP) that utilizes the GAAP framework, but is tailored to permit regulators to analyze the unique nature of the business of insurance. Developed by the NAIC, SAP focuses on the balance sheet, rather than the income statement, and emphasizes insurer liquidity. See National Association of Insurance Commissioners, *Statutory Accounting Principles* (last updated July 11, 2017), available at: *http://www.naic.org/cipr_topics/topic_statutory_accounting_principles.htm.*

335. See Acceptance from Foreign Private Issuers of Financial Statements Prepared in Accordance with International Financial Reporting Standards without Reconciliation to U.S. GAAP (Dec. 21, 2007) [73 Fed. Reg. 985 (Jan. 4, 2008)]. For example, in 2007, the SEC issued a final rule in which it accepted financial statements prepared according to IFRS that are included in SEC filings from foreign private securities issuers.

336. For example, life insurers are increasingly offering annuity contracts that are not exempt securities but also are not eligible for registration on Form N-4, which is specifically tailored to variable annuities. To offer their products, these insurers must use registration forms designed for equity or debt offerings by public companies. Waiver of disclosure requirements that are irrelevant to regulated insurance product offerings would reduce regulatory costs and improve consumer disclosure. See Clayton Letter.

basis for annual reports that Treasury is required to submit to Congress concerning the Program.[337] Treasury collects this information from a number of sources, including insurance rating bureaus and directly from participating insurers. Much (although not all) of the data collected by Treasury for its analyses is on a state or national level. Even at this level of detail, the data collected by Treasury to fulfill its statutory mandate requires substantial effort on the part of reporting insurers. For example, Treasury calculates that insurance groups that write on a nationwide basis could be required to report more than 8,000 individual data elements, some of which must be generated by reference to even more detailed information.

In 2016, state insurance regulators also began collecting data on terrorism risk insurance. Although much of the information sought by the states is similar in nature to that collected by FIO, the state data calls have sought information — from individual insurance companies and in some cases on a policy- and zip-code-level basis — which is more granular than the data requested by Treasury.

By comparison, because of the request for various kinds of information at a policy level, the state data call could generate a reporting obligation into the millions of individual data elements for individual insurance companies that write large numbers of TRIP-eligible lines policies on a nationwide basis. Although individual responding insurers that issue smaller numbers of TRIP-eligible lines policies will be subject to a lesser burden, the data call burden on insurance groups writing terrorism risk insurance subject to the Program can be significant.

Throughout Treasury's engagement, stakeholders routinely commented that these data calls serve the same or similar purposes, and that the multiple data calls, on different bases, create an undue burden on portions of the insurance industry.

*Recommendations*

The Secretary will direct FIO to coordinate with state insurance regulators and the NAIC to attempt to eliminate or reduce the inconsistencies between the existing data calls concerning terrorism risk insurance. Assuming this can be done, state insurance regulators and FIO should also explore the possibility of conducting a single data call that can serve the needs of both federal and state authorities while reducing unnecessary compliance costs on industry.

---

337. Terrorism Risk Insurance Act of 2002 §§ 104(h)(1), (2), 108(h); 15 U.S.C. § 6701 note ("TRIA"). Because the provisions of TRIA, as amended (including the Terrorism Risk Insurance Program Reauthorization Act of 2015, Public Law No. 114-1, 129 Stat. 3), appear in a note of the United States Code, references to the provisions of TRIA or the 2015 Reauthorization Act are identified by the sections of the law (e.g., TRIA § 102(1) (definition of an "act of terrorism"). See also Federal Insurance Office, U.S. Department of the Treasury, *Report on the Overall Effectiveness of the Terrorism Risk Insurance Program* (June 2016), available at: https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/2016_TRIP_Effectiveness_%20Report_FINAL.pdf; see also Federal Insurance Office, U.S. Department of the Treasury, *Study of Small Insurer Competitiveness in the Terrorism Risk Insurance Marketplace* (June 2017), available at: https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/Study_of_Small_Insurer_Competitiveness_in_the_Terrorism_Risk_Insurance_Marketplace_(June_2017).pdf.

### Certifying an "Act of Terrorism"

Section 107 of the Terrorism Risk Insurance Program Reauthorization Act of 2015 (TRIP Reauthorization Act)[338] required Treasury to issue a report concerning the process by which an act of terrorism is certified by the Secretary (Certification Process)[339] for purposes of the Program, and also to promulgate final rules concerning the Certification Process. Treasury's report concerning the Certification Process was issued in October 2015.[340] In April 2016, Treasury issued a proposed rule and received a number of comments suggesting changes. In December 2016, Treasury made certain changes to the proposed rule, and issued an interim final rule — subject to a further opportunity for comment — concerning the Certification Process. [341]

The Certification Process set forth in the interim final rule requires Treasury to notify the public when the process commences, and provide updates as the process continues. The interim final rule does not obligate Treasury to commence a Certification Process at any specific time after an event has occurred, given that uncertainties regarding the circumstances of the event or the extent of insured losses, for example, may not permit Treasury to commence a Certification Process at a specifically designated time. Stakeholders have stated that this approach does not provide them with sufficient certainty when they are required to handle claims arising out of a particular event. This uncertainty is generated in part because an insured that failed to purchase terrorism coverage may be subject to an exclusion triggered only in the event the Secretary certifies an event as an act of terrorism.

The Treasury rules concerning the Certification Process provide for a transparent process that will notify the public if a particular event is being evaluated as to whether it is an act of terrorism under the TRIP Reauthorization Act. Such information will permit policyholders and insurers to assess their rights and responsibilities in light of the Program in a timely fashion. Treasury would only evaluate an event for certification as an "act of terrorism" under TRIA, however, if the event had some reasonable likelihood of resulting in insured losses in excess of the certification threshold.

#### Recommendations

The Secretary will direct FIO to be proactive in applying this Certification Process in connection with any event that has some reasonable likelihood of resulting in more than $5 million in insured losses under TRIA, to provide transparency to the public as to whether the event is under consideration by the Secretary for purposes of the Program. State regulators, policyholders, and insurers are likewise encouraged to inform Treasury whenever they believe an "act of terrorism" under TRIA

---

338. Pub. L. 114-1, 129 Stat. 3.

339. See TRIP Reauthorization Act § 107.

340. U.S. Department of the Treasury, *The Process for Certifying an "Act of Terrorism" under the Terrorism Risk Insurance Act of 2002* (Oct. 2015), available at: *https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/2015%20Report%20on%20the%20Certification%20Process%20under%20the%20Terrorism%20-%20Production%20Version.pdf*.

341. See TRIP Certification [81 Fed. Reg. 88592 (Dec. 7, 2016)] ("Certification") (as codified at 31 C.F.R. § 50.60-50.63); Terrorism Risk Insurance Program [81 Fed. Reg. 93756 (Dec. 21, 2016)].

has taken place, for which they have some reason to believe total insured losses are or will be in excess of $5 million.[342]

### The Advisory Committee on Risk-Sharing Mechanisms

The Advisory Committee on Risk-Sharing Mechanisms (ACRSM) is a federal advisory committee established by the TRIP Reauthorization Act. ACRSM is statutorily required to provide advice, recommendations, and encouragement with respect to the creation and development of non-governmental risk-sharing mechanisms to protect against losses arising from acts of terrorism.[343] The ACRSM is comprised of nine members who are representatives of insurers, reinsurers, and capital market participants.[344] The ACRSM is now investigating the potential for increasing private participation in the terrorism risk insurance market. To facilitate its exploration of these topics, the ACRSM created five subcommittees (Direct Insurance, Reinsurance, Capital Markets, Exploration of Catastrophic Risks in Other Markets, and Consumer Interests).

*Recommendations*

In recognition of the importance of the Program and the upcoming consideration of any further reauthorization, the Secretary encourages the ACRSM to continue its efforts and develop recommendations for FIO. In particular, the work of the ACRSM should focus on how to increase private market participation in the terrorism insurance marketplace, with the goal of providing enhanced taxpayer protection in a way that does not result in market dislocations for the consumers and providers of terrorism risk insurance. FIO should also evaluate potential ways to increase private market participation in the terrorism insurance marketplace. Increased private market participation will protect, and help promote, the security and financial and economic strength of the United States.

## Insurer Data Security

To protect the integrity of, and confidence in, the insurance marketplace, it is important to protect the personal identifiable information (PII), private health information (PHI), and financial information of policyholders and other third parties stored on insurers' systems. The protection of information systems is also crucial for the integrity and resilience of insurers' operations. As the 2015 data breaches at health insurers Anthem, Inc. and Premera Blue Cross illustrate,[345] insurers are attractive targets for cyber criminals and other hackers. The U.S. insurance industry has great diversity, ranging from large companies with global presences to local insurers that operate in only a single county. Although large insurers generally have sophisticated cybersecurity systems and

---

342. See TRIP, Certification, 81 Fed. Reg. at 88595 (Dec. 7, 2016)] ("[N]othing in TRIA or Treasury's proposed rules prohibits a stakeholder from contacting Treasury to bring to its attention an event that the stakeholder believes might be subject to certification under TRIA, or other information relevant to that event.").

343. TRIP Reauthorization Act § 110.

344. 15 U.S.C. § 6701, note.

345. Anthem, Inc., *Statement Regarding Cyber Attack against Anthem* (Feb. 5, 2015), available at: *https://www.anthem.com/health-insurance/about-us/pressreleasedetails/WI/2015/1813/statement-regarding-cyber-attack-against-anthem*; Premera Blue Cross, *About the Cyberattack* (Mar. 2015), available at: *https://www.premera.com/wa/visitor/about-the-cyberattack*.

practices, the same is not necessarily true for smaller insurers.[346] Regardless of size, it is critical that all insurers protect policyholder and third party information.

Cybersecurity and data security are national policy issues that require coordination among federal and state public sector entities and partnership between the public and private sectors. Officials and regulators at both federal and state levels of government are working with insurers to improve the cybersecurity of the insurance industry, and are focused on increasing insurer cybersecurity while decreasing the burdens imposed by the proliferation of non-uniform data security and data breach notification laws and regulations.

Most states have had insurance-specific data protection laws on the books for many years.[347] In recent years, the NAIC has moved to improve protection of PII and PHI possessed by insurers. In addition to data *security* requirements, every state except for Alabama and South Dakota has enacted data breach *notification* requirements through "legislation requiring private or governmental entities to notify individuals of security breaches of information involving personally identifiable information."[348]

In October 2017, after a year and a half of development, the NAIC adopted an Insurance Data Security Model Law.[349] Subject to certain exceptions, the NAIC Insurance Data Security Model Law is intended to apply to insurers, agents, and other licensees. The model law addresses: (1) the implementation of information security programs, (2) investigation of cybersecurity events, including risk assessment and risk management, as well as oversight of third-party service providers, and (3) notification to state insurance regulators about cybersecurity events, including but not limited to providing relevant state insurance commissioners with a description of how the information was exposed, lost, stolen, or breached; how the event was discovered; the period during which the information system was compromised; the total number of consumers affected in the state; and the efforts being undertaken to remediate the situation. The Insurance Data Security Model Law does not, however, require data breach notification to consumers,[350] nor would it displace existing state laws regarding data privacy or data breach notification.

---

346. Fitch Ratings noted that smaller insurers would have to "allocate significant new resources and bear significant costs to meet the requirements" in the NAIC's *Insurance Data Security Model Law. See* Fitch Ratings, *Press Release: NAIC Rules May Boost U.S. Insurers' Cyber Risk Management* (Aug. 16, 2017), available at: *https://www.fitchratings.com/site/pr/1027897*.

347. Between 1980 and 2002, the NAIC released three model laws and regulations regarding data privacy and information security: (1) the *Insurance Information and Privacy Protection Model Act; (2)* the *Privacy of Consumer Financial and Health Information Model Regulation*; and (3) the *Standards for Safeguarding Consumer Information Model Regulation*. Not all states have adopted laws that are the same or substantially similar to each of these models.

348. National Conference of State Legislatures, *Security Breach Notification Laws* (last updated Apr. 12, 2017), available at: *http://www.ncsl.org/research/telecommunications-and-information-technology/security-breach-notification-laws.aspx*.

349. See NAIC, *NAIC Passes Insurance Data Security Model Law* (Oct. 24, 2017), available at: *http://www.naic.org/Releases/2017_docs/naic_passes_data_security_model_law.htm*; NAIC, *Data Security Model Law v6 clean* (Aug. 7, 2017), available at: *http://www.naic.org/documents/cmte_ex_cswg_final_model_law_v6_clean.pdf*.

350. The Insurance Data Security Model Law requires notification to consumers only if there already is an applicable state data breach notification law.

New York State has moved forward to address data security. On March 1, 2017, the New York Department of Financial Services (NYDFS) implemented a new cybersecurity regulation for entities under its jurisdiction, Cybersecurity Requirements for Financial Services Companies.[351] The regulation requires banks, insurance companies, and other financial services institutions regulated by the NYDFS "to establish and maintain a cybersecurity program designed to protect consumers' private data and ensure the safety and soundness of New York's financial services industry."[352] The regulation is the first of its kind at the state level and is similar in many respects to the Insurance Data Security Model Law.

The Insurance Data Security Model Law will not necessarily result in nationally uniform insurance laws regarding data breach notification and data security. The model law does not address consumer notification, and the degree of discretion and flexibility afforded to states in adopting and implementing NAIC model laws may undercut uniformity with regard to data security. Even though the Insurance Data Security Model Law has been adopted by the NAIC, as with all model laws, it still needs to be enacted by states to enter into force. Such enactment may take some states several years, and even then, uniform adoption is not guaranteed. Further, the Insurance Data Security Model Law will supplement, not replace, other state laws regarding privacy and consumer data, including insurer-specific laws consistent with existing NAIC model laws and regulations. Because these laws are neither uniform nor specific to insurers, complying with this patchwork of breach notification laws poses regulatory challenges and inefficiencies for insurers that operate in multiple states.

*Recommendations*

Treasury supports the state-based system of insurance regulation and recognizes that many aspects of the business of insurance are local in nature and do not lend themselves to uniform national approaches. However, data security, data breach notifications, and more broadly, cybersecurity are also issues of national concern. U.S. insurers should be subject to the same requirements for cybersecurity and protection of PII and PHI regardless of where they are domiciled and operate, and U.S. policyholders should be able to expect the same level of protection of their personal data regardless of where they live.

Treasury recommends prompt adoption of the NAIC Insurance Data Security Model Law by the states. Treasury further recommends that that if adoption and implementation of the Insurance Data Security Model Law by the states do not result in uniform data security regulations within five years, Congress pass a law setting forth requirements for insurer data security, but leaving supervision and enforcement with state insurance regulators.

Treasury also recommends that state legislators, state regulators, and the NAIC work to expeditiously pass uniform legislation regarding data breach notification for insurers, and encourages the NAIC to make any such model law an accreditation standard. If adoption and implementation

---

351. New York State Department of Financial Services, Cybersecurity Requirements for Financial Services Companies (Feb. 13, 2017), 23 NYCRR Part 500.

352. New York State, *Press Release: Governor Cuomo Announces First-In-The-Nation Cybersecurity Regulation protecting Consumers and Financial Institutions from Cyber-Attacks to Take Effect March 1* (Feb. 16, 2017), available at: *http://www.dfs.ny.gov/about/press/pr1702161.htm.*

of data breach notification efforts by the states do not result in uniform requirements within five years, Treasury encourages Congress to pass a law setting forth requirements for data breach notification specific to insurers. Such legislation should leave supervision and enforcement with state insurance regulators.

## Insurer Cyber Threats

Treasury serves as the federal interface for matters involving cyber threats and cybersecurity for institutions within the financial services sector, including insurers.[353] The Secretary also chairs the Financial and Banking Information Infrastructure Committee (FBIIC), a coordinating body of financial regulatory agencies — including a representative of state insurance regulators — tasked with improving the reliability and security of the financial-sector infrastructure. The FBIIC regularly collaborates with the Financial Services Sector Coordinating Council (FSSCC), a private-sector body that works with Treasury toward the shared goal of maintaining a robust and resilient financial services sector.

Treasury also works with the insurance industry and state and federal insurance regulators to improve insurance-sector cybersecurity through improved information sharing, effective supervision by relevant regulators, and increased coordination between the public and private sectors. For example, in August 2017, together with the FSSCC, Treasury led a public-private tabletop exercise with participants from the insurance industry, state regulators, the NAIC, and law enforcement community. Employing a simulated cyber incident, this tabletop exercise was designed to identify key challenges for effective public-private response and coordination. Treasury also works closely with the Financial Services Information Sharing and Analysis Center (FS-ISAC), a cyber and physical threat intelligence analysis and sharing resource for the financial services sector, including insurers.

*Recommendations*

Treasury recommends that steps be taken to improve information sharing within the insurance industry. Insurance industry cyber security is enhanced when insurers share information with each other about threats and best practices, and collaborate with the public sector on cybersecurity issues. Treasury and state insurance regulators should continue to promote insurer participation in the FS-ISAC and similar entities, particularly among the thousands of small and regional firms that operate within the United States that may not yet be engaged with such national information sharing efforts. In addition, the Secretary will direct FIO to establish a working group charged with assessing cybersecurity challenges for the insurance sector and issuing recommendations to insurance sector participants and relevant regulators, with particular attention paid to small and regional insurers.

---

353. Presidential Policy Directive 21: Critical Infrastructure Security and Resilience.

## Challenges in the Cyber Insurance Market

As cyber risks have increased over the last two decades, the insurance industry has responded with a variety of insurance products. These products — loosely referred to as "cyber insurance" — cover risks arising "from the use of electronic data and its transmission, including technology tools such as the Internet and telecommunications networks," as well as "physical damage that can be caused by cyber attacks, fraud committed by misuse of data, any liability arising from data storage, and the availability, integrity, and confidentiality of electronic information."[354] By providing a risk transfer mechanism, cyber insurance contributes to the financial resilience of policyholders that suffer a cybersecurity incident or attack. This is especially important given that the average cost of a data breach is $3.62 million.[355] Cyber insurance policies may also provide access to pre- and post-breach resources to help policyholders reduce their vulnerability to, or recover from, such events.

The cyber insurance market reached an estimated $3 to $4 billion in gross premiums in 2016, with the large majority of the demand historically (and presently) based in the United States.[356] In comparison, the cyber insurance market was estimated to be approximately $2.75 billion in 2015 and $2 billion in 2014.[357] Currently, approximately 100 insurers offer cyber insurance products.[358] The market for cyber insurance is relatively concentrated, however, with the top 15 insurers comprising more than 80% of the market in 2016.[359]

Two related obstacles to the continued growth of the cyber insurance market are: (1) a lack of relevant data regarding evolving cyber risks, and (2) the threat of accumulation risk. At the center of these challenges is the difficulty in collecting and analyzing data regarding cyber risks. Industry representatives acknowledge that "the availability of data on cyber risk is scarce" and "even if historical data are available, the fast changing environment might render this data

---

354. CRO Forum, *Cyber Resilience: The Cyber Risk Challenge and the Role of Insurance* (Dec. 2014), at 5, available at: *http://www.thecroforum.org/cyber-resilience-cyber-risk-challenge-role-insurance/*. Cyber losses arising out of a certified act of terrorism may be covered under the Terrorism Risk Insurance Program (Program) [81 Fed. Reg. 95312 (Dec. 27, 2016). However, cyber losses can arise in a variety of ways and cause impacts that would not satisfy the requirements of the Program.

355. Ponemon Institute Study, *Cost of Data Breach Study 2017* (June 13, 2017), available at: *https://www.ponemon.org/library/2017-cost-of-data-breach-study-united-states*.

356. Standard & Poor's, *Looking Before They Leap: U.S. Insurers Dip Their Toes In The Cyber-Risk Pool* (June 2015), available at: *https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1403078&SctArtId=320678*.

357. U.S. Department of the Treasury, Federal Insurance Office, *Annual Report on the Insurance Industry* (Sept. 2015), available at: *https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/2015%20FIO%20Annual%20Report_Final.pdf*; U.S. Department of the Treasury, Federal Insurance Office, *Annual Report on the Insurance Industry* (Sept. 2016), available at: *https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/2016_Annual_Report.pdf*.

358. NAIC, *Report on the Cybersecurity Insurance Coverage Supplement* (Aug. 6, 2017), available at: *http://www.naic.org/documents/cmte_ex_cybersecurity_tf_rpt_cyber_ins_coverage_supplment.pdf*.

359. Insurance Journal, *Cyber Insurance Premium Volume Grew 35% to $1.3 Billion in 2016 (June 23, 2017)*, available at: *http://www.insurancejournal.com/news/national/2017/06/23/455508.htm*.

useless."[360]   Thus, insurers may lack "the necessary inputs for creating a reliable cyber model" that would mirror the advanced modeling done for other types of catastrophic risk, such as hurricanes.[361]   Without the data to better assess exposure of individual policyholders to cyber losses, insurers have difficulty appropriately understanding accumulation risk (i.e., the risk that a single cybersecurity incident causes losses to multiple policyholders across multiple lines of insurance). For example, insurers have difficulty analyzing the risk of multiple policyholders using the same software, hardware, or third-party service providers.[362]   An attack that targets such commonly used products or services could cause enormous losses, both insured and uninsured.[363]

To assess the need for more and better data regarding cyber risk and associated losses, the Department of Homeland Security formed a Cyber Incident and Analysis Working Group, made up of chief information security officers and chief security officers from various critical infrastructure sectors, insurers, and cybersecurity professionals. This working group focused on the feasibility of a cyber incident database, publishing several white papers on the topic.[364] While neither the insurance industry nor any other private sector actor has developed the database proposed by the working group, the industry is working to improve data collection and the modeling of cyber risks. For example, individual insurers rely on proprietary collections of claims and other data, and catastrophe risk modelers are creating new tools for insurers.[365]

## Product Approval and Speed to Market

The state-based insurance product approval process varies from state to state, as do compliance standards for insurers. Some states require products to be approved before they are offered (i.e., prior approval); others allow introduction to the market without approval so long as specified standards are met (i.e., use and file); and still others reserve the option to review a product after its introduction (i.e., file and use). Both the duration of review and the substantive standards for approval can vary based on different rules and regulations, the opinions of individual examiners, and state insurance department resource constraints.

---

360. Geneva Association, *Ten Key Questions on Cyber Risk and Cyber Risk Insurance* (Nov. 2016), available at: *https://www.genevaassociation.org/research-topics/cyber-and-innovation/ten-key-questions-cyber-risk-and-cyber-risk-insurance*.

361. AIR, *Issue Brief: Insuring Cyber Risks* (July 2017), available at: *www.air-worldwide.com/publications/white-papers/documents/insuring-cyber-risk*.

362. AIG, *Cyber Today: Outlook, Underwriting Challenges, and Recommendations* (presentation, Federal Advisory Committee on Insurance, Washington, D.C., Aug. 17, 2017).

363. Cyence and Lloyd's, *Counting the Cost: Cyber Exposure Decoded* (2017), available at: *https://www.lloyds.com/news-and-insight/risk-insight/library/technology/countingthecost*.

364. Department of Homeland Security, *Cybersecurity Insurance* (last published June 30, 2016), available at: *https://www.dhs.gov/cybersecurity-insurance*.

365. Insurance Journal, Ne*w Modeling Product from AIR Worldwide Analyzes Client Cyber Risk* (Apr. 24, 2017), available at: *http://www.insurancejournal.com/news/national/2017/04/24/448698.htm*; Insurance Journal, *RMS Expands Range of 'Cyber-Physical' Models for Property Insurers* (Apr. 6, 2017), available at: *http://www.insurancejournal.com/news/international/2017/04/06/447172.htm*.

Such variability can be problematic for the many insurers that conduct business on a regional or other multistate basis, including numerous large carriers operating in multiple markets nationwide. For these companies, lack of uniformity in key aspects of regulation can create significant burdens and undermine efficient and effective regulation. In particular, inconsistent standards with respect to speed-to-market in the product approval process can harm product innovation and the competiveness of insurance products compared to other financial products, while also increasing costs and reducing consumer choice.

### The Interstate Insurance Product Regulation Commission (IIPRC)

The states and the NAIC have long recognized concerns over lack of uniformity in product approvals and taken steps to improve the process. In July 2003, the NAIC adopted the Interstate Insurance Product Regulation Compact (Compact), which created the Interstate Insurance Product Regulation Commission (IIPRC).[366] The IIPRC develops uniform product standards for specified life insurance, annuity, disability income, and long-term care products.[367] If a product is filed for approval with the IIPRC, its uniform product approval standards supersede the standards of any compacting state unless the insurer submits a product directly to a compacting state's insurance regulator (and not the IIPRC) for approval.

Despite the IIPRC's accomplishments, the nationwide uniformity and efficiency of the product approval process remain a work in progress.[368] California, Florida, and New York, which collectively represented 20.5% of nationwide premium in 2015, have not joined the Compact. Insurance company representatives have called attention to a common pattern: a new product obtains approval in a majority of states through the IIPRC or direct filings within several months, but approval in the remaining states, including some states with large populations, can take additional months or even years. In some cases, a product is never approved by all states. In addition, even when products are approved, inconsistent or conflicting state laws, regulations, and regulatory practices create state-by-state variations, resulting in significant additional costs for insurers with respect to product administration and marketing.

*Recommendations*

To increase consumer choice and decrease costs for both insurers and, by extension, consumers, Treasury encourages the NAIC to bring in states that have not yet joined the Compact. Treasury also encourages the IIPRC to continue its efforts to complete the development of standards for

---

366. Upon the adoption of the Compact by a state, the state is allowed the join the IIPRC. The IIPRC came into existence in May 2006 upon meeting the threshold requirement of 26 states or 40% of premium volume nationwide.

367. The IIPRC currently has 45 members (44 states and Puerto Rico) representing about 70% of nationwide premium volume. In 2016, the 226 insurers registered with the IIPRC submitted 1,059 products for review, of which 976 were approved with an average approval time of 30 days. For statistical information regarding participation in the Compact and product approvals, see the IIPRC's website, available at: *http://www.insurancecompact.org/*.

368. Treasury recognizes that improving the speed-to-market of financial products presents challenges for regulators, given the pace of market changes and product innovation. Treasury further recognizes the productive efforts of the NAIC, including establishment of the IIPRC and the continuing work of the Speed to Market Working Group under the Innovation and Technology Task Force.

all product lines within its authority. Finally, Treasury recommends that the states take steps to mitigate inconsistent or conflicting state laws, regulations, and practices applicable to approval of insurance products.

### Commercial Lines Regulation

Commercial insurance (i.e., insurance coverage for business) is a subset of P&C insurance that had over $294 billion in direct written premiums in 2016 (see Figure 18). Commercial insurance is an important component to economic growth because it allows businesses to transfer some of the risks associated with doing business. To cover the risk involved in the many different kinds of businesses, commercial lines insurers sell over 20 major insurance coverages and dozens of specialty products.[369] The unique nature of commercial operations makes standardized policy forms impractical, which creates demand for custom (i.e., manuscript) policies to address insurance needs.

---

369. Insurance Information Institute, *Commercial Insurance−Introduction*, available at: *http://www.iii.org/ publications/commercial-insurance/introduction*.

Figure 18: U.S. Commercial Lines Direct Premiums Written by P&C Insurance Groups ($ billions)



Source: SNL Financial (includes all lines of business)

Insurance sold to sophisticated commercial policyholders is, for several reasons, generally subject to less regulatory scrutiny than policies sold to individuals and families. Commercial policyholders often have insurance subject-matter expertise and bargaining power that individual consumers lack. Commercial policyholders are also better able to self-insure against risk of loss associated with coverage disputes or insurer insolvency.

The rate, form, and policy form filing requirements, particularly for commercial lines, present potential opportunities for state insurance regulation to become more efficient, effective, and appropriately tailored. Stakeholders noted that admitted insurers in commercial lines often face inconsistent and lengthy product approval periods that limit their ability to meet policyholder needs. Insurers that attempt to file products nationwide can be subject to significant transaction costs, which can be passed on to consumers. Additionally, certain stakeholders noted that this filing process can be a barrier to the development of new and innovative products.

Policymakers at the state and federal levels have enacted legislation that may be beneficial for state insurance regulators and the NAIC to consider as they look to improve the uniformity and efficiency of commercial lines regulation. To date, most solutions involve exempting policyholders or insurers from some of the regulatory hurdles in cases where potential commercial buyers meet specified criteria relating to premium paid, the buyer's size, or the nature of the risk being insured.

For instance, in 2010, Congress passed the Non-Admitted and Reinsurance Reform Act of 2010 (NRRA),[370] which applies to nonadmitted insurers. "Nonadmitted" insurers function to permit access to products that would not ordinarily be available through the admitted market.[371] Risks typically written in the nonadmitted market include: (1) nonstandard risk (e.g., those with unusual underwriting requirements), (2) unique risks that admitted carriers do not offer, and (3) capacity risks for which an insured seeks a higher level of coverage than admitted insurers are willing to provide.

Subject to two conditions, the NRRA exempts brokers who are looking to place commercial risk from completing a due diligence search[372] in the admitted market prior to placing risk in the non-admitted market.[373] In many cases, this is advantageous to exempt commercial purchasers (ECPs) because the non-admitted market can be more cost effective for specialized risk than the admitted market. Insurance products are also specialized to meet commercial purchaser needs and are not subject to a potentially lengthy state regulatory approval process.

Similarly, New York's "Free Trade Zone" exempts insurers from some filing requirements for eligible risks when the insurer has a special license to do so. The Free Trade Zone divides risks into two classes, one based on the level of annual premium, or Class 1, and the other based on the nature of the risks (specifically, risks that are of an unusual nature, present a high loss hazard, or are difficult to place) or Class 2.[374] These filing exemptions allow some insurers to respond quickly to requests for coverage, and to tailor the policy language to the particular needs of buyers.

In 2015, the NAIC's Commercial Lines Working Group also issued recommendations to stream-line the regulation of commercial insurance products by: (1) revising its definition of ECP to achieve greater uniformity, (2) allowing the use of manuscript policies without prior approval, (3) establishing conditions for exempting multistate risks from form and rate filing requirements, and (4) encouraging states to review existing authority to improve the efficiency and effectiveness

---

370. 15 U.S.C. § 8206.

371. For additional discussion of admitted and nonadmitted insurers, see *supra* at 74-75.

372. State due diligence requirements typically call for brokers to establish that a statutorily determined number of admitted insurers (usually two or three) declined to underwrite the risk before the broker may attempt to place the coverage with nonadmitted insurers.

373. Generally, exempt commercial purchasers are defined by the NRRA as any person purchasing commercial insurance that: (1) retains a qualified risk manager to negotiate insurance coverage; (2) has paid aggregate insurance premiums in excess of $100,000 in the immediately preceding 12 months; and (3) either (a) possesses a net worth in excess of $20,000,000; (b) employs more than 500 full-time or full-time equivalent employees or is a member of an affiliated group employing more than 1,000 employees; (c) is a not-for-profit organization or public entity generating annual budgeted expenditures of at least $30,000,000; or (d) is a municipality with a population in excess of 50,000 persons. 15 U.S.C. § 8206.

374. New York State Insurance Department, Special Risk Insurance (11 NYCRR 16).

of rate and form review for commercial lines.[375] If implemented, such recommendations would also streamline the ability of admitted insurers to meet buyer needs. To date, the NAIC has not formally acted on any of these recommendations, and stakeholders expressed that momentum to deregulate commercial lines appears to have stalled.

*Recommendations*

Treasury encourages state legislators, state regulators, the NAIC, and insurance stakeholders to work together on proposals for more efficient regulation of commercial lines products. If implemented in a manner that is appropriately tailored and with sufficient consumer safeguards, commercial lines deregulation can decrease costs for insurers, encourage innovation, and mitigate uncertainties created by inconsistent and conflicting state laws, regulations, and practices. To promote competition and meet market demands in a timely fashion, states should consider the ECP definition under the NRRA, New York's Free Trade Zone, and the 2015 NAIC Commercial Lines Working Group recommendations.

## Producer Licensing and Appointments

State laws require insurance agents and brokers (collectively, "producers") to be licensed in every jurisdiction where they conduct business. According to the NAIC, more than 2.2 million individuals and over 230,000 business entities, many of which are small businesses, were licensed as producers in 2016.[376]

Due to the increasingly interstate nature of the business of insurance, producers are often required to obtain licenses in more than one state. Individually licensed producers collectively hold more than 6.2 million separate insurance licenses, while licensed business entities hold approximately 520,000 separate insurance licenses.[377] Nearly 15,000 business entities are licensed to operate in more than five jurisdictions and approximately 232,000 individual producers are licensed in five or more jurisdictions. However, a lack of reciprocity between the states and multiple layers of licensing requirements make obtaining and maintaining producer licenses a costly and time-consuming practice. Many states impose additional conditions on non-resident producers and choose not to recognize licensing determinations made by the insurance regulators in the producer's home state. For instance, some states require nonresidents to obtain an individual insurance license, obtain a license for the applicant's agency, and register as a foreign corporation with the secretary of state.

Licensing compliance costs have a disproportionate competitive effect on small and mid-sized businesses with smaller economies of scale. One industry association noted that approximately 60% of its members have at least one person on staff whose duties are dedicated to obtaining and maintaining the appropriate licenses for the agency and its personnel, and that agencies must devote significant resources to licensing compliance.

---

375. NAIC Commercial Lines (EX) Working Group, *Recommendations* (June 29, 2015), available at: *http://www. naic.org/documents/cmte_c_170608_clwg_final_rec.pdf*.

376. NAIC, 2016 Insurance Department, *Resources Capital Report* (June 2017), available at: *http://www.naic.org/ prod_serv/STA-BB-16-01.pdf*.

377. Id.

### National Association of Registered Agents and Brokers

To address licensing inefficiencies and related issues — and with the strong support of the industry and its regulators — on January 12, 2015, the President signed into law the National Association of Registered Agents and Brokers Reform Act of 2015 (NARAB II).[378]

The purpose of NARAB II is to establish a one-stop licensing compliance mechanism for insurance producers operating outside their home states, while preserving the longstanding authority of states to oversee insurance producers. To do so, NARAB II establishes a 13-member Board of Directors to govern and supervise all activities of the association. Members of the Board of Directors — consisting of eight state insurance commissioners and five industry members with demonstrated expertise in producer licensing — are appointed by the President, with the advice and consent of the Senate.[379] In 2016, representatives for 10 of the 13 NARAB Board of Director positions were nominated, but not confirmed. Without a board to establish, govern, and supervise its activities, the Association is still not operational.[380]

The proper implementation of NARAB II should spur economic growth by helping to facilitate insurance transactions across state lines. NARAB II will reduce the redundancies that every agent licensed in multiple states must currently navigate, and provide consumers with additional options.

*Recommendations*

Treasury will take steps to expeditiously recommend nominees to President Trump who can be sent to the Senate for confirmation. To do so, the Secretary will direct FIO to solicit nominee recommendations and work with stakeholders on the Association's establishment. To ensure sufficient regulatory expertise, Treasury also recommends that the appointment process proceed in a manner to maintain a quorum composed of a majority of state insurance regulators.

### Producer Appointments

In a majority of states, some insurance producers cannot act on behalf of an insurance company unless the producer is appointed by the insurer as its agent.[381] A producer acts as an agent of an insurer when the producer is compensated for selling, soliciting, or negotiating any product of the insurer. In order for producers to be appointed in a particular state, insurers must typically submit a notice of appointment to that state's department of insurance and pay a fee.

---

378. 15 U.S.C. § 6751 et seq. See also 2016 Federal Insurance Office, *Annual Report.* NARAB II reestablished the National Association of Registered Agents and Brokers (the Association), which was originally authorized by the Gramm-Leach-Bliley Act in 1999 [Pub L, No. 106–102, 113 Stat. 1338], but never established.

379. The Association may not receive, accept, or borrow any amounts from the federal government to pay for, or reimburse it for the costs of establishing or operating the association (15 U.S.C. § 6763).

380. National Association of Professional Surplus Lines Offices, Ltd., *NAPSLO Questions and Answers: Implementation of National Association of Registered Agents and Brokers (NARAB)*, available at: *https://www. napslo.org/wcm/Legislative_Advocacy___PAC/NARAB_Implementation/wcm/Legislative_Advocacy___PAC/ NARAB_Implementation.aspx?hkey=4929bb49-1a7b-4a55-bb73-2493d731026f.*

381. See NAIC, *Producer Licensing Model Law and State Adoption Chart*, available at: *http://www.naic.org/store/ free/MDL-218.pdf* ("Adoption Chart").

State regulators have taken steps to promote uniformity in agent appointments, such as establishing the National Insurance Producer Registry (NIPR, an affiliate of the NAIC), a public-private partnership that hosts a website permitting agents, agencies, and insurers to apply for licenses and make appointments. All 50 states, the District of Columbia, and the U.S. Virgin Islands, Guam, and Puerto Rico now use the NIPR.[382] At least 40 states have also adopted the NAIC Producer Licensing Model Act (PLMA) in whole or part, which has provided additional uniformity in the producer licensing process, including appointments as insurer agents.[383]

Despite these advancements, inconsistencies with respect to producer appointments remain problematic. The producer appointment portion of the PLMA is optional, and states that have adopted the language interpret it in a number of ways.[384] For instance, some states interpret the PLMA to mean that appointments may be filed either within 15 days from execution of the agency contract or within 15 days after the insurer receives the initial submission of business from the producer, while others conclude that the appointment must occur at the earlier of the two times.

In addition, insurance regulators are likely to have most or all of a producer's information (e.g., which insurers have appointed the producer) on hand or readily accessible through other means. Although specific requirements vary by state, in most cases, the producer appointment requirement is in addition to requirements for: (1) corporate licenses for the business, (2) individual agent licenses, (3) agency licenses, (4) agency affiliation requirements, (5) insurer licenses, and (6) insurer appointments, which are required by insurers and compel agents and agencies to be appointed by the insurer to sell the insurer's products.

*Recommendations*

Treasury encourages state regulators and the NAIC to assess how to increase the efficiency and uniformity of the producer appointment process. This assessment should focus on reducing inefficiencies and unnecessary compliance burdens. For instance, Treasury encourages all states to adopt the PLMA and encourages regulators to interpret appointment provisions of the PLMA consistently. Treasury also encourages state legislators, state regulators, and the NAIC to consider whether the information received from the appointment reporting process is already procured or available by other requirements imposed on producers and/or insurers and, if not, whether such information can be obtained through other, more efficient means.

---

382. See NAIC and CIPR, *National Insurance Producer Registry (NIPR)*, available at: *http://www.naic.org/cipr_topics/topic_nipr.htm*.

383. Adoption Chart.

384. Id.

## Regulatory Structure and Issues of Duplication, Overlap, and Fragmentation

### *Federal Interagency Coordination*

While the business of insurance is primarily regulated at the state level, numerous federal agencies or authorities are involved in insurance with varying roles and responsibilities. An internal Treasury analysis indicates that more than 20 federal agencies or authorities are involved in varying degrees with insurance or the insurance industry.[385] In some cases, the federal government itself is a participant in the insurance sector, either as a consumer or provider of insurance through a specific program.

Furthermore, insurance markets and activities have evolved in scope and complexity, thereby requiring some federal agencies to set forth rules specifically addressing the business of insurance. The advent of insurance-linked securities, the sale of variable life insurance and annuities, and the use of derivatives by insurers are examples of areas where federal regulation directly impacts the business of insurance. At times, federal agencies have not adequately considered the unique business model of insurers when promulgating rules and regulations, such as instances where prudential rules do not appropriately reflect the differences between banks and insurers.

The convergence of insurance with other financial sector products, along with the increasingly global nature of markets and economies, suggests that the business of insurance will continue to have implications at the federal level. It is important that the federal government develop an effective and harmonized approach to engagement with the insurance sector that adequately reflects the nature and existing regulatory regime of the business.

*Recommendations*

In addition to the specific recommendations of coordination detailed throughout this report, Treasury recommends that federal agencies and entities establish formal mechanisms to promote coordination and communication across the federal government with respect to insurance-related issues. Federal agencies and entities should also establish policies and procedures that take into account the similarities and differences of insurers and other types of businesses within the financial sector, such as banks and mutual funds.

Rather than conferring with federal agencies regarding insurance-related issues on an informal, ad hoc basis, FIO should establish a more structured and rationalized approach to its engagement with federal agencies and entities on insurance-related issues. Also, to promote coordination of the federal government's authority with respect to insurance, FIO should consult with and advise federal agencies and entities conducting rulemaking or policy action that relates to insurance.

### *State and Federal Coordination*

As discussed, certain insurance activities, products, and issues are within the scope of both federal and state regulators. In exercising their respective authorities, state and federal regulators may take positions that create tension, conflict, or duplication between state and federal requirements. Throughout the stakeholder engagement process, stakeholders suggested that there could be

---

385. See, e.g., "Other Federal Regulators and Agencies Involved in Insurance," *supra* at 88-90.

improved communication and coordination between state and federal regulators on subjects where they share jurisdiction.

Additionally, several of the leading insurance regulatory and public policy issues facing the insurance market may be appropriate for various levels of involvement by both state and the federal governments. For example, cybersecurity and data protection, the use of big data in insurance underwriting, rapid advances in innovative technology, and investments in infrastructure are all issues on which state and federal governments should engage.

*Recommendations*

As the primary regulators of insurance, states should be consulted and afforded the opportunity to provide input when the business of insurance is implicated at the federal level. In furtherance of this objective, FIO should lead coordination efforts among federal and state agencies to improve communication and develop policy with respect to insurance-related issues. Such engagement will help to mitigate overlapping or duplicative mandates and promote coordination on issues of mutual concern to the insurance sector.

035357

# International Engagement

## Multilateral Standard Setting Framework

### The Financial Stability Board

The Financial Stability Board (FSB) was established in 2009 after the G-20 London Summit as the G-20's financial regulatory reform implementation organization.[386] The FSB was established to coordinate at the international level regarding the work of national financial authorities and international standard-setting bodies (including the IAIS), and to develop and promote the implementation of effective regulatory, supervisory, and other financial sector policies. In collaboration with other international financial institutions, the FSB intends to address vulnerabilities affecting financial systems in the interest of global financial stability.[387]

The FSB's membership consists of 70 representatives from 25 jurisdictions and 10 international organizations and standard-setting bodies.[388] Treasury, the Federal Reserve, and the SEC are the U.S. members of the FSB.[389] It is important to note, in the context of multilateral standard setting, that entities such as the FSB have no legal authority or jurisdiction over the United States.

### The International Association of Insurance Supervisors

Established in 1994, the IAIS is the international standard-setting body responsible for developing and assisting in the implementation of principles, standards, and other supporting material for the supervision of the insurance sector.[390] The IAIS's objectives are: to promote effective and globally consistent supervision of the insurance industry, to develop and maintain fair, safe, and stable insurance markets, and to contribute to global financial stability.[391] IAIS members include insurance supervisors and regulators from more than 200 jurisdictions in approximately 140 countries.[392]

In addition to FIO, the other U.S.-based members of the IAIS are the 56 state and territory insurance regulators who represent the individual sovereign jurisdictions within the United States, the NAIC, and the Federal Reserve.[393] Collectively, this group is informally known as "Team U.S.A." The IAIS does not have regulatory power or legal authority, and any standards agreed upon at the IAIS are not binding and must be adopted voluntarily by each member jurisdiction.

---

386. See *http://www.fsb.org/about/history*; see also *supra* at 57-59.

387. See FSB, *Charter*, available at: *http://www.fsb.org/wp-content/uploads/FSB-Charter-with-revised-Annex-FINAL.pdf*.

388. Financial Stability Board, *3rd Annual Report* (July 25, 2016), available at: *http://www.fsb.org/wp-content/uploads/FSB-3rd-Annual-Report.pdf*.

389. U.S. authorities may also participate in the FSB plenary based of their roles in other capacities. For example, the President of the Federal Reserve Bank of New York currently serves as Chairman of the Committee on the Global Financial System and participates in the FSB plenary in that capacity.

390. See *https://www.iaisweb.org*.

391. Id.

392. Id.

393. FIO became a full member of the IAIS in 2012 and the Federal Reserve became a full member in 2014.

Any international standards are not effective in the United States unless implemented through the relevant state and/or federal legislative process.

---

Figure 19: U.S. Federal Agencies Membership in Selected International Bodies



| U.S. federal agencies | International bodies |
|---|---|

Commodity Futures Trading Commission

Federal Deposit Insurance Corporation

Federal Reserve Board of Governors

Office of the Comptroller of the Currency

Securities and Exchange Commission

U.S. Department of the Treasury

Group of Twenty (G20) - Finance Ministers and Central Bank Governors

Financial Stability Board (FSB)

Basel Committee on Banking Supervision

International Organization of Securities Commissions

International Association of Insurance Supervisors

Committee on Payment and Settlement Systems

International Association of Deposit Insurers

_____ U.S. federal agency is a member of indicated international body

_ _ _ _ U.S. federal agency is not a member of FSB but participates in select FSB activities

Source: GAO, based on international organization and U.S. federal agency information

## Multilateral Work on Insurance

### *The Financial Stability Board*

As noted above, a key initiative of the FSB is the identification of SIFIs, and the IAIS is charged by the FSB with recommending insurers for potential SIFI identification. In 2013, the IAIS developed an assessment methodology to inform a recommendation to the FSB of insurers that may be eligible for identification as a G-SIFI.[394] In July 2013, the FSB — in consultation with the IAIS

---

394. FSB, *Global Systemically Important Insurers and the Policy Measures That Will Apply to Them* (July 18, 2013), available at: http://www.fsb.org/wp-content/uploads/r_130718.pdf?page_moved=1.

and national authorities — identified an initial list of nine insurers that are G-SIIs.[395] An annual identification process was subsequently conducted, with nine insurers identified as G-SIIs, which will be subject to a set of G-SIIs policy measures developed by IAIS consistent with FSB's general G-SIFI framework.[396]

The FSB is also the standard-setting body for resolution issues for G-SIIs, having promulgated the Key Attributes for Effective Resolution Regimes for Financial Institutions. The FSB's Cross-Border Crisis Management Group for Insurers (iCBCM) assists and supports regulatory authorities in the development and implementation of resolution-related policy measures. Specifically, the iCBCM assists the Resolution Steering Group in developing and maintaining implementation guidance for resolution regimes for systemically important insurers; monitoring the progress of Crisis Management Groups (CMGs) for each G-SII and the negotiation of cross-border cooperation agreements among CMG members; and the development of guidance on resolution strategies and recovery and resolution plans for G-SIIs.

Throughout Treasury's engagement with insurance stakeholders, representatives argued that there was an absence of U.S. insurance expertise at the FSB,[397] which impairs both the FSB and the U.S. insurance industry. First, stakeholders expressed that the FSB is unable to fully appreciate the U.S. insurance industry, its regulatory regime, and the U.S. insurer resolution process. Second, insurance stakeholders expressed concern that they do not have adequate representation at the FSB, which is important to ensure that any FSB actions sufficiently consider the insurance business model. Further, stakeholders expressed that the FSB's efforts on insurance-related issues, such as the identification of G-SIIs, is too heavily influenced by the central banks and prudential regulators that have a disproportionate representation at the FSB.

*Recommendations*

U.S. engagement in the FSB and international financial regulatory standard-setting bodies, such as the IAIS, remains important to promote financial stability, level the playing field for U.S. financial institutions, and prevent unnecessary and overly burdensome regulatory standard-setting that could stifle financial innovation. While the FSB has a wide mandate to evaluate whether various vulnerabilities could create global financial stability risk and should be addressed through regulatory action, Treasury strongly believes that the FSB's activities should be limited to its purpose of monitoring and enhancing global financial stability. Wherever possible, financial stability risk assessments and standards should be tailored to industry sectors and undertaken by the appropriate standard setter with the necessary technical supervisory expertise, including, for insurance-related matters, the IAIS. Moreover, U.S. members of the FSB should work to revise the G-SIFI framework so it appropriately takes into account the differentiated ways sectors are structured and manage risks. Reliance on the technical supervisory expertise at the standard-setting bodies, such as the IAIS, is important to this tailoring effort.

---

395. Id.

396. IAIS, *Global Systemically Important Insurers; Updated Assessment Methodology*, available at: *https://www.iaisweb.org/file/61179/updated-g-sii-assessment-methodology-16-june-2016*

397. See FSB, *Members of the Financial Stability Board*, available at: *http://www.fsb.org/about/organisation-and-governance/members-of-the-financial-stability-board/*.

Treasury is also concerned that the FSB's efforts remain overly influenced by prudential regulatory perspectives and may, in certain instances, insufficiently take into account the differences between the banking and insurance industries and their different regulatory regimes. Accordingly, Treasury believes that the FSB should better utilize the expertise of the IAIS on insurance-related issues where appropriate. To ensure that insurance stakeholders' concerns are fully appreciated, Treasury will also advocate for increased transparency and stakeholder engagement at the FSB, as well as for standards and principles consistent with the state-based U.S. insurance regulatory system.

### The International Association of Insurance Supervisors

There are four key IAIS bodies: (1) the General Meeting, (2) the Executive Committee, (3) the Financial Stability and Technical Committee, and (4) the Implementation Committee. Much of the IAIS's standard-setting work is headed by the Financial Stability and Technical Committee, which reports directly to the Executive Committee. In 2016, the IAIS established the Financial Stability and Technical Committee by merging the Financial Stability Committee and Technical Committee.[398]

Reporting to the IAIS committees are multiple working groups and task forces that focus on a range of prudential regulation and supervision topics, including financial stability and market conduct. For example, the Capital Solvency and Field Testing Working Group and the Insurance Groups Working Group — both of which report to the Financial Stability and Technical Committee — are charged with developing the ICS and supervisory materials related to group supervision, respectively.

*Recommendations*

To the extent that the IAIS considers any future organizational changes to its existing structure, Treasury recommends that these changes be done in a manner that ensures appropriate and geographically balanced representation and committee leadership among the IAIS members.

---

398. See IAIS, *January Newsletter*, available at: *https://www.iaisweb.org/page/news/newsletter-archive/file/58705/iais-newsletter-january-2016.*

Figure 20: International Association of Insurance Supervisors Organizational Structure (updated March 2017)



G-SII - Global systemically important insurer
IAIS - International Association of Insurance Supervisors
SAPR - Self-Assessment and Peer Review

Source: IAIS

### Transparency

In 2014, the IAIS adopted reforms to improve its financial independence, efficiency, and transparency by eliminating a prior IAIS policy under which stakeholders paid an annual fee to attend IAIS meetings as "observers."[399] The new policy, which went into effect in January 2015, eliminates the distinction between stakeholders that pay fees and those that do not.[400] The IAIS has also recently developed a Stakeholder Engagement Plan and published a plan summary emphasizing the IAIS' new engagement opportunities and commitments.[401] The IAIS has also begun posting summaries of the stakeholder comments raised in the consultation process.

Although the elimination of stakeholder fees mitigated disparate treatment of stakeholders, this policy change also had the effect of further restricting the ability of industry and consumer stakeholders to provide significant feedback at the IAIS. In particular, stakeholders have commented that the process is not sufficiently transparent during the early stages of the standard development process. Instead, stakeholders are generally able to participate only after policies are, in effect, developed, and any such engagement takes the form of a consultation rather than collaborative discussion. Treasury believes that the IAIS, IAIS members, and stakeholders can benefit from increased transparency and accountability in the international standard-setting process.

*Recommendations*

Although the IAIS has taken initial steps to improve stakeholder transparency, Treasury recommends that the IAIS take additional action to further increase transparency and stakeholder input into IAIS decision-making. Treasury will continue to encourage U.S. members of the IAIS to collectively advocate for increased transparency and collaboration during the international standard development process. Specifically, Treasury will advocate for increased utilization of stakeholder workshops and informational sessions — both in person and by teleconference — to further involve stakeholders.

### Role of the Federal Insurance Office

Although international standards are not self-executing, numerous federal agencies participate in standard development processes at international financial standard-setting bodies (SSBs). Among other things, this is done to enable that: (1) U.S. interests are well-represented in international standard-setting bodies, (2) the federal government is able to consider potential competitive impacts on the U.S. and global economies, and (3) standards contemplated by SSBs are consistent with this Administration's policies and objectives.

However, as discussed above, the insurance sector is unique among the financial services industry because it is primarily regulated at the state level. Thus, when the IAIS was founded in 1994, there

---

399. Federal Insurance Office, *Annual Report*, 2016, at 69, available at: *https://www.treasury.gov/initiatives/fio/ reports-and-notices/Documents/2016_Annual_Report.pdf.*

400. Id.

401. IAIS, *[Draft] Stakeholder Engagement Plan for Stakeholder Feedback* (November 23, 2016), at 3, available at: *https://www.iaisweb.org/page/consultations/closed-consultations/draft-stakeholder- engagement-plan*; IAIS, *Brief Overview of IAIS Stakeholder Engagement Plan* (March 20, 2017), available at: *https://www.iaisweb.org/page/about-the-iais/policies-and-procedures/file/65583/ brief-overview-of-comprehensive-stakeholder-engagement-plan.*

was no federal agency with insurance expertise to ensure that U.S. interests were represented.[402] Stakeholders noted to Treasury that the absence of a federal voice was concerning because there was often inconsistency among state insurance commissioners, frequent changes in state commissioner leadership at the IAIS, and Constitutional impediments on the ability of state insurance commissioners to speak on behalf of the United States.

Among other reasons, Congress established FIO to lead coordination efforts among U.S. IAIS members to: (1) enable the federal government to express its position on insurance-related matters in international forums, (2) enable the federal government to coordinate and develop policies that are consistent across the financial services sector, and (3) provide a stable and consistent voice from the United States in support of the U.S. industry and its regulators at the international level.

Stakeholders have expressed to Treasury that a unified federal voice promoting the state-based regulatory system and the interests of the U.S. insurance sector is essential to enable the United States to enhance its influence at the IAIS and within other international standard-setting forums. Stakeholders have also expressed that FIO has historically not done enough to ensure that, when possible, there is one coordinated message from "Team U.S.A."

*Recommendations*

Treasury strongly supports continued U.S. participation in international SSBs such as the IAIS to promote U.S. interests. Treasury has redefined FIO's mission at the IAIS to, among other things: (1) advocate for the U.S. state-based insurance regulatory system, U.S. consumers, the U.S. insurance sector, and growth in the broader U.S. economy, (2) coordinate the views of Team U.S.A., and (3) promote greater transparency and stakeholder engagement in international standard-setting forums. To assist in the furtherance of its core mission and to promote U.S. economic interests, Treasury believes FIO should have a permanent, voting membership on the IAIS Executive Committee.

### Improved Coordination and Transparency

Since the time when FIO and the Federal Reserve became members of the IAIS, federal and state entities have coordinated efforts and attempted to harmonize policy on prudential aspects of international insurance matters.[403] FIO regularly convenes U.S. stakeholder sessions at Treasury and interested stakeholders regularly meet with FIO, state insurance regulators, the NAIC, and the Federal Reserve. However, Team U.S.A. has not achieved a unified and consistent policy position at the IAIS and other international forums. This is due, in part, to the autonomy, unique perspective, and different mandate of each individual U.S. member of the IAIS.[404] One consistent concern noted by stakeholders is that the inability of Team U.S.A. to collaborate and speak with a unified voice at the IAIS detracts from the collective influence of the U.S. members. This view was also

---

402. The NAIC and insurance regulators of each of the 50 states, five territories, and the District of Columbia were members of the IAIS prior to FIO's establishment.

403. For instance, Team U.S.A. members regularly hold ad-hoc and scheduled calls and meetings.

404. Each member of Team U.S.A. has different perspectives and priorities. For example, and as a general matter, state insurance regulators and the NAIC focus on policyholder protection, the Federal Reserve focuses on safety and soundness, and FIO develops federal policy on prudential aspects of international insurance matters.

included in a 2015 Government Accountability Office (GAO) report.[405] Stakeholders noted that it would be beneficial to the U.S. insurance sector to have increased transparency and stakeholder input in the development of policy positions by Team U.S.A.

*Recommendations*

U.S. representatives at the IAIS should advance policy positions that best represent the interests of the U.S. insurance sector, U.S. consumers, the state-based U.S. insurance regulatory system, and the U.S. economy. Treasury recognizes that each member of Team U.S.A. has a different mandate. Nevertheless, Treasury believes that the U.S. members of the IAIS will be best-positioned to advance American interests if Team U.S.A. coordinates its efforts and harmonizes its policy positions at the IAIS.

In furtherance of this objective, Treasury recommends that an enhanced interagency process between the U.S. members of the IAIS be established to ensure stronger and more efficient coordination on international prudential insurance matters. Treasury endorses the 2015 GAO report recommendation that Team U.S.A. develop best practices to implement and sustain interagency collaborative efforts, and the Secretary will direct FIO to coordinate with the other U.S. members of the IAIS to formally define and implement this strengthened collaborative process.

To increase transparency, the Secretary will also direct FIO to conduct quarterly coordination meetings for stakeholders to engage with Team U.S.A. members on issues arising at the IAIS. Additionally, the Secretary will direct FIO to consider establishing an advisory committee or other mechanism, such as issuing formal requests for information, to provide increased stakeholder input to members of Team U.S.A.

## Advancing American Competitiveness Abroad

### *Access to Foreign Markets by U.S. Insurers*

Emerging markets present significant opportunities for the insurance industry and foreign jurisdictions to develop an insurance marketplace that protects policyholders, encourages investment, and encourages expansion. The economic growth rate in certain emerging markets significantly outpaces the rest of the world.[406] With respect to insurance, the economic growth rate of emerging markets outpaces the overall average, due in part to the fact that emerging markets have low insurance penetration and density relative to more developed economies.

Some emerging markets have seen rapid expansion in recent years. For example, premiums in emerging Asian economies grew by 17% in 2016, compared to 3% premium growth in the U.S. over the same time. The Chinese market largely drove this growth as life premiums grew by 29%.[407]

---

405. GAO, *International Insurance Capital Standards, Collaboration among U.S. Stakeholders Has Improved but Could Be Enhanced*, at 36-43, available at: *http://www.gao.gov/assets/680/671043.pdf*.

406. For example, in 2016, India remained the fastest growing major economy with real GDP growth of 7%. Likewise, China, the world's second largest economy, experienced real GDP growth of 6.7%. By contrast, real GDP growth for the global economy was 2.5%. See Swiss Re Institute, sigma No 3/2017, at 3, available at: *http://institute.swissre.com/research/overview/sigma/3_2017.html*. ("Sigma No 3/2017").

407. See *Sigma No 3/2017* at 9.

In other emerging markets, the insurance penetration remains relatively low. In India, for example, insurers write only 1.5% of the world's total insurance premiums,[408] notwithstanding the country's large population and other economic factors that make the Indian insurance marketplace ripe for significant growth.

Despite these opportunities, certain jurisdictions have imposed measures that prevent host jurisdictions from achieving greater insurance penetration and realizing the associated benefits, including better risk management and possibly higher economic growth rates, which could be reached through a more open approach to foreign insurers and investment. The nature of the restrictions varies in scope, application, and line of business. For example, some jurisdictions place caps on foreign direct investment, thereby keeping domestic joint-venture partners in a controlling position. Others restrict the transfer of data and impose local server requirements. Still others restrict the manner in which insurers may purchase reinsurance from non-domestic reinsurers, which undermines the fundamental insurance principle of global risk diversification, increases the vulnerability of financial stability consequences, and inhibits domestic competition.

These measures also restrict the ability of non-domestic insurers, reinsurers, and intermediaries — including those domiciled in the United States — from competing on a level playing field. Regardless of purpose, the result of such measures by certain countries is to provide a strategic advantage and market position to their domestic insurers, to the detriment of U.S. companies. By contrast, few barriers to entry exist for insurers and reinsurers seeking to do business in the United States. This has helped make the United States the world's largest insurance market with 29% of the global market share. Certain market access restrictions may also be inconsistent with certain IAIS Insurance Core Principles.

*Recommendations*

The Secretary will direct FIO and the Undersecretary for International Affairs to enhance engagement in multilateral and bilateral dialogues on issues concerning the insurance sector's international market access. These dialogues should work to prevent market access restrictions in other jurisdictions, as well as evaluate potential measures that could be taken to protect the competitiveness of U.S. companies in global markets. Such dialogues should also promote access to insurance products and services in jurisdictions where market penetration is low. Treasury will coordinate with other federal agencies and entities that are engaged in multilateral and bilateral dialogues on market access issues affecting the insurance industry.

In addition, Treasury recommends that members of Team U.S.A. encourage the IAIS to analyze whether certain market access restrictions such as forced domestic retention of reinsurance risk and foreign direct investment are consistent with the goals of the IAIS Insurance Core Principles.

### Covered Agreements

Title V of Dodd-Frank authorizes the Secretary and the United States Trade Representative jointly to negotiate a covered agreement on behalf of the United States. A covered agreement is an

---

408. PWC, *India Insurance Perspective* (July 24, 2017), available at: *http://www.pwc.in/assets/pdfs/publications/2017/india-insurance-perspective.pdf*.

international agreement regarding prudential measures with respect to the business of insurance or reinsurance that achieves a level of protection for insurance and reinsurance consumers that is substantially equivalent to the level of protection achieved under state insurance or reinsurance regulation.[409]

In January 2017, the United States and the European Union (EU) announced their agreement on final legal text of a covered agreement formally titled *Bilateral Agreement Between the United States of America and the European Union On Prudential Measures Regarding Insurance and Reinsurance* (U.S.-EU Covered Agreement). The U.S.-EU Covered Agreement addresses three areas of insurance and reinsurance prudential measures: (1) group supervision, (2) reinsurance supervision, including collateral and local presence requirements, and (3) exchange of information between supervisory authorities.

The U.S.-EU Covered Agreement promotes U.S. interests by allowing U.S. insurers with EU operations to avoid burdensome worldwide group capital, governance, and reporting requirements under the EU's "Solvency II" prudential regulatory system for insurers, as well as EU local presence and collateral requirements for U.S. reinsurers. Of most interest for the EU, the Agreement builds on NAIC initiatives underway at the state level and commits the United States to eliminating state-based reinsurance collateral requirements as applied to liabilities ceded to EU reinsurers that meet the consumer protection standards specified in the Agreement. Collateral elimination for EU reinsurers will apply prospectively only, on a national basis, and according to the timeline established in the Agreement.

On September 22, 2017, the U.S.-EU Covered Agreement was signed by the Secretary and the U.S. Trade Representative on behalf of the United States, and the Estonian and EU Ambassadors to the United States on behalf of the EU. The Secretary noted that "by providing regulatory clarity and reducing regulatory burdens, the Agreement enables American companies to be more competitive in the EU, enhances opportunities for U.S. insurers and reinsurers at home and abroad, and furthers the administration's goal of sustained economic growth."[410]

In conjunction with signing the Agreement, the United States released a Policy Statement[411] that provides additional clarity for the domestic insurance sector on certain terms of the Agreement, and addresses how the United States intends to implement the Agreement. The Policy Statement emphasizes that the Agreement "affirms the U.S. system of insurance regulation, including the role of state insurance regulators as the primary supervisors of the business of insurance" in the United States and explains that the U.S.-EU Covered Agreement supports the principles specified in the Core Principles Executive Order.[412] The Policy Statement also recognizes the key implementation

---

409. 31 U.S.C. § 313(r)(2).

410. Treasury, *USTR Sign Covered Agreement on Prudential Insurance and Reinsurance Measures with the European Union* (Sept. 22, 2017), available at: *https://www.treasury.gov/press-center/press-releases/Pages/ sm0164.aspx.*

411. Treasury, *Statement of the United States on the Covered Agreement with the European Union* (Sept. 22, 2017), available at: *https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/US_Covered_ Agreement_Policy_Statement_Issued_September_2017.pdf.*

412. Id.

role that state insurance regulators will play in meeting U.S. obligations under the Agreement, including revising relevant laws concerning credit for reinsurance.[413]

Given the benefits associated with the U.S.-EU Covered Agreement, additional covered agreements may be mutually beneficial to the United States and other foreign jurisdictions. For example, should the United Kingdom (U.K.) withdraw from the EU, the United States should consider whether it would be mutually beneficial for the United States and the U.K. to enter into negotiations on prudential insurance and reinsurance matters, similar to those addressed by the U.S.-EU Covered Agreement. The U.K. is the fourth largest global insurance market by life and nonlife direct written premium and companies domiciled there — including the Lloyd's market — are important sources of insurance and reinsurance capacity in the United States.[414]

*Recommendations*

Treasury believes that appropriate transparency and regular, substantive engagement with stakeholders is necessary for the proper implementation of the U.S.-EU Covered Agreement. Accordingly, the Secretary will direct FIO to continue to improve its coordination with state insurance regulators, the NAIC, and other stakeholders as the provisions of the U.S.-EU Covered Agreement are implemented in the respective jurisdictions. Treasury will also coordinate and consult with the Office of the United States Trade Representative, Congress, state insurance commissioners, and other industry stakeholders as it explores entering into covered agreement negotiations with other foreign jurisdictions.

# Economic Growth and Informed Choices

## Insurer Investment in Infrastructure

Due to a persistent low interest rate environment over the past 10 years, the net yield on invested assets achieved by insurers has steadily declined. As a result, insurers have increasingly sought out higher-yielding alternatives, one of which is infrastructure investment. Infrastructure investments are a key priority of the Trump Administration,[415] and may be funded publicly, privately, or through public-private partnerships. In the United States, the main funding vehicle for infrastructure projects historically has been through the municipal bond market. More recently, private equity investment in infrastructure projects has increased as well.

Insurers find equity investments in public/private partnerships especially appealing. This is particularly true for life insurers, which benefit from not only potentially higher yields

---

413. Id.

414. Insurance Information Institute, *Insurance Fact Book 2017, Premiums, World Life and Nonlife Insurance in 2016*, available at: *https://www.iii.org/publications/insurance-fact-book-2017/world-insurance-markets/premiums* (sub. req.). Industry stakeholders have expressed concerns about the effect of the U.K.'s withdrawal from EU, in view of the recently finalized covered agreement with the EU.

415. See The White House, *President Trump is Working to Rebuild our Nation's Infrastructure* (Feb. 28, 2017), available at: *https://www.whitehouse.gov/the-press-office/2017/02/28/president-trump-working-rebuild-our-nations-infrastructure.*

and returns, but more importantly, long-duration assets that better match cash flows on long-duration insurance liabilities. Infrastructure investment is also attractive to property and casualty insurers that historically have been among the largest investors in municipal bonds.

Nevertheless, current state requirements regarding the amount and type of capital insurers must hold do not reflect the special features of infrastructure investments and, in some cases, may actually penalize insurers to the point that such investments are not economically viable. As such, more calibrated regulatory treatment of infrastructure investments, particularly as regards capital requirements, may allow insurers to consider committing more funds to this investment class. State insurance regulators, through the NAIC, are taking preliminary steps to explore revising Risk-Based Capital standards to permit increased insurer investment in infrastructure projects.[416]

*Recommendations*

Treasury recommends that state insurance regulators and the NAIC evaluate potential steps to encourage the development of more calibrated regulatory treatment of high-quality infrastructure investments. Specifically, and in a manner that safeguards financial stability, state regulators and the NAIC should consider revising Risk-Based Capital charges to reflect the stable cash flows of high-quality infrastructure investments as compared to general equity investments with more volatile returns.

## Retirement Security

### The Promotion of Lifetime Retirement Income

The life insurance industry and its products play an important role in providing a secure retirement for millions of Americans. The retiree population (i.e., individuals age 65 and older) continues to expand rapidly, mainly due to the aging of the estimated 76 million members of the Baby Boom generation.[417] However, even as the need for retirement income is growing, research indicates that about half of working-age households are at risk of being unable to maintain their standard of living in retirement.[418] A primary reason for Americans' lack of readiness for retirement is "longevity risk," or the risk of outliving assets accumulated during the retiree's working years.[419]

---

416. NAIC, Valuation of Securities (E) Task Force Special Session: Infrastructure Investment (Agenda) (August 28, 2016), *http://www.naic.org/meetings1608/committees_e_vos_ssi_2016_summer_nm_agenda.pdf*.

417. Insured Retirement Institute, *Boomer Expectations for Retirement 2017*, at 3, available at: *https://www.myirionline.org/docs/default-source/research/iri_boomers-expectations-for-retirement-2017.pdf*.

418. Alicia H. Munnell, Wenliang Hou, and Geoffrey T. Sanzenbacher, *Do Householders Have a Good Sense of Their Retirement Preparedness?, Center for Retirement Research* (Feb. 2017), Number 17-4, available at: *http://crr.bc.edu/wp-content/uploads/2017/02/IB_17-4.pdf*.

419. Today, for a couple age 65, there is an 85 percent chance one will live to age 85, and a 67 percent chance one will reach age 90; also, for one in four couples, one will reach age 95. Insured Retirement Institute, State of the Insured Retirement Industry: 2016 Review & 2017 Outlook, at 25, available at: *https://www.myirionline.org/docs/default-source/research/iri-state-of-the-insured-retirement-industry---2016-review-and-2017-outlook.pdf?sfvrsn=2.*

Although 401(k) plans and other defined contribution plans are important retirement savings vehicles, they differ from traditional pension plans in that 401(k) plans are designed and used primarily for asset accumulation rather than as a source of guaranteed income. In addition, only about two-thirds of private sector workers have access to any type of employer-sponsored retirement plan,[420] and even workers enrolled in a 401(k) plan have limited access to sources of guaranteed lifetime income under the plan. Apart from Social Security and pensions, annuities[421] are the only retirement savings products offering a guaranteed income stream that cannot be outlived. This feature alone can make annuities a valuable component of a retirement savings portfolio. Despite the benefits that annuities can provide, they are not widely offered in defined contribution plans.

Employers cite concerns over legal liability under the Employee Retirement Income Security Act of 1974 (ERISA) as the principal deterrent to offering an in-plan annuity option.[422] In 2008, the Department of Labor (DOL) adopted a "safe harbor" rule providing that plan sponsors selecting an annuity provider could satisfy the fiduciary standard of ERISA by meeting specified conditions, including "appropriately" considering information "sufficient" to assess the annuity provider's ability to make all future payments under the annuity contract.[423] Because these terms are not defined, and because the safe harbor rule requires plan fiduciaries to reach conclusions about the solvency of the annuity provider years or decades into the future, many employers and their professional advisors are not comfortable relying on the safe harbor.

In 2014, the DOL published information indicating that it was developing amendments to the safe harbor rule to provide plan sponsors with more certainty that they have discharged their obligation when selecting an annuity provider.[424] To date, however, the DOL has not issued any proposals to replace or amend the safe harbor.[425]

The prudence of a fiduciary decision under ERISA is based on the particular facts and circumstances, making it difficult to establish bright-line tests for conduct deemed to satisfy

---

420. Bipartisan Policy Center, *Securing Our Financial Future: Report of the Commission on Retirement Security and Personal Savings* (June 2016), at 20, available at: *https://bipartisanpolicy.org/wp-content/uploads/2016/06/BPC-Retirement-Security-Report.pdf*.

421. In an annuity contract, in exchange for a premium, a life insurer agrees to make scheduled payments for the lifetimes of one or more persons, or for a specified number of years. Annuities are available in a number of different forms. In the simplest form, known as a single premium immediate annuity, an individual pays one upfront premium and the insurer begins to make regular payments not later than one year from the issuance of the contract. In a deferred annuity, the insurer guarantees a fixed income starting at a future date in exchange for a single premium or a series of premiums beginning at the date of purchase. Deferred annuities with guaranteed payments that do not begin until an advanced age (such as 85) are generally referred to as longevity annuities.

422. See Government Accountability Office, *DOL Could Take Steps to Improve Retirement Income Options for Plan Participants* (August 2016), at 26-32, available at: *http://www.gao.gov/assets/680/678924.pdf*.

423. 29 C.F.R. § 2550.404a-4.

424. Introduction to the Regulatory Agenda of Federal Regulatory and Deregulatory Actions [79 Fed. Reg. 895, 1024 (Jan. 7, 2014)].

425. On July 13, 2015, the DOL issued guidance on the selection and monitoring of annuity providers for benefit distributions from defined contribution plans. This guidance did not address any issues relating to selecting and monitoring providers of in-plan investment options. See DOL, *Field Assistance Bulletin No. 2015-02* (July 13, 2015), available at: *https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2015-02*.

the fiduciary standard. While Treasury acknowledges this challenge, it also believes that the sponsors of many employer retirement plans, particularly for small to mid-size employers, may not possess the financial sophistication or have access to affordable advice for evaluating the ability of a life insurer to make all future payments under an annuity contract that may last for decades.

*Recommendations*

To encourage the availability of in-plan annuity options and promote broader consumer choice, Treasury recommends that the Department of Labor and Treasury develop proposals on how to establish or certify one or more expert, independent fiduciary entities to assess the long-term financial strength of annuity providers. These assessments, which could be in the form of ratings or other specific metrics, could assist ERISA-governed plan sponsors in complying with their fiduciary duty obligations in selecting annuity providers for plans and enable fiduciaries to rely on such assessments as a safe harbor. This independent fiduciary function would not otherwise affect the fiduciaries' ERISA responsibilities to evaluate all other aspects of the annuity purchase decision.

### Long-Term Care Insurance

Long-term care (LTC) refers to the means of meeting the health or personal care needs of individuals who are unable to care for themselves without assistance. The federal Medicare and Medicaid programs combined pay for almost two thirds of LTC expenditures,[426] which are projected to increase significantly due to the expanding senior population and increased life expectancy.[427]

Since the 1970s, private insurers have offered LTC insurance to protect against the risk of needing long-term care at older ages. Sales of LTC insurance peaked in the early 2000s but have since experienced a steep decline based primarily on the business decisions of numerous insurers to exit the market. In response, state insurance regulators and the NAIC are actively reviewing a range of LTC insurance issues and potential policy changes to stabilize and potentially regrow the private market. For example, in April 2017 the NAIC established a Long Term Care Insurance Task Force and released a list of 10 federal public policy changes that could help to increase private long-term care financing options for middle-income Americans.[428] These changes included allowing participants in employer-sponsored retirement plans to make penalty-free withdrawals to purchase LTC insurance, creating LTC savings accounts similar to Health Savings Accounts, and establishing more generous federal tax incentives for LTC insurance.

---

426. In 2015, U.S. spending on long-term care was funded primarily by Medicare and Medicaid (63%), with a 20% contribution from direct out-of-pocket spending and three percent from private LTC insurance. See Peter Gallanis, et al., *State of the Long-Term Care Insurance Industry: NOLHGA Presentation to the NAIC* (presentation, NAIC, March 30, 2017), available at: *http://www.naic.org/documents/cmte_e_mlwg_related_state_of_ltc_industry.pdf*.

427. An estimated 12 million Americans currently need LTC, a number projected to reach 27 million by 2050. See Bipartisan Policy Center, *Initial Recommendations to Improve the Financing of Long-Term Care* (Feb. 2016), available at: *https://cdn.bipartisanpolicy.org/wp-content/uploads/2016/12/BPC-Health-Long-Term-Care-Financing-Recommendations.pdf*.

428. NAIC Long Term Care (B) Subgroup, Long Term Care Federal Policy Options to Present to Congress (Apr. 3, 2017), available at: *http://www.naic.org/documents/government_relations_ltc_fed_policy_opt.pdf*.

*Recommendations*

Given the growing social need for LTC and the resulting strain on public resources, state and federal officials should collaborate on addressing the challenges of financing LTC. In addition to the existing state efforts to address problems in the LTC insurance market, the challenges in financing LTC require a coordinated response from the federal government because they are of national interest. Accordingly, Treasury will convene an inter-agency task force, including representatives of the Department of Health and Human Services, Treasury, the IRS, and the Office of Management and Budget, to develop policies to complement reforms at the state level relating to the regulation of long-term care insurance. The task force's work should be coordinated with the ongoing work of state insurance regulators and the NAIC.

# Appendix A

## Participants in the Executive Order Engagement Process



# Participants in the Executive Order Engagement Process

| Academics | |
| --- | --- |
| Adi Sunderam, Harvard Business School | John Taylor, Stanford University Hoover Institution |
| Anat Admati, Stanford Graduate School of Business | Lawrence White, New York University Stern School of Business |
| Arnold Kling, Independent Scholar | Mark Willis, New York University Furman Center |
| Arthur Wilmarth, Jr., George Washington University Law School | Richard Herring, University of Pennsylvania, The Wharton School |
| David Skeel, University of Pennsylvania Law School | Roberta Romano, Yale Law School |
| Jay Rosengard, Harvard Kennedy School | Robin Greenwood, Harvard Business School |
| John Cochrane, Stanford University Hoover Institution | Sanjai Bhagat, University of Colorado Leeds School of Business |

| Consumer Advocates | |
| --- | --- |
| AARP | Coalition for Investor Choice |
| Americans for Financial Reform | Consumer Federation of America |

| Regulators and Government Related Entities | |
| --- | --- |
| Consumer Financial Protection Bureau | Financial Industry Regulatory Authority |
| Federal Deposit Insurance Corporation | National Association of Insurance Commissioners |
| Federal Reserve Board | North American Securities Administrators Association |

Appendix A • Participants in the Executive OrderEngagement Process

| Office of the Comptroller of the Currency | U.S. Securities and Exchange Commission |
|---|---|
| U.S. Commodity Futures Trading Commission | |

### Industry and Trade Groups

| | |
|---|---|
| Ace Group (Chubb) | The Cypress Group |
| Aegon N.V. (Transamerica) | Dodge and Cox |
| Aflac Inc. | Federated Investors Inc. |
| American International Group, Inc. | Fidelity Investments |
| Allianz SE | Financial Services Roundtable |
| Allstate Corporation | Franklin Templeton Investments |
| Alvarez and Marsal, LLC | Foley & Lardner LLP |
| American Council of Life Insurers | GEICO Corporation |
| American Insurance Association | Government Finance Officers Association |
| American Investment Council | The Guardian Life Insurance Company of America |
| Aon plc | Independent Insurance Agents and Brokers of America, Inc. |
| Association for Financial Professionals | Institutional Limited Partners Association |
| AXA S.A. | Insured Retirement Institute |
| BlackRock | Invesco |
| Capital Group | Investment Advisers Association |
| Cincinnati Financial Corporation | Investment Company Institute |
| Council of Insurance Agents and Brokers | |

| | |
|---|---|
| Jackson National Life Insurance Company | Nomura Securities |
| JP Morgan Asset Management | Northwestern Mutual Life Insurance Company |
| Legg Mason | Odyssey Re Holdings Corporation |
| Liberty Mutual Group, Inc. | Oliver Wyman Group |
| Lincoln Financial Bancorp, Inc. | Pacific Life Insurance Company |
| Lloyd's | PIMCO |
| Managed Funds Association | The Principal Financial Group |
| Manulife Financial Corporation (John Hancock) | Progressive Corporation |
| Marsh and McLennan Companies, Inc. | Prudential Financial, Inc. |
| Massachusetts Mutual Life Insurance Company | Property Casualty Insurers Association of America |
| Mesirow Financial | Reinsurance Association of America |
| MetLife, Inc. | RGA Reinsurance Company |
| National Association of Mutual Insurance Companies | Securities Industry and Financial Markets Association |
| National Conference of Insurance Guaranty Funds | Sonecon LLC. |
| National Organization of Life & Health Insurance Guaranty Associations | State Farm Mutual Automobile Insurance Company |
| Nationwide Mutual Insurance Company | State Street Global Advisors |
| Natixis | Sullivan and Cromwell |
| Neuberger Berman | Swiss Re Ltd. |
| New York Life Insurance Company | T. Rowe Price |
| | The Hartford Financial Services Group, Inc. |

| | |
|---|---|
| Teachers Insurance and Annuity Association of America | Vanguard |
| Transatlantic Reinsurance Company | Waddell and Reed |
| Travelers Companies, Inc. | Wellington Management |
| United States Automobile Association | XL Group Ltd. |
| | Zurich Insurance Company Ltd. |

## Think Tanks

| | |
|---|---|
| American Enterprise Institute | Competitive Enterprise Institute |
| Aspen Institute | Heritage Foundation |
| Better Markets | Hoover Institution |
| Bipartisan Policy Center | Mercatus Center at George Mason University |
| Brookings Institution | New America |
| CATO Institute | Pew Charitable Trust |
| Center for American Progress | R Street Institute |
| Committee on Capital Markets Regulation | Urban Institute |

035378

# Appendix B

## Regulatory and Legislative Recommendations



# Regulatory and Legislative Recommendations

## Asset Management

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

### Systemic Risk and Stress Testing

| Recommendation | Congress | Regulator | Core Principle |
|---|---|---|---|
| Treasury's position is that entity-based systemic risk evaluations of asset managers or their funds are generally not the best approach for mitigating risks arising from asset management. Instead, primary federal regulators should focus on potential systemic risks arising from asset management products and activities, and on implementing regulations that strengthen the asset management industry as a whole. | | SEC | C, D, F |
| The FSOC should maintain primary responsibility for identifying, evaluating, and addressing systemic risks in the U.S. financial system, and should look to the SEC to address systemic risks through regulation within and across the asset management industry in the United States. | | FSOC, SEC | F, G |
| Treasury supports legislative action to amend Dodd-Frank to eliminate the stress testing requirement for investment advisers and investment companies. | Congress | | F |

### Liquidity Risk Management

| Recommendation | Congress | Regulator | Core Principle |
|---|---|---|---|
| Treasury supports the 15% limitation on illiquid assets. | | SEC | A, C, F |
| Treasury supports the SEC adopting a principles-based approach to liquidity risk management rulemaking and any associated bucketing requirements. The SEC should take appropriate action to postpone the currently scheduled December 2018 implementation of Rule 22e-4's bucketing requirement. | | SEC | A, C, F |

### Derivatives

| Recommendation | Congress | Regulator | Core Principle |
|---|---|---|---|
| The SEC should consider a derivatives rule that would include a derivatives risk management program and an asset segregation requirement, but reconsider what, if any, portfolio limits should be part of the rule. The SEC should also reconsider the scope of assets that would be considered qualifying coverage assets for purposes of the asset segregation requirement. | | SEC | A, C, F |
| The SEC should examine the derivatives data that will be reported by funds starting next year and publish analysis based on empirical data regarding their use of derivatives. | | SEC | C |

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |
| **Exchange Traded Funds** | | | |
| The SEC should move forward with a "plain-vanilla" ETF rule that allows entrants to access the market without the cost and delay of obtaining exemptive relief orders, subject to conditions the SEC determines appropriate and in the public interest. To this end, the SEC should either re-propose or propose a new rule on ETFs for public comment. | | SEC | A, C, F |
| The SEC should consider establishing a single process for ETF and related approvals rather than allowing SEC divisions to set multiple and sometimes conflicting requirements. | | SEC | A, F |
| **Business Continuity and Transition Planning** | | | |
| The current SEC proposal on business continuity and transition planning should be withdrawn. With the existing principles-based rule already in place, there is no compelling need for additional rulemaking in this area. | | SEC | F, G |
| The SEC and its staff should continue to work with investment companies, investment advisers, and other relevant parties to recommend improvements to business continuity plans, to the extent that such plans are determined not to be sufficiently robust, and to address new issues as they arise. | | SEC | C, F, G |
| **Dual CFTC and SEC Registration** | | | |
| The CFTC should amend its rules so that an investment company registered with the SEC and its adviser are exempt from dual registration and regulation by the CFTC as a CPO. To address concerns of de facto commodity pools operating without sufficient oversight, the CFTC and the SEC should work together to identify a single regulator for these entities, with the goal that oversight of these entities will either remain with the SEC or be transferred to the CFTC and NFA. | | CFTC, SEC | A, C, F, G |
| The CFTC and the SEC should cooperate to share information provided by their respective regulated entities so that disclosures made to one agency can address the information needs of the other agency to monitor the markets for securities and derivatives transactions. | | CFTC, SEC | G |
| The CFTC should amend its rules to exempt private funds and their advisers from registration as CPOs if the advisers are subject to regulatory oversight by the SEC. Treasury also recommends that the CFTC review and determine what, if any, exemptions should be made available for SEC-exempt reporting advisers. | | CFTC | A, C, F, G |

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

### Modernizing the Delivery of Fund Disclosures

| | | | |
|---|---|---|---|
| The SEC should finalize its proposed rule to modernize its shareholder report disclosure requirements and permit the use of implied consent for electronic disclosures. | | SEC | A, F |
| The SEC should explore other areas for which the delivery of information to investors through an electronic medium using implied consent is appropriate and consistent with investor protection; however, investors should retain the choice to continue to receive paper disclosures. | | SEC | A, F, G |

### Asset Management Reporting and Disclosure Requirements

| | | | |
|---|---|---|---|
| The SEC, the CFTC, SROs, and other regulators should work together to rationalize and harmonize the reporting regimes. Where possible, duplicative forms should be combined and any unnecessary or inconsistent data collection should be eliminated. Treasury recommends that regulators continue to update reporting requirements to utilize structured data where appropriate. | | SEC, CFTC, SROs, States | F, G |

### The Volcker Rule

| | | | |
|---|---|---|---|
| Regulators should take further action to reduce the burden of the Volcker Rule on asset managers and investors. The relevant agencies should continue to refrain from enforcing the Volcker Rule's proprietary trading restrictions against foreign private funds that are not "covered funds" under the rule until a permanent solution to the identified challenges is implemented. | | FRB, FDIC, OCC, SEC, CFTC | D, F |
| The agencies should also forbear on enforcement of the restriction on funds sharing names with banking entities, consistent with Treasury's Banking Report. | | FRB, FDIC, OCC, SEC, CFTC | A, D, F |
| Congress should revise the definition of "banking entity" to encompass only insured depository institutions, their holding companies, foreign banking organizations, and affiliates and subsidiaries of such entities, defined as those in which there is 25% or more voting equity or voting power on the investment committee. | Congress | | D, F |

035383

| Recommendation | Policy Responsibility | | Core Principle |
| --- | --- | --- | --- |
| | Congress | Regulator | |

## International Engagement

| Recommendation | Congress | Regulator | Core Principle |
| --- | --- | --- | --- |
| The United States should play a leading role in international standard-setting bodies such as the FSB and IOSCO, particularly with respect to financial market supervision and asset management where U.S. firms and markets are the largest in the world. | | FRB, SEC, CFTC | E |
| Treasury recommends further improvements to the FSB and SSB processes to better promote transparency, accountability, and appropriate representation with respect to policymaking. | | FRB, SEC, CFTC | E |
| Treasury recommends that U.S. representatives to FSB and IOSCO review the particular processes used by each international standard-setting body and work to ensure that they utilize a collaborative process that includes, where appropriate, economic analysis and subject-matter expertise at the relevant standard-setting body. | | FRB, SEC, CFTC | E |
| Treasury recommends that the FSB transition away from using the term "shadow banking" in its monitoring of credit intermediation outside of the regular banking sector. | | FRB, SEC | E |
| The U.S. members of the FSB should work to revise the G-SIFI framework so that it appropriately takes into account the differentiated ways that sectors are structured and manage risks. | | FRB, SEC | E |

| Recommendation | Policy Responsibility | | Core Principle |
| --- | --- | --- | --- |
| | Congress | Regulator | |

### Economic Growth and Informed Choices

| | | | |
| --- | --- | --- | --- |
| Treasury supports the current efforts at the DOL to re-examine the implications of the Fiduciary Rule. Treasury believes it is appropriate to delay full implementation of the Fiduciary Rule until the relevant issues, including costs of the rule and exemptions, are evaluated and addressed to best serve investors, and believes that such assessment and resolution of standard of conduct issues should include participation by the SEC and other regulators. | | DOL, SEC | A, C, F |
| Treasury believes that conflicts of interest should be addressed in a manner that preserves, to the extent possible, access to a wide range of asset classes, investment products, business models, distribution channels, and other relevant features of financial services that benefit American workers and their families. | | DOL, SEC | A, F |
| Within the federal regulatory framework, Treasury believes that the SEC and DOL should work together to address standards of conduct for financial professionals who provide investment advice to IRA and non-IRA accounts. | | DOL, SEC | A, G |
| Treasury recommends that the DOL and the SEC engage with state insurance regulators regarding the impact of the standards of care on the annuities market. | | DOL, SEC, States | A, G |
| Treasury encourages the SEC, the DOL, and the states to work together to implement a regulatory framework appropriately tailored to both preserve investor choice and protect retirement investors in an efficient and effective manner. | | DOL, SEC, States | C |

035385

## Insurance

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

### Systemic Risk and the Insurance Industry

| Recommendation | Congress | Regulator | Core Principle |
|---|---|---|---|
| Treasury's position is that entity-based systemic risk evaluations of insurance companies generally are not the best approach for mitigating risks arising from the insurance industry. Instead, insurance regulators should focus on potential risks arising from insurance products and activities, and on implementing regulations that strengthen the insurance industry as a whole. Insurance regulation at the federal level should be conducted in coordination with the states. | | FRB, States | B, D, F, G |
| FIO and the other U.S. members of the IAIS should support the IAIS' work on the activities-based approach because it is a more appropriate method of assessing potential systemic risk in the global insurance market. The U.S. members of the IAIS should advocate for the development of an activities-based framework that is proportionate and appropriately tailored to the U.S. insurance market. The IAIS should reassess its existing G-SII policy measures, including how to improve the IAIS' 2014 guidance on liquidity management and planning. FIO and the other U.S. members of the IAIS should also take steps to improve the IAIS G-SII assessment methodology and consider how to increase transparency with respect to the assessment methodology's development. U.S. members of the IAIS should advocate that the IAIS enhance its work on cross-sectoral consistency with other financial sectors – such as through work with the Basel Committee on Banking Supervision. | | Treasury, FRB, States | B, D, E, F, G |

### Preserving Solvency: Capital Initiatives

| Recommendation | Congress | Regulator | Core Principle |
|---|---|---|---|
| The group capital initiatives by the NAIC, the states, and the Federal Reserve should be harmonized, to the extent possible, to mitigate duplicative and unnecessary regulatory burdens for U.S. insurers. The Secretary will direct FIO to consult with the state insurance regulators, the NAIC, and the Federal Reserve on their respective group capital initiatives to produce the best outcomes for U.S. insurers, U.S. policyholders, and the U.S. insurance market. The Secretary will direct FIO to coordinate this work. FIO will then advocate for the U.S. approach to group capital in international forums. | | FRB, States Treasury | D, E, F |
| The ICS should recognize the diverse approaches to solvency regulation taken by various jurisdictions around the globe. A core goal should be to ensure that the ICS initiative accommodates the U.S. insurance business model and the existing state-based regulatory system. Such standards should also be developed in a manner that recognizes the variety of supervisory approaches to valuation and accounting requirements, and definitions of what constitutes capital. The IAIS should reexamine its current timeline to deliver ICS Version 2.0 in 2019. The IAIS should postpone ICS Version 2.0 until a later date to allow further consultation with IAIS members and stakeholders on the development of an ICS that is implementable in all major insurance markets. | | FRB, States, Treasury | D, E |

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

### Preserving Solvency: Liquidity Initiatives

| | | | |
|---|---|---|---|
| Treasury encourages state insurance regulators, the NAIC, and the Federal Reserve to continue their work on addressing potential liquidity risk in the insurance sector. The Secretary will direct FIO to monitor developments in liquidity management and liquidity stress testing, and to encourage state insurance regulators, the NAIC, and the Federal Reserve to continue to make progress on domestic liquidity risk initiatives. The Secretary will also direct FIO to advocate for improvements to the existing IAIS standards regarding liquidity management and planning. | | FRB, States | B, D, E, F |

### Role of State and Federal Regulation

| | | | |
|---|---|---|---|
| Treasury is committed to FIO's increased transparency and stakeholder engagement, and will implement mechanisms to achieve these objectives. Treasury and FIO are also committed to more regular and consistent engagement with state insurance regulators and stakeholders on developing issues of importance to the insurance industry, state regulators, and U.S. policyholders. | | Treasury | F, G |
| The Federal Reserve should leverage information procured from ISLHCs by state regulators and the NAIC, including information regarding an ISLHC's ultimate parent company. The Federal Reserve should also harmonize its financial reporting and recordkeeping requirements with corresponding state regulatory requirements. The Federal Reserve, state insurance regulators, and the NAIC should establish formal procedures to better coordinate the supervision and examinations of insurers regulated by both state insurance regulators and the Federal Reserve. The Federal Reserve should reassess whether its ISLHC examinations are appropriately tailored and proportionate to the unique business model of each ISLHC, and the size, organizational structure, and potential risks posed by each ISLHC. | | FRB | F, G |
| Congress should clarify the "business of insurance" exception to ensure that the CFPB does not engage in the oversight of activities already monitored by state insurance regulators. | Congress | CFPB | F, G |
| HUD should reconsider its use of the disparate impact rule. In particular, HUD should consider whether the disparate impact rule, as applied, is consistent with McCarran-Ferguson and existing state law. HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether it is reconcilable with actuarially sound principles. | | HUD | F, G |
| The SEC should prioritize annuity-related disclosure reform by proposing a rule permitting a variable annuity summary prospectus and a streamlined prospectus update, while continuing to provide appropriate disclosure to investors. The SEC should also move forward with finalization of Rule 30e-3, and take steps to improve the efficiency and effectiveness of the regulation of insurance products under its jurisdiction. The SEC should enhance its engagement with the insurance sector, including state insurance regulators and the NAIC, to assess how FASB and IFRS standards could affect the insurance industry. | | SEC | A, F |

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

### Terrorism Risk Insurance Program

| | | | |
|---|---|---|---|
| The Secretary will direct FIO to coordinate with state insurance regulators and the NAIC to attempt to eliminate or reduce the inconsistencies between existing data calls concerning terrorism risk insurance. State insurance regulators and FIO should also explore the possibility of conducting a single data call that can serve the needs of both federal and state authorities while reducing unnecessary compliance costs on industry. | | Treasury, States | F, G |
| The Secretary will direct FIO to be proactive in applying the Certification Process in connection with any event that has some reasonable likelihood of resulting in more than $5 million in insured losses under TRIA. State regulators, policyholders, and insurers are likewise encouraged to inform Treasury whenever they believe an "act of terrorism" under TRIA has taken place, for which they have some reason to believe total insured losses are or will be in excess of $5 million. | | Treasury, States | F, G |
| The Secretary encourages the ACRSM to continue its efforts and develop recommendations for FIO. The work of the ACRSM should focus on how to increase private market participation in the terrorism insurance marketplace. FIO should also evaluate potential ways to increase private market participation in the terrorism insurance marketplace. | | Treasury | F, G |

### Insurer Data Security

| | | | |
|---|---|---|---|
| The states should promptly adopt the NAIC Insurance Data Security Model Law. If adoption and implementation of the Insurance Data Security Model Law by the states do not result in uniform data security regulations within five years, Congress should pass a law setting forth requirements for insurer data security, but leaving supervision and enforcement with state insurance regulators. State legislators, regulators, and the NAIC should also work to expeditiously pass uniform legislation regarding data breach notification for insurers, and the NAIC is encouraged to make any such model law an accreditation standard. If adoption and implementation of data breach notification efforts by the states do not result in uniform requirements within five years, Congress should pass a law setting forth requirements for data breach notification specific to insurers. Such legislation should leave supervision and enforcement with state insurance regulators. | Congress | States | F, G |

### Insurer Cyber Threats

| | | | |
|---|---|---|---|
| Steps should be taken to improve information sharing within the insurance industry. Treasury and state insurance regulators should continue to promote insurer participation in the FS-ISAC and similar entities, particularly among the thousands of small and regional firms that operate within the United States that may not yet be engaged with such national information sharing efforts. The Secretary will direct FIO to establish a working group charged with assessing cybersecurity challenges for the insurance sector and issuing recommendations to insurance sector participants and relevant regulators, with particular attention paid to small and regional insurers. | | Treasury | F, G |

035388

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

## Product Approval and Speed to Market

| | | | |
|---|---|---|---|
| Treasury encourages the NAIC to bring in states that have not yet joined the Compact. Treasury also encourages the IIPRC to continue its efforts to complete the development of standards for all product lines within its authority. States should take steps to mitigate inconsistent or conflicting state laws, regulations, and practices applicable to approval of insurance products. | | States | D, F, G |
| Treasury encourages state legislators, state regulators, the NAIC, and insurance stakeholders to work together on proposals for more efficient regulation of commercial lines products. To promote competition and meet market demands in a timely fashion, states should consider the ECP definition under the NRRA, New York's Free Trade Zone, and the 2015 NAIC Commercial Lines Working Group recommendations. | | States | D, F, G |

## Producer Licensing and Appointments

| | | | |
|---|---|---|---|
| Treasury will take steps to expeditiously recommend nominees for the Board of Directors of NARAB II to President Trump who can be sent to the Senate for confirmation. To do so, the Secretary will direct FIO to solicit nominee recommendations and work with stakeholders on the Association's establishment. The appointment process should proceed in a manner to maintain a quorum composed of a majority of state insurance regulators. | | Treasury | A, D, F |
| Treasury encourages state regulators and the NAIC to assess how to increase the efficiency and uniformity of the producer appointment process. Treasury also encourages all states to adopt the PLMA and encourages regulators to interpret appointment provisions of the PLMA consistently. State legislators, regulators, and the NAIC should consider whether the information received from the appointment reporting process is already procured or available by other requirements imposed on producers and/or insurers and, if not, whether such information can be obtained through other, more efficient means. | | States | D, F, G |

## Regulatory Structure and Issues of Duplication, Overlap, and Fragmentation

| | | | |
|---|---|---|---|
| Federal agencies and entities should establish formal mechanisms to promote coordination and communication across the federal government with respect to insurance-related issues. Federal agencies and entities should also establish policies and procedures that take into account the similarities and differences of insurers and others types of businesses in the financial sector, such as banks and mutual funds. FIO should establish a more structured and rationalized approach to its engagement with federal agencies and entities on insurance-related issues. Also, FIO should consult with and advise federal agencies and entities conducting rulemaking or policy action that relates to insurance. | | All (e.g., FRB, CFTC, SEC, FEMA) | C, F, G |
| States should be consulted and afforded the opportunity to provide input when the business of insurance is implicated at the federal level. FIO should lead coordination efforts among federal and state agencies to improve communication and develop policy with respect to insurance-related issues. | | All (e.g., DHS, FBIIC) | F, G |

035389

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

## Multilateral Work on Insurance

| | | | |
|---|---|---|---|
| The FSB's activities should be limited to its purpose of monitoring and enhancing global financial stability. Wherever possible, financial stability risk assessments and standards should be tailored to industry sectors and undertaken by the appropriate standard setter with the necessary technical supervisory expertise, including, for insurance-related matters, the IAIS. Moreover, U.S. members of the FSB should work to revise the G-SIFI framework so that it appropriately takes into account the differentiated ways that sectors are structured and manage risks. The FSB should better utilize the expertise of the IAIS on insurance-related issues where appropriate. Treasury will also advocate for increased transparency and stakeholder engagement at the FSB, as well as for standards and principles consistent with the state-based U.S. insurance regulatory system. | | Treasury | D, E |
| Any future organizational changes to the IAIS' existing structure should be done in a manner that ensures appropriate and geographically balanced representation and committee leadership among the IAIS members. | | FRB, States, Treasury | D, E |
| The IAIS should take additional action to further increase transparency and stakeholder input into IAIS decision-making. Treasury will continue to encourage U.S. members of the IAIS to collectively advocate for increased transparency and collaboration during the international standard development process. Treasury will advocate for increased utilization of stakeholder workshops and informational sessions – both in person and by teleconference – to further involve stakeholders. | | Treasury, FRB, States | D, E |
| Treasury has redefined FIO's mission at the IAIS to, among other things: (1) advocate for the U.S. state-based insurance regulatory system, U.S. consumers, the U.S. insurance sector, and growth in the broader U.S. economy, (2) coordinate the views of Team U.S.A., and (3) promote greater transparency and stakeholder engagement in international standard-setting forums. FIO should have a permanent, voting membership on the IAIS Executive Committee. | | Treasury | D, E |
| U.S. representatives at the IAIS should advance policy positions that best represent the interests of the U.S. insurance sector, U.S. consumers, the state-based U.S. insurance regulatory system, and the U.S. economy. An enhanced inter-agency coordination process between the U.S. members of the IAIS should be established to ensure stronger and more efficient coordination on international prudential insurance matters. The Secretary will direct FIO to coordinate with the other U.S. members of the IAIS to formally define and implement this strengthened collaborative process. The Secretary will also direct FIO to conduct quarterly coordination meetings for stakeholders to engage with Team U.S.A. members on issues arising at the IAIS. Additionally, the Secretary will direct FIO to consider establishing an advisory committee or other mechanism, such as issuing formal requests for information, to provide increased stakeholder input to members of Team U.S.A. | | Treasury, FRB, States | D, E |

| Recommendation | Policy Responsibility | | Core Principle |
|---|---|---|---|
| | Congress | Regulator | |

## Advancing American Competitiveness Abroad

| | | | |
|---|---|---|---|
| The Secretary will direct FIO and the Undersecretary for International Affairs to enhance engagement in multilateral and bilateral dialogues on issues concerning the insurance sector's international market access. Treasury will coordinate with other federal agencies and entities that are engaged in multilateral and bilateral dialogues on market access issues affecting the insurance industry. Members of Team U.S.A. should encourage the IAIS to analyze whether certain market access restrictions are consistent with the goals of the IAIS Insurance Core Principles. | | Treasury | D, E |
| The Secretary will direct FIO to continue to improve its coordination with state insurance regulators, the NAIC, and other stakeholders as the provisions of the U.S.-EU Covered Agreement are implemented in the respective jurisdictions. Treasury will also coordinate and consult with the Office of the United States Trade Representative, Congress, state insurance commissioners, and other industry stakeholders as it explores entering into covered agreement negotiations with other foreign jurisdictions. | | Treasury, USTR | D, E |

## Insurer Investment in Infrastructure

| | | | |
|---|---|---|---|
| State insurance regulators and the NAIC should evaluate potential steps to encourage the development of more calibrated regulatory treatment of high-quality infrastructure investments. Specifically, and in a manner that safeguards financial stability, state regulators and the NAIC should consider revising Risk-Based Capital charges to reflect the stable cash flows of high-quality infrastructure investments as compared to general equity investments with more volatile returns. | | States | F |

## Retirement Security

| | | | |
|---|---|---|---|
| The Department of Labor and Treasury should develop proposals on how to establish or certify one or more expert, independent fiduciary entities to assess the long-term financial strength of annuity providers. These assessments, which could be in the form of ratings or other specific metrics, could assist ERISA-governed plan sponsors in complying with their fiduciary duty obligations in selecting annuity providers for plans and enable fiduciaries to rely on such assessments as a safe harbor. | | DOL, Treasury | A, F, G |
| Treasury will convene an inter-agency task force, including representatives of the Department of Health and Human Services, Treasury, the IRS, and the Office of Management and Budget, to develop policies to complement reforms at the state level relating to the regulation of long-term care insurance. The task force's work should be coordinated with the ongoing work of state insurance regulators and the NAIC. | | Treasury, HHS, IRS, OMB, etc. | A, C, G |

035391



